UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br>BANKRUPTCY APPEALS<br><br>This Filing Relates to<br><br><br>ALL MATTERS | 21 cv 7532 (CM)<br>21 cv 7585 (CM)<br>21 cv 7961 (CM)<br>21 cv 7962 (CM)<br>21 cv 7966 (CM)<br>21 cv 7969 (CM)<br>21 cv 8034 (CM)<br>21 cv 8042 (CM)<br>21 cv 8049 (CM)<br>21 cv 8055 (CM)<br>21 cv 8139 (CM)<br>21 cv 8258 (CM)<br>21 cv 8271 (CM)<br>21 cv 8548 (CM)<br>21 cv 8566 (CM)<br><br>On Appeal from the United<br>States Bankruptcy Court for the<br>Southern District of New York |

## BRIEF OF THE DEBTORS-APPELLEES

Marshall S. Huebner
(*marshall.huebner@davispolk.com*)
Benjamin S. Kaminetzky
(*ben.kaminetzky@davispolk.com*)
Eli J. Vonnegut
(*eli.vonnegut@davispolk.com*)
James I. McClammy
(*james.mcclammy@davispolk.com*)
Marc J. Tobak
(*marc.tobak@davispolk.com*)
Gerard X. McCarthy
(*gerard.mccarthy@davispolk.com*)


DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7984

*Counsel to the Debtors-Appellees
and Debtors in Possession*

## CORPORATE DISCLOSURE STATEMENT

Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in the above-captioned chapter 11 proceedings (collectively, the "**Debtors**"), by and through undersigned counsel, respectfully represent:

1.      Non-Debtor Pharmaceutical Research Associates L.P. directly owns 100% of the ownership interests of PPLP.  Non-Debtor PLP Associates Holdings L.P. directly owns approximately 99.5061% of the ownership interests of Pharmaceutical Research Associates L.P. Non-Debtor BR Holdings Associates L.P. directly owns 100% of the ownership interests of PLP Associates Holdings L.P.  Non-Debtor Beacon Company and non-Debtor Rosebay Medical Company L.P. each directly owns 50% of the ownership interests of BR Holdings Associates L.P.  Non-Debtor Heatheridge Trust Company Limited, as Trustee under Settlement dated 31 December 1993 directly owns 100% of the ownership interests of Beacon Company.  Richard S. Sackler, M.D. and Cedar Cliff Fiduciary Management Inc., as Trustees under Trust Agreement dated November 5, 1974, directly own 98% of the ownership interests of Rosebay Medical Company L.P.  To the best of the Debtors' knowledge and belief, no other person or entity directly or indirectly owns 10% or more of the ownership interests of PPLP.

2.      Non-debtor Banela Corporation directly owns 50% of the ownership interests of Debtor Purdue Pharma Inc. ("**PPI**"); non-debtor Linarite Holdings LLC directly owns 25% of the ownership interests of PPI; and non-debtor Perthlite Holdings LLC directly owns 25% of the ownership interests of PPI.  Non-debtor Millborne Trust Company Limited, as Trustee of the Hercules Trust under Declaration of Trust dated 2 March 1999, directly owns 100% of the ownership interests of Banela Corporation.  Non-debtor Data LLC, as Trustee under Trust Agreement dated December 23, 1989, directly owns 100% of the ownership interests of Linarite Holdings LLC.  Non-debtor Cornice Fiduciary Management LLC, as Trustee under Trust

Agreement dated December 23, 1989, directly owns 100% of the ownership interests of Perthlite

Holdings LLC.  To the best of the Debtors' knowledge and belief, no other person or entity

directly or indirectly owns 10% or more of the ownership interests of PPI.

3.      PPLP directly owns 100% of the ownership interests of the following Debtors:

Purdue Transdermal Technologies L.P., Purdue Pharmaceuticals L.P., Purdue Pharma

Manufacturing L.P., Adlon Therapeutics L.P., Imbrium Therapeutics L.P., Greenfield

BioVentures L.P., Nayatt Cove Lifescience Inc., Purdue Pharmaceutical Products L.P., Rhodes

Associates L.P., Avrio Health L.P., Seven Seas Hill Corp., and Ophir Green Corp.  PPLP directly

owns 99% of the ownership interests of Debtor Purdue Neuroscience Company.  PPI directly

owns the remaining 1% of the ownership interests of Purdue Neuroscience Company.

4.      Debtor Rhodes Associates L.P. directly owns 100% of the ownership interests of

the following Debtors: Rhodes Technologies, Rhodes Pharmaceuticals L.P. and Paul Land Inc.

5.      Debtor Rhodes Technologies directly owns 100% of the ownership interests of

Debtor UDF L.P. and Debtor SVC Pharma Inc.

6.      Debtor UDF LP directly owns 100% of the ownership interests of Debtor Button

Land L.P. and Debtor Quidnick Land L.P.  Debtor UDF LP directly owns 99% of the ownership

interests of Debtor SVC Pharma LP.  Debtor SVC Pharma Inc. directly owns 1% of the

ownership interests of Debtor SVC Pharma LP.

7.      Debtor Seven Seas Hill Corp. and Debtor Ophir Green Corp. each directly owns

50% of the ownership interests of Debtor Purdue Pharma of Puerto Rico.

# TABLE OF CONTENTS

PAGE

JURISDICTIONAL STATEMENT ..........................................................................................1

COUNTER STATEMENT OF ISSUES ON APPEAL...........................................................1

STANDARD OF REVIEW ON APPEAL ..............................................................................2

INTRODUCTION ....................................................................................................................3

STATEMENT OF THE CASE.................................................................................................8

I.      The Pre-Petition Litigation Against the Debtors and Related Parties.................................8

II.     Pre-Petition Negotiations and the Settlement Framework.................................................11

III.    Chapter 11 Proceedings .....................................................................................................13

        A.      Mediation and Resolution of Inter-Creditor Allocation Issues (Phase One
                Mediation)...............................................................................................................14

        B.      DOJ Resolution.......................................................................................................16

        C.      Mediation and Resolution of Creditor and Estate Claims against the
                Sackler Families (Phase Two Mediation) ..............................................................17

        D.      Filing of the Debtors' Plan of Reorganization and Disclosure Statement .............19

        E.      Further Mediation Before Judge Chapman (Phase Three Mediation)...................19

        F.      The Plan ..................................................................................................................21

        G.      Channeling Injunction and Shareholder Releases Under the Plan.........................23

        H.      Notice, Solicitation, and Voting.............................................................................27

IV.     Confirmation Hearing and Order Confirming the Plan .....................................................28

V.      The Appeals .......................................................................................................................31

SUMMARY OF ARGUMENT ..............................................................................................31

ARGUMENT...........................................................................................................................33

I.      The Bankruptcy Court Correctly Determined That the Shareholder Releases Are
        Appropriate Under Controlling Second Circuit Law.........................................................33

        A.      The Bankruptcy Court Correctly Concluded that the Shareholder Releases
                Satisfy the Requirements of Second Circuit Law ..................................................38

|   | 1. | The Bankruptcy Court Made Detailed Findings That the Shareholder Releases Are Essential to the Debtors' Abatement-Centric Reorganization | 38 |
|   | 2. | Appellants Identify No Clear Errors That Could Undermine the Bankruptcy Court's Conclusion | 43 |
| B. | | The Appellants' Attempts to Avoid Application of Second Circuit Law Fail | 48 |
|   | 1. | Third-Party Releases Are Permitted in the Second Circuit | 48 |
|   | 2. | There Is No "Police Power" Exception to Metromedia | 49 |
|   | 3. | The Shareholder Releases Do Not Violate the Due Process Clause | 65 |
|   | 4. | The Court Has Subject Matter Jurisdiction to Confirm the Plan and the Shareholder Releases | 76 |
|   | 5. | The Bankruptcy Court Had the Statutory Authority to Enter a Final Order Confirming the Plan and the Shareholder Releases | 94 |
|   | 6. | The Bankruptcy Court Had the Constitutional Authority to Enter a Final Order Confirming the Plan and the Shareholder Releases | 96 |
|   | 7. | The Plan Does Not Violate the Bankruptcy Clause of the United States Constitution | 97 |
| II. | | The Shareholder Settlement Is Reasonable and in the Best Interests of the Estates | 97 |
| III. | | The Bankruptcy Court Correctly Concluded that the Plan is in the Best Interest of Creditors Under Section 1129(a)(7) | 99 |
| A. | | The Bankruptcy Court Correctly Concluded That The Plain Meaning of Section 1129(a)(7) Does Not Require the Court to Consider The Value of Claims Creditors Hold Against Third-Parties | 101 |
| B. | | The Bankruptcy Court Correctly Concluded, In the Alternative, that the Best Interests Test is Satisfied Even If Third-Party Claims are Appropriately Considered | 103 |
| IV. | | The Appeal of Certain Canadian Municipalities and First Nations Creditors is Meritless | 111 |
| A. | | The Canadian Appellants Misunderstand the Plain Language of the Plan | 112 |
| B. | | The Canadian Appellants are Subject to the Bankruptcy Court's Personal Jurisdiction | 114 |
| C. | | Claims of the Canadian Appellants Are Properly Classified in Class 11(c) and Have an Opportunity for Compensation Accordingly | 119 |
| V. | | The Bankruptcy Court Did Not Abuse Its Discretion In Issuing the Disclosure Statement Order or the Advance Order | 122 |

CONCLUSION...................................................................................................................122

## TABLE OF AUTHORITIES

C<span>ASE</span>(S)

P<span>AGE</span>(S)

*In re Adelphia Commc'ns Corp.*,
   368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................................48

*In re A.H. Robins Co., Inc.*,
   880 F.2d 694 (4th Cir. 1989) ....................................................................34

*Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.)*,
   519 F.3d 640 (7th Cir. 2008) ..............................................34, 35, 57, 58

*Amadeo v. Zant*,
   486 U.S. 214 (1988) ....................................................................................2

*Amchem Prods. v. Windsor*,
   521 U.S. 591 (1997) ..................................................................................67

*In re AOV Indus., Inc.*,
   792 F.2d 1140 (D.C. Cir. 1986)..........................................................78, 95

*Arizona v. United States*,
   567 U.S. 387 (2012) ..................................................................................60

*Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*,
   817 F.3d 433 (2d Cir. 2016) ....................................................................101

*In re Bernard L. Madoff Inv. Sec. LLC*,
   740 F.3d 81 (2d Cir. 2014) ........................................................................49

*In re Berry Ests., Inc.*,
   812 F.2d 67 (2d Cir. 1987) ........................................................................62

*Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*,
   21 F.3d 477 (2d Cir. 1994)......................................................................119

*Canadian St. Regis Band of Mohawk Indians ex rel. Francis v. New York*,
   278 F. Supp. 2d 313 (N.D.N.Y. 2003)....................................................118

*Celotex Corp. v. Edwards*,
   514 U.S. 300 (1995) ............................................................................77, 80

*Cherokee Nation v. Georgia*,
   30 U.S. 1 (1831) ......................................................................................117

*Citizens for Resp. and Ethics in Wash. v. Fed. Election Comm'n*,
    993 F.3d 880 (D.C. Cir. 2021)........................................................................63

*City of New York v. Golden Feather Smoke Shop, Inc.*,
    2009 WL 705815 (E.D.N.Y. Mar. 16, 2009)................................................118

*Czyzewski v. Jevic Holding Corp.*,
    137 S. Ct. 973 (2017).....................................................................................54

*In re Dairy Mart Convenience Stores, Inc.*,
    351 F.3d 86 (2d Cir. 2003) .....................................................................542, 55

*In re Delta Air Lines, Inc.*,
    374 B.R. 516 (S.D.N.Y. 2007) .....................................................................98

*Deutsche Bank AG, London Branch v. Metromedia Fiber Network, Inc.*
    (*In re Metromedia Fiber Network, Inc.*),
    416 F.3d 136 (2d Cir. 2005) ................................................................ *passim*

*In re Ditech Holding Corp.*,
    606 B.R. 544 (Bankr. S.D.N.Y. 2019) ......................................101, 102 107, 108

*In re Dow Corning Corp.*,
    237 B.R. 380 (Bankr. E.D. Mich. 1999)......................................................103

*In re Dow Corning Corp.*,
    280 F.3d 648 (6th Cir. 2002) .........................................................34, 35, 120

*In re Dow Corning Corp.*,
    287 B.R. 396 (E.D. Mich. 2002) ...................................................................34

*In re Drexel Burnham Lambert Grp., Inc.*,
    130 B.R. 910 (S.D.N.Y. 1991) .....................................................................36

*In re EAL (Delaware) Corp.*,
    1994 WL 828320 (D. Del. Aug. 3, 1994).....................................................116

*Elliott v. Gen. Motors LLC* (*In re Motors Liquidation Co.*),
    829 F.3d 135 (2d Cir. 2016) ...............................................................2, 66, 77

*In re Equan Realty Corp.*,
    2009 WL 7193572 (Bankr. S.D.N.Y. Dec. 17, 2009) ....................................77

*In re Exide Holdings, Inc.*,
    2021 WL 3145612 (D. Del. July 26, 2021) ........................................ *passim*

*In re Fairpoint Commc'ns, Inc.*,
    452 B.R. 21 (S.D.N.Y. 2011) ............................................................................88

*In re Genco Shipping & Trading Ltd*,
    513 B.R. 233 (Bankr. S.D.N.Y. 2014) ...............................................................48

*In re Glob. Indus. Techs.*, Inc.
    645 F.3d 201 (3d Cir. 2011) ..............................................................................34

*In re Great Atl. & Pac. Tea Co.*,
    472 B.R. 666 (S.D.N.Y. 2012) ..............................................................111, 116

*In re Greektown Holdings, LLC*,
    532 B.R. 680 (E.D. Mich. 2015) .....................................................................117

*Heckler v. Chaney*,
    470 U.S. 821 (1985) ..........................................................................................63

*Irving Tanning Co. v. Me. Superintendent of Ins.*,
    496 B.R. 644 (B.A.P. 1st Cir. 2013) ..................................................................61

*In re Johns-Manville Corp.*,
    517 F.3d 52 (2d Cir. 2008) ................................................................................93

*Kane v. Johns-Manville Corp.*,
    843 F.2d 636 (2d Cir. 1988) ..............................................................................99

*In re Karta Corp.*,
    342 B.R. 45 (S.D.N.Y. 2006) ......................................................................37, 49

*In re Kirwan Offs. S. à.r.l.*,
     592 B.R. 489 (S.D.N.Y. 2018) .................................................................. *passim*

*Krystal Energy Co. v. Navajo Nation*,
    357 F.3d 1055 (9th Cir. 2004) .........................................................................118

*Kyrgyz Republic v. Kumtor Gold Co. CJSC  (In re Kumtor Gold CO. CJSC)*,
    2021 WL 4926014 (S.D.N.Y. Oct. 20, 2021)..................................................115

*Law v. Siegel*,
    571 U.S. 415 (2014) ..........................................................................................54

*Leocal v. Ashcroft*,
    543 U.S. 1 (2004) ............................................................................................102

*Macarthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
    837 F.2d 89 (2d Cir. 1988) ................................................................. *passim*

*In re Mayes*,
    294 B.R. 145 (B.A.P. 10th Cir. 2003) ..................................................118

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996) ................................................................................60

*Michigan v. Bay Mills Indian Cmty.*,
    572 U.S. 782 (2014) ..............................................................................117

*In re Millennium Lab Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019) ....................................................34, 95, 96

*Mission Prod. Holdings v. Tempnology, LLC*,
    139 S. Ct. 1652 (2019) ............................................................................54

*Monarch Life Ins. Co. v. Ropes & Gray*,
    65 F.3d 973 (1st Cir. 1995) .....................................................................34

*In re Money Ctr. of Am., Inc.*,
    565 B.R. 87 (Bankr. D. Del. 2017) ......................................................117

*Montgomery Cnty. v. Barwood, Inc.*,
    422 B.R. 40 (D. Md. 2009) ...................................................................619

*In re Morton*,
    866 F.2d 561 (2d Cir. 1989) ...................................................................62

*Motorola, Inc. v. Off. Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*),
    478 F.3d 452 (2d Cir. 2007) .............................................................2, 98

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950) ................................................................................66

*In re Multiut Corp.*,
    449 B.R. 323 (Bankr. N.D. Ill. 2011) ..................................................119

*Nat'l Heritage Found., Inc. v. Highbourne Found.*,
    760 F.3d 344 (4th Cir. 2014) ..................................................................34

*New York v. United States*,
    505 U.S. 144 (1992) ................................................................................62

*Nieves v. Bartlett*,

139 S. Ct. 1715 (2019)................................................................63

*Ortiz v. Fibreboard Corp.*,
 527 U.S. 815 (1999) ...........................................................67

*Pac. Gas & Elec. Co. v. Cal. ex rel. Cal. Dep't of Toxic Substances Control
 (In re PG&E)*,
 350 F.3d 932 (9th Cir. 2003) ...............................................61

*Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*,
 639 F.3d 572 (2d Cir. 2011) .................................................80

*In re Peabody Energy Corp.*,
 958 F.3d 717 (8th Cir. 2020) ...........................................57, 58

*Penn Terra, Ltd. v. Dep't of Env. Res. Com. of Pa.*,
 733 F.2d 267 (3d Cir. 1984) .................................................51

*People v. Purdue Pharma L.P.*,
 2021 WL 5227329 (Cal. Super. Ct. Nov. 1, 2021)..................92

*Pepper v. Litton*,
 308 U.S. 295 (1939) ........................................................35, 97

*Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*,
 676 F.3d 45 (2d Cir. 2012) .......................................80, 87, 93, 94

*In re Plant Insulation Co.*,
 469 B.R. 843 (Bankr. N.D. Cal. 2012) ................................103

*Printz v. United States*,
 521 U.S. 898 (1997) ...........................................................62

*In re Purdue Pharma L.P.*,
 619 B.R. 38 (S.D.N.Y. 2020) ......................................... *passim*

*In re Quigley Co.*,
 437 B.R. 102 (Bankr. S.D.N.Y. 2010)............................102, 108

*In re Residential Capital, LLC*,
 508 B.R. 838 (Bankr. S.D.N.Y. 2014) .................................88

*In re RMS Titanic, Inc.*,
 569 B.R. 825 (Bankr. M.D. Fla. 2017).............................115, 116

*In re Sabine Oil & Gas Corp.*,

555 B.R. 180 (Bankr. S.D.N.Y. 2016) ...................................................................88

*SE Property Holdings, LLC v. Seaside Eng'g & Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)*,
  780 F.3d 1070 (11th Cir. 2015) ........................................................................34

*SEC v. Drexel Burnham Lambert Grp., Inc., (In re Drexel Burnham Lambert Grp., Inc.)*,
  960 F.2d 285 (2d Cir. 1992).................................................................... *passim*

*In re S.G. Phillips Constructors, Inc.*,
  45 F.3d 702 (2d Cir. 1995) ............................................................................113

*In re Smart World Techs., LLC*,
  423 F.3d 166 (2d Cir. 2005) .......................................................................54, 55

*SPV Osus, Ltd. v. UBS AG*,
  882 F.3d 333 (2d Cir. 2018) .................................................................... *passim*

*State ex rel. Hunter v. Johnson & Johnson*,
  2021 WL 5191372 (Okla. Nov. 9, 2021) ........................................................92

*In re Stearns Holdings, LLC*,
  607 B.R. 781 (Bankr. S.D.N.Y. 2019) ...........................................................49

*Stern v. Marshall*,
  564 U.S. 462 (2011) ........................................................................................96

*Stoll v. Gottlieb*,
  305 U.S. 165 (1938) ........................................................................................78

*In re Stone & Webster, Inc.*,
  276 B.R. 360 (Bankr. D. Del. 2002)..............................................................116

*Thomas v. Arn*,
  474 U.S. 140 (1985) ........................................................................................69

*In re TK Holdings Inc.*,
  2018 WL 1306271 (Bankr. D. Del. Mar. 13, 2018)........................................34

*In re Tuli*,
  172 F.3d 707 (9th Cir. 1999) .................................................................115, 116

*In re Union Golf of Florida, Inc.*,
  242 B.R. 51 (Bankr. M.D. Fla. 1998) ............................................................52

*United States v. Banuelos-Rodriguez,*
  215 F.3d 969 (9th Cir. 2000) .......................................................................................63

*United States v. Energy Res. Co.,*
  495 U.S. 545 (1990) ...............................................................................................35, 97

*United States v. Pacheco,*
  225 F.3d 148 (2d Cir. 2000) .....................................................................................102

*U.S. Smokeless Tobacco Mfg. Co. v. City of New York,*
  708 F.3d 428 (2d Cir. 2013) ......................................................................................60

*Vann v. Angelone,*
  73 F.3d 519 (4th Cir. 1996) .......................................................................................63

*In re Vianese,*
  195 B.R. 572 (Bankr. N.D.N.Y. 1995) .....................................................................118

*In re Whitaker,*
  474 B.R. 687 (B.A.P. 8th Cir. 2012)..........................................................................118

*Winstar Holdings, LLC v. Blackstone Grp. L.P.,*
  2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) .....................................................88, 89

*In re Worldcom, Inc. Sec. Litig.,*
  293 B.R. 308 (S.D.N.Y. 2003) ...................................................................................81

*In re W.R. Grace & Co.,*
  475 B.R. 34 (D. Del. 2012) ......................................................................................103

*In re W.R. Grace & Co.,*
  729 F.3d 311 (3d Cir. 2013) .....................................................................................121

<u>CONSTITUTION</u>

U.S. Const. art. I, § 8.................................................................................................97

<u>STATUTES & RULES</u>

11 U.S.C. § 101 ...........................................................................................................50

11 U.S.C. § 101(27) ...................................................................................113, 115, 116

11 U.S.C. § 105 ......................................................................................34, 113, 114

11 U.S.C. § 105(a) ............................................................................................. *passim*

11 U.S.C. § 106 ........................................................................................................114

11 U.S.C. § 106(a) ............................................................................................ *passim*

11 U.S.C. § 362 ..........................................................................................................49

11 U.S.C. § 362(a) .....................................................................................................60

11 U.S.C. § 362(b)(4) ....................................................................................48, 49, 50

11 U.S.C. § 363 ........................................................................................................114

11 U.S.C. § 523(a) .....................................................................................................50

11 U.S.C. § 524 ..........................................................................................................51

11 U.S.C. § 524(e) .....................................................................................................34

11 U.S.C. § 524(g) ...............................................................................................51, 52

11 U.S.C. § 542 ........................................................................................................114

11 U.S.C. § 544 ..........................................................................................................52

11 U.S.C. § 1109(b) ...................................................................................................53

11 U.S.C. § 1123 ..................................................................................................30, 33

11 U.S.C. § 1123(a)(3) ..............................................................................................27

11 U.S.C. § 1123(a)(4) ............................................................................................118

11 U.S.C. § 1123(a)(5) ..............................................................................................33

11 U.S.C. § 1123(b)(5) ........................................................................................33, 34

11 U.S.C. § 1123(b)(6) ........................................................................................33, 34

11 U.S.C. § 1129(a)(1) ..............................................................................................34

11 U.S.C. § 1129(a)(7) ..................................................................................... *passim*

11 U.S.C. § 1129(b)(1) ............................................................................................119

11 U.S.C. § 1141 ..................................................................................................50, 56

28 U.S.C. § 157 ....................................................................................................78, 93

28 U.S.C. § 157(a), (b) ...............................................................................................1

28 U.S.C. § 157(b)(2)(L) .....................................................................................76, 93

28 U.S.C. § 158(a)(1) ..................................................................................................1

28 U.S.C. § 1334 ..................................................................................................75, 78

28 U.S.C. § 1334(a) .....................................................................................................1

28 U.S.C. § 1334(b) ...................................................................................................75

28 U.S.C. § 1452(a) ...................................................................................................50

Fed. R. Bankr. P. 9019 ..........................................................................................2, 96

Fed. R. Civ. P. 23 ......................................................................................................65

Sec. 77B of the Bankruptcy Act of 1898 ......................................................................77

OTHER AUTHORITIES

1 Collier on Bankruptcy ¶ 3.01 (16th 2021) ...............................................................77

Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, sec. 111(b), 108 Stat. 4117 (1994)
    (codified as amended in scattered sections of 11 U.S.C.) .....................................53

B. Meier, *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic*, N.Y.
    Times, May 29, 2018 ..........................................................................................74

*Filming the opioid epidemic: 5 must-see documentaries*, HEALTHCAREDIVE (Nov. 27, 2018),
    https://www.healthcaredive.com/news/filming-the-opioid-epidemic-5-must-see-
    documentaries/541573/ ........................................................................................74

H.R. Rep. No. 95-595, at 342 (1977) ..........................................................................51

H.R. Rep. No. 103-834, 103d Cong., 2nd Sess. 12; 140 Cong. Rec. H10765 (Oct. 4, 1994) ......53

J. Randles, *Congressional Democrats Target Legal Releases for Purdue Pharma Owners*, WALL
    ST. J., Mar. 19, 2021 ..........................................................................................74

J. Walker & J.S. Hopkins, *Purdue Led Its Opioid Rivals in Pills More Prone to Abuse*, WALL ST.
    J., Sept. 19, 2019 ................................................................................................74

L. Bernstein & S. Higham, *Purdue Pharma in talks over multi-billion dollar deal
    to settle more than 2,000 opioid lawsuits*, WASH. POST, Aug. 27, 2019 ...............................74

Press Release, *Confirmed Plan of Reorganization of Purdue Pharma L.P. Facilitates Creation of
    New Company – "Knoa Pharma"*, Business Wire (Sept. 3, 2021),
    https://www.businesswire.com/news/home/20210903005441/en/Confirmed-Plan-of-
    Reorganization-of-Purdue-Pharma-L.P.-Facilitates-Creation-of-New-Company-
    %E2%80%93-%E2%80%9CKnoa-Pharma%E2%80%9D ...................................................22

*The Crime of the Century*, HBO (2021), https://www.hbo.com/documentaries/the-crime-of-the-
    century.............................................................................................................7

## JURISDICTIONAL STATEMENT

Judge Robert D. Drain of the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**") had subject matter jurisdiction to enter a final order confirming the *Twelfth Amended Plan of Reorganization* (App. A3049 ("**Plan**")) and the order confirming the Plan (App. A3537 ("**Confirmation Order**")) of Purdue Pharma L.P. and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, "**Debtors**" or "**Purdue**") pursuant to 28 U.S.C. § 157(a) and (b) and 1334(a).[1] This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a)(1), which confers jurisdiction to district courts to hear appeals "from final judgments, orders, and decrees" of bankruptcy courts.  28 U.S.C. § 158(a)(1).

## COUNTER STATEMENT OF ISSUES ON APPEAL

1.      Did the Bankruptcy Court correctly determine that the Plan's Shareholder Releases are appropriate under governing Second Circuit law?

2.      Did the Bankruptcy Court abuse its discretion in determining that the Shareholder Settlement is fair and equitable and in the best interests of the estates?

3.      Did the Bankruptcy Court correctly determine that the Plan is in the "best interest" of creditors under section 1129(a)(7) of the Bankruptcy Code?

4.      Did the Bankruptcy Court correctly determine that the Shareholder Releases and the Plan's classification scheme were proper as to certain Canadian entities?

---

[1] All capitalized terms not defined herein shall have the meaning ascribed to such terms in the Plan. (*See* Plan § 1.1.)  For reference, *see* Debtors Glossary of Terms, Dkt. No. 115, *State of Washington v. Purdue Pharma L.P. (In re Purdue Pharma L.P.)*, Case No. 21-cv-7532 (CM) (S.D.N.Y).

5.      Did the Bankruptcy Court abuse its discretion by issuing the *Order (I) Approving the Disclosure Statement for Fifth Amended Joint Chapter 11 Plan (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* (the "**Disclosure Statement Order**") (App. A0374) and *Order (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust, and TopCo (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other Related Relief* (Sept. 15, 2021) (App. A3372) (the "**Advance Order**")?

## STANDARD OF REVIEW ON APPEAL

A bankruptcy court's factual findings are reviewed for clear error and legal conclusions are reviewed *de novo*. *See Elliot v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 157 (2d Cir. 2016) ("***Motors Liquidation***"). The clearly erroneous standard of review is highly deferential, and where a bankruptcy court's "account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Amadeo v. Zant*, 486 U.S. 214, 223 (1988) (internal quotation and citation omitted). The reasonableness of a bankruptcy court's application of Federal Rule of Bankruptcy Procedure 9019 in determining whether to approve a settlement is reviewed for abuse of discretion. *See In re Iridium Operating LLC*, 478 F.3d 452, 461 n.13 (2d Cir. 2007). A bankruptcy court's legal conclusions, including a determination that it has subject matter jurisdiction, are reviewed *de novo*. *See Motors Liquidation*, 829 F.3d at 152.

2

## INTRODUCTION

According to the Appellants,[2] because the Plan received support from "only" 95% of 120,000 voting creditors (including 97% of almost 5,000 voting governmental creditors)—instead of absolute unanimity and 100% voter participation from the more than 600,000 contingent creditors—the law mandates that billions of dollars of value that could be dedicated to abate the opioid crisis, compensate victims, and provide life-saving medications must be destroyed in a liquidation.  Appellants prefer that creditors instead spend years pursuing uncertain recoveries in thousands of separate, uncoordinated, and protracted races to the courthouse.  The fact—as found by the Bankruptcy Court—that this massive destruction of value would occur, and that creditors, including the Appellants, would likely recover nothing from Purdue if the Plan is not consummated, was not contested by the Appellants at trial.  They nevertheless continue to assert that the law compels this tragic result.

Thankfully, they are wrong.  For more than 30 years, Second Circuit law has authorized bankruptcy courts to confirm plans of reorganization that enjoin, channel, and non-consensually release claims between creditors of a chapter 11 debtor and third parties in extraordinary circumstances where, as here, the reorganization of the debtors and adjustment of the debtor-creditor relationship requires that inextricably linked third-party claims be resolved as well.  After receiving testimony from 41 confirmation witnesses and entering into evidence more than 2,800 exhibits, the Bankruptcy Court issued a 159-page ruling making detailed factual

---

[2] "Appellants" means, jointly, the United States Trustee ("**U.S. Trustee**"), the States of California, Washington, Connecticut, Delaware, Rhode Island, Vermont, Maryland, Oregon, and the District of Columbia (collectively, the "**State Appellants**"), the City of Grande Prairie, the City of Brantford, the City of Lethbridge, and the City of Wetaskiwin (collectively, the "**Canadian Municipalities**"), The Peter Ballantyne Cree Nation and The Lac La Ronge Indian Band (collectively, "**Canadian First Nations**," together with the Canadian Municipalities, "**Canadian Appellants**"), Ronald Bass, Ellen Isaacs, and Maria Ecke.

findings supporting confirmation of the Plan.  The record definitively established that the third-party releases included in the Plan, including those targeted by the Appellants under Section 10.7 of the Plan ("**Shareholder Releases**") were necessary, both because the Debtors' ultimate owners ("**Sacklers**" or "**Sackler Families**") would not agree to contribute billions of dollars to the Plan without receiving those releases in return and because the creditors—who outnumber the Appellants many thousands of times over—would "never agree to a structure under which their own recoveries [under the Plan] were delayed and in fact exposed to the threat of complete dissipation if other similarly situated creditors asserting claims in the billions of dollars were allowed to pursue their claims to judgment . . . against the Sacklers."  (App. A4618 (Aug. 23, 2021 Conf. Hr'g Tr.) at 97:14-98:7.)  Without the Sacklers' settlement payments and the Shareholder Releases, the Plan's many complex intercreditor settlements collapse.  This too was found by the trier of fact.  With that collapse would come protracted and costly intercreditor litigation where creditors would vie against one another for shares of an ever-shrinking pie, and liquidation would likely ensue.  Moreover, to leave no doubt that the Shareholder Releases fit squarely within Second Circuit law, the Bankruptcy Court repeatedly and significantly narrowed their scope, ultimately conditioning confirmation of the Plan on a final narrowing of the Shareholder Releases to cover only claims for which the Debtors' conduct is a "legal cause" or a "legally relevant factor."  (App. A3508 (Modified Bench Ruling ("**MBR**") at 131.)

Because the facts found at trial and decades of established precedent support the Plan's releases, the Appellants must resort to asking this Court to create new law to achieve their preferred outcome.  The Appellants' attack on controlling law is most obvious when they argue that the Second Circuit should reverse 33 years of consistent jurisprudence on non-consensual third-party releases, depart from the majority of other Circuits, and newly hold that such releases

are categorically forbidden.  The State Appellants go even further in seeking to overturn settled law and ask the Court to give them and only them a brand-new bespoke exception from the Second Circuit's third-party release case law for so-called "police power" claims.  But it is well established that bankruptcy courts have the power to enjoin state "police power" actions (especially those for money damages for past conduct) when such actions interfere with (and in this case preclude) a reorganization.  The grab-bag of federalism doctrines that the Appellants cite neither have any application to a basic exercise of federal bankruptcy law nor justify inventing a new exception that would give a single governmental actor the right to veto any plan, even if supported by tens or hundreds of thousands of others.

The Appellants next argue that the Bankruptcy Court lacked subject matter jurisdiction to issue the channeling injunction and Shareholder Releases.  They are wrong.  Under Second Circuit law, the confirmation hearing and injunction contained in the Confirmation Order "arises in" the chapter 11 cases, and the claims subject to the release easily surpass the minimum "conceivable effect" on the estate necessary to support "related to" jurisdiction.  *SPV OSUS, Ltd. v. UBS AG*, 882 F.3d 333, 339-40 (2d Cir. 2017).  The Appellants ask this Court to ignore the Bankruptcy Court's detailed factual findings of manifold and inextricable connections between the claims subject to the Shareholder Releases and the Debtors' estates—and Judge Drain's order limiting the releases to claims where the "Debtor's conduct, or a claim asserted against the Debtor" is a "legal cause of the released claim, or a legally relevant factor to the third-party cause of action against the shareholder released party." (App. A3508 (MBR) at 131).)

The U.S. Trustee (and the United States Department of Justice ("**DOJ**"), in its "Statement of Interest") goes even further in its attempt to nullify existing and governing third-party release case law by arguing that due process requires full-scale litigation on the merits—literally every

single claim—before a claim can be released or enjoined without claimants' consent.  But this, of course, is directly contrary to decades of decisions authorizing third-party releases and would eviscerate the bankruptcy system's ability to resolve complex mass tort matters.  It also improperly conflates litigation on the merits with the power to enjoin and release such litigation as part of a bankruptcy plan.  And it ignores the truly extraordinary (and extraordinarily costly) notice of the bar date that reached an estimated 98% of the U.S. adult population, with an average frequency of exposure of eight times, and separately of the confirmation hearing that reached an estimated 87% of the U.S. adult population with an average frequency of message exposure of five times, as shown by uncontested evidence at trial.  The Appellants' hodgepodge of other arguments—including that the Bankruptcy Court allegedly lacked constitutional or statutory authority to enter a final order confirming a plan of reorganization that contained third-party releases or that the Plan somehow violates the Bankruptcy Clause—are equally without merit.

