**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

In re:
PURDUE PHARMA L.P., *et al.*,
BANKRUPTCY APPEALS

No. 21-cv-7532 (CM) (Consolidated)

---

This Filing Relates to

---

ALL MATTERS

---

## BRIEF OF APPELLEE THE RAYMOND SACKLER FAMILY

MILBANK LLP
Gerard Uzzi
Alexander B. Lees
55 Hudson Yards
New York, NY 10001
Tel: (212) 530-5000
Facsimile: (212) 530-5219
guzzi@milbank.com
alees@milbank.com

JOSEPH HAGE AARONSON LLC
Gregory P. Joseph
Mara Leventhal
485 Lexington Avenue, 30th Floor
New York, NY 10017
Tel: (212) 407-1200
Facsimile: (212) 407-1280
gjoseph@jhany.com
mleventhal@jhany.com

*Counsel for The Raymond Sackler Family*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

ARGUMENT ......................................................................................................... 3

I.      Purdue could not successfully restructure without the Sackler families' settlement.......... 3

        A.      Plaintiffs would face significant obstacles in proving the merits of their
                claims and collecting on any judgment.................................................... 4

        B.      Purdue's 2020 guilty plea does not establish the families' liability. ..................... 8

II.     The Plan does not represent an "abuse" of the bankruptcy system. ................................ 13

        A.      The Sackler families had no control over, and were adverse to, the Debtors
                throughout the bankruptcy cases.......................................................... 13

        B.      Purdue's bankruptcy resulted in more transparency and higher recoveries
                than any alternate proceeding. ............................................................. 15

        C.      Releasing Parties will receive substantial consideration, provided by the
                Sackler families, in exchange for their releases.................................... 17

        D.      The releases do not grant "blanket immunity." ..................................... 19

        E.      The releases respond to actual direct and indirect litigation risk faced by
                the Shareholder Released Parties. ......................................................... 21

III.    The releases, by design, fall within the limits of federal bankruptcy jurisdiction. ........... 25

        CONCLUSION....................................................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agbebaku v. Sigma Aldrich, Inc.*,
   No. 24-C-02-004175, 2003 WL 24258219 (Md. Cir. Ct. June 24, 2003) ..............................13

*Celotex Corporation v. Edwards*,
   514 U.S. 300 (1995)..........................................................................................................26

*City of New Haven v. Purdue Pharma L.P.*,
   2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019)...........................................................6

*Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*,
   619 B.R. 38 (S.D.N.Y. 2020)......................................................................................27, 29

*Fletcher v. Havre De Grace Fireworks Co.*,
   229 Md. 196, *modified on other grounds*, 229 Md. 196 (Md. 1962)......................................12

*In re Karta Corp.*,
   342 B.R. 45 (S.D.N.Y. 2006)..............................................................................................20

*Morris v. Osmose Wood Preserving*,
   340 Md. 519 (1995) ..........................................................................................................13

*Pease v. Abbott Labs. Inc.*,
   Civ. A. No. JKB-12-1844, 2013 WL 174478 (D. Md. Jan. 16, 2013)....................................13

*Sackler v. Utah Div. of Consumer Prot.*,
   No. 190905862 (D. Utah Oct. 10, 2019)........................................................................ *passim*

*SPV Osus Ltd. v. UBS AG*,
   882 F.3d 333 (2d Cir. 2018)....................................................................................26, 27, 30

*State of California v. Purdue Pharma L.P. et al.*,
   No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. 2021)...........................................6, 28

*State of Oklahoma v. Johnson & Johnson, et al.*,
   No. 118474 (Okla. 2021) ....................................................................................................6

*State v. Purdue Pharma L.P.*,
   No. 19-CV-19045 (Sup. Ct. of CA Oct. 2, 2019) ................................................................22

*State of North Dakota ex rel. Stenehjem v. Purdue Pharma L.P., et al.*,
   2019 WL 2245743 (N.D. Dist. May 10, 2019)......................................................................6

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het*
   *Kapitaal Van Saybolt Int'l B.V. v. Schreiber*,
   327 F.3d 184 (2d Cir. 2003)............................................................................11

*Toliver v. Waicker*,
   210 Md. App. 52 (Md. Ct. Spec. App. 2013) ...................................................13

*United States v. Purdue Frederick Co.*,
   495 F. Supp. 2d 569 (W.D. Va. 2007) ..............................................................5

**Statutes**

28 U.S.C. § 1334(b)...........................................................................................26

Md. Code, Com. L. § 13-104(1) .........................................................................13

Md. Code, Com. L. § 13-408 .............................................................................13

**Other Authorities**

Fed. R. Evid. 408(a)..........................................................................................11

Judge for Yourselves: Full Defenses Presentation (Dec. 6, 2019) ...................5, 28, 29

## PRELIMINARY STATEMENT

The Raymond Sackler family supports the Plan[1] because it is an extraordinary opportunity to bring much-needed resources to abate the opioid crisis, rather than spending years depleting those resources through litigation. The Debtors and an overwhelming majority of creditors support the Plan for the same reason, having taken discovery of unprecedented scope and concluded that settling is better for everyone than continued fighting. But if the will of a small minority (the appellants) prevails over that of every other stakeholder and the Plan is not consummated, then litigation will be the only alternative, and the Raymond Sackler family members are prepared to mount a vigorous defense on their and Purdue's behalf.

Mindful of the Court's admonition to avoid duplicative briefing, the Raymond Sackler family will rely upon arguments advanced by other appellees and dedicate this brief principally to correcting mischaracterizations of the record that pervade the appellants' briefs.

*First*, despite the appellants' characterization, Shareholder Released Parties are the owners of the Debtors until proven otherwise. Without the resolution offered by this Plan, they will litigate to protect that right and to defend themselves and their company. As Judge Drain recognized, plaintiffs would face significant obstacles to proving their claims, as well as to collecting on any judgment they might obtain. If the Plan is not confirmed, everyone will return to litigation, which will be fraught with risk for claimants. Recent court decisions in just the last few weeks rejecting public nuisance claims against opioid manufacturers confirm that if claims were litigated here, the Shareholder Released Parties would have strong defenses and plaintiffs

---

[1] Capitalized terms not otherwise defined herein have the meaning set forth in Exhibit A to Debtors' Notice of Filing of Glossary of Terms Related to the Chapter 11 Cases (ECF No. 115, RSF A-2532).

may end up with nothing. Claimants also would face competition with one another in a race to judgment, eliminating the possibility of a fair allocation of any value recovered. *Infra* Part I.

*Second*, the record completely contradicts the appellants' arguments that the Sackler families have controlled the Debtors and "abused" the bankruptcy process. An independent examiner investigated these allegations and concluded that they are meritless. No family member has had any role at the Debtors since well before the bankruptcy began; meanwhile, the Debtors have acted as plaintiffs, investigating claims against the families throughout the bankruptcy process. Nor have the Sackler families escaped "accountability," even assuming they need to be held "accountable"; they have made extraordinarily broad disclosures and are voluntarily paying $4.325 billion (and making other substantial concessions) to satisfy unproven claims against them and Purdue. That far exceeds what creditors would have received in civil litigation or individual family-member bankruptcies. Likewise, the appellants are wrong in arguing that the Sackler families are receiving "blanket immunity." Notwithstanding the payment of $4.325 billion, the Plan contains extensive carve-outs from the releases, including for criminal liability and claims based on future conduct, and the releases otherwise are narrowly tailored to respond to the actual civil litigation risk that the Shareholder Released Parties face – including attempts by plaintiffs to sue all individuals, entities, and trusts connected with the families, regardless of their relationship to Purdue (or lack thereof). *Infra* Part II.

