UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: PURDUE PHARMA<br><br>BANKRUPTCY APPEALS | 21-cv-7532;<br>21-cv-7585;<br>21-cv-7961;<br>21-cv-7962;<br>21-cv-7966;<br>21-cv-7969;<br>21-cv-8034;<br>21-cv-8042;<br>21-cv-8049;<br>21-cv-8055;<br>21-cv-8139;<br>21-cv-8258;<br>21-cv-8271;<br>21-cv-8548;<br>21-cv-8557;<br>21-cv-8566<br>(Consolidated) |

## ANSWERING BRIEF OF APPELLEES
## MORTIMER-SIDE INITIAL COVERED SACKLER PERSONS

Maura K. Monaghan
Jasmine Ball
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836

*Attorneys for Mortimer-Side Initial Covered
Sackler Persons*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ....................................................................................... iii

PRELIMINARY STATEMENT .................................................................................. 1

STATEMENT OF THE CASE..................................................................................... 4

I.     Under the Settlement, the Sackler Families Agreed to Significant Financial and
       Non-Monetary Obligations and Received the Shareholder Releases as
       Consideration .................................................................................................. 4

II.    The Shareholder Releases Provide Global Finality to the Sackler Families and
       Release Claims That Would Otherwise Burden the Estate................................. 5

III.   The Shareholder Releases Provide the Global Finality That Enables the Sackler
       Families to Enter the Shareholder Settlement Agreement ................................. 7

ARGUMENT .............................................................................................................. 9

I.     The Bankruptcy Court Correctly Held That It Has Subject Matter Jurisdiction to
       Confirm the Plan with the Shareholder Releases ............................................. 9

       A.     The Bankruptcy Court Correctly Found That the Shareholder Released
              Claims Would Have a Conceivable Effect on the Estate If Litigation
              Resumed.................................................................................................. 10

       B.     Appellants' Labeling of Their Claims as "Direct" Is Irrelevant to Whether
              Their Claims Have an Effect on the Estate .......................................... 16

       C.     The Bankruptcy Court Had Jurisdiction to Release Claims Against all
              Shareholder Released Parties ................................................................. 19

II.    The Bankruptcy Court Correctly Determined That the Bankruptcy Code
       Authorizes the Confirmation of a Plan That Provides for Non-Debtor Releases in
       Appropriate Circumstances................................................................................ 21

       A.     The Second Circuit Has Recognized for Decades That the Bankruptcy
              Court Is Authorized to Approve Non-Debtor Releases ....................... 22

III.   The Bankruptcy Court Correctly Held That the Shareholder Releases Are
       Appropriate Under *Metromedia* and Other Controlling Second Circuit Precedent.......... 24

       A.     The Releases Are Consistent with Each of the *Metromedia* Guideposts.............. 24

              1.     Payments of $4.325 Billion Are "Substantial" ........................ 24

              2.     Claims Against the Shareholder Released Parties Are Channeled to
                     Applicable Trusts ................................................................. 25

i

|     | 3. | The Shareholder Released Claims Would Impact the Debtors' Reorganization | 26 |
|     | 4. | The Plan Received Overwhelming Creditor Support | 28 |
|     | 5. | The Plan Meets the "Full Payment" Guidepost | 28 |
| B. | | The Carefully Constructed Settlement in This Case is the Type of Rare Circumstance Contemplated by *Metromedia* to Justify Shareholder Releases | 29 |
|     | 1. | The Shareholder Releases Arise in the Rare and Unique Circumstances Where Non-Debtor Releases Are Appropriate | 30 |
|     | 2. | Appellants Refuse to Acknowledge That Litigation Against the Sackler Families Would Be Protracted and Risky | 34 |
| C. | | The Appellant States Are Not Entitled to Upend the Plan by Seeking Special Treatment for Their Claims | 37 |
|     | 1. | As the Shareholder Releases Are Authorized Under the Bankruptcy Code, No Parties Can Seek a Carve-Out for Their Claims | 38 |
| D. | | The Plan Accomplishes the Public Health Objectives the States Claim They Seek to Provide—and Those Benefits Would Be Lost If the Plan Collapsed | 41 |
| E. | | Appellants Misleadingly Recast the Release of Specific Claims in a Settlement as a Bankruptcy Discharge | 43 |
| IV. | | The Bankruptcy Court Correctly Determined That the Shareholder Releases Do Not Violate Due Process | 45 |
| A. | | Claimants' Due Process Rights Were Appropriately Satisfied with Notice of the Shareholder Releases and the Opportunity to Object | 45 |
| B. | | Personal Injury Claimants Received Adequate and Appropriate Notice Regarding the Shareholder Releases | 47 |
| CONCLUSION | | | 49 |

## <u>TABLE OF AUTHORITIES</u>

CASES

*Bank of Am. Nat. Tr. and Sav. Assn. v. 203 North LaSalle Street P'ship*,
    526 U.S. 434 (1999)..............................................................................................40

*California v. Purdue Pharma L.P.*,
    No. 30-2014-00725287-CU-BT-CXC,
    2021 WL 5227329 (Cal. Super. Ct. Nov. 1, 2021) ................................................36

*Central Virginia Community College v. Katz*,
    546 U.S. 356 (2006)........................................................................................39, 40

*City of New Haven v. Purdue Pharma, L.P.*,
    No. X07HHDCV176086134S,
    2019 WL 423990 (Conn. Super. Ct. Sept. 30, 2020)...........................................34

*Commonwealth v. Purdue Pharma, L.P.*,
    No. 1884CV01808,
    2019 WL 6497887 (Mass. Super. Nov. 6, 2019) .................................................17

*Elican Holdings, Inc. v. Hudson Oil Refin. Corp.*,
    96 A.D.2d 792 (N.Y. App. Div. 1983) ................................................................14

*Ermini v. Vittori*,
    758 F.3d 153 (2d Cir. 2014)..................................................................................8

*In re A.H. Robins Co.*,
    88 B.R. 742 (E.D. Va. 1988),
    *aff'd* 880 F.2d 694 (4th Cir. 1989).....................................................................29

*In re A.H. Robins Co., Inc.*,
    880 F.2d 694 (4th Cir. 1989) .............................................................21, 22, 28, 29

*In re Adelphia Comm'ns Corp. Sec. and Derivative Litig.*,
    2005 WL 1404798 (S.D.N.Y. June 14, 2005) .....................................................15

*In re Aegean Marine Petroleum Network Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019).............................................................32, 33

*In re Airadigm Commc'ns, Inc.*,
    519 F.3d 640 (7th Cir. 2008) ...............................................................................21

*In re Am. Hardwoods*,
    885 F.2d 621 (9th Cir. 1989) ...............................................................................22

*In re Bernard L. Madoff Inv. Sec. LLC*,
   740 F.3d 81 (2d Cir. 2014).................................................................16, 23

*In re Cont'l Airlines*,
   203 F.3d 203 (3d Cir. 2000).......................................................................22

*In re Dow Corning Corp.*,
   280 F.3d 648 (6th Cir. 2002) ....................................................................43

*In re Drexel Burnham Lambert Grp., Inc.*,
   130 B.R. 910 (S.D.N.Y. 1991),
   *aff'd*, 960 F.2d 285 (2d Cir. 1992) ...........................................................44

*In re Drexel Burnham Lambert Grp., Inc.*,
   960 F.2d 285 (2d Cir. 1992)................................................................21, 22

*In re Exide Holdings, Inc.*,
   No. 20-11157-CSS,
   2021 WL 3145612 (D. Del. July 26, 2021) .........................................38, 39

*In re Johns-Manville Corp.* ("*Manville III*"),
   517 F.3d 52 (2d Cir. 2008),
   *rev'd on other grounds*, 557 U.S. 137 (2009)......................................17, 19

*In re Karta Corp.*,
   342 B.R. 45 (S.D.N.Y. 2006)..............................................................31, 32

*In re Lower Bucks Hosp.*,
   488 B.R. 303 (E.D. Pa. 2013) ...................................................................12

*In re Metromedia Fiber Network, Inc.*,
   416 F.3d 136 (2d Cir. 2005)........................3, 16, 21, 22, 23, 24, 29, 30, 31, 45

*In re MF Global Inc.*,
   No. 11–2790 (MG) SIPA,
   2012 WL 3242533 (Bankr. S.D.N.Y. Aug. 10, 2012) ..........................30, 43

*In re Midway Gold US, Inc.*,
   575 B.R. 475 (Bankr. D. Colo. 2017) .........................................................23

*In re Millennium Lab Holdings II, LLC*,
   591 B.R. 559 (D. Del. 2018).....................................................................12

*In re Millennium Lab Holdings II, LLC*,
   945 F.3d 126 (3d Cir. 2019)...........................................................12, 31, 44

*In re NII Holdings, Inc.*,
   536 B.R. 61 (Bankr. S.D.N.Y. 2015).....................................................30, 43

*In re Purdue Pharm. L.P.*,
    619 B.R. 38 (S.D.N.Y. 2020)..................................................................10, 13, 14, 15, 39

*In re Quigley Co., Inc.*,
    676 F.3d 45 (2d Cir. 2012)..................................................................15, 16

*In re Residential Capital, LLC*,
    512 B.R. 179 (Bankr. S.D.N.Y. 2014)..................................................32, 33

*In re Residential Capital, LLC*,
    No. 12–12020 (MG),
    2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11, 2013)..........................48

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016)..................................................47

*In re Spookyworld, Inc.*,
    346 F.3d 1 (1st Cir. 2003)....................................................................37

*In re Tronox Inc.*,
    855 F.3d 84 (2d Cir. 2017)..................................................................42

*In re Wash. Mut., Inc. Secs., Derivative & ERISA Litig.*,
    No. 2:08-md-1919 MJP,
    2009 WL 3711614 (W.D. Wash. Nov. 2, 2009)....................................12

*Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*,
    154 F. Supp. 2d 682 (S.D.N.Y. 2001)..................................................8

*Kennedy v. Josephthal & Co.*,
    No. 82-913-MA,
    1983 WL 1314 (D. Mass. May 9, 1983)..............................................13

*MacArthur Co. v. Johns-Manville Corp.*,
    837 F.2d 89 (2d Cir. 1988)..................................................15, 21, 22, 43

*Motors Liquidation Co. v. Gen. Motors LLC*,
    829 F.3d 135 (2d Cir 2016)..................................................................46

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
    339 U.S. 306 (1950)............................................................................46

*Oklahoma ex rel. Hunter v. Johnson & Johnson*,
    2021 OK 54 (2021)..............................................................................35

*SPV Osus Ltd. v. UBS AG*,
    882 F.3d 333 (2d Cir. 2018)..................................................................9, 15

*State ex rel. Jennings v. Purdue Pharma, L.P.*,
 C.A. No. N18C-01-223 MMJ CCLD,
 2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019) ...................................................34

*State Ex Rel. Stenehjem v Purdue Pharma L.P.*,
 No. 08-2018-CV-01300,
 2019 WL 2245743 (N.D. Dist. May 10, 2019) ......................................................34

*Tenn. Student Assistance Corp. v. Hood*,
 541 U.S. 440 (2004) ..............................................................................................40

*Texas Industries, Inc. v. Radcliff Materials, Inc.*,
 451 U.S. 630 (1981) ..............................................................................................14

*Toib v. Radloff*,
 501 U.S. 157 (1991) ..............................................................................................40

*United States v. Purdue Frederick Co., Inc.*,
 495 F. Supp. 2d 569 (W.D. Va. 2007) ...................................................................34

*United States v. Whiting Pools*,
 462 U.S 198 (1983) ...............................................................................................40

*White v. Curo Tex. Holdings, LLC*,
 C.A. No. 12369-VCL,
 2016 WL 6091692 (Del. Ch. Sept. 6, 2016) ..........................................................12

## STATUTES

11 U.S.C. § 105 ................................................................................................................21

11 U.S.C. § 524 .............................................................................................22, 23, 43, 28

11 U.S.C. § 1123 ..............................................................................................................21

11 U.S.C. § 1129 ..............................................................................................................28

28 U.S.C. § 1452 ..............................................................................................................38

## OTHER AUTHORITIES

3A Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1137 (2019) ....................35

H.R. Rep. 103-834, 103d Cong., 2nd Sess. 12; 140 Cong. Rec. H10765 (Oct. 4,
 1994) .....................................................................................................................23

Jan Hoffman, *The Core Legal Strategy Against Opioid Companies May Be
 Faltering*, N.Y. TIMES (Nov. 11, 2021) .................................................................36

U.S. CONST. Art. I cl. 8 .................................................................................................................39

Appellees, the Mortimer-side Initial Covered Sackler Persons,[1] by and through their undersigned counsel, hereby submit this brief in opposition to the briefs filed by appellants California, Washington, Connecticut, Delaware, Rhode Island, Vermont, Oregon, and Washington D.C. (collectively, the "Appellant States"); and the United States Trustee (together, "Appellants").[2]  As set forth below, the Hon. Robert D. Drain (the "Bankruptcy Court") properly confirmed the Plan.[3]

## PRELIMINARY STATEMENT

Appellants agree with the vast majority of creditors that the Plan is a public health breakthrough that directs much-needed resources to the best purpose:  abatement of the opioid crisis.  Appellants are themselves parties to a complicated agreement among all creditors regarding the division and use of the very funds to be contributed by the Sackler families. Indeed, the Bankruptcy Court observed that counsel for Appellant Washington touted this inter-creditor settlement structure "as the best thing since sliced bread, almost a miracle."  Side A App., Aug. 13, 2021 Hr'g Tr. at 199:12–14.  Appellants' only objection to the plan implementing the structure they negotiated is to the non-debtor releases for the shareholders and former directors (the "Shareholder Releases")—but those releases enable the financial contribution that

---

[1] The Side A ICSPs include Theresa Sackler, Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer D.A. Sackler, as well as trusts of which they are beneficiaries and the trustees of those trusts, and Beacon Company.  Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties ¶ 1, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Nov. 20, 2019), ECF No. 518.

