Nos. 21-cv-7532 (Lead); 21-cv-7585; 21-cv-7961; 21-cv-7962; 21-cv-7966; 21-cv-7969; 21-cv8034; 21-cv-8042; 21-cv-8049; 21-cv-8055; 21-cv-8139; 21-cv-8258; 21-cv-8271; 21-cv-8538; 21-cv-8557; 21-cv-8566 (Consolidated)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

## IN RE PURDUE PHARMA L.P., ET AL., DEBTORS

APPEALS FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
BANKR. CASE NO. 19-23649 (RDD)

## THE AD HOC GROUP OF INDIVIDUAL VICTIMS' (I) APPELLEE BRIEF AND (II) JOINDER TO THE APPELLEE BRIEFS OF THE DEBTORS AND THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS

WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 819-8200
Fax: (212) 354-8113
J. Christopher Shore
Michele J. Meises
Alice Tsier
Amanda J. Wong

ASK LLP
60 East 42nd Street, 46th Floor
New York, New York 10165
Tel.: (212) 267-7342
Fax: (212) 918-3427
Edward E. Neiger
Jennifer A. Christian

*Co-Counsel for Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ I

TABLE OF AUTHORITIES ..................................................................................... II

SUMMARY OF ARGUMENT ................................................................................... 1

COUNTER-STATEMENT OF FACTS ..................................................................... 5

ARGUMENT ............................................................................................................ 15

    I.      The U.S. Trustee Does Not Have an Unconditional Right to Speak on Behalf of AHG Personal Injury Victims ............................................. 15

    II.     The U.S. Trustee Has Not Identified Any Opioid-Based Claims Against Shareholder Released Parties that Purdue Creditors Have Standing to Pursue ............................................................................................. 19

           A.     Second Circuit Precedent Gives the Debtors Standing to Pursue and Settle Certain Third-Party Claims to Benefit All Creditors..................... 19

           B.     The Sample Complaints Allege Claims that Are Property of the Debtors' Estates.................................................................................. 24

                    a.     Certain Claims Alleged in the Sample Complaints Are Facially Claims that Are Property of the Debtors' Estates ........... 24

                    b.     The Claims Alleged in the Sample Complaints Are Based Solely on Conduct Causing Generalized Harm to All Creditors .................................................................................... 26

           C.     Allowing Certain Creditors to Assert Claims that Are Property of the Debtors' Estates Would Be Fundamentally Unfair ........................... 29

CONCLUSION ......................................................................................................... 33

## TABLE OF AUTHORITIES

### CASES

*Artesanias Hacienda Real S.A. de C.V. v. N. Mill Cap., LLC (In re Wilton Armetale, Inc.)*,
    968 F.3d 273 (3d Cir. 2020) ...............................................................................20

*Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*,
    296 F.3d 164 (3d Cir. 2002) ...............................................................................20

*Deutsche Oel & Gas S.A. v. Energy Cap. Partners Mezzanine Opportunities Fund A, LP*,
    No. 19-cv-11058 (RA), 2020 U.S. Dist. LEXIS 181000 (S.D.N.Y. Sept. 30, 2020) ............24

*Heden v. Johnson & Johnson*,
    No. 19-00586 (D.R.I. filed Nov. 12, 2019) ........................................................... 25, 27, 28

*Hickey v. Purdue Pharma, et al.*,
    No. 19-11806 (D. Mass filed Aug. 22, 2019) ....................................................27

*In re Atty's at Law & Debt Relief Agencies*,
    353 B.R. 318 (S.D. Ga. 2006)...............................................................................16

*In re CIL Ltd.*,
    No. 13-11272-JLG, 2018 Bankr. LEXIS 354 (Bankr. S.D.N.Y. Feb. 9, 2018)............... 20, 21

*In re Emoral, Inc.*,
    740 F.3d 875 (3d Cir. 2014) ...............................................................................20

*In re Insys Therapeutics, Inc.*,
    Case No. 19-11292 (KG)...............................................................................11

*In re Maremont Corp.*,
    Case No. 19-10118 (KJC) (Bankr. D. Del.) ........................................................11

*In re PG&E Corp.*,
    Case No. 19-30088 (DM) (Bankr. N.D. Cal.)....................................................11

*In re Purdue Pharma L.P.*,
    Case No. 19-23649 (S.D.N.Y. November 9, 2021), AHG App......................................... 6, 30

*In re Purdue Pharma L.P.*,
    Case No. 21-cv-08049 (CM) (S.D.N.Y. Oct. 29, 2021).................................. 16, 18

*In re Purdue Pharma L.P.*,
    Case No. 21-cv-08557 (CM) (S.D.N.Y. Oct. 29, 2021).................................. 16, 18

*In re Purdue Pharma L.P.*,
    Case No. 21-cv-08566 (CM) (S.D.N.Y. Oct. 19, 2021).................................. 16, 18

*In re Quigley Co.*,
    391 B.R. 695 (Bankr. S.D.N.Y. 2008) ................................................................. 18

*In re Yarway Corp.*,
    Case No. 13-11025 (BLS) (Bankr. D. Del.) ........................................................ 11

*Mandelbrot v. J.T. Thorpe Settlement Tr. (In re J.T. Thorpe, Inc.)*,
    870 F.3d 1121 (9th Cir. 2017) ........................................................................... 13

*Map to Health v. AmerisourceBergen Drug Corp.*,
    No. 21-45093 (N.D. Ohio filed July 15, 2021) ................................................... 28

*Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*,
    740 F.3d 81 (2d Cir. 2014) ........................................................................... 20, 22

*Mercy House Teen Challenge v. AmerisourceBergen Drug Corp.*,
    No. 18-46070 (N.D. Ohio filed Mar. 15, 2019) ................................................. 28

*Pope v. Rice*,
    04 Civ. 4171 (DLC), 2005 U.S. Dist. LEXIS 4011 (S.D.N.Y. Mar. 14, 2005)...................... 16

*Rhodes v. Rhodes Techs., Inc.*,
    No. 19-cv-00885 (M.D. Tenn. filed Oct. 5, 2019) .............................................. 28

*Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.*,
    121 F. Supp.3d 321 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016)................ 21, 22, 30

*Singleton v. Wulff*,
    428 U.S. 106 (1976) ........................................................................................... 18

*Tilley v. Purdue Pharma L.P.*,
    No. 19-00566 (S.D. W. Va. filed Aug. 2, 2019) ................................................. 28

*Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*,
    855 F.3d 84 (2d Cir. 2017) ....................................................................... 4, 20, 21, 23

## STATUTES AND OTHER AUTHORITY

11 U.S.C. § 307 ........................................................................................................ 16

11 U.S.C. § 541(a)(1) ............................................................................................... 19

18 U.S.C. § 1962(c) .................................................................................................. 25

11 USC § 541(a)(3) ................................................................................................... 25

## SUMMARY OF ARGUMENT

For decades now, the U.S. opioid victim community has implored federal and state governments, regulators, district and U.S. attorneys, and courts to stop the sickening expansion of the global opioid epidemic.  These efforts have largely been undertaken at the grassroots level by not-for-profit organizations, mothers and fathers on behalf of their addicted or deceased children, and victims themselves who have spoken of the devastating effects of prescription opioids on their lives.  With few exceptions, however, the authorities accomplished nothing.  Instead, in the last decade, deaths from opioid overdoses have continued to escalate, setting an ignominious record of more than 90,000 deaths in 2019.

Then, in late 2019, Purdue filed for bankruptcy.[1]  Through diligent collective action, lengthy mediation and chapter 11 plan processes, and the self-funded efforts of the Ad Hoc Group of Individual Victims (the "Ad Hoc Group"), the opioid victim community has achieved a remarkable result – hundreds of millions of dollars for direct injury reimbursements and billions of dollars specifically allocated for abatement, the disclosure of millions of documents that provide an open historical record of how society can avoid similar catastrophes, and the removal of at least one group of involved parties – the Sackler Family Members – from the prescription opioid

---

[1] Capitalized terms not defined herein shall have the meaning ascribed thereto in the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Bankr. ECF No. 3726], UST App. 1070-1227 (the "Plan") or the *Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Bankr. ECF No. 3787], UST App. 1-271 (the "Confirmation Order"), as applicable.  References to documents on this Court's lead docket are cited as "ECF No."  References to documents on the Bankruptcy Court's docket are cited as "Bankr. ECF No."  References to the U.S. Trustee's Appendix are cited as "UST App."  References to the Ad Hoc Group's Appendix are cited as "AHG App."  References to page numbers refer to the ECF pagination stamped on top of each page of filed documents.

business.  Of the hundreds of thousands of creditors who participated in, and are entitled to share in, these achievements, fewer than a dozen have sought to overturn that result in this appeal.

At the center of this opposition stands the U.S. Trustee, as self-proclaimed federal bankruptcy "watchdog."  The U.S. Trustee is not a creditor in Purdue's cases and has no economic stake in the outcome of these proceedings.  It has no ties to the opioid crisis and it had no role in the negotiations that crafted the Plan.  Indeed, in its appeal, the U.S. Trustee offers nothing in lieu of the existing Plan and indeed seems unconcerned with the very real possibility that, if this Court reverses the Confirmation Order, personal injury victims would be returned to the status quo ante, with no financial recovery, no abatement funds for their communities, no document depository, and no exclusion of the Sackler Family Members from the opioid business.  Undaunted, the U.S. Trustee constructs its attack not on behalf of the federal government (which is a key creditor) but on behalf of individuals whose alleged "direct claims" against the Sackler Family Members are, as incorrectly asserted by the U.S. Trustee, being released for "no compensation" and in "violat[ion of] the victims' constitutional due process rights."

The U.S. Trustee's argument on behalf of victims in this appeal is materially inaccurate, as discussed in detail herein.  Most important, the Plan does pay compensation for claims against the Sackler Family Members, as the Bankruptcy Court reiterated just days ago. But at its heart, the U.S. Trustee's argument is built on the irresponsible fiction that there is an individual who exists with direct claims against the Sackler Family Members that she can assert on her own behalf, and whose constitutional rights are impermissibly compromised by the Plan.

The Ad Hoc Group will not repeat the other appellees' arguments and will instead join in the arguments of the Debtors and the Creditors' Committee that the non-Debtor releases set forth in Sections 10.6 and 10.7 of the Plan (the "Third-Party Releases") are constitutional and

permissible under the Bankruptcy Code.  The Ad Hoc Group will, however, address three specific issues raised by the U.S. Trustee in its brief (and, to some extent, echoed in the briefs of certain other appellants).  In the Counter-Statement of Facts below, we provide the Court with important context regarding how the Plan's trust distribution procedures operate, including who and what they will and will not compensate.  The subsequent Argument then addresses two key legal points affecting individual victims: (1) the U.S. Trustee's lack of authority to speak for personal injury victims who are already speaking for themselves, including members of the Ad Hoc Group (the "AHG Personal Injury Victims"); and (2) the U.S. Trustee's failure to identify a single non-derivative claim held by any individual against any of the Sackler Family Members which are "extinguished" by the Third-Party Releases.

First, the U.S. Trustee centers its constitutional attack by invoking the rights of personal injury victims who did not vote on the Plan, voted to reject the Plan, or never appeared in the Chapter 11 Cases at all.  While the Ad Hoc Group does not contest that the U.S. Trustee can serve an important role in bankruptcy cases, its attempt to anoint itself as the speaker for all personal injury victims in this appeal, including the AHG Personal Injury Victims, is improper.  There is simply no support in the record for the U.S. Trustee's paternalistic assumption that creditors who voted to reject the Plan or who did not vote at all did so to protest the Third-Party Releases.  In fact, the Ad Hoc Group is authorized to speak on behalf of the AHG Personal Injury Victims, including those who voted to reject the Plan or who did not vote at all, and the Ad Hoc Group (1) supports the Plan (including the Third-Party Releases contained therein) and (2) opposes the U.S. Trustee's and the DOJ's efforts to unravel a settlement that has the support of all but a small fraction of personal injury victims, 38 states, and 4,933 cities, municipalities, and tribes.

Second, lacking any meaningful support from actual victims for its campaign, the U.S. Trustee posits that the Plan, "without notice to thousands of victims," extinguishes individuals' direct claims against the Shareholder Released Parties (including Sackler Family Members) without due process or compensation. *Brief of Appellant, William K. Harrington, United States Trustee* at 35-36 [ECF No. 91] ("UST Br."). This Court has twice asked the U.S. Trustee to identify such claims so that all parties can determine the magnitude of the issue and the precise nature of the claims being released. *See* Hr'g Tr. dated Oct. 12, 2021 at 33:13-17, AHG App. at 808; *Order Consolidating Newly-Docketed Appeals and Addressing Other Matters* [ECF No. 75]. Rather than responding, the U.S. Trustee simply asked this Court to take judicial notice of eight complaints (the "Sample Complaints") filed in courts around the country. *See Appellant U.S. Trustee's Notice of Motion and Motion for Judicial Notice* [ECF No. 89]; *Memorandum of Law in Support of Appellant United States Trustee's Motion for Judicial Notice* [ECF No. 90] ("UST Mot. for Judicial Notice"). As detailed herein, none of the Sample Complaints identifies a particular opioid-related claim against persons covered by the Third-Party Releases. Instead, all seek to hold Sackler Family Members liable for injuries resulting from Purdue's opioid marketing practices. Insofar as their claims rest on the Shareholder Released Parties' involvement in Purdue's marketing and sales of OxyContin, the plaintiffs in the Sample Complaints are similarly situated to all creditors who have filed proofs of claim in the Chapter 11 Cases. Under controlling Second Circuit law, discussed below, these "derivative" claims can only be pursued by the Debtors (the estate fiduciaries) for the benefit of all of their creditors, not by any individual. *See Tronox Inc. v. Kerr McGee Corp. (In re Tronox Inc.)*, 855 F.3d 84 (2d Cir. 2017).

In pressing this point, the Ad Hoc Group does not seek to undermine the strength of claims against the Shareholder Released Parties, or to diminish the depth of injuries suffered. That so

many parties can trace their various harms to Purdue and OxyContin is a testament to the destructive nature of that business.  Yet, because all of Purdue's creditors can claim that the Sackler Family Members injured them by driving Purdue's misleading and aggressive marketing of OxyContin, allowing certain creditors to recover from Shareholder Released Parties would be fundamentally unfair and permit a double-recovery: first from the funds distributed under the Plan and second from separate litigation of any purported direct claims.  That type of inequity is the very reason that the Second Circuit (and others) have adopted the derivative claim rules at issue here.  All creditors here have potential claims against the Shareholder Released Parties.  In exchange for a release of all of those claims under the Plan, the putative defendants have provided billions of dollars to be shared ratably by all creditors.  There is nothing "unconstitutional" about holding nonconsenting creditors to that deal, and the Court should affirm the Confirmation Order in all respects.

## <u>COUNTER-STATEMENT OF FACTS</u>

As the party that devised the trust distribution procedures by which personal injury victims will receive compensation for their personal injury claims against Purdue and the Shareholder Released Parties (the "<u>PI TDP</u>"), the Ad Hoc Group wishes to clarify the U.S. Trustee's misstatements concerning the operation of the PI TDP and its treatment of third-party claims held by victims.  Specifically, the U.S. Trustee argues that the Plan "denies the victims of the opioid crisis any compensation for their separate direct claims against the Sackler Family (and hundreds of other non-debtors)."  UST Br. at 19.  The U.S. Trustee further contends that "the Plan documents expressly prohibit any value being paid based on pre-petition causes of action against the Sackler Family or other non-debtors for opioid-related personal injury claims."  *Id.*

This position was recently rejected by the Bankruptcy Court in connection with the various appellants' requests for a stay pending appeal at a November 9, 2021 hearing:

> The U.S. Trustee is clearly wrong that personal injury claimants and other
> creditors are receiving nothing on account of their third-party claims against the
> released parties. It is clear that it is the settlement of those third-party claims that
> enables the entire plan and the distributions under the plan, without which they
> would receive in my view as I found based on the analysis of the evidence,
> including the rights of the United States in the DOJ settlement to a super-priority
> claim and the limited recoveries that they would have in the free-for-all litigation
> that would ensue, literally no recovery. The plan treats personal injury claims as
> receiving a distribution based on the liquidation of the underlying claim against
> the Debtor. That does not mean that the personal injury claimants are not receiving
> value on account of their third-party claims, but it reflects I believe that their third-
> party claims are overlapping . . . .

Hr'g Tr. dated Nov. 9, 2021 at 261:7-262:6, *In re Purdue Pharma L.P.,* Case No. 19-23649 (RDD)

(S.D.N.Y. November 9, 2021), AHG App. at 1112-113.

The Bankruptcy Court's conclusion is demonstrably correct. <u>First</u>, since its inception,

Purdue's bankruptcy filing was always intended to encompass a global settlement between the

Debtors, the Sackler Family Members, and plaintiff constituencies:

> After a year of intense and arduous negotiations, the Debtors, the Debtors' ultimate
> owners . . . and a critical mass of plaintiff constituencies have reached an agreement
> in principle on the structure of ***a global resolution of the Pending Actions*** . . . – one
> that can be finalized and effectuated only through chapter 11.

*Debtors' Informational Brief* at 3 [Bankr. ECF No. 17], UST App. at 1239 (emphasis added).

These "Pending Actions" included not just suits against Purdue, but also suits against "a number

of [r]elated [p]arties – such as former directors (including members of the Sackler [f]amilies) or

current directors, officers, and entities associated with the Debtors."

In the months following the Debtors' disclosures, the Bankruptcy Court ordered two

mediations – an initial mediation and a supplemental mediation. *Order Appointing Mediators*

[Bankr. ECF No. 895], AHG App. at 56-66 and *Order Expanding Scope of Mediation* [Bankr. ECF

No. 1756], AHG App. at 76-79. The purpose of the initial mediation was to address allocation of

moneys between creditors; the supplemental mediation was to specifically mediate any claim "that

may be asserted by the estate <u>or any of the Non-Federal Public Claimants</u> against the Covered

Parties . . . <u>or that may otherwise become the subject of releases potentially granted to the Covered Parties</u> . . . ." *Order Expanding Scope of Mediation* ¶ 3, AHG App. at 77 (emphasis added). Those mediations resulted in the global resolution of not just claims by the Debtors' estates against the Sackler Family Members, but of all claims against the Sackler Family Members related to Purdue's opioid-related conduct. As the Bankruptcy Court found, the Sackler Family Members are contributing "$4.325 billion to the estates" under the Shareholder Settlement Agreement, an amount that totals "at least twice the value of the Debtors as a going concern" and that "allow[s] the Debtors to make the payments required under the DOJ Resolution and the Plan Settlements." Confirmation Order ¶ II.D.iii, UST App. at 30. The Bankruptcy Court also correctly found that the Sackler Family Members are providing these payments in exchange for their releases under the Plan:

> The Shareholder Settlement would not be possible without the Shareholder Releases because the Sackler Families would not enter into the Shareholder Settlement, and cause the payments and other concessions contemplated therein, without the Shareholder Releases and Channeling Injunction. The Plan Settlements, including the intercreditor allocation agreements and settlements reached in Mediation, are premised upon the consideration under the Shareholder Settlement Agreement, and the term sheets agreed to by the private claimants in Mediation were conditioned on the participation of the Sackler Families in the Plan.

*Id.* ¶ II.D.iii, UST App. at 29. Because the victims' claims against the Sackler Family Members are channeled to and resolved by the PI Trust, and because the money being used by the PI Trust to pay victims under the Plan is in large part the Sackler Family Members' money, distributions made to victims pursuant to the Plan are in fact part on account of third-party claims against the Sackler Family Members.

    <u>Second</u>, the Plan expressly provides that funds from the Sackler Family Members are being used to pay whatever direct and third-party claims exist within the scope of the Third-Party Releases. Specifically, the Plan channels to the PI Trust a set of claims defined as "PI Channeled

Claims."  Plan §§ 1.1, 4.10(b)(ii), (c)(ii), UST App. at 1079. "PI Channeled Claims" consists of
(1) "PI Claims," which are prepetition opioid-related personal injury claims against any Debtor,
and (2) prepetition opioid-related personal injury claims against certain non-Debtor parties,
including the Sackler Family Members.[2]  *Id.* § 1.1, UST App. at 1127 (emphasis added).  PI
Channeled Claims are further subdivided as between "NAS PI Channeled Claims," which are
claims for personal injuries resulting from intrauterine exposure to opioids (such as "neonatal
abstinence syndrome" ("NAS")), and "Non-NAS PI Channeled Claims," which are all other
opioid-related personal injury claims.  *Id.*  The PI TDP then contains two separate procedures for
the evaluation and payment of PI Claims: the "NAS PI TDP," which applies to NAS PI Channeled
Claims, and the "Non-NAS PI TDP," which applies to Non-NAS PI Channeled Claims.

The PI TDP performs both the claim allowance and the claim valuation process for all
individual personal injury claimants.  Early in the Chapter 11 Cases and without an objection from
the U.S. Trustee, it was decided that these issues would be deferred in the interest of value-
preserving mediation to decide the threshold issue of value allocation among the Debtors' major
constituencies.  *See Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of
Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* at 87 [Bankr. ECF No. 2983],
UST App. at 1487 ("The Mediators' initial and exclusive objective . . . was to mediate the
dispute(s) between the Non-Federal Public Claimants . . . and the Private Claimants . . . as to the

---

[2] "PI Channeled Claim" is defined to include any "Released Claim" or "Shareholder Released
Claim" that is for alleged opioid-related personal injury (or similar opioid-related cause of action).
Plan § 1.1, UST App. at 1079.  "Released Claims" are causes of action released pursuant to
Section 10.6(a) of the Plan (releases by Debtors of the Released Parties) and Section 10.6(b) of the
Plan (releases by the Releasing Parties of the Released Parties).  *Id.* §§ 1.1; 10.6, UST App. at
1079, 1197-99.  Shareholder Released Claims are causes of action released pursuant to
Section 10.7(a) of the Plan (releases by Debtors of the Shareholder Released Parties) and
Section 10.7(b) of the Plan (releases by the Releasing Parties of the Shareholder Released Parties).
Plan §§ 1.1; 10.7, UST App. at 1079, 1200-1202.

allocation of value/proceeds available from the Debtors' Estates . . . . Mediation . . . avoid[ed] the protracted, burdensome and costly process associated with testing the validity of each of the claims filed in the Chapter 11 Cases through a claims objection process.").  But deferment of claim resolution is not eradication, and these claim processes still need to occur at the individual trust level.  Accordingly, the PI TDP empowers the PI Trust's claims administrator (the "PI Claims Administrator") to solicit evidentiary support from each personal injury victim seeking to recover under the PI TDP (a "PI Claimant"), evaluate the evidentiary submissions received, communicate with PI Claimants to request additional evidence where needed, and ultimately to determine whether the submitted claim should be allowed or disallowed.  *See, e.g.*, Non-NAS PI TDP §§ 3 (claim allowance criteria), 3(d) (requiring submission of PI Claim Form (defined below) along with supporting evidence); 4 (claim allowance criteria); 5 (describing how evidence received from PI Claimants will be evaluated).[3]  The PI TDP sets forth clear, objective, and uniform criteria by which each claim will be evaluated, and, in the interest of accommodating all PI Claimants regardless of circumstance, provides alternative evidentiary bases for PI Claimants who, for example, may be unable to locate medical records.  *See, e.g.*, *id.* § 5(g) (allowing  claimant who cannot locate medical records to submit affidavits establishing alternative evidentiary basis for claims).

The claim allowance process requires PI Claimants to submit a form (the "PI Claim Form")[4] to the PI Claims Administrator detailing their injuries, attesting to the Purdue-brand

---

[3] Bankr. ECF No. 3655at Ex. I, AHG App. at 124.

[4] The PI Claim Form exists in two variations: the NAS PI Claim Form (for PI Claimants holding NAS PI Channeled Claims), and the Non-NAS PI Claim Form (for PI Claimants holding Non-NAS PI Channeled Claims).  NAS PI Claim Form at 167 [Bankr. ECF No. 3528], AHG App. at 84; Non-NAS PI Claim Form at 74 [Bankr. ECF No. 3528], AHG App. at 142.  Due to the difference in the nature of injury as between NAS PI Claims and Non-NAS PI Claims, the NAS

opioids used, and attaching evidence, among other things. *See generally* PI Claim Form. The PI Claim Form is also the mechanism by which a PI Claimant chooses to "opt in" to the PI TDP or to "opt out" and liquidate their claims in the tort system instead. Non-NAS PI Claim Form at 4; NAS PI Claim Form at 4. Noting as much at the time, and explicitly anticipating a later submission of evidence (to which the U.S. Trustee did not then object), the Debtors did not ask the Bankruptcy Court to require, and the Bankruptcy Court did not so require, evidentiary submissions earlier in the Chapter 11 Cases when victims were first submitting their initial proof of claim forms. *See Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof* ¶ 4.i [Bankr. ECF No. 800], AHG App. at 5 ("If a claimant . . . elects not to supplement their proof of claim by attaching supporting documentation at the time of filing a claim, the absence of . . . supporting documentation . . . will not result in the denial of the claim, though the claimant may be asked or required to provide additional information or supporting documentation at a later date"). Instead, the Debtors sought to make the process as easy as possible for individual victims, many unrepresented, to file a proof of claim by the Bar Date. As summarized by the Bankruptcy Court:

> [T]he Debtors' program made filing a proof of claim easy, more easy than in most cases. It is a myth, for example, that one needs detailed medical information to file a claim in these cases. There is also no bar to filing a proof of claim in this case if you cannot prove that you or your loved one was prescribed OxyContin or some other opioid from Purdue; that would not be a perjured proof of claim or a false proof of claim if you have a good faith belief in such claim. It might ultimately turn out that the claim would be disallowed because there might not be a legal basis for the claim, but the notion that you must be prescribed and show the prescription for one of the Debtors' opioid products in order to file a claim is simply not true.

---

PI Claim Form requires different evidentiary submissions than the Non-NAS PI Claim Form. For convenience, this Brief will refer to both claim forms together as "the PI Claim Form").

June 3, 2020 Bar Date Ext. Mot. Hr'g Tr. at 90:10-11, AHG App. at 389.

The evidentiary submissions accomplished through the PI Claim Form after the Effective Date of the Plan are thus the only way for PI Claimants to demonstrate the strength of their claim, and the only way for the PI Claims Administrator to weed out claims by individuals who did not actually suffer injuries from Purdue-brand opioid products. Assertions by the U.S. Trustee, then, that requiring the submission of an additional claim form post-confirmation is somehow a draconian measure imposing "emotional[], physical[], and psychological[] burden[s]" on "each individual creditor" – issues raised for the first time in briefing before this Court[5] – are absurd. UST Br. at 13. It is typical for trust distribution procedures in mass tort bankruptcies to require claim forms and evidentiary submissions post-confirmation;[6] there is simply no other way to do it.

Once a PI Claim Form is submitted under the PI TDP, the PI Claims Administrator will value that claim based on the extent of the PI Claimant's injury. For example, under the Non-NAS

---

[5] None of the U.S. Trustee's three objections to the Plan raise any issue with the submission of evidence and an additional claim form post-confirmation. *See Objection of United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors*, [Bankr. ECF No. 3256], AHG App. at 1578-1612; *Supplemental Objection of United States Trustee to (I) Eighth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors and (II) Proposed Confirmation Order* [Bankr. ECF No. 3636], AHG App. at 1613-1616; *Supplemental Objection of United States Trustee to (I) Eleventh Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors, and (II) Any Proposed Confirmation Order* [Bankr. ECF No. 3710], AHG App. at 1617-1620.

[6] *See, e.g.*, *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) [Dkt. No. 1049-13], Ex M, at 5-6, AHG App. at 1343-1344 (requiring opioid-related personal injury claimants to submit completed claim form established by trust administrator and supporting evidence); *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del.) [Dkt. No. 238-2], Ex D, at 39-40, AHG App. at 1318-19 (requiring asbestos-related personal injury claimants to submit completed claim form established by claims administrator and supporting evidence); *In re Yarway Corp.*, Case No. 13-11025 (BLS) (Bankr. D. Del.) [Dkt. No. 859-3] Ex. C, at 24-25, AHG App. 1237-28 (same); *In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal.) [Dkt. No. 7037], Ex. 2, at 2-7, AHG App. at 1345-1350 (requiring claimants asserting property loss, economic loss, and fire-related personal injury claims to submit claims assistance program claim forms, claims questionnaires and damages questionnaires to claims administrator).

PI TDP, the injury of addiction from opioids is assigned a lower monetary value than the injury of death while on OxyContin.  Non-NAS PI TDP § 8 (table of distributions based on injuries) [Bankr. ECF No. 3655], AHG App. 138-39. [7]  Like the allowance criteria, injury valuation is clear, objective, and uniform across all claims, with the goal of fairness across the board.  Primarily for reasons of efficiency, the PI TDP does not separately evaluate multiple claims held by a single PI Claimant with a single injury against different Debtor entities, e.g., one claim against Purdue Pharma L.P. and one claim against Purdue Pharma Inc. [8]  Likewise, it does not separately evaluate that victim's claims against each Sackler Family Member separately from that victim's claims against each Debtor.  The PI TDP properly assumes that the strength of any one of these claims, namely, the sufficiency of evidentiary support provided and the extent of injury suffered, rises and falls together with the strength of each other claim.  Put differently, if an individual's claim against Purdue Pharma L.P. is disallowed because that individual cannot show that she actually used a Purdue-brand opioid product, then her claim against Purdue Pharma Inc. or against Dr. Richard Sackler is likely to also fail for the same reason.  While this assumption may not be perfect, trust

---

[7] The table provides for "point" values rather than dollar values because the PI Claims Administrator will not know until the claims allowance and evaluation process is underway how many and what type of allowed claims the PI Trust will have to pay from the fixed amount of cash allocated to the PI Trust under the Plan; nor does he yet know exactly how much cash the PI Trust will have to distribute, as the value allocated to the PI Trust under the Plan varies depending on the later receipt of insurance proceeds.  Plan § 5.2(d)(i)(D), UST App. at 1133.  These "point" values will be converted to dollar values later in time, but as of confirmation it was anticipated that the dollar award amount per point would be between $0.80 and $1.20.    Non-NAS PI TDP at § 8(b), AHG App. at 138-39.

[8] If a PI Claimant holds multiple claims for multiple injuries, e.g., one claim for that claimant's own addiction and another claim on behalf of a deceased person's estate, then those claims will be evaluated and paid separately under the PI TDP.  Non-NAS PI Claim Form at 1 ("If you hold multiple Non-NAS PI Claims against the Debtors on account of injuries to more than one person who used opioids, then fill out one Claim Form for each of those Non-NAS PI Claims. If you hold multiple Non-NAS PI Claims on account of multiple injuries to the same person who used opioids, then fill out only one Claim Form."); NAS PI Claim Form at 1 ("If you represent the interests of more than one NAS Child, you must file a Claim Form on behalf of each individual NAS Child.").

distribution procedures by their nature make approximations based on credible evidence, rather than subjecting claimants and the trust to the expense of adversarial litigation. *Mandelbrot v. J.T. Thorpe Settlement Tr. (In re J.T. Thorpe, Inc.)*, 870 F.3d 1121, 1123 (9th Cir. 2017) ("Trusts often compensate claimants through a streamlined procedure less clunky than traditional litigation. This system diverts fewer resources away from compensating claimants, which is generally a good thing.").

Thus, instead of evaluating separately every conceivable claim of an individual – a task which could multiply the work (and cost) of the PI Claims Administrator by an order of magnitude, as well as burden PI Claimants with complex evidentiary submissions of which the U.S. Trustee already belatedly complains – the PI TDP evaluates each victim's entire package of claims using a one-claim proxy, and then it provides compensation for that entire package of claims. This is clearly set forth in the PI Claim Form and PI TDP:

> One Claim Form submitted for a Non-NAS PI Claim shall be deemed to be a Claim Form in respect of that Non-NAS PI Claim and also any Non-NAS PI Channeled Claims against a Released Person or Shareholder Released Person that are associated with that Non-NAS PI Claim.

Non-NAS PI Claim Form at 74-75 [Bankr. ECF No. 3528], AHG App. at 142-43.

> Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party. ***However, any Distribution to a Non-NAS PI Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the injuries that are the subject of his/her Non-NAS PI Claim.***

Non-NAS PI TDP at § 2(b)(ii) [Bankr. ECF No. 3655], AHG App. at 128 (emphasis added); *see also* NAS PI TDP at § 2(b)(ii)) [Bankr. ECF No. 3655], AHG App. at 118 (same language for NAS claims). Notably, the U.S. Trustee selectively quotes only the first sentence of section 2(b)(ii)

of the Non-NAS PI TDP quoted above, and omits the second sentence emphasized above, which makes clear the tie between PI Channeled Claims and TDP Distributions  UST Br. at 19.

For holders of PI Claims who choose to opt out of the liquidation procedures under the PI TDP, the process works similarly.  Holders of PI Claims who opt out may pursue liquidation of their PI Claims in the tort system instead by filing suit against the PI Trust, to which all the PI Channeled Claims are channeled under the Plan.  Non-NAS PI Opt-Out Procedures at 83 [Bankr. ECF No. 3528], AHG App. at 15.[9]  Just as is the case for those who opt in to the PI TDP, an individual victim who opts out may hold claims against multiple Debtor entities and against multiple Shareholder Released Parties.  And, just as is the case for those who opt in, adjudication in the tort system will evaluate only claims against Purdue as a proxy for the victim's entire package of claims.  *Id*.  And, just as in the "opt-in" context, whatever value is assigned to the adjudicated claim is deemed to be compensation for the entire package of claims deriving from the same injury:

> Only claims that meet the definition of "Non-NAS PI Claim" under the Plan may be litigated in the tort system. The adjudication of a Non-NAS PI Claim in the tort system shall be deemed to be an adjudication of that Non-NAS PI Claim and any associated Non-NAS PI Channeled Claims of the Non-NAS PI Claimant regarding the same injuries that are the subject of his or her Non-NAS PI Claim.

*Id*.  The opt-out also contains certain features designed to protect those who opted in to the settlement from outsized jury awards obtained by those who opted out, i.e., the court-determined value of a claim in the opt-out system is pared by the same percentage as it would have been if the holder had opted in, and the resulting number is subject to a cap to prevent any one victim's luck in the tort system from sapping substantial value from the limited funds to be shared by all victims.

---

[9] As the Non-NAS PI Opt-Out Procedures are essentially identical to the NAS PI Opt-Out Procedures, this Brief will cite only to the former.

*Id*. §§ 3 ("Non-NAS Maximum Value"); 4 ("Non-NAS Payment Percentage") [Bankr. ECF No. 3528], AHG App. at 153-54.

In sum, contrary to one of the central tenets of the U.S. Trustee's appeal, the Plan <u>does</u> compensate personal injury victims on account of claims within the scope of the Third-Party Releases. The PI TDP simply streamlines the claims allowance and claims evaluation process so as not to require separate evidentiary submissions and separate valuation of each claim held by the same victim for the same injury in the claim determination process.

## **ARGUMENT**

I.     **The U.S. Trustee Does Not Have an Unconditional Right to Speak on Behalf of AHG Personal Injury Victims**

In the legal portion of its brief, the U.S. Trustee centers its attack on the rights of purportedly "tens of thousands" of opioid victims who did not consent affirmatively to the Third-Party Releases and those who filed "hundreds" of prepetition lawsuits against the Sacklers. UST Br. at 2 ("Hundreds of lawsuits were brought against the Sackler Family and other non-[D]ebtors before Purdue filed its bankruptcy case and the bankruptcy court enjoined those and new lawsuits, which injunction became permanent under the Plan."). The U.S. Trustee then seeks to exercise its statutory authority as "watchdog" to pursue reversal of the Confirmation Order on the basis that it improperly impinges on the constitutional rights of those nonconsenting creditors. As noted above, a fundamental problem with these piggybacking arguments is that "tens of thousands" of nonconsenting individual personal injury victims are not themselves asserting their constitutional rights to sue the Sackler Family Members in perpetuity. *Id.*. at 35.

About half or approximately 35,000 of the people who did not vote on the Plan, and several hundred who voted "No," are members of the Ad Hoc Group, which authorized its counsel to speak on its behalf. *See generally Final Declaration of Christina Pullo of Prime Clerk LLC*

*Regarding the Solicitation of Votes and Tabulations of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [Bankr. ECF No. 3372], UST App. at 1891-1955. The Ad Hoc Group nonetheless supports the Plan (including the Third-Party Releases), and the U.S. Trustee is not entitled to supplant that group's counsel in speaking for its members. *See Pope v. Rice*, 04 Civ. 4171 (DLC), 2005 U.S. Dist. LEXIS 4011, at *23-24 (S.D.N.Y. Mar. 14, 2005) (explaining that counsel cannot create a fiduciary relationship without the mutual consent of the represented party). Although section 307 of the Bankruptcy Code allows the U.S. Trustee to be heard on any issue in a bankruptcy case, "[t]hat right is not unconditional." *In re Atty's at Law & Debt Relief Agencies*, 353 B.R. 318, 322 (S.D. Ga. 2006). The U.S. Trustee should not be permitted to substitute its voice for that of the Ad Hoc Group where Ad Hoc Group members are concerned.

More fundamentally, there are myriad reasons why individuals might not have voted in favor of the Plan that have nothing to do with the Third-Party Releases. For example, although two of the individual appellants have raised the Third-Party Releases as issues on appeal, *see Amended Statement of Issues filed by Ronald Bass, Sr.* [ECF No. 71], *In re Purdue Pharma L.P.,* Case No. 21-cv-08049 (CM) (S.D.N.Y. Oct. 29, 2021); *Ellen Isaacs' Statement of Issues and Designations of Records on Appeal* [ECF No. 26], *In re Purdue Pharma L.P.,* Case No. 21-cv-08557 (CM) (S.D.N.Y. Oct. 29, 2021) (solely incorporating the U.S. Trustee's and other appellants' statements of issues), neither has asserted that he or she has direct claims against the Sackler Family Members that are being released by the Third-Party Releases. [10] Similarly, in the Bankruptcy Court, these appellants never claimed they were directly harmed by the Sackler Family

---

[10] It is unclear whether Ms. Ecke raises any issue with the Third-Party Releases. *See Maria Ecke's Designation of Bankruptcy Record on Appeal* [ECF No. 28], *In re Purdue Pharma L.P.,* Case No. 21-cv-08566 (CM) (S.D.N.Y. Oct. 19, 2021).

Members; instead, they asserted that the Sacklers were responsible for the harms caused by Purdue. *See, e.g.*, *Letter from Ronald Bass Sr. to Judge Drain* at 2 [ECF No. 3721], AHG App. at 276 ("The Sackler's family shareholders and stakeholders of New Jersey, et al., shall be held personally liable for the Purdue Pharma, L.P., et al., corporation's distribution and harm caused me by the opioids drugs and its synthetics."); *Ellen Isaacs Emergency Request for Immediate Injunction and Hearing for Due Process, Production for Evidentiary Documents & Other Relief* ¶¶ 5, 11 [Bankr. ECF No. 3582], AHG App. at 258-59 (alleging that the Sacklers should not be absolved of criminal prosecution for the acts of Purdue Pharma); *Maria Ecke's Motion for Original Claim Payment and for Rule 5004 of the Federal Rules of Bankruptcy Procedure* at 2 [Bankr. ECF No. 4074], AHG App. at 294 ("Any agreement that would permit a [b]ankruptcy that takes away the [p]laintiff's rights of due process and permits a corporation and the people who run these [c]orporations to absolve themselves from criminal prosecution while humans continue to die is against the [l]aw of the [c]onstitution.").

    Relatedly, there are individuals for whom the U.S. Trustee purports to speak who objected to the Third-Party Releases in the Bankruptcy Court but chose not to appeal.[11]  For example, the

---

[11] In fact, it is not the case that all of the specific victims to whom the U.S. Trustee refers in its brief objected to "the proposed extinguishment of their claims." UST Br. at 14.  Indeed many did not even mention the Third-Party Releases.  *See, e.g.*, Bankr. ECF Nos. 422, UST App. at 2095-98 (endorsing Massachusetts' lawsuit, which has since been settled); 443, UST App. at 2099-2100 (same); 2210, AHG App. at 80-81 (letter to the Bankruptcy Court objecting to the amount of settlement paid by the Sacklers); 3028, AHG App. at 184-85 (letter to the Bankruptcy Court objecting to the amount of payouts for creditors); 3099, UST App. at 2101-07 (requesting that the Bankruptcy Court instruct the prison officers to provide pro se claimant with mail from Prime Clerk); 3125, AHG App. at 204-07 (objection to the amount paid to creditors); 3271, AHG App. at 208-19 (objecting to notice procedures requesting additional constructive and actual notice to potential creditors); 3575, UST App. at 2110-15 ("[T]he Sackler family [] is trying to keep their ill-gotten fortune off the backs of the heartbroken people who lost their loved ones.").  The DOJ identifies these same individuals as examples of claims to be released, as well as one more personal injury victims who did not reference the Third-Party Releases but asked the Bankruptcy Court "not

U.S. Trustee concedes that the plaintiff in one of the Sample Complaints – *Hartman v. Sackler* – "objected to the Plan based in part on 'the extraordinarily broad nonconsensual third-party releases of the Sackler Family and other non-debtors.'" UST Br. at 60.   Mr. Hartman ultimately chose not to appeal the Confirmation Order, and there is no evidence to support the notion that he chose not to do so because he wanted the U.S. Trustee to file an appeal on his behalf. Indeed, of all the individuals who objected to, or otherwise expressed dissatisfaction with, the Plan (*see* UST Br. at 9, 14, 49), only three chose to appeal the Confirmation Order.   *See Notice of Appeal and Statement of Elections of Ellen Isaacs* [ECF No. 1], *In re Purdue Pharma L.P.,* Case No. 21-cv-08557 (CM) (S.D.N.Y. Oct. 18, 2021); *Amended Notice of Appeal and Statement of Election of Ronald Bass Sr.* [ECF No. 70], *In re Purdue Pharma L.P.,* Case No. 21-cv-08049 (CM) (S.D.N.Y. Oct. 29, 2021); *Notice of Appeal and Statement of Election of Maria Ecke* [ECF No. 1], *In re Purdue Pharma L.P.,* Case No. 21-cv-08566 (CM) (S.D.N.Y. Oct. 19, 2021).

In short, we do not contest that the U.S. Trustee may appear and be heard on what it believes is the public interest.   But, the U.S. Trustee does not have an unconditional right to pursue an appeal on behalf of individuals who are currently represented in this appeal or whose objections were overruled by the Bankruptcy Court and chose not to appeal such ruling.   *In re Quigley Co.*, 391 B.R. 695, 702 (Bankr. S.D.N.Y. 2008) (confirming that a litigant in bankruptcy proceedings "'must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties,'" and recognizing that "'third parties themselves usually will be the best proponents of their own rights'") (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *Singleton v. Wulff*, 428 U.S. 106, 114 (1976)).   As such, the Ad Hoc Group submits that this Court

---

allow the certification of this chapter 11 filing which will limit [the Sacklers'] liability to a mere, at most, $48,000 per claim" *See* DOJ Br. at 13, citing ECF No. 2966.

be wary of the U.S. Trustee's attempts to wear the mantle of a victim in an attempt to rally a groundswell of creditor dissent against the Third-Party Releases.

## II.      The U.S. Trustee Has Not Identified Any Opioid-Based Claims Against Shareholder Released Parties that Purdue Creditors Have Standing to Pursue

At its core, the U.S. Trustee's attack on the Plan and the Confirmation Order is that the Third-Party Releases extinguish direct claims held by individuals against the Shareholder Released Parties. UST Br. at 1 ("Purdue's Plan strips opioid victims of their direct claims against the Sackler Family and other non-debtors for their own misconduct . . . ."); *id.* at 30 ("The releases thus extend even to someone *with no claim against Purdue* but who has a Purdue-*related* opioid claim against the Sackler Family that arose after bankruptcy.").  In response to this Court's repeated inquiries regarding claim identification, the U.S. Trustee points to, but does not substantiate, "the hundreds of lawsuits" filed pre- and postpetition that name the Sackler Family Members and other Shareholder Released Parties as defendants.  *Id.* at 21 ("By the time Purdue filed for bankruptcy relief, various Sackler Family members and related entities were also defendants in approximately 400 civil actions nationwide.").  To further its position, the U.S. Trustee filed a motion asking this Court to take judicial notice of eight Sample Complaints [ECF No. 89].

Under controlling law, none of the claims asserted in these Sample Complaints can be properly asserted by individuals against Sackler Family Members in light of Purdue's status as a debtor in possession.

### A.      Second Circuit Precedent Gives the Debtors Standing to Pursue and Settle Certain Third-Party Claims to Benefit All Creditors.

The answer to this Court's questions regarding direct and derivative claims begins with constitutes property of a debtor's estate.  The Bankruptcy Code defines a debtor's "estate" as "all legal or equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. § 541(a)(1).  The estate obviously includes the debtor's own assets, including legal claims.

Legal claims are considered property of the estate if they "could have been asserted by the debtor against third parties as of the petition date." *In re CIL Ltd.*, No. 13-11272-JLG, 2018 Bankr. LEXIS 354, at *14, (Bankr. S.D.N.Y. Feb. 9, 2018); *see also In re Emoral, Inc.*, 740 F.3d 875, 879 (3d Cir. 2014) ("[I]f the claim existed at the commencement of the filing and the debtor could have asserted the claim on his own behalf under state law.") (quoting *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 169 (3d Cir. 2002)). Importantly, however, a debtor's estate may also include legal claims that never belonged to a debtor prepetition, but instead encompass certain <u>creditor</u> claims against non-debtors. These "so-called 'derivative claims'" are not unique to any single creditor but "arise from harm done to the estate" and "seek relief against third parties that pushed the debtor into bankruptcy." *Marshall v. Picard (In re Bernard L. Madoff Inv. Secs. LLC)*, 740 F.3d 81, 89 (2d Cir. 2014).

Under the derivative claim rules, claims against third parties relying on theories of indirect liability (such as alter ego, veil piercing, or successor liability theories) have routinely been found to be property of a debtor's estate, because establishing that a third party is indirectly liable for claims against the debtors benefits the entire creditor body by "increas[ing] the pool of assets available to all creditors." *Tronox*, 855 F.3d at 107 ("The facts necessary to prove that the Tronox debtors committed the underlying torts may be particular to the Avoca Plaintiffs, but the facts necessary to impute that liability to New Kerr-McGee 'would be . . . generally available to any creditor, and recovery would serve to increase the pool of assets available to all creditors.'") (quoting *Emoral*, 740 F.3d at 881).

Once these claims become property of a debtor's estate, the automatic stay prevents any creditor, including one who had a direct claim prepetition, from seeking to recover on that claim. *Artesanias Hacienda Real S.A. de C.V. v. N. Mill Cap., LLC (In re Wilton Armetale, Inc.)*, 968

F.3d 273, 280 (3d Cir. 2020) ("[O]nce a cause of action becomes the estate's property, the Bankruptcy Code gives the trustee, and only the trustee, the statutory authority to pursue it.")  *See also In re CIL*, 2018 Bankr. LEXIS 354, at \*14.  Prohibiting creditors from pursuing these types of creditor causes of action supports the fundamental goals of promoting an orderly resolution of claims, an equitable distribution of a debtor's assets, and the prevention of creditors from racing to the courthouse to obtain preferential recoveries.  As the Second Circuit explained in *Tronox*:

> The whole point of channeling claims through bankruptcy is to avoid creditors getting ahead of others in line of preference and to promote an equitable distribution of debtor assets.  That is why, after a company files for bankruptcy, creditors lack standing to assert claims that are estate property. Instead, the trustee is conferred the right to recover for derivative, generalized claims; only the estate is charged with ensuring equitable distribution of estate assets and preventing individual creditors from pursuing their own interests and thus diminishing the res available to the rest of the creditors.

*Id.* at 106 (citations omitted).

Most relevant to this appeal, derivative claims may extend to claims based on a third party's wrongful conduct if every creditor could assert a similar claim against the third party relating to the debtor.  *Ritchie Cap. Mgmt., L.L.C. v. Gen. Elec. Cap. Corp.,* 121 F. Supp.3d 321, 334 (S.D.N.Y. 2015), *aff'd*, 821 F.3d 349 (2d Cir. 2016).  These are general claims that "affect the creditors as a class; they are not unique to individual creditors."  *Id.*  By contrast, particularized claims are "specific to that plaintiff, in that his injury is 'directly traced to' the non-debtor's conduct.  Examples include where a defendant violated 'an independent legal duty in its dealing with plaintiffs,' or where a defendant directly, knowingly misled plaintiffs to induce them to purchase securities issued by a debtor."  *Id.* (citations omitted).

In *Ritchie*, investors who lost millions of dollars in the debtor's Ponzi scheme sued a lender that allegedly discovered and then perpetuated the scheme.  The lender argued that the investors lacked standing because the causes of action (aiding and abetting fraud, civil conspiracy, and

unjust enrichment) were property of the debtor's estate, which the bankruptcy trustee had already asserted against the lender.  The investors tried to distinguish their claims from those of the bankruptcy trustee by framing them as "independent" claims against the defendants for their own wrongful conduct in perpetuating the Ponzi scheme.  The Court concluded that the investors' allegations were "not specific to [the investors], but instead are allegations of generalized harm. Any creditor . . . could make the same claim" that the investors have.  *Id.* at 336.

The Second Circuit decision in *Madoff* reinforces this concept.  In *Madoff*, former customers of the bankrupt Madoff estate (Bernard L. Madoff Investment Securities LLC ("BLMIS")) sued Madoff's co-conspirators, alleging they had improperly withdrawn billions of dollars from BLMIS.  740 F.2d at 85.  The Second Circuit addressed whether that lawsuit against non-debtor third parties violated the bankruptcy court's permanent injunction barring parties from filing derivative claims.  *Id.* at 87.  The Second Circuit concluded that the complaints impermissibly attempted to "plead around" the bankruptcy court's injunction barring all claims as derivative of those asserted by the bankruptcy trustee by trying to make it appear that they were stating claims unlike those of the trustee.  *Id.* at 91-92 (complaints purported to assert non-derivative conspiracy-based claims, while trustee raised fraudulent conveyance claims).  Although the creditors argued that they alleged "particularized injuries," the Second Circuit concluded that "the allegations in appellants' respective . . . complaints echo those made by the Trustee." *Id.* at 91.  As a result, the Second Circuit concluded that the purported conspiracy based claims were "derivative" of those asserted by the bankruptcy trustee.  *Id.* at 93.

By contrast, in *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, the SIPA trustee sought to bring common law claims against non-debtor financial institutions for facilitating the debtor's fraud.  721 F.3d 54, 70 (2d Cir. 2013).  The Second Circuit found that the

particular claims were not "common" or "general," and thus not derivative, because they sought to hold the financial institutions liable "for their handling of individual investments made on various dates in varying amounts" and thus "could not have harmed all customers in the same way." *Id.* at 71. Notably, although the injury ultimately suffered by creditors in *JP Morgan* was similar to the injury suffered by creditors in *Madoff* (both cases addressed financial losses by investors from Madoff's Ponzi scheme), the claims in *JP Morgan* were not derivative because they were based on wrongful conduct by non-debtors that was particularized to individual creditors.

Because of the very different treatment of what might appear to be similar claims, courts have recognized that one must look past the labels in a complaint because parties often attempt to "plead around a bankruptcy" by trying to emphasize the particular nature of their injury and framing the claims as based on the third party's own wrongful conduct. *Tronox*, 855 F.3d at 100. But as the Second Circuit explained in *Tronox*, the fact that a creditor suffered a particular harm does not make his claim direct:

> [E]very creditor in bankruptcy has an individual claim . . . against the debtor, whether it be in tort . . . , contract, or otherwise. But often there are claims against third parties that wrongfully deplete the debtor's assets. Individual creditors may wish to bring claims against those third parties to seek compensation for harms done to them by the debtor and secondary harms done to them by the third parties in wrongfully diverting assets of the debtor that would be used to pay the claims of the individual creditor. The fact that an individual creditor may seek to do so does not make those secondary claims particular to the creditor, for it overlooks the obvious: Every creditor has a similar claim for the diversion of assets of the debtor's estate. Those claims are general—they are not tied to the harm done to the creditor by the debtor, but rather are based on an injury to the debtor's estate that creates a secondary harm to all creditors regardless of the nature of their underlying claim against the debtor.

*Id.* at 103-04.

Thus, rather than focusing on the nature of the injury alleged by the creditor, or on the creditor's characterization of a claim, courts look to the nature of the legal claims asserted. For example, this Court recently considered whether a creditor's state law gross negligence claim was

derivative.  *Deutsche Oel & Gas S.A. v. Energy Cap. Partners Mezzanine Opportunities Fund A, LP*, No. 19-cv-11058 (RA), 2020 U.S. Dist. LEXIS 181000 (S.D.N.Y. Sept. 30, 2020).  The plaintiff in *Deutsche Oel* sued an oil and gas company's interim chief operating officer and a private equity firm that lent it $160 million.  Plaintiff alleged that the defendants mismanaged the company, driving it into bankruptcy.  The defendants removed the action to this Court and simultaneously moved to transfer it to the bankruptcy court, arguing, *inter alia*, that the bankruptcy court had "arising in" jurisdiction over the claims because they were derivative claims released under the third-party releases in the debtor's plan.  *Id.* at *27.  This Court agreed, holding that the claim was derivative because it was "not based on circumstances unique to DOGSA [the plaintiff], but rather is 'based on an injury to the debtor's estate that creates a secondary harm to all creditors.'" *Id.* at *29 (internal citations omitted).

In sum, the issue here is not so simple as posited by the U.S. Trustee, with its bare reference to "hundreds of lawsuits" and its hands-off submission of the Sample Complaints.  The law is clear that the Court must examine the nature of the legal claim asserted in order to evaluate whether the claim is derivative.  Here, the requisite scrutiny proves fatal to the U.S. Trustee's appeal.

### B.   The Sample Complaints Allege Claims that Are Property of the Debtors' Estates

#### a.   *Certain Claims Alleged in the Sample Complaints Are Facially Claims that Are Property of the Debtors' Estates*

As a starting point to the required scrutiny, several of the Sample Complaints allege claims that, on their face, are estate claims that seek to hold Sackler Family Members accountable for transfers they received from the Debtors (which are statutorily the exclusive property of the Debtors).

For example, the plaintiff in *Heden v. Johnson & Johnson*, alleges that Purdue and other drug manufacturers, as well as their executives, downplayed the risks of OxyContin and thereby

caused "a true epidemic . . . in every State to one degree or another."  UST Mot. for Judicial Notice at 51.  Although the *Heden* complaint names "the Sackler Family" as well as David, Mortimer, and Richard Sackler as defendants, its central allegation is that the Sackler Family Members "took home tens of billions of dollars" based on the sale of Oxycodone and OxyContin.  *Id*. at 50-51, 55.  This is clearly an estate claim as only the Debtors may recover transfers made by Purdue to the Sackler Family Members, both under the Plan and the Bankruptcy Code.  *See* Plan §§ 10.15, 10.20, UST App. at 1209-1210, 1211; *see also* 11 USC §§ 541(a)(3) (property recovered under § 550 is property of the estate); 550 (allowing estate to recover property fraudulently or preferentially transferred).

Similarly, several of the Sample Complaints seek to assert what are plainly veil piercing claims against the Sackler Family Members.  In *Map to Health v. AmerisourceBergen*, the plaintiff seeks to hold the entire Sackler family liable under RICO for Purdue's actions.  UST Mot. for Judicial Notice at 369-70 ("At all relevant times, [the Sackler Pharmaceutical Enterprise], in violation of Section 1962(c) of RICO, 18 U.S.C. § 1962(c), conducted (managed) or participated, directly or indirectly, in the conduct (management) of the Sackler Pharma Enterprise"); *id.* at 371-72 ("The [Purdue defendants] and other[s] . . . beneficially owned and controlled by the Sackler [d]efendants[12] . . . joined the Sackler Pharma Enterprise with full awareness and complicity, and acted in concert with the Sackler [d]efendants to pool information about vulnerable targets and share the king size profits reaped from the sale of opioids . . . , deliberately ignoring duties to comply with laws and regulations on marketing and sales of controlled substances.").[13]

---

[12] The complaint specifically names as defendants Richard, Beverly, David, Ilene, Jonathan, Kathe, Mortimer, and Theresa Sackler.

[13] Plaintiff in this Sample Complaint also makes some allegations about the Sacklers' role in Purdue's conduct.  *See* UST Mot. for Judicial Notice at 106 ("Together, the Sackler Defendants directed and otherwise participated in Purdue's deceptive sales and marketing practices, sending

Insofar as *Heden, Map to Health*, and the other Sample Complaints seek to recover from "The Sackler Family" and the "Sackler Pharmaceutical Enterprise" for Purdue's conduct, they can do so only by relying on theories of alter ego or veil piercing.  But as discussed above and as the Bankruptcy Court recognized in the Modified Bench Ruling, claims based on alter ego/veil piercing theories are derivative claims that are property of the Debtors' estates.  *See Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan* at 81-82 [Bankr. ECF No. 3786], UST App. at 569 ("Modified Bench Ruling") ("[C]laims based on theories of alter ego, piercing the corporate veil, and breach of fiduciary duty/failure to supervise . . . would belong to the Debtors' estates, not individual creditors, because at least as far as the confirmation hearing record reflects, such claims would be based on a generalized injury to the estates and creditors rather than conduct directed only at certain creditors").

> **b.    *The Claims Alleged in the Sample Complaints Are Based Solely on Conduct Causing Generalized Harm to All Creditors***

The bigger issue here relates to claims that are not classically denominated as estate claims but nonetheless fit in the *Ritchie* and *Deutsche Oel* rubric of derivative injury.  A close reading of the Sample Complaints demonstrates that none moves the individuals away from the *Madoff* world into *JP Morgan*.

First, and critically, no Sample Complaint alleges conduct by the defendants that is specifically directed at the plaintiff.  There are no allegations of any specifically targeted conduct by any Sackler Family Member or any distinguishing injury that falls outside the general scope of harms suffered by individual victims of Purdue.  Rather, each Sample Complaint alleges that the

---

hundreds of orders to executives and other employees. From the money that Purdue collected as a result of its wrongful conduct, they paid themselves and their family billions of dollars.").  But, as discussed below, these are generalized allegations that are not specific to any creditor.

Sackler defendants named therein acted wrongfully in their roles as Purdue's board members by directing Purdue to aggressively market OxyContin while downplaying the risk of addiction.

For example, in *Hartman v. Sackler*, plaintiff seeks to recover from the Sackler defendants named therein and other former officers and directors of Purdue for the very conduct that is the basis of the global settlement in the Chapter 11 Cases – i.e., defendants' role in causing the opioid epidemic. UST Mot. for Judicial Notice at 13. Although Mr. Hartman does not name the Debtors as defendants, this complaint seeks to recover for the conduct of Purdue, alleging, among other things, that "[i]n 1996 defendants introduced OxyContin" (*id.*); "Defendants promoted their product with marketing that was designed to obscure the risk of addiction and even the fact that they were behind the campaign" (*id.* at 14); and "[b]y 2006, prosecutors found damning evidence that Defendants intentionally deceived doctors and patients about the opioids." *Id.* at 22. Where the *Hartman* complaint identifies individual conduct by the named defendants, it is conduct that (as in *Ritchie*) all creditors of Purdue can allege they were harmed by. *See e.g.*, *id.* at 24 ("To protect themselves from governmental review and simultaneously continue their pushing of opioids the Sacklers called upon four of the [d]efendants to assist them in continuing to operate the business outside the law."); *id.* ("Stewart knowingly and intentionally sent sales representatives out to promote opioid sales."); *id.* at 26 ("Timney directed the sales of Defendants' opioid and focused on the media coverage of opioid-related issues. He also continued Stewart's aggressive sales strategy to increase profits.").

The same is true of the other Sample Complaints. *See* UST Mot. for Judicial Notice at 74, *Hickey v. Purdue Pharma, et al.*, No. 19-11806 (D. Mass filed Aug. 22, 2019) ("The Sackler Family through Purdue Pharma caused pain and suffering through intentional fraud, violating the consumer protection act"); *id.* at 50-51, *Heden v. Johnson & Johnson*, No. 19-00586, (D.R.I. filed

Nov. 12, 2019) (alleging "the Sackler Family who owns it [Purdue Pharmaceuticals L.P.]" caused "a true epidemic . . . in every State to one degree or another" (*id.* at 3)); *id.* at 107, *Map to Health v. AmerisourceBergen Drug Corp.*, No. 21-45093 (N.D. Ohio filed July 15, 2021) ("From the 1990s until 2007, [the Sacklers in their capacity as Purdue officers] directed a decade of misconduct, which led to criminal convictions, a judgment of this Court, and commitments that Purdue would not deceive doctors and patients again."); *id.* at 436, *Mercy House Teen Challenge v. AmerisourceBergen Drug Corp.*, No. 18-46070 (N.D. Ohio filed Mar. 15, 2019) (same); *id.* at 743, *Rhodes v. Rhodes Techs., Inc.*, No. 19-cv-00885, (M.D. Tenn. filed Oct. 5, 2019) ("Nevertheless, the Sackler Defendants . . . remained actively involved in Purdue's affairs and would also have been aware of deceptive marketing in their capacity as a board members at all relevant times." (emphasis added)); *id.* at 968, *Tilley v. Purdue Pharma L.P.*, No. 19-00566 (S.D. W. Va. filed Aug. 2, 2019) ("The directors, which include the Sackler Family Defendants, also oversaw Purdue's push to steer patients away from safer alternatives.").

Second, the Sample Complaints allege generalized conduct that harmed all creditors of Purdue, exposed Purdue to opioid-related liability, and ultimately pushed Purdue into bankruptcy. Regardless of whether these claims are styled as state-law claims or claims for fraud or negligence, they are indistinguishable from the breach of fiduciary duty claims that were thoroughly investigated by the Creditors' Committee and settled by the Debtors in the Chapter 11 Cases. As explained in the declaration of Michael Atkinson submitted into evidence below:

> The UCC investigated the manner in which the Sacklers and other fiduciaries carried out, or breached, their fiduciary duties to the Debtors. . . . This investigation also required consideration of the degree to which the Sacklers and others exposed the Debtors to liability through aggressive marketing tactics and/or enriched the Sacklers at the expense of the Debtors and the Debtors' creditors. Specifically, the UCC investigated the degree to which the Sacklers failed to exercise reasonable care as directors, failed to implement reasonable steps to monitor or address red flags related to the opioid businesses and otherwise breached their fiduciary duties.

The UCC also investigated the extent to which the Sacklers overstepped the bounds of ordinary director behavior and actively managed or micromanaged the Debtors' opioid marketing and other activities. The UCC also investigated the Sacklers' domination and control of the non-family directors who served on the Debtors' board. Finally, among other things, the UCC conducted extensive analysis regarding questions of standing [and] the strength of breach of fiduciary duty claims.

*Declaration of Michael Atkinson in Support of the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* at 15 [Bankr. ECF. No. 3460], AHG App. at 247.

Because all creditors of Purdue can make the same claim – that the Sackler Family Members injured them by driving Purdue's misleading and aggressive marketing of OxyContin – it would be unfair to allow some creditors but not others to assert these claims outside of bankruptcy.

### C.   Allowing Certain Creditors to Assert Claims that Are Property of the Debtors' Estates Would Be Fundamentally Unfair

There are three reasons why the Court should not allow some creditors to assert claims against the Shareholder Released Parties outside the bankruptcy.

<u>First</u>, permitting certain creditors to assert claims against the Shareholder Released Parties would enable such creditors to receive a double recovery. The Third-Party Releases only cover Purdue's creditors or holders of claims that arose during the Chapter 11 Cases but are based on Purdue's past conduct. Under the Plan, such creditors receive a recovery in satisfaction of their claims against Purdue and the Sackler Family Members by virtue of the funds being provided by the Sackler Family Members. But if this Court agrees with the U.S. Trustee's position, these same creditors would also be able to recover from the Sackler Family Members a second time – for the same injury and based on the same conduct – by litigating outside the bankruptcy and obtaining recoveries without any sharing obligation.

29

The purpose of the derivative claims doctrine is to prevent such an outcome and ensure that if a third party's action harms all creditors, then all creditors receive the proceeds from that recovery.   As the Bankruptcy Court correctly observed in discussing releases "that are truly derivative of the Debtors' claims," such releases "simply prevent third parties . . . from improperly adding a second fork with which to eat their share of the pie."   Modified Bench Ruling at 105, UST App. at 592.   *See also Ritchie*, 121 F. Supp.3d at 333 ("Significant here, to promote the orderly resolution of all claims and prevent creditors from racing to the courthouse to achieve preferential recoveries, the bankruptcy trustee has 'exclusive standing' to assert causes of action belonging to the estate." (citations omitted).[14]  Thus, claims against Shareholder Released Parties who are or were officers, directors, or agents of the Debtors would at a minimum subject the Debtors' estates to future indemnity claims, litigation expenses and, if successful on the merits, further liability.

Second, allowing some creditors to pursue claims that are the property of the Debtors' estates outside of bankruptcy would reward those creditors who refused to participate in a process designed to (i) distribute the value of a global settlement in a ratable and fair way, and (ii) avoid a rush to the courthouse.   As discussed at length in the Counter-Statement of Facts, the PI TDP already provides personal injury victims who wish to litigate the merits of their opioid-based personal injury claims outside of bankruptcy with the ability to opt out of liquidating their claims pursuant to the PI TDP, but it does so in a way that protects the rest of the creditors participating

---

[14] Here, the risk of a double-recovery is particularly high precisely because many of the Shareholder Released Parties may have indemnification claims against the Debtors.  As this Court is aware, the Purdue Pharmaceutical Limited Partnership Agreement contains indemnification provisions that apply to current and former directors and officers of the company "so long as the Indemnitee shall be subject to any possible Proceeding by reason of the fact that the Indemnitee is or was . . . a director, officer or Agent of [the Purdue entities]."   *Purdue Pharma*, 619 B.R. at 44.

in the settlement.  Specifically, in recognition of the fact that no creditor in the Chapter 11 Cases can recover the full value of its claim, the PI TDP protects those who opted in to the settlement from excessive jury awards obtained by creditors who opted out by subjecting the recovery of any claim to a reduction by the same percentage as that claim would have been haircut if that individual had proceeded through the PI TDP, and the resulting number is subject to a cap.  Thus, the Plan still protects any personal injury victim's right to recover for her opioid-based injury in the courts – but not to continue to haul the Sackler Family Members into court forever.  By contrast, the U.S. Trustee's attempt to excise the Third-Party Releases from the Plan would allow certain creditors to skip the process entirely and jump the line ahead of those who agreed to compromise their claims in order to prevent the chaos of unending litigation.

<u>Third</u>, as discussed by the Debtors and the Creditors' Committee in their briefs, the U.S. Trustee's position would allow a handful of creditors to frustrate a Plan that offers personal injury victims relief that they may not otherwise be able to achieve in litigation – including the plaintiffs in the Sample Complaints.  For example, in his complaint, Mr. Heden requests "a Judge and Jury order that the Sackler family be forced to divest ownership of not only Purdue Pharmaceuticals L.P. as mentioned . . . . They should not be allowed any ownership of any kind in any opioid companies moving forward and in perpetuity."  UST Mot. for Judicial Notice at 58.  Mr. Heden could not get this relief in the litigation that he filed; under the Plan, however, the Sackler Family Members have agreed to exit their opioid-business worldwide.  *See* Mediator's Report ¶ 5(iii) [Bankr. ECF No. 3119], AHG App. at 187-88.  Similarly, under the Plan, most creditors have agreed to put their recoveries towards abatement (including holders of Hospital Claims, Third-Party Payors, and States).  *See* Modified Bench Ruling at 72-73, UST App. at 559-560 ("Remarkably, all parties with the exception of the personal injury claimants agreed in the

mediation to use the value that they would receive solely for abatement purposes, the multiplier-effect benefits of which I've already described. This includes the private, corporate entity claimants as well as the non-federal governmental claimants."). Without the Plan, any of those creditors could pursue Purdue and the Sackler Family Members in litigation and keep any money they recover to themselves with no need to put it towards abatement. *Id.* at 560-61 ("Without the $4.325 billion being paid by the Sacklers under the plan and the other elements of the Sackler settlements, those other elements of the plan would not happen. The record is clear on that. The private/public settlement would fall apart and the abatement settlements likely would fall apart for lack of funding and the inevitable fighting over a far smaller and less certain recovery with its renewed focus on pursuing individual claims and races to collection.").

Among all of Purdue's creditors, the personal injury victims, including those with any as-yet-unarticulated direct claims, would suffer disproportionately from such an outcome. All that the U.S. Trustee is promising here is more litigation. Yet, unlike the federal government or other public side creditors, personal injury victims cannot afford to compete with the Debtors in pursuing years-long litigation against the Sackler Family Members, attempting to enforce judgments against the Sackler Family Members' offshore assets. Moreover, if the Confirmation Order were reversed, any compensation that personal injury victims could recover from Purdue or the Sackler Family Members would only be available to those willing to subject themselves to the burdens of discovery, which, in the case of personal injury claims, would be extremely invasive and individualized, going to each claimant's medical history. The central irony here is that the "constitutional right" that the U.S. Trustee champions here – the right of individuals to litigate against Sackler Family Members into eternity – will, in all likelihood, be worth far <u>less</u> than what all victims are being provided now under the Plan.

## **CONCLUSION**

For these reasons, the Ad Hoc Group respectfully requests that the Court affirm the orders

on appeal.

Dated: November 15, 2021
        New York, New York

*/s/ J. Christopher Shore*                   */s/ Edward E. Neiger*

WHITE & CASE LLP                     ASK LLP
1221 Avenue of the Americas        60 East 42nd Street, 46th Floor
New York, New York 10020           New York, New York 10165
Tel.: (212) 819-8200                  Tel.: (212) 267-7342
Fax: (212) 354-8113                  Fax: (212) 918-3427
J. Christopher Shore                  Edward E. Neiger
Michele J. Meises                    Jennifer A. Christian
Alice Tsier
Amanda J. Wong                     *Co-Counsel for Ad Hoc Group of Individual*
                                             *Victims of Purdue Pharma L.P., et al*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h), the undersigned certifies that the above brief complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(7)(B) since, excluding the parts of the brief exempted by Federal Rule of Bankruptcy Procedure 8015(g), this memorandum contains 12,216 words.  This brief has been prepared in a proportionally spaced typeface in Times New Roman 12-point font and therefore complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and type style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6), as modified by the May 21, 2021 Individual Practices and Procedures—Chief Judge Colleen McMahon § V(D),

*/s/ Alice Tsier*
Alice Tsier

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 15, 2021, I electronically filed the foregoing with the

Clerk of the Court for the United States District Court for the Southern District of New York by

using the CM/ECF system.  I certify that all participants in the case are registered CM/ECF users

and that service will be accomplished by the CM/ECF system.

Further, in compliance with the Court's Standing Order dated November 25, 2009, and the

May 21, 2021 Individual Practices and Procedures—Chief Judge Colleen McMahon § V(A), I

have caused courtesy copies, marked as such, to be sent via messenger to:

> The Honorable Colleen McMahon
> Chief Judge
> United States District Court for the
>   Southern District of New York
> Daniel Patrick Moynihan United States
>   Courthouse
> 500 Pearl Street, Room 2550
> New York, NY 10007-1312


*/s/ Alice Tsier*
Alice Tsier