Nos. 21-cv-7532 (Lead); 21-cv-7585; 21-cv-7961; 21-cv-7962; 21-cv-7966; 21-cv-7969; 21-cv8034; 21-cv-8042; 21-cv-8049; 21-cv-8055; 21-cv-8139; 21-cv-8258; 21-cv-8271; 21-cv-8538; 21-cv-8557; 21-cv-8566 (Consolidated)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE PURDUE PHARMA L.P., ET AL., DEBTORS

APPEALS FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
BANKR. CASE NO. 19-23649 (RDD)

# APPENDIX TO THE AD HOC GROUP OF INDIVIDUAL VICTIMS' (I) APPELLEE BRIEF AND (II) JOINDER TO THE APPELLEE BRIEFS OF THE DEBTORS' AND THE OFFICIAL COMMITTEE OF UNSECURED CREDTIORS

# VOLUME I

WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 819-8200
Fax: (212) 354-8113
J. Christopher Shore
Michele J. Meises
Alice Tsier
Amanda J. Wong

ASK LLP
60 East 42nd Street, 46th Floor
New York, New York 10165
Tel.: (212) 267-7342
Fax: (212) 918-3427
Edward E. Neiger
Jennifer A. Christian

*Co-Counsel for Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al*

# INDEX

| Document | Appendix Pages |
|---|---|
| **VOLUME I** | |
| Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof [Bankr. ECF No. 800] | A.1 – 55 |
| Order Appointing Mediators [Bankr. ECF No. 895] | A.56 – 66 |
| Mediators' Report [Bankr. ECF No. 1716] | A.67 – 75 |
| Order Expanding Scope of Mediation [Bankr. ECF No. 1756] | A.76 – 79 |
| Letter from Maria Ecke to Committee Members re: Objection to Settlement Amount [Bankr. ECF No. 2210] | A.80 – 81 |
| NAS PI TDP [Bankr. ECF No. 3528, 3655] | A.82 – 123 |
| Non-NAS PI TDP [Bankr. ECF No. 3528, 3655] | A.124 – 183 |
| Letter from Les Buris to Judge Drain re: Objection to Amount Paid to Creditors [Bankr. ECF No. 3028] | A.184 – 185 |
| Mediator's Report [Bankr. ECF No. 3119] | A.186 – 203 |
| Kelvin Singleton's Objection to the Amount Paid to Creditors [Bankr. ECF No. 3125] | A.204 – 207 |
| Objection to Plan and Plan Confirmation [Bankr. ECF No. 3271] | A.208 – 219 |
| Declaration of Michael Atkinson in Support of the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [Bankr. ECF No. 3460] | A.220 – 256 |
| Ellen Isaacs' Emergency Request for Immediate Injunction and Hearing for Due Process, Production for Evidentiary Documents & Other Relief [Bankr. ECF No. 3582] | A.257 – 274 |
| Letter from Ronald Bass Sr. to Judge Drain [Bankr. ECF No. 3721] | A.275 – 292 |
| Maria Ecke's Motion for Original Claim Payment and for Rule 5004 of the Federal Rules of Bankruptcy Procedure [Bankr. ECF No. 4074] | A.293 – 299 |
| **VOLUME II** | |
| *In re Purdue Pharma L.P.,* Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. June 3, 2020) (Bar Date Ext. Mot. Hr'g Tr.) | A.300 – 424 |
| *In re Purdue Pharma L.P.,* Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. August 25, 2021) ("Confirmation Hr'g Tr.") | A.425 – 775 |

| | |
|---|---|
| *In re Purdue Pharm Bankruptcy Appeals*, Case No. 21-cv-7532 (CM) *et seq.* (S.D.N.Y. October 12, 2021) ("Scheduling Conference Tr.") | A.776 – 851 |
| *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (S.D.N.Y. November 9, 2021) ("Hr'g Tr. re: Motion for Stay Pending Appeal") | A.852 – 1208 |
| **VOLUME III** | |
| Asbestos Personal Injury Trust Distribution Procedure, *In re Yarway Corp.,* Case No. 13-11025 (BLS) (Bankr. D. Del.) [Dkt. No. 859-3] | A.1209 – 1274 |
| Asbestos Personal Injury Trust Distribution Procedure, *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del.) [Dkt. No. 238-2] | A.1275 – 1338 |
| Proposed TPP Class and Third Party Payor Claim Procedures, *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) [Dkt. No. 1049-13] | A.1339 – 1347 |
| Fire Victim Claims Resolution Procedures, *In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal.) [Dkt. No. 7037] | A.1348 – 1359 |
| **VOLUME IV** | |
| Lloyd Dixon et al., *RAND Technical Report: Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts* xiv (2010) | A.1360 - 1577 |
| **VOLUME V** | |
| Objection of United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors [Bankr. ECF No. 3256] | A.1578 – 1612 |
| Supplemental Objection of United States Trustee to (I) Eighth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors and (II) Proposed Confirmation Order [Bankr. ECF No. 3636] | A.1613 – 1616 |
| Supplemental Objection of United States Trustee to (I) Eleventh Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors, and (II) Any Proposed Confirmation Order [Bankr. ECF No. 3710] | A.1617 – 1620 |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.**[1] | **(Jointly Administered)** |

### ORDER ESTABLISHING (I) DEADLINES FOR FILING PROOFS OF CLAIM AND PROCEDURES RELATING THERETO, (II) APPROVING THE PROOF OF CLAIM FORMS, AND (III) APPROVING THE FORM AND MANNER OF NOTICE THEREOF

Upon the motion (the "**Motion**") of Purdue Pharma, L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these proceedings (collectively, the "**Debtors**," the "**Company**," or "**Purdue**"), for an order, pursuant to Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") 2002, 3003(c)(3), and 9008 fixing deadlines and establishing procedures for filing proofs of claim and approving the form and manner of service thereof;[2] and upon all pleadings filed in connection with the Motion and the record of the hearing held by the Court on the Motion on January 24, 2020; and it appearing that the relief requested and granted hereby is in the best interests of the Debtors, their estates, and creditors; and that adequate notice of the Motion has been given and that no further notice or hearing is necessary; and after due

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Motion.

**A.1**

deliberation and good and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.     The Motion is granted as set forth herein.

2.     The Bar Date Notice and the Governmental Opioid Claimant Proof of Claim Form, the Personal Injury Claimant Proof of Claim Form, the General Opioid Claimant Proof of Claim Form, (together, the "**Opioid Proof of Claim Forms**"), and the Non-Opioid Claimant Proof of Claim Form (together, with the Opioid Proof of Claim Forms, the "**Proof of Claim Forms**"), in substantially the forms annexed hereto as Exhibits 1, 2, 3, 4, and 5, respectively, and the manner of providing notice of the Bar Dates proposed in the Motion, are approved in all respects pursuant to Bankruptcy Rules 2002(a)(7) and 2002(l).  The form and manner of notice of the Bar Dates approved herein are deemed to fulfill the notice requirements of the Bankruptcy Rules and the Local Rules for the Court, and notice of the Bar Dates in the form and manner as proposed by the Debtors herein is fair and reasonable and will provide good, sufficient, and due notice to all creditors of their rights and obligations in connection with claims they may assert against the Debtors' estates in these chapter 11 cases.  Accordingly, the Debtors are authorized and directed to serve and/or publish the notice of the Bar Date as set forth below.

3.     Except as otherwise provided in paragraphs 13 and 14 of this Order, all persons and entities (including, without limitation, individuals, partnerships, corporations, joint ventures, trusts, governmental units, and Native American Tribes) holding a pre-petition claim, as defined in Section 101(5) of the Bankruptcy Code, against the Debtors which arose on or prior to the filing of the chapter 11 petitions on September 15, 2019 (the "**Petition Date**"), <u>must</u> file a proof of claim in writing or electronically in accordance with the procedures below so that it is received **on or before 5:00 p.m. (Prevailing Eastern Time) on June 30, 2020 (the "General**

2

**A.2**

Bar Date"). All persons and entities holding an opioid-related claim against the Debtors that

arose after the Petition Date may also file a proof of claim using the forms described herein. The

General Bar Date shall be identified in the Bar Date Notice.

4. For the purposes of determining the timeliness of the filing of a proof of claim

and for determining whether a claimant should use the Opioid Proof of Claim Forms, the

following procedures for the filing of proofs of claim shall apply:

    a. **Governmental Opioid Claimant Proof of Claim Forms** must (i) be completed by any governmental unit or Native American Tribe, alleging a claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of all natural, semi-synthetic or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II or III drugs pursuant to the federal Controlled Substances Act, as the following **Brand Name Medications**: OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, or OxyFast®; or the following **Generic Medications:** oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®) (a "**Purdue Opioid**" or "**Purdue Opioids**")[3]; and (ii) conform substantially to the proof of claim form attached hereto as Exhibit 2.

    b. **Personal Injury Claimant Proof of Claim Forms** must (i) be completed by any claimant seeking damages based on personal injury to the claimant or another individual related to the taking of Purdue Opioids; and/or the taking of another opioid for which the claimant believes Purdue is responsible for their damages; and (ii) conform substantially to the proof of claim form attached hereto as Exhibit 3;

    c. **General Opioid Claimant Proof of Claim Forms** must (i) be completed by any individual or entity, other than a governmental unit or Native American

---

[3] The term "Purdue Opioid(s)" shall not mean: (i) medications and other substances to treat opioid or other substance use disorders, abuse, addiction or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of opioids or opioid products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) opioids listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

**A.3**

Tribe, alleging a claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue Opioids, excluding claims for personal injury; and (ii) conform substantially to the proof of claim form attached hereto as Exhibit 4;

d.  **Non-Opioid Claimant Proof of Claim Form** must (i) be completed by any person or entity alleging claims against the Debtors based on non-opioid-related injuries or harm; and (ii) conform substantially to the proof of claim form attached hereto as Exhibit 5.  Non-Opioid Claimant Proof of Claim Forms must specify by name and case number the Debtor against which the claim is filed.  If the holder asserts a claim for non-opioid related injuries or harm against more than one Debtor or has such claims against different Debtors, a separate proof of claim form must be filed with respect to each Debtor;

e.  For the avoidance of doubt, holders asserting claims on any of the Opioid Proof of Claim Forms and the Federal Government (as defined herein) are not required to file separate proofs of claim against each Debtor with respect to which any such holder has or may have a claim or specify by name the Debtor against which the claim is filed or the case number of such Debtor's bankruptcy case.  All Opioid Proof of Claim Forms, as well as claims filed by the Federal Government, will be docketed against the lead case, *In re Purdue Pharma L.P., et al.,* No. 19-23649 (RDD), without the need for further designation by a holder, and shall be deemed filed as against each of the Debtors in each of the Debtors' chapter 11 cases and in any of their successor cases;

f.  Proofs of claim must be filed either (i) electronically through Prime Clerk's proof of claim website for these cases at https://restructuring.primeclerk.com/purduepharma/ (the "**Case Website**") by following instructions for filing proofs of claim electronically; (ii) by mailing the original proof of claim by First-Class mail to Prime Clerk's Claim Processing Center for the Debtors at Purdue Pharma Claims Processing Center, c/o Prime Clerk LLC, Grand Central Station, PO Box 4850, New York, NY 10163-4850; (iii) by mailing the original proof of claim by overnight mail to Prime Clerk's Claim Processing Center for the Debtors at Purdue Pharma Claims Processing Center, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232; or (iv) by delivering the original proof of claim by hand to (x) the United States Bankruptcy Court for the Southern District of New York at 300 Quarropas Street, White Plains, NY 10601; provided, that if the proof of claim contains confidential information as provided in this Order, the proof of claim be delivered in an envelope marked "CONFIDENTIAL"; or (y) Prime Clerk's Claims Processing Center for the Debtors at Purdue Pharma Claims Processing Center, c/o Prime Clerk LLC, 850 Third Avenue, Suite 412, Brooklyn, NY 11232;

**A.4**

g.  Proofs of claim will be deemed filed only when **received** by the Clerk of the Bankruptcy Court or by Prime Clerk on or before the General Bar Date;

h.  Proofs of claim must (i) be signed; (ii) be in the English language; and (iii) be denominated in United States currency;

i.  If a claimant is unable to answer certain questions or elects not to supplement their proof of claim by attaching supporting documentation at the time of filing a claim, the absence of an answer or supporting documentation, by itself, will not result in the denial of the claim, though the claimant may be asked or required to provide additional information or supporting documentation at a later date.  A claimant may also amend or supplement a proof of claim after it is filed, including, for the avoidance of doubt, after the applicable Bar Date, but not, without leave of Court, to assert a new or additional claim;

j.  Timely filed claims that satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and/or this Order shall not be disallowed solely by reason of a lack of detail or specificity in response to questions asked in the forms approved by this Order; and

k.  Proofs of claim sent by facsimile, telecopy, or electronic mail transmission **will not** be accepted.

5.  All Personal Injury Claimant Proof of Claim Forms and any supporting documentation submitted with the forms, shall remain highly confidential and shall not be made available to the public.  For the avoidance of doubt, only the claim number, claim amount, and the total number of the personal injury claims, including any subcategories thereof (such as claims on behalf of minors with Neonatal Abstinence Syndrome), will be made publicly available on the Case Website and only such information will be included in the publicly available Claims Register.  Copies of Personal Injury Claimant Proof of Claim Forms and supporting documentation shall be treated as Professionals' Eyes Only/Confidential Information and, as applicable, as Information Protected Pursuant to the Health Insurance Portability and Accountability Act of 1996 as set forth in the Protective Order entered by the Court on January 28, 2020 [Dkt. No. 784] (the "**Protective Order**"), and made available only to the Court and to those that agree to be bound by the Protective Order.

5

**A.5**

6.      All claim forms that are <u>not</u> Personal Injury Claimant Proof of Claim Forms will be made publicly available on the Case Website in their entirety (unless Prime Clerk, in its discretion, determines that a personal injury claimant mistakenly filled out a different proof of claim form).  For the avoidance of doubt, the Governmental Opioid Claimant Proof of Claim Forms, the General Opioid Proof of Claim Forms, and the Non-Opioid Proof of Claim Forms will be made publicly available on the Case Website in their entirety.  Prime Clerk shall be exculpated from liability[4] for, and shall be under no obligation or duty to advise claimants and/or make determinations as to whether the appropriate Proof of Claim Form was used; *provided however*, to the extent that a claimant seeks such advice, Prime Clerk shall refer the claimant to the instructions detailing the Proof of Claim Forms in the Bar Date Notice and to Prime Clerk's proof of claim website for these cases at  https://restructuring.primeclerk.com/purduepharma/; *further provided however*, that in no event shall Prime Clerk be exculpated in the case of its own bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.

7.      Notwithstanding anything to the contrary in this Order, the Motion, any provision of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of New York, the Guidelines, any other order of this Court, any proof of claim form or notice of a bar date, for administrative purposes, (i) any member of an ad hoc committee or ad hoc group delineated in this Order, specifically the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (other than the PEC[5]) (the "**Consenting Ad Hoc**

---

[4] Whenever Prime Clerk is acting on behalf of the Clerk of the Court, the exculpation and indemnification provisions in this Order shall also apply to the Clerk of the Court.

[5] The PEC or Plaintiffs' Executive Committee is the sixteen-member court-appointed committee in *In re National Prescription Opiate Litigation*, Case No. 17-md-02804, MDL No. 2804.

6

**A.6**

Committee"), the Ad Hoc Committee of NAS Babies, the Ad Hoc Group of Hospitals,[6] the Ad Hoc Group of Non-Consenting States (the "**Non-Consenting States**"), the Multi-State Governmental Entities Group, and the Ad Hoc Group of Individual Victims (each, an "**Ad Hoc Committee**" or "**Ad Hoc Group**"), that have filed verified statements pursuant to Bankruptcy Rule 2019 in these cases as of the date of this Order (as each such statement may be amended, modified or supplemented from time to time, each, a "**Rule 2019 Statement,**" and as such membership may change from time to time, each, a "**Member**" and, collectively the "**Members**"), and (ii) any individual or entity (including any governmental entity, territory or Native American Tribe) that provides requisite authorization to counsel for the applicable Ad Hoc Group or Ad Hoc Committee—provided such authorization is reasonably acceptable to the Debtors and the Creditors' Committee (each, a "**Consenting Claimant**" and, collectively, the "**Consenting Claimants**")—is authorized and entitled, but not required, to file, amend, modify and/or supplement one or more consolidated proof(s) of claim, including, in each case, through counsel or other authorized agent (together with any amendments, modifications or supplements thereto, each a "**Consolidated Claim**" and, collectively, the "**Consolidated Claims**"), using the appropriate Opioid Proof of Claim Form,[7] on behalf of each and every Member of the applicable Ad Hoc Group or Ad Hoc Committee and Consenting Claimant, or any subgroup thereof, that elects to be included in the applicable Consolidated Claim for any and all claims such applicable Members and/or Consenting Claimants have or may have against any or all of the Debtors;

---

[6] "Ad Hoc Group of Hospitals" shall have the meaning set forth in the *Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [Docket No. 577] (as the same may be amended, modified or supplemented from time to time).

[7] For the avoidance of doubt, the Members of the Ad Hoc Group of Hospitals are authorized and entitled, but not required, to file, amend, modify and/or supplement a Consolidated Claim using the General Opioid Claimant Proof of Claim Form for any and all claims the Members of the Ad Hoc Group of Hospitals have or may have against any or all of the Debtors.

**A.7**

*provided that* such Consolidated Claim has attached either (y) individual proof of claim forms for each such applicable Member of the applicable Ad Hoc Group or Ad Hoc Committee and/or Consenting Claimant, or (z) a spreadsheet or other form of documentation that lists each such applicable Member of the applicable Ad Hoc Group or Ad Hoc Committee and/or Consenting Claimant and provides individualized information that substantially conforms to information requested in the applicable Opioid Proof of Claim From.[8]

8.      In the case of (a) states, federal districts, or territories that are Members or Consenting Claimants, nothing shall preclude counsel for the Consenting Ad Hoc Committee and/or counsel for the Non-Consenting States from filing a Consolidated Claim on behalf of all such states, federal districts, and territories, and (b) cities, counties, other municipalities or Native American Tribes that are Members or Consenting Claimants, nothing shall preclude counsel for the Consenting Ad Hoc Committee from filing a Consolidated Claim on behalf of all such cities, counties, other municipalities or Native American Tribes; *provided that* the Consolidated Claim has attached either (i) individual proofs of claim for each governmental entity, or (ii) a summary describing the collective claims/theories, any claims/theories specific to an individual state, federal district, or territory, and the amount of the claim (which may include unliquidated claim amounts), and such counsel is hereby authorized to file a Consolidated Claim (subject to receiving the requisite authority from the Members and/or Consenting Claimants in accordance with paragraph 7).

---

[8] In responding to the questions, or providing the information requested, in the applicable Opioid Proof of Claim Form, the applicable Member of the applicable Ad Hoc Group or Ad Hoc Committee and/or Consenting Claimant may refer to and rely on the statements made in a complaint that such Member and/or Consenting Claimants has filed against the Debtor(s) (which complaint will be attached).

**A.8**

9.      Any health plan, health insurer, health plan administrator, or other third party payor of relevant claims (each a "**TPP**"), is authorized and entitled, but not required, to file a Consolidated Claim on account of any or all plan sponsors, employer groups, fully insured, or self-funded programs administered by such TPP (a "**TPP Consolidated Claim**").  Such TPP may use the General Opioid Claimant Proof of Claim Form for these (or any other) TPP claims. A TPP Consolidated Claim must provide a spreadsheet or other form of documentation reasonably acceptable to the Debtors and Creditors' Committee that lists the employer group or plan sponsor of each self-funded program administered by the TPP, the amount of such sponsor's claim, and a description of the claim basis.  Such TPP may, but need not, include any of its other claims, including but not limited to fully insured, at risk, and direct claims, in the same claim form.  Any supporting information provided by a TPP in connection with any Proof of Claim Form filed, whether provided with the initial filing, or provided later as contemplated pursuant to paragraph 4 above, shall be treated as Professionals' Eyes Only/Confidential Information and, as applicable, as Information Protected Pursuant to the Health Insurance Portability and Accountability Act of 1996 as set forth in the Protective Order, and made available only to the Court and to those that agree to be bound by the Protective Order.

10.      Notwithstanding anything to the contrary in this Order, the Motion, any provision of the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules for the Southern District of New York, the Guidelines, any other order of this Court, any Proof of Claim Form or notice of the Bar Dates, the Consolidated Claim(s) and the TPP Consolidated Claims shall have the same effect as if each Member of the applicable Ad Hoc Group or Ad Hoc Committee or Consenting Claimant (or sponsor in the case of a TPP) had individually filed its own proof of claim against each of the Debtors in each of the Debtors' chapter 11 cases and in any of their

**A.9**

successor cases.  No Consolidated Claim or TPP Consolidated Claim shall be disallowed, reduced or expunged solely on the basis that such Consolidated Claim is filed collectively by the Members and/or Consenting Claimants, or sponsor, as applicable, rather than by each Member or Consenting Claimant, or sponsor, individually.  By filing a Consolidated Claim, or a TPP Consolidated Claim, the Members, Consenting Claimants and sponsor are deemed to have satisfied the applicable Bankruptcy Rules, including, without limitation, Bankruptcy Rule 3001. Filing of Consolidated Claims or TPP Consolidated Claims in this manner is intended solely for the purpose of administrative convenience.  Absent further order of the Court, Consolidated Claims or TPP Consolidated Claims shall not be construed, submitted, or allowed as class proofs of claim (or as motions to approve class proofs of claim), nor shall the allowance of the filing of the Consolidated Claims or TPP Consolidated Claims be construed in any way as a determination that any claims in these chapter 11 cases may be submitted as class claims, the rights of all parties being reserved in that regard.

11.     Notwithstanding anything to the contrary in this Order, the Motion, any other order of this Court, any proof of claim form or notice of a bar date, the federal government of the United States, including any agency, department, or instrumentality of the federal government, including, for the avoidance of doubt, Pension Benefit Guaranty Company (the "**Federal Government**"), is authorized to file, amend, modify and/or supplement proofs of claim using the Non-Opioid Claimant Proof of Claim Form, instead of the Governmental Opioid Claimant Proof of Claim Form, for any and all claims the Federal Government has or may have against any of the Debtors, including claims against the Debtors based on the Debtors' production, marketing and sale of Purdue Opioids.  Claims filed by the Federal Government shall not be disallowed,

**A.10**

reduced or expunged solely on the basis that the claim is filed on the Non-Opioid Claimant Proof of Claim Form instead of the Governmental Opioid Claimant Proof of Claim Form.

12.     Notwithstanding and in addition to any prior agreements by the Debtors to indemnify the Indemnified Parties (as defined below), the Debtors shall indemnify, defend and hold Prime Clerk and its members, directors, officers, employees, representatives, affiliates, consultants, subcontractors, and agents (collectively, the "**Indemnified Parties**") from and against any and all losses, claims, damages, judgments, liabilities, and expenses, whether direct or indirect (including, without limitation, counsel fees and expenses) (collectively, "**Losses**") resulting from, arising out of or related to information made publicly available on the Case Website; *provided however*, that in no event shall Prime Clerk be indemnified in the case of its own bad faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct.  Without limiting the generality of the foregoing, Losses include any liabilities resulting from claims by any third parties against any Indemnified Party.

13.     Any person or entity that holds a claim that arises from the rejection of an executory contract or unexpired lease pursuant to Section 365 of the Bankruptcy Code, must file a proof of claim based on such rejection on or before the later of the (i) General Bar Date; and (ii) thirty (30) days after entry of any order authorizing the rejection of such executory contract or unexpired lease (together, the "**Rejection Damages Bar Date**").

14.     If the Debtors amend or supplement their Schedules subsequent to the date hereof, the Debtors shall give notice of such amendment or supplement to the holders of claims affected thereby, and such holders must file amended or original claims to take into account such amendment(s) to the Schedules on or before the later of: (i) the General Bar Date; and (ii) thirty (30) days after the date such holders of affected claims are served with notice that the Debtors

11

**A.11**

amended their Schedules to identify, reduce, delete, or change the amount, priority, classification, or other status of such a claim (together, the "**Amended Schedules Bar Date**").

15.     Nothing in this Order shall prejudice the right of the Debtors or any other party in interest to dispute or assert offsets or defenses to any claim reflected in the Schedules.

16.     The following persons or entities need not file a proof of claim on or prior to the applicable Bar Date:

> a.  the Office of the United States Trustee for the Southern District of New York on account of claims for fees and applicable interests payable pursuant to 28 U.S.C. § 1930;
>
> b.  any person or entity alleging a claim against the Debtors that has already filed a proof of claim in the above-captioned case in a form substantially similar to Official Bankruptcy Form 410;
>
> c.  any person or entity whose claim is listed on the Schedules filed by the Debtors, provided that (i) the claim is <u>not</u> scheduled as "disputed," "contingent," or "unliquidated;" <u>and</u> (ii) the claimant does not disagree with the amount, nature, and priority of the claim as set forth in the Schedules;
>
> d.  any holder of a claim that heretofore has been allowed by Order of this Court entered on or before the applicable Bar Date;
>
> e.  any person or entity whose claim has been paid in full by any of the Debtors;
>
> f.  any holder of a claim for which a separate deadline has been fixed by this Court;
>
> g.  any party that is exempt from filing a proof of claim pursuant to an order of the Court in these chapter 11 cases;
>
> h.  any Debtor having a claim against another Debtor;
>
> i.  any holder of a claim allowable under § 503(b) and § 507(a)(2) of the Bankruptcy Code as an expense of administration (other than any claim allowable under section 503(b)(9) of the Bankruptcy Code), including any professionals retained pursuant to orders of the Court who assert administrative claims for fees and expenses subject to the Court's approval pursuant to sections 330 and 331 of the Bankruptcy Code;
>
> j.  current or former employees of the Debtors and current or former officers and directors of the Debtors who are not parties to currently pending litigation arising from or related to the Debtors' production, marketing and sale of

**A.12**

Purdue Opioids who assert claims for indemnification and/or contribution arising as a result of such individuals' services to the Debtors; and

k.  a current or former employee of the Debtors, if an order of this Court authorized the Debtors to honor such claim in the ordinary course of business as a wage, commission or benefit, including any order of this Court approving the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 6]; *provided* that a current or former employee must submit a Proof of Claim by the General Bar Date for all other claims arising on or before the Petition Date, including claims for benefits not provided for pursuant to an order of the Court, wrongful termination, discrimination, harassment, hostile work environment, and/or retaliation.

17.     Pursuant to Bankruptcy Rule 3003(c)(2), all holders of claims that fail to comply with this Order by timely filing a proof of claim in appropriate form shall (i) be forever barred, estopped, and enjoined form asserting such claims against the Debtors, their property, or their estates (or submitting a proof of claim with respect thereto) and (ii) not treated as a creditor with respect to such claim for the purposes of voting and distribution with respect to any chapter 11 plan or plans of reorganization that may be filed in these cases.

18.     The Debtors shall cause to be mailed (i) the appropriate proof of claim form and (ii) a copy of the Bar Date Notice substantially in the form attached hereto as Exhibit 1, which shall be deemed adequate and sufficient if served by first-class mail no later than ten (10) business days after the date of entry of this Order upon:

a.  the U.S. Trustee;

b.  counsel to the Creditors' Committee;

c.  all persons or entities that have filed proofs of claim as of the Bar Date Order;

**A.13**

<blockquote>

d.   all creditors and other known holders of claims as of the date of the Bar Date Order, including all persons or entities listed in the Schedules as holding claims, at the addresses stated therein;

e.   all counterparties to the Debtors' executory contracts and unexpired leases listed on the Schedules at the addresses stated therein;

f.   all current parties to litigation with the Debtors or their counsel (as of the date of entry of the Bar Date Order);

g.   all regulatory authorities that regulate the Debtors' businesses;

h.   all (i) current employees of the Debtors, (ii) all former employees of the Debtors terminated on or after January 1, 2016, and (iii) all of the Debtors' retirees (to the extent that contact information for former employees and retirees is available in the Debtors' records);

i.   all parties known to the Debtors as having <u>potential</u> claims against the Debtors' estates (including: (i) prescribers of Purdue brand name medications; (ii) Purdue Opioid users who are included in an adverse event report or who have filed a product complaint and provided contact information; (iii) callers to Purdue who have threatened, but not filed, litigation and provided contact information; and (iv) entities and individuals, other than current, former, and retired employees, officers, and directors, that have requested indemnification);

j.   the Internal Revenue Service for the district in which the case is pending and, if required by Bankruptcy Rule 2002(j), the Securities and Exchange Commission and any other required governmental units (a list of such agencies is available from the Office of the Clerk of the Court);

k.   all other taxing authorities for the jurisdictions in which the Debtors maintain or conduct business or own property; and

l.   all parties who have requested notice pursuant to Bankruptcy Rule 2002.

</blockquote>

19.   The Supplemental Notice Plan, as described in the declaration of Jeanne C. Finegan (the "**Finegan Declaration**"), is hereby approved and shall be deemed good, adequate, and sufficient publication notice of the Bar Dates and the procedures for filing proofs of claim in these chapter 11 cases.   The Debtors are authorized to implement the components of the Supplemental Notice Plan as set forth in the Motion, the Memorandum of Law in Support of Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and

14

Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof (the "**Memorandum of Law**"), and the Finegan Declaration.  Prime Clerk will provide weekly reports to the Debtors and the Creditors' Committee regarding the Supplemental Notice plan, outlining:  (i) website traffic; (ii) television ads that have aired and to be aired (including proposed schedules, to the extent known); (iii) radio aids aired and to be aired (including proposed schedules, to the extent known); (iv) impressions served; (v) social impressions; (vi) engagement (e.g., shares, comments, likes); (vii) online display ads served; (viii) ads that have been published in print (including proposed schedules, to the extent known); (ix) out of home advertising that has run (including proposed schedules, to the extent known); (x) media contacts (including specific names, if known); (xi) bar date notices mailed; and (xii) claims filed and preliminarily processed.

20.    In addition to the other provisions of the Supplemental Notice Plan, and pursuant to Bankruptcy Rule 2002(l) and the Guidelines, the Debtors shall publish a summary of the Bar Date Notice (i) once in the national editions of each of *The Wall Street Journal*, *The New York Times*, and *USA Today*, and (ii) once in each of the following magazines:  *People Magazine*, *Sports Illustrated*, *People En Espanol*, *National Geographic*, *Men's Health*, *Good Housekeeping*, *Parents*, and *Parents Latina*.

21.    The Debtors shall publish a summary of the Bar Date Notice (i) once in the weekday and Saturday editions of *The Globe & Mail, National Post, and Le Journal de Montreal*; and (ii) once in the national publications of each of *Canadian Geographic*, *Canadian Living*, *Chatelaine* (English and French Editions), *Maclean's*, *Reader's Digest* (English and French Editions*), Coup de Pouce*, and *L'actualite*.

15

**A.15**

22.     Nothing contained in this Order, the Motion, the Memorandum of Law, or any proof of claim or notice of the Bar Dates is intended to be or shall be construed as an admission of the Debtors' liability, an admission as to the validity of any claim against the Debtors, or a waiver of the Debtors' or any appropriate party in interest's rights to dispute any claim.

23.     The Debtors and Prime Clerk are authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Order.

24.     Entry of this Order is without prejudice to the right of the Debtors to seek a further order of this Court fixing a date by which holders of claims or interests not subject to the Bar Dates established herein must file such proofs of claim or interest or be barred from doing so.

25.     To the extent that the Debtors, with the consent of the Creditor's Committee, seek to extend the General Bar Date, the Debtors may do so upon notice including a statement that the relief requested therein may be granted, pursuant to Local Rule 9074-1, without a hearing if no objection is timely filed and served in accordance with the *Second Amended Order Establishing Certain Notice, Case Management, and Administrative Procedures*, entered on November 18, 2019 [Dkt. No. 498].

Dated:  February 3, 2020
        White Plains, New York

                              /s/Robert D. Drain
                              _____
                              THE HONORABLE ROBERT D DRAIN
                              UNITED STATES BANKRUPTCY JUDGE

16

**A.16**

Case 7:21-cv-07532-CM    Document 57-1    Filed 11/15/21    Page 20 of 302

# EXHIBIT 1

## Bar Date Notice

Error! Unknown document property name.

19-23649-cv-07592-CM Document 157-1 Filed 12/15/21 Page 21 of 302

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P., *et al.*,** | **Case No. 19-23649** |
| **Debtors.¹** | **(Jointly Administered)** |

### NOTICE OF DEADLINES REQUIRING FILING OF PROOFS OF CLAIM

**TO ALL PERSONS (INCLUDING LEGAL GUARDIANS OF CHILDREN AND PERSONS CLAIMING ON BEHALF OF DECEASED PERSONS) AND ENTITIES WITH CLAIMS AGAINST ANY OF THE DEBTOR ENTITIES LISTED BELOW:**

| Name of Debtor | Case Number | Tax Identification Number |
|---|---|---|
| Purdue Pharma L.P. | 19-23649 | XX-XXX7484 |
| Purdue Pharma Inc. | 19-23648 | XX-XXX7486 |
| Purdue Transdermal Technologies | 19-23650 | XX-XXX1868 |
| Purdue Pharma Manufacturing L.P. | 19-23651 | XX-XXX3821 |
| Purdue Pharmaceuticals L.P. | 19-23652 | XX-XXX0034 |
| Imbrium Therapeutics L.P. | 19-23653 | XX-XXX8810 |
| Adlon Therapeutics L.P. | 19-23654 | XX-XXX6745 |
| Greenfield BioVentures L.P. | 19-23655 | XX-XXX6150 |
| Seven Seas Hill Corp. | 19-23656 | XX-XXX4591 |
| Ophir Green Corp. | 19-23657 | XX-XXX4594 |
| Purdue Pharma of Puerto Rico | 19-23658 | XX-XXX3925 |
| Avrio Health L.P. | 19-23659 | XX-XXX4140 |
| Purdue Pharmaceutical Products L.P. | 19-13660 | XX-XXX3902 |
| Purdue Neuroscience Company | 19-23661 | XX-XXX4712 |
| Nayatt Cove Lifescience Inc. | 19-23662 | XX-XXX7805 |
| Button Land L.P. | 19-23663 | XX-XXX7502 |
| Rhodes Associates L.P. | 19-23666 | N/A |
| Paul Land Inc. | 19-23664 | XX-XXX7425 |

¹ The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1

**A.18**

| Quicknick Land L.P. | 19-23665 | XX-XXX7584 |
| Rhodes Pharmaceuticals L.P. | 19-23667 | XX-XXX6166 |
| Rhodes Technologies | 19-23668 | XX-XXX7143 |
| UDF LP | 19-23669 | XX-XXX0495 |
| SVC Pharma LP | 19-23670 | XX-XXX5717 |
| SVC Pharma Inc. | 19-23671 | XX-XXX4014 |

The United States Bankruptcy Court for the Southern District of New York has entered an Order establishing **5:00 p.m. (Prevailing Eastern Time) on June 30, 2020** (the "**General Bar Date**") as the last date for each person or entity (including individuals (which includes legal guardians of children and persons claiming on behalf of deceased persons), partnerships, corporations, joint ventures, trusts, governmental units, and Native American Tribes) to file a proof of claim against any of the Debtors listed above (the "**Debtors**").

The General Bar Date and the procedures set forth below for filing proofs of claim apply to all claims against the Debtors that arose prior to September 15, 2019 (in other words, for claims that arise from an action that the Debtors took prior to September 15, 2019, but you may assert a claim for damages suffered by any person or entity both prior to and after that date), the date on which the Debtors commenced cases under chapter 11 of the United States Bankruptcy Code (the "**Petition Date**"), except for claims listed in Section 4 below that are specifically excluded from the General Bar Date filing requirement.

## 1.  WHO MUST FILE A PROOF OF CLAIM

Unless you hold a type of claim described in Section 4(c) below or the Court orders otherwise, you MUST file a proof of claim to vote on any chapter 11 plan filed in these cases.  In addition, failure to file a proof of claim may prevent you from sharing in distributions from the Debtors' bankruptcy estates if you have a claim that arose prior to Petition Date, and is not one of the types of claims described in Section 4 below.  Claims based on acts or omissions of the Debtors that occurred before the Petition Date must be filed on or prior to the General Bar Date, even if such claims are not now fixed, liquidated, or certain or did not mature or become fixed, liquidated, or certain before the Petition Date.

Under Section 101(5) of the Bankruptcy Code and as used in this Notice, the word "claim" means:  (a) **a right to payment**, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) **a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment**, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

**This Notice is being sent to many persons and entities that have had some relationship with or have done business with the Debtors but may not have an unpaid claim against the Debtors.  The fact that you have received this Notice does not mean that you have a claim or that the Debtors or the Court believe that you have a claim against the Debtors.**

2

## 2.  WHICH FORM TO FILE

Your filed proof of claim must conform substantially to the appropriate case-specific proof of claim form that accompanies this Notice.

For the purpose of this Notice and the accompanying proof of claim forms, "**Purdue Opioid**" means all natural, semi-synthetic or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II or III drugs pursuant to the federal Controlled Substances Act, produced, marketed, or sold by the Debtors as: (i) the following **Brand Name Medications**: OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, or OxyFast®; and (ii) the following **Generic Medications:** oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®).[2]

Personal Injury Claimant Proof of Claim Form:

If you have a claim against the Debtors based on your own personal injury or another person's personal injury (for example, you are filing on behalf of a deceased or incapacitated individual or a minor) related to the taking of a Purdue Opioid and/or the taking of another opioid for which you believe Purdue is responsible for your damages, you must file a proof of claim form that is (or is substantially similar to) the Personal Injury Claimant Proof of Claim Form.

For example, individuals seeking damages for death, addiction or dependence, lost wages, loss of consortium, or Neonatal Abstinence Syndrome ("**NAS**"), regardless of the legal cause of action (fraud, negligence, misrepresentation, conspiracy, etc.), must file the Personal Injury Claimant Proof of Claim Form.

If you have a claim against the Debtors based on the Debtors' production, marketing and sale of Purdue Opioids, in addition to your claim based on personal injury as a result of taking a Purdue Opioid or another opioid, you may include those claims on the Personal Injury Claimant Proof of Claim Form by completing Part 5 of the Personal Injury Claimant Proof of Claim Form.

**Confidentiality of Forms:**  All Personal Injury Claimant Proof of Claim Forms and any supporting documentation submitted with those forms, shall remain <u>highly confidential</u> and shall not be made available to the public.  For the avoidance of doubt, only the claim number, claim amount, and the total number of the personal injury claims, including any subcategories thereof (such as claims on behalf of minors with NAS) will be made publicly available on the Debtors' case website hosted by Prime Clerk (the "**Case Website**") and only such information will be included in the publicly available Claims Register.  Copies of Personal Injury Claimant Proof of

---

[2] The term "Purdue Opioid(s)" shall not mean: (i) medications and other substances to treat opioid or other substance use disorders, abuse, addiction or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of opioids or opioid products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) opioids listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

**A.20**

Claim Forms and supporting documentation shall be treated as Professionals' Eyes Only/Confidential and, as applicable, as Information Protected Pursuant to the Health Insurance Portability and Accountability Act of 1996 as set forth in the Protective Order entered by the Court on January 28, 2020 [Dkt. No. 784], and made available only to the Court and to those that agree to be bound by the Protective Order.

### Governmental Opioid Claimant Proof of Claim Form:

If you are a governmental unit or a Native American Tribe, and you have a claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue Opioids, you must file a proof of claim form that is (or is substantially similar to) the Governmental Opioid Claimant Proof of Claim Form.

### General Opioid Claimant Proof of Claim Form:

If you are a person or entity, other than a governmental unit or Native American Tribe, and you have a claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue Opioids, excluding claims for personal injury, you must file a proof of claim form that is (or is substantially similar to) the General Opioid Claimant Proof of Claim Form.

For example, hospitals, insurers, third-party payors, or insureds seeking damages for an injury other than a personal injury—a financial or economic injury, for instance—must file the General Opioid Claimant Proof of Claim Form.

If you have a claim against the Debtors based on non-opioid-related injuries or harm, in addition to your claim based on the Debtors' production, marketing and sale of Purdue Opioids, you may include those claims on the General Opioid Claimant Proof of Claim Form by filling out Part 4 on the General Opioid Claimant Proof of Claim Form.

### Non-Opioid Claimant Proof of Claim Form (Official Form 410):

If you are a person or entity and you have a claim against the Debtors based on non-opioid related injuries or harm, you must file a proof of claim form that is (or is substantially similar to) the Non-Opioid Claimant Proof of Claim Form (Official Form 410).

For example, trade creditors seeking outstanding payments or governmental units asserting tax claims must file the Non-Opioid Claimant Proof of Claim Form.

Any holder of a claim against more than one Debtor for non-opioid related injuries or harm must file a separate proof of claim with respect to each such Debtor, and all holders of such claims must identify on their proof of claim the specific Debtor against which their claim is asserted and the case number of that Debtor's bankruptcy case.  A list of the names of the Debtors and their case numbers is set forth in the table on the first page of this Notice.

### Applicable to All Proof of Claim Forms:

The Debtors are enclosing the appropriate proof of claim form for use in these cases; if your claim is scheduled by the Debtors, the form also sets forth the amount of your claim as scheduled by the Debtors, the specific Debtor against which the claim is scheduled, and whether

the claim is scheduled as disputed, contingent, or unliquidated.  You will receive a different proof of claim form for each claim scheduled in your name by the Debtors.  Additional proof of claim forms may be obtained at the website established by Prime Clerk, located at http://PurduePharmaClaims.com/.

All proof of claim forms must be **signed** by the claimant or such individual authorized to act on behalf of the claimant.  If the claimant is not an individual, an authorized agent of the claimant (such as the claimant's lawyer) must sign the claim form.  It must be written in English and be denominated in United States currency.

**You may attach to your completed proof of claim any documents on which the claim is based (if voluminous, a summary may be attached) if you would like, but you are not required to do so, and failure to attach any such documents will not affect your ability to submit a proof of claim form or result in the denial of your claim.  You may be required, in the future, to provide supporting documents for your claim.  You may also amend or supplement your proof of claim after it is filed, including, for the avoidance of doubt, after the applicable Bar Date, but not, without permission from the Court, to assert a new or additional claim.  Do not send original documents with your proof of claim, as they will not be returned to you and may be destroyed after they are processed and reviewed.**

Your proof of claim form must **not** contain complete social security numbers or taxpayer identification numbers (only the last four digits), a complete birth date (only the year), the name of a minor (only the minor's initials), or a financial account number (only the last four digits of such financial account).

All proof of claim forms that are not Personal Injury Claimant Proof of Claim Forms will be made publicly available on the Case Website in their entirety.  For the avoidance of doubt, the Governmental Opioid Claimant Proof of Claim Forms, the General Opioid Proof of Claim Forms, and the Non-Opioid Proof of Claim Forms will be made publicly available on the Case Website in their entirety.

**3.   WHEN AND WHERE TO FILE**

All proofs of claim must be filed so as to be received on or before **June 30, 2020, at 5:00 p.m. (Prevailing Eastern Time)** as follows:

<div align="center">

IF BY U.S. POSTAL SERVICE MAIL:
</div>

> Purdue Pharma Claims Processing Center
> c/o Prime Clerk LLC
> Grand Central Station, PO Box 4850
> New York, NY 10163-4850

Error! Unknown document property name.

**A.22**

IF BY OVERNIGHT MAIL

      Purdue Pharma Claims Processing Center
      c/o Prime Clerk LLC
      850 Third Avenue, Suite 412
      Brooklyn, NY 11232

IF DELIVERED BY HAND

      Purdue Pharma Claims Processing Center
      c/o Prime Clerk LLC
      850 Third Avenue, Suite 412
      Brooklyn, NY 11232

OR

      United States Bankruptcy Court
      Southern District of New York
      300 Quarropas Street
      White Plains, NY 10601[3]

IF ELECTRONICALLY

      The website established by Prime Clerk, via the link entitled "Submit a
      Claim" on such website located at http://PurduePharmaClaims.com/ and
      following the instructions provided.

      Proofs of claim will be deemed filed only when <u>received</u> at the addresses listed above or filed electronically on or before the General Bar Date. Proofs of claim may not be delivered by facsimile, telecopy, or electronic mail transmission.

## 4.  CLAIMS FOR WHICH PROOFS OF CLAIM NEED NOT BE FILED

      You do **not** need to file a proof of claim on behalf of a claim on or prior to the General Bar Date if the claim falls into one of the following categories:

    a.  the Office of the United States Trustee for the Southern District of New York on account of claims for fees and applicable interests payable pursuant to 28 U.S.C. § 1930;

    b.  any person or entity alleging a claim against the Debtors that has already filed a proof of claim in the above-captioned case in a form substantially similar to Official Bankruptcy Form 410 (unless you wish to assert the claim against a Debtor not mentioned in the prior proof of claim, in which case an additional proof of claim must be filed);

---

[3] Proofs of claim delivered by hand to the Clerk's Office that contain confidential information as permitted hereby must be delivered in an envelope marked "CONFIDENTIAL".

c.  any person or entity whose claim is listed on the Schedules filed by the Debtors, provided that (i) the claim is <u>not</u> scheduled as "disputed", "contingent", or "unliquidated"; <u>and</u> (ii) the claimant does not disagree with the amount, nature and priority of the claim as set forth in the Schedules;

d.  any holder of a claim that heretofore has been allowed by Order of this Court;

e.  any person or entity whose claim has been paid in full by any of the Debtors;

f.  any holder of a claim for which specific deadlines have previously been fixed by this Court;

g.  any party that is exempt from filing a proof of claim pursuant to an order of the Court in these chapter 11 cases;

h.  any Debtor having a claim against another Debtor;

i.  any holder of a claim allowable under § 503(b) and § 507(a)(2) of the Bankruptcy Code as an expense of administration (other than any claim allowable under section 503(b)(9) of the Bankruptcy Code), including any professionals retained by the Debtors pursuant to orders of the Court who assert administrative claims for fees and expenses subject to the Court's approval pursuant to sections 330 and 331 of the Bankruptcy Code;

j.  current or former employees of the Debtors and current and former officers and directors of the Debtors who are not parties to currently pending litigation arising from or related to the Debtors' production, marketing and sale of Purdue Opioids who assert claims for indemnification and/or contribution arising as a result of such individuals' services to the Debtors; and

k.  a current or former employee of the Debtors, if an order of this Court authorized the Debtors to honor such claim in the ordinary course of business as a wage, commission or benefit, including any order of this Court approving the *Motion of Debtors for Entry of an Order Authorizing (I) Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits and Other Compensation and (B) Maintain Employee Benefits Programs and Pay Related Administrative Obligations, (II) Employees and Retirees to Proceed with Outstanding Workers' Compensation Claims and (III) Financial Institutions to Honor and Process Related Checks and Transfers* [D.I. 6]; *provided* that a current or former employee must submit a Proof of Claim by the General Bar Date for all other claims arising on or before the Petition Date, including claims for benefits not provided for pursuant to an order of the Court, wrongful termination, discrimination, harassment, hostile work environment, and/or retaliation.

## 5.  EXECUTORY CONTRACTS AND UNEXPIRED LEASES

The Bankruptcy Code provides that the Debtors may, at any time before a plan of reorganization or liquidation is confirmed by the Court, choose to reject certain executory contracts or unexpired leases.  If your contract or lease is rejected, you may have a claim resulting from that rejection.  The deadline to file a Proof of Claim for damages relating to the rejection of the contract or lease is **the later of (i) the General Bar Date and (ii) thirty (30) days after entry of any order authorizing the rejection of the contract or lease**.

7

**A.24**

## 6. CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE APPLICABLE BAR DATE

ANY HOLDER OF A CLAIM THAT IS NOT EXEMPTED FROM THE REQUIREMENTS OF THIS ORDER, AS SET FORTH IN SECTION 4 ABOVE, AND THAT FAILS TO TIMELY FILE A PROOF OF CLAIM IN THE APPROPRIATE FORM SHALL NOT BE TREATED AS A CREDITOR WITH RESPECT TO SUCH CLAIM FOR THE PURPOSES OF VOTING ON ANY PLAN OF REORGANIZATION FILED IN THESE CASES AND PARTICIPATING IN ANY DISTRIBUTION IN THE DEBTORS' CASES ON ACCOUNT OF SUCH CLAIM.

## 7. THE DEBTORS' SCHEDULES AND ACCESS THERETO

You may be listed as the holder of a claim against one or more of the Debtors in the Debtors' Schedules of Assets and Liabilities and/or Schedules of Executory Contract and Unexpired Leases (collectively, the "**Schedules**").

To determine if and how you are listed on the Schedules, please refer to the descriptions set forth on the enclosed proof of claim forms regarding the nature, amount, and status of your claim(s). If you received post-petition payments (i.e., after September 15, 2019) from the Debtors (as authorized by the Court) on account of your claim, the enclosed proof of claim form will reflect the net amount of your claims. If the Debtors believe that you hold claims against one or more than one Debtor, you will receive multiple proof of claim forms, each of which will reflect the nature and amount of your claims against one Debtor, as listed in the Schedules.

As set forth above, if you agree with the nature, amount, and status of your claim as listed in the Debtors' Schedules, and if you do not dispute that your claims is only against the Debtor specified by the Debtors, and if you clam is not described as "disputed," "contingent," or "unliquidated," you need not file a proof of claim. Otherwise, or if you decide to file a proof of claim, you must do so before the General Bar Date in accordance with the procedures set forth in this Notice.

In the event that the Debtors amend or supplement their Schedules, the holder of claim affected by the Debtors' amendment(s) or supplement(s) shall have until **the later of (i) the General Bar Date and (ii) thirty (30) days after the holder of a claim is served with notice that the Debtors amended or supplemented their Schedules**.

Copies of Debtors' schedules are available for inspection on the Bankruptcy Court's electronic docket for the Debtors' chapter 11 cases, which is posted on (a) the website established by Prime Clerk for the Debtors at http://PurduePharmaClaims.com/ and (b) on the Courts website at http://www.nysb.uscourts.gov. A login and password to the Court's Public access to Electronic Court Records ("**PACER**") are required to access this information and can be obtained through the PACER Service Center at http://www.pacer.gov. Copies of the Schedules may also be examined between the hours of 9:00 a.m. and 4:30 p.m., Monday through Friday at the Office of the Clerk of the Bankruptcy Court, 300 Quarropas Street, White Plains, NY 10601. Copies of the Debtors' Schedules may also be obtained by request to Prime Clerk at the following address, telephone number, and email address:

Error! Unknown document property name.

**A.25**

Purdue Pharma L.P., Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412, Brooklyn, NY 11232
Toll Free:  (844) 217-0912    Email:  purduepharmainfo@primeclerk.com

**Please note that Prime Clerk cannot provide legal advice, nor can it advise you as to
whether you should file a proof of claim.  A holder of a possible claim against the Debtors
should consult an attorney regarding any matters not covered by this Notice, such as
whether the holder should file a proof of claim.**

Dated: February 3, 2020                        **BY ORDER OF THE COURT**
        White Plains, New York

**Error! Unknown document property name.**

**A.26**

Case 7:21-cv-07532-CM    Document 157-1    Filed 11/15/21    Page 30 of 302

**EXHIBIT 2**

**Governmental Opioid Claimant Proof of
Claim Form**

EXHIBIT 2 -
Government Opioid

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| **Debtors.** | **(Jointly Administered)** |

# Governmental Opioid Claimant Proof of Claim Form

**You may file your claim electronically at PurduePharmaClaims.com via the link entitled "Submit a Claim."**

**For questions regarding this Proof of Claim Form, please call Prime Clerk at (844) 217-0912 or visit PurduePharmaClaims.com.**

**Read the instructions at the end of this document before filling out this form. This form is for governmental units and Native American Tribes to assert a general unsecured claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue Opioids.**

<u>Do not</u> use this form to assert any other pre-petition claims, including secured claims or claims entitled to priority under 11 U.S.C. § 507(a). Secured claims, claims entitled to priority under 11 U.S.C. § 507(a) and non-opioid related claims should be filed on a Non-Opioid Claimant Proof of Claim (Form 410).

Creditor (also referred to as "You" throughout) shall provide information responsive to the questions set forth below. Instructions and Definitions are provided at the end of this document. You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your claim. Creditor shall supplement its responses if it learns that they are incomplete or incorrect in any material respect.

For Part 3, governmental units that have filed litigation against the Debtor(s) that is part of the federal multidistrict litigation in Ohio, *In re National Opiate Litigation*, MDL No. 17-02804 (N.D. Ohio 2017) ("Ohio MDL"), and have submitted a Government Plaintiff Fact Sheet in connection with that proceeding, may rely on their Government Plaintiff Fact Sheet to complete the questions in Part 3. For the avoidance of doubt, only governmental units who have filed litigation that is part of the Ohio MDL, and not governmental units that are part of the negotiation class in the Ohio MDL but have not otherwise filed litigation that is part of the MDL, may rely on their Government Plaintiff Fact Sheet to complete the questions in Part 3.

**You must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, including the supporting documentation requested herein. **Do not send original documents** as they will not be returned, and they may be destroyed after scanning.

**Fill in all the information about the claim as of September 15, 2019, the Petition Date. You may also fill in information regarding any claims You believe You may have after September 15, 2019 on this form. This form should be completed to the best of Your ability with the information available to You. If You are unable to answer certain questions at this time, the absence of an answer, by itself, will not result in the denial of Your claim, though You may be asked or required to provide additional information at a later date. You may also amend or supplement Your claim after it is filed.**

| **Part 1:** | **Identify the Claim** |
|---|---|

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | Name of the entity to be paid for this claim. |
| | | Other names the creditor used with the Debtor(s): _____ |
| 2. | **Has this claim been acquired from someone else or some other entity?** | ☐ No. <br> ☐ Yes. From whom? _____ |

| | | | |
|---|---|---|---|
| 3. | **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
| | | Name <br><br> Number    Street <br><br> City          State          ZIP Code <br><br> Contact phone _____ <br><br> Contact email _____ | Name <br><br> Number    Street <br><br> City          State          ZIP Code <br><br> Contact phone _____ <br><br> Contact email _____ |

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☐ No. <br> ☐ Yes.  Claim number on court claims registry (if known)_____    Filed on ____ <br> MM / DD / YYYY |
| 5. | **Do You know if anyone else has filed a proof of claim for this claim?** | ☐ No. <br> ☐ Yes. Who made the earlier filing? _____ |

---

**Part 2**   **Attorney Information (Optional)**

| | | |
|---|---|---|
| 6. | **Are you represented by an attorney in this matter?** <br><br> You do not need an attorney to file this form. | ☐ No. <br> ☐ Yes. If yes, please provide the following information: <br><br> _____ <br> Law Firm Name <br><br> _____ <br> Attorney Name <br><br> _____ <br> Address <br><br> _____   _____   _____ <br> City         State         ZIP Code <br><br> Contact phone _____  Contact email _____ |

---

**Part 3**   **Information as of September 15, 2019, the Petition Date, About Your Claim**

7. **When do You allege you were first injured as a result of the Debtors' alleged conduct?**

_____ / _____
Month      Year

☐ If You believe that this question has been answered in the Government Plaintiff Fact Sheet submitted in the Ohio MDL, *In re National Opiate Litigation*, MDL No. 17-02804 (N.D. Ohio 2017) ("Ohio MDL"), and You wish to rely on Your statements made in the Government Plaintiff Fact Sheet to answer this question, check this box.

☐ If You believe that this question has been answered in a complaint that you have filed against the Debtor(s), and You wish to rely on Your statements made in that complaint to answer this question, check this box.

8. **How much is the claim?**

$ _____ ;  or

☐ If You believe that this question has been answered in the Government Plaintiff Fact Sheet submitted in the Ohio MDL, and You wish to rely on Your statements made in the Government Plaintiff Fact Sheet to answer this question, check this box.

☐ If You believe that this question has been answered in a complaint that you have filed against the Debtor(s), and You wish to rely on Your statements made in that complaint to answer this question, check this box.

☐ Unknown.

9. **Describe the citizens and entities that You represent in this claim:**

_____
_____
_____
_____
_____

☐ If You believe that this question has been answered in the Government Plaintiff Fact Sheet submitted in the Ohio MDL, and You wish to rely on Your statements made in the Government Plaintiff Fact Sheet to answer this question, check this box.

☐ If You believe that this question has been answered in a complaint that you have filed against the Debtor(s), and You wish to rely on Your statements made in that complaint to answer this question, check this box.

| | |
|---|---|
| **10.** **Describe the conduct of the Debtors You allege resulted in injury or damages to You.**<br><br>Attach additional sheets if necessary. | _____<br>_____<br>_____<br>_____ |

❑  If You believe that this question has been answered in the Government Plaintiff Fact Sheet submitted in the Ohio MDL, and You wish to rely on Your statements made in the Government Plaintiff Fact Sheet to answer this question, check this box.

❑  If You believe that this question has been answered in a complaint that you have filed against the Debtor(s), and You wish to rely on Your statements made in that complaint to answer this question, check this box.

| | |
|---|---|
| **11.** **Describe all alleged causes of action, sources of damages, legal theories of recovery, etc. that You are asserting against the Debtors.**<br><br>Attach additional sheets if necessary. | _____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____ |

❑  If You believe that this question has been answered in the Government Plaintiff Fact Sheet submitted in the Ohio MDL, and You wish to rely on Your statements made in the Government Plaintiff Fact Sheet to answer this question, check this box.

❑  If You believe that this question has been answered in a complaint that you have filed against the Debtor(s), and You wish to rely on Your statements made in that complaint to answer this question, check this box.

| | |
|---|---|
| **12.** **Based on information reasonably available to You, please identify each category of damages or monetary relief that You allege, and include the amount of damages you assert for each category, if known.**<br><br>Attach additional sheets if necessary. | _____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____ |

❑  If You believe that this question has been answered in the Government Plaintiff Fact Sheet submitted in the Ohio MDL, and You wish to rely on Your statements made in the Government Plaintiff Fact Sheet to answer this question, check this box.

❑  If You believe that this question has been answered in a complaint that you have filed against the Debtor(s), and You wish to rely on Your statements made in that complaint to answer this question, check this box.

| 13. Based on information reasonably available to You, provide the total number of opioid-related overdose deaths of Your residents each year for the later of (i) 2008, or (ii) the date on which the period for which You are seeking damages begins. | Year | Total number of opioid related overdose deaths, if available |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

❑ If You believe that this question has been answered in the Government Plaintiff Fact Sheet submitted in the Ohio MDL, and You wish to rely on Your statements made in the Government Plaintiff Fact Sheet to answer this question, check this box.

❑ If You believe that this question has been answered in a complaint that you have filed against the Debtor(s), and You wish to rely on Your statements made in that complaint to answer this question, check this box.

---

**Part 4:**   **Supporting Documentation**

| 14. Please provide the following supporting documentation if you would like (but You are not required) to supplement this proof of claim. | ■ Provide any documents supporting Your claim, including but not limited to:  any Plaintiff Fact Sheets and accompanying documents submitted in the MDL proceeding in the Northern District of Ohio; any complaint, petition, information, or similar pleading filed in any civil or criminal proceeding involving the Debtors; and any records supporting Your claim for damages. |
|---|---|

❑ In lieu of uploading or resubmitting the Government Plaintiff Fact Sheet that was submitted in the Ohio MDL, the creditor authorizes the Debtors to make the Government Plaintiff Fact Sheet, submitted on _____ in the Ohio MDL, available to Prime Clerk, the Court, and any party who agrees to be bound by the Protective Order to be submitted for entry by the Court for use in connection with this proof of claim and these chapter 11 cases.

❑ In lieu of uploading or submitting the complaint  filed against the Debtor(s), the creditor authorizes the Debtors to make the complaint filed on _____ with caption _____ available to Prime Clerk, the Court, and any party who agrees to be bound by the Protective Order to be submitted for entry by the Court for use in connection with this proof of claim and these chapter 11 cases.

19-23649-rdd   Doc 800-2   Filed 02/03/20   Entered 02/03/20 16:09:09   Exhibit
Governmental Opioid Claimant Proof of Claim   Pg 6 of 8

Case 7:21-cv-07532-CM   Document 157-1   Filed 12/5/21   Page 35 of 302

| Part 5: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____ (mm/dd/yyyy)

_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name _____
        First name              Middle name              Last name

Title _____

Company _____
        Identify the corporate servicer as the company if the authorized agent is a servicer.

Address _____
        Number        Street

        _____
        City                              State    ZIP Code

# Instructions for Governmental Opioid Proof of Claim Form

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the bankruptcy case was filed, September 15, 2019. You may also fill in information regarding any claims You believe You may have after September 15, 2019 on this form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**

  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because they will not be returned and may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

- **Each question in this proof of claim form should be construed independently, unless otherwise noted. No question should be construed by reference to any other question if the result is a limitation of the scope of the answer to such question.**

- **The questions herein do not seek the discovery of information protected by the attorney-client privilege.**

- **The words "and" and "or" should be construed as necessary to bring within the scope of the request all responses and information that might otherwise be construed to be outside its scope.**

- **After reviewing this form and any supporting documentation submitted with this form, additional information and documentation may be requested.**

- **Purdue Pharma (Canada) is not a debtor in this case. If Your claim is against only Purdue Pharma (Canada), You do not have a claim in this case and should not file and submit this form.**

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at PurduePharmaClaims.com.

## Understand the terms used in this form

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**A.33**

19-23649-rdd   Doc 800-2   Filed 02/03/20   Entered 02/03/20 16:09:09   Exhibit
Governmental Opioid Claimant Proof of Claim   Pg 8 of 8

Case 7:21-cv-07532-CM   Document 127-1   Filed 02/15/21   Page 37 of 302

**Opioid Task Force:** Any group organized for the purpose of studying, evaluating, reporting about, investigating, making recommendations concerning, or otherwise considering the existence, origins, causes, responsible entities, effects, remedies, corrective measures for, or ways of combating the abuse, misuse, or addiction to opioids in Your geographical boundaries.

**Prescription Opioids:** FDA-approved pain-reducing medications consisting of natural, synthetic, or semisynthetic chemicals that bind to opioid receptors in a patient's brain or body to produce an analgesic effect, for the manufacture and sale of which You seek to hold the Debtors liable.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Purdue Opioid** means all natural, semi-synthetic or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II or III drugs pursuant to the federal Controlled Substances Act, produced, marketed or sold by the Debtors as (i) the following **Brand Name Medications:** OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, and OxyFast®, and (ii) the following **Generic Medications:** oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®). The term "Purdue Opioid(s)" shall not mean: (i) medications and other substances to treat opioid or other substance use disorders, abuse, addiction or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of opioids or opioid products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) opioids listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

**If by first class mail:**
Purdue Pharma Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

**If by overnight courier or hand delivery:**
Purdue Pharma Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

**You may also file your claim electronically at
PurduePharmaClaims.com via the link entitled "Submit a
Claim."**

---

**Do not file these instructions with your form**

**A.34**

Case 7:21-cv-07532-CM   Document 157-1   Filed 11/15/21   Page 38 of 302

# EXHIBIT 3

## Personal Injury Claimant Proof of Claim
Form

**A.35**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors. | **(Jointly Administered)** |

# Personal Injury Claimant Proof of Claim Form
## (Including Parents and Guardians)

You may file your claim electronically at **PurduePharmaClaims.com** via the link entitled "Submit a Claim."

For questions regarding this Proof of Claim Form, please call Prime Clerk at (844) 217-0912 or visit **PurduePharmaClaims.com**.

Read the instructions at the end of this document before filling out this form. This form is for individuals to assert an unsecured claim against the Debtors seeking damages based on actual or potential future personal injury to the claimant or another (for example, deceased, incapacitated, or minor family member) related to the taking of a Purdue Opioid and/or the taking of another opioid for which You believe Purdue is responsible for Your damages.

**Do not** use this form to assert only a non-personal injury claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue Opioids. File such claims on a General Opioid Claimant Proof of Claim Form. However, if You have a claim against the Debtors based on or involving the production, marketing and sale of opioids, in addition to Your claim based on personal injury, You may include information related to that claim on the Personal Injury Claimant Proof of Claim Form by completing Part 5 of this form.

**Do not** use this form to assert any other pre-petition claims, including secured claims or claims entitled to priority under 11 U.S.C. § 507(a). Secured claims, claims entitled to priority under 11 U.S.C. § 507(a) and non-opioid related claims should be filed on a Non-Opioid Claimant Proof of Claim Form (Form 410).

Creditor (also referred to as "You" throughout) shall provide information responsive to the questions set forth below. Creditors may include parents, foster parents, and guardians submitting claims on behalf of minors with Neonatal Abstinence Syndrome ("NAS"). Instructions and definitions are provided at the end of this document. You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your claim. You shall supplement Your responses if You learn that they are incomplete or incorrect in any material respect.

Personal Injury Claimant Proof of Claim Forms and any supporting documentation submitted with the form shall remain highly confidential and shall not be made available to the public. For the avoidance of doubt, all pages of the Personal Injury Claimant Proof of Claim Form and supporting documentation shall be treated as highly confidential and made available only to the Court and to those that agree to be bound by the Protective Order.

**Fill in all the information about the claim as of September 15, 2019, the Petition Date. You may also fill in information regarding any claims You believe You may have after September 15, 2019 on this form. This form should be completed to the best of Your ability with the information available to You. If You are unable to answer certain questions at this time, the absence of an answer, by itself, will not result in the denial of Your claim, though You may be asked or required to provide additional information at a later date. You may also amend or supplement Your claim after it is filed.**

Please note that supporting documentation is requested in certain portions of the form. Please provide the requested information to the best of Your ability. At Your discretion, You may also provide additional information to supplement Your claim in any manner available to You.

**Do not** send original documents, as they will not be returned, and they may be destroyed after scanning.

| | |
|---|---|
| **Part 1:** | **Identify the Claim** |

**1. Who is the creditor?**

Name of the individual to be paid for this claim. If the creditor is a minor (under 18), please provide only the minor's initials.

_____

Other names the creditor used with the debtor, including maiden or other names used:

_____

If Your claim is based on personal injury to another (for example, a deceased, incapacitated, or minor family member), please provide the name of that other person (that is, the injured person). If the injured person is a minor (under 18), please provide only the minor's initials:

_____

If You are submitting a claim on behalf of another person, please provide Your name and relationship to that person:

_____

If you are submitting a claim on behalf of a minor, are You the Legal Guardian?

☐ No          ☐ Yes

**A.36**

19-23649-rdd    Doc 800-3    Filed 02/03/20    Entered 02/03/20 16:09:09    Exhibit
Personal Injury Claimant Proof of Claim    Pg 3 of 8
Case 7:21-cv-07532-CM    Document 157-1    Filed 11/15/21    Page 40 of 302

| 2. | **What is the year of birth, gender, and last 4 digits of the social security number of the creditor (or injured person, if the claim is based on the personal injury of another)?** | Year of Birth: _____<br><br>Gender:  ☐ Male    ☐ Female<br><br>Last 4 Digits of Social Security Number (if available):  XXX-XX-_____  _____  _____  _____ |

| 3. | **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|
| | | Name _____ | Name _____ |
| | | Number    Street | Number    Street |
| | | City          State          ZIP Code | City          State          ZIP Code |
| | | Contact phone _____ | Contact phone _____ |
| | | Contact email _____ | Contact email _____ |

| 4. | **Does this claim amend one already filed?** | ☐ No.<br>☐ Yes. Claim number on court claims registry (if known)_____     Filed on _____<br>MM  /  DD  /  YYYY |
|---|---|---|

| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☐ No.<br>☐ Yes. Who made the earlier filing? _____ |
|---|---|---|

| **Part 2:** | **Attorney Information (Optional)** |
|---|---|

| 6. | **Are You represented by an attorney in this matter?**<br><br>You do not need an attorney to file this form. | ☐ No.<br>☐ Yes. If yes, please provide the following information:<br><br>_____<br>Law Firm Name<br><br>_____<br>Attorney Name<br><br>_____<br>Address<br><br>City                    State                    ZIP Code<br><br>Contact phone _____    Contact email _____ |
|---|---|---|

| **Part 3:** | **Information as of September 15, 2019, the Petition Date, About Your Claim** |
|---|---|

| 7. | **How much is the claim?** | $ _____ or<br>☐    Unknown. |
|---|---|---|

| 8. | **Select all that apply to You.** | ☐    Creditor has been injured by use of an opioid.<br><br>☐    Although Creditor is not currently aware of any injury, Creditor wants to file now to keep the ability to seek payment if Creditor has a future injury or harm due to use of an opioid.<br><br>☐    Creditor has a claim arising out of another person's use of an opioid. ***Please answer all questions in Part 4 as if that person (the injured person) is filling out the form.***<br><br>☐    Creditor is submitting a claim on behalf of a minor with NAS.  ***Please answer all questions in Part 4 as if the birth mother of the minor is filling out the form (to the extent such information is available to You).*** |
|---|---|---|

**A.37**

19-23649-rdd    Doc 800-3    Filed 02/03/20    Entered 02/03/20 16:09:09    Exhibit
Personal Injury Claimant Proof of Claim    Pg 4 of 8

Case 7:21-cv-07532-CM    Document 157-1    Filed 12/15/21    Page 41 of 302

**9.** **Briefly describe the type of injury alleged from Your use or another person's use of an opioid. Select all that apply.**

Attach additional sheets if necessary.

❑  Death

❑  Overdose

❑  Addiction/Dependence/Substance Use Disorder

❑  Lost Wages/Earning Capacity

❑  Loss of Consortium

❑  NAS-related

    ❑  Learning Disability

    ❑  Spina Bifida

    ❑  Developmental Disability

    ❑  Heart Defects

    ❑  Congenital Defects or Malformations

❑  Expenses for Treatment

❑  Other (describe): _____

_____

_____

---

**10.** **Describe the basis for Your claim, including all alleged causes of action, sources of damages, etc., You are asserting against the Debtors.**

Attach additional sheets if necessary.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

**11.** **Please identify and quantify each category of damages or monetary relief that You allege, including all injunctive relief that You seek. Check as many boxes as are applicable.**

❑  Compensatory:  $_____    or    ❑  Unknown

(for example, lost wages, pain and suffering, expenses not reimbursed, loss of consortium, etc.)

Punitive:  $_____    or    ❑  Unknown

❑  Other (describe): _____

_____

**A.38**

| 12. Have You ever filed a lawsuit against any of the Debtors at any time? | ☐ No |
|---|---|
| | ☐ Yes. If yes, please provide the following information and attach supporting documentation: |

Case Caption: _____

Court and Case/Docket Number: _____

Attorney Information:

Law Firm Name

Attorney Name

Address

City                    State                    ZIP Code

Contact phone _____    Contact email _____

---

**Part 4:**    **Information About Opioid Use**
If You have a claim arising out of another person's use of an opioid, please answer these questions as if the injured person is filling out the form. If You are submitting a claim on behalf of a minor with NAS, please answer these questions as if the birth mother of the minor is filling out the form (to the extent such information is available to You).

| 13. Were You <u>prescribed or administered</u> a Purdue brand name opioid by a healthcare professional? | ☐ Unknown (select if You were prescribed a prescription opioid but do not know the specific medication). |
|---|---|
| | ☐ No. |
| | ☐ Yes. If yes, please provide the following information to the extent reasonably available: |
| | **Please identify the Purdue brand name opioid(s) that You were prescribed or administered by a healthcare professional. Check as many medications as applicable.** |

| | |
|---|---|
| ☐ Butrans® | ☐ OxyContin® |
| ☐ DHC Plus® | ☐ OxyFast® |
| ☐ Dilaudid® | ☐ OxyIR® |
| ☐ Hysingla ER® | ☐ Palladone® |
| ☐ MS Contin® | ☐ Ryzolt® |
| ☐ MSIR® | |

| 14. Were You ever <u>prescribed or administered</u> *any* opioid (other than a Purdue brand name opioid) by a healthcare professional? | ☐ Unknown (select if You were prescribed a prescription opioid but do not know the specific medication). |
|---|---|
| | ☐ No. |
| | ☐ Yes. If yes, please provide the following information to the extent reasonably available: |
| | Brand Name Opioid, if known: _____ |
| | **Please identify the generic opioid(s) that You were prescribed or administered by a healthcare professional. Check as many medications as applicable.** |

| | |
|---|---|
| ☐ Buprenorphine transdermal system | ☐ Oxycodone extended-release tablets |
| ☐ Hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®) | ☐ Oxycodone immediate-release tablets |
| ☐ Hydromorphone immediate-release tablets | ☐ Oxycodone and acetaminophen tablets (generic to Percocet®) |
| ☐ Hydromorphone oral solution | ☐ Tramadol extended-release tablets |
| ☐ Morphine extended-release tablets | |
| ☐ Other Generic: _____ | |

**A.39**

| Part 5: | Other (Non-Personal Injury) Opioid-Related Claims |
|---|---|

**15. Do You believe You have any other claims based on or involving the Debtors' production, marketing and sale of Purdue Opioids that are not based on a personal injury?**

☐ No.

☐ Yes. If yes, please describe the nature of the claim(s) (Attach additional sheets if necessary).

_____

_____

_____

_____

_____

_____

**16. How much is the claim?**

$ _____  or

☐   Unknown.

| Part 6: | Supporting Documentation |
|---|---|

**17. Please provide the following supporting documentation if You would like (but You are not required) to supplement this proof of claim.**

■   Provide any documents supporting Your claim, including but not limited to:  any complaint that You have filed against the Debtor(s), prescriptions, pharmacy records or statements showing prescriptions, or any records supporting Your claims of damages.

| Part 7: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐   I am the creditor.

☐   I am the creditor's attorney, guardian, kinship (or other authorized) caretaker, executor, or authorized agent.

☐   Other (describe): _____

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____(mm/dd/yyyy)

_____
                Signature
**Print the name of the person who is completing and signing this claim:**

Name          _____
               First name          Middle name          Last name

Title          _____

Company        _____

Address        _____
               Number          Street

               _____
               City                    State     ZIP Code

Contact phone  _____       Email _____

**A.40**

# Instructions for Personal Injury Claimant Proof of Claim Form

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

## How to fill out this form

- **Fill in all of the information about the claim as of the date the bankruptcy case was filed, September 15, 2019. You may also fill in information regarding any claims You believe You may have after September 15, 2019 on this form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any available supporting documents to this form.** Attach copies of any documents that show that the debt exists, a lien secures the debt, or both.

  Also attach copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because they will not be returned and may be destroyed after scanning.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **A parent, foster parent, or guardian may complete this form on behalf of a minor child if there is reason to believe that the birth mother may have taken opioid products.**

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

- **Each question in this proof of claim form should be construed independently, unless otherwise noted.  No question should be construed by reference to any other question if the result is a limitation of the scope of the answer to such question.**

- **The questions herein do not seek the discovery of information protected by the attorney-client privilege.**

- **The words "and" and "or" should be construed as necessary to bring within the scope of the request all responses and information that might otherwise be construed to be outside its scope.**

- **After reviewing this form and any supporting documentation submitted with this form, additional information and documentation may be requested.**

- **Purdue Pharma (Canada) is not a debtor in this case. If Your claim is against only Purdue Pharma (Canada), You do not have a claim in this case and should not file and submit this form.**

## Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may also call Prime Clerk at (844) 217-0912, send an inquiry to purduepharmainfo@primeclerk.com, or submit an inquiry or live chat with Prime Clerk through the case website at PurduePharmaClaims.com.

## Understand the terms used in this form

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth.

**A.41**

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Purdue Opioid** means all natural, semi-synthetic or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II or III drugs pursuant to the federal Controlled Substances Act, produced, marketed or sold by the Debtors as (i) the following **Brand Name Medications:** OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, and OxyFast®, and (ii) the following **Generic Medications:** oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®).  The term "Purdue Opioid(s)" shall not mean: (i) medications and other substances to treat opioid or other substance use disorders, abuse, addiction or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of opioids or opioid products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) opioids listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

**If by first class mail:**
Purdue Pharma Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

**If by overnight courier or hand delivery:**
Purdue Pharma Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

**You may also file your claim electronically at PurduePharmaClaims.com via the link entitled "Submit a Claim."**

---

| **Do not file these instructions with your form** |
| --- |

**A.42**

**EXHIBIT 4**

**General Opioid Claimant Proof of Claim
Form**

**A.43**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors. | **(Jointly Administered)** |

# General Opioid Claimant Proof of Claim Form

You may file your claim electronically at **PurduePharmaClaims.com** via the link entitled "Submit a Claim."

For questions regarding this Proof of Claim Form, please call Prime Clerk at (844) 217-0912 or visit **PurduePharmaClaims.com**.

Read the instructions at the end of this document before filling out this form. This form is for any person or entity, other than a governmental unit or Native American Tribe, to assert a general unsecured claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue Opioids, excluding claims for personal injury.

**Do not** use this form to assert a claim against the Debtors seeking damages based on personal injury related to the taking of a Purdue Opioid and/or the taking of another opioid for which You believe Purdue is responsible for Your damages.  File such claims on a Personal Injury Claimant Proof of Claim Form.

**Do not** use this form to assert any other pre-petition claims, including secured claims or claims entitled to priority under 11 U.S.C. § 507(a). Secured claims, claims entitled to priority under 11 U.S.C. § 507(a), and non-opioid related claims should be filed on a Non-Opioid Claimant Proof of Claim Form (Form 410).  However, if You have a claim against the Debtors based on non-opioid-related injuries or harm, in addition to Your claim based on or involving the Debtors' production, marketing and sale of Purdue Opioids, You may include information related to that claim on the General Opioid Claimant Proof of Claim Form by completing Part 4 of this form.

Creditor (also referred to as "You" throughout) shall provide information responsive to the questions set forth below. Instructions and Definitions are provided at the end of this document. You shall provide information reasonably available to You and are not excused from providing the requested information for failure to appropriately investigate Your claim. Creditor shall supplement its responses if it learns that they are incomplete or incorrect in any material respect.

**You must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim. **Do not send original documents** as they will not be returned, and they may be destroyed after scanning.

Fill in all the information about the claim as of September 15, 2019, the Petition Date.  You may also fill in information regarding any claims You believe You may have after September 15, 2019 on this form.  This form should be completed to the best of Your ability with the information available to You.  If You are unable to answer certain questions at this time, the absence of an answer, by itself, will not result in the denial of Your claim, though You may be asked or required to provide additional information at a later date.  You may also amend or supplement Your claim after it is filed.

## Part 1:  Identify the Claim

| | | | |
|---|---|---|---|
| 1. | **Who is the current creditor?** | Name of the individual or entity to be paid for this claim. If the creditor is a minor (under 18), please provide only the minor's initials. _____ <br><br> Other names the creditor used with the debtor, including maiden, d/b/a/, or other names used: _____ | |
| 2. | **Describe the creditor making the claim.** | ❑ Individual      ❑ Retirement or Pension Fund Administrator <br> ❑ Hospital      ❑ Pharmacy Benefit Manager <br> ❑ Third Party Payor      ❑ Other (describe): _____ | |
| 3. | **Has this claim been acquired from someone else or some other entity?** | ❑ No <br> ❑ Yes. From whom? _____ | |
| 4. | **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Name _____ <br><br> Number    Street _____ <br><br> City      State      ZIP Code <br><br> Contact phone _____ <br> Contact email _____ | **Where should payments to the creditor be sent?** (if different) <br><br> Name _____ <br><br> Number    Street _____ <br><br> City      State      ZIP Code <br><br> Contact phone _____ <br> Contact email _____ |

| 5. | **Does this claim amend one already filed?** | ☐ No<br>☐ Yes.  Claim number on court claims registry (if known)_____ | Filed on _____<br>MM / DD / YYYY |
| 6. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☐ No<br>☐ Yes. Who made the earlier filing? _____ | |

---

| **Part 2:** | **Attorney Information (Optional)** |
| --- | --- |

| 7. | **Are you represented by an attorney in this matter?**<br><br>You do not need an attorney to file this form. | ☐ No.<br>☐ Yes. If yes, please provide the following information:<br><br>_____<br>Law Firm Name<br><br>_____<br>Attorney Name<br><br>_____<br>Address<br><br>_____<br>City                          State                          ZIP Code<br><br>Contact phone _____ Contact email _____ |

---

| **Part 3:** | **Information as of September 15, 2019, the Petition Date, About Your Claim** |
| --- | --- |

| 8. | **Do you have any number you use to identify the debtor?** | ☐ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |
| 9. | **How much is the claim?** | $ _____ or<br>☐ Unknown. |
| 10. | **When do You allege You were first injured as a result of the Debtors' alleged conduct?** | _____ / _____<br>Month          Year |
| 11. | **Describe the conduct of the Debtors You allege resulted in injury or damages to You.**<br><br>Attach additional sheets if necessary. | _____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____ |

**A.45**

Case 7:21-cv-07532-CM   Document 127-1   Filed 12/15/21   Page 49 of 302
19-23649-rdd   Doc 800-4   Filed 02/03/20   Entered 02/03/20 16:09:09   Exhibit
General Opioid Claimant Proof of Claim    Pg 4 of 7

**12. Describe all alleged causes of action, sources of damages, legal theories of recovery, etc. that You are asserting against the Debtors.**

Attach additional sheets if necessary.

_____

_____

_____

_____

_____

_____

_____

_____

_____

**13. Please identify and quantify each category of damages or monetary relief that You allege, including all injunctive relief that You seek (for example, actual damages, compensatory damages, punitive damages, and/or penalty damages).**

Please attach all supporting documentation including, but not limited to, any records supporting Your claims of damages, if You would like (but You are not required), to supplement this proof of claim. Do not include medical records.

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**14. Have you ever filed a lawsuit against any of the Debtors at any time?**

☐ No

☐ Yes. If yes, please provide the following information and attach supporting documentation:

Case Caption: _____

Court and Case/Docket Number: _____

Attorney Information:

_____
Law Firm Name

_____
Attorney Name

_____
Address

_____
City                              State                         ZIP Code

Contact phone _____   Contact email _____

**A.46**

| Part 4: | Non-Opioid-Related Claims |
|---|---|

**15. Do You believe You have any claims against the Debtors based on <u>non-opioid-related</u> claims or harm?**

❑ No.

❑ Yes. If yes, please describe the nature of the claim(s) (Attach additional sheets if necessary).

_____

_____

_____

_____

_____

**16. How much is the claim?**

$ _____ or

❑ Unknown.

| Part 5: | Sign Below |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

❑ I am the creditor.

❑ I am the creditor's attorney or authorized agent.

❑ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

❑ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____ (mm/dd/yyyy)

_____
Signature

**Print the name of the person who is completing and signing this claim:**

Name _____
First name          Middle name          Last name

Title _____

Company _____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address _____
Number          Street

_____
City                              State     ZIP Code

**A.47**

Case 7:21-cv-07532-CM    Document 127-1    Filed 12/15/21    Page 51 of 302

# Instructions for General Opioid Proof of Claim Form

These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.

> **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
> 18 U.S.C. §§ 152, 157 and 3571.

### How to fill out this form

- **Fill in all of the information about the claim as of the date the bankruptcy case was filed, September 15, 2019.  You may also fill in information regarding any claims You believe You may have after September 15, 2019 on this form.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**

  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because they will not be returned and may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

- Each question in this proof of claim form should be construed independently, unless otherwise noted.  No question should be construed by reference to any other question if the result is a limitation of the scope of the answer to such question.

- The questions herein do not seek the discovery of information protected by the attorney-client privilege.

- The words "and" and "or" should be construed as necessary to bring within the scope of the request all responses and information that might otherwise be construed to be outside its scope.

- After reviewing this form and any supporting documentation submitted with this form, additional information and documentation may be requested.

- **Purdue Pharma (Canada) is not a debtor in this case. If Your claim is against only Purdue Pharma (Canada), You do not have a claim in this case and should not file and submit this form.**

### Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at [PurduePharmaClaims.com.](PurduePharmaClaims.com)

### Understand the terms used in this form

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**A.48**

19-23649-rdd   Doc 800-4   Filed 02/03/20   Entered 02/03/20 16:09:09   Exhibit
General Opioid Claimant Proof of Claim    Pg 7 of 7

Case 7:21-cv-07532-CM   Document 127-1   Filed 04/15/21   Page 52 of 302

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Purdue Opioid** means all natural, semi-synthetic or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II or III drugs pursuant to the federal Controlled Substances Act, produced, marketed or sold by the Debtors as (i) the following **Brand Name Medications:** OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, and OxyFast®, and (ii) the following **Generic Medications:** oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®).  The term "Purdue Opioid(s)" shall not mean: (i) medications and other substances to treat opioid or other substance use disorders, abuse, addiction or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of opioids or opioid products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) opioids listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

**If by first class mail:**
Purdue Pharma Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

**If by overnight courier or hand delivery:**
Purdue Pharma Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

**You may also file your claim electronically at PurduePharmaClaims.com via the link entitled "Submit a Claim."**

---

**Do not file these instructions with your form**

# EXHIBIT 5

## Non-Opioid Claimant Proof of Claim
## Form

# UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

| **Fill in this information to identify the case (Select only one Debtor per claim form):** | | |
|---|---|---|
| ☐ Purdue Pharma L.P. (Case No. 19-23649) | ☐ Seven Seas Hill Corp. (Case No. 19-23656) | ☐ Paul Land Inc. (Case No. 19-23664) |
| ☐ Purdue Pharma Inc. (Case No. 19-23648) | ☐ Ophir Green Corp. (Case No. 19-23657) | ☐ Quidnick Land L.P. (Case No. 19-23665) |
| ☐ Purdue Transdermal Technologies L.P.(Case No. 19-23650) | ☐ Purdue Pharma of Puerto Rico (Case No. 19-23658) | ☐ Rhodes Associates L.P. (Case No. 19-23666) |
| ☐ Purdue Pharma Manufacturing L.P. (Case No. 19-23651) | ☐ Avrio Health L.P. (Case No. 19-23659) | ☐ Rhodes Pharmaceuticals L.P. (Case No. 19-23667) |
| ☐ Purdue Pharmaceuticals L.P. (Case No. 19-23652) | ☐ Purdue Pharmaceutical Products L.P. (Case No. 19-23660) | ☐ Rhodes Technologies (Case No. 19-23668) |
| ☐ Imbrium Therapeutics L.P. (Case No. 19-23653) | ☐ Purdue Neuroscience Company (Case No. 19-23661) | ☐ UDF LP (Case No. 19-23669) |
| ☐ Adlon Therapeutics L.P. (Case No. 19-23654) | ☐ Nayatt Cove Lifescience Inc. (Case No. 19-23662) | ☐ SVC Pharma LP (Case No. 19-23670) |
| ☐ Greenfield BioVentures L.P. (Case No. 19-23655) | ☐ Button Land L.P. (Case No. 19-23663) | ☐ SVC Pharma Inc. (Case No. 19-23671) |

## Modified Form 410
# Non-Opioid Claimant Proof of Claim Form                                04/19

**You may file your claim electronically at PurduePharmaClaims.com via the link entitled "Submit a Claim."**

**For questions regarding this Proof of Claim Form, please call Prime Clerk at (844) 217-0912 or visit PurduePharmaClaims.com.**

Read the instructions at the end of this document before filling out this form. This form is for making a claim for payment in a bankruptcy case.

**Do not** use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

**Do not** use this form to assert a claim against the Debtors based on or involving opioids or their production, marketing and sale, including without limitation, the Debtors' production, marketing and sale of Purdue Opioids, or if you are seeking damages based on personal injury as a result of taking a Purdue Opioid. File such claims on either a General Opioid Claimant Proof of Claim Form, a Personal Injury Claimant Proof of Claim Form, or a Governmental Opioid Claimant Proof of Claim Form, as applicable.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not** send original documents as they will not be returned, and they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of September 15, 2019.**

| **Part 1:** | **Identify the Claim** |
|---|---|

| 1. Who is the current creditor? | |
|---|---|
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor |

| 2. Has this claim been acquired from someone else? | ☐ No ☐ Yes. From whom? |
|---|---|

| 3. Where should notices and payments to the creditor be sent? Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|---|
| | Name | Name |
| | Number        Street | Number        Street |
| | City        State        ZIP Code | City        State        ZIP Code |
| | Contact phone | Contact phone |
| | Contact email | Contact email |

| | |
|---|---|
| **4. Does this claim amend one already filed?** | ☐ No<br>☐ Yes.  Claim number on court claims registry (if known)_____    Filed on _____<br><div align="right">MM  / DD / YYYY</div> |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☐ No<br>☐ Yes. Who made the earlier filing? _____ |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed (September 15, 2019)**

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☐ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  _____  _____  _____  _____ |
| **7. How much is the claim?** | $_____ . **Does this amount include interest or other charges?**<br>☐ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| **8. What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as health care information.<br>_____ |
| **9. Is all or part of the claim secured?** | ☐ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**                       $_____<br><br>**Amount of the claim that is secured:**       $_____<br><br>**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**  $_____<br><br>**Annual Interest Rate** (when case was filed)_____%<br>☐ Fixed<br>☐ Variable |
| **10. Is this claim based on a lease?** | ☐ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____ |

| 11. **Is this claim subject to a right of setoff?** | ☐ No |
| | ☐ Yes. Identify the property: _____ |

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | |
| | ☐ Yes. *Check one:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(   ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ☐ No | |
| | ☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim.** | $_____ |

## Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____ (mm/dd/yyyy)

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | _____ |
| | First name              Middle name              Last name |
| Title | _____ |
| Company | _____ |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | _____ |
| | Number          Street |
| | _____ |
| | City                          State        ZIP Code |
| Contact phone | _____          Email _____ |

# Instructions for Non-Opioid Claimant Proof of Claim Form

United States Bankruptcy Court                                                                    12/15

**These instructions and definitions generally explain the law. In certain circumstances, such as bankruptcy cases that debtors do not file voluntarily, exceptions to these general rules may apply. You should consider obtaining the advice of an attorney, especially if you are unfamiliar with the bankruptcy process and privacy regulations.**

> A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
> 18 U.S.C. §§ 152, 157 and 3571.

### How to fill out this form

- **Fill in all of the information about the claim as of the date the bankruptcy case was filed, September 15, 2019.**

- **Check the box for the debtor against whom you are filing a claim.**

- **If the claim has been acquired from someone else, then state the identity of the last party** who owned the claim or was the holder of the claim and who transferred it to you before the initial claim was filed.

- **Attach any supporting documents to this form.**

  Attach redacted copies of any documents that show that the debt exists, a lien secures the debt, or both. (See the definition of *redaction* on the next page.)

  Also attach redacted copies of any documents that show perfection of any security interest or any assignments or transfers of the debt. In addition to the documents, a summary may be added. Federal Rule of Bankruptcy Procedure (called "Bankruptcy Rule") 3001(c) and (d).

- **Do not attach original documents because they will not be returned and may be destroyed after scanning.**

- **If the claim is based on delivering health care goods or services, do not disclose confidential health care information. Leave out or redact confidential information both in the claim and in the attached documents.**

- **A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, individual's tax identification number, or financial account number, and only the year of any person's date of birth.** See Bankruptcy Rule 9037.

- **For a minor child, fill in only the child's initials and the full name and address of the child's parent or guardian.** For example, write *A.B., a minor child* (*John Doe, parent, 123 Main St., City, State*). See Bankruptcy Rule 9037.

### Confirmation that the claim has been filed

To receive confirmation that the claim has been filed, enclose a stamped self-addressed envelope and a copy of this form. You may view a list of filed claims in this case by visiting the Claims and Noticing Agent's website at PurduePharmaClaims.com.

### Understand the terms used in this form

**Administrative expense:** Generally, an expense that arises after a bankruptcy case is filed in connection with operating, liquidating, or distributing the bankruptcy estate. 11 U.S.C. § 503.

**Claim:** A creditor's right to receive payment for a debt that the debtor owed on the date the debtor filed for bankruptcy. 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Claim Pursuant to 11 U.S.C. § 503(b)(9):** A claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of the Debtor's business. Attach documentation supporting such claim.

**Creditor:** A person, corporation, or other entity to whom a debtor owes a debt that was incurred on or before the date the debtor filed for bankruptcy. 11 U.S.C. § 101 (10).

**Debtor:** A person, corporation, or other entity who is in bankruptcy. Use the debtor's name and case number as shown in the bankruptcy notice you received. 11 U.S.C. § 101 (13).

**A.54**

**Evidence of perfection:** Evidence of perfection of a security interest may include documents showing that a security interest has been filed or recorded, such as a mortgage, lien, certificate of title, or financing statement.

**Information that is entitled to privacy:** A *Proof of Claim* form and any attached documents must show only the last 4 digits of any social security number, an individual's tax identification number, or a financial account number, only the initials of a minor's name, and only the year of any person's date of birth. If a claim is based on delivering health care goods or services, limit the disclosure of the goods or services to avoid embarrassment or disclosure of confidential health care information. You may later be required to give more information if the trustee or someone else in interest objects to the claim.

**Priority claim:** A claim within a category of unsecured claims that is entitled to priority under 11 U.S.C. § 507(a). These claims are paid from the available money or property in a bankruptcy case before other unsecured claims are paid. Common priority unsecured claims include alimony, child support, taxes, and certain unpaid wages.

**Proof of claim:** A form that shows the amount of debt the debtor owed to a creditor on the date of the bankruptcy filing. The form must be filed in the district where the case is pending.

**Purdue Opioid** means all natural, semi-synthetic or synthetic chemicals that interact with opioid receptors on nerve cells in the body and brain, and that are approved by the U.S. Food & Drug Administration (FDA) and listed by the DEA as Schedule II or III drugs pursuant to the federal Controlled Substances Act, produced, marketed or sold by the Debtors as (i) the following **Brand Name Medications:** OxyContin®, Hysingla ER®, Butrans®, Dilaudid®, Ryzolt, MS Contin®, MSIR®, Palladone®, DHC Plus®, OxyIR®, and OxyFast®, and (ii) the following **Generic Medications:** oxycodone extended-release tablets, buprenorphine transdermal system, hydromorphone immediate-release tablets, hydromorphone oral solution, tramadol extended-release tablets, morphine extended-release tablets, oxycodone immediate-release tablets, oxycodone and acetaminophen tablets (generic to Percocet®), hydrocodone and acetaminophen tablets (generic to Vicodin® or Norco®).  The term "Purdue Opioid(s)" shall not mean: (i) medications and other substances to treat opioid or other substance use disorders, abuse, addiction or overdose; (ii) raw materials and/or immediate precursors used in the manufacture or study of opioids or opioid products, but only when such materials and/or immediate precursors are sold or marketed exclusively to DEA-licensed manufacturers or DEA-licensed researchers; or (iii) opioids listed by the DEA as Schedule IV drugs pursuant to the federal Controlled Substances Act.

**Redaction of information:** Masking, editing out, or deleting certain information to protect privacy. Filers must redact or leave out information entitled to **privacy** on the *Proof of Claim* form and any attached documents.

**Secured claim under 11 U.S.C. § 506(a):** A claim backed by a lien on particular property of the debtor. A claim is secured to the extent that a creditor has the right to be paid from the property before other creditors are paid. The amount of a secured claim usually cannot be more than the value of the particular property on which the creditor has a lien. Any amount owed to a creditor that is more than the value of the property normally may be an unsecured claim. But exceptions exist; for example, see 11 U.S.C. § 1322(b) and the final sentence of § 1325(a).

Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment may be a lien.

**Setoff:** Occurs when a creditor pays itself with money belonging to the debtor that it is holding, or by canceling a debt it owes to the debtor.

**Unsecured claim:** A claim that does not meet the requirements of a secured claim. A claim may be unsecured in part to the extent that the amount of the claim is more than the value of the property on which a creditor has a lien.

## Offers to purchase a claim

Certain entities purchase claims for an amount that is less than the face value of the claims. These entities may contact creditors offering to purchase their claims. Some written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court, the bankruptcy trustee, or the debtor. A creditor has no obligation to sell its claim. However, if a creditor decides to sell its claim, any transfer of that claim is subject to Bankruptcy Rule 3001(e), any provisions of the Bankruptcy Code (11 U.S.C. § 101 et seq.) that apply, and any orders of the bankruptcy court that apply.

## Please send completed Proof(s) of Claim to:

**If by first class mail:**
Purdue Pharma Claims Processing Center
c/o Prime Clerk LLC
Grand Central Station, PO Box 4850
New York, NY 10163-4850

**If by overnight courier or hand delivery:**
Purdue Pharma Claims Processing Center
c/o Prime Clerk LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

**You may also file your claim electronically at**
**PurduePharmaClaims.com** **via the link entitled "Submit a**
**Claim."**

| Do not file these instructions with your form |
| --- |

**A.55**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.,* | Case No. 19-23649 (RDD) |
| Debtors.[1] | (Jointly Administered) |

## ORDER APPOINTING MEDIATORS

Upon the unopposed motion (the "**Motion**") of Purdue Pharma L.P. ("**PPLP**") and its affiliates that are debtors and debtors in possession in these cases (collectively, the "**Debtors**," the "**Company**," or "**Purdue**"), for entry of an order (this "**Order**") directing the appointment of the Honorable Layn Phillips and Mr. Kenneth Feinberg as co-mediators and requiring that the Mediation Parties (defined herein) attend and participate in good faith in mediation, which will involve the mediation of the issue(s) defined herein, pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012 (Preska, C.J.),[2] as a core matter under 28 U.S.C. § 157(b)(1) that this Court may decide by a final order consistent with Article III of the United States Constitution; and this Court having found that venue in this district is proper pursuant to 28 U.S.C. § 157(b); and it appearing that the relief requested is in the best interests of the

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

[2] Capitalized terms not defined herein shall have the same meaning ascribed to them in the Motion.

Debtors, their estates, and creditors; and that adequate notice has been given and that no further notice is necessary; and after due deliberation, and good and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      The Court authorizes and appoints the Honorable Layn Phillips and Mr. Kenneth Feinberg, working together on the same terms (both economic and non-economic), to serve as co-mediators in these chapter 11 cases (each a "**Mediator**," and together, the "**Mediators**") and to conduct the mediation as set forth herein. The Mediators will be compensated at a rate of $500,000 per month each. The Mediators, upon agreement between them, shall be entitled to retain, in their sole discretion, financial, public health or other professionals or consultants to assist them; *provided however* that the aggregate cost of all such financial or other professionals or consultants so retained shall not exceed $250,000 without further order of this Court.

3.      The Mediators are authorized to mediate the dispute(s) between the Non-Federal Public Claimants, on the one hand, and the Private Claimants,[3] on the other, as to the allocation of value/proceeds available from the Debtors' estates, including, without limitation, from any settlements, to such claimants, in each case on an aggregate basis as between them. In doing so, the Mediators and Mediation Parties may need to consider a variety of concepts and issues, including, without limitation, various sources of value for the estates, various claims of persons or entities who are not Mediation Parties, the interests of private non-Mediation Parties, such as individuals for whom health care professionals have prescribed the Debtors' FDA-approved pain and other medications, and different modes and methods of allocation. In addition, the Mediators

---

[3] "Private Claimants" include the parties listed in paragraph 6.b.

**A.57**

may, in their discretion, recommend to the Mediation Parties an expansion to the scope of the mediation.  However, subject to the following sentence or further order of this Court, the Mediators are not authorized to mediate disputes, if any, with respect to the allocation(s) of value/proceeds among entities or persons comprising the Non-Federal Public Claimants or among entities or persons comprising the Private Claimants.  The Mediators may also mediate any other issues that are agreed upon by all of the Mediation Parties.

4.     The Mediation Parties shall consist of the following: (i) the Debtors; (ii) the Official Committee of Unsecured Creditors (including any *ex officio* members) (the "**Creditors' Committee**"); (iii) the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "**Consenting Ad Hoc Committee**"); (iv) the Ad Hoc Committee of NAS Babies; (v) the Ad Hoc Group of Hospitals[4]; (vi) the Ad Hoc Group of Non-Consenting States (the "**Non-Consenting States**"); (vii) the Multi-State Governmental Entities Group (the "**MSGE Group**"); (viii) the Ad Hoc Group of Individual Victims; (ix) counsel for the Blue Cross Blue Shield Association, various third party payors and health insurance carrier plaintiffs; and (x) the group of individual health insurance purchasers, represented by Stevens & Lee. P.C. (the "**Insurance Purchasers"**) (each, a "**Mediation Party**," and, together, the "**Mediation Parties**").[5]  To the extent not previously executed, the Mediation Parties shall execute and agree to be bound by the Protective Order signed by the Court on January 27, 2020, Dkt. No. 784 (the "**Protective Order**").

---

[4] "Ad Hoc Group of Hospitals" shall have the meaning set forth in the *Verified Statement of the Ad Hoc Group of Hospitals Pursuant to Bankruptcy Rule 2019* [Dkt. No. 577] (as the same may be amended, modified or supplemented from time to time).

[5] Nothing in this Order is intended to or shall compel trade claimants (independently of their fiduciary, the UCC), the Debtors' current or former employees, officers and directors, the Federal Government or the shareholders to participate in the mediation at this time.

5.      Unless otherwise directed by the Mediators, each of the Mediation Parties, including a representative subset of their respective principals, attorneys, and advisors who are able to participate and make recommendations on behalf of the applicable Mediation Party shall attend and participate in the mediation sessions.  For the avoidance of doubt, nothing in this Order seeks to delegate the ultimate decision-making authority on any potential resolution of the mediation from a particular Non-Federal Public or Private Claimant to a representative subset; *provided however*, that any settlement agreement(s) involving any Mediation Party reached through mediation shall be subject to the provisions of paragraph 10.  The Mediators, after consultation with the Mediation Parties, may request each Mediation Party participating in a mediation session to appear with at least one principal, although, for the avoidance of doubt, the selection of that principal shall be left to the discretion of each Mediation Party and nothing in this Order requires, or is intended to require—even at the request of the Mediators—the direct participation or attendance at the Mediation by, any particular individual or any individual holding a particular title or rank.

6.      For the avoidance of doubt:

a.  "Non-Federal Public Claimants," as defined in the Motion and used in this Order in connection with the mediation, includes only the states, federal districts and U.S. territories, political subdivisions of the states and Native American Tribes, and does not include the federal government of the United States, or any agency, department, or instrumentality of the federal government (the "**Federal Government**").  The Federal Government is not required to participate in the mediation at this time.  All rights of the Federal Government— and, indeed, all of the parties—with respect to the valuation and ultimate plan

**A.59**

treatment of any claims of the Federal Government are fully reserved. Notwithstanding any other provision of this Order, the Federal Government shall be entitled, without further order of the Court, to send representatives to observe mediation sessions, in a manner to be specified further under the Mediation Procedures (defined below).

b. "Private Claimants" as defined in this Motion and used in the Proposed Order in connection with the mediation includes only certain private parties, including, hospitals; health insurance carrier plaintiffs and third party payors; purchasers of private health insurance; various individuals and estates alleging personal injury or wrongful death claims, including guardian claimants asserting claims on behalf of minors born with NAS due to exposure to opioids in utero; and claimants comprising a putative class of NAS children seeking medical monitoring funding, and does not include trade claimants (except to the extent represented by their fiduciary, the UCC), current or former employees, officers or directors of the Debtors, or members of the Sackler family (in any capacity). All rights of these parties—and, indeed, of all parties in interest— with respect to the valuation and ultimate plan treatment of any claims of, or against, these parties not currently in the mediation are fully reserved.

7. Additional parties in interest other than the Mediation Parties (the "**Additional Parties**") may participate voluntarily in the mediation in response to a request from the Mediators, or further order of this Court. The Mediators may request that the Court order any Additional Parties to attend the mediation, and nothing herein limits any Mediation Party's rights with respect to the ability to make such a request of the Court. In such event, appropriate notice and a hearing

**A.60**

shall be provided. All Additional Parties shall become subject to all of the provisions of this Order and shall agree to be bound by the Protective Order.

8. No later than three business days following the entry of this Order, or as soon thereafter as the Mediators are available, the Mediators shall meet and confer with the Mediation Parties and the Federal Government to commence discussions regarding mediation procedures and a schedule for mediation, which shall be consistent with the terms of this Order in all material respects (collectively, the "**Mediation Procedures**"). The Mediators will ultimately determine the Mediation Procedures, in their sole discretion, so long as such procedures are consistent with the terms of this Order in all material respects.

9. Except as provided in paragraphs 7 and 17, the Mediators shall have no communication with the Court relating to the substance of the mediation or matters occurring during the mediation. Further, the Mediators shall not disclose whether a verbal agreement was reached or a Mediation Party has refused to execute a definitive written settlement agreement. The Mediators shall have no obligation to make written comments or recommendations. Except as provided in paragraph 17, the Mediators shall not be compelled to testify or disclose any information concerning the mediation in any forum or proceeding, nor shall any Mediation Party, any Additional Party, or any other party in interest: (a) call or subpoena the Mediators as a witness or expert in any proceeding relating to the mediation, the subject matter of the mediation, or any thoughts or impressions that the Mediators may have about the Mediation Parties, or their respective positions, in the mediation; (b) subpoena any notes, documents or other materials prepared by the Mediators in connection with the mediation; or (c) offer any statements, views or opinions of the Mediators in connection with any proceeding, including, without limitation, any pleading or other submission to any court.

**A.61**

10.     Subject to paragraph 5: (a) no party shall be bound by anything said or done during the mediation, unless a Mediation Party voluntarily agrees to be so bound by a written and signed stipulation submitted to the Mediators and the Mediation Parties; and (b) the results of the mediation are non-binding unless the Mediation Parties that agree to be so bound otherwise agree; *provided however*, that any settlement agreement(s) reached through mediation reduced to writing and signed shall be as binding against each signatory as those reached through litigation, subject, with respect to the Debtors, to the requirements of section 363(b) of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 9019, and this Court will retain jurisdiction to enforce any such settlement agreement(s).

11.     All communications made by and all submissions prepared by a Mediation Party in connection with the mediation, including but not limited to: (a) discussions among any of the Mediation Parties during the course of the mediation, including discussions with or in the presence of the Mediators, (b) mediation statements and any other documents or information provided to the Mediators or the Mediation Parties in the course of the mediation, and (c) all correspondence, settlement proposals, counterproposals, term sheets, and offers of compromise produced for, as a result of, or in connection with the mediation (collectively, the "**Settlement Proposals**") shall remain confidential, shall not be made available to the public and, as applicable, shall be subject to the Protective Order; *provided however*, that (i) the party making any such Settlement Proposal may agree to the disclosure of such Settlement Proposal pursuant to a confidentiality agreement or otherwise; and (ii) nothing in this Order limits the ability of any Mediation Party to (x) speak publicly (whether through court pleadings, court statements or otherwise) regarding issues in these cases, provided that doing so does not disclose confidential mediation exchanges, data or discussions regarding Settlement Proposals or responses thereto, or (y) comment on the opioid

crisis and those involved in it, these Debtors or these cases, provided that doing so does not, independently of this Order, violate the Protective Order. The materials described in each of the foregoing clauses (a) through (c): (i) shall be protected from disclosure (and shall not be disclosed) to any other Mediation Party or to any other person or party who is not a Mediation Party (including holders of claims for which the Mediation Party is acting in a representative, agent or trustee capacity to the extent such holders are not themselves Mediation Parties) except in accordance with this Order or an applicable confidentiality agreement; (ii) shall not constitute a waiver of any existing privileges and immunities; (iii) shall not be used for any purpose other than the mediation; (iv) shall be subject to protection under Rule 408 of the Federal Rules of Evidence and any equivalent or comparable state law; and (v) except for the sole purpose of enforcing in the Court a settlement agreement reached in this mediation, shall not be admissible for any purpose in any judicial or administrative proceeding. For the avoidance of doubt, if no such settlement agreement is reached, then the foregoing materials shall not be admissible anywhere. The terms of the Protective Order and this Order shall govern any issues with respect to any Mediation Party's disclosure of any Settlement Proposals.

12. The Mediation Parties and their counsel and advisors shall not in any way disclose to any non-party or to any court, including, without limitation, in any pleading or other submission to any court, any such discussion, mediation statement, other document or information, correspondence, resolution, or Settlement Proposal (subject to paragraph 11) that may be made or provided in connection with the mediation; *provided however*, that nothing in this Order shall prevent a Mediation Party from sharing with the Mediators, and thereafter disclosing, to the extent not prohibited by a separate confidentiality agreement or the Protective Order, any draft objections, any potential legal arguments such Mediation Party may raise in the chapter 11 cases, reports of

**A.63**

its own experts, any document produced or obtained in discovery, any information that is, was, or becomes available to a Mediation Party outside of the mediation, such Mediation Party's own work product or materials, or other pleadings filed or to be filed by such Mediation Party with a court of competent jurisdiction.

13.     Notwithstanding anything in this Order to the contrary, nothing in this Order other than compliance with the Protective Order shall prevent a Mediation Party from disclosing information revealed during the mediation to the extent such disclosure is required, or as may be required or requested by a governmental or regulatory entity with oversight or other authority over such Mediation Party, that is within the oversight or other authority of such governmental or regulatory entity, or required by statute or court order or other legal or regulatory requirements applicable to such Mediation Party; *provided however*, that if such Mediation Party is requested or required to disclose any information to any third party or governmental or regulatory authority, such Mediation Party shall, to the extent not legally prohibited, provide the disclosing party with prompt written notice of such requirement prior to any disclosure and shall furnish only that portion of such information or take only such action as is legally required.

14.     To the extent that any Mediation Party is in possession of privileged or confidential documents and/or information provided to such Mediation Party pursuant to the terms and conditions of the Protective Order, such information may, but shall not be required to, be disclosed to the Mediators and other Mediation Parties, but shall otherwise remain privileged and confidential.  Any Mediation Party may provide documents and/or information to the Mediators that are subject to a privilege or other protection from discovery, including the attorney-client privilege, the work-product doctrine, or any other privilege, right, or immunity the parties may be entitled to claim or invoke (the "**Privileged Information**").  By providing the Privileged

Information solely to the Mediators and no other party, no Mediation Party nor its respective professionals intends to, nor shall, waive, in whole or in part, the attorney-client privilege, the work-product doctrine, or any other privilege, right or immunity they may be entitled to claim or invoke with respect to any Privileged Information or otherwise. Any work product, materials, or information shared or produced by a Mediation Party with the Mediators, including Privileged Information, shall be subject to all applicable mediation privileges and shall not be shared by the Mediators with any other Mediation Parties without the consent of the sharing or producing Mediation Party.

15. Nothing in this Order is intended to, nor shall it, waive, release, compromise, or impair in any way whatsoever, any claims or defenses that a party has or may have, whether known or unknown, in connection with or relating to acts or omissions that took place prior to entry of this Order.

16. Nothing in this Order is intended to, nor shall it operate as, granting relief from the automatic stay in the chapter 11 cases, or the Preliminary Injunction, as amended from time to time, entered by the Court in the adversary proceeding styled, *Purdue Pharma L.P. et al. v. Commonwealth of Massachusetts et al.*, Adv. Proc. No. 19-08289 (Bankr. S.D.N.Y. Nov. 6, 2019) (RDD), Dkt. No. 105.

17. Promptly following the termination of the mediation in accordance with the Mediation Procedures (such date, the "**Termination Date**"), but no later than two (2) business day after the Termination Date, the Mediators shall file a notice with the Court setting forth the following: (a) that the Mediators have conducted the mediation, (b) the names of the participants

**A.65**

in the mediation, (c) whether the participants in the mediation acted in good faith, and (d) whether and to what extent the mediation was successful.

18.     The Mediators shall be immune from claims arising out of acts or omissions incident to their service as Mediators in these chapter 11 cases.

19.     The Debtors are authorized to take all actions necessary or appropriate to effectuate the relief granted in this Order in accordance with the Motion.

20.     For the avoidance of doubt, to the extent any part of this Order shall conflict with Local Rule 9019-1 or the General Order, the terms and provisions of this Order shall govern.

21.     This Court retains exclusive jurisdiction to enter supplemental orders concerning all matters arising from or related to the implementation, interpretation, and enforcement of this Order, and to enter such orders at continued hearings on this Motion.

Dated:     March 3, 2020
           White Plains, New York

                              */s/Robert D. Drain*
                              _____
                              THE HONORABLE ROBERT D DRAIN
                              UNITED STATES BANKRUPTCY JUDGE

**A.66**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X

In re:                                                    :        Chapter 11
                                                          :
PURDUE PHARMA L.P., *et al.*,                             :        Case No. 19-23649 (RDD)
                                                          :
                                 Debtors.                 :        (Jointly Administered)
                                                          :
----------------------------------------------------------- X

## MEDIATORS' REPORT

The Honorable Layn Phillips and Mr. Kenneth Feinberg, appointed co-mediators (the "Mediators") in these cases pursuant to an order of this Court entered March 4, 2020 (the "Mediation Order") (Dkt. No. 895),[1] respectfully submit this report in accordance with paragraph 17 of the Mediation Order.

### Initial Statement

1.      The Mediators   report that every participant in the Mediation, whether participating as an official Mediation Party or informally, engaged with both the Mediators and one another in good faith for the purpose of negotiating an allocation of the Debtors' estate as among the Private Claimants and Non-Federal Public Claimants.   The participants in the Mediation process who were not "Mediation Parties" included the United States of America, Native American Tribes, representatives of a putative class of independent public school districts (the "PSD")[2], proposed representatives of a putative class of children born with NAS in the State of West Virginia (the "WV NAS"), the NAACP and a group of victim advocates which refer to

---

[1]      Unless the context requires otherwise, capitalized terms not defined in this Report have the meanings given them in the Mediation Order.

[2]      The PSD also participated in Mediation pursuant to the April 21, 2020 consent order.  The Public School Districts are represented by the law firms of Mehri & Skalet, and Hughes Socol Piers Resnick & Dym, Ltd. and their co-counsel.   The Non-Federal Public Claimants do not include the PSD.

themselves as the "Ad Hoc Committee on Accountability". The Mediators also heard the views of individual claimants during the Mediation.

2. For ease of reference, the following defined terms are used in this report:

    a. The <u>Non-Federal Public Claimants</u> means the Ad Hoc Group of Non-Consenting States (the "<u>NCSG</u>"), the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "<u>AHC</u>") and the Multistate Governmental Entity Group (the "<u>MSGE</u>").

    b. The <u>Personal Injury Claimants</u> means the Ad Hoc Group of Individual Victims.

    c. The <u>TPPs</u> means counsel for the Blue Cross Blue Shield Association, various third-party payors and health insurance carrier plaintiffs.

    d. The <u>Hospitals</u> means the Ad Hoc Group of Hospitals.

    e. The <u>NAS Committee</u> means the Ad Hoc Committee of NAS Children.

    f. The <u>Insurance Purchasers</u> means a putative class of individual health insurance purchasers.

    g. <u>Native American Tribes</u> means the Muscogee (Creek) Nation, a member of the AHC, the Cheyenne & Arapaho Tribes, an ex officio member of the Unsecured Creditors' Committee, and other federally recognized tribes represented by various counsel from the Tribal Leadership Committee and the Plaintiffs Executive Committee in MDL No. 2804.

A list of the names and counsel and principals who participated in one or more mediation sessions is attached hereto as <u>Exhibit A</u>.

**A.68**

## Summary of Mediation Outcomes

### *The Non-Federal Public Claimants Abatement Agreement*

3.     During the Mediation, the Non-Federal Public Claimants agreed among themselves that all value received by them through these chapter 11 cases would be exclusively dedicated to programs designed to abate the opioid crisis, and that such value cannot be used for any other purpose (other than an amount to fund administration of the programs themselves and to pay legal fees and costs).   To the Mediators' knowledge, this is the first time States, Territories, Native American Tribes and Local Governments have agreed to be bound by such a commitment.  The Non-Federal Public Claimants also have agreed that these requirements will be embedded in a plan of reorganization for Purdue and the related order confirming such plan.

4.     The NCSG, the AHC and the MSGE also addressed and resolved other significant issues, including value allocation for all Native American Tribes (and the inclusion of culturally appropriate abatement programs for these communities) and a default mechanism that, in the absence of a standalone agreement between a State or Territory and its political subdivisions, provides a structure and process for applying funds to abate the opioid crisis and ensures consultation through local participation mechanisms in determining which programs will be funded from value received.  The NAACP and the Non-Federal Public Claimants are also committed to continuing to engage regarding concerns about the equitable implementation of the abatement program in each State. This discussion has not ended and will continue.   No agreement between the PSDs and the Non-Federal Government Entities has been reached to date. We will continue to seek resolution between the PSDs and the Non-Federal Government Entities.

**A.69**

*The Private Claimants' Agreements*

5.    Subject to limited conditions discussed below, there are four written term sheets each of which, individually, is supported by the Debtors, the Non-Federal Public Claimants and the specific individual Private Claimant group (or counsel to certain members of such Private Claimant Group) that is counterparty to such term sheet, which addresses allocation of estate value to each Private Claimant group, respectively.   Such term sheets have been reached, respectively, with each of the Personal Injury Claimants, the Hospitals, counsel to certain of the TPPs, and the NAS Committee (with regard to abatement) (the "TS Private Claimants").   In addition, the Debtors and the Insurance Purchasers have reached an agreement for an agreed sum to be paid over two years that will be dedicated to a specific abatement use that has been agreed by the Debtors and the Insurance Purchasers.

6.    Subject to the terms of the term sheet reached with the Personal Injury Claimants, personal injury claimants will be eligible to receive cash distributions through fair and equitable trust distribution procedures developed by the Personal Injury Claimants but subject to the consent of the Non-Federal Public Claimants, such consent not to be unreasonably withheld, and approval by the Court as part of a confirmed plan of reorganization.  The NAS Committee (with regard to personal injury claims) and others are participating in the drafting of the trust distribution procedures.

7.    The term sheets for the Hospitals, TPPs, and NAS Committee (with regard to abatement)   require each private creditor group to use substantially all of their respective allocations to fund mutually agreeable programs designed to abate the opioid crisis (including treatments), pursuant to commitments embodied in a confirmed plan of reorganization.

### Other Elements of the Term Sheets

8.      While certain details of the term sheets remain to be finalized, there are certain similarities among the agreements, as set forth below.

9.      First, each of the Private Claimants will receive a fixed amount of value over time, the values and time periods varying for each such group.

10.      Second, in exchange for this treatment under a confirmed plan of reorganization, the Private Claimants will release (or support releases of) the Debtors, their estates, and their respective current and former officers, directors, employees, and owners (and any related trusts and their respective trustees and beneficiaries), subject to paragraph 12 below.

11.      Third, legal fees for each Private Claimant group will be paid exclusively out of its agreed distribution or by other agreements with individual claimants (and not by the estate), although the application of legal fees remains to be resolved between the Non-Federal Public Claimants and each of the Private Claimant groups.

12.      Fourth, all term sheets with the TS Private Claimants are conditioned on the Court's confirmation of a plan of reorganization that includes participation by the Sackler family in the plan of reorganization (although this does not limit the ability of any Non-Federal Public Claimant to object to or vote against a plan of reorganization).  Three of the four term sheets also are conditioned on resolution of the United States' claims on terms reasonably acceptable to the Non-Federal Public Claimants, and email correspondence with respect to the fourth term sheet addresses this issue as well.

### Next Steps

13.      As indicated above, there remain terms to be negotiated by the parties with respect to each of the term sheets in order to reach final agreements between each of the four TS

**A.71**

Private Claimant groups and the Non-Federal Public Claimants, respectively. In addition, the Debtors and the Insurance Purchasers will need to finalize their agreement.

14. The Non-Federal Public Claimants and the four TS Private Claimants have indicated an intent to work diligently with the Mediators to resolve certain remaining open issues pertaining to their term sheets. The Debtors and the Insurance Purchasers will do the same.

15. We have agreed to remain available throughout September (and, if necessary, longer) to help facilitate resolution of open issues.

**A.72**

Dated:   September 23, 2020

By: _____
Layn R. Phillips

By: *Ken Feinberg pp Layn R. Phillips*
Kenneth R. Feinberg

*Mediators*

**Exhibit A**

**List of Mediation Parties**

| Mediation Parties | Name of Individual Participants |
|---|---|
| Debtors | Marc Kesselman (Purdue Pharma L.P.) <br> Marshall Huebner (Davis Polk & Wardwell LLP) <br> Frances Bivens (Davis Polk & Wardwell LLP) <br> Benjamin Kaminetzky (Davis Polk & Wardwell LLP) <br> Eli Vonnegut (Davis Polk & Wardwell LLP) <br> Sheila Birnbaum (Dechert LLP) |
| Official Committee of Unsecured Creditors | Arik Preis (Akin Gump Strauss Hauer & Feld, LLP) <br> Sara Brauner (Akin Gump Strauss Hauer & Feld, LLP) <br> Mike Atkinson (Province, LLP) |
| NCSG | Michelle Burkart (California Attorney General) <br> Judith Fiorentini (California Attorney General) <br> Kimberly Massicotte (Connecticut Attorney General) <br> Jeremy Pearlman (Connecticut Attorney General) <br> Sandy Alexander (Massachusetts Attorney General) <br> Gillian Feiner (Massachusetts Attorney General) <br> M. Umair Khan (New York Attorney General) <br> David Nachman (New York Attorney General) <br> James Donahue (Pennsylvania Attorney General) <br> Neil Mara (Pennsylvania Attorney General) <br> Melissa Van Eck (Pennsylvania Attorney General) <br> Tad O'Neill (Washington Attorney General) <br> Pillsbury Winthrop Shaw Pittman LLP |
| AHC | John Guard (Florida Attorney General) <br> Gary Gotto (Keller Rohrback LLP) <br> Joseph Rice (Motley Rice LLC) <br> Pamela Thurmond (City of Philadelphia) <br> Paul Hanly (Simmons Hanly Conroy LLC) <br> Michael Leftwich (Tennessee Attorney General) <br> Jennifer Peacock (Tennessee Attorney General) <br> Paul Singer (Texas Attorney General) <br> Brown Rudnick LLP <br> Gilbert LLP <br> Kramer Levin Naftalis & Frankel LLP <br> Otterbourg P.C. |

| Mediation Parties | Name of Individual Participants |
|---|---|
| MSGE | Joanne Cicala (The Cicala Law Firm PLLC) <br> F. Jerome Tapley (Cory Watson, P.C.) <br> John White (Harrison White, P.C.) <br> Dara Hegar (The Lanier Law Firm) <br> Todd Court (McAfee & Taft) <br> Jeffrey Simon (Simon Greenstone Panatier, P.C.) <br> Shelly Sanford (Watts Guerra LLP) <br> Caplin & Drysdale |
| Personal Injury Claimants | Ryan Hampton (Individual) <br> Cheryl Juaire (Individual) <br> Anne Andrews (Andrews & Thornton) <br> Sean Higgins (Andrews & Thornton) <br> Ed Neiger (ASK LLP) <br> Ed Gentle (Gentle, Turner, Sexton & Harbison, LLC) <br> Chris Shore (White & Case LLP) |
| TPPs | Mark Fischer (Rawlings & Associates, PLLC) <br> Tom Sobol (Hagens Berman Sobol Shapiro LLP) <br> Lauren Barnes (Hagens Berman Sobol Shapiro LLP) <br> Gerald Lawrence (Lowey Dannenberg P.C.) |
| Hospitals | John W. (Don) Barrett (Barret Law Group, P.A.) <br> Robert A. Clifford (Clifford Law Offices, P.C.) <br> Jonathan W. Cuneo (Cuneo Gilbert & LaDuca, LLP) |
| NAS Committee | Celeste Brustowicz (Cooper Law Firm, LLC) <br> Scott Bickford (Martzell Bickford & Centola, LLC) <br> Calvin Fayard (Calvin C. Fayard, Jr. APC) <br> Kevin Malone (Krupnick Campbell Malone) |
| Insurance Purchasers | Nicholas F. Kajon (Stevens & Lee, P.C.) <br> James Young (Morgan & Morgan, P.A.) <br> Juan R. Martinez (Morgan & Morgan, P.A.) |

**A.75**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------X
                                              :
In re:                                        :   Chapter 11
                                              :
PURDUE PHARMA L.P., et al.,                   :   Case No. 19-23649 (RDD)
                                              :
                    Debtors.                  :   (Jointly Administered)
                                              :
---------------------------------------------------------------- X
```

## ORDER EXPANDING SCOPE OF MEDIATION

Entry of an order (this "Supplemental Mediation Order") supplementing the order (the "Mediation Order")[1] entered by the Court on March 4, 2020 [Dkt. No. 895] directing the appointment of the Honorable Layn Phillips and Mr. Kenneth Feinberg (the "Mediators") to serve as co-mediators in these chapter 11 cases as set forth therein being in the estates' best interests; and the Court having jurisdiction to consider such request pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Supplemental Mediation Order being a core proceeding under 28 U.S.C. § 157(b) that this Court may decide by a final order consistent with Article III of the United States Constitution; and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that no other or further notice or a hearing is required; and after due deliberation the Court having determined that such relief is in the best interests of the Debtors, their estates, their creditors and all parties in interest,

IT IS HEREBY ORDERED THAT:

---

[1] Unless the context requires otherwise, capitalized terms not defined in this Order have the meanings given them in the Mediation Order.

**A.76**

1.      This Supplemental Mediation Order supplements the Mediation Order, as set forth herein, and all provisions of the Mediation Order not expressly amended hereby remain in full force and effect.

2.      In accordance with paragraph 3 of the Mediation Order, the Mediators are authorized to continue the existing mediation to resolve open issues referenced in the *Mediators' Report* [Dkt. No. 1716]; *provided* that the Non-Federal Public Claimants and the Private Claimants shall not reopen or renegotiate issues that have already been resolved in the mediation as of such date.

3.      In accordance with paragraph 3 of the Mediation Order, the scope of the Mediators' authority shall be expanded to authorize the Mediators to mediate any and all potential claims or causes of action that may be asserted by the estate or any of the Non-Federal Public Claimants against the Covered Parties (as defined in the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [Dkt. No. 518]) or that may otherwise become the subject of releases potentially granted to the Covered Parties in these chapter 11 cases (the "Shareholder Claims").

4.      With respect to the mediation of Shareholder Claims as set forth herein, the Mediation Parties shall consist solely of the (i) Debtors, (ii) Creditors' Committee, (iii) Consenting Ad Hoc Committee, (iv) Non-Consenting States, (v) MSGE Group, and (vi) representatives of the Covered Parties.  To the extent not previously executed, the Mediation Parties shall execute and agree to be bound by the Protective Order.  The Federal Government shall be entitled, without further order of the Court, to participate in mediation sessions as an observer.  The advisors to the Mediation Parties listed in this paragraph 4 shall be permitted to disclose information, including, without limitation, discussions, proposals, agreements, and written materials but expressly

**A.77**

excluding any proposal, mediation position, analysis, agreement or similar information from or with a mediation party who has not consented to its disclosure under this paragraph regarding the mediation of Shareholder Claims to counsel to any party that is bound both by the Protective Order and the Mediation Order (including, as applicable for such party, so long as such counsel is included within the designated counsel pursuant to paragraph 44 of the Protective Order), which counsel shall continue to be bound by the Protective Order in connection with the receipt of any such information.

5.      The mediation with respect to the Shareholder Claims authorized hereby shall continue until terminated by the Mediators or by further order of this Court.

6.      Paragraph 14 of the Mediation Order is hereby amended and restated as follows: To the extent that any Mediation Party is in possession of privileged or confidential documents and/or information provided to such Mediation Party pursuant to the terms and conditions of the Protective Order, such information may (with the written consent of the party that owns such privilege), but shall not be required to, be disclosed to the Mediators and other Mediation Parties, but shall otherwise remain privileged and confidential. Any Mediation Party may provide documents and/or information to the Mediators that are subject to a privilege or other protection from discovery, including the attorney-client privilege, the work product doctrine, or any other privilege, right, or immunity the parties may be entitled to claim or invoke (the "Privileged Information"). By providing the Privileged Information to the Mediators or by consenting in writing to the Mediators providing such Privileged Information to another party, no Mediation Party nor its respective professionals intends to, nor shall, waive, in whole or in part, the attorney-client privilege, the work-product doctrine, or any other privilege, right or immunity they may be entitled to claim or invoke with respect to any Privileged Information or otherwise. Any work product, materials, or information shared or produced by a Mediation Party with the Mediators, including Privileged Information, shall be subject to all applicable

**A.78**

mediation privileges and shall not be shared by the Mediators with any other Mediation Parties without the consent of the sharing or producing Mediation Party.

7.      References to "Mediation Parties" in paragraphs 5, 9, 10, 11, 12, and 13 of the Mediation Order shall be construed, for purposes of mediation of the Shareholder Claims, to apply to the Mediation Parties listed in paragraph 4 hereof.

8.      Participation in the mediation does not waive any jurisdictional defenses that otherwise would apply to any party, all of which defenses are reserved.

9.      Except as expressly set forth herein, the Mediation Order shall remain in full force and effect.

10.     The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated:  September 30, 2020          /s/Robert D. Drain
        White Plains, New York      THE HONORABLE ROBERT D. DRAIN
                              1.    UNITED STATES BANKRUPTCY JUDGE

**A.79**

December 13, 2020

Maria Ecke
8 Glenbrook Drive
West Simsbury, CT 06092

Ryan Hampton, Blue Cross Blue Shield Association, CVS Caremark Part D Services
LLC and Health LLC, Cheryl Juaire, LTS Lohmann Therapy Systems Corporation,
Pension Benefits Guaranty Corporation, Walter Lee Salmons, Kara Trainor, West Boca
Medical Center,
Official Committee of Unsecured Creditors
C/o Akin Gump Strauss Hauer Feld LLP
Bank of America Tower
1 Bryant Park
New York, New York 10036
Attn: Attorney Edan Lisovicz and Attorney Arik Pries

Re: Chapter 11 Proceedings in Case No. 19-23649 for Purdue Pharma L.P.

Dear Committee Members:

According to Google: "the Sackler family behind Purdue Pharma is one of the richest
families in the U.S. with an ESTIMATED 13 BILLION FORTUNE FROM THE SALES
OF THE CONTROVERSIAL PRESCRIPTION PAINKILLER OXYCONTIN."
According to Forbes also on Google: "Today, Purdue is still 100% owned by the Sackler
family, generates some $3 billion in sales in the U.S. Separate Sackler-owned companies
which sell drugs in Europe, Canada, Asia, and Latin America. An estimated 20 family
members share the fortune. Sacklers withdrew $12 BILLION OVER 13 YEARS FROM
PURDUE PHARMA AS THE OPIOID EPIDEMIC GREW."

To my understanding after my conversation dated December 12, 2020 with Attorney
Edan Lisovicz of Akin Gump Strauss Hauer & Feld LLP, emails to Ryan Hampton,
Committee Member, and Attorney Ed Neiger, who represents the victims in this case, I
learned that the Sackler family only wants to settle for 3 billion over 7 years. This is the
amount of money that the members of the Sackler family still make per year.

THE AMOUNT OF $3 BILLION IS A SLAP IN THE FACE OF THE MANY
AMERICANS WHO HAVE LOST THEIR BELOVED CHILDREN OR RELATIVES
BECAUSE OF THIS ILLEGALLY PUSHED DRUG BY PURDUE PHARMA. How
can mediators and attorneys put a price on the lives of victims and the injury that it has
caused to families unless they have lost children to the drug themselves? Purdue Pharma
should pay the Claim No. 16810 to Maria Zekoff Ecke, Richard Robert Ecke's Claim No.
22855, Andrew Richard Ecke's Claim No. 23016 in the amount of $242,000,000.00 and
Peter F. Sottile's Claim No. 16817 in the amount of $250,000.00 which is less than
originally asked for.

**A.80**

The mediators Layn Phillips, Kenneth Feinberg, and the Court should also be careful which company they choose to administer the Settlement. My own personal experience with Kurzman Carson Consultants (KCC), 75 Rowland Way, Suite 250, Novato, CA 94945 and other KCC affiliates such as Gilardi & Company LLC in Louisville, KY, Epic Global (Claims Administrator) in San Francisco, and the U.S. mega-banks, which put me in foreclosure was MUCH LESS THAN SATISFACTORY. All this had a negative effect on my family's life and ultimately led to my divorce but PURDUE PHARMA'S ADDICTIVE DRUG OXYCONTIN AND OXYCODONE, WHICH LED TO THE DEATH OF MY BEAUTIFUL, SMART SON, DAVID JONATHAN ECKE ON DECEMBER 17, 2015 WAS THE DESTRUCTION OF OUR LIVES. Doctors and PURDUE PHARMA needlessly prescribed this devil drug to my son due to greed. Only one doctor prescribed physical therapy, which my son actually needed. Now I have only tears and memories to comfort me.

Thank you from a bereaved mother,

*Maria Ecke*

Maria Ecke

Cc: Judge Robert D. Drain
U.S. Bankruptcy Court
For the Southern District of New York
300 Quarropas Street
White Plains, New York 10601

THIS IS TO CERTIFY THAT I HAVE MAILED A COPY ON DEC. 14, 2020 TO:

Cc: Marshall Huebner
Davis Polk and Wardwell
450 Lexington Ave.
New York, NY 10017

Cc: Layn Phillips
2101 East Coast Highway
Suite 250
Corona Del Mar, CA 92625

Cc: Kenneth Feinberg
1455 Pennsylvania Ave., N.W.
Suite 390
Washington D.C. 20004

A.81

# EXHIBIT J

**NAS PI TDP**

# EXHIBIT A

## SAMPLE CLAIM FORM FOR
## THE INDIVIDUAL PURDUE PHARMA LP PI TRUST DISTRIBUTION
## PROCEDURE FOR NAS PI CLAIMS

# P U R D U E   P H A R M A   P I   T D P
# N A S   C L A I M   F O R M
# I N S T R U C T I O N S   P A G E

**THIS IS A SAMPLE CLAIM FORM AND IS SUBJECT TO CHANGE. DO NOT COMPLETE THE FORM AT THIS TIME. A BLANK COPY OF THE FINAL FORM WILL BE AVAILABLE ONLINE AND BY MAIL FOR YOU TO COMPLETE AT THE APPROPRIATE TIME AFTER THE PURDUE PLAN OF REORGANIZATION HAS BEEN APPROVED AND GONE EFFECTIVE.**

This claim form (the "Claim Form") must be completed for each NAS PI Claimant seeking to recover money from the Purdue Personal Injury Trust (the "PI Trust") on its NAS PI Channeled Claim(s).[1] IF YOU DO NOT TIMELY RETURN THIS CLAIM FORM AS INSTRUCTED, YOU WILL BE DEEMED TO HAVE CONSENTED TO HAVE YOUR NAS PI CHANNELED CLAIM(S) LIQUIDATED UNDER THE NAS PI TDP, AND YOUR CLAIM(S) WILL BE DISALLOWED UNDER THE NAS PI TDP FOR YOUR FAILURE TO TIMELY RESPOND.

If you represent the interests of an NAS Child and are seeking to recover money from the Purdue Personal Injury Trust (The "PI Trust") on account of an that NAS Child's NAS PI Channeled Claim(s), you must complete this Claim Form (the "Claim Form") and return the form as instructed below. If you do not complete the form, you will NOT qualify to receive funds on behalf of the child you represent.

If you believe that the NAS Child you represent holds multiple NAS PI Claims against the Debtors on account of multiple injuries, you should still submit only one Claim Form. One Claim Form submitted for a NAS PI Claim shall be deemed to be a Claim Form in respect of that NAS PI Claim and also any NAS PI Channeled Claims against a Released Person or Shareholder Released Person that are associated with that NAS PI Claim.

If you represent the interests of more than one NAS Child, you must file a Claim Form on behalf of each individual NAS Child. YOU CANNOT file one Claim Form on behalf of multiple children.

**Please follow the instructions of each section carefully to ensure that your Claim Form is submitted correctly**. Except as otherwise indicated, all words shall be given their ordinary, dictionary meaning. Submitting this Claim Form does not guarantee that you will receive payment from the PI Trust. Whether or not you receive payment depends on whether you make the additional required submissions, as set forth on this Claim Form and further detailed in the NAS PI TDP, and whether or not your claim meets the eligibility requirements set forth in the NAS PI TDP.

This Claim Form allows you to choose to "opt out" of the streamlined, expedited NAS PI TDP liquidation process with respect to any NAS PI Claim against one or more of the Debtors, and instead pursue that NAS PI Claim in the tort system by filing a lawsuit against the PI Trust at your own expense. You may litigate in court only with respect to a NAS PI Claim held against one or more Debtors, and may not litigate any other NAS PI Channeled Claims. If you select the "opt out" option, you will not be eligible to receive any distribution under the streamlined liquidation procedures of the NAS PI TDP. Furthermore, you will not be allowed to opt back in to the liquidation provisions of the NAS PI TDP if your lawsuit is unsuccessful in the tort system. In other words, if you lose your lawsuit, you cannot return to the NAS PI Trust and ask for money. And importantly, if you do

---

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the NAS PI TDP or, if not defined therein, then the meanings ascribed to them in the Chapter 11 Plan.

**A.84**

obtain a judgment in a court against the PI Trust, that award will be subject to reduction pursuant to the "opt out" procedures set forth in Exhibit B to the NAS PI TDP.  See the procedures set forth in Exhibit B to the NAS PI TDP for more detail.  YOU MAY ONLY OPT OUT BY CHECKING THE "OPT OUT" BOX AND TIMELY RETURNING THIS CLAIM FORM.  FAILURE TO RESPOND DOES NOT CONSTITUTE OPTING OUT.

For those who do not "opt out:" If your claim is Allowed by the Claims Administrator of the PI Trust, your claim will be liquidated and paid according to the NAS PI TDP.  If your claim is Disallowed by the Claims Administrator, you will not receive a distribution from the PI Trust.  All claimants whose NAS PI Channeled Claims are Allowed by the Claims Administrator shall receive an equal distribution from the PI Trust NAS Fund, subject to the deductions described in the NAS PI TDP.

By submitting this Claim Form and choosing to liquidate your NAS PI Claim under the NAS PI TDP, you are deemed to consent to the Lien Resolution Program and to become a party to the LRP Agreement, under which certain health insurance companies, known as "Third-Party Payors" or "TPPs," have agreed to resolve their claims against you and/or your recoveries under the NAS PI TDP for reduced amounts or, in some cases, by waiving their claims altogether.  The LRP Agreement is attached as Exhibit [ ] to the [  ] Plan Supplement.

**Instructions for Submission**: You may complete and submit this Claim Form either online, at ████████, or by mailing back the completed Claim Form to ████████

**A.85**

# PURDUE PHARMA PI TDP
# NAS CLAIM FORM

## PART ONE: PERSONAL INFORMATION OF NAS PI CLAIMANT AND HIS/HER REPRESENTATIVE

What is the Claim Number assigned to the NAS Child's claim by Prime Clerk? ██████████

### Section 1.A: Fill out the information of the NAS Child below:

NAS Child's Name: ████████████████████

NAS Child's Date of Birth: ████████████████████

NAS Child's Address: ████████████████████

NAS Child's Social Security Number (or taxpayer ID): ████████████████

### Section 1.B: Fill out your own information below:

Your Name: ████████████████

Your Date of Birth: ████████████████

Your Address: ████████████████

Your Social Security Number: ████████████████

Your Phone Number: ████████████████

State whether you are the "natural parent," "legal guardian," or "other custodian" of the NAS Child: ████████████████

- 3 -

**A.86**

## PART TWO: "OPT OUT" OF LIQUIDATION UNDER THE NAS PI TDP LIQUIDATION PROCEDURE

If you would like to forfeit all rights to have the NAS PI Claimant's NAS PI Channeled Claim(s) liquidated under the NAS PI TDP and instead pursue the NAS PI Claimant's NAS PI Claim by filing a lawsuit against the PI Trust in court at your own expense, check the following box and provide the additional information sought in this PART TWO. **WARNING: Mark the box in this paragraph of PART TWO only if you elect to "opt out" of the NAS PI TDP liquidation process and instead pursue your NAS PI Claim in civil court through the tort system by filing a lawsuit in court at your own expense.**

☐ **I have checked this box to opt out of the liquidation procedures of the NAS PI TDP and the PI Trust NAS Fund.**

---

## PART THREE: MEDICAL PROVIDER INFORMATION  (skip this section if you elected to "opt out")

**Section 3.A:** This section concerns licensed medical providers who have diagnosed the NAS Child with any medical, physical, cognitive or emotional condition resulting from his/her intrauterine exposure to opioids or opioid replacement or treatment medication(s).  The diagnoses may include, but are not limited to, the condition known as neonatal abstinence syndrome ("NAS").   Fill out and provide the following information, if known:

| Name of Licensed Medical Provider | Address | City | State | Zip | Date of Diagnosis | |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Section 3.B:**  Even if you do not know the information sought in Section 3.A, **please include with your submission of this Claim Form Competent Evidence that a licensed medical provider has diagnosed the NAS PI Claimant with any medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication(s).**  The diagnoses may include, but are not limited to, the condition known as neonatal abstinence syndrome ("NAS").  The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselors or therapists, or professionals at a rehabilitation center.  Evidence can include, among other things, medical records evidencing that the NAS Child had a NAS diagnosis, including post-natal treatment for symptoms caused by opioid exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or medical evidence of maternal opioid use.

**A.87**

**Section 3.C: Was the NAS Child born in a medical facility? If so:**

Name of the Facility where
the NAS Child was born:                  ██████████████████████

Location (city and state)
where the NAS Child was born:            ██████████████████████

---

**PART FOUR: MEDICAL LIENS** (skip this section if you elected to "opt out")

**Section 4.A: Did any insurance company pay for medical treatment for the NAS Child's opioid-related injuries?**

Yes:     ☐

No:      ☐

**Section 4.B: In the last 20 years, was the NAS Child eligible for coverage by any of the following, or did any of the following actually pay for his/her opioid-related health costs? Respond by writing "Yes" or "No" next to each insurance provider name, and provide the requested information as to each. If any insurance carrier who provided coverage to the NAS Child is not identified, please fill in that carrier's name and information at the bottom of the chart.**

| Type of Insurance | Yes/ No | Street Address | Phone Number | Policy Number (if any) | Policy Holder | Dates of Coverage |
|---|---|---|---|---|---|---|
| Medicare | | | | | | |
| Medicaid | | | | | | |
| Tricare | | | | | | |
| VA | | | | | | |
| Champus | | | | | | |
| Private (Name Below): | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**PART FIVE: SIGNATURE (You must complete this Part Five regardless of your elections above)**

**Please fill out and sign this section when you have completed this Claim Form.**

NAS Child's Name:                    _____

NAS Child's E-mail (if any):         _____

NAS Child's Phone Number (if any):   _____

**A.88**

Your Name:  _____

Your E-mail:  _____

Your Phone Number:  _____


I am including the evidence requested in Section 3.B above in my submission of this form:  ☐


*I declare under penalty of perjury that the representations made and the information provided on this Claim Form are true, correct and complete to the best of my knowledge.*

<br>

_____

*Signature of NAS PI Claimant or individual acting on behalf of the NAS PI Claimant*

**A.89**

**EXHIBIT B**

**PROCEDURES FOR NAS PI CLAIMANTS WHO OPT TO LIQUIDATE
THEIR NAS PI CLAIMS IN THE TORT SYSTEM RATHER THAN UNDER THE
INDIVIDUAL PURDUE PHARMA L.P. NAS TRUST DISTRIBUTION PROCEDURE**

The following procedures shall apply in the case of an NAS PI Claimant[1] who elects, subject to the terms hereof, to liquidate his or her NAS PI Claim by commencing a lawsuit in the tort system after so timely indicating on his or her NAS PI Claim Form. By so electing, such NAS PI Claimant forfeits any right to have his or her NAS PI Claim liquidated under the liquidation provisions of the NAS PI TDP, and instead shall have the right to liquidate his or her NAS PI Claim exclusively in the tort system. Only claims that meet the definition of "NAS PI Claim" under the Plan may be litigated in the tort system. The adjudication of an NAS PI Claim in the tort system shall be deemed to be an adjudication of that NAS PI Claim and any associated NAS PI Channeled Claims of the NAS PI Claimant regarding the same injuries that are the subject of his or her NAS PI Claim. Any Distribution from the PI Trust on a Final Judgment (as defined below) in respect of such NAS PI Claim, if any, shall be deemed to be a Distribution in satisfaction and conclusive resolution of such NAS PI Claim and such associated NAS PI Channeled Claims.

**§ 1.    SUITS IN THE TORT SYSTEM.**

If an NAS PI Claimant timely filed a proof of claim in the Chapter 11 Cases asserting his or her NAS PI Claim, then he or she may elect to liquidate such NAS PI Claim in the tort system rather than under the NAS PI TDP by checking the box so indicating on his or her NAS PI Claim Form, which NAS PI Claim Form must be filed by the date that is one hundred and fifty (150) days[2] after the applicable NAS PI Claim Form is disseminated to him/her.[3] If the NAS PI Claimant makes such election, then the NAS PI Claimant may file a lawsuit regarding only his or her NAS PI Claim (and no other claims) against only the PI Trust (and including no other parties as defendants) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[4] unless such court orders pursuant to 28 USC § 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which the NAS PI Claim arose.

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the NAS PI TDP or, if not defined in the NAS PI TDP, the meanings ascribed to such terms in the Plan.

[2]    Within sixty (60) days after the Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if the NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, each NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

[3]    The filing of an NAS PI Claim Form indicating that an NAS PI Claimant has elected to liquidate his or her NAS PI Claim in the tort system shall have no effect on any federal or state statute of limitation or repose applicable to the NAS PI Claims asserted by such NAS PI Claimant.

[4]    The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

Any such lawsuit shall be filed by the NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit shall be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[5] All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[6]

Subject to the PI Trust's receipt of an NAS PI Claim Form so indicating that an NAS PI Claimant has elected to retain the option to file a lawsuit in the tort system as set forth above, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit as discovery material. Any such NAS PI Claimant will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the PI Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such NAS PI Claimant who propounds on the PI Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional documents or testimonial discovery must in such request (i) represent that such NAS PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the NAS PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Trust shall not be liable for any costs incurred by parties other than the PI Trust in connection with third-party discovery propounded by any party other than the PI Trust.[7]

If an NAS PI Claimant obtains a judgment on his or her NAS PI Claim in the tort system and such judgment becomes a final order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Trust, subject to the limitations set forth in Section 2 below, as well as the applicable NAS Payment Percentage and NAS Maximum Value (each as defined below), as provided in Section 6 below, the deductions as set forth in Section 6 below, and the resolution of healthcare liens, as provided in Section 7 below.

---

[5] The trustee of the PI Trust (the "PI Trustee") shall be empowered (i) to bring one or more consolidated actions against multiple Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system and (ii) to seek to consolidate multiple lawsuits commenced by individual Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[6] Among other things, the PI Trust shall be empowered to assert that the claim that is the subject of an NAS PI Claimant's lawsuit is not an "NAS PI Claim" within the meaning of the Plan.

[7] In order to minimize costs incurred by the PI Trust in connection with third-party discovery, the PI Trustee shall be empowered to seek to consolidate discovery propounded by Holders of PI Claims or the PI Trust in multiple lawsuits commenced by individual Holders of PI Claims against the PI Trust.

**A.91**

## § 2.    LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any NAS PI Claim litigated against the PI Trust in the tort system.

## § 3.    NAS MAXIMUM VALUE.

Payment on a Final Judgment for an NAS Child shall not exceed $21,000 (the "NAS Maximum Value") which is estimated to be three times the maximum value that will be distributed under the NAS PI TDP for a given NAS PI Claim.

## § 4.    NAS PAYMENT PERCENTAGE.

A Final Judgment on an NAS PI Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the same percentage that NAS PI Claims liquidated under the NAS PI TDP are reduced prior to payment. In other words, an NAS PI Claimant who elects to liquidate his or her NAS PI Claim in the tort system shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all NAS PI Channeled Claims entitled to a recovery pursuant to the NAS PI TDP. Subject to Section 5.2(c) of the Plan, the estimated awards for NAS PI Claims liquidated under the NAS PI TDP represent an estimated pro-rata percentage recovery by NAS PI Claimants holding Allowed NAS PI Channeled Claims of approximately 2% (such pro-rata percentage recovery as may be altered over time, the "NAS Payment Percentage"). The initial NAS Payment Percentage is 2%.

No Holder of an NAS PI Claim who elects to liquidate his or her NAS PI Claim in the tort system shall receive a payment that exceeds the liquidated value of his or her NAS PI Claim multiplied by the NAS Payment Percentage in effect at the time of payment (such value so reduced, the "NAS Percentage-Reduced Claim"); provided, however, that if there is a reduction in the NAS Payment Percentage, the PI Trustee, in his or her sole discretion, may cause the NAS PI Trust Fund to pay an NAS PI Claim based on the NAS Payment Percentage that was in effect prior to the reduction if the judgment in respect of such NAS PI Claim became a Final Judgment prior to the date on which the PI Trustee proposes the new NAS Payment Percentage to the PI Trust's oversight committee (the "Oversight Committee") and the processing of such NAS PI Claim was unreasonably delayed due to circumstances beyond the control of the NAS PI Claimant or the NAS PI Claimant's Counsel (as applicable).

## § 5.    ADJUSTMENT OF THE NAS PAYMENT PERCENTAGE.

The NAS Payment Percentage shall be subject to change if the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, determines that an adjustment is required. No less frequently than once every three (3) years, commencing with the date that is three (3) years after the Effective Date of the Plan, the PI Trustee (with the assistance of the Claims Administrator) shall reconsider the then-applicable NAS Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration and

with the consent of the Oversight Committee, change the NAS Payment Percentage if necessary. The PI Trustee shall reconsider the then-applicable NAS Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the Oversight Committee.

The PI Trustee shall base his or her determination of the NAS Payment Percentage on current estimates of the number of NAS PI Channeled Claims, the value of the assets of the PI Trust NAS Fund available for the payment of Allowed NAS PI Channeled Claims pursuant to the NAS PI TDP and amounts due and estimated to become due pursuant to the NAS PI TDP in respect of Final Judgments obtained by NAS PI Claimants who elect to liquidate their NAS PI Claims in the tort system, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of (i) full value to all Holders of Allowed NAS PI Channeled Claims and (ii) the NAS Maximum Value to NAS PI Claimants who elect to liquidate their NAS PI Claims in the tort system. When making these determinations, the PI Trustee (with the assistance of the Claims Administrator) shall exercise common sense and flexibly evaluate all relevant factors.

If a redetermination of the NAS Payment Percentage has been proposed in writing to the Oversight Committee by the PI Trustee, but such redetermination of the NAS Payment Percentage has not yet been adopted by the Oversight Committee, a NAS PI Claimant that has obtained a Final Judgment shall receive the lower of the then-current NAS Payment Percentage and the proposed NAS Payment Percentage. However, if the proposed NAS Payment Percentage is the lower amount but is not subsequently adopted by the Oversight Committee, the NAS PI Claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed NAS Payment Percentage is the higher amount and subsequent adopted, the NAS PI Claimant who has obtained a Final Judgment shall thereafter receive the difference between the current amount and the higher adopted amount.

At least thirty (30) days prior to proposing in writing to the Oversight Committee a change in the NAS Payment Percentage, the PI Trustee shall post to the PI Trust's website a notice indicating the PI Trustee is reconsidering the NAS Payment Percentage.

If the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, makes a determination to increase the NAS Payment Percentage due to a material change in estimates of the future assets and/or liabilities of the PI Trust NAS Fund, the Claims Administrator shall make supplemental payments to all NAS PI Claimants who obtained previously a Final Judgment and received payments based on a lower NAS Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the NAS PI Channeled Claim in question multiplied by the newly-adjusted NAS Payment Percentage, less all amounts paid previously to the NAS PI Claimant in respect of such NAS PI Channeled Claim.

The PI Trust's obligation to make a supplemental payment to an NAS PI Claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the PI Trust's obligation shall resume, and the PI Trust shall pay any such aggregate supplemental payments due to such NAS PI Claimant, at such time that the total exceeds $100.00.

**A.93**

## § 6.    PAYMENT OF JUDGMENTS FOR MONEY DAMAGES.

An NAS PI Claimant who obtains a Final Judgment shall be entitled to receive from the PI Trust NAS Fund, in full and final satisfaction of that Final Judgment, a gross amount (subject to deductions set forth next) equal to the *lesser* of (i) the NAS Percentage-Reduced Claim (using the NAS Payment Percentage then in effect) and (ii) the NAS Maximum Value (such lesser amount, the "NAS Gross Amount"). A NAS PI Claimant's NAS Gross Amount shall be subject to the following deductions and holdbacks: (A) its pro-rata share of the Creditor Trust Operating Expenses of the PI Trust; (B) amounts necessary to settle liens held by private insurance companies against such amount, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against such amount, if any; (D) its pro-rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan and the Trust Agreement, and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of such NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[8]  The resulting net amount shall be paid to the NAS PI Claimant in the form of an initial payment not to exceed $3,500.00 and five (5) additional equal installments in years six (6) through ten (10) following the year of the initial payment; *subject, however*, to the prior satisfaction of healthcare liens as set forth in Section 7 below. In no event shall interest be paid in respect of any judgment obtained in the tort system.

None of the NAS Percentage-Reduced Claim, the NAS Maximum Value, the NAS Gross Amount, the deductions therefrom, or the payment schedule is subject to any appeal or reconsideration.

## § 7.    RESOLUTION OF HEALTH CARE LIENS.

The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental healthcare liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 8.    APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

 The special procedures set forth in Exhibit E to the NAS PI TDP shall apply to all NAS PI Claimants who are minors under applicable law and elect, subject to the terms hereof, to liquidate their NAS PI Claims by commencing a lawsuit in the tort system. Anyone seeking a Distribution from the PI Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached to the NAS PI TDP as Exhibit D.[9]

---

[8]    Your individual attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from the award.

[9]    Exhibit D contains two declaration forms. One applies if the NAS-Decedent named the NAS PI Claimant as executor in his/her will; the other applies if the NAS Decedent had no will.

**A.94**

**EXHIBIT C**

**SAMPLE HIPAA FORMS FOR**
**THE INDIVIDUAL PURDUE PHARMA LP PI TRUST DISTRIBUTION**
**PROCEDURE FOR NAS PI CLAIMS**

**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE
MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS
BEEN CONFIRMED AND GONE EFFECTIVE**

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ▮▮▮▮▮▮▮▮▮   Date: ▮▮▮▮▮▮▮▮▮

Date of Birth: ▮▮▮▮▮▮▮▮▮   SSN: ▮▮▮▮▮▮▮▮▮

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges).**

   Dates of Services: From: _____  To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**A.96**

**MASSIVE: Medical & Subrogation Specialists**
**25657 Southfield Road**
**Southfield, MI 48075**
**(p) 833-466-2774     (f) 877-294-7893**

5. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA. If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                     Date

Relationship to Patient (If signed by Legal Representative)

**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE**

### AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ███████████████     Date: ███████████████

Date of Birth: ███████████████     SSN: ███████████████

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges).**

   Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

A.98

**GENTLE, TURNER, SEXTON & HARBISON, LLC**
**501 Riverchase Parkway East, Suite 100**
**Hoover, Alabama 35244**
**(p) 205-716-3000    (f) 205-716-2364**

5. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA. If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                              Date

Relationship to Patient (If signed by Legal Representative)

**A.99**

**EXHIBIT D**

**SAMPLE HEIRSHIP DECLARATIONS FOR
THE INDIVIDUAL PURDUE PHARMA LP PI TRUST DISTRIBUTION
PROCEDURE FOR NAS PI CLAIMS**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-1 | SWORN DECLARATION: SIGNATORY IS EXECUTOR UNDER DECEDENT'S LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last will and Testament of the Decedent.

## I. DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name |
|---|---|---|---|---|
| | | | | |

| Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | Date of Death | ___/___/___ (Month/Day/Year) |
|---|---|---|---|

| Residence/Legal Domicile Address at Time of Death | Street | | | |
|---|---|---|---|---|
| | City | | State | Zip Code |

## II. PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name |
|---|---|---|---|---|
| | | | | |

| Your Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| |
|---|---|

| Prime Clerk POC Number assigned to your PI Claim | |
|---|---|

| Your Address | Street | | | |
|---|---|---|---|---|
| | City | | State | Zip Code |

| Your Relationship to Decedent | |
|---|---|

| Basis of Your Authority to Act for the Decedent | |
|---|---|

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the [ ] Amended Chapter 11 Plan of Purdue Pharma L.P. and its affiliated debtors (the "Plan").

1

**A.101**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____. 2. |
|---|---|



**A.102**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | III. HEIRS AND BENEFICIARIES OF DECEDENT |
|---|---|
| | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) |

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | **Name** | **Information** | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

A.103

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | | Name | Information | |
|---|---|---|---|---|
| 4. | | | **Address** | |
| | | | **Relationship to Decedent** | |
| | | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |
| 5. | | | **Address** | |
| | | | **Relationship to Decedent** | |
| | | | **Notified of Settlement?** | ☐ Yes. How Notified: _____<br><br>☐ No. Why Not: _____ |

**A.104**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| IV. PI Claimant Certification |
|---|

This Sworn Declaration is an official document for submission to the PI Trust. By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e) No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

5

**A.105**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(g) I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h) No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids. The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(i) I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j) I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct. I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V. PI CLAIMANT SIGNATURE | | | |
|---|---|---|---|
| **Signature** | | **Date** | ____/____/____ <br> (Month/Day/Year) |

6

**A.106**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-2 | SWORN DECLARATION: DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT |
|------|---------------------------------------------------------------------|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

### I. DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name |
|------|-----------|---|------|-----------|
| | | | | |

| Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | Date of Death | ____/____/____ (Month/Day/Year) |
|------------------------|---|---|---|

| Residence/Legal Domicile Address at Time of Death | Street | | | |
|---|---|---|---|---|
| | City | | State | Zip Code |

### II. PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name |
|-----------|-----------|---|------|-----------|

| Your Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| |
|---|---|

| Prime Clerk POC Number assigned to your PI Claim | |
|---|---|

| Your Address | Street | | | |
|---|---|---|---|---|
| | City | | State | Zip Code |

| Your Relationship to Decedent | |
|---|---|

| Basis of Your Authority to Act for the Decedent | |
|---|---|

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the [ ] Amended Chapter 11 Plan of Purdue Pharma L.P. and its affiliated debtors (the "Plan").

1

**A.107**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | |
|---|---|
| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death.<br><br>2. |



**A.108**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | III. HEIRS AND BENEFICIARIES OF DECEDENT |
|---|---|
| | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) |

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | Name | Information | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

**A.109**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

<table>
<tr>
<td></td>
<td align="center"><strong>Name</strong></td>
<td colspan="3" align="center"><strong>Information</strong></td>
</tr>
<tr>
<td rowspan="4"><strong>4.</strong></td>
<td rowspan="4"></td>
<td colspan="3"><strong>Address</strong></td>
</tr>
<tr>
<td colspan="2"><strong>Relationship to Decedent</strong></td>
<td></td>
</tr>
<tr>
<td rowspan="2"><strong>Notified of Settlement?</strong></td>
<td>☐ Yes. How Notified: _____</td>
<td></td>
</tr>
<tr>
<td>☐ No. Why Not: _____</td>
<td></td>
</tr>
<tr>
<td rowspan="4"><strong>5.</strong></td>
<td rowspan="4"></td>
<td colspan="3"><strong>Address</strong></td>
</tr>
<tr>
<td colspan="2"><strong>Relationship to Decedent</strong></td>
<td></td>
</tr>
<tr>
<td rowspan="2"><strong>Notified of Settlement?</strong></td>
<td>☐ Yes. How Notified: _____</td>
<td></td>
</tr>
<tr>
<td>☐ No. Why Not: _____</td>
<td></td>
</tr>
</table>

## IV. PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust. By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

**A.110**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(f)   I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g)   No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(h)   I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i)   I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V.   PI Claimant Signature | | |
|---|---|---|
| **Signature** | _____ | **Date** | ____/____/____ <br> (Month/Day/Year) |

**A.111**

## EXHIBIT E

### DISTRIBUTIONS TO OR FOR THE BENEFIT OF MINOR CLAIMANTS FOR THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE[1]

The following procedures apply to any PI Claimant who is a minor under applicable law (a "Minor Claimant") for so long as the PI Claimant remains a minor under applicable law. These procedures apply regardless of whether the Minor Claimant holds an NAS PI Claim or a Non-NAS PI Claim, and regardless of whether the Minor Claimant's Proxy (as defined below) elects to have that PI Claim liquidated under the PI TDP[2] or to pursue it in the tort system.

1. **Actions by Proxy of Minor Claimant.** A Minor Claimant's custodial parent, his/her legal guardian under applicable law (a "Guardian"), or an adult providing custody and care to the minor (any of the foregoing acting on behalf of the Minor Claimant, the "Proxy") is authorized to make submissions on behalf of the Minor Claimant under the PI TDP, subject to paragraph 2 below. The Proxy shall be responsible for submitting, on behalf of such Minor Claimant, all required forms under the PI TDP, including the Claim Form, as well as any evidence required by the PI Trust to support the Claim Form, and any other documentation required or requested pursuant to the PI TDP. The Proxy is authorized to take, on behalf of a Minor Claimant, all actions under the PI TDP that the Minor Claimant would be authorized to take if such Minor Claimant were an adult, other than receiving distributions from the PI Trust (unless so authorized by paragraph 5 below). These actions include, where permitted, making an opt-out or, if the Minor Claimant is a Non-NAS PI

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PI TDP (as defined below).

[2] "PI TDP" refers to either the NAS PI TDP or the Non-NAS PI TDP, as applicable for any particular PI Claimant.

**A.112**

Claimant, making a payment election or requesting an appeal pursuant to Exhibit C to the Non-NAS PI TDP.

2. **Establishing Proxy of a Minor Claimant**. Any purported Proxy making a submission to the PI Trust on behalf of a Minor Claimant shall include along with such submission documentation of his/her authority to act on behalf of the Minor Claimant, consisting of the following:

   a. If the purported Proxy is the Guardian of the Minor Claimant, then the court order appointing that Proxy as Guardian, or other documents reasonably acceptable to the Claims Administrator as sufficient under applicable law to evidence the guardianship.

   b. If the purported Proxy is the custodial parent of the Minor Claimant, then a sworn statement that such Proxy is the custodial parent of the Minor Claimant.

   c. If the purported Proxy is neither the Guardian nor custodial parent of the Minor Claimant, then a sworn statement by the purported Proxy that he/she is providing custody and care to the Minor Claimant, stating for how long he/she has been providing such care and custody, explaining his/her relationship to the Minor Claimant and the circumstances around the provision of care and custody, as well as a statement and/or records from one or more of the following in support of his/her sworn statement:

      1. Minor Claimant's school

      2. Purported Proxy's landlord or property manager

      3. Minor Claimant's health provider

      4. Minor Claimant's child care provider

**A.113**

    5.  Purported Proxy's placement agency

    6.  Governmental social services agency

    7.  Indian tribe officials

    8.  Purported Proxy's employer

Whether the purported Proxy is a Guardian, custodial parent, or neither, the Claims Administrator may require additional corroborating evidence at his discretion, including in the event that instructions are received from more than one purported Proxy for the same Minor Claimant.

**3. Distributions to Minor Claimants.** When the PI Trust has determined the final distributable amount on a Minor Claimant's claim, it will send notice of such final amount to the Minor Claimant's Proxy and counsel (if known). Such notice will include a letter inviting the Proxy to discuss how the distributable amount was determined, and the Claims Administrator will take reasonable steps to ensure that the Proxy understands how such amount was determined. Any distributions owing to a Minor Claimant that are ready for issue by the PI Trust at a time when the Minor Claimant is still a minor under applicable law shall be (i) used to pay the individual attorneys' fees of the Minor Claimant pursuant to Section 4 below and (ii) with respect to the remainder, paid into an interest-bearing sub-fund of the Trust (the "Minor Claimants Account"), held there for the sole benefit of the Minor Claimant, and invested in a U.S. governmental money-market fund until such funds are distributed pursuant to Section 5 below or until the Minor Claimant becomes an adult under applicable law (the "Adult Distribution Date"), at which time the amount then held in such account (including interest earned) shall be paid directly to such PI Claimant. Pending distributions for all Minor Claimants may be held in the same sub-fund.

**A.114**

4. **Payments of attorneys' fees.**

   Within a reasonable period following receipt of notice of the final distributable amount on Minor Claimant's PI Channeled Claim, and using forms to be provided by the Claims Administrator, the Minor Claimant's counsel shall submit to the PI Trust, with a copy to the Proxy, a request for payment of legal fees and expenses from the Minor's recovery. It is the Minor Claimant's attorney's duty to comply with all ethical and legal rules respecting such legal fees and expenses, and the Claims Administrator is permitted to rely upon such representation in issuing payments in respect of such fees and expenses. Absent objection from the Proxy with respect to such asserted fees and expenses, the Claims Administrator shall remit payment to the Minor Claimant's attorney in accordance with the latter's request.

5. **Early Distributions.** Funds held in the Minor Claimants Account for a Minor Claimant may be released prior to the Adult Distribution Date only pursuant to (a) an order of a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or (b) an order entered by the United States Bankruptcy Court for the Southern District of New York.

**A.115**

# INDIVIDUAL PURDUE PHARMA L.P.
# PI TRUST DISTRIBUTION PROCEDURE FOR NAS PI CHANNELED CLAIMS

## § 1. APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for NAS PI Channeled Claims (as defined below) (the "NAS PI TDP") sets forth the manner in which NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust NAS Fund to Holders of NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all NAS PI Claims, which are Claims against any Debtor for alleged opioid-related personal injury to an NAS Child or similar opioid-related Causes of Action against any Debtor asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that are not (A) Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are for alleged opioid-related personal injury to an NAS Child or that are similar opioid-related Causes of Action asserted by or on behalf of an NAS Child, in each case, that arose prior to the Petition Date, and that are not (A) Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims or (B) held by a Domestic Governmental Entity. NAS PI Channeled Claims shall be administered, liquidated and discharged pursuant to this NAS PI TDP, and satisfied solely from the PI Trust NAS Fund (as defined below). Holders of NAS PI Channeled Claims are referred to herein as "NAS PI Claimants."

NAS PI Channeled Claims liquidated under this NAS PI TDP shall be (i) Allowed or Disallowed (such NAS PI Channeled Claims so Allowed, "Allowed NAS PI Channeled Claims") and, for Allowed NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this NAS PI TDP.

An Award for an NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation,

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3185] (the "Plan") in the chapter 11 cases of Purdue Pharma L.P. and its Debtor affiliates (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

**A.116**

costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[2] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

This NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your NAS PI Claim should be submitted to [____].[3]

---

**ELECTION TO LIQUIDATE NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NAS PI TDP**

**An NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her NAS PI Claim in the tort system rather than pursuant to the streamlined liquidation procedures set herein (a "<u>NAS Opt-Out Claimant</u>"), may assert and liquidate such NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B, and shall forfeit all rights to liquidate such NAS PI Claim (and any associated NAS PI Channeled Claims regarding the same injuries that are the same subject of its NAS PI Claim) under the streamlined procedures set forth in this NAS PI TDP. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NAS PI TDP.**

---

## § 2.   ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)   Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

---

[2]   If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[3]   Submission instructions to be added after solicitation.

**A.117**

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)      Claims Administrator.

(i)      The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer, process, resolve and liquidate PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "Trustee"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "Claims Administrator") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)     The Trustee and the Claims Administrator[4] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance of all NAS PI Channeled Claims liquidated under this NAS PI TDP. Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, and not to any associated NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to an NAS PI Claimant on account of his/her NAS PI Claim is deemed to be a distribution in satisfaction of all NAS PI Channeled Claims held by such NAS PI Claimant with respect to the injuries that are the subject of his/her NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any NAS PI Claimant to ensure compliance with the terms outlined in this document. For NAS PI Claimants who execute the required HIPAA forms attached hereto as

---

[4]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

**A.118**

Exhibit C, the Claims Administrator also has the power to directly obtain such NAS PI Claimant's medical records.

## § 3.  INITIAL NAS PI CHANNELED CLAIM ALLOWANCE.

For an NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in this NAS PI TDP to be Allowed, the applicable NAS PI Claimant must, with respect to that NAS PI Channeled Claim:

(a)     Hold such NAS PI Channeled Claim against one or more Debtors;

(b)     Have already timely[5] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her NAS PI Claim against one or more Debtors;

(c)     Demonstrate by Competent Evidence (as defined below) a diagnosis by a licensed medical provider of a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as neonatal abstinence syndrome ("NAS"). The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician assistants, mental health counselor or therapist, or professional at a rehabilitation center. Only NAS PI Claims based on injuries or facts occurring prior to the filing of your NAS PI Claim Form are eligible for recovery.

(d)     Complete, sign and submit the NAS PI Claim Form attached hereto as Exhibit A by the date that is 150 days[6] after the NAS PI Claim Form is disseminated[7] to NAS PI Claimants;[8]

---

[5]     If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders. Notwithstanding this deadline, in addition to the other requirements herein, up to 274 late-filed Claims filed by NAS PI Claimants who appear on the West Virginia NAS Birth Score Program and are represented by the WV NAS Ad Hoc Group ("WV NAS Claimants") and who demonstrate the following to the satisfaction of the Claims Administrator shall be considered as if their Claim had been timely filed: (1) that the Claimant is a WV NAS Claimant, (2) that a Proof of Claim was filed in the Chapter 11 Cases by or on behalf of such WV NAS Claimant prior to April 15, 2021, and (3) a sworn declaration from the parent/guardian/custodian of such WV NAS Claimant that such parent/guardian/custodian did not know about the Chapter 11 Cases or Bar Date prior to the Bar Date.

[6]     Subject to extension in the discretion of the Claims Administrator.

[7]     Within 60 days after the Effective Date, the NAS PI Claim Form will be made available to NAS PI Claimants electronically and, if an NAS PI Claimant is a pro se claimant, also mailed to such NAS PI Claimant in physical copy. When disseminated, the NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the NAS PI Claim Form must be returned.

(e)    Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit C; and

(f)    If the NAS PI Channeled Claim concerns the injuries of a decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit D.[9]

Any NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given NAS PI Channeled Claim shall have that NAS PI Channeled Claim Allowed.

**If an NAS PI Claimant does not satisfy these requirements with respect to an NAS PI Channeled Claim that is being liquidated under the liquidation provisions of this NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this NAS PI TDP, you must complete the NAS PI Claim Form as instructed by the deadline, which is 150 days[10] after the NAS PI Claim Form is disseminated. Failure to timely submit the NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

### § 4.    COMPETENT EVIDENCE REQUIRED.

(a)    To receive a recovery on his/her NAS PI Claim, an NAS PI Claimant must submit one of the following forms of evidence ("Competent Evidence"):

(i)    A document from a licensed medical provider diagnosing the NAS Child with a medical, physical, cognitive or emotional condition resulting from the NAS Child's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to the condition known as NAS;

(ii)    A document from a licensed medical provider affirming that the NAS Child had Neonatal Opioid Withdrawal Syndrome ("NOWS"); or

(iii)    Other medical records evidencing that the NAS Child had an NAS diagnosis, including post-natal treatment for symptoms caused by opioid

---

[8]    If the NAS PI Claimant checks the box on the NAS PI Claim Form indicating his/her election to liquidate his/her NAS PI Claim in the tort system rather than under the liquidation provisions of this NAS PI TDP, then such NAS PI Claim will not be liquidated hereunder.

[9]    Exhibit D contains two declaration forms. One applies if the decedent named the person filing the NAS PI Claim Form as executor in his/her will; the other applies if the decedent had no will.

[10]    Subject to extension in the discretion of the Claims Administrator.

**A.120**

exposure, symptoms of post-natal withdrawal from opioids, medical scoring for NAS or NOWS which is positive or indicates fetal opioid exposure, a positive toxicology screen of the birth mother or infant for opioids or opioid-weaning drugs, or medical evidence of maternal opioid use.

(b)   The Claims Administrator shall have discretion to determine whether these evidentiary requirements have been met, including whether the forms of evidence submitted constitute Competent Evidence.[11] Any NAS PI Claimant who fails to meet these requirements is not entitled to any payment.

(c)   The Claims Administrator shall have the discretion to request additional relevant documentation believed to be in the possession of the NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 4.

(d)   If the Claims Administrator determines that an NAS PI Claim Form or accompanying evidence submitted hereunder is incomplete, he will notify the NAS PI Claimant and afford a 30-day period to cure any such deficiency. Such deficiencies include, but are not limited to, failure to sign or complete the NAS PI Claim Form, failure to execute the required HIPAA authorizations, or failure to submit qualifying evidence. If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed on an otherwise qualifying NAS PI Channeled Claim. If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the NAS PI Claimant from receiving all or part of any Award (s)he would otherwise be entitled to on such NAS PI Channeled Claim.

## § 5.   AWARDS.

The money available in the PI Trust NAS Fund for distribution to NAS PI Claimants shall be divided equally among the Allowed NAS PI Channeled Claims and allocated as equal gross awards to the Holders of such Allowed NAS PI Channeled Claims. The PI Trust may issue Distributions on account of Allowed NAS PI Channeled Claims in installments as funds are received by the PI Trust, or on account of installments pursuant to a court order. Because distributions to minors are to be held in trust until the minor becomes a legal adult (unless a

---

[11]   Competent Evidence necessary for Allowance of an NAS PI Claim is evidence, in the opinion of the Trustee, that establishes that the occurrence of a diagnosis of NAS with respect to an NAS PI Claimant is more likely true than not true, *i.e.* a probability standard. Competent Evidence requires more than a mere possibility or scintilla of truth, but such standard does not require proof that rises to the level of clear and convincing evidence. However, notwithstanding anything to the contrary in this NAS PI TDP, proof of a prescription of an opioid product shall not be required.

**A.121**

competent court orders otherwise), it may take years before you have received all of your Award.

Your Distribution amount under the NAS PI TDP is a gross award that will be further reduced to pay the applicable PI Trust Deductions and Holdbacks. In addition, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

Although the Plan channels claims for all types of personal injury damages to the PI Trust, including both economic and non-economic or general damages, Awards issued hereunder compensate only general pain and suffering on account of the NAS Child's injuries. Because of limited funds, economic damages and punitive damages are not compensable.

## § 6.    BAR FOR PRIOR SETTLED CASES.

An NAS PI Claimant whose NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this NAS PI TDP on account of such NAS PI Channeled Claim and shall not recover from the PI Trust on account of such NAS PI Channeled Claim.

## § 7.    SPECIAL PROCEDURES IN RESPECT OF MINORS.

For NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit E hereto also apply and shall supplement the procedures set forth in this NAS PI TDP.

## § 8.    FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate NAS PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique NAS PI Claimant identification numbers, and strategic NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of NAS PI Channeled Claims to ensure that they are being evaluated and paid fairly.

## § 9.    APPEALS.

If an NAS PI Claimant is dissatisfied with any determination made by the Claims Administrator with respect to his or her NAS PI Channeled Claim, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the NAS PI Claimant should identify the determination with which the NAS PI Claimant disagrees and state the reasons for the disagreement. The NAS PI Claimant may submit any additional documentation (s)he wishes to have considered. Only one appeal is permitted per Proof of Claim. The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the NAS PI Claimant and/or his/her counsel, as applicable. In the event that the Claims Office determines that the records submitted in support of the NAS PI Claimant's claim are unreliable, the notification of status shall advise the NAS PI Claimant of such determination and shall identify the particular records or statements that are

**A.122**

deemed unreliable. In evaluating such appeal, the Claims Administrator shall not change the NAS PI TDP allowance criteria.

NAS PI Claimants shall have no other appeal rights beyond those set forth in this Section 9. Determinations made by the Claims Administrator in the appeals process pursuant to this Section 9 shall be final and binding and are not subject to further appeal in any forum.f

**A.123**

# EXHIBIT I

**Non-NAS PI TDP**

# INDIVIDUAL PURDUE PHARMA L.P.
## PI TRUST DISTRIBUTION PROCEDURE FOR NON-NAS PI CHANNELED CLAIMS

## § 1.    APPLICABILITY AND SUBMISSION INSTRUCTIONS.

This trust distribution procedure for Non-NAS PI Channeled Claims (as defined below) (the "Non-NAS PI TDP") sets forth the manner in which Non-NAS PI Channeled Claims may become eligible for payments from, and shall be fully discharged by, the PI Trust.[1] Distributions in respect of Non-NAS PI Channeled Claims shall be exclusively in the form of Distributions from the PI Trust Non-NAS Fund to Holders of Non-NAS PI Channeled Claims on the terms set forth herein.

Pursuant to the Plan and the Master TDP, the following claims (the "Non-NAS PI Channeled Claims") will be channeled to, and liability therefore shall be assumed by, the PI Trust as of the Effective Date of the Plan: (i) all Non-NAS PI Claims, which are Claims against any Debtor for alleged opioid-related personal injury or other similar opioid-related Causes of Action against any Debtor, in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Claims, Third-Party Payor Claims, NAS Monitoring Claims or Hospital Claims, or (B) held by a Domestic Governmental Entity, and (ii) all Released Claims or Shareholder Released Claims that are for alleged opioid-related personal injury or that are similar opioid-related Causes of Action, in each case, that arose prior to the Petition Date, and that are not (A) NAS PI Channeled Claims, Third-Party Payor Channeled Claims, NAS Monitoring Channeled Claims or Hospital Channeled Claims, or (B) held by a Domestic Governmental Entity. Non-NAS PI Channeled Claims shall be administered and resolved pursuant to this Non-NAS PI TDP, and satisfied solely from the PI Trust Non-NAS Fund. Holders of Non-NAS PI Channeled Claims are referred to herein as "Non-NAS PI Claimants."[2]

Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP shall be (i) Allowed or Disallowed (such Non-NAS PI Channeled Claims so Allowed, "Allowed Non-NAS PI Channeled Claims") and, for Allowed Non-NAS PI Channeled Claims, (ii) liquidated to determine the gross amounts receivable thereon (an "Award"), in each case pursuant to the terms of this Non-NAS PI TDP.

An Award for a Non-NAS PI Channeled Claim liquidated hereunder will be a gross number before deduction of the following "PI Trust Deductions and Holdbacks": (A) a pro rata share of the operating expenses of the PI Trust; (B) amounts held back under the Lien Resolution Program (the "LRP Agreement") to settle liens held by private insurance companies against that Award, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like

---

[1]    Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [ECF No. 3185] (the "Plan") (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

[2]    "Non-NAS PI Claimant" includes each person holding a Non-NAS PI Channeled Claim arising from his/her own opioid use, and each person holding a Non-NAS PI Channeled Claim arising from the opioid use of a decedent (such deceased person, a "Decedent").

Medicare, Tricare, VA, or Medicaid against that Award, if any; (D) a pro rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases, subject to Section 5.8(g) of the Plan; and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of the Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan.[3] In addition to the deductions and holdbacks described above, your award may be subject to claims by certain state or tribal healthcare programs that are not part of the LRP Agreement.

The order of payments to be made hereunder by the PI Trust is set forth in § 6. No amounts shall be paid on account of a Non-NAS PI Channeled Claim unless such Claim has been Allowed.

This Non-NAS PI TDP sets forth what evidence and forms you must submit in order to be eligible to receive an Award. Forms may be completed online at the PI Trust's website, www._____.com, or by mailing back the completed forms to the PI Trust at the below address. Evidence in support of your Non-NAS PI Claim should be submitted to [____].[4]

---

[3]   If you have an individual attorney, then your attorney, rather than the PI Trust, will be responsible for deducting his/her fees and expenses from your Award.

[4]   Submission instructions to be added after solicitation.

**A.126**

---

**ELECTION TO LIQUIDATE NON-NAS PI CLAIM IN THE
TORT SYSTEM RATHER THAN UNDER THIS NON-NAS PI TDP**

**A Non-NAS PI Claimant who (i) timely filed a Proof of Claim in the Chapter 11 Cases prior to the General Bar Date asserting his/her Non-NAS PI Claim against one or more Debtors and (ii) elects expressly, by timely submission of the Non-NAS PI Claim Form attached hereto as Exhibit A, to liquidate his/her Non-NAS PI Claim in the tort system rather than pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP (each, a "Non-NAS Opt-Out Claimant" and, collectively, the "Non-NAS Opt-Out Claimants"), may assert and liquidate such Non-NAS PI Claim in the tort system at his/her own expense, as set forth in more detail in Exhibit B hereto, and shall forfeit all rights to liquidate such Non-NAS PI Claim (and any associated Non-NAS PI Channeled Claims regarding the same injuries that are the same subject of his/her Non-NAS PI Claim) under the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP, as well as the right to expedited appeal set forth in Exhibit C hereto. The right to litigate in the tort system is available only with respect to Claims that meet the definition of "PI Claim" set forth in the Plan.**

**OPTING OUT REQUIRES YOU TO TAKE THE AFFIRMATIVE ACTION OF CHECKING THE "OPT OUT" BOX ON THE NON-NAS PI CLAIM FORM AND TIMELY SUBMITTING YOUR NON-NAS PI CLAIM FORM TO THE PI TRUST. FAILURE TO TIMELY SUBMIT THE NON-NAS PI CLAIM FORM SHALL CONSTITUTE CONSENT TO HAVE YOUR NON-NAS PI CHANNELED CLAIMS LIQUIDATED PURSUANT TO THE PROVISIONS OF THIS NON-NAS PI TDP.**

---

## § 2.    ALLOCATION OF FUNDS; CLAIMS ADMINISTRATOR.

(a)    Allocations of Funds to the PI Trust and Further Allocation to the PI Trust NAS Fund and the PI Trust Non-NAS Fund.

Under the Plan, the PI Trust will receive a gross amount of between $700 million and $750 million (minus amounts distributed directly to the United States under the United States-PI Claimant Medical Expense Claim Settlement), in the form of an initial installment of $300 million on the Effective Date of the Plan and subsequent installments, in each case subject to the United States-PI Claimant Medical Expense Claim Settlement. The PI Trust shall establish a fund to pay NAS PI Channeled Claims (the "PI Trust NAS Fund"); and a fund to pay Non-NAS PI Channeled Claims (the "PI Trust Non-NAS Fund"), and shall allocate each distribution it receives under the Plan as follows: (i) 6.43% to the PI Trust NAS Fund, up to an aggregate maximum of $45 million, and (ii) the remainder to the PI Trust Non-NAS Fund, in each case subject to applicable PI Trust Deductions and Holdbacks.

(b)    Claims Administrator.

(i)    The PI Trust shall be established in accordance with § 5.7 of the Plan to (1) assume all liability for the PI Channeled Claims, (2) hold the MDT PI Claim and collect the Initial PI Trust Distribution and payments due under

the MDT PI Claim in accordance with the Private Entity Settlements and the PI Trust Documents, (3) administer and resolve PI Channeled Claims, (4) make Distributions on account of Allowed PI Channeled Claims in accordance with the PI Trust Documents (including this Non-NAS PI TDP), (5) fund the TPP LRP Escrow Account and make payments therefrom to LRP Participating TPPs, in each case, in accordance with and subject to the terms of the LRP Agreement and (6) carry out such other matters as are set forth in the PI Trust Documents. The trustee of the PI Trust (the "<u>Trustee</u>"), Edgar Gentle III, of Gentle, Turner, Sexton & Harbison, LLC, will serve as claims administrator (the "<u>Claims Administrator</u>") to carry out the duties of the Trustee as set forth in the Plan and PI Trust Documents.

(ii)    The Trustee and the Claims Administrator[5] shall determine, pursuant to the requirements set forth herein, the Allowance or Disallowance and valuation of all Non-NAS PI Channeled Claims liquidated under §§ 6-9 of this Non-NAS PI TDP, regardless of the type of Award sought. Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party. However, any Distribution to a Non-NAS PI Claimant on account of his/her Non-NAS PI Claim is deemed to be a distribution in satisfaction of all Non-NAS PI Channeled Claims held by such Non-NAS PI Claimant with respect to the injuries that are the subject of his/her Non-NAS PI Claim. The Claims Administrator may investigate any such claim, and may request information from any Non-NAS PI Claimant to ensure compliance with the terms outlined in this document. For Non-NAS PI Claimants who execute the required HIPAA forms attached hereto as Exhibit D, the Claims Administrator also has the power to directly obtain such Non-NAS PI Claimant's medical records.

## § 3.    INITIAL NON-NAS PI CHANNELED CLAIM ALLOWANCE.

For a Non-NAS PI Channeled Claim that is being liquidated pursuant to the streamlined procedures set forth in §§ 6-9 of this Non-NAS PI TDP to be Allowed, the applicable Non-NAS PI Claimant <u>must, with respect to that Non-NAS PI Channeled Claim</u>:

(a)    <u>Hold such Non-NAS PI Channeled Claim against one or more Debtors;</u>

(b)    <u>Demonstrate usage of a qualifying **prescribed** opioid listed in Exhibit E hereto (a "Qualifying Opioid")</u>

(i)    Non-NAS PI Claimants who used only (or, as applicable, where the Decedent used only) a **non-prescribed** (diverted) version of a Qualifying

---

[5]    As the same individual is serving as both Trustee and Claims Administrator, reference to actions by each reference Mr. Gentle acting in such respective capacity.

Opioid (OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt) are not eligible for an Easy Payment, Base Payment or Level Award (each as defined below) unless that Non-NAS PI Claimant or Decedent (as applicable) was a minor when s/he initiated usage of a non-prescribed, *branded* version of a Qualifying Opioid;

(c)     Have already timely[6] filed an individual personal injury Proof of Claim against one or more Debtors in the Chapter 11 Cases asserting his/her Non-NAS PI Claim against one or more Debtors;

(d)     Complete, sign and submit the Non-NAS PI Claim Form attached hereto as Exhibit A, checking at least one injury box[7] by the date that is 90 days[8] after the Non-NAS PI Claim Form is disseminated[9] to Non-NAS PI Claimants;[10]

(e)     Complete, sign and submit the two HIPAA consent forms attached hereto as Exhibit D; and

(f)     If the Non-NAS PI Channeled Claim concerns the injuries of a Decedent, then also execute and submit the appropriate Heirship Declaration attached hereto as Exhibit F.[11]

Any Non-NAS PI Claimant who satisfies all of the above requirements (a)-(f) with respect to a given Non-NAS PI Channeled Claim shall have that Non-NAS PI Channeled Claim Allowed.

---

[6]     If the Proof of Claim was filed after the General Bar Date but before April 23, 2021, the Claims Administrator shall consider the Non-NAS PI Channeled Claim without penalty. If the Proof of Claim was filed on April 23, 2021 or after, the Non-NAS PI Channeled Claim asserted by such Proof of Claim shall be Disallowed unless (i) the Claims Administrator determines, which determination shall be on a case-by-case basis, that good cause exists to treat the late-filed Non-NAS PI Channeled Claim as if it were timely filed, or (ii) the Bankruptcy Court so orders otherwise.

[7]     In the event a Non-NAS PI Claimant does not check any injury box from use of opioids on his/her Non-NAS PI Claim Form, his/her Non-NAS PI Channeled Claim shall be Disallowed. The Non-NAS PI Claim Form shall include clear language notifying a Non-NAS PI Claimant that if he or she fails to check any injury box from use of opioids, s/he will receive no recovery on his/her Non-NAS PI Channeled Claim.

[8]     Subject to extension in the discretion of the Claims Administrator.

[9]     Within 60 days after the Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if a Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, the Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

[10]    If the Non-NAS PI Claimant checks the box on the Non-NAS PI Claim Form indicating his/her election to liquidate his/her Non-NAS PI Claim in the tort system rather than under §§ 6-9 of this PI TDP, then such Non-NAS PI Claim will not be liquidated hereunder.

[11]    Exhibit F hereto contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

**A.129**

**If a Non-NAS PI Claimant does not satisfy these requirements with respect to a Non-NAS PI Channeled Claim that is being liquidated under §§ 6-9 of this Non-NAS PI TDP, INCLUDING THE REQUIREMENT TO TIMELY SUBMIT HIS/HER NON-NAS PI CLAIM FORM AND ANY NECESSARY ACCOMPANYING EVIDENCE, then such Non-NAS PI Channeled Claim shall be Disallowed.**

**Regardless of whether you elect to "opt out" or to have your claim liquidated under this Non-NAS PI TDP, you must complete the Non-NAS PI Claim Form as instructed by the deadline, which is 90 days[12] after the Non-NAS PI Claim Form is disseminated. Failure to timely submit the Non-NAS PI Claim Form (and any required supporting evidence) will result in your claim being disallowed. In other words, if you do nothing, you will not receive any compensation from the PI Trust.**

## § 4. DETERMINING WHETHER A PRODUCT IS QUALIFYING.

One of the following is required to demonstrate a Qualifying Opioid as listed in Exhibit E:

(a) A Non-NAS PI Claimant who provides evidence of a prescription for brand name OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt may rely on the name alone without the necessity of a corresponding NDC number.

(b) In order for a Non-NAS PI Claimant to qualify based on the use of one of the generic products listed in Exhibit E (e.g., oxycodone ER/CR, morphine sulfate ER, hydromorphone), s/he must present either:

(i) The product's corresponding NDC number, which is set forth in Exhibit E;[13] or

(ii) A notation in the record submitted that the product is manufactured or sold by Rhodes or Purdue.

(c) A Non-NAS PI Claimant who used (or, as applicable, where the Decedent used) a generic oxycodone prescription that does not contain evidence of § 4(a) or (b) may only qualify if the prescription utilizes one of the following:

(i) Oxycodone CR (or controlled release); or

(ii) Oxycodone ER (or extended release).

## § 5. TYPES OF EVIDENCE REQUIRED FOR QUALIFYING PRODUCTS.

All Non-NAS PI Claimants must demonstrate a prescription (which contains the name of the Non-NAS PI Claimant or Decedent, as applicable) and a Qualifying Opioid by one of the following pieces of evidence (a)-(e):[14]

---

[12]   Subject to extensions which the Claims Administrator may give in his discretion.

[13]   Subject to additional NDC numbers after discovery from or other disclosure by Debtors.

**A.130**

(a)    Pharmacy prescription records;

(b)    Prescription records, including without limitation:

   (i)    A visit note in which the prescribing physician lists a prescription for one of the Qualifying Opioids; or

   (ii)    A signed prescription from a doctor for one of the Qualifying Opioids;

(c)    A historical reference to one of the Qualifying Opioids, including but not limited to:[15]

   (i)    A reference in contemporaneous medical records to historical use of one of the Qualifying Opioids;

   (ii)    A reference in contemporaneous substance abuse/rehabilitation/mental health records to historical use of one of the Qualifying Opioids;

   (iii)    A reference in contemporaneous law enforcement records to historical use of one of the Qualifying Opioids; or

   (iv)    A reference in contemporaneous family law or other legal proceedings records to historical use of one of the Qualifying Opioids;

(d)    A photograph of the prescription bottle or packaging of one of the Qualifying Opioids with the name of the Non-NAS PI Claimant or Decedent (as applicable) as the patient listed the prescription label; or

(e)    A certification supplied by a Debtor, any of its successors (including the PI Trust), or a third party at a Debtor's or one of its successors' request, indicating that customer loyalty programs, patient assistance programs ("PAPs"), copay assistance programs, or any other data otherwise available to the certifying entity reflects that the Non-NAS PI Claimant or Decedent (as applicable) had at least one prescription for one of the Qualifying Opioids.

(f)    If a Non-NAS PI Claimant holds a Non-NAS PI Channeled Claim based on the Non-NAS PI Claimant's or Decedent's use of only *diverted* (i.e., without a lawful prescription) qualifying branded products as a minor pursuant to § 3(b)(i) above and cannot meet the evidentiary requirements of § 5(a)-(e) above,[16] s/he may still qualify if s/he can demonstrate both of the following:[17]

---

[14]    Subject to the exceptions set forth in provisions (f) and (g) of this Section 5.

[15]    The record must have been created prior to September 15, 2019 only if the historical reference is self-reported by the Non-NAS PI Claimant.

[16]    Since by definition diversion cases do not have a prescription, a Non-NAS PI Claimant could otherwise meet the evidentiary requirements above only with a historical reference to the diverted use of a qualifying product as

**A.131**

(i)    By a declaration under penalty of perjury (a) from the Non-NAS PI Claimant, or (b) in the case of a claim arising from a Decedent's opioid use, from any third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(ii)    By an *additional* declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt as a minor. The declaration must also state how long the diverted OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(g)    In the event a Non-NAS PI Claimant holds a claim arising from a *lawful* prescription of a qualifying product and cannot meet the evidentiary requirements of § 5(a)-(e) above, s/he may only qualify if s/he demonstrates <u>all</u> of the following:

(i)    That the Non-NAS PI Claimant or his/her agents made a bona fide attempt to retrieve all known prescribing physician medical charts, all known pharmacy charts, all known rehabilitation charts, <u>and</u> all known insurance explanations of benefits. An affidavit of no records (ANR), certificate of no records (CNR), affidavit of destroyed records (ADR), or certificate of destroyed records (CNR) must be provided as to all known records listed above (and in the Non-NAS PI Claim Form). Alternatively, if some medical records were produced in response to the Non-NAS PI Claimant's request but others were not, then evidence must be provided that the Non-NAS PI Claimant requested all records but that only limited records were produced by the facilities (with an explanation of how the portion of records not provided by the custodian likely contains required evidence and the basis for that assessment of probability); and

(ii)    By a declaration under penalty of perjury from the Non-NAS PI Claimant or, in the case of a claim arising from the opioid use of a Decedent, from a

---

a minor. In the absence of that historical reference in the medical records, this declaration requirement can be used under the conditions set forth in this subsection.

17    Sample affidavits will be made available on the PI Trust website.

**A.132**

third party with knowledge of the Decedent's opioid use, that the Non-NAS PI Claimant or Decedent is known to have been prescribed and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3; and

(iii)    By a supporting declaration from a third party with personal knowledge of the Non-NAS PI Claimant's or Decedent's use of opioids products stating under penalty of perjury that the declarant has personal knowledge that the Non-NAS PI Claimant or Decedent is known to have used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt. The declaration must also state how long the prescribed OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt was used for purposes of determining whether the Non-NAS PI Channeled Claim would qualify for Tier 2 or Tier 3.

(h)    The Claims Administrator shall have discretion, subject to the appeal process set forth in Exhibit C hereto, to determine whether the requirements in § 5(f)-(g) above have been met so as to provide sufficient indicia of reliability that the Non-NAS PI Claimant or Decedent was prescribed (or as a minor received diverted) and used OxyContin, MS Contin, Dilaudid, Hysingla ER, Butrans, DHC Plus, MSIR, OxyFast, OxyIR, Palladone, or Ryzolt.

(i)    In no event may a Non-NAS PI Claimant whose evidence of qualifying product use is based solely on the declarations under § 5(f)-(g) qualify for Tier 1A or Tier 1B. Whether the Non-NAS PI Claimant qualifies for Tier 2 or Tier 3 will be based on the length of use stated in the declaration.

(j)    Any Non-NAS PI Claimant who fails to meet the requirements of § 3, § 4 and § 5(a)-(g) is not entitled to any payment, including Easy Payment, Base Payment, or Level Award (each as defined below).

(k)    The Claims Administrator has the discretion to request additional documentation believed to be in the possession of the Non-NAS PI Claimant or his or her authorized agent or lawyer. The Claims Administrator has the sole discretion, subject to the appeal process set forth in Exhibit C hereto, to Disallow, or to reduce or eliminate Awards on, claims being liquidated hereunder where he concludes that there has been a pattern and practice to circumvent full or truthful disclosure under this § 5.

A.133

## § 6.    ORDER OF PAYMENTS; EASY PAYMENT.

A Non-NAS PI Claimant may choose between receiving an "Easy Payment" **_or_** a "Base Payment" and "Level Award," as detailed below.

The PI Trust will make payments in the following order:

(a)     Easy Payment of $3,500 per qualifying Non-NAS PI Claimant[18] to those Non-NAS PI Claimants who elect to receive an Easy Payment; and

(b)     Base Payments and Level Awards to qualified Non-NAS PI Claimants who did not elect to receive an Easy Payment.

Because monies are being received by the PI Trust in installments, payments of Awards other than Easy Payments may be in installments. Additionally, payments of Awards may be further delayed into installment payments if a competent court so orders. Finally, distributions to minors are to be held in trust until the minor becomes a legal adult (unless a competent court orders otherwise). For all of these reasons, it may take years before you receive all of your Award.

A Non-NAS PI Claimant meeting the requirements of § 3 (Allowance) pursuant to the standards set in § 4 (Determining What is a Qualifying Product) and § 5 (Evidence Required to Demonstrate a Qualifying Product) may elect on his/her Non-NAS PI Claim Form to receive a set payment (an "Easy Payment") in lieu of other compensation. **NOTE: if you select an Easy Payment, you are NOT eligible to receive any additional funds for your Non-NAS PI Channeled Claim**. That means you cannot receive any of the Base Payments or Level Awards below. If you select an Easy Payment and your Non-NAS PI Channeled Claim is determined to be an Allowed Non-NAS PI Channeled Claim, you will be entitled to a gross payment of $3,500, before deduction of any fees, costs or liens as described herein, within a reasonably short amount of time after receipt of your claims package by the Claims Administrator, or as soon as all applicable liens have been cleared. The Easy Payment is also expected to be free of many (but not all) types of health care liens, including liens of Third-Party Payors.

## § 7.    ADDITIONAL AWARD DETERMINATION.

(a)     Allowed Non-NAS PI Channeled Claims held by Non-NAS PI Claimants who do not elect to receive an Easy Payment and who otherwise meet the Qualifying Opioid requirement shall be categorized[19] as follows:

(i)     **Tier 1A**:

A.     Base Payment:

---

[18]    If a Non-NAS PI Claimant has multiple qualified PI Claims on account of personal injuries to more than one opioid user, then that Non-NAS PI Claimant may have distinct Non-NAS PI Claims, each of which may recover hereunder.

[19]    Non-NAS PI Claimants who assert or allege Qualifying Opioid usage in their Non-NAS PI Claim Forms for which they cannot produce corresponding evidence will not recover on account of such alleged opioid usage.

**A.134**

1. For a Non-NAS PI Claimant who demonstrates that his/her or the Decedent's addiction, dependence or substance abuse began while using one of the Qualifying Opioids.

2. Other than submission of qualifying product records under § 3, § 4 and § 5(a)-(f), no additional documents are required for a Holder of an Allowed Non-NAS PI Channeled Claim to secure a Tier 1A Base Payment. The showing required for a Tier 1A Base Payment is a temporal relationship between use of a qualifying product and the onset of addiction, dependence or substance abuse within six months after use of a qualifying product. There is a presumption that proof of qualifying product usage under the methods above within 6 months before the onset of addiction, dependence or substance abuse (as set forth in the Non-NAS PI Claim Form) is sufficient.

   aa. However, notwithstanding evidence of a qualifying product usage before the onset of addiction, dependence or substance abuse noted in the Non-NAS PI Claim Form, if the Non-NAS PI Claim Form, pharmacy, medical or other records demonstrate any of the below indicia of addiction, dependence or substance abuse that precede the earliest use of a qualifying product demonstrated by a Non-NAS PI Claimant, the claim does not qualify for Tier 1A.

      a. diagnosis of addiction, dependence or substance abuse relating to opioid use made by any licensed medical professional;

      b. treatment in a rehabilitation center for opioid use disorder;

      c. overdose, withdrawal, or detox from an opioid;

      d. consecutive use of opioids with MME of greater than 90 mg/day for 6 months or more;

      e. use of illegal opioids; or

      f. use of medication-assisted treatment ("MAT") like methadone.

B. Level Awards: In addition to Base Payments, Tier 1A Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

   1. Level A:

      aa. For Non-NAS PI Claimants who demonstrate one or more of the following:

11

**A.135**

a. Opioid Use Disorder ("OUD");[20]

b. MAT usage >6 months. MAT drugs include methadone, buprenorphine, Butrans, Suboxone, Zubsolv, Methadose, and naltrexone; or

c. Administration of Narcan, Evzio or Naloxone.

2. *Level B*:

aa. For Non-NAS PI Claimants who demonstrate death caused by an opioid (such as overdose or withdrawal).

C. <u>Additional Evidence for Level Awards</u>:

1. If making a claim for a Tier 1A Level Award based on OUD diagnosis, medical records, including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a medical or health professional. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

2. If making a claim for a Tier 1 A Level Award based on MAT or Narcan, Evzio or Naloxone use, pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No affidavits may be used to meet this requirement. The records do not have to coincide in time with the provided qualifying product use.

3. If making a claim for a Tier 1A Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports. The records do not have to coincide in time with the provided qualifying product use. No declarations may be used to meet this requirement.

4. The Non-NAS PI Claimant may submit such additional information as the Non-NAS PI Claimant believes will assist the Claims Administrator's determination of the appropriate amount of any Non-NAS PI Channeled Claim that has satisfied the initial claim validity requirements.

(ii) **Tier 1B:** Claims based on opioid-related death (overdose or withdrawal) while on OxyContin (temporal relationship between date of death and usage of OxyContin) qualify for Tier 1B Base Payment. Only branded OxyContin qualifies under Tier 1B (i.e., no other Qualifying Opioids). There are no Level Awards. If a Non-NAS PI Claimant is making a claim

---

[20] The diagnosis can be made by any licensed medical professional, specifically including physicians, nurses, physician's assistant, mental health counselor or therapist, or professional at a rehabilitation center.

**A.136**

for a Tier 1B Award, the death certificate of the Decedent as well as any toxicology reports or autopsy reports must be produced. The death must coincide in time with the provided qualifying product use (i.e. the timing of usage, including number of pills, falls within 5 days of the death). For example, if the Decedent had a prescription 20 days before death and the number of pills in that prescription was enough such that it can reasonably be expected the Decedent was using it within 5 days of death, the case qualifies. Conversely, if the Decedent had a prescription 45 days before death and the number of pills in the prescription was such that it can reasonably be expected that the Decedent would have run out of pills 15 days before death, the case does not qualify. The underlying addiction does not need to have begun during qualifying product use; OxyContin use at the time of death is sufficient.

(iii)   **<u>Tier 2</u>:** Non-NAS PI Claimants must demonstrate use of a qualifying product for 6 months or more; however, the usage does not have to be consecutive.

    A.   <u>Base Payment</u>: Other than for qualifying product records under § 3, § 4 and § 5(a)-(g), no additional documents are required for a Tier 2 Base Payment. All Non-NAS PI Claimants that qualify for Tier 2 will receive a Base Payment.

    B.   <u>Level Awards</u>: In addition to Base Payments, Tier 2 Non-NAS PI Claimants meeting the criteria below qualify for the additional payment attendant to the highest Level they qualify for (but not multiple Levels).

        1.   *Level A*:

           aa.   For Non-NAS PI Claimants who demonstrate one or more of the following:

              a. Opioid Use Disorder (OUD);

              b. MAT $\geqslant$ 6 months days; or

              c. Administration of Narcan, Evzio or Naloxone.

        2.   *Level B*:

           aa.   For Non-NAS PI Claimants who demonstrate death caused by an opioid.

    C.   <u>Additional Evidence for Level Awards</u>:

        1.   If making a claim for a Tier 2 Level Award based on OUD diagnosis, then medical records—including rehabilitation records, primary care, hospital, billing or other records reflecting a diagnosis of OUD made by a licensed medical or health professional—can serve as additional evidence. No affidavits may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

13

**A.137**

2.  If making a claim for a for a Tier 2 Level Award based on MAT or on Narcan, Evzio or Naloxone use, then pharmacy or other medical records reflecting use of MAT, Narcan, Evzio or Naloxone can serve as additional evidence. The types of evidence that qualify to show MAT, Narcan, Evzio or Naloxone exposure are the same as those in § 5(a)-(d). No declarations may be used to meet this requirement. The records do not have to coincide in time with the qualifying product use.

3.  If making a claim for a Tier 2 Level Award based on death, the death certificate of the Decedent as well as any toxicology reports or autopsy reports can serve as additional evidence. The records do not have to coincide in time with the qualifying product use. No affidavits may be used to meet this requirement.

(iv)    **Tier 3:** Claims based on the use of a qualifying product less than 6 months and otherwise not meeting the criteria of Tier 1A, Tier 1B or Tier 2 are entitled to no additional payments other than the Base Payment. Non-NAS PI Claimants who elect to receive the Easy Payment cannot receive any additional compensation, and no Tier applies to their Non-NAS PI Claims. However, in the event a Non-NAS PI Claimant declines the Easy Payment and elects to proceed but does not qualify for Tiers 1A, 1B, or 2, such Non-NAS PI Claimant will receive the Tier 3 Base Payment and only the Tier 3 Base Payment.

## § 8.    BASE PAYMENTS AND LEVEL AWARDS.

(a)    Grid Origins.

The point values provided in this grid resulted from the work of counsel to the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject matter experts for the Ad Hoc Group of Individual Victims and the other holders of PI Channeled Claims, and collaborative discussions with stakeholders. The estimated amount per point is based on a sample, and will be updated periodically on the PI Trust's website, www._____.com.

(b)    Amount of Money Per Point.

Based on an initial sample, we estimate that the dollar award amount per point will be between $0.80 and $1.20. The dollar amount ultimately awarded per point will be determined with reference to the funds available in the PI Trust and the pool of claims remaining against the PI Trust after the payment of Easy Payments.

**A.138**

|  | Tier 1A<br>*Addiction from Purdue Opioids* | Tier 1B<br>*Death on OxyContin* | Tier 2<br>*Purdue Opioids Use ≥6 months* | Tier 3<br>*No Addiction/ Death from Purdue Opioids, and Purdue Opioids Use <6 months* |
|---|---|---|---|---|
| **BASE PAYMENTS** | 20,000 pts[21] | 40,000 pts | 6,000 pts | $3,500 |
| **LEVELS (one of the below)[22]** |  |  |  |  |
| **A** | 10,000 pts<br><br>OUD Diagnosis, OR MAT for ≥6 months | N/A | 3,000 pts<br><br>OUD Diagnosis, OR MAT for ≥6 months | N/A |
| **B** | 20,000 pts<br><br>Death from an Opioid | N/A | 20,000 pts<br><br>Death from an Opioid | N/A |

## § 9. ADDITIONAL CLAIM FACTORS AND VALUATION.

(a)     To the extent practicable, only objective factors are to be scored, based upon the axiom that in mass torts consistency is fairness.

(b)     This grid is based in part on other scoring grids developed in comparable cases with unique customization according to the claims and injuries encountered and reviewed in sampling individual PI Claims.

(c)     Because of limited funds, economic damages are not compensable. This Non-NAS PI TDP only compensates general pain and suffering. Nonetheless, all personal injury damages from use of Qualifying Opioids are being channeled to the PI Trust and released, including both economic and non-economic or general damages.

(d)     Only reported injuries are to be scored.

(e)     In no circumstance shall the Claims Administrator assign any claim value for any punitive damages, exemplary damages, statutory enhanced damages, or attorneys' fees or costs (including statutory attorneys' fees and costs).

(f)     Only Non-NAS PI Claims based on injuries or facts occurring prior to the filing of your Non-NAS PI Claim Form are eligible for recovery.

---

[21]   Non-NAS PI Claimants who do not claim addiction, dependence or abuse of opioids are not entitled to receive Tier 1A Awards.

[22]   If a Non-NAS PI Claimant does not qualify for additional Level Awards, he/she does not get additional money above the Base Payment. A Non-NAS PI Claimant can only qualify for one, but not multiple, Level Awards.

A.139

## § 10.   BAR FOR PRIOR SETTLED CASES.

A Non-NAS PI Claimant whose Non-NAS PI Channeled Claim was reduced prior to the Petition Date to a settlement, judgment, or award against a Debtor shall be barred from receiving any Award under this Non-NAS PI TDP (Easy Payment, Base Payment or Level Award) on account of such Non-NAS PI Channeled Claim and shall not recover from the PI Trust on account of such Non-NAS PI Channeled Claim; provided, however, that a prior settlement with respect to a living person's OUD claim does not bar a subsequent wrongful death claim arising out of that settled OUD claim.

## § 11.   SPECIAL PROCEDURES IN RESPECT OF MINORS.

For Non-NAS PI Claimants who are minors under applicable law, the special procedures set forth in Exhibit G hereto also apply and shall supplement the procedures set forth in this Non-NAS PI TDP.

## § 12.   FAIRNESS AUDITS AND FRAUD PREVENTION.

The Claims Administrator will use appropriate technology and strategies to prevent paying fraudulent claims while making the claims process as simple as possible. Reasonable steps will be taken to mitigate fraud so as to ensure a fair and secure claims review and payment process, while not falsely flagging legitimate PI Channeled Claims. Among the techniques will be technology to prevent claims submitted by BOTS, unique Non-NAS PI Claimant identification numbers, and strategic Non-NAS PI Claim Form fields. Periodic fairness audits will be conducted on samples of Non-NAS PI Channeled Claims to ensure that they are being graded and paid fairly.

## § 13.   CHARITY.

The PI Trust will establish a charitable trust to accept donations that can be used to address the opioid addiction crisis by providing grant funding for recovery support services, addiction and addiction family harm reduction-related activities, education, family support, community-based advocacy efforts, and assistance to organizations providing services to individuals and caregivers grappling with opioid-related problems of Non-NAS PI Claimants. The distribution of funding provided by this charity may be streamlined through qualified not-for-profit organizations. The charity will be funded only through donations; none of the funds received by the PI Trust under the Plan will be diverted to fund this charity. Non-NAS PI Claimants may choose to allocate part or all of their share of their recovery to this charity.

## § 14.   APPEALS.

Each Non-NAS PI Claimant who has his/her Non-NAS PI Channeled Claims liquidated under this Non-NAS PI TDP has an appeal right, which is described in Exhibit C. Decisions of the Appeals Master pursuant to Exhibit C are final and binding, and Non-NAS PI Claimants have no further appeal rights as to any determinations made by the Claims Administrator under this Non-NAS PI TDP beyond those set forth in Exhibit C.

**A.140**

**EXHIBIT A**

**SAMPLE CLAIM FORM FOR
THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION
PROCEDURE FOR NON-NAS PI CLAIMS**

# PURDUE PHARMA PI TDP
# NON-NAS CLAIM FORM
# INSTRUCTIONS PAGE

**THIS IS A SAMPLE CLAIM FORM AND IS SUBJECT TO CHANGE. DO NOT COMPLETE THE FORM AT THIS TIME. A BLANK COPY OF THE FINAL FORM WILL BE AVAILABLE ONLINE AND BY MAIL FOR YOU TO COMPLETE AT THE APPROPRIATE TIME AFTER THE PURDUE PLAN OF REORGANIZATION HAS BEEN APPROVED AND GONE EFFECTIVE.**

This claim form (the "Claim Form") must be completed by each Non-NAS PI Claimant seeking to recover money from the Purdue Personal Injury Trust (The "PI Trust") on its Non-NAS PI Channeled Claim(s).[1]  IF YOU DO NOT TIMELY RETURN THIS CLAIM FORM AS INSTRUCTED, YOU WILL BE DEEMED TO HAVE CONSENTED TO HAVE YOUR NON-NAS PI CHANNELED CLAIM(S) LIQUIDATED UNDER THE NON-NAS PI TDP, AND YOUR CLAIM(S) WILL BE DISALLOWED UNDER THE NON-NAS PI TDP FOR YOUR FAILURE TO TIMELY RESPOND.

If you hold multiple Non-NAS PI Claims against the Debtors on account of injuries to *more than one* person who used opioids, then fill out one Claim Form for each of those Non-NAS PI Claims. If you hold multiple Non-NAS PI Claims on account of multiple injuries to *the same* person who used opioids, then fill out only one Claim Form. One Claim Form submitted for a Non-NAS PI Claim shall be deemed to be a Claim Form in respect of that Non-NAS PI Claim and also any Non-NAS PI Channeled Claims against a Released Person or Shareholder Released Person that are associated with that Non-NAS PI Claim.

**Follow the instructions of each section carefully to ensure that your Claim Form is submitted correctly**. If any section does not pertain to your claim, leave it blank. Except as otherwise indicated, all words shall be given their ordinary, dictionary meaning. Submitting this Claim Form does not guarantee that you will receive payment from the PI Trust. Whether or not you receive payment depends on whether you make the additional required submissions, as set forth in the Non-NAS PI TDP, and whether or not your claim meets the eligibility requirements set forth in the Non-NAS PI TDP.

This Claim Form allows you to choose to "opt out" of the streamlined, expedited Non-NAS PI TDP liquidation process with respect to any Non-NAS PI Claim against one or more of the Debtors, and instead pursue that Non-NAS PI Claim in the tort system by filing a lawsuit against the PI Trust at your own expense. You may litigate in court only with respect to a Non-NAS PI Claim held against one or more of the Debtors, and may not litigate other Non-NAS PI Channeled Claims. If you select the "opt out" option, you will not be eligible to receive the Easy Payment or any "Base Payment" or "Level Award." Furthermore, you will not be allowed to get back in to the Non-NAS PI TDP if your lawsuit is unsuccessful in the tort system. Any final judgment you obtain in the tort system against the Non-NAS PI Trust will be subject to reduction pursuant to the "opt out" procedures set forth in Exhibit B to the Non-NAS PI TDP.  YOU MAY ONLY OPT OUT BY CHECKING THE "OPT OUT" BOX AND TIMELY RETURNING THIS CLAIM FORM.  FAILURE TO RESPOND DOES NOT CONSTITUTE OPTING OUT.

For those who do not "opt out," this Claim Form requires you to choose between receiving an "Easy Payment" of $3,500 or seeking a "Base Payment" and "Level Award." If your Non-NAS PI Claim is eligible for

---

[1] Capitalized terms used but not defined herein have the meanings ascribed in the Non-NAS PI TDP or, if not defined therein, then the meanings ascribed to them in the Chapter 11 Plan.

**A.142**

payment, then the "Easy Payment" choice will get you money faster, but may not pay as much as a "Base Payment" or "Level Award" would ultimately pay.

By submitting this Claim Form and choosing to liquidate your Claim under the Non-NAS TDP, you are deemed to consent to the Lien Resolution Program and to become a party to the LRP Agreement, under which certain health insurance companies, known as "Third-Party Payors" or "TPPs," have agreed to resolve their claims against you and/or your recoveries under the Non-NAS PI TDP for reduced amounts or, in some cases, by waiving their claims altogether.  The LRP Agreement is attached as Exhibit [ ] to the [   ] Plan Supplement.

**Instructions for Submission**: You may complete and submit this Claim Form either online, at █████████████, or by mailing back the completed Claim Form to █████████████
███████████████████████████████.

**A.143**

# PURDUE PHARMA PI TDP NON-NAS CLAIM FORM

## PART ONE: PERSONAL INFORMATION OF NON-NAS PI CLAIMANT

What is the Claim Number assigned to your claim by Prime Clerk? ██████████████

Please only fill out **one** of the following sections (Section 1.A or 1.B).

- If you hold a PI Claim arising from your own use of opioids (or if such holder is alive and you are completing this form as his/her representative), fill out Section 1A.

- If you hold a PI Claim due to use of opioids by a deceased person (or you are completing this form on behalf of such a holder as his/her representative), fill out Section 1.B.

**Section 1.A: If you hold a PI Claim arising from your own use of opioids (or if such holder is alive and you are completing this form as his/her representative), then the term "Claimant" in this Claim Form refers to the person who used opioids, whether that is you or the person you represent. Please fill out the information below:**

Claimant's Name**:** ████████████████████████

Claimant's Date of Birth: ████████████████████████

Claimant's Address: ████████████████████████

Claimant's Social Security Number (or Taxpayer ID): ██████████████

**Representative Name (if applicable):** ██████████████████

**Legal Authority for Representative (if applicable):** ████████████
 **(e.g., POA, Legal Guardian, Conservator):**

**Section 1.B: If you are filing a PI Claim due to another's death from use of opioids, or you are completing this form as the representative of an individual with a claim due to another's death from use of opioids, please fill out the information below.**

Name of Deceased Person Who Used Opioids: ██████████████████

Address at Time of Death of Deceased
Person Who Used Opioids : ████████████████████

Date of Birth of Deceased Person Who Used Opioids: ████████████████

Date of Death: ████████████████████

Cause of Death: ████████████████████

**A.144**

Social Security Number (or Taxpayer ID) of Person Who Used Opioids: █████████████

Name of Claimant Filing Claim
on behalf of the Person Who Used Opioids: █████████████████████

Claimant's Address: ██████████████████████████

Claimant's Relationship to Person Who Used Opioids: ████████████████
(i.e., parent, sibling, child, spouse, etc.)

**Representative Name (if applicable):** ██████████████████

**Legal Authority for Representative (if applicable):** ███████████████
 **(e.g., POA, Legal Guardian, Conservator):**

If a Court has appointed you as Executor, Administrator or Personal Representative of the deceased person's estate, then submit the court order so appointing you along with your Claim Form.  If a Court has not appointed you as Executor, Administrator, or Personal Representative of the deceased person's estate, then also execute and submit the appropriate Heirship Declaration attached**.**

---

## PART TWO: "OPT OUT" OF THE NON-NAS PI TDP LIQUIDATION PROCEDURE

If you would like to forfeit all rights to have your Non-NAS PI Channeled Claim(s) liquidated under the Non-NAS PI TDP and instead to pursue your Non-NAS PI Claim by filing a lawsuit against the PI Trust in court at your own expense, check the following box. If you "opt out," you will not be eligible to receive an "Easy Payment," "Base Payment," or "Level Award" from the  PI Trust.

Mark the following box **only if** you **elect to "opt out" of the Non-NAS PI TDP liquidation process and instead pursue your Non-NAS PI Claim in civil court through the tort system by filing a lawsuit in court at your own expense**:

---

## PART THREE: EASY PAYMENT ELECTION (If you selected "Opt Out," then skip this Part Three)

**Section 3.A:** You may elect to receive an "Easy Payment" in lieu of other compensation. If you elect to receive an Easy Payment, you will receive a one-time payment of $3,500 within a reasonably short amount of time after receipt of your Claims Package by the Claims Administrator and resolution of any healthcare liens. The Easy Payment is expected to be free of many but not all types of health care liens. Even if you select the Easy Payment option, you must comply with the requirements of the Non-NAS PI TDP. **WARNING: If you elect to receive an Easy Payment, you are not eligible to receive any additional Awards for your Non-NAS PI Channeled Claims. On the other hand, declining the Easy Payment election and seeking a "Base Payment" and "Level Award" may result in receiving payment at a later date and through installments.**

Mark the following box **only if** you **elect to receive the Easy Payment** and **waive all additional Awards** or compensation:

---

- 4 -

**A.145**

**PART FOUR: TIERING AND LEVEL DESIGNATION (If you selected "Opt Out" or Easy Payment, SKIP this Part Four)**

**Section 4.A:** In this section, please mark the tier that applies to your Non-NAS PI Claim. IF MULTIPLE TIERS APPLY, CHECK THE HIGHEST TIER THAT APPLIES TO YOUR CLAIM. Please refer to the Non-NAS PI TDP for full definitions and qualifying criteria.

**Highest**

↑

**Tier 1B (highest tier):**

☐ You can demonstrate opioid-related death (such as overdose or withdrawal) while on Oxycontin.

**Tier 1A:**

☐ You can demonstrate that addiction, dependence, or substance abuse began while using one of the qualifying opioids.

**Tier 2:**

☐ You can demonstrate use of a qualifying product for 6 months or more (does not have to be consecutive use).

**Tier 3 (lowest tier):**

☐ You can demonstrate use of a qualifying product for less than 6 months and otherwise do not meet the criteria of any of the above tiers.

**Lowest**

**Section 4.B:** If you selected **Tier 1A** or **Tier 2** above, please mark the level designation that applies to your Non-NAS PI Claim. IF BOTH LEVEL B AND LEVEL A APPLY TO YOU, CHOOSE LEVEL B. Please refer to the Non-NAS PI TDP for full definitions and qualifying criteria. (If you checked a Tier 1B or Tier 3 Claim above, SKIP this section.)

**Highest**

↑

**Level B (highest level):**

☐ You can demonstrate death caused by an opioid (e.g., death caused by overdose or withdrawal).

**Level A (lowest level):**

☐ You can demonstrate (1) a diagnosis of Opioid Use Disorder (OUD), (2) MAT usage of 6 months or more, or (3) administration of Narcan, Evzio, or Naloxone.

**Lowest**

- 5 -

**A.146**

**PART FIVE: PRESCRIBED MEDICATIONS** (If you selected "Opt Out," SKIP this Part Five)

**Section 5.A:** Identify any of the following Purdue-brand opioids that the person whose opioid use is the subject of your Non-NAS PI Claim was **prescribed**. *Include evidence of the prescriptions when submitting this Claim Form. (A claim may qualify without prescription if the person who used opioids was a minor at the time the use began.)*

| | Date of first prescription: | Date of last prescription | Length of Use |
|---|---|---|---|
| OxyContin ☐ | | | |
| MSContin ☐ | | | |
| Dilaudid ☐ | | | |
| Butrans ☐ | | | |
| Hysingla ☐ | | | |
| DHC Plus ☐ | | | |
| MSIR ☐ | | | |
| OxyFast ☐ | | | |
| Oxy IR ☐ | | | |
| Palladone ☐ | | | |
| Ryzolt ☐ | | | |
| Rhodes Generic (name) _____ ☐ | | | |

**Section 5.B:** Identify any of the following Medication Assistance Treatment (MAT) drugs prescribed to the person whose opioid use is the subject of your Non-NAS PI Claim. *Include evidence of the prescriptions when submitting this Claim Form.* (If you selected Easy Payment, SKIP this Section.)

| | Date of first prescription: | Date of last prescription | Length of Use |
|---|---|---|---|
| Buprenorphine: ☐ | | | |
| Butrans: ☐ | | | |
| Methadone: ☐ | | | |
| Suboxone ☐ | | | |
| Zubsoly: ☐ | | | |
| Naltrexone: ☐ | | | |

**A.147**

<u>**Section 5.C:**</u> **Identify any of the following medications provided to the person whose opioid use is the subject of your Non-NAS PI Claim during or after an opioid overdose.** <u>***Include evidence of the prescriptions or administration when submitting this Claim Form.***</u> **(If you selected <span style="color:green">Easy Payment</span>, SKIP this Section.)**

| | | Date administered: |
|---|---|---|
| Narcan: | ☐ | |
| Evzio: | ☐ | |
| Naloxone: | ☐ | |

---

<u>**PART SIX: INJURIES SUFFERED BY THE PERSON WHO USED OPIOIDS**</u> <span style="color:blue">**(If you selected "Opt Out,", SKIP this Part Six)**</span>

<u>**WARNING: IF YOU DO NOT CHECK ANY INJURIES ON THIS LIST, THEN YOUR NON-NAS PI CHANNELED CLAIMS WILL BE DISALLOWED AND YOU WILL RECEIVE NO RECOVERY**</u>

<u>**Section 6.A:**</u>

**Please mark all that are applicable to your claim.**

_____ <u>ADDICTION</u>
    Date addiction began: _____
    Opioid that started the addiction: _____
    Diagnosis and Date of Opioid Use Disorder: _____

_____ <u>WITHDRAWALS</u>
    Date(s) withdrawal(s) occurred: _____

_____ <u>OVERDOSE</u>
    Date(s) overdose(s) occurred: _____

_____ <u>JAIL</u>
    Date(s) jail sentence(s) began/ended: _____
    The charge(s): _____

_____ <u>REHAB</u>
    Dates of inpatient or outpatient rehabilitation: _____

---

**A.148**

**PART SEVEN: MEDICAL PROVIDER INFORMATION (If you selected "Opt Out" or Easy Payment, SKIP this Part Seven)**

**Section 7.A:** In this section, please identify information for the medical providers (prescribing doctors and pharmacies) who prescribed opioids to the person whose opioid use is the subject of your Non-NAS PI Claim:

| Name of Prescriber/Pharmacy | Address | City | State | Zip | Date Range From | Date Range To |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

**PART EIGHT: MEDICAL LIENS (If you selected "Opt Out," SKIP this Part Eight)**

**Section 8.A:** Did any insurance company pay for medical treatment for the opioid-related injuries that gave rise to your Non-NAS PI Claim?

Yes: ☐

No: ☐

**Section 8.B:** In the last 20 years, was the person whose opioid use is the subject of your Non-NAS PI Claim eligible for coverage by any of the following, or did any of the following actually pay for his/her opioid-related health costs? Respond by writing "Yes" or "No" next to each insurance provider name, and provide the requested information as to each. If any insurance carrier who provided coverage to the person who used opioids is not listed below, please write in that carrier's name and information at the bottom of the chart.

| Type of Insurance | Yes/ No | Street Address | Phone Number | Policy Number (if any) | Policy Holder | Dates of Coverage |
|---|---|---|---|---|---|---|
| Medicare |  |  |  |  |  |  |
| Medicaid |  |  |  |  |  |  |
| Tricare |  |  |  |  |  |  |
| VA |  |  |  |  |  |  |
| Champus |  |  |  |  |  |  |
| Private (Name Below): |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |

**A.149**

**PART NINE:** **SIGNATURE (You must complete this Part Nine regardless of your elections above)**

**Section 9.A:** **Please sign this section when you have completed this Claim Form.**

Name of person who is signing this form: _____

E-mail address of person who is signing this form: _____

Phone Number of person who is signing this form: _____

I am including the evidence requested above in my submission of this form: ☐

*I declare under penalty of perjury that the representations made and the information provided on this Claim Form are true, correct and complete to the best of my knowledge.*

_____

*Signature of Non-NAS PI Claimant (or signature of Representative Completing this Form for a Non-NAS PI Claimant)*

**A.150**

**EXHIBIT B**

**PROCEDURES FOR NON-NAS PI CLAIMANTS WHO OPT
TO LIQUIDATE THEIR NON-NAS PI CLAIMS IN THE TORT
SYSTEM RATHER THAN UNDER THE INDIVIDUAL PURDUE
PHARMA L.P. NON-NAS TRUST DISTRIBUTION PROCEDURE**

The following procedures shall apply in the case of a Non-NAS PI Claimant[1] who elects, subject to the terms hereof, to liquidate his or her Non-NAS PI Claim by commencing a lawsuit in the tort system after so timely indicating on his or her Non-NAS PI Claim Form. By so electing, such Non-NAS PI Claimant forfeits any right to have his or her Non-NAS PI Claim liquidated under sections 6 through 9 (inclusive) of the Non-NAS PI TDP, and instead shall have the right to liquidate his or her Non-NAS PI Claim exclusively in the tort system. Only claims that meet the definition of "Non-NAS PI Claim" under the Plan may be litigated in the tort system. The adjudication of a Non-NAS PI Claim in the tort system shall be deemed to be an adjudication of that Non-NAS PI Claim and any associated Non-NAS PI Channeled Claims of the Non-NAS PI Claimant regarding the same injuries that are the subject of his or her Non-NAS PI Claim. Any Distribution from the PI Trust on a Final Judgment (as defined below) in respect of such Non-NAS PI Claim, if any, shall be deemed to be a Distribution in satisfaction and conclusive resolution of such Non-NAS PI Claim and such associated Non-NAS PI Channeled Claims.

## § 1.   SUITS IN THE TORT SYSTEM.

If a Non-NAS PI Claimant timely filed a proof of claim in the Chapter 11 Cases asserting his or her Non-NAS PI Claim, then he or she may elect to liquidate such Non-NAS PI Claim in the tort system rather than under the Non-NAS PI TDP by checking the box so indicating on his or her Non-NAS PI Claim Form, which Non-NAS PI Claim Form must be filed by the date that is ninety (90) days[2] after the applicable Non-NAS PI Claim Form is disseminated to him/her.[3] If the Non-NAS PI Claimant makes such election, then the Non-NAS PI Claimant may file a lawsuit regarding only his or her Non-NAS PI Claim (and no other claims) against only the PI Trust (and including no other parties as defendants) solely in the United States District Court for the Southern District of New York (the "SDNY District Court"),[4] unless such court orders pursuant to 28 USC

---

[1]   Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Non-NAS PI TDP or, if not defined in the Non-NAS PI TDP, the meanings ascribed to such terms in the Plan.

[2]   Within sixty (60) days after the Effective Date, the Non-NAS PI Claim Form will be made available to Non-NAS PI Claimants electronically and, if the Non-NAS PI Claimant is a pro se claimant, also mailed to such Non-NAS PI Claimant in physical copy. When disseminated, each Non-NAS PI Claim Form will clearly state the absolute deadline (e.g., "January 30, 2022") by which the Non-NAS PI Claim Form must be returned.

[3]   The filing of a Non-NAS PI Claim Form indicating that a Non-NAS PI Claimant has elected to liquidate his or her Non-NAS PI Claim in the tort system shall have no effect on any federal or state statute of limitation or repose applicable to the Non-NAS PI Claims asserted by such Non-NAS PI Claimant.

[4]   The Debtors shall seek an order from the SDNY District Court requiring that lawsuits filed by Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system be filed and tried solely in the SDNY District Court pursuant to 28 U.S.C. § 157(b)(5).

§ 157(b)(5) that such suit may be filed and tried in the United States District Court for the district in which the Non-NAS PI Claim arose.

Any such lawsuit shall be filed by the Non-NAS PI Claimant in an individual capacity and not as a member or representative of a class, and no such lawsuit shall be consolidated with the lawsuit of any other plaintiff by, or on the motion of, any plaintiff.[5] All defenses (including, with respect to the PI Trust, all defenses which could have been asserted by the Debtors, except as otherwise provided in the Plan) shall be available to both sides at trial.[6]

Subject to the PI Trust's receipt of a Non-NAS PI Claim Form so indicating that a Non-NAS PI Claimant has elected to retain the option to file a lawsuit in the tort system as set forth above, NewCo and the Plan Administration Trust will establish and maintain, as necessary, a document reserve (the "PI Document Reserve") containing such materials as are necessary to such lawsuit as discovery material. Any such Non-NAS PI Claimant will be provided access to the PI Document Reserve subject to agreeing to (i) a protective order acceptable to the PI Trustee, the Plan Administration Trustee, and NewCo, and (ii) to the extent that the materials deposited into the PI Document Reserve include any documents produced by the Shareholder Released Parties that are not included in the Public Document Repository in accordance with the Plan and the Shareholder Settlement Agreement (the "Shareholder Released Party Documents"), the Protective Order, which shall exclusively govern the terms of disclosure of the Shareholder Released Party Documents. Any such Non-NAS PI Claimant who propounds on the PI Trust, NewCo, the Plan Administration Trustee, any other Creditor Trust, or any Debtor a request for additional documents or testimonial discovery must in such request (i) represent that such Non-NAS PI Claimant has conducted a reasonable search of the PI Document Reserve and, if it has been established, the Public Document Repository, and believes, based on such reasonable search, that the documents, information, or testimony it seeks is not available in either the PI Document Reserve or the Public Document Repository, and (ii) state and explain the basis for the Non-NAS PI Claimant's good faith belief that the additional discovery he or she seeks is relevant to such lawsuit. The PI Trust shall not be liable for any costs incurred by parties other than the PI Trust in connection with third-party discovery propounded by any party other than the PI Trust.[7]

If a Non-NAS PI Claimant obtains a judgment on his or her Non-NAS PI Claim in the tort system and such judgment becomes a final order (a "Final Judgment"), such Final Judgment shall be deemed "Allowed" for purposes under the Plan and shall be payable by the PI Trust, subject to the limitations set forth in Section 2 below, as well as the Non-NAS Payment Percentage and Non-

---

[5] The trustee of the PI Trust (the "PI Trustee") shall be empowered (i) to bring one or more consolidated actions against multiple Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system and (ii) to seek to consolidate multiple lawsuits commenced by individual Holders of PI Claims who elect, subject to the terms hereof, to liquidate their PI Claims by commencing separate lawsuits in the tort system.

[6] Among other things, the PI Trust shall be empowered to assert that the claim that is the subject of a Non-NAS PI Claimant's lawsuit is not a "Non-NAS PI Claim" within the meaning of the Plan.

[7] In order to minimize costs incurred by the PI Trust in connection with third-party discovery, the PI Trustee shall be empowered to seek to consolidate discovery propounded by Holders of PI Claims or the PI Trust in multiple lawsuits commenced by individual Holders of PI Claims against the PI Trust.

**A.152**

NAS Maximum Value (each as defined below), as provided in <u>Section 6</u> below, the deductions as set forth in <u>Section 6</u> below, and the resolution of healthcare liens, as provided in <u>Section 7</u> below.

## § 2.    LIMITATION ON DAMAGES AND ATTORNEYS' FEES.

Notwithstanding their availability in the tort system, no multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), and no interest, attorneys' fees or costs (including statutory attorneys' fees and costs) shall be payable, with respect to any Non-NAS PI Claim litigated against the PI Trust in the tort system.

## § 3.    NON-NAS MAXIMUM VALUE.

Payment on a Final Judgment for a Non-NAS PI Claim shall not exceed the dollar-equivalent of 120,000 points (the "<u>Non-NAS Maximum Value</u>"), which is three times the maximum point value attributed under the liquidation provisions of the Non-NAS PI TDP to eligible claims for the most severe injuries. Points will be converted to dollars consistent with the conversion set forth in section 8 of the Non-NAS PI TDP. As set forth in more detail in the Non-NAS PI TDP, the dollar amount ultimately awarded per point will be determined with reference to the funds remaining in the PI Trust and to the pool of claims remaining against the PI Trust. It will vary depending on how many people choose to opt out their claims and how expensive it is for the PI Trust to defend those claims in the tort system. It will also depend on the payment elections made by those who are liquidating their claims under sections 6 through 9 (inclusive) of the Non-NAS PI TDP. At this time, it is estimated that the dollar award amount per point will be between $0.80 and $1.20.

## § 4.    NON-NAS PAYMENT PERCENTAGE.

A Final Judgment on a Non-NAS Claim, minus any multiple, exemplary, statutory enhanced and/or punitive damages (i.e., damages other than compensatory damages), interest, attorneys' fees or costs (including statutory attorneys' fees and costs) that may have been awarded as part of such Final Judgment, shall be subject to reduction by the same percentage that Non-NAS PI Claims liquidated under the Non-NAS PI TDP are reduced prior to payment. In other words, a Non-NAS PI Claimant who elects to liquidate his or her Non-NAS PI Claim in the tort system shall not be entitled to receive more than his or her pro-rata share of the value available for distribution to all Non-NAS PI Channeled Claims entitled to a recovery pursuant to the Non-NAS PI TDP. Based upon the work of the Ad Hoc Group of Individual Victims, statistical sampling and modeling performed by financial analysts and subject-matter experts for the Ad Hoc Group of Individual Victims and other Holders of PI Claims, review of judgments obtained in lawsuits, settlement history, and collaborative discussions with stakeholders, the Base Payments and Level Awards described in the Non-NAS PI TDP represent an estimated pro-rata percentage recovery by PI Claimants holding Allowed PI Channeled Claims of approximately 2.0% (such pro-rata percentage recovery as may be altered over time, the "<u>Non-NAS Payment Percentage</u>"). Accordingly, the initial Non-NAS Payment Percentage is 2.0%.

No Holder of a Non-NAS PI Claim who elects to liquidate his or her Non-NAS PI Claim in the tort system shall receive a payment that exceeds the liquidated value of his or her Non-NAS PI Claim multiplied by the Non-NAS Payment Percentage in effect at the time of payment (such value so reduced, the "<u>Non-NAS Percentage-Reduced Claim</u>"); *provided, however*, that if there is

**A.153**

a reduction in the Non-NAS Payment Percentage, the PI Trustee, in his or her sole discretion, may cause the Non-NAS PI Trust to pay a Non-NAS PI Claim based on the Non-NAS Payment Percentage that was in effect prior to the reduction if the judgment in respect of such Non-NAS PI Claim became a Final Judgment prior to the date on which the PI Trustee proposes the new Non-NAS Payment Percentage to the PI Trust's oversight committee (the "Oversight Committee") and the processing of such Non-NAS PI Claim was unreasonably delayed due to circumstances beyond the control of the Non-NAS PI Claimant or the Claimant's Counsel (as applicable).

## § 5.    ADJUSTMENT OF THE NON-NAS PAYMENT PERCENTAGE.

The Non-NAS Payment Percentage shall be subject to change if the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, determines that an adjustment is required. No less frequently than once every three (3) years, commencing with the date that is three (3) years after the Effective Date of the Plan, the PI Trustee (with the assistance of the Claims Administrator) shall reconsider the then-applicable Non-NAS Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration and with the consent of the Oversight Committee, change the Non-NAS Payment Percentage if necessary. The PI Trustee shall reconsider the then-applicable Non-NAS Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the Oversight Committee.

The PI Trustee shall base his or her determination of the Non-NAS Payment Percentage on current estimates of the number, types, and values of Non-NAS PI Channeled Claims, the value of the assets of the PI Trust Non-NAS Fund available for the payment of Allowed Non-NAS PI Channeled Claims pursuant to the Non-NAS PI TDP and amounts due and estimated to become due pursuant to the Non-NAS PI TDP in respect of Final Judgments obtained by Non-NAS PI Claimants who elect to liquidate their Non-NAS PI Claims in the tort system, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of (i) full value to all Holders of Allowed Non-NAS PI Channeled Claims and (ii) the Non-NAS Maximum Value to Non-NAS PI Claimants who elect to liquidate their Non-NAS PI Claims in the tort system. When making these determinations, the PI Trustee (with the assistance of the Claims Administrator) shall exercise common sense and flexibly evaluate all relevant factors.

If a redetermination of the Non-NAS Payment Percentage has been proposed in writing to the Oversight Committee by the PI Trustee, but such redetermination of the Non-NAS Payment Percentage has not yet been adopted by the Oversight Committee, a Non-NAS PI Claimant that has obtained a Final Judgment shall receive the lower of the then-current Non-NAS Payment Percentage and the proposed Non-NAS Payment Percentage. However, if the proposed Non-NAS Payment Percentage is the lower amount but is not subsequently adopted by the Oversight Committee, the Non-NAS PI Claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Non-NAS Payment Percentage is the higher amount and subsequent adopted, the Non-NAS PI Claimant who has obtained a Final Judgment shall thereafter receive the difference between the current amount and the higher adopted amount.

**A.154**

At least thirty (30) days prior to proposing in writing to the Oversight Committee a change in the Non-NAS Payment Percentage, the PI Trustee shall post to the PI Trust's website a notice indicating the PI Trustee is reconsidering the Non-NAS Payment Percentage.

If the PI Trustee (with the assistance of the Claims Administrator), with the consent of the Oversight Committee, makes a determination to increase the Non-NAS Payment Percentage due to a material change in estimates of the future assets and/or liabilities of the PI Trust Non-NAS Fund, the Claims Administrator shall make supplemental payments to all Non-NAS PI Claimants who obtained previously a Final Judgment and received payments based on a lower Non-NAS Payment Percentage. The amount of any such supplemental payment shall be the liquidated value of the Non-NAS PI Channeled Claim in question multiplied by the newly-adjusted Non-NAS Payment Percentage, less all amounts paid previously to the Non-NAS PI Claimant in respect of such Non-NAS PI Channeled Claim.

The PI Trust's obligation to make a supplemental payment to a Non-NAS PI Claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00. However, the PI Trust's obligation shall resume, and the PI Trust shall pay any such aggregate supplemental payments due to such Non-NAS PI Claimant, at such time that the total exceeds $100.00.

## § 6. PAYMENT OF JUDGMENTS FOR MONEY DAMAGES.

A Non-NAS PI Claimant who obtains a Final Judgment shall be entitled to receive from the PI Trust Non-NAS Fund in full and final satisfaction of that Final Judgment, a gross amount (subject to deductions set forth next) equal to the *lesser* of (i) the Non-NAS Percentage-Reduced Claim and (ii) the Non-NAS Maximum Value, in each case as then in effect (as described next) (such lesser amount, the "Non-NAS Gross Amount"). A Non-NAS PI Claimant's Non-NAS Gross Amount shall be subject to the following deductions and holdbacks: (A) its pro-rata share of the Creditor Trust Operating Expenses of the PI Trust; (B) amounts necessary to settle liens held by private insurance companies against such amount, if any; (C) amounts prepaid to the United States under the United States-PI Claimant Medical Expense Claim Settlement to settle liens of the federal healthcare programs like Medicare, Tricare, VA, or Medicaid against such amount, if any; (D) its pro-rata share of the compensation, costs and fees of professionals that represented or advised the Ad Hoc Group of Individual Victims and the NAS Committee in connection with the Chapter 11 Cases as and to the extent provided in the PI Trust Agreement, subject to Section 5.8(g) of the Plan, and (E) the common benefit assessment required under Section 5.8(c) of the Plan, and the fees and costs of such Non-NAS PI Claimant's individual attorney(s) in the Chapter 11 Cases, if any, which deduction shall be taken by such individual attorney and reduced by the common benefit assessment in accordance with Section 5.8(c) of the Plan. The resulting net amount shall be paid to the Non-NAS PI Claimant in the form of an initial payment not to exceed $3,500.00 and five (5) additional equal installments in years six (6) through ten (10) following the year of the initial payment; *subject, however*, to the prior satisfaction of healthcare liens as set forth in Section 7 below. In no event shall interest be paid in respect of any judgment obtained in the tort system.

5

**A.155**

None of the Non-NAS Percentage-Reduced Claim, the Non-NAS Maximum Value, the Non-NAS Gross Amount, the deductions therefrom, or the payment schedule is subject to any appeal or reconsideration.

## § 7.    RESOLUTION OF HEALTH CARE LIENS.

The PI Trust shall not issue any payment in respect of a Final Judgment until the Claims Administrator has received proof to his or her reasonable satisfaction that any private or governmental healthcare liens or similar claims against such Final Judgment have been satisfied or will be satisfied out of the recovery.

## § 8.    APPLICABILITY OF SPECIAL PROCEDURES FOR MINORS AND HEIRS.

The special procedures set forth in Exhibit G to the Non-NAS PI TDP shall apply to all Non-NAS PI Claimants who are minors under applicable law and elect, subject to the terms hereof, to liquidate their Non-NAS PI Claims by commencing a lawsuit in the tort system. Anyone seeking a Distribution from the PI Trust in his or her capacity as an heir must execute and submit the applicable Heirship Declaration attached to the Non-NAS PI TDP as Exhibit F.[8]

---

[8]    Exhibit F contains two declaration forms. One applies if the Decedent named the Non-NAS PI Claimant as executor in his/her will; the other applies if the Decedent had no will.

A.156

1

# EXHIBIT C

### PROCEDURE FOR DEFICIENCIES AND APPEALS FOR
### THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE
### FOR NON-NAS PI CLAIMS

These procedures apply only to PI Channeled Claims liquidated under sections 6 through 9 (inclusive) of the PI Trust Distribution Procedure for Non-NAS Claims (the "Non-NAS PI TDP"), and are not available for NAS PI Claims or for any PI Claims liquated in the tort system.

**1.01    Curing Deficiencies.**    If the Claims Administrator[1]  determines that a claim submitted pursuant to the Non-NAS PI TDP is incomplete, (s)he will notify the PI Claimant and afford a 14-day period to cure any such deficiency.    Such deficiencies include, but are not limited to, failure to sign the Claim Form (Exhibit A to the Non-NAS PI TDP), failure to complete the Claim Form, failure to execute a HIPAA authorization (Exhibit D to the Non-NAS PI TDP), or submission of a declaration that fails to meet the requirements of § 5 of the Non-NAS PI TDP.    If the deficiency is timely cured to the satisfaction of the Claims Administrator, no deduction or penalty will be assessed to an otherwise qualifying Claim.    If the deficiency is not timely cured, or not cured at all, the Claims Administrator, depending on the nature of the deficiency, has the authority to prevent the Non-NAS PI Claimant from receiving all or part of any award (s)he would otherwise be entitled to.

**1.02    Appeals to the Claims Administrator.**    If a Non-NAS PI Claimant is dissatisfied with his/her award determination pursuant to the Non-NAS PI TDP or a determination by the Claims Administrator thereunder to limit or prohibit an award pursuant to the deficiency process described in Section 1.01 above or any other determination made by the Claims Administrator under the Non-NAS PI TDP, (s)he can appeal to the Claims Administrator within fourteen (14) days of receiving notice of such Claims Administrator determination by submitting a written document clearly marked as "Appeal to Claims Administrator." In that document, the Non-NAS PI Claimant should identify the determination with which the Non-NAS PI Claimant disagrees and state the reasons for the disagreement. The Non-NAS PI Claimant may submit any additional documentation (s)he wishes to have considered.    Only one appeal is permitted per Proof of Claim.    The Claims Administrator shall conduct a de novo review and promptly issue a ruling in writing to the Non-NAS PI Claimant and/or his/her counsel, as applicable.    In the event that the Claims Office determines that the records submitted in support of the Non-NAS PI Claimant's claim are unreliable, the notification of status shall advise the Non-NAS PI Claimant of such determination and shall identify the particular records or statements that are deemed unreliable.    The Claims Administrator shall not change the Non-NAS PI TDP allowance criteria.    The Non-NAS PI Claimant shall have the right to appeal any such determination to the Appeals Master as set forth in Section 1.03 herein.

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Non-NAS PI TDP.

**A.157**

2

**1.03**   **Appeals to Appeals Master.**   Non-NAS PI Claimants who disagree with the ruling of the Claims Administrator may appeal to the Appeals Master within fourteen (14) days of notice of such ruling by submitting a written statement outlining the Non-NAS PI Claimant's position and why he/she believes the Claims Administrator has erred.   An appeal fee of $1,000 shall be assessed against the Non-NAS PI Claimant's recovery from the PI Trust regardless of the outcome of the appeal.   The Appeals Master shall review only the appeal record and claim file in deciding the appeal.   The Appeals Master shall apply the guidelines and procedures established in the Non-NAS PI TDP, and the appeals process shall not result in any modification of substantive eligibility criteria.   The Appeals Master shall issue a determination on the appeal in writing, which shall be served on the Non-NAS PI Claimant (and his/her counsel, where applicable) and the Claims Administrator.   Decisions of the Appeals Master pursuant hereto are final and binding, and Non-NAS PI Claimants have no further appeal rights beyond those set forth herein.

**EXHIBIT D**

**HIPAA FORMS FOR**
**THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION**
**PROCEDURE FOR NON-NAS CLAIMS**

SAMPLE FORM – DO NOT COMPLETE. A FINAL VERSION WILL BE
MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS
BEEN CONFIRMED AND GONE EFFECTIVE

## AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ▮▮▮▮▮▮▮▮▮▮▮     Date: ▮▮▮▮▮▮▮▮▮▮▮

Date of Birth: ▮▮▮▮▮▮▮▮▮▮▮     SSN: ▮▮▮▮▮▮▮▮▮▮▮

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim. If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges).**

   Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV). It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**A.160**

**MASSIVE: Medical & Subrogation Specialists**
**25657 Southfield Road**
**Southfield, MI 48075**
**(p) 833-466-2774     (f) 877-294-7893**

5. I understand I have the right to revoke this authorization at any time.  I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department.  I understand the revocation will not apply to information that has already been released in response to this authorization.  I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy.   Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary.  I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization.  I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524.  I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA.  If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                        Date

Relationship to Patient (If signed by Legal Representative)

**A.161**

**SAMPLE FORM – DO NOT COMPLETE.  A FINAL VERSION WILL BE MADE AVAILABLE TO YOU AFTER THE CHAPTER 11 PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE**

### AUTHORIZATION TO DISCLOSE HEALTH INFORMATION

Claimant Name: ████████████ Date: ████████████

Date of Birth: ████████████ SSN: ████████████

1. The following individuals or organizations are authorized to disclose my health records to the parties specified below in section #4: **(Note: Please list the names of your medical care providers and your health insurance providers that may have records relevant to the resolution of your PI Claim.  If you are unsure of the exact legal name of your medical providers and health insurance providers, you can leave this blank, and we will complete it for you with the understanding that you authorize all relevant parties):**

   _____

2. The type and amount of information to be used or disclosed as follows:

   The entire record, including but not limited to: any and all medical records, mental health records, psychological records, psychiatric records, problem lists, medication lists, lists of allergies, immunization records, history and physicals, discharge summaries, laboratory results, x-ray and imaging reports, medical images of any kind, video tapes, photographs, consultation reports, correspondence, itemized invoices and billing information, and information pertaining to Medicaid or Medicare eligibility and all payments made by those agencies, for the following dates: **(Note: List the date range for which the medical providers and insurance companies above may have records relevant to the resolution of your PI Claim. If you are unsure of the exact dates, then leave this blank, and we will complete this section for you with the understanding that you authorize all relevant date ranges).**

   Dates of Services: From: _____ To: _____

3. I understand that the information in my health records may include information relating to sexually transmitted disease, acquired immunodeficiency syndrome (AIDS), or human immunodeficiency virus (HIV).  It may also include information about behavioral or mental health services, as well as treatment for alcohol and drug abuse.

4. The health information may be disclosed to and used by the following individual and/or organization:

**A.162**

**GENTLE, TURNER, SEXTON & HARBISON, LLC**
**501 Riverchase Parkway East, Suite 100**
**Hoover, Alabama 35244**
**(p) 205-716-3000    (f) 205-716-2364**

5. I understand I have the right to revoke this authorization at any time. I understand if I revoke this authorization, I must do so in writing and present my written revocation to the health information management department. I understand the revocation will not apply to information that has already been released in response to this authorization. I understand the revocation will not apply to my insurance company when the law provides my insurer with the right to contest a claim under my policy. Unless otherwise revoked, this authorization will expire 10 years after the date that I sign it.

6. I understand that authorizing the disclosure of this health information is voluntary. I can refuse to sign this authorization and forego a recovery under the Purdue bankruptcy personal injury trust distribution procedures. I understand that no organization may condition treatment, payment, enrollment, or eligibility for benefits on my signing of this authorization. I understand I may inspect or copy the information to be used or disclosed, as provided in CFR 1634.524. I understand any disclosure of information carries with it the potential for an unauthorized re-disclosure and the information may not be protected by federal confidentiality rules or HIPAA. If I have questions about disclosure of my health information, I can contact the parties listed above in section #4.

Patient or Legal Representative                                    Date

Relationship to Patient (If signed by Legal Representative)

**A.163**

**EXHIBIT E**

**QUALIFYING OPIOIDS FOR**
**THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE**
**FOR NON-NAS PI CLAIMS**

| Drug Name | NDC Labeler and Drug Prefix |
|-----------|------------------------------|
| OxyContin | 59011-410-[1] |
| OxyContin | 59011-415- |
| OxyContin | 59011-420- |
| OxyContin | 59011-430- |
| OxyContin | 59011-440- |
| OxyContin | 59011-460- |
| OxyContin | 59011-480- |
| OxyContin | 59011-0100- |
| OxyContin | 59011-0103- |
| OxyContin | 59011-0105- |
| OxyContin | 59011-0107- |
| OxyContin | 59011-0109- |
| OxyContin | 43063-0244- |
| OxyContin | 43063-0245- |
| OxyContin | 43063-0246- |
| OxyContin | 43063-0354- |
| Butrans | 59011-750- |
| Butrans | 59011-751- |
| Butrans | 59011-752- |
| Butrans | 59011-757- |
| Butrans | 59011-758- |
| Hysingla ER | 59011-271- |
| Hysingla ER | 59011-272- |
| Hysingla ER | 59011-273- |
| Hysingla ER | 59011-274- |
| Hysingla ER | 59011-275- |
| Hysingla ER | 59011-276- |
| Hysingla ER | 59011-277- |
| MS Contin | 42858-515- |
| MS Contin | 42858-631- |
| MS Contin | 42858-760- |
| MS Contin | 42858-799- |
| MS Contin | 42858-900- |
| MS Contin | 00034-0513- |
| MS Contin | 00034-0514- |
| MS Contin | 00034-0515- |

---

[1] Pharmacies may include an additional "0" in the second segment of NDC Labeler and Drug Prefixes, such that, in respect of eight digit NDC Labeler and Drug Prefixes listed herein (for example, 59011-410-), a pharmacy record may include a "0" as a ninth digit (for example, 59011-0410).

**A.164**

| MS Contin | 00034-0516- |
|---|---|
| MS Contin | 00034-0517- |
| MS Contin | 16590-884- |
| Dilaudid | 42858-122- |
| Dilaudid | 42858-234- |
| Dilaudid | 42858-338- |
| Dilaudid | 42858-416- |
| Dilaudid | 76045-009- |
| Dilaudid | 76045-010- |
| Dilaudid | 0074-2414- |
| Dilaudid | 0074-2415- |
| Dilaudid | 0074-2416- |
| Dilaudid | 0074-2426- |
| Dilaudid | 0074-2451- |
| Dilaudid | 0074-2452- |
| OxyIR | 59011-0201- |
| OxyFast | 59011-0225- |
| MSIR | 00034-0518- |
| MSIR | 00034-0519- |
| MSIR | 00034-0521- |
| MSIR | 00034-0522- |
| MSIR | 00034-0523- |
| Palladone | 59011-0312- |
| Palladone | 59011-0313- |
| Palladone | 59011-0314- |
| Palladone | 59011-0315- |
| Buprenorphine | 42858-353- |
| Buprenorphine | 42858-493- |
| Buprenorphine | 42858-501- |
| Buprenorphine | 42858-502- |
| Buprenorphine | 42858-586- |
| Buprenorphine | 42858-750- |
| Buprenorphine | 42858-839- |
| Hydromorphone Hydrochloride | 42858-301- |
| Hydromorphone Hydrochloride | 42858-302- |
| Hydromorphone Hydrochloride | 42858-303- |
| Hydromorphone Hydrochloride | 42858-304- |
| Morphine Sulfate | 42858-801- |
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-804- |
| Morphine Sulfate | 42858-805- |
| Morphine Sulfate | 0904-6557- |
| Morphine Sulfate | 0904-6558- |
| Morphine Sulfate | 0904-6559- |
| Morphine Sulfate | 35356-833- |
| Morphine Sulfate | 35356-836- |
| Morphine Sulfate | 35356-838- |
| Morphine Sulfate | 42858-801- |

**A.165**

| | |
|---|---|
| Morphine Sulfate | 42858-802- |
| Morphine Sulfate | 42858-803- |
| Morphine Sulfate | 42858-810- |
| Morphine Sulfate | 42858-811- |
| Morphine Sulfate | 42858-812- |
| Morphine Sulfate | 61919-966- |
| Morphine Sulfate | 67296-1561- |
| Morphine Sulfate | 68084-157- |
| Morphine Sulfate | 68084-158- |
| Morphine Sulfate | 16590-966- |
| Oxycodone Hydrochloride | 0406-0595- |
| Oxycodone Hydrochloride | 0093-0031- |
| Oxycodone Hydrochloride | 0093-0032- |
| Oxycodone Hydrochloride | 0093-0033- |
| Oxycodone Hydrochloride | 0093-5731- |
| Oxycodone Hydrochloride | 0093-5732- |
| Oxycodone Hydrochloride | 0093-5733- |
| Oxycodone Hydrochloride | 0093-5734- |
| Oxycodone Hydrochloride | 0115-1556- |
| Oxycodone Hydrochloride | 0115-1557- |
| Oxycodone Hydrochloride | 0115-1558- |
| Oxycodone Hydrochloride | 0115-1559- |
| Oxycodone Hydrochloride | 0115-1560- |
| Oxycodone Hydrochloride | 0115-1561- |
| Oxycodone Hydrochloride | 0115-1562- |
| Oxycodone Hydrochloride | 0591-2693- |
| Oxycodone Hydrochloride | 0591-2708- |
| Oxycodone Hydrochloride | 0591-3503- |
| Oxycodone Hydrochloride | 0781-5703- |
| Oxycodone Hydrochloride | 0781-5726- |
| Oxycodone Hydrochloride | 0781-5767- |
| Oxycodone Hydrochloride | 0781-5785- |
| Oxycodone Hydrochloride | 10702-801- |
| Oxycodone Hydrochloride | 10702-803- |
| Oxycodone Hydrochloride | 42858-001- |
| Oxycodone Hydrochloride | 42858-002- |
| Oxycodone Hydrochloride | 42858-003- |
| Oxycodone Hydrochloride | 42858-004- |
| Oxycodone Hydrochloride | 42858-005- |
| Oxycodone Hydrochloride | 49884-136- |
| Oxycodone Hydrochloride | 49884-137- |
| Oxycodone Hydrochloride | 49884-138- |
| Oxycodone Hydrochloride | 49884-197- |
| Oxycodone Hydrochloride | 60505-3537- |
| Oxycodone Hydrochloride | 60505-3538- |
| Oxycodone Hydrochloride | 60505-3539- |
| Oxycodone Hydrochloride | 60505-3540- |
| Oxycodone Hydrochloride | 60951-0702- |
| Oxycodone Hydrochloride | 60951-0703- |

**A.166**

| | |
|---|---|
| Oxycodone Hydrochloride | 60951-0705- |
| Oxycodone Hydrochloride | 60951-0710- |
| Oxycodone Hydrochloride | 63304-400- |
| Oxycodone Hydrochloride | 63304-401- |
| Oxycodone Hydrochloride | 67296-1376- |
| Oxycodone Hydrochloride | 67296-1560- |
| Oxycodone Hydrochloride | 68774-0161- |
| Oxycodone Hydrochloride | 68774-0162- |
| Oxycodone Hydrochloride | 68774-0163- |
| Oxycodone Hydrochloride | 68774-0164- |
| Oxycodone Hydrochloride | 00093-0024- |
| Oxycodone Hydrochloride | 00093-0031- |
| Oxycodone Hydrochloride | 00093-0032- |
| Oxycodone Hydrochloride | 00093-0033- |
| Oxycodone Hydrochloride | 00115-1644- |
| Oxycodone Hydrochloride | 00172-6354- |
| Oxycodone Hydrochloride | 00172-6355- |
| Oxycodone Hydrochloride | 00172-6356- |
| Oxycodone Hydrochloride | 00172-6357- |
| Oxycodone Hydrochloride | 00591-3501- |
| Oxycodone Hydrochloride | 00591-3502- |
| Oxycodone Hydrochloride | 00591-3503- |
| Oxycodone Hydrochloride | 00591-3504- |
| Oxycodone Hydrochloride | 52152-0408- |
| Oxycodone Hydrochloride | 52152-0409- |
| Oxycodone Hydrochloride | 52152-0410- |
| Oxycodone Hydrochloride | 52152-0411- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-040- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-139- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-201- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-202- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-203- |
| Hydrocodone Bitartrate/Acetaminophen | 42858-238- |
| Oxycodone/Acetaminophen | 42858-102- |
| Oxycodone/Acetaminophen | 42858-103- |
| Oxycodone/Acetaminophen | 42858-104- |

**A.167**

**EXHIBIT F**

**HEIRSHIP DECLARATION FOR**
**THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION**
**PROCEDURE FOR NON-NAS PI CLAIMS**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-1 | SWORN DECLARATION:<br>SIGNATORY IS EXECUTOR UNDER DECEDENT'S LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because no probate or estate proceeding has been commenced, but you have been named as executor or executrix (or comparable position under applicable state law) under the Last will and Testament of the Decedent.

## I. DECEDENT INFORMATION

| Name | First Name | | | M.I. | Last Name |
|---|---|---|---|---|---|
| | | | | | |

| Social Security Number | \|___\|___\|___\| - \|___\|___\| - \|___\|___\|___\|___\| | Date of Death | ___/___/___<br>(Month/Day/Year) |
|---|---|---|---|

| Residence/Legal Domicile Address at Time of Death | Street | | |
|---|---|---|---|
| | City | State | Zip Code |

## II. PI CLAIMANT INFORMATION

| Your Name | First Name | | | M.I. | Last Name |
|---|---|---|---|---|---|

| Your Social Security Number | \|___\|___\|___\| - \|___\|___\| - \|___\|___\|___\|___\| | | |
|---|---|---|---|
| Prime Clerk POC Number assigned to your PI Claim | | | |
| Your Address | Street | | |
| | City | State | Zip Code |

| Your Relationship to Decedent | |
|---|---|
| Basis of Your Authority to Act for the Decedent | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the [ ] Amended Chapter 11 Plan of Purdue Pharma L.P. and its affiliated debtors (the "Plan").

1

**A.169**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. Last Will and Testament of _____, dated _____. <br><br> 2. |
|---|---|



2

**A.170**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | III. HEIRS AND BENEFICIARIES OF DECEDENT |
|---|---|
| | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) |

Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified.

| | Name | Information | |
|---|---|---|---|
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

3

**A.171**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | Name | Information | | |
|---|---|---|---|---|
| **4.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: | |
| | | | ☐ No. Why Not: | |
| **5.** | | **Address** | | |
| | | **Relationship to Decedent** | | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: | |
| | | | ☐ No. Why Not: | |

SAMPLE

**A.172**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

## IV. PI CLAIMANT CERTIFICATION

This Sworn Declaration is an official document for submission to the PI Trust. By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) The copy of the Last Will and Testament provided by me is the Last Will and Testament of the Decedent.

(e) No application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator because state law does not require it.

(f) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

**A.173**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(g) I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(h) No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids. The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(i) I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(j) I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct. I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| V. PI CLAIMANT SIGNATURE | | |
|---|---|---|
| **Signature** | _____ | **Date** _____/_____/_____ <br> (Month/Day/Year) |

6

**A.174**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

**THIS IS A SAMPLE DECLARATION FORM FOR PURPOSES OF SOLICITATION. DO NOT FILL OUT THIS FORM AT THIS TIME. ONCE THE PI PLAN HAS BEEN CONFIRMED AND GONE EFFECTIVE, THE FINAL COPY OF THIS FORM WILL BE MADE AVAILABLE TO YOU FOR COMPLETION AND SUBMISSION TO THE PI TRUST.[1]**

| SD-2 | SWORN DECLARATION: DECEDENT DID NOT LEAVE A LAST WILL AND TESTAMENT |
|---|---|

You are required to complete this declaration if you hold a PI Claim[2] (and thus are a "PI Claimant") regarding the opioid-related death of another person (the "Decedent"), and you have not been appointed with the authority to act on behalf of the Decedent because the Decedent Claimant died without a Will and no probate or estate proceeding has been opened.

## I. DECEDENT INFORMATION

| Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| | | | | | |
| Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | Date of Death | ___/___/___ (Month/Day/Year) | |
| Residence/Legal Domicile Address at Time of Death | Street | | | | |
| | City | | State | Zip Code | |

## II. PI CLAIMANT INFORMATION

| Your Name | First Name | | M.I. | Last Name | |
|---|---|---|---|---|---|
| Your Social Security Number | \|__\|__\|__\| - \|__\|__\| - \|__\|__\|__\|__\| | | | | |
| Prime Clerk POC Number assigned to your PI Claim | | | | | |
| Your Address | Street | | | | |
| | City | | State | Zip Code | |
| Your Relationship to Decedent | | | | | |
| Basis of Your Authority to Act for the Decedent | | | | | |

---

[1] Submission instructions shall be provided along with the final form after the Plan has been confirmed and gone effective.
[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the [ ] Amended Chapter 11 Plan of Purdue Pharma L.P. and its affiliated debtors (the "Plan").

1

**A.175**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| **List here and attach copies of all document(s) evidencing the basis for your authority** | 1. A copy of the intestate statute of the state or domicile of the Deceased Claimant at the time of his or her death.<br><br>2. |
| --- | --- |



**A.176**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | III. HEIRS AND BENEFICIARIES OF DECEDENT | | |
|---|---|---|---|
| | (ATTACH ADDITIONAL SHEETS FOR THE SECTION IF NEEDED) | | |
| | Use the space below to identify the name and address of all persons who may have a legal right to share in any settlement payment on behalf of the claim of the Decedent. Also state if and how you notified these persons of the settlement, or the reason they cannot be notified. | | |
| | **Name** | **Information** | |
| **1.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **2.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |
| **3.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br> ☐ No. Why Not: _____ |

SAMPLE

A.177

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

| | Name | Information | |
|---|---|---|---|
| **4.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |
| **5.** | | **Address** | |
| | | **Relationship to Decedent** | |
| | | **Notified of Settlement?** | ☐ Yes. How Notified: _____ <br><br> ☐ No. Why Not: _____ |

| IV.    PI CLAIMANT CERTIFICATION |
|---|

This Sworn Declaration is an official document for submission to the PI Trust. By signing this Sworn Declaration, I certify and declare under penalty of perjury pursuant to 28 U.S.C. Section 1746 that:

(a) I am seeking authority to act on behalf of the Decedent and his or her estate, heirs, and beneficiaries in connection with the PI TDP, including with respect to the submission of forms and supporting evidence and the receipt of payment for any such awards.

(b) I will abide by all substantive laws of the Decedent's last state of domicile concerning the compromise and distribution of any monetary award to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(c) No one else has been appointed the personal representative, executor, administrator, or other position with the authority to act on behalf of the Decedent and his or her estate.

(d) There is no known last will and testament of the Decedent and no application or proceeding has been filed in state or other court to administer the estate of the Decedent or to appoint an executor or administrator;

(e) I will notify the Claims Administrator immediately if my authority to act is curtailed, surrendered, withdrawn, or terminated.

**A.178**

# HEIRSHIP DECLARATION FOR PURDUE PI TDP

(f)  I am not aware of any objections to my appointment and service as the PI Claimant on behalf of the Decedent and his or her estate, heirs, and beneficiaries.

(g)  No person notified under Section III objects to my serving as the PI Claimant and taking such steps as required by the PI TDP to resolve all claims related to the Decedent's prescription and/or use of Purdue opioids.  The persons named in Section III are all of the persons who may have a legal right to share in any settlement payment issued in respect of the injuries of the Decedent.

(h)  I will comply with any and all provisions of the state law regarding the compromise and distribution of the proceeds of the settlement of a survival or wrongful death claim to the appropriate heirs or other beneficiaries and any other parties with any right to receive any portion of any payments.

(i)  I will indemnify and hold harmless the PI Trust, the Claims Administrator, the Appeals Master, and the agents and representatives of any of the foregoing, from any and all claims, demands, or expenses of any kind arising out of distributions from the PI trust on account of injuries of the Decedent.

The information I have provided in this Declaration is true and correct.  I understand that the Claims Administrator and Court will rely on this Declaration, and false statements or claims made in connection with this Declaration may result in fines, imprisonment, and/or any other remedy available by law.

| | V.  PI CLAIMANT SIGNATURE | | |
|---|---|---|---|
| **Signature** | _____ | **Date** | ____/____/____ <br> (Month/Day/Year) |

**A.179**

## EXHIBIT G

## DISTRIBUTIONS TO OR FOR THE BENEFIT OF MINOR CLAIMANTS FOR THE INDIVIDUAL PURDUE PHARMA L.P. PI TRUST DISTRIBUTION PROCEDURE[1]

The following procedures apply to any PI Claimant who is a minor under applicable law (a "Minor Claimant") for so long as the PI Claimant remains a minor under applicable law. These procedures apply regardless of whether the Minor Claimant holds an NAS PI Claim or a Non-NAS PI Claim, and regardless of whether the Minor Claimant's Proxy (as defined below) elects to have that PI Claim liquidated under the PI TDP[2] or to pursue it in the tort system.

1. **Actions by Proxy of Minor Claimant.** A Minor Claimant's custodial parent, his/her legal guardian under applicable law (a "Guardian"), or an adult providing custody and care to the minor (any of the foregoing acting on behalf of the Minor Claimant, the "Proxy") is authorized to make submissions on behalf of the Minor Claimant under the PI TDP, subject to Section 2 below. The Proxy shall be responsible for submitting, on behalf of such Minor Claimant, all required forms under the PI TDP, including the Claim Form, as well as any evidence required by the PI Trust to support the Claim Form, and any other documentation required or requested pursuant to the PI TDP. The Proxy is authorized to take, on behalf of a Minor Claimant, all actions under the PI TDP that the Minor Claimant would be authorized to take if such Minor Claimant were an adult, other than receiving distributions from the PI Trust (unless so authorized by Section 5 below). These actions include, where

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the PI TDP (as defined below).

[2] "PI TDP" refers to either the NAS PI TDP or the Non-NAS PI TDP, as applicable for any particular PI Claimant.

permitted, making an opt-out or, if the Minor Claimant is a Non-NAS PI Claimant, making a payment election or requesting an appeal pursuant to Exhibit C to the Non-NAS PI TDP.

2. **Establishing Proxy of a Minor Claimant**. Any purported Proxy making a submission to the PI Trust on behalf of a Minor Claimant shall include along with such submission documentation of his/her authority to act on behalf of the Minor Claimant, consisting of the following:

    a. If the purported Proxy is the Guardian of the Minor Claimant, then the court order appointing that Proxy as Guardian, or other documents reasonably acceptable to the Claims Administrator as sufficient under applicable law to evidence the guardianship.

    b. If the purported Proxy is the custodial parent of the Minor Claimant, then a sworn statement that such Proxy is the custodial parent of the Minor Claimant.

    c. If the purported Proxy is neither the Guardian nor custodial parent of the Minor Claimant, then a sworn statement by the purported Proxy that he/she is providing custody and care to the Minor Claimant, stating for how long he/she has been providing such care and custody, explaining his/her relationship to the Minor Claimant and the circumstances around the provision of care and custody, as well as a statement and/or records from one or more of the following in support of his/her sworn statement:

        1. Minor Claimant's school

        2. Purported Proxy's landlord or property manager

        3. Minor Claimant's health provider

        4. Minor Claimant's child care provider

**A.181**

5. Purported Proxy's placement agency

6. Governmental social services agency

7. Indian tribe officials

8. Purported Proxy's employer

Whether the purported Proxy is a Guardian, custodial parent, or neither, the Claims Administrator may require additional corroborating evidence at his discretion, including in the event that instructions are received from more than one purported Proxy for the same Minor Claimant.

3. **Distributions to Minor Claimants.** When the PI Trust has determined the final distributable amount on a Minor Claimant's claim, it will send notice of such final amount to the Minor Claimant's Proxy and counsel (if known). Such notice will include a letter inviting the Proxy to discuss how the distributable amount was determined, and the Claims Administrator will take reasonable steps to ensure that the Proxy understands how such amount was determined. Any distributions owing to a Minor Claimant that are ready for issue by the PI Trust at a time when the Minor Claimant is still a minor under applicable law shall be (i) used to pay the individual attorneys' fees of the Minor Claimant pursuant to Section 4 below and (ii) with respect to the remainder, paid into an interest-bearing sub-fund of the Trust (the "Minor Claimants Account"), held there for the sole benefit of the Minor Claimant, and invested in a U.S. governmental money-market fund until such funds are distributed pursuant to Section 5 below or until the Minor Claimant becomes an adult under applicable law (the "Adult Distribution Date"), at which time the amount then held in such account (including interest earned) shall be paid directly to such PI Claimant. Pending distributions for all Minor Claimants may be held in the same sub-fund.

**A.182**

4. **Payments of attorneys' fees.**

   Within a reasonable period following receipt of notice of the final distributable amount on Minor Claimant's PI Channeled Claim, and using forms to be provided by the Claims Administrator, the Minor Claimant's counsel shall submit to the PI Trust, with a copy to the Proxy, a request for payment of legal fees and expenses from the Minor's recovery. It is the Minor Claimant's attorney's duty to comply with all ethical and legal rules respecting such legal fees and expenses, and the Claims Administrator is permitted to rely upon such representation in issuing payments in respect of such fees and expenses. Absent objection from the Proxy with respect to such asserted fees and expenses, the Claims Administrator shall remit payment to the Minor Claimant's attorney in accordance with the latter's request.

5. **Early Distributions.** Funds held in the Minor Claimants Account for a Minor Claimant may be released prior to the Adult Distribution Date only pursuant to (a) an order of a U.S. court of general jurisdiction in the Minor Claimant's state of residence, or (b) an order entered by the United States Bankruptcy Court for the Southern District of New York.

**A.183**

Les Burris
1575 Deming Drive
Orlando, Florida 32825
(407) 489-0498
Lesburris1@aol.com
Claim #6177

U.S. Clerk of the                                    June 9, 2021
U.S. Bankruptcy Court
Southern District of New York
300 Quarropas Street
White Plains, NY10601

Dear Honorable Judge Robert Drain,

It is disappointing to be in the position we are in as creditors.  Our loved ones have died and suffered due to the policies of Purdue Pharma. Purdue Pharma pleaded to Federal crimes. Our loved ones have been used as steeping stones for everyone to get paid, mostly lawyers and consultants except for the families of those harmed.  We consider this not only insult to injury, but a slap in the face in what is regarded as the most preposterous legal rape in the history of Federal Bankruptcy cases. Never in the history of bankruptcy proceedings has an entity filed for bankruptcy and walked away as billionaires.  It's the same concept behind buying a there been a cap on personal injury awards, but here we are. Its apparent this is the future of America, since legal precedent is being set here for the sole purpose to abuse the foundation of this great nation.

Everyone who has complained about the Disclosure Statement has not come up with a better plan, but please consider a better working solution to creating a better payout for all creditors.  I am not a lawyer, or an accountant, but I know that there are laws out there whether it's uniform commercial code law or prior legal precedent that can apply to this case.  The question is, is the legal system willing to work for the greater good of the many instead of the good for the few or one? To increase the payouts for creditors which currently, at best a paltry $48,000 dollars, I respectfully ask that you consider the following remedy.  It's the same concept behind buying a car or a house. When a person buys a car or a house, they are not able to obtain the title until it is all paid off.  Well, if you reverse the roles, Purdue is the buyer and the creditors are the "car or house".  The car or a  better payout is a debt in the form of a credit line extended to the creditors.  The creditors can have a credit line that belongs to them just as if they were the Sacklers. This credit line is in addition to the awards granted. That credit line can extend for as long as Purdue pharma is a working profitable entity, which it is.  This credit line would not only be extended out to the personal injury trust, but also for other claimants.  It essentially places Purdue as an entity of work or servitude to it's creditors until it pays off it's debt to them. The creditors will have a credit line according to the health of the company, and over time, when assets are seized from the Sacklers, that credit line can be paid off. Another idea is to open a

**A.184**

treasury account with a credit line that the Sacklers have to pay back to the government once new discovery has proven harm to the creditors. Whoever manages these funds has to have a "cap" or a functioning budget that has to be approved so that there is no runaway spending. Eventually, Purdue the entity can pay back it's creditors without a cap on awards. The millions of dollars that where paid to the Department of Justice by the Sacklers can be sort of like a PMI on a house. Respectfully, your honor, your decisions will impact case law for years and we as creditors please ask that you consider any relief measures offered for reparations in this case. As creditors, we think that the settlements should be greater than the harm Purdue Pharma has instilled on our loved ones.

Respectfully,

Les Burris

Les Burris

**A.185**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

## MEDIATOR'S REPORT

Pursuant to paragraph 1 of the Order Appointing the Honorable Shelley C. Chapman as Mediator, dated May 7, 2021 [ECF No. 2820] (the "Appointment Order"), the Court appointed the Honorable Shelley C. Chapman as mediator (the "Mediator") to conduct a mediation (the "Mediation") between the Non-Consenting States, on the one hand, and the representatives of the Covered Parties[1], on the other hand, with respect to the agreement in principle reached among the Covered Parties, the Debtors, the Creditors' Committee, the Consenting Ad Hoc Committee, and the MSGE Group (each as defined in the Appointment Order). The Mediator respectfully submits this report in accordance with paragraph 14 of the Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman, dated May 18, 2021 [ECF No. 2879] (the "Mediation Order").

### Statement of Mediator

1. Between May 7, 2021 and June 29, 2021, the Mediator conducted approximately 145 telephonic meetings with the Non-Consenting States and the Covered Parties. On June 28,

---

[1] "Covered Parties" means the Initial Covered Sackler Persons and the Additional Covered Sackler Persons (each as defined in the *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518]).

2021, the Mediator presented a settlement proposal to the Debtors, the Covered Parties, and the Non-Consenting States.  The in-person Mediation was conducted on June 30, 2021 (from approximately 8:30 a.m. until approximately 8:00 p.m.) and on July 1, 2021 (from approximately 8:30 a.m. until approximately midnight), with additional discussions between and among the Mediator, the Covered Parties, and certain Non-Consenting States continuing through the night of June 30th and also continuing through the date hereof.  At the in-person Mediation on July 1, 2021, the Mediator presented a revised settlement proposal to the Debtors, the Covered Parties, and the Non-Consenting States (the "Mediator's Settlement Proposal").

2. A list of the participants in the Mediation is attached hereto as Exhibit A.

3. All parties participated in the Mediation in good faith.  The negotiations were difficult and hard-fought, with the outcome uncertain until well into the night of July 1.

**Summary of Mediation Outcomes**

4. The Mediation resulted in an agreement in principle among a majority, but not all, of the participants in the Mediation, subject to documentation and approval of this Court.  The following Non-Consenting States accepted the Mediator's Settlement Proposal: Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Wisconsin.  The other Non-Consenting States have not yet accepted the Mediator's Settlement Proposal.  The Covered Parties accepted the Mediator's Settlement Proposal, as did the Debtors.

5. The parties accepting the Mediator's Settlement Proposal have reached agreement on the following, in each case as set forth in further detail in definitive documentation:

(i) Enhanced economic consideration to be provided by the Sackler family members in the form of $50 million in incremental cash payments, consisting of $25 million on or about June 30, 2022 and $25 million on or about

June 30, 2023, as well as acceleration of $50 million in previously agreed settlement payments, consisting of $25 million on or about June 30, 2024 and $25 million on or about June 30, 2025;

(ii)     A material expansion of the scope of the public document repository to be established under the Debtors' proposed plan of reorganization to include tens of millions of documents and approximately 13 categories of attorney-client privileged documents (see Exhibit B attached hereto);

(iii)    A prohibition with regard to the Sackler family's naming rights related to charitable contributions until they have fully paid all obligations owed by them under the terms of the contemplated settlement and exited, worldwide, all businesses that engage in the manufacturing or sale of opioids;

(iv)    Timing for disposition of NewCo following the consummation of the Debtors' plan of reorganization; and

(v)     Plan adjustments to permit states or other non-federal governmental entities that do not wish to receive all or a portion of their Abatement Distributions from NOAT[2] in accordance with the NOAT Trust Distribution Procedures to disclaim or transfer such rights, in whole or in part, subject to any consent or other rights of applicable states or local governments under the default allocation mechanism in the NOAT TDP or an applicable Statewide Abatement Agreement.

---

[2] "NOAT" means the National Opioid Abatement Trust to be established under the Debtors' proposed plan of reorganization.

6. In addition, the individual trustees of NOAT, or such other qualified party or parties as shall be selected by the Bankruptcy Court, will, subject to receipt of necessary approvals, become the controlling members of the Raymond and Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences, which shall have an aggregate value of at least $175 million, and will be required to limit the purposes of the Foundations to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis.

7. The Mediator remains available to assist the parties with respect to the resolution of outstanding unresolved issues.

Dated: New York, New York
July 7, 2021

/s/Shelley C. Chapman
HONORABLE SHELLEY C. CHAPMAN

**Exhibit A**
Purdue Pharma Mediator's Report
List of Mediation Participants[1]

| State / Firm | Party |
|---|---|
| **Ad Hoc Group of Non-Consenting States** | |
| State of California | Rob Bonta (Attorney General) |
| | Michelle Burkart |
| State of Colorado | Phil Weiser (Attorney General) |
| | Megan Rundlet |
| State of Connecticut | William Tong (Attorney General) |
| | Matthew Fitzsimmons |
| State of Delaware | Kathy Jennings (Attorney General) |
| | Owen Lefkon |
| District of Columbia | Karl A. Racine (Attorney General) |
| | Wendy Weinberg |
| State of Hawaii | Clare E. Connors (Attorney General) |
| | Bryan Yee |
| State of Idaho | Lawrence Wasden (Attorney General) |
| | Brett Delange |
| State of Illinois | Kwame Raoul (Attorney General) |
| | Adam Braun |
| | Susan Ellis |
| State of Iowa | Tom Miller (Attorney General) |
| | Nathan Blake |
| State of Maine | Aaron Frey (Attorney General) |
| | Linda Conti |
| State of Maryland | Brian E. Frosh (Attorney General) |
| | Brian Edmunds |
| Commonwealth of Massachusetts | Maura Healey (Attorney General) |
| | Gillian Feiner |
| State of Minnesota | Keith Ellison (Attorney General) |
| | John Keller |
| State of Nevada | Aaron D. Ford (Attorney General) |
| | Mark Krueger |
| | Laura Tucker |
| State of New Hampshire | John Formella (Attorney General) |
| | James Boffetti |

---

[1] Attorneys General did not attend the Mediation in person but were all available telephonically.

| State of New Jersey | Gurbir S. Grewal (Attorney General) |
| | Lara Fogel |
| State of New York | Letitia James (Attorney General) |
| | Jennifer Levy |
| State of North Carolina | Josh Stein (Attorney General) |
| | Wesley Swain Wood |
| | Daniel Mosteller |
| State of Oregon | Ellen F. Rosenblum (Attorney General) |
| | David Hart |
| Commonwealth of Pennsylvania | Josh Shapiro (Attorney General) |
| | James Donahue |
| State of Rhode Island | Peter F. Neronha (Attorney General) |
| | Neil Kelly |
| State of Vermont | T.J. Donovan Jr. (Attorney General) |
| | Jill Abrams |
| Commonwealth of Virginia | Mark Herring (Attorney General) |
| | Thomas Beshere |
| State of Washington | Bob Ferguson (Attorney General) |
| | Tad O'Neill |
| State of Wisconsin | Josh Kaul (Attorney General) |
| | R. Duane Harlow |
| Pillsbury Winthrop Shaw Pittman LLP | Andrew Troop |
| | Hugh McDonald |
| | Andrew Alfano |
| **Sackler Side B** | |
| Milbank LLP | Gerard Uzzi |
| | Nicholas Prey |
| Paul, Weiss, Rifkind, Wharton & Garrison LLP | Theodore Wells Jr. |
| | Michele Hirshman |
| **Sackler Side A** | |
| Debevoise & Plimpton LLP | Jeffrey Rosen |
| | Mary Jo White |
| | Maura Kathleen Monaghan |
| **Debtors** | |
| Purdue Pharma | Marc Kesselman |
| Davis Polk & Wardwell LLP | Marshall Huebner |
| | Jacob Weiner |
| | Max Linder |
| Dechert LLP | Sheila Birnbaum |

**A.191**

|  | Hayden Coleman |
|---|---|
| **Mediator** | |
| N/A | Hon. Shelley C. Chapman |
|  | Jamie Eisen |
|  | Leslie Kan |

## Exhibit B
Purdue Pharma Mediator's Report
Public Document Repository
Terms to be Added to Plan of Reorganization[1]

***Public Document Repository***.

        (a)    **Summary**. The document disclosure program provided in this Plan will lead to the public disclosure of the most significant documents about Purdue, the Sackler family, and the opioid crisis, including video depositions and millions of documents that Purdue produced in investigations and litigation over the past two decades. In addition, it will lead to the public disclosure of millions of documents not previously available to the public, including documents not previously produced in any investigation or litigation and certain privileged documents from the years when Purdue developed and promoted OxyContin, as identified below.

        The document disclosure program and Public Document Repository ("**PDR**") will be conducted in a way to maximize public confidence and public access and will set a new standard for transparency.

        (b)    **DOJ Repository Obligation**. The Debtors bear sole responsibility for complying with the DOJ document repository obligation set forth in the Debtors' Plea Agreement in *United States v. Purdue Pharma L.P.*, No. 2:20-cr-01028-MCA (D.N.J.) ("**DOJ Repository Obligation**"), and the DOJ Repository Obligation is not modified by this Plan. Similarly, the Debtors' satisfaction of the DOJ Repository Obligation shall not diminish the additional commitment to disclosure provided by this Plan. Instead, the public shall receive the full benefit of both, and the PDR shall contain the full set of documents that the Debtors have agreed to host under the DOJ Repository Obligation.

        (c)    **Disclosure Oversight Board**. As described further below, the disclosure program provided in this Plan shall be overseen by a volunteer Disclosure Oversight Board ("**DOB**"), consisting of two representatives from each of the AHC, NCSG, and the Creditors' Committee and one representative from each of the Tribes and MSGE. No current or former director, officer, employee, or attorney of the Debtors shall serve on the DOB or oversee the disclosure program.

        (d)    **Purdue Legal Matters**. As described further below, important material for the disclosure program is contained in documents that the Debtors preserved, collected, logged, and produced in connection with investigations and litigation about Purdue's opioid business. Many non-privileged documents were produced in those matters; and many privileged documents were identified and logged. This Section 5.12 provides for the disclosure of many documents from the Purdue Legal Matters, which is a broad set of investigations and litigation defined in the Plan.

---

[1] Certain capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 2982].

(e) **Disclosure Program Budget**. As described further below, the disclosure program is designed to avoid unnecessary expense, including by employing an unpaid volunteer oversight board and by using negotiated agreements to avoid the need for litigation. To ensure the funding necessary for the disclosure program, Purdue, the Shareholders, the Creditors' Committee, and the Government Consent Parties negotiated funding provisions designed to preserve the value provided to claimants and dedicated to abatement. Initial funding shall be from the additional Sackler payments. Timing and quantum of other funding shall be agreed upon among the parties, this shall constitute the Disclosure Program Budget ("**Disclosure Program Budget**"), which shall be spent at the direction of the DOB.

In addition, as already provided in the Plan, Domestic Governmental Entities may elect (but are not required) to direct portions of their distributions to the PDR under terms provided in the Plan. Moreover, the DOB shall be permitted, but not required, to coordinate its work on this disclosure program with the work of state Attorneys General on related disclosures in the opioid industry, in a manner that reduces the costs and increases the benefits of this disclosure program. Finally, to make efficient use of the knowledge and expertise of the Debtors and their professionals, the Plan provides for significant materials to be collected by the Effective Date, as described further below.

For the avoidance of doubt, the PDR shall not be owned, held, administered or operated by the DOB, the Master Disbursement Trust, or any Creditor Trust; the role of the DOB and the Master Disbursement Trust is to develop and oversee a temporary program to set up the appropriate PDR and achieve the goals of the disclosure program

(f) **Access Materials**. On the Effective Date, or as soon as reasonably practicable thereafter, the DOB shall be provided access to a set of non-privileged materials for the purpose of accomplishing the PDR (collectively, the "**Access Materials**"). These Access Materials shall include:

      (i)     all transcripts and audio or video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions;

      (ii)    all documents produced by the Debtors in the Purdue Legal Matters (which comprise more than 13 million documents and more than 100 million pages);

      (iii)   the non-privileged documents from the Debtors' Relativity database described below (which are estimated to comprise more than 20 million additional documents beyond those produced in the Purdue Legal Matters);

      (iv)   all privilege logs regarding documents withheld by the Debtors in the Purdue Legal Matters; and

      (v)   documents obtained during the bankruptcy by the NAS Children Ad Hoc Committee regarding clinical and pre-

clinical studies conducted by the Debtors or other companies associated with the Sackler families.

(g) **Debtors' Relativity Database.** In the course of the Purdue Legal Matters, the Debtors collected a significant set of documents that are stored in a Relativity database. This collection includes files from more than two hundred custodians who played important roles at Purdue, including every member of the Sackler family who sat on the board or worked at the company. It also includes non-custodial documents, such as collections from electronic drives and paper archives. The custodial and non-custodial documents collected for the Relativity database are from files that Purdue has preserved pursuant to broad document preservation policies in place for over twenty years, including from an email archive containing emails dating to the 1990s. Pursuant to the terms provided in this <u>Section 5.12</u>, materials from the Relativity database will be available for the disclosure program as described above.

(h) **Additional Collections.** On the Effective Date, or as soon as reasonably practicable thereafter, the DOB will identify to Debtors the additional custodians whose documents should be collected, to the extent possible, from the email archive and other preserved files and the Debtors will load those files into the Relativity database for inclusion as Access Materials or Sequestered Materials as applicable.

(i) **Sequestered Materials.** On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors shall provide the Plan Administration Trust ("**PAT**") with certain Privileged documents, described below, collected by Debtors during the course of the Purdue Legal Matters and stored in the Debtors' Relativity database, ("**Sequestered Materials**") to be preserved for access by the DOB. The provision of the Sequestered Materials to the PAT shall not constitute a waiver of any applicable privileges and, for clarity, no waiver of any applicable privilege shall occur prior to the Sequestration Date described below. The Sequestered Materials are estimated to include hundreds of thousands of documents.

To leverage efficiencies, the Debtors' current document review teams with experience reviewing Purdue's documents for privilege will screen and review, as necessary, all documents currently in the Relativity database for Privilege, Attorney Work Product, confidentiality, HIPAA, and critical business information before turning over documents as Access Materials or for sequestration. The DOB will aid the Debtors' document review team in setting parameters and search terms to effectuate accurate screening and review. The DOB may, confidentially and subject to privilege, request and be provided with information, and as necessary, an appropriate, expert-aided statistically valid sampling of the relevant documents or other methodologies to aid in the foregoing review under an appropriate protective order and non-waiver agreement.

Subject to the Sequestration Date, below, the Debtors agree to waive attorney client and work product privilege over documents created before May 1, 2014 ("**Cutoff Date**") that fall within the following categories:

(i) Marketing materials, promotional materials, and sales strategies. This will include, for example, legal advice on: marketing and promotional materials as part of the Medical,

**A.195**

Regulatory, Legal ("**MRL**") review process, and other reviews of statements in promotional and marketing materials to ensure consistency with a product's labeling and legal requirements; sales training materials (such as how to instruct the sales team on what they can and cannot say about the products); review of all call notes and whether statements on sales calls were appropriate; call planning; and sales bulletins. For the avoidance of doubt, "sales strategies" in this paragraph includes documents related to (1) medical liaisons, (2) continuing medical education, (3) the Evolve to Excellence program, (4) Purdue's interactions with medical advocacy groups, and (5) legal advice regarding the performance, selection, retention, management, and compensation of personnel in sales and marketing;

(ii)    Materials reflecting legal advice on submissions to the FDA and compliance with FDA regulations. This will include, for example, advice on the decision to reformulate OxyContin, advice on interactions and communications with FDA, and advice on FDA requirements;

(iii)   Legal advice regarding distributions to the Sacklers;

(iv)    Legal advice regarding the organization or function of the board of directors;

(v)     Legal advice regarding grants, gifts, and other payments with respect to naming rights of Purdue and its shareholders;

(vi)    Legal advice regarding the performance, selection, retention, management, and compensation of the CEO of Purdue Pharma;

(vii)   Legal advice regarding Purdue's interactions with state licensing boards and the Federation of State Medical Boards;

(viii)  Legal advice regarding Purdue's interactions with Key Opinion Leaders, advisory boards and treatment guidance;

(ix)    Legal advice regarding advocacy before the United States Congress or a state legislative branch with respect to OxyContin;

(x)     Employment records and files created before the Cutoff Date pertaining to employment terminations or disciplinary actions related to opioid sales and marketing, including documents created before the Cutoff Date pertaining to internal investigations of personnel related to marketing of

**A.196**

opioids, in all cases subject to applicable federal and state privacy and similar laws with respect to employees and with any redactions necessary to comply therewith; and

(xi)     To the extent provided during the time period while the Corporate Integrity Agreement was in effect, legal advice regarding compliance with the Corporate Integrity Agreement entered into between Purdue and the DOJ.

Subject to the Sequestration Date, below, the Debtors agree to waive attorney client and work product privilege over the following categories of documents:

(xii)    Documents reflecting Law Department reviews of, and decisions regarding, health care providers and pharmacies pursuant to Purdue's Abuse and Diversion Detection (ADD), Order Monitoring System (OMS), and Suspicious Order Monitoring (SOM) programs prior to mid-2018, which will have been or will be provided to the Department of Justice under a June 2019 non-waiver agreement; and

(xiii)   Documents created before February 2018 reflecting legal review, analysis and advice with respect to advice received from McKinsey related to the sale and marketing of opioids; and

(xiv)    Documents created before June 30, 2017 reflecting legal review, analysis and advice with respect to Practice Fusion.

To the extent documents subject to any of these waivers was previously logged on a privilege log in a Purdue Legal Matter, the Debtors shall provide the DOB with amended privilege logs that indicate the entries being produced pursuant to these waivers. For the avoidance of doubt, Privileged communications about interactions with the media with respect to subject matters that are otherwise waived herein are included in such waivers.

The Governmental Consent Parties and other parties hereto acknowledge that certain documents described in paragraphs (i) through (xiv) are subject to joint defense agreements, common interest privileges and other rights of third parties, which the Debtors do not have authority to waive. The Debtors will provide the DOB with privilege logs reflecting documents subject to such third-party privileges and rights that are identified in the course of identifying and compiling the Sequestration Materials. No documents subject to such third-party privileges and rights shall be included in the PDR, absent appropriate resolution of such third parties' rights and privileges. Further, the Debtors, the Governmental Consent Parties, and the other parties hereto acknowledge that no waiver of Privilege described herein shall be construed as subject matter waiver.

Subject to these acknowledgements, the Debtors, the Governmental Consent Parties, and the other parties hereto further agree to work together in good faith to

**A.197**

ensure that all documents consistent with the foregoing Sequestration Materials categories shall be available to the DOB for potential inclusion in the Public Document Repository.

To the extent that a document within the Access Materials also falls within a category of Sequestered Materials (for example, a document that was produced in a Purdue Legal Matter under <u>Section 5.12(f)(ii)</u> and is in the Debtors' Relativity database under <u>Section 5.12(i)(i)</u>), the document is eligible for access and disclosure as an Access Material regardless of the fact that it also appears in the set of data being preserved as Sequestered Materials.

(j)     **Protection of the Privilege.** For the avoidance of doubt, Debtors do not waive and do not agree to provide as Sequestered Materials for the PDR any Privileged documents and communications not otherwise identified in <u>Sections 5.12(i)(i)</u> through <u>(xiv)</u>. Such Privileged documents and communications not otherwise identified in <u>Sections 5.12(i)(i)</u> through <u>(xiv)</u> shall be removed from the Relativity database and separately preserved, and shall not be eligible for the PDR at any time. All Privileged documents removed from the Debtors' Relativity database, and not included in the Sequestered Materials described above, will be provided to the PAT, separately from the Sequestered Materials. The PAT will retain these materials for the period described in <u>Section 5.12(v)</u> below. For clarity, except for the Sequestered Documents identified in <u>Sections 5.12(i)(i)</u> through <u>(xiv)</u> above, the Debtors shall not intentionally provide the Master Distribution Trust or DOB with access to any documents or content of documents that are Privileged. Privileged documents subject to a clawback by Debtors in the Purdue Legal Matters. In the event that the Debtors inadvertently provide the Master Distribution Trust or DOB with access to Privileged documents except for those documents identified in <u>Sections 5.12(i)</u> through <u>(xiv)</u> above, that inadvertent provision does not operate as a waiver of the Privilege and, upon discovery, the DOB and/or Master Distribution Trust must promptly take steps to return the documents to the PAT or destroy such documents.

(k)     **Sequestration Date**. On January 1, 2025, NewCo or the Master Disbursement Trust ("**MDT**") shall deliver the Sequestered Materials to the Host Institution. Those materials shall be made available for assessment by the DOB and disclosure in the PDR subject to the other provisions of this Section. The Host Institution may add Sequestered Materials to the PDR on the earlier of June 30, 2025 or the date after January 1, 2025 on which the MDT Claims are paid in full under the Plan.

(l)     **Responsibilities of the DOB**. The DOB shall be responsible for:

(i)     accomplishing prompt, broad, permanent, public disclosure of millions of the Debtors' documents via the PDR to allow the public to examine the Debtors' role in the opioid crisis;

(ii)    engaging with survivors, advocates, journalists, scholars, policymakers, and others to ensure that the disclosure program serves the public;

(iii)   directing the use of the Disclosure Program Budget;

(iv)    establishing protections for Protected Information, as described below;

(v)     establishing procedures for resolution of Challenges to the redaction or disclosure of information, as described below;

(vi)     overseeing the Host Institution's implementation of the disclosure program;

(vii)     coordinating, as appropriate, the disclosure of documents from other producing parties or non-parties in opioid cases whose confidential information is included in the Access Materials including by discussing inclusion of Access Materials containing such third-party confidential information;

(viii)     ensuring the long-term sustainability and success of the disclosure program; and

(ix)     retaining and overseeing staff, counsel, or such other resources as are necessary and appropriate to accomplish he DOB's responsibilities under this <u>Section 5.12</u>.

(m)     **Host Institution**. The Host Institution(s) shall be selected by the governmental entities that support the Plan. The Host Institution will be responsible for hosting and maintaining the PDR in perpetuity, including but not limited to: maintaining control and security over documents in the PDR; providing an accessible user interface; and providing clear and transparent explanations of its procedures to the public. Subject to restrictions and oversight imposed by the DOB, the Host Institution may employ appropriate resources to accomplish its responsibilities, including but not limited to the use of permanent university employees, temporary employees, contractors, and vendor services. Commensurate with the large responsibilities assigned to the Host Institution, and subject to the decisions and oversight of the DOB and the requirements of this Plan, much of the Disclosure Program Budget may be directed to the Host Institution to fund the accomplishment of its responsibilities.

(n)     **Prompt Disclosure**. In keeping with the importance of the matter, the DOB shall dedicate its best efforts to ensure prompt disclosure and shall seek to ensure that the public receives substantial disclosure at least every quarter. The DOB shall prioritize prompt disclosure of the transcripts and audio and video recordings of depositions taken in the Purdue Legal Matters, together with the exhibits to those depositions. The Debtors will prioritize prompt production of the documents that Debtors have agreed to host pursuant to the DOJ Repository Obligation for immediate inclusion in the PDR for the sake of efficiency and cost savings.

(o)     **Redaction of Protected Information**. The DOB shall implement appropriate procedures to protect the following information ("**Protected Information**") by redacting Protected Information in documents before they are disclosed to the public in the PDR and by promptly catching and correcting errors if Protected Information is disclosed. Protected Information is: (i) any information protected from disclosure by the Health Insurance Portability and Accountability Act or similar state or federal statute; (ii) personal email addresses or personal phone numbers; (iii) information subject to confidentiality rights of third parties; (iv) information

**A.199**

subject to current trade secrets protection; (v) information regarding individuals that is of a purely personal nature and does not pertain to the Debtors' opioid business or related practices; and (vi) information otherwise protected by law. For the avoidance of doubt, Protected Information that should be redacted in a written document shall also be redacted in audio or video, such as deposition recordings.

(p) **Limits on Redaction**. There shall be no redaction of: (i) names of the Debtors' directors, officers, employees, agents, attorneys, or consultants or of prescribers or of officials or employees of a government agency; (ii) email addresses at the "pharma.com" or "purduepharma.com" domain; or (iii) trade secrets in documents dated more than 5 years before the disclosure.

(q) **Inadvertent Release of Privileged or Protected Information.** Notwithstanding anything else in the Plan, the PDR shall not contain or disclose any documents or content of documents that are Privileged, except for those documents identified in Sections 5.12(i) through (xiv) above that are eligible for the PDR after January 1, 2025, or any Protected Information. Inadvertent disclosure of Privileged documents in the PDR does not operate as a waiver of Privilege and, upon discovery, any Privileged documents must be promptly removed from the Document Repository.

The DOB will have sole liability for reviewing, evaluating, processing, and redacting all Protected Information before any document is placed in the PDR, but may permit any individual or entity to review, evaluate, process, or redact Protected Information. The DOB will establish a procedure that permits any party or member of the public to identify or challenge the disclosure of any potentially Protected Information placed in the PDR. The DOB will cause any document identified through this process to be immediately removed from the PDR pending review. Any disagreements regarding whether such material is Protected Information shall be resolved by the Special Master. The DOB will bear full legal responsibility arising out of or related to any improper disclosure of Protected Information.

(r) **Special Master**. Immediately after the Effective Date, or as soon as reasonably practicable thereafter, the Bankruptcy Court shall appoint a Disclosure Oversight Special Master (the "**Special Master**"). The Special Master's qualifications shall include former service as a judicial officer, whether as a state or federal judge. The Special Master will adjudicate all privilege and related disputes. No current or former director, officer, employee, or attorney of the Debtors, the Creditors' Committee, or Governmental Consent Party shall be eligible to be appointed as the Special Master, counsel or staff working under the Special Master, provided that prior work for a Governmental Consent Party that was completed prior to 2015 shall not preclude the appointment of a Special Master. The Special Master's reasonable hourly fees and expenses shall be paid out of the Disclosure Program Budget.

To the extent that the DOB seeks to (a) challenge Debtors' assertion of Privilege with respect to any documents withheld or redacted from production in the Purdue Legal Matters, or excluded by Debtors from the Access Materials or (b) disclose any Protected Information in the PDR, such efforts shall be subject to review by the Special Master, who shall have final say regarding whether (1) the Master Distribution Trust and/or DOB should be provided with such materials, and (2) such materials shall be protected from public disclosure.

**A.200**

All challenges to documents over which Debtors assert Privilege or documents with Protected Information in the PDR, including challenges brought by either the DOB or members of the public, shall be brought within (i) one year of the Effective Date or (ii) within one year from, when the document or information at issue is first withheld from the PDR by redaction or logging, whichever of (i) or (ii) is earliest, but in no event after two years from the Effective Date.  On or shortly after the Effective Date, the Court shall appoint a law firm to defend against challenges to whether documents or information withheld from the PDR are Privileged or Protected Information ("**Privilege Defense Counsel**").  Privilege Defense Counsel shall have the duty to represent the interests of the holder of Privilege or beneficiary of Protected Information in responding to disputes before the Special Master.

Any party seeking to initiate a challenge to the Privilege or Protected Information designation of a document or information in a document or any other challenge to the inclusion or exclusion of documents in the PDR (the "**Petitioner**") must first, as a condition precedent to any such challenge, meet and confer with Privilege Defense Counsel by serving a written statement of the specific material being disputed and the reasons for disputing each such material.  If the meet and confer does not resolve the dispute, then the Petitioner shall submit a brief to the Special Master arguing why each individual document at issue should not be considered Privileged or subject to protection or should otherwise be included or excluded.  Once a challenge has been submitted, the Special Master shall set a briefing schedule, permitting Privilege Defense Counsel no fewer 21 days to respond to the challenge, which may include *in camera* submissions in response.  At the discretion of the Special Master, the briefing schedule may also include supplemental submissions, oral argument, or other procedures the Special Master deems necessary to reach a determination.  The Special Master shall then evaluate and decide the challenge based upon existing legal precedent of federal law within the U.S. Court of Appeals for the Second Circuit, and shall be empowered to determine whether such materials are subject to a valid claim of Privilege or otherwise constitute Protected Information or should have otherwise been included or excluded, but shall not be empowered to waive any Privilege ever asserted by Debtors with respect to the Purdue Legal Matters or with respect to the Access Materials.  If the Petitioner does not prevail, then the Special Master has the discretion to shift to the Petitioner some or all of the reasonable legal expense of Privilege Defense Counsel, whose reasonable fees and expenses shall otherwise be paid for by the Disclosure Program Budget.  If the Special Master determines that the challenge was frivolous, harassing, needlessly increasing costs or expenses, or otherwise brought for an improper purpose, then the Special Master shall shift to the Petitioner some or all of the reasonable legal expense of Privilege Defense Counsel. For avoidance of doubt, any materials determined by the Special Master to be Privileged or to contain Protected Information shall not be included in the PDR.

Pending resolution of a challenge asserting a document was improperly disclosed, the Host Institution shall remove or redact each identified, challenged document.

(s)      **Materials Produced by Shareholder Released Parties**.  With respect to the Sackler family members' documents, the document repository shall include all documents that were produced in the bankruptcy cases and that relate to the manufacturing, sale, or marketing of opioids in the United States, the Debtors' alleged role or liability in connection with the opioid crisis, or the regulatory approval of any opioid product sold in the United States by the Debtors, but subject to appropriate exclusions for documents covered by the attorney-client

<div align="right">

**A.201**

</div>

and work product privileges and certain confidential information (including exclusions for information and documents related to the finances, financing activities, taxes and tax filings, investments, and third party business and advisory relationships of the Shareholder Released Parties).

The Sackler family members and the Governmental Consent Parties shall agree to the appointment of a special master to resolve disputes regarding whether certain documents or information is required to be included in the document repository by the Sackler family members. If such parties cannot agree on a special master, the parties shall request that Judge Drain appoint the special master.

The Sackler family members shall have the right to claw back documents that they were entitled to exclude in accordance with this provision but inadvertently produced to the Public Document Repository, and such inadvertent production shall not operate as a waiver of rights. The special master shall resolve any disputes between Sackler family members and the Governmental Consent Parties concerning the exercise of clawback rights.

For the avoidance of doubt, "Sackler family members' documents" refer only to documents in the Sackler family members' possession, custody or control. Section 5.12(s) does not refer to documents including or involving Sackler family members that are in the Debtors' possession, custody or control.

(t)     **Release of Confidentiality Rights by Parties Receiving Releases.** With regard to the disclosure of information in the PDR as authorized by this Section, the protections provided to Released Parties and Shareholder Released Parties shall be limited to the protections provided by this Plan. To the extent that Released Parties and Shareholder Released Parties possess rights to confidentiality beyond those provided this Plan (for example, a contractual confidentiality provision), those rights are waived to facilitate this disclosure program in exchange for the benefit of the releases provided to the Released Parties and Shareholder Released Parties by the Plan.

(u)     **DOJ Settlement Communications**. Communications between the Debtors and DOJ regarding settlement or cooperation between 2015 and the final, non-appealable conclusion of *U.S. v. Purdue Pharma L.P.*, Case 2:20-cr-01028-MCA (D.N.J.) shall be protected from disclosure to the Master Distribution Trust and the DOB and shall not be included in the PDR, nor shall any internal Debtor documents reflecting such communications or the strategy for such communications. The Debtors shall implement this exclusion when creating the set of Sequestered Materials.

(v)     **Documents Produced By Certain Financial Institutions**. The disclosure program shall not include the documents produced by financial institutions pursuant to the examination authorized by the Court at ECF No. 1143. For the avoidance of doubt, if the same information also appears in a second source that is subject to disclosure (*e.g.*, a deposition exhibit), then the information in that second source is subject to disclosure.

**A.202**

(w)    **Active Vendor Contracts**. The PDR shall not disclose the NewCo's active vendor contracts or expired contracts that would reveal the sum and substance of active contracts.  The DOB shall take appropriate steps to implement this exclusion.

(x)    **Exculpation and Indemnification of DOB members and Host Institution**.  To the maximum extent permitted by applicable law, the DOB members, whenever appointed, and the Host Institution shall not have or incur any liability for actions taken or omitted in his or her capacity as a DOB member, or on behalf of the DOB, except those acts found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud, and shall be entitled to indemnification and reimbursement for reasonable fees and expenses in defending any and all of his or her actions or inactions in his or her capacity as a DOB member, except for any actions or inactions found to be arising out of his or her willful misconduct, bad faith, gross negligence or fraud.  Any valid indemnification claim of any of the DOB members shall be satisfied from the Disclosure Program Budget.

(y)    **Reports**. On each of the first five anniversaries of the Effective Date, the DOB shall publish a public report describing the activities of the disclosure program, the use of any funds expended, and any funds committed for future use.

(z)    **Wind Down**. In or after January 2026, the DOB shall wind itself down.  If appropriate to facilitate the long-term success of the PDR, the DOB may arrange for another long-lived institution, such as one or more Attorneys General Offices, to interact with the Host Institution after the DOB is wound down (*e.g.*, by receiving reports). Upon the wind down of the DOB, the Host Institution shall be responsible for the permanent maintenance of the PDR. For avoidance of doubt, however, the access to the Access Materials granted to the DOB herein shall not be transferred to any successor institution other than the Host Institution.  Upon the wind down of the DOB, the Access Materials shall, at NewCo's election, be returned to NewCo or destroyed or if NewCo no longer exists, the documents shall be destroyed or transferred to Privilege Defense Counsel.

Within 90 days of the announcement of the dissolution of the Plan Administration Trust, the Plan Administration Trust shall use commercially reasonable efforts to return to Privileged materials to Privilege Defense Counsel who shall retain the materials in a segregated client file.

**A.203**

Kelvin X. Singleton
1800 California Drive
Vacaville, California 95696

FILED
U.S. BANKRUPTCY COURT

2021 JUL -6 P 2:02

S.D. OF N.Y.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE:

PURDUE PHARMA L.P., et al.,

DEBTORS

CHAPTER 11

CASE NO. 19-23649 (RDD)

OBJECTION TO
DEBTOR'S PLAN
OF REORGANIZATION

    CREDITOR, Kelvin X. Singleton, hereby formally object to the Debtor(s) Plan of Reorganization. This objection is based on the Pleadings before the, Memorandum of Points and Authorities Declarations and Exhibits related to the other effected parties and this creditor himself.

<u>Preliminary Statement</u>

    Claimant/Creditor herein claims that he has been gravely effected by the Debtor(s) manipulating use of delivering their opiod "pain-killing medication to the Public, including this party. Resulting from taking numerous opiods, from oxycotin to Roxycet, to Morphine (MS), the claimant has become addicted to this form of "controlled substance" and has Physical maladies behind the long-term usage of this drug.

— 1 —

**A.204**

On April 25, 2020, a declaration and exhibits was filed with his Personal Injury claim showing the adverse injuries caused by the usage of the drugs. The Claimant not only had to suffer physical withdrawals that is/was very painful and embarassing, he now suffers chronic severe constipation, bowel obstruction having to take multiple laxatives and stool softeners to use the bathroom. These issues claimant did not suffer from prior to the usage of the drug Oxycotin, Roxicet, Percocet and Morphine (see attached Declaration #1).

Because evidence has been submitted to the Court providing evidence of harm, to include but not limited to "opiod abuse" noted by his Primary Care Physician (PCP) and medical records of gastro-intestinal issues, the causation can be traced back to the usage of the Debtor's drugs. The Debtor's settlement-Plan does nothing to ease the harms physically done to this Objecting Party and will do nothing without compensation.

The Creditor/Claimant also object to the settlement Plan because the Plan was drafted on half of the government, Politicians, big businesses and share holders, who at the end of the day will control the 8$.075 billion dollar settlement amount. This settlement will never be seen by those who have been effected by this addictive drugs. The Creditor's Personal injury claim

-2-

A.205

is supported by the exhibits attached to the claim and are
in attached as attachments to this objection. He contin-
ues to suffer the affect of having become addicted to the
opiod substance. (See Declaration at 2)

Because the Creditor has shown that he was provided
multiple prescriptions and was injured as a result of taking
the opiod substance, he believes the amount estimated on
Page III of the disclosure statement of $3,500 and $48,000 is
not enough Recovery monies for those who suffered
harm or death.[1]

For the reasons(s) set forth above and those
related objections by the other interested Parties, Creditor
herein objects to the Plan.

Date: June 26, 2021

/s/ _____
Kelvin D. Spotwood

[1] This "Creditor" will state that As a Result of his inability to gain Access at
legal books and Rules related to Bankruptcy Court in New York, he has had
to address this objection in Any Way. Nevertheless, his personal injury
claim is real and supported by evidence.

-3-

A.206

**Case Name:** _IN RE: PURDUE PHARMA L.P., et al._

**Case Number:** _19: 23649 (RDD)_

**Court:** _U.S. BANKRUPTCY COURT_

## PROOF OF SERVICE BY MAIL

I, _KELVIN X. SINGLETON_ declare:

That I am over the age of eighteen years of age and am not a party to the above entitled cause of action. That I reside in Solano County, California at the California Medical Facility, at 1600 California Drive, P.O. Box 2500, Vacaville, California, 95696-2500.

That on _JUNE 29, 2021_ I served the attached: a true copy of the attached:

_OBJECTION TO DEBTOR'S PLAN OF REORGANIZATION_

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal legal mail collection system at the California Medical Facility, Vacaville, California, addressed as follows:

_U.S. BANKRUPTCY COURT-_
_SOUTHERN DISTRICT OF NEW YORK_
_THE HONORABLE ROBERT D. DRAIN_
_300 QUARROPAS STREET_
_WHITE PLAINS, NEW YORK 10601-4140_

_DAVIS, POLK & WARDWELL_
_450 LEXINGTON AVENUE_
_NEW YORK, NEW YORK_
_10017_

I declare under penalty of perjury and under the laws of the State of California that the foregoing is true and correct. That this proof of service was executed on _JUNE 29, 2021_ at the California Medical Facility, Vacaville, California.

_KELVIN X. SINGLETON_
**Declarant**

**Declarant's Signature**

**A.207**

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE: Purdue Pharma L.P.         CASE NO.: 19-23649-RDD

Social Security/Taxpayer ID/Employer ID/
Other Nos.: 06-1307484

## OBJECTION TO PLAN AND PLAN CONFIRMATION

Creighton Bloyd, Stacey Bridges, and Charles Fitch (collectively, the Recovering Creditors) hereby object to the reorganization plan proposed by the Debtors. In support of this objection, the Recovering Creditors state:

1.      Bridges is a recovering opioid use disorder patient who filed a claim on behalf of herself and all persons similarly situated to her. The claim is attached hereto as Exhibit 1. No one objected to the claim.

2.      Fitch is a recovering opioid use disorder patient in the custody of the Alabama Department of Corrections (ADOC). Fitch did not timely file a claim, but was substituted for Bridges as a named plaintiff in an amended complaint filed in an adversary proceeding that Creighton Bloyd and Bridges began. Fitch may be deemed to have filed a claim.

3.      Debtors did not provide constitutionally adequate notice to potential claimants, particularly those potential claimants incarcerated in State prisons. It is

**A.208**

no secret that prisons (particularly State prisons) in the United States are densely

populated with opioid use disorder victims. Incarcerated victims generally lack

access to the media that the Debtors used to provide notice to potential claimants.

This shortcoming is not diminished by the fact that some prisoners managed to file

claims. A few hundred, or even a few thousand, claims from prisoners would not

indicate meaningful notice to a population of over 1.2 million, 17% of whom were

actively using opioids even while in custody, according to a report published in

2019 by the Substance Abuse and Mental Health Administration.

4.     On information and belief, the distribution procedures anticipated by

the Plan would unfairly prejudice poor people and incarcerated persons. The

procedures not only call for extensive information that poor people (particularly

incarcerated persons) may struggle to provide under the best of circumstances, but

also anticipate that victims will have access to such things as computers capable of

reading from jump drives. Assuming one managed to transmit a jump drive to

persons in custody, they could not use it, because prisoners generally lack access to

computers, especially when confined in close custody.

5.     The Plan is such that many thousands of opioid use disorder victims in

active recovery will likely receive no (as opposed to low) claim distributions due to

inadequate notice and the difficulties of proving claims in the anticipated

distribution process. This will leave the assets of the PI trust to defend claims

2

**A.209**

brought by class representatives of such victims, who will necessarily have their recoveries (and the trust assets) diminished by litigation expenses, including fees paid in class action settlements, if any, outside of bankruptcy. Other types of creditors (including some personal injury victims who are the survivors of persons who died from opioid use disorder) are not similarly constrained by lack of notice and, in any event, have far greater resources to pursue recoveries both within the confines of the proposed Plan and outside of bankruptcy, to the extent the proposed Plan leaves them the opportunity to do so. If the purpose of the Plan is equitably to distribute assets to creditors and then to reorganize the company, this way of proceeding is inadvisable. It would be far preferable to give additional constructive, if not actual, notice to opioid use disorder victims, particularly those who are in active recovery and who can be easily located, and then to allow them to present streamlined claims, especially where they prefer receiving cash or cash equivalent distributions, however small.

WHEREFORE, Bridges and Fitch object to confirmation of the Plan and respectfully request the Court to set their objections for hearing.

Respectfully submitted,

s/ Frank Ozment
Frank Ozment (ASB-7203-N73J)

3

**A.210**

Frank Ozment Attorney at Law, LLC
217 Country Club Park, Box 501
Birmingham, AL 35213
Phone: (205) 847-5401
***Attorney for Plaintiffs***

**OF COUNSEL:**
Roderick Graham (ASB-3237-R74R)
Graham and Associates, P.C.
P.O. Box 43334
Birmingham, Alabama 35243
Phone: (205) 427-9494
***Attorney for Plaintiffs***

4

**A.211**

# EXHIBIT
# 1





**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | In Re: Purdue Pharma, L. P. |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: Northern District of New York | |
| Case number | 7:2019-bk-23649 |

## Official Form 410

# Proof of Claim

Claim No. [ 178 ]
Initials [ IC ]  NK

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

---

**Part 1:    Identify the Claim**

**1. Who is the current creditor?**

Stacey Bridges, on behalf of herself and all similarly situated individuals
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor    Stacey Amerson, 9311 Alabama Hwy. 91, Hanceville, AL 35077

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

C/o Roderick Graham, Esq.
Name

2910 Linden Avenue
Number    Street

Birmingham          AL       35209
City              State        ZIP Code

Contact phone  (205) 4279494

Contact email  rodgrah@hotmail.com

Where should payments to the creditor be sent? (if different)

_____
Name

_____
Number        Street

_____
City          State        ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
                  MM  / DD  / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

Official Form 410                    **Proof of Claim**                    page 1

**A.213**

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ ___contingent and unliquidated___ . Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

___personal injury___

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $_____

Amount of the claim that is secured: $_____

Amount of the claim that is unsecured: $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $_____

Annual Interest Rate (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

**Proof of Claim**

**A.214**

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☐ Yes. Check one:

Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

$_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

$_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.

$_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

### Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/17/2019
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| | | |
|---|---|---|
| Name | Roderick | Graham |
| | First name     Middle name | Last name |
| Title | Attorney | |
| Company | Graham and Associates | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | |
| Address | P. O. Box 43334 | |
| | Number     Street | |
| | Birmingham | AL     35243 |
| | City | State   ZIP Code |
| Contact phone | _____ | Email   Rodgrah@hotmail.com |

**A.215**

## ATTACHMENT TO CLAIM

On behalf of herself and all others similarly situated to her, Stacey Bridges brings this claim against the debtors for damages and equitable relief, including money damages, for the injuries that she has suffered by reason of her addiction first to Oxycontin (Oxycodone) and then to heroin.

When she was a teenager, Ms. Bridges suffered a severe accident, leaving her in very intense pain. Her doctors prescribed Oxycontin, which the debtors had promoted as safe form of pain relief. In fact, Oxy was highly addictive. Ms. Bridges became addicted to the drug. After her husband was murdered in the Walker County Jail, her doctors took her off Oxy, and she turned to heroin to satisfy the addiction that Oxy had caused.

The following years were those of almost unspeakable tragedy for Ms. Bridges. Despite having been raised by a devoted father and having had some education, she fell into a life controlled by her need for heroin. She was jailed and, while she was in jail, she was, together with several other reason, made to serve the sexual demands of the jailers. However, in very recent months, she has twice been through a medical detox program, and she is now in medically assisted therapy, the linchpin of which is a prescription for suboxone.

**A.216**

Ms. Bridges is uninsured. Suboxone is very expensive, as are programs for medical detox and rehabilitation and recovery. Today, Ms. Bridges literally lives from one suboxone prescription to the next.

In this bankruptcy case, there are many municipalities and other local governments seeking money damages from the debtor. If these claims are allowed, the viability of the debtors is questionable. Moreover, even if one assumes that such artificial legal entities as State and local governments actually suffered damages as a result of the opioid prescription practices that those entities, despite having considerable police powers, allowed to flourish, those damages pale in comparison to the suffering inflicted by those prescription practices on actual, living human beings such as Ms. Bridges. Just as importantly, if not more importantly, any money awarded to those artificial entities will likely find its way to their general funds, where it will do little or nothing to alleviate suffering, much less the medical rehabilitation of men and women such as Ms. Bridges.

Ms. Bridges understands that there may be those who argue for an award of money damages payable directly to recovering heroin addicts such as herself. At least in her case at present and those similarly situated to her at present, such she submits that such an award would be inadvisable on an individual basis. If for

**A.217**

no other reason, the impact of the legal system on current and recovering heroin addicts is often such that they cannot safely have custody of money. We are not against the court given money to a person addicts to heroin. In fact, we seek money damages to help the addict persons start anew.

But for these and other reasons, Ms. Bridges asks this Court to establish a channel trust broadly similar to those employed in the asbestos bankruptcies some years ago. She asks the Court to order the debtors to pay money into the trust to pay for the evaluation of opioid addicts who began their addiction with Oxy or other products manufactured by the debtors, for the medically supervised detoxification of such addicts, for the recovery programs necessary for those addicts to reenter society, and for the long term medically assisted therapy, including the counseling and prescriptions (for Suboxone, Vivitrol, methadone or other such medicines as may be necessary or advisable for such therapy).

Ms. Bridges promises vigorously to participate in the administration of any such moneys, so that the moneys are used as efficiently as possible. Toward that end, she promises to press those who administer the money to use telemedicine and other measures designed to make effective therapy available to the broadest population possible. She has already had her counsel consult experts in the rehabilitation of heroin addicts, as well as persons learned in telemedicine and on

**A.218**

the cutting edge of the delivery of addiction recovery services to persons who,

like her, live in Rural America, where the opioid crisis is often the most acute and

the need for medically assisted therapy is most necessary.  She also asks that her

lawyers be awarded a reasonable attorneys' fee.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- :
                                                                 :
In re:                                                           :    Chapter 11
                                                                 :
PURDUE PHARMA L.P., *et al.*,                                    :    Case No. 19-23649 (RDD)
                                                                 :
                                          Debtors.[1]            :    (Jointly Administered)
                                                                 :
---------------------------------------------------------------- :

### DECLARATION OF MICHAEL ATKINSON IN SUPPORT
### OF THE STATEMENT OF THE OFFICIAL COMMITTEE OF UNSECURED
### CREDITORS IN SUPPORT OF CONFIRMATION OF THE SIXTH
### AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
### PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS

Under 28 U.S.C. § 1746, I, MICHAEL ATKINSON, declare under the penalty of perjury

that the following is true and correct to the best of my knowledge, information and belief:

1.  I am over 21 years of age. I am a Principal at Province, LLC ("Province"), a financial

advisory firm with principal offices located at 2360 Corporate Circle, Suite 330, Henderson,

Nevada 89074, and additional offices in Los Angeles, Miami, Stamford, and the Washington DC-

Baltimore metropolitan areas. Province serves as financial advisor to the Official Committee of

Unsecured Creditors (the "Official Committee") in the above-captioned chapter 11 cases (the

"Chapter 11 Cases").

2.  I submit this declaration (the "Declaration") in support of the *Statement of the Official*

*Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter*

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable
jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal
Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium
Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp.
(4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue
Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805),
Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes
Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC
Pharma Inc. (4014).

**A.220**

*11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors*, filed contemporaneously herewith (the "Statement").

3.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge and on my review of documents and information that I have considered in my capacity as an advisor to the Official Committee.  If called upon to testify, I could and would testify competently to the facts and opinions set forth herein.

4.  This Declaration will address (i) my background, (ii) the Official Committee's investigation and assessment of the claims proposed to be settled by the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 3185] (as modified, amended or supplemented from time to time, the "Plan"), (iii) the arms' length negotiations that resulted in the proposed settlement of claims against the Sacklers (the "Sackler Resolution") and settlement to allocate value among the opioid claimants (the "Intercreditor Agreements" and, together with the Sackler Resolution, the "Plan Settlement"), (iv) the Official Committee's determination to support the Plan, and (v) certain information concerning the Debtors' pre-petition distributions on account of tax payments and, separately, distributions under the Plan.

## Professional Background and Education

5.  Province was engaged by the Official Committee at the outset of these Chapter 11 Cases.  I lead Province's work on behalf of the Official Committee, and have participated in almost all aspects of these Chapter 11 Cases that the Official Committee has had a role in, including the Official Committee's investigation and analysis of claims, the negotiations that led to the Plan Settlement, and twice a week telephonic meetings with the Official Committee throughout these

**A.221**

Chapter 11 Cases. I have worked closely with the Official Committee's legal counsel, Akin Gump Strauss Hauer & Feld LLP ("Akin"), in connection with this engagement.

6. I received my Masters of Business Administration from Loyola University in 1992, and I am a Certified Public Accountant in the state of Maryland. I have more than 30 years of experience advising companies and creditors' committees in connection with restructuring transactions and chapter 11 cases.

7. Prior to joining Province, I was a Managing Director and Head of the Creditors' Rights Group for Protiviti, Inc. from 2007 to 2017. I was also a Managing Director at Navigant Consulting from 2001 to 2007. I was also a founding member and Managing Director of Penta Advisory Services from 1997 to 2000.

8. To date, I have worked with more than 100 companies in a wide variety of states of financial distress, and I have served as financial advisor to creditors' committees in more than fifty chapter 11 cases. My experience also includes advising boards, individual creditors, and other stakeholders across a broad range of industries.

9. I have led more than 50 creditors' committee cases and debtor cases and served, or am currently serving, as a financial advisor in bankruptcies including, but not limited to, bankruptcies of Mallinckrodt plc, Boy Scouts of America, Cyprus Mines Corporation, Insys Therapeutics, True Religion Apparel Inc., Toys "R" Us Property Company I LLC, Gymboree, Achaogen, Aegerion Pharmaceuticals, Pernix Therapeutics, Samuels Jewelers, Z Gallerie, Heritage Home Group, American Tire Distributors, Nine West Holdings, Alpha Natural Resources, Health Diagnostic Laboratory, Papa Gino's, Circuit City, Linens 'n Things, Erikson Retirement Communities, and Metromedia Steakhouses. I have also represented more than 30 post-confirmation trusts, including

**A.222**

REDACTED

those of Toys "R" Us Property Company I LLC, Chi-Chi's, ATA Airlines, Murray's Inc., and United Petroleum.

10. Province and its senior professionals also have extensive experience with respect to reorganizations and restructuring of distressed companies, both out of court and in chapter 11 proceedings.  Province has extensive experience representing official creditors' committees, debtors, creditors, trustees, and others in a wide variety of bankruptcy cases, including, as financial advisor to the official committees of unsecured creditors in FTD, Sizmek, Brookstone, J&M Stores (Fallas), The Rockport Company, Claire's Stores, Inc., The Walking Company, Patriot National, Mac Acquisition LLC (Romano's Macaroni Grill), Payless ShoeSource, Inc., Eastern Outfitters LLC, Inc., Performance Sports Group, Golfsmith International Holdings, Inc., Aéropostale, Inc., Pacific Sunwear, Inc., Fresh & Easy, LLC, National Air Cargo, Inc., Magnetation, LLC, and KSL Media Inc. matters, the debtors in Woodbridge Group of Companies, LLC, Penthouse Global Media, Focus Property Group, Superior Linen, Argosy Casino (Penn National) and American West Homes, and the trustee in Maxus Energy, Avaya, Inc., La Paloma Generating Company LLC, RadioShack Corporation, Coldwater Creek, Inc., Loehmann's Inc., and Eddie Bauer.

### The Official Committee's Investigation

11. At the outset of these Chapter 11 Cases, Akin and Province commenced an investigation on behalf of the Official Committee of, among other things, the claims that could be asserted against the Sacklers and related entities on behalf of the Debtors' estates.  This also included an investigation concerning the likelihood of success of any potential estate claims against the Sacklers and related entities, the likely damages associated with such claims, and the likelihood of collecting on any judgment rendered in favor of such claims.

4

REDACTED

12. The Official Committee sought and obtained extensive discovery in order to conduct this investigation, including review of certain of the Debtors' privileged documents that were produced to the Official Committee on a common interest basis, in exchange for the Official Committee's agreement to withdraw its motions to compel as against the Debtors.[2]  In addition, the Official Committee noticed and/or participated in 16 depositions.

13. The Official Committee also analyzed reports presented by the Debtors that set forth the history of cash and non-cash transfers to the Sacklers and related entities,[3] and presentations made by the Sacklers concerning their trust structures, their assets, and their defenses to the claims.[4]

14. The Official Committee used the information it obtained through these cases in order to analyze, among other things:[5]

  a.  The merits of estate claims that could be asserted against the Sacklers and related parties;

  b.  The degree (if any) to which the Sacklers and other fiduciaries exposed the Debtors to liability through aggressive marketing tactics and other misconduct, the Debtors' role (if any) in the opioid epidemic, the Debtors' failure (if any) to implement

---

[2] *See Notice of Agreement Between Debtors and Official Committee of Unsecured Creditors Regarding Privilege Motions and Adjournment of Hearing with Respect to Remaining Privilege Disputes as to the Sacklers* [ECF No. 1908]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents or for* In Camera *Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged* [ECF No. 1752].

[3] *See Notice of Filing of Report of the Special Committee* [ECF No. 654]; *Notice of Filing of Report of the Special Committee* [ECF No. 1194].

[4] *Notice of Filing of Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 291]; *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* [ECF No. 518].

[5] The Official Committee investigated, researched, and considered numerous potential issues.  This Declaration does not purport to identify all of the issues considered.

**A.224**

procedures to identify or investigate red flags, and the Sacklers' involvement (if any) in any misconduct and or knowledge regarding such conduct;

c. The potential damages for each of the estate claims against the Sacklers and related parties, including prejudgment interest;

d. Putative defenses concerning the estate claims against the Sacklers and related parties;

e. The value, nature, location, and ownership structure of the Sacklers' wealth, assets and investments;

f. The trust structure through which the Sacklers own the Debtors and through which the Sacklers hold the majority of their wealth;

g. The value and intent behind transfers of cash, intellectual property rights, royalty rights, equity investments, and other non-cash transfers of value from the Debtors to the Sacklers and affiliated entities; and

h. The value and salability of the Debtors' affiliated entities.

**Mediation and Plan Negotiations**

15. Various parties have participated in three significant phases of mediation in connection with these Chapter 11 Cases ("Phase I," "Phase II," and "Phase III," respectively, and collectively, the "Mediation").

16. Phase I of the Mediation included formal mediation sessions from March 6, 2020 to September 11, 2020. The parties agreed that the purpose of the Phase I Mediation[6] was to determine the relative allocation of the value of the Debtors' estates as between groups of public claimants, on the one hand, and private claimants, on the other hand.

---

[6] *See Order Appointing Mediators* [ECF No. 895].

**A.225**

17. Phase I of the Mediation involved the Debtors, the Official Committee, and representatives of nearly all significant opioid claimant constituencies.[7]  In addition, certain other parties, including the Department of Justice, representatives of public school claimants, and the NAACP had varying levels of involvement in Phase I of the Mediation, but were not official Phase I mediation parties.

18. Along with Akin professionals, I was extensively involved in Phase I of the Mediation. The negotiations were hard-fought, arms' length, and at times contentious.  The Official Committee's approach to Mediation was to seek to ensure that the outcome was fair and appropriate, given the various different claimant groups participating.

19. The Phase I Mediation ultimately resulted in the Intercreditor Agreements.[8]  During and after the Phase I Mediation, and as set forth in the *Mediator's Report* [ECF No. 3339] filed July 28, 2021, the Phase I mediation parties also continued to negotiate terms to govern the payment of certain fees of opioid claimant counsel ("Fee Agreements") which are set forth in the Plan.[9]  The Fee Agreements were the product of extensive negotiations.

20. Phase II of the Mediation began in September 2020.  In Phase II, the scope of the mediators' authority was expanded to authorize the mediators to mediate any and all potential claims or causes of action that may be asserted against the Sacklers and/or the Sacklers' entities, or that could otherwise become the subject of releases potentially granted to the Sacklers in these Chapter 11 Cases.[10]

---

[7] *See Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* [ECF No. 2983] ("Disclosure Statement") at 86 (listing the Phase I mediation parties).

[8] *See Mediators' Report* [ECF No. 1716]; *Mediator's Report* [ECF No. 2548].

[9] *See Mediators' Report* [ECF No. 3339].

[10] *See Order Expanding Scope of Mediation* [ECF No. 1756] ¶ 3.  Phase II also authorized the mediators to continue the existing mediation to resolve open issues referenced in the *Mediators' Report* [ECF No. 1716], provided however that the mediation parties were not permitted to reopen or renegotiate issues that had already been resolved in the mediation as of that date.

21. Phase II of the Mediation included the Debtors, the Official Committee, the Ad Hoc Committee, the Non-Consenting States Group, the MSGE Group, and the Sacklers.

22. Along with Akin professionals, I was also extensively involved in Phase II of the Mediation. The negotiations were, at times, contentious. The Official Committee understood that the Intercreditor Agreements would unravel absent success in Phase II since those agreements are conditioned on confirmation of a plan of reorganization that included a contribution from the Sacklers.[11]  I understand that certain representatives of the Public Opioid Claimants[12] would not confirm that the Public Opioid Claimants would  honor the Intercreditor Agreements absent a settlement with the Sacklers included in a plan of reorganization in chapter 11.

23. Towards the end of the Phase II of Mediation, the Official Committee, the Debtors, the Ad Hoc Committee, the MSGE Group, and the Sacklers ultimately reached an agreement in principle on the broad economic terms of a settlement.  This agreement was later modified as a result of further negotiations in Phase III of the Mediation.  I did not participate in any negotiations conducted during Phase III of the Mediation.

24. Along with Akin professionals, I have been involved in extensive negotiations concerning the Plan and the settlement with the Sacklers.  Ultimately, the Plan Settlement, including the Sackler Resolution, is the product of close to two years of intense, arms' length and often contentious discovery and negotiation.

---

[11] *See Mediators' Report* [ECF No. 1716] ¶ 12.
[12] As used in the Statement, the term "Public Opioid Claimant" refers to a holder of a Non-Federal Domestic Governmental Claim (as defined in the Plan).

**A.227**

**The Official Committee's Consideration of the Plan**

25. The Debtors' solicitation materials included an extensive and thorough letter from the Official Committee to all creditors regarding the Plan (the "UCC Letter"). A true and correct copy of the UCC Letter is attached to this Declaration as Exhibit A.

26. I believe that the Official Committee's view of the Plan is accurately set forth in the UCC Letter.

27. The Official Committee made the decision to support the Plan without any coercion or pressure from the Debtors or any other party in these Chapter 11 Cases. The Official Committee's decision was based on its independent analysis and work in these Chapter 11 Cases.

**Debtors' Distributions to Certain Public Opioid Claimants in
Pre-Petition Taxes and under the Plan**

28. The Debtors reported that they transferred $10.4 billion to or for the benefit of the Sacklers between 2008 and 2017, of which $4.68 billion were transfers in the form of tax distributions.[13] Of the total $4.68 billion transferred in the form of tax distributions as disclosed by the Debtors, at least ███████ was directed to or for the benefit of the Sacklers for payment of their estimated tax liabilities owed to the United States, Connecticut, Rhode Island, California, Maryland, Oregon, and Delaware. Those totals are set forth in the following chart:

---

[13] *Notice of Filing of Report of the Special Committee* [ECF No. 654] at 11.

| Taxing Authority | Approximate Tax Revenue | |
|---|---|---|
| United States | ███ | |
| Connecticut | ███ | |
| Rhode Island | ███ | |
| California | ███ | |
| Maryland | ███ | |
| Oregon | ███ | |
| Delaware | ███ | |
| Washington | ███ | |
| New Hampshire | ███ | |
| Vermont | ███ | |
| District of Columbia | ███ | |
| **Total:** | ███ | |

29. I determined these amounts by reviewing the tax distributions reported by the Debtors, per payee identified in the Debtors' records.[14] Some Public Opioid Claimants likely received less than the amounts set forth in this table, in actuality, given that the Sacklers have disclosed that they paid ███ in taxes from 2008 to 2017,[15] which is approximately ███ ███ of the total value of distributions made by the Debtors for the Sacklers' estimated tax liabilities. However, it is certain that transfers to these taxing agencies were significant, as the Debtors identified approximately $2.29 billion in transfers that were paid *directly* to the United States Treasury (that is, not even including amounts transferred to the Sacklers, which were then to be remitted to the appropriate taxing authorities).[16]

30. As shown above, approximately ███ of the value distributed from the Debtors to the Sacklers was intended for the estimated tax liability owed to the federal government.

31. I also calculated the consideration that will be distributed to California, Washington, Maryland, Oregon, Connecticut, New Hampshire, Delaware, Rhode Island, Vermont, and the

---

[14] *See, e.g.* PPLPUCC500051645; PPLPUCC500051775. I also considered SAP accounting system information from the Debtors including journal entries and other SAP support.

[15] *See* RSF00000001.

[16] *Notice of Filing of Report of the Special Committee* [ECF No. 654] at 67.

A.229

District of Columbia and their subdivisions under the Plan. I calculated these distributions by multiplying each respective state's percentage allocations in the NOAT Agreement by an assumed $4 billion in total distributable value for the NOAT. The $4 billion in estimated proceeds to the NOAT is from the Debtors' Disclosure Statement, but the figure is likely conservative as it excludes potential proceeds of insurance claims and any release of restricted cash as well as the increased payments under the Shareholder Settlement Agreement.[17] By my calculation, the following amounts are estimated to be distributed to the respective states and their subdivisions under the Plan, assuming $4 billion in available cash proceeds to the NOAT:

| Objector and their Subdivisions | Estimated Allocation |
|---|---|
| California | $397 million |
| Washington | $93 million |
| Maryland | $84 million |
| Oregon | $58 million |
| Connecticut | $54 million |
| New Hampshire | $26 million |
| Delaware | $20 million |
| Rhode Island | $20 million |
| Vermont | $12 million |
| District of Columbia | $9 million |
| **Total:** | **$772 million** |

[*remainder of page left intentionally blank*]

---

[17] *See Notice of Filing of Eighth Plan Supplement Pursuant to the Fifth Amended Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors, Shareholder Settlement Agreement* [ECF No. 3121] (the "Shareholder Settlement Agreement").

A.230

The foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: August 5, 2021
  Fulton, MD

              */s/ Michael Atkinson*
              Michael Atkinson

**A.231**

# EXHIBIT A

*In re Purdue Pharma L.P.*, Case No. 19-23469 (RDD)

**Plan Support Letter**

To all unsecured creditors of Purdue Pharma L.P. and its affiliated debtors and debtors in possession (collectively, the "Debtors" or "Purdue"):

We write this letter as lead counsel to, and on behalf of, the Official Committee of Unsecured Creditors (the "UCC") appointed in Purdue's bankruptcy cases (the "Chapter 11 Cases"). The UCC consists of the following nine members:

1.  a personal injury victim who suffered from opioid use disorder;

2.  a third party payor and trade association for 35 independent health insurance companies collectively insuring 110 million members;

3.  a trade creditor and co-defendant in opioid litigation that has asserted indemnification claims;

4.  the mother of a child who died of an opioid overdose;

5.  the mother of a child diagnosed upon birth with Neonatal Abstinence Syndrome ("NAS") due to fetal opioid exposure;

6.  a trade creditor;

7.  the federal entity responsible for insuring defined benefit pension plans;

8.  the grandfather of a child diagnosed upon birth with NAS due to fetal opioid exposure; and

9.  a hospital.

The purpose of this letter is to explain to all creditors the UCC's position with respect to the *Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [ECF No. 2982] (as amended, the "Plan").[1]

The UCC is an independent fiduciary for and represents the interests of **all creditors** in the Chapter 11 Cases. In their capacities as **unpaid** and **volunteer** members of the UCC, the above individuals and representatives of the above institutions have met, on average, twice weekly during these cases (approximately 160 times) and have reviewed and considered daily emails from counsel regarding the events that have occurred over the more than 600 days since the UCC's appointment. The UCC members have reviewed thousands of documents, listened to numerous hearings, attended presentations and reviewed analyses from their own advisors, as well as the advisors and principals of numerous other parties.

At the outset of their appointment, the UCC members agreed not to speak to the press or otherwise make public statements regarding Purdue's bankruptcy or the Sacklers, and instead determined to make their views known through the positions advanced by the UCC in Court. This self-imposed "gag order" has been, and continues to be, a hardship for many of the members of the UCC. This is particularly true for the victim advocates, who prior to their appointment to the UCC, had made it their lives' work to combat the opioid crisis and speak publicly on opioid issues. This situation was exacerbated by the decision made by certain other parties to speak through various forms of media in order to make their positions known. Indeed, it is in part because of the public silence of its members to date that the UCC is compelled to make the important and somewhat lengthy statements contained in this letter.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Plan.

**A.233**

Below is a brief overview of the items covered in this letter.

| | |
|---|---|
| **Section I** | A summary of the UCC's conclusions and position regarding the Plan |
| **Section II** | An overview of certain background information regarding the Chapter 11 Cases |
| **Section III** | The UCC's approach to the Chapter 11 Cases |
| **Section IV** | Phase I Mediation: determining allocation of value among creditor constituencies |
| **Section V** | The work the UCC and its advisors have done to understand, evaluate and prepare to prosecute the various potential causes of action against the Sacklers |
| **Section VI** | Phase II Mediation: the attempt to negotiate a settlement among the Sacklers, the Public Claimants,[2] the UCC and the Debtors |
| **Section VII** | The Emergency Relief Fund and Document Repository |
| **Section VIII** | The future of Purdue |
| **Section IX** | Concluding remarks about the Plan |

***For the reasons explained in this letter, the UCC (i) has determined that it will not object to the Plan and (ii) encourages all creditors to vote to accept the Plan**.*[3]

I.     SUMMARY OF THE UCC'S CONCLUSIONS

Since its formation, the UCC has advocated for an outcome that (i) maximizes value for those harmed by the conduct of the Debtors and the members of the Sackler family and (ii) allocates such value fairly among numerous creditor constituencies, including personal injury victims (including children diagnosed upon birth with NAS), hospitals, insurance ratepayers, third-party payors (including employer and government-sponsored health insurance plans administered by these companies), States, municipalities, Native American Tribes, public schools and the Federal Government.

In an effort to maximize value available for creditors, the UCC and its advisors have thoroughly investigated and analyzed whether the approximately $3 billion originally offered by the Sacklers, coupled with other contingent consideration and the value of Purdue itself, was sufficient to compensate creditors for (i) the harm caused by the Debtors' sale and marketing of opioid products and (ii) value and assets that Purdue caused to be distributed to the Sacklers or to entities under the Sacklers' control.  As a result of this investigation (the "Investigation"), the UCC developed a detailed understanding of the value that could be recovered from the Sacklers in litigation.  Armed with the results of this work, the UCC, along with the Debtors and the Consenting Committee (as defined below), participated in mediation ("Phase II Mediation") to reach resolution with the Sacklers over an increased contribution, which resulted in an additional $1.275 billion in guaranteed value beyond the approximately $3 billion initially offered.

With respect to ensuring that value is allocated fairly among various creditor constituencies, the UCC and its advisors worked closely with the Debtors, the Public Claimants and the various groups representing the Private

---

[2] The term "Public Claimants" refers collectively to the States, both in the Consenting Committee and the NCSG, their political subdivisions, Native American Tribes and other entities defined in the Plan as the holders of "Non-Federal Domestic Governmental Claims."

[3] Although the UCC has determined to support the Plan, final documentation of the Sackler Settlement (as defined below), as well as certain other supplemental documents related to the Plan, remains subject to continued negotiation.  As such, and for the avoidance of doubt, nothing contained in this letter is or should be construed as the UCC's agreement to any terms of the Sackler Settlement or the Plan that have not been filed publicly as of the date of this letter.  To the extent these ongoing negotiations fail to result in consensus regarding open issues, the UCC will no longer be in a position to support the Plan and will disclose its views in a supplemental filing on the Court's docket.

2

**A.234**

Claimants,[4] in particular during mediation ("Phase I Mediation" and together with Phase II Mediation, "Mediation"). Ultimately, Phase I Mediation resulted in settlements in principle among certain of the Public Claimants and Private Claimants.

As a result of all of its work and the knowledge it has gained to date, the UCC has determined that the best path forward is confirmation of the Plan. Indeed, this is the only path that will ensure value can begin to make its way to creditors, who desperately need it as soon as practicable. To be clear, the UCC believes that the claims against the Sacklers and related parties could well be worth more than the $4.275 billion (the "Settlement Amount") contemplated by the settlement with members of the Sackler family (the "Sackler Settlement"). Nevertheless, two factors strongly favor acceptance of the Plan: (i) the significant risk, cost and delay (potentially years) that would result from pursuing the Sacklers and related parties through litigation; and (ii) the importance of preserving the agreements reached between Public Claimants and Private Claimants regarding allocation of value, absent which creditors would be forced to engage in time-consuming, messy and costly litigation.

The UCC therefore views the Plan as an imperfect solution that remains the **only** way to ensure that individuals, institutions and States and their political subdivisions start to receive the funds necessary to compensate them for their injuries (for individuals) and abate the opioid crisis (for every other party), which continues to take a staggering toll and has only been exacerbated by the COVID-19 pandemic.

*Therefore, with appropriate deference to M. de Voltaire, the UCC urges creditors not to let the perfect be the enemy of the good.*

## II.    OVERVIEW AND BACKGROUND OF THE CHAPTER 11 CASES

Purdue's bankruptcy has occurred against the backdrop of the opioid crisis, which is the single worst man-made epidemic—and other than the COVID-19 pandemic, the defining public health crisis—of this generation. It has resulted in half a million deaths and ruined countless other lives, in addition to leaving thousands of children suffering from fetal opioid exposure. Indeed, a few sentences could hardly do justice to the horrors of the opioid crisis and the human toll wrought by the Debtors' past actions. Therefore, the UCC will not attempt to explain in this letter the widespread harm and devastation to individuals and families alike with which many readers of this letter are all too familiar. Suffice it to say that this tragic backdrop, coupled with the many complex legal issues to which it has given rise, have made these Chapter 11 Cases among the most complex, difficult, important, emotional and painful imaginable.

### A.    *The Opioid Crisis Resulted in Extensive Litigation Against Purdue and Others*

In addition to the tragic human toll, the opioid epidemic has resulted in extensive litigation. More than a dozen opioid manufacturers, distributors and retail pharmacies have been named as defendants in thousands of lawsuits brought by numerous and varied plaintiff groups. These lawsuits seek to hold defendants responsible for creating or perpetuating the opioid crisis. In 2017, much of this litigation was centralized in the United States District Court for the Northern District of Ohio, in a single multi-district litigation entitled *In re National Prescription Opiate Litigation*, Case No. 17-2804 (the "MDL"). Even within this landscape of litigation, two things set Purdue apart from the other defendants.

*First*, Purdue manufactured OxyContin—a blockbuster "branded" opioid drug, which was sold to consumers by name and marketed aggressively to doctors and patients alike. Purdue's role in creating the opioid crisis through its marketing tactics placed it front and center in many of the complaints filed against multiple opioid defendants. *Second*, unlike any of the other defendants, Purdue was owned and operated for many years by members of a single family: the Sacklers. For their role in owning and operating Purdue, many members of the Sackler family were named individually as defendants in various litigations. Moreover, because Purdue was owned

---

[4] The term "Private Claimants" refers collectively to the holders of Hospital Claims, Third-Party Payor Claims, Ratepayer Claims, NAS Monitoring Claims and PI Claims, each as defined in the Plan.

**A.235**

exclusively by the Sacklers, the Sacklers were able to cause Purdue to transfer assets out of the reach of Purdue's creditors, to themselves and other entities they owned. Indeed, between 2008 and 2017, the Sacklers—as the owners and operators of Purdue—transferred **more than $10 billion** from the company to their own personal accounts and trusts. These amounts were generated largely from the sales of OxyContin.

A wide variety of plaintiff groups have brought claims and causes of action against the Debtors and the Sacklers, including the following:

1. the United States Department of Justice (the "DOJ");

2. the States (through their attorneys general);

3. political subdivisions of the States (including cities and counties);

4. Native American Tribes;

5. a putative class of independent public school districts ("Public Schools");

6. personal injury victims;

7. mothers/guardians of children diagnosed at birth with NAS;

8. hospitals;

9. third party payors (including employer and government-sponsored health insurance plans administered by these companies);

10. a putative class of guardians for children diagnosed with NAS (the "NAS Monitoring Class") seeking establishment of a medical monitoring program to monitor the effect of *in utero* exposure to opioids;

11. a putative class of purchasers of private health insurance (the "Ratepayers") who allege that they were forced to pay increased premiums to account for the impact of the opioid crisis; and

12. a putative class of independent emergency room physicians.

Collectively, the damages asserted by these plaintiff groups amount to **trillions** of dollars. The various defendants do not have the means to pay these amounts in full. As a result, the media has reported that some of these defendants are in the process of negotiating settlements. Other defendants continue to litigate. And still others—Insys Therapeutics, Inc. ("Insys"), Purdue and Mallinckrodt plc ("Mallinckrodt")—have filed for bankruptcy protection.

**B.** **Purdue and the Sacklers Attempted To Settle with a Subset of Plaintiffs and Filed for Chapter 11 To Implement Their Settlement Framework**

Before filing for chapter 11, Purdue attempted to settle with certain governmental plaintiffs. Specifically, in August 2019, Purdue and the Sacklers reached an agreement with 23 States and what is referred to as the "Plaintiffs' Executive Committee" or "PEC."[5] Most notably, this settlement contemplated that the Sacklers would pay $3 billion in fixed payments over seven years to settle all claims against them—not only those brought by the settling States and the PEC. In addition, the settlement provided that the Sacklers would give up their ownership interests in Purdue, including control of the Debtors' cash, assets and insurance rights, to their creditors.

On September 15, 2019, Purdue filed for bankruptcy protection with this compromise—the so-called "Settlement Framework"—agreed to in principle by the settling States, the PEC, the Debtors and the Sacklers. At

---

[5] The PEC was appointed in the MDL to coordinate the efforts of the various plaintiffs, but largely consists of attorneys for municipalities and political subdivisions. A separate group of approximately 1,300 entities (mostly political subdivisions) referred to as the "Multi-State Governmental Entities Group" or "MSGEG," was formed to represent the interests of its members, which sought an independent voice in the Chapter 11 Cases.

**A.236**

the outset of the Chapter 11 Cases, certain settling States and the PEC formed the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants (the "<u>Consenting Committee</u>").

The Settlement Framework was publicized at the outset of the cases as being worth between $10 and $12 billion. A portion of the perceived value of the Settlement Framework was rooted in the notion that Purdue would emerge from bankruptcy as a "public benefit company," in which the Sacklers would have no role,[6] which would manufacture and distribute addiction treatment and opioid overdose reversal drugs to the public for free or at cost. This program was called Purdue's "<u>Public Health Initiative</u>"; and between $4 and $5 billion of the $10 to $12 billion in settlement value was attributed to the value of these free or at-cost drugs. In other words, Purdue would use roughly $600 million of cash (which otherwise would be distributed to creditors) to manufacture these drugs, and then give away such drugs for free (or sell them at or below cost). Once this and other facts were considered, the UCC determined that the ***Settlement Framework actually was worth somewhere between $5 and $6 billion in direct value to the litigants that had been harmed by the Sacklers and Purdue***. Moreover, while there can be no dispute that the Public Health Initiative was (and remains) a noble goal, the UCC is steadfast in the belief that the funds from Purdue's estates should be distributed to the claimants that had been harmed by the Sacklers and Purdue.

The UCC was not the only constituency to express concerns regarding the Settlement Framework. 24 State attorneys general (and the attorney general for the District of Columbia) formed a group, known as the "<u>Non-Consenting States</u>" or "<u>NCSG</u>," to advance their position that the Settlement Framework was not sufficient. Indeed, the NCSG has fought against the Settlement Framework throughout the Chapter 11 Cases, and continues to oppose the enhanced Sackler Settlement.

### C. *Appointment of the UCC*

In all chapter 11 cases, the Office of the United States Trustee (the "<u>U.S. Trustee</u>"), an arm of the DOJ, is tasked with determining whether to appoint a fiduciary committee to represent the interests of all unsecured creditors.[7] Here, the U.S. Trustee appointed the UCC on September 26, 2019, 11 days after Purdue commenced the Chapter 11 Cases.

The UCC's nine members (described on the first page of this letter) represent diverse interests. Importantly, the UCC does not include any governmental entities because the U.S. Trustee has taken the position that governmental entities cannot sit on official creditors' committees. Nevertheless, the UCC owes fiduciary duties to ***all*** unsecured creditors, regardless whether such creditors are Public or Private Claimants.

During the first few months of the Chapter 11 Cases, four different parties requested to join the UCC in an *ex officio* (non-voting) capacity: (i) Cameron County, Texas (on behalf of the MSGEG); (ii) the Cheyenne and Arapaho Tribes (on behalf of an ad hoc group of Native American Tribes); (iii) Thornton Township High School District 205, a public school district in Illinois (on behalf of a putative class of independent public school districts); and (iv) the State of Maryland. The UCC voted to accept all four, but the State of Maryland subsequently withdrew its request. The other three joined the UCC and remain *ex officio* members.

### D. *Intercreditor Dynamics*

Since the beginning of the Chapter 11 Cases, the interactions between the UCC and the two major Public Claimant groups (the Consenting Committee and the NCSG) has been complicated, as has the relationship between the Public Claimants and the Private Claimants generally. While all claimants are united in their desire to obtain the most value from the Sacklers and from Purdue's assets to fund creditor recoveries, the Public Claimants and Private Claimants have been at odds regarding where that value should go once it is received.

---

[6] At least since the agreement on the Settlement Framework, the Sacklers have had no board or management role in Purdue.

[7] An "unsecured" creditor is any creditor that does not have a lien, mortgage or similar security interest in a debtor's assets. Purdue does not have any debt to banks or similar institutions in the form of loans, bonds or notes. As a result, the vast majority of the Debtors' creditors are unsecured.

**A.237**

Specifically, the Public Claimants have expressed to the UCC and others their view that, as sovereigns, they are entitled to most of the value received through the Chapter 11 Cases to abate the opioid crisis and, further, they should be in control of how such value is allocated to other creditor groups and ultimately used. To be sure, it is commendable that the Public Claimants have been consistent in their desire to ensure that as much money as possible goes to abate the opioid crisis. Indeed one of the fundamental principles of the Plan is that the Public Claimants will use substantially all of the value they receive for abatement (and the Public Claimants have required that all Private Claimants other than personal injury claimants use substantially all of the money they receive for abatement) and the mishaps stemming from the oft-criticized use of the tobacco settlement money almost two decades ago will not be repeated.[8] Consistent with this overall approach, the Public Claimants also viewed, and continue to view, themselves as the arbiter of the strength of all creditors' claims, including their own.

Many of the Private Claimants have taken the position that the Chapter 11 Cases should function as a vehicle to achieve an allocation of value among *all* of the various claimants, based on the strength and weakness of their respective claims (although, admittedly, each Private Claimant group tends to think its claims are the strongest) and the amount of harm each such constituency has suffered. Many Private Claimants have also expressed the view that there is no basis to require claimants to use the value they receive for specified opioid abatement purposes, or in any other particular way. Finally, certain of the Private Claimants have argued that many of the States and their subdivisions were aware of the magnitude of the opioid crisis for years before bringing litigation, but nevertheless continued to receive value from the opioid business through tax revenues—notwithstanding their ability to take action, in their sovereign capacity, to abate the opioid crisis and stop various opioid defendants from causing harm. Accordingly, these Private Claimants have taken the position that Public Claimant allocations should be reduced (and such value reallocated to other creditors), at least by the amount of the tax revenues they have received, and possibly more.

Because of its composition, the UCC often was viewed as the voice of the Private Claimants alone, rather than of all unsecured creditors. Aside from being incorrect as a matter of bankruptcy law, this perception has resulted in unfortunate tensions throughout the Chapter 11 Cases. Indeed, it is impossible to understand how the Plan was constructed—and why the UCC does not object to the Plan—without understanding these dynamics.

## III. THE UCC'S GENERAL APPROACH TO THE CHAPTER 11 CASES

From the outset, the UCC has made clear that it believes there are three pillars to a successful outcome in these cases.

1. ***Determining a Fair Allocation***: Negotiating or otherwise determining a fair and appropriate allocation among all Private and Public Claimants, based on legal principles.

2. ***Maximizing Value***: Increasing the total value available to *all* claimants, primarily by investigating the Settlement Framework and increasing the contribution from the Sacklers.

3. ***Furthering Public Health Objectives***: Ensuring that the results of these cases are consistent with the urgent need to combat the opioid crisis and help those most in need.

Each of these goals is addressed in further detail below.

---

[8] Recently, certain States have been criticized for the manner in which they have used (or not used) settlement money from the recent multi-State opioid settlement with McKinsey & Co., and, therefore, the Plan represents a landmark achievement on behalf of the Public Claimants. *See, e.g.,* Mary Murphy, *Parents who lost children to opioids demand NYS settlement money for treatment*, PIX11News, (updated June 2, 2021 at 6:39 PM EDT) https://pix11.com/ news/local-news/parents-who-lost-children-to-opioids-demand-nys-settlement-money-for-treatment/.

A.238

## IV.    DETERMINING A FAIR ALLOCATION AMONG OPIOID CLAIMANTS

The Debtors, the UCC and numerous other parties organized a six-month Mediation process to promote agreement between the Public and Private Claimants regarding the allocation of whatever value would eventually be received from the Sacklers and related parties, along with any value from the Debtors' estates. Without such an agreed resolution, creditors would compete against one another for value in costly and time-consuming litigation of all against all.

Perhaps even more significant than the uncertainty of any claimant's recovery was the uncertainty of timing that would have resulted from a failure to reach an allocation settlement. Without an agreement on allocation, the Debtors would be required to hold onto the value of their businesses and any value obtained from the Sacklers unless and until litigation regarding entitlement to such value among claimants was fully and finally resolved, a costly process that could take years. By contrast, a largely consensual mediated resolution of allocation issues would enable the Debtors to confirm a plan of reorganization and put their (and the Sacklers') value to work more quickly to compensate victims and abate the opioid crisis.

### A.    *The Scope and Participants for Phase I Mediation*

Following discussions regarding the appropriate scope of the mediation, the number of mediators and the participants in such mediation, the parties agreed that the Honorable Layn Phillips (Ret.) and Kenneth Feinberg would be appointed co-mediators (collectively, the "Mediators")[9] of Phase I Mediation. The parties then turned to negotiating and drafting a form of order that would govern the process. As reflected in the *Order Appointing Mediators* [ECF No. 895] (the "Mediation Order"), the parties agreed that the purpose of Phase I Mediation was solely to determine the relative allocation of the value of the Debtors' estates as between Public Claimants, on the one hand, and Private Claimants, on the other hand, and *not* allocation among the claimants on each side. In addition, the Mediation Order contained provisions identifying the Phase I Mediation Parties,[10] the role of the DOJ in the mediation and heavily-negotiated provisions regarding confidentiality and what could and could not be disclosed publicly regarding the mediation.

### B.    *Keeping Phase I Mediation on the Right Track*

The UCC's objective for Phase I Mediation was to work with the other parties to help facilitate an outcome that was (i) fair and appropriate and (ii) the product of a fair and reasoned process.

Due to factors both within and outside the parties' control, Phase I Mediation progressed slowly at the outset. The start of the mediation in March 2020 coincided with the onset of the COVID-19 pandemic, which prevented in-person meetings with the Mediators and among the Phase I Mediation Parties. In addition, the Public Claimants chose to focus first on reaching agreement among themselves regarding how the value to be distributed to the Public Claimants would be allocated—a commendable goal. Only after the Public Claimants reached general agreement on this issue did negotiations regarding allocation of estate value *as between* Public Claimants and Private Claimants begin in earnest.

In July 2020, and with the parties still in negotiations, the Court imposed a deadline of August 31, 2020 for Phase I Mediation to conclude. As this deadline approached, it became clear that several issues appeared to be

---

[9] Mr. Feinberg is a world-renowned mediator with whom almost all of the advisors to the Phase I Mediation Parties have had prior experience in other complex mass tort cases. Judge Phillips is another world-renowned mediator and former federal district court judge, who had mediated the Debtors' $275 million settlement with the State of Oklahoma prior to the Debtors filing for bankruptcy.

[10] Phase I Mediation involved representatives of nearly all significant creditor constituencies, including: (i) the Debtors; (ii) the UCC (including *ex officio* members); (iii) the Consenting Committee; (iv) the Ad Hoc Committee of NAS Babies; (v) the Ad Hoc Group of Hospitals; (vi) the Non-Consenting States; (vii) the MSGEG; (viii) the Ad Hoc Group of Individual Victims; (ix) counsel for the Blue Cross and Blue Shield Association, various third party payors and employer and government-sponsored health insurance plans administered by these companies; and (x) the Ratepayers (collectively, the "Phase I Mediation Parties"). In addition, certain other parties, including the DOJ, the Public Schools and the NAACP had varying levels of involvement in Phase I Mediation, but were not official Phase I Mediation Parties.

**A.239**

hindering progress, and the mediation likely would fail or result in an inappropriate outcome. Accordingly, on August 19, 2020, the UCC expressed to the Mediators and the Phase I Mediation Parties the UCC's views, including with respect to a viable path forward. Because of the confidentiality provisions of the Mediation Order, this letter cannot provide significant detail regarding the specifics of what occurred during Phase I Mediation or the nature of the UCC's specific views. Indeed, although certain developments during the mediation were leaked to media outlets, the only "official" information regarding Phase I Mediation to be disclosed publicly was included in the *Mediators' Report* [ECF No. 1716] filed with the Court on September 23, 2020 (the "1st Mediators' Report") and in the subsequent *Mediator's Report* [ECF No. 2548] filed with the Court on March 23, 2021 following the conclusion of Phase II Mediation (the "2nd Mediators' Report" and, together with the 1st Mediators' Report, the "Mediators' Reports").

### C. *Phase I Mediation Results*

As described in the Mediators' Reports, Phase I Mediation resulted in: (i) the Public Claimants' agreement that all value they receive in the Chapter 11 Cases would be used to fund programs intended to abate the opioid crisis; (ii) an allocation of estate value, pursuant to fixed payment schedules, among four Private Claimant constituencies—Personal Injury Claimants,[11] Hospital Claimants,[12] Third-Party Payor Claimants and NAS Monitoring Claimants (with regard to abatement), as reflected in four separate term sheets agreed to by the Public Claimants and the specific Private Claimant group party to such term sheet (collectively, the "Phase I Mediation Settlements"); and (iii) the agreement of the Hospital Claimants, Third-Party Payor Claimants and NAS Monitoring Claimants to use substantially all of the value they receive to fund programs to abate the opioid crisis.[13] Each of the Phase I Mediation Settlements was conditioned on confirmation of a plan of reorganization that included a contribution from the Sacklers. In other words, if no settlement ultimately was reached with the Sacklers, then there was no requirement that the Phase I Mediation Settlements be honored by the Public Claimants. Furthermore—and critically for the dynamics of Phase II Mediation—because each of the Phase I Mediation Settlements contemplated that the Private Claimants would receive a fixed recovery over a defined period of time, the Public Claimants would receive all of the upside that could result from litigating against or settling with the Sacklers, beyond the value required to pay the settling Private Claimants.

Phase I Mediation resulted in an approximate split of Purdue's "nominal" or headline value of 79% to Public Claimants and 21% to Private Claimants (in the aggregate), which, after taking into account timing of payments, equals a 76% / 24% split on a "net present value" basis. These amounts were negotiated and agreed to by the Phase I Mediation Parties, and were not dictated, mandated or even proposed by the UCC. Certain creditors may believe that this outcome is unfair because it provides too much value to the Private Claimants; others may believe that Public Claimants received too much value. The UCC offers the following observations:

1. The Public Claimants—in particular, the States and their political subdivisions, including the PEC—brought most of the pre-bankruptcy litigation against Purdue and the Sacklers. As a result, certain parties believe that the Public Claimants are most responsible for increasing the pot of value available to creditors, and as such, are entitled to receive most of Purdue's available value.

2. The Debtors' most significant assets are the causes of action against the Sacklers. The extent to which the Sacklers' agreement to contribute $4.275 billion to the estates as part of the Sackler Settlement was motivated by the strength of these causes of action (as opposed to a fear of defending against the direct causes of action of the States, their political subdivisions and the other Public and Private Claimants),

---

[11] Eight months after Phase I of Mediation had been substantially completed, the Personal Injury Claimants agreed to further subdivide their allocation as between NAS Personal Injury Claimants and Non-NAS Personal Injury Claimants.

[12] The Hospital Claimants are defined in the Plan to include claims held by "a provider of healthcare treatment services or any social services, in its capacity as such, that is not a Domestic Governmental Entity."

[13] In addition, the Debtors and the ratepayers reached agreement on a sum to be paid over two years for dedicated abatement purposes.

**A.240**

however, is unclear.  Analysis of both the estate causes of action and the direct causes of action is set forth later in this letter.

3. At its core, the opioid crisis involves harm to people.  Indeed, there would be no crisis were it not for the individuals who have suffered immeasurable harm.  Therefore, some believe that the more than 140,000 personal injury victims[14] who filed claims against the Debtors should have received a larger allocation.

4. With the exception of personal injury victims, each litigation creditor's claim can be divided into three parts: (i) a "damages" claim to compensate for past harm; (ii) a "future damages" claim to compensate for future harm; and (iii) an "abatement" claim to pay for programs to combat the opioid crisis in the future.  As noted above, the Public Claimants have stated that they believe all estate value (other than payments to address past damages suffered by personal injury victims) should be used exclusively for abatement.  Moreover, the Public Claimants required in connection with the Phase I Mediation Settlements that Private Claimants, other than personal injury victims, forego compensation for past and future damages claims and use any recoveries solely for abatement purposes.

5. The UCC has observed that creditor constituencies—both public and private—believe that the claims of other creditor constituencies are not as strong as their own.  In addition, certain constituencies believe that other constituencies were culpable, at least in part, for the opioid crisis.

6.  As of the date of this letter, the treatment of the Public Schools' claims remains unresolved.  The UCC hopes that there will be further negotiation regarding such claims that will result in a resolution.

Despite an imperfect process and the foregoing observations, the UCC supports the resolutions reached in Phase I Mediation because: (i) funds are needed to address the opioid crisis ***now***; (ii) the alternative to a mediated resolution—*i.e.*, litigation regarding the merits of creditor constituency's claims—would be costly and time-consuming and would further delay the use of funds to combat the opioid crisis; and (iii) the outcome has been agreed to by almost all of the Phase I Mediation Parties.

## V.    THE UCC CONDUCTED A THOROUGH INVESTIGATION OF THE SACKLERS, INDEPENDENT FROM THE DEBTORS IN ORDER TO FULFILL ITS FIDUCIARY DUTIES AND MAXIMIZE VALUE[15]

The UCC made clear immediately upon its appointment that it needed to conduct a thorough investigation into the proposed settlement before the UCC could consider supporting the Settlement Framework.  Moreover, "prepetition" or pre-bankruptcy litigation presented serious allegations concerning the Debtors' and the Sacklers' role in the opioid epidemic.  As such, numerous unsecured creditors informed the UCC that they believed a thorough investigation into the Debtors' role in the opioid epidemic and massive transfers of wealth to or for the benefit of the Sackler family was itself a primary objective in the Chapter 11 Cases.

The UCC therefore set out to fulfill its fiduciary duties by investigating these issues.  Among other things, the UCC's Investigation:

1. was designed to determine the ***magnitude of the value recoverable from the Sacklers***, through litigation or otherwise;

---

[14] Counsel to the UCC has responded to more than 200 personal injury victims who reached out directly and has communicated with a number of the approximately 100 additional individuals who filed letters on the Court's docket.

[15] This section contains references to various Court orders and filings submitted by the UCC and other parties in interest.  For the sake of brevity, this letter does not include citations to every such filing.  To the extent any claimant would like to review any of the cited materials, such claimant may find them on the public docket (*available at* https://restructuring.primeclerk.com/purduepharma/Home-DocketInfo) or should feel free to reach out to counsel to the UCC to obtain copies of such documents.

2. involved an ***evaluation of claims*** (i) against the Sacklers and (ii) relating to the Debtors' prepetition marketing practices, transfers of value to the Sacklers and other potential misconduct; and

3. involved an ***assessment of the Sacklers' ability to satisfy any judgment*** rendered against them, and the ***likelihood of successfully collecting upon*** any such judgment.

All together, the Investigation encompassed document discovery of the Debtors, the Sacklers, more than 100 Sackler-owned entities in the United States and abroad (including the foreign independent associated companies ultimately owned by the Sackler families (the "IACs")) and the other entities owned and controlled by the Sackler families (the "Other II Way Entities" and together with the IACs, the "Sackler Entities"), the Debtors' insurance brokers, non-Sackler directors, certain financial institutions and the Debtors', the Sacklers' and Sackler Entities' long-time advisors at Norton Rose Fulbright US LLP ("NRF"). The UCC conducted 16 depositions of Sacklers, directors and executives of the Debtors, advisors to the Debtors or Sacklers and other key personnel. The UCC analyzed the Settlement Framework in light of the findings from this Investigation, and worked to maximize the estates' value by ensuring that the claims against the Sacklers would be prosecuted if the Settlement Framework was not sufficiently improved.

## A. *The UCC's Initial Discovery Efforts*

The UCC initially sought to conduct its Investigation through voluntary disclosures from the Debtors and the Sacklers. During the first days of the Chapter 11 Cases, the Debtors filed a motion with the Court seeking a preliminary injunction (the "Preliminary Injunction") to enjoin cases relating to the Debtors' opioid business from proceeding against the Debtors or the Sacklers. Due to, among other things, the Debtors' and the Sacklers' agreement to provide discovery to the UCC on a voluntary basis, the UCC supported the Preliminary Injunction. These commitments and obligations were memorialized in a stipulation (the "Case Stipulation").

Beginning in October 2019, the UCC issued diligence requests to the Debtors and the Sacklers. The UCC sought categories of information that were relevant to potential estate causes of action against the Sacklers, including causes of action pertaining to the Sacklers' ownership and control of the Debtors, misconduct of the Debtors while under the Sacklers' control and the transfer of billions of dollars in value from the Debtors to the Sacklers and the Sackler Entities.

The UCC understood that the Debtors had formed a special committee (the "Special Committee"), which had been delegated full authority respecting all matters concerning the Sacklers and was overseeing investigations concerning the Sacklers. Starting in early November 2019, the UCC met with the Debtors in an effort to learn about the Special Committee's investigatory process and seek to collaborate and coordinate the two investigations. The Debtors made available to the UCC and other parties certain documents, including the Transfer Reports (as defined below) detailing cash and non-cash transfers made by the Debtors to and for the benefit of the Sacklers. The Debtors also made clear, however, that they did not intend to share much of the work product and analysis of the Special Committee with the UCC. Therefore, the UCC concluded that a thorough and vigorous investigation (independent of the Special Committee's investigation) would be necessary to fulfil the UCC's fiduciary duties.

The UCC was also committed to sharing the findings from its Investigation with its constituents to the greatest extent possible. Thus, the UCC entered into a comprehensive protective order that allowed the production of confidential material to a broad range of professionals for such groups. The UCC also negotiated a protocol that permitted sharing confidential information between and among certain groups of creditors.

## B. *The UCC Investigation Was Rigorous and Exhaustive*

**The Sacklers:** Pursuant to the Case Stipulation, the UCC was not permitted to seek formal discovery from the Sacklers until first attempting to obtain disclosures voluntarily. Prior to the UCC's discovery efforts in these Chapter 11 Cases, minimal discovery had been taken from the Sacklers in any context, including the prepetition

**A.242**

litigation.[16]  The UCC issued its first diligence requests to the Sacklers in November 2019 and issued additional comprehensive requests in January 2020.  Counsel for the UCC and the Sacklers met and conferred on many occasions in a good faith effort to agree on the appropriate scope of discovery in response to the UCC's diligence requests.  For example, between January and March 2020, the UCC's advisors conferred with representatives of the Sackler family concerning discovery by telephone on at least four occasions, and exchanged many more meet and confer letters and emails.  The UCC also began the process of negotiating custodians and search terms with the Sacklers for purposes of obtaining Sackler family emails and other relevant electronically stored information, such as e-mails.  Unfortunately, the Sacklers were not willing to provide (voluntarily) sufficient discovery from the perspective of the UCC.

On March 25, 2020, the UCC filed a motion with the Court under Rule 2004 of the Federal Rules of Bankruptcy Procedure, seeking authorization to conduct an examination of the Sacklers, including by serving formal subpoenas for documents and testimony.  The Court granted the request, and the UCC served formal discovery demands on the Sacklers on March 31.  The UCC continued to engage in multiple meet and confers with the Sacklers regarding the scope of its subpoenas, and the Sacklers continued to object to discovery requested by the UCC.  On two more occasions, the UCC determined that it had reached an impasse with the Sacklers regarding the scope of discovery and thus sought assistance from the Court.  Pursuant to the Court's instruction on June 8, the parties resumed their meet and confer efforts and finally reached agreements concerning the scope of the Sacklers' disclosures, which were set forth in publicly filed stipulations.  In total, the Sacklers have produced more than 450,000 documents in response to the UCC's discovery demands.

**The IACs and Other II Way Entities:**  The UCC also sought discovery from the IACs and Other II Way Entities, which received over a billion dollars in additional value from the Debtors in the form of cash and non-cash transfers over the past decade.  The UCC at first sought to obtain diligence in the possession of these entities on a voluntary basis from the Sacklers.  Early in these Chapter 11 Cases, the Sacklers' longtime advisors coordinated some initial responses to the UCC's requests concerning the IACs, but those advisors later stopped responding.  Accordingly, the UCC sought assistance from the Court to require the Sacklers to order the IACs to cooperate.  As a result, the IACs engaged new counsel, and the UCC met and conferred in good faith with the IACs' new counsel.  The Other II Way Entities also engaged their own counsel to respond to diligence requests, with whom the UCC likewise met and conferred concerning voluntary disclosures.

The UCC ultimately determined that it would not be possible to reach agreement with either the IACs or the Other II Way Entities concerning voluntary disclosures, and sought and received authorization from the Court to serve formal subpoenas on the IACs and the Other II Way Entities.  The UCC then sent a formal subpoena to the IACs on July 6 and served a subpoena on the Other II Way Entities on July 11.  The UCC met and conferred with counsel to the IACs and the Other II Way Entities numerous times regarding the scope of their respective disclosures.  The UCC also negotiated two stipulation (each of which was filed publicly) with the IACs concerning the scope of the IACs' disclosures.  Ultimately, the IACs produced almost 800,000 documents and the Other II Way Entities produced approximately 40,000 documents in response to the UCC's discovery demands.

**The Debtors:**  The UCC issued its first voluntary diligence requests to the Debtors in October 2019, and later supplemented those requests with additional comprehensive requests in January 2020.  The UCC sought corporate governance and formation documents, board materials, contracts, insurance documents, copies of prepetition productions and other materials necessary for the evaluation of claims.  The UCC also requested that the Debtors obtain and review emails and documents of key custodians that were never produced in prepetition litigation, including the files of Sacklers and other directors and executives on company servers.  The UCC met and conferred numerous times with the Debtors over the scope of its Investigation, and ultimately negotiated a stipulation (which was filed publicly) to govern the disclosures.  To date, the Debtors have produced approximately

---

[16] For instance, the only Sackler documents produced by any Sacklers in the MDL were fewer than 200 documents produced by Richard Sackler.

**A.243**

700,000 documents in response to the UCC's requests, and have also provided copies of approximately 12 million documents that had been produced in prepetition litigation or produced to the DOJ or Congress.

**NRF:** The law firm Norton Rose Fulbright served as long-time counsel to the Debtors, the Sacklers, the IACs and the Other II Way Entities. Moreover, Stuart Baker, a former partner at NRF, held numerous non-legal roles with the Debtors, the Sacklers and their trusts, the IACs and the Other II Way Entities, including roles as an executive, a director and a trustee. Accordingly, the UCC moved the Court for authorization to serve a formal subpoena on Mr. Baker, which the Court granted. The UCC also moved the Court for authorization to serve a formal subpoena on NRF, which the Court also granted. The UCC met and conferred with the Debtors, the Sacklers, the IACs, the Other II Way Entities and Mr. Baker to ensure that the NRF's files were searched and reviewed for non-privileged documents responsive to the UCC's requests. NRF ultimately produced, directly or jointly with the Debtors, close to 200,000 documents in response to the UCC's requests.

**Other Related Parties:** The UCC also sought and was granted authority, through formal motion practice before the Court, to seek document productions from other parties, including non-Sackler directors of the Debtors and certain of the Debtors' insurers regarding policies and potential coverages. The insurance brokers produced more than 4,000 documents in response to the UCC's discovery requests.

**Financial Institutions:** Finally, the UCC joined in a motion by the NCSG for authorization to conduct an examination of financial institutions to obtain information in relation to the location and amount of the Sacklers' assets and transfers of those assets over time.

**Privileged Materials:** The Debtors, the Sacklers, the IACs and NRF withheld or redacted tens of thousands of documents from their productions, including as a result of claims of privilege asserted by the various parties. The UCC spent significant time and effort obtaining and analyzing privilege and redaction logs, and concluded that the grounds offered for withholding and/or redacting many of these documents were subject to challenge. Accordingly, the OCC engaged in extensive meet and confer meetings with the producing parties, and later moved the Court to compel the production of such documents from the Debtors and the Sacklers.[17] Ultimately, the Debtors and the Sacklers voluntarily agreed to produce in full or to limit the redactions on more than 16,700 documents that were previously withheld and/or redacted.

**Agreement with the Debtors on Privileged Materials:** In addition, the UCC reached consensual resolution of its motions directed to the Debtors, with the Debtors agreeing to produce to the UCC nearly 13,000 Debtor-privileged documents in exchange for the UCC withdrawing its motions. The privileged documents so-produced included every communication by and among the Sacklers and other directors or executives of the Debtors responsive to the UCC's document requests.[18] *The UCC is aware of no other creditors' committee that has obtained comparable access to such a volume of privileged documents from a debtor in bankruptcy, and appreciates the Debtors' willingness to provide—and constructive cooperation in providing—these documents to the UCC in connection with its Investigation.*

The following chart summarizes the number of documents the UCC obtained that were produced either prior to or following the commencement of the Chapter 11 Cases.

---

[17] *See Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents or for In Camera Review, Based on Good Cause, Crime Fraud, and At Issue Exceptions to Claims of Privilege* [ECF No. 1753]; *Official Committee of Unsecured Creditors' Motion to Compel Production of Purportedly Privileged Documents, or for* In Camera *Review, Based on Failure of the Sacklers and the Debtors to Demonstrate Documents Identified on Logs Are Privileged* [ECF No. 1752].

[18] *See Notice of Agreement Between Debtors and Official Committee of Unsecured Creditors Regarding Privilege Motions and Adjournment of Hearing with Respect to Remaining Privilege Disputes as to the Sacklers* [ECF No. 1908]. The motions remain adjourned with respect to the Sacklers, and the UCC will proceed with its motions to compel privileged documents from the Sacklers in the event that a settlement with the Sacklers is not approved.

**A.244**

| Producing Party | Document Category | Approximate Document Count | Approximate Page Count |
|---|---|---|---|
| Sacklers | Documents produced in response to UCC's discovery requests | 465,008 | 2,604,556 |
| | Documents produced in prepetition litigation | 152 | 634 |
| IACs | Documents produced in response to UCC's discovery requests | 782,252 | 7,896,339 |
| Other II Way Entities | Documents produced in response to UCC's discovery requests | 38,323 | 326,828 |
| Debtors | Documents produced in prepetition litigation | 9,865,317 | 71,120.741 |
| | Documents produced to the DOJ | 2,230,764 | 12,354,380 |
| | Documents produced to Congress | 7,951 | 92,617 |
| | Documents produced in response to the UCC's requests | 711,494 | 4,815,418 |
| NRF | Documents produced in response to the UCC's requests | 197,476 | 1,478,280 |
| Insurance Broker | Documents produced in response to the UCC's requests | 4,157 | 41,884 |
| Non-Sackler Directors | Documents produced in prepetition litigation | 2,157 | 17,230 |
| Sacklers' Financial Institutions | Documents produced in response to NCSG's requests | 3,540 | 94,429 |
| TOTAL | | 14,305,051 | 99,365,056 |

### C. *The UCC Obtained Critical Information Regarding Both the Claims Against the Sacklers and the Sacklers' Ability To Pay*

The documents that the UCC obtained from the Debtors, the Sacklers and others related to the merits of the claims against the Sacklers, including the Sacklers' ownership and control of the Debtors, knowledge of and involvement in misconduct and intent concerning prepetition transactions dating back to the 1990s, as well as documents relating to claims against the Sacklers and the Debtors arising out of Purdue's opioid businesses. The UCC also sought and obtained documents related to the Sacklers' ability to pay an eventual judgment, including documents concerning their wealth and investments, and documents concerning the intricate array of trusts through which the Sacklers own the Debtors and other assets.

The UCC obtained more than 14 million documents (comprising close to 100 million pages), including approximately 2 million documents that had not been produced previously in any litigation or in connection with a government investigation. The UCC utilized analytics and targeted searches to review the 12 million documents that had been produced prepetition efficiently and cost effectively. The UCC also relied on a dedicated team of contract attorneys and efficiency counsel to review the documents newly produced in the Chapter 11 Cases. Through this review, the UCC identified thousands of documents of great relevance to claims against Purdue and the Sacklers and other key issues.

The Case Stipulation also required the Sacklers to make presentations regarding the trusts through which they held their wealth, their assets and their asserted defenses. The UCC carefully analyzed these presentations and assessed them in the context of the extensive diligence it obtained in the Chapter 11 Cases.

The UCC also carefully reviewed the reports prepared by the Special Committee that detailed the cash and non-cash transfers made by the Debtors to the Sacklers and their entities (the "Transfer Reports"). The UCC relied on the accuracy of the Transfer Reports and generally did not seek to recreate that work beyond verifying the

**A.245**

reasonableness of the information contained therein through a variety of means. The UCC did obtain discovery from the Sacklers, however, in order to conduct additional analysis that was not addressed in the Transfer Reports.

In connection with the Investigation, the UCC conducted 16 depositions of key personnel (identified in coordination with the NCSG), including seven members of the Sackler family,[19] long-serving members of the Debtors' board,[20] the Debtors' current and past CEOs,[21] a former Vice President and Associate General Counsel at Purdue,[22] Stuart Baker and other Sackler family advisors.[23] When the UCC encountered difficulties in scheduling these depositions, the UCC moved the Court for authority to serve compulsory discovery demands to obtain the depositions, which the Court granted.

### D. *The UCC Obtained Information Necessary To Evaluate the Strength of Estate Claims*

As a result of these discovery efforts, the UCC obtained and analyzed the information necessary to evaluate the strength and potential value of the Debtors' estates' claims against the Sacklers, held for the benefit of the Debtors' creditors.[24]

*First, the UCC obtained the information necessary to evaluate potential fraudulent transfer claims to claw back more than $4.1 billion in non-tax U.S. partner cash distributions from the Debtors to the Sacklers through their trusts.* The UCC obtained documents, and conducted legal research, in order to investigate whether the transfers would be avoidable and recoverable as intentional or constructive fraudulent transfers. Among other things, this analysis required consideration of the Debtors' intent in approving the transfers and the Debtors' insolvency at the time of each transfer, taking into account the Debtors' contingent liabilities from opioid litigation. The UCC did not have access to the Special Committee's insolvency analysis described in the Disclosure Statement, and thus the UCC conducted an independent insolvency analysis, spanning 2008 through 2017. Such analysis tested whether the Debtors (i) had total liabilities that exceeded the total fair value of their assets, (ii) incurred debts beyond their ability to pay as they matured, or (iii) had unreasonably small capital to operate their business in the ordinary course and (iv) received reasonably equivalent value in exchange for cash and non-cash transfers. This analysis required the UCC to assess the Debtors': (a) research and development, strategic and business plans and budgets; (b) actual and projected financial position; and (c) operating results and cash flows. The UCC also performed extensive research and analysis of probable and reasonable estimable opioid liabilities at all relevant points in time, based on industry, scientific and economic studies and literature on opioid use and abuse (some of which included Purdue's own funded studies), findings from litigation filings, internal communications and other facts identified in support of allegations of misconduct as well as the Sacklers and Purdue's awareness of the forthcoming opioid litigation and resulting liability. Furthermore, the UCC assessed the applicable statutes of limitations, including the statutes of limitations available to any so-called "golden creditor," and the impact of prejudgment interest on the value of claims.

*Second, the UCC obtained information necessary to evaluate potential fraudulent transfer claims to claw back approximately $4.7 billion in tax distributions made by the Debtors on behalf of the Sacklers and their trusts.* The UCC sought extensive discovery concerning the purpose and context of these tax distributions, in order to investigate the intent behind those transfers and the Debtors' insolvency at the time of those transfers. The UCC also investigated the extent to which the Sacklers might argue that such tax distributions conferred any form of value on the Debtors.

---

[19] Richard Sackler, Mortimer D.A. Sackler, Kathe Sackler, Theresa Sackler, Ilene Sackler-Lefcourt, David Sackler and Marianna Sackler.

[20] Cecil Pickett and F. Peter Boer.

[21] Mark Timney, John Stewart and Craig Landau.

[22] Robin Abrams.

[23] Stephen Ives and Jonathan White.

[24] The UCC investigated, researched, and considered numerous potential claims. This letter does not purport to identify all of the claims considered, or all of the issues considered in connection with those claims.

**A.246**

*Third, the UCC obtained information necessary to identify and evaluate potential fraudulent transfer claims to claw back transfers to the Sackler Entities for the benefit of the Sacklers.* These transfers included, among others: (i) cash of approximately $1.5 billion; (ii) additional non-cash value, based on below-market royalty payments charged by the Debtors (when the Debtors were owned and controlled by the Sacklers) to the IACs for the international licensing and sale of OxyContin to an Other II-Way Entity; and (iii) stock and equity interests and other valuable intellectual property assets transferred to or for the benefit of the Sacklers and the Sackler Entities for no consideration. Among other things, the UCC investigated the intent of the Debtors and the particular circumstances of each of transfer of value to the Sackler Entities by reviewing, among other things, the Debtors' related party agreements, board materials, presentations, transfer documents and financial information. The UCC also prepared analyses to assess the value of the non-cash property that was transferred to determine whether the Debtors had received reasonably equivalent value in exchange, and if not, an estimate of potential damages. The UCC examined the tax implications of all non-cash transactions, particularly those involving intellectual property rights, between the Debtors and the Sackler Entities and the effect that unwinding those transactions would have on any settlement. As part of this effort, the UCC prepared an analysis of the royalty rates that governed the Debtors' licensing agreements with the IACs.

*Fourth, the UCC obtained the diligence necessary to investigate potential breach of fiduciary duty claims.* The UCC investigated the manner in which the Sacklers and other fiduciaries carried out, or breached, their fiduciary duties to the Debtors. This analysis required consideration of the Debtors' financial condition, taking into account their contingent liability from opioid marketing practices. This investigation also required consideration of the degree to which the Sacklers and others exposed the Debtors to liability through aggressive marketing tactics and/or enriched the Sacklers at the expense of the Debtors and the Debtors' creditors. Specifically, the UCC investigated the degree to which the Sacklers failed to exercise reasonable care as directors, failed to implement reasonable steps to monitor or address red flags related to the opioid businesses and otherwise breached their fiduciary duties. The UCC also investigated the extent to which the Sacklers overstepped the bounds of ordinary director behavior and actively managed or micromanaged the Debtors' opioid marketing and other activities. The UCC also investigated the Sacklers' domination and control of the non-family directors who served on the Debtors' board. Finally, among other things, the UCC conducted extensive analysis regarding questions of standing, the strength of breach of fiduciary duty claims and the collectability of any judgment on such claims against the assets held in the Sacklers' trusts.

*Fifth, the UCC obtained the diligence necessary to evaluate claims to pierce the Debtors' corporate veil, or to argue that the Sacklers and the Sacklers' numerous trusts and other entities constituted alter egos of the Debtors.* The UCC obtained discovery to investigate the extent to which the Debtors disregarded corporate formalities, shared resources, intermingled assets or otherwise were not separate from the Sacklers' trusts or other entities.

*Sixth, the UCC obtained the discovery necessary to investigate numerous other claims, including claims for unlawful dividends and unjust enrichment.*

*Finally, the UCC obtained the information necessary to evaluate the Sacklers' ability to satisfy potential judgments on claims.* The UCC pursued extensive discovery to investigate the location, nature and ownership of the Sacklers' wealth. This included an investigation into a complex array of domestic and foreign trusts through which each side of the Sackler family holds its ownership of the Debtors and other assets. The UCC obtained and analyzed extensive information concerning the assets held in trust, the location of proceeds of potentially fraudulent transfers within the trust structures and the recoverability of trust assets in the event a judgment was rendered. The Sacklers provided an analysis of flow of funds summarizing cash transfers received from Purdue and the proximate recipients of those funds. The UCC analyzed these presentations and performed related diligence, including meeting periodically with the Sacklers' financial advisors to request additional support related to certain holdings and transfers. The UCC also obtained discovery from the Sacklers to conduct its own tracing analysis on a sampling of cash distributions made by the Debtors. The UCC's analysis comprised detailed sample tracing of funds from the Debtors to and through the entities and holding companies above them, to the recipient Sackler trusts, individuals and Sackler Entities, as well as subsequent intra-trust/individual distributions and recoverability against each

15

recipient. Additionally, the UCC sought to develop a holistic view of the primary historical funding sources of each trust's assets to estimate the proportion of value attributable to proceeds from Purdue distributions to determine the theoretical value of recoverable assets. The UCC also investigated whether the trusts were insufficiently independent from the Sacklers in their individual capacities, used for improper purposes or failed to follow formalities such that the assets held in one or more of the trusts would be available to satisfy a judgment against the Sacklers. Finally, the UCC analyzed international law concerning foreign trust structures as asset protection vehicles.

### E. *The UCC Also Evaluated Third-Party Direct Claims Against the Sacklers To Assess the Impact of Third-Party Releases*

In addition to investigating potential estate causes of action, the UCC obtained discovery pertaining to the Debtors' role in the opioid epidemic and the Sacklers' involvement in any misconduct. The UCC worked with creditor constituencies to ensure that search criteria utilized to obtain documents from the Debtors, the Sacklers, the IACs, the Other II Way Entities and NRF incorporated terms designed to capture evidence of potential misconduct and any Sackler involvement in the same.

### F. *The UCC's View of the Debtors' and the Sacklers' Liability and Related Motion Practice*

As noted above, the UCC moved to compel both the Debtors and the Sacklers to produce communications with their respective counsel and other documents that were withheld on privilege grounds. To that end, the UCC argued that the fiduciary, crime fraud and "at issue" exceptions to the privilege applied, and required the Sacklers and the Debtors to produce such withheld materials. In connection with these privilege motions, the UCC marshalled hundreds of pages of evidence gathered through its discovery efforts demonstrating that claims against the Debtors were "colorable," and that there was "probable cause" to conclude that the Sacklers and the Debtors had engaged in intentional fraud and breaches of fiduciary duty in connection with transferring billions of dollars to the Sacklers between 2007 and 2017. To the extent Sackler transfers could be shown to be the product of actual fraud based on the extensive evidence unearthed, the UCC argued that the primary obstacles to Sackler liability (statutes of limitation arguments) and creditor recovery (transfers to spendthrift trusts) would fall away. The Debtors settled the motion as to them by supplying the UCC with unprecedented access to Debtor-privileged documents, as discussed above. The motion as against the Sacklers is still pending, but will be withdrawn in the event the Plan is approved.

## VI. REACHING AGREEMENT OVER ADDITIONAL VALUE FROM THE SACKLERS THROUGH PHASE II MEDIATION

Around the time Phase I Mediation concluded, the Debtors proposed that the Mediators continue to serve in an expanded capacity to mediate claims and causes of action that may be asserted by the Debtors' estates or creditors against members of the Sackler family and related parties. While the UCC did not object to mediating such disputes, it believed that commencing this second phase of mediation was premature in light of the significant work that still needed to be done in connection with its Investigation. Nonetheless, the key parties agreed to engage in Phase II Mediation, beginning in September 2020.

As noted, each of the Phase I Mediation Settlements was conditioned on confirmation of a chapter 11 plan that included a contribution from the Sacklers. Moreover, pursuant to the Phase I Mediation Settlements, Private Claimants would not receive the benefit of any increase in the value of a Sackler contribution. Further, because the Consenting Committee had already agreed to the Settlement Framework with the Sacklers, the views of the Non-Consenting States would, in many ways, drive negotiations with the Sacklers during Phase II Mediation. The UCC's efforts during Phase II Mediation focused on increasing the value of the Sackler contribution to ensure that the Phase I Mediation Settlements would be preserved and that other creditors—specifically the NCSG—ultimately would support a plan of reorganization. Specifically, the UCC focused on attempting to bridge the gap between the Sacklers and the NCSG. In addition, the UCC (i) continued to conduct, in close coordination with the NCSG, its

**A.248**

Investigation and (ii) presented its preliminary analysis of the value of estate claims—based on the incomplete discovery it had received at the time—to the Mediators and the Phase II Mediation Parties other than the Sacklers.

As the Court-imposed deadline for Phase II Mediation of January 31, 2021 neared, it became clear that the gap between the Sacklers and the Non-Consenting States would prove too great to be bridged. Given the importance of achieving a resolution with the Sacklers in order to preserve the Phase I Mediation Settlements, the UCC began working closely with the Debtors, the Consenting Committee and the MSGEG on the terms of a proposal to the Sacklers that each of the four parties would support.[25] After exchanging numerous proposals and counterproposals, the UCC, the Debtors, the Consenting Committee, the MSGEG and the Sacklers reached an agreement in principle on the broad economic terms of a settlement. Although the Private Claimants would not receive any of the upside of the increased Settlement Amount, the UCC understood (based on its discussions with the advisors to the various Private Claimant groups) that the Private Claimants also supported the Sackler Settlement.

To be clear, the UCC does not believe that the Sackler Settlement reflects the full value of the claims against the Sacklers and related parties before taking other factors into account. Moreover, the UCC acknowledges that many creditors—including those who have suffered the most harm as a result of the Sacklers' role in the opioid crisis—may view the proposed Sackler Settlement unfavorably. Indeed, the UCC understands why certain creditors believe the Sacklers should be forced to give up more, if not all, of their wealth in exchange for the releases proposed under the Plan. Notwithstanding the foregoing, the UCC views the Sackler Settlement as an imperfect solution that nevertheless is superior to any other available alternatives for the majority of Purdue's creditors.

## VII.    THE PUBLIC HEALTH LANDSCAPE OF THE CHAPTER 11 CASES

Since the beginning of the Chapter 11 Cases, the UCC has been guided by an understanding of the ways in which the opioid crisis makes these cases different from all others. The public health and safety catastrophe caused in part by Purdue's past conduct required—and continues to require—immediate action. Thus, the costs of delay are far more severe than in most chapter 11 cases. The issues described in this section are part and parcel of the UCC's decision to not object to the Plan.

### A.    *The UCC's Attempt To Establish an Emergency Relief Fund*

The first time counsel to the UCC spoke on the record in the Chapter 11 Cases, it articulated the UCC's vision for a $200 million emergency relief fund (the "ERF"). The idea was as follows: because of the urgent need for front-line relief, the Debtors should use some of their value to provide ***immediate*** funding for organizations dedicated to fighting the opioid crisis. Various parties appeared receptive to this idea, and the Court explicitly disclaimed the notion that agreement on the terms of an ERF would be "utopian." The UCC therefore began work to establish an ERF to start to put the Debtors' value to work in order to combat the opioid crisis.

The UCC, at the request of the Consenting Committee, drafted a term sheet. The term sheet proposed funding, through a grant process, primarily for underfunded entities, such as recovery community organizations, harm reduction centers, syringe exchange programs and family support services. The selection of these targets was based on two factors. *First*, such organizations were not the recipients of funding appropriated by the federal government for State programs. *Second*, such organizations were not already creditors in the Chapter 11 Cases, and, therefore, providing funding to such organizations would not function as a prepayment of any claims that should otherwise be treated in the Chapter 11 Cases. The cornerstone of the term sheet was an independent board for the ERF, which would have autonomous discretion to accept grant proposals. In addition, the term sheet was premised on the UCC's view—in turn based on research and government statistics—that certain States had yet to use millions of dollars in federal opioid grants, due to various reasons.

The Consenting Committee (supported here by the DOJ) opposed three key foundations of the UCC's ERF proposal. *First*, the Consenting Committee objected to the proposed quantum of the ERF. *Second*, the Consenting

---

[25] At the same time, all parties continued their efforts to encourage the NCSG to participate in the ongoing negotiations with the Sacklers.

Committee would not agree in advance to any terms governing the types of organizations that would be the recipients of ERF funds. *Finally*, the Consenting Committee made clear that it would not support any ERF unless the money went directly to States, to be channeled through existing State infrastructure, rather than being controlled by a neutral oversight board.

After several months of negotiations, the Debtors attempted to broker a compromise. Unfortunately, the States and the UCC were unable to reach agreement (largely due to the issues of scope and control). The UCC's proposal of two smaller ERFs—one along the lines supported by each group—was also rebuffed. In March 2020, in connection with the commencement of Phase I Mediation, the parties agreed to put discussions of an ERF off until such process was complete. The issue was never revisited.

The UCC believes that the failure to establish an ERF remains one of the greatest disappointments of the Chapter 11 Cases, but also provides essential color for why the UCC is not objecting to the Plan.

### B. *The Importance of a Document Repository*

One of the key public health objectives for the Debtors, the UCC and numerous other parties in the Chapter 11 Cases has been transparency. Indeed, ameliorating the opioid crisis and all of the harm the Debtors and the Sacklers have caused will require public access to a large volume of documents detailing the history of Purdue's actions. Only through this sort of unprecedented disclosure, can we shine a light on Purdue's tragic past and ensure that we are not condemned to repeat the conduct that gave rise to the worst man-made public health crisis of our generation.

Accordingly, the creation of a public document repository has been a central tenet for all parties, including, importantly, both Purdue itself and the Court, since the outset of the Chapter 11 Cases. In October 2019, the Court explained, "[T]here's a legitimate public interest in knowing what happened with Purdue."[26] The UCC recognizes and appreciates that since the first day of the Chapter 11 Cases, Purdue has made this one of its most significant goals.

As set forth in the Disclosure Statement, the concept of a public document repository took a step forward when the Debtors included it as a binding obligation in connection with the DOJ Resolution, and the Debtors have committed that any order approving the Plan will contain a ***requirement*** that such a repository be established and that the parameters are acceptable to the Debtors and various creditor groups, including the UCC. The details and mechanics of the document repository have been the subject of numerous discussions among various parties, including, among others, State attorneys general, members of the UCC and the Debtors. As of the date of this letter, all parties continue to work on ironing out the repository's parameters, terms and conditions, and the UCC is heartened by the efforts of all parties.

The UCC is hopeful that once established, the document repository will provide critical information to scholars, doctors and the general public alike and serve as a resource for generations to come.

### C. *The Future of Purdue and the Failed Attempt To Secure a Purchaser for Purdue's Assets*

During the Chapter 11 Cases, a debate emerged regarding what should happen to Purdue's business following emergence from bankruptcy. A wide range of views was expressed to the UCC by various parties in interest, including the following.

1. OxyContin sales should cease entirely, and the non-OxyContin portions of the Purdue business should be liquidated, with the value distributed to creditors.

---

[26] Transcript of October 11, 2019 Hearing at 65:2–3.

**A.250**

2.  Creditors—primarily the States—should "own" reorganized Purdue (including the OxyContin business) and run it in a morally, ethically and socially responsible manner.

3.  Purdue should become a "public benefit company" that can conduct its business to provide a broad range of monetary and non-monetary benefits to the American public, the profits of which would flow to the States.

4.  Purdue should be sold to a third party that will agree to abide by the Voluntary Business Injunction[27] that has been in place during the Chapter 11 Cases to restrict the Debtors' conduct surrounding the sale and marketing of opioid products.

This debate regarding the future of Purdue became a central focus during Mediation. To the UCC's knowledge, both the Consenting Committee and the NCSG favored selling Purdue (rather than owning it themselves), but the NCSG wanted to sell it to a third party during the Chapter 11 Cases, while the Consenting Committee appeared willing to hold onto the business after Purdue emerged from chapter 11, with certain divisions being sold promptly thereafter and others sold later. The Debtors preferred a longer-term ownership plan (perhaps through 2029) of the various business lines, with a significant portion of Purdue's future revenue being used for the Public Health Initiative—*i.e.*, bringing to market opioid addiction reversal drugs for free or at cost for the benefit of the American public. And, finally, the DOJ appeared to be focused on ensuring a vast majority of future revenue was used for opioid crisis abatement purposes, and ultimately would require pursuant to the terms of their settlement the new owners of Purdue to transform Purdue into a "public benefit company or entity with a similar mission."

In the summer of 2020—approximately one year after the commencement of the Chapter 11 Cases—an interested party (the "Potential Purchaser") contacted the Debtors to explore purchasing the Debtors' assets. The Potential Purchaser had experience working with opioid companies and was not a defendant (or affiliated with any defendant) in any opioid litigation. The parties agreed that it would be worthwhile to provide diligence to the Potential Purchaser to determine whether its interest would result in an actionable bid.

For almost four months, the Debtors provided the Potential Purchaser with a significant amount of diligence. As a result of that diligence, as well as feedback from various parties—including the NCSG, the Consenting Committee, the UCC and the Debtors—the Potential Purchaser worked to reformulate its proposal a number of times. In the UCC's view, these various reformulations were indicative of the Potential Purchaser's interest as well as its willingness to modify the proposed transaction structure based on the feedback it received from various parties. Unfortunately, however, the Potential Purchaser was not able to increase materially the value of its proposal.

In connection with Phase II Mediation (in late January 2021), the parties in interest resumed discussions regarding the future of Purdue. It is fair to say that the parties had varying perspectives on this issue, including the proposals made by the Potential Purchaser. These discussions centered on whether Public Claimants should have either a direct or indirect ownership interest in reorganized Purdue, the value being offered by the Potential Purchaser, and whether the Potential Purchaser's proposal would still result in the Public Claimants as the economic beneficiaries of an opioid company. Ultimately, the Consenting Committee (and the Debtors) determined not to engage further with the Potential Purchaser absent dramatic (and infeasible) changes to the proposal.

The UCC understood and accepted that any decision regarding the future of Purdue ultimately rested with the Public Claimants, given the results of Phase I Mediation. Moreover, the UCC fully recognizes the complex and varied perspectives regarding the future of Purdue, and as such, does not object to the fact that the Plan does not contemplate the sale of Purdue. Under the Plan, not only will the Sacklers have no ownership or management role with Purdue, but also Purdue will continue to (i) be bound by the Voluntary Business Injunction and (ii) have an

---

[27] *See Order Pursuant to 11 U.S.C. § 105(a) Granting, in part, Motion for a Preliminary Injunction*, *Purdue Pharma L.P. v. Commonwealth. of Mass.*, Adv. Pro. No. 19-08289 (Bankr. S.D.N.Y. Oct. 11, 2019) [ECF No. 82] (as amended from time to time, the "Voluntary Business Injunction").

**A.251**

independent monitor whose role is to ensure that Purdue/NewCo follows public health and safety. It is hoped that Purdue/NewCo's competitors will be held to the same standards.

## VIII. THE UCC'S ASSESSMENT OF THE PLAN

Having experienced first-hand the events set forth in this letter, the UCC views the Plan as an imperfect solution that is, nonetheless, a better outcome for the majority of Purdue's creditors than any other available alternative. This view, and the decision not to object to the Plan, rest on three fundamental premises: (i) claimants need recoveries *now*, not at some uncertain time in the future; (ii) the ability to obtain such value for creditors would be uncertain without the various settlements contemplated by the Plan; and (iii) without the Plan, there is no clear mechanism to provide value to the creditors who need it.

### A. *Victims and Other Creditors Need Recoveries Now*

Creditors cannot wait for years of litigation to play out before they get value from the Debtors' estates. Indeed, the Debtors' creditors cannot wait any longer for relief. Individual victims require financial compensation *now*, and all other claimants require funds to abate the opioid crisis in the absence of federal funding. The situation could not be any more dire. After 20 months in bankruptcy, it is time for the Debtors to put their money to work compensating victims and abating the opioid crisis.

### B. *Litigating Claims Against the Sacklers Will Not Result in Immediate Payment*

The UCC has conducted an unprecedented Investigation of the claims against the Sacklers. The following critical points bear repeating in connection with the UCC's rationale for not objecting to the Plan:

1. The Sacklers likely are liable to the Debtors (and thus to their creditors) in amounts far in excess of the Settlement Amount, *but* obtaining judgments to establish that liability could take years; and there can be no guarantee of success.

2. The Sacklers have assets far in excess of the $4.275 billion Settlement Amount, *but* obtaining a judgment against the Sacklers does not guarantee that either the Debtors or their creditors will be able to access those assets, many of which are in overseas trusts.

3. In addition to the Debtors' claims against the Sacklers, the UCC believes that the Debtors' creditors may well also hold direct claims against the Sacklers far in excess of their total assets. ***Without the Preliminary Injunction and settlement in place to restrain litigation against the Sacklers, however, the Sacklers are likely to exhaust their collectible assets fighting and/or paying ONLY the claims of certain creditors with the best ability to pursue the Sacklers in court***.

Against this backdrop, the benefits of a settlement are clear. Indeed, a settlement is the only way to bring value into the Debtors' estates now for the benefit of *all* creditors. Certainly, there is a chance—and not a small one—that litigating against the Sacklers could eventually lead to a judgment or multiple judgments greater than $4.275 billion. But such judgment could be years in the future, and there is no guarantee that the proceeds of those judgments, if they can even be monetized, would be distributed to all creditors in an equal or fair manner.

### C. *The Plan Is the Only Way To Preserve the Phase I Mediation Settlements*

Many State attorneys general in the NCSG have stated publicly that the $4.275 billion Settlement Amount is insufficient to pay for the damage and destruction wrought by the opioid crisis. ***This undoubtedly is true.*** As discussed above, the claims in these cases total in the trillions of dollars; and no amount of recovery could truly compensate victims for these immeasurable damages. But absent an agreement with the Sacklers, all of the work done in Phase I Mediation and the agreements reached could fall apart.

**A.252**

Once it became clear that the Sacklers would not pay the amount the NCSG desired, the creditors in these cases had a choice to either (i) not reach a settlement with the Sacklers and seek to lift the Preliminary Injunction that protected the Sacklers to permit the 3,000+ lawsuits to spring back to life or (ii) reach a settlement with the Sacklers that did not include the NCSG. If creditors could have agreed that pursuing (i) would have kept intact the Phase I Mediation Settlements (for example, by agreement among all parties to pay the first dollars obtained from the Sacklers in satisfaction of those settlements), then an entirely different plan could be before us—one that allowed the Public Claimants to continue pursuing their and the Debtors' claims against the Sacklers, while preserving the Phase I Mediation Settlements. But such a consensus could not be reached. Therefore, the only available path forward to preserve the Phase I Mediation Settlements (including the settlement among the Public Claimants regarding the division of assets amongst them) was to reach a reasonable settlement with the Sacklers.

In sum, although the UCC believes the claims against the Sacklers likely are worth more than $4.275 billion, the Phase I Mediation Settlements would not hold without the Sackler Settlement. Moreover, under the current construct, ***any increase in the Settlement Amount would not benefit any Private Claimant***, in any event. Because there is no other path to intercreditor peace, the UCC supports the imperfect, but entirely necessary Sackler Settlement embodied in the Plan as it stands.

**D.** ***The Plan Represents a Reasonable Resolution of Claims Against the Sacklers and Related Parties***

As part of its Investigation, the UCC evaluated, among others, the following categories of claims and causes of action.

| Claim | Issue |
|---|---|
| *Intentional Fraudulent Conveyance* | Did Purdue (at the direction of the Sacklers) intentionally transfer $10 billion out of Purdue and to the Sacklers (including to their related trusts and the Sackler Entities) between 2008 and 2017, with an intent to "hinder, delay or defraud" Purdue's creditors from being able to collect on their claims? |
| *Constructive Fraudulent Conveyance* | Did Purdue (at the direction of the Sacklers) transfer $10 billion out of Purdue and to the Sacklers (including to their related trusts and the Sackler Entities) between 2008 and 2017 at a time when Purdue was insolvent (or rendered insolvent as a result of such transfers) without Purdue receiving "reasonably equivalent value" in return? |
| *Breach of Fiduciary Duty* | In connection with the decisions contemplated above (or otherwise), did the Sacklers, as members of the Purdue Board of Directors, breach their fiduciary duties to Opioid Claimants? |
| *Unjust Enrichment* | Were the Sacklers and related parties unjustly enriched as a result of any of the transfers Purdue made to the Sacklers (including to their related trusts and the Sackler Entities)? |

In considering the likelihood of success of each of the above categories of claims, the UCC thoroughly evaluated the following questions, among others:

1. What evidence, if any, exists to demonstrate that Purdue and the Sacklers engaged in intentional fraud?

2. To the extent there is evidence of intentional fraud, is that evidence stronger in respect of certain members or "sides" of the Sackler family (*i.e.*, Side A or Side B)?

3. Can all members of the Sackler family be held "jointly and severally liable" for any such claims?

4. Was Purdue insolvent (or rendered insolvent by relevant transfers) at any point from 2008 to 2017?

21

**A.253**

5. How is insolvency demonstrated based on actual and potential litigation claims?

6. Was Purdue more or less likely to be insolvent at different points in time from 2008 to 2017?

7. Given that Federal and State governments received $4-5 billion in taxes throughout the applicable period, should those entities, as the ultimate recipient of the proceeds of a fraudulent transfer, be required to return such value to the Purdue estates?

8. To what extent can the proceeds of each transfer be traced, which may or may not be necessary to recover value from fraudulent transfers?

9. Which party has the burden of proof on tracing the proceeds of fraudulent transfers?

10. At what point in time did the Sacklers (and the Purdue Board) begin to owe fiduciary duties to Opioid Claimants?

11. What knowledge did the Sacklers have of the impending onslaught of litigation liability they would face and when did they have that knowledge?

12. What knowledge did the Sacklers have that Purdue had engaged in conduct that would lead to the onslaught of litigation liability they ultimately would face? When did they have that knowledge? Were they the architects of that conduct, or did they just receive reports from management?

13. Did the Sacklers micromanage the affairs of Purdue, such that they had full knowledge of all of Purdue's conduct?

14. If the allegations underlying these causes of action could be proved, would prejudgment interest apply to the judgments obtained? If so, what would the appropriate rate of such interest be?

Beyond these questions regarding the "estate" claims, the UCC conducted a thorough and balanced review of the strengths and weaknesses of the various "direct" legal claims made (or that could be made) against the Sacklers by the Public and Private Claimants outside of the bankruptcy, in order to determine whether the Settlement Amount was fair consideration for the releases that the Sacklers were seeking. The UCC considered several factors in assessing the viability of these claims, including: (i) statutes of limitations (whether the alleged wrongful acts took place too long ago); (ii) causation (whether the alleged wrongful acts caused the alleged harm); (iii) federal preemption (whether government involvement in approving the drugs and the drug labels was significant enough for Purdue and the Sacklers to avoid liability); and (iv) the municipal cost recovery rule (whether government efforts to deal with the opioid crisis fall within the government's normal duty of providing public services).

In addition, the UCC considered the potential damages available to the Public and Private Claimants for each of these types of claims, including but not limited to the potential recovery of: (i) remedial costs associated with addressing the opioid crisis; (ii) costs associated with abating the opioid crisis; (iii) disgorgement of profits or benefits that Purdue and the Sacklers received; (iv) fines for state law violations; and (v) injunctive relief. The UCC also considered whether and how much the Public and Private Claimants might be able to obtain in court absent the bankruptcy setting. In considering the specific claims brought against the Sacklers, the UCC focused on the following claims, among others:

1. *Public Nuisance* – The UCC assessed both common law public nuisance and statutory public nuisance claims, which both the Public and Private Claimants included in various prepetition actions. In assessing these claims, the UCC considered numerous factors, including but not limited to the following:

    a. to prove common law public nuisance claims, plaintiffs would need to demonstrate that Purdue and the Sacklers acted with intent to create the public nuisance;

**A.254**

b. whether it is possible to prove that the Sacklers acted together with the other defendants or that each individual defendant intended to create the public health and safety crisis (rather than intended to engage in general profit-seeking activities);

c. claimants may need to convince a trier of fact that it should ignore government approval of the product and its labeling, doctor prescriptions of the products and patient abuse of the product as potential intervening causes of the crisis; and

d. the only trial on this issue (against Johnson & Johnson) resulted in a ruling on behalf of the plaintiffs, giving claimants precedent for their claims against Purdue and the Sacklers.

2. ***RICO*** – The UCC assessed Public and Private Claimant claims under the RICO Act. In considering these claims, the UCC balanced the following factors:

a. the Ohio MDL court specifically upheld such claims on both a motion to dismiss and a subsequent summary judgment motion; and

b. RICO claims require a finding of intentional illegal acts conducted via mail or wires.

3. ***Consumer Protection*** – The UCC contemplated Public and Private Claimant consumer protection claims focusing on, among other things, the evidentiary standard in many States for consumer protection claims (including the fact that many consumer protection statutes do not require that consumers were actually misled), as well as potential recoveries associated with such claims.

4. ***Deceptive Practices*** – In evaluating these claims asserted by both Public and Private Claimants, focusing on arguments that the relevant statutes are generally broadly construed (such that neither intent nor actual deception are required), and also considering (i) to whom the allegedly deceptive practices claims were aimed and (ii) the proof of related damages/injury.

5. ***Unfair Trade Practices*** – In evaluating these claims by both Public and Private Claimants, the UCC considered (i) plaintiffs' allegations that Purdue and the Sacklers implemented marketing schemes that purportedly led to higher rates of opioid prescriptions and addiction (and ignored large volumes of product flooding the market and being diverted to the black market) as well as (ii) the difficulty of proving that the alleged actions caused opioid abuse and the opioid crisis.

6. ***Unjust Enrichment*** – Public Claimants have asserted numerous types of unjust enrichment claims. Some allege Purdue and the Sacklers were unjustly enriched when the States paid Purdue for opioids through Medicaid and workers' compensation programs. Others assert that Purdue was enriched by its failure to exercise due diligence in preventing diversion and by its deceptive marketing practices. The UCC considered the allegations and supporting evidence as well as whether the States/municipalities actually conferred a compensable benefit on Purdue/the Sacklers by remedying and mitigating the alleged harms and whether these claims would be difficult to prove.

7. ***Negligence*** – In assessing these claims brought by both Public and Private Claimants, the UCC balanced the fact that the Ohio MDL court determined that the plaintiffs plausibly alleged that defendants had a duty not to act negligently in their marketing against the standard for negligence and the difficulty of proof on certain issues.

This letter is not the appropriate forum to address each of these issues regarding estate and third-party claims. This is particularly true in light of the structure of the Sackler Settlement, which provides that in the event the Sacklers breach their payment obligations, the Master Distribution Trust (the "MDT")—which is responsible for making all payments to other creditor trusts for subsequent distribution—would take ownership of (and have the ability to pursue for creditors' benefit) all estate claims and causes of action against the Sacklers and related

**A.255**


parties; and further, that upon such "snapback," all Public and Private Claimants would be free to re-commence (or commence) their direct causes of action. As such, it would be inappropriate for this letter to provide the UCC's views on these issues.

The UCC can confirm, however, that (as discussed herein) the number and scope of issues considered by the UCC in connection with its Investigation was vast, its analysis thorough and the time spent immense. And the results of the Investigation—along with all of the other work the UCC and its advisors performed and the numerous other diverse factors at play—were the various settlements contained in the Plan, including the Sackler Settlement, the Phase I Mediation Settlements and numerous others. If the Sackler Settlement could be evaluated in a vacuum, the UCC almost certainly would have come to a different conclusion. But it cannot be.

The UCC is also aware that the Plan, and the Sackler Settlement in particular, have received significant criticism. Notwithstanding this criticism, and considering the requirements imposed by the bankruptcy process and the myriad competing interests at play, the UCC believes with conviction that the terms of the Plan represent the only viable conclusion to the Chapter 11 Cases. Indeed, confirmation of the Plan will ensure that funds are distributed promptly to begin to compensate victims and abate the opioid crisis that continues to grip this Country.

*Accordingly, the UCC urges every unsecured creditor to vote in favor of the Plan.*

**A.256**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | | |
|---|---|---|
| In Re: Purdue Pharma, LP, et al, | ) | Chapter 11 |
| | ) | case no. 19-23649 (Bankr. S.D.N.Y.) |
| Debtors, | ) | (Jointly Administered) |
| | ) | |

---

## EMERGENCY REQUEST FOR IMMEDIATE INJUNCTION AND HEARING FOR DUE PROCESS, PRODUCTION FOR EVIDENTIARY DOCUMENTS & OTHER RELIEF

**COMES NOW**, Ellen Isaacs, Pro Se, a Citizen of the United States of America and on behalf of "**WE THE PEOPLE**" OF THE UNITED STATES OF AMERICA, respectfully request an injunction against the proceedings entitled above based upon the following facts to be true and correct to the best of my knowledge upon the filing of this pleading:

I am acting in my own self defense and for all the families that have not had a voice for their beloved one(s).

1.      WE ARE IN A PUBLIC HEALTH AND SAFETY EMERGENCY  THAT IS NOT POLITICAL.

2.      The process of the Bankruptcy proceedings are in violation of The U.S. Constitution's 14th Amendment.

**Wherein; No State shall make or enforce any law** which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of **LIFE, liberty,** or **property**, without **due process of law**; nor deny to any person within its jurisdiction the equal protection of the laws.

Our family members are deceased  and have been deprived of life, dying every single day (see CDC) or still struggling with their afflictions (see SAMSHA). The families through various organizations have been demanding due process; to no avail.

3.      Fourteenth Amendment of the US Constitution -- "Rights Guaranteed: **Privileges and Immunities of Citizenship, Due Process, and Equal Protection**. All persons born or

**A.257**

naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and the State wherein they reside".

4.       The bankruptcy proceedings are prohibiting WE THE PEOPLE  the plaintiffs our due process which is guaranteed by the 14th Amendment of The Constitution. "Due process is the legal requirement that the state must respect all legal rights that are owed to a person. Due process balances the power of law of the land protects the individual person from it. When a government harms a person without following the exact course of the law, this constitutes a due process violation, which offends the rule of law".

"Due process has also been frequently interpreted as limiting laws and legal proceedings so that judges, instead of legislators, may define and guarantee fundamental fairness, justice, and liberty". Everything that continues to go on during this Bankruptcy hearing has been up to discretion. The word discretion is defined in the Webster Dictionary as FREEDOM. Our family members are dead and not FREE and those beloved ones family members left behind full of pain, anguish, grief and so on are NOT FREE of mental and physical dis-ease due to the Trauma inflicted by Purdue Pharma and these proceedings.

5.       Any agreement that would permit a Bankruptcy that takes away the plaintiff's rights of due process and permits a Corporation and people that run these corporations to absolve themselves from criminal prosecution while humans continue to die daily is against the law of The Constitution. The Bankruptcy should never have included Purdue Pharma's admitted criminal actions. This Bankruptcy case could have continued  with the criminal case immediately redirected to the Department of Justice when the Sackler's admitted they were guilty. The Bankruptcy Court is not the venue to absolve criminal actions.

6.       Once it was determined that Oxycontin was highly addictive and killing humans the product should have been referred back to the DEA for removal from the public market place and criminal action should have been immediately ensued. The physicians should have been given 90 days notice to put patients on another form of medication that would not kill nearly an entire generation and traumatize a large part of society as a whole from the families, First Responders to the Funeral Directors. Case Precedence ?

7.       Purdue Pharma harmed my life with Oxycontin after a surgery, my son at the age of 16 was prescribed Oxycontin after a fall. The physician in part was following the guidelines of the manufacturer Purdue Pharma and their misleading pamphlets and aggressive marketing team. This ultimately caused his demise and fractured my family. I have lived this nightmare from all spectrums of the abuse of discretion by Purdue Pharma and Big Pharma as a whole. Please stop this from happening to other families.

**A.258**

8.      It appears Purdue Pharma is suppressing their financial wealth in offshore bank accounts as an act of rebellion and the Federal Bankruptcy Court should not be permitting this to occur. This too is an abuse of power in conflict with the Fourteenth Amendment of The Constitution of The United States of America.

9.      It is of record, Purdue Pharma has flipped many of their assets into Real Estate Holdings between family members out of the principle Sackler's names.

10.     It is of record, Purdue Pharma has taken their wealth and created another pharmaceutical company entitled Mundi Pharmaceuticals for continual residual income off the sales of pharmaceuticals. All while what appears to be dumping Purdue Pharma into a public holding company for the government to handle while they walk away unscathed and avoid ongoing responsibility where Oxycontin will continue to be peddled by our government. Bankruptcy proceedings were never contrived to avoid criminal prosecution.

11.     It is of record, Purdue Pharma (The Sackler's and their adhoc committee members) have been permitted through the bankruptcy proceedings to continue to perjure themselves throughout the entire proceedings. As well as live on the Senate Hearings. This should not be considered by this Court or The Senate. This behavior is very much like that of the Tobacco Industry saying "I don't believe" this to be addicting. For documents to be presented to a Sackler Family Member and the evidence clearly showing their culpability and for them to repeatedly say "I don't recall" is harming to all of the family members and adds insult to their grief.

12.     As of this day, every eight minutes someone is dying from an opioid overdose/drug induced homicide that was proven in 2007 to have begun with Purdue Pharma.

13.     WE THE PEOPLE are not being permitted to review the discovery documents, interrogatories, tapes of live feed or anything related to the within case.

14.     The fifteen (15) States that filed in favor of the bankruptcy settlement appear to have taken their own discretion to agreggiosly agree to the settlement. It appears that their yes votes are not the total will of the people. Please see Exhibit "A" attached hereto. It was shocking for me to see who these representatives are and what party they are affiliated with.

15.     There are nine (9) states that have not yet decided to agree with the settlement. Please see Exhibit "B".

16.     Most citizens were not aware of these bankruptcy proceedings until after the deadline to file. Then there are the family members that are continually dying after the deadline to file that

**A.259**

have no recourse to file a claim against Purdue Pharma because the settlement depicts no further liability.

17. This all started in the 1960's when Arthur Sacker created Valium and Librium. This is when Arthur Sackler began sedating WE THE PEOPLE and their fortune began to develop.

18. Then Purdue Pharma's/Sackler's advancement to Oxycontin. Per one of many physicians, Oxycontin is a man made synthetic drug more lethal than heroin. This was known to have killed 500,000 over 20 years and now that number appears to have jumped since 2018 to 900,000 through various avenues that all started with Purdue Pharma.

19. A Prime Clerk, only one representative of claimants, reported there were 618,194 proof of claims and only 120,301 actually voted. This is less than 20% of the votes. Interestingly enough not even 80% of the votes were not returned and/or counted. Nor could the Prime Clerk Representative break down the claims for the court during the final bankruptcy hearing.

20. There was so much confusion around the voting process with my son's Law Firm. In this request it states that I should check the "yes" box to agree with the settlement. This was quite alarming to see the representative for my attorney's office suggesting to vote yes for this settlement when Purdue Pharma killed my son and the same for so many families across our Nation. I voted NO!

21. Another litigant filed an affidavit to the Bankruptcy Court advising that she had also been solicited to vote yes by "Prime Clerk". This matter was not addressed. Attempts to access the certified copy of the affidavit are being met with great resistance. Please see the uncertified copy of Affidavit attached hereto as Exhibit "C".

22. The harm caused by Purdue Pharma is going to go on for generations to come by the trauma passed down through the children, parents, siblings, nieces, nephews and extended family members. Many of the families are being prescribed valium or some other benzodiazepine, antidepressants, antipsychotics and so much more to deal with the mental pain and grief. This action is causing a rise in overdoses, drug induced homicides, suicides, suicidal ideations, cutting, harming of self or other's. See SAMSHA or one of the 20 other government agencies I have contacted with no response. The grave fallout of societies emotional well being and lack of pursuit of LIFE, LIBERTY, PROPERTY AND DUE PROCESS has been shattered by Purdue Pharma. Purdue Pharma has made a mockery out of the U.S. Legal Justice System.

23. SAMSHA is currently "reporting " 52% of *WE THE PEOPLE* are suffering from Mental Health Dis-Ease. Then there are the uninsured and under-reported that will not go to a psychiatrist or physician out of fear and stigma. This figure appears to be grossly higher.

**A.260**

24.     Purdue Pharma enslaved women that were pregnant with oxycontin and/or they flipped to a Medicated Assisted Drug. Both drugs have case studies that evidence the children could be born dependent. It has been alleged in one or more of the 22,000 hours of discovery documents that Purdue Pharma has killed pregnant mother's and their unborn fetuses.

In the matter of Sarah Janie Hicks v. the State of Alabama, Chief Justice Roy S. Moore gave one of many notable examples of inalienable rights as he declared:

" … an unborn child has an inalienable right to life from its earliest stages of development," and added, "I write separately to emphasize that the inalienable right to life is a gift of God that civil government must secure for all persons – born and unborn."

25.     This matter has also spilled over into other countries where Purdue Pharma has taken media air time in these Countries. Purdue Pharma should not be allowed to conduct business anywhere.

26.     Due Process is continually and systematically being withheld from WE THE PEOPLE – The fundamental, constitutional right to fair legal proceedings in which all parties will be given notice of the proceedings, and have an opportunity to be heard. So much so that Elizabeth Warren, Carolyn Maloney, and other Congressional Leaders have written a letter to USAG Merrick Garland to appeal the Bankruptcy proceedings. Letter to USAG Merrick Garland is attached hereto as Exhibit "D".

27..     On August 9, 2021 at the White Plains Bankruptcy Court three (3) young girls attempted to file a letter to Judge Drain and were not permitted their due process to file said letter with the clerk. The security guards took the letter and escorted them out of the courthouse. The letter to Judge Drain is attached hereto as Exhibit "E". WE OBJECT!

28.     The only way to participate in the final proceedings, without having any evidence made available to all of the plaintiff's in this case, is to watch it from a room in Manhattan, N.Y. or call in on a phone line. A phone line that had to be changed. As we all tried to scramble to catch up. Then most of the first day's hearing was indiscernible. From what could be understood, the individuals communicating over zoom could not understand what the questions and answers were and had to ask for many statements to be repeated.

29.     COVID or not, **WE THE PEOPLE** deserve to have our 14th Amendment rights and **LIFE, Liberty, Property (evidence) and due process of law. This proposed agreement is**

**A.261**

illegitimate. Bankruptcy was never intended to take away amnesty for criminal prosecution and should never be any part of said agreement.

**I, Ellen Isaacs, on behalf of myself and *WE THE PEOPLE* Object to these Bankruptcy Proceedings and request the following relief; along with other such relief that this Court deems just, meet and proper:**

1. An immediate injunction stopping the above-captioned Bankruptcy proceedings.
2. All medical examiner reports collected by a third party for every accidental overdose and homicide by drugs since the first prescription of Oxycontin. Upon review of opioid related cases the surviving family members are to be notified of these proceedings to determine if they have a valid claim. Followed by continual relief for the families due to Purdue Pharma's devastation to the families and friends across OUR Nation. Much like a fund developed for the families after 9/11.
3. A full blown investigation of overdoses by Valium and Librium since the first prescriptions.
4. Release to the public of all of the discovery, evidentiary, interrogatories, video feeds, pictures, emails, taped conversations that the court is holding/obtaining.
5. Allow sufficient time for the ballots to be returned regarding the bankruptcy only.
6. A full blown investigation into Janet Woodcock, DEA's, involvement with approving Oxycontin and other man made synthetic drugs purported to relieve pain. See Vioxx.
7. All votes for each state to be recounted. Should a State AG have voted against the Will of the people for their specific State they are to be immediately removed from office.
8. Seizure of all of Purdue Pharma, The Sackler's, assets and holdings including Mundi Pharmaceutical.
9. The USAG and UN to oversee the entire Bankruptcy proceedings and Criminal Prosecution.
10. STARTING WITH THE CONSTITUTIONAL LAW, THE PRECEDENCES AND ALL OF THE OTHER REASONS STATED ABOVE REQUIRE AN IMMEDIATE INJUNCTION ENTERED IMMEDIATELY AND A HEARING SHOULD BE GRANTED AS SOON AS POSSIBLE FOR MYSELF. ELLEN ISAACS, AND WE THE PEOPLE.

**A.262**

Respectfully submitted this 17th day of August, 2021.

_____

Ellen Isaacs, Pro Se


Sworn to and subscribed before me this 16th day of August 2021.

_____

NOTARY PUBLIC

ALEX PARUS
Commission # GG 221785
Expires September 24, 2022
Bonded Thru Budget Notary Services

EXHIBIT "B"

STATE YES VOTES FOR PURDUE PHARMACY BANKRUPTCY PROCEEDINGS

| State | Affiliated Party | Attorney General |
|---|---|---|
| Colorado | D | Phil Weiser |
| Hawaii | D | Claire Connors |
| Idaho | R | Lawrence Rasden |
| Illinois | D | Kwarne Raoul |
| Iowa | D | Thomas L. Miller |
| Maine | D | Aaron Frey |
| Minnesota | D | Keith Ellison |
| Nevada | D | Aaron Ford |
| New Jersey | D (Acting) | Gurbir Grewel |
| North Carolina | D | Josh Stein |
| Pennsylvania | D | Josh Shapiro |
| Virginia | D | Mark Herring |
| Wisconsin | D | Josh Kaul |

The remaining states voted NO to the settlement with the exception of those States listed on Exhibit "C". These States abstained and according to Robert's Rules are counted as Yes votes.

EXHIBIT "C"

### STATES THAT HAVE ABSTAINED FROM VOTING IN BANKRUPTCY SETTLEMENT

| STATE | Affiliated Party AG |
|---|---|
| California | D |
| Delaware | D |
| Maryland | D |
| New Hampshire | R |
| Oregon | D |
| Rhode Island | D |
| Vermont | D |
| Washington | D |
| | |
| District of Columbia | D |

EXHIBIT C

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re

PURDUE PHARMA L.P., *et al.*[1]

Debtors.

Chapter 11

Case No. 19-23649
(RDD)

(Jointly Administered)

## AFFIDAVIT OF KATHERINE MOORHEAD REGARDING PRIME CLERK, LLC AS SOLICITATION AGENT

STATE OF KENTUCKY )
                   ) S.S.
COUNTY OF JEFFERSON )

Katherine Moorhead, being duly sworn, upon her oath deposes and states as follows:

1.  From November 2001 to May 2002, I suffered from opioid use disorder due to the prescribed use of Hydrocodone.

2.  On July 26, 2020, I submitted claim number 89688 in the above-captioned cases.

3.  On June 28, 2021 I received a ballot solicitation package in connection with the Sixth Amended Joint Reorganization Plan for Purdue Pharma and Affiliated Debtors (the "Plan").

---

[1] The debtors in these chapter 11 cases ("**Debtors**" or "**Purdue**"), along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014) (collectively, the "**Bankruptcy Cases**").

4.     Having questions about the effect of voting for or against the Plan, I called the solicitation agent, Prime Clerk LLC ("Prime Clerk"), pursuant to instructions provided in the solicitation materials.

5.     On June 28, 2021, at approximately 3:50 in the afternoon, I spoke with a Prime Clerk representative, "Hunter," who informed me that if I did not vote "yes," in support of the Plan, "the process would start all over and I would never see any money."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this Affidavit was executed the 5th day of August, 2021.

KATHERINE MOORHEAD

SWORN TO AND SUBSCRIBED before
Me this _____ day of _____, 2021

_____
NOTARY PUBLIC

**A.267**

## Congress of the United States
### Washington, DC 20510

August 6, 2021

The Honorable Merrick Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Attorney General Garland:

We write to you today urging the Department of Justice ("DOJ") to file an immediate direct appeal of Purdue Pharma, L.P.'s ("Purdue") plan of reorganization, in order to avoid releasing the Sackler family from accountability for the opioid crisis they helped create.

Purdue filed for bankruptcy in 2019 as a means of dealing with the thousands of cases against the company for its role in the opioid crisis.[1] From the outset of this case, Purdue's owners, members of the Sackler family (the "Sacklers"), have piggybacked off of Purdue's bankruptcy case to avoid personal accountability for their actions at Purdue.

First, the Sacklers have obtained nearly two years of stays from litigation against them. Now, in a matter of days, the Bankruptcy Court will convene for the Confirmation Hearing of Purdue's Chapter 11 Plan of Reorganization (the "Plan").[2] Under the Plan, the Sacklers will be granted releases for themselves and their accomplices, not just from Purdue's claims against them, but from their own direct liability to Purdue's creditors, irrespective of those creditors' consent ("nonconsensual third-party releases"). The Sacklers, who bear a significant responsibility for the opioid crisis, are solvent, non-debtor parties who are abusing the bankruptcy system to avoid accountability for their actions. The DOJ has the ability and the responsibility to put an end to the Sackler's irresponsible and unfair efforts.

The United States is one of Purdue Pharma's largest creditors. On June 30, 2021, House Oversight and Reform Committee Chairwoman Carolyn B. Maloney and Congressman Mark DeSaulnier sent you a letter urging the DOJ to oppose the Plan because its terms were in direct conflict with the DOJ's prior position regarding the unlawfulness of the nonconsensual release of government claims brought against non-debtors, such as those brought by state attorneys general against the Sacklers.[3]

---

[1] New York Times, "Purdue Pharma, Maker of OxyContin, Files for Bankruptcy," Jan Hoffman and Mary Williams Walsh, September 15, 2019, https://www.nytimes.com/2019/09/15/health/purdue-pharma-bankruptcy-opioids-settlement.html.
[2] The Confirmation Hearing is set for August 12, 2021.
[3] Letter from Chairwoman Carolyn B. Maloney, House Committee on Oversight and Reform, and Rep. Mark DeSaulnier, to Attorney General Merrick Garland, Department of Justice, June 30, 2021, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2021-06-29.CBM%20DeSaulnier%20to%20Garland-DOJ%20re%20Purdue%20Plan%20of%20Reorganization.pdf.

On July 19, 2021, the DOJ filed a "statement" with the U.S. Bankruptcy Court in the Southern District of New York to express its "fundamental concerns" with the nonconsensual third-party releases in the Plan.[4] More specifically, the DOJ stated that these releases violate due process, are not permitted under the Bankruptcy Code, and that bankruptcy courts lack authority to approve the releases in the Plan.[5]

The DOJ provided an in-depth analysis of the constitutional rights at issue in this case. At their core, the proposed nonconsensual third-party releases in the Plan violate the due process rights of thousands of people because they deprive them of their property (in this case, their claims against the Sacklers) without reasonable notice and an opportunity to be heard.[6] The non-consenting creditors in this case, including individual victims and several state Attorneys General, want to litigate their cases against the Sacklers. However, they will be unjustly denied that opportunity if the Plan is confirmed.

Despite the arguments your agency raised against the nonconsensual third-party releases in Purdue's Plan, the DOJ did not actually object to the Plan or even vote against the Plan.[7] In fact, your agency did not vote on the Plan at all.[8] In failing to cast a ballot, the DOJ has effectively voted to *approve* the Plan that it claims is unconstitutional.[9]

There is still time for the DOJ to play a key role in this case by seeking an immediate direct appeal to the Second Circuit Court of Appeals on the constitutionality of the Plan's nonconsensual third-party releases.[10] Such an immediate direct appeal is appropriate as there is no controlling precedent on the constitutionality of nonconsensual third-party releases either in the Second Circuit or from the Supreme Court of the United States and this case involves a matter of public importance.[11] If the DOJ pursues this appeal, it should also consider asking the

---

[4] Statement of the United States Regarding the Shareholder Release filed by Audrey Strauss, United States Attorney for the Southern District of New York, on behalf of the United States of America, with hearing being held on 8/9/2021, July 19, 2021, https://restructuring.primeclerk.com/purduepharma/Home-DocketInfo.

[5] *Id.*

[6] *Id.*

[7] In contrast, the United States Trustee did object to the plan. Objection of the United States Trustee to the Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. July 19, 2021) (Dkt. No. 3256).

[8] *See* Exhibit A to Preliminary Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. July 26, 2021) (Dkt. No. 3327).

[9] Disclosure Statement for the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors, *In re Purdue Pharma, L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. June 3, 2021) (Dkt. No. 2983) § I.H ("The Debtors will argue to the Bankruptcy Court that if no holders of Claims in a particular Class that is entitled to vote on the Plan vote to accept or reject the Plan, then such Class shall be deemed to accept the Plan."). *See also In re Ruti-Sweetwater, Inc.,* 836 F.2d 1263, 1266 (10th Cir. 1988) (inaction by a nonvoting single class creditor constituted acceptance by the class); *In re Adelphia Commns., Corp.*, 368 B.R. 140, 260-63 (Bankr. S.D.N.Y. 2007) (following *Ruti-Sweetwater*).

[10] Whether the appeal is an immediate direct appeal or an interlocutory appeal depends on whether a confirmation order by a non-Article III bankruptcy judge that contains a non-consensual release of personal injury and wrongful death claims can be considered a final order. For purposes of this letter, we refer to an appeal, whether direct or interlocutory, as a direct appeal.

[11] 28 U.S.C. § 158(d)(2)(A)(i).

2

Court of Appeals for a stay of the Plan pending appeal to avoid having the court nullify the appeal by invoking the doctrine of equitable mootness.[12] Some Courts of Appeal rely on this controversial doctrine to avoid unwinding bankruptcy plans that go into effect, even if a plan is wrongly confirmed.

In light of the DOJ's concerns about the constitutionality and lack of Second Circuit and U.S. Supreme Court precedent on the legality of nonconsensual third-party releases and the lack of a trustee or examiner motion to evaluate the merits of the Plan, we respectfully request that the DOJ take its next opportunity to intervene in the case by appealing the Plan on constitutional grounds.

We also seek your response to the following questions:

1. Will the DOJ seek an immediate direct appeal of the Plan and a stay of the Plan pending appeal to avoid the applicability of the doctrine of equitable mootness?

2. Why didn't the DOJ, representing a creditor holding a $2 billion claim in this case, cast a vote on the Plan?

3. If the DOJ is concerned about the constitutionality of the nonconsensual third-party releases in the Plan, why did the agency not vote against the plan and instead take an action that is effectively interpreted as being in favor of the Plan?

4. Is it now official DOJ policy that nonconsensual third-party releases are unconstitutional and will it object to their use in future cases?

Sincerely,

Elizabeth Warren
United States Senator

Richard Blumenthal
United States Senator

Carolyn B. Maloney
Member of Congress

Mark DeSaulnier
Member of Congress

---

[12] 28 U.S.C. § 158(d)(2)(D). The United States may also seek a stay of the Plan from the Court of Appeals if the Bankruptcy Court declines to act. Fed. R. Bank. P. 8007(b).

3

**A.270**



PO Box 424, Binghamton, NY 13902
607-296-3016
truthpharm@gmail.com
www.truthpharm.org

Honorable Robert D. Drain
United States Bankruptcy Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4140

Aug 2, 2021

Re: Purdue Pharma, LP, et al., case no. 19-23649 (Bankr. S.D.N.Y.)

Dear Judge Drain,

My name is Alexis Pleus, Founder and Executive Director of Truth Pharm, an advocacy organization with over 12,000 followers dedicated to reducing the harms of substance use. I am joined by many other organizations, including families, claimants and members of the harmed public in writing this letter to you to make you aware of the thousands of innocent victims who have been misinformed, and purposefully blocked out of this bankruptcy process.

We collectively OBJECT to these proceedings, the proposed settlement and the non-debtor releases provided by this court.

This court failed to reach the majority of people harmed by Purdue Pharma. Hundreds of thousands of harmed American citizens don't even know they are part of a heinous process set to rob them of their rights. Imagine the children left behind without parents as a result of the Sacklers' actions who will come to this realization some 15-25 years from now and realize, it was your court that robbed them of their rights to hold the perpetrators of their lifelong harm accountable.

The harmed have not been provided the opportunity to be heard. The harmed have not been provided due process, which is our constitutional right. We have collectively been represented by attorneys who are out of reach for us, the individuals harmed by Purdue Pharma. We were not provided legal guidance or documents that are legible without an attorney's interpretations and those interpretations were not even made available to us. For months we have fielded calls from members of our organizations, harmed individuals who are about to be forced to live by the orders of a bankruptcy court that has been strategically orchestrated by the Sacklers to avoid the truth and accountability we have the right to pursue. From day one, we have been railroaded by the Sackler's demands and this court's servitude to the Sacklers.

Purdue Pharma and the Sacklers have been making headlines for years - leading to an overdose epidemic as declared by the CDC in 2011 where the CDC specifically pointed out the rise in overdoses as

Page 1

**A.271**



PO Box 424, Binghamton, NY 13902
607-296-3016
truthpharm@gmail.com
www.truthpharm.org

being directly linked to a market flooded with prescription painkillers.[1] In 2012, 259 million prescriptions were written for opioids,[2] which was more than enough to give every American adult their own bottle of pills. Year after year, we have watched the death toll rise, watched as more people struggled and the addiction treatment system became completely overwhelmed and countless families sounded the alarms. The Sacklers dug their heels in, hired more marketing consultants, and worked to mar the reputation of the people who became addicted to their drug while they raked in $3 billion per year in personal wealth as a result of their continued sales of Oxycontin.[3]

Certainly you and your court are aware of these facts. And so, for you to choose to block due process for the very people who have been harmed, is unfathomable.

The actions of Purdue Pharma, the role the Sackler family played in harming the American people now and for generations to come, has been and will continue to be well documented.

And it would appear that you have chosen to sell your legacy, your reputation, your fame, your court and our opportunity for justice to the highest bidder to be recorded in history as the judge who let them get away with it all.

Perhaps you were for sale all along, but we, the harmed, the memories of our children, brothers, sisters, mothers and families are not for sale and we will not allow your violent acts against us to move forward without resistance and without our voices collectively saying NO. This is not justice and we OBJECT.

While those harmed by the Sacklers are impacted by the criminal justice system, medical bills, treatment costs, costs of funerals and of raising the children left behind, this court chooses to give the Sacklers and over a thousand of their fellow bad-actors a pass. The Sacklers have used their wealth and influence to sway FDA approvals, to avoid accountability in the 2007 Department of Justice criminal case, to delay passage of the Sackler Act and now, it's about to happen again with this travesty of a bankruptcy process right here in your court.

The Sacklers have exercised unfair influence throughout the entire bankruptcy process resulting in court decisions and settlement provisions that shields billions of Purdue opioid blood money from creditors and forever protects the Sacklers from lawsuits and criminal courts. In addition, the court afforded Sacklers power to extend its releases to include hundreds of trusts, businesses, and financial

---

[1] https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html
[2] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5011952/
[3]

https://www.forbes.com/sites/alexmorrell/2015/07/01/the-oxycontin-clan-the-14-billion-newcomer-to-forbes-2015-list-of-richest-u-s-families/?sh=38e142b775e0

Page 2

**A.272**



PO Box 424, Binghamton, NY 13902
607-296-3016
truthpharm@gmail.com
www.truthpharm.org

and legal specialists, thus freeing the family to pursue the same criminal strategies internationally. Under the protective watch of countless lawyers and *Your Honor*, the Sacklers have controlled every aspect of communications and settlement negotiations thus supporting the oft stated belief this is a handpicked court and you are a handpicked judge with a reputation of legal interpretations that consistently favor debtors and non-debtors at the expense of creditors. In the process of filing for bankruptcy, Purdue Pharma somehow managed to scrape together millions of dollars in bonus payments to their top executives who your court also granted non-debtor releases for. Meanwhile, the supposed bankrupt Purdue Pharma afforded over $600 million in attorney fees which will surpass payouts to the individual claimants harmed by Purdue Pharma, who have nothing left to scrape together to have their own legal representation. Your court is allowing this unbalance and we OBJECT.

Consider the facts, approximately 130,000 harmed individuals filed Personal Injury claims, some through contingency attorneys. That number doesn't begin to represent the actual numbers of individuals who had the right to file considering the count of overdose fatalities alone is over 900,000 and as stated previously, in just *one year* we saw a flood of 259 million prescriptions. These numbers don't count the countless individuals who died of sepsis, endocarditis and other afflictions related to Substance Use Disorder. Nor does it include the countless individuals who suffered for years with Substance Use Disorder who are now in recovery nor those still struggling. It is likely that the actual count of people harmed by the Sacklers and Purdue Pharma, if we count all of these and the children and parents left behind, tops 5 million. And this court only managed to reach 130,000. That alone should cause this court to reconsider settling this case.

Furthermore, we understand, Your Honor, has stated that only those who can prove they were prescribed a Purdue Pharma prescription will get a settlement. What of people like my family? My son died 7 years ago. His first prescription for oxycontin was written nearly 12 years before he died. Those records are not even available to me. What of the countless individuals who became addicted due to the market being flooded with unnecessarily prescribed Purdue opioids?

Additionally, claimants have been misinformed about how voting for the plan will impact their settlement. Most believed they had to vote yes to remain a claimant. Based on a preliminary voting table we obtained, it appears under 60k of the 130k voted, but it was touted by your court that 95% of claimants support the proposed bankruptcy plan. That's funny math. We do not agree with this consistent yet erroneous fallacy of the court purporting support for the plan by the harmed. The cavalier elimination of huge numbers of innocent recipients of the Sackler felonious behavior is cruel and damaging and is a gross misrepresentation of our position. We OBJECT.

**A.273**



PO Box 424, Binghamton, NY 13902
607-296-3016
truthpharm@gmail.com
www.truthpharm.org

In addition, there are many questions regarding the increasing possibility that non-voting claimants were automatically classified as yes votes, a huge prejudicial maneuver that we need confirmed one way or another. There was a problem with abstention due to the complicated, confusing and overwhelming amount of instruction and pressure to vote yes.

When we turned to the Personal Injury Lawyers representing the collective claims, we were advised to hire independent counsel for bankruptcy issues while concurrently being aggressively pressed to vote yes. Likewise, the UCC provided a detailed plan critique that was extremely disheartening to the individual claimants, but also advised us to vote yes as it was the only option available now and in the future. We have a right to representation, which you have not granted. The UCC does not have the right to sway the vote in the Court's favor.

The hugely ineffective communications to claimants doesn't begin to compare with what are clearly some of the most offensive aspects of the bankruptcy settlement. First and foremost the releases being handed to the SACKLERS. Secondly, it appears that the SACKLERS bled Purdue dry of their opioid profits and now act like the paltry amount being paid out over nine years (especially to individuals and families) is a substantial and fair amount. Why would we, as a class, saddled with years of opioid related bills, death and despair, agree to such an insulting payout? We do not. We object.

Why would we, the direct recipients of the anguish of years of lies and watching the SACKLERS get away with horrific crimes against citizens accept these unconscionable releases to the SACKLERS? We, the public, are not willing to accept being stripped of our Constitutional Right to pursue justice against Purdue Pharma and the Sacklers. Once again, we object to this court's attempts to release the Sacklers unscathed.

We object to this one-sided plan until the issues of the low number of individual claimants are explored and the issues of the individual claimants' rights being violated are investigated. We are at the front-line of the horrors of corporate criminal acts and fear this settlement plan will pave the way for the Sacklers and others to cause the loss of yet another 500K lives.

Sincerely,

Alexis Pleus for Truth Pharm and countless other organizations and individuals

*To Judge Drain*

Hon. Robert R. Drain. U.S.B.J.,
United States Bankruptcy Court
Southern District of New York
   300 Quarropas Street
White Plains, New York 10601

         **Chapter 11**

      **(Jointly Administrated)**

August 23, 2021

**In re: Purdue Pharma, L.P., et al., Case No. 19-23649(RRD)**
     **United States Bankruptcy Court**

                    **Claim No. 89590**

Dear Judge Drain;

In light of the factual information of my drug addiction, including opioids, which lead to my disabilities and discrimination under Section 504 of the Rehabilitation Act, as the statute fully explain in the unambiguous section of opioid addiction or drug addiction under the  American with Disabilities Act of 1990 and as amended; refer to JFK satellite Unit at the Muhlenberg Hospital, full range toxicology report; which was done by forensic toxicology testing of my body fluids and the results of the lab procedures identifying and quantifying potential toxins, which include prescription medications and drugs of abuse and the interpretations of the findings.

 The State of New Jersey, et al., discrimination against me for past non-violent crimes of subculture behavior's of drug addiction and I was stigmatize **because of my disability and drug addiction** and to injuries suffered related to the opioid addiction, which had a substantial limit of major activities in my life.

I was being stigmatized and discriminated against by shareholders/stakeholders, et al., (debtors and defendants) who have a contractual relationship with the pharmaceutical companies at issues, in the denial of essential services or the participation in a covered entity's programs, activities, or services. Theirs' no justifiable or qualified reason to exclude me from participating in programs and services offered by any of the State of New Jersey public and private entities that received federal funding and healthcare benefits for my son.

*1*

**A.275**

The State of New Jersey have waved immunity when it accepted federal funding; Judge, whether Congress validly conditioned the receipt of federal financial assistance on a waiver of States' (New Jersey, et al.,) Eleventh Amendment immunity for suite under Section 504 of the Rehabilitation Act, 29 U.S.C. 794 (Section 504). I was denied services and the right to participate in activities that was federally funded for Title II Public Entities.

This court has authority to enter its finding of facts and conclusions of law based on non-core proceeding against the Public Entities and their employees, et al., (shareholders and stakeholders and financial directors) contractual relationship through New Jersey's Division of Investments, et al., with the debtors, Purdue Pharma, L.P., et al., and "Sackler's Family", if appropriate referred to the UNITED States District of the Second Circuit or in the alternative sit down in conference with this claimant to make hold on all loses due to the discriminatory conduct of the pharmaceutical industries' shareholders/stakeholders toward me.

The Sackler's family shareholders and stakeholders of New Jersey, et al., shall be held personally liable for the Purdue Pharma, L.P., et al., corporation's distribution and harm caused me by the opioids drugs and its synthetics.

The Sackler's family request for immunities for its cohorts, violates the Spending Clause of Congress and the restrictions congress placed on the debtors shareholders/stakeholder and financial advisors, money managers, et al., see Section 2000d-7 which is an unambiguously conditions of the State of New Jersey, et al., recipients of federal funding on a waiver of sovereign immunity.

Purdue Pharma, L.P., et al., has an obligation as to those of its shareholders under the Americans with Disabilities Act of 1990 and as amended, to hold them accountable for their investment in the opioids production that had an effect on the commerce.

Be mindful I was discriminated against by the State of New Jersey, et al., because of my opioid addiction to Oxycontin and other manufactured opiate drugs that were prescribed to me by licenses doctors exercising prudent clinical judgment for my medical necessity to manage the pain I was experiencing and suffering from due the reason of my hospitalization.

2

**A.276**

The Title 11 proceeding before the court, I am asserting Section 157(c)(1), which congress gave this court the authority in its finding in law and conclusion in a non-core proceeding for actions that's otherwise related to this claim under title 11of Purdue Pharma, L.P., et al., restructuring petition to the United States Bankruptcy Court, it is without question that this matter is intimately related to the harm I suffered from the opioid's addiction(s) related to my claims I filed against a list of defendants.

Judge Drain, I requested from the shareholders/stakeholders of the pharmaceutical industries investors early childhood intervention services for my son, as well as medical services to ameliorate any conditions related to his health as a result of his mother's unfortunate circumstances of prenatal abstinence syndrome,* I was discriminated against and denied any services and I was further discriminated because of my age, by Main Street Counseling Services, who had a contractual relationship with the shareholder/stakeholders.

The Main Street Counseling Services is covered under Title II of the American with Disabilities Act of 1990 and as amended.

As pointed out above, Section 2000d-7 embodies exactly the type of unambiguous condition the U.S. Supreme Court discussed in Atascadero, putting States (shareholders/stakeholders) on express notice that a condition for receiving federal funds was their consent to suit in federal court fopr alleged violations of Section 504; Thus, in Lane v. Pena, 518 U.S. 187 (1996), the Supreme Court noted "the care with which Congress responded to their decision in Atascadero" 473 U.S. 234 (1985); and the court concluded that in enacting Section 2000d-7,  Congress sought to provide the sort of unequivocal wavier that their precedents demand, see in light of Lane v. Pena:

**"And Lane's "equal treatment" argument falters as well on a point previously discussed: Section 505(a)(2) itself indicates congressional intent to treat federal Executive agencies *differently* from other § 504(a) defendants for purposes of remedies. See *supra*, at 192-193. The existence of the § 505(a) (2) remedies provision brings this case outside the "general rule" we discussed in *Franklin:* This is not a case in which "a right of action exists to enforce a federal right and Congress is silent on the question of remedies." 503 U. S., at 69. Title IX, the statute at issue in *Franklin,* made no mention of available remedies. *Id.,* at 71. The Rehabilitation Act, by sharp contrast, contains a provision labeled "Remedies and attorney fees," § 505. Congress has thus spoken to the question of remedies in § 505(a)(2), the only "remedies" provision directly addressed to §**

*3*

504 violations, and has done so in a way that suggests that it did not in fact intend to waive the Federal Government's sovereign immunity against monetary damages awards for Executive agencies' violations of § 504(a). Given the existence of a statutory provision that is directed precisely to the remedies available for violations of § 504, it would be a curious application of our sovereign immunity jurisprudence to conclude, as the dissent appears to do, see *post,* at 209-210, that the lack of clear reference to Executive agencies in any express remedies provision indicates congressional intent to subject the Federal Government to monetary damages.

III

Even if §§ 504(a) and 505(a)(2) together do not establish the requisite unequivocal waiver of immunity, Lane insists, the "equalization" provision contained in § 1003 of the Rehabilitation 198*198 Act Amendments of 1986, 100 Stat. 1845, 42 U. S. C. § 2000d—7, reveals congressional intent to equalize the remedies available against all defendants for § 504(a) violations. Section 1003 was enacted in response to our decision in *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234 (1985), where we held that Congress had not unmistakably expressed its intent to abrogate the States' Eleventh Amendment immunity in the Rehabilitation Act, and that the States accordingly were not "subject to suit in federal court by litigants seeking retroactive monetary relief under § 504." *Id.,* at 235. By enacting § 1003, Congress sought to provide the sort of unequivocal waiver that our precedents demand. That section provides:

"(1) A State shall not be immune under the Eleventh Amendment . . . from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

"(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State." 42 U. S. C. § 2000d—7(a).

The "public entities" to which § 1003 refers, Lane concludes, must include the federal Executive agencies named in § 504(a), and those agencies must be subject to the same remedies under § 504(a), including monetary damages, as are private entities".

**Judge,** if a state agency does not wish to accept the conditions attached to the funds, it is free to decline the assistance. But if it does accept federal money, then it is clear that it has agreed to the conditions as well.

The Sacklers family, tumbling on their shareholders/stakeholders acceptance of the federal funding in violation of the American with Disabilities Act of 1990 and as amended.

*4*

I'm attaching to this letter in support my claims copies from New Jersey Civil Service Commissioner Executive "responsibilities of the agency of the shareholder/stakeholders".

If the Bankruptcy Court view the *civil services responsibilities and other issues in my fraudulent conveyance **inter alia** as a non-core proceeding than referral with the court's finding of facts of law to the United State District Court for the Southern District of New York a de novo trial or in the alternative sit with me on a settlement.

Ronald Bass, Sr.

**\*There was political reasons behind my opioid addiction**

5

*Courtesy to the Judge*



STATE OF NEW JERSEY
CIVIL SERVICE COMMISSION
Office of the Chair/Chief Executive Officer
PO Box 317
Trenton, NJ 08625-0317

Chris Christie
*Governor*
Kim Guadagno
*Lt. Governor*

Robert M. Czech
*Chair/Chief Executive Officer*

August 18, 2011

Ronald Bass
Post Office Box 1062
Plainfield, NJ 07061.

Dear Mr. Bass:

The following is in response to your letter dated August 14, 2011. In your letter, you inquire about the job requirements for Adriem Caldwell, Supervising Family Service Specialist II, and Lashonda Drake, Caseworker Family Service Specialist II. We are providing you with a copy of their respective job specifications. You have also inquired about these employees' class of service; our records indicate that both of these employees are serving in classified positions.

We suggest you forward an Open Public Records Act ("OPRA") request, for the aforementioned employees' resumes, to the Appointing Authority, the New Jersey Department of Children and Families. Their website contains a link to OPRA, which is located at the bottom of their home page: http://www.state.nj.us/dcf/.

If you have any questions, please contact me via e-mail at Christopher.Randazzo@csc.state.nj.us.

Sincerely,

Chris Randazzo
Assistant Chief of Staff
New Jersey Civil Service Commission
Phone: (609) 292-7045
Fax: (609) 984-3631

Encl:

**A.280**



**New Jersey
Civil Service
Commission**

You are reading the State of New Jersey Job Descriptions. This is **not** a Job Vacancy Announcement.

**Job Specification**

**SUPERVISING FAMILY SERVICE SPECIALIST 2**

**DEFINITION**

Under direction of a District Manager 2 or other supervisory official in the Division of Youth and Family Services, supervises the delivery of social services in a district office or adoption resource center, in day care, residential, foster care, and in other areas of child care; assists the District Manager in administering office activities according to agency policy in personnel, budget, systems, and training; coordinates service with other family and children's services providers and maintains positive relationships with other concerned community groups and individuals; participates in the development of policy, procedures, and standards; does other related duties.

**NOTE:** The examples of work for this title are for illustrative purposes only. A particular position using this title may not perform all duties listed in this job specification. Conversely, all duties performed on the job may not be listed.

**NOTE: Appointments may be made to positions requiring bilingual skills.**

**62141C - Bilingual in Spanish and English**
SPECIAL SKILL
Applicants must be able to read, write, speak, understand, or communicate in Spanish and English sufficiently to perform the duties of this position.

**EXAMPLES OF WORK:**

Assists in planning work activities and supervising subordinate staff in the delivery of social services, protective services, foster home finding and placement, residential placement, volunteer coordination, staff training, and resource development.

Schedules, plans, and conducts conferences with subordinates to interpret policy; provides advice in handling difficult cases.

Schedules, prepares materials for, and helps conduct training sessions to apprise staff aware of community resources; and division policy and procedures; participates in orientation of new staff and supervisors.

Supervises work operations and/or functional programs, and has responsibility for effectively recommending the hiring, firing, promoting, demoting, and/or discipline of employees.

Delivers speeches to define the agency's role and its services; promotes the objective of preventing abuse and neglect to school systems, hospitals, clinics, institutions, professional groups and others.

Provides case consultation with other professional staff to discuss family problems and treatment methods.

Utilizes community resources for mental health, medical, vocational, educational, residential, and other assistance.

Provides recommendations and develops plans for needed community services.

A.281

Conducts surveys, studies, and investigations to evaluate and broaden program effectiveness.

Analyzes need for specialized social work activities within a local area based on client population and provides for these services; which may include: protective services for children, domestic violence, sexual abuse, substance abuse, adolescent behavior, parenting skills and others.

Works with a staff committee to review, develop and implement policies, procedures, standards and rules..

Serves as a member of social planning groups and represents the division at meetings and conferences.

Prepares reports.

When working as a consultant, trains and supervises unit supervisors through conferences, and evaluates their performance.

Participates in the development of unit policy and procedure.

Supervises the establishment and maintenance of records and files.

Will be required to learn to utilize various types of electronic and/or manual recording and information systems used by the agency, office, or related units.

**REQUIREMENTS:**

**EDUCATION:**

Graduation from an accredited college or university with a Bachelor's degree.

**EXPERIENCE:**

Three (3) years of experience in social work, direct support counseling, guidance, or casework involving high risk child abuse and neglect or other problematic socioeconomic situations involving counseling services to clients with social, emotional, psychological, or behavioral problems including gathering and analyzing information, determining needs, and planning and carrying out treatment plans.

**NOTE:** A supervised social work field placement of three hundred (300) hours serviced through an accredited college or university or performed in a social service agency may be substituted for one (1) year of indicated experience.

**NOTE:** Applicants who do not possess the required degree may substitute additional experience as indicated on a year-for-year basis with thirty (30) semester hour credits being equal to one (1) year of experience.

**NOTE:** A Master's degree in Social Work, Psychology, Guidance and Counseling, Divinity, Marriage and Family Therapy, or other related behavioral science area may be substituted for one (1) year of experience.

**LICENSE:**

Appointees will be required to possess a driver's license valid in New Jersey only if the operation of a vehicle, rather than employee mobility, is necessary to perform essential duties of the position.

**KNOWLEDGE AND ABILITIES:**

Knowledge of the types of social service agencies likely to be of assistance in providing for the needs of those with social, emotional, psychological or behavioral problems.

Knowledge of the economic, social, emotional, and other problems of

**A.282**

Contributes to the development and/or implementation of an appropriate case plan.

Develops cooperative working relationship with court personnel and with other agencies and individuals that also work with children whose conduct brings them before court.

Responsible for locating and securing resource homes for children in need of placement, and ensuring the permanency, safety and well-being of the children therein.

Conducts follow-up visits to ensure Resource Family home is in compliance with licensing standards.

Refers families for services.

Conducts training for Resource Family applicants and/or new Resource Families.

Conducts home evaluation and processes relative care payments.

Ensures the Local Office is in compliance with all Child Placement Review Legislation/Statutes with clear and precise understanding and direction regarding the out of home placement aspects of the Division's Policy and Procedures.

## REQUIREMENTS:

### EDUCATION:

Graduation from an accredited college or university with a Bachelor's degree.

### EXPERIENCE:

One (1) year of experience in professional social work, direct support counseling, guidance, or case management involving high risk child abuse and neglect or other problematic situations involving counseling services to clients with social, emotional, psychological, or behavioral problems including gathering and analyzing information, determining needs, and planning and supporting and/or carrying out treatment plans.

**NOTE:** A supervised social work field placement of three hundred (300) hours serviced through an accredited college or university or performed in a social service agency may be substituted for the indicated experience.

**NOTE:** A Master's degree in Social Work, Psychology, Guidance and Counseling, Divinity, Marriage and Family Therapy, or other related behavioral science area may be substituted for the indicated experience.

**NOTE:** Applicants who do not possess the required degree may substitute additional professional case management experience on a year for year basis with one (1) year of experience being equal to thirty (30) semester hour credits.

### LICENSE:

Appointees will be required to possess a driver's license valid in New Jersey only if the operation of a vehicle, rather than employee mobility, is necessary to perform essential duties of the position.

### KNOWLEDGE AND ABILITIES:

Knowledge of the economic, social, emotional, and other problems of abused and neglected family members.

Knowledge of the signs of child abuse and neglect.

A.283

01/02/2010



**New Jersey
Civil Service
Commission**

---

You are reading the State of New Jersey Job Descriptions. This is **not** a Job Vacancy Announcement.

---

**Job Specification**

**FAMILY SERVICE SPECIALIST 2**

**DEFINITION:**

Under direction of a Supervising Family Services Specialist 2 or other supervisory official in the Department of Children and Families, performs field and office work to:

- screen allegations of child abuse and/or neglect; and/or
- initiate or conduct various types of investigations including child welfare assessments or abuse and/or neglect referrals in problematic high risk family situations, in-home supervision, residential placement, assessment, recruitment, and placement in resource family/foster homes, adoption related work and placement supervision; and/or
- manages various aspects of court involved cases; and/or
- refers families for services; and/or
- facilitates Family Team Meetings; and/or
- collects, records and analyzes significant facts, draws conclusions, and determines appropriate action;
- does other related duties.

**NOTE:** The examples of work for this title are for illustrative purposes only. A particular position using this title may not perform all duties listed in this job specification. Conversely, all duties performed on the job may not be listed.

**NOTE: Appointments may be made to positions requiring bilingual skills.**

**62152C - Bilingual in Spanish and English**
SPECIAL SKILL
Applicants must be able to read, write, speak, understand, or communicate in Spanish and English sufficiently to perform the duties of this position.

**EXAMPLES OF WORK:**

Conducts investigations for abuse and neglect referrals within required timeframes; interviews children, parents, relatives, neighbors, and other collateral parties to the family or institution; obtains medical care if necessary; assesses safety and risk for children and takes appropriate action; seeks court intervention, police assistance, or in severe situations removal of the child from an unsafe environment in accordance with statute.

Engages families, identifies underlying needs, arranges and facilitates Family Team Meetings as appropriate to foster the development of a case plan that identifies functional strengths, builds on supports and service linkages for the family.

Utilizes community resources; maintains cooperative relationships with public and private agencies identifies service limitations.

Provides information or testimony to juvenile courts and other committees as directed.

**A.285**

Gathers evidence of abuse and neglect, prepares affidavits and depositions, takes or obtains pictures, medical reports, and other documentation, and contacts the local police or prosecutor's office when necessary.

Provides documentation for the preparation of detailed affidavits and legal complaints for court review, acts as a witness in court, and provides testimony under oath.

Processes children for adoption placement; prepares computation for adoption subsidy.

Prepares forms and reports and other required paperwork.

Visits homes of client and families to plan and implement corrective measures and approaches to problems of parent/child relationships.

Provides assessment and treatment services to children and their families using agency and community resources.

Prepares for and facilitates Family Team Meetings in accordance with the case practice model.

Prepares for and facilitates parent child visitation and sibling visitation as appropriate in accordance with the case practice model.

Conducts investigations to identify problems leading to family disintegration; secures substitute care and temporary or permanent custody of children unable to remain at home.

Recruits resource family/foster homes, screens and evaluates applicants for resource family/foster and adoption care and does child specific recruitment.

May oversee activities of paraprofessional staff, students, and volunteers providing support services for children and their families.

Assesses alleged abuse and neglect referrals through telephone or in-person interviews; evaluates seriousness of complaint, and provides recommendation for assignment to a service unit.

Lifts and carries children, and secures them in car seats.

Will be required to learn to utilize various types of electronic and/or manual recording and information systems used by the agency, office, or related units.

*In non-caseload carrying positions, the following duties may include but not be limited to:*

Screens requests for Department of Children and Families' services including: reports of suspected abuse or neglect of children; requests for non-abuse or neglect-related child welfare services; general information and referral services.

May be responsible for locating, identifying, developing and securing resources in the community and from other agencies for services to children and families.

May be responsible for receiving, processing and expediting requests for daycare services for children.

Participates in statewide collection of data, tracking key process milestones and service outcomes and regularly utilizes available data systems.

Effectively represents Department of Children and Families in matters before the New Jersey Superior Court's Family Practice Division involving juveniles by providing policy interpretation and case planning information.

A.286


**New Jersey Civil Service Commission**

You are reading the State of New Jersey Job Descriptions. This is **not** a Job Vacancy Announcement.

### Job Specification

#### SUPERVISING FAMILY SERVICE SPECIALIST 2

#### DEFINITION

Under direction of a District Manager 2 or other supervisory official in the Division of Youth and Family Services, supervises the delivery of social services in a district office or adoption resource center, in day care, residential, foster care, and in other areas of child care; assists the District Manager in administering office activities according to agency policy in personnel, budget, systems, and training; coordinates service with other family and children's services providers and maintains positive relationships with other concerned community groups and individuals; participates in the development of policy, procedures, and standards; does other related duties.

**NOTE:** The examples of work for this title are for illustrative purposes only. A particular position using this title may not perform all duties listed in this job specification. Conversely, all duties performed on the job may not be listed.

**NOTE: Appointments may be made to positions requiring bilingual skills.**

#### 62141C - Bilingual in Spanish and English
SPECIAL SKILL
Applicants must be able to read, write, speak, understand, or communicate in Spanish and English sufficiently to perform the duties of this position.

#### EXAMPLES OF WORK:

Assists in planning work activities and supervising subordinate staff in the delivery of social services, protective services, foster home finding and placement, residential placement, volunteer coordination, staff training, and resource development.

Schedules, plans, and conducts conferences with subordinates to interpret policy; provides advice and in handling difficult cases.

Schedules, prepares materials for, and helps conduct training sessions to apprise staff aware of community resources; and division policy and procedures; participates in orientation of new staff and supervisors.

Supervises work operations and/or functional programs, and has responsibility for effectively recommending the hiring, firing, promoting, demoting, and/or discipline of employees.

Delivers speeches to define the agency's role and its services; promotes the objective of preventing abuse and neglect to school systems, hospitals, clinics, institutions, professional groups and others.

Provides case consultation with other professional staff to discuss family problems and treatment methods.

Utilizes community resources for mental health, medical, vocational, educational, residential, and other assistance.

Provides recommendations and develops plans for needed community services.

A.287

Knowledge of the methods used to identify whether abuse or neglect has occurred.

Knowledge of problems encountered in the investigation of child abuse referrals and other problematic family situations.

Knowledge of counseling and interviewing techniques.

Knowledge of the methods used to conduct investigations.

Knowledge of the methods used to collect and analyze data.

Knowledge of the types of community services and resources likely to be used by the client population served.

Knowledge of assessment methods used to match child to a Resource Family.

Knowledge of the types of social service agencies likely to be of assistance in providing for the needs of those with social, emotional, psychological or behavioral problems.

Ability to engage families in critical decision making and case planning.

Ability to interpret and apply the Child Protective Services and child welfare policies and procedures.

Ability to maintain client confidentiality including all documentation and information contained in the case record.

Ability to interpret and apply laws, rules and regulations to specific situations.

Ability to interact with the public in a professional manner.

Ability to assess if it is necessary to place children in out-of-home settings.

Ability to monitor the effectiveness and appropriateness of services provided to meet the needs of children and families.

Ability to identify the need for other community resources and services, and make appropriate referrals.

Ability to collect and analyze data and evaluate the social relationships of individuals and families and take appropriate action including providing services.

Ability to conduct investigations of child abuse and child neglect under the direction of a supervisor.

Ability to conduct safety assessment and prepare safety plans with supervisory consultation and guidance.

Ability to identify risk factors through observation, interviews and collateral sources.

Ability to conduct field visits and/or studies.

Ability to document all case related activities.

Ability to prepare case plans with families and appropriate interested parties.

Ability to prepare case histories, records, and reports.

Ability to prepare clear, sound, accurate and complete reports of investigations containing findings, conclusions and recommendations.

Ability to demonstrate strong writing and organizational skills.

A.288

Ability to interview persons who may be emotionally upset or antagonistic, and obtain information needed for planning realistic goals for improved family and/or individual functioning.

Ability to remain calm and decisive in emergency situations, make immediate and critical decisions based on agency policy and perform judiciously under pressure.

Ability to lift, carry, position and secure children in car seats.

Ability to act as witness in court, and to prepare documents for court review.

Ability to utilize various types of electronic and/or manual recording and information systems used by the agency, office, or related units.

Ability to read, write, speak, understand, and communicate in English sufficiently to perform duties of this position. American Sign Language or Braille may also be considered as acceptable forms of communication.

Persons with mental or physical disabilities are eligible as long as they can perform essential functions of the job with or without reasonable accommodation. If the accommodation cannot be made because it would cause the employer undue hardship, such persons may not be eligible.

**This job specification is applicable to the following title code(s) which are different work week or work month and/or variants of the job class title:**

| Job Spec Code | Variant | State, Local or Common | Class of Service | Work Week | State Class Code | Local Class Code | Salary Range | Note |
|---|---|---|---|---|---|---|---|---|
| 62152 | | S | C | NE | 22 | N/A | P22 | - |
| 62152C | Bilingual In Spanish And English | S | C | NE | 22 | N/A | P22 | - |

This job specification is for **state** government use only.
Salary range is only applicable to state government.
Local salaries are established by individual local jurisdictions.

6/4/2011



### State of New Jersey

DEPARTMENT OF CHILDREN AND FAMILIES
P. O. BOX 717
TRENTON, NEW JERSEY 08625-0717

CHRIS CHRISTIE
*Governor*

KIM GUADAGNO
*Lt. Governor*

ALLISON BLAKE, PH.D., L.S.W.
*Commissioner*

**August 19, 2011**

<u>**Open to Employees of the Department of Children and Families who are permanent in a competitive title with underlying permanent State service as a promotional or lateral opportunity, subject to current promotional and hiring restrictions.**</u>

**DEPARTMENT-WIDE**

**JOB OPPORTUNITY #068-11**

**POSITION:**   **SUPERVISING ADMINISTRATIVE ANALYST**

**LOCATION:**   **Department of Children and Families**
**Office of Information Technology and Reporting**
**50 East State Street**
**Trenton, NJ  08625**

**SALARY:**   **(M32) $71,878.65 - $100,638.17**

**DEFINITION:**  Under general supervision of a supervisory official, directs the review, analysis, and appraisal of administrative procedures/policies, organizational structure, and performance for a small state department, large division, or agency to improve efficiency/effectiveness of operations of the organizational unit; supervises subordinate administrative analysts; has charge of work concerned with data processing, administrative practices, budget, and/or other operational studies of the department/agency; does other related duties as required.

**REQUIREMENTS**

**SPECIAL NOTE:**  This position requires in-depth knowledge of all DYFS fiscal and business functions, as well as of NJ Spirit. Experience with the development of software applications, modifications, and enhancements are needed. This individual will need to be able to work with administrative and business analysts, and software developers.  Supervisory experience is also required.

**EDUCATION:**  Graduation from an accredited college or university with a Bachelor's degree.

**EXPERIENCE:**  Five (5) years of experience in the review, analysis, and evaluation of budget, organization, administrative practices, operational methods, management operations, or data processing applications, or any combination thereof, which shall have included responsibility for the

*1 - B*

A.290

recommendation, planning, and/or implementation of improvements in a business or government agency, two (2) years of which shall have been in a supervisory capacity.

**NOTE:** Applicants who do not possess the required education may substitute additional experience as indicated on a year-for-year basis with thirty (30) semester hour credits being equal to one (1) year of experience.

**NOTE:** A Master's degree in Public Administration, Economics, Finance, Accounting, or Business Administration may be substituted for one (1) year of indicated nonsupervisory experience.

**LICENSE:** Appointee will be required to possess a driver's license valid in New Jersey only if the operation of a vehicle, rather than employee mobility, is necessary to perform essential duties of the position.

**NOTE:** APPLICABLE SPECIAL RE-EMPLOYMENT LIST ESTABLISHED DUE TO LAYOFFS WILL BE USED BEFORE ANY APPOINTMENTS ARE MADE.

**Resume Submittal:** Please submit a current resume with a cover letter to:

> **Jessica Chianese, Personnel Coordinator**
> **Department of Children and Families**
> **Office of Human Resources**
> **P. O. Box 717**
> **Trenton, New Jersey 08625-0717**
>
> **Email:** Jessica.Chianese@dcf.state.nj.us

**No later than close of business on September 2, 2011.**

New Jersey is An Equal Opportunity Employer

I−B

A.291

Vito Genna, Clerk of Court
United States Bankruptcy Court
Southern District of New York
300 Quarropas Street, Rm. 147
White Plains, NY 10601

August 23, 2021

**Chapter 11**

**(Jointly Administrated)**

**In Re: Case No. 19-23649 (RDD)**
 **PURDUE PHARMA, LP, et al.**
 **Debtors**

**Claim No. 89590**

Dear Clerk,

Find letter to Judge Robert D. Drain in support of the hearing for the month of October 2021; also find an extra copy for me to be stamped and return back in the self-address envelope.

One courtesy copy for the Judge's Chamber convenience.

Sincerely

Ronald Bass, Sr.

Cc: United States Trustee
 Prime Clerk, LLC

**A.292**

November 4, 2021

Maria Ecke



Pro Se Council

United States Bankruptcy Court

Southern District of New York

In re:

Purdue Pharma L.P. et all                    Chapter 11

Debtors.                                      Case No. 19-23649 (RDD)

## MOTION FOR ORGINAL CLAIM PAYMENT AND FOR RULE 5004 OF THE FEDERAL RULES OF BANKRUPCTY PROCEDURE GOVERNED BY 28 USC455 — DISMISSAL OF JUDGE DRAIN

### ARGUMENT

1.) The bankruptcy ruling FINDING OF FACT, CONCLUSIONS OF LAW, AND ORDER CONFIRMINGTHE TWELFTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS IS PROHIBITING WE THE PEOPLE, THE PLAINTIFFS, OUR DUE PROCESS WHICH IS GUARANTEED BY THE 14th AMEDMENT OF THE CONSTITUTION. "Due process is the legal requirement the state must respect all legal right that are owed to one person. Due process balances the power of the land protects the individual from it. When a government harms a person without following the exact course of the law, this constitutes a due process violation, which offends the rule of law." This ruling by Judge Drain offends both the "rule of the law", many other innocent victims including Ellen Isaacs and me, Maria Ecke.

2.) Our family members are deceased and have been deprived of life or still struggling with their afflictions as my other son does. He doesn't even have children after 12 years of marriage. Could it be that Purdue Pharma's drugs interfere or interfered with his reproductive system? The drugs that the Sackler family made. The families through various sources have been demanding due process; to no avail.

**A.293**

3.) Any agreement that would permit a Bankruptcy that takes away the Plaintiff's right of due process and permits a corporation and people that run these corporations to absolve themselves from criminal prosecution while humans continue to die daily is against the law of The Constitution. The Bankruptcy should never have included Purdue Pharma's admitted criminal actions. This Bankruptcy case could have continued with the criminal case immediately redirected to the Department of Justice when the Sackler's admitted they were guilty. The Bankruptcy Court is not the venue to absolve criminal actions.

4.) Ellen Isaacs filed a Motion that is not on the Docket requesting that Judge Drain be removed from the bench pending a psychosocial evaluation. In response the Court advised Ellen Isaacs to take the matter to a higher Court. She also asked him to recuse himself from the case and he avoided this portion of that Motion – Docket No. 3582. Instead, Judge Drain walked into the Court room on September 15, 2021, with a previously prepared document. He had no consideration for the Oral Argument, and nothing was addressed. The Denial prepared by the Debtors at Judge Drain's request is inaccurate. There is an omnibus hearing pending in December to rectify this matter.

5.) **"Rule 5004. Disqualification (a) Disqualification of Judge. A bankruptcy judge shall be governed by 28 U.S.C. §455 and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case.** (b) Disqualification of Judge from Allowing Compensation. A bankruptcy judge shall be disqualified from allowing compensation to a person who is a relative of the bankruptcy judge or with whom the judge is so connected as to render it improper for the judge to authorize such compensation.

### Notes

(As amended Apr. 29, 1985, eff. Aug. 1, 1985; Mar. 30, 1987, eff. Aug. 1, 1987.)

### Notes of Advisory Committee on Rules—1983

Subdivision (a). **Disqualification of a bankruptcy judge is governed by 28 U.S.C. §455. That section provides that the judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned" or under certain other circumstances. In a case under the Code, it is possible that the disqualifying circumstance will be isolated to an adversary proceeding or contested matter. The rule makes it clear that when the disqualifying circumstance is limited in that way the judge need only disqualify himself from presiding over that adversary proceeding or contested matter. It is possible, however, that even if the disqualifying circumstance arises in connection with an adversary proceeding, the effect will be so pervasive that disqualification from presiding over the case is appropriate.** This distinction is consistent with the definition of "proceeding" in 28 U.S.C. §455(d)(1). Subdivision (b) precludes a bankruptcy judge from allowing compensation from the estate to a relative or other person closely associated with the judge. The subdivision applies where the judge has not appointed or approved the employment of the person requesting compensation. Perhaps the most frequent application of the subdivision 1 will be in the allowance of administrative expenses under §503(b)(3)–(5) of the Code. For example, if an attorney or accountant is retained by an

indenture trustee who thereafter makes a substantial contribution in a chapter 11 case, the attorney or accountant may seek compensation under §503(b)(4). If the attorney or accountant is a relative of or associated with the bankruptcy judge, the judge may not allow compensation to the attorney or accountant. Section 101(34) defines relative and Rule 9001 incorporates the definitions of the Code. See the Advisory Committee's Note to Rule 5002.

### Notes of Advisory Committee on Rules—1985

Amendment Subdivision (a) was affected by the Bankruptcy Amendments and Federal Judgeship Act of 1984, P.L. 98–353, 98 Stat. 333. The 1978 Bankruptcy Reform Act, P.L. 95– 598, included bankruptcy judges in the definition of United States judges in 28 U.S.C. §451 and they were therefore subject to the provisions of 28 U.S.C. §455. This was to become effective on April 1, 1984, P.L. 95–598, §404(b). Section 113 of P.L. 98–353, however, appears to have rendered the amendment to 28 U.S.C. §451 ineffective. Subdivision (a) of the rule retains the substance and intent of the earlier draft by making bankruptcy judges subject to 28 U.S.C. §455. The word "associated" in subdivision (b) has been changed to "connected" in order to conform with Rule 5002(b).

***Subdivision (a).*** **Disqualification of a bankruptcy judge is governed by <u>28 U.S.C. §455</u>. That section provides that the judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned" or under certain other circumstances. In a case under the Code it is possible that the disqualifying circumstance will be isolated to an adversary proceeding or contested matter. The rule makes it clear that when the disqualifying circumstance is limited in that way the judge need only disqualify himself from presiding over that adversary proceeding or contested matter.**

**It is possible, however, that even if the disqualifying circumstance arises in connection with an adversary proceeding, the effect will be so pervasive that disqualification from presiding over the case is appropriate. This distinction is consistent with the definition of "proceeding" in <u>28 U.S.C. §455(d)(1)</u>.**

*Subdivision (b)* precludes a bankruptcy judge from allowing compensation from the estate to a relative or other person closely associated with the judge. The subdivision applies where the judge has not appointed or approved the employment of the person requesting compensation. Perhaps the most frequent application of the subdivision will be in the allowance of administrative expenses under §503(b)(3)–(5) of the Code. For example, if an attorney or accountant is retained by an indenture trustee who thereafter makes a substantial contribution in a chapter 11 case, the attorney or accountant may seek compensation under §503(b)(4). If the attorney or accountant is a relative of or associated with the bankruptcy judge, the judge may not allow compensation to the attorney or accountant. Section 101(34) defines relative and Rule 9001 incorporates the definitions of the Code. See the Advisory Committee's Note to Rule 5002.

### NOTES OF ADVISORY COMMITTEE ON RULES—1987 AMENDMENT

The rule is amended to be gender neutral. The bankruptcy judge before whom the matter is pending determines whether disqualification is required.

<u>[1] So in original. Probably should be "circumstance".</u>"

6.) **ONCE AGAIN FROM CORNELL LAW SCHOOL – LEGAL INFORMATION INSTITUTE:**

"**LII   U.S. Code   Title 28   Part I…Chapter 21   Sec.455**"

"**28 U.S. Code § 455 - Disqualification of justice, judge, or magistrate judge**

- <u>U.S. Code</u>
- Notes
- State Regulations

prev | next

**(a)**

**Any justice, judge, or magistrate <u>judge of the United States</u> shall disqualify himself in any <u>proceeding</u> in which his impartiality might reasonably be questioned.**

**(b)He shall also disqualify himself in the following circumstances:**

**(1)**

**Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the <u>proceeding</u>;**

**(2)**

Where in private practice he served as lawyer in the matter in controversy, or a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter, or the judge or such lawyer has been a material witness concerning it.

**(3)**

Where he has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the <u>proceeding</u> or expressed an opinion concerning the merits of the particular case in controversy;

**(4)**

He knows that he, individually or as a <u>fiduciary</u>, or his spouse or minor child residing in his household, has a financial interest in the subject matter in controversy or in a party to the <u>proceeding</u>, or any other interest that could be substantially affected by the outcome of the <u>proceeding</u>;

**(5)**He or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

**A.296**

(i)

Is a party to the <u>proceeding</u>, or an officer, director, or trustee of a party;

(ii)

Is acting as a lawyer in the <u>proceeding</u>;

(iii)

Is known by the judge to have an interest that could be substantially affected by the outcome of t the <u>proceeding</u>;

(iv)

Is to the judge's knowledge likely to be a material witness in the <u>proceeding</u>.

(c)

A judge should inform himself about his personal and <u>fiduciary</u> financial interests, and make a reasonable effort to inform himself about the personal financial interests of his spouse and minor children residing in his household.

(d) For the purposes of this section the following words or phrases shall have the meaning indicated:

(1)

"<u>proceeding</u>" includes pretrial, trial, appellate review, or other stages of litigation;

(2)

the degree of relationship is calculated according to the civil law system.

(3)

"<u>fiduciary</u>" includes such relationships as executor, administrator, trustee, and guardian;

(4) "financial interest" means ownership of a legal or equitable interest, however small, or a relationship as director, adviser, or other active participant in the affairs of a party, except that:

(i)

Ownership in a mutual or common investment fund that holds securities is not a "financial interest" in such securities unless the judge participates in the management of the fund;

(ii)

An office in an educational, religious, charitable, fraternal, or civic organization is not a "financial interest" in securities held by the organization;

(iii)

The proprietary interest of a policyholder in a mutual insurance company, of a depositor in a mutual savings association, or a similar proprietary interest, is a "financial interest" in the organization only if the outcome of the <u>proceeding</u> could substantially affect the value of the interest;

**A.297**

**(iv)**

Ownership of government securities is a "financial interest" in the issuer only if the outcome of the <u>proceeding</u> could substantially affect the value of the securities.

**(e)**

No justice, judge, or magistrate judge shall accept from the parties to the <u>proceeding</u> a waiver of any ground for disqualification enumerated in subsection (b). Where the ground for disqualification arises only under subsection (a), waiver may be accepted provided it is preceded by a full disclosure on the record of the basis for disqualification.

**(f)**

Notwithstanding the preceding provisions of this section, if any justice, judge, magistrate judge, or bankruptcy judge to whom a matter has been assigned would be disqualified, after substantial judicial time has been devoted to the matter, because of the appearance or discovery, after the matter was assigned to him or her, that he or she individually or as a <u>fiduciary</u>, or his or her spouse or minor child residing in his or her household, has a financial interest in a party (other than an interest that could be substantially affected by the outcome), disqualification is not required if the justice, judge, magistrate judge, bankruptcy judge, spouse or minor child, as the case may be, divests himself or herself of the interest that provides the grounds for the disqualification.

(June 25, 1948, ch. 646, <u>62 Stat. 908</u>; <u>Pub. L. 93–512, § 1</u>, Dec. 5, 1974, <u>88 Stat. 1609</u>; <u>Pub. L. 95–598, title II, § 214(a)</u>, (b), Nov. 6, 1978, <u>92 Stat. 2661</u>; <u>Pub. L. 100–702, title X, § 1007</u>, Nov. 19, 1988, <u>102 Stat.</u> <u>102 Stat. 4667</u>; <u>Pub. L. 101–650, title III, § 321</u>, Dec. 1, 1990, <u>104 Stat. 5117</u>.)"

7.) My handsome, smart, beautiful, tall, thin son, David Jonathan Ecke had done nothing wrong but get rear ended by a car at a stand still on a bridge while traveling to school. He was 6'6" tall and he had to call a friend to drive him home from the hospital because both Richard Ecke, his father, and I, Maria Ecke, were working. He was prescribed by a doctor for many years until he became addicted and died. Does anyone in the Sackler family take OxyContin or Oxycodone? Can the Sackler family bring David Jonathan Ecke back to life?

8.) Why has the Department of Justice and Judge Drain ignored the criminal aspect of this matter? If a drug dealer had given drugs to someone and that person died, he/she would be in jail – maybe for life. Why aren't we, victims able to prosecute the Sackler family criminally or in other ways?

9.) Why didn't Judge Drain rule on my request for **Rule 3008-1 RECONSIDERATION OF CLAIMS?** He just ignored my plea – Docket 3575 entered 8/16/2021.

10.)   **WHY IS THE ENTIRE CASE SEALED FROM THE PUBLIC? THIS IS A HEALTH MATTER OF GRAVE IMPORTANCE TO THE ENTIRE WORLD!**

**MOTION FOR RELIEF BY ORIGINAL CLAIM PAYMENT**

I am respectfully asking for the Court to pay each of us, Maria Ecke, Richard Ecke, Andrew Ecke, and Peter Sottile the $242,000,000.00 which I originally asked for because my beautiful, smart son David Jonathan Ecke should not have been killed by the Defendants. With this money, I will start a foundation --A Star David- -which will really help victims of drugs not just the States etc. See Exhibit A. The Sacklers do not deserve to walk away from this while creating a new company to fuel their own pockets.

## CERTIFICATE OF SERVICE

I, Maria Ecke, hereby certify that on November 5, 2021, I caused a true and correct copies of the foregoing to be served (I) by the Court's Case File (CM/ECF) System upon all parties who are deemed to have consented to electronic service; (ii) by email upon the parties who provided email addresses set forth in the Master Service List maintained by the Debtors in respect of these chapter 11 cases; and (iii) by email upon the Office of the United States Trustee for the Southern District of New York (Attn: Paul K. Schwartzberg, paul.schwartzberg@usdoj.gov).

/s/Maria Ecke

_____

Pro Se

**A.299**