Bereft of legal or factual support for their arguments, many Appellants advance two overarching, false narratives.  One is that, as Maryland and others shockingly claim, there is "no question that [the] Debtors would be able to successfully reorganize here without the Sackler contribution."  (Md. Br. at 56.)  As explained above, the evidence demonstrates that is not so.  Indeed, the states themselves, including all of the State Appellants, expressly conditioned their Phase One Mediation agreements with the private creditors on a settlement with the Sacklers.  Another is that, as the U.S. Trustee in a grievous, baseless insult to creditors and their professionals, who spent years crafting this plan, asserts that Purdue "substituted its judgment for the victim's own judgment about whether it was best" to accept the settlements and recoveries under the Plan rather than pursue their third-party claims.  (UST Br. at 30.)  Here, too, the

evidence is exclusively and overwhelmingly to the contrary.  Testimony from the many architects of the years-long legal strategy that forced Purdue into bankruptcy and brought the Sacklers to the negotiating table, and from an advisor to the Official Committee of Unsecured Creditors ("**UCC**") that serves as the fiduciary for all unsecured creditors in the cases, demonstrated that <u>creditors</u> led a more than two-year effort to extract maximum value from the Sacklers, and ultimately, to accept the Plan's resolution of their claims against the Sacklers. These efforts included exhaustive discovery (likely the broadest discovery ever conducted in a chapter 11 case), grueling negotiations, and multi-party, multi-state mediation guided by three preeminent mediators.

Tellingly, although one would not know it from the Appellants' briefs, <u>every single organized creditor group in the Debtors' chapter 11 cases supports the Plan</u>, including (1) the UCC; (2) the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("**Ad Hoc Committee**") (which includes the court-appointed Plaintiffs' Executive Committee and Co-Lead Counsel ("**PEC**") in the Ohio multidistrict litigation ("**MDL**") (where over 2,200 of the prepetition litigation has been consolidated); (3) the Multi-State Governmental Entities Group ("**MSGE**"); (4) the Native American Tribes; (5) the Ad Hoc Committee of NAS Children ("**NAS Committee**"); (6) the Ad Hoc Group of Hospitals ("**Hospitals**"); (7) the Ad Hoc Group of Individual Victims ("**PI Group**"; (8) the Third-Party Payor group; (9) the group of ratepayer mediation participants; (10) the group of public school districts; and (11) the majority of states that formerly constituted the Non-Consenting States.[3]  Thus, the many groups of creditors who

---

[3] The group formally known as the "Non-Consenting States" included California, <u>Colorado</u>, Connecticut, Delaware, the District of Columbia, <u>Hawaii</u>, <u>Idaho</u>, <u>Illinois</u>, <u>Iowa</u>, <u>Maine</u>, Maryland, <u>Massachusetts</u>, <u>Minnesota</u>, <u>Nevada</u>, New Hampshire, <u>New Jersey</u>, <u>New York</u>, <u>North Carolina</u>, Oregon, <u>Pennsylvania</u>, Rhode Island, Vermont, <u>Virginia</u>, Washington, and <u>Wisconsin</u>.  However, the majority of this group (the underlined members) voted in favor of the
(….continued)

actually represent the victims (on whose behalf the Trustee purports to object) support the Plan. Intimations to the contrary are false and, of course, unsupported by a shred of evidence.

For all of these reasons, and for the reasons set forth below,[4] the Confirmation Order should be affirmed.

## STATEMENT OF THE CASE

I.       **The Pre-Petition Litigation Against the Debtors and Related Parties**

Before initiating their chapter 11 cases, the Debtors were defendants in more than 2,600 civil actions in dozens of courts and other fora around the country ("**Pending Actions**").  (App. A2095 (JX-3044) (Declaration of Jesse DelConte) ("**DelConte Fact Decl.**") ¶ 34 n.9.)  Plaintiffs generally alleged that the Debtors acted improperly in the marketing and sale of opioid medications and sought monetary damages based on public nuisance, consumer protection laws, unjust enrichment, false claims acts, and similar claims.  *See, e.g.*, Transfer Order, *In re Nat'l Prescription Opiate Litig.*, No. 17-MD-2804, at 3 (J.P.M.L. Dec. 12, 2017), Dkt. No. 1 (centralizing complaints where "[p]laintiffs variously bring claims for violation of RICO statutes, consumer protection laws, state analogues to the Controlled Substances Act, as well as common law claims such as public nuisance, negligence, negligent misrepresentation, fraud and unjust enrichment" raising "common factual questions about, *inter alia*, the manufacturing and distributor defendants' knowledge of and conduct regarding the alleged diversion of these

---

(continued….)

Debtors' Plan as a result of agreements reached during the Phase Three Mediation (defined herein) and did not oppose the Debtors' Plan at confirmation.

[4] The Debtors acknowledge the severe consequences of the opioid crisis on individuals, and recognize the courage of the *pro se* appellants to publicly share their views on the Plan.  Because the *pro se* appellants do not raise any legal or factual issues not raised by the represented appellants, the Debtors do not separately address the briefs of Ms. Ecke or Ms. Isaacs.  (Mr. Bass has not yet filed his brief.)

prescription opiates, as well as the manufacturers' alleged improper marketing of such drugs").

Although some of the plaintiffs also sought injunctive relief against the Debtors, such requests

were functionally claims for monetary relief, including abatement measures, to address past

misconduct.  (App. 3530 (MBR) at 153.)  Indeed, the conduct at issue in the Pending Actions

was discontinued years before the bankruptcy filing.  In addition to Pending Actions against the

Debtors, the Debtors also were subject to investigation by multiple components of the DOJ since

at least June 2016.

Prepetition litigation was not confined to the Debtors.  Litigation arising out of the

Debtors' opioid products also named the Debtors' related parties as defendants, including certain

members of Sackler Families and current and former directors and officers.  (*See, e.g.*, App.

A5038 (JX-0783) (Compl., *State of Oregon v. Richard Sackler*, 19cv44161 (Cir. Ct. Or. Oct. 10,

2019) ("**Oregon Compl.**") (complaint filed in 2019 naming related parties as defendants).)

Naming these parties as defendants—in addition to or in lieu of the Debtors—accelerated as

rumors of the Debtors' impending bankruptcy swirled in the spring and summer of 2019.  (*See,

e.g.*, Appendix of Appellants The States of Washington, Connecticut, Delaware, Rhode Island

and Vermont, Dkt. No 103, *In re Purdue Pharma L.P. Bankruptcy Appeals*, Case No. 20-cv-

07532-CM (S.D.N.Y) ("**Appealing States App'x.**") A-525 (JX-0840 (Second Am. Compl., filed

in *State of Connecticut v. Purdue Pharma L.P.* (X07 HHD-CV-19-6105325-S, Conn. Super. Ct.),

dated July 1, 2019 ("**Connecticut Compl.**")).)

As is relevant here, all but one of State Appellants (Washington) has filed a lawsuit

against at least one member, and in some cases up to nine members, of the Sackler Families

arising out of their ownership and management of the Debtors.[5]  These State Appellants either name Purdue as a co-defendant in the same complaint or assert claims against Purdue in an earlier-filed complaint.[6]

The State Appellants' complaints against the Sacklers assert claims that are substantially similar (and often identical) to those they assert against the Debtors and are predicated on similar allegations and conduct.  The general thrust of those allegations is that members of the Sackler Families played an active role in and directed <u>the Debtors'</u> wrongful conduct in connection with the opioid crisis.  (*See e.g.*, Appealing States App'x. A-1298 (Del. Compl.) ¶¶ 7, 50) (alleging that "[t]hrough their management, direction, and control of **<u>Purdue</u>**, the Sackler Defendants have engaged, and in some cases continue to engage, in a massive marketing campaign to misstate and conceal the risks of treating chronic pain with opioids" and that "**<u>Purdue's</u>** misconduct . . . was at the direction of the Sackler Defendants, who were the chief architects and beneficiaries of **<u>Purdue's</u>** deception") (emphasis added); Appealing States App'x. A-2339 (Rhode Island

---

[5] (*See e.g.*, Appealing States App'x. A-1553 (JX-1649) (Compl. at ¶ 3, S*tate of Vermont v. Sackler* (Super. Ct. Chittenden Unit (May 21, 2018) ("Purdue executed this scheme at the direction of eight people in a single family that owned the company and controlled a majority of the seats on the company's board of directors: the Sacklers.")); *see also* Appealing States App'x. A-525 (Connecticut Compl.); App. A4838 (JX-1753) (*Consumer Protection Division, Office of the Attorney General v. Purdue Pharma*, Amended Statement of Charges, dated May 29, 2019 ("**Maryland Compl.**"); App. A4974 (JX-0947) (First Amended Compl., *The People of the State of California v. Purdue Pharma L.P.*, 19STcv19045 (Super. Ct. Cal. Oct. 2, 2019) ("**California Compl.**")); Appealing States App'x. A-1289 (JX-1646) (Compl., *State of Delaware v. Richard Sackler*, Case No. N19C-09-062 MMJ CCLD (Del. Superior Ct. Sept. 9, 2019) ("**Del. Compl.**")); App. A4814 (JX-1647) (Compl., *State of Oregon v. Richard Sackler*, 19cv22185 (Ore. Cir. Ct., Multnomah Cty. May 16, 2019) ("**Oregon Compl.**")); Appealing States App'x. A-2322 (JX-2214) (Compl., *Rhode Island v. Sackler*, No. PC 2019-9399 (R.I. Super. Ct., Bristol Cty.) ("**Rhode Island Compl.**")).)

[6] (*E.g.*, App. A4974; *compare* Appealing States App'x. A-875 (JX-0948) (Compl., *State of Vermont v. Purdue Pharma L.P.* (757-9-18, Super. Ct. Vt. October 31, 2018)) *with* Appealing States App. A-1553 (JX-1649) (Compl., *State of Vermont v. Richard Sackler*, Case No. 469-5-19 (VT Superior Ct. Chittenden Unit, May 21, 2019).)

Compl.) ¶ 71 ("[A]t the direction of the Sacklers, **Purdue** kept pushing opioids and people kept dying.") (emphasis added).)  Some of the allegations against the Sackler Families are, in fact, carbon copies of the allegations made against the Debtors, merely swapping out one name for the other.  (*Compare* Appealing States App'x. A-1534 (JX-1648) (Amended Compl., *State of Rhode Island v. Purdue Pharma L.P.*, Case No. PC 2018-4555 (R. I. Superior Ct. Providence Feb. 25, 2019) ("**Rhode Island Purdue Compl.**") at ¶ 358)) ("**Purdue** . . .  successfully mislead healthcare providers and patients alike, and changed the perception and practices regarding opioids.") (emphasis added) *with* Appealing States App'x. A-2349 (Rhode Island Compl. at ¶ 117)  ("**The Sacklers** successfully mislead healthcare providers and patients alike, and changed the perception and practices regarding opioids.") (emphasis added); App. A4185 (JX-0537) (Coleman Decl.) ¶ 18 (containing charts comparing allegations in complaints).)  Notably, there is not a single allegation that the Sacklers caused or exacerbated the opioid crisis outside of or dissociated from their roles as owners, directors, and officers of Purdue.  A representative sample of such allegations from each of the State Appellants' complaints, and from the complaints submitted by the U.S. Trustee, is set out in the charts attached hereto as Annexes A and B, respectively.

By the summer of 2019, it had become apparent that litigation on the scale faced by the Debtors was untenable and would result in their financial and operational destruction.  It was equally obvious that bankruptcy provided the only forum that could halt the immense destruction of value associated with continued litigation of the Pending Actions and productively orient the parties toward a potentially value-maximizing and equitable global resolution.

## II.     Pre-Petition Negotiations and the Settlement Framework

For the better part of the year preceding the Debtors' chapter 11 petitions, a number of plaintiff constituencies—including many state attorneys general and the PEC in the MDL—the

11

Sackler Families, and Purdue engaged in discussions concerning a potential global resolution of the Pending Actions.  These negotiations, spearheaded by key plaintiff constituencies, resulted in an agreement in principle on the structure of a global resolution of opioid litigation related to the Debtors ("**Settlement Framework**") in the days leading up to the Debtors' bankruptcy filings. (App. A0001 (Settlement Framework Term Sheet); App. A1814-15 (JX-3041) (Declaration of John Guard ("**Guard Decl.**") ¶¶ 56-60).)

The Settlement Framework had, broadly speaking, three core pillars.  Purdue's shareholders would: (1) relinquish their equity interests in the Debtors, which would be converted into a public benefit company dedicated to abating the opioid crisis; (2) engage in a sale process for their ex-U.S. pharmaceutical businesses; and (3) make a payment over time to the Debtors' estates of at least $3 billion, with potential upside above that.  (*See generally* App. A0001-12 (Settlement Framework Term Sheet).)  The plaintiff constituencies that negotiated and supported the Settlement Framework opposite the Sacklers included no fewer than 23 state attorneys general and analogous officials from the five U.S. territories, as well as the PEC. (App. A1815 (Guard Decl. ¶ 60).)  The PEC comprised attorneys at law firms that collectively represent over 1,000 municipalities (including cities, counties, towns, and villages), as well as Native American tribes, individuals, and third-party payors.  The Settlement Framework therefore had substantial (but far from unanimous) support, and was later memorialized in an unsigned term sheet among the Ad Hoc Committee, the Debtors, and the shareholders.  (App. A0001-12 (Settlement Framework Term Sheet).)  While important, the Settlement Framework was just that—a framework and starting place for potentially achieving a value-maximizing resolution in the Debtors' bankruptcy.  (App. A1773-74 (JX-3037) (Declaration of John Dubel ¶ 37) ("**Dubel Decl.**").)

III.    **Chapter 11 Proceedings**

On September 15, 2019, the Debtors filed for chapter 11 protection.  Shortly thereafter, the Debtors sought and obtained a preliminary injunction enjoining pursuit of the Pending Actions.  *See In re Purdue Pharma L.P.*, 619 B.R. 38, 57-62 (S.D.N.Y. 2020) (affirming preliminary injunction).  The Debtors requested this preliminary injunction—which was supported by both the UCC and the AHC—not only to halt the destruction of value associated with the Pending Actions but also provide the parties-in-interest with the respite necessary to craft a resolution that would not be achievable outside bankruptcy.  In an unprecedented step, the Debtors concurrently asked the Bankruptcy Court to enjoin the Debtors from, among other things, engaging in virtually all promotion of opioid products and providing financial support to third parties for the purpose of promoting opioids or opioid products ("**Voluntary Injunction**"). (App. A1795 (JX-3038) (Declaration of Jon Lowne ¶ 27) ("**Lowne Decl.**").)  Although the Debtors had ceased marketing opioids in early 2018, the Debtors requested the Voluntary Injunction to further assure the bankruptcy court, the parties, and the public that the Debtors would not engage in the marketing conduct alleged in the Pending Actions.  The Debtors' compliance with the Voluntary Injunction has been overseen throughout the chapter 11 cases by two highly respected monitors.  Nearly all of the Voluntary Injunction's obligations and terms have, in fact, since been incorporated into the myriad governance obligations and covenants under the Plan—to which no party objected—that are intended to ensure that NewCo (the public benefit company that will emerge from the bankruptcy) operates in a responsible manner in the public interest.  (App. A3439 (MBR) at 62.)

For the next two years, the Debtors and their various creditor stakeholders engaged in dual-tracked work streams.  The first was massive discovery and disclosure, which—as this Court recognized—was a pre-condition to the preliminary injunction being entered.  *See In re*

*Purdue Pharma L.P.*, 619 B.R. at 58-59.  An extraordinary amount of discovery was provided by the Debtors, the Sacklers, and third parties during the chapter 11 cases, with the Debtors alone producing over 90 million pages of documents to estate stakeholders on a wide variety of issues, including materials going to both estate claims and underlying opioid liability claims.  (App. A1788 (Lowne Decl. ¶ 7).)  As the Bankruptcy Court commented, "more information has been provided with respect to this [P]lan and more specifically with respect to the elements of a settlement with the Sacklers than [the Bankruptcy Court] had[] ever seen, and [perhaps] ha[s] ever been provided in any [c]hapter 11 case."  (App. A4521 (Hr'g Tr. 56:5-9 (Mar. 24, 2021)); App. A3455 (MBR) at 78.)  This staggering amount of information enabled the parties to assess potential claims against the Sackler Families and associated entities—of extreme interest to many creditors—and was carefully weighed during the comprehensive investigations performed by multiple parties in the cases, including the Special Committee of the Debtors' Board of Directors ("**Special Committee**") and the UCC.

The second was a series of mediated negotiations.  While information sharing and various investigations were ongoing, the relevant parties-in-interest, including all of the State Appellants, engaged in over a year of mediation to resolve allocation issues among the Debtors' creditors as well as determine if a satisfactory agreement with the shareholders could be achieved.  These intense and often around-the-clock efforts, described in more detail below, culminated in the hard-fought agreements that are now reflected in the Debtors' overwhelmingly supported Plan.

A.      **Mediation and Resolution of Inter-Creditor Allocation Issues (Phase One Mediation)**

As the Special Committee and UCC investigations were progressing, the Debtors and core creditor constituencies participated in mediation before two consensually selected and highly respected mediators, the Honorable Layn Phillips (ret.) and Kenneth Feinberg, on the

issue of allocation of the value of the Debtors' estates between the Non-Federal Public Claimants (as defined in the Mediation Order), on the one hand, and the Private Claimants (as defined in the Mediation Order), on the other hand ("**Phase One Mediation**").  (*See* App. A0094 (Order Appointing Mediators (Mar. 4, 2020)) ¶ 3.)  The Bankruptcy Court and the parties alike recognized these allocation issues as a critical gating item to the success of the Debtors' reorganization.

The Phase One Mediation facilitated the resolution of important issues in these chapter 11 cases.  First, the Non-Federal Public Claimants made the historic commitment to dedicate all value received by them to abate the opioid crisis.  (App. A0120 (JX-1637) (Phase One Mediators' Report) ¶ 3.)  Second, the Non-Federal Public Claimants resolved critical issues as to allocation of value amongst themselves.  (*See id.* ¶ 4; *see also* App. A1811 (Guard Decl.) ¶¶ 43-44.)  And third, agreement was reached on written term sheets with certain Private Claimant groups that addressed allocation of estate value to each group.  Under these agreements, the Private Claimants would receive fixed cash payments over time.  Moreover, the Ad Hoc Group of Hospitals, the Third-Party Payor Group, and the NAS Committee (with respect to medical monitoring) agreed to dedicate substantially all of their distributions to abate the opioid crisis. (*See* App. A0121 (Phase One Mediators' Report) ¶¶ 5-7).)  The State Appellants, then part of the Non-Consenting States, participated in these negotiations.  **All of the Phase One Mediation term sheet agreements were (and remain) conditioned by the creditors—including all nine State Appellants—on confirmation of a plan of reorganization that includes participation by the Sackler Families, (*see id.* ¶ 12), as both governmental and Private Claimants reaffirmed at the confirmation hearing.**  (*See, e.g.*, App. A1817 (Guard Decl.) ¶ 67 ("Without the availability of the Sackler assets, compromise between the Non-Federal Public Claimants and

the Private Claimants would have not been possible."); App. A4608 (Aug. 16, 2021 Confr. Hr'g

Tr. 143:14-144:10 (Atkinson) ("The UCC believes, with conviction, that the terms of the plan

represent the only viable conclusion for the Chapter 11 cases . . ."); App. A4615 (Aug. 23, 2021

Confr. Hr'g Tr. 58:8-25 (Debtors) (noting creditor group support)).)  In large measure, these

agreements, premised on settlement payments from the Sacklers, form the basis of the

framework for the distributions contemplated under the Plan.

### B.      DOJ Resolution

In November 2020, Purdue Pharma, L.P. ("**PPLP**") entered into (i) a plea agreement

("**Plea Agreement**") by and between PPLP and the United States, and (ii) a civil settlement

agreement by and between PPLP and the United States ("**Civil Settlement**," and together with

the Plea Agreement, the "**DOJ Resolution**") to fully resolve the United States' civil and criminal

investigations into the Debtors' past practices related to the production, sale, marketing, and

distribution of opioid products.  (App. A0288 (Order Granting Motion Pursuant to 11 U.S.C.

§ 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors

and the United States).)  Pursuant to the Plea Agreement, among other things, the Debtors and

the United States agreed to a criminal forfeiture judgment in the amount of $2 billion

("**Forfeiture Judgment**") that will be entered upon the acceptance of the Plea Agreement, and

will be deemed to have the status of an allowed superpriority administrative expense claim

against PPLP at that time, regardless of the outcome on appeal.  (App. A0127 (JX-2094) U.S.

Department of Justice Plea Agreement with Purdue Pharma L.P.).)  Critically for the success of

the chapter 11 cases, the United States further agreed to provide a credit offsetting the Forfeiture

Judgment ("**Forfeiture Judgment Credit**") of up to $1.775 billion for value distributed or

otherwise conferred by PPLP under the Plan in respect of claims asserted by state, tribal, or local

government entities, provided that the Plan provides for the establishment of a public benefit

company (or entity with a similar mission) and certain other terms and conditions described in the Plea Agreement.  The Plan contemplates that the Debtors will be able to utilize the full amount of the Forfeiture Judgment Credit.

**C.      Mediation and Resolution of Creditor and Estate Claims against the Sackler Families (Phase Two Mediation)**

With key intercreditor allocation issues resolved, the Debtors and their creditors next turned their focus toward a second phase of mediation to see if a settlement could be reached with the Sackler Families.

In September 2020, the Bankruptcy Court authorized the mediators—working full time—to mediate potential claims or causes of action held by the creditors and the Debtors against Sackler Families.  This mediation is commonly referred to as the "**Phase Two Mediation**." (App. A0294 (JX-1638) (Phase Two Mediators' Report) at 1.)  This Phase Two Mediation was critical because it was essential that any potential settlement of claims against the Sackler Families that was to be reflected in the Debtors' Plan receive substantial creditor support.  (App. A1773-74, A1778 (Dubel Decl.) ¶¶ 37-38, 46.)  Without that support, any plan predicated upon such a settlement would not have been viable.

Ultimately, the Phase Two Mediation resulted in the terms of a settlement agreed to by five of the six mediation parties (the Debtors, UCC, AHC, MSGE, and Sackler Families) that included material improvements to the initial Settlement Framework.[7]  Specifically, the guaranteed amount that the Sackler Families would be required to pay in the aggregate increased from a minimum of $3 billion over seven years under the initial Settlement Framework to $4.275 billion over nine years (or ten years if certain amounts are paid ahead of schedule in the first six

---

[7] Agreement could not be reached during the Phase Two Mediation with the final mediation participant, the group formally known as the "Non-Consenting States."

years).  $4.275 billion was the settlement amount jointly recommended by the mediators after months of full time work (a fact that alone conclusively proves its reasonableness).  (*See* App. A0302 (JX-1638) (Phase Two Mediators' Report) at 9.)  The principal consideration for such payments are the releases of any actual or potential claims or causes of action against parties associated with the Sackler Families and related parties that are reflected in the Plan.  (App. A1778-79 (Dubel Decl.) ¶ 46.)

A settlement with the Sackler Families without the Plan's releases would not be possible because <u>creditors</u> could not and would not allow opt-out parties to destroy what the vast majority had worked for years to achieve.  Six creditor groups—the UCC (a statutorily-appointed fiduciary), the MSGE, AHC, the Ad Hoc Group of Personal Injury Claimants, the NAS Committee and the Hospitals—so represented to the Court at confirmation.  *See, e.g.*, App. A4615 (Aug. 23, 2021 Confr. Hr'g (Debtors)) Tr. 58:8-25 (**noting that the UCC, AHC, the MSGE, the PI Group, the NAS Committee, and the Hospitals had authorized the Debtors to state on the record that those groups would "not support a plan that allows for opt-outs that are material along the lines requested by the objecting states.  Even if the Sacklers consented to the carve out, everyone of those six groups would instantly . . .  withdraw their support for the plan and fiercely oppose it**."); App. A4624 (Aug. 23, 2021 Confr. Hr'g  Tr. 120:9-22 (MSGE) ("[T]he releases are necessary as part . . .  of th[e] global deal for the public creditors and the private creditors to receive the funds they have been allocated under the [P]lan, to put towards abatement of the opioid crisis.").)  In addition to supporting the terms of the settlement, the UCC, Ad Hoc Committee, and MSGE were parties to the Phase Two Mediation and heavily involved in its negotiation.

D. **Filing of the Debtors' Plan of Reorganization and Disclosure Statement**

On Sunday, March 14, 2021, in advance of a full Board meeting, the Special Committee considered whether to authorize the filing of the Plan, including the Shareholder Settlement Term Sheet. (App. A1779, A1782 (Dubel Decl.) ¶¶ 47, 54)  The Special Committee determined that the terms of the settlement then reached by the five mediation parties and the settlement amount jointly recommended by the mediators was fair, equitable, and reasonable and that the settlement reflected a reasoned judgment as to the trade-off between a possible but uncertain recovery of a larger amount through continued litigation versus an agreed recovery of settlement payments that are certain but may be less than what the Debtors potentially could obtain in litigation.  (*Id.* at ¶¶ 49- 58.)  The full board then authorized the filing of the Plan (*id.* at ¶ 54), and its first iteration was filed on March 15, 2021.

E. **Further Mediation Before Judge Chapman (Phase Three Mediation)**

Even with the Plan on file, however, the parties sought to expand its base of support and to further improve the Shareholder Settlement, which the Bankruptcy Court facilitated by ordering yet another round of mediation.  Pursuant to a May 7, 2021 order, the Honorable Shelley C. Chapman presided over an additional mediation between the Non-Consenting States and the Sackler Families with respect to the then-existing terms of the Shareholder Settlement (the "**Phase Three Mediation**").  (*See* App. A0673 (JX-1639) (Phase Three Mediator's Report); App. A1783-84 (Dubel Decl.) ¶ 57-58.)  Over the next seven weeks, Judge Chapman held approximately 145 telephonic meetings with the mediation parties, before presenting a mediator's proposal on June 28, 2021.  (App. A0673 (Phase Three Mediator's Report) ¶ 1.)  The in-person Phase Three Mediation then took place on June 30, 2021 and July 1, 2021 over the course of 27 hours.  (*Id.*)  These "difficult and hard-fought negotiations," which ran well into the

night of July 1, resulted in a further improved Shareholder Settlement, agreed to by a majority of participants and most of the remaining Non-Consenting States.  (*See id.* ¶¶ 3-5.)

Specifically, the Shareholder Settlement's further improved terms included (i) additional payments of $50 million by the Sackler Families, and the material acceleration of another $50 million in previously agreed settlement payments, resulting in total payments of $4.325 billion; (ii) a "material expansion of the scope of the public document repository" to be established under the Plan including the waiver of attorney-client and other privileges for many documents; (iii) prohibitions with respect to the Sackler Families' naming rights for charitable contributions until they have fully paid all obligations under the Shareholder Settlement and exited all opioid businesses worldwide; and (iv) timing for disposition of NewCo after the consummation of the Plan. In addition, the individual trustees of NOAT, or other qualified parties chosen by the Bankruptcy Court, will become the controlling members of the Raymond and Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences.  (*See id.* ¶ 6.) These foundations will have an aggregate value of at least $175 million, and their purposes will be limited to those consistent with efforts to abate the opioid crisis.  (*See id.*)

As a result of the Phase Three Mediation, the attorneys general of fifteen <u>additional</u> states—Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Wisconsin—agreed to support the improved Shareholder Settlement.  (*See id.* ¶ 4.)  With these states, 60% of the formerly Non-Consenting States—including some of the most previously vocal opponents—agreed to support the materially improved Shareholder Settlement, adding to the already-broad consensus in favor of the Plan among the stakeholders in the chapter 11 cases.  (*See id.*)  Of the 48 states, 38

supported the Plan, joining every major organized creditor group in the cases.  (App. A0737 (JX-3028) (Declaration of Christina Pullo) ("**Pullo Decl.**"), Ex. B.)

### F.     The Plan

The Plan, as amended to reflect the terms of the further improved Shareholder Settlement, represents (by a very wide margin) the best available path to a value-maximizing resolution of the chapter 11 cases for all creditors <u>including the Appellants</u>.  (*See* App. A2083 (DelConte Fact Decl.) ¶ 4.)  The core components of the Plan include the following:

*First*, the Plan embodies many critical—and mutually independent—settlement agreements reached during the three successive phases of mediation that together establish the Plan's historic, abatement-centric distribution framework.  Under the Plan, the overwhelming majority of Purdue's current value, including the billions of dollars of proceeds secured by the Shareholder Settlement, will be transferred to nine trusts ("**Creditor Trusts**") that will fund opioid abatement efforts and compensate personal injury claimants, including the NOAT, which will make distributions to qualified governmental entities.  (*Id*. ¶¶ 5-6.)  Each of the Creditor Trusts, with the exception PI Trust and PI Futures Trust, will make distributions <u>solely</u> for opioid abatement purposes.  (*Id*. ¶¶ 5-6.)  The PI Trusts will make distributions to qualified personal injury victims including children with NAS.  (*Id*. ¶ 17.)  The distribution of value from the Debtors' estates to the NOAT and the Tribe Trust, alone, is estimated to exceed $4 billion.  (*Id*. ¶ 31.)  The private creditor trusts are estimated to receive in excess of $1 billion in value under the Plan, including approximately $700-750 million of which will be used to compensate personal injury claimants.  (*See id.* ¶¶ 19-30; App. A3110-15 (Plan) §§ 5.2, 5.2(d).)

*Second*, the Plan also delivers on an important commitment made by the Debtors at the very outset of the chapter 11 cases:  the creation of a public document repository—one that is expected to make over 100 million pages of Purdue material available for public review.  (App.

21

A1788 (Lowne Decl.) ¶ 7.)  The AHC testified at the confirmation hearing that the establishment

of this public document repository was among their highest priorities.  (App. A4586-87](Aug.

13, 2021 Confr. Hr'g Tr. 151:17-152:9 (Weinberg) ("[O]f all the aspects of . . . the injunctive

relief part of [the Plan], [the public document repository] . . . is extremely important from the

standpoint of, not only what it is that we developed in terms of evidence, [but also] lessons to be

learned from the conduct that was uncovered and revealed.")); App. A4598 (Aug. 16, 2021

Confr. Hr'g Tr. 83:20-22, 84:12-23 (Conroy) ("[I]it could be that the document repository is

actually the most valuable piece of this settlement.").)  The public document repository will be

hosted by an academic institution or library and will include more than 13,000,000 documents

(consisting of more than 100,000,000 pages) produced in the chapter 11 cases and tens of

millions of <u>additional</u> documents, including certain documents currently subject to the attorney-

client privilege that would not have been produced in litigation.  (App. A1788 (Lowne Decl.) ¶

7.)  The Plan ensures that scholars and the public can have access to all of these materials.

     *Third*, under the Plan, PPLP will cease to exist.  Purdue's current business operating

assets will be transferred to NewCo,[8] a new entity that will be dedicated to mitigating the opioid

crisis with an operating structure aimed at ensuring that it operates in a responsible and

sustainable manner with "layers of oversight . . . informed by the public interest at every step"

(App. A3439 (MBR) at 62).  PPLP, which has more than one billion dollars of cash on its

balance sheets (as well as valuable insurance policies), will transfer hundreds of millions of

---

[8] Following the effective date, NewCo will operate under the name KNOA Pharma.
Press Release, *Confirmed Plan of Reorganization of Purdue Pharma L.P. Facilitates Creation of
New Company – "Knoa Pharma"*, Business Wire (Sept. 3, 2021), *accessible at*
https://www.businesswire.com/news/home/20210903005441/en/Confirmed-Plan-of-
Reorganization-of-Purdue-Pharma-L.P.-Facilitates-Creation-of-New-Company-%E2%80%93-
%E2%80%9CKnoa-Pharma%E2%80%9D.

dollars on the effective date to the Creditor Trusts.  PPLP will then be dissolved.  No federal,

state, or local governmental entity will own the equity of NewCo.  Instead, NewCo will be

indirectly owned by the Public Creditor Trusts.  (App. A2086, A2088 (DelConte Fact Decl.) ¶¶

7, 14.)  NewCo also will continue the Debtors' development of opioid overdose reversal and

addiction treatment medications, and will be authorized to deliver millions of doses of such

medications at low or no cost when development is complete.  Finally, under the terms of the

Shareholder Settlement, the Sackler Families will be subject to restrictions on participation in

any opioid business, and a variety of other critical covenants and limitations.  (*See* App. A2219-

20 (Seventeenth Plan Supplement (Shareholder Settlement Agreement)) Ex. AA, § 8.09).)

>    **G.      Channeling Injunction and Shareholder Releases Under the Plan**

In order to facilitate the global, abatement-centric resolution of claims contemplated

above, the Plan channels claims against the Debtors, their shareholders, and their respective

related parties to Creditor Trusts for treatment according to applicable trust documents

("**Channeling Injunction**")  (*see* App. A3182-84 (Plan) § 10.8) and also releases claims against

these parties.  The target of the Appellants in these appeals is the so-called "third-party releases"

under Section 10.7(b) of the Plan, which release claims non-debtors have asserted or might assert

against the Shareholder Released Parties, including members of the Sackler Families and certain

of their related individuals and entities.  The Shareholder Releases are repeatedly

mischaracterized by the Appellants in their briefing but, in reality, their operation is stringent.

The final form of the Shareholder Releases is the result of extensive and hard fought

negotiation by <u>creditors</u> opposite the Sacklers—as well as multiple rounds of further narrowing

by the Bankruptcy Court.  Indeed, as a condition to confirming the Plan, Judge Drain required

that the Shareholder Releases be limited to claims for which the Debtors' liability is the cause or

a legally relevant factor.  (App. A3508 (MBR) at 131; App. A3348 (Twelfth Amended Plan Blackline) at 129.)

To be <u>potentially</u> subject to the Shareholder Releases, a claim must be: (1) held by a "Releasing Party," (2) against a "Shareholder Released Party," (3) "based on or relating . . . to the Debtors . . . their Estates or . . . the [c]hapter 11 [c]ases," <u>and</u> (4) a claim as to which "conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor." (App. A3180-81 (Plan) § 10.7(b).)  Even claims that satisfy all four of these independent requirements, however, are <u>not</u> released if they fall into any one of <u>six</u> separate categories of "Excluded Claims" (discussed below) or the independent exclusion for "Non-Opioid Excluded Claims" (also discussed below).  (*Id.*; *see also id.* at § 1.1.)  The structure of the Shareholder Releases therefore includes overlapping limitations and exclusions that <u>together</u> operate to circumscribe their scope.   To illustrate:

<u>First</u>, the Shareholder Releases bind only "Releasing Parties," which are, with a lone exception believed to be a null set and governed by analogous language,[9] limited to "Holders of Claims against . . . the Debtors," i.e., creditors of the Debtors.  (*See* Plan § 1.1 at 34.)  In other

---

[9] "Releasing Parties" also includes "Holders of Future PI Channeled Claims" which include claims against the Debtors or the Shareholder Released Parties.  (*Id.*)  This narrowly addresses claims premised upon alleged **prepetition** wrongdoing that results in injuries that do not arise until **after** the Petition Date (as defined in the Plan, PI Future Channeled Claims).  As the Bankruptcy Court found—and as no one contests on appeal—there are not likely to be **any** such future claims that are viable. (App. A3583 (Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Plan) ("**FOF/COL**") at 47.)  The Bankruptcy Court thus determined that this belt-and-suspenders means of ensuring the finality of the settlement was fair and reasonable.  (*Id.*)  The Bankruptcy Court thus determined that this belt-and-suspenders means of ensuring the finality of the settlement was fair and reasonable.  (*Id.*)  The U.S. Trustee, tellingly, fails to mention any of this when describing this aspect of the Shareholder Releases.  (UST Br. at 18.)

words, anyone with a present injury who was harmed by the Sacklers and not by the Debtors is
not bound by the releases.

  Second (and yet further tying to governing case law, as discussed below) claims subject
to the Shareholder Releases are limited to claims (1) that arise from or relate to the Debtors, their
estates, or their chapter 11 cases and (2) for which "any conduct, omission or liability of any
Debtor or any Estate is the legal cause or is otherwise a legally relevant factor."  (App. A3080-81
(Plan) § 10.7(b).)  The Debtors, therefore, must be at the heart of the claim for that claim to be
subject to the Shareholder Releases.  Through the exclusion of "Non-Opioid Excluded Claims,"
the Shareholder Releases are further limited to claims that arise from or relate to opioid-related
conduct or allegations made in pending opioid-related litigation or allege liability of the Sacklers
that is derivative of liability of the Debtors.  "Non-Opioid Excluded Claim" is defined broadly to
exclude from the Shareholder Releases any non-derivative claim that (i) does **not** arise from or
relate to "Opioid-Related Activities," the "Pending Opioid Actions" or opioid use or misuse or
the consequences thereof and (ii) is **not** based upon and does not arise from the same allegations
in the Pending Opioid Actions.  (Id. at § 1.1.)  If a claim does not pass all three of these tests,
then that claim against the shareholders is not released.  Period.

  Third, the definition of "Shareholder Released Parties" is circumscribed to limit the
release recipients to those necessary to ensure that the parties to the settlement—creditors and the
principal Sacklers—receive their bargained-for protection from collateral attacks on the Plan.  To
address concerns regarding the lack of specific identification of release recipients, Shareholder
Released Parties is defined to include the individuals and entities specifically identified on
Exhibit X to the Shareholder Settlement or that otherwise fall within one of the narrowly tailored
categories.  (See id.)  Moreover, the Plan specifically provides that persons that fall into one of

these categories receive a release <u>only</u> in their capacity as a related party or transferee of the Sacklers.  In other words, in addition to the general limitations described above applicable to <u>all</u> Shareholder Released Parties, <u>none</u> of these non-identified Shareholder Released Parties are released in any way from "conduct or actions **independent** of [their] capacity" as a related party. (*Id.* at § 1.1 (definition of "Shareholder Released Party").)  Recipients of funds from the Sacklers, for instance, are released only as transferees and only for claims to recover from them the funds transferred.  (*Id.*)  Furthermore, except for a tiny handful of such parties expressly identified on Exhibit X to the Shareholder Settlement, no financial advisor, attorney, accountant, investment banker, consultant, expert or other professional of the Sacklers is released by non-debtors pursuant to the Shareholder Releases.  (*See id.* at § 10.7(b).)

The Appellants' "descriptions" of the definition of "Shareholder Released Parties" omit critical limitations and details.  The U.S. Trustee, for example, makes much of the fact that Shareholder Released Parties include "unborn" descendants of the Sackler Families (UST Br. 13), but fails to explain how anyone could have a tort claim against an unborn individual for past conduct, much less a need to exercise police powers against her.  (*Id.*)  These individuals are of course included in the releases to ensure that funds they may receive in the future from their parents cannot be pursued—in other words to give effect to the core releases, not to expand them.  The DOJ points to the number of parties on Exhibit X of the Settlement Agreement seemingly as evidence of the releases' over breadth (DOJ Stmt. at 10), but fails to note that the individuals and entities listed on Exhibit X consist of Sackler family trusts and trustees, entities owned or controlled by the Sacklers, or officers, directors or advisors that have been or could be targets of litigation concerning the Debtors.  As the evidence at the confirmation trial established, the scope of the Shareholder Released Parties that benefit from the releases is critical to ensuring

that there is no avenue for litigants to circumvent or undermine the value-maximizing resolution in the Plan by pursuing ever-more attenuated parties for claims that are, in essence, claims against the Debtors or Sacklers for the Debtors' alleged wrongdoing.  Again, these parties are included to give effect to the core release, not to expand it.  In hundreds of settlements, the entirely typical use of phrases like "and their present and future officers, directors, employees, affiliates, representatives and advisors" would yield the identical and, in fact, broader list of "hundreds of related parties."

Fourth, after all of the above limitations are applied, the Shareholder Releases also overarchingly carve out "Excluded Claims" including (1) criminal claims, (2) income tax claims, (3) claims related to conduct of Sackler entities organized in Canada and not based upon conduct of the Debtors, and (4) claims against any party arising from such party's conduct after the Effective Date of the Plan.  These exclusions protect a wide-swath of claims from release and preserve, for example, the State Appellants' ability to prosecute any released party in a criminal action or to pursue any claims arising from any actions taken after the Effective Date.

H.      Notice, Solicitation, and Voting

Solicitation of the Plan commenced in June 2021.  (*See* App A0374 (Order Approving Disclosure Statement) ("**Disclosure Stmt. Order**").)

When votes were ultimately tallied, it became apparent that support for the Plan amongst the Debtors' creditors was overwhelming.  (App. A3385-86 (MBR) at 8-9.)  As Judge Drain noted, "votes on most [c]hapter 11 plans, even in large cases, number between a few and a few thousand."  (*Id.*)   Here, over 120,000 creditors voted, with more than 95% of the ballots cast and more than 96% of the amount of total voting dollars voted to accept the Plan.  (*See* App. A0735 (Pullo Decl., Ex. A.))  Each and every class of creditors overwhelmingly voted to accept the

Plan. The Debtors believe this to be the highest voter turnout in U.S. bankruptcy history—and certainly one that exceeds any reasonable expectation even in the largest chapter 11 cases.

IV.     **Confirmation Hearing and Order Confirming the Plan**

The confirmation hearing commenced on August 12, 2021. Arrayed against the extraordinarily broad consensus in support of the Plan was a small group of objectors, including eight States and the District of Columbia, that together amounted to less than one-fifth of one percent of the claimants in these cases, as well as the United States Trustee. The objectors raised several arguments, including that the Shareholder Settlement should not be approved, that the Shareholder Releases were illegal and rendered the Plan unconfirmable as a matter of law, and that the Plan was not in the "best interests" of creditors. Notwithstanding that its claims were not subject to the Shareholder Releases, the DOJ also filed a "statement" challenging them.

The trial record is extensive. Over the course of six full trial days, the Bankruptcy Court received the testimony of over 40 fact and expert witnesses. Thirty-five of these witnesses were introduced by the proponents and supporters of the Plan (of which nine had their direct, written testimony entered into evidence without any cross examination by the objectors, and the majority of whom were cross-examined for only a short period of time). The Bankruptcy Court also accepted into evidence over 2,800 exhibits. For their part, the objectors—now Appellants—proffered only 5 witness and a little over 350 exhibits, the bulk of which went to the underlying merits of the Pending Actions. The only non-adverse witness called by the Appellants—the expert called to opine on the Sacklers' wealth—was so trampled on cross examination that he all but conceded that his conclusions were invalid. (*See* Aug. 17, 2021 Conf. Hr'g Tr. at 170:14-208:2, *In re Purdue Pharma L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y.) The Bankruptcy Court then presided over more than two days of oral argument. On September 1, 2021, the Bankruptcy Court overruled each of the objections and confirmed the Plan in a six-hour, comprehensive

bench ruling that was later reduced to a written decision spanning more than 150 pages.  The

Bankruptcy Court's extensive factual findings—deeply rooted in the extraordinary factual

record—and holdings are described in greater detail in connection with the Debtors' response to

the Appellants' arguments in the Argument section.  But in brief:

- **<u>Notice</u>**:  The Bankruptcy Court found that notice of the confirmation hearing, including notice of the Plan's proposed release of third-party claims against the Shareholder Released Parties, was "sufficient" and "unprecedentedly broad."  With respect to the Shareholder Releases, in particular, the Debtors' notices, were "simple [and] in plain English," "contemplated a broad release of the Sacklers and their related entities of civil claims pertaining to the Debtors, including claims against them held by third parties," and reached an estimated 87% of the U.S. adult population an average of five times, including through billions of online and social media views.  (App. A3382-85 (MBR) at 5-8.)

- **<u>Pro Se Objections and Good Faith Under Section 1129(a)(3)</u>**:  The Bankruptcy Court addressed each of the *pro se* objections respectfully and carefully.  (*Id.* at 54-71.) Addressing a common thread throughout the *pro se* objections—that the Plan was somehow the "Sacklers' Plan"— Judge Drain observed that this was "simply misleading."  (*Id.* at 68.)  "This is <u>not</u> the Sacklers' Plan.  The Debtors are not the Sacklers' company anymore.  There is literally no evidence to the contrary – none."  (*Id.* (citing also Examiner's report confirming the same.)  As the Bankruptcy Court recognized, "these cases were driven as much, if not more, by the [UCC] and other creditors."  (*Id.* at 68-69.)

- **<u>Approval of the Shareholder Settlement</u>**:  The Bankruptcy Court determined that the Shareholder Settlement was fair and reasonable and in the best interests of the estates. The Plan comprised "many interrelated settlements . . . that would not be achievable if either of the settlements with the Sacklers fell away," including the "remarkabl[e]" agreement by all creditor constituencies (with the exception of the personal injury victims) to dedicate 100% of their recoveries to abatement."  (*Id.* at 71-72.)  "Without the $4.325 billion being paid by the Sacklers under the [P]lan and the other elements of the Sackler settlements, those other elements of the [P]lan would not happen.  The record is clear on that."  (*Id.* at 73.)

  Analyzing the *Iridium* factors, the Bankruptcy Court observed that he personally thought the settlement negotiated by the creditors might have been for a greater amount, but <u>found</u> that the Shareholder Settlement had been negotiated at arm's length, the level of transparency provided had been staggering, the settlement had garnered overwhelming support, the risks of pursuing litigation (and subsequent risks of collection) were great, and the alternative to settlement was likely liquidation of the Debtors and no recoveries for unsecured creditors.  (*Id.* at 78-103.)

For instance, the Bankruptcy Court found "[t]he [Shareholder Settlement] was clearly and unmistakably the result of arm's length bargaining" and the efforts of "three outstanding mediators" and was preceded by the "most extensive discovery process" that the Bankruptcy Court had ever seen. (*Id.* at 78.) With respect to the likelihood of complex and protracted litigation, the Bankruptcy Court acknowledged that, at first impression, the Sackler Families' aggregate net worth of over $11 billion might be seen to weigh against approval of the Shareholder Settlement. But the Sackler Families, the Bankruptcy Court noted, are "not a simple group of a few defendants." (*Id.* at 85.) They are instead a diffuse group consisting of many branches and "pods" with "widely scattered" assets held, in significant part, in many offshore spendthrift trusts. (*Id.*)

Moreover, the Bankruptcy Court noted that while the record contained evidence that the Sacklers were aware of the risk of opioid-related litigation against them and sought to "shield themselves," the amount of money actually recoverable by the estates is potentially limited by a number of factors, including the fact that Purdue had plead guilty in 2007, over 40% of the payments to the Sackler Families were made for the purposes of paying taxes (and thus arguably were made for fair consideration), and the statute of limitations would limit the reach back by the estates to most claims. (*Id.* at 92-94.)

- **Shareholder Releases**:  It is against this backdrop—simply omitted by the Appellants in their briefing before this Court—that the Bankruptcy Court approved the Shareholder Releases.  After rejecting threshold arguments that it lacked jurisdiction and power to approve the Shareholder Releases that the Appellants target in their respective appeals, the Bankruptcy Court then concluded that the non-consensual release of a handful of holdout creditors was critical to the Plan, and if such claims were not channeled and released, the Plan would collapse. (*Id.* at 135.)  In particular, the Bankruptcy Court found that the circumstances of the chapter 11 cases were "unique," the settlement payments from the shareholders were "substantial," the Plan was overwhelmingly accepted, the Shareholder Releases, as narrowed by the Court, were "narrowly tailored" to ensure the success of the Plan, and on balance, the settlement was fair to the non-consenting claimants. (*Id.* at 135-37.)

  The Bankruptcy Court also found that the non-consenting creditors' claims "ultimately derive from the Debtors' conduct to the extent that as a legal matter one or more of the Sacklers can be said to have directed it or have had the knowledge and power to have directed it but failed to do so." (MBR at 139.)  The Bankruptcy Court also reiterated that without Shareholder Releases, the estates could not secure the Shareholder Contribution, and without the Shareholder Contribution, "the [P]lan would unravel." (*Id.* at 143.)

- **Best Interests:**  The Bankruptcy Court held that the Plan was in the "bests interests" of creditors under section 1129(a)(7), including because the Bankruptcy Court found as a matter of fact that "the objectors' aggregate net recovery on their claims against the Debtors <u>and</u> the [S]hareholder [R]eleased [P]arties would be materially less than their recovery under the Plan." (*Id.* at 143-46 (emphasis in original).)

Acknowledging that case law only required consideration of "hypothetical recovery from non-debtor sources" where those recoveries are "neither speculative or incapable of estimation," the Bankruptcy Court rejected the argument that the Plan fails the best interests test because the Debtors did not estimate the value of the objectors' direct claims. (*Id.* at 146.) The Bankruptcy Court noted that "given the evidence regarding the strengths and weaknesses of the [direct] claims, including the cost of pursuing them, the risks of collection, and the dilutive effect of all of the other litigation that would be pursued by all of the other creditors in these cases, including all of the other states and governmental entities who are otherwise agreeing to the plan that would have the same types of third-party claims, as well as the Chapter 7 trustee on behalf of the estate, . . . . no additional evidence is required." (*Id.* at 147-48.)

## V.    **The Appeals**

Now, the U.S. Trustee and a tiny number of the Debtors' over 614,000 creditors—including eight states and the District of Columbia, certain Canadian entities, and three *pro se* individuals—who altogether constitute less than 0.01% of voting creditors and less than 0.003% of all creditors—filed timely notices of appeal of the Confirmation Order.[10] The Appellants primarily contest, in what are largely rehashes of their confirmation objections, the Bankruptcy Court's approval of the third-party releases that are the linchpin of the Debtors' Plan, although they also raise a number of other ancillary issues.

## SUMMARY OF ARGUMENT

The Bankruptcy Court's order confirming the Debtors' Plan (as well the Disclosure Statement Order and Advance Order) should be affirmed because the Court correctly determined that (i) the third-party releases satisfy the requirements of Second Circuit law; (ii) the Shareholder Settlement is reasonable and in the best interests of the Estates; (iii) the Plan satisfies the requirements of section 1129(a)(7); and (iv) approval of the Plan was proper as to the Canadian Appellants.

---

[10] The U.S. Trustee also appealed the Disclosure Statement Order and the Advance Funding Order.

For decades, the Second Circuit has recognized that the broad equitable authority of bankruptcy courts to modify debtor-creditor relationships—including the Court's authority under sections 105(a) and 1123 of the Bankruptcy Code—includes the power to confirm plans containing nonconsensual third-party releases. *See Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 141 (2d Cir. 2005) ("**Metromedia**"); *see also SEC v. Drevel Burnham Lambert Grp., Inc.*, *(In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285, 293 (2d Cir. 1992) ("**Drexel**") (same); *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89, 93-94 (2d Cir. 1988) ("**Johns-Manville**").  On the record of an eight-day trial, which involved the testimony of over 40 witnesses and tens of thousands of pages of evidence, the Bankruptcy Court correctly found that the Shareholder Releases are "important to the success of the Plan" given the "unique" circumstances of the case—they are therefore appropriate under governing law.  *See Metromedia*, 416 F.3d at 142-43.  And the Appellants fail to identify any clearly erroneous factual finding could justify reversal.  Moreover, the grab-bag of federalism doctrines that the Appellants cite have no application to a basic exercise of federal bankruptcy law nor justify inventing a new exception that would give governmental actors the right to veto any plan, even if supported by tens or hundreds of thousands of others.  As for the claim that the Shareholder Releases endanger the public welfare or health, they do not, as the Bankruptcy Court correctly found.

Nor did the Bankruptcy Court abuse its discretion in determining—on the basis of the all but uncontroverted and overwhelming trial record—that the Shareholder Settlement is fair, reasonable and in the best interests of the estates.  There is simply no evidence to support Maryland's assertion that the Bankruptcy Court's issuance of the preliminary injunction at the

outset of the chapter 11 cases—which applied to the states' claims against the Sacklers—somehow fatally infected the arms-length bargaining process that produced the Shareholder Settlement reached after years of mediation and litigation.  Moreover, the preliminary injunction was both supported by the UCC and the AHC, and affirmed as lawful and proper by this Court.

Relatedly, in reliance on the Debtors' liquidation analysis, and evidence regarding the value of the Debtors' businesses, the obstacles to collection against the Sacklers, and the dilutive effects of uncoordinated litigation, the Bankruptcy Court correctly found—as the trier of fact—that in a liquidation scenario "the objectors' aggregate net recovery on their claims against the Debtor and the shareholder released parties would be materially less than their recovery under the [P]lan."  (MBR at 143.)  This is not surprising since the only evidence and testimony on this was from plan supporters.  Moreover, as the Bankruptcy Court correctly concluded, the plain meaning of section 1129(a)(7) does not require the Court to consider the value of claims creditors hold against third-parties.  Therefore, the Bankruptcy Court correctly determined, with two independent rulings, that the Plan satisfies the requirements of section 1129(a)(7).

Finally, the Bankruptcy Court's determination that it was appropriate to bind the Canadian Appellants—who at this late date still either misunderstand or mischaracterize the releases as to Purdue Canada—to the release provisions in the Plan and that the classification scheme under the Plan was proper are correct.

The Bankruptcy Court's order confirming the Debtors' Plan should be affirmed.

## **ARGUMENT**

### I.    **The Bankruptcy Court Correctly Determined That the Shareholder Releases Are Appropriate Under Controlling Second Circuit Law**

Under 33 years of consistently applied Second Circuit law, courts in the Second Circuit can enjoin and release litigation against non-debtors when that "plays an important part in the

debtor's reorganization." *Metromedia*, 416 F.3d at 141; *see also Drexel*, 960 F.2d at 293

(same); *Johns-Manville*, 837 F.2d at 93-94 (holding that section 105(a) "has been construed

liberally to enjoin suits that might impede the reorganization process" and affirming injunction

of third-party claims against non-debtor insurers).  Six other Circuits have similarly recognized

that the Bankruptcy Code authorizes such channeling injunctions and third-party releases.

*Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 983-85 (1st Cir. 1995); *In re Millennium

Lab Holdings II, LLC.*, 945 F.3d 126, 137-40 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr.

v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020); *Nat'l Heritage Found., Inc. v.

Highbourne Found.*, 760 F.3d 344, 350-51 (4th Cir. 2014), *cert. denied*, 135 S. Ct. 961 (2015);

*In re A.H. Robins Co., Inc.*, 880 F.2d 694, 701-02 (4th Cir. 1989); *In re Dow Corning Corp.*, 280

F.3d 648, 656-58 (6th Cir. 2002); *Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns,

Inc.)*, 519 F.3d 640, 655-58 (7th Cir. 2008); *SE Property Holdings, LLC v. Seaside Eng'g &

Surveying, Inc. (In re Seaside Eng'g & Surveying, Inc.)*, 780 F.3d 1070, 1076-79 (11th Cir.

2015); *see also In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 206 (3d Cir. 2011).

Channeling injunctions and third-party releases are, for good reason, an established part

of bankruptcy jurisprudence in extraordinary cases.  Where, as here, and in a number of other

mass tort cases, claims against the Debtors cannot be equitably treated without cutting through a

Gordian knot of claims against related parties closely tied to the debtors, the Bankruptcy Code

authorizes courts to enjoin and release litigation among non-debtor parties to enable a value-

maximizing resolution for all.  *See Johns-Manville*, 837 F.2d at 93-94 (affirming use of third-

party releases to resolve mass tort bankruptcy); *In re Dow Corning Corp.*, 287 B.R. 396, 402-417

(E.D. Mich. 2002) (same); *In re TK Holdings Inc.*, No. 17-11375, 2018 WL 1306271 (Bankr. D.

Del. Mar. 13, 2018) (approving same).

It is similarly well-established that the power to enjoin and release third-party litigation is rooted in the Bankruptcy Code's broad authority to modify debtor-creditor relationships in a plan.  Under section 1123, a plan <u>must</u> provide adequate means for the plan's implementation "[n]otwithstanding any otherwise applicable nonbankruptcy law," 11 U.S.C. § 1123(a)(5), and further <u>may</u> include "any other appropriate provision not inconsistent with provisions of this title," 11 U.S.C. §1123(b)(6).  And, under section 105(a) of the Code, bankruptcy courts enjoy the broad authority to "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Sections 1123 and 105(a) together provide broad "residual authority" to craft appropriate plans of reorganization consistent with "the traditional understanding that bankruptcy courts, as courts of equity, have broad authority to modify creditor-debtor relationships."  *United States v. Energy Resources Co.*, 495 U.S. 545, 549 (1990); *see also Pepper v. Litton*, 308 U.S. 295, 296 (1939) (recognizing bankruptcy court's "broad equitable powers").  As a result, this Court, the Second Circuit, and a majority of other Courts of Appeals have all concluded that the Bankruptcy Code authorizes [bankruptcy] courts confirming a plan to enjoin and non-consensually release claims between non-debtors when necessary and appropriate to adjust the debtor-creditor relationship consistent with the Code. *See, e.g.*, *In re Kirwan Offs. S.à.r.l.*, 592 B.R. 489, 511 (S.D.N.Y. 2018) (recognizing that the authority to enter non-consensual third-party releases is "derived from . . . bankruptcy law," "subject to 11 U.S.C. §§ 1129(a)(1), 1123(b)(5) & (6), 105, and 524(e)" and "flow[s] from a federal statutory scheme") (citations omitted), *aff'd sub nom. In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019); *see also In re Airadigm Commc'ns, Inc.*, 519 F.3d at 657 ("In light of these provisions [§§ 105(a) and 1123(b)(6)], we hold that this 'residual authority' permits the bankruptcy court to release third parties from liability to participating creditors if the release is

'appropriate' and not inconsistent with any provision of the bankruptcy code."); *In re Dow Corning Corp.*, 280 F.3d at 656 (same).

Over more than 30 years, the Second Circuit has repeatedly affirmed that non-consensual third-party releases and channeling injunctions may be imposed when essential to a value maximizing reorganization.  In *Johns-Manville*, for example the Second Circuit upheld an injunction that channeled all claims against Johns-Manville's insurance policies—the estates' largest asset—to a settlement trust.  *Johns-Manville*, 837 F.2d at 92.  MacArthur, a distributor of Manville's asbestos products "claim[ed] to be a coinsured under the settled policies by virtue of 'vendor endorsements' contained in the policies," *id.* at 92, and argued that as a beneficiary of "separate and distinct" state-created rights under the policies, "the [b]ankruptcy [c]ourt lacked jurisdiction and authority to enjoin suits against Manville's insurers," *id.* at 91-92.  The Second Circuit rejected this argument.  Recognizing that section 105(a) must be "construed liberally to enjoin suits that might impede the reorganization process," and because "the insurance settlement/injunction arrangement was essential . . . to a workable reorganization," the Court of Appeals held that the injunction against MacArthur "[fell] well within the bankruptcy court's equitable powers."  *Id.* at 93-94.

The District Court and Second Circuit reaffirmed this holding in *In re Drexel Burnham Lambert Group, Inc.*  There, in settlement of SEC charges, Drexel agreed to create a $350 million fund to compensate investors.  130 B.R. 910, 913 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992).  Drexel contributed $200 million, but filed for bankruptcy before the remainder came due.  *Id.*  In the bankruptcy proceedings, Drexel reached a comprehensive settlement with the SEC and approximately 15,000 other claimants in which Drexel agreed to contribute the remaining $150 million to the SEC fund which, together with Drexel's remaining assets, would

be divided among the various claimants.  *Id.*  A key feature of the settlement was a permanent injunction barring future lawsuits against Drexel's former directors and officers.  *Id.* at 928.  The Court of Appeals upheld the third-party release and injunction as important to the plan because the "[s]ettlement [a]greement [was] unquestionably an essential element of the [debtors'] ultimate reorganization" and the injunction, in turn, was "a key component of the [s]ettlement [a]greement."  960 F.2d at 293.  "Without the injunction," the Second Circuit recognized, "the directors and officers would be less likely to settle," obstructing a resolution that would maximize funds available to those whom the debtor had injured.  *Id.*

Most recently, in *Metromedia*, the Second Circuit again reaffirmed that third-party releases and channeling injunctions are appropriate in "rare" circumstances, and identified a number of such circumstances, including where (1) the estate received substantial consideration; (2) the enjoined claims were channeled to a settlement trust rather than extinguished; (3) the enjoined claims would directly impact the debtor's reorganization by way of indemnity or contribution; or (4) the plan otherwise provided for the full payment of the enjoined claims. *Metromedia*, 416 F.3d at 141-42 (collecting cases); *see also In re Karta Corp.*, 342 B.R. 45, 54 (S.D.N.Y. 2006) ("Non-debtor releases have been approved by courts in this Circuit where, for example, the estate received substantial consideration in return for the release, and where the enjoined claims were 'channeled' to a settlement fund rather than extinguished.").  The Second Circuit, however, emphasized that the inquiry is "not a matter of factors and prongs." *Metromedia*, 416 F.3d at 142.  Rather, the touchstone of the inquiry is a determination that "unusual" or "unique" circumstances exist that "render the release terms important to the success of the plan."  *Id.* at 142-43.

A.    **The Bankruptcy Court Correctly Concluded that the Shareholder Releases Satisfy the Requirements of Second Circuit Law**

1.    **The Bankruptcy Court Made Detailed Findings That the Shareholder Releases Are Essential to the Debtors' Abatement-Centric Reorganization**

In light of controlling Second Circuit law, the task before the Bankruptcy Court was to determine whether the Plan's third-party releases and channeling injunctions were "important to the success of the [p]lan" given the "unusual" or "unique" circumstances of the case.  *See Metromedia*, 416 F.3d at 143.  After an eight-day trial, which involved the testimony of 41 witnesses and the introduction of tens of thousands of pages of exhibits into evidence, the Bankruptcy Court's detailed factual findings leave no doubt that the Plan's third-party releases, including the Shareholder Releases, were not only important, but in fact essential, to the Plan and appropriate under governing law.

<u>First</u>, the Bankruptcy Court found that the cases—perhaps the most complex in chapter 11 history (App. A3512 (MBR) at 135)—present "unique" and "unusual" circumstances that justify non-consensual releases due to the inextricable interrelation between the claims against the Debtors and against the Shareholder Released Parties.  (*Id.* at 2-3 ("These cases are complex also because the Debtors' assets include enormous claims against their controlling shareholders, and in some instances directors and officers, who are members of the Sackler family, whose aggregate net worth, though greater than the Debtors', also may well be insufficient to satisfy the Debtors' claims against them and other very closely related claims that are separately asserted by third parties who are also creditors of the Debtors.").)  In particular, the Bankruptcy Court found that the facts underlying the Shareholder Released Parties' liability to the Debtors' creditors substantially overlapped with the facts underlying their liability to the Debtors on the estate causes of action—the most significant asset of the estate.  (*Id.* at 103-04 ("The third-party claims

that the plan would release and enjoin are very closely related on the facts to the estates' claims

for alter ego, veil piercing, and breach of fiduciary duty/failure to supervise settled under the

plan").)  These complex interrelationships made this case the "rare" case in which restructuring

of the debtor-creditor relationship would not be possible without third-party releases.  *See In re*

*Kirwan*, 592 B.R. at 511 (explaining that "resolving . . . claims against third parties will be

integral only in 'rare cases'") (citing *Metromedia*, 416 F.3d at 141).

Second, the Bankruptcy Court found that the $4.325 billion settlement payment that the

Sackler Families and their related entities agreed to make in satisfaction of claims of the Debtors

and its creditors was both "substantial" and critical to confirmation of the Plan.  Indeed, the

settlement payments from the Sacklers far exceed the going concern valuation of the Debtors,

which was estimated to range between $1.6 billion to $2.0 billion, (App. 1755-56 (JX-3035)

(Declaration of Joseph Turner) ("Turner Decl.") ¶ 22), and four times the amount of cash that the

Debtors' have on hand, (Debtors' Corporate Monthly Operating Report (Dkt. No. 3800) at 1-3).

Moreover, the trial record demonstrated that the critical intercreditor settlements were expressly

contingent upon settlement payments by the Sackler Families, and that, in particular, the states

would not agree to allocate defined cash amounts to private creditors without a settlement with

the Sacklers.  Consequently, the Bankruptcy Court found that the many intercreditor settlements

under the Plan depended upon the Shareholder Settlement.  (App. A3382-85 (MBR) at 73 ("Each

of those settlements hinges on at least the amount of money to be distributed under the [P]lan

coming from the Sacklers and their related entities in return for (x) the Debtors' settlement and

(y) the third-party claims settlement."); *see also* App. A3565 (FOF/COL) at 29 ("The Plan

Settlements, including the intercreditor allocation agreements and settlements reached in

Mediation, are premised upon the consideration under the Shareholder Settlement Agreement,

and the term sheets agreed to by the private claimants in Mediation were conditioned on the participation of the Sackler Families in the Plan"); App. 1751-53 (Turner Decl.) ¶¶ 13-16 (finding that the absence of a shareholder settlement would create "a substantial risk that the Debtors or their successors would not be able to satisfy their payment obligations under the [p]rivate [e]ntity [s]ettlements").)

The Bankruptcy Court found that, without the settlement payments from the Sacklers and the many non-monetary obligations the Sacklers assumed pursuant to the Shareholder Settlement, "[t]he private/public settlement would fall apart and the abatement settlements likely would fall apart for lack of funding and the inevitable fighting over a far smaller and less certain recovery with its renewed focus on pursuing individual claims and races to collection." (App. A3450-51 (MBR) at 73-74; *see also id.* at 135 ("Without the settlement payments, . . . the plan would unravel, including the complex interrelated settlements that depend upon the payments being supplied under the settlement in addition to the non-monetary consideration under it").) The Shareholder Releases were thus critical to the abatement-centric plan because "the [S]hareholder [R]eleased [P]arties are not going to agree to provide the consideration under the settlement without receiving the [S]hareholder [R]elease[s] in return." (*Id.* at 136.) The Bankruptcy Court as the trier of fact also found that, without the releases, "the [P]lan would unravel and the Debtors' cases would likely convert to cases under [c]hapter 7 of the Bankruptcy Code." (*Id.* at 141.) These findings are not contestable as there is no evidence supporting any other conclusion.

Third, the Bankruptcy Court found that a collapse of the Plan and interrelated settlements would catastrophically reduce the amount of value available for abatement and victim compensation. The court credited the testimony of the Debtors' liquidation expert and concluded

that "[u]nder the most realistic scenarios described in that analysis, there would literally be no recovery by unsecured creditors from the estates in a [c]hapter 7 liquidation, which is . . . the most likely result if the settlements with the shareholder released parties were not approved, given the likely unraveling of the heavily negotiated and intricately woven compromises in the plan and the ensuing litigation chaos." (*Id.* at 90.)  Even in the "best case" liquidation scenario, the court found, unsecured creditors would share a "small" recovery of only $699 million in value, as compared to billions provided under the Plan.  (*Id.* at 141-42.)

Fourth, the Bankruptcy Court found that continued litigation of opioid claims against the Shareholder Released Parties would diminish or destroy the value of the Debtors' estates, and, consequently, the recoveries to the Debtors' creditors.  The court identified no fewer than five distinct mechanisms through which continued litigation would negatively impact the *res* of the Debtors' estates, even if it somehow were possible to reorganize the Debtors without a shareholder resolution.  First, pursuit of litigation against members of the Sackler Families would "directly affect . . . the Debtors' ability to pursue the states' own closely related, indeed fundamentally overlapping claims" against the Sacklers (*id.* at 111), thereby imperiling what may be the single largest asset of the estate.  Second, continued litigation against the Sackler Families would necessarily "implicate NewCo and could have an impact on the operations of NewCo and NewCo's ability to support abatement," (App. A3565-66 (FOF/COL) at 29-30.) Third, some, but not all, of that negative impact would also result, as the Bankruptcy Court found, from the assertion of rights to indemnification and contribution, or, fourth, claims against shared insurance—all of which would impact and could reduce the value of the estates.  (App. App. A3844 (MBR) at 111.)  Fifth, and finally, even if—contrary to fact—the intercreditor allocations could have been implemented without a Shareholder Settlement, continued creditor

litigation against the Sacklers could undo those carefully-negotiated agreements.  (App. A3565 (FOF/COL) at 29 ("Without the [Shareholder] Releases, and therefore without the consideration under the Shareholder Settlement Agreement, there could be no certainty that such agreed up allocations would not be undermined by collateral litigation").)  Indeed, as six creditor groups represented at the confirmation hearing, no deal would be possible without broad third-party releases and they could not, and would not, support a plan that permitted the remaining dissenting states to opt out.  (*See, e.g.*, App. A4615 (Aug. 23, 2021 Confr. Hr'g Tr. 58:8-25) (Debtors) (noting that the UCC, AHC, the MSGE, the PI Group, the NAS Committee, and the Hospitals had authorized the Debtors to state on the record that those groups would "not support a plan that allows for opt-outs that are material along the lines requested by the objecting states").)

Fifth, the Bankruptcy Court both significantly (and repeatedly) narrowed the releases into their final form and found that the final releases were tailored to the scope required to allow the Debtors' reorganization.  As noted above, the Bankruptcy Court unsurprisingly concluded that the claims subject to the Shareholder Releases and Channeling Injunction overlapped with the claims against the Debtors (and the Debtors' claims against the released third parties).  To further ensure that the Shareholder Releases apply only to those third-party claims that must be resolved to restructure the debtor-creditor relationship, the Bankruptcy Court imposed a further requirement:  that only claims for which a Debtor's conduct, or a claim asserted against a Debtor, was a "legal cause" or a "legally relevant factor" would be subject to an involuntary third-party release.  (App. A3505-08, A3534 (MBR) at 128-31, 157 (reviewing case law, including this Court's decision in *In re Karta Corp.*, and tailoring language of the Plan's release in recognition that scope of release must bear a "legally relevant" relationship to the debtors).

Sixth, the Bankruptcy Court found that the Plan, including the Shareholder Releases, was supported by every organized creditor constituency in the cases and an overwhelming majority of voting creditors, including each class of opioid claimants.  Approximately 95% of votes cast were in favor of confirmation; on a class-by-class basis every voting class voted "overwhelmingly" in favor of the plan.  (*Id.* at 9, 136.)  In the two personal injury classes, Class 10(a) and Class 10(b), 98% and 95.7% of votes cast were in favor of confirmation.  (MBR at 9.)  And, the acceptance rate of the non-federal governmental claimants was more than 96%.  (*Id.* at 71, 83, 154; *see also* App. A0735 (Pullo Decl.) Ex. A.)

## 2. Appellants Identify No Clear Errors That Could Undermine the Bankruptcy Court's Conclusion

While Appellants' principal argument is that *Metromedia* itself is wrong or subject to a heretofore unexpressed exception for "police power" actions (arguments addressed in Section I(B)(2), *infra*), Appellants also assert that the Bankruptcy Court erred in the factual finding that the releases are essential to the restructuring and justified under *Metromedia* and its predecessors.  Their basic assertion is that creditors' claims against the Sacklers could somehow be excised from the Plan and the Debtors' reorganized without any payments from or resolution of claims against the Sacklers.  (*E.g.*, Md. Br. at 56 (Oct. 26, 2021), Dkt. No. 100 ("There can be no question that Debtors would be able to successfully reorganize here without the Sackler contribution and in the absence of providing the Sackler family members and those who have made no contribution . . . releases . . ."); *id.* at 4 ("Even though a different plan could have likely been confirmed more quickly . . ."); Appealing States Br. at 30 (Oct. 27, 2021), Dkt. No. 101 (arguing that the Bankruptcy Court erred in concluding that the releases are important "based solely on the Sacklers demand for blanket immunity as a condition to contributing to the estate"); UST Br. at 51 (Oct. 25, 2021), Dkt. No. 91 (claiming "[i]t [wa]s not established that the Non-

Debtor releases were necessary to reorganize Purdue").)  This unsupported and unsupportable canard is contrary to the overwhelming evidence at trial, the Bankruptcy Court's exhaustive factual findings, and the states' own conduct.  It is no surprise that this truly astonishing factual claim is made only in briefs that cite literally nothing—and certainly no party under oath—to support it.

The trial evidence demonstrated that the Plan could not be funded without the payments under the Shareholder Settlement, and that, without that contribution, the Debtors would likely be forced to liquidate in a manner that left nothing or, at best, billions of dollars less in recoveries to opioid claimants.  Judge Drain specifically found that "[w]ithout the $4.325 billion being paid by the Sacklers under the Plan and the other elements of the Sackler settlements . . . [t]he private/public settlement would fall apart and the abatement settlements would likely fall apart for lack of funding," and "inevitable fighting [would occur] over a far smaller and less certain recovery with its renewed focus on pursuing individual claims and races to collection."  (MBR at 73-74.)  The unrebutted testimony of Joseph Turner, the Debtors' investment banker, established that without the payments under the Shareholder Settlement, the estates are not likely to have sufficient value to satisfy the various cash-out agreements reached with key private plaintiffs groups during the Phase One Mediation, and, thus, the Debtors could not satisfy the DOJ's Forfeiture Judgment upon emergence.  (App. A1752-53 (Turner Decl.) ¶¶ 15-16.)  Likewise, as the Bankruptcy Court found, the <u>uncontested</u> testimony of Jesse DelConte, the Debtors' financial advisor, established that "[u]nder the most realistic scenarios described in that analysis, there would literally be no recovery by unsecured creditors from the estates in a [c]hapter 7 liquidation," which Judge Drain determined would be "the most likely result if the settlements with the Shareholder Released Parties were not approved, given the likely unraveling of the

heavily negotiated and intricately woven compromises in the plan and the ensuing litigation chaos."  (App. A3467 (MBR) at 90.)

What's more, despite their unsupported and unsupportable assertions that the Shareholder Settlement is not essential, all of the states (including the State Appellants) concluded Phase One Mediation with agreements <u>conditioned</u> on the participation of the Sackler Families in the resolution of the cases.  This was expressly noted in the final report filed on the docket by the mediators at the conclusion of the Phase One Mediation.  (App. A0122 (Phase 1 Mediators' Report) ¶ 12.)  Representatives of the states that support the Plan and the UCC similarly testified under oath that the intercreditor agreements could not have been reached without payments from the Sacklers.  (*See, e.g.*, App. A1817 (Guard Decl.) ¶ 67 ("Without the availability of the Sackler assets, compromise between the Non-Federal Public Claimants and the Private Claimants would have not been possible"); App. A4608 (Aug. 16, 2021 Confr. Hr'g Tr. 115:1-5, 143:14-144:10 (Atkinson) ("The UCC believes, with conviction, that the terms of the [P]lan represent the only viable conclusion for the [c]hapter 11 cases . . .").)

Appellants' next contention is that the Bankruptcy Court erred in concluding as the trier of fact that the $4.325 billion shareholder settlement payment is "substantial" because it is not "substantial compared to the total liability and the wealth remaining with them."  (Appealing States Br. at 35.)  The Appealing States and the U.S. Trustee also argue that the Shareholder Releases are inappropriate because the Plan does not provide for full payment on the released claims.  (Appealing States Br. at 35; UST Br. at 52.)  But these are simply rehashes of arguments the Bankruptcy Court rejected.  The claims asserted against the Debtors are in the tens of trillions of dollars (or more).  (*See* App. A0730 (Pullo Decl. (Aug. 8, 2021), Dkt. No. 3372) ¶ 8.)  The Bankruptcy Court "carefully considered" the "aggregate amount of claims asserted against the

Sacklers or the aggregate amount of the wealth" and acknowledged that the settlement "leaves the Sackler [F]amily members in the aggregate with substantial wealth." (App. A3382-85 (MBR) at 58, 136-37.)   Nevertheless, the Bankruptcy Court concluded, after an exhaustive review of the fairness of the settlement and the impediments to collection, that the Shareholder Settlement would be preferable to the alternative, because "if [the Bankruptcy Court] denied confirmation of the [P]lan, the objectors' aggregate net recovery on their claims against the Debtors and the Shareholder Released Parties would be materially less than their recovery under the [P]lan." (App. A3382-85 (MBR) at 143; *see also* Section I(A)(1), *supra*.)   As the Bankruptcy Court found, there could be "serious . . . problems that would be faced in collection that the [P]lan settlements materially reduce." (App. A3476 (MBR) at 99.)   For example, the amount of money actually recoverable by the estates was potentially limited by a number of factors, including the fact that Purdue had plead guilty in 2007 and resolved issues related to its pre-2007 conduct, over 40% of the payments to the Sackler Families were made for the purposes of paying taxes (and thus arguably were made for fair consideration), and the statute of limitations might limit the reach back by the estates. (*See* App. A3469-71 (MBR) at 92-94.)

Appellants also attempt to minimize the negative impact that future litigation would have on the estates by focusing solely on indemnification and contribution claims, and now make the factual assertion that "the Sacklers undisputed bad acts would invalidate any indemnity and insurance claims." (Appealing States Br. 32.)   Of course, indemnity and contribution are far from the only impacts that such litigation would have on the estates: as described above, such litigation would have no fewer than five concrete impacts on the estates, including that it would potentially hinder the Debtors' efforts to monetize the estates' valuable claims against the shareholders, which are predicated on the existence of that very liability.

But even addressed on its own terms, Appellants' arguments assume a scenario where they have in fact prevailed on their direct actions <u>and</u> the further scenario that they prevail in all subordination litigation against every Sackler related party before the Bankruptcy Court.  As the Bankruptcy Court concluded, there can be no guarantee of that outcome (*see* App. A3466-68 (MBR) at 89-91), and "[l]itigation over a disputed indemnification or contribution claim is itself an effect upon the [e]state," (App. A3561-62 (FOF/COL) at 25-26).  The Appealing States' only response is pure speculation.  They assert that the Debtors' insurance coverage potentially would not be implicated by suits against related parties involving the Debtors' conduct.  (Appealing States Br. at 32.)  They also contend the "releases cover potentially thousands of individuals and entities who have no plausible indemnity claims against Purdue."  (Appealing States Br. at 33.) Again, as discussed further below in connection with the Appellants' jurisdictional arguments, these aspirational factual assertions are directly contradicted by the trial evidence and the Bankruptcy Court's clear factual findings: "[l]itigation of [the Shareholder Released Claims, as narrowed by the Bankruptcy Court] could deplete the value of certain insurance policies, could lead to the assertion of indemnification and contribution claims against the [e]states, and could prejudice the [e]states or the Master Dis[bursement] Trust [("**MDT**")] (and therefore reduce the value available for distribution to the Creditor Trusts) in future litigation of such claims or causes of action."  (App. A3561-62 (FOF/COL) at 25-26; App. A3488 MBR at 111 ("[T]he third party claims that are covered by the [S]hareholder [R]elease[s] under the [P]lan . . . directly affect the *res* of the Debtors' estates, including insurance rights [and] the Shareholder Released Parties' rights to indemnification <u>and contribution</u>") (emphasis added).)  These potential impacts on the estates are far more than sufficient to justify a third-party release.  *See, e.g.*, *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (permitting third-party

release for claims that trigger indemnification obligations that arose before the bankruptcy); *In re Adelphia Commc'ns Corp.*, 368 B.R. at 267 (approving third-party releases for "the enjoined claims [that] indirectly impact[ed] the debtor's reorganization by way of indemnity or contribution").

## B.   The Appellants' Attempts to Avoid Application of Second Circuit Law Fail

What remains of the Appellants' arguments is that, notwithstanding the detailed factual findings above that establish that the third-party releases are essential to the Plan, such releases are per se unlawful such that the Plan must be consigned to failure.  Those arguments are without merit.

### 1.   Third-Party Releases Are Permitted in the Second Circuit

The U.S. Trustee (and the DOJ in whatever capacity it has appeared) contend that third-party releases are categorically prohibited under the Bankruptcy Code.  (*See* UST Br. 38-50; DOJ Stmt. at 30 ("Despite *Metromedia*, it is the Government's position that involuntary third-party releases are not authorized by the Bankruptcy Code, and thus the Shareholder Release here is unlawful." (emphasis added).)  This assertion—despite the law being "x," make it not "x"— should be rejected because it is simply not the law in the Second Circuit, where it is well established that third-party releases are permissible under appropriate and unique circumstances. *See Metromedia*, 416 F.3d at 141-43; *Drexel*, 960 F.2d at 293.  It also is not the law in the substantial majority of other Circuits, which similarly permit third-party releases.

Moreover, the U.S. Trustee and Maryland advance the meritless claim that *Metromedia* should be ignored because its holding regarding the availability of nonconsensual releases is non-binding "dicta" or because the case was decided on other grounds.  (UST Br. at 50; Md. Br. at 55 ("*Metromedia's* dictum . . .").)  That argument is frivolous.  The Second Circuit itself describes *Metromedia* as holding that nonconsensual third-party releases are authorized in

appropriate circumstances.  *See In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 93 n.12 (2d

Cir. 2014) ("In *In re Metromedia Fiber Network, Inc*., <u>we held</u> that a bankruptcy court could

permit the nonconsensual release of creditors' claims against third parties upon a finding of

'truly unusual circumstances' that 'render the release terms important to [the] success of the

[underlying bankruptcy reorganization plan].'" (emphasis added)); *In re Karta Corp*., 342 B.R.

at 54 ("In *Metromedia,* <u>the Second Circuit held</u> that . . . non-debtor releases . . . are proper only

in rare cases.") (quotation omitted and emphasis added); *In re Kirwan Offices S.à.r.l*., 592 B.R.

at 503-12 (affirming approval of non-debtor releases in confirmation order because was one of

the "rare cases" under *Metromedia* where the Second Circuit "permit[s] them"); *In re Stearns*

*Holdings, LLC*, 607 B.R. 781, 787 (Bankr. S.D.N.Y. 2019) ("Applying *Metromedia*, courts in

this District have held that a non-debtor release may be justified . . .").  Bankruptcy and district

courts have faithfully applied *Metromedia's* holding for years, and not one has ever suggested

that it is nonbinding dicta.

## 2.    There Is No "Police Power" Exception to Metromedia

For their part, the State Appellants urge this Court to craft a brand-new exception to

*Metromedia* for so-called "police power" claims.  (Appealing States Br. at 11-27; Md. Br. at 13,

53-54; Cal. Br. at 7-10 (Oct. 26, 2021), Dkt. No. 99.)  Their argument is ultimately premised on a

grab bag of inapposite statutory provisions, out-of-context case law, and inapplicable legal

doctrines—some of which, if accepted, would not just prohibit third-party releases of police

power actions but also third-party releases more generally, directly contrary to binding circuit

precedent.  The Bankruptcy Court correctly held that the State Appellants' requested police

power exception is without support (App. A3526-34 (MBR) at 149-57), and this Court should

likewise reject it.

>    **(i)     Third-Party Releases of So-Called Police Power Actions Do Not
>             Violate and Are Not Otherwise Inconsistent with the Bankruptcy
>             Code**

As they did before the Bankruptcy Court, the State Appellants cite a number of isolated provisions of the Bankruptcy Code that they claim demonstrate that third-party releases of police power actions are inconsistent with or contravene the Code. (Appealing States Br. at 14-17, 25-27; Md. Br. at 48-54.) Of course, the provisions of the Bankruptcy Code pursuant to which the Plan was confirmed and third-party releases were imposed draw no distinction between claims held by states and other parties. (App. A3526 (MBR) at 149 ("In certain carefully delineated instances, the Bankruptcy Code and the Judicial Code recognize the police power of states and other governmental units, but only in those limited contexts.") (emphasis added).) Unsurprisingly, none of the provisions cited by the State Appellants supports the proposition that a release of police power claims—let alone money damage claims for past conduct—contravenes the Code, and the first actually establishes precisely the opposite.

Section 362(b)(4), for example, provides a limited exception to the automatic stay for police power actions. *See* 11 U.S.C. § 362(b)(4). The State Appellants contend that this provision reflects "Congress' intent not to displace the [S]tates' exercise of police powers through litigation." (Md. Br. at 50; *see* Appealing States' Br. at 15.) Not so. Section 362(b)(4), as the Bankruptcy Court correctly held, provides only a "limited exception" to the automatic stay. (App. A3382-85 (MBR) at 149-50.) It does not, by its own terms, even allow governmental actions to <u>enforce</u> a monetary judgment from the automatic stay (a governmental entity has to come to the bankruptcy court to do that). (*Id.*) To the point, "[t]he effect of [the police-powers exception of section 362(b)(4)] <u>is not to make the action immune from injunction. The court has ample powers to stay actions not covered by the automatic stay</u>." *See* H.R. Rep. No. 95-595, at 342 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6298 (emphasis added).

Congress therefore recognized that bankruptcy courts have the power to (and do) prevent governmental entities from pursuing so-called police power actions under appropriate circumstances.  This very Court confirmed as much when affirming the Bankruptcy Court's preliminary injunction: "the police powers exception is irrelevant to [the] appeal" and "[n]othing in § 362(b)(4) constrained [Judge Drain] from entering such an injunction."  *In re Purdue Pharma L.P.*, 619 B.R. 38, 57 (S.D.N.Y. 2020).

*Penn Terra Ltd. v. Dep't of Env. Res., Com. of Pa.*, 733 F.2d 267 (3d Cir. 1984), which Maryland relies on in support of its argument under section 362 (Md. Br. at 49), illustrates the same point.  In the course of addressing the scope of the police and regulatory power exception under section 362, the panel explained that section 105(a) acted to balance the goals of the Code against the effects of the exception, because in "some individual situations" police power actions "may run so contrary to the policy of the Bankruptcy Code that [they] should not be permitted." *Id.* at 273.  Indeed, the *Penn Terra* panel repeatedly noted that where—exactly as here—a police power action "results in an impermissible dilution of federal bankruptcy policy, then the bankruptcy court may always issue an injunction tailored to fit those circumstances . . . based upon traditional equitable standards."  *Id.* at 274 (emphasis added).  Nothing in section 362(b)(4) constrained Judge Drain in any way from entering the third-party release at issue in this appeal.

The State Appellants' reliance on 28 U.S.C. § 1452(a) also is misplaced as it concerns the removal of "police and regulatory" claims to federal court and subsequent adjudication of those claims, which this appeal plainly does not involve.  Moreover, section 1452(a) says nothing about whether the Bankruptcy Court has the power to enjoin the prosecution of such claims as part of a plan of reorganization (which it clearly does)—a different inquiry altogether.  For this reason, among many others, the Appealing States' citation to a single out-of-Circuit lower court

case is inapposite. (Appealing States Br. at 15 (citing *In re Union Golf of Florida, Inc*., 242 B.R. 51, 58-60 (Bankr. M.D. Fla. 1998) (holding that plan including provision purporting to allow debtor to violate county zoning regulations on prospective basis could not bind county under 11 U.S.C. § 1141 since zoning violation did not create a "claim" within the meaning 11 U.S.C. § 101, and discussing 28 U.S.C. § 1452(a) in cursory dicta in that context).)

Nor are the State Appellants correct that an exception for police power actions should be inferred from section 523(a), which relates to the non-dischargeability of certain claims only against individual debtors. (Appealing States' Br. at 16-17, 25; Md. Br. at 50-51.) The Appellants go so far as to allege that the Shareholder Releases constitute a "blanket release" or a "super-discharge." (Appealing States Br. at 3, 9.) As an initial matter, this argument proves too much. Section 523(a) applies only to individuals, and so, under the State Appellants' logic, the Sackler entities and trusts that are Shareholder Released Parties could still receive broader releases than any natural Sackler persons. *See* 11 U.S.C. § 523(a). In any event, the fatal flaw in the State Appellants' reasoning (inflammatory rhetoric aside) is that a third-party release is not a bankruptcy discharge. To the contrary, a wide gulf separates the two (as the Second Circuit recognized over 30 years ago and Judge Drain repeatedly noted). *See Johns-Manville*, 837 F.2d at 91 ("[T]he injunctive orders do not offer the umbrella protection of a discharge in bankruptcy"). The discharge provided to a debtor upon confirmation applies to nearly every prepetition claim. Third-party releases, by contrast, are available only under unique circumstances, are often (as here) tailored to specific claims, are closely scrutinized, and are not imposed automatically but only where such releases are determined by the bankruptcy court to, inter alia, be important to a debtor's reorganization. (*See supra* Section I(A)(1).) A discharge and third-party release serve entirely different functions, and their respective scopes reflect

that—a distinction that the Bankruptcy Court understood when it narrowly tailored the third-party releases here.

Maryland's and the U.S. Trustee's claim that section 524(g), which provides for channeling injunctions with respect to claims against third parties in the asbestos context, precludes fashioning third-party releases outside of that context is equally unavailing, and is nothing more than a request for this Court to somehow nullify governing Second Circuit precedent.  (Md. Br. at 52; UST Br at 38-41.)  As the Bankruptcy Court correctly observed, the relevant legislative history expressly establishes that "[section 524] is not intended to alter any authority bankruptcy courts may already have to issue injunctions in connection with a plan of reorganization."  (App. A3500 (MBR) at 123 (citing H.R. Rep. 103-834, 103d Cong., 2nd Sess. 12; 140 Cong. Rec. H10765 (Oct. 4, 1994)).  The Public Law enacting the amendments to section 524 makes that point express through a rule of construction.  *See* Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, sec. 111(b), 108 Stat. 4117 (1994) (codified as amended in scattered sections of 11 U.S.C.) ("Rule of Construction—Nothing in [11 USC § 524] shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization").  In other words, precisely the opposite inference that Maryland and the U.S. Trustee wishes to draw is warranted: section 524(g) was simply one congressional effort to codify a subset of already well-established equitable powers, and Congress was express that no equitable powers were intended to be displaced by its enactment.  Indeed, it is telling that Appealing States—who advanced this argument often before the Bankruptcy Court—have seemingly abandoned it on appeal.

Finally, the Appealing States are not correct that third-party releases violate the "general bankruptcy rule" (Appealing States Br. at 26)—taken out of context from a Supreme Court case

far afield from the one at hand—that "[t]he estate cannot possess anything more than the debtor itself did outside of bankruptcy," *see Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S.Ct. 1652, 1663 (2019), or contravene section 544 of the Bankruptcy Code, which allows debtors to void certain transfers.  Both claims suffer from, among other things, the mistaken notion that the Debtors are somehow possessing the rights of or asserting the claims of the Appealing States because the Plan contains a third-party release.  Unsurprisingly, the Appealing States have not cited a single case that remotely suggests that third-party releases are not viable under that logic.  And each of these arguments would of course mean that seven Circuits, including the Second, have erred for decades (and that this Court should overrule *Manville*, *Drexel*, and *Metromedia* as wrongly decided).

For all of these reasons, the State Appellants' argument that third-party releases of police power claims cannot be squared with Supreme Court cases like *Law v. Siegel*, 571 U.S. 415 (2015), and *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973 (2017), and Second Circuit cases such as *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86 (2d Cir. 2003), and *In re Smart World Techs., LLC*, 423 F.3d 166 (2d Cir. 2005), is incorrect.  Unlike in those cases, the Bankruptcy Court's confirmation of the Plan here flowed directly from the Congress' grant of authority under the Bankruptcy Code, did not contravene any Bankruptcy Code provision, and was not inconsistent with any fundamental bankruptcy tenet.  *Compare Siegel*, 571 U.S. at 422 ("Thus, the Bankruptcy Court's 'surcharge' was unauthorized if it contravened a specific provision of the Code.  We conclude that it did."); *Jevic Holding Corp.*, 137 S.Ct. at 984 (rejecting appropriateness of priority-violating distributions as part of a structured dismissal); *In re Smart World Techs., LLC*, 423 F.3d at 184 ("Section 1109(b), as we have explained, does not entitle appellees to take over Smart World's legal claims, and various other provisions of the

Code assign to Smart World alone the role of legal representative of, and fiduciary to, the

bankruptcy estate.  These are statutory limitations that the bankruptcy court cannot overstep

simply by invoking § 105(a)."); *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d at 92

(denying motion to require debtor to renew letter of credit under section 105(a) after court ruled

that movant was not entitled to lift the automatic stay to pursue that relief outside of bankruptcy).

> **(ii)     Precedent Supports the Non-Consensual Release of State Claims under Appropriate Circumstances, and No Case Holds That a Police Power Claim Cannot be Subject to a Third-Party Release**

Putting aside (for the moment) that the inquiry of whether the State Appellants' claims

can be properly subject to a third-party release starts and stops with *Metromedia*, it bears

emphasis that there <u>is</u> specific precedent for the release of claims for damages asserted by both

state and federal agencies—authority which, although identified by the Bankruptcy Court (MBR

at 152), the State Appellants continue to downplay or ignore.  In dramatic contrast, the State

Appellants have not proffered (and the Debtors have not located) a single case—anywhere,

ever—holding that a third-party release cannot be imposed with respect to such a claim simply

because the claim is asserted by a governmental entity.

The recent case of *In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612 (D.

Del. July 26, 2021), is incredibly instructive.  There, the debtor (Exide) filed for chapter 11

protection facing mounting environmental remediation expenses stemming from sixteen battery

recycling facilities in ten states, including California.  *See id.* at *2.  To generate capital to fund

remediation, Exide marketed and reached a deal to sell its viable businesses to a number of

buyers.  *See id.* at *2.  Exide nonetheless still lacked sufficient funds to remediate the harm it had

caused at its sites and, absent some alternative, the sites would likely have to be abandoned and

the costs borne by the states.  *See id.*  To avoid that outcome, the debtors and the states

negotiated for months before five different mediators, ultimately reaching agreement on a

mediators' proposal for a global settlement.  *Id.*  The terms of that global settlement provided, among other things, for the creation of an environmental remediation trust to be funded by the debtors and funds paid by the buyers of Exide's businesses.  *Id.*  This global settlement was overwhelmingly supported by all key stakeholders:  the creditors' committee, the U.S. government, and ten state environmental regulators, including California's Department of Toxic Substances and Control, which had jurisdiction over Exide's California site.  *See id.* at *3.  Weeks after the mediation concluded, however, the California Governor's office rejected the global settlement.  *See id.* at *2.  To avoid the collapse of the Plan—and abandonment of numerous hazardous sites in nearly a dozen states within no way to fund remediation efforts— Exide amended its plan to provide that California would still receive the same settlement payment it would have received under the initial plan, but that its third-party claims against the buyers and their related parties who had contributed funds to enable the global settlement would be involuntarily released.  *Id.*

       The bankruptcy court confirmed the plan over California's objection, and the district court affirmed.  *Id.* at *7.  Because the bankruptcy court had found that third-party releases of the state claim were essential (the "sine qua non") to preserving an otherwise overwhelmingly supported global resolution, securing critical payments needed to fund the remediation trusts, and avoiding the threats posed by abandonment of contaminated properties, the district court held that California's claims against third parties could be released without its consent.  *Id.* at *6-7.

       *In re Exide* provides a recent illustrative example of a court imposing a non-consensual release of a state claim to prevent the destruction of an otherwise value-maximizing, overwhelmingly-supported, and publicly beneficial global resolution when the stringent requirements for third-party releases are otherwise satisfied.  Moreover, in *In re Exide*, the

United States Department of Justice on behalf of the Environmental Protection Agency, not only expressly supported (including on appeal) the non-consensual third-party release of a state's claim in that case—in stark contrast to the United States' categorical position here that third-party releases are unlawful—they also opposed a stay of that confirmation order on appeal and sought to have the appeal dismissed as equitably moot.  *See* Br. Appellee, United States of America, Dkt. No. 59 at 23, *In re Exide Holdings, Inc.*, No. 20-cv-01402 (D. Del.); *see also id.* Dkt. No. 14 at 5, Opp'n. of the United States to Emergency Mot. for Stay Pending Appeal.  This briefing can be founded in the Debtors' Addendum of Unpublished Authority filed contemporaneously herewith.  And every single State Appellant (with the exception of the District of Columbia) was a creditor in *Exide*.  Not one of them (except of course California) opposed the involuntary release of California's third-party claims.

The State Appellants quarrel with the Bankruptcy Court's discussion of *In re Peabody Energy Corporation*, 958 F.3d 717, 723 (8th Cir. 2020), and *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008).  (*See* App. A3529 (MBR) at 152; Appealing States Br. at 18-21.)  But these authorities—two other Courts of Appeal—confirm that a bankruptcy court's power to confirm a plan with third-party releases clearly encompasses claims for money damages, even if such money damages claims arise under laws that are traditionally conceived as police power laws.  In *In re Peabody*, for example, the Eighth Circuit found that the bankruptcy court acted well within its discretion in determining that public nuisance claims brought by municipalities against Peabody had been discharged under its plan notwithstanding the plan's exception to discharge for claims under "applicable police or regulatory law."  958 F.3d at 723.  There, because municipalities "were seeking damages and disgorgement of fifty-years-worth of profits" and "if . . . successful, they would obtain a pecuniary advantage over other creditors," the Eighth

Circuit found that the bankruptcy court was within its discretion in determining that the plan did not except such claims from discharge. *Id.* Moreover, the Eighth Circuit expressly rejected the municipalities' separate contention that their public nuisance claims were not subject to discharge under section 1141 of the Bankruptcy Code. *See id.* at 725. Because the municipalities' claims, although ostensibly equitable in nature under state law, sought money damages, that put those claims squarely within the scope of a permissible discharge. *See id.* (finding that even "if the municipalities cannot deposit abatement-fund payments into their general treasuries, it is the municipalities and their people who stand to benefit from them").

Similarly, in *In re Airadigm Communications,* the Seventh Circuit expressly affirmed the non-consensual release of the Federal Communications Commission's claim for damages against a third-party non-debtor that had contributed assets to the estates to enable a global settlement. 519 F.3d at 657. The Appellants advance a host of factual reasons (largely based on their erroneous characterizations of the facts in the cases at bar) as to why this Court should ignore these highly instructive cases. (*E.g.*, Appealing States Br. at 18-20 (arguing that release in *Airadigm* is distinguishable because releases there were found to be "narrow, did not provide blanket immunity, and excluded willful misconduct" and release in *Peabody* is distinguishable because *Peabody* did not involve claims against third parties). The fundamental point underlying the Bankruptcy Court's citation of these cases, however, remains: courts have consistently upheld releasing governmental claims against third parties under appropriate circumstances, and no court—**anywhere, ever**—has held that the Bankruptcy Code <u>prohibits</u> such releases.

### (iii)   The Plan Does Not "Unconstitutionally Preempt" State Police Power Laws

The State Appellants resort to generalized arguments predicated on amorphous conceptions of "state sovereignty, comity, and federalism." (Appealing States Br. at 15.) The

Appealing States contend that the Shareholder Releases "unconstitutionally preempt[]" their state police power claims in violation of federal preemption law.  (Appealing States Br. at 17-20.)  According to the Appealing States, the Bankruptcy Court should have presumed (based on "bedrock principles" of sovereignty and comity) that in the absence of <u>explicit</u> statutory authorization for third-party releases concerning state police power claims, such releases are somehow prohibited.  (Appealing States Br. at 17.)  But this has the interpretive presumption exactly backwards.  Congress intended to grant broad authority to bankruptcy courts to "modify creditor-debtor relationships," particularly in the context of approving plans of reorganization, and not to limit that authority to particular claims or claimants unless Congress expressly provides otherwise.  As the Bankruptcy Court observed, "[a third-party] injunction is most clearly within the ambit of traditional bankruptcy power when it pertains primarily to the collection of money on claims that overlap claims against a debtor's estate, not to enforcement of states' rights otherwise to regulate conduct." (App. A3530 (MBR) at 153.)  *See Kirwan*, 592 B.R. at 511 (holding that the Bankruptcy Code "reflects Congress'[] exercise of its preemption powers, which permit the 'abolition of [rights] to attain a permissible legislative object'" and "[b]y way of the Bankruptcy Code, Congress authorized 'wholesale preemption of state laws regarding creditors' rights' and has delegated this preemptive power to bankruptcy courts").

Close inspection reveals that the Appealing States' argument is almost exclusively premised on out-of-context snippets from authorities addressing situations utterly inapposite to the present one.  Many address questions of whether a state legal regime <u>outside</u> of the bankruptcy context is preempted wholesale by federal law and cannot be enforced—a situation that cannot be remotely analogized to the case at hand.  *See Arizona v. U.S.*, 567 U.S. 387, 393 (2012) (addressing whether federal law preempts and renders generally invalid provisions of a

state statute concerning immigration issues and upholding injunction obtained by the United States preventing certain of the provisions from taking effect); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487 (1997) (analyzing whether the Medical Device Amendments preempted common law negligence claims, with plurality determining that it was "implausible" that "Congress effectively precluded state courts from affording state consumers any protection from injuries resulting from a defective medical device," particularly where the federal act did not create a private right of action and thus interpreting the statute to preempt common law claims "would have barred most, if not all, relief for persons injured by defective products"); *U.S. Smokeless Tobacco Mfg. Co. v. City of New York*, 708 F.3d 428, 430, 436 (2d Cir. 2013) (rejecting argument that a New York City ordinance governing the sale of flavored tobacco products was generally preempted and further concluding that the "ordinance represents an exercise of local police power that Congress specifically allowed in enacting [the federal regime that was claimed to preempt the ordinance]").

A handful of other cases cited, though ostensibly in the bankruptcy context, raised preemptions questions because the plans contained provisions that would affirmatively <u>violate</u> state or local law.  For example, in *Montgomery Cty., MD v. Barwood, Inc.*, 422 B.R. 40, 43-49 (D. Md. 2009), the court refused to affirm confirmation of a plan that would permit the transfer from the Debtor of a significant portion of the taxicab medallions issued in a county in a way that would violate county law and upend the county's purposeful regulatory regime that otherwise sought to ensure a centralized taxicab structure and accountability by keeping most medallions with fleets rather than individuals (to whom the Debtors sought to transfer the medallions at issue).  Likewise, in *In re Irving Tanning Co.*, 496 B.R. 644, 661 (B.A.P. 1st Cir. 2013), the court refused to permit a plan that violated state self-insurance and property laws in the workers

compensation context and otherwise appropriated funds held pursuant to those laws that were not

the Debtors' property.  *See also Pac. Gas & Elec. Co. v. California ex rel. California Dept of*

*Toxic Substances Control (In re PG&E)*, 350 F.3d 932, 934, 937 (9th Cir. 2003) (addressing plan

that would disaggregate PG&E into four new corporations, which disaggregation state parties

contended violated the California Public Utilities Code). Here, the third-party release and

accompanying channeling injunction cannot be fairly characterized as violating or invalidating

any state law.  Indeed, where, as here, the claims against the released third parties are highly

interrelated and stem from the same underlying conduct of the Debtors—and the resolution of

the latter would be impossible without the former—a release of those claims as part of a plan

falls at the heartland of the power granted to bankruptcy courts under the Bankruptcy Code to

modify debtor-creditor relations.  This is particularly the case, where, as here, such claims seek

only damages for past wrongful conduct, the conduct giving rise to the lawsuits—marketing of

opioids—ceased in 2018, no member of the Sackler Families remains connected with the

Debtors, and the Debtors' successors will be subject to stringent, and fully agreed to, governance

obligations and covenants that ensure they operate in the public interest.

Finally, the only two Second Circuit cases cited by the Appealing States are entirely

inapposite.  Neither involve the scope of the power granted under the Bankruptcy Code to

approve third-party releases of claims that seek money damages for past conduct that are

essential to a plan of reorganization.  *See In re Morton*, 866 F.2d 561, 564 (2d Cir. 1989)

(analyzing whether the automatic stay under section 362(a) preempts state law requiring debtors

to obtain an extension of its lien); *In re Berry Ests., Inc.*, 812 F.2d 67, 71 (2d Cir. 1987)

(considering whether bankruptcy court could distribute excess rents to landlord in violation of

New York State's Emergency Tenant Protection, thereby allowing the landlord to retain rents to which he was not entitled and which were in excess of those permitted under State law).

### (iv) Third-Party Releases Do Not Implicate the "Anti-Commandeering" Doctrine

Yet further afield is Maryland's assertion that third-party releases violate the so-called "anti-commandeering" doctrine.  (Md. Br. at 35-41.)  Pursuant to that doctrine, the federal government "may neither issue directives requiring [s]tates to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program."  *Printz v. United States*, 521 U.S. 898, 935 (1997).  So, for example, Congress cannot constitutionally compel states to either enact legislation providing for the disposal of nuclear waste or require them to take title to, and possession of, that waste.  *See New York v. United States*, 505 U.S. 144, 176 (1992).  Nor can it require state chief law enforcement officers to conduct handgun background checks.  *Printz*, 521 U.S. at 935.  Simply describing the anti-commandeering doctrine proves its inapplicability here.  Nothing in the third-party releases remotely purports to command Maryland's officials to enact a federal policy or program.  If there is any federalism problem lurking here, it would be found in the assertion that this Court should construct a new doctrine that would allow a single government entity to commandeer a reorganization in order to achieve its preferred outcome by unilaterally withholding its consent to a value-maximizing Plan validly crafted under federal law (and supported by 97% of all voting governments).

### (v) The Bankruptcy Court Did Not "Assum[e] the Mantle of the Prosecutor"

Maryland also is wrong that, in approving third-party releases, the Bankruptcy Court somehow "assum[ed] the mantle of the prosecutor."  (Md. Br. at 41.)  It did not.  Rather, the Bankruptcy Court held that, pursuant to long-established and controlling Second Circuit law,

pursuit of a narrow set of claims by states and other parties against a defined set of third-parties could be enjoined and those claims channeled because that third-party release was critical to the Debtors' reorganization and value-maximizing Plan.  And, importantly, the releases at issue—supported by 97% of almost 5,000 non-federal governmental claimants—<u>do not cover criminal claims</u>.  The authority cited by Maryland is thus entirely inapposite.  *See, e.g., Citizens for Resp. and Ethics in Washington v. Fed. Election Comm'n*, 993 F.3d 880, 882 (D.C. Cir. 2021) (rejecting attempt by watchdog group to require Federal Election Commission to pursue enforcement action); *Nieves v. Bartlett*, 139 S.Ct. 1715, 1720 (2019) (addressing whether the existence of probable cause defeats a retaliatory arrest claim as a matter of law); *U.S. v. Banuelos-Rodriguez*, 215 F.3d 969, 970-71 (9th Cir. 2000) (determining that a defendant's argument that he would have been offered a plea bargain if arrested in a different district which would, in turn, have resulted in a shorter sentence was not a proper ground for departing from federal sentencing guidelines); *Vann v. Angelone*, 73 F.3d 519, 521 (refusing to substantively review state parole decision and finding that such decision satisfied the requirements of the due process clause); *Hecker v. Chaney*, 470 U.S. 821, 835 (1985) (rejecting attempt by death row inmates to force FDA to take enforcement action against Oklahoma and Texas for misusing drugs in lethal injections).[11]

### (vi)    The Shareholder Releases Do Not Endanger the Public Welfare or Health

Ultimately, the State Appellants' request that this Court fashion from whole cloth a police power exception to *Metromedia* and contravene the governing law, in this Circuit and the

---

[11] Maryland's separate contention that "[t]he judicial power does not permit courts to make settlement decisions for parties" (Md. Br. at 43) not only misapprehends the nature of third-party releases but, as conceived, is nothing more than an (incorrect) argument that third-party releases are categorically impermissible.

majority of other Circuits, is animated by a rather breathless claim that the Bankruptcy Court

"encroache[d] on the States' sovereign power to protect the welfare of their residents."

(Appealing States' Br. at 10; Maryland Br. at (police power claims seek to "obtain stronger

equitable relief, promote deterrence, vindicate the law, and through the regulation of conduct,

maintain and improve the public health").)  As the Bankruptcy Court correctly held, this is not

true.  The claims subject to the third-party releases are claims for <u>damages</u> arising from <u>past</u>

<u>conduct</u>.  (MBR at 153 ("[A]s a practical matter[,] the plan only limits the objecting states'

remedies against the shareholder released parties to collect money on account of their past

conduct."); (Aug. 23, 2021 Confr. Hr'g (Court)) Tr. 211:12-17 ("We've already covered this.

The way the states are protecting people from harm here is by asking for more money.  It's not to

stop someone or make someone build a better fence.  It's not to stop someone from polluting.

It's to get more money.").)  The last Sackler participated in a board meeting in 2018.  The

Sacklers have not had a role in Purdue since.  They will not be involved in NewCo.  And as part

of the Shareholder Settlement—negotiated by governmental and private claimants and the UCC

as fiduciary for all unsecured creditors—they have agreed to exit the opioid business worldwide.

(*See* App. A2212 (Shareholder Settlement) § 8.09.)   Permitting the State Appellants to continue

to pursue claims against the Sacklers for damages for past conduct will not promote the public

health by protecting the public from ongoing misconduct, because there is none.  Rather, it will

deny all parties a settlement years in the making—and block billions of dollars in abatement

funding from going to the thousands of governmental entities, including other sovereign states,

who overwhelmingly voted in favor of the Plan and strongly believe that the Plan best addresses

these very concerns.

Indeed, allowing the State Appellants to pursue their claims would destroy the Debtors'

abatement-centric Plan and the objectors' recoveries, along with all other creditors', would do

far, far worse.  As the Bankruptcy Court found after an extensive trial with dozens of witnesses

under oath: "[I]f the objecting governmental units were carved out of the release, the Plan would

fail, and the Debtors would likely liquidate, and the objectors would collect materially less

money from the Debtors and the Shareholder Released Parties in the aggregate, as would the

other states and governmental entities who support the Plan's confirmation."  (MBR at 154.)

That result is unfathomable and would be to the severe detriment of the public welfare.  This

Court should not countenance it.

For all of the foregoing reasons, this Court should decline the State Appellants' invitation

to craft a bespoke and unsupported exception to controlling law governing when nonconsensual

releases can be lawfully imposed.

### 3.    The Shareholder Releases Do Not Violate the Due Process Clause

The U.S. Trustee and the DOJ also contend that the Shareholder Releases violate the Due

Process Clause, largely based on the astonishing claim that every single party holding a claim

against the Sacklers must be provided the trappings of full adversarial litigation on their claims.

(UST Br. at 25-31; DOJ Stmt. at 19-30.)  The radical nature of this claim should not be

misunderstood—it is that for over 30 years, seven Circuits, including the Second Circuit (many

times), this Court (several times) and dozens of others have all been violating the U.S.

Constitution.  Due Process requires no such thing.  Holders of released claims received far more

than constitutionally adequate notice of the Debtors' bankruptcy and the Shareholder Releases

through the Debtors' unprecedented noticing program, and they had every opportunity to have

their objections addressed at the lengthy confirmation trial (as evidenced by the many objections

that were addressed at the confirmation hearing on this very issue).  *See Mullane v. Central*

*Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) ("An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."); *Motors Liquidation*, 829 F.3d at 158 ("Courts ask whether the [the debtor] acted reasonably in selecting means likely to inform persons affected, not whether each property owner actually received notice.") (quotation omitted); (*see also* UST Br. at 28 (citing *Mullane*). As the Bankruptcy Court correctly held, the government's due process objections (yet another attempt to simply nullify governing law) are without merit. (App. A3381-85; A3489-93 (MBR) at 4-8; 112-16.)

The U.S. Trustee and DOJ first argue that due process requires that parties with released claims be permitted to either litigate to final judgment or settle on their own accord. (UST Br. at 26 ("Yet, here, opioid victims are forever deprived of their day in court against the Sackler Family and other non-debtors; they lost their claims without any opportunity to choose whether to litigate or to settle their claims, violating their due process rights."); *id.* ("But a plan may not constitutionally compel victims to forfeit their property rights against non-debtors without consent."); DOJ Stmt. at 23 ("A person cannot be required to settle a claim without his consent."); *id.* at 24 (arguing Due Process was violated because there was no "opportunity for claimants to present their claims" and claimants "were unable to litigate their claims to a liability judgment on the merits.").) This is just another argument that *Metromedia* and third-party releases are illegal *per se* and the irreconcilable polar opposite of the position recently advanced by the DOJ in *Exide*. If holders of released claims always must have the merits of their causes of actions determined by a court (or settled with their consent), then bankruptcy courts can <u>never</u> impose non-consensual releases of such claims in <u>any</u> circumstance against <u>any</u> party. That,

66

however, is contrary to the governing law in the Second Circuit (and in the First, Third, Fourth, Sixth, Seventh, and Eleventh Circuits). (*See supra* Section I.) Suffice it to say that it is incredible to claim that seven Courts of Appeals and dozens of district and bankruptcy courts throughout the nation have been for decades violating the Constitution when confirming plans of reorganization that contain non-consensual releases, and that nobody noticed (including, seemingly, the offices of the U.S. Trustee) until late 2021. The Debtors are not aware of a single case—anywhere, any time—that has concluded that non-consensual third-party releases contravene the Due Process Clause, and the U.S. Trustee and DOJ have not cited even one, either here or below.[12]

The DOJ's (unsupported) claim that the Debtors were required to serve every single creditor subject to the Shareholder Releases with a summons and a complaint (DOJ Stmt. at 26-30) is a close cousin of the foregoing, made up from whole cloth, and equally without merit. There is no case—anywhere, ever—holding that an individual or entity must be formally joined to a bankruptcy proceeding via summons and complaint to be subject to a third-party release. For good reason. As described below, individuals and entities subject to the Shareholder Releases received constitutionally adequate notice, guided by the standard articulated in *Mullane* (which the other federal government Appellant, the U.S. Trustee, concedes supplies the

---

[12] The DOJ's discussion of two Supreme Court cases involving the "adventurous application" of Rule 23 to settle wide-ranging asbestos liability is perplexing. The holdings and analysis in both cases addressed and were inextricably intertwined with Rule 23—which is inapplicable here. *See Ortiz v. Firebrand Corp.*, 527 U.S. 815, 821 (1999) (rejecting certification of settlement class on Rule 23 limited fund theory); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597 (1997) (holding that asbestos-related Rule 23 class did not satisfy Rule 23's requirements in a number of critical respects). Moreover, these authorities expressly distinguish the situation in those cases from <u>bankruptcy</u>, which involves "a special remedial scheme . . . expressly foreclosing successive litigation by nonlitigants." *Ortiz*, 527 at U.S. at 846.

governing standard (UST Br. at 28)) and thus were provided with an opportunity to be heard. The Constitution requires no more.

The U.S. Trustee takes issue with the notice of the Shareholder Releases provided in the chapter 11 cases. (UST Br. at 28-30.) As an initial matter, the proper time and place to have raised any notice concerns was in connection with the Bankruptcy Court's approval of the Debtors' disclosure statement and notice procedures, which the U.S. Trustee did not do. Despite objecting to certain other discrete parts of the disclosure statement not relevant here, the U.S. Trustee did not object to the form or adequacy of notice of the Shareholder Releases in the Supplemental Confirmation Hearing Notice Plan at the disclosure statement stage when that issue was ripe for consideration. ((U.S. Trustee Disclosure Statement Obj., Bankr. Dkt. No. 2686) at 2-3, 15-17 (challenging adequacy of information for creditors to make a "reasoned decision about whether the exchange of money" under the Shareholder Settlement represented a "fair exchange or bargain" where the release information was still "to come" based on ongoing negotiations but not whether claimants were on notice that their rights would be affected by a third-party release); *see also* (May 26, 2021 Hr'g, Bankr. Dkt. No. 2981) Tr. 81:2-82:1, 87:19-88:9 (explaining argument was "simply" that "it[] [was] unclear if everyone receiving release is contributing to the plan").)

The Bankruptcy Court's order approving the disclosure statement, solicitation procedures, and voting procedures expressly provided that "[t]he Confirmation Hearing Notice, Publication Notice, and plain language summary of the Confirmation Hearing Notice each, if properly delivered or published, as applicable, as provided herein, provide holders of Claims, holders of Interests and all Persons that have held or asserted, that hold or assert or that may in the future hold or assert any Channeled Claim or any Shareholder Released Claim with sufficient

notice of the releases, exculpatory provisions, and injunctions . . . ." (*See* App. A0381 (Disclosure Statement Order) ¶ 17 (emphasis added).)  Having stayed silent at a time when such concerns could have been addressed, the U.S. Trustee should not be heard now to complain of alleged notice deficiencies.  *See Thomas v. Arn*, 474 U.S. 140, 148 (1985) (waiver rules exist to prevent a litigant from "sandbagging" a court by failing to object at the proper time).

In any event, whatever concerns the U.S. Trustee might have are had without merit in the context of the chapter 11 cases.  As the Bankruptcy Court correctly held on the basis of uncontroverted evidence, notice was more than constitutionally sufficient.  (App. A3381-85; A3489-93 (MBR) at 4-8; 112-16.)  With respect to the general bar date, in addition to providing actual, written notice to all known and potential claimants,[13] the Debtors implemented quite possibly the most extensive legal notice programs ever deployed (the "**Bar Date Notice Plan**"), using virtually every form of modern media to provide publication notice to an estimated 98% of all adults in the United States over the age of 18 with an average frequency of message exposure of eight times, and an estimated 86% of all adults in Canada over the age of 18 with an average frequency of message exposure of four times.  (*See* App. A0793 (Third Suppl. Decl. of Jeanne C. Finegan (Aug. 5, 2021) ¶ 5, Bankr. Dkt. No. 3403; App. A3382-83 MBR at 5-6.)  All of the

---

[13] Known claimants included: (i) persons or entities that had filed proofs of claim as of the Bar Date Order; (ii) all creditors and other known holders of claims (including those listed on the Debtors' Schedules); (iii) all counterparties to the Debtors' executory contracts and unexpired leases; (iv) all current parties to litigation with the Debtors; (v) current, former, and retired employees, officers, and directors; and (vi) parties known to the Debtors as having potential claims against the Debtors.  (App. 0021 (Finegan Decl. (Jan. 3, 2020), Dkt. No. 719) ¶ 20.)  Parties known to have potential claims against the Debtors, in turn, included: "(i) prescribers of Purdue brand name medications; (ii) Purdue opioid users who are included in an adverse event report or who have filed a product complaint and provided contact information; (iii) callers to Purdue who have threatened but not filed litigation and provided contact information; and (iv) entities and individuals, other than current, former, and retired employees, officers, and directors, that have requested indemnification."  (*Id.*)

advertisements either directed viewers to the PurduePharmaClaims.com website ("**Claims Website**") for more information about how to file a proof of claim or explicitly informed claimants that they could request to receive a proof of claim through the Claims Website or by contacting Prime Clerk (Purdue's noticing agent) through email, mail, or a toll-free number. (*See* App. A0114 (Suppl. Finegan Decl. (May 20, 2020), Bankr. Dkt. No. 1179) ¶ 20); App. A0032-38 (Finegan Decl. (Jan. 3, 2020), Dkt. No. 719) ¶¶ 46-57, 85.)  Over 45,000 TV commercials aired on ABC, NBC, and CBS, serving over 742 million impressions; over 182,000 TV commercials aired on CNN, Fox News, History, TNT, and Galavision, serving over 358 million impressions; and over 450 TV commercials aired on nine U.S. Territory TV stations. (App. A0796 (Third. Suppl. Finegan Decl.) ¶ 10.)  In addition, over 177,000 radio commercials aired in the U.S., serving over 232 million impressions, and approximately 775 radio commercials aired on twelve radio stations in the U.S. territories.  (*Id.* ¶ 11.)  Advertisements in magazines and newspapers served approximately 124 million impressions in the U.S. and approximately 19 million impressions in Canada.  (*Id.* ¶ 9.)  Collectively, the digital portion of this noticing plan, which included display, keyword search terms, social media advertisements, and digital video advertisements, served over 1.5 billion impressions in the U.S. and over 129 million impressions in Canada.  (*Id.* ¶ 8.)  Finally, the press releases and earned media outreach generated over 2,500 news stories across the U.S. and Canada.  (*Id.* ¶ 7.)

As the—yet again, uncontroverted and overwhelming—evidence established, the Debtors also gave unprecedentedly broad and deep notice of the confirmation hearing including (i) actual, written notice to all known holders of claims and interests, as well as certain potential unknown claimants, and (ii) publication notice via an additional noticing program (the "**Supplemental Confirmation Hearing Notice Plan**") to an estimated 87% of all adults in the United States

over the age of 18 with an average frequency of message exposure of five times—in addition to the average frequency of message exposure of eight times already achieved by the Bar Date Notice Plan—and an estimated 82% of adults in Canada with an average frequency of message exposure of six times, as well as notice in 39 other countries.  (App. A0798 (Third Suppl. Finegan Decl.) ¶¶ 15-16; App. A3382-85 (MBR) at 5-6.)  The actual, written notice to all known holders of claims in the voting classes contained the full text of the releases.  (App. A0378 (Disclosure Statement Order (Confirmation Hearing Notice)) ¶ 9, Ex. 12.)  The Supplemental Confirmation Hearing Plan provided notice of (i) the Disclosure Statement Order, (ii) <u>key provisions of the Plan, including the Shareholder Releases</u>, (iii) the confirmation hearing date, and (iv) deadlines for voting on the Plan, objecting to the Plan, and filing an allowance request through magazines, newspapers, online display advertisements, internet search terms, social media campaigns, and earned media.  (App. A0800 (Third Suppl. Finegan Decl.) ¶¶ 19-22.)

The U.S. Trustee contends that the notice afforded by these extraordinary campaigns was somehow rendered "illusory" by the supposed complexity and breadth of the Shareholder Releases in the Plan.  (UST Br. at 28.)  Here, too, the facts are a complete answer.  The Shareholder Releases were described at many different levels of specificity in many different noticing documents.  The publication version of the Confirmation Hearing Notice, which was published in *The Wall Street Journal*, *The New York Times*, *USA Today*, *Financial Times (Worldwide edition)*, and *International Herald Tribune*, stated in no uncertain terms that the Plan "provides for the release of any actual or potential claims or causes of action against the Shareholder Released Parties"—"including members of the Sackler families"—"relating to the Debtors (including claims in connection with Opioid-Related Activities)."  (*See* App. A0800 (Third Suppl. Finegan Decl. (Confirmation Hr'g Publication Notice)) ¶ 20.)  Leaving no base

uncovered, the Debtors also broadly distributed a shorter, plain language version of the Confirmation Hearing Notice across the U.S. and Canada and in 39 other countries, which stated on its very first page, "Did You File a Claim Against Purdue Pharma as Part of its Bankruptcy Proceeding?  Do You Have a Claim Against Purdue Pharma's Owners?" and noted that the Plan includes "releases of any actual or potential claims against Sackler family members, and certain other individuals and related entities, relating to Purdue Pharma L.P. and its affiliated debtors." (*See* App. A0801 (Third Suppl. Finegan Decl. (Confirmation Hr'g Magazine Ad)) ¶ 21; App. A4727 (Confirmation Hearing Flyer); App. A4730 (Sample of Online Advertisements of Confirmation Hearing).)  Advertisements in magazines and newspapers served approximately 76 million impressions in the U.S. and approximately 10 million impressions in Canada, and directed readers to the Claims Website.  (App. A0801 (Third Suppl. Finegan Decl. ¶ 21); App. A4554 (Conf. Hr. Tr. 93:2-94:13, 102:14-103:11 (Aug. 12, 2021), Bankr. Dkt. No. 3602.)  In addition, press releases, which included the same language noted above, and earned media outreach generated over 3,700 news stories across the U.S. and Canada, affecting an audience of approximately 1,355,035,380, and also directed readers to the Claims Website.  (App. A0800 (Third Suppl. Finegan Decl. (Confirmation Hearing Press Release) ¶ 19.)  And, if that somehow were not enough, the digital portion of the Supplemental Confirmation Hearing Notice Plan deployed online advertisements that provided the confirmation hearing date and voting deadline, included the language, "Did you file a claim against Purdue Pharma? Think you have a claim against the Sacklers or any of Purdue Pharma's owners?" and directed individuals to the Claims Website, which included a prominent, plain language description of the "Sackler Family Releases."  (*Id.* ¶ 22; JX-0942 (Sample of Online Advertisements of Confirmation Hearing).) This digital campaign served over 906 million digital media impressions in the U.S., over 162

million digital media impressions in Canada, and over 2.6 billion digital media impressions in the other 39 countries covered by the Supplemental Confirmation Hearing Notice Plan.  (*Id.*)  All told, the Debtors spent a staggering sum—over $32,000,000—on noticing in connection with these cases.  ((Second Suppl. Finegan Decl. (May 24, 2020), Bankr. Dkt. No. 2917) ¶ 4.)

Collectively, as of July 19, 2021, the Debtors' Bar Date Notice Plan and Supplemental Confirmation Hearing Notice Plan had resulted in over 5.2 billion impressions being served across digital media, over 7,100 news mentions globally, and more than 890,000 users visiting the Claims Website, generating more than 1.7 million page views.  ((Second Suppl. Finegan Decl. (May 24, 2020), Bankr. Dkt. No. 2917) ¶ 24.)  And yet further, the Debtors' prepetition conduct and the dangers of opioids have been further publicized by an immense amount of media attention and public scrutiny since well before the Petition Date and continuing throughout the chapter 11 cases.  There have been numerous documentaries on broadcast and cable TV, as well as online and through digital TV, including PBS, HBO, Netflix, and YouTube, among others.[14] In addition, the Debtors, the Sacklers, and the opioid crisis have been the subject of dozens, if not hundreds, of articles in many of the largest newspapers in the United States, including *The New York Times*, *The Wall Street Journal*, and *The Washington Post*.[15]

---

[14] To name a few, both the addictive effects of opioid products and the Debtors' prepetition marketing practices were the focus of *Understanding the Opioid Epidemic* (YouTube 2018), *One Nation, Overdosed* (MSNBC 2017), *Heroin(e)* (Netflix 2017), *Recovery Boys* (Netflix 2018), *Do No Harm: The Opioid Epidemic* (PBS 2018), and *The Crime of the Century* (HBO 2021).  *See Filming the opioid epidemic: 5 must-see documentaries*, HEALTHCAREDIVE (Nov. 27, 2018), https://www.healthcaredive.com/news/filming-the-opioid-epidemic-5-must-see-documentaries/541573/; The Crime of the Century, HBO, (2021), https://www.hbo.com/documentaries/the-crime-of-the-century.

[15] *See, e.g.*, Jonathan Randles, *Congressional Democrats Target Legal Releases for Purdue Pharma Owners*, WALL ST. J. (Mar. 19, 2021); Joseph Walker & Jared S. Hopkins, *Purdue Led Its Opioid Rivals in Pills More Prone to Abuse*, WALL ST. J. (Sept. 19, 2019); Lenny Bernstein & Scott Higham, *Purdue Pharma in talks over multi-billion dollar deal to settle more* (....continued)

In view of the foregoing, the Bankruptcy Court's <u>factual</u> determinations regarding the adequacy of notice are unimpeachable—and certainly not reversible for clear error.  As the Bankruptcy Court found, "the most widespread notices of the [P]lan's proposed third-party claims release were simple, in plain English that the [P]lan contemplated a broad release of the Sacklers and their related entities of civil claims pertaining to the Debtors, including claims against them held by third parties."  (App. A3384-85 (MBR) at 7-8.)  The Bankruptcy Court further found that "extensive media coverage of these cases also hammered home that point," and, in fact, "exaggerated the extent of the [P]lan's proposed releases of claims held against the Sacklers and further noted controversy over its basis in applicable law."  (App. A3384 (MBR) at 7.)  On this record, there is no possible doubt that, as the trier of fact found, "the Debtors' notice of the confirmation hearing and the proposed releases in the [P]lan was sufficient and indeed unprecedentedly broad."  (App. A3385 (MBR) at 8.)  The U.S. Trustee has provided no basis whatsoever to disturb this well-supported factual finding and, of course, both at trial and on appeal has presented no evidence of any kind.

The U.S. Trustee is also not correct that some kind of infirmity exists because notice allegedly "came too late for those who had not filed proofs of claim against Purdue."  (UST Br. at 29.)  In light of the substantial narrowing of the Shareholder Releases that occurred during trial—including the requirement that Purdue's conduct, omission or liability be a legal cause of or a legally relevant factor to released causes of action—the U.S. Trustee has not and could not possibly identify a single party that has a claim against the Sacklers but not also against Purdue—despite being asked for months to identify such parties.  The objection highlighted by

(continued….)

*than 2,000 opioid lawsuits*, WASH. POST (Aug. 27, 2019); Barry Meier, *Pain Killer: An Empire of Deceit and the Origin of America's Opioid Epidemic*, N.Y. TIMES (May 29, 2018).

the U.S. Trustee—that of Paul Hartman—only further proves the point.  (UST Br. at 29.)  Mr.
Hartman's state law complaint does not assert a claim against Purdue only because the complaint
was artfully drafted to avoid naming Purdue in light of the pendency of Purdue's bankruptcy.
Indeed, even a cursory examination of the allegations in the Hartman complaint reveals that
those allegations only involve the Sacklers' conduct in connection with Purdue.  (*See* Volume I
of Exhibits to Memorandum of Law in Support of Appellant United States Trustee's Motion For
Judicial Notice [ECF No. 89] Exhibit I (Comp., *Hartman v. Sackler*); *see also* Annex B.)  Notice
of Purdue's bankruptcy and the third-party releases has been extraordinary, and is more than
sufficient to satisfy due process.  (App. 3490 (MBR) at 113.)

        Finally, the U.S. Trustee's—yet again, flatly false—claim that the Plan deprives
victims of any compensation with respect to claims against the Sackler Families ignores both the
express terms and purpose of the personal injury trust distribution procedures upon which it
relies and the financial reality of the Plan and the Debtors' reorganization.  (*See* U.S. Trustee Br.
at 30-31.)  To be sure, those trust distribution procedures state that distributions thereunder will
only be made with consideration of the claims held against the Debtors, and not against the non-
debtor parties.  (App. A0308 (Personal Injury Trust Distribution Procedures—Fourth Plan
Supplement Ex. C [Bankr. Dkt. No. 2868]) ("**PI TDPs**") at 3).  But that is because those
procedures, quite properly, are designed to compensate for <u>harm</u> suffered by the personal injury
victims.  The—again, uncontroverted—evidence of the Debtors' expert Deborah Greenspan
established that the "base-plus-level" compensation structure of the personal injury trust
distribution procedures is "reasonable and consistent with structures employed in other mass tort
bankruptcy trusts and resolution programs" because it differentiates between claims based on
defined criteria primarily reflecting "the relative severity of the claimed condition (or

injury)."  (App. A0913-16 (Report of Deborah Greenspan at 35-37 (Aug. 5, 2021), Bankr. Dkt.

No. 3412).)  Indeed, the very next sentence of the quoted distribution procedures (which the U.S.

Trustee omits) expressly states that distributions are deemed to be a distribution in satisfaction of

<u>all</u> channeled claims with respect to the injuries that are the subject of those channeled claims.

(App. A0308 PI TDPs at 3).)  In addition, the reality is that most of the value being distributed to

victims will come <u>from the Sacklers</u> to resolve <u>all claims against the Sacklers</u>, and without such

payments from the Shareholder Settlement the personal injury victims are likely to receive little

or nothing.  (*See* App. A3518-19 (MBR) at 141-42.)  The assertion that personal injury victims

are not being compensated for their claims against the Sacklers is frivolous, and even more

troubling given that the actual counsel for the actual victims who developed the personal injury

trust distribution procedures have repeatedly informed the U.S. Trustee that this claim is false

and without merit.  (*See, e.g*, (Hr'g Tr. 149:5-151:6 (Oct. 14, 2021)).)

       **4.**     **The Court Has Subject Matter Jurisdiction to Confirm the Plan and the Shareholder Releases**

      The Bankruptcy Court correctly concluded that it has subject matter jurisdiction to

confirm the Plan.  (App. A3482-89 (MBR) at 105-12; *see also* App. A3548, 61 (FOF/COL) I.B,

II(a).)  Congress' grant of jurisdiction extends to all civil proceedings "arising under," "arising

in" or "related to" cases under title 11.  28 U.S.C. § 1334(b).  The Supreme Court "has instructed

lower federal courts to construe the jurisdictional grants in [s]ection[] 1334 . . . broadly,

recognizing that 'Congress intended to grant comprehensive jurisdiction to the bankruptcy courts

so that they might deal efficiently and expeditiously with all matters connected with the

bankruptcy estate.'"  *In re Purdue Pharma, L.P.*, 619 B.R. 38, 48 (S.D.N.Y. 2020) (quoting

*Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995)).  Despite this "comprehensive" grant of

jurisdiction, several Appellants argue that the Bankruptcy Court exceeded its subject matter

jurisdiction to confirm the Plan and the Shareholder Releases.  (Appealing States Br. at 36-39;

MD. Br. at 29; DOJ Stmt. at 31-44). They err.

**(i)**      **The Bankruptcy Court Correctly Held That It Had Arising In
or Arising Under Jurisdiction to Confirm the Plan**

As an initial matter, although ignored by some Appellants entirely, the Bankruptcy Court

had the power to confirm the Plan and enjoin the continuation of the third-party litigation related

to the Debtors under its "arising under" and "arising in" jurisdiction.  *See In re Equan Realty*

*Corp.*, No. 08-14017(RDD), 2009 WL 7193572, at *1 (Bankr. S.D.N.Y. Dec. 17, 2009) (noting

that the confirmation of a plan is a "proceeding arising under title 11"); 1 Collier on Bankruptcy

¶ 3.01 (16th 2021) (explaining that matters "arising under" title 11 include "confirmation of a

plan under chapters 9, 11, 12 or 13").  As the Bankruptcy Court correctly held, citing this Court's

"impeccable" logic in *In re Kirwan*, the proceeding to confirm the Plan "is a proceeding central

to the bankruptcy court's adjustment of the debtor/creditor relationship" and therefore is a

proceeding "arising in a [chapter 11] case (as it would have "no existence outside of the

bankruptcy')" and "under" the Bankruptcy Code.  (App. A3494 (MBR) at 117 (citing *In re*

*Motors Liquidation Co.*, 829 F.3d at 151); *see also* App. A3561 (FOF/COL) II(a).)

"Matters that 'arise in' the bankruptcy are identified as "core proceedings," and include a

nonexclusive list of 16 types of cases that the bankruptcy courts may "hear and determine," and

in which they may "constitutionally enter orders and judgments."  *In re Purdue Pharma L.P.*,

619 B.R. at 55.  Confirmation of the Plan is a statutorily designated "core" proceeding as well.

*See* 28 U.S.C. § 157(b)(2)(L).  Moreover, as this Court recognized in *In re Kirwan*, bankruptcy

courts have "arising in" jurisdiction to confirm a plan enjoining third-party claims so long as the

released claims are "sufficiently related to the issues before the bankruptcy court [to]

extinguish[] th[e] claim."  *See In re Kirwan Offices S.a.R.L.*, 592 B.R. at 504-06.  Here, the

77

Shareholder Releases satisfy that test (quite possibly more than any third-party releases ever approved by any bankruptcy court), as they "play[] an important role" in the Debtors' Plan for all of the reasons found by the Bankruptcy Court above.  *See id.* (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d at 293).

To be clear, in confirming the Plan, the Bankruptcy Court did **not** exercise jurisdiction to <u>hear</u> or <u>adjudicate</u> the third-party claims that are subject to the Shareholder Releases.  Such a proceeding would fall outside of the Bankruptcy Court's arising in jurisdiction, as this Court recognized in the appeal of the preliminary injunction in this case.  *See In re Purdue Pharma L.P.,* 619 B.R. at 57 (holding that the Bankruptcy Court could not "adjudicate the *Dunaway* claims against Dr. Sackler without first being permitted to do so by this court" (emphasis added).)  "A confirmed reorganization plan that includes [involuntary] releases," by contrast, "does not address the merits of the claims being released. . . .  Rather, it effectively cancels those claims so as to permit a total reorganization of the debtor's affairs in a manner available only in bankruptcy."  *In re Kirwan Offices*, 592 B.R. at 504-05 (citing *Stoll v. Gottlieb*, 305 U.S. 165, 169, 177 (1938) (holding that res judicata precluded state court action seeking to enforce guarantee that bankruptcy court determined was "cancel[ed]," pursuant to § 77B of the Bankruptcy Act of 1898, in connection with confirmed reorganization plan); *see also In re AOV*, 792 F.2d 1140, 1145 (D.C. Cir. 1986) ("[C]onfirmation of a reorganization plan are clearly proceedings at the core of bankruptcy law . . . . Although the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings, we do not read *Marathon* and its progeny to prohibit all bankruptcy court decisions that may have tangential effects.  The expansive reading of *Marathon* . . . would limit the power of these article I courts to a far greater degree than we believe Congress or the Supreme Court intended.").

Some Appellants (and the DOJ) nevertheless appear to contend, without citation to any authority, that the adjudication of the merits of their claims under state law and cancellation of their claims as part of a plan and channeling injunction are effectively the same thing.  (*E.g.*, DOJ Stmt. at 33-34 (failing to acknowledge distinction between the two and arguing no "arising in" jurisdiction because causes of actions exist outside of bankruptcy); Md. Br. at 14 (claiming that this Court already held on earlier appeal in this case that such claims do not arise in bankruptcy).  But, as noted above, this Court rejected this very argument in *In re Kirwan* because cancellation of claims in a plan "does not address the merits . . . [which] are governed by non-bankruptcy law."  592 B.R. at 504.  The DOJ and Maryland also argue that the Debtors cannot "manufacture" jurisdiction "by simply including the release of those non-debtor claims in the Plan."  (DOJ Stmt. at 34-36; MD. Br. at 25-28.)  This too, however, was addressed head-on, and rejected, by this Court in *Kirwan* because under well-established Second Circuit law, "where confronted with matters that qualify as core and non-core, matters that are integral to the integrity of the bankruptcy process render the entire proceeding core."  592 B.R. at 506 (collecting cases).  Here, even if a cancellation and channeling of the Appellants' claims as part of a plan was an exercise in non-core power—which it is not—the fact that this cancellation is integral to the restructuring does not remove the confirmation proceeding beyond the Bankruptcy Court's core power.  And, as demonstrated above, no Appellant has proffered any evidence to suggest Judge Drain's extensive factual findings grounded in a deep factual record that the Shareholder Releases were integral to the Plan is clearly erroneous.[16]

---

[16] Some Appellants confuse a federal court's subject matter jurisdiction under 28 U.S.C. § 1334 with a bankruptcy court's authority to enter final orders under 28 U.S.C. § 157.  (*E.g.*, DOJ Br. ¶ 34-41 (arguing "if a bankruptcy court had core jurisdiction to approve a non-debtor released based simply on the inclusion of the release in a bankruptcy plan, it would subvert the bedrock principle that parties cannot manufacture subject matter jurisdiction.").)  That the
(….continued)

>           **(ii)     The Bankruptcy Court Correctly Held That It Had "Related
>                      To" Jurisdiction To Enjoin the Appellants' Claims Against the
>                      Sackler Families Arising From the Debtors' Conduct**

"Related to" jurisdiction provides an independent basis for this Court to affirm the

Bankruptcy Court's jurisdiction to confirm the Plan, as the Bankruptcy Court correctly held.

In the Second Circuit, a bankruptcy court has "related to" jurisdiction to enjoin suits that

"might have <u>any conceivable effect</u> on the bankruptcy estate." *SPV Osus Ltd. v. UBS AG*, 882

F.3d 333, 339-340 (2d Cir. 2018) (emphasis added) (quoting *Parmalat Cap. Fin. Ltd. v. Bank of

Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011); *see* App. A3484, 87 (MBR) at 107, 110.  The

words "conceivable effect" are as broad as they appear: an action has a "conceivable effect" on a

bankruptcy estate "if the outcome could alter the debtors' rights, liabilities, options, or freedom

of action . . . and which in any way impacts upon the handling and administration of the

bankruptcy estate."  *SPV Osus Ltd.*, 882 F.3d at 340 (quoting *Celotex Corp. v. Edwards*, 514

U.S. at 308 n.6); *see also Pfizer Inc. v. Law Offices of Peter G. Angelos (In re Quigley Co., Inc.)*,

676 F.3d 45, 57 (2d Cir. 2012) ("[T]he touchstone for bankruptcy jurisdiction remains whether

its outcome might have any 'conceivable effect' on the bankruptcy estate." (internal quotation

marks omitted)).  For this reason, as this Court recognized in the *Dunaway* appeal, "'the

existence of strong interconnections between the third party action and the bankruptcy' has

frequently served as the basis for 'related to' jurisdiction."  *See In re Purdue Pharma L.P.*, 619

B.R. 38, 49 (S.D.N.Y. 2020) (quoting *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321

(S.D.N.Y. 2003) (listing cases).)  As the DOJ rightly concedes, the Second Circuit has adopted a

---

(continued….)

Bankruptcy Court had "core" authority to enter a final order confirming the plan is separately
addressed in sections I.B.5 and I.B.6, *infra*.

"broad" definition that has "only expanded since . . . 2007" and is a "more flexible approach" than the approaches of other circuits.  (DOJ Stmt. at 42-43.)

In *SPV OSUS*, for example, the Second Circuit held that bankruptcy court in the Madoff investments chapter 11 proceeding had "related to" jurisdiction to stay a state court action by a non-debtor against a financial services provider who was alleged to have aided and abetted the Madoff Ponzi scheme.  882 F.3d at 342.  The Court of Appeals held that because "[t]he gravamen of SPV's complaint is that defendants are joint tortfeasors with Madoff and BLMIS," that action, if successful, would provide the third party with a putative contribution claim against the estates.  *Id.* at 340.  In other words, "when one tortfeasor files for bankruptcy, any action against their co-tortfeasors for the same conduct falls within the bankruptcy court's 'related to' jurisdiction, since a finding of joint and several liability against the whole group could impact the *res* of the insolvent party' estate."  *In re Purdue Pharma L.P.*, 619 B.R. at 50.  "That is because a trial on harms alleged to have been caused in whole or in part by the debtor is 'related to' the bankruptcy, whether or not they are named as a defendant, because a judgment implicating the debtor's conduct could conceivably 'alter the debtor's rights, liability, options, or freedom of action.'"  *Id.* (quoting *SPV Osus*, 882 F.3d at 340 (emphasis added)).

The Bankruptcy Court correctly held that it had "related to" jurisdiction to enjoin the claims that are subject to the Shareholder Releases.  Indeed, notwithstanding the Appellants' revisionist attempts to recast this Court's affirmance in *Dunaway*, this Court already has held that the Bankruptcy Court had "related to" jurisdiction to enjoin state law claims by certain Tennessee plaintiffs against Richard Sackler because "the complaint in [the Tennessee action] accuse[d] Dr. Sackler and Purdue of interrelated conduct that contributed to the same harms."  *In re Purdue Pharma L.P.*, 619 B.R. at 50.  As this Court recognized, "allowing the Appellants to

proceed against Purdue's former president and co-chairman could 'conceivably affect' the *res* of the Debtors' estate, because the individual case is likely to raise the issue of the corporate entity's liability, even if only indirectly." *Id.* "At core, the [Tennessee plaintiffs'] Action – like so many other cases brought against the Debtors and the Sackler family – rests on the theory that Purdue and its employees committed misconduct at the direction of Dr. Sackler and others who controlled the corporation and its actions. It follows that Purdue's conduct and related liability 'will remain at the heart' of any further litigation against Dr. Sackler." *Id.*

So too the Appellants' claims. The Bankruptcy Court made extensive <u>factual</u> findings that the claims that are the subject to the Shareholder Releases, including the Appellants' third-party claims against the Sackler Families and their related persons and entities, are highly interconnected with claims against the Debtors (and, critically, the Debtors' estate claims' against the Sackler Families) and that resolution of the former could not possibly avoid implicating the latter. (App. A3561 (FOF/COL) II(a) (finding that "Shareholder Released Claims have factual and legal issues in common with actual or potential claims or causes of action against the Debtors and actual or potential claims or causes of action of the [e]states against third parties, including the Shareholder Released Parties"); App. A3480 (MBR) at 103 ("The third-party claims that the plan would release and enjoin are very closely related on the facts to the estates' claims for alter ego, veil piercing, and breach of fiduciary duty/failure to supervise settled under the plan.").)[17] Based on this, the Bankruptcy Court found that litigation of the Shareholder Released Claims would "directly affect the *res* of the Debtors' estates" in a number of concrete, and far more than "conceivable," ways: it could, among other things,

---

[17] For this reason, the suggestion that Judge Drain's opinion lacked "detailed findings" (Md. Br. at 27) or failed to "articulat[e] exactly which released parties would have potential claims" (DOJ Br. 44) is simply untrue.

deplete the value of certain shared insurance policies that constitute a significant asset of the

estates; lead to the assertion of indemnification and contribution claims against the estates;

prejudice the estates (or the Debtors' successor, the MDT) in future litigation of such claims or

causes of action; and detrimentally impact NewCo's ability to operate and support abatement.

(App. A3488 (MBR) at 111; *see also* App. A3561, 65 (FOF/COL) II(a), II(d)(iii).)  These

extensive, multiple, independent, factual findings of conceivable effect are more than sufficient

to establish "related to" jurisdiction to confirm the Plan under governing Second Circuit law.

Appellants advance a host of arguments that Judge Drain exceeded his subject matter

jurisdiction, but those arguments, at their core, boil down to the assertion that jurisdiction is

lacking because their claims against the Sacklers are somehow "independent" of their claims

against the Debtors.  (*See, e.g.*, Appealing States Br. at 38 (arguing no jurisdiction because

"States' claims are direct claims against the Sacklers for their own wrongdoing and do not seek

recovery from the Purdue Estate").  This is incorrect, and, indeed, a red herring, as no one

(certainly not the Debtors or the Bankruptcy Court) asserted, found, or based any position or

ruling on the claim that the Sacklers might not be liable for damages.  Ever.

Each of the State Appellants, except Washington, filed a complaint naming individual

members of Sackler Families.  These complaints either name Purdue as a co-defendant in that

same complaint or in a separate, but substantially similar, complaint.  *See infra* Annex A.  For

example, Connecticut, which names Purdue, certain of its former directors and officers, and eight

members of the Sackler Families and certain of their holdings companies and trusts, alleges that

members of the Sackler Families "direct[ed] **Purdue**" (¶ 92), "played an active and central role

in the management of **Purdue**" (¶ 112), "were directly involved in developing and approving

**Purdue's** deceptive and illegal activities"  (¶ 114), and "participated directly in **Purdue's** unfair

and deceptive acts and practices" (¶ 132). The District of Columbia's complaint, which names only Richard Sackler, alleges that he "formulated, directed, controlled, had the authority to control, participated in, or with knowledge approved of the acts or practices of **Purdue** . . . ." (¶ 47), "repeatedly impelled **Purdue** management to increase the sale of Purdue's opioids" (¶ 52), was "actively involved in shaping the messages that **Purdue** sales representatives provided during their sales calls" (¶ 53), "was involved in forming strategies that **Purdue** used to combat bad press that Purdue received about its opioids" (¶ 54). The remainder of the State Appellants' complaints—as well as the complaints by individuals cited by U.S. Trustee as examples of claims that would be released under the Plan—are substantially similar, as detailed in Annex A and B, *infra*.

What is obvious from the Appellants' complaints—notwithstanding their repeated baseless assertions to the contrary—is that no Appellant can demonstrate that any of the Sackler defendants named would be liable under their consumer protection statutes unless Purdue also engaged in alleged misconduct. Nor has any Appellant identified any claim by any party anywhere that would be subject to the Shareholder Releases but that does not, at its core, stem from the Sacklers' involvement in running or managing the Debtors. Even the Appellants' (and DOJ's) briefing on this very issue cannot escape this basic fact. (*E.g.*, DOJ Stmt. at 6 (arguing that under state law, Sacklers may be held liable "through their control of Purdue and ratification of its conduct"); *id.* at 22 (alleging claims against the Sacklers as "personally liable for their conduct while directors or officers of Purdue"). At bottom, the gravamen of each of these complaints is that a handful of Sackler Family members who sat on the Purdue board directed and caused Purdue to engage in wrongful conduct. These are exactly the sort of inextricably intertwined co-tortfeasor claims that easily give rise to "related to" jurisdiction under established

Second Circuit law.  *See In re Purdue Pharma L.P.*, 619 B.R. at 51 (holding "there is no way for the Appellants to pursue the allegations against Dr. Sackler without implicating Purdue, and vice versa.").  That the Appealing States can pursue these claims "directly" against members of the Sackler Families under state law without necessarily naming Purdue as a defendant or collecting proceeds directly from the estates (Appealing States Br. at 6-7, 38) is totally irrelevant.  *See In re Purdue Pharma L.P.*, 619 B.R. at 52 (noting that litigation about "harms alleged to have been caused in whole or in part by the debtor is 'related to' the bankruptcy, <u>whether or not they are named as a defendant</u>").

After attempting to wish away the inextricably interconnected nature of their claims against the Shareholder Released Parties and the Debtors, the Appellants resort to a series of scattershot attacks on Judge Drain's factual findings that litigation of their released claims would have multiple conceivable effects on the estates, and that the Debtors have otherwise failed to meet the burden.  (Appealing States Br. at 38; Md. Br. 25-29 (alleging that Judge Drain's jurisdictional findings are "conjecture" and "unsupported by evidence or analysis"); DOJ Stmt. at 43-44).  But these arguments are directly contrary to Judge Drain's clear factual findings and the extensive record at trial (ignored by the Appellants in their briefing).  And the Appellants— who failed to cross-examine <u>any</u> witnesses regarding these findings or present a single witness of their own—not one—point to no evidence on appeal that could justify concluding that any factual finding was "clearly erroneous."

<u>First</u>, the Appealing States claim that potential impacts on insurance coverage do not establish jurisdiction because they allege that from the 2005 to 2015 there was no director and officer ("D&O") insurance policy that would have covered any officer, director or other person during that period.  (Appealing States Br. at 38.)  This <u>factual</u> claim (made by lawyers without

any evidence or support) is at best misleading.[18]  But it is also beside the point.  The Appellants

do not dispute that the Debtors in fact have D&O policies for policy periods covering from 2003

to 2004 and from 2016 to 2018 with stated limits of approximately $100 million, and that the

insurers have been asked to respond to all opioid related claims that have been alleged against

directors and officers of Purdue.  (App. A2098-99 (DelConte Fact Decl. ¶¶ 41-44 (Aug. 5, 2021),

Dkt. No. 3456); App. A4076 – A4130 (JX1508-1519 (letters to insurers notifying of

circumstance of potential claims).)  The uncontested record at trial establishes, therefore, that this

coverage might extend to members of the Sackler Families and to many other former officers

and directors who are defendants in the Appellants' consumer protection actions.  (App. A4571

(Hr'g Tr. 65:1-67:24 (Aug. 13, 2021).)

        The Appealing States' only response is that the Debtors nonetheless failed to meet their

burden because they failed to prove that the policy exclusions in the Debtors' D&O policies for

wrongful or fraudulent action would not apply.  (Appealing States Br. at 38.)  But their argument

fundamentally misstates the test.  "Related to" jurisdiction, of course, requires only any

"conceivable effect"—not certainty that such claims would succeed.  If the Appellants' claims

against such persons or entities were to succeed, "or even if they merely require[d] [those

parties] to incur defense costs in litigating against them," that would undeniably "directly affect

[the Debtors'] bankruptcy estate," as Judge Drain correctly found.  *In re Quigley Co., Inc.*, 676

F.3d at 53 (holding third-party claims' effects on insurance policy shared by debtor and released

nondebtor sufficed to create "related to" jurisdiction); *MacArthur Co.*, 837 F.2d at 92-93 (same).

---

        [18] The Debtors did purchase D&O insurance covering its directors and officers for the
period from 2005 through 2016.  But no opioid-related claims were reported under those
policies.

The Appealing States' briefing also fails to mention the clear and uncontested record evidence the Debtors <u>also</u> maintained "general liability" shared insurance covenants and policies, that together with the D&O policies, cover the relevant period and are subject to total liability limits, where applicable, in the <u>billions</u> of dollars.  (App. A2096-97 (DelConte Fact Decl. ¶¶ 36, 38-39 (Aug. 5, 2021), Dkt. No. 3456).)  As the uncontested testimony of Jesse DelConte established at trial, the general liability policies provide coverage to entities designated as "Named Insured(s)," which include, among others, certain Debtors and their affiliated entities, as well as their employees for acts related to the Named Insured's business, who would qualify as released parties under the Plan.  (*See* App. A2097 (*id.* ¶¶ 38-39.)  Virtually every one of the Sackler <u>entities</u> named in the Appealing States' complaints are Named Insureds in the Debtors' insurance policies.  (*Compare* Annex A ("Defendants" column) *with* App. 2097 (DelConte at ¶ 39 n.10) and App. A4705-18 (JX-0599) (demonstrative example of schedule of Named Insureds of this type).)  There can be no dispute that should litigation against these covered parties continue, such litigation could result in claims for coverage that could decrease the amounts available to the Debtors based on the applicable liability limits.  (*See* App. 4554 (Hr'g Tr. 65:1-67:24 (Aug. 13, 2021)).)  That these polices—which constitute a significant asset of the estates and a critical component of value to be distributed by MDT—are currently the subject of vigorously contested litigation being pursued at the estates' expense (*see* Adv. Proc. Case No. 21-07005 (RDD) *Avrio Health L.P. et al. v. Specialty Insurance Company (f/k/a) American International Specialty Lines Insurance Company) et al.*), is, all by itself and leaving everything else aside, proof positive that disputes over shared coverage will impact the *res* of the estates. The Appealing States do not come close to establishing that Judge Drain's factual findings were clearly erroneous.

Second, the State Appellants argue that potential indemnification claims cannot serve as a basis for related to jurisdiction because the Bankruptcy Court "failed to consider that no party would be entitled to be indemnified for conduct that was not undertaken in good faith." (Appealing States Br. at 38) and that none of the Shareholder Released Parties would be entitled to indemnification (Md. Br. at 27).  This sweeping prediction about how future courts might resolve future issues with respect to dozens of parties misstates the law and is contrary to the facts adduced at trial.  Under well-established Second Circuit law, "a contingent indemnification obligation can be sufficient to satisfy the 'conceivable effect' test because such obligation 'directly affects the *res* of the bankruptcy estate.'"  *In re Sabine Oil & Gas Corp.*, 555 B.R. at 290 (quoting *In re FairPoint Commc'ns*, 452 B.R. 21, 29 (Bankr. S.D.N.Y. 2011)); *see also SPV Osus Ltd.*, 882 F.3d at 340; *In re Residential Cap., LLC*, 508 B.R. 838, 848-849 (Bankr. S.D.N.Y. 2014) ("[T]hird-party [indemnification] claims such as the ones asserted by [a released party] would affect the *res* of the estate, satisfying the jurisdictional underpinnings for the third-party release approved by the Court.").  And for a contingent claim to satisfy this test, the basis for the claim need only be plausible.  *See Winstar Holdings, LLC v. Blackstone Grp. L.P.*, 2007 WL 4323003, at *1, n.1 (S.D.N.Y. Dec. 10, 2007).

Here, Judge Drain correctly found that claims subject to the Shareholder Releases could lead to the assertion of plausible indemnification and contribution claims.  There is no dispute that the Debtors' governing documents include mandatory indemnification provisions requiring the company to, except under certain circumstances, indemnify and defend all directors and officers of PPI; directors, officers and trustees of PPLP and certain subsidiaries; and certain agents or representatives of PPI, PPLP and certain subsidiaries or affiliates.  (*See* App. A4131 (JX-0872 (June 20, 2019 PPLP Am. & Restated Partnership Agreement) § 18); *see also* App.

A4068 (JX-1222 (Apr. 18, 2008 By-Laws Amendment) ¶ 2 (providing for mandatory indemnification by PPI of directors and officers)); JX-2011 (PPI Minutes (same)); App. A4089 (JX-1803 (Third Am. PPLP Partnership Agreement § 20 (adoption of same by PPLP)).)  The State Appellants' complaints name various members of the Sackler Families and other individuals who were former officers or members of PPI's board of directors.  (*See* Annex A.)  It defies credulity to assert that if the States Appellants' claims—which are fundamentally claims against Purdue—are allowed to proceed, that members of the Sackler Families or these related individuals would not attempt to assert claims for indemnification.

Indeed, this Court, in its opinion affirming the preliminary injunction, already passed on this issue as well and found it "conceivable" that one such suit "would give rise to a colorable indemnification claim" by Richard Sackler, thus creating "related to" jurisdiction to preliminarily enjoin the underlying litigation.  *In re Purdue Pharma*, 619 B.R. at 52.  Here, every one of the Appealing States complaints names Richard Sackler as a defendant, as well as various other members of the Sackler Families, all but one of whom has filed contingent proofs of claim for indemnification.  (*See, e.g.*, App. A4489-A4513 (Proofs of Claim Nos. 137527 (Estate of Raymond Sackler), 137453 (Estate of Jonathan Sackler), 137590 (Richard Sackler), 137599 (Estate of Beverly Sackler), 137706 (Kathe Sackler).)  And even if some third parties might not satisfy the standards for indemnity, it is not credible to claim that, if thousands of lawsuits were allowed to proceed, no indemnity claim by any party could possibly succeed in any forum.

The Appellants also all but ignore the potential for common law or statutory contribution claims that Judge Drain also found could have a conceivable effect on the Estates.  As the Second Circuit opined in *SPV OSUS*, where, as here, there is a "high degree of interconnectedness between the [third-party] action and the [debtor's] bankruptcies, it is a

difficult to imagine a scenario wherein [the third party] would not also sue [the debtor]" on a putative contribution theory. *SPV OSUS*, 882 F.3d at 342. Here, there can be little doubt that if tens of thousands of creditors were to pursue other Sackler-related parties—whether it be their trusts, their advisors, their dependents, or the like—such defendants would claim over against Purdue for contribution. The contingent proofs of claim filed by such persons during the course of the chapter 11 cases demonstrates this with crystalline clarity. The State Appellants' unsupported and self-serving statements in their briefs that "[n]o . . . reasonable basis [for such claims] was established" (Appealing States Br. at 38) or "indemnification or contribution are generally available and inappropriate under statute police power actions" (Md. Br. at 27)[19] does not undermine this conclusion. As the Bankruptcy Court correctly held, "[l]itigation over a disputed indemnification or contribution claim is itself an effect upon the Estates." (App. A3568 (FOF/COL) II(a).) *See SPV OSUS*, 882 F.3d at 342 (holding that "simply settling the issue of whether a late claim is allowable would likely have an effect on the estate").

Third, even if the Appealing States were somehow correct that neither claims against shared insurance nor the potential for indemnification or contribution claims provide a sufficient basis to exercise jurisdiction—and they are not—the Appellants also entirely ignore the Bankruptcy Court's separate finding that litigation against the Shareholder Released Parties could prejudice the estates' pursuit of their own material claims against those parties, which as the Bankruptcy Court noted, would likely have the best chance of material success. (App. A3488, 3517 (MBR) at 111, 140.)

---

[19] Notably, although Maryland purports to cite case law establishing this proposition, it does not even cite a case under Maryland law that would purport to address its state case law claims.

For example, in a no Shareholder Settlement scenario, the estates would be forced into "competition" with direct claimants and, to the extent those claimants lose on their claims, any resulting judgment would be used by the Shareholder Released Parties to show the absence of fraudulent transfer liability resulting from that alleged debt, or to defend against veil piercing or alter ego claims asserted by the estates. (App. 3518-19 (MBR) at 140-41.) Even in an entirely hypothetical scenario where some form of the Plan were approved, but the Appellants were allowed to pursue their direct claims against the Shareholder Released Parties, there still would be a conceivable effect on the estates. Under the Plan, the Debtors' claims against certain members of the Shareholder Released Parties (the "**Shareholder Release Snapback Parties**") will be transferred to the MDT. (*See* App. A3127 (Plan § 5.6).) In the event of certain breaches of the Shareholder Settlement, the MDT may file a Notice of Shareholder Release Snapback, whereupon the Shareholder Releases shall be null and void with respect to the breaching Shareholder Release Snapback Parties, and the Channeling Injunction shall no longer bar suits brought against those parties (i.e., the Snapback). (*See* App. A3179, 83 (Plan §§ 10.7, 10.8(c)).) The MDT may then pursue litigation against the relevant Shareholder Release Snapback Parties using any recovered proceeds to fund the MDT and creditor trusts. (*See* App. A3127-34 (Plan §§ 5.6(a)(ii), 5.6(c), 5.6(l)).) If litigation by third parties were to proceed against those benefiting from the Shareholder Releases, those claims would certainly involve the same predicate issues concerning alleged wrongdoing by Purdue as the MDT's claims. And, if the defendants were to prevail in such litigation, that could risk creating an adverse record against the MDT, potentially decreasing a recovery in respect of the claims held by the MDT—or at the very least, increasing the costs of pursuing such claims—and thus devaluing them. *See* Hr'g Tr. 45:4-23, *Mallinckrodt Plc v. State of Connecticut*, Adv. Proc. No. 20-50850 (Bankr. D. Del. Nov. 23, 2020), Dkt. No.

168 (concluding that the court had "related to" jurisdiction to enjoin third-party claims because of, among other things, a "risk of . . . record taint if the actions are allowed to proceed"); *cf. SPV Osus Ltd.*, 882 F.3d at 342 (explaining that "a high degree of interconnectedness between" a third-party action and a bankruptcy supports a finding of "related to" jurisdiction). Indeed, as shown by two recent decisions issued in the days leading up to the filing of this brief, all sides face risk in continued litigation. *See, e.g.*, *State ex rel. Hunter v. Johnson & Johnson*, 2021 WL 5191372, at *1 (Okla. Nov. 9, 2021); *California v. Purdue Pharma L.P.*, 2021 WL 5227329, at *20 (Cal. Super. Ct. Nov. 01, 2021).

<u>Fourth</u>, unable to avoid the clear factual finding that the particular claims of the Appellants on appeal would have multiple conceivable effects on the estates, the U.S. Trustee and the DOJ resort to baseless speculation that the Debtors have introduced evidence that only "*some* of the Shareholder Released Parties *may* have indemnification rights against the Debtors." (DOJ Stmt. at 43-44.) This, though, is directly contradicted by the record. No Appellant can identify a single claim that would be subject to the terms of the release but which would not result in the effects found by Judge Drain. That is not surprising. Judge Drain's multiple narrowings of the Shareholder Releases in the ways described above in the Introduction, *supra*, <u>ensures</u> that the releases are narrowly tailored to apply to claims that necessarily will have the attendant conceivable effects found at trial.

Finally, because the uncontested record establishes multiple, independent direct impacts on the estates that would result from litigation of their claims against the Sacklers, Appellants' assertion that the Second Circuit's decisions in *Manville III* is "controlling" or "dictates the outcome here" (Appealing States Br. 37-38; Md. Br. at 21), fails. In *In re Johns-Manville Corp.*, 517 F.3d 52, 57 (2d Cir. 2008) (often called *Manville III*), Manville had entered into an

agreement with its insurer, Travelers, to settle claims against its asbestos policies.  The bankruptcy court approved the settlement and enjoined all non-derivative claims against Travelers instead channeling them to the trusts.  *Id.*  Plaintiffs later brought statutory and common law claims alleging that Travelers had violated an independent legal duty to them.  *See id.* at 57-58.  The independent tortious conduct alleged, however, did not depend directly or indirectly on Manville's alleged wrongdoing.  *See In re Quigley Co., Inc.*, 676 F.3d at 56 (observing that "claims at issue [in *Manville III*] were not premised on Manville's conduct").  For instance, some of these plaintiffs alleged that they "declined to file personal injury suits against Manville because Travelers . . . suppressed information about asbestos hazards and intentionally propagated an allegedly-fraudulent 'state of the art' defense to frustrate claimants' rights," <u>allegations that had nothing to do with conduct at Manville</u>.  *Manville III*, 517 F.3d at 57. In declining to exercise jurisdiction, the Second Circuit found that the "vast majority" were claims which sought "to recover directly from [the] debtor's insurer for the insurer's own independent wrongdoing," "ma[d]e no claim against an asset of the estate," and whose litigation as a factual matter "<u>[did not] affect the estate.</u>"  *Id.* at 64-65 (emphasis added).

That could not be further from the facts here.  While premised on consumer protection statutes and brought against members of the Sackler Families directly, the State Appellants' claims depend entirely on demonstrating <u>Purdue's</u> misconduct in connection with the opioid crisis.  Indeed, as noted above, their actual allegations center on the Sacklers' conduct in running the Debtors.  Moreover, contrary to the suggestions of some of the Appellants, *Manville III* (or *Manville IV*, which merely confirmed *Manville III*'s ultimate holding after the Supreme Court vacated the decision on other grounds) does not represent a narrowing of the scope of "related to" jurisdiction in the Second Circuit.  (Appealing States Br. at 37 ("[T]he Court in *Manville III*

made clear that the "direct effect" test cannot be met based solely on similar factual allegations in claims against debtor and non-debtor").  As the Bankruptcy Court correctly held, the Second Circuit's 2012 decision in *In re Quigley Co.* made crystal clear "*Manville III* did not work a change in [Second Circuit] jurisprudence."  676 F.3d at 56.  Rather, the "touchstone for bankruptcy jurisdiction remains whether [a claim's] outcome might have any 'conceivable effect' on the bankruptcy estate" and that "[a] suit against a third party alleging liability not derivative of the debtor's conduct but that nevertheless poses the specter of direct impact on the *res* of the bankrupt estate may just as surely impair the bankruptcy court's ability to make a fair distribution of the bankrupt assets as a third-party suit alleging derivative liability."  *Id*. at 57-58 (internal quotations omitted).  *Manville III* therefore has no bearing on this appeal.

### 5.    The Bankruptcy Court Had the Statutory Authority to Enter a Final Order Confirming the Plan and the Shareholder Releases

Next, some Appellants argue that the Bankruptcy Court did not have the "core" authority to enter a final order confirming the Plan under section 157 of Title 28.  Not so.  The confirmation of the Plan is a "core proceeding."  *See* 28 U.S.C. § 157(b)(2)(L).  As this Court held in *In re Kirwan*—reasoning that was subsequently adopted by the Third Circuit in *In re Millennium Labs*—where, as here, a bankruptcy court considers non-consensual third-party releases in connection with the confirmation of a proposed plan of reorganization, it acts pursuant to its core authority.  *See In re Kirwan*, 592 B.R. at 504; *In re Millennium Lab Holdings II, LLC.*, 945 F.3d at 137 (in appeal from confirmation of plan containing nonconsensual third-party releases, holding that "[t]he Bankruptcy Court indisputably had 'core' statutory authority to confirm the plan"); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1145 (D.C. Cir. 1986) ("The approval of a disclosure statement and the confirmation of a reorganization plan are clearly proceedings at

the core of bankruptcy law . . . [a]lthough the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings.").

The DOJ's and U.S. Trustee's arguments ignore this authority entirely.  For example, the DOJ argues that analysis of whether the Bankruptcy Court has "core" jurisdiction must be "evaluated independently" of the Plan itself.  (DOJ Stmt. at 35.)  But as much as they would like to wish away the law, they cannot.  The operative proceeding for determining the Bankruptcy Court's power to enter final orders is the confirmation proceeding.  *See In re Kirwan*, 592 B.R. at 505 (holding that "operative proceeding" is "confirmation of a plan").  The fact that a plan contains third-party releases does not change that.  As this Court explained in *Kirwan*—and underscored in these very cases—"although a bankruptcy court's 'consider[ation] [of] a third-party release as part of a proposed plan of reorganization . . . may have the <u>effect</u> of a ruling on the merits, it is <u>not</u> a ruling on the merits—and thus operates on an entirely different jurisdictional footing.'"  *In re Purdue Pharma L.P.*, 619 B.R. at 57 (quoting *In re Kirwan*, 592 B.R. at 507) (emphasis in original).

Advancing absolutely no contravening authority on this point,] the DOJ's remaining arguments on this point fail.  The argument—that *Kirwan* and *Millennium* are distinguishable on their facts (DOJ Stmt. at 37-38)—is irrelevant.  It is hardly surprising that the factual circumstances there were different.  *Metromedia*'s requirement that the factual circumstances be "unique" and "rare" effectively ensures this.  But the ultimate holding in these case—that a court acts pursuant to its "core" authority when it confirms a plan of reorganization containing third-party releases that are sufficiently related to the debtors and the plan—remains.  *See In re Kirwan Offices*, 592 B.R. at 506.  The DOJ's remaining assertions merely rehash its unsupported

arguments that the Shareholder Releases are not "necessary" or "narrowly tailored" to accomplish their purpose (DOJ Stmt. 36-38), but those too fail as demonstrated above.

6.    **The Bankruptcy Court Had the Constitutional Authority to Enter a Final Order Confirming the Plan and the Shareholder Releases**

For similar reasons, the U.S. Trustee's and DOJ's assertions that the Court lacks constitutional authority to confirm a plan containing third-party releases are unavailing. (*See* UST Br. at 33-38; DOJ Stmt. at 31-44.) To be sure, as Article I courts, bankruptcy courts may enter <u>final judgment</u> only on claims that "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *See Stern v. Marshall*, 564 U.S. 462, 499 (2011). But the Bankruptcy Court was not asked to enter final judgment on any claims. As this Court in *Kirwan* held—and as the Third Circuit likewise held in a recent decision directly on point—a bankruptcy court has constitutional authority to confirm a plan containing third-party releases where such releases are "integral to" the restructuring. *See In re Millennium Lab Holdings*, 945 F.3d at 137-140; *Kirwan*, 592 B.R. at 509-512; *see also* Hr'g Tr. 91:14-19, *In re Windstream Holdings, Inc.*, No. 19-22312 (RDD) (Bankr. S.D.N.Y. May 8, 2020) (challenges to the Court's constitutional authority to confirm a plan containing third-party releases "will always be denied until the Second Circuit or the Supreme Court rules otherwise based on the Third Circuit's Millennium case and the Kirwan case"). Here, the Shareholder Releases are necessary to the Plan, as demonstrated above, and thus fall well within the Court's constitutional authority. Despite extensive focus on this argument, the DOJ and U.S. Trustee's arguments all flow from the mistaken premise that the Plan <u>adjudicates</u> third-party claims on the merits, which as demonstrated above, is contrary to law.

96

7.      **The Plan Does Not Violate the Bankruptcy Clause of the United States Constitution**

Finally, the U.S. Trustee contends that the Court's ability to impose third-party releases somehow unconstitutionally exceeds the scope of the Bankruptcy Clause under Article I, section 8 of the U.S. Constitution (and yet again, *sub silentio*, seeking to nullify decades of precedent). (*See* UST Br. at 31-33.) But despite labelling this as a constitutional argument, the U.S. Trustee essentially just contests whether the released claims are sufficiently "related to" these cases—a challenge to the Bankruptcy Court's subject matter jurisdiction.  (*See* UST Br. at 32 ("The non-Debtor releases are not limited to claims that would impact the *res* of Purdue's bankruptcy estate.").)  As noted above, Congress granted broad "residual authority" to craft appropriate plans of reorganization consistent with "the traditional understanding that bankruptcy courts as courts of equity" are vested with "broad authority to modify creditor-debtor relationships." *Energy Resources Co.*, 495 U.S. at 549; *see also Pepper v. Litton*, 308 U.S. at 296 (recognizing bankruptcy court's "broad equitable powers"); *see* Section I, *supra*.  Where, as here, claims against the debtors cannot be equitably treated without treating highly-interconnected related claims between and among creditors and other parties, the power to release and channel those claims falls in the heartland of the Bankruptcy Court's power to "modify debtor-creditor relationships."

II.     **The Shareholder Settlement Is Reasonable and in the Best Interests of the Estates**

Maryland's throw away argument at the end of its brief that the Bankruptcy Court erred in approving the Shareholder Settlement under the governing standard set forth in *In re Iridium Operating LLC*, is entirely without merit. *See* 478 F.3d 452, 462 (2d Cir. 2007).  A bankruptcy court's determination "pursuant to Rule 9019 that a settlement is reasonable is viewed for abuse of discretion," *In re Delta Air Lines, Inc.*, 374 B.R. 516, 522 (S.D.N.Y. 2007), and Maryland

does not come anywhere close to satisfying that high bar, *id.* (observing that a "bankruptcy court will have abused its discretion if no reasonable man could agree with the decision to approve a settlement"). Indeed, Maryland cannot seriously contest that the Bankruptcy Court properly weighed the factors enumerated in the Second Circuit's controlling *Iridium* decision. The Bankruptcy Court determined that the Shareholder Settlement (and the interrelated creditor settlements that hinged on such settlement) were fair, reasonable, and in the best interests of the estates on the basis of an extensive and largely uncontroverted trial record, and its opinion is thorough, well-reasoned, and correct. (MBR at 71-103.) What Maryland claims instead is that the Bankruptcy Court's position that third-party releases are appropriate under certain circumstances (endorsed in 33 years of Second Circuit law), and its issuance of the preliminary injunction at the outset of the chapter 11 cases (affirmed by this Court) to protect the reorganization somehow infected the whole process and outweighs everything else. (Md. Br. at 57-59.) At base, Maryland argues that this Court must overturn the Confirmation Order <u>because the Bankruptcy Court followed decades of governing precedent</u>.

The Bankruptcy Court's position on third-party releases is consistent with—and compelled by—controlling Second Circuit authority, *see supra* Section I(A), and this Court itself affirmed the preliminary injunction as an appropriate exercise of the Bankruptcy Court's power. *In re Purdue Pharma L.P.*, 619 B.R. at 57-62. Maryland cannot convert its disagreement with the foregoing and the propriety of the Shareholder Releases into an attack on the reasonableness of the Shareholder Settlement, particularly where, as here, Maryland failed to adduce evidence to the contrary at trial or meaningfully contest the evidence put forth by the plan proponents that the settlement was negotiated and reached and overwhelmingly endorsed by creditors, including 80% of U.S. states, after years of mediation and litigation.

**III.    The Bankruptcy Court Correctly Concluded that the Plan is in the Best Interest of Creditors Under Section 1129(a)(7)**

Under Section 1129(a)(7), a plan may be confirmed only if each holder of a claim or interest in an impaired class has either accepted the plan or will receive or retain property having a present value, as of the effective date of the plan, of not less than the value such holder would so receive if the debtor were liquidated under chapter 7 of the Bankruptcy Code at that time.  11 U.S.C. § 1129(a)(7); *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 649 (2d Cir. 1988).  The Bankruptcy Court concluded for two independent reasons that this test was satisfied, and found as the trier of fact that objecting creditors would not receive less under the plan than they would so receive under a chapter 7 liquidation.  (App. A3523, A3535-36 (MBR) at 146, 148-149.)

The Bankruptcy Court credited the testimony of the Debtors' expert witness on liquidation, Jesse DelConte, which offered "low" "mid" and "high" estimates of the liquidation value of the Debtors' assets, the costs of liquidation, and aggregate recoveries to classes of the estates' creditors in a chapter 7 liquidation.  (App. A0813, A0818, A0829 (JX-3051)(Amended Expert Declaration of Jesse DelConte) ("**DelConte Expert Decl.**") at ¶¶ 9, 16, 48.)  The Court found that the Plan provided an estimated more than $5 billion in recoveries to opioid litigation claimants (App. A3395 (MBR) at 18.).  By contrast, the Court found that "[u]nder the most realistic scenarios described in [DelConte's] analysis, there would literally be <u>no</u> recovery by unsecured creditors from the estates in a Chapter 7." (App. A3467 (MBR) at 90.).  The Court further found that "even in the less likely 'best case' scenario" presented in DelConte's analysis, opioid litigation claimants collectively would share $699 million (as opposed to billions under the Plan).  (App. A3518-19 (MBR) at 141-42.)[20]

_____

[20] One of the key drivers of the extraordinary reduction in recoveries is that "in a liquidation scenario the United States' agreement in the DOJ's October 2020 settlement with
(….continued)

No party offered any competing expert or percipient witness testimony on the liquidation value of the Debtors' assets, the costs of liquidation, or likely creditor recoveries from the estates in a liquidation scenario.  Accordingly, the Court correctly concluded that in a chapter 7 liquidation creditors stood to recover nothing, and at best, billions of dollars less than they would recover under the Plan on their claims against the Debtors.  (App. A3519 (MBR) at 142.)

Appellants do not appear to seriously dispute that the consequence of a liquidation would be billions of dollars less in recoveries from the <u>estates</u>, and certainly point to no evidence to the contrary, for there is none.  And, in one of the most deafening of the dozens of deafening silences of the Appellants' papers on critical points, not one of them even alleges—let alone refers to one peppercorn of evidence—that they believe that they (or anyone) would actually receive more in a liquidation, even when including their claims against the Sacklers.  Rather, the Appealing States and California argue that the Bankruptcy Court erred in determining that the Plan satisfies the "best interests" of creditors test with respect to claims subject to the Shareholder Releases, first, by concluding that section 1129(a)(7) does not contemplate accounting for those third-party claims, and second, in making its straightforward factual finding that section 1129(a)(7)'s test is satisfied even if such claims are taken into account.  (Appealing States Br. at 39-48; Cal. Joinder at 1 (Oct. 26, 2021), Dkt. No. 99.)

---

(continued….)

Purdue to forego $1.775 billion of its $2 billion superpriority administrative expense claim for the benefit of the plan's abatement program would disappear" (App. A3467 (MBR) at 90,) meaning that the DOJ would be entitled to recover $2 billion from the estates ahead of unsecured creditors (*id*.).

A.   **The Bankruptcy Court Correctly Concluded That The Plain Meaning of Section 1129(a)(7) Does Not Require the Court to Consider The Value of Claims Creditors Hold Against Third-Parties**

Section 1129(a)(7) does not state that bankruptcy courts evaluating a plan providing for third-party releases must consider the value of such claims when comparing plan recoveries to the expected recovery in a hypothetical chapter 7 liquidation.  Rather, that section requires that the Court must compare the value a creditor will "receive or retain <u>under the plan</u> on account of such claim" against "the amount that such holder would <u>so</u> receive or retain" in a chapter 7 liquidation.  11 U.S.C. § 1129(a)(7) (emphasis added).  After considering whether the plain meaning of "<u>so</u> receive or retain" encompasses creditors' rights against third parties, the Bankruptcy Court concluded that "as a matter of grammar," the use of "so receive or retain" in the second clause, which concerns a chapter 7 liquidation means, refers back to "on account of such claim" in the first clause referring to Plan recoveries.  Thus, the Court interpreted 1129(a)(7) to require a comparison "between the amount that the objecting creditor would receive under the plan on account of its claim and what it would 'so' receive—that is, also on account of its claim—if the debtor were liquidated under chapter 7."  (App. A3521-22 (MBR) at 144-45.)

Appellants argue that the Bankruptcy Court erred because the "plain language" of 1129(a)(7) requires consideration of third-party claims that a creditor would "retain" in a chapter 7 but must non-consensually release under a Chapter 11 plan, which is the reading adopted by *In re Quigley*, 437 B.R. 102, 144-45 (Bankr. S.D.N.Y. 2010) and *In re Ditech*, 606 B.R. 544, 609-10 (Bankr. S.D.N.Y. 2019).  But only the Bankruptcy Court's interpretation of the plain meaning statute is consistent with the basic canon of construction that courts "must give effect to every word of a statute wherever possible."  *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004); *see Assoc. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016) ("[W]e

must attempt to give effect to the plain meaning of each word in the statute." (internal quotation marks omitted) (quoting *United States v. Pacheco*, 225 F.3d 148, 156 (2d Cir. 2000)).  Under the Bankruptcy Court's reading of the statute, the word "so" can and could do only one thing—link the value considered under a plan—the value that a creditor will "receive or retain under the plan on account of such claim"—with the value the creditor will "receive or retain" on account of that claim under a chapter 7 liquidation.  The readings advanced in *Quigley* and *Ditech* render the word "so" superfluous.

Furthermore, while Appellants attempt to cast the Bankruptcy Court as an outlier against a consensus consistent with *Quigley* and *Ditech*, a careful review of the case law demonstrates that a number of courts have limited the best interest test to the amounts "received or retained" on claims against the estate.  For example, in an analogous context, certain asbestos claimants against W.R. Grace argued that its plan failed the best interests test because those claimants could pursue recoveries from W.R. Grace's insurers in a hypothetical chapter 7 liquidation while such claims were enjoined under the plan.  *In re W.R. Grace*, 475 B.R. 34, 149 (D. Del. 2012). The district court rejected this argument, and concluded that the best interest test considered only the amount that claimants would obtain from the estates in a hypothetical chapter 7 liquidation, not the amount claimants would allegedly recover from the estates' insurers.  475 B.R. at 149-50. Indeed, the rule that a liquidation analysis consider only what may be realized on a claim against the debtor in chapter 7 liquidation and not from other sources has been applied in a number of contexts.  *See, e.g.*, *In re Plant Insulation Co.*, 469 B.R. 843, 888 (Bankr. N.D. Cal. 2012) (declining to follow *Quigley*, and explaining that 1129(a)(7) requires comparison of the amounts received on claims against the Debtor under a plan and a hypothetical chapter 7 scenario); *In re ARO Liquidation, Inc.*, Case No. 16-11275 (Bankr. S.D.N.Y. March 28, 2018), Hr'g Tr. at 20:4-

10 (following *W.R. Grace* and *Plant Insulation*); *see In re Dow Corning*, 237 B.R. 380, 411

(Bankr. E.D. Mich. 1999) ("When employing the best-interest-of-creditors test, courts look at the

dividend the creditor would receive from the chapter 7 trustee—and only that amount—for

comparison with the dividend available under the plan.").

**B.    The Bankruptcy Court Correctly Concluded, In the Alternative, that the
Best Interests Test is Satisfied Even If Third-Party Claims are Appropriately
Considered**

Although the Bankruptcy Court concluded that section 1129(a)(7) does not require

bankruptcy courts to consider amounts a claimant might receive from third-party claims, the

Bankruptcy Court nonetheless specifically engaged in this alternative analysis, found that "the

objectors' aggregate net recovery on their claims against the Debtor <u>and</u> the shareholder released

parties would be materially less than their recovery under the Plan," (App. A3520 (MBR) at 143)

and concluded as the trier of fact that the "[P]lan also meets Bankruptcy Code section

1129(a)(7)'s 'best interests' test under a broad construction of that test" (App. A3526 (MBR) at

149).

The starting point for this analysis was the finding that the hundreds of thousands of

unsecured claimants would collectively recover nothing, or at most $699 million, in a

liquidation—billions of dollars less than they would recover under the Plan.  (App. A3518-19

(MBR) at 141-42; App. A0813, A0829 (DelConte Expert Decl. at ¶¶ 9, 48).)  This meant that

creditor recoveries in a liquidation could be <u>greater</u> than Plan recoveries only if third-party

recoveries in a liquidation scenario could reasonably bridge that gulf.  The Bankruptcy Court

concluded that they could not, and rested its finding on "the evidence regarding the strengths and

weaknesses of the claims, including the cost of pursuing them, the risks of collection, and the

dilutive effect of all of the other litigation that would be pursued by all of the other creditors in

these cases, including all of the other states and governmental entities who are otherwise

agreeing to the plan that would have the same types of third-party claims, as well as the Chapter 7 trustee on behalf of the estate" (App. A3524-25 (MBR) at 147-48) as well as its consideration of the history of settlements involving the Sacklers, (App. A3525 (MBR) at 148).

Each of the factors the Bankruptcy Court considered in its evaluation of the objectors' net aggregate recoveries in a liquidation scenario was thoroughly explored at the confirmation hearing.  Evidence regarding the "strengths and weaknesses of the claims" against the Sacklers included the live testimony elicited by the State Appellants from four members of the Sackler family (David Sackler, Richard Sacker, Mortimer Sacker, and Kathe Sackler) and a deposition and declaration testimony by Ilene Sackler Lefcourt, which the Court viewed as relevant to "the strength of the estates' and third-parties' claims against them.  (App. A3468-69 (MBR) at 91-92.)  Countervailing evidence included fact and expert testimony submitted by the Sacklers, including testimony that "over 40 percent of the asserted avoidable transfer to the Sacklers or their related entities went to pay taxes associated with Purdue."  (App. A3470 (MBR) at 93 (referring to declarations of Carl Trompetta, Bankr. Dkt. No. 3415 (Aug. 5, 2021), and Jennifer Blouin ("**Blouin Decl.**"), Bankr. Dkt. No. 3419 (Aug. 5, 2021)); *id.* at 96 (referring to declaration of Lawrence Hamermesh ("**Hamermesh Decl.**"), Bankr. Dkt. No. 3421 (Aug. 5, 2021)); *see also* App. A1875-A1880 (Martin Report (Mortimer Sackler Family), Ex. C at 32-37 (Aug. 5, 2021), Bankr. Dkt. No. 3448); App. A1589-92 (Am. Martin Report (Raymond Sackler Family), Ex. H at 25-28 (Aug. 4, 2021), Bankr. Dkt. No. 3422); Declaration of Maureen M. Chakraborty ("**Chakraborty Decl.**") (Aug. 4, 2021), Bankr. Dkt. No. 3420); Expert Report of Michael Cushing (June 15, 2021), Bankr. Dkt. No. 3442-1).).  Evidence regarding the "risks of collection" of judgments against the Sacklers included the fact and expert testimony of Timothy Martin, who submitted 913 pages of declarations detailing the nature, location, and form of

ownership of the material assets of each of the two sides of the Sackler Families (App. A1829 (Martin Report (Mortimer Sackler Family)); App. 1020 (Am. Martin Report (Raymond Sackler Family)), and Steven Ives, who testified to the validity of information that the Raymond Sackler family provided to Timothy Martin (App. 1011-1013 (Ives Decl. ¶¶ 14-20 (Aug. 5, 2021), Bankr. Dkt. No. 3417).). (*See* App. A3462 (MBR) at 85 (referring to the "trial declarations of Timothy Martin and Steven Ives" regarding the Sacklers' assets).) The Bankruptcy Court also pointed to the testimony of the Mortimer Sackler family's expert on trust law of the Bailiwick of Jersey, who testified to the obstacles to collecting a judgment against Jersey trusts for the benefit of members of the Sackler families. (App. A3463-64 (MBR) at 86-87; *See* Expert Report of Michael Cushing, Bankr. Dkt. No 3442 (JX-0409), *In re Purdue Pharma L.P.*, Case No. 19-23649 (Bankr. S.D.N.Y.).) Evidence regarding the dilutive effect of litigation abounded. The Court had, in the form of the Martin Reports, detailed information about the amount of assets available to satisfy any judgment against any individual Sackler defendant, and the amount and nature of assets held in trusts for the Sacklers' benefit. (App. A1875-A1880 (Martin Report (Mortimer Sackler Family)), Ex. C at 32-37; App. 1589-92 (Am. Martin Report (Raymond Sackler Family), Ex. H at 25-28). The Court's own claims register demonstrated that the states alone had asserted $2.156 trillion in claims (App. A3519 (MBR) at 142), and that the aggregate amount of the "only roughly 10 percent" of claims filed in a liquidated amount came to "roughly $40 trillion of liability (excluding a $100 trillion claim that was filed by an individual." (App. A3395-96 (MBR) at 18-19; App. A0730 (JX-3028) (Pullo Decl. ¶ 8).)

Based on the extensive trial record, the Court found that "recovery on judgments would be difficult" because of "the dispersal of the Sacklers' wealth, including (x) among many different people or family groups, including outside of the U.S. and (y) in allegedly spendthrift

trusts, including, again, outside of the U.S." (App. A3518 (MBR) at 141.) The Court also noted that over 40% of the payments to the Sackler Families were made for the purposes of paying taxes (and thus arguably were made for fair consideration), and the statute of limitations could limit the reach back by the estates to most claims. (*See* App. A3470-72 (MBR) at 92-94.) The Court also found that any judgments would be diluted because the objecting states would be competing in a "battle of the century" with other creditors and the chapter 7 trustee liquidating the Debtors' estates for "only a small pro rata share of any recovery from" the assets of the Sackler defendants that "would be materially less than their recovery under the [P]lan." (App. A3518-19, A3525-26 (MBR) at 141-42, 148-49.) The Court gave particular weight to dilution by other governmental claimants, evaluating the objecting states' share of $450 billion of the aggregate $2.156 trillion consolidated State proof of claim, and found that, in the absence of a settlement "at least the other governmental entities would pursue similar claims against the shareholder released parties" because "they would never permit the objecting states, which are similarly situated to them, to win a litigation race." (App. A3519-20 (MBR) at 142-43.) Finally, the Court canvassed the limited history of settlements involving the Sackler families, including the Sackler's 2020 settlement with the DOJ for $225 million, their 2019 settlement with Oklahoma for $75 million, and that they "paid nothing" to obtain a release from Kentucky as part of that state's 2016 settlement with Purdue. (App. A3525 (MBR) at 148.)

The Appealing States do not identify any basis upon which to conclude these detailed findings of fact are clear error. Indeed, despite arguing that the best interests test must be "satisfied with evidence, not assumptions," the Appealing States do not cite a <u>single</u> exhibit, page, or line of the voluminous evidentiary record in support of their contention that the Bankruptcy Court erred, or identify any <u>fact</u> that could show the Bankruptcy Court's estimation

of objectors' recoveries in a hypothetical chapter 7 liquidation was clear error.  (Appealing States Br. at 44.)  Instead, they argue the Bankruptcy Court "committed three legal errors" in reaching its conclusion.  The "errors" they identify are not legal errors at all but only attempts to reargue the confirmation hearing while simply wishing away the factual findings and voluminous record below. (Appealing States Br. at 43.)

The Appealing States' first argument is that the Bankruptcy Court erred because it concluded that "the State's claims against the Sacklers lacked value without any actual evidence as to the value of those claims," (Appealing States Br. at 43) and that it "relied on assumptions rather than evidence."  (Appealing States Br. at 44.)  As has just been explored, that is simply not true.  The Bankruptcy Court explained that, "based on the record of the confirmation hearing, [it had assessed] what . . . would be recovered by the objectors if the Debtors were liquidated in Chapter 7, both on account of their claims against the Debtors and on account of their third-party claims" ((App. A3523 (MBR) at 146), made additional factual findings (App. A3524-26 (MBR) at 147-149) and directed the parties to findings that it had made in the prior 140-plus pages of its ruling (*see, e.g.*, App. A3525-26 (MBR) at 148-49 (referring to "the other evidence that I have already discussed at length" relating to third-party claims against the Sacklers)).

It appears that the Appealing States argue that "no evidence" regarding the value of the state's claims existed because Mr. DelConte did not attempt to value those claims—as he testified he "couldn't adequately estimate the value of those potential claims."  (App. A4580 (Hr'g Tr. 72:11-12 (Aug. 13, 2021)).)  That is of no moment, however.  Both *Quigley* and *Ditech* require consideration of third-party recoveries for purposes of the best interests analysis only when such recoveries are "neither speculative nor incapable of estimation."  *In re Quigley*, 437 B.R. at 145; *In re Ditech*, 606 B.R. at 615.  Thus, even under Appellants' view of the law, a

Debtor need not attempt to estimate third-party recoveries that are not "capable of estimation"—which is precisely how Mr. DelConte viewed third-party claims against the Sacklers.  In any case, the Bankruptcy Court did not view the absence of testimony by Mr. DelConte to be relevant to its analysis; it specifically rested its findings on <u>other</u> evidence (App. A3525 (MBR) at 147) and found that "no additional evidence" was required (*id.* at 147-48).  The Debtors have <u>never</u> asserted that creditors might not or do not have claims against the Sacklers.  The issue ultimately is rather simple:  if any do, all do, which quickly leads to claims asserted totaling tens of trillions of dollars.  It is impossible to assess how much any individual claimant would actually recover in a world where tens of thousands are simultaneously suing the Sacklers. These are the ultimate inestimable claims that both *Quigley* and *Ditech* said do not get counted under section 1129(a)(7).

The Appealing States' next argument, that the Bankruptcy Court erred because it relied upon on "profoundly inaccurate" legal assumptions about the relative or absolute strength of the States' claims (Appealing States Br. at 44) both bears no relationship to the record below and entirely misses the point of the Court's best interest analysis.  Contrary to the Appealing States' contention, the Bankruptcy Court did not find that their claims would be "diluted to worthlessness."  (Appealing States Br. at 46.)  What it <u>did</u> find was that objecting states would recover less on their claims against third-parties and on their estate claims in a chapter 7 scenario than their ratable share of the billions of dollars of creditor recoveries under the Plan.  (*See, e.g.*, App. A3519 (MBR) at 142 (comparing the "pro rata share" of recoveries against the Shareholder Released Parties against the "claims that under the plan are to be resolved by agreed multi-billion-dollar payments for abatement.").)  As explained above, that finding does not rest on a conclusion that the Appealing States' claims were weak, but the reality that they and all other

states (and hundreds of thousands of others) would be chasing the same, limited pool of assets and facing obstacles to collection and the risks of litigation. (*See* Section I.B.4(ii), *supra*.)  The Bankruptcy Court's findings about <u>dilution</u> could only be disturbed by compelling evidence that the Appealing States' claims are stronger than the claims of other States (even if one were to assume, as they do, that states have the strongest claims)[21] <u>and</u> that they would win the "race to the courthouse" against those other States and the estates <u>and</u> that they would surmount obstacles to collection.  They had their day—or over 8 days—in court and did not even try to make this showing.

Considered in the proper light, the remainder of the Appealing States' attempts to disguise as "errors of law" the inferences and conclusions the Bankruptcy Court drew from the extensive record or assert that no evidence exists when such evidence is clearly found, can be readily rejected.  The Appealing States' contention that the Bankruptcy Court made a legal error by failing to recognize their claims "differ in crucial respect from claims brought by other litigants" and that states enjoy advantages over other litigants (Appealing States Br. at 46) is both misguided, as explained above, and unsupported by the record.  The very Bankruptcy Court finding they cite as embodying this error (App. A3524 (MBR) at 147) specifically emphasizes the dilutive effect of "all of the <u>other states and governmental entities</u> who are otherwise agreeing to the plan that would have the same types of third-party claims," and the Court elsewhere emphasized the dilutive effect of other States' claims: "the states and territories filed proofs of claims in these cases aggregating at least $2.156 trillion. The share of that sum for the

---

[21] This assumption is far from agreed, as many creditor groups, including the personal injury claimants, vehemently contest the States' asserted primacy of place among claimants against Purdue and the Sackler.

objectors who have attacked the plan's third-party claims release is roughly 450 billion, or less than 21 percent" (App. A3519-20 (MBR) at 142-43).

Their assertion that the Bankruptcy Court "provided no explanation of the legal or evidentiary support" (Appealing States Br. at 46) for its conclusion that the estates' avoidance claims would "probably would have the best chance of material success among all of the claims against the shareholder released parties" (*id.* citing App. A3518 (MBR) at 141)) is likewise false. The Bankruptcy Court dedicated 28 pages of its opinion to canvassing the evidence regarding strength of those claims and, in the course of that discussion, comparing and contrasting them with third-party claims.  (MBR at 71-99.)  It is also categorically false that "no [] evidence was proffered" regarding the value of the estate's fraudulent transfer claims, as the Appealing States assert (Appealing State Br. at 46.).  Thousands of pages of expert reports and declarations addressed the strength of these claims.  (Declaration of Richard A. Collura (Aug. 5, 2021), Bankr. Dkt. No. 3410); Declaration of David W. DeRamus, PhD (Aug. 5, 2021), Bankr. Dkt. No. 3428); Chakraborty Decl. (Aug. 4, 2021), Bankr. Dkt. No. 3420); App. A1829 (Martin Report (Mortimer Sackler Family)); App. A1020 (Am. Martin Report (Raymond Sackler Family)); Blouin Decl. (Aug. 5, 2021), Dkt. No. 3419); Hamermesh Decl. (Aug. 5, 2021), Bankr. Dkt. No. 3421).)  The Bankruptcy Court made a specific finding on the value of those claims and the closely-related third-party claims.  (App. A3476 (MBR) a99 ("I believe that in a vacuum the ultimate judgments that could be achieved on the estates' claims (and the closely related third-party claims that are being settled under the plan) might well be higher than the amount that the Sacklers are contributing.").  Mr. DelConte's liquidation analysis also included an estimate of the value of such claims in liquidation scenarios.  (App. A0821, A0824-25 (DelConte Expert Decl.) ¶¶ 23, 33.).

Appealing States' final argument—that the Court committed legal error by "relying upon the lack of meaningful history of settlements or resolutions" because the "only reason there is no similar history here is that the Court stayed all actions"—fares no better.  (Appealing States Br. at 46.)  As has already been explained, the Bankruptcy Court did consider settlements that provided for releases of members of the Sackler Families, including a 2016 settlement with Kentucky, the 2019 settlement with Oklahoma, and the 2020 settlement with the Department of Justice, and determined that the "amounts reasonably compare to the proposed recoveries to the objecting states under the plan."  (App. A3525 (MBR) at 148.)  That the Appealing States wish the Bankruptcy Court gave greater weight to their meritless argument about the impact of the preliminary injunction, or settlements they hypothesize might have existed but for that injunction, is no basis to disturb the Bankruptcy Court's detailed findings (especially where the Appellants introduced zero evidence and have in fact never even asserted how or why they would do better in a horrifying meltdown liquidation).

## IV.     The Appeal of Certain Canadian Municipalities and First Nations Creditors is Meritless

The Bankruptcy Court's decision to overrule the objection of the Canadian Appellants to the release provisions in the Plan, and its finding that the Plan's classification of the Canadian Appellants was proper, should be affirmed.[22]  (App. A3413, A3417 (MBR) at 36, 40.)

---

[22] The Canadian Appellants also incorporate by reference "the issues raised by other appellants."  Canadian Appellants' Br. at xi.  While such issues were not preserved for appeal by Canadian Appellants due to their failure to raise those issues before the Bankruptcy Court despite having the opportunity to do so, the Debtors' responses to such issues are set forth fully above. See e.g., In re Great Atl. & Pac. Tea Co., Inc., 472 B.R. 666, 679 (S.D.N.Y. 2012) ("Appellant waived its arguments" on appeal where "it did not raise these particular arguments below despite the opportunities to do so in its written objections or at the Hearing.")

## A.      The Canadian Appellants Misunderstand the Plain Language of the Plan

As an initial matter, the Canadian Appellants' arguments are premised on a deeply flawed understanding of the Shareholder Releases.  The Canadian Appellants' claims, by their own admission, "concern the operations of Purdue Canada, the Debtors' Canadian non-bankrupt affiliate" and the Shareholder Released Parties' control, direction, and oversight of Purdue Canada, and accordingly are materially different from those held by domestic municipalities and Indian tribes.  (Canadian Appellants' Br. at 17-18, 21.)  Despite their argument that their claims against the Sacklers arise out of the Canadian conduct of Purdue Canada, the Canadian Appellants argue that the releases apply to them because all claims that "concern conduct that even touches" the Debtors are released (Canadian Appellants' Br. at 12).  This is wrong.

As has been explained at length in Section III.G, *supra*, claims are subject to the Shareholder Releases if they relate to the Debtors <u>and</u> the "conduct, omission or liability of any Debtor or any Estate" is a "legal cause or [] otherwise legally relevant factor" for the claim. (App. 3180 (Plan at 126).)  Thus, if a Debtor's conduct is not either a "legal cause" or a "legally relevant factor" with respect to a particular claim, such claim is not subject to the Shareholder Release in the first place.  The Canadian Appellants' failure to acknowledge this express limitation, including by asserting that "[t]he releases extinguish . . . all non-Debtors' direct opioid causes of action against the Shareholder Released Parties that are 'based on or relating to, or in any manner arising from, in whole or in part, the Debtors,'" misrepresents the plain language of the Plan.  (Canadian Appellants' Br. at 11.)

Moreover, the Plan provides for an <u>additional</u> specific limitation on the Shareholder Releases with respect to Purdue Canada.  Claims that are "Excluded Claims" are excluded from the Shareholder Release.  (*See* App. A3176 (Plan § 10.7(b)) ("Notwithstanding anything herein

to the contrary, (x) nothing in the Plan shall release any Excluded Claim").)  The Plan defines

"Excluded Claim" to include:

> . . . (v) any Cause of Action . . . against any non-Debtor Person (including, without limitation . . . "Purdue Canada"[] or any other Shareholder Released Party) that (x) arises out of or relates to the conduct of any corporations, companies, partnerships and other entities formed under the laws of Canada or its provinces affiliated or associated with any of the Debtors, including, without limitation, Purdue Canada and (y) is not based upon any conduct of the Debtors, including any Opioid-Related Activities of the Debtors . . . .

(App. A3064 (Plan at 10).)  To further dispel any doubt, the definition of "Excluded Claim" goes

on to state:

> For greater certainty, with respect to the foregoing clause (v), to the extent a Cause of Action is asserted in Canada against a Shareholder Released Party and/or former director or officer of a Debtor, the knowledge of that Person regarding the Opioid-Related Activities of the Debtors may be asserted against that Person and form part of the Cause of Action in Canada, and any such assertion shall be without prejudice to all defenses of the applicable Shareholder Released Party or former officer or director to such assertion.

(*Id*.)  This language was negotiated for months by counsel for the Canadian Provinces

specifically to preserve such governmental claims.  (*See* App. A4552 (Hr'g Tr. 47:19-48:17

(Aug. 9, 2021); *see also* Agreed Stipulation and Order, Bankr. Dkt. No. 3520 at ¶ 2 & n.3).  So,

too, the Canadian Appellants' claims concerning the operations of Purdue Canada will be

"Excluded Claims" unless those claims are "based upon any conduct *of the Debtors* . . . ."  (*Id.*

(emphasis added).)  Based upon the scope of the Shareholder Release under Section 10.7(b) and

the definition of Excluded Claim, the Bankruptcy Court correctly concluded that, "[t]o the extent

they are against Purdue Canada or other non-Debtors, [the Canadian Appellants' claims] are

fully preserved under the plan.  Nor are claims that are based on the shareholder released parties'

conduct related to non-Debtors released or enjoined under the plan."  (App. A3410 (MBR) at 33

n.2; *see also id.* at 39 n.3.)  But, again, the Canadian Appellants never once cite to this plain

language of the Plan either, and instead misrepresent to this Court that the Plan sets a different

standard—that claims that "even touch" the Debtors are not Excluded Claims.  (Canadian

Appellants' Br. at 12, 24).  Furthermore, if the Canadian Appellants were correct that such

claims "are not subject to the carve-out and are [*sic*] released" (Canadian Appellants' Br. at 24),

one would have expected, at a minimum, the Canadian Provinces (which negotiated the terms of

the carve-out over many months) or any other foreign governmental entity to have joined in this

objection.  None has.

**B.      The Canadian Appellants are Subject to the Bankruptcy Court's Personal Jurisdiction**

The Canadian Appellants suggest, wholly without support, that sovereign immunity

would, if applicable, bar the Bankruptcy Court's imposition of the Shareholder Releases as to

them.  (Canadian Appellants' Br. at 26.)  In addition to providing no legal authority for this

position, the Canadian Appellants premise their argument on the fact that the Shareholder

Releases "impose liability" on the Canadian Appellants.  (*Id.*)  Not so.  (*See* Section I(B)(2)(iii),

*supra*.)  But, even assuming *arguendo* that sovereign immunity could serve as an impediment to

imposing third-party releases on a foreign governmental creditor, it is no impediment here:  The

Canadian Appellants freely and voluntarily subjected themselves to the jurisdiction of the

Bankruptcy Court by filing proofs of claim in these proceedings, and the Bankruptcy Code

abrogates any immunity they may have.

While the Canadian Appellants first argue that they were "involuntarily hailed" into the

Bankruptcy Court (Canadian Appellants' Br. at 39-42), that is patently untrue.  Each of the

Canadian Appellants inserted themselves into these proceedings by voluntarily filing a proof of

claim against the Debtors.  (*See* App. A4216, A4342-A4374 (Claim Nos. 145592, 144455,

144366, 144514, 144475, 144465).)  In so doing, each of the Canadian Appellants voluntarily

subjected itself to the jurisdiction of the Bankruptcy Court.  *See In re S.G. Phillips Constructors,*

*Inc.*, 45 F.3d 702, 707 (2d Cir. 1995) (finding claimant "by filing its proof of claim in this case . .

. necessarily submitted to the court's equitable power to resolve its claims").  The Canadian Appellants' argument that the Court exercised jurisdiction over absentee class members is similarly nonsensical.  No class of Canadian Municipalities or Canadian First Nations and Metis People have been certified in the underlying litigation, as the Canadian Appellants concede (Canadian Appellants' Br. at 7, 42), and they never even filed a motion for leave to file class proofs of claim in the chapter 11 cases.  Indeed, no class has been certified for <u>any</u> creditor group in the chapter 11 cases.  The six Canadian Appellants speak for themselves alone, and cannot assert the rights of third parties not before the Court.

### 1.    Sovereign Immunity under the FSIA is Abrogated by Section 106(a)

Section 106(a) of the Bankruptcy Code abrogates any sovereign immunity that the Canadian Municipalities may have under the Foreign Sovereign Immunities Act ("**FSIA**").  Section 106(a) provides that, with respect to certain enumerated sections of the Code, including section 105 under which the Shareholder Releases are issued, *see* Section I.A, *supra*, "[n]otwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit."  11 U.S.C. § 106(a).  As relevant here, "governmental unit" is defined to include a "foreign state" and any "other foreign or domestic government."  11 U.S.C. § 101(27).  The Canadian Appellants do not dispute that the four Canadian Municipalities fall within the scope of section 101(27).

Every court to have considered the issue has held that section 106 abrogates sovereign immunity under the FSIA.  Less than one month ago, Judge Hellerstein identified two prior cases as the only cases addressing this issue—*In re Tuli*, 172 F.3d 707 (9th Cir. 1999) and *In re RMS Titanic, Inc.*, 569 B.R. 825 (Bankr. M.D. Fla. 2017).  *See Kyrgyz Repub. v. Kumtor Gold Co. CJSC (In re Kumtor Gold Co. CJSC)*, No. 21 Civ. 6578, 2021 WL 4926014, at *5 n.2 (S.D.N.Y. Oct. 20, 2021).  In *In re Tuli*, the Ninth Circuit held that a "foreign state or other foreign or

domestic government" "can no longer assert sovereign immunity from liability for certain actions under the Bankruptcy Code" because section 106 abrogated sovereign immunity under the FSIA, and thus Iraq could not assert sovereign immunity as a defense to an adversary proceeding brought by a civil engineering contractor pursuant to section 542.  172 F.3d at 711-12.  And, relying on *Tuli*, the Bankruptcy Court for the Middle District of Florida held that section 106(a) abrogated sovereign immunity as to the Republic of France with respect to claims for recovery of artifacts salvaged from the RMS Titanic pursuant to sections 105 and 363.  *In re RMS Titanic, Inc.*, 569 B.R. at 833.

The Canadian Appellants' argument accordingly finds no support in applicable precedent—and the two cases the Canadian Appellants cite are not to the contrary.  In *In re Stone & Webster*, the Bankruptcy Court for the District of Delaware considered only whether the court had jurisdiction over a breach of contract adversary proceeding under the commercial activities exception to the FSIA.  *In re Stone & Webster Inc.*, 276 B.R. 360, 362, 365 (Bankr. D. Del. 2002).  As section 106(a) and the abrogation of sovereign immunity under the Bankruptcy Code were not at issue, *In re Stone & Webster* has no bearing on the instant appeal.  Similarly, *In re EAL (Delaware) Corp.* is inapposite because that case involved a predecessor version of section 106(a) which contained a narrower abrogation of sovereign immunity that only applied to "any claim against such governmental unit . . . that arose out of the same transaction or occurrence out of which such governmental unit's claim arose."  No. 93-578-SLR, 1994 WL 828320, at *12 (D. Del. Aug. 3, 1994).  The District Court for the District of Delaware there held only that the act at issue did not constitute a "claim" within the meaning of the predecessor statute, *id.*, which holding has no relevance to the alleged sovereign immunity of the Canadian Municipalities here.

### 2.     Canadian First Nations' Sovereign Immunity Argument is Baseless

For the very first time in these cases, the Canadian Appellants argue on appeal that the alleged sovereign immunity of the Canadian First Nations derived from common law and not the FSIA prevents the Shareholder Releases from being imposed on them.  (Canadian Appellants' Br. at 27-30, 33-36.)  As a procedural matter, this argument should be dismissed as it was never raised before the Bankruptcy Court, despite numerous opportunities to do so.  *See e.g.*, *In re Great Atl. & Pac. Tea Co., Inc.*, 472 B.R. at 679.  On the merits, the Canadian Appellants' argument is unavailing as it simply ignores, if not purposefully obfuscates, the material distinction between <u>domestic</u> Indian tribes and the <u>foreign</u> Canadian First Nations.

Section 101(27) of the Bankruptcy Code defines "governmental unit" to mean "United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States . . . , a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government."  11 U.S.C. § 101(27). The term does not expressly include domestic Indian tribes, but does include "other . . . domestic government[s]."

Whether section 101(27) applies to <u>domestic</u> Indian tribes is the subject of debate in light of the doctrine of domestic tribal sovereign immunity under U.S. law, which is grounded in the complex history of the relationship between the Indian tribes within the boundaries of the United States—the so-called non-foreign "domestic dependent nations" of *Cherokee Nation v. Georgia*, 30 U.S. 1, 17 (1831)—and the U.S. Government.  *See, e.g.*, *Michigan v. Bay Mills Indian Community*, 572 U.S. 782, 800 (2014) (describing domestic tribes as retaining a "special brand of sovereignty").  Given the canons of statutory construction premised on this "special" relationship, courts are split as to whether domestic Indian tribes are "other . . . domestic governments[s]" within the meaning of section 101(27) and, therefore, "governmental units"

whose sovereign immunity Congress intended to abrogate under section 106(a).  *See, e.g.*, *In re Greektown Holdings, LLC*, 532 B.R. 680, 690-701 (E.D. Mich. 2015) (summarizing split and holding "other domestic governments" under the Bankruptcy Code did not "unambiguously, clearly, unequivocally and unmistakably refer[] to Indian tribes"); *In re Money Center of Am., Inc.*, 565 B.R. 87, 101-03 (Bankr. D. Del. 2017) (summarizing split and following *Greektown* and *Whitaker*); *compare Krystal Energy Co. v. Navajo Nation*, 357 F.3d 1055, 1056 (9th Cir. 2004), *as amended on denial of reh'g* (Apr. 6, 2004) (finding that "Congress did abrogate the sovereign immunity of Indian tribes under 11 U.S.C. §§ 106(a) and 101(27)" through the term "other domestic governments"); *In re Vianese*, 195 B.R. 572, 575-76 (Bankr. N.D.N.Y. 1995) (same) *with In re Whitaker*, 474 B.R. 687, 695 (B.A.P. 8th Cir. 2012) (holding that section 101(27) did not encompass Indian tribes because, while domestic, Indian tribes have not been referred to as "governments" by the Supreme Court); *In re Mayes*, 294 B.R. 145, 148 n. 10 (B.A.P. 10th Cir. 2003) (interpreting "domestic government" in section 101(27) to not include Indian nations and tribes).

None of this debate, however, applies to the two Canadian First Nations, which are not domestic.  (*See* Canadian Appellants' Br. at 47-48.)  First, Canadian Appellants have provided no support, evidentiary or otherwise, for the principle that the two Canadian First Nations have sovereign immunity.  A proponent of sovereign immunity, including "in the case of a party claiming tribal sovereign immunity," bears "the burden of establishing that they are entitled to sovereign immunity."  *City of New York v. Golden Feather Smoke Shop, Inc.*, No. 08-CV-3966 (CBA), 2009 WL 705815 (E.D.N.Y. Mar. 16, 2009).  The only case on which the Canadian Appellants rely, *Canadian St. Regis Band of Mohawk Indian* ex rel. *Francis v. New York*, does not support their argument.  There, the district court specifically did <u>not</u> decide whether the

118

Canadian tribal entities before it were, in fact, legal tribes, and, in holding tribal sovereign immunity did not bar the claims at issue, did not need to reach the question.  278 F. Supp. 2d 313, 321 n.3, 358-60 (N.D.N.Y. 2003).

Second, the Canadian Appellants do not and cannot explain why section 106(a)'s catch-all reference to "other foreign [] governments" does not apply to the two Canadian First Nations without inventing a new unstated limitation that an entity is an "other foreign . . . government" only if it has "full governmental authority."  (Canadian Appellants' Br. at 35.)  They identify no legal authority for such a condition, have made no effort to demonstrate that this condition, if it were to exist, would apply here as a matter of fact, and the evidentiary record is closed. Moreover, to the extent that the Canadian Appellants suggest that section 106(a) cannot abrogate the sovereign immunity of foreign native tribes if it does not abrogate the immunity of domestic Indian tribes, this argument too must fail.  As explained above, the division among courts on the issue of whether Congress intended to include domestic Indian tribes in the definition of "governmental unit" emanates from the "special" relationship between domestic Indian tribes and the U.S. Government.  That nuanced split has no bearing on whether Congress intended to include any foreign tribal or similar governmental entity—which has no similar "special" relationship with the U.S. Government and could take many different forms in jurisdictions around the world—through the "other foreign [] governments" catch-all.  Accordingly, this argument should be overruled.

### C.    Claims of the Canadian Appellants Are Properly Classified in Class 11(c) and Have an Opportunity for Compensation Accordingly

The Canadian Appellants argue that the Plan violates section 1123(a)(4) of the Bankruptcy Code because the Canadian Appellants' claims will not receive the same treatment as claims of domestic municipalities and domestic Indian tribes in Classes 4 and 5.  (*See*

Canadian Appellants' Br. at 46-47.)  Section 1123(a)(4) has no application to the Canadian

Appellants' appeal because it requires equality of treatment only among creditors in the same

class, 11 U.S.C. § 1123(a)(4); *see In re Multiut Corp.*, 449 B.R. 323, 336 (Bankr. N.D. Ill. 2011),

and the Canadian Appellants are classified in Class 11(c).

      To the extent the Canadian Appellants mean to argue that they should have been

classified in Classes 4 and 5, this, too, would fail because a Debtor may separately classify

claims so long as the classification scheme has a reasonable basis.  *See Boston Post Rd. Ltd.

P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 482-83 (2d Cir. 1994)

(recognizing similar claims may be separately classified unless sole purpose is to engineer

assenting impaired class); *In re Drexel Burnham Lambert Grp., Inc*., 138 B.R. at 757 ("A plan

proponent is afforded significant flexibility in classifying claims under § 1122(a) if there is a

reasonable basis for the classification scheme and if all claims within a particular class are

substantially similar."); *see also In re LightSquared, Inc.*, 513 B.R. 56, 83 (Bankr. S.D.N.Y.

2014); *see generally* 7 COLLIER ON BANKRUPTCY ¶¶ 1122.03, 11.29.03 (16th Ed. 2021).  The

Bankruptcy Court concluded that "there are reasonable bases for separately classifying" the

Canadian Appellants' claims, (App. A3411-12 (MBR) at 34-35), and the Canadian Appellants

identify no evidence that could show this finding to be clear error.  The Bankruptcy Court found,

and the Canadian Appellants do not dispute, that the Canadian Appellants (i) operate under

different regulatory regimes "with regard to opioids and abatement" than do domestic

counterparts; and (ii) "the allocation mediation conducted by Messrs. Feinberg and Phillips that

resulted in the plan's division of the Debtors' assets and third-party claims . . . involved only

U.S.-based public claimants with their own regulatory interests and characteristics."  (App.

A3512 (MBR) at 35.)  Indeed, in an odd turn, the Canadian Appellants go to great lengths to

distinguish their claims from those held by the domestic creditors in Classes 4 and 5:  they explain (i) "[t]he Canadian Appellants are in Canada, [(ii)] the bulk of their legal claims arise in Canada, [(iii)] those claims concern the operations of Purdue Canada," and (iv) the Canadian Appellants' claims "bear no relation to the Shareholder Released Parties' control, direction, and oversight of *the Debtors* or their U.S. operations."  (Canadian Appellants' Br. at 17-18 (emphasis in original).)  These concessions provide a more than sufficient basis to classify the Canadian Appellants' claims separately from those of domestic municipalities and Indian tribes.  The logic of the Bankruptcy Court's findings is further underscored, as the Court noted, by the fact that "U.S. and Canadian creditors have been found to be properly classified separately," in prior mass tort cases. (App. A3512-12 (MBR) at 35-36 (citing *In re Dow Corning Corp.*, 280 F.3d at 661; *In re W.R. Grace & Co.*, 729 F.3d 311, 329-30 (3d Cir. 2013)).)

Any inquiry regarding the treatment of the Canadian Appellants' claims thus ends at their concession that their claims will receive the same treatment as all other Claims in Class 11(c) (Canadian Appellants' Br. at 44, 47-48.), which is all the Code requires.  Because Class 11(c) accepted the Plan, (App. A0735 (JX-3028) (Pullo Decl.), Ex. A.) the Canadian Appellants cannot argue that the Plan discriminates against their <u>class</u> of claims, which can only be raised by a creditor in a <u>dissenting</u> class.  11 U.S. Code § 1129(b)(1) ("[T]he court . . . shall confirm the plan . . . if the plan does not discriminate unfairly . . . with respect to <u>each class of claims or interests that is impaired under, and has not accepted, the plan</u>.") (emphasis added).  And they could not show any "unfair discrimination" given that they made no attempt at trial to compare the ratable recoveries in each class, but instead compare only the value reserved for each class.  And this too shows nothing:  that there is "only" $15 million reserved for Class 11(c) tells nothing about recoveries to class 11(c) claimants, or how those compare to the recoveries on the trillions of

dollars of claims asserted in classes 4 and 5.  That the Canadian Appellants wish they received something more or different, at the expense of all other creditors, is no basis to overturn confirmation of the Plan.

**V.**     **The Bankruptcy Court Did Not Abuse Its Discretion In Issuing the Disclosure Statement Order or the Advance Order**

The U.S. Trustee also appeals the "related" order approving the Debtors' disclosure statement and the Advance Order because "[n]on-debtor releases are unconstitutional and violate the Bankruptcy Code."  (UST Br. at 57-58.)  Because the U.S. Trustee's challenge to these related orders is predicated on its erroneous argument that the Shareholder Releases are illegal, this Court should affirm these orders for the reasons established above.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's order confirming the Debtors' Twelfth Amended Plan, the Disclosure Statement Order, and the Advance Order should be affirmed.

Dated:   November 15, 2021
         New York, New York

DAVIS POLK & WARDWELL LLP

By:   */s/ Marshall S. Huebner*

450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Eli J. Vonnegut
James I. McClammy
Marc J. Tobak
Gerard X. McCarthy

*Counsel to the Appellees-Debtors
and Debtors in Possession*

**Annex A**

Select Allegations in Complaints Filed by State Appellants

| California | |
|---|---|
| App. 4974 (JX-0947) (First Am. Comp., *The People of California v. Purdue Pharma L.P.*, No. 19STCVl9045 (L.A. Super Ct. 2019)) | |
| **Defendants** | **Allegations** |
| **Entities**: Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company Inc.<br><br>**Individual Defendants**: Dr. Richard S. Sackler; Beverly Sackler; Jonathan Sackler; David Sackler; Marianna Sackler; Theresa Sackler; Ilene Sackler Lefcourt; Dr. Kathe Sackler; Mortimer D.A. Sackler; and Does 9 through 100 | • ¶ 6: "Purdue, under the direction of the Sacklers, continued its aggressive deceptive marketing campaign and over-promotion of opioids following its 2007 guilty plea."<br><br>• ¶ 8: "The Sacklers were directly involved in developing, directing, and voting on Board matters that facilitated Purdue's deceptive practices that helped create the crisis we face today."<br><br>• ¶ 17: "At all relevant times, Dr. Richard Sackler, through his direction of Purdue and participation in the marketing and sales activities of Purdue, has transacted business throughout California, including in Los Angeles County." *See also* ¶¶ 19-25.<br><br>• ¶ 191: "Purdue is a family-owned business. The Sacklers have always controlled Purdue, and occupied a majority of Purdue Pharma Inc.'s Board since its inception in 1990 until 2018 . . . The Sacklers had control and oversight over Purdue's deceptive conduct."<br><br>• ¶ 192: "The Sacklers were actively involved in directing Purdue's marketing strategies in a way that downplayed opioids' many risks and overstated their benefits. The Sacklers made decisions that caused Purdue to downplay the addictive nature of their opioids . . ." |

| Connecticut | |
|---|---|
| Appealing States App. A-525 (Second Am. Comp., *State of Connecticut v. Purdue Pharma L.P.*, No. X07 HHD-CV-19-6105325-S (Hartford Sup. Ct. July 1, 2019)) | |
| **Entities**: Purdue Pharma L.P.; Purdue Pharma Inc.; Purdue Holdings L.P.; PLP Associates Holdings L.P.; BR Holdings Associates L.P.; Rosebay Medical Company L.P.; | • ¶ 92: "Beginning in 2008, Purdue at the direction of the Individual Defendants, began adding hundreds of sales representatives to their sales force, until their sales force reached a high in 2016 of more than double what it had been in 2007, to help carry out their deceptive sales campaign."<br><br>• ¶ 112: "The Individual Defendants played an active and |

| | |
|---|---|
| and Beacon Company<br><br>**Individual Defendants**: Richard S. Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Frank Peter Boer; Paulo Costa; Cecil Picket; Ralph Snyderman; Judith Lewent; John Stewart; and Mark Timney | central role in the management of Purdue."<br><br>• ¶ 113: "Starting at the top, the Sacklers own and led Purdue. The Sacklers were directly involved in developing and approved Purdue's deceptive and illegal activities in Connecticut, and they each participated in the decisions to mislead Connecticut prescribers, and patients to generate a huge financial windfall for themselves."<br><br>• ¶ 114: "The other Individual Defendants were directly involved in developing and approving Purdue's deceptive and illegal activities in Connecticut, and they each participated in the decisions to mislead Connecticut prescribers and patients in return for money."<br><br>• ¶ 132: "The Individual Defendants participated directly in Purdue's unfair and deceptive acts and practices alleged in this Complaint." *See also* ¶¶ 133-44. |

| | |
|---|---|
| **Delaware**<br><br>Appealing States App. A-1289 (JX-1646) (Comp., *Delaware v. Sackler*, No. N19C-09-062 MMJ CCLD (Del. Super. Ct. Sep. 9, 2019)) | |
| **Entities**: None<br><br>**Individual Defendants**: Richard Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Theresa Sackler; David Sackler | • ¶ 9: "The Sackler-directed aggressive marketing campaign enabled Purdue to overcome the longstanding medical consensus that opioids were unsafe for the treatment of chronic pain . . ."<br><br>• ¶ 60: "Under the management, control, and direction of the Sackler Defendants, Purdue has engaged in a multi-million-dollar marketing campaign to minimize and misstate the risks of addiction and abuse when prescription opioids are used to treat chronic pain."<br><br>• ¶ 90: "Purdue specifically targeted its marketing to primary care physicians, who are generally less aware of the medical literature regarding the dangers of treating chronic pain with opioids . . ."<br><br>• ¶ 254: "The Sackler Defendants knew or should have known that their continuing efforts to employ deceptive and unfair marketing, despite Purdue being previously sanctioned by government agencies for such actions, would contribute to the opioid epidemic in Delaware . . ." |

| District of Columbia | |
| --- | --- |
| **App. A4946 (JX-0946) (Unredacted Comp.,** *District of Columbia v. Purdue Pharma L.P.*, No. 2019 CA 003680 B (D.C. Super. Ct. Civil Div. July 8, 2019)) | |
| **Entities**: Purdue Pharma L.P.; Purdue Pharma Inc.<br><br>**Individual Defendants**: Richard Sackler | • ¶ 47:  "At all times material to this Complaint, R. Sackler, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, participated in, or with knowledge approved of the acts or practices of Purdue, including the unlawful acts and practices set forth in this Complaint."<br><br>• ¶ 52:  "R. Sackler repeatedly impelled Purdue management to increase the sale of Purdue's opioids."<br><br>• ¶ 53:  "R. Sackler and the rest of the Purdue Board were actively involved in shaping the messages that Purdue sales representatives provided during their sales calls."<br><br>• ¶ 54:  "R. Sackler was involved in forming strategies that Purdue used to combat bad press that Purdue received about its opioids."<br><br>• ¶ 55:  "R. Sackler was involved in helping Purdue negotiate a label for OxyContin with the FDA that would enable the company to broadly market its new drug."<br><br>• ¶ 57:  "In sum, R. Sackler was involved in overseeing and directing the business of Purdue, including but not limited to by: making hiring decisions, setting the budgets (and therefore the goals) for opioids sales, analyzing (and criticizing) the work of Purdue employees, setting bonuses for Purdue employees . . ." |

| Maryland | |
| --- | --- |
| **App. A4838 (JX-1753) (Comp.,** *Consumer Protection Division (AG Office, Maryland) v. Purdue Pharma, L.P.*, No. 311366 (May 29, 2019)) | |
| **Entities**: Purdue Pharma L.P.; Purdue Pharma Inc.; The Purdue Frederick Company Inc.; Purdue Pharmaceutical Products LP; Avrio Health Limited Partnership; Rhodes Pharmaceuticals LP | • ¶ 62:  "Richard Sackler, Jonathan Sackler, Mortimer Sackler, Kathe Sackler, Ilene Sackler Lefcourt, Theresa Sackler, and David Sackler . . . each knowingly aided, participated in and benefited from the unlawful conduct of Purdue. They were deeply and personally involved. Purdue is the family business."<br><br>• ¶ 63:  "At the direction of the Sackler Respondents, Purdue has in the last two decades manufactured, marketed, sold, and distributed opioids in Maryland and nationwide . . ." |

| **Individual Defendants**: Richard Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Kathe Sackler; Ilene Sackler Lefcourt; Theresa Sackler; David Sackler | • ¶ 65: "The Sackler Respondents were chief architects and beneficiaries of Purdue's false marketing and deception and failure to report suspicious orders." |
|---|---|
| | • ¶ 67: "The Sackler Respondents controlled and directed all of the misconduct described herein; including knowingly and intentionally directing sales representatives to promote Purdue's addictive and lethal narcotics and failing to report suspicious orders." |
| | • ¶ 108: "At the Sackler Respondents' direction, Purdue managers hired and trained a sales force comprised of hundreds of sales reps." |
| | • ¶ 120: "At the Sackler Respondents' direction, Purdue also tracked physicians' prescribing practices . . ." |
| | • ¶ 128: "At the Sackler Respondents' direction, Purdue encouraged doctors to prescribe high doses and failed to warn that higher doses carry heightened risk of addiction, overdose, and death." |
| | • ¶ 222: "The Sackler Respondents helped direct Purdue's unlawful marketing techniques, using many of the same unethical techniques developed by Arthur Sackler, to maximize their sales of opioid products. The Sackler Respondents worked hard to ensure that Purdue succeeded financially." |
| | • ¶ 225: "The Sackler Respondents were deeply involved in OxyContin's marketing campaign." |
| | • ¶ 232: "The Sackler Respondents participated in the unfair and deceptive trade practices engaged in by Purdue." |
| | • ¶ 253: "The Sackler Respondents, in their capacities as directors and executives, controlled the operation of Purdue's sales representatives." |

| <u>Oregon</u><br><br>App A4814 (JX-1647) (Comp., *State of Oregon v. Richard S. Sackler et al.*, No. 19CV22185 (Multnomah Cir. Ct. Aug. 30, 2019)) | | |
|---|---|---|
| **Entities**: Purdue Pharma L.P.; Purdue Pharma Inc.<br><br>**Individual Defendants**: Richard S. Sackler; | • ¶ 25: "By virtue of their control of Purdue Pharma Inc., the Sacklers have complete control over Purdue Pharma L.P."<br><br>• ¶ 37: "Richard Sackler also constantly pressured Purdue's executives to increase sales." | |

| Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler | • ¶ 46: "As Board members of Purdue Pharma Inc., the general partner of Purdue Pharma L.P., the Sacklers voted for hundreds of resolutions that directed Purdue Pharma L.P. to transfer money out of the company to entities they controlled and owned." |
|---|---|
| **App. A5038 (JX-0783) (Comp., *State of Oregon v. Richard S. Sackler et al.*, No. 19CV44161 (Multnomah Cir. Ct. Oct. 10, 2019))** ||
| **Entities:** None<br><br>**Individual Defendants**: Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler | • ¶ 17: "In particular, as members of Purdue's Board, the Sacklers approved and oversaw a deceptive marketing scheme that was purposely directed at Oregon prescribers, patients, and the State itself."<br><br>• ¶ 29: "Purdue is an agent of the Sacklers. Purdue's own CEO stated directly that the Sacklers control Purdue by 'serv[ing] as the 'de facto' CEO.'"<br><br>• ¶ 33: "In the State of Oregon, the Sacklers, through Purdue, aggressively and illegally marketed and promoted OxyContin."<br><br>• ¶ 46: "Purdue implemented the Sacklers' demand for ever-increasing sales by hiring more and more sales staff to aggressively push Purdue's opioid products."<br><br>• ¶ 51: "The Sacklers directed Purdue to focus its sales efforts on reckless prescribers, knowingly causing a substantial risk of serious injury to Oregonians." |
| **Rhode Island**<br><br>Appealing States App. A-2322 (JX-2214) (Comp., *Rhode Island v. Sackler,* No. PC2019-9399 (R.I. Super. Ct. Sep. 10, 2019)) ||
| **Entities:** None<br><br>**Individual Defendants**: Richard S. Sackler; Jonathan D. Sackler; Mortimer D.A. Sackler; Kathe A. Sackler; Ilene Sackler Lefcourt; David A. Sackler; Beverly Sackler; Theresa Sackler | • ¶ 10: "Through their decisions and directives, the Sacklers knowingly caused the promotion and sales of Purdue and Rhodes opioids in Rhode Island, from the sales messages passed directly to Rhode Island prescribers by Purdue sales representatives, to the third-party articles and webinars made available to Rhode Island prescribers by Purdue."<br><br>• ¶ 44: "The Sacklers controlled Purdue and directed Purdue's misconduct as described herein and in Exhibit A."<br><br>• ¶ 58: "The Sacklers were behind Purdue's decision to deceive doctors and patients from the beginning. In 1997, Richard Sackler, Kathe Sackler, and other Purdue |

<table>
<tr><td></td><td>

executives determined—and recorded in secret internal correspondence—that doctors had the crucial misconception that OxyContin was weaker than morphine, which led them to prescribe OxyContin much more often—even as a substitute for Tylenol. In fact, OxyContin is more potent than morphine. Richard Sackler directed Purdue staff not to tell doctors the truth, because the truth could reduce OxyContin sales."

- ¶ 79: "From 2007 through 2018, the Sacklers controlled Purdue's deceptive sales campaign. They directed the company to hire hundreds more sales representatives, who visited doctors thousands more times."

</td></tr>
</table>

|  |
| --- |
| **Vermont** |
| Appealing States App. A-1553 (JX-1649) (Comp., *State of Vermont v. Sackler* (Super. Ct. Chittenden Unit May 21, 2018)) |

| | |
| --- | --- |
| **Entities:** None<br><br>**Individual Defendants:** Richard S. Sackler; Beverly Sackler; David A. Sackler; Ilene Sackler Lefcourt; Jonathan D. Sackler; Kathe Sackler; Mortimer D.A. Sackler, and Theresa Sackler | <ul><li>¶ 3: "Purdue executed this scheme at the direction of eight people in a single family that owned the company and controlled a majority of the seats on the company's board of directors: the Sacklers."</li><li>¶ 5: "The Sacklers shaped the marketing campaigns that Purdue carried out, and they set sales objectives."</li><li>¶ 11: "From 2007 into 2018, the Sacklers charted a new—but equally crooked—course for Purdue."</li><li>¶ 27: "For decades, Purdue—with the Sacklers at its helm—cultivated the demand for its opioids and opioids generally, and profited from their overprescribing, misuse, and abuse."</li><li>¶ 45: "From these positions—as Board members and high-ranking executive employees of Purdue—the Sacklers were personally aware of, condoned and directed, and were responsible for the deceptive and unfair marketing activities described below."</li><li>¶ 107: "Continuing their pattern of deep involvement in Purdue's operations, the Sacklers directed the company to hire hundreds more sales representatives to visit doctors thousands more times."</li><li>¶ 135: "The Sacklers also knew and intended that the sales representatives would push higher doses of Purdue's opioids."</li></ul> |

|  | • ¶ 379: "[T]he Sacklers constantly directed Purdue to be more aggressive with its sales force. Between 2008 and 2016, the Sacklers directed significant expansions of the sales force, with the express purpose of increasing revenues. The Sacklers also pushed Purdue to increase the intensity of detailers' activities-requiring more visits per day and more visits to higher volume prescribers. Between 2008 and 2017, Purdue repeatedly approved increases in the number of sale representatives and the budget for marketing. At the same time, the Sacklers were setting and approving sales goals-in terms of dollars, prescriptions written, and milligrams purchased." |
|---|---|

**Annex B**

Select Allegations in Complaints Identified by U.S. Trustee

| Hickey v. Purdue Pharma, et al. | |
| --- | --- |
| Volume I of Exhibits to Memorandum of Law in Support of Appellant United States Trustee's Motion For Judicial Notice [ECF No. 89] Exhibit 4 (Comp., *Hickey v. Purdue Pharma L.P.*) | |
| **Entities:** Purdue Pharma L.P.; Purdue Pharma Inc.<br><br>**Individual Defendants**:<br>Richard Sackler; Theresa Sackler; Kathe Sackler; Jonathan Sackler; Mortimer Sackler; David Sackler; Ilene Sackler Lefcourt | • ¶ 3:  "Members of the Sackler Family and other Purdue Executives purposefully downplayed the addictive properties of OxyContin and promoted sales tactics meant to encourage doctors to prescribe as much OxyContin, in the highest doses and longest duration as possible—despite the potential risk of abuse . . ."<br><br>• ¶ 5:  "The Sackler Family through Purdue Pharma caused pain and suffering through intentional fraud, violating the Consumer Protection Act."<br><br>• ¶ 7:  "Through Purdue and the Sackler Familys deceptive and unfair acts, I . . . suffered . . . losses." |

| Hartman v. Sackler | |
| --- | --- |
| Volume I of Exhibits to Memorandum of Law in Support of Appellant United States Trustee's Motion For Judicial Notice [ECF No. 89] Exhibit I (Comp., *Hartman v. Sackler*) | |
| **Entities:**<br><br>**Individual Defendants**:<br>Richard Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; Mortimer Sackler; Theresa Sackler; Peter Boer; Judith Lewent; Cecil Pickett; Paulo Costa; Ralph Snyderman; Ralph Snyderman; John Stewart; Mark Timney; Craig Landau; Russell Gasdia | • ¶ 28:  "To maximize revenue, the defendants increased the dose for OxyContin and developed the slogan, Individualize The Dose."<br><br>• ¶ 41: "In 1996, they launched OxyContin. From the beginning of the launch the Sacklers viewed limits on opioids as an obstacle to greater profits. The Sacklers considered selling OxyContin in some countries as an uncontrolled drug. In February of 1997, the Sackler's *[sic]* staff reported to them that selling Oxycontin as *'non-narcotic,'* without the safeguards that protect patients from addictive drugs would provide 'a vast increase of the market potential.'"<br><br>• ¶ 46: "Starting in 1999, the Sacklers hired hundreds of additional sales representatives, whom they used to deceive doctors into believing that the risk of addiction to OxyContin was 'less than one percent.'"<br><br>• ¶ 53: "On May 9, 2007, the Sacklers again voted to have |

| | their company [Purdue] plead guilty and enter a series of agreements by which the Sacklers' business would never deceive doctors and patients about opioids again. The Sacklers admitted in an Agreed Statement of Facts that, for more than six years, Sacklers' supervisors and employees intentionally deceived doctors about OxyContin . . ." |
|---|---|

## Heden v. Johnson & Johnson

Volume I of Exhibits to Memorandum of Law in Support of Appellant United States Trustee's Motion For Judicial Notice [ECF No. 89] Exhibit 3 (Comp., *Heden v. Johnson & Johnson*)

| | |
|---|---|
| **Entities**: Purdue Pharmaceuticals L.P.; Rhodes Pharmaceuticals L.P.[23]<br><br>**Individual Defendants**: Craig Landau; Richard Sackler; David Sackler; Mortimer Sackler; the Sackler Family; Russell Gasdia[24] | • Pg. 5: "All distributed by Purdue Pharma L.P., Rhodes Pharmaceuticals L.P. . . . the Sackler's [*sic*], and others mentioned."<br><br>• Pg. 7: "In 2010 alone, the Sackler family received $877 million from OxyContin sales, this complaint shows, and according to independent reports."<br><br>• Pg. 8: "Richard Sackler, Purdue Pharmaceuticals L.P. . . . and other Companies top Executives listed above are mainly responsible for fueling the opioid epidemic."<br><br>• Pg. 12: "No matter who he hurt, it was business as usual at Purdue Pharma L.P., as well as all other companies listed above with Richard Sackler and others pushing a purified street drug." |

## Rhodes v. Rhodes Techs., Inc.

Volume I of Exhibits to Memorandum of Law in Support of Appellant United States Trustee's Motion For Judicial Notice [ECF No. 89] Exhibit 7 (Comp., *Rhodes v. Rhodes Techs., Inc.*)

| | |
|---|---|
| **Entities**: Rhodes Technologies, Inc.<br><br>**Individual Defendants**: Richard Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; | • ¶ 25: "Nevertheless, the Sackler Defendants, upon information and belief, remained actively involved in Purdue's affairs and would also have been aware of deceptive marketing in their capacity as a board members at all relevant times."<br><br>• ¶ 28: "From the time Purdue first developed OxyContin, the Sackler Defendants were focused on sales. Richard Sackler |

---

[23] Non-Purdue defendants were also named.

[24] Non-Sackler defendants were also named.

| Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David Sackler[25] | • Pgs. 30-31: "This drug crisis began with a lie to create a market for opioid drugs. It started with a decision by Purdue and the Sackler Defendants (collectively, "Purdue Entities"), to promote opioids deceptively and illegally in order to create a market for opioid drugs and significantly increase sales and costs to consumers, thereby generating billions of dollars in revenue for Purdue's private owners, the Sackler family."<br><br>• Pg. 37: "The Sackler family is the sole owner of Purdue and one of the wealthiest families in America, with a net worth of $13 billion as of 2016. The company's profits go to Sackler family trusts and entities." |
| --- | --- |

| Tilley v. Purdue Pharma L.P.<br><br>Volume I of Exhibits to Memorandum of Law in Support of Appellant United States Trustee's Motion For Judicial Notice [ECF No. 89] Exhibit 8 (Comp., *Tilley v. Purdue Pharma L.P.*) ||
| --- | --- |
| **Entities**: Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.; Rhodes Technologies; Rhodes Technologies Inc.; Rhodes Pharmaceuticals L.P.; Rhodes Pharmaceuticals Inc.; The P.F. Laboratories, Inc.[26]<br><br>**Individual Defendants**: Richard Sackler; Kathe Sackler; Jonathan Sackler; Mortimer D.A. Sackler; Ilene Sackler Lefcourt; Beverly Sackler; Theresa Sackler; David Sackler; Trust for the Benefit of the Raymond Sackler Family | • ¶ 188: "Because the Sackler Family Defendants and/or the Sackler Families control of the board of PPI, all of the officers employed by PPI and PPLP reported to them. This ensured Sackler domination and control of PPI and PPLP."<br><br>• ¶ 191: "The Sackler Family Defendants . . . caused Purdue and other associated companies that they beneficially owned and controlled to distribute to the Sackler Families hundreds of millions of dollars of profits earned by Purdue . . . from the sale of opioids."<br><br>• ¶ 196: "As a senior executive of Purdue, Richard Sackler was actively involved in the invention, development, marketing, promotion, and sale of Purdue's opioid products, including OxyContin."<br><br>• ¶ 241: "Members of the Sackler family were daily on site at Purdue's headquarters, controlling the management of their family business and all of its employees."<br><br>• ¶ 269: "The Sackler Family Defendants oversaw Purdue's scheme to send sales representatives to visit doctors |

---

[25] Non-Sackler defendants were also named.

[26] Non-Purdue defendants were also named.

| | thousands of times. They oversaw Purdue's scheme to hire top prescribers to promote its opioids." <br><br> • ¶ 272: "The directors, which included the Sackler Family Defendants, oversaw the tactics that sales representatives used to push opioids." *See also* ¶¶ 272-83. |
|---|---|

| | |
|---|---|
| **Map to Health v. AmerisourceBergen Drug Corp.** <br><br> Volume I of Exhibits to Memorandum of Law in Support of Appellant United States Trustee's Motion For Judicial Notice [ECF No. 89] Exhibit 5 (Comp., *Map to Health v. AmerisourceBergen Drug Corp.*) | |
| **Entities**:  Purdue Pharma L.P.; Purdue Pharma, Inc.; The Purdue Frederick Company, Inc.[27] <br><br> **Individual Defendants**: Richard Sackler; Beverly Sackler; David Sackler; Ilene Sackler Lefcourt; Jonathan Sackler; Kathe Sackler; John Stewart; Mark Timney; Craig Landau; Russell Gasdia; Mortimer D.A. Sackler; Theresa Sackler | • ¶ 75: "At all relevant times, at least through the end of 2018, the Sackler Defendants controlled Purdue's deceptive sales campaign." <br><br> • ¶ 619: "The Purdue Individual Defendants were also aware that Purdue regularly received 'Reports of Concern' about abuse and diversion of opioids, as well as reports of other adverse events, and also calls to Purdue's compliance 'hotline.' In July 2007, staff told the Sackler Defendants that more than 5,000 cases of adverse events had been reported to Purdue in just the first three months of 2007." <br><br> • ¶ 907: "Knowing that their products were highly addictive, ineffective and unsafe for the treatment of long-term chronic pain, non-acute and noncancer pain, the Sackler Pharma Enterprise, owned, directed and controlled at all times by the Sackler Defendants, engaged in a scheme to unlawfully increase their profits and sales, and grow their share of the prescription painkiller market." |

---

[27] Non-Purdue defendants were also named.

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), as modified by Judge McMahon's instruction at the October 12 Scheduling Hearing regarding page and word limitations, the undersigned certifies that the above memorandum contains 43,294 words. The above memorandum also complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6), as modified by the January 29, 2020 Individual Practices and Procedures—Chief Judge Colleen McMahon § V(D), because this memorandum has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman 12-point font.

*/s/ Marshall S. Huebner*
Marshall S. Huebner