*Third*, the appellants' argument that the releases exceed the bankruptcy court's subject-matter jurisdiction is deeply flawed. Relying on their assertions that released claims belong personally to them, and not to the bankruptcy estates, the appellants ignore long-standing Supreme Court and Second Circuit precedent permitting the injunction and release of non-estate claims against non-debtors so long as their outcome could have a "conceivable effect" on the

estates. That standard is met here *by definition*: the plain text of the releases limits their scope only to claims held by parties that also are creditors of the Debtors, and as to which the Debtors' conduct or liability is legally relevant. It is therefore impossible to hypothesize a claim covered by the releases that will not affect the estates in some way. Adjudication of released claims would necessarily affect the size of the Debtors' liabilities based on the same alleged conduct and legal theories; it would affect the viability of the Debtors' overlapping estate claims against the Sackler families that depend upon proof of Debtor misconduct (for example, for fraudulent transfer, veil piercing, or breach of fiduciary duty); and it conceivably could give rise to a defendant's right to seek indemnity or contribution from the Debtors or claim against the Debtors' insurance coverage. *Infra* Part III.

## ARGUMENT

### I.   Purdue could not successfully restructure without the Sackler families' settlement.

In trying to escape the conclusion that the third-party releases are essential to the Plan, Maryland blithely tells the Court that "a different plan could likely have been confirmed more quickly, leaving the Sacklers' creditors free to pursue the claims against the Sacklers."[2] But this ignores a critical fact. As of today, Shareholder Released Parties are the equity owners of the Debtors. If there were no settlement, the Raymond Sackler family would protect that interest, and Purdue's value and other family wealth would not be just available for the taking. Instead, plaintiffs like Maryland and other states would have to prove that they are entitled to Purdue or to other family-owned assets. And that means years of litigation with no guarantee of success – and likely no recovery at all for the plaintiffs.[3]

---

[2] RSF A-2544 (Corrected Brief of Appellant, The State of Maryland at 4 (ECF No. 121) ("Md. Br.")).

[3] *See infra* at 4-5; *see also* RSF A-3330 (JX-3034 (Decl. of David Sackler ¶ 5 (Bankr. ECF No. 3418) ("The alternative to the Shareholder Settlement is litigation. I believe that we have good

### A.   Plaintiffs would face significant obstacles in proving the merits of their claims and collecting on any judgment.

Today, no appellant has an allowed claim against the estates. Absent the Plan, the

Raymond Sackler family would object to proofs of claim against Purdue, including those filed by

the appellant states. Raymond Sackler family members also would mount their own numerous

defenses to liability in any action directly against them. MBR[4] at 139-40. Judge Drain found that

significant defenses would be available to the Shareholder Released Parties, including that

"many of the claims pre-date 2007 and are barred by prior settlements or statutes of limitations";

that most family members "never served on Purdue's Board, did not otherwise engage in

decision-making for Purdue, and that their ability to control Purdue, if they exercised their shares

along with their family members, does not, standing alone, suffice to ascribe liability"; and that

family members who did serve on the board were not sufficiently involved in Purdue's conduct

to be held liable for it. *Id.*[5]

The appellants are well aware of the problems they would face in trying to prove their

claims: at the outset of the bankruptcy cases, the Sackler families made detailed presentations to

the Debtors and the creditors outlining their defenses,[6] and the Raymond Sackler family

summarized them again in a statement that was referenced in the Disclosure Statement (which

---

legal defenses to the claims asserted against my family. If the Shareholder Settlement and releases are not approved, my family and I will vigorously defend ourselves.")))

[4] "MBR" refers to the Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan (Bankr. ECF No. 3786, RSF A-1368).

[5] *See also id.* at 91-100 (discussing in greater detail the Sackler family's overlapping defenses to the estate claims against them). In addition to those referenced by Judge Drain, the Sackler family's defenses to the appellants' claims include lack of causation, preemption, lack of personal jurisdiction and others described in the Raymond-Side Plan Statement. *See generally* RSF A-982 (Statement of Raymond Sackler Family in Support of Plan Confirmation (Bankr. ECF No. 3438)).

[6] *See generally* Judge for Yourselves: Full Defenses Presentation (Dec. 6, 2019), https://www.judgeforyourselves.info/videos/presentations/.

has been made publicly available).[7] The Raymond Sackler family's brief in support of confirmation of the Plan likewise outlines in detail the problems with the allegations against family members.[8] To establish these defenses, the Raymond Sackler family would introduce the trove of factual evidence that was admitted into the record at the confirmation hearing.

These are not abstract concerns for the plaintiffs, including not only the appellants but each of the overwhelming number of claimants who support the settlement and are relying on receiving the $4.325 billion to be paid by the Sackler families. No plaintiff has ever obtained an opioid-related judgment against Purdue. As for individual users of opioid products, "courts have consistently found that despite extensive discovery, [such] plaintiffs were unable to show that Purdue's misbranding [in the period 1996 to 2001] proximately caused their injuries." *United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007) (collecting cases dismissing claims against Purdue). In the current wave of opioid litigation, where the predominant claims have been brought by governmental entities on a "public nuisance" theory, the only actions against Purdue that were litigated to finality resulted in judgments in Purdue's favor. In Connecticut and North Dakota, the courts rejected suits seeking to hold Purdue liable for causing the opioid crisis through its alleged mismarketing of opioids, including because "federal law preempts the State's state law claims, which are based on the marketing of Purdue's medication for their FDA-approved uses," and because "the State's causal theory is too attenuated." *State of North Dakota ex rel. Stenehjem v. Purdue Pharma L.P., et al.*, 2019 WL 2245743, at *8-11 (N.D. Dist. May 10, 2019); *see also City of New Haven v. Purdue Pharma*

---

[7] *See* RSF A-83 (Submission by the Raymond Sackler Family of a Proposed Position Statement for Inclusion or Reference in the Debtors' Disclosure Statement (Bankr. ECF No. 2853)).
[8] *See* RSF A-982 (Statement of Raymond Sackler Family in Support of Plan Confirmation at 5-7, 21-28 (Bankr. ECF No. 3438)).

*L.P.*, 2019 WL 423990, at \*7 (Conn. Super. Ct. Jan. 8, 2019) ("[P]laintiffs couldn't suggest even a possible way to calculate the degree of individual causation in this case.").

These are not isolated decisions. Earlier this month, in a case against other opioid manufacturers, a court in California rejected similar claims on the grounds that even aside from causation theories, "any adverse downstream consequences flowing from medically appropriate prescriptions cannot constitute an actionable public nuisance." *State of California v. Purdue Pharma L.P. et al.*, No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. 2021). And just last week, the Oklahoma Supreme Court overturned a public nuisance judgment against an opioid manufacturer, concluding that public nuisance law does not extend to the manufacturing, marketing, and selling of legal products like prescription opioids. *State of Oklahoma v. Johnson & Johnson, et al.*, No. 118474 (Okla. 2021).

Showing that Purdue engaged in actionable conduct would be necessary for plaintiffs to establish a valid claim against members of the Sackler families – who have been accused only of having acted through or on behalf of Purdue – but it would not be sufficient. Plaintiffs also would need to show that there is a basis for subjecting individual family members to jurisdiction in various forums around the country and imposing liability for alleged involvement in Purdue's conduct. The only case that reached a final decision on that issue was litigated in the Utah District Court, which dismissed claims against Kathe Sackler because "membership of a Board that sent salespeople into Utah is insufficient by itself" to subject her to personal jurisdiction in that state. *Sackler v. Utah Div. of Consumer Prot.*, No. 190905862 at 10 (D. Utah Oct. 10, 2019).

All plaintiffs, not just the appellants, also would face obstacles to collecting on any judgment they might obtain. As Judge Drain found, this is mainly because most of the families' wealth is held by spendthrift trusts, not by the individual defendants, which means those assets

may be protected from claimants seeking to sue family members. MBR at 85-88. This finding

was amply supported by the record. At the confirmation hearing, uncontroverted evidence

demonstrated that the most creditors could hope to get from the Sackler family in a judgment-

collection scenario would be about $1.1 billion, which represents the amount of all assets held by

individual family members who served on Purdue's board (i.e., assets not held by spendthrift

trusts).[9] The Raymond Sackler family further demonstrated that the amount that could be

collected would likely be less for a variety of reasons: assets would be degraded by litigation

expenses; the value of illiquid assets, such as minority interests in the IACs, would be less in the

context of a forced sale compared to a consensual sale occurring under a settlement; and to

recover the entirety of the individual defendants' personal wealth, plaintiffs would have to prove

their claims against each former family director based on the unique – and in some instances

non-existent – allegations against each of them individually.[10]

Judge Drain found that the "issue of collection if the settlement were not approved

is . . . a significant concern." MBR at 88. He further found that a return to a litigation posture

would mean "inevitable fighting over a far smaller and less certain recovery with its renewed

focus on pursuing individual claims and races to collection." *Id.* at 73-74. Through the settlement

here, by contrast, the Sackler families are contributing nearly four times what could be collected

in a best-case litigation scenario for the plaintiffs.

In suggesting that some alternative plan was somehow easily achievable, the appellants

ignore all of these risks and attempt to substitute their judgment for that of the overwhelming

---

[9] *See* RSF A-257 (Decl. of Timothy J. Martin, Ex. H (Exec. Summ., Raymond-side March 31, 2021 Updated Net Assets Rep.) (Bankr. ECF No. 3422)); RSF A-3350 (JX-3092 (Decl. of Timothy J. Martin, Ex. C (Mortimer-side Updated Net Assets Report July 28, 2021) (Bankr. ECF No. 3448))).

[10] *See id.*

majority of creditors who supported the plan. They quote Judge Drain's remarks that the contribution amount from the Sackler families was a "bitter" result and that he hoped for "a higher settlement."[11] Yet, Judge Drain also acknowledged that "neither a defendant's wealth nor the amount of claims asserted against it should dictate the fairness of a settlement without considering the claims' merits, the costs and delay of continued litigation, and risks relating to the collectability of any eventual judgments." MBR at 137. And Judge Drain concluded that when evaluating the outcome of these cases, "one also must look at the process and the issues in . . . light of the alternatives and with a clear understanding of the risks and rewards of continued litigation versus the settlements set forth in the plan." MBR at 71.[12] By removing all litigation and collection risk, and by ensuring a fair distribution among creditors without competition, the settlement with the Sackler families is fair for all claimants.

### B.    Purdue's 2020 guilty plea does not establish the families' liability.

With no evidence of wrongdoing by members of the Sackler families, the appellants simply assume that they are entitled to all of Purdue's and the families' assets based on the mistaken argument that Purdue's 2020 criminal plea establishes the families' liability. Not so. The core of the appellants' civil claims has been that Purdue's post-2007 marketing of opioids was "deceptive" and caused many people to become addicted when they otherwise would not have, leading to public expenditures responding to the opioid crisis. The federal government –

---

[11] RSF A-2153 (Brief of Appellants the States of Washington, Connecticut, Delaware, Rhode Island, and Vermont at 10 (App. No. 21-7532, ECF No. 97) ("Consolidated States' Br.")); RSF A-2544 (Md. Br. at 10).

[12] *See also id.* at 90 (acknowledging that, under a Chapter 7, "there would literally be no recovery by unsecured creditors from the estates in a Chapter 7 liquidation, which is . . . the most likely result if the settlements with the shareholder released parties were not approved, given the unraveling of the heavily negotiated and intricately woven compromises in the plan and the ensuing litigation chaos"); *id.* at 143 (concluding that, if confirmation were denied, "the objectors' aggregate net recovery on their claims against the Debtors and the shareholder released parties would be materially less than their recovery under the plan").

which is the primary regulator of truth in the marketing of FDA-approved medicine like OxyContin – has never endorsed this notion. The FDA, in fact, has rejected many of these theories.[13] In its criminal resolution with the DOJ, Purdue admitted only a narrow set of facts in Schedule A to its plea agreement. None concerned the supposed "deceptive" nature of marketing materials or injury to any non-federal plaintiff. And none implicated the Sackler families at all.[14]

In Count 1, Purdue admitted to deceiving the DEA in connection with requests for allocation of the DEA's overall nationwide quota of prescription opioids, including by failing to provide information about healthcare providers flagged by the company's internal anti-diversion programs, and that it thereby aided and abetted healthcare providers in dispensing medically unnecessary opioid prescriptions.[15] There is no admission – or allegation – that the prescriptions written by these healthcare providers occurred in any particular state, had any effect on any non-federal claimant, or occurred within any statute of limitations that might govern a civil claim. And there is no admission – or allegation – that any Sackler family members were involved in or had knowledge of the conduct.

In Count 2, Purdue admitted that it offered speakers' fees to two healthcare providers for the purpose of inducing them to write opioid prescriptions that would be paid for by federal healthcare programs.[16] But there is no admission – or allegation – that any state or other civil plaintiff was financially affected by any prescription written, especially given that the prescriptions were paid for by federal programs. There is no admission – or allegation – as to the year in which the improper payments were made or whether they occurred within the applicable

---

[13] *See* RSF A-3312 (JX-2359 (2013 PROP Letter)); RSF A-3294 (JX-2182 (FDA Denial of Conn. AG Richard Blumenthal Pet.)).
[14] RSF A-3198 (JX-2094 (Plea Agreement)).
[15] *Id.* at 15-17 ¶¶ a-g.
[16] *Id.*at 17, ¶ h.

statute of limitations for any civil plaintiff's claims. And once again, there is no admission – or allegation – that any Sackler family members were involved in or had knowledge of the conduct.

Finally, in Count 3, Purdue admitted that in 2016, it entered into a one-year contract with Practice Fusion (a cloud-based electronic health records platform) to run a program to alert healthcare providers to conduct pain assessments and document pain treatment plans.[17] Purdue admitted that one purpose of this was to increase Purdue's opioid sales, "portions of which were paid for by federal health care programs."[18] But there is no admission – or allegation – that the Practice Fusion alerts had any effect in any particular state or on any non-federal claimant, or that any Sackler family members were involved in or knew of the conduct.

In short, the facts underlying Purdue's guilty plea do not support a conclusion that the Sackler families are liable on any claim that has been lodged against them – by appellants or anyone else. The admissions have nothing to do with whether Purdue's marketing was misleading, led to anyone's addiction or abuse, or caused the opioid crisis or any expenditures by any non-federal entity.  And no Sackler family members were implicated in any of the conduct to which the company admitted. Judge Drain therefore expressly recognized that if civil litigation were to continue, Purdue's guilty plea did not establish, much less foreclose members of the Sackler families from disputing, any alleged involvement "in Purdue's wrongful conduct, such as the conduct admitted by it in the October 2020 DOJ settlement." MBR at 139-40.[19]

---

[17] *Id.* at 17-18, ¶¶ i-p.

[18] *Id.* at 18, ¶ o.

[19] The separate civil settlement agreements that Purdue and the Sackler families reached with DOJ also cannot support civil claims against the family members. In its civil settlement agreement, Purdue denied the allegations it was resolving, except to the extent already admitted in connection with the guilty plea; and the Sackler family members likewise denied all allegations that their agreement resolved. Settlements and denied allegations are not evidence. *E.g.*, Fed. R. Evid. 408(a).

Further, Purdue's admissions in the guilty plea are not binding on Sackler family members in separate litigation against them. The plea agreement was executed at a time when the family members no longer had any role at the company and were not on the board or otherwise in positions of supposed control. As such, the plea agreement cannot form the basis of collateral estoppel against them. *See Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 184, 184-86 (2d Cir. 2003) (holding that "[c]ollateral estoppel applies only against a party to a previous adjudication and that party's 'privies'" and concluding that corporation was not bound by conviction of former CEO because they were not in privity "at the time of [his] trial").

There is no merit to Maryland's specious contention that, at the confirmation hearing, Richard Sackler admitted facts sufficient to establish his (let alone other family members') liability under Maryland law for participating in illegal conduct.[20] Dr. Sackler testified that he had a telephone call with McKinsey personnel concerning their recommendations to Purdue management regarding sales, that the Purdue board was aware of McKinsey's recommendations, and that Purdue implemented the recommendation that Purdue's sales force "stop calling on doctors who didn't prescribe opioids . . . but to shift the emphasis to (indiscernible) [decile] 8, 9 and 10 doctors."[21] He also testified, without contradiction, that he "didn't take any action at all" with respect to McKinsey's recommendations,[22] and that management reported to the board that "seeing the busiest doctors who used the most opioids is in general very difficult to do."[23]

---

[20] RSF A-2544 (Md. Br. at 9, 23). Maryland also contends that David, Mortimer, and Kathe Sackler "admitted" facts establishing their liability but cites no testimony or other purported admission of any kind by them.

[21] *See* RSF A-1191 (Confirmation Hr'g Tr. (Aug. 18, 2021) at 94:3-95:23, 97:5-24 (Bankr. ECF No. 3614)).

[22] *Id.* at 97:3-4.

[23] *Id.* at 98:15-17.

Nothing in that testimony indicated that Dr. Sackler participated in any supposedly misleading statement about prescription opioids or other wrongdoing. There was no questioning about marketing materials, much less any suggestion that the board was shown any deceptive marketing materials, nor any suggestion that the board had any reason to believe that any recommendation by McKinsey – at that time, one of the most respected management consulting firms in the world – might be promoting any sort of deception. None of the questioning at the confirmation hearing produced any evidence that Richard Sackler (or any other Sackler family member) personally participated in, or directed, the dissemination of any misleading statement about prescription opioids to healthcare providers in Maryland or any other state. Yet those are the alleged unfair trade practices that form the basis of the appellants' claims. *See, e.g.*, *Fletcher v. Havre De Grace Fireworks Co.*, 229 Md. 196, 200-01, *modified on other grounds*, 229 Md. 196, 203-04 (Md. 1962); *Toliver v. Waicker*, 210 Md. App. 52, 61 (Md. Ct. Spec. App. 2013).[24]

The appellants are long on rhetoric about the supposed evidence of wrongdoing by members of the Sackler family, but short on proof. When it came to the trial, where the appellants examined Purdue's former directors and presented evidence, as Judge Drain observed, "we certainly didn't have any Perry Mason moments."[25] That observation was an understatement. At the hearing, Richard Sackler was confronted with just one substantive document from his tenure at Purdue: an email he sent in 2010, in which he said that he supported

---

[24] Maryland's claims are also legally defective. Among other things, the Maryland Consumer Protection Act, like those of many other states, does not apply to any products (like Purdue's prescription opioid medications) provided in the course of medical services (Md. Code, Com. L. §§ 13-104(1), 13-408; *Agbebaku v. Sigma Aldrich, Inc.*, No. 24-C-02-004175, 2003 WL 24258219, *11 (Md. Cir. Ct. June 24, 2003); *Pease v. Abbott Labs. Inc.*, Civ. A. No. JKB-12-1844, 2013 WL 174478, *2 (D. Md. Jan. 16, 2013)), and it applies only to "deceptive trade practice[s] [that] occur in the sale or offer for sale [of the product] *to the consumer*" (*Morris v. Osmose Wood Preserving*, 340 Md. 519, 540-41 (1995)).

[25] RSF A-1205 (Confirmation Hr'g Tr. (Aug. 23, 2021) at 176:5-9 (Bankr. ECF No. 3659)).

asking the FDA for early approval of the abuse-deterrent formulation of OxyContin, even though "it will take about $150 million away from [Purdue's] bottom line" because it would help to address the crisis of opioid abuse.[26] The objectors tried to explain away their failure to present any real evidence as a result of the bankruptcy court's preliminary injunction. But Judge Drain correctly rejected their excuses, observing that the objectors had "approximately 10 million documents with a Creditors' Committee and an Ad Hoc group of Non-Consenting States combing them for any signs of active management."[27]  They still came up short.

## II.     The Plan does not represent an "abuse" of the bankruptcy system.

The appellants are fond of relying on *Metromedia* for the proposition that third-party releases can be the subject of "abuse," and then crafting a narrative that the Sackler families conspired to take advantage of the bankruptcy laws to achieve some outcome that they could not achieve in their own bankruptcies or in continued civil litigation. But rhetoric is no substitute for facts. The record shows that the Sackler families had no control over the outcome of these cases, and all other parties in interest are better off under this Plan than under any alternative.

### A.     The Sackler families had no control over, and were adverse to, the Debtors throughout the bankruptcy cases.

Throughout the confirmation hearing, in their appeal, and even outside the courtroom in the press, the appellants have attempted to cast the Plan as the "Sacklers' Plan," arguing that the families have controlled Purdue's bankruptcy for their own benefit. Nothing could be further from the truth. All Sackler family members who served on Purdue's board had stepped down by January 2019, and no family member has held any role at the Debtors since.[28] On November 6,

---

[26] RSF A-3538 (JX-3274 (R. Sackler Email to C. Landau)); RSF A-1191 (Confirmation Hr'g Tr. (Aug. 18, 2021) at 105:13-108:21 (Bankr. ECF No. 3614)).

[27] RSF A-1205 (Confirmation Hr'g Tr. (Aug. 23, 2021) at 176:10-25 (Bankr. ECF No. 3659)).

[28] *See* RSF A-2611 (JX-0534 (Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors at 60 (Bankr. ECF No. 2983)

2019, the shareholders relinquished their right to replace the Special Committee during the bankruptcy cases without leave of the court.[29]

At every step of the way in these cases, therefore, the Sackler families were not in control of the bankruptcy process or the Debtors. To the contrary, the Debtors have been hostile and adverse to the families.[30] The Debtors, together with the UCC and other creditor constituencies, took enormously broad discovery of the families for the purpose of determining whether to settle or litigate. So, too, did the Debtors, along with their creditors, negotiate on the opposite side of the table from the family, acting as plaintiffs and seeking in several rounds of mediation to extract greater and greater concessions from the defendants.

It was never a foregone conclusion that a settlement would be reached: many key creditor constituencies did not support a settlement for much of the mediation process, and the Sackler families expressed their resolve to continue litigating if a deal would not be achieved. In the end, though, the Sackler families agreed to provide far more under the Plan than was proposed at the start of the bankruptcy, and the Debtors and nearly every creditor agreed that this provided a better outcome than continued litigation.

If there were any remaining doubt that this Plan is not the Sackler families', it was quashed by the findings of the independent examiner Steven D. Lerner, who was appointed in

---

(noting that "[n]o member of the Sackler Families is currently a member of the Board or employed by the Debtors" and "[t]he last member of the Sackler Families to serve on the Board resigned in January 2019"))).

[29] *See* RSF A-191 (Report of Stephen D. Lerner, Examiner, at 27-28 (Bankr. ECF No. 3285) ("Examiner's Report")); *see also* Ex. 2 to Examiner's Report, Decl. of Kenneth Buckfire, ¶ 8; Ex. 3 to Examiner's Report, Decl. of Michael Cola, ¶ 8; Ex. 4 to Examiner's Report, Decl. of John S. Dubel ¶ 8.

[30] *See, e.g.*, RSF A-1201 (Confirmation Hr'g Tr. (Aug. 19, 2021) at 40:20-25 (wherein Huebner advises the court that "[t]he Sacklers have not directed Purdue since the end of 2018 when they all left the board"), 151:19-24 (Huebner cross-examination of Mortimer D. Sackler) (Bankr. ECF No. 3638)).

June 2021 by Judge Drain specifically to determine whether the Special Committee of Purdue's board "acted independently and not under the direction or influence of the Sackler Families with respect to the Shareholder Settlement reflected in the Plan."[31] The examiner "found no evidence that the Sackler Families either attempted to, or did, influence the Special Committee in its work"; and that "all of the evidence identified in the course of the Examiner's investigation indicated that the Special Committee acted independently in evaluating and recommending the Shareholder Settlement and Plan and that it was not controlled or influenced, or subjected to attempted control or influence, by the Sackler Families."[32]

Given these incontrovertible facts, it cannot be said that the Sackler families tried to impose their will on the bankruptcy process. Rather, it is the appellants that are trying to do so, pushing their agenda to override the desires of every other creditor constituency.

**B.     Purdue's bankruptcy resulted in more transparency and higher recoveries than any alternate proceeding.**

The appellants argue that the Sackler family members are "escaping accountability" because they are receiving releases through Purdue's reorganization rather than through their own bankruptcies.[33]  This contention is belied by the record.

This bankruptcy process has cost the Sackler families in enormous ways – reputationally, emotionally, and monetarily. To suggest that the Sackler families are somehow "getting away" with something assumes a culpability that has never been proven and ignores that they are voluntarily paying more than $4.3 billion in cash and giving up all the equity of their company to settle their and Purdue's alleged civil opioid liability, among many other concessions. Ironically, this also overlooks that not only the appellants, but also every other claimant hoping to receive a

---

[31] RSF A-191 (Examiner's Report at 3 (internal quotations omitted)).
[32] *Id.* at 3-4.
[33] *See, e.g.*, RSF A-2153 (Consolidated States' Br. at 28-29).

share of the contribution may very well lose in litigation, in which case the Sackler families will be vindicated and will keep the $4.325 billion.

Such arguments by the appellants likewise ignore the extraordinary level of transparency to which the Sackler families have been subjected. In an examination taken under Federal Rule of Bankruptcy Procedure 2004, the Raymond Sackler family *alone* produced approximately one million pages of discovery relating to a broad array of topics, including Purdue's marketing and sale of opioids, transfers or distributions by Purdue to any Sackler family trusts or entities, and the Sackler families' proposed contribution to a settlement in these cases. The materials comprised personal emails and other communications dating back at least to 1995, and more than a decade's worth of bank statements, financial statements, tax returns, tax workpapers, and loan information for family members and trusts of which they are beneficiaries.[34] The scope of the search leading to these disclosures was preposterous, covering such far-flung sources as college email boxes and social media accounts established in the names of deceased pets, minor children, spouses, and business ventures having nothing to do with Purdue or pharmaceuticals.[35] In addition, the Rule 2004 examination involved depositions – attended and, in some instances, conducted by the appellant states – of every living member of the Raymond Sackler family who served on Purdue's board, as well as family members who never held meaningful roles at Purdue, and their close advisors. All of this was on top of the discovery taken of the Mortimer Sackler family and the IACs, as well as discovery of the Debtors themselves, which totaled 90

---

[34] *See* RSF A-79 (Statement of the Raymond Sackler Family in Support of the Debtors' Confirmation Procedures Order ¶ 2 (Bankr. ECF No. 2792)).

[35] *See* RSF A-8 (The Raymond Sackler Family's Opposition to the Official Committee of Unsecured Creditors' General Challenges Motion at 5 (Bankr. ECF No. 1810)).

million pages.[36] Adding to this unprecedented transparency, many of the documents disclosed in

the Rule 2004 process, as well as deposition transcripts, will be made public if the Plan is

consummated.

The appellants do not identify a single document or piece of information that they wanted

to obtain, or that they would have gotten in continued civil litigation or in family members'

individual bankruptcies, but did not receive in Purdue's bankruptcy. Nor could they. Judge Drain

found that the creditors in these cases received more information from the Sackler families than

they would have gotten in any other proceeding.[37] He further found in his confirmation order that

this was "the most extensive discovery process that not only I have seen after practicing

bankruptcy law since 1984 and being on the bench since 2002, but I believe any court in

bankruptcy has ever seen." MBR at 78. Thus, he concluded, "any assertion that there has not

been 'transparency' in these cases . . . is simply incorrect, and is particularly galling when

asserted by any of the states that continue to object to the plan on this basis." MBR at 79.

**C.      Releasing Parties will receive substantial consideration, provided by the
          Sackler families, in exchange for their releases.**

---

[36] *See* RSF A-2611 (JX-0534 (Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of
Reorganization of Purdue Pharma L.P. and its Affiliated Debtors at 85 (Bankr. ECF No. 2983))).
[37] *See* MBR at 78-79 (noting that "discovery beyond even the normally extensive discovery in
bankruptcy" occurred); RSF A-1205 (Confirmation Hr'g Tr. (Aug. 23, 2021) 157:7-158:5
(concluding that discovery here was "broader than even normal 2004 discovery" and finding that
discovery would have been "less rigorous" had the Sackler family members filed for personal
bankruptcy) (Bankr. ECF No. 3659)); *see also* RSF A-1527 (Findings of Fact, Conclusions of
Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of
Purdue Pharma L.P. and Its Affiliated Debtors ¶ KK (c)(vii) (finding that "[t]he parties have
engaged in extraordinarily broad discovery" and that such discovery "exceeded the scope of
discovery that would be obtainable before judgment in civil litigation") (Bankr. ECF No. 3787)
("FOF/COL")).

The appellants contend that the Releasing Parties are receiving nothing in exchange for their claims.[38] This is absolutely false. Under the Plan, claims are channeled to trusts that will distribute funds to creditors out of the $4.325 billion cash contribution from the Sackler families.[39] The claims that are being channeled specifically include Shareholder Released Claims,[40] and the distributions that will be made to creditors through the trusts are "in consideration of the release . . . of any and all . . . Shareholder Released Claims related to or arising from" claims against the Debtors.[41] In other words, if a party holds a claim against the Debtors *and* against the Sackler families based on the same facts and conduct, those two claims are both channeled together to the same trust, and receive the same payment. The Sackler families' contribution to the Plan satisfies claims against both them and Purdue simultaneously.

The Sackler families also are giving up rights in the Debtors' insurance policies that cover judgments and defense costs associated with opioid litigation.[42] This agreement to relinquish insurance rights leaves the proceeds of the Debtors' policies to plaintiffs pursuing claims against Purdue, without competition from family members who are covered.

Moreover, the creditor trusts are receiving enormous sums of money without any creditor having to prove its claims against the Sackler families or to collect on a judgment. The initial

---

[38] RSF A-2014 (Brief of Appellant, William K. Harrington, United States Trustee at 11 (ECF No. 91) ("UST Br.")); RSF A-2263 (Brief of the Canadian Appellants at 43-44 (ECF No. 98) ("Canada Br.")).

[39] *See* RSF A-1527 (FOF/COL ¶ II(d)(iv) (concluding that "[t]he consideration under the Shareholder Settlement Agreement . . . constitutes a substantial contribution to the Estates" and observing that the payments totaling $4.325 billion "total at least twice the value of the Debtors as a going concern")).

[40] RSF A-1210 (Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors (Bankr. ECF No. 3726) ("Plan") at 4 (definition of "Channeled Claims")).

[41] RSF A-1210 (Plan § 6.19).

[42] *See* RSF A-3332 (JX-3044 ¶ 35 (Declaration of Jesse DelConte (Bankr. ECF No. 3456))).

distribution to NOAT, for instance, is estimated to be $220 million, and that trust will receive

additional amounts over time, including proceeds from the reorganized company, for an

estimated total of over $3 billion.[43] The initial distribution to the PI Trust will be at least $300

million, and it is estimated to receive up to $750 million in total under the Plan.[44] Judge Drain

found that these amounts going to creditor groups through the Plan are likely more than what

they would receive in a litigation scenario, especially considering obstacles to collecting on any

judgment that might be obtained. MBR at 85-88; *see supra* Part I.

> **D.      The releases do not grant "blanket immunity."**

The appellants cite *Metromedia* in arguing that the Plan improperly grants the

Shareholder Released Parties "blanket immunity."[45] This ignores that the releases are narrowly

tailored to bear a direct relationship to the *Debtors'* own liability, which is being restructured as

part of the *Debtors'* chapter 11 cases. *See In re Karta Corp.*, 342 B.R. 45, 57 (S.D.N.Y. 2006).

Several important, interacting constraints in the Plan ensure that claims against the

Shareholder Released Parties are released only if they are intertwined or overlapping with claims

against the Debtors. *First*, the only non-debtor parties granting releases of the Shareholder

Released Parties are those who also have a claim against the Debtors.[46] If a person currently

holds a claim against a Shareholder Released Party but has had no connection with Purdue and

so does not have even a potential claim against the Debtors – for example, someone who has

---

[43] RSF A-1210 (Plan § 5.13(b)); *see generally* RSF A-102 (NOAT Trust Distribution Procedures (Bankr. ECF No. 3232 (Notice of Filing of Tenth Plan Supplement Pursuant to the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors, Ex. G))).

[44] RSF A-1210 (Plan at 13 (definition of "Initial PI Trust Distribution")); RSF A-1210 (Plan § 5.2(d)(i)(D)); RSF A-2611 (JX-0534 (Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors at 12 (Bankr. ECF No. 2983))).

[45] *E.g.*, RSF A-2014 (UST Br. at 1, 53).

[46] RSF A-1210 (Plan at 34 (definition of "Releasing Parties")).

only a slip-and-fall claim for an injury suffered on a Sackler family member's residential property – that person is *not* giving a release under the Plan.

*Second*, the claims that the Releasing Parties are enjoined from pursuing are only those related to the Debtor, where any conduct, omission or liability of any Debtor or any estate is the legal cause or is otherwise a legally relevant factor. This language was added at the request of Judge Drain at the conclusion of his bench ruling. The release language previously stated that any claim "related to" the Debtors be released. Judge Drain expressed concern that this language, standing alone, might be too broad. He cited the Second Circuit's decision in *In re Quigley Company*, which explained that a bankruptcy court's jurisdiction to enjoin third-party claims is not so broad as to encompass claims where the debtor's relationship to the claim is merely coincidental. 676 F.3d 45, 61-62 (2d Cir. 2012) (hypothesizing age discrimination claim that would be too tangential to fall within bankruptcy court's jurisdiction to enjoin the claim). For example, consider a hypothetical person injured in a car accident involving a family board member in the parking lot of Purdue's headquarters in 2016. Although a personal injury claim based on this incident might be "related to" Purdue in a plain-English sense (the company's parking lot was the site of the accident, and the family member would not have been there but for his or her role as board member at the time), the liability or conduct of Purdue would not be the legal cause of the claim, or otherwise a legally relevant factor in determining the family member's liability. While the Raymond Sackler family does not believe any claim like this exists, the point is that it likely would not be within the bankruptcy court's jurisdiction and so is not released under the Plan.

*Third*, many types of claims are expressly carved out of the releases. Among other things, the releases exclude criminal actions, tax liabilities, and claims based solely on the conduct of

non-Debtor Purdue Canada. The releases also exclude any claim based on future conduct that occurs after the "Effective Date" of the Plan.

Given these numerous constraints, it cannot be said that the Plan provides "blanket immunity." It grants, at most, a limited release in exchange for substantial consideration.

### E.    The releases respond to actual direct and indirect litigation risk faced by the Shareholder Released Parties.

The appellants complain that the releases are being granted to too broad a group of parties. But each category of releasees is justified by the circumstances of the cases, the actual litigation risk the families faced before the bankruptcy, and the enormous sums the families are paying to achieve a separation from Purdue and its liabilities.

The individual family members who are being released include both former directors and those who never held roles with the Debtors.[47] While the rationale for releasing the former directors is straightforward given their service on the board and their having been named in many lawsuits before the bankruptcy, the releases for other Shareholder Released Parties is similarly well justified. The pre-petition lawsuits showed that Sackler family members and other related parties who had no meaningful involvement with Purdue are nonetheless direct or indirect targets of litigation relating to Purdue. For example, Marianna Sackler (daughter of Richard) was named in a complaint by the California Attorney General.[48] Marianna held only a part-time, temporary position in Purdue's Research & Development Department for about four months in 2009-2010, when she was a young adult. California nevertheless alleged, without any conceivable factual support, that she had "control and oversight" over Purdue.[49]

---

[47] *See* RSF A-1210 (Plan at 35 (defining "Sackler Family Members")).
[48] RSF A-3134 (JX-0947 (First Am. Compl., *State v. Purdue Pharma L.P.*, No. 19-CV-19045, ¶ 156 (Sup. Ct. of CA Oct. 2, 2019))).
[49] *Id.* ¶ 191.

In addition to individual family members, numerous pre-bankruptcy lawsuits sought recovery from trusts of which they are beneficiaries and from entities that they own. For example, New York counties and municipalities sued a so-called "Trust for the Benefit of Members of the Raymond Sackler Family" for aiding and abetting, and participating in, the alleged wrongdoing of Purdue.[50] Oregon's Attorney General took the most sweeping approach, alleging that Purdue, Sackler family members, and numerous family trusts and entities are all alter egos of one another – a so-called "Sackler Pharmaceutical Enterprise." Oregon sought to impose Purdue's liability on all these individuals, trusts, and entities though an omnibus collapsing theory.[51] The pleading techniques deployed in the pre-bankruptcy lawsuits thus demonstrated that every person or asset connected to the Sackler families, however remotely, was at risk of being swept into opioid litigation based solely on that association.

The U.S. Trustee vociferously complains that the definition of Shareholder Released Parties includes descendants of Mortimer and Raymond Sackler who are not yet born.[52] This complaint is empty. The definition of "Excluded Claim" in the Plan clarifies that the only claims being released are those based on pre-Effective Date conduct, where the Debtors' conduct or liability is a legally relevant factor. One could easily foresee a plaintiff suing a future Sackler descendant as an end-run around the releases for living family members (thereby potentially regaining access to the shared assets of the Sackler family members). The history of opioid litigation has shown that the kinds of claims a plaintiff will assert against the Sackler families is

---

[50] *See* RSF A-1 (Short Form Compl., *County of Suffolk v. Purdue Pharma L.P., et al.*, No. 400001-2017, ¶ 4, Addendum (N.Y. Cnty. Suffolk Oct. 23, 2018)).

[51] RSF A-3110 (JX-0841 ¶¶ 1, 4, 61 (Compl., *State of Oregon v. Richard S. Sackler* (Or. Cir. Ct. Aug. 30, 2019) (alleging that the Sacklers and Purdue are "part of the unified economic entity of the Sackler Pharmaceutical Enterprise"))).

[52] *See* RSF A-2014 (UST Br. at 1, 13, 18, 29, 32); *see also* RSF A-1210 (Plan at 35 (definition of "Sackler Family Members"), 37 (definition of "Shareholder Released Parties")).

bounded only by the imagination – and not by the facts. But it is impossible to imagine a *legitimate* claim against an as-yet unborn person for conduct that already has taken place.

The other principal complaint about the definition of Shareholder Released Parties is that some clauses, rather than specifically naming the releasees, list categories, roles, and positions (such as successors and predecessors, officers and directors, trusts and trustees, and so forth). The U.S. Trustee argues that these categorical descriptions render the releases overbroad because "thousands" of non-debtors are shielded from "all civil opioid-related suits."[53] The consolidated states' brief similarly contends that these "myriad . . . unnamed parties" are being released from claims "related in any way to Purdue's or the Sacklers' role in the opioid epidemic."[54] The appellants deliberately ignore (with ellipses in place of the relevant language)[55] that these categorical descriptions have capacity limitations. While it theoretically may be possible that these categories include numerous parties, it is not true that these parties are receiving a release from "all civil opioid-related suits."[56]

For example, transferees of funds from Shareholder Released Parties are being released solely in their capacities as transferees of those funds, and solely to the extent of the transfers received.[57] So if a Releasing Party brought an opioid-related claim against a transferee based on some conduct other than the receipt of funds and for some recovery beyond the transferred property, the claim would not be released by virtue of the defendant's status as transferee. An

---

[53] RSF A-2014 (UST Br. at 1, 53).
[54] RSF A-2153 (Consolidated States' Br. at 9).
[55] *Id.*
[56] This argument similarly overlooks that the third-party releases expressly do *not* extend to any of the Shareholder Released Parties' financial advisors, attorneys, accountants, investment bankers, consultants, experts, and other outside professionals. RSF A-1210 (Plan at 126 (excluding from third-party releases the "Shareholder Released Parties identified in clause (vii)(C) of the definition of Shareholder Released Parties")).
[57] RSF A-1210 (Plan at 37 (definition of "Shareholder Released Parties")).

analogous limitation applies for all categories of related parties whose releases are dependent on capacity (e.g., predecessors, executors, employees, directors, officers, etc.). The essential point is that the "unnamed" releasees are only being released to the extent, and by virtue of, their relationship to the Sackler families and their entities and trusts – not for unrelated conduct or liability that could not affect the families or their assets.

A key reason for describing releasees by category is that it is impractical to identify them all by name – and, in some circumstances, it is impossible. Consider, for example, a trust that has not yet been formed. If it were created in the future and family assets were transferred to it, that trust would require protection from the releases, even though it could not possibly be named in a plan that is drafted today. Similarly, even for a trust that currently exists, trustees may change over time. The *position* of trustee therefore needs to be protected, even if the individual or entity that serves as trustee at some other time cannot be identified (or may not even exist) today.

As for why the listed categories were included in the definition of Shareholder Released Parties, the answer is that the releases were designed to give broad protection to the families and their assets from litigation exposure relating to Purdue, in exchange for the huge amounts of money they are paying and the other concessions they are making under the settlement. The releases therefore had to be drafted to prevent gamesmanship by clever claimants. A plaintiff should not be able to "get around" the releases of specifically named parties by suing someone else who is not listed by name in the Plan but who is closely related – such that a suit against the unnamed person is effectively a suit against the named party. If employees, directors, officers, and similar closely-related parties could be harassed with litigation based solely on their

relationship to the Sackler families, family members and their businesses would be harmed and the releases of them would be greatly diluted.[58]

## III.   The releases, by design, fall within the limits of federal bankruptcy jurisdiction.

The appellants argue that a federal court's jurisdiction under the Bankruptcy Clause in the Constitution must be *in rem*, and that the releases in the Plan went beyond this jurisdiction and became *in personam* because they extend to claims held by non-debtors against non-debtors.[59] This misconstrues the standard. While true third-party claims are not themselves property of the estate, they still can fall within federal bankruptcy jurisdiction if they "relate to" the bankruptcy within the meaning of section 1334(b). 28 U.S.C. § 1334(b). That is, the Judicial Code gives bankruptcy courts jurisdiction not only over the property of the estate itself, but also over any proceedings that could affect the estate and its property, and that could therefore interfere with the exercise of *in rem* jurisdiction if not enjoined. The Supreme Court held as much decades ago. *See Celotex Corporation v. Edwards*, 514 U.S. 300, 307-10 (1995) (court had jurisdiction to enjoin third-party claims that were "related to" the bankruptcy, including where continued litigation of those claims would "destroy any chance" of the debtor's reorganizing).

The Second Circuit has elaborated on the applicable jurisdictional standard numerous times, as the other appellees address in detail. Suffice it to say here that the Second Circuit's cases, taken together, establish that "related to" jurisdiction is "capacious" (*SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 340 (2d Cir. 2018)) and extends – at a minimum – to claims that are

---

[58] *See* RSF A-1120 (Confirmation Hr'g Tr. (Aug. 13, 2021) at 245:14-247:21 (testimony of G. Lynam, discussing concern that the Sackler family members would be harmed by parties' refusing to work with them in the future absent releases for related parties, and that Sackler family entities and trusts customarily enter into indemnification agreements with third parties that could expose them to liability if those third parties were sued) (Bankr. ECF No. 3602)).
[59] *See* RSF A-2085 (Statement of Interest of the United States of America Regarding the Shareholder Release at 26-29 (ECF No. 94) ("U.S. Statement of Interest")).

premised, in a legally relevant way, on the debtor's conduct or liability because litigating them necessarily requires adjudicating the debtor's implication in the alleged wrongdoing. As explained in cases like *SPV* and *Worldcom*, "[t]he existence of strong interconnections between the third party action and the bankruptcy has been cited frequently by courts in concluding that the third party litigation is related to the bankruptcy proceeding." *SPV*, 882 F.3d at 342 (quoting *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003)).

And as this Court already held in affirming Judge Drain's preliminary injunction here, jurisdiction exists if "there is no way . . . to pursue the allegations against [the Sackler families] without implicating Purdue, and vice versa." *Dunaway v. Purdue Pharms. L.P. (In re Purdue Pharms. L.P.)*, 619 B.R. 38, 51 (S.D.N.Y. 2020).

With this understanding, it is clear that the third-party claims enjoined and released in the Plan were within the bankruptcy court's jurisdiction. Not only are the releases being granted only by parties that *also* have a claim against a Debtor – for example, for an injury suffered because of the Debtors' allegedly unlawful marketing of opioids – but also, the only claims against the Shareholder Released Parties that are being released are civil claims that relate to the Debtors, in that the conduct or liability of the Debtors is legally relevant.[60] The releases thus conform to the scope of "related to" jurisdiction *by definition*. They were purposefully drafted with jurisdictional limitations in mind, intentionally deploying concepts found in the Second Circuit's cases. And so, the third-party claims enjoined and released in the Plan, if litigated, would have a conceivable effect on the bankruptcy estate for numerous reasons.

In any litigation of opioid claims against Shareholder Released Parties where Purdue's conduct is a legal basis, the defendants would have all the same defenses to liability that Purdue

---

[60] *See* RSF A-1210 (Plan § 10.7(b)).

would have. They would argue, among many other things, that Purdue's marketing of OxyContin was not "deceptive"; that claims of deceptive marketing are preempted by federal law given that the label had to be FDA approved; and that a plaintiff cannot prove that Purdue's marketing and sale of opioids proximately caused any injury, including because doctors (so-called "learned intermediaries") broke the chain of causation when they exercised their own independent judgment to prescribe OxyContin.[61] Since the only claims at issue here are those alleging that the Sackler family members participated in or otherwise are liable for Purdue's conduct, they would defend themselves by also defending Purdue.

The assertion of such defenses necessarily would implicate both the liabilities and the assets of Purdue, and therefore would directly affect the bankruptcy *res*. As for liabilities, an adjudication of a shared defense would affect the viability of proofs of claim asserted in the bankruptcy, thereby increasing or decreasing the size of the claims pool in the chapter 11 cases.

As for assets, the outcome of litigation in which a family member asserts a defense shared with Purdue would affect the viability of the estates' own causes of action. For instance, if the litigation of claims against a family member established that Purdue had no liability for deceptive marketing in the first place, the estate would have no basis to argue that the directors violated their fiduciary duties by causing Purdue to engage in wrongful conduct and become exposed to lawsuits. If tort claims against Purdue were shown to be meritless, the estate would be unable to establish its fraudulent transfer claims because it could not prove that Purdue was insolvent or intended to defraud tort claimants when it made dividends to its owners. Nor would there be any Debtor liability to impose on shareholders through an alter-ego or veil-piercing

---

[61] *See*, *e.g.*, *State of California v. Purdue Pharma L.P. et al.*, No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct. 2021); Judge for Yourselves: Full Defenses Presentation (Dec. 6, 2019), https://www.judgeforyourselves.info/videos/presentations/.

theory. The value of the estates' claims against the shareholders therefore would rise and fall based on the outcome of third-party claims against those same defendants. If there ever were a case where litigation of the third-party claims would affect the bankruptcy *res*, this is it. *See* MBR at 111 ("I conclude that the third-party claims that are covered by the shareholder release under the plan . . . directly affect the *res* of the Debtors' estates, including . . . the Debtors' ability to pursue the estates' own closely related, indeed fundamentally overlapping, claims[.]").[62]

While that alone is enough to find that the bankruptcy court had jurisdiction, there are additional reasons. If the third-party claims against the Sackler families were to succeed, the family members would at least conceivably have the right to seek compensation from the estates. For those who were directors of Purdue, this might take the form of indemnification. But more broadly, for all Shareholder Released Parties (former directors or otherwise), there would be a potential right of contribution, as Judge Drain concluded. *Id.*[63]

In addition, if the third-party claims were litigated, Shareholder Released Parties would be able to assert all rights under the Debtors' insurance policies that they are giving up under the Plan. If any person covered by the insurance policies must pay damages or defense costs associated with Shareholder Released Claims, that person might be able to claim against

---

[62] *See also* RSF A-1527 (FOF/COL ¶ II(a) (finding that Shareholder Released Claims "have factual and legal issues in common with" estate claims, and that their adjudication "could prejudice the Estates or the Master Distribution Trust . . . in future litigation of" the estate claims)).

[63] *See also id.* (finding that litigation "could lead to the assertion of indemnification and contribution claims against the Estates" and observing that "[l]itigation over a disputed indemnification or contribution claim is itself an effect upon the Estates") (Bankr. ECF No. 3787).

Purdue's insurance policy, which would decrease the amounts available to the Debtors based on the overall liability limits.

The appellants argue that indemnity and insurance coverage do not extend to acts of willful misconduct or fraud, which some of the complaints against the Sackler families allege. This reflects a misunderstanding of the relevant standard. For the bankruptcy court to have jurisdiction over a third-party claim, there need not be certainty that the action will affect the estate; there need only be a conceivable possibility. Courts have held that the existence of a mere debate over rights to indemnity or insurance can satisfy the "related to" test, since the chance of litigation over those issues could deplete estate assets. *E.g.*, *SPV*, 882 F.3d at 341.

## **CONCLUSION**

For the reasons above and in the other appellees' briefs, the order of the bankruptcy court confirming the Plan should be affirmed.

Dated: November 15, 2021
     New York, NY

MILBANK LLP


By: */s/ Alexander B. Lees* _____

Gerard Uzzi
Alexander B. Lees
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000

JOSEPH HAGE AARONSON LLP
Gregory P. Joseph
Mara Leventhal
485 Lexington Avenue
New York, NY 10017
Telephone: 212-407-1200

*Counsel to the Raymond Sackler Family*

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Alexander B. Lees, hereby certify that the foregoing document complies with the word limit of Federal Bankruptcy Rule 8015 because, excluding the parts of the document exempted by FRBP 8015(g), it contains 10303 words.

Date: November 15, 2021

By: */s/ Alexander B. Lees*
Alexander B. Lees