[2] To date, an appeal was also filed by certain entities referred to as the Canadian Appellants, as well as *pro se* appellants Ronald Bass, Sr., Ellen Isaacs, and Maria, Andrew, and Richard Ecke.  A "Statement of Interest" was also filed by the United States Department of Justice ("**DOJ**").  Side A respectfully refers the Court to the briefs of the Appellant Debtors and other Plan proponents with respect to briefs filed by these parties and other arguments raised on appeal that are not addressed in Side A's brief.

[3] Capitalized terms not otherwise defined herein have the meaning set forth in Exhibit A to Debtors' *Notice of Filing of Glossary of Terms Related to the Chapter 11 Cases*, *In re Purdue Pharma L.P., et al., Bankruptcy Appeals*, 21-cv-7532 (S.D.N.Y.), ECF No. 115.

1

is the linchpin of the Plan and is an express condition of the inter-creditor agreement the Appellants joined.

In other words, while heaping praise on the Jenga tower that has been built here, Appellants seek to yank out the block on which the entire edifice rests. Appellants' legal argument that non-debtor releases are entirely impermissible is plainly without merit. Decades of case law in the Second Circuit and elsewhere have recognized that bankruptcy courts may confirm plans that provide for involuntary non-debtor releases in appropriate circumstances. Appellants' arguments are therefore really directed at whether <u>these</u> releases are within the Bankruptcy Court's authority. But the Bankruptcy Court correctly determined that these non-debtor releases are the key to the entire Plan.

<u>First</u>, the Bankruptcy Court has subject matter jurisdiction to approve the releases. The Shareholder Releases inarguably have the required "conceivable effects" on the Estate because they cover claims that are based on the Debtors' alleged conduct and, if litigated, would enmesh the reorganized Debtors in unending litigation. The Estate would also incur extensive costs associated with claims for indemnification and contribution by Purdue's former directors and other defendants.

<u>Second</u>, the Bankruptcy Code authorizes the releases under the facts of this case. Under Second Circuit law, non-debtor releases are appropriate where they are integral to the debtors' plan of reorganization and resolve a contingent liability asserted against the debtors and non-debtors, and where they facilitate a significant financial contribution that makes the restructuring possible. Those are precisely the circumstances here. Indeed, the Shareholder Releases are an essential component of the Plan that provides for the global resolution of the very litigation against Purdue and related parties that led to the Chapter 11 filing. The $4.325 billion in

payments to be made by the Sackler families is the keystone that makes possible the Estate's funding of abatement trusts and payments to individual claimants. Absent releases, the Plan would collapse; there would be endless litigation; the Debtors would liquidate; the benefits of a nationwide abatement program would be lost; and there would be no payments to individual claimants. In such circumstances, creditors would recover far less than they would receive under the Plan.

Third, Appellants' other challenges to the Shareholder Releases are even weaker. There is no "police power" exception to *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136 (2d Cir. 2005). The Bankruptcy Code provides for specific treatment for "police power" claims in two narrow circumstances that have nothing to do with plan confirmation or non-debtor releases. The Bankruptcy Code simply does not allow a handful of states to torpedo a value-maximizing plan of reorganization just because they would like to litigate in their own courtrooms; most Appellants, if not all, would receive nothing if litigation resumed.

Fourth, the U.S. Trustee's claim to speak for personal injury claimants whose due process rights were allegedly violated because they were denied their "day in court" is antithetical to the bankruptcy system, the purpose of which is to consolidate claims and resolve them in a way that maximizes value for all creditors. It also misconstrues what due process requires in a Chapter 11 case. The personal injury claimants who as a class voted overwhelmingly in favor of the Plan, and whose authorized representatives are Appellees here, had their day—many days, in fact—in court. They received extensive discovery, deposed witnesses, and participated in a lengthy confirmation hearing. Under established law, the due process rights of creditors are satisfied through notice and the opportunity to object. The Debtors provided extensive notice regarding

the Shareholder Releases, on top of widespread media coverage of the bankruptcy proceedings, giving anyone who wanted to object ample opportunity to do so.

The Plan should therefore be affirmed on appeal.

## STATEMENT OF THE CASE

I.    **Under the Settlement, the Sackler Families Agreed to Significant Financial and Non-Monetary Obligations and Received the Shareholder Releases as Consideration**

An underlying theme of the Appellants' briefs is that the settlement prevents them from taking more punitive actions against the Sackler families.  The settlement, however, is a resolution that prioritizes maximizing creditors' aggregate recovery while imposing indisputably significant obligations on the Sackler families.

First and foremost, the settlement requires the Sackler families to make payments of $4.325 billion, which the Bankruptcy Court described as the largest shareholder contribution in history.  Side A App., Seventeenth Plan Supplement, Exhibit AA: Shareholder Settlement Agreement § 2.01 [hereinafter, "**Settlement Agreement**"]; Side A App., Confirmation Order at 30 [hereinafter "**Confirmation Order**"]; Side A App., Modified Bench Ruling at 136 [hereinafter "**MBR**"].  The Sackler families must also contribute their equity in Purdue to the public interest.  Settlement Agreement § 2.10.  The Sackler families must sell a group of privately-held international pharmaceutical companies known as the Independent Associated Companies ("IACs") and pay the proceeds to the Estate, in partial satisfaction of their financial commitment.  Settlement Agreement § 3.01.  The members of the Sackler families who served on Purdue's board (the "Sackler Former Directors") (and entities for their benefit) are required to exit the opioid business worldwide after the IACs are sold.  Settlement Agreement § 8.09.

At the creditors' behest, the settlement incorporates multi-tiered creditor support annexes with each of the eight Side A family groups and the two Side B family groups.  These annexes

impose obligations on at least sixty parties on Side A.  Settlement Agreement, Exhibit A: Payment Groups & IAC Payment Parties.  These annexes include detailed restrictions on the management and use of assets, requirements governing the establishment of liens and other security measures, and a host of multifaceted requirements.  *See* Settlement Agreement, Annexes A–C.

The Sackler families will contribute documents they have produced during the course of the bankruptcy relating to Purdue's prescription opioid business to a public repository, which will also include tens of millions of documents produced by the Debtors.  Settlement Agreement § 11.14; Side A App., Twelfth Am. Joint Chapter 11 Plan of Reorganization § 5.12 [hereinafter, the "**Plan**"].

As consideration for entering into the settlement, the Sackler families will receive releases that provide a global resolution of two sets of claims.  Section 10.7(a) of the Plan provides for releases of claims that could be brought by the Estate, relating to distributions from Purdue to entities for the benefit of the Sacker families and alter-ego type claims.  Plan section 10.7(b) provides for a release of specified civil claims that could be brought by third-party plaintiffs.  Under the terms of a "channeling injunction," eligible claims will be channeled to trusts established for the benefit of applicable creditor groups; the proceeds of the Sackler families' settlement payments will flow to these trusts.  *Id.* § 10.8.

## II.    The Shareholder Releases Provide Global Finality to the Sackler Families and Release Claims That Would Otherwise Burden the Estate

The Sackler families' agreement to the obligations described above is contingent upon the release of claims that have been or may be brought by both the Estate and third-party plaintiffs.  This appeal concerns the Shareholder Releases, which cover claims that (i) fall within

the definition of Shareholder Released Claims <u>and</u> (ii) target the defined categories of
"Shareholder Released Parties."

"Shareholder Released Claims" include claims relating to Purdue's prescription opioid
business (and certain categories of claims related to non-opioid products) and claims related to
the Estate.[4]  Plan § 10.7.  Per instructions from the Bankruptcy Court, these releases are
applicable only if "any conduct, omission or liability of any Debtor or any Estate is the legal
cause or is otherwise a legally relevant factor."  Confirmation Order at 67; Plan § 10.7(b).

The "Shareholder Released Parties" include Side A individuals and entities that are
inextricably intertwined with the settlement and Purdue.  For Side A, participation in the
settlement—including making its share of the settlement payments (approximately $2 billion)
and agreeing to the sale of the IACs—requires the participation of the entire family and structure
because Side A's assets are spread out across many parties.  Side A App., White Decl. ¶¶ 9–11;
MBR at 85.  Side A's active participation in the settlement therefore encompasses individuals
who did not serve on Purdue's board and numerous trusts.  (*See* section II, *infra*.)

The Plan defines "Shareholder Released Parties," Plan § 1.1, to include the following
groups:

**Members of the Mortimer D. Sackler family**:  This group includes the widow of Dr.
Mortimer D. Sackler and his descendants.  Settlement Agreement, Exhibit X.

**Trusts, trustees and protectors**:  Trusts for the benefit of some or all of Dr. Mortimer
D. Sackler's descendants hold a significant percentage of Side A's wealth, including funds that
originated from Purdue.  MBR at 85; Side A App., White Decl. ¶¶ 7–9.  These trusts also hold

---

[4] The Plan also includes a standard release for claims arising out of the restructuring.  *Id.*

Side A's equity in Purdue and the IACs.  *Id.* ¶¶ 9–10.  The parties in this group include individuals and trust companies with fiduciary responsibilities related to administering the trusts.

**The IACs**:  The IACs (referred to as "II-Way Entities" in the settlement, Settlement Agreement, Exhibit X) received distributions from Purdue and certain of them sell opioid products.  The IACs will be pledged to the MDT and will be sold under the terms of the Plan, with the proceeds paid to the Estate under the terms of the Plan.  Settlement Agreement § 3.01.  Without releases, their salability would be in doubt.

**Transferees**:  The releases cover individuals or entities who received transfers of funds that originated from Purdue.  The releases for members of this group extend only to the extent of such person's capacity as transferee <u>and</u> only to the extent of the funds transferred to them.  *Id.*

**Related persons, entities, and property**:  This category is limited to individuals or entities with a legal or agency relationship to individuals or entities in the preceding categories, *e.g.*, advisors or entities in the same corporate family.  *Id.*

**III.    The Shareholder Releases Provide the Global Finality That Enables the Sackler Families to Enter the Shareholder Settlement Agreement**

For Side A, making its share of the $4.325 billion in payments under the settlement will require contributions from a large number of individuals and entities—and these parties are able to make those contributions because of the finality provided by the Shareholder Releases.

One Side A Former Director testified that the Shareholder Releases allow the Sackler families to participate in the settlement because it "brings closure which enables the family to make this very substantial contribution . . . ."  Side A App., Aug. 19 Hr'g Tr. at 200:24–201:9.  Jonathan White testified on behalf of the trustee-directors of certain Side A trusts (the "**Trustees**" and "**Trusts**," respectively) that they can commit the Trusts to significant obligations such as those set forth in the settlement if and only if those obligations are in the best interest of

all beneficiaries.  Side A App., Aug. 16, 2021 Hr'g Tr. at 183:12–18, 209:6–210:3; Side A App.,

White Decl. ¶ 21.  The Trustees determined that entry into the settlement is in the beneficiaries'

best interest only if it provides global finality for the Trusts, beneficiaries and related parties.

Side A App., Aug. 16, 2021 Hr'g Tr. at 209:6–210:3.  Otherwise, the Trustees would have to

preserve trust assets to fund the beneficiaries' defenses as well as to protect the Trusts' assets.

Side A App., White Decl. ¶ 3.

An order from the Royal Court of Jersey (the "**Royal Court**") dated August 5, 2021

confirms that certain of the Trusts (including trusts holding Side A's interests in Purdue and the

IACs) are authorized to participate in the Shareholder Settlement Agreement only if the Plan

provides releases for the Trusts, Trustees, Protectors, Special Trustees and all beneficiaries.  Side

A App., Aug. 5, 2021 Royal Court of Jersey Order at 3–4.  If the Trustees failed to act in

accordance with this order and committed assets from the Trusts without obtaining the required

releases, the Trustees could be held personally liable for breach of trust.  Side A App., White

Decl. ¶ 24.  Subsequent to the Confirmation Hearing, the Royal Court issued an order dated

October 18, 2021 that is contemplated by the Settlement Agreement.  Side A App. at

M-ISCP_4186–87, Oct. 18, 2021 Royal Court of Jersey Order.[5]  It provides final authorization

for the Side A Trustees to commit the Trusts to enter into the settlement agreement in the form

that it was incorporated into the Plan that was confirmed by the Bankruptcy Court.  *Id.* at 1–2.

---

[5] This Court may take judicial notice of this order.  *See Ermini v. Vittori*, 758 F.3d 153, 156 n.2 (2d Cir. 2014) (granting motion for court to take judicial notice of decision from Italian court pursuant to FRE 201); *Jordan (Bermuda) Inv. Co. v. Hunter Green Invs. Ltd.*, 154 F. Supp. 2d 682, 689 (S.D.N.Y. 2001) (taking judicial notice of judgment of British Virgin Islands court).

## ARGUMENT

**I.     The Bankruptcy Court Correctly Held That It Has Subject Matter Jurisdiction to Confirm the Plan with the Shareholder Releases[6]**

The Bankruptcy Court correctly held that the Shareholder Releases meet the "conceivable effects" test for subject matter jurisdiction, as the resumption of litigation against the released parties—which is inextricably predicated on the conduct of the Debtors—would burden the Estate.  Notwithstanding these unassailable findings, Appellants assert that the court lacks subject matter jurisdiction.  First, Appellants speculate that the Estate could rid itself of claims for indemnification and contribution without incurring any costs.   Br. of Appellants the States of Washington, Connecticut, Delaware, Rhode Island and Vermont, ECF No. 101 (hereinafter "**Multi-State Brief**") at 32; CA Brief at 4; Corrected Br. of Appellant, the State of Maryland, ECF No. 121-1 (hereinafter "**MD Brief**"), at 27.  Second, they maintain that because their claims are "direct," or assert personal conduct, such claims fall outside the *res* of the Estate.  Multi-State Brief at 33, 37-39; MD Brief at 25-29; Appellants' Principal Br., ECF No. 95 (hereinafter "**CA Brief**"), at 4;  Br. of Appellant, William K. Harrington, U.S. Trustee, ECF No. 91 (hereinafter "**UST Brief**"), at 21, 32.   But the Second Circuit has made clear that where, as here, a claim has a "conceivable effect" on the Estate, the court has subject matter jurisdiction no matter what label the plaintiffs affix to their claims.

---

[6] The discussion below addresses subject matter jurisdiction that arises out of the "conceivable effects" of litigation covered by the Shareholder Releases.  Side A anticipates that other Appellees will address the Bankruptcy Court's alternative determination that this matter is a "core proceeding" and that the court therefore had "arising in" jurisdiction.  *See* MBR at 117; Confirmation Order at 25–26.

A.    **The Bankruptcy Court Correctly Found That the Shareholder Released Claims Would Have a Conceivable Effect on the Estate If Litigation Resumed**

The law governing subject matter jurisdiction is not in dispute:  a bankruptcy court has subject matter jurisdiction to issue non-debtor releases to enjoin lawsuits that have a "conceivable effect" on the *res* of the estate, meaning that "the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankruptcy estate."  *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339–40 (2d Cir. 2018) (citations omitted); *see also In re Purdue Pharm. L.P.* ("**Dunaway**"), 619 B.R. 38, 48–49 (S.D.N.Y. 2020) (*cited in* MD Brief at 15–16; Multi-State Brief at 38; UST Brief at 37–38; CA Brief at 11).

The Bankruptcy Court found that the resumption of litigation against the Shareholder Released Parties could have a "conceivable effect" on the Estate for multiple reasons. Appellants have no response at all to several such findings, any one of which would sustain the Bankruptcy Court's jurisdiction:

**The Estate would lose $4.325 billion and would be in intense competition with third-party plaintiffs for any available litigation recoveries.**  The Bankruptcy Court found that the releases are the consideration that the Sackler families received for agreeing to make $4.325 billion in payments.  MBR at 136.  If Appellants prevailed in overturning the Shareholder Releases, the settlement would be void.  The Estate would wither away, simultaneously shrinking by over $4 billion while expending millions of dollars in legal fees fighting both with creditor groups and Sackler families.  *Id.* at 88–90, 135.

As the Bankruptcy Court recognized, any renewal of litigation covered by the Shareholder Releases would be highly prejudicial to the Estate.  *See* MBR at 11 (litigation would prejudice "Debtors' ability to pursue the [E]states' . . . fundamentally overlapping, claims");

Confirmation Order at 26 (such litigation would "prejudice the Estates . . . (and therefore reduce the value available for distribution to the Creditor Trusts) in future litigation" of the Estate's claims).  Third-party plaintiffs are pursuing allegations that Purdue engaged in unlawful marketing.  The Estate's fraudulent conveyance claims (which Side A vigorously denies) are predicated on the allegation that the risk of this very litigation rendered Purdue insolvent as of the time that it made distributions.  If litigation resumes and third-party plaintiffs lose (similar to what happened in Oklahoma last week (*see* section III.B.2, *infra*)), such losses would undermine the Estate's argument that litigation risk rendered Purdue insolvent.  Furthermore, the Estate and third-party plaintiffs would be pursuing the same Sackler family assets; any assets claimed by third-party plaintiffs would not be available to the Estate.

**The resumption of litigation would burden the reorganized Debtors and interfere with its operations.**  The Bankruptcy Court found that "[t]he resumption of litigation that would otherwise be the subject of the Shareholder Settlement would implicate [Knoa] and could have an impact on the operations of [Knoa] and [Knoa's] ability to support abatement."  Confirmation Order at 30.  Litigation covered by the Shareholder Releases would involve the safety and efficacy of OxyContin—a product that Knoa will continue to manufacture—and the business practices of legacy Purdue, the very claims that led to the Chapter 11 filing in the first place.  Appellant Oregon, for example, argued that the Shareholder Releases should be disallowed because "OxyContin is highly addictive, dangerous, and deadly."  Side A App. at M-ICSP_3615, Oregon Compl. at 2.  Knoa would become actively involved in this litigation, either of its own accord (due to the need to defend one of its core products) or because parties to the litigation would, at minimum, seek witness testimony or documents regarding OxyContin.  This litigation

would impose significant costs on Knoa and burden its key personnel, thereby inhibiting its operations and ability to carry out the Public Health Initiatives contemplated by the Plan.

Appellants ignore all of these effects and particularly focus on two other findings by the Bankruptcy Court as to the conceivable effect of revived litigation on the Estate:  (i) such litigation would result in indemnification or contribution claims on the Estate and (ii) the Shareholder Former Directors would make claims on the Debtors' insurance policies.  *See* Multi-State Brief at 32–33, 37–38; MD Brief at 27–28; CA Brief at 4; UST Brief at 32, 52–53. Appellants' argument that such claims would not have a "conceivable effect" on the Estate rests on nothing more than speculation that Appellants would win every case litigated, no such victory would give rise to indemnification, contribution, or claims on the Estate's insurance policy, <u>and</u> the Estate would somehow avoid incurring any costs, whether in connection with the litigation itself or defense against indemnity, contribution, and related claims.

**The Estate has an indemnification obligation for advancement of fees.**  The Sackler Former Directors (at a minimum) are entitled to advancement of attorney's fees for all causes of action, even those that would not ultimately be indemnifiable if the plaintiff prevailed on the merits.  *See* Side A App. at M-ICSP_4195–97, Purdue Pharma Inc. Minutes of a Meeting of the Board of Directors, dated Nov. 19, 2004, at 2–4; *see also White v. Curo Tex. Holdings, LLC*, C.A. No. 12369-VCL, 2016 WL 6091692, at *3, *8, *27 (Del. Ch. Sept. 6, 2016) (citing *U.S. ex rel. Capshaw v. White*, C.A. No. 3-12-cv-4457N (N.D. Tex. Dec. 7, 2015)) (individuals entitled to advancement of fees with respect to actions under False Claims Act and government investigation).  The District Court addressed precisely this issue in *Millennium*, holding that the obligation to advance attorney fees for RICO/fraud claims had a "conceivable effect" even if such claims ultimately would not be indemnifiable if the plaintiff prevailed on the merits.  *In re*

*Millennium Lab Holdings II, LLC*, 591 B.R. 559, 583 (D. Del. 2018), *aff'd*, 945 F.3d 126 (3d Cir. 2019); *see also In re Lower Bucks Hosp*., 488 B.R. 303, 315–16 (E.D. Pa. 2013); *In re Wash. Mut., Inc. Secs., Derivative & ERISA Litig.*, No. 2:08-md-1919 MJP, 2009 WL 3711614, at *2 (W.D. Wash. Nov. 2, 2009).

**Defendants could seek contribution from the Estate regardless of whether indemnification is available.**  The resumption of litigation could also result in claims against the Estate for contribution.  This Court addressed this issue in *Dunaway*, recognizing that if a Former Director were found to have violated the statute in question, he would have a statutory right to contribution against Purdue.  *Dunaway*, 619 B.R. at 52.  Maryland cites a case for the proposition that indemnification is not available for violation of the Massachusetts consumer protection statute—but ignores that this same opinion recognizes that a defendant may seek contribution.  *See Kennedy v. Josephthal & Co.*, No. 82-913-MA, 1983 WL 1314, at *6–7 (D. Mass. May 9, 1983) (cited in MD Brief at 28) (defendant was permitted "to state a claim for contribution against alleged joint tortfeasors for violations of chapter 93A and common law fraud").

**Defendants could seek indemnification or contribution for non-fraud claims.**  Appellants' argument that the Estate would face no indemnification or contribution claims because their "police power" claims are not indemnifiable exists only in a fictitious universe where the Shareholder Release remains in force, but Appellants' "police power" claims are allowed to proceed.  In reality, any carve-out would cause the Plan to collapse, unleashing a torrent of non-fraud claims brought by Appellants and other parties.  *See, e.g.*, Side A App., *Hartman* Compl. ¶¶ 96–99 (cited in UST Brief at 47) (cause of action under Restatement (Second) of Torts § 402A); Side A App., *Map to Health* Compl. ¶¶ 957–1007 (cited in UST

Brief at 48) (negligence, common-law nuisance, and unjust enrichment); Side A App., California First Am. Compl. ¶¶ 236–49 (public nuisance); Side A App., Delaware Compl. ¶¶ 278-89 (negligence); Side A App., Rhode Island Compl. ¶¶ 334–61 (public nuisance); Side A App., Washington First Am. Compl. ¶¶ 6.1–7.13 (public nuisance and common-law negligence).  Even case law cited by Appellants recognizes that indemnification and contribution are available for non-fraud claims.  *See, e.g.*, *Elican Holdings, Inc. v. Hudson Oil Refin. Corp.*, 96 A.D.2d 792, 793 (N.Y. App. Div. 1983) (cited in MD Brief at 27) ("[T]o the extent that the payments represented clean-up costs and other similar expenses . . . contribution or indemnity may be obtained against a party alleged to be a joint tort-feasor.").[7]

**Any losses by plaintiffs would result in significant indemnity payments to Side A:** Appellants also ask the Court to assume they will have a 100 percent success rate in litigation. Anything less than a perfect winning record would mean that the Shareholder Released Parties would have at least some indemnifiable claims that would directly harm the Estate.  *See Dunaway*, 619 B.R. at 52 ("Dunaway Action seeks redress for the acts [the Former Director] allegedly took in his official position to fuel the opioid crisis; therefore, it is conceivable that the Dunaway Action would give rise to a colorable indemnification claim under the LPA.").  In reality, however, Plaintiffs would face considerable risks in all phases of litigation as discussed in Section III.B.2, below.

---

[7] Additionally, Maryland cites *Texas Industries, Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630 (1981), as support for the broad proposition that "[i]ndemnification and contribution are generally unavailable and inappropriate under statutory police power actions and common law claims for wrongdoing because of strong public policies against recognizing them," MD Br. at 27–28, but the Supreme Court reached no such conclusion.  The Supreme Court simply held that it lacked the authority to create a cause of action for contribution for violation of the Clayton and Sherman Acts and declined to take a position on the merits of allowing such contribution claims. *Tex. Indus.*, 451 U.S. at 645–47.

**Litigation over an indemnification or contribution claim itself could have a conceivable effect on the Estate.**  Even if the Estate were to take the position advocated by Appellants that it has no indemnification or contribution obligations, that would trigger litigation with the Sackler families who would vigorously seek to enforce their rights.[8]  The mere possibility of indemnification or contribution litigation is sufficient to have a conceivable effect on the *res* of the Estate.  *Dunaway*, 619 B.R. at 53 (when applying the conceivable effects test, "even unsuccessful claims, or those raised in subsequent, untimely, and frivolous lawsuits can 'result in the estate incurring costs,' which directly impacts the res of the bankruptcy") (citing *SPV*, 882 F.3d at 341); *see also SPV*, 882 F.3d at 340–41; *In re Adelphia Comm'ns Corp. Sec. and Derivative Litig.*, 2005 WL 1404798, at *1–2 (S.D.N.Y. June 14, 2005).  That is particularly true here where the Sackler families have meritorious claims for indemnification with respect to litigation arising out of the Debtors' marketing practices.

Appellants' arguments regarding insurance policies suffer from similar flaws.  While Appellants do not deny that the Estate has insurance policies covering the Sackler Former Directors, or that claims by those directors and others could deplete those policies, the Appellants assert that any such insurance claims would be excluded due to alleged bad acts. Multi-State Brief at 32–33.  The same reasons that losses or costs may be indemnifiable apply equally to claims against the Debtors' insurance policies.  The Estate's insurance policies could be depleted if, for example, a Shareholder Former Director prevailed in litigation (as was the case in Utah (*see* section III.B.2, *infra*)); a plaintiff hypothetically prevailed on a non-fraud cause of action; or if the Estate litigated whether it had indemnification, contribution or insurance

---

[8] Side A App., White Decl. ¶ 27.

obligations.  *See In re Quigley Co., Inc.*, 676 F.3d 45, 53 (2d Cir. 2012); *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 92-93 (2d Cir. 1988).

>    **B.**     **Appellants' Labeling of Their Claims as "Direct" Is Irrelevant to Whether Their Claims Have an Effect on the Estate**

Appellants attempt to evade the Bankruptcy Court's broad *in rem* subject matter jurisdiction by muddling two distinct legal inquiries:  whether a claim has a conceivable effect on the estate and whether a claim is the property of the estate.  Appellants assert that they have brought "direct" claims because they allege members of the Sackler families engaged in misconduct and that the Bankruptcy Court's jurisdiction is limited to "derivative" claims.  UST Brief at 42–45.  The Second Circuit, however, has explicitly stated that the Bankruptcy Court's *in rem* jurisdiction extends to <u>both</u> claims that are the property of the Estate <u>and</u> claims that have a conceivable effect on the Estate:

> It thus appears from our case law that, while we have treated whether a suit seeks to impose derivative liability as a helpful way to assess whether it has the potential to affect the bankruptcy res, <u>the touchstone for bankruptcy jurisdiction remains "whether its outcome might have any 'conceivable effect' on the bankruptcy estate</u>" . . . .  But whether the direct result of a suit against a third party will be the removal of assets from the bankruptcy estate is separate from the question whether the third party's alleged liability is derivative of the debtor's (although in certain suits, as our case law indicates, the two questions may become intertwined).  <u>A suit against a third party alleging liability not derivative of the debtor's conduct but that nevertheless poses the specter of direct impact on the res of the bankrupt estate may just as surely impair the bankruptcy court's ability to make a fair distribution of the bankrupt's assets as a third-party suit alleging derivative liability</u>.

*In re Quigley Co.*, 676 F.3d at 57–58 (emphasis added).

Case law on which Appellants rely concerning the release of third-party claims focuses on the distinction between direct and derivative claims in circumstances where the only question was whether certain claims were released <u>by the Estate</u>.  UST Brief at 42-44.  The Second Circuit has previously explained that the release of derivative claims by the Estate does not need

to satisfy the "stringent standard laid out in *Metromedia* for injunctive relief."  *See In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 93 n.12 (2d Cir. 2014).  Here, the Bankruptcy Court evaluated the relief under *Metromedia* precisely because many of the claimants, including Appellants, asserted that the released claims are "direct" claims.

Appellants' reliance on a few decisions that found that the complaint at issue sufficiently alleged "direct" participation in Purdue's activities by the Former Directors is misplaced.  Those decisions do not establish that Appellants and others have asserted "independent" claims.  Instead, those courts looked at whether the unproven allegations asserted that the Former Directors personally participated in <u>Purdue's</u> marketing and promotional activities.  *See Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 6497887, at *1 (Mass. Super. Nov. 6, 2019) ("The Commonwealth alleges that members of the Sackler family . . . each personally participated in creating, directing, or approving deceptive and unfair marketing messages and materials sent into Massachusetts.  It is this <u>unfair and deceptive marketing of Purdue's addictive opioid products</u>—and OxyContin in particular—that the Commonwealth alleges was a substantial cause of the opioid crisis." (emphasis added)).  Indeed, certain of Appellants, most notably Maryland, have argued that the Shareholder Released Parties are strictly liable for Purdue's actions.  MD Brief at 23.  This consistent and emphatic reliance on the Debtors' conduct as the gravamen of their claims against the Shareholder Released Parties only confirms the Bankruptcy Court's appropriate exercise of jurisdiction.

Appellants rely on *Manville III*, but that decision is similarly consistent with the Bankruptcy Court's holding that it had *in rem* jurisdiction to approve the Shareholder Releases. MBR at 107–11.  *Manville III* involved claims regarding an insurer's independent, allegedly tortious conduct in denying coverage that neither were derivative claims that were property of

the Estate *nor* claims related to the Debtor's own conduct that would have any effect on the

Estate.  *In re Johns-Manville Corp.* ("*Manville III*"), 517 F.3d 52, 63–65 (2d Cir. 2008), *rev'd on*

*other grounds*, 557 U.S. 137 (2009).  In other words, *Manville III* held that specific claims fell

outside of the terms of the non-debtor releases in that case, but did not hold that a bankruptcy

court could never release a direct claim if it has a "conceivable effect" on the Estate.  *Id.*

Here, by contrast, Appellants have uniformly asserted claims against the Shareholder

Released Parties that are entirely based on Purdue's alleged marketing practices (whether on

theories of personal participation or responsibility as a controlling shareholder).  Every single

Appellant State that has filed suit has not only acknowledged but has <u>insisted</u> that its lawsuit is

predicated on the released parties' participation in, or responsibility for, Purdue's marketing

activities:

| Appellant | Allegations |
|---|---|
| California | ¶ 191:  "<u>Purdue</u> is a family-owned business.  The Sacklers have always controlled <u>Purdue</u>, and occupied a majority of <u>Purdue</u> Pharma Inc.'s Board since its inception in 1990 until 2018." <br> Side A App., California First Am. Compl. |
| Connecticut | ¶ 107:  "Starting at the top, the Sacklers own and led <u>Purdue</u>." <br> ¶ 125:  "The Sacklers always held the controlling majority of the Board, which gave them full power over <u>Purdue</u>." <br> Side A App., Connecticut Am. Compl. |
| Delaware | ¶ 2:  "The misconduct of the Sackler Defendants in their direction of <u>Purdue</u> . . . has created an epidemic of prescription opioid abuse in Delaware." <br> Side A App., Delaware Compl. |
| Maryland | ¶ 222:  "The Sackler Respondents helped direct <u>Purdue's</u> unlawful marketing techniques." <br> Side A App., Maryland Am. Statement of Charges. |
| Oregon | ¶ 33:  "In the State of Oregon, the Sacklers, <u>through Purdue</u>, aggressively and illegally marketed and promoted OxyContin." <br> Side A App., October 2019 Oregon Compl. |

| Appellant | Allegations |
|---|---|
| Rhode Island | ¶ 10:  "The Sacklers . . . have long held an ownership interest in <u>Purdue</u> and Rhodes, and continue to hold such an ownership interest.  Through their decisions and directives, the Sacklers knowingly caused the promotion and sales of <u>Purdue</u> and Rhodes opioids in Rhode Island."<br>Side A App., Rhode Island Compl. |
| Vermont | ¶ 516:  "[T]he Sacklers either directed <u>Purdue</u> to engage in the deceptive and unconscionable practices described herein or were aware of the conduct and responsible for it."<br>Side A App., Vermont Compl. |
| Washington D.C. | ¶ 47:  "R. Sackler, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, participated in, or with knowledge approved the acts or practices <u>of Purdue</u>."<br>Side A App., District of Columbia Compl. |

Appellants also disregard that the Bankruptcy Court tailored the Shareholder Releases to exclude claims that are actually independent of the Debtors' conduct, consistent with *Manville III*.  The definition of Shareholder Released Claims covers claims related to (i) Purdue's business (and specified categories of claims relating to non-opioid products) and (ii) the Estate.  As belts and suspenders the Bankruptcy Court further limited that definition to claims for which "the conduct, omission, or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor."  Confirmation Order at 67.  Appellants have not identified and cannot identify any allegation of unlawful conduct against Sackler family members that falls within the scope of the Shareholder Releases but lacks a "conceivable effect" on the Estate.

### C.    The Bankruptcy Court Had Jurisdiction to Release Claims Against all Shareholder Released Parties

Appellants suggest that, even if the releases for the Sackler Former Directors were justified, there would be no basis for jurisdiction over claims brought against all Shareholder Released Parties.  Appellants are wrong because (i) a resumption of litigation would result in suits against a wide set of parties based on their alleged Purdue connections and (ii) such claims

would overlap with the allegations against the Debtors and have the types of effects on the Estate that are described above.  (*See* section I.A, *supra*.)

Were litigation to resume, plaintiffs would continue to target the individuals and entities that comprise the Shareholder Released Parties, beyond just the Sackler Former Directors, and any such claims would have a conceivable effect (at minimum) on the Estate.  Oregon's Complaint argues—with no particularized allegations—that *all* Sackler family members and entities for their benefit constitute an amorphous group Oregon calls the "Sackler Pharmaceutical Enterprise" and that all members of this supposed "Enterprise" are responsible for actions taken by Purdue.  Side A App. at M-ICSP_3614, Oregon Compl. at 1; *see also* Side A App., *Map to Health* Compl. (cited in UST Brief at 48) (making allegations about the supposed "Sackler Pharmaceutical Enterprise").  California similarly named as defendants (i) the daughter of a Side B Former Director, even though she never sat on Purdue's board and her role at Purdue was limited to working in Purdue's R&D group for a few months a decade ago, and (ii) fictitious "John Does" 9–100, each of whom is allegedly "responsible in some manner for the violations of law alleged."  Side A App., California Compl.¶¶ 21, 27.

The same issues relating to claims against a Sackler Former Director would arise in claims against <u>any</u> Shareholder Released Party that falls within the scope of the release because such a claim would necessarily be predicated on allegations about Purdue's alleged conduct:

- Litigation based on allegations about Purdue's conduct would burden Knoa;

- The Estate would find itself in competition with other plaintiffs in pursuit of the Released Parties' assets; and

- Any Shareholder Released Party could seek contribution or indemnification from the Debtors as a joint tortfeasor with Purdue.

The Bankruptcy Court's findings confirm the need for the Shareholder Releases in light of the close relationship amongst the Side A parties that are coming together to support the settlement:

> Not every shareholder released party is necessarily going to make a specific payment under the plan, but the Sackler family members are obligated to cause the payments to be made, and the relationships among the shareholder released parties are sufficiently close to lead to the conclusion that the aggregate settlement payment hinges on each being released.  <u>Understandably the shareholder released parties are not going to agree to provide the consideration under the settlement without receiving the shareholder release in return</u>.

MBR at 136 (emphasis added).  This group of parties cannot come together to make billions of dollars in settlement payments, comply with the detailed requirements in the credit support annexes, and sell the IACs if plaintiffs are simultaneously pursuing Side A's assets.

## II.    The Bankruptcy Court Correctly Determined That the Bankruptcy Code Authorizes the Confirmation of a Plan That Provides for Non-Debtor Releases in Appropriate Circumstances

Courts in this circuit uniformly agree that the Bankruptcy Court is authorized under the Bankruptcy Code to approve a plan of reorganization that includes non-debtor releases under appropriate circumstances.  *See Drexel Burnham*, 960 F.2d at 293; *Metromedia*, 416 F.3d at 141; *Johns-Manville Corp.*, 837 F.2d at 91.  Consistent with that conclusion, the Seventh Circuit has also specified that the approval of non-debtor releases is authorized by (i) the Bankruptcy Court's "broad" "equitable powers" and (ii) Section 1123(b)(6), which authorizes a court to "include any other appropriate provision not inconsistent with the applicable provisions of this title," thereby giving the Bankruptcy Court the "residual authority . . . to release third parties from liability to participating creditors if the release is 'appropriate' and not inconsistent with . . . the bankruptcy code."  *In re Airadigm Commc'ns, Inc.*, 519 F.3d 640, 657 (7th Cir. 2008).  *See also In re A.H. Robins Co., Inc.*, 880 F.2d 694, 701 (4th Cir. 1989) ("Bankruptcy courts are courts of equity.  11 U.S.C. § 105(a) . . . confers equitable powers upon the bankruptcy courts.").

A.     **The Second Circuit Has Recognized for Decades That the Bankruptcy Court Is Authorized to Approve Non-Debtor Releases**

*Metromedia* confirms that the Second Circuit has long recognized the authority of bankruptcy courts to confirm plans of reorganization, and provides guidance regarding when it is appropriate to do so.  *See Metromedia*, 416 F.3d at 141–42.  The Second Circuit affirmed that it had "previously held that '[i]n bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan.'"  *Id.* at 141 (emphasis added) (quoting *In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992).  While non-debtor releases are not appropriate for every garden-variety case, they are permitted in certain circumstances, including where:

> A central focus of these . . . reorganizations was the global settlement of massive liabilities against the debtors and co-liable parties.  Substantial financial contributions from non-debtor co-liable parties provided compensation to claimants in exchange for the release of their liabilities and made these reorganizations feasible.

*Id.* at 142 (alterations in original) (quoting *In re Cont'l Airlines*, 203 F.3d 203, 212–13 (3d Cir. 2000).  The Second Circuit cited favorably to prior instances in which non-debtor releases were approved in *MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 93–94 (2d Cir. 1988) (releases of claims against non-debtor insurer in connection with resolution of mass tort asbestos bankruptcy); *A.H. Robins*, 880 F.2d at 701 (releases of non-debtor claims in Dalkon Shield bankruptcy); *Drexel Burnham*, 960 F.2d at 293 (approving settlement of 850 securities claims against Drexel and non-debtor personnel involving $1.3 billion payment by non-debtors).  While each case involving appropriate non-debtor releases is necessarily unique, the pattern of such cases demonstrates that the Second Circuit views them as are particularly appropriate in cases involving mass torts and extensive contingent liabilities.

*Metromedia* also unequivocally considers and rejects the same arguments that Appellants now advance here.  The opinion references both (i) the same decisions from the Ninth and Tenth Circuit that Appellants cite in support of the argument that Section 524(e) precluded non-debtor releases and (ii) the argument that non-debtor releases are authorized only in the asbestos context, as set forth in Section 524(g).  *Metromedia*, 416 F.3d at 141–42.  The Second Circuit nonetheless recognized that longstanding Second Circuit precedent permits non-debtor releases and provides detailed guidance about when they are appropriate.  *Id.*  Moreover, the Ninth Circuit, the only circuit to have expressly disapproved of non-debtor releases, never considered them in the context of a mass tort action.  *In re Am. Hardwoods*, 885 F.2d 621 (9th Cir. 1989); *Cf. In re Midway Gold US, Inc.*, 575 B.R. 475, 505–06 (Bankr. D. Colo. 2017) (recognizing that Tenth Circuit law does not preclude non-debtor releases in appropriate circumstances).

Appellants also have no response to Section 524(g)'s legislative history, which makes clear that Congress did not intend to displace or curtail the Bankruptcy Court's authority to issue non-debtor releases under other provisions of the Bankruptcy Code.  MBR at 123 (quoting H.R. Rep. 103-834, 103d Cong., 2nd Sess. 12; 140 Cong. Rec. H10765 (Oct. 4, 1994)) (Section 524(g) was "not intended to alter any authority bankruptcy courts may already have to issue injunctions in connection with a plan of reorganization").[9]

Finally, Appellants' argument that *Metromedia*'s extensive analysis of non-debtor releases is mere *dicta* that need not be followed would come as a surprise to the Second Circuit, which subsequently characterized its discussion as a holding.  *In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81, 93, n.12 (2nd Cir. 2014).  Furthermore, *Metromedia* itself recognizes that a

---

[9] The U.S. Trustee cites only to a GAO report, UST Brief at 39 n.13, that confirms that Section 524(g) was enacted because there were lingering concerns regarding whether the Manville injunction would survive challenges—which is not inconsistent with the injunction being valid even absent a statutory enactment.

dismissal for mootness does not render the court's discussion of the merits advisory dicta:

"Because equitable mootness bears only upon the proper remedy, and does not raise a threshold

question of our power to rule, a court is not inhibited from considering the merits before

considering equitable mootness.  Often, an appraisal of the merits is essential to the framing of

an equitable remedy."  *Metromedia*, 416 F.3d at 144 (citations omitted).

**III.    The Bankruptcy Court Correctly Held That the Shareholder Releases Are Appropriate Under *Metromedia* and Other Controlling Second Circuit Precedent**

        **A.    The Releases Are Consistent with Each of the *Metromedia* Guideposts**

                **1.    Payments of $4.325 Billion Are "Substantial"**

The Bankruptcy Court found that the contribution from the Sackler families, including

$4.325 billion in payments, is "substantial" in dollar terms and "the largest amount that

shareholders have ever paid."  MBR at 136.  While no Appellant disputes that $4.325 billion in

payments from the Sackler families is a substantial amount of money by any measure,

Appellants nonetheless claim that this guidepost was not satisfied because (i) the payments are a

fraction of the trillions of dollars of claims asserted against the Debtors and (ii) the settlement

can be satisfied from funds that Appellants claim were wrongfully distributed from the Debtors.

There is, however, no basis in *Metromedia* to determine whether a payment is "substantial" by

reference to an external benchmark.  That is particularly true where the proposed comparison is

to unliquidated claims for trillions of dollars that are facially unmoored to any cognizable legal

and factual theory.  In making their argument, Appellants also disregard that the $4.325 billion in

payments is roughly equivalent to the amount of non-tax cash distributions from Purdue since

2008.  Side A App. at M-ICSP_2289, AlixPartners Report at 29.

### 2. Claims Against the Shareholder Released Parties Are Channeled to Applicable Trusts

The Bankruptcy Court found that "[t]he Plan provides for the channeling of . . . [the] Shareholder Released Claims" and "[a]pplicable Channeled Claims are eligible for treatment by the Creditor Trusts." Confirmation Order at 30, 42. Claims brought by state and local governments will be channeled to NOAT. Those claimants will be compensated through billions of dollars in abatement funds—available because of the settlement—that will be distributed to governmental entities across the country. Personal injury claims will be channeled to the Personal Injury Trust and eligible claimants will receive payments pursuant to the trust distribution procedures. Plan § 4.10(b)(ii); *id.* § 4.10(c)(ii).

While not disputing the existence of the channeling injunction, Appellants claim that the Plan does not provide any compensation for claims brought against members of the Sackler families, relying on a statement in the TDPs: "Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party." UST Brief at 19 (quoting Confirmation Order, Non-NAS PI TDP § 2 (Side A App. at M-ICSP_0374)). Appellants, however, disregard that the next sentence of the TDP refutes their claim: "However, any Distribution to a Non-NAS PI Claimant . . . is deemed to be a distribution in satisfaction of <u>all</u> Non-NAS PI Channeled Claims." Confirmation Order, Non-NAS PI TDP § 2 (Side A App. at M-ICSP_0374)). Appellants' claim is also mistaken because it is the payments by the Sackler families that will allow the Estate to fund all creditor trusts, including the trust for the benefit of personal injury claimants. Absent these payments by the Sackler families, personal injury claimants would receive no recovery at all. *See* MBR at 90. Similarly, there would be no abatement funding without the settlement payments from the Sackler families.

25

### 3.      The Shareholder Released Claims Would Impact the Debtors'
   Reorganization

The Bankruptcy Court made detailed factual findings in support of its determination that

the settlement, including the Shareholder Releases, is critical to the Debtors reorganization:

> Absent the consideration provided to the Debtors' Estates under the Shareholder
> Settlement, the Plan would not have been feasible.  In the absence of the Plan
> Settlement, of which the Third-Party Releases are a key and inextricable element,
> the litigation of thousands of pending actions to judgment and through appeals in
> the civil court system would likely result in the destruction of the significant value
> that would otherwise have been distributed to opioid abatement efforts and
> personal injury claimants.

Confirmation Order at 29–30.  The Bankruptcy Court found that, if the Appellant States

succeeded in carving their claims out of the Shareholder Releases, the consequences would be

catastrophic to the Estate and creditors:

> [I]f the objecting governmental units were carved out of the release, the plan
> would fail, the <u>Debtors would likely liquidate</u>, and the objectors would collect
> materially less money from the Debtors and the shareholder released parties in the
> aggregate, as would the other states and governmental entities and non-public
> unsecured creditors who support the plan's confirmation.

MBR at 154 (emphasis added).

Specifically, absent funding from the Sackler families, "[t]he private/public settlement

[reached in the Phase I mediation] would fall apart and the abatement settlements likely would

fall apart for lack of funding . . . ."  *Id.* at 73.  Moreover, Purdue would no longer be eligible for a

$1.775 billion credit against DOJ's $2 billion allowed, super-priority forfeiture claim because the

credit is available only if (i) the Debtors provide at least $1.775 billion in abatement resources to

state and local governments and (ii) a pharmaceutical entity emerges that is operated for the

public benefit.  As the Debtors' valuation is approximately $1.8 billion, DOJ's enforcement of its

$2 billion forfeiture claim would likely consume the Debtors' assets.  *Id.* at 90–91.

The Bankruptcy Court further found that the Appellant States would themselves fare poorly if their actions caused the Plan to collapse:

> I have no doubt that a Chapter 7 trustee and at least the other governmental entities would pursue similar claims against the shareholder released parties . . . . They would never permit the objecting states, which are similarly situated to them, to win a litigation race.

*Id.* at 143 (emphasis added). Furthermore, given the sheer number of claimants, there would be a "dilutive effect upon any individual third-party claimant's recovery from the shareholder released parties . . . ." *Id.* at 629–30.

The resumption of litigation arising out of the claims that would otherwise be covered by the Shareholder Releases would also impact the Estate for all the reasons described in Section I.

Notwithstanding the Bankruptcy Court's extensive factual findings regarding necessity of the Shareholder Releases to the Debtors' reorganization, Appellants still suggest it might be possible for the Debtors to reorganize without funding from the Sackler families. MD Brief at 55; UST Brief at 51. But aside from a few *ipse dixit* statements in their briefs, Appellants never explain how such a reorganization would be feasible. The Bankruptcy Court repeatedly pressed Appellants regarding alternatives to confirming the Plan but received no response other than vague hopes about a return to mediation. Side A App., Aug. 23, 2021 Hr'g Tr. at 151:25–52:20, 207:1–210:9.

DOJ also cannot square its prior support for an abatement-based resolution—which could be made possible only by the Shareholder Releases—with its current opposition to those very releases. In October 2020, DOJ praised the $1.775 billion forfeiture credit because it would facilitate nationwide abatement programs:

> In reaching this resolution, the United States felt it was incredibly important that the credits of the estate, which include the states, thousands of local governments, trial authorities, and victims of opioid use disorder, receive the vast majority of

> the United States' potential recoveries in this case to permit those entities to put those funds towards <u>the important and critical work of abatement of this crisis</u>. This global resolution achieves that goal as 88.757 percent or 1.775 of the $2 billion of funds in our criminal asset forfeiture deal goes towards abatement.

Side A App., Nov. 17, 2020 Hr'g Tr. at 141:23–42:8 (emphasis added).  If DOJ's position on

appeal is <u>rejected</u>, then billions of dollars will be available to achieve "the important and critical

work of abatement of this crisis."  *Id.*  If, by contrast, DOJ's position is accepted, then there will

be no funding for abatement.  DOJ itself, however, could come out ahead because it could

recover $2 billion for itself.

### 4.    The Plan Received Overwhelming Creditor Support

The Bankruptcy Court found that the Plan has achieved support as more than 95 percent

of voting creditors supported the Plan, greatly exceeding the requirements for plan confirmation

under Section 1129, and even easily clearing the higher 75 percent supermajority that would be

required under the analogous provisions of Section 524(g).  *See* Confirmation Order at 42.  At a

time when it is not clear that any proposition in the United States can achieve ninety-five percent

support, that level of consensus is remarkable.

### 5.    The Plan Meets the "Full Payment" Guidepost

The Bankruptcy Court found that this criterion was appropriately addressed by

considering whether the settlement was in the best interest of creditors—and found it was

because "aggregate net recovery on their claims against the Debtors and the shareholder released

parties would be <u>materially less</u> than their recovery under the plan."  MBR at 143 (emphasis

added).  Consistent with this conclusion, Side A demonstrated at the Confirmation Hearing that

even if plaintiffs were somehow successful in claiming all the assets of the Side A Former

Directors that have been named as defendants, they would receive at most $400 million.  Side A

App., Martin Decl., Exhibit C at 21; Side A App., Aug. 23, 2021 Hr'g Tr. at 68:13–18.  Side A

will pay approximately five times that amount as under the Plan because a far broader set of Side A individuals and trusts are voluntarily contributing to the settlement.

Appellants disagree with the Bankruptcy Court's application of this guidepost, arguing that "[t]the Plan does not come close to providing for full payments to non-consenting parties of the enjoined claims," a "critical fact" identified in *In re A.H. Robins Co.*, 880 F.2d 694, 701 (4th Cir. 1989). *See* Multi-State Brief at 35. Full payment, however, could not possibly require that anyone with non-debtor claims receive payment for the unliquidated amount set forth in their proof of claim. If that were the case, any party could defeat non-debtor releases simply by following the lead of the single creditor in this matter who asserted a claim for $100 trillion. MBR at 18; Side A App., Disclosure Statement at 25. *In re A.H. Robins* was no different: the bankruptcy court there did not rely on proofs of claim. Instead, the bankruptcy court reviewed estimates of the value of the claims at issue and found that roughly fifty-nine percent of the lowest end of the ranged estimate offered by creditors was sufficient for those creditors to be paid in full. *See In re A.H. Robins Co.*, 88 B.R. 742, 747 (E.D. Va. 1988), *aff'd* 880 F.2d 694 (4th Cir. 1989).

### B.    The Carefully Constructed Settlement in This Case is the Type of Rare Circumstance Contemplated by *Metromedia* to Justify Shareholder Releases

The Bankruptcy Court found that Purdue's bankruptcy is "unique" and "the most complex" case that the Bankruptcy Court has ever handled, or, in its estimation, "that the courts under Chapter 11 have handled." MBR at 135. The court recognized that the Shareholder Releases are an "integral and necessary part of the Plan" that will allow the Debtors to reorganize. Confirmation Order at 29. The Shareholder Releases make possible the contributions from the Sackler families. MBR at 135. These funds are "critical to confirmation of the [P]lan"; without the payments, the "plan would unravel, including the complex interrelated

settlements that depend upon the payments being supplied under the settlement in addition to the non-monetary consideration under it." MBR at 135. Appellants attempt to turn this requirement on its head by arguing that the Bankruptcy Court had no precedent for its decision. But *Metromedia* actually requires that non-debtor releases are appropriate only in unique circumstances, so it is hardly surprising that the precise circumstances of this case are not identical to those that have come before.

Appellants' argument that the Bankruptcy Court erred in reaching these conclusions because the Sackler families are supposedly "abusing" the bankruptcy process is a sound bite, not a legal argument. There is nothing abusive about paying $4.325 billion, funding an innovative public health program applauded even by Appellants, agreeing to additional extensive terms and in exchange, receiving releases. *See In re NII Holdings, Inc.*, 536 B.R. 61, 65 (Bankr. S.D.N.Y. 2015) (stating that "compromise and settlement" form "the heart and soul of every successful chapter 11 proceeding"); *In re MF Global Inc.*, No. 11–2790 (MG) SIPA, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (stating that settlement and compromise are "favored" because they "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate"). Moreover, Appellants ignore that (i) courts have repeatedly recognized that non-debtor releases are not abusive, but appropriate where, as here, they are critical to the debtors' reorganization, and (ii) the Sackler families have strong defenses that they will litigate for years to come if the Plan collapses.

### 1. The Shareholder Releases Arise in the Rare and Unique Circumstances Where Non-Debtor Releases Are Appropriate

Appellants attack the Shareholder Releases on the basis that they are unsupported by precedent and are therefore abusive. Appellants are wrong on both fronts. The absence of a case that arises precisely on all fours with the Shareholder Releases is unsurprising given the truly

unprecedented nature of this case, including (among other things) one of the most complex mass tort bankruptcies in history; the overlap of allegations against the Debtors and Shareholder Released Parties; the interlocking settlement agreements involving a wide array of parties; the pressing need for abatement resources; and the vast creditor support for the Plan. The Shareholder Releases are a critical component of a Plan that provides the only realistic means for the Debtors to reorganize and to implement a nationwide abatement program. Far from being "abusive," this matter presents precisely the type of rare circumstances contemplated by *Metromedia* where non-debtor releases are appropriate.

Following *Metromedia*, opinions have recognized that non-debtor releases were appropriate in circumstances, including where third-party payments were necessary to avoid a liquidation triggered by inability to satisfy an obligation to DOJ; the debtors and non-debtors both benefit from the releases; the releases served important policy objectives; and the releases averted runaway litigation resulting from mass tort actions. Here, the Shareholder Releases have been carefully tailored by the Bankruptcy Court (*See* section I.B, *supra*) and accomplish all of these objectives. *See* Confirmation Order at 27–31.

In *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 140, the Third Circuit affirmed that non-debtor releases were appropriate because they were integral to the debtors' reorganization. Millennium entered into an agreement with DOJ and other government entities to pay $256 million to settle claims against it; it risked financial doom if it did not make the payment by a required date. *Id.* at 130. Two shareholders subsequently entered into a restructuring agreement whereby they would provide $325 million in needed funding in return for releases relating to claims arising out of a prior credit agreement. The Third Circuit overruled objections to those releases, explaining that the releases made possible payments by

31

third-parties, absent which "liquidation, not reorganization, would have been Millennium's sole option." *Id*. at 137. Here too, the Bankruptcy Court found that, absent the payments from the Sackler families, Purdue would lose the DOJ forfeiture credit and would perforce liquidate. Confirmation Order at 29.

In *In re Karta Corp.*, 342 B.R. 45 (S.D.N.Y. 2006), this Court affirmed a plan that provided for the reorganization of a closely held recycling business over the objections from a dissident family member whose claims were released. The Court explained that the releases were appropriate because the non-debtors would not have made vital contributions to the plan absent the releases, and the interests of the debtors and non-debtors were aligned with respect to claims brought by the objector. *Id*. at 54–57. Furthermore, the Court highlighted an additional "uniqueness factor," namely: the public interest arising out of the settlement between the debtors and the municipality, which was integral to the plan, and the municipality's interest in the development of its waterfront. *Id*. at 56. This Court modified the release to cover only claims related to business at issue. *Id*. at 57.

Many, if not all, of these same factors apply here as well. The Estate and Shareholder Released Parties share an interest in the resolution of Purdue-related claims. Just as this Court in *Karta* recognized that municipal involvement was a "uniqueness factor," that is all the more true in this matter where the opioid crisis is a matter of national importance and NOAT's distribution procedures are the product of extensive coordination among national, state and local authorities. Side A App., Guard Decl. ¶ 46; MBR at 48–50. And the Bankruptcy Court has already limited the Shareholder Releases to claims arising out of Purdue's prescription opioid marketing. *See* MBR at 104, 131; Section I.B, *supra*.

Judge Glenn concluded in *In re Residential Capital, LLC*, 512 B.R. 179 (Bankr. S.D.N.Y. 2014), that a contribution by a released party of $2.1 billion was the "lynchpin of the Plan, without which <u>the cases would devolve into endless litigation, the Plan would not be confirmable or feasible, and the recoveries currently contemplated by the Plan would not exist</u>." *Id.* at 188 (emphasis added).  Here too, the Shareholder Releases are critical both because they make possible the Debtors' reorganization and because, in their absence, the result would be endless litigation.

While Appellants frequently point to the opinion in *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y. 2019), in support of their critique of the Shareholder Releases, CA Brief at 3; UST Brief at 38, that opinion is consistent with the cases described above.  That decision recognized that non-debtor releases are appropriate where (i) "barring a particular claim is important in order to accomplish a particular feature of the restructuring" or where, as in *Residential Capital*, the non-debtor releases were justified by the fact that "the parent company did not want to settle the claims made by Residential Capital unless the overlapping third-party claims would also be barred" and (ii) the release of "a particular claim is important to accomplish a particular feature of the restructuring." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. at 726–27.  These are precisely the circumstances here, where (among other things) the Debtors cannot successfully reorganize as long as litigation against the Shareholder Released Parties regarding Purdue is ongoing and where renewed litigation would inflict significant costs on the Estate.  Confirmation Order at 29; *see also* section I.A, *supra*.

2.    **Appellants Refuse to Acknowledge That Litigation Against the Sackler Families Would Be Protracted and Risky**

Appellants' claim that the bankruptcy process was misused here to shield the Shareholder Released Party from liability, UST Brief at 17-19; CA Brief at 3; Multi-State Brief at 6; MD Brief at 55-57, rests on the false premise that the liability of members of the Sackler families is a foregone conclusion. Side A has been clear and consistent that it prefers a settlement that directs resources to families and communities to scorched earth litigation. But if Appellants succeeded in cratering the Plan, Side A would defend itself vigorously and plaintiffs—and of course, the Estate—would find themselves embroiled in costly litigation for years to come.

**Personal Jurisdiction**: Cases in many states will not even get off the ground for lack of personal jurisdiction. In the single case against a Sackler Former Director that went to final judgment, a Utah District Court, acting on appellate review, issued an extraordinary writ dismissing an administrative claim that was filed against a Side A Former Director based on her alleged role in overseeing Purdue's marketing practices. Side A App., *Sackler v. Utah Div. of Consumer Prot.*, No. 190905862 at 10 (D. Utah Oct. 10, 2019). The Utah court dismissed the case because that individual did not participate in any of Purdue's conduct in that state and Utah therefore lacked personal jurisdiction. *Sackler v. Utah Div. of Consumer Prot.*, No. 190905862 at 10 (D. Utah Oct. 10, 2019). Such an outcome likely would repeat itself across the country because claims will be dismissed by trial courts or on appeal in states where Side A Former Directors and other defendants cannot be subject to personal jurisdiction.

**Merits**: Side A has strong defenses on the merits to tort claims raised by third-party plaintiffs. Purdue itself has had a long history of prevailing against individual plaintiffs who brought OxyContin marketing claims or resolving them for modest amounts, as plaintiffs consistently failed to prove that Purdue's alleged conduct had caused the harm that they alleged.

34

*See, e.g.*, *United States v. Purdue Frederick Co., Inc.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007). The Appellants' claims are even more attenuated as their fundamental claim is for response costs to a broad crisis that is not even limited to the injuries of the plaintiffs who could not prove Purdue's liability in their individual cases. Prior to Purdue's Chapter 11 filing, one case was dismissed because the claims were preempted and the plaintiff could not prove causation; another case was dismissed because the plaintiff could not prove causation; and several nuisance claims were dismissed as a matter of law. *State Ex Rel. Stenehjem v Purdue Pharma L.P.*, No. 08-2018-CV-01300, 2019 WL 2245743 at *11 (N.D. Dist. May 10, 2019); *City of New Haven v. Purdue Pharma, L.P.*, No. X07HHDCV176086134S, 2019 WL 423990, at *8 (Conn. Super. Ct. Sept. 30, 2020); *State ex rel. Jennings v. Purdue Pharma, L.P.*, C.A. No. N18C-01-223 MMJ CCLD, 2019 WL 446382, at *12 (Del. Super. Ct. Feb. 4, 2019).

The Former Directors would have defenses above and beyond those available to Purdue. Among other things, as a matter of law, plaintiffs would have to show that each former director personally participated in Purdue's alleged misconduct. *See, e.g.*, 3A Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1137 (2019) (corporate director "is not personally liable for torts of the corporation . . . merely by virtue of holding corporate office, but can only incur personal liability by participating in the wrongful activity")—something plaintiffs have not been able to do in more than two years of litigation. Maryland's claim that the Bankruptcy Court's statements at oral argument support their contention that Sackler Former Directors "admitted at the confirmation hearing facts sufficient to establish direct liability under Maryland law," MD Brief at 23–24, is false; the Bankruptcy Court pointed out that the question before it was whether, in light of the risks to both sides, the settlement was appropriate. Side A App., Aug. 23 Hr'g Tr. at 178:15–79:3. Maryland seems to be arguing that the Former Directors "admitted"

that they served on Purdue's board and that as directors they can be held liable for Purdue's alleged conduct, but none of the cases they cite support that assertion (nor could they, because it would fundamentally upend basic principles of corporate governance).  MD Brief at 23.

Developments in opioid litigation since the Confirmation Hearing confirm the strength of Side A's defenses.  Just days ago, the Oklahoma Supreme Court reversed a trial court determination that Johnson & Johnson's prescription opioid marketing created a public nuisance, the very cause of action that many parties have asserted against the Debtors and Sackler Former Directors.  Consistent with longstanding precedent, the Oklahoma Supreme Court held that the sale of lawful prescription drugs cannot give rise to a public nuisance because such an action "would create unlimited and unprincipled liability for product manufacturers."  *Oklahoma ex rel. Hunter v. Johnson & Johnson*, 2021 OK 54 ¶ 19 (2021).  The court also rejected the very argument made by Appellants here, *i.e.*, that the Sackler families should be responsible for trillions of dollars in damages resulting from the abuse of any opioid:  "J&J should not be responsible for the harms caused by opioids that it never manufactured, marketed or sold." Similarly, at the culmination of a lengthy bench trial, a California trial court recently issued a tentative ruling for the defendants.  The court rejected the claim that that the rise in opioid prescriptions was a reflection of wrongdoing, as "[t]here is simply no evidence to show that the rise in prescriptions was not the result of the medically appropriate provision of pain medications to patients in need."  *California v. Purdue Pharma L.P.*, No. 30-2014-00725287-CU-BT-CXC, 2021 WL 5227329, at *7 (Cal. Super. Ct. Nov. 1, 2021).  In light of these developments, the *New York Times* quoted Paul Geller, an attorney who is a signatory of Maryland's Statement of Charges against the Sackler Former Directors, Side A App. at M-ICSP_3586, Am. Statement of Charges at MDA-114, acknowledging that these opinions present "a stark reminder that there is

no such thing as a slam-dunk case — trials involve a degree of risk, and appeals are unpredictable." Jan Hoffman, *The Core Legal Strategy Against Opioid Companies May Be Faltering*, N.Y. TIMES (Nov. 11, 2021), https://www.nytimes.com/2021/11/11/health/opioids-lawsuits-public-nuisance.html.

**Judgment Enforcement**:  Even if plaintiffs somehow prevailed, they would face significant challenges enforcing any judgment.  Dr. Mortimer D. Sackler spent the last several decades of his life living outside of the United States and a majority of his children were born and currently reside outside the United States.  Side A App., White Decl. ¶ 13.  As a consequence, Side A's assets are spread out amongst a large number of individuals and entities. MBR at 85.  A significant percentage of Side A's assets have been held in discretionary Jersey trusts for decades.  Side A App., White Decl. ¶ 11, FN 7.  The Bankruptcy Court credited the unrebutted expert testimony presented by Side A regarding the significant, if not insurmountable, barriers that any U.S. plaintiffs would face in seeking to enforce any judgment against Jersey trusts.  MBR at 86–87.

**C.     The Appellant States Are Not Entitled to Upend the Plan by Seeking Special Treatment for Their Claims**

Appellants argue that their "police power" claims should be carved out of the Shareholder Release, even at the cost of causing the Plan to collapse.  The Bankruptcy Code, however, does not permit states to exempt themselves from non-debtor releases that facilitate a complex reorganization.  Furthermore, the Plan achieves many public health benefits, including a nationwide abatement program, that would disappear if the states had their way and the Plan collapsed.

1.      **As the Shareholder Releases Are Authorized Under the Bankruptcy Code, No Parties Can Seek a Carve-Out for Their Claims**

Appellant States' argument that their "police power" claims must be carved out of the Shareholder Releases, even at the price of the Plan collapsing, finds no support in the authorities they cite.

The Bankruptcy Code only recognizes governmental "police power" claims (which would include those brought by any government, not just states) in two contexts, neither of which has anything to do with plan confirmation or third-party releases.  First, police and regulatory powers claims brought by any government entity are exempt from the automatic stay. This exception is designed to ensure that a stay triggered by a bankruptcy filing does not automatically stop ongoing law enforcement or regulatory activity.  *See, e.g.*, *In re Spookyworld, Inc.*, 346 F.3d 1, 9 (1st Cir. 2003) (cited in MD Brief at 50) (police powers exception to the automatic stay applied to action to enjoin continuing violations of Massachusetts Building Code).  Instead, "actions excepted from the automatic stay," including "police power" claims "may be subject to injunctive relief under section 105(a) of the Bankruptcy Code," which is exactly what this Court affirmed here.  MBR at 151–52.  Second, litigation involving "police powers" claims cannot be removed to be tried in the Bankruptcy Court.  *See* MBR at 150–51 (discussing 28 U.S.C. § 1452(a)).  These provisions have nothing to do with this appeal:  the automatic stay is not being litigated; Appellants are not seeking to enjoin any ongoing misconduct; and no one is seeking to remove cases to the Bankruptcy Court.

As the Bankruptcy Court correctly recognized, "[p]lan injunctions have previously been imposed over governmental units' police or regulatory power."  MBR at 152.  DOJ itself has argued in favor of such releases.  In *In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612 (D. Del. July 26, 2021), the U.S. District Court for the District of Delaware recently

upheld a plan that provided for the involuntary release of non-debtor claims by a California regulator, the Department of Toxic Substances Control ("**DTSC**").  DTSC opposed the release of its claims, arguing that the "*de minimis* consideration [to be provided under the plan] is not nearly sufficient to justify imposing the Non-Consensual Releases on DTSC and preventing California from pursuing claims against those individuals and entities responsible for bankrolling and profiting from Exide's devastating environmental harm."  Side A App., DTSC *Exide* Brief at 43.  DOJ—acting on behalf of the Environmental Protection Agency—disagreed with DTSC.  DOJ took the position (in contravention to the view expressed by the U.S. Trustee here) that "non-consensual third-party releases are permissible only in the most extraordinary cases and only in the absence of unfairness."  Side A App., DOJ *Exide* Brief at 23 (emphasis added).  DOJ supported the releases in part because the plan was the product of a global mediation process with extensive mediator involvement (as is the case here).  *Id.* at 23–24.  The District Court ultimately upheld the plan because (among other things) the matter was "'really . . . unprecedented' because of the complex environmental issues and the limited financial resources available for remediation," and because of the "finding that a third party release was sine qua non for the Consenting Creditors to voluntarily contribute funds necessary for the consummation of the plan."  *Exide*, 2021 WL 3145612 at *14 (quotations omitted).  These conclusions apply with equal force to the Shareholder Releases.

This Court in *Dunaway* similarly rejected the argument that "police power" claims should be "treated differently than other litigation stayed under a Section 105(a) order."  *Dunaway*, 619 B.R. at 57 (S.D.N.Y. 2020).  This Court explained that the Bankruptcy Court properly enjoined an action brought by five district attorneys in Tennessee because "the [p]reliminary injunction was not entered pursuant [to] the automatic stay provision" and the court found that the exercise

of the injunction was "necessary and appropriate to the bankruptcy." *Id.*  The Court added that

the Bankruptcy Court exercised its authority "based on his understanding that 'there will be

transparency as to what happened . . . upon confirmation of a plan and thereafter.'"  *Id.* at 62.

That, of course, is precisely what happened in the following two years—in which creditors

received an unprecedented amount of discovery, conducted numerous depositions, and

participated in a lengthy Confirmation Hearing.  MBR at 78–80.

Lacking support in the Bankruptcy Code, Appellant States fall back on general principles

of federalism.  But outside of the limited police power exceptions described above, federalism

supports the Bankruptcy Court's refusal to allow these states to thwart the overwhelming

consensus among the creditors because "Congress' power under Art. I cl. 8 of the Constitution to

enact uniform bankruptcy laws overrides" whatever powers the states might otherwise have as

sovereigns.  MBR, at 152 (emphasis added).  Maryland quotes from the Supreme Court's

decision in *Central Virginia Community College v. Katz*, 546 U.S. 356, 378 (2006), but that

opinion confirms the Bankruptcy Court's conclusion: "[i]n ratifying the Bankruptcy Clause, the

States acquiesced in subordination of whatever sovereign immunity they might otherwise have

asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts."

MD Brief at 33 (quoting *Katz*); *see also Tenn. Student Assistance Corp. v. Hood*, 541 U.S. 440,

448 (2004) ("Under our longstanding precedent, States, whether or not they choose to participate

in the proceeding, are bound by a bankruptcy court's discharge order no less than other

creditors.")

Maryland attempts to distance itself from this holding by arguing that the "connection

between the *res* of the Estate and the States' police power claims against non-debtors is

speculative at best."  MD Brief at 34.  That is incorrect because the Bankruptcy Court has

jurisdiction over Maryland's action given the effects it would have on the *res* of the estate (*see* section I.A, *supra*).  Appellants cannot invoke principles of federalism as a basis to prevent the Bankruptcy Court's exercise of *in rem* jurisdiction to confirm a Plan that satisfies the objectives of Chapter 11 by providing creditors including a majority of their fellow states with a recovery that is greater than they would receive in liquidation and by ensuring such funds are distributed equitably.  *See, e.g.*, *United States v. Whiting Pools*, 462 U.S 198, 203 (1983) ("By permitting reorganization, Congress anticipated that the business would continue to provide jobs, to satisfy creditors' claims, and to produce a return for its owners. Congress presumed that the assets of the debtor would be more valuable if used in a rehabilitated business than if 'sold for scrap'") (internal citations omitted); *Bank of Am. Nat. Tr. and Sav. Assn. v. 203 North LaSalle Street P'ship*, 526 U.S. 434, 453 (1999) (Chapter 11"preserv[es] going concerns and maximize[es] property available to satisfy creditors"); *Toib v. Radloff*, 501 U.S. 157, 163 (1991) (Chapter 11 "embodies the general [Bankruptcy] Code policy of maximizing the value of the bankruptcy estate").

### D.     The Plan Accomplishes the Public Health Objectives the States Claim They Seek to Provide—and Those Benefits Would Be Lost If the Plan Collapsed

Appellants claim that they need to continue litigating for policy reasons, such as to "secure the public interests in an adjudication that the non-debtors here engaged in wrongdoing, obtain stronger equitable relief, promote deterrence, vindicate the law, and, through the regulation of conduct, maintain and improve the public health and provide the accountability." MD Brief at 25.  The bankruptcy process, culminating in the Plan, accomplishes many, if not all, of these core objectives:

- Accountability:  Appellants were given ample opportunity during discovery and the Confirmation Hearing to depose members of the Sackler families and other parties, examine witnesses in open court, and make arguments (through briefs and orally) regarding their views on the Sackler families.

- Equitable relief:  The Plan imposes significant restrictions on the business practices of Knoa's business and effectively bars the Sackler Former Directors from participating in the opioid industry.

- Transparency:  The Plan provides for the creation of a repository that makes available to the public millions of documents related to Purdue and the Sackler families.

- Public health:  The Plan provides for the creation of a nationwide abatement program that equitably distributes billions of dollars in resources between and among states and local governments and requires the funds to be used for evidence-based programs.

Unsurprisingly, Appellant States are unwilling to acknowledge that their litigation pursuits could turn them into spoilers, causing their constituents and everyone else to lose the benefits of the Plan.  Nor do Appellants explain what countervailing benefits, if any, they would receive from litigation in their state courts or administrative chambers.  Maryland, for example, has not specified what, if any, "stronger equitable relief" it seeks or how its actions would "improve the public health."  MD Brief at 25.  Indeed, there appears to be nothing left for Maryland to enjoin:  not only do the Sackler Former Directors no longer sit on Purdue's board, but the Sackler families have agreed not to engage in the opioid business in or outside the United States.  Nor is the Appellant States' interest in a fulsome state court trial a paramount consideration that they have consistently prioritized.  Before the Chapter 11 filing, Maryland sought to win the destructive litigation "race" by pursuing an abbreviated administrative proceeding designed for garden variety consumer protection disputes.  MD Appendix, MD Am. Statement of Charges, at MDA-008.  In such proceedings, discovery is far more limited than the extensive exploration fostered by the Bankruptcy Court.  Side A App. at M-ICSP_3591–92, Proponent's Response in Opposition to Motion to Continue Administrative Hearing at 4–5, *Consumer Protection Div. v. Purdue Pharma, L.P.*, No. 19-023-311366 (Consumer Protection Div., Office of the Md. Attorney General Aug. 2, 2019).

Appellant States also assume that they can leverage "advantages unavailable to other litigants" to enforce their judgment before anyone else is able to do so.  Multi-State Brief at 44. This boast itself illustrates the need for a collective resolution as opposed to value-destructive, zero-sum litigation.  One of bankruptcy's goals is equitable treatment among creditors.  *In re Tronox Inc.*, 855 F.3d 84, 106 (2d Cir. 2017).  The Appellant States' apparent desire to beat not only their fellow States but all of the personal injury creditors to the finish line is wholly contrary to that principle.  Moreover, the rosy scenario posited by Appellant States will not materialize because if Appellants sabotage the Plan, Bankruptcy Court found that the liquidating trustee and other creditors "would never permit the objecting states, which are similarly situated to them, to win a litigation race."  MBR at 143.  Indeed, most of Appellants' suits would not even get off the ground because they would be dismissed for lack of personal jurisdiction.

### E.  Appellants Misleadingly Recast the Release of Specific Claims in a Settlement as a Bankruptcy Discharge

Appellants' claim that the Shareholder Releases are improper, because they cover certain types of claims that could not be discharged in a non-corporate, individual bankruptcy, UST Brief at 41–42, erroneously conflates bankruptcy discharges with non-debtor releases, and seeks to impose a newly concocted limitation on non-debtor releases that would destroy the Plan.

As courts in the Second Circuit and elsewhere have recognized, bankruptcy discharges and non-debtor releases serve separate and distinct purposes.  *See MacArthur Co. v. Johns-Manville Corp.*, 837 F.2d 89, 91 (2d Cir 1988) (non-debtor releases were not discharges because they "do not offer the umbrella protection of a discharge in bankruptcy", but rather, "they preclude only those suits against the settling insurers that arise out of or relate to Manville's insurance policies" (emphasis added)); *see also In re Dow Corning Corp.*, 280 F.3d 648, 657 (6th Cir. 2002) ("These courts primarily rely on section 524(e) of the Code . . . . However, this

43

language explains the effect of a debtor's <u>discharge</u>.  It does not prohibit the <u>release</u> of a non-debtor.") (emphasis added).  Here, the Shareholder Releases do not have the effect of providing anyone with "umbrella protection of a discharge in bankruptcy," which would cover any and all debts that could be discharged under the Bankruptcy Code.  *Johns-Manville Corp.*, 837 F.2d at 91.  The Shareholder Releases enjoin a category of claims that are related to the litigation that gave rise to Purdue's bankruptcy and parallel the Chapter 11 Debtors' discharge of those claims. The complete resolution of that litigation is critical to the Debtors' successful reorganization.

Appellants' position would also undermine the strong preference of this Court for settlements that allow debtors to reorganize.  *See In re NII Holdings, Inc.*, 536 B.R. 61, 65 (Bankr. S.D.N.Y. 2015) (stating that "compromise and settlement" form "the heart and soul of every successful chapter 11 proceeding"); *In re MF Global Inc.*, No. 11–2790 (MG) SIPA, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y. Aug. 10, 2012) (stating that settlement and compromise are "favored" because they "minimize costly litigation and further parties' interests in expediting the administration of the bankruptcy estate").   If, as Appellants maintain, the Shareholder Releases could not cover claims that could not be dischargeable in an individual bankruptcy, then Debtors' reorganization would become impossible.  Absent finality arising out of the resolution of all claims relating to Purdue's prescription opioid marketing, (i) the Sackler families could not and would not enter into the settlement and make $4.325 billion in payments and (ii) the Debtors would remain saddled with the costs and burdens associated with ongoing litigation.  (*See* sections I.A, III, *supra*)  Indeed, prior plans of reorganization have included releases for non-debtor fraud claims.  *In re Drexel Burnham Lambert Grp., Inc.*, 130 B.R. 910 (S.D.N.Y. 1991), *aff'd*, 960 F.2d 285 (2d Cir. 1992) (approving settlement agreement enjoining securities fraud claims against directors and officers of the Debtor company, finding that the

settlement was an "essential element" of the reorganization); *In re Millennium Lab Holdings II, LLC*, 945 F.3d at 140 (approving third-party releases for individual directors and officers enjoining claims, including RICO, as well as state law claims for fraudulent inducement, and aiding and abetting fraud, finding that the releases were "critical" to the plan's success). Significantly, Appellants do not—and cannot—cite any authority in support of their view that the assessment of whether a non-debtor release is appropriate should depend on what might hypothetically happen if an individual filed for bankruptcy. That is even more true here, where Appellants have made no attempt to show that any Shareholder Released Party is even at risk of filing for bankruptcy.

Finally, Appellants' suggestion that the Bankruptcy Court allowed the Sackler families to avoid the transparency that would be required if they were individual debtors is nonsense. The Bankruptcy Court specifically found that the Sackler families had satisfied the extraordinary obligation to provide "discovery beyond even the normally extensive discovery in bankruptcy cases." MBR at 78.

## IV. The Bankruptcy Court Correctly Determined That the Shareholder Releases Do Not Violate Due Process

### A. Claimants' Due Process Rights Were Appropriately Satisfied with Notice of the Shareholder Releases and the Opportunity to Object

The U.S. Trustee seeks to eviscerate *Metromedia* and decades of precedent by advancing the novel and unsubstantiated argument that such non-debtor releases violate the due process rights of personal injury plaintiffs who are supposedly denied their "day in court." UST Brief at 26. Of course, it would not be "a" day in court. If the U.S. Trustee's argument were accepted, the race to the courthouse would lead to thousands of days in court in scores of individual cases, while the 95% of personal injury creditors who voted for settlement were left empty handed. This argument is at odds with the operation of the entire bankruptcy process, which prefers

settlement to litigation and seeks to avoid costly and value-destructive duplicative proceedings. The U.S. Trustee is in effect seeking to transform Chapter 11 into an opt-out class action.

Personal injury plaintiffs—indeed all of the creditors—here <u>did</u> have their day in court— many days, in fact.  Their interests were actively represented during the bankruptcy proceedings by parties including the UCC, which is a fiduciary for all creditors, counsel for consenting and non-consenting states, and various committees who acted on behalf of personal injury claimants. During this time, these representatives were active participants in an extensive process:

- The Debtors and Sackler families produced millions of documents.  MBR at 79;

- Every living Sackler Former Director was deposed, together with other Sackler family members and advisors;

- The Debtors provided an extensive notice campaign in advance of the Confirmation Hearing; these notices referenced and described the Shareholder Releases.  MBR at 4–8;

- The settlement negotiations and the Shareholder Releases were the subject of extensive reporting in the media;

- Parties were given the opportunity to object to the Disclosure Statement and Plan; indeed, the U.S. Trustee quotes liberally from such objectors.  UST Brief at 42;

- The Bankruptcy Court heard motions and argument from *pro se* plaintiffs and objectors. MBR at 54;

- At the Confirmation Hearing, members of the Sackler families, advisors to the Sackler families, and representatives of the Debtors were cross examined.  MBR at 91;

- At the Confirmation Hearing, Plan proponents and objectors had the opportunity to present written and oral arguments (including their perspectives on the Sackler families); and

- Access to the Confirmation Hearing was provided to the public and the hearing received extensive media coverage.

The Bankruptcy Court pointed to the "uncontroverted declarations" of several prominent plaintiff attorneys who "describe the hard-fought litigation and negotiation process leading to the settlement contained in the plan for personal injury claimants, a settlement they support . . . ."

MBR at 59.  This settlement, which received the support of over 95 percent of voting personal injury claimants, provides eligible claimants with specified payments on top of the benefits afforded by a nationwide abatement program.  *See id.* at 60.  By contrast, if the U.S. Trustee had its way and litigation resumed, all of these benefits would be lost.

In any event, the due process rights of personal injury claimants were satisfied.  In bankruptcy, due process requires "appris[ing] interested parties of the pendency of the action and afford[ing] them an opportunity to present their objections."  *Motors Liquidation Co. v. Gen. Motors LLC*, 829 F.3d 135, 158 (2d Cir 2016) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).  The U.S. Trustee's claim that such notice is insufficient for parties bringing claims covered by the Shareholder Releases—and that they should be treated as ordinary civil litigants—rests on the false premise that the Bankruptcy Court lacks jurisdiction over their claim.  As described above, the Bankruptcy Court does have jurisdiction over such claims (Section I) and their release under the Plan is authorized under the Bankruptcy Code (Section III).  Thus, the proper due process inquiry is whether personal injury claimants received appropriate notice—which they did.  (*See* section IV.B, *infra*.)

### B.     Personal Injury Claimants Received Adequate and Appropriate Notice Regarding the Shareholder Releases

The U.S. Trustee's claim that personal injury claimants were not properly notified of the Shareholder Releases is unfounded.  The Bankruptcy Court made detailed findings regarding the vast noticing campaign that explicitly discussed the Shareholder Releases.  MBR at 4–8.

Nor does the communication of the Shareholder Releases violate due process by omitting relevant information.  While conceding that the Bankruptcy Court found that the notice campaign informed the public that the Plan "contemplated a broad release of the Sackler family and related entities," the U.S. Trustee claims that notice "failed to reveal the vast extent of other

non-debtors granted civil immunity by the Plan." UST Brief at 29. The premise of the Trustee's argument is false: no one has been afforded "civil immunity"; and the Plan provides only for the release of certain categories of claims that are necessary to the Debtors' reorganization. The identity of the core Shareholder Released Parties is similarly not difficult to discern from the Plan, and consists of: (i) members of the Sackler families; (ii) the trusts, trustees and protectors, which are responsible for overseeing many assets of the Sackler families; (iii) the Purdue ownership entities; and (iv) the IACs. The U.S. Trustee has not identified a single concrete instance of someone having a released claim, which by definition is related to Purdue, and yet not knowing that his or her claim was being released by the Plan.

There is similarly nothing improper (let alone violative of due process) about the use of technical language in Shareholder Releases, as such language is a common feature of complex litigation settlements and plans of reorganization. *See, e.g.*, *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 318 n.27 (Bankr. S.D.N.Y. 2016) (approving plan of reorganization with non-debtor releases); *In re Residential Capital, LLC*, No. 12–12020 (MG), 2013 WL 12161584, at *43 (Bankr. S.D.N.Y. Dec. 11, 2013) (same). Furthermore, the language of the Shareholder Releases was scrutinized during the Plan negotiations—which included representatives of the public and fiduciaries for all creditors—and, perhaps most importantly, by the Bankruptcy Court itself during the Confirmation Hearing, resulting in further revisions to ensure that the scope of the Shareholder Releases is fully consistent with Second Circuit law.

## CONCLUSION

The Plan reflects a consensus that the settlement presents the only realistic path forward. It allows the Debtors to reorganize and start the flow of funds to the communities that need them most.  The Shareholder Releases are exactly what the Second Circuit had in mind when it outlined the rare and unique circumstances in which non-debtor releases make possible the resolution of otherwise unsolvable litigation.  The Bankruptcy Court had both subject matter jurisdiction and statutory authority to issue them.  The appeals should therefore be denied and the Confirmation Order should be affirmed.


Dated: November 15, 2021
New York, New York

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP
By: */s/ Maura Kathleen Monaghan*
Maura Kathleen Monaghan
Jasmine Ball
919 Third Avenue
New York, New York 10022
Telephone:(212) 909-6000
Facsimile: (212) 909-6836
Email:      mkmonaghan@debevoise.com
               jball@debevoise.com

*Counsel for the Mortimer-side Initial Covered Sackler Persons*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing brief complies with the type-volume, type-face, and type-style limitations of Bankruptcy Rule 8015.  Although Federal Rule of Bankruptcy Procedure 8015(a) sets a limit of 13,000 words, this Court has stated that the page limits are inapplicable.  *See* Oct. 12, 2021 Hr'g Tr. at 21.  Excluding table of contents, table of authorities, signature blocks, and certificates, this brief contains 14,857 words.  Under the Individual Rules of Chief Judge Colleen McMahon, this Court requires a type-face of twelve-point serif font.  The foregoing complies with the typeface and type style requirements.

Dated: November 15, 2021
New York, New York

By:  */s/ Maura Kathleen Monaghan*
Maura Kathleen Monaghan

*Counsel for the Mortimer-side Initial Covered Sackler Persons*

50

**CERTIFICATE OF SERVICE**

I, Maura Kathleen Monaghan, hereby certify that, on November 15, 2021, I caused true and correct copies of the foregoing document to be served by the Court's CM/ECF System to all parties who are deemed to have consented to electronic service.  I have also caused a courtesy copy of the foregoing document to be sent by hand delivery to the Chambers of Judge Colleen McMahon.

Dated: November 15, 2021
New York, New York

By*:  /s/ Maura Kathleen Monaghan*
Maura Kathleen Monaghan

*Counsel for the Mortimer-side Initial Covered Sackler Persons*

51