Nos. 21-cv-7532 (Lead); 21-cv-7585; 21-cv-7961; 21-cv-7962; 21-cv-7966; 21-cv-7969; 21-cv8034; 21-cv-8042; 21-cv-8049; 21-cv-8055; 21-cv-8139; 21-cv-8258; 21-cv-8271; 21-cv-8538; 21-cv-8557; 21-cv-8566 (Consolidated)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE PURDUE PHARMA L.P., ET AL., DEBTORS

APPEALS FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
BANKR. CASE NO. 19-23649 (RDD)

## APPENDIX TO THE AD HOC GROUP OF INDIVIDUAL VICTIMS' (I) APPELLEE BRIEF AND (II) JOINDER TO THE APPELLEE BRIEFS OF THE DEBTORS' AND THE OFFICIAL COMMITTEE OF UNSECURED CREDTIORS

## VOLUME II

WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 819-8200
Fax: (212) 354-8113
J. Christopher Shore
Michele J. Meises
Alice Tsier
Amanda J. Wong

ASK LLP
60 East 42nd Street, 46th Floor
New York, New York 10165
Tel.: (212) 267-7342
Fax: (212) 918-3427
Edward E. Neiger
Jennifer A. Christian

*Co-Counsel for Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al*

# INDEX

| Document | Appendix Pages |
|---|---|
| **VOLUME I** | |
| Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof [Bankr. ECF No. 800] | A.1 – 55 |
| Order Appointing Mediators [Bankr. ECF No. 895] | A.56 – 66 |
| Mediators' Report [Bankr. ECF No. 1716] | A.67 – 75 |
| Order Expanding Scope of Mediation [Bankr. ECF No. 1756] | A.76 – 79 |
| Letter from Maria Ecke to Committee Members re: Objection to Settlement Amount [Bankr. ECF No. 2210] | A.80 – 81 |
| NAS PI TDP [Bankr. ECF No. 3528, 3655] | A.82 – 123 |
| Non-NAS PI TDP [Bankr. ECF No. 3528, 3655] | A.124 – 183 |
| Letter from Les Buris to Judge Drain re: Objection to Amount Paid to Creditors [Bankr. ECF No. 3028] | A.184 – 185 |
| Mediator's Report [Bankr. ECF No. 3119] | A.186 – 203 |
| Kelvin Singleton's Objection to the Amount Paid to Creditors [Bankr. ECF No. 3125] | A.204 – 207 |
| Objection to Plan and Plan Confirmation [Bankr. ECF No. 3271] | A.208 – 219 |
| Declaration of Michael Atkinson in Support of the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [Bankr. ECF No. 3460] | A.220 – 256 |
| Ellen Isaacs' Emergency Request for Immediate Injunction and Hearing for Due Process, Production for Evidentiary Documents & Other Relief [Bankr. ECF No. 3582] | A.257 – 274 |
| Letter from Ronald Bass Sr. to Judge Drain [Bankr. ECF No. 3721] | A.275 – 292 |
| Maria Ecke's Motion for Original Claim Payment and for Rule 5004 of the Federal Rules of Bankruptcy Procedure [Bankr. ECF No. 4074] | A.293 – 299 |
| **VOLUME II** | |
| *In re Purdue Pharma L.P.,* Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. June 3, 2020) (Bar Date Ext. Mot. Hr'g Tr.) | A.300 – 424 |
| *In re Purdue Pharma L.P.,* Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. August 25, 2021) ("Confirmation Hr'g Tr.") | A.425 – 775 |

| | |
|---|---|
| *In re Purdue Pharm Bankruptcy Appeals*, Case No. 21-cv-7532 (CM) *et seq.* (S.D.N.Y. October 12, 2021) ("Scheduling Conference Tr.") | A.776 – 851 |
| *In re Purdue Pharma L.P.*, Case No. 19-23649 (RDD) (S.D.N.Y. November 9, 2021) ("Hr'g Tr. re: Motion for Stay Pending Appeal") | A.852 – 1208 |
| **VOLUME III** | |
| Asbestos Personal Injury Trust Distribution Procedure, *In re Yarway Corp.,* Case No. 13-11025 (BLS) (Bankr. D. Del.) [Dkt. No. 859-3] | A.1209 – 1274 |
| Asbestos Personal Injury Trust Distribution Procedure, *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del.) [Dkt. No. 238-2] | A.1275 – 1338 |
| Proposed TPP Class and Third Party Payor Claim Procedures, *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) [Dkt. No. 1049-13] | A.1339 – 1347 |
| Fire Victim Claims Resolution Procedures, *In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal.) [Dkt. No. 7037] | A.1348 – 1359 |
| **VOLUME IV** | |
| Lloyd Dixon et al., *RAND Technical Report: Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts* xiv (2010) | A.1360 - 1577 |
| **VOLUME V** | |
| Objection of United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors [Bankr. ECF No. 3256] | A.1578 – 1612 |
| Supplemental Objection of United States Trustee to (I) Eighth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors and (II) Proposed Confirmation Order [Bankr. ECF No. 3636] | A.1613 – 1616 |
| Supplemental Objection of United States Trustee to (I) Eleventh Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors, and (II) Any Proposed Confirmation Order [Bankr. ECF No. 3710] | A.1617 – 1620 |

Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 19-23649-rdd

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   PURDUE PHARMA L.P.,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  June 3, 2020

17                  10:03 AM

18

19

20

21  B E F O R E :

22  HON ROBERT D. DRAIN

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO: UNKNOWN

Page 2

1    HEARING re Amended Agenda (ECF #1219)

2

3    Motion Pursuant to 11 U.S.C. §§ 105(a) and 501 and Fed. R.

4    Bankr. P. 2002 and 3003(c)(3) for Entry of an Order (I)

5    Extending the General Bar Date for a Limited Period and (II)

6    Approving the Form and Manner of Notice Thereof filed by

7    James I. McClammy on behalf of Purdue Pharma L.P. (ECF#1178)

8

9    Objection Limited Objection of the Ad Hoc Committee on

10   Accountability to the Debtors Motion for an Order Extending

11   General Bar Date (related document(s)1178) (ECF #1187)

12

13   Limited Objection of the Non-Consenting States To Debtors'

14   Motion (related document(s)1178) filed by Andrew M. Troop on

15   behalf of Ad Hoc Group of Non- Consenting States. (Troop,

16   Andrew) (ECF #1197)

17

18   Ad Hoc Committee's Objection to Requests to Extend the Bar

19   Date (related document(s)1178, 1173) filed by Kenneth H.

20   Eckstein on behalf of Ad Hoc Committee of Governmental and

21   Other Contingent Litigation Claimants (ECF #1202)

22

23   Debtors' Omnibus Reply (ECF #1214)

24

25

Page 3

1    Supplemental Declaration of Jeanne C. Finegan (related

2    document(s)1178) filed by James I. McClammy on behalf of

3    Purdue Pharma L.P. (ECF #1179)

4

5    Memorandum of Law Limited Objection to Ad Hoc Committee's

6    Limited Objection to Debtors' Motion to Extend General Bar

7    Date (related document(s)1187) filed by Paul A. Rachmuth on

8    behalf of Ad Hoc Committee on Accountability (ECF #1788)

9

10   Declaration of Michael S. Quinn in Support of the Ad Hoc

11   Committee on Accountability's Limited Objection to Debtors'

12   Motion to Extend the General Bar Date (related

13   document(s)1187) filed by Paul A. Rachmuth on behalf of Ad

14   Hoc Committee on Accountability (ECF #1189)

15

16   Statement / Multi-State Governmental Entities Groups

17   Statement in Support of the Debtors' Motion for Entry of an

18   Order Extending the General Bar Date for a Limited Period

19   and Approving the Form of Notice Thereof (related

20   document(s)1178) (ECF #1196)

21

22

23

24

25

Page 4

1    Statement of the Ad Hoc Group of Individual Victims (I) in

2    Support of the Debtor's Motion for Entry of an Order

3    Extending the General Bar Date for a Limited Period and

4    (III) Objecting to Requests for Entry of Order Extending Bar

5    date by Ninety Days 1173 (related document(s)1178) filed by

6    J. Christopher Shore on behalf of Ad Hoc Group of Individual

7    Victims of Purdue Pharma L.P. (ECF #1198)

8

9    Statement of Unsecured Committee In Support of Debtors'

10   Motion (ECF #1213)

11

12   Notice For Listen-In Only Dial-in Information (ECF #1216)

13

14   Letter Re: Request for Extension of Bar Date Filed by

15   Harrison Cullen (ECF #1133)

16

17   Letter to Judge Drain re: Supporting Harrison Cullens

18   request filed on 5/6/20 to extend the deadline for

19   individual claims to September 30th. (related

20   document(s)1133) Filed by Joanne Peterson (ECF #1141)

21

22   Letter Letter to Judge Drain re: an addition to the letter I

23   wrote to you in October, 2019 against the proposed

24   settlement for Pursue Pharma (related document(s)280) Filed

25   by Stephen G. Gelfand (ECF #1142)

Page 5

1    Letter to Judge Drain re: support to Harrison Cullens

2    request to extend the deadline by Ninety days for filing of

3    individual claims... (related document(s)1133) Filed by

4    Edward J. Bisch (ECF #1145)

5

6    Letter to Judge Drain re: support Harrison Cullens request

7    to extend the deadline to September 30, 2020 for filing of

8    individual claims (related document(s)1133) Filed by Barbara

9    Van Rooyan (ECF #1149)

10

11   Letter to Judge Drain re: support of the letter submitted by

12   Harrison Cullen, filed to the docket on May 6, 2020,

13   regarding movement of the bar date for individual victims to

14   September 30, 2020. (related document(s)1133) Filed by

15   Cynthia Munger (ECF #1153)

16

17   Motion to File Proof of Claim After Claims Bar Date /support

18   Harrison Cullens request to extend the deadline by Ninety

19   days for filing of individual claims filed by Dan Schneider

20   (ECF #1157)

21

22   Motion to File Proof of Claim After Claims Bar Date (request

23   that you extend the filing of personal injury claims against

24   Purdue Pharma and the drug OxyContin) filed by Ed Vanicky.

25   (ECF #1158)

Page 6

1    Letter to Judge Drain re: Support Harrison Cullens request

2    filed on 5/6/20 to extend deadline for individual claims to

3    September 30th (related document(s)1133) Filed by Maryanne

4    Frangules MOAR Executive Director (ECF #1160)

5

6    Motion to File Proof of Claim After Claims Bar Date filed by

7    On behalf of the Farash Family Barbara Farash (ECF #1168)

8

9    Letter to Judge Drain re: support of Harrison Cullen's

10   request by ninety days. The deadline of individual claims

11   (related document(s)1133) Filed by Leona Nuss (ECF #1174)

12

13   Statement / Multi-State Governmental Entities Groups

14   Statement in Support of the Debtors' Motion for Entry of an

15   Order Extending the General Bar Date for a Limited Period

16   and Approving the Form of Notice Thereof (ECF #1196)

17

18   Statement of the Ad Hoc Group of Individual Victims (I) in

19   Support of the Debtor's Motion for Entry of an Order

20   Extending the General Bar Date for a Limited Period and

21   (III) Objecting to Requests for Entry of Order Extending Bar

22   date by Ninety Days 1173 (related document(s)1178) filed by

23   J. Christopher Shore (ECF #1198)

24

25

Page 7

1    Limited Objection of the Debtors to Pending Requests

2    Regarding Extension of the Bar Date (related documents 1185,

3    1157, 1158) (related document(s)1149, 1153, 1173,

4    1174, 1133, 1145, 1142, 1160, 1141) filed by James I.

5    McClammy on behalf of Purdue Pharma L.P. (ECF #1199)

6

7    Statement of the Official Committee of Unsecured Creditors

8    in Response to Letter Briefs Requesting Extension of Bar

9    Date (related document(s)1178) filed by Ira S. Dizengoff on

10   behalf of The Official Committee of Unsecured Creditors of

11   Purdue Pharma L.P., et al. (ECF #1200)

12

13   Statement / Memorandum in Support of the Entry of an Order

14   Extending the Bar Date filed by Andrew M. Troop on behalf of

15   Ad Hoc Group of Non-Consenting States (ECF #1173)

16

17   Objection / Ad Hoc Committee's Objection to Requests to

18   Extend the Bar Date (related document(s)1178, 1173) filed by

19   Kenneth H. Eckstein on behalf of Ad Hoc Committee of

20   Governmental and Other Contingent Litigation Claimants (ECF

21   #1202)

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
                                              Page 8

  1   A P P E A R A N C E S :

  2

  3   DAVIS POLK & WARDWELL LLP

  4         Attorneys for the Debtors

  5         450 Lexington Avenue

  6         New York, NY 10017

  7

  8   BY:  MARSHALL HUEBNER (TELEPHONICALLY)

  9         BENJAMIN KAMINETZKY (TELEPHONICALLY)

 10         JAMES MCCLAMMY (TELEPHONICALLY)

 11

 12   U.S. DEPARTMENT OF JUSTICE

 13         Attorney for the U.S. Trustee

 14         86 Chambers Street

 15         New York, NY 10007

 16

 17   BY:  PAUL SCHWARTZBERG (TELEPHONICALLY)

 18

 19   WHITE & CASE

 20         Attorney for Ad Hoc Group of Individual Victims

 21         1221 Avenue of the Americas

 22         New York, NY 10020

 23

 24   BY:  CHRISTOPHER SHORE  (TELEPHONICALLY)

 25
```

Page 9

1   PILLSBURY WINTHROP SHAW PITTMAN LLP

2        Attorneys for Ad Hoc Group of Non-Consenting States

3        31 West 52nd Street

4        New York, NY 10019

5

6   BY:  ANDREW M. TROOP (TELEPHONICALLY)

7

8   EISENBERG & BAUM LAW

9        Attorney for Ad Hoc Committee on Accountability

10       24 Union Square East

11       New York, NY 10003

12

13  BY:  MICHAEL QUINN (TELEPHONICALLY)

14

15  FINSON LAW FIRM

16       Attorney for Anne Alexander, et al.

17       126 Westwind Mall

18       Marina del Rey, CA 90292

19

20  BY:  LOWELL FINSON  (TELEPHONICALLY)

21

22

23

24

25

```
                                                    Page 10

 1   CAPLIN & DRYSDALE

 2       Attorneys for Multi-State Governmental Entities Group

 3       One Thomas Circle, NW, Suite 1100

 4       Washington, DC 20005

 5

 6   BY:  GEORGE M. O'CONNOR (TELEPHONICALLY)

 7

 8   STEVENS & LEE

 9       Attorney for Putative Class Claimants

10       485 Madison Avenue, 20th Floor

11       New York, NY 10022

12

13   BY:  CONSTANTINE DEAN POURAKIS (TELEPHONICALLY)

14

15   MCGRAIL & BENSINGER LLP

16       Attorney Ad Hoc Group of Hospitals

17       888-C 8th Avenue #107

18       New York, NY 10019

19

20   BY:  ILANA VOLKOV (TELEPHONICALLY)

21

22

23

24

25
```

```
                                                        Page 11

 1    NEIGER LLP

 2         Attorney for Ad Hoc Group of Individual Victims

 3         151 West 46th Street

 4         New York, NY 10036

 5

 6    BY:  EDWARD NEIGER (TELEPHONICALLY)

 7

 8    DEBEVOISE & PLIMPTON LLP

 9         Attorneys for Beacon Company

10         919 Third Avenue

11         New York, NY 10022

12

13    BY:  JASMINE BALL (TELEPHONICALLY)

14         JEFFREY ROSEN (TELEPHONICALLY)

15         NATASHA LABOVITZ (TELEPHONICALLY)

16         MAURA MONAGHAN (TELEPHONICALLY)

17         DANIEL E. STROIK (TELEPHONICALLY)

18         HAROLD WILLIFORD (TELEPHONICALLY)

19

20    CAPLIN & DRYSDALE

21         Attorney for Multi-State Governmental Entities Group

22         1 Thomas Circle, NW

23         Washington, DC 20005

24

25    BY:  KEVIN MACLAY  (TELEPHONICALLY)
```

Page 12

```
 1    ROYER COOPER COHEN BRAUNFELD

 2         Attorney for Independent Associated Companies

 3         1120 Avenue of the Americas, 4th Floor

 4         New York, NY 10036

 5

 6    BY:  MARC SKAPOF (TELEPHONICALLY)

 7         MARC HIRSCHFIELD (TELEPHONICALLY)

 8

 9    FIND JUSTICE

10         Attorney for Independent Public Schools

11         1250 Connecticut Avenue NW

12         Washington, DC 200363

13

14    BY:  CYRUS MEHRI (TELEPHONICALLY)

15         STEVEN SKALET  (TELEPHONICALLY)

16         AISHA RICH  (TELEPHONICALLY)

17         JOSHUA KARSH (TELEPHONICALLY)

18

19    HUGHES SOCOL PIERS RESNICK & DYM, LTD

20         Attorney for Board of Education of the City of Chicago,

21         School District No. 299

22         70 West Madison Street

23         Chicago, IL 60602

24

25    BY:  MATTHEW PIERS (TELEPHONICALLY)
```

Page 13

1  MILBANK TWEED

2       Attorney for Raymond Sackler Family

3       55 Hudson Yards

4       New York, NY 10001

5

6  BY:  ALEX LEES (TELEPHONICALLY)

7       GERARD UZZI (TELEPHONICALLY)

8

9  AKIN GUMP

10       Attorney for Official Committee of

11       Unsecured Creditors

12       One Bryant Park

13       New York, NY 10036

14

15  BY:  MITCHELL P. HURLEY (TELEPHONICALLY)

16       ARIK PREIS (TELEPHONICALLY)

17

18  LITT LAW GROUP

19       Attorney for Ad Hoc Committee on Accountability

20       66 North Village Avenue

21       Rockville Centre, NY 11570

22

23  BY:  PAUL RACHMUTH (TELEPHONICALLY)

24

25

Page 14

```
 1   JOSEPH HAGE AARONSON LLC

 2        Attorney for Raymond Sackler Family

 3        485 Lexington Avenue

 4        New York, NY 10017

 5

 6   BY:  GREGORY JOSEPH (TELEPHONICALLY)

 7        MARA LEVENTHAL (TELEPHONICALLY)

 8

 9   KRAMER LEVIN

10        Attorney for Ad Hoc Committee of

11        Governmental and Other Contingent

12        Litigation Claimants

13        1177 Avenue of the Americas

14        New York, NY 10036

15

16   BY:  KENNETH H. ECKSTEIN  (TELEPHONICALLY)

17

18   ALSO APPEARING TELEPHONICALLY:

19   DANIELLE GENTIN-STOCK

20   DONALD CREADORE

21   ANDREW ALFANO

22   THOMAS MAEGLIN

23   LAWRENCE FOGELMAN

24   MEGAN RUNDLET

25   GEORGE CALHOUN
```

```
 1    SHEILA BIRNBAUM

 2    MEGAN RUNDLET

 3    GEORGE CALHOUN

 4    SHEILA BIRNBAUM

 5    HAYDEN COLEMAN

 6    THOMAS MAHLUM

 7    HEATHER CROCKETT

 8    DANIELLE LEVINE

 9    MARK LIGHTNER

10    DAVID JONES

11    RICK ARCHER

12    ARTEM SKOROSTENSKY

13    NICHOLAS KAJON

14    HOWARD NATIONS

15    EMILY WALDEN

16    JENNIFER CHRISTIAN

17    GEOFF MULVIHILL

18    LAURIE MISKOWIEC

19    SYDENHAM ALEXANDER

20    ALIX BROZMAN

21    ERICA CLARK

22    HARRISON CULLEN

23    WHITNEY FOGELBERG

24    CAROLINE GANGE

25    SETH MEYER
```

Page 16

```
 1   VIOLA M. SO

 2   BARBARA VAN ROOYAN

 3   SHIRA WEINER

 4   EDWARD BISCH

 5   CATRINA SHEA

 6   JEREMY KLEINMAN

 7   SHAYNA SACKS

 8   AGOSTINO ZAMMIELLO

 9   DENNIS CHU

10   ERIC HWANG

11   JEREMY PEARLMAN

12   BROOKS BARKER

13   NICHOLAS PREY

14   JEREMY RYAN

15   RYAN D. SLAUGH

16   MARK YORK

17   CLAUDIA SPRINGER

18   CYNTHIA MUNGER

19   ADAM HABERKOM

20   SCOTT BICKFORD

21   MEGAN KAPLER

22   NATHANIEL REGENOLD

23   HOLLY NIGHBERT

24   HAYLEY THEISEN

25   MARIA CHUTCHIAN
```



1    EMILY F. MACKAY

2    CHARLOTTE BISMUTH

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                 P R O C E E D I N G S

 2            THE COURT:  Good morning.  This is Judge Drain and

 3      we're here in In re Purdue Pharma, LP, et al.  This is a

 4      completely telephonic hearing; therefore, I'm going to ask

 5      you stating your name and client the first time you speak,

 6      to do so again if you come in later in the hearing and one

 7      would reasonably believe that the Court reporter might not

 8      know who you are from your voice.  I may ask you to identify

 9      yourself also for that same reason later in the hearing.

10            There is only one authorized recording of this

11      hearing.  It's being taken by Court Solutions.  Court

12      Solutions provides that recording to our clerk's office on a

13      daily basis.  If you want a transcript of the hearing, you

14      should contact the clerk's office to arrange for one.

15            So, with that introduction, I have the amended

16      agenda for today's hearing, which really covers only one

17      matter, which is the issue of the proposed extension of the

18      June 30 bar date in this case.  So, with that introduction,

19      I should hear from counsel for the Debtors on their motion.

20            MR. HUEBNER:  Sure.  Good morning, Your Honor.

21      It's Marshall Huebner of Davis, Polk, and Wardwell for the

22      Debtors.  Can I be heard clearly and well?

23            THE COURT:  Yes.  Yeah, fine, thank you.

24            MR. HUEBNER:  Sure.  Okay.  Let me begin on a more

25      personal note to the Court.  The U.S. Trustee's office,
```

```
1    really everybody on the line, obviously, these are very

2    difficult, painful, and trying times in many ways.  I hope

3    that people are all safe and healthy and well in their

4    various circumstances.  I also did want to thank the Court.

5    This is, obviously, and extra hearing on top of our normal

6    omnibus schedule.  We are all very well aware of how

7    burdened the Court is on multiple, very large matters, and

8    so thank you for accommodating us in something that,

9    obviously, we think is quite important.

10          I want to spend just about three minutes, Your

11   Honor.  We try to give very brief case updates since,

12   obviously, there are -- sort of 97 percent of the iceberg is

13   under the waterline and not visible and most of it, frankly,

14   should be that way until it's time to bring it to the Court

15   or other attention, but there are a couple of things, I

16   think, are worth just quickly noting, none of which may be

17   news, but still worth noting.

18          Last week, we filed what we call Report 1D, Your

19   Honor, which is a very detailed and voluminous, I think 401

20   pages, I think, probably even without exhibits, report that

21   is covering the period from January 1 of 2008 until, I

22   believe, the petition date.  It covers all intercompany and

23   other corporate transactions between the Debtors on the one

24   hand, and shareholder and other shareholder-owned entities

25   on the other hand, and all non-cash transfers.
```

Page 20

```
 1              As the Court surely remembers, on December 16th,
 2      only three months after the filing date, we filed an equally
 3      extraordinarily detailed and thorough Report 1A.  Report 1A
 4      covered all cash distributions and dividends and the like,
 5      but obviously, there was more connectivity between Purdue on
 6      the one hand and the shareholders and shareholder-owned
 7      companies on the other hand.
 8              Report 1B is the other half of the circle, so
 9      whether it was a dividend or something that was not cash or
10      whether it was a contractual relationship or royalty
11      agreement, anything, this is designed to be another massive
12      plank in our early promise of, what I think, can probably
13      fairly be called radical transparency.  And this, I think,
14      now covers the waterfront for all transaction for a very
15      long period between the Debtors on the one hand and the
16      shareholders and shareholder-owned entities on the other
17      hand.
18              I should also note, because it hasn't come up, I
19      think, to anyone's attention recently, but we know that some
20      creditors hold it very sacred and we're still waiting for
21      proposals for -- from some of them for some more
22      granularity, but we have also not forgotten the promise that
23      we made several times on the record -- and as I think this
24      Court knows, we always keep our promises -- that when this
25      case is over, as soon as we can all get it over, for any
```

Page 21

1  number of reasons, responsibly and well, and the plan and

2  the releases contemplated go effective, with whatever final

3  form the plan takes, there will be a repository of documents

4  the way there has been other -- after other analogous

5  situations, like, I believe, tobacco, for example.

6        We know that that is important to people and I

7  don't want it to think -- I don't want anybody to think the

8  we have forgotten about that commitment.  The only other

9  thing that I will quickly mention before I turn to the,

10 essentially, single item on the agenda is mediation, and I

11 think brevity is probably appropriate here.  People are very

12 hard at work on the mediations.  The mediators, themselves,

13 are also very hard at work.

14       There were many mediations days in May.  There are

15 many mediation days in June, and I think that it's

16 proceeding.  More than that, I probably should not say, but

17 I didn't want the Court to think that despite the

18 complexities of everybody's current situation, that the

19 bottom 97 percent of the iceberg was not proceeding along

20 multiple fronts.  It most assuredly is.

21       With respect to today's hearing, Your Honor, let

22 me now turn to the agenda.  It will, on the main, be handled

23 by my partner, Jim McClammy who, for today's purposes, we

24 will actually just call Mr. McClammy as opposed to saying

25 Jim.  I would note that the agenda letter is slightly

Case 7:21-cv-07532-CM Document 157-2 Filed 11/15/21 Page 25 of 912
Case 7:21-cv-07532-CM Document 157-2 Filed 11/15/21 Page 25 of 912
Pg 22 of 125

Page 22

```
 1    complicated because there were some letters from patient

 2    advocate and similar groups that were put on the docket

 3    early on.  We don't -- I don't know the origin of those or

 4    whether it's a concerted effort.  Doesn't really matter.

 5            People have a right to express views; although, we

 6    do remain concerned that groups continue to use our docket

 7    to express their views on topics, as opposed to seeking

 8    relief from the Court.  Those were more in the nature of

 9    hybrid letters, and then, although the core parties knew

10    that we were on the very brink of filing a motion, we did

11    get a kind of statement and memorandum of law from the non-

12    consenting states filed a few hours before our motion hit

13    the docket.

14            I think Your Honor already said, as we see it,

15    this is really a single-issue hearing.  I think probably the

16    right order of operations -- sorry, one last thing.

17            We did confirm with Mr. Troop that they do not

18    intend to cross examine Ms. Finegan, because that would have

19    made this hearing much more complicated, and I actually

20    don't think that any of the facts in the Prime Clerk

21    declaration are disputed by anybody, but I'll leave the

22    technicalities of moving that into evidence to Mr. McClammy,

23    but it was important to us because, obviously, if there was

24    going to be a cross examination, the Court might have wanted

25    video or some other mechanic to ensure that a witness could
```

19-23649-cv Doc 837-32 Filed 07/16/21 Entered 07/16/21 16:57 Main Document Pg 23 of 125
Case 1:21-cv-03332-GHW Document 157-2 Filed 11/15/21 Page 26 of 912
Page 23

1    be sworn in, but we don't believe that is the case.

2            And so, what I think probably makes sense and

3    they're sort of two different movants at the end of the day.

4    I think there is our motion that seeks the 30-day extension

5    and then there's Mr. Troop's sort of motion, statement and

6    memorandum, that seeks a 90-day extension, and there are a

7    whole bunch of other people who just have views on those

8    two, I don't know, ideas, for lack of a better word.

9    Probably, it makes sense for the Debtors to go first, which

10   Your Honor has already said, so I think that's definitely

11   what's happening.

12           It probably makes sense for Mr. Troop to go second

13   because, I think, he's probably the chief spokesman of the

14   other point of view, and then I think -- and the Committee

15   actually put a very helpful chart in their pleading, showing

16   sort of the lay of the land.  Now I think at that point,

17   maybe we turn the podium over -- and I didn't write out an

18   order because I didn't want to be cheeky, but obviously,

19   there are a variety of other major stakeholders who have

20   views on zero, 30, 90, something else, and then we sort of

21   maybe bring it home after that.

22           So, if that sounds sensible, I will turn the

23   podium over to Mr. McClammy and then Mr. Troop can follow

24   and then we'll sort of figure out a good order of operations

25   for the people who have views on, essentially, the two

Page 24

1    primary options before the Court.  Is that --

2              THE COURT:  Okay.

3              MR. HUEBNER:  -- sensible, Your Honor?

4              THE COURT:  Well, I actually believe there's only

5    one motion before me, which is the Debtors motion.  That

6    isn't to say that -- I take seriously the other matters on

7    the docket, including the Ad Hoc Committee of States

8    filings, but there really only is one motion before me, and

9    of course, this is motion for relief from an order, my prior

10   bar date order, from February.

11             So, I think it is appropriate to proceed with that

12   motion, but I also think, the order that you're suggesting,

13   which is that your presentation be followed by the Ad Hoc

14   Non-Consenting States Committee is fine.  So, why don't we

15   proceed on that basis?

16             MR. HUEBNER:  Okay, terrific.  So then, I will

17   turn my microphone onto mute and ask for Mr. McClammy to

18   take over, including whatever admission of the declaration

19   is necessary, and thank you.

20             THE COURT:  Okay.

21             MR. MCCLAMMY:  Good morning, Your Honor.  Jim

22   McClammy on behalf of -- Jim McClammy of David, Polk, and

23   Wardwell on behalf of the Debtors.

24             THE COURT:  Morning.

25             MR. MCCLAMMY:  Good morning.  With us on the phone

Page 25

1    today is Ms. Jeanne Finegan, our declarant from Prime Clerk.

2    Also, on the phone from Davis Polk, we have Ms. Jacquelyn

3    Knudson and Ester Townes, my David Polk colleagues who have

4    been, really, unflagging in their efforts in connection with

5    the bar date, and their efforts have been greatly

6    appreciated.

7            And as Mr. Huebner mentioned, all parties, I

8    believe, really greatly appreciate, especially in these

9    trying times, the Court's and the parties' efforts to

10   continue to move these cases forward.

11           So, with that, Your Honor, I'll turn to the fact

12   that we have on, before the Court today, the motion to

13   extend the bar date by 30 days.  I'll note that that has

14   been supported by the Unsecured Creditors Committee, the

15   Multistate Governmental Entities Ad Hoc Group, and the Ad

16   Hoc Group of Individual Victims.

17           I believe it was noted in the statement in support

18   by the Unsecured Creditors Committee that the Individual

19   Victims Ad Hoc Group may have taken the position that they

20   were supporting the motion only with respect to personal

21   injury victims.  Our read of their papers, and after further

22   communications with counsel for the Individual Victims

23   Group, it is our understanding that they support the

24   extension of extension of the bar date for all potential

25   claimants, and not just the individual victims.

Page 26

```
 1           Your Honor, I'd like to make, I think, a brief
 2    statement, just to give an overview of the Debtors'
 3    positions with respect to the various statements that have
 4    been filed in support and in opposition to our motion, then,
 5    I would then propose to move into evidence the declaration
 6    of Ms. Finegan before we move on to a brief legal argument
 7    addressing each of the objections, if that's okay with Your
 8    Honor.
 9           THE COURT:  That's fine.
10           MR. MCCLAMMY:  Thank you, Your Honor.  You know,
11    as Your Honor knows, it's the Debtors' job, really, to be
12    good stewards of these cases, and often, as here, that means
13    managing the requests and views of all parties in interest,
14    in light of what is necessary to both move these cases
15    forward without undue delay and without increasing the
16    administrative burden on the bankruptcy, on these estates.
17    And it was really, with that in mind, that the Debtors
18    reviewed and really took into consideration the many
19    conflicting views that they've received in light of the
20    submissions that were made with respect to the ongoing
21    COVID-19 pandemic.
22           Some of the key constituencies, as mentioned,
23    including the Ad Hoc Committee of Governmental and Other
24    Contingent Litigation Claimants have made it clear that they
25    do not believe that any extension of the bar date is
```

1    necessary, whether it be 30 days or 90 days.  However, the

2    Ad Hoc Committee did agree that, should an extension be

3    granted, it should be for 30 days.  Others, particularly

4    those individual creditors and groups, including the Ad Hoc

5    Group of Non-Consenting States have filed requests for

6    extensions on the docket and believe that the bar date

7    should be extended for a prolonged period of at least 90

8    days.

9             And still others, like the Official Committee of

10   Unsecured Creditors, the Ad Hoc Group of Individual Victims,

11   and the Multi-State Governmental Entities Group, have

12   supported the Debtors' request for a limited 30-day, one-

13   time extension for all potential claimants, even though some

14   of them may have not preferred to have any extension of the

15   general bar date at all.

16            For their part, the Debtors believe supplemental

17   notice plan is running successfully and effectively, and

18   it's providing notice to the Debtors' potential claimants

19   and also provides a workable way for them to file their

20   proofs of claim.  In fact, with the increased time spent in

21   front of TVs and online as a result of COVID-19, some of the

22   elements of the plan, really, have already over delivered.

23            And I say that, all to make clear that the Debtors

24   did not determine that 30 days was the right amount of time

25   to extend the general bar date in light of COVID-19, in a

1    vacuum.  The Debtors have spent considerable time

2    reconciling those varying views in light of the success of

3    the notice program and evaluating that and the needs of

4    these cases, before determining if 30 days was the right

5    number.

6          In landing on that 30-day timeframe, the Debtors

7    considered a number of key factors.  First, there is no

8    credible argument that the Debtors, with the noticing agent,

9    have not been providing adequate notice to potential

10    claimants through what this Court knows is an unprecedented,

11    robust, and multifaceted supplemental notice plan.

12          Second, the notice program and the claims filing

13    process was developed with mechanisms in place that, as it

14    turns out, are workable, even during the pandemic and the

15    shutdown.  There's a toll-free number and online information

16    available.  There's the fact that the claimants are allowed

17    to request and file proofs of claim forms by mail.

18          We required only a baseline of necessary

19    information, and we simplified the forms in a way that took

20    into account these considerations, after having discussed

21    them with all of the creditor constituencies that ended up

22    supporting the bar date when it was first presented to the

23    Court, including with respect to the ability to provide

24    information with the filing of your claims and

25    documentations with the filing of your claims, but not

Page 29

1    making that a necessary component of filing those claims.

2           Third, is generalized and potentially -- the

3    generalized and potentially speculative assertions of

4    difficulty in filing claims cannot, in and of themselves,

5    justify the substantial cost to these estates and the

6    resulting reduction and potential recovery to the Debtors'

7    claimants, that a delay due to a prolonged extension of the

8    bar date would cause.

9           In addition to the fact, that there will be the

10   direct cost of about $700,000 to conduct the notice program

11   for the extension, there will also be substantial secondary

12   costs, including from keeping the bankruptcy estate in place

13   longer than otherwise might be, the cost of which has been

14   in the millions, indeed perhaps tens of millions of dollars

15   per month in these cases in recent times.

16          Fourth, to the extent that potential claimants do

17   have legitimate individualized claims of difficulties

18   warranting a deviation from the bar date, the Bankruptcy

19   Code and the bankruptcy rules provide mechanisms for those

20   claimants to seek appropriate relief from the Court.

21          And fifth, with the proposed 30-day extension, the

22   bar date in this case will have run for 178 days, a time

23   period that is much longer than the bar date periods in

24   other mass tort bankruptcy cases.

25          With that general overview, Your Honor, I would

Page 30

1    like to move now for the submission into evidence of the

2    declaration of Ms. Jeanne C. Finegan.  As I mentioned, Ms.

3    Finegan is on the phone and she is a vice president of

4    notice and media solutions at Prime Clerk, LLC.  She

5    submitted a declaration in connection with the original bar

6    date motion and submitted a supplemental declaration in

7    support of the motion for an extension that was submitted on

8    Ma 20th of this year, and it's found at Docket No. 1179.

9            We have reached out to counsel for the objectors,

10   and my understanding is that counsel for the Non-Consenting

11   States and also counsel for the Ad Hoc Committee for

12   Accountability have no objection to the submission of her

13   declaration into evidence.  And with that, Your Honor, I

14   would move for the submission of that declaration into

15   evidence.

16           THE COURT:  Okay.  Does anyone want to question

17   Ms. Finegan on her supplemental declaration?

18           MR. TROOP:  Your Honor, Andrew Troop from

19   Pillsbury for the Non-Consenting States.  No, we don't plan

20   on questioning Ms. Finegan.

21           THE COURT:  Okay, thank you.  All right.  Ms.

22   Finegan is on the line, I see, in looking at the hearing

23   dashboard.  Let me ask you, ma'am, I have your supplemental

24   declaration here.  It's dated May 20th, which is fairly

25   recently, but knowing that this would be your direct

```
 1    testimony in this matter, is there anything in it that you

 2    wish to change?  You may have -- you might be on mute.  I'm

 3    not sure.  Your -- yeah, there you go.  Is there anything --

 4              MS. FINEGAN:  Apology --

 5              THE COURT:  -- you would wish to change, Ms.

 6    Finegan?

 7              MS. FINEGAN:  Apologies, Your Honor.  No, the

 8    declaration stands.

 9              THE COURT:  Okay.  Very well, thank you.  I may

10    have questions related to it, but I have a feeling that Mr.

11    McClammy will be able to answer them.  If not, I'll come

12    back to you for an answer, if I don't get one from him.  But

13    having said that and having reviewed the declaration, I will

14    admit it into evidence as Ms. Finegan's direct testimony.

15    And, of course, I also have her declaration from January

16    30th of this year, in support of the original bar date

17    motion, which was ultimately granted in somewhat modified

18    form in early February as well as her testimony at the

19    hearing on the bar date motion, which I've also re-reviewed.

20              So, that doesn't need to be admitted again.  it's

21    already part of the record, but the supplemental declaration

22    is now admitted.  So, you can go ahead, Mr. McClammy, with

23    the rest of your presentation.

24              MR. MCCLAMMY:  Thank you, Your Honor.  Turning

25    first, with respect to the Ad Hoc Group of Individual
```

Page 32

1    Victims, one of the things that we discussed with them in

2    connection with their submitting a statement in support of

3    the extension of the bar date, with making sure that's -- we

4    made clear for the record that, although we believe that

5    cause exists here to extend the bar date for a limited 30

6    days, these Debtors do agree with some of the points that

7    are made in the statement of support submitted by the Ad Hoc

8    Group of Individual Victims, in particular, that potential

9    claimants, including individuals, should not delay filing a

10   claim simply because there is an extension.

11        Extending the bar date here is not intended as an

12   open invitation from -- for potential claimants to delay

13   such a filing.  Rather, we see this extension, which is

14   being requested under unprecedented circumstances, as being

15   meant as an accommodation to those who may be having or

16   experiencing difficulties in light of COVID-19 in completing

17   the claims filing process.  Notice of the bar date extension

18   will be provided as set forth in the supplemental

19   declaration of Ms. Finegan so that the claimants are aware

20   of the extended bar date, and that a failure to submit a

21   claim by that extended date will mean that such a claim

22   could be subject to being barred or being disallowed.

23        However, as noted by the Ad Hoc Group of

24   Individual Victims, there is, in fact, a possibility that

25   even with all the notice that has been provided and with the

```
 1    extension of the bar date, that there may be claimants that

 2    seek to file claims under Bankruptcy Rule 9006 on the basis

 3    of excusable neglect.  If Debtors will endeavor to give

 4    appropriate consideration to late filing claimants who

 5    affirm that they did not receive actual notice and/or who

 6    believe that their particular circumstances justify their

 7    failure to comply with the bar date, including hardships

 8    occasioned by COVID-19.

 9            We believe that that provides some important

10    context to keep in mind when considering the objections that

11    seek 90 days or longer extensions to the bar date.  With

12    that, I will turn now to the --

13            THE COURT:  Well, can I -- let me jump in here,

14    and I think I should, just to make my view clear, and I

15    think it's consistent with the law.  A bar date is a very

16    important event in a Chapter 11 case, including these cases.

17    As the courts say, it's not just a mere procedural gauntlet.

18    It really is a key deadline for asserting one's claims in

19    the case.

20            The Second Circuit, in fact, in its own words, has

21    taken a hard line in applying a bar date deadline and said

22    that if compliance with the bar date is within the control

23    of the party who missed it, it's a very rare case where the

24    bar date deadline would be extended.  So, I think it is

25    important to note that it is an important deadline that
```

Page 34

1  needs to be complied with.  If someone is, heaven forbid, in

2  the hospital or for some other reason unable not because of

3  their neglect or a legitimate -- for a legitimate excuse,

4  not to file a claim by the bar date, then on motion by them,

5  Courts extend it.

6        But the Courts look at those requests carefully

7  and, as I said, generally unless there's a good reason why

8  the deadline could not be complied with, the request for an

9  extension is normally denied, and that might particularly be

10  the case when there has been a lengthy period, such as

11  provided for here.  So, while it is clear that there may be

12  exceptions, and the Supreme Court has recognized that in the

13  Pioneer case and Bankruptcy Rules recognize it in Rule 9006,

14  those exceptions are limited.

15        So, people should definitely not wait until the

16  last minute under the assumption that, well, if they miss it

17  by a day or two, it'll be okay.  They should file their

18  claim promptly, before the last minute, to assure themselves

19  that it can actually be recognized as a claim in the case.

20        MR. MCCLAMMY:  Thank you, Your Honor.  Very much

21  appreciated and completely agree with the Court's statement

22  on -- in that regard, and we think that that will be very

23  helpful to the process going forward, to have the claims in

24  as soon as they can be filed.

25        THE COURT:  Let me say one other thing.  There are

Page 35

```
 1    a great deal of potential -- a great number of potential

 2    claimants here who are not entitled to individual notice,

 3    i.e., a letter to them that would say, you have until X date

 4    to file your proof of claim.

 5            That is because the Debtors' product here was in

 6    very wide circulation and the parties, and ultimately, the

 7    Court concluded that individualized notice to anyone who was

 8    prescribed OxyContin or some other product by the Debtors

 9    that would give rise, potentially, to a claim, would not be

10    required on an individual basis, but rather through the

11    extensive notice program that the Debtors proposed, that

12    with some changes, I approved.

13            So, you should not expect, as a claimant, to be

14    getting, necessarily, an individual notice or letter.  If

15    you see an advertisement on TV or online or a billboard,

16    that applies to you, and you need to, therefore, abide by

17    the deadline.  The deadline will be running regardless

18    whether you got individualized notice, i.e., a letter to you

19    specifically or not.

20            There may be exceptions for some people who, if

21    they can show that the Debtor actually knew you,

22    particularly, would have a claim or would be reasonably

23    knowable to the Debtor, but it's not a good idea to rely on

24    those exceptions, because, again, the Courts narrowly

25    construe bar date or requests for relief from the bar date.
```

Page 36

1    So, when you see an advertisement or a billboard or a notice

2    on YouTube or in a blog, follow up and file the claim by the

3    deadline.

4         MR. MCCLAMMY:  Thank you, Your Honor.  With that,

5    I'd like to move to the Non-Consenting States objection to a

6    30-day extension.  The Non-Consenting States, I see, it

7    really failed to demonstrate why anything more than a one-

8    time, 30-day extension of the general bar date would be

9    reasonable here, or satisfy the cause standard.  And

10   although the Non-Consenting States correctly note that the

11   Debtors' supplemental notice plan was developed prior to

12   COVID-19, it seems to me that they failed to appreciate the

13   that the supplemental notice plan is not static in nature

14   and, in fact, has been adjusted and optimized in response to

15   COVID-19.

16        For example, if you're looking at the supplemental

17   Finegan declaration, Paragraph 15, it notes that in response

18   to COVID-19, Prime Clerk adjusted TV commercials to air

19   during day parts and on networks where research has shown

20   that 35 increase -- a 35 percent increase in viewership, in

21   general, increased national TV spots, and streaming video

22   ads in response to movie theater closures, and the fact that

23   we mailed a two-page full color summary flier of the bar

24   date notice to 178 mobile health teams for distribution to

25   replace the planned boots-on-the-ground approach.

1          Moreover, as previously discussed, the Debtors'

2     claims filing process includes mechanisms that safeguard

3     against potential impacts of COVID-19 and impact it could

4     have had on the process.  As I mentioned, the proof of claim

5     forms can be received and filed by mail.  The filing of a

6     proof of claim form does not require access to medical

7     records.  Indeed, this was a specifically negotiated and

8     much discussed point, including with the Non-Consenting

9     States Group in advance of the filing of the original bar

10    date motion, that supporting documentation is not an

11    absolute requirement.

12          It may be needed at some time and even demanded at

13    some time later, but is not a requirement before claimants

14    file their proof of claim.  And, indeed, claimants do not

15    need specific personnel or even an attorney to file a claim.

16    We believe the claim forms are straightforward, and also, it

17    was noted in our claims form process, that the failure to

18    answer a question, in and of itself, will not necessarily

19    result in the denial of a claim.

20          It's also important to note that in arguing that

21    the Debtors can extend the general bar date by 90 days with,

22    in their view, "only" an additional $1.4 million above the

23    Debtors' estimate of $700,000 for the direct costs of the

24    extended notice program, that the Non-Consenting States

25    overlook the soft and the hard costs that would certain run

```
 1    into the tens of millions of dollars if these cases are

 2    delayed, and for those reasons, Your Honor, we believe that

 3    the Non-Consenting States Group's objections should be

 4    overruled.

 5              With respect to the Ad Hoc Committee of

 6    Accountability --

 7              THE COURT:  Could -- I'm sorry, can I interrupt

 8    you on this?  And I know I'll be hearing from Mr. Troop in

 9    due course, but I had some questions for you on the 90-day

10    alternative.

11              At least one of the pleadings in support of the

12    Debtors' motion, albeit in somewhat reluctant support,

13    states that the Debtors are seeking or planning on filing a

14    Chapter 11 plan this fall, which could be as early as the

15    end of September or later in the fall, but that's the

16    Debtors' goal and that it is argued -- argues for not having

17    a bar date extension to the end of September.

18              I didn't see anything to that effect, although,

19    maybe I just missed it, in the Debtors' own pleadings.  Do

20    the Debtors have -- and this is not something written in

21    stone, but did the Debtors have a goal as to when they would

22    be filing a plan in this case?

23              MR. MCCLAMMY:  Your Honor --

24              MR. HUEBNER:  Your Honor, with Mr. McClammy's

25    consent, I'll jump in.  We are reluctant, frankly, in an
```

1    open forum and in our pleadings to set forth exactly what

2    our multi-tracks or plans and thoughts and calendars are.

3    It is a complicated case.  The mediation is a complicated

4    thing that is proceeding alongside the bankruptcy process,

5    as are other major initiatives.  Our goal is to get this

6    company out of Chapter 11 as soon as humanly possible and to

7    turn off all the professionals and send everybody home and

8    give the money out to the stakeholders and to the people who

9    need it.

10           We want to file a plan at the earliest possible

11   opportunity.  Several things clearly have to happen before

12   that is possible.  If we filed a plan tomorrow with the

13   mediation midstream, other things unresolved, we think in

14   this case that would be very counterproductive.  There are

15   some cases in which Debtors file plans that have the support

16   of no one, just to get balls rolling.

17           From where we sit right now, on June 3rd, this is

18   not that case at this time.  Do we hope that a plan is

19   absolutely viable sometime in the next few months?

20   Absolutely.  Which month of fall, is there a dream of

21   something a little earlier, is there a fear of something a

22   little later?  Sure.  But as each thing gets pushed out,

23   take the probability that this entire case and the tens of

24   millions of dollars of risk and business evaporation loss

25   and known cost, it makes it much more of a certainty that

Page 40

```
 1    those will be incurred and the money will not go where we

 2    need it.

 3            So, I apologize for not saying something as simple

 4    as, oh, Your Honor, first time ever, you missed something.

 5    Page 7, Footnote 6, we said we're to file a plan between

 6    August 15th and September 30th.  There is no such footnote,

 7    because we don't think it's appropriate to lay something

 8    like that out just yet.  But, given that we're now in the

 9    beginning of June and we have a bunch of rows left to hoe,

10    there is certainly a hope, and more than a hope, that we

11    could be doing something in that general landing zone.

12            I would prefer not to be more specific than that,

13    unless the Court requires it.

14            THE COURT:  Okay, that's fine.  And then I had one

15    other question.  I'm aware, although I don't think there's a

16    reported decision on this, of one other fairly recent case

17    where a bar date was extended, or at least there was an

18    additional major effort to get claims in, in a mass tort

19    context, and that was the PG&E case.  That was prompted by a

20    perception that simply no one or very few people were filing

21    claims and that there might be something wrong with the

22    notice program that was associated with the bar date for

23    those tort -- potential tort claimants.

24            I did not see in the pleadings, except in one

25    letter which was filed fairly early in May, any contention
```

Page 41

1    that the anticipated number of claims being filed is

2    actually much lower -- I'm sorry, the number of claims

3    actually filed by individuals is much lower than was

4    anticipated.

5           Now, I appreciate, we're only at June 3, and

6    probably the data on the claims dates back to last week,

7    which is still more than a month before the end of the

8    current bar date period, but is there a perception on the

9    Debtors' part, maybe either Mr. McClammy or Ms. Finegan can

10   answer this, that the claims that were anticipated actually

11   greatly exceed the numbers that are being filed to date?

12          MR. MCCLAMMY:  Your Honor, Jim McClammy.  In

13   response to that, there isn't anything that we've seen to

14   suggest that there is a -- that there was an issue with the

15   noticing, nothing that's bearing itself out in the number of

16   claims being filed, the number of hits to the website, and

17   the number of page views to the website as set forth in Ms.

18   Finegan's declaration.  So, there isn't anything along those

19   lines.

20          It's really occasioned by trying to find the right

21   balance in light of the perception of difficulties that

22   people may be having as a result of COVID-19 and how that

23   may be impacting the schedules and finding the right

24   balance, cost-wise, between saying no extension and,

25   perhaps, having to deal with a larger number of people

1    filing motions, to file late claims, or extending the bar

2    date for a short period of time to further strengthen the,

3    what we think is a successful program.

4          THE COURT:  Okay.  All right.

5          MR. MCCLAMMY:  With that, Your Honor, perhaps

6    before ceding the podium, I'd like to just finish up by

7    addressing briefly the Ad Hoc Committee on Accountability

8    and their assertions.

9          THE COURT:  Sure.

10          MR. MCCLAMMY:  So, as the Court noted, letters are

11    not going out to individual claimants, everyone that has

12    been prescribed a Purdue opioid or Purdue product, and that

13    was made after considering the substantial cost, time, and

14    effort that would be involved in undertaking such an

15    endeavor.  And indeed, the claims discussed by the

16    accountability group are really no different than any of the

17    other opioid-based claims in these cases, all of which,

18    really, in one form or another, assert that some Purdue

19    marketing effort or other created an environment in which

20    more opioids were prescribed.

21          The argument that they're making, in many ways,

22    proves too much, and if you were to follow the logic of the

23    AHCA, the Ad Hoc Committee on Accountability, the Debtors

24    would need to seek out and obtain personal contact

25    information for all such potential claimants from third

Veritext Legal Solutions
www.veritext.com
212-267-6868            516-608-2400

A.341

1    parties and provide direct notice to all members of the

2    public that had received a prescription for a Purdue opioid.

3           We believe that, based on the already substantial

4    cost of the noticing in these case, the alternative direct

5    noticing efforts would have undoubtedly depleted the

6    substantial portion of the value of the Debtors' estates and

7    that doing so would have also increased the amount of time

8    it would've taken to have the notice program run its course.

9           In developing the notice strategy, the Debtors

10   considered how best to reach this multitude of potential

11   claimants, which we do not believe all of them are, in fact,

12   known claimants, nor do we believe that all of them,

13   necessarily, have potential claims, and we quickly realized

14   that attempting such a scorched earth search to obtain the

15   name and address information, some of which may no longer be

16   accurate, of these individuals, was simply not feasible for

17   a number of reasons, including that some of this information

18   is protected by HIPAA and that the requests for records that

19   would need to be sought and negotiated through means such as

20   protective orders and subpoenas, and the potential

21   litigation over all of that, would've come at a great

22   expense and delay.

23          And such efforts to provide actual written notice

24   would have been impractical and costly and, as I mentioned,

25   cause undue delay to these Chapter 11 cases.  So, based on

Page 44

1    the above, it became clear that such persons are, in fact,

2    the very definition of unknown claimants because their

3    identities were not known or reasonably ascertainable by the

4    Debtors, and that information with respect to such claimants

5    were not within the possession of the Debtors or in their

6    books and records.

7         Indeed, after acknowledging that the actual

8    written notice was only -- not only not legally required for

9    these unknown claimants, but also entirely impractical.  The

10   Debtors and Prime Clerk, after consulting with key

11   constituencies in these cases, including the Creditors

12   Committee and other ad hoc groups, developed a supplemental

13   noticing plan that, as the Court has noted, is really far

14   reaching and is designed to reach 95 percent of the U.S.

15   adult population within average times of -- fixed times and

16   frequency and over 80 percent of the Canadian adult

17   population on an average of three times and is, in fact, on

18   track to exceed those targets.

19        We also believe that the cases relied upon by the

20   Committee on Accountability actually support the Debtors'

21   decision to provide notice to potential claimant who are not

22   in the Debtors' books and records through that supplemental

23   notice plan.  Those case, particularly, In RE:  Motors

24   Liquidation case and the In RE:  TK Holdings case really

25   stand for the general proposition that fashioning adequate

Page 45

```
 1    notice will depend on the circumstances of the particular
 2    case and, in some cases, perhaps more than examination of a
 3    Debtor's books and records may be required in order to
 4    satisfy the reasonable ascertainable standard.
 5           But in neither of those case is there any
 6    suggestion that that was something that would need to be
 7    undertaken here.  In fact, if you look at something like In
 8    RE:  Motors Liquidation Corp. at 2015 Bankruptcy Lexus 44,
 9    45, you see the Court there noted that efforts beyond just
10    looking at the books and records are generally not required.
11           And if you look at the TK Holdings case, the
12    Debtors there sought information from a third party and its
13    subsidiary, and eventually the California Department of
14    Motor Vehicles, but that was for contact information
15    contained in the registration records for certain potential
16    claimants in those cases, so it was very particularized and
17    not something that, I think, can be applied here where we
18    would be looking at the logic of what they're asking to be
19    simply to extend notice to really every single recipient of
20    a prescription of a Purdue opioid, which, as this Court has
21    determined, is unworkable under the circumstances.
22           So, for those reasons, Your Honor, the Debtors,
23    being aware of the impact of the ongoing COVID-19 pandemic,
24    and taking into consideration the various views of the
25    creditor constituencies, we would request that the Court
```

1    enter an order extending the bar date for a limited, one-

2    time extension of 30 days.  Unless Your Honor has any

3    questions, I will cede the podium to Mr. Troop and reserve

4    the right to respond on rebuttal.

5              THE COURT:  Okay.

6              MR. TROOP:  Thank you, Your Honor.  It's Andrew

7    Troop from Pillsbury for the Non-Consenting States.  Can I

8    proceed?

9              THE COURT:  Yes, good morning.

10             MR. TROOP:  Good morning, Your Honor.  Hopefully,

11   everyone can hear me.  I join in Mr. Huebner's thoughts for

12   everyone in light of the disruption to our lives and

13   people's lives as a result of COVID-19.  The world is a very

14   different place than when you entered the bar date order on

15   February 3rd.

16             Your Honor, I want to be as focused as I can here,

17   so bear with me if I take long pauses as I'm reading over my

18   notes from what's been said so far today.  First, Your

19   Honor, I do want to note that I think that everyone,

20   reluctantly or not, who's spoken in connection with or filed

21   pleadings in connection with the extension of the bar date

22   has acknowledged the unprecedented circumstances in which we

23   find ourselves and that those unprecedented circumstances

24   have, notwithstanding the breadth and scope of the notice,

25   supplemental notice program enacted by the Debtors, guided

Page 47

1  everyone to acknowledge that accommodations need to be

2  reached.

3            And in that regard, Your Honor, let me say

4  clearly, that the Debtors decision to file the motion where

5  the standard before you in deciding whether to extend the

6  bar date is for cause and not for excusable neglect, was not

7  lost, at least, on me.  If the standard were excusable

8  neglect after the bar date, as you note, your ability to

9  react to provide relief is extremely circumscribed by Second

10 Circuit and, frankly, Supreme Court precedent, and the issue

11 that you would need to be, as I read the cases, focused on

12 is, really, the issue -- are many of the issues that have

13 been discussed, the scope and breadth of notice.

14           But we find ourselves in a situation where the

15 scope and breadth of notice is only part of the analysis

16 that I think the Court needs to undertake in determining

17 when and for how long to extend the bar date for cause,

18 because it's not the scope of notice here that's at issue.

19 It is how current circumstances have impacted or may impact

20 the ability, willingness, focus of parties to respond.

21           Your Honor, there's been some suggestion in some

22 of the pleadings as to why the Non-Consenting States have

23 taken up this torch, and while the pleadings acknowledge

24 that states have been impacted, as well, by COVID-19,

25 they've been impacted in terms of their budgets, their own

1    internal restructuring, the fact that the health care

2    workers at the state who are significantly involved in this

3    case are also the ones with primary responsibility for

4    responding to COVID-19.

5           The impact of COVID-19 on Non-Consenting States

6    has been disproportionally high.  According to the

7    Washington Post yesterday, 104,755 people have died from

8    COVID-19.  Nearly 80,000 of those people, more than 75

9    percent, are in Non-Consenting States.  The impact, here, is

10    far and wide, and Your Honor, it's frankly farther and wider

11    because of events over the last week.

12           Who would've thought we would've woken up this

13    morning to New York Times headlines that combat troops are

14    stationed outside of Washington, D.C., that National

15    Guardsmen are in many major cities, that Secretaries of

16    State's Offices were closed yesterday across the country?

17           These facts require an additional yard, Your

18    Honor.  They require that no one -- no one.  I can't say no

19    one, Your Honor.  They require that the likelihood that

20    someone will have to come before you and ask for permission

21    to file a late filed claim, based on the excusable neglect

22    standard, is minimized to the greatest extent possible.

23    And, Your Honor, we've already taken this into account in

24    connection with other matters in this case.

25           Your Honor, you may recall at a hearing before you

Page 49

1    on May 1st, believe it was Mr. Hurley discussing certain

2    discovery disputes before you, and one of those involved an

3    individual named Mr. Ives who is a Sackler-related party

4    where Mr. Hurley reported that Mr. Ives was unable to

5    respond to discovery requests because of what's been

6    happening with COVID-19.

7            And in response to that, with respect to discovery

8    requests that have been outstanding since early March, the

9    Court gave parties until September 1st to respond to

10   discovery, a significant increase over the -- much more than

11   parties in interest wanted in terms of responding to

12   document requests that are critical to the ability to -- for

13   this case to proceed.  I'll come back to that in just a

14   second, Your Honor.

15           So in sum, Your Honor, we're here because the

16   circumstances are different.  The standard before you is not

17   excusable neglect and the world is a very different place

18   without -- and without making any overly political statement

19   with regard to it, it's in a worse place than it was on

20   February 3rd.  The major -- so it seems, Your Honor, that

21   we're not arguing about an extension amongst most of the

22   parties, the Ad Hoc Committee notwithstanding.

23           We're really talking about how long, and that the

24   arguments provided in response to -- I'm sorry, one other

25   issue, Your Honor.  You asked a question about whether --

Page 50

1   how proofs of claim were coming in against estimates.  We

2   don't know what the estimates were that the Debtors had or

3   that Prime Clerk worked for them, and admittedly, Your

4   Honor, this is anecdotal, but someone in this case said to

5   me, Troop, if we extend the bar date, that could be

6   thousands and thousands of more claims filed.

7         And I thought to myself at the time, doesn't that

8   just prove the point?  Doesn't that just prove the point?

9   And, Your Honor, even if you apply the --

10         THE COURT:  Well, except it's not proof.  It's not

11   proof.  It's --

12         MR. TROOP:  I --

13         THE COURT:  -- hearsay, so --

14         MR. TROOP:  Your Honor, and I didn't -- I was very

15   clear about that.

16         THE COURT:  Yeah, I know, but maybe people --

17         MR. TROOP:  I think --

18         THE COURT:  -- who are not lawyers are not, so I

19   want to make it clear that that's not in any way evidence of

20   anything.

21         MR. TROOP:  But, Your Honor, we live in a world

22   where you can't gather evidence about the impact.  You can't

23   go out and interview people.  You can't go door to door and

24   do a survey.

25         THE COURT:  Well, but you can --

Page 51

1              MR. TROOP:  You have --

2              THE COURT:  You can't -- but you can look, as Ms.

3    Finegan did, at visits to the claims website and you can

4    look at the claims that have been filed to date and see

5    whether they are, as one would anticipate, or whether

6    they're dramatically lower.  That's just --

7              MR. TROOP:  And --

8              THE COURT:  That is evidence.

9              MR. TROOP:  And, Your Honor, I don't think there's

10   evidence on that, either.

11             THE COURT:  Well, I asked the question.  I was

12   told no, they're not dramatically lower, by the --

13             MR. TROOP:  By the Debtors' lawyer.

14             THE COURT:  Well, I --

15             MR. TROOP:  Right?  He's not aware of it --

16             THE COURT:  Ms. Finegan, you heard my question of

17   Mr. McClammy.  Do you disagree with his answer?  I think

18   you're going to have to unmute yourself again, Ms. Finegan.

19   So, Ms. Finegan, do you disagree with Mr. McClammy's answer,

20   which was, it does not appear to the Debtors that the claims

21   that have been filed to date are materially lower than would

22   be anticipated as of today's date or as of last week?

23             MS. FINEGAN:  Your Honor, I agree with Mr.

24   McClammy.

25             THE COURT:  Okay.  Now, I appreciate --

1    MR. TROOP:  Then, Your Honor --

2    THE COURT:  -- let me --

3    MR. TROOP:  -- I --

4    THE COURT:  I don't want to leave it at that, Mr.

5 Troop, because I also appreciate, of course, that we're

6 talking about June 3 and probably looking at claims from

7 last Friday, the end of May, and the bar date, as currently

8 set, is June 30 and there's always a large number of claims

9 that are filed shortly before the bar date.  Not -- you

10 know, people, human nature being what it is, people wait

11 until the last minutes.

12    So, I'm not sure how conclusive that evidence is,

13 but at least it's evidence, and I would be approaching this

14 very differently if this were a PG&E situation where people

15 are scratching their heads why there aren't as many claims

16 being filed as one would think.

17    MR. TROOP:  And, Your Honor, I therefore, again,

18 commend everyone for bringing this to you sooner rather than

19 later, recognizing, as I do agree with you, that the numbers

20 here will be much clearer on June 28th than they are today.

21 By June 28th, I think, everyone would agree, it would be a

22 very different effort in time to extend the bar date.

23    Your Honor, I may have a question, now, for Ms.

24 Finegan in light of your question, but I want to think about

25 it just a minute, of I may, and come back to it.

Veritext Legal Solutions
www.veritext.com
212-267-6868        A.351  516-608-2400

1          THE COURT:  Okay.

2          MR. TROOP:  Your Honor, the other, I would say,

3     the other most significant argument against a longer

4     extension, which is, I think, what you were getting at in

5     terms of asking when plan might be filed, is this fall --

6     whether it would be this fall, is whether extending the bar

7     date for 90 days would, in fact, delay the case.  And, Your

8     Honor, I think not.  I mean, Mr. Huebner accurately

9     described the efforts of the parties engaged in mediation to

10    address the primary issue that was set forth for mediation,

11    which is allocation and, like Mr. Huebner, I am hesitant to

12    share with you details by -- other than to confirm everyone

13    is working very hard.

14          The public side creditors are making substantial

15    progress.  There were 25-ish, I think, maybe 20-ish days of

16    mediation set out for people in June, and while, again, this

17    is a changed circumstance, when the mediation was authorized

18    by the Court -- and the point of that, Your Honor, is the

19    mediation is moving along but taking longer than people

20    anticipated.  Think everyone -- I think the Court had hoped

21    that mediation would be concluded now, on this primary

22    issue, and you've urged us all to move expeditiously, but I

23    note that had that schedule, which maybe I expressed some

24    skepticism about, but had that schedule held, the bar date

25    would've come in after the mediation concluded.

Page 54

1          So, the -- now tying, as some do, the need to get

2     proofs of claim in with the mediation, is a red herring,

3     Your Honor.  It's a red herring.  And in terms of moving the

4     case forward, Your Honor, it's similarly a red herring.

5     There are, as alluded to, many issues that need to be

6     resolved or people need to try to resolve before filing or

7     abandoning a consensual plan is decided.

8          It's -- I've alluded already, Your Honor, to the

9     Sackler discovery and its timing.  Your Honor, I understood

10     you to order that Sackler discovery be concluded by

11     September 1st.  That's much more than 30 days from now, and

12     it will take months, I think, at least, but months to

13     analyze all those documents, confirm the Sackler's roles and

14     finances, and be able to evaluate and make reasoned

15     decisions on the plan with releases that Mr. Huebner

16     confirmed the Debtors intend to pursue.

17          Similarly, Your Honor, one of the parties that is

18     not compulsory -- is not compelled to engage in the

19     mediation is the United States and the Department of

20     Justice.  And the claims that the United States will assert,

21     may assert, it's demanded treatment in this case, and, Your

22     Honor, there's no secret, I think, here.  I think last month

23     the Debtors' special counsel, Skadden, charged the estate $2

24     million or so in their last interim fee application.

25          And their job is exclusively to deal with DOJ and

Page 55

1    DOJ issues.  Those are all issues that are going to need to

2    be hammered down, nailed down, and resolved before a plan

3    can get presented to you for confirmation.  And those are

4    things beyond my control, Your Honor, but they are things

5    that are going to have to be considered.  So, nothing in

6    this case, in light of these issues, will be adversely

7    affected by a 90-day extension as opposed to a 30-day

8    extension.

9            In contrast, aside from enhancing, if not, in

10   actuality, the perception of the fairness of the process, in

11   light of changed circumstances, is clear.  And the costs of

12   not doing so are less predictable than the costs of doing

13   so.  No one can predict, Your Honor, whether now, 30 days

14   from now, or 90 days from now.  Readily admit that, that

15   late claims will get filed in this case.

16           But I think as you noted, Your Honor, the longer

17   the time, the more effort that's made to permit claims to be

18   filed, probably -- and I admit I have no evidence on this,

19   Your Honor, but we've all done this for a long time,

20   minimizes the likelihood that more claim -- more late-filed

21   claims will be filed than with a sooner bar date.  And I

22   think, frankly, Your Honor, it will make it easier for

23   everyone to address it the issues by the third -- the Second

24   Circuit when it comes to dealing with late filed claims.

25           So in sum, Your Honor, I think that the issues

Page 56

1    here are simply not whether, but how long to extend the bar

2    date, whether the intended benefits of extending the bar

3    date would be better achieved with a longer extension than a

4    shorter extension, in light of the fact that it's not the

5    scope of notice that people are fighting about, but people's

6    ability to respond, and whether, in fact, there will be

7    demonstrable delay in this case as a result, which there

8    will not be, Your Honor.

9            In fact, I don't think anyone thinks that having

10   proofs of claims on file are necessary for the mediation

11   process to continue because, as I noted, it was never

12   contemplated they would be on file as a prerequisite to

13   that.

14           Your Honor, I'm going to skip my question to Ms.

15   Finegan.

16           THE COURT:  Okay.

17           MR. TROOP:  Okay?  Any questions for me, Your

18   Honor?

19           THE COURT:  No.  No, thanks.

20           MR. HUEBNER:  So, Your Honor, it's Marshall

21   Huebner.  In terms of the, sort of, continued order of

22   operations, I think it probably makes sense -- again,

23   there's no magic to this, but I think that while, sort of,

24   Mr. Troop's theory of the longer bar date is right before

25   us, I -- the one other party that I believe has counsel, I

Page 57

1    believe it's called the Ad Hoc Committee of Accountability

2    which is a new group.  I think it's actually five

3    individuals who have retained counsel, and if counsel is on

4    the line, we certainly would cede the podium to them to make

5    whatever remarks they believe appropriate.

6              THE COURT:  Okay.

7              MR. RACHMUTH:  Thank you.  May I, Your Honor?

8              THE COURT:  Yes, go ahead.

9              MR. RACHMUTH:  -- Paul Rachmuth on -- this is Paul

10   Rachmuth on behalf of the Ad Hoc Committee on Accountability

11   from Eisenberg and Baum.  Our focus in this case is much

12   narrower than the other committees that have spoken before

13   you, and it is, as the title of our group suggests, it is to

14   increase the accountability of the Debtor in the process.

15             The objection that we filed is premised on earlier

16   this year, there was a company, Practice Fusion, which is an

17   electronic medical records company, entered into a deferred

18   prosecution agreement with Vermont Attorney General's

19   Office.

20             THE COURT:  January 27th, right?

21             MR. RACHMUTH:  Yes, Your Honor.  This company pled

22   guilty to receiving illegal kickback from a drug

23   manufacturer, which many have identified at Purdue Pharma,

24   and I don't believe there can be any doubt that the party

25   named is Purdue Pharma.  Several of the exhibits used even

1   have Purdue Pharma's name on them.  The illegality was the

2   creation of a scheme to target patients in -- by creating a

3   medical billing system that influenced doctors to prescribe

4   extended-release opioids.

5           Accordingly, the victims of this scheme that was

6   perpetrated by the Debtor here were those patients that were

7   targeted.  And they're the victims, whether or not they

8   received OxyContin or another Purdue Pharma drug or a third

9   party's drug.  So the issue we have is that unless they are

10  -- receive notice that they are a claimant in this case,

11  specifically informing them that they were injured by Purdue

12  Pharma because of this illegal scheme, even if they were to

13  receive a hand-delivered note -- notice of the bar date,

14  they would not know to file a claim.

15          So, there is a database with the names of these

16  parties in it that's at Practice Fusion's custody and

17  control which can be accessed, which has all the relevant

18  information.  It is a known set of names and the Debtor, if

19  it so chooses or, if necessary, by 2004 from a third party,

20  including us, could get those specific names of the parties

21  that were targeted by the Debtor and are victims of this

22  scheme.

23          We're asking for two things.  One, that the Debtor

24  provide these parties notice, and a simple notice that

25  Purdue Pharma has filed bankruptcy and if you've been

Page 59

1    injured by Purdue Pharma you have a claim, that notice isn't

2    sufficient because unless someone is told that Purdue Pharma

3    was behind this scheme, that even if they received a third-

4    party's opioids, they're still a victim of this scheme and

5    therefore are a potential creditor, unless that information

6    if provided, then a notice is insufficient.

7           And because of the time that we're -- to get the

8    names from Practice Fusion and construct this very narrow

9    focused, directed notice campaign, the 90 days would be

10   needed, not the 30 days.  And I believe that this benefits

11   the entire estate, not just this one narrow group of

12   creditors, because as both the Debtor and Mr. Troop have

13   pointed out, the hurdles for a party to overcome filing a

14   late-filed claim are high.

15          However, if that party can show they never knew

16   that they had a claim before the bar date, I expect Your

17   Honor would grant their claim.  In other words, there is a

18   whole class of creditors here, who would have an excusable

19   neglect to have late-filed claims.  So whether it is 90,

20   120, or 180 days down the line, if a creditor from this

21   Practice Fusion scheme does file a claim, that could

22   interrupt the case.

23          However, as Mr. Troop pointed out, this case is

24   not nearly ready for a consensual plan and the size of the

25   numerator in this case, the number of creditors, is not

Page 60

1   really the issue that's going to hold things up.  Delaying

2   90 days to get proper notice to this group of creditors

3   would not injure the process at all.  I realized the

4   enormity of the issue that's going on in this case.  I

5   understand this is a very small issue in comparison to all

6   of the major issues that Your Honor is dealing with.

7           I'm asking that this one issue, for this group of

8   creditors, be addressed appropriately.  Thank you.

9           THE COURT:  Okay.

10          MR. HUEBNER:  So at this point, Your Honor, again,

11  let me ask, is there anyone else -- there were some other

12  letter filings with respect to the request for a longer

13  extension.  We're not, obviously, taking a view.  We didn't

14  try to preclude any from speaking or being heard.  We're not

15  asserting any sort of party interest defense, anything like

16  that.

17          So is there anyone else from the people who are

18  listed in the agenda letter supporting a 90-day extension

19  who would like to be heard before I can sort of swing back

20  to the other stakeholders in the case?

21          MR. TROOP:  Your Honor, this is Andrew Troop again

22  from Pillsbury for the non-consenting states.  Your Honor, I

23  do believe that there was one person who had tried to dial

24  in but was unable to do so.  I'm just sharing that I haven't

25  heard from anyone else that intend to -- their intent to

Page 61

1    participate or present today.

2            THE COURT:  Okay.  Well, I mean, I'm not sure why

3    they weren't -- aren't able to do so or whether they

4    contacted the Court.  But if no one has anything further to

5    say in opposition to the motion or, perhaps better put,

6    seeking a longer extension, then I'm happy to hear from

7    other parties maybe beginning with the creditors' committee.

8            MR. PREIS:  Good morning, Your Honor.  Can you

9    hear me?

10            THE COURT:  Yes.

11            MR. PREIS:  Good morning.  This is Arik Preis from

12   Akin Gump Strauss Hauer & Feld on behalf of the Official

13   Committee of Unsecured Creditors.  Thank you, Your Honor,

14   for allowing us to speak this morning on what is really an

15   important issue in these cases.

16            We filed a statement yesterday setting forth our

17   position; that's at Docket #1213.

18            THE COURT:  Right.  I've reviewed that.

19            MR. PREIS:  Okay.  We included a chart there that

20   set forth the positions of various parties that filed

21   pleadings.  In setting forth those positions, we tried to

22   explain the fact that different positions have been taken by

23   different parties in this case that are, frankly, similarly

24   situated.  In some cases, we actually have the exact same

25   time of claimant taking a diametrically opposed position on

1      an issue that would appear to affect them in the same way.

2              So I want to be actually a little specific because

3      our chart, although we tried to hit all the parties that had

4      filed pleadings, some of the parties that filed the

5      pleadings actually have multiple groups within their parties

6      or within their ad hoc group.  And I think it's probably

7      instructive for me to just go through all the different

8      types of claimants in this case and give you a sense of

9      where they are.  And we feel we're a little bit better

10     situated than anyone in the case right now to tell you this,

11     given who sits on our creditors' committee and our

12     interactions with a lot of the parties in the case.

13             So on the state side, you have the ad hoc group of

14     consenting group, 23 of them, arguing for no extension, and

15     the ad hoc group of non-consenting states, I believe there

16     are 25 of them along with some territories and District of

17     D.C., arguing for a 90-day extension.  On the county and

18     municipality side, and this is part of the reason I want to

19     go through this, the PEC and the MDL, which purports to

20     represent I believe 2,000 or so cities, counties and

21     municipalities, they're a member of the consenting group

22     and, therefore, they support no extension.  Then you have

23     the multi-state group, which is comprised of 1500

24     municipalities representing 60 million people, arguing for a

25     30-day extension.

1           On the personal injury side, you have letter

2    requests arguing for a 90-day extension, as you know, and

3    newly formed ad hoc group of accountability, which you just

4    heard from, arguing for a 90-day extension for an entirely

5    different reason.  And then an ad hoc group of personal

6    injury victims, which has been vocal in this case and

7    purports to speak for 40,000 individual victims, supporting

8    only a 30-day extension.

9           Then there are a few groups that didn't file

10   anything -- the ad hoc group of ANS, the ad hoc group of

11   hospitals and the third-party payors, all of whom are

12   important players in these cases, did not file pleadings.

13   Each of them has a representative claimant or two that sits

14   on the creditors' committee; specifically, the creditors'

15   committee has a hospital on its committee, West Boca Medical

16   Center, one mother of an NAS child, one grandfather of an

17   NAS child, a third-party payor, Blue Cross & Blue Shield

18   Association, all of whom are on the UCC.  And I've been told

19   that although they didn't file a paper, the NAS ad hoc group

20   is of the view that if an extension is granted, it would

21   support a 30-day extension.

22           In addition, there are the Native American tribes.

23   Although they too did not file their own specific pleading,

24   some of them are members of the ad hoc group of consenting

25   parties, which group supported no extension, and some are ex

Page 64

1    officio members of the UCC.

2         And so, Your Honor, with this amount of difference

3    of opinions, not on type of claimant lines and not on

4    private versus public claimant lines, as you've heard

5    discussed on other issues, and, frankly, not on political

6    lines, it seems that one really needs to consider what the

7    various arguments here because one can't simply say X

8    creditor is saying Y because of how this affects them like

9    in a normal way case.

10        So some groups, the first issue that remains most

11   of the groups focus on is that we need to recognize that

12   opioid victims have been hit hard by the COVID-19 pandemic

13   for various reasons and, as such, need an extension of bar

14   date.  The ad hoc group of PIs appears in their pleadings to

15   provide some compelling rationales for how PI victims have

16   been particularly harmed by COVID-19.  Others have argued

17   that state and local governments or hospitals or third-party

18   payors have been focused on COVID-19, which indeed we would

19   want them to be and hope that they are.  And as such, we're

20   not focused on filling out a group claim form.

21        But although it's hard to argue that these types

22   of positions don't appear to have merit, the consenting

23   group may have been right when they said there's actually no

24   hard evidence that any group or individual was, in fact,

25   adversely affected by COVID-19 in a way that prevented them

1    from receiving notice of the bar date or filling out a proof

2    of claim form.  I think you even said earlier there's no

3    evidence.  All we can say about this issue, at best, is that

4    it's simply impossible to know for certain which side is

5    right on this issue.

6           Second, some have seemed to hint that the noticing

7    program is not going to hit its noticing targets as a result

8    of COVID-19 process and, as such, an extension is warranted.

9    But there's no evidence of that either.  Jeanne Finegan's

10   argument -- Miss Finegan presented uncontroverted evidence

11   about the way the program worked and who it was targeted and

12   how it has been effective.  Some claimants seem to imply

13   that the noticing program hasn't worked or can't worked

14   because COVID-19 will result in people being unable to fill

15   out proof of claim forms.  But the truth is, the program is

16   a noticing program, it's not a file a proof of claim

17   program, and forms can be filled in online and almost no

18   documentation is necessary.  Indeed, the forms were intended

19   to be as simple as possible to fill out with different types

20   of forms for individuals making their forms even easier to

21   fill out.

22          I would note though on this point, Your Honor,

23   that earlier, you asked the Debtors or Prime Clerk whether

24   they have reason to believe that the number of claimants

25   that have filed claims is less than the amount anticipated,

Page 66

1    and Miss Finegan and Mr. McClammy answered that no, it's

2    not.  And I noted earlier -- I'm king of guessing here -

3    that Mr. Troop thought for a second about whether he was

4    going to cross-examine Miss Finegan and maybe he was going

5    to ask her about this issue.

6         But I too thought about it because I've never in

7    all of our discussions with the Debtors ever been told what

8    the Debtors or Prime Clerk expected as of this time or any

9    time as far as the number of claims to be filed.  Indeed,

10   that would require some pretty difficult assumptions about

11   number of claimants, likely amount of claimants who file

12   claims in mass torts of this unprecedented size and other

13   factors.

14        But I can assure you, Your Honor, that some groups

15   have absolutely told their Debtors their view on this.  For

16   example, the NAS ad hoc group has voiced to the Debtors

17   their view that the number of claimants that have filed NAS

18   claims is less than the amount they would have anticipated

19   as of now and has worked with the Debtors in an effort to

20   modify some of the noticing strategies as it relates to NAS.

21   For example, they've worked to modify images that are used

22   online since they're more applicable to the NAS children.

23        At this point, I think the NAS ad hoc group at

24   best would say that the jury is still out on this issue.  I

25   can't speak for any other group, but I did want to note that

Page 67

1    in response to something you raised earlier.

2           Third, some would argue that we shouldn't have any

3    extension because that will in some way impact mediation.

4    And I found myself agreeing with what Mr. Troop just said

5    and, indeed, it was in our papers.  That argument doesn't

6    ring true at all.  We began discussing mediation in late

7    February and began formal mediation in early March.  The bar

8    date on March 1st was 120 days away.  At that time, no one

9    objected to mediation or even voiced a view that we should

10   hold off on mediation because we don't know how many claims

11   will be in by the bar date and that we can't reach

12   resolution until we know the number of claims.  Meaningful

13   negotiations were intended to occur starting then, have

14   occurred and will occur prior to the bar date deadline

15   whenever it will be.

16          Moreover, and as Mr. Troop also alluded to, but

17   I'm going to need to fix something he said in a second, we

18   are in the midst of investigating the claims against the

19   Sacklers.  You are very aware from various discovery

20   disputes brought to your attention last month, and indeed

21   yesterday, we submitted another long letter to you of

22   various discovery issues that have arisen based on what you

23   ordered 32 days ago.

24          Discovery is likely months away from concluding,

25   much less having the UCC and the non-consenting states and

Page 68

1    perhaps others from agreeing to the settlement framework.

2    Therefore, while we obviously hope and would want the

3    consensual resolution by early fall, as was indicated

4    earlier, if not sooner, a lot has to be done before that.

5            And, Your Honor, I just want to correct something

6    that Mr. Troop earlier mentioned when talking about the

7    impact that COVID-19 had on getting access to Mr. Ives'

8    documents.  We had offered to meet and confer to reduce the

9    number of documents offline with Mr. Ives' counsel and that

10   the deadline should be based on the number of documents

11   returned.  Mr. Ives is still taking the position that his

12   documents would be due September 1st, and we are asking to

13   require them by separate letter, and obviously not for this

14   call for this hearing, to finish by August 1st.  But at no

15   point has anybody ever agreed to a deadline of discovery of

16   September 1st for anything.  As you know, there is a

17   deadline of July 1st for certain production to be done, but

18   again, that's not for this call.

19           Finally, in any argument that the bar date

20   extension should be only for one or a specific type of

21   claimant are just -- we don't believe are consistent with

22   fundamental fairness, and I think Mr. McClammy addressed

23   that earlier on in his comments.

24           Given all these competing positions, Your Honor,

25   and the arguments we've heard, our initial view, as we

Page 69

1   explained in our papers, was there should be a surgical

2   approach for extensions; specifically, if someone or some

3   institution or some governmental party, indeed, did have a

4   hardship due to COVID-19 and could not file a claim on time,

5   then they should file a late claim and submit an affidavit

6   to that effect, and there would be the need for the Debtor

7   to give everyone notice that this process was in effect.

8           But as we explained in our papers, requiring

9   people to go through this verification process and then have

10  a claims administrator adjudicate, or that the reasons were

11  indeed legitimate and ensuring that this process was run in

12  a fair and cost effective manner would have been

13  impracticable, difficult to negotiate, time consuming to

14  administer, and may in fact be unfair to those who we were

15  actually trying to help, so we decided to abandon that

16  proposal.

17          Therefore, we looked at all the competing

18  interests, which I went through with you earlier, and the

19  rationale espoused, and we considered the fact and

20  circumstances not just of this case, but of the world we

21  live in and, frankly, notions of fundamental fairness.

22          And honestly, Your Honor, I think it's fair to say

23  that once one determines that an extension of some sort is

24  appropriate, determining the length of that extension,

25  whether it's 15 or 30 or 45 or 60 or 90 days, is frankly

Page 70

```
 1    simply a matter of what feels right based on what everyone

 2    is arguing and what people are saying as reasons for

 3    extending or not.

 4            The UCC is a fiduciary, therefore supports a 30-

 5    day extension, not because it necessarily is a legally right

 6    answer, because frankly we're not sure there is a legally

 7    right answer, but because it strikes the appropriate balance

 8    among all the various positions advanced by all of the

 9    different parties in the case.  And perhaps in that way,

10    it's the legally right answer.  Thank you, Your Honor.

11            THE COURT:  Okay, thank you.

12            MR. ECKSTEIN:  Your Honor, good morning.  This is

13    Kenneth Eckstein of Kramer Levin on behalf of the Ad Hoc

14    Committee of Consenting States and Local Governments.  Would

15    it be appropriate for me to speak at this point?

16            MR. ECKSTEIN:  Sure, go ahead.

17            MR. ECKSTEIN:  Thank you, Your Honor.  I trust

18    Your Honor has had an opportunity to read the pleading that

19    we submitted.  I believe that we are standing alone in some

20    respects in taking the position that there is no cause or

21    basis in this case for an extension of the bar date.  But

22    let me just briefly summarize some of the points that we've

23    made and address some of the comments that have been made

24    this morning.

25            First, Your Honor, I want to echo the comments
```

Case 7:21-cv-07532-CM Document 157 Filed 11/15/21 Page 74 of 912
Case 1:20-md-03292-CM Document 157 Filed 01/21/20 Page 71 of 125
Pg 71 of 125

Page 71

1    that have been made by I believe all the speakers in noting

2    that the members of the ad hoc committee of consenting

3    states and local governments, and that includes all the

4    states and all of the cities, counties and municipalities

5    that sit on the ad hoc committee are keenly focused on the

6    demands and challenges presented by the COVID-19 crisis.

7            And I'm sure Your Honor can appreciate that the

8    members of the ad hoc committee, while focusing intensely on

9    a great deal of constructive activity that has been taking

10   place in this case over the last 90 days, has been working

11   almost full time as well on confronting the challenges in

12   their respective states and municipalities, and I don't

13   believe that there is any party in this case that is more

14   aware of the challenges presented by COVID-19 than the ad

15   hoc committee of consenting states and local governments.

16           Notwithstanding this crisis and that the crisis

17   clearly is unprecedented, I think as Your Honor has heard

18   repeatedly from I think again all of the parties, we're

19   balancing the challenges of the crisis with a very, very

20   unusual, I would say unique Chapter 11 case, which is at

21   this point I think heading into it's tenth month, with

22   tremendous cost and expense for all the constituencies and

23   where the significant resources that we had hoped were going

24   to be put into the system have not yet found their way to

25   start providing relief for the opioid crisis and its

Page 72

1    victims, and we think those are the balances that have to be
2    considered here.

3              At the end of the day, Your Honor, we have to
4    determine whether or not there's cause for an extension of
5    the bar date.  I believe there is uniform recognition that
6    the bar date that was established and approved by this Court
7    in this case is a model of a broad and comprehensive bar
8    date, it was undertaken at massive expense to the estate;
9    over $23 million was expended in providing broad and
10   extensive notice of the bar date in this case in a manner
11   that I certainly have not encountered in any other case in
12   which I've been involved.

13             The length of the bar date, even for a mass tort
14   case, is extremely long, and there has been no suggestion in
15   the papers or this hearing that there are parties who cannot
16   file the claim.  Every case, whether it's a bar date or a
17   pleading or a deadline, everybody wants more time and we all
18   recognize that and it's always more comfortable and it's
19   easier to have more time.  We also, I think, appreciate that
20   whenever there is a delay or an extension of time, it causes
21   delay to the case; that is almost axiomatic and that will be
22   true here as well.

23             We do need to balance.  And what I think Your
24   Honor has before you is the fact that there is a robust and
25   effective bar date that was put in place, that there is no

1   specific compelling need for more time, that in fact the

2   evidence demonstrates that the claims are coming in, and the

3   fact of the matter is we are devoting day in and day out.

4   The parties in this case are devoting almost their entire

5   day in certain cases to mediation.

6           It is true, mediation was started before we knew

7   what the exact amount of the claims were going to be, but we

8   all recognized that by June 30th, we were going to have the

9   claims on file.  And we appreciated that, while we hoped

10  mediation would have been done earlier, the fact of the

11  matter is in a case of this complexity, it's no surprise

12  that it's ongoing and it's going to continue to be ongoing

13  for a while.  But as Your Honor has heard from Mr. Troop and

14  from others, progress has been made, and I believe progress

15  will be continued to be made.  And we all must, in this

16  case, aspire to the filing of a plan as early as possible,

17  and I don't think anybody would quarrel with the fact that

18  we should be aspiring to file a plan by the fall of 2020.

19          I appreciate full well, there are many, many

20  hurdles that could interfere with that goal.  So it would

21  seem obvious to me, Your Honor, and hopefully to the Court,

22  that creating additional hurdles to show this case down is

23  exactly what nobody in this case needs.  Unfortunately, we

24  do have a limited amount of resources, and we're working

25  mightily to figure out what the most effective way is to

Page 74

1  make those resources available to numerous competing

2  parties.

3          If one party is going to say we are not yet

4  prepared to weigh in on what is the appropriate treatment

5  for our constituency in this case because we don't know the

6  universe of our claims, that could be a significant

7  impediment to making the critical necessary progress to

8  resolving the mediation and getting to the point where we

9  can file a plan.

10          The ad hoc committee is completely sympathetic

11  with all of the problems that we're all confronting.  And

12  this position should not be heard as anything other than a

13  desire to balance the sympathy for the challenges that we're

14  all dealing with, with the responsibility that we all have

15  to keep this case moving forward as constructively and

16  effectively as possible, and each of the parties who have

17  spoken, I believe, are doing that.  But by opening up a key

18  deadline, as Your Honor has pointed out, the bar date is not

19  merely an incidental or technical deadline; it is a key

20  dating item to be able to really make the progress we need

21  to in this case.

22          In the absence of cause because it's -- maybe it

23  feels better to give more time, that's not cause in this

24  case, Your Honor, so we would submit that the right answer

25  is notwithstanding the fact that it may feel good, we think

1    the Court should conclude that it has put a robust

2    comprehensive extensive bar date in place where all parties

3    have received notice.

4                To the extent there are attorneys who want to file

5    claims, they've had months and months to do so, and there

6    are very, very simple mechanisms to make sure that the basic

7    requirement of filing a claim is satisfied; there is no

8    cause for another 30, 60 or 90 days to do so.  To the

9    contrary, we should be doing everything in our power to keep

10   this case moving and to not create additional impediments to

11   delay, all of which is costing this estate millions and

12   millions of dollars a month that will continue to be

13   incurred unless we commit ourselves collectively to actually

14   achieving a resolution that should be in hand.

15               So, Your Honor, we believe that there is no cause

16   for extending the bar date.  We believe that the notice

17   period in this case is adequate.  We believe that the Court

18   does have the ability, if there are specific exceptions that

19   surface in the future, to deal with the excusable neglect

20   standard by applying it to the unique circumstances that we

21   face right now in this country.  And if the facts warrant, I

22   have no doubt that Your Honor will find an opportunity to

23   accommodate genuine needs for additional time, and we

24   believe that the right conclusion in this case is for the

25   Court's order establishing a June 30 bar date to be

1  maintained.

2         At the conclusion of our pleading, Your Honor, we

3  did say if the Court nonetheless believes that it is

4  prepared to open up this bar date, which is a very

5  significant event for the Court to do in a case of this

6  size; if the Court is going to nonetheless open up the bar

7  date, we believe that the appropriate step would be, in that

8  case, to provide not more than 30 days, make it available to

9  all parties, and that would be the fallback ruling that we

10  would recommend in the event the Court believes that there

11  actually is some need to extend.  We appreciate Your Honor's

12  consideration.  Thank you.

13         THE COURT:  Okay, thanks.

14         MR. MACLAY:  Your Honor, this is Kevin Maclay for

15  the MSG.  May I be heard?

16         THE COURT:  Briefly, yes.

17         MR. MACLAY:  Thank you, Your Honor, and I will be

18  brief because I don't want to retread any already applied

19  ground.

20         THE COURT:  Right, and that's the only reason I

21  suggested it.  I think we're probably getting to the point

22  of diminishing returns on other arguments since I think

23  we've now covered the gamut of the responses.

24         MR. MACLAY:  Thank you, Your Honor, yes, very

25  briefly.  As was noted by counsel for the UCC, my group

Page 77

1    represents approximately 60 million people, localities

2    across the country who are on the front lines of both the

3    opioid and now the Covid crisis.  We carefully considered

4    the Debtors' positions and the evidence presented in support

5    of those positions, and we concluded that the Debtors'

6    judgment was correct; that the appropriate balance between

7    the hardships that have been laid out by some of the letter

8    writers and then, ultimately, the non-consenting state

9    group, and the delay to the case that, in our view, will

10   also inevitably result.  If a further extension were

11   granted, that the 30-day period was the correct period.

12   Thank you, Your Honor.

13          THE COURT:  Okay, thank you.  Anyone else?  And I

14   have read all the pleadings on this, so you can be assured

15   of that.

16          MR. McCLAMMY:  Your Honor, it's Jim McClammy for

17   the Debtors.

18          THE COURT:  Well, before you speak, Mr. McClammy,

19   I had a question for you or maybe Ms. Finegan.  The Debtors

20   budgeted over $23 million for the bar date notice process,

21   and as her supplemental declaration states, it's now more

22   than two-thirds done.  My question is, is there some point

23   of diminishing returns by way of an extension given that a

24   fair amount of this money has already been spent and you're

25   not contemplating a lot more; it's just a reference to an

1  extension.  I just don't know.

2        In terms of noticing, is there some point by which

3  the extension goes out far enough so that the message that

4  you've already spent, you know, more than two-thirds of the

5  work on has been diluted?  I hope that's clear; if not, you

6  could ask me where it isn't clear.

7        MR. McCLAMMY:  Yes.  In the first instance, that

8  may be a question for Ms. Finegan.  I'll see if Ms.

9  Finegan's able to respond.

10        MS. FINEGAN:  Your Honor, in response to your

11  question, while we are two-thirds of the way through the

12  program's timeline, a majority of the budget has already

13  been spent and contractually committed.  We are currently in

14  a maintenance level just to keep awareness.  So at a very

15  minimum, the program is running online, social media ads and

16  display ads on YouTube.  We have yet to publish one magazine

17  title; again, that's coming out on June 12th, which is

18  "Parents Latina."  And then the program is, for the most

19  part, concluded.

20        THE COURT:  Okay.  But I guess my question is, a

21  tremendous amount of work and money has gone in to telling

22  people that June 30th is the deadline.  Is there any logic

23  to the notion that if you get more than a month or so beyond

24  that deadline with a new deadline, that the work already

25  done is vitiated, you know, so that people kind of lose

Page 79

```
 1    their memory of that ad they saw or that website banner that

 2    they saw, you know, if you go much beyond the time that the

 3    Debtors have said, or does it really not matter?

 4              MS. FINEGAN:  If I understand your question

 5    correctly, Your Honor, I believe that it is always helpful

 6    for individuals to have a continuous reminder of a message

 7    in front of them.  Of course, it's always up to that

 8    individual whether or not that they take action.  We are

 9    only 50 percent of the equation, so I believe that it is

10    helpful to have messages continuously in front of

11    individuals as reminders.

12              THE COURT:  Okay.  And isn't it -- there were

13    estimates given that the extra 30 days that the Debtors were

14    requesting would cost in hard dollars about $700,000, and

15    that 90 days would cost $2.1 million.  Is there a weekly

16    cost to this; is it that simple that it's X hundred thousand

17    per week?

18              MS. FINEGAN:  Typically, the media contracts are

19    negotiated on a monthly basis.  Certainly, we could work

20    that out for you.  I don't have that easily at my disposal,

21    but I'm happy to calculate that for Your Honor.

22              THE COURT:  But generally, you would negotiate a

23    month worth of --

24              MS. FINEGAN:  Yes, that's correct.

25              THE COURT:  I mean, Mr. Preis said -- you know,
```

1    Mr. Preis threw out numbers like 30 days, 45 days, 60 days,

2    90 days; all but one of those was on a monthly basis.  And I

3    guess that you're saying that generally speaking, if you're

4    going to have maintenance, it would be on a monthly basis.

5                MS. FINEGAN:  That's generally the case.  However,

6    there have been notice programs that have extended into 45

7    days, so it can be accomplished most certainly.

8                THE COURT:  All right.  But you don't have a sense

9    of what the cost of that would be.

10               MS. FINEGAN:  To run the program for 45 days?

11               THE COURT:  Yeah.

12               MS. FINEGAN:  I do not have that easily at my

13   fingertips, but I'm happy to gather it for you.

14               THE COURT:  Okay.  All right, thanks.  All right,

15   so Mr. McClammy, I interrupted you, but go ahead briefly.

16               MR. McCLAMMY:  Thank you, Your Honor.  Briefly,

17   Your Honor, I just want to respond to the points raised with

18   respect to the deferred prosecution agreement by the ad hoc

19   committee on accountability.  I believe Mr. Huebner might

20   have a couple of additional words as a general rebuttal, if

21   that's all right.

22               THE COURT:  Okay.

23               MR. McCLAMMY:  So, Your Honor, with respect to the

24   arguments raised by the ad hoc committee on accountability

25   concerning the deferred prosecution agreement, I just

Page 81

1    reiterate the remarks made in my opening; that those

2    patients are really not differently situated from the other

3    potential claimants in this case whose contact information

4    the Debtors do not have access to.  And, you know, the fact

5    that they may have had a contract with a party that was

6    subject to the deferred prosecution agreement does not

7    change that.

8          You know, in fact, you know, it's been very

9    public, the accusations against Purdue, including claims of

10   conspiracy.  So in addition to the fact that the deferred

11   prosecution agreement was in January, you know, it is not as

12   though those that believe that they have claims tied to

13   opioid use would have no basis for considering whether or

14   not they had a claim against Purdue based upon information

15   that was publicly available to them at the time.

16         So for those reasons and for the reasons included

17   in our papers, Your Honor, we suggest that the request that

18   there be a limited noticing tied to parties that may have

19   been impacted by the matters that are outlined in the

20   deferred prosecution agreement, that that should be

21   overruled.  And with that, I will turn it over to Mr.

22   Huebner.

23         THE COURT:  Okay.

24         MR. HUEBNER:  Your Honor, let me be very brief.  I

25   hope not to take more than five minutes, but this is very

19-23649-shl Doc 3292-1 Filed 07/16/21 Entered 07/16/21 12:40:45 Main Document
Pg 82 of 125
Case 7:21-cv-03332-CM Document 157 Filed 12/15/21 Page 85 of 912

Page 82

1   important, and I think there is actually a lot on the line.

2          Number one, I do want to acknowledge, we're all

3   talking about competing goods and we're all talking about

4   balance.  It's not -- this is not a binary issue.  The issue

5   is there is a material cost of delay, there is risk of

6   delay, and there is a probability of delay.  And ultimately,

7   in part, this comes down to judgment, but the judgment has

8   to be looked at in context, and the context is that this

9   original bar date was, you know, on a combined basis

10  probably the longest, deepest, most expensive, most

11  elaborate bar date in U.S. history.

12         We sort of joke about it, but, you know, that is

13  actually what Jim McClammy got sort of, you know, canonized

14  as St. Jim because we spent weeks and weeks and weeks taking

15  incredible amounts of input from every single group about

16  how to improve, extend and deepen the program and do things,

17  frankly, that in many cases, have never been done before.

18         And, you know, the numbers that we're talking

19  about, if you even sort of close your eyes and go back even

20  just a few years, to say that 95 percent of the more than

21  300 million people in our country will hear about the bar

22  date more than six times is something that 10-15 years ago,

23  nobody could have even fantasized could be something that's

24  going to be put into a declaration.  Now it used to be you

25  would mail it to creditors' last known address and you would

Page 83

1   take out four newspaper ads and that would be it.  This is

2   as far from that as anything could be.

3           And at the end of the day, as Your Honor has noted

4   several times, this is about evidence.  It's applying the

5   facts to the law and notions of fairness.  The evidence at

6   this hearing, just like the evidence at the original

7   hearing, is all and exclusively the Debtors.  There is a

8   very detailed declaration about the extraordinary number of

9   touchpoints that the bar date has already had, about the

10  extraordinary length of the bar date, and as far as we can

11  tell from sophisticated computer website hits and things

12  that those of us over 50 barely understand, an extraordinary

13  effectiveness in getting the message out.  And no one has

14  actually said anything to the contrary, except I guess from

15  Mr. Troop saying that some unknown person quipped to him

16  that he or she believes that we may see more claims if the

17  bar date is extended, which obviously isn't really hearsay,

18  it's just an aside.

19          And so, you know, I think at the end of the day,

20  the Debtors listened hard as they did the first time, and

21  the committee listened hard; I should say committees because

22  there are about seven of them.  But in this case, I mean the

23  official committee of unsecured creditors, which is the

24  fiduciary for all unsecured creditors, for all claimants in

25  this case who seek to file a claim and assert one against

Page 84

1    the Debtors.

2         And so, you have the twin fiduciaries who listened

3    and listened and listened and listened to arguments for only

4    my group, only my group and one other group, only on a

5    showing of cause, none at all, zero days, 15 days, 30 days,

6    45 days, 60 days, a couple of people saying 90 days.  And we

7    made a judgment to move for relief from our own motion that

8    was granted on unanimous unopposed consent because we

9    thought an extra time period was needed.  Nobody has said,

10   and there are no red herrings here, that for every day the

11   bar date is extended, the case will be extended, and it will

12   cost X dollars.

13        We obviously understand and I think I was very

14   clear at the outset, as was Mr. McClammy, that there are

15   many other things going on in this case, very many people

16   are hard at work on parallel tracks, and we're massively

17   parallel processing.  But any time one of the mega-things

18   gets pushed out, the case almost surely gets pushed out,

19   which is why we said that a further extension, we believe,

20   is highly likely to take tens of millions of dollars in

21   damage to the business and risk and cost and delay out of

22   the hands of the people that we're desperately trying to get

23   the money to as soon as we possibly can.

24        And so, I think at the end of the day, you know,

25   the layout of the parties is also not irrelevant, you know,

1    and Mr. Preis went into that in some detail.  And it's a

2    matter of counting heads and it's not a matter of saying,

3    you know, the two Chapter 11 fiduciaries are completely in

4    accord on the approach because obviously the states are

5    sovereign and their fiduciaries.

6           And, unfortunately, it's been the case at so many

7    hearings in this case, the dissenting states are on one side

8    and a great number of other ad hoc committees and

9    individuals and the Debtors and the UCC are on the other,

10   and that's their right and they are obviously the caring

11   fiduciaries for the citizens of their states.  But we also

12   have many people who separately speak for and legally

13   represent or purport to or allege to the individuals in the

14   state or the subdivisions within those states or the

15   hospitals within those states or the (indiscernible) within

16   those states.

17          And so, at the end of the day, you know, there's

18   no magic right answer, but it is a question of balancing

19   competing goods.  And the Debtors, joined by I think the

20   overall majority of organized parties in the case, very

21   strongly stick with the balance that they struck after

22   listening for weeks to all the parties and all their various

23   thoughts in the rather extraordinary step of seeking relief

24   from their own motion to extend what, as I said at the

25   outset, was I think already the touchiest, in terms of

Page 86

1    touching Americans in enormous numbers enormous number of

2    times, longest deepest and probably most expensive bar date

3    that any of us has ever seen, and we ask that the relief in

4    the form for which we have moved be granted.

5            THE COURT:  Okay.  All right, appreciate

6    everyone's input on this.  I have before me a motion by the

7    Debtors to extend the general bar date in this case from

8    June 30th to July 30th of this year, a 30-day extension.  It

9    was made in response to, first, a number of letters filed

10   starting in early May by individuals, as well as

11   organizations, that have a role in fighting the opioid

12   crisis in this country for an extension of the bar date in

13   light of COVID-19.

14           But it's also clear to me that the effect of

15   COVID-19 was being considered at the same time by the key

16   parties-in-interest in this case, including the Debtors

17   independently, the official unsecured creditors' committee

18   and various ad hoc committees, and that led to the Debtors'

19   motion.

20           It has elicited a remarkable range of responses.

21   I think, if one were counting heads, the general majority of

22   parties-in-interest in the case have agreed to the concept

23   of a 30-day extension, with the exception of the two groups

24   of states and, in terms of the consenting ad hoc committee,

25   other governmental entities which interestingly have taken

```
 1    diametrically opposite positions.  One group, the non-
 2    consenting states group has sought a 90-day extension;
 3    whereas, the so-called consenting ad hoc group has argued
 4    that there should be no extension.
 5            Frankly, I do not doubt the good faith and well-
 6    meaning nature of any of these responses.  I think people on
 7    this issue, as they have with other issues in this case,
 8    have taken their positions in good faith and sincerely, not
 9    with an ultimate strategic end that would harm the ultimate
10    claimants here, which are the parties that would be affected
11    by the bar date.
12            This is a highly unusual case.  There is no funded
13    debt.  All of the claimants here effectively are unsecured
14    creditors and all but a minute portion are claimants because
15    of either tort or other theories connected to opioids.  And
16    if one were to draw them diagrams, one could conclude, given
17    the presence of all but a couple of states who have already
18    settled prepetition their claims, that every citizen of
19    every state in the United States is a claimant in one way or
20    another, at least in terms of being represented by their
21    state Attorneys' General or state governments, and in
22    addition, multiple governmental entities below the state
23    level.
24            Nevertheless, it is critical here, as in every
25    case, to have finality as to the universe of claims so that
```

```
 1    the parties can be confident that a Chapter 11 plan that
 2    distributes the Debtors' value to claimants is doing so
 3    without risk of other claimants coming out of the woodwork
 4    and asserting claims separate and apart from the plan.
 5              In light of that fact and the unique circumstances
 6    of this case, i.e. the very broad number of claimants or
 7    potential claimants, the Debtors proposed, and the Court
 8    approved in early February of this year, an extraordinary
 9    bar date in terms of the number of days to assert a claim,
10    as well as an extraordinary notice program, which has a high
11    cost to it, over $23 million.
12              But all of the constituents active in these cases
13    believed then, and I think still believe now, that that cost
14    was warranted given the number of potential claimants, their
15    desire to see the types of claims asserted.  And the fact
16    that under the Supreme Court and Second Circuit case law on
17    notice, much of that notice -- most of that notice would
18    need to be not individualized because the Debtors do not
19    have readily ascertainable data to provide individual
20    notices.
21              And, in fact, one could argue that if that were
22    the case, you'd provide individual notices to every person
23    in the United States, but rather would need to provide, in
24    addition to the notice on people on their schedules and who
25    one would say are readily ascertainable claimants or
```

Page 89

1    potential claimants, one would need to provide extensive

2    public notice far beyond the normal notice in Chapter 11

3    cases through, generally speaking, limited print media.

4           The notice here is indeed extraordinary, as was

5    detailed on Page 8 of Ms. Finegan's declaration in support

6    of the original bar date motion and then in her supplemental

7    declaration from May 20th in support of the current motion,

8    the notice is not only in print media, but extensive

9    television and radio notice, community outreach, and -- and

10   I think this is perhaps going to be more of a trend but it's

11   a major element of the notice here -- online, social media,

12   out of home, i.e. billboards, and earned media, including

13   bloggers and creative messaging.  That was combined with a

14   simplified proof of claims form and the ability to file a

15   claim or first, get more information about filing a claim

16   online -- there was a specific claims website -- and to file

17   a claim either online or by mail.

18          Based on Ms. Finegan's supplemental declaration,

19   it appears clear to me that that process of providing notice

20   has been quite successful in its goal in ultimately reaching

21   roughly 95 percent of all adults in the United States over

22   the age of 18 with an average frequency of message exposure

23   of six times, as well as over 80 percent of all adults in

24   Canada with an average message exposure of over three times.

25          In addition, the bar date program provided

1    sufficient flexibility so that with the Covid pandemic, the

2    Debtors were able to switch out of certain types of

3    noticing, most specifically in movie theaters, into other

4    types of noticing, and to move their funds also to types of

5    media that, apparently in light of Covid, have gained

6    substantial viewership.

7            The Court recognizes, however, that there are two

8    steps in a proof of claim filing process: there is the

9    notice process, and then there's the process in filing a

10   proof of claim.  Here, the Debtors' program made filing a

11   proof of claim easy, more easy than in most cases.  It is a

12   myth, for example, that one needs detailed medical

13   information to file a claim in these cases.  There is also

14   no bar to filing a proof of claim in this case if you cannot

15   prove that you or your loved one was prescribed OxyContin or

16   some other opioid from Purdue; that would not be a perjured

17   proof of claim or a false proof of claim if you have a good

18   faith belief in such a claim.

19           It might ultimately turn out that the claim would

20   be disallowed because there might not be a legal basis for

21   the claim, but the notion that you must be prescribed and

22   show the prescription for one of the Debtors' opioid

23   products in order to file a claim is simply not true.

24           On the other hand, the Debtors have recognized

25   that there is cause to believe that because of the COVID-19

Page 91

1    pandemic and the requirement that individuals maintain

2    social distancing and, generally speaking, do not engage

3    with others unless in a necessary setting, that filing a

4    proof of claim might be somewhat more difficult and require

5    an extension of the bar date.

6         Many of the initial letters mentioned the fact

7    that the deadline for filing tax returns was extended 90

8    days from April, from mid-April to mid-July, for example.

9    The Debtors have proposed an extension to the end of July

10   for the bar date here, which would be in effect a six-month

11   notice period which, as the Debtors point out, is

12   extraordinary long in the context of any Chapter 11 case,

13   even one like this.

14        Based on the evidence before me, it is only the

15   perception that COVID-19 has upended peoples' lives that

16   would require any extension here, as opposed to what no one

17   has argued but what has been considered in other cases, some

18   problem in the notice program or some new discovery of

19   another claim group or something like that.  Frankly, the

20   only basis for the requested extension is simply a

21   perception.  There is no real evidence that the filing of

22   claims in these cases has, in fact, been materially affected

23   by the COVID-19 crisis.

24        That leads to what is the right extension.  And,

25   frankly, given the variation or variables in the parties'

1    views on this, I think counsel for the committee, Mr. Preis

2    -- or Mr. Preis, excuse me -- is right and also candid in

3    saying one doesn't have a necessarily correct legally right

4    answer here, but merely needs to do what one things makes

5    sense in light of all of the circumstances.

6         The Debtors basically give three reasons for an

7    extension not being more than 30 days.  First and

8    importantly, there is a cost to a longer extension.  Even a

9    30-day extension would have, as estimated, a $700,000 hard

10   cost; whereas, it is estimated that a 90-day extension would

11   have a $2.1 million hard cost.

12        Secondly, there are undoubted, I believe, and

13   greater than $2.1 million so-called soft costs in having a

14   lengthy beyond-30-day extension of the bar date.  Bankruptcy

15   cases often work on deadlines.  The bar date is a critical

16   deadline in a bankruptcy case.  Even though other matters

17   are continuing in this case on an active basis, including

18   plan mediation and discovery related to analysis of a plan

19   that would contain within it potential releases for third

20   parties, the delay of a bar date inevitably has some adverse

21   effect on getting this case over with promptly.

22        And arguing for a longer date, frankly, I think

23   the argument comes down to there's no real harm in having a

24   longer date, and a longer date would leave no question as to

25   whether there's a legitimate excuse for not filing a proof

Page 93

1    of claim by, at this point, July 30th if the Debtors' motion

2    were granted, as opposed to two months later, September

3    30th.

4            As far as the cost benefit analysis, it has been

5    argued that that longer period would provide some more

6    fairness to people and present litigation over extensions of

7    the bar date under Rule 9006 and the Supreme Court's Pioneer

8    case, litigation over which might actually add cost to the

9    estate.  On the other hand, it is my experience that if

10   someone can show a good reason for an extension -- and in

11   this case, it would be I think if they actually had COVID-

12   19, were hospitalized and basically for the period at issue

13   unable to function reasonably -- the bar date would be

14   voluntarily extended and the Court would agree with that.

15   But I agree with the committee's analysis that a more

16   complicated set of rules for extensions would be unworkable.

17           In light of all of the arguments that were made

18   and my analysis here, I conclude that the bar date should be

19   extended the 30 days that the Debtors have requested, that

20   the committee has agreed with, and that most of the parties

21   that have taken a position here have agreed with.

22           Again, it is highly unusual to extend a bar date.

23   I don't believe the extension is warranted based on any

24   deficiencies in the notice program, and I believe that an

25   extension of two weeks beyond the date for the extension on

Page 94

1    filing taxes is weighing all the factors here appropriate,

2    so I will grant the Debtors motion in that regard.

3              I want to say one thing further about timing.

4    We're in the ninth month of this case.  In some ways, this

5    motion is a microcosm of the case as a whole.  It has

6    elicited strong views from multiple parties, views that,

7    again, I believe are taken in good faith and not to foster

8    any specifically parochial agenda.  Nevertheless, the

9    parties were not able to reach agreement on something as

10   simple as an extension of the bar date.

11             I began by saying how unusual this case is.  What

12   I did not state then and what I want to make perfectly clear

13   to everyone now, although I believe everyone knows it, is

14   that what is most unusual about this case is that there is

15   ongoing harm, not I hope harm being caused but harm being

16   suffered by individuals, individual people, as well as the

17   governments that serve them.  The parties in this case need

18   to realize that the result in this case cannot be exactly

19   what they want; perfection is not achievable here, and an

20   effort to achieve perfection will leave the people who are

21   suffering at greater harm.  The parties here need to

22   understand that where there's a public health crisis, as

23   Covid has brought home, many views need to be taken into

24   account.  There is no one perfect treatment.

25             I want this case to move, and I will make it move

1  if the parties don't start accommodating each other.  And

2  one way to do that is to tell the Debtors we don't need

3  consensus on everything.  You have an active, well-informed

4  and diligent official creditors committee that represents

5  everyone.

6           The Debtors themselves, as far as I can see in

7  this case, have been acting as good appropriate fiduciaries.

8  If people cannot see other peoples' points of view and some

9  consensus can be built, we need to move ahead.  So I fully

10  understand Mr. Huebner's point that we cannot set a date for

11  a plan here.  But if I hear a month or two from now that

12  people cannot set aside their views as to what is the

13  perfect use for the money that is available here and agree

14  to share on how that is to be used, I will be taking steps

15  to move the case along separately, and it's shame on us if

16  we don't do that.  This is flesh and blood.

17           Secondly, if there is an expectation here of a

18  plan that will have, in return for a contribution, releases.

19  When I say discovery should be X and I say it in a way to

20  avoid further litigation over discovery, then everyone

21  should understand it should be X and not Y.

22           Now I appreciate that I got the letter from the

23  creditors' committee yesterday and the Sacklers and others

24  should have time to respond and they can respond by Friday,

25  I think you all know why I am extremely disappointed by what

Page 96

1    I read in that letter.  So unless it's not true, I will be

2    issuing orders.

3            I want the firm, if we're to have a conference, I

4    want Dentons on the phone and I want the new firm on the

5    phone and they will be accountable, as will anyone who has

6    been instructing them to do something other than I

7    instructed to be done last May, the beginning of May.  Hedge

8    funds may play games like this -- and, frankly, although

9    it's important to a company and the people it employs to

10   come out of bankruptcy, I will give hedge funds some time to

11   shoot themselves in the foot.  State Attorneys' General and

12   governments shouldn't be doing that, nor should the

13   Sacklers.

14           You must be thinking practically here to get this

15   company out of bankruptcy and devoting its money to the

16   Debtors, so enough said on that topic.  I'll be looking for

17   the order from the Debtors on the motion that was on for

18   today.

19           MR. HUEBNER:  Thank you, Your Honor.

20

21               (Whereupon these proceedings were concluded

22                at 12:28 PM)

23

24

25

Page 97

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing
transcript is a true and accurate record of the proceedings.

# Sonya Ledanski Hyde

Digitally signed by Sonya Ledanski Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital@veritext.com, c=US
Date: 2021.07.16 09:07:22 -04'00'

Sonya Ledanski Hyde

Veritext Legal Solutions

330 Old Country Road

Suite 300

Mineola, NY 11501

Date:  June 4, 2020

[& - 60]

| | | | |
|---|---|---|---|
| **&** | **1174** 6:11 7:4 | 86:13,15 90:25 | 59:10 62:25 63:8 |
| **&** 8:3,19 9:8 10:1 | **1177** 14:13 | 91:15,23 93:12 | 63:21 69:25 70:4 |
| 10:8,15 11:8,20 | **1178** 2:7,11,14,19 | **19-23649** 1:3 | 75:8,25 76:8 |
| 12:19 61:12 63:17 | 3:2,20 4:5 6:22 | **1a** 20:3,3 | 77:11 79:13 80:1 |
| **1** | 7:9,18 | **1b** 20:8 | 84:5 86:8,23 92:7 |
| | **1179** 3:3 30:8 | **1d** 19:18 | 92:9,14 93:19 |
| **1** 11:22 19:21 | **1185** 7:2 | **1st** 49:1,9 54:11 | **300** 1:13 82:21 |
| **1.4** 37:22 | **1187** 2:11 3:7,13 | 67:8 68:12,14,16 | 97:22 |
| **10-15** 82:22 | **1189** 3:14 | 68:17 | **3003** 2:4 |
| **10001** 13:4 | **1196** 3:20 6:16 | **2** | **30th** 4:19 6:3 |
| **10003** 9:11 | **1197** 2:16 | | 31:16 40:6 73:8 |
| **10007** 8:15 | **1198** 4:7 6:23 | **2** 54:23 | 78:22 86:8,8 93:1 |
| **10017** 8:6 14:4 | **1199** 7:5 | **2,000** 62:20 | 93:3 |
| **10019** 9:4 10:18 | **120** 59:20 67:8 | **2.1** 79:15 92:11,13 | **31** 9:3 |
| **10020** 8:22 | **1200** 7:11 | **20** 53:15 | **32** 67:23 |
| **10022** 10:11 11:11 | **1202** 2:21 7:21 | **20005** 10:4 11:23 | **330** 97:21 |
| **10036** 11:4 12:4 | **1213** 4:10 61:17 | **2002** 2:4 | **35** 36:20,20 |
| 13:13 14:14 | **1214** 2:23 | **200363** 12:12 | **3rd** 39:17 46:15 |
| **104,755** 48:7 | **1216** 4:12 | **2004** 58:19 | 49:20 |
| **105** 2:3 | **1219** 2:1 | **2008** 19:21 | **4** |
| **10601** 1:14 | **1221** 8:21 | **2015** 45:8 | |
| **107** 10:17 | **1250** 12:11 | **2019** 4:23 | **4** 97:25 |
| **10:03** 1:17 | **126** 9:17 | **2020** 1:16 5:7,12 | **40,000** 63:7 |
| **11** 2:3 33:16 38:14 | **12:28** 96:22 | 5:14 73:18 97:25 | **401** 19:19 |
| 39:6 43:25 71:20 | **12th** 78:17 | **20th** 10:10 30:8 | **44** 45:8 |
| 85:3 88:1 89:2 | **15** 36:17 69:25 | 30:24 89:7 | **45** 45:9 69:25 80:1 |
| 91:12 | 84:5 | **23** 62:14 72:9 | 80:6,10 84:6 |
| **1100** 10:3 | **1500** 62:23 | 77:20 88:11 | **450** 8:5 |
| **1120** 12:3 | **151** 11:3 | **24** 9:10 | **46th** 11:3 |
| **1133** 4:15,20 5:3,8 | **15th** 40:6 | **248** 1:13 | **485** 10:10 14:3 |
| 5:14 6:3,11 7:4 | **16th** 20:1 | **25** 53:15 62:16 | **4th** 12:3 |
| **1141** 4:20 7:4 | **178** 29:22 36:24 | **27th** 57:20 | **5** |
| **1142** 4:25 7:4 | **1788** 3:8 | **280** 4:24 | |
| **1145** 5:4 7:4 | **18** 89:22 | **28th** 52:20,21 | **5/6/20** 4:18 6:2 |
| **1149** 5:9 7:3 | **180** 59:20 | **299** 12:21 | **50** 79:9 83:12 |
| **11501** 97:23 | **19** 26:21 27:21,25 | **3** | **501** 2:3 |
| **1153** 5:15 7:3 | 32:16 33:8 36:12 | | **52nd** 9:3 |
| **1157** 5:20 7:3 | 36:15,18 37:3 | **3** 1:16 2:4 41:5 | **55** 13:3 |
| **11570** 13:21 | 41:22 45:23 46:13 | 52:6 | **6** |
| **1158** 5:25 7:3 | 47:24 48:4,5,8 | **30** 5:7,14 18:18 | |
| **1160** 6:4 7:4 | 49:6 64:12,16,18 | 23:4,20 25:13 | **6** 5:12 40:5 |
| **1168** 6:7 | 64:25 65:8,14 | 27:1,3,12,24 28:4 | **60** 62:24 69:25 |
| **1173** 2:19 4:5 6:22 | 68:7 69:4 71:6,14 | 28:6 29:21 32:5 | 75:8 77:1 80:1 |
| 7:3,15,18 | | 36:6,8 46:2 52:8 | 84:6 |
| | | 54:11 55:7,13 | |

19-23649-rdd Doc 352-4 Filed 07/16/21 Entered 07/16/21 15:12:43 Main Document
Case 7:21-cv-03932-CM Document 15-2 Filed 07/27/21 Page 102 of 912

Pg 99 of 125

**[60602 - agreed]**                                                                Page 2

| | | | |
|---|---|---|---|
| **60602** 12:23 | **absence** 74:22 | **acting** 95:7 | **adequate** 28:9 |
| **66** 13:20 | **absolute** 37:11 | **action** 79:8 | 44:25 75:17 |
| **7** | **absolutely** 39:19 | **active** 88:12 92:17 | **adjudicate** 69:10 |
| **7** 40:5 | 39:20 66:15 | 95:3 | **adjusted** 36:14,18 |
| **70** 12:22 | **access** 37:6 68:7 | **activity** 71:9 | **administer** 69:14 |
| **700,000** 29:10 | 81:4 | **actual** 33:5 43:23 | **administrative** |
| 37:23 79:14 92:9 | **accessed** 58:17 | 44:7 | 26:16 |
| **75** 48:8 | **accommodate** | **actuality** 55:10 | **administrator** |
| **8** | 75:23 | **ad** 2:9,15,18,20 | 69:10 |
| **8** 89:5 | **accommodating** | 3:5,8,10,13 4:1,6 | **admission** 24:18 |
| **80** 44:16 89:23 | 19:8 95:1 | 6:18 7:15,17,19 | **admit** 31:14 55:14 |
| **80,000** 48:8 | **accommodation** | 8:20 9:2,9 10:16 | 55:18 |
| **86** 8:14 | 32:15 | 11:2 13:19 14:10 | **admitted** 31:20,22 |
| **888** 10:17 | **accommodations** | 24:7,13 25:15,15 | **admittedly** 50:3 |
| **8th** 10:17 | 47:1 | 25:19 26:23 27:2 | **ads** 36:22 78:15 |
| **9** | **accomplished** | 27:4,10 30:11 | 78:16 83:1 |
| **90** 23:6,20 27:1,7 | 80:7 | 31:25 32:7,23 | **adult** 44:15,16 |
| 33:11 37:21 38:9 | **accord** 85:4 | 38:5 42:7,23 | **adults** 89:21,23 |
| 53:7 55:7,14 59:9 | **account** 28:20 | 44:12 49:22 57:1 | **advance** 37:9 |
| 59:19 60:2,18 | 48:23 94:24 | 57:10 62:6,13,15 | **advanced** 70:8 |
| 62:17 63:2,4 | **accountability** | 63:3,5,10,10,19 | **adverse** 92:20 |
| 69:25 71:10 75:8 | 2:10 3:8,14 9:9 | 63:24 64:14 66:16 | **adversely** 55:6 |
| 79:15 80:2 84:6 | 13:19 30:12 38:6 | 66:23 70:13 71:2 | 64:25 |
| 87:2 91:7 92:10 | 42:7,16,23 44:20 | 71:5,8,14 74:10 | **advertisement** |
| **9006** 33:2 34:13 | 57:1,10,14 63:3 | 79:1 80:18,24 | 35:15 36:1 |
| 93:7 | 80:19,24 | 85:8 86:18,24 | **advocate** 22:2 |
| **90292** 9:18 | **accountability's** | 87:3 | **affect** 62:1 |
| **919** 11:10 | 3:11 | **adam** 16:19 | **affidavit** 69:5 |
| **95** 44:14 82:20 | **accountable** 96:5 | **add** 93:8 | **affirm** 33:5 |
| 89:21 | **accurate** 43:16 | **addition** 4:22 29:9 | **age** 89:22 |
| **97** 19:12 21:19 | 97:4 | 63:22 81:10 87:22 | **agenda** 2:1 18:16 |
| **a** | **accurately** 53:8 | 88:24 89:25 | 21:10,22,25 60:18 |
| **aaronson** 14:1 | **accusations** 81:9 | **additional** 37:22 | 94:8 |
| **abandon** 69:15 | **achievable** 94:19 | 40:18 48:17 73:22 | **agent** 28:8 |
| **abandoning** 54:7 | **achieve** 94:20 | 75:10,23 80:20 | **ago** 67:23 82:22 |
| **abide** 35:16 | **achieved** 56:3 | **address** 43:15 | **agostino** 16:8 |
| **ability** 28:23 47:8 | **achieving** 75:14 | 53:10 55:23 70:23 | **agree** 27:2 32:6 |
| 47:20 49:12 56:6 | **acknowledge** 47:1 | 82:25 | 34:21 51:23 52:19 |
| 75:18 89:14 | 47:23 82:2 | **addressed** 60:8 | 52:21 93:14,15 |
| **able** 31:11 54:14 | **acknowledged** | 68:22 | 95:13 |
| 61:3 74:20 78:9 | 46:22 | **addressing** 26:7 | **agreed** 68:15 |
| 90:2 94:9 | **acknowledging** | 42:7 | 86:22 93:20,21 |
| | 44:7 | | |

[agreeing - available]                                                Page 3

agreeing 67:4
68:1
agreement 20:11
57:18 80:18,25
81:6,11,20 94:9
ahca 42:23
ahead 31:22 57:8
70:16 80:15 95:9
air 36:18
aisha 12:16
akin 13:9 61:12
al 7:11 9:16 18:3
albeit 38:12
alex 13:6
alexander 9:16
15:19
alfano 14:21
alix 15:20
allege 85:13
allocation 53:11
allowed 28:16
allowing 61:14
alluded 54:5,8
67:16
alongside 39:4
alternative 38:10
43:4
amended 2:1
18:15
american 63:22
americans 86:1
americas 8:21
12:3 14:13
amount 27:24
43:7 64:2 65:25
66:11,18 73:7,24
77:24 78:21
amounts 82:15
analogous 21:4
analysis 47:15
92:18 93:4,15,18
analyze 54:13

andrew 2:14,16
7:14 9:6 14:21
30:18 46:6 60:21
anecdotal 50:4
anne 9:16
ans 63:10
answer 31:11,12
37:18 41:10 51:17
51:19 70:6,7,10
74:24 85:18 92:4
answered 66:1
anticipate 51:5
anticipated 41:1,4
41:10 51:22 53:20
65:25 66:18
anybody 21:7
22:21 68:15 73:17
anyone's 20:19
apart 88:4
apologies 31:7
apologize 40:3
apology 31:4
apparently 90:5
appear 51:20 62:1
64:22
appearing 14:18
appears 64:14
89:19
applicable 66:22
application 54:24
applied 45:17
76:18
applies 35:16
apply 50:9
applying 33:21
75:20 83:4
appreciate 25:8
36:12 41:5 51:25
52:5 71:7 72:19
73:19 76:11 86:5
95:22
appreciated 25:6
34:21 73:9

approach 36:25
69:2 85:4
approaching
52:13
appropriate
21:11 24:11 29:20
33:4 40:7 57:5
69:24 70:7,15
74:4 76:7 77:6
94:1 95:7
appropriately
60:8
approved 35:12
72:6 88:8
approving 2:6
3:19 6:16
approximately
77:1
april 91:8,8
archer 15:11
aren't 52:15
argue 64:21 67:2
88:21
argued 38:16
64:16 87:3 91:17
93:5
argues 38:16
arguing 37:20
49:21 62:14,17,24
63:2,4 70:2 92:22
argument 26:6
28:8 42:21 53:3
65:10 67:5 68:19
92:23
arguments 49:24
64:7 68:25 76:22
80:24 84:3 93:17
arik 13:16 61:11
arisen 67:22
arrange 18:14
artem 15:12
ascertainable
44:3 45:4 88:19

88:25
aside 55:9 83:18
95:12
asked 49:25 51:11
65:23
asking 45:18 53:5
58:23 60:7 68:12
aspire 73:16
aspiring 73:18
assert 42:18 54:20
54:21 83:25 88:9
asserted 88:15
asserting 33:18
60:15 88:4
assertions 29:3
42:8
associated 12:2
40:22
association 63:18
assumption 34:16
assumptions
66:10
assure 34:18
66:14
assured 77:14
assuredly 21:20
attempting 43:14
attention 19:15
20:19 67:20
attorney 8:13,20
9:9,16 10:9,16
11:2,21 12:2,10
12:20 13:2,10,19
14:2,10 37:15
57:18
attorneys 8:4 9:2
10:2 11:9 75:4
87:21 96:11
august 40:6 68:14
authorized 18:10
53:17
available 28:16
74:1 76:8 81:15

[available - budgets]                                                   Page 4

95:13
avenue  8:5,21
  10:10,17 11:10
  12:3,11 13:20
  14:3,13
average  44:15,17
  89:22,24
avoid  95:20
aware  19:6 32:19
  40:15 45:23 51:15
  67:19 71:14
awareness  78:14
axiomatic  72:21

**b**

b  1:21
back  31:12 41:6
  49:13 52:25 60:19
  82:19
balance  41:21,24
  70:7 72:23 74:13
  77:6 82:4 85:21
balances  72:1
balancing  71:19
  85:18
ball  11:13
balls  39:16
bankr  2:4
bankruptcy  1:1
  1:12,23 26:16
  29:12,18,19,24
  33:2 34:13 39:4
  45:8 58:25 92:14
  92:16 96:10,15
banner  79:1
bar  2:5,11,18 3:6
  3:12,18 4:3,4,14
  5:13,17,22 6:6,15
  6:20,21 7:2,8,14
  7:18 18:18 24:10
  25:5,13,24 26:25
  27:6,15,25 28:22
  29:8,18,22,23
  30:5 31:16,19

32:3,5,11,17,20
33:1,7,11,15,21
33:22,24 34:4
35:25,25 36:8,23
37:9,21 38:17
40:17,22 41:8
42:1 46:1,14,21
47:6,8,17 50:5
52:7,9,22 53:6,24
55:21 56:1,2,24
58:13 59:16 64:13
65:1 67:7,11,14
68:19 70:21 72:5
72:6,7,10,13,16
72:25 74:18 75:2
75:16,25 76:4,6
77:20 82:9,11,21
83:9,10,17 84:11
86:2,7,12 87:11
88:9 89:6,25
90:14 91:5,10
92:14,15,20 93:7
93:13,18,22 94:10
barbara  5:8 6:7
  16:2
barely  83:12
barker  16:12
barred  32:22
based  42:17 43:3
  43:25 48:21 67:22
  68:10 70:1 81:14
  89:18 91:14 93:23
baseline  28:18
basic  75:6
basically  92:6
  93:12
basis  18:13 24:15
  33:2 35:10 70:21
  79:19 80:2,4
  81:13 82:9 90:20
  91:20 92:17
baum  9:8 57:11

beacon  11:9
bear  46:17
bearing  41:15
began  67:6,7
  94:11
beginning  40:9
  61:7 96:7
behalf  2:7,15,20
  3:2,8,13 4:6 6:7
  7:5,10,14,19
  24:22,23 57:10
  61:12 70:13
belief  90:18
believe  18:7 19:22
  21:5 23:1 24:4
  25:8,17 26:25
  27:6,16 32:4 33:6
  33:9 37:16 38:2
  43:3,11,12 44:19
  49:1 56:25 57:1,5
  57:24 59:10 60:23
  62:15,20 65:24
  68:21 70:19 71:1
  71:13 72:5 73:14
  74:17 75:15,16,17
  75:24 76:7 79:5,9
  80:19 81:12 84:19
  88:13 90:25 92:12
  93:23,24 94:7,13
believed  88:13
believes  76:3,10
  83:16
benefit  93:4
benefits  56:2
  59:10
benjamin  8:9
bensinger  10:15
best  43:10 65:3
  66:24
better  23:8 56:3
  61:5 62:9 74:23
beyond  45:9 55:4
  78:23 79:2 89:2

92:14 93:25
bickford  16:20
billboard  35:15
  36:1
billboards  89:12
billing  58:3
binary  82:4
birnbaum  15:1,4
bisch  5:4 16:4
bismuth  17:2
bit  62:9
blog  36:2
bloggers  89:13
blood  95:16
blue  63:17,17
board  12:20
boca  63:15
books  44:6,22
  45:3,10
boots  36:25
bottom  21:19
braunfeld  12:1
breadth  46:24
  47:13,15
brevity  21:11
brief  19:11 26:1,6
  76:18 81:24
briefly  42:7 70:22
  76:16,25 80:15,16
briefs  7:8
bring  19:14 23:21
bringing  52:18
brink  22:10
broad  72:7,9 88:6
brooks  16:12
brought  67:20
  94:23
brozman  15:20
bryant  13:12
budget  78:12
budgeted  77:20
budgets  47:25

**[built - claimants]** Page 5

| | | | |
|---|---|---|---|
| **built** 95:9 | 56:7 57:11 58:10 | **centre** 13:21 | **circumstance** |
| **bunch** 23:7 40:9 | 59:22,23,25 60:4 | **certain** 37:25 | 53:17 |
| **burden** 26:16 | 60:20 61:23 62:8 | 45:15 49:1 65:4 | **circumstances** |
| **burdened** 19:7 | 62:10,12 63:6 | 68:17 73:5 90:2 | 19:4 32:14 33:6 |
| **business** 39:24 | 64:9 69:20 70:9 | **certainly** 40:10 | 45:1,21 46:22,23 |
| 84:21 | 70:21 71:10,13,20 | 57:4 72:11 79:19 | 47:19 49:16 55:11 |
| **c** | 72:7,10,11,14,16 | 80:7 | 69:20 75:20 88:5 |
| **c** 2:4 3:1 8:1 10:17 | 72:21 73:4,11,16 | **certainty** 39:25 | 92:5 |
| 18:1 30:2 97:1,1 | 73:22,23 74:5,15 | **certified** 97:3 | **cities** 48:15 62:20 |
| **ca** 9:18 | 74:21,24 75:10,17 | **challenges** 71:6 | 71:4 |
| **calculate** 79:21 | 75:24 76:5,8 77:9 | 71:11,14,19 74:13 | **citizen** 87:18 |
| **calendars** 39:2 | 80:5 81:3 83:22 | **chambers** 8:14 | **citizens** 85:11 |
| **calhoun** 14:25 | 83:25 84:11,15,18 | **change** 31:2,5 | **city** 12:20 |
| 15:3 | 85:6,7,20 86:7,16 | 81:7 | **claim** 5:17,22 6:6 |
| **california** 45:13 | 86:22 87:7,12,25 | **changed** 53:17 | 27:20 28:17 32:10 |
| **call** 19:18 21:24 | 88:6,16,22 90:14 | 55:11 | 32:21,21 34:4,11 |
| 68:14,18 | 91:12 92:16,17,21 | **changes** 35:12 | 34:19 35:4,9,22 |
| **called** 20:13 57:1 | 93:8,11 94:4,5,11 | **chapter** 33:16 | 36:2 37:4,6,14,15 |
| 87:3 92:13 | 94:14,17,18,25 | 38:14 39:6 43:25 | 37:16,19 48:21 |
| **campaign** 59:9 | 95:7,15 | 71:20 85:3 88:1 | 50:1 54:2 55:20 |
| **canada** 89:24 | **cases** 25:10 26:12 | 89:2 91:12 | 58:14 59:1,14,16 |
| **canadian** 44:16 | 26:14 28:4 29:15 | **charged** 54:23 | 59:17,21 64:20 |
| **candid** 92:2 | 29:24 33:16 38:1 | **charlotte** 17:2 | 65:2,15,16 69:4,5 |
| **canonized** 82:13 | 39:15 42:17 43:25 | **chart** 23:15 61:19 | 72:16 75:7 81:14 |
| **can't** 48:18 50:22 | 44:11,19 45:2,16 | 62:3 | 83:25 88:9 89:15 |
| 50:22,23 51:2 | 47:11 61:15,24 | **cheeky** 23:18 | 89:15,17 90:8,10 |
| **caplin** 10:1 11:20 | 63:12 73:5 82:17 | **chicago** 12:20,23 | 90:11,13,14,17,17 |
| **care** 48:1 | 88:12 89:3 90:11 | **chief** 23:13 | 90:18,19,21,23 |
| **carefully** 34:6 | 90:13 91:17,22 | **child** 63:16,17 | 91:4,19 93:1 |
| 77:3 | 92:15 | **children** 66:22 | **claimant** 35:13 |
| **caring** 85:10 | **cash** 19:25 20:4,9 | **chooses** 58:19 | 44:21 58:10 61:25 |
| **caroline** 15:24 | **catrina** 16:5 | **christian** 15:16 | 63:13 64:3,4 |
| **case** 1:3 8:19 | **cause** 29:8 32:5 | **christopher** 4:6 | 68:21 87:19 |
| 18:18 19:11 20:25 | 36:9 43:25 47:6 | 6:23 8:24 | **claimants** 2:21 |
| 23:1 29:22 33:16 | 47:17 70:20 72:4 | **chu** 16:9 | 7:20 10:9 14:12 |
| 33:19,23 34:10,13 | 74:22,23 75:8,15 | **chutchian** 16:25 | 25:25 26:24 27:13 |
| 34:19 38:22 39:3 | 84:5 90:25 | **circle** 10:3 11:22 | 27:18 28:10,16 |
| 39:14,18,23 40:16 | **caused** 94:15 | 20:8 | 29:7,16,20 32:9 |
| 40:19 43:4 44:23 | **causes** 72:20 | **circuit** 33:20 | 32:12,19 33:1,4 |
| 44:24,24 45:2,5 | **cede** 46:3 57:4 | 47:10 55:24 88:16 | 35:2 37:13,14 |
| 45:11 48:3,24 | **ceding** 42:6 | **circulation** 35:6 | 40:23 42:11,25 |
| 49:13 50:4 53:7 | **center** 63:16 | **circumscribed** | 43:11,12 44:2,4,9 |
| 54:4,21 55:6,15 | | 47:9 | 45:16 62:8 65:12 |

65:24 66:11,11,17
81:3 83:24 87:10
87:13,14 88:2,3,6
88:7,14,25 89:1
**claims** 4:19 5:3,8
5:17,19,22,23 6:2
6:6,10 28:12,24
28:25 29:1,4,17
32:17 33:2,18
34:23 37:2,17
40:18,21 41:1,2,6
41:10,16 42:1,15
42:17 43:13 50:6
51:3,4,20 52:6,8
52:15 54:20 55:15
55:17,21,24 56:10
59:19 65:25 66:9
66:12,18 67:10,12
67:18 69:10 73:2
73:7,9 74:6 75:5
81:9,12 83:16
87:18,25 88:4,15
89:14,16 91:22
**clark** 15:21
**class** 10:9 59:18
**claudia** 16:17
**clear** 26:24 27:23
32:4 33:14 34:11
44:1 50:15,19
55:11 78:5,6
84:14 86:14 89:19
94:12
**clearer** 52:20
**clearly** 18:22
39:11 47:4 71:17
**clerk** 22:20 25:1
30:4 36:18 44:10
50:3 65:23 66:8
**clerk's** 18:12,14
**client** 18:5
**close** 82:19
**closed** 48:16

**closures** 36:22
**code** 29:19
**cohen** 12:1
**coleman** 15:5
**colleagues** 25:3
**collectively** 75:13
**color** 36:23
**combat** 48:13
**combined** 82:9
89:13
**come** 18:6 20:18
31:11 43:21 48:20
49:13 52:25 53:25
96:10
**comes** 55:24 82:7
92:23
**comfortable** 72:18
**coming** 50:1 73:2
78:17 88:3
**commend** 52:18
**comments** 68:23
70:23,25
**commercials** 36:18
**commit** 75:13
**commitment** 21:8
**committed** 78:13
**committee** 2:9,20
3:8,11,14 4:9 7:7
7:10,19 9:9 13:10
13:19 14:10 23:14
24:7,14 25:14,18
26:23 27:2,9
30:11 38:5 42:7
42:23 44:12,20
49:22 57:1,10
61:7,13 62:11
63:14,15,15 70:14
71:2,5,8,15 74:10
80:19,24 83:21,23
86:17,24 92:1
93:20 95:4,23

**committee's** 2:18
3:5 7:17 93:15
**committees** 57:12
83:21 85:8 86:18
**communications** 25:22
**community** 89:9
**companies** 12:2
20:7
**company** 11:9
39:6 57:16,17,21
96:9,15
**comparison** 60:5
**compelled** 54:18
**compelling** 64:15
73:1
**competing** 68:24
69:17 74:1 82:3
85:19
**completely** 18:4
34:21 74:10 85:3
**completing** 32:16
**complexities** 21:18
**complexity** 73:11
**compliance** 33:22
**complicated** 22:1
22:19 39:3,3
93:16
**complied** 34:1,8
**comply** 33:7
**component** 29:1
**comprehensive** 72:7 75:2
**comprised** 62:23
**compulsory** 54:18
**computer** 83:11
**concept** 86:22
**concerned** 22:6
**concerning** 80:25
**concerted** 22:4
**conclude** 75:1
87:16 93:18

**concluded** 35:7
53:21,25 54:10
77:5 78:19 96:21
**concluding** 67:24
**conclusion** 75:24
76:2
**conclusive** 52:12
**conduct** 29:10
**confer** 68:8
**conference** 96:3
**confident** 88:1
**confirm** 22:17
53:12 54:13
**confirmation** 55:3
**confirmed** 54:16
**conflicting** 26:23
**confronting** 71:11
74:11
**connected** 87:15
**connecticut** 12:11
**connection** 25:4
30:5 32:2 46:20
46:21 48:24
**connectivity** 20:5
**consensual** 54:7
59:24 68:3
**consensus** 95:3,9
**consent** 38:25
84:8
**consenting** 2:13
2:15 7:15 9:2
22:12 24:14 27:5
30:10,19 36:5,6
36:10 37:8,24
38:3 46:7 47:22
48:5,9 60:22
62:14,15,21 63:24
64:22 67:25 70:14
71:2,15 77:8
86:24 87:2,3
**consider** 64:6
**considerable** 28:1

**consideration**
26:18 33:4 45:24
76:12
**considerations**
28:20
**considered** 28:7
43:10 55:5 69:19
72:2 77:3 86:15
91:17
**considering** 33:10
42:13 81:13
**consistent** 33:15
68:21
**conspiracy** 81:10
**constantine** 10:13
**constituencies**
26:22 28:21 44:11
45:25 71:22
**constituency** 74:5
**constituents**
88:12
**construct** 59:8
**constructive** 71:9
**constructively**
74:15
**construe** 35:25
**consulting** 44:10
**consuming** 69:13
**contact** 18:14
42:24 45:14 81:3
**contacted** 61:4
**contain** 92:19
**contained** 45:15
**contemplated**
21:2 56:12
**contemplating**
77:25
**contention** 40:25
**context** 33:10
40:19 82:8,8
91:12
**contingent** 2:21
7:20 14:11 26:24

**continue** 22:6
25:10 56:11 73:12
75:12
**continued** 56:21
73:15
**continuing** 92:17
**continuous** 79:6
**continuously**
79:10
**contract** 81:5
**contracts** 79:18
**contractual** 20:10
**contractually**
78:13
**contrary** 75:9
83:14
**contrast** 55:9
**contribution**
95:18
**control** 33:22 55:4
58:17
**cooper** 12:1
**core** 22:9
**corp** 45:8
**corporate** 19:23
**correct** 68:5 77:6
77:11 79:24 92:3
**correctly** 36:10
79:5
**cost** 29:5,10,13
39:25 41:24 42:13
43:4 69:12 71:22
79:14,15,16 80:9
82:5 84:12,21
88:11,13 92:8,10
92:11 93:4,8
**costing** 75:11
**costly** 43:24
**costs** 29:12 37:23
37:25 55:11,12
92:13
**counsel** 18:19
25:22 30:9,10,11

54:23 56:25 57:3
57:3 68:9 76:25
92:1
**counterproducti...**
39:14
**counties** 62:20
71:4
**counting** 85:2
86:21
**country** 48:16
75:21 77:2 82:21
86:12 97:21
**county** 62:17
**couple** 19:15
80:20 84:6 87:17
**course** 24:9 31:15
38:9 43:8 52:5
79:7
**court** 1:1,12 18:2
18:7,11,11,23,25
19:4,7,14 20:1,24
21:17 22:8,24
24:1,2,4,20,24
25:12 26:9 28:10
28:23 29:20 30:16
30:21 31:5,9
33:13 34:12,25
35:7 38:7 40:13
40:14 42:4,9,10
44:13 45:9,20,25
46:5,9 47:10,16
49:9 50:10,13,16
50:18,25 51:2,8
51:11,14,16,25
52:2,4 53:1,18,20
56:16,19 57:6,8
57:20 60:9 61:2,4
61:10,18 70:11
72:6 73:21 75:1
75:17 76:3,5,6,10
76:13,16,20 77:13
77:18 78:20 79:12
79:22,25 80:8,11

80:14,22 81:23
86:5 88:7,16 90:7
93:14
**court's** 75:25 93:7
**courts** 33:17 34:5
34:6 35:24
**court's** 25:9 34:21
**covered** 20:4
76:23
**covering** 19:21
**covers** 18:16
19:22 20:14
**covid** 26:21 27:21
27:25 32:16 33:8
36:12,15,18 37:3
41:22 45:23 46:13
47:24 48:4,5,8
49:6 64:12,16,18
64:25 65:8,14
68:7 69:4 71:6,14
77:3 86:13,15
90:1,5,25 91:15
91:23 93:11 94:23
**creadore** 14:20
**create** 75:10
**created** 42:19
**creating** 58:2
73:22
**creation** 58:2
**creative** 89:13
**credible** 28:8
**creditor** 28:21
45:25 59:5,20
64:8
**creditors** 7:7,10
13:11 20:20 25:14
25:18 27:4,10
44:11 53:14 59:12
59:18,25 60:2,8
61:7,13 62:11
63:14,14 82:25
83:23,24 86:17
87:14 95:4,23

A.403

[crisis - defense]                                                                    Page 8

**crisis** 71:6,16,16
71:19,25 77:3
86:12 91:23 94:22
**critical** 49:12 74:7
87:24 92:15
**crockett** 15:7
**cross** 22:18,24
63:17 66:4
**cullen** 4:15 5:12
15:22
**cullen's** 6:9
**cullens** 4:17 5:1,6
5:18 6:1
**current** 21:18
41:8 47:19 89:7
**currently** 52:7
78:13
**custody** 58:16
**cynthia** 5:15
16:18
**cyrus** 12:14

**d**

**d** 1:22 16:15 18:1
**d.c.** 48:14 62:17
**daily** 18:13
**damage** 84:21
**dan** 5:19
**daniel** 11:17
**danielle** 14:19
15:8
**dashboard** 30:23
**data** 41:6 88:19
**database** 58:15
**date** 2:5,11,19 3:7
3:12,18 4:3,5,14
5:13,17,22 6:6,15
6:20,22 7:2,9,14
7:18 18:18 19:22
20:2 24:10 25:5
25:13,24 26:25
27:6,15,25 28:22
29:8,18,22,23
30:6 31:16,19

32:3,5,11,17,20
32:21 33:1,7,11
33:15,21,22,24
34:4 35:3,25,25
36:8,24 37:10,21
38:17 40:17,22
41:8,11 42:2 46:1
46:14,21 47:6,8
47:17 50:5 51:4
51:21,22 52:7,9
52:22 53:7,24
55:21 56:2,3,24
58:13 59:16 64:14
65:1 67:8,11,14
68:19 70:21 72:5
72:6,8,10,13,16
72:25 74:18 75:2
75:16,25 76:4,7
77:20 82:9,11,22
83:9,10,17 84:11
86:2,7,12 87:11
88:9 89:6,25 91:5
91:10 92:14,15,20
92:22,24,24 93:7
93:13,18,22,25
94:10 95:10 97:25
**dated** 30:24
**dates** 41:6
**dating** 74:20
**david** 15:10 24:22
25:3
**davis** 8:3 18:21
25:2
**day** 23:3,4,6 27:12
28:6 29:21 34:17
36:6,8,19 38:9
55:7,7 60:18
62:17,25 63:2,4,8
63:21 70:5 72:3
73:3,3,5 77:11
83:3,19 84:10,24
85:17 86:8,23
87:2 92:9,10,14

**days** 4:5 5:2,19
6:10,22 21:14,15
25:13 27:1,1,3,8
27:24 28:4 29:22
32:6 33:11 37:21
46:2 53:7,15
54:11 55:13,14
59:9,10,20 60:2
67:8,23 69:25
71:10 75:8 76:8
79:13,15 80:1,1,1
80:2,7,10 84:5,5,5
84:6,6,6 88:9 91:8
92:7 93:19
**dc** 10:4 11:23
12:12
**deadline** 4:18 5:2
5:7,18 6:2,10
33:18,21,24,24
34:8 35:17,17
36:3 67:14 68:10
68:15,17 72:17
74:18,19 78:22,24
78:24 91:7 92:16
**deadlines** 92:15
**deal** 35:1 41:25
54:25 71:9 75:19
**dealing** 55:24
60:6 74:14
**dean** 10:13
**debevoise** 11:8
**debt** 87:13
**debtor** 1:9 35:21
35:23 57:14 58:6
58:18,21,23 59:12
69:6
**debtor's** 4:2 6:19
**debtors** 2:10,13
2:23 3:6,11,17 4:9
6:14 7:1 8:4 18:19
18:22 19:23 20:15
23:9 24:5,23
26:17 27:16,23

28:1,6,8 32:6 33:3
35:8,11 37:21
38:13,20,21 39:15
42:23 43:9 44:4,5
44:10 45:12,22
46:25 47:4 50:2
51:20 54:16 65:23
66:7,8,15,16,19
77:4,5,17,19 79:3
79:13 81:4 83:7
83:20 84:1 85:9
85:19 86:7,16,18
88:2,7,18 90:2,10
90:22,24 91:9,11
92:6 93:1,19 94:2
95:2,6 96:16,17
**debtors'** 26:2,11
27:12,18 29:6
35:5 36:11 37:1
37:23 38:12,16,19
41:9 43:6 44:20
44:22 51:13 54:23
**debtor's** 45:3
**december** 20:1
**decided** 54:7
69:15
**deciding** 47:5
**decision** 40:16
44:21 47:4
**decisions** 54:15
**declarant** 25:1
**declaration** 3:1,10
22:21 24:18 26:5
30:2,5,6,13,14,17
30:24 31:8,13,15
31:21 32:19 36:17
41:18 77:21 82:24
83:8 89:5,7,18
**deepen** 82:16
**deepest** 82:10
86:2
**defense** 60:15

Veritext Legal Solutions
www.veritext.com

**A.404**

**deferred** 57:17
80:18,25 81:6,10
81:20
**deficiencies** 93:24
**definitely** 23:10
34:15
**definition** 44:2
**del** 9:18
**delay** 26:15 29:7
32:9,12 43:22,25
53:7 56:7 72:20
72:21 75:11 77:9
82:5,6,6 84:21
92:20
**delayed** 38:2
**delaying** 60:1
**delivered** 27:22
58:13
**demanded** 37:12
54:21
**demands** 71:6
**demonstrable**
56:7
**demonstrate** 36:7
**demonstrates**
73:2
**denial** 37:19
**denied** 34:9
**dennis** 16:9
**dentons** 96:4
**department** 8:12
45:13 54:19
**depend** 45:1
**depleted** 43:5
**described** 53:9
**designed** 20:11
44:14
**desire** 74:13 88:15
**desperately** 84:22
**despite** 21:17
**detail** 85:1
**detailed** 19:19
20:3 83:8 89:5

90:12
**details** 53:12
**determine** 27:24
72:4
**determined** 45:21
**determines** 69:23
**determining** 28:4
47:16 69:24
**developed** 28:13
36:11 44:12
**developing** 43:9
**deviation** 29:18
**devoting** 73:3,4
96:15
**diagrams** 87:16
**dial** 4:12 60:23
**diametrically**
61:25 87:1
**didn't** 21:17
23:17,18 38:18
50:14 60:13
**died** 48:7
**difference** 64:2
**different** 23:3
42:16 46:14 49:16
49:17 52:22 61:22
61:23 62:7 63:5
65:19 70:9
**differently** 52:14
81:2
**difficult** 19:2
66:10 69:13 91:4
**difficulties** 29:17
32:16 41:21
**difficulty** 29:4
**diligent** 95:4
**diluted** 78:5
**diminishing** 76:22
77:23
**direct** 29:10 30:25
31:14 37:23 43:1
43:4

**directed** 59:9
**director** 6:4
**disagree** 51:17,19
**disallowed** 32:22
90:20
**disappointed**
95:25
**discovery** 49:2,5,7
49:10 54:9,10
67:19,22,24 68:15
91:18 92:18 95:19
95:20
**discussed** 28:20
32:1 37:1,8 42:15
47:13 64:5
**discussing** 49:1
67:6
**discussions** 66:7
**display** 78:16
**disposal** 79:20
**disproportionally**
48:6
**disputed** 22:21
**disputes** 49:2
67:20
**disruption** 46:12
**dissenting** 85:7
**distancing** 91:2
**distributes** 88:2
**distribution** 36:24
**distributions** 20:4
**district** 1:2 12:21
62:16
**dividend** 20:9
**dividends** 20:4
**dizengoff** 7:9
**docket** 5:12 22:2
22:6,13 24:7 27:6
30:8 61:17
**doctors** 58:3
**document** 2:11,14
2:19 3:2,7,13,20
4:5,20,24 5:3,8,14

6:3,11,22 7:3,9,18
49:12
**documentation**
37:10 65:18
**documentations**
28:25
**documents** 7:2
21:3 54:13 68:8,9
68:10,12
**doesn't** 22:4
31:20 50:7,8
**doing** 40:11 43:7
55:12,12 74:17
75:9 88:2 96:12
**doj** 54:25 55:1
**dollars** 29:14 38:1
39:24 75:12 79:14
84:12,20
**donald** 14:20
**don't** 21:7,7 22:3
22:3,20 23:1,8
24:14 30:19 31:12
40:7,15 50:2 51:9
52:4 56:9 57:24
**door** 50:23,23
**doubt** 57:24 75:22
87:5
**drain** 1:22 4:17
4:22 5:1,6,11 6:1
6:9 18:2
**dramatically** 51:6
51:12
**draw** 87:16
**dream** 39:20
**drug** 5:24 57:22
58:8,9
**drysdale** 10:1
11:20
**due** 29:7 38:9
68:12 69:4
**dym** 12:19

**[e - expensive]** Page 10

| e | |
|---|---|

**e** 1:21,21 8:1,1 11:17 18:1,1 97:1
**earlier** 39:21 57:15 65:2,23 66:2 67:1 68:4,6 68:23 69:18 73:10
**earliest** 39:10
**early** 20:12 22:3 31:18 38:14 40:25 49:8 67:7 68:3 73:16 86:10 88:8
**earned** 89:12
**earth** 43:14
**easier** 55:22 65:20 72:19
**easily** 79:20 80:12
**east** 9:10
**easy** 90:11,11
**ecf** 2:1,7,11,16,21 2:23 3:3,8,14,20 4:7,10,12,15,20 4:25 5:4,9,15,20 5:25 6:4,7,11,16 6:23 7:5,11,15,20
**echo** 70:25
**eckstein** 2:20 7:19 14:16 70:12,13,16 70:17
**ecro** 1:25
**ed** 5:24
**education** 12:20
**edward** 5:4 11:6 16:4
**effect** 38:18 69:6 69:7 86:14 91:10 92:21
**effective** 21:2 65:12 69:12 72:25 73:25
**effectively** 27:17 74:16 87:13

**effectiveness** 83:13
**effort** 22:4 40:18 42:14,19 52:22 55:17 66:19 94:20
**efforts** 25:4,5,9 43:5,23 45:9 53:9
**eisenberg** 9:8 57:11
**either** 41:9 51:10 65:9 87:15 89:17
**elaborate** 82:11
**electronic** 57:17
**element** 89:11
**elements** 27:22
**elicited** 86:20 94:6
**emily** 15:15 17:1
**employs** 96:9
**enacted** 46:25
**encountered** 72:11
**endeavor** 33:3 42:15
**ended** 28:21
**engage** 54:18 91:2
**engaged** 53:9
**enhancing** 55:9
**enormity** 60:4
**enormous** 86:1,1
**ensure** 22:25
**ensuring** 69:11
**enter** 46:1
**entered** 46:14 57:17
**entire** 39:23 59:11 73:4
**entirely** 44:9 63:4
**entities** 3:16 6:13 10:2 11:21 19:24 20:16 25:15 27:11 86:25 87:22
**entitled** 35:2

**entry** 2:4 3:17 4:2 4:4 6:14,19,21 7:13
**environment** 42:19
**equally** 20:2
**equation** 79:9
**eric** 16:10
**erica** 15:21
**especially** 25:8
**espoused** 69:19
**essentially** 21:10 23:25
**established** 72:6
**establishing** 75:25
**estate** 29:12 54:23 59:11 72:8 75:11 93:9
**estates** 26:16 29:5 43:6
**ester** 25:3
**estimate** 37:23
**estimated** 92:9,10
**estimates** 50:1,2 79:13
**et** 7:11 9:16 18:3
**evaluate** 54:14
**evaluating** 28:3
**evaporation** 39:24
**event** 33:16 76:5 76:10
**events** 48:11
**eventually** 45:13
**everybody** 19:1 39:7 72:17
**everybody's** 21:18
**everyone's** 86:6
**evidence** 22:22 26:5 30:1,13,15 31:14 50:19,22 51:8,10 52:12,13

55:18 64:24 65:3 65:9,10 73:2 77:4 83:4,5,6 91:14,21
**ex** 63:25
**exact** 61:24 73:7
**exactly** 39:1 73:23 94:18
**examination** 22:24 45:2
**examine** 22:18 66:4
**example** 21:5 36:16 66:16,21 90:12 91:8
**exceed** 41:11 44:18
**exception** 86:23
**exceptions** 34:12 34:14 35:20,24 75:18
**exclusively** 54:25 83:7
**excusable** 33:3 47:6,7 48:21 49:17 59:18 75:19
**excuse** 34:3 92:2 92:25
**executive** 6:4
**exhibits** 19:20 57:25
**exists** 32:5
**expect** 35:13 59:16
**expectation** 95:17
**expected** 66:8
**expeditiously** 53:22
**expended** 72:9
**expense** 43:22 71:22 72:8
**expensive** 82:10 86:2

[experience - filing]                                                          Page 11

experience 93:9
experiencing
  32:16
explain 61:22
explained 69:1,8
exposure 89:22,24
express 22:5,7
expressed 53:23
extend 2:18 3:6
  3:12 4:18 5:2,7,18
  5:23 6:2 7:18
  25:13 27:25 32:5
  34:5 37:21 45:19
  47:5,17 50:5
  52:22 56:1 76:11
  82:16 85:24 86:7
  93:22
extended 27:7
  32:20,21 33:24
  37:24 40:17 58:4
  80:6 83:17 84:11
  84:11 91:7 93:14
  93:19
extending 2:5,10
  3:18 4:3,4 6:15,20
  6:21 7:14 32:11
  42:1 46:1 53:6
  56:2 70:3 75:16
extension 4:14 7:2
  7:8 18:17 23:4,6
  25:24,24 26:25
  27:2,13,14 29:7
  29:11,21 30:7
  32:3,10,13,17
  33:1 34:9 36:6,8
  38:17 41:24 46:2
  46:21 49:21 53:4
  55:7,8 56:3,4
  60:13,18 61:6
  62:14,17,22,25
  63:2,4,8,20,21,25
  64:13 65:8 67:3
  68:20 69:23,24

70:5,21 72:4,20
  77:10,23 78:1,3
  84:19 86:8,12,23
  87:2,4 91:5,9,16
  91:20,24 92:7,8,9
  92:10,14 93:10,23
  93:25,25 94:10
extensions 27:6
  33:11 69:2 93:6
  93:16
extensive 35:11
  72:10 75:2 89:1,8
extent 29:16
  48:22 75:4
extra 19:5 79:13
  84:9
extraordinarily
  20:3
extraordinary
  83:8,10,12 85:23
  88:8,10 89:4
  91:12
extremely 47:9
  72:14 95:25
eyes 82:19

f
f 1:21 17:1 97:1
face 75:21
fact 25:11 27:20
  28:16 29:9 32:24
  33:20 36:14,22
  43:11 44:1,17
  45:7 48:1 53:7
  56:4,6,9 61:22
  64:24 69:14,19
  72:24 73:1,3,10
  73:17 74:25 81:4
  81:8,10 88:5,15
  88:21 91:6,22
factors 28:7 66:13
  94:1
facts 22:20 48:17
  75:21 83:5

failed 36:7,12
failure 32:20 33:7
  37:17
fair 69:12,22
  77:24
fairly 20:13 30:24
  40:16,25
fairness 55:10
  68:22 69:21 83:5
  93:6
faith 87:5,8 90:18
  94:7
fall 38:14,15
  39:20 53:5,6 68:3
  73:18
fallback 76:9
false 90:17
family 6:7 13:2
  14:2
fantasized 82:23
far 44:13 46:18
  48:10 66:9 78:3
  83:2,10 89:2 93:4
  95:6
farash 6:7,7
farther 48:10
fashioning 44:25
fear 39:21
feasible 43:16
february 24:10
  31:18 46:15 49:20
  67:7 88:8
fed 2:3
fee 54:24
feel 62:9 74:25
feeling 31:10
feels 70:1 74:23
feld 61:12
fiduciaries 84:2
  85:3,5,11 95:7
fiduciary 70:4
  83:24

fifth 29:21
fighting 56:5
  86:11
figure 23:24 73:25
file 5:17,22 6:6
  27:19 28:17 33:2
  34:4,17 35:4 36:2
  37:14,15 39:10,15
  40:5 42:1 47:4
  48:21 56:10,12
  58:14 59:21 63:9
  63:12,19,23 65:16
  66:11 69:4,5
  72:16 73:9,18
  74:9 75:4 83:25
  89:14,16 90:13,23
filed 2:6,14,19 3:2
  3:7,13 4:5,14,18
  4:20,24 5:3,8,12
  5:14,19,24 6:2,3,6
  6:11,22 7:4,9,14
  7:18 19:18 20:2
  22:12 26:4 27:5
  34:24 37:5 39:12
  40:25 41:1,3,11
  41:16 46:20 48:21
  50:6 51:4,21 52:9
  52:16 53:5 55:15
  55:18,20,21,24
  57:15 58:25 59:14
  59:19 61:16,20
  62:4,4 65:25 66:9
  66:17 86:9
filing 5:2,7,19,23
  20:2 22:10 28:12
  28:24,25 29:1,4
  32:9,13,17 33:4
  37:2,5,9 38:13,22
  40:20 42:1 54:6
  59:13 73:16 75:7
  89:15 90:8,9,10
  90:14 91:3,7,21
  92:25 94:1

A.407

**filings** 24:8 60:12
**fill** 65:14,19,21
**filled** 65:17
**filling** 64:20 65:1
**final** 21:2
**finality** 87:25
**finally** 68:19
**finances** 54:14
**find** 12:9 41:20
  46:23 47:14 75:22
**finding** 41:23
**fine** 18:23 24:14
  26:9 40:14
**finegan** 3:1 22:18
  25:1 26:6 30:2,3
  30:17,20,22 31:4
  31:6,7 32:19
  36:17 41:9 51:3
  51:16,18,19,23
  52:24 56:15 65:10
  66:1,4 77:19 78:8
  78:10 79:4,18,24
  80:5,10,12
**finegan's** 65:9
  78:9 89:5,18
**finegan's** 31:14
  41:18
**fingertips** 80:13
**finish** 42:6 68:14
**finson** 9:15,20
**firm** 9:15 96:3,4
**first** 18:5 23:9
  28:7,22 31:25
  40:4 46:18 64:10
  70:25 78:7 83:20
  86:9 89:15 92:7
**five** 57:2 81:25
**fix** 67:17
**fixed** 44:15
**flesh** 95:16
**flexibility** 90:1
**flier** 36:23

**floor** 10:10 12:3
**focus** 47:20 57:11
  64:11
**focused** 46:16
  47:11 59:9 64:18
  64:20 71:5
**focusing** 71:8
**fogelberg** 15:23
**fogelman** 14:23
**follow** 23:23 36:2
  42:22
**followed** 24:13
**foot** 96:11
**footnote** 40:5,6
**forbid** 34:1
**foregoing** 97:3
**forgotten** 20:22
  21:8
**form** 2:6 3:19
  6:16 21:3 31:18
  37:6,17 42:18
  64:20 65:2 86:4
  89:14
**formal** 67:7
**formed** 63:3
**forms** 28:17,19
  37:5,16 65:15,17
  65:18,20,20
**forth** 32:18 39:1
  41:17 53:10 61:16
  61:20,21
**forum** 39:1
**forward** 25:10
  26:15 34:23 54:4
  74:15
**foster** 94:7
**found** 30:8 67:4
  71:24
**four** 83:1
**fourth** 29:16
**framework** 68:1
**frangules** 6:4

**frankly** 19:13
  38:25 47:10 48:10
  55:22 61:23 64:5
  69:21,25 70:6
  82:17 87:5 91:19
  91:25 92:22 96:8
**free** 28:15
**frequency** 44:16
  89:22
**friday** 52:7 95:24
**front** 27:21 77:2
  79:7,10
**fronts** 21:20
**full** 36:23 71:11
  73:19
**fully** 95:9
**function** 93:13
**fundamental**
  68:22 69:21
**funded** 87:12
**funds** 90:4 96:8
  96:10
**further** 25:21
  42:2 61:4 77:10
  84:19 94:3 95:20
**fusion** 57:16 59:8
  59:21
**fusion's** 58:16
**future** 75:19

**g**

**g** 4:25 18:1
**gained** 90:5
**games** 96:8
**gamut** 76:23
**gange** 15:24
**gather** 50:22
  80:13
**gauntlet** 33:17
**gelfand** 4:25
**general** 2:5,11 3:6
  3:12,18 4:3 6:15
  6:20 27:15,25
  29:25 36:8,21

37:21 40:11 44:25
  80:20 86:7,21
  87:21 96:11
**generalized** 29:2
  29:3
**generally** 34:7
  45:10 79:22 80:3
  80:5 89:3 91:2
**general's** 57:18
**gentin** 14:19
**genuine** 75:23
**geoff** 15:17
**george** 10:6 14:25
  15:3
**gerard** 13:7
**getting** 35:14 53:4
  68:7 74:8 76:21
  83:13 92:21
**give** 19:11 26:2
  33:3 35:9 39:8
  62:8 69:7 74:23
  92:6 96:10
**given** 40:8 62:11
  68:24 77:23 79:13
  87:16 88:14 91:25
**go** 21:2 23:9,12
  31:3,22 40:1
  50:23,23 57:8
  62:7,19 69:9
  70:16 79:2 80:15
  82:19
**goal** 38:16,21 39:5
  73:20 89:20
**goes** 78:3
**going** 18:4 22:24
  34:23 42:11 51:18
  55:1,5 56:14 60:1
  60:4 65:7 66:4,4
  67:17 71:23 73:7
  73:8,12 74:3 76:6
  80:4 82:24 84:15
  89:10

A.408

**good** 18:2,20
23:24 24:21,25
26:12 34:7 35:23
46:9,10 61:8,11
70:12 74:25 87:5
87:8 90:17 93:10
94:7 95:7
**goods** 82:3 85:19
**governmental**
2:20 3:16 6:13
7:20 10:2 11:21
14:11 25:15 26:23
27:11 69:3 86:25
87:22
**governments**
64:17 70:14 71:3
71:15 87:21 94:17
96:12
**grandfather**
63:16
**grant** 59:17 94:2
**granted** 27:3
31:17 63:20 77:11
84:8 86:4 93:2
**granularity** 20:22
**great** 35:1,1 43:21
71:9 85:8
**greater** 92:13
94:21
**greatest** 48:22
**greatly** 25:5,8
41:11
**gregory** 14:6
**ground** 36:25
76:19
**group** 2:15 4:1,6
6:18 7:15 8:20 9:2
10:2,16 11:2,21
13:18 25:15,16,19
25:23 27:5,10,11
31:25 32:8,23
37:9 42:16 57:2
57:13 59:11 60:2

60:7 62:6,13,14
62:15,21,23 63:3
63:5,10,10,19,24
63:25 64:14,20,23
64:24 66:16,23,25
76:25 77:9 82:15
84:4,4,4 87:1,2,3
91:19
**groups** 3:16 6:13
22:2,6 27:4 44:12
62:5 63:9 64:10
64:11 66:14 86:23
**group's** 38:3
**guardsmen** 48:15
**guess** 78:20 80:3
83:14
**guessing** 66:2
**guided** 46:25
**guilty** 57:22
**gump** 13:9 61:12

### h

**h** 2:19 7:19 14:16
**haberkom** 16:19
**hage** 14:1
**half** 20:8
**hammered** 55:2
**hand** 19:24,25
20:6,7,15,17
58:13 75:14 90:24
93:9
**handled** 21:22
**hands** 84:22
**happen** 39:11
**happening** 23:11
49:6
**happy** 61:6 79:21
80:13
**hard** 21:12,13
33:21 37:25 53:13
64:12,21,24 79:14
83:20,21 84:16
92:9,11

**hardship** 69:4
**hardships** 33:7
77:7
**harm** 87:9 92:23
94:15,15,15,21
**harmed** 64:16
**harold** 11:18
**harrison** 4:15,17
5:1,6,12,18 6:1,9
15:22
**hasn't** 20:18
**hauer** 61:12
**hayden** 15:5
**hayley** 16:24
**heading** 71:21
**headlines** 48:13
**heads** 52:15 85:2
86:21
**health** 36:24 48:1
94:22
**healthy** 19:3
**hear** 18:19 46:11
61:6,9 82:21
95:11
**heard** 18:22 51:16
60:14,19,25 63:4
64:4 68:25 71:17
73:13 74:12 76:15
**hearing** 2:1 18:4,6
18:9,11,13,16
19:5 21:21 22:15
22:19 30:22 31:19
38:8 48:25 68:14
72:15 83:6,7
**hearings** 85:7
**hearsay** 50:13
83:17
**heather** 15:7
**heaven** 34:1
**hedge** 96:7,10
**held** 53:24
**help** 69:15

**helpful** 23:15
34:23 79:5,10
**herring** 54:2,3,4
**herrings** 84:10
**hesitant** 53:11
**he's** 23:13 51:15
**high** 48:6 59:14
88:10
**highly** 84:20
87:12 93:22
**hint** 65:6
**hipaa** 43:18
**hirschfield** 12:7
**history** 82:11
**hit** 22:12 62:3
64:12 65:7
**hits** 41:16 83:11
**hoc** 2:9,15,18,20
3:5,8,10,14 4:1,6
6:18 7:15,17,19
8:20 9:2,9 10:16
11:2 13:19 14:10
24:7,13 25:15,16
25:19 26:23 27:2
27:4,10 30:11
31:25 32:7,23
38:5 42:7,23
44:12 49:22 57:1
57:10 62:6,13,15
63:3,5,10,10,19
63:24 64:14 66:16
66:23 70:13 71:2
71:5,8,15 74:10
80:18,24 85:8
86:18,24 87:3
**hoe** 40:9
**hold** 20:20 60:1
67:10
**holdings** 44:24
45:11
**holly** 16:23
**home** 23:21 39:7
89:12 94:23

**hon** 1:22
**honestly** 69:22
**honor** 18:20 19:11
19:19 21:21 22:14
23:10 24:3,21
25:11 26:1,8,10
26:11 29:25 30:13
30:18 31:7,24
34:20 36:4 38:2
38:23,24 40:4
41:12 42:5 45:22
46:2,6,10,16,19
47:3,21 48:10,18
48:19,23,25 49:14
49:15,20,25 50:4
50:9,14,21 51:9
51:23 52:1,17,23
53:2,8,18 54:3,4,8
54:9,17,22 55:4
55:13,16,19,22,25
56:8,14,18,20
57:7,21 59:17
60:6,10,21,22
61:8,13 64:2
65:22 66:14 68:5
68:24 69:22 70:10
70:12,17,18,25
71:7,17 72:3,24
73:13,21 74:18,24
75:15,22 76:2,14
76:17,24 77:12,16
78:10 79:5,21
80:16,17,23 81:17
81:24 83:3 96:19
**honor's** 76:11
**hope** 19:2 39:18
40:10,10 64:19
68:2 78:5 81:25
94:15
**hoped** 53:20
71:23 73:9
**hopefully** 46:10
73:21

**hospital** 34:2
63:15
**hospitalized**
93:12
**hospitals** 10:16
63:11 64:17 85:15
**hours** 22:12
**howard** 15:14
**hudson** 13:3
**huebner** 8:8 18:20
18:21,24 24:3,16
25:7 38:24 53:8
53:11 54:15 56:20
56:21 60:10 80:19
81:22,24 96:19
**huebner's** 95:10
**huebner's** 46:11
**hughes** 12:19
**human** 52:10
**humanly** 39:6
**hundred** 79:16
**hurdles** 59:13
73:20,22
**hurley** 13:15 49:1
49:4
**hwang** 16:10
**hybrid** 22:9
**hyde** 7:25 97:3,8

**i**

**i.e.** 35:3,18 88:6
89:12
**iceberg** 19:12
21:19
**idea** 35:23
**ideas** 23:8
**identified** 57:23
**identify** 18:8
**identities** 44:3
**ii** 2:5
**iii** 4:4 6:21
**il** 12:23
**ilana** 10:20

**illegal** 57:22 58:12
**illegality** 58:1
**images** 66:21
**impact** 37:3 45:23
47:19 48:5,9
50:22 67:3 68:7
**impacted** 47:19
47:24,25 81:19
**impacting** 41:23
**impacts** 37:3
**impediment** 74:7
**impediments**
75:10
**imply** 65:12
**important** 19:9
21:6 22:23 33:9
33:16,25,25 37:20
61:15 63:12 82:1
96:9
**importantly** 92:8
**impossible** 65:4
**impracticable**
69:13
**impractical** 43:24
44:9
**improve** 82:16
**incidental** 74:19
**included** 61:19
81:16
**includes** 37:2 71:3
**including** 24:7,18
26:23 27:4 28:23
29:12 32:9 33:7
33:16 37:8 43:17
44:11 58:20 81:9
86:16 89:12 92:17
**increase** 36:20,20
49:10 57:14
**increased** 27:20
36:21 43:7
**increasing** 26:15
**incredible** 82:15

**incurred** 40:1
75:13
**independent** 12:2
12:10
**independently**
86:17
**indicated** 68:3
**indiscernible**
85:15
**individual** 4:1,6
4:19 5:3,8,13,19
6:2,10,18 8:20
11:2 25:16,18,22
25:25 27:4,10
31:25 32:8,24
35:2,10,14 42:11
49:3 63:7 64:24
79:8 88:19,22
94:16
**individualized**
29:17 35:7,18
88:18
**individuals** 32:9
41:3 43:16 57:3
65:20 79:6,11
85:9,13 86:10
91:1 94:16
**inevitably** 77:10
92:20
**influenced** 58:3
**information** 4:12
28:15,19,24 42:25
43:15,17 44:4
45:12,14 58:18
59:5 81:3,14
89:15 90:13
**informed** 95:3
**informing** 58:11
**initial** 68:25 91:6
**initiatives** 39:5
**injure** 60:3
**injured** 58:11
59:1

A.410

| | | | |
|---|---|---|---|
| **injury** 5:23 25:21 63:1,6 | **issue** 18:17 22:15 41:14 47:10,12,18 49:25 53:10,22 58:9 60:1,4,5,7 61:15 62:1 64:10 65:3,5 66:5,24 82:4,4 87:7 93:12 | **jasmine** 11:13 | **keeping** 29:12 |
| **input** 82:15 86:6 | | **jeanne** 3:1 25:1 30:2 65:9 | **kenneth** 2:19 7:19 14:16 70:13 |
| **instance** 78:7 | | **jeffrey** 11:14 | **kevin** 11:25 76:14 |
| **institution** 69:3 | | **jennifer** 15:16 | **key** 26:22 28:7 33:18 44:10 74:17 74:19 86:15 |
| **instructed** 96:7 | | **jeremy** 16:6,11,14 | |
| **instructing** 96:6 | | **jim** 21:23,25 24:21,22 41:12 77:16 82:13,14 | |
| **instructive** 62:7 | | | **kickback** 57:22 |
| **insufficient** 59:6 | **issues** 47:12 54:5 55:1,1,6,23,25 60:6 64:5 67:22 87:7 | | **kind** 22:11 78:25 |
| **intend** 22:18 54:16 60:25 | | **joanne** 4:20 | **king** 66:2 |
| **intended** 32:11 56:2 65:18 67:13 | | **job** 26:11 54:25 | **kleinman** 16:6 |
| | **issuing** 96:2 | **join** 46:11 | **knew** 22:9 35:21 59:15 73:6 |
| **intensely** 71:8 | **item** 21:10 74:20 | **joined** 85:19 | |
| **intent** 60:25 | **it'll** 34:17 | **joke** 82:12 | **know** 18:8 20:19 21:6 22:3 23:8 26:10 38:8 50:2 50:16 52:10 58:14 63:2 65:4 67:10 67:12 68:16 74:5 78:1,4,25 79:2,25 81:4,8,8,11 82:9 82:12,13,18 83:19 84:24,25 85:3,17 95:25 |
| **interactions** 62:12 | **it's** 18:11,21 19:14 21:15 22:4 26:11 27:18 30:8 30:24 31:20 33:15 33:17,23 35:23 40:7 41:20 46:6 47:18 48:10 49:19 50:10,10,11 52:13 54:3,4,8,21 56:4 56:20 57:1,2 | **jones** 15:10 | |
| **intercompany** 19:22 | | **joseph** 14:1,6 | |
| **interest** 26:13 49:11 60:15 86:16 86:22 | | **joshua** 12:17 | |
| | | **judge** 1:23 4:17 4:22 5:1,6,11 6:1 6:9 18:2 | |
| **interestingly** 86:25 | | | |
| **interests** 69:18 | | **judgment** 77:6 82:7,7 84:7 | |
| **interfere** 73:20 | **ives** 49:3,4 68:7,9 68:11 | **july** 68:17 86:8 91:8,9 93:1 | **knowable** 35:23 |
| **interim** 54:24 | **i'd** 26:1 36:5 42:6 | | **knowing** 30:25 |
| **internal** 48:1 | **i'll** 22:21 25:11,13 31:11 38:8,25 49:13 | **jump** 33:13 38:25 | **known** 39:25 43:12 44:3 58:18 82:25 |
| **interrupt** 38:7 59:22 | | **june** 1:16 18:18 21:15 39:17 40:9 41:5 52:6,8,20,21 53:16 73:8 75:25 78:17,22 86:8 97:25 | |
| **interrupted** 80:15 | | | **knows** 20:24 26:11 28:10 94:13 |
| **interview** 50:23 | **i'm** 18:4 31:2 38:7 40:15 41:2 46:17 49:24 52:12 56:14 60:7 | | **knudson** 25:3 |
| **introduction** 18:15,18 | | **jury** 66:24 | **kramer** 14:9 70:13 |
| **investigating** 67:18 | | **justice** 8:12 12:9 54:20 | |
| **invitation** 32:12 | **i've** 31:19 54:8 | **justify** 29:5 33:6 | **l** |
| **involved** 42:14 48:2 49:2 72:12 | **j** | **k** | **l.p.** 1:7 2:7 3:3 4:7 7:5,11 |
| **ira** 7:9 | **j** 4:6 5:4 6:23 | **kajon** 15:13 | **labovitz** 11:15 |
| **irrelevant** 84:25 | **jacquelyn** 25:2 | **kaminetzky** 8:9 | **lack** 23:8 |
| **ish** 53:15,15 | **james** 2:7 3:2 7:4 8:10 | **kapler** 16:21 | **laid** 77:7 |
| **isn't** 24:6 41:13 41:18 59:1 | | **karsh** 12:17 | **land** 23:16 |
| | **january** 19:21 31:15 57:20 81:11 | **keenly** 71:5 | **landing** 28:6 40:11 |
| | | **keep** 20:24 33:10 74:15 75:9 78:14 | |

A.411

**large** 19:7 52:8
**larger** 41:25
**late** 33:4 42:1
  48:21 55:15,20,24
  59:14,19 67:6
  69:5
**latina** 78:18
**laurie** 15:18
**law** 3:5 9:8,15
  13:18 22:11 33:15
  83:5 88:16
**lawrence** 14:23
**lawyer** 51:13
**lawyers** 50:18
**lay** 23:16 40:7
**layout** 84:25
**leads** 91:24
**leave** 22:21 52:4
  92:24 94:20
**led** 86:18
**ledanski** 7:25 97:3
  97:8
**lee** 10:8
**lees** 13:6
**left** 40:9
**legal** 26:6 90:20
  97:20
**legally** 44:8 70:5,6
  70:10 85:12 92:3
**legitimate** 29:17
  34:3,3 69:11
  92:25
**length** 69:24
  72:13 83:10
**lengthy** 34:10
  92:14
**leona** 6:11
**letter** 4:14,17,22
  4:22,22 5:1,6,11
  5:11 6:1,9 7:8
  21:25 35:3,14,18
  40:25 60:12,18
  63:1 67:21 68:13

77:7 95:22 96:1
**letters** 22:1,9
  42:10 86:9 91:6
**level** 78:14 87:23
**leventhal** 14:7
**levin** 14:9 70:13
**levine** 15:8
**lexington** 8:5 14:3
**lexus** 45:8
**light** 26:14,19
  27:25 28:2 32:16
  41:21 46:12 52:24
  55:6,11 56:4
  86:13 88:5 90:5
  92:5 93:17
**lightner** 15:9
**likelihood** 48:19
  55:20
**limited** 2:5,9,13
  3:5,6,11,18 4:3
  6:15,20 7:1 27:12
  32:5 34:14 46:1
  73:24 81:18 89:3
**line** 19:1 30:22
  33:21 57:4 59:20
  82:1
**lines** 41:19 64:3,4
  64:6 77:2
**liquidation** 44:24
  45:8
**listed** 60:18
**listen** 4:12
**listened** 83:20,21
  84:2,3,3,3
**listening** 85:22
**litigation** 2:21
  7:20 14:12 26:24
  43:21 93:6,8
  95:20
**litt** 13:18
**little** 39:21,22
  62:2,9

**live** 50:21 69:21
**lives** 46:12,13
  91:15
**llc** 14:1 30:4
**llp** 8:3 9:1 10:15
  11:1,8
**local** 64:17 70:14
  71:3,15
**localities** 77:1
**logic** 42:22 45:18
  78:22
**long** 20:15 46:17
  47:17 49:23 55:19
  56:1 67:21 72:14
  91:12
**longer** 29:13,23
  33:11 43:15 53:3
  53:19 55:16 56:3
  56:24 60:12 61:6
  92:8,22,24,24
  93:5
**longest** 82:10 86:2
**look** 34:6 45:7,11
  51:2,4
**looked** 69:17 82:8
**looking** 30:22
  36:16 45:10,18
  52:6 96:16
**lose** 78:25
**loss** 39:24
**lost** 47:7
**lot** 62:12 68:4
  77:25 82:1
**loved** 90:15
**lowell** 9:20
**lower** 41:2,3 51:6
  51:12,21
**lp** 18:3

**m**

**m** 2:14 7:14 9:6
  10:6 16:1
**ma** 30:8

**mackay** 17:1
**maclay** 11:25
  76:14,14,17,24
**madison** 10:10
  12:22
**maeglin** 14:22
**magazine** 78:16
**magic** 56:23 85:18
**mahlum** 15:6
**mail** 28:17 37:5
  82:25 89:17
**mailed** 36:23
**main** 21:22
**maintain** 91:1
**maintained** 76:1
**maintenance**
  78:14 80:4
**major** 23:19 39:5
  40:18 48:15 49:20
  60:6 89:11
**majority** 78:12
  85:20 86:21
**making** 29:1 32:3
  42:21 49:18 53:14
  65:20 74:7
**mall** 9:17
**managing** 26:13
**manner** 2:6 69:12
  72:10
**manufacturer**
  57:23
**mara** 14:7
**marc** 12:6,7
**march** 49:8 67:7,8
**maria** 16:25
**marina** 9:18
**mark** 15:9 16:16
**marketing** 42:19
**marshall** 8:8
  18:21 56:20
**maryanne** 6:3
**mass** 29:24 40:18
  66:12 72:13

**massive** 20:11
72:8
**massively** 84:16
**material** 82:5
**materially** 51:21
91:22
**matter** 1:5 18:17
22:4 31:1 70:1
73:3,11 79:3 85:2
85:2
**matters** 19:7 24:6
48:24 81:19 92:16
**matthew** 12:25
**maura** 11:16
**ma'am** 30:23
**mcclammy** 2:7
3:2 7:5 8:10 21:23
21:24 22:22 23:23
24:17,21,22,22,25
26:10 31:11,22,24
34:20 36:4 38:23
41:9,12,12 42:5
42:10 51:17,24
66:1 68:22 77:16
77:16,18 78:7
80:15,16,23 82:13
84:14
**mcclammy's**
38:24 51:19
**mcgrail** 10:15
**mdl** 62:19
**mean** 32:21 53:8
61:2 79:25 83:22
**meaning** 87:6
**meaningful** 67:12
**means** 26:12
43:19
**meant** 32:15
**mechanic** 22:25
**mechanisms**
28:13 29:19 37:2
75:6

**media** 30:4 78:15
79:18 89:3,8,11
89:12 90:5
**mediation** 21:10
21:15 39:3,13
53:9,10,16,17,19
53:21,25 54:2,19
56:10 67:3,6,7,9
67:10 73:5,6,10
74:8 92:18
**mediations** 21:12
21:14
**mediators** 21:12
**medical** 37:6
57:17 58:3 63:15
90:12
**meet** 68:8
**mega** 84:17
**megan** 14:24 15:2
16:21
**mehri** 12:14
**member** 62:21
**members** 43:1
63:24 64:1 71:2,8
**memorandum** 3:5
7:13 22:11 23:6
**memory** 79:1
**mention** 21:9
**mentioned** 25:7
26:22 30:2 37:4
43:24 68:6 91:6
**mere** 33:17
**merely** 74:19 92:4
**merit** 64:22
**message** 78:3 79:6
83:13 89:22,24
**messages** 79:10
**messaging** 89:13
**meyer** 15:25
**michael** 3:10 9:13
**microcosm** 94:5
**microphone** 24:17

**mid** 91:8,8
**midst** 67:18
**midstream** 39:13
**mightily** 73:25
**milbank** 13:1
**million** 37:22
54:24 62:24 72:9
77:1,20 79:15
82:21 88:11 92:11
92:13
**millions** 29:14,14
38:1 39:24 75:11
75:12 84:20
**mind** 26:17 33:10
**mineola** 97:23
**minimized** 48:22
**minimizes** 55:20
**minimum** 78:15
**minute** 34:16,18
52:25 87:14
**minutes** 19:10
52:11 81:25
**miskowiec** 15:18
**missed** 33:23
38:19 40:4
**mitchell** 13:15
**moar** 6:4
**mobile** 36:24
**model** 72:7
**modified** 31:17
**modify** 66:20,21
**monaghan** 11:16
**money** 39:8 40:1
77:24 78:21 84:23
95:13 96:15
**month** 29:15
39:20 41:7 54:22
67:20 71:21 75:12
78:23 79:23 91:10
94:4 95:11
**monthly** 79:19
80:2,4

**months** 20:2
39:19 54:12,12
67:24 75:5,5 93:2
**morning** 18:2,20
24:21,24,25 46:9
46:10 48:13 61:8
61:11,14 70:12,24
**mother** 63:16
**motion** 2:3,10,14
3:6,12,17 4:2,10
5:17,22 6:6,14,19
18:19 22:10,12
23:4,5 24:5,5,8,9
24:12 25:12,20
26:4 30:6,7 31:17
31:19 34:4 37:10
38:12 47:4 61:5
84:7 85:24 86:6
86:19 89:6,7 93:1
94:2,5 96:17
**motions** 42:1
**motor** 45:14
**motors** 44:23 45:8
**movants** 23:3
**move** 25:10 26:5,6
26:14 30:1,14
36:5 53:22 84:7
90:4 94:25,25
95:9,15
**moved** 86:4
**movement** 5:13
**movie** 36:22 90:3
**moving** 22:22
53:19 54:3 74:15
75:10
**msg** 76:15
**multi** 3:16 6:13
10:2 11:21 27:11
39:2 62:23
**multifaceted**
28:11
**multiple** 19:7
21:20 62:5 87:22

94:6
**multistate** 25:15
**multitude** 43:10
**mulvihill** 15:17
**munger** 5:15
16:18
**municipalities**
62:21,24 71:4,12
**municipality**
62:18
**mute** 24:17 31:2
**myth** 90:12

**n**

**n** 8:1 18:1 97:1
**nailed** 55:2
**name** 18:5 43:15
58:1
**named** 49:3 57:25
**names** 58:15,18
58:20 59:8
**narrow** 59:8,11
**narrower** 57:12
**narrowly** 35:24
**nas** 63:16,17,19
66:16,17,20,22,23
**natasha** 11:15
**nathaniel** 16:22
**national** 36:21
48:14
**nations** 15:14
**native** 63:22
**nature** 22:8 36:13
52:10 87:6
**nearly** 48:8 59:24
**necessarily** 35:14
37:18 43:13 70:5
92:3
**necessary** 24:19
26:14 27:1 28:18
29:1 56:10 58:19
65:18 74:7 91:3
**need** 31:20 35:16
37:15 39:9 40:2

42:24 43:19 45:6
47:1,11 54:1,5,6
55:1 64:11,13
67:17 69:6 72:23
73:1 74:20 76:11
88:18,23 89:1
94:17,21,23 95:2
95:9
**needed** 37:12
59:10 84:9
**needs** 28:3 34:1
47:16 64:6 73:23
75:23 90:12 92:4
**neglect** 33:3 34:3
47:6,8 48:21
49:17 59:19 75:19
**negotiate** 69:13
79:22
**negotiated** 37:7
43:19 79:19
**negotiations**
67:13
**neiger** 11:1,6
**neither** 45:5
**networks** 36:19
**never** 56:11 59:15
66:6 82:17
**nevertheless**
87:24 94:8
**new** 1:2 8:6,15,22
9:4,11 10:11,18
11:4,11 12:4 13:4
13:13 14:4,14
48:13 57:2 78:24
91:18 96:4
**newly** 63:3
**news** 19:17
**newspaper** 83:1
**nicholas** 15:13
16:13
**nighbert** 16:23
**ninety** 4:5 5:2,18
6:10,22

**ninth** 94:4
**non** 2:13,15 7:15
9:2 19:25 22:11
24:14 27:5 30:10
30:19 36:5,6,10
37:8,24 38:3 46:7
47:22 48:5,9
60:22 62:15 67:25
77:8 87:1
**normal** 19:5 64:9
89:2
**normally** 34:9
**north** 13:20
**note** 18:25 20:18
21:25 25:13 33:25
36:10 37:20 46:19
47:8 53:23 58:13
65:22 66:25
**noted** 25:17 32:23
37:17 42:10 44:13
45:9 55:16 56:11
66:2 76:25 83:3
**notes** 36:17 46:18
**notice** 2:6 3:19
4:12 6:16 27:17
27:18 28:3,9,11
28:12 29:10 30:4
32:17,25 33:5
35:2,7,11,14,18
36:1,11,13,24
37:24 40:22 43:1
43:8,9,23 44:8,21
44:23 45:1,19
46:24,25 47:13,15
47:18 56:5 58:10
58:13,24,24 59:1
59:6,9 60:2 65:1
69:7 72:10 75:3
75:16 77:20 80:6
88:10,17,17,17,24
89:2,2,4,8,9,11,19
90:9 91:11,18
93:24

**notices** 88:20,22
**noticing** 28:8
41:15 43:4,5
44:13 65:6,7,13
65:16 66:20 78:2
81:18 90:3,4
**noting** 19:16,17
71:1
**notion** 78:23
90:21
**notions** 69:21
83:5
**notwithstanding**
46:24 49:22 71:16
74:25
**number** 21:1 28:5
28:7,15 35:1 41:1
41:2,15,16,17,25
43:17 52:8 59:25
65:24 66:9,11,17
67:12 68:9,10
82:2 83:8 85:8
86:1,9 88:6,9,14
**numbers** 41:11
52:19 80:1 82:18
86:1
**numerator** 59:25
**numerous** 74:1
**nuss** 6:11
**nw** 10:3 11:22
12:11
**ny** 1:14 8:6,15,22
9:4,11 10:11,18
11:4,11 12:4 13:4
13:13,21 14:4,14
97:23

**o**

**o** 1:21 18:1 97:1
**o'connor** 10:6
**objected** 67:9
**objecting** 4:4 6:21
**objection** 2:9,9,13
2:18 3:5,6,11 7:1

7:17,17 30:12
36:5 57:15
**objections** 26:7
33:10 38:3
**objectors** 30:9
**obtain** 42:24
43:14
**obvious** 73:21
**obviously** 19:1,5,9
19:12 20:5 22:23
23:18 60:13 68:2
68:13 83:17 84:13
85:4,10
**occasioned** 33:8
41:20
**occur** 67:13,14
**occurred** 67:14
**october** 4:23
**offered** 68:8
**office** 18:12,14,25
57:19
**offices** 48:16
**official** 7:7,10
13:10 27:9 61:12
83:23 86:17 95:4
**officio** 64:1
**offline** 68:9
**oh** 40:4
**okay** 18:24 24:2
24:16,20 26:7
30:16,21 31:9
34:17 40:14 42:4
46:5 51:25 53:1
56:16,17 57:6
60:9 61:2,19
70:11 76:13 77:13
78:20 79:12 80:14
80:22 81:23 86:5
**old** 97:21
**omnibus** 2:23
19:6
**once** 69:23

**ones** 48:3
**one's** 33:18
**ongoing** 26:20
45:23 73:12,12
94:15
**online** 27:21
28:15 35:15 65:17
66:22 78:15 89:11
89:16,17
**open** 32:12 39:1
76:4,6
**opening** 74:17
81:1
**operations** 22:16
23:24 56:22
**opinions** 64:3
**opioid** 42:12,17
43:2 45:20 64:12
71:25 77:3 81:13
86:11 90:16,22
**opioids** 42:20 58:4
59:4 87:15
**opportunity**
39:11 70:18 75:22
**opposed** 21:24
22:7 55:7 61:25
91:16 93:2
**opposite** 87:1
**opposition** 26:4
61:5
**optimized** 36:14
**options** 24:1
**order** 2:4,10 3:18
4:2,4 6:15,19,21
7:13 22:16 23:18
23:24 24:9,10,12
45:3 46:1,14
54:10 56:21 75:25
90:23 96:17
**ordered** 67:23
**orders** 43:20 96:2
**organizations**
86:11

**organized** 85:20
**origin** 22:3
**original** 30:5
31:16 37:9 82:9
83:6 89:6
**outlined** 81:19
**outreach** 89:9
**outset** 84:14 85:25
**outside** 48:14
**outstanding** 49:8
**overall** 85:20
**overcome** 59:13
**overlook** 37:25
**overly** 49:18
**overruled** 38:4
81:21
**overview** 26:2
29:25
**owned** 19:24 20:6
20:16
**oxycontin** 5:24
35:8 58:8 90:15

**p**

**p** 2:4 8:1,1 13:15
18:1
**page** 36:23 40:5
41:17 89:5
**pages** 19:20
**painful** 19:2
**pandemic** 26:21
28:14 45:23 64:12
90:1 91:1
**paper** 63:19
**papers** 25:21 67:5
69:1,8 72:15
81:17
**paragraph** 36:17
**parallel** 84:16,17
**parents** 78:18
**park** 13:12
**parochial** 94:8
**part** 27:16 31:21
41:9 47:15 62:18

78:19 82:7
**participate** 61:1
**particular** 32:8
33:6 45:1
**particularized**
45:16
**particularly** 27:3
34:9 35:22 44:23
64:16
**parties** 22:9 25:7
26:13 35:6 43:1
47:20 49:9,11,22
53:9 54:17 58:16
58:20,24 61:7,20
61:23 62:3,4,5,12
63:25 70:9 71:13
72:15 73:4 74:2
74:16 75:2 76:9
81:18 84:25 85:20
85:22 86:16,22
87:10 88:1 91:25
92:20 93:20 94:6
94:9,17,21 95:1
**parties'** 25:9
**partner** 21:23
**parts** 36:19
**party** 33:23 45:12
49:3 56:25 57:24
58:19 59:13,15
60:15 63:11,17
64:17 69:3 71:13
74:3 81:5
**party's** 58:9 59:4
**patient** 22:1
**patients** 58:2,6
81:2
**paul** 3:7,13 8:17
13:23 57:9,9
**pauses** 46:17
**payor** 63:17
**payors** 63:11
64:18

| | | | |
|---|---|---|---|
| pearlman 16:11 | perjured 90:16 | plank 20:12 | 68:24 70:8 77:4,5 |
| pec 62:19 | permission 48:20 | planned 36:25 | 87:1,8 |
| pending 7:1 | permit 55:17 | planning 38:13 | possession 44:5 |
| people 19:3 21:6 | perpetrated 58:6 | plans 39:2,15 | possibility 32:24 |
| 21:11 22:5 23:7 | person 60:23 | play 96:8 | possible 39:6,10 |
| 23:25 34:15 35:20 | 83:15 88:22 | players 63:12 | 39:12 48:22 65:19 |
| 39:8 40:20 41:22 | personal 5:23 | pleading 23:15 | 73:16 74:16 |
| 41:25 48:7,8 | 18:25 25:20 42:24 | 63:23 70:18 72:17 | possibly 84:23 |
| 50:16,23 52:10,10 | 63:1,5 | 76:2 | post 48:7 |
| 52:14 53:16,19 | personnel 37:15 | pleadings 38:11 | potential 25:24 |
| 54:6 56:5 60:17 | persons 44:1 | 38:19 39:1 40:24 | 27:13,18 28:9 |
| 62:24 65:14 69:9 | peterson 4:20 | 46:21 47:22,23 | 29:6,16 32:8,12 |
| 70:2 77:1 78:22 | petition 19:22 | 61:21 62:4,5 | 35:1,1 37:3 40:23 |
| 78:25 82:21 84:6 | pg&e 40:19 52:14 | 63:12 64:14 77:14 | 42:25 43:10,13,20 |
| 84:15,22 85:12 | pharma 1:7 2:7 | pled 57:21 | 44:21 45:15 59:5 |
| 87:6 88:24 93:6 | 3:3 4:7,24 5:24 | plimpton 11:8 | 81:3 88:7,14 89:1 |
| 94:16,20 95:8,12 | 7:5,11 18:3 57:23 | pm 96:22 | 92:19 |
| 96:9 | 57:25 58:8,12,25 | podium 23:17,23 | potentially 29:2,3 |
| peoples 91:15 | 59:1,2 | 42:6 46:3 57:4 | 35:9 |
| 95:8 | pharma's 58:1 | point 23:14,16 | pourakis 10:13 |
| people's 46:13 | phone 24:25 25:2 | 37:8 50:8,8 53:18 | power 75:9 |
| 56:5 | 30:3 96:4,5 | 60:10 65:22 66:23 | practically 96:14 |
| percent 19:12 | pi 64:15 | 68:15 70:15 71:21 | practice 57:16 |
| 21:19 36:20 44:14 | piers 12:19,25 | 74:8 76:21 77:22 | 58:16 59:8,21 |
| 44:16 48:9 79:9 | pillsbury 9:1 | 78:2 91:11 93:1 | precedent 47:10 |
| 82:20 89:21,23 | 30:19 46:7 60:22 | 95:10 | preclude 60:14 |
| perception 40:20 | pioneer 34:13 | pointed 59:13,23 | predict 55:13 |
| 41:8,21 55:10 | 93:7 | 74:18 | predictable 55:12 |
| 91:15,21 | pis 64:14 | points 32:6 70:22 | prefer 40:12 |
| perfect 94:24 | pittman 9:1 | 80:17 95:8 | preferred 27:14 |
| 95:13 | place 28:13 29:12 | political 49:18 | preis 13:16 61:8 |
| perfection 94:19 | 46:14 49:17,19 | 64:5 | 61:11,11,19 79:25 |
| 94:20 | 71:10 72:25 75:2 | polk 8:3 18:21 | 80:1 85:1 92:1,2 |
| perfectly 94:12 | plains 1:14 | 24:22 25:2,3 | premised 57:15 |
| period 2:5 3:18 | plan 21:1,3 27:17 | population 44:15 | prepared 74:4 |
| 4:3 6:15,20 19:21 | 27:22 28:11 30:19 | 44:17 | 76:4 |
| 20:15 27:7 29:23 | 36:11,13 38:14,22 | portion 43:6 | prepetition 87:18 |
| 34:10 41:8 42:2 | 39:10,12,18 40:5 | 87:14 | prerequisite |
| 75:17 77:11,11 | 44:13,23 53:5 | position 25:19 | 56:12 |
| 84:9 91:11 93:5 | 54:7,15 55:2 | 61:17,25 68:11 | prescribe 58:3 |
| 93:12 | 59:24 73:16,18 | 70:20 74:12 93:21 | prescribed 35:8 |
| periods 29:23 | 74:9 88:1,4 92:18 | positions 26:3 | 42:12,20 90:15,21 |
| | 92:18 95:11,18 | 61:20,21,22 64:22 | |

A.416

**prescription** 43:2
45:20 90:22
**presence** 87:17
**present** 61:1 93:6
**presentation**
24:13 31:23
**presented** 28:22
55:3 65:10 71:6
71:14 77:4
**president** 30:3
**pretty** 66:10
**prevented** 64:25
**previously** 37:1
**prey** 16:13
**primary** 24:1 48:3
53:10,21
**prime** 22:20 25:1
30:4 36:18 44:10
50:3 65:23 66:8
**print** 89:3,8
**prior** 24:9 36:11
67:14
**private** 64:4
**probability** 39:23
82:6
**probably** 19:20
20:12 21:11,16
22:15 23:2,9,12
23:13 41:6 52:6
55:18 56:22 62:6
76:21 82:10 86:2
**problem** 91:18
**problems** 74:11
**procedural** 33:17
**proceed** 24:11,15
46:8 49:13
**proceeding** 21:16
21:19 39:4
**proceedings**
96:21 97:4
**process** 28:13
32:17 34:23 37:2
37:4,17 39:4

55:10 56:11 57:14
60:3 65:8 69:7,9
69:11 77:20 89:19
90:8,9,9
**processing** 84:17
**product** 35:5,8
42:12
**production** 68:17
**products** 90:23
**professionals** 39:7
**program** 28:3,12
29:10 35:11 37:24
40:22 42:3 43:8
46:25 65:7,11,13
65:15,16,17 78:15
78:18 80:10 82:16
88:10 89:25 90:10
91:18 93:24
**program's** 78:12
**programs** 80:6
**progress** 53:15
73:14,14 74:7,20
**prolonged** 27:7
29:7
**promise** 20:12,22
**promises** 20:24
**prompted** 40:19
**promptly** 34:18
92:21
**proof** 5:17,22 6:6
35:4 37:4,6,14
50:10,11 65:1,15
65:16 89:14 90:8
90:10,11,14,17,17
91:4 92:25
**proofs** 27:20
28:17 50:1 54:2
56:10
**proper** 60:2
**proposal** 69:16
**proposals** 20:21
**propose** 26:5

**proposed** 4:23
18:17 29:21 35:11
88:7 91:9
**proposition** 44:25
**prosecution** 57:18
80:18,25 81:6,11
81:20
**protected** 43:18
**protective** 43:20
**prove** 50:8,8
90:15
**proves** 42:22
**provide** 28:23
29:19 43:1,23
44:21 47:9 58:24
64:15 76:8 88:19
88:22,23 89:1
93:5
**provided** 32:18,25
34:11 49:24 59:6
89:25
**provides** 18:12
27:19 33:9
**providing** 27:18
28:9 71:25 72:9
89:19
**public** 12:10 43:2
53:14 64:4 81:9
89:2 94:22
**publicly** 81:15
**publish** 78:16
**purdue** 1:7 2:7
3:3 4:7 5:24 7:5
7:11 18:3 20:5
42:12,12,18 43:2
45:20 57:23,25
58:1,8,11,25 59:1
59:2 81:9,14
90:16
**purport** 85:13
**purports** 62:19
63:7

**purposes** 21:23
**pursuant** 2:3
**pursue** 4:24 54:16
**pushed** 39:22
84:18,18
**put** 22:2 23:15
61:5 71:24 72:25
75:1 82:24
**putative** 10:9

**q**

**quarrel** 73:17
**quarropas** 1:13
**question** 30:16
37:18 40:15 49:25
51:11,16 52:23,24
56:14 77:19,22
78:8,11,20 79:4
85:18 92:24
**questioning** 30:20
**questions** 31:10
38:9 46:3 56:17
**quickly** 19:16
21:9 43:13
**quinn** 3:10 9:13
**quipped** 83:15
**quite** 19:9 89:20

**r**

**r** 1:21 2:3 8:1 18:1
97:1
**rachmuth** 3:7,13
13:23 57:7,9,9,10
57:21
**radical** 20:13
**radio** 89:9
**raised** 67:1 80:17
80:24
**range** 86:20
**rare** 33:23
**rationale** 69:19
**rationales** 64:15
**raymond** 13:2
14:2

**rdd** 1:3
**reach** 43:10 44:14
67:11 94:9
**reached** 30:9 47:2
**reaching** 44:14
89:20
**react** 47:9
**read** 25:21 47:11
70:18 77:14 96:1
**readily** 55:14
88:19,25
**reading** 46:17
**ready** 59:24
**real** 91:21 92:23
**realize** 94:18
**realized** 43:13
60:3
**really** 18:16 19:1
22:4,15 24:8 25:4
25:8 26:11,17,18
27:22 33:18 36:7
41:20 42:16,18
44:13,24 45:19
47:12 49:23 60:1
61:14 64:6 74:20
79:3 81:2 83:17
**reason** 18:9 34:2
34:7 62:18 63:5
65:24 76:20 93:10
**reasonable** 36:9
45:4
**reasonably** 18:7
35:22 44:3 93:13
**reasoned** 54:14
**reasons** 21:1 38:2
43:17 45:22 64:13
69:10 70:2 81:16
81:16 92:6
**rebuttal** 46:4
80:20
**recall** 48:25
**receive** 33:5 58:10
58:13

**received** 26:19
37:5 43:2 58:8
59:3 75:3
**receiving** 57:22
65:1
**recipient** 45:19
**recognition** 72:5
**recognize** 34:13
64:11 72:18
**recognized** 34:12
34:19 73:8 90:24
**recognizes** 90:7
**recognizing** 52:19
**recommend** 76:10
**reconciling** 28:2
**record** 20:23
31:21 32:4 97:4
**recording** 18:10
18:12
**records** 37:7
43:18 44:6,22
45:3,10,15 57:17
**recovery** 29:6
**red** 54:2,3,4 84:10
**reduce** 68:8
**reduction** 29:6
**reference** 77:25
**regard** 34:22 47:3
49:19 94:2
**regarding** 5:13
7:2
**regardless** 35:17
**regenold** 16:22
**registration** 45:15
**reiterate** 81:1
**related** 2:11,14,19
3:1,7,12,19 4:5,19
4:24 5:3,8,14 6:3
6:11,22 7:2,3,9,18
31:10 49:3 92:18
**relates** 66:20
**relationship**
20:10

**release** 58:4
**releases** 21:2
54:15 92:19 95:18
**relevant** 58:17
**relied** 44:19
**relief** 22:8 24:9
29:20 35:25 47:9
71:25 84:7 85:23
86:3
**reluctant** 38:12
38:25
**reluctantly** 46:20
**rely** 35:23
**remain** 22:6
**remains** 64:10
**remarkable** 86:20
**remarks** 57:5
81:1
**remembers** 20:1
**reminder** 79:6
**reminders** 79:11
**repeatedly** 71:18
**replace** 36:25
**reply** 2:23
**report** 19:18,20
20:3,3,8
**reported** 40:16
49:4
**reporter** 18:7
**repository** 21:3
**represent** 62:20
85:13
**representative**
63:13
**represented** 87:20
**representing**
62:24
**represents** 77:1
95:4
**request** 4:14,18
5:2,6,18,22 6:1,10
27:12 28:17 34:8
45:25 60:12 81:17

**requested** 32:14
91:20 93:19
**requesting** 7:8
79:14
**requests** 2:18 4:4
6:21 7:1,17 26:13
27:5 34:6 35:25
43:18 49:5,8,12
63:2
**require** 37:6
48:17,18,19 66:10
68:13 91:4,16
**required** 28:18
35:10 44:8 45:3
45:10
**requirement**
37:11,13 75:7
91:1
**requires** 40:13
**requiring** 69:8
**research** 36:19
**reserve** 46:3
**resnick** 12:19
**resolution** 67:12
68:3 75:14
**resolve** 54:6
**resolved** 54:6 55:2
**resolving** 74:8
**resources** 71:23
73:24 74:1
**respect** 21:21
25:20 26:3,20
28:23 31:25 38:5
44:4 49:7 60:12
80:18,23
**respective** 71:12
**respects** 70:20
**respond** 46:4
47:20 49:5,9 56:6
78:9 80:17 95:24
95:24
**responding** 48:4
49:11

| | | | |
|---|---|---|---|
| **response** 7:8 | **road** 97:21 | **satisfied** 75:7 | **seeks** 23:4,6 |
| 36:14,17,22 41:13 | **robert** 1:22 | **satisfy** 36:9 45:4 | **seen** 41:13 86:3 |
| 49:7,24 67:1 | **robust** 28:11 | **saw** 79:1,2 | **send** 39:7 |
| 78:10 86:9 | 72:24 75:1 | **saying** 21:24 40:3 | **sense** 23:2,9,12 |
| **responses** 76:23 | **rockville** 13:21 | 41:24 64:8 70:2 | 56:22 62:8 80:8 |
| 86:20 87:6 | **role** 86:11 | 80:3 83:15 84:6 | 92:5 |
| **responsibility** | **roles** 54:13 | 85:2 92:3 94:11 | **sensible** 23:22 |
| 48:3 74:14 | **rolling** 39:16 | **schedule** 19:6 | 24:3 |
| **responsibly** 21:1 | **room** 1:13 | 53:23,24 | **separate** 68:13 |
| **rest** 31:23 | **rooyan** 5:9 16:2 | **schedules** 41:23 | 88:4 |
| **restructuring** | **rosen** 11:14 | 88:24 | **separately** 85:12 |
| 48:1 | **roughly** 89:21 | **scheme** 58:2,5,12 | 95:15 |
| **result** 27:21 37:19 | **rows** 40:9 | 58:22 59:3,4,21 | **september** 4:19 |
| 41:22 46:13 56:7 | **royalty** 20:10 | **schneider** 5:19 | 5:7,14 6:3 38:15 |
| 65:7,14 77:10 | **royer** 12:1 | **school** 12:21 | 38:17 40:6 49:9 |
| 94:18 | **rule** 33:2 34:13 | **schools** 12:10 | 54:11 68:12,16 |
| **resulting** 29:6 | 93:7 | **schwartzberg** | 93:2 |
| **retained** 57:3 | **rules** 29:19 34:13 | 8:17 | **seriously** 24:6 |
| **retread** 76:18 | 93:16 | **scope** 46:24 47:13 | **serve** 94:17 |
| **return** 95:18 | **ruling** 76:9 | 47:15,18 56:5 | **set** 32:18 39:1 |
| **returned** 68:11 | **run** 29:22 37:25 | **scorched** 43:14 | 41:17 52:8 53:10 |
| **returns** 76:22 | 43:8 69:11 80:10 | **scott** 16:20 | 53:16 58:18 61:20 |
| 77:23 91:7 | **rundlet** 14:24 | **scratching** 52:15 | 93:16 95:10,12 |
| **reviewed** 26:18 | 15:2 | **search** 43:14 | **seth** 15:25 |
| 31:13,19 61:18 | **running** 27:17 | **second** 23:12 | **setting** 61:16,21 |
| **rey** 9:18 | 35:17 78:15 | 28:12 33:20 47:9 | 91:3 |
| **rich** 12:16 | **ryan** 16:14,15 | 49:14 55:23 65:6 | **settled** 87:18 |
| **rick** 15:11 | | 66:3 67:17 88:16 | **settlement** 4:24 |
| **right** 22:5,16 | **s** | **secondary** 29:11 | 68:1 |
| 27:24 28:4 30:21 | **s** 2:11,14,19 3:2,7 | **secondly** 92:12 | **seven** 83:22 |
| 39:17 41:20,23 | 3:10,13,20 4:5,20 | 95:17 | **shame** 95:15 |
| 42:4 46:4 51:15 | 4:24 5:3,8,14 6:3 | **secret** 54:22 | **share** 53:12 95:14 |
| 56:24 57:20 61:18 | 6:11,22 7:3,9,9,18 | **secretaries** 48:15 | **shareholder** |
| 62:10 64:23 65:5 | 8:1 18:1 | **see** 22:14 30:22 | 19:24,24 20:6,16 |
| 70:1,5,7,10 74:24 | **sackler** 13:2 14:2 | 32:13 35:15 36:1 | **shareholders** 20:6 |
| 75:21,24 76:20 | 49:3 54:9,10 | 36:6 38:18 40:24 | 20:16 |
| 80:8,14,14,21 | **sacklers** 67:19 | 45:9 51:4 78:8 | **sharing** 60:24 |
| 85:10,18 86:5 | 95:23 96:13 | 83:16 88:15 95:6 | **shaw** 9:1 |
| 91:24 92:2,3 | **sackler's** 54:13 | 95:8 | **shayna** 16:7 |
| **ring** 67:6 | **sacks** 16:7 | **seek** 29:20 33:2 | **shea** 16:5 |
| **rise** 35:9 | **sacred** 20:20 | 33:11 42:24 83:25 | **sheila** 15:1,4 |
| **risk** 39:24 82:5 | **safe** 19:3 | **seeking** 22:7 | **shield** 63:17 |
| 84:21 88:3 | **safeguard** 37:2 | 38:13 61:6 85:23 | |

**shira** 16:3
**shoot** 96:11
**shore** 4:6 6:23
  8:24
**short** 42:2
**shorter** 56:4
**shortly** 52:9
**show** 35:21 59:15
  73:22 90:22 93:10
**showing** 23:15
  84:5
**shown** 36:19
**shutdown** 28:15
**side** 53:14 62:13
  62:18 63:1 65:4
  85:7
**significant** 49:10
  53:3 71:23 74:6
  76:5
**significantly** 48:2
**similar** 22:2
**similarly** 54:4,17
  61:23
**simple** 40:3 58:24
  65:19 75:6 79:16
  94:10
**simplified** 28:19
  89:14
**simply** 32:10
  40:20 43:16 45:19
  56:1 64:7 65:4
  70:1 90:23 91:20
**sincerely** 87:8
**single** 21:10 22:15
  45:19 82:15
**sit** 39:17 71:5
**sits** 62:11 63:13
**situated** 61:24
  62:10 81:2
**situation** 21:18
  47:14 52:14
**situations** 21:5

**six** 82:22 89:23
  91:10
**size** 59:24 66:12
  76:6
**skadden** 54:23
**skalet** 12:15
**skapof** 12:6
**skepticism** 53:24
**skip** 56:14
**skorostensky**
  15:12
**slaugh** 16:15
**slightly** 21:25
**small** 60:5
**social** 78:15 89:11
  91:2
**socol** 12:19
**soft** 37:25 92:13
**solutions** 18:11,12
  30:4 97:20
**somewhat** 31:17
  38:12 91:4
**sonya** 7:25 97:3,8
**soon** 20:25 34:24
  39:6 84:23
**sooner** 52:18
  55:21 68:4
**sophisticated**
  83:11
**sorry** 22:16 38:7
  41:2 49:24
**sort** 19:12 23:3,5
  23:16,20,24 56:21
  56:23 60:15,19
  69:23 82:12,13,19
**sought** 43:19
  45:12 87:2
**sounds** 23:22
**southern** 1:2
**sovereign** 85:5
**speak** 18:5 61:14
  63:7 66:25 70:15
  77:18 85:12

**speakers** 71:1
**speaking** 60:14
  80:3 89:3 91:2
**special** 54:23
**specific** 37:15
  40:12 58:20 62:2
  63:23 68:20 73:1
  75:18 89:16
**specifically** 35:19
  37:7 58:11 63:14
  69:2 90:3 94:8
**speculative** 29:3
**spend** 19:10
**spent** 27:20 28:1
  77:24 78:4,13
  82:14
**spoken** 46:20
  57:12 74:17
**spokesman** 23:13
**spots** 36:21
**springer** 16:17
**square** 9:10
**st** 82:14
**stakeholders**
  23:19 39:8 60:20
**stand** 44:25
**standard** 36:9
  45:4 47:5,7 48:22
  49:16 75:20
**standing** 70:19
**stands** 31:8
**start** 71:25 95:1
**started** 73:6
**starting** 67:13
  86:10
**state** 3:16 6:13
  10:2 11:21 27:11
  48:2 62:13,23
  64:17 77:8 85:14
  87:19,21,21,22
  94:12 96:11
**statement** 3:16,17
  4:1,9 6:13,14,18

  7:7,13 22:11 23:5
  25:17 26:2 32:2,7
  34:21 49:18 61:16
**statements** 26:3
**states** 1:1,12 2:13
  2:15 7:15 9:2
  22:12 24:7,14
  27:5 30:11,19
  36:5,6,10 37:9,24
  38:3,13 46:7
  47:22,24 48:5,9
  54:19,20 60:22
  62:15 67:25 70:14
  71:3,4,12,15
  77:21 85:4,7,11
  85:14,15,16 86:24
  87:2,17,19 88:22
  89:21
**state's** 48:16
**static** 36:13
**stating** 18:5
**stationed** 48:14
**step** 76:7 85:23
**stephen** 4:25
**steps** 90:8 95:14
**steven** 12:15
**stevens** 10:8
**stewards** 26:12
**stick** 85:21
**stock** 14:19
**stone** 38:21
**straightforward**
  37:16
**strategic** 87:9
**strategies** 66:20
**strategy** 43:9
**strauss** 61:12
**streaming** 36:21
**street** 1:13 8:14
  9:3 11:3 12:22
**strengthen** 42:2
**strikes** 70:7

[stroik - think]

**stroik** 11:17
**strong** 94:6
**strongly** 85:21
**struck** 85:21
**subdivisions**
85:14
**subject** 32:22 81:6
**submission** 30:1
30:12,14
**submissions** 26:20
**submit** 32:20 69:5
74:24
**submitted** 5:11
30:5,6,7 32:7
67:21 70:19
**submitting** 32:2
**subpoenas** 43:20
**subsidiary** 45:13
**substantial** 29:5
29:11 42:13 43:3
43:6 53:14 90:6
**success** 28:2
**successful** 42:3
89:20
**successfully** 27:17
**suffered** 94:16
**suffering** 94:21
**sufficient** 59:2
90:1
**suggest** 41:14
81:17
**suggested** 76:21
**suggesting** 24:12
**suggestion** 45:6
47:21 72:14
**suggests** 57:13
**suite** 10:3 97:22
**sum** 49:15 55:25
**summarize** 70:22
**summary** 36:23
**supplemental** 3:1
27:16 28:11 30:6
30:17,23 31:21

32:18 36:11,13,16
44:12,22 46:25
77:21 89:6,18
**support** 3:10,17
4:2,9 5:1,6,11,17
6:1,9,14,19 7:13
25:17,23 26:4
30:7 31:16 32:2,7
38:11,12 39:15
44:20 62:22 63:21
77:4 89:5,7
**supported** 25:14
27:12 63:25
**supporting** 4:17
25:20 28:22 37:10
60:18 63:7
**supports** 70:4
**supreme** 34:12
47:10 88:16 93:7
**sure** 18:20,24
31:3 32:3 39:22
42:9 52:12 61:2
70:6,16 71:7 75:6
**surely** 20:1 84:18
**surface** 75:19
**surgical** 69:1
**surprise** 73:11
**survey** 50:24
**swing** 60:19
**switch** 90:2
**sworn** 23:1
**sydenham** 15:19
**sympathetic**
74:10
**sympathy** 74:13
**system** 58:3 71:24

| t |
| --- |

**t** 97:1,1
**take** 24:6,18
39:23 46:17 54:12
79:8 81:25 83:1
84:20

**taken** 18:11 25:19
33:21 43:8 47:23
48:23 61:22 86:25
87:8 93:21 94:7
94:23
**takes** 21:3
**talking** 49:23 52:6
68:6 82:3,3,18
**target** 58:2
**targeted** 58:7,21
65:11
**targets** 44:18 65:7
**tax** 91:7
**taxes** 94:1
**teams** 36:24
**technical** 74:19
**technicalities**
22:22
**telephonic** 18:4
**telephonically** 8:8
8:9,10,17,24 9:6
9:13,20 10:6,13
10:20 11:6,13,14
11:15,16,17,18,25
12:6,7,14,15,16
12:17,25 13:6,7
13:15,16,23 14:6
14:7,16,18
**television** 89:9
**tell** 62:10 83:11
95:2
**telling** 78:21
**tens** 29:14 38:1
39:23 84:20
**tenth** 71:21
**terms** 47:25 49:11
53:5 54:3 56:21
78:2 85:25 86:24
87:20 88:9
**terrific** 24:16
**territories** 62:16
**testimony** 31:1,14
31:18

**thank** 18:23 19:4
19:8 24:19 26:10
30:21 31:9,24
34:20 36:4 46:6
57:7 60:8 61:13
70:10,11,17 76:12
76:17,24 77:12,13
80:16 96:19
**thanks** 56:19
76:13 80:14
**that's** 23:10 26:7
26:9 32:3 38:15
40:14 41:15 47:18
50:19 51:6 54:11
55:17 58:16 60:1
60:4
**theater** 36:22
**theaters** 90:3
**theisen** 16:24
**theories** 87:15
**theory** 56:24
**thereof** 2:6 3:19
6:16
**there's** 23:5 24:4
28:15,16 34:7
40:15 47:21 51:9
52:8 54:22 56:23
**they're** 23:3 42:21
45:18 51:6,12
58:7 59:4
**they've** 26:19
47:25
**thing** 21:9 22:16
34:25 39:4,22
94:3
**things** 19:15 32:1
39:11,13 55:4,4
58:23 60:1 82:16
83:11 84:15,17
92:4
**think** 19:9,16,19
19:20 20:12,13,19
20:23 21:7,7,11

21:15,17 22:14,15
22:20 23:2,4,10
23:13,14,16 24:11
24:12 26:1 33:14
33:15,24 34:22
39:13 40:7,15
42:3 45:17 46:19
47:16 50:17 51:9
51:17 52:16,21,24
53:4,8,15,20,20
54:12,22,22 55:16
55:22,25 56:9,22
56:23 57:2 62:6
65:2 66:23 68:22
69:22 71:17,18,21
72:1,19,23 73:17
74:25 76:21,22
82:1 83:19 84:13
84:24 85:19,25
86:21 87:6 88:13
89:10 92:1,22
93:11 95:25
**thinking** 96:14
**thinks** 56:9
**third** 11:10 29:2
42:25 45:12 55:23
58:8,19 59:3
63:11,17 64:17
67:2 92:19
**thirds** 77:22 78:4
78:11
**thomas** 10:3
11:22 14:22 15:6
**thorough** 20:3
**thought** 48:12
50:7 66:3,6 84:9
**thoughts** 39:2
46:11 85:23
**thousand** 79:16
**thousands** 50:6,6
**three** 19:10 20:2
44:17 89:24 92:6

**threw** 80:1
**tied** 81:12,18
**time** 18:5 19:14
27:13,20,24 28:1
29:22 36:8 37:12
37:13 39:18 40:4
42:2,13 43:7 46:2
50:7 52:22 55:17
55:19 59:7 61:25
66:8,9 67:8 69:4
69:13 71:11 72:17
72:19,20 73:1
74:23 75:23 79:2
81:15 83:20 84:9
84:17 86:15 95:24
96:10
**timeframe** 28:6
**timeline** 78:12
**times** 19:2 20:23
25:9 29:15 44:15
44:15,17 48:13
82:22 83:4 86:2
89:23,24
**timing** 54:9 94:3
**title** 57:13 78:17
**tk** 44:24 45:11
**tobacco** 21:5
**today** 25:1,12
46:18 52:20 61:1
96:18
**today's** 18:16
21:21,23 51:22
**told** 51:12 59:2
63:18 66:7,15
**toll** 28:15
**tomorrow** 39:12
**top** 19:5
**topic** 96:16
**topics** 22:7
**torch** 47:23
**tort** 29:24 40:18
40:23,23 72:13
87:15

**torts** 66:12
**touchiest** 85:25
**touching** 86:1
**touchpoints** 83:9
**townes** 25:3
**track** 44:18
**tracks** 39:2 84:16
**transaction** 20:14
**transactions**
19:23
**transcribed** 7:25
**transcript** 18:13
97:4
**transfers** 19:25
**transparency**
20:13
**treatment** 54:21
74:4 94:24
**tremendous** 71:22
78:21
**trend** 89:10
**tribes** 63:22
**tried** 60:23 61:21
62:3
**troop** 2:14,15
7:14 9:6 22:17
23:12,23 30:18,18
38:8 46:3,6,7,10
50:5,12,14,17,21
51:1,7,9,13,15
52:1,3,5,17 53:2
56:17 59:12,23
60:21,21 66:3
67:4,16 68:6
73:13 83:15
**troops** 48:13
**troop's** 23:5 56:24
**true** 67:6 72:22
73:6 90:23 96:1
97:4
**trust** 70:17
**trustee** 8:13

**trustee's** 18:25
**truth** 65:15
**try** 19:11 54:6
60:14
**trying** 19:2 25:9
41:20 69:15 84:22
**turn** 21:9,22
23:17,22 24:17
25:11 33:12 39:7
81:21 90:19
**turning** 31:24
**turns** 28:14
**tv** 35:15 36:18,21
**tvs** 27:21
**tweed** 13:1
**twin** 84:2
**two** 23:3,8,25
34:17 36:23 58:23
63:13 77:22 78:4
78:11 85:3 86:23
90:7 93:2,25
95:11
**tying** 54:1
**type** 64:3 68:20
**types** 62:8 64:21
65:19 88:15 90:2
90:4,4
**typically** 79:18

**u**

**u.s.** 1:23 8:12,13
18:25 44:14 82:11
**u.s.c.** 2:3
**ucc** 63:18 64:1
67:25 70:4 76:25
85:9
**ultimate** 87:9,9
**ultimately** 31:17
35:6 77:8 82:6
89:20 90:19
**unable** 34:2 49:4
60:24 65:14 93:13
**unanimous** 84:8

**uncontroverted** 65:10
**understand** 60:5 79:4 83:12 84:13 94:22 95:10,21
**understanding** 25:23 30:10
**understood** 54:9
**undertake** 47:16
**undertaken** 45:7 72:8
**undertaking** 42:14
**undoubted** 92:12
**undoubtedly** 43:5
**undue** 26:15 43:25
**unfair** 69:14
**unflagging** 25:4
**unfortunately** 73:23 85:6
**uniform** 72:5
**union** 9:10
**unique** 71:20 75:20 88:5
**united** 1:1,12 54:19,20 87:19 88:23 89:21
**universe** 74:6 87:25
**unknown** 1:25 44:2,9 83:15
**unmute** 51:18
**unopposed** 84:8
**unprecedented** 28:10 32:14 46:22 46:23 66:12 71:17
**unresolved** 39:13
**unsecured** 4:9 7:7 7:10 13:11 25:14 25:18 27:10 61:13 83:23,24 86:17 87:13

**unusual** 71:20 87:12 93:22 94:11 94:14
**unworkable** 45:21 93:16
**updates** 19:11
**upended** 91:15
**urged** 53:22
**use** 22:6 81:13 95:13
**uzzi** 13:7

**v**

**vacuum** 28:1
**value** 43:6 88:2
**van** 5:9 16:2
**vanicky** 5:24
**variables** 91:25
**variation** 91:25
**variety** 23:19
**various** 19:4 26:3 45:24 61:20 64:7 64:13 67:19,22 70:8 85:22 86:18
**varying** 28:2
**vehicles** 45:14
**verification** 69:9
**veritext** 97:20
**vermont** 57:18
**versus** 64:4
**viable** 39:19
**vice** 30:3
**victim** 59:4
**victims** 4:1,7 5:13 6:18 8:20 11:2 25:16,19,21,22,25 27:10 32:1,8,24 58:5,7,21 63:6,7 64:12,15 72:1
**video** 22:25 36:21
**view** 23:14 33:14 37:22 60:13 63:20 66:15,17 67:9 68:25 77:9 95:8

**viewership** 36:20 90:6
**views** 22:5,7 23:7 23:20,25 26:13,19 28:2 41:17 45:24 92:1 94:6,6,23 95:12
**village** 13:20
**viola** 16:1
**visible** 19:13
**visits** 51:3
**vitiated** 78:25
**vocal** 63:6
**voice** 18:8
**voiced** 66:16 67:9
**volkov** 10:20
**voluminous** 19:19
**voluntarily** 93:14

**w**

**wait** 34:15 52:10
**waiting** 20:20
**walden** 15:15
**want** 18:13 19:4 19:10 21:7,7,17 23:18 30:16 39:10 46:16,19 50:19 52:4,24 62:2,18 64:19 66:25 68:2 68:5 70:25 75:4 76:18 80:17 82:2 94:3,12,19,25 96:3,4,4
**wanted** 22:24 49:11
**wants** 72:17
**wardwell** 8:3 18:21 24:23
**warrant** 75:21
**warranted** 65:8 88:14 93:23
**warranting** 29:18
**washington** 10:4 11:23 12:12 48:7

**48:14**
**waterfront** 20:14
**waterline** 19:13
**way** 19:14 21:4 27:19 28:19 50:19 62:1 64:9,25 65:11 67:3 70:9 71:24 73:25 77:23 78:11 87:19 95:2 95:19
**ways** 19:2 42:21 94:4
**we've** 68:25 70:22 76:23
**website** 41:16,17 51:3 79:1 83:11 89:16
**week** 19:18 41:6 48:11 51:22 79:17
**weekly** 79:15
**weeks** 82:14,14,14 85:22 93:25
**weigh** 74:4
**weighing** 94:1
**weiner** 16:3
**went** 69:18 85:1
**west** 9:3 11:3 12:22 63:15
**westwind** 9:17
**we'll** 23:24
**we're** 18:3 20:20 40:5,8 41:5 49:15 49:21,23 52:5 58:23 59:7 60:13 60:14
**we've** 41:13 48:23 55:19
**what's** 23:11 46:18 49:5
**white** 1:14 8:19
**whitney** 15:23
**who's** 46:20

| wide | y |
|---|---|
| **wide** 35:6 48:10 | |
| **wider** 48:10 | **y** 64:8 95:21 |
| **williford** 11:18 | **yard** 48:17 |
| **willingness** 47:20 | **yards** 13:3 |
| **winthrop** 9:1 | **yeah** 18:23 31:3 |
| **wise** 41:24 | 50:16 80:11 |
| **wish** 31:2,5 | **year** 30:8 31:16 |
| **witness** 22:25 | 57:16 86:8 88:8 |
| **woken** 48:12 | **years** 82:20,22 |
| **woodwork** 88:3 | **yesterday** 48:7,16 |
| **word** 23:8 | 61:16 67:21 95:23 |
| **words** 33:20 | **york** 1:2 8:6,15,22 |
| 59:17 80:20 | 9:4,11 10:11,18 |
| **work** 21:12,13 | 11:4,11 12:4 13:4 |
| 78:5,21,24 79:19 | 13:13 14:4,14 |
| 84:16 92:15 | 16:16 48:13 |
| **workable** 27:19 | **youtube** 36:2 |
| 28:14 | 78:16 |
| **worked** 50:3 | **you're** 24:12 |
| 65:11,13,13 66:19 | 36:16 51:18 |
| 66:21 | **you've** 53:22 |
| **workers** 48:2 | 58:25 |
| **working** 53:13 | |
| 71:10 73:24 | z |
| **world** 46:13 49:17 | **zammiello** 16:8 |
| 50:21 69:20 | **zero** 23:20 84:5 |
| **worse** 49:19 | **zone** 40:11 |
| **worth** 19:16,17 | |
| 79:23 | |
| **would've** 43:8,21 | |
| 48:12,12 53:25 | |
| **write** 23:17 | |
| **writers** 77:8 | |
| **written** 38:20 | |
| 43:23 44:8 | |
| **wrong** 40:21 | |
| **wrote** 4:23 | |
| x | |
| **x** 1:4,10 35:3 64:7 | |
| 79:16 84:12 95:19 | |
| 95:21 | |

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9         Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11              United States Bankruptcy Court

12              Tele/Video Proceedings

13              300 Quarropas Street, Room 248

14              White Plains, NY 10601

15

16              August 25, 2021

17              10:03 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO: UNKNOWN

Page 2

1     HEARING re Continuance of Confirmation Hearing From August

2     23, 2021

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25     Transcribed by:   Sonya Ledanski Hyde

```
                                                    Page 3

 1   A P P E A R A N C E S :

 2

 3   DAVIS POLK WARDWELL LLP

 4        Attorney for Debtors

 5        450 Lexington Avenue

 6        New York, NY 10017

 7

 8   BY:  MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

 9        BENJAMIN KAMINETZKY (TELEPHONICALLY)

10        JAMES I. MCCLAMMY (TELEPHONICALLY)

11        ELI J. VONNEGUT (TELEPHONICALLY)

12        GERARD MCCARTHY (TELEPHONICALLY)

13        MARC J. TOBAK (TELEPHONICALLY)

14

15   CAPLIN DRYSDALE

16        Attorneys for Multi State Governmental Entities Group

17        One Thomas Circle

18        Washington, DC 20005

19

20   BY:  KEVIN MACLAY (TELEPHONICALLY)

21

22

23

24

25
```

```
                                              Page 4
 1   PULLMAN COMLEY

 2        Attorneys for State of Connecticut

 3        850 Main Street

 4        Bridgeport, CT 06604

 5

 6   BY:  IRVE GOLDMAN (TELEPHONICALLY)

 7

 8   MILBANK, TWEED, HADLEY & MCCLOY LLP

 9        Attorneys for the Raymond Sackler Family

10        55 Hudson Yards

11        New York, NY 10001

12

13   BY:  GERARD UZZI (TELEPHONICALLY)

14

15   KRAMER LEVIN NAFTALIS & FRANKEL LLP

16        Attorneys for Ad Hoc Committee

17        1177 Avenue of the Americas

18        New York, NY 10036

19

20   BY:  JONATHAN WAGNER (TELEPHONICALLY)

21

22

23

24

25
```

1   WEST VIRGINIA ATTORNEY GENERAL'S OFFICE

2        Attorneys for the Attorney General for the State of

3        West Virginia

4        State Capitol Complex, Bldg. 1, Room E-26

5        Charleston, WV 25305

6

7   BY:  PATRICK JAMES MORRISEY (TELEPHONICALLY)

8

9   SULLIVAN WORCESTER LLP

10        Attorneys for Purdue Pharma, L.P.

11        1633 Broadway

12        New York, NY 10019

13

14   BY:  JEFFREY R. GLEIT (TELEPHONICALLY)

15

16   LITE DEPALMA GREENBERG AFANADOR, LLC

17        Attorneys for Canadian Municipality and First Nation

18        Creditors

19        570 Broad Street, Suite 1201

20        Newark, NJ 07102

21

22   BY:  ALLEN J. UNDERWOOD (TELEPHONICALLY)

23

24

25

1   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

2        Attorney for State of Maryland

3        200 Saint Paul Place

4        Baltimore, MD 20852

5

6   BY:  BRIAN EDMUNDS (TELEPHONICALLY)

7

8   US ATTORNEY'S OFFICE

9        86 Chambers Street, 3rd Floor

10       New York, NY 10007

11

12  BY:  LAWRENCE FOGELMAN (TELEPHONICALLY)

13

14  PILLSBURY WINTHROP SHAW PITTMAN LLP

15       Attorneys for Ad Hoc Group of Non-Consenting States

16       31 West 52nd Street

17       New York, NY 10019

18

19  BY:  ANDREW M. TROOP (TELEPHONICALLY)

20

21

22

23

24

25

Page 7

1   FRANK OZMENT ATTORNEY AT LAW, LLC

2        Attorneys for Bridges Bloyd Fitch

3        217 Country Club Park, Box 501

4        Birmingham, AL 35213

5

6   BY:  JAMES FRANKLIN OZMENT (TELEPHONICALLY)

7

8   WHITE & CASE LLP

9        Attorneys for The Ad Hoc Group of Individual Victims of

10        Purdue Pharma

11        1221 Avenue of the Americas

12        New York, NY 10020

13

14   BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

15

16   GILBERT LLP

17        Attorneys for Ad Hoc Comm. of Gov't and Litig.

18        Claimants

19        700 Pennsylvania Ave. SE, Suite 400

20        Washington, DC 20003

21

22   BY:  EMILY GRIM (TELEPHONICALLY)

23

24

25

Page 8

1    WILMER CUTLER PICKERING HALE AND DORR

2          Attorneys for Navigators Specialty Insurance Company

3          7 World Trade Center

4          New York, NY 10007

5

6    BY: PHILIP D. ANKER (TELEPHONICALLY)

7

8    REED SMITH LLP

9          Attorneys for the Debtor

10         Reed Smith Centre

11         225 Fifth Avenue

12         Pittsburgh, PA 15222

13

14   BY:  PAUL M. SINGER (TELEPHONICALLY)

15

16   MARIA ECKE, PRO SE  (TELEPHONICALLY)

17

18   CARRIE L. MCGAHA, PRO SE  (TELEPHONICALLY)

19

20   ALSO PRESENT TELEPHONICALLY:

21   J. CHRISTOPHER SHORE

22   CATHERINE STEEGE

23   ANDREW M. TROOP

24   EVAN JONES

25   ARIK PREIS

Page 9

```
 1    PAUL KENAN SCHWARTZBERG
 2    MATTHEW J. GOLD
 3    THOMAS ROBINSON O'NEILL
 4    JILL S. ABRAMS
 5    ROXANA ALEALI
 6    ANDREW VINCENT ALFANO
 7    PHILIP D. ANKER
 8    MICHAEL ATINSON
 9    MITCHELL JAY AUSLANDER
10    JASMINE BALL
11    PRIYA BARANPURIA
12    BROOKS BARKER
13    DAVID E. BLABEY JR.
14    LOUIS BOGRAD
15    SARA BRAUNER
16    DAVID BROWN
17    GABE BRUNSWICK
18    AARON CAHN
19    MARK CHALOS
20    GERARD CICERO
21    HAYDEN COLEMAN
22    DANIEL CONNOLLY
23    ABBY G. CUNNINGHAM
24    MELANIE L. CYGANOWSKI
25    MARIO D'ANGELO
```

1   PETER C. D'APICE

2   STACY DASARO

3   JOSEPH G. DAVIS

4   KEVIN DAVIS

5   MARK DEARMAN

6   JESSE DELACONTE

7   SHANNON DEVON

8   CLINT DOCKEN

9   JOHN C. DOUGHERTY

10   JOHN DUBEL

11   STEPHANIE EBERHARDT

12   KENNETH H. ECKSTEIN

13   BERNARD ARDAVAN ESKANDARI

14   MATHEW FARRELL

15   JENNIFER S. FEENEY

16   LAURA FEMINO

17   ROBERT FINZI

18   MATTHEW FITZSIMMONS

19   PAMELA FLETCHER

20   SAM FRAIDIN

21   HEATHER FRAZIER

22   BRYCE L. FRIEDMAN

23   KATHERINE GALLE

24   CAROLINE GANGE

25   JOSEPHINE GARTRELL

1   GILL GELDREICH

2   MELISSA GIBSON

3   JARED GIDDENS

4   MAGALI GIDDENS

5   SCOTT GILBERT

6   MICHAEL GOLDSTEIN

7   GEOFFREY S. GOODMAN

8   ISLEY MARKMAN GOSTIN

9   GARY GOTTO

10   JARED T. GREEN

11   JAMES S. GREEN, JR.

12   DEBORAH GREENSPAN

13   EMILY GRIM

14   JOHN GUARD

15   ADAM P. HABERKORN

16   CATHERINE BEIDERMAN HEITZENRATER

17   ANGELA K. HERRING

18   MICHELE HIRSHMAN

19   JENNA A. HUDSON

20   MITCHELL HURLEY

21   ELISA HYDER

22   LINDA IMES

23   MARK S. INDELICATO

24   HAROLD D. ISRAEL

25   SAMUEL ISSACHAROFF

1   STEVEN IVES

2   ETHAN KAMINETZKY

3   NICKOLAS KARAVOLAS

4   KAREN KENNEDY

5   MARC KESSELMAN

6   DARREN S. KLEIN

7   JEREMY C. KLEINMAN

8   LAWRENCE KOTLER

9   ANN KRAMER

10   M. NATASHA LABOVITZ

11   ALEXANDER LEES

12   DANIEL LENNARD

13   NICOLE A. LEONARD

14   MARA LEVENTHAL

15   DANIELLE J. LEVINE

16   RUTH LICHTENFELD

17   JEFFREY LIESENMER

18   EDAN LISOVICZ

19   JOHN LONGMIRE

20   JOHN LOWNE

21   MICHAEL LUSKIN

22   BRIAN S. MASUMOTO

23   PATRICK C. MAXCY

24   LAURA MCCLOUD

25   HUGH M. MCDONALD

1   SHANNON M. MCNULTY

2   MICHELE MEISES

3   LIVY MEZEI

4   NATHANIEL MILLER

5   JONATHAN E. MITNICK

6   DAVID MOLTON

7   MAURA KATHLEEN MONAGHAN

8   ANDREW J. MUHA

9   AISLING MURRAY

10   EDWARD E. NEIGER

11   MICHAEL PATRICK O'NEIL

12   DAMIAN O'SULLIVAN

13   JAMES FRANKLIN OZMENT

14   JENNIFER PEACOCK

15   STEPHEN POHL

16   KATHERINE PORTER

17   DOUGLASS PRESS

18   NICHOLAS PREY

19   MICHELE PULGGARI

20   KAMI QUINN

21   MARION QUIRK

22   GILLIAN RENDEL

23   CHRISTINA RICARTE

24   JOSEPH RICE

25   RACHAEL RINGER

Page 14

1    CHRISTOPHER ROBERTSON

2    JEFFREY J. ROSEN

3    JORDAN ROSENBAUM

4    PAUL S. ROTHSTEIN

5    JASON RUBINSTEIN

6    MEGAN PARIS RUNDLET

7    WILLIAM T. RUSSELL

8    JEREMEY W. RYAN

9    JAMES SALWEN

10   DANIEL JOSEPH SAVAL

11   SETH SCHINFELD

12   ELIZABETH SCHLECKER

13   FREDERICK E. SCHMIDT

14   MICHAEL SHEPHERD

15   RICHARD SHORE

16   RICHARD SILBERT

17   LIANNA SIMMONDS

18   PAUL SINGER

19   MARC F. SKAPOF

20   ARTEM SKOROSTENSKY

21   D. RYAN SLAUGH

22   JOSEPH L. SOROKIN

23   CLAUDIA Z. SPRINGER

24   HOWARD STEEL

25   ERIC STODOLA

```
 1   ADAM SWINGLE

 2   JEROME TAPLEY

 3   PAMELA THURMOND

 4   MARC J. TOBAK

 5   SARA E. TONNESEN

 6   KELLY TSAI

 7   JOSEPH TURNER

 8   MELISSA L. VAN ECK

 9   MICHAEL J. VENDITTO

10   RYAN A. WAGNER

11   JORDAN A. WEBER

12   WENDY WEINBERG

13   SHIRA WEINER

14   WILLIAM P. WEINTRAUB

15   MARTIN WEIS

16   MARTIN JAMES WEIS

17   ALLISON H. WEISS

18   THEODORE WELLS, JR.

19   STEVEN WILAMOWSKY

20   DANIEL WOLF

21   LAUREN S. ZABEL

22   JAMIE ZEEVI

23   DAVID ZYLBERBERG

24

25
```

1           P R O C E E D I N G S

2                THE COURT:  Good morning.  This is Judge Drain.

3      We're here in In Re Purdue Pharma L.P., et al., on the

4      second day of oral argument in relation to the Debtors'

5      request for confirmation of their amended Chapter 11 plan.

6                MR. HUEBNER:  Your Honor, with apologies, we're

7      not hearing any audio.  I'm not sure if the Court needs to

8      be heard yet or not.  I apologize for interrupting.

9                THE COURT:  Thank you.  I thought it was off of

10     mute, but it wasn't.  Let me start over again.  Thanks.

11               Good morning, this is Judge Drain.  We're here in

12     In Re Purdue Pharma L.P., et al., on the second and last day

13     of oral argument on the Debtors' request for confirmation of

14     their amended Chapter 11 plan.

15               I have the order of topics and time that the

16     parties have agreed to allocate to them, which the parties

17     circulated overnight.  And I'm happy to follow that order

18     for purposes of today's hearing.

19               MR. HUEBNER:  Perfect, Your Honor.  Good morning.

20     For the record, Marshall Huebner, from Davis Polk &

21     Wardwell, on behalf of the Debtors.

22               Your Honor, two things before we start the agenda.

23     You know, as always, we have sort of a dual role as a plan

24     proponent and as an advocate sometimes for our stakeholders,

25     but also a shepherd of the process.

1          Your Honor, I think it was not lost on anybody on

2     Monday that Your Honor expressed strong views about

3     attempting to get to a deal with a final very small number

4     of stakeholders not yet onboard.  I believe three times you

5     mentioned the heroic effort of Judge Chapman, who worked in

6     Phase 3 of mediation.

7          I do want to advise the Court that Judge Chapman

8     seems to have heard that, and she is absolutely back in the

9     saddle, working extraordinarily hard, again, as a sitting

10    judge, for, of course, no compensation, just part of public

11    service, to try to see if anything can be done.

12         As I'm sure it's also not going to be a surprise

13    for the Court to hear, further work tailoring and narrowing

14    the releases is something that is the subject of many of the

15    objections, and certainly the subject of a fair number of

16    very clear thoughts from the Judge.

17         And so while on one hand, because there are

18    elements that are being discussed among the parties.  And I

19    won't say more than that, except that the Debtors are

20    working around the clock to try to facilitate to see if

21    something can be done assisting Judge Chapman.

22         There are other elements as well, as there were in

23    round 3 of mediation.  There were new covenants and

24    economics and other things.  And I can't say more than that.

25    That would be inappropriate, and so, of course, I won't.

1           But a fourth or additional element is the

2    releases.  Strategically, one might have argued for a

3    position that that should be sorted used as part of a

4    potential big set of final trades in a ground-floor

5    mediation by Judge Chapman.  But I think that would not have

6    been the right answer.

7           The right answer is to fix (indiscernible) it now

8    and give the Court and all parties comfort that people,

9    including on the Sackler side, and facilitated very strongly

10   by the Debtors and others, continuously recalibrating and

11   trying to make this the best possible deal for all Purdue

12   stakeholders.

13          In the middle of the night last night, we filed

14   the ninth amended plan of reorganization, which really does

15   one thing primarily, which is substantially further narrow

16   and tailor the third-party releases that I think it's fair

17   to say lie at the heart of much of the colloquy and

18   objection at this hearing.

19          And so rather than saving it to be offered in

20   mediation, which is now basically ongoing, it's in already

21   and there for people to see.  I think some people understand

22   it.  Some people, I think, are still having it explained to

23   them.  It's very complicated.  We are working around the

24   clock on located things.

25          So in about 30 seconds, I will turn the podium

1   over to Mr. Uzzi, who will, I think, probably be in the best

2   position to describe to describe those releases, and how

3   they have changed, and how it is hopefully important to the

4   objectors , and also quite important to the Court.

5          But before I do that, one over item in my other

6   role, which is I do want to let the Court know that the Gulf

7   objection, as Your Honor may remember, was argued by Mr.

8   Luskin (indiscernible) with Mr. Tobak, negotiations towards

9   settling that also continue, as we are.  Obviously, as

10  you've seen, you know, every time I get up, we have either

11  another settlement or fewer objections to announce.  I think

12  everyone knows that's our MO, and we're still doing it here

13  at the last day of oral argument.  And so those are the two

14  procedural matters before we get to the agenda.

15         So with that, with the Court's permission, I'd ask

16  Mr. Uzzi to help explain the changes, and certainly in the

17  minds of the Sacklers, you know, the changes that they made.

18         THE COURT:  Okay.  Before I hear from Mr. Uzzi, I

19  think I ought to say two things.  First, I have not spoken

20  to Judge Chapman about her continuation as a mediator in the

21  case, either before or after what you have just described.

22  Nevertheless, I'm quite grateful to her, you know, if she's

23  been willing to take on that role.  And I obviously

24  encourage the parties to try to resolve their differences,

25  including with her really dedicated and expert efforts,

```
 1   which she brings to every mediation, and certainly from my
 2   reading of her mediators report that was filed earlier in
 3   the case, she brought to this one.  So I welcome that
 4   development.  Although it's a surprise to me.  But I'm
 5   grateful for it, and it's certainly in line with the
 6   admonition I gave to the parties on Monday.
 7             Secondly, unfortunately, I have not had the
 8   opportunity to review the change in the ninth amended plan.
 9   So I'm largely in listening mode here, not commenting mode.
10   But again, I welcome the parties continued work on the scope
11   of the release and injunction of third-party claims.
12             So, having said that, I'm happy to hear from Mr.
13   Uzzi.
14             MR. HUEBNER:  Your Honor, before he begins, just
15   two very quick notes.  To give credos where they're also
16   due, the first round mediators also continued after
17   mediation formally entered (indiscernible) mediation --
18             THE COURT:  I understand that.
19             MR. HUEBNER:  -- privilege --
20             THE COURT:  And, you know, we've been really
21   fortunate to have world-class mediators in this case, and
22   they take their role -- they took their role and take their
23   role seriously and continued beyond the original time
24   allocated.  And you know, again, I encouraged that under the
25   mediation order.  And similarly, even though my mediation
```

```
 1    order for Judge Chapman set a specific deadline for the

 2    parties, and as everyone knows, deadlines are important,

 3    based on what you've described to me, the discussions that

 4    are ongoing now are similarly under that order.  If you face

 5    a similar deadline, which is I intend to rule on Friday on

 6    this request for confirmation on the plan.

 7               MR. HUEBNER:  Yeah, Your Honor.  That was the

 8    tentative point I was going to make.  I actually did not

 9    have time to double check it, but hopefully my memory is

10    right, that the order actually expressly contemplates post-

11    mediation conversations that I actually believe keep our --

12    remained governed by the confidentiality shields.  And so,

13    everyone who is having those conversations is treating them

14    as such.

15               So with that, Your Honor, let me turn my

16    microphone off and turn it over to Mr. Uzzi to explain what

17    was filed overnight.

18               THE COURT:  Okay.

19               MR. UZZI:  Thank you, Your Honor.  Gerard Uzzi of

20    Milbank, on behalf of the Raymond Sackler family.

21               Your Honor, I think what I'd like to do here is

22    explain to you what we try to accomplish and the changes,

23    but not necessarily go through those changes line by line.

24    Obviously, if you'd like us to do that, we can do that as

25    well.  But at least, you know, first give you the conceptual
```

Page 22

1    overview, and then I'll take direction from the Court.

2         Your Honor, I mean, I would agree with Mr.

3    Huebner.  You know, we did not and weren't interested in

4    (indiscernible) these things up as a bargaining chip in

5    mediation, further discussions.  What we've tried to do is

6    be sponsored, not only to the Court's comments, but also to

7    comments of some of the objectors, to the extent that we

8    could.

9         Before I get into the actual changes, Your Honor,

10   just for the sake of clarity of the record, I think there

11   are a few things that I can say that I hope is helpful as it

12   relates to what the releases don't cover, never have

13   covered.  And you know, one of those things, of course, is

14   criminal liability.

15        And I know Your Honor knows that the releases

16   don't cover criminal liability.  There continues to be, you

17   know, some innuendo and clouding, I think, that issued both

18   inside this courtroom and outside.  And I thought it might

19   be helpful, just for on the record, to hear a Sackler

20   representative say these releases do not cover criminal

21   liability.  Hopefully, that puts any debate on that topic to

22   an end.

23        There's been a number of suggestions of the tax

24   liability being released.  Tax liability is expressly carved

25   out.  There is no release of tax liability.  It doesn't

Page 23

```
 1    matter who the taxing authority is.  There's no release of

 2    tax liabilities.

 3             There also has been some suggestion that we were

 4    attempting to shield releasing parties from their future

 5    conduct.  The release never contemplated that.  We've

 6    clarified that.  But it was something that was never in the

 7    release, and I thought it might be helpful just to clarify

 8    that.

 9             As far as the comments we've tried to address now,

10    that were admittedly picked up by the release, the first one

11    is one that I would characterize as the undiscovered

12    McKinsey issue, or the undisclosed McKinsey issue, or

13    something to that effect.  And the release was drafted, Your

14    Honor, against a backdrop of the Sacklers and their entities

15    having been thoroughly examined and thoroughly investigated.

16    And we just, in the drafting of the releases, believe that

17    if there were that type of party, somebody would come to us,

18    they would identify it, and of course, we would add to that

19    excluded party list.  And that's the spirit of how we had

20    drafted that release in (indiscernible).

21             What we originally proposed on Monday to address

22    what I'll call the undisclosed or undiscovered McKinsey

23    issue, is a carve out for -- we used the defined term

24    willful misconduct, which was probably not a good defined

25    term -- but to really pick up some intentional wrongdoing.
```

Page 24

```
 1              As we worked on this over the last day, we decided
 2    to make really what I think is a material change here as it
 3    relates to the third-party releases of the shareholder
 4    consultants.  And that is to simply carve them out.  And so
 5    the shareholder consultants are carved out -- with one
 6    exception I'll talk about in the second -- are carved out of
 7    the release, the third-party release, completely.  And we
 8    hope that that just dispenses with the issue.
 9              The one consultant that's not an outside third-
10    party firm, which then exists on what used to be Exhibit H -
11    - and we've updated it to be Schedule X, I believe, now --
12    is simply Norton Rose, Your Honor.  And they do fit into a
13    different category.  They have been both the family and the
14    Debtors' -- with their predecessor, Chadbourne & Parke,
15    counsel to the firm for decades.  They have been subject to
16    discovery here.  They have been investigated.  And we do
17    think it's appropriate to keep them on the exhibit.  But
18    we've otherwise carved everybody else out.
19              Because of that, we then removed the defined
20    willful related party claim, as we just don't believe it's
21    necessary anymore and doesn't and shouldn't probably apply
22    to the other parties that were in the release who are
23    similarly situated to what I would call the core releasees
24    here.
25              I'll note further, Your Honor, if the exhibit had
```

Page 25

1    my permanent, Milbank -- and I don't think I'm stretching to

2    say the release of professionals is pretty standard in any

3    release -- but we heard the commentary of why does a certain

4    named firm need a release.

5            The fact is, my firm doesn't need a release, so we

6    carved ourself out.  And we did that because I, along with

7    all of my co-advisors here, we do not want to be a

8    distraction here.  So Milbank is out, and the other named

9    third-party advisors are also off the schedule.  And we hope

10   that that goes a material way to addressing all of the

11   concerns.

12           The other issue we tried to address, Your Honor,

13   is to be further responsive on the non-opioid-related

14   claims.  And as you'll remember from Monday, Your Honor,

15   there was some colloquy over what did that mean.  First,

16   I'll say we've added "reckless" to the definition there of

17   the type of conduct, the predicate conduct or the predicate

18   state of mind, I should say, that would trigger that.

19           Your Honor asked me if that definition picked up

20   fraud, and I incorrectly said no.  And I apologize for that.

21   I went back and read it and I think under that definition,

22   it already picked up fraud.  And actually, things are a lot

23   broader than fraud, are not limited to fraud.  And the

24   operative word, when you take a look at it, Your Honor, is

25   "unlawful."  All right?  So, clearly, fraud is unlawful, but

1    unlawful isn't limited to fraud.  And I think that that word

2    really does it.  But we did add fraud or fraudulent conduct

3    to the definition, just to be clear.

4         We changed then, Your Honor, the definition from

5    willful misconduct to non-opioid actual misconduct claim.

6    We just think that that is a more descriptive term.  I've

7    had a lot of semi-scholarly colleagues try to tell me that

8    willful misconduct was confusing, so we just try to take

9    that confusion out.  That, Your Honor, applies to all the

10   releasees.  So if all the releasees are on for non-opioid

11   liability are subject to the non-opioid actual misconduct

12   claim.

13        And then, if you look -- when you go through this,

14   Your Honor, and you know, I will give you the cite.  In

15   10.7(v), where the heaviest blackline is, that is simply to

16   pick up the indemnification claims that could otherwise be

17   asserted against the Sacklers.  If we're carving out from

18   the releasees the -- I'll call it the McKinseys of the world

19   -- we can't have, of course, a backdoor coming back in.  And

20   we just clarified that language in there.  It was always

21   like that, Your Honor, but we just needed to change the

22   words in order to pick it up because of other changes we've

23   made.

24        Your Honor, that's the overview.  I'm happy to go

25   into some detail.  I'm also happy to answer any questions

1    you might have.

2           THE COURT:  Well, again, I haven't had a chance to

3    parse the language, but I appreciate the overview.  I guess

4    what I would say -- and I appreciate that these changes, as

5    you've described them, are constructive and have narrowed

6    considerably the release -- is that I'll carve out some time

7    at the end of today's argument for people who have objected

8    on the basis of the breadth of the release, and that only.

9    Not any other aspects of the release, but just the breadth

10   of the release, to have the chance to point out to me their

11   view, if they still have it, that the releases still overly

12   broad.

13          So I think all of the people on the call today or

14   on the Zoom today have the proposed allocation of time for

15   oral argument today.  And just at some time at the end of

16   that schedule for people to point out to me if they want to,

17   and for the Debtors and others to respond, issues that

18   remain as to the breadth of the release language.  And that

19   will --

20          MS. UZZI:  Thank you --

21          THE COURT:  -- give me a chance to look it over at

22   the lunch break also.

23          MR. UZZI:  Very well, Your Honor.

24          THE COURT:  Okay.  Thank you.

25          MR. HUEBNER:  Okay.  So, Your Honor, I believe

1    that brings us to the first item on the agenda, which is

2    best interests of Ditech.  Mr. Goldman asked for 35 minutes,

3    so we're fine with that.  I may run a little bit longer than

4    my initial plan of 20, for fairness and symmetry, and

5    because I have something I want to begin with before I

6    actually head into best interests.

7                    THE COURT:  Okay.

8                    MR. HUEBNER:  Your Honor, there was some

9    interesting colloquies from the Court, pretty scholarly,

10   frankly, for those of us who are, you know, bankruptcy

11   folks.  On Pages 180-182 of the transcript, and then again

12   on 57-259, about the factor of Metromedia that requires, or

13   seems to contemplate, creditors being paid in full, which

14   just makes no analytic sense, because there's nothing to

15   release if creditors are paid in full.  And Your Honor cited

16   millennium labs and their fairness test, the much more

17   recent Third Circuit decision, as seemingly a logical

18   imperative and much more sensible.

19                    In addition, Your Honor, you actually cited

20   ourself to 1129(a)(7) on Page 181, Line 12-16, and said, you

21   know, isn't this the right answer?  Because if 1127 requires

22   -- 1129(a)(7) requires that you're getting more than you

23   would get in another scenario, is not definitionally fair,

24   so that proving the best interests test may actually be kind

25   of what the Third Circuit meant.

1          Third Circuit Standard, as of course I think all

2     litigants in this case know, in their recent decision from

3     2019, is that, "The hallmarks of permissible nonconsensual

4     releases are fairness, necessity to reorganization, and

5     specific factual findings to support these conclusions."

6     That's Metromedia at Page 139.  I'm sorry -- Millenium --

7     I'm just so tired -- at Page 139.

8          So I think that's actually dead on.  And so, you

9     know, when I now will launch into my best interests

10    argument, which is really so important because it is the

11    view of basically everybody in the case, rather than one

12    objector, implicitly or explicitly, that this is the highest

13    and best recovery for creditors, and it is better than a

14    liquidation,  plus the pursuit of third-party claims.  I

15    think that actually the Third Circuit maybe had it right.

16    And fairness means, you know, if you can't do better than

17    what we're getting for you under this plan, what else should

18    we be doing but this plan?

19          So with that, if Your Honor will let me launch it.

20          THE COURT:  Can I -- and I, at risk of -- and I

21    don't think it's -- it doesn't derail your argument, but I

22    want to be clear.  The best interests test, as set out in

23    Section 1129(7), is a statutory test, and one needs to

24    follow the words of the statute.  And the courts to some

25    extent disagree about what the statute says, based on its

1    plain terms.

2            What I was addressing contemplates one

3    interpretation of the best interests test.  But even if one

4    takes the other interpretation of it, which is that you

5    don't look at what one gets on one's claim in the case, you

6    just look at what you get on the claim in the case, I think

7    that fairness, in the sense described not only by the

8    Millenium Court, but actually in the earlier section of

9    Quigley by Judge Bernstein, requires some analysis, if it

10   can be done, into what sort of recovery the enjoined parties

11   would have if the plan were not confirmed.  And that's not

12   applying strictly the best interests test.  That's a more

13   rigorous view of fairness than one might normally apply to a

14   9019 settlement, in other words.

15           MR. HUEBNER:  Your Honor, I agree completely.  And

16   as you'll hopefully here in a few minutes, I'm going to

17   cover every alternative interpretation of 1129(a)(7), and

18   show you why we are extraordinarily comfortable that we meet

19   the statute's 24:16  we meet the statute's _____

20           Your Honor, 1129(a)(7), as of course everyone

21   knows, requires that the Debtors demonstrate that rejecting

22   impaired creditors who receive no less under the plan than

23   they would in the hypothetical Chapter 7 liquidation.

24           Here, Your Honor, the Debtors' proposed plan is

25   expected to distribute well in excess of $5.5 billion in

1    cash on account of contingent liability claims.  There is no

2    dispute that creditors will recover billions more under

3    claims against the Debtors than they would recover if the

4    Debtors had to liquidate.

5             The only possible dispute is whether the rejecting

6    creditors could actually recover, in a Debtor liquidation on

7    their own third-party claims against the Sacklers and

8    others, value that exceeds all of their many recoveries

9    under the plan, including the settlement of those third-

10   party claims, but as to a very small number of parties is

11   being imposed by the will and the votes and positions of the

12   overwhelming majority.  There are three principal objections

13   why this objection fails.

14            First, as Your Honor just noted, the Second

15   Circuit has not actually determined whether third-party

16   claims should be considered at all in the best interests

17   analysis.  And other courts that are also thoughtful, do not

18   agree with Quigley and Ditech.

19            The AHC argued this in their brief at Pages 155-

20   158.  I will actually rest of their papers on this point,

21   because I actually prefer to spend my time on the assumption

22   that it is obligatory, including for the larger fairness

23   reasons, for us to get the Court and all parties comfortable

24   that even rejecting creditors do better under this plan than

25   any other alternative we know of.

Page 32

1            So, Your Honor, if you accord with Quigley and

2     Ditech, which is just fine for us and many others, it is

3     clear beyond peradventure that under the holdings of those

4     cases, we are not required to assign a specific dollar value

5     to the potential recoveries on rejecting creditors'

6     unknowable, inestimable third-party claims.

7            To the contrary, both of those cases make it

8     crystal clear that the value of third-party claims is only

9     to be considered when the claims are both, one, not

10    speculative, and two, capable of estimation.

11           Let's take a close look at those cases.  Quigley

12    is an asbestos case in which Judge Bernstein estimated the

13    value of third-party claims against Pfizer, Quigley's

14    parent, based on a 19-year track record of settlements, for

15    which Pfizer had paid over $1.2 billion and a mathematical

16    average of 23 percent of the claims asserted against it over

17    almost two decades.  437 B.R. 134, 146.  But that two-decade

18    track record, the claims at issue were not speculative and

19    were capable of estimation.

20           In Ditech, the Debtor tried to do something really

21    pretty sneaky, and they were caught.  They actually, in

22    fact, estimated the settlement and resolution value of the

23    varied third-party claims for some purposes under their plan

24    and (indiscernible).  And then -- but not for these

25    purposes.  And Judge Wiles said, no way, you can't pick some

Page 33

```
 1    purposes and not others.  You have already told me that the
 2    claims are not speculative and hypothetical, but rather that
 3    you can estimate them.  606 B.R. 544, 620-621.
 4            The contrast to the instant facts could not
 5    possibly be greater.  Unlike Quigley, there is no multi-
 6    decade history of judgments or settlements or percent
 7    allocations against the third parties to draw from.
 8            And unlike in Ditech, the Debtors have
 9    consistently stated that the value of an individual
10    rejecting creditor's direct claims, what they would actually
11    recover some day if this plan failed, is the very definition
12    of unknowable and unquantifiable.
13            Your Honor, given the Debtors' extensive record
14    evidence on liquidation, including its DelConte expert
15    report, Paragraph 9, et seq., the disclosure settlement
16    Sections 173-175, the objectors really need to demonstrate
17    that their own actual recoveries on direct claims in a
18    liquidation would be massive, knowable and quantifiable.
19            I will stop at 11 reasons why that quixotic
20    endeavor cannot succeed.  One, the terrible destruction of
21    estate value in a liquidation.  It is uncontested and
22    uncontestable that the liquidation of the Debtors would
23    greatly reduce the value available to go to these very
24    creditors.  DelConte at 9; Turner at 22; disclosure Appendix
25    B at 11.  So those billions get wiped from creditor
```

1    recoveries in a liquidation.

2          Two A and two B, massive professional fees and

3    totally uncertain allocation of any recovery to specific

4    creditors from the estates in a liquidation.  Liquidating

5    the estates and resolving the hundreds of thousands of

6    claims filed, will require a multi-year massive investment

7    of professional these.

8          Liquidating the claims and resolving the relative

9    entitlement of creditors vis-à-vis one another, once Phase 1

10   mediation is erased, would be an intercreditor litigation

11   maelstrom of victims and stakeholders against victims and

12   stakeholders, whose outcome is unknowable.  The only thing

13   we do know is that rational fees will be at least half a

14   billion and maybe more than $1.5 billion.  DelConte

15   declaration at Paragraph 36.

16         And as Mr. Shore, who actually represents tens of

17   thousands of PI victims, told the Court: "Do not forget.  We

18   are the largest group, the largest number of voters, the

19   largest claimants."  And as he had told many of us, they

20   will be back if there is no deal under this plan.

21         Number 3, reduced recovery on the estate claims

22   against the Sacklers.  The estate might recover less on its

23   claims against the Sacklers in a liquidation.  Mr. DelConte

24   sets forth multiple reasons for this in his report.  See

25   DelConte declaration at 33.  This result is also described

Page 35

1      in our disclosure statement.  It's painful, but it's true.

2      No party cross-examined Mr. DelConte on this sworn

3      testimony.

4              And then we have the testimony of Ms. Conroy, who

5      has been suing Purdue for 19 years under his partner and

6      (indiscernible) partner, named partner, who was there

7      alongside her.  Her testimony, August 16, transcript 18, 9-

8      22, is that this deal reflects a peace premium where we're

9      getting more than we would get if global peace were not able

10     to be on offer.

11             Four.  The DOJ's claims.  The DOJ has an agreed $2

12     billion forfeiture claim with superpriority status.  They

13     also have billions of dollars of other claims, that if the

14     deal falls apart, they will likely assert, or likewise, in

15     rem claims, priority claims, nondischargeable claims,

16     because they're the federal government, et cet.

17             Those claims might absorb every dollar of net

18     estate liquidation proceeds, leaving nothing for anybody

19     else.  Because among so many other things, even if parts of

20     the deal stuck, we don't think we can satisfy the conditions

21     for getting the $1.775 billion forfeiture credit that is in

22     fact on offer in the settlement this Court approved, with

23     them ironically over the objection of the remaining

24     objectors to confirmation.

25             Five -- which is a coalition of sorts.  Instead of

Page 36

1    four or five or more billion dollars that non-federal

2    governmental creditors in Class 4 are getting, they will

3    likely get close to zero.  The consequence, when you add up

4    all the predecessor points of the value destruction in

5    seismic into creditor reallocations that I have outlined, is

6    massive and uncontroverted.

7              Mr. DelConte's liquidation analysis lays out in

8    two of the three scenarios, Class 4 creditors get zero.

9    Only in a high case scenario, there's $699.1 million for all

10   creditors to share, not just the rejecting creditors in

11   Class 4.

12             The objectors did not question any of these

13   conclusions, although they had ample opportunity in days of

14   trial testimony.  I talked on Monday about my simplistic

15   view that we're here to apply facts to law.  No objector

16   designated a competing expert.  No objector submitted an

17   expert report with a competing liquidation analysis.  No

18   objector designated a rebuttal expert, critiquing Mr.

19   DelConte's analysis.  No party even deposed Mr. DelConte.

20   And no party spent any material time on cross-examination on

21   these issues.  If they meant it, we should have tried to

22   prove it.

23             There is no evidence of any kind from any party at

24   all that the likely recovery on their own direct claims is

25   concrete for estimable.  The Debtors' evidence that the

1   claims are speculative and not capable of estimation is

2   overwhelming.

3           Six -- and a lot of these are tied to the public

4   good and to helping America and Americans -- abatement.  Dr.

5   Gaurisankaran testified, without contravention, and I quote,

6   "Abatement programs that reduce opioid misuse for a

7   population will confer economic value to all entities that

8   serve the same population and claim to incur costs because

9   of opioid misuse."  Declaration at 47.  And that abatement

10  results in "multiplier effects" that provide creditors,

11  especially governments, I believe, with value that may well

12  exceed the dollar value distributed under the plan.

13          In the liquidation, there can be no guarantee that

14  all or most or even a substantial portion of the funds

15  creditors someday recover from the Sacklers would actually

16  have to go to abatement, and thus, this important multiplier

17  is gone.

18          I do want to reiterate, Your Honor, one last time,

19  my apology to Washington and Maryland, who seemingly passed

20  statutes -- who did pass statutes -- of course, what they

21  said to the Court is true -- directing their recoveries must

22  go to abatement.  I got that wrong and I'm very sorry about

23  that.  But as I also then noted, there are many, many other

24  states whose situation is exactly the contrary, and there

25  are tens of thousands of other creditors who would be in

```
1    line with no obligations, as they have extraordinarily

2    agreed to in this case, to dedicate all of their recoveries,

3    other than the PIs, to abatement.

4             Seven.  Objectors would need to bridge a chasm of

5    billions of dollars to win an 1129(a)(7) argument, because

6    they are billions in the hole due to the total wipeout of

7    their plan recoveries.  And it's from there they must begin

8    to try to argue that exclusively and solely from their own

9    potential recoveries on non-speculative claims against the

10   third parties, they would get more than the billions that

11   they would make unavailable to everybody if the plan was not

12   confirmed.

13            Eight.  It is utterly impossible for any of the

14   few objecting rejecting creditors to demonstrate that they,

15   and only they -- and that's the critical phrase -- and only

16   they, will when the frenetic race to the courthouse against

17   third parties.

18            The objectors' suggestion that the Debtors could

19   have hired a damages expert to addressed the objectors' best

20   interest argument only highlights the staggering depth of

21   their misunderstanding of the law.  Damages are about claims

22   that one could assert.  The best interests test is about

23   recoveries; what I actually do better than this plan at the

24   end.

25            It is beyond cavil, Your Honor, that no claimant
```

```
 1    could possibly credibly predict that the actual recovery on
 2    their claim against the Sacklers, after years of internecine
 3    warfare among creditors and disorderly races to hundreds of
 4    thousands -- or for thousands of courthouses -- is knowable.
 5    It's like trying to solve a single equation that has
 6    hundreds or thousands of variables. 4(a) plus 5(b) minus
 7    5(c) plus 8(d) equals X?  It cannot be solved.
 8              And it has nothing to do -- nothing -- with the
 9    merits and strength and validity of the claims of any
10    individual entity against the Sacklers.  Because for an
11    individual rejecting creditor to prove that it itself would
12    actually recover more, it can't only show that it's likely
13    to get a big judgment.  It has to show that no one else
14    would, and only they would.
15              Because logic dictates that if the three rejecting
16    states who have made a best interests objection have
17    meritorious claims, so do all the non-rejecting states.  And
18    if all the states have meritorious claims, then it stands to
19    reason that many other public creditors also have
20    meritorious claims.  And if all states and tribes and
21    municipalities have valid claims against the Sacklers,
22    likely so do the hundreds of thousands of private contingent
23    liability claimants.
24              And every one of these groups for whom the Debtor
25    is a fiduciary has filed proofs of claim under penalty of
```

Page 40

1   perjury, that they believe that they have those claims

2   against the Debtors and the Sacklers, which is why the

3   States' $2.156 trillion claim, as large as it is, is dwarfed

4   20 times over by the $39 trillion of other filed claims.

5   And that's only 10 percent of them, because while the

6   states' claim was liquidated, most of the other claims, 90

7   percent of them, were not.

8          Nine.  Thousands of claimants would be chasing a

9   smaller and possibly (indiscernible) of assets.  Let's

10  assume that direct claimants are able to recover every penny

11  of the aggregate personal wealth of the individual members

12  of the Sackler Family, named as Defendants in the third-

13  party litigation.  Claimants would still come up billion

14  short of the $4.375 billion that the Sackler Families have

15  agreed to pay under the settlement, and even more billions

16  short of the $5.5 billion total in minimum projected value

17  that those creditor standard receiver under the plan.

18         And during the years that people were suing the

19  Sacklers, one would imagine the Sacklers will pay hundreds

20  of millions or more in legal fees, and might, for example,

21  use their assets to settle with non-rejecting creditors.  So

22  if non-rejecting creditors get settlements, then rejecting

23  creditors even more can't do better than they would do under

24  the plan.  Which is why the intercreditor complexity, which

25  seemingly, virtually every single party in the entire case,

1    except for nine, seemingly understands and has reluctantly

2    and painfully led them to conclude that this settlement,

3    which does leave the Sacklers with material wealth, is

4    better for them, the claimants, than any other alternative.

5            Ten.  Claimants cannot reasonably estimate the

6    prospect of they themselves successfully recovering on their

7    direct claims.  I am not going to cite -- and I am most

8    certainly not ever going to accord with or endorse the

9    evidence and argument submitted by the Sacklers about their

10   lack of culpability and their defenses to collection with

11   respect to their trusts.  Not now.  Not ever.  They are the

12   Defendants and estate is the Plaintiff, along with many

13   others.  And if we do not settle, we will be suing them for

14   billions of dollars.  Make no mistake.

15           But what I am is the fiduciary and spokesman for

16   the shareholders.  The Debtors didn't vote on the plan.

17   That's not our job.  But 38 attorneys general, and the UCC,

18   and the AHC, and the MSG, and the adult (indiscernible), and

19   the pediatric (indiscernible), and the tribes, and the

20   hospitals, and the TPPs, and the rate payers, and the

21   Board's Special Committee, considered a great, great many

22   things in deciding to accept this settlement.

23           I think it is fair to say that while we disagree,

24   Jersey law, Wyoming and Connecticut trusts, and Mr.

25   Cushing's testimony, do raise litigable issues with respect

Page 42

1    to the ability to recover on direct claims against the

2    Sacklers from the very material assets held in their

3    (indiscernible) trusts.

4            As I noted on Monday, Your Honor -- ironically, I

5    think it was Paragraph 239 of our brief -- the Debtors have

6    the strongest claims against those trusts, because we have

7    in rem claims based on the irrevocable vested in the estate

8    of the fraudulent transfer and analogous claims.  Those are

9    not direct claims.  So they don't figure into the

10   hypothetical 1129(a)(7) showing when you're trying to weigh

11   a direct claim as an add-on to what you might get in a

12   liquidation.

13           And Your Honor, in this regard, the litany I just

14   read to you, it is incredibly telling that in this case,

15   with over half a million creditors, there is one objection,

16   one, that makes a best interests objection.  One.  Mr.

17   Gold's pleading on behalf of DC, Maryland and Connecticut.

18   And with no disrespect intended, because I think he's doing

19   a terrific job and he's a very serious lawyer, he made that

20   objection in one page of his brief.  No factual support for

21   the types of claims that would need to be proved.

22           THE COURT:  Actually, I thought it was just

23   Connecticut --

24           MR. HUEBNER:  Finally, Your Honor --

25           THE COURT:  I thought it was just Connecticut and

Page 43

1    Maryland on that one.  DC joined the other one --

2                MR. HUEBNER:  Oh, Your Honor, I apologize.  I

3    thought that objection said filed on behalf of DC, Maryland

4    and Connecticut.  But if DC didn't join that argument, then

5    it's one objection on behalf of two parties, as opposed to

6    three.  But I think, you know -- I think the point is the

7    same.

8                THE COURT:  You know what?  I was wrong.  It does

9    include DC.

10               MR. HUEBNER:  Your Honor, Judges are never wrong.

11               THE COURT:  Well, I was wrong.

12               MR. HUEBNER:  Number 11.  Your Honor, Number 11.

13   Claimants rejecting creditors making a best interests

14   argument cannot possibly quantify or know or estimate the

15   massive cost and delay to them of lengthy and chaotic

16   jurisdiction, because as many as 58 jurisdictions all over

17   the world.  No creditor could possibly allege without

18   speculating what they would actually recover net of the cost

19   of litigation and collection and delay, after years of

20   (indiscernible) warfare by thousands of creditors with all

21   against all.

22               For these 11 reasons, Your Honor, among others,

23   the direct claims of three creditors out of the hundreds of

24   thousands who have raised a best interests test, I believe

25   are literally the archetype -- actually the archetype of

1    claims that in these complex circumstances are speculative

2    and not capable of estimation.

3         Your Honor, that brings me to my third and final

4    meta point.  While I hope that my reasons each individually,

5    and certainly collectively, demonstrate the views of so many

6    for whom I'm speaking today, that rejecting creditors would

7    not do better in the liquidation, and would do ever so

8    terribly worse even inclusive of their direct claims.  I

9    have overwhelmingly, in fact, perfect empirical evidence

10   from July and August of 2021 for the unassailable veracity

11   of this position.

12        38 states, 80 percent of the voting states have

13   done the work for years, litigating against Purdue and the

14   Sacklers, weighing the alternatives, and fighting like hell

15   for their citizens against Purdue and the Sacklers.  And

16   they have concluded that the Plan provides superior value to

17   states than does liquidation.  This is true for this -- many

18   other creditor groups, who I will not again list, who

19   support this Plan.  And between all these parties, they are

20   represented by many of the most sophisticated, and one might

21   argue fearsome, mass tort plaintiffs' firms and other

22   litigation firms in this country whose clients I can

23   guarantee you, having done almost nothing else for three and

24   a half year, have suffered at least as much loss and have

25   unthinkable antipathy for the Sacklers as any of the Plan

1    objectors.

2            In stark contrast to the wild speculation to the

3    nth power, they would be involved in assessing what an

4    individual rejecting creditor, out of 614,000 competitors,

5    would actually recover in liquidation, the market of states

6    identically situated to the one best interest set of

7    objectors, has spoken on this point with extraordinary

8    clarity, and chosen which gives them the better recovery.

9            And of course, Your Honor, the bankruptcy system

10   under the guidance of the Supreme Court, love market tests

11   to prove things.  See e.g., 203 N. Lasalle, 119 S.Ct. 1411.

12   There's no better way to know what something is worth than

13   what people will actually choose when faced with a choice.

14   80 percent of identically situated claimants clearly think

15   that their direct claims against the Sackler cannot close

16   the more than $5.5 billion gap between what people are

17   getting under the Plan to help their citizens in these

18   terrible times.  And the alternative, whose worst feature

19   would be creditors fighting one another and competing

20   another.

21            And for the record, Your Honor, the $5.5 billion

22   number that I have been using is exceedingly conservative

23   because it does not take into account, as our evidence shows

24   recoveries on insurance proceeds, which we hope are the

25   billions, and terminal asset value when NewCo is monetized,

Page 46

1    that it's slated also to flow all but exclusively to

2    governmental creditors, these very objecting creditors, for

3    abatement with its multiplier under the Plan.

4           I also didn't count PHI, which many people believe

5    itself could be worth billions, especially to states by

6    avoiding further damage, and helping their citizens, or the

7    public spillover multiplier.  None of that is in the math.

8    $5.5 billion is just the cash in the sworn evidence and

9    nothing more.

10          And, Your Honor, this is therefore a much more

11   central plaintivist case than just best interest.  The value

12   hold that any alternative to this Plan, and certainly

13   liquidation, would create for all creditors, but for the

14   states far more than anyone else, is way bigger than $5.5

15   billion, and it cannot possibly be refilled and then

16   exceeded by a liquidation and direct suits against the

17   Sacklers.

18          I should also note, Your Honor, that I did not

19   include or take into account Mr. Prices argument that Your

20   Honor Mr. Gold about on Monday, that over $4 billion out of

21   the $10.4 billion in cash that the Sacklers took out of

22   Purdue, which in 2008 and 2019, went directly -- directly to

23   state and federal governments at the Sacklers' request to

24   pay their person income taxes.  Because they set Purdue up

25   as a limited partnership, the Sacklers, it's not a taxpayer.

```
 1              I believe, Your Honor, cited a figure of $285
 2      million in the Atkinson declaration about Connecticut;
 3      ironically, the objector on best interest ground.  And the
 4      federal government whose number is 10 times that, who might
 5      face serious exposure as the transferee's a preferential
 6      transfers that were made for the benefit of the Sacklers.
 7      There is a day they have to pay that money back so that all
 8      creditors could share it, not just the data to keep it.
 9              And that also goes into best interest because in a
10      liquidation, that money might come back into the estate to
11      be shared by all.  But as I said, I left many, many things
12      out of my core analysis because it was enough.
13              To assume, Your Honor, that 80 percent of the
14      states are wrong about what is in the best interest of
15      states is not rational.  And even out of the nine objectors,
16      only two states and D.C. even made the objection at all,
17      which is more telling.  States have accepted the Plan, as
18      all other creditors have, by an overwhelming margin -- all
19      other creditor classes and groups have because they believe
20      that while it is painful and difficult and horrible to the
21      lives of many to leave the Sacklers with wealth, the Plan
22      furthers their best interests and provides value billions in
23      excess of what would result from the meltdown of the estates
24      and resuming the litigation free-for-all that prevailed
25      before these cases began.
```

1          Your Honor, except for lawyers, nobody does better

2     in a liquidation, nobody, which would destroy so much that

3     so many have worked for so long to bring -- to bring to

4     fruition, to help victims and abate the opioid crisis.  We

5     ask that the best interest objection be overruled.

6               THE COURT:  Okay.  Thanks.

7               Mr. Goldman, I think you're taking this on behalf

8     of Connecticut, Maryland, and D.C.?

9               MR. GOLDMAN:  Yes, Your Honor, and I can add to

10    that list since we have been coordinating among all the

11    objecting states, and the states of Oregon, Delaware,

12    Vermont, Rhodes Island, and Maryland, and Washington.

13              THE COURT:  Okay.  Although I don't think any of

14    those actually raised this issue.

15              MR. GOLDMAN:  I would correct the record, Your

16    Honor.  Washington and Oregon did join in our objection at

17    Paragraph 104 of their objection.

18              THE COURT:  Okay.

19              MR. GOLDMAN:  So, there are actually five -- well,

20    four states and the District of Columbia that are advancing

21    this objection.

22              THE COURT:  Okay.

23              MR. GOLDMAN:  So, let me proceed.  I think Mr.

24    Huebner did a good job of explaining the best interest test,

25    but if I could just go over it briefly to set the framework

Page 49

1    for my argument?  As you mentioned, it requires that in a

2    peered class of creditors, each of the class members must

3    either accept the Plan or will receive under the Plan, at

4    least as much as they would receive in a Chapter 7.

5              THE COURT:  Actually, that isn't the specific

6    language of 1129(a)(7), right?  The provision says, "With

7    respect to each impaired class or claims... each holder of a

8    claim or interest of such class has accepted the plan; or" -

9    - and then here's the key language -- "will receive" will

10   replayed -- "or retained under the plan on account of such

11   claim... property of a value as of the effective date of the

12   plan that is not less than the amount that such holder would

13   so receive or retain if the debtor were liquidated under

14   chapter 7 of this title".  I emphasize the word, "so"

15   because I think it's arguably there for a reason.  And as

16   the AHC objection points out, it would seem to modify on

17   account of such claim, and therefore, focus the Court on the

18   claims' recovery in Chapter. 7, as opposed to just recovery

19   generally.

20             I don't know if you have a response on that point?

21             MR. GOLDMAN:  Of course, both the courts in

22   Quigley  and Dietech have rejected that --

23             THE COURT:  They -- well, actually, they didn't

24   reject it in that the argument wasn't made to them.  There's

25   no discussion of that reading or the meaning of the word, or

```
 1      -- of "so" in that provision, in either of those cases that

 2      they cite.  But I appreciate that Judge Garrity and Judge

 3      Bernstein are certainly -- or -- but Judge Bernstein's now

 4      retired, so are or were certainly excellent judges, but it's

 5      an argument that's been made to me that I don't think was

 6      made to them.

 7                  MR. GOLDMAN:  Well, I would point out first that

 8      the Debtor has not argued for any back in their brief --

 9                  THE COURT:  But AHC did.  The --

10                  MR. GOLDMAN:  Yes.

11                  THE COURT: -- the Ad Hoc group of governmental

12      entities.

13                  MR. GOLDMAN:  I would -- I would respond that I

14      don't think "so" would change the idea that was expressed in

15      the Dietech and the Quigley cases, that in the Chapter 7,

16      those creditors would be retaining on account of their

17      claim, rights against third parties.  That plan proposes two

18      weeks.

19                  So, I would argue that the single word "so" would

20      not alter the analysis that was articulated in both of those

21      cases that where they distinguished between the Chapter 13

22      test, which doesn't include the word "retain," to conclude

23      that what they would retain in Chapter 7 is the right to go

24      against third parties who are proposed to be released.

25                  THE COURT:  Okay.  Well --
```

1              MR. GOLDMAN:  That's -- that's fair.

2              THE COURT:  -- again, I -- as I said to Mr.

3    Huebner, I'm not sure ultimately this matters because I

4    think consistent with the section of the Quigley case as

5    well as other cases that have considered plans that have

6    sought to impose a third-party release or injunction, it is

7    incumbent on the Court to look at what's being given up

8    under the plan in terms of evaluating that request, whether

9    or not it's under 1129(a)(7), too.

10             So, I just wanted to note the issue.  I -- to me,

11   I can't ignore the word.  I will note also that "claim" is

12   not defined as a claim against the debtor in 1015 of the

13   Code.  On the other hand, it would, I think, open up a

14   fairly large can of worms if courts started to look at all

15   sorts of recoveries from third-party sources, that one would

16   get under it in Chapter 7 as a mandatory exercise for

17   confirming a plan.

18             But maybe it's -- maybe it's academic given the

19   larger point that I think controls here, which is that I

20   have to look at -- beyond the 9019 analysis because that

21   really applies to the Debtors' estate and creditors -- what

22   it is that the injunction of third-party claims would

23   deprive the objectors of, or alternatively, whether it's

24   actually a fair deal for them.

25             MR. GOLDMAN:  May I proceed, Your Honor?

Page 52

1                THE COURT:  Sure.  Yes.  Go ahead.

2                MR. GOLDMAN:  Okay.  So, as the Dietech court

3      observed, according -- from an earlier Southern District

4      case, the command of Section 1129(a)(7)(ii) is perhaps the

5      strongest protection creditors have in Chapter 11.

6                I think Mr. Huebner's argument that because 80 or

7      90 percent of the states have accepted the Plan, should

8      somehow mean that the best interest test is satisfied.

9      Well, if you go with the majority or super-majority of

10     creditors who are voting in favor of the Plan, that

11     essentially wipes out the purpose of the best interest test,

12     which was -- is to protect the dissenting creditors.  It's a

13     totality to say that because the majority voted yes, they

14     must be right.

15               That is a sophistic, S-O-P-H-I-S-T-I-C --

16               THE COURT:  Right.

17               MR. GOLDMAN:  -- argument.

18               THE COURT:  Right.  The purpose of the test is --

19               MR. GOLDMAN:  So --

20               THE COURT:  -- really to protect the minority on

21     your -- I understand that.

22               MR. GOLDMAN:  Fine.  And the Plan proponent bears

23     the burden of proof to demonstrated with evidence that the

24     test has been satisfied.  They can't shift to the burden to

25     the dissenting creditor, as suggested by Mr. Huebner, to

Page 53

1    prove what it would recover on its direct claims.  It's the

2    Debtors' burden of proof on best interest.

3              And just to remind the Court, the dissenting

4    creditors here are California, Connecticut, Delaware, the

5    District of Columbia, Maryland, New Hampshire, Oregon, Rhode

6    Island, Vermont, and Washington.

7              And the best interest of creditors requires a

8    comparison of what those dissenting creditors would receive

9    under the Plan, and what they were to receive in a

10   hypothetical litigation.  It doesn't say what all of the

11   Class 4 creditors would receive under the Plan in relation

12   to what they all would receive in a liquidation.  The

13   analysis is focused on the dissenting creditors.  And for

14   that first part of the test, the Debtors did not even

15   present evidence of the amount the dissenting creditors

16   would receive under the Plan.

17             Now, although Mr. DelConte testified that it would

18   be a multiplication exercise --

19             THE COURT:  No, I actually have --

20             MR. GOLDMAN:  -- based on the allocation --

21             THE COURT:  -- I actually have a chart of what

22   each of those states would receive under the Plan and I

23   don't think that's controverted.

24             MR. GOLDMAN:  Well, my point is, they didn't

25   present evidence of that, Your Honor, prepare a chart.  It -

```
 1     - like --

 2              THE COURT:  I mean, I believe it's -- I believe

 3     it's in the record.  I -- we -- I didn't -- we didn't make

 4     it up.

 5              MR. GOLDMAN:  Be that as it may, they didn't

 6     present it in their brief as to what we would receive or in

 7     argument to make the comparison of what we would receive in

 8     a liquidation.

 9              And on the other side of the equation --

10              THE COURT:  Oh, I'm sorry.  I thought you -- I

11     don't have a specific number of what they would receive in a

12     liquidation.  I do have what they would receive under the

13     Plan, at least an estimate of what they would receive.

14              MR. GOLDMAN:  That's what I meant.  That's what I

15     meant, so I acknowledge that.

16              THE COURT:  Okay.

17              MR. GOLDMAN:  All I'm saying is there wasn't --

18     that wasn't presented by Mr. DelConte, it was presented in

19     the Debtors' brief as to what we would receive, to make the

20     comparison.

21              And on the other side of the equation, because in

22     Chapter 7 there would be no third-party releases, it's our

23     contention there must be some proof of what the dissenting

24     states would receive if they were permitted to go forward

25     against the Sacklers.  And yet, no such proof was provided.
```

Page 55

1          Mr. DelConte testified that no attempt was even

2   made to estimate or project what the dissenting states would

3   recover on claims against the Sacklers.  That was at the

4   8/13 Transcript, Page 61.  And that his liquidation analysis

5   did not include the value for any of the direct claims of

6   Purdue creditors against any of the Sacklers.  Ant that was

7   at Page 58 of his testimony.

8          Indeed, the Debtors did not even attempt to

9   ascertain university -- universal creditors in these estates

10   that are asserting claims against the Sacklers.  We

11   acknowledge that Mr. DelConte, at Page 57 of his testimony,

12   that failure stands in stark contrast to the evaluation that

13   was done in the Dietech case by Alex Partners.  He should

14   have at least attempted to identify and put a settlement

15   value on the consumer claims that would have survived in

16   Chapter 7 case in Dietech, and could have been asserted

17   against the buyer of the consumer credit agreements there.

18          The Debtors attempt to excuse their lack of proof

19   with the argument that the claims are speculative but not

20   capable of estimation, that is not supported by anything

21   other than the Debtors' counsel's say-so.  The same argument

22   was made by the debtors in Dietech and it was squarely

23   rejected.

24          THE COURT:  Well, it --

25          MR. GOLDMAN:  There, the --

1          THE COURT:  -- it was made, but obviously it was

2     rejected because they'd actually quantified them.

3          MR. GOLDMAN:  They tried -- they tried to quantify

4     them, and the court held that that was not acceptable proof.

5     And the consumer claims there that would have been

6     extinguished if --

7          THE COURT:  But even as -- even as quantified,

8     there was no countervailing benefit at all in return for

9     them.

10          MR. GOLDMAN:  In the sense of -- I'm not sure I

11     understand what Your Honor means.

12          THE COURT:  There was no showing of any real

13     benefit to the -- to the consumers that were giving up those

14     claims other than the $5 million.  So, you had $252 million

15     versus $5 million.

16          MR. GOLDMAN:  Well, I understand that, Your Honor,

17     my -- my point is that the claims -- the consumer claims --

18     that would have been extinguished under the Plan by the 363

19     Sale of the consumer credit agreements, would have been

20     available to assert against the buyer in Chapter 7, a buyer

21     of the consumer credit agreements.  And they were based on

22     very attenuated claims.

23          There were account misstatements, claims --

24     wrongful -- claims of wrongful foreclosure, unfair

25     collection practices and the like, and they gave rise to

Page 57

1    potential claims under the Real Estate Settlement Procedures

2    Act, the Truth in Lending Act, Fair Credit Reporting Act,

3    and Fair Debt Collection Practices Act.  All those claims

4    were unliquidated.

5              And based on the analysis done by Alex Partners,

6    3,900 proofs of claim were identified as being consumer-

7    related, and 265 proofs of claim having been matched to

8    pending litigation.  No such analysis was done in this case.

9              THE COURT:  But in -- in Dietech, Dietech and its

10   predecessor had a history of dealing with these types of

11   claims and with settling them, which was a basis for Alex

12   Partners' analysis.

13             What I have here is something more attenuated.  I

14   have the settlements from the 2007 period.  I have the

15   settlement with the State of New York where the Sacklers

16   themselves paid $75,000.  I have the settlement more

17   recently with the State of Oklahoma, where they paid $75

18   million.  And I have a number of complaints, some of which

19   have survived motions to dismiss, although largely on

20   procedural grounds -- those motions being made largely on

21   procedural grounds, such as noncompliance with federal law,

22   preemption, or jurisdiction grounds.  So, you just don't

23   have the same type of track record here.

24             MR. GOLDMAN:  You don't have the same type of

25   track record, but I would point out that in neither of those

1    cases did the court hold that some sort of settlement

2    history was a prerequisite to, you know, the finding that

3    they weren't speculative or remote.

4                THE COURT:  That's true.

5                MR. GOLDMAN:  There was a settlement --

6                THE COURT:  But they -- but they did rely on the

7    settlement history.

8                MR. GOLDMAN:  Oh, well, it's -- it would be hard

9    to dispute that, Your Honor, and I do agree.  However, I

10   would point out in Dietech that the settlement history was

11   only for about a year and a half, and it didn't include that

12   many claims.  That's not to say that because there is no

13   settlement history, by necessity, claims are speculative and

14   remote.

15               Remember, the Debtors, as Mr. Huebner pointed out

16   in a prior hearing, there were a total of 18 experts that

17   were hired in this case, albeit not all of them by the

18   Debtor.  And I find it more than curious that on this one

19   issue, given all those experts and how creative the Debtors

20   have managed to be in this case, didn't present any expert

21   even on the issue of whether the claims themselves were

22   speculative and incapable of estimation.  They're just

23   asking you to make that conclusion based on their say-so.

24               Mr. DelConte was not an expert on estimating

25   claims or affixing damages.  He said -- he gave the party

1    line, that, well, we just didn't feel comfortable that we

2    could estimate these claims.  But he wasn't the expert that

3    was hired to do it.  In fact, he acknowledged that the

4    Debtors didn't hire an expert to do that or even to tell the

5    Court that they weren't estimable.

6            THE COURT:  Fair point.

7            MR. GOLDMAN:  I just, again, point out and I

8    recognize the difference on settlement history, but in

9    Pfizer -- or Quigley as well, the claims were unliquidated

10   and disputed, albeit there was some history for the court to

11   evaluate.  But again, my point is, it's not a necessary

12   condition.  No court has held that.  And in Dietech, none of

13   the consumer claims at issue have even gone to judgement.

14           I would also point out that --

15           THE COURT:  But there had been -- but there had

16   been other consumer claims that had gone to the stage where

17   they were settled.

18           MR. GOLDMAN:  Correct.  And my point is they

19   hadn't gone to judgment.

20           THE COURT:  These particular ones, yeah.

21           MR. GOLDMAN:  Yes, yes.

22           THE COURT:  But I think there were similar claims

23   that had gone to judgment as well as some being settled.  I

24   mean, frankly, I think they're some that have been ruled on

25   in the Southern District Bankruptcy Court.

Page 60

1          MR. GOLDMAN:  Your Honor, I'll defer -- I'll defer

2   to you on that.  I just -- I don't -- my -- I thought that

3   based on the settlement data they had, that none had gone to

4   judgment, but I'm not completely sure about that --

5          THE COURT:  Okay.

6          MR. GOLDMAN:  -- now that Your Honor has raised

7   the point.

8          The fact -- it's ironic that the fact that no

9   settlement and litigation data is available here is the

10   result of the Debtors' own doing.  I mean, the states have

11   been prevented from continuing with actions against the

12   Sacklers for almost two years by the preliminary injunction,

13   that the Debtors were asked -- weren't even successful in

14   getting.  They shouldn't be able to turn around now and use

15   that standstill to argue that the claims can't be valued

16   because there's no settlement data.

17          But if the states had been permitted to go

18   forward, we may very well have had some settlement data or

19   judgments in either direction for the Court to make a

20   decision on this task.

21          THE COURT:  But I guess that goes to the other

22   point, which is the primary point I think that the Debtors

23   have been making, which is they have focused only lightly on

24   the strength of the states' claims against the Sacklers and

25   very heavily on the recovery that the states would have on

Page 61

1     those claims.

2              MR. GOLDMAN:  They haven't focused.

3              THE COURT:  They have focused primarily on the

4     recovery that the states would have on those claims.

5              MR. GOLDMAN:  Yes.  And I -- I will get to that.

6              THE COURT:  Okay.

7              MR. GOLDMAN:  Point, Your Honor.  But before I do

8     that, I'd like to address the argument that they make in

9     their brief that in order for it to be true that holders of

10    all third-party claims would be better off in a liquidation

11    because of the value of claims released under the Plan, the

12    aggregate recovery due in those claims, it would be -- it

13    exceeds $4.8 billion.

14             Now, Mr. DelConte confirmed, the Debtors made no

15    attempt to even ascertain the universe of creditors that are

16    asserting claims against the Sacklers.  The Debtors are

17    simply assuming that every creditor in the case would assert

18    claims against the Sacklers and that all those claims would

19    be completely homogenous, would not vary in their merit, or

20    type of claim, and that is simply not a valid assumption.

21             They did not do the analysis that was done in

22    Ditech to see which creditors were asserting claims against

23    the Sacklers, and I'm not aware of any proof of claim in the

24    case that was asserted against the Sacklers as opposed to

25    the Debtor.

1            Second, the best interest test requires looking at

2     what the dissenting creditors would receive on their direct

3     claims.  We'll recover, I acknowledge recovery, and now with

4     the holders of all third-party claims, which the Debtors

5     haven't even identified, would receive, in a hypothetical --

6            THE COURT:  But I think the point is the dilutive

7     effect of the claims that actually are, we know, just leave

8     it to that.  The claims of the individual states filed

9     against the Debtors, and I think we know a fair number of

10    the governmental entities, non-state governmental entities,

11    as well as the liquidated value of those claims.

12            I think their point is that even if you confine it

13    to that aggregate amount, there would be an enormous

14    dilutive effect, not that you would measure what the others

15    got, but that the effect of their pursuit of those claims

16    would dilute the objector's recovery, along with various

17    other things too, like the cost and delay.

18            MR. GOLDMAN:  I do understand the point, but I'm

19    not sure that it's a valid assumption that every state is

20    asserting claims against the Sacklers; not all states did

21    file claims against the Sacklers.  I don't think any effort

22    was made to identify which complaints were actually filed.

23    And if they weren't filed, which states intended to make

24    claims against the Sacklers, but not because of the Chapter

25    11 filing in September of 2019 and the preliminary

Page 63

1    injunction.

2          So my point is they simply haven't been

3    identified.  They've asked Your Honor to assume that

4    everyone would make claims against the Sacklers, but there

5    really is no evidence that all of them would is my point.

6          And as to the competing claims of the estates

7    against the trust, I would submit that analysis ignores that

8    if just three states get judgments against one or more of

9    the Sacklers, they could be put into involuntary bankruptcy

10   where the interest in their offshore trusts would be

11   susceptible to becoming property of their estates.  No

12   analysis was done on the effect of a potential bankruptcy

13   filing and what that would mean in terms of their interests

14   in the trusts and whether the estates' claims against the

15   trust would prevail or have priority over those interests

16   that could possibly become property of the estate.

17          THE COURT:  Can we just --

18          MR. GOLDMAN:  There's no --

19          THE COURT:  I think you're making two points there

20   and I want to just make sure I understand them.

21          There would be estate claims that would be

22   asserted by Purdue in a liquidation against the trust,

23   fraudulent transfer claims.  We do have expert testimony on

24   that, and as well as the recoverability of that.  Parties

25   have said that they would dispute it if, in fact, there was

Page 64

1    litigation, but they haven't disputed it in this case.

2    Under the stipulation, there's no adverse consequence to

3    them for having not disputed it.

4          And then I think you're saying that in a Sackler

5    parties bankruptcy, the assets of the estate or his or her

6    estate would become property of the estate.  But there is

7    testimony, I believe, that most, if not all, of those trusts

8    are spendthrift trusts, which you would have to adjudicate

9    in, I believe, Jersey.

10         MR. GOLDMAN:  Well, to the extent those trusts are

11   self-settled with monies from the settlors, I think they're

12   vulnerable to attack.  The cases cited by the Debtor in its

13   brief about the Greenwich v. Tyson case in Connecticut, they

14   all presume that the trusts were not self-settled.  Self-

15   settled trusts are not given protection from creditors.

16         So I would just make the point that they could be

17   vulnerable to that type of challenge in an individual

18   bankruptcy.  But even getting beyond that, you know, the --

19         THE COURT:  But again, there would be a factual

20   determination of that in a Sackler bankruptcy, an individual

21   Sackler personal bankruptcy, but then you'd have to enforce

22   that judgment against the assets of the trust, which I think

23   mean you'd have to go through Jersey.  And when I say

24   Jersey, I don't mean the state of New Jersey, I mean the

25   bailiwick of New Jersey.

1           MR. GOLDMAN:  I understand.  I understand what you

2      mean.

3           THE COURT:  Right.

4           MR. GOLDMAN:  And I acknowledge that, Your Honor.

5      But I know the states, the states would be poised to do that

6      I'm sure.

7           THE COURT:  Well, they might well be poised, but

8      they didn't cross-examine Mr. Cushing on their ability to

9      actually move from being poised to collecting.

10          MR. GOLDMAN:  Well, I'm merely pointing out that

11     that analysis on the bankruptcy aspect of this was not done

12     in terms of an individual bankruptcy of any of the Sacklers

13     that might suffer judgments from the states.

14          And beyond that, I'm presuming since they would be

15     themselves the subject of Chapter 11 cases, their post-

16     bankruptcy income would also become part of their estates

17     and, you know, going forward.

18          So the trust would not be the only source of

19     recovery.  You'd also have their interest in the IACs that

20     would come into their bankruptcy estates and potentially --

21     well, basically, all of their assets and interest in

22     property, and no analysis was done on that.

23          And I think that it's important that it had to

24     have been done because in the absence of a confirmed plan

25     and if the states are committed to go forward, we would

Page 66

1   maintain it's likely that the estates would obtain judgments

2   against one or more of the Sacklers and is a likelihood that

3   they could be subject to a bankruptcy proceeding.

4          And I would just also note that this idea that the

5   disclosure statement and the assumption that these claims

6   are just speculative and not capable of estimation shouldn't

7   be held to satisfy their burden of proof on the best

8   interest of creditors test, given its importance to

9   dissenting creditors like the ones we have here.

10          As the Bankruptcy Court stated in In re. Mcorp,

11   137 B.R. at 228, a proposed plan of reorganization may not

12   be confirmed where the evidence is not sufficient on which

13   to base an independent determination that the proposed plan

14   is in the best interest to creditors.  And I submit that was

15   not done here.

16          Just to briefly address a few points that Mr.

17   Huebner made.  I don't want to forget those.

18          I viewed his point that we can't prove the

19   authority that we can prevail on our claims or get a

20   recovery as effectively shifting the burden of proof on the

21   best interest of creditors test.  It's not our burden to

22   prove what we would recover.  They made this point in their

23   brief that we didn't submit expert testimony on what we'd

24   recover.  It's not our burden of proof.

25          On this issue of the taxes that Connecticut and

1    other states may have received from the tax distribution, I

2    think is a complete red herring.  Each of the states was

3    immediate transferee of that money.  So if we took in good

4    faith and without knowledge, we're protected under Section

5    550, and there's no colorable claim that the states didn't

6    take tax money in good faith.

7              With that, Your Honor, I --

8              THE COURT:  So the states -- I mean, I think -- I

9    don't want to really -- I think that the personal injury

10   claimants would say, well, who was supposed to be regulating

11   Purdue if not its home state and the federal government, the

12   two of which got the most taxes.  So I guess that comes down

13   to whether a failure regulation warrants any sort of either

14   presumption of knowledge as to the taxes or some basis to

15   subordinate claims.

16             MR. GOLDMAN:  I understand the theory, Your Honor.

17   I'll just say that is quite a stretch.

18             THE COURT:  Well, I think it would be an argument.

19   Let's leave it at that.

20             MR. GOLDMAN:  I'm happy to leave it at that, Your

21   Honor.

22             THE COURT:  And personal injury lawyers, I'm sure

23   wouldn't hesitate to make it; whether it'd win or not is

24   another story.

25             MR. GOLDMAN:  With that, Your Honor, I'll give the

Page 68

1    floor to any rebuttal.

2            THE COURT:  Okay.  Thank you, Mr. Goldman.

3            MR. GOLDMAN:  Thank you, Your Honor.

4            MR. HUEBNER:  Your Honor, I think I'll be

5    relatively brief, but there are some things that were said

6    that -- there were quite a few things that were said

7    factually, but I think it's worth letting everybody know it.

8            And, you know, this is actually a much more

9    important conversation that he raised than just best

10   interests because in many ways, this is the heart of

11   everything, which is why are so many people in favor of

12   doing this as opposed to its alternative.  And so, I

13   actually embrace a demanding Third Circuit standard that

14   this is the fairest, best outcome under extraordinary

15   outcomes, which is why we didn't actually brief that Ditech

16   don't really apply, someone else did, because we're fine

17   within the plan.

18           And here you asked me a few days ago during cross-

19   examination to not get into conceptions of justice and

20   fairness, but let's talk about a few things that are more

21   directly relevant to the statute.  Number one, Your Honor,

22   is you've heard me say many times, I have never once ever

23   defended Purdue's past conduct or the Sacklers.  We arrived

24   in March 2018.

25           But the facts are that it was not the Sacklers who

```
 1    paid $75,000 to New York State; it was Purdue.  And in

 2    Oklahoma, the Sacklers were note even sued; Purdue was sued.

 3    And Purdue paid to settle that for a variety of reasons and

 4    the Sacklers were not parties to the consent judgment and

 5    made a voluntary contribution of $75 million.  Might those

 6    suits have expanded and were they thinking lots of complex

 7    things when they settled?  They are not my clients and never

 8    have been, so I don't know and it's not my business.

 9            But the facts are that there is no track record, I

10    believe, which is part of what angers so many people, of the

11    Sacklers actually having had judgments entered against them.

12    I believe there are none.

13            Your Honor, the first point -- and I appreciate

14    the references both to sophistry and to tautologies -- are

15    simply not correct.  In many cases, an individual member of

16    the class is differently situated and has a third-party

17    claim that many others might not have.  They might be

18    properly classified in the same class vis-à-vis the Debtors

19    but have a unique opportunity to recover more than in a

20    liquidation because they have third-party claims that could

21    be pursued that the plan would take away.

22            And if those claims are not speculative and

23    reasonably capable of estimation, which is the best possible

24    law for Mr. Goldman's clients, then they have a real

25    argument.
```

Page 70

1           Here, it is absolutely appropriate to take

2     judicial notice of 50 states, 48 states, 38 states that I

3     will argue in more detail in a few minutes are, in fact,

4     virtually identically situated, have made the same choice.

5     So, in fact, it's neither a tautology nor is it sophistry.

6           Number two, Your Honor.  We fully accept that it

7     is our burden, but the Court has to consider everything

8     including what the objectors bring as part of raising an

9     objection and one page in a brief with no claims that they

10    would actually do better and nothing to suggest it.  Even

11    now, no one has ever said I know a better way where

12    creditors get more, I know a better way where victims get

13    more redress.  If someone thought that was really the case

14    after $500 million in legal fees, maybe they should have

15    just said it.

16          Your Honor, with respect to burden, let's talk

17    about the facts in the record.  The allocation chart among

18    the states about what each one is getting goes to, like,

19    nine decimal places.  I'll read one example: Alabama,

20    $1.6579015983 percent.  The Debtors had no involvement in

21    that.  The states worked it out amongst themselves and

22    decided how much each one was getting and then handed it to

23    us and said please staple it to the documents and file it on

24    the docket, which we did at No. 3232, Exhibit C, Schedule 3.

25    Don't take it from me.  Take it from them.

1          Then there's Mr. DelConte's testimony under oath

2     in these proceedings that perhaps the objectors did not

3     remember.  We're all dancing faster than anyone should have

4     to.  So I quote, this is from the transcript on August 13th

5     at Page 72, beginning at Line 9.  The questioner was Mr.

6     Kaminetzky.  The witness under oath was Mr. DelConte.

7          "Q: And could you tell the Court why is it that

8     you didn't account or put a value on those causes of

9     action?"  This is in response to the questions that he got

10    about direct claims.

11         "A: We did not.  We determined that we couldn't

12    adequately estimate the value of those potential claims, you

13    know, based on the fact that, as I testified before and as

14    laid out in the disclosure statement, the fact that there's

15    a number of different causes of action that various third

16    parties could have against the shareholders, as well as a

17    number of defenses that the shareholders could have against

18    those particular causes of action and the fact that none of

19    these causes of action had been taken to judgment to date.

20    We didn't think that we were accurately able to estimate

21    what the total value should be, so we determined that we

22    should not include that in the liquidation analysis."

23         He testified under oath in a Federal Court that

24    the claims were not estimable.

25         THE COURT:  But he is not --

1              MR. HUEBNER:  (crosstalk) requires --

2              THE COURT:  He is not a lawyer, and Mr. Goldman's

3     point is that he thinks you could have provided a lawyer who

4     would testify as to why it would be speculative.  What is

5     your response to that?

6              MR. HUEBNER:  Your Honor, apologies, Your Honor.

7     I'm actually going to get to that with cites and more in a

8     few moments if that's okay with you as part of the flow.

9              Your Honor, the next issue is that, you know, with

10    all due respect, he actually ignored every single one of my

11    11 points, right, and it's basically now agreed, as the

12    record makes clear, that the five to six to seven billion

13    dollars of Debtor value is gone in a liquidation.

14             What he did was he said there's no evidence of

15    what we get in a liquidation; that's false.  In two of the

16    three scenarios in the declaration, Class 4 creditors share

17    zero.  If Connecticut's percentage is 1.3490069542 of zero,

18    it is still zero.

19             The third scenario, which is the only one where

20    they would get anything, they share $699 million, compared

21    to the five to six to eight billion dollars that states

22    alone are sharing under the plan.  I can't get anyone -- I

23    couldn't get a bevy of supercomputers to testify what

24    Connecticut would likely end up with out of $699 million.

25    When all the intercreditor deals were voided, Mr. Shore

                                                          Page 73

1     moved to subordinate their claims.  We had $400 trillion --

2     trillion of projected non-state claims against their 2.156

3     trillion.

4            To say that I need a lawyer under oath to say

5     nobody could possibly in the universe credit a material

6     recovery that Connecticut in a liquidation I think is not

7     what -- that's arguably sophistry.  I mean, the facts are so

8     clear, and they're not arguing to the contrary.  They're

9     just saying we don't have to prove anything.  We think we've

10    met our burden by miles.

11           And let me keep explaining why, Your Honor.  Your

12    Honor, we sort of covered this and, you know, it's not

13    curious that there's no expert.  There's no expert because

14    it's so obvious and so unassailable that if everyone chases

15    the Sacklers -- and everyone is everyone -- it's unknowable

16    what any individual creditor gets.

17           Think about what Mr. Goldman had to argue.  Oh,

18    maybe many of the states won't sue the Sacklers.  They'll

19    just say, you know, even though we're going to get nothing

20    from this case because the Debtors melted down, the company

21    was destroyed, and we couldn't get that value and we lost

22    PHI, we'll let our brother and sister states go through the

23    Sacklers and we'll just stay home and wish them the very

24    best while our citizens get zero, zero from the Sacklers,

25    zero for abatement.

```
 1              I mean, it's not -- it's just so far beyond the

 2     pale to have to respond to an assumption.  I mean, I could

 3     ask Mr. Eckstein to speak after me and confirm that there's

 4     no state anywhere that's going to allow others to sue the

 5     Sacklers while they do nothing.  They all have identical,

 6     similar, analogous, different causes of action.  The only

 7     reason the Sacklers are named in some complaints and not

 8     others is because of the Chapter 11, which we'll discuss in

 9     a minute.

10              In fact, you know what?  Let's discuss it right

11     now, because it's just so not right that almost two years

12     in, we're still hearing what is truly -- and I don't mean

13     this unkindly -- a canard about the PI blocking information

14     flow.

15              So let me remind everybody.  The preliminary

16     injunction was supported by the Official Committee of

17     Unsecured Creditors on behalf of everybody as the statutory

18     fiduciary appointed by the Department of Justice to

19     vindicate all of Purdue's creditors as best they know how.

20     They were supported by the AHC.

21              THE COURT:  If I could interrupt.  I think Mr.

22     Goldman's point was not about -- he was not saying there was

23     a lack of information about the Sacklers or claims that

24     might be asserted against them.

25              I think what he was saying is that they -- certain
```

Page 75

1    states at least would have gotten a judgment but for the

2    injunction and, therefore, the claims could be -- the face

3    amount of the claims could be treated as something that

4    there is evidence on.

5              MR. HUEBNER:  So, Your Honor, that's exactly where

6    I was about to go.

7              THE COURT:  Okay.

8              MR. HUEBNER:  I was first noting, because people

9    keep implying that the injunction was somehow put in place

10   for the benefit of the Sacklers --

11             THE COURT:  Well, I don't think Mr. Goldman was

12   doing that.

13             MR. HUEBNER:  -- and wanting to be farther --

14             THE COURT:  I don't think he could because that's

15   not -- he wasn't doing it and he couldn't have done it

16   because it's not --

17             MR. HUEBNER:  Correct.

18             THE COURT:  -- the fact.

19             MR. HUEBNER:  So now let me address the actual

20   point.

21             THE COURT:  Okay.

22             MR. HUEBNER:  I agree, and it was both nothing and

23   too much at the same time.  As Your Honor might remember the

24   state of Washington actually said when reading the

25   injunction, please let just us proceed to trial because

1     we're very far along and we think it would be helpful.

2          You've never heard me ever dispute the strength or

3     validity of any individual claimant's claim against the

4     Sacklers.  The problem is one creditor winning against the

5     Sacklers only supports the likelihood that all creditors

6     would win against the Sacklers, and if all creditors win

7     against the Sacklers, no individual creditors' recovery is

8     knowable.  But what is knowable is that four, five, six,

9     seven, eight billion dollars that is already on the table

10    evaporates and creditors have to do better trying to share

11    only what they get against the Sacklers in that scenario,

12    and that's my argument.

13         You know, the notion of Mr. Goldman having to say,

14    you know, only a small number of states might sue them, it's

15    just so -- I don't even know what to say in response to

16    that.  We can line up 100,000 creditors right now at the

17    podium to say I swear I will sue the Sacklers along with

18    suing Purdue to recover for the acts of this company and its

19    owners, and everyone on the planet knows it.

20         Your Honor, Mr. Gold then -- Mr. Goldman, I'm so

21    sorry.  Mr. Goldman then sort of testified and sort of

22    speculated that in a subsequent Sackler bankruptcy, if that

23    happened, we would all do better because maybe they go into

24    Chapter 11 and maybe their trusts would be brought in and

25    maybe they're not self-settled trusts and maybe we could get

Page 77

1    all their assets.

2           Well, here's my answer to that.  With all due

3    respect to Mr. Goldman, who is in the 1/500th of 1 percent

4    of our creditors who objected to confirmation, many of us

5    have spent years figuring out how to get the best deal and

6    analyzing the all risks and rewards.

7           And here's the testimony, which is in evidence,

8    from Mr. Atkinson, whose declaration is extraordinarily

9    important and attaches the UCC letter which went out to all

10   creditors and is extraordinarily important.  Paragraph 11:

11          "At the outset of these Chapter 11 cases, Akin and

12   Province commenced an investigation on behalf of the

13   Official Committee of among other things, the claims that

14   could be asserted against the Sacklers and related entities

15   on behalf of the Debtors' estates.  This also included an

16   investigation concerning the likelihood of success of any

17   potential estate claims against the Sacklers and related

18   entities, the likely damages associated with such claims,

19   and the likelihood of collecting on any judgment rendered in

20   favor of such claims."

21          Everyone looked at collectability.  What does Mr.

22   Goldman think we were all doing for the last three years?

23   This is a huge part of what people were doing, people like

24   the AHC and the UCC and the PIs and the special committee

25   thought about all of these thing.  So like an intellectual

```
 1    colloquy about what might happen in a hypothetical Sackler
 2    bankruptcy which Jersey law and Connecticut and Maryland
 3    law, this is the work that was done for tens of thousands of
 4    hours and all the people suing Purdue and suing the
 5    Sacklers.
 6             And nobody but this one objection apparently
 7    believes that there's a better alternative, and this
 8    objection doesn't really believe it either because you'll
 9    notice you never heard anybody say, and you certainly didn't
10    hear Mr. Goldman say, I actually think my clients would do
11    better.  Nobody could say that, not under oath and not in a
12    signed pleading.
13             I have tremendous respect for how seriously Mr.
14    Goldman takes his signature, and unlike other pleadings in
15    this case, there is nothing in his that an officer of the
16    court should not be comfortable saying, but I think the
17    silences are also important.  And ironically, I think that
18    you can take judicial notice of the silences as well.
19             Two final points, Your Honor.  In case the record
20    is somehow not clear, I have never ever said that any state
21    would not prevail against the Sacklers.  My point is
22    different, and it has always been different, which is we're
23    back to the tragedy of the commons, is that everybody would
24    prevail.  And we discussed this or there's a risk and the
25    odds are the same for everybody.
```

```
 1              And so, Connecticut on its $50.1 billion claim is
 2    likely to prevail.  o are 47 or 48 or 42 other states and
 3    tens and tens of thousands of other Creditors who suffered
 4    similar injury.
 5              Finally, it's not really relevant because I said
 6    it's Mr. Preis' argument and I'm not making it, but right is
 7    right.  So let me be very clear.  Purdue as you have heard
 8    in other context, often in very strong tones, pled guilty to
 9    multiple crimes in 2007 and had a corporate monitor in place
10    that many of these states participated in the monitoring and
11    had rights and access to information.  Suffice it to say
12    that if the Estate is forced to go in a different place and
13    has to seek fairness in recoveries for all, Mr. Goldman's
14    sort of testimony again about we're a BFP.  We have no
15    knowledge, we weren't on notice -- not my theory, not in my
16    pleadings, but that's something that a lawyer can represent
17    to a court and I daresay Mr. Goldman has no facts to support
18    that some day some court might find about who might have
19    been able to stop this years ago.  I have nothing further.
20              THE COURT:  Okay.  All right.  Why don't we move
21    on then to the next topic on today's agenda which is the
22    classification argument made by the objecting states other
23    than West Virginia, which frankly, I'm not sure at this
24    point, given the vote, matters that much, but it's on the
25    agenda and I'll hear it briefly for the time that's been
```

Page 80

1    allotted.

2            MR. MCCARTHY:  Your Honor, for the record, Gerry

3    McCarthy of Davis Polk on behalf of the Debtors.  Can Your

4    Honor hear me clearly?

5            THE COURT:  Yes.

6            MR. MCCARTHY:  So the next item on the agenda, as

7    Your Honor just noted, which I now will address are the

8    classification objections of Washington, Oregon, as well as

9    Connecticut, Maryland, and the District of Columbia.  I

10   believe there were also some joinders by California,

11   Delaware, Rhode Island and Vermont.

12           The objecting states contended the plan improperly

13   classifies them with cities, municipalities and other local

14   governments.  That objection should be overruled for two

15   basic reasons.  First, and most importantly, the Debtor's

16   classification framework is entirely proper.  The objecting

17   states arguing to the contrary is simply incorrect.

18           The Court, I know, is more than familiar with the

19   straightforward rules governing classification, the first

20   set forth in Section 1122(a) is that claims or interests may

21   be classified together if they're "substantially similar."

22   The second is that a Debtor has a great deal of flexibility

23   to place similar claims into different classes and can do so

24   as long as there is a legitimate reason for it, but doesn't

25   have to.  It's the first of these rules that disposes of the

1     issues here.

2          The claims of the states and municipalities are

3     substantially similar, and thus are properly classified

4     together.  As to the initial matter, these claims are all

5     unsecured and thus have an identical relationship to the

6     property in the Debtors' Estate.  That alone is sufficient

7     to classify them together.

8          These claims also arise out of the Debtors'

9     production, marketing, and sale of opioid medications.  In

10    other words, they arise from the same facts.  And although

11    there is no need whatsoever to get this granular, and there

12    may so variation state to state, state and municipal claims

13    also allege many similar theories to recover.  For

14    illustrative purposes, one could compare the complaints of

15    Seattle and Washington State at JX79 and JX944 respectively.

16    They both have a certain public nuisance claims under the

17    same statute, Revised Code of Washington Chapter 7.48.  They

18    both assert consumer protection claims under the same

19    statute, the Washington Consumer Protection Act.

20          Or one could compare the complaints of San

21    Francisco and California at JX825 and JX947 respectively.

22    They too both assert public nuisance claims under the same

23    statutes, California Civil Code Sections 3479 and 3480, and

24    the two both assert consumer protection claims under the

25    same statutes.

Page 82

1          In addition to the foregoing, the Class 4 claims

2    were all recovering under and through NOAT, treatment that

3    the states and local governments specifically negotiated for

4    and that arose out of the Phase 1 mediation.  It is not at

5    all unusual in Chapter 11 cases that claims arising --

6    claims recovering under the same trust are classified

7    together.

8          All in all, the states had no case that even

9    purports to require, let alone actually holds that states

10   must be classified from other creditors as a general matter

11   because that case doesn't exist.  To the contrary, multiple

12   states invariably hold claims in sizeable Chapter 11 cases

13   including for things like taxes and environmental matters

14   and the Debtors invariably had discretion to classify states

15   with other creditors.

16         Here, the states are classified with other non-

17   federal government creditors which is entirely proper under

18   the circumstances.

19         Second, Your Honor, as you mentioned at the onset,

20   the states' objections are essentially moot.  If the states

21   were to be separately classified, the class would be an

22   accepting class, overwhelmingly so any way you look at it.

23         Christine Pullo from Prime Clerk testified in

24   Exhibit B of her declaration -- that's at Docket No. 3372 --

25   that of the 48 states that voted on the plan, 38 voted in

1    favor and 10 voted to reject.  That's 79.17 percent of the

2    states that voted to accept.  The number stays basically the

3    same if one equates the District of Columbia and other U.S.

4    territories.  In that case, Ms. Pullo testified 79.25

5    percent of the states voted to accept the plan.  And that's

6    Footnote 5 of Ms. Pullo's declaration.

7            If we were to count by population, one would reach

8    approximately the same results as Washington concedes in

9    Paragraph 67 of its objection and Connecticut concedes in

10   Paragraph 63 of its.  The states voting to reject the plan

11   account for roughly 20 percent of the U.S. population.

12   That's a number that doesn't really vary if you include the

13   U.S. territories.

14           If one were to go by states on proof of claim, you

15   would again reach the same result as Washington and

16   Connecticut concede in those two paragraphs.  And if we were

17   to count by the percentage of allocations each state

18   received from NOAT, one could reach approximately the same

19   result too.

20           For all these reasons, Your Honor, the objecting

21   states classification objection should be overruled.  It

22   shouldn't pass without mention that the objecting states

23   evoke a number of irrelevant legal doctrines that they

24   believe demonstrate that their claims are different in class

25   from those of local governments.  These certain notions of

1    state sovereignty and a so-called Dillon Rule.  Suffice it

2    to say that none of these doctrines in any way mandate

3    separate classification here.

4            I will now turn the virtual podium over, unless

5    Your Honor has any questions, to Mr. Maclay who represents

6    the Multi-State Entity Group and who I understand will

7    address some of the points that I just mentioned briefly.

8            THE COURT:  Okay, that's fine, thank you.

9            MR. MACLAY:  Thank you, Your Honor, Kevin Maclay

10   for the Multi-State Governmental Entities Group.  Cognizant

11   of Your Honor comments, I will keep this argument brief.

12           Your Honor, despite the fact that local

13   governments have strong claims that they've expended

14   significant efforts in pursuing opioid defendants, including

15   Purdue, despite the fact they have suffered substantial harm

16   and despite the critical role that local governments play in

17   abatement efforts, including under the proposed plan here,

18   objecting states seek to challenge the plan's

19   classifications of the non-criminal domestic governmental

20   claims in Class 4.

21           Your Honor, just to make a very important

22   overarching point, local governments are at the front lines

23   of the opioid crisis.  If you're in your local community and

24   you call 911, Your Honor, whether it's because of the

25   criminal emergency related to opioids or a medical emergency

Page 85

1    related to opioids, the person who comes, Your Honor, is a

2    local policeman, a local firefighter, a local county

3    hospital member, et cetera.

4            It is the local governments who brought most of

5    the claims against the Debtors prepetition as set forth in

6    the Debtors' docketed filing at 718 earlier on this case and

7    it is a clear fact, as has been noted by many of the cases

8    cited to in our brief, that cities and counties and other

9    local governmental entities have numerous claims including

10   for increased healthcare costs, increased foster care costs,

11   increased crime-related costs, info, and tax revenue.  And a

12   number of cases, such as the City of Surprise case, Your

13   Honor, lay this out.

14           Secondly, Your Honor, it is surprisingly absent

15   from any of the objections filed by the objecting states any

16   mention of the Home Rule Doctrine.  They mention Dillion's

17   Rule which has been largely superseded as a point of matter

18   by the nearly ubiquitous entry into the Home Rule Doctrine

19   by almost every state and this is laid out quite cogently,

20   Your Honor, in our brief in the dispatch of the City of New

21   York versus Beretta Corp, which is the District Court for

22   the Eastern District of New York.

23           For example, in that case, the court reasoned that

24   precluding the City of New York from bringing a suit aimed

25   at redressing the problem of gun-related violence would

1    interfere with its authority to promote the safety and well-

2    being of its inhabitants.  It is quite clear, Your Honor,

3    that local governments have both the duty and the authority

4    to pursue defendants of mass tort-related incidents

5    including opioid defendants.  And the record is replete with

6    examples of that.

7            For example, Your Honor, if you were to look at

8    Paragraph 20 of the MSGE Group reply is support of plan

9    confirmation, we list a litany of cases demonstrating that

10   local governments have standing to bring such claims and in

11   Paragraph 16 to 19 and 21 to 24, we have another litany of

12   cases demonstrating the survival of motions to dismiss by

13   those same governmental entities.

14           It is also clear, Your Honor, that very recently

15   in Tennessee, nine counties and eighteen cities and towns

16   reached a tentative 35-million-dollar settlement with Endo

17   Corporation, another opioid defendant, on July 22nd of 2021.

18   And in three other state courts, Your Honor, California, New

19   York, and West Virginia, county and city plaintiffs are

20   either currently in trial or have recently concluded trial

21   and are waiting verdicts seeking billions of dollars in

22   damages.

23           And, of course, as the Debtor's counsel aptly

24   noted, Your Honor, it is, of course, true that under the

25   proposed plan, cities and counties are part of the abatement

1    efforts and a very important part of the abatement efforts

2    set forth in the plan that we week confirmation of here

3    today.

4              And, of course, one final point, Your Honor, the

5    parens patriae argument made by the objecting states is

6    overstated first of all, because parens patriae powers do

7    belong to the various states and localities in their various

8    circumstances as our brief pointed out.  And secondly, the

9    proprietary actions that all local governments can bring

10   heavy overlap with such parens patriae actions as pointed

11   out also in the authorities that we cited you to.

12             To make a long story short, Your Honor, there is

13   no valid basis to argue the states must be classified

14   separately from local government and the surprising

15   suggestion in the states objections that local governments

16   don't have valuable and important rights to pursue against

17   opioid defendants is just incredibly shortsighted as well as

18   misleading and just flatly wrong.  And so for those reasons,

19   Your Honor, we support the Debtors in this particular

20   example of argument as well as overall with the plan.  We

21   restate Your Honor that local governments and states, in

22   fact, are appropriately classified together in Class 4.

23   Thank you.

24             THE COURT:  Okay.  Thanks.  I think Mr. Gold is

25   handling this for the objecting states, but I may be wrong.

1            MR. GOLD:  Your Honor, you are correct, Matthew

2     Gold, Kleinberg, Kaplan, Wolff and Cohen, representing

3     Washington, Oregon and District of Columbia.  Your Honor,

4     can you hear me?

5            THE COURT:  Yes.

6            MR. GOLD:  Okay.  Thank you.  I will proceed.  I

7     will first note that this oral argument is based on

8     coordination and cooperation with the Attorneys General

9     Offices of Connecticut, Delaware, Maryland, Rhode Island,

10    and Vermont and will be provided in a unified fashion as

11    we've discussed before, Your Honor.

12            THE COURT:  Right.

13            MR. GOLD:  And, Your Honor, I, too, will be brief

14    in my comments in this regard.  First, I want to

15    emphatically say that our argument is not meant -- and we

16    don't believe it is -- in any way to be disrespecting to

17    local governments and the first responders and anyone in

18    that group.  We have not been arguing that they do not have

19    claims.  We are not arguing that their claims do not, in

20    certain respects, overlap with claims that are brought by

21    the states.

22            But we are arguing is that the states, the

23    totality of the claims brought by the states and the

24    objecting states in particular, contain many significant

25    areas that cannot be brought by the municipalities which

1    supports why the states should be classified separately.

2            For example, in Washington, only the state can

3    seek as a remedy civil penalties with respect to violations.

4    That is not something that can be brought by municipalities.

5    Now particularly with respect to classification, I will

6    first --

7            THE COURT:  Have the states asserted a different

8    priority based on that right?

9            MR. GOLD:  No, Your Honor.

10           THE COURT:  Okay.

11           MR. GOLD:  I will first note that it is the

12   Debtors' burden to prove that the classifications were

13   proper.  The Debtors have argued that the argued that the

14   classification error can be fixed by going back to the

15   voting results and preparing a count of what the results

16   would have been had the states been in a separate class.

17           And frankly, Your Honor, I find this is amazing.

18   The Debtors waited until after the votes had been cast to

19   rearrange them into a better classification.

20           A classification error cannot be fixed through a

21   hypothetical analysis of how the votes might have been

22   arranged under a different classification.  The Debtors

23   certainly cite no cases to support this theory that

24   classification can ex post facto be revised.  The disclosure

25   statement certainly did not disclose to the voters that

1    their claims might be rearranged into separate classes for

2    purposes of determining how the plan would go.

3              And, Your Honor, as you, yourself, stated, show me

4    an election where that was done.  I'm not aware that that's

5    how elections are handled in this country that the votes can

6    be re-scrambled and realigned if they were not properly

7    counted in the first place.

8              THE COURT:  They are counted.

9              MR. GOLD:  They are counted.

10             THE COURT:  My statement was as to somehow

11   assuming votes that weren't counted.  But let me just cut to

12   the chase.  I just frankly do not understand this argument.

13   The caselaw could not be clearer that the focus as far as

14   1122 of the Bankruptcy Code is concerned, which refers to

15   substantially similar claims, goes to the right of the

16   claimant against the assets of the estate.  So you can,

17   although you don't have to, classify claims based on breach

18   of contract in the same class with claims based on tort

19   because each of them is unsecured and has the same right

20   against the debtor's assets, general unsecured claims.  Is

21   there any aspect of your argument that is consistent with

22   that proposition?

23             MR. GOLD:  Your Honor, I'm not disputing that the

24   claims as treated in the plan are all general unsecured

25   claims.

```
 1              THE COURT:  Okay.  So I think you lose.  So let's

 2     move on to the NOAT allocation.

 3              MR. GOLD:  I simply --

 4              THE COURT:  This is just a waste of time, Mr.

 5     Gold, and I don't understand frankly -- it's just -- I've

 6     read your brief.  The only question I had is whether you had

 7     some sort of priority claim, which you told me you don't or

 8     your clients don't.  There's been no attempt to designate

 9     any vote in the class as to, you know, being for a claim

10     that is only held by a state, which would be the remedy

11     under the brief's argument that only the states can assert

12     certain types of claims as opposed to a classification

13     argument since concededly there are general unsecured claims

14     held by the other governmental entities.  There's no

15     contention of any vote manipulation here given -- and this

16     is where the actual votes, I think, are relevant.

17              So this is just, this argument makes no sense.

18              MR. GOLD:  Your Honor, I was simply responding to

19     the argument that the Debtors' had just made and they made

20     in their papers.

21              THE COURT:  Well, okay.

22              MR. GOLD:  I have one other response to the

23     argument that the Debtors have made in their papers, Your

24     Honor.  I will be brief with respect to this as well.

25              THE COURT:  All right.
```

```
 1              MR. GOLD:  It relates to feature that the claims

 2      were all accorded one dollar votes.  We submit that the one

 3      dollar claim setup was preposterous on its face.  There may

 4      well be cases where that is the right approach, but not in

 5      this case.  While the amounts of the claims might not have

 6      been fixed, the one dollar setup lumped together claims that

 7      were known to be different and several orders of magnitude

 8      different in size.  The Attorneys General of the states

 9      represent the entire state and are not simply the sum of the

10      municipalities that are contained therein.  And by arranging

11      the class and one dollar votes for every party in it, the

12      Debtors were setting up a structure where they knew that

13      they would be able to prevail in the ultimate voting and in

14      a way that was inconsistent with what they had to be aware

15      were the significant differences in the sizes of the claims.

16      We submit that it is improper in this case.  I have nothing

17      further to add, Your Honor, unless you have questions.

18              THE COURT:  No, I don't.  Thank you.

19              MR. GOLD:  Thank you, Your Honor.

20              THE COURT:  I don't know if the Debtors or the

21      MSGE want to respond on the one dollar point?

22              MR. HUEBNER:  Your Honor, I'll hit that one.  The

23      answer is very simple.  The NOAT allocation and he actually

24      answers a bunch of the sort of points that were made, the

25      NOAT allocation was agreed to among all the states and
```

Page 93

1    entities as their Class 4 shared distribution. The one

2    dollar was agreed to basically by everybody to avoid what

3    could have been an unthinkable 3018 process. No 3018

4    motions were ever filed. We've never heard from anybody

5    ever in this case until this objection was filed. And these

6    procedures, as Your Honor remembers, were worked out with

7    the AHC, with the NCSG, and with the UCC and the disclosure

8    statement and these mechanics were agreed to by no objection

9    from either today's objectors or I believe anyone else that

10    was unresolved. To say now that the one dollar thing

11    justifies some sort of infirmity is totally inappropriate.

12            And one other very brief point, speaking of

13    inappropriate, to recharacterize Mr. McCarthy's presentation

14    or brief as the Debtors have conceded they made a mistake

15    and now they're trying to fix it, is just misrepresenting to

16    this Court, just ridiculous.

17            THE COURT: I don't need to hear on that point.

18            MR. HUEBNER: Thank you, Your Honor.

19            MR. MACLAY: Your Honor, Kevin Maclay for the MSGE

20    Group. On the legal aspects of the one dollar claim, I

21    would direct Your Honor to Page 16 of our confirmation brief

22    and No. 27, where we go through a number cases that have

23    held a one dollar -- in a mass tort case, a one dollar

24    voting amount is appropriate. And I would just like to read

25    to Your Honor the A.H. Robbins analysis, which was affirmed

1    by the Fourth Circuit: "Any attempt to evaluate each

2    individual claim for purposes of voting on the debtors plan

3    of reorganization would, as a practical matter, be an act of

4    futility and would be so time consuming as to impose on many

5    deserving claimants further intolerable delay not only to

6    their detriment but to the detriment of the financial well-

7    being of the estate as well."

8             And I think, Your Honor, that analysis totally

9    applies here and clearly justifies the one dollar voting

10   amount because to liquidate the various and complex

11   interrelated claims of all of the claimants here would have

12   been essentially an impossible undertaking and certainly the

13   gain would not have been worth the gamble, Your Honor, as

14   noted by A.H. Robin and a litany of other cases cited in our

15   brief.

16            THE COURT:  Okay.  Very well.  I guess to me,

17   ultimately the fact that the class that the objecting states

18   say that they would want to be in, which would be a class of

19   states only, voted overwhelmingly in favor of the plan,

20   suggests that they would want to fight it out with these

21   other 38 states as to the amounts of their claims, which I

22   don't think is what Mr. Gold was saying, which is that the

23   local governments have smaller claims.  I actually think it

24   is a nonmaterial amendment to a plan to allow a plan to be

25   amended to reclassify in a class if one believed that the

1    class needed to be reclassified.

2              So I guess, to me, this seems to be unlike some of

3    the other arguments that the objecting states have made,

4    just an attempt to throw sand in the gears without any real

5    merit to it whatsoever.

6              So why don't we move onto the next topic, which is

7    the NOAT allocation issue raised as the only basis for West

8    Virginia's objection to the plan and I think here, counsel

9    for the Ad Hoc Committee of States and other Governmental

10   Entities will argue in support of the plan and then we'll

11   hear from West Virginia's counsel in support of the

12   objection.

13             MR. WAGNER:  Thank you, Your Honor.  Can you see

14   and hear me?  It's Jonathan Wagner from Kramer Levin on

15   behalf of the Ad Hoc Committee of Governmental and Other

16   Contingent Litigation Claimants.

17             THE COURT:  Yes, I can.

18             MR. WAGNER:  Before I start, I just want to thank

19   my Kramer Levin colleagues who have worked on this matter.

20             Your Honor, there are difficult questions that you

21   need to answer in this hearing, but allocation is not one of

22   them.  And while we take the objection every seriously, it's

23   not really a close question.  The context is very important.

24   We have 49 states on one side and 1 on the other.  And when

25   does the majority of the states in this country agree on

Page 96

 1    anything?

 2            Here, you have 49 states who agree, or at least

 3    didn't object -- I don't want to overstate it -- and only

 4    one has disagreed.  In fact, 49 --

 5            THE COURT:  I actually think it's 47 to 1, but

 6    that's okay.

 7            MR. WAGNER:  I won't round up to 49, but it's 1 on

 8    the other side and if the plan is so grossly unfair, why is

 9    it that only one state is objecting?  These numbers alone

10    could be used to justify compliance with the code, but even

11    if you put aside those numbers and address the objections on

12    its merits, it's clear that this plan satisfies the code.

13    And as Mr. Huebner noted, no plan is perfect, but this one

14    is pretty good.  It's also fair to West Virginia.

15            As we heard during the testimony, West Virginia

16    has about half a percent of the nation's population, but is

17    getting more than twice that under the plan.  And the reason

18    is because the plan takes into account the intensity and

19    severity measures that have been advocated by West Virginia

20    itself.  It just doesn't take them into account at the same

21    extent.

22            Now Your Honor has to decide this issue based on a

23    record that's before you and I don't know what Attorney

24    General Morrisey is going to raise, but in this case, we

25    have two witnesses, one was John Guard from the Florida

Page 97

1    Attorney General's Office who was a very credible witness,

2    and on the other side, we had Dr. Cowan who was the only

3    witness offered by West Virginia and his testimony was full

4    of admissions and contradictions.  And his admissions on

5    fairness and the reasonable nature of the plan and good

6    faith are prone to objection.

7           Let me bring up the specific objection.  The first

8    is that the plan was not proposed in good faith in violation

9    of Section 1129(a)(3).  Under 1129(a)(3), a plan has to be

10   proposed with honestly and good intentions.  That's the

11   Chassix case, 533 B.R. 64 at 74.  To get in on one side, we

12   had John Guard's testimony and his declaration.  And Dr.

13   Cowan's testimony to the contrary just does not overcome

14   that testimony.

15          Mr. Guard was extremely credible and as Your Honor

16   will recall, there was no significant cross-examination of

17   him.  He testified to years of negotiations and compromises

18   back and forth.  That was at Paragraph 10 to 47 of his

19   declaration, and the testimony on Day 2, Pages 95, 105-106,

20   and 118.

21          Now, could it really be that an allocation plan

22   that was negotiated by all of the country's Attorneys

23   General was negotiated in bad faith, that there was some

24   national conspiracy among the top legal officers of the

25   various states?  Just to state that proposition shows how

Page 98

1    farfetched it is.  These are negotiations that had to

2    balance the interests of fifty different states.  And nobody

3    ganged up on West Virginia.

4            Now the two -- there were two specific complaints

5    raised by West Virginia under 1129(a)(3).  The first is that

6    the plan is a political compromise.  As Your Honor is well

7    aware, compromise is de rigueur in bankruptcy and is, in

8    fact, favored.  Compromise is not a dirty word.

9            A second specific objection is that the large

10   states somehow took control of this process.  This is not

11   consistent with the outcome here.  The small states,

12   including West Virginia, do very well under this plan, and,

13   Your Honor, should ask what proof has been offered here that

14   the large states seized the process.  There's been no fact

15   witness offered by West Virginia, and on top of this we have

16   the admission by Dr. Cowan, that the plan, that reasonable

17   people may differ.  That's at page 230 of the fourth day of

18   the hearing.

19           Another (indiscernible) issue of good faith, Your

20   Honor, is whether the plan achieves the result that's

21   consistent with the Bankruptcy Code.  That's the Chassix

22   case at 533 B.R. 74, and as -- my -- the others who have

23   made presentations before have noted, this is a plan that --

24   that confers substantial value on many different creditor

25   groups, and it not only delivers value to creditors, I think

Page 99

1   it's fair to say it's a plan that's in the national

2   interests.  It's a plan that literally saves lives, and how

3   often can -- how often can somebody say that about a

4   bankruptcy plan?

5            On this score that (indiscernible) that the

6   statements pre-litigation by Dr. Cowan, I think, are very

7   relevant, "spending more now in an effective way, though,

8   will reduce damages".  That's Exhibit 389 at Page 12, and as

9   he also admitted, all the plans here are effective, at the

10  pages 241 to 242 of his testimony.  So how could a plan

11  that's in the national interest somehow be bad faith?  That

12  -- is that an objection raised by West Virginia is that it

13  is one of equal treatment under 1123(a)(4) of the plan, of

14  the code.

15           Now here, all the states are subject to the same

16  criteria, the treatment is identical, and under the W.R.

17  Grace case, "what matters is not the claimants recover the

18  same amount, but they have an equal opportunity to recover

19  on their claims".  That's W.R. Grace 729 f.3rd after Page

20  327.  Since all the states are treated equally, you could

21  argue that the proper standard is Rule 9019, and here the

22  settlement clearly falls above the lowest point in raise of

23  -- in range of reasonableness.

24           There's no argument to the contrary and Dr.

25  Cowan's admissions that the plan -- that the plan is

Page 100

```
 1    reasonable really ends the matter, and I'd also note his
 2    admission that he prefers the bankruptcy plan to no plan.
 3    That's at Page 242 to 243 of the fourth day of the hearing.
 4    But even if Rule 9019 is not the standard, and you simply
 5    apply 1123(a)(4), the objection still fails.  West Virginia
 6    has characterized this objection as -- as follows, "same
 7    treatment does not mean identical treatment, and courts have
 8    approved settlements where the class members received
 9    different percentages of recovery to take into account
10    different factors.  So long as the settlement terms of
11    fashionably based on legitimate considerations."  That's the
12    West Virginia objection at Paragraph 28, citing cases.
13              The objection that West Virginia raised is -- is
14    that the plan places too much emphasis on population,
15    however, we have Dr. Cowan's statement, prelitigation, that
16    "large communities likely should receive more than small
17    communities".  That's Exhibit 380 -- 388 at Page 6.  In any
18    event, West Virginia overstates the importance of population
19    under this plan.
20              Just to go into a little bit of math, population
21    is 31 percent of 80 -- of the first 85 percent and the
22    balance is intensity measures, and then you have the
23    remaining 15 percent that's all intensity measures and you
24    all have the -- you also have the 1 percent intensity fund,
25    and for all of those reasons, that's why West Virginia,
```

1    which has about a half a percent of the population, is

2    getting more -- is getting 1.16 percent of the funds.

3            But, Your Honor, may legitimately ask why

4    (indiscernible) the population at all?  It's not at a

5    political -- or it's not a political criteria.  It's a

6    rational criteria.  It's not like throwing darts against the

7    wall.  Mr. Guard testified that there are issues concerning

8    the intensity and severity measures, which make them

9    subjective in some sense, and population is an objective

10   measure.  And I'd refer the Court to Mr. Guard's testimony

11   at Pages 90 to 91 of the second day of the hearing, where he

12   noted issues concerning under reporting as to those severity

13   and intensity measures, inconsistencies among the states in

14   reporting cause of death; and he said at Page 91,

15   "population was added to try to deal with the issues that

16   existed for the other metrics", and -- and he went on to

17   say, "population was and is a typical metric that is

18   utilized in State Attorney General settlements", again, Page

19   91.  And we cited in our -- in our response a couple of -- a

20   couple of among many instances in which national settlements

21   used population as the only factor.  In Recompact Disc, 216

22   F.R.D. 197 at 200, in re Toys-R-Us antitrust litigation 191

23   F.R.D. 347 at Page 350, and significantly, Dr. Cowan

24   admitted that this settlement is a lot more fair than other

25   national settlements, including the national tobacco

Page 102

1    settlement. That's at Page 2 -- (indiscernible).

2         Just a minute on California, I don't know whether

3    Attorney General Morris is going to raise that issue.  It's

4    a minor point, whether they contribute to the intensity

5    fund.  But during cross-examination, it was established that

6    had the plan used expenditures on criminal justice as a

7    factor, as Dr. Cowan did in his prelitigation hypotheticals,

8    then California would have been far better than the 9.9

9    percent it gets under this plan.

10        The one final point, Dr. Cowan's plan, it's

11   legally irrelevant under NII Holdings 536 B.R. at 125, but

12   even if you plan more than (indiscernible) it doesn't really

13   advance the objection.  And when an expert changes his

14   opinion so dramatically, as I think Dr. Cowan did from

15   prelitigation to post-litigation, really has no credibility.

16   And he admitted during his -- during the cross that his

17   post-litigation plan is not remote -- does not remotely

18   resemble his pre-litigation plan.  And then also, he

19   admitted before litigation -- he admitted before litigation

20   that "there is no simple answer to the question how to

21   allocate one large settlement -- one large opioid

22   settlement.  Too many questions remain.  Too many issues

23   need to be resolved."  That's Exhibit 388 at Page 14.  He

24   had admitted that what's fair under these circumstances is

25   complicated.  That's Pages 233 to 234.

```
                                                    Page 103

 1            He said that spending more money won't necessarily

 2    get you better results.  That's Exhibit (indiscernible) at

 3    Page (indiscernible).  He said, "treatment in terms of

 4    offerings may not translate into increased efficacy", and

 5    just -- "just spending more to achieve equality may not be

 6    the best outcome".  That's Exhibit 392 at Page 12.  And then

 7    also, his plan produces very odd results.  Washington, which

 8    has one fourth the population of Texas gets more than Texas.

 9    Kentucky, one fourth the population of New York, gets more

10    than New York.  Virginia, with a growing population, four

11    times the population of West Virginia, which is loosing

12    population, gets less than West Virginia.  And Your Honor,

13    the point of that exercise was to understand the point that

14    if you change this plan to make it more fair to one state,

15    for example, West Virginia, you have problems elsewhere in

16    the plan.  But I think it underscores how difficult it was

17    to reach a compromise here, a balance, and I think all of

18    that allows, Your Honor, discretion to (indiscernible)

19    allocation under this plan.

20            To sum up, Your Honor, allocation under this plan

21    is based on rational and legitimate considerations.  It's

22    actually quite an achievement.  It confers the benefit on

23    the States and on the Nation as a whole.  And I have to say

24    no good deed goes unpunished because West Virginia, does

25    pretty well under this plan, and West Virginia's criticism
```

1    really fail on their own terms, but certainly in the large

2    context of this case.  And the larger context is as the West

3    Virginia expert, himself noted, the more time that this

4    problem festers without additional spending on opioid

5    abatement, the worse the problem will become.  And that's

6    probably why the West Virginia expert admitted that he

7    prefers the current plan to no plan.  And for all those

8    reasons, Your Honor, the Court should reject the objection.

9    Thank you.

10           THE COURT:  Okay.  Thanks.  So again, Counsel for

11   West Virginia, Mr. Morrisey, I think is going to handle the

12   argument in support of the objection.

13           MR. MORRISEY:  Your Honor, this is Attorney

14   General, Patrick Morrisey, and I'm grateful for the

15   opportunity to appear before you today.  I would mention, at

16   the outset, that the issue of the opioid epidemic is quite

17   severe in our state, and regardless of all of the issues

18   that you're hearing about, I think one area that we can find

19   in common with virtually every party, is everyone would

20   mention that West Virginia was ground zero at the opioid

21   epidemic.  If you looked at many of the metrics, West

22   Virginia had the most horrific of experience with the level

23   of intensity and severity that I think virtually all counsel

24   would concede.

25           The reason I'm very appreciative to be before you

```
 1    today is because this decision represents the first of

 2    likely many in a series of court cases which will determine

 3    how abatement is going to occur in the country, and I

 4    recognize that many of the states spent many years and they

 5    worked on it.  But just because many states agree on a

 6    flawed formula doesn't make it correct.  And so we are

 7    asking the Court to look at the grave issues associated with

 8    this particular case in having the predominant population

 9    based model, contrary to Counsel's argument that it's 31

10    percent population, effectively, a vast majority of this

11    formula is based upon population.  It's not based on

12    severity.  In fact, the one severity measure that everyone

13    can point to is the 1 percent fund that's been discussed a

14    lot.

15            If you actually looked very carefully at what the

16    principle public health agency of the country, whose task

17    was charged with looking at these issues comes up with,

18    they've indicated that intensity should represent 15 percent

19    of the overall formula.  The difference between 1 percent

20    and 15 percent is obviously very stark.  Now Counsel --

21            THE COURT:  Can I just say that --

22            MR. MORRISEY:  -- indicated --

23            THE COURT:  -- let me just interrupt you --

24            MR. MORRISEY:  Sure.

25            THE COURT:  -- Mr. Morrisey, that -- you're --
```

Page 106

1    you're referring to the, it's an acronym, it's S A -- S H --

2    I'm not trying to letter --

3              MR. MORRISEY:  SAMHSA?

4              THE COURT:  SAMSA, but it's SAMHSA?

5              MR. MORRISEY: SAMHSA -- I think it's Substance

6    Abuse Mental Health Services Administration.

7              THE COURT:  And -- and as I understand it, that

8    has changed -- that comes out once a year or every other

9    year and it is changed from time to time?

10             MR. MORRISEY:  It has changed.  I know that the

11   most recent formula that we've looked at, they have an

12   intensity fund applying to ten states that then would be

13   able to claim up to 15 percent of the aggregate dollars that

14   Congress appropriates.

15             THE COURT:  Okay.

16             MR. MORRISEY:  So if we step back to Counsel's

17   arguments that this plan was made in good intention, I think

18   that that statement could be torn apart fairly quickly.

19   Let's start with something that Counsel indicates is a very

20   small issue, and you can make an argument about whether 1

21   percent of the aggregate funds going to a particular state

22   is small or large, but when you're talking about the largest

23   state in the country for all the states to come together

24   behind, what I would call, the California carveout or cash

25   grab, you're talking about a significant amount of money.

Page 107

1     Not only with respect to the amount with this Purdue

2     bankruptcy, but all those in the future.  And so, that 1

3     percent is not indicative of good intentions.

4           How could every state contribute to a particular

5     intensity fund showing that at least on a minimal basis, all

6     states believe that intensity's important and one state be

7     afforded the opportunity, due to political consideration, to

8     argue well, we shouldn't have that in there.

9           Your Honor, the arguments we bring before you

10    today, we think are straight forward and don't contain some

11    of the same controversy that you had on Monday, or you've

12    had throughout.  These issues that we'll bring in with

13    respect to No. 1, trying to eliminate the California carve

14    out.  That's straight forward.  That could be easily

15    adjusted because there's no rational basis, whatsoever, no

16    legitimate consideration that one state should ignore

17    intensity considerations.  I would defy Counsel to come up

18    with one good reason.  They cite an 18 percent issue with

19    respect to judicial enforcement and other matters, but

20    nothing in the record indicates that that's even tied

21    directly to opioids.

22          There are many reasons why a state ultimately

23    might have more resource needs with respect to law

24    enforcement and other areas.  But everyone that's gone

25    through this process would acknowledge that the California

1    piece is one of the blites on this deal that needs to be

2    changed, because once again, it's not good faith to allow

3    one state to not contribute to a fund that every other state

4    does.

5           The second piece, which I think is equally

6    powerful, is that most of this formula is once again based

7    upon population.  Counsel cites 31 percent, but if you look

8    closely at the formula when you're looking at morphine

9    equivalents, when you're looking at several other factors,

10    it's clear that we're effectively quadrupling the population

11    count, and Counsel and our expert witness, Chuck Cowan,

12    testified to that fact without any contravention.

13           That's something that's not rational when you're

14    trying to solve a problem.  It -- Counsel states that this

15    is consistent with many other matters that get settled by

16    the state, but frequently, when states are involved in a

17    consumer or an antitrust matter, there could be

18    discouragement and there could be something focused on a

19    population.  This particular issue deals with the disease

20    state of individuals and what's happening within specific

21    communities.

22           So to be able to say there should be a population

23    based formula to solve the problem, rational economic theory

24    would never suggest that you're going to go in and say how

25    many people live in a state?  That's how we're going to deal

1    with the opioid epidemic?  It's an embarrassment and an

2    affront to any attempt to have good faith when the focus is

3    so much on population.  And of course, there were rigorous

4    discussions about this for years.  I recognize that many of

5    my colleagues ultimately decided to move in a different

6    direction, but the importance for this Court, for this

7    precedent, to get it correct, to do two things; eliminating

8    that California carve out, and two, asking to go back and to

9    either: a) change the population based system and move it

10   more to an intensity system, or b) simply taking an easier

11   tactic, which would be to move from 1 percent of intensity

12   fund to 2 percent or 3 percent, which I would note is very

13   different than what SAMHSA recommends, at 15 percent.  That

14   would create a much different abatement structure, which is

15   going to allow money to flow to the communities that

16   actually need it most.  And I think that's what we're all

17   here to do, to make sure that money gets out quickly.

18   That's why we've tried to work collaboratively with the

19   states, and we haven't objected to other provisions, but we

20   see this as a fatal flaw of the agreement.

21        But, Your Honor, you have the ability to help

22   change that and to convince the parties that a California

23   cash grab, or carve out, is inappropriate.  It should make

24   America very, very upset, and separately, the intensity fund

25   is still inadequate, given the fact that when you solve a

1    problem, you look at healthcare capacity.  You look at the

2    structure or what's being done to deliver healthcare within

3    a particular community.  You look at the opioid deaths and

4    you look at the people that are not treated, currently.

5    Based upon all of those factors, it's clear that West

6    Virginia is a unicorn, so it's not surprising that we would

7    get voted out on a particular issue like this because our

8    numbers are so bad, compared to every other state.

9            We're asking the Court to help bring that good

10   faith back to the process by making those two modest

11   considerations: 1) eliminate that carve out, and 2) increase

12   the size of the intensity fund so that many years from now,

13   we're not going to go back and look at this like we all

14   looked at tobacco, that the moneys were actually not put in

15   adequately to solve the problem.  That is just ended up

16   being a political grab bag.  That's what we should all

17   oppose.

18           This is a court of law where everyone expects to

19   get the best treatment under a quality of law.  It's not

20   Congress, it shouldn't be compared to that where they make

21   political deals all the time.  We have a chance to actually

22   focus on solving the problem, the right way, in a manner

23   that this allocation formula does not.

24           Your Honor, I'm very grateful for the opportunity

25   to personally come before you today.  This is the number one

1    issue facing our state, and I wanted to amplify how

2    important it is that we fix this because what this Court

3    decides to do is likely to serve as a president going

4    forward for all the other litigation that we have against

5    manufacturers and pharmacies.  And what we've found through

6    all the years, West Virginia's been out in front, leading on

7    this issues, is that we have to focus on intensity and

8    severity.  And this allocation formula does not do that, and

9    the record makes that clear.

10             THE COURT:  Okay.  Thank you.

11             MR. WAGNER:  This issue has to be decided on the

12   record and there's a -- there's a record before your Honor.

13   I don't think I need to dwell on it any longer.  Second, Mr.

14   Guard, I think testified eloquently why population is not

15   some random (indiscernible).  It covers some of the

16   subjective problems with the other factors; and third and

17   for this, I'm going to have to defer to my bankruptcy

18   colleagues, but as I understand it, Your Honor, doesn't get

19   to redline this part of the plan.  It's either plan or no

20   plan, and it's significant that Dr. Cowan, when he was asked

21   plan or no plan, he said he prefers the plan.  Thank you.

22             THE COURT:  Well, don't go away yet, Mr. Wagner.

23   I -- I agree, the record is pretty -- is not pretty, it's

24   well developed on this issue, with one possible exception,

25   which is why California, of all states isn't contributing to

Page 112

```
 1    the 1 percent small state fund.  I understand there was
 2    testimony that California has the highest, I believe there
 3    was testimony, I'll have to go back and look at it.  Either
 4    has the highest or a significant amount of criminal justice
 5    expense.  But and I appreciate your, and Mr. Guard was
 6    (indiscernible) limited in what could be discussed about the
 7    party's negotiations, particularly given the sensitive
 8    nature of individual states negotiations.  But I -- I --
 9    again, I'm dealing with a specific statute, which is
10    1123(a)(4), which says that a plan shall provide the same
11    treatment for each claim or interest of a particular class,
12    unless the holder of a particular claim or interest agrees
13    to less favorable treatment.  And I understand that you said
14    that this proposal, just like the State of West Virginia's
15    proposal, isn't a straight or simple pro-rata treatment,
16    it's a formula that has adjustments to it to take into
17    account various different states or groups of states
18    interests.  But they all seem to have acted as a group,
19    except on this one point, where only California is carved
20    out, unless I'm missing something.
21            MR. WAGNER:  No it's only -- it's only California.
22    So a couple of points.  First, the class -- first of all the
23    class has voted for this.  Everyone else has gone along with
24    it --
25            THE COURT:  No, but that's --
```

Page 113

```
 1              MR. WAGNER:  -- second of all --
 2              THE COURT:  -- that's not -- but that's not --
 3     1123(a)(4) applies notwithstanding the class vote, if
 4     there's an objector, like West Virginia, then they can raise
 5     1123(a)(4).
 6              MR. WAGNER:  Well, look, I -- I can't speak to
 7     California's motivation, but this is not -- it's not a big
 8     issue.  It's a contribution to 1 percent, and California
 9     does have an argument, as I noted during the cross of Dr.
10     Cowan, that had a different set of factors been used --
11              THE COURT:  I understand that, but again, the
12     statute I'm dealing with is provide the same treatment for
13     each claim.  Now here, I get it, it's in the context of a
14     heavily negotiated settlement among the states, the 48
15     states that are participating in this plan.  The other two
16     having settled with Purdue, pre-bankruptcy.  So I think to
17     some extent, one looks at the fairness of the overall
18     settlement as opposed to the same treatment, and that's
19     corroborated by the fact that the -- Mr. Cowan's proposal is
20     depends on different factors too, it's not the same, you
21     know, it's not just a prorata under one measure for -- for
22     any state.
23              But it -- it is -- unless there's a really good
24     explanation for it, it is somewhat anomalous that
25     California, alone, is not contributing to the small state
```

1    fund.  Unless I'm missing something.

2            MR. WAGNER:  Well, again --

3            THE COURT:  I mean, I think, I mean, maybe I'm

4    putting words in Mr. Morrisey's mouth, but if it's not that

5    big a contribution, why doesn't California just agree to it?

6            MR. WAGNER:  Again, I can't speak to California's

7    motivation, but I would say it's in the general context of

8    the plan.  It's not -- it's not material.

9            THE COURT:  Well --

10           MR. WAGNER:  The contribution --

11           THE COURT:  -- but -- I -- (indiscernible) I don't

12   know.  I don't -- I think that argues both ways, frankly.

13   All right.

14           MR. WAGNER:  I -- yeah, I take, Your Honor's

15   point.

16           MR. MORRISEY:  Your Honor --

17           THE COURT:  I mean, I -- I -- the reason I've had

18   -- and I'm sorry to interrupt you, Mr. Morrisey, the reason

19   I'm asking this is you do have a very good record here, Mr.

20   Wagner, generally.  But all I have, I think on the

21   California piece, unless I'm missing some piece of it, is

22   that one can argue that if you took law enforcement as an

23   allocation factor and Mr. Cowan, did testify that that could

24   be taken as an allocation factor, California would actually

25   be getting a lot more.  What I don't have is whether that's

1   any different than all the other 47 states or whether

2   they're just saying my way or the highway.  Even though they

3   really aren't that different than the other 47.  But maybe

4   there's something in the record that suggests that they are

5   unique, or that of the states contributing to the 1 percent

6   fund, they have a highly disproportionate amount of law

7   enforcement activity, particularly related to opioids.

8          MR. WAGNER:  Well, again, I think -- again, I

9   think the (indiscernible) of California could have argued

10  otherwise, and this was a -- this was (indiscernible) and a

11  compromise among the states, and they've all gone -- they've

12  all gone along with it, including others similarly situated

13  (indiscernible) West Virginia, but I take, Your Honor's

14  point.

15         THE COURT:  Okay.  Well, I hate to --

16         MR. MORRISEY:  Your Honor --

17         THE COURT:  -- I hate to -- if I could just get

18  this out, Mr. Morrisey.  I hate to suggest more issues for

19  people to negotiate over in the next couple of days, but

20  this may be one that the states may want to discuss with the

21  State of California.  I -- I under -- I think I do

22  understand both sides arguments on this point.  But I'll

23  hear Mr. Morrisey on it.

24         MR. MORRISEY:  Your Honor, I would address the

25  materiality issue that in light of the sums of money that

```
 1    are involved, when you're talking about 1 percent of a

 2    state's share, if you look at $10 billion, hypothetically,

 3    that's $100 million.

 4            THE COURT:  No I -- that's --

 5            MR. MORRISEY:  And so it --

 6            THE COURT:  -- I agree.

 7            MR. MORRISEY:  -- from a West Virginia

 8    perspective, when you're talking about a small intensity

 9    fund, we could be talking millions of dollars, and so that's

10    the first piece.  So it is material, and second, once again,

11    we would point out that the record is very clear, that John

12    Guard testified that California said this was good enough,

13    and that they weren't going to give any more, but once again

14    that doesn't meet a good faith standard, and that's why

15    we've always asked, at a minimum, not only to increase the

16    intensity fund but this is a blight on the deal, and it

17    doesn't meet any rational considerations.  It's not based on

18    a legitimate consideration.

19            THE COURT:  Well, I -- I do -- I would put a

20    qualification on what you just said, sir, which is I don't

21    think this is a good faith issue.  I think it's really a

22    same treatment issue and I -- I have a hard time seeing one

23    state, whether it be West Virginia on one side or California

24    on the other, having a unique treatment that other hadn't

25    negotiated, you know, for some very good reason, and I'm not
```

```
 1    sure I see one here.  But I'll have to -- I'll have to
 2    consider this carefully.
 3               MR. WAGNER:  And just one more point about the
 4    math, if the intensity fund is 1 percent, 1 percent of 40 --
 5    $4.5 billion, if my lawyer math is right, is $45 -- $45
 6    million, the West Virginia --
 7               THE COURT:  I -- but look, it's the, you know,
 8    it's the (indiscernible) Webster's line it's a small school,
 9    but there are those that love it, you know, money's money
10    here.  It's important.
11               MR. WAGNER:  The West Virginia share of that is
12    $450,000.
13               THE COURT:  Well, that -- that can help -- that
14    can help someone in West Virginia.
15               MR. HUEBNER:  But Your Honor, one very small point
16    from the Debtors, if the states are able to work this out
17    amongst themselves in connection with the Court's, I think,
18    pretty strong direction, we think that'll be fabulous.  If
19    the Court, nonetheless, felt in the absence of such an
20    agreement, that the Court was essentially going to direct
21    it, this is not the debtor's fight, but we would certainly
22    not have no objection to that as the plan proponent it is
23    our plan that would be changed.  I think that the Debtor's
24    view has at least some small relevance and we would not
25    object.
```

Page 118

```
 1              THE COURT:  Okay.  Thank you.

 2              MR. ECKSTEIN:  Your Honor, I would just make one

 3    point.  This is Kenneth Eckstein.  I do want to point out --

 4    and I hear Your Honor's suggestion, and I think we would

 5    obviously love to have that consensus achieved.  I do want

 6    to point out that California remains an (indiscernible)

 7    state and I don't --

 8              THE COURT:  I understand.

 9              MR. ECKSTEIN:  -- hold out the likelihood that

10    we're going to be able to resolve this specific issue with a

11    state still objecting to the plan.  So from a resolution

12    standpoint, I don't want to give the wrong impression, Your

13    Honor, about what's (indiscernible).

14              THE COURT:  That's fair.  I just -- I want -- I

15    think -- and I don't know whether specific counsel from

16    California is listening, although they've joined in.

17    California's joined in the Oregon and Washington objection

18    and others.  It's -- look, I'm just pointing out my concern

19    about this issue.  That's all.

20              MR. ECKSTEIN:  And we do understand, Your Honor.

21    And obviously, the states worked as hard as they possibly

22    could to bring the broadest possible consensus.

23              THE COURT:  Well, that's clear.

24              MR. ECKSTEIN:  There is this --

25              THE COURT:  I -- look, that is clear to me.  That
```

Page 119

```
 1    is clear to me, but nevertheless, I have to apply

 2    1123(a)(4).

 3            MR. ECKSTEIN:  I believe, Your Honor, that you

 4    can, and I believe that there is equal treatment.  But

 5    you're correct that that equal treatment includes an

 6    exception, in a sense, for one state that would've argued

 7    for more.  They believe they were entitled to more --

 8            THE COURT:  I agree.

 9            MR. ECKSTEIN:  -- than they're getting, and this

10    is where the settlement came to rest.  Can it be improved?

11    Like all settlements, yes, but I just --

12            THE COURT:  Well, that's --

13            MR. ECKSTEIN:  -- want to suggest, Your Honor,

14    that this one may be difficult for us to change.  And I

15    don't --

16            THE COURT:  That's fair --

17            MR. ECKSTEIN:  -- want Your Honor frustrated by

18    the inability to make that movement right now.

19            THE COURT:  Okay.  Very well.

20            MR. ECKSTEIN:  Thank you.

21            THE COURT:  All right.  Thank you both counsel on

22    that issue.  So I think we are next, on the topic list, for

23    the objection by the Canadian municipalities and First

24    People's listed in Mr. Underwood's objection.  And again,

25    this is to cover points other than the third-party release
```

Page 120

```
 1   point, except for one sort of overarching jurisdictional
 2   point that Mr. Underwood wanted to discuss I think, which is
 3   sovereign immunity or foreign sovereign immunity.  So the
 4   Debtors have reserved a very brief time for their remarks,
 5   and then I'll hear from Mr. Underwood.  And then they have
 6   some time for rebuttal.
 7              MR. TOBAK:  Thank you, Your Honor.
 8              MR. UNDERWOOD:  Your Honor, Allen --
 9              MR. TOBAK:  Oh.
10              MR. UNDERWOOD:  Go ahead.
11              MR. TOBAK:  Anyway, this is Mark TOBAK, Davis Polk
12   for the Debtors.  The Debtors' response to the Canadian
13   objector's objection is set forth in full in our brief, and
14   there's no need to repeat it here.  It appears that over the
15   course of the hearing, Mr. Underwood's argument may have
16   evolved since the filing of our reply brief.  So the Debtors
17   do reserve their time for rebuttal.
18              THE COURT:  Okay.  So --
19              MR. UNDERWOOD:  Thank you.
20              THE COURT:  -- Mr. Underwood, you can go ahead.
21              MR. UNDERWOOD:  Thank you, Your Honor.  Allen
22   Underwood on behalf of -- Allen Underwood with the firm of
23   Lite Depalma Greenberg and Afanador on behalf of certain
24   Canadian municipal creditors and Canadian First Nations
25   creditors.  I think the way that we have always viewed this
```

Page 121

```
 1    proposed plan (indiscernible) and it's a (indiscernible)

 2    short period of time that it may be leading this Court to

 3    error.  In particular, irregardless of any of the other

 4    arguments made by other creditors, that may be leading this

 5    Court to errors particularly with regard to the Canadian

 6    Municipalities and First Nations.

 7              Technically, the Sacklers (indiscernible) vast

 8    wealth beyond the jurisdiction of this U.S. court, and that

 9    wealth was largely derived from the U.S. enterprise that is

10    actually before this Court.  In so doing, and unfortunately

11    at least as this plan is drafted, the Sacklers have made

12    themselves in their trust something along the effect of --

13    and it's not (indiscernible) themselves.  And in effect, in

14    the manner in which they're contributing assets to the plan,

15    they are not -- they're not bowing to this Court.  Rather,

16    they're seeking to direct it.

17              THE COURT:  Mr. Underwood, this is --

18              MR. UNDERWOOD:  In essence --

19              THE COURT:  -- really far afield from, not only

20    your objection, but also from what I just said, which is

21    that you had your chance to argue about third-party release

22    already.  I -- it's also, I think, just not -- I'm not quite

23    sure where you're going on this.  They actually are

24    submitting to the Court's jurisdiction to perform the

25    settlement, including the injunctive provisions of the
```

Page 122

1    settlement.  So --

2              MR. UNDERWOOD:  I --

3              THE COURT:  And as far as the -- your clients,

4    whether the Court would have jurisdiction over your clients,

5    they've all filed claims in this case.  They're looking to

6    recover --

7              MR. UNDERWOOD:  That correct.

8              THE COURT:  -- money in this case.

9              MR. UNDERWOOD:  That's correct, Your Honor.  And

10   where I was going from the outset was this notion,

11   effectively, that the Sacklers cast a dark pale over this

12   entire settlement by suggesting that -- there's a pinhole

13   that they suggest that they would walk away from this plan

14   in the event that these releases are not approved.  And I

15   don't know whether that's true or not.

16             But what they've done is to -- effectively, this

17   Court is administering non-Debtor assets in Canada by way of

18   the IACs and the rights of the Canadian Claimants in Canada

19   to bring claims against the Sacklers.  And I think that

20   jurisdictionally in the first instance here, that's a bit of

21   a problem.

22             Now I'll go to Section 106, and I guess the

23   related issue, which is the way that this plan was

24   structured, if you were an international creditor, you were

25   given the devil's choice of filing a claim and affirmatively

1    participating in this process or not filing a claim and

2    seeing how it played out.  And I guess reserving your rights

3    to pursue assets elsewhere.

4           The problem is that this Court -- because of the

5    fact that the overall resolution here is actually

6    administering non-Debtor assets in such a vast manner, that

7    it's a bit unfair, generally, I think, to hold the Canadian

8    Creditors to the kind of global Section 106 waiver that the

9    Debtors would suggest.  And the Debtors cite no case law

10   about the scope of 106.  And I think in principle, my

11   understanding of what Section 106 is, is it's a defensive

12   provision effectively to make sure that there are counter-

13   claims under the Bankruptcy Code that can be brought so that

14   if a sovereign submits to this Court an affirmative claim,

15   there can be counterclaims.

16          Now, in this case, there's been no allegation of

17   any form of Debtor claim, counterclaim, avoidance action

18   claim against Canada.  All Canada's set to do by

19   participating is preserving its rights.  And in fact,

20   obviously the Canadian Municipal Creditors are glad they

21   participated because, frankly, assets in Canada are being

22   directed under the plan confirmed here to U.S. trusts, and

23   those are U.S. trusts, which the Canadian Municipal

24   Creditors and First Nations are not -- they're not

25   beneficiaries.

Page 124

1          And this is really because of the manner in which

2     the Debtor has structured this plan.  And when I say that, I

3     -- we would have no argument here today had the Debtor

4     effectively put the Canadian Municipal and First Nation

5     Creditors in Classes 4 and 5 under the plan.  And in fact,

6     actually, factually, that's exactly what my clients thought

7     up until -- and the Debtor admits this -- up until virtually

8     a week before the plan objection on the sixth amended plan

9     was due, at which point the Canadians were advised, well,

10    despite the fact that you received ballots in Classes 4 and

11    5, you're actually going to be treated in Class 11C.

12          And it was at that point that the Canadian

13    Municipalities and First Nations realized that merely filing

14    a claim in this case was not going to be enough to preserve

15    their rights before this Court, and that they would have to

16    take the actions they have taken since that point.  But bear

17    in mind, Your Honor, that was a point 30 days ago.  I think

18    there was a presumption on the part of the Canadians that by

19    filing a claim, their claim would get -- again, in same

20    manner and fashion, and fairly with respect to other

21    similarly situated claims.

22          Now, the Debtor clearly will make a distinction

23    between the Canadian Municipal claims and Canadian First

24    Nation claim, and the municipality claims, the State claims,

25    the City claims that are filed by the United States

1    entities.  And they make that distinction by a nebulous

2    reference to how different those claims are.  They've never

3    actually factually driven down why is a Canadian state

4    different -- or excuse me, a Canadian municipality different

5    from a U.S. municipality.

6              I would assert that the main difference is that

7    there was a coalition of U.S. states and later

8    municipalities that understood that they were -- and did

9    press in their own direction to establish the classes under

10   the plan, and that that was something that the Canadians

11   presumed that ultimately they would be brought into.  And

12   they waited patiently, and ultimately, that never happened.

13             THE COURT:  Well --

14             MR. UNDERWOOD:  And that, again, is why we're

15   here.

16             THE COURT:  -- the objection itself acknowledges

17   that the plan says what it says, which is that --

18             MR. UNDERWOOD:  Right.

19             THE COURT:  -- they're in the -- that the class

20   that would receive the governmental entities and the class

21   that would receive Native American tribes that would receive

22   distributions for abatement purposes through the trust would

23   be U.S. governmental entities and tribes governed by U.S.

24   law.  I mean, that's -- that is clear in the plan, and it's

25   acknowledged.  So I think the issue here, the legal issue,

Page 126

1    is not that your clients have a right to be in that -- in

2    one of those two classes depending on whether they're a

3    First Nations Creditor or a Canadian Municipal Creditor, but

4    whether their treatment in the Class 11 is somehow improper.

5    Now, Class 11 --

6              MR. UNDERWOOD:  And --

7              THE COURT:  -- Class 11 voted for the plan, right?

8              MR. UNDERWOOD:  It --

9              THE COURT:  In favor of the plan.

10             MR. UNDERWOOD:  Interestingly enough, Your Honor,

11   I think if you look at the voting tabulation for Class 11C,

12   and we did examine (indiscernible) tabulation, the

13   tabulation -- had the Canadian Creditors been able to

14   (indiscernible) dollar claim, the tabulation would have been

15   -- I think in terms of numerosity, the majority of creditors

16   in 11C, no matter how you slice it, would have voted in

17   favor of 11C.

18             But in terms of overall value, but for the dollar

19   value restriction, if you attribute any reasonable value to

20   the Canadian First Nations claims in terms of dollar value,

21   that class would've voted against the plan.  And I don't --

22             THE COURT:  But those claims are unliquidated.

23   And the Debtors, I think, are correct.  Having received the

24   proofs of claim myself, it's very hard to see from the

25   claims whether they're against the Debtors or against Perdue

```
 1    Canada or one of the Canadian entities.  So there's been no
 2    motion to estimate.  I don't know why you don't count the
 3    dollar amount.
 4            MR. UNDERWOOD:  And I don't want to waste a lot of
 5    the Court's time on that subject.  I think what we really
 6    come down to is the Debtor hasn't presented anything to
 7    suggest these Canadian municipalities and First Nations are
 8    any different than tribes or cities in the U.S.  Now what
 9    does that mean --
10            THE COURT:  But I would push back on that too.
11    They do say that there's a substantial issue, which again, I
12    could not get to the bottom of in looking at the proofs of
13    claim and the complaints attached to, as to whether these
14    claims are against Perdue Canada or against the Debtors.
15    And it's only to the extent they're against the Debtors that
16    they would even have a right to recover.
17            And of course, if they're against Perdue Canada,
18    they're not covered by the injunction under the plan.  And
19    on top of that, and we just spent about 40 minutes on this
20    issue, it's quite clear to me that as far as the allocation
21    under the plan is concerned on the public side, the
22    governmental entities side, it's pretty much a minor
23    miracle, but it did happen that those public entities were
24    able to agree on an allocation.
25            But I have no basis to think that that agreement
```

```
 1    would then include folding in foreign creditors who did not

 2    participate, and I don't think sought to participate, in the

 3    mediation on that issue.  And --

 4              MR. UNDERWOOD:  I think --

 5              THE COURT:  And so, you know, I think courts have

 6    been recognized that there is a basis for separate

 7    classification.  In fact, making a distinction even between

 8    foreign claimants and U.S. claimants as long as there's a

 9    rational basis for it, and including in the Sixth Circuit in

10    the Dow Corning case, Class 5 Nevada Claims v. Dow Corning

11    Corp., 288 F.3d 648, 642 (6th Cir. 2012).

12              Now, that was a case where there was evidence as

13    to the different types of recovery in different countries.

14    So -- but the principle is you don't have to -- you can

15    discriminate between domestic and foreign creditors if

16    there's a rational basis for it.  And it seems to me there's

17    a rational basis.

18              I -- what is not clear to me is whether these

19    three -- I'm sorry, I think it's -- not three, I think it's

20    six creditors, would have any right to get involved in the

21    allocation abatement aspect of this, and frankly, how much,

22    if they even did, would go to them as opposed to their share

23    of the $15 million in cash, which is coming out right away,

24    which they could certainly apply to abatement if they

25    liquidate their claims and they're against the U.S.
```

```
 1              MR. UNDERWOOD:  I think the difficulty that I'm
 2   seeing here, Your Honor, is that I haven't seen anybody
 3   distinguish what makes the international border here.  What
 4   makes Windsor, Canada different from Detroit?  What makes a
 5   Canadian Mohican different from a New York State Mohican?
 6              THE COURT:  I --
 7              MR. UNDERWOOD:  And that I understand, Your Honor.
 8              THE COURT:  Well --
 9              MR. UNDERWOOD:  I understand.
10              THE COURT:  -- but I'll answer that -- I'll try to
11   answer that question from my own perspective, and you could
12   try to persuade me otherwise.  I think the answer is we had
13   a many-months-long process in the mediation with Messrs.
14   Fineburg and Philips, as well as a mediation among the
15   states themselves, regarding the public side allocation,
16   which was incredibly difficult.  And frankly, I don't see
17   how do we open that.  I just -- you know, there was --
18   people -- look, I -- people did ask to be involved in the
19   mediation.  The NAACP asked to be involved in it.  I said
20   okay, but I think not having participated in that, and I
21   can't predict how that would've turned out if the -- if your
22   clients had sought and been granted the right to participate
23   in it, whether the U.S. entities would've said, no, it's
24   just too complicated.
25              But leave that aside.  They didn't participate in
```

1    it.  And at this point, we would be rewriting rules that

2    just, you know, I think the Debtor has the perfect right

3    under the Bankruptcy Code to have separate classification

4    and given the acceptance of the plan, separate treatment by

5    these two -- well, it was -- really would be four because

6    you have the Native American tribes and the First Nation

7    tribes, four different classes.

8             So, you know, it's not as if the class in which

9    the -- your clients are classified are getting nothing.

10   They're getting money upfront.  There's no argument that

11   they would be getting more in the -- if they had

12   participated in the no-added Native American tribes class.

13   And indeed given the acceptance by Class 11, I don't think

14   that argument flies because that's a cram-down argument.

15   That's an 1129(b) disparate treatment or unfair treatment

16   argument.

17            So I just -- I don't -- to me, this objection sort

18   of tries to fit within applicable sections of the Bankruptcy

19   Code, but it just doesn't -- it doesn't -- to me it doesn't.

20   It doesn't fit in.

21            MR. UNDERWOOD:  Your Honor, I appreciate your

22   explanation, and I'm going to try to convince you otherwise

23   --

24            THE COURT:  Okay.

25            MR. UNDERWOOD:  -- in the few minutes allowed.

Page 131

1            THE COURT:  And I'm going to (indiscernible) --

2            MR. UNDERWOOD:  (indiscernible)

3            THE COURT:  -- to make a good -- you can hear if

4    they have that chance.

5            MR. UNDERWOOD:  I greatly appreciate it.  And I

6    will -- I am reserving to subsequently here address the

7    jurisdictional question.  But as to this issue, the counsel

8    for these Creditors did reach out to the Debtors.  The

9    Debtors, in my opinion, were the first parties that had the

10   last clear chance to address these claims in what I think is

11   a more equitable fashion.

12           Mr. Dubel testified that the Special Committee

13   never reached out to these Creditors.  These Creditors filed

14   their proofs of claim.  Ultimately, Your Honor, what I would

15   go back to here is reference to the In re Dana Corp. case in

16   the Southern District, and Public Airways and this notion

17   that all claimants that are in a class must have the same

18   opportunity for recovery.  I understand the notion that that

19   you're driving --

20           THE COURT:  They're not in the same class.

21   They're in a different class.

22           MR. UNDERWOOD:  All right.  I'm not going to beat

23   a dead horse there.

24           THE COURT:  Okay.

25           MR. UNDERWOOD:  I think the placement of them into

Page 132

```
 1    a different class was a problem, and that's why I actually
 2    started this argument at a different -- perhaps a higher
 3    level, which is ultimately what happens here is material to
 4    the global perception of U.S. courts and their manner in
 5    which they deal with creditors.
 6              And I think that the perception of the Debtors not
 7    having addressed foreign municipalities in the same way that
 8    they addressed U.S. municipalities when -- and let's face
 9    it.  If they were all vendors, the fact that they were
10    across the state border would not have impacted -- all other
11    things being equal would not have impacted their
12    classifications, and they would have this (indiscernible).
13              THE COURT:  I agree with that.
14              MR. UNDERWOOD:  All right.
15              THE COURT:  I agree with that.  On the other hand
16    --
17              MR. UNDERWOOD:  So --
18              THE COURT:  On the other hand, if they were
19    personal injury claimants, a la the Dow Corning case, the
20    Court -- the plan proponent wouldn't be within its rights to
21    have a separate classification if there was a rational basis
22    for it based on the different nature of their recovery.  And
23    again, there is a -- there was a very lengthy, expensive,
24    and well-publicized process here to mediate the allocation
25    and treatment of public creditors that those who wish to
```

1    participate in, really pretty much just had to file

2    something if they were let in the door in a timely fashion,

3    and they would've participated, including the NAACP for

4    example and the school districts.

5         So I think -- look, clearly it is up to the

6    Canadian court in it's -- in response to a motion for final

7    recognition to decide this issue.  But I think the record

8    should be clear that there was no exclusion of the Canadian

9    Municipal Creditors and First Nations Creditors from that

10   process, and the process was a lynchpin of this plan.  To

11   now reopen it would be, I think, impossible to bring other

12   parties into it.

13        On the other hand, the class in which the Canadian

14   Creditors were classified, voted to accept the plan, and I

15   don't -- I have no evidence that they're -- even setting

16   aside that they -- because of that vote this is irrelevant

17   to me legally, under the Bankruptcy Code it might be

18   relevant to a Canadian court of recognition.  I don't know,

19   but there's no evidence that they're getting a worse deal

20   than if they had been included in the trust structure.

21   They're getting their pro rata share of $15 million in cash

22   right away that wouldn't happen but for, I believe, the

23   other aspects of the plan.

24        MR. UNDERWOOD:  I think, Your Honor, I just want

25   to make clear that at least the Canadian Creditors view this

1   as a conscious choice by the Debtors in the manner which

2   they classified these Creditors.  And ultimately, it's

3   impossible to say how the mediation might have ended.  It

4   never even started, and that again there was a conscious

5   choice by someone other than this Creditor.

6          So, ultimately -- I don't want to necessarily

7   belabor this point any further, but it does raise the

8   ultimate implication, which is an issue for this Court and

9   for the United States, which is it would not be a good thing

10  generally for the Canadian (indiscernible) to accept this

11  Court's confirmation of a plan.  And specifically with

12  regard to this case, there is no question that that outcome

13  would affect the implementation, I think, of the plan.  So

14  it is material, I think, in a larger perspective.  I'm

15  willing to move onto jurisdiction.

16          THE COURT:  Okay.

17          MR. UNDERWOOD:  And essentially, with regard to

18  that -- and even there, it's still a release issue, I

19  suppose.  Because what we're really talking -- what I'm

20  talking about is under (indiscernible) Petroleum Network,

21  and I'm sure you're more familiar with the case than I am,

22  what these (indiscernible) are affecting is an involuntary

23  release of a foreign sovereign's, effectively, claims

24  against the U.S. Debtor.

25          Now, in terms of those claims, the proof of claims

Page 135

1  attached complaints that assert fraud, public, nuisance, a

2  variety of forms of relief.  And those are the very same

3  forms of relief that are sought by United States

4  municipalities.

5         In terms of the jurisdiction of this Court to

6  enter a nonconsensual release under Section 1141 of the

7  Bankruptcy Code, I think there is fundamentally -- and this

8  is absolutely without offense to the Court, but I think that

9  there is a jurisdictional question at the outset of whether

10  a non-Article 3 judge actually has that authority.

11         I'll pull very quickly back to the second aspect

12  of this issue, which is, all right, we all agree about what

13  Section 106 specifically says, but what was it really

14  intended to do and what does it really mean in this case?

15  And are there other statutes that abrogate 106 for the very

16  specific purposes of this case?  And I think in terms of

17  106, the Debtors, who really don't cite any case law or

18  analysis of 106, I think -- I think the way that I look at

19  106 and the way other courts have looked at Section 106 is

20  that it is to preserve defensive rights.

21         Meaning preserve avoidance actions, preserve, you

22  know, separate Debtor actions against foreign sovereigns so

23  that they can't sneak in and sneak out of the court without

24  having full relief on both sides.  But I think here, as I

25  stated earlier, there is no -- there are no such claims that

Page 136

 1    have been asserted.  So ultimately, with regard to 106, the

 2    -- ultimately, the way that the foreign sovereignty immunity

 3    statute actually trumps Section 106 in the Code.  To be

 4    frank, I couldn't find any law on that either way.

 5          And maybe Davis Polk can correct me on that, but

 6    ultimately there is no exception under the Foreign Sovereign

 7    Immunities Act that would otherwise apply here.  So other

 8    than filing a claim, which unquestionably my clients had to

 9    do, wanted to do, they wanted to participate in this case,

10    it was important that they did it because, frankly, Canadian

11    assets are affected by the proceedings before this Court,

12    and there's no denying that.

13          I think ultimately there's a real question here

14    about whether the Foreign Sovereign Immunities Act, under

15    this very specific factual circumstance, may trump the plain

16    language of Section 106.  Because what we're talking about

17    here is really the relationship between two countries, and

18    I'm certain that the people of Canada will not be happy when

19    they come to understand that there is an entire abatement

20    procedure that they were effectively left out of.  Maybe

21    that is what it is, but that's fundamentally, I think the

22    Foreign Sovereign Immunities Act jurisdictional Section 106

23    issue before this Court.  And I hope I was able to frame

24    that in some fashion.

25          THE COURT:  Well --

Page 137

1        MR. UNDERWOOD:  And we'll certainly raise it on an

2    objection.

3        THE COURT:  I understand your objection, and I

4    think it really comes down to the Court's, the Circuit

5    Court's, analysis of, first, what is being done when a plan

6    does enjoin the prosecution of a third-party claim; and

7    secondly, whether, by its plain terms, 106(a)(1) and (b)

8    permit that with regard to an entity, a governmental entity

9    that has sovereign immunity.

10        But I will note, though, that the injunction is,

11    as argued by the Debtors and their allies, the committee and

12    the other ad hoc groups that are supporting the plan, serve

13    an integral role enabling any recovery under the plan,

14    including the recovery in Class 11, which is what your

15    clients would have.

16        And again, as far as participating in an abatement

17    program, the -- I have no -- nothing to suggest that the pro

18    rata share of the Class 11 consideration that would flow to

19    the Canadian Creditors that you represent would be anything

20    less than the value of the abatement program that would flow

21    to them, which is, you know, obviously something that, I

22    mean, directly flow to them.  To the extent they're right

23    across the border from a state or municipality that has that

24    type of program, there would be some indirect effect, as was

25    testified.  But notwithstanding the size of the value that's

Page 138

1    going into the NOAT and Native American tribes' trusts, when

2    you look at the denominator, if you added your client's

3    claims to it, it's quite possible to me that, even if they

4    had asked to participate in the mediation, and had been

5    included in the procedures, these creditors wouldn't have

6    any aliquot share of that abatement program that would come

7    close to their pro rata share of the cash that they're

8    getting right away that they can themselves apply to

9    abatement.

10            MR. UNDERWOOD:  I think, Your Honor -- and it's a

11   funny thing because I have always said I would never, ever

12   listen to a client who says -- that says to me that it's

13   just about money.  This isn't just about money, and I think

14   we cannot say because there never was an allocation to

15   Canada as to what it might have received as to these claims.

16   But that be -- I would also say that, and sincerely, very

17   sincerely, the municipalities and First Nation's interests

18   in the Class 4 and 5 programs wasn't just money.  They were

19   genuinely interested in the other aspects of the abatement

20   programs that they are also not partaking in.

21            THE COURT:  Well, they have every opportunity to

22   use those programs as a model for their own use of the money

23   that they're getting, and frankly to -- if they -- if there

24   are other municipalities that would oppose that, try to

25   convince the court in Canada that the condition of

Page 139

1    recognition is that the recoveries by Canadian creditors be

2    used towards abatement.

3            MR. UNDERWOOD:  I -- I'm sure that someone will

4    make those arguments in Canada before the NCAA.  I guess my

5    concern also is that the result of this confirmed plan will

6    be, to a degree potentially, a handcuffing of the Canadian

7    Creditors to recover presuming that they are locked out of

8    any recovery against the U.S. assets.  They're not a part of

9    the NOAD or the tribal trust.

10           And presuming that the liquidation value or net

11   sale value of the Canadian entity is then conveyed to those

12   very trusts, which the Canadians are not participating, and

13   presuming that as (indiscernible) --

14           THE COURT:  That's a mistake.  Your clients, to

15   the extent they have claims against the Canadian entities,

16   can go against the Canadian entities.  There's -- they're

17   not being enjoined from doing that.  To the extent they have

18   claims against the Canadian entities, they are not being

19   enjoined from proceeding against them.  There might be a

20   race to the courthouse on that point, but they have those

21   claims.

22           MR. UNDERWOOD:  I understand.

23           THE COURT:  There's no doubt about that.  So I

24   just --

25           MR. UNDERWOOD:  I understand the fundamental

Page 140

1    difficult position, and I'm greatly appreciative of the work

2    that everyone in this case has done to achieve any kind of

3    result in an otherwise insoluble case.  But I think

4    ultimately when we look at the liquidation value of those

5    Canadian assets, they pale in comparison to the U.S. assets.

6              THE COURT:  But --

7              MR. UNDERWOOD:  Or their treatment of the note.  I

8    think ultimately if we believe that the Canadian Creditors

9    will be handcuffed in their ability to collect against the

10   Sacklers under Canadian actions, we've left Canada with very

11   little from this proceeding, and that is what it is.  And I

12   told clients that on the first day that I took this case.  I

13   think ultimately I appreciate Your Honor's work in this

14   case.

15             THE COURT:  Okay.

16             MR. UNDERWOOD:  Thank you.

17             THE COURT:  Thank you.  All right.  Any rebuttal?

18             MR. TOBAK:  Briefly, Your Honor.  The first point

19   I'll note -- and this is Mark TOBAK, Davis Polk for the

20   Debtors, is that oddity that we had earlier in argument that

21   it was illegal for the Debtors to classify states in the

22   United States together with the municipalities of counties

23   within that state.  And now we have an argument that it is

24   apparently illegal for the Debtors to classify cities in an

25   entirely different country separately from the states and

1    municipalities in this country.  And I think that gets to

2    the point of, you know, it was asked many times why the

3    Canadian municipalities and First Nations are being

4    (indiscernible).

5              THE COURT:  You cut out.  I'm not sure what

6    happened there.  Are you there?

7              WOMAN:  (indiscernible)

8              MR. TOBAK:  All right.  Your Honor, can you hear?

9              THE COURT:  Yeah, now I can hear you.

10             MR. TOBAK:  Thank you.  I don't know where it cut

11   out, but I'll say that the suit (indiscernible) --

12             THE COURT:  You got -- you cut out again.  Yeah, I

13   think when you move your paper you might mute yourself.

14             MR. TOBAK:  Oh.  There's a (indiscernible)

15   keyboard underneath my lectern.

16             THE COURT:  There you go.

17             MR. TOBAK:  Your Honor, I apologize for that.

18             THE COURT:  That's fine.

19             MR. TOBAK:  In any event, the point is that Canada

20   is a separate country, and that's fundamentally important

21   for many reasons.  The most important reason, as Your

22   Honor's already noted, is that there is an independent

23   company, an IAC, in Canada called Purdue Canada, and that

24   entity sells and markets pharmaceuticals in Canada.  The

25   importance of the border, which Mr. Underwood asked about,

Page 142

1    is particularly important in the context of highly regulated

2    pharmaceutical products which are subject to a great deal of

3    regulation in the United States, an entirely separate regime

4    of regulation in Canada under that country's laws.  That is

5    why Perdue Pharma does business in the United States and not

6    in Canada.

7              To the point of the Canadian municipalities'

8    desire to participate in an allocation and abatement scheme,

9    fundamentally we hope, as Your Honor has already noted, that

10   perhaps this plan of confirm can be used as a model for a

11   similar scheme in Canada with respect to Canadian

12   municipalities and assets of the Canadian company.

13             I will note, however, that in this plan here, the

14   testimony is that it has taken literally years, including

15   years before Perdue filed for bankruptcy, to develop this

16   plan and to develop an abatement model that was targeted to

17   the communities in this country.  It would be entirely

18   inappropriate to attempt to in-graph that model into

19   different communities in the different country under

20   different legal regimes with different allocations of

21   national, provincial, and local responsibilities, and to

22   address different conduct by different companies and solve

23   the different needs.

24             With respect to the jurisdictional point, I think

25   it can't really be said better than 106(a), which

1    specifically provides that it abrogates the sovereign

2    immunity of any governmental entity, including a foreign

3    state with respect to Section 105 of the Bankruptcy Code.   I

4    can't find in the Code any suggestion that it is limited

5    only to the assertion of a counter claim by a Debtor.

6              As Your Honor also noted, the jurisdictional basis

7    for this proceeding is a simple, Section 1334, and this is

8    on the basis of any other aspect of a plan being confirmed.

9    With respect to whether there's any case holding that

10   sovereign immunity is abrogated by Section 106, one case is

11   the In re RMS Titanic case, which is at 569 B.R. 825 from

12   the Middle District of Florida 2017 which states that

13   pursuant to Section 106(a), foreign states can no longer

14   assert sovereign immunity from liability under the

15   Bankruptcy Code.

16             And then it notes that Section 106 abrogates

17   sovereign immunity as to a governmental unit.  It cites to

18   several cases.  One from the Ninth Circuit and others from

19   other bankruptcy courts across the country.  I think that's

20   really all there is to say with respect to sovereign

21   immunity other than, also, the fundamental point that the

22   municipalities and First Nations did come to this court and

23   seek to participate in this proceeding, which is also a

24   waiver of whatever immunity they might have had otherwise.

25             Unless Your Honor has any further questions, I

Page 144

```
 1    think we rest on that and our papers.

 2             THE COURT:  No, I think that's fine.  Thank you

 3    both.

 4             MR. UNDERWOOD:  Your Honor, may I make one comment

 5    as to the reference to the RMS Titanic case?

 6             THE COURT:  Sure.

 7             MR. UNDERWOOD:  And I think it came through in

 8    what counsel said.  The RMS Titanic case refers to the

 9    liability of a foreign sovereign.  It doesn't refer to the

10    taking of a right, and I'll rest on that, and I appreciate

11    it.  Thank you.

12             THE COURT:  Okay.  Thank you.  All right.  It's

13    1:30.  We have probably another two or three hours at most.

14    Does it make sense to take a break for lunch?

15             MAN:  Your Honor, that actually is exactly what I

16    was going to suggest.  And just for people who are following

17    the hearing, we have the (indiscernible) and Bridges, I

18    think, objection up next, then insurers, then pro ses, and

19    then whatever miscellaneous matters are remaining with

20    respect to the releases.  I think the allocated time for

21    those things is actually a little bit under three hours.  So

22    hopefully we will be able to keep to that, but we'll see how

23    the afternoon goes.

24             THE COURT:  Okay.  So I'll come back at 2:30 then.

25             MR. UZZI:  Your Honor, if I may, just before we
```

Page 145

1    break, I have a comment that I hope is helpful as it relates

2    to narrowing the release a little bit.  And again for the

3    record, Gerard Uzzi of Milbank for the Ray Sackler family.

4    Now, I realize, Your Honor, when I made the presentation

5    earlier, I said something, with I meant, and it's a little

6    inconsistent with one of the words on the page, which is

7    there is no release of tax liability.  But the carve-out for

8    that is in the definition of excluded claim, and when I went

9    back and checked --

10             THE COURT:  But that's been there for a while.

11             MR. UZZI:  Well, and it has been, Your Honor.  And

12   I realize, though, I said any taxes.  What it says in

13   excluded claims is income tax, and we meant any tax.  And so

14   we could strike the word income.  And just -- I know people

15   are preparing for, you know, possible argument after lunch.

16   And just if that helps simplify things, I wanted to make

17   that announcement prior to the break.  That's all.

18             THE COURT:  Okay.  That's good.  Thank you.  All

19   right.  So again --

20             MR. UZZI:  You're welcome.

21             THE COURT:  -- we'll come back at 2:30.

22             (Recess)

23             THE COURT:  Okay, good afternoon.  This is Judge

24   Drain.  We are back on the record In re Purdue Pharma LP and

25   the confirmation hearing.

1          The next matter, or next topic rather, of oral

2     argument I believe is the argument on objections filed by

3     Mr. Overton and his counsel to Creighton Bloyd, Stacey

4     Bridges, and Charles Fitch.  Creighton Bloyd actually had

5     two objections.  The other two people joined with him in

6     one.  And I'm sorry, I said Overton.  And I apologize, Mr.

7     Ozment, it's Mr. Frank Ozment.

8          So I think the Debtor's counsel is going to go

9     first on this and then we were going to hear from Mr.

10    Ozment.

11          MR. TOBAK:  That's correct, Your Honor.  For the

12    record, it's Marc Tobak from Davis Polk for the Debtors.

13          Reserving most of our time for rebuttal, I want to

14    make two points with respect to the objections by Mr. Bloyd,

15    Ms. Bridges, and Mr. Fitch to notice provided to

16    incarcerated unknown claimants.

17          And the fundamental point, Your Honor, is that

18    this is not their objection to raise.  They do not argue

19    that they were not provided with the adequate notice, and

20    they can't.  That would be contradicted by the facts.

21          According to the timestamp on Ms. Bridges' proof

22    of claim, she filed just three days after this Court entered

23    the bar date order in February 2020.  And Mr. Bloyd filed

24    his proof of claim in June 2020.

25          Mr. Fitch, by the way, hasn't filed a proof of

1    claim even though he is a plaintiff in an adversary

2    proceeding against the Debtors.  And we have been in contact

3    with his counsel since at least January of this year.

4          So their objection to notice is raised on behalf

5    of other parties who, as far as we were aware, Mr. Ozment

6    does not represent in this proceeding, and as far as we are

7    aware, not before the Court.  Mr. Ozment's clients,

8    therefore, lack standing to assert the rights of other

9    parties in attempt to thwart confirmation of the plan.

10         And I quote from the Second Circuit's opinion in

11   Kane v. Johns-Manville, which is 843 F2.d 636 at 642,

12   "Generally, litigants in federal court are barred from

13   asserting constitutional and statutory rights of others in

14   an effort to obtain relief for themselves."  That rule

15   precludes Mr. Ozment's clients from raising the alleged

16   notice rights of others.

17         Indeed, the Second Circuit's decision in Kane is

18   almost an exact parallel here.  There, an asbestos claimant

19   in Johns Manville bankruptcy attempted to appeal on the

20   ground that other asbestos claimants had not obtained

21   adequate notice.  The Second Circuit refused to entertain

22   that appeal, and it held that an objector who had himself

23   received notice could not assert the alleged rights of third

24   parties.

25         Judge Newman, for the panel, noted that, "The

1    general rule that third party standing is particularly

2    relevant in bankruptcy proceedings, as parties may often

3    find it personally expedient to assert the rights of others

4    in attempt to block confirmation of a plan."  And that quote

5    is from 843 F.2d at 645.

6              I don't doubt the sincerity of Mr. Ozment or his

7    clients.  But in this case where his three clients stand,

8    just as in Kane, opposed to over 95 percent of the voting

9    creditors in their class, opposed to the statutory

10   fiduciary, all unsecured creditors, and also opposed to the

11   Ad Hoc Group of individual victims, there is more than

12   sufficient reason to conclude that his clients lack standing

13   to assert the rights of others.

14             I also briefly note that the objection was quite

15   untimely.  Your Honor approved the Debtor's extraordinary

16   and exhaustive noticing program in February 2020.  And that

17   program was expanded through the extended bar date order,

18   which is at Docket 1221, on June 3rd, 2020.  And as Ms.

19   Finigan testified earlier, the Debtors engaged in yet

20   another additional and extensive noticing program in

21   connection with the confirmation hearing.  And that was

22   approved on June 3rd of this year at Docket 2988 in the

23   exposure statement order.  Mr. Ozment and his clients never

24   before raised these issues until filing their objections on

25   July 19th.

1          With all respect, had they wished to alter the

2     notice program rather than belatedly point to it as an

3     obstacle to confirmation, it could have been raised earlier

4     at a time in 2020 or 2021 when it might have -- when things

5     might have been changed.

6          With that, I will reserve the rest of our time for

7     rebuttal.

8          THE COURT:  Okay.  Do you want to -- there is a

9     second declaration.  Are you going to deal with that

10    separately?  A second objection by Mr. Creighton.

11         MR. TOBAK:  I believe we addressed all -- both the

12    Bloyd and Bridges and --

13         THE COURT:  I'm sorry, Mr. Creighton Bloyd.

14         MR. TOBAK:  Mr. Bloyd, correct.  So that's the one

15    at -- I think it's Docket 3277.

16         THE COURT:  Right.

17         MR. TOBAK:  We'll rest on our papers with respect

18    to that unless the Court has any questions and rebuttal to

19    Mr. Ozment's argument.

20         THE COURT:  All right.  So you're reserving

21    rebuttal on that one.  Okay.

22         MR. TOBAK:  Correct.  Thank you.

23         THE COURT:  Okay.  All right, Mr. Ozment.

24         MR. OZMENT:  Your Honor, thank you.  This is Frank

25    Ozment, and I represent Creighton Bloyd, Stacey Bridges, and

1    Charles Fitch.

2              With respect to the Article Three and case or

3    controversy issue, I'm not familiar with the case that he

4    cited.  But I would point that we are not bringing a case or

5    controversy here.  There is a case or controversy already.

6    I think, you know, the power of Congress to regulate

7    bankruptcy under Article 1, Section 8, is really what this

8    is about, is our coming in and saying, you know, we don't

9    think this is fair.

10             With respect to Ms. Bridges in particular, while

11   she is not presently incarcerated, she certainly has been.

12   And, you know, that threat remains.  So to the extent that

13   there is some issue there, perhaps it's capable of

14   repetition but (indiscernible).

15             The more important thing I think is to get to the

16   heart of what we're saying here.  And I normally don't read

17   a closing argument to a judge, but in the interest of time,

18   I wrote this one down.

19             In Mullane v. Central Hanover, the court

20   recognized that due process requires a debtor to give notice

21   to a creditor before the creditor's claims could be

22   extinguished.  If the identity of the debtors and their

23   whereabouts are unknowable, then those can be by

24   publication.  If the identity and whereabouts are reasonably

25   ascertainable, the creditor cannot rely merely on those by

1    publication absent some other extraordinary circumstances.

2            Over the years, courts have recognized that

3    creditor (indiscernible).  The creditor has a lien, the

4    debtor generally has to do a little more.  The creditor is

5    unsecured perhaps by publication by notices where acceptable

6    if the creditor is unknown.

7            Here, there is no doubt, and Christina Pullo

8    testified about it in her declaration but also in cross, the

9    Debtors made a herculean effort to notify a lot of people.

10   And to a large extent, they appear to have succeeded, with

11   one very notable exception.

12           Their efforts were focused on people in the free

13   world, not so much people in prison.  Normally, this might

14   not matter much.  In an ordinary case, notice provided to

15   the free world might leak over into the incarcerated world.

16   And if this were a case about promissory notes and the

17   creditors were all banks, well, you wouldn't expect to find

18   too many creditors in prison, or at least in federal prison

19   -- I'm sorry, in state prison.

20           But this is not a normal case.  This is a case

21   about addiction.  Addiction drives people to crime, and

22   everybody knows that.  Prisons are disproportionately likely

23   to house people suffering from addiction.  Moreover, this

24   was noticed during a period in American History that was

25   very nearly unique.  A pandemic, when common sense dictates

Page 152

1    that the public not go in and out of prisons, which of

2    course are places where social distancing is pretty much

3    impossible.

4           While Ms. Pullo I think gave very good testimony

5    and certainly put some of my concerns (indiscernible) notice

6    of the free world, it was also clear from her testimony that

7    the Debtors did very little to alert prisoners in particular

8    about the need to file claims.

9           This is particularly unfortunate in this case --

10   and this goes somewhat to Mr. Bloyd's objection, Your Honor

11   -- because victims should have been lienholders under the

12   Mandatory Victims Restitution Act.  The United States and

13   the Debtor basically agreed that victims would not get their

14   rights under the MVRA because it would take too long to

15   figure out who they were or just generally to calculate what

16   they would receive.

17          And at this point, I want to emphasize that was

18   not a proceeding in which Davis Polk represented the

19   Debtors.

20          Ultimately, that issue may be a matter for the

21   sentencing court to revisit.  It may ultimately be something

22   that Congress wants to take up.  But in the meanwhile, that

23   deprivation of lienholder status and that effort to ignore

24   the rights of victims under the MVRA -- sorry about that,

25   Judge -- aggravates this situation that we (indiscernible).

1          Personal injury victims might argue that their

2    liens should prime those of the (indiscernible) states.

3    Right now, we are merely trying to avoid the injury that

4    resulted from the lack of notification.  Interestingly --

5    well, I'll just skip that point.

6          There is a solution to all this, although this not

7    be the time, place to take it up.  Bridges and Bloyd filed

8    proofs of claim on behalf of all people similarly situated

9    to them.  That is to say living former opioids addicts who

10   are in active recovery.  Perhaps allowing their claims to

11   serve as timely filed proofs of claim will overcome the

12   (indiscernible) notice, especially for those who are locked

13   up.

14          As a practical matter, this may not mean much from

15   the perspective of outsiders in the free world.  For

16   prisoners, however, the recovery of amounts as low as $3,500

17   is life-changing.  It can pay off fines, pay the fees

18   necessary to get into community corrections, or pay child

19   support.

20          But, again, the proof of claim issue is not before

21   the Court today.  We have filed a motion to allow those

22   proofs of claim to be treated as adequate for satisfying the

23   bar date.  However, we don't have a hearing date on that

24   yet.  I thought we did, and I called Ms. Li yesterday and

25   she said she didn't (indiscernible).

1          The issue today is whether the Debtors proved that

2     they provided notice to one of the most densely-concentrated

3     populations of opioid use disorder victims in the nation,

4     that is to say the men and women who are incarcerated.  I

5     don't think it's very hard to find those people.  They have

6     publicly-listed addresses.  At each address, the

7     concentration of victims is high.

8          I respectfully submit, and somewhat reluctantly

9     submit in light of all the work that's gone into this case,

10    that confirmation should be denied unless and until the

11    Debtors are going to get or allow the prisoners formally to

12    file late claims.

13         And that ends my written statement, Your Honor.

14    And with respect to Creighton Bloyd's objection, I will tell

15    you that I filed that because I felt as if I did not file

16    it, then I would not be able to take it up with the United

17    States District Court when sentencing is concluded.  I don't

18    know, quite frankly, that there is much that you can do

19    about that in this proceeding, but I did feel like it had to

20    be (indiscernible).  And I'll be glad to take questions on

21    it if you like.

22         THE COURT:  Well, I have reviewed the Mandatory

23    Victims Restitution Act.  I don't think I have questions on

24    it.  And ultimately that is an act that applies I think at

25    the sentencing stage.  So I don't think I have any questions

Page 155

1    there.

2         As far as the notice point is concerned, I think

3    standing is probably an absolute barrier here since it does

4    not seem to me that Creighton Bloyd or Ms. Bridges or Mr.

5    Fitch have an injury to be addressed by the relief sought in

6    the first objection to them.  So I don't think I have

7    questions, Mr. Ozment.

8         MR. OZMENT:  Thank you, Your Honor.  That's it for

9    me.

10        THE COURT:  Okay.  You're on mute.

11        MAN:  Yes.  I see Mr. Shore has joined, and I

12   defer to him if he wishes to respond to any points regarding

13   the treatment of personal injury claimants under the TDPs.

14        MR. SHORE:  Two points, Your Honor.  It's Chris

15   Shore from White & Case on behalf of the Ad Hoc Group of

16   personal injury victims, which includes 55,000 individuals,

17   including incarcerated individuals.

18        It's unclear to me what the status is of the full

19   objection.  We've heard some argument today on it.  I'd like

20   to address the class proof of claim issue because I think to

21   some extent what is happening today, or if the Court

22   confirms the plan is going to affect the class claims

23   status.  Two, to address the claims and the objections that

24   somehow either of the TDPs is disproportionally unfavorable

25   to incarcerated individuals or otherwise does not take into

1    consideration their unique circumstances.

2            On the first point, the TDPs, which are plan

3    supplements -- I think the 16th plan supplement was just

4    filed -- the Court will be approving those.  Those require

5    that anybody who receives money from the TDP has an

6    individual proof of claim on file.

7            So while Mr. Ozment is saying he wants to reserve

8    the right to seek class treatment, he hasn't done it yet.

9    And if you -- without getting too far into it, the Musicland

10   factors that would go into whether or not that claim would

11   be filed, it would certainly be our position that the

12   allowance of a class proof of claim, which would, according

13   to the papers, take the personal injury class from 135,000

14   individuals to 1.5 million individuals, would affect the

15   administration of the estate going forward because the whole

16   TDP gets upended, distributions are made uncertain, and

17   you're going to have to change a central feature of the TDP,

18   which is that it's being done on an individualized basis.

19           So, you know, while I appreciate he's not pressing

20   and not seeking today class treatment for the claims, we are

21   going to have some distinct views with respect to whether

22   that would ever be appropriate.

23           But to be clear, I don't think the objection is

24   that the TDPs as drafted were drafted in bad faith.  I think

25   the point Mr. Ozment was making in the objection was it

1    doesn't take into consideration the unique facts of

2    incarcerated individuals.

3           And I hope Your Honor can see from the TDPs and

4    what have been said about them, there was a great deal of

5    thought and effort that was put into balancing the due

6    process issues on the one hand with code requirements and

7    the need to get money out to individuals in a timely

8    fashion.  And to some extent, it was a zero sum game.  The

9    more money that's spent on process, the less money there is

10   to distribute at the end of the day.

11          The -- one of the central premises of the TDPs is

12   the requirement under the Code that people file proofs of

13   claim.  And the TDP, the notice in the TDP backs off of the

14   Debtor's incredible notice program, both at the -- or with

15   respect to both bar date times.

16          Even so, there are provisions in the TDP which

17   allow individuals with late filed claims to either come to

18   the Court and seek relief under Rule 9006 or go to the

19   claims administrator, who has authority in his or her

20   discretion to allow the claim as timely.  And that's

21   Footnote 6 in the non-NAS TDP.

22          So there's nothing discriminatory against

23   individuals who are incarcerated.  They have the same right

24   and ability to file a late claim as anybody else.  Nor is

25   the actual claims process discriminatory.  Every claim under

1   the Code is required to be substantiated with proof.

2          There are two -- and maybe Mr. Ozment can address

3   it with more specificity.  There are two ideas I think

4   buried in the concerns of incarcerated individuals.  One is

5   it just takes them longer to get the health records that are

6   necessary to substantiate their claims.  Again, under the

7   TDP, the claims administrator has discretion to elongate the

8   deadlines for any given individual.  That's Footnote 8 in

9   the non-NAS TDP.  So there is already built-in flexibility

10  to the extent it's a question of timing.

11          We extended the question of being able to gain

12  access to records at all, which is an issue faced by some

13  incarcerated individuals.  Again, the TDP provides that if

14  the individual is not able to gain access to their medical

15  records, they can file declarations to that effect and make

16  the necessary showings to obviate the need for their actual

17  medical records to substantiate.

18          So, you know, I'm not sure what else we can do

19  consistent with the law and the Code to relieve the

20  obligations that exist under the Code with respect to people

21  having to file proofs of claim and people having to

22  substantiate proofs of claim with proof.  Because we just

23  can't have a TDP in which any individual can come forward

24  without any proof and take money out of the PI trust that is

25  otherwise slated for real individuals with real proof and

Page 159

1    real harm.

2            THE COURT:  Okay.  Thank you.

3            MR. OZMENT:  Your Honor, may I briefly address

4    that?

5            THE COURT:  Well, I just want to make sure -- do

6    the Debtors have anything more to say on this point, or

7    shall I just hear briefly from Mr. Ozment?

8            MAN:  With regard to the TDPs, no.  With regard to

9    notice, while Your Honor's ruling with respect to standing

10   probably disposes of the issue, just given the importance of

11   notice and its scope of notice provided, I want to note just

12   two points if that's appropriate right now.

13           THE COURT:  Okay.

14           M:  The first is that under the law, constructive

15   notice by publication is sufficient notice to unknown

16   claimants.  It's not accurate to say that everyone who is

17   incarcerated was provided notice through a constructive

18   means such as publication or television or other forms of

19   ads.  To the contrary, any known claimants, as is set forth

20   in Ms. Finigan's declarations, were provided with actual

21   notice by mail.

22           Secondly, in response to a question from Mr.

23   Ozment in the hearing, she testified that there was actual

24   specific outreach by mailings directed to prison outreach

25   organizations and to entities responsible for the management

Page 160

1     of prison facilities, which is set forth in her testimony of

2     August 12th, 2021 at Transcript, Page 76, Lines 10 through

3     18.

4               And the third point builds off those two.  And on

5     the other hand, we don't have any record evidence to support

6     Mr. Ozment's and his clients' assertions regarding the scope

7     of notice and what is or isn't available in prisons.  And

8     while, again, we don't doubt the sincerity of any of them or

9     in any way discount the importance of providing relief to

10    those who are incarcerated, on the other hand, there just

11    isn't record evidence of those assertions.  And with that,

12    we rest on our papers.

13              THE COURT:  Okay.

14              MR. OZMENT:  Your Honor, first, a quantitative

15    issue.  This would not amount (indiscernible) the claims.

16    There are roughly 1.2 million in physical custody of state

17    prisons.  And, you know, roughly 20 percent of those

18    probably use opioids even while in custody.  But that

19    doesn't mean that they product manufactured by Purdue.  So

20    we're not talking about flooding the trust with those

21    claims.

22              With respect to the issue regarding trust

23    distribution procedures, we are not asking for relief on it.

24    As a practical matter, by the time a prisoner arrives in

25    prison as opposed to jail, the people who run those

1    correction facilities know pretty much everything there is

2    to know about them.  And so hopefully to the extent that

3    people have had an opioid use disorder, problem that's well

4    known, and also perhaps even a level of what drug was it.

5    So, for example, you know, some drug courts will keep up

6    with, you know, was it OxyContin, Lortab, what led you

7    astray.

8            So we're not asking for relief on it.  But as a

9    practical matter, as you saw in the hearing involving

10   Augustus Evans earlier, I think it was last week, you know,

11   prisoners need help navigating this.  And it's very

12   difficult to motivate and engage people to help them,

13   especially volunteers, when, you know, it could be sort of a

14   dry well and in the discretion of my fellow bar member here

15   in Birmingham, who is a fine fellow, Ed Gentle, who is the

16   claim administrator.

17           I think, you know, we're going to get people

18   engaged in helping these folks, as we did with voting rights

19   issues and things of that nature.  They need to have some

20   understanding that, you know, if you get your stuff together

21   and it's in order, you're not totally wasting your time.

22   Otherwise, these claims are not going to get filed.  It's

23   just going to be too overwhelming for them.

24           And finally, in terms of filing a proof of claim

25   late and so forth, one of the last things in the world we

Page 162

1    want to do is snow the Court, or Mr. Gentle, or anybody else

2    with a ton of paperwork on whether somebody should be

3    allowed to file a late claim.

4              What we're talking about here is just one

5    (indiscernible).  Okay?  We're not asking for the right to

6    vote as we did -- as one of the earlier petitioners did.

7    We're just saying there's a problem with notice.  And it

8    needs to be addressed so that those people who are, you

9    know, perhaps not as poignant and heart-tugging as some of

10   the other stories, can file claims where it's appropriate.

11             So much of this is getting ahead of ourselves. But

12   since we touched on this issue, I wanted to clarify that

13   we're not, you know, going (indiscernible).

14             THE COURT:  Okay.  Thank you.  All right, thank

15   you both.

16             I think the next topic that is on is objections by

17   certain insurers to either aspects of the plan or proposed

18   aspects of the confirmation order.  And the Debtors, again,

19   will go first, as will the -- they will be followed by the

20   Ad Hoc Committee of Certain States and Other Governmental

21   Entities.  And then we'll hear from Navigators' counsel, I

22   think Mr. Anker.

23             So who is going to be speaking on behalf of the

24   Debtors on this?

25             MR. SINGER:  Good afternoon, Your Honor.  It's

Page 163

1       Paul Singer from Reed Smith on behalf of --

2                 THE COURT:  Okay, afternoon.

3                 MR. SINGER:  Thank you, Your Honor.  We are

4       special counsel -- special insurance counsel to the Debtors.

5       I will be (indiscernible) with provisions of Section 510 of

6       the plan, which we believe as written is appropriate and

7       consistent with appliable law.  Emily Grim will be speaking

8       on behalf of the AHC and will address the findings of fact

9       and the conclusions of law to which the insureds have

10      objected.

11                Section 526(I) of the plan, Your Honor, provides

12      that the Master Disbursement Trust will receive the Debtor's

13      rights under any insurance policy that may -- and I

14      emphasize may -- provide coverage for opioid claims.

15                The purpose of the transfer is to enable the MDP

16      to pursue recoveries under the Debtors' policies, and if

17      successful, would distribute any proceeds recovered to

18      opioid creditors pursuant to (indiscernible) the plan.

19                This arrangement is typical of those found in mass

20      tort cases.  The assignment of insurance rights has been

21      proved under Section 1123.05, most notably by the Third

22      Circuit in the Federal Mogul case.

23                To be clear, the plan does not require any

24      findings as to the value of the insurance or the extent to

25      which the policy would actually cover opioid claims.  But

1    the plan does seek findings intended to insure that the plan

2    itself doesn't somehow create additional risk to recover

3    that the Debtors would not have faced prepetition.  For that

4    reason, the plan includes language in Section 510 that

5    confirms, consistent with applicable law, that this Court's

6    findings are binding on insurers but then any other defenses

7    to coverage insurers may have are preserved.

8            According to certain insurers, they should be

9    entitled to argue in first confirmation coverage litigation

10   that keep components of the plan vitiates coverage.  Under

11   objection, they assert that the plan would insulate them

12   from any aspects of the plan or the confirmation order that

13   may be detrimental to these arguments.  They make these

14   assertions notwithstanding the understanding the adversary

15   proceeding that findings of the Court would be binding on

16   them in the coverage litigation.

17           Quite simply, the law does not permit the insurers

18   to undermine the plan's settlement framework, but to use it

19   as a basis to stake their coverage obligation.  To the

20   contrary, the Bankruptcy Code, the policies underlying it

21   that the parties should negotiate a plan that settles

22   claims, and the insurers' own policies, may of which contain

23   provisions that, notwithstanding the bankruptcy of the

24   insured, they remain in effect.  All of that prohibit the

25   insured from seeking an exemption from the (indiscernible)

1    of the plan, the confirmation order for the Bankruptcy Code.

2         To be sure, neither the Bankruptcy Code nor its

3    prior iteration in 1898 or 1939 requires the inclusion of

4    the broad neutrality language sought by the insureds.

5    Indeed, the term neutrality as used by the insureds is a

6    misnomer.  What the insurers are seeking are special

7    exemptions from rulings that are otherwise binding on them

8    as they would be on any other party in interest.  There is

9    no law saying matters that are decided in connection with

10   the plan confirmation can't be used in a subsequent

11   insurance coverage action.  Indeed, Your Honor confirmed

12   this we believe in the insured's adversary proceeding --

13         WOMAN:  Quiet.  I think they heard me yell.

14         MR. SINGER:  Am I being heard, Your Honor?

15         THE COURT:  People should keep their phone on mute

16   unless they are speaking.

17         MR. SINGER:  As I was saying, the principle that

18   plan confirmation orders can be used in other proceedings is

19   longstanding.  Discharge orders are often used with effect

20   to the release of claims under a plan in a state law

21   proceeding.  And indeed, free and clear orders likewise

22   issued under Section 363 are often used in state court

23   proceedings to demonstrate that there's no success or

24   liability.

25         The carveout that the insurers seek here, if you

1    call it neutrality, was developed in the early 2000s in the

2    Combustion Engineering and Pittsburgh Corning cases as a

3    tool to limit the ability of a debtor's (indiscernible)

4    frustrate or delay the plan confirmation process.

5              Indeed, each of those cases went to the Third

6    Circuit several times, and the Pittsburgh Corning case took

7    over a decade to get to confirmation.

8              The neutrality language that the insurers seek

9    indicate that they would have no -- the confirmation would

10   have no impact on their rights.  And by that, they would be

11   deprived of standing to object or interfere with

12   confirmation.  Such provisions (indiscernible) on the

13   specific considerations of each case.  Here, no one has

14   concluded the insureds are deprived of standing.  Indeed,

15   they have appeared and are being heard here.

16             As such, as any other party in interest, the

17   insurer should not be able to deny the existence of a plan

18   confirmed by this Court in conformity with the Bankruptcy

19   Code and the findings by this Court contained in the order

20   approving the confirmation and the settlements embodied in

21   the plan.  Accordingly, we believe that the language as set

22   in Section 510 of the plan is appropriate and

23   (indiscernible).

24             Unless the Court has questions, I would like to

25   turn the podium over to Ms. Grim on behalf of the AHC.

Page 167

1          THE COURT:  I don't think I have any questions for

2     you, Mr. Singer.  If I have questions, it goes to -- or they

3     go to what besides the transfer of the policies to the

4     trust, to the MDT, are the Debtors and their allies seeking

5     to put in the confirmation order.  But I think Ms. Grim is

6     going to discuss that.

7          MR. SINGER:  If she doesn't, I can come back to

8     it, Your Honor.  Thank you.

9          THE COURT:  Okay, fine.

10         MS. GRIM:  Thank you, Mr. Singer.  And good

11    afternoon, Your Honor.  Emily Grim, Gilbert LLP, counsel to

12    the Ad Hoc Committee of Governmental and Other Contingent

13    Litigation Claimants.

14         Your Honor, the Debtors have included a number of

15    findings and conclusions in the proposed confirmation order

16    that are necessary to preserve the value of the insured's

17    rights being transferred to the MDT.

18         We provided Your Honor with a list of these

19    findings in Exhibit A in our joint reply to the insurer's

20    confirmation objections, so I won't read them word for word

21    unless you'd like me to.  But generally speaking, they

22    provide that the settlements embodied in the plan are

23    reasonable and were negotiated in good faith, that the

24    insurers had notice and an opportunity to participate in the

25    negotiations, and that the negotiation and resolution of the

1    Debtor's liabilities through these bankruptcy proceedings

2    shall not excuse any insurer from its coverage obligations,

3    regardless of any contrary policy terms.

4            The purpose of these findings is to ensure that

5    nothing about the plan itself or the Debtor's actions in

6    negotiating and proposing the plan diminishes the value of

7    the insurance assets being transferred to the MDT.

8            Now, certain of the Debtor's insurers have argued

9    in their plan and confirmation objections that this Court

10   can't issue these rulings.  Their view is that they should

11   be entitled to argue in coverage litigation that key

12   components of the plan release them from any and all

13   liability under the policies.

14           One of the defenses that they've specifically said

15   that the plan must preserve for them, that the plan's

16   settlement of the opioid liabilities violates the policy's

17   consent to settle provisions.  They argue that these are

18   just your typical, non-core, state law based coverage

19   defenses, and therefore that they must be decided in the

20   insurance adversary proceeding and not here.  We would argue

21   that that's not accurate for a number of reasons.

22           The first, these findings don't require the Court

23   to rule on garden variety coverage disputes.  They don't

24   require the Court to rule on whether the policies provide

25   coverage for opioid liabilities, they don't require the

1   Court to determine the value of any such coverage.  What

2   they seek is a determination that the insurers cannot

3   disclaim coverage based solely on the Debtor's actions in

4   this bankruptcy or on the contents of the plan itself.

5            We would argue that that's an issue that's

6   inextricably intertwined with the Debtor's ability to

7   marshal, preserve, and distribute their assets to creditors,

8   satisfaction of their liabilities, and that it couldn't

9   exist outside of bankruptcy.  That makes them core issues

10   properly decided by this Court as part of confirmation and

11   not, for example, by a Bermuda arbitration panel considering

12   coverage disputes post-confirmation.

13            The second reason that these findings are

14   appropriate for confirmation is that they are required by

15   the plan.  The Ad Hoc Committee and the other creditors that

16   voted in favor of the plan did so with the understanding

17   that the MDT will be entitled to access the same rights to

18   coverage as the Debtors for the opioid liabilities.

19            Now, they agreed to take on the risk that insurers

20   could raise garden variety coverage defenses.  For example,

21   that an occlusion bars coverage for the claims.  But they

22   did not agree to take on the additional risk that the plan

23   itself would destroy the value of the insurance asset.  And

24   in fact --

25            THE COURT:  Could I interrupt just for a second?

1           MS. GRIM:  Of course.

2           THE COURT:  Sorry, you can go ahead.

3           MS. GRIM:  Of course.  They negotiated language in

4    the plan specifically intended to protect against that risk.

5    And I'll give you some cites.

6           Section 9.10 of the plan requires that the

7    confirmation order contain a finding that the insurance

8    rights transfer is effective, notwithstanding any policy

9    provisions to the contrary.

10          THE COURT:  Can I interrupt you?  I understand

11   this is a negotiated provision of the plan.  But if it -- if

12   that violates the Bankruptcy Code in some way, then it

13   doesn't matter, right, other than that the parties'

14   intentions with regard to the plan are frustrated.  It

15   doesn't --

16          MS. GRIM:  Yeah.  I think Your Honor has to

17   determine -- sorry.

18          THE COURT:  The argument to override this is

19   really the argument under 1123(a)(5) and the caselaw.

20          MS. GRIM:  That's correct, Your Honor.

21          THE COURT:  Okay.

22          MS. GRIM:  Section 5.6(I), just to give you the

23   other cite in the plan so that you have it, requires that

24   the confirmation order contain findings necessary to

25   preserve the MDT insurance rights.  These provisions have

Page 171

1 been in the plan since its inception.  And omitting the

2 findings they require would be a material change to the

3 plan.

4    A third reason these findings are appropriate is

5 that they are consistent with the Bankruptcy Code and the

6 policies underlying it.  The purpose of the Code, as Your

7 Honor well knows, is to enable debtors to use their existing

8 assets to resolve liabilities promptly and efficiently.

9    If insurers were entitled to control a debtor's

10 settlement of its liabilities in bankruptcy, that would

11 frustrate that purpose.  It would give insurers, who have no

12 fiduciary obligations to the estate and who, frankly, have

13 every incentive to use the reorganization process to delay

14 or minimize their coverage obligations, an effective veto

15 right over the plan.

16    Accepting the insurers' argument would mean that

17 this Court is powerless to prevent a debtor's insurers from

18 frustrating the Chapter 11 process, and we just don't think

19 that's an outcome that the Code contemplates here.  We think

20 that's the very reason Congress gave bankruptcy courts tools

21 like Section 1123(a)(5) to be implemented into the plan.

22    I would also like to address briefly the insurers'

23 reference to other cases where the plan and confirmation

24 order may have, for whatever reason, preserved all coverage-

25 related issues (indiscernible) confirmation.  And I have two

1    responses to that.

2              The first is I think there is emphasis that not

3    all plans have preserved coverage issues for resolution

4    post-confirmation.  The Babcock case we cited in our reply

5    to the insurer's plan objections included findings in the

6    confirmation order that the plan did not violate any consent

7    to settle provisions.

8              Second, these other cases cited by the insurers

9    are largely irrelevant because every case is different.  I

10   can't really speak to the specific considerations at issue

11   in those cases, but I can tell you that the findings the

12   Debtors seek here are critically important to this plan

13   because of its unique abatement-based trust structure.

14             If you look at the more traditional asbestos trust

15   structures, claims typically are channeled to a trust, and

16   then the trust liquidates and pays individual claimants post

17   confirmation.  So in that scenario, if the insurers

18   (indiscernible) about what the claims were worth or whether

19   the trust's award was reasonable, the parties would have an

20   opportunity to litigate that dispute and its impact on the

21   coverage post-confirmation.

22             But here, there is no post-confirmation

23   liquidation process for most of the creditors' claims.

24   There is no point, for example, at which NOAD is going to be

25   valuing individual claims.  So there's really no other

1   opportunity for the insurers and the MDT to establish the

2   value of any liabilities dissolve by the plan or the

3   reasonableness of that resolution.  So that's why any

4   dispute should be resolved here during confirmation and why

5   this Court's ruling on these issues should be binding on the

6   insurers.

7           As Your Honor knows, we have addressed the

8   insurers' objections to specific findings and conclusions in

9   our papers.  So in the interest of time, I'll just address

10  any specific findings on which you have questions.  But

11  before I do that, I do have one issue I would like to clean

12  up the record for.  And that is on the finding that you

13  referenced earlier on the assignment of insurance rights.

14          The insurers seek to modify Confirmation Order

15  Finding LE, which states that the Bankruptcy Code authorizes

16  the transfer and vesting of the MDT transferred assets

17  notwithstanding any terms of the Purdue insurance policies

18  or provisions of non-bankruptcy law.

19          The objecting insurers have asserted that since

20  they previously notified the Debtors that they don't object

21  to the transfer of the MDT insurance rights, the Court

22  shouldn't render what they call an advisory ruling regarding

23  the Code's authorization of such transfer.  Instead, they

24  propose a finding that basically says the objecting insurers

25  have not challenged the validity of the transfer.

1           In our joint reply to the insurers' confirmation

2   objections, we noted that a ruling on this issue would not

3   be advisory because another insurer, Chubb, had objected to

4   the transfer.  We understand that Chubb has formally

5   withdrawn its objection on that point, so we do want to make

6   the record clear on that.

7           But I do think it's important to emphasize that

8   this withdrawal doesn't obviate the need for the finding.

9   The finding addresses a crucial component of the plan,

10  including in the confirmation order, and a condition

11  precedent to plan confirmation.  And in addition, the

12  language proposed by the certain insurers doesn't indicate

13  universal commitment from all insurers, including those

14  insurers subject to Bermuda arbitration who have not

15  appeared at confirmation.  So it really just doesn't provide

16  sufficient protection for the Debtors (indiscernible).

17          So I will pause now to address any questions Your

18  Honor might have.  And otherwise, I'll save any of my

19  remaining time for rebuttal.

20          THE COURT:  Okay.  I think it's probably better to

21  hear from Mr. Anker first and then I'll see if I have

22  questions for you if you want to raise anything in rebuttal.

23          MS. GRIM:  Thank you, Your Honor.

24          THE COURT:  Thanks.

25          MR. ANKER:  Thank you, Your Honor.  Philip Anker,

Page 175

1    Wilmer Cutler Pickering Hale & Dorr, for Navigators.  Can

2    you hear me okay, Your Honor?

3              THE COURT:  Yes, fine.  Thank you.

4              MR. ANKER:  I am in a -- I apologize, Your Honor.

5    I am on the West Coast.  Came out for a niece's wedding.

6    And so I'm in a hotel.  And if the connection gets bad, I

7    will do my best.

8              Your Honor, I am not in the habit -- and this will

9    be the first time when I quote Admiral James Stockdale, who

10   Your Honor may remember was Ross Perot's vice presidential

11   candidate I think in '92, when at his debate, he said in a

12   puzzled way that looked like it wasn't rhetorical, "Why am I

13   here?"  He got crucified for that, and I think that was

14   unfair.  History has shown it.  But I am raising it as a

15   rhetorical question, at least in part, because I don't know

16   why we are here.

17             You have lots of complicated issues to resolve,

18   and I echo the sentiments that someone had expressed earlier

19   that, frankly, this is a case about the public interest more

20   than a typical commercial bankruptcy.

21             Insurance coverage, however, is not one of the

22   issues.  And frankly -- and I will say this and it's not

23   directed at Mr. Singer, it's not directed personally at Ms.

24   Grim, it's certainly not directed at Davis Polk.  But what I

25   think we are fundamentally about here is an attempt by the

1    Gilbert firm and for coverage reasons to get precedent for

2    other cases not before you where there are in fact tricky

3    issues.  There is nothing here that warrants the Court's

4    intervention.

5              Let me start with the plan, which I hope I can

6    deal with quickly, and then move to the findings and

7    conclusions, which I think are where Your Honor is

8    principally focused.

9              What I didn't hear Mr. Singer address was the

10   basic point.  We are prepared to live with the language --

11   we suggested a minor tweak, a minor tweak -- the language

12   that was in the plan that went out to vote.  This is not our

13   language.  I agree, insurers have sometimes asked for five

14   pages on insurance neutrality.  The Debtor went out with a

15   single sentence in their Fifth Amended Plan.  That sentence

16   we are prepared to live with.  As I said, we asked for one

17   tweak to it, which was to add a sentence that made it clear

18   what we think Your Honor already said in the ruling in the

19   adversary that while Your Honor would be making findings,

20   the legal consequences of those findings for coverage would

21   be for another day.

22             We made that clear to the Debtors on July 5th.  We

23   did not hear from the Debtors until they actually filed,

24   they actually filed their Sixth Amended Plan very late on

25   the night of the 15th.  I saw it for the first time on the

1    morning of the 16th when I got up.  And it was a complete

2    rewrite.  Instead of saying nothing in the plan, the plan

3    documents or the order will one way or the other have any

4    affect on the rights or obligations of the insurance

5    companies or the rights or obligations of the Debtors, they

6    then said, provided, however, everything can change it.  The

7    plan can change it, the plan documents can change it.  Any

8    order Your Honor has entered at any point in time in this

9    bankruptcy, any order in other litigation can change it.

10            And think about that for a moment, Your Honor.

11   Most of the plan documents we have not seen yet.  They are

12   going to be filed with -- ultimately at the time it's

13   defined to include any document necessary when the plan goes

14   into effect or to have it go effective.

15            There are provisions in documents that have

16   already been filed that state, for example, that insurance

17   policies provide coverage, something we may well dispute

18   given products exclusions and the like.  There are

19   references to policies that we think were -- in fact at

20   least some insurers think were settled and released long

21   ago.

22            Think about every order Your Honor has entered.  I

23   have not, I will confess, followed this bankruptcy.  One of

24   the things that I think may be lost here is that until the

25   adversary was filed, which was in 2021, no insurer thought

1    that this bankruptcy affected them at all because, frankly,

2    given the products exclusions, my client and every other

3    client thought that there would never be an attempt to get

4    coverage here.  You will hear the merits of that later.  But

5    I don't know what happened in 2020 in various adversaries or

6    other cases, yet their language would cover that.

7              So we ask that you simply go back to and the

8    Debtors go back to the language they had when they solicited

9    acceptances of the plan.  We have suggested a tweak.  I will

10   leave it to Your Honor whether it's appropriate or not.  But

11   frankly, the main issue there is just the basic language

12   that went out in solicitation.  And no one can argue on the

13   other side the new languages required for confirmation, but

14   the creditors overwhelming voted in favor of confirmation

15   with the original language, and no one is suggesting that

16   anyone is changing their vote, and no one is going to make

17   that suggestion and file the motion and seek relief.

18             With that, unless Your Honor has questions, I

19   thought I might move to the findings and conclusions.  First

20   --

21             THE COURT:  Could I --

22             MR. ANKER:  Sure.

23             THE COURT:  And maybe this goes to the findings

24   and conclusions point.  But the first sentence that -- or

25   the first question that the Admiral asked was who am I.  And

1   then he said why am I here.  And Ms. Grim has said that you

2   don't represent all of the insurers.  In fact, there are

3   other insurers that are covered by arbitration agreements.

4   Am I right about that?

5            So when I hear you talk about the revised language

6   for the proposed findings of fact and conclusions, that's

7   just from your clients, right?

8            MR. ANKER:  Your Honor, let me try to take that

9   on, the language with respect to the transfer or assignment

10  of the policy.  First, I represent Navigators, but I have

11  been asked to argue on behalf of all objecting carriers.  So

12  none of the other carriers objected, including the ones in

13  the arbitration.  I also think -- and I will ask coverage

14  counsel to correct me if I'm wrong -- they have -- and I

15  think they've proposed this to Your Honor, to have a stay of

16  the arbitration until and unless Your Honor, or if the

17  reference is withdrawn, the district court, decides the

18  insurance coverage action.

19           But the language we have proposed with respect to

20  the transfer issue would specifically --

21           THE COURT:  So much for arbitration being fast and

22  efficient.  But go ahead.

23           MR. ANKER:  Your Honor, on that point I'm not

24  going to disagree with you.  But let me just read to you the

25  last sentence.  And this is our language.  Your Honor, I

Page 180

1      don't know if you have it in front of you.

2              THE COURT:  I do.

3              MR. ANKER:  I am looking -- okay.  If you look at

4      our blackline, the last sentence says, "In the absence of

5      any outstanding objections, such transfer (indiscernible)

6      the MDT insurance rights is authorized."  It doesn't simply

7      say no one will object, it says it's authorized.  The only

8      real difference is we want a predicate that says it's based

9      on the absence of objection by those parties who actually

10     filed an objection.  And that goes to the point I was

11     raising earlier.

12              Look, I think it's a very different case.  But one

13     of my insurance clients is in another case right now that

14     almost has as much publicity as this case.  And so is Ms.

15     Grim on the other side.  And there is an effort there to

16     assign to the trust non-debtor insurance policies.  We think

17     that is not something that 1123 authorizes, including in the

18     Third Circuit.  And I think this is all about precedent for

19     another case not before Your Honor that can be resolved

20     then.  Our language would make it a hundred percent clear

21     that the transfer is authorized to the trust.  That is going

22     to preclude anyone from arguing that the transfer vitiates

23     coverage.  We simply want it as the predicate that there is

24     no dispute over the issue.  And because there's no dispute

25     over the issue, the Court can go on and not resolve -- not

Page 181

1     reach it.

2              As Ms. Grim notes, the only party that objected on

3     this ground, Chubb, has withdrawn that objection.  Mr.

4     Copper of the Duane Morris firm is I believe on the line and

5     can confirm that if Your Honor has any doubts.  But I spoke

6     to him specifically and got that representation and

7     therefore feel comfortable that I can confirm with Ms. Grim

8     set on the record.

9              I will also say that Debtors and the Committee

10    suggested the stay of the arbitration.  So it wasn't other

11    insurers.  But that's not my fight, Your Honor.  That's an

12    issue for another day about the wisdom, or lack thereof, of

13    arbitration.

14             Let's look at the other findings.  The second

15    issue on which there is some slight disagreement is over

16    Finding JJA, where we have stricken the second sentence and

17    added the words, "viewed collectively" in the first

18    sentence.  This is a finding, quote, "The settlements

19    reached between the Debtors, we would add viewed

20    collectively" and the opioid-related claimants as embodied

21    in the plan are reasonable and were entered in good faith

22    based on arm's length negotiations.  We then would strike

23    such negotiation, settlement, or resolution of liabilities,

24    shall not operate to excuse any insurer from its obligations

25    under any policy notwithstanding any terms of such insurance

Page 182

1   policy, including any consent to settle or pay first

2   provision or provisions of non-bankruptcy law.

3           Let me explain what's going on here.  But let me

4   start with a predicate.  No one is asking on our side for a

5   finding (indiscernible) the finding Ms. Grim

6   (indiscernible).  We are not asking that Your Honor find

7   that in fact the settlements do create any defenses

8   (indiscernible).  That is a question for another day to be

9   decided again by Your Honor with full briefing and a full

10  record.

11          Let's talk now about the two things, the two

12  tweaks here.  First, why viewed collectively?  Well, this is

13  an issue specific, Your Honor, to my client.  My client,

14  with respect to some of its policies, insured a particular

15  debtor, Rhodes, R-h-o-d-e-s.  The disclosure statement notes

16  that Rhodes did not advertise or market any opioids at all.

17  It just manufactured generics.  There is nothing in this

18  record, nothing in this record about it at all and whether

19  to the extent it's contributing any settlement is or is not

20  reasonable.

21          You may remember in the examination -- and if I

22  butcher her last name, Your Honor, I apologize.  Ms.

23  Horewitz, the expert for the Committee.  She acknowledged on

24  cross that her evaluation of comparing the liabilities to

25  the assets was done on an aggregate basis looking at all of

Page 183

1    the debtors collectively, not individually.

2          So that brings me to the second point.  Why strike

3    the second sentence?  Your Honor, I don't know whether --

4    I'm not a coverage lawyer, as Your Honor knows.  I am a

5    bankruptcy lawyer.  I don't know whether there are or are

6    not defenses here relating to whether the Debtors violated

7    policy provisions.  But I do know this.  There is no record

8    before Your Honor.  I know the following chronology.  The

9    mediation occurred in 2020.  And it was not until 2020 there

10   was an adversary and anyone had a clue -- I think you will

11   get this when the evidence comes in in the insurance

12   coverage action -- that the Debtors were even mediating and

13   -- there was no clue that the Debtors would seek any

14   coverage.  What will the evidence be about whether the

15   Debtors in connection with their mediation reached out to

16   the carriers, spoke to the carriers, consulted with the

17   carriers, sought the carriers' consent to any settlement?

18   That -- and none of that evidence is before Your Honor

19   today.  What are the implications (indiscernible) about what

20   that evidence is?  That's going to turn on what state law

21   may apply.  Is it the law of New York, the law of New

22   Jersey, the law of Oklahoma, the law of California?  None of

23   that in that briefing is before Your Honor, in part because

24   the Debtors didn't seek these findings and didn't put them

25   in their proposed order until after briefing had closed by a

1    month on plan confirmation objections.

2            We are not asking Your Honor to make any

3    determination that somehow the Debtors have impaired

4    coverage that otherwise would exist.  We simply think that

5    is an issue to be decided in this adversary proceeding upon

6    a full factual record and a full legal briefing, none of

7    which is before Your Honor today.  And so not only would

8    (indiscernible) due process where we had no notice before

9    plan objections came in that these findings would be sought.

10           I will pause there.  Section 9.1 and 5.6(I) that

11   Ms. Grim and Mr. Singer referenced are all about transfer.

12   The headings are about transfer and assignment.  They have

13   nothing to do with reasonableness of settlement.  And so,

14   no, there was no notice they would be seeking this finding

15   or conclusion.

16           So, A, it's inconsistent with due process for them

17   to seek it now.  And, B, Your Honor doesn't have the

18   evidence and doesn't have the briefing.  And I will say it

19   as clearly as I can.  We are not saying, therefore, that

20   there has been a waiver by the Debtors that they can't later

21   argue that of course they can seek coverage, of course there

22   is no problem here.  But this is not the occasion.

23           And I'll just make one last point on that this is

24   not the occasion.  Your Honor has determined

25   (indiscernible).  This is not a case where insurance

Page 185

1    coverage is a predicate to plan confirmation and

2    feasibility.  Your Honor has determined that whether or not

3    there is coverage, this plan is feasible.

4              There's only two other findings, and I'll just go

5    through them really quickly.  One is a finding in Paragraph

6    E, as in Earl, H as in Harold, in our objection, Your Honor,

7    to the findings.  I think we discussed this one in Paragraph

8    -- I actually skipped over it.  I think it was in Paragraph

9    1, Your Honor.  Yes, it is.  We are perfectly with a finding

10   that all parties, including the carriers, had notice of the

11   filing of the Chapter 11 cases.  We are not going to claim

12   that we were ostriches that put our heads in the sand.  It

13   was all over the front page of every newspaper in the

14   country.  But whether as a result we had an opportunity

15   participate or notice that the liabilities were being

16   mediated, negotiated, and resolved, that's the sentence we

17   propose to have stricken.  It's really the same point.  No,

18   until the adversary was filed, I don't think the evidence

19   will show any carrier who had any reason to think there was

20   going to be any effort to get coverage here.  And again, Ms.

21   Grim may dispute that, but the evidence is not in front of

22   you, and the briefing is not in front of you, and it can be

23   resolved in the coverage (indiscernible).

24             The final provision, Your Honor, is I think in our

25   objection covered by Paragraph 5.  I'm skipping over the one

1    in Paragraph 4, Your Honor, which deals with Plan

2    Confirmation Order JJB.  The Debtors no longer seek that

3    finding, so there is no reason we need to discuss it.  But

4    as to the last one, Paragraph NN, again, I don't know what

5    we're arguing about.  We do not deny that Section 524(e) of

6    the Bankruptcy Code says what it says.  We are not arguing

7    it's unconstitutional.  The discharge of a debtor does not

8    discharge anyone else in their liability.  No one is arguing

9    that.  What effect, if any, any release may have, whether we

10   had notice of it or not, are things to be argued later.

11        Your Honor, I want to end, unless Your Honor has

12   questions, where I started.  We didn't have due process

13   about these findings.  We didn't have an opportunity to

14   address them.  We didn't have an opportunity to retain

15   experts and the like.  And more importantly, now there is no

16   record before Your Honor on any of them and there is no

17   reason why you need to reach them in a case where insurance

18   coverage is not core to confirmation in which the adversary

19   is before Your Honor, the arbitration will be stayed.  And

20   we will proceed on a full record with full briefing.  And

21   it's particularly inappropriate in a case where whatever

22   coverage there is or isn't will not be outcome determinative

23   in the feasibility of this bankruptcy, and the creditors

24   overwhelmingly voted for the plan without any such findings

25   and with the plan and with the neutrality language in 510

1    that the Debtors went out with and we are perfectly

2    comfortable with.

3              So with that, Your Honor, I would be happy to

4    address any issues Your Honor may have.  I see you're

5    flipping pages.  If I can be of help, happy to do so.

6              THE COURT:  Well, I guess I wanted to focus on the

7    language in JJA and the third sentence.  What's being

8    referred to here is settlements of the opioid-related

9    claims.  It would seem to me that any insurer of an entity

10   that has opioid-relate liability, including the D&O insurer,

11   should be covered by this provision.  And you're just

12   confining your remarks to insurers of companies that don't

13   have opioid-related liability, right?

14             MR. ANKER:  Your Honor, you referred to the third

15   sentence of JJA, and I see two sentences.

16             THE COURT:  Well, the third clause.  Maybe it's

17   the third clause.  You don't like the phrase, you want to

18   strike the phrase, "Such negotiation, settlement, or

19   resolution of liability shall not operate to excuse any

20   insurer from its obligations under any insurance policy."

21             MR. ANKER:  Correct, Your Honor.

22             THE COURT:  Including any consent to settle or pay

23   first provisions.  And I want to set aside an insurer of a

24   company that does not have opioid-related claims.  I don't

25   see why this sentence shouldn't have that language in it as

1     to every other insurer.

2             MR. ANKER:  So by every other insurer I take it,

3     Your Honor, you mean an insurer of Purdue, insurer of those

4     Debtors who marketed --

5             THE COURT:  Who have opioid-related claims.

6             MR. ANKER:  Your Honor, there are insurance

7     policies -- and again, I'm going to get a little bit over my

8     skis here because I'm not a coverage lawyer.  But insurance

9     policies as a basic predicate have as a term of them dealing

10    with the moral hazard.  If you're going to ask me, the

11    insurer, to pay, then you've got to bring me in.  You can't

12    settle without talking with me --

13            THE COURT:  Right.  But that law is different in

14    bankruptcy cases.  So I'm just trying to figure out -- I

15    think your point was -- and you made it by focusing on

16    Rhodes -- that how can a settlement be reasonable of opioid-

17    related liability if it applies to a insured that doesn't

18    have opioid-related liability.  And there is some logic to

19    that.  But I don't understand the logic otherwise.  I mean,

20    the parties have briefed the bankruptcy issue otherwise.  So

21    I mean, I just --

22            MR. ANKER:  Let me try to address the bankruptcy

23    issue.  Your Honor, I think 99 percent of the cases about

24    whether bankruptcy law preempts -- my apologies Your Honor -

25    - bankruptcy law preempts state law with respect to

Page 189

1    insurance policies and contract rights deals with the

2    transfer question.  Really two questions.  Can the transfer

3    occur on the initiation of the bankruptcy from the

4    prepetition debtor to the estate and (indiscernible)

5    transfer later to the trust.  That's the issue in Federal

6    Mogul, the case Your Honor cited.  And it in fact goes off

7    on the language in 1123(a)(5) that addresses whether -- that

8    specifically says a plan can provide for the transfer of

9    rights.

10            There is not a lot of law, there is very little

11   law on whether consent to settle provisions are or are not

12   overwritten by the Bankruptcy Code.  I would ask Your Honor

13   to resolve that issue.  I'm not asking you to rule my way,

14   but I would ask you to let that issue be briefed with a

15   record.  I think you will find a record here that there was

16   no effort to consult with the insurers.  That's not what

17   typically happens in bankruptcy.  I can tell you or

18   represent to you that I am in other bankruptcies where the

19   debtors come to us and say here's what we're thinking of

20   doing.  What do you think?  What are your views?  How do you

21   think about it?  Would you consent to this?  And that's not

22   going to be the record here I think, but Your Honor doesn't

23   know one way or the other.  And I'd like to have an

24   opportunity to full brief that issue with an opportunity to

25   convince you that that's not what Federal Mogul stands for.

Page 190

1         But neither the factual record nor the legal

2    briefing is there.  And again, I'm not asking by striking

3    this language out.  I want to be a hundred percent clear.

4    And if you think language needs to be added to be neutral to

5    make the point express, I don't have any objection to that.

6    I am not arguing that by striking this language, you're

7    implicitly ruling our way on the merits.  I am simply, if I

8    can use the colloquial expression, suggesting we kick the

9    can down the road so that down the road there can be full

10   briefing, and to the extent it matters, a factual record.

11        But, Your Honor, I'll just end on this.  Federal

12   Mogul and 99 percent of the cases, Combustion Engineering

13   and others, are about the transfer question, not about

14   whether a debtor can settle without -- not about provisions

15   and policies -- not about anti-assignment provisions, but

16   about -- they are about anti-assignment provisions, but

17   they're not about provisions that require consent or at

18   least consultation.  And obviously lots of insurers' rights

19   are fully preserved.  Let's look at one that's going to be -

20   - frankly may make all of this moot in the end of the day.

21        The policies overwhelmingly have products

22   exclusions.  They exclude any liability of a carrier to the

23   extent that the insured, Purdue's liability arises out of

24   its manufacture of a product.  No one is arguing, including

25   Ms. Grim or Mr. Singer, that somehow the Bankruptcy Code

Page 191

```
 1    overrides that.  No one would argue that the Bankruptcy Code
 2    overrides limits, aggregate limits in policy.  No one would
 3    --
 4         THE COURT:  All right.  But I was really going to
 5    a different question.  I can look at and will look at
 6    further the cases on consent or pay first, et cetera.  I'm
 7    really focusing just on the point you made with regard to
 8    insureds that don't have opioid-related claimants.
 9         I don't see how -- this is really a question for
10    both of you.  I don't see how a settlement with opioid-
11    related claimants would affect one way or another an
12    insurer's obligation with respect to a consent or pay first
13    provision unless the insured -- I mean, I don't see how they
14    could be claiming on that insurance policy to pay the opioid
15    claims.  By definition it seems to me that your Rhodes issue
16    wouldn't come up.
17         MR. ANKER:  Your Honor, the Debtors are seeking
18    coverage from Rhodes.  I think we're conflating multiple
19    issues.  So let me try to help divide them up in a way that
20    may be helpful.
21         First, the Debtors are seeking coverage from
22    Rhodes.  Our position is that they are not entitled to that
23    coverage, and the Court should not be making a
24    reasonableness finding that affects Rhodes.  That goes to
25    reasonableness.
```

Page 192

1              THE COURT:  Well, are they looking for coverage

2      for opioid-related claims?

3              MR. ANKER:  I believe they are, Your Honor.  I

4      don't know that there are any opioid -- I mean, I don't know

5      that there are any -- we actually looked at proofs of claim

6      and could hardly find a proof of claim against Rhodes.

7              THE COURT:  Okay.

8              MR. ANKER:  But I do think in the adversary, they

9      are seeking coverage under the Rhodes policy with respect to

10     their settlements of opioid liability, including I think

11     settlements by other debtors.  And so we simply want to be

12     able -- and this is one issue -- preserve as to Rhodes the

13     ability to argue that whatever reasonableness there may be

14     of the aggregate settlement, as to Rhodes there is no basis

15     for there to be a claim for coverage.  Because if it is

16     contributing, it is doing so as a volunteer because it does

17     not face opioid liability having not marketed opioids.

18     That's one issue.

19             THE COURT:  Again, this language just goes to

20     opioid-related claimants.  So I don't see how --

21             MR. ANKER:  Yes.  Your Honor, I confused you, and

22     I apologize.  When I was making the Rhodes point, it was the

23     first part of this clause, the words "Viewed collectively".

24     There's two different points going on here.  One is why did

25     we want to add the words "Viewed collectively"?  Because we

Page 193

1    don't want a finding that's specific to Rhodes.  The

2    strikeout on the second sentence --

3                THE COURT:  Well, I don't think there is one.  It

4    says Debtors, plural.

5                MR. ANKER:  If we have a clear record on that,

6    Your Honor, and there's going to be no argument, we want it

7    viewed collectively to be clear.  But the (indiscernible) is

8    going to be in front of Your Honor.  Your Honor understands

9    that that is about the Debtors -- Debtors, S, plural -- I

10   can accept that.

11               The second sentence has nothing to do with the

12   Rhodes issue.  And I apologize, Your Honor.  I evidently

13   confused you.  So --

14               THE COURT:  Okay.  So I don't think we need to

15   cover the second sentence further, because now I understand

16   where we are on this one.

17               MR. ANKER:  Okay.

18               THE COURT:  Okay.

19               MR. ANKER:  Thank you, Your Honor.  Are there are

20   any other questions Your Honor has?

21               THE COURT:  Well, I guess I want to go back to the

22   first part, which is I have the proposed findings, I have

23   the plan.  I don't -- you expressed a concern that under the

24   language of the plan, the Debtors could sneak something in

25   besides what's in the proposed findings.  And say, for

Page 194

1   example, the coverage limits or the coverage exception is

2   waived.  I mean, I don't -- is that the concern?  I mean, I

3   think I have what is before me that they're actually

4   seeking.

5        So, Your Honor, let me focus you on Section 510 of

6   the current plan as opposed to the one that went out for

7   solicitation.

8        THE COURT:  Right.

9        MR. ANKER:  It is very much like the one we have.

10  But then it has a proviso.  After saying nothing in the

11  plan, the plan documents, or the confirmation order shall

12  alter, supplement, change, decrease, or modify the terms of

13  the Purdue insurance policies, including the MDT insurance

14  policies.  That's all that was in there when it went out to

15  the creditors.

16       Now they've added the following, quadruple the

17  number of words.  "Provided that notwithstanding anything in

18  the foregoing to the contrary, the enforceability and

19  applicability of the terms, including conditions,

20  limitations, and/or exclusions of the Purdue insurance

21  policies, including the MDT insurance policies.  And thus,

22  the rights or obligations of any of the insurance companies,

23  the Debtors, or the trust, including the Master Distribution

24  Trust, arising out of or under any Purdue insurance policy,

25  including any MDT insurance policy, whether before or after

1    the effective date, are subject to the Bankruptcy Code and

2    appliable law, including any actions or obligations of

3    Debtors thereunder.  The terms of the plan and the plan

4    documents, the confirmation order, including findings," --

5    and they (indiscernible) -- "and any other ruling or order

6    entered by the Bankruptcy Code.

7            So they have a proviso that says --

8            THE COURT:  So -- so I understand that.  So I

9    think you are worried about the plan documents and any other

10   orders or rulings, including in the future.  Right?

11           MR. ANKER:  And the past.

12           THE COURT:  Okay.

13           MR. ANKER:  Correct, Your Honor.

14           THE COURT:  And I can understand that if, you

15   know, the insurers didn't have notice of those issues.  And

16   maybe it should be dealt with that way.  I'm not -- as far

17   as I'm concerned, what they're asking me to find and rule on

18   is what we're just been talking about for the last half hour

19   or so.  It's the proposed findings of fact and conclusions

20   of law provisions that we've been discussing.  And if they

21   actually -- and I don't believe this is the case -- sought

22   something from the Court that was not on notice to your

23   clients, it couldn't be encompassed by that language because

24   you wouldn't have notice of it.  And if that's what needs to

25   be clarified, it should be.  I mean, I just don't -- that

1    should be an easy fix.

2              MR. ANKER:  Your Honor, I think it is an easy fix

3    if it's limited to the plan and the confirmation order.  But

4    let me -- what I'm looking at.  First, I am concerned about

5    the plan documents.  I don't know what's going to be in

6    them, when we're going to have an opportunity to look at

7    them.  But going back in time, it says under any order

8    entered by the bankruptcy court without any temporary

9    limitation, without any language about notice on us.  That

10   would include any order you entered at the outset of the

11   case before the adversary --

12             THE COURT:  I understand.  But that has to be

13   qualified by notice, obviously.  I mean, Mr. Singer's point

14   is insurers can't sit back and say everything that happens

15   in a bankruptcy case on notice to us doesn't matter.  You

16   know, the normal rules of judicial estoppel, collateral

17   estoppel, and law of the case just don't matter for

18   insurers.  That's just -- that's not right.  But those

19   principles all require notice.  So that could be --

20             MR. ANKER:  And, Your Honor, I think that can be

21   fixed with a notice provision, adequate notice.  I will say,

22   Your Honor, there's a lot of law on whether findings in a

23   contested matter are in fact res judicata for purposes of a

24   future adversary.  That's an issue we can brief with you

25   later.

1          But I will say, Your Honor, let me go back to this

2     provision for a moment.  Why can't we have the language that

3     was there when the plan went out that the creditors wrote it

4     on?  This is a last second change.

5          THE COURT:  But it's not a last second change.

6     You all have been able to blackline the proposed order, for

7     example.  I mean, you -- as you said, you and Ms. Grim and

8     Mr. Singer have been living these issues in multiple cases.

9     You know the caselaw.  You know the issues.  This is not

10    really a surprise here.  And if you just have that language,

11    then you have the potential for the coverage exclusions.

12    And I don't think that's right given the record as far as

13    the transfer.

14          And I think, although I will double check the

15    caselaw with regard to the pay first and consent points --

16          MR. ANKER:  Your Honor, this is not a pay -- I

17    want to make sure we're drawing issues --

18          THE COURT:  I understand.  But that's why I don't

19    think it really matters.  And, frankly, I don't think the

20    consent really matters, either.  I mean, to me, if the

21    claims are being settled, they will only be settled in this

22    context.  They will be settled for a lot worse in some other

23    context.  So what -- the deletion of this language would

24    mean that the insurers could go -- could raise this whole

25    issue, that we've had six days of trial and two days of oral

1    argument on as to whether the settlement is proper or not

2    all over again.  That just doesn't make sense.

3              MR. ANKER:  Your Honor --

4              THE COURT:  And I think the underlying principle

5    is right, that in bankruptcy it's a collective proceeding.

6    The insurers' rights are to object on the context of the

7    collective proceeding.  And if they really believed that

8    these settlements were on their backs properly or

9    improperly, they would have objected.  They would have

10   raised their voice.  And they've just not.

11             MR. ANKER:  So, Your Honor --

12             THE COURT:  I mean, their issues are much more

13   narrow, primarily.  They're basically saying we didn't cover

14   this sort of stuff.  And the settlement doesn't say they

15   did.  This is not a -- this is very different from a case

16   where they're asking for a finding that there's X degree of

17   insurance coverage that actually applies to these claims.

18   They're not seeking that relief.  They just want to prevent

19   settlements that if I approve them, I will find are

20   reasonable on notice to the insurers, the insurers coming

21   back and saying no, we have to relitigate that whole thing.

22   And to me that just is not right.

23             MR. ANKER:  I understand Your Honor's position.

24   Do I understand correctly that either we'll have the words

25   "viewed collectively" added or at as clear to Your Honor

1    that this is not specific to -- is not a finding with

2    respect to Rhodes --

3              THE COURT:  It's to all the debtors.  It says

4    debtors, plural.

5              MR. ANKER:  That's correct.

6              THE COURT:  We're not allocating, you know, X to

7    one debtor and Y to another.  But at the same time, I don't

8    -- I think that the language that insurers have proposed be

9    stricken really should stay, because it's -- I think under

10   these circumstances, isn't a settlement that is being

11   proposed to be funded primarily by the insurers.  In fact,

12   the evidence suggests -- Mr. Huebner's presentation today

13   was exclusive of insurance.  So that was on top.  And so I

14   think all things considered, I understand why the insurers

15   haven't objected, because to them it's -- it actually

16   ensures that, frankly, as much money as possible goes out to

17   reduce their potential liability.

18             MR. ANKER:  Your Honor, so I take it you believe

19   the language should remain in Paragraph JJA.  Does Your

20   Honor have any questions about any of the other provisions

21   that are --

22             THE COURT:  Well, I don't really agree with them.

23   I just think, again, I think there should be a reference to

24   the withdrawal of the objections.  That's fine.  I think

25   that's an important aspect of the record.  And that may well

1    help you in your concern about precedent, although I don't

2    think what we're dealing with here involves insurance of

3    non-debtors being used to pay debtor obligations.  But I

4    think the objection should be noted and the withdrawal of

5    objections and the lack of objections by any others.

6               MR. ANKER:  Thank you, Your Honor.

7               THE COURT:  Okay.  Okay.  And as far as the

8    language in the plan itself, I mean, I think I've been

9    clear.  If the Debtors or the MDT try to alter the insurers'

10   rights other than as set forth in the findings of fact or in

11   the confirmation order itself or in the plan documents that

12   you have, without due notice, you just can't -- that's not

13   operative.  That can't be operative.

14              MR. ANKER:  Thank you, Your Honor.

15              THE COURT:  I don't know how you word that.  I

16   imagine you'll probably come up with some language to cover

17   that.  But it's basically a fundamental principle.  So even

18   if you can't in the next day or so come up with that

19   language, I think the record is clear that, you know, you

20   can't have super-secret probation.

21              MR. ANKER:  Thank you, Your Honor.

22              THE COURT:  Okay.  Okay.  Thank all three of you.

23   I do, that is.

24              MS. GRIM:  Your Honor, may I have the opportunity

25   to address a few of Mr. Anker's points?

Page 201

1          THE COURT:  Sure.  I'm sorry.  Go ahead.

2          MS. GRIM:  On Mr. Anker's point as to why are we

3     here, I just want to reiterate I think we've made it pretty

4     clear that we're here because the insurers have made it

5     clear that they seek to negate coverage solely based on the

6     plan.  And even if Mr. Anker agrees not to object to any

7     aspect of the plan, that we need these findings to preserve

8     the value of the MDT insurance rights.

9          Mr. Anker is correct and we agree, the recovery of

10    proceeds is not a predicate to confirmation, but transfer of

11    the insurance rights is a predicate.  And the MDT's ability

12    to access those rights without having the transfer itself or

13    any other aspects of the plan vitiates coverage is also a

14    predicate.  And 1123(a)(5) preempts any policy provisions

15    that may impede the Debtor's ability to implement this plan.

16          I also need to address Mr. Anker's suggestion that

17    our firm, Gilbert, is seeking confirmation findings solely

18    for precedent in other cases.  Because, frankly --

19          THE COURT:  Well, it wouldn't work anyways.  So

20    that's fine.

21          But I just want to -- again, can I go back to

22    something?  I am not aware of any other provision of the

23    plan that -- other than what we've been talking about today,

24    that affects the insurers' rights.  Is there any?  I'm not

25    aware of any.

Page 202

```
 1              MS. GRIM:  No, Your Honor.  And I know certain
 2    insurers raised some concerns regarding -- I believe it was
 3    the definition of the MDT insurance rights or the schedule
 4    that listed certain policies that fall within that
 5    definition.  We want to make clear the plan is not
 6    presupposing that those policies provide coverage for the
 7    opioid liabilities.  You know, if any of these provisions
 8    give Mr. Anker heartburn, I think he's had a number of weeks
 9    now to raise them.  We have addressed other concerns by
10    other objecting insurers to clarify language, that we're not
11    trying to do that.
12              So I think what you see is what you get here.  We
13    are seeking the findings that we are seeking.
14              THE COURT:  All right.
15              MS. GRIM:  And that's it.
16              THE COURT:  Okay.  All right.  Thank you.
17              MS. GRIM:  I do think it's important, if I could
18    just have two minutes to address his due process arguments.
19    And I don't want to drag this out, but I do think it's
20    important to correct the record on this.  We've had numerous
21    conversations about the scope and intent of this provision,
22    starting back on May 9th.  The Ad Hoc Committee and the
23    Debtors made clear from the get-go even with the old
24    language that the intent was to preserve the same rights and
25    obligations the insurers and debtors had under the policies
```

1    prepetition, but not to permit the insurers to limit or

2    escape their coverage obligations based on any aspects of

3    the plan for the Chapter 11 process.  The insurers expressed

4    a contrary view, and that's why revised the provision to

5    begin with.  So I think it's a little bit of a stretch to

6    say that they were taken off guard.  But even if they were -

7    - and I'm not going to beat a dead horse on this because I

8    think Your Honor made the point effectively -- what exactly

9    have the insurers been deprived of?  They've had the

10   opportunity to object to the plan, to the confirmation

11   order.  We are here right now.  They had the opportunity

12   cross-examine witnesses during trial last week.  And so any

13   due process confers here being unfounded.  And in fact, I

14   believe we provided these confirmation order findings back

15   on August 11th, which might have been before the Court even

16   had them, although Debtor counsel can correct me on that.

17   So, again, I just need to correct the record on that point.

18          Again, if Your Honor has any specific questions on

19   the particular findings that were not already addressed, I'm

20   happy to address those.  But otherwise, I'll --

21          THE COURT:  I don't think I do.  I think you've

22   gone through them.

23          MR. ANKER:  Your Honor, this is Mr. Anker.  I'm

24   not going to reargue anything.  I will say I assume that --

25   I note Your Honor is talking about working on language in

1   the next two days.  I think we heard you loud and clear

2   about the notice points and other points.  I assume and will

3   request that the Debtors furnish us with a copy of any

4   revised confirmation order and plan documents so we can see

5   them.  And not formally settling the order, but so that we

6   can see them and give our comments.

7              THE COURT:  Absolutely.  That's fine.

8              MR. ANKER:  Thank you, Your Honor.

9              THE COURT:  But again, as far as these proposed

10  findings are concerned, except for the references to the

11  withdrawal of the objection and there being no other

12  objections and just the record being clear, the Debtors

13  means Debtors, plural.  I am actually comfortable with the

14  language as proposed by the Debtors here.  And that includes

15  the release point, which is really tied into the settlement

16  point which we discussed for a while.

17             MR. ANKER:  Thank you, Your Honor.

18             THE COURT:  Okay.  All right.

19             The next thing for oral argument is time that I

20  asked be reserved for the people who filed pro se objections

21  to the plan, i.e. people who were not represented by lawyers

22  who filed a timely objection to the plan.  And I think two

23  of those people have, as I understand from my clerks, either

24  signed up for the Zoom for Government feed to address their

25  objection or at least been given the information to do that

1    because of an earlier request to speak.

2            So the Debtors at this point don't have anyone to

3    speak first.  I think they reserve their rights to respond.

4    But I am happy to hear from the individuals who did want to

5    speak who filed a timely objection.

6            And I have down on my list Ms. McGaha.  I hope I

7    am pronouncing that right.  I see you there.  And you can go

8    ahead, ma'am.  I want to assure you and the other pro se

9    objectors, even if they've not signed up to speak, that I

10   have reviewed each of the plan objections.  And actually,

11   there were some statements by claimant that were not

12   expressly couched as an objection, but they were riled

13   around the time before the -- around and before the deadline

14   for objecting to the plan.  And I think actually Ms.

15   McGaha's filing was one of those.  But I was treating it as

16   a plan objection.  So I am happy to hear from you, ma'am.

17           MS. MCGAHA:  Thank you, Your Honor.  Before I --

18   my name is Carrie McGaha.

19           THE COURT:  McGaha, okay.

20           MS. MCGAHA:  McGaha.

21           THE COURT:  Thank you.  Okay.

22           MS. MCGAHA:  You are not alone in mis pronouncing.

23   Before I begin, I would like to ask a couple questions, if I

24   may.

25           THE COURT:  Okay.

```
 1            MS. MCGAHA:  I was confused on the voting.  I've
 2    heard you all talk about it.  And I was kind of under the --
 3    it sounded to me -- now, I'm not a lawyer.  I don't know if
 4    this is all like -- plus, I have a damaged mind from all the
 5    opiates I took, and I process information kind of like sand
 6    through a colander.  And so -- but when I was reading the
 7    voting and the ballot, it seemed like if I voted no, I was
 8    kind of relinquishing some of my claim amount.  Like I was
 9    almost ready to vote yes just to --
10            THE COURT:  No.
11            MS. MCGAHA:  And so I don't know if anyone else
12    had that understanding, but --
13            THE COURT:  No one has raised that point.  And I
14    think the ballot materials were clear.  The vote was just a
15    vote on the plan.  It had nothing to do with whether your
16    claim would be allowed or not.
17            MS. MCGAHA:  Okay, thank you.  Also, my broad
18    understanding of this plan is that the new company will be
19    able to -- is going to continue the sale of OxyContin and
20    partial opiates, opiate antagonists, and other drugs in
21    order to fund abatement.  Is that an improper understanding?
22            THE COURT:  Well, it depends what you mean by the
23    word continue.  It will be under a very strict set of
24    operating guidelines in the form of an injunction.  It will
25    have, as it has had during the whole course of this case, a
```

Page 207

1    monitor.  The first monitor I think is now the Health and

2    Human Services Secretary.  People of statute.  It will have

3    governance by representatives of, you know, the Claimants.

4           So your answer is -- again, depends on how you

5    define the word continuing.  I think it's quite clear -- and

6    the Debtors already have represented and the monitors have I

7    think made this clear -- that whatever marketing practices

8    that Purdue had that have been alleged to have flooded the

9    country with opioids, of just its opioids, will not -- has

10   not and will not be occurring, that the salesforce doesn't

11   exist.  There is no salesforce.

12          So if you've been listening to the trial over the

13   last week or so, there is a balance for a regulated company

14   like this that sells products that are inherently dangerous

15   where nevertheless the regulators contend that they agree

16   that they are not prohibited and can be used for proper

17   purposes.

18          So it's not going to stop selling opioids, but it

19   will not be selling them in a way that existed at least

20   through the period that it was marketing them with the

21   salesforce and trying to drive up prescriptions, et cetera.

22          MS. MCGAHA:  Okay.  Thank you.  I appreciate the

23   previous speakers and yourself for giving me an intro into

24   what I feel like I need to say.  I don't have a script

25   written here.  I'm just going to try to pray that the whole

```
 1    experience speaks for me and anoints my words.  Because this

 2    is all very confusing.

 3              But who am I?  I am someone who has had --

 4    apparently I am the only on this list that's willing to

 5    speak to you today who has been through this.  But I feel

 6    like I have relevant life experience with this.  Because I

 7    did work around, as I have indicated in my submissions,

 8    drugs, you know, a lifetime ago.  And I've never been in

 9    trouble with the law.  I never did anything, you know,

10    illegal and all that kind of stuff while I was working.  But

11    way back in the eighties, you know, somehow people didn't

12    need long-acting opiates to get their relief from pain.  And

13    when the Oxycontin was introduced by Purdue onto the market

14    and then pushed out by the doctors -- who I also hold highly

15    responsible, because one can't function without the other.

16    That having taken these drugs for over 15 years and

17    survived, those long-acting opiates act completely different

18    than short-acting opiates.

19              And I know that there's a lot of testimony

20    concerning the diversion, that that's why they formulated

21    OxyContin the way they did, to prevent diversion, and it's

22    not 100 percent -- or however they adulterate it or

23    whatever.  I don't know.

24              I don't have a lot of experience with the illegal,

25    incarcerated, all that kind of stuff, but having taken those
```

Page 209

1    drugs, when you're taking those long-acting drugs for

2    chronic pain -- and I'm not talking about acute pain -- I

3    think that these drugs are miracles to help people with

4    acute pain.  But these long-acting drugs, they take away

5    your individual ability to kind of manage your own pain.

6            You know, used to it was as-needed for pain.  Once

7    you get over that, you know, three to -- three days to 10

8    days of post-op or whatever the injury, or whatever it is,

9    and you kind of start to heal.  You know, you should be

10   decreasing the usage, and your pain should lessen.

11           And what they did to me was they just kind of --

12   and then they -- the doctors still give you the breakthrough

13   pain pills, and so either way you're getting a long acting

14   drug that's supposed to prevent you from abusing it, but

15   then they still give you the short-acting drugs to help with

16   the breakthrough pain because every time you take them and

17   if you're on a constant level, your tolerance is constantly

18   building up, and so you're just always building up this

19   tolerance to the drug, and your tolerance to the pain goes

20   way, way down.

21           And so it's a vicious snowball of psychic hell

22   that happens on these drugs.  And as a patient who still

23   suffers from chronic pain, but the Lord really helped me in

24   dealing with it, the -- see, this is the sand going through

25   the colander.  I just lost my thought, but I do have a few

1    notes here.

2            It's the risk of reinjury.  That's what I was

3    going to say.  When you're taking those drugs just constant

4    long term, especially for chronic pain that you really need

5    to address in non-pharmaceutical ways if possible, which I

6    think the introduction of these drugs pushed like they were

7    onto the market prevented a lot of development of the

8    alternatives that, you know, could've been really developed

9    over the past 20 years rather than just relying on all these

10   opiates and then, you know, we're in the situation that

11   we're in.

12           But when you take opiates for pain and injury,

13   like I have a really bad back, and so it does take away that

14   (indiscernible) of the pain, and so you think you can do

15   stuff that you really shouldn't do it.  You know, you are

16   feeling less pain.  It's really not that -- I never felt no

17   pain unless I was unconscious, but your pain is -- whatever

18   happens to you, you do -- you do more than you really should

19   do.  You don't allow yourself to heal so that you -- and you

20   know, eventually heal fully, and I'm going on and on.

21           THE COURT:  No, no.  I think I understand your

22   point.

23           MS. MCGAHA:  Okay.  I'm sorry.  I'm going to try

24   to keep this short because I don't want to cost anyone --

25           THE COURT:  That's fine.

1          MS. MCGAHA:  -- any more money than necessary.

2     You guys get paid beaucoups of money, so I don't want to

3     take away from --

4          THE COURT:  Well, I don't get paid by the hour, so

5     you can go ahead.

6          MS. MCGAHA:  Okay.  I think it delays healing,

7     anyway, the OxyContin especially.

8          I feel like the way that that was approved by the

9     FDA and all of the experts that have -- not all but a lot of

10    experts that approved these -- that regulate and approve

11    these decisions, I -- I mean, I just really kind of -- I

12    don't understand it because OxyContin -- no one should

13    really need constant opiate of OxyContin if they're still

14    going to get the short-acting drugs.  I mean, it just

15    doesn't make sense to me.

16         But I think I tried to make that point in my

17    submission also, that there's a symbiotic relationship

18    between the healthcare system and the pharmaceutical

19    industry.  And it's like hand in glove, and the -- all these

20    people out here would not have been prescribed these drugs

21    if the doctors hadn't have been, you know, benefiting

22    somehow.

23         And that, I feel like, is kind of a missing link

24    or whatever in this plan is that it -- I know this is a

25    pharmaceutical bankruptcy and all this kind of stuff, and I

```
 1    just hope that whoever, you know, the state leaders or

 2    whoever gets to introduce the solutions or decide how the

 3    money's spent in each state remembers that people out here

 4    like myself in, you know, Podunk USA where you have to drive

 5    an hour just to get, you know, anywhere, and if you want to

 6    go to a good -- a really good doctor, you're going to drive

 7    three hours.

 8            And so a lot of the solutions that I've outlined

 9    in my submissions are alternatives that I personally have

10    been trying to use some of them on my own, but if they'd

11    have been more available, you know, years ago, if this had

12    not been offered as a solution, I would not have gone out on

13    the street and looked for illegal drugs to ease my pain.

14            I would've had to -- I mean, I was the type of

15    person -- I would've done what I -- you know, what the

16    doctor recommended, and I relied on those doctors to put my

17    best interests at heart and to, you know, follow their

18    Hippocratic Oath and not just get the country addicted to

19    opiates like that's the only solution.

20            I mean, you've got these task forces who know all

21    of this.  All these doctors, they know this.  But down here

22    in these -- you know, out here in no man's land, it's a

23    different world, and the way that they're doing the funding

24    of the abatement programs, you know, and a lot of this, it

25    is based on population and the MMEs.
```

Page 213

```
 1              And I fear that there's just going to be these

 2      huge bureaucracies of these agencies who are going to -- you

 3      know, it's all going to funnel through.  And by the time it

 4      gets down on the ground to the people that really need it,

 5      there's not going to be very much left, and I know there's

 6      all sorts of formulas that they go by and everything, and

 7      that's kind of necessary.  But from where I'm standing,

 8      that's just what I see, and that's what happens in rural

 9      areas.

10              The drug-induced decline that we experienced over

11      the years, you know, people leave.  And they go to nice

12      areas, the big city where, you know, those places, their

13      population grows, and they get more money, and people leave

14      here because, you know, less money.  And so it's just kind

15      of -- the problem gets bigger, and it's all because of the

16      drugs.  And --

17              THE COURT:  Okay.

18              MS. MCGAHA:  I just wanted to say also that on the

19      unit dose thing, I tried to describe how that would've

20      helped me, and I feel like if they're going to continue to

21      sell especially OxyContin -- but I feel like all narcotics

22      should be in like a card.

23              I don't know if you're familiar with Accutane, but

24      it's a drug, and it's sold on a card so the you can see,

25      okay, I took that.  You don't want to overdo it.  You know,
```

Page 214

1    or birth control pills.  You can see when you took it and,

2    you know, how many you took.

3           And that was one of my problems because for a long

4    time, I was on fentanyl patches.  I had 100 microgram

5    fentanyl patch every 48 hours, and I was taking 120 Dilaudid

6    a month along with it, and it went on for years.  And it was

7    either fentanyl or OxyContin along with the Dilaudid or

8    other drugs.

9           And so the doctors that prescribe these and the

10   doctors that are in the Sackler family and executives with

11   the pharmaceutical company, you know, they're uniquely

12   trained and credentialed to know the pharmacology and the

13   human anatomy and how all this kind of interacts.  And you

14   know, they should've known the history of opium in this

15   country and, you know, for hundreds of years, the addiction

16   that can happen from it.

17          But the side effects, you know, you get memory

18   loss and confusion, and then you combine that with Valium or

19   whatever, and it's just even worse.  And so I can just

20   remember, I mean, you're looking down the barrel of a bottle

21   of pills, and you can't tell how many are in there, and

22   you're in pain.  You're suffering and you're vulnerable, and

23   you know, we're depending on the doctor to not give us

24   something that really is going to harm us.

25          But when you're in that situation, and I was the

1    only one that could manage my drugs.  I was like the

2    healthcare drug expert in my family.  And you know, I didn't

3    do a very good job.  There was never a time that I ever

4    diverted my drugs or mis -- abused my drugs or did anything

5    like that, but there were times that I made my mistakes, and

6    one of those times caused me to almost die, and my children

7    found me.  And you know, they were traumatized by that, and

8    you know, they probably should've filed a claim for all of

9    the trauma that they went through, but that's beside the

10   point.

11           But the diversion that the Sacklers talk about

12   when they testified, like that's the biggest problem, which

13   I get that that is a big problem in this country.  In fact,

14   before I even filed this claim, I had written letters to my

15   governor, and the attorney general, and my local sheriff

16   kind of similar to the things that I've written in my

17   submissions because I felt like the -- that's what I felt

18   like God was trying to tell me what to do.

19           But they kept talking about diversion.  In this

20   case, you're only going to get paid money as a personal

21   injury person if you have proof, you know, medical records

22   and pharmacy records that you actually took these drugs,

23   from my understanding of it.

24           And so -- but it seems like all of these abatement

25   programs and a lot of the talk that the Sacklers had was all

1    about diversion, and they kept mentioning, you know, heroin

2    was on the rise anyway, and kind of like it was inevitable

3    that opiates were going to be a crisis, and if they knew

4    heroin was already on the rise, why they thought introducing

5    OxyContin and pushing all these drugs out onto the market

6    would be a great solution, I don't know.

7              I think that's negligence, and I think not putting

8    those drugs, knowing the side effects of those drugs on the

9    patients taking them and expecting those people to manage

10   the consumption of those drugs -- when you go in the

11   hospital, you know, the nurses chart every pill.  They count

12   every pill.  They keep up with every pill like it's some

13   kind of piece of gold or something.  But if you're a

14   patient, you're supposed to manage all this on your own

15   while you're suffering, and suffering the side effects?  It

16   just seems like negligence to me.

17             And the quantities were just outrageous.  And I've

18   had multiple surgeries over my lifetime, and I do know what

19   -- the quantities and how drugs were prescribed in the '80s,

20   and somehow people managed to recover from surgery, and

21   recovery from injury, and recover from all sorts of things

22   without being -- having it necessary to be put on long-

23   acting opiates.  And that's my biggest concern --

24             THE COURT:  Right.

25             MS. MCGAHA:  -- is (indiscernible).

Page 217

```
 1              THE COURT:  I hate to do this, Ms. McGaha, but I
 2     think -- I read your objection.  I think we're now circling
 3     back to things we've already discussed, and --
 4              MS. MCGAHA:  Okay.
 5              THE COURT:  -- you discussed them quite clearly,
 6     so I'm going to --
 7              MS. MCGAHA:  Okay.
 8              THE COURT:  -- thank you.
 9              I want to make two observations.  First, the
10     abatement programs under this plan are not locked in stone,
11     except for the fact that the money has to be used for
12     abatement, so my hope is -- and I believe this is the hope
13     of the states, and local governments, and hospitals that had
14     a hand in putting together these abatement and treatment
15     programs is that people learn as they go along, and part of
16     the learning is going to come from the reports that have to
17     be filed in this case as to effectiveness of treatment and
18     the effectiveness of the abatement programs, how to do this
19     best.
20              And I think -- it is clear to me at least that
21     this -- that that task is a complicated one, but it includes
22     the ability of people like yourself, people who run
23     community groups, who run associations of both people who
24     themselves have suffered from opioid use disorder and their
25     relatives to have input, to speak to their councilmen, their
```

1      mayor, their governor, and the local health authorities, to

2      give them their input.  And I think that's important,

3      obviously.

4             So this is not -- you know, I think this money is

5      to come in over a substantial amount of time, and it is not

6      going to -- if I confirm the plan -- always going to be a

7      2021 abatement program.  We'll learn from it, and so your

8      observations are important there.

9             MS. MCGAHA:  Thank you, Your Honor.  I appreciate

10     the opportunity to voice my concerns and speak to the Court,

11     and I really appreciate all your time and effort.

12            THE COURT:  Okay.  Thank you.

13            All right.  I don't know if -- I just have on my

14     list Ms. McGaha, but I don't know if anyone else who filed a

15     timely objection as a pro se wants to speak.  Otherwise, I

16     guess I'll hear from the Debtor's counsel.

17            Okay.  Oh, I think there is one other person.  Ms.

18     Eck?

19            MS. ECKE:  Yes.  Judge Drain, please, please

20     forgive the unmuting, the untimely unmuting of my computer.

21            THE COURT:  Oh, that was -- that's --

22            MS. ECKE:  And the --

23            THE COURT:  That's fine, ma'am.  That was for like

24     one tenth of a second, and I'm sure Mr. Singer has

25     experienced much worse over the pandemic on various Zoom

1    calls that he was on, including probably dogs and children

2    and all sorts of things, so don't worry about that.

3              MS. ECKE:  Thank you.  Anyway, I'm going to --

4              THE COURT:  And Ms. Eck, I don't know if you want

5    -- if you want to be on the screen.  You don't have to be,

6    but I'm not able to see you.  If you don't want to be on the

7    screen, that's fine.

8              MS. ECKE:  It's okay.  I just don't know how to do

9    it.

10             THE COURT:  Oh, okay.

11             MS. ECKE:  Any way.

12             THE COURT:  The person who's running this in the

13   courtroom -- my tech person says your camera is actually

14   covered by something.

15             MS. ECKE:  Oh.  Oh, oh, oh.  I got it.  That's

16   still not -- that's the lights above.

17             THE COURT:  Yeah.  It has to be pointed --

18             MS. ECKE:  It's not helping.

19             THE COURT:  Anyway, it's all right.

20             MS. ECKE:  Okay.  Anyway, my objection to the

21   restructuring of Purdue Pharma LP et al, case number 19-

22   23649.

23             Dear Judge Drain, I began researching OxyContin,

24   and its generative derivatives as my son prescribe -- my

25   son's doctor prescribed this to him at an early age.  After

Page 220

1   my dearest firstborn died December 17th, 2015, nine days

2   after my birthday on December 8th, and nine days bore my

3   poor, deaf, Vietnam veteran's ex-husband's birthday on

4   December 26th in 2015, I was immediately awoken to learn

5   about this overprescribed drug.

6          At first when I started to -- trying to write a

7   motion for claim payment in early November of 2020, I

8   spilled out my heart to all the following individuals in

9   this instance.  This was an extreme, extreme tragedy, as

10  many of the attorneys, including Marshall Huebner of Davis

11  Polk & Wardwell; Layn Phillips of Corona Del Mar,

12  California; Kenneth Feinberg of Washington DC, and many

13  others, including Ryan Hampton, Blue Cross Blue Shield

14  Association, CVS Caremark Part D Services LLC; and Health

15  LLC; Cheryl Juaire, T -- L-S --LTS Lohmann Therapy Systems

16  Corporation, Pension Benefit Guaranty Corporation, Walter

17  Lee Salmons, Kara Trainor, West Boca Medical Center; the

18  official committee of unsecured creditors, care of Akin Gump

19  Strauss Hauer & Feld LLP; Bank of America Tower, One Bryant

20  Park, New York, New York 10036.

21          Attention Attorney Edan Lisovicz and Attorney Arik

22  Preis who are in my letter dated December 13th, 2020.  My

23  letter to Judge Drain July 30th, 2020 you can read in full

24  online.  Please also view my motion for claim payment dated

25  December 15th, 2020.

Page 221

1          Previously, I had begged the Attorney General of

2     Connecticut, George Jepsen, presiding attorney general for

3     Connecticut from 2011 to 2019 for help for the mothers of

4     Connecticut who had lost their children due to this crisis.

5     I had also contacted the Connecticut Department of Health

6     previously and received no help from anyone -- or from

7     anyone personally or for my group of bereaved mothers.

8          Gloria (indiscernible), head of Consumer Affairs

9     for Attorney George Jepsen of Connecticut who was in office

10    from 2011 to 2019 and Sandra Arenas, the new head of

11    Consumer Affairs for Attorney George -- Attorney General

12    William Tong of Connecticut from January 1st, 2019 had

13    already told me that the state only sues for the state, not

14    for the individuals.

15         At this point in my life, I feel in my opinion

16    that I have been used and abused by the state of

17    Connecticut.  I was born in the great country of America and

18    always thought that I would receive help if I asked for it.

19    I'm really hurt by everyone's indifference to my personal

20    tragedy and the personal tragedies of many others.

21         Attorney James I. McClammy of Davis, Polk &

22    Wardwell, the attorneys who are defending Purdue Pharma LP's

23    actions first contacted me via e-mail, later by Jacquelyn

24    Knudson of Davis Polk & Wardwell on December 3rd, 2020 via

25    telephone.  Then I called Attorney Knudson on December 7th,

Page 222

1    2020.  Attorney James I. McClammy wrote a letter dated

2    December 8th, 2020 and mail it to me December 9th, 2020

3    stating that I had talked to Attorney Knudson on December

4    7th, 2020.

5            My previous letter to you, Judge Drain, was dated

6    December 15th, 2020.  That was my motion for claim payment.

7    On February 24th, 2019, there was a segment on television of

8    60 Minutes entitled "Did the FDA Ignite the Opioid Epidemic?

9    A drug manufacturer Denounces his own industry and explains

10   to 60 minutes how a label change by the FDA expanded the use

11   of opioids" in which correspondent Bill Whitaker talks to Ed

12   Thompson, a Pennsylvania drug manufactures -- manufacturer

13   who tells about his lawsuit of the FDA at the beginning of

14   the OxyContin crisis.

15           60 Minutes had to petition the courts of West

16   Virginia to get the information to issue this segment of the

17   television program since according to 60 Minutes, the drug

18   manufacturers and the FDA were holding secret meetings about

19   the labeling of the drug.

20           Ed Thompson states that OxyContin was on the

21   market since 1990, and the FDA new how potent the drug was.

22   Ed Thompson explains how a high-dose long-duration opioid

23   kills people when there was no scientific evidence to

24   condone long-term use of opioids.  Ed Thompson had stopped

25   the high-potency, high-dose drugs that he manufactured in

Page 223

1    1962.

2            Therefore, in my opinion, I don't agree with the

3    declaration of Jonathan Greville White on page 4, Article 9,

4    which states "Beacon Trust, one of the general trusts is the

5    ultimate owner of the 50 percent limited partner Purdue

6    Pharma LP, Purdue, which holds for the benefit of Side A an

7    entity for the benefit of Raymond Sackler or Side B is the

8    ultimate owner of the blankie of the Purdue equity.

9            "Beacon Trust was settled in 1993 by Mortimer D.

10   Sackler, several years before OxyContin was launched.  I am

11   the director of Heathridge Trust Company Limited, which is a

12   trustee of the Beacon Trust Company Limited, which is a

13   trustee of the Beacon Trust.

14           "Since the death of Mortimer D. Sackler in 2019,

15   the Beacon Trust has been an irrevocable trust of the

16   benefit of Theresa Sackler, Dr. Mortimer D. Sackler's issue,

17   and various charitable beneficiaries.  The Beacon Trust

18   instrument provides that its trustee holds the Beacon Trust

19   funds in its discretion with prior written consent of the

20   special trustees to pay income and/or capital to or for the

21   benefit of one or more Dr. Mortimer D. Sackler's spouse,

22   defendants, and/or charitable foundations."

23           Later, Jonathan Greville White states, "Each of

24   these general trusts is an irrevocable discretionary trust.

25   Their beneficiaries are typically to the Sackler, and the

Page 224

1    issue of Dr. Mortimer D. Sackler.  One general trust confers

2    upon Theresa Sackler a life interest over the income that is

3    generated each year."

4           According to LexisNexis and the Bloomberg Law on

5    December 17th, 2019 at 6:09 p.m., Samantha Stokes wrote,

6    "Purdue Pharma has paid several big law firms for the legal

7    work on behalf of the Sackler family members, including

8    Debevoise, McDermott and Norton Rose, according to new

9    documents" and "Purdue Pharma, the embattled pharmaceutical

10   company at the center of the opioid crisis has paid more

11   than 17.5 million in legal fees on behalf of the Sackler

12   family to more than a dozen law firms, according to the new

13   documents filed in the company's bankruptcy. Debevoise &

14   Plimpton was paid the majority of the legal spend, more than

15   11.4 million for its legal work for the Sacklers from the

16   first half of 2018 through 2018 through early 2019 according

17   to an audit filed Monday in the U.S. Bankruptcy Court in the

18   Southern District of New York where the company is

19   undergoing Chapter 11 restructuring."

20          If the Sackler family used the money that they

21   spent on attorneys instead of for themselves -- instead of

22   themselves, all parties would be happier.

23          As far as my understanding from Arik Preis,

24   partner at Akin Gump who called me at 6:30 p.m. on July

25   30th, 2021 after I sent my original July 30th letter off and

Page 225

1    will object if I give you actual numbers for our

2    conversation dated Friday, July 30th, 2021, there are four

3    main sides of this restructuring equation, one consisting of

4    the official committee of unsecured creditors and all the

5    others in my previous letter dated December 13th, 2020;

6    another side consisting of a few brave pro se advocates and

7    me who are supposedly supposed to get virtually nothing; an

8    additional side of states with attorney generals,

9    municipalities, and an abundance of lawyers handling Chapter

10   11 in case number 19-234649, getting the majority of at

11   least three quarters of the funds, which may or may not help

12   injured victims directly from an 18-year trust.  And

13   finally, the fourth side consisting of the Sackler family

14   who is trying to use their ill-gotten fortune off the backs

15   of heartbroken people who lost their loved ones.

16            On July 19, 2021, Attorney William -- Attorney

17   General William Hong filed objections to, "Bankruptcy plan

18   with legal shields for the Sackler family."  Therefore, I'm

19   asking the Honorable Judge Drain for Rule number 3008-1,

20   reconsideration of claims.  We need to object to the

21   restructuring of Perdue Pharma and initiate an entirely new

22   vote for the mothers, fathers, brothers, sisters, and all

23   who are now living a life of heartache, depression, and

24   loneliness from this drug that had been evaluated years

25   earlier by the Perdue Corporation and hidden from the public

1    that highly addictive and shoved under the proverbial rug.

2              Are the Sacklers and their lawyers at Davis Polk

3    and Wardwell willing to clone my dear son or bring him back

4    to help me in my disabled old feeble age?  I don't think so.

5    thank you, Your Honor.

6              THE COURT:  All right.  And thank you, Ms. Ecke.

7    I will say just one point, and that is that it obviously

8    took a lot of courage to say what you've said in this

9    setting.  I some people will disagree with it, and I think

10   there are some points that just weren't right like Davis

11   Polk being the Sacklers' lawyers, which is not true.  But on

12   the other hand, what comes through very clearly is I think

13   the main point of your objection and your statement, which

14   is that this company's product or products caused tremendous

15   pain and harm.

16             And it is turning over all of its assets under

17   this plan in a way that the parties interested in the case

18   have determined best resolves that pain and harm knowing

19   full well that it never can resolve that pain and harm, and

20   that is something that will never be fully resolved or even

21   partially resolved.

22             THE COURT:  All right.  We had reserved time at

23   the end of this argument for miscellaneous matters,

24   including further discussion of the release language in the

25   plan.  I don't know whether there is a remaining argument on

Page 227

```
1     the DMP issues or not.

2            MR. GLEIT:  Your Honor, Jeff Gleit of Sullivan and

3     Worcester.  I have a -- just a brief statement that I'd like

4     to make in connection with it, and I'm available to answer

5     any questions you have.

6            THE COURT:  Okay.  That's fine.

7            MR. GLEIT:  Okay.  Thank you, Your Honor.  On

8     Monday morning, Ms. Duvani had stated that the Debtors, the

9     AHC, and the DMPs reached a settlement in connection with

10    substantially all of the DMPs objections.  The plan with one

11    narrow exception, that is the objection that the insured

12    injunction improperly deprived certain DMPs of their rights

13    as additional insureds under the DMVT insurance policies.

14    With regard to that objection, the DMPs have agreed to rest

15    on their papers, which can be found at docket 3306.

16            I'd like to make just one brief point, which is

17    not in my firm's reply brief but is addressed in Davis

18    Polk's brief, which is at docket number 3461 at paragraph

19    206.  As we've heard throughout this confirmation hearing,

20    the plan contains multiple settlements and transactions, all

21    of which must be approved for this plan to be consummated.

22    As I'm sure Your Honor's aware, the MVT insurance -- insurer

23    injunction is one of these essential and integrated

24    provisions.

25            The Debtor's insurance policies, the rights to
```

1    which are being transferred to the master disbursement

2    trust, provide a substantial source of value for the

3    abatement distributions and the distributions the personal

4    injury claimants contemplated to be made under the plan.

5    The MVT insured injunction is essential to preserving and

6    ultimately realizing the value.  It is integral to the plan,

7    and its applicability to the DMPs is necessary for this plan

8    to be consummated.

9            Absent questions from Your Honor, I will not

10   repeat the arguments which are fully set forth in the briefs

11   of my firm, Davis Polk's firm -- the Davis Polk firm, and

12   the AHC which are located at docket numbers 3506, 3461, and

13   3465 respectively.  I do want to, though, note to Your Honor

14   that there was a joint stipulation between the Debtors and

15   the DMPs which was filed at docket number 3612, which

16   contains excerpts from the relevant insurance provisions in

17   the parties' contracts, which the Court may find helpful.

18           So unless Your Honor has questions, I'm happy to

19   cede the Zoom podium.

20           THE COURT:  Okay.  That's fine.  Thank you.

21           Do the Debtors have any rebuttal, or are they

22   going to rest on their papers too?

23           MR. GLEIT:  I think you mean the DMPs.  I'm

24   (indiscernible) counsel.

25           THE COURT:  I'm sorry.  Excuse me.  The DMPs.

 1              WOMAN:  No, Your Honor.  We rest on our papers.

 2              THE COURT:  Okay.  Very well.  All right.  So I

 3      had a chance to review what I think are the changes that

 4      were included in the ninth amended plan that was the subject

 5      of discussion at the beginning of this oral argument this

 6      morning.  I'm assuming that other parties have too at this

 7      point.  I don't know if there are further changes in it, but

 8      I said I would give parties who were objecting to the

 9      breadth of the third party injunction release and the plan

10      an opportunity to comment on the revisions and as to whether

11      there was still, in light of those revisions, an issue as to

12      the breadth of the release.

13              And obviously this is without prejudice to

14      objectors' other arguments regarding the release, which I've

15      heard and will be considering.  This just goes to the

16      release language.  And I don't know if there's been further

17      discussion and agreement beyond what was submitted this

18      morning, so maybe I should ask that question first and then

19      I'll hear from objecting parties.  And I see the Debtor's

20      counsel on the screen, Mr. Vonnegut.  Have there been any

21      further changes from what was filed this morning or last

22      night?

23              MR. VONNEGUT:  Good afternoon, Your Honor.  For

24      the record, Eli Vonnegut of Davis Polk and Wardwell.  There

25      have been no further revisions to the drafting of the

1    releases.  However, we have had several conversations with

2    Mr. Edmunds of Maryland that I think have been helpful in

3    clarifying his understanding of how the releases function.

4    And so I'm happy to walk Your Honor and other parties

5    through those issues so that hopefully everybody else can

6    share that understanding, if that would be helpful.

7              THE COURT:  Okay.  All right.  That's fine.

8              MR. VONNEGUT:  Okay.  So a number of the questions

9    about the releases that we've gotten this week from Mr.

10   Edmunds I think are premised on some misunderstandings of

11   how they work, so I'd just like to clarify a couple of

12   foundational issues about what is in and what is out.

13             First, there have been a number of references to

14   conduct that is described as unlawful asking whether claims

15   arising from unlawful conduct would not be released.  That

16   one is very simple.  The very first provision of excluded

17   claims is criminal claims.  Criminal claims are not being

18   released, period, full stop.  What is a little bit harder

19   and what we have had extensive discussions with Mr. Edmunds

20   about is capacity limitations.

21             So a variety of parties that received revisions

22   under the plan only received those releases for claims

23   against them in their specified capacities.  So for

24   instance, with respect to related parties of the Debtor that

25   Mr. Edmunds raised, there were a couple of questions along

1    the lines of if some participant in the pharmaceutical

2    industry had a relationship with the Debtor, do they become

3    released for all claims against them, and the answer is no.

4    The only claims that are released that party are claims

5    against them in their capacity with which they were related

6    to the Debtor.

7            A similar limitation, which we've discussed before

8    but I think it bears emphasis because it's important, is

9    that parties are only released for claims that relate to the

10   Debtor.  So they have to be tied to the Debtor.  And again,

11   it's not the case that if you have one claim against you

12   released because it is related to the Debtor that other

13   claims become released.  You are only released in that

14   limited capacity.  So if a party had one relationship with

15   the Debtor and then independent conduct, claims arising from

16   the independent conduct is not released.

17           Now, the most important issue that we discussed

18   with Mr. Edmunds that I think is important to emphasize is a

19   revision that we made in response to Your Honor's commentary

20   on Monday's hearing regarding the settlement with the

21   distributors, manufacturers, and pharmacies, the DMPs.  So

22   we had some colloquy about whether those parties are

23   included in the third-party releases.  The answer is no, and

24   we've now made that very clear in Section 10.6B, which is

25   the third-party release provision as distinct from the

1    releases of claims held by the Debtors.

2            So we've now added to Section 10.6B a footnote

3    that says co-defendants are not released parties under

4    Section 10.6B of the plan.  This is important.  As we

5    discussed with Mr. Edmunds, we believe that this addresses a

6    lot of the concerns and the confusion that have been raised

7    regarding the scope of the releases here.  "Co-defendant" is

8    a very broad term.  It includes any party that is a

9    defendant in a pending opioid action commenced as of the

10   effective date.  It also includes any holder of a co-

11   defendant claim.  And a holder of a co-defendant claim is

12   effectively anybody who has asserted or might assert a claim

13   against the Debtors to attempt to recoup their own costs in

14   opioid-related litigation.

15           So if you zoom back out, effectively the term is

16   what it sounds like.  Co-defendants in the opioid litigation

17   are excluded wholly from the third-party releases.  And the

18   only exclusions to that are --

19           MAN:  (indiscernible)

20           THE COURT:  You can go ahead.

21           MR. VONNEGUT:  Excuse me.  The only exceptions to

22   that are current a informer, officers, directors, authorized

23   agents, and employees of the Debtors.  So I'm hopeful that

24   that helps, Your Honor.  I am cognizant that these are

25   complex, and we've been fielding many, many questions as

Page 233

1    quickly as we can.

2              THE COURT:  Okay.  All right.  Thank you.

3              MR. VONNEGUT:  Of course.

4              THE COURT:  I have some comments, but I'm happy to

5    hear from other parties first.  Maybe they have the same

6    comments.

7              MAN:  Your Honor, good afternoon, Your Honor.

8    Sorry, Brian.  Do you want to go first, or you want me to go

9    first?

10             MR. VONNEGUT:  Oh, one more point that I forgot to

11   clarify.  Mr. Edmunds also raised the question of whether

12   the releases might complicate efforts to obtain discovery in

13   unrelated litigation.  The answer is that they will not.  We

14   received a proposed addition to the plan from Mr. Edmunds

15   that we're working on, but recipients of releases are still

16   obligated to comply with subpoenas and other discovery.

17   We're not attempting to relieve them of that obligation.

18   And that will be made clear in the next amended plan.

19             THE COURT:  Okay.  I know you both spoke at the

20   same time and then neither of you spoke, so I'll just look

21   to Mr. Edmunds first.

22             MR. EDMUNDS:  Thank you, Your Honor.  I'll be

23   brief.  I think that we've had this -- Mr. Vonnegut and Mr.

24   Huebner and I in various, I guess, combinations have had

25   this discussion for quite some time.  The issue -- and I'm

1    not sure that Mr. Vonnegut's presentation exactly resolves

2    it as we agreed over the lunch hour that we took when Mr.

3    Huebner, Mr. Vonnegut and I were on the call to resolve it.

4              But let me just -- the issue narrowly that I have

5    been raising and on behalf of other objecting states have

6    been raising is that the -- is the same one that you went

7    over Monday, which is that the definition of related

8    parties, specifically Debtor-related parties who were

9    released under 10.6B is very broad.  And we -- the position,

10   our position, is that those releases are inappropriate if

11   they release people who independently, who are not closely

12   connected with the Debtors, those who have independently

13   engaged in conduct, including conduct that involves the

14   marking and sale of produced opioids.  There is -- so there

15   has been --

16             THE COURT:  Can I -- I'm sorry to interrupt just

17   for a second.  10.6D, is that the Debtor release or the

18   third-party release?

19             MR. EDMUNDS:  It's B, Your Honor, and it's the

20   Debtor release.  It's the --

21             MAN:  10.6B is third-party.  The Debtor release is

22   10.6A, Your Honor.

23             THE COURT:  All right.  So --

24             MR. EDMUNDS:  Right.

25             THE COURT:  -- I think it's important to keep the

1    -- so we're talking about the third-party release?

2              MR. EDMUNDS:  Yes, we're talking about the third-

3    party release --

4              THE COURT:  All right.

5              MR. EDMUNDS:  -- of the Debtor-related parties,

6    and I misunderstood your question.

7              THE COURT:  Right.  Okay.

8              MR. EDMUNDS:  The third-party release of claims

9    against Debtor-related parties --

10             THE COURT:  Right.

11             MR. EDMUNDS:  -- which is the issue here.  And

12   that could be very broad, and that's as literally

13   incorporated as it's broad.  There is a new footnote, and

14   this is a new understanding that I understood Mr. Huebner

15   was going to clarify this afternoon on the record, which is

16   that those actors, the related parties who, in their own

17   right, engaged in the same misconduct related to Purdue

18   should not be released and are released, they are arguably

19   partially incorporated in -- if you go through a string of

20   definitions, the definition of co-defendants.

21             And the definition of co-defendants then

22   incorporates the holders of co-defendant claims under which

23   you can make an argument that those who participated in

24   Perdue's opioid-related conduct are, in fact, released by

25   the footnote.

Page 236

```
 1            MAN:  One issue I just want to clarify, the

 2    footnote makes clear that co-defendants are not released.

 3    That is the purpose of the footnote.  It is not expanding in

 4    any way.

 5            MR. EDMUNDS:  I may have miss -- I may have

 6    omitted a "not", but I think that's sort of the reason that

 7    this is getting difficult.  We're going through multiple

 8    layers of --

 9            THE COURT:  Well, if the intent is that they don't

10    have that release, then the parties can make that clear.

11    And that's what I'm hearing, at least.

12            MR. EDMUNDS:  I think that we have agreed.  I

13    thought it was going to be made clearer on the record.  I

14    think that there is still an issue that needs to be that --

15    and Mr. Vonnegut and I have been discussing this by email

16    during the hearing this afternoon.  I think that there is

17    something -- some work that we still need to do, and I think

18    that we will be able to do that.

19            But I wanted to -- we may not be arguing before

20    the Court again on this issue, so I wanted to explain

21    overall what the issue is that we are trying to resolve, and

22    that is that wrongdoers shouldn't be released from state

23    police power claims when they've not contributed to the

24    plan.  And I think that we're -- there is an agreement in

25    principle as to that.  I think we need to make sure that the
```

Page 237

1    language is -- it incorporates that and is clear.  And clear

2    because I think we'll face interpretive questions over that

3    if it's not in implementing our police powers.  So --

4              THE COURT:  Well --

5              MR. EDMUNDS:  -- that's the concern, and I think

6    --

7              THE COURT:  All right.

8              MR. EDMUNDS:  -- we can work on that.

9              THE COURT:  I want to be clear, though.  I think

10   that I heard from Mr. Vonnegut that there was an agreement

11   generally on that point.  But on the other hand there are

12   certain causes of action that the Debtor has, such as, you

13   know, failed to supervise vicarious liability, veil-piercing

14   alter ego, things like that where a discharge of the Debtor,

15   if someone was acting just without wrongdoing, you know,

16   without their own knowledge of unlawful conduct, really

17   shouldn't be a back door to violate the bankruptcy discharge

18   or the injunction from those who were contributing.

19              So that's where I draw the line.  And it really

20   should go truly to their own independent wrongful conduct,

21   not conduct as, you know, an employee of the Debtor, just as

22   an employee of the Debtor.  And this is similar to the

23   language in Section 524(g)(4), you know, which provides for

24   an injunction of claims related to the Debtor based on the

25   third-party's involvement in the management of the Debtor or

1    predecessor to the Debtor, or services as an officer or

2    director or employee.

3             So those types of claims really shouldn't -- I

4    view -- and there is going to be some line-drawing here that

5    you can't do -- inevitably, there might be someone who gets

6    sued where you're not sure until you actually look at the

7    facts carefully, which is why I think they have the

8    provision to come back here.  And I've done this once in

9    another case, and I found that the injunction actually

10   applied in one situation but not in another, and that may

11   well happen.  But I think if there is separate independent

12   wrongdoing that's short of being illegal, a crime, which no

13   one is protected from by a co-defendant, we do carve it out.

14            And that would cover any -- you know, any third-

15   party like, I don't know, some pharmacy chain that Perdue

16   dealt with.  But if you're talking about officers,

17   directors, employees, you know, the case law is pretty clear

18   that you can't, through the back door, go after them just

19   because they worked for a company that you would have a

20   claim against.  So I hope that provides some guidance to you

21   all.

22            MR. EDMUNDS:  It does, Your Honor, and that's not

23   the issue.  The issue is to take, for example, the seven, I

24   think, entities identified on the -- actually, entities or

25   individuals identified on the excluded party list, or at

Page 239

1    least the corporate ones that are there.  Those are actors

2    who engaged in Perdue's marketing, but they're not

3    employees.  They're not close to the company.  They're not

4    of the kind that you're mentioning.

5            And the idea is just to make sure that these

6    releases do not categorically apply to what Mr. Uzzi

7    referred to this morning as, you know, the undiscovered

8    McKenzie.

9            THE COURT:  Right.  If -- obviously, if they have

10   engaged in their own separate wrongdoing, and I think the

11   Debtors -- I think if I heard Mr. Vonnegut correctly, the

12   Debtors agree with you on that.  It's just a matter of

13   making the language clear.

14           MR. EDMUNDS:  Right.  I think that's the case.

15           MR. VONNEGUT:  That's correct, Your Honor.

16           THE COURT:  Okay.

17           MR. VONNEGUT:  Unsurprisingly, we think you've got

18   it exactly right.  The independent conduct is not released.

19   Co-defendants, period, full stop, do not get third-party

20   releases.

21           THE COURT:  Okay.  All right.  Okay.  Should I

22   have Mr. --

23           MR. EDMUNDS:  Thank you, Your Honor.

24           THE COURT:  Should I have Mr. Fogelman then?

25           MR. FOGELMAN:  Thank you, Your Honor.  Good

1    afternoon.  This is Larry Fogelman on behalf of the United

2    States.  Your Honor, as you said while preserving all of our

3    arguments set forth in our statement, the changes made

4    overnight do not address the very issues the Court has

5    raised throughout this hearing concerning the extraordinary

6    overbreadth of the non-Debtor releases, including Your

7    Honor's admonition that the non-Debtor releases should not

8    include fraud concern non-opioid products.  Let me explain.

9          First, the release in Section 10.7B still covers

10   everything related to the Debtors, et al.  The key language

11   has not changed.  The release includes all causes of action

12   based on or relating to the Debtors, to the estates, or the

13   Chapter 11 cases.  That covers literally everything.  Now,

14   there is a carve-out to the extent that such of action "is

15   based on such shareholder release parties actual and

16   separate non-opioid actual misconduct".

17         But the definition of non-opioid actual misconduct

18   is too narrow and does not clearly permit (indiscernible)

19   concerning the other pharmaceutical products that the

20   Debtors manufactured, including (indiscernible), as well as

21   any other liabilities that could arise from owning and

22   operating a pharmaceutical company, including police and

23   regulatory claims.  These could relate to state consumer

24   protection statutes, state public nuisance laws, state

25   environmental liabilities, state workplace safety laws,

Page 241

1   state employment laws, state civil fraud claims, state fraud

2   and contracting, any state ADA laws, state labor laws just

3   to name a few examples.

4              THE COURT:  So, could I interrupt?

5              MR. FOGELMAN:  Specifically, Your Honor -- yeah.

6              THE COURT:  Could I interrupt you?  I had the same

7   reaction, I have to confess, when I read the definition of

8   non-opioid actual misconduct.  I had two reactions.  The

9   first was I -- it seemed in clause 1 to take away what it

10  gave at the beginning of clause 1.  It says an action taken

11  or not taken --

12             MR. FOGELMAN:  I --

13             THE COURT:  -- deliberately or recklessly in bad

14  faith, and with actual knowledge.  So reckless is not with

15  actual knowledge, but so --

16             MR. FOGELMAN:  That --

17             THE COURT:  -- so it seems to take away language

18  that arguably is there, but that I think it takes away.  But

19  more importantly, I have this point.  And again, I am

20  distinguishing between releases --

21             MAN:  (indiscernible)

22             THE COURT:  -- that a debtor can give and is

23  giving here based on the Debtor's own analysis --

24             MAN:  (indiscernible)

25             THE COURT:  -- and I think everyone else's

Page 242

```
1    analysis, as to the types of things that are listed in the

2    language at the bottom of the next definition.  Veil-

3    piercing alter ego, agency vicarious liability, constructive

4    notice, controlled personal liability, failure to supervise,

5    or otherwise, with the exception of maybe of controlled

6    personal liability.  Those are all things that a debtor can

7    release.  Those are all -- there's no contention here that

8    any individual, as to these non-opioid matters, has taken

9    any action that would give rise to anything like this, and

10   it's the Debtor's claim in the first place.

11            So I can see why one would want to make it clear

12   in the Debtor release that this covers this type of conduct,

13   and I don't have a problem with a strike-suit mechanism that

14   has people -- if there's any doubt as to which side of the

15   line it would fall on, bringing their suit here first.  But

16   I just -- I don't -- by definition, then, what we're talking

17   about are not debtor claims, but third-parties claims.  I

18   just -- I'm not -- I don't see why we are covering them in a

19   release for non-opioid conduct.  I just don't -- why?

20   There's no money being paid for that.

21            MS. MONAGHAN:  Your Honor --

22            MR. FOGELMAN:  Your Honor, I see both Ms. Monaghan

23   and Mr. Uzzi looking like --

24            THE COURT:  Right.

25            MR. FOGELMAN:  -- they're ready to address that, so
```

Page 243

```
 1    I'll let them.

 2                 THE COURT:  Right.

 3                 MS. MONAGHAN:  I'll start, Your Honor, and then

 4    Mr. Uzzi can talk you through the language.  So I don't want

 5    you to get the wrong idea about us.  We were trying to draft

 6    a release that matched and mirrored the claims that have

 7    been made and not anything else.  But even though claims for

 8    things like alter ego or vicarious liability are estate

 9    claims, the complaints here have frequently almost, you

10    know, without exception raised claims on the theory that the

11    former directors are vicariously and strictly liable for

12    everything the company did.

13                 THE COURT:  Yeah, and I --

14                 MS. MONAGHAN:  So for example --

15                 THE COURT:  -- want to be clear.  I don't have a

16    problem with that as far as the language of a release, again

17    tracking 524(g)(4).  But we're talking now about non-opioid

18    conduct, and --

19                 MS. MONAGHAN:  So let me turn to that.

20                 THE COURT:  -- if someone just, you know, says

21    that director so-and-so or officer so-and-so, not a Sackler

22    person, but just -- you know, or a Sackler I suppose, is

23    liable for alter-ego, that's an estate claim, and it's being

24    released by the estate.  So I don't think -- I think other

25    than having a mechanism to come to the court if you're going
```

1    to be asserting such a claim, you need anything more than

2    the estate release to the Debtor release.  And it just

3    complicates things to include all this other stuff, and the

4    alter-ego, etc.

5              Because what is the other stuff?  It has to be

6    something broader than that, that isn't an estate claim.

7    And if it's for non-opioids, I don't see -- I mean, that's

8    not been the focus of the case.  It's not the basis for the

9    settlement.

10             MS. MONAGHAN:  So, Your Honor, we tried to draft

11   the release in a way that addressed what we see as the

12   fundamental problem with the non-opioid claims, which is

13   that they are often opioid claims in disguise.

14             THE COURT:  Well, all right, but that would be

15   released.  And so, you could say that, again, even if it's a

16   opioid claim in disguise, it's released and you have to come

17   to the Court if you're saying no, it's not in disguise, so

18   you don't have litigation in Florida by the equivalent of

19   the people in the Madoff case that kept saying, oh, it's not

20   really a claim against the Madoff estate, it's something

21   else.

22             MS. MONAGHAN:  That, frankly, Your Honor, is what

23   we were nervous about.  The concept that the release extends

24   to or does not extend to non-opioid related activity that a

25   person actually undertakes, as opposed to something that's

Page 245

1    just being attributed to them by virtue of their position as

2    a director or shareholder.

3                THE COURT:  All right.

4                MS. MONAGHAN:  That is what we were trying to

5    capture.

6                THE COURT:  Okay, but --

7                MS. MONAGHAN:  If the language doesn't do that, I

8    think we can try to address.

9                THE COURT:  I don't think -- see if I get this

10   right.  I don't think the way to address those concerns,

11   which are legitimate ones, is to create a category of

12   misfeasance that is excluded from the release.  I think it's

13   to create a category that's clearly covered by the Debtor

14   release and to make it clear that you can't get around the

15   settlement release, which is over opioid related claims, by

16   creative pleading.

17                And ultimately, the Court that imposes the release

18   should be the person that decides whether it's creative

19   pleading or whether it's legitimate, and that is an issue.

20   I mean, that, as I said in the case that I was referring to,

21   the released party one on one point and lost on the other

22   one and, frankly, the only one that had any value was the

23   one they won on, so the party stopped suing.

24                But that plan didn't have the gatekeeping

25   mechanism.  They had to go down to Florida and they had an

Page 246

1    extra, you know, two stages of litigation and expense before

2    they finally got up here.  But I think I'm happy with the

3    gatekeeping mechanism like that if the gate is clear enough.

4              MR. UZZI:  Your Honor, for the record, Gerard Uzzi

5    of Milbank on behalf of the Raymond Sackler Family.

6              Look, we take a great deal of comfort with the

7    gatekeeping mechanism.  But it does matter what those gates

8    are or what the gate that needs to go through, I guess, is

9    the better, you know, metaphor.

10             But, you know, I do think, and I'd like to address

11   for a moment, Your Honor, what these releases were always

12   intended to pick up and whether it's supposed to be non-

13   opioid -- excuse me -- only opioid liability or whether it

14   was supposed to be broader than that.

15             And, Your Honor, I think we need to put these

16   releases and this plan in the context of the facts and

17   circumstances that brought this plan before the Court.  And

18   along those facts and circumstances are that we were

19   approached by our counterparties -- so the creditors are

20   large, the Debtors here, the fiduciaries -- to negotiate a

21   release that was expressly supposed to be what we've said

22   global peace, but, you know, is a complete and clean

23   separation from these Debtors for all civil liability.

24             And that's in the record, Your Honor.  It's in the

25   record, Ms. Conroy --

Page 247

```
 1              THE COURT:  It really isn't.  I mean, David
 2    Sackler said it was for opioid liability.  I know others
 3    said --
 4              MR. UZZI:  Well, he said --
 5              THE COURT:  -- they wanted global peace and they
 6    were going to rely on the lawyers.  But look, the way this
 7    reads right now, non-opioid actual misconduct, if David
 8    Sackler -- it probably hasn't happened, but if he was in a
 9    car accident where he was negligent, it would be released
10    because this doesn't cover negligence and that can't be
11    right.
12              MR. UZZI:  Well, I agree with that, Your Honor,
13    but I don't believe it's -- I believe it can't be right, but
14    I also don't believe that's what's picked up here.  I mean,
15    I don't -- if he's in a car accident, whether he's negligent
16    or not --
17              THE COURT:  Well, all right.  If he was driving a
18    company car.
19              MR. UZZI:  I don't -- I don't believe, Your Honor,
20    that is in the release as it relates to -- and it was Mr.
21    Vonnegut said there are capacity limiters on both ends of
22    the release, and there's a capacity limiter also with
23    respect to the party who's granting the release.
24              And so, you know, a car accident in a company car
25    that is the negligence of the individual person is not an
```

Page 248

1    action taken in the capacity as the employee or the director

2    or the shareholder or whatever it may be of the Debtors, and

3    we're not trying to pick that up, Your Honor.

4            What we were trying to do here, Your Honor, what

5    we were trying to do is we're trying to be responsive to the

6    allegation of or maybe a concern that if there were facts

7    that were later discovered that people would have said, hey,

8    you know, that was conduct that should not have been

9    released had we identified it today that it can be picked up

10   here.

11           But if we listen to the testimony, Your Honor, and

12   the questioning in this case -- I mean, you know, in the

13   record, you know, as far as the investigation that --

14           THE COURT:  Well, all right, I'm going to cut you

15   short.  I just think that would mean then that this language

16   is, I think, too narrow.  I understand your point.  If

17   someone is being sued just because they were a board member,

18   all right, or just because they were an officer because it

19   turned out that, you know, Purdue had negligently put

20   together the formula for a non-opioid drug and they were

21   just being sued as an officer or an employee, I think the

22   Debtor release covers it.

23           But I also think there are probably claims that

24   are not deliberate and with actual knowledge that

25   legitimately someone's conduct might actually -- their own

Page 249

```
 1    conduct, not just conduct as an officer, but their own
 2    individual conduct would make them liable for that product,
 3    and we've done nothing about that hypothetical product in
 4    this case.  So either this has to be really --
 5             MR. FOGELMAN:  Your Honor, can I give --
 6             THE COURT:  I mean, look, in the case --
 7             MR. FOGELMAN:  I'm sorry.
 8             THE COURT:  In the case law, the Second Circuit,
 9    including in the Quigley case and in the Manville IV case
10    after the remand from the Supreme Court has really cabined
11    the term derivative -- or actually expanded the term
12    derivative from how it's normally used, which is a claim on
13    behalf of the debtor or through the debtor to be something
14    broader than that.  But there's some limits to that, and
15    it's not just based on, you know, actual knowledge of
16    misconduct or bad faith or deliberate.  It can be separate
17    and independent conduct.
18             So I want to -- I think if you're going to cover
19    non-opioid claims, it really needs to be something more than
20    just Debtor related and really bad stuff.
21             MR. FOGELMAN:  Can I -- sorry.
22             THE COURT:  I mean, non-debtor related or really
23    bad stuff, because you can have debtor-related stuff that I
24    think would fall outside of the Second Circuit's admittedly
25    broad definition of what a derivative claim is, is that
```

1    entitled to a release under the right circumstances under a

2    plan, and I don't think this language does it.

3            And you can spend a lot of time dealing with that

4    language or you can just carve out non-opioid conduct,

5    except for conduct that is independent of one's acting under

6    one's duty as an officer, director, or, you know, alter ego,

7    veil piercing, et cetera, all of which is clearly

8    derivative.

9            MR. FOGELMAN:  Your Honor, that's all helpful, and

10   I take to heart your comments that you believe that many of

11   those claims, like the failure to supervise claim, would be

12   a Debtor claim.  That may be right, Your Honor, it may not

13   be, depending upon how somebody would plead it.

14           I'd like to give you the example or one of the

15   examples we're trying to solve for Your Honor, just to put

16   it clearly out there.  You've heard a lot about Adhansia in

17   the questioning, and there's certainly a fair amount of

18   inuendo about Adhansia and what the Sacklers involvement in

19   Adhansia may have been.  Adhansia was one of the search

20   terms in the discovery that was taken.

21           There's been plenty of discovery and plenty of

22   investigation about Adhansia.  Adhansia was not approved by

23   the FDA until all of the Sacklers were off the board.

24   Adhansia wasn't launched until about the petition date.

25           And so, anything that relates to Adhansia, the

```
 1    marketing and sale of Adhansia has been done by a Chapter 11

 2    debtor with a pristine board under the supervision of this

 3    Court and under the supervision of a court-appointed

 4    monitor.  Yet, yet there seems to be a pretty clear effort

 5    that people want to string something along and tie some sort

 6    of wrongful conduct to the Sacklers around Adhansia.

 7              Now, if in fact, one of the Sacklers or one of the

 8    released parties, not just the Sacklers, did something with

 9    respect to Adhansia that was reckless or deliberate and

10    intended to cause harm, of course, that should be carved

11    out, Your Honor.

12              But these creative legal theories on trying to --

13    and I'm just picking Adhansia of one example of trying to

14    bring the Sacklers back in and seems to be intended to get

15    through a back door is what we're trying to solve for.

16              I'm not particularly wedded to how we solve for

17    that, Your Honor, but it is something that either --

18              THE COURT:  Again, to me, if people are suing

19    them, I guess it's perfectly legitimate to not to want to

20    have your clients even be sued for just being on the board,

21    which includes getting information, or for being an officer.

22              But at the same time, you're putting the onus on

23    the party suing to show not only that that isn't the case,

24    but also that they acted deliberately, recklessly, or in

25    some other standard that's not really tied, I think,
```

Page 252

```
 1   necessarily to a cause of action that would be independent.

 2   I think you might be trying, although I didn't like this

 3   language, to do that.

 4           But I think a -- I mean, I just -- Adhansia is not

 5   a control person liability type of liability, right?  It

 6   just isn't.  That's not --

 7           MR. FOGELMAN:  I don't know, Your Honor.  I mean,

 8   that's the problem that I have.  I just -- I don't know.

 9           THE COURT:  But no one has asserted in this case,

10   it's just can't be -- and they're not paying for it.

11           MR. FOGELMAN:  No, but, Your Honor --

12           THE COURT:  They're paying for peace of mind --

13           MR. FOGELMAN:  Your Honor --

14           THE COURT:  -- over something that I think they

15   get peace of mind on just by the fact that they can't be

16   sued as an officer and director.

17           MR. FOGELMAN:  I think what we bargained for, Your

18   Honor, is a complete separate from civil liability.

19           THE COURT:  No, I don't --

20           MR. FOGELMAN:  Now, I recognize --

21           THE COURT:  The record doesn't show that.  I'm

22   sorry, the record just doesn't show that.

23           MR. FOGELMAN:  I think that --

24           THE COURT:  It doesn't show that.

25           MR. FOGELMAN:  Your Honor --
```

1           THE COURT:  It doesn't show that your clients

2    bargained, for example, for release from CERCLA liability.

3           MR. FOGELMAN:  It's (crosstalk).

4           THE COURT:  It just doesn't.

5           MR. FOGELMAN:  Your Honor, I mean, the settlement

6    agreement and this plan speaks for itself as far as what the

7    bargain was.  The testimony of Miss Conroy made it clear

8    that they wanted the peace premium, that they want to be --

9           THE COURT:  Miss Conroy is a PI lawyer.  She's not

10   an environment lawyer.  If the Sacklers have control group

11   liability for an undiscovered Superfund site, I'm not giving

12   them a release.  It's just not going to happen period.

13          MR. FOGELMAN:  But, Your Honor --

14          THE COURT:  It's not going to happen period.  It's

15   not going to happen, and the lawyers should realize it.

16   That's it.  I've given you enough time to draft it.  I'm

17   telling you how it should be drafted now because you

18   haven't' drafted it.  I am not releasing them from a

19   Superfund site, for example, which would be related to

20   Purdue.  That's not what this case is about.  Had enough of

21   this.

22          MR. FOGELMAN:  Your Honor, we will --

23          THE COURT:  And no court would affirm me if I did

24   on appeal.

25          MR. FOGELMAN:  Your Honor, they think --

Page 254

```
 1                THE COURT:  It didn't even affirm -- it wouldn't

 2      have affirmed Judge Lifland if the interpretation was right

 3      as to the separate fraud of the insurance company to the

 4      asbestos claimants.  Now the question wasn't that it was

 5      fraud; it's that it was separate.  So you can't define your

 6      way out of that by behavior unless you cover all of the

 7      types of claims that could be raised for separate conduct,

 8      not the Debtor conduct or as an officer and director of the

 9      Debtor.

10                So look, you're not going to persuade me on this,

11      that you're just not going to persuade me.

12                MR. FOGELMAN:  I'm not trying to persuade you to

13      go further, Your Honor, then I think what I'm asking for.

14      What we've tried to address is that very issue of the

15      separate conduct.  Maybe we didn't do it well.  We will take

16      another shot at this, Your Honor, and try and submit

17      something.

18                THE COURT:  All right, but the times a' wasting.

19                MR. FOGELMAN:  Understood.

20                THE COURT:  And I think there are going to be

21      examples that you're not going to be able to cover unless

22      you do it the other way around and not do it with the

23      gravamen of every potential truly separate claim and instead

24      say that this release will cover, because it's a Debtor

25      release, as to non-opioid conduct claims that the Debtor
```

Page 255

1   would have and those are expansive, including derivative

2   claims for acting improperly on the board, for example.

3           But if there's a separate claim that doesn't fit

4   into that and it comes back to the Court and the Court finds

5   that, this release shouldn't cover it.

6           MR. FOGELMAN:  That's helpful.

7           THE COURT:  I think that the released parties

8   should have the protection of strike suits brought all over

9   the country.  Instead, they should be channeled here, and

10  you should be able to show this to a state court or a

11  federal court in wherever, Tennessee or Florida or wherever,

12  saying, no, you know, they had to come to the bankruptcy

13  court first to decide whether this provision applied or not.

14          I understand that and I've encouraged that, but I

15  just don't think you can define out by qualitative types of

16  misconduct from this release, unless they're going to pay a

17  lot more than they're paying because they're not paying to

18  be released from a CERCLA claim, for example.

19          MR. FOGELMAN:  And, Your Honor, we were not trying

20  to do that, so --

21          THE COURT:  Well, but this -- I mean, that would

22  be the effect.

23          MR. FOGELMAN:  Understood, Your Honor.  Well,

24  there is a separate carveout for all federal liabilities, so

25  technically --

Page 256

```
 1            THE COURT:  Well, state law equivalent.

 2            MR. FOGELMAN:  But understood, Your Honor, but

 3    understood.

 4            THE COURT:  All right.

 5            MR. FOGELMAN:  So we will do our best, Your Honor,

 6    to accommodate or to address your --

 7            THE COURT:  All right.  No, Mr. Fogelman, I think

 8    -- I mean, you have other points, but there is a balance

 9    here under the case law.  And I'm not asking you to waive

10    your rights to say that case law is wrong, but there's a

11    balance here between how the Second Circuit defines broadly

12    derivative actions that can be enjoined and separately

13    independent actions that can't.  And I think what I'm

14    getting at is how you draw that line.

15            MR. FOGELMAN:  I appreciate Your Honor's

16    considering our argument, and I have nothing further at this

17    time.  Thank you.

18            THE COURT:  Okay.  All right.  I mean, look, this

19    is all over the case law.  The Carter Corporation, Judge

20    McMahon says, you know, you address what you were settling

21    and not everything else, and they rewrote the plan in

22    Carter.  It was a small plan, it's a small construction

23    company, but they rewrote it, and they shouldn't have had

24    to.

25            MR. SCHWARTZBERG:  Good afternoon, Your Honor.
```

Page 257

1    Paul Schwartzberg from the U.S. Trustee's Office.

2              THE COURT:  Afternoon.

3              MR. SCHWARTZBERG:  Thank you, Your Honor.  I just

4    wanted to take up the opportunity Your Honor had offered.

5    We do have a few comments on the recent changes, in addition

6    to what we had filed in our objection and our oral

7    arguments.

8              And I wanted to bring the Court's attention of the

9    new definition of shareholder releases, which is now Exhibit

10   X to the shareholder agreement, as well as the defined term,

11   "designated shareholder release parties," which is Exhibit S

12   to the shareholder agreement.  And I wanted to point out --

13   Your Honor, can you hear me?

14             THE COURT:  Yes.  I can hear you fine.

15             MR. SCHWARTZBERG:  Okay.  All right, thank you,

16   Your Honor.

17             I wanted to point out first the shareholder

18   agreement as testimony shared, it has not actually been

19   finalized yet, so the released parties are Exhibit X and

20   Exhibit S could be expanded and we don't know who those are.

21   And, in fact, Your Honor, pursuant to the shareholder

22   agreement of Section 1106, even after it's signed, it could

23   still be amended, and I think between agreement of the NBT

24   and the Sacklers.  So we're concerned that even after --

25             THE COURT:  I'm assuming it will be attached to

Page 258

1    the confirmation order and the parties will have a chance to

2    review it before the order is entered.

3            MR. SCHWARTZBERG:  But, Your Honor, even after the

4    order is entered, the shareholder agreement does allow --

5            THE COURT:  No, no, not after the order is entered

6    because that's the injunction.

7            MAN 1:  Your Honor, we're not going to be adding

8    parties.

9            THE COURT:  No.

10           MAN 1:  Mr. Fogelman doesn't need to worry about

11   that.

12           THE COURT:  They wouldn't be able to even if they

13   wanted to.  They're not going to do that.

14           MR. SCHWARTZBERG:  Could they make the case,

15   Section 11.06 to make it clear that the amendments that they

16   can make only are up to confirmation?

17           THE COURT:  Well, put it in the confirmation

18   order.  The Court's approving this and nothing further.

19           MR. SCHWARTZBERG:  Thank you, Your Honor.  That

20   would be very helpful.

21           THE COURT:  Okay.

22           MAN 1:  That works for us, Your Honor.

23           MR. SCHWARTZBERG:  And as I said also, Your Honor,

24   Exhibit X still -- we were talking about the breadth of the

25   releases.  Exhibit X still includes as related entities the

Page 259

```
 1    businesses, the assets, and the entities owned by Side A.

 2    We believe this is overly broad and, in fact, I believe it

 3    was Mr. Mortimer Sackler had indicated he couldn't even

 4    identify all of his investments, so we think that term is

 5    too broad.

 6              THE COURT:  Why?

 7              MR. SCHWARTZBERG:  Unidentified, Your Honor, at

 8    this point.  We can't identify.

 9              THE COURT:  But if you cabin the -- there's no --

10    these are the payors, right?  And as we've just discussed,

11    what's going to be released as far as third parties is

12    opioid-related claims.  So there's no indication that any of

13    these entities, separately and apart in conjunction with

14    Purdue, was engaging in any opioid-related activity.

15              On the other hand, they are backing up the payment

16    of the plan.

17              MR. SCHWARTZBERG:  Our concern, Your Honor, is

18    these are entities that even the Sacklers may not know.

19              THE COURT:  But -- all right.  Keep going.

20              MR. SCHWARTZBERG:  I'll move on to my next point,

21    Your Honor.

22              THE COURT:  Okay.

23              MR. SCHWARTZBERG:  In regard to the --

24              THE COURT:  I guess you haven't read the discovery

25    that the committee and the Debtors had, right?
```

1            MR. SCHWARTZBERG:  That's correct, Your Honor.

2            THE COURT:  Okay.  They have.

3            MR. SCHWARTZBERG:  Your Honor, in regard to the

4      non-opioid misconduct claims, we -- I think you had

5      addressed that, and we just reserve our rights on that to

6      see what the new drafting is regarding this because we had

7      concerns regarding that.

8            And then last point, Your Honor, I had is just a

9      concern regarding, once again, the breadth of the releases.

10     We do note that the Debtors -- we're trying to figure out if

11     the Debtors are including released parties that are not --

12     releasing parties that are not -- or causing releases that

13     will be suffered by parties that are not creditors of this

14     case.

15           The releasing parties include holders of claims

16     and causes of action.  And I know the bankruptcy code

17     defines creditors in this case as just part of the holders

18     of claims.  So when they throw in holders of claims and

19     causes of actions, it makes it look like they're trying to

20     expand those who are going to give releases to those who are

21     not creditors in the case.  And if they need to limit it to

22     just people who are creditors in the case, they should make

23     it clear in the documents, Your Honor.

24           And I believe those are the only additional

25     comments I had, unless Your Honor has any questions.

Page 261

1              THE COURT:  Okay.

2              MR. UZZI:  Nothing further from the Debtor, Your

3      Honor.

4              MR. GOLDMAN:  Your Honor, may I be heard briefly?

5              THE COURT:  Sure.

6              MR. GOLDMAN:  Irve Goldman, Pullman Comley, for

7      the State of Connecticut.

8              I had agreed to very briefly address this argument

9      under the miscellaneous topic, as opposed to separately.  I

10     don't expect to take more than five minutes on this, Your

11     Honor, so I hope you'll bear with me.

12             So I'm presenting this in addition to the states

13     that joined our objection either expressly or by

14     incorporation, and also on behalf of Rhode Island and

15     Delaware.  It relates to the argument in our brief that the

16     plan infringes on the states' rights to have had their

17     police power claims adjudicated with damages fixed in the

18     actions they commenced against Purdue in their own courts.

19             And this relates to Section 362(b)(4), the

20     legislative history of which provides that the purpose of it

21     is to allow a government action for a violation of a

22     consumer protection law to proceed unabated by the automatic

23     stay in order to "fix damages for violations of such a law."

24             The plan takes away that right by channeling all

25     the states' claims to the NOAT Trust, which will be funded

Page 262

1   by the Sackler plan contributions, and then distributing

2   those funds based on a state-by-state allocation percentage.

3   And in fact, it's a pot plan from which the states will take

4   their allocated share of what is put in the pot.

5           This mechanism, we contend, eliminates the states'

6   rights to fix damages in their own actions, and therefore,

7   the plan doesn't comply with the applicable provisions in

8   Title 11.

9           I realize it would have been administratively

10  cumbersome and time-consuming to have allowed for the fixing

11  of damages in those actions in this case, but that is simply

12  the hand the Debtors were dealt when they invoked the

13  protections of the bankruptcy court, and I would submit they

14  must therefore live with the burdens of the Code.  And that

15  is set forth in 362(b)(4).

16          I would also submit that administrative

17  convenience can't be allowed to trump the clear protection

18  provided for states to fix their claims for damages without

19  being held up by the automatic stay.

20          THE COURT:  Well --

21          MR. GOLDMAN:  And that's all I have, Your Honor.

22          THE COURT:  -- that's already been litigated and

23  affirmed on appeal, without any further appeal.  I'm not

24  quite sure what you're saying at this point.  Are you

25  suggesting that even though 362 by itself wouldn't apply

Page 263

1    post-confirmation, that somehow they would have a right to

2    liquidate their claims, even though they would get whatever

3    recovery they'd get under the plan?  So they would --

4              MR. GOLDMAN:  No, I'm not saying --

5              THE COURT:  -- the states would actually spend the

6    money to do that?

7              MR. GOLDMAN:  No, I'm not saying that, Your Honor.

8    I'm saying that that was a preliminary injunction.  It

9    wasn't a permanent injunction --

10             THE COURT:  Right.

11             MR. GOLDMAN:  -- to stay the states.  And the fact

12   that we're at the confirmation stage should not cut off the

13   rights to have liquidated those claims --

14             THE COURT:  That's the --

15             MR. GOLDMAN:  -- because of --

16             THE COURT:  -- whole reason that the...  Look,

17   Congress, in the legislative history made it clear that one

18   could still enjoin police power under the right

19   circumstances to liquidate a claim.  And of course, the

20   provision itself says it doesn't apply to payment of the

21   claim.  The plan is just providing for payment of the claim.

22             So I just -- I hear your argument, but frankly, it

23   makes no sense.  It's another sand in the gears.  I mean,

24   it's just...

25             MR. GOLDMAN:  I hear Your Honor.  I'm just trying

```
 1    to make the point that I understand the injunction was

 2    issued and it was preliminary.  I don't think that that

 3    means we shouldn't have had the right to -- before the plan

 4    reached the confirmation stage -- to liquidate those claims,

 5    instead of having them just put into a trust based on an

 6    allocation formula.

 7              THE COURT:  In fact, the injunction applies

 8    through confirmation, and then the stay is no longer in

 9    place, and therefore, 362 doesn't apply at all.  Instead,

10    it's the plan.

11              MR. GOLDMAN:  I would maintain that because of

12    that, our rights are subverted under 362(b)(4).  And I'll

13    just leave it at that, Your Honor.

14              THE COURT:  Okay.

15              MR. KAMINETZKY:  Your Honor, if I could briefly

16    respond?  Benjamin Kaminetzky, of Davis Polk, for the

17    Debtors.

18              THE COURT:  Okay, fine.

19              MR. KAMINETZKY:  I know -- I'm actually so happy

20    that this was raised, because we've all been wondering what

21    plan B was for the objecting states, and I think this is

22    just a perfect way to end today.  Because what they're

23    saying is that we should go back to the first day of this

24    case, when the Debtors basically said, we're done, we're not

25    litigating anymore.  In Your Honor's words, we've given
```

Page 265

1    ourselves up.

2          But they're still demanding -- and then we've

3    worked for months and months, years, on a distribution

4    mechanism, but now they're saying, you know what, we want to

5    have a trial anyway on the merits against the Debtors, who

6    aren't contesting liability, just for like fun, so that we

7    could then...

8          I don't know -- are they saying then they'll go

9    back to the NOAT anyway after they have their show trial,

10   that we're not contesting liability, and they'll abide by

11   the NOAT?  Or are they saying, no, we won't; we'll jump the

12   line, and the State of Connecticut will ignore the last two

13   years, and we'll get our judgment against the Debtors, who

14   aren't contesting liability, and we'll get everything?  It

15   is just so confounding.

16         And I'm actually -- this is a great way to end the

17   hearing because what we've just showed is that there's

18   absolutely no alternative other than going back to September

19   of 2019, relitigating the automatic stay, having Your Honor

20   give us this day.  And this isn't even what was

21   controversial about the automatic stay.

22         Remember, the automatic stay that was the most

23   controversial was the Sacklers.  He's saying he wants to

24   litigate.  They want to have 50 trials.  Maybe it's even

25   more.  Maybe because -- I'm not sure if this goes to all the

1    instrumentalities of the stay too, so we should have

2    thousands of trials around the country against a Debtor that

3    admitted on the first day that it's no longer contesting

4    liability.

5           It is just the insanity -- or, I shouldn't say

6    that -- the idea that this is what's being advocated at this

7    point, right here, at the last minute of the confirmation

8    hearing, I think speaks volumes.

9           THE COURT:  Well, look, I think...  I want to say

10   this diplomatically.  There have been times in this case

11   where the high quality of the lawyers has actually not been

12   a good thing, because lawyers who are really creative and

13   thoughtful sometimes come up with ideas that maybe seem well

14   in the shower, but actually don't make any sense.  And I

15   just...

16          Look, Mr. Goldman, your clients have made some

17   good points going to the merits of the Sackler settlement.

18   That's where the focus should be, not on something like

19   this.  This is just not constructive.  So, I would hope the

20   parties would continue to discuss the former, and not burden

21   this case with the latter.

22          MR. GOLDMAN:  I hear you, Your Honor.

23          THE COURT:  Okay.  All right.  Mr. Underwood, I

24   don't know if you had a comment on the release language, or

25   you just...

Page 267

1             MR. UNDERWOOD:  Yes.  I have a very quick comment,

2      Your Honor, that I want to raise.  We have a provision in

3      the plan.  It's very straightforward as well.  We have a

4      provision in the plan that regards excluded claims.  There

5      is a portion of that provision that addresses Canadian

6      claims, or Canadian claims against Purdue Canada.

7             We now have language in that provision that says

8      that non-opioid actual misconduct claims are effectively, I

9      guess, released.  And this is --

10            THE COURT:  No, that's what we've just been

11     talking about, so I wouldn't worry about that.

12            MR. UNDERWOOD:  Okay.  And the second aspect of

13     that, very quickly, Your Honor.  My understanding is -- and

14     I did ask the Debtors' counsel about this last evening, or

15     this morning -- provision 11.1(e) would then suggest that if

16     there's any provision such as the non-opioid actual

17     misconduct claim in the excluded claim, we would have to

18     come back to the United States to get approval.  It seems a

19     little untoward that the Provinces at this point would have

20     to come to Your Honor in order to bring, you know, a federal

21     conveyance action against a Canadian entity.

22            I just want to put that on the record, make sure

23     the Debtor understood where I was coming from.

24            THE COURT:  No.  Look, first of all, claims

25     against the Canadian entity would have to be for fraudulent

1    -- I don't think there's any release of a fraudulent

2    transfer claim against the Canadian entity in this plan.

3            MR. UNDERWOOD:  Okay.  I'm not -- perhaps it's not

4    a release.  But what this seems to say is -- and I don't

5    want to delay this further, but -- a claim that is not based

6    upon conduct of the Debtors, including opioid-related

7    activities of the Debtors, and that effectively -- or any

8    non-opioid actual misconduct claim.

9            So I would presume that any Canadian creditor

10   could argue in Canada that the officers, directors,

11   Sacklers, owners, whomever, have left the Canadian entity

12   with unreasonably small capital.  That, to me, would be the

13   type of claim that may be a non-opioid claim that could not

14   then be brought.

15           THE COURT:  Again, but I want to be clear, if it's

16   just against these third parties because they are an

17   employee or officer of the Debtor, which would be, I guess,

18   the transferee, then, yeah, they would have to come back

19   here if there's any question about that.  It would have to

20   be based on their own independent conduct.  So, for example,

21   if they were a transferee of the Canadian company, then you

22   wouldn't have to come back here.

23           MR. VONNEGUT:  Your Honor, may I address this

24   point?  I think I should be able to clear up some confusion.

25           THE COURT:  Okay.

1           MR. VONNEGUT:  So, the gatekeeping function that

2     Mr. Underwood is referring to in 11.1(e).  That only applies

3     to non-opioid actual misconduct claims, which are their own

4     prong under excluded claims.  The claims against the

5     Canadian entity that are not tied to the Debtor, those are

6     separately excluded claims, and there's no gatekeeping

7     function if he's pursuing those claims.

8           THE COURT:  No, but his point was a different one,

9     which is if the Debtor or a released party was being sued

10    for having received a fraudulent transfer by the Canadian

11    company, whether they would have to -- the Plaintiff would

12    have to come to this Court as a gatekeeping mechanism to

13    proceed.

14           And this should be able to be drafted so that the

15    gatekeeping mechanism doesn't apply to clearly independent

16    claims such as that, where if board member X received

17    $100,000 as a gift from Purdue Canada, he wasn't a board

18    member of Purdue Canada, didn't do anything for Purdue

19    Canada, was just a -- you know, they decided to give him a

20    gift, and Purdue Canada was insolvent.  If under applicable

21    fraudulent transfer law in Canada, that would be a

22    fraudulent transfer law, I don't think you should have to

23    come to this Court to sue that board member.

24           MR. VONNEGUT:  Understood and agreed, Your Honor.

25           THE COURT:  Right.  So, on the other hand, if

Page 270

```
1    Purdue Canada is suing the board member because she was a

2    board member of Purdue when Purdue got a fraudulent

3    transfer, you would have to come to the Court, because if

4    the only basis for the lawsuit is -- or the basis for the

5    lawsuit, or a basis for the lawsuit, is that she was just a

6    board member.  And that's a veil-piercing claim, and the

7    creditors -- those types of claims are subject to the

8    discharge, the Debtors' discharge, because you're just

9    trying to do a backdoor to get at the Debtor through the

10   insurance and through the former officer or director.

11          Okay.  All right.  Anything else?

12          MR. HUEBNER:  Your Honor, one very last thing from

13   the Debtor.  As Your Honor noted last week, there are

14   extraordinary letters and other filings on the docket, and

15   actually, we just wanted to echo the courage that it takes

16   to tell stories, and specifically to come to court as a non-

17   lawyer is extraordinary.  Those are things that all of us

18   weigh and worked on, and we read many of those in working on

19   all this.

20          We (indiscernible) for many parties.  I think that

21   we all owe the Court and chambers -- whichever way the

22   confirmation hearing ends and whatever order is issued,

23   we're all aware that we have dumped thousands and thousands

24   of pages on the Court.  And I think that -- you know, I just

25   wanted to note that as we move towards the closing of the
```

1    confirmation hearing, in probably the most difficult Chapter

2    11 case in history in terms of what is at stake, in terms of

3    what was at stake, in terms of the national health issues

4    and the impact of the crisis.  And it seemed odd to end the

5    hearing without some recognition of the just extraordinary

6    nature, in every possible way, of these proceedings.

7               THE COURT:  Okay.  Well, certainly I want to thank

8    the Clerk's office.

9               MR. HUEBNER:  Yes.  Including certainly that the

10   Zooms for hundreds of people and the accessibility in the

11   (indiscernible).  So I won't belabor the record.  It just

12   felt appropriate to say something, given what we've all been

13   working on together.

14              One last thing, Your Honor.  There are obviously

15   still some documents to be finalized.  Those things are

16   moving along at warp speed and the emails are being

17   exchanged.  Obviously, we're aware that those things have to

18   be done and on file prior to entry of the confirmation

19   orders and the like.  Obviously, Your Honor gave some pretty

20   clear guidance on some of the restructuring issues within

21   the last hour, which we will attend to; the shareholders

22   settlement agreement, in addition to the representations we

23   just talked about, about not letting anyone add any further

24   parties.

25              So those things will be hitting the docket in

Page 272

1    revised forms as fast as we humanly can get the parties sort

2    of shepherded together to do that.

3            I see Mr. Troop has come on (indiscernible) I

4    assume that is not an accident, since he is quite nimble in

5    Zoom and appears, I think, only when he plans to.  So let me

6    ask him what he wants to talk about, and maybe that will be

7    what brings us home.

8            MR. TROOP:  Well, thank you very much, Mr.

9    Huebner.  Your Honor, Andrew Troop, for the Nonconsenting

10   States.

11           Your Honor, I actually don't want to divert at all

12   from the (indiscernible) truly heartfelt comments by the

13   Court and Mr. Huebner with respect to the individuals in

14   this case.  I think it's something that all of us who don't

15   represent individual victims (indiscernible) that we all

16   share, and our admiration for the two victims who spoke

17   (indiscernible).

18           But do we have some process things that we have to

19   get to, and Mr. Huebner touched on them.  And we just need

20   to make sure that we, at the appropriate time and in the

21   appropriate way, do not lose sight of the issues that remain

22   unresolved and may be subject to debate with regard to how,

23   for example, the Sackler settlement is resolved.

24           Your Honor, this afternoon during the hearing,

25   Your Honor, the Debtors filed a revised perspective

Page 273

1   injunction for NewCo, where there is an issue that is

2   identified (indiscernible) open, and we just need to manage

3   that process and want to do so in a way that's efficient for

4   the Court.  And so we will continue to work on that with the

5   Debtors.

6           But this is a complex case with lots of threads

7   still untied, and we just need to make sure that we don't

8   lose sight of that.

9           THE COURT:  Okay.  Fair point.  I've told the

10  parties that I intend to rule Friday morning at 10:00.  I

11  intend to give you a bench ruling.  As you know, I believe

12  it's important in cases large and small to move the matter

13  promptly, after having heard the evidence.  And given my

14  calendar, that's the best way to do it.  As I often do with

15  a lengthy bench ruling, I'll go over the transcript, and I

16  may edit it, although I won't change it in terms of the

17  substance.  But I think it's important for the parties to

18  get that ruling and know that they're going to get it on

19  Friday morning.

20          However, if the parties, as I have encouraged them

21  to do, will reach some form of agreement, either among

22  themselves or with the efforts of Judge Chapman as mediator,

23  they can let me know before I give that ruling, if they want

24  to circulate it, socialize it, make sure everyone

25  understands it.  I won't be offended at all by that.  In

Page 274

1    fact, I'll encourage you, as I have encouraged you, to

2    continue that work.

3            As far as other loose ends are concerned, if they

4    are truly loose ends, I guess I will have to deal with them

5    after I give you my ruling, which the parties have to

6    realize will in some measure give me a fair amount of

7    control over the outcome, if they can't reach an agreement

8    themselves, because the issue, almost by definition, will

9    not be so important that it would hold up confirmation.

10   Rather, it's just an issue that needs to get resolved one

11   way or the other, and of course, I would rather the parties

12   resolve it on their own, as I expect they would do.  But if

13   they can't, I guess we'll deal with that after my ruling and

14   as part of the process of submitting the confirmation order.

15           I won't require the order to be formally settled

16   if I grant confirmation.  But I will want to make sure the

17   parties have sufficient time to read any changes to it,

18   including -- you know, obviously, as I told Mr. Anker, he

19   would have time, everyone else falls in that boat too.

20           So, I want to thank all the parties.  We covered

21   an extraordinary amount of ground in six days of trial and

22   two days of oral argument.  We could not have done that

23   without the parties working very hard to streamline the

24   trail efficiently, which I believe by and large they did.

25           And I also want to thank all of the lawyers, some

Page 275

1   of whom I have made some gruff comments to.  But that is no

2   reflection on the lawyers themselves, but simply to let the

3   parties know my views on that particular issue, which

4   unfortunately, when you're on Zoom, I found the Court needs

5   to be more expressive about than if you're there in person.

6   I'm not quite sure what human chemistry leads to that

7   result, but it's true, based on over a year's experience now

8   in handling hearings remotely.  So I hope no one took that

9   personally.  It really went to the argument, and not the

10  lawyer.

11          So, thank you all, and I'll see you all again on

12  Friday morning at 10:00.

13          (Whereupon, these proceedings were concluded at

14  6:03 PM)

15

16

17

18

19

20

21

22

23

24

25

Page 276

1                   C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5
      Sonya Ledanski            Digitally signed by Sonya Ledanski
6                               Hyde
      Hyde                      DN: cn=Sonya Ledanski Hyde, o, ou,
7                               email=digital@veritext.com, c=US
                                Date: 2021.08.26 13:49:09 -04'00'
8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 26, 2021

| & | | | |
|---|---|---|---|
| **&** 4:8,15 7:8 | **100,000** 76:16 | 189:7 201:14 | **16** 35:7 86:11 |
| 16:20 24:14 | 269:17 | **1123.05** 163:21 | 93:21 |
| 155:15 175:1 | **10001** 4:11 | **1127** 28:21 | **1633** 5:11 |
| 220:11,19 221:21 | **10007** 6:10 8:4 | **1129** 28:20,22 | **16th** 156:3 177:1 |
| 221:24 224:13 | **10017** 3:6 | 29:23 30:17,20 | **17.5** 224:11 |

| 0 | | | |
|---|---|---|---|
| | **10019** 5:12 6:17 | 38:5 42:10 49:6 | **173-175** 33:16 |
| **06604** 4:4 | **10020** 7:12 | 51:9 52:4 97:9,9 | **17th** 220:1 224:5 |
| **07102** 5:20 | **10036** 4:18 220:20 | 98:5 130:15 | **18** 35:7 58:16 |
| | **1015** 51:12 | **1141** 135:6 | 107:18 160:3 |
| | **104** 48:17 | **11501** 276:23 | 225:12 |

| 1 | | | |
|---|---|---|---|
| | **105** 143:3 | **1177** 4:17 | **180-182** 28:11 |
| **1** 5:4 34:9 77:3 | **105-106** 97:19 | **118** 97:20 | **181** 28:20 |
| 82:4 95:24 96:5,7 | **106** 122:22 123:8 | **119** 45:11 | **1898** 165:3 |
| 100:24 105:13,19 | 123:10,11 135:13 | **11c** 124:11 126:11 | **19** 32:14 35:5 |
| 106:20 107:2,13 | 135:15,17,18,19 | 126:16,17 | 86:11 219:21 |
| 109:11 110:11 | 135:19 136:1,3,16 | **11th** 203:15 | 225:16 |
| 112:1 113:8 115:5 | 136:22 137:7 | **12** 99:8 103:6 | **19-234649** 225:10 |
| 116:1 117:4,4 | 142:25 143:10,13 | **12-16** 28:20 | **19-23649** 1:3 |
| 137:7 150:7 185:9 | 143:16 | **120** 214:5 | **191** 101:22 |
| 241:9,10 258:7,10 | **10601** 1:14 | **1201** 5:19 | **1939** 165:3 |
| 258:22 | **10:00** 273:10 | **1221** 7:11 148:18 | **1962** 223:1 |
| **1.16** 101:2 | 275:12 | **125** 102:11 | **197** 101:22 |
| **1.2** 32:15 160:16 | **10:03** 1:17 | **12th** 160:2 | **1990** 222:21 |
| **1.3490069542** | **11** 16:5,14 33:19 | **13** 50:21 | **1993** 223:9 |
| 72:17 | 33:25 43:12,12,22 | **1334** 143:7 | **19th** 148:25 |
| **1.5** 34:14 156:14 | 52:5 62:25 65:15 | **134** 32:17 | **1:30** 144:13 |
| **1.6579015983** | 72:11 74:8 76:24 | **135,000** 156:13 | **1st** 221:12 |
| 70:20 | 77:10,11 82:5,12 | **137** 66:11 | |

| | | | 2 |
|---|---|---|---|
| **1.775** 35:21 | 126:4,5,7 130:13 | **139** 29:6,7 | |
| **1/500th** 77:3 | 137:14,18 171:18 | **13th** 71:4 220:22 | **2** 35:11 97:19 |
| **10** 40:5 47:4 83:1 | 185:11 203:3 | 225:5 | 102:1 109:12 |
| 97:18 116:2 160:2 | 224:19 225:10 | **14** 102:23 | 110:11 |
| 209:7 | 240:13 251:1 | **1411** 45:11 | **2.156** 40:3 73:2 |
| **10.4** 46:21 | 262:8 271:2 | **146** 32:17 | **20** 28:4 40:4 83:11 |
| **10.6a** 234:22 | **11.06** 258:15 | **15** 100:23 105:18 | 86:8 160:17 210:9 |
| **10.6b** 231:24 | **11.1** 267:15 269:2 | 105:20 106:13 | **200** 6:3 101:22 |
| 232:2,4 234:9,21 | **11.4** 224:15 | 109:13 128:23 | **20003** 7:20 |
| **10.6d** 234:17 | **1106** 257:22 | 133:21 208:16 | **20005** 3:18 |
| **10.7** 26:15 | **1122** 80:20 90:14 | **15222** 8:12 | **2000s** 166:1 |
| **10.7b** 240:9 | **1123** 99:13 100:5 | **155** 31:19 | **2007** 57:14 79:9 |
| **100** 116:3 208:22 | 112:10 113:3,5 | **158** 31:20 | **2008** 46:22 |
| 214:4 | 119:2 170:19 | **15th** 176:25 | **2011** 221:3,10 |
| | 171:21 180:17 | 220:25 222:6 | **2012** 128:11 |

**2015**  220:1,4
**2017**  143:12
**2018**  68:24 224:16
  224:16
**2019**  29:3 46:22
  62:25 221:3,10,12
  222:7 223:14
  224:5,16 265:19
**2020**  146:23,24
  148:16,18 149:4
  178:5 183:9,9
  220:7,22,23,25
  221:24 222:1,2,2
  222:4,6 225:5
**2021**  1:16 2:2
  44:10 86:17 149:4
  160:2 177:25
  218:7 224:25
  225:2,16 276:25
**203**  45:11
**206**  227:19
**20852**  6:4
**21**  86:11
**216**  101:21
**217**  7:3
**22**  33:24 35:8
**225**  8:11
**228**  66:11
**22nd**  86:17
**23**  2:2 32:16
**230**  98:17
**233**  102:25
**234**  102:25
**23649**  219:22
**239**  42:5
**24**  86:11
**241**  99:10
**242**  99:10 100:3
**243**  100:3
**248**  1:13
**24:16**  30:19
**24th**  222:7

**25**  1:16
**252**  56:14
**25305**  5:5
**26**  5:4 276:25
**265**  57:7
**26th**  220:4
**27**  93:22
**28**  100:12
**285**  47:1
**288**  128:11
**2988**  148:22
**2:30**  144:24
  145:21

**3**

**3**  17:6,23 34:21
  70:24 97:9,9 98:5
  109:12 135:10
**3,500**  153:16
**3,900**  57:6
**30**  18:25 124:17
**300**  1:13 276:22
**3008-1**  225:19
**3018**  93:3,3
**30th**  220:23
  224:25,25 225:2
**31**  6:16 100:21
  105:9 108:7
**3232**  70:24
**327**  99:20
**3277**  149:15
**33**  34:25
**330**  276:21
**3306**  227:15
**3372**  82:24
**3461**  227:18
  228:12
**3465**  228:13
**347**  101:23
**3479**  81:23
**3480**  81:23
**35**  28:2 86:16
**350**  101:23

**3506**  228:12
**35213**  7:4
**36**  34:15
**3612**  228:15
**362**  261:19 262:15
  262:25 264:9,12
**363**  56:18 165:22
**38**  41:17 44:12
  70:2 82:25 94:21
**380**  100:17
**388**  100:17 102:23
**389**  99:8
**39**  40:4
**392**  103:6
**3rd**  6:9 148:18,22
  221:24

**4**

**4**  36:2,8,11 39:6
  46:20 53:11 72:16
  82:1 84:20 87:22
  93:1 99:13 100:5
  112:10 113:3,5
  119:2 124:5,10
  138:18 186:1
  223:3 237:23
  243:17 261:19
  262:15 264:12
**4.375**  40:14
**4.5**  117:5
**4.8**  61:13
**40**  117:4 127:19
**400**  7:19 73:1
**42**  79:2
**437**  32:17
**45**  117:5,5
**450**  3:5
**450,000**  117:12
**47**  37:9 79:2 96:5
  97:18 115:1,3
**48**  70:2 79:2 82:25
  113:14 214:5
**49**  95:24 96:2,4,7

**5**

**5**  39:6,7 56:14,15
  83:6 124:5,11
  128:10 138:18
  170:19 171:21
  185:25 189:7
  201:14
**5.5**  30:25 40:16
  45:16,21 46:8,14
**5.6**  170:22 184:10
**50**  70:2 223:5
  265:24
**50.1**  79:1
**500**  70:14
**501**  7:3
**510**  163:5 164:4
  166:22 186:25
  194:5
**524**  186:5 237:23
  243:17
**526**  163:11
**52nd**  6:16
**533**  97:11 98:22
**536**  102:11
**544**  33:3
**55**  4:10
**55,000**  155:16
**550**  67:5
**569**  143:11
**57**  55:11
**57-259**  28:12
**570**  5:19
**58**  43:16 55:7
**5th**  176:22

**6**

**6**  100:17 157:21
**60**  222:8,10,15,17
**606**  33:3
**61**  55:4
**614,000**  45:4
**620-621**  33:3
**63**  83:10

**636** 147:11
**64** 97:11
**642** 128:11 147:11
**645** 148:5
**648** 128:11
**67** 83:9
**699** 72:20,24
**699.1** 36:9
**6:03** 275:14
**6:09** 224:5
**6:30** 224:24
**6th** 128:11

**7**

**7** 8:3 28:20,22
29:23 30:17,20,23
38:5 42:10 49:4,6
49:14,18 50:15,23
51:9,16 52:4
54:22 55:16 56:20
**7.48.** 81:17
**700** 7:19
**718** 85:6
**72** 71:5
**729** 99:19
**74** 97:11 98:22
**75** 57:17 69:5
**75,000** 57:16 69:1
**76** 160:2
**79.17** 83:1
**79.25** 83:4
**7th** 221:25 222:4

**8**

**8** 39:7 150:7 158:8
**8/13** 55:4
**80** 44:12 45:14
47:13 52:6 100:21
**80s** 216:19
**825** 143:11
**843** 147:11 148:5
**85** 100:21
**850** 4:3
**86** 6:9

**8th** 220:2 222:2

**9**

**9** 33:15,24 35:7
71:5 223:3
**9.1** 184:10
**9.10** 170:6
**9.9** 102:8
**90** 40:6 52:7
101:11
**9006** 157:18
**9019** 30:14 51:20
99:21 100:4
**91** 101:11,14,19
**911** 84:24
**95** 97:19 148:8
**99** 188:23 190:12
**9th** 202:22 222:2

**a**

**a.h.** 93:25 94:14
**aaron** 9:18
**abate** 48:4
**abatement** 37:4,6
37:9,16,22 38:3
46:3 73:25 84:17
86:25 87:1 104:5
105:3 109:14
125:22 128:21,24
136:19 137:16,20
138:6,9,19 139:2
142:8,16 172:13
206:21 212:24
215:24 217:10,12
217:14,18 218:7
228:3
**abby** 9:23
**abide** 265:10
**ability** 42:1 65:8
109:21 140:9
157:24 166:3
169:6 192:13
201:11,15 209:5
217:22

**able** 35:9 40:10
60:14 71:20 79:19
92:13 106:13
108:22 117:16
118:10 126:13
127:24 136:23
144:22 154:16
158:11,14 166:17
192:12 197:6
206:19 219:6
236:18 254:21
255:10 258:12
268:24 269:14
**abrams** 9:4
**abrogate** 135:15
**abrogated** 143:10
**abrogates** 143:1
143:16
**absence** 65:24
117:19 180:4,9
**absent** 85:14
151:1 228:9
**absolute** 155:3
**absolutely** 17:8
70:1 135:8 204:7
265:18
**absorb** 35:17
**abundance** 225:9
**abuse** 106:6
**abused** 215:4
221:16
**abusing** 209:14
**academic** 51:18
**accept** 41:22 49:3
70:6 83:2,5
133:14 134:10
193:10
**acceptable** 56:4
151:5
**acceptance** 130:4
130:13
**acceptances** 178:9

**accepted** 47:17
49:8 52:7
**accepting** 82:22
171:16
**access** 79:11
158:12,14 169:17
201:12
**accessibility**
271:10
**accident** 247:9,15
247:24 272:4
**accommodate**
256:6
**accomplish** 21:22
**accord** 32:1 41:8
**accorded** 92:2
**account** 31:1
45:23 46:19 49:10
49:17 50:16 56:23
71:8 83:11 96:18
96:20 100:9
112:17
**accurate** 159:16
168:21 276:4
**accurately** 71:20
**accutane** 213:23
**achieve** 103:5
140:2
**achieved** 118:5
**achievement**
103:22
**achieves** 98:20
**acknowledge**
54:15 55:11 62:3
65:4 107:25
**acknowledged**
59:3 125:25
182:23
**acknowledges**
125:16
**acronym** 106:1
**act** 57:2,2,2,3
81:19 94:3 136:7

136:14,22 152:12
154:23,24 208:17
**acted** 112:18
251:24
**acting** 208:12,17
208:18 209:1,4,13
209:15 211:14
216:23 237:15
250:5 255:2
**action** 71:9,15,18
71:19 74:6 123:17
165:11 179:18
183:12 232:9
237:12 240:11,14
241:10 242:9
248:1 252:1
260:16 261:21
267:21
**actions** 60:11 87:9
87:10 124:16
135:21,22 140:10
168:5 169:3 195:2
221:23 256:12,13
260:19 261:18
262:6,11
**active** 153:10
**activities** 268:7
**activity** 115:7
244:24 259:14
**actors** 235:16
239:1
**acts** 76:18
**actual** 22:9 26:5
26:11 33:17 39:1
75:19 91:16
157:25 158:16
159:20,23 225:1
240:15,16,17
241:8,14,15 247:7
248:24 249:15
267:8,16 268:8
269:3

**acute** 209:2,4
**ad** 4:16 6:15 7:9
7:17 50:11 95:9
95:15 137:12
148:11 155:15
162:20 167:12
169:15 202:22
**ada** 241:2
**adam** 11:15 15:1
**add** 23:18 26:2
36:3 42:11 48:9
92:17 176:17
181:19 192:25
271:23
**added** 25:16
101:15 130:12
138:2 181:17
190:4 194:16
198:25 232:2
**addicted** 212:18
**addiction** 151:21
151:21,23 214:15
**addictive** 226:1
**addicts** 153:9
**adding** 258:7
**addition** 28:19
82:1 174:11
233:14 257:5
261:12 271:22
**additional** 18:1
104:4 148:20
164:2 169:22
225:8 227:13
260:24
**address** 23:9,21
25:12 61:8 66:16
75:19 80:7 84:7
96:11 115:24
131:6,10 142:22
154:6 155:20,23
158:2 159:3 163:8
171:22 173:9
174:17 176:9

186:14 187:4
188:22 200:25
201:16 202:18
203:20 204:24
210:5 240:4
242:25 245:8,10
246:10 254:14
256:6,20 261:8
268:23
**addressed** 38:19
132:7,8 149:11
155:5 162:8 173:7
202:9 203:19
227:17 244:11
260:5
**addresses** 154:6
174:9 189:7 232:5
267:5
**addressing** 25:10
30:2
**adequate** 146:19
147:21 153:22
196:21
**adequately** 71:12
110:15
**adhansia** 250:16
250:18,19,19,22
250:22,24,25
251:1,6,9,13
252:4
**adjudicate** 64:8
**adjudicated**
261:17
**adjusted** 107:15
**adjustments**
112:16
**administering**
122:17 123:6
**administration**
106:6 156:15
**administrative**
262:16

**administratively**
262:9
**administrator**
157:19 158:7
161:16
**admiral** 175:9
178:25
**admiration**
272:16
**admission** 98:16
100:2
**admissions** 97:4,4
99:25
**admits** 124:7
**admitted** 99:9
101:24 102:16,19
102:19,24 104:6
266:3
**admittedly** 23:10
249:24
**admonition** 20:6
240:7
**ads** 159:19
**adult** 41:18
**adulterate** 208:22
**advance** 102:13
**advancing** 48:20
**adversaries** 178:5
**adversary** 147:1
164:14 165:12
168:20 176:19
177:25 183:10
184:5 185:18
186:18 192:8
196:11,24
**adverse** 64:2
**advertise** 182:16
**advise** 17:7
**advised** 124:9
**advisors** 25:7,9
**advisory** 173:22
174:3

advocate 16:24
advocated 96:19
  266:6
advocates 225:6
afanador 5:16
  120:23
affairs 221:8,11
affect 134:13
  155:22 156:14
  177:4 191:11
affirm 253:23
  254:1
affirmative
  123:14
affirmatively
  122:25
affirmed 93:25
  254:2 262:23
affixing 58:25
afforded 107:7
affront 109:2
afield 121:19
afternoon 144:23
  145:23 162:25
  163:2 167:11
  229:23 233:7
  235:15 236:16
  240:1 256:25
  257:2 272:24
age 219:25 226:4
agencies 213:2
agency 105:16
  242:3
agenda 16:22
  19:14 28:1 79:21
  79:25 80:6
agents 232:23
aggravates
  152:25
aggregate 40:11
  61:12 62:13
  106:13,21 182:25
  191:2 192:14

ago 68:18 79:19
  124:17 177:21
  208:8 212:11
agree 22:2 30:15
  31:18 58:9 75:22
  95:25 96:2 105:5
  111:23 114:5
  116:6 119:8
  127:24 132:13,15
  135:12 169:22
  176:13 199:22
  201:9 207:15
  223:2 239:12
  247:12
agreed 16:16
  35:11 38:2 40:15
  72:11 92:25 93:2
  93:8 152:13
  169:19 227:14
  234:2 236:12
  261:8 269:24
agreement 109:20
  117:20 127:25
  229:17 236:24
  237:10 253:6
  257:10,12,18,22
  257:23 258:4
  271:22 273:21
  274:7
agreements 55:17
  56:19,21 179:3
agrees 112:12
  201:6
ahc 31:19 41:18
  49:16 50:9 74:20
  77:24 93:7 163:8
  166:25 227:9
  228:12
ahead 52:1 120:10
  120:20 162:11
  170:2 179:22
  201:1 205:8 211:5
  232:20

aimed 85:24
airways 131:16
aisling 13:9
akin 77:11 220:18
  224:24
al 7:4 16:3,12
  219:21 240:10
alabama 70:19
albeit 58:17 59:10
aleali 9:5
alert 152:7
alex 55:13 57:5,11
alexander 12:11
alfano 9:6
aliquot 138:6
allegation 123:16
  248:6
allege 43:17 81:13
alleged 147:15,23
  207:8
allen 5:22 120:8
  120:21,22
allies 137:11
  167:4
allison 15:17
allocate 16:16
  102:21
allocated 20:24
  144:20 262:4
allocating 199:6
allocation 27:14
  34:3 53:20 70:17
  91:2 92:23,25
  95:7,21 97:21
  103:19,20 110:23
  111:8 114:23,24
  127:20,24 128:21
  129:15 132:24
  138:14 142:8
  262:2 264:6
allocations 33:7
  83:17 142:20

allotted 80:1
allow 74:4 94:24
  108:2 109:15
  153:21 154:11
  157:17,20 210:19
  258:4 261:21
allowance 156:12
allowed 130:25
  162:3 206:16
  262:10,17
allowing 153:10
allows 103:18
alongside 35:7
alter 50:20 149:1
  194:12 200:9
  237:14 242:3
  243:8,23 244:4
  250:6
alternative 30:17
  31:25 41:4 45:18
  46:12 68:12 78:7
  265:18
alternatively
  51:23
alternatives 44:14
  210:8 212:9
amazing 89:17
amended 16:5,14
  18:14 20:8 94:25
  124:8 176:15,24
  229:4 233:18
  257:23
amendment 94:24
amendments
  258:15
america 37:4
  109:24 220:19
  221:17
american 125:21
  130:6,12 138:1
  151:24
americans 37:4

americas  4:17
  7:11
amount  49:12
  53:15 62:13 75:3
  93:24 94:10 99:18
  106:25 107:1
  112:4 115:6 127:3
  160:15 206:8
  218:5 250:17
  274:6,21
amounts  92:5
  94:21 153:16
ample  36:13
amplify  111:1
analogous  42:8
  74:6
analysis  30:9
  31:17 36:7,17,19
  47:12 50:20 51:20
  53:13 55:4 57:5,8
  57:12 61:21 63:7
  63:12 65:11,22
  71:22 89:21 93:25
  94:8 135:18 137:5
  241:23 242:1
analytic  28:14
analyzing  77:6
anatomy  214:13
andrew  6:19 8:23
  9:6 13:8 272:9
angela  11:17
angers  69:10
anker  8:6 9:7
  162:22 174:21,25
  174:25 175:4
  178:22 179:8,23
  180:3 187:14,21
  188:2,6,22 191:17
  192:3,8,21 193:5
  193:17,19 194:9
  195:11,13 196:2
  196:20 197:16
  198:3,11,23 199:5

199:18 200:6,14
  200:21 201:6,9
  202:8 203:23,23
  204:8,17 274:18
anker's  200:25
  201:2,16
ann  12:9
announce  19:11
announcement
  145:17
anoints  208:1
anomalous  113:24
answer  18:6,7
  26:25 28:21 77:2
  92:23 95:21
  102:20 129:10,11
  129:12 207:4
  227:4 231:3,23
  233:13
answers  92:24
ant  55:6
antagonists
  206:20
anti  190:15,16
antipathy  44:25
antitrust  101:22
  108:17
anybody  17:1
  35:18 78:9 93:4
  129:2 156:5
  157:24 162:1
  232:12
anymore  24:21
  264:25
anyway  120:11
  211:7 216:2 219:3
  219:19,20 265:5,9
anyways  201:19
apart  35:14
  106:18 259:13
apologies  16:6
  72:6 188:24

apologize  16:8
  25:20 43:2 141:17
  146:6 175:4
  182:22 192:22
  193:12
apology  37:19
apparently  78:6
  140:24 208:4
appeal  147:19,22
  253:24 262:23,23
appear  104:15
  151:10
appeared  166:15
  174:15
appears  120:14
  272:5
appendix  33:24
appliable  163:7
  195:2
applicability
  194:19 228:7
applicable  130:18
  164:5 262:7
  269:20
applied  238:10
  255:13
applies  26:9 51:21
  94:9 113:3 154:24
  188:17 198:17
  264:7 269:2
apply  24:21 30:13
  36:15 68:16 100:5
  119:1 128:24
  136:7 138:8
  183:21 239:6
  262:25 263:20
  264:9 269:15
applying  30:12
  106:12
appointed  74:18
  251:3
appreciate  27:3,4
  50:2 69:13 112:5

130:21 131:5
  140:13 144:10
  156:19 207:22
  218:9,11 256:15
appreciative
  104:25 140:1
approach  92:4
approached
  246:19
appropriate
  24:17 70:1 93:24
  156:22 159:12
  162:10 163:6
  166:22 169:14
  171:4 178:10
  271:12 272:20,21
appropriately
  87:22
appropriates
  106:14
approval  267:18
approve  198:19
  211:10
approved  35:22
  100:8 122:14
  148:15,22 211:8
  211:10 227:21
  250:22
approving  156:4
  166:20 258:18
approximately
  83:8,18
aptly  86:23
arbitration
  169:11 174:14
  179:3,13,16,21
  181:10,13 186:19
archetype  43:25
  43:25
ardavan  10:13
area  104:18
areas  88:25
  107:24 213:9,12

**arenas** 221:10
**arguably** 49:15
  73:7 235:18
  241:18
**argue** 38:8 44:21
  50:19 60:15 70:3
  73:17 87:13 95:10
  99:21 107:8
  114:22 121:21
  146:18 153:1
  164:9 168:11,17
  168:20 169:5
  178:12 179:11
  184:21 191:1
  192:13 268:10
**argued** 18:2 19:7
  31:19 50:8 89:13
  89:13 115:9 119:6
  137:11 168:8
  186:10
**argues** 114:12
**arguing** 73:8
  80:17 88:18,19,22
  180:22 186:5,6,8
  190:6,24 236:19
**argument** 16:4,13
  19:13 27:7,15
  29:10,21 38:5,20
  41:9 43:4,14
  46:19 49:1,24
  50:5 52:6,17 54:7
  55:19,21 61:8
  67:18 69:25 76:12
  79:6,22 84:11
  87:5,20 88:7,15
  90:12,21 91:11,13
  91:17,19,23 99:24
  104:12 105:9
  106:20 113:9
  120:15 124:3
  130:10,14,14,16
  132:2 140:20,23
  145:15 146:2,2

149:19 150:17
  155:19 170:18,19
  171:16 193:6
  198:1 204:19
  226:23,25 229:5
  235:23 256:16
  261:8,15 263:22
  274:22 275:9
**arguments** 95:3
  106:17 107:9
  115:22 121:4
  139:4 164:13
  202:18 228:10
  229:14 240:3
  257:7
**arik** 8:25 220:21
  224:23
**arises** 190:23
**arising** 82:5
  194:24 230:15
  231:15
**arm's** 181:22
**arose** 82:4
**arranged** 89:22
**arrangement**
  163:19
**arranging** 92:10
**arrived** 68:23
**arrives** 160:24
**artem** 14:20
**article** 135:10
  150:2,7 223:3
**articulated** 50:20
**asbestos** 32:12
  147:18,20 172:14
  254:4
**ascertain** 55:9
  61:15
**ascertainable**
  150:25
**aside** 96:11
  129:25 133:16
  187:23

**asked** 25:19 28:2
  60:13 63:3 68:18
  111:20 116:15
  129:19 138:4
  141:2,25 176:13
  176:16 178:25
  179:11 204:20
  221:18
**asking** 58:23
  105:7 109:8 110:9
  114:19 160:23
  161:8 162:5 182:4
  182:6 184:2
  189:13 190:2
  195:17 198:16
  225:19 230:14
  254:13 256:9
**aspect** 65:11
  90:21 128:21
  135:11 143:8
  199:25 201:7
  267:12
**aspects** 27:9 93:20
  133:23 138:19
  162:17,18 164:12
  201:13 203:2
**assert** 35:14 38:22
  56:20 61:17 81:18
  81:22,24 91:11
  125:6 135:1
  143:14 147:8,23
  148:3,13 164:11
  232:12
**asserted** 26:17
  32:16 55:16 61:24
  63:22 74:24 77:14
  89:7 136:1 173:19
  232:12 252:9
**asserting** 55:10
  61:16,22 62:20
  147:13 244:1
**assertion** 143:5

**assertions** 160:6
  160:11 164:14
**assessing** 45:3
**asset** 45:25 169:23
**assets** 40:9,21
  42:2 64:5,22
  65:21 77:1 90:16
  90:20 121:14
  122:17 123:3,6,21
  136:11 139:8
  140:5,5 142:12
  168:7 169:7 171:8
  173:16 182:25
  226:16 259:1
**assign** 32:4
  180:16
**assignment**
  163:20 173:13
  179:9 184:12
  190:15,16
**assisting** 17:21
**associated** 77:18
  105:7
**association**
  220:14
**associations**
  217:23
**assume** 40:10
  47:13 63:3 203:24
  204:2 272:4
**assuming** 61:17
  90:11 229:6
  257:25
**assumption** 31:21
  61:20 62:19 66:5
  74:2
**assure** 205:8
**astray** 161:7
**atinson** 9:8
**atkinson** 47:2
  77:8
**attached** 127:13
  135:1 257:25

**attaches** 77:9
**attack** 64:12
**attempt** 55:1,8,18
  61:15 91:8 94:1
  95:4 109:2 142:18
  147:9 148:4
  175:25 178:3
  232:13
**attempted** 55:14
  147:19
**attempting** 17:3
  23:4 233:17
**attend** 271:21
**attention** 220:21
  257:8
**attenuated** 56:22
  57:13
**attorney** 3:4 5:1,2
  6:1,2 7:1 96:23
  97:1 101:18 102:3
  104:13 215:15
  220:21,21 221:1,2
  221:9,11,11,21,25
  222:1,3 225:8,16
  225:16
**attorney's** 6:8
**attorneys** 3:16 4:2
  4:9,16 5:2,10,17
  6:15 7:2,9,17 8:2
  8:9 41:17 88:8
  92:8 97:22 220:10
  221:22 224:21
**attribute** 126:19
**attributed** 245:1
**audio** 16:7
**audit** 224:17
**august** 1:16 2:1
  35:7 44:10 71:4
  160:2 203:15
  276:25
**augustus** 161:10
**auslander** 9:9

**authorities** 87:11
  218:1
**authority** 23:1
  66:19 86:1,3
  135:10 157:19
**authorization**
  173:23
**authorized** 180:6
  180:7,21 232:22
**authorizes** 173:15
  180:17
**automatic** 261:22
  262:19 265:19,21
  265:22
**available** 33:23
  56:20 60:9 160:7
  212:11 227:4
**ave** 7:19
**avenue** 3:5 4:17
  7:11 8:11
**average** 32:16
**avoid** 93:2 153:3
**avoidance** 123:17
  135:21
**avoiding** 46:6
**award** 172:19
**aware** 61:23 90:4
  92:14 98:7 147:5
  147:7 201:22,25
  227:22 270:23
  271:17
**awoken** 220:4

**b**

**b** 1:21 33:25 34:2
  39:6 82:24 109:10
  130:15 137:7
  184:17 223:7
  234:19 261:19
  262:15 264:12,21
**b.r.** 32:17 33:3
  66:11 97:11 98:22
  102:11 143:11

**babcock** 172:4
**back** 17:8 25:21
  26:19 34:20 47:7
  47:10 50:8 78:23
  89:14 97:18
  106:16 109:8
  110:10,13 112:3
  127:10 131:15
  135:11 144:24
  145:9,21,24 167:7
  178:7,8 193:21
  196:7,14 197:1
  198:21 201:21
  202:22 203:14
  208:11 210:13
  217:3 226:3
  232:15 237:17
  238:8,18 251:14
  251:15 255:4
  264:23 265:9,18
  267:18 268:18,22
**backdoor** 26:19
  270:9
**backdrop** 23:14
**backing** 259:15
**backs** 157:13
  198:8 225:14
**bad** 97:23 99:11
  110:8 156:24
  175:6 210:13
  241:13 249:16,20
  249:23
**bag** 110:16
**bailiwick** 64:25
**balance** 98:2
  100:22 103:17
  207:13 256:8,11
**balancing** 157:5
**ball** 9:10
**ballot** 206:7,14
**ballots** 124:10
**baltimore** 6:4

**bank** 220:19
**bankruptcies**
  189:18
**bankruptcy** 1:1
  1:11,23 28:10
  45:9 59:25 63:9
  63:12 64:5,18,20
  64:21 65:11,12,16
  65:20 66:3,10
  76:22 78:2 90:14
  98:7,21 99:4
  100:2 107:2
  111:17 113:16
  123:13 130:3,18
  133:17 135:7
  142:15 143:3,15
  143:19 147:19
  148:2 150:7
  164:20,23 165:1,2
  166:18 168:1
  169:4,9 170:12
  171:5,10,20
  173:15,18 175:20
  177:9,23 178:1
  182:2 183:5 186:6
  186:23 188:14,20
  188:22,24,25
  189:3,12,17
  190:25 191:1
  195:1,6 196:8,15
  198:5 211:25
  224:13,17 225:17
  237:17 255:12
  260:16 262:13
**banks** 151:17
**bar** 146:23 148:17
  153:23 157:15
  161:14
**baranpuria** 9:11
**bargain** 253:7
**bargained** 252:17
  253:2

**bargaining** 22:4
**barker** 9:12
**barred** 147:12
**barrel** 214:20
**barrier** 155:3
**bars** 169:21
**base** 66:13
**based** 21:3 29:25
  32:14 42:7 53:20
  56:21 57:5 58:23
  60:3 71:13 88:7
  89:8 90:17,18
  96:22 100:11
  103:21 105:9,11
  105:11 108:6,23
  109:9 110:5
  116:17 132:22
  168:18 169:3
  172:13 180:8
  181:22 201:5
  203:2 212:25
  237:24 240:12,15
  241:23 249:15
  262:2 264:5 268:5
  268:20 275:7
**basic** 80:15
  176:10 178:11
  188:9
**basically** 18:20
  29:11 65:21 72:11
  83:2 93:2 152:13
  173:24 198:13
  200:17 264:24
**basis** 27:8 57:11
  67:14 87:13 95:7
  107:5,15 127:25
  128:6,9,16,17
  132:21 143:6,8
  156:18 164:19
  182:25 192:14
  244:8 270:4,4,5
**beacon** 223:4,9,12
  223:13,15,17,18

**bear** 124:16
  261:11
**bears** 52:22 231:8
**beat** 131:22 203:7
**beaucoups** 211:2
**becoming** 63:11
**began** 47:25
  219:23
**begged** 221:1
**beginning** 71:5
  222:13 229:5
  241:10
**begins** 20:14
**behalf** 16:21
  21:20 42:17 43:3
  43:5 48:7 74:17
  77:12,15 80:3
  95:15 120:22,23
  147:4 153:8
  155:15 162:23
  163:1,8 166:25
  179:11 224:7,11
  234:5 240:1 246:5
  249:13 261:14
**behavior** 254:6
**beiderman** 11:16
**belabor** 134:7
  271:11
**belatedly** 149:2
**believe** 17:4 21:11
  23:16 24:11,20
  27:25 37:11 40:1
  43:24 46:4 47:1
  47:19 54:2,2 64:7
  64:9 69:10,12
  78:8 80:10 83:24
  88:16 93:9 107:6
  112:2 119:3,4,7
  133:22 140:8
  146:2 149:11
  163:6 165:12
  166:21 181:4
  192:3 195:21

199:18 202:2
  203:14 217:12
  232:5 247:13,13
  247:14,19 250:10
  259:2,2 260:24
  273:11 274:24
**believed** 94:25
  198:7
**believes** 78:7
**belong** 87:7
**bench** 273:11,15
**beneficiaries**
  123:25 223:17,25
**benefit** 47:6 56:8
  56:13 75:10
  103:22 220:16
  223:6,7,16,21
**benefiting** 211:21
**benjamin** 3:9
  264:16
**bereaved** 221:7
**beretta** 85:21
**bermuda** 169:11
  174:14
**bernard** 10:13
**bernstein** 30:9
  32:12 50:3
**bernstein's** 50:3
**best** 18:11 19:1
  28:2,6,24 29:9,13
  29:22 30:3,12
  31:16 38:19,22
  39:16 42:16 43:13
  43:24 45:6 46:11
  47:3,9,14,22 48:5
  48:24 52:8,11
  53:2,7 62:1 66:7
  66:14,21 68:9,14
  69:23 73:24 74:19
  77:5 103:6 110:19
  175:7 212:17
  217:19 226:18
  256:5 273:14

**better** 29:13,16
  31:24 38:23 40:23
  41:4 44:7 45:8,12
  48:1 61:10 70:10
  70:11,12 76:10,23
  78:7,11 89:19
  102:8 103:2
  142:25 174:20
  246:9
**bevy** 72:23
**beyond** 20:23
  32:3 38:25 51:20
  64:18 65:14 74:1
  121:8 229:17
**bfp** 79:14
**big** 18:4 39:13
  113:7 114:5
  213:12 215:13
  224:6
**bigger** 46:14
  213:15
**biggest** 215:12
  216:23
**bill** 222:11
**billion** 30:25
  32:15 34:14,14
  35:12,21 36:1
  40:13,14,16 45:16
  45:21 46:8,15,20
  46:21 61:13 72:12
  72:21 76:9 79:1
  116:2 117:5
**billions** 31:2
  33:25 35:13 38:5
  38:6,10 40:15
  41:14 45:25 46:5
  47:22 86:21
**binding** 164:6,15
  165:7 173:5
**birmingham** 7:4
  161:15
**birth** 214:1

**birthday** 220:2,3
**bit** 28:3 100:20
  122:20 123:7
  144:21 145:2
  188:7 203:5
  230:18
**blabey** 9:13
**blackline** 26:15
  180:4 197:6
**blankie** 223:8
**bldg** 5:4
**blight** 116:16
**blites** 108:1
**block** 148:4
**blocking** 74:13
**bloomberg** 224:4
**bloyd** 7:2 146:3,4
  146:14,23 149:12
  149:13,14,25
  153:7 155:4
**bloyd's** 152:10
  154:14
**blue** 220:13,13
**board** 248:17
  250:23 251:2,20
  255:2 269:16,17
  269:23 270:1,2,6
**board's** 41:21
**boat** 274:19
**boca** 220:17
**bograd** 9:14
**border** 129:3
  132:10 137:23
  141:25
**bore** 220:2
**born** 221:17
**bottle** 214:20
**bottom** 127:12
  242:2
**bowing** 121:15
**box** 7:3
**brauner** 9:15

**brave** 225:6
**breach** 90:17
**breadth** 27:8,9,18
  229:9,12 258:24
  260:9
**break** 27:22
  144:14 145:1,17
**breakthrough**
  209:12,16
**brian** 6:6 12:22
  233:8
**bridge** 38:4
**bridgeport** 4:4
**bridges** 7:2
  144:17 146:4,15
  149:12,25 150:10
  153:7 155:4
**bridges'** 146:21
**brief** 31:19 42:5
  42:20 50:8 54:6
  54:19 61:9 64:13
  66:23 68:5,15
  70:9 84:11 85:8
  85:20 87:8 88:13
  91:6,24 93:12,14
  93:21 94:15 120:4
  120:13,16 189:24
  196:24 227:3,16
  227:17,18 233:23
  261:15
**brief's** 91:11
**briefed** 188:20
  189:14
**briefing** 182:9
  183:23,25 184:6
  184:18 185:22
  186:20 190:2,10
**briefly** 48:25
  66:16 79:25 84:7
  140:18 148:14
  159:3,7 171:22
  261:4,8 264:15

**briefs** 228:10
**bring** 48:3,3 70:8
  86:10 87:9 97:7
  107:9,12 110:9
  118:22 122:19
  133:11 188:11
  226:3 251:14
  257:8 267:20
**bringing** 85:24
  150:4 242:15
**brings** 20:1 28:1
  44:3 183:2 272:7
**broad** 5:19 27:12
  165:4 206:17
  232:8 234:9
  235:12,13 249:25
  259:2,5
**broader** 25:23
  244:6 246:14
  249:14
**broadest** 118:22
**broadly** 256:11
**broadway** 5:11
**brooks** 9:12
**brother** 73:22
**brothers** 225:22
**brought** 20:3
  76:24 85:4 88:20
  88:23,25 89:4
  123:13 125:11
  246:17 255:8
  268:14
**brown** 9:16
**brunswick** 9:17
**bryant** 220:19
**bryce** 10:22
**building** 209:18
  209:18
**builds** 160:4
**built** 158:9
**bunch** 92:24
**burden** 52:23,24
  53:2 66:7,20,21

66:24 70:7,16
  73:10 89:12
  266:20
**burdens** 262:14
**bureaucracies**
  213:2
**buried** 158:4
**business** 69:8
  142:5
**businesses** 259:1
**butcher** 182:22
**buyer** 55:17 56:20
  56:20

**c**

**c** 3:1 10:1,9 12:7
  12:23 16:1 39:7
  52:15 70:24 276:1
  276:1
**cabin** 259:9
**cabined** 249:10
**cahn** 9:18
**calculate** 152:15
**calendar** 273:14
**california** 53:4
  80:10 81:21,23
  86:18 102:2,8
  106:24 107:13,25
  109:8,22 111:25
  112:2,19,21 113:8
  113:25 114:5,21
  114:24 115:9,21
  116:12,23 118:6
  118:16 183:22
  220:12
**california's** 113:7
  114:6 118:17
**call** 23:22 24:23
  26:18 27:13 84:24
  106:24 166:1
  173:22 234:3
**called** 84:1 141:23
  153:24 221:25
  224:24

calls 219:1
camera 219:13
canada 122:17,18
  123:18,21 127:1
  127:14,17 129:4
  136:18 138:15,25
  139:4 140:10
  141:19,23,23,24
  142:4,6,11 267:6
  268:10 269:17,18
  269:19,20,21
  270:1
canada's 123:18
canadian 5:17
  119:23 120:12,24
  120:24 121:5
  122:18 123:7,20
  123:23 124:4,12
  124:23,23 125:3,4
  126:3,13,20 127:1
  127:7 129:5 133:6
  133:8,13,18,25
  134:10 136:10
  137:19 139:1,6,11
  139:15,16,18
  140:5,8,10 141:3
  142:7,11,12 267:5
  267:6,21,25 268:2
  268:9,11,21 269:5
  269:10
canadians 124:9
  124:18 125:10
  139:12
canard 74:13
candidate 175:11
can't 146:20
  158:23 165:10
  168:10 172:10
  184:20 188:11
  196:14 197:2
  200:12,13,18,20
  208:15

capable 32:10,19
  37:1 44:2 55:20
  66:6 69:23 150:13
capacities 230:23
capacity 110:1
  230:20 231:5,14
  247:21,22 248:1
capital 223:20
  268:12
capitol 5:4
caplin 3:15
capture 245:5
car 247:9,15,18
  247:24,24
card 213:22,24
care 85:10 220:18
carefully 105:15
  117:2 238:7
caremark 220:14
caroline 10:24
carrie 8:18 205:18
carrier 185:19
  190:22
carriers 179:11
  179:12 183:16,16
  183:17 185:10
carriers' 183:17
carter 256:19,22
carve 23:23 24:4
  27:6 107:13 109:8
  109:23 110:11
  145:7 238:13
  240:14 250:4
carved 22:24 24:5
  24:6,18 25:6
  112:19 251:10
carveout 106:24
  165:25 255:24
carving 26:17
case 1:3 7:8 19:21
  20:3,21 29:2,11
  30:5,6 32:12 36:9
  38:2 40:25 42:14

46:11 51:4 52:4
  55:13,16 57:8
  58:17,20 61:17,24
  64:1,13 70:13
  73:20 78:15,19
  82:8,11 83:4 85:6
  85:12,23 92:5,16
  93:5,23 96:24
  97:11 98:22 99:17
  104:2 105:8 122:5
  122:8 123:9,16
  124:14 128:10,12
  131:15 132:19
  134:12,21 135:14
  135:16,17 136:9
  140:2,3,12,14
  143:9,10,11 144:5
  144:8 148:7 150:2
  150:3,4,5 151:14
  151:16,20,20
  152:9 154:9
  155:15 163:22
  166:6,13 172:4,9
  175:19 180:12,13
  180:14,19 184:25
  186:17,21 189:6
  195:21 196:11,15
  196:17 198:15
  206:25 215:20
  217:17 219:21
  225:10 226:17
  231:11 238:9,17
  239:14 244:8,19
  245:20 248:12
  249:4,6,8,9,9
  251:23 252:9
  253:20 256:9,10
  256:19 258:14
  260:14,17,21,22
  262:11 264:24
  266:10,21 271:2
  272:14 273:6

caselaw 90:13
  170:19 197:9,15
cases 32:4,7,11
  47:25 50:1,15,21
  51:5 58:1 64:12
  65:15 69:15 77:11
  82:5,12 85:7,12
  86:9,12 89:23
  92:4 93:22 94:14
  100:12 105:2
  143:18 163:20
  166:2,5 171:23
  172:8,11 176:2
  178:6 185:11
  188:14,23 190:12
  191:6 197:8
  201:18 240:13
  273:12
cash 31:1 46:8,21
  106:24 109:23
  128:23 133:21
  138:7
cast 89:18 122:11
categorically
  239:6
category 24:13
  245:11,13
catherine 8:22
  11:16
caught 32:21
cause 101:14
  251:10 252:1
caused 215:6
  226:14
causes 71:8,15,18
  71:19 74:6 237:12
  240:11 260:16,19
causing 260:12
cavil 38:25
cede 228:19
center 8:3 220:17
  224:10

central 46:11
150:19 156:17
157:11
centre 8:10
cercla 253:2
255:18
certain 25:3 74:25
81:16 83:25 88:20
91:12 120:23
136:18 162:17,20
164:8 168:8
174:12 202:1,4
227:12 237:12
certainly 17:15
19:16 20:1,5 41:8
44:5 46:12 50:3,4
78:9 89:23,25
94:12 104:1
117:21 128:24
137:1 150:11
152:5 156:11
175:24 250:17
271:7,9
certified 276:3
cet 35:16
cetera 85:3 191:6
207:21 250:7
chadbourne
24:14
chain 238:15
challenge 64:17
84:18
challenged 173:25
chalos 9:19
chambers 6:9
270:21
chance 27:2,10,21
110:21 121:21
131:4,10 229:3
258:1
change 20:8 24:2
26:21 50:14
103:14 109:9,22

119:14 156:17
171:2 177:6,7,7,9
194:12 197:4,5
222:10 273:16
changed 19:3 26:4
106:8,9,10 108:2
117:23 149:5
240:11
changes 19:16,17
21:22,23 22:9
26:22 27:4 102:13
229:3,7,21 240:3
257:5 274:17
changing 153:17
178:16
channeled 172:15
255:9
channeling
261:24
chaotic 43:15
chapman 17:5,7
17:21 18:5 19:20
21:1 273:22
chapter 16:5,14
30:23 49:4,14,18
50:15,21,23 51:16
52:5 54:22 55:16
56:20 62:24 65:15
74:8 76:24 77:11
81:17 82:5,12
171:18 185:11
203:3 224:19
225:9 240:13
251:1 271:1
characterize
23:11
characterized
100:6
charged 105:17
charitable 223:17
223:22
charles 146:4
150:1

charleston 5:5
chart 53:21,25
70:17 216:11
chase 90:12
chases 73:14
chasing 40:8
chasm 38:4
chassix 97:11
98:21
check 21:9 197:14
checked 145:9
chemistry 275:6
cheryl 220:15
child 153:18
children 215:6
219:1 221:4
chip 22:4
choice 45:13 70:4
122:25 134:1,5
choose 45:13
chosen 45:8
chris 155:14
christina 13:23
151:7
christine 82:23
christopher 7:14
8:21 14:1
chronic 209:2,23
210:4
chronology 183:8
chubb 174:3,4
181:3
chuck 108:11
cicero 9:20
cir 128:11
circle 3:17
circling 217:2
circuit 28:17,25
29:1,15 31:15
68:13 94:1 128:9
137:4 143:18
147:21 163:22
166:6 180:18

249:8 256:11
circuit's 249:24
circuit's 147:10
147:17
circulate 273:24
circulated 16:17
circumstance
136:15
circumstances
44:1 82:18 87:8
102:24 151:1
156:1 199:10
246:17,18 250:1
263:19
cite 26:14 41:7
50:2 89:23 107:18
123:9 135:17
170:23
cited 28:15,19
47:1 64:12 85:8
87:11 94:14
101:19 150:4
172:4,8 189:6
cites 72:7 108:7
143:17 170:5
cities 80:13 85:8
86:15,25 127:8
140:24
citing 100:12
citizens 44:15
45:17 46:6 73:24
city 85:12,20,24
86:19 124:25
213:12
civil 81:23 89:3
241:1 246:23
252:18
claim 24:20 26:5
26:12 30:5,6
35:12 37:8 39:2
39:25 40:3,6
42:11 49:8,11,17
50:17 51:11,12

57:6,7 61:20,23
67:5 69:17 76:3
79:1 83:14 91:7,9
92:3 93:20 94:2
106:13 112:11,12
113:13 122:25
123:1,14,17,18
124:14,19,19,24
126:14,24 127:13
131:14 136:8
137:6 143:5 145:8
146:22,24 147:1
153:8,11,20,22
155:20 156:6,10
156:12 157:13,20
157:24,25 158:21
158:22 161:16,24
162:3 185:11
192:5,6,15 206:8
206:16 215:8,14
220:7,24 222:6
231:11 232:11,11
232:12 238:20
242:10 243:23
244:1,6,16,20
249:12,25 250:11
250:12 254:23
255:3,18 263:19
263:21,21 267:17
267:17 268:2,5,8
268:13,13 270:6
**claimant**   38:25
90:16 147:18
205:11
**claimant's**   76:3
**claimants**   7:18
34:19 39:23 40:8
40:10,13 41:4,5
43:13 45:14 67:10
94:5,11 95:16
99:17 122:18
128:8,8 131:17
132:19 146:16

147:20 155:13
159:16,19 167:13
172:16 181:20
191:8,11 192:20
207:3 228:4 254:4
**claiming**   191:14
**claims**   20:11
25:14 26:16 29:14
31:1,3,7,10,16
32:6,8,9,13,16,18
32:23 33:2,10,17
34:6,8,21,23
35:11,13,15,15,15
35:17 36:24 37:1
38:9,21 39:9,17
39:18,20,21 40:1
40:4,6 41:7 42:1,6
42:7,8,9,21 43:23
44:1,8 45:15 49:7
49:18 51:22 53:1
55:3,5,10,15,19
56:5,14,17,17,22
56:23,24 57:1,3
57:11 58:12,13,21
58:25 59:2,9,13
59:16,22 60:15,24
61:1,4,10,11,12
61:16,18,18,22
62:3,4,7,8,11,15
62:20,21,24 63:4
63:6,14,21,23
66:5,19 67:15
69:20,22 70:9
71:10,12,24 73:1
73:2 74:23 75:2,3
77:13,17,18,20
80:20,23 81:2,4,8
81:12,16,18,22,24
82:1,5,6,12 83:24
84:13,20 85:5,9
86:10 88:19,19,20
88:23 90:1,15,17
90:18,20,24,25

91:12,13 92:1,5,6
92:15 94:11,21,23
99:19 122:5,19
123:13 124:21,23
124:24,24,25
125:2 126:20,22
126:25 127:14
128:10,25 131:10
134:23,25,25
135:25 138:3,15
139:15,18,21
145:13 150:21
152:8 153:10
154:12 155:22,23
156:20 157:17,19
157:25 158:6,7
160:15,21 161:22
162:10 163:14,25
164:22 165:20
169:21 172:15,18
172:23,25 187:9
187:24 188:5
191:15 192:2
197:21 198:17
225:20 230:14,17
230:17,17,22
231:3,4,4,9,13,15
232:1 235:8,22
236:23 237:24
238:3 240:23
241:1 242:17,17
243:6,7,9,10
244:12,13 245:15
248:23 249:19
250:11 254:7,25
255:2 259:12
260:4,15,18,18
261:17,25 262:18
263:2,13 264:4
267:4,6,6,8,24
269:3,4,4,6,7,16
270:7

**clarified**   23:6
26:20 195:25
**clarify**   23:7
162:12 202:10
230:11 233:11
235:15 236:1
**clarifying**   230:3
**clarity**   22:10 45:8
**class**   20:21 36:2,8
36:11 49:2,2,7,8
53:11 69:16,18
72:16 82:1,21,22
83:24 84:20 87:22
89:16 90:18 91:9
92:11 93:1 94:17
94:18,25 95:1
100:8 112:11,22
112:23 113:3
124:11 125:19,20
126:4,5,7,11,21
128:10 130:8,12
130:13 131:17,20
131:21 132:1
133:13 137:14,18
138:18 148:9
155:20,22 156:7
156:12,13,20
**classes**   47:19
80:23 90:1 124:5
124:10 125:9
126:2 130:7
**classification**
79:22 80:8,16,19
83:21 84:3 89:5
89:14,19,20,22,24
91:12 128:7 130:3
132:21
**classifications**
84:19 89:12
132:12
**classified**   69:18
80:21 81:3 82:6
82:10,16,21 87:13

87:22 89:1 130:9
133:14 134:2
**classifies** 80:13
**classify** 81:7
82:14 90:17
140:21,24
**claudia** 14:23
**clause** 187:16,17
192:23 241:9,10
**clean** 173:11
246:22
**clear** 17:16 26:3
29:22 32:3,8
72:12 73:8 78:20
79:7 85:7 86:2,14
96:12 108:10
110:5 111:9
116:11 118:23,25
119:1 125:24
127:20 128:18
131:10 133:8,25
152:6 156:23
163:23 165:21
174:6 176:17,22
180:20 190:3
193:5,7 198:25
200:9,19 201:4,5
202:5,23 204:1,12
206:14 207:5,7
217:20 231:24
233:18 236:2,10
237:1,1,9 238:17
239:13 242:11
243:15 245:14
246:3 251:4 253:7
258:15 260:23
262:17 263:17
268:15,24 271:20
**clearer** 90:13
236:13
**clearly** 25:25
45:14 80:4 94:9
99:22 124:22

133:5 184:19
217:5 226:12
240:18 245:13
250:7,16 269:15
**clerk** 82:23
**clerk's** 271:8
**clerks** 204:23
**client** 138:12
178:2,3 182:13,13
**client's** 138:2
**clients** 44:22 69:7
69:24 78:10 91:8
122:3,4 124:6
126:1 129:22
130:9 136:8
137:15 139:14
140:12 147:7,15
148:7,7,12,23
179:7 180:13
195:23 251:20
253:1 266:16
**clients'** 160:6
**clint** 10:8
**clock** 17:20 18:24
**clone** 226:3
**close** 32:11 36:3
45:15 95:23 138:7
239:3
**closed** 183:25
**closely** 108:8
234:11
**closing** 150:17
270:25
**clouding** 22:17
**club** 7:3
**clue** 183:10,13
**coalition** 35:25
125:7
**coast** 175:5
**code** 51:13 81:17
81:23 90:14 96:10
96:12 98:21 99:14
123:13 130:3,19

133:17 135:7
136:3 143:3,4,15
157:6,12 158:1,19
158:20 164:20
165:1,2 166:19
170:12 171:5,6,19
173:15 186:6
189:12 190:25
191:1 195:1,6
260:16 262:14
**code's** 173:23
**cogently** 85:19
**cognizant** 84:10
232:24
**cohen** 88:2
**colander** 206:6
209:25
**coleman** 9:21
**collaboratively**
109:18
**collateral** 196:16
**colleagues** 26:7
95:19 109:5
111:18
**collect** 140:9
**collectability**
77:21
**collecting** 65:9
77:19
**collection** 41:10
43:19 56:25 57:3
**collective** 198:5,7
**collectively** 44:5
181:17,20 182:12
183:1 192:23,25
193:7 198:25
**colloquial** 190:8
**colloquies** 28:9
**colloquy** 18:17
25:15 78:1 231:22
**colorable** 67:5
**columbia** 48:20
53:5 80:9 83:3

88:3
**combinations**
233:24
**combine** 214:18
**combustion** 166:2
190:12
**come** 23:17 40:13
47:10 65:20
106:23 107:17
110:25 127:6
136:19 138:6
143:22 144:24
145:21 157:17
158:23 167:7
189:19 191:16
200:16,18 217:16
218:5 238:8
243:25 244:16
255:12 266:13
267:18,20 268:18
268:22 269:12,23
270:3,16 272:3
**comes** 67:12 85:1
105:17 106:8
137:4 183:11
226:12 255:4
**comfort** 18:8
246:6
**comfortable**
30:18 31:23 59:1
78:16 181:7 187:2
204:13
**coming** 26:19
128:23 150:8
198:20 267:23
**comley** 4:1 261:6
**comm** 7:17
**command** 52:4
**commenced** 77:12
232:9 261:18
**comment** 144:4
145:1 229:10
266:24 267:1

**commentary** 25:3
231:19
**commenting** 20:9
**comments** 22:6,7
23:9 84:11 88:14
204:6 233:4,6
250:10 257:5
260:25 272:12
275:1
**commercial**
175:20
**commitment**
174:13
**committed** 65:25
**committee** 4:16
41:21 74:16 77:13
77:24 95:9,15
131:12 137:11
162:20 167:12
169:15 181:9
182:23 202:22
220:18 225:4
259:25
**common** 104:19
151:25
**commons** 78:23
**communities**
100:16,17 108:21
109:15 142:17,19
**community** 84:23
110:3 153:18
217:23
**companies** 142:22
177:5 187:12
194:22
**company** 8:2
73:20 76:18
141:23 142:12
187:24 206:18
207:13 214:11
223:11,12 224:10
224:18 238:19
239:3 240:22

243:12 247:18,24
254:3 256:23
268:21 269:11
**company's** 224:13
226:14
**compare** 81:14,20
**compared** 72:20
110:8,20
**comparing** 182:24
**comparison** 53:8
54:7,20 140:5
**compensation**
17:10
**competing** 36:16
36:17 45:19 63:6
**competitors** 45:4
**complaints** 57:18
62:22 74:7 81:14
81:20 98:4 127:13
135:1 243:9
**complete** 67:2
177:1 246:22
252:18
**completely** 24:7
30:15 60:4 61:19
208:17
**complex** 5:4 44:1
69:6 94:10 232:25
273:6
**complexity** 40:24
**compliance** 96:10
**complicate** 233:12
**complicated**
18:23 102:25
129:24 175:17
217:21
**complicates** 244:3
**comply** 233:16
262:7
**component** 174:9
**components**
164:10 168:12

**compromise** 98:6
98:7,8 103:17
115:11
**compromises**
97:17
**computer** 218:20
**concede** 83:16
104:24
**conceded** 93:14
**concededly** 91:13
**concedes** 83:8,9
**concentrated**
154:2
**concentration**
154:7
**concept** 244:23
**conceptions** 68:19
**conceptual** 21:25
**concern** 118:18
139:5 193:23
194:2 200:1
216:23 237:5
240:8 248:6
259:17 260:9
**concerned** 90:14
127:21 155:2
195:17 196:4
204:10 257:24
274:3
**concerning** 77:16
101:7,12 208:20
240:5,19
**concerns** 25:11
152:5 158:4 202:2
202:9 218:10
232:6 245:10
260:7
**conclude** 41:2
50:22 148:12
**concluded** 44:16
86:20 154:17
166:14 275:13

**conclusion** 58:23
184:15
**conclusions** 29:5
36:13 163:9
167:15 173:8
176:7 178:19,24
179:6 195:19
**concrete** 36:25
**condition** 59:12
138:25 174:10
**conditions** 35:20
194:19
**condone** 222:24
**conduct** 23:5
25:17,17 26:2
68:23 142:22
230:14,15 231:15
231:16 234:13,13
235:24 237:16,20
237:21 239:18
242:12,19 243:18
248:8,25 249:1,1
249:2,17 250:4,5
251:6 254:7,8,15
254:25 268:6,20
**confer** 37:7
**confers** 98:24
103:22 203:13
224:1
**confess** 177:23
241:7
**confidentiality**
21:12
**confine** 62:12
**confining** 187:12
**confirm** 74:3
142:10 181:5,7
218:6
**confirmation** 2:1
16:5,13 21:6
35:24 77:4 86:9
87:2 93:21 134:11
145:25 147:9

148:4,21 149:3
154:10 162:18
164:9,12 165:1,10
165:18 166:4,7,9
166:12,20 167:5
167:15,20 168:9
169:10,12,14
170:7,24 171:23
171:25 172:4,6,17
172:21,22 173:4
173:14 174:1,10
174:11,15 178:13
178:14 184:1
185:1 186:2,18
194:11 195:4
196:3 200:11
201:10,17 203:10
203:14 204:4
227:19 258:1,16
258:17 263:1,12
264:4,8 266:7
270:22 271:1,18
274:9,14,16
**confirmed** 30:11
38:12 61:14 65:24
66:12 123:22
139:5 143:8
165:11 166:18
**confirming** 51:17
**confirms** 155:22
164:5
**conflating** 191:18
**conformity**
166:18
**confounding**
265:15
**confused** 192:21
193:13 206:1
**confusing** 26:8
208:2
**confusion** 26:9
214:18 232:6
268:24

**congress** 106:14
110:20 150:6
152:22 171:20
263:17
**conjunction**
259:13
**connected** 234:12
**connecticut** 4:2
41:24 42:17,23,25
43:4 47:2 48:8
53:4 64:13 66:25
72:24 73:6 78:2
79:1 80:9 83:9,16
88:9 221:2,3,4,5,9
221:12,17 261:7
265:12
**connecticut's**
72:17
**connection**
117:17 148:21
165:9 175:6
183:15 227:4,9
**connolly** 9:22
**conroy** 35:4
246:25 253:7,9
**conscious** 134:1,4
**consensus** 118:5
118:22
**consent** 69:4
168:17 172:6
182:1 183:17
187:22 189:11,21
190:17 191:6,12
197:15,20 223:19
**consenting** 6:15
**consequence** 36:3
64:2
**consequences**
176:20
**conservative**
45:22
**consider** 70:7
117:2

**considerably** 27:6
**consideration**
107:7,16 116:18
137:18 156:1
157:1
**considerations**
100:11 103:21
107:17 110:11
116:17 166:13
172:10
**considered** 31:16
32:9 41:21 51:5
199:14
**considering**
169:11 229:15
256:16
**consistent** 51:4
90:21 98:11,21
108:15 158:19
163:7 164:5 171:5
**consistently** 33:9
**consisting** 225:3,6
225:13
**conspiracy** 97:24
**constant** 209:17
210:3 211:13
**constantly** 209:17
**constitutional**
147:13
**construction**
256:22
**constructive** 27:5
159:14,17 242:3
266:19
**consult** 189:16
**consultant** 24:9
**consultants** 24:4,5
**consultation**
190:18
**consulted** 183:16
**consumer** 55:15
55:17 56:5,17,19
56:21 57:6 59:13

59:16 81:18,19,24
108:17 221:8,11
240:23 261:22
**consumers** 56:13
**consuming** 94:4
262:10
**consummated**
227:21 228:8
**consumption**
216:10
**contact** 147:2
**contacted** 221:5
221:23
**contain** 88:24
107:10 164:22
170:7,24
**contained** 92:10
166:19
**contains** 227:20
228:16
**contemplate**
28:13
**contemplated**
23:5 228:4
**contemplates**
21:10 30:2 171:19
**contend** 207:15
262:5
**contended** 80:12
**contention** 54:23
91:15 242:7
**contents** 169:4
**contested** 196:23
**contesting** 265:6
265:10,14 266:3
**context** 79:8
95:23 104:2,2
113:13 114:7
142:1 197:22,23
198:6 246:16
**contingent** 31:1
39:22 95:16
167:12

continuance 2:1
continuation
  19:20
continue 19:9
  206:19,23 213:20
  266:20 273:4
  274:2
continued 20:10
  20:16,23
continues 22:16
continuing 60:11
  207:5
continuously
  18:10
contract 90:18
  189:1
contracting 241:2
contracts 228:17
contradicted
  146:20
contradictions
  97:4
contrary 32:7
  37:24 73:8 80:17
  82:11 97:13 99:24
  105:9 159:19
  164:20 168:3
  170:9 194:18
  203:4
contrast 33:4 45:2
  55:12
contravention
  37:5 108:12
contribute 102:4
  107:4 108:3
contributed
  236:23
contributing
  111:25 113:25
  115:5 121:14
  182:19 192:16
  237:18

contribution 69:5
  113:8 114:5,10
contributions
  262:1
control 98:10
  171:9 214:1 252:5
  253:10 274:7
controlled 242:4,5
controls 51:19
controversial
  265:21,23
controversy
  107:11 150:3,5,5
controverted
  53:23
convenience
  262:17
conversation 68:9
  225:2
conversations
  21:11,13 202:21
  230:1
conveyance
  267:21
conveyed 139:11
convince 109:22
  130:22 138:25
  189:25
cooperation 88:8
coordinating
  48:10
coordination 88:8
copper 181:4
copy 204:3
core 24:23 47:12
  168:18 169:9
  186:18
corning 128:10,10
  132:19 166:2,6
corona 220:11
corp 85:21 128:11
  131:15

corporate 79:9
  239:1
corporation 86:17
  220:16,16 225:25
  256:19
correct 48:15
  59:18 69:15 75:17
  88:1 105:6 109:7
  119:5 122:7,9
  126:23 136:5
  146:11 149:14,22
  170:20 179:14
  187:21 195:13
  199:5 201:9
  202:20 203:16,17
  239:15 260:1
correction 161:1
corrections
  153:18
correctly 198:24
  239:11
correspondent
  222:11
corroborated
  113:19
cost 43:15,18
  62:17 210:24
costs 37:8 85:10
  85:10,11 232:13
couched 205:12
could've 210:8
couldn't 169:8
  195:23
councilmen
  217:25
counsel 24:15
  86:23 95:8,11
  104:10,23 105:20
  106:19 107:17
  108:7,11,14
  118:15 119:21
  131:7 144:8 146:3
  146:8 147:3

162:21 163:4,4
  167:11 179:14
  203:16 218:16
  228:24 229:20
  267:14
counsel's 55:21
  105:9 106:16
count 46:4 83:7
  83:17 89:15
  108:11 127:2
  216:11
counted 90:7,8,9
  90:11
counter 123:12
  143:5
counterclaim
  123:17
counterclaims
  123:15
counterparties
  246:19
countervailing
  56:8
counties 85:8
  86:15,25 140:22
countries 128:13
  136:17
country 7:3 44:22
  90:5 95:25 105:3
  105:16 106:23
  140:25 141:1,20
  142:17,19 143:19
  185:14 207:9
  212:18 214:15
  215:13 221:17
  255:9 266:2
  276:21
country's 97:22
  142:4
county 85:2 86:19
couple 101:19,20
  112:22 115:19
  205:23 230:11,25

**courage** 226:8
270:15
**course** 17:10,25
22:13 23:18 26:19
29:1 30:20 37:20
45:9 49:21 86:23
86:24 87:4 109:3
120:15 127:17
152:2 170:1,3
184:21,21 206:25
233:3 251:10
263:19 274:11
**court** 1:1,11 16:2
16:7,9 17:7,13
18:8 19:4,6,18
20:18,20 21:18
22:1 27:2,21,24
28:7,9 29:20 30:8
31:23 34:17 35:22
37:21 42:22,25
43:8,11 45:10
48:6,13,18,22
49:5,17,23 50:9
50:11,25 51:2,7
52:1,2,16,18,20
53:3,19,21 54:2
54:10,16 55:24
56:1,4,7,12 57:9
58:1,4,6 59:5,6,10
59:12,15,20,22,25
60:5,19,21 61:3,6
62:6 63:17,19
64:19 65:3,7
66:10 67:8,18,22
68:2 70:7 71:7,23
71:25 72:2 74:21
75:7,11,14,18,21
78:16 79:17,18,20
80:5,18 84:8
85:21,23 87:24
88:5,12 89:7,10
90:8,10 91:1,4,21
91:25 92:18,20

93:16,17 94:16
95:17 96:5 101:10
104:8,10 105:2,7
105:21,23,25
106:4,7,15 109:6
110:9,18 111:2,10
111:22 112:25
113:2,11 114:3,9
114:11,17 115:15
115:17 116:4,6,19
117:7,13,19,20
118:1,8,14,23,25
119:8,12,16,19,21
120:18,20 121:2,5
121:8,10,15,17,19
122:3,4,8,17
123:4,14 124:15
125:13,16,19
126:7,9,22 127:10
128:5 129:6,8,10
130:24 131:1,3,20
131:24 132:13,15
132:18,20 133:6
133:18 134:8,16
135:5,8,23 136:11
136:23,25 137:3
138:21,25 139:14
139:23 140:6,15
140:17 141:5,9,12
141:16,18 143:22
144:2,6,12,24
145:10,18,21,23
146:22 147:7,12
149:8,13,16,18,20
149:23 150:19
152:21 153:21
154:17,22 155:10
155:21 156:4
157:18 159:2,5,13
160:13 162:1,14
163:2 164:15
165:15,22 166:18
166:19,24 167:1,9

168:9,22,24 169:1
169:10,25 170:2
170:10,18,21
171:17 173:21
174:20,24 175:3
178:21,23 179:17
179:21 180:2,25
187:6,16,22 188:5
188:13 191:4,23
192:1,7,19 193:3
193:14,18,21
194:8 195:8,12,14
195:22 196:8,12
197:5,18 198:4,12
199:3,6,22 200:7
200:15,22 201:1
201:19 202:14,16
203:15,21 204:7,9
204:18 205:19,21
205:25 206:10,13
206:22 210:21,25
211:4 213:17
216:24 217:1,5,8
218:10,12,21,23
219:4,10,12,17,19
224:17 226:6,22
227:6 228:17,20
228:25 229:2
230:7 232:20
233:2,4,19 234:16
234:23,25 235:4,7
235:10 236:9,20
237:4,7,9 239:9
239:16,21,24
240:4 241:4,6,13
241:17,22,25
242:24 243:2,13
243:15,20,25
244:14,17 245:3,6
245:9,17 246:17
247:1,5,17 248:14
249:6,8,10,22
251:3,3,18 252:9

252:12,14,19,21
252:24 253:1,4,9
253:14,23,23
254:1,18,20 255:4
255:4,7,10,11,13
255:21 256:1,4,7
256:18 257:2,14
257:25 258:5,9,12
258:17,21 259:6,9
259:19,22,24
260:2 261:1,5
262:13,20,22
263:5,10,14,16
264:7,14,18 266:9
266:23 267:10,24
268:15,25 269:8
269:12,23,25
270:3,16,21,24
271:7 272:13
273:4,9 275:4
**court's** 19:15 22:6
117:17 121:24
127:5 134:11
137:4,5 257:8
258:18
**courthouse** 38:16
139:20
**courthouses** 39:4
**courtroom** 22:18
219:13
**courts** 29:24
31:17 49:21 51:14
86:18 100:7 128:5
132:4 135:19
143:19 151:2
161:5 171:20
222:15 261:18
**court's** 164:5
173:5 176:3
**covenants** 17:23
**cover** 22:12,16,20
30:17 119:25
163:25 178:6

193:15 198:13
200:16 238:14
247:10 249:18
254:6,21,24 255:5
**coverage** 163:14
164:7,9,10,16,19
165:11 168:2,11
168:18,23,25
169:1,3,12,18,20
169:21 171:14,24
172:3,21 175:21
176:1,20 177:17
178:4 179:13,18
180:23 183:4,12
183:14 184:4,21
185:1,3,20,23
186:18,22 188:8
191:18,21,23
192:1,9,15 194:1
194:1 197:11
198:17 201:5,13
202:6 203:2
**covered** 22:13
73:12 127:18
179:3 185:25
187:11 219:14
245:13 274:20
**covering** 242:18
**covers** 111:15
240:9,13 242:12
248:22
**cowan** 97:2 98:16
99:6 101:23 102:7
102:14 108:11
111:20 113:10
114:23
**cowan's** 97:13
99:25 100:15
102:10 113:19
**cram** 130:14
**create** 46:13
109:14 164:2
182:7 245:11,13

**creative** 58:19
245:16,18 251:12
266:12
**credentialed**
214:12
**credibility** 102:15
**credible** 97:1,15
**credibly** 39:1
**credit** 35:21 55:17
56:19,21 57:2
73:5
**creditor** 33:25
36:5 39:11 40:17
43:17 44:18 45:4
47:19 52:25 61:17
73:16 76:4 98:24
122:24 126:3,3
134:5 150:21,25
151:3,3,4,6 268:9
**creditor's** 33:10
**creditors** 5:18
28:13,15 29:13
30:22 31:2,6,24
32:5 33:24 34:4,9
36:2,8,10,10
37:10,15,25 38:14
39:3,19 40:21,22
40:23 42:15 43:13
43:20,23 44:6
45:19 46:2,2,13
47:8,18 49:2
50:16 51:21 52:5
52:10,12 53:4,7,8
53:11,13,15 55:6
55:9 61:15,22
62:2 64:15 66:8,9
66:14,21 70:12
72:16 74:17,19
76:5,6,7,10,16
77:4,10 79:3
82:10,15,17 98:25
120:24,25 121:4
123:8,20,24 124:5

126:13,15 128:1
128:15,20 131:8
131:13,13 132:5
132:25 133:9,9,14
133:25 134:2
137:19 138:5
139:1,7 140:8
148:9,10 151:17
151:18 163:18
169:7,15 178:14
186:23 194:15
197:3 220:18
225:4 246:19
260:13,17,21,22
270:7
**creditors'** 172:23
**creditor's** 150:21
**credos** 20:15
**creighton** 146:3,4
149:10,13,25
154:14 155:4
**crime** 85:11
151:21 238:12
**crimes** 79:9
**criminal** 22:14,16
22:20 84:19,25
102:6 112:4
230:17,17
**crisis** 48:4 84:23
216:3 221:4
222:14 224:10
271:4
**criteria** 99:16
101:5,6
**critical** 38:15
84:16
**critically** 172:12
**criticism** 103:25
**critiquing** 36:18
**cross** 35:2 36:20
65:8 68:18 97:16
102:5,16 113:9
151:8 182:24

203:12 220:13
**crosstalk** 72:1
253:3
**crucial** 174:9
**crucified** 175:13
**crystal** 32:8
**ct** 4:4
**culpability** 41:10
**cumbersome**
262:10
**cunningham** 9:23
**curious** 58:18
73:13
**current** 104:7
194:6 232:22
**currently** 86:20
110:4
**cushing** 65:8
**cushing's** 41:25
**custody** 160:16,18
**cut** 90:11 141:5
141:10,12 248:14
263:12
**cutler** 8:1 175:1
**cvs** 220:14
**cyganowski** 9:24

**d**

**d** 1:22 8:6 9:7
11:24 14:21 16:1
39:7 182:15
220:14 223:9,14
223:16,21 224:1
**d&o** 187:10
**d.c.** 47:16 48:8
**damage** 46:6
**damaged** 206:4
**damages** 38:19,21
58:25 77:18 86:22
99:8 261:17,23
262:6,11,18
**damian** 13:12
**dana** 131:15

dancing   71:3
dangerous   207:14
daniel   9:22 12:12
  14:10 15:20
danielle   12:15
daresay   79:17
dark   122:11
darren   12:6
darts   101:6
dasaro   10:2
data   47:8 60:3,9
  60:16,18
date   49:11 71:19
  146:23 148:17
  153:23,23 157:15
  195:1 232:10
  250:24 276:25
dated   220:22,24
  222:1,5 225:2,5
david   9:13,16
  13:6 15:23 247:1
  247:7
davis   3:3 10:3,4
  16:20 80:3 120:11
  136:5 140:19
  146:12 152:18
  175:24 220:10
  221:21,24 226:2
  226:10 227:17
  228:11,11 229:24
  264:16
day   16:4,12 19:13
  24:1 33:11 47:7
  79:18 97:19 98:17
  100:3 101:11
  140:12 157:10
  176:21 181:12
  182:8 190:20
  200:18 264:23
  265:20 266:3
days   36:13 68:18
  115:19 124:17
  146:22 197:25,25

204:1 209:7,8
  220:1,2 274:21,22
dc   3:18 7:20 42:17
  43:1,3,4,9 220:12
de   98:7
dead   29:8 131:23
  203:7
deadline   21:1,5
  205:13
deadlines   21:2
  158:8
deaf   220:3
deal   17:3 18:11
  34:20 35:8,14,20
  51:24 77:5 80:22
  101:15 108:1,25
  116:16 132:5
  133:19 142:2
  149:9 157:4 176:6
  246:6 274:4,13
dealing   57:10
  112:9 113:12
  188:9 200:2
  209:24 250:3
deals   72:25
  108:19 110:21
  186:1 189:1
dealt   195:16
  238:16 262:12
dear   219:23 226:3
dearest   220:1
dearman   10:5
death   101:14
  223:14
deaths   110:3
debate   22:21
  175:11 272:22
debevoise   224:8
  224:13
deborah   11:12
debt   57:3
debtor   1:9 8:9
  31:6 32:20 39:24

49:13 50:8 51:12
  58:18 61:25 64:12
  72:13 80:22
  122:17 123:6,17
  124:2,3,7,22
  127:6 130:2
  134:24 135:22
  143:5 150:20
  151:4 152:13
  176:14 180:16
  182:15 186:7
  189:4 190:14
  199:7 200:3
  203:16 230:24
  231:2,6,10,10,12
  231:15 234:8,17
  234:20,21 235:5,9
  237:12,14,21,22
  237:24,25 238:1
  240:6,7 241:22
  242:6,12,17 244:2
  245:13 248:22
  249:13,13,20,22
  249:23 250:12
  251:2 254:8,9,24
  254:25 261:2
  266:2 267:23
  268:17 269:5,9
  270:9,13
debtor's   80:15
  86:23 90:20
  117:21,23 218:16
  227:25 229:19
  241:23 242:10
debtors   3:4 16:4
  16:13,21 17:19
  18:10 24:14 27:17
  30:21,24 31:3,4
  33:8,13,22 36:25
  38:18 40:2 41:16
  42:5 51:21 53:2
  53:14 54:19 55:8
  55:18,21,22 58:15

58:19 59:4 60:10
  60:13,22 61:14,16
  62:4,9 69:18
  70:20 73:20 77:15
  80:3 81:6,8 82:14
  85:5,6 87:19
  89:12,13,18,22
  91:19,23 92:12,20
  93:14 94:2 117:16
  120:4,12,12,16
  123:9,9 126:23,25
  127:14,15 131:8,9
  132:6 134:1
  135:17 137:11
  140:20,21,24
  146:12 147:2
  148:19 150:22
  151:9 152:7,19
  154:1,11 159:6
  162:18,24 163:4
  164:3 167:4,14
  169:18 171:7
  172:12 173:20
  174:16 176:22,23
  177:5 178:8 181:9
  181:19 183:1,6,12
  183:13,15,24
  184:3,20 186:2
  187:1 188:4
  189:19 191:17,21
  192:11 193:4,9,9
  193:24 194:23
  195:3 199:3,4
  200:3,9 202:23,25
  204:3,12,13,14
  205:2 207:6 227:8
  228:14,21 232:1
  232:13,23 234:12
  239:11,12 240:10
  240:12,20 246:20
  246:23 248:2
  259:25 260:10,11
  262:12 264:17,24

265:5,13 267:14
268:6,7 270:8
272:25 273:5
**debtors'** 163:16
**debtor's** 146:8
148:15 157:14
163:12 166:3
168:1,5,8 169:3,6
171:9,17 201:15
**decade** 32:17 33:6
166:7
**decades** 24:15
32:17
**december** 220:1,2
220:4,22,25
221:24,25 222:2,2
222:3,6 224:5
225:5
**decide** 96:22
133:7 212:2
255:13
**decided** 24:1
70:22 109:5
111:11 165:9
168:19 169:10
182:9 184:5
269:19
**decides** 111:3
179:17 245:18
**deciding** 41:22
**decimal** 70:19
**decision** 28:17
29:2 60:20 105:1
147:17
**decisions** 211:11
**declaration** 34:15
34:25 37:9 47:2
72:16 77:8 82:24
83:6 97:12,19
149:9 151:8 223:3
**declarations**
158:15 159:20

**decline** 213:10
**decrease** 194:12
**decreasing** 209:10
**dedicate** 38:2
**dedicated** 19:25
**deed** 103:24
**defendant** 86:17
232:7,9,11,11
235:22 238:13
**defendants** 40:12
41:12 84:14 86:4
86:5 87:17 223:22
232:3,16 235:20
235:21 236:2
239:19
**defended** 68:23
**defending** 221:22
**defenses** 41:10
71:17 164:6
168:14,19 169:20
182:7 183:6
**defensive** 123:11
135:20
**defer** 60:1,1
111:17 155:12
**define** 207:5
254:5 255:15
**defined** 23:23,24
24:19 51:12
177:13 257:10
**defines** 256:11
260:17
**definition** 25:16
25:19,21 26:3,4
33:11 145:8
191:15 202:3,5
234:7 235:20,21
240:17 241:7
242:2,16 249:25
257:9 274:8
**definitionally**
28:23

**definitions** 235:20
**defy** 107:17
**degree** 139:6
198:16
**del** 220:11
**delaconte** 10:6
**delaware** 48:11
53:4 80:11 88:9
261:15
**delay** 43:15,19
62:17 94:5 166:4
171:13 268:5
**delays** 211:6
**delconte** 33:13,24
34:14,23,25 35:2
36:19 53:17 54:18
55:1,11 58:24
61:14 71:6
**delconte's** 36:7,19
71:1
**deletion** 197:23
**deliberate** 248:24
249:16 251:9
**deliberately**
241:13 251:24
**deliver** 110:2
**delivers** 98:25
**demanding** 68:13
265:2
**demonstrate**
30:21 33:16 38:14
44:5 83:24 165:23
**demonstrated**
52:23
**demonstrating**
86:9,12
**denied** 154:10
**denominator**
138:2
**denounces** 222:9
**densely** 154:2
**deny** 166:17 186:5

**denying** 136:12
**depalma** 5:16
120:23
**department** 74:18
221:5
**depending** 126:2
214:23 250:13
**depends** 113:20
206:22 207:4
**deposed** 36:19
**depression** 225:23
**deprivation**
152:23
**deprive** 51:23
**deprived** 166:11
166:14 203:9
227:12
**depth** 38:20
**derail** 29:21
**derivative** 249:11
249:12,25 250:8
255:1 256:12
**derivatives**
219:24
**derived** 121:9
**describe** 19:2,2
213:19
**described** 19:21
21:3 27:5 30:7
34:25 230:14
**descriptive** 26:6
**deserving** 94:5
**designate** 91:8
**designated** 36:16
36:18 257:11
**desire** 142:8
**despite** 84:12,15
84:16 124:10
**destroy** 48:2
169:23
**destroyed** 73:21
**destruction** 33:20
36:4

**detail** 26:25 70:3
**determination**
   64:20 66:13 169:2
   184:3
**determinative**
   186:22
**determine** 105:2
   169:1 170:17
**determined** 31:15
   71:11,21 184:24
   185:2 226:18
**determining** 90:2
**detriment** 94:6,6
**detrimental**
   164:13
**detroit** 129:4
**develop** 142:15,16
**developed** 111:24
   166:1 210:8
**development** 20:4
   210:7
**devil's** 122:25
**devon** 10:7
**dictates** 39:15
   151:25
**didn't** 153:25
   176:9 183:24,24
   186:12,13,14
   195:15 198:13
   208:11
**die** 215:6
**died** 220:1
**dietech** 49:22
   50:15 52:2 55:13
   55:16,22 57:9,9
   58:10 59:12
**differ** 98:17
**difference** 59:8
   105:19 125:6
   180:8
**differences** 19:24
   92:15

**different** 24:13
   71:15 74:6 78:22
   78:22 79:12 80:23
   83:24 89:7,22
   92:7,8 98:2,24
   100:9,10 109:5,13
   109:14 112:17
   113:10,20 115:1,3
   125:2,4,4 127:8
   128:13,13 129:4,5
   130:7 131:21
   132:1,2,22 140:25
   142:19,19,20,20
   142:22,22,23
   172:9 180:12
   188:13 191:5
   192:24 198:15
   208:17 212:23
   269:8
**differently** 69:16
**difficult** 47:20
   95:20 103:16
   119:14 129:16
   140:1 161:12
   236:7 271:1
**difficulty** 129:1
**dilaudid** 214:5,7
**dillion's** 85:16
**dillon** 84:1
**dilute** 62:16
**dilutive** 62:6,14
**diminishes** 168:6
**diplomatically**
   266:10
**direct** 33:10,17
   36:24 40:10 41:7
   42:1,9,11 43:23
   44:8 45:15 46:16
   53:1 55:5 62:2
   71:10 93:21
   117:20 121:16
**directed** 123:22
   159:24 175:23,23

175:24
**directing** 37:21
**direction** 22:1
   60:19 109:6
   117:18 125:9
**directly** 46:22,22
   68:21 107:21
   137:22 225:12
**director** 223:11
   238:2 243:21
   245:2 248:1 250:6
   252:16 254:8
   270:10
**directors** 232:22
   238:17 243:11
   268:10
**dirty** 98:8
**disabled** 226:4
**disagree** 29:25
   41:23 179:24
   226:9
**disagreed** 96:4
**disagreement**
   181:15
**disbursement**
   163:12 228:1
**disc** 101:21
**discharge** 165:19
   186:7,8 237:14,17
   270:8,8
**disclaim** 169:3
**disclose** 89:25
**disclosure** 33:15
   33:24 35:1 66:5
   71:14 89:24 93:7
   182:15
**discount** 160:9
**discouragement**
   108:18
**discovered** 248:7
**discovery** 24:16
   233:12,16 250:20
   250:21 259:24

**discretion** 82:14
   103:18 157:20
   158:7 161:14
   223:19
**discretionary**
   223:24
**discriminate**
   128:15
**discriminatory**
   157:22,25
**discuss** 74:8,10
   115:20 120:2
   167:6 186:3
   266:20
**discussed** 17:18
   78:24 88:11
   105:13 112:6
   185:7 204:16
   217:3,5 231:7,17
   232:5 259:10
**discussing** 195:20
   236:15
**discussion** 49:25
   226:24 229:5,17
   233:25
**discussions** 21:3
   22:5 109:4 230:19
**disease** 108:19
**disguise** 244:13
   244:16,17
**dismiss** 57:19
   86:12
**disorder** 154:3
   161:3 217:24
**disorderly** 39:3
**disparate** 130:15
**dispatch** 85:20
**dispenses** 24:8
**disposes** 80:25
   159:10
**disproportionally**
   155:24

disproportionate
115:6
disproportionat...
151:22
dispute 31:2,5
58:9 63:25 76:2
172:20 173:4
177:17 180:24,24
185:21
disputed 59:10
64:1,3
disputes 168:23
169:12
disputing 90:23
disrespect 42:18
disrespecting
88:16
dissenting 52:12
52:25 53:3,8,13
53:15 54:23 55:2
62:2 66:9
dissolve 173:2
distancing 152:2
distinct 156:21
231:25
distinction 124:22
125:1 128:7
distinguish 129:3
distinguished
50:21
distinguishing
241:20
distraction 25:8
distribute 30:25
157:10 163:17
169:7
distributed 37:12
distributing 262:1
distribution 67:1
93:1 160:23
194:23 265:3
distributions
125:22 156:16

228:3,3
distributors
231:21
district 1:2 48:20
52:3 53:5 59:25
80:9 83:3 85:21
85:22 88:3 131:16
143:12 154:17
179:17 224:18
districts 133:4
ditech 28:2 31:18
32:2,20 33:8
61:22 68:15
diversion 208:20
208:21 215:11,19
216:1
divert 272:11
diverted 215:4
divide 191:19
dmp 227:1
dmps 227:9,10,12
227:14 228:7,15
228:23,25 231:21
dmvt 227:13
docken 10:8
docket 70:24
82:24 148:18,22
149:15 227:15,18
228:12,15 270:14
271:25
docketed 85:6
doctor 212:6,16
214:23 219:25
doctors 208:14
209:12 211:21
212:16,21 214:9
214:10
doctrine 85:16,18
doctrines 83:23
84:2
document 177:13
documents 70:23
177:3,7,11,15

194:11 195:4,9
196:5 200:11
204:4 224:9,13
260:23 271:15
doesn't 157:1
160:19 164:2
167:7 170:13,15
174:8,12,15 180:6
184:17,18 188:17
189:22 196:15
198:2,14 207:10
dogs 219:1
doing 19:12 29:18
42:18 60:10 68:12
75:12,15 77:22,23
121:10 139:17
189:20 192:16
212:23
doj 35:11
doj's 35:11
dollar 32:4 35:17
37:12 86:16 92:2
92:3,6,11,21 93:2
93:10,20,23,23
94:9 126:14,18,20
127:3
dollars 35:13 36:1
38:5 41:14 72:13
72:21 76:9 86:21
106:13 116:9
domestic 84:19
128:15
don't 35:20 148:6
150:8,16 153:23
154:5,17,23,25
155:6 156:23
160:5,8 167:1
168:22,23,25
171:18 173:20
175:15 178:5
179:2 180:1 183:3
183:5 185:18
186:4 187:12,17

187:24 188:19
190:5 191:8,9,10
191:13 192:4,4,20
193:1,3,14,23
194:2 195:21,25
196:5,17 197:12
197:18,19 199:7
199:22 200:1,15
202:19 203:21
205:2 206:3,11
207:24 273:7
door 133:2 237:17
238:18 251:15
dorr 8:1 175:1
dose 213:19
222:22,25
double 21:9
197:14
doubt 139:23
148:6 151:7 160:8
242:14
doubts 181:5
dougherty 10:9
douglass 13:17
dow 128:10,10
132:19
dozen 224:12
dr 37:4 97:2,12
98:16 99:6,24
100:15 101:23
102:7,10,14
111:20 113:9
223:16,21 224:1
draft 243:5
244:10 253:16
drafted 23:13,20
121:11 156:24,24
253:17,18 269:14
drafting 23:16
229:25 260:6
drag 202:19
drain 1:22 16:2
16:11 145:24

218:19 219:23
220:23 222:5
225:19
**dramatically**
102:14
**draw** 33:7 237:19
256:14
**drawing** 197:17
238:4
**drive** 207:21
212:4,6
**driven** 125:3
**drives** 151:21
**driving** 131:19
247:17
**drug** 161:4,5
209:14,19 213:10
213:24 215:2
220:5 222:9,12,17
222:19,21 225:24
248:20
**drugs** 206:20
208:8,16 209:1,1
209:3,4,15,22
210:3,6 211:14,20
212:13 213:16
214:8 215:1,4,4
215:22 216:5,8,8
216:10,19 222:25
**dry** 161:14
**drysdale** 3:15
**dual** 16:23
**duane** 181:4
**dubel** 10:10
131:12
**due** 20:16 38:6
61:12 72:10 77:2
107:7 124:9
150:20 157:5
184:8,16 186:12
200:12 202:18
203:13 221:4

**dumped** 270:23
**duration** 222:22
**duty** 86:3 250:6
**duvani** 227:8
**dwarfed** 40:3
**dwell** 111:13
**d'angelo** 9:25
**d'apice** 10:1

**e**

**e** 1:21,21 3:1,1 5:4
9:13 13:5,10
14:13 15:5 16:1,1
182:15 185:6
186:5 221:23
267:15 269:2
276:1
**e.g.** 45:11
**earl** 185:6
**earlier** 20:2 30:8
52:3 85:6 135:25
140:20 145:5
148:19 149:3
161:10 162:6
173:13 175:18
180:11 205:1
225:25
**early** 166:1
219:25 220:7
224:16
**ease** 212:13
**easier** 109:10
**easily** 107:14
**eastern** 85:22
**easy** 196:1,2
**eberhardt** 10:11
**echo** 175:18
270:15
**eck** 15:8 218:18
219:4
**ecke** 8:16 218:19
218:22 219:3,8,11
219:15,18,20
226:6

**eckstein** 10:12
74:3 118:2,3,9,20
118:24 119:3,9,13
119:17,20
**economic** 37:7
108:23
**economics** 17:24
**ecro** 1:25
**ed** 161:15 222:11
222:20,22,24
**edan** 12:18 220:21
**edit** 273:16
**edmunds** 6:6
230:2,10,19,25
231:18 232:5
233:11,14,21,22
234:19,24 235:2,5
235:8,11 236:5,12
237:5,8 238:22
239:14,23
**edward** 13:10
**effect** 23:13 62:7
62:14,15 63:12
121:12,13 137:24
158:15 164:24
165:19 177:14
186:9 255:22
**effective** 49:11
99:7,9 170:8
171:14 177:14
195:1 232:10
**effectively** 66:20
105:10 108:10
122:11,16 123:12
124:4 134:23
136:20 203:8
232:12,15 267:8
268:7
**effectiveness**
217:17,18
**effects** 37:10
214:17 216:8,15

**efficacy** 103:4
**efficient** 179:22
273:3
**efficiently** 171:8
274:24
**effort** 17:5 62:21
147:14 151:9
152:23 157:5
180:15 185:20
189:16 218:11
251:4
**efforts** 19:25
84:14,17 87:1,1
151:12 233:12
273:22
**ego** 237:14 242:3
243:8,23 244:4
250:6
**eight** 38:13 72:21
76:9
**eighteen** 86:15
**eighties** 208:11
**either** 19:10,21
49:3 50:1 60:19
67:13 78:8 86:20
93:9 109:9 111:19
112:3 136:4
155:24 157:17
162:17 197:20
198:24 204:23
209:13 214:7
249:4 251:17
261:13 273:21
**election** 90:4
**elections** 90:5
**element** 18:1
**elements** 17:18,22
**eli** 3:11 229:24
**eliminate** 107:13
110:11
**eliminates** 262:5
**eliminating** 109:7

elisa 11:21
elizabeth 14:12
elongate 158:7
eloquently 111:14
else's 241:25
email 236:15
emails 271:16
embarrassment
109:1
embattled 224:9
embodied 166:20
167:22 181:20
embrace 68:13
emergency 84:25
84:25
emily 7:22 11:13
163:7 167:11
emphasis 100:14
172:2 231:8
emphasize 49:14
152:17 163:14
174:7 231:18
emphatically
88:15
empirical 44:9
employee 237:21
237:22 238:2
248:1,21 268:17
employees 232:23
238:17 239:3
employment
241:1
enable 163:15
171:7
enabling 137:13
encompassed
195:23
encourage 19:24
274:1
encouraged 20:24
255:14 273:20
274:1

endeavor 33:20
ended 110:15
134:3
endo 86:16
endorse 41:8
ends 100:1 154:13
247:21 270:22
274:3,4
enforce 64:21
enforceability
194:18
enforcement
107:19,24 114:22
115:7
engage 161:12
engaged 148:19
161:18 234:13
235:17 239:2,10
engaging 259:14
engineering 166:2
190:12
enjoin 137:6
263:18
enjoined 30:10
139:17,19 256:12
enormous 62:13
ensure 168:4
ensures 199:16
enter 135:6
entered 20:17
69:11 146:22
177:8,22 181:21
195:6 196:8,10
258:2,4,5
enterprise 121:9
entertain 147:21
entire 40:25 92:9
122:12 136:19
entirely 80:16
82:17 140:25
142:3,17 225:21
entities 3:16 23:14
37:5 50:12 62:10

62:10 77:14,18
84:10 85:9 86:13
91:14 93:1 95:10
125:1,20,23 127:1
127:22,23 129:23
139:15,16,18
159:25 162:21
238:24,24 258:25
259:1,13,18
entitled 119:7
164:9 168:11
169:17 171:9
191:22 222:8
250:1
entitlement 34:9
entity 39:10 84:6
137:8,8 139:11
141:24 143:2
187:9 223:7
267:21,25 268:2
268:11 269:5
entry 85:18
271:18
environment
253:10
environmental
82:13 240:25
epidemic 104:16
104:21 109:1
222:8
equal 99:13,18
119:4,5 132:11
equality 103:5
equally 99:20
108:5
equals 39:7
equates 83:3
equation 39:5
54:9,21 225:3
equitable 131:11
equity 223:8
equivalent 244:18
256:1

equivalents 108:9
erased 34:10
eric 14:25
error 89:14,20
121:3
errors 121:5
escape 203:2
eskandari 10:13
especially 37:11
46:5 153:12
161:13 210:4
211:7 213:21
essence 121:18
essential 227:23
228:5
essentially 52:11
82:20 94:12
117:20 134:17
establish 125:9
173:1
established 102:5
estate 33:21 34:21
34:22 35:18 41:12
42:7 47:10 51:21
57:1 63:16,21
64:5,6,6 77:17
79:12 81:6 90:16
94:7 156:15
171:12 189:4
243:8,23,24 244:2
244:6,20
estates 34:4,5
47:23 55:9 63:6
63:11,14 65:16,20
66:1 77:15 240:12
estimable 36:25
59:5 71:24
estimate 33:3 41:5
43:14 54:13 55:2
59:2 71:12,20
127:2
estimated 32:12
32:22

estimating  58:24
estimation  32:10
  32:19 37:1 44:2
  55:20 58:22 66:6
  69:23
estoppel  196:16
  196:17
et  16:3,12 33:15
  35:16 85:3 191:6
  207:21 219:21
  240:10 250:7
ethan  12:2
evaluate  59:11
  94:1
evaluated  225:24
evaluating  51:8
evaluation  55:12
  182:24
evan  8:24
evans  161:10
evaporates  76:10
evening  267:14
event  100:18
  122:14 141:19
eventually  210:20
everybody  24:18
  29:11 38:11 68:7
  74:15,17 78:23,25
  93:2 151:22 230:5
everyone's  221:19
evidence  33:14
  36:23,25 41:9
  44:9 45:23 46:8
  52:23 53:15,25
  63:5 66:12 72:14
  75:4 77:7 128:12
  133:15,19 160:5
  160:11 183:11,14
  183:18,20 184:18
  185:18,21 199:12
  222:23 273:13
evidently  193:12

evoke  83:23
evolved  120:16
ex  89:24 220:3
exact  147:18
exactly  37:24 75:5
  124:6 144:15
  203:8 234:1
  239:18
examination
  36:20 68:19 97:16
  102:5 182:21
examine  65:8
  126:12 203:12
examined  23:15
  35:2
example  40:20
  70:19 85:23 86:7
  87:20 89:2 103:15
  133:4 161:5
  169:11,20 172:24
  177:16 194:1
  197:7 238:23
  243:14 250:14
  251:13 253:2,19
  255:2,18 268:20
  272:23
examples  86:6
  241:3 250:15
  254:21
exceed  37:12
exceeded  46:16
exceedingly  45:22
exceeds  31:8
  61:13
excellent  50:4
exception  24:6
  111:24 119:6
  136:6 151:11
  194:1 227:11
  242:5 243:10
exceptions  232:21
excerpts  228:16

excess  30:25
  47:23
exchanged  271:17
exclude  190:22
excluded  23:19
  145:8,13 230:16
  232:17 238:25
  245:12 267:4,17
  269:4,6
exclusion  133:8
exclusions  177:18
  178:2 190:22
  194:20 197:11
  232:18
exclusive  199:13
exclusively  38:8
  46:1
excuse  55:18
  125:4 168:2
  181:24 187:19
  228:25 232:21
  246:13
executives  214:10
exemption  164:25
exemptions  165:7
exercise  51:16
  53:18 103:13
exhaustive  148:16
exhibit  24:10,17
  24:25 70:24 82:24
  99:8 100:17
  102:23 103:2,6
  167:19 257:9,11
  257:19,20 258:24
  258:25
exist  82:11 158:20
  169:9 184:4
  207:11
existed  101:16
  207:19
existence  166:17
existing  171:7

exists  24:10
expand  260:20
expanded  69:6
  148:17 222:10
  249:11 257:20
expanding  236:3
expansive  255:1
expect  151:17
  261:10 274:12
expected  30:25
expecting  216:9
expects  110:18
expedient  148:3
expended  84:13
expenditures
  102:6
expense  112:5
  246:1
expensive  132:23
experience  104:22
  208:1,6,24 275:7
experienced
  213:10 218:25
expert  19:25
  33:14 36:16,17,18
  38:19 58:20,24
  59:2,4 63:23
  66:23 73:13,13
  102:13 104:3,6
  108:11 182:23
  215:2
experts  58:16,19
  186:15 211:9,10
explain  19:16
  21:16,22 182:3
  236:20 240:8
explained  18:22
explaining  48:24
  73:11
explains  222:9,22
explanation
  113:24 130:22

**explicitly** 29:12
**exposure** 47:5
  148:23
**express** 190:5
**expressed** 17:2
  50:14 175:18
  193:23 203:3
**expression** 190:8
**expressive** 275:5
**expressly** 21:10
  22:24 205:12
  246:21 261:13
**extend** 244:24
**extended** 148:17
  158:11
**extends** 244:23
**extensive** 33:13
  148:20 230:19
**extent** 22:7 29:25
  64:10 96:21
  113:17 127:15
  137:22 139:15,17
  150:12 151:10
  155:21 157:8
  158:10 161:2
  163:24 182:19
  190:10,23 240:14
**extinguished** 56:6
  56:18 150:22
**extra** 246:1
**extraordinarily**
  17:9 30:18 38:1
  77:8,10
**extraordinary**
  45:7 68:14 148:15
  151:1 240:5
  270:14,17 271:5
  274:21
**extreme** 220:9,9
**extremely** 97:15

**f**

**f** 1:21 14:19 276:1
**f.2d** 148:5
**f.3d** 128:11
**f.3rd** 99:19
**f.r.d.** 101:22,23
**f2.d** 147:11
**fabulous** 117:18
**face** 21:4 47:5
  75:2 92:3 132:8
  192:17 237:2
**faced** 45:13
  158:12 164:3
**facilitate** 17:20
**facilitated** 18:9
**facilities** 160:1
  161:1
**facing** 111:1
**fact** 25:5 32:22
  35:22 44:9 59:3
  60:8,8 63:25 70:3
  70:5 71:13,14,18
  74:10 75:18 84:12
  84:15 85:7 87:22
  94:17 96:4 98:8
  98:14 105:12
  108:12 109:25
  113:19 123:5,19
  124:5,10 128:7
  132:9 163:8
  169:24 176:2
  177:19 179:2,6
  182:7 189:6
  195:19 196:23
  199:11 200:10
  203:13 215:13
  217:11 235:24
  251:7 252:15
  257:21 259:2
  262:3 263:11
  264:7 274:1
**facto** 89:24

**factor** 28:12
  101:21 102:7
  114:23,24
**factors** 100:10
  108:9 110:5
  111:16 113:10,20
  156:10
**facts** 33:4 36:15
  68:25 69:9 70:17
  73:7 79:17 81:10
  146:20 157:1
  238:7 246:16,18
  248:6
**factual** 29:5 42:20
  64:19 136:15
  184:6 190:1,10
**factually** 68:7
  124:6 125:3
**fail** 104:1
**failed** 33:11
  237:13
**fails** 31:13 100:5
**failure** 55:12
  67:13 242:4
  250:11
**fair** 17:15 18:16
  28:23 41:23 51:1
  51:24 57:2,3 59:6
  62:9 96:14 99:1
  101:24 102:24
  103:14 118:14
  119:16 150:9
  250:17 273:9
  274:6
**fairest** 68:14
**fairly** 51:14
  106:18 124:20
**fairness** 28:4,16
  29:4,16 30:7,13
  31:22 68:20 79:13
  97:5 113:17
**faith** 67:4,6 97:6,8
  97:23 98:19 99:11

108:2 109:2
  110:10 116:14,21
  156:24 167:23
  181:21 241:14
  249:16
**fall** 202:4 242:15
  249:24
**falls** 35:14 99:22
  274:19
**false** 72:15
**familiar** 80:18
  134:21 150:3
  213:23
**families** 40:14
**family** 4:9 21:20
  24:13 40:12 145:3
  214:10 215:2
  224:7,12,20
  225:13,18 246:5
**far** 23:9 46:14
  74:1 76:1 90:13
  102:8 121:19
  122:3 127:20
  137:16 147:5,6
  155:2 156:9
  195:16 197:12
  200:7 204:9
  224:23 243:16
  248:13 253:6
  259:11 274:3
**farfetched** 98:1
**farrell** 10:14
**farther** 75:13
**fashion** 88:10
  124:20 131:11
  133:2 136:24
  157:8
**fashionably**
  100:11
**fast** 179:21 272:1
**faster** 71:3
**fatal** 109:20

fathers 225:22
favor 52:10 68:11
  77:20 83:1 94:19
  126:9,17 169:16
  178:14
favorable 112:13
favored 98:8
fda 211:9 222:8
  222:10,13,18,21
  250:23
fear 213:1
fearsome 44:21
feasibility 185:2
  186:23
feasible 185:3
feature 45:18 92:1
  156:17
february 146:23
  148:16 222:7
federal 35:16 36:1
  46:23 47:4 57:21
  67:11 71:23 82:17
  147:12 151:18
  163:22 189:5,25
  190:11 255:11,24
  267:20
feeble 226:4
feed 204:24
feel 59:1 154:19
  181:7 207:24
  208:5 211:8,23
  213:20,21 221:15
feeling 210:16
feeney 10:15
fees 34:2,13 40:20
  70:14 153:17
  224:11
feinberg 220:12
feld 220:19
fellow 161:14,15
felt 117:19 154:15
  210:16 215:17,17
  271:12

femino 10:16
fentanyl 214:4,5,7
festers 104:4
fewer 19:11
fiduciaries 246:20
fiduciary 39:25
  41:15 74:18
  148:10 171:12
fielding 232:25
fifth 8:11 176:15
fifty 98:2
fight 94:20 117:21
  181:11
fighting 44:14
  45:19
figure 42:9 47:1
  152:15 188:14
  260:10
figuring 77:5
file 62:21 70:23
  133:1 152:8
  154:12,15 156:6
  157:12,24 158:15
  158:21 162:3,10
  178:17 271:18
filed 18:13 20:2
  21:17 34:6 39:25
  40:4 43:3 62:8,22
  62:23 85:15 93:4
  93:5 122:5 124:25
  131:13 142:15
  146:2,22,23,25
  153:7,11,21
  154:15 156:4,11
  157:17 161:22
  176:23,24 177:12
  177:16,25 180:10
  185:18 204:20,22
  205:5 215:8,14
  217:17 218:14
  224:13,17 225:17
  228:15 229:21
  257:6 272:25

filing 62:25 63:13
  85:6 120:16
  122:25 123:1
  124:13,19 136:8
  148:24 161:24
  185:11 205:15
filings 270:14
final 17:3 18:4
  44:3 78:19 87:4
  102:10 133:6
  185:24
finalized 257:19
  271:15
finally 42:24 79:5
  161:24 225:13
  246:2
financial 94:6
find 58:18 79:18
  89:17 104:18
  136:4 143:4 148:3
  151:17 154:5
  182:6 189:15
  192:6 195:17
  198:19 228:17
finding 58:2 170:7
  173:12,15,24
  174:8,9 181:16,18
  182:5,5 184:14
  185:5,9 186:3
  191:24 193:1
  198:16 199:1
findings 29:5
  163:8,24 164:1,6
  164:15 166:19
  167:15,19 168:4
  168:22 169:13
  170:24 171:2,4
  172:5,11 173:8,10
  176:6,19,20
  178:19,23 179:6
  181:14 183:24
  184:9 185:4,7
  186:13,24 193:22

193:25 195:4,19
  196:22 200:10
  201:7,17 202:13
  203:14,19 204:10
finds 255:4
fine 28:3 32:2
  52:22 68:16 84:8
  141:18 144:2
  161:15 167:9
  175:3 199:24
  201:20 204:7
  210:25 218:23
  219:7 227:6
  228:20 230:7
  257:14 264:18
fineburg 129:14
fines 153:17
finigan 148:19
finigan's 159:20
finzi 10:17
firefighter 85:2
firm 24:10,15
  25:4,5 120:22
  176:1 181:4
  201:17 228:11,11
  228:11
firm's 227:17
firms 44:21,22
  224:6,12
first 5:17 19:19
  20:16 21:25 23:10
  25:15 28:1 31:14
  50:7 53:14 69:13
  75:8 80:15,19,25
  87:6 88:7,14,17
  89:6,11 90:7 97:7
  98:5 100:21 105:1
  112:22,22 116:10
  119:23 120:24
  121:6 122:20
  123:24 124:4,13
  124:23 126:3,20
  127:7 130:6 131:9

133:9 137:5
138:17 140:12,18
141:3 143:22
146:9 155:6 156:2
159:14 160:14
162:19 164:9
168:22 172:2
174:21 175:9
176:25 178:19,24
178:25 179:10
181:17 182:1,12
187:23 191:6,12
191:21 192:23
193:22 196:4
197:15 205:3
207:1 217:9 220:6
221:23 224:16
229:18 230:13,16
233:5,8,9,21
240:9 241:9
242:10,15 255:13
257:17 264:23
266:3 267:24
**firstborn** 220:1
**fit** 24:12 130:18
130:20 255:3
**fitch** 7:2 146:4,15
146:25 150:1
155:5
**fitzsimmons**
10:18
**five** 35:25 36:1
48:19 72:12,21
76:8 176:13
261:10
**fix** 18:7 93:15
111:2 196:1,2
261:23 262:6,18
**fixed** 89:14,20
92:6 196:21
261:17
**fixing** 262:10

**flatly** 87:18
**flaw** 109:20
**flawed** 105:6
**fletcher** 10:19
**flexibility** 80:22
158:9
**flies** 130:14
**flipping** 187:5
**flooded** 207:8
**flooding** 160:20
**floor** 6:9 18:4
68:1
**florida** 96:25
143:12 244:18
245:25 255:11
**flow** 46:1 72:8
74:14 109:15
137:18,20,22
**focus** 49:17 90:13
109:2 110:22
111:7 187:6 194:5
244:8 266:18
**focused** 53:13
60:23 61:2,3
108:18 151:12
176:8
**focusing** 188:15
191:7
**fogelman** 6:12
239:24,25 240:1
241:5,12,16
242:22,25 249:5,7
249:21 250:9
252:7,11,13,17,20
252:23,25 253:3,5
253:13,22,25
254:12,19 255:6
255:19,23 256:2,5
256:7,15 258:10
**folding** 128:1
**folks** 28:11 161:18
**follow** 16:17
29:24 212:17

**followed** 162:19
177:23
**following** 144:16
183:8 194:16
220:8
**follows** 100:6
**footnote** 83:6
157:21 158:8
232:2 235:13,25
236:2,3
**forced** 79:12
**forces** 212:20
**foreclosure** 56:24
**foregoing** 82:1
194:18 276:3
**foreign** 120:3
128:1,8,15 132:7
134:23 135:22
136:2,6,14,22
143:2,13 144:9
**forfeiture** 35:12
35:21
**forget** 34:17 66:17
**forgive** 218:20
**forgot** 233:10
**form** 123:17
206:24 273:21
**formally** 20:17
154:11 174:4
204:5 274:15
**former** 153:9
243:11 266:20
270:10
**forms** 135:2,3
159:18 272:1
**formula** 105:6,11
105:19 106:11
108:6,8,23 110:23
111:8 112:16
248:20 264:6
**formulas** 213:6
**formulated**
208:20

**forth** 34:24 80:20
85:5 87:2 97:18
120:13 159:19
160:1 161:25
200:10 228:10
240:3 262:15
**fortunate** 20:21
**fortune** 225:14
**forward** 54:24
60:18 65:17,25
107:10,14 111:4
156:15 158:23
**foster** 85:10
**found** 111:5
163:12 215:7
227:15 238:9
275:4
**foundational**
230:12
**foundations**
223:22
**four** 35:11 36:1
48:20 76:8 103:10
130:5,7 225:2
**fourth** 18:1 94:1
98:17 100:3 103:8
103:9 225:13
**fraidin** 10:20
**frame** 136:23
**framework** 48:25
80:16 164:18
**francisco** 81:21
**frank** 7:1 136:4
146:7 149:24
**frankel** 4:15
**franklin** 7:6 13:13
**frankly** 28:10
59:24 79:23 89:17
90:12 91:5 114:12
123:21 128:21
129:16 136:10
138:23 154:18
171:12 175:19,22

178:1,11 190:20
197:19 199:16
201:18 244:22
245:22 263:22
**fraud**   25:20,22,23
25:23,25 26:1,2
135:1 240:8 241:1
241:1 254:3,5
**fraudulent**   26:2
42:8 63:23 267:25
268:1 269:10,21
269:22 270:2
**frazier**   10:21
**frederick**   14:13
**free**   47:24 151:12
151:15 152:6
153:15 165:21
**frenetic**   38:16
**frequently**   108:16
243:9
**friday**   21:5 225:2
273:10,19 275:12
**friedman**   10:22
**front**   84:22 111:6
180:1 185:13,21
185:22 193:8
**fruition**   48:4
**frustrate**   166:4
171:11
**frustrated**   119:17
170:14
**frustrating**
171:18
**full**   28:13,15 97:3
120:13 135:24
155:18 182:9,9
184:6,6 186:20,20
189:24 190:9
220:23 226:19
230:18 239:19
**fully**   70:6 190:19
210:20 226:20
228:10

**fun**   265:6
**function**   208:15
230:3 269:1,7
**fund**   100:24 102:5
105:13 106:12
107:5 108:3
109:12,24 110:12
112:1 114:1 115:6
116:9,16 117:4
206:21
**fundamental**
139:25 143:21
146:17 200:17
244:12
**fundamentally**
135:7 136:21
141:20 142:9
175:25
**funded**   199:11
261:25
**funding**   212:23
**funds**   37:14 101:2
106:21 223:19
225:11 262:2
**funnel**   213:3
**funny**   138:11
**furnish**   204:3
**further**   17:13
18:15 22:5 24:25
25:13 46:6 79:19
92:17 94:5 134:7
143:25 191:6
193:15 226:24
229:7,16,21,25
254:13 256:16
258:18 261:2
262:23 268:5
271:23
**furthers**   47:22
**futility**   94:4
**future**   23:4 107:2
195:10 196:24

**g**

**g**   9:23 10:3 16:1
237:23 243:17
**gabe**   9:17
**gain**   94:13 158:11
158:14
**galle**   10:23
**gamble**   94:13
**game**   157:8
**gange**   10:24
**ganged**   98:3
**gap**   45:16
**garden**   168:23
169:20
**garrity**   50:2
**gartrell**   10:25
**gary**   11:9
**gate**   246:3,8
**gatekeeping**
245:24 246:3,7
269:1,6,12,15
**gates**   246:7
**gaurisankaran**
37:5
**gears**   95:4 263:23
**geldreich**   11:1
**general**   5:2 6:1
41:17 82:10 88:8
90:20,24 91:13
92:8 96:24 97:23
101:18 102:3
104:14 114:7
148:1 215:15
221:1,2,11 223:4
223:24 224:1
225:17
**general's**   97:1
**generally**   49:19
114:20 123:7
134:10 147:12
151:4 152:15
167:21 237:11

**generals**   225:8
**general's**   5:1
**generated**   224:3
**generative**   219:24
**generics**   182:17
**gentle**   161:15
162:1
**genuinely**   138:19
**geoffrey**   11:7
**george**   221:2,9,11
**gerard**   3:12 4:13
9:20 21:19 145:3
246:4
**gerry**   80:2
**getting**   28:22
29:17 35:9,21
36:2 45:17 60:14
64:18 70:18,22
96:17 101:2,2
114:25 119:9
130:9,10,11
133:19,21 138:8
138:23 156:9
162:11 209:13
225:10 236:7
251:21 256:14
**gibson**   11:2
**giddens**   11:3,4
**gift**   269:17,20
**gilbert**   7:16 11:5
167:11 176:1
201:17
**gill**   11:1
**gillian**   13:22
**give**   18:8 20:15
21:25 26:14 27:21
67:25 116:13
118:12 150:20
170:5,22 171:11
202:8 204:6
209:12,15 214:23
218:2 225:1 229:8
241:22 242:9

249:5 250:14
260:20 265:20
269:19 273:11,23
274:5,6
**given** 33:13 51:7
51:18 58:19 64:15
66:8 79:24 91:15
109:25 112:7
122:25 130:4,13
158:8 159:10
177:18 178:2
197:12 204:25
253:16 264:25
271:12 273:13
**gives** 45:8
**giving** 56:13
207:23 241:23
253:11
**glad** 123:20
154:20
**gleit** 5:14 227:2,2
227:7 228:23
**global** 35:9 123:8
132:4 246:22
247:5
**gloria** 221:8
**glove** 211:19
**go** 21:23 26:13,24
33:23 37:16,22
48:25 50:23 52:1
52:9 54:24 60:17
64:23 65:25 73:22
75:6 76:23 79:12
83:14 90:2 93:22
100:20 108:24
109:8 110:13
111:22 112:3
120:10,20 122:22
128:22 131:15
139:16 141:16
146:8 152:1
156:10 157:18
162:19 167:3

170:2 177:14
178:7,8 179:22
180:25 185:4
193:21 197:1,24
201:1,21 202:23
205:7 211:5 212:6
213:6,11 216:10
217:15 232:20
233:8,8 235:19
237:20 238:18
245:25 246:8
254:13 264:23
265:8 273:15
**god** 215:18
**goes** 25:10 47:9
60:21 70:18 90:15
103:24 144:23
152:10 167:2
177:13 178:23
180:10 189:6
191:24 192:19
199:16 209:19
229:15 265:25
**going** 17:12 21:8
30:16 41:7,8
65:17 72:7 73:19
74:4 89:14 96:24
102:3 104:11
105:3 106:21
108:24,25 109:15
110:13 111:3,17
116:13 117:20
118:10 121:23
122:10 124:11,14
130:22 131:1,22
138:1 144:16
146:8,9 149:9
154:11 155:22
156:15,17,21
161:17,22,23
162:13,23 167:6
172:24 177:12
178:16 179:24

180:21 182:3
183:20 185:11,20
188:7,10 189:22
190:19 191:4
192:24 193:6,8
196:5,6,7 203:7
203:24 206:19
207:18,25 209:24
210:3,20,23
211:14 212:6
213:1,2,3,5,20
214:24 215:20
216:3 217:6,16
218:6,6 219:3
228:22 235:15
236:7,13 238:4
243:25 247:6
248:14 249:18
253:12,14,15
254:10,11,20,21
255:16 258:7,13
259:11,19 260:20
265:18 266:17
273:18
**gold** 9:2 46:20
76:20 87:24 88:1
88:2,6,13 89:9,11
90:9,23 91:3,5,18
91:22 92:1,19
94:22 216:13
**gold's** 42:17
**goldman** 4:6 28:2
48:7,9,15,19,23
49:21 50:7,10,13
51:1,25 52:2,17
52:19,22 53:20,24
54:5,14,17 55:25
56:3,10,16 57:24
58:5,8 59:7,18,21
60:1,6 61:2,5,7
62:18 63:18 64:10
65:1,4,10 67:16
67:20,25 68:2,3

73:17 75:11 76:13
76:20,21 77:3,22
78:10,14 79:17
261:4,6,6 262:21
263:4,7,11,15,25
264:11 266:16,22
**goldman's** 69:24
72:2 74:22 79:13
**goldstein** 11:6
**good** 16:2,11,19
23:24 37:4 48:24
67:3,6 96:14 97:5
97:8,10 98:19
103:24 106:17
107:3,18 108:2
109:2 110:9
113:23 114:19
116:12,14,21,25
131:3 134:9
145:18,23 152:4
162:25 167:10,23
181:21 212:6,6
215:3 229:23
233:7 239:25
256:25 266:12,17
**goodman** 11:7
**gostin** 11:8
**gotten** 75:1
225:14 230:9
**gotto** 11:9
**gov't** 7:17
**governance** 207:3
**governed** 21:12
125:23
**governing** 80:19
**government** 35:16
47:4 67:11 82:17
87:14 204:24
261:21
**governmental**
3:16 36:2 46:2
50:11 62:10,10
84:10,19 85:9

86:13 91:14 95:9
95:15 125:20,23
127:22 137:8
143:2,17 162:20
167:12
**governments**
37:11 46:23 80:14
82:3 83:25 84:13
84:16,22 85:4
86:3,10 87:9,15
87:21 88:17 94:23
217:13
**governor** 215:15
218:1
**grab** 106:25
109:23 110:16
**grace** 99:17,19
**grant** 274:16
**granted** 129:22
**granting** 247:23
**granular** 81:11
**graph** 142:18
**grateful** 19:22
20:5 104:14
110:24
**gravamen** 254:23
**grave** 105:7
**great** 41:21,21
80:22 142:2 157:4
216:6 221:17
246:6 265:16
**greater** 33:5
**greatly** 33:23
131:5 140:1
**green** 11:10,11
**greenberg** 5:16
120:23
**greenspan** 11:12
**greenwich** 64:13
**greville** 223:3,23
**grim** 7:22 11:13
163:7 166:25
167:5,10,11 170:1

170:3,16,20,22
174:23 175:24
179:1 180:15
181:2,7 182:5
184:11 185:21
190:25 197:7
200:24 201:2
202:1,15,17
**grossly** 96:8
**ground** 18:4 47:3
104:20 147:20
181:3 213:4
274:21
**grounds** 57:20,21
57:22
**group** 3:16 6:15
7:9 34:18 50:11
84:6,10 86:8
88:18 93:20
112:18 148:11
155:15 221:7
253:10
**groups** 39:24
44:18 47:19 98:25
112:17 137:12
217:23
**growing** 103:10
**grows** 213:13
**gruff** 275:1
**guarantee** 37:13
44:23
**guaranty** 220:16
**guard** 11:14 96:25
97:15 101:7
111:14 112:5
116:12 203:6
**guard's** 97:12
101:10
**guess** 27:3 60:21
67:12 94:16 95:2
122:22 123:2
139:4 187:6
193:21 218:16

233:24 246:8
251:19 259:24
267:9 268:17
274:4,13
**guidance** 45:10
238:20 271:20
**guidelines** 206:24
**guilty** 79:8
**gulf** 19:6
**gump** 220:18
224:24
**gun** 85:25
**guys** 211:2

## h

**h** 10:12 15:17
24:10 52:15 106:1
182:15 185:6
**haberkorn** 11:15
**habit** 175:8
**hadley** 4:8
**hale** 8:1 175:1
**half** 34:13 42:15
44:24 58:11 96:16
101:1 195:18
224:16
**hallmarks** 29:3
**hampshire** 53:5
**hampton** 220:13
**hand** 17:17 51:13
132:15,18 133:13
157:6 160:5,10
211:19 217:14
226:12 237:11
259:15 262:12
269:25
**handcuffed** 140:9
**handcuffing**
139:6
**handed** 70:22
**handle** 104:11
**handled** 90:5
**handling** 87:25
225:9 275:8

**hanover** 150:19
**happen** 78:1
127:23 133:22
214:16 238:11
253:12,14,15
**happened** 76:23
125:12 141:6
178:5 247:8
**happening** 108:20
155:21
**happens** 132:3
189:17 196:14
209:22 210:18
213:8
**happier** 224:22
**happy** 16:17
20:12 26:24,25
67:20 136:18
187:3,5 203:20
205:4,16 228:18
230:4 233:4 246:2
264:19
**hard** 17:9 58:8
116:22 118:21
126:24 154:5
274:23
**harder** 230:18
**harm** 84:15 159:1
214:24 226:15,18
226:19 251:10
**harold** 11:24
185:6
**hasn't** 146:25
156:8
**hate** 115:15,17,18
217:1
**hauer** 220:19
**haven't** 199:15
**hayden** 9:21
**hazard** 188:10
**head** 28:6 221:8
221:10

**headings** 184:12
**heads** 185:12
**heal** 209:9 210:19
210:20
**healing** 211:6
**health** 105:16
106:6 158:5 207:1
218:1 220:14
221:5 271:3
**healthcare** 85:10
110:1,2 211:18
215:2
**hear** 17:13 19:18
20:12 22:19 78:10
79:25 80:4 88:4
93:17 95:11,14
115:23 118:4
120:5 131:3 141:8
141:9 146:9 159:7
162:21 174:21
175:2 176:9,23
178:4 179:5 205:4
205:16 218:16
229:19 233:5
257:13,14 263:22
263:25 266:22
**heard** 16:8 17:8
25:3 68:22 76:2
78:9 79:7 93:4
96:15 155:19
165:13,14 166:15
204:1 206:2
227:19 229:15
237:10 239:11
250:16 261:4
273:13
**hearing** 2:1,1 16:7
16:18 18:18 58:16
74:12 95:21 98:18
100:3 101:11
104:18 120:15
144:17 145:25
148:21 153:23

159:23 161:9
227:19 231:20
236:11,16 240:5
265:17 266:8
270:22 271:1,5
272:24
**hearings** 275:8
**heart** 18:17 68:10
150:16 162:9
212:17 220:8
250:10
**heartache** 225:23
**heartbroken**
225:15
**heartburn** 202:8
**heartfelt** 272:12
**heather** 10:21
**heathridge**
223:11
**heaviest** 26:15
**heavily** 60:25
113:14
**heavy** 87:10
**heitzenrater**
11:16
**held** 42:2 56:4
59:12 66:7 91:10
91:14 93:23
147:22 232:1
262:19
**hell** 44:14 209:21
**help** 19:16 45:17
48:4 109:21 110:9
117:13,14 161:11
161:12 187:5
191:19 200:1
209:3,15 221:3,6
221:18 225:11
226:4
**helped** 209:23
213:20
**helpful** 22:11,19
23:7 76:1 145:1

191:20 228:17
230:2,6 250:9
255:6 258:20
**helping** 37:4 46:6
161:18 219:18
**helps** 145:16
232:24
**herculean** 151:9
**here's** 189:19
**heroic** 17:5
**heroin** 216:1,4
**herring** 11:17
67:2
**hesitate** 67:23
**hey** 248:7
**he's** 156:19 202:8
**hidden** 225:25
**high** 36:9 154:7
222:22,25,25
266:11
**higher** 132:2
**highest** 29:12
112:2,4
**highlights** 38:20
**highly** 115:6
142:1 208:14
226:1
**highway** 115:2
**hippocratic**
212:18
**hire** 59:4
**hired** 38:19 58:17
59:3
**hirshman** 11:18
**history** 33:6 57:10
58:2,7,10,13 59:8
59:10 151:24
175:14 214:14
261:20 263:17
271:2
**hit** 92:22
**hitting** 271:25

**hoc** 4:16 6:15 7:9
7:17 50:11 95:9
95:15 137:12
148:11 155:15
162:20 167:12
169:15 202:22
**hold** 46:12 58:1
82:12 118:9 123:7
208:14 274:9
**holder** 49:7,12
112:12 232:10,11
**holders** 61:9 62:4
235:22 260:15,17
260:18
**holding** 143:9
222:18
**holdings** 32:3
102:11
**holds** 82:9 223:6
223:18
**hole** 38:6
**home** 67:11 73:23
85:16,18 272:7
**homogenous**
61:19
**hon** 1:22
**honestly** 97:10
**hong** 225:17
**honor** 16:6,19,22
17:1,2 19:7 20:14
21:7,15,19,21
22:2,9,15 23:14
24:12,25 25:12,14
25:19,24 26:4,9
26:14,21,24 27:23
27:25 28:8,15,19
29:19 30:15,20,24
31:14 32:1 33:13
37:18 38:25 42:4
42:13,24 43:2,10
43:12,22 44:3
45:9,21 46:10,18
46:20 47:1,13

| | | | |
|---|---|---|---|
| 48:1,9,16 51:25 | 165:11,14 167:8 | 252:11,13,18,25 | **hospital** 85:3 |
| 53:25 56:11,16 | 167:11,14,18 | 253:5,13,22,25 | 216:11 |
| 58:9 60:1,6 61:7 | 170:16,20 171:7 | 254:13,16 255:19 | **hospitals** 41:20 |
| 63:3 65:4 67:7,16 | 173:7 174:18,23 | 255:23 256:2,5,25 | 217:13 |
| 67:21,25 68:3,4 | 174:25 175:2,4,8 | 257:3,4,13,16,21 | **hotel** 175:6 |
| 68:21 69:13 70:6 | 175:10 176:7,18 | 258:3,7,19,22,23 | **hour** 195:18 211:4 |
| 70:16 72:6,6,9 | 176:19 177:8,10 | 259:7,17,21 260:1 | 212:5 234:2 |
| 73:11,12 75:5,23 | 177:22 178:10,18 | 260:3,8,23,25 | 271:21 |
| 76:20 78:19 80:2 | 179:8,15,16,23,25 | 261:3,4,11 262:21 | **hours** 78:4 144:13 |
| 80:4,7 82:19 | 180:19 181:5,11 | 263:7,25 264:13 | 144:21 212:7 |
| 83:20 84:5,9,11 | 182:6,9,13,22 | 264:15 265:19 | 214:5 |
| 84:12,21,24 85:1 | 183:3,4,8,18,23 | 266:22 267:2,13 | **house** 151:23 |
| 85:13,14,20 86:2 | 184:2,7,17,24 | 267:20 268:23 | **howard** 14:24 |
| 86:7,14,18,24 | 185:2,6,9,24 | 269:24 270:12,13 | **hudson** 4:10 |
| 87:4,12,19,21 | 186:1,11,11,16,19 | 271:14,19 272:9 | 11:19 |
| 88:1,3,11,13 89:9 | 187:3,4,14,21 | 272:11,24,25 | **huebner** 3:8 16:6 |
| 89:17 90:3,23 | 188:3,6,23,24 | **honor's** 114:14 | 16:19,20 20:14,19 |
| 91:18,24 92:17,19 | 189:6,12,22 | 115:13 118:4 | 21:7 22:3 27:25 |
| 92:22 93:6,18,19 | 190:11 191:17 | 140:13 141:22 | 28:8 30:15 42:24 |
| 93:21,25 94:8,13 | 192:3,21 193:6,8 | 227:22 231:19 | 43:2,10,12 48:24 |
| 95:13,20 96:22 | 193:8,12,19,20 | 240:7 256:15 | 51:3 52:25 58:15 |
| 97:15 98:6,13,20 | 194:5 195:13 | 264:25 | 66:17 68:4 72:1,6 |
| 101:3 103:12,18 | 196:2,20,22 197:1 | **honorable** 225:19 | 75:5,8,13,17,19 |
| 103:20 104:8,13 | 197:16 198:3,11 | **honor's** 159:9 | 75:22 92:22 93:18 |
| 107:9 109:21 | 198:25 199:18,20 | 198:23 | 96:13 117:15 |
| 110:24 111:12,18 | 200:6,14,21,24 | **hope** 22:11 24:8 | 220:10 233:24 |
| 114:16 115:16,24 | 202:1 203:8,18,23 | 25:9 44:4 45:24 | 234:3 235:14 |
| 117:15 118:2,13 | 203:25 204:8,17 | 136:23 142:9 | 270:12 271:9 |
| 118:20 119:3,13 | 205:17 218:9 | 145:1 157:3 176:5 | 272:9,13,19 |
| 119:17 120:7,8,21 | 226:5 227:2,7 | 205:6 212:1 | **huebner's** 52:6 |
| 122:9 124:17 | 228:9,13,18 229:1 | 217:12,12 238:20 | **huebner's** 199:12 |
| 126:10 129:2,7 | 229:23 230:4 | 261:11 266:19 | **huge** 77:23 213:2 |
| 130:21 131:14 | 232:24 233:7,7,22 | 275:8 | **hugh** 12:25 |
| 133:24 138:10 | 234:19,22 238:22 | **hopeful** 232:23 | **human** 207:2 |
| 140:18 141:8,17 | 239:15,23,25 | **hopefully** 19:3 | 214:13 275:6 |
| 142:9 143:6,25 | 240:2 241:5 | 21:9 22:21 30:16 | **humanly** 272:1 |
| 144:4,15,25 145:4 | 242:21,22 243:3 | 144:22 161:2 | **hundred** 180:20 |
| 145:11 146:11,17 | 244:10,22 246:4 | 230:5 | 190:3 |
| 148:15 149:24 | 246:11,15,24 | **horewitz** 182:23 | **hundreds** 34:5 |
| 152:10 154:13 | 247:12,19 248:3,4 | **horrible** 47:20 | 39:3,6,22 40:19 |
| 155:8,14 157:3 | 248:11 249:5 | **horrific** 104:22 | 43:23 214:15 |
| 159:3 160:14 | 250:9,12,15 | **horse** 131:23 | 271:10 |
| 162:25 163:3,11 | 251:11,17 252:7 | 203:7 | |

hurley 11:20
hurt 221:19
husband's 220:3
hyde 2:25 276:3,8
hyder 11:21
hypothetical
  30:23 33:2 42:10
  53:10 62:5 78:1
  89:21 249:3
hypothetically
  116:2
hypotheticals
  102:7

**i**

i.e. 204:21
iac 141:23
iacs 65:19 122:18
idea 50:14 66:4
  239:5 243:5 266:6
ideas 158:3
  266:13
identical 74:5
  81:5 99:16 100:7
identically 45:6
  45:14 70:4
identified 57:6
  62:5 63:3 238:24
  238:25 248:9
  273:2
identify 23:18
  55:14 62:22 259:4
  259:8
identity 150:22,24
ignite 222:8
ignore 51:11
  107:16 152:23
  265:12
ignored 72:10
ignores 63:7
ii 52:4
illegal 140:21,24
  208:10,24 212:13
  238:12

illustrative 81:14
imagine 40:19
  200:16
imes 11:22
immediate 67:3
immediately
  220:4
immunities 136:7
  136:14,22
immunity 120:3,3
  136:2 137:9 143:2
  143:10,14,17,21
  143:24
impact 166:10
  172:20 271:4
impacted 132:10
  132:11
impaired 30:22
  49:7 184:3
impede 201:15
imperative 28:18
implement 201:15
implementation
  134:13
implemented
  171:21
implementing
  237:3
implication 134:8
implications
  183:19
implicitly 29:12
  190:7
implying 75:9
importance 66:8
  100:18 109:6
  141:25 159:10
  160:9
important 19:3,4
  21:2 29:10 37:16
  65:23 68:9 77:9
  77:10 78:17 84:21
  87:1,16 95:23

107:6 111:2
  117:10 136:10
  141:20,21 142:1
  150:15 172:12
  174:7 199:25
  202:17,20 218:2,8
  231:8,17,18 232:4
  234:25 273:12,17
  274:9
importantly
  80:15 186:15
  241:19
impose 51:6 94:4
imposed 31:11
imposes 245:17
impossible 38:13
  94:12 133:11
  134:3 152:3
impression
  118:12
improper 92:16
  126:4 206:21
improperly 80:12
  198:9 227:12
  255:2
improved 119:10
inability 119:18
inadequate
  109:25
inappropriate
  17:25 93:11,13
  109:23 142:18
  186:21 234:10
incapable 58:22
incarcerated
  146:16 150:11
  151:15 154:4
  155:17,25 157:2
  157:23 158:4,13
  159:17 160:10
  208:25
incentive 171:13

inception 171:1
incidents 86:4
include 43:9
  46:19 50:22 55:5
  58:11 71:22 83:12
  128:1 177:13
  196:10 240:8
  244:3 260:15
included 77:15
  133:20 138:5
  167:14 172:5
  229:4 231:23
includes 119:5
  155:16 164:4
  204:14 217:21
  232:8,10 240:11
  251:21 258:25
including 18:9
  19:25 31:9,22
  33:14 70:8 82:13
  84:14,17 85:9
  86:5 98:12 101:25
  115:12 121:25
  128:9 133:3
  137:14 142:14
  143:2 155:17
  174:10,13 179:12
  180:17 182:1
  185:10 187:10,22
  190:24 192:10
  194:13,19,21,23
  194:25 195:2,4,10
  219:1 220:10,13
  224:7 226:24
  234:13 240:6,20
  240:22 249:9
  255:1 260:11
  268:6 271:9
  274:18
inclusion 165:3
inclusive 44:8
income 46:24
  65:16 145:13,14

223:20 224:2
**inconsistencies**
101:13
**inconsistent** 92:14
145:6 184:16
**incorporated**
235:13,19
**incorporates**
235:22 237:1
**incorporation**
261:14
**incorrect** 80:17
**incorrectly** 25:20
**increase** 110:11
116:15
**increased** 85:10
85:10,11 103:4
**incredible** 157:14
**incredibly** 42:14
87:17 129:16
**incumbent** 51:7
**incur** 37:8
**indelicato** 11:23
**indemnification**
26:16
**independent**
66:13 141:22
231:15,16 237:20
238:11 239:18
249:17 250:5
252:1 256:13
268:20 269:15
**independently**
234:11,12
**indicate** 166:9
174:12
**indicated** 105:18
105:22 208:7
259:3
**indicates** 106:19
107:20
**indication** 259:12

**indicative** 107:3
**indifference**
221:19
**indirect** 137:24
**indiscernible** 18:7
19:8 20:17 22:4
23:20 32:24 35:6
40:9 41:18,19
42:3 43:20 98:19
99:5 101:4 102:1
102:12 103:2,3,18
111:15 112:6
114:11 115:9,10
115:13 117:8
118:6,13 121:1,1
121:7,13 126:12
126:14 131:1,2
132:12 134:10,20
134:22 139:13
141:4,7,11,14
144:17 150:14
151:3 152:5,25
153:2,12,25
154:20 160:15
162:5,13 163:5,18
164:25 166:3,12
166:23 171:25
172:18 174:16
180:5 182:5,6,8
183:19 184:8,25
185:23 189:4
193:7 195:5
210:14 216:25
221:8 228:24
232:19 240:18,20
241:21,24 270:20
271:11 272:3,12
272:15,17 273:2
**individual** 7:9
33:9 39:10,11
40:11 45:4 62:8
64:17,20 65:12
69:15 73:16 76:3

76:7 94:2 112:8
148:11 156:6
158:8,14,23
172:16,25 209:5
242:8 247:25
249:2 272:15
**individualized**
156:18
**individually** 44:4
183:1
**individuals**
108:20 155:16,17
155:25 156:14,14
157:2,7,17,23
158:4,13,25 205:4
220:8 221:14
238:25 272:13
**induced** 213:10
**industry** 211:19
222:9 231:2
**inestimable** 32:6
**inevitable** 216:2
**inevitably** 238:5
**inextricably**
169:6
**infirmity** 93:11
**info** 85:11
**information** 74:13
74:23 79:11
204:25 206:5
222:16 251:21
**informer** 232:22
**infringes** 261:16
**inhabitants** 86:2
**inherently** 207:14
**initial** 28:4 81:4
**initiate** 225:21
**initiation** 189:3
**injunction** 20:11
51:6,22 60:12
63:1 74:16 75:2,9
75:25 127:18
137:10 206:24

227:12,23 228:5
229:9 237:18,24
238:9 258:6 263:8
263:9 264:1,7
273:1
**injunctive** 121:25
**injured** 225:12
**injury** 67:9,22
79:4 132:19 153:1
153:3 155:5,13,16
156:13 209:8
210:12 215:21
216:21 228:4
**innuendo** 22:17
**input** 217:25
218:2
**insanity** 266:5
**inside** 22:18
**insoluble** 140:3
**insolvent** 269:20
**instance** 122:20
220:9 230:24
**instances** 101:20
**instant** 33:4
**instrument**
223:18
**instrumentalities**
266:1
**insulate** 164:11
**insurance** 8:2
45:24 163:4,13,20
163:24 165:11
168:7,20 169:23
170:7,25 173:13
173:17,21 175:21
176:14 177:4,16
179:18 180:6,13
180:16 181:25
183:11 184:25
186:17 187:20
188:6,8 189:1
191:14 194:13,13
194:20,21,22,24

194:25 198:17
199:13 200:2
201:8,11 202:3
227:13,22,25
228:16 254:3
270:10
insure 164:1
insured 164:24,25
182:14 188:17
190:23 191:13
227:11 228:5
insureds 163:9
165:4,5 166:14
191:8 227:13
insured's 165:12
167:16
insurer 166:17
168:2 174:3
177:25 181:24
187:9,10,20,23
188:1,2,3,3,11
227:22
insurers 144:18
162:17 164:6,7,8
164:17 165:6,25
166:8 167:24
168:8 169:2,19
171:9,11,17 172:8
172:17 173:1,6,14
173:19,24 174:12
174:13,14 176:13
177:20 179:2,3
181:11 187:12
189:16 195:15
196:14,18 197:24
198:20,20 199:8
199:11,14 201:4
202:2,10,25 203:1
203:3,9
insurers' 164:22
171:16,22 173:8
174:1 190:18
198:6 200:9

201:24
insurer's 167:19
172:5 191:12
integral 137:13
228:6
integrated 227:23
intellectual 77:25
intend 21:5
273:10,11
intended 42:18
62:23 135:14
164:1 170:4
246:12 251:10,14
intensity 96:18
100:22,23,24
101:8,13 102:4
104:23 105:18
106:12 107:5,17
109:10,11,24
110:12 111:7
116:8,16 117:4
intensity's 107:6
intent 202:21,24
236:9
intention 106:17
intentional 23:25
intentions 97:10
107:3 170:14
interacts 214:13
intercreditor
34:10 40:24 72:25
interest 38:20
45:6 46:11 47:3,9
47:14 48:5,24
49:8 52:8,11 53:2
53:7 62:1 63:10
65:19,21 66:8,14
66:21 99:11
112:11,12 150:17
165:8 166:16
173:9 175:19
224:2

interested 22:3
138:19 226:17
interesting 28:9
interestingly
126:10 153:4
interests 28:2,6
28:24 29:9,22
30:3,12 31:16
38:22 39:16 42:16
43:13,24 47:22
63:13,15 68:10
80:20 98:2 99:2
112:18 138:17
212:17
interfere 86:1
166:11
international
122:24 129:3
internecine 39:2
interpretation
30:3,4,17 254:2
interpretive 237:2
interrelated 94:11
interrupt 74:21
105:23 114:18
169:25 170:10
234:16 241:4,6
interrupting 16:8
intertwined 169:6
intervention
176:4
intolerable 94:5
intro 207:23
introduce 212:2
introduced
208:13
introducing 216:4
introduction
210:6
inuendo 250:18
invariably 82:12
82:14

investigated
23:15 24:16
investigation
77:12,16 248:13
250:22
investment 34:6
investments 259:4
invoked 262:12
involuntary 63:9
134:22
involved 45:3
108:16 116:1
128:20 129:18,19
involvement
70:20 237:25
250:18
involves 200:2
234:13
involving 161:9
ironic 60:8
ironically 35:23
42:4 47:3 78:17
irregardless
121:3
irrelevant 83:23
102:11 133:16
172:9
irrevocable 42:7
223:15,24
irve 4:6 261:6
island 48:12 53:6
80:11 88:9 261:14
isley 11:8
isn't 160:7,11
186:22 199:10
israel 11:24
issacharoff 11:25
issue 23:12,12,23
24:8 25:12 32:18
48:14 51:10 58:19
58:21 59:13 66:25
72:9 95:7 96:22
98:19 102:3

104:16 106:20
107:18 108:19
110:7 111:1,11,24
113:8 115:25
116:21,22 118:10
118:19 119:22
122:23 125:25,25
127:11,20 128:3
131:7 133:7 134:8
134:18 135:12
136:23 150:3,13
152:20 153:20
154:1 155:20
158:12 159:10
160:15,22 162:12
168:10 169:5
172:10 173:11
174:2 178:11
179:20 180:24,25
181:12,15 182:13
184:5 188:20,23
189:5,13,14,24
191:15 192:12,18
193:12 196:24
197:25 222:16
223:16 224:1
229:11 231:17
233:25 234:4
235:11 236:1,14
236:20,21 238:23
238:23 245:19
254:14 273:1
274:8,10 275:3
**issued** 22:17
165:22 264:2
270:22
**issues** 27:17 36:21
41:25 81:1 101:7
101:12,15 102:22
104:17 105:7,17
107:12 111:7
115:18 148:24
157:6 161:19

169:9 171:25
172:3 173:5
175:17,22 176:3
187:4 191:19
195:15 197:8,9,17
198:12 227:1
230:5,12 240:4
271:3,20 272:21
**it'd** 67:23
**item** 19:5 28:1
80:6
**iteration** 165:3
**it's** 146:7,12
149:15 150:13
154:5 155:14,18
156:18 158:10
159:16 161:11,21
161:22 162:10,25
174:7,20 175:22
175:23,24 177:12
178:10 180:7,8,12
182:19 184:16
185:17 187:16
195:19 196:3
197:5 198:5 199:3
199:9,15 200:17
202:17,19 203:5
207:5,18
**iv** 249:9
**ives** 12:1
**i'd** 155:19 189:23
**i'll** 153:5 154:20
170:5 173:9
174:18,21 184:23
185:4 190:11
203:20
**i'm** 146:6 149:13
150:3 151:19
158:18 175:6
179:14,23 183:4
185:25 188:7,8,14
189:13 190:2
191:6 195:16,17

196:4 201:1,24
203:7,19,23 206:3
207:25
**i've** 200:8 206:1
208:8

## j

**j** 3:11,13 5:22
7:14 8:21 9:2
12:15 13:8 14:2
15:4,9
**jacquelyn** 221:23
**jail** 160:25
**james** 3:10 5:7 7:6
11:11 13:13 14:9
15:16 175:9
221:21 222:1
**jamie** 15:22
**january** 147:3
221:12
**jared** 11:3,10
**jasmine** 9:10
**jason** 14:5
**jay** 9:9
**jeff** 227:2
**jeffrey** 5:14 12:17
14:2
**jenna** 11:19
**jennifer** 10:15
13:14
**jepsen** 221:2,9
**jeremey** 14:8
**jeremy** 12:7
**jerome** 15:2
**jersey** 41:24 64:9
64:23,24,24,25
78:2 183:22
**jesse** 10:6
**jill** 9:4
**jja** 181:16 187:7
187:15 199:19
**jjb** 186:2
**job** 41:17 42:19
48:24 215:3

**john** 10:9,10
11:14 12:19,20
96:25 97:12
116:11
**johns** 147:11,19
**join** 43:4 48:16
**joinders** 80:10
**joined** 43:1
118:16,17 146:5
155:11 261:13
**joint** 167:19 174:1
228:14
**jonathan** 4:20
13:5 95:14 223:3
223:23
**jones** 8:24
**jordan** 14:3 15:11
**joseph** 10:3 13:24
14:10,22 15:7
**josephine** 10:25
**jr** 9:13 11:11
15:18
**juaire** 220:15
**judge** 1:23 16:2
16:11 17:5,7,10
17:16,21 18:5
19:20 21:1 30:7
32:12,25 50:2,2,3
135:10 145:23
147:25 150:17
152:25 218:19
219:23 220:23
222:5 225:19
254:2 256:19
273:22
**judgement** 59:13
**judges** 43:10 50:4
**judgment** 39:13
59:19,23 60:4
64:22 69:4 71:19
75:1 77:19 265:13
**judgments** 33:6
60:19 63:8 65:13

66:1 69:11
**judicata** 196:23
**judicial** 70:2
78:18 107:19
196:16
**july** 44:10 86:17
148:25 176:22
220:23 224:24,25
225:2,16
**jump** 265:11
**june** 146:24
148:18,22
**jurisdiction** 43:16
57:22 121:8,24
122:4 134:15
135:5
**jurisdictional**
120:1 131:7 135:9
136:22 142:24
143:6
**jurisdictionally**
122:20
**jurisdictions**
43:16
**justice** 68:19
74:18 102:6 112:4
**justifies** 93:11
94:9
**justify** 96:10
**jx79** 81:15
**jx825** 81:21
**jx944** 81:15
**jx947** 81:21

**k**

**k** 11:17
**kami** 13:20
**kaminetzky** 3:9
12:2 71:6 264:15
264:16,19
**kane** 147:11,17
148:8
**kaplan** 88:2

**kara** 220:17
**karavolas** 12:3
**karen** 12:4
**katherine** 10:23
13:16
**kathleen** 13:7
**keep** 21:11 24:17
47:8 73:11 75:9
84:11 144:22
161:5 164:10
165:15 210:24
216:12 234:25
259:19
**kelly** 15:6
**kenan** 9:1
**kennedy** 12:4
**kenneth** 10:12
118:3 220:12
**kentucky** 103:9
**kept** 215:19 216:1
244:19
**kesselman** 12:5
**kevin** 3:20 10:4
84:9 93:19
**key** 49:9 168:11
240:10
**keyboard** 141:15
**kick** 190:8
**kills** 222:23
**kind** 28:24 36:23
123:8 140:2 206:2
206:5,8 208:10,25
209:5,9,11 211:11
211:23,25 213:7
213:14 214:13
215:16 216:2,13
239:4
**klein** 12:6
**kleinberg** 88:2
**kleinman** 12:7
**knew** 92:12 216:3
**know** 16:23 19:6
19:10,17,22 20:20

20:24 21:25 22:3
22:13,15,17 26:14
28:10,21 29:2,9
29:16 31:25 34:13
43:6,8,14 45:12
49:20 58:2 62:7,9
64:18 65:5,17
68:7,8 69:8 70:11
70:12 71:13 72:9
73:12,19 74:10,19
76:13,14,15 80:18
91:9 92:20 96:23
102:2 106:10
113:21 114:12
116:25 117:7,9
118:15 122:15
127:2 128:5
129:17 130:2,8
133:18 135:22
137:21 141:2,10
145:14,15 150:6,8
150:12 154:18
156:19 158:18
160:17 161:1,2,5
162:9,13 175:15
178:5 180:1 183:3
183:5,7,8 186:4
189:23 192:4,4
195:15 196:5,16
197:9,9 199:6
200:15,19 202:1,7
206:3,11 207:3
208:8,9,11,19,23
209:6,7,9 210:8
210:10,15,20
211:21,24 212:1,4
212:5,11,15,17,20
212:21,22,24
213:3,5,11,12,14
213:23,25 214:2
214:11,12,14,15
214:17,23 215:2,7

215:8,21 216:1,6
216:11,18 218:4
218:13,14 219:4,8
226:25 229:7,16
233:19 237:13,15
237:21,23 238:14
238:15,17 239:7
243:10,20,22
246:1,9,10,22
247:2,24 248:8,12
248:13,19 249:15
250:6 252:7,8
255:12 256:20
257:20 259:18
260:16 264:19
265:4,8 266:24
267:20 269:19
270:24 273:11,18
273:23 274:18
275:3
**knowable** 33:18
39:4 76:8,8
**knowing** 216:8
226:18
**knowledge** 67:4
67:14 79:15
237:16 241:14,15
248:24 249:15
**known** 92:7
159:19 161:4
214:14
**knows** 19:12 21:2
22:15 30:21 76:19
151:22 171:7
173:7 183:4
**knudson** 221:24
221:25 222:3
**kotler** 12:8
**kramer** 4:15 12:9
95:14,19

A.739

**l**

**l**  8:18 9:24 10:22
  14:22 15:8 220:15
**l.p.**  1:7 5:10 16:3
  16:12
**la**  132:19
**label**  222:10
**labeling**  222:19
**labor**  241:2
**labovitz**  12:10
**labs**  28:16
**lack**  41:10 55:18
  74:23 147:8
  148:12 153:4
  181:12 200:5
**laid**  71:14 85:19
**land**  212:22
**language**  26:20
  27:3,18 49:6,9
  136:16 164:4
  165:4 166:8,21
  170:3 174:12
  176:10,11,13
  178:6,8,11,15
  179:5,9,19,25
  180:20 186:25
  187:7,25 189:7
  190:3,4,6 192:19
  193:24 195:23
  196:9 197:2,10,23
  199:8,19 200:8,16
  200:19 202:10,24
  203:25 204:14
  226:24 229:16
  237:1,23 239:13
  240:10 241:17
  242:2 243:4,16
  245:7 248:15
  250:2,4 252:3
  266:24 267:7
**languages**  178:13
**large**  40:3 51:14
  98:9,14 100:16

102:21,21 104:1
106:22 151:10
246:20 273:12
274:24
**largely**  20:9 57:19
  57:20 85:17 121:9
  172:9
**larger**  31:22
  51:19 104:2
  134:14
**largest**  34:18,18
  34:19 106:22
**larry**  240:1
**lasalle**  45:11
**late**  154:12 157:17
  157:24 161:25
  162:3 176:24
**launch**  29:9,19
**launched**  223:10
  250:24
**laura**  10:16 12:24
**lauren**  15:21
**law**  7:1 36:15
  38:21 41:24 57:21
  69:24 78:2,3
  107:23 110:18,19
  114:22 115:6
  123:9 125:24
  135:17 136:4
  158:19 159:14
  163:7,9 164:5,17
  165:9,20 168:18
  173:18 182:2
  183:20,21,21,22
  183:22 188:13,24
  188:25,25 189:10
  189:11 195:2,20
  196:17,22 208:9
  224:4,6,12 238:17
  249:8 256:1,9,10
  256:19 261:22,23
  269:21,22

**lawrence**  6:12
  12:8
**laws**  142:4 240:24
  240:25 241:1,2,2
**lawsuit**  222:13
  270:4,5,5
**lawyer**  42:19 72:2
  72:3 73:4 79:16
  117:5 183:4,5
  188:8 206:3 253:9
  253:10 270:17
  275:10
**lawyers**  48:1
  67:22 204:21
  225:9 226:2,11
  247:6 253:15
  266:11,12 274:25
  275:2
**lay**  85:13
**layers**  236:8
**layn**  220:11
**lays**  36:7
**le**  173:15
**leaders**  212:1
**leading**  111:6
  121:2,4
**leads**  275:6
**leak**  151:15
**learn**  217:15
  218:7 220:4
**learning**  217:16
**leave**  41:3 47:21
  62:7 67:19,20
  129:25 178:10
  213:11,13 264:13
**leaving**  35:18
**lectern**  141:15
**led**  41:2 161:6
**ledanski**  2:25
  276:3,8
**lee**  220:17
**lees**  12:11

**left**  47:11 136:20
  140:10 213:5
  268:11
**legal**  40:20 70:14
  83:23 93:20 97:24
  125:25 142:20
  176:20 184:6
  190:1 224:6,11,14
  224:15 225:18
  251:12 276:20
**legally**  102:11
  133:17
**legislative**  261:20
  263:17
**legitimate**  80:24
  100:11 103:21
  107:16 116:18
  245:11,19 251:19
**legitimately**  101:3
  248:25
**lending**  57:2
**length**  181:22
**lengthy**  43:15
  132:23 273:15
**lennard**  12:12
**leonard**  12:13
**lessen**  209:10
**letter**  77:9 106:2
  220:22,23 221:1,5
  224:25 225:5
**letters**  215:14
  270:14
**letting**  68:7
  271:23
**let's**  181:14
  182:11 190:19
**level**  104:22 132:3
  161:4 209:17
**leventhal**  12:14
**levin**  4:15 95:14
  95:19
**levine**  12:15

lexington  3:5
lexisnexis  224:4
li  153:24
liabilities  23:2
  168:1,16,25 169:8
  169:18 171:8,10
  173:2 181:23
  182:24 185:15
  202:7 240:21,25
  255:24
liability  22:14,16
  22:21,24,24,25
  26:11 31:1 39:23
  143:14 144:9
  145:7 165:24
  168:13 186:8
  187:10,13,19
  188:17,18 190:22
  190:23 192:10,17
  199:17 237:13
  242:3,4,6 243:8
  246:13,23 247:2
  252:5,5,18 253:2
  253:11 265:6,10
  265:14 266:4
liable  243:11,23
  249:2
lianna  14:17
lichtenfeld  12:16
lie  18:17
lien  151:3
lienholder  152:23
lienholders
  152:11
liens  153:2
liesenmer  12:17
life  153:17 208:6
  221:15 224:2
  225:23
lifetime  208:8
  216:18
lifland  254:2

light  115:25 154:9
  229:11
lightly  60:23
lights  219:16
likelihood  66:2
  76:5 77:16,19
  118:9
likewise  35:14
  165:21
limit  166:3 203:1
  260:21
limitation  196:9
  231:7
limitations  194:20
  230:20
limited  25:23 26:1
  46:25 112:6 143:4
  196:3 223:5,11,12
  231:14
limiter  247:22
limiters  247:21
limits  191:2,2
  194:1 249:14
linda  11:22
line  20:5 21:23,23
  28:20 38:1 59:1
  71:5 76:16 117:8
  181:4 237:19
  238:4 242:15
  256:14 265:12
lines  84:22 160:2
  231:1
link  211:23
liquidate  31:4
  94:10 128:25
  263:2,19 264:4
liquidated  40:6
  49:13 62:11
  263:13
liquidates  172:16
liquidating  34:4,8
liquidation  29:14
  30:23 31:6 33:14

33:18,21,22 34:1
  34:4,23 35:18
  36:7,17 37:13
  42:12 44:7,17
  45:5 46:13,16
  47:10 48:2 53:12
  54:8,12 55:4
  61:10 63:22 69:20
  71:22 72:13,15
  73:6 139:10 140:4
  172:23
lisovicz  12:18
  220:21
list  23:19 44:18
  48:10 86:9 119:22
  167:18 205:6
  208:4 218:14
  238:25
listed  119:24
  154:6 202:4 242:1
listen  138:12
  248:11
listening  20:9
  118:16 207:12
litany  42:13 86:9
  86:11 94:14
lite  5:16 120:23
literally  43:25
  99:2 142:14
  235:12 240:13
litig  7:17
litigable  41:25
litigants  29:2
  147:12
litigate  172:20
  265:24
litigated  262:22
litigating  44:13
  264:25
litigation  34:10
  40:13 43:19 44:22
  47:24 53:10 57:8
  60:9 64:1 95:16

99:6 101:22
  102:15,17,18,19
  102:19 111:4
  164:9,16 167:13
  168:11 177:9
  232:14,16 233:13
  244:18 246:1
little  28:3 100:20
  140:11 144:21
  145:2,5 151:4
  152:7 188:7
  189:10 203:5
  230:18 267:19
live  108:25 176:10
  176:16 262:14
lives  47:21 99:2
living  153:9 197:8
  225:23
livy  13:3
llc  5:16 7:1 220:14
  220:15
llp  3:3 4:8,15 5:9
  6:14 7:8,16 8:8
  167:11 220:19
local  80:13 82:3
  83:25 84:12,16,22
  84:23 85:2,2,2,4,9
  86:3,10 87:9,14
  87:15,21 88:17
  94:23 142:21
  215:15 217:13
  218:1
localities  87:7
located  18:24
  228:12
locked  139:7
  153:12 217:10
logic  39:15 188:18
  188:19
logical  28:17
lohmann  220:15
loneliness  225:24

**long** 48:3 80:24
  87:12 100:10
  128:8 129:13
  152:14 177:20
  208:12,17 209:1,4
  209:13 210:4
  214:3 216:22
  222:22,24
**longer** 28:3
  111:13 143:13
  158:5 186:2 264:8
  266:3
**longmire** 12:19
**longstanding**
  165:19
**look** 25:24 26:13
  27:21 30:5,6
  32:11 51:7,14,20
  82:22 86:7 105:7
  108:7 110:1,1,3,4
  110:13 112:3
  113:6 116:2 117:7
  118:18,25 126:11
  129:18 133:5
  135:18 138:2
  140:4 172:14
  180:3,12 181:14
  190:19 191:5,5
  196:6 233:20
  238:6 246:6 247:6
  249:6 254:10
  256:18 260:19
  263:16 266:9,16
  267:24
**looked** 77:21
  104:21 105:15
  106:11 110:14
  135:19 175:12
  192:5 212:13
**looking** 62:1
  105:17 108:8,9
  122:5 127:12
  180:3 182:25

  192:1 196:4
  214:20 242:23
**looks** 113:17
**loose** 274:3,4
**loosing** 103:11
**lord** 209:23
**lortab** 161:6
**lose** 91:1 272:21
  273:8
**loss** 44:24 214:18
**lost** 17:1 73:21
  177:24 209:25
  221:4 225:15
  245:21
**lot** 25:22 26:7
  37:3 101:24
  105:14 114:25
  127:4 151:9
  189:10 196:22
  197:22 208:19,24
  210:7 211:9 212:8
  212:24 215:25
  226:8 232:6 250:3
  250:16 255:17
**lots** 69:6 175:17
  190:18 273:6
**loud** 204:1
**louis** 9:14
**love** 45:10 117:9
  118:5
**loved** 225:15
**low** 153:16
**lowest** 99:22
**lowne** 12:20
**lp** 145:24 219:21
  223:6
**lp's** 221:22
**lts** 220:15
**lumped** 92:6
**lunch** 27:22
  144:14 145:15
  234:2

**luskin** 12:21 19:8
**lynchpin** 133:10

**m**

**m** 6:19 8:14,23
  12:10,25 13:1
  159:14
**ma'am** 218:23
**maclay** 3:20 84:5
  84:9,9 93:19,19
**madoff** 244:19,20
**maelstrom** 34:11
**magali** 11:4
**magnitude** 92:7
**mail** 159:21
  221:23 222:2
**mailings** 159:24
**main** 4:3 125:6
  178:11 225:3
  226:13
**maintain** 66:1
  264:11
**majority** 31:12
  52:9,9,13 95:25
  105:10 126:15
  224:14 225:10
**making** 43:13
  60:23 63:19 79:6
  110:10 128:7
  156:25 176:19
  191:23 192:22
  239:13
**man** 144:15
  155:11 159:8
  232:19 233:7
  234:21 236:1
  241:21,24 258:7
  258:10,22
**man's** 212:22
**manage** 209:5
  215:1 216:9,14
  273:2
**managed** 58:20
  216:20

**management**
  159:25 237:25
**mandate** 84:2
**mandatory** 51:16
  152:12 154:22
**manipulation**
  91:15
**manner** 110:22
  121:14 123:6
  124:1,20 132:4
  134:1
**manufacture**
  190:24
**manufactured**
  160:19 182:17
  222:25 240:20
**manufacturer**
  222:9,12
**manufacturers**
  111:5 222:18
  231:21
**manufactures**
  222:12
**manville** 147:11
  147:19 249:9
**mar** 220:11
**mara** 12:14
**marc** 3:13 12:5
  14:19 15:4 146:12
**march** 68:24
**margin** 47:18
**maria** 8:16
**mario** 9:25
**marion** 13:21
**mark** 9:19 10:5
  11:23 120:11
  140:19
**market** 45:5,10
  182:16 208:13
  210:7 216:5
  222:21
**marketed** 188:4
  192:17

**marketing** 81:9
207:7,20 239:2
251:1
**markets** 141:24
**marking** 234:14
**markman** 11:8
**marshal** 169:7
**marshall** 3:8
16:20 220:10
**martin** 15:15,16
**maryland** 6:1,2
37:19 42:17 43:1
43:3 48:8,12 53:5
78:2 80:9 88:9
230:2
**mass** 44:21 86:4
93:23 163:19
**massive** 33:18
34:2,6 36:6 43:15
**master** 163:12
194:23 228:1
**masumoto** 12:22
**matched** 57:7
243:6
**material** 24:2
25:10 36:20 41:3
42:2 73:5 114:8
116:10 132:3
134:14 171:2
**materiality**
115:25
**materials** 206:14
**math** 46:7 100:20
117:4,5
**mathematical**
32:15
**mathew** 10:14
**matter** 1:5 23:1
81:4 82:10 85:17
94:3 95:19 100:1
108:17 126:16
146:1 151:14
152:20 153:14

160:24 161:9
170:13 196:15,17
196:23 239:12
246:7 273:12
**matters** 19:14
51:3 79:24 82:13
99:17 107:19
108:15 144:19
165:9 190:10
197:19,20 226:23
242:8
**matthew** 9:2
10:18 88:1
**maura** 13:7
**maxcy** 12:23
**mayor** 218:1
**ma'am** 205:8,16
**mccarthy** 3:12
80:2,3,6
**mccarthy's** 93:13
**mcclammy** 3:10
221:21 222:1
**mccloud** 12:24
**mccloy** 4:8
**mcdermott** 224:8
**mcdonald** 12:25
**mcgaha** 8:18
205:6,17,18,19,20
205:20,22 206:1
206:11,17 207:22
210:23 211:1,6
213:18 216:25
217:1,4,7 218:9
218:14
**mcgaha's** 205:15
**mckenzie** 239:8
**mckinsey** 23:12
23:12,22
**mckinseys** 26:18
**mcmahon** 256:20
**mcnulty** 13:1
**mcorp** 66:10

**md** 6:4
**mdp** 163:15
**mdt** 167:4,17
168:7 169:17
170:25 173:1,16
173:21 180:6
194:13,21,25
200:9 201:8 202:3
**mdt's** 201:11
**mean** 22:2 25:15
52:8 54:2 59:24
60:10 63:13 64:23
64:24,24 65:2
67:8 73:7 74:1,2
74:12 100:7 114:3
114:3,17 125:24
127:9 135:14
137:22 153:14
160:19 171:16
188:3,19,21
191:13 192:4
194:2,2 195:25
196:13 197:7,20
197:24 198:12
200:8 206:22
211:11,14 212:14
212:20 214:20
228:23 244:7
245:20 247:1,14
248:12,15 249:6
249:22 252:4,7
253:5 255:21
256:8,18 263:23
**meaning** 49:25
135:21
**means** 29:16
56:11 159:18
204:13 264:3
**meant** 28:25
36:21 54:14,15
88:15 145:5,13
**measure** 62:14
101:10 105:12

113:21 274:6
**measures** 96:19
100:22,23 101:8
101:13
**mechanics** 93:8
**mechanism**
242:13 243:25
245:25 246:3,7
262:5 265:4
269:12,15
**mediate** 132:24
**mediated** 185:16
**mediating** 183:12
**mediation** 17:6,23
18:5,20 20:1,17
20:17,25,25 21:11
22:5 34:10 82:4
128:3 129:13,14
129:19 134:3
138:4 183:9,15
**mediator** 19:20
273:22
**mediators** 20:2,16
20:21
**medical** 84:25
158:14,17 215:21
220:17
**medications** 81:9
**meet** 30:18,19
116:14,17
**meetings** 222:18
**megan** 14:6
**meises** 13:2
**melanie** 9:24
**melissa** 11:2 15:8
**meltdown** 47:23
**melted** 73:20
**member** 69:15
85:3 161:14
248:17 269:16,18
269:23 270:1,2,6
**members** 40:11
49:2 100:8 224:7

memory  21:9
214:17
men  154:4
mental  106:6
mention  83:22
85:16,16 104:15
104:20
mentioned  17:5
49:1 82:19 84:7
mentioning  216:1
239:4
merely  65:10
124:13 150:25
153:3
merit  61:19 95:5
meritorious  39:17
39:18,20
merits  39:9 96:12
178:4 190:7 265:5
266:17
messrs  129:13
met  73:10
meta  44:4
metaphor  246:9
metric  101:17
metrics  101:16
104:21
metromedia
28:12 29:6
mezei  13:3
michael  9:8 11:6
12:21 13:11 14:14
15:9
michele  11:18
13:2,19
microgram  214:4
microphone  21:16
middle  18:13
143:12
milbank  4:8 21:20
25:1,8 145:3
246:5

miles  73:10
millenium  29:6
30:8
millennium  28:16
miller  13:4
million  36:9 42:15
47:2 56:14,14,15
57:18 69:5 70:14
72:20,24 86:16
116:3 117:6
128:23 133:21
156:14 160:16
224:11,15
millions  40:20
116:9
mind  25:18
124:17 206:4
252:12,15
minds  19:17
mineola  276:23
minimal  107:5
minimize  171:14
minimum  40:16
116:15
minor  102:4
127:22 176:11,11
minority  52:20
minus  39:6
minute  74:9 102:2
266:7
minutes  28:2
30:16 70:3 127:19
130:25 202:18
222:8,10,15,17
261:10
miracle  127:23
miracles  209:3
mirrored  243:6
mis  205:22 215:4
miscellaneous
144:19 226:23
261:9

misconduct  23:24
26:5,5,8,11
235:17 240:16,17
241:8 247:7
249:16 255:16
260:4 267:8,17
268:8 269:3
misfeasance
245:12
misleading  87:18
misnomer  165:6
misrepresenting
93:15
missing  112:20
114:1,21 211:23
misstatements
56:23
mistake  41:14
93:14 139:14
mistakes  215:5
misunderstanding
38:21
misunderstandi...
230:10
misunderstood
235:6
misuse  37:6,9
mitchell  9:9 11:20
mitnick  13:5
mmes  212:25
mo  19:12
mode  20:9,9
model  105:9
138:22 142:10,16
142:18
modest  110:10
modify  49:16
173:14 194:12
mogul  163:22
189:6,25 190:12
mohican  129:5,5
molton  13:6

moment  177:10
197:2 246:11
moments  72:8
monaghan  13:7
242:21,22 243:3
243:14,19 244:10
244:22 245:4,7
monday  17:2 20:6
23:21 25:14 36:14
42:4 46:20 107:11
224:17 227:8
234:7
monday's  231:20
monetized  45:25
money  47:7,10
67:3,6 103:1
106:25 109:15,17
115:25 117:9
122:8 130:10
138:13,13,18,22
156:5 157:7,9,9
158:24 199:16
211:1,2 213:13,14
215:20 217:11
218:4 224:20
242:20 263:6
money's  117:9
212:3
moneys  110:14
monies  64:11
monitor  79:9
207:1,1 251:4
monitoring  79:10
monitors  207:6
month  184:1
214:6
months  129:13
265:3,3
moot  82:20
190:20
moral  188:10
morning  16:2,11
16:19 177:1 227:8

229:6,18,21 239:7
267:15 273:10,19
275:12
**morphine** 108:8
**morris** 102:3
181:4
**morrisey** 5:7
96:24 104:11,13
104:14 105:22,24
105:25 106:3,5,10
106:16 114:16,18
115:16,18,23,24
116:5,7
**morrisey's** 114:4
**mortimer** 223:9
223:14,16,21
224:1 259:3
**mothers** 221:3,7
225:22
**motion** 127:2
133:6 153:21
178:17 220:7,24
222:6
**motions** 57:19,20
86:12 93:4
**motivate** 161:12
**motivation** 113:7
114:7
**mouth** 114:4
**move** 65:9 79:20
91:2 95:6 109:5,9
109:11 134:15
141:13 176:6
178:19 259:20
270:25 273:12
**moved** 73:1
**movement** 119:18
**moving** 271:16
**msg** 41:18
**msge** 86:8 92:21
93:19
**muha** 13:8

**mullane** 150:19
**multi** 3:16 33:5
34:6 84:6,10
**multiple** 34:24
79:9 82:11 191:18
197:8 216:18
227:20 236:7
**multiplication**
53:18
**multiplier** 37:10
37:16 46:3,7
**municipal** 81:12
120:24 123:20,23
124:4,23 126:3
133:9
**municipalities**
39:21 80:13 81:2
88:25 89:4 92:10
119:23 121:6
124:13 125:8
127:7 132:7,8
135:4 138:17,24
140:22 141:1,3
142:7,12 143:22
225:9
**municipality** 5:17
124:24 125:4,5
137:23
**murray** 13:9
**musicland** 156:9
**mute** 16:10
141:13 155:10
165:15
**mvra** 152:14,24
**mvt** 227:22 228:5

**n**

**n** 3:1 16:1 45:11
276:1
**naacp** 129:19
133:3
**naftalis** 4:15
**name** 182:22
205:18 241:3

**named** 25:4,8
35:6 40:12 74:7
**narcotics** 213:21
**narrow** 18:15
198:13 227:11
240:18 248:16
**narrowed** 27:5
**narrowing** 17:13
145:2
**narrowly** 234:4
**nas** 157:21 158:9
**natasha** 12:10
**nathaniel** 13:4
**nation** 5:17
103:23 124:4,24
130:6 154:3
**nation's** 96:16
138:17
**national** 97:24
99:1,11 101:20,25
101:25 142:21
271:3
**nations** 120:24
121:6 123:24
124:13 126:3,20
127:7 133:9 141:3
143:22
**native** 125:21
130:6,12 138:1
**nature** 97:5 112:8
132:22 161:19
271:6
**navigating** 161:11
**navigators** 8:2
175:1 179:10
**navigators'**
162:21
**nbt** 257:23
**ncaa** 139:4
**ncsg** 93:7
**nearly** 85:18
151:25

**nebulous** 125:1
**necessarily** 21:23
103:1 134:6 252:1
**necessary** 24:21
59:11 153:18
158:6,16 167:16
170:24 177:13
211:1 213:7
216:22 228:7
**necessity** 29:4
58:13
**need** 25:4,5 33:16
38:4 42:21 73:4
81:11 93:17 95:21
102:23 109:16
111:13 120:14
152:8 157:7
158:16 161:11,19
174:8 186:3,17
193:14 201:7,16
203:17 207:24
208:12 210:4
211:13 213:4
225:20 236:17,25
244:1 246:15
258:10 260:21
272:19 273:2,7
**needed** 26:21 95:1
209:6
**needs** 16:7 29:23
107:23 108:1
142:23 162:8
190:4 195:24
236:14 246:8
249:19 274:10
275:4
**negate** 201:5
**negligence** 216:7
216:16 247:10,25
**negligent** 247:9
247:15
**negligently**
248:19

negotiate  115:19
  164:21 246:20
negotiated  82:3
  97:22,23 113:14
  116:25 167:23
  170:3,11 185:16
negotiating  168:6
negotiation
  167:25 181:23
  187:18
negotiations  19:8
  97:17 98:1 112:7
  112:8 167:25
  181:22
neiger  13:10
neither  57:25 70:5
  165:2 190:1
  233:20
nervous  244:23
net  35:17 43:18
  139:10
network  134:20
neutral  190:4
neutrality  165:4,5
  166:1,8 176:14
  186:25
nevada  128:10
never  22:12 23:5
  23:6 43:10 68:22
  69:7 76:2 78:9,20
  93:4 108:24 125:2
  125:12 131:13
  134:4 138:11,14
  148:23 178:3
  208:8,9 210:16
  215:3 226:19,20
nevertheless
  19:22 119:1
  207:15
new  1:2 3:6 4:11
  4:18 5:12 6:10,17
  7:12 8:4 17:23
  53:5 57:15 64:24

64:25 69:1 85:20
  85:22,24 86:18
  103:9,10 129:5
  178:13 183:21,21
  206:18 220:20,20
  221:10 222:21
  224:8,12,18
  225:21 235:13,14
  257:9 260:6
newark  5:20
newco  45:25
  273:1
newman  147:25
newspaper
  185:13
nice  213:11
nicholas  13:18
nickolas  12:3
nicole  12:13
niece's  175:5
night  18:13,13
  176:25 229:22
nii  102:11
nimble  272:4
nine  40:8 41:1
  47:15 70:19 86:15
  220:1,2
ninth  18:14 20:8
  143:18 229:4
nj  5:20
nn  186:4
noad  139:9
  172:24
noat  82:2 83:18
  91:2 92:23,25
  95:7 138:1 261:25
  265:9,11
non  6:15 25:13
  26:5,10,11 36:1
  38:9 39:17 40:21
  40:22 62:10 73:2
  82:16 84:19
  122:17 123:6

135:10 157:21
  158:9 168:18
  173:18 180:16
  182:2 200:3 210:5
  240:6,7,8,16,17
  241:8 242:8,19
  243:17 244:7,12
  244:24 246:12
  247:7 248:20
  249:19,22 250:4
  254:25 260:4
  267:8,16 268:8,13
  269:3 270:16
noncompliance
  57:21
nonconsensual
  29:3 135:6
nonconsenting
  272:9
nondischargeable
  35:15
nonmaterial
  94:24
normal  151:20
  196:16
normally  30:13
  150:16 151:13
  249:12
norton  24:12
  224:8
notable  151:11
notably  163:21
note  24:25 46:18
  51:10,11 66:4
  69:2 88:7 89:11
  100:1 109:12
  137:10 140:7,19
  142:13 148:14
  159:11 203:25
  228:13 260:10
  270:25
noted  31:14 37:23
  42:4 80:7 85:7

86:24 94:14 96:13
  98:23 101:12
  104:3 113:9
  141:22 142:9
  143:6 147:25
  174:2 200:4
  270:13
notes  20:15
  143:16 151:16
  181:2 182:15
  210:1
notice  70:2 78:9
  78:18 79:15
  146:15,19 147:4
  147:16,21,23
  149:2 150:20
  151:14 152:5
  153:12 154:2
  155:2 157:13,14
  159:9,11,11,15,15
  159:17,21 160:7
  162:7 167:24
  184:8,14 185:10
  185:15 186:10
  195:15,22,24
  196:9,13,15,19,21
  196:21 198:20
  200:12 204:2
  242:4
noticed  151:24
notices  151:5
noticing  148:16
  148:20
notification  153:4
notified  173:20
notify  151:9
noting  75:8
notion  76:13
  122:10 131:16,18
notions  83:25
notwithstanding
  113:3 137:25
  164:14,23 170:8

173:17 181:25
194:17
**november** 220:7
**nth** 45:3
**nuisance** 81:16,22
135:1 240:24
**number** 17:3,15
22:23 31:10 34:18
34:21 43:12,12
45:22 47:4 54:11
57:18 62:9 68:21
70:6 71:15,17
76:14 83:2,12,23
85:12 93:22
110:25 167:14
168:21 194:17
202:8 219:21
225:10,19 227:18
228:15 230:8,13
**numbers** 96:9,11
110:8 225:1
228:12
**numerosity**
126:15
**numerous** 85:9
202:20
**nurses** 216:11
**ny** 1:14 3:6 4:11
4:18 5:12 6:10,17
7:12 8:4 276:23

**o**

**o** 1:21 16:1 52:15
79:2 182:15 276:1
**oath** 71:1,6,23
73:4 78:11 212:18
**object** 96:3
117:25 166:11
173:20 180:7
198:6 201:6
203:10 225:1,20
**objected** 27:7
77:4 109:19
163:10 174:3

179:12 181:2
198:9 199:15
**objecting** 38:14
46:2 48:11 79:22
80:12,16 83:20,22
84:18 85:15 87:5
87:25 88:24 94:17
95:3 96:9 118:11
173:19,24 179:11
202:10 205:14
229:8,19 234:5
264:21
**objection** 18:18
19:7 31:13 35:23
39:16 42:15,16,20
43:3,5 47:16 48:5
48:16,17,21 49:16
70:9 78:6,8 80:14
83:9,21 93:5,8
95:8,12,22 97:6,7
98:9 99:12 100:5
100:6,12,13
102:13 104:8,12
117:22 118:17
119:23,24 120:13
121:20 124:8
125:16 130:17
137:2,3 144:18
146:18 147:4
148:14 149:10
152:10 154:14
155:6,19 156:23
156:25 164:11
174:5 180:9,10
181:3 185:6,25
190:5 200:4
204:11,22,25
205:5,12,16 217:2
218:15 219:20
226:13 227:11,14
257:6 261:13
**objections** 17:15
19:11 31:12 80:8

82:20 85:15 87:15
96:11 146:2,5,14
148:24 155:23
162:16 167:20
168:9 172:5 173:8
174:2 180:5 184:1
184:9 199:24
200:5,5 204:12,20
205:10 225:17
227:10
**objective** 101:9
**objector** 29:12
36:15,16,18 47:3
43:4 147:22
**objector's** 62:16
120:13
**objectors** 19:4
22:7 33:16 35:24
36:12 38:4,18,19
45:1,7 47:15
51:23 70:8 71:2
93:9 205:9 229:14
**obligated** 233:16
**obligation** 164:19
191:12 233:17
**obligations** 38:1
158:20 168:2
171:12,14 177:4,5
181:24 187:20
194:22 195:2
200:3 202:25
203:2
**obligatory** 31:22
**observations**
217:9 218:8
**observed** 52:3
**obstacle** 149:3
**obtain** 66:1
147:14 233:12
**obtained** 147:20
**obviate** 158:16
174:8

**obvious** 73:14
**obviously** 19:9,23
21:24 56:1 105:20
118:5,21 123:20
137:21 190:18
196:13 218:3
226:7 229:13
239:9 271:14,17
271:19 274:18
**occasion** 184:22
184:24
**occlusion** 169:21
**occur** 105:3 189:3
**occurred** 183:9
**occurring** 207:10
**odd** 103:7 271:4
**oddity** 140:20
**odds** 78:25
**offended** 273:25
**offense** 135:8
**offer** 35:10,22
**offered** 18:19 97:3
98:13,15 212:12
257:4
**offerings** 103:4
**office** 5:1 6:1,8
97:1 221:9 257:1
271:8
**officer** 78:15
238:1 243:21
248:18,21 249:1
250:6 251:21
252:16 254:8
268:17 270:10
**officers** 97:24
232:22 238:16
268:10
**offices** 88:9
**official** 74:16
77:13 220:18
225:4
**offshore** 63:10

**oh** 43:2 54:10
58:8 73:17 120:9
141:14 218:17,21
219:10,15,15,15
219:15 233:10
244:19
**okay** 19:18 21:18
27:24,25 28:7
48:6,13,18,22
50:25 52:2 54:16
60:5 61:6 68:2
72:8 75:7,21
79:20 84:8 87:24
88:6 89:10 91:1
91:21 94:16 96:6
104:10 106:15
111:10 115:15
118:1 119:19
120:18 129:20
130:24 131:24
134:16 140:15
144:12,24 145:18
145:23 149:8,21
149:23 155:10
159:2,13 160:13
162:5,14 163:2
167:9 170:21
174:20 175:2
180:3 192:7
193:14,17,18
195:12 200:7,7,22
200:22 202:16
204:18 205:19,21
205:25 206:17
207:22 210:23
211:6 213:17,25
217:4,7 218:12,17
219:8,10,20 227:6
227:7 228:20
229:2 230:7,8
233:2,19 235:7
239:16,21,21
245:6 256:18

257:15 258:21
259:22 260:2
261:1 264:14,18
266:23 267:12
268:3,25 270:11
271:7 273:9
**oklahoma** 57:17
69:2 183:22
**old** 202:23 226:4
276:21
**omitted** 236:6
**omitting** 171:1
**onboard** 17:4
**once** 34:9 68:22
106:8 108:2,6
116:10,13 209:6
238:8 260:9
**one's** 30:5 250:5,6
**ones** 59:20 66:9
179:12 225:15
239:1 245:11
**ongoing** 18:20
21:4
**online** 220:24
**onset** 82:19
**onus** 251:22
**op** 209:8
**open** 51:13 129:17
273:2
**operate** 181:24
187:19
**operating** 206:24
240:22
**operative** 25:24
200:13,13
**opiate** 206:20
211:13
**opiates** 206:5,20
208:12,17,18
210:10,12 212:19
216:3,23
**opinion** 102:14
131:9 147:10

221:15 223:2
**opioid** 25:13 26:5
26:10,11 37:6,9
48:4 81:9 84:14
84:23 86:5,17
87:17 102:21
104:4,16,20 109:1
110:3 154:3 161:3
163:14,18,25
168:16,25 169:18
181:20 187:8,10
187:13,24 188:5
188:16,18 191:8
191:10,14 192:2,4
192:10,17,20
202:7 217:24
222:8,22 224:10
232:9,14,16
235:24 240:8,16
240:17 241:8
242:8,19 243:17
244:12,13,16,24
245:15 246:13,13
247:2,7 248:20
249:19 250:4
254:25 259:12,14
260:4 267:8,16
268:6,8,13 269:3
**opioids** 84:25 85:1
107:21 115:7
153:9 160:18
182:16 192:17
207:9,9,18 222:11
222:24 234:14
244:7
**opium** 214:14
**opportunity** 20:8
36:13 69:19 99:18
104:15 107:7
110:24 131:18
138:21 167:24
172:20 173:1
185:14 186:13,14

189:24,25 196:6
200:24 203:10,11
218:10 229:10
257:4
**oppose** 110:17
138:24
**opposed** 43:5
49:18 61:24 68:12
91:12 113:18
128:22 148:8,9,10
160:25 194:6
244:25 261:9
**oral** 16:4,13 19:13
27:15 88:7 146:1
197:25 204:19
229:5 257:6
274:22
**order** 16:15,17
20:25 21:1,4,10
26:22 61:9 146:23
148:17,23 161:21
162:18 164:12
165:1 166:19
167:5,15 170:7,24
171:24 172:6
173:14 174:10
177:3,8,9,22
183:25 186:2
194:11 195:4,5
196:3,7,10 197:6
200:11 203:11,14
204:4,5 206:21
258:1,2,4,5,18
261:23 267:20
270:22 274:14,15
**orders** 92:7
165:18,19,21
195:10 271:19
**ordinary** 151:14
**oregon** 48:11,16
53:5 80:8 88:3
118:17

**organizations**
159:25
**original** 20:23
178:15 224:25
**originally** 23:21
**ostriches** 185:12
**ought** 19:19
**ourself** 25:6 28:20
**outcome** 34:12
68:14 98:11 103:6
134:12 171:19
186:22 274:7
**outcomes** 68:15
**outlined** 36:5
212:8
**outrageous**
216:17
**outreach** 159:24
159:24
**outset** 77:11
104:16 122:10
135:9 196:10
**outside** 22:18 24:9
169:9 249:24
**outsiders** 153:15
**outstanding** 180:5
**overall** 87:20
105:19 113:17
123:5 126:18
236:21
**overarching**
84:22 120:1
**overbreadth**
240:6
**overcome** 97:13
153:11
**overdo** 213:25
**overlap** 87:10
88:20
**overly** 27:11
259:2
**overnight** 16:17
21:17 240:4

**overprescribed**
220:5
**override** 170:18
**overrides** 191:1,2
**overruled** 48:5
80:14 83:21
**overstate** 96:3
**overstated** 87:6
**overstates** 100:18
**overton** 146:3,6
**overview** 22:1
26:24 27:3
**overwhelming**
31:12 37:2 47:18
161:23 178:14
**overwhelmingly**
44:9 82:22 94:19
186:24 190:21
**overwritten**
189:12
**owe** 270:21
**owned** 259:1
**owner** 223:5,8
**owners** 76:19
268:11
**owning** 240:21
**oxycontin** 161:6
206:19 208:13,21
211:7,12,13
213:21 214:7
216:5 219:23
222:14,20 223:10
**ozment** 7:1,6
13:13 146:7,7,10
147:5 148:6,23
149:23,24,25
155:7,8 156:7,25
158:2 159:3,7,23
160:14
**ozment's** 147:7,15
149:19 160:6
**o'neil** 13:11

**o'neill** 9:3
**o'sullivan** 13:12

**p**

**p** 3:1,1 11:15
15:14 16:1 52:15
**p.m.** 224:5,24
**pa** 8:12
**page** 28:20 29:6,7
42:20 55:4,7,11
70:9 71:5 93:21
98:17 99:8,19
100:3,17 101:14
101:18,23 102:1
102:23 103:3,6
145:6 160:2
185:13 223:3
**pages** 28:11 31:19
97:19 99:10
101:11 102:25
176:14 187:5
270:24
**paid** 28:13,15
32:15 57:16,17
69:1,3 211:2,4
215:20 224:6,10
224:14 242:20
**pain** 208:12 209:2
209:2,4,5,6,10,13
209:16,19,23
210:4,12,14,16,17
210:17 212:13
214:22 226:15,18
226:19
**painful** 35:1 47:20
**painfully** 41:2
**pale** 74:2 122:11
140:5
**pamela** 10:19
15:3
**pandemic** 151:25
218:25
**panel** 147:25
169:11

**paper** 141:13
**papers** 31:20
91:20,23 144:1
149:17 156:13
160:12 173:9
227:15 228:22
229:1
**paperwork** 162:2
**paragraph** 33:15
34:15 42:5 48:17
77:10 83:9,10
86:8,11 97:18
100:12 185:5,7,8
185:25 186:1,4
199:19 227:18
**paragraphs** 83:16
**parallel** 147:18
**parens** 87:5,6,10
**parent** 32:14
**paris** 14:6
**park** 7:3 220:20
**parke** 24:14
**parse** 27:3
**part** 17:10 18:3
53:14 65:16 69:10
70:8 72:8 77:23
86:25 87:1 111:19
124:18 139:8
169:10 175:15
183:23 192:23
193:22 217:15
220:14 260:17
274:14
**partaking** 138:20
**partial** 206:20
**partially** 226:21
235:19
**participant** 231:1
**participate** 128:2
128:2 129:22,25
133:1 136:9 138:4
142:8 143:23
167:24 185:15

**participated**
79:10 123:21
129:20 130:12
133:3 235:23
**participating**
113:15 123:1,19
137:16 139:12
**particular** 59:20
71:18 87:19 88:24
105:8 106:21
107:4 108:19
110:3,7 112:11,12
121:3 150:10
152:7 182:14
203:19 275:3
**particularly** 89:5
112:7 115:7 121:5
142:1 148:1 152:9
186:21 251:16
**parties** 16:16,16
17:18 18:8 19:24
20:6,10 21:2 23:4
24:22 30:10 31:10
31:23 33:7 38:10
38:17 43:5 44:19
50:17,24 63:24
64:5 69:4 71:16
109:22 131:9
133:12 147:5,9,24
148:2 164:21
172:19 180:9
185:10 188:20
224:22 226:17
228:17 229:6,8,19
230:4,21,24 231:9
231:22 232:3
233:5 234:8,8
235:5,9,16 236:10
240:15 242:17
251:8 255:7
257:11,19 258:1,8
259:11 260:11,12
260:13,15 266:20

268:16 270:20
271:24 272:1
273:10,17,20
274:5,11,17,20,23
275:3
**parties'** 170:13
**partner** 35:5,6,6
223:5 224:24
**partners** 55:13
57:5,12
**partnership** 46:25
**parts** 35:19
**party** 18:16 20:11
23:17,19 24:3,7
24:10,20 25:9
29:14 31:7,10,15
32:6,8,13,23 35:2
36:19,20,23 40:13
40:25 51:6,15,22
54:22 58:25 61:10
62:4 69:16,20
92:11 104:19
119:25 121:21
137:6 148:1 165:8
166:16 181:2
229:9 231:4,14,23
231:25 232:8,17
234:18,21 235:1,3
235:8 238:15,25
239:19 245:21,23
247:23 251:23
269:9
**party's** 112:7
237:25
**pass** 37:20 83:22
**passed** 37:19
**patch** 214:5
**patches** 214:4
**patient** 209:22
216:14
**patiently** 125:12
**patients** 216:9

**patriae** 87:5,6,10
**patrick** 5:7 12:23
13:11 104:14
**paul** 6:3 8:14 9:1
14:4,18 163:1
257:1
**pause** 174:17
184:10
**pay** 40:15,19
46:24 47:7 153:17
153:17,18 182:1
187:22 188:11
191:6,12,14
197:15,16 200:3
223:20 255:16
**payers** 41:20
**paying** 252:10,12
255:17,17
**payment** 220:7,24
222:6 259:15
263:20,21
**payors** 259:10
**pays** 172:16
**peace** 35:8,9
246:22 247:5
252:12,15 253:8
**peacock** 13:14
**pediatric** 41:19
**peered** 49:2
**penalties** 89:3
**penalty** 39:25
**pending** 57:8
232:9
**pennsylvania**
7:19 222:12
**penny** 40:10
**pension** 220:16
**people** 18:8,21,21
18:22 27:7,13,16
40:18 45:13,16
46:4 68:11 69:10
75:8 77:23,23
78:4 98:17 108:25

110:4 115:19
129:18,18 136:18
144:16 145:14
146:5 151:9,12,13
151:21,23 153:8
154:5 157:12
158:20,21 160:25
161:3,12,17 162:8
165:15 204:20,21
204:23 207:2
208:11 209:3
211:20 212:3
213:4,11,13 216:9
216:20 217:15,22
217:22,23 222:23
225:15 226:9
234:11 242:14
244:19 248:7
251:5,18 260:22
271:10
**people's** 119:24
**peradventure**
32:3
**percent** 32:16
33:6 40:5,7 44:12
45:14 47:13 52:7
70:20 77:3 83:1,5
83:11 96:16
100:21,21,23,24
101:1,2 102:9
105:10,13,18,19
105:20 106:13,21
107:3,18 108:7
109:11,12,12,13
112:1 113:8 115:5
116:1 117:4,4
148:8 160:17
180:20 188:23
190:3,12 208:22
223:5
**percentage** 72:17
83:17 262:2

percentages 100:9
perception 132:4
  132:6
perdue 126:25
  127:14,17 142:5
  142:15 225:21,25
  238:15
perdue's 235:24
  239:2
perfect 16:19 44:9
  96:13 130:2
  264:22
perfectly 185:9
  187:1 251:19
perform 121:24
period 57:14
  121:2 151:24
  207:20 230:18
  239:19 253:12,14
perjury 40:1
permanent 25:1
  263:9
permissible 29:3
permission 19:15
permit 137:8
  164:17 203:1
  240:18
permitted 54:24
  60:17
perot's 175:10
person 46:24 85:1
  212:15 215:21
  218:17 219:12,13
  243:22 244:25
  245:18 247:25
  252:5 275:5
personal 40:11
  64:21 67:9,22
  132:19 153:1
  155:13,16 156:13
  215:20 221:19,20
  228:3 242:4,6

personally 110:25
  148:3 175:23
  212:9 221:7 275:9
perspective 116:8
  129:11 134:14
  153:15 272:25
persuade 129:12
  254:10,11,12
peter 10:1
petition 222:15
  250:24
petitioners 162:6
petroleum 134:20
pfizer 32:13,15
  59:9
pharma 1:7 5:10
  7:10 16:3,12
  142:5 145:24
  219:21 221:22
  223:6 224:6,9
  225:21
pharmaceutical
  142:2 210:5
  211:18,25 214:11
  224:9 231:1
  240:19,22
pharmaceuticals
  141:24
pharmacies 111:5
  231:21
pharmacology
  214:12
pharmacy 215:22
  238:15
phase 17:6 34:9
  82:4
phi 46:4 73:22
philip 8:6 9:7
  174:25
philips 129:14
phillips 220:11
phone 165:15

phrase 38:15
  187:17,18
physical 160:16
pi 34:17 74:13
  158:24 253:9
pick 23:25 26:16
  26:22 32:25
  246:12 248:3
picked 23:10
  25:19,22 247:14
  248:9
pickering 8:1
  175:1
picking 251:13
piece 108:1,5
  114:21,21 116:10
  216:13
piercing 237:13
  242:3 250:7 270:6
pill 216:11,12,12
pills 209:13 214:1
  214:21
pillsbury 6:14
pinhole 122:12
pis 38:3 77:24
pittman 6:14
pittsburgh 8:12
  166:2,6
place 6:3 75:9
  79:9,12 80:23
  90:7 153:7 242:10
  264:9
placement 131:25
places 70:19
  100:14 152:2
  213:12
plain 30:1 136:15
  137:7
plains 1:14
plaintiff 41:12
  147:1 269:11
plaintiffs 44:21
  86:19

plaintivist 46:11
plan 16:5,14,23
  18:14 20:8 21:6
  28:4 29:17,18
  30:11,22,24 31:9
  31:24 32:23 33:11
  34:20 37:12 38:7
  38:11,23 40:17,24
  41:16 44:16,19,25
  45:17 46:3,12
  47:17,21 49:3,3,8
  49:10,12 50:17
  51:8,17 52:7,10
  52:22 53:9,11,16
  53:22 54:13 56:18
  61:11 65:24 66:11
  66:13 68:17 69:21
  72:22 80:12 82:25
  83:5,10 84:17
  86:8,25 87:2,20
  90:2,24 94:2,19
  94:24,24 95:8,10
  96:8,12,13,17,18
  97:5,8,9,21 98:6
  98:12,16,20,23
  99:1,2,4,10,13,25
  99:25 100:2,2,14
  100:19 102:6,9,10
  102:12,17,18
  103:7,14,16,19,20
  103:25 104:7,7
  106:17 111:19,19
  111:20,21,21,21
  112:10 113:15
  114:8 117:22,23
  118:11 121:1,11
  121:14 122:13,23
  123:22 124:2,5,8
  124:8 125:10,17
  125:24 126:7,9,21
  127:18,21 130:4
  132:20 133:10,14
  133:23 134:11,13

137:5,12,13 139:5
142:10,13,16
143:8 147:9 148:4
155:22 156:2,3
162:17 163:6,11
163:18,23 164:1,1
164:4,10,11,12,21
165:1,10,18,20
166:4,17,21,22
167:22 168:5,6,9
168:12,15 169:4
169:15,16,22
170:4,6,11,14,23
171:1,3,15,21,23
172:5,6,12 173:2
174:9,11 176:5,12
176:15,24 177:2,2
177:7,7,11,13
178:9 181:21
184:1,9 185:1,3
186:1,24,25 189:8
193:23,24 194:6
194:11,11 195:3,3
195:9 196:3,5
197:3 200:8,11
201:6,7,13,15,23
202:5 203:3,10
204:4,21,22
205:10,14,16
206:15,18 211:24
217:10 218:6
225:17 226:17,25
227:10,20,21
228:4,6,7 229:4,9
230:22 232:4
233:14,18 236:24
245:24 246:16,17
250:2 253:6
256:21,22 259:16
261:16,24 262:1,3
262:7 263:3,21
264:3,10,21 267:3
267:4 268:2

plan's 84:18
planet 76:19
plans 51:5 99:9
  172:3 272:5
plan's 164:18
  168:15
play 84:16
played 123:2
plead 250:13
pleading 42:17
  78:12 245:16,19
pleadings 78:14
  79:16
please 70:23
  75:25 218:19,19
  220:24
pled 79:8
plenty 250:21,21
plimpton 224:14
plural 193:4,9
  199:4 204:13
plus 29:14 39:6,7
  206:4
pm 275:14
podium 18:25
  76:17 84:4 166:25
  228:19
podunk 212:4
pohl 13:15
poignant 162:9
point 21:8 27:10
  27:16 31:20 43:6
  44:4 45:7 49:20
  50:7 51:19 53:24
  56:17 57:25 58:10
  59:6,7,11,14,18
  60:7,22,22 61:7
  62:6,12,18 63:2,5
  64:16 66:18,22
  69:13 72:3 74:22
  75:20 78:21 79:24
  84:22 85:17 87:4
  92:21 93:12,17

99:22 102:4,10
103:13,13 105:13
112:19 114:15
115:14,22 116:11
117:3,15 118:3,3
118:6 120:1,2
124:9,12,16,17
130:1 134:7
139:20 140:18
141:2,19 142:7,24
143:21 146:17
149:2 150:4
152:17 153:5
155:2 156:2,25
159:6 160:4
172:24 174:5
176:10 177:8
178:24 179:23
180:10 183:2
184:23 185:17
188:15 190:5
191:7 192:22
196:13 201:2
203:8,17 204:15
204:16 205:2
206:13 210:22
211:16 215:10
221:15 226:7,13
227:16 229:7
233:10 237:11
241:19 245:21
248:16 257:12,17
259:8,20 260:8
262:24 264:1
266:7 267:19
268:24 269:8
273:9
pointed 58:15
  87:8,10 219:17
pointing 65:10
  118:18
points 36:4 49:16
  63:19 66:16 72:11

78:19 84:7 92:24
112:22 119:25
146:14 155:12,14
159:12 192:24
197:15 200:25
204:2,2 226:10
256:8 266:17
poised 65:5,7,9
police 236:23
  237:3 240:22
  261:17 263:18
policeman 85:2
policies 163:16
  164:20,22 167:3
  168:13,24 171:6
  173:17 177:17,19
  180:16 182:14
  188:7,9 189:1
  190:15,21 194:13
  194:14,21,21
  202:4,6,25 227:13
  227:25
policy 163:13,25
  168:3 170:8
  179:10 181:25
  182:1 183:7
  187:20 191:2,14
  192:9 194:24,25
  201:14
policy's 168:16
political 98:6
  101:5,5 107:7
  110:16,21
polk 3:3 16:20
  80:3 120:11 136:5
  140:19 146:12
  152:18 175:24
  220:11 221:21,24
  226:2,11 228:11
  229:24 264:16
polk's 227:18
  228:11

**poor** 220:3
**population** 37:7,8
  83:7,11 96:16
  100:14,18,20
  101:1,4,9,15,17
  101:21 103:8,9,10
  103:11,12 105:8
  105:10,11 108:7
  108:10,19,22
  109:3,9 111:14
  212:25 213:13
**populations** 154:3
**porter** 13:16
**portion** 37:14
  267:5
**position** 18:3 19:2
  44:11 140:1
  156:11 191:22
  198:23 234:9,10
  245:1
**positions** 31:11
**possible** 18:11
  31:5 69:23 111:24
  118:22 138:3
  145:15 199:16
  210:5 271:6
**possibly** 33:5 39:1
  40:9 43:14,17
  46:15 63:16 73:5
  118:21
**post** 21:10 65:15
  89:24 102:15,17
  169:12 172:4,16
  172:21,22 209:8
  263:1
**pot** 262:3,4
**potency** 222:25
**potent** 222:21
**potential** 18:4
  32:5 38:9 57:1
  63:12 71:12 77:17
  197:11 199:17
  254:23

**potentially** 65:20
  139:6
**power** 45:3 150:6
  236:23 261:17
  263:18
**powerful** 108:6
**powerless** 171:17
**powers** 87:6 237:3
**practical** 94:3
  153:14 160:24
  161:9
**practices** 56:25
  57:3 207:7
**pray** 207:25
**pre** 99:6 102:18
  113:16
**precedent** 109:7
  174:11 176:1
  180:18 200:1
  201:18
**preclude** 180:22
**precludes** 147:15
**precluding** 85:24
**predecessor** 24:14
  36:4 57:10 238:1
**predicate** 25:17
  25:17 180:8,23
  182:4 185:1 188:9
  201:10,11,14
**predict** 39:1
  129:21
**predominant**
  105:8
**preemption** 57:22
**preempts** 188:24
  188:25 201:14
**prefer** 31:21
**preferential** 47:5
**prefers** 100:2
  104:7 111:21
**preis** 8:25 79:6
  220:22 224:23

**prejudice** 229:13
**preliminary**
  60:12 62:25 74:15
  263:8 264:2
**prelitigation**
  100:15 102:7,15
**premised** 230:10
**premises** 157:11
**premium** 35:8
  253:8
**prepare** 53:25
**prepared** 176:10
  176:16
**preparing** 89:15
  145:15
**prepetition** 85:5
  164:3 189:4 203:1
**preposterous** 92:3
**prerequisite** 58:2
**prescribe** 214:9
  219:24
**prescribed** 211:20
  216:19 219:25
**prescriptions**
  207:21
**present** 8:20
  53:15,25 54:6
  58:20
**presentation**
  93:13 145:4
  199:12 234:1
**presentations**
  98:23
**presented** 54:18
  54:18 127:6
**presenting** 261:12
**presently** 150:11
**preserve** 124:14
  135:20,21,21
  167:16 168:15
  169:7 170:25
  192:12 201:7
  202:24

**preserved** 164:7
  171:24 172:3
  190:19
**preserving** 123:19
  228:5 240:2
**president** 111:3
**presidential**
  175:10
**presiding** 221:2
**press** 13:17 125:9
**pressing** 156:19
**presume** 64:14
  268:9
**presumed** 125:11
**presuming** 65:14
  139:7,10,13
**presumption**
  67:14 124:18
**presupposing**
  202:6
**pretty** 25:2 28:9
  32:21 96:14
  103:25 111:23,23
  117:18 127:22
  133:1 152:2 161:1
  201:3 238:17
  251:4 271:19
**prevail** 63:15
  66:19 78:21,24
  79:2 92:13
**prevailed** 47:24
**prevent** 171:17
  198:18 208:21
  209:14
**prevented** 60:11
  210:7
**previous** 207:23
  222:5 225:5
**previously** 173:20
  221:1,6
**prey** 13:18
**prices** 46:19

primarily 18:15
61:3 198:13
199:11
primary 60:22
prime 82:23 153:2
principal 31:12
principally 176:8
principle 105:16
123:10 128:14
165:17 198:4
200:17 236:25
principles 196:19
prior 58:16
145:17 165:3
223:19 271:18
priority 35:15
63:15 89:8 91:7
prison 151:13,18
151:18,19 159:24
160:1,25
prisoner 160:24
prisoners 152:7
153:16 154:11
161:11
prisons 151:22
152:1 160:7,17
pristine 251:2
private 39:22
privilege 20:19
priya 9:11
pro 8:16,18
112:15 133:21
137:17 138:7
144:18 204:20
205:8 218:15
225:6
probably 19:1
23:24 24:21 104:6
144:13 155:3
159:10 160:18
174:20 200:16
215:8 219:1 247:8
248:23 271:1

probation 200:20
problem 76:4
85:25 104:4,5
108:14,23 110:1
110:15,22 122:21
123:4 132:1 161:3
162:7 184:22
213:15 215:12,13
242:13 243:16
244:12 252:8
problems 103:15
111:16 214:3
procedural 19:14
57:20,21
procedure 136:20
procedures 57:1
93:6 138:5 160:23
proceed 48:23
51:25 75:25 88:6
186:20 261:22
269:13
proceeding 66:3
139:19 140:11
143:7,23 147:2,6
152:18 154:19
164:15 165:12,21
168:20 184:5
198:5,7
proceedings 1:12
71:2 136:11 148:2
165:18,23 168:1
271:6 275:13
276:4
proceeds 35:18
45:24 163:17
201:10
process 16:25
93:3 98:10,14
107:25 110:10
123:1 129:13
132:24 133:10,10
150:20 157:6,9,25
166:4 171:13,18

172:23 184:8,16
186:12 202:18
203:3,13 206:5
272:18 273:3
274:14
produced 234:14
produces 103:7
product 160:19
190:24 226:14
249:2,3
production 81:9
products 142:2
177:18 178:2
190:21 207:14
226:14 240:8,19
professional 34:2
34:7
professionals 25:2
program 137:17
137:20,24 138:6
148:16,17,20
149:2 157:14
218:7 222:17
programs 37:6
138:18,20,22
212:24 215:25
217:10,15,18
prohibit 164:24
prohibited 207:16
project 55:2
projected 40:16
73:2
promissory
151:16
promote 86:1
promptly 171:8
273:13
prone 97:6
prong 269:4
pronouncing
205:7,22
proof 52:23 53:2
54:23,25 55:18

56:4 61:23 66:7
66:20,24 83:14
98:13 134:25
146:21,24,25
153:20 155:20
156:6,12 158:1,22
158:24,25 161:24
192:6 215:21
proofs 39:25 57:6
57:7 126:24
127:12 131:14
153:8,11,22
157:12 158:21,22
192:5
proper 80:16
82:17 89:13 99:21
198:1 207:16
properly 69:18
81:3 90:6 169:10
198:8
property 49:11
63:11,16 64:6
65:22 81:6
proponent 16:24
52:22 117:22
132:20
proposal 112:14
112:15 113:19
propose 173:24
185:17
proposed 23:21
27:14 30:24 50:24
66:11,13 84:17
86:25 97:8,10
121:1 162:17
167:15 174:12
179:6,15,19
183:25 193:22,25
195:19 197:6
199:8,11 204:9,14
233:14
proposes 50:17

**proposing** 168:6
**proposition** 90:22
  97:25
**proprietary** 87:9
**prorata** 113:21
**prosecution** 137:6
**prospect** 41:6
**protect** 52:12,20
  170:4
**protected** 67:4
  238:13
**protection** 52:5
  64:15 81:18,19,24
  174:16 240:24
  255:8 261:22
  262:17
**protections**
  262:13
**prove** 36:22 39:11
  45:11 53:1 66:18
  66:22 73:9 89:12
**proved** 42:21
  154:1 163:21
**proverbial** 226:1
**provide** 37:10
  112:10 113:12
  163:14 167:22
  168:24 174:15
  177:17 189:8
  202:6 228:2
**provided** 54:25
  72:3 88:10 146:15
  146:19 151:14
  154:2 159:11,17
  159:20 167:18
  177:6 194:17
  203:14 262:18
**provides** 44:16
  47:22 143:1
  158:13 163:11
  223:18 237:23
  238:20 261:20

**providing** 160:9
  263:21
**province** 77:12
**provinces** 267:19
**provincial** 142:21
**proving** 28:24
**provision** 49:6
  50:1 123:12
  170:11 182:2
  185:24 187:11
  191:13 196:21
  197:2 201:22
  202:21 203:4
  230:16 231:25
  238:8 255:13
  263:20 267:2,4,5
  267:7,15,16
**provisions** 109:19
  121:25 157:16
  163:5 164:23
  166:12 168:17
  170:9,25 172:7
  173:18 177:15
  182:2 183:7
  187:23 189:11
  190:14,15,16,17
  195:20 199:20
  201:14 202:7
  227:24 228:16
  262:7
**proviso** 194:10
  195:7
**psychic** 209:21
**public** 17:10 37:3
  39:19 46:7 81:16
  81:22 105:16
  127:21,23 129:15
  131:16 132:25
  135:1 152:1
  175:19 225:25
  240:24
**publication**
  150:24 151:1,5

  159:15,18
**publicity** 180:14
**publicized** 132:24
**publicly** 154:6
**pulggari** 13:19
**pull** 135:11
**pullman** 4:1 261:6
**pullo** 82:23 83:4
  151:7 152:4
**pullo's** 83:6
**purdue** 1:7 5:10
  7:10 16:3,12
  18:11 35:5 44:13
  44:15 46:22,24
  55:6 63:22 67:11
  69:1,2,3 76:18
  78:4 79:7 84:15
  107:1 113:16
  141:23 145:24
  160:19 173:17
  188:3 194:13,20
  194:24 207:8
  208:13 219:21
  221:22 223:5,6,8
  224:6,9 235:17
  248:19 253:20
  259:14 261:18
  267:6 269:17,18
  269:18,20 270:1,2
  270:2
**purdue's** 68:23
  74:19
**purdue's** 190:23
**purports** 82:9
**purpose** 52:11,18
  163:15 168:4
  171:6,11 236:3
  261:20
**purposes** 16:18
  32:23,25 33:1
  81:14 90:2 94:2
  125:22 135:16
  196:23 207:17

**pursuant** 143:13
  163:18 257:21
**pursue** 86:4 87:16
  123:3 163:16
**pursued** 69:21
**pursuing** 84:14
  269:7
**pursuit** 29:14
  62:15
**push** 127:10
**pushed** 208:14
  210:6
**pushing** 216:5
**put** 55:14 63:9
  71:8 75:9 96:11
  110:14 116:19
  124:4 152:5 157:5
  167:5 183:24
  185:12 212:16
  216:22 246:15
  248:19 250:15
  258:17 262:4
  264:5 267:22
**puts** 22:21
**putting** 114:4
  216:7 217:14
  251:22
**puzzled** 175:12

**q**

**quadruple** 194:16
**quadrupling**
  108:10
**qualification**
  116:20
**qualified** 196:13
**qualitative** 255:15
**quality** 110:19
  266:11
**quantifiable**
  33:18
**quantified** 56:2,7
**quantify** 43:14
  56:3

quantitative
 160:14
quantities 216:17
 216:19
quarropas 1:13
quarters 225:11
question 36:12
 91:6 95:23 102:20
 129:11 131:7
 134:12 135:9
 136:13 158:10,11
 159:22 175:15
 178:25 182:8
 189:2 190:13
 191:5,9 229:18
 233:11 235:6
 254:4 268:19
questioner 71:5
questioning
 248:12 250:17
questions 26:25
 71:9 84:5 92:17
 95:20 102:22
 143:25 149:18
 154:20,23,25
 155:7 166:24
 167:1,2 173:10
 174:17,22 178:18
 186:12 189:2
 193:20 199:20
 203:18 205:23
 227:5 228:9,18
 230:8,25 232:25
 237:2 260:25
quick 20:15 267:1
quickly 106:18
 109:17 135:11
 176:6 185:5 233:1
 267:13
quiet 165:13
quigley 30:9
 31:18 32:1,11
 33:5 49:22 50:15

51:4 59:9 249:9
quigley's 32:13
quinn 13:20
quirk 13:21
quite 19:4,22
 67:17 68:6 85:19
 86:2 103:22
 104:16 121:22
 127:20 138:3
 148:14 154:18
 164:17 207:5
 217:5 233:25
 262:24 272:4
 275:6
quixotic 33:19
quote 37:5 71:4
 147:10 148:4
 175:9 181:18

**r**

r 1:21 3:1 5:14
 16:1 101:22
 182:15 276:1
race 38:16 139:20
races 39:3
rachael 13:25
raise 41:25 96:24
 99:22 102:3 113:4
 134:7 137:1
 146:18 169:20
 174:22 197:24
 202:9 267:2
raised 43:24
 48:14 60:6 68:9
 95:7 98:5 99:12
 100:13 147:4
 148:24 149:3
 198:10 202:2
 206:13 230:25
 232:6 233:11
 240:5 243:10
 254:7 264:20
raising 70:8
 147:15 175:14

180:11 234:5,6
random 111:15
range 99:23
rata 112:15
 133:21 137:18
 138:7
rate 41:20
rational 34:13
 47:15 101:6
 103:21 107:15
 108:13,23 116:17
 128:9,16,17
 132:21
ray 145:3
raymond 4:9
 21:20 223:7 246:5
rdd 1:3
reach 83:7,15,18
 103:17 131:8
 181:1 186:17
 273:21 274:7
reached 86:16
 131:13 181:19
 183:15 227:9
 264:4
reaction 241:7
reactions 241:8
read 25:21 42:14
 70:19 91:6 93:24
 150:16 167:20
 179:24 217:2
 220:23 241:7
 259:24 270:18
 274:17
reading 20:2
 49:25 75:24 206:6
reads 247:7
ready 206:9
 242:25
real 56:12 57:1
 69:24 95:4 136:13
 158:25,25 159:1
 180:8

realigned 90:6
realize 145:4,12
 253:15 262:9
 274:6
realized 124:13
realizing 228:6
reallocations 36:5
really 18:14 19:25
 20:20 23:25 24:2
 26:2 29:10 32:20
 33:16 51:21 52:20
 63:5 67:9 68:16
 70:13 78:8 79:5
 83:12 95:23 97:21
 100:1 102:12,15
 104:1 113:23
 115:3 116:21
 121:19 124:1
 127:5 130:5 133:1
 134:19 135:13,14
 135:17 136:17
 137:4 142:25
 143:20 150:7
 170:19 172:10,25
 174:15 185:5,17
 189:2 191:4,7,9
 197:10,19,20
 198:7 199:9,22
 204:15 209:23
 210:4,8,13,15,16
 210:18 211:11,13
 212:6 213:4
 214:24 218:11
 221:19 237:16,19
 238:3 244:20
 247:1 249:4,10,19
 249:20,22 251:25
 266:12 275:9
reargue 203:24
rearrange 89:19
rearranged 90:1
reason 39:19
 49:15 74:7 80:24

96:17 104:25
107:18 114:17,18
116:25 141:21
148:12 164:4
169:13 171:4,20
171:24 185:19
186:3,17 236:6
263:16
**reasonable** 97:5
98:16 100:1
126:19 167:23
172:19 181:21
182:20 188:16
198:20
**reasonableness**
99:23 173:3
184:13 191:24,25
192:13
**reasonably** 41:5
69:23 150:24
**reasoned** 85:23
**reasons** 31:23
33:19 34:24 43:22
44:4 69:3 80:15
83:20 87:18
100:25 104:8
107:22 141:21
168:21 176:1
**rebuttal** 36:18
68:1 120:6,17
140:17 146:13
149:7,18,21
174:19,22 228:21
**recalibrating**
18:10
**recall** 97:16
**receive** 30:22 49:3
49:4,9,13 53:8,9
53:11,12,16,22
54:6,7,11,12,13
54:19,24 62:2,5
100:16 125:20,21
125:21 152:16

163:12 221:18
**received** 67:1
83:18 100:8
124:10 126:23
138:15 147:23
221:6 230:21,22
233:14 269:10,16
**receiver** 40:17
**receives** 156:5
**recess** 145:22
**recharacterize**
93:13
**recipients** 233:15
**reckless** 25:16
241:14 251:9
**recklessly** 241:13
251:24
**reclassified** 95:1
**reclassify** 94:25
**recognition** 133:7
133:18 139:1
271:5
**recognize** 59:8
105:4 109:4
252:20
**recognized** 128:6
150:20 151:2
**recommended**
212:16
**recommends**
109:13
**recompact** 101:21
**reconsideration**
225:20
**record** 16:20
22:10,19 32:14,18
33:13 45:21 48:15
54:3 57:23,25
69:9 70:17 72:12
78:19 80:2 86:5
96:23 107:20
111:9,12,12,23
114:19 115:4

116:11 133:7
145:3,24 146:12
160:5,11 173:12
174:6 181:8
182:10,18,18
183:7 184:6
186:16,20 189:15
189:15,22 190:1
190:10 193:5
197:12 199:25
200:19 202:20
203:17 204:12
229:24 235:15
236:13 246:4,24
246:25 248:13
252:21,22 267:22
271:11 276:4
**records** 158:5,12
158:15,17 215:21
215:22
**recoup** 232:13
**recover** 31:2,3,6
33:11 34:22 37:15
39:12 40:10 42:1
43:18 45:5 53:1
55:3 62:3 66:22
66:24 69:19 76:18
81:13 99:17,18
122:6 127:16
139:7 164:2
216:20,21
**recoverability**
63:24
**recovered** 163:17
**recoveries** 31:8
32:5 33:17 34:1
37:21 38:2,7,9,23
45:24 51:15 79:13
139:1 163:16
**recovering** 41:6
82:2,6
**recovery** 29:13
30:10 34:3,21

36:24 39:1 45:8
49:18,18 60:25
61:4,12 62:3,16
65:19 66:20 73:6
76:7 100:9 128:13
131:18 132:22
137:13,14 139:8
153:10,16 201:9
216:21 263:3
**red** 67:2
**redline** 111:19
**redress** 70:13
**redressing** 85:25
**reduce** 33:23 37:6
99:8 199:17
**reduced** 34:21
**reed** 8:8,10 163:1
**refer** 101:10
144:9
**reference** 125:2
131:15 144:5
171:23 179:17
199:23
**referenced** 173:13
184:11
**references** 69:14
177:19 204:10
230:13
**referred** 187:8,14
239:7
**referring** 106:1
245:20 269:2
**refers** 90:14 144:8
**refilled** 46:15
**reflection** 275:2
**reflects** 35:8
**refused** 147:21
**regard** 42:13
88:14 121:5
134:12,17 136:1
137:8 159:8,8
170:14 191:7
197:15 227:14

259:23 260:3
272:22
**regarding** 129:15
155:12 160:6,22
173:22 202:2
229:14 231:20
232:7 260:6,7,9
**regardless** 104:17
168:3
**regards** 267:4
**regime** 142:3
**regimes** 142:20
**regulate** 150:6
211:10
**regulated** 142:1
207:13
**regulating** 67:10
**regulation** 67:13
142:3,4
**regulators** 207:15
**regulatory** 240:23
**reinjury** 210:2
**reiterate** 37:18
201:3
**reject** 49:24 83:1
83:10 104:8
**rejected** 49:22
55:23 56:2
**rejecting** 30:21
31:5,24 32:5
33:10 36:10 38:14
39:11,15,17 40:21
40:22,22 43:13
44:6 45:4
**relate** 187:10
231:9 240:23
**related** 24:20
25:13 57:7 77:14
77:17 84:25 85:1
85:11,25 86:4
115:7 122:23
171:25 181:20
187:8,13,24 188:5

188:17,18 191:8
191:11 192:2,20
230:24 231:5,12
232:14 234:7,8
235:5,9,16,17,24
237:24 240:10
244:24 245:15
249:20,22,23
253:19 258:25
259:12,14 268:6
**relates** 22:12 24:3
92:1 145:1 247:20
250:25 261:15,19
**relating** 183:6
240:12
**relation** 16:4
53:11
**relationship** 81:5
136:17 211:17
231:2,14
**relative** 34:8
**relatively** 68:5
**relatives** 217:25
**release** 20:11
22:25 23:1,5,7,10
23:13,20 24:7,7
24:22 25:2,3,4,5
27:6,8,9,10,18
28:15 51:6 119:25
121:21 134:18,23
135:6 145:2,7
165:20 168:12
186:9 204:15
226:24 229:9,12
229:14,16 231:25
234:11,17,18,20
234:21 235:1,3,8
236:10 240:9,11
240:15 242:7,12
242:19 243:6,16
244:2,2,11,23
245:12,14,15,17
246:21 247:20,22

247:23 248:22
250:1 253:2,12
254:24,25 255:5
255:16 257:11
266:24 268:1,4
**released** 22:24
50:24 61:11
177:20 230:15,18
231:3,4,9,12,13
231:13,16 232:3
234:9 235:18,18
235:24 236:2,22
239:18 243:24
244:15,16 245:21
247:9 248:9 251:8
255:7,18 257:19
259:11 260:11
267:9 269:9
**releasees** 24:23
26:10,10,18
**releases** 17:14
18:2,16 19:2
22:12,15,20 23:16
24:3 27:11 29:4
54:22 122:14
144:20 230:1,3,9
230:22 231:23
232:1,7,17 233:12
233:15 234:10
239:6,20 240:6,7
241:20 246:11,16
257:9 258:25
260:9,12,20
**releasing** 23:4
253:18 260:12,15
**relevance** 117:24
**relevant** 68:21
79:5 91:16 99:7
133:18 148:2
208:6 228:16
**relied** 212:16
**relief** 135:2,3,24
147:14 155:5

157:18 160:9,23
161:8 178:17
198:18 208:12
**relieve** 158:19
233:17
**relinquishing**
206:8
**relitigate** 198:21
**relitigating**
265:19
**reluctantly** 41:1
154:8
**rely** 58:6 150:25
247:6
**relying** 210:9
**rem** 35:15 42:7
**remain** 27:18
102:22 164:24
199:19 272:21
**remained** 21:12
**remaining** 35:23
100:23 144:19
174:19 226:25
**remains** 118:6
150:12
**remand** 249:10
**remarks** 120:4
187:12
**remedy** 89:3
91:10
**remember** 19:7
25:14 58:15 71:3
75:23 175:10
182:21 214:20
265:22
**remembers** 93:6
212:3
**remind** 53:3
74:15
**remote** 58:3,14
102:17
**remotely** 102:17
275:8

removed  24:19
rendel  13:22
render  173:22
rendered  77:19
reopen  133:11
reorganization
  18:14 29:4 66:11
  94:3 171:13
repeat  120:14
  228:10
repetition  150:14
replayed  49:10
replete  86:5
reply  86:8 120:16
  167:19 172:4
  174:1 227:17
report  20:2 33:15
  34:24 36:17
reporting  57:2
  101:12,14
reports  217:16
represent  79:16
  92:9 105:18
  137:19 147:6
  149:25 179:2,10
  189:18 272:15
representation
  181:6
representations
  271:22
representative
  22:20
representatives
  207:3
represented  44:20
  152:18 204:21
  207:6
representing  88:2
represents  34:16
  84:5 105:1
request  16:5,13
  21:6 46:23 51:8
  204:3 205:1

require  34:6 82:9
  156:4 163:23
  168:22,24,25
  171:2 190:17
  196:19 274:15
required  32:4
  158:1 169:14
  178:13
requirement
  157:12
requirements
  157:6
requires  28:12,21
  28:22 30:9,21
  49:1 53:7 62:1
  72:1 150:20 165:3
  170:6,23
res  196:23
researching
  219:23
resemble  102:18
reserve  120:17
  149:6 156:7 205:3
  260:5
reserved  120:4
  204:20 226:22
reserving  123:2
  131:6 146:13
  149:20
resolution  32:22
  118:11 123:5
  167:25 172:3
  173:3 181:23
  187:19
resolve  19:24
  118:10 171:8
  175:17 180:25
  189:13 226:19
  234:3 236:21
  274:12
resolved  102:23
  173:4 180:19
  185:16,23 226:20

226:21 272:23
  274:10
resolves  226:18
  234:1
resolving  34:5,8
resource  107:23
respect  41:11,25
  49:7 70:16 72:10
  77:3 78:13 89:3,5
  91:24 107:1,13,19
  107:23 124:20
  142:11,24 143:3,9
  143:20 144:20
  146:14 149:1,17
  150:2,10 154:14
  156:21 157:15
  158:20 159:9
  160:22 179:9,19
  182:14 188:25
  191:12 192:9
  199:2 230:24
  247:23 251:9
  272:13
respectfully  154:8
respectively  81:15
  81:21 228:13
respects  88:20
respond  27:17
  50:13 74:2 92:21
  155:12 205:3
  264:16
responders  88:17
responding  91:18
response  49:20
  71:9 72:5 76:15
  91:22 101:19
  120:12 133:6
  159:22 231:19
responses  172:1
responsibilities
  142:21
responsible
  159:25 208:15

responsive  25:13
  248:5
rest  31:20 119:10
  144:1,10 149:6,17
  160:12 227:14
  228:22 229:1
restate  87:21
restitution  152:12
  154:23
restriction  126:19
restructuring
  219:21 224:19
  225:3,21 271:20
result  34:25 47:23
  60:10 83:15,19
  98:20 139:5 140:3
  185:14 275:7
resulted  153:4
results  37:10 83:8
  89:15,15 103:2,7
resuming  47:24
retain  49:13 50:22
  50:23 186:14
retained  49:10
retaining  50:16
retired  50:4
return  56:8
revenue  85:11
review  20:8 229:3
  258:2
reviewed  154:22
  205:10
revised  81:17
  89:24 179:5 203:4
  204:4 272:1,25
revision  231:19
revisions  229:10
  229:11,25 230:21
revisit  152:21
rewards  77:6
rewrite  177:2
rewriting  130:1

**rewrote** 256:21,23
**rhetorical** 175:12
 175:15
**rhode** 53:5 80:11
 88:9 261:14
**rhodes** 48:12
 182:15,16 188:16
 191:15,18,22,24
 192:6,9,12,14,22
 193:1,12 199:2
**ricarte** 13:23
**rice** 13:24
**richard** 14:15,16
**ridiculous** 93:16
**right** 18:6,7 21:10
 25:25 28:21 29:15
 49:6 50:23 52:14
 52:16,18 65:3
 72:11 74:10,11
 76:16 79:6,7,20
 88:12 89:8 90:15
 90:19 91:25 92:4
 110:22 114:13
 117:5 119:18,21
 125:18 126:1,7
 127:16 128:20,23
 129:22 130:2
 131:22 132:14
 133:22 135:12
 137:22 138:8
 140:17 141:8
 144:10,12 145:19
 149:16,20,23
 153:3 156:8
 157:23 159:12
 162:5,14 170:13
 171:15 179:4,7
 180:13 187:13
 188:13 191:4
 194:8 195:10
 196:18 197:12
 198:5,22 202:14
 202:16 203:11

 204:18 205:7
 216:24 218:13
 219:19 226:6,10
 226:22 229:2
 230:7 233:2
 234:23,24 235:4,7
 235:10,17 237:7
 239:9,14,18,21
 242:24 243:2
 244:14 245:3,10
 247:7,11,13,17
 248:14,18 250:1
 250:12 252:5
 254:2,18 256:4,7
 256:18 257:15
 259:10,19,25
 261:24 263:1,10
 263:18 264:3
 266:7,23 269:25
 270:11
**rights** 50:17 79:11
 87:16 122:18
 123:2,19 124:15
 132:20 135:20
 147:8,13,16,23
 148:3,13 152:14
 152:24 161:18
 163:13,20 166:10
 167:17 169:17
 170:8,25 173:13
 173:21 177:4,5
 180:6 189:1,9
 190:18 194:22
 198:6 200:10
 201:8,11,12,24
 202:3,24 205:3
 227:12,25 256:10
 260:5 261:16
 262:6 263:13
 264:12
**rigorous** 30:13
 109:3

**rigueur** 98:7
**riled** 205:12
**ringer** 13:25
**rise** 56:25 216:2,4
 242:9
**risk** 29:20 78:24
 164:2 169:19,22
 170:4 210:2
**risks** 77:6
**rms** 143:11 144:5
 144:8
**road** 190:9,9
 276:21
**robbins** 93:25
**robert** 1:22 10:17
**robertson** 14:1
**robin** 94:14
**robinson** 9:3
**role** 16:23 19:6,23
 20:22,22,23 84:16
 137:13
**room** 1:13 5:4
**rose** 24:12 224:8
**rosen** 14:2
**rosenbaum** 14:3
**ross** 175:10
**rothstein** 14:4
**roughly** 83:11
 160:16,17
**round** 17:23
 20:16 96:7
**roxana** 9:5
**rubinstein** 14:5
**rug** 226:1
**rule** 21:5 84:1
 85:16,17,18 99:21
 100:4 147:14
 148:1 157:18
 168:23,24 189:13
 195:17 225:19
 273:10
**ruled** 59:24

**rules** 80:19,25
 130:1 196:16
**ruling** 159:9
 173:5,22 174:2
 176:18 190:7
 195:5 273:11,15
 273:18,23 274:5
 274:13
**rulings** 165:7
 168:10 195:10
**run** 28:3 160:25
 217:22,23
**rundlet** 14:6
**running** 219:12
**rural** 213:8
**russell** 14:7
**ruth** 12:16
**ryan** 14:8,21
 15:10 220:13

**s**

**s** 3:1 9:4 10:15
 11:7,11,23 12:6
 12:22 14:4 15:21
 16:1 52:15,15
 106:1,1 182:15
 193:9 220:15
 257:11,20
**s.ct.** 45:11
**sackler** 4:9 18:9
 21:20 22:19 40:12
 40:14 45:15 64:4
 64:20,21 76:22
 78:1 145:3 214:10
 223:7,10,14,16,25
 224:1,2,7,11,20
 225:13,18 243:21
 243:22 246:5
 247:2,8 259:3
 262:1 266:17
 272:23
**sackler's** 223:16
 223:21

**sacklers** 19:17
23:14 26:17 31:7
34:22,23 37:15
39:2,10,21 40:2
40:19,19 41:3,9
42:2 44:14,15,25
46:17,21,23,25
47:6,21 54:25
55:3,6,10 57:15
60:12,24 61:16,18
61:23,24 62:20,21
62:24 63:4,9
65:12 66:2 68:23
68:25 69:2,4,11
73:15,18,23,24
74:5,7,23 75:10
76:4,5,6,7,11,17
77:14,17 78:5,21
121:7,11 122:11
122:19 140:10
215:11,25 224:15
226:2,11 250:18
250:23 251:6,7,8
251:14 253:10
257:24 259:18
265:23 268:11
**saddle** 17:9
**safety** 86:1 240:25
**saint** 6:3
**sake** 22:10
**sale** 56:19 81:9
139:11 206:19
234:14 251:1
**salesforce** 207:10
207:11,21
**salmons** 220:17
**salwen** 14:9
**sam** 10:20
**samantha** 224:5
**samhsa** 106:3,4,5
109:13
**samsa** 106:4

**samuel** 11:25
**san** 81:20
**sand** 95:4 185:12
206:5 209:24
263:23
**sandra** 221:10
**sara** 9:15 15:5
**satisfaction** 169:8
**satisfied** 52:8,24
**satisfies** 96:12
**satisfy** 35:20 66:7
**satisfying** 153:22
**saval** 14:10
**save** 174:18
**saves** 99:2
**saving** 18:19
**saw** 161:9 176:25
**saying** 54:17 64:4
73:9 74:22,25
78:16 94:22 115:2
150:8,16 156:7
162:7 165:9,17
177:2 184:19
194:10 198:13,21
244:17,19 255:12
262:24 263:4,7,8
264:23 265:4,8,11
265:23
**says** 29:25 49:6
112:10 125:17,17
135:13 138:12,12
145:12 173:24
180:4,7,8 186:6,6
189:8 193:4 195:7
196:7 199:3
219:13 232:3
241:10 243:20
256:20 263:20
267:7
**scenario** 28:23
36:9 72:19 76:11
172:17

**scenarios** 36:8
72:16
**schedule** 24:11
25:9 27:16 70:24
202:3
**scheme** 142:8,11
**schinfeld** 14:11
**schlecker** 14:12
**schmidt** 14:13
**scholarly** 26:7
28:9
**school** 117:8
133:4
**schwartzberg** 9:1
256:25 257:1,3,15
258:3,14,19,23
259:7,17,20,23
260:1,3
**scientific** 222:23
**scope** 20:10
123:10 159:11
160:6 202:21
232:7
**score** 99:5
**scott** 3:8 11:5
**scrambled** 90:6
**screen** 219:5,7
229:20
**script** 207:24
**se** 7:19 8:16,18
204:20 205:8
218:15 225:6
**search** 250:19
**seattle** 81:15
**second** 16:4,12
24:6 31:14 62:1
80:22 82:19 98:9
101:11 108:5
111:13 113:1
116:10 135:11
147:10,17,21
149:9,10 169:13
169:25 172:8

181:14,16 183:2,3
193:2,11,15 197:4
197:5 218:24
234:17 249:8,24
256:11 267:12
**secondly** 20:7
85:14 87:8 137:7
159:22
**seconds** 18:25
**secret** 200:20
222:18
**secretary** 207:2
**section** 29:23 30:8
51:4 52:4 67:4
80:20 97:9 122:22
123:8,11 135:6,13
135:19 136:3,16
136:22 143:3,7,10
143:13,16 150:7
163:5,11,21 164:4
165:22 166:22
170:6,22 171:21
184:10 186:5
194:5 231:24
232:2,4 237:23
240:9 257:22
258:15 261:19
**sections** 33:16
81:23 130:18
**see** 17:11,20 18:21
34:24 45:11 61:22
95:13 109:20
117:1 126:24
129:16 144:22
155:11 157:3
174:21 187:4,15
187:25 191:9,10
191:13 192:20
202:12 204:4,6
205:7 209:24
213:8,24 214:1
219:6 229:19
242:11,18,22

244:7,11 245:9
260:6 272:3
275:11
**seeing**  116:22
123:2 129:2
**seek**  79:13 84:18
89:3 143:23 156:8
157:18 164:1
165:25 166:8
169:2 172:12
173:14 178:17
183:13,24 184:17
184:21 186:2
201:5
**seeking**  86:21
121:16 156:20
164:25 165:6
167:4 184:14
191:17,21 192:9
194:4 198:18
201:17 202:13,13
**seemingly**  28:17
37:19 40:25 41:1
**seen**  19:10 129:2
177:11
**segment**  222:7,16
**seismic**  36:5
**seized**  98:14
**self**  64:11,14,14
76:25
**sell**  213:21
**selling**  207:18,19
**sells**  141:24
207:14
**semi**  26:7
**sense**  28:14 30:7
56:10 91:17 101:9
119:6 144:14
151:25 198:2
211:15 263:23
266:14
**sensible**  28:18

**sensitive**  112:7
**sent**  224:25
**sentence**  176:15
176:15,17 178:24
179:25 180:4
181:16,18 183:3
185:16 187:7,15
187:25 193:2,11
193:15
**sentences**  187:15
**sentencing**  152:21
154:17,25
**sentiments**  175:18
**separate**  84:3
89:16 90:1 128:6
130:3,4 132:21
135:22 141:20
142:3 238:11
239:10 240:16
249:16 252:18
254:3,5,7,15,23
255:3,24
**separately**  82:21
87:14 89:1 109:24
140:25 149:10
256:12 259:13
261:9 269:6
**separation**  246:23
**september**  62:25
265:18
**seq**  33:15
**series**  105:2
**serious**  42:19 47:5
**seriously**  20:23
78:13 95:22
**serve**  37:8 111:3
137:12 153:11
**service**  17:11
**services**  106:6
207:2 220:14
238:1
**ses**  144:18

**set**  18:4 21:1
29:22 45:6 46:24
48:25 80:20 85:5
87:2 113:10
120:13 123:18
159:19 160:1
166:21 181:8
187:23 200:10
206:23 228:10
240:3 262:15
**seth**  14:11
**sets**  34:24
**setting**  92:12
133:15 226:9
**settle**  40:21 41:13
69:3 168:17 172:7
182:1 187:22
188:12 189:11
190:14
**settled**  59:17,23
64:11,14,15 69:7
76:25 108:15
113:16 177:20
197:21,21,22
223:9 274:15
**settlement**  19:11
30:14 31:9 32:22
33:15 35:22 40:15
41:2,22 55:14
57:1,15,16 58:1,5
58:7,10,13 59:8
60:3,9,16,18
86:16 99:22
100:10 101:24
102:1,21,22
113:14,18 119:10
121:25 122:1,12
164:18 168:16
171:10 181:23
182:19 183:17
184:13 187:18
188:16 191:10
192:14 198:1,14

199:10 204:15
227:9 231:20
244:9 245:15
253:5 266:17
271:22 272:23
**settlements**  32:14
33:6 40:22 57:14
100:8 101:18,20
101:25 119:11
166:20 167:22
181:18 182:7
187:8 192:10,11
198:8,19 227:20
**settles**  164:21
**settling**  19:9
57:11 204:5
256:20
**settlors**  64:11
**setup**  92:3,6
**seven**  38:4 72:12
76:9 238:23
**severe**  104:17
**severity**  96:19
101:8,12 104:23
105:12,12 111:8
**shannon**  10:7
13:1
**share**  36:10 47:8
72:16,20 76:10
116:2 117:11
128:22 133:21
137:18 138:6,7
230:6 262:4
272:16
**shared**  47:11 93:1
257:18
**shareholder**  24:3
24:5 240:15 245:2
248:2 257:9,10,11
257:12,17,21
258:4
**shareholders**
41:16 71:16,17

271:21
sharing 72:22
shaw 6:14
shepherd 14:14
16:25
shepherded 272:2
sheriff 215:15
shield 23:4 220:13
shields 21:12
225:18
shift 52:24
shifting 66:20
shira 15:13
shore 7:14 8:21
14:15 34:16 72:25
155:11,14,15
short 40:14,16
87:12 121:2
208:18 209:15
210:24 211:14
238:12 248:15
shortsighted
87:17
shot 254:16
should've 214:14
215:8
shouldn't 173:22
187:25
shoved 226:1
show 30:18 39:12
39:13 90:3 185:19
251:23 252:21,22
252:24 253:1
255:10 265:9
showed 265:17
shower 266:14
showing 42:10
56:12 107:5
showings 158:16
shown 175:14
shows 45:23 97:25
side 18:9 54:9,21
95:24 96:8 97:2

97:11 116:23
127:21,22 129:15
178:13 180:15
182:4 214:17
216:8,15 223:6,7
225:6,8,13 242:14
259:1
sides 115:22
135:24 225:3
sight 272:21 273:8
signature 78:14
signed 78:12
204:24 205:9
257:22
significant 84:14
88:24 92:15 97:16
106:25 111:20
112:4
significantly
101:23
silbert 14:16
silences 78:17,18
similar 21:5 59:22
74:6 79:4 80:21
80:23 81:3,13
90:15 142:11
215:16 231:7
237:22
similarly 20:25
21:4 24:23 115:12
124:21 153:8
simmonds 14:17
simple 92:23
102:20 112:15
143:7 230:16
simplify 145:16
simplistic 36:14
simply 24:4,12
26:15 61:17,20
63:2 69:15 80:17
91:3,18 92:9
100:4 109:10
164:17 178:7

180:6,23 184:4
190:7 192:11
262:11 275:2
sincerely 138:16
138:17
sincerity 148:6
160:8
singer 8:14 14:18
162:25 163:1,3
165:14,17 167:2,7
167:10 175:23
176:9 184:11
190:25 197:8
218:24
singer's 196:13
single 39:5 40:25
50:19 72:10
176:15
sir 116:20
sister 73:22
sisters 225:22
sit 196:14
site 253:11,19
sitting 17:9
situated 24:23
45:6,14 69:16
70:4 115:12
124:21 153:8
situation 37:24
152:25 210:10
214:25 238:10
six 37:3 72:12,21
76:8 128:20
197:25 274:21
sixth 124:8 128:9
176:24
size 92:8 110:12
137:25
sizeable 82:12
sizes 92:15
skapof 14:19
skip 153:5

skipped 185:8
skipping 185:25
skis 188:8
skorostensky
14:20
slated 46:1 158:25
slaugh 14:21
slice 126:16
slight 181:15
small 17:3 31:10
76:14 98:11
100:16 106:20,22
112:1 113:25
116:8 117:8,15,24
256:22,22 268:12
273:12
smaller 40:9
94:23
smith 8:8,10
163:1
sneak 135:23,23
193:24
sneaky 32:21
snow 162:1
snowball 209:21
social 152:2
socialize 273:24
sold 213:24
solely 38:8 169:3
201:5,17
solicitation
178:12 194:7
solicited 178:8
solution 153:6
212:12,19 216:6
solutions 212:2,8
276:20
solve 39:5 108:14
108:23 109:25
110:15 142:22
250:15 251:15,16
solved 39:7

solving 110:22
somebody 23:17
  99:3 162:2 250:13
someday 37:15
someone's 248:25
somewhat 113:24
  152:10 154:8
son 219:24 226:3
son's 219:25
sonya 2:25 276:3
  276:8
sophistic 52:15
sophisticated
  44:20
sophistry 69:14
  70:5 73:7
sorokin 14:22
sorry 29:6 37:22
  54:10 76:21
  114:18 128:19
  146:6 149:13
  151:19 152:24
  170:2,17 201:1
  210:23 228:25
  233:8 234:16
  249:7,21 252:22
sort 16:23 30:10
  58:1 67:13 73:12
  76:21,21 79:14
  91:7 92:24 93:11
  120:1 130:17
  161:13 198:14
  236:6 251:5 272:1
sorted 18:3
sorts 35:25 51:15
  213:6 216:21
  219:2
sought 51:6 128:2
  129:22 135:3
  155:5 165:4
  183:17 184:9
  195:21

sounded 206:3
sounds 232:16
source 65:18
  228:2
sources 51:15
southern 1:2 52:3
  59:25 131:16
  224:18
sovereign 120:3,3
  123:14 136:6,14
  136:22 137:9
  143:1,10,14,17,20
  144:9
sovereign's
  134:23
sovereigns 135:22
sovereignty 84:1
  136:2
speak 74:3 113:6
  114:6 172:10
  205:1,3,5,9 208:5
  217:25 218:10,15
speakers 207:23
speaking 44:6
  93:12 162:23
  163:7 165:16
  167:21
speaks 208:1
  253:6 266:8
special 41:21
  77:24 131:12
  163:4,4 165:6
  223:20
specialty 8:2
specific 21:1 29:5
  32:4 34:3 49:5
  54:11 97:7 98:4,9
  108:20 112:9
  118:10,15 135:16
  136:15 159:24
  166:13 172:10
  173:8,10 182:13
  193:1 199:1

203:18
specifically 82:3
  134:11 135:13
  143:1 168:14
  170:4 179:20
  181:6 189:8 234:8
  241:5 270:16
specificity 158:3
specified 230:23
speculated 76:22
speculating 43:18
speculation 45:2
speculative 32:10
  32:18 33:2 37:1
  38:9 44:1 55:19
  58:3,13,22 66:6
  69:22 72:4
speed 271:16
spend 31:21
  224:14 250:3
  263:5
spending 99:7
  103:1,5 104:4
spendthrift 64:8
spent 36:20 77:5
  105:4 127:19
  157:9 212:3
  224:21
spilled 220:8
spillover 46:7
spirit 23:19
spoke 181:5
  183:16 233:19,20
  272:16
spoken 19:19 45:7
spokesman 41:15
sponsored 22:6
spouse 223:21
springer 14:23
squarely 55:22
stacey 146:3
  149:25

stacy 10:2
stage 59:16
  154:25 263:12
  264:4
stages 246:1
staggering 38:20
stake 164:19
  271:2,3
stakeholders
  16:24 17:4 18:12
  34:11,12
stand 148:7
standard 25:2
  29:1 40:17 68:13
  99:21 100:4
  116:14 251:25
standing 86:10
  147:8 148:1,12
  155:3 159:9
  166:11,14 213:7
standpoint 118:12
stands 39:18
  55:12 189:25
standstill 60:15
staple 70:23
stark 45:2 55:12
  105:20
start 16:10,22
  95:18 106:19
  176:5 182:4 209:9
  243:3
started 51:14
  132:2 134:4
  186:12 220:6
starting 202:22
state 3:16 4:2 5:2
  5:4 6:1,2 25:18
  46:23 57:15,17
  62:10,19 64:24
  67:11 69:1 73:2
  74:4 75:24 78:20
  81:12,12,12,15
  83:17 84:1,6,10

85:19 86:18 89:2
91:10 92:9 96:9
97:25 101:18
103:14 104:17
106:21,23 107:4,6
107:16,22 108:3,3
108:16,20,25
110:8 111:1 112:1
112:14 113:22,25
115:21 116:23
118:7,11 119:6
124:24 125:3
129:5 132:10
137:23 140:23
143:3 151:19
160:16 165:20,22
168:18 177:16
183:20 188:25
212:1,3 221:13,13
221:16 236:22
240:23,24,24,25
241:1,1,1,2,2
255:10 256:1
261:7 262:2,2
265:12
**state's** 116:2
**stated** 33:9 66:10
90:3 135:25 227:8
**statement** 35:1
66:5 71:14 89:25
90:10 93:8 100:15
106:18 148:23
154:13 182:15
226:13 227:3
240:3
**statements** 99:6
205:11
**states** 1:1,11 6:15
37:24 39:16,17,18
39:20 40:3,6
44:12,12,17 45:5
46:5,14 47:14,15
47:16,17 48:11,11

48:20 52:7 53:22
54:24 55:2 60:10
60:17,24,25 61:4
62:8,20,23 63:8
65:5,5,13,25 67:1
67:2,5,8 70:2,2,2
70:18,21 72:21
73:18,22 75:1
76:14 79:2,10,22
80:12,17 81:2
82:3,8,9,12,14,16
82:20,20,25 83:2
83:5,10,14,21,22
84:18 85:15 87:5
87:7,13,15,21,25
88:21,22,23,24
89:1,7,16 91:11
92:8,25 94:17,19
94:21 95:3,9,24
95:25 96:2 97:25
98:2,10,11,14
99:15,20 101:13
103:23 105:4,5
106:12,23 107:6
108:14,16 109:19
111:25 112:8,17
112:17 113:14,15
115:1,5,11,20
117:16 118:21
124:25 125:7
129:15 134:9
135:3 140:21,22
140:25 142:3,5
143:12,13 152:12
153:2 154:17
162:20 173:15
217:13 222:20
223:4,23 225:8
234:5 240:2
261:12,16,25
262:3,5,18 263:5
263:11 264:21
267:18 272:10

**stating** 222:3
**status** 35:12
152:23 155:18,23
**statute** 29:24,25
68:21 81:17,19
112:9 113:12
136:3 207:2
**statute's** 30:19,19
**statutes** 37:20,20
81:23,25 135:15
240:24
**statutory** 29:23
74:17 147:13
148:9
**stay** 73:23 179:15
181:10 199:9
261:23 262:19
263:11 264:8
265:19,21,22
266:1
**stayed** 186:19
**stays** 83:2
**steege** 8:22
**steel** 14:24
**step** 106:16
**stephanie** 10:11
**stephen** 13:15
**steven** 12:1 15:19
**stipulation** 64:2
228:14
**stockdale** 175:9
**stodola** 14:25
**stokes** 224:5
**stone** 217:10
**stop** 33:19 79:19
207:18 230:18
239:19
**stopped** 222:24
245:23
**stories** 162:10
270:16
**story** 67:24 87:12

**straight** 107:10,14
112:15
**straightforward**
80:19 267:3
**strategically** 18:2
**strauss** 220:19
**streamline** 274:23
**street** 1:13 4:3
5:19 6:9,16
212:13
**strength** 39:9
60:24 76:2
**stretch** 67:17
203:5
**stretching** 25:1
**stricken** 181:16
185:17 199:9
**strict** 206:23
**strictly** 30:12
243:11
**strike** 145:14
181:22 183:2
187:18 242:13
255:8
**strikeout** 193:2
**striking** 190:2,6
**string** 235:19
251:5
**strong** 17:2 79:8
84:13 117:18
**strongest** 42:6
52:5
**strongly** 18:9
**structure** 92:12
109:14 110:2
133:20 172:13
**structured** 122:24
124:2
**structures** 172:15
**stuck** 35:20
**stuff** 161:20
198:14 208:10,25
210:15 211:25

244:3,5 249:20,23
249:23
subject 17:14,15
24:15 26:11 65:15
66:3 99:15 127:5
142:2 174:14
195:1 229:4 270:7
272:22
subjective 101:9
111:16
submission
211:17
submissions 208:7
212:9 215:17
submit 63:7 66:14
66:23 92:2,16
154:8,9 254:16
262:13,16
submits 123:14
submitted 36:16
41:9 229:17
submitting 121:24
274:14
subordinate
67:15 73:1
subpoenas 233:16
subsequent 76:22
165:10
subsequently
131:6
substance 106:5
273:17
substantial 37:14
84:15 98:24
127:11 218:5
228:2
substantially
18:15 80:21 81:3
90:15 227:10
substantiate
158:6,17,22
substantiated
158:1

subverted 264:12
succeed 33:20
succeeded 151:10
success 77:16
165:23
successful 60:13
163:17
successfully 41:6
sue 73:18 74:4
76:14,17 269:23
sued 69:2,2 238:6
248:17,21 251:20
252:16 269:9
sues 221:13
suffer 65:13
suffered 44:24
79:3 84:15 217:24
260:13
suffering 151:23
214:22 216:15,15
suffers 209:23
suffice 79:11 84:1
sufficient 66:12
81:6 148:12
159:15 174:16
274:17
suggest 70:10
108:24 115:18
119:13 122:13
123:9 127:7
137:17 144:16
267:15
suggested 52:25
176:11 178:9
181:10
suggesting 122:12
178:15 190:8
262:25
suggestion 23:3
38:18 87:15 118:4
143:4 178:17
201:16

suggestions 22:23
suggests 94:20
115:4 199:12
suing 35:5 40:18
41:13 76:18 78:4
78:4 245:23
251:18,23 270:1
suit 85:24 141:11
242:13,15
suite 5:19 7:19
276:22
suits 46:16 69:6
255:8
sullivan 5:9 227:2
sum 92:9 103:20
157:8
sums 115:25
super 52:9 200:20
supercomputers
72:23
superfund 253:11
253:19
superior 44:16
superpriority
35:12
superseded 85:17
supervise 237:13
242:4 250:11
supervision 251:2
251:3
supplement 156:3
194:12
supplements
156:3
support 29:5
42:20 44:19 79:17
86:8 87:19 89:23
95:10,11 104:12
153:19 160:5
supported 55:20
74:16,20
supporting
137:12

supports 76:5
89:1
suppose 134:19
243:22
supposed 67:10
209:14 216:14
225:7 246:12,14
246:21
supposedly 225:7
supreme 45:10
249:10
sure 16:7 17:12
51:3 52:1 56:10
60:4 62:19 63:20
65:6 67:22 79:23
105:24 109:17
117:1 121:23
123:12 134:21
139:3 141:5 144:6
158:18 159:5
165:2 178:22
197:17 201:1
218:24 227:22
234:1 236:25
238:6 239:5 261:5
262:24 265:25
267:22 272:20
273:7,24 274:16
275:6
surgeries 216:18
surgery 216:20
surprise 17:12
20:4 85:12 197:10
surprising 87:14
110:6
surprisingly
85:14
survival 86:12
survived 55:15
57:19 208:17
susceptible 63:11
swear 76:17

swingle  15:1
sworn  35:2 46:8
symbiotic  211:17
symmetry  28:4
system  45:9 109:9
  109:10 211:18
systems  220:15

**t**

t  11:10 14:7 52:15
  220:15 276:1,1
table  76:9
tabulation  126:11
  126:12,13,14
tactic  109:11
tailor  18:16
tailoring  17:13
take  19:23 20:22
  20:22 22:1 25:24
  26:8 32:11 45:23
  46:19 67:6 69:21
  70:1,25,25 78:18
  95:22 96:20 100:9
  112:16 114:14
  115:13 124:16
  144:14 152:14,22
  153:7 154:16,20
  155:25 156:13
  157:1 158:24
  169:19,22 179:8
  188:2 199:18
  209:4,16 210:12
  210:13 211:3
  238:23 241:9,17
  246:6 250:10
  254:15 257:4
  261:10 262:3
taken  71:19
  114:24 124:16
  142:14 203:6
  208:16,25 241:10
  241:11 242:8
  248:1 250:20

takes  30:4 78:14
  96:18 158:5
  241:18 261:24
  270:15
talk  24:6 68:20
  70:16 179:5
  182:11 206:2
  215:11,25 243:4
  272:6
talked  36:14
  222:3 271:23
talking  106:22,25
  116:1,8,9 134:19
  134:20 136:16
  160:20 162:4
  188:12 195:18
  201:23 203:25
  209:2 215:19
  235:1,2 238:16
  242:16 243:17
  258:24 267:11
talks  222:11
tapley  15:2
targeted  142:16
task  60:20 105:16
  212:20 217:21
tautologies  69:14
tautology  70:5
tax  22:23,24,25
  23:2 67:1,6 85:11
  145:7,13,13
taxes  46:24 66:25
  67:12,14 82:13
  145:12
taxing  23:1
taxpayer  46:25
tdp  156:5,16,17
  157:13,13,16,21
  158:7,9,13,23
tdps  155:13,24
  156:2,24 157:3,11
  159:8

tech  219:13
technically  121:7
  255:25
tele  1:12
telephone  221:25
telephonically  3:8
  3:9,10,11,12,13
  3:20 4:6,13,20 5:7
  5:14,22 6:6,12,19
  7:6,14,22 8:6,14
  8:16,18,20
television  159:18
  222:7,17
tell  26:7 59:4 71:7
  154:14 172:11
  189:17 214:21
  215:18 270:16
telling  42:14
  47:17 253:17
tells  222:13
temporary  196:8
ten  41:5 106:12
tennessee  86:15
  255:11
tens  34:16 37:25
  78:3 79:3,3
tentative  21:8
  86:16
tenth  218:24
term  23:23,25
  26:6 165:5 188:9
  210:4 222:24
  232:8,15 249:11
  249:11 257:10
  259:4
terminal  45:25
terms  30:1 51:8
  63:13 65:12
  100:10 103:3
  104:1 126:15,18
  126:20 134:25
  135:5,16 137:7
  161:24 168:3

173:17 181:25
  194:12,19 195:3
  250:20 271:2,2,3
  273:16
terrible  33:20
  45:18
terribly  44:8
terrific  42:19
territories  83:4,13
test  28:16,24
  29:22,23 30:3,12
  38:22 43:24 48:24
  50:22 52:8,11,18
  52:24 53:14 62:1
  66:8,21
testified  37:5
  53:17 55:1 71:13
  71:23 76:21 82:23
  83:4 97:17 101:7
  108:12 111:14
  116:12 131:12
  137:25 148:19
  151:8 159:23
  215:12
testify  72:4,23
  114:23
testimony  35:3,4
  35:7 36:14 41:25
  55:7,11 63:23
  64:7 66:23 71:1
  77:7 79:14 96:15
  97:3,12,13,14,19
  99:10 101:10
  112:2,3 142:14
  152:4,6 160:1
  208:19 248:11
  253:7 257:18
tests  45:10
texas  103:8,8
thank  16:9 21:19
  27:20,24 68:2,3
  84:8,9 87:23 88:6
  92:18,19 93:18

95:13,18 104:9
111:10,21 118:1
119:20,21 120:7
120:19,21 140:16
140:17 141:10
144:2,11,12
145:18 149:22,24
155:8 159:2
162:14,14 163:3
167:8,10 174:23
174:25 175:3
193:19 200:6,14
200:21,22 202:16
204:8,17 205:17
205:21 206:17
207:22 217:8
218:9,12 219:3
226:5,6 227:7
228:20 233:2,22
239:23,25 256:17
257:3,15 258:19
271:7 272:8
274:20,25 275:11
**thanks** 16:10 48:6
87:24 104:10
174:24
**that's** 146:11
149:14 154:9
155:8 157:9,20
158:8 159:12
161:3 168:21
169:5,5 170:20
171:19,20 173:3
179:6 181:11,11
183:20 185:16
189:5,16,21,25
190:19 192:18
193:1 194:14
195:24 196:18,18
196:24 197:12,18
199:5,24,25
200:12 201:20
202:15 203:4

204:7 208:4
**theodore** 15:18
**theories** 81:13
251:12
**theory** 67:16
79:15 89:23
108:23 243:10
**therapy** 220:15
**thereof** 181:12
**theresa** 223:16
224:2
**thereunder** 195:3
**there's** 157:22
162:7 165:23
172:25 180:24
185:4 192:24
193:6 196:22
198:16
**they're** 190:17
194:3 195:17
198:13,16,18
**they've** 168:14
179:15 194:16
198:10 203:9
205:9
**thing** 18:15 34:12
77:25 93:10 134:9
138:11 150:15
198:21 204:19
213:19 266:12
270:12 271:14
**things** 16:22
17:24 18:24 19:19
22:4,11,13 25:22
35:19 41:22 45:11
47:11 62:17 68:5
68:6,20 69:7
77:13 82:13 109:7
132:11 144:21
145:16 149:4
161:19,25 177:24
182:11 186:10
199:14 215:16

216:21 217:3
219:2 237:14
242:1,6 243:8
244:3 270:17
271:15,17,25
272:18
**think** 17:1 18:5,16
18:21,22 19:1,11
19:19 21:21 22:10
22:17 24:2,17
25:1,21 26:1,6
27:13 29:1,8,15
29:21 30:6 35:20
41:23 42:5,18
43:6,6 45:14 48:7
48:13,23 49:15
50:5,14 51:4,13
51:19 52:6 53:23
59:22,24 60:22
62:6,9,12,21
63:19 64:4,11,22
65:23 67:2,8,9,18
68:4,7 71:20 73:6
73:9,17 74:21,25
75:11,14 76:1
77:22 78:10,16,17
87:24 91:1,16
94:8,22,23 95:8
96:5 98:25 99:6
102:14 103:16,17
104:11,18,23
106:5,17 107:10
108:5 109:16
111:13,14 113:16
114:3,12,20 115:8
115:9,21 116:21
116:21 117:17,18
117:23 118:4,15
119:22 120:2,25
121:22 122:19
123:7,10 124:17
125:25 126:11,15
126:23 127:5,25

128:2,4,5,19,19
129:1,12,20 130:2
130:13 131:10,25
132:6 133:5,7,11
133:24 134:13,14
135:7,8,16,18,18
135:24 136:13,21
137:4 138:10,13
140:3,8,13 141:1
141:13 142:24
143:19 144:1,2,7
144:18,20 146:8
149:15 150:6,9,15
152:4 154:5,23,24
154:25 155:2,6,20
156:3,23,24 158:3
161:10,17 162:16
162:22 165:13
167:1,5 170:16
171:18,19 172:2
174:7,20 175:11
175:13,25 176:7
176:18 177:10,19
177:20,22,24
179:13,15 180:12
180:16,18 183:10
184:4 185:7,8,18
185:19,24 188:15
188:23 189:15,20
189:21,22 190:4
191:18 192:8,10
193:3,14 194:3
195:9 196:2,20
197:12,14,19,19
198:4 199:8,9,14
199:23,23,24
200:2,4,8,19
201:3 202:8,12,17
202:19 203:5,8,21
203:21 204:1,22
205:3,14 206:14
207:1,5,7 209:3
210:6,14,21 211:6

211:16 216:7,7
217:2,2,20 218:2
218:4,17 226:4,9
226:12 228:23
229:3 230:2,10
231:8,18 233:23
234:25 236:6,12
236:14,16,17,24
236:25 237:2,5,9
238:7,11,24
239:10,11,14,17
241:18,25 243:24
243:24 245:8,9,10
245:12 246:2,10
246:15 248:15,16
248:21,23 249:18
249:24 250:2
251:25 252:2,4,14
252:17,23 253:25
254:13,20 255:7
255:15 256:7,13
257:23 259:4
260:4 264:2,21
266:8,9 268:1,24
269:22 270:20,24
272:5,14 273:17
**thinking** 69:6
189:19
**thinks** 72:3
**third** 18:16 20:11
24:3,7,9 25:9
28:17,25 29:1,14
29:15 31:7,9,15
32:6,8,13,23 33:7
38:10,17 40:12
44:3 50:17,24
51:6,15,22 54:22
61:10 62:4 68:13
69:16,20 71:15
72:19 111:16
119:25 121:21
137:6 147:23
148:1 160:4

163:21 166:5
171:4 180:18
187:7,14,16,17
229:9 231:23,25
232:17 234:18,21
235:1,2,8 237:25
238:14 239:19
242:17 259:11
268:16
**thomas** 3:17 9:3
**thompson** 222:12
222:20,22,24
**thoroughly** 23:15
23:15
**thought** 16:9
22:18 23:7 42:22
42:25 43:3 54:10
60:2 70:13 77:25
124:6 153:24
157:5 177:25
178:3,19 209:25
216:4 221:18
236:13
**thoughtful** 31:17
266:13
**thoughts** 17:16
**thousands** 34:5,17
37:25 39:4,4,6,22
40:8 43:20,24
78:3 79:3 266:2
270:23,23
**threads** 273:6
**threat** 150:12
**three** 17:4 31:12
36:8 39:15 43:6
43:23 44:23 63:8
72:16 77:22 86:18
128:19,19 144:13
144:21 146:22
148:7 150:2
200:22 209:7,7
212:7 225:11

**throw** 95:4 260:18
**throwing** 101:6
**thurmond** 15:3
**thwart** 147:9
**tie** 251:5
**tied** 37:3 107:20
204:15 231:10
251:25 269:5
**time** 16:15 19:10
20:23 21:9 27:6
27:14,15 31:21
36:20 37:18 75:23
79:25 91:4 94:4
104:3 106:9,9
110:21 116:22
120:4,6,17 121:2
127:5 144:20
146:13 149:4,6
150:17 153:7
160:24 161:21
173:9 174:19
175:9 176:25
177:8,12 196:7
199:7 204:19
205:13 209:16
213:3 214:4 215:3
218:5,11 226:22
233:20,25 250:3
251:22 253:16
256:17 262:10
272:20 274:17,19
**timely** 133:2
153:11 157:7,20
204:22 205:5
218:15
**times** 17:4 40:4
45:18 47:4 68:22
103:11 141:2
157:15 166:6
215:5,6 254:18
266:10
**timestamp** 146:21

**timing** 158:10
**tired** 29:7
**titanic** 143:11
144:5,8
**title** 49:14 262:8
**tobacco** 101:25
110:14
**tobak** 3:13 15:4
19:8 120:7,9,11
120:11 140:18,19
141:8,10,14,17,19
146:11,12 149:11
149:14,17,22
**today** 27:13,14,15
44:6 87:3 104:15
105:1 107:10
110:25 124:3
153:21 154:1
155:19,21 156:20
183:19 184:7
199:12 201:23
208:5 248:9
264:22
**today's** 16:18 27:7
79:21 93:9
**told** 33:1 34:17,19
91:7 140:12
221:13 273:9
274:18
**tolerance** 209:17
209:19,19
**ton** 162:2
**tones** 79:8
**tong** 221:12
**tonnesen** 15:5
**tool** 166:3
**tools** 171:20
**top** 97:24 98:15
127:19 199:13
**topic** 22:21 79:21
95:6 119:22 146:1
162:16 261:9

topics 16:15
torn 106:18
tort 44:21 86:4
  90:18 93:23
  163:20
total 38:6 40:16
  58:16 71:21
totality 52:13
  88:23
totally 34:3 93:11
  94:8 161:21
touched 162:12
  272:19
tower 220:19
towns 86:15
toys 101:22
tpps 41:20
track 32:14,18
  57:23,25 69:9
tracking 243:17
trade 8:3
trades 18:4
traditional 172:14
tragedies 221:20
tragedy 78:23
  220:9 221:20
trail 274:24
trained 214:12
trainor 220:17
transactions
  227:20
transcribed 2:25
transcript 28:11
  35:7 55:4 71:4
  160:2 273:15
  276:4
transfer 42:8
  63:23 163:15
  167:3 170:8
  173:16,21,23,25
  174:4 179:9,20
  180:5,21,22
  184:11,12 189:2,2

189:5,8 190:13
  197:13 201:10,12
  268:2 269:10,21
  269:22 270:3
transferee 67:3
  268:18,21
transferee's 47:5
transferred
  167:17 168:7
  173:16 228:1
transfers 47:6
translate 103:4
trauma 215:9
traumatized
  215:7
treated 75:3 90:24
  99:20 110:4
  124:11 153:22
treating 21:13
  205:15
treatment 82:2
  99:13,16 100:7,7
  103:3 110:19
  112:11,13,15
  113:12,18 116:22
  116:24 119:4,5
  126:4 130:4,15,15
  132:25 140:7
  155:13 156:8,20
  217:14,17
tremendous 78:13
  226:14
trial 36:14 75:25
  86:20,20 197:25
  203:12 207:12
  265:5,9 274:21
trials 265:24
  266:2
tribal 139:9
tribes 39:20 41:19
  125:21,23 127:8
  130:6,7,12 138:1

tricky 176:2
tried 22:5 23:9
  25:12 32:20 36:21
  56:3,3 109:18
  211:16 213:19
  244:10 254:14
tries 130:18
trigger 25:18
trillion 40:3,4
  73:1,2,3
troop 6:19 8:23
  272:3,8,9
trouble 208:9
true 35:1 37:21
  44:17 58:4 61:9
  86:24 122:15
  226:11 275:7
  276:4
truly 74:12
  237:20 254:23
  272:12 274:4
trump 136:15
  262:17
trumps 136:3
trust 63:7,15,22
  64:22 65:18 82:6
  121:12 125:22
  133:20 139:9
  158:24 160:20,22
  163:12 167:4
  172:13,14,15,16
  180:16,21 189:5
  194:23,24 223:4,9
  223:11,12,13,15
  223:15,17,18,24
  224:1 225:12
  228:2 261:25
  264:5
trustee 223:12,13
  223:18
trustee's 257:1
trustees 223:20

trusts 41:11,24
  42:3,6 63:10,14
  64:7,8,10,14,15
  76:24,25 123:22
  123:23 138:1
  139:12 223:4,24
trust's 172:19
truth 57:2
try 17:11,20 19:24
  21:22 26:7,8 38:8
  101:15 129:10,12
  130:22 138:24
  179:8 188:22
  191:19 200:9
  207:25 210:23
  245:8 254:16
trying 18:11 39:5
  42:10 76:10 93:15
  106:2 107:13
  108:14 153:3
  188:14 202:11
  207:21 212:10
  215:18 220:6
  225:14 236:21
  243:5 245:4 248:3
  248:4,5,5 250:15
  251:12,13,15
  252:2 254:12
  255:19 260:10,19
  263:25 270:9
tsai 15:6
tugging 162:9
turn 18:25 21:15
  21:16 60:14 84:4
  166:25 183:20
  243:19
turned 129:21
  248:19
turner 15:7 33:24
turning 226:16
tweak 176:11,11
  176:17 178:9

| | | | |
|---|---|---|---|
| **tweaks** 182:12 | **u** | **underlying** | **undertaking** |
| **tweed** 4:8 | | 164:20 171:6 | 94:12 |
| **twice** 96:17 | **u.s.** 1:23 83:3,11 | 198:4 | **underwood** 5:22 |
| **two** 16:22 19:13 | 83:13 121:8,9 | **undermine** | 120:2,5,8,10,19 |
| 19:19 20:15 32:10 | 123:22,23 125:5,7 | 164:18 | 120:20,21,22,22 |
| 32:17,17 34:2,2 | 125:23,23 127:8 | **underneath** | 121:17,18 122:2,7 |
| 36:8 43:5 47:16 | 128:8,25 129:23 | 141:15 | 122:9 125:14,18 |
| 50:17 60:12 63:19 | 132:4,8 134:24 | **underscores** | 126:6,8,10 127:4 |
| 67:12 70:6 72:15 | 139:8 140:5 | 103:16 | 128:4 129:1,7,9 |
| 74:11 78:19 80:14 | 224:17 257:1 | **understand** 18:21 | 130:21,25 131:2,5 |
| 81:24 83:16 96:25 | **ubiquitous** 85:18 | 20:18 52:21 56:11 | 131:22,25 132:14 |
| 98:4,4 109:7,8 | **ucc** 41:17 77:9,24 | 56:16 62:18 63:20 | 132:17 133:24 |
| 110:10 113:15 | 93:7 | 65:1,1 67:16 84:6 | 134:17 137:1 |
| 126:2 130:5 | **ultimate** 92:13 | 90:12 91:5 103:13 | 138:10 139:3,22 |
| 136:17 144:13 | 134:8 223:5,8 | 106:7 111:18 | 139:25 140:7,16 |
| 146:5,5,14 155:14 | **ultimately** 51:3 | 112:1,13 113:11 | 141:25 144:4,7 |
| 155:23 158:2,3 | 94:17 107:22 | 115:22 118:8,20 | 266:23 267:1,12 |
| 159:12 160:4 | 109:5 125:11,12 | 129:7,9 131:18 | 268:3 269:2 |
| 171:25 182:11,11 | 131:14 132:3 | 136:19 137:3 | **underwood's** |
| 185:4 187:15 | 134:2,6 136:1,2,6 | 139:22,25 170:10 | 119:24 120:15 |
| 189:2 192:24 | 136:13 140:4,8,13 | 174:4 188:19 | **undisclosed** 23:12 |
| 197:25 202:18 | 152:20,21 154:24 | 193:15 195:8,14 | 23:22 |
| 204:1,22 217:9 | 177:12 228:6 | 196:12 197:18 | **undiscovered** |
| 241:8 246:1 | 245:17 | 198:23,24 199:14 | 23:11,22 239:7 |
| 265:12 272:16 | **unabated** 261:22 | 204:23 210:21 | 253:11 |
| 274:22 | **unassailable** | 211:12 248:16 | **unfair** 56:24 96:8 |
| **type** 23:17 25:17 | 44:10 73:14 | 255:14 264:1 | 123:7 130:15 |
| 57:23,24 61:20 | **unavailable** 38:11 | **understanding** | 175:14 |
| 64:17 137:24 | **uncertain** 34:3 | 123:11 161:20 | **unfavorable** |
| 212:14 242:12 | 156:16 | 164:14 169:16 | 155:24 |
| 252:5 268:13 | **unclear** 155:18 | 206:12,18,21 | **unfortunate** |
| **types** 42:21 57:10 | **unconscious** | 215:23 224:23 | 152:9 |
| 91:12 128:13 | 210:17 | 230:3,6 235:14 | **unfortunately** |
| 238:3 242:1 254:7 | **unconstitutional** | 267:13 | 20:7 121:10 275:4 |
| 255:15 270:7 | 186:7 | **understands** 41:1 | **unfounded** |
| **typical** 101:17 | **uncontestable** | 193:8 273:25 | 203:13 |
| 163:19 168:18 | 33:22 | **understood** 125:8 | **unicorn** 110:6 |
| 175:20 | **uncontested** | 235:14 254:19 | **unidentified** |
| **typically** 172:15 | 33:21 | 255:23 256:2,3 | 259:7 |
| 189:17 223:25 | **uncontroverted** | 267:23 269:24 | **unified** 88:10 |
| **tyson** 64:13 | 36:6 | **undertakes** | **unique** 69:19 |
| | **undergoing** | 244:25 | 115:5 116:24 |
| | 224:19 | | 151:25 156:1 |

Veritext Legal Solutions
www.veritext.com

157:1 172:13
uniquely 214:11
unit 143:17
213:19
united 1:1,11
124:25 134:9
135:3 140:22
142:3,5 152:12
154:16 240:1
267:18
universal 55:9
174:13
universe 61:15
73:5
university 55:9
unkindly 74:13
unknowable 32:6
33:12 34:12 73:15
150:23
unknown 1:25
146:16 151:6
159:15
unlawful 25:25,25
26:1 230:14,15
237:16
unliquidated 57:4
59:9 126:22
unmuting 218:20
218:20
unpunished
103:24
unquantifiable
33:12
unquestionably
136:8
unreasonably
268:12
unrelated 233:13
unresolved 93:10
272:22
unsecured 74:17
81:5 90:19,20,24
91:13 148:10

151:5 220:18
225:4
unsurprisingly
239:17
unthinkable
44:25 93:3
untied 273:7
untimely 148:15
218:20
untoward 267:19
unusual 82:5
updated 24:11
upended 156:16
upfront 130:10
upset 109:24
usa 212:4
usage 209:10
use 40:21 60:14
138:22,22 154:3
160:18 161:3
164:18 171:7,13
190:8 212:10
217:24 222:10,24
225:14
utilized 101:18
utterly 38:13
uzzi 4:13 19:1,16
19:18 20:13 21:16
21:19,19 27:20,23
144:25 145:3,11
145:20 239:6
242:23 243:4
246:4,4 247:4,12
247:19 261:2

**v**

v 26:15 64:13
128:10 147:11
150:19
valid 39:21 61:20
62:19 87:13
validity 39:9 76:3
173:25

valium 214:18
valuable 87:16
value 31:8 32:4,8
32:13,22 33:9,21
33:23 36:4 37:7
37:11,12 40:16
44:16 45:25 46:11
47:22 49:11 55:5
55:15 61:11 62:11
71:8,12,21 72:13
73:21 98:24,25
126:18,19,19,20
137:20,25 139:10
139:11 140:4
163:24 167:16
168:6 169:1,23
173:2 201:8 228:2
228:6 245:22
valued 60:15
valuing 172:25
van 15:8
variables 39:6
variation 81:12
varied 32:23
variety 69:3 135:2
168:23 169:20
230:21
various 62:16
71:15 87:7,7
94:10 97:25
112:17 178:5
218:25 223:17
233:24
vary 61:19 83:12
vast 105:10 121:7
123:6
veil 237:13 242:2
250:7 270:6
venditto 15:9
vendors 132:9
veracity 44:10
verdicts 86:21

veritext 276:20
vermont 48:12
53:6 80:11 88:10
versus 56:15
85:21
vested 42:7
vesting 173:16
veteran's 220:3
veto 171:14
vicarious 237:13
242:3 243:8
vicariously
243:11
vice 175:10
vicious 209:21
victims 7:9 34:11
34:11,17 48:4
70:12 148:11
152:11,12,13,24
153:1 154:3,7,23
155:16 225:12
272:15,16
video 1:12
vietnam 220:3
view 27:11 29:11
30:13 36:15
117:24 133:25
168:10 203:4
220:24 238:4
viewed 66:18
120:25 181:17,19
182:12 192:23,25
193:7 198:25
views 17:2 44:5
156:21 189:20
275:3
vincent 9:6
vindicate 74:19
violate 172:6
237:17
violated 183:6
violates 168:16
170:12

**violation** 97:8
261:21
**violations** 89:3
261:23
**violence** 85:25
**virginia** 5:1,3
79:23 86:19 96:14
96:15,19 97:3
98:3,5,12,15
99:12 100:5,12,13
100:18,25 103:10
103:11,12,15,24
104:3,6,11,20,22
110:6 113:4
115:13 116:7,23
117:6,11,14
222:16
**virginia's** 95:8,11
103:25 111:6
112:14
**virtual** 84:4
**virtually** 40:25
70:4 104:19,23
124:7 225:7
**virtue** 245:1
**vis** 34:9,9 69:18
69:18
**vitiates** 164:10
180:22 201:13
**voice** 198:10
218:10
**voided** 72:25
**volumes** 266:8
**voluntary** 69:5
**volunteer** 192:16
**volunteers** 161:13
**vonnegut** 3:11
229:20,23,24
230:8 232:21
233:3,10,23 234:3
236:15 237:10
239:11,15,17
247:21 268:23

269:1,24
**vonnegut's** 234:1
**vote** 41:16 79:24
91:9,15 113:3
133:16 162:6
176:12 178:16
206:9,14,15
225:22
**voted** 52:13 82:25
82:25 83:1,2,5
94:19 110:7
112:23 126:7,16
126:21 133:14
169:16 178:14
186:24 206:7
**voters** 34:18
89:25
**votes** 31:11 89:18
89:21 90:5,11
91:16 92:2,11
**voting** 44:12
52:10 83:10 89:15
92:13 93:24 94:2
94:9 126:11 148:8
161:18 206:1,7
**vulnerable** 64:12
64:17 214:22

**w**

**w** 14:8
**w.r.** 99:16,19
**wagner** 4:20
15:10 95:13,14,18
96:7 111:11,22
112:21 113:1,6
114:2,6,10,14,20
115:8 117:3,11
**waited** 89:18
125:12
**waiting** 86:21
**waive** 256:9
**waived** 194:2
**waiver** 123:8
143:24 184:20

**walk** 122:13 230:4
**wall** 101:7
**walter** 220:16
**want** 17:7 19:6
25:7 27:16 28:5
29:22 37:18 63:20
66:17 67:9 88:14
92:21 94:18,20
95:18 96:3 115:20
118:3,5,12,14
119:13,17 127:4
133:24 134:6
146:13 149:8
152:17 159:5,11
162:1 174:5,22
180:8,23 186:11
187:17,23 190:3
192:11,25 193:1,6
193:21 197:17
198:18 201:3,21
202:5,19 205:4,8
210:24 211:2
212:5 213:25
217:9 219:4,5,6
228:13 233:8,8
236:1 237:9
242:11 243:4,15
249:18 251:5,19
253:8 265:4,24
266:9 267:2,22
268:5,15 271:7
272:11 273:3,23
274:16,20,25
**wanted** 51:10
111:1 120:2 136:9
136:9 145:16
162:12 187:6
213:18 236:19,20
247:5 253:8 257:4
257:8,12,17
258:13 270:15,25
**wanting** 75:13

**wants** 152:22
156:7 218:15
265:23 272:6
**wardwell** 3:3
16:21 220:11
221:22,24 226:3
229:24
**warfare** 39:3
43:20
**warp** 271:16
**warrants** 67:13
176:3
**washington** 3:18
7:20 37:19 48:12
48:16 53:6 75:24
80:8 81:15,17,19
83:8,15 88:3 89:2
103:7 118:17
220:12
**wasn't** 175:12
181:10
**waste** 91:4 127:4
**wasting** 161:21
254:18
**way** 25:10 32:25
45:12 46:14 70:11
70:12 82:22 84:2
88:16 92:14 99:7
110:22 115:2
120:25 122:17,23
132:7 135:18,19
136:2,4 146:25
160:9 170:12
175:12 177:3
189:13,23 190:7
191:11,19 195:16
207:19 208:11,21
209:13,20,20
211:8 212:23
219:11 226:17
236:4 244:11
245:10 247:6
254:6,22 264:22

265:16 270:21
271:6 272:21
273:3,14 274:11
**ways** 68:10
114:12 210:5
**we've** 20:20 22:5
23:5,9 24:11,18
25:16 26:22 73:9
88:11 93:4 106:11
109:18 111:5
116:15 140:10
217:3 227:19
230:9 231:7,24
232:2,25 233:23
246:21 249:3
254:14 259:10
264:20,25 265:2
265:17 267:10
271:12
**wealth** 40:11 41:3
47:21 121:8,9
**weber** 15:11
**webster's** 117:8
**wedded** 251:16
**wedding** 175:5
**week** 87:2 124:8
161:10 203:12
207:13 230:9
270:13
**weeks** 50:18 202:8
**weigh** 42:10
270:18
**weighing** 44:14
**weinberg** 15:12
**weiner** 15:13
**weintraub** 15:14
**weis** 15:15,16
**weiss** 15:17
**welcome** 20:3,10
145:20
**wells** 15:18
**wendy** 15:12

**went** 25:21 46:22
77:9 101:16 145:8
166:5 176:12,14
178:12 187:1
194:6,14 197:3
214:6 215:9 234:6
275:9
**west** 5:1,3 6:16
79:23 86:19 95:7
95:11 96:14,15,19
97:3 98:3,5,12,15
99:12 100:5,12,13
100:18,25 103:11
103:12,15,24,25
104:2,6,11,20,21
110:5 111:6
112:14 113:4
115:13 116:7,23
117:6,11,14 175:5
220:17 222:15
**we'll** 149:17
162:21 198:24
**we're** 150:16
160:20 161:8,17
162:4,5,7,13
186:5 189:19
191:18 195:18
196:6 197:17
199:6 200:2 201:4
202:10
**we've** 155:19
195:20 197:25
201:3,23 202:20
**whatsoever** 81:11
95:5 107:15
**what's** 182:3
187:7 193:25
196:5
**whereabouts**
150:23,24
**whichever** 270:21
**whitaker** 222:11

**white** 1:14 7:8
155:15 223:3,23
**wholly** 232:17
**wilamowsky**
15:19
**wild** 45:2
**wiles** 32:25
**willful** 23:24
24:20 26:5,8
**william** 14:7
15:14 221:12
225:16,17
**willing** 19:23
134:15 208:4
226:3
**wilmer** 8:1 175:1
**win** 38:5 67:23
76:6,6
**windsor** 129:4
**winning** 76:4
**winthrop** 6:14
**wiped** 33:25
**wipeout** 38:6
**wipes** 52:11
**wisdom** 181:12
**wish** 73:23 132:25
**wished** 149:1
**wishes** 155:12
**withdrawal** 174:8
199:24 200:4
204:11
**withdrawn** 174:5
179:17 181:3
**witness** 71:6 97:1
97:3 98:15 108:11
**witnesses** 96:25
203:12
**wolf** 15:20
**wolff** 88:2
**woman** 141:7
165:13 229:1
**women** 154:4

**won** 245:23
**wondering** 264:20
**won't** 167:20
**worcester** 5:9
227:3
**word** 25:24 26:1
49:14,25 50:19,22
51:11 98:8 145:14
167:20,20 200:15
206:23 207:5
**words** 26:22
29:24 30:14 81:10
114:4 145:6
181:17 192:23,25
194:17 198:24
208:1 264:25
**work** 17:13 20:10
44:13 78:3 109:18
117:16 140:1,13
154:9 201:19
208:7 224:7,15
230:11 236:17
237:8 273:4 274:2
**worked** 17:5 24:1
48:3 70:21 93:6
95:19 105:5
118:21 238:19
265:3 270:18
**working** 17:9,20
18:23 203:25
208:10 233:15
270:18 271:13
274:23
**workplace** 240:25
**works** 258:22
**world** 8:3 20:21
26:18 43:17
151:13,15,15
152:6 153:15
161:25 212:23
**worms** 51:14
**worried** 195:9

| | y | z |
|---|---|---|
| **worry**  219:2 | **y**  199:7 | **z**  14:23 |
| 258:10 267:11 | **yards**  4:10 | **zabel**  15:21 |
| **worse**  44:8 104:5 | **yeah**  21:7 59:20 | **zeevi**  15:22 |
| 133:19 197:22 | 114:14 141:9,12 | **zero**  36:3,8 72:17 |
| 214:19 218:25 | 170:16 219:17 | 72:17,18 73:24,24 |
| **worst**  45:18 | 241:5 243:13 | 73:25 104:20 |
| **worth**  45:12 46:5 | 268:18 | 157:8 |
| 68:7 94:13 172:18 | **year**  32:14 34:6 | **zoom**  27:14 |
| **would've**  119:6 | 44:24 58:11 106:8 | 204:24 218:25 |
| 126:21 129:21,23 | 106:9 147:3 | 228:19 232:15 |
| 133:3 212:14,15 | 148:22 224:3 | 272:5 275:4 |
| 213:19 | 225:12 | **zooms**  271:10 |
| **wouldn't**  151:17 | **year's**  275:7 | **zylberberg**  15:23 |
| 191:16 195:24 | **years**  35:5 39:2 | , |
| 201:19 | 40:18 43:19 44:13 | **'92**  175:11 |
| **write**  220:6 | 60:12 74:11 77:5 | à |
| **written**  154:13 | 77:22 79:19 97:17 | **à**  34:9 69:18 |
| 163:6 207:25 | 105:4 109:4 | |
| 215:14,16 223:19 | 110:12 111:6 | |
| **wrong**  37:22 43:8 | 142:14,15 151:2 | |
| 43:10,11 47:14 | 208:16 210:9 | |
| 87:18,25 118:12 | 212:11 213:11 | |
| 179:14 243:5 | 214:6,15 223:10 | |
| 256:10 | 225:24 265:3,13 | |
| **wrongdoers** | **yell**  165:13 | |
| 236:22 | **yesterday**  153:24 | |
| **wrongdoing** | **york**  1:2 3:6 4:11 | |
| 23:25 237:15 | 4:18 5:12 6:10,17 | |
| 238:12 239:10 | 7:12 8:4 57:15 | |
| **wrongful**  56:24 | 69:1 85:21,22,24 | |
| 56:24 237:20 | 86:19 103:9,10 | |
| 251:6 | 129:5 183:21 | |
| **wrote**  150:18 | 220:20,20 224:18 | |
| 197:3 222:1 224:5 | **you'd**  167:21 | |
| **wv**  5:5 | **you'll**  200:16 | |
| **wyoming**  41:24 | **you're**  149:20 | |
| x | 155:10 156:17 | |
| **x**  1:4,10 24:11 | 161:21 187:4,11 | |
| 39:7 198:16 199:6 | 188:10 190:6 | |
| 257:10,19 258:24 | **you've**  188:11 | |
| 258:25 269:16 | 203:21 207:12 | |

LacWpurO

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    In re                              21 Civ. 7532 (CM)
                                        et seq.
4    PURDUE PHARMA BANKRUPTCY APPEALS

5                                       Oral Argument

     ------------------------------x
6                                       New York, N.Y.
                                        October 12, 2021
7                                       2:00 p.m.

8    Before:

9                      HON. COLLEEN MCMAHON,

10                                        District Judge

11                         APPEARANCES

12   KLEINBERG, KAPLAN, WOLFF & COHEN, P.C.
          Attorneys for Appellant States of Washington
13        Connecticut, Delaware, Rhode Island and Vermont
     BY:  MATTHEW J. GOLD
14        -and-
     PULLMAN & COMLEY, LLC
15   BY:  IRVE J. GOLDMAN

16   DAVIS POLK & WARDWELL LLP
          Attorneys for Appellees Purdue Pharma, et al.
17   BY:  BENJAMIN S. KAMINETZKY
          MARSHALL S. HUEBNER
18
     BRIAN EDMUNDS
19        Office of the Attorney General of the State of Maryland
          Attorney for Appellant State of Maryland
20
     BERNARD A. ESKANDARI
21        California Department of Justice
          Attorney for Appellant State of California
22

23

24

25
```

LacWpurO

```
 1
    BETH A. LEVENE
 2  BENJAMIN HIGGINS
         Department of Justice
 3       Attorneys for Appellant
         U.S. Trustee William K. Harrington
 4
    A. DAMIAN WILLIAMS
 5       United States Attorney for the
         Southern District of New York
 6  BY:  PETER M. ARONOFF
         Assistant United States Attorney
 7
    CAPLIN & DRYSDALE
 8       Attorneys for Appellee
         Multi-State Governmental Entities Group
 9  BY:  JAMES P. WEHNER, Jr.
         JEFFREY A. LIESEMER
10
    DEBEVOISE & PLIMPTON, LLP
11       Attorneys for Appellee
         Mortimer Sackler Family/Side B of the Sackler Family
12  BY:  MAURA K. MONAGHAN
13  MILBANK, TWEED, HADLEY & McCLOY LLP
         Attorneys for Appellee
14       Raymond Sackler Family/Side B of the Sackler Family
    BY:  GERARD H. UZZI
15
    AKIN GUMP STRAUSS HAUER & FELD LLP
16       Attorneys for Interested Party
         Official Committee of Unsecured
17       Creditors of Purdue Pharma L.P., *et al.*
    BY:  ERIK PREIS
18       MITCHELL P. HURLEY
19  KRAMER LEVIN NAFTALIS & FRANKEL, LLP
         Attorneys for Interested Party
20       Ad Hoc Committee and other
         Contingent Litigation Claimants
21  BY:  KENNETH H. ECKSTEIN
         DAVID E. BLABEY, Jr.
22
    WHITE & CASE LLP
23       Attorneys for Intervenor
         Ad Hoc Group of Individual Victims
24       of Purdue Pharma, L.P.
    BY:  J. CHRISTOPHER SHORE
25
```

LacWpurO

1          THE COURT:  Thank you very much for all of your

2     filings over the weekend.  I particularly thank you for the

3     document that you filed this morning, identifying the issues

4     that we need to address, and I'm very happy to address those

5     issues in the order that you have listed them.  OK?  That's

6     fine.

7          Let's say, as a general matter, issues on appeal, we

8     have a number of appellants.  It seems to me that the people

9     who have filed notices of appeal should identify for me what

10    their issues are.

11         Let me start by saying this.

12         For me, there is one giant, overarching issue in this

13    case.  It's the Sackler bar order.  It's the constitutionality

14    of the Sackler bar order.  It's the statutory authorization for

15    the Sackler bar order, and that impinges on everything.  That's

16    the big dog here.  I am not going to allow the tails of the dog

17    to wag the dog.  The dog is going to get dealt with as fast as

18    I possibly can do it.  I understand there are some collateral

19    issues on appeal that various parties have raised, but I'm

20    principally interested in the Sackler bar order issue, and that

21    presents, as far as I can tell, a pure question of law, about

22    as pure a question of law as you can get.

23         Let's start with the first party that filed an appeal,

24    the state of Washington.

25         Go, Mr. Gold.

LacWpurO

1              MR. GOLD:  Thank you, your Honor.

2              We have raised what you were describing as the Sackler

3     release issue as our primary issue on appeal, both with respect

4     to the injunction and with respect to jurisdiction of that same

5     bar order.  The other principal issue that we've raised on

6     appeal is the best interest of creditors' test, which also, to

7     a certain extent, relates to that release.

8              THE COURT:  OK.  Who has the next number in sequence?

9     Who is 21 Civ. 7585?  Do you know your case number?

10             I guess you don't know your case number.

11             MR. GOLD:  Your Honor --

12             THE COURT:  District of Columbia's not here.  OK.  Not

13    here.

14             Who is next?

15             Next is 7961, and that would be Grand Prairie.  And

16    7962 is the Cree Nation, and then the U.S. trustee.

17             MS. LEVENE:  Thank you, your Honor.

18             Your Honor, we've submitted our list of issues on

19    appeal.  I think without, you know, waiving any specific issue

20    or argument, it is fair to say that everything ties back to

21    what we see as the (inaudible) nondebtor release and I keep

22    seeing a glimpse of our arguments with the emergency motion to

23    stay  We think it's impermissible based on the due process

24    clause.

25             THE COURT:  I know.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A.779**

LacWpurO

```
 1          MS. LEVENE:  OK.
 2          THE COURT:  Believe me.  I've read it all.  OK?
 3          Great.  After that, we have two appeals filed.
 4          MS. LEVENE:  Yes, we do, your Honor.  One appeal is of
 5    the confirmation order.  The other appeal is the advance order
 6    authorizing that funding.
 7          THE COURT:  Right.
 8          MS. LEVENE:  Skip ahead, we believe we can consolidate
 9    those two separate appeals.
10          THE COURT:  OK.
11          MS. LEVENE:  And I think they all do tie back to the
12    release.
13          THE COURT:  It may all tie back to the release.
14    Right.  OK.
15          State of Maryland.
16          MR. EDMUNDS:  Yes, your Honor.
17          We have essentially the releases, your Honor, and the
18    validity of the channel injunction and all of the subsidiary
19    issues that are related to that as subordinate issues under
20    that heading, and also the best interests issue, which relates
21    to them too.
22          THE COURT:  OK.
23          Connecticut, I assume, is the same as Washington.
24          MR. GOLDMAN:  Yes, it is, your Honor.
25          I would just add that there was an issue listed about
```

LacWpurO

1    the bankruptcy court here misapplying the *Metromedia* factors.

2              THE COURT:  That's part of the same thing.

3              MR. GOLDMAN:  I would agree.  I was just getting more

4    specific, your Honor.

5              THE COURT:  No.  It's all part of the same thing.

6              MR. GOLDMAN:  Agreed.

7              THE COURT:  OK.

8              California.

9              MR. ESKANDARI:  California agrees with your Honor that

10   the Sackler release is the big dog here.

11             THE COURT:  Good.  OK.

12             Delaware, anything different?

13             MR. GOLD:  Nothing different for Delaware, your Honor.

14             THE COURT:  Right.  OK.  And Rhode Island.

15             MR. GOLD:  Same, your Honor.

16             THE COURT:  Oregon.  Is Oregon even here?

17             Fine.

18             MR. GOLD:  They're not here, but they have the same --

19   we've coordinated with them and they have the same as well.

20             THE COURT:  OK.  Terrific.

21             MS. LEVENE:  Your Honor, there are some *pro se*

22   appeals, and so I don't know --

23             THE COURT:  That's not the first item on the list.

24   That's item four on the list.

25             MS. LEVENE:  I just didn't know what issues those were

LacWpurO

1    going to raise.

2           THE COURT:  I have no idea.  They'll be dealt with

3    when we deal with them.  I would rather imagine that most of

4    them at least have something to do with the Sackler release

5    issue.  They may have other matters that they raise as well,

6    but I'd be surprised if they didn't mention the Sackler release

7    issue.

8           OK.  I have a motion from United States trustee, which

9    I understand, as a technical matter -- this is on the identity

10   of the appellees, which I understand, as a technical matter,

11   the United States trustee is raising the issue of who

12   constitutes an appellee, and I agree -- by the way, I've read

13   the briefs on both sides.  And I agree with the United States

14   trustee that as a technical matter, the appellees in this case

15   are the people who litigated the Sackler issue below.  And so

16   if it's not in your brief below and you didn't rise to speak to

17   that particular issue below, you're not an appellee.

18          Now, the reason I found the issue kind of weird is

19   what makes you think I wouldn't just listen to these other --

20   the unsecured creditors committee is in, the governmental and

21   other contingent litigation committee is in.  What makes you

22   think I'm not going to grant like that a motion for amicus

23   status?

24          MS. LEVENE:  Your Honor, we have never opposed it.

25          THE COURT:  And what's the difference?

1          MS. LEVENE:  Your Honor, we have, as we've said all

2     along that we would consent to amicus participation, and we

3     gave broad notice when we sought our notice of appeal so that

4     people could seek to intervene or participate on any case they

5     wish.  So we do not oppose amicus status, and we never have.

6          THE COURT:  1109(b) is a nifty little statute that

7     says absolutely nothing about who is a party on appeal, and

8     that is why I agree with the United States trustee that if you

9     litigated below the issues that are raised on the appeal,

10    you're an appellee, and otherwise you're a party who should be

11    heard.  OK?  So I think that anybody in this room, which I

12    think is, maybe, one or two committees, who falls into that

13    status can make a pretty pro forma, one-page motion, and assume

14    that I would grant it.  OK?

15          Again, understand I'm becoming familiar with the

16    record here, but odd as this is to say, this is not about

17    the -- the core issue here is the Sackler release issue, and

18    that does not turn, in my head, on the evilness of the Sacklers

19    or the lack of evilness of the Sacklers.  It turns on whether

20    this is constitutional, whether this is statutorily authorized.

21          Judge Drain, God bless him.  First of all, I want to

22    say on the record in this courtroom that that man has driven

23    himself to distraction for you folks and done a brilliant job.

24    There is no way I could have come up with, let alone read into

25    the record that fast after that trial, that opinion, given with

1   all those issues.  It was just an amazing tour de force art of

2   judging, and he's to be commended for it, and I do.  And I want

3   that on the record.  OK?

4        But I have to whittle this down to what's really the

5   juice.  OK?  And we all know what the juice is.  There's never

6   been a case like this before:  I've read dozens and dozens of

7   cases.  There is no case that has facts like this.  *Drexel* does

8   not have facts like this.  *Metromedia* does not have facts like

9   this.  The issue is, is it constitutional; is it statutorily

10  authorized?  And then we have the *Metromedia* factors, which

11  obviously the state of the record plays into that.  But that's

12  the juice here.  OK?  That's what we're going to resolve.  At

13  least we're going to resolve it if you're here, which is

14  another question, but that's down the list.

15       MR. SHORE:  Your Honor, may I be heard on behalf of

16  the individual victims?

17       THE COURT:  Yes, Mr. Shore.

18       MR. SHORE:  Just briefly, first to address the issue

19  of participation today, we can certainly get a motion on file,

20  but to the extent we're going to be addressing the stay --

21       THE COURT:  Everybody in this room is participating

22  today.  OK?

23       MR. SHORE:  And second, the difference between amicus

24  status and appellee can be a real one, first of all, in

25  connection with any motion, but second, and I'll just digress

LacWpurO

```
 1   for a moment.  Our group is 65,000 or essentially half of the

 2   individual victims.

 3             THE COURT:  OK.  Did you litigate the issue below?

 4   Can you point me to something that shows you raised that issue,

 5   the issue, below?

 6             MR. SHORE:  There are several issues that are raised

 7   by this appeal that come up.  One is what was mentioned before,

 8   which is the advances order, which is on appeal and which will

 9   be put in.

10             THE COURT:  Maybe they'll be stayed by the end of the

11   week.

12             MR. SHORE:  Right, but to the extent issues come up

13   with that, we did participate on that.

14             THE COURT:  Great.  Anything you're participated in

15   you're obviously a part of.

16             MR. SHORE:  Sure.

17             THE COURT:  1109 does that for all.  I'll grant you

18   that.  1109 goes that far.

19             MR. SHORE:  Right.

20             Then second, within our group are 35,000 people who

21   did not vote on the plan and several hundred who voted "no" on

22   the plan.

23             THE COURT:  Understood.  I understand that there are

24   thousands upon thousands of people who either voted "no" or

25   didn't vote at all.
```

LacWpurO

1           MR. SHORE:  Right.

2           THE COURT:  Understood.

3           MR. SHORE:  Right.

4           THE COURT:  That certainly gives you the right as an

5    amicus to advance their interests.  OK?  It does.

6           MR. SHORE:  OK.  Maybe it's a matter of semantics.

7           THE COURT:  To me, I think it's a matter of semantics.

8    The U.S. trustee had this statement, We will allow you to be an

9    amicus as long as you limit yourself to this and that.  I

10   didn't say that.

11          MR. SHORE:  OK.

12          THE COURT:  You're an amicus.  You represent the

13   interests of your people.

14          MR. SHORE:  Fine.

15          Just to be clear, we do have definitive views with

16   respect to the U.S. trustee's assertion of our members'

17   constitutional rights with respect to the third-party releases,

18   and so we'll just address that whether it's an amicus or an

19   appellee, your Honor.

20          THE COURT:  Whether you're a one or the other, you

21   will put those views in front of me.

22          MR. SHORE:  Thank you, your Honor, very much.

23          THE COURT:  I don't want anybody not to be heard.  OK?

24   There are a lot of people here who wouldn't technically qualify

25   as appellees, but they want to be heard.

LacWpurO

1          MR. SHORE:  Thank you, your Honor.

2          THE COURT:  Yes, sir.

3          MR. WEHNER:  Your Honor, if I could be heard briefly

4    on the question of appellee status?

5          THE COURT:  All you have to do is point me to what

6    is -- send me a one-page motion that says I can prove that I

7    argued this issue below.

8          MR. WEHNER:  August 23, the transcript is at 118:10.

9          THE COURT:  I don't have the transcript.

10         MR. WEHNER:  Well, I understand.  We'll send it to

11   your Honor.

12         THE COURT:  Thank you.

13         MR. WEHNER:  We argued the release issue.  We are

14   appellees on all issue.

15         THE COURT:  Fine.  Great.  If you can prove that,

16   great.  Phenomenal.  Terrific.  I told you what I thought about

17   the U.S. trustee's motion.

18         MR. WEHNER:  Thank you, your Honor.

19         THE COURT:  OK.  Item three.

20         MR. PREIS:  Your Honor, there is one -- I know you

21   said the parties that are here.  There is one *ad hoc* group,

22   which is called the Ad Hoc Group of NAS Children.

23         THE COURT:  Yes.

24         MR. PREIS:  It is on the phone, but they're not

25   speaking on the phone.  They had asked me to make sure that to

LacWpurO

1    the extent this issue arises, that they have the same rights,

2    and they're not in the room.

3        THE COURT:  Truly, a one-page motion to be heard as

4    amicus, unless they argued it below.  If they argued it below,

5    all they have to do is attach the appropriate pages from the

6    transcript or their brief.

7        MR. PREIS:  Thank you, your Honor.

8        THE COURT:  I just have to tell you that as a

9    practical matter it's not going to make a hill of beans' worth

10   of difference.  It really isn't.

11       OK.  What does this mean, coordination/consolidation

12   of appeals?

13       MR. KAMINETZKY:  Good afternoon, your Honor.

14       Your Honor, we just heard there's 15 or 16 differing

15   appeals.  What this item is asking is that we could make some

16   sense out of the chaos and have a single record on appeal, a

17   single briefing schedule, a single date for oral argument.

18       THE COURT:  Oh, yeah.

19       MR. KAMINETZKY:  Permission to file an omnibus reply

20   in opposition so that you're not reading 16 different --

21       THE COURT:  Absolutely, positively.

22       MR. KAMINETZKY:  OK.

23       THE COURT:  Whatever will expedite this.  Of course,

24   it should be consolidated.  We only need one record on appeal.

25       MR. KAMINETZKY:  With respect to designations and

LacWpurO

1   counterdesignations.

2            MS. LEVENE:  Your Honor, before we move on to the next

3   item --

4            THE COURT:  I want to move on, but he doesn't start

5   talking.

6            MS. LEVENE:  I'm sorry.  I thought consolidation issue

7   was a couple items later.

8            MR. KAMINETZKY:  No, it's this.  Because each appeal

9   has its own time clock, we have 16 rolling designations and

10   counterdesignations that are making scores of associates crazy

11   back in my office, so what we'd like to do is have one omnibus

12   designation.

13            THE COURT:  Pick a date.

14            MR. KAMINETZKY:  Exactly.  So we could work that out,

15   and if that's OK with your Honor --

16            THE COURT:  You should have worked it out by now.  If

17   I haven't made it clear, I'm going to move this thing.

18            MR. KAMINETZKY:  Good.

19            THE COURT:  OK?  I'm going to move this thing.

20   Assuming it's still here by the end of the week, I'm going to

21   move this thing.

22            MR. KAMINETZKY:  Awesome.

23            THE COURT:  So work it out.

24            MR. KAMINETZKY:  Good.

25            THE COURT:  Now, the U.S. trustee wanted to be heard

**A.789**

LacWpurO

1    on this issue.

2              MS. LEVENE:  Yes, your Honor.

3              All I was going to say about consolidation is we just

4    want to make sure things are moving along on an expedited

5    basis, and we had proposed a faster schedule than some other

6    people in the room.  That was our only concern about

7    consolidation, is if other people with different issues --

8              THE COURT:  Well, if we have to thrash out the dates

9    here and now, I'm happy to do it.

10             MR. KAMINETZKY:  Your Honor, that's item five, and

11   we'll get there in probably about 43 seconds.

12             THE COURT:  Right.

13             *Pro se* appeals, what do I need to know about the *pro*

14   *se* appeals?

15             MR. KAMINETZKY:  Your Honor, only that we're just

16   asking that these appeals be subject to the same schedule.  Let

17   me just give you a little background on the *pro se* appeals.  I

18   don't know if anyone is on the line.

19             Two of the *pro se* appeals -- those are Marisa Maria

20   Ecke and Elaine Isaacs -- are basically focused on the same

21   issue as the other appeals as your Honor has, you know,

22   third-party release.

23             THE COURT:  Sackler release, right.

24             MR. KAMINETZKY:  Right.

25             There's one additional *pro se* appeal of a Mr. Ronald

**A.790**

LacWpurO

1   Bass.  He has slightly different issues, claims against the

2   debtors and the state of New Jersey under the Americans With

3   Disabilities Act.  While this is different in kind, we just ask

4   that all of these *pro se* appeals, including Mr. Bass, proceed

5   on the same schedule.

6          THE COURT:  I have no problem with that.

7          MR. KAMINETZKY:  OK.  I guess that was 48 seconds.

8          So now we're up to --

9          THE COURT:  Wait a minute.  The U.S. trustee wants to

10  be heard.

11         MS. LEVENE:  I just wanted to footnote that last I

12  checked, two of those appeals hadn't been docketed yet, so I

13  just wanted to alert you to that.

14         THE COURT:  OK.  Well, presumably they'll get on the

15  docket today.  It was a holiday weekend.

16         MS. LEVENE:  Yeah, but I don't think those individuals

17  would have had notice of this hearing to be here.

18         THE COURT:  OK.

19         OK.  I have item five as proposed schedules.

20         MR. KAMINETZKY:  Yes, your Honor.

21         What we did is we included in the chart or in the

22  items list that we provided last night or early this morning

23  the bids and the asks.  There's three proposals.  The good news

24  is they're pretty much --

25         THE COURT:  Pretty close.

LacWpurO

```
 1          MR. KAMINETZKY:  They're pretty close.  It's the U.S.

 2   trustee's, the appealing states' and the appellees'.  You'll be

 3   shocked to hear that we believe that the appellees' proposed

 4   schedule is the most reasonable.  It is quick.  It is fast.

 5   You have the file brief going in November 19.  You have oral

 6   argument, at your Honor's discretion and leisure, (inaudible)

 7   after November 22.  And as you'll hear in detail when we move

 8   on to the TRO and the stay, that's well before any possible

 9   emergence date with respect to the plan of reorganization.

10          THE COURT:  When is the sentencing?

11          MR. KAMINETZKY:  The earliest it possibly could be --

12   we don't have it scheduled yet -- is December 1.

13          THE COURT:  Who is the sentencing judge?

14          MR. KAMINETZKY:  It's in front of the District of New

15   Jersey.  I'm not sure the name of the judge, your Honor.  I

16   apologize.

17          MS. MONAGHAN:  I believe it's Claro.

18          MR. KAMINETZKY:  Claro.

19          THE COURT:  Claro?

20          MS. MONAGHAN:  I believe that's it.

21          THE COURT:  A new judge.

22          MS. MONAGHAN:  District of New Jersey, your Honor.

23          THE COURT:  Not a name I know.

24          MR. KAMINETZKY:  Your Honor, the earliest we could

25   possibly emerge under the agreement is December 8, so obviously
```

**A.792**

LacWpurO

```
 1   your Honor's going to rule when your Honor rules, and I'm not
 2   here to tell your Honor how quickly your Honor has to rule, but
 3   we believe that the appellees' schedule is fast.  It gives
 4   people adequate time, given that these issues have been chewed
 5   on and rechewed on down below, and we think the appealing
 6   states' schedule is just too long and we want indeed to get
 7   this moving.
 8            THE COURT:  OK.  And the U.S. trustee wants a slightly
 9   shorter schedule.
10            MS. LEVENE:  Your Honor, I believe our schedule is
11   roughly the same, just starting earlier, and that's because we
12   want to move this along quickly.
13            THE COURT:  It's like four days earlier.
14            MS. LEVENE:  Right.
15            THE COURT:  Usually when I have bids and asks, there's
16   about a three-week to three-month difference.
17            MS. LEVENE:  No.
18            THE COURT:  Four days is --
19            MS. LEVENE:  They're very, very close.
20            I had a couple things I wanted to add regarding the
21   schedule.  One of the things is for amicus participation, we
22   would like to get amicus briefs filed at the same time as the
23   primary party briefs --
24            THE COURT:  Agreed.
25            MS. LEVENE:  -- to move them along.
```

**A.793**

1          And the other is just a footnote.  We want to go

2     forward on the schedule.  We've got a week for reply briefing

3     here.  We assume we're going ahead with the default word limits

4     under the bankruptcy rules, but we wanted to reserve our right

5     on reply to either move for additional pages or a little bit of

6     additional time if we're faced with six, seven, or eight

7     responding briefs that we need to reply to.

8          THE COURT:  OK.

9          MR. KAMINETZKY:  Your Honor, that's a fair point.  If

10    I may?  If your Honor could be flexible with respect to pages,

11    because --

12         THE COURT:  Oh, please.

13         MR. KAMINETZKY:  -- respond.

14         THE COURT:  Please.  Please forget about the page

15    limit, but don't tell me stuff I know.

16         MR. KAMINETZKY:  Understood.

17         THE COURT:  OK?  You can eliminate the boilerplate and

18    just get to the meat of it, but I genuinely want helpful

19    briefs, and for me, helpful briefs are briefs that discuss and

20    distinguish, or whatever the opposite of distinguish is, the

21    relevant cases.  I sit in the Second Circuit.  You know that.

22         So, for example, to the United States Attorney,

23    whether I agree with you or not, I can't tell the Second

24    Circuit that *Metromedia* is wrong.  There are many interesting

25    arguments that can be made under *Metromedia*, and I could, in

LacWpurO

1    fact, tell them if I thought it was wrong.  I just couldn't

2    have ruled on them.  So I'm particularly interested in Second

3    Circuit precedent for this.

4         This is how I train my law clerks.  A helpful brief, a

5    helpful opinion, is one that doesn't mention a case and then

6    put some quote in a parenthetical.  It's a brief that tells me

7    what the case is about, what the holding in the case was, and

8    why the relevant language matters.  It's a brief that says

9    we're on all fours with this, or our case can be distinguished

10   in the following way.  I really don't need to give you guys

11   brief-writing lessons.  I'm assuming I've got the best of the

12   best of the best in this room, but that's a brief that's

13   helpful to me.

14        I'm already reading cases like crazy.

15        MR. KAMINETZKY:  Your Honor, just to respond to the

16   U.S. trustee, we're all kind of dancing as fast as we can, and

17   we're going to have 16 appeals to, or 16 possibly briefs, maybe

18   some of them are consolidated.

19        THE COURT:  You're going to write an omnibus brief on

20   the --

21        MR. KAMINETZKY:  Of course.  Obviously we're going to

22   do that to make it easier for your Honor, but I don't think the

23   U.S. trustee needs another week or whatever it is for the

24   reply.  We've all done this before, so your Honor, I guess

25   that's where we are.  We have these three proposals.

LacWpurO

1          THE COURT:  I'm trying to figure out what you agreed

2     with on the U.S. trustee's proposal.

3          MR. KAMINETZKY:  Oh.

4          THE COURT:  That's where you started out.

5          Let me hear from the states.

6          MR. GOLDMAN:  Yes, your Honor.

7          We're jointly representing five states, and we're

8     seeking to coordinate to file a unified brief or at least one

9     in which the other appealing states could adopt, in whole or

10    substantially in part.  They are Maryland, California, Oregon,

11    and the District of Columbia.  Each of those states has their

12    own appellate team that we're going to have to coordinate with.

13         THE COURT:  And you're going to have to work real

14    fast.

15         MR. GOLDMAN:  Your Honor, we're prepared to do that.

16    We just think that what we have proposed is the most reasonably

17    expeditious timetable that we can manage.  We can't just dust

18    off our briefs that were submitted below.  We weren't given the

19    opportunity to reply to the objections that we received in

20    response to our objections.

21         THE COURT:  Then you might want to start there.

22         MR. GOLDMAN:  There is a record that we have to deal

23    with, an extensive record, and a 157-page bench ruling from

24    Judge Drain that has citations and extensive reasoning that

25    really wasn't quite articulated in the briefs below.  So we

LacWpurO

1    have that to deal with.  I think that 17 days from today is not

2    an unreasonable, and it's not an unduly lengthy period of time

3    to expect the states to react to this, to raise issues that are

4    before the Court here.  So we would maintain that we stick with

5    our schedule, which still gets us into early September by the

6    time -- or mid-September.

7            THE COURT:  Early December.

8            MR. GOLDMAN:  Yes.

9            THE COURT:  OK.  Here's my constraint.  My constraint

10   is that I'm starting a two-defendant criminal trial on December

11   7, so I have to have the argument before that.  That's my

12   concern, and it's not going to go away.

13           MR. GOLDMAN:  Your Honor, I could suggest as a

14   compromise position that we could just cut back the appellees'

15   reply brief to November 12.  They still have almost two weeks

16   to respond to our opening brief.

17           MR. KAMINETZKY:  Your Honor, may I just make a point?

18           The judge ruled on September 1.  We've been sitting on

19   this.  September 1 is now almost two months ago.  I appreciate

20   everything --

21           THE COURT:  No, it's not.  September 1 is a month and

22   a half ago.

23           MR. KAMINETZKY:  Six weeks ago.  You're right.

24           THE COURT:  Be fair.

25           MR. KAMINETZKY:  It's six weeks ago.

LacWpurO

1          So yes, there is an extensive record.

2          THE COURT:  But everybody should be working on their

3     briefing all along.

4          MR. KAMINETZKY:  Everybody's been working on it.

5     Right.

6          THE COURT:  And attorneys general, God bless them, are

7     as slow as molasses, and I feel for you in this regard.  I

8     understand the difficulties that you have with your clients.  I

9     don't have your clients.

10          Here's what I would propose.  I actually do like the

11     appellees' schedule with the oral argument for scheduled for

12     the 30th of November, but if the states find that they're

13     having difficulties with their clients, I'll be happy to give

14     you a few extra days, if that happens.  It's all going to be

15     the same anyway.  And if the appellants, particularly the U.S.

16     trustee, seem to have issues with the 19th, I'll be happy to

17     give you a few days, over the weekend.  That will, I point out,

18     allow you all to have a better Thanksgiving weekend than I will

19     have.

20          MR. HUEBNER:  Your Honor, just one very small point?

21          There are a huge number of states on the appellee side

22     also, many multiples, frankly, of those than on the appellant

23     side, and just in the interests of fairness, to be clear, there

24     are 38 states who support the plan.

25          THE COURT:  I'm aware of that.  There are 38 states

LacWpurO

1    that support the plan.  Tell them they'll have overnight to

2    comment on the brief.  It's time for you guys to tell your

3    clients and the other, the states, if they want to comment on

4    the brief, fine.  They've got 24 hours.  That's what the judge

5    says.

6              MR. HUEBNER:  Understood.

7              THE COURT:  All right?  You can blame it on me.  It's

8    not you.  It's me.

9              I'm being told by Mr. O'Neill -- this is Jim O'Neill,

10   my senior law clerk; he runs this operation, and I'm being told

11   that people need to speak up and be very clear, because we have

12   folks on the phone.

13             OK.  I'm adopting the appellees' proposed schedule

14   with the understanding that anybody can ask for an extension of

15   three or four days, and that's fine.  I'm setting oral argument

16   for November 30, 10 a.m.

17             Block the day.  I hear you guys talk a lot.  When I

18   told Judge Drain that I'd entered the TRO, he told me you talk

19   a lot.

20             Yes, sir.

21             MR. GOLD:  Your Honor, just to clarify, to make sure

22   that if we are going to be requesting three or four additional

23   days at some point, that would be done by means of an

24   ECF-letter; is that the proper way to do it?

25             THE COURT:  It would actually be by ECF notice of

**A.799**

LacWpurO

1      motion, but that's all it has to be, an ECF notice of motion.

2                 MR. GOLD:  Thank you, your Honor.

3                 THE COURT:  But try to adhere to the schedule.

4                 Yes, sir.

5                 MR. PREIS:  Your Honor, I just wanted to clarify one

6      thing, which is if the states ask for a few more days to submit

7      their opening brief, then obviously those extra days get added

8      on to our response brief timing so we wouldn't get jammed by

9      their extra days.

10                 THE COURT:  Sure.

11                 MR. PREIS:  OK.

12                 THE COURT:  But I think you can start writing your

13     brief now.

14                 MR. PREIS:  I understand.

15                 THE COURT:  I really think if it were me, if I were

16     still on that side of the bench, I'd already have a draft of my

17     brief on appeal.  And let's not pretend that you don't.

18                 Record designations and providing a record to the

19     Court, you're going to work that out.

20                 MR. KAMINETZKY:  Your Honor, just to understand your

21     Honor's preference, do you want us to start providing your

22     Honor copies of all the designated exhibits?  Do you want us to

23     wait until the briefs are filed and to see what the --

24                 THE COURT:  Oh, start shipping them in.

25                 MR. KAMINETZKY:  OK.  And do you like things in hard

LacWpurO

1    copy?

2              THE COURT:  I regret to say that I do.

3              MR. KAMINETZKY:  OK.  And do you want everything

4    that's designated and counterdesignated?

5              THE COURT:  No.  I want what's important.

6              MR. KAMINETZKY:  OK.  May I suggest, then, your Honor,

7    that we wait to see what exhibits are incorporated into the

8    various briefs?

9              THE COURT:  That's what makes the most sense to me.

10             MR. KAMINETZKY:  OK.

11             THE COURT:  If it's not important enough to be in your

12   brief, it's really not important enough.  You know that.

13             MR. KAMINETZKY:  Agreed.

14             Is there anything your Honor would like now, before

15   the briefs are filed, that would -- just anything you need we

16   could give you?

17             THE COURT:  I'll tell you what.  You know the record.

18   I don't.  If there's something you think I should be looking at

19   already, other than case law, which I am devouring, feel free

20   to submit it by, say, next Monday.  OK?  I'll take a look at

21   it.

22             MR. KAMINETZKY:  Your Honor, would you like all the

23   briefs down below?  Would that be helpful?

24             THE COURT:  No.

25             MR. KAMINETZKY:  OK.

LacWpurO

1          THE COURT:  Because I'll just read the same thing all

2     over again.

3          MR. KAMINETZKY:  We will do that.

4          THE COURT:  Great.

5          MR. KAMINETZKY:  Moving on to the certification of

6     direct appeal.

7          THE COURT:  Oh, yes.  Now, having done all of that,

8     how many people in this room are supporting that application?

9          OK.  Some are, some aren't.  Obviously, the bankruptcy

10    rules are very unusual to us district court judges, so it took

11    me a while to figure out that Judge Drain had jurisdiction

12    notwithstanding the fact that you had filed a notice of appeal.

13    He'll be hearing that on Thursday.  He'll do what he's going to

14    do, and then you have to go to the circuit, and if this all

15    bypasses me, this will have been lovely.  It will have been

16    nice knowing you.  I will certainly ask Chief Judge Livingston

17    if this works like a three-judge court if maybe I get to be

18    designated to be on the panel, but who knows.  OK?

19          At the very least, it was an education.

20          MR. KAMINETZKY:  Your Honor, you saw my (inaudible).

21    Our only point here was that whatever happens shouldn't delay

22    what's happening here in court.

23          THE COURT:  It absolutely does not.

24          MR. KAMINETZKY:  Even if Judge Drain certifies, as

25    your Honor knows, the Second Circuit then has to agree to take

LacWpurO

1    it.

2                 THE COURT:  Yes, I know that.

3                 MR. KAMINETZKY:  They might not even consider that

4    before your Honor's ruled on this.

5                 THE COURT:  I know that.  Believe me.  Until they take

6    it away from me, it's here.

7                 MR. KAMINETZKY:  OK.  Thank you, your Honor.

8                 Wow.  We've really done --

9                 THE COURT:  And by the way, if they take it, they

10   should take the briefing schedule too.

11                MR. GOLDMAN:  Your Honor, before we get to the stay

12   motion, just to make a note that the appeal of the state of

13   Vermont has not yet been docketed with the district court, that

14   they would be one of the appealing states and one of which we

15   represent, so -- they haven't gotten a number yet, though.

16                THE COURT:  OK.

17                MR. GOLDMAN:  I don't know how we deal with that.

18                THE COURT:  It will be automatically added by the

19   assignment committee to my docket when there's a number, when

20   it's docketed.  You're here today, so I assume that Vermont's

21   interests are represented.  Vermont is bound by this schedule.

22   I don't know why it took Vermont so long to decide that it

23   wanted to file a notice of appeal, but no attorney general gets

24   to dictate the schedule in my courtroom, and this is a fast

25   schedule, for all the obvious reasons.

LacWpurO

| | |
|---|---|
| 1 | OK.  I think we've reached the U.S. trustee's |
| 2 | emergency motion for a stay pending appeal, which has been |
| 3 | joined in by Connecticut, Washington, and Maryland. |
| 4 | MR. KAMINETZKY:  Your Honor, if I may? |
| 5 | THE COURT:  No, you may not.  It's not your motion. |
| 6 | MR. KAMINETZKY:  OK. |
| 7 | THE COURT:  OK. |
| 8 | MS. LEVENE:  Your Honor, we appreciate the entry of |
| 9 | the temporary restraining order, given the expiration of the |
| 10 | automatic stay, and consideration of the emergency stay motion |
| 11 | today. |
| 12 | THE COURT:  Well, I am going to give folks a chance to |
| 13 | put in a brief, like in the next 24 hours, but you may as well |
| 14 | argue it now.  I'll extend the TRO.  There will be a ruling by |
| 15 | Thursday at the end of the day. |
| 16 | MS. LEVENE:  Thank you, your Honor. |
| 17 | Will we have a chance to respond? |
| 18 | THE COURT:  No.  No reply. |
| 19 | MS. LEVENE:  All right, your Honor. |
| 20 | Thank you for allowing us to present this.  We view |
| 21 | this as an emergency, and we appreciate your willingness to |
| 22 | engage and rule quickly.  As we'll explain, the Court has |
| 23 | jurisdiction to enter a stay pending appeal, and we believe a |
| 24 | stay can be decided on the existing record. |
| 25 | THE COURT:  I agree. |

**A.804**

LacWpurO

```
 1              Next.
 2              MS. LEVENE:  As you know already, we're committed to
 3    an expedited briefing schedule, and I raise that because the
 4    primary argument that we have heard -- we haven't seen a
 5    written file in response to our request for a stay yet, nor in
 6    the bankruptcy court either.  I raise that because the primary
 7    argument in response is concern about delay.
 8              THE COURT:  There are two arguments.  One is you're
 9    not going to succeed on the merits.  The other one is the
10    letter.
11              MS. LEVENE:  And so as the delay point, I think the
12    expedited schedule is quite relevant, and I'll get to that more
13    in a little bit.  We think that the permissibility is
14    nonconsensual (inaudible) releases.
15              THE COURT:  Now I'm starting to lose you.  OK?  I
16    can't understand.
17              You know what would be helpful to me?
18              MS. LEVENE:  Should I go to the podium?
19              THE COURT:  Go to the podium, take off your mask, and
20    argue this.  And please don't tell me what the standards are
21    for an injunction.
22              MS. LEVENE:  All right.  Can you hear me all right?
23              THE COURT:  Oh, so wonderful.
24              MS. LEVENE:  It's nice to be able to speak without the
25    mask, your Honor.  Thank you.
```

**A.805**

LacWpurO

1          So, in our emergency motion, we asked for a stay

2     pending a decision on the stay pending appeal, which you have

3     granted, and we appreciate that.  For the stay pending appeal,

4     we would like a stay pending exhaustion of all appeals, and of

5     course, we've asked for alternative relief, if you deny the

6     stay pending appeal, a stay long enough for us to seek relief

7     from the Second Circuit.

8          On the standards for a stay, we believe we've met

9     them.  Because this does raise very important issues, we

10    believe we have a likelihood of success on the merits for the

11    reasons we discussed in our brief, and we don't think it can be

12    disputed that there are serious questions here on the merits

13    that raise a fair ground for litigation and the balance of the

14    hardships, including the harm to the victims who had their

15    claims eliminated potentially without appellate review on the

16    merits favor the stay.

17         Your Honor, in one of your orders, you raised a

18    question about whether you have the power to enter a stay

19    pending appeal, and you do.  I don't know if you still have

20    that question in your mind.

21         THE COURT:  I don't have that question in my mind.

22         MS. LEVENE:  OK.

23         THE COURT:  I've done some research.

24         MS. LEVENE:  I didn't quite hear you.

25         THE COURT:  I've done some research.

LacWpurO

```
1              MS. LEVENE:  All right.  So you do have that power.

2              We think we meet the standard for a stay, and you've

3    read our papers so I'll be brief about the merits arguments.

4    But as I said, there are serious issues here that raise fair

5    ground for litigation.  And because these releases violate the

6    due process clause, there was not adequate notice that

7    individuals, victims who are being denied their opportunity to

8    sue the Sacklers and other nondebtors are being deprived of

9    their property interests of these claims against nondebtors

10   without an adequate opportunity to be heard, without

11   compensation and without consent, we think that raises serious

12   due process issues.

13             We also think these releases are not permitted by the

14   code even as it's been interpreted by the Second Circuit, and

15   we understand that you're bound by the Second Circuit.

16             THE COURT:  Right.  I want to hear your argument on

17   that point.

18             MS. LEVENE:  I'm sorry.  I'm having trouble hearing

19   you.

20             THE COURT:  I said I'd love to hear your argument on

21   that point.

22             MS. LEVENE:  So, as for *Metromedia*, *Metromedia*

23   actually didn't hold the releases at issue there to be OK.  It

24   dismissed the case on equitable mootness grounds, and it didn't

25   address the constitutional issues that we've raised here.  And
```

LacWpurO

1    it talked about the cases that did allow such releases as being

2    rare cases that met certain conditions which are not met here.

3    Because these releases are so very broad, they extend far

4    beyond the persons who would have a claim for indemnity or

5    contribution, for example.

6            There's not a channeling of the claims.  I know the

7    debtors have talked about there being a channeling of the

8    claims, but the way the plan documents work is if you have a

9    claim against the Sacklers or some of these other nondebtors,

10   it's defined as a channeled claim, but then no compensation is

11   being paid on that claim, and we think that separates this very

12   distinctly from some of these cases where claims are channeled.

13           THE COURT:  I'm curious about something that needs to

14   be put on the record.  The kinds of claims that we're talking

15   about, the claims against the Sacklers, the nonderivative

16   claims, the state law claims, the nondischargable claims, what

17   are we talking about, and who has standing to assert them?

18           MS. LEVENE:  Your Honor, it's very broad, broadly

19   defined because the cause of action is very broadly defined.

20   It includes things like fraud, for example, that can't be

21   discharged.  It includes things like defenses and offsets,

22   which wouldn't be covered by a bankruptcy discharge.  And it's

23   defined in a way that is -- so to compare it, for example, to

24   524(g), which was at issue in the *Quigley* case and which

25   applies to asbestos cases --

LacWpurO

1          THE COURT:  It only applies to asbestos cases.

2          MS. LEVENE:  But just to compare it to that, there,

3    the liability must arise based on the conduct of the debtor.

4          Here, the release is raised more broadly, where the

5    debtor conduct should be either a legally relevant factor or a

6    legal cause, and so you've got what (inaudible) conjunctive of

7    524(g), where it has to be based on the conduct of the debtor

8    and the liability must arise by reason of the defendant's

9    statutory relationship to the debtor.  Here, that's all broken

10   apart.  So it doesn't have to be -- the liability doesn't have

11   to be because of the conduct.  We don't really know what

12   legally relevant factor means here.

13         THE COURT:  Your position is that 524(g) isn't

14   relevant anyway, so who cares?

15         MS. LEVENE:  To extent that we're talking about what

16   derivative liability is, it's a way of contrasting.

17         THE COURT:  But isn't your point --

18         (Indiscernible overlap)

19         MS. LEVENE:  Derivative liability.  It's not based

20   just on liability for the debtor's conduct.

21         THE COURT:  Right.  We're talking about, and I'll use

22   the phrase, "nonderivative claim."  That's your problem, the

23   release of nonderivative claims, the evil things that the

24   Sacklers allegedly did.  And I'm just curious whose claims are

25   those?  Who has such a claim?

LacWpurO

 1          MS. LEVENE:  Your Honor, there are a number of

 2     individuals who could have a claim.  There are suits.  There

 3     are, I think, 400 suits against the Sacklers.

 4          THE COURT:  But the Sacklers didn't say anything to

 5     any of those people.  I'm just trying to figure out what the --

 6     you're the ones who say, and I agree with you, that it's very

 7     difficult to parse the scope of this release, and I'm trying to

 8     figure out what is and what might not be covered.  And a fraud

 9     claim requires a misrepresentation of some sort to someone.

10          This is not like *Metromedia*, where the claims that

11     were being discussed by Judge Jacobs in his disquisition before

12     he ruled on equitable mootness grounds were claims that the

13     Kluge family had against the corporation.  The Kluges owned

14     *Metromedia*.

15          This is not like *Drexel*, where we're talking about a

16     discrete number, like 850 securities fraud claims.  They were

17     all securities fraud claims.  Everyone knew what they were.

18     I'm trying to figure out what are these claims that people are

19     asserting against the Sacklers or that they would like to

20     assert against the Sacklers?

21          MS. LEVENE:  Yes, your Honor.

22          And you know, to some extent, we don't know because

23     people were not able to file claims in light of the preliminary

24     injunction.  We do know there have been objections filed to the

25     plan, and they're the ones that we cited in our brief where

LacWpurO

1  someone who objected had, I believe, a class action complaint.

2          THE COURT:  A class action complaint premised on what?

3          MS. LEVENE:  Your Honor, I'm afraid I'm not

4  sufficiently familiar with those details right now.

5          THE COURT:  OK.

6          MS. LEVENE:  But I believe they wanted, they want to

7  hold the Sacklers liable for their own actions and their own

8  conduct.

9          THE COURT:  Right.  As opposed to their conduct as

10  officers, directors, managers.

11         MS. LEVENE:  As opposed to saying Purdue did this, and

12  therefore, you're liable because you're a director, but for

13  their own individual conduct.

14         THE COURT:  Other than their conduct as officers,

15  directors, and managers.  OK.

16         OK.  Maybe somebody else in the room can enlighten me

17  a little bit, but you go ahead and argue your motion.

18         MS. LEVENE:  And your Honor, of course, we, in

19  addition to the statutory argument, do think there are

20  constitutional issues here, including the due process clause,

21  including the Court's authority to enter these releases under

22  the bankruptcy clause and as an Article I --

23         THE COURT:  You have a Thurgood Marshall argument that

24  only this Court could do this, but Judge Drain couldn't do

25  this.

LacWpurO

1      MS. LEVENE:  Yes.  And there's a piece of that where

2    an exclusion for certain nonopioid claims where the bankruptcy

3    court as a gatekeeper functioned, which we think implicates --

4      THE COURT:  I'm sorry.

5      MS. LEVENE:  There is an exclusion from the release of

6    these certain nonopioid claims, but for those claims the

7    bankruptcy court plays a gatekeeper function.  They have to be

8    brought first to the bankruptcy court, which could say, no,

9    you're not allowed to pursue those claims.  And we think that

10   raises certain issues as well.

11     THE COURT:  I see.  OK.

12     MS. LEVENE:  So, your Honor, we think these are very

13   serious questions on the merits, and they do present a fair

14   ground for litigation, particularly as recognized in the *Arnaut*

15   cases that present these facts and the balance of harms raised

16   in favor of a stay.  Your Honor, as you recognize --

17     THE COURT:  Basically, you're balancing the harms, and

18   the immediacy or close to immediacy of payment is balanced, on

19   the one hand, against the other extinguishment of claims by

20   people who have constitutional claims or have common law claims

21   against the Sacklers under some theory, on the other.

22     MS. LEVENE:  Yes, your Honor.  We think the complete

23   elimination of the rights outweighs a delay.

24     THE COURT:  A delay of a few weeks or a couple of

25   months in the great scheme of things.

LacWpurO

```
1        MS. LEVENE:  Yeah, and hope, you know, we want to
2   obviously have this moving quickly.
3        THE COURT:  I know.
4        MS. LEVENE:  And we do think that outweighs,
5   particularly if there's a risk that there would not be
6   appellate review in the absence of a stay because of equitable
7   mootness, and to be clear, we don't think equitable mootness
8   should apply, but it's unquestionably a risk.
9        THE COURT:  Yes.  It turned out the case I was
10  thinking of was a statutory mootness case.  It was the Sears
11  case.  It wasn't an equitable mootness case, but I have
12  encountered equitable mootness before.
13        When is that being argued in the Supreme Court?
14        MS. LEVENE:  You know what?  I believe that petition
15  for certiorari was denied today.
16        THE COURT:  You're joking.
17        MS. LEVENE:  I'm not joking.
18        MR. HUEBNER:  It was denied.  One was denied last
19  week.  The other was denied today.
20        THE COURT:  Oh, my God.
21        OK.
22        MS. LEVENE:  So, we are left to grapple with a
23  doctrine that we don't think should apply, but the Second
24  Circuit --
25        THE COURT:  Your point is you can never know.
```

LacWpurO

1          (Indiscernible overlap)

2          MS. LEVENE:  -- agree with us.

3          THE COURT:  Because who knows where the line is for

4     substantial confirmation.

5          MS. LEVENE:  Yes, and the debtors have said that

6     nothing that's happening now could be a ground for equitable

7     mootness, and you know, we can all agree about that and the

8     Second Circuit may still not agree.  And we want to make sure

9     that there's review on the merits in this case.  And we don't

10    want to take any risks with that, and we don't think we should

11    get to a point where we're litigating equitable mootness

12    either.  The stay is a way to make sure that this case on

13    appeal gets heard on the merits.

14         THE COURT:  OK.

15         Let me hear from Davis Polk.

16         MR. KAMINETZKY:  Good afternoon, your Honor.

17         It's truly unbelievable what's going on here, because

18    it seems like we're in an alternate universe.  I need to set

19    the record straight.

20         There's one absolutely critical and, we believe,

21    dispositive fact that the U.S. trustee hasn't told you that I

22    think should frame our discussion and allow us to chart a

23    reasonable path forward, and I appreciate your Honor saying

24    that you'll give us an opportunity to file a brief on the stay

25    point, but that is entirely unnecessary. and let me tell you

LacWpurO

1    why.

2              There is absolutely no emergency here that requires an

3    immediate stay or a TRO, because there is zero risk -- zero

4    risk -- of near-term events or actions that could lead to

5    equitable mootness.  In this regard, this chapter 11 case is

6    quite different than cases that your Honor might have

7    encountered in the past, where the debtors could emerge by

8    sending wire transfers or transferring stock.  That's not the

9    point here.

10             Every party in this case knows, because we have told

11   them, because Judge Drain has said so, because it's spelled out

12   in black and white in a plea agreement that there is no

13   scenario where the debtors can emerge until December 8 --

14   December 8 -- at the earliest.

15             Let me explain.

16             As your Honor's aware, we've heard a little bit about

17   this Purdue Pharma, one of the debtors in this case, after a

18   contested hearing entered into a plea agreement with the

19   Department of Justice to resolve its criminal and civil

20   investigation.  The timing of the effective date of the plan is

21   tied to the date of the sentencing hearing in the New Jersey

22   district court.

23             Under the plea agreement, the sentencing hearing is

24   required to occur 75 days after the debtor's plan is confirmed

25   and at least seven days before the plan becomes effective.

LacWpurO

1          What does that mean?

2          At least 82 days must elapse between the entry of the

3   confirmation order and effective date of the plan.  So since

4   the confirmation order was entered on September 17, the

5   sentencing hearing cannot -- cannot -- occur before December

6   the 1st and the effective date cannot occur sooner than

7   December 8.  There is absolutely no danger that the debtors

8   will emerge suddenly, without notice, at an unforeseen time.

9          Now, your Honor's order Saturday night -- now, the

10  debtors have been laying the complex groundwork to emerge after

11  sentencing, to secure licensing, to obtain regulatory approval,

12  setting up new shell companies, and the like.  But it's

13  precisely because this process is protracted that we have a

14  long period.  We baked in a long period between the

15  confirmation order and this plea agreement.  But performing

16  these ministerial tasks are critical to ensuring that the

17  debtors will ultimately emerge and become co-effective after

18  the sentencing once we're authorized to do so.

19          And what does that mean?

20          That means that there's multi-hundred million dollar

21  distributions to the opioid abatement trust and to the personal

22  injury compensation trust that we need to start getting the

23  ball rolling.  But we fully understand your Honor's concern.

24          THE COURT:  Just talk to me a minute.  You're talking

25  about giving large sums of money, pursuant to the plan, to the

**A.816**

LacWpurO

1    trust during this 82-day interval?

2            MR. KAMINETZKY:  Absolutely not.  Absolutely,

3    positively, 100 percent not.  And this is what we went through

4    with Judge Drain in great, you know, detail.

5            All we're doing is we're setting up, doing this

6    ministerial task of setting up shell corporations.  We're not

7    making any distributions.  We're not doing anything that's

8    irreversible, and that's why Judge Drain found -- and this is

9    so critical.  We had this discussion with Judge Drain.  They

10   moved for a stay in front of Judge Drain, as the rules require.

11           THE COURT:  Right.  And he put it off until --

12           MR. KAMINETZKY:  November 9.

13           And why did he?

14           Your Honor, November 9 is when the stay hearing

15   occurs.  The U.S. trustee is not happy about that.  They don't

16   want to have a full evidentiary hearing, which is required

17   under the law.  They have the burden of proof, and the law says

18   it's a heavy burden to get a stay.  There's going to be

19   witnesses.  We've already exchanged witness lists.

20           THE COURT:  Why are there going to be witnesses?

21           MR. KAMINETZKY:  Because the key issue is the balance

22   of harms of a stay or of not a stay, and we have -- and your

23   Honor, and they're sitting in the courtroom.  The balance of

24   harms isn't even close here.  We're talking about depriving

25   victims, depriving states of abatement funds, but your Honor --

LacWpurO

```
 1              THE COURT:  For a few weeks, for a month or two --
 2              MR. KAMINETZKY:  But --
 3              THE COURT:  -- in a process that has gone on for many
 4    years.
 5              MR. KAMINETZKY:  Right.
 6              THE COURT:  We're not talking about depriving anybody
 7    of anything for a long period of time, except the people who
 8    lose their claims and they're deprived forever.
 9              MR. KAMINETZKY:  OK.  Well --
10              THE COURT:  You cannot convince me that a delay of a
11    month or two is so horrible that it outweighs the possibility
12    of equitable mootness.
13              MR. KAMINETZKY:  Your Honor, that's where I'm getting
14    to.
15              There is no possibility of equitable mootness between
16    now and December 8, at the very earliest.  The normal process,
17    as it is the in this -- your Honor knows this well.  When your
18    Honor rules and someone appeals and moves to his first stay,
19    who do they go to first?
20              They go to the district court.  The same rules apply
21    here.  They go to Judge Drain.
22              On November 9, Judge Drain has committed to ruling on
23    the stay issue.  If they're unhappy with the ruling, they have
24    a month to come before your Honor and continue their stay
25    motion.
```

LacWpurO

```
 1              What are they doing here now?

 2              This is already scheduled for November 9, a month

 3    before the earliest date we can possibly emerge.  Why are we

 4    litigating in two different fora the exact same issue?  The

 5    rule is we go to the bankruptcy court first.  We're there.

 6    We've exchanged witness lists.  They then, all of a sudden, on

 7    Friday afternoon, file a motion in front of your Honor, Oh, my

 8    God, we need a stay.

 9              But your Honor, we're already litigating.  Give Judge

10    Drain the chance.  You know how Judge Drain works.  He already

11    said he will rule on November 9.  If they're not happy, we'll

12    come back.

13              But what are we doing here now?

14              Judge Drain is going to hear this exact issue.

15              THE COURT:  OK.  Then my question for the U.S. trustee

16    is what can possibly happen between now and November 9 that

17    will compromise your interests in any way?  That's my question

18    for the U.S. trustee.

19              MS. LEVENE:  Yes, your Honor.

20              And I have a couple of responses.  First of all,

21    while, you know, the debtors say that nothing that they're

22    doing now can support equitable mootness, that doesn't bind the

23    Second Circuit.  And while distributions to claimants aren't

24    being made, my understanding is that money is being moved, so

25    the advance order authorized an advance of $297 million, and
```

LacWpurO

1    the sentencing hearing is before the effective date.  Debtors

2    have previously not conceded that they would not make an

3    equitable mootness argument based on that.

4            THE COURT:  I hate to say it, but I've been burned on

5    statutory mootness -- grant you, in *Sears* -- where the debtor

6    said he wouldn't make a statutory mootness argument and then

7    ended up making a statutory mootness argument.  And guess what?

8    It was statutorily moot, and there was nothing I could do about

9    it.  And that was after I had written a 43-page opinion on the

10   merits.

11           MR. KAMINETZKY:  There's no statutory --

12           THE COURT:  I know, so the debtor can say it won't

13   make an equitable mootness argument, but it can change its

14   mind.  So I'm not interested in what the debtor says about

15   whether it will or it won't, but it can't say anything today

16   that binds it.

17           MR. KAMINETZKY:  Your Honor, with respect to the

18   advance, it's un -- the advance motion, the order itself says

19   nothing herein can support an equitable mootness argument.  The

20   judge's order says.

21           THE COURT:  That's what Judge Drain said in the *Sears*

22   case about statutory mootness.  He said I don't see how that

23   could ever possibly apply here.  He was wrong.

24           MR. HUEBNER:  Your Honor --

25           THE COURT:  I understand statutory mootness and

LacWpurO

1    equitable mootness are not the same thing, but they have the

2    same impact.  They have the same effect, which is to say they

3    extinguish the appeal.

4          MR. HUEBNER:  Your Honor, may I help for just a

5    moment?  I think I can make this very easy.

6          Between now and November 9, nothing is happening that

7    relies on the confirmation order for its source of authority.

8    No money, not one dollar, is being paid out to claimants,

9    period, end of story.  Out of $1 billion of cash and seven to

10   $10 billion in total value, a total of under $6.9 million was

11   going to be used by the estate for ministerial matters to pay

12   fees to begin to set up the boxes to receive funds once we go

13   effective.

14         We even put unwind provisions into that.  It's before

15   a thousandth of one percent of the estate's assets.  To be

16   candid, your Honor, a different law firm probably would not

17   have filed the funding motion.  All debtors begin preparing for

18   emergence long before they ever get to the confirmation hearing

19   and do many ministerial acts.  No court anywhere in the country

20   ever in U.S. history has held that the type of entirely

21   ministerial acts that are being done now give rise to mootness,

22   and that's true all the way until December 1.

23         Your Honor, we have a hearing on November 9, which

24   precedes that, and the short answer is there is no emergency.

25   The trustee tells you in their opening line of their brief,

LacWpurO

1    which we respect in part, they filed the brief because the

2    Second Circuit, in their view, in an extremely conservative

3    view, requires that no stone be left unturned in being diligent

4    in prosecuting their appeal.  I think we can all agree that the

5    U.S. trustee has been extraordinarily diligent.  Frankly, we

6    took your Honor's order of the day before that said, in all

7    caps, stop filing papers right now.

8            THE COURT:  Stop filing letters.

9            MR. HUEBNER:  Letters.

10           So we actually didn't reply because we thought you'd

11   be very upset at us if we burdened you with even more

12   documents.

13           THE COURT:  Oh, I've gotten more.

14           MR. HUEBNER:  We have a 56-page brief ready for Judge

15   Drain being shaped now.  It's not only that we say it, because

16   this is a doctrine, not a statutory obligation.  The parties

17   stipulated, every party who is an appellee here, including even

18   the Sacklers, on the funding order that no party would ever

19   argue it gave rise to mootness.  Everyone in the courtroom

20   agreed it would be a frivolous argument that no case ever

21   handed down supports.

22           Here, it's actually very easy.  Nothing is happening

23   before November 9 except for things that don't even need court

24   authority.

25           With respect to the funding motion, your Honor, which

LacWpurO

1    could never give rise to mootness, every party has agreed that

2    that peppercorn of the amount of spending in this case could

3    never give rise to mootness.  As it happens, there are also

4    unwarranted provisions.  A lot of that money has already gone

5    out.

6              THE COURT:  You mean unlike provisions in the event

7    that you lose on appeal.

8              MR. HUEBNER:  Correct, your Honor.  If we can't go

9    effective, then we largely unwind the boxes.  But ironically,

10   and this is really what's very ironic, these boxes are for

11   victim trusts.  Everyone agrees that the victims will get

12   distributions in these cases.  Even in what we believe is an

13   unthinkable situation, where this plan does not go effective

14   and we have to start again on a new one, there will still need

15   to be trusts to pay victims, so this is not about the Sackler

16   releases or the confirmation per se of risk plans.  This will

17   be even for any plan.  But there are already four sets of

18   safety valves.  It's an incredibly trivial fund.  Everyone

19   agrees it could never give rise to mootness.  The judge has so

20   ordered.  It probably doesn't even need court authority and can

21   be largely unwound.  It's just professional fees to set up

22   trusts to provide information so that the victims of this

23   terrible situation, if we are allowed to go effective, can get

24   paid when available.

25             Let me give you an easy example, your Honor.  The *ad*

LacWpurO

1  *hoc* committees of the now roughly 38 states –– originally 24

2  and then 15 flipped –– they and others have been interviewing

3  board candidates for months, long before the confirmation

4  hearings, long before briefs were filed, because the vision

5  always was that a brand-new board and all that would be taking

6  place.  That's not in the confirmation order.  No one needs the

7  court's authority to do that.  There is just nothing happening

8  right now.  The trustee has, in its view, done its job, leaving

9  no micro pebble unturned and showing its diligence on appeal,

10 but the reality is there is a four-factor test for an

11 injunction.  She said the words at the beginning of her

12 argument, through all layers of appeal, so somehow we're here

13 asking for a multiyear injunction on one day's notice and not

14 even a business day.

15            THE COURT:  I'm considering an application for a stay

16 pending the appeal before me.

17            MR. HUEBNER:  Understood, your Honor.

18            THE COURT:  I'm considering it.

19            MR. HUEBNER:  Understood.

20            THE COURT:  I don't tell the Second Circuit what they

21 can and can't do in terms of stays.

22            MR. HUEBNER:  Your Honor, the good news is ––

23            THE COURT:  That's the way it works.

24            MR. HUEBNER:  –– the reason we put the schedule right

25 in the order was because this is actually very easy.  It's

LacWpurO

```
 1   over.  You've set oral argument for November 30.  We can't
 2   emerge until probably two weeks after that in the real world,
 3   so there is already time.  We can revisit this in three or four
 4   or five or six weeks, but right now, irreparable harm, there's
 5   no conceivable harm.  There isn't even a peppercorn of harm
 6   because the only potential harm at all is the possible risk of
 7   mootness.  And again, we can talk on another day about how the
 8   law works and whether that counts, but even if it does, there
 9   is no possible mootness.  None.
10           Your Honor, to be clear, and one of the reasons why --
11           THE COURT:  Can I interrupt for a moment?  You say
12   everybody agrees.  Where is this stipulation?
13           MR. HUEBNER:  Sure.
14           Your Honor, we represented it on the record.  When
15   Judge Drain had a scheduling conference and said I don't see
16   any emergency need for a bridge order, nothing is happening
17   right now, we actually had this oral argument.  And what was
18   the scheduling conference, sort of like this one, a little bit
19   turned into the oral argument on the need for an emergency
20   bridge order, and each of the parties, in fact, the easiest way
21   to think about it, your Honor, maybe, is there are two sets of
22   two on the appellees' side.  There are two for these hearings,
23   the debtors and the committee.  There are two sets of
24   governmental creditors, representing almost every government in
25   the country.  4,924 governments voted on this plan --
```

LacWpurO

```
1      governments, not individuals -- and had a 97 percent acceptance
2      rate.  One is the ad hoc committee of the governmental
3      creditors that largely speaks for a majority of the states.
4      The other is the multi-state governmental entities group, which
5      largely speaks for the municipalities.  You have two
6      fiduciaries, two governmental groups.
7             Then the individual victims are largely split along
8      two, NAS children and the adult PI's represented by Mr. Shore.
9      Those are the private and those are the actual victims, which
10     also makes this ironic.  The U.S. trustee keeps claiming to
11     speak for victims when the victims are right here, and then the
12     final two, who are very different in kind because the rest of
13     us are plaintiffs and the Sacklers are the defendants and we
14     were getting ready to sue the Sacklers for many billions of
15     dollars had the creditor groups not settled.
16            The A side and the B side are the last pairing.  All
17     of those parties, every one of them, agreed and represented and
18     we've been here the whole case.
19            THE COURT:  And you can print out those pages of the
20     transcript and show them to me.
21            MR. HUEBNER:  Sure, and our brief, your Honor, if your
22     view --
23            THE COURT:  A 56-page brief.
24            MR. HUEBNER:  Well, it would need to be modified, your
25     Honor.  We've been hit with quite a few filings.
```

LacWpurO

```
 1                    THE COURT:  I know.

 2                    MR. HUEBNER:  That's actually one of the arguments we

 3       make to you, is that this has already been ruled upon.

 4                    Let me say this, your Honor, so there's no doubt of

 5       any kind.

 6                    THE COURT:  (inaudible) by Judge Drain and you can

 7       consider this an appeal.

 8                    MR. HUEBNER:  But your Honor, here's how we think

 9       about it, so there's no misunderstanding at all.

10                    We want you to rule.  One of the reasons we are

11       opposing direct certification, among others -- one of the

12       reasons, among others, that we do not support direct

13       certification is because your order's made it clear you would

14       move quickly, and there are hundreds of thousands of real

15       people here who want this plan and need this plan.  And so it

16       was for that reason that the schedule just lays out perfectly,

17       because nothing is happening except de minimis ministerial

18       actions between now and December.  Your Honor has already

19       pledged to hear us on November 30, which is what we want.

20                    There was never a vision, as you'll see the minute you

21       start seeing pleadings from us, to moot your ruling, ever,

22       which is why we found this motion extraordinary and

23       extraordinarily unnecessary.  As you saw from the schedule, we

24       proposed a schedule faster than most of the appellants

25       precisely because we want a ruling in the time that we hope
```

LacWpurO

1    will be sufficient, and if we get to December and your Honor

2    says I need another ten days, another trial's come up, an

3    emergency, this is very complicated, I can't rule until

4    December 14, at least on the debtor side, your Honor, not going

5    to be another choice because you're the judge, we would accept

6    that in a heartbeat.

7         We're trying to balance, as the fiduciary for all

8    parties, the fact that 1-1,000th of our creditors are seeking a

9    stay.  The other 99.99 percent are not.  That's the highest

10   voter turnout in chapter 11 history, and ten *ad hoc* groups

11   representing every possible (inaudible) stakeholders voted

12   overwhelmingly in favor of the plan.  A small number of people

13   have a different vision, and there's a lot to talk about.  But

14   your Honor, to be fair to the actual victims, tens of thousands

15   of whose counsel is in the room and the vast majority of the

16   states whose counsel is in the room, (inaudible) dominated

17   obviously, as it often does, by the appellants' opening salvos.

18   But a TRO and a stay are emergency extraordinary motions in

19   which all four factors bear an evidentiary burden on the

20   movant.  The movant has no evidence.  They have a concern that,

21   maybe, possibly, they might run an incremental risk of

22   equitable mootness, and they just are not correct.

23        And if your Honor wants a stipulation, we will draft

24   one this afternoon.  Every appellee will sign a stipulation

25   that says we hereby swear for all time that nothing that

LacWpurO

1    transpires prior to December 1 could ever give rise to

2    mootness, nor will we ever so assert, and your Honor can sign

3    it.  Judge Drain can sign it.  We can just show it to you.

4          There's no real issue here.  Everyone understands that

5    the real mootness issues, if they are even legally cognizable

6    as supporting a stay, begin in December.  Judge Drain a going

7    to have a hearing, and your Honor, there will be witnesses.

8    There will be state attorney general witnesses on our side,

9    because, in fact, the harms are much more serious than the U.S.

10   trustee's leading you to believe.  But again, that's not

11   today's issue.  Today's issue is, is there an emergency that

12   requires --

13          (Indiscernible overlap)

14          THE COURT:  -- no irreparable harm at this moment.

15          MR. HUEBNER:  Correct, your Honor.  And the day may

16   come -- I'm not saying it won't -- when the decision about

17   mootness versus effectiveness might have to be decided.  That

18   day is more than six weeks away.

19          MR. KAMINETZKY:  (inaudible) given all that from the

20   normal process --

21          THE COURT:  OK.

22          MR. KAMINETZKY:  -- of having the trial court rule on

23   the state issues and then your Honor, as the appellate court,

24   if necessary, can review after having seen the developed record

25   of the evidence and of everything else that Judge Drain has

LacWpurO

1    committed to completing on November 9.

2            MR. HUEBNER:  Your Honor, let me say one last thing,

3    if I may, and I apologize a little bit for the tag team.

4            Obviously, this is a case of almost unthinkable

5    complexity.  The U.S. trustee made quite a few statements in

6    their oral arguments, and one of dangers when one side files a

7    big brief and you didn't is that things get even slightly

8    locked into the judge's mind.  So if I could just have 90 more

9    seconds, I promise it will not be more than that, I just want

10   to be very clear a few things, and I will leave it at that,

11   unless the Court has questions.

12           No. 1, the issue, the allegation of inadequate notice

13   that the U.S. trustee makes is literally mind-boggling.  There

14   are factual findings by Judge Drain.

15           THE COURT:  I've read Judge Drain's opinion.

16           MR. KAMINETZKY:  Done.  But they've said they're --

17           THE COURT:  I've read Judge Drain's opinion.

18           MR. HUEBNER:  Understood.  The second issue, your

19   Honor, they misdescribe the releases, frankly, again and again.

20           THE COURT:  Well, somebody better describe them to me,

21   because I don't understand them.

22           MR. HUEBNER:  Your Honor, we will, but let me make it

23   very easy.  With an infinitesimally small exception that we

24   believe requires the overlap of two different null sets, no

25   third-party claims against the Sacklers is being released that,

LacWpurO

1   by a party who does not also hold a claim against the debtors.

2   I'm not sure what class action -- after first saying she

3   doesn't know what it says, but then she actually went on to say

4   what she hoped it said, that maybe some people somewhere

5   alleged that the Sacklers somehow have liability unrelated to

6   the debtors.  We've been at this for three and a half years,

7   your Honor, and we don't know of any such claim.

8           The plan was tailored at Judge Drain's demand.  It

9   used to say holders of claims and causes of action can be

10  deemed releasing parties.  Judge Drain rejected that.  One of

11  the six changes that was made in the final days was to narrow

12  and narrow and narrow the releases.  You have to be a holder of

13  a claim against the debtors to have released your claims

14  against the Sacklers, with, as I said, only one exception,

15  which no one has ever identified as possibly even theoretically

16  containing a claimant, which relates to a hypothetical,

17  possible future claim not yet asserted that relates to products

18  already in the stream of commerce that is also a claim against

19  the Sacklers that is not also a claim against Purdue.

20          We actually don't think either of those categories

21  exist.  When I say we, your Honor, let me be very clear,

22  because pronouns can be very tricky things, and people often

23  obfuscate when they speak to a court or write emails or letters

24  what their pronouns.  Let me be very clear.  We mean the PI

25  victims who have counsel in this case and have an *ad hoc*

LacWpurO

1    committee that has represented them for years; the MDL PEC,

2    which was appointed by Judge Polster and is part of the *ad hoc*

3    committee that represents the huge umbrella group in the MDL

4    the official committee of unsecured creditors -- there is a

5    fiduciary for every creditor in this case -- and the debtors,

6    who are fiduciaries for all.

7            THE COURT:  Understood.  All understood.  All

8    understood, and I thank the U.S. trustee's reference to class

9    actions was to the fact that if this were still in front of my

10   old law school classmate Judge Polster, the people who are so

11   ably represented in this court would have an opportunity to

12   say:  You know what?  I don't want to be here.  I want to bring

13   my own lawsuit.  I don't like this.  I don't want to be

14   represented by these people.

15           And that's not what's happening here, and I think that

16   that is the essence of the U.S. trustee's class action

17   argument.

18           MR. HUEBNER:  Your Honor, we agree, and if they were

19   in one of the seven circuits that has upheld third-party

20   releases being extraordinary circumstances in bankruptcy cases,

21   that argument would not prevail.  And the Second Circuit -- and

22   we'll talk about that a lot, I think, next month.

23           THE COURT:  We'll talk about that a lot.

24           MR. KAMINETZKY:  -- is, we believe, clearly one of

25   those.  If we were in one of the few circuits that essentially

LacWpurO

1    said what one could argue is the analytic equivalent of a

2    nonopt-out class action cannot be obtained through the

3    bankruptcy system, then none of us would be here because we'd

4    have a different plan and it would probably be unthinkably

5    worse for all creditors, because your Honor, one of the things

6    that you're seeing here, which unfortunately, the more you

7    peel, the more complicated it gets, there are over 25

8    intercreditor settlements embodied in the plan.  So when the

9    U.S. trustee told you, as she did a few minutes ago, Oh, the

10   victims aren't getting paid from the money coming in from the

11   Sacklers, that is untrue, because --

12          THE COURT:  I didn't quite hear that.

13          MR. HUEBNER:  No, your Honor.  The phrase she used

14   was --

15          THE COURT:  We're now too much into the weeds.

16          MR. HUEBNER:  Agreed.

17          THE COURT:  OK?  We're now too much into the weeds for

18   me.  I've only been in the case for a few days.

19          MR. HUEBNER:  Agreed.  Let me back right out, because

20   in the end, I can end where I started, unless the Court has any

21   questions.

22          There is no possible, credible, nonsanctionable claim

23   that anything happening between now and December 1 could

24   possibly give rise to mootness, and the possible potential risk

25   of mootness is the only allegation of potential harm.  Even if

LacWpurO

1    I give them all three other factors, there is no harm, and in

2    whatever way this Court wants comfort, from every single

3    appellee, that that view is forever and signed and guaranteed,

4    we will do so.  And if we're approaching December and there's a

5    potential risk, I guess -- I actually don't think that will

6    happen because, frankly, your Honor's passion for speed and

7    understanding of the desperate needs of this case is

8    extraordinarily acute.

9            THE COURT:  Well, look, I understand that it has to go

10   fast, and I understand that it's all important.

11           Let me hear from the U.S. trustee.  It's her motion.

12           MS. LEVENE:  Your Honor, thank you.

13           Your Honor, what we've just heard all relates to the

14   advance order.  It doesn't relate to the confirmation order,

15   and so I think that needs to be clear, that what they're

16   talking about is all -- you know, they're saying they don't

17   even need the confirmation order for what they're doing right

18   now.  So none of that is an argument against staying a

19   confirmation order.

20           But the other thing we heard was that the key date is

21   December 1, which is not the effective date.

22           THE COURT:  Actually, what they said December 8, but

23   by December 1, if nothing had happened or if I thought I was

24   going to have a hard time getting a decision out, that maybe

25   then I would entertain a motion for a stay.  Or actually, I

LacWpurO

1    think what he really said was Judge Drain's going to hear this

2    on November 9 anyway.

3              MR. HUEBNER:  Correct.

4              THE COURT:  And if he rules against a stay, you'll

5    take an appeal and it will be a lot closer to December by then

6    and I might look at the equitable injury point differently.

7    That's, I think, what he said.

8              MR. HUEBNER:  Yes, your Honor.  Exactly.

9              MS. LEVENE:  Your Honor, there's two dates.  The

10   earliest effective date is December 8 and the sentencing date

11   December 1, and my understanding of what Mr. Huebner has been

12   saying is that December 1 is a critical date and that he is

13   not --

14             THE COURT:  It's a critical date because the earliest

15   effective date is tied to the sentencing date.  But if the

16   sentencing doesn't happen until January, then I guess the

17   earliest effective date may be in January.

18             MR. HUEBNER:  That's exactly the point, your Honor.

19   December 1 could become December 4 or December 9 or December

20   12.  But it's sure awfully after December 9, and we know that

21   already, and that's why the burden of extraordinary harm and

22   public --

23             THE COURT:  OK.  Got it, got it, got it.  Let me

24   listen to her.

25             MS. LEVENE:  So, we haven't heard a reason why the

LacWpurO

1   confirmation order should not be stayed.

2          THE COURT:  But yes, you have.  You've heard a reason.

3   The reason is there's no irreparable harm because we aren't

4   going to be able to do anything that is authorized, for which

5   our authority derives from the confirmation order, until at

6   least the middle of December.  That's what they said.  So why

7   do you need an injunction in the middle of October, especially

8   when you're going to see it again in the middle of November?

9          MS. LEVENE:  Your Honor, two things.

10         While we appreciate everybody's stipulations, as you

11  pointed out, that does not bind the Second Circuit with respect

12  to what's going on now.

13         THE COURT:  Well, actually, no.  What I was pointing

14  out was in my case, dealing with another form of mootness, what

15  Judge Drain opined and what the lawyers represented to Judge

16  Drain turned out to be of no moment because the lawyers'

17  client's interests changed and the lawyer did what was in his

18  client's interests and not what he told Judge Drain he would

19  not do.

20         MR. HUEBNER:  Which is why we're willing to be bound,

21  your Honor, in any way anyone --

22         THE COURT:  OK.  Fine.

23         MS. LEVENE:  Your Honor, equitable mootness is a

24  judgment doctrine.

25         THE COURT:  Yes.

LacWpurO

1          MS. LEVENE:  That stipulation cannot bind the Court to

2     look at this and take a different --

3          THE COURT:  Just thinking this out loud, but the only

4     stipulation that I would accept is a stipulation that the

5     argument will not be raised at any time in any court.

6          MR. KAMINETZKY:  Your Honor --

7          THE COURT:  Wait a minute.  You don't need to talk.

8          MR. KAMINETZKY:  Oh, sorry.

9          THE COURT:  And going back to Judge Jacobs, who wrote

10    this incredibly long opinion on what turned out to be utterly

11    irrelevant issues in *Metromedia* and then talked about equitable

12    mootness, the reason, he said, that he was opining on all those

13    ultimately irrelevant issues was because they might have some

14    bearing on what is equitable.  OK?  So I guess it's possible

15    that there's some three-judge panel in the Second Circuit that

16    would not find it inequitable if somebody went back on his

17    word.  But the difference between equitable mootness and

18    statutory mootness is it wasn't in the statute.  If it's in the

19    statute, you can't get around it.  And equity requires that you

20    behave, so I think, I believe that's the essence of the

21    argument.

22         MS. LEVENE:  I understand the argument, your Honor.

23    Our concern is, of course, none of that is binding on --

24         THE COURT:  Understood.

25         MS. LEVENE:  -- Second Circuit.

LacWpurO

1      THE COURT:  You're saying if the circuit could raise

2   equitable mootness *sua sponte* and would do so, that's what

3   you're now afraid of, that the circuit will raise the question

4   of equitable mootness *sua sponte*.

5      MS. LEVENE:  If every party actually were to stipulate

6   that they would never raise it, yes, that is a concern.  But we

7   are also concerned, your Honor, about, you know, again,

8   December 1 --

9      THE COURT:  I still want to know what's going to

10  happen between now and November 9.  In the end, my dear friend,

11  my former law partner, Judge Drain, has a hearing on this for

12  November 9.  So I'm more focused on what's happening between

13  now and November 9 than I am on what's happening between

14  November 9 and December 1, because if I don't like Judge

15  Drain's ruling and you come back, I can always undo that,

16  unless you're in the circuit, in which case you're at their

17  mercy.

18      MS. LEVENE:  And what is happening is they're setting

19  up the trusts.  There's money as been described, being paid to

20  professionals.  It's, you know, building technology, paying for

21  the services for these trusts.  There's disclosure of PI data

22  that we talked about, and of course, we're concerned about how

23  they --

24      THE COURT:  PI data being?

25      MS. LEVENE:  Excuse me?

LacWpurO

1          THE COURT:  PI data being what, identifying

2     information?

3          MS. LEVENE:  Personal information, including names and

4     social security numbers.

5          THE COURT:  Thank you.

6          MS. LEVENE:  Birth dates, that kind of thing.

7          THE COURT:  OK.

8          MS. LEVENE:  And we want to ensure that there is time,

9     of course, to bring this up to an appellate court, whether it's

10    this Court or the Second Circuit, if we don't get the stay,

11    that there is time to do that.  So we would want --

12         THE COURT:  Since you're either going to get the stay

13    or not get the stay this week, I think you have time to bring

14    it to the circuit.  You can go next week.  You want to be there

15    anyway.  Right?

16         MS. LEVENE:  Yes, your Honor.  If we got a decision up

17    or down --

18         THE COURT:  I mean I'm not going to sit on this for

19    five weeks.

20         MS. LEVENE:  As opposed to deferring to Judge Drain's

21    decision, you know, a hearing in November.

22         THE COURT:  OK.  I get it.  I get it.  OK.

23         MR. KAMINETZKY:  Your Honor --

24         MS. LEVENE:  I don't want to get to a point where

25    they've set up everything that they need to to flip a switch

LacWpurO

```
 1    and then they flip the switch and they go forward to sentencing
 2    or they go forward with the equitable -- the effective date,
 3    and suddenly, we're out of luck.
 4              THE COURT:  In a hypothetical world, where the Second
 5    Circuit doesn't take this, you're sitting here on the 30th of
 6    November and we're all talking about this stuff, and the
 7    sentencing is scheduled for December the 1st and you stand up
 8    and say, Judge, they can flip a switch, what makes you think I
 9    wouldn't stay it then?
10              MS. LEVENE:  Your Honor --
11              THE COURT:  I've already written one opinion in
12    bankruptcy that I had to undo because of the stupid mootness
13    issue.  So what makes you think I would want to run that risk
14    again?
15              MS. LEVENE:  I understand, your Honor.
16              THE COURT:  Hypothetically.
17              MS. LEVENE:  If we're in that position, that's, you
18    know, what we'll do.  And you know, we need to make sure we
19    know sufficiently in advance to be able to come and do that.
20              THE COURT:  Agreed.
21              MS. LEVENE:  But we are --
22              THE COURT:  Absolutely agreed.
23              MS. LEVENE:  We are concerned that there's no
24    guarantees of how the Second Circuit would view the actions
25    being taken now.
```

**A.840**

LacWpurO

1          THE COURT:  OK.  All right.

2          Now, you wanted to say something, for the state of

3     Washington, *et al.*

4          MR. GOLD:  Thank you, your Honor.

5          THE COURT:  Hello, Mr. Gold.

6          MR. GOLD:  Your Honor, I just want to observe that

7     Mr. Huebner made some eloquent statements about the position of

8     the debtors with respect to how I would just generally

9     characterize how the events that he's referring to could not

10    lead to equitable mootness; he never would argue that it would

11    lead to equitable mootness, ought to be bound to that

12    statement, and I just think it would be helpful for the record

13    because all of the other parties who are claiming they are

14    appellees who are here in the courtroom, it would be helpful

15    for them to state for the record that they agree with

16    Mr. Huebner's position rather than have the Court simply take

17    what Mr. Huebner's articulated and have some other party say I

18    didn't say anything at the hearing, I reserved the right to --

19         THE COURT:  Oh, believe me.  If it came to that, it

20    would have to be in writing, signed by everybody, or there

21    would be --

22         MR. GOLD:  Thank you, your Honor.

23         MR. ECKSTEIN:  Your Honor, may I be heard?

24         THE COURT:  Mr. Eckstein.

25         MR. ECKSTEIN:  Your Honor, good afternoon.

**A.841**

LacWpurO

On behalf of the *ad hoc* committee of governmental
claimants, thank you for the opportunity to be heard, your
Honor.

Your Honor, I do not think I need to belabor what has
already been a long hearing.  I'm not going to try not to
repeat.  Mr. Huebner, I believe, has very, very effectively and
accurately described the sentiments of all of the parties on
the appellees' side.  I do respect Mr. Gold's comments, and I
do want to try to appeal to your Honor to make sure you
appreciate what is actually happening over the near term.

First of all, I'm going to respond directly to
Mr. Gold's suggestion, and I'm going to represent on behalf of
my client that we completely subscribe to the view that the
events that are taking place over the next few weeks, the
ministerial acts, the ordinary-course steps that are being
taken to prepare the company in the event we have the
opportunity to emerge will not be a basis for my clients to
assert equitable mootness in any court, and that should be
unequivocal.  And that was our position several weeks ago in
front of Judge Drain.  That was included in Judge Drain's order
and it should be represented again here so your Honor knows
that is the case, and I agree it should be done in writing,
because it's an important issue and there should be no
confusion.

The reason, your Honor, why I rise to make it clear

1    that is our view is because it is, in fact, critical to the

2    work that we've been doing over the past two years in this case

3    and in particular over the last several months.  It is critical

4    to allow us to continue to at least move this case to a

5    position where, assuming ultimately the order is affirmed, we

6    have the ability to go effective, because it is critical that

7    this plan go effective.  Every month of delay is costing tens

8    of millions of dollars for this estate.

9              What are we doing over the next couple of weeks?

10             Your Honor, in my case, for example, we're in the

11   process of interviewing very, very significant individuals who

12   are being considered to become members of the board of the new

13   company that will be created out of old Purdue.  That is a very

14   significant responsibility.  We're dealing with people of

15   national reputation.  We have an outside search firm that has

16   been doing this for months.  And your Honor, respectfully,

17   there's concern that in the face of a stay imposed by your

18   Honor, we may be precluded from taking any further steps to

19   complete the seating of this board.

20             Now, obviously, the board's not going to take any

21   responsibility for this company until the plan goes effective,

22   but I think as your Honor can appreciate, it takes weeks, if

23   not longer, to get people comfortable with taking this

24   responsibility on.  What does it mean, dealing with the

25   posteffective date insurance, all of the other factors that go

LacWpurO

1    into setting up a new company?

2            There are trusts that are being created.  We have to

3    identify trustees who will be responsible for disbursing

4    billions and billions of dollars to the states, municipalities,

5    the hospitals, the third-party payors and the individuals, each

6    of whom are beneficiaries of this plan.  This is a complicated

7    infrastructure.  All we want to make sure is that we have the

8    ability not to lose precious time.

9            One of the important parts of this settlement was a

10   conclusion by all the parties who support it that it is time to

11   put the billions of dollars that we have available through this

12   plan to the benefit of abating the opioid crisis.  It's taken a

13   long time, because as Mr. Huebner said, this case is the

14   product of scores of individual settlements that have been

15   reached between multiple constituencies.  My clients dedicated

16   themselves for two years, working with the UCC, working with

17   the debtors, working with the MSGE, working with all the other

18   private groups to reach settlements as to how we can try to

19   implement a plan.

20           That was a very, very monumental task, and remarkably,

21   it was done consensually.  And I think as your Honor

22   appreciates, that is not always the case, but it was done

23   consensually, which is the reason why the only issue, the only

24   real issue that your Honor is going to have to contend with is

25   whether or not the legal issue of the third-party release, all

1    the other issues essentially were resolved.  So we genuinely

2    are hoping that we will have the ability for this plan to go

3    effective, and we urge the Court to give us the flexibility

4    that we believe is reasonable to take these ministerial steps

5    based upon the understanding that all of the appellees in this

6    case, the debtors, UCC and everybody else, is going to confirm,

7    orally and in writing, that none of these steps are going to

8    give rise to an argument for equitable mootness, and I wanted

9    to make sure that that is clear.

10          At the appropriate time, your Honor, as Mr. Huebner

11   says, we'll describe for your Honor the billions of dollars

12   that we've negotiated to come out -- to come out -- from both

13   Purdue and from the Sacklers as part of this settlement for the

14   benefit of abating the opioid crisis and for the benefit of

15   paying the individual private creditors who are the

16   beneficiaries of this plan.  And we believe that staying

17   that -- once the plan can go effective, we believe staying that

18   will cause dramatic, dramatic harm.  But that is not something

19   that we have to confront today.  All we want to focus on today

20   is making sure that we have the ability to continue to put the

21   building blocks in place, none of which -- none of which --

22   will give rise to equitable mootness, and we believe that

23   therefore there shouldn't be a stay of those items, coupled

24   with the representation that we can't go effective, as your

25   Honor has heard, until early December.

LacWpurO

1        THE COURT:  OK.

2        MR. ECKSTEIN:  Hopefully that's a little bit of

3    context.

4        THE COURT:  Got it.

5        MR. ECKSTEIN:  I don't want to be --

6        THE COURT:  I've got it.

7        MR. HUEBNER:  Your Honor, let me make it a bit easier.

8        We're happy -- the debtors are in sole control of

9    sending further funds out under the funding motion.  As it

10   happens, as I described before, it's entirely for ministerial

11   items, and most of it has already gone, because the order was

12   entered weeks ago.  If your Honor would be more comfortable

13   having the debtors not use the small amounts of remaining money

14   under that order, we'd be happy to.  That's the only thing we

15   know of that is actually happening.  But your Honor, to be

16   clear, we're sort of in a double through the looking glass

17   world right now.

18       Equitable mootness is a doctrine that says that when

19   there's a comprehensive, irreversible change in circumstances

20   that cannot possibly be undone, that's the effective date of a

21   plan.

22       THE COURT:  I know that.

23       MR. HUEBNER:  Courts have said that for 25 years.

24       THE COURT:  I know that.

25       MR. HUEBNER:  And the second thing, your Honor, is you

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

**A.846**

LacWpurO

1   keep asking what is happening before November 9 that is an
2   emergency that I need to issue an extraordinary order to stop,
3   and the answer is nothing.
4              THE COURT:  OK.
5              MR. HUEBNER:  It's just that simple.
6              THE COURT:  OK.  All right.
7              MR. ECKSTEIN:  Your Honor, thank you very much.
8              THE COURT:  I've got what I need.
9              If you must.
10             MR. EDMUNDS:  Your Honor, very briefly.
11             I would just like to note we weren't sure what to do
12  following this Court's order Sunday night.  We have, the states
13  have slightly different arguments and slightly, have
14  articulated different reasons in their own stay motions before
15  the bankruptcy court, and I think just one of them at least is
16  relevant here, and that is that this -- the states that have
17  objected to this settlement.  Those states believe that the
18  settlement is not adequate to do what we need to do to rein in
19  the opioid crisis the conduct has created.
20             THE COURT:  OK.
21             MR. EDMUNDS:  Courts have held that any time that we
22  are enjoined from exercising our police powers there is
23  irreparable harm, but the bigger irreparable harm may be what
24  if everyone is wrong.
25             THE COURT:  People, people, I've really --

LacWpurO

```
 1            MR. EDMUNDS:  What if -- I mean no one is
 2    guaranteeing, and I might agree that it's unlikely the actions
 3    in the next month will equitably moot the case, but what if
 4    we're all wrong?  A court can't determine the preclusive effect
 5    of its own judgment.  I've cited that many times in a different
 6    area of the law, but I think the same principle is applicable
 7    here.  What if we're wrong?  There may be a harm that comes
 8    from the fact that we haven't gotten enough or we haven't
 9    deterred conduct sufficiently to take care of this massive
10    crisis that we face.  And that's an additional concern that the
11    states have that I think warrants, given the significance of
12    this case to the public health, a stay so that we know that we
13    are going forward with the right plan when we are, the plan
14    that will ultimately be approved and we do not run the risk
15    that we're going forward with one that is wrong and that we'll
16    be stuck with all the same.
17            Thank you, your Honor.
18            MR. HUEBNER:  Your Honor, with respect to Mr. Edmunds,
19    I'm actually so glad he spoke up, because what it shows even
20    more clearly than until a few minutes ago is that there are
21    different arguments on the propriety of the stay that no one
22    has even briefed yet.  As it happens, we're ready to explain
23    those relevant cases to Judge Drain because we think they do
24    not remotely stand for the principle for which Mr. Edmunds
25    cited them, but the whole point is he hasn't even filed his
```

LacWpurO

1  papers yet in this court because they're down below before the

2  trial court who is ready to hear this in three and a half weeks

3  where we can actually have due process.  And that's the

4  ultimate irony, that many of the appellants' core position is a

5  denial of due process in some cases on behalf of people who do

6  not exist, and we will show this Court that on the merits, that

7  the alleged victims U.S. trustee's seeking to protect don't

8  exist.  But the appellees also deserve due process.

9           THE COURT:  Mr. Huebner, please.

10          MR. HUEBNER:  Thank you, your Honor.

11          THE COURT:  Yes, sir.

12          MR. SHORE:  Your Honor, very briefly.

13          On behalf of the *ad hoc* group of individual victims, I

14  just want to focus on one thing that's getting lost, and it

15  sounds like Mr. Huebner was willing to give it away when he

16  says we're not going to spend any more money on advances.  We

17  were the ones who came up with the advances order.  We drafted

18  the motion for the debtors and we asked them to file it, and it

19  was to address one irony in all this case.  Everybody else in

20  this room is either being funded through the debtors' estate,

21  all of their fees and expenses, or is a state or the federal

22  government.

23          We are a group of individual victims out of whose

24  money, out of whose pockets any money needs to be spent to

25  start advancing.  So we came to the debtors with a very

LacWpurO

1    definitive budget of $4,012,500, broken down into categories I

2    can bring to your Honor, all of which needs to be spent before

3    the trust can get up and running and get money out to victims.

4    No one's going to say here that victims should be denied money

5    when it's ready to go, and every day that we're delayed in

6    spending money on getting this up and running is a day that

7    victims won't get money.

8             So I'm just going to implore your Honor that we don't

9    need a stay of this.  It's $4,012,500, which is probably about

10   a week of money that the debtors are spending on the

11   professionals in this room, because everybody's getting funded.

12   We're not.  If we don't get the money, we can't do it.  If we

13   don't do it, there's going to be more delay.  So I haven't

14   heard an argument, particularly when the order itself by which

15   the debtors were given authority to advance the money to us,

16   any argument as to how that's going to scramble an egg or do

17   anything else when the order itself says that no party can rely

18   on it for equitable mootness, which is something we were, of

19   course, willing to give up because who would ever argue that.

20            So as they exist right now, I think the TRO would

21   prevent the debtors from doing that, and as I said, I implore

22   your Honor, there is no need to extend that order, because that

23   is just keeping money out of the hands of victims if we're

24   right in the appeal, which we think we are.

25            THE COURT:  Which you think you are and other people

LacWpurO

```
 1   think you're not, and the one thing I won't compromise is my
 2   ability to decide that.  OK?  At least until you take it away
 3   from me and send it to a different court and then they can do
 4   whatever they want.
 5           You'll have a decision tomorrow.  The TRO's extended
 6   for one day, and that's that.
 7           Thank you.  Very educational.
 8           What else do we have on the agenda today?
 9           MR. KAMINETZKY:  Your Honor, that was our last agenda
10   item.
11           THE COURT:  Oh, really.  That's wonderful.
12           I've chaired many meetings over the last five years.
13   Do we have any new business?
14           Good.  I'm delighted.  Excellent.
15           It is a pleasure meeting you all.  It was lovely
16   seeing some of your faces.  It will be great to work with you
17   if that's the way it comes out, and someone should let me know
18   what happens on Thursday with Judge Drain.  OK?
19           All right.  Great.  Thank you, all, very much.
20           Thank you, California, for being here.
21           MS. LEVENE:  Thank you, your Honor.
22           (Adjourned)
23
24
25
```

Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-23649-rdd

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    PURDUE PHARMA L.P.,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                 United States Bankruptcy Court

13                 300 Quarropas Street, Room 248

14                 White Plains, NY 10601

15

16                 November 9, 2021

17                 9:49 AM

18

19

20

21   B E F O R E :

22   HON ROBERT D. DRAIN

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ART

Page 2

1    HEARING re Order signed on 11/3/2021 Establishing Procedures

2    for Remote Hearing on Motions for Stay Pending Appeal with

3    hearing to be held on 11/9/2021 at 10:00 AM at

4    Videoconference (ZoomGove) (RDD)

5

6    HEARING re Notice of Agenda / Agenda for November 9, 2021

7    Hearing

8

9    HEARING re Motion for Stay Pending Appeal / Memorandum of

10   Law In Support of United States Trustees Expedited Motion

11   for a Stay of Confirmation Order and Related Orders Pending

12   Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007

13   (related document(s)3777, 3776) filed by Linda Rifkin on

14   behalf of United States Trustee. (ECF #3778)

15

16   HEARING re Objection to Motion / Ad Hoc Committee's

17   Objection to Stay Motions (related document(s)3801, 3873,

18   3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein

19   on behalf of Ad Hoc Committee of Governmental and Other

20   Contingent Litigation Claimants. (ECF #4002)

21

22   HEARING re Opposition Tribal Group Joinder in Opposition to

23   Stay Motions filed by Peter D'Apice on behalf of Certain

24   Native American Tribes and Others (ECF #4003)

25

Page 3

1    HEARING re Opposition of the Official Committee of Unsecured

2    Creditors to Motions for Stay Pending Appeal (related

3    document(s) 3801, 3873, 3789, 3845) filed by Ira S.

4    Dizengoff on behalf of The Official Committee of Unsecured

5    Creditors of Purdue Pharma L.P., et al. (ECF #4006)

6

7    HEARING re Opposition The Ad Hoc Committee of NAS Children's

8    Joinder to Opposition of the Official Committee of Unsecured

9    Creditors to Motions for Stay Pending Appeal (related

10   document(s)4006) filed by Harold D. Israel on behalf of Ad

11   Hoc Committee of NAS Babies. (ECF #4009)

12

13   HEARING re Opposition Joinder of the Private Insurance

14   Ratepayers to Opposition of the Official Committee of

15   Unsecured Creditors to Motions for Stay Pending Appeal

16    (related document(s)3801, 3873, 3789, 3845) filed by

17   Nicholas F. Kajon on behalf of Eric, Hestrup, et al.

18    (ECF #4010)

19

20   HEARING re Opposition /Joinder (related document(s)4006)

21   filed by Lauren Guth Barnes on behalf of Blue Cross Blue

22   Shield Association. (ECF #4011)

23

24

25

Page 4

1   HEARING re Objection to Motion /The Ad Hoc Group of

2   Individual Victims' (I) Objection to the United States

3   Trustee's and Certain Public Creditors' Motion for Stay

4   Pending Appeal and (II) Joinder in the Opposition of the

5   Official Committee of Unsecured Creditors to Motions for

6   Stay Pending Appeal (related document(s)3873, 3972, 3789,

7   3845) filed by J. Christopher Shore on behalf of Ad Hoc

8   Group of Individual Victims of Purdue Pharma L.P.

9   (ECF #4012)

10

11  HEARING re Memorandum of Law/Debtors' Memorandum of Law in

12  Opposition to the Motions for Stays of the Confirmation

13  Order and the Advance Order Pending Appeal (related .

14  document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845)

15  filed by Marshall Scott Huebner on behalf of Purdue Pharma

16  L.P. (ECF #4014)

17

18  HEARING re Opposition of the MSGE Group to the Motions to

19  Stay Pending Appeal (related document(s)3801, 3873, 3890,

20  3789, 3860, 3845) filed by Kevin C. Maclay on behalf

21  of Multi-State Governmental Entities Group. (ECF #4016)

22  Opposition - Joinder to the Opposition of the Official

23  Committee of Unsecured Creditors to Motions for Stay Pending

24  Appeal (related document(s)4006) filed by Michael Patrick

25  O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #4017)

Page 5

1    HEARING re Reply to Motion Reply in Support of United States

2    Trustee's Motion for a Stay of Confirmation Order and

3    Related Orders Pending Appeal Pursuant to Federal Rule of

4    Bankruptcy Procedure 8007 (related document(s)3801, 3972,

5    3778) filed by Paul Kenan Schwartzberg on behalf of United

6    States Trustee. (ECF #4050)

7

8    Related Documents:

9    Order signed on 9/15/2021 Granting Motion (I) Authorizing

10   the Debtors to Fund Establishment of the Creditor Trusts,

11   the Master Disbursement Trust and Topco, (II) Directing

12   Prime Clerk LLC to Release Certain Protected Information,

13   and (III) Granting Other Related Relief (Related Doc# 3484).

14   (ECF #3773)

15

16   HEARING re Motion to Shorten Time United States Trustees Ex

17   Parte Motion For An Order Shortening Notice And Scheduling

18   Hearing With Respect To The United States Trustees Expedited

19   Motion For A Stay Of Confirmation Order And Related Orders

20   Pending Appeal Pursuant To Federal Rule Of Bankruptcy

21   Procedure 8007 (related document(s)3 778) filed by Linda

22   Riffkin on behalf of United States Trustee.(ECF #3779)

23

24

25

Page 6

1    HEARING re Modified Bench Ruling On For Confirmation Of

2    Eleventh Amended Joint Chapter 11 Plan Signed on 9/17/2021.

3    (ECF #3786)

4

5    HEARING re Findings Of Fact, Conclusions Of Law, And Order

6    Confirming The Twelfth Amended Joint Chapter 11 Plan Of

7    Reorganization Of Purdue Pharma L.P. And Its Affiliated

8    Debtors Signed On 9/17/2021 (related document(s)3726).

9    (ECF #3787)

10

11   HEARING re Amended Motion for Stay Pending Appeal/ Amended

12   Memorandum of Law In Support Of United States Trustee's

13   Expedited Motion For A Stay Of Confirmation Order And

14   Related Orders Pending Appeal Pursuant To Federal Rule Of

15   Bankruptcy Procedure 8007 (related document(s)3799, 3777,

16   3776, 3778, 3779) filed by Linda Riffkin on behalf of United

17   States Trustee. (ECF #3801)

18

19   HEARING re Motion to Stay/ Memorandum of Law in Support of

20   United States Trustee's Expedited Motion to Extend the

21   Automatic Stay of the Confirmation Order and for a Limited

22   Stay of the Related Orders Pending Resolution of His

23   Expedited Motion for a Stay Pending Appeal (related

24   document(s)3786, 3787, 3773) filed by Linda Riffkin on

25   behalf of United States Trustee. (ECF #3803)

Page 7

1   HEARING re Motion to Shorten Time I United States Trustees

2   Ex Parte Motion for an Order Shortening Notice and

3   Scheduling Hearing with Respect to the United States

4   Trustee's Expedited Motion to Extend the Automatic Stay of

5   the Confirmation Order and for a Limited Stay of the Related

6   Orders Pending Resolution of His Expedited Motion for a

7   Stay Pending Appeal (related document(s)3803) filed by Linda

8   Riffkin on behalf of United States Trustee. (ECF #3804)

9

10   HEARING re Statement/ Notice of Listen-Only Dial-in for

11   Status and Scheduling Conference (related document(s)3779)

12   filed by Eli J. Vonnegut on behalf of Purdue Pharma L.P.

13   (ECF #3838)

14

15   HEARING re Motion for Stay Pending Appeal / Second Amended

16   Memorandum Of Law In Support Of United States Trustees

17   Amended Expedited Motion For A Stay Of Confirmation

18   Order And Related Orders Pending Appeal Pursuant To Federal

19   Rule Of Bankruptcy Procedure 8007 (related document(s)3801,

20   3778) filed by Brian S. Masumoto on behalf of United States

21   Trustee. (ECF #3972)

22

23

24

25

Page 8

1    HEARING re Motion for Stay Pending Appeal/ Blackline Second

2    Amended Memorandum Of Law In Support Of United States

3    Trustees Amended Expedited Motion For A Stay Of Confirmation

4    Order And Related Orders Pending Appeal Pursuant To Federal

5    Rule Of Bankruptcy Procedure 8007 (related document(s)3972)

6    filed by Brian S. Masumoto on behalf of United States

7    Trustee. (ECF #3973)

8

9    HEARING re Objection to Motion / Ad Hoc Committee's

10   Objection to Stay Motions (related document(s)3801, 3873,

11   3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein

12   on behalf of Ad Hoc Committee of Governmental and Other

13   Contingent Litigation Claimants. (ECF #4002)

14

15   HEARING re Declaration of Cheryl Juaire in Support of the

16   Opposition of the Official Committee of Unsecured Creditors

17   to Motions for Stay Pending Appeal (related document(s)4006)

18   filed by Ira S. Dizengoff on behalf of The Official

19   Committee of Unsecured Creditors of Purdue Pharma L.P., et

20   al. (ECF #4007)

21

22

23

24

25

Page 9

1     HEARING re Declaration of Kara Trainor in Support of the

2     Opposition of the Official Committee of Unsecured Creditors

3     to Motions for Stay Pending Appeal (related document(s)4006)

4     filed by Ira S. Dizengoff on behalf of The Official

5     Committee of Unsecured Creditors of Purdue Pharma L.P., et

6     al. (ECF #4008)

7

8     HEARING re Motion to Allow/ Debtors' Motion for Leave to

9     Exceed the Page Limit in Filing Memorandum of Law in

10    Opposition to the Motions for Stays of the Confirmation

11    Order and the Advance Order Pending Appeal filed by Marc

12    Joseph Tobak on behalf of Purdue Pharma L.P. (ECF #4013)

13

14    HEARING re Declaration of Jesse DelConte (related

15    document(s)4014) filed by Marshall Scott Huebner on behalf

16    of Purdue Pharma L.P. (ECF #4015)

17

18    HEARING re Opposition of the MSGE Group to the Motions to

19    Stay Pending Appeal (related document(s)3801, 3873, 3890,

20    3789, 3860, 3845) filed by Kevin C. Maclay on behalf

21    of Multi-State Governmental Entities Group. (ECF #4016)

22

23

24

25

1   HEARING re Amended Statement Supplemental Designation of

2   Record in Rebuttal and in Support of United States Trustee's

3   Second Amended Expedited Motion for a Stay of Confirmation

4   Order and Related Orders Pending Appeal Pursuant to Federal

5   Rule of Bankruptcy Procedure 8007 (related document(s)3972)

6   filed by Paul Kenan Schwartzberg on behalf of United States

7   Trustee. (ECF #4043)

8

9   HEARING re Motion to Allow Motion to Exceed Page Limit in

10  Filing Reply in Support of United States Trustee's Motion

11  for a Stay of Confirmation Order and Related Orders Pending

12  Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007

13  filed by Paul Kenan Schwartzberg on behalf of United States

14  Trustee. (ECF #4049)

15

16  HEARING re Motion for Stay Pending Appeal (related

17  document(s)3786, 3787, 3773) filed by Matthew J. Gold on

18  behalf of State of Washington.(ECF #3789)

19

20  Responses Received:

21  Objection to Motion/ Ad Hoc Committee's Objection to Stay

22  Motions (related document(s)3801, 3873, 3972, 3789, 3778,

23  3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc

24  Committee of Governmental and Other Contingent Litigation

25  Claimants. (ECF #4002)

Page 11

1

2     HEARING re Opposition Tribal Group Joinder in Opposition to

3     Stay Motions filed by Peter D'Apice on behalf of Certain

4     Native American Tribes and Others. (ECF #4003)

5

6     HEARING re Opposition of the Official Committee of Unsecured

7     Creditors to Motions for Stay Pending Appeal (related

8     document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff

9     on behalf of The Official Committee of Unsecured Creditors

10    of Purdue Pharma L.P., et al.(ECF #4006)

11

12    HEARING re Opposition The Ad Hoc Committee of NAS Children's

13    Joinder to Opposition of the Official Committee of Unsecured

14    Creditors to Motions for Stay Pending Appeal (related

15    document(s)4006) filed by Harold D. Israel on behalf of Ad

16    Hoc Committee of NAS Babies. (ECF #4009)

17

18    HEARING re Opposition Joinder of the Private Insurance

19    Ratepayers to Opposition of the Official Committee of

20    Unsecured Creditors to Motions for Stay Pending Appeal

21    (related document(s)3801, 3873, 3789, 3845) filed by

22    Nicholas F. Kajon on behalf of Eric Hestrup, et al.

23    (ECF #4010)

24

25

Page 12

1    HEARING re Opposition /Joinder (related document(s)4006)

2    filed by Lauren Guth Barnes on behalf of Blue Cross Blue

3    Shield Association. (ECF #4011)

4

5    HEARING re Objection to Motion /The Ad Hoc Group of

6    Individual Victims' (I) Objection to the United States

7    Trustee's and Certain Public Creditors' Motion for Stay

8    Pending Appeal and (II) Joinder in the Opposition of the

9    Official Committee of Unsecured Creditors to Motions for

10   Stay Pending Appeal (related document(s)3873, 3972, 3789,

11   3845) filed by J. Christopher Shore on behalf of Ad Hoc

12   Group of Individual Victims of Purdue Pharma L.P.

13   (ECF #4012)

14

15   HEARING re Memorandum of Law/ Debtors' Memorandum of Law in

16   Opposition to the Motions for Stays of the Confirmation

17   Order and the Advance Order Pending Appeal (related

18   document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845)

19   filed by Marshall Scott Huebner on behalf of Purdue Pharma

20   L.P. (ECF #4014)

21

22   HEARING re Opposition of the MSGE Group to the Motions to

23   Stay Pending Appeal (related document(s)3801, 3873, 3890,

24   3789, 3860, 3845) filed by Kevin C. Maclay on behalf

25   of Multi-State Governmental Entities Group. (ECF #4016)

Page 13

```
 1    HEARING re Opposition - Joinder to the Opposition of the
 2    Official Committee of Unsecured Creditors to Motions for
 3    Stay Pending Appeal (related document(s)4006) filed by
 4    Michael Patrick O'Neil on behalf of Ad Hoc Group of
 5    Hospitals. (ECF #4017)
 6
 7    Related Documents:
 8    Modified Bench Ruling On Confirmation Of Eleventh Amended
 9    Joint Chapter 11 Plan Signed on 9/17/2021. (ECF #3786)
10
11    HEARING re Findings Of Fact, Conclusions Of Law, And Order
12    Confirming The Twelfth Amended Joint Chapter 11 Plan Of
13    Reorganization Of Purdue Pharma L.P. And Its Affiliated
14    Debtors Signed On 9/17/2021 (related document(s)3726).
15     (ECF #3787)
16
17    HEARING re Objection to Motion/ Ad Hoc Committee's Objection
18     to Stay Motions (related document(s)3801, 3873, 3972, 3789,
19     3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of
20     Ad Hoc Committee of Governmental and Other Contingent
21     Litigation Claimants. (ECF #4002)
22
23
24
25
```

Page 14

1   HEARING re Objection to Motion I Ad Hoc Committee's

2   Objection to Stay Motions (related document(s)3801, 3873,

3   3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein I

4   on behalf of Ad Hoc Committee of Governmental and Other

5   Contingent Litigation Claimants. (ECF #4002)

6

7   HEARING re Declaration of Cheryl Juaire in Support of the

8   Opposition of the Official Committee of Unsecured Creditors

9   to Motions for Stay Pending Appeal (related document(s)4006)

10  filed by Ira S. Dizengoff on behalf of The Official

11  Committee of Unsecured Creditors of Purdue Pharma L.P., et

12  al. (ECF #4007)

13

14  HEARING re Declaration of Kara Trainor in Support of the

15  Opposition of the Official Committee of Unsecured Creditors

16  to Motions for Stay Pending Appeal (related document(s)4006)

17  filed by Ira S. Dizengoff on behalf of The Official

18  Committee of Unsecured Creditors of Purdue Pharma L.P., et

19  al. (ECF #4008)

20

21  HEARING re Motion to Allow/ Debtors' Motion for Leave to

22  Exceed the Page Limit in Filing Memorandum of Law in

23  Opposition to the Motions for Stays of the Confirmation

24  Order and the Advance Order Pending Appeal filed by Marc

25  Joseph Tabak on behalf of Purdue Pharma L.P. (ECF #4013)

Page 15

1    HEARING re Declaration of Jesse DelConte (related

2    document(s)4014) filed by Marshall Scott. Huebner on behalf

3    of Purdue Pharma L.P. (ECF #4015)

4

5    HEARING re Opposition of the MSGE Group to the Motions to

6    Stay Pending Appeal (related document(s)3801, 3873, 3890,

7    3789, 3860, 3845) filed by Kevin C. Maclay on behalf of

8    Multi-State Governmental Entities Group. (ECF #4016)

9

10   HEARING re Reply to Motion Reply in Further Support of

11   Motion of the States of Washington and Connecticut for a

12   Stay Pending Appeal filed by Matthew J. Gold on behalf of

13   State of Washington. (ECF #4051)

14

15   HEARING re Motion for Stay Pending Appeal of Confirmation

16   and Trust Advances Orders filed by Brian Edmunds on behalf

17   of State Of Maryland. (ECF #3845)

18

19   Responses Received:

20   Objection to Motion/ Ad Hoc Committee's Objection to Stay

21   Motions (related document(s)3801, 3873, 3972, 3789, 3778,

22   3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc

23   Committee of Governmental and Other Contingent Litigation

24   Claimants. (ECF #4002)

25

Page 16

1    HEARING re Opposition Tribal Group Joinder in Opposition to

2    Stay Motions filed by Peter D'Apice on behalf of Certain

3    Native American Tribes and Others. (ECF #4003)

4

5    HEARING re Opposition of the Official Committee of Unsecured

6    Creditors to Motions for Stay Pending Appeal (related

7    document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff

8    on behalf of The Official Committee of Unsecured Creditors

9    of Purdue Pharma L.P., et al. (ECF #4006)

10

11   HEARING re Opposition The Ad Hoc Committee of NAS Children's

12   Joinder to Opposition of the Official Committee of Unsecured

13   Creditors to Motions for Stay Pending Appeal (related

14   document(s)4006) filed by Harold D. Israel on behalf of Ad

15   Hoc Committee of NAS Babies. (ECF #4009)

16

17   HEARING re Opposition Joinder of the Private Insurance

18   Ratepayers to Opposition of the Official Committee of

19   Unsecured Creditors to Motions for Stay Pending Appeal

20   (related document(s)3801, 3873, 3789, 3845) filed by

21   Nicholas F. Kajon on behalf of Eric Hestrup, et al.

22   (ECF #4010)

23

24

25

Page 17

1    HEARING re Opposition /Joinder (related document(s)4006)

2    filed by Lauren Guth Barnes on behalf of Blue Cross Blue

3    Shield Association. (ECF #4011)

4

5    HEARING re Objection to Motion /The Ad Hoc Group of

6    Individual Victims' (I) Objection to the United States

7    Trustee's and Certain Public Creditors' Motion for Stay

8    Pending Appeal and (II) Joinder in the Opposition of the

9    Official Committee of Unsecured Creditors to Motions for

10   Stay Pending Appeal (related document(s)3873, 3972, 3789,

11   3845) filed by J. Christopher Shore on behalf of Ad Hoc

12   Group of Individual Victims of Purdue Pharma L.P.

13   (ECF #4012)

14

15   HEARING re Memorandum of Law/ Debtors' Memorandum of Law in

16   Opposition to the Motions for Stays of the Confirmation

17   Order and the Advance Order Pending Appeal (related

18   document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845)

19   filed by Marshall Scott Huebner on behalf of Purdue Pharma

20   L.P. (ECF #4014)

21

22   HEARING re Opposition of the MSGE Group to the Motions to

23   Stay Pending Appeal (related document(s)3801, 3873, 3890,

24   3789, 3860, 3845) filed by Kevin C. Maclay on behalf

25   of Multi-State Governmental Entities Group. (ECF #4016)

```
                                              Page 18

1    HEARING re Opposition - Joinder to the Opposition of the

2    Official Committee of Unsecured Creditors to Motions for

3    Stay Pending Appeal (related document(s)4006) filed by

4    Michael Patrick O'Neil on behalf of Ad Hoc Group of

5    Hospitals. (ECF #4017)

6

7    HEARING re Reply to Motion for a Stay of Confirmation and

8    Trust Advances Orders Pending ;I Appeal (related

9    document(s)3801, 3973, 3873, 3972, 3789, 3778, 3860, 3803,

10   3845) filed by Brian Edmunds on behalf of State Of Maryland.

11   (ECF #4048)

12

13   HEARING re Related Documents:

14   Order signed on 9/15/2021 Granting Motion (I) Authorizing

15   the Debtors to Fund Establishment of the Creditor Trusts,

16   the Master Disbursement Trust and Topco, (II) Directing

17   Prime Clerk LLC to Release Certain Protected Information,

18   and (III) Granting Other elated Relief (Related Doc# 3484).

19   (ECF #3773)

20

21   HEARING re Modified Bench Ruling On For Confirmation Of

22   Eleventh Amended Joint Chapter 11 Plan Signed on 9/17/2021.

23   (ECF #3786)

24

25
```

Page 19

1    HEARING re Findings Of Fact, Conclusions Of Law, And Order

2    Confirming The Twelfth Amended Joint Chapter 11 Plan Of

3    Reorganization Of Purdue Pharma L.P. And Its Affiliated

4    Debtors Signed On 9/17/2021 (related document(s)3726).

5    (ECF #3787)

6

7    HEARING re Objection to Motion I Ad Hoc Committee's

8    Objection to Stay Motions (related document(s)3801, 3873,

9    3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein

10   on behalf of Ad Hoc Committee of Governmental and Other

11   Contingent Litigation Claimants. (ECF #4002)

12

13   HEARING re Declaration of Cheryl Juaire in Support of the

14   Opposition of the Official Committee of Unsecured Creditors

15   to Motions for Stay Pending Appeal (related document(s)4006)

16   filed by Ira S. Dizengoff on behalf of The Official

17   Committee of Unsecured Creditors of Purdue Pharma L.P., et

18   al. (ECF #4007)

19

20   HEARING re Declaration of Kara Trainor in Support of the

21   Opposition of the Official Committee of Unsecured Creditors

22   to Motions for Stay Pending Appeal (related document(s)4006)

23   filed by Ira S. Dizengoff on behalf of The Official

24   Committee of Unsecured Creditors of Purdue Pharma L.P., et

25   al. (ECF #4008)

1    HEARING re Motion to Allow/ Debtors' Motion for Leave to

2    Exceed the Page Limit in Filing Memorandum of Law in

3    Opposition to the Motions for Stays of the Confirmation

4    Order and the Advance Order Pending Appeal filed by Marc

5    Joseph Tabak on behalf of Purdue Pharma L.P. (ECF #4013)

6

7    HEARING re Declaration of Jesse Del Conte ( related

8    document( s )4014) filed by Marshall Scott Huebner on behalf

9    of Purdue Pharma L.P. (ECF #4015)

10

11   HEARING re Opposition of the MSGE Group to the Motions to

12   Stay Pending Appeal (related document(s)3801, 3873, 3890,

13   3789, 3860, 3845) filed by Kevin C. Maclay on behalf of

14   Multi-State Governmental Entities Group. (ECF #4016)

15

16   HEARING re Motion for Stay Pending Appeal (related

17   document(s)3810, 3847) filed by Ronald Bass Sr. (ECF #3860)

18

19   HEARING re Responses Received:

20   Objection to Motion/ Ad Hoc Committee's Objection to Stay

21   Motions (related document(s)3801, 3873, 3972, 3789, 3778,

22   3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc

23   Committee of Governmental and Other Contingent Litigation

24   Claimants. (ECF #4002)

25

Page 21

1    HEARING re Opposition Tribal Group Joinder in Opposition to

2    Stay Motions filed by Peter D'Apice on behalf of Certain

3    Native American Tribes and Others. (ECF #4003)

4

5    HEARING re Opposition of the Official Committee of Unsecured

6    Creditors to Motions for Stay Pending Appeal (related

7    document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff

8    on behalf of The Official Committee of Unsecured Creditors

9    of Purdue Pharma L.P., et al. (ECF #4006)

10

11   HEARING re Opposition The Ad Hoc Committee of NAS Children's

12   Joinder to Opposition of the Official Committee of Unsecured

13   Creditors to Motions for Stay Pending Appeal (related

14   document(s)4006) filed by Harold D. Israel on behalf of Ad

15   Hoc Committee of NAS Babies. (ECF #4009)

16

17   HEARING re Opposition Joinder of the Private Insurance

18   Ratepayers to Opposition of the Official Committee of

19   Unsecured Creditors to Motions for Stay Pending Appeal

20    (related document(s)3801, 3873, 3789, 3845) filed by

21   Nicholas F. Kajon on behalf of Eric Hestrup, et al.

22    (ECF #4010)

23

24

25

Page 22

1    HEARING re Opposition /Joinder (related document(s)4006)

2    filed by Lauren Guth Barnes on behalf of Blue Cross Blue

3    Shield Association. (ECF #4011)

4

5    HEARING re Objection to Motion /The Ad Hoc Group of

6    Individual Victims' (I) Objection to the United States

7    Trustee's and Certain Public Creditors' Motion for Stay

8    Pending Appeal and (II) Joinder in the Opposition of the

9    Official Committee of Unsecured Creditors to Motions for

10   Stay Pending Appeal (related document(s)3873, 3972, 3789,

11   3845) filed by J. Christopher Shore on behalf of Ad Hoc

12   Group of Individual Victims of Purdue Pharma L.P.

13   (ECF #4012)

14

15   HEARING re Memorandum of Law/ Debtors' Memorandum of Law in

16   Opposition to the Motions for Stays of the Confirmation

17   Order and the Advance Order Pending Appeal (related

18   document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845)

19   filed by Marshall Scott Huebner on behalf of Purdue Pharma

20   L.P. (ECF #4014)

21

22   HEARING re Opposition of the MSGE Group to the Motions to

23   Stay Pending Appeal (related document(s)3801, 3873, 3890,

24   3789, 3860, 3845) filed by Kevin C. Maclay on behalf

25   of Multi-State Governmental Entities Group. (ECF #4016)

Page 23

1    HEARING re Opposition - Joinder to the Opposition of the

2    Official Committee of Unsecured Creditors to Motions for

3    Stay Pending Appeal (related document(s)4006) filed by

4    Michael Patrick O'Neil on behalf of Ad Hoc Group of

5    Hospitals. (ECF #4017)

6

7    HEARING re Related Documents:

8    Modified Bench Ruling On Confirmation Of Eleventh Amended

9    Joint Chapter 11 Plan Signed on 9/17/2021.

10   (ECF #3786)

11

12   HEARING re Findings Of Fact, Conclusions Of Law, And Order

13   Confirming The Twelfth Amended Joint Chapter 11 Plan Of

14   Reorganization Of Purdue Pharma L.P. And Its Affiliated

15   Debtors Signed On 9/17/2021 (related document(s)3726).

16   (ECF #3787)

17

18   HEARING re Objection to Motion/ Ad Hoc Committee's Objection

19   to Stay Motions (related document(s)3801, 3873, 3972, 3789,

20   3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of

21   Ad Hoc Committee of Governmental and Other Contingent

22   Litigation Claimants. (ECF #4002)

23

24

25

Page 24

```
 1    HEARING re Objection to Motion I Ad Hoc Committee's

 2    Objection to Stay Motions (related document(s)3801, 3873,

 3    3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein

 4    on behalf of Ad Hoc Committee of Governmental and Other

 5    Contingent Litigation Claimants. (ECF #4002)

 6

 7    HEARING re Declaration of Cheryl Juaire in Support of the

 8    Opposition of the Official Committee of Unsecured Creditors

 9    to Motions for Stay Pending Appeal (related document(s)4006)

10    filed by Ira S. Dizengoff on behalf of The Official

11    Committee of Unsecured Creditors of Purdue Pharma L.P., et

12    al. (ECF #4007)

13

14    HEARING re Declaration of Kara Trainor in Support of the

15    Opposition of the Official Committee of Unsecured Creditors

16    to Motions for Stay Pending Appeal (related document(s)4006)

17    filed by Ira S. Dizengoff on behalf of The Official

18    Committee of Unsecured Creditors of Purdue Pharma L.P., et

19    al. (ECF #4008)

20

21    HEARING re Motion to Allow/ Debtors' Motion for Leave to

22    Exceed the Page Limit in Filing Memorandum of Law in

23    Opposition to the Motions for Stays of the Confirmation

24    Order and the Advance Order Pending Appeal filed by Marc

25    Joseph Tabak on behalf of Purdue Pharma L.P. (ECF #4013)
```

Page 25

1   HEARING re Declaration of Jesse DelConte (related

2   document(s)4014) filed by Marshall Scott Huebner on behalf

3   of Purdue Pharma L.P. (ECF #4015)

4

5   HEARING re Opposition of the MSGE Group to the Motions to

6   Stay Pending Appeal (related document(s)3801, 3873, 3890,

7   3789, 3860, 3845) filed by Kevin C. Maclay on behalf of

8   Multi-State Governmental Entities Group. (ECF #4016)

9

10  HEARING re Motion for Stay Pending Appeal filed by Allen J.

11  Underwood on behalf of Certain Canadian Municipality

12  Creditors and Canadian First Nation Creditors (ECF #3873)

13

14  Responses Received:

15  Objection to Motion/ Ad Hoc Committee's Objection to Stay

16  Motions (related document(s)3801, 3873, 3972, 3789, 3778,

17  3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc

18  Committee of Governmental and Other Contingent Litigation

19  Claimants. (ECF #4002)

20

21  HEARING re Opposition Tribal Group Joinder in Opposition to

22  Stay Motions filed by Peter D'Apice on behalf of Certain

23  Native American Tribes and Others. (ECF #4003)

24

25

Page 26

1    HEARING re Opposition of the Official Committee of Unsecured

2    Creditors to Motions for Stay Pending Appeal (related

3    document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff

4    on behalf of The Official Committee of Unsecured Creditors

5    of Purdue Pharma L.P., et al. (ECF #4006)

6

7    HEARING re Opposition The Ad Hoc Committee of NAS Children's

8    Joinder to Opposition of the Official Committee of Unsecured

9    Creditors to Motions for Stay Pending Appeal (related

10   document(s)4006) filed by Harold D. Israel on behalf of Ad

11   Hoc Committee of NAS Babies. (ECF #4009)

12

13   HEARING re Opposition Joinder of the Private Insurance

14   Ratepayers to Opposition of the Official Committee of

15   Unsecured Creditors to Motions for Stay Pending Appeal

16   (related document(s)3801, 3873, 3789, 3845) filed by

17   Nicholas F. Kajon on behalf of Eric Hestrup, et al.

18   (ECF #4010)

19

20   HEARING re Opposition /Joinder (related document(s)4006)

21   filed by Lauren Guth Barnes on behalf of Blue Cross Blue

22   Shield Association. (ECF #4011)

23

24

25

1    HEARING re Objection to Motion /The Ad Hoc Group of

2    Individual Victims' (I) Objection to the United States

3    Trustee's and Certain Public Creditors' Motion for Stay

4    Pending Appeal and (II) Joinder in the Opposition of the

5    Official Committee of Unsecured Creditors to Motions for

6    Stay Pending Appeal (related document(s)3873, 3972, 3789,

7    3845) filed by J. Christopher Shore on behalf of Ad Hoc

8    Group of Individual Victims of Purdue Pharma L.P.

9    (ECF #4012)

10

11   HEARING re Memorandum of Law/ Debtors' Memorandum of Law in

12   Opposition to the Motions for Stays of the Confirmation

13   Order and the Advance Order Pending Appeal (related

14   document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845)

15   filed by Marshall Scott Huebner on behalf of Purdue Pharma

16   L.P. (ECF #4014)

17

18   HEARING re Opposition of the MSGE Group to the Motions to

19   Stay Pending Appeal (related document(s)3801, 3873, 3890,

20   3789, 3860, 3845) filed by Kevin C. Maclay on behalf of

21   Multi-State Governmental Entities Group. (ECF #4016)

22

23

24

25

Page 28

1  HEARING re Opposition - Joinder to the Opposition of the

2  Official Committee of Unsecured Creditors to Motions for

3  Stay Pending Appeal (related document(s)4006) filed by

4  Michael Patrick O'Neil on behalf of Ad Hoc Group of

5  Hospitals. (ECF #4017)

6

7  HEARING re Reply to Motion Reply in Support of United States

8  Trustee's Motion for a Stay of Confirmation Order and

9  Related Orders Pending Appeal Pursuant to Federal Rule of

10  Bankruptcy Procedure 8007 (related document(s)3801, 3972,

11  3778) filed by Paul Kenan Schwartzberg on behalf of United

12  States Trustee. (ECF #4050)

13

14  Related Documents:

15  Modified Bench Ruling On Confirmation Of Eleventh Amended

16  Joint Chapter 11 Plan Signed on 9/17/2021.

17  (ECF #3786)

18

19  HEARING re Findings Of Fact, Conclusions Of Law, And Order

20  Confirming The Twelfth Amended Joint Chapter 11 Plan Of

21  Reorganization Of Purdue Pharma L.P. And Its Affiliated

22  Debtors Signed On 9/17/2021 (related document(s)3726).

23  (ECF #3787)

24

25

Page 29

```
 1    HEARING re Objection to Motion/ Ad Hoc Conm1ittee's
 2    Objection to Stay Motions (related document(s)3801, 3873,
 3    3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein
 4    on behalf of Ad Hoc Committee of Governmental and Other
 5    Contingent Litigation Claimants. (ECF #4002)
 6
 7    HEARING re Objection to Motion/ Ad Hoc Committee's Objection
 8    to Stay Motions (related document(s)3801, 3873, 3972, 3789,
 9    3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of
10    Ad Hoc Committee of Governmental and Other Contingent
11    Litigation Claimants. (ECF #4002)
12
13    HEARING re Declaration of Cheryl Juaire in Support of the
14    Opposition of the Official Committee of Unsecured Creditors
15    to Motions for Stay Pending Appeal (related document(s)4006)
16    filed by Ira S. Dizengoff on behalf of The Official
17    Committee of Unsecured Creditors of Purdue Pharma L.P., et
18    al. (ECF #4007)
19
20    HEARING re Declaration of Kara Trainor in Support of the
21    Opposition of the Official Committee of Unsecured Creditors
22    to Motions for Stay Pending Appeal (related document(s)4006)
23    filed by Ira S. Dizengoff on behalf of The Official
24    Committee of Unsecured Creditors of Purdue Pharma L.P., et
25    al. (ECF #4008)
```

1    HEARING re Motion to Allow/ Debtors' Motion for Leave to

2    Exceed the Page Limit in Filing Memorandum of Law in

3    Opposition to the Motions for Stays of the Confirmation

4    Order and the Advance Order Pending Appeal filed by Marc

5    Joseph Tobak on behalf of Purdue Pharma L.P. (ECF #4013)

6

7    HEARING re Declaration of Jesse DelConte (related

8    document(s)4014) filed by Marshall Scott Huebner on behalf

9    of Purdue Pharma L.P. (ECF #4015)

10

11   HEARING re Opposition of the MSGE Group to the Motions to

12   Stay Pending Appeal (related document(s)3801, 3873, 3890,

13   3789, 3860, 3845) filed by Kevin C. Maclay on behalf of

14   Multi-State Governmental Entities Group. (ECF #4016)

15

16   HEARING re Motion for Stay Pending Appeal filed by Ellen

17   Isaacs (ECF #3890)

18

19   HEARING re Responses Received:

20   Objection to Motion/ Ad Hoc Committee's Objection to Stay

21   Motions (related document(s)3801, 3873, 3972, 3789, 3778,

22   3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc

23   Committee of Governmental and Other Contingent Litigation

24   Claimants. (ECF #4002)

25

1    HEARING re Opposition Tribal Group Joinder in Opposition to

2    Stay Motions filed by Peter D'Apice on behalf of Certain

3    Native American Tribes and Others. (ECF #4003)

4

5    HEARING re Opposition of the Official Committee of Unsecured

6    Creditors to Motions for Stay Pending Appeal (related

7    document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff

8    on behalf of The Official Committee of Unsecured Creditors

9    of Purdue Pharma L.P., et al. (ECF #4006)

10

11   HEARING re Opposition The Ad Hoc Committee of NAS Children's

12   Joinder to Opposition of the Official Committee of Unsecured

13   Creditors to Motions for Stay Pending Appeal (related

14   document(s)4006) filed by Harold D. Israel on behalf of Ad

15   Hoc Committee of NAS Babies. (ECF #4009)

16

17   HEARING re Opposition Joinder of the Private Insurance

18   Ratepayers to Opposition of the Official Committee of

19   Unsecured Creditors to Motions for Stay Pending Appeal

20   (related document(s)3801, 3873, 3789, 3845) filed by

21   Nicholas F. Kajon on behalf of Eric Hestrup, et al.

22   (ECF #4010)

23

24

25

1    HEARING re Opposition /Joinder (related document(s)4006)

2    filed by Lauren Guth Barnes on behalf of Blue Cross Blue

3    Shield Association. (ECF #4011)

4

5    HEARING re Objection to Motion /The Ad Hoc Group of

6    Individual Victims' (I) Objection to the United States

7    Trustee's and Certain Public Creditors' Motion for Stay

8    Pending Appeal and (II) Joinder in the Opposition of the

9    Official Committee of Unsecured Creditors to Motions for

10   Stay Pending Appeal (related document(s)3873, 3972, 3789,

11   3845) filed by J. Christopher Shore on behalf of Ad Hoc

12   Group of Individual Victims of Purdue Pharma L.P.

13   (ECF #4012)

14

15   HEARING re Memorandum of Law / Debtors' Memorandum of Law in

16   Opposition to the Motions for Stays of the Confirmation

17   Order and the Advance Order Pending Appeal (related

18   document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845)

19   filed by Marshall Scott Huebner on behalf of Purdue Pharma

20   L.P. (ECF #4014)

21

22   HEARING re Opposition of the MSGE Group to the Motions to

23   Stay Pending Appeal (related document(s)3801, 3873, 3890,

24   3789, 3860, 3845) filed by Kevin C. Maclay on behalf

25   of Multi-State Governmental Entities Group. (ECF #4016)

Page 33

1    HEARING re Opposition - Joinder to the Opposition of the

2    Official Committee of Unsecured Creditors to Motions for

3    Stay Pending Appeal (related document(s)4006) filed by

4    Michael Patrick O'Neil on behalf of Ad Hoc Group of

5    Hospitals. (ECF #4017)

6

7    Related Documents:

8    Modified Bench Ruling On Confirmation Of Eleventh Amended

9    Joint Chapter 11 Plan Signed on 9/17/2021.

10   (ECF #3786)

11

12   HEARING re Findings Of Fact, Conclusions Of Law, And Order

13   Confirming The Twelfth Amended Joint Chapter 11 Plan Of

14   Reorganization Of Purdue Pharma L.P. And Its Affiliated

15   Debtors Signed On 9/17/2021 (related document(s)3726).

16   (ECF #3787)

17

18   HEARING re Objection to Motion/ Ad Hoc Committee's Objection

19   to Stay Motions (related document(s)3801, 3873, 3972, 3789,

20   3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of

21   Ad Hoc Committee of Governmental and Other Contingent

22   Litigation Claimants. (ECF #4002)

23

24

25

1    HEARING re Objection to Motion/ Ad Hoc Committee's Objection

2    to Stay Motions (related document(s)3801, 3873, 3972, 3789,

3    3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of

4    Ad Hoc Committee of Governmental and Other Contingent

5    Litigation Claimants. (ECF #4002)

6

7    HEARING re Declaration of Cheryl Juaire in Support of the

8    Opposition of the Official Committee of Unsecured Creditors

9    to Motions for Stay Pending Appeal (related document(s)4006)

10   filed by Ira S. Dizengoff on behalf of The Official

11   Committee of Unsecured Creditors of Purdue Pharma L.P., et

12   al. (ECF #4007)

13

14   HEARING re Declaration of Kara Trainor in Support of the

15   Opposition of the Official Committee of Unsecured Creditors

16   to Motions for Stay Pending Appeal (related document(s)4006)

17   filed by Ira S. Dizengoff on behalf of The Official

18   Committee of Unsecured Creditors of Purdue Pharma L.P., et

19   al. (ECF #4008)

20

21   HEARING re Motion to Allow/ Debtors' Motion for Leave to

22   Exceed the Page Limit in Filing Memorandum of Law in

23   Opposition to the Motions for Stays of the Confirmation

24   Order and the Advance Order Pending Appeal filed by Marc

25   Joseph Tabak on behalf of Purdue Pharma L.P. (ECF #4013)

Page 35

1    HEARING re Declaration of Jesse DelConte (related

2    document(s)4014) filed by Marshall Scott Huebner on behalf

3    of Purdue Pharma L.P. (ECF #4015)

4

5    HEARING re Opposition of the MSGE Group to the Motions to

6    Stay Pending Appeal (related document(s)3801, 3873, 3890,

7    3789, 3860, 3845) filed by Kevin C. Maclay on behalf of

8    Multi-State Governmental Entities Group. (ECF #4016)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 36

1   A P P E A R A N C E S :

2

3   UNITED STATES DEPARTMENT OF JUSTICE

4        Attorneys for the U.S. Trustee

5        201 Varick Street, Suite 1006

6        New York, NY 10014

7

8   BY:  BENJAMIN HIGGINS (TELEPHONICALLY)

9        BETH LEVINE (TELEPHONICALLY)

10

11  MILBANK, TWEED, HADLEY & MCCLOY LLP

12       Attorneys for the Raymond Sackler Family

13       55 Hudson Yards

14       New York, NY 10001

15

16  BY:  GERARD UZZI (TELEPHONICALLY)

17

18  DEBEVOISE & PLIMPTON

19       Attorneys for the Mortimer Sackler Family

20       919 Third Avenue

21       New York, NY 10022

22

23  BY:  MAURA KATHLEEN MONAGHAN (TELEPHONICALLY)

24

25

Page 37

1   OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

2       Attorney for State of Maryland

3       200 Saint Paul Place

4       Baltimore, MD 20852

5

6   BY:  BRIAN EDMUNDS (TELEPHONICALLY)

7

8   KRAMER LEVIN NAFTALIS FRANKEL LLP

9       Attorneys for the Ad Hoc Committee

10      1177 Avenue of the Americas

11      New York, NY 10036

12

13  BY:  JONATHAN M. WAGNER (TELEPHONICALLY)

14

15  DAVIS POLK WARDWELL LLP

16      Attorney for Debtors

17      450 Lexington Avenue

18      New York, NY 10017

19

20  BY:  BENJAMIN S. KAMINETZKY (TELEPHONICALLY)

21

22

23

24

25

```
                                              Page 38
 1   WHITE & CASE LLP

 2         Attorneys for Ad Hoc Group of Individual Victims

 3         1221 Avenue of the Americas

 4         New York, NY 10020

 5

 6   BY:  J. CHRISTOPHER SHORE (TELEPHONICALLY)

 7

 8   KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

 9         Attorneys for the State of Washington

10         500 Fifth Avenue

11         New York, NY 10110

12

13   BY:  MATTHEW J. GOLD (TELEPHONICALLY)

14

15   LITE DEPALMA GREENBERG & AFANADOR

16         Attorneys for Certain Canadian Municipality Creditors

17         and Canadian First Nation Creditors

18         570 Broad Street

19         Newark, NJ 07102

20

21   BY:  ALLEN J. UNDERWOOD III (TELEPHONICALLY)

22

23

24

25
```

Page 39

```
 1    PULLMAN COMLEY, LLC

 2         Attorney on behalf of State of Connecticut

 3         850 Main Street

 4         Bridgeport, CT 06604

 5

 6    BY:  IRVE J. GOLDMAN (TELEPHONICALLY)

 7

 8    AKIN GUMP STRAUSS HAUER & FELD LLP

 9         Attorneys for Official Committee of Unsecured Creditors

10         One Bryant Park

11         New York, New York 10036

12

13    BY:  MITCHELL HURLEY (TELEPHONICALLY)

14         ARIK PREIS (TELEPHONICALLY)

15

16    FLORIDA OFFICE OF THE ATTORNEY GENERAL

17         Attorneys for the Ad Hoc Committee

18         PL-01 The Capitol

19         Tallahassee, FL 32399

20

21    BY:  JOHN GUARD (TELEPHONICALLY)

22

23

24

25
```

```
 1   SOUTHERN DISTRICT OF NEW YORK

 2        86 Chambers Street, 3rd Floor

 3        New York, New York 10007

 4

 5   BY:  LARRY FOGELMAN (TELEPHONICALLY)

 6

 7   CAPLIN DRYSDALE

 8        Attorneys for Multi-State Governmental Entities Group

 9        One Thomas Circle, NW

10        Washington, DC 20005

11

12   BY:  JEFFREY J. LIESEMER (TELEPHONICALLY)

13

14   RONALD BASS, SR.

15   CHERYL JUAIRE

16   KARA TRAINOR

17   COLIN JORGENSEN

18

19   ALSO PRESENT TELEPHONICALLY:

20

21   JILL S. ABRAMS

22   ROXANA ALEALI

23   MICHAEL ATKINSON

24   JASMINE BALL

25   BROOKS BARKER
```

1   KATHRYN BENEDICT

2   SCOTT R. BICKFORD

3   DAVID E. BLABEY

4   SARA BRAUNER

5   JULIUS CHEN

6   DYLAN CONSLA

7   MARIO D'ANGELO

8   JESSE DELACONTE

9   MARIA ECKE

10   KENNETH H. ECKSTEIN

11   BERNARD ARDAVAN ESKANDARI

12   LAURA FEMINO

13   MAGALI GIDDENS

14   MARSHALL SCOTT HUEBNER

15   MITCHELL HURLEY

16   ELLEN ISAACS

17   HAROLD D. ISRAEL

18   EVAN C. JONES

19   GREGORY JOSEPH

20   MARC KESSELMAN

21   DARREN S. KLEIN

22   ALEXANDER LEES

23   BETH ANN LEVENE

24   MARA LEVENTHAL

25   DANIELLE J. LEVINE

1   KEVIN C. MACLAY

2   BRIAN S. MASUMOTO

3   GERARD MCCARTHY

4   JAMES I. MCCLAMMY

5   HUGH M. MCDONALD

6   SHANNON M. MCNULTY

7   MICHELE MEISES

8   AISLING MURRAY

9   EDWARD E. NEIGER

10   MICHAEL PATRICK O'NEIL

11   RACHEL OBALDO

12   KATHERINE PORTER

13   LINDA RIFKIN

14   RACHAEL RINGER

15   CHRISTOPHER ROBERTSON

16   JEFFREY J. ROSEN

17   ELIZABETH SCHLECKER

18   PAUL KENAN SCHWARTZBERG

19   LUCAS H. SELF

20   MICHAEL C. SHEPHERD

21   MARC F. SKAPOF

22   LAURA SMITH

23   KATE SOMERS

24   CLAUDIA Z. SPRINGER

25   ETHAN STERN ERIC STODOLA

1   JACQUELYN SWANNER

2   JEROME TAPLEY

3   MARC JOSEPH TOBAK

4   ESTHER TOWNES

5   ANDREW M. TROOP

6   ALICE TSIER

7   MELISSA L. VAN ECK

8   ANDREW D. VELEZ-RIVERA

9   ELI J. VONNEGUT

10   JORDAN A. WEBER

11   THEODORE WELLS

12   LAUREN S. ZABEL

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 44

1          P R O C E E D I N G S

2          THE COURT:  Okay, good morning.  This is Judge

3     Drain.  We're here in In re Purdue Pharma, L.P., et al on

4     the hearing on motions for a stay pending appeal of the

5     Court's confirmation order, as well as the Court's, what

6     I'll refer to as implementation procedures order filed by

7     the United States Trustee, the States of Washington,

8     Connecticut, and California, certain Canadian creditors, Ms.

9     Ellen Isaacs, and Mr. Ronald Bass.

10          So I believe I've reviewed all of the relevant

11     pleadings on these motions, including the various objections

12     and the replies and the declarations submitted in support of

13     the objections.

14          I'll also note my order dated November 3, 2021

15     establishing procedures for this remote hearing, which is

16     being held entirely remotely.  For those participating in

17     the hearing as a movant or objectant by Zoom for Government

18     and, otherwise, by telephone.

19          So I'm happy to proceed with the motions, unless

20     there's been any development on them, which I had encouraged

21     the last time the parties were before me as a way

22     potentially to resolve these motions.

23          MR. HIGGINS:  Your Honor, this is Ben Higgins for

24     the U.S. Trustee.  I'm joined today by my colleague, Beth

25     Levine from the U.S. Trustee's Washington office, and she'll

Page 45

1     be handling the oral argument for the U.S. Trustee.

2              We had two housekeeping issues to flag for Your

3     Honor, but we don't have a resolution of the stay motions,

4     to answer Your Honor's question directly.

5              THE COURT:  All right, very well.  On the

6     housekeeping, the request to exceed page limits on various

7     pleadings?

8              MR. HIGGINS:  That is the first item, yes, Your

9     Honor.

10             THE COURT:  Okay.  And the Debtors made such a

11    motion too.  I'll grant both of those motions.

12             MR. HIGGINS:  Thank you, Your Honor.

13             The second housekeeping issue, as we previewed for

14    Your Honor at the October 14 status conference, we did file

15    a amended memorandum of law at Docket No. 3972 with specific

16    citations to documents.

17             And we also, as we discussed at the October 14

18    hearing, we filed two designations at Docket Nos. 3918 and

19    4043, identifying specific documents that are either in the

20    record and that we're asking the Court to take judicial

21    notice of.  We haven't received any objections, but if we

22    did, I know Your Honor raised a couple of questions at the

23    last status conference.

24             So to the extent I can clarify anything or address

25    any questions, I'm happy to do that, Your Honor.

1            THE COURT:  I think you reduced the list to

2      address my concerns, which were that you were seeking that I

3      take judicial notice of matters that were not appropriate to

4      take judicial notice of, namely press accounts and the like,

5      correct?

6            MR. HIGGINS:  Well, just to be clear, Your Honor,

7      the second designation was actually a supplement to the

8      first designation, so we were still asking you to take

9      judicial notice of what we listed in the first designation.

10     And I can clarify what we're seeking it for, Your Honor, and

11     you can determine if it's appropriate or not.  You know,

12     we're happy to live with your decision on that.

13            THE COURT:  Okay.  Why don't you do that.

14            MR. HIGGINS:  Sure, Your Honor.

15            So I believe the items that you raised issues

16     with, we listed some pending legislation, as well as the

17     records of some of congressional hearings concerning the

18     validity of third-party releases.

19            And we're asking you to take judicial notice

20     merely for the fact that the validity of third-party

21     releases is an issue of public interest and they're publicly

22     available documents, and we're simply asking you to take

23     judicial notice of the fact these materials exist.  That's

24     the limit of it and we're willing to live with Your Honor's

25     decision either way, but that's the request, Your Honor.

1              THE COURT:  Okay.  Do any of the objectors have a

2     view on this?

3              MR. KAMINETZKY:  Not quite sure about judicial for

4     what purpose he's offering them judicial notice.  Your Honor

5     is welcome to notice that.

6              THE COURT:  Okay.

7              MR. KAMINETZKY:  The rest of -- what I saw most of

8     what's been submitted are various pleadings from this case,

9     we don't have a problem with that.

10              THE COURT:  Right, and I have no problem with

11     those pleadings or with pleadings filed in other courts, as

12     long as they're not being -- sought to be admitted for the

13     truth of the pleadings as opposed to just the fact that

14     these are pleadings that have been filed.

15              MR. HIGGINS:  And that's correct.

16              MR. KAMINETZKY:  With respect to newspaper

17     accounts, I'm not sure what the point is.  Is it for

18     evidentiary purposes?  I'm just struggling to understand

19     what exactly the request of the Court is before we made an

20     objection or not.

21              MR. HIGGINS:  Sure.  I'm not sure there are any

22     newspaper accounts, Your Honor.

23              THE COURT:  I don't think there are at this point,

24     and maybe there never were.  I thought I saw one that you

25     had submitted, although they were included, I believe, in

1    the record of the hearing.

2            I will take judicial notice of the bill and the

3    hearing for the fact that they took place, not for anything

4    as far as the hearing is concerned that any other

5    evidentiary purpose or for which they might be asserted.

6            MR. HIGGINS:  Thank you, Your Honor.  Those are

7    the housekeeping issues from the U.S. Trustee's perspective.

8            THE COURT:  Okay, very well.

9            MR. EDMUNDS:  Your Honor, Brian Edmunds for

10   Maryland.  I don't -- it may be helpful if I address a

11   threshold issue from our reply first.  I think the Court

12   will probably want to hear what everyone has to say anyway.

13           But logically, the one issue which is the effect

14   of the District Court's decision on the Trustee's and

15   Canadian entities' motion for a stay in that Court limits, I

16   think, what is before the Court today.

17           Because there's a clear ruling, an unappealed

18   ruling, a ruling, in fact, that the appellees acquiesced

19   from the District Court that holds that there's a likelihood

20   of success on the merits and that the issue raised by the

21   Trustee, which is the issue of equitable mootness, raises

22   when the Debtors or appellees are actually doing something

23   that the balance of hardships would tip decidedly in the

24   Trustee's and the Canadian entities' favor.

25           And so, there's a finding, and there's a finding

1    that in the end denies those parties' motion for a stay

2    because the District Court found that there's nothing going

3    on right now.  But you found that without prejudice to the

4    states making motions and to the U.S. Trustee coming forward

5    with evidence that something is happening now.  So it's

6    without prejudice to that showing or to those showings, and

7    she does not decide the states' motions, which had not been

8    formally brought before her.

9             But to the extent she rules on that equitable

10   mootness issue and addresses the likelihood of success on

11   the merits is raised in the other parties' motions before

12   that Court, those findings are her decision.  And I'm not

13   sure that, you know, there's any -- they could have

14   appealed, but I think that they become law of the case in

15   light of the fact that they haven't.

16            And they've, in fact, filed a stipulation in the

17   District Court essentially doing -- purporting to comply

18   with the conditions that the District Court placed in its

19   denial of the stay, so that issue, I think, is the threshold

20   matter.

21            And I understand the Court is likely to hear

22   everybody, but just as a logical matter, it seemed important

23   to raise that first.

24            THE COURT:  I'm looking for my copy --

25            MR. EDMUNDS:  Your Honor, if it's helpful --

```
1              THE COURT:  I'm looking for that copy of that

2     order.  This was an issue that really was, if anything,

3     touched on in a reply, so you've caught me a little bit

4     unprepared on this, Mr. Edmunds, but I want to get out the

5     order.

6              MR. EDMUNDS:  I'm sorry, Your Honor.  I mean, we

7     filed our motion before we were in the District Court.

8              THE COURT:  I know.

9              MR. EDMUNDS:  But if you need the opinion --

10             THE COURT:  I'm not faulting you for not raising

11    it when you did then, but I want to make sure I have Judge

12    McMahon's order in front of me, which I am leafing through.

13    Well, here it is.  I found it.

14             MR. EDMUNDS:  I think it might be attached to our

15    reply as an exhibit.  If it's helpful, Your Honor, I think

16    the relevant language --

17             THE COURT:  No.  I'm reading -- let me read it --

18             MR. EDMUNDS:  Okay.

19             THE COURT:  -- as to the points that you're

20    specifically raising.

21             MR. EDMUNDS:  Sure.

22             THE COURT:  Well, again, I've just reread it.  And

23    on the two points that you've raised, Mr. Edmunds, that you

24    say would be law of the case, the first one is whether the

25    merits prong has been satisfied.  And there, Judge McMahon
```

1    says, "In this case, Debtors conceded at oral argument on

2    October 12 the existence of sufficiently serious questions

3    going to the merits to make them a fair ground for

4    litigation."

5            The other point that you raised, however, as far

6    as the possibility of equitable mootness is in the context

7    of the balance of hardship and not as to a finding as to

8    whether equitable mootness has risen above the level of

9    speculation.

10           So I think it's a little more -- maybe I didn't

11   hear you clearly enough, but I think it's a little more

12   complicated than you stated.  I think that issue of

13   irreparable harm and its relation to equitable mootness and

14   the issue of the balance of the harms and its relation to

15   equitable mootness are not exactly the same issue.  And

16   secondly, I think they're both quite context specific as far

17   as the record before the Court.

18           The case law seems to be uniform that the risk of

19   equitable mootness -- and of course, that's an evaluation

20   that the Court needs to make and that clearly is not law of

21   the case as far as Judge McMahon's order -- standing alone

22   or vel non is not irreparable harm or arguably harm but

23   needs to be taken into account with other factors.

24           So it seems to me that the record before me is

25   important still on that point.

1          If the objectors are arguing that the risk of

2    equitable mootness just isn't to be taken into account, I

3    completely agree with you; in fact, I wouldn't need Judge

4    McMahon's ruling because it is to be taken into account.

5    But I don't think it's dispositive on this point, given the

6    different record before her and before me.

7          So I think the thing we should probably focus on,

8    although I'm happy to hear you more on this, is the effect

9    of the Debtors' concession.  I mean, both -- not both -- all

10   parties have spent a considerable amount of time,

11   notwithstanding that concession, arguing the merits of the

12   appeal, both in the motions themselves, which again I

13   repeat, were made before the hearing before Judge McMahon,

14   but also in the replies.

15         So I was going to suggest to the parties that they

16   spend the vast bulk of their time not addressing the merits,

17   but rather, addressing the other three factors and the bond

18   issues.  But why don't I hear from the objectors on the

19   merits point in the first case as to whether their

20   concession should be viewed as a concession for this hearing

21   as well.

22         MR. EDMUNDS:  Sure, Your Honor.  Let me just --

23   you've read it the same way, I think, we have, which is that

24   there is a fact issue on the balance of hardships and that

25   the question of whether, you know, the possibility of

1    equitable mootness vel non is a, you know, irreparable harm

2    question, is decided by her and that equitable mootness

3    could pose irreparable harm, but the fact issues are still

4    left open as to what's happening now.

5            So I think -- I'm not saying -- I wasn't saying

6    anything different and I think that we've read it the same

7    way.

8            THE COURT:  Well, maybe with one qualification,

9    Mr. Edmunds.  Based on my review of the case law, and I

10   don't think Judge McMahon is saying anything different, the

11   weight to be given to the risk of equitable mootness

12   constitute two ways: first, the way that we clearly agree

13   on, which is the Court needs to evaluate how likely it is

14   that something would become equitably moot; the second is

15   whether -- and this second point is very closely tied to the

16   first point -- I think the more likely it is that something

17   becomes equitably moot, the less important it is to

18   establish something in addition to the risk of mootness.

19           And nevertheless, I do think that is a second

20   inquiry because I believe all the courts, including the

21   Adelphia court and St. Johnsbury Trucking court have said

22   standing alone, the risk of equitable mootness isn't enough.

23   But what needs to be shown, in addition to that, can be any

24   one of the other factors, it seems to me.  It can be the

25   seriousness of the issues on appeal; it can be the issue of

1    whether a reversal as appear at victory.

2            You know, there are all sorts of things that can

3    affect that extra something that I think all the courts

4    recognize you need to have in addition to just the risk of

5    equitable mootness.  And again, that can be merely the

6    seriousness of the issues on appeal, and also, the courts'

7    assessment of the likelihood of success on appeal.  If

8    something really does seem to be maybe not a frivolous

9    appeal, but a real long shot, then the risk of mootness

10   really doesn't seem to be something that courts care about.

11           So I think I may go back again to the question,

12   which is the -- my recommendation was that we not spend a

13   lot of time on the merits of the appeal, showing of the

14   substantial possibility of success, and really only as it

15   pertains to the other three issues.

16           So Mr. Kamenetzky's on the screen.  I know there

17   are other objectors too, but I'll look to you on that point.

18   You're on mute.

19           MR. KAMINETZKY:  Your Honor, good morning.

20   Benjamin Kaminetzky of Davis Polk for the Debtors.

21           I could just address the effect of Judge McMahon's

22   order, the kind of contention by Maryland that there's some

23   sort of law of the case or issue preclusion because I think

24   that's just completely inherently wrong.  If you want, I can

25   go further, but I just think it's important that we address

1    that upfront because Mr. Edmunds suggested something that

2    just, it's just completely and utterly false.  If I could

3    get two minutes on that.

4          And then, you know, I assume you'd want them to go

5    first on the other factors.  And I agree that spending a lot

6    of time on probability of success on the merits, which is

7    devolved into another oral argument that you've heard for

8    hours now, are so -- on the point, just Mr. Edmunds point.

9    Again, it's just a blatant mischaracterization of Judge

10   McMahon's decision and what happened.  So let me just give

11   you some context.

12         The U.S. Trustee filed an emergency stay motion

13   before the District Court on the evening of Friday, October

14   8th.  After entering a TRO based on the U.S. Trustee's

15   breathless suggestion that something could be happening over

16   the weekend, Judge McMahon heard that motion the very next

17   business day without a single brief from the Debtors or any

18   other party.

19         We had no opportunity -- the Debtors and the plan

20   proponents had no opportunity to put in any evidence at the

21   hearing.  All the District Court had was the brief that the

22   U.S. Trustee filed in connection with its Friday night

23   emergency motion, had no evidence from anyone else, no

24   briefs from anyone else.  They didn't even have the

25   confirmation hearing transcripts or anything.

Page 56

```
 1            What Judge McMahon focused on at this emergency

 2    hearing that was held, you know, that Tuesday, which was the

 3    next business day, was -- and the Debtors and the plan

 4    proponents didn't present any argument whatsoever on the

 5    likelihood of success of the appeal.  The focus was solely

 6    on whether the movant's evidence might suffer harm in the

 7    interim period between that day and today when Your Honor

 8    will be hearing the stay motion.

 9            All of that notwithstanding, the District Court

10    denied the U.S. Trustee's stay motion the next business day,

11    as she concluded that the movants had not identified any

12    concrete harm that will arise between now and November 9

13    when Judge Drain is scheduled to consider the various stay

14    motions.  That's on Page 12 of her decision.

15            Now, the notion --

16            THE COURT:  Okay, so could I just interrupt you?

17    So you're basically saying that your concession that Judge

18    McMahon's decision refers to was really just a concession

19    for purposes of that hearing because you were focusing on

20    the --

21            MR. KAMINETZKY:  It wasn't even that.  Judge

22    McMahon misheard.  She didn't have the transcript.  What Mr.

23    Huebner said is even if we give them all three other

24    factors, they nevertheless lose because there's no harm.

25    There was a hypothetical which he misheard.  We corrected
```

1    her in a subsequent filing and said, no, we've reviewed the

2    transcript.  It was one of these even if they're right that

3    there are substantial issues, there's no harm because

4    nothing would happen between now and November 9, so it was

5    kind of in that context.

6           And Judge McMahon, as you said, there was a

7    concession, but there actually wasn't; it wasn't in the

8    context of an even if they could prove all three other

9    factors, they certainly can prove imminent harm.  And again,

10   we corrected her on the record.  We sent a letter

11   identifying and pointing that out in the transcript.

12          But more important, the law is very clear what

13   collateral estoppel means and it doesn't mean.  And, I mean,

14   Second Circuit law here is well developed:  Collateral

15   estoppel only applies if the identical issue was decided in

16   the prior proceeding.  And none of the issues, Your Honor,

17   none of the issues before the Court today was actually

18   decided by Judge McMahon.

19          Again, what she was focused on, based on the U.S.

20   Trustee's emergency motion, is do I need to do something now

21   before the November 9 hearing before Judge Drain, and she

22   said no, but that was the entire focus of the hearing.  And

23   as Your Honor knows, nothing could possibly have happened

24   because the sentencing needs to happen and the effective

25   date and all that.

Page 58

1            So there was absolutely no ruling whatsoever on

2      the balance of harm with respect to an indefinite stay,

3      which the movants are seeking, or even any sort of stay

4      beyond November 9.

5            There's also -- you know, we talked about that

6      there wasn't a concession.  There's also collateral estoppel

7      only applies where there's a full and fair opportunity to

8      litigate the relevant issues in the first proceeding, and

9      I'm quoting from Central Hudson Gas & Electric Company, 56

10     F.3d 359 at 368.  Obviously, when on an emergency motion

11     filed on Friday night when we're imminent on Tuesday

12     morning, was obviously not a full and fair opportunity to

13     litigate.  So even if it was the same issue, they still

14     don't get collateral estoppel because the Judge only heard

15     one side; there was no ability to submit evidence.

16            And finally, Your Honor, it's blackletter law that

17     collateral estoppel only applies where there was a final

18     judgment on the merits.  And to say this again, this was a

19     decision on a TRO on a stay motion, not a final judgment on

20     the merits, and it cannot give rise to collateral estoppel.

21            And, of course, neither the two cases that

22     Maryland cites in its brief has anything remotely to do with

23     the preclusive effect of a decision on emergency stay

24     motion.  They both involve prior actions that were litigated

25     to a final judgment on the merits.  In the PCH case that

Page 59

1    they cite, there was a final and binding decision on the

2    merits and affirmed on appeal that the relationship between

3    parties was a joint venture and the Court found that that

4    was law of the case.  And in the other case they cite, the

5    Central Hudson case, there was a trial and a judgment and

6    that's when the Court held that there was a collateral

7    estoppel.

8              So, I mean, I think it speaks volumes that the

9    actual movants before the District Court didn't even dare

10   make this argument that there's some collateral estoppel

11   effect of Judge McMahon's decision.  And I see why now

12   people are -- I mean, it's clear why now, because this is

13   such a, quite frankly, bizarre argument that somehow on a

14   TRO emergency motion that there's some sort of binding

15   decision that's law of the case that prevents Your Honor

16   from making his own determination I think is just completely

17   and utterly wrong.

18             And I'll stop now because I don't want to, again,

19   step on anyone's toes.

20             THE COURT:  Okay, all right.  Well, I think you've

21   addressed the point I really wanted you to address, which is

22   what sort of concession was referred to in that order, and I

23   think I have the context here in any event.  I don't believe

24   it was a concession, other than for purposes of that

25   argument and not for purposes of this argument.

Page 60

1                    Although that being said, it appears to me that

2          the parties should primarily focus on the other three

3          factors for obtaining a stay pending appeal and assume that

4          I've reviewed their arguments with respect to the

5          substantial possibility of success on the merits and still

6          remain fully aware of how I addressed those issues in my

7          decision.

8                    MR. EDMUNDS:  Your Honor, may I respond briefly?

9                    THE COURT:  Well, I don't think there's -- I think

10         I've already given my view on this, and I don't think

11         there's any other thing to say on it.  I mean, I'm not sure

12         there's anything more to be said on it really, unless you

13         say that somehow that they did concede for all time.

14                    MR. EDMUNDS:  I don't think it matters whether

15         it's a concession.  I think the District Court made a ruling

16         on the issue, and it made a determination as to likelihood

17         of success on the merits and it said that it was not going

18         to allow the appeal to come equitably mooted.

19                    THE COURT:  Clearly, the order doesn't say that.

20         It says the Debtors concede, and the only issue is whether

21         they conceded for purposes of that argument or for all time,

22         and I'm satisfied that they did not concede for all time

23         because I can't imagine they would in that context.  There's

24         no ruling on the likelihood of the merits, no discussion on

25         the likelihood of the merits here.

Page 61

1            MR. EDMUNDS:  But I would just say we respectfully

2      disagree, reading the entire opinion that she didn't.  But I

3      understand Your Honor's ruling.

4            THE COURT:  Okay.

5            MR. EDMUNDS:  I don't need to say more I guess.

6            THE COURT:  Okay.

7            MR. EDMUNDS:  All right.  Thank you, Your Honor.

8            THE COURT:  All right.  Okay, so I do have a

9      suggestion for structuring this argument beyond what I've

10     already said, which is I want the parties to focus on what

11     sort of stay they are seeking in terms of duration and

12     activity, and also address it in the light of Bankruptcy

13     Rule 8025.

14            The parties -- the U.S. Trustee has thrown out

15     different alternatives, which includes a stay that would be

16     ordered by me for a relatively brief period after the

17     District Court's ruling.

18            It's not clear to me whether the three states have

19     limited their request for a stay in any way or whether

20     they're seeking a stay by me that would go through

21     ultimately a final order, which could conceivably be either

22     denial of certiorari or a ruling by the Supreme Court.

23            And I think this is important in the context again

24     of Bankruptcy Rule 8025, which is titled, Stay of a District

25     Court -- or BAP, but the focus here's on the District Court

Page 62

 1    of course -- Judgment, which states in (a):  "Unless the

 2    District Court orders otherwise, its judgment is stayed for

 3    14 days after entry."  And I'll also note in that regard (c)

 4    of Rule 8025, which says that if the District Court enters a

 5    judgment affirming an order of judgment or a decree of the

 6    Bankruptcy Court, a stay of the District Court's judgment

 7    automatically stays the Bankruptcy Court's order, judgment,

 8    or decree for the duration of the appellate stay.

 9            And then Rule 8025(b) states, is headed for a stay

10    pending appeal to the Court of Appeals and states in (1) in

11    general:  "When a party's motion and notice to all other

12    parties to the appeal, the District Court may stay its

13    judgment pending an appeal to the Court of Appeals."  In

14    (2), it says, "Time limit.  The stay must not exceed 30 days

15    after the judgment is entered, except for cause shown," and

16    then it says, "Stay continued if before a stay expires.  The

17    party who obtained the stay appeals to Court of Appeals, the

18    stay continues until final disposition by the Court of

19    Appeals."

20            And then finally, (d) states:  "This rule does not

21    limit the power of the Court of Appeals or any of its judges

22    to do the following, including: a stay; stay proceedings

23    while an appeal is pending; suspending, modifying, restore,

24    vacating, or granting a stay while an appeal is pending; or

25    issue any order appropriate to preserve the status quo or

1    the effectiveness of any judgment to be entered."

2             So clearly, appeals from Bankruptcy Court orders

3    should generally and ordinarily be, where there's a motion

4    seeking a stay, that motion should be brought first in the

5    Bankruptcy Court, and courts regularly deny such motions if

6    they are not brought first in the Bankruptcy Court unless

7    there's a legitimate reason to do so.  But 8007 pertains to

8    a motion for a stay of a judgment, order, or decree of the

9    Bankruptcy Court pending appeal.

10            So I have a serious concern that any request for a

11   stay pending appeal beyond the District Court's ruling is

12   not really properly before me or it shouldn't be decided by

13   me -- maybe that's a better way to phrase it -- given Rule

14   8025.

15            So let me first ask, is anyone looking for relief

16   beyond a stay up to the time that the District Court rules?

17            MS. LEVINE:  Your Honor, this is Beth Levine for

18   the United States Trustee.

19            We have asked for relief beyond that.  We think,

20   as we argued in our papers, that this Court has the

21   authority, both under Rule 8007 and its inherent authority

22   to control its docket, to stay its own orders, to enter a

23   stay pending a conclusion of the appellate process, so we

24   have asked for that full relief of a stay pending the

25   conclusion of the appellate process or, in the alternative,

1    pending the District Court's decision.  So we have asked for

2    that additional relief.

3                  THE COURT:  Right.  Although I don't think you

4    addressed Rule 8025 or the case law interpreting it.

5                  MS. LEVINE:  Your Honor, I think we addressed the

6    language if 8025, which is different.  You know, Rule 8007

7    does not have the limiting language that refers to the

8    duration of the stay that Rule 8025 does.  8025 refers to

9    the District Court's stay of another court, the Bankruptcy

10   Court's order, which I think is a somewhat different thing

11   than a Bankruptcy Court staying its own order, and that

12   you've got that discretion to stay your own order pending

13   the appeals.

14                  Certainly, you've got the discretion to determine

15   how long that stay should be, but we are asking for that

16   stay for the full duration of the appellate process, with

17   the alternative request for a stay at least until the

18   District Court has made its decision.

19                  THE COURT:  Okay.

20                  MS. LEVINE:  Your Honor, would you like me to

21   proceed with our motion now or to hear from others on that

22   at this point?

23                  THE COURT:  Well, let me just make sure, as far as

24   the three states are concerned, are you looking for a stay

25   through the entire course of any appellate process?

1              MR. EDMUNDS:  Maryland is, Your Honor, and we'd

2      agree with what Ms. Levine just argued.

3              THE COURT:  Okay.

4              MR. GOLD:  Your Honor, Matthew Gold from Kleinberg

5      Kaplan representing State of Washington and Connecticut.

6              We agree with what Ms. Levine said, our original

7      requests, so that there was no question was for the broader

8      stay.  But our alternative position minimum, if you would,

9      is that we have a stay that preserves the status quo and

10     leaves the positions intact so that it can be decided by the

11     District Court or any higher Court when the issue gets put

12     to them.

13             THE COURT:  Okay.

14             MR. ESKANDARI:  Bernie Eskandari on behalf of

15     California, Your Honor.  I may have misheard at the

16     beginning of the hearing, you included California with --

17             THE COURT:  No.  If I did, it was a mistake.

18             MR. ESKANDARI:  Thank you.

19             THE COURT:  It's just Washington and Connecticut

20     and Maryland.  Sorry to give you a heart attack there.

21             MR. GOLDMAN:  Your Honor, if I may add -- Irv

22     Goldman, Pullman & Comley, for the State of Connecticut.

23             Just to note, Bankruptcy Rule 8007 does embrace

24     motions not only to the Bankruptcy Court but to the District

25     Court, so I would contend it does contemplate a stay pending

1    appeal through the Circuit.  And there's no limiting

2    language in Bankruptcy Rule 8000(a)(1)(A) as to what is

3    meant by pending appeal, so it's open ended.  I would just

4    add that point.

5              THE COURT:  Okay.  Well, I will note that there

6    are a number of decisions that rule otherwise, including In

7    re Russo, 2017 B.R. Lexis 544 at 5-6 (Bankr. C.D. Cal, Feb.

8    27, 2017), In re VCR I, LLC 2019 B.R. Lexis 3376 at 27

9    (Bankr. S.D. Miss., Oct. 28, 2019), and In re Schupbach

10   Investments, LLC 2016 B.R. Lexis 836 at 5-6 (Bankr. D.

11   Kans., March 17, 2016), In re Howell-Robinson, 2008 WL

12   5076975 at 2 (Bankr. D.D.C. July 30, 2008), and Culwell v.

13   Texas Equipment Co. (In re Texas Equipment Co.) 283 B.R.

14   222, 230-31 (Bankr. N.D. Texas 2002).

15              I will note that Judge Roman in this District left

16   the issue open in Credit One Bank, N.A. v. Anderson (In re

17   Anderson) 560 B.R. 84, 88 (S.D.N.Y. 2016).  Although rather

18   than the Bankruptcy Court decide the motion, which was made

19   to him, in the alternative under either 8007 or 8025, he

20   decided the motion himself under 8025 after his ruling and

21   denied the motion on the merits for a stay.

22              But I think it's important, and I believe it's

23   consistent actually with Judge McMahon's approach, for the

24   parties to focus on the two alternative forms of stay that

25   the parties are seeking here: their preferred one, which is

1    through the entire appellate process, and alternatively,

2    through the District Court's ruling.

3          Because the determination of the issues and, in

4    particular, the three factors other than on the merits, to

5    my mind, could be quite different depending on whether it's

6    a stay through the District Court's ruling or a stay through

7    either denial of cert or a ruling by the Supreme Court,

8    which obviously would take a significantly longer amount of

9    time.

10          And on the merits issue, obviously a trial judge

11    that is faced with a request for a stay pending appeal is

12    always in the awkward position of evaluating the merits of

13    the trial judge's own opinion -- that isn't a problem for

14    the District Judge -- and makes that review, I think, much

15    more, in some ways at least, if on a psychological basis,

16    more meaningful.

17          So I really do want the parties to focus on those

18    two different durations for a stay, and so, you should

19    address your arguments accordingly.

20          So I don't know if you decided who was going to go

21    first, whether it's Ms. Levine or counsel for one of the

22    three states, but one of you should go ahead.

23          MS. LEVINE:  Your Honor, I'm ready to proceed.

24    Thank you.  This is Beth Levine again with the Department of

25    Justice for the United States Trustee.

```
 1              I'll save my introductory remarks.  You know why
 2     we're here.  I will skip over much on the likelihood of
 3     success on your direction.
 4              I wanted to say one thing, which is that Judge
 5     McMahon in Footnote 4 on Page 10 of her decision, you know,
 6     said that she considered it obvious that there are serious
 7     questions going to the merits and making the fair ground for
 8     litigation.  We think that is true.
 9              You know, certainly, we don't expect you to agree
10     that you've erred.  We know you disagree with our legal
11     position.  But we think there are very serious questions and
12     that they merit appellate review and that the denial of that
13     appellate review, if there were a dismissal based on
14     equitable mootness, would be irreparable harm.
15              And it's not just the denial of appellate review
16     vel non itself; it's because you have claims here that are
17     being eliminated without consent that would be permanently
18     irreparably gone without that appellate review.
19              THE COURT:  Well, can we focus on that for a
20     second?  First, you went -- and I'm responsible for this
21     since I told the parties not to focus substantially on the
22     merits -- you went very quickly from that to the issue of
23     irreparable harm.
24              And I just -- I want to be upfront with everyone.
25     It seems to me that there are, in fact, issues going to the
```

1     merits that are somewhere between, you know, a mere

2     possibility of success and a probability of success.  I

3     think many of the issues raised by the U.S. Trustee and the

4     three states do not fall into that category; that, in fact,

5     they are unlikely to prevail on appeal.  Those go to the

6     524(e) point, the due process point, and their assessment of

7     the merits of the settlement.

8          But I agree that the issue of a release of third-

9     party claims is, in every instance, a serious issue that

10    requires a Court to sift through complicated legal and

11    factual considerations.  And the limits, in particular, on

12    what types of claims that would belong to a third party,

13    i.e., not the Debtors' estate, that can be appropriately,

14    legally enjoined requires serious parsing of the case law

15    and is certainly something that even the Second Circuit case

16    law recognizes as an issue where the lower court can get it

17    wrong, as was the case in Metromedia and Carter and other

18    decisions which recognize the underlying principle that the

19    Court has power to enjoin third-party claims.  But drawing

20    the line as to what claims can be enjoined and what can't is

21    something that courts can well disagree on.

22          So on that point -- unlike on the due process, the

23    jurisdictional points, the 524 point, frankly, even the

24    state sovereignty point, all of which I think are unlikely

25    to prevail on appeal -- this issue as to how released claims

1   are to be cabined is, I believe, one that does satisfy the

2   requirement to show a strong showing of likelihood to

3   succeed on the merits, such that there's a fair ground for

4   litigation.

5           Although again, as recognized, for example, by

6   Judge Chapman in In re Sabine Oil & Gas Corp., 551 B.R. 132,

7   143 (Bankr. S.D.N.Y. 2016), the focus on the degree of

8   likelihood of success is tempered by the balance of the

9   harms or the Court's assessment of the balance of the harms.

10          So I suppose the objectors can try to persuade me

11  to the contrary, but I think that I want to turn then to the

12  irreparable harm point that you were starting to make.  And

13  the argument you made is that the people and governmental

14  entities that objected to the release or injunction would

15  lose their rights if a stay was not granted.

16          And again, this goes to my direction to you all to

17  focus on the two different times for the stay.  I confess

18  I'm having a hard time seeing how that would be the case if

19  the stay were granted or not granted either way through the

20  date of the District Court's ruling with the additional 14

21  days that are added on under Rule 8025.

22          And further, I'm having a hard time, although

23  maybe not as hard, with the argument that equitable mootness

24  really would occur here if a stay were not granted through

25  the date of the entire appellate process.  I guess that

Page 71

```
 1    depends, in some measure, upon whether the plan is

 2    substantially consummated.

 3             But as far as the release is concerned, the

 4    majority of the payments by the released parties, as you

 5    yourself point out, occurs substantially down the road, and

 6    under the plan, they have a credit only for what they've

 7    paid in the interim.

 8             So it seems to me under either scenario too broad

 9    to say that these people who the U.S. Trustee says that he's

10    speaking on behalf of would lose their rights.  They would

11    only lose it if there's equitable mootness, right?

12             MS. LEVINE:  Your Honor, that is the primary

13    concern, that is if there is equitable mootness and there's

14    not a review on the merits, they would lose their rights

15    that would otherwise --

16             THE COURT:  Well, there's no other concern, right?

17    I mean, it's just based on equitable mootness, nothing else.

18             MS. LEVINE:  Your Honor, I think there's also a

19    concern about what's going to happen in the interim is, you

20    know, defendants' move to dismiss based on these releases,

21    for example.  As noted in our brief and one of the cases

22    that's pending, one of the defense had suggested that the

23    releases apply.  This was prior to the Court's decision, so

24    it was a different context.  But we don't know how that

25    would play out and whether cases would be dismissed with
```

```
1    prejudice in the intervening time, so I think there is that

2    risk.  But our primary concern is the equitable mootness

3    risk that would make it irreparable if there's no longer a

4    possibility of review on the merits.

5                THE COURT:  So there are -- but that wouldn't

6    really happen until the effective date of the plan, right?

7                MS. LEVINE:  Your Honor, it's my understanding

8    that the releases become effective on the effective date.

9                THE COURT:  Right.

10               MS. LEVINE:  So what we want to avoid happening --

11   but if the appeals dismissed without a review on the merits,

12   that effective date is going to come and go, and the Debtors

13   have --

14               THE COURT:  But I'm asking you to focus on that if

15   and how likely that's to happen.

16               MS. LEVINE:  Yes, Your Honor.  So focusing first

17   on the timing of the District Court's decision, Your Honor.

18   Under the plan -- well, first of all, they've argued that

19   it's not just the effective date that may cause equitable

20   mootness.  They have very specifically preserved their

21   rights to argue that the criminal sentencing, which will

22   happen before the effective date, can be a basis for

23   equitable mootness.

24               THE COURT:  What do we think about that?  I mean,

25   that's under a separate plea agreement; that's not under the
```

```
 1    plan.

 2              MS. LEVINE:  Your Honor, it obviously raises a

 3    concern because they've indicated they're going to argue it.

 4    But our concern is also, you know, they've said nothing else

 5    that's happening before the effective date can constitute

 6    equitable mootness, and we've got two concerns about that,

 7    Your Honor.  One is, as we've stated, you know, their

 8    stipulation about that doesn't bind the Second Circuit, it

 9    doesn't bind other parties.

10              We've had other parties that haven't signed the

11    stipulation that have filed oppositions to motions to stay.

12    We've asked multiple times what's happening.  We haven't

13    gotten a response.  So we don't know what's going on that

14    someone else might look to and say, you know, is the basis

15    of an equitable mootness argument.

16              But the other thing we're concerned about, Your

17    Honor, is --

18              THE COURT:  But how could any of those things --

19    I'm sorry to interrupt you.  But how could any of those

20    things be substantial consummation?

21              MS. LEVINE:  Your Honor, I don't think there'll be

22    substantial consummation, but under Second Circuit law, the

23    test is a substantial or comprehensive change in

24    circumstances.  And, you know, clearly, the Debtors think

25    that something can happen before substantial consummation
```

1    that would support equitable mootness because they said they

2    might argue that based on sentencing.

3            And the concern, Your Honor, is it may be that,

4    you know, they have said they've structured this so that

5    they have time between the confirmation and the sentencing

6    to get certain things done, that they want to get certain

7    things done before they are sentenced.  We don't have

8    clarity on what those things are.

9            But we don't know, you know, what pre-effective

10   date activity is going to open the door to sentencing or

11   pre-effective date activity they're going to say is well,

12   you know, say it's transferring assets to NewCo.

13   Transferring assets to NewCo on its own, they might say,

14   well, that can be undone.  But then after we get past

15   sentencing, we don't know what their argument is.  Is it

16   going to be that well, now that it's been sentenced, that

17   asset transfer can't be undone?

18           So we don't really know how these things interplay

19   together, which makes us very concerned about when, you

20   know, not just the effective date, but also the sentencing.

21   And also what else is happening and how those things work

22   together so that if we get past sentencing, they're going to

23   come back and say, oh, well, you know, this other pre-

24   effective date activity on its own could be reversed, but

25   now it can be undone.  Now that bell cannot be unrung.

Page 75

1           And so, for all these reasons, we have concerns

2      about these other activities.

3           THE COURT:  But look, the presumption of equitable

4      mootness, which is when their five-step case in the Second

5      Circuit case law comes into effect, is where the plan has

6      been substantially consummated.  Generally, courts focus on

7      the distributions under the plan as that, or transfers to be

8      made under the plan that cannot be unwound.

9           So far, I'm just hearing sort of vague fears, as

10     opposed to anything that actually would give rise to any

11     real risk at all of equitable mootness.

12          MS. LEVINE:  Your Honor, we think it's a

13     substantial risk because of what the Debtors have said

14     regarding the impact of sentencing, but we also think that

15     the dates here --

16          THE COURT:  Let me -- I mean, Judge Kaplan dealt

17     with this head on in the St. Johnsbury case.  He says to

18     begin with, the government's failure to concede that its

19     appeal would be moot absent a stay does not help those

20     opposing the motion any more than the opponents' failure to

21     concede that the appeal would not be so moot it harms them.

22          Mootness is a doctrine grounded in constitutional

23     considerations designed to limit courts to the resolution of

24     actual controversies, although I think the case law has

25     moved on since then and the focus is really, for equitable

1   mootness purposes, on the finality of bankruptcy plans.

2          And then he says the parties through additional

3   proceeding, therefore, cannot determine even by agreement

4   whether a case is moot; that is for the Court.

5          But again, we're talking about equitable mootness.

6   I don't think there's any argument that there would be

7   constitutional mootness here, absent probably well after the

8   effective date.  But as far as equitable mootness is

9   concerned, I'm just not seeing it.

10          I mean, again, the case law in the Second Circuit

11  focuses on the five-step test where a plan has been

12  substantially consummated.  Other circuits focus on simply

13  whether third parties' expectations, i.e., parties who are

14  not parties to the appeal or on either side of the contested

15  issues, would be so harmed that the Court would not exercise

16  what it otherwise has, which is an unflagging duty to

17  exercise its jurisdiction.  And I just...  I mean, how would

18  you undermine the plan my invoking equitable mootness for

19  things that were done before substantial consummation?  It

20  just seems like a contradiction in terms.

21          MS. LEVINE:  Your Honor, as I think the St.

22  Johnsbury case pointed out, we're in a difficult position.

23  We don't want to argue against ourselves.  We don't think

24  equipment mootness would or should apply --

25          THE COURT:  No, you don't have to --

1           MS. LEVINE:  -- but the Debtors --

2           THE COURT:  I'm not asking you to argue against

3    yourselves.  But I just don't...  But I think here you need

4    to show me that this harm is not just conjectural.

5           MS. LEVINE:  Your Honor, the reason we think it's

6    more conjectural is based on what the Debtors have said

7    regarding what they're going to argue about equitable

8    mootness, and they've pinned it, not just to the effective

9    date, but to the sentencing date, which under the plan could

10   be as early as November 1st, which is the day after our

11   argument in the District Court, with the effective date

12   really soon after that, as early as December 8th, a week

13   later.

14           So, you know, talking about the timing and the

15   proposals that they have offered, you know, we think

16   certainly we should at the very least get a stay until the

17   District Court's decision to make sure those dates don't

18   come and go before the District Court has a chance to rule.

19   We are going at --

20           THE COURT:  Let me focus on that point.  If it is

21   clear that the District Court is going to rule before

22   substantial consummation of the plan, before the effective

23   date, why is a stay needed?  Why should the Debtors and the

24   other parties who are in support of the plan be precluded

25   from laying the groundwork in case the conditions to the

1    effective date do occur, such as setting up new boards,

2    setting up the trusts, et cetera?

3           I raised this point, you know, the first time that

4    a stay was asked on an emergency basis, and I'm still having

5    a hard time seeing how that works.  And frankly, if one

6    looks at Judge McMahon's order, which I'm not doing, but

7    it's as much in support for that view also, that there

8    really doesn't seem to be anything that's really going to

9    really run the risk of equitable mootness until after the

10   effective date, which it appears, at least, would occur

11   after Judge McMahon's ruling.

12          Now, I think you acknowledged that the stay you're

13   seeking would have to be a stay of everything, but could

14   just be a stay of the effective date, right?  Or at least it

15   doesn't have to be a stay of everything?  I don't want to

16   put words in your mouth.  You didn't agree with this to the

17   other point.  You didn't agree that it could just be a stay

18   of the effective date.  But I think you did agree that the

19   stay of the confirmation order would not have to be a stay

20   of all of the order in order for there to be no risk of

21   equitable mootness, right?

22          MS. LEVINE:  Your Honor, in our motion we talked

23   about one specific thing, because one of the opponents had

24   raised a concern about secreting assets.  And you know, we

25   tried to have this conversation with the Debtors just to

Page 79

1    find out what are the specific things that you would want

2    exempted from a stay.  And we didn't get an answer to that

3    question.

4           So if there was a question of other specific

5    things, those are things we would have to take under

6    consideration or have authority to agree to any other

7    specific thing than what we put in our brief.

8           But you know, we understand that Judge McMahon is

9    moving very, very quickly.  We're all moving as quickly as

10   we can to get the appeal decided quickly.  But there's no

11   guarantee that she is going to decide before a date certain,

12   particularly when these states are approaching in December.

13          THE COURT:  So that would argue just for staying

14   the effective date until after her ruling, not staying

15   everything else that the Debtor would be doing to prepare

16   for the effective date, which isn't really --

17          MS. LEVINE:  Well, Your Honor --

18          THE COURT:  -- which isn't really under the

19   confirmation order anyway, because the confirmation order

20   doesn't really contemplate any material transactions before

21   the effective date, I think.  Right?  None have been

22   identified.

23          MS. LEVINE:  Your Honor, the way to stay the

24   effective date is to stay the confirmation order, because

25   those are the transactions that lead up to getting to the

Page 80

```
 1    effective date and --

 2              THE COURT:  Let me ask --

 3              MS. LEVINE:  -- lead up to getting to the

 4    sentencing.

 5              THE COURT:  Let me ask you the question different.

 6    What transactions out of the ordinary course do you believe

 7    they confirmation order authorizes now before the effective

 8    date?

 9              MS. LEVINE:  Your Honor, the confirmation order

10    grants a broad authorization to engage in the transactions

11    that they need to implement the plan.  And part of the

12    problem is we're in the dark on exactly what they're doing.

13    We want to maintain the status quo because equitable

14    mootness is an existential threat to our appeal.  And

15    maintaining the status quo is the only way to protect

16    against that risk of equitable mootness.  You know, it's --

17              THE COURT:  Do you have any case that stands for

18    that proposition?

19              MS. LEVINE:  I'm sorry, which --

20              THE COURT:  That any risk --

21              MS. LEVINE:  -- that equitable mootness is --

22              THE COURT:  -- any risk of equitable mootness is

23    enough?  In fact, most of the cases say just the opposite of

24    that.  It has to be a real risk, coupled with other things,

25    or at least something else.  Now, maybe that something else
```

Page 81

```
 1    here may simply be the significance of ruling on the merits

 2    of the appeal.

 3            But it would still seem to me that if you had --

 4    and this is repeated in numerous rulings -- there's one by

 5    Judge Briccetti in U.S. Bank National Association v.

 6    Windstream Holdings, Inc., 2020 U.S. District LEXIS 137183.

 7    Merely invoking equitable mootness as the Appellants have

 8    done here -- a risk that is present in any post-confirmation

 9    appeal of a Chapter 11 plan -- is not sufficient to

10    demonstrate irreparable harm.  If the Court were to credit

11    this kind of argument for every such request, it would be

12    forced to review nearly every bankruptcy appeal on an

13    expedited basis and, of course, grant the motion if some

14    other factor were established.  And he cites there In Re

15    Calpine Corp., 2008 Bankr. LEXIS 217 (Bankr. S.D.N.Y. Jan.

16    24, 2008).

17            But there are lots of courts that say that.  That

18    you can't just say there's a risk of equitable mootness and

19    then get a stay pending appeal.  You have to actually focus

20    on what that risk is and how real it is, and then see how

21    it's tied into the other factors.

22            And I'm still not seeing it as far as between now

23    and a date within a reasonable time after Judge McMahon's

24    ruling, which I think the drafters of the rule have said is

25    at a minimum 14 days.  And that would be just a stay of the
```

```
 1    effective date.  I mean, there's no discussion about how

 2    this plan could be substantially consummated before then.

 3              And even then, there's the issue of who are the

 4    people who are harmed by a continued appeal?  And if we're

 5    focusing just on the Sacklers, I don't think that's the type

 6    of harm for the shareholder released parties; that's the

 7    type of harm that the courts recognize is a basis for

 8    equitable mootness, because they're in the heart of the

 9    issues that are on appeal.  There would have to be other

10    third parties, legitimate parties who aren't in the dispute

11    who were being harmed.

12              MS. LEVINE:  Your Honor, you know, this sort of

13    goes back a little bit to where I started, where we think

14    the harm is the complete elimination of claims that becomes

15    unreviewable if the appeals are equitably moot.

16              THE COURT:  All right.  I think we've covered --

17              MS. LEVINE:  And --

18              THE COURT:  -- this point, because again, I don't

19    think you really answered my question on how it becomes

20    unreviewable.  I just don't -- I don't see it here.  I don't

21    think you carried your burden of proof on that point, at

22    least through the date of Judge McMahon's ruling and the

23    rule stay that goes into effect.  And then parties can ask

24    her if she thinks there's a basis for a further stay in the

25    Second Circuit.  And they will have had the benefit of
```

```
 1    looking at the issue besides equitable mootness that you're

 2    focusing on, which is the importance of the merits, and can

 3    weigh those themselves.

 4            I just -- I don't -- the release isn't going to be

 5    effective until the effective date.  So to lose the release

 6    doesn't happen until the effective date.

 7            MS. LEVINE:  And Your Honor, we think it's --

 8    we're asking for a stay, you know, and in the alternative,

 9    at least a stay through the District Court's decision, to

10    make sure those dates don't pass, to make sure that we can

11    this appeal heard on the merits.  We think that's critically

12    important.  We think it raises really important issues that

13    should be heard on the merits.

14            THE COURT:  All right.  Well, again, I can

15    understand that argument as far as a stay of the effective

16    date.  I'm still not seeing it as far as a stay of other

17    actions, which would not be -- I don't believe -- authorized

18    before the effective date.  And I've already ruled, and I

19    continue to believe, that the advance order is clearly not a

20    basis for equitable mootness.  I mean, it's just -- that

21    would be -- for a doctrine which is already under legitimate

22    attack, to rule that that order is a basis for equitable

23    mootness is just -- I can't imagine it.  I mean, I think

24    that's a frivolous argument.  I really can't -- it's just

25    inconceivable.
```

1          MS. LEVINE:  Your Honor, I appreciate your views

2    on that.  You know, it's our concern that Second Circuit's

3    not bound, and our hands are tied a little bit because we're

4    in the dark about what the Debtors are actually doing.  We

5    have asked them --

6          THE COURT:  All right.  Well, I'll --

7          MS. LEVINE:  -- multiple times.

8          THE COURT:  -- ask the Debtors.

9          MS. LEVINE:  We haven't gotten an answer.

10          THE COURT:  I'll ask the Debtors what they believe

11    they're authorized to do before the effective date to lead

12    to the argument that the plan is substantially consummated

13    and, therefore, it would be inequitable for third parties,

14    not the parties who have the benefit of the release, that

15    you are appealing, in essence.  That's the harm you're

16    trying to address is your dispute over the legitimacy of the

17    third-party release.  And I think I do have a -- just

18    because I...  Look, the cases are reported for a reason.

19    The lower courts follow them.

20          So, you know, one reads Charter, one reads

21    Windstream, one reads the Chateaugay case, and Metromedia.

22    I mean, these are MPM Silicones.  These are published

23    opinions by the Second Circuit where they lay out when

24    something will be found to be equitably moot.  And it is an

25    equitable doctrine, and so the facts matter.

1          But, you know, I think actually the trial courts

2     have been given the job generally to find the facts in light

3     of the case law, and I just can't imagine that the facts

4     before me, up at least until the effective date, would lead

5     the Second Circuit to find that the appeal was rendered

6     equitably moot.

7          It's just -- there's no effective date, there's no

8     substantial consummation, there's no sale that's happening

9     before the effective date, there's no other transaction.

10    And it just -- it doesn't fit even within the actually

11    fairly pro-equitable mootness case law in the circuit, which

12    focuses on the heavy showing someone has to make against

13    equitable mootness when a plan has been substantially

14    consummated.  This plan isn't even effective, so it's hard

15    to believe that it could be substantially consummated.

16          Anyway, so why don't we move on to the balance of

17    hardships and public policy.

18          MS. LEVINE:  Your Honor, so on the balance of

19    hardships, the opposing parties have rested primarily upon a

20    harm from delay.  No one questions the importance of

21    providing relief to those who have suffered from the opioid

22    crisis.  In our view, that supports a stay.  Those who

23    oppose the plan have also suffered from the opioid crisis.

24    They have equally pressing interests and abatement and

25    compensation, but they would have their claims eliminated

Page 86

```
1    entirely by the plan, not just delayed.

2            And we don't agree that a stay would cause

3    significant delay in the context of this case, which has

4    been pending for over two years, with litigation against

5    Purdue and the Sackler Family that began before that, where

6    the appeal is being expedited at a very rapid pace before

7    the District Court.  The argument on that appeal is in just

8    three weeks.  And, of course, if it went to the Second

9    Circuit, we would seek to expedite it there as well.

10           The United States Trustee is the watchdog, the

11   congressionally appointed watchdog, acting in the public

12   interest to try and make sure bankruptcy is not abused.

13   We're advocating -- we understand you disagree -- but to

14   ensure that the plan does not transgress the Constitution or

15   the Code, and we think there's a public interest in having

16   these issues heard on the merits regarding these third-party

17   releases, and having, you know, the appellate courts provide

18   more clarity on the limits of when they're allowed and when

19   they're not allowed.

20           The Debtors and their allies have relied a lot on

21   the creditors' support for the plan suggests that a stay

22   would be against the public interest.  The creditors'

23   support for the plan is not the same thing as the public

24   interest.  It just reflects the interest of the creditors

25   that voted in favor of the plan.
```

1          There is a significant public interest in

2     vindicating the rights of the minority and preventing the

3     will of the majority from going unchecked by appellate

4     review.  And we think that permanent elimination of the

5     claims against the consent of the people who did not want to

6     release these claims outweighs that marginal delay, which,

7     again, we think -- particularly focusing in on the District

8     Court decision -- is relatively minimal.

9          THE COURT:  Well, let's not focus on the District

10    Court decision for the moment.  Let's focus on when you

11    believe that -- when do you believe that a final decision

12    here would be made?  And I'm assuming that's through the

13    Supreme Court process.

14          MS. LEVINE:  Yes.  If this were to go -- if

15    someone were to petition for certiorari, it would be to the

16    Supreme Court for process, and of course, if the Supreme

17    Court granted cert, that would certainly reflect that these

18    are significant issues that were review.

19          THE COURT:  So have you projected how long that

20    would take, that process?  Are we talking 2024?

21          MS. LEVINE:  Your Honor, I don't know the answer

22    to that.

23          THE COURT:  Isn't that important to figure out?

24          MS. LEVINE:  I don't know that there's any way to

25    predict with any kind of certainty how quickly the courts

1    will go, other than we've committed to expediting these

2    appeals.  And you know, that's shown through our actions

3    with how quickly we are moving in the District Court.

4              THE COURT:  Well, does that apply to the Supreme

5    Court, though?  They don't take expedited appeals like this,

6    do they?

7              MS. LEVINE:  Yeah, I don't know exactly what the

8    process is, Your Honor, but I don't think that the

9    expediting works in the same way in the Supreme Court.  So I

10   don't have an answer for how long that would be.  But, Your

11   Honor, we do think that these issues are important and that,

12   you know, a delay from the stay is outweighed by the

13   elimination of these rights.  And that that would be an

14   irreparable injury for these claims to be eliminated

15   entirely, without a full review on the merits.

16             THE COURT:  And as far as the individuals' rights

17   are concerned, you assert them -- that they would be

18   asserted by individual under state consumer protection laws?

19             MS. LEVINE:  Some of this -- well, some of the

20   individual claims are under state consumer protection laws,

21   Your Honor.  Some are under common law.  I'm not sure I

22   quite caught your question.

23             THE COURT:  I'm just trying to figure out what the

24   claims that you're looking to protect are, as far as

25   individuals' claims.

1          MS. LEVINE:  Direct claims, based on the

2     individual non-debtor conduct for their own misconduct,

3     breaching a duty directly to the Plaintiffs, such as the

4     cases that -- the complaints that we cited in our brief,

5     which allege claims under state consumer protection

6     statutes, common law fraud, negligence, RICO.  There's a

7     number of claims that have been asserted along those lines

8     that allege direct participation and direct liability, based

9     on the individual Defendants' own misconduct.

10          THE COURT:  Okay.  And that misconduct would be

11    misconduct in being an officer or director or shareholder of

12    the Debtors?

13          MS. LEVINE:  In the cases that we've cited, yes.

14    I believe the individual defendants were in those roles.

15    But the allegations are that they'd reached -- is not just a

16    sort of veiled piercing, breach of fiduciary duty,

17    imputation of the company's conduct, but that the

18    individuals had breached their own duty and engaged in their

19    own misconduct, making them directly liable to the

20    Plaintiffs.

21          THE COURT:  Have you found any of those cases or

22    any evidence from the confirmation hearing that shows that

23    those allegations don't substantially or entirely overlap

24    with the showing that would be necessary for piercing the

25    corporate veil or other causes of action that the Debtors

1    would have?

2            MS. LEVINE:  Your Honor, the factual allegations

3    may overlap, but I mean, I think this gets to where we

4    disagree with what the proper scope of the non-debtor

5    releases are, and that is something that we think should --

6    is an important issue that should be reviewed, and one of

7    the reasons why we're seeking a stay pending appeal.

8            You know, when Metromedia talked about the cases

9    that have -- the rare cases that have allowed these

10   releases, they were in circumstances that were more limited.

11   They were in class actions, like Drexel, which is this is

12   not -- are aware they were, you know, more surely derivative

13   claims, such as fraudulent -- you know, claims that were

14   duplicate fraudulent transfer claims, like in Madoff or

15   Tronox or in Manville I, where it was directly against the

16   asset of the estate, and that in the claim was a secondary

17   insured that was derivative of the primary insureds' claim,

18   the debtor was the primary insured.

19           So we think that question of whether overlapping

20   factual allegations is enough to put this within the scope

21   of a non-debtor release and whether that's the appropriate

22   scope is an important question, as a question that should be

23   addressed on appellate review.

24           THE COURT:  Well, no, I've already said I believe

25   that's correct.  I'm just trying to figure out here -- and

Page 91

1     this is in a different context; this is balancing the harms

2     -- the right of someone to pursue, which on the facts are

3     duplicate claims or overlapping claims, is so strong,

4     particularly when they would receive a recovery, at least

5     which was found under the plan, they wouldn't receive at all

6     without the settlement, is enough to override the harm

7     caused by the delay.

8             MS. LEVINE:  Your Honor, we think there is harm

9     here.  The claims directly against the Sacklers or other

10    non-debtors were never valued.  And there's a harm to having

11    the choice of whether to settle --

12            THE COURT:  I actually did value them.

13            MS. LEVINE:  -- or proofs of that claim are not --

14            THE COURT:  I don't know why --

15            MS. LEVINE:  -- taken away from you.

16            THE COURT:  I don't know why you say that.  I

17    actually did value them in the aggregate.  And I considered

18    those complaints.  And I said, given the battle of the

19    century that would ensue, the settlement was fair.  The U.S.

20    Trustee took no discovery on those issues and didn't make

21    any case on them.  Some of the objecting states did, and I'm

22    sure Judge McMahon will read carefully the witness testimony

23    on those points.

24            But I have to say, I am having a hard time seeing

25    how those claims, which really are overlapping claims as far

Page 92

```
 1   as I can tell -- and I did the best I could to cabin the

 2   release to make it clear that they would not expand beyond

 3   that -- that the people that you're looking out for would

 4   get any recovery whatsoever in the context where the

 5   settlement was not in place and there would be a litigation

 6   free-for-all.

 7           Again, you have the United States getting it

 8   superpriority claim.  You have individual states litigating

 9   their claims.  And then that's up against a class action

10   lawyer or two or three, back in the MDL, where there already

11   was, by the substantial private side in the MDL, a

12   settlement for a lesser amount, namely $3 billion.

13           So I'm just having a hard time seeing, other than

14   the intellectual desire to clarify this issue one way or the

15   other, how the people who would object to the release of

16   their claims are harmed more than the people who would be

17   receiving the benefit of the plan distributions.

18           MS. LEVINE:  Your Honor, I think we have a

19   disagreement about what the evidence shows about that.  But

20   there's also a harm from having that choice taken away, and

21   what we view of a violation of due process rights to be

22   forced into a settlement that one does not agree to.

23           THE COURT:  Well, the parties you're speaking on

24   behalf of certainly had notice of the confirmation hearing

25   and the right to hire a lawyer to make that very argument,
```

1    which is a lot easier to make than hiring a lawyer to

2    compete against 48 states and the Debtors and the lawyers

3    and their clients who make up the Ad Hoc Committee of

4    Personal Injury Claimants.

5            If they're not prepared even to hire a lawyer to

6    fight the plan, how do you assume that they're going to even

7    undertake the litigation that you want to preserve for them?

8            MS. LEVINE:  Your Honor, the premise that there

9    was adequate notice, again, you know, we disagree with.

10   That's part of our objection.  And we know you disagree.

11   And this is part of the reason why we think this needs

12   appellate review.

13           And you know, there are parties who have filed

14   claims that would be precluded.  We think we've shown that.

15   There are numerous cases listed in the preliminary

16   injunction.

17           THE COURT:  But they haven't objected to the plan.

18   And you're not going to represent --

19           MS. LEVINE:  Mr. Hartman has.

20           THE COURT:  You're not going to represent them in

21   the litigation, right?

22           MS. LEVINE:  No, Your Honor.  And of course, the

23   United States Trustee is here not representing individuals,

24   but representing the public interest in making sure that the

25   bankruptcy system isn't abused.  But we think, you know, you

Page 94

```
 1    can still look to that harm, the due process harm to people

 2    who are having claims eliminated, and to the public interest

 3    in having these significant important issues addressed on

 4    appeal as part of your harms balancing in addressing a stay

 5    pending appeal.

 6              THE COURT:  Okay.

 7              MS. LEVINE:  Your Honor, I don't know if you have

 8    further questions.  You know, we've made our case in our

 9    briefs.  Obviously, we have some disagreements, but we would

10    stand on a request for a stay pending appeal.  And I will,

11    if you have no further questions, cede the floor to some of

12    the other movants.

13              THE COURT:  Okay.

14              MR. GOLD:  Good morning, Your Honor.  Matthew

15    Gold, from Kleinberg Kaplan, representing the State of

16    Washington.  Can you hear me?

17              THE COURT:  Yes.

18              MR. GOLD:  May I proceed?

19              THE COURT:  And see you too.  Yes.  You can go

20    ahead.

21              MR. GOLD:  Thank you, Your Honor.  First, I just

22    would like to touch on -- because I think it's an important

23    point in context of the questions that Your Honor has raised

24    -- the attempts that were made to try to resolve this matter

25    prior to this hearing.
```

Page 95

1              I think the key point, which Your Honor said in

2       framing the question for us, was that it would be my wish

3       that the schedule for the appeal is a reasonable one and

4       does not run the risk of causing Norma's harm to creditors.

5       I'm not going to quote every word you said, but the key

6       point was, with a second potential look at the Appellate

7       Court as to whether any further stay is necessary.

8              And I think that that is the point here where,

9       with what we -- what I described earlier as our fallback

10      position, that we are seeking to have a stay consistent with

11      Rule 8025 that would at least take the process through a

12      decision from the District Court, and then give a period of

13      time for a higher court to decide whether to further extend

14      the stay.  The --

15              THE COURT:  Can I represent you on that point, Mr.

16      Gold?

17              MR. GOLD:  Sure.

18              THE COURT:  When talking to the U.S. Trustee's

19      counsel, I made a distinction between a stay of the

20      effective date, or the occurrence of the effective date

21      under the order, which would be a specific condition to the

22      effective date in the order and in the plan, and a stay of

23      the order in its entirety.  And it seemed to me that the

24      latter might be warranted, but not the former.  I mean --

25              MR. GOLD:  Well --

1          THE COURT:  -- the other way around.  That the

2     latter would not be warranted, but the former might be.

3          MR. GOLD:  I think that a proper consideration of

4     that question, Your Honor, requires a consideration of the

5     effect of sentencing.  And that is the -- and that is

6     something that may not -- that is clearly contemplated under

7     the confirmation order, although it may not be completely

8     clear how it -- whether it arises under the plan or under a

9     separate stipulation.

10          But the connection, Your Honor -- and I think the

11     Debtor has been very clear about this -- is that they are

12     going to press that once sentencing has occurred, they will

13     be suffering immense harms if they are not permitted to then

14     consummate the plan and to enter into the transactions under

15     the plan.  And so that, therefore, to enable there to be a

16     meaningful stay of the consummation of the plan, as Your

17     Honor has posited, there needs to be a delay of the

18     sentencing as well.

19          If the Debtors can posit -- now, right now I'm

20     positing what their argument is going to be, and I realize

21     that that's a somewhat shaky limb to be on, but that's

22     pretty much where I understand their position is going to

23     be, so that to prevent the possibility of a shipwreck or

24     major harms occurring if there is sentencing and not a --

25     and they can't consummate the plan, we need to have a delay

1     in the sentencing.

2              If the sentencing is delayed and concurrent with

3     that a stay of the effective date of the plan, we believe

4     then Your Honor's analysis is correct, that that should be

5     sufficient to maintain the status quo and prevent there

6     being a substantial consummation that would be the predicate

7     for an equitable mootness argument.

8              Now, even there, we're at a slight disadvantage

9     because, as the U.S. Trustee has said, we don't know exactly

10    what the Debtors would be doing and it would be a lot

11    cleaner for us to accept this, if the Debtors would

12    straightforwardly say, we agree with you; nothing else that

13    is happening here would create a predicate for equitable

14    mootness, along the lines of the assurances they gave to the

15    parties in connection with the advance order, so that we

16    would have a basis of knowing that there wasn't something

17    going on that we're not aware of and that in our saying we

18    don't think there's a problem, someone plays a gotcha game

19    and says, yes, they weren't aware of this and that happened.

20             But based on our assessment, what we're aware of

21    being contemplated, that's the one critical point that we

22    have to add.  There has to be a delay in sentencing and then

23    a delay in the effective date of the plan, which would

24    happen together because the effective date of the plan can't

25    occur without sentencing in the first instance.

1          And so the reason we were unable to reach any kind

2     of resolution with the Debtors in trying to resolve this

3     short of having this lengthy hearing today was that they

4     insisted that any resolution we reached with them had to

5     include a date certain for the sentencing to occur.

6          And so that's why we've been unable to reach an

7     assessment with them, because they kept including the

8     sentencing, reserving their right to argue that the

9     occurrence of the sentencing would create an equitable

10    mootness problem, either by itself or because of what would

11    be entailed afterwards.  They didn't get to that level of

12    specificity.  But that's why we tie those two things

13    together.

14          THE COURT:  Okay.  And I appreciate that I may be

15    asking you to say things that are contrary to your later

16    argument that sentencing wouldn't render the plan moot.  And

17    all I can say is that you wouldn't be held to those things

18    in the future, and I'm sure the Debtors have thought of them

19    to.

20          So I'm having a hard time seeing how the

21    sentencing could create equitable mootness.  I mean, it's

22    part of a plea agreement.  It's scheduled in front of a

23    different judge.  I guess I could enjoin --

24          MR. GOLD:  Oh --

25          THE COURT:  -- the Debtors from seeking it.  But

Page 99

1    the agreement has this provision that they're supposed to go

2    get sentenced.

3              MR. GOLD:  Well, Your Honor, as I understand it --

4    and again, this will be something that the Debtors are

5    saying this is argument that they're going to make.

6              THE COURT:  Right.

7              MR. GOLD:  And if they say before the Court now

8    that they would not make this argument, that might be a lot

9    cleaner.  But as I understand it, their position is going to

10   be that once sentencing occurs, they are no longer able to

11   operate as the companies that are currently constituted.

12   That because they will be sentenced, they will be unable to

13   sell product, to receive Medicare, or contributions and

14   other things.  And that therefore, they will be threatened

15   with an immediate shutdown, a corporate catastrophe, unless

16   they are able to go ahead with the restructurings that are

17   contemplated under the plan, and so then that's why those

18   two will be tied together.

19             Now, I should say that, Your Honor, we would love

20   nothing more than to engage with the Debtors and to say is

21   there a way to allow this to go forward, to allow some

22   corporate restructuring to take place, to allow some

23   payments to go to the victims of Purdue and the Sacklers

24   that are supposed to be receiving payments under the plan.

25             We're not trying to -- that's not our goal, to

1    prevent those types of assistance from happening.  And if

2    there is a way for the parties to on one hand permit some of

3    these things to go forward, while on the other hand

4    preserving the right of appeal, we are very -- we have

5    always been open to having that discussion of trying to make

6    propositions along those lines to the parties.  Or perhaps

7    something along the lines of the emergency relief fund that

8    was proposed during the case, but that did not occur.

9    Something like that that could perhaps take place to allow

10   parties to get relief.

11            What we perceive is that the parties who have

12   refused to engage with us on this point are doing so because

13   they want to be able to hold up the possibility of relief as

14   their ticket to getting an equitable mootness that would

15   preclude further appeals.

16            So if there is a way of managing to separate these

17   things through stipulation, or an order, or something that

18   allows some of these things to occur -- and I think Your

19   Honor is right that perhaps they are not at all necessarily

20   as abstract principles linked, but we believe that -- our

21   understanding is that the way this plan has been drafted and

22   that this plan has been put together -- and this is a plan

23   that has been drafted and put together with a clear strategy

24   of preserving it through equitable mootness -- that the

25   effort has been made to tie these things together so that

Page 101

1    they could not be disentangled, and so that starting down

2    this road would necessarily create the predicates for

3    equitable mootness.  And that starts with the sentencing and

4    then pulls in the restructuring and then the other matters

5    that occur there.

6            I will just note then with respect to the timing,

7    the plea agreement took place, I'm going to say, in October

8    or so of 2020, and was held in abeyance for a period of time

9    to allow further proceedings before this Court, confirmation

10   and other such things.  The Debtors then, for reasons that

11   are at least opaque to us, put in a further delay for them

12   to do certain preparations prior to the sentencing

13   occurring.

14           So it's pretty clear to us that the sentencing,

15   which we are not asking to be undone but can be held in

16   abeyance while the issues under the plan receive proper

17   appellate review, and so holding those matters off, the

18   Debtor has managed to stay in this presentencing period for

19   over a year now and contemplated further staying.

20           So we believe that the most effective and simplest

21   way to preserve the status quo is to have, as Your Honor

22   said, a stay that includes the effective date plus the

23   sentencing to avoid the shipwreck scenario.  Or in the

24   alternative, we're perfectly -- we are desirous of trying to

25   come up with a better way to allow some benefits to go

```
 1    through, if it will not -- if the parties can agree that

 2    doing that will not equitably moot an appeal.

 3            But so far, we have not received serious

 4    engagements on that.  And apparently, the parties prefer to

 5    try to use the very real need of these victims to receive

 6    money as a kind of hostage situation where they can't get

 7    their money unless our appeals are irrevocably denied

 8    through (indiscernible) risk.

 9            THE COURT:  Okay.

10            MR. GOLD:  I will not -- I will move on, then,

11    Your Honor.  I will not touch on the merits particularly,

12    because as I think Your Honor said, we agree that the

13    standard is sufficiently flexible, that we've made enough of

14    a showing with the merits of the appeals that we wish to put

15    forward, to satisfy the test in the Second Circuit.  And we

16    concede that we have to meet several factors of the prongs,

17    and it's not simply enough to have succeeded on one of them.

18    But we believe that we've made a sufficient showing on those

19    to move on to the other prongs as well.

20            I would just note that the irreparable harm that

21    we will suffer here is the deprivation of the rights of the

22    moving states to bring their independent actions under state

23    law against the Sacklers.  And that the potential loss of

24    those claims is certainly real enough to satisfy any

25    requirements that it not simply be mere equitable mootness,
```

```
 1    but equitable mootness plus a consequence, that that's the

 2    consequence here.

 3           And then there are other cases also raised in the

 4    briefs that we believe are also compelling, that says that

 5    any time a state is prevented from enforcing its laws, it

 6    has also suffered an irreparable harm.  Those two together,

 7    we believe, certainly satisfy the requirement that there be

 8    a form of irreparable harm shown here.

 9           I will then turn, if Your Honor doesn't have

10    questions, to the question of the balancing of the harms,

11    which is the next factor here.

12           It feels to us that an awful lot of the arguments

13    that the stay opponents have put forward basically can be

14    described from the movie, "Blazing Saddles", where the

15    sheriff who finds himself in a difficult spot -- played by

16    Cleavon Little -- points a gun at his own head and manages

17    to convince the parties that the threat to himself that he

18    is posing are sufficient to allow him to be extricated from

19    that position.  And the reason I mention that here is

20    because the harms that the stay opponents are positing here

21    are ones that they are themselves creating to a large

22    extent.

23           So first, as I've touched on already, is the

24    question of the sentencing.  I believe their argument is

25    going to be that if sentencing occurs, but they can't
```

Page 104

1    proceed, they will suffer harm.  Well, the simple answer is

2    for them to seek to defer sentencing until the appeals have

3    run their course.

4            Second, we have these arguments that the Sacklers

5    have the right to terminate the agreement if a stay is

6    entered.  And I find this an outrageous suggestion, Your

7    Honor.  I will note that during the hearing that took place

8    on October 14th on certification of a direct appeal, there

9    was another issue regarding a Sackler termination right.

10           Mr. Huebner stated emphatically to this Court that

11   of course he had a waiver of that Sackler termination right,

12   and that he would not be coming into the court without

13   having a waiver of that termination right in his pocket.

14   And the reason for that was self-evident.  How could one

15   think that Purdue would put in jeopardy the Sackler

16   settlement agreement, the centerpiece of the plan?  But that

17   is what Purdue is arguing right here.  That they granted the

18   Sackler a walk right.

19           I will note that this walk right was slipped into

20   the agreement at literally the last moment, while the

21   confirmation trial was proceeding, after the evidentiary

22   portion of the confirmation trial had closed, after all the

23   testimony about how wonderful a settlement this was had

24   already been placed on the record.

25           And I will also note that Purdue did not consider

Page 105

1    this walk right to be significant enough to advise the Court

2    and other parties, oh, by the way, we've posted an amended

3    Sackler settlement agreement, and it happens to contain a

4    provision that will allow the Sacklers to terminate this if

5    there's a stay pending appeal, which a possibility of

6    request for a stay was clearly contemplated by everyone.

7             So, now, how could this be?  How is it possible

8    that all the tremendous lawyers representing the stay

9    opponents voluntarily put in jeopardy the centerpiece of the

10   plan?  Not because they were confident that there would be

11   no appeal, nor that there would not be a motion for a stay

12   pending appeal.  It has to be that they could not seriously

13   expect that the Sacklers would spurn all the benefits that

14   they get under this plan and actually exercise this right,

15   and rather, because they intended to use this provision as a

16   means to bludgeon the courts into denying a stay.  And we

17   submit that that should not be permitted here.

18            Second argument that they put forward relates to

19   the attorneys' fees that they themselves are incurring and

20   will incur during the period of the stay.  We believe this

21   is also an outrageous point.  If they seriously believed

22   that the size of the fees that they generate were causing

23   harms to victims of Purdue and the Sacklers, they ought to

24   be finding ways to limit their fees.

25            To start with, it was not necessary for seven

1    oppositions to the stay motions filed by seven different

2    parties to be filed.  They could've coordinated a single

3    filing.  I know this could be done because the states

4    routinely coordinate to present fewer filings to Your Honor.

5           More to the point, steps could've been taken

6    during the case to curtail the amount of professional fees

7    during the case, or to curtail the amount of fees that will

8    be charged post-confirmation.  But no.  The only way in

9    which the stay opponents suggest that fees ought to be

10   controlled is by denying this stay to the Appellants.  And

11   we submit that that is too transparent to take seriously.

12          Then we reach what I believe is the far more

13   serious concern, which is the delay in relief going to the

14   victims of Purdue and the Sacklers.  I just note that this

15   is not a new problem.  This is a problem that's been

16   weighing on everyone through the over two years that this

17   case has been pending.  This did not suddenly become a

18   problem.  The victims of Purdue and the Sacklers needed help

19   two years ago when the cases were filed.  But that undoubted

20   need was subordinated to the legal process of this case.

21          The plan opponents could have during the case

22   established the emergency relief fund to provide faster

23   relief to the victims.  But they didn't.  Now, we are in a

24   post-confirmation pre-effective date period.  There was the

25   famous 82-day period before the plan could go effective,

```
 1    which was put in there, as we understand it, for the
 2    convenience of the Debtors to allow them a deliberate period
 3    of time to undertake certain corporate transactions.
 4          If the harm to the parties of not getting their
 5    money sooner was a serious possibility, that period of time
 6    could've been shortened as well, but it wasn't.  The only
 7    time when this delay apparently becomes intolerable is when
 8    it's used as a means to curtail the stay that we're
 9    requesting and the preservation of our appellate rights.
10          The appealing states -- and especially in this
11    context, where we are asking for a stay -- goes through the
12    time of the anticipated ruling of the District Court, plus a
13    meaningful period of time to take the issue to a higher
14    court.  The incremental harm to those parties that will
15    occur during this relatively imitated period is far less of
16    a kind of all the terrible delays that they've had to suffer
17    through the case and does not provide an independent basis
18    for denying a limited stay through this time period.
19          THE COURT:  Well, I'm having a hard time following
20    that point, Mr. Gold.  I mean, it's still harm, and I think
21    that the real issue is how great a harm is it in comparison
22    --
23          MR. GOLD:  I agree, Your Honor.
24          THE COURT:  -- to the countervailing harm of
25    giving the Appellants the opportunity to try to vindicate
```

Page 108

1    their rights on appeal.

2           MR. GOLD:  I completely agree, Your Honor.  And

3    it's a complicated issue because this is apples and oranges,

4    if I may say.  The harms that we have here are different in

5    type, difficult to quantify, and so the Court has to engage

6    in the kind of balancing.  I'm just suggesting that the harm

7    here will not -- we're not disputing that it really occurs,

8    but this harm is one that the parties have lived with

9    throughout the case because there were important legal

10   principles or other things that were taking place.  And

11   we're suggesting that it does not outweigh here the

12   preservation of our appellate rights.

13          THE COURT:  Well, again, that may be the case

14   through a relatively short period after what would normally

15   be the effective date, because distributions in some measure

16   would be made into the trust, but not out of the trust, for

17   a period after the effective date.  But the longer you go,

18   the more the delay really counts, because there comes a

19   point when (indiscernible) claims start being liquidated and

20   the NOAT procedures are established, and at that point, the

21   money really does start going out.

22          MR. GOLD:  Well, I --

23          THE COURT:  Have your clients and the Debtors

24   talked about when that point is likely to be?

25          MR. GOLD:  Well, as I said, Your Honor, what we

1    have attempted to do with the Debtors is to find a way to --

2    and again, using the model that was engaged with the trust

3    advance motion to have the parties agree to allow various

4    steps to take place, including the ones that Your Honor has

5    listed -- and we have had, I have to say, little engagement

6    or appetite for engagement from the Debtors or the other

7    parties in terms of being able to parse.

8            I do agree that part of the benefit of having the

9    stay be limited to the period of time that we've discussed

10   in terms of getting us to the next level is that we can

11   analyze more concretely what steps are going to occur,

12   rather than looking at and allowing the next courts to be

13   able to focus on what issues would be arising then, and what

14   could be concretely happening then, and weighing that

15   against the harms that might occur.

16           It is certainly for the purposes of the District

17   Court's ruling, that by all evidence, Judge McMahon is

18   keenly aware of the importance of having a decision done

19   quickly.  And frankly, again, the other benefit is that

20   because she was aware of this, she was able to insist on a

21   briefing schedule to enable that all to work.

22           And if we are going to the next court, should that

23   be necessary, then, again, the Second Circuit could be in a

24   position to condition a stay upon an expedited briefing

25   schedule before the Second Circuit, which no lower court

1   could meaningfully be in a position to impose on the Second

2   Circuit, which they could do themselves.

3           So we posit that the harm for this period of time

4   is not sufficient to outweigh the importance of the

5   appellate rights that are being preserved, and that the

6   issue may have to be revisited by another court with its own

7   timetable in place and depending on where the matters stand

8   at that point.

9           And as I said, we are more than willing to try to

10  work with these parties to find a way to allow transactions

11  to occur, to allow even payments to go to needy parties, if

12  there can be a way to structure that to not affect the

13  appellate rights.

14          So now I turn Your Honor to the public interest

15  component of the process.  We submit that it is manifestly

16  in the public interest that this plan be fully tested on

17  appeal, not -- the Debtors seem to sometimes have the

18  position that the only appeal that is meaningful here is

19  appeal to the District Court.  This case could have been in

20  front of the Second Circuit already, had the Debtors agreed

21  to certification of a direct appeal.  But they chose not to.

22          THE COURT:  Well, the Circuit would have had to

23  have taken it too.

24          MR. GOLD:  That's true, Your Honor.  I'm just

25  saying that the Debtor -- that we didn't reach that point.

```
 1    And part of the reason why we didn't reach that point was

 2    that the Debtors at that hearing insisted that it was

 3    important that we go to the full process of first review

 4    from the Bankruptcy Court, and then review from the Court of

 5    Appeals.

 6              And so we want to -- now that we are on that path,

 7    we want to make sure that all levels of appeal are preserved

 8    and not booted out through equitable mootness.  And we

 9    submit that that is manifestly in the public interest, and

10    that it is against the public interest that parties be

11    permitted to design plans to create equitable mootness

12    factors in them as a means of avoiding review.  I mean, Your

13    Honor, I can state that I received emails today of CLA

14    programs that are already being designed and marketed to

15    teach bankruptcy lawyers how to design plans that provide

16    non-consensual releases and that can be protected by

17    equitable mootness.  The community and the country as a

18    whole is watching this, and it is critical --

19              THE COURT:  Equitable mootness --

20              MR. GOLD:  -- that this is --

21              THE COURT:  -- has been an issue in the -- at the

22    circuit level for decades.

23              MAN:  I understand, Your Honor.

24              THE COURT:  And somewhat inexplicably to me the

25    Supreme Court turned down cert this last term on two cases
```

1    that could've resolved that issue.  That has nothing to do

2    with this plan at all.  And it would seem to me that as we

3    just discussed, the public interest in avoiding harm,

4    tangible harm, to the victims increases with time.  And

5    you're just ignoring that when you talk about the public

6    interest.

7              And again, it's well-recognized that one issue,

8    one element of the public interest, is the finality of

9    reorganizations.  So I think it's much more complicated than

10   you're saying here, but I also think that what you're

11   arguing for now is well beyond what you had been arguing

12   for, which is some form of a stay through a ruling by the

13   District Court.  Because now you're talking about staying

14   matters through a determination by the Supreme Court, which

15   could be in 2024.  And --

16             MR. GOLD:  Allow me to clarify, Your Honor,

17   because I understand why you might have thought that, but

18   that's not what I meant to say.  The -- I think we have been

19   candid that we will -- that we intend to seek stays that go

20   on to the higher levels.  What I am now suggesting to Your

21   Honor is that the stay that we would be obtaining from Your

22   Honor would preserve our ability to seek further stays from

23   higher courts --

24             THE COURT:  Okay.  Fine.

25             MR. GOLD:  -- and that --

1          THE COURT:  Then I -- that's fine.  So we're

2     really -- I think -- look, here, the public interest point

3     very much dovetails with the balance of harms, as far as I

4     can see.  The parties here have agreed on the form of the

5     distribution of the money under this plan and have touted it

6     as something that is a single achievement.  When I say the

7     parties here, I mean both the appellees and the appellants.

8          So what we're talking about here is a dispute

9     between the appellants and the appellees on whether more

10    money can be obtained through this process because that's

11    what we're talking about.  We're talking about more money,

12    and whether that warrants additional delay.  And to me that

13    just goes back to the balancing of the harms.

14          MR. GOLD:  Well, Your Honor, the -- I would just

15    clarify a few points of what you have stated.  I do agree

16    that the appealing states participated in the design of many

17    features of the plan, and that we do believe that a lot of

18    those features of the plan are salutary and are ones that we

19    agreed to together.  But that was always -- those were

20    always being negotiated based on the predicate that other

21    issues, principally the releases, could also be

22    satisfactorily resolved, and unfortunately, they were not.

23          The -- I will also note that the issues that arise

24    vis-a-vis the Sacklers, are not solely issues relating to

25    the amount of money that can be paid.  Although that is

Page 114

1    certainly an important component of it, but there are other

2    issues regarding, for instance, the Sackler agreement to

3    have their name taken off of various institutions, about the

4    scope of the -- of when documents can be available in the

5    document depository -- or repository and other things that

6    are not, that take this case beyond a mere matter of money.

7            And I again state that the appealing states are

8    highly anxious to try to find ways to reduce the burdens on

9    the ones that Your Honor has identified rather than to hold

10   them hostage as a means of avoiding appellate

11   (indiscernible) important question.  Because we -- because

12   all of these are -- all the things that Your Honor stated

13   are matters of public concern.  But where you have a --

14   where you have what as Your Honor has identified as non-

15   frivolous, serious questions regarding the permissible scope

16   of a -- of releases granted pursuant to a confirmation

17   order, having those issues clarified on appeal we submit is

18   a compelling public interest, notwithstanding the other

19   matters that Your Honor has identified.

20           THE COURT:  Well, those other matters are, I

21   think, pretty eloquently laid out in the declarations of Ms.

22   Juaire.  I'm hoping I'm pronouncing that right, J-U-A-I-R-E,

23   and Ms. Trainor, T-R-A-I-N-O-R.

24           MR. GOLD:  Your Honor, I will --

25           THE COURT:  I guess I've heard you and I

1    appreciate what you've said, Mr. Gold, about the State's

2    willingness to work with the appellees on intermediate steps

3    that minimize that countervailing harm that they detail.

4            I guess the point that I need to press is, are the

5    three states prepared to accept some risk of equitable

6    mootness as part of those steps.  The U.S. Trustee

7    apparently takes the position that it's not, which seems

8    rather bizarre to me and contrary to the case law.  But I

9    don't know whether what you're offering here is just couched

10   by saying of course we can't take a risk of equitable

11   mootness, or is it willing to take some risk?

12            MR. GOLD:  Well, Your Honor, our -- we -- first,

13   we are agreeing to accept some -- our issue is not -- our

14   view is not identical to the U.S. Trustee, which as you've

15   obviously seen from the briefing that has been submitted.

16   We have not taken a separate appeal from the advance order.

17   We're not pursuing that.  We are accepting that.

18            While there is in theory some risk of equitable

19   mootness from that, we don't consider it to be a significant

20   enough one that we are pursuing that.  And so we are

21   exercising some judgment in terms of what risks of equitable

22   mootness we are willing to take and which not.

23            We also recognize that the framework that was

24   adopted with respect to the trust advance order had a -- and

25   in fact, also the structure that Judge McMahon adopted with

Page 116

1    respect to her ruling involved having the various parties to

2    the appeal stipulate that they were not going to use these

3    matters as the basis for an argument for equitable mootness.

4    Now, we recognize that that is not bulletproof, that it's --

5              THE COURT:  No, I actually think it is.

6              MR. GOLD:  And the higher court could --

7              THE COURT:  I --

8              MR. GOLD:  The higher court could make its own

9    determination --

10             THE COURT:  Yeah, I --

11             MR. GOLD:  -- but again, we --

12             THE COURT:  -- think it is pretty bulletproof.  I

13   mean, again, my quote from Judge Kaplan was focusing on

14   constitutional mootness, which is really a different issue

15   --

16             MR. GOLD:  Yes.

17             THE COURT:  -- as opposed to equitable mootness.

18   It would seem to me very hard for anyone to rule that it was

19   equitable to hold something as causing mootness when the

20   very party that would benefit from that had stipulated that

21   it wouldn't.  That would seem --

22             MR. GOLD:  Right.

23             THE COURT:  -- at the height of not being

24   equitable.

25             MR. GOLD:  Your Honor, I have said very much the

```
 1    same in my analysis of that question, although it's more

 2    meaningful coming from Your Honor than it is from a mere

 3    lawyer.  The point I'm making is that if we -- so, if the

 4    parties -- what we have been proposing was that the parties

 5    stipulate that they would not seek to use the steps that we

 6    are suggesting that we would be willing to negotiate with

 7    them as the basis for an equitable mootness argument.

 8             And while that is not nearly as bullet proof in

 9    the context of payments going to parties as it is in the

10    context of establishing trusts or other such matters, we are

11    certainly willing to seriously consider taking the risk that

12    some other party might raise those things, notwithstanding

13    the party's stipulation.  But we think that having the

14    parties stipulate to that would go a long way to allow that

15    to occur.

16             That's far from the situation where if we say

17    we're willing to allow certain things to go forward knowing

18    that the other parties, like say with the sentencing where

19    the Debtors have said let there be no mistake.  When

20    sentencing occurs, we are going to insist that that has

21    equitable mootness concerns.  That's a very different

22    analysis for us than something where the Debtors have

23    stipulated that they are not going to raise equitable

24    mootness.

25             So if the -- all I'm suggesting is that if these
```

Page 118

1    parties -- if their principal concern is in getting aid to

2    the victims, then they should be willing to work with us to

3    waive equitable mootness arguments and allow the payments to

4    go forward.  If on the other hand --

5              THE COURT:  No, that's fine.  I understand your

6    point.  Okay?

7              MR. GOLD:  Okay, Your Honor.  The -- Mr. Goldman

8    is going to be addressing the issues regarding the

9    declarations that have been submitted, so I will not further

10   extend this hearing by stating them myself.  And the --

11   unless Your Honor has any questions, I don't think --

12             THE COURT:  Well --

13             MR. GOLD:  -- there's anything --

14             THE COURT:  -- are one of you going to address the

15   bond issue?

16             MR. GOLD:  I can do that, Your Honor.  The -- we

17   submit that this case is governed by the plain language of

18   the rule that says a bond or other security is not required

19   when an appeal is taken by the United States, its officer,

20   its agency, or by direction of any department of the federal

21   government.

22             And we have here the -- that is our circumstance.

23   We are dealing with appeals that have been simultaneously or

24   substantially simultaneously filed by the U.S. Trustee,

25   which fits the category of the United States, its officer

1    agency, and by the states.  We are raising substantially

2    similar issues, or I would say that the U.S. Trustee has

3    issued a broad panoply of issues that include the issues

4    that we are raising on our appeal, and that based on that,

5    no bond can be required on this consolidated appeal.

6             Certainly if the -- if no bond is applied or a

7    stay is granted for the U.S. Trustee, there should be no

8    bond for -- because the same stay will be in effect, and

9    it's the same stay that will be protecting the U.S. as well

10   as the states.

11            We also -- I don't have much to add to our

12   argument that there are other cases that recognize an

13   analogy between sovereign states and the U.S., although the

14   rule does not specifically mention them, and that therefore

15   finds it inappropriate to impose bonds on the states by

16   analogy.  But that's -- though we finally -- we would simply

17   submit that the cases that the stay opponents founded were

18   -- had nothing to do with our circumstances, had to do with

19   bonds being required of non-government actors, and provide

20   no illumination on what the Court should be doing.

21            THE COURT:  So what do you make of the committee

22   notes to Rule 8007(c) and (d), the 2014 committee notes,

23   which state that (c) and (d) retain the provisions of the

24   former rule to condition the granting of relief on the

25   posting of a bond by the Appellant except when that party is

Page 120

```
 1    a federal government entity?
 2              MR. GOLD:  Well, Your Honor, I will make two
 3    points here.  I think that that -- first, I would say that
 4    that comment is not directed to the circumstance where there
 5    are simultaneous appeals by multiple parties, and that the
 6    -- I would secondly point out that there is substantial case
 7    law saying that what the Court should be looking at is the
 8    language of the rule itself rather than the committee notes
 9    that provide distinctions that were not included in the
10    language of the rule itself, and that because the U.S.
11    Trustee is entitled to an unbonded appeal here, it --
12    there's -- there should be no bond.  There'll be no point in
13    having an additional bond when it's the same appeal.
14              THE COURT:  So the general rationale for exempting
15    the United States from the bonding requirement is that most
16    judgments, and this is consistent with 28 U.S.C. 24
17    something -- the U.S. Trustee cites it -- is that the United
18    States is good for it because it's a judgment against the
19    United States, and the United States is always good for it.
20              Your interpretation of this rule would mean that
21    if there was a judgment against the United States and
22    against third parties, the third parties would have the
23    benefit of the United States being good for its portion of
24    it, and that they would have -- they could just have a free
25    ride on that, and the Plaintiff should take the risk?
```

Page 121

1          MR. GOLD:  Well, Your Honor, I'm not sure what the

2     judgment would --

3          THE COURT:  No, I'm just talking about --

4          MR. GOLD:  -- would be --

5          THE COURT:  -- your interpretation of the rule,

6     which would include, I think, that scenario, which doesn't

7     seem to me to be a -- an interpretation that Congress would

8     want.

9          MR. GOLD:  Well, Your Honor, when -- since we are

10    dealing here with states, and I don't believe that there's

11    any serious issue regarding collectability --

12          THE COURT:  Actually, Judge Posner thought there

13    was in Lightfoot v. Walker, 797 F.2d 505 and 506 through 07

14    (7th Cir. 1986).  So, anyway.  But I guess there is the

15    issue as to what we've just been talking about is the

16    balance of the harms, and that balance may become

17    significantly greater as time goes on.  Before then, the

18    Debtors have attempted to quantify that in the DelConte

19    declaration.

20          But I'm not sure -- well, it's really a question

21    for the Debtors as to the delay by three months, what does

22    that mean?  But I think what it means is it's more on the

23    back end than the front end where there's significant loss.

24    But I don't think there's any doubt that the cost for a

25    lengthy delay of, you know, several months to a year or two

Page 122

```
1    really is dramatic here in terms of dollars and cents.  So

2    it would seem to me that, as time goes by, the need for a

3    bond grows dramatically to offset the vindication or not of

4    the Appellant's right on appeal.

5              MR. GOLD:  Well, Your Honor, I guess that gets

6    back to the point that we discussed before why it may make

7    more sense to have Your Honor stay -- take us through the

8    relative short term when the costs are relatively contained

9    and lower and allow a later court that -- a higher court

10   that can have a better sense of how long it will be taking

11   on the appeal resolve that issue.

12             THE COURT:  Okay.

13             MR. GOLD:  Thank you, Your Honor.  I have nothing

14   further to add at this point.  I may have rebuttal points

15   after the Debtors or another party's presentation.

16             THE COURT:  Okay.

17             MR. GOLDMAN:  Your Honor, Irve Goldman, Pullman

18   and Comley for the State of Connecticut.  May I be up next?

19             THE COURT:  Yes, that's fine.

20             MR. GOLDMAN:  Thank you, Your Honor.  I first

21   wanted to just for Connecticut adopt the arguments that we

22   made by Mr. Gold for Washington and affirm that, you know,

23   the principal form of relief that we are seeking at this

24   point is our fallback, or what was previously described as a

25   fallback position.
```

Page 123

1           We are looking for a stay until 14 days after

2   Judge McMahon issues her ruling, which I would note may very

3   well come after December 8th, which is what the Debtors

4   described as the earliest point when the effective date can

5   occur, which is seven days after the 75th day after the date

6   of the confirmation order.

7           And it seems unlikely that it will come after that

8   date because we have oral argument, as Your Honor knows, on

9   November 30th, and Judge McMahon has advised us that she

10  starts a two-defendant criminal trial on December 7th.  So

11  that would give her less than a week to get out what I would

12  anticipate is a very complex decision.  So we would project

13  that it would likely come after that trial has concluded.

14  But I just want to circle --

15          THE COURT:  What's on trial?  It's oral argument.

16  Oh, the criminal trial.

17          MR. GOLDMAN:  Yes, correct, Your Honor.

18          THE COURT:  Well --

19          MR. GOLDMAN:  That's what we were advised.

20          THE COURT:  Okay.

21          MR. GOLDMAN:  And if I could just circle back for

22  a moment to this apprehension that we have of equitable

23  mootness based on the Debtor's indication that they'll argue

24  the criminal sentencing will, you know, be the fulcrum for

25  that in a stipulation that was filed with the District Court

1    on October 20th that dealt with their commitment not to

2    argue that anything pursuant to the advance order or in the

3    preparatory stages leading up to the effective date, they

4    would not argue with the basis for equitable mootness.

5            It carved out in paragraph 2 the following

6    provision.  The stipulation does not address the criminal

7    sentencing of Perdue or the effect or consequences of such

8    sentencing on these or other appeals.  So currently, they

9    have signaled the intention to argue that, and I think the

10   stay of the confirmation order would be the most effective

11   way to prevent that from happening.

12           The reason I say that is because the plea

13   agreement itself provides that the parties, meaning Perdue

14   and USDOJ will agree to request that the sentencing hearing

15   take place no earlier than 75 days following the date of

16   confirmation.  This contemplates a joint request.  And so

17   that if there is a stay of the confirmation order, there

18   would be no reason for any party of the Debtors or the

19   United States to request a scheduling of the sentencing

20   hearing for the very reason that the Debtors have argued

21   that if they are sentenced and thereby become a convicted

22   felon, that would put their continued operation at jeopardy.

23           So I think the most effective way to deal with

24   that would be to stay the order.  And I think Mr. Gold also

25   touched on this as part of the calculus of determining

1    whether there was irreparable harm.  We contend the Court

2    should not only consider the risk of equitable mootness, but

3    the consequences that would ensue to the states if their

4    causes of action are eliminated, which is unquestionably

5    their property, not property of the estate.  And in an

6    equitable mootness scenario, that property will have been

7    taken away without appellate review of whether the taking

8    was proper.

9              I know Your Honor has concluded that the states

10   will likely do better or will do better financially under

11   the plan than they would if they were permitted to go

12   against the Sacklers and other third parties.  But that does

13   not account for the character of these release police power

14   claims as a deterrent to future wrongdoers and simply

15   assumes incorrectly that their value is purely financial.

16             Now, if I can turn to the balance of the harms,

17   and specifically the declarations that have been submitted

18   by the various parties.  As Your Honor is aware, we've made

19   some discreet, detailed objections to the admissibility of

20   some portion of the declarations, and which of course must

21   follow the Rules of Evidence.  Everyone's trying to

22   establish a record here, and so applying the Rules of

23   Evidence is important in this context.

24             And under the Rules, the testimony offered by a

25   declaration has to be based on personal knowledge, not

```
 1    hearsay.  The sufficiency of personal knowledge has to be
 2    established by what is in the declaration.  It can't contain
 3    conclusory statements or arguments.  It has to set forth
 4    specific facts.  And to the extent a lay opinion is offered,
 5    it has to be based on the declarant's own person knowledge
 6    and must not be based on specialized knowledge.  And all the
 7    declarations, to one degree or another, fails to satisfy one
 8    or more of those requirements.
 9            Mr. DelConte's declaration, for example, talks
10    about operational risk to the Debtors.  He first says that
11    the State could result in delay in bringing about public
12    initiatives to market.  He says "could".  He doesn't say
13    what initiatives are being planned to go to market during
14    the period of any stay, no facts establishing what his
15    personal knowledge of what the initiatives are.  He's
16    obviously not a member of Perdue's public initiative group.
17            Granted, he is a financial advisor for the
18    company, but I think here he is being used as a type of all-
19    purpose as an expert for all things Perdue.  And I don't
20    think that he can be used to just say in a conclusory
21    fashion some unspecified initiatives will be delayed during
22    a period of the stay we're requesting.  In part four of the
23    declaration --
24            THE COURT:  Well, they would certainly be delayed
25    if the Debtors weren't able to engage in any business, right
```

Page 127

1    because of the criminal plea?

2         MR. GOLDMAN:  Well, if they pled -- correct.  If

3    they were a convicted felon, according to the Debtors, that

4    would restrict -- eventually, maybe not automatically as I'm

5    told, but eventually it would lead to the termination of

6    their licenses and the ability to do business unless the

7    properties could be transferred to NewCo at that point.

8         But as I had indicated, Your Honor, if Your Honor

9    stays the order for the period we're requesting, it is

10   highly unlikely that that criminal sentencing will take

11   place during the period of that stay.  And again, those

12   unspecified initiatives that he says aren't -- will be

13   delayed --

14        THE COURT:  That's not really an evidentiary

15   objection.  You're just objecting to the fact that it

16   doesn't say very much, and I get that.  I understand that,

17   but that's not an evidentiary objection.

18        MR. GOLDMAN:  Then I'll move on, Your Honor, to

19   what I think is an evidentiary objection.  It's part 4 of

20   the declaration, which is a recitation of what Mr. DelConte

21   believes could be the operational risks if the stay is

22   granted.  Based on how upset the employees, vendors, and

23   customers would be if there was a delay occasioned by the

24   stay, clearly that's based on what he was told the Debtors

25   told their customers, vendors, and employees.

1            And certainly, Mr. DelConte is not competent to

2      testify as to how other parties, namely the customers,

3      vendors, and employees, would react to a stay of limited

4      duration, particularly when they have certainly hung in

5      there and not walked away during the two-plus years that

6      this case is undergoing Chapter 11.  There's certainly no

7      basis for believing that now suddenly that the -- whether a

8      confirmation order has been appealed, that they wouldn't

9      tolerate a few additional months of delay.

10            In fact, if anything, there was greater

11      uncertainty in terms of what would happen with the --

12            THE COURT:  Mr. Goldman, can I interrupt you?  Are

13      you testifying now --

14            MR. GOLDMAN:  Certainly.

15            THE COURT:  -- or are you making argument based on

16      your assessment of how people think?

17            MR. GOLDMAN:  Well, that is argument, Your Honor.

18            THE COURT:  And that's how I would treat this.

19            MR. GOLDMAN:  And --

20            THE COURT:  This is his prediction based on his

21      knowledge of the Debtor's business of what would happen.

22      Not what will happen, but his prediction.

23            MR. GOLDMAN:  Well, again, I think that that -- he

24      wasn't offered as an expert, and I think he is testifying

25      based on what he was told.  And --

Page 129

```
 1              THE COURT:  Well, that's what you're saying too.
 2    I'm just saying it's a prediction.
 3              MR. GOLDMAN:  Well, Your Honor, I'm not offering
 4    my argument as testimony yet, but he is.
 5              THE COURT:  Well, only for this --
 6              MR. GOLDMAN:  So --
 7              THE COURT:  -- I will treat only for that purpose
 8    is what he reasonably believes based on his knowledge of the
 9    company.
10              MR. GOLDMAN:  Let me move on to Mr. Gard.  And in
11    paragraph 3, again, this really goes over what Mr. DelConte
12    testified to, and that it's his belief that a delay, though
13    materially, would give us Perdue's residual value and
14    talking about the uncertainty of the bankruptcy process.
15    Again, he -- this is lay opinion.  It's not supported by
16    facts establishing it's within his personal knowledge.
17              And this is in the province of experts to say what
18    Perdue's residual value might be given the uncertainty and
19    delay of -- and stay of the limited duration that we're
20    requesting.  And in paragraphs 14 and 16, he offers the
21    prediction that as a result of the delayed distributions
22    during the stay, it's quite possible that additional
23    Americans will die, and then suggest that a stay will allow
24    Americans to needlessly die, who would not have died but for
25    a stay.
```

Page 130

1          Now, this is obvious argument as well and not

2     fact.  I mean, evidence of widespread death as a result of

3     stay of limited duration has got to be based --

4          THE COURT:  Well, again --

5          MR. GOLDMAN:  -- on more than --

6          THE COURT:  -- it depends on what the length of

7     the stay is.  I just -- look, on your first point, the only

8     example that he gives for the effect of a stay is if the

9     plea goes forward without the plan being implemented.  And

10    to me that is a meaningful effect.  To the extent he's

11    talking about other effects on keeping senior employees, I

12    agree with you.

13          I don't think he's really -- unlike Mr. DelConte,

14    he's not really in a position, you know, other than anyone

15    else or different than anyone else to talk about that point.

16    But on the plea point, I understand his point.

17          And then, look, the testimony is based upon I

18    think an undisputed fact that roughly 200 opioid-related

19    overdose deaths occur, and that those deaths have been

20    increasing at remarkable percentage rates over the last

21    couple of years.  And I think he and -- he is perfectly

22    positioned to discuss that point given his job, which he's

23    required to assess how best to deal with that issue for his

24    state.

25          And I take, again, his prediction that at some

1    point -- and he doesn't really say when that point is, but

2    at some point, a stay can lead to additional deaths if it

3    results in a meaningful delay of funds.  I don't see how

4    anyone could dispute that.

5            MR. GOLDMAN:  Your Honor, I do -- the point I'm

6    trying to make here is that Mr. Gar and the other

7    declarations are trying to draw a causal connection here

8    then because distributions will be delayed, that will result

9    in grievous harm.  And there just -- that really is in the

10   province of experts.

11           What will happen, they haven't said the amount of

12   funds that are going to be delayed.  What would otherwise be

13   disbursed and used by the various constituents --

14           THE COURT:  The record is --

15           MR. GOLDMAN:  -- during period of --

16           THE COURT:  The record is crystal clear that every

17   dollar counts because there is no surplus.  If that weren't

18   the case, then your client's lawsuits are meaningless.  This

19   is a really strange exercise, Mr. Goldman, I have to say.

20           MR. GOLDMAN:  Well, I make --

21           THE COURT:  And I guess --

22           MR. GOLDMAN:  -- they're --

23           THE COURT:  -- what you're saying is your clients

24   really don't think this money counts?

25           MR. GOLDMAN:  No, that is not --

Page 132

1           THE COURT:  Is that what you're --

2           MR. GOLDMAN:  -- what I'm saying, Your Honor.

3           THE COURT:  -- ultimately saying here in terms of

4    saving lives and addressing the opioid crisis?

5           MR. GOLDMAN:  No, it is not, and I would

6    acknowledge that it certainly does count.  The point I'm

7    trying to make is that they are trying to translate that

8    into grievous harm based on not knowing what the amount is

9    going to be disbursed during this limited duration and for

10   what purposes.

11          THE COURT:  But he wasn't responding to just a

12   limited duration.  The motion sought a stay through the

13   entire appeal process through the Supreme Court.  So these

14   declarations address through the end of 2023 and through the

15   end of 2024.  I agree with you.  If you're looking for or if

16   I'm considering a shorter injunction, then this information,

17   although still meaningful because if anyone dies, that

18   pretty important.

19          MR. GOLDMAN:  Yes.

20          THE COURT:  Plus all of the other societal harms

21   that flow from not having the funding start.  But if the

22   funding isn't really going to start in any event until --

23   let's pick a date.  And I'm not talking about the effective

24   date now, I'm talking about when funding would actually

25   start.  Let's say that's January 1, then your point is a

1    point on argument, not an evidentiary point, which is that

2    this declaration doesn't say that there's any harm

3    specifically before January 1 because it doesn't establish

4    that the funding would start then -- before then.

5              MR. GOLDMAN:  Well, that is what my argument is

6    directed to.

7              THE COURT:  All right, but --

8              MR. GOLDMAN:  -- Your Honor.  I understand --

9              THE COURT:  -- I don't think that's an evidentiary

10   point.  I think that's an argument.  That's a point you can

11   make in argument.

12             MR. GOLDMAN:  Very well, Your Honor.  I'll -- I

13   will move on.  And I would echo what Mr. Gold had said is

14   that even beyond that date, we would welcome any sort of

15   interim measures for disbursing funds for abatement and

16   other purposes, similar to the ERF.  An ERF2, if you will --

17             THE COURT:  Well, the ERF didn't happen --

18             MR. GOLDMAN:  -- and could even be --

19             THE COURT:  -- so but I take your statement now

20   seriously.

21             MR. GOLDMAN:  Thank you, Your Honor.

22             THE COURT:  Okay.

23             MR. GOLDMAN:  I was just going to make the point

24   it could be implemented pursuant to 363(b) and not pursuant

25   to the plan to remove any idea that it would be -- cause

1    equitable moot.

2              THE COURT:  Okay.

3              MR. GOLDMAN:  Just moving onto the declarations

4    that the UCC submitted, I think we -- from the two members

5    who have experienced firsthand the devastating effects of

6    the opioid epidemic, I think that, you know, it has to be

7    acknowledged that of all the people who have a right to

8    express an opinion on what will occur due to the opioid

9    epidemic if a stay is issued, is these two people.

10             However, that does not make certain parts of their

11   declarations admissible, which is really what we have the

12   objection to.  I think, you know, they have to be given all

13   the solicitudes for the personal loss they've suffered and

14   admiration for what they have turned that into in terms of

15   positive giveback.  And I hope the objections or challenges

16   to certain portions of their declarations will be taken in

17   that vein.  They're simply technical in nature in terms of

18   establishing what record is made on these proceedings.

19             THE COURT:  Well, again, I mean, I think you're

20   objecting to one of the declarants saying that various forms

21   of treatment have stopped over the last year or the last

22   several months for want of funding.  And asking me to draw

23   an inference that, under the plan, similar occurrences

24   wouldn't -- would be prevented in the future, I think she --

25   again, I think that the witness can make a prediction of

1    that.  You know, take it for what it's worth.

2          She's much closer in my mind to the facts that she

3    outlines than just someone who isn't looking at it from the

4    outside.  But ultimately, I think it's the same point, which

5    is it depends on when the funds start flowing and what can

6    only make an educated prediction, which is certainly what

7    the members of the UCC, including these two people, did and

8    are doing.  So that's how I treat those types of statements.

9          MR. GOLDMAN:  I would just reiterate the point,

10   Your Honor.  There is going to be evidence that there is

11   incalculable loss, which is the way it's phrased in one of

12   the declarations.  And I really think it should be the

13   province of expert testimony.  It is based on some

14   specialized knowledge as to a prediction of what is going to

15   occur and (indiscernible).

16          THE COURT:  Well, but again, I -- look, I guess it

17   depends on what you mean by the term "incalculable".  You

18   could certainly calculate the monetary costs of someone

19   dying and their relatives having to take care of their

20   children.  But it is perfectly legitimate to say that

21   actually isn't calculable.  It may be calculable for

22   purposes of posting a bond, but I don't think these two

23   declarations are submitted for that purpose, for determining

24   what the amount of a bond would be.

25          I think they're submitted for the point, which I

Page 136

1    view as one that is adequately supported, that where you

2    have this number of deaths due to opioid overdoses occurring

3    on a daily basis, and you have insufficient funds as

4    acknowledged by all of the lawsuits, including by the State

5    of Washington and the State of Connecticut, that the more

6    money you have, the fewer people will die.  I mean, I don't

7    see how you can dispute that.

8            And maybe it's one person.  Maybe it's 100, but to

9    me that's incalculable, and it's -- it pretty -- I think it

10   does offset in terms of the balance of the harms, someone's

11   right to pursue their appellate rights to the Supreme Court

12   where the Supreme Court has denied certiorari on these

13   various issues multiple times in the last decade.  So again,

14   that applies primarily, if not entirely -- and I'll hear the

15   Debtors on this, of course, and the other parties, including

16   the UCC's counsel, to the request for an injunction through

17   the entire appellate process.

18           It may not apply in a meaningful way to an

19   injunction through a ruling by the District Court where it's

20   not clear to me that money would be flowing in any event

21   during that period as opposed to personal injury claims

22   being liquidated, as opposed to the 14 days when the

23   abatement procedures after the effective date are supposed

24   to be submitted, etc.

25           But I just -- I don't understand how in one breath

1    the State Attorneys General of Connecticut, Washington, and

2    Maryland can say that their rights to decide for themselves

3    how to pursue monetary claims against the released parties

4    are of critical importance without focusing on the

5    consequences of the delay caused by the -- that right.

6            MR. GOLDMAN:  Well, Your Honor, it's one of the

7    reasons why we did restrict and scale back the request

8    that's before you now.

9            THE COURT:  Okay.  But I'm not going to --

10           MR. GOLDMAN:  Which is a --

11           THE COURT:  I'm not going to exclude anything in

12   these two declarations other than, again, where obviously

13   the declarant is making a prediction or stating her view as

14   to the cause of something.  It's not for the truth, but

15   rather for her evaluation of that cause or prediction, which

16   is what people who serve on unsecured Creditors' committee,

17   including this one, that net 200 times and over 700 separate

18   communications does.

19           MR. GOLDMAN:  So except, Your Honor, that is all I

20   have.

21           THE COURT:  Okay.  All right.

22           MR. EDMUNDS:  Your Honor, if I --

23           THE COURT:  Go --

24           MR. EDMUNDS:  This is the --

25           THE COURT:  Why don't you go ahead, Mr. Edmunds --

Page 138

1              MR. EDMUNDS:  Oh, I'm sorry.  Go ahead.

2              THE COURT:  -- and then I'll hear from Mr.

3       Underwood?

4              MR. EDMUNDS:  Okay.  I just -- I -- thank you,

5       Your Honor.  I will just try to hit on some points that go

6       to the second part of my argument that haven't been said so

7       far to try to make it quicker.  But I think that one issue

8       that's been identified is the critical importance of the

9       sentencing that it may have in creating a possibility of

10      equitable mootness.  And people have talked about already

11      and argued that there is a chance there, including from some

12      of the effects of the sentencing upon the Debtors, that may

13      produce the grounds for equitable mootness may create

14      irreparable harm.

15             But there's one other thing that people haven't

16      talked about yet, and that -- and I am not an expert, but I

17      have some experience with the difficulty of changing a

18      sentence once it's imposed.  There are constitutional,

19      statutory, and federal criminal procedures, doctrines and

20      issues that arise that may make it hard to undo a sentencing

21      once it's in place.  And I think that that may be one of the

22      sources for the Debtor's clearly apparent position that, you

23      know, that they will not agree that this -- to any

24      stipulation against the equitable mootness of the effect of

25      the sentencing of Perdue in the District of New Jersey.

1          I think that that's a huge issue that happens

2     before the effective date that could be significant in its

3     effects.  And I don't pretend to know everything about it.

4     I don't know the criminal doctrines.

5          THE COURT:  Let's just move on.  Okay.  You raised

6     the point, but there's no reason talking about it further if

7     that's the extent of your knowledge.  So we should move on.

8          MR. EDMUNDS:  Well, I think -- I mean, I think,

9     you know, the basics of it, the due process clause, the

10    double jeopardy clause, Federal Rule 35, and certain

11    provisions of the U.S. Code do place limits on it.  I think

12    that that's -- I mean, in part, it's hard to anticipate

13    where that will go in advance, and everybody has that same

14    difficulty.  So I think that's an issue there, and I think

15    others have talked about the immediate effect on Perdue and

16    its business.

17          The -- our -- moving on, our motion raised other

18    issues of irreparable harm that are not related to -- and we

19    did not rely on the possibility of equitable mootness.  We

20    talked about in our original motion in September, the cost

21    to the estate of going forward with a plan that may be

22    altered or reversed on appeal.  And part of that was related

23    to the trust advances issues, but it's also related to the

24    fact that if you look at the fee statements that are coming

25    in, a whole lot of money is being spent on attorneys' fees

Page 140

1    from the estate to reimburse the pursuit of the plan, things

2    that may --

3              THE COURT:  Mr. Edmunds, I've never seen that as a

4    basis for irreparable harm to an Appellant.  Ever.  And --

5              MR. EDMUNDS:  I think that the --

6              THE COURT:  -- frankly, it goes to the assessment

7    of merits.  So I guess to me, that just doesn't make sense,

8    that argument.

9              MR. EDMUNDS:  I mean, I -- the point I would make,

10   Your Honor, is that if potentially millions in fees are

11   expended from the estate in pursuit of implementing the

12   plan, that's money that the estate doesn't get back.  It may

13   not -- in fact, I'm -- I agree it would not equitably moot

14   an appeal, but --

15             THE COURT:  It's not anything of an equitable

16   mootness.

17             MR. EDMUNDS:  But it is still irreparable harm.

18             THE COURT:  It's not a basis for irreparable harm.

19   It's not -- cite me one case on that point.

20             MR. EDMUNDS:  We really don't have a case, Your

21   Honor.  It's just --

22             THE COURT:  Then please move on.

23             MR. EDMUNDS:  -- logical that if the estate --

24             THE COURT:  That is not a basis for irreparable

25   harm.  It just isn't.

Page 141

```
 1            MR. EDMUNDS:  All right.  I will move on.  The
 2   other irreparable harm that exists, though, is I think the
 3   possibility of implementing the plan and changing
 4   relationships, and then you're having to roll it back if
 5   it's changed or if it's reversed.
 6            THE COURT:  Is that another word for mootness.
 7            MR. EDMUNDS:  No.
 8            THE COURT:  No?
 9            MR. EDMUNDS:  I don't think it is, Your Honor.  I
10   think that there are things that the Court has ruled, and
11   Debtors have stipulated that don't constitute irreparable
12   harm that are happening -- or that don't constitute a ground
13   for equitable mootness that are happening right now that do
14   constitute a potential irreparable harm.  How significant
15   they are --
16            THE COURT:  Like what?
17            MR. EDMUNDS:  -- is I think --
18            THE COURT:  What are you talking about?
19            MR. EDMUNDS:  They are, to the best of my
20   understanding, going about forming structures, registering.
21   I understand that there is regulatory activity that is
22   involved on the sort of licensing side.  They are -- and
23   they're continuing their operations, moving forward with
24   operations amid uncertainty.  And there's been a lot of, I
25   guess, question in the papers of whether there's evidence of
```

1    the effects of that uncertainty on the business.

2              But I would point out that these are the very

3    things that they use to justify their first day motions.

4    And the -- in docket number 3, the declaration of John Lowne

5    changing things --

6              THE COURT:  So can I interrupt --

7              MR. EDMUNDS:  -- changing their cash management --

8              THE COURT:  -- you?  So is --

9              MR. EDMUNDS:  -- systems.

10             THE COURT:  Is the State of Maryland not amenable

11   unlike the State of Washington and the State of Connecticut

12   to permitting new code to be formed, for example?  The types

13   of stipulations that Mr. Gold and Mr. Goldman were referring

14   to.

15             MR. EDMUNDS:  I think I'd have to -- we are

16   amenable to some form of agreement, but I think I would have

17   to look at the precise contours of that and make an

18   evaluation as to how serious it was.  So not as I sit here

19   today, I don't think I can agree to that without some sort

20   of detail about what it is.

21             You know, it -- there are risks and there are

22   harms inherent in anything that happens, and I think it

23   requires sort of a precise evaluation as to whether we would

24   agree to that.  And I'm just not -- I don't even know

25   exactly what the requirements or what the permissions would

1   be.

2          THE COURT:  Well, the general concept would be

3   that -- and I believe Mr. Gold laid this out -- that the

4   appellees would not argue equitable mootness based upon a

5   transfer of the Debtor's business as provided for under the

6   plan to NewCo and making the initial distribution under the

7   plan.  Either under the plan or in the form of a 363 motion.

8          MR. EDMUNDS:  Your Honor, I mean, I think that the

9   -- things that significant, there may be ways you could --

10  nuances that you can remove from it, but I think that things

11  that significant carry with them the possibility of

12  irreparable harm.  Both from the possibility of mootness and

13  from the sheer fact that you might be unwinding, which

14  independent of equitable mootness will cause some amount of

15  loss.  And it may not add up to the amount of loss that

16  would --

17         THE COURT:  Let me make sure I understand --

18         MR. EDMUNDS:  -- could be substantial

19  consummations.

20         THE COURT:  -- this.  You lost below, right?  You

21  lost.  You're now seeking a stay pending appeal, and yet

22  you're arguing that if you win, which is an "if", the cost

23  of unwinding itself is irreparable harm?  That's really what

24  you're saying?

25         MR. EDMUNDS:  I think that there are costs

Page 144

1    associated with going forward now, both to the estate and to

2    everyone else, that warrant consideration as part of the

3    balance of hardships that --

4              THE COURT:  So you're saying irreparable harm

5    would --

6              MR. EDMUNDS:  -- you know, that the Court has to

7    undertake.

8              THE COURT:  You're saying irreparable harm is

9    literally proceeding with the order itself.

10             MR. EDMUNDS:  I think -- again, I would have to

11   look at the details of the --

12             THE COURT:  Mr. Edmunds --

13             MR. EDMUNDS:  -- specific exceptions.

14             THE COURT:  -- look, do you have anything more to

15   say on any --

16             MR. EDMUNDS:  Yeah, that's usually --

17             THE COURT:  Do you have anything more to say --

18             MR. EDMUNDS:  I do.

19             THE COURT:  -- on this point or any other point?

20             MR. EDMUNDS:  I do, Your Honor.  I mean --

21             THE COURT:  All right.

22             MR. EDMUNDS:  -- I will try to move on from it,

23   but let -- but I would say -- I would note that the very

24   hardships that I'm talking about are written throughout

25   their first-day motions and in the declarations that they

Page 145

1    submitted in support of that.  They talk about changing

2    structure and changing organization and changing management.

3              THE COURT:  But that's before they won, and your

4    state is appealing it.  It's a big difference, so move on.

5    Honestly.

6              MR. EDMUNDS:  I think the hardships --

7              THE COURT:  You know, this wasn't made in your

8    objection.

9              MR. EDMUNDS:  -- as a matter of fact, so --

10             THE COURT:  This wasn't made in your motion or

11   your reply, and if it was, it would've just been devastated.

12   So move on.  This is just silly.

13             MR. EDMUNDS:  It was -- just to be clear, Your

14   Honor, it was in our motion.  And we did not rely on

15   equitable mootness, but I will move on.

16             I would also just talk briefly about the issue of

17   the irreparable harm that the appellees raised, the

18   objectors raised.  I think the Court is correct that we all

19   see it as getting more money for the abatement, for the

20   opioid crisis, and to address the opioid crisis is

21   important.  But there are other trades that are made in

22   pursuit of this plan that I think make it hard for them to

23   establish that the harm that they suggest will occur will

24   actually occur from a short stay --

25             THE COURT:  Okay.  We covered --

Page 146

1          MR. EDMUNDS:  -- to the appellate process.

2          THE COURT:  We covered this, Mr. Edmunds.  I -- we

3     -- we've covered this point.  And in fact, I generally

4     agreed with the other -- with your colleagues on this.  So I

5     don't think we need to go over this again.

6          MR. EDMUNDS:  Well, I'd just say that there is the

7     deterrence effect and there are the other, I think, benefits

8     from doing more, that the State of Maryland at least sees

9     from proceeding to do more to enforce its laws.  And I think

10    that those have sort of a canceling effect on, you know, any

11    hardship that -- concrete hardship that could be raised by

12    the other parties.

13          So with that, I will -- I think those are the

14    critical points, and I'll rely on others for their previous

15    arguments.

16          THE COURT:  Okay.  Thank you.

17          MR. BASS:  Judge Drain, this is Mr. Bass, Ronald

18    Bass.  May I come in?

19          THE COURT:  Well, I -- someone was actually in the

20    queue before you.  Let's do Mr. Underwood first.

21          MR. BASS:  Oh, okay.

22          THE COURT:  And then we'll -- I'll hear from you.

23          MR. BASS:  Okay.  Okay.

24          MR. UNDERWOOD:  Thank you, Your Honor.  Allen

25    Underwood, on behalf of Canadian municipalities -- certain

Page 147

1    Canadian municipalities and First Nation creditors.

2            Very briefly, I'd like to again adopt the

3    positions of Connecticut and Washington as stated here and

4    in their papers.  I think what's very important and what

5    we've emphasized throughout this case is that the Canadian

6    municipalities and First Nations are a little different than

7    the states with regard to certain legal issues.  And that

8    has an impact on, A, what Judge McMahon is deciding but it

9    also has an impact on the irreparable harm issue that we're

10   -- I think we're discussing.  There's no question that the

11   Canadian municipalities have read direct claims against non-

12   debtor, shareholder released parties.

13           THE COURT:  I think there's a substantial

14   question, and that's what I found in my ruling.

15           MR. UNDERWOOD:  I believe under Canadian law, they

16   have claims under the Competition Act, that -- it's a fairly

17   broad act that enables direct claims against -- and this is

18   I guess a fundamental problem, Judge, is that we've got a

19   corporate structure that has parallel ownership.

20           It's not -- it's not like a typical subsidiary

21   relationship.  One -- is controlling multiple --

22   corporations.  In effect, the shareholder -- whether through

23   non-debtor entities that are U.S. entities or direct action

24   on boards -- are controlling those entities.  And under

25   Canadian law, there's a basis for direct claim against those

```
1    parties.

2              Obviously the problem or the question or the

3    interpretation of the plan and whether or not the release as

4    granted occupies the territory fully -- that's the

5    structural problem -- the appeal is we believe meritorious.

6    And ultimately -- irreparable harm which is that ultimately

7    these Canadian creditors stand to lose the claims they may

8    have against U.S. non-debtor entities or U.S. released

9    shareholders -- confirmed plan.

10             It's a structural problem.  It's a structural

11   problem that the debtors and the Sacklers created when they

12   created their corporate structure.  That's all it is.  I

13   wish I could change it.

14             THE COURT:  Well, all I will note is I don't think

15   you addressed this legal argument on the nature of the

16   Canadian creditors' claims anywhere in your motion.

17             MR. UNDERWOOD:  I actually believe that there is a

18   reference.

19             THE COURT:  Where is it?

20             MR. UNDERWOOD:  Within -- certainly within my

21   reply.  I actually quote a portion of the brief.  I think --

22   let me pull up the page that referenced this issue.  It's

23   cited in the reply, Your Honor.  And it's more than alluded

24   to in the actual motion.

25             And to remind you, Your Honor, the motion was
```

Page 149

1    actually filed in advance of the briefing before the

2    district court.  So I believe if we look at, yeah, Page 4,

3    Paragraph 8.

4         THE COURT:  Okay.  I see it.

5         MR. UNDERWOOD:  So there is a colorable basis for

6    a claim by my clients against non-debtor, third-party

7    released parties.  And irreparable harm, as we cited in the

8    reply and I think in the moving papers, is the loss of that

9    financial claim or right.

10        So that's a principal question that I think in the

11   first instance you're looking for which is what is the

12   irreparable injury in the absence of a stay.  And that is

13   obviously the concern.

14        I think in terms of the resolution of the matter,

15   I think Your Honor is very thoughtful on this question of a

16   longer stay versus a shorter stay, a stay through finality

17   versus a stay more or less governed by a Rule 8025.  And

18   certainly I think that the Canadian appellants take the

19   position that a stay 14 days -- through 14 days after the

20   rendering of the district court decision is more than

21   adequate at this time.

22        But I do think it is a thoughtful question by Your

23   Honor because honestly the circumstance where a trial court

24   would be looking at whether or not to stay its own decision

25   for longer than any determination that might be made by an

1    appellate court would be a circumstance where the trial

2    court recognized that there's some aspect, be it

3    constitutional or structural, in the plan that would be

4    jeopardized were it not stayed, meaning that there's

5    something about it that deserves finality.  And I would

6    leave that question to Your Honor's best judgment.

7              But I would also repeat that in terms of the stay,

8    the lesser of the two alternatives that Your Honor described

9    is certainly -- is certainly acceptable to the First

10   Nations, without waiving whatever Your Honor might decide

11   about a longer or a larger stay.

12             I think there's a fundamental interesting question

13   with regard to the sentencing and the plea agreement, and it

14   is a problem.  And I think in terms of it, I've read the

15   plea agreement many times.  I see it as little more than a

16   financial settlement, and that's what we do in this court.

17   And ultimately I'm not aware of due process issues that

18   would bar a stay through the date of sentencing with regard

19   to the defendants.

20             I think it makes a huge amount of sense because

21   whether or not the sentencing gives rise to equitable

22   mootness is going to impact what may happen subsequent to

23   the appellate process because obviously you've got your

24   superpriority claim that may come into effect if for any

25   reason the terms of the plan are modified such that -- you

1    know, such that the plea is -- the plan isn't funded.  So

2    that would be the concern.

3            So although certainly the Canadian First Nations

4    agree that the lesser of the two stays that Your Honor had

5    explained would be sufficient here, I would request that the

6    Court be mindful of the fact that the sentencing will have a

7    material impact on this case and, depending upon the results

8    of the appellate process, it may completely impact whether

9    or not the assets of the debtor can be liquidated and how,

10   if it came to that -- I don't think anybody wants it to come

11   to that, but if it did, the fact that the sentencing had

12   gone forward might be a problem if it's not a basis for

13   equitable mootness.

14           So ultimately, Your Honor, I mean, I think that's,

15   you know, by in large the points that I wanted to make or

16   things that perhaps I wanted to highlight from our concern.

17   Ultimately I think the harm that we have here is an

18   interesting circumstance of -- so effectively the IACs are

19   non-debtor parties.

20           Those are the assets that in part, over time, will

21   fund the trust in the United States.  My clients are

22   presently stayed from pursuing those assets.  Whether or not

23   that remains to be the case will be the subject I suppose --

24   and the determination before the CCAA court in Canada which

25   is pending for December 1.  And that's another example.

Page 152

```
 1              I'm not sure if it's irreparable harm.  But it is
 2    an instance of another intervening deadline with regard to
 3    an international matter where it might be worth the
 4    consideration of the Court of the fact that a stay here
 5    would probably relieve that Canadian court of a difficult
 6    decision.  And maybe I'm wrong.  I don't know.  But that
 7    would be my take on it.
 8              So, but ultimately I think the debtor has
 9    ultimately the benefit of these IAC assets.  These are
10    assets that ultimately my clients would be seeking to
11    recover from if they're permitted to do so by way of appeal
12    or before the CCAA court.
13              And I'm making this argument with reference to the
14    bond issue because, first of all, I'm not aware of the
15    debtor having an affirmative claim against the CMFN.
16    Frankly if they're sovereigns, there's a question of whether
17    or not there would be an applicable need for a pond under
18    that circumstance.
19              But ultimately what's interesting is that it's
20    arguable that the debtors in fact have a lien on Canadian
21    assets by virtue of the settlement such that I would say
22    whether or not Your Honor finds a need for posting of a bond
23    by any other appellate creditor here, ultimately because of
24    the fact that these Canadian assets are dedicated under the
25    existing plan and settlement and trust to the debtor, that I
```

1    think there's a strong argument that the debtor is protected

2    and there should be no need for an appellate bond with

3    regard to the Canadian creditors here.  That's all I have to

4    say --

5              THE COURT:  I'm sorry.  What Canadian assets are

6    you referring to?

7              MR. UNDERWOOD:  Purdue Canada.  At a bare minimum,

8    Purdue Canada because it's dedicated to -- you know, to sale

9    and contribution to the debtor.  I can't -- I can't speak,

10   and don't want to speak directly to the extent to which

11   Purdue Canada has been securitized pursuant to those

12   settlement agreements.  But it may have been.

13             THE COURT:  But the bond would be to protect

14   against the damage, if any, caused by the delay or any other

15   factor that the stay would occasion.  So it would be

16   something beyond what the debtors already have.

17             MR. UNDERWOOD:  Right.  But that's presuming that

18   there is -- I think the argument would be that -- and I do

19   think there's some case law to this effect, that, in effect,

20   the debtors already have a form of a lien.  I agree --

21             THE COURT:  But it's not a lien on your clients'

22   assets.  It's their own assets.

23             MR. UNDERWOOD:  It's not --

24             THE COURT:  They already have it.  They already --

25   no, but they already have it.  The bond would be to bond

Page 154

1    against damage that your clients would cause.

2              MR. UNDERWOOD:  Right.  I would -- I would differ.

3    But thank you, Your Honor.  I appreciate your --

4              THE COURT:  Well, I mean, that was the result in

5    the Adelphia case.  Okay.  Just 361 B.R. 337, S.D.N.Y.

6    (2007).  Excuse me.  Okay.  Thank you, Mr. Underwood.

7              MR. UNDERWOOD:  Thank you, Your Honor.

8              THE COURT:  Okay.  Mr. Bass, are you still there?

9              MR. BASS:  Yes.  I'm here.  I'm here, Your Honor.

10             THE COURT:  Okay.  All right.

11             MR. BASS:  Well, I also filed a motion for a stay.

12   Go ahead.  What were you saying?  I apologize.

13             THE COURT:  No.  I can hear you fine.

14             MR. BASS:  Oh, okay.  I had filed a motion for a

15   stay, and I have gotten an order from Judge McMahon to have

16   my briefing on the 19th.  So I asked her an extension of

17   time.  So I'm asking you wait until she hear my motion -- I

18   mean my brief, then we can proceed.  So that's what I'm

19   waiting for, her order of an extension of time.

20             THE COURT:  Okay.  Well --

21             MR. BASS:  Besides -- one more thing.  And I'm

22   trying to get that merged.  The cases that I have in the

23   bankruptcy court with the Mallinckrodt to merge it with this

24   here so she can handle both of them -- both of them, both of

25   the cases.

Page 155

1            THE COURT:  All right.  Okay.  Anything else?

2            MR. BASS:  No.  I'm just waiting for -- you know,

3     grant me the -- that order to stay as well as adopt the

4     position --

5            THE COURT:  I'm sorry.  I heard you through, "As

6     well as you adopt," and then I couldn't hear the rest.

7            MR. BASS:  No.  I said adopt the position of

8     Lauren (ph), the attorney, the female attorney who came on,

9     I said I am adopting -- I am adopting her position.

10            THE COURT:  Okay.

11            MR. BASS:  -- against the shareholders and, you

12     know --

13            THE COURT:  Okay.  All right.  Well, on your first

14     point, the briefing schedule set by Judge McMahon on your

15     appeal of the confirmation order is not the subject of a --

16     it's not something that I can stay.  It's not my order, and

17     it's not really covered by the bankruptcy rules.  That's

18     something you'll have to take up with her --

19            MR. BASS:  Right.

20            THE COURT:  -- whether you get an extension or

21     not.  So that's not really an appropriate subject for a stay

22     that I would be considering.

23            MR. BASS:  Okay.

24            THE COURT:  And the same goes for your desire to

25     have the district court consider together your appeal of the

Page 156

```
 1    confirmation order and the other litigation that was the

 2    subject of your motion that I heard back in mid-October.

 3              MR. BASS:  Right.

 4              THE COURT:  And I denied that motion in an order

 5    entered on October 15th that's at Docket Number 3958.

 6              MR. BASS:  Right.

 7              THE COURT:  But again, if any of that litigation

 8    is to be consolidated with your appeal, that's really up to

 9    Judge McMahon.  It's not -- it's not something that I could

10    rule on.

11              MR. BASS:  Oh, all right.

12              THE COURT:  Okay.  Okay.  I think the only movant

13    that I haven't heard from is Ms. Isaacs, who adopted the

14    motion filed by the State of Washington, and of course we've

15    heard the State of Washington and the State of Connecticut

16    at length.  So I don't know if you have anything further,

17    Ms. Isaacs, to say.  No?  All right.

18              It's quarter to 2:00.  We've obviously been going

19    for a long time.  I'm going to take a break for lunch, and

20    be back at 2:30, at which point I'll hear from the

21    objectants and, if warranted, brief rebuttal.  And then I'll

22    give you my ruling.

23              (Recess)

24              THE COURT:  Okay.  Good afternoon.  We're back on

25    the record In re Purdue Pharma, LP, et al, and the motions
```

Page 157

1    by various parties, various Appellants, for a stay pending

2    appeal of my confirmation order in the so-called advance

3    order or preparations order.  And we're turning to the

4    objectors at this point.

5              MR. KAMINETZKY:  Good afternoon, Your Honor.

6    Benjamin Kaminetzky, of Davis Polk, for the Debtors.  I see

7    Ms. Isaacs is on the line.

8              THE COURT:  Okay.

9              MR. KAMINETZKY:  Do you want to --

10             THE COURT:  Well, I had asked whether Ms. --

11   before we broke, I had asked Ms. Isaacs whether she wanted

12   to add anything to her motion, which adopted the motion by

13   the State of Connecticut and the State of Washington and

14   didn't get a response.  So, Ms. Isaac, I don't know if you

15   have anything more to add to what you filed?  You're on

16   moot.

17             MS. ISAACS:  I'm sorry.  Thank you for taking the

18   time to hear me this afternoon.  I understand you called me

19   before lunch break.

20             THE COURT:  Yes.

21             MS. ISAACS:  There's been multiple emails going

22   back and forth.  I am having a great deal of difficulty with

23   the Clerk's office in getting the Zoom links and getting

24   onto Zoom.  As for anything to be added at this time, I

25   stand with the Trustees and all of the states that are in

Page 158

```
 1    disagreement with what's going on with the appeal.  And

 2    that's all I have.

 3              THE COURT:  Okay.  Thank you.  All right.  So I'll

 4    hear briefly from the objectants and, again, I read the

 5    objections and all the other pleadings.  I would like to

 6    focus again primarily, I think at this point, on the shorter

 7    term stay, the alternative request by the movants for a stay

 8    through the ruling by the District Court of some or all of

 9    the confirmation order, or perhaps just the effective date.

10              I also note that I have a number of declarations,

11    which we've already discussed during the discussion of

12    Connecticut and Washington's motion.  I don't know if you

13    want to -- I mean, different people have put up these

14    different witnesses, but I don't know if you want to deal

15    with those first or you have a time when you want to

16    introduce those declarations.  I leave that up to the

17    objectors also.

18              MR. KAMINETZKY:  Thank you, Your Honor.  Again,

19    Mr. Kaminetzky, of Davis Polk, for the Debtors.  So I guess

20    I could move for the admission of Mr. DelConte's

21    declaration, just to get that over with at this point.  I

22    could address --

23              THE COURT:  Okay.

24              MR. KAMINETZKY:  It sounds like the Court has

25    already ruled on, I guess it was the motion to exclude that
```

Page 159

```
 1    testimony.  I'm happy to respond to the points you've made -

 2    -

 3            THE COURT:  No, I --

 4            MR. KAMINETZKY:  -- but it's sounds like we've

 5    done that already.

 6            THE COURT:  I did.  I ruled on that.  So is Mr.

 7    DelConte available?

 8            MR. KAMINETZKY:  Yes, Your Honor.  He's here.

 9            THE COURT:  Okay.  Can you put him on the screen?

10            MR. KAMINETZKY:  Yes.  I'm told any second now.

11            THE COURT:  Okay.

12            MR. KAMINETZKY:  You know, he was in his -- I'm

13    sorry.

14            THE COURT:  Okay.  Can you hear me, Mr. DelConte?

15            MR. DELCONTE:  I can.  Can you hear me?

16            THE COURT:  Yes, I can.  Thank you.  And see you

17    as well.

18            MR. DELCONTE:  Can you hear me?

19            THE COURT:  Yes.

20            MR. DELCONTE:  Okay.

21            THE COURT:  And I can see you too.  So, Mr.

22    DelConte, you submitted a declaration intended to be your

23    direct testimony in connection with the objection to the

24    stay motions.  It's dated October 22, 2021.  Would you raise

25    your right hand, please?  Do you swear to tell the truth,
```

Page 160

```
 1    the whole truth, and nothing but the truth, so help you God?

 2              MR. DELCONTE:  I do.

 3              THE COURT:  Okay.  And it's D-E-L-C-O-N-T-E, J-E-

 4    S-S-E?

 5              MR. DELCONTE:  That's correct.

 6              THE COURT:  Okay.  So, Mr. DelConte, as I said,

 7    you submitted a declaration in connection with these matters

 8    on October 22, 2021.  Sitting here today, November 9th,

 9    knowing that it would be your direct testimony, is there

10    anything in it that you wish to change?

11              MR. DELCONTE:  No, sir.

12              THE COURT:  Okay.  Does anyone want to cross-

13    examine Mr. DelConte on his declaration?  And again, I've

14    limited that declaration to the extent that I ruled so in

15    the colloquy with Mr. Goldman.  Okay.  Mr. DelConte, I had a

16    question for you.  Do you have your declaration there?

17              MR. DELCONTE:  I do.

18              THE COURT:  Okay.  In your declaration, you

19    discuss the timing of payments under the plan and describe

20    them in Paragraphs 7 through 9 and 12 through 21, and also

21    payments to fund the NewCo under the plan in Paragraph 22.

22    And then in Paragraph 26, 27 and 28, you do that present

23    value calculation based on your assessment of the delay in

24    distributions that would result from a stay of three months

25    through 6, 9, 12, 18 and 24 months.  Do you see that there?
```

1          MR. DELCONTE:  Yes, I do.

2          THE COURT:  Okay.  My question is, assume for the

3     moment a stay through the date of a ruling by the District

4     Court of the effective date of the plan, and then tack on 14

5     days to that.  So assume that would be sometime, let's just

6     say, in the third or fourth week of December.  Obviously,

7     I'm making a prediction on how the District Court might

8     rule.  The court might rule later than that; might rule

9     earlier than that.  When you say three months, what are you

10    tracking off of as the effective date?

11         MR. DELCONTE:  I'm tracking off of the end of the

12    year, which a good proxy for when, you know, I think the

13    earliest that we could potentially emerge would be.  So a

14    three-month delay in this case would be delaying emergence

15    from December 31st to the end of March.

16         THE COURT:  Okay.  And --

17         MR. DELCONTE:  2022.

18         THE COURT:  I got it.  And the distributions that

19    would be -- that you track as coming in on the effective

20    date for that period, are any of those distributions to the

21    end-users of the money, or are those distributions to the

22    trust and to NewCo?

23         MR. DELCONTE:  Yeah, those distributions that

24    we're tracking, and these are the distributions to -- both

25    the Federal government and the creditors are in public

1    trusts.  Those are just the timing of those payments --

2              THE COURT:  So there would be a distribution to

3    the Federal government --

4              MR. DELCONTE:  -- to those trusts, not -- we

5    haven't taken into account any -- yeah, I mean, there's the

6    $225 million payment to DOJ and there's a $25 million

7    payment to other Federal entities, in addition to the

8    trusts; $600-some-odd million would be distributed to the

9    creditor of the public trusts.  And we're tracking the

10   payments to those trusts.  We haven't done anything to take

11   into account payments from those trusts ultimately to the

12   end-users.

13             THE COURT:  Okay.  All right.  Then is there some

14   amount that would also go to fund NewCo, or is that just

15   there already, in essence?

16             MR. DELCONTE:  Yeah, I mean, that money is

17   currently sitting at OldCo or PPLP, and at emergence, $200

18   million of that would go to NewCo.  As far as the harms that

19   we've looked at here, we've only been looking at harm as it

20   relates to the distributions that would ultimately go to

21   either the Federal government or the various trusts.  We

22   haven't taken into account anything that the (sound drops)

23   distributed to NewCo.

24             THE COURT:  Okay.  All right.  Those are my only

25   questions.  Thank you.  I don't know if you have any

Page 163

1    redirect on that, Mr. Kaminetzky?  No?

2             MR. KAMINETZKY:  I do not, Your Honor.  Sorry.

3             THE COURT:  Okay.  Your testimony is complete, Mr.

4    DelConte.  You can go off screen now.

5             MR. DELCONTE:  Okay.  Thank you very much.

6             (Declaration of Jesse DelConte Admitted Into

7    Evidence)

8             MR. KAMINETZKY:  Okay, Your Honor.  Shall I

9    proceed?

10            THE COURT:  Yes.

11            MR. KAMINETZKY:  Okay.  Again, Benjamin

12   Kaminetzky, of Davis Polk, for the Debtors.  So, Your Honor,

13   I'm going to take your guidance, of course, and at first

14   I'll focus on what we'll call the short-term period between,

15   let's call it, now and the District Court's ruling.

16            And Your Honor, what we've done is we've provided

17   and have been willing to provide complete protection to the

18   movants against all risk of equitable mootness in the near

19   term, which would allow for Judge McMahon to decide the

20   pending appeals on the merits and would have eliminated the

21   need for today's hearing, but we're already here.  And all

22   that we ask for is an escape hatch for the movants to

23   renotice the motion in a proper forum if there's any risk

24   that mootness were to arise in the future in a situation

25   that we quite frankly don't expect to happen.

Page 164

1           And this is exactly what Your Honor suggested we

2      do, which was to try to "hit the sweet spot," based on a

3      reasonable prediction of when the District Court might rule.

4      So let's be crystal clear on where we are right now and what

5      it is that the movants have refused to accept.

6           The Debtors and the other plan proponents have now

7      made the following six unilateral concessions in writing,

8      signed, which provides everything the movants can get out of

9      this hearing.  Now, Your Honor noted that the movants need

10     to show harm, not just conjecture -- I wrote those words

11     down -- but we have eliminated even conjecture.  What do I

12     mean by that?

13          Every single party that intends to present

14     arguments or evidence to the District Court on appeal.  That

15     includes the Debtors, the UCC, the AHC, the MSGE, the NAS

16     group.  Both sides of the Sackler Family have stipulated in

17     writing to you, to the District Court, that they will never

18     argue before any court that the appeals of the confirmation

19     orders have been rendered equitably moot by the actions

20     taken in advance of the effective date in furtherance of the

21     plan, pursuant to both the confirmation order and the

22     advance order.  Okay?

23          This agreement is set forth in stipulation and was

24     filed on October 20th on the District Court's docket.  The

25     Debtors have agreed that the effective date will not occur

Page 165

1    until the earlier of seven days following a decision by the

2    District Court on the appeals and December 30th.  In

3    addition, Sir, the Debtors have the --

4              THE COURT:  Can I --

5              MR. KAMINETZKY:  Sorry.

6              THE COURT:  Can I just stop you there?  So, on the

7    stipulation, the movants have said that you've carved out

8    arguing equitable mootness with respect to the sentencing

9    and its effects.

10             MR. KAMINETZKY:  Yes.  And that's -- we test in

11   the next point, Your Honor.

12             THE COURT:  Okay.

13             MR. KAMINETZKY:  We have agreed that we will not

14   request that the criminal sentencing take place before

15   December 20th.  Now, under the plan, as Your Honor knows,

16   the sentencing hearing could otherwise occur as of December

17   1st.  But let's just pause for a second on that, just so

18   it's clear.

19             The plea and sentencing is pursuant to a separate

20   agreement with the DOJ, not the plan and confirmation.

21   There was some confusion about that, but that's not

22   something that's addressed under the plan.  That's something

23   we agreed to to the DOJ.  But lest you think we're hiding

24   anything, we've also agreed that we'll file a notice on the

25   docket -- and obviously, it will be on the New Jersey

Page 166

1  court's docket -- when the criminal sentencing hearing is

2  scheduled.

3          And lest you think we're hiding anything and not

4  being transparent, the sentencing hearing has not been

5  scheduled, and suffice it to say that scheduling a

6  sentencing hearing in a U.S. District Court can take several

7  weeks.  And we haven't asked -- we haven't reached out yet

8  to schedule that sentencing hearing.

9          So isn't something that could happen in the dead

10 of night without any notice.  This is a sentencing hearing

11 in a very public case.  There'll be plenty of notice.  And

12 we've agreed already in writing that the earliest it

13 possibly could occur is December 20th.  But again, that date

14 -- we haven't even reached out to obtain a sentencing date.

15 And when I say we, I mean we and/or the DOJ.

16          THE COURT:  Well --

17          MR. KAMINETZKY:  Okay.  So that's number --

18          THE COURT:  Okay.  Why don't --

19          MR. KAMINETZKY:  -- four.  The --

20          THE COURT:  Why don't you go through all the

21 points, and I'll come back to questions I have.

22          MR. KAMINETZKY:  Okay, good.  Number four, the

23 Debtors will provide no less than 14-days' notice of the

24 actual effective date.  And that was something Judge McMahon

25 asked us to do, and we obviously have agreed to do it.  I

1    already talked about that we'll file on the docket when the

2    criminal sentencing has been scheduled.

3             And finally, the plan opponents agree that the

4    movants may renew their stay motions or file a new motion as

5    of the earlier of the District Court's decision on appeal

6    and December 15th.

7             So these concessions provide the movants complete

8    protection from the risk of equitable mootness until

9    December 20th at the earliest and would either allow the

10   District Court to decide the appeals on the merits, or if

11   contrary to everyone's expectation, Judge McMahon's ruling

12   is delayed, tee up the stay motions at a later point in

13   time, before any risk of mootness becomes imminent.

14            We've built everything in so that the two things

15   that could possibly render -- you know, arguably render

16   anything equitably moot, we've built into the stipulation

17   that we've provided, protection that they could come back to

18   court and make any -- renew this motion.

19            So there's literally -- I mean, the only harm that

20   they could articulate --

21            THE COURT:  Well --

22            MR. KAMINETZKY:  -- in the short-term stay or in

23   the short-term period is the equitable mootness, and we have

24   taken it off the table.

25            THE COURT:  So could I explore that for a minute

```
                                                      Page 168
 1     or two?

 2              MR. KAMINETZKY:  Please.

 3              THE COURT:  I expect you heard me initially having

 4     some doubt as to how the sentencing, when it occurs,

 5     arguably give rise to equitable mootness.  And I was told

 6     one thing, and perhaps two.  First I was told that if the

 7     sentencing occurs, there will be tremendous pressure to go

 8     effective at that point, because the Debtors, as opposed to

 9     NewCo, which only exists under the plan if the plan goes

10     effective, would not be able to continue on in their

11     business.  What is your response to that?

12              MR. KAMINETZKY:  That might very well be the case.

13              THE COURT:  Okay.

14              MR. KAMINETZKY:  That the -- again, it's not

15     necessarily two seconds later, but there's certainly a risk

16     of that.

17              THE COURT:  Well, how --

18              MR. KAMINETZKY:  And that is why we're not --

19              THE COURT:  How soon afterwards does that happen?

20              MR. KAMINETZKY:  Well, I'm not sure.  I don't

21     think it's necessarily up to us.

22              THE COURT:  Okay.

23              MR. KAMINETZKY:  I'm not the expert in this area.

24     But I'm not here to argue that the sentencing isn't a very

25     big deal.  I'm here saying that there's no risk that that
```

1    could happen under the stipulation that we've provided, or

2    are willing to provide, or have provided to the other side

3    without giving them an opportunity to come back and get a

4    stay, if necessary.

5              Obviously, if we're in that position and Judge

6    McMahon hasn't ruled yet, we'll take that into account and

7    most likely extend that date.  We're not --

8              THE COURT:  Well --

9              MR. KAMINETZKY:  -- here trying --

10             THE COURT:  I'm sorry.  What is the harm to the

11   Debtors and the other Appellees of delaying the sentencing,

12   or having the Debtors request a sentencing hearing date that

13   would be, say, at the end of December?  Is there some

14   difference between December 20 and December 31, or...?

15             MR. KAMINETZKY:  No, there's no -- if you want

16   another 10 -- put it to December 31, we're happy to do this.

17   The issue here, Your Honor, is we all are expecting -- and

18   if you were at Judge McMahon's hearing, we heard it -- she

19   put this -- what she called a "rocket docket."  We all

20   expect her to rule promptly.

21             The only risk we are protecting -- you know, why

22   can't I just get up and say we'll give them -- you know,

23   we'll stipulate until Judge McMahon's ruling.  In all likely

24   circumstances, that's what we're doing.  We just feel as

25   fiduciaries, you know, who knows what could happen.  So we

Page 170

```
 1    want some outside date that if Judge McMahon, for whatever

 2    reason, doesn't rule by then, we could come back to you or,

 3    you know, we could see where we are.

 4             We just can't right now say, you know, we'll wait

 5    until Judge McMahon's ruling.  Although, you know, that's

 6    where we all expect to be.  Judge McMahon, again, she's

 7    scheduled oral arguments November 30th.  Right after doing

 8    that, she said, "And I have a criminal trial starting on

 9    December 7th."  The implication of that, I thought, was that

10    she's going to try to rule very promptly.  And that's why

11    we've set the dates the way they are, December 20th,

12    December 30th.

13             But, you know, those are all -- and that's why we

14    just want the back-up drop-dead date.  But again, we all

15    expect -- and the purpose of the stipulation is to give them

16    comfort that nothing will happen until Judge McMahon rules,

17    both the effective date and the sentencing.

18             THE COURT:  So, can we --

19             MR. KAMINETZKY:  And once we've -- Your Honor,

20    this is -- I'm sorry.

21             THE COURT:  The proposal is, as you've repeated

22    just now, that the agreement is that the effective date

23    would not occur until the earlier of the District Court's

24    ruling or December 30, which places the onus on the movants

25    to seek a ruling within the 14-day notice period that you've
```

1    agreed to, assuming that a ruling isn't forthcoming by

2    December 30, right?  That's really what you --

3              MR. KAMINETZKY:  Right, that's --

4              THE COURT:  That's what you're suggesting.

5              MR. KAMINETZKY:  Yes, because -- and again, the

6    burden is on -- let's just -- I'm not asking for a favor,

7    Your Honor.

8              THE COURT:  Right.

9              MR. KAMINETZKY:  The burden is on them.  Like, a

10   stay isn't the natural state of being.  A stay is

11   extraordinary, and they have a burden.  Their only burden,

12   the only harm that they could talk about -- and again, we're

13   limiting this to the interim period as equitable mootness.

14   We have taken it off the table until, you know, Judge

15   McMahon rules, for all intents and purposes.  We think we're

16   done, then.

17             And again, if there's an issue or, the only thing

18   that we've added is a -- you know, let's say something

19   happens and Judge McMahon doesn't rule, yes, the burden

20   would be on them.  But that's fair because we don't expect

21   that to happen and they can't -- sitting here today, they

22   can't meet their burden.

23             First of all, equitable mootness alone shouldn't

24   count.  But even assuming it does, and even -- and we heard

25   Your Honor loud and clear, that Your Honor wants meaningful

Page 172

1       appellate review.  So do I.  We've given them meaningful

2       appellate review until Judge McMahon rules.

3               And at that point in time, Your Honor -- and I

4       could go through the case law; Your Honor already did it --

5       basically, that's all you could give them at this hearing,

6       because under the vast majority of rule, with the exception

7       of a single case that the U.S. Trustee found, is that Your

8       Honor's kind of jurisdiction, or Your Honor's ability to

9       impose a stay, or Your Honor's stay dissolves after the

10      District Court rules.

11              So we're giving them, with one exception, until

12      Judge McMahon rules.  With the safety valve that the Debtors

13      need and as plan fiduciary needs, is if something goes

14      sideways and for some reason Judge McMahon hasn't ruled, we

15      could come back to you at that time.

16              THE COURT:  Are there other actions...?  Let's say

17      I just stayed the effective date and not the plan itself --

18      I mean, the confirmation order itself; I stayed one of the

19      conditions to the effective date, which would -- until the

20      District Court ruled or December 30, whatever was earlier --

21      are there steps that would involve either -- let me just

22      turn to the applicable section -- the transfer of material

23      assets under the plan or distributions to creditors before

24      then --

25              MR. KAMINETZKY:  No, no, no.

1          THE COURT:  -- i.e. substantial consummation?

2          MR. KAMINETZKY:  No, no and no.  What we're doing

3    now, as we've always said, we're setting up trusts, paying

4    professionals, seeking regulatory approvals.  There's no

5    transfer of assets until the effective date.  We're setting

6    up for that effective date when the transfers actually

7    occur.  That's why it was giving ice in winter to say that -

8    - you know, for us to make clear and stipulate again and

9    again and again that we won't make any equitable mootness

10   argument with respect to any actions pursuant to advance

11   this order pertaining to the confirmation order, you know,

12   with a sentencing that we talked about otherwise.

13          THE COURT:  And --

14          MR. KAMINETZKY:  So the answer is --

15          THE COURT:  And that's all part of you and the

16   Other Appellees' stipulation, that those sorts of things --

17          MR. KAMINETZKY:  Stipulated to it --

18          THE COURT:  Would not --

19          MR. KAMINETZKY:  -- filed it on the docket.

20          THE COURT:  You would not argue equitable mootness

21   based on those sorts of things?

22          MR. KAMINETZKY:  Absolutely.  That's black and

23   white.  We've said it.  It's filed upon the docket in the

24   District Court, and we sent a signed version of it to the

25   other side as well and to Your Honor.

1           Again, Your Honor, it may be a -- for us, it's an

2    important point.  If we remove the equitable mootness risk,

3    which is the only risk or the only harm that they've

4    identified, they are not entitled even to the short-term

5    stay, period.  And we've done that.

6           And we've taken into account anything that they've

7    identified, including, obviously, the effective date and the

8    sentencing, by giving them comfort that we won't seek

9    sentencing before December 20th.  If you want us to move

10   that to December 31st, we're happy to do that as well.

11          But again, we don't control the sentencing.  The

12   District Court does.  All we can say is we won't seek to

13   schedule it until then.  But again, all that we're looking

14   for is some sort of safety valve that we think won't be

15   necessary, because we think Judge McMahon is -- she's

16   indicated that she realizes how exigent this is.

17          THE COURT:  So I just want to make sure.

18   Originally, I think you said that you would request that the

19   current sentencing will not take place before December 8,

20   but then you said December 20.

21          MR. KAMINETZKY:  No, it's December -- we've agreed

22   not to...  I'm sorry.  We've agreed not to seek to have the

23   sentencing hearing occur before December 20th.  That's in

24   the current stipulation that we had sent over.

25          THE COURT:  Okay.  And --

1              MR. KAMINETZKY:  December 8th was the earliest.

2     Just the dates are a little -- December 1st was the --

3              THE COURT:  That was the earliest that it could

4     happen.

5              MR. KAMINETZKY:  It could happen.  Exactly.  As

6     opposed to -- but this in a further agreement.  But we're

7     happy to -- there's nothing written in stone about December

8     (indiscernible).  But all we're trying to do is give Judge

9     McMahon time that she needs to rule without any risk of

10    equitable mootness between now and then.  And once we've

11    done that, they have what they need, all the harm that

12    they've identified has been dealt with, and we should be

13    done.  It's really as simple as that.

14             THE COURT:  Okay.  Well, why don't I hear from

15    counsel for the U.S. Trustee on this point.

16             MR. KAMINETZKY:  Okay.  All right.  I'll be back.

17             MS. LEVINE:  Your Honor, my video takes just a

18    second.

19             THE COURT:  No, that's fine, Ms. Levine.

20             MS. LEVINE:  I'll go ahead and start.  I don't

21    know what's going on with my video.  It'll come up soon.

22             But, Your Honor, I think what I've heard is that

23    there is an agreement that there should not be equitable

24    mootness, at least before the District Court rules.  And

25    where there is a difference of opinion is what would cause

Page 176

```
1    that to happen.  And you know, with respect to the

2    stipulation that they've sent, it's really unclear to us.

3    You know, that was an offer that they had sent, which we did

4    not agree to for various reasons, including that it

5    purported to limit our ability to seek stay relief.

6              And we're, again -- you the concern here is

7    sentencing, which as you've heard, they do intend to argue

8    sentencing will constitute equitable mootness, and we don't

9    know what -- they've offered to have that, I guess, as early

10   -- no earlier than December 20th.  That's part of the

11   stipulation, but it's attached to conditions that would

12   limit when we could seek further state relief.  That would

13   prevent us from going back to court until December 15th,

14   just five days before then.

15             THE COURT:  Well, let's say it's December 30th

16   instead, so you have a full 14 days.

17             MS. LEVINE:  Your Honor, we were willing to

18   discuss a stipulation in the context of trying to get to a

19   consensual resolution --

20             THE COURT:  No, no.  I'm just --

21             MS. LEVINE:  -- and we weren't --

22             THE COURT:  -- focusing on the merits.  I'm trying

23   to figure out what's the harm in that, in what has just been

24   proposed with the change that the sentencing also would

25   occur no earlier than December 30.  So you pretty much know
```

1    that the 14 days to renew the stay motion would be in mid-

2    December, if there hasn't been a ruling by them.  And you'd

3    tea that up before the 30th.

4              MS. LEVINE:  Your Honor, our concern is twofold.

5    You know, one is making sure that we get a ruling before

6    that day comes, with plenty of time to seek a further stay.

7    You know, I know you disagree about this, but we do have

8    concerns about the other activities that are going on.  And

9    the only way to ensure that someone doesn't come in and say

10   those other activities don't cause equitable mootness is a

11   stay.  And the only sure way to ensure that they're not

12   going to request a sentencing date that then ends up falling

13   before a ruling by the District Court is a stay of the

14   confirmation order.  That's the only sure way we know of.

15             THE COURT:  I don't understand -- I guess --

16             MS. LEVINE:  And the --

17             THE COURT:  You're saying because there's an

18   outside date for the effective date, which would be December

19   30 in the proposal, right?

20             MS. LEVINE:  Well, it's the sentencing, Your

21   Honor, that they say that they're going to --

22             THE COURT:  Well, both dates.  But December 30

23   could be a date before the District Court rules.

24             MS. LEVINE:  It could be, yes.  And that would

25   undermine sort of the whole project, which is to make sure

Page 178

1   we're getting a ruling before there is --

2           THE COURT:  But the U.S. Trustee was making

3   emergency motions for a stay while I was still on the bench

4   ruling on the plan.  The U.S. Trustee is perfectly capable

5   of making this motion.  In fact, it's already done so, and

6   we've already had a hearing on it.  So it wouldn't seem to

7   me that hard when you have 14-days' notice to do it.

8           MS. LEVINE:  We certainly could go back to the

9   Court if we have to go back to the Court, Your Honor.  We

10  don't see the harm in entering the stay now, though, to

11  prevent that additional motion practice, which will cost

12  everyone resources, you know, particularly if the stay is

13  less than what we are asking for, but is just through the

14  date of the District Court decision.

15          THE COURT:  That's all you're going to get.

16          MS. LEVINE:  You know, that --

17          THE COURT:  You're not going to get any more than

18  that, Ms. Levine.  So I don't think you should worry about

19  giving up anything on this point.

20          MS. LEVINE:  I got that impression, Your Honor.

21          THE COURT:  Okay.

22          MS. LEVINE:  So, you know, what we're talking

23  about balancing is, you know, that short amount of time,

24  that short amount of delay, to ensure that the District

25  Court is able to rule on the merits, which I think --

1          THE COURT:  All right.  So let me just ask Mr. --

2          MS. LEVINE:  -- everybody agrees on this is

3    something that should happen.

4          THE COURT:  -- Mr. Kaminetzky.  Your concern is

5    really just if something happens that is unexpected, that

6    delays Judge McMahon from ruling, right?  I mean, that's

7    really why you've put this earlier of District Court ruling

8    or December 30, right?

9          MR. KAMINETZKY:  Exactly.  We did --

10          THE COURT:  So --

11          MR. KAMINETZKY:  -- I mean, again --

12          THE COURT:  I mean, if that happens -- I mean, I

13   don't what it would be.  Maybe, you know...  I don't know

14   what happens.  But I think what Ms. Levine is saying is why

15   can't the Debtors come back to me and say it's a port for us

16   to have the effective date go forward now?

17          MR. KAMINETZKY:  The answer is, Your Honor, just

18   that's not what the law is.  The law --

19          THE COURT:  Because it --

20          MR. KAMINETZKY:  -- isn't that --

21          THE COURT:  It would shift the burden.  You're

22   saying it would shift the burden.

23          MR. KAMINETZKY:  It shifts the burden.  Yeah, the

24   burden is on them to show -- and I'm now quoting from the

25   Calpine case, how it has to be neither remote nor

Page 180

1    speculative, but actual and imminent.  There is no harm.

2              THE COURT:  Okay.

3              MR. KAMINETZKY:  The only harm they've articulated

4    is equitable mootness, and we've taken that off the table.

5    They are not entitled to a stay.  We've written it in blood

6    seven or eight times that we've eliminated any risk to them.

7    And if the unexpected happens, I'm fine with -- you know,

8    December 15th they could file their new motion.  We'll wait

9    until December -- the earliest sentencing date is December

10   31st, which means that the effective date -- the earliest

11   one has to be seven days later.  They have all the time in

12   the world if the risk becomes actual and imminent.  But it

13   isn't, because we've agreed to take that off the table.

14             THE COURT:  So when -- I'm just trying to figure

15   out how the 14-days' notice of the effective date would tie

16   into a December 30 sentencing date and a December 30 end

17   date to the voluntary stay.  When would you give that

18   notice?

19             I guess you'd get -- can I interrupt you?  I guess

20   what you would do -- correct me if I'm wrong -- is you would

21   fairly soon, I suppose, reach out to the District Court in

22   New Jersey and say, can you give us a sentencing hearing

23   sometime between December 30 and the next available date

24   thereafter.  Right?  So you know when that would be?  And

25   then you would -- then you would --

1            MR. KAMINETZKY:  Yes, Your Honor.  We can't --

2            THE COURT:  And then you would say in your --

3            MR. KAMINETZKY:  We can't go --

4            THE COURT:  Then you would say in your notice,

5     we're giving you more than 14-days' notice.  We're giving

6     you a notice that we plan to go effective whatever date is

7     after that sentencing hearing that you have to go effective?

8     Or would it be the date of the sentencing hearing?

9            MR. KAMINETZKY:  Well, it's both, Your Honor.  We

10    would give them notice of the sentencing hearing when it's

11    scheduled.  And obviously, it hasn't been scheduled yet.

12    So, you know -- and Your Honor knows how busy District

13    Courts are.  So we'd give them immediate notice of that.

14    They'll then know for sure that we can't go effective until

15    after that date.  The earliest is seven days after that date

16    under the plan.  And then they have plenty of notice of both

17    the sentencing hearing, which won't happen overnight, as

18    well as the effective date that will happen there after.

19            THE COURT:  So is the sentencing hearing date,

20    though, the key date, because the puzzle really does

21    arguably change -- that's the missing piece of the puzzle as

22    far as mootness is concerned?  So really, the notice of the

23    effective date is less important than the noticing of the

24    sentence date?

25            MR. KAMINETZKY:  Correct.  And I mean, perhaps,

Page 182

```
 1    yes, maybe perhaps, but the answer is they're going to have

 2    plenty of notice of the sentencing date.  And there's a

 3    reason we're not playing games, Your Honor.  We're not ready

 4    to be sentenced yet.  We still have work to do that's --

 5                THE COURT:  Right.  Well, so --

 6                MR. KAMINETZKY:  -- you know, to get ready for

 7    this --

 8                THE COURT:  So I could require that you provide

 9    not only 14-days' notice of the actual effective date, but

10    also 14-days' notice of the sentencing date.

11                MR. KAMINETZKY:  I have no problem with that.  I

12    mean, again, it's in the District Court's discretion.  But

13    like --

14                THE COURT:  No, I mean -- but I --

15                MR. KAMINETZKY:  -- no problem here.

16                THE COURT:  I'm assuming the District Court will

17    give you at least 14-days' notice, right?

18                MR. KAMINETZKY:  I certainly expect that to be the

19    case.  I think it would be quite -- in a public case like

20    this, for a company like Purdue to be sentenced, I assume

21    the District Court will give plenty of notice to everyone,

22    including the public.  So there's nothing happening here in

23    secret.  This isn't the type of, you know, equitable

24    mootness that you're scared that wires will be sent out in

25    the middle of the  night.  This is the most public events
```

Page 183

1    that you could imagine is the sentencing of Purdue Pharma in

2    a United States District Court.

3              And again, Your Honor, we're happy to -- I can

4    repeat this -- we're all thinking -- you know, we all think

5    that Judge McMahon, when she indicated in reading between

6    the lines that she's going to rule quickly, so setting

7    December 30th and January 7th is really not a problem.  We

8    just feel we need the protection of some outside date, just

9    in case who knows what.

10             THE COURT:  Okay.  All right.

11             MR. KAMINETZKY:  And Your Honor, Ms. Levine came

12   back to these, you know, mysterious other things that are

13   happening.  But we've already dealt with those mysterious

14   other things that are happening.  How many times does Your

15   Honor have to rule that there's just simply no equitable

16   mootness possibility there?  And again, we've stipulated it,

17   and every plan proponent has stipulated that we will never,

18   ever, ever make the argument that that would be to equitable

19   mootness, any of those activities.

20             THE COURT:  Okay.  All right.  Does any other

21   movant have anything to say on these points?  Any other stay

22   movant?

23             MR. GOLD:  Your Honor, Matthew Gold.  Can you hear

24   me?

25             THE COURT:  Yes.

1           MR. GOLD:  Just a couple of brief observations,

2      Your Honor.  The first is it seems to me, given the

3      construct of the Debtors' (indiscernible) that there would

4      be no additional burden on the Debtor, and it would make

5      perfect sense for them to provide us with substantially

6      immediate notice a time when a request is made of the

7      District Court for sentencing to occur, rather than saying

8      send a date and -- I mean, if they're making a request to

9      the District Court, they should be able to tell everyone

10     that they have done so right then and there, or

11     substantially (sound drops) thereafter, regardless of when

12     that occurs.

13          The second thing is that I still find in the

14     Debtors' proposal a subtle rewriting of Rule 8025, which

15     Your Honor discussed earlier, which provides for a two-week

16     stay following the ruling of the District Court, rather than

17     --

18          THE COURT:  That still applies.  That still

19     applies.  This is just -- this just takes you up to the

20     District Court ruling.

21          MR. GOLD:  I understand.  I just...  It just

22     seems, to us, cleanest when not creating confusion to say

23     that whatever Your Honor grants would be coterminous with

24     the stay that comes from under Rule 8025, rather than having

25     to have anyone puzzle out what happens if one stay applies -

Page 185

```
 1    - ends earlier, and another stay does not.

 2              THE COURT:  Well, to me, the way to do that is to

 3    say it's...  First of all, the Debtors are not proposing a

 4    stay here.  They're proposing a stipulation that would

 5    obviate the need for a stay.  And that at that point, you

 6    know, you have the District Court ruling.  And then 8025

 7    comes into play.

 8              MR. GOLD:  Okay.  Well, the Debtors' stipulation

 9    did not contain anything that said that it was not -- it was

10    possible we were concerned in reading it that it might be

11    intended to be a derogation of whatever rights --

12              THE COURT:  No.

13              MR. GOLD:  -- under 8025 --

14              THE COURT:  I understand, but I don't --

15              MR. GOLD:  -- and not --

16              THE COURT:  Well, no one even mentioned 8025, but

17    I understand that point.  But I think that that would be

18    clear from my ruling here.

19              MR. GOLD:  Okay.  And Your Honor, I mean, the only

20    other thing which I will suggest is it's hard for me to

21    believe that anyone wants to be deliberately setting a

22    deadline that runs to New Years Eve, or immediately, giving

23    a few days after that, if parties are going to be having to

24    run in for emergency applications would make a certain

25    amount of sense, given that the Debtors have conceded that a
```

Page 186

1   few days here or there is not going to make a meaningful

2   difference in this context.

3            Other than that, I have nothing to add on this

4   point, Your Honor.

5            THE COURT:  Okay.

6            MR. GOLDMAN:  Your Honor, may I just add one

7   additional point?  Irv Goldman, Pullman & Comley, for the

8   State of Connecticut.

9            THE COURT:  Sure.

10           MR. GOLDMAN:  I think Your Honor hit directly on

11   the head that the important date here, especially if the

12   District Court has ruled by December 30, is the criminal

13   sentencing date.  Although they've agreed to postpone asking

14   for that to be held to December 30 or December 31, if it

15   does actually fall on that date, I think it does make it --

16   and this follows up on Mr. Gold's point -- somewhat of a

17   difficulty in trying to get an emergency stay motion over

18   the holiday season, running up to December 30th.  So I think

19   it does, for that reason, make (sound drops) sense to have

20   that pushed out so we're not running into the holidays.

21           THE COURT:  Well, I'm assuming you would make it -

22   - you would file it and get a date a couple weeks before

23   then.  But I understand the hearing time.  Understand that

24   point, I don't think any court is particularly excited to

25   have a hearing, although I think it would probably be

1    shorter than this one, on the New Year's Eve.

2           MR. GOLDMAN:  Yes.  That's all I had, Your Honor.

3           THE COURT:  Okay.  All right.  Okay, so, look, I

4    think obviously there is a lot more that the objectors want

5    to get in the record for this hearing.  But I do think that

6    the Debtors' proposal, with some tweaking, really does make

7    a lot of sense in the interim, particularly given Mr.

8    DelConte's testimony that the money itself wouldn't be

9    flowing even to the trusts until the beginning of 2022, and

10   wouldn't thereafter, at least for a while, be going out --

11   at least for a couple of weeks -- be going out to third

12   parties in the form of the abatement payments.  And probably

13   a little bit longer for the personal injury claimants, which

14   is the offsetting harm that the objectors have highlighted,

15   and rightfully so.

16           So, why don't I throw out -- and people can be

17   thinking about this while I hear the rest of the argument --

18   that the Court's ruling would be to deny the stay request,

19   on the conditions that the effective date not occur until

20   the earlier of the issuance of the District Court's ruling

21   and January 7th.  That the Debtors will not seek a

22   sentencing hearing to occur any earlier than January 7th,

23   and that they will provide notice, not only of when that

24   hearing is scheduled, but also their request for one to the

25   Appellants.  And that the movants may renew their stay

```
1    motion on at least 14-days' notice.  And of course, that

2    would also be accompanied by the stipulation that's been

3    signed that the Appellees will not argue that any of the

4    other actions that would be taken leading up to either the

5    District Court ruling or January 7 would serve as a basis

6    for equitable mootness.

7              So you all can mull that over, but I don't know if

8    you want to go into additional argument, Mr. Kaminetzky, or

9    does that conclude your argument?  In which case, I'll hear

10   from the other objectants.  I think you're on mute still.

11             MR. KAMINETZKY:  I am on mute.  I have a double

12   mute because I don't trust just one mute.  But here's --

13   well, Your Honor, we have -- if Your Honor wants me to

14   address the longer stay, if that's still on the table, then

15   I have a lot to say about that in terms of irreparable harm

16   and the other prongs.  If not, then I'll save that for,

17   hopefully, never.  But it's really up to you.

18             We do have a -- you know, we have a lot to say on

19   the three-hour argument that the other side had on

20   irreparable harm and the balances of harms and public policy

21   and bond and all of that.  So, Your Honor, I don't want to

22   do something that you're not -- you don't want us to do, but

23   we're happy to make that record or not make that record.

24             THE COURT:  Well, unfortunately, where I know

25   where I'm coming out, at least some of the movants, not all
```

1    of them, really are, I think, still actively pursuing as an

2    alternative the stay through the conclusion of the appellate

3    process.  So I think we should, albeit maybe so as to

4    preserve the record, at least get in the witness

5    declarations and hear brief argument on the irreparable harm

6    and balance of the harms and public policy points for, or

7    with respect to, movants' request for a stay beyond the

8    dates that I have posited, which again would be the earlier

9    to occur of the District Court's ruling and January 7th,

10   although that wouldn't be a stay.  That would be a denial of

11   the motion on the conditions that these agreements be made

12   by the Appellees.

13           MR. WAGNER:  Your Honor, Jonathan Wagner, from

14   Kramer Levin, on the issue of the declarants -- on behalf of

15   the Ad Hoc Committee.  Our declarant, Mr. Guard, has to

16   leave by 4:00 --

17           THE COURT:  Okay.

18           MR. WAGNER:  -- to pick up his son.

19           THE COURT:  Okay.

20           MR. WAGNER:  So can we swear him in now and have

21   him attest to his declaration?

22           THE COURT:  Yes, that's fine.

23           MR. WAGNER:  That's fine.

24           THE COURT:  And I see him there on the screen.

25   So, Mr. Guard, would you raise your right hand, please?  Do

Page 190

```
1     you swear or affirm to tell the truth, the whole truth, and

2     nothing but the truth, so help you God?

3               MR. GUARD:  I do.

4               THE COURT:  Thank you.  And it's John M. G-U-A-R-

5     D?

6               MR. GUARD:  Yes, sir.

7               THE COURT:  Okay.  So, Mr. Guard, you submitted a

8     declaration intended to be your direct testimony on these

9     motions for stay pending appeal.  It's dated October 22,

10    2021.  Knowing again that it would be your direct testimony,

11    is there anything in it sitting here on November 9 that you

12    want to change?

13              MR. GUARD:  No, Your Honor.

14              THE COURT:  Okay.  Does anyone want to cross-

15    examine Mr. Guard?  Okay.  I have reviewed Mr. Guard's

16    declaration.  I believe it's quite clear.  I have, in part,

17    limited it, as I ruled in my colloquy with Mr. Goldman, in

18    light of Connecticut and Washington's objection to its

19    admissibility.  But otherwise, I'll admit it now.  It's just

20    direct testimony.  So, you can sign off, Mr. Guard.

21              MR. GUARD:  Thank you, Your Honor.

22              THE COURT:  Okay.

23              (Declaration of John M. Guard Admitted Into

24    Evidence)

25              THE COURT:  I think other objectors also submitted
```

1   declarations that they may want to move the admission of

2   now.  Mr. Jorgensen and the Committee's two witnesses, Ms.

3   Juaire and Ms. Trainor.

4          MR. HURLEY:  Your Honor, if I may, it's Mitch

5   Hurley, on behalf of the Official Committee of Unsecured

6   Creditors.

7          THE COURT:  Okay.

8          MR. HURLEY:  Your Honor, my colleague, Arik Preis,

9   is going to argue the objection to the stay motion on behalf

10  of the UCC.  I'm taking the virtual podium here only to

11  offer into evidence the declarations of Ms. Juaire and Ms.

12  Trainor.

13         Both witnesses are members of the UCC, who have

14  dedicated countless uncompensated hours to these cases.

15  Both agreed during the course of the cases to cease their

16  ordinarily outspoken public advocacy relating to Purdue.

17  Both have suffered unthinkable personal loss as a result of

18  the opioid epidemic.  And both have responded by devoting

19  virtually all of their time helping others (indiscernible)

20  community.

21         As such, the ICC submits these witnesses have

22  unique knowledge and insights in matters of great relevance

23  to the exercise the Court is undertaking on the stay motion,

24  and that those insights should be a part of the record.

25         The states of Washington and Connecticut were

1    alone in objecting to admission of the declarations of Ms.

2    Juaire and Ms. Trainor, and then only with respect to

3    several discrete statements included in those declarations.

4         My understanding is that the Court already has

5    overruled the objections of Washington and Connecticut, as

6    explained in more detail by the Court earlier in these

7    proceedings today.  And I therefore will not address further

8    those objections, unless Your Honor has questions for me.

9    And both of the witnesses are present and available to

10   affirm their declarations, if Your Honor wishes.

11        THE COURT:  Just to be clear, I didn't completely

12   overrule the two states' objections.  I granted them to the

13   extent that I found that each declarant was predicting or

14   offering a rationale for the exact effect of the delay of

15   payments under the plan and/or stating their belief as to

16   why certain sources of abatement have shut down over the

17   last several months.

18        I admit them for predictions by a reasonably

19   informed person who has dedicated, as you said,

20   substantially all of their time to these types of issues,

21   and who have in each case involved them to a significant

22   degree in understanding and interacting with others like

23   them, who have devoted themselves as well to abatement of

24   the opioid crisis.

25        So, why don't we start with Ms. Juaire?  She can

Page 193

1    go on the screen.  Okay.  Would you raise your right hand,

2    please?  Do you swear or affirm to tell the truth, the whole

3    truth, and nothing but the truth, so help you God?

4              MS. JUAIRE:  I do.

5              THE COURT:  And it's Cheryl, C-H-E-R-Y-L, Juaire,

6    J-U-A-I-R-E?

7              MS. JUAIRE:  Yes.

8              THE COURT:  Okay.  Ms. Juaire, you submitted a

9    declaration in connections with these motions for a stay

10   pending appeal that was intended to be your direct

11   testimony.  It's dated October 21, 2021.  Sitting here today

12   on November 9, is there anything in it that you would wish

13   to change?

14             MS. JUAIRE:  No.

15             THE COURT:  Okay.  Does anyone want to cross-

16   examine Ms. Juaire?  Okay.

17             I have read the declaration and I don't have any

18   questions on it.  It's quite clear to me, and I will admit

19   it as Ms. Juaire's direct testimony subject to the

20   limitation on admission that I previously articulated.

21             So thank you, Ms. Juaire, and you can sign off at

22   this point.

23             MS. JUAIRE:  Thank you.

24             THE COURT:  Okay.  And then can we bring Ms.

25   Trainor on the screen?  Good afternoon.  Would you raise

```
1    your right hand, please?  Do you swear or affirm to tell the
2    truth, the whole truth, and nothing but the truth, so help
3    you God?
4              MS. TRAINOR:  I do.
5              THE COURT:  Okay.  And it's K-A-R-A T-R-A-I-N-O-R?
6              MS. TRAINOR:  Yes.
7              THE COURT:  And Ms. Trainor, you submitted a
8    declaration in connection with this set of motions for a
9    stay pending appeal.  It's dated October 21, 2021, and it's
10   intended to be your direct testimony.
11             Sitting here today on November 9, is there
12   anything in it that you wish to change?
13             MS. TRAINOR:  No.
14             THE COURT:  Okay.  Does anyone want to cross-
15   examine Ms. Trainor on her declaration?  Okay.
16             And again, I've reviewed it and I found it to be
17   quite clear and subject to the limitation on admissibility
18   that I previously noted, I will admit it as Ms. Trainor's
19   direct testimony.  I don't have any questions of her, so
20   thank you and you can sign off, ma'am.
21             MS. TRAINOR:  Thank you.
22             THE COURT:  Okay.
23             MAN 1:  Thank you, Your Honor.
24             THE COURT:  Okay.  I think there were two other
25   declarations, one by Mr. Jorgensen and then one that came
```

1    out very recently, which may or may not be necessary given

2    my ruling on the objections to admissibility by the State of

3    Connecticut and the State of Washington, but I think that's

4    Mr. Jorgensen.  And a declaration by another official from

5    Arkansas, which I'm looking for and can't find at the moment

6    -- here it is, I have it -- Mr. Lane.

7              MR. LIESEMER:  Yes, Your Honor.  This is Jeffrey

8    Liesemer on behalf of the multi-state governmental entities

9    group.  We had filed the declaration of Mr. Jorgensen, and

10   if we could proceed, I can see if we can bring him up.

11             THE COURT:  Yes.  If you could pull him on the

12   screen, that'd be fine.

13             MR. LIESEMER:  And while we are waiting for Mr.

14   Jorgensen to appear, I just did want to remind Your Honor

15   that Washington and Connecticut had raised certain

16   evidentiary objections to the declaration of Mr. Jorgensen,

17   similar to the other declarants.

18             And we filed the declaration of Mr. Kirk Lane

19   yesterday to respond to the narrow point that was raised by

20   the two states, and Mr. Lane's declaration is at Docket

21   4075.

22             THE COURT:  Okay, right.  I have it here now.

23   Okay.  I see Mr. Jorgensen now.  Would you raise your right

24   hand, please?  Do you swear or affirm to tell the truth, the

25   whole truth, and nothing but the truth, so help you God?

```
                                                        Page 196
 1           MR. JORGENSEN:  I do.

 2           THE COURT:  And it's Colin, C-O-L-I-N, Jorgensen,

 3    J-O-R-G-E-N-S-E-N?

 4           MR. JORGENSEN:  Yes, Your Honor.

 5           THE COURT:  Okay.  So, Mr. Jorgensen, you

 6    submitted in connection with the motions for stay pending

 7    appeal.  It's dated October 20, 2021.  It's intended to be

 8    your direct testimony in support of the multi-state

 9    governmental entities group in opposition to those motions.

10           Knowing that and sitting here today on November

11    9th, is there anything in it that you would wish to change?

12           MR. JORGENSEN:  One thing, Your Honor, an update.

13           THE COURT:  Okay.

14           MR. JORGENSEN:  In Paragraph 12 on Page 5-6 of my

15    affidavit, I cite the number 515 drug overdose deaths in

16    Arkansas for 2020.

17           THE COURT:  Right.

18           MR. JORGENSEN:  And since I wrote and signed the

19    declaration, I've learned that the updated final number is

20    547 overdose deaths in Arkansas in 2020.

21           THE COURT:  Okay.

22           MR. JORGENSEN:  I can source that for you if you

23    want.

24           THE COURT:  I think you should do that for you,

25    yes.
```

1          MR. JORGENSEN:  Okay.  So I found that number on

2     the Arkansas Drug Director's website, which is

3     artakeback.org.  There's a news button you can push.  And

4     when you go into that, it's the most recent post on the

5     website is from October 28th, just less than two weeks ago,

6     and that article, the last sentence in that articles cites

7     the number 547 drug overdose deaths in Arkansas in 2020.

8          When I saw that, I knew that must mean they have

9     arrived at a final number, and I reached out to Kirk Lane,

10    who is the Arkansas Drug Director, and I asked him to source

11    that for me.  And he sent me several reports from the

12    Arkansas Department of Health, which maintains these final

13    numbers and death certificates and things.

14          And I reviewed the reports and saw that they

15    consistently all cited the number 547 as the number for

16    overdose deaths in Arkansas in 2020.

17          THE COURT:  Okay.

18          MR. JORGENSEN:  It doesn't change much in

19    substance for my affidavit.  It's just the more accurate

20    number now with that update.

21          THE COURT:  Okay, thank you.  Does anyone want to

22    cross-examine Mr. Jorgensen on his declaration?  Okay.

23          Again, I've reviewed his declaration carefully.

24    It, like other declarations that I've already admitted into

25    evidence, cites the CDC estimates for drug overdose deaths

Page 198

1    in 2020, and also as we've just heard, focuses on the State

2    of Arkansas for that sad statistic.

3            I will admit Mr. Jorgensen's declaration, subject

4    to admitting Mr. Lane's declaration, and the limitations

5    generally as to any assumptions as to other parties' actions

6    that would derive from third parties as being only Mr.

7    Jorgensen's analysis or prediction.

8            But I will note that his task here, I believe,

9    qualifies him to make such predictions and analyses, given

10   his role on behalf of the AAC; that is the Association of

11   Arkansas Counties.

12           So you can sign off Mr. Jorgensen.

13           MR. JORGENSEN:   Thank you, Your Honor.

14           THE COURT:  Okay.  And then can we pull up Mr.

15   Lane?

16           MR. LIESEMER:  Your Honor, Mr. Lane's declaration

17   goes to a very narrow point.  Washington and Connecticut had

18   asserted that the document that is attached to Mr.

19   Jorgensen's declaration as Exhibit 1 did not fall under the

20   public records exception to the rule against hearsay.  We

21   provide Mr. Lane's declaration to give assurance that it

22   does meet the public records exception.  And so, he's not

23   speaking to any of the four prongs regarding the motion to

24   stay, so it's a very narrow point.

25           If Your Honor does not need Mr. Lane's declaration

1    to admit all of Mr. Jorgensen's declaration, including the

2    exhibit, then I think we can dispense with that.  We do not,

3    because of the narrow issue, we do not have Mr. Lane on

4    standby.

5              THE COURT:  Okay.  All right, well, let me ask Mr.

6    Goldman and Mr. Gold.  Having seen Mr. Lane's declaration,

7    would you still challenge the admission of the report that's

8    attached as Exhibit 1 to his declaration, the Naloxone Saves

9    Program report?

10             MR. GOLDMAN:  Your Honor, Irv Goldman.  No, no

11   objection.

12             THE COURT:  So I will admit Mr. Lane's declaration

13   for that purpose.

14             Okay.  I think those are all the witnesses, so I'm

15   happy to go back now for brief oral argument by the

16   objectants, although again, I've reviewed the pleadings.

17             MR. LIESEMER:  Your Honor, I'll just be very brief

18   and turn it over then to the other plan proponent objectors.

19             Let me just say two things: one is with respect

20   to, you know, your tentative rulings or what have you.

21   That's all fine, except for -- I'm just a civil litigator

22   that plays in Bankruptcy Court from time to time.

23             I am told that Your Honor's suggestion or

24   requirement that we provide notice of even a request for

25   sentencing, that is something that perhaps we should not

Page 200

1    agree to, given that this is an agreement between the U.S.

2    Attorney's Office and the Debtors, and we're not sure how

3    the U.S. Attorney's Office would feel about that; number

4    one.

5              Number two.  If we're talking about just a request

6    for sentencing and not the sentencing date itself, we'll be

7    getting in front of the U.S. District Court.  I mean, if

8    we're calling up the clerk of the court and asking for a

9    sentencing date and that somehow triggers a requirement to

10   tell the world that we've done so, that seems like kind of

11   stepping on the toes of the New Jersey District Court.

12             And finally and most importantly, Your Honor, is

13   I'm told that the sentencing schedule is going to be

14   scheduled plenty in advance of any hearing, reporting

15   likely, you know, 30-45 days.  I can't guarantee because I

16   don't have the judge's calendar.  But this again isn't

17   something that happens overnight; this is something that the

18   public is going to be invited to.

19             So we believe that, you know, giving notice as

20   soon as it's scheduled will give plenty of time for anyone

21   to do whatever they feel they need to do to protect their

22   rights.

23             THE COURT:  Okay.

24             MR. LIESEMER:  And then on the balance of harms,

25   we'll rely on Mr. DelConte's declaration and the extensive

Page 201

1    discussion of the cataclysmic harms that could occur to the

2    Debtors should this thing delay the -- should confirmation

3    be -- sorry -- emergence be delayed for any significant

4    period of time.

5              But I will turn it over to the various creditors'

6    group to make the principal argument with respect to the

7    balance of harm, the public interest, as well as the bond

8    issue.

9              THE COURT:  Okay.

10             MR. PREIS:  Good afternoon, Your Honor.  This is

11   Arik Preis from Akin Gump Strauss Hauer & Feld on behalf of

12   the Official Committee.  Can you hear me?  Are there any

13   issues?

14             THE COURT:  I can hear you and see you fine.

15             MR. PREIS:  Okay.

16             THE COURT:  Although you seem to be inside a

17   filing cabinet.  I don't know, it looks -- I'm worried for

18   you, but that's okay.  Now I see you're in a conference

19   room.

20             MR. PREIS:  So I want to do this, if it's okay, I

21   want to address my oral argument first and then, hopefully,

22   that will inform my response to your proposal from a little

23   while ago about how you would propose resolving the issue

24   through a stipulation.

25             Can I proceed in that manner?

```
                                                    Page 202

 1              THE COURT:  Sure.

 2              MR. PREIS:  Okay.  And I'm going to, if I've

 3    hesitated, it's because I want to try to speak through some

 4    things, and so, it may take me a second to (sound glitch)

 5    over.

 6              In general, obviously, the Official Committee

 7    vehemently opposed the movant's request.  We actually spent

 8    quite a bit of time with them trying to avoid this hearing

 9    because we thought the offer we gave them gave them the

10    functional (sound glitch) of what they were asking.

11              They insisted on having the hearing.  And lest any

12    of us forget, I won't belabor this, but during the course of

13    this hearing, approximately 30 people have died due to

14    opioid overdose.  But notwithstanding our views regarding,

15    you know, the impropriety of this hearing, we must do what

16    we can to protect the interests of the 630,000 claimants who

17    are waiting to receive their money, that roughly 96 percent

18    of voting claimants who voted in support of the plan and

19    then 10 ad hoc groups who all expressed support and objected

20    to the stay motion.

21              So I'm going to pensively just address harm to the

22    movants and then the public interest.

23              On harm to the movants, I'm not going to address

24    equitable mootness; you addressed that already.  The only

25    real other argument that the movants made is that the three
```

1    state attorney generals argue that if a stay is not granted,

2    their ability to enforce their police power will be

3    irreparably harmed.

4           That's misguided for two reasons.  First, it needs

5    to be repeated that there's absolutely nothing, has been

6    nothing, and will never be anything that stops anyone from

7    criminally prosecuting any of the Debtors receiving the

8    relief.  Attorneys general and those that can bring the

9    criminal prosecution has had this (sound glitch) for more

10   than -- forever, and they've been investigating the Sacklers

11   for more than three years, and they had the right to gain

12   access to every piece of evidence the UCC and the NCSP

13   uncovered in one of the most thorough investigations ever in

14   the history of bankruptcy.  If they thought they had a

15   viable criminal case, they would have brought.

16          Instead, they've gone out of their way to confuse

17   people, including their citizens, by blaming Your Honor for

18   issuing an order that gives permanent immunity to the

19   Sacklers, which they therefore cry -- used to cry

20   irreparable harm.

21          General Tong ordered on September 20th that the

22   Bankruptcy Court's ruling let the Sacklers off the hook by

23   affording them permanent immunity from lawsuit that would

24   hold them accountable for the damage they've caused.

25          General Ferguson in Washington ordered on

1    September 2nd, the confirmation order let the Sacklers off

2    the hook by granting them permanent immunity from lawsuits

3    in exchange for (sound glitch) profits they made from the

4    opioid epidemic.

5            In fact, they well know that this is the

6    creditors' plan.  If the states and municipalities that

7    drives the public (sound glitch), the NAS, the third-party

8    payers, the ratepayers, the hospitals who all overwhelmingly

9    voted in favor of the plan.  They know this, but it's easier

10   for them to blame Your Honor and this Court.

11           Second, it cannot be the case that these three

12   AGs' ability to enforce (sound glitch) is irreparably

13   harmed, while the ability of no other attorney general

14   across the United States is similarly  harmed.  Indeed, we

15   actually are forgetting that there are five other state

16   attorneys generals who are vigorously appealing the

17   confirmation order and the District of Columbia which have

18   not joined in the request for a stay.  They all looked at

19   the facts and circumstances of the case and determined

20   there's no irreparable harm to the citizens of their state

21   if the plan is permitted to be effective without a stay.

22           Said another way, 94 percent of the AGs

23   representing 95 percent of the population chose to follow

24   the whim of 96 percent of the voters.  So why is every

25   single creditor, other than three AGs, not seeking an

Page 205

```
 1     extraordinary remedy of a stay?  Obviously, the answer is

 2     the irreparable harm.

 3              A lot has been written about this.  Your Honor

 4     said you read the papers.  I'm not going to belabor some of

 5     this, but I just want to note a few things.

 6              You mentioned the CDC estimates.  You mentioned

 7     how they've gone up in the past year.  The simple answer is

 8     they're losing the fight in the opioid epidemic.  But the

 9     daily deaths, approximately 204, are opioid (sound glitch).

10              There are currently more than 1.6 million

11     Americans estimated to be suffering from OUD.  By some

12     estimates, the annual cost of dealing with the opioid

13     epidemic is $78 billion.  Each day that funds are held back,

14     there are real-world and life-and-death consequences.

15     Abatement programs go unfunded, overdose reversal medicine

16     does not get distributed, community centers are not (sound

17     glitch).  I could go on and on and on.

18              The point is, as Your Honor said earlier, every

19     day and every dollar makes a difference.

20              The three AGs and the U.S. Trustee are unswayed.

21     They give three responses.  First, they argue that they're

22     working hard to get their appeals heard quickly, so a little

23     delay is tolerable.  Second, they argue that the cases have

24     been delayed for two years by the UCC, among others, and

25     therefore, a few more months isn't going to matter in the
```

1   big picture or a few days.  They argue the new National

2   Opioid Settlement that's bringing in lots of money, and

3   therefore, not getting money from the Sacklers isn't as bad

4   as it may seem.

5            These are dangerous arguments.  Let's start with

6   the first one.  No delay is tolerable.

7            The attorney general from the State of Missouri

8   recently stated that the number of opioid overdose deaths is

9   like a plane going down every day, a month, a year.  As Miss

10  Juaire and Miss Trainor explained in their declarations,

11  they see the devastation every day.

12           Indeed, our office has fielded more than 500

13  calls, letters, and emails from victims over the past two

14  years and returned each one.  We've listened to their

15  stories, we've grieved with them, we've attempted to explain

16  the injustice being done.

17           Indeed, yesterday, just as an example, I took a

18  call from Robert Bernhoff, a resident of the State of

19  Washington, who was in a 2009 ski accident, was prescribed

20  Oxi and was on it for three years and it changed and ruined

21  his life.  Now why do I mention him?  It turns out he was a

22  fifth grade teacher in 2006 for Attorney General Ferguson's

23  niece, and he asked that I note his unhappiness and the

24  State of Washington's attempt to (sound glitch) distribution

25  of funds.

```
 1          If the U.S. Trustee and the attorney generals get
 2     their wish and we're stayed for even six months, and
 3     assuming that that's all it is, there will be 36,000 more
 4     deaths; that's 1 percent of the population of the State of
 5     Connecticut.
 6          As Mr. Guard said in his declaration, it's
 7     unconscionable that the remote chance that some (sound
 8     glitch) creditor could recover some money from the Sacklers
 9     on some distant day or that some known creditors could
10     receive additional money after years of litigation could
11     justify the additional death of a single American; Paragraph
12     14 of his declaration.
13          The second argument that the movants make is that
14     the case has already been delayed for two years by the UCC,
15     among others, and therefore, incremental delay should be on
16     us and shouldn't be a big deal.  We don't believe those
17     arguments even merit a response, but I just want to point
18     out a few things.
19          First, the UCC has done virtually everything in
20     its power since the day it was appointed to move (sound
21     glitch) out for abatement and victim compensation.  We all
22     know what happened with the ERF.  We saw the potential that
23     this looks to be a long case, and we tried very hard to get
24     money out to community organizations two years ago.
25          Everyone knows, now in hindsight, look at how
```

```
 1    important that money could have been if the DOJ, among

 2    others, was one of the biggest opponents to the ERF.

 3              Second, I won't go through everything that's

 4    happened over the course of the last two years.  But to be

 5    clear, there was six months of mediation, of which three

 6    months was just public and public negotiations and three

 7    months of public and private negotiations, six months of

 8    mediation with the Sacklers, another three or four months to

 9    document the deal, and the elongated confirmation hearing.

10              All that has occurred with the movants sitting

11    there and watching and being part of every little piece of

12    it.  I'm not criticizing them, but they couldn't say that

13    the past two years, because the case has lasted two years,

14    that in some way that another few days isn't going to make a

15    difference.

16              The movants' third rationale, and admittedly only

17    Generals Tong and Ferguson make this harmfully misleading

18    argument, is that there's money from other sources coming

19    in, and so the Purdue money -- not getting the Purdue money

20    now is tolerable.  Specifically, AGs Tong and Ferguson

21    trumpet the National Opioid Settlement with three

22    distributors and Johnson & Johnson, 26 billion over 15

23    years.  Without a doubt, the UCC applauds these efforts,

24    although ironically, the State of Washington hasn't agreed

25    to it.
```

1            But what the AGs don't say in their papers, and

2     indeed, they haven't said publicly in anything we can find,

3     is that not one dollar of the 26 billion goes to private

4     side claimants.  That's not an accident.

5            But why am I raising that here?  Washington and

6     Connecticut makes such a big deal about the NOS in their

7     papers, and they say that the money is coming in, but they

8     don't say that 1.4 billion of the Purdue money goes to

9     claimants who are getting zero from the National Opioid

10    Settlement.  It's something they don't want to admit.

11           Moreover, it's just innate to say that an (sound

12    glitch) claimant because they're getting money from the NOS

13    and tolerate some delay in getting the Purdue money.  The

14    cost of the opioid crisis is $78 billion a year.

15           As Your Honor said on August 23rd and during the

16    confirmation hearing, it just seems really boneheaded to say

17    this 4.25 billion won't pay off from all the opioid (sound

18    glitch), you shouldn't take it.

19           With that, Your Honor, I'll turn to the public

20    interest program.

21           The U.S. Trustee states that the co-op with the

22    U.S. Trustee and the public interest are, "one in the same"

23    because the government's interest is the public interest.

24    The U.S. Trustee further states that when the government is

25    the movant, the public interest and irreparable injury fact

Page 210

1    (sound glitch), despite through a number of cases for that

2    proposition.

3              Let me respond in four ways.  First, not one case

4    that the U.S. Trustee cite stands for the proposition that

5    when the U.S. Trustee is the movant that the federal

6    government's interest is the one being implicated for

7    confirmation over (sound glitch).

8              Knowing this, in its appellate papers, the U.S.

9    Trustee has started referring to itself as the government,

10   as opposed to the Office of the United States Trustee.

11   We're not disputing that the U.S. Trustee's website says

12   that it's a component arm of the DOJ.  But perhaps the U.S.

13   Trustee has not cited any cases where the U.S. -- because

14   the U.S. Trustee is never a creditor.  And therefore, it's

15   role as a so-called (indiscernible) doesn't merit its

16   interest being equated with the public for the purpose of

17   this analysis.

18             In other words, no one with the (sound glitch) to

19   say that such an extraordinary remedy that should only be

20   granted in the most narrow of circumstances.  Perhaps courts

21   should be wary of holding up the will of actual creditors

22   for the desires of a non-creditor.

23             Second, under the facts and circumstances of this

24   case in particular, it's inexplicable that the U.S. Trustee

25   is taking the position that its interest are those of the

Page 211

1    government.  To be clear, there are other federal government

2    interests in this case, and not one of them has brought a

3    motion for a stay pending appeal.

4         Even the DOJ, who is unimaginably -- imaginably

5    filed amicus briefs all but appealing the confirmation order

6    and objecting to confirmation has not asked (sound glitch)

7    pending appeal.  The DOJ settled its civil claims for 225

8    million.  They settled their criminal claims for 225

9    million.  They settled their unsecured claims for 65

10   million.  The various governmental agencies settled their

11   issues with Purdue and other private side claimants and

12   public side claimants by taking 4 percent of the amount that

13   was going to go to PIs and taking and transferring it to

14   themselves.

15        So the case where every governmental entity that

16   is a creditor has already settled with Purdue and the

17   Sacklers and the other plaintiffs is either getting money on

18   the effective date or has already received such money.  It's

19   pretty difficult to believe that the U.S. Trustee, which is

20   not a creditor, nor does it act in any interest other than

21   what it perceives to be others' interest, to take the

22   position its acting as the government.

23        Third, (sound glitch) for one moment that the U.S.

24   Trustee could credibly argue that their interests are those

25   of the government.  In that instance, the question is, is

Page 212

1    the government's interest really coterminous with the public

2    interest in this case.  Let's consider the following

3    factors.

4             First, between 2008 and 2017, the Sackler's family

5    took approximately 11 billion out (sound glitch).  Of this

6    amount, 4 billion went straight to the federal government in

7    the form of taxes.  That makes the federal government not

8    only the biggest recipient of Sackler money in the last 13

9    years, but the transferee of an alleged fraudulent

10   conveyance.  Yet, the federal government has not once

11   offered to make this money available for opioid abatement

12   for victims of (sound glitch).

13            Second, the DOJ settled their civil differences

14   with the Sackler family in 2020 in return for a cash payment

15   of 225 million.  They received the money.  They refused to

16   agree that the money would be earmarked for opioid abatement

17   and compensation or in ERF.

18            Third, they settled their criminal claims against

19   Purdue in 2020 in return for 225 million and an unsecured

20   claim of 25 million.  Unlike every single other opioid

21   claimant in the case under the plan, the DOJ refused to

22   agree that their money would be used for abatement or victim

23   compensation.

24            Fourth, in 2007, in return they received -- they

25   settled their differences with Purdue in return for 634

1   million, none of which was earmarked for abatement or victim

2   compensation, and Purdue's agreement to comply with the CIA

3   for five years.  The terms of the CIA are publicly

4   available.  To be clear, Purdue was required to maintain a

5   reporting to the federal government.  During those five

6   years, Purdue generated the most money they did and took out

7   the most money out of Purdue during the 2008 to 2012 period.

8            Yet, after all public and private companies, they

9   were done with mediation, the federal government, through

10   its agency, entered to negotiate and demanded and took 25

11   million for personal injury claim and transferred that to

12   federal agencies.  The DOJ's settlement with Purdue contains

13   a clause (sound glitch) under certain conditions, one of

14   which will occur if the U.S. Trustee prevails in its appeal,

15   the DOJ (sound glitch) a $2 billion priority claim ahead of

16   all the other opioid claimants.

17            So again, not only if their appeal wins do the

18   claimants not get anything, but the DOJ takes all of it.

19   (sound glitch) negotiations of the ERF, the DOJ argued

20   vigorously against the ERF.  During the UCC's investigation

21   of the Sacklers, the DOJ refused to insert itself on the

22   claims (sound glitch) in any discovery dispute regarding the

23   documents uncovered in the DOJ's investigation.

24            In other words, when given the chance to help the

25   public by joining forces with the UCC and the (sound

Page 214

1      glitch), the DOJ didn't do anything.

2           And perhaps most egregiously, the U.S. Trustee

3      argues that the due process rights of PIs have been violated

4      because of the imposition of the non-consenting third-party

5      releases.  Unbelievably, the U.S. Trustee went out and tried

6      to recruit personal injury victims who will join their

7      brief; apparently, their first foray into speaking to

8      personal injury victims in this case.

9           Yet, nowhere in their papers did they explain the

10     reality that if they are successful in their appeal, it's

11     almost certain that every single one of the Debtors' 140,000

12     personal injury victims will receive close to zero, if not

13     zero, in their own litigation.

14          Fourth, the Official Committee contends the public

15     interest in this case overwhelmingly supports denying the

16     stay for the reasons of the irreparable harm that I

17     mentioned earlier, the overwhelming support of the voters,

18     the overwhelming support of the ad hoc group.

19          Indeed, I think it's fair to say that there's

20     never been a case where the public interest is so

21     overwhelmingly opposed to the (sound drops).

22          Your Honor, with that, I'd like to address the

23     proposal that you made about 15 minutes ago.

24          THE COURT:  Okay.

25          MR. PREIS:  If I understood your proposal earlier,

Page 215

1    Your Honor said that it'll be -- a condition to the

2    effective date is that it will be the earlier of January 7th

3    and the District Court ruling; is that correct?  Do I have

4    that right?

5            THE COURT:  Well, first, I have not -- this

6    proposal does not contemplate the entry of a stay.  What it

7    contemplates is the denial of the stay motions without

8    prejudice to the future right to bring them on the

9    conditions of the denial and that it lays out the

10   conditions.

11           And the first condition is, in fact, that the

12   appellees would agree that the effective date would not

13   occur until the District Court's ruling and January 7.

14           MR. PREIS:  So if I understand that correctly and

15   if the Debtors are not permitted to seek a sentencing

16   hearing earlier than January 7th, which was I believe

17   another condition, then it's possible if, as we all heard

18   Judge McMahon say that she -- you know, she has a trial

19   coming up on December 7th, and we kind of read between the

20   lines that Her Honor may rule before that.

21           Then between, let's call it December 7th and

22   January 7th -- now actually, it's really January 14th

23   because we can't go into (sound glitch) until seven days

24   after the criminal sentencing, you would be delaying (sound

25   glitch), but because by those terms.  Is that correct?  I

Page 216

 1    want to understand if that's what you meant.

 2             THE COURT:  Well, yes, correct.  And that's

 3    primarily to give the movants the opportunity to renew their

 4    motion.

 5             MR. PREIS:  Again, (sound glitch) that will be 37

 6    days -- I'm sorry -- 30 days, 37 because (crosstalk).

 7             THE COURT:  Well, except that under Rule 8025,

 8    unless Judge McMahon shortened it, there would be 14 days

 9    added on to the December 7th date, so you'd be at December

10    21.

11             MR. PREIS:  Right.  Which is I think why in the

12    original proposal, we get offered December 20th, which I

13    understand was not December 21.  The only reason I'm raising

14    this is because part of our argument, the irreparable harm

15    (sound glitch).  And I know Mr. Kaminetzky said, you know,

16    being December 20th to December 30th is okay.  And then, you

17    know, there was some discussion about the holidays, so let's

18    move it to January 7.

19             In effect, we've now elongated almost more than

20    half a month before -- if it turns out that Judge McMahon

21    actually rules by December 7 and we're able to get a

22    sentencing hearing by December 20th, we will move their

23    effective date by 17 or 18 days at the very least.  And

24    again, from our perspective, every day matters.

25             THE COURT:  Well, except -- let me address that

Page 217

1    because, again, I fully accept that there is almost

2    immeasurable harm in not getting the plan distributions to

3    PI claimants and to the state and governmental entities for

4    the purpose of abatement, and the other entities, the Indian

5    tribes and the hospitals and the like.

6           But based on my understanding of the plan and Mr.

7    DelConte's testimony, the money wouldn't actually go to them

8    until sometime after the effective date and probably weeks

9    after the effective date.

10          So I think that the real issue where the balancing

11   of the harms comes into play or the real time comes into

12   play is where the movants would seek a stay after the

13   District Court's ruling, pending appeal to the Second

14   Circuit.

15          MR. PREIS:  I don't dispute your reading of Mr.

16   DelConte's declaration.  But isn't what all you've done is

17   just move the same period back (sound glitch).

18          THE COURT:  I did.  I moved it a week from the end

19   of the year to January 7th, and that's basically because --

20   or arguably two weeks from December 21 to January 7, and

21   that's basically because I have some concerns about imposing

22   a hearing date on Judge McMahon around New Year's Eve or

23   around the Christmas holiday, so that's the only reason.

24          And it didn't seem to me, given the testimony,

25   that the delivery of the distributions beyond the trusts

Page 218

1    would happen any slower because of that.

2            MR. PREIS:  I'm sorry, that wasn't my point.  I'm

3    sorry.

4            What I was trying to say is if all you've done is

5    move the initial distribution date back from December 21 to

6    January 14th or whatever it is, then that same period,

7    between the time the money first goes to the trust and the

8    money goes out, that same increment just gets added whenever

9    the money first goes out (sound glitch).

10           So that delay, that lag from the time the money

11   goes to the trust to the time it actually goes out, that

12   occurs no matter when the money (sound glitch) mid-January,

13   then you have a delay of (sound drops).

14           So the fact that there's -- you understand what

15   I'm saying or am I not making myself clear?

16           THE COURT:  No, I do.  I understand.  For example,

17   the 14 days for the states to deliver their final NOAT

18   allocation would start running from the effective date,

19   which would be those 14 days later.  I do see that.

20           MR. PREIS:  Yes, that was my point.  And that's

21   why when I said every day mattered, so it is actually by

22   moving everything back 17 days, it has a real effect.  So

23   anyways, that was my first point.

24           My second point is --

25           THE COURT:  Well, could I interrupt you for a

1    second?  I guess for mootness purposes, it doesn't really

2    help to change it to the distribution date, as opposed to

3    the effective date because the effective date is also the

4    date when you transfer it to the trusts and set up NewCo,

5    the benefit company.

6             So I'm thinking out loud, but I think you may have

7    offered a solution of just making it the distribution date,

8    but I don't think that works for mootness purposes.

9             MR. PREIS:  Yeah.

10            THE COURT:  Okay.

11            MR. PREIS:  The second point, and I know Mr.

12   Kaminetzky raised this, this idea of having to give public

13   notice of when the Debtors even request the notice.

14            THE COURT:  No, I understand.  I understand that

15   point.  I don't think that really helps very much in any

16   event.  I mean, the key thing is when the District Court

17   schedules it.

18            MR. PREIS:  Correct, yes.

19            THE COURT:  Right.

20            MR. PREIS:  Okay, that was it.  Okay, that was it,

21   Your Honor.  That's all I had.  Thank you.

22            THE COURT:  Okay.

23            MR. FOGELMAN:  Your Honor, may I briefly respond

24   to Mr. Preis's, frankly, outrageous accusations against the

25   government?

Page 220

1            THE COURT:  I think you have a right to do that,

2     Mr. Fogelman.

3            MR. FOGELMAN:  Your Honor, I just want to say

4     about everything Mr. Preis said was a mischaracterization or

5     just absolutely blatantly untrue.  That time, Your Honor, is

6     all entirely irrelevant as to whether a stay should be

7     granted.

8            And, you know, I'm happy to go into everything one

9     by one if Your Honor would like.  Again, I don't think any

10    of this is even relevant, but just to give one brief

11    example.  The government, you know, submitted a letter to

12    the Court at Mr. Preis's urging, when the government first

13    was in settlement negotiations with the Sacklers and Mr.

14    Preis raised the issue about providing those funds toward

15    abatement.

16            And we clearly explained to the Court on the

17    record that the government is constrained in how it can

18    respond by the Miscellaneous Receipts Act.  And that, in any

19    event, while we couldn't direct those monies towards an

20    abatement fund, you know, the largest recipients of civil

21    recoveries are federal health care agencies that provide

22    billions of dollars towards opioid use disorder treatment.

23            So for Mr. Arik to stand up there and make the

24    statements he made is absolutely outrageous, Your Honor, and

25    completely irrelevant.

Page 221

1           I'm not going to -- sorry.

2           THE COURT:  Anyway, I think it is largely

3    irrelevant.  The only way it is relevant or the remarks

4    about the role of the federal government in the case and in

5    history of prior settlement really goes to what the U.S.

6    Trustee's public interest argument is.

7           And in that sense, I think the U.S. Trustee has

8    been clear, in front of me at least, that it's not focusing

9    on anything other than its party in interest right as a

10   watchdog over the bankruptcy system, not on the other

11   interests of the federal government.

12          And on that point, Mr. Preis is basically just

13   saying that, you know, the watchdog is, in his view, barking

14   at the wrong person.  But I think we should just cut it off

15   at this point.

16          MR. FOGELMAN:  Thank you, Your Honor.

17          THE COURT:  Okay.  Should I hear from the ad hoc

18   group of states and other plaintiffs?

19          MR. WAGNER:  Yes, Your Honor.  Jonathan Wagner

20   from Kramer Levin Naftalis & Frankel, representing the ad

21   hoc committee of governmental and other contingent

22   litigation claimants.  Can you hear me?

23          THE COURT:  Yes.

24          MR. WAGNER:  I'll make some introductory remarks

25   and then address the issues of irreparable harm, balance of

Page 222

1    hardship, and public policy.  And I'll address a long-term

2    stay and short-term stay, and I'll try not to repeat the

3    arguments that have been made today.

4            It's important to remember that the committee

5    represents dozens of governmental agencies and entities.

6    And despite the handful of state objections and the U.S.

7    Trustee's objection, far more government entities support

8    the plan and oppose a stay than seek a stay; it's really far

9    more.

10           And there's a super-majority of states who support

11   the plan and 97 percent of the non-federal domestic

12   governmental entities who voted on the plan voted in favor

13   and there's a good reason for that and Your Honor has

14   recognized that in the confirmation decision.  The sooner

15   the money is allowed to be spent on abatement, the better

16   the citizens of those states and those supporting states and

17   local governments will be.

18           And despite suggestions to the contrary, the

19   dissenting states, their citizens will benefit as well.

20   They'll get their fair share of the monetary recovery, and

21   they'll get non-monetary benefits as well.

22           So let me now turn to irreparable harm, balance of

23   hardships, and public interest.  In terms of a long-term

24   stay, that issue has been addressed in Mr. Guard's

25   declaration, which Your Honor I know has read and read

1    carefully, and it's been addressed in the other declarations

2    as well.

3              And just to sum up at Paragraph 16 of his

4    declaration, "The abatement plan is designed to save lives,

5    and any delay in funding the abatement plan will thwart that

6    critical goal."  And between now and June, there's close a

7    billion dollars that's supposed to be allocated with respect

8    to abatement.  That's a serious amount of money.

9              In terms of a short-term stay, I make three

10   points.  Most of the points on the short-term stay have been

11   made already, including with respect to equitable mootness -

12   - that's clearly off the table -- the mechanics of the

13   sentencing, and also the suggestion that somehow the Court

14   can cherry pick the settlement here and have it rejigger.

15   This was a settlement that was really a herculean task to

16   achieve, and it was carefully constructed and can't easily

17   be pulled apart.

18             The three points I want to make on the short-term

19   stay are as follows.  First, burden matters, and here the

20   burden is squarely on the movants, and they have not

21   satisfied their burden.

22             Second, a stay, even a short-term stay, creates a

23   cloud and to give one -- and an unnecessary cloud.  And just

24   to give one example, the committee has been interviewing

25   potential board members for the MDT, the NOAT, and for

Page 224

```
 1    NewCo.  And I think it's not a stretch to say that the more

 2    there's a delay in the effective date of the plan, the more

 3    the candidates -- some of them are very prominent people --

 4    may be reluctant to sign on.

 5            And then the final point I want to make with

 6    respect to the short-term stay is that the Court has to

 7    exercise its equitable powers sparingly.  That's, in many

 8    cases, just give you a couple, United States against Veres,

 9    1989 U.S. District Lexis 7069 at *17, "A court should

10    exercise its equitable powers sparingly."  And the same

11    point is made in many bankruptcy cases, In re Rix 2015 B.R.

12    Lexis 3988 at *6.

13            And in light of the safeguards that have been

14    offered here, it would be an improper exercise of the

15    Court's equitable powers to grant a stay.

16            The last point I want to make, and I hope this

17    isn't a point that Your Honor has to address, is the bond.

18    I don't think Your Honor needs to get into the issue of

19    whether the U.S. Trustee needs to post a bond because the

20    states do.  And Your Honor made the point, citing the

21    advisory committee language and other opponents of the stay

22    have cited the cases, that made clear that the states can't

23    piggyback on any rules that might apply to the U.S. Trustee.

24            That's all I have, Your Honor, unless you have any

25    questions.
```

Page 225

```
 1              THE COURT:  Okay.  Well, I guess -- look, what
 2    I've been considering is not a stay, but an order denying
 3    the motion on conditions, so that would obviate the need to
 4    deal with a bond.  And, you know, I don't think that your
 5    side of the issue would prefer a stay with a bond to that,
 6    right?
 7              MR. WAGNER:  Certainly not.
 8              THE COURT:  Okay, all right.  Thank you.
 9              MR. WAGNER:  Thank you.
10              THE COURT:  I'm also assuming, because I would
11    also, if I were to grant a stay, condition it on the ongoing
12    commitment as the appellants have already committed, to
13    pursue all appellant relief on an expedited basis.  But I'm
14    assuming they will continue to do that based on their
15    statements and their understand of the importance of
16    resolving these issues promptly.
17              MR. LIESEMER:  Your Honor, may I be heard very
18    briefly?
19              THE COURT:  Sure.
20              MR. LIESEMER:  Jeffrey Liesemer on behalf of the
21    MSGE Group.
22              Your Honor, when Judge McMahon ruled on the United
23    States Trustee's emergency motion for a stay before she
24    denied it without prejudice and she did so on the condition
25    that the appellees, which included the MSGE Group, enter
```

1    into a stipulation saying that all of the preparatory

2    actions under the advance order are not a basis for invoking

3    equitable mootness.  She ordered the Debtors to impose a 14-

4    day advance notice requirement on any effective date, and

5    she also said that the appeals would proceed on a rocket

6    docket.

7            And on that basis with those guardrails in place,

8    Judge McMahon said that the U.S. Trustee's speculation about

9    the possibility of equitable mootness did not rise to the

10   level of irreparable harm, and I would submit that it's the

11   same today.  There really hasn't been any material change.

12   The movants haven't identified anything that changes the

13   situation from the time that Judge McMahon has ruled.

14           And in addition to that, we have the Debtor, who

15   has offered up even additional guardrails, and Your Honor is

16   now contemplating guardrails as well insofar as denying the

17   stay motions with conditions.

18           So no showing with respect to irreparable harm and

19   specifically equitable mootness has been made, and I think

20   the motions can be safety denied on that basis, subject to

21   the guardrails, which Judge McMahon found to be sufficient

22   as is.

23           With respect to a longer-term stay, we share Your

24   Honor's concerns that that would clash with Rule 8025 and

25   essentially read Rule 8025 out of the bankruptcy rules.  And

1    so, therefore, if there were a stay in place if they did

2    make their showing, then it would have to be limited up

3    through the District Court's ruling.

4            And with respect to the other elements, with

5    respect to balance of harms and the public interest and the

6    bond in the event that there would be an unlimited stay to

7    allow the appellate avenues to be exhausted, we simply stand

8    on our papers and on Colin Jorgensen's declaration.

9            Your Honor understands the point as time

10   progresses, the financial and human toll increases, and that

11   puts a big weight against any stay.  And with respect to

12   public interest, there is public interest in settlements and

13   the finality of reorganizations and, above all, finding one

14   way to resolve this public health crisis.

15           So we join the other opponents in opposing any

16   stay pending appeal.  Thank you.

17           THE COURT:  Thank you.

18           MR. SHORE:  Your Honor, Chris Shore from White &

19   Case on behalf of the ad hoc group of individual victims.

20           I want to -- and I've been feverishly kind of

21   working on my notes to address what I think is the issue

22   here, both respect the long-term stay, short-term stay, and

23   the idea of a denial of motions with conditions.

24           Let me start here.  Look, we tried to address the

25   issue outside of Court with respect to essentially a denial

1    of the stay without conditions.  The appellants refused, so

2    now we have two pending motions with two separate requests:

3    one is a pending motion for a stay through the District

4    Court decision plus 14 days, and another is a request from

5    the U.S. Trustee for a stay through all appeals.

6            I think you need to deny both of those on the

7    merits with findings and conclusion.  And you ask, why can't

8    I just do this simply if we prevail at the District Court on

9    the appeal, and we think we will -- we wouldn't be here

10    fighting this and have fought for the plan if we didn't

11    think we will -- there is going to be another hearing.

12    Whether that is in the end of December or the beginning of

13    January, someone's bringing a motion in front of Judge

14    McMahon for the big stay, the one that nobody can control,

15    which is the time between when the Second Circuit appeal

16    gets docketed and when the Second Circuit rules.

17            So there is a fact of a hearing coming up.  And as

18    one of the very creditor constituencies who isn't either

19    funded by taxpayers or by the estate, we simply can't have

20    10-hour hearings all the time on these subjects without

21    getting work-product which can be used in subsequent

22    hearings.

23            So my request is that we actually make use of the

24    evidentiary record that's here, not just throw this to Judge

25    McMahon to deal with with her busy docket and to have a

1   whole other hearing, evidentiary hearing, which she may not

2   even have the time for given the announcement of what her

3   schedule is.

4          So let me turn to the merits on why you should

5   deny the stay and what the specific findings I'm talking

6   about.  Let me just address very briefly the likelihood of

7   success because no one touched on this.  I'll only say this:

8   The order that was presented to you reflected what the

9   Debtors conceded, not what anybody else did.  We all became

10  appellants after that hearing, or at least we became

11  appellants after that hearing over the objection of the U.S.

12  Trustee and we all joined the argument.  So that's a

13  technical argument that you can get rid of.

14          I want to focus on only one event:  The day that

15  the Debtors are ready to consummate their plan but can't

16  because of some existing stay or the existence of some

17  conditions and how we protect the individuals, just the

18  individuals, from the harms accrue from that day forward.  I

19  think those harms accrue whether the stay is short or

20  whether the stay is long, and I want to address an issue

21  that Mr. Preis raised on that (sound glitch).

22          Let me start here.  You know that at the beginning

23  of the hearing that (sound glitch) rules are set up so that

24  (sound glitch) did this.  It's not, I don't think, because

25  the Bankruptcy Court is likely to agree or disagree that its

1    own findings are subject to appeal or not, but rather

2    because the Bankruptcy Court is in the best position,

3    understanding who the parties are, what they're looking for,

4    what they're promising, and what the harms are in the event

5    there is or is not a stay.

6          So even if Judge McMahon were to rule before an

7    available exit and contemplate a further stay, this Court's

8    view of what (sound glitch) stay, that is a stay that would

9    exist through a Second Circuit ruling or a cert denial may

10   prove critical to her own analysis, which is likely have to

11   be conducted on a short notice brief period if and when that

12   (sound drops).

13         As to the harm calculus here, as we pointed out in

14   our objection, it's not a one-size-fit-all analysis.  Each

15   applicant must make its own case based upon its own harmed

16   balanced against the harms to the others and the public.

17         The U.S. Trustee is in a different position than

18   the states.  First, they allege no harms to themselves.

19   They have no economic (sound glitch) in the outcome of this

20   (sound drops).  Two, the U.S. Trustee's claim, I think as

21   part of the public interest prong, is that there's a

22   societal harm of the erosion of constitutional rights of

23   individuals who allegedly have direct claims against the

24   Sacklers, which are being released for no compensation.

25         I'm not going to repeat arguments I made at the

1    last hearing regarding this no compensation argument.  I'll

2    just say that the intention is both counterfactual in light

3    of the TEPs and inflammatory.  But their whole analysis

4    centers on the harm to these hypothetical individual Sackler

5    claimants.

6            Now, as we pointed out in our objection, we

7    represent probably the bulk of individuals who would

8    otherwise have the right to bring claims against the

9    Sacklers in light of the fact that 35,000 of our group

10   didn't vote on the plan and several hundred voted no.

11           But I think the U.S. Trustee misses the mark when

12   they attack our group for what seems to be a criticism that

13   we do not speak for every victim.  We have never purported

14   to speak for every victim.  We've only purported to speak

15   for our group, and we have spoken, sometimes in a loud

16   voice, on behalf of those who've authorized us.

17           In contrast, not one victim has authorized or come

18   forward in support of the U.S. Trustee's motion for a stay.

19   And the important part here is not the authorization piece;

20   it's the lack of identification of the individuals who may

21   be harmed and a quantification of that harm.

22           At the last hearing, Your Honor spoke directly to

23   the U.S. Trustee about trauma and what you viewed as the

24   narrow window that it provides for direct claims against

25   non-debtor fiduciaries and shareholders.  The time for them

Page 232

```
1    to come forward with proof of harm was now.  What followed

2    was not proof, but an attempt to cite to complaints that

3    allege claims squarely within (indiscernible) and Madoff.

4              There was a reference today to the Hartman

5    pleading, which they did not include.  I don't know how they

6    expect Your Honor to make the analysis that everyone of

7    these circuit court says is you need to look at the

8    substance of the claim, not the label, to determine whether

9    they are derivative claims or individual claims.  I've

10   reviewed the complaints.  They are all classic-looking

11   derivative claim.  You can't just say something is a

12   consumer rights claim when, in fact, it is just dressed up

13   as a breach of fiduciary duty claim by directors and

14   officers.

15             So this is a stay hearing where they are supposed

16   to come forward with evidence.  Just saying that someone has

17   alleged it in a complaint does not quantify the harm of

18   denying that.  There is no articulation -- these claims are

19   worth $30, these claims are worth $100, these claims are

20   worth a billion dollars.  There is none of that in the U.S.

21   Trustee's application.

22             So what we are left with on their application in

23   the harm calculus is on the one side, the constitutional

24   rights of unidentified individuals with unquantified claims

25   that are hypothetically, but not proven, to be non-
```

1    derivative, all of which can be asserted and against and

2    recovered from the TADPs that will be funded by the

3    Sacklers.  That's what their harm is.

4            Balanced against that and what the remainder of my

5    analysis focuses on and the real harms of real individuals

6    that accrue the moment the Debtors are ready to consummate

7    the plan, which could be December 14th, it could be January

8    6th, whatever, were contemplating that they won't be able to

9    do that because there is a pending order of court, whether

10   written as a stay or a denial of a stay with conditions.

11           And let me pause here because people are just

12   getting it wrong with respect to the harms.  There are two

13   harm prongs and two things to be balanced.  The applicant on

14   a stay needs to prove irreparable harm to them.  They also

15   need to prove the lack of any harm to individuals.  It's

16   their burden.  And we're not talking about irreparable harm

17   because people aren't focusing on, and I think Your Honor

18   was alluding to it, what a bond means.

19           The bond is the source of recovery for people who

20   were harmed by the imposition of a stay.  None of these

21   applicants have come forward and said regardless of whether

22   there's a bond, you can feel free to sue me if I turn out to

23   be wrong and I lose on appeal after a three-month delay.

24   That's not how bonds work.

25           Now, as to the harm for the individuals, which

Page 234

1     need to be protected, some of those harms are mathematically

2     certain.  Under the plan, the personal injury victims don't

3     ride with the ups and downs of the Debtor.  We get a fixed

4     (sound drops).  Whether the plan is funded in December 2021,

5     January 2022, January 2023, or some other time, the fund and

6     this plan remains in place, the amount paid stays the same,

7     which means there is a certain loss of the time value of

8     money.

9          And to amplify what Mr. Preis said, with respect

10    to the individuals, once the trusts get funded, then the

11    notices -- remember, we had the hearing on the advanced

12    payments so that we can get the notices out immediately --

13    the notices go out.  In addition, all the expenses, the

14    frontloaded expenses of the trust, can get paid.  Then as

15    soon as someone gets a form, they can check a quick pay and

16    it can go back and we can start the distribution process.

17         So if the plan is delayed 14 days, the initiation

18    of that process starts 14 days later, the first payment that

19    goes out is 14 days after that.  So there is a demonstrable

20    harm in any stay of the effective date of the plan beyond

21    the date that the Debtors are ready to go forward.

22         There are also mathematically certain but

23    unquantifiable fees of just the cost of continuing in the

24    bankruptcy case.  The advantage of an effective date is

25    people can go pencils down with respect to issues that are

Page 235

```
 1   ongoing in the case.  And again, we are not a state funded
 2   or taxpayer funded, my participation in hearings like this
 3   is just coming out of creditor recoveries.
 4           I won't touch, because Mr. Preis did it so well,
 5   the harm in delaying abatement funds.  But in a world in
 6   which a stay is in place for only 14 days, the Debtors are
 7   told cool it 14 days and 10 -- let's leave aside debts
 8   payment -- 10 new injuries occur, who's paying for that?
 9   Why is it the Debtors responsibility?  They wanted to start
10   the process of getting money out to people.  The applicants
11   came forward and said, hold your horses, I've got
12   hypothetical rights that need to be protected here in the
13   interest of (sound glitch) and 10 new injuries occurred, the
14   United States Trustee is not stepping forward and saying
15   don't worry, we'll take care of those people.
16           But the real risk here, and which nobody is
17   articulated and which I think Your Honor needs to tell to
18   Judge McMahon, is the risk to the deal.  Right?  Now let me
19   start -- I'm still trying to wrap my head around a public
20   use of the plea bonds, a little example, but the personal
21   injury victims are not holding a gun to anybody.  We have no
22   power over this situation.  And unless and until the Debtors
23   are ready to consummate this plan and the Sacklers are
24   willing to fund, we're not getting anything.  We can't
25   compel anybody to do anything.
```

Page 236

```
1              And as to the risks of harm, the Court has a

2     detailed exhaustive record of the difficulties they faced

3     getting to consensus in these cases, the hard fought triumph

4     of the deal coming together, especially for victims, through

5     direct cash payments and the use of essentially all but the

6     U.S. Government's money for abatement.

7              This Court, not the District Court or the Second

8     Circuit, is in the best position to understand and

9     articulate the risks to Debtors, that it should articulate I

10    believe in findings and conclusions, when their effective

11    date gets stayed.

12             And the risk is what happens if something stops

13    the effective date of the plan.  First, if this deal were to

14    fall apart prior to an affirmance, right?  We get in a

15    situation where someone delivers a termination of the deal,

16    right, and then we find out we were right all along.  And

17    were this case to liquidate, there's unopposed evidence that

18    everybody gets nothing.  The liquidation analysis results in

19    a zero for individuals.

20             That's not hypothetical.  Remember Mr. Preis said

21    to you with respect to the super-priority admin claim, the

22    U.S. Government has not committed that in the event that the

23    confirmation is -- or sorry -- the plan does not go

24    effective, they won't set forth their super-priority

25    administrative claim.  In other words, there is a real
```

Page 237

1    possibility if this deal doesn't get to closure that all of

2    the money goes to the United States.  Does anybody really

3    want to be responsible for that?

4            The Court's also in a unique position to

5    understand what basis what a big case like this puts forward

6    in terms of harms, the potential harms, to a deal in an

7    uncertain period.  First, plans face market risks.  During

8    this case, the Dow had its second biggest percentage drop

9    ever.  Is anybody really committing that if the Dow goes up

10   30 percent that we're all going to let the Sacklers walk

11   away with that additional bounty, or if the Dow goes down 30

12   percent, the Sacklers are still going to be willing and able

13   to fund?

14           Plans face regulatory risk, right.  I mean, those

15   risks in all fields that occurred or what they're talking

16   about there, let's get the Sacklers out of jail for free

17   deal, regulations change and what was possible at one point

18   in time may not be possible later.  Again, is that really

19   going to happen between December 14th and January 7th?

20   Probably not, though not certain.  But if we're talking

21   about informing Judge McMahon of what could happen between

22   January and August, that matters.

23           Plans face legislative risks.  Nobody here, by the

24   way, none of the appellants here is committing that they

25   would not be pursuing any legislation that could have an

Page 238

1       impact on this case.

2               Plans face political risk, especially in this case

3       in which half the creditor body are elected officials.  The

4       notions that come or others will all stay in the deal as

5       their political landscape changes is not certain.

6               And as Your Honor noted during the confirmation

7       hearing, this settlement is around a shifting landscape of

8       judicial precedent that exists, all of which at any given

9       time will empower somebody who cut the deal to say they got

10      a bad deal and somebody else to say they got a good deal.

11              Obviously, the risks increase over time.  But

12      nobody is promising anything if they are wrong in the law

13      and it takes long enough for us to prove that to the

14      Appellate Court that the plan falls apart and we have to

15      start over.  Nobody is assuring that a plan which is

16      consummatable on December 14 will still be consummatable on

17      January 14th.

18              So how does this play out?  Again, I think the

19      U.S. Trustee, given their role, statutory role, and the

20      absence of any direct harm to them and the fact that they're

21      purporting to speak on behalf of individuals and have yet to

22      articulate who they're speaking for, what their claims are,

23      and what they're worth should have their application denied

24      on the merits with prejudice right now with specific

25      findings about their lack of proof, with one caveat.

Page 239

```
1              They've taken the position that they have zero

2     responsibility to post the bond.  I don't need to get into

3     that argument at this late date.  They have zero economic

4     responsibility if they're right.

5              So deny their motion.  But they can be clear,

6     nothing prevents the U.S. Trustee from piggybacking off a

7     stay that is awarded to some other party, and nothing

8     prevents the U.S. Trustee from volunteering to post a bond

9     to protect for a month.

10             So what does a bond look like with respect to the

11    other applicants?  I don't think any stay is necessary.  I

12    think a denial of the stay with conditions isn't necessary.

13    But we have no objection to this Court giving Judge McMahon

14    until January 7th to rule.

15             But if the Debtors are ready to consummate before

16    January 7th, they should provide a notice, everybody, 14

17    days that we're ready to consummate.  And that will give the

18    applicants the opportunity to post a bond in that window if

19    they want to have a stay or they can go to Judge McMahon if

20    they're riding on her stay, that is your stay is requiring

21    and she still hasn't ruled, that gives them an opportunity

22    to raise that with (sound drops).

23             Even with respect to this short bump, right.

24    That's our only source of recovery for both catastrophe and

25    the mathematically certain funds that accrue.  We shouldn't
```

Page 240

1   equate an opportunity for a meaningful appellate review with

2   a free opportunity for appellate review.  And I tend to that

3   that if and when the states are forced into a position of

4   having to post a bond, they'll think long and hard about

5   their pursuit of further appellate relief beyond Judge

6   McMahon.

7          To form an amount, I'm not -- I can't quite figure

8   out how best to create the right dynamic for that.  But it

9   seems to me that if the Court set a per diem or a bond for

10  the period between the time the Debtors are ready to rule

11  and when Judge McMahon are ready to exit and when Judge

12  McMahon rules, that will precipitate a discussion with Judge

13  McMahon about when she is able to rule.  And it will allow a

14  ready calculation.  If she says I can't do it by the 7th, I

15  can do it by January 30th, that's 23 days of per diem

16  (indiscernible).  And I tend to think, as I said, that

17  sparks a conversation about how this is going to proceed

18  forward.

19         As to the larger bond, I guess if Your Honor is

20  not contemplating extending beyond the time that's necessary

21  for her to rule, it still, as I said, provides context if

22  you were to provide findings and conclusions that there are

23  real harms, demonstrable harms, and the manifest risk of

24  catastrophic harms that need to be protected with a bond.

25  Again, subject to upward or downward revision by Judge

Page 241

1    McMahon and subject to what other parties use.  But we're

2    talking about (indiscernible) in the hundreds of millions of

3    dollars or billions.  Because if the risk were to manifest

4    itself, something comes out that causes somebody to walk

5    away from this deal and we end up in a liquidation scenario,

6    nobody wants to wear the risk of having stopped a plan which

7    would have provided (indiscernible) to people and that

8    turned out to be legal, but nonetheless was frustrated

9    because there was an open-ended stay in place.

10           Not one of the states has come forward and say

11   they didn't have the wherewithal to post a bond.  And again,

12   a bond only sets the outside amount of the damages which get

13   compensated.  If it turns out that they have to post a $500

14   million bond and only a million dollars is proven to be the

15   actual damages, so be it.  Then only a million dollars gets

16   compensated out of that.  But we don't set a bond based upon

17   a hope that the debtors will be able to consummate in this

18   fixed 12-month window that the Second Circuit is going to

19   need to be able to issue what we all hope will be a ruling

20   which sets forth in chapter and verse exactly what the rules

21   are with respect to non-debtor reliefs.

22           The last point on these conditions.  Conditions

23   run both ways.  And this is why I think that the denial with

24   conditions on the Debtor which you are raising now is a bit

25   fraught.  Conditions run both ways, right?  The appellants

1    here will be taking an opportunity of having an additional

2    14 days to do whatever they're going to do.  Are they

3    allowed to legislate in that period?  Are they allowed to

4    exercise their police powers in that period?  Are they, as

5    Mr. Kaminetzky hinted to, able to stand in front of the

6    district court in New Jersey and argue that the Court should

7    adjourn that hearing?  Right?  Which would be the setup date

8    for how this goes forward.  Are they required to commit to

9    move quickly as well?  Are they free to argue in front of

10   the Second Circuit that they really need 90 days to file a

11   (indiscernible).

12          I just think lifting it and saying a denial with

13   conditions opens up a whole debate about what they're

14   allowed to do that I think (indiscernible) with a denial of

15   these motions on the merits or -- or if they want a stay, a

16   stay with an interim bond requirement, that is a shot bond

17   requirement and an understanding going forward of what that

18   stay -- that bond is going to look like if we are getting a

19   ruling, you know, at the end of December or the beginning of

20   January.

21          THE COURT:  Okay.

22          MR. SHORE:  And other than that unless Your Honor

23   has any questions, that's all I have.

24          THE COURT:  Okay.

25          MR. ISRAEL:  Good afternoon, Your Honor.  Harold

Page 243

```
 1    Israel on behalf of the NAS Committee.  May I be heard very
 2    briefly?
 3                THE COURT:  Sure.
 4                MR. ISRAEL:  Thank you, Your Honor.  The NAS
 5    Committee, another entity that is not funded by the
 6    taxpayers, represents the most innocent victims of the
 7    opioid crisis, the NAS children, will focus its argument
 8    exclusively on the irreparable harm and the public interest
 9    in light of Mr. Shore and Mr. Preis' arguments which they
10    adopt.
11                The appellants in this case have made clear that
12    they will go to the ends of the earth to prevent the plan
13    from becoming effective.  In the meantime, the opioid crisis
14    rages across the country.
15                A stay will mean, ironically, that the Sacklers
16    will retain all of their money, except of course what they
17    have to pay the professionals, while compensation to the NAS
18    children and the other personal injury victims will be
19    delayed indefinitely if not forever.  There will also be a
20    delay of billions of dollars of abatement funds that would
21    otherwise be used to combat the opioid crisis and a delay in
22    making vital documents available to the public through the
23    document repository.
24                For what reason?  So that the appellants can exact
25    vengeance on the Sacklers without any regard to whether
```

Page 244

1    there will be any corresponding benefit to the personal

2    injury victims, including the NAS children, of the opioid

3    crisis.

4             To be clear, the NAS Committee had hoped for a far

5    larger settlement.  However, the plan, including the

6    settlement and the third-party releases and the

7    corresponding public interest must be viewed in reality.

8    The NAS class voted overwhelmingly in favor of the plan, and

9    Kara Trainor, a parent of an NAS child, outlined in great

10   detail in her declaration why she supports the plan,

11   notwithstanding her personal situation.  The appellants

12   ignore this massive support of both the voters and Ms.

13   Trainor in their pleadings.

14            Simply put, a stay of the confirmation order

15   delays implementation of what could be lifesaving programs

16   for opioid victims, current and future, and compensation for

17   some of the neediest people in the country.  For what?  So

18   perhaps the U.S. Government can get an additional $2 billion

19   at the expense of all other claimants, a result worse than

20   the tobacco litigation?  Or so three states or five states

21   can make life miserable for the Sacklers by litigating

22   against them for the foreseeable future, resulting in no

23   compensation to the NAS children and the other opioid use

24   victims and allowing the Sacklers to retain billions of

25   dollars that would otherwise go for abatement?  Who wins in

1    this case?

2            Vengeance is not a purpose of the Bankruptcy Code

3    and will not compensate the NAS children or the other opioid

4    victims, will not fund research and other abatement

5    strategies, will not make millions of opioid-related

6    research documents available to the public domain.  It will,

7    however, allow the Sacklers to retain more of their wealth

8    than they would under the plan.  It cannot be said that such

9    a result is in the public interest.  Thank you, Your Honor.

10           THE COURT:  Okay, thank you.

11           I don't know if any other objectant wants to

12   speak.  I forgot to ask Mr. Kaminetzky if he could update me

13   on the termination right that was addressed in the pleadings

14   and in Mr. Gold's argument.

15           It seems to me that, at least with respect to the

16   type of relief I am contemplating, it's highly unlikely that

17   that termination right would be exercised.  But I'd like

18   your thoughts on where it stands, whether it's been waived

19   through the date that you've proposed and the like.

20           MR. KAMINETZKY:  Apologies, Your Honor, for that

21   dramatic camera movement.

22           The answer is I don't -- we have not had that

23   discussion.  Maybe you should ask the Sackler.  This is

24   something that was heavily negotiated and it's in there,

25   it's part of the agreement.  I would suspect that it won't

1    be a problem given the short term that we're talking about.

2    But kind of following up, I mean, it's in there, and it's

3    their right to waive it or not.

4              Unlike the previous way that we talked about

5    before when it came to the direct certification, I don't

6    have an answer sitting here whether or not they'd waive, but

7    I certainly hope that they would.

8              Maybe it's time to mention just to underscore --

9    and maybe this is the appropriate time in the changing

10   landscape.  During this hearing, actually, the Oklahoma

11   Supreme Court reversed the J&J judgment, saying that public

12   nuisance statute doesn't apply in this are to legally-

13   manufactured products.  And this comes on the heels of the

14   California decision earlier this week going the same way.

15             But let me just leave it at that.  And, you know,

16   I assume you could direct this to the Sacklers.

17             THE COURT:  Okay.  Well, do I have the two sides

18   of the Sacklers' counsel on the call?

19             MR. UZZI:  Your Honor, it's Gerard Uzzi of

20   Millbank on behalf of the Raymond Sackler Family.

21             THE COURT:  Afternoon.

22             MR. UZZI:  As it relates to -- go ahead, Your

23   Honor, I'm sorry.

24             THE COURT:  I was going to say, first of all, I'm

25   not sure whether the denial of these motions as I've posited

Page 247

```
1    it would trigger the termination right.  But assuming it

2    did, would that brief extension be something that your

3    clients would be prepared to assert as a termination right?

4            MR. UZZI:  Well, Your Honor, just before I get to

5    that, just to check a box.  As it relates to what Mr.

6    Kaminetzky raised on the issue of certification, that has

7    been waive.  I think, frankly, we had formally memorialized

8    it (indiscernible).

9            THE COURT:  Right.

10            MR. UZZI:  As it relates to -- I think the

11    termination right you're referring to now is that three

12    months after confirmation date -- there has not been a

13    request made of our clients to waive that.  So I'm not in a

14    position today to say (indiscernible) specifically on that

15    issue.  And right now we are anticipating at least that the

16    court is going to rule before then, the district court is

17    going to rule before that time.

18            Your Honor, I don't want to speculate as to if and

19    when I do consult with my client as to what they'll say

20    other than to say we've come this far, Your Honor.  There is

21    certainly not a desire to abandon this at this point.

22            THE COURT:  Okay, thank you.

23            Ms. Monaghan, I know you represent the other side

24    of the Sackler family.

25            MS. MONAGHAN:  Correct, Your Honor.  On behalf of
```

Page 248

```
 1    the so-called Side A of the family, we are in the same

 2    position as Mr. Uzzi is in that no request was made of us

 3    for a waiver.  That said, we're not looking to walk away

 4    from the settlement in any regard.  I just haven't actually

 5    gotten instruction from my clients on the questions they

 6    have put to us.

 7              THE COURT:  Okay, thanks.  Okay.  I said that I

 8    would be willing to hear a brief rebuttal, but I really want

 9    this to be very brief, not a rehash of arguments that have

10    previously been made, if anyone wants to speak in rebuttal.

11              MS. LEVINE:  Your Honor, this is Beth Levine.  My

12    computer is going very slowly right now, so hopefully we'll

13    get video in a second.  I did just want to speak briefly.  I

14    will try not to repeat anything.  I wanted to address a

15    couple of things that have been raised that I think are

16    inaccurate.

17              You know, there was a suggestion that it is

18    somehow improper for us to seek a hearing because while we

19    tried to negotiate a consensual resolution, it didn't work.

20    And we did as part of that effort suggest why don't you give

21    us -- you know, if you've got a list of things you have

22    exempted from the stay, tells what they are.  And, you know,

23    it didn't work.

24              THE COURT:  I am not blaming either side for the

25    fact of this hearing.  I had the opportunity after the
```

1    appellees sent me an email requesting a chambers conference

2    to meet and see if a settlement could be obtained.  And I

3    just concluded it was of more benefit to have a full record.

4         MS. LEVINE:  Thank you, Your Honor.  There were

5    suggestions or allegations that the United States Trustee is

6    taking the position it's taking because it's trying to get

7    the, you know, $2 billion.  And that is just an absolutely

8    baseless allegation.  I think if Your Honor wanted to hear

9    more about that, Mr. Fogelman could address it.  But I think

10   it's enough to say that that's baseless.  We've taken this

11   position on the non-debtor releases the whole time.  It's

12   not just some way to try and get back that money.

13        With respect to the United States Trustee's role,

14   I think you've recognized in your comment that, you know, we

15   are not representing the government in its creditor role,

16   but we are representing the government in the government

17   interests.  We obviously have a disagreement on where the

18   public interest is.  You know, we've talked about the harm.

19   I don't want to repeat myself but, you know, we don't

20   represent individual victims, White & Case doesn't represent

21   individual victims.  They've acknowledged they don't

22   represent anyone.  There are individuals who have come

23   forward and objected.  There have been over 200,000 people

24   who voted no.  So we've cited some of those examples.  Ms.

25   Isaacs, for example, Mr. Hartman.  And we did include the

1     complaints in our request for judicial notice, including Mr.

2     Hartman's complaint.

3          With respect to the suggestion that we might

4     voluntarily post a bond, we don't have the authority to do

5     that, so we think that's just not a factor to be considered.

6          THE COURT:  Well, I would consider it in the sense

7     of it's a factor to consider in balancing the harms.  Not as

8     something that I could require, but the absence of one may

9     make it harder to balance the harms in your client's favor.

10          MS. LEVINE:  I do think it's interesting with

11     respect to this question of the termination right.  There

12     are two questions.  One is just as a factual matter; my

13     understanding is that termination right doesn't come into

14     play if there has been a delay because of licensing delays.

15     And we don't know what the status is, but we think it's

16     interesting that the Debtor's proposed the stipulation

17     without checking on that.  But we don't think, as we put in

18     our papers, that that is likely to happen.  And it does not

19     sound like it is based on what's been said here today.

20          Lastly, you know, obviously we are here on our

21     motion.  We're asking for a stay at least until the district

22     court's decision.  But with respect to the order it sounds

23     like you are considering, you made a comment that I wanted

24     to clarify, which is whether you're suggesting you would

25     enter or include in your order a limit on the ability to

1    seek a stay from the district court.

2              THE COURT:  No, I don't remember saying that.

3              MS. LEVINE:  Okay.  Then I may just have not heard

4    that correctly.

5              THE COURT:  It's just the opposite.  You would

6    have the ability to seek a stay from the district court

7    after you get the notice.

8              MS. LEVINE:  Your Honor, it's been a long day.  I

9    don't want to repeat what we've said.  Obviously we disagree

10   with a lot of what the stay movants had said, but we will at

11   this point stand on our papers and I will cede the floor to

12   any other movants who had something to add.

13             THE COURT:  Okay.

14             MR. EDMUNDS:  Your Honor, if I may just for less

15   than a minute.  Brian Edmunds for the State of Maryland.  I

16   would just point out some of the overarching themes that

17   have been presented to you, that we are a state and we are

18   charged with protecting our public and believe that we are

19   doing that in appealing.  And I think that some of the

20   arguments that would give to us the status of essentially a

21   private creditor are what requires us to appeal.  I think

22   that it's our job, and we do this, to protect.  And we are

23   spending money now on the opioid crisis on trying to abate

24   it.  And I think that our -- I think it's important to

25   remember that and recognize that, that we wouldn't be doing

1  this and pursuing an appeal if we didn't think that we were

2  serving the public.  And that's all I have, Your Honor.

3            THE COURT:  Okay.

4            MR. GOLD:  Your Honor, Matthew Gold, Kleinberg

5  Kaplan.  Can you hear me?

6            THE COURT:  Yes.

7            MR. GOLD:  Thank you.  Your Honor, I too will be

8  very brief.  First, I just want to note that the argument

9  that Mr. Preis made, and we've heard this several times

10  about how criminal liability is not being affected by this,

11  is a total red herring.  No one has ever contended the

12  criminal liability was implicated by this, but that's not at

13  all the point.  The states have a significant statutory

14  scheme that involves both criminal and civil penalties for

15  which to go against wrongdoers.  And among other things,

16  there are different burdens of proof.  And that's why the

17  states have both criminal and civil laws that play in this

18  area.

19            And it's not for Mr. Preis or the Debtors to say

20  you have your criminal remedies, that's enough, you don't

21  need those other ones, in the first instance.  And secondly,

22  for us to be pointing out that the result of this settlement

23  and this plan is to give the Sacklers complete immunity of

24  their opioid-related obligations on the civil side does not

25  mean that we're implying that it has anything to do with the

Page 253

1    criminal liability.  And it's valuable enough that the

2    Sacklers have been insisting on it.  So I think that's just

3    simply a matter of misdirection.

4            Second, I just want to note Mr. Shore, after

5    making a statement about how we needed to not engage in

6    speculation and to needed concrete matters, engaged in a 10

7    to 15-minute series of speculations and hypotheticals about

8    various risks without evidence about them occurring, but

9    simply as speculation that this might happen and that might

10   happen as risks involved of Court's resolution.  We submit

11   that those are not germane for these purposes and have no

12   demonstrated basis other than just speculation.

13           Third, I just want to note that this morning, I

14   stated for the record, and not for the first time, that

15   states are extremely willing to try to find a way to

16   mitigate the harms to parties and allow the appeals to

17   proceed.  I heard not a whisper, complete crickets from all

18   the objecting parties with respect to engaging with us on

19   that point.  And we can't do it by ourselves.

20           THE COURT:  I know you can't do it by yourself,

21   but you can't do it without Maryland and the U.S. Trustee,

22   too.  And they're not willing to do that.  So, I mean, it's

23   good for your two clients, but it would be a waste of time

24   if they are not prepared to do it.  And I took away from

25   their candid comments that they aren't.

1          MR. GOLD:  Okay.  We will review the issue with

2     them, Your Honor.

3          THE COURT:  Okay.

4          MR. GOLD:  Thank you for that comment.

5          THE COURT:  If they were, that would be great.

6     But that's not the record before me.

7          MR. GOLD:  Okay.  Thank you, Your Honor.  I have

8     no further comments.

9          THE COURT:  Okay.  All right.  I have before me

10    three motions for a stay pending appeal, a first day motion

11    by the United States Trustee for a stay pending appeal of

12    two orders, the Court's order confirming the Twelfth Amended

13    Chapter 11 Plan in these cases, and secondly, the Court's

14    so-called Advance Order permitting the Debtors to take

15    certain procedural steps and spend a relatively modest

16    amount of money to be more ready to effectuate the

17    transaction under the plan if and when the effective date

18    occurs.

19          The other two motions are first by the states of

20    Washington and Connecticut, and second by the State of

21    Maryland, which seek a stay pending appeal over the

22    confirmation order.

23          Three other appellants have joined in one or the

24    other of those motions, and in respect of one of them have

25    supplemented the joinder to some extent.  So Mr. Bass has

Page 255

1    joined in the other motions, although it is clear to me both

2    from his filing and his remarks today that his focus really

3    was not on a stay pending appeal of the confirmation order -

4    - he hasn't joined in or appealed the advance order -- but

5    rather to have the briefing schedule and hearing schedule

6    with respect to his appeal delayed by the district court.

7    And I have explained to him that that really is a decision

8    for the district court to make.

9         I also have a motion and a joinder by certain

10   Canadian Creditors, Municipality, and First Nations

11   Claimants that has joined in the other motions, although I

12   don't believe that they have appealed the advance order.

13   And that they primarily focus, if not exclusively focus on

14   the issues raised by the states.  And I have Ms. Isaacs'

15   motion, which literally adopts the State of Washington and

16   the State of California -- I'm sorry, the State of

17   Connecticut's motion.

18        When I address the State of Washington and the

19   State of Connecticut's motion, I will also be addressing,

20   therefore, Ms. Isaacs' motion.  And similarly, when I

21   address the first three motions that I mentioned, I will be

22   addressing the Canadian claimants' motion except when I

23   briefly address their unique issues on the prong in the

24   standard for evaluating motions for a stay pending appeal,

25   focusing on the need for a strong showing that the movant is

Page 256

1    likely to succeed on the merits of the appeal.

2            The movants have the burden of proof with respect

3    to their motions for the stay pending appeal, and that has

4    been characterized as a heavy one.  And the grant of a stay

5    pending appeal has been characterized as extraordinary

6    relief.  See In re General Motors Corp., 409 B.R. 24 (Bankr.

7    S.D.N.Y. 2009 with regard to the first point, and In re

8    Sabine Oil & Gas Corporation, 551 B.R. 132, 142 (Bankr.

9    S.D.N.Y 2016) on the second point.

10           The grant of a stay pending appeal is an exercise

11   of judicial discretion dependent on the circumstances of a

12   particular case, id Sabine Oil, 548 B.R. 681 and In re

13   General Motors, 409 B.R. 30.  They are, again, treated as an

14   exception, not the rule, and are granted only in limited

15   circumstances, In re Brown, 2020 WL 3264057, at *5 (Bankr.

16   S.D.N.Y. June 10, 2020).

17           To satisfy its burden to obtain a stay pending

18   appeal, the movant needs to establish a proper balance in

19   its favor of the following four factors; whether the movant

20   has made a strong showing that it is likely to succeed on

21   the merits, whether the movant will be irreparably injured

22   absent a stay, whether a stay will substantially injure the

23   other parties interested in the proceeding, sometimes

24   referred to as the assessment of the balance of harms, and

25   four, where the public interest lies.  See Nken v. Holder,

Page 257

1    556 U.S. 418, 434 (2009) and Kelly v. Honeywell Int'l, Inc.,

2    933 F.3d 173, 188-184 (2d Cir. 2019).

3            The Honeywell case is an important gloss on the

4    first factor requiring a strong showing that the movant is

5    likely to succeed on the merits of the underlying appeal by

6    its focus on the need for that showing to show a fair ground

7    for litigation.  A number of courts have phrased this as a

8    showing regarding the success on appeal somewhere between

9    possible and probable.  Again, see Brown, 2020 WL 3264057 *7

10   and Sabine Oil, 548 B.R. 683, 684, which also notes in Judge

11   Chapman's opinion that the probability of success that must

12   be demonstrated can be viewed as inversely proportional to

13   the amount of irreparable injury that the movant will suffer

14   absent of the stay.  In other words, more of one excuse is

15   less of the other, id at 684.

16           I will briefly address the first prong, which,

17   along with the prong of a showing of irreparable harm, are

18   the two factors that are viewed as most critical in the

19   analysis, Nken v. Holder, 556 U.S. 434.  See also Uniformed

20   Fire Officers Association v. De Blasio, 973 F.3d 41-48 (2d

21   Cir. 2020).

22           This analysis of the merits by the court that

23   issued the order upon which the appeal is based is one that

24   places that court in the position of looking at its ruling

25   objectively as one would from the outside to see whether

1    there are fair grounds for litigation of the appeal.  And

2    depending on the strength, or lack thereof, of a showing of

3    irreparable harm, perhaps more than that to warrant a stay.

4           Obviously the Court's determination of the issues

5    before it that are the subject of the movants' appeals was

6    carefully undertaken by me after a lengthy trial and set

7    forth in a 155-page written memorandum of decision.  The

8    issues on appeal I believe do not all warrant a finding of a

9    strong showing likely to succeed on the merits or of likely

10   success on the merits somewhere between possible and

11   probable.  Again, recognizing the sliding scale for this --

12   for purposes of this stay pending appeal determination.

13          Certain of the issues raised I believe are clear

14   under applicable Second Circuit law and a real stretch by

15   the appellants.  Those include the so-called due process

16   argument, the so-called 524(e) argument, the analysis of the

17   merits of the settlement, and the argument that the Second

18   Circuit should change its law from how it is currently

19   articulated.

20          As far as the due process argument is concerned,

21   the United States Trustee has argued that the plan, with its

22   injunction of certain third-party direct claims against the

23   released parties, violates the due process clause by taking

24   those claims without the right to a hearing and a trial,

25   citing and relying on large measure upon Ortiz v. Fibreboard

Page 259

1   Corp., 527 U.S. 815 (1999).

2           As far as the notice point is concerned, I made

3   extensive factual findings as to the notice that was

4   provided and was received by those who are creditors of the

5   Debtors.  I will note my view that the plan itself and the

6   underlying claims that have been identified by the U.S.

7   Trustee apply to release or enjoin direct third-party claims

8   that overlap with in a highly meaningful way claims of the

9   Debtors or against the Debtors.  And therefore, such notice

10  would be sufficient.  I will note further that there is no

11  absolute right to a trial beyond the trial that the court

12  held as to the bona fides of the settlement with its right

13  to object, which was preceded by a right to vote on the plan

14  and to object to the plan generally, including the

15  classification scheme set forth in the plan.

16          That scheme and the right to vote and the review

17  by the bankruptcy court clearly distinguishes the bankruptcy

18  process as recognized by the Second Circuit that would

19  encompass certain types of releases of third-party claims

20  from the fact pattern and concerns raised by the Supreme

21  Court in Ortiz, where there was a concern that those that

22  would be bound by a non-opt-out settlement were not

23  adequately represented because of conflicts of interest,

24  where there was no vote, and no plan process including the

25  right to object to classification and voting, and ultimately

1    the court's review of the proposed settlement in that

2    context.

3            The Supreme Court largely recognized this fact in

4    Ortiz itself, recognizing that its general view as to due

5    process was qualified by a special remedial scheme, quoting

6    Martin v. Wilks, 490 U.S. 755, 762, Note 2 (1989), which

7    specifically referenced the bankruptcy legislative scheme.

8            I believe the bench ruling sufficiently dealt with

9    the inapplicability of the 524(e) argument, including citing

10   well-reasoned opinions by other circuit courts on it.

11           As a factual matter, I will note that the U.S.

12   Trustee took no discovery in connection with the

13   confirmation hearing or generally in the case as a whole and

14   largely played the role of a kibitzer on the evidence during

15   the trial, offering no witnesses of its own.  And to the

16   extent it does, or the U.S. Trustee does object to the

17   analysis of the merits of the settlement, I find it highly

18   unlikely that that analysis would prevail on appeal.

19           As far as the moving states' arguments on the

20   merits that overlap with the ones that I just raised, I

21   won't address them again.  But I will note that I believe I

22   comprehensively dealt with their classification arguments

23   and their voting arguments and that the evidence in my

24   analysis of recoveries under 1129(a)(7) clearly establishes

25   that the plan would satisfy the best interest test even if

1    one considered the rights that they were being required to

2    give up to pursue third-party claims against the released

3    parties, although that was an alternative holding.

4         The U.S. Trustee's and the states' other

5    arguments, however, I believe if there was a strong showing

6    of irreparable harm, would satisfy the first prong of their

7    burden of proof.  The U.S. Trustee is clearly wrong that

8    personal injury claimants and other creditors are receiving

9    nothing on account of their third-party claims against the

10   released parties.  It is clear that it is the settlement of

11   those third-party claims that enables the entire plan and

12   the distributions under the plan, without which they would

13   receive in my view as I found based on the analysis of the

14   evidence, including the rights of the United States in the

15   DOJ settlement to a super-priority claim and the limited

16   recoveries that they would have in the free-for-all

17   litigation that would ensue, literally no recovery.

18        The plan treats personal injury claims as

19   receiving a distribution based on the liquidation of the

20   underlying claim against the Debtor.  That does not mean

21   that the personal injury claimants are not receiving value

22   on account of their third-party claims, but it reflects I

23   believe that their third-party claims are overlapping, and

24   though entitling them perhaps to a direct recover as opposed

25   to a recovery through the Debtor, viewed as derivative

Page 262

1    claims under the analysis by the circuit in the Tronox case

2    as well as by other courts that have distinguished claims

3    that may be direct but are asserted because of harm to all

4    of a debtor's creditors as opposed to individual creditors

5    as discussed in the Tronox case, which is referenced and

6    discussed at some length in my opinion.  See also the

7    discussion in Deutsche Oel & Gas S.A. v. Energy Capital

8    Partners Mezzanine Opportunities Fund A, LP, U.S. Dist.

9    LEXIS 181000 (S.D.N.Y. September 20, 2020), and In re CIL

10   Limited, 2018 Bankr. LEXIS 354 (Bankr. S.D.N.Y. February 9,

11   2018).

12           As I also noted in the memorandum in support of

13   the order, the circuit has now made it clear,

14   notwithstanding the citation by the U.S. Trustee of Johns

15   Manville Corp. v. Chubb Indemnity Insurance Company, 606

16   F.2d 135, 153-154 (2d. Cir. 2010), that the evaluation is

17   only in respect of in rem claims.  As stated and discussed

18   at length in the Quigley case, the Court's power extends to

19   in personam claims as long as the factors laid out by the

20   Circuit are satisfied after a searching inquiry by the

21   Court.

22           However, those factors have been the subject of

23   different analyses over the years as to what is properly

24   subject to an injunction of a direct third-party claim.  And

25   I believe that it is that issue, i.e. how those claims are

1    cabined between the clear instance where they should not be

2    enjoined as discussed in the Manville III opinion, and where

3    they should be.

4         I have tried to narrow those so that it does

5    reflect in the plan that such claims are only those where

6    there is a substantial or an entire overlap.  And I believe

7    that the factual record of the claims that the U.S. Trustee

8    purports to be protecting reflects just that overlap, i.e. a

9    lack of direct fraud as opposed to allegations of extensive

10   control over an enterprise that itself engaged in fraud or

11   other violations of consumer law which would apply to all

12   creditors, to protect all creditors of the debtors.

13        While I believe there is less of a fair ground for

14   litigation on the second point which is raised only by the

15   moving states, namely that notwithstanding there being any

16   specific protection for them in the Bankruptcy Code, their

17   status as a governmental entity takes them out of the reach

18   of this particular plan injunction.  Notwithstanding that,

19   the injunction at this point given the creditors' other

20   agreements applies just to the creditors' right to pursue

21   monetary claims against the third parties.

22        The state creditors have argued that the deterrent

23   effect of pursuing those claims is a valid governmental

24   interest, which to some extent it is.  But I believe that it

25   is going far too far to state that that interest requires

1    them to decide whether there would be a trial or not of such

2    claims where they overlap with the claims against the

3    Debtor's estate and by the Debtor's estate, as I believe

4    they are cabined under the plan.

5           I will note that the moving states have at times

6    argued that that public interest extends to their right to

7    take discovery and engage in a trial, but I will also note

8    that they have touted in this motion the benefits of the so-

9    called national settlement in the multi-district litigation

10   in which two of the three of them are parties where there

11   has been no trial by them, and I believe far less discovery

12   that occurred in this case, that they would have and did

13   have direct access to.  But with that also I believe that

14   that package of issues is an issue for consideration

15   appropriately under the first prong of the test for

16   obtaining a stay pending appeal.

17          The other most critical factor is whether the

18   movant will be irreparably injured absent the stay.  For all

19   intents and purpose, although the movants have each

20   attempted to argue other injuries, the injury that they

21   posit as an irreparable injury is the risk that during the

22   course of their appeals, the plan would be so far

23   consummated that the appeals would become equitably moot.

24          The equitable mootness doctrine is at one level

25   fairly well established in the Second Circuit, although

1    throughout the country there is a wide variation on how

2    courts look at it.  I say at one level because the courts

3    have also made it clear that, "The doctrine is deployed in a

4    pragmatic and flexible fashion and must be responsive to the

5    specific factors presented in a particular case ultimately

6    to focus on as a prudential matter whether a court should

7    dismiss a bankruptcy appeal when even though effective

8    relief could conceivably be fashioned, implementation of

9    that relief would be inequitable."  See Beeman v. BGI

10   Creditors' Liquidating Trust (In re BGI, Inc.), 772 F.3d

11   102, 107-08 (2d Cir. 2014) and GLM DWF Inc. v. Windstream

12   Holdings Inc. (In re Windstream Holdings Inc.), 838 Fed.

13   Appx. 634 (2d Cir. Feb. 18, 2021.  Where a plan has been

14   substantially consummated, the circuit presumes that an

15   appeal is equitably moot.  And in that circumstance, a party

16   seeking to overcome that presumption may do so only by

17   demonstrating that five factors are met.  But that of course

18   is only where, again, a plan has been substantially

19   consummated under the Bankruptcy Code, id In re Windstream

20   Holdings Ind., 838 Fed. Appx. 634, 636.

21          The course by a vast majority have held that the

22   possibility of equitable mootness standing alone does not

23   constitute irreparable harm.  Rather, it is a form of

24   prejudice which with some other consideration can constitute

25   equitable harm.  Again, taking into account the equitable

1    nature of the request for relief, i.e. the stay pending

2    appeal, it would seem to me that that other factor can be

3    any one of the three other factors, i.e. the very importance

4    and seriousness of the appeal on the merits and the harm or

5    lack of harm to other parties and/or the public interest,

6    which includes both a sense of the importance of the

7    finality of bankruptcy plans where they are complicated and

8    involve delicately-negotiated and extensively-reviewed

9    compromises as against the public interest in literally

10   getting an appeal right beyond the trial court

11   determination.  See for example the discussion of this topic

12   in In Re Adelphia Communications Corp., 361 B.R. 337, 347-

13   348 (S.D.N.Y. 2007) and In re St. Johnsbury Trucking

14   Company, 185 B.R. 687 (S.D.N.Y. 1995), both of which cases

15   considered some balancing of the other factors in addition

16   to the risk of equitable mootness.

17          And on the other side of the equation, the

18   discussion in In re Windstream Holdings Ind., 2020 U.S.

19   Dist. LEXIS 167183 (S.D.N.Y. August 3, 2020) where the

20   district court makes the clearly correct point that merely

21   invoking equitable mootness as the appellants have done

22   here, a risk that is present in any post-confirmation appeal

23   of a Chapter 11 plan, is not sufficient on its own to

24   demonstrate irreparable harm.  That's id at Page 7 quoting

25   In re Calpine Corp., 2008 Bankr. LEXIS 217 (Bankr. S.D.N.Y.

Page 267

1       January 24, 2018).   See also In re W.R. Grace & Company, 475

2       B.R. 34 -- I'm sorry, I have the wrong cite.   It's at Pages

3       207 through 08 (D. Del. 2012), affirmed 729 F.3d 332 (3rd

4       Cir. 2013).

5                   In the cases where courts have taken seriously the

6       risk of equitable mootness, they have either, as in the

7       Adelphia case, had grave doubts about the merits of the

8       appeal and believe that they needed to be addressed, or the

9       harm to the other parties was offset by the need for an

10      appeal where there was other irreparable harm besides

11      mootness that would occur if the appeal were not heard.

12                  As for the mootness issue as irreparable harm and

13      irreparable harm in general, the allegation of irreparable

14      harm and the showing of it must be neither remote nor

15      speculative, but actual and imminent.   The possibility of

16      irreparable harm is too lenient.   Nken v. Holder, 556 U.S.

17      434-435 and In re Sabine Oil & Gas Corp., 551 B.R. 143.

18                  Here, the appellants are in two different camps as

19      far as the relief that they are seeking from me.   The U.S.

20      Trustee has clearly asked for a stay pending appeal

21      throughout all of the appeals, i.e. through potentially

22      determination of its appeal by the Supreme Court.   It has a

23      fallback position in which it asks for a stay through the

24      district court determination on the appeal plus some

25      additional time.

1          The moving states I think are much more focused on

2     a short-term stay.  And based on their remarks during oral

3     argument, I believe they would confine their motion to such

4     a request.

5          As I stated during oral argument, and I won't

6     repeat the cases that I cited, it seems to me that

7     Bankruptcy Rule 8025 effectively limits the bankruptcy

8     court's ability to issue a stay pending appeal of a district

9     court's order.  The provisions of Rule 8007 and Rule 8025 do

10    not entirely mesh, as noted by the district court in Credit

11    One Bank N.A. v. Anderson (In re Anderson), 560 B.R. 84, 88

12    (S.D.N.Y. 2016).  But as I've previously cited, there are

13    plenty of cases where bankruptcy courts have limited their

14    stays because of Rule 8025 up to the date of the district

15    court's ruling.

16          I believe that is appropriate here not only

17    because of Rule 8025, but also because of the distinctly

18    different factual considerations underlying a request for a

19    stay pending appeal in these appeals and in these cases for

20    a stay pending appeal through the district court's ruling

21    and a stay thereafter.

22          The district court has made it clear that it is on

23    a fast track to determining the appeal, which it will hear

24    oral argument on at the end of November and may well rule on

25    by the end of the first week of December.  Moreover, the

1  appellees have stipulated and will be prepared to add to

2  that stipulation based on the record at oral argument that

3  they will not cause the effective date to occur, that is the

4  effective date of the plan, until the earlier of the

5  district court's ruling, which under Rule 8025 and results

6  in, unless the district court orders otherwise, a 14-day

7  stay and December 31.

8          They have also stipulated that they will not argue

9  equitable mootness to a subsequent appellate court, whether

10  that's the Second Circuit or the Supreme Court based on

11  actions taken prior to the effective date of the plan,

12  including in respect of the advance order.

13          Based on my review of the plan in addition to that

14  stipulation, it is highly unlikely that the plan would

15  permit any actions to be taken prior to the effective date

16  that would come anywhere close to the types of transactions

17  that give rise to equitable mootness under the law of the

18  Second Circuit.  That includes coming anywhere close to

19  achieving substantial consummation of the plan under the

20  Bankruptcy Code.

21          The appellees have further stipulated that they

22  will give the appellants, including the movants, 14 days'

23  notice of their actual efforts to cause the effective date

24  to occur, of the actual effective date that is, or the

25  projected effective date.

1          Finally, they have stated -- and again, this would

2     be a condition for my order -- that they would render the

3     movant's equitable mootness arguments moot by agreeing that

4     the hearing on the sentencing of the debtors under the DOJ

5     settlement agreement, that that hearing would be no earlier

6     than December 31, which it is clear is the actual date that

7     will be one where there is ample notice, clearly more than

8     14 days' notice, to the appellants, including the moving

9     parties here.

10         Given all of the foregoing and the burden of proof

11    as to irreparable harm that the movants have, I conclude

12    that they have not established irreparable harm with respect

13    to a stay which I believe is the only appropriate stay that

14    I could grant, which is to the date of the district court

15    ruling and a reasonable outside date wherein there would be

16    sufficient notice for the movants to renew a stay motion in

17    the district court.

18         The Debtors have suggested December 31 for that

19    outside date, and it has been suggested to me by the movants

20    that that date, being New Year's Eve and during the holiday

21    season, may place an undue burden on the district court in

22    scheduling a stay hearing, and to a lesser extent a burden

23    on the parties.  However, again, it appears more likely to

24    me, although of course this is entirely up to the district

25    court, that the district court will rule before December 31.

1    And I believe that the scheduling issue can be dealt with by

2    saying the earlier of the district court's ruling and

3    December 31 or such later date.  I'm sorry, subject to the

4    district court's calendar.  So if the district court is not

5    available at or around December 31 to hear a potential

6    renewed stay motion depending on the district court's ruling

7    and when that occurs, then it would be the later date for

8    the district court to hold the hearing.

9              Clearly, the parties here have already prepared

10   their stay motions.  Indeed, the U.S. Trustee prepared four

11   of them, which are all in my pleading binder.  And we have

12   had an extensive record for this hearing.  I believe under

13   those circumstances it's not a burden for them if the

14   district court can schedule a stay hearing if they decide to

15   make a stay motion after the district court's ruling by the

16   outside date of December 31 if the district court had not

17   ruled by then.

18             Otherwise, the appellate process would be governed

19   by Rule 8025.  And accordingly, I believe that a key element

20   on the conditions that I just stated for the movants

21   prevailing on the request for a stay pending appeal has not

22   been met.

23             I will also address, however, the last two prongs

24   that the movants would have to show, namely that there is no

25   substantial injury to other parties interested in the

Page 272

1    proceeding and where the public's interest lies.

2              As far as there being no substantial harm to other

3    parties interested, the record here is clear and I believe,

4    frankly, uncontroverted that there is to the contrary

5    substantial harm to the Debtor's creditors, the vast

6    majority of whom have either not objected to the plan and/or

7    voted in favor of the plan affirmatively in each instance,

8    the vast majority that is.

9              After the Debtors are ready to have the effective

10   date of the plan occur, and it appears to me that that would

11   not be realistically before December 31, although perhaps a

12   week before they could be ready, after that date when they

13   are ready, every day that they do not implement the

14   effective date which starts the process of liquidating

15   personal injury claims and making distributions on them and

16   making the initial distributions for abatement purposes

17   seriously causes harm to the creditors.  It is clear to me

18   that the personal injury creditors bargained for a rapid

19   payout, which is reflected not only in their bargaining for

20   a fixed, upfront sum of several hundred million dollars, but

21   also the procedures they've adopted for consistent with due

22   process and the burden of proof a streamlined option to

23   liquidate one's proof of claim.

24              Similarly, the roughly up to a billion dollars

25   minus the funds going to the personal injury creditors would

1   be going out shortly after the effective date through 2023

2   for abatement purposes, as well as the $225 million payment

3   to the United States, which although not specifically

4   earmarked for abatement purposes, United States has

5   represented the vast majority of which will go to hospitals

6   and other care facilities.  This is amply testified to by

7   Mr. Guard as far as the payments are concerned at Paragraphs

8   9 through 13 of his declaration as well as at Paragraphs 7

9   through 9 and 12 through 21 and in the summary at Paragraph

10  25 of Mr. DelConte's declaration.  That declaration also

11  address in Paragraph 22 and 23 the funding of Newco and

12  setting it up as a public benefit company to focus on

13  developing products at a reasonable price to combat the

14  opioid crisis.

15          As Mr. Guard eloquently summarized, many states

16  have been litigating these issues since, well -- I'll quote

17  him, because it's actually quite telling -- for as long as

18  five years before the commencement of the bankruptcy case in

19  addition to the two years of this bankruptcy case.  I

20  believe that that length of time was necessary to satisfy

21  the due process Iridium and Metromedia factors as well as to

22  negotiate the intricate intercreditor deals in the plan.

23  The additional time of a stay pending appeal after the

24  district court's ruling is necessary only to have further

25  appeals.  There is nothing else that would hold up the

Page 274

1    payment of the money.

2            As Ms. Juaire and Ms. Trainor eloquently have

3    testified, that payment is, if made, to be put to use both

4    for the immediate needs of the individual victims and for

5    abatement purposes at a time when every dollar counts.  And

6    as time passes, the problem only gets worse.

7            As testified to by Mr. Guard and Mr. Jorgenson,

8    opioid deaths have been increasing over the last two years

9    at a very disturbing level, roughly 30 percent nationally,

10   such that in the last year of March to March, roughly 200

11   opioid-related overdose deaths occur each day.

12           I agree with the states of Washington and

13   Connecticut that if the parties could all agree that those

14   initial distributions could be made and the parties who are

15   appealing would take the risk on equitable mootness with

16   regard to those distributions, that would be all to the

17   good.  But the U.S. Trustee and the State of Maryland do not

18   seem to be prepared to agree to such a resolution to get

19   money out promptly.

20           So on the one hand, we have that clear, tangible

21   harm.  On the other hand, post the date when the Debtors

22   would be ready to go effective, which, again, would be at

23   the end of this year, we have tangible harm as described in

24   the Juaire, Trainor, Guard and Jorgenson declarations,

25   contrasted with the legitimate but non-economic harm of

Page 275

 1     having extra layers of appeal.

 2             The public interest factor in some respects

 3     dovetails with the foregoing analysis.  The U.S. Trustee

 4     states that it is protecting the interests of those who did

 5     not object to the plan but did not affirmatively accept it

 6     and those who did object to the plan.  It has not, however,

 7     provided any information to me that would indicate that

 8     those parties would effectively be able to pursue their

 9     claims against the released parties to recover anything and

10     would not -- and in addition would not recover any amounts

11     from the Debtors.

12             The vindication of that public policy, i.e.

13     protecting the minority, at some point -- and I believe that

14     point comes soon after the Debtors are ready for the

15     effective date, although maybe with enough time to have an

16     expedited appeal to the circuit depending on the seriousness

17     of the issues on appeal -- is sufficient to carry the day on

18     the public policy point.  But those issues can be addressed

19     by the district court if there is a motion for a stay after

20     its ruling.

21             In light of its assessment of all four factors,

22     including the first factor, the likelihood of success on

23     appeal, and with the benefit of this record which, again, is

24     extensive with extensive evidence offered by the party that

25     doesn't have the burden of proof on this issue, the

1    objectants, with no evidence offered for what I'll refer to

2    as the longer stay issue of the balance of harms by the

3    movants.

4           The other public interest factor I have been told

5    is the deterrence factor.  I will note, however, that at

6    some point the public's desire to get paid may well outpace

7    that deterrence factor, particularly where, again, the issue

8    is one simply of a fight over money and the movants can

9    simply not close their eyes to the fact that their

10   litigation alternatives are ones where they already with

11   regard to other defendants that they have pursued have

12   resulted in settlements rather than trials and where the

13   effect of a lengthy stay would prevent the release of the

14   document repository which can be used not only by the public

15   and academics, but also to actually fight the remaining

16   trials and litigation that's pending against other parties.

17          Counsel for the Ad Hoc Committee of Personal

18   Injury Claimants has suggested that I require at this point

19   the posting of a bond by the states and the non U.S. Trustee

20   appellants.  Of course the posting of a bond to protect the

21   appellees from the adverse effects of a stay is the norm

22   rather than the exception.  And even where the Court has

23   believed that there are not just possible but quite probable

24   issues on the merits, it has required the posting of a bond,

25   and a substantial bond pending appeal.  See In re Adelphia

```
 1    Communications Corp., 361 B.R. 337.

 2              The U.S. Trustee I believe correctly points out

 3    that Rule 8007(d) exempts the federal government from a bond

 4    requirement.  And while that language is not entirely clear,

 5    I believe that that is the case.  However, that does not

 6    help the U.S. Trustee on the issue of the harm to other

 7    parties or the balancing of the harms since it offers

 8    nothing in return for the risk that it will have been wrong

 9    and have pursued a lengthy appeal process that results in

10    the substantial delay of payments that literally save lives

11    and families.

12              8007(d) says nothing about any other entity,

13    including any other governmental entity being exempt from

14    the bond requirements.  And in fact, there is meaningful

15    caselaw on that point or under the analogous Federal Rule of

16    Civil Procedure 62.  The fact that state courts don't impose

17    a bond on other states I believe is irrelevant, as noted by

18    more than one of the objectors.  A federal statute including

19    the Bankruptcy Code as interpreted by the bankruptcy courts

20    will defeat a state's interest in enforcing its law and in

21    protecting appellees if in fact it obtains a stay.  The

22    basic principle was set forth in Butner v. United States,

23    440 U.S. 45, 48 (1979).  And, in fact, in other cases bonds

24    have been imposed on states.  I cited one of those during

25    oral argument, Lightfoot v. Walker 797 F.2d 505 (7th Cir.
```

1   1986), a decision by Judge Posner.  See also Cayuga Indian

2   Nation of New York v. Pataki, 188 F. Supp. 2d 223 (S.D.N.Y

3   2002) and PAO Tatneft v. Ukraine, 2021 U.S. Dist. LEXIS

4   102179, 6-7 (D.D.C. June 1, 2021).  That latter decision

5   also is authority for requiring the Canadian entities to

6   post a bond.

7        Again, I do not believe a bond is required with

8   respect to the order that I will grant, which denies the

9   stay request.  But I am denying the U.S. Trustee's request

10  for a broader stay, i.e. one that would last through the

11  entire appellate process because it is not posting a bond.

12  And I would deny a similar request by the movant states

13  because they have not offered to post a bond where it is

14  clear that there would be substantial harm to third parties

15  occasioned by delay after the date when the Debtors have

16  acknowledged they will, and only by that date, be ready to

17  go effective with their plan.

18       Counsel for the Ad Hoc Committee of Personal

19  Injury Claimants has also suggested that I oppose additional

20  reciprocal conditions on my not granting the motion,

21  reciprocal to the conditions that I am imposing on the

22  debtors and the other plan proponents.  They would basically

23  go to any efforts by the movants to delay emergence other

24  than of course through the appellate process.  That would

25  include continuing their commitment to an expedited

1    appellate process, not seeking to adjourn the sentencing

2    hearing before the district court in New Jersey and the

3    like.

4         I am not prepared to impose those conditions.

5    However, I will reserve the appellee's right to revisit

6    those conditions if such delaying tactics are undertaken.  I

7    don't believe they will be because I believe they are

8    antithetical to the stated goals of the movants to expedite

9    the appeal process and get money out to claimants.  But if

10   that proves not to be the case, then I will lift the

11   conditions that I am imposing as a quid pro quo to my not

12   granting the stay motions.

13        I noted that the Canadian claimants' motion

14   essentially rides along on the mootness point with the other

15   three motions that I have described.  On the merits point,

16   it addresses arguments unique to the Canadian claimants

17   based on their assertions that they are sovereign entities

18   and therefore that their rights cannot be constrained.  I

19   have clearly disagreed with that in my confirmation ruling.

20        I will also note that the objections to the

21   Canadian claimants' points on this argument are well taken.

22   Canadian claimants, not all of them, but Canadian claimants

23   in their group have filed proofs of claim in these cases on

24   behalf of all of the claimants, which would subject them to

25   the court's jurisdiction.  Moreover, the claimants' rights

1    are not specifically protected under the Bankruptcy Code.

2    They fall into the waiver of sovereign immunity for

3    governmental entities.

4         And again, I believe that the comprehensive

5    bankruptcy scheme recognized by not only Ortiz but also

6    Butner and the circuit in Manville IV, 606 F.3d 135, all

7    contemplate that those types of rights can be constrained by

8    the Court even where they pertain to or limit the ability to

9    pursue claims that are direct claims, at least where those

10   direct claims overlap with claims assertable by all

11   creditors and based on actions that are primarily actions

12   through the Debtors.

13        So I will look for an order consistent with my

14   ruling.  I will not require a notice of when the Debtors are

15   asking for a hearing date, but only a notice of the hearing

16   date (indiscernible) the hearing date.  I will not extend

17   the outer date for their condition beyond December 31, but

18   that will be subject to the district court's schedule,

19   obviously tying into the commitment that has already been

20   given by the appellees of a 14-day notice of the actual

21   effective date, which is all tied to giving the movants time

22   to renew their motion for appeal -- I'm sorry, for a stay

23   pending appeal, excuse me.

24        All right, are there any questions on what the

25   order should say?

1          MR. FOGELMAN:  Your Honor, this is Larry Fogelman

2   on behalf of the United States.  May I make one comment?

3          THE COURT:  Okay.

4          MR. FOGELMAN:  It's really -- it's just a

5   clarification of one of the comments that Your Honor made.

6   While it's true that almost all of our civil recoveries for

7   the federal healthcare agencies that do help treat opioid

8   use disorder, I just -- and that includes the $225 million

9   from the Sackler settlement which will be a civil claim.

10  And that was addressed in the letter that we filed with the

11  Court.  I just want to clarify that the $225 million asset

12  forfeiture recovery under the plea agreement, that's

13  required by statute to go to the asset forfeiture fund

14  (indiscernible).  I think Your Honor had said that the asset

15  forfeiture amount goes to the federal healthcare agencies.

16  So I just wanted to make that clarification for the Court.

17          THE COURT:  Okay.  Thank you.

18          MR. FOGELMAN:  Thank you.

19          THE COURT:  All right.  So are there any questions

20  on the order?  No?

21          MR. KAMINETZKY:  We will do our best, Your Honor.

22  I think we understand.

23          THE COURT:  I don't want the parties to spend an

24  enormous amount of time negotiating this order.  If there is

25  a disagreement about what the parties think I said, you

Page 282

1    should promptly send me the alternative proposed orders with

2    the second one blacklined to show the changes and I'll enter

3    the one that I believe is consistent with my ruling.

4              MR. KAMINETZKY:  We will do so, Your Honor.

5              THE COURT:  Okay, very well.  Thank you.

6              (Whereupon these proceedings were concluded at

7    6:32 PM)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 283

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  November 12, 2021

| & |
| --- |

**&**   36:11,18 38:1
38:15 39:8 58:9
65:22 70:6 186:7
201:11 208:22
221:20 227:18
249:20 256:8
262:7 267:1,17

| 0 |
| --- |

**01**   39:18
**06604**   39:4
**07**   121:13
**07102**   38:19
**08**   265:11 267:3

| 1 |
| --- |

**1**   62:10 66:2
132:25 133:3
151:25 194:23
198:19 199:8
207:4 278:4
**1.4**   209:8
**1.6**   205:10
**10**   68:5 169:16
202:19 228:20
235:7,8,13 253:6
256:16
**100**   136:8 232:19
**10001**   36:14
**10007**   40:3
**10014**   36:6
**10017**   37:18
**10020**   38:4
**10022**   36:21
**10036**   37:11 39:11
**1006**   36:5
**10110**   38:11
**102**   265:11
**102179**   278:4
**10601**   1:14
**107**   265:11
**10:00**   2:3

**11**   6:2,6 13:9,12
18:22 19:2 23:9
23:13 28:16,20
33:9,13 81:9
128:6 212:5
254:13 266:23
**11/3/2021**   2:1
**11/9/2021**   2:3
**1129**   260:24
**11501**   283:23
**1177**   37:10
**12**   51:2 56:14
160:20,25 196:14
241:18 273:9
283:25
**12151**   283:7
**1221**   38:3
**13**   212:8 273:8
**132**   70:6 256:8
**135**   262:16 280:6
**137183**   81:6
**14**   45:14,17 62:3
70:20 81:25 123:1
129:20 136:22
149:19,19 161:4
166:23 170:25
176:16 177:1
178:7 180:15
181:5 182:9,10,17
188:1 207:12
216:8 218:17,19
226:3 228:4
234:17,18,19
235:6,7 238:16
239:16 242:2
269:6,22 270:8
280:20
**140,000**   214:11
**142**   256:8
**143**   70:7 267:17
**14th**   104:8 215:22
218:6 233:7
237:19 238:17

**15**   208:22 214:23
253:7
**153-154**   262:16
**155**   258:7
**15th**   156:5 167:6
176:13 180:8
**16**   129:20 223:3
**167183**   266:19
**17**   66:11 216:23
218:22 224:9
**173**   257:2
**18**   160:25 216:23
265:13
**181000**   262:9
**185**   266:14
**188**   278:2
**188-184**   257:2
**19-23649**   1:3
**1979**   277:23
**1986**   121:14 278:1
**1989**   224:9 260:6
**1995**   266:14
**1999**   259:1
**19th**   154:16
**1st**   77:10 165:17
175:2

| 2 |
| --- |

**2**   62:14 66:12
124:5 213:15
244:18 249:7
260:6
**20**   169:14 174:20
196:7 262:9
**200**   37:3 130:18
137:17 162:17
274:10
**200,000**   249:23
**20005**   40:10
**2002**   66:14 278:3
**2006**   206:22
**2007**   154:6 212:24
266:13

**2008**   66:11,12
81:15,16 212:4
213:7 266:25
**2009**   206:19 256:7
257:1
**201**   36:5
**2010**   262:16
**2012**   213:7 267:3
**2013**   267:4
**2014**   119:22
265:11
**2015**   224:11
**2016**   66:10,11,17
70:7 256:9 268:12
**2017**   66:7,8 212:4
**2018**   262:10,11
267:1
**2019**   66:8,9 257:2
**2020**   81:6 101:8
196:16,20 197:2
197:16 198:1
212:14,19 256:15
256:16 257:9,21
262:9 266:18,19
**2021**   1:16 2:6
44:14 159:24
160:8 190:10
193:11 194:9
196:7 234:4
265:13 278:3,4
283:25
**2022**   161:17 187:9
234:5
**2023**   132:14 234:5
273:1
**2024**   87:20 112:15
132:15
**204**   205:9
**207**   267:3
**20852**   37:4
**20th**   124:1 164:24
165:15 166:13
167:9 170:11

174:9,23 176:10
203:21 216:12,16
216:22
**21**   160:20 193:11
194:9 216:10,13
217:20 218:5
273:9
**217**   81:15 266:25
**22**   159:24 160:8
160:21 190:9
273:11
**222**   66:14
**223**   278:2
**225**   162:6 211:7,8
212:15,19 273:2
281:8,11
**23**   240:15 273:11
**230-31**   66:14
**23rd**   209:15
**24**   81:16 120:16
160:25 256:6
267:1
**248**   1:13
**25**   162:6 212:20
213:10 273:10
**26**   160:22 208:22
209:3
**27**   66:8,8 160:22
**28**   66:9 120:16
160:22
**283**   66:13
**28th**   197:5
**2:00**   156:18
**2:30**   156:20
**2d**   257:2,20
262:16 265:11,13
278:2
**2nd**   204:1

**3**

**3**   5:21 44:14 92:12
129:11 142:4
266:19

**30**   62:14 66:12
170:24 171:2
172:20 176:25
177:19,22 179:8
180:16,16,23
186:12,14 202:13
216:6 232:19
237:10,11 256:13
274:9
**30-45**   200:15
**300**   1:13 283:22
**30th**   123:9 165:2
170:7,12 176:15
177:3 183:7
186:18 216:16
240:15
**31**   169:14,16
186:14 269:7
270:6,18,25 271:3
271:5,16 272:11
280:17
**31st**   161:15
174:10 180:10
**32399**   39:19
**3264057**   256:15
257:9
**330**   283:21
**332**   267:3
**337**   154:5 266:12
277:1
**3376**   66:8
**34**   267:2
**347**   266:12
**348**   266:13
**3484**   5:13 18:18
**35**   139:10
**35,000**   231:9
**354**   262:10
**359**   58:10
**36,000**   207:3
**361**   154:5 266:12
277:1

**363**   133:24 143:7
**368**   58:10
**37**   216:5,6
**3726**   6:8 13:14
19:4 23:15 28:22
33:15
**3773**   5:14 6:24
10:17 18:19
**3776**   2:13 6:16
**3777**   2:13 6:15
**3778**   2:14,18 4:14
5:5 6:16 7:20 8:11
10:22 12:18 13:19
14:3 15:21 17:18
18:9 19:9 20:21
22:18 23:20 24:3
25:16 27:14 28:11
29:3,9 30:21
32:18 33:20 34:3
**3779**   5:22 6:16
7:11
**3786**   6:3,24 10:17
13:9 18:23 23:10
28:17 33:10
**3787**   6:9,24 10:17
13:15 19:5 23:16
28:23 33:16
**3789**   2:18 3:3,16
4:6,14,20 8:11
9:20 10:18,22
11:8,21 12:10,18
12:24 13:18 14:3
15:7,21 16:7,20
17:10,18,24 18:9
19:9 20:13,21
21:7,20 22:10,18
22:24 23:19 24:3
25:7,16 26:3,16
27:6,14,20 29:3,8
30:13,21 31:7,20
32:10,18,24 33:19
34:2 35:7

**3799**   6:15
**3801**   2:17 3:3,16
4:14,19 5:4 6:17
7:19 8:10 9:19
10:22 11:8,21
12:18,23 13:18
14:2 15:6,21 16:7
16:20 17:18,23
18:9 19:8 20:12
20:21 21:7,20
22:18,23 23:19
24:2 25:6,16 26:3
26:16 27:14,19
28:10 29:2,8
30:12,21 31:7,20
32:18,23 33:19
34:2 35:6
**3803**   2:18 6:25 7:7
8:11 10:23 13:19
14:3 15:22 18:9
19:9 20:22 23:20
24:3 25:17 29:3,9
30:22 33:20 34:3
**3804**   7:8
**3810**   20:17
**3838**   7:13
**3845**   2:18 3:3,16
4:7,14,20 8:11
9:20 10:23 11:8
11:21 12:11,18,24
13:19 14:3 15:7
15:17,22 16:7,20
17:11,18,24 18:10
19:9 20:13,22
21:7,20 22:11,18
22:24 23:20 24:3
25:7,17 26:3,16
27:7,14,20 29:3,9
30:13,22 31:7,20
32:11,18,24 33:20
34:3 35:7
**3847**   20:17

**[3860 - 6th]**

**3860**  4:14,20 9:20
12:18,24 15:7
17:18,24 18:9
20:13,17 22:18,24
25:7 27:14,20
30:13 32:18,24
35:7
**3873**  2:17 3:3,16
4:6,14,19 8:10
9:19 10:22 11:8
11:21 12:10,18,23
13:18 14:2 15:6
15:21 16:7,20
17:10,18,23 18:9
19:8 20:12,21
21:7,20 22:10,18
22:23 23:19 24:2
25:6,12,16 26:3
26:16 27:6,14,19
29:2,8 30:12,21
31:7,20 32:10,18
32:23 33:19 34:2
35:6
**3890**  4:14,19 9:19
12:18,23 15:6
17:18,23 20:12
22:18,23 25:6
27:14,19 30:12,17
32:18,23 35:6
**3918**  45:18
**3958**  156:5
**3972**  2:18 4:6,14
5:4 7:21 8:5,11
10:5,22 12:10,18
13:18 14:3 15:21
17:10,18 18:9
19:9 20:21 22:10
22:18 23:19 24:3
25:16 27:6,14
28:10 29:3,8
30:21 32:10,18
33:19 34:2 45:15

**3973**  8:7 18:9
**3988**  224:12
**3rd**  40:2 267:3

## 4

**4**  68:5 127:19
149:2 211:12
212:6
**4.25**  209:17
**4002**  2:20 8:13
10:25 13:21 14:5
15:24 19:11 20:24
23:22 24:5 25:19
29:5,11 30:24
33:22 34:5
**4003**  2:24 11:4
16:3 21:3 25:23
31:3
**4006**  3:5,10,20
4:24 8:17 9:3
11:10,15 12:1
13:3 14:9,16 16:9
16:14 17:1 18:3
19:15,22 21:9,14
22:1 23:3 24:9,16
26:5,10,20 28:3
29:15,22 31:9,14
32:1 33:3 34:9,16
**4007**  8:20 14:12
19:18 24:12 29:18
34:12
**4008**  9:6 14:19
19:25 24:19 29:25
34:19
**4009**  3:11 11:16
16:15 21:15 26:11
31:15
**4010**  3:18 11:23
16:22 21:22 26:18
31:22
**4011**  3:22 12:3
17:3 22:3 26:22
32:3

**4012**  4:9 12:13
17:13 22:13 27:9
32:13
**4013**  9:12 14:25
20:5 24:25 30:5
34:25
**4014**  4:16 9:15
12:20 15:2 17:20
20:8 22:20 25:2
27:16 30:8 32:20
35:2
**4015**  9:16 15:3
20:9 25:3 30:9
35:3
**4016**  4:21 9:21
12:25 15:8 17:25
20:14 22:25 25:8
27:21 30:14 32:25
35:8
**4017**  4:25 13:5
18:5 23:5 28:5
33:5
**4043**  10:7 45:19
**4048**  18:11
**4049**  10:14
**4050**  5:6 28:12
**4051**  15:13
**4075**  195:21
**409**  256:6,13
**41-48**  257:20
**418**  257:1
**434**  257:1,19
**434-435**  267:17
**440**  277:23
**45**  277:23
**450**  37:17
**475**  267:1
**48**  93:2 277:23
**490**  260:6
**4:00**  189:16

## 5

**5**  256:15
**5-6**  66:7,10
196:14
**500**  38:10 206:12
241:13
**505**  121:13 277:25
**506**  121:13
**5076975**  66:12
**515**  196:15
**524**  69:6,23
258:16 260:9
**527**  259:1
**544**  66:7
**547**  196:20 197:7
197:15
**548**  256:12 257:10
**55**  36:13
**551**  70:6 256:8
267:17
**556**  257:1,19
267:16
**56**  58:9
**560**  66:17 268:11
**570**  38:18

## 6

**6**  160:25 224:12
**6-7**  278:4
**600**  162:8
**606**  262:15 280:6
**62**  277:16
**630,000**  202:16
**634**  212:25 265:13
265:20
**636**  265:20
**65**  211:9
**681**  256:12
**683**  257:10
**684**  257:10,15
**687**  266:14
**6:32**  282:7
**6th**  233:8

**7**

**7**   160:20 188:5
  215:13 216:18,21
  217:20 257:9
  260:24 266:24
  273:8
**700**   137:17
**7069**   224:9
**729**   267:3
**75**   124:15
**755**   260:6
**75th**   123:5
**762**   260:6
**772**   265:10
**778**   5:21
**78**   205:13 209:14
**797**   121:13 277:25
**7th**   121:14 123:10
  170:9 183:7
  187:21,22 189:9
  215:2,16,19,21,22
  216:9 217:19
  237:19 239:14,16
  240:14 277:25

**8**

**8**   149:3 174:19
**8000**   66:2
**8007**   2:12 5:4,21
  6:15 7:19 8:5 10:5
  10:12 28:10 63:7
  63:21 64:6 65:23
  66:19 119:22
  268:9 277:3,12
**8025**   61:13,24
  62:4,9 63:14 64:4
  64:6,8,8 66:19,20
  70:21 95:11
  149:17 184:14,24
  185:6,13,16 216:7
  226:24,25 268:7,9
  268:14,17 269:5
  271:19

**815**   259:1
**82**   106:25
**836**   66:10
**838**   265:12,20
**84**   66:17 268:11
**850**   39:3
**86**   40:2
**88**   66:17 268:11
**8th**   55:14 77:12
  123:3 175:1

**9**

**9**   1:16 2:6 28:16
  56:12 57:4,21
  58:4 160:20,25
  190:11 193:12
  194:11 262:10
  273:8,9
**9/15/2021**   5:9
  18:14
**9/17/2021**   6:2,8
  13:9,14 18:22
  19:4 23:9,15
  28:22 33:9,15
**90**   242:10
**919**   36:20
**933**   257:2
**94**   204:22
**95**   204:23
**96**   202:17 204:24
**97**   222:11
**973**   257:20
**9:49**   1:17
**9th**   160:8 196:11

**a**

**aac**   198:10
**abandon**   247:21
**abate**   251:23
**abatement**   85:24
  133:15 136:23
  145:19 187:12
  192:16,23 205:15
  207:21 212:11,16
  212:22 213:1

  217:4 220:15,20
  222:15 223:4,5,8
  235:5 236:6
  243:20 244:25
  245:4 272:16
  273:2,4 274:5
**abeyance**   101:8
  101:16
**ability**   58:15
  112:22 127:6
  172:8 176:5 203:2
  204:12,13 250:25
  251:6 268:8 280:8
**able**   99:10,16
  100:13 109:7,13
  109:20 126:25
  168:10 178:25
  184:9 216:21
  233:8 237:12
  240:13 241:17,19
  242:5 275:8
**abrams**   40:21
**absence**   149:12
  238:20 250:8
**absent**   75:19 76:7
  256:22 257:14
  264:18
**absolute**   259:11
**absolutely**   58:1
  173:22 203:5
  220:5,24 249:7
**abstract**   100:20
**abused**   86:12
  93:25
**academics**   276:15
**accept**   97:11
  115:5,13 164:5
  217:1 275:5
**acceptable**   150:9
**accepting**   115:17
**access**   203:12
  264:13

**accident**   206:19
  209:4
**accompanied**
  188:2
**account**   51:23
  52:2,4 125:13
  162:5,11,22 169:6
  174:6 261:9,22
  265:25
**accountable**
  203:24
**accounts**   46:4
  47:17,22
**accrue**   229:18,19
  233:6 239:25
**accurate**   197:19
  283:4
**accusations**
  219:24
**achieve**   223:16
**achievement**
  113:6
**achieving**   269:19
**acknowledge**
  132:6
**acknowledged**
  78:12 134:7 136:4
  249:21 278:16
**acquiesced**   48:18
**act**   147:16,17
  211:20 220:18
**acting**   86:11
  211:22
**action**   89:25 92:9
  125:4 147:23
**actions**   58:24
  83:17 88:2 90:11
  102:22 164:19
  172:16 173:10
  188:4 198:5 226:2
  269:11,15 280:11
  280:11

actively 189:1
activities 75:2
  177:8,10 183:19
activity 61:12
  74:10,11,24
  141:21
actors 119:19
actual 59:9 75:24
  148:24 166:24
  180:1,12 182:9
  210:21 241:15
  267:15 269:23,24
  270:6 280:20
ad 2:16,19 3:7,10
  4:1,7,25 8:9,12
  10:21,23 11:12,15
  12:5,11 13:4,17
  13:20 14:1,4
  15:20,22 16:11,14
  17:5,11 18:4 19:7
  19:10 20:20,22
  21:11,14 22:5,11
  23:4,18,21 24:1,4
  25:15,17 26:7,10
  27:1,7 28:4 29:1,4
  29:7,10 30:20,22
  31:11,14 32:5,11
  33:4,18,21 34:1,4
  37:9 38:2 39:17
  93:3 189:15
  202:19 214:18
  221:17,20 227:19
  276:17 278:18
add 65:21 66:4
  97:22 119:11
  122:14 143:15
  157:12,15 186:3,6
  251:12 269:1
added 70:21
  157:24 171:18
  216:9 218:8
addition 53:18,23
  54:4 162:7 165:3

226:14 234:13
  266:15 269:13
  273:19 275:10
additional 64:2
  70:20 76:2 113:12
  120:13 128:9
  129:22 131:2
  178:11 184:4
  186:7 188:8
  207:10,11 226:15
  237:11 242:1
  244:18 267:25
  273:23 278:19
address 45:24
  46:2 48:10 54:21
  54:25 59:21 61:12
  67:19 84:16
  118:14 124:6
  132:14 145:20
  158:22 188:14
  192:7 201:21
  202:21,23 214:22
  216:25 221:25
  222:1 224:17
  227:21,24 229:6
  229:20 248:14
  249:9 255:18,21
  255:23 257:16
  260:21 271:23
  273:11
addressed 59:21
  60:6 64:4,5 90:23
  94:3 148:15
  165:22 202:24
  222:24 223:1
  245:13 267:8
  275:18 281:10
addresses 49:10
  279:16
addressing 52:16
  52:17 94:4 118:8
  132:4 255:19,22

adelphia 53:21
  154:5 266:12
  267:7 276:25
adequate 93:9
  149:21
adequately 136:1
  259:23
adjourn 242:7
  279:1
admin 236:21
administrative
  236:25
admiration
  134:14
admissibility
  125:19 190:19
  194:17 195:2
admissible 134:11
admission 158:20
  191:1 192:1
  193:20 199:7
admit 190:19
  192:18 193:18
  194:18 198:3
  199:1,12 209:10
admitted 47:12
  163:6 190:23
  197:24
admittedly
  208:16
admitting 198:4
adopt 122:21
  147:2 155:3,6,7
  243:10
adopted 115:24
  115:25 156:13
  157:12 272:21
adopting 155:9,9
adopts 255:15
advance 4:13 9:11
  12:17 14:24 17:17
  20:4 22:17 24:24
  27:13 30:4 32:17

34:24 83:19 97:15
  109:3 115:16,24
  124:2 139:13
  149:1 157:2
  164:20,22 173:10
  200:14 226:2,4
  254:14 255:4,12
  269:12
advanced 234:11
advances 15:16
  18:8 139:23
advantage 234:24
adverse 276:21
advise 105:1
advised 123:9,19
advisor 126:17
advisory 224:21
advocacy 191:16
advocating 86:13
afanador 38:15
affect 54:3 110:12
affidavit 196:15
  197:19
affiliated 6:7
  13:13 19:3 23:14
  28:21 33:14
affirm 122:22
  190:1 192:10
  193:2 194:1
  195:24
affirmance
  236:14
affirmative
  152:15
affirmatively
  272:7 275:5
affirmed 59:2
  267:3
affirming 62:5
affording 203:23
afternoon 156:24
  157:5,18 193:25
  201:10 242:25

246:21
**agencies** 211:10
213:12 220:21
222:5 281:7,15
**agency** 118:20
119:1 213:10
**agenda** 2:6,6
**aggregate** 91:17
**ago** 106:19 197:5
201:23 207:24
214:23
**agree** 52:3 53:12
55:5 65:2,6 68:9
69:8 78:16,17,18
79:6 86:2 92:22
97:12 102:1,12
107:23 108:2
109:3,8 113:15
124:14 130:12
132:15 138:23
140:13 142:19,24
151:4 153:20
167:3 176:4 200:1
212:16,22 215:12
229:25 274:12,13
274:18
**agreed** 110:20
113:4,19 146:4
164:25 165:13,23
165:24 166:12,25
171:1 174:21,22
180:13 186:13
191:15 208:24
**agreeing** 115:13
270:3
**agreement** 72:25
76:3 98:22 99:1
101:7 104:5,16,20
105:3 114:2
124:13 142:16
150:13,15 164:23
165:20 170:22
175:6,23 200:1

213:2 245:25
270:5 281:12
**agreements**
153:12 189:11
263:20
**agrees** 179:2
**ags** 204:12,22,25
205:20 208:20
209:1
**ahc** 164:15
**ahead** 67:22 94:20
99:16 137:25
138:1 154:12
175:20 213:15
246:22
**aid** 118:1
**aisling** 42:8
**akin** 39:8 201:11
**al** 3:5,17 8:20 9:6
11:10,22 14:12,19
16:9,21 19:18,25
21:9,21 24:12,19
26:5,17 29:18,25
31:9,21 34:12,19
44:3 156:25
**albeit** 189:3
**aleali** 40:22
**alexander** 41:22
**alice** 43:6
**allegation** 249:8
267:13
**allegations** 89:15
89:23 90:2,20
249:5 263:9
**allege** 89:5,8
230:18 232:3
**alleged** 212:9
232:17
**allegedly** 230:23
**allen** 25:10 38:21
146:24
**allies** 86:20

**allocated** 223:7
**allocation** 218:18
**allow** 9:8 10:9
14:21 20:1 24:21
30:1 34:21 60:18
99:21,21,22 100:9
101:9,25 103:18
105:4 107:2 109:3
110:10,11 112:16
117:14,17 118:3
122:9 129:23
163:19 167:9
227:7 240:13
245:7 253:16
**allowed** 86:18,19
90:9 222:15 242:3
242:3,14
**allowing** 109:12
244:24
**allows** 100:18
**alluded** 148:23
**alluding** 233:18
**altered** 139:22
**alternative** 63:25
64:17 65:8 66:19
66:24 83:8 101:24
158:7 189:2 261:3
282:1
**alternatively** 67:1
**alternatives** 61:15
150:8 276:10
**amenable** 142:10
142:16
**amended** 6:2,6,11
6:11 7:15,17 8:2,3
10:1,3 13:8,12
18:22 19:2 23:8
23:13 28:15,20
33:8,13 45:15
105:2 254:12
**american** 2:24
11:4 16:3 21:3
25:23 31:3 207:11

**americans** 129:23
129:24 205:11
**americas** 37:10
38:3
**amicus** 211:5
**amid** 141:24
**amount** 52:10
67:8 92:12 106:6
106:7 113:25
131:11 132:8
135:24 143:14,15
150:20 162:14
178:23,24 185:25
211:12 212:6
223:8 234:6 240:7
241:12 254:16
257:13 281:15,24
**amounts** 275:10
**ample** 270:7
**amplify** 234:9
**amply** 273:6
**analogous** 277:15
**analogy** 119:13,16
**analyses** 198:9
262:23
**analysis** 97:4
117:1,22 198:7
210:17 230:10,14
231:3 232:6 233:5
236:18 257:19,22
258:16 260:17,18
260:24 261:13
262:1 275:3
**analyze** 109:11
**anderson** 66:16
66:17 268:11,11
**andrew** 43:5,8
**ann** 41:23
**announcement**
229:2
**annual** 205:12
**answer** 45:4 79:2
84:9 87:21 88:10

104:1 173:14
179:17 182:1
205:1,7 245:22
246:6
**answered** 82:19
**anticipate** 123:12
139:12
**anticipated**
107:12
**anticipating**
247:15
**antithetical** 279:8
**anxious** 114:8
**anybody** 151:10
229:9 235:21,25
237:2,9
**anyone's** 59:19
**anyway** 48:12
79:19 85:16
121:14 221:2
**anyways** 218:23
**apart** 223:17
236:14 238:14
**apologies** 245:20
**apologize** 154:12
**apparent** 138:22
**apparently** 102:4
107:7 115:7 214:7
**appeal** 2:2,9,12
3:2,9,15 4:4,6,13
4:19,24 5:3,20
6:11,14,23 7:7,15
7:18 8:1,4,17 9:3
9:11,19 10:4,12
10:16 11:7,14,20
12:8,10,17,23
13:3 14:9,16,24
15:6,12,15 16:6
16:13,19 17:8,10
17:17,23 18:3,8
19:15,22 20:4,12
20:16 21:6,13,19
22:8,10,17,23

23:3 24:9,16,24
25:6,10 26:2,9,15
27:4,6,13,19 28:3
28:9 29:15,22
30:4,12,16 31:6
31:13,19 32:8,10
32:17,23 33:3
34:9,16,24 35:6
44:4 52:12 53:25
54:6,7,9,13 56:5
59:2 60:3,18
62:10,12,13,23,24
63:9,11 66:1,3
67:11 69:5,25
75:19,21 76:14
79:10 80:14 81:2
81:9,12,19 82:4,9
83:11 85:5 86:6,7
90:7 94:4,5,10
95:3 100:4 102:2
104:8 105:5,11,12
108:1 110:17,18
110:19,21 111:7
114:17 115:16
116:2 118:19
119:4,5 120:11,13
122:4,11 132:13
139:22 140:14
143:21 148:5
152:11 155:15,25
156:8 157:2 158:1
164:14 167:5
190:9 193:10
194:9 196:7 211:3
211:7 213:14,17
214:10 217:13
227:16 228:9,15
230:1 233:23
251:21 252:1
254:10,11,21
255:3,6,24 256:1
256:3,5,10,18
257:5,8,23 258:1

258:8,12 260:18
264:16 265:7,15
266:2,4,10,22
267:8,10,11,20,22
267:24 268:8,19
268:20,23 271:21
273:23 275:1,16
275:17,23 276:25
277:9 279:9
280:22,23
**appealed** 49:14
128:8 255:4,12
**appealing** 84:15
107:10 113:16
114:7 145:4
204:16 211:5
251:19 274:15
**appeals** 62:10,13
62:17,17,19,21
63:2 64:13 72:11
82:15 88:2,5
100:15 102:7,14
104:2 111:5
118:23 120:5
124:8 163:20
164:18 165:2
167:10 205:22
226:5 228:5
253:16 258:5
264:22,23 267:21
268:19 273:25
**appear** 54:1
195:14
**appears** 60:1
78:10 270:23
272:10
**appellant** 119:25
140:4 225:13
**appellant's** 122:4
**appellants** 81:7
106:10 107:25
113:7,9 149:18
157:1 187:25

225:12 228:1
229:10,11 237:24
241:25 243:11,24
244:11 254:23
258:15 266:21
267:18 269:22
270:8 276:20
**appellate** 62:8
63:23,25 64:16,25
67:1 68:12,13,15
68:18 70:25 86:17
87:3 90:23 93:12
95:6 101:17 107:9
108:12 110:5,13
114:10 125:7
136:11,17 146:1
150:1,23 151:8
152:23 153:2
172:1,2 189:2
210:8 227:7
238:14 240:1,2,5
269:9 271:18
278:11,24 279:1
**appellees** 48:18
48:22 113:7,9
115:2 143:4
145:17 169:11
173:16 188:3
189:12 215:12
225:25 249:1
269:1,21 276:21
277:21 280:20
**appellee's** 279:5
**appetite** 109:6
**applauds** 208:23
**apples** 108:3
**applicable** 152:17
172:22 258:14
**applicant** 230:15
233:13
**applicants** 233:21
235:10 239:11,18

**application**
232:21,22 238:23
**applications**
185:24
**applied** 119:6
**applies** 57:15 58:7
58:17 136:14
184:18,19,25
263:20
**apply** 71:23 76:24
88:4 136:18
224:23 246:12
259:7 263:11
**applying** 125:22
**appointed** 86:11
207:20
**appreciate** 84:1
98:14 115:1 154:3
**apprehension**
123:22
**approach** 66:23
**approaching**
79:12
**appropriate** 46:3
46:11 62:25 90:21
155:21 246:9
268:16 270:13
**appropriately**
69:13 264:15
**approvals** 173:4
**approximately**
202:13 205:9
212:5
**appx** 265:13,20
**ardavan** 41:11
**area** 168:23
252:18
**aren't** 253:25
**arguable** 152:20
**arguably** 51:22
167:15 168:5
181:21 217:20

**argue** 72:21 73:3
74:2 76:23 77:2,7
79:13 98:8 123:23
124:2,4,9 143:4
164:18 168:24
173:20 176:7
188:3 191:9 203:1
205:21,23 206:1
211:24 242:6,9
264:20 269:8
**argued** 63:20 65:2
72:18 124:20
138:11 213:19
258:21 263:22
264:6
**argues** 214:3
**arguing** 52:1,11
104:17 112:11,11
143:22 165:8
**argument** 45:1
51:1 55:7 56:4
59:10,13,25,25
60:21 61:9 70:13
70:23 73:15 74:15
76:6 77:11 81:11
83:15,24 84:12
86:7 92:25 96:20
97:7 98:16 99:5,8
103:24 105:18
116:3 117:7
119:12 123:8,15
128:15,17 129:4
130:1 133:1,5,10
133:11 138:6
140:8 148:15
152:13 153:1,18
173:10 183:18
187:17 188:8,9,19
189:5 199:15
201:6,21 202:25
207:13 208:18
216:14 221:6
229:12,13 231:1

239:3 243:7
245:14 252:8
258:16,16,17,20
260:9 268:3,5,24
269:2 277:25
279:21
**arguments** 60:4
67:19 103:12
104:4 118:3
122:21 126:3
146:15 164:14
170:7 206:5
207:17 222:3
230:25 243:9
248:9 251:20
260:19,22,23
261:5 270:3
279:16
**arik** 39:14 191:8
201:11 220:23
**arises** 96:8
**arising** 109:13
**arkansas** 195:5
196:16,20 197:2,7
197:10,12,16
198:2,11
**arm** 210:12
**arrived** 197:9
**art** 1:25
**artakeback.org.**
197:3
**article** 197:6
**articles** 197:6
**articulate** 167:20
236:9,9 238:22
**articulated** 180:3
193:20 235:17
258:19
**articulation**
232:18
**aside** 235:7
**asked** 63:19,24
64:1 73:12 78:4

84:5 154:16
157:10,11 166:7
166:25 197:10
206:23 211:6
267:20
**asking** 45:20 46:8
46:19,22 64:15
72:14 77:2 83:8
98:15 101:15
107:11 134:22
154:17 171:6
178:13 186:13
200:8 202:10
250:21 280:15
**asks** 267:23
**aspect** 150:2
**assert** 88:17 247:3
**assertable** 280:10
**asserted** 48:5
88:18 89:7 198:18
233:1 262:3
**assertions** 279:17
**assess** 130:23
**assessment** 54:7
69:6 70:9 97:20
98:7 128:16 140:6
160:23 256:24
275:21
**asset** 74:17 90:16
281:11,13,14
**assets** 74:12,13
78:24 151:9,20,22
152:9,10,21,24
153:5,22,22
172:23 173:5
**assistance** 100:1
**associated** 144:1
**association** 3:22
12:3 17:3 22:3
26:22 32:3 81:5
198:10 257:20
**assume** 55:4 60:3
93:6 161:2,5

182:20 246:16
**assumes** 125:15
**assuming** 87:12
171:1,24 182:16
186:21 207:3
225:10,14 247:1
**assumptions**
198:5
**assurance** 198:21
**assurances** 97:14
**assuring** 238:15
**atkinson** 40:23
**attached** 50:14
176:11 198:18
199:8
**attack** 65:20
83:22 231:12
**attempt** 206:24
232:2
**attempted** 109:1
121:18 206:15
264:20
**attempts** 94:24
**attest** 189:21
**attorney** 37:1,2
37:16 39:2,16
155:8,8 203:1
204:13 206:7,22
207:1
**attorney's** 200:2,3
**attorneys** 36:4,12
36:19 37:9 38:2,9
38:16 39:9,17
40:8 105:19 137:1
139:25 203:8
204:16
**august** 209:15
237:22 266:19
**authority** 63:21
63:21 79:6 250:4
278:5
**authorization**
80:10 231:19

**authorized** 83:17
84:11 231:16,17
**authorizes** 80:7
**authorizing** 5:9
18:14
**automatic** 6:21
7:4
**automatically**
62:7 127:4
**available** 46:22
114:4 159:7
180:23 192:9
212:11 213:4
230:7 243:22
245:6 271:5
**avenue** 36:20
37:10,17 38:3,10
**avenues** 227:7
**avoid** 72:10
101:23 202:8
**avoiding** 111:12
112:3 114:10
**awarded** 239:7
**aware** 60:6 90:12
97:17,19,20
109:18,20 125:18
150:17 152:14
**awful** 103:12
**awkward** 67:12

**b**

**b** 1:21 62:9
133:24
**b.r.** 66:7,8,10,13
66:17 70:6 154:5
224:11 256:6,8,12
256:13 257:10
266:12,14 267:2
267:17 268:11
277:1
**babies** 3:11 11:16
16:15 21:15 26:11
31:15

**back** 54:11 74:23
82:13 92:10
113:13 121:23
122:6 123:21
137:7 140:12
141:4 156:2,20,24
157:22 166:21
167:17 169:3
170:2,14 172:15
175:16 176:13
178:8,9 179:15
183:12 199:15
205:13 217:17
218:5,22 234:16
249:12
**bad** 206:3 238:10
**balance** 48:23
51:7,14 52:24
58:2 70:8,9 85:16
85:18 113:3
121:16,16 125:16
136:10 144:3
189:6 200:24
201:7 221:25
222:22 227:5
250:9 256:18,24
276:2
**balanced** 230:16
233:4,13
**balances** 188:20
**balancing** 91:1
94:4 103:10 108:6
113:13 178:23
217:10 250:7
266:15 277:7
**ball** 40:24
**baltimore** 37:4
**bank** 66:16 81:5
268:11
**bankr** 66:7,9,10
66:12,14 70:7
81:15,15 256:6,8
256:15 262:10,10

266:25,25
**bankruptcy** 1:1
1:12,23 2:12 5:4
5:20 6:15 7:19 8:5
10:5,12 28:10
61:12,24 62:6,7
63:2,5,6,9 64:9,11
65:23,24 66:2,18
76:1 81:12 86:12
93:25 111:4,15
129:14 154:23
155:17 199:22
203:14,22 221:10
224:11 226:25
229:25 230:2
234:24 245:2
259:17,17 260:7
263:16 265:7,19
266:7 268:7,7,13
269:20 273:18,19
277:19,19 280:1,5
**bap** 61:25
**bar** 150:18
**bare** 153:7
**bargained** 272:18
**bargaining**
272:19
**barker** 40:25
**barking** 221:13
**barnes** 3:21 12:2
17:2 22:2 26:21
32:2
**based** 53:9 55:14
57:19 68:13 71:17
71:20 74:2 77:6
89:1,8 97:20
113:20 119:4
123:23 125:25
126:5,6 127:22,24
128:15,20,25
129:8 130:3,17
132:8 135:13
143:4 160:23

164:2 173:21
217:6 225:14
230:15 241:16
250:19 257:23
261:13,19 268:2
269:2,10,13
279:17 280:11
**baseless** 249:8,10
**basic** 277:22
**basically** 56:17
103:13 172:5
217:19,21 221:12
278:22
**basics** 139:9
**basis** 67:15 72:22
73:14 78:4 81:13
82:7,24 83:20,22
97:16 107:17
116:3 117:7 124:4
128:7 136:3 140:4
140:18,24 147:25
149:5 151:12
188:5 225:13
226:2,7,20 237:5
253:12
**bass** 20:17 40:14
44:9 146:17,17,18
146:21,23 154:8,9
154:11,14,21
155:2,7,11,19,23
156:3,6,11 254:25
**battle** 91:18
**becoming** 243:13
**beeman** 265:9
**began** 86:5
**beginning** 65:16
187:9 228:12
229:22 242:19
**behalf** 2:14,19,23
3:4,10,17,21 4:7
4:15,20,25 5:5,22
6:16,25 7:8,12,20
8:6,12,18 9:4,12

9:15,20 10:6,13
10:18,23 11:3,9
11:15,22 12:2,11
12:19,24 13:4,19
14:4,10,17,25
15:2,7,12,16,22
16:2,8,14,21 17:2
17:11,19,24 18:4
18:10 19:10,16,23
20:5,8,13,22 21:2
21:8,14,21 22:2
22:11,19,24 23:4
23:20 24:4,10,17
24:25 25:2,7,11
25:17,22 26:4,10
26:17,21 27:7,15
27:20 28:4,11
29:4,9,16,23 30:5
30:8,13,22 31:2,8
31:14,21 32:2,11
32:19,24 33:4,20
34:3,10,17,25
35:2,7 39:2 65:14
71:10 92:24
146:25 189:14
191:5,9 195:8
198:10 201:11
225:20 227:19
231:16 238:21
243:1 246:20
247:25 279:24
281:2
**belabor** 202:12
205:4
**belief** 129:12
192:15
**believe** 44:10
46:15 47:25 53:20
59:23 66:22 70:1
80:6 83:17,19
84:10 85:15 87:11
87:11 89:14 90:24
97:3 100:20

101:20 102:18
103:4,7,24 105:20
106:12 113:17
121:10 143:3
147:15 148:5,17
149:2 185:21
190:16 198:8
200:19 207:16
211:19 215:16
236:10 251:18
255:12 258:8,13
260:8,21 261:5,23
262:25 263:6,13
263:24 264:3,11
264:13 267:8
268:3,16 270:13
271:1,12,19 272:3
273:20 275:13
277:2,5,17 278:7
279:7,7 280:4
282:3
**believed** 105:21
276:23
**believes** 127:21
129:8
**believing** 128:7
**bell** 74:25
**belong** 69:12
**ben** 44:23
**bench** 6:1 13:8
18:21 23:8 28:15
33:8 178:3 260:8
**benedict** 41:1
**benefit** 82:25
84:14 92:17 109:8
109:19 116:20
120:23 152:9
219:5 222:19
244:1 249:3
273:12 275:23
**benefits** 101:25
105:13 146:7
222:21 264:8

**benjamin** 36:8
37:20 54:20 157:6
163:11
**bernard** 41:11
**bernhoff** 206:18
**bernie** 65:14
**best** 92:1 130:23
141:19 150:6
230:2 236:8 240:8
260:25 281:21
**beth** 36:9 41:23
44:24 63:17 67:24
248:11
**better** 63:13
101:25 122:10
125:10,10 222:15
**beyond** 58:4 61:9
63:11,16,19 92:2
112:11 114:6
133:14 153:16
189:7 217:25
234:20 240:5,20
259:11 266:10
280:17
**bgi** 265:9,10
**bickford** 41:2
**big** 145:4 168:25
206:1 207:16
209:6 227:11
228:14 237:5
**biggest** 208:2
212:8 237:8
**bill** 48:2
**billion** 92:12
205:13 208:22
209:3,8,14,17
212:5,6 213:15
223:7 232:20
244:18 249:7
272:24
**billions** 220:22
241:3 243:20
244:24

**bind** 73:8,9
**binder** 271:11
**binding** 59:1,14
**bit** 50:3 82:13
  84:3 187:13 202:8
  241:24
**bizarre** 59:13
  115:8
**blabey** 41:3
**black** 173:22
**blackletter** 58:16
**blackline** 8:1
**blacklined** 282:2
**blame** 204:10
**blaming** 203:17
  248:24
**blasio** 257:20
**blatant** 55:9
**blatantly** 220:5
**blazing** 103:14
**blood** 180:5
**bludgeon** 105:16
**blue** 3:21,21 12:2
  12:2 17:2,2 22:2,2
  26:21,21 32:2,2
**board** 223:25
**boards** 78:1
  147:24
**body** 238:3
**bona** 259:12
**bond** 52:17
  118:15,18 119:5,6
  119:8,25 120:12
  120:13 122:3
  135:22,24 152:14
  152:22 153:2,13
  153:25,25 188:21
  201:7 224:17,19
  225:4,5 227:6
  233:18,19,22
  239:2,8,10,18
  240:4,9,19,24
  241:11,12,14,16

  242:16,16,18
  250:4 276:19,20
  276:24,25 277:3
  277:14,17 278:6,7
  278:11,13
**bonding** 120:15
**bonds** 119:15,19
  233:24 235:20
  277:23
**boneheaded**
  209:16
**booted** 111:8
**bound** 84:3
  259:22
**bounty** 237:11
**box** 247:5
**brauner** 41:4
**breach** 89:16
  232:13
**breached** 89:18
**breaching** 89:3
**break** 156:19
  157:19
**breath** 136:25
**breathless** 55:15
**brian** 7:20 8:6
  15:16 18:10 37:6
  42:4 48:9 251:15
**briccetti** 81:5
**bridgeport** 39:4
**brief** 55:17,21
  58:22 61:16 71:21
  79:7 89:4 148:21
  154:18 156:21
  184:1 189:5
  199:15,17 214:7
  220:10 230:11
  247:2 248:8,9
  252:8
**briefing** 109:21
  109:24 115:15
  149:1 154:16
  155:14 255:5

**briefly** 60:8
  145:16 147:2
  158:4 219:23
  225:18 229:6
  243:2 248:13
  255:23 257:16
**briefs** 55:24 94:9
  103:4 211:5
**bring** 102:22
  193:24 195:10
  203:8 215:8 231:8
**bringing** 126:11
  206:2 228:13
**broad** 38:18 71:8
  80:10 119:3
  147:17
**broader** 65:7
  278:10
**broke** 157:11
**brooks** 40:25
**brought** 49:8 63:4
  63:6 203:15 211:2
**brown** 256:15
  257:9
**bryant** 39:10
**built** 167:14,16
**bulk** 52:16 231:7
**bullet** 117:8
**bulletproof** 116:4
  116:12
**bump** 239:23
**burden** 82:21
  171:6,9,11,11,19
  171:22 179:21,22
  179:23,24 184:4
  223:19,20,21
  233:16 256:2,17
  261:7 270:10,21
  270:22 271:13
  272:22 275:25
**burdens** 114:8
  252:16

**business** 55:17
  56:3,10 126:25
  127:6 128:21
  139:16 142:1
  143:5 168:11
**busy** 181:12
  228:25
**butner** 277:22
  280:6
**button** 197:3

**c**

**c** 4:20 9:20 12:24
  15:7 17:24 20:13
  22:24 25:7 27:20
  30:13 32:24 35:7
  36:1 41:18 42:1
  42:20 44:1 62:3
  119:22,23 160:3
  193:5 196:2 283:1
  283:1
**c.d.** 66:7
**cabin** 92:1
**cabined** 70:1
  263:1 264:4
**cabinet** 201:17
**cal** 66:7
**calculable** 135:21
  135:21
**calculate** 135:18
**calculation**
  160:23 240:14
**calculus** 124:25
  230:13 232:23
**calendar** 200:16
  271:4
**california** 44:8
  65:15,16 246:14
  255:16
**call** 163:14,15
  206:18 215:21
  246:18
**called** 157:2,18
  169:19 210:15

248:1 254:14
258:15,16 264:9
**calling** 200:8
**calls** 206:13
**calpine** 81:15
179:25 266:25
**camera** 245:21
**camps** 267:18
**canada** 151:24
153:7,8,11
**canadian** 25:11
25:12 38:16,17
44:8 48:15,24
146:25 147:1,5,11
147:15,25 148:7
148:16 149:18
151:3 152:5,20,24
153:3,5 255:10,22
278:5 279:13,16
279:21,22,22
**canceling** 146:10
**candid** 112:19
253:25
**candidates** 224:3
**can't** 240:7,14
253:19,20,21
**capable** 178:4
**capital** 262:7
**capitol** 39:18
**caplin** 40:7
**care** 54:10 135:19
220:21 235:15
273:6
**carefully** 91:22
197:23 223:1,16
258:6
**carried** 82:21
**carry** 143:11
275:17
**carter** 69:17
**carved** 124:5
165:7

**case** 1:3 38:1 47:8
49:14 50:24 51:1
51:18,21 52:19
53:9 54:23 58:25
59:4,4,5,15 64:4
69:14,15,17 70:18
75:4,5,17,24 76:4
76:10,22 77:25
80:17 84:21 85:3
85:11 86:3 91:21
94:8 100:8 106:6
106:7,17,20,21
107:17 108:9,13
110:19 114:6
115:8 118:17
120:6 128:6
131:18 140:19,20
147:5 151:7,23
153:19 154:5
161:14 166:11
168:12 172:4,7
179:25 182:19,19
183:9 188:9
192:21 203:15
204:11,19 207:14
207:23 208:13
210:3,24 211:2,15
212:2,21 214:8,15
214:20 221:4
227:19 230:15
234:24 235:1
236:17 237:5,8
238:1,2 243:11
245:1 249:20
256:12 257:3
260:13 262:1,5,18
264:12 265:5
267:7 273:18,19
277:5 279:10
**caselaw** 277:15
**cases** 58:21 71:21
71:25 80:23 84:18
89:4,13,21 90:8,9

93:15 103:3
106:19 111:25
119:12,17 154:22
154:25 191:14,15
205:23 210:1,13
224:8,11,22 236:3
254:13 266:14
267:5 268:6,13,19
277:23 279:23
**cash** 142:7 212:14
236:5
**cataclysmic** 201:1
**catastrophe** 99:15
239:24
**catastrophic**
240:24
**category** 69:4
118:25
**caught** 50:3 88:22
**causal** 131:7
**cause** 62:15 72:19
86:2 133:25
137:14,15 143:14
154:1 175:25
177:10 269:3,23
**caused** 91:7 137:5
153:14 203:24
**causes** 89:25
125:4 241:4
272:17
**causing** 95:4
105:22 116:19
**caveat** 238:25
**cayuga** 278:1
**ccaa** 151:24
152:12
**cdc** 197:25 205:6
**cease** 191:15
**cede** 94:11 251:11
**centerpiece**
104:16 105:9
**centers** 205:16
231:4

**central** 58:9 59:5
**cents** 122:1
**century** 91:19
**cert** 67:7 87:17
111:25 230:9
**certain** 2:23 4:3
5:12 11:3 12:7
16:2 17:7 18:17
21:2 22:7 25:11
25:22 27:3 31:2
32:7 38:16 44:8
74:6,6 79:11 98:5
101:12 107:3
117:17 134:10,16
139:10 146:25
147:7 185:24
192:16 195:15
213:13 214:11
234:2,7,22 237:20
238:5 239:25
254:15 255:9
258:13,22 259:19
**certainly** 57:9
64:14 68:9 69:15
77:16 87:17 92:24
102:24 103:7
109:16 114:1
117:11 119:6
126:24 128:1,4,6
128:14 132:6
135:6,18 148:20
149:18 150:9,9
151:3 168:15
178:8 182:18
225:7 246:7
247:21
**certainty** 87:25
**certificates**
197:13
**certification**
104:8 110:21
246:5 247:6

certified 283:3
certiorari 61:22
  87:15 136:12
cetera 78:2
challenge 199:7
challenges 134:15
chambers 40:2
  249:1
chance 77:18
  138:11 207:7
  213:24
change 73:23
  148:13 160:10
  176:24 181:21
  190:12 193:13
  194:12 196:11
  197:18 219:2
  226:11 237:17
  258:18
changed 141:5
  206:20
changes 226:12
  238:5 282:2
changing 138:17
  141:3 142:5,7
  145:1,2,2 246:9
chapman 70:6
chapman's
  257:11
chapter 6:2,6 13:9
  13:12 18:22 19:2
  23:9,13 28:16,20
  33:9,13 81:9
  128:6 241:20
  254:13 266:23
character 125:13
characterized
  256:4,5
charged 106:8
  251:18
charter 84:20
chateaugay 84:21

check 234:15
  247:5
checking 250:17
chen 41:5
cherry 223:14
cheryl 8:15 14:7
  19:13 24:7 29:13
  34:7 40:15 193:5
child 244:9
children 135:20
  243:7,18 244:2,23
  245:3
children's 3:7
  11:12 16:11 21:11
  26:7 31:11
choice 91:11
  92:20
chose 110:21
  204:23
chris 227:18
christmas 217:23
christopher 4:7
  12:11 17:11 22:11
  27:7 32:11 38:6
  42:15
chubb 262:15
cia 213:2,3
cil 262:9
cir 121:14 257:2
  257:21 262:16
  265:11,13 267:4
  277:25
circle 40:9 123:14
  123:21
circuit 57:14 66:1
  69:15 73:8,22
  75:5 76:10 82:25
  84:23 85:5,11
  86:9 102:15
  109:23,25 110:2
  110:20,22 111:22
  217:14 228:15,16
  230:9 232:7 236:8

241:18 242:10
  258:14,18 259:18
  260:10 262:1,13
  262:20 264:25
  265:14 269:10,18
  275:16 280:6
circuit's 84:2
circuits 76:12
circumstance
  118:22 120:4
  149:23 150:1
  151:18 152:18
  265:15
circumstances
  73:24 90:10
  119:18 169:24
  204:19 210:20,23
  256:11,15 271:13
citation 262:14
citations 45:16
cite 59:1,4 140:19
  196:15 210:4
  232:2 267:2
cited 89:4,13
  148:23 149:7
  197:15 210:13
  224:22 249:24
  268:6,12 277:24
cites 58:22 81:14
  120:17 197:6,25
citing 224:20
  258:25 260:9
citizens 203:17
  204:20 222:16,19
civil 199:21 211:7
  212:13 220:20
  252:14,17,24
  277:16 281:6,9
cla 111:13
claim 90:16,17
  91:13 92:8 147:25
  149:6,9 150:24
  152:15 212:20

213:11,15 230:20
  232:8,11,12,13
  236:21,25 261:15
  261:20 262:24
  272:23 279:23
  281:9
claimant 209:12
  212:21
claimants 2:20
  8:13 10:25 13:21
  14:5 15:24 19:11
  20:24 23:22 24:5
  25:19 29:5,11
  30:24 33:22 34:5
  93:4 187:13
  202:16,18 209:4,9
  211:11,12 213:16
  213:18 217:3
  221:22 231:5
  244:19 255:11
  261:8,21 276:18
  278:19 279:9,16
  279:22,22,24
claimants' 255:22
  279:13,21,25
claims 68:16 69:9
  69:12,19,20,25
  82:14 85:25 87:5
  87:6 88:14,20,24
  88:25 89:1,5,7
  90:13,13,14 91:3
  91:3,9,25,25 92:9
  92:16 93:14 94:2
  102:24 108:19
  125:14 136:21
  137:3 147:11,16
  147:17 148:7,16
  211:7,8,9 212:18
  213:22 230:23
  231:8,24 232:3,9
  232:9,18,19,19,24
  238:22 258:22,24
  259:6,7,8,19

261:2,9,11,18,22
261:23 262:1,2,17
262:19,25 263:5,7
263:21,23 264:2,2
272:15 275:9
280:9,9,10,10
clarification
281:5,16
clarified 114:17
clarify 45:24
46:10 92:14
112:16 113:15
250:24 281:11
clarity 74:8 86:18
clash 226:24
class 90:11 92:9
244:8
classic 232:10
classification
259:15,25 260:22
claudia 42:24
clause 139:9,10
213:13 258:23
cleaner 97:11
99:9
cleanest 184:22
clear 46:6 48:17
57:12 59:12 61:18
77:21 92:2 96:8
96:11 100:23
101:14 131:16
136:20 145:13
164:4 165:18
171:25 173:8
185:18 190:16
192:11 193:18
194:17 208:5
211:1 213:4
218:15 221:8
224:22 239:5
243:11 244:4
255:1 258:13
261:10 262:13

263:1 265:3
268:22 270:6
272:3,17 274:20
277:4 278:14
clearly 51:11,20
53:12 60:19 63:2
73:24 83:19 96:6
105:6 127:24
138:22 220:16
223:12 259:17
260:24 261:7
266:20 267:20
270:7 271:9
cleavon 103:16
clerk 5:12 18:17
200:8
clerk's 157:23
client 247:19
client's 131:18
clients 93:3
108:23 131:23
149:6 151:21
152:10 153:21
154:1 247:3,13
248:5 253:23
client's 250:9
close 214:12 223:6
269:16,18 276:9
closed 104:22
closely 53:15
closer 135:2
closure 237:1
cloud 223:23,23
cmfn 152:15
code 86:15 139:11
142:12 245:2
263:16 265:19
269:20 277:19
280:1
cohen 38:8
colin 40:17 196:2
227:8

collateral 57:13
57:14 58:6,14,17
58:20 59:6,10
colleague 44:24
191:8
colleagues 146:4
collectability
121:11
colloquy 160:15
190:17
colorable 149:5
columbia 204:17
combat 243:21
273:13
come 60:18 72:12
74:23 77:18
101:25 123:3,7,13
146:18 150:24
151:10 166:21
167:17 169:3
170:2 172:15
175:21 177:9
179:15 231:17
232:1,16 233:21
238:4 241:10
247:20 249:22
250:13 269:16
comes 75:5
108:18 177:6
184:24 185:7
217:11,11 241:4
246:13 275:14
comfort 170:16
174:8
coming 49:4
104:12 117:2
139:24 161:19
188:25 208:18
209:7 215:19
228:17 235:3
236:4 269:18
comley 39:1 65:22
122:18 186:7

commencement
273:18
comment 120:4
249:14 250:23
254:4 281:2
comments 253:25
254:8 281:5
commit 242:8
commitment
124:1 225:12
278:25 280:19
committed 88:1
225:12 236:22
committee 2:19
3:1,4,7,8,11,14
4:5,23 8:12,16,19
9:2,5 10:24 11:6,9
11:12,13,16,19
12:9 13:2,20 14:4
14:8,11,15,18
15:23 16:5,8,11
16:12,15,18 17:9
18:2 19:10,14,17
19:21,24 20:23
21:5,8,11,12,15
21:18 22:9 23:2
23:21 24:4,8,11
24:15,18 25:18
26:1,4,7,8,11,14
27:5 28:2 29:4,10
29:14,17,21,24
30:23 31:5,8,11
31:12,15,18 32:9
33:2,21 34:4,8,11
34:15,18 37:9
39:9,17 93:3
119:21,22 120:8
137:16 189:15
191:5 201:12
202:6 214:14
221:21 222:4
223:24 224:21
243:1,5 244:4

276:17 278:18
**committee's** 8:9
10:21 13:17 14:1
15:20 19:7 20:20
23:18 24:1 25:15
29:7 30:20 33:18
34:1 191:2
**committee's** 2:16
**committing** 237:9
237:24
**common** 88:21
89:6
**communications**
137:18 266:12
277:1
**community**
111:17 191:20
205:16 207:24
**companies** 99:11
213:8
**company** 58:9
126:18 129:9
182:20 219:5
262:15 266:14
267:1 273:12
**company's** 89:17
**comparison**
107:21
**compel** 235:25
**compelling** 103:4
114:18
**compensate** 245:3
**compensated**
241:13,16
**compensation**
85:25 207:21
212:17,23 213:2
230:24 231:1
243:17 244:16,23
**compete** 93:2
**competent** 128:1
**competition**
147:16

**complaint** 232:17
250:2
**complaints** 89:4
91:18 232:2,10
250:1
**complete** 82:14
163:3,17 167:7
252:23 253:17
**completely** 52:3
54:24 55:2 59:16
96:7 108:2 151:8
192:11 220:25
**complex** 123:12
**complicated**
51:12 69:10 108:3
112:9 266:7
**comply** 49:17
213:2
**component**
110:15 114:1
210:12
**comprehensive**
73:23 280:4
**comprehensively**
260:22
**compromises**
266:9
**computer** 248:12
**concede** 60:13,20
60:22 75:18,21
102:16
**conceded** 51:1
60:21 185:25
229:9
**conceivably** 61:21
265:8
**concept** 143:2
**concern** 63:10
71:13,16,19 72:2
73:3,4 74:3 78:24
84:2 106:13
114:13 118:1
149:13 151:2,16

176:6 177:4 179:4
259:21
**concerned** 48:4
64:24 71:3 73:16
74:19 76:9 88:17
181:22 185:10
258:20 259:2
273:7
**concerning** 46:17
**concerns** 46:2
73:6 75:1 117:21
177:8 217:21
226:24 259:20
**concession** 52:9
52:11,20,20 56:17
56:18 57:7 58:6
59:22,24 60:15
**concessions** 164:7
167:7
**conclude** 188:9
270:11
**concluded** 56:11
123:13 125:9
249:3 282:6
**conclusion** 63:23
63:25 189:2 228:7
**conclusions** 6:5
13:11 19:1 23:12
28:19 33:12
236:10 240:22
**conclusory** 126:3
126:20
**concrete** 56:12
146:11 253:6
**concretely** 109:11
109:14
**concurrent** 97:2
**condition** 95:21
109:24 119:24
215:1,11,17
225:11,24 270:2
280:17

**conditions** 49:18
77:25 172:19
176:11 187:19
189:11 213:13
215:9,10 225:3
226:17 227:23
228:1 229:17
233:10 239:12
241:22,22,24,25
242:13 271:20
278:20,21 279:4,6
279:11
**conduct** 89:2,17
**conducted** 230:11
**conference** 7:11
45:14,23 201:18
249:1
**confess** 70:17
**confident** 105:10
**confine** 268:3
**confirmation** 2:11
4:12 5:2,19 6:1,13
6:21 7:5,17 8:3
9:10 10:3,11
12:16 13:8 14:23
15:15 17:16 18:7
18:21 20:3 22:16
23:8 24:23 27:12
28:8,15 30:3
32:16 33:8 34:23
44:5 55:25 74:5
78:19 79:19,19,24
80:7,9 81:8 89:22
92:24 96:7 101:9
104:21,22 106:8
106:24 114:16
123:6 124:10,16
124:17 128:8
155:15 156:1
157:2 158:9
164:18,21 165:20
172:18 173:11
177:14 201:2

204:1,17 208:9
209:16 210:7
211:5,6 222:14
236:23 238:6
244:14 247:12
254:22 255:3
260:13 266:22
279:19
**confirmed**  148:9
**confirming**  6:6
13:12 19:2 23:13
28:20 33:13
254:12
**conflicts**  259:23
**confuse**  203:16
**confusion**  165:21
184:22
**congress**  121:7
**congressional**
46:17
**congressionally**
86:11
**conjectural**  77:4,6
**conjecture**  164:10
164:11
**conm1ittee's**  29:1
**connecticut**  15:11
39:2 44:8 65:5,19
65:22 122:18,21
136:5 137:1
142:11 147:3
156:15 157:13
158:12 186:8
190:18 191:25
192:5 195:3,15
198:17 207:5
209:6 254:20
274:13
**connecticut's**
255:17,19
**connection**  55:22
96:10 97:15 131:7
159:23 160:7

194:8 196:6
260:12
**connections**  193:9
**consensual**
111:16 176:19
248:19
**consensus**  236:3
**consent**  68:17
87:5
**consenting**  214:4
**consequence**
103:1,2
**consequences**
124:7 125:3 137:5
205:14
**consider**  56:13
104:25 115:19
117:11 125:2
155:25 212:2
250:6,7
**considerable**
52:10
**consideration**
79:6 96:3,4 144:2
152:4 264:14
265:24
**considerations**
69:11 75:23
268:18
**considered**  68:6
91:17 250:5 261:1
266:15
**considering**
132:16 155:22
225:2 250:23
**consistent**  66:23
95:10 120:16
272:21 280:13
282:3
**consistently**
197:15
**consla**  41:6

**consolidated**
119:5 156:8
**constituencies**
228:18
**constituents**
131:13
**constitute**  53:12
73:5 141:11,12,14
176:8 265:23,24
**constituted**  99:11
**constitution**  86:14
**constitutional**
75:22 76:7 116:14
138:18 150:3
230:22 232:23
**constrained**
220:17 279:18
280:7
**construct**  184:3
**constructed**
223:16
**consult**  247:19
**consumer**  88:18
88:20 89:5 232:12
263:11
**consummatable**
238:16,16
**consummate**
96:14,25 229:15
233:6 235:23
239:15,17 241:17
**consummated**
71:2 75:6 76:12
82:2 84:12 85:14
85:15 264:23
265:14,19
**consummation**
73:20,22,25 76:19
77:22 85:8 96:16
97:6 173:1 269:19
**consummations**
143:19

**contain**  105:3
126:2 185:9
**contained**  122:8
**contains**  213:12
**conte**  20:7
**contemplate**
65:25 79:20 215:6
230:7 280:7
**contemplated**
96:6 97:21 99:17
101:19 105:6
**contemplates**
124:16 215:7
**contemplating**
226:16 233:8
240:20 245:16
**contend**  65:25
125:1
**contended**  252:11
**contends**  214:14
**contention**  54:22
**contested**  76:14
**context**  51:6,16
55:11 57:5,8
59:23 60:23 61:23
71:24 86:3 91:1
92:4 94:23 107:11
117:9,10 125:23
176:18 186:2
240:21 260:2
**contingent**  2:20
8:13 10:24 13:20
14:5 15:23 19:11
20:23 23:21 24:5
25:18 29:5,10
30:23 33:21 34:4
221:21
**continue**  83:19
168:10 225:14
**continued**  62:16
82:4 124:22
**continues**  62:18

continuing 141:23
234:23 278:25
contours 142:17
contradiction
76:20
contrary 70:11
98:15 115:8
167:11 222:18
272:4
contrast 231:17
contrasted 274:25
contribution
153:9
contributions
99:13
control 63:22
174:11 228:14
263:10
controlled 106:10
controlling
147:21,24
controversies
75:24
convenience
107:2
conversation
78:25 240:17
conveyance
212:10
convicted 124:21
127:3
convince 103:17
cool 235:7
coordinate 106:4
coordinated
106:2
copy 49:24 50:1
corp 70:6 81:15
256:6 259:1
262:15 266:12,25
267:17 277:1
corporate 89:25
99:15,22 107:3

147:19 148:12
corporation 256:8
corporations
147:22
correct 46:5 47:15
90:25 97:4 123:17
127:2 145:18
160:5 180:20
181:25 215:3,25
216:2 219:18
247:25 266:20
corrected 56:25
57:10
correctly 215:14
251:4 277:2
corresponding
244:1,7
cost 121:24
139:20 143:22
178:11 205:12
209:14 234:23
costs 122:8 135:18
143:25
coterminous
184:23 212:1
couched 115:9
could've 106:2,5
107:6 112:1
counsel 67:21
95:19 136:16
175:15 246:18
276:17 278:18
count 132:6
171:24
counterfactual
231:2
countervailing
107:24 115:3
counties 198:11
countless 191:14
country 111:17
243:14 244:17
265:1 283:21

counts 108:18
131:17,24 274:5
couple 45:22
130:21 184:1
186:22 187:11
224:8 248:15
coupled 80:24
course 51:19
58:21 62:1 64:25
80:6 81:13 86:8
87:16 93:22 104:3
104:11 115:10
125:20 136:15
156:14 163:13
188:1 191:15
202:12 208:4
243:16 264:22
265:17,21 270:24
276:20 278:24
court 1:1,12 44:2
45:5,10,20 46:1
46:13 47:1,6,10
47:19,23 48:8,11
48:15,16,19 49:2
49:12,17,18,21,24
50:1,7,8,10,17,19
50:22 51:17,20
53:8,13,21,21
55:13,21 56:9,16
57:17 59:3,6,9,20
60:9,15,19 61:4,6
61:8,22,25,25
62:2,4,6,10,12,13
62:17,18,21 63:2
63:5,6,9,16,20
64:3,9,11,18,19
64:23 65:3,11,11
65:13,17,19,24,25
66:5,18 67:7
68:19 69:10,16,19
71:16 72:5,9,14
72:24 73:18 75:3
75:16 76:4,15,25

77:2,11,18,20,21
79:13,18 80:2,5
80:17,20,22 81:10
82:16,18 83:14
84:6,8,10 86:7
87:8,9,10,13,16
87:17,19,23 88:3
88:4,5,9,16,23
89:10,21 90:24
91:12,14,16 92:23
93:17,20 94:6,13
94:17,19 95:7,12
95:13,15,18 96:1
98:14,25 99:6,7
101:9 102:9
104:10,12 105:1
107:12,14,19,24
108:5,13,23
109:22,25 110:6
110:19,22 111:4,4
111:19,21,24,25
112:13,14,24
113:1 114:20,25
116:5,6,7,8,10,12
116:17,23 118:5
118:12,14 119:20
119:21 120:7,14
121:3,5,12 122:9
122:9,12,16,19
123:15,18,20,25
125:1 126:24
127:14 128:12,15
128:18,20 129:1,5
129:7 130:4,6
131:14,16,21,23
132:1,3,11,13,20
133:7,9,17,19,22
134:2,19 135:16
136:11,12,19
137:9,11,21,23,25
138:2 139:5 140:3
140:6,15,18,22,24
141:6,8,10,16,18

**A.1151**

| | | | |
|---|---|---|---|
| 142:6,8,10 143:2 | 182:14,16,16,21 | 266:10,20 267:22 | **covered**  82:16 |
| 143:17,20 144:4,6 | 183:2,10,20,25 | 267:24 268:10,22 | 145:25 146:2,3 |
| 144:8,12,14,17,19 | 184:7,9,16,18,20 | 269:6,9,10 270:14 | 155:17 |
| 144:21 145:3,7,10 | 185:2,6,12,14,16 | 270:17,21,25,25 | **create**  97:13 98:9 |
| 145:18,25 146:2 | 186:5,9,12,21,24 | 271:4,8,14,16 | 98:21 101:2 |
| 146:16,19,22 | 187:3 188:5,24 | 275:19 276:22 | 111:11 138:13 |
| 147:13 148:14,19 | 189:17,19,22,24 | 279:2 280:8 281:3 | 240:8 |
| 149:2,4,20,23 | 190:4,7,14,22,25 | 281:11,16,17,19 | **created**  148:11,12 |
| 150:1,2,16 151:6 | 191:7,23 192:4,6 | 281:23 282:5 | **creates**  223:22 |
| 151:24 152:4,5,12 | 192:11 193:5,8,15 | **court's**  44:5,5 | **creating**  103:21 |
| 153:5,13,21,24 | 193:24 194:5,7,14 | 48:14 61:17 62:6 | 138:9 184:22 |
| 154:4,8,10,13,20 | 194:22,24 195:11 | 62:7 63:11 64:1,9 | **credibly**  211:24 |
| 154:23 155:1,5,10 | 195:22 196:2,5,13 | 64:10 67:2,6 70:9 | **credit**  66:16 71:6 |
| 155:13,20,24,25 | 196:17,21,24 | 70:20 71:23 72:17 | 81:10 268:10 |
| 156:4,7,12,24 | 197:17,21 198:14 | 77:17 83:9 109:17 | **creditor**  5:10 |
| 157:8,10,20 158:3 | 199:5,12,22 200:7 | 163:15 164:24 | 18:15 152:23 |
| 158:8,23,24 159:3 | 200:8,11,23 201:9 | 166:1 167:5 | 162:9 204:25 |
| 159:6,9,11,14,16 | 201:14,16 202:1 | 170:23 182:12 | 207:8 210:14,22 |
| 159:19,21 160:3,6 | 204:10 214:24 | 187:18,20 189:9 | 211:16,20 228:18 |
| 160:12,18 161:2,4 | 215:3,5 216:2,7 | 203:22 215:13 | 235:3 238:3 |
| 161:7,8,16,18 | 216:25 217:18 | 217:13 224:15 | 249:15 251:21 |
| 162:2,13,24 163:3 | 218:16,25 219:10 | 227:3 230:7 237:4 | **creditors**  3:2,5,9 |
| 163:10 164:3,14 | 219:14,16,19,22 | **courts**  47:11 | 3:15 4:3,5,23 8:16 |
| 164:17,18 165:2,4 | 220:1,12,16 221:2 | 53:20 54:3,6,10 | 8:19 9:2,5 11:7,9 |
| 165:6,12 166:6,16 | 221:17,23 223:13 | 63:5 69:21 75:6 | 11:14,20 12:7,9 |
| 166:18,20 167:10 | 224:6,9 225:1,8 | 75:23 81:17 82:7 | 13:2 14:8,11,15 |
| 167:18,21,25 | 225:10,19 227:17 | 84:19 85:1 86:17 | 14:18 16:6,8,13 |
| 168:3,13,17,19,22 | 227:25 228:4,8 | 87:25 105:16 | 16:19 17:7,9 18:2 |
| 169:8,10 170:18 | 229:25 230:2 | 109:12 112:23 | 19:14,17,21,24 |
| 170:21 171:4,8 | 232:7 233:9 236:1 | 181:13 210:20 | 21:6,8,13,19 22:7 |
| 172:10,16,20 | 236:7,7 238:14 | 257:7 260:10 | 22:9 23:2 24:8,11 |
| 173:1,13,15,18,20 | 239:13 240:9 | 262:2 265:2,2 | 24:15,18 25:12,12 |
| 173:24 174:12,17 | 242:6,6,21,24 | 267:5 268:13 | 26:2,4,9,15 27:3,5 |
| 174:25 175:3,14 | 243:3 245:10 | 277:16,19 | 28:2 29:14,17,21 |
| 175:19,24 176:13 | 246:11,17,21,24 | **court's**  250:22 | 29:24 31:6,8,13 |
| 176:15,20,22 | 247:9,16,16,22 | 253:10 254:12,13 | 31:19 32:7,9 33:2 |
| 177:13,15,17,22 | 248:7,24 250:6 | 258:4 260:1 | 34:8,11,15,18 |
| 177:23 178:2,9,9 | 251:1,2,5,6,13 | 262:18 268:8,9,15 | 38:16,17 39:9 |
| 178:14,15,17,21 | 252:3,6 253:20 | 268:20 269:5 | 44:8 86:21,22,24 |
| 178:25 179:1,4,7 | 254:3,5,9 255:6,8 | 271:2,4,6,15 | 95:4 137:16 147:1 |
| 179:10,12,19,21 | 257:22,24 259:11 | 273:24 279:25 | 148:7,16 153:3 |
| 180:2,14,21 181:2 | 259:17,21 260:3 | 280:18 | 161:25 172:23 |
| 181:4,19 182:5,8 | 262:21 265:6 | | 191:6 201:5 204:6 |

207:9 210:21
255:10 259:4
261:8 262:4,4
263:12,12,22
272:5,17,18,25
280:11
**creditors'** 263:19
263:20 265:10
**crickets** 253:17
**criminal** 72:21
123:10,16,24
124:6 127:1,10
138:19 139:4
165:14 166:1
167:2 170:8
186:12 203:9,15
211:8 212:18
215:24 252:10,12
252:14,17,20
253:1
**criminally** 203:7
**crisis** 85:22,23
132:4 145:20,20
192:24 209:14
227:14 243:7,13
243:21 244:3
251:23 273:14
**critical** 97:21
111:18 137:4
138:8 146:14
223:6 230:10
257:18 264:17
**critically** 83:11
**criticism** 231:12
**criticizing** 208:12
**cross** 3:21 12:2
17:2 22:2 26:21
32:2 160:12
190:14 193:15
194:14 197:22
**crosstalk** 216:6
**cry** 203:19,19

**crystal** 131:16
164:4
**ct** 39:4
**culwell** 66:12
**current** 174:19,24
244:16
**currently** 99:11
124:8 162:17
205:10 258:18
**curtail** 106:6,7
107:8
**customers** 127:23
127:25 128:2
**cut** 221:14 238:9

**d**

**d** 1:22 3:10 11:15
16:14 21:14 26:10
31:14 41:17 43:8
44:1 62:20 66:10
119:22,23 160:3
190:5 267:3 277:3
277:12
**d'apice** 11:3 16:2
21:2 25:22 31:2
**d.d.c.** 66:12 278:4
**daily** 136:3 205:9
**damage** 153:14
154:1 203:24
**damages** 241:12
241:15
**dangerous** 206:5
**danielle** 41:25
**dare** 59:9
**dark** 80:12 84:4
**darren** 41:21
**date** 57:25 70:20
70:25 72:6,8,12
72:19,22 73:5
74:10,11,20,24
76:8 77:9,9,11,23
78:1,10,14,18
79:11,14,16,21,24
80:1,8 81:23 82:1

82:22 83:5,6,16
83:18 84:11 85:4
85:7,9 95:20,20
95:22 97:3,23,24
98:5 101:22
106:24 108:15,17
123:4,5,8 124:3
124:15 132:23,24
133:14 136:23
139:2 150:18
158:9 161:3,4,10
161:20 164:20,25
166:13,14,24
169:7,12 170:1,14
170:17,22 172:17
172:19 173:5,6
174:7 177:12,18
177:18,23 178:14
179:16 180:9,10
180:15,16,17,23
181:6,8,15,15,18
181:19,20,23,24
182:2,9,10 183:8
184:8 186:11,13
186:15,22 187:19
200:6,9 211:18
215:2,12 216:9,23
217:8,9,22 218:5
218:18 219:2,3,3
219:4,7 224:2
226:4 234:20,21
234:24 236:11,13
239:3 242:7
245:19 247:12
254:17 268:14
269:3,4,11,15,23
269:24,25 270:6
270:14,15,19,20
271:3,7,16 272:10
272:12,14 273:1
274:21 275:15
278:15,16 280:15
280:16,16,17,21

283:25
**dated** 44:14
159:24 190:9
193:11 194:9
196:7
**dates** 75:15 77:17
83:10 170:11
175:2 177:22
189:8
**david** 41:3
**davis** 37:15 54:20
157:6 158:19
163:12
**day** 55:17 56:3,7
56:10 77:10
106:25 123:5
142:3 144:25
170:25 177:6
205:13,19 206:9
206:11 207:9,20
216:24 218:21
226:4 229:14,18
251:8 254:10
269:6 272:13
274:11 275:17
280:20
**days** 62:3,14
70:21 81:25 123:1
123:5 124:15
136:22 149:19,19
161:5 165:1
166:23 176:14,16
177:1 178:7
180:11,15 181:5
181:15 182:9,10
182:17 185:23
186:1 188:1
200:15 206:1
208:14 215:23
216:6,6,8,23
218:17,19,22
228:4 234:17,18
234:19 235:6,7

239:17 240:15
242:2,10
days' 269:22
270:8
dc 40:10
de 257:20
dead 166:9 170:14
deadline 152:2
185:22
deal 124:23
130:23 157:22
158:14 168:25
207:16 208:9
209:6 225:4
228:25 235:18
236:4,13,15 237:1
237:6,17 238:4,9
238:10,10 241:5
dealing 118:23
121:10 205:12
deals 273:22
dealt 75:16 124:1
175:12 183:13
260:8,22 271:1
death 130:2
197:13 205:14
207:11
deaths 130:19,19
131:2 136:2
196:15,20 197:7
197:16,25 205:9
206:8 207:4 274:8
274:11
debate 242:13
debevoise 36:18
debtor 1:9 79:15
89:2 90:4,18,21
96:11 101:18
110:25 147:12,23
148:8 149:6 151:9
151:19 152:8,15
152:25 153:1,9
184:4 226:14

231:25 234:3
241:21,24 249:11
261:20,25
debtor's 123:23
128:21 138:22
143:5
debtors 4:11 5:10
6:8 9:8 12:15
13:14 14:21 17:15
18:15 19:4 20:1
22:15 23:15 24:21
27:11 28:22 30:1
32:15 33:15 34:21
37:16 45:10 48:22
51:1 52:9 54:20
55:17,19 56:3
60:20 69:13 72:12
73:24 75:13 77:1
77:6,23 78:25
84:4,8,10 86:20
89:12,25 91:10
93:2 96:19 97:10
97:11 98:2,18,25
99:4,20 101:10
107:2 108:23
109:1,6 110:17,20
111:2 117:19,22
121:18,21 122:15
123:3 124:18,20
126:10,25 127:3
127:24 136:15
138:12 141:11
148:11 152:20
153:16,20 157:6
158:19 163:12
164:6,15,25 165:3
166:23 168:8
169:11,12 172:12
179:15 184:3,14
185:3,8,25 187:6
187:21 200:2
201:2 203:7
214:11 215:15

219:13 226:3
229:9,15 233:6
234:21 235:6,9,22
236:9 239:15
240:10 241:17
252:19 254:14
259:5,9,9 263:12
270:4,18 272:9
274:21 275:11,14
278:15,22 280:12
280:14
debtor's 250:16
262:4 264:3,3
272:5
debts 235:7
decade 136:13
decades 111:22
december 77:12
79:12 123:3,10
151:25 161:6,15
165:2,15,16
166:13 167:6,9
169:13,14,14,16
170:9,11,12,24
171:2 172:20
174:9,10,19,20,21
174:23 175:1,2,7
176:10,13,15,25
177:2,18,22 179:8
180:8,9,9,16,16
180:23 183:7
186:12,14,14,18
215:19,21 216:9,9
216:12,13,16,16
216:21,22 217:20
218:5 228:12
233:7 234:4
237:19 238:16
242:19 268:25
269:7 270:6,18,25
271:3,5,16 272:11
280:17

decide 49:7 66:18
79:11 95:13 137:2
150:10 163:19
167:10 264:1
271:14
decided 53:2
57:15,18 63:12
65:10 66:20 67:20
79:10
decidedly 48:23
deciding 147:8
decision 46:12,25
48:14 49:12 55:10
56:14,18 58:19,23
59:1,11,15 60:7
64:1,18 68:5
71:23 72:17 77:17
83:9 87:8,10,11
95:12 109:18
123:12 149:20,24
152:6 165:1 167:5
178:14 222:14
228:4 246:14
250:22 255:7
258:7 278:1,4
decisions 66:6
69:18
declarant 137:13
189:15 192:13
declarant's 126:5
declarants 134:20
189:14 195:17
declaration 8:15
9:1,14 14:7,14
15:1 19:13,20
20:7 24:7,14 25:1
29:13,20 30:7
34:7,14 35:1
121:19 125:25
126:2,9,23 127:20
133:2 142:4
158:21 159:22
160:7,13,14,16,18

163:6 189:21
190:8,16,23 193:9
193:17 194:8,15
195:4,9,16,18,20
196:19 197:22,23
198:3,4,16,19,21
198:25 199:1,6,8
199:12 200:25
207:6,12 217:16
222:25 223:4
227:8 244:10
273:8,10,10
**declarations**
44:12 114:21
118:9 125:17,20
126:7 131:7
132:14 134:3,11
134:16 135:12,23
137:12 144:25
158:10,16 189:5
191:1,11 192:1,3
192:10 194:25
197:24 206:10
223:1 274:24
**decree** 62:5,8 63:8
**dedicated** 152:24
153:8 191:14
192:19
**defeat** 277:20
**defendant** 123:10
**defendants** 71:20
89:9,14 150:19
276:11
**defense** 71:22
**defer** 104:2
**degree** 70:7 126:7
192:22
**del** 20:7 267:3
**delaconte** 41:8
**delay** 85:20 86:3
87:6 88:12 91:7
96:17,25 97:22,23
101:11 106:13

107:7 108:18
113:12 121:21,25
126:11 127:23
128:9 129:12,19
131:3 137:5
153:14 160:23
161:14 178:24
192:14 201:2
205:23 206:6
207:15 209:13
218:10,13 223:5
224:2 233:23
243:20,21 250:14
277:10 278:15,23
**delayed** 86:1 97:2
126:21,24 127:13
129:21 131:8,12
167:12 201:3
205:24 207:14
234:17 243:19
255:6
**delaying** 161:14
169:11 215:24
235:5 279:6
**delays** 107:16
179:6 244:15
250:14
**delconte** 9:14 15:1
25:1 30:7 35:1
121:18 127:20
128:1 129:11
130:13 159:7,14
159:15,18,20,22
160:2,5,6,11,13
160:15,17 161:1
161:11,17,23
162:4,16 163:4,5
163:6
**delconte's** 126:9
158:20 187:8
200:25 217:7,16
**delconte's** 273:10

**deliberate** 107:2
**deliberately**
185:21
**delicately** 266:8
**deliver** 218:17
**delivers** 236:15
**delivery** 217:25
**demanded** 213:10
**demonstrable**
234:19 240:23
**demonstrate**
81:10 266:24
**demonstrated**
253:12 257:12
**demonstrating**
265:17
**denial** 49:19
61:22 67:7 68:12
68:15 189:10
215:7,9 227:23,25
230:9 233:10
239:12 241:23
242:12,14 246:25
**denied** 56:10
66:21 102:7
136:12 156:4
225:24 226:20
238:23
**denies** 49:1 278:8
**deny** 63:5 187:18
228:6 229:5 239:5
278:12
**denying** 105:16
106:10 107:18
214:15 225:2
226:16 232:18
278:9
**depalma** 38:15
**department** 36:3
67:24 118:20
197:12
**dependent** 256:11

**depending** 67:5
110:7 151:7 258:2
271:6 275:16
**depends** 71:1
130:6 135:5,17
**deployed** 265:3
**depository** 114:5
**deprivation**
102:21
**derivative** 90:12
90:17 232:9,11
233:1 261:25
**derive** 198:6
**derogation**
185:11
**describe** 160:19
**described** 95:9
103:14 122:24
123:4 150:8
274:23 279:15
**deserves** 150:5
**design** 111:11,15
113:16
**designation** 10:1
46:7,8,9
**designations**
45:18
**designed** 75:23
111:14 223:4
**desire** 92:14
155:24 247:21
276:6
**desires** 210:22
**desirous** 101:24
**despite** 210:1
222:6,18
**detail** 115:3
142:20 192:6
244:10
**detailed** 125:19
236:2
**details** 144:11

**determination**
59:16 60:16 67:3
112:14 116:9
149:25 151:24
258:4,12 266:11
267:22,24
**determine** 46:11
64:14 76:3 232:8
**determined**
204:19
**determining**
124:25 135:23
268:23
**deterrence** 146:7
276:5,7
**deterrent** 125:14
263:22
**deutsche** 262:7
**devastated** 145:11
**devastating** 134:5
**devastation**
206:11
**developed** 57:14
**developing**
273:13
**development**
44:20
**devolved** 55:7
**devoted** 192:23
**devoting** 191:18
**dial** 7:10
**didn't** 241:11
248:19,23 252:1
**die** 129:23,24
136:6
**died** 129:24
202:13
**diem** 240:9,15
**dies** 132:17
**differ** 154:2
**difference** 145:4
169:14 175:25
186:2 205:19

208:15
**differences**
212:13,25
**different** 52:6
53:6,10 61:15
64:6,10 67:5,18
70:17 71:24 80:5
91:1 98:23 106:1
108:4 116:14
117:21 130:15
147:6 158:13,14
230:17 252:16
262:23 267:18
268:18
**difficult** 76:22
103:15 108:5
152:5 211:19
**difficulties** 236:2
**difficulty** 138:17
139:14 157:22
186:17
**direct** 89:1,8,8
104:8 110:21
147:11,17,23,25
159:23 160:9
190:8,10,20
193:10,19 194:10
194:19 196:8
220:19 230:23
231:24 236:5
238:20 246:5,16
258:22 259:7
261:24 262:3,24
263:9 264:13
280:9,10
**directed** 120:4
133:6
**directing** 5:11
18:16
**direction** 68:3
70:16 118:20
**directly** 45:4 89:3
89:19 90:15 91:9

153:10 186:10
231:22
**director** 89:11
197:10
**director's** 197:2
**directors** 232:13
**disadvantage**
97:8
**disagree** 61:2
68:10 69:21 86:13
90:4 93:9,10
177:7 229:25
251:3
**disagreed** 279:19
**disagreement**
92:19 158:1
249:17 281:25
**disagreements**
94:9
**disbursed** 131:13
132:9
**disbursement**
5:11 18:16
**disbursing** 133:15
**discovery** 91:20
213:22 260:12
264:7,11
**discreet** 125:19
**discrete** 192:3
**discretion** 64:12
64:14 182:12
256:11
**discuss** 130:22
160:19 176:18
**discussed** 45:17
109:9 112:3 122:6
158:11 184:15
262:5,6,17 263:2
**discussing** 147:10
**discussion** 60:24
82:1 100:5 158:11
201:1 216:17
240:12 245:23

262:7 266:11,18
**disentangled**
101:1
**dismiss** 71:20
265:7
**dismissal** 68:13
**dismissed** 71:25
72:11
**disorder** 220:22
281:8
**dispense** 199:2
**disposition** 62:18
**dispositive** 52:5
**dispute** 82:10
84:16 113:8 131:4
136:7 213:22
217:15
**disputing** 108:7
210:11
**dissenting** 222:19
**dissolves** 172:9
**dist** 262:8 266:19
278:3
**distant** 207:9
**distinction** 95:19
**distinctions** 120:9
**distinctly** 268:17
**distinguished**
262:2
**distinguishes**
259:17
**distributed** 162:8
162:23 205:16
**distribution** 113:5
143:6 162:2
206:24 218:5
219:2,7 234:16
261:19
**distributions** 75:7
92:17 108:15
129:21 131:8
160:24 161:18,20
161:21,23,24

162:20 172:23
217:2,25 261:12
272:15,16 274:14
274:16
**distributors**
208:22
**district**   1:2 40:1
48:14,19 49:2,17
49:18 50:7 55:13
55:21 56:9 59:9
60:15 61:17,24,25
62:2,4,6,12 63:11
63:16 64:1,9,18
65:11,24 66:15
67:2,6,14 70:20
72:17 77:11,17,18
77:21 81:6 83:9
86:7 87:7,9 88:3
95:12 107:12
109:16 110:19
112:13 123:25
136:19 138:25
149:2,20 155:25
158:8 161:3,7
163:15 164:3,14
164:17,24 165:2
166:6 167:5,10
170:23 172:10,20
173:24 174:12
175:24 177:13,23
178:14,24 179:7
180:21 181:12
182:12,16,21
183:2 184:7,9,16
184:20 185:6
186:12 187:20
188:5 189:9 200:7
200:11 204:17
215:3,13 217:13
219:16 224:9
227:3 228:3,8
236:7 242:6
247:16 250:21

251:1,6 255:6,8
264:9 266:20
267:24 268:8,10
268:14,20,22
269:5,6 270:14,17
270:21,24,25
271:2,4,4,6,8,14
271:15,16 273:24
275:19 279:2
280:18
**disturbing**   274:9
**dizengoff**   3:4 8:18
9:4 11:8 14:10,17
16:7 19:16,23
21:7 24:10,17
26:3 29:16,23
31:7 34:10,17
**doc**   5:13 18:18
**docket**   45:15,18
63:22 142:4 156:5
164:24 165:25
166:1 167:1
169:19 173:19,23
195:20 226:6
228:25
**docketed**   228:16
**doctrine**   75:22
83:21 84:25
264:24 265:3
**doctrines**   138:19
139:4
**document**   2:13,17
3:3,10,16,20 4:6
4:14,19,24 5:4,21
6:8,15,24 7:7,11
7:19 8:5,10,17 9:3
9:15,19 10:5,17
10:22 11:8,15,21
12:1,10,18,23
13:3,14,18 14:2,9
14:16 15:2,6,21
16:7,14,20 17:1
17:10,18,23 18:3

18:9 19:4,8,15,22
20:8,12,17,21
21:7,14,20 22:1
22:10,18,23 23:3
23:15,19 24:2,9
24:16 25:2,6,16
26:3,10,16,20
27:6,14,19 28:3
28:10,22 29:2,8
29:15,22 30:8,12
30:21 31:7,14,20
32:1,10,18,23
33:3,15,19 34:2,9
34:16 35:2,6
114:5 198:18
208:9 243:23
276:14
**documents**   5:8
13:7 18:13 23:7
28:14 33:7 45:16
45:19 46:22 114:4
213:23 243:22
245:6
**doesn't**   131:1
246:12 249:20
250:13 275:25
**doing**   48:22 49:17
78:6 79:15 80:12
84:4 97:10 100:12
102:2 119:20
135:8 146:8
169:24 170:7
173:2 251:19,25
**doj**   162:6 165:20
165:23 166:15
208:1 210:12
211:4,7 212:13,21
213:15,18,19,21
214:1 261:15
270:4
**doj's**   213:12,25
**dollar**   131:17
205:19 209:3

274:5
**dollars**   122:1
220:22 223:7
232:20 241:3,14
241:15 243:20
244:25 272:20,24
**domain**   245:6
**domestic**   222:11
**don't**   76:23,25
82:5,20 83:17
146:5 148:14
151:10 152:6
153:10 156:16
177:15 241:16
245:11,22 246:5
247:18 248:20
249:19,19,21
250:4,15,17 251:2
251:9 252:20
255:12 277:16
279:7 281:23
**door**   74:10
**double**   139:10
188:11
**doubt**   121:24
168:4 208:23
**doubts**   267:7
**dovetails**   113:3
275:3
**dow**   237:8,9,11
**downs**   234:3
**downward**   240:25
**dozens**   222:5
**drafted**   100:21,23
**drafters**   81:24
**drain**   1:22 44:3
56:13 57:21
146:17
**dramatic**   122:1
245:21
**dramatically**
122:3

**draw** 131:7 134:22
**drawing** 69:19
**dressed** 232:12
**drexel** 90:11
**drives** 204:7
**drop** 170:14 237:8
**drops** 162:22 184:11 186:19 214:21 218:13 230:12,20 234:4 239:22
**drug** 196:15 197:2 197:7,10,25
**drysdale** 40:7
**due** 69:6,22 92:21 94:1 134:8 136:2 139:9 150:17 202:13 214:3 258:15,20,23 260:4 272:21 273:21
**duplicate** 90:14 91:3
**duration** 61:11 62:8 64:8,16 128:4 129:19 130:3 132:9,12
**durations** 67:18
**duty** 76:16 89:3 89:16,18 232:13
**dwf** 265:11
**dying** 135:19
**dylan** 41:6
**dynamic** 240:8
**d'angelo** 41:7
**d'apice** 2:23

**e**

**e** 1:21,21 36:1,1 41:3 42:9 44:1,1 69:6 114:22 160:3 160:3,3,4 193:5,6 196:3,3 258:16

260:9 283:1
**earlier** 95:9 124:15 161:9 165:1 167:5 170:23 172:20 176:10,25 179:7 184:15 185:1 187:20,22 189:8 192:6 205:18 214:17,25 215:2 215:16 246:14 269:4 270:5 271:2
**earliest** 123:4 161:13 166:12 167:9 175:1,3 180:9,10 181:15
**early** 77:10,12 176:9
**earmarked** 212:16 213:1 273:4
**earth** 243:12
**easier** 93:1 204:9
**easily** 223:16
**ecf** 2:14,20,24 3:5 3:11,18,22 4:9,16 4:21,25 5:6,14,22 6:3,9,17,25 7:8,13 7:21 8:7,13,20 9:6 9:12,16,21 10:7 10:14,18,25 11:4 11:10,16,23 12:3 12:13,20,25 13:5 13:9,15,21 14:5 14:12,19,25 15:3 15:8,13,17,24 16:3,9,15,22 17:3 17:13,20,25 18:5 18:11,19,23 19:5 19:11,18,25 20:5 20:9,14,17,24 21:3,9,15,22 22:3 22:13,20,25 23:5

23:10,16,22 24:5 24:12,19,25 25:3 25:8,12,19,23 26:5,11,18,22 27:9,16,21 28:5 28:12,17,23 29:5 29:11,18,25 30:5 30:9,14,17,24 31:3,9,15,22 32:3 32:13,20,25 33:5 33:10,16,22 34:5 34:12,19,25 35:3 35:8
**echo** 133:13
**eck** 43:7
**ecke** 41:9
**eckstein** 2:18 8:11 10:23 13:19 14:3 15:22 19:9 20:22 23:20 24:3 25:17 29:3,9 30:22 33:20 34:3 41:10
**economic** 230:19 239:3 274:25
**ecro** 1:25
**edmunds** 15:16 18:10 37:6 48:9,9 49:25 50:4,6,9,14 50:18,21,23 52:22 53:9 55:1,8 60:8 60:14 61:1,5,7 65:1 137:22,24,25 138:1,4 139:8 140:3,5,9,17,20 140:23 141:1,7,9 141:17,19 142:7,9 142:15 143:8,18 143:25 144:6,10 144:12,13,16,18 144:20,22 145:6,9 145:13 146:1,2,6 251:14,15

**educated** 135:6
**edward** 42:9
**effect** 48:13 52:8 54:21 58:23 59:11 75:5 82:23 96:5 119:8 124:7 130:8 130:10 138:24 139:15 146:7,10 147:22 150:24 153:19,19 192:14 216:19 218:22 263:23 276:13
**effective** 57:24 72:6,8,8,12,19,22 73:5 74:9,11,20 74:24 76:8 77:8 77:11,22 78:1,10 78:14,18 79:14,16 79:21,24 80:1,7 82:1 83:5,5,6,15 83:18 84:11 85:4 85:7,9,14 95:20 95:20,22 97:3,23 97:24 101:20,22 106:24,25 108:15 108:17 123:4 124:3,10,23 132:23 136:23 139:2 158:9 161:4 161:10,19 164:20 164:25 166:24 168:8,10 170:17 170:22 172:17,19 173:5,6 174:7 177:18 179:16 180:10,15 181:6,7 181:14,18,23 182:9 187:19 204:21 211:18 215:2,12 216:23 217:8,9 218:18 219:3,3 224:2 226:4 234:20,24

**A.1158**

236:10,13,24
243:13 254:17
265:7 269:3,4,11
269:15,23,24,25
272:9,14 273:1
274:22 275:15
278:17 280:21
**effectively** 151:18
268:7 275:8
**effectiveness** 63:1
**effects** 130:11
134:5 138:12
139:3 142:1 165:9
276:21
**effectuate** 254:16
**effort** 100:25
248:20
**efforts** 208:23
269:23 278:23
**egregiously** 214:2
**eight** 180:6
**either** 45:19 46:25
61:21 66:19 67:7
70:19 71:8 76:14
98:10 143:7
162:21 167:9
172:21 188:4
211:17 228:18
248:24 267:6
272:6
**elated** 18:18
**elected** 238:3
**electric** 58:9
**element** 112:8
271:19
**elements** 227:4
**eleventh** 6:2 13:8
18:22 23:8 28:15
33:8
**eli** 7:12 43:9
**eliminated** 68:17
85:25 88:14 94:2
125:4 163:20

164:11 180:6
**elimination** 82:14
87:4 88:13
**elizabeth** 42:17
**ellen** 30:16 41:16
44:9
**elongated** 208:9
216:19
**eloquently** 114:21
273:15 274:2
**email** 249:1
**emails** 111:13
157:21 206:13
**embrace** 65:23
**emerge** 161:13
**emergence** 161:14
162:17 201:3
278:23
**emergency** 55:12
55:23 56:1 57:20
58:10,23 59:14
78:4 100:7 106:22
178:3 185:24
186:17 225:23
**emphasized** 147:5
**emphatically**
104:10
**employees** 127:22
127:25 128:3
130:11
**empower** 238:9
**enable** 96:15
109:21
**enables** 147:17
261:11
**encompass** 259:19
**encouraged** 44:20
**ended** 66:3 241:9
**ends** 177:12 185:1
243:12
**energy** 262:7
**enforce** 146:9
203:2 204:12

**enforcing** 103:5
277:20
**engage** 80:10
99:20 100:12
108:5 126:25
253:5 264:7
**engaged** 89:18
109:2 253:6
263:10
**engagement** 109:5
109:6
**engagements**
102:4
**engaging** 253:18
**enjoin** 69:19
98:23 259:7
**enjoined** 69:14,20
263:2
**enormous** 281:24
**ensue** 91:19 125:3
261:17
**ensure** 86:14
177:9,11 178:24
**entailed** 98:11
**enter** 63:22 96:14
225:25 250:25
282:2
**entered** 62:15
63:1 104:6 156:5
213:10
**entering** 55:14
178:10
**enterprise** 263:10
**enters** 62:4
**entire** 57:22 61:2
64:25 67:1 70:25
132:13 136:17
261:11 263:6
278:11
**entirely** 44:16
86:1 88:15 89:23
136:14 220:6
268:10 270:24

277:4
**entirety** 95:23
**entities** 4:21 9:21
12:25 15:8 17:25
20:14 22:25 25:8
27:21 30:14 32:25
35:8 40:8 48:15
48:24 70:14
147:23,23,24
148:8 162:7 195:8
196:9 217:3,4
222:5,7,12 278:5
279:17 280:3
**entitled** 120:11
174:4 180:5
**entitling** 261:24
**entity** 120:1
211:15 243:5
263:17 277:12,13
**entry** 62:3 215:6
**epidemic** 134:6,9
191:18 204:4
205:8,13
**equally** 85:24
**equate** 240:1
**equated** 210:16
**equation** 266:17
**equipment** 66:13
66:13 76:24
**equitable** 48:21
49:9 51:6,8,13,15
51:19 52:2 53:1,2
53:11,22 54:5
68:14 70:23 71:11
71:13,17 72:2,19
72:23 73:6,15
74:1 75:3,11,25
76:5,8,18 77:7
78:9,21 80:13,16
80:21,22 81:7,18
82:8 83:1,20,22
84:25 85:11,13
97:7,13 98:9,21

100:14,24 101:3
102:25 103:1
111:8,11,17,19
115:5,10,18,21
116:3,17,19,24
117:7,21,23 118:3
123:22 124:4
125:2,6 134:1
138:10,13,24
139:19 140:15
141:13 143:4,14
145:15 150:21
151:13 163:18
165:8 167:8,23
168:5 171:13,23
173:9,20 174:2
175:10,23 176:8
177:10 180:4
182:23 183:15,18
188:6 202:24
223:11 224:7,10
224:15 226:3,9,19
264:24 265:22,25
265:25 266:16,21
267:6 269:9,17
270:3 274:15
equitably 53:14
53:17 60:18 82:15
84:24 85:6 102:2
140:13 164:19
167:16 264:23
265:15
erf 133:16,17
207:22 208:2
212:17 213:19,20
erf2 133:16
eric 3:17 11:22
16:21 21:21 26:17
31:21 42:25
erosion 230:22
erred 68:10
escape 163:22

eskandari 41:11
65:14,14,18
especially 107:10
186:11 236:4
238:2
essence 84:15
162:15
essentially 49:17
226:25 227:25
236:5 251:20
279:14
establish 53:18
125:22 133:3
145:23 256:18
established 81:14
106:22 108:20
126:2 264:25
270:12
establishes 260:24
establishing 2:1
44:15 117:10
126:14 129:16
134:18
establishment
5:10 18:15
estate 69:13 90:16
125:5 139:21
140:1,11,12,23
144:1 228:19
264:3,3
esther 43:4
estimated 205:11
estimates 197:25
205:6,12
estoppel 57:13,15
58:6,14,17,20
59:7,10
et 3:5,17 8:19 9:5
11:10,22 14:11,18
16:9,21 19:17,24
21:9,21 24:11,18
26:5,17 29:17,24
31:9,21 34:11,18

44:3 78:2 156:25
ethan 42:25
evaluate 53:13
evaluating 67:12
255:24
evaluation 51:19
137:15 142:18,23
262:16
evan 41:18
eve 185:22 187:1
217:22 270:20
evening 55:13
event 59:23
132:22 136:20
219:16 220:19
227:6 229:14
230:4 236:22
events 182:25
eventually 127:4
127:5
everybody 49:22
139:13 179:2
236:18 239:16
everyone's 125:21
167:11
evidence 49:5
55:20,23 56:6
58:15 89:22 92:19
109:17 125:21,23
130:2 135:10
141:25 163:7
164:14 190:24
191:11 197:25
203:12 232:16
236:17 253:8
260:14,23 261:14
275:24 276:1
evident 104:14
evidentiary 47:18
48:5 104:21
127:14,17,19
133:1,9 195:16
228:24 229:1

ex 5:16 7:2
exact 192:14
243:24
exactly 47:19
51:15 80:12 88:7
97:9 142:25 164:1
175:5 179:9
241:20
examine 160:13
190:15 193:16
194:15 197:22
example 70:5
71:21 126:9 130:8
142:12 151:25
206:17 218:16
220:11 223:24
235:20 249:25
266:11
examples 249:24
exceed 9:9 10:9
14:22 20:2 24:22
30:2 34:22 45:6
62:14
exception 172:6
172:11 198:20,22
256:14 276:22
exceptions 144:13
exchange 204:3
excited 186:24
exclude 137:11
158:25
exclusively 243:8
255:13
excuse 154:6
257:14 280:23
exempt 277:13
exempted 79:2
248:22
exempting 120:14
exempts 277:3
exercise 76:15,17
105:14 131:19
191:23 224:7,10

224:14 242:4
256:10
**exercised** 245:17
**exercising** 115:21
**exhausted** 227:7
**exhaustive** 236:2
**exhibit** 50:15
198:19 199:2,8
**exigent** 174:16
**exist** 46:23 230:9
**existence** 51:2
229:16
**existential** 80:14
**existing** 152:25
229:16
**exists** 141:2 168:9
238:8
**exit** 230:7 240:11
**expand** 92:2
**expect** 68:9
105:13 163:25
168:3 169:20
170:6,15 171:20
182:18 232:6
**expectation**
167:11
**expectations**
76:13
**expecting** 169:17
**expedite** 86:9
279:8
**expedited** 2:10
5:18 6:13,20,23
7:4,6,17 8:3 10:3
81:13 86:6 88:5
109:24 225:13
275:16 278:25
**expediting** 88:1,9
**expended** 140:11
**expense** 244:19
**expenses** 234:13
234:14

**experience** 138:17
**experienced**
134:5
**expert** 126:19
128:24 135:13
138:16 168:23
**experts** 129:17
131:10
**expires** 62:16
**explain** 206:15
214:9
**explained** 151:5
192:6 206:10
220:16 255:7
**explore** 167:25
**express** 134:8
**expressed** 202:19
**extend** 6:20 7:4
95:13 118:10
169:7 280:16
**extending** 240:20
**extends** 262:18
264:6
**extension** 154:16
154:19 155:20
247:2
**extensive** 200:25
259:3 263:9
271:12 275:24,24
**extensively** 266:8
**extent** 45:24 49:9
103:22 126:4
130:10 139:7
153:10 160:14
192:13 254:25
260:16 263:24
270:22
**extra** 54:3 275:1
**extraordinary**
171:11 205:1
210:19 256:5
**extremely** 253:15

**extricated** 103:18
**eyes** 276:9

**f**

**f** 1:21 3:17 11:22
16:21 21:21 26:17
31:21 42:21 278:2
283:1
**f.2d** 121:13
262:16 277:25
**f.3d** 58:10 257:2
257:20 265:10
267:3 280:6
**face** 237:7,14,23
238:2
**faced** 67:11 236:2
**facilities** 273:6
**fact** 6:5 13:11
19:1 23:12 28:19
33:12 46:20,23
47:13 48:3,18
49:15,16 52:3,24
53:3 68:25 69:4
80:23 115:25
127:15 128:10
130:2,18 139:24
140:13 143:13
145:9 146:3 151:6
151:11 152:4,20
152:24 178:5
204:5 209:25
215:11 218:14
228:17 231:9
232:12 238:20
248:25 259:20
260:3 276:9
277:14,16,21,23
**factor** 81:14
103:11 153:15
250:5,7 257:4
264:17 266:2
275:2,22 276:4,5
276:7

**factors** 51:23
52:17 53:24 55:5
56:24 57:9 60:3
67:4 81:21 102:16
111:12 212:3
256:19 257:18
262:19,22 265:5
265:17 266:3,15
273:21 275:21
**facts** 84:25 85:2,3
91:2 126:4,14
129:16 135:2
204:19 210:23
**factual** 69:11 90:2
90:20 250:12
259:3 260:11
263:7 268:18
**fails** 126:7
**failure** 75:18,20
**fair** 51:3 58:7,12
68:7 70:3 91:19
171:20 214:19
222:20 257:6
258:1 263:13
**fairly** 85:11
147:16 180:21
264:25
**fall** 69:4 186:15
198:19 236:14
280:2
**fallback** 95:9
122:24,25 267:23
**falling** 177:12
**falls** 238:14
**false** 55:2
**families** 277:11
**family** 36:12,19
86:5 164:16 212:4
212:14 246:20
247:24 248:1
**famous** 106:25
**far** 48:4 51:5,16
51:21 64:23 71:3

75:9 76:8 81:22
83:15,16 88:16,24
91:25 102:3
106:12 107:15
113:3 117:16
138:7 162:18
181:22 222:7,8
244:4 247:20
258:20 259:2
260:19 263:25,25
264:11,22 267:19
272:2 273:7
**fashion** 126:21
265:4
**fashioned** 265:8
**fast** 268:23
**faster** 106:22
**faulting** 50:10
**favor** 48:24 86:25
171:6 204:9
222:12 244:8
250:9 256:19
272:7
**fears** 75:9
**features** 113:17
113:18
**feb** 66:7 265:13
**february** 262:10
**fed** 265:12,20
**federal** 2:12 5:3
5:20 6:14 7:18 8:4
10:4,12 28:9
118:20 120:1
138:19 139:10
161:25 162:3,7,21
210:5 211:1 212:6
212:7,10 213:5,9
213:12 220:21
221:4,11 222:11
277:3,15,18 281:7
281:15
**fee** 139:24

**feel** 169:24 183:8
200:3,21 233:22
**feels** 103:12
**fees** 105:19,22,24
106:6,7,9 139:25
140:10 234:23
**feld** 39:8 201:11
**felon** 124:22
127:3
**female** 155:8
**femino** 41:12
**ferguson** 203:25
208:17,20
**ferguson's** 206:22
**feverishly** 227:20
**fewer** 106:4 136:6
**fibreboard**
258:25
**fides** 259:12
**fiduciaries** 169:25
231:25
**fiduciary** 89:16
172:13 232:13
**fielded** 206:12
**fields** 237:15
**fifth** 38:10 206:22
**fight** 93:6 205:8
276:8,15
**fighting** 228:10
**figure** 87:23 88:23
90:25 176:23
180:14 240:7
**file** 45:14 165:24
167:1,4 180:8
186:22 242:10
**filed** 2:13,18,23
3:3,10,16,21 4:7
4:15,20,24 5:5,21
6:16,24 7:7,12,20
8:6,11,18 9:4,11
9:15,20 10:6,13
10:17,23 11:3,8
11:15,21 12:2,11

12:19,24 13:3,19
14:3,10,17,24
15:2,7,12,16,22
16:2,7,14,20 17:2
17:11,19,24 18:3
18:10 19:9,16,23
20:4,8,13,17,22
21:2,7,14,20 22:2
22:11,19,24 23:3
23:20 24:3,10,17
24:24 25:2,7,10
25:17,22 26:3,10
26:16,21 27:7,15
27:20 28:3,11
29:3,9,16,23 30:4
30:8,13,16,22
31:2,7,14,20 32:2
32:11,19,24 33:3
33:20 34:3,10,17
34:24 35:2,7 44:6
45:18 47:11,14
49:16 50:7 55:12
55:22 58:11 73:11
93:13 106:1,2,19
118:24 123:25
149:1 154:11,14
156:14 157:15
164:24 173:19,23
195:9,18 211:5
279:23 281:10
**filing** 9:9 10:10
14:22 20:2 24:22
30:2 34:22 57:1
106:3 201:17
255:2
**filings** 106:4
**final** 58:17,19,25
59:1 61:21 62:18
87:11 196:19
197:9,12 218:17
224:5
**finality** 76:1 112:8
149:16 150:5

227:13 266:7
**finally** 58:16
62:20 119:16
167:3 200:12
270:1
**financial** 125:15
126:17 149:9
150:16 227:10
**financially** 125:10
**find** 79:1 85:2,5
104:6 109:1
110:10 114:8
184:13 195:5
209:2 236:16
253:15 260:17
**finding** 48:25,25
51:7 105:24
227:13 258:8
**findings** 6:5 13:11
19:1 23:12 28:19
33:12 49:12 228:7
229:5 230:1
236:10 238:25
240:22 259:3
**finds** 103:15
119:15 152:22
**fine** 112:24 113:1
118:5 122:19
154:13 175:19
180:7 189:22,23
195:12 199:21
201:14
**fire** 257:20
**first** 25:12 38:17
45:8 46:8,9 48:11
49:23 50:24 52:19
53:12,16 55:5
58:8 63:4,6,15
67:21 68:20 72:16
72:18 78:3 94:21
97:25 103:23
111:3 115:12
120:3 122:20

126:10 130:7
142:3 144:25
146:20 147:1,6
149:11 150:9
151:3 152:14
155:13 158:15
163:13 168:6
171:23 184:2
185:3 201:21
203:4 205:21
206:6 207:19
210:3 212:4 214:7
215:5,11 218:7,9
218:23 220:12
223:19 230:18
234:18 236:13
237:7 246:24
252:8,21 253:14
254:10,19 255:10
255:21 256:7
257:4,16 261:6
264:15 268:25
275:22
**firsthand** 134:5
**fit** 85:10 230:14
**fits** 118:25
**five** 75:4 76:11
176:14 204:15
213:3,5 244:20
265:17 273:18
**fixed** 234:3
241:18 272:20
**fl** 39:19
**flag** 45:2
**flexible** 102:13
265:4
**floor** 40:2 94:11
251:11
**florida** 39:16
**flow** 132:21
**flowing** 135:5
136:20 187:9

**focus** 52:7 56:5
57:22 60:2 61:10
61:25 66:24 67:17
68:19,21 70:7,17
72:14 75:6,25
76:12 77:20 81:19
87:9,10 109:13
158:6 163:14
229:14 243:7
255:2,13,13 257:6
265:6 273:12
**focused** 56:1
57:19 268:1
**focuses** 76:11
85:12 198:1 233:5
**focusing** 56:19
72:16 82:5 83:2
87:7 116:13 137:4
176:22 221:8
233:17 255:25
**fogelman** 40:5
219:23 220:2,3
221:16 249:9
281:1,1,4,18
**follow** 84:19
125:21 204:23
**followed** 232:1
**following** 62:22
107:19 124:5,15
164:7 165:1
184:16 212:2
246:2 256:19
**follows** 186:16
223:19
**footnote** 68:5
**foray** 214:7
**forced** 81:12
92:22 240:3
**forces** 213:25
**foregoing** 270:10
275:3 283:3
**foreseeable**
244:22

**forever** 203:10
243:19
**forfeiture** 281:12
281:13,15
**forget** 202:12
**forgetting** 204:15
**forgot** 245:12
**form** 103:8
112:12 113:4
122:23 142:16
143:7 153:20
187:12 212:7
234:15 240:7
265:23
**formally** 49:8
247:7
**formed** 142:12
**former** 95:24 96:2
119:24
**forming** 141:20
**forms** 66:24
134:20
**forth** 126:3
157:22 164:23
236:24 241:20
258:7 259:15
277:22
**forthcoming**
171:1
**forum** 163:23
**forward** 49:4
99:21 100:3
102:15 103:13
105:18 117:17
118:4 130:9
139:21 141:23
144:1 151:12
179:16 229:18
231:18 232:1,16
233:21 234:21
235:11,14 237:5
240:18 241:10
242:8,17 249:23

**fought** 228:10
236:3
**found** 49:2,3
50:13 59:3 84:24
89:21 91:5 147:14
172:7 192:13
194:16 197:1
226:21 261:13
**founded** 119:17
**four** 126:22
166:19,22 198:23
208:8 210:3
256:19,25 271:10
275:21
**fourth** 161:6
212:24 214:14
**framework**
115:23
**framing** 95:2
**frankel** 37:8
221:20
**frankly** 59:13
69:23 78:5 109:19
140:6 152:16
163:25 219:24
247:7 272:4
**fraud** 89:6 263:9
263:10
**fraudulent** 90:13
90:14 212:9
**fraught** 241:25
**free** 92:6 120:24
233:22 237:16
240:2 242:9
261:16
**friday** 55:13,22
58:11
**frivolous** 54:8
83:24 114:15
**front** 50:12 98:22
110:20 121:23
200:7 221:8
228:13 242:5,9

**frontloaded**
234:14
**frustrated** 241:8
**fulcrum** 123:24
**full** 58:7,12 63:24
64:16 88:15 111:3
176:16 249:3
**fully** 60:6 110:16
148:4 217:1
**functional** 202:10
**fund** 5:10 18:15
100:7 106:22
151:21 160:21
162:14 220:20
234:5 235:24
237:13 245:4
262:8 281:13
**fundamental**
147:18 150:12
**funded** 151:1
228:19 233:2
234:4,10 235:1,2
243:5
**funding** 132:21,22
132:24 133:4
134:22 223:5
273:11
**funds** 131:3,12
133:15 135:5
136:3 205:13
206:25 220:14
235:5 239:25
243:20 272:25
**further** 15:10
54:25 70:22 82:24
94:8,11 95:7,13
100:15 101:9,11
101:19 112:22
118:9 122:14
139:6 156:16
175:6 176:12
177:6 192:7
209:24 230:7

240:5 254:8
259:10 269:21
273:24
**furtherance**
164:20
**future** 98:18
125:14 134:24
163:24 215:8
244:16,22

**g**

**g** 44:1 190:4 196:3
**gain** 203:11
**game** 97:18
**games** 182:3
**gar** 131:6
**gard** 129:10
**gas** 58:9 70:6
256:8 262:7
267:17
**general** 37:1
39:16 62:11
120:14 137:1
143:2 202:6 203:8
203:21,25 204:13
206:7,22 256:6,13
260:4 267:13
**generally** 63:3
75:6 85:2 146:3
198:5 259:14
260:13
**generals** 203:1
204:16 207:1
208:17
**generate** 105:22
**generated** 213:6
**gerard** 36:16 42:3
246:19
**germane** 253:11
**getting** 79:25 80:3
92:7 100:14 107:4
109:10 118:1
145:19 157:23,23
178:1 200:7 206:3

208:19 209:9,12
209:13 211:17
217:2 228:21
233:12 235:10,24
236:3 242:18
266:10
**giddens** 41:13
**give** 55:10 56:23
58:20 65:20 75:10
95:12 123:11
129:13 156:22
168:5 169:22
170:15 172:5
175:8 180:17,22
181:10,13 182:17
182:21 198:21
200:20 205:21
216:3 219:12
220:10 223:23,24
224:8 239:17
248:20 251:20
252:23 261:2
269:17,22
**giveback** 134:15
**given** 52:5 53:11
60:10 63:13 85:2
91:18 129:18
130:22 134:12
172:1 184:2
185:25 187:7
195:1 198:9 200:1
213:24 217:24
229:2 238:8,19
246:1 263:19
270:10 280:20
**gives** 130:8
150:21 203:18
239:21
**giving** 107:25
169:3 172:11
173:7 174:8
178:19 181:5,5
185:22 200:19

239:13 280:21
**glitch** 202:4,10
203:9 204:3,7,12
205:9,17 206:24
207:8,21 209:12
209:18 210:1,7,18
211:6,23 212:5,12
213:13,15,19,22
214:1 215:23,25
216:5,15 217:17
218:9,12 229:21
229:23,24 230:8
230:19 235:13
**glm** 265:11
**gloss** 257:3
**go** 54:11,25 55:4
61:20 67:20,22
69:5 72:12 77:18
87:14 88:1 94:19
99:1,16,21,23
100:3 101:25
106:25 108:17
110:11 111:3
112:19 117:14,17
118:4 125:11
126:13 137:23,25
138:1,5 139:13
146:5 154:12
162:14,18,20
163:4 166:20
168:7 172:4
175:20 178:8,9
179:16 181:3,6,7
181:14 188:8
193:1 197:4
199:15 205:15,17
208:3 211:13
215:23 217:7
220:8 234:13,16
234:21,25 236:23
239:19 243:12
244:25 246:22
252:15 273:5

274:22 278:17,23
281:13
**goal**  99:25 223:6
**goals**  279:8
**god**  160:1 190:2
193:3 194:3
195:25
**goes**  70:16 82:13
82:23 107:11
113:13 121:17
122:2 129:11
130:9 140:6
155:24 168:9
172:13 198:17
209:3,8 218:7,8,9
218:11,11 221:5
234:19 237:2,9,11
242:8 281:15
**going**  49:2 51:3
52:15 60:17 67:20
68:7,25 71:19
72:12 73:3,13
74:10,11,16,22
77:7,19,21 78:8
79:11 83:4 87:3
93:6,18,20 95:5
96:12,20,22 97:17
99:5,9 101:7
103:25 106:13
108:21 109:11,22
116:2 117:9,20,23
118:8,14 131:12
132:9,22 133:23
135:10,14 137:9
137:11 139:21
141:20 144:1
150:22 156:18,19
157:21 158:1
163:13 170:10
175:21 176:13
177:8,12,21
178:15,17 182:1
183:6 185:23

186:1 187:10,11
191:9 200:13,18
202:2,21,23 205:4
205:25 206:9
208:14 211:13
221:1 228:11
230:25 237:10,12
237:19 240:17
241:18 242:2,17
242:18 246:14,24
247:16,17 248:12
263:25 272:25
273:1
**gold**  10:17 15:12
38:13 65:4,4
94:14,15,18,21
95:16,17,25 96:3
98:24 99:3,7
102:10 107:20,23
108:2,22,25
110:24 111:20
112:16,25 113:14
114:24 115:1,12
116:6,8,11,16,22
116:25 118:7,13
118:16 120:2
121:1,4,9 122:5
122:13,22 124:24
133:13 142:13
143:3 183:23,23
184:1,21 185:8,13
185:15,19 199:6
252:4,4,7 254:1,4
254:7
**gold's**  186:16
**goldman**  39:6
65:21,22 118:7
122:17,17,20
123:17,19,21
127:2,18 128:12
128:14,17,19,23
129:3,6,10 130:5
131:5,15,19,20,22

131:25 132:2,5,19
133:5,8,12,18,21
133:23 134:3
135:9 137:6,10,19
142:13 160:15
186:6,7,10 187:2
190:17 199:6,10
199:10
**gold's**  245:14
**good**  44:2 54:19
94:14 120:18,19
120:23 156:24
157:5 161:12
166:22 193:25
201:10 222:13
238:10 242:25
253:23 274:17
**gotcha**  97:18
**gotten**  73:13 84:9
154:15 248:5
**governed**  118:17
149:17 271:18
**government**  44:17
118:21 119:19
120:1 161:25
162:3,21 209:24
210:9 211:1,1,22
211:25 212:6,7,10
213:5,9 219:25
220:11,12,17
221:4,11 222:7
236:22 244:18
249:15,16,16
277:3
**government's**
75:18 209:23
210:6 212:1 236:6
**governmental**
2:19 4:21 8:12
9:21 10:24 12:25
13:20 14:4 15:8
15:23 17:25 19:10
20:14,23 22:25

23:21 24:4 25:8
25:18 27:21 29:4
29:10 30:14,23
32:25 33:21 34:4
35:8 40:8 70:13
195:8 196:9
211:10,15 217:3
221:21 222:5,12
263:17,23 277:13
280:3
**governments**
222:17
**grace**  267:1
**grade**  206:22
**grant**  45:11 81:13
155:3 224:15
225:11 256:4,10
270:14 278:8
**granted**  70:15,19
70:19,24 87:17
104:17 114:16
119:7 126:17
127:22 148:4
192:12 203:1
210:20 220:7
256:14
**granting**  5:9,13
18:14,18 62:24
119:24 204:2
278:20 279:12
**grants**  80:10
184:23
**grave**  267:7
**great**  107:21
157:22 191:22
244:9 254:5
**greater**  121:17
128:10
**greenberg**  38:15
**gregory**  41:19
**grieved**  206:15
**grievous**  131:9
132:8

**ground** 51:3 68:7
70:3 141:12 257:6
263:13
**grounded** 75:22
**grounds** 138:13
258:1
**groundwork**
77:25
**group** 2:22 4:1,8
4:18,21,25 9:18
9:21 11:2 12:5,12
12:22,25 13:4
15:5,8 16:1 17:5
17:12,22,25 18:4
20:11,14 21:1
22:5,12,22,25
23:4 25:5,8,21
27:1,8,18,21 28:4
30:11,14 31:1
32:5,12,22,25
33:4 35:5,8 38:2
40:8 126:16
164:16 195:9
196:9 201:6
214:18 221:18
225:21,25 227:19
231:9,12,15
279:23
**groups** 202:19
**grows** 122:3
**guarantee** 79:11
200:15
**guard** 39:21
189:15,25 190:3,6
190:7,13,15,20,21
190:23 207:6
273:7,15 274:7,24
**guard's** 190:15
222:24
**guardrails** 226:7
226:15,16,21
**guess** 61:5 70:25
98:23 114:25

115:4 121:14
122:5 131:21
135:16 140:7
141:25 147:18
158:19,25 176:9
177:15 180:19,19
219:1 225:1
240:19
**guidance** 163:13
**gump** 39:8 201:11
**gun** 103:16
235:21
**guth** 3:21 12:2
17:2 22:2 26:21
32:2

## h

**h** 2:18 8:11 10:23
13:19 14:3 15:22
19:9 20:22 23:20
24:3 25:17 29:3,9
30:22 33:20 34:3
41:10 42:19 193:5
**hadley** 36:11
**half** 216:20 238:3
**hand** 100:2,3
118:4 159:25
189:25 193:1
194:1 195:24
274:20,21
**handful** 222:6
**handle** 154:24
**handling** 45:1
**hands** 84:3
**happen** 57:4,24
71:19 72:6,15,22
73:25 83:6 97:24
128:11,21,22
131:11 133:17
150:22 163:25
166:9 168:19
169:1,25 170:16
171:21 175:4,5
176:1 179:3

181:17,18 218:1
237:19,21 250:18
253:9,10
**happened** 55:10
57:23 97:19
207:22 208:4
**happening** 49:5
53:4 55:15 72:10
73:5,12 74:21
85:8 97:13 100:1
109:14 124:11
141:12,13 182:22
183:13,14
**happens** 105:3
139:1 142:22
171:19 179:5,12
179:14 180:7
184:25 200:17
236:12
**happy** 44:19
45:25 46:12 52:8
159:1 169:16
174:10 175:7
183:3 188:23
199:15 220:8
**hard** 70:18,22,23
78:5 85:14 91:24
92:13 98:20
107:19 116:18
138:20 139:12
145:22 178:7
185:20 205:22
207:23 236:3
240:4
**harder** 250:9
**hardship** 51:7
146:11,11 222:1
**hardships** 48:23
52:24 85:17,19
144:3,24 145:6
222:23
**harm** 51:13,22,22
53:1,3 56:6,12,24

57:3,9 58:2 68:14
68:23 70:12 77:4
81:10 82:6,7,14
84:15 85:20 91:6
91:8,10 92:20
94:1,1 95:4
102:20 103:6,8
104:1 107:4,14,20
107:21,24 108:6,8
110:3 112:3,4
115:3 125:1 131:9
132:8 133:2
138:14 139:18
140:4,17,18,25
141:2,12,14
143:12,23 144:4,8
145:17,23 147:9
148:6 149:7
151:17 152:1
162:19 164:10
167:19 169:10
171:12 174:3
175:11 176:23
178:10 180:1,3
187:14 188:15,20
189:5 201:7
202:21,23 203:20
204:20 205:2
214:16 216:14
217:2 221:25
222:22 226:10,18
230:13,22 231:4
231:21 232:1,17
232:23 233:3,13
233:14,15,16,25
234:20 235:5
236:1 238:20
243:8 249:18
257:17 258:3
261:6 262:3
265:23,25 266:4,5
266:24 267:9,10
267:12,13,14,16

270:11,12 272:2,5
272:17 274:21,23
274:25 277:6
278:14
**harmed**   76:15
82:4,11 92:16
203:3 204:13,14
230:15 231:21
233:20
**harmfully**   208:17
**harms**   51:14 70:9
70:9 75:21 91:1
94:4 96:13,24
103:10,20 105:23
108:4 109:15
113:3,13 121:16
125:16 132:20
136:10 142:22
162:18 188:20
189:6 200:24
201:1 217:11
227:5 229:18,19
230:4,16,18 233:5
233:12 234:1
237:6,6 240:23,23
240:24 250:7,9
253:16 256:24
276:2 277:7
**harold**   3:10 11:15
16:14 21:14 26:10
31:14 41:17
242:25
**hartman**   93:19
232:4 249:25
**hartman's**   250:2
**hasn't**   255:4
**hatch**   163:22
**hauer**   39:8 201:11
**haven't**   248:4
**head**   75:17 103:16
186:11 235:19
**headed**   62:9

**health**   197:12
220:21 227:14
**healthcare**   281:7
281:15
**hear**   48:12 49:21
51:11 52:8,18
64:21 94:16
136:14 138:2
146:22 154:13,17
155:6 156:20
157:18 158:4
159:14,15,18
175:14 183:23
187:17 188:9
189:5 201:12,14
221:17,22 248:8
249:8 252:5
268:23 271:5
**heard**   55:7,16
58:14 83:11,13
86:16 114:25
155:5 156:2,13,15
168:3 169:18
171:24 175:22
176:7 198:1
205:22 215:17
225:17 243:1
251:3 252:9
253:17 267:11
**hearing**   2:1,2,3,6
2:7,9,16,22 3:1,7
3:13,20 4:1,11,18
5:1,16,18 6:1,5,11
6:19 7:1,3,10,15
8:1,9,15 9:1,8,14
9:18 10:1,9,16
11:2,6,12,18 12:1
12:5,15,22 13:1
13:11,17 14:1,7
14:14,21 15:1,5
15:10,15 16:1,5
16:11,17 17:1,5
17:15,22 18:1,7

18:13,21 19:1,7
19:13,20 20:1,7
20:11,16,19 21:1
21:5,11,17 22:1,5
22:15,22 23:1,7
23:12,18 24:1,7
24:14,21 25:1,5
25:10,21 26:1,7
26:13,20 27:1,11
27:18 28:1,7,19
29:1,7,13,20 30:1
30:7,11,16,19
31:1,5,11,17 32:1
32:5,15,22 33:1
33:12,18 34:1,7
34:14,21 35:1,5
44:4,15,17 45:18
48:1,3,4 52:13,20
55:21,25 56:2,8
56:19 57:21,22
65:16 75:9 89:22
92:24 94:25 98:3
104:7 111:2
118:10 124:14,20
163:21 164:9
165:16 166:1,4,6
166:8,10 169:12
169:18 172:5
174:23 178:6
180:22 181:7,8,10
181:17,19 186:23
186:25 187:5,22
187:24 200:14
202:8,11,13,15
208:9 209:16
215:16 216:22
217:22 228:11,17
229:1,1,10,11,23
231:1,22 232:15
234:11 238:7
242:7 246:10
248:18,25 255:5
258:24 260:13

270:4,5,22 271:8
271:12,14 279:2
280:15,15,16
**hearings**   46:17
228:20,22 235:2
**hearsay**   126:1
198:20
**heart**   65:20 82:8
**heavily**   245:24
**heavy**   85:12 256:4
**heels**   246:13
**height**   116:23
**held**   2:3 44:16
56:2 59:6 98:17
101:8,15 186:14
205:13 259:12
265:21
**help**   75:19 106:18
160:1 190:2 193:3
194:2 195:25
213:24 219:2
277:6 281:7
**helpful**   48:10
49:25 50:15
**helping**   191:19
**helps**   219:15
**herculean**   223:15
**herring**   252:11
**hesitated**   202:3
**hestrup**   3:17
11:22 16:21 21:21
26:17 31:21
**hiding**   165:23
166:3
**higgins**   36:8 44:23
44:23 45:8,12
46:6,14 47:15,21
48:6
**higher**   65:11
95:13 107:13
112:20,23 116:6,8
122:9

**highlight** 151:16
**highlighted**
 187:14
**highly** 114:8
 127:10 245:16
 259:8 260:17
 269:14
**hindsight** 207:25
**hinted** 242:5
**hire** 92:25 93:5
**hiring** 93:1
**history** 203:14
 221:5
**hit** 138:5 164:2
 186:10
**hoc** 2:16,19 3:7,11
 4:1,7,25 8:9,12
 10:21,23 11:12,16
 12:5,11 13:4,17
 13:20 14:1,4
 15:20,22 16:11,15
 17:5,11 18:4 19:7
 19:10 20:20,22
 21:11,15 22:5,11
 23:4,18,21 24:1,4
 25:15,17 26:7,11
 27:1,7 28:4 29:1,4
 29:7,10 30:20,22
 31:11,15 32:5,11
 33:4,18,21 34:1,4
 37:9 38:2 39:17
 93:3 189:15
 202:19 214:18
 221:17,21 227:19
 276:17 278:18
**hold** 100:13 114:9
 116:19 203:24
 235:11 271:8
 273:25
**holder** 256:25
 257:19 267:16
**holding** 101:17
 210:21 235:21

 261:3
**holdings** 81:6
 265:12,12,20
 266:18
**holds** 48:19
**holiday** 186:18
 217:23 270:20
**holidays** 186:20
 216:17
**hon** 1:22
**honestly** 145:5
 149:23
**honeywell** 257:1,3
**honor** 44:23 45:3
 45:9,12,14,22,25
 46:6,10,14,25
 47:4,22 48:6,9
 49:25 50:6,15
 52:22 54:19 56:7
 57:16,23 58:16
 59:15 60:8 61:7
 63:17 64:5,20
 65:1,4,15,21
 67:23 71:12,18
 72:7,16,17 73:2,7
 73:17,21 74:3
 75:12 76:21 77:5
 78:22 79:17,23
 80:9 82:12 83:7
 84:1 85:18 87:21
 88:8,11,21 90:2
 91:8 92:18 93:8
 93:22 94:7,14,21
 94:23 95:1 96:4
 96:10,17 99:3,19
 100:19 101:21
 102:11,12 103:9
 104:7 106:4
 107:23 108:2,25
 109:4 110:14,24
 111:13,23 112:16
 112:21,22 113:14
 114:9,12,14,19,24

 115:12 116:25
 117:2 118:7,11,16
 120:2 121:1,9
 122:5,7,13,17,20
 123:8,17 125:9,18
 127:8,8,18 128:17
 129:3 131:5 132:2
 133:8,12,21
 135:10 137:6,19
 137:22 138:5
 140:10,21 141:9
 143:8 144:20
 145:14 146:24
 148:23,25 149:15
 149:23 150:8,10
 151:4,14 152:22
 154:3,7,9 157:5
 158:18 159:8
 163:2,8,12,16
 164:1,9 165:11,15
 169:17 170:19
 171:7,25,25 172:3
 172:4 173:25
 174:1 175:17,22
 176:17 177:4,21
 178:9,20 179:17
 181:1,9,12 182:3
 183:3,11,15,23
 184:2,15,23
 185:19 186:4,6,10
 187:2 188:13,13
 188:21 189:13
 190:13,21 191:4,8
 192:8,10 194:23
 195:7,14 196:4,12
 198:13,16,25
 199:10,17 200:12
 201:10 203:17
 204:10 205:3,18
 209:15,19 214:22
 215:1,20 219:21
 219:23 220:3,5,9
 220:24 221:16,19

 222:13,25 224:17
 224:18,20,24
 225:17,22 226:15
 227:9,18 231:22
 232:6 233:17
 235:17 238:6
 240:19 242:22,25
 243:4 245:9,20
 246:19,23 247:4
 247:18,20,25
 248:11 249:4,8
 251:8,14 252:2,4
 252:7 254:2,7
 281:1,5,14,21
 282:4
**honor's** 45:4
 46:24 61:3 97:4
 150:6 172:8,8,9
 199:23 226:24
**hook** 203:22
 204:2
**hope** 134:15
 224:16 241:17,19
 246:7
**hoped** 244:4
**hopefully** 188:17
 201:21 248:12
**hoping** 114:22
**horses** 235:11
**hospitals** 4:25
 13:5 18:5 23:5
 28:5 33:5 204:8
 217:5 273:5
**hostage** 102:6
 114:10
**hour** 188:19
 228:20
**hours** 55:8 191:14
**housekeeping**
 45:2,6,13 48:7
**howell** 66:11
**hudson** 36:13
 58:9 59:5

huebner  4:15 9:15
  12:19 15:2 17:19
  20:8 22:19 25:2
  27:15 30:8 32:19
  35:2 41:14 56:23
  104:10
huge  139:1 150:20
hugh  42:5
human  227:10
hundred  231:10
  272:20
hundreds  241:2
hung  128:4
hurley  39:13
  41:15 191:4,5,8
hyde  35:25 283:3
  283:8
hypothetical
  56:25 231:4
  235:12 236:20
hypothetically
  232:25
hypotheticals
  253:7

**i**

i.e.  69:13 76:13
  173:1 262:25
  263:8 266:1,3
  267:21 275:12
  278:10
iac  152:9
iacs  151:18
icc  191:21
ice  173:7
idea  133:25
  219:12 227:23
identical  57:15
  115:14
identification
  231:20
identified  56:11
  79:22 114:9,14,19
  138:8 174:4,7

175:12 226:12
  259:6
identifying  45:19
  57:11
ignore  244:12
ignoring  112:5
ii  4:4 5:11 12:8
  17:8 18:16 22:8
  27:4 32:8
iii  5:13 18:18
  38:21 263:2
illumination
  119:20
imaginably  211:4
imagine  60:23
  83:23 85:3 183:1
imitated  107:15
immeasurable
  217:2
immediate  99:15
  139:15 181:13
  184:6 274:4
immediately
  185:22 234:12
immense  96:13
imminent  57:9
  58:11 167:13
  180:1,12 267:15
immunity  203:18
  203:23 204:2
  252:23 280:2
impact  75:14
  147:8,9 150:22
  151:7,8 238:1
implement  80:11
  272:13
implementation
  44:6 244:15 265:8
implemented
  130:9 133:24
implementing
  140:11 141:3

implicated  210:6
  252:12
implication  170:9
implying  252:25
importance  83:2
  85:20 109:18
  110:4 137:4 138:8
  225:15 266:3,6
important  49:22
  51:25 53:17 54:25
  57:12 61:23 66:22
  83:12,12 87:23
  88:11 90:6,22
  94:3,22 108:9
  111:3 114:1,11
  125:23 132:18
  145:21 147:4
  174:2 181:23
  186:11 208:1
  222:4 231:19
  251:24 257:3
importantly
  200:12
impose  110:1
  119:15 172:9
  226:3 277:16
  279:4
imposed  138:18
  277:24
imposing  217:21
  278:21 279:11
imposition  214:4
  233:20
impression
  178:20
improper  224:14
  248:18
impropriety
  202:15
imputation  89:17
inaccurate  248:16
inapplicability
  260:9

inappropriate
  119:15
incalculable
  135:11,17 136:9
include  98:5
  119:3 121:6 232:5
  249:25 250:25
  258:15 278:25
included  47:25
  65:16 120:9 192:3
  225:25
includes  61:15
  101:22 164:15
  266:6 269:18
  281:8
including  44:11
  53:20 62:22 66:6
  98:7 109:4 135:7
  136:4,15 137:17
  138:11 174:7
  176:4 182:22
  199:1 203:17
  223:11 244:2,5
  250:1 259:14,24
  260:9 261:14
  269:12,22 270:8
  275:22 277:13,18
inconceivable
  83:25
incorrectly
  125:15
increase  238:11
increases  112:4
  227:10
increasing  130:20
  274:8
increment  218:8
incremental
  107:14 207:15
incur  105:20
incurring  105:19
ind  265:20 266:18

**indefinite** 58:2
**indefinitely**
243:19
**indemnity** 262:15
**independent**
102:22 107:17
143:14
**indian** 217:4
278:1
**indicate** 275:7
**indicated** 73:3
127:8 174:16
183:5
**indication** 123:23
**indiscernible**
102:8 108:19
114:11 135:15
175:8 184:3
191:19 210:15
232:3 240:16
241:2,7 242:11,14
247:8,14 280:16
281:14
**individual** 4:2,8
12:6,12 17:6,12
22:6,12 27:2,8
32:6,12 38:2
88:18,20 89:2,9
89:14 92:8 227:19
231:4 232:9
249:20,21 262:4
274:4
**individuals** 88:16
88:25 89:18 93:23
229:17,18 230:23
231:7,20 232:24
233:5,15,25
234:10 236:19
238:21 249:22
**inequitable** 84:13
265:9
**inexplicable**
210:24

**inexplicably**
111:24
**inference** 134:23
**inflammatory**
231:3
**inform** 201:22
**information** 5:12
18:17 132:16
275:7
**informed** 192:19
**informing** 237:21
**inherent** 63:21
142:22
**inherently** 54:24
**initial** 143:6 218:5
272:16 274:14
**initially** 168:3
**initiation** 234:17
**initiative** 126:16
**initiatives** 126:12
126:13,15,21
127:12
**injunction** 70:14
93:16 132:16
136:16,19 258:22
262:24 263:18,19
**injure** 256:22
**injured** 256:21
264:18
**injuries** 235:8,13
264:20
**injury** 88:14 93:4
136:21 149:12
187:13 209:25
213:11 214:6,8,12
234:2 235:21
243:18 244:2
257:13 261:8,18
261:21 264:20,21
271:25 272:15,18
272:25 276:18
278:19

**injustice** 206:16
**innate** 209:11
**innocent** 243:6
**inquiry** 53:20
262:20
**insert** 213:21
**inside** 201:16
**insights** 191:22,24
**insist** 109:20
117:20
**insisted** 98:4
111:2 202:11
**insisting** 253:2
**insofar** 226:16
**instance** 69:9
97:25 114:2
149:11 152:2
211:25 252:21
263:1 272:7
**institutions** 114:3
**instruction** 248:5
**insufficient** 136:3
**insurance** 3:13
11:18 16:17 21:17
26:13 31:17
262:15
**insured** 90:17,18
**insureds** 90:17
**int'l** 257:1
**intact** 65:10
**intellectual** 92:14
**intend** 112:19
176:7
**intended** 105:15
159:22 185:11
190:8 193:10
194:10 196:7
**intends** 164:13
**intention** 124:9
231:2
**intents** 171:15
264:19

**interacting**
192:22
**intercreditor**
273:22
**interest** 46:21
86:12,15,22,24,24
87:1 93:24 94:2
110:14,16 111:9
111:10 112:3,6,8
113:2 114:18
201:7 202:22
209:20,22,23,23
209:25 210:6,16
210:25 211:20,21
212:1,2 214:15,20
221:6,9 222:23
227:5,12,12
230:21 235:13
243:8 244:7 245:9
249:18 256:25
259:23 260:25
263:24,25 264:6
266:5,9 272:1
275:2 276:4
277:20
**interested** 256:23
271:25 272:3
**interesting** 150:12
151:18 152:19
250:10,16
**interests** 85:24
202:16 211:2,24
221:11 249:17
275:4
**interim** 56:7 71:7
71:19 133:15
171:13 187:7
242:16
**intermediate**
115:2
**international**
152:3

**interplay** 74:18
**interpretation**
  120:20 121:5,7
  148:3
**interpreted**
  277:19
**interpreting** 64:4
**interrupt** 56:16
  73:19 128:12
  142:6 180:19
  218:25
**intervening** 72:1
  152:2
**interviewing**
  223:24
**intolerable** 107:7
**intricate** 273:22
**introduce** 158:16
**introductory** 68:1
  221:24
**inversely** 257:12
**investigating**
  203:10
**investigation**
  213:20,23
**investigations**
  203:13
**investments** 66:10
**invited** 200:18
**invoking** 76:18
  81:7 226:2 266:21
**involve** 58:24
  172:21 266:8
**involved** 116:1
  141:22 192:21
  253:10
**involves** 252:14
**ira** 3:3 8:18 9:4
  11:8 14:10,17
  16:7 19:16,23
  21:7 24:10,17
  26:3 29:16,23
  31:7 34:10,17

**iridium** 273:21
**ironically** 208:24
  243:15
**irrelevant** 220:6
  220:25 221:3
  277:17
**irreparable** 51:13
  51:22 53:1,3
  68:14,23 70:12
  72:3 81:10 88:14
  102:20 103:6,8
  125:1 138:14
  139:18 140:4,17
  140:18,24 141:2
  141:11,14 143:12
  143:23 144:4,8
  145:17 147:9
  148:6 149:7,12
  152:1 188:15,20
  189:5 203:20
  204:20 205:2
  209:25 214:16
  216:14 221:25
  222:22 226:10,18
  233:14,16 243:8
  257:13,17 258:3
  261:6 264:21
  265:23 266:24
  267:10,12,13,13
  267:16 270:11,12
**irreparably** 68:18
  203:3 204:12
  256:21 264:18
**irrevocably** 102:7
**irv** 65:21 186:7
  199:10
**irve** 39:6 122:17
**isaac** 157:14
**isaacs** 30:17 41:16
  44:9 156:13,17
  157:7,11,17,21
  249:25

**isaacs'** 255:14,20
**israel** 3:10 11:15
  16:14 21:14 26:10
  31:14 41:17
  242:25 243:1,4
**issuance** 187:20
**issue** 45:13 46:21
  48:11,13,20,21
  49:10,19 50:2
  51:12,14,15 52:24
  53:25 54:23 57:15
  58:13 60:16,20
  62:25 65:11 66:16
  67:10 68:22 69:8
  69:9,16,25 82:3
  83:1 90:6 92:14
  104:9 107:13,21
  108:3 110:6
  111:21 112:1,7
  115:13 116:14
  118:15 121:11,15
  122:11 130:23
  138:7 139:1,14
  145:16 147:9
  148:22 152:14
  169:17 171:17
  189:14 199:3
  201:8,23 217:10
  220:14 222:24
  224:18 225:5
  227:21,25 229:20
  241:19 247:6,15
  254:1 262:25
  264:14 267:12
  268:8 271:1
  275:25 276:2,7
  277:6
**issued** 119:3
  134:9 257:23
**issues** 45:2 46:15
  48:7 52:18 53:3
  53:25 54:6,15
  57:3,16,17 58:8

  60:6 67:3 68:25
  69:3 76:15 82:9
  83:12 86:16 87:18
  88:11 91:20 94:3
  101:16 109:13
  113:21,23,24
  114:2,17 118:8
  119:2,3,3 123:2
  136:13 138:20
  139:18,23 147:7
  150:17 192:20
  201:13 211:11
  221:25 225:16
  234:25 255:14,23
  258:4,8,13 264:14
  273:16 275:17,18
  276:24
**issuing** 203:18
**it'll** 175:21 215:1
**item** 45:8
**items** 46:15
**it's** 245:16,18,24
  245:25 246:2,2,8
  246:19 249:6,6,10
  249:11 250:7,10
  250:15 251:5,8,22
  251:24 252:19
  253:1,22 267:2
  271:13 273:17
  281:4,4,6
**iv** 280:6
**i'd** 245:17
**i'll** 273:16 276:1
  282:2
**i'm** 240:7 246:23
  246:24 247:13
  255:16 267:2
  271:3 280:22
**i've** 246:25 268:12

**j**

**j** 4:7 7:12 10:17
  12:11 15:12 17:11
  22:11 25:10 27:7

32:11 38:6,13,21
39:6 40:12 41:25
42:16 43:9 114:22
160:3 193:6 196:3
**j&j** 246:11
**jacquelyn** 43:1
**jail** 237:16
**james** 42:4
**jan** 81:15
**january** 132:25
133:3 183:7
187:21,22 188:5
189:9 215:2,13,16
215:22,22 216:18
217:19,20 218:6
218:12 228:13
233:7 234:5,5
237:19,22 238:17
239:14,16 240:15
242:20 267:1
**jasmine** 40:24
**jeffrey** 40:12
42:16 195:7
225:20
**jeopardized** 150:4
**jeopardy** 104:15
105:9 124:22
139:10
**jerome** 43:2
**jersey** 138:25
165:25 180:22
200:11 242:6
279:2
**jesse** 9:14 15:1
20:7 25:1 30:7
35:1 41:8 163:6
**jill** 40:21
**job** 85:2 130:22
251:22
**john** 39:21 142:4
190:4,23
**johns** 262:14

**johnsbury** 53:21
75:17 76:22
266:13
**johnson** 208:22
208:22
**join** 214:6 227:15
**joinder** 2:22 3:8
3:13,20 4:4,22
11:2,13,18 12:1,8
13:1 16:1,12,17
17:1,8 18:1 21:1
21:12,17 22:1,8
23:1 25:21 26:8
26:13,20 27:4
28:1 31:1,12,17
32:1,8 33:1
254:25 255:9
**joined** 44:24
204:18 229:12
254:23 255:1,4,11
**joining** 213:25
**joint** 6:2,6 13:9,12
18:22 19:2 23:9
23:13 28:16,20
33:9,13 59:3
124:16
**jonathan** 37:13
189:13 221:19
**jones** 41:18
**jordan** 43:10
**jorgensen** 40:17
191:2 194:25
195:4,9,14,16,23
196:1,2,4,5,12,14
196:18,22 197:1
197:18,22 198:12
198:13
**jorgensen's** 198:3
198:7,19 199:1
227:8
**jorgenson** 274:7
274:24

**joseph** 9:12 14:25
20:5 24:25 30:5
34:25 41:19 43:3
**juaire** 8:15 14:7
19:13 24:7 29:13
34:7 40:15 114:22
191:3,11 192:2,25
193:4,5,7,8,14,16
193:21,23 206:10
274:2,24
**juaire's** 193:19
**judge** 1:23 44:2
50:11,25 51:21
52:3,13 53:10
54:21 55:9,16
56:1,13,17,21
57:6,18,21 58:14
59:11 66:15,23
67:10,14 68:4
70:6 75:16 78:6
78:11 79:8 81:5
81:23 82:22 91:22
98:23 109:17
115:25 116:13
121:12 123:2,9
146:17 147:8,18
154:15 155:14
156:9 163:19
166:24 167:11
169:5,18,23 170:1
170:5,6,16 171:14
171:19 172:2,12
172:14 174:15
175:8 179:6 183:5
215:18 216:8,20
217:22 225:22
226:8,13,21
228:13,24 230:6
235:18 237:21
239:13,19 240:5
240:11,11,12,25
257:10 278:1

**judge's** 67:13
200:16
**judges** 62:21
**judgment** 58:18
58:19,25 59:5
62:1,2,5,5,6,7,13
62:15 63:1,8
115:21 120:18,21
121:2 150:6
246:11
**judgments** 120:16
**judicial** 45:20
46:3,4,9,19,23
47:3,4 48:2 238:8
250:1 256:11
**julius** 41:5
**july** 66:12
**june** 223:6 256:16
278:4
**jurisdiction** 76:17
172:8 279:25
**jurisdictional**
69:23
**justice** 36:3 67:25
**justify** 142:3
207:11

**k**

**k** 194:5
**kajon** 3:17 11:22
16:21 21:21 26:17
31:21
**kamenetzky's**
54:16
**kaminetzky** 37:20
47:3,7,16 54:19
54:20 56:21 157:5
157:6,9 158:18,19
158:24 159:4,8,10
159:12 163:1,2,8
163:11,12 165:5
165:10,13 166:17
166:19,22 167:22
168:2,12,14,18,20

168:23 169:9,15
170:19 171:3,5,9
172:25 173:2,14
173:17,19,22
174:21 175:1,5,16
179:4,9,11,17,20
179:23 180:3
181:1,3,9,25
182:6,11,15,18
183:11 188:8,11
216:15 219:12
242:5 245:12,20
247:6 281:21
282:4
**kans**   66:11
**kaplan**   38:8 65:5
75:16 94:15
116:13 252:5
**kara**   9:1 14:14
19:20 24:14 29:20
34:14 40:16 244:9
**kate**   42:23
**katherine**   42:12
**kathleen**   36:23
**kathryn**   41:1
**keenly**   109:18
**keeping**   130:11
**kelly**   257:1
**kenan**   5:5 10:6,13
28:11 42:18
**kenneth**   2:18 8:11
10:23 13:19 14:3
15:22 19:9 20:22
23:20 24:3 25:17
29:3,9 30:22
33:20 34:3 41:10
**kept**   98:7
**kesselman**   41:20
**kevin**   4:20 9:20
12:24 15:7 17:24
20:13 22:24 25:7
27:20 30:13 32:24
35:7 42:1

**key**   95:1,5 181:20
219:16 271:19
**kibitzer**   260:14
**kind**   54:22 57:5
81:11 87:25 98:1
102:6 107:16
108:6 172:8
200:10 215:19
227:20 246:2
**kirk**   195:18 197:9
**klein**   41:21
**kleinberg**   38:8
65:4 94:15 252:4
**knew**   197:8
**know**   45:22 46:11
49:13 50:8 52:25
53:1 54:2,16 55:4
56:2 58:5 64:6
67:20 68:1,5,9,10
69:1 71:20,24
73:4,7,13,14,24
74:4,9,9,12,15,18
74:20,23 77:14,15
78:3,24 79:8
80:16 82:12 83:8
84:2,20 85:1
86:17 87:21,24
88:2,7,12 90:8,12
90:13 91:14,16
93:9,10,13,25
94:7,8 97:9 106:3
115:9 121:25
122:22 123:24
125:9 130:14
134:6,12 135:1
138:23 139:3,4,9
142:21,24 144:6
145:7 146:10
151:1,15 152:6
153:8 155:2,12
156:16 157:14
158:12,14 159:12
161:12 162:25

167:15 169:21,22
169:25 170:3,4,5
170:13 171:14,18
173:8,11 175:21
176:1,3,9,25
177:5,7,7,14
178:12,16,22,23
179:13,13 180:7
180:24 181:12,14
182:6,23 183:4,12
185:6 188:7,18,24
199:20 200:15,19
201:17 202:15
204:5,9 207:22
215:18 216:15,15
216:17 219:11
220:8,11,20
221:13 222:25
225:4 229:22
232:5 242:19
245:11 246:15
247:23 248:17,21
248:22 249:7,14
249:18,19 250:15
250:20 253:20
**knowing**   97:16
117:17 132:8
160:9 190:10
196:10 210:8
**knowledge**   125:25
126:1,5,6,15
128:21 129:8,16
135:14 139:7
191:22
**known**   207:9
**knows**   57:23
123:8 165:15
169:25 181:12
183:9 207:25
**kramer**   37:8
189:14 221:20

**l**

**l**   43:7 160:3 193:5
196:2
**l.p.**   1:7 3:5 4:8,16
6:7 7:12 8:19 9:5
9:12,16 11:10
12:12,20 13:13
14:11,18,25 15:3
16:9 17:12,20
19:3,17,24 20:5,9
21:9 22:12,20
23:14 24:11,18,25
25:3 26:5 27:8,16
28:21 29:17,24
30:5,9 31:9 32:12
32:20 33:14 34:11
34:18,25 35:3
44:3
**l7/2021**   28:16
**label**   232:8
**lack**   231:20
233:15 238:25
258:2 263:9 266:5
**lag**   218:10
**laid**   114:21 143:3
262:19
**landscape**   238:5,7
246:10
**lane**   195:6,18
197:9 198:15
199:3
**lane's**   195:20
198:4,16,21,25
199:6,12
**language**   50:16
64:6,7 66:2
118:17 120:8,10
224:21 277:4
**large**   103:21
151:15 258:25
**largely**   221:2
260:3,14

**larger** 150:11 240:19 244:5

**largest** 220:20

**larry** 40:5 281:1

**lasted** 208:13

**lastly** 250:20

**late** 239:3

**laura** 41:12 42:22

**lauren** 3:21 12:2 17:2 22:2 26:21 32:2 43:12 155:8

**law** 2:10 4:11,11 6:5,12,19 7:16 8:2 9:9 12:15,15 13:11 14:22 17:15 17:15 19:1 20:2 22:15,15 23:12 24:22 27:11,11 28:19 30:2 32:15 32:15 33:12 34:22 45:15 49:14 50:24 51:18,20 53:9 54:23 57:12,14 58:16 59:4,15 64:4 69:14,16 73:22 75:5,24 76:10 85:3,11 88:21 89:6 102:23 115:8 120:7 147:15,25 153:19 172:4 179:18,18 238:12 258:14,18 263:11 269:17 277:20

**laws** 88:18,20 103:5 146:9 252:17

**lawsuit** 203:23

**lawsuits** 131:18 136:4 204:2

**lawyer** 92:10,25 93:1,5 117:3

**lawyers** 93:2 105:8 111:15

**lay** 84:23 126:4 129:15

**layers** 275:1

**laying** 77:25

**lays** 215:9

**lead** 79:25 80:3 84:11 85:4 127:5 131:2

**leading** 124:3 188:4

**leafing** 50:12

**learned** 196:19

**leave** 9:8 14:21 20:1 24:21 30:1 34:21 150:6 158:16 189:16 235:7 246:15

**leaves** 65:10

**ledanski** 35:25 283:3,8

**lees** 41:22

**left** 53:4 66:15 232:22

**legal** 68:10 69:10 106:20 108:9 147:7 148:15 241:8 283:20

**legally** 69:14 246:12

**legislate** 242:3

**legislation** 46:16 237:25

**legislative** 237:23 260:7

**legitimacy** 84:16

**legitimate** 63:7 82:10 83:21 135:20 274:25

**length** 130:6 156:16 262:6,18 273:20

**lengthy** 98:3 121:25 258:6 276:13 277:9

**lenient** 267:16

**lesser** 92:12 150:8 151:4 270:22

**lest** 165:23 166:3 202:11

**letter** 57:10 220:11 281:10

**letters** 206:13

**level** 51:8 98:11 109:10 111:22 226:10 264:24 265:2 274:9

**levels** 111:7 112:20

**levene** 41:23

**leventhal** 41:24

**levin** 37:8 189:14 221:20

**levine** 36:9 41:25 44:25 63:17,17 64:5,20 65:2,6 67:21,23,24 71:12 71:18 72:7,10,16 73:2,21 75:12 76:21 77:1,5 78:22 79:17,23 80:3,9,19,21 82:12,17 83:7 84:1,7,9 85:18 87:14,21,24 88:7 88:19 89:1,13 90:2 91:8,13,15 92:18 93:8,19,22 94:7 175:17,19,20 176:17,21 177:4 177:16,20,24 178:8,16,18,20,22 179:2,14 183:11 248:11,11 249:4 250:10 251:3,8

**lexington** 37:17

**lexis** 66:7,8,10 81:6,15 224:9,12 262:9,10 266:19 266:25 278:3

**liability** 89:8 252:10,12 253:1

**liable** 89:19

**licenses** 127:6

**licensing** 141:22 250:14

**lien** 152:20 153:20 153:21

**lies** 256:25 272:1

**liesemer** 40:12 195:7,8,13 198:16 199:17 200:24 225:17,20,20

**life** 205:14 206:21 244:21

**lifesaving** 244:15

**lift** 279:10

**lifting** 242:12

**light** 49:15 61:12 85:2 190:18 224:13 231:2,9 243:9 275:21

**lightfoot** 121:13 277:25

**likelihood** 48:19 49:10 54:7 56:5 60:16,24,25 68:2 70:2,8 229:6 275:22

**limb** 96:21

**limit** 9:9 10:9 14:22 20:2 24:22 30:2 34:22 46:24 62:14,21 75:23 105:24 176:5,12 250:25 280:8

**limitation** 193:20 194:17

**limitations** 198:4
**limited** 6:21 7:5
  61:19 90:10
  107:18 109:9
  128:3 129:19
  130:3 132:9,12
  160:14 190:17
  227:2 256:14
  261:15 262:10
  268:13
**limiting** 64:7 66:1
  171:13
**limits** 45:6 48:15
  69:11 86:18
  139:11 268:7
**linda** 2:13 5:21
  6:16,24 7:7 42:13
**line** 69:20 157:7
**lines** 89:7 97:14
  100:6,7 183:6
  215:20
**linked** 100:20
**links** 157:23
**liquidate** 236:17
  272:23
**liquidated** 108:19
  136:22 151:9
**liquidating**
  265:10 272:14
**liquidation**
  236:18 241:5
  261:19
**list** 46:1 248:21
**listed** 46:9,16
  93:15 109:5
**listen** 7:10
**listened** 206:14
**lite** 38:15
**literally** 104:20
  144:9 167:19
  255:15 261:17
  266:9 277:10

**litigate** 58:8,13
**litigated** 58:24
**litigating** 92:8
  244:21 273:16
**litigation** 2:20
  8:13 10:24 13:21
  14:5 15:23 19:11
  20:23 23:22 24:5
  25:18 29:5,11
  30:23 33:22 34:5
  51:4 68:8 70:4
  86:4 92:5 93:7,21
  156:1,7 207:10
  214:13 221:22
  244:20 257:7
  258:1 261:17
  263:14 264:9
  276:10,16
**litigator** 199:21
**little** 50:3 51:10
  51:11 82:13 84:3
  103:16 109:5
  147:6 150:15
  175:2 187:13
  201:22 205:22
  208:11 235:20
**live** 46:12,24
**lived** 108:8
**lives** 132:4 223:4
  277:10
**llc** 5:12 18:17 39:1
  66:8,10
**llp** 36:11 37:8,15
  38:1 39:8
**local** 222:17
**logical** 49:22
  140:23
**logically** 48:13
**long** 47:12 54:9
  64:15 87:19 88:10
  117:14 122:10
  156:19 207:23
  222:1,23 227:22

229:20 238:13
  240:4 251:8
  262:19 273:17
**longer** 67:8 72:3
  99:10 108:17
  149:16,25 150:11
  187:13 188:14
  226:23 276:2
**look** 54:17 73:14
  75:3 84:18 94:1
  95:6 113:2 130:7
  130:17 135:16
  139:24 142:17
  144:11,14 149:2
  187:3 207:25
  225:1 227:24
  232:7 239:10
  242:18 265:2
  280:13
**looked** 162:19
  204:18
**looking** 49:24
  50:1 63:15 64:24
  83:1 88:24 92:3
  109:12 120:7
  123:1 132:15
  135:3 149:11,24
  162:19 174:13
  195:5 230:3
  232:10 248:3
  257:24
**looks** 78:6 201:17
  207:23
**lose** 56:24 70:15
  71:10,11,14 83:5
  148:7 233:23
**losing** 205:8
**loss** 102:23 121:23
  134:13 135:11
  143:15,15 149:8
  191:17 234:7
**lost** 143:20,21

**lot** 54:13 55:5
  86:20 93:1 97:10
  99:8 103:12
  113:17 139:25
  141:24 187:4,7
  188:15,18 205:3
  251:10
**lots** 81:17 206:2
**loud** 171:25 219:6
  231:15
**love** 99:19
**lower** 69:16 84:19
  109:25 122:9
**lowne** 142:4
**lp** 156:25 262:8
**lucas** 42:19
**lunch** 156:19
  157:19

| m |
|---|

**m** 37:13 42:5,6
  43:5 190:4,23
**ma'am** 194:20
**maclay** 4:20 9:20
  12:24 15:7 17:24
  20:13 22:24 25:7
  27:20 30:13 32:24
  35:7 42:1
**madoff** 90:14
  232:3
**magali** 41:13
**main** 39:3
**maintain** 80:13
  97:5 213:4
**maintaining**
  80:15
**maintains** 197:12
**major** 96:24
**majority** 71:4
  87:3 172:6 222:10
  265:21 272:6,8
  273:5
**making** 49:4
  59:16 68:7 89:19

93:24 117:3
128:15 137:13
143:6 152:13
161:7 177:5 178:2
178:5 184:8
218:15 219:7
243:22 253:5
272:15,16
**mallinckrodt**
154:23
**man** 111:23
194:23
**managed** 101:18
**management**
142:7 145:2
**manages** 103:16
**managing** 100:16
**manifest** 240:23
241:3
**manifestly** 110:15
111:9
**manner** 201:25
**manufactured**
246:13
**manville** 90:15
262:15 263:2
280:6
**mara** 41:24
**marc** 9:11 14:24
20:4 24:24 30:4
34:24 41:20 42:21
43:3
**march** 66:11
161:15 274:10,10
**marginal** 87:6
**maria** 41:9
**mario** 41:7
**mark** 231:11
**market** 126:12,13
237:7
**marketed** 111:14
**marshall** 4:15
9:15 12:19 15:2

17:19 20:8 22:19
25:2 27:15 30:8
32:19 35:2 41:14
**martin** 260:6
**maryland** 15:17
18:10 37:1,2
48:10 54:22 58:22
65:1,20 137:2
142:10 146:8
251:15 253:21
254:21 274:17
**massive** 244:12
**master** 5:11 18:16
**masumoto** 7:20
8:6 42:2
**material** 79:20
151:7 172:22
226:11
**materially** 129:13
**materials** 46:23
**mathematically**
234:1,22 239:25
**matter** 1:5 49:20
49:22 84:25 94:24
114:6 145:9
149:14 152:3
205:25 218:12
250:12 253:3
260:11 265:6
**mattered** 218:21
**matters** 46:3
60:14 101:4,17
110:7 112:14
114:13,19,20
116:3 117:10
160:7 191:22
216:24 223:19
237:22 253:6
**matthew** 10:17
15:12 38:13 65:4
94:14 183:23
252:4

**maura** 36:23
**mccarthy** 42:3
**mcclammy** 42:4
**mccloy** 36:11
**mcdonald** 42:5
**mcmahon** 50:25
52:13 53:10 55:16
56:1,22 57:6,18
68:5 79:8 91:22
109:17 115:25
123:2,9 147:8
154:15 155:14
156:9 163:19
166:24 169:6
170:1,6,16 171:15
171:19 172:2,12
172:14 174:15
175:9 179:6 183:5
215:18 216:8,20
217:22 225:22
226:8,13,21
228:14,25 230:6
235:18 237:21
239:13,19 240:6
240:11,12,13
241:1
**mcmahon's** 50:12
51:21 52:4 54:21
55:10 56:18 59:11
66:23 78:6,11
81:23 82:22
167:11 169:18,23
170:5
**mcnulty** 42:6
**md** 37:4
**mdl** 92:10,11
**mdt** 223:25
**mean** 50:6 52:9
57:13,13 59:8,12
60:11 71:17 72:24
75:16 76:10,17
82:1 83:20,23
84:22 90:3 95:24

98:21 107:20
111:12 113:7
116:13 120:20
121:22 130:2
134:19 135:17
136:6 139:8,12
140:9 143:8
144:20 151:14
154:4,18 158:13
162:5,16 164:12
166:15 167:19
172:18 179:6,11
179:12,12 181:25
182:12,14 184:8
185:19 197:8
200:7 219:16
237:14 243:15
246:2 252:25
253:22 261:20
**meaning** 124:13
150:4
**meaningful** 67:16
96:16 107:13
110:18 117:2
130:10 131:3
132:17 136:18
171:25 172:1
186:1 240:1 259:8
277:14
**meaningfully**
110:1
**meaningless**
131:18
**means** 57:13
105:16 107:8
111:12 114:10
121:22 180:10
233:18 234:7
**meant** 66:3
112:18 216:1
**measure** 71:1
108:15 258:25

measures 133:15
mechanics 223:12
mediation 208:5,8
  213:9
medicare 99:13
medicine 205:15
meet 102:16
  171:22 198:22
  249:2
meises 42:7
melissa 43:7
member 126:16
members 134:4
  135:7 191:13
  223:25
memorandum 2:9
  4:11,11 6:12,19
  7:16 8:2 9:9 12:15
  12:15 14:22 17:15
  17:15 20:2 22:15
  22:15 24:22 27:11
  27:11 30:2 32:15
  32:15 34:22 45:15
  258:7 262:12
memorialized
  247:7
mention 103:19
  119:14 206:21
  246:8
mentioned 185:16
  205:6,6 214:17
  255:21
mere 69:1 102:25
  114:6 117:2
merely 46:20 54:5
  81:7 266:20
merge 154:23
merged 154:22
merit 68:12
  207:17 210:15
meritorious 148:5
merits 48:20
  49:11 50:25 51:3

52:11,16,19 54:13
55:6 58:18,20,25
59:2 60:5,17,24
60:25 66:21 67:4
67:10,12 68:7,22
69:1,7 70:3 71:14
72:4,11 81:1 83:2
83:11,13 86:16
88:15 102:11,14
140:7 163:20
167:10 176:22
178:25 228:7
229:4 238:24
242:15 256:1,21
257:5,22 258:9,10
258:17 260:17,20
266:4 267:7
276:24 279:15
mesh 268:10
met 265:17
  271:22
metromedia
  69:17 84:21 90:8
  273:21
mezzanine 262:8
michael 4:24 13:4
  18:4 23:4 28:4
  33:4 40:23 42:10
  42:20
michele 42:7
mid 156:2 177:1
  218:12
middle 182:25
milbank 36:11
millbank 246:20
million 162:6,6,8
  162:18 205:10
  211:8,9,10 212:15
  212:19,20 213:1
  213:11 241:14,14
  241:15 272:20
  273:2 281:8,11

millions 140:10
  241:2 245:5
mind 67:5 135:2
mindful 151:6
mineola 283:23
minimal 87:8
minimize 115:3
minimum 65:8
  81:25 153:7
minority 87:2
  275:13
minus 272:25
minute 167:25
  251:15 253:7
minutes 55:3
  214:23
miscellaneous
  220:18
mischaracteriza...
  55:9 220:4
misconduct 89:2
  89:9,10,11,19
misdirection
  253:3
miserable 244:21
misguided 203:4
misheard 56:22
  56:25 65:15
misleading 208:17
misses 231:11
missing 181:21
missouri 206:7
mistake 65:17
  117:19
mitch 191:4
mitchell 39:13
  41:15
mitigate 253:16
model 109:2
modest 254:15
modified 6:1 13:8
  18:21 23:8 28:15
  33:8 150:25

modifying 62:23
moment 87:10
  104:20 123:22
  161:3 195:5
  211:23 233:6
monaghan 36:23
  247:23,25
monetary 135:18
  137:3 222:20,21
  263:21
money 102:6,7
  107:5 108:21
  113:5,10,11,25
  114:6 131:24
  136:6,20 139:25
  140:12 145:19
  161:21 162:16
  187:8 202:17
  206:2,3 207:8,10
  207:24 208:1,18
  208:19,19 209:7,8
  209:12,13 211:17
  211:18 212:8,11
  212:15,16,22
  213:6,7 217:7
  218:7,8,9,10,12
  222:15 223:8
  234:8 235:10
  236:6 237:2
  243:16 249:12
  251:23 254:16
  274:1,19 276:8
  279:9
monies 220:19
month 161:14
  206:9 216:20
  233:23 239:9
  241:18
months 121:21,25
  128:9 134:22
  160:24,25 161:9
  192:17 205:25
  207:2 208:5,6,7,7

208:8 247:12
**moot** 53:14,17
  75:19,21 76:4
  82:15 84:24 85:6
  98:16 102:2 134:1
  140:13 157:16
  164:19 167:16
  264:23 265:15
  270:3
**mooted** 60:18
**mootness** 48:21
  49:10 51:6,8,13
  51:15,19 52:2
  53:1,2,11,18,22
  54:5,9 68:14
  70:23 71:11,13,17
  72:2,20,23 73:6
  73:15 74:1 75:4
  75:11,22 76:1,5,7
  76:8,18,24 77:8
  78:9,21 80:14,16
  80:21,22 81:7,18
  82:8 83:1,20,23
  85:11,13 97:7,14
  98:10,21 100:14
  100:24 101:3
  102:25 103:1
  111:8,11,17,19
  115:6,11,19,22
  116:3,14,17,19
  117:7,21,24 118:3
  123:23 124:4
  125:2,6 138:10,13
  138:24 139:19
  140:16 141:6,13
  143:4,12,14
  145:15 150:22
  151:13 163:18,24
  165:8 167:8,13,23
  168:5 171:13,23
  173:9,20 174:2
  175:10,24 176:8
  177:10 180:4

181:22 182:24
  183:16,19 188:6
  202:24 219:1,8
  223:11 226:3,9,19
  264:24 265:22
  266:16,21 267:6
  267:11,12 269:9
  269:17 270:3
  274:15 279:14
**morning** 44:2
  54:19 58:12 94:14
  253:13
**mortimer** 36:19
**motion** 2:9,10,16
  4:1,3 5:1,2,9,16
  5:17,19 6:11,13
  6:19,20,23 7:1,2,4
  7:6,15,17 8:1,3,9
  9:8,8 10:3,9,9,10
  10:16,21 12:5,7
  13:17 14:1,21,21
  15:10,11,15,20
  17:5,7 18:7,14
  19:7 20:1,1,16,20
  22:5,7 23:18 24:1
  24:21,21 25:10,15
  27:1,3 28:7,8 29:1
  29:7 30:1,1,16,20
  32:5,7 33:18 34:1
  34:21,21 45:11
  48:15 49:1 50:7
  55:12,16,23 56:8
  56:10 57:20 58:10
  58:19,24 59:14
  62:11 63:3,4,8
  64:21 66:18,20,21
  75:20 78:22 81:13
  105:11 109:3
  132:12 139:17,20
  143:7 145:10,14
  148:16,24,25
  154:11,14,17
  156:2,4,14 157:12

157:12 158:12,25
  163:23 167:4,18
  177:1 178:5,11
  180:8 186:17
  188:1 189:11
  191:9,23 198:23
  202:20 211:3
  216:4 225:3,23
  228:3,13 231:18
  239:5 250:21
  254:10 255:9,15
  255:17,19,20,22
  264:8 268:3
  270:16 271:6,15
  275:19 278:20
  279:13 280:22
**motions** 2:2,17,23
  3:2,9,15 4:5,12,18
  4:23 8:10,17 9:3
  9:10,18 10:22
  11:3,7,14,20 12:9
  12:16,22 13:2,18
  14:2,9,16,23 15:5
  15:21 16:2,6,13
  16:19 17:9,16,22
  18:2 19:8,15,22
  20:3,11,21 21:2,6
  21:13,19 22:9,16
  22:22 23:2,19
  24:2,9,16,23 25:5
  25:16,22 26:2,9
  26:15 27:5,12,18
  28:2 29:2,8,15,22
  30:3,11,21 31:2,6
  31:13,19 32:9,16
  32:22 33:2,19
  34:2,9,16,23 35:5
  44:4,11,19,22
  45:3,11 49:4,7,11
  52:12 56:14 63:5
  65:24 73:11 106:1
  142:3 144:25
  156:25 159:24

167:4,12 178:3
  190:9 193:9 194:8
  196:6,9 215:7
  226:17,20 227:23
  228:2 242:15
  246:25 254:10,19
  254:24 255:1,11
  255:21,24 256:3
  271:10 279:12,15
**motors** 256:6,13
**mouth** 78:16
**movant** 44:17
  156:12 183:21,22
  209:25 210:5
  255:2 256:18,19
  256:21 257:4,13
  264:18 278:12
**movant's** 56:6
  202:7
**movants** 56:11
  58:3 59:9 94:12
  158:7 163:18,22
  164:5,8,9 165:7
  167:4,7 170:24
  187:25 188:25
  189:7 202:22,23
  202:25 207:13
  208:10,16 216:3
  217:12 223:20
  226:12 251:10,12
  256:2 264:19
  269:22 270:11,16
  270:19 271:20,24
  276:3,8 278:23
  279:8 280:21
**movants'** 258:5
**movant's** 270:3
**move** 71:20 85:16
  102:10,19 127:18
  129:10 133:13
  139:5,7 140:22
  141:1 144:22
  145:4,12,15

**158:20 174:9**
191:1 207:20
216:18,22 217:17
218:5 242:9
**moved** 75:25
217:18
**movement** 245:21
**movie** 103:14
**moving** 79:9,9
88:3 102:22 134:3
139:17 141:23
149:8 218:22
260:19 263:15
264:5 268:1 270:8
**mpm** 84:22
**msge** 4:18 9:18
12:22 15:5 17:22
20:11 22:22 25:5
27:18 30:11 32:22
35:5 164:15
225:21,25
**mull** 188:7
**multi** 4:21 9:21
12:25 15:8 17:25
20:14 22:25 25:8
27:21 30:14 32:25
35:8 40:8 195:8
196:8 264:9
**multiple** 73:12
84:7 120:5 136:13
147:21 157:21
**municipalities**
146:25 147:1,6,11
204:6
**municipality**
25:11 38:16
255:10
**murray** 42:8
**mute** 54:18
188:10,11,12,12
**mysterious**
183:12,13

**n**

**n** 36:1 44:1
114:23 160:3
194:5 196:2,3,3
283:1
**n.a.** 66:16 268:11
**n.d.** 66:14
**naftalis** 37:8
221:20
**naloxone** 199:8
**name** 114:3
**narrow** 195:19
198:17,24 199:3
210:20 231:24
263:4
**nas** 3:7,11 11:12
11:16 16:11,15
21:11,15 26:7,11
31:11,15 164:15
204:7 243:1,4,7
243:17 244:2,4,8
244:9,23 245:3
**nation** 25:12
38:17 147:1 278:2
**national** 81:5
206:1 208:21
209:9 264:9
**nationally** 274:9
**nations** 147:6
150:10 151:3
255:10
**native** 2:24 11:4
16:3 21:3 25:23
31:3
**natural** 171:10
**nature** 134:17
148:15 266:1
**ncsp** 203:12
**near** 163:18
**nearly** 81:12
117:8
**necessarily**
100:19 101:2

168:15,21
**necessary** 89:24
95:7 105:25
109:23 169:4
174:15 195:1
239:11,12 240:20
273:20,24
**need** 50:9 52:3
54:4 57:20 61:5
77:3 80:11 96:25
102:5 106:20
115:4 122:2 146:5
152:17,22 153:2
163:21 164:9
172:13 175:11
183:8 185:5
198:25 200:21
225:3 228:6 232:7
233:15 234:1
235:12 239:2
240:24 241:19
242:10 252:21
255:25 257:6
267:9
**needed** 77:23
106:18 253:5,6
267:8
**neediest** 244:17
**needlessly** 129:24
**needs** 51:20,23
53:13,23 57:24
93:11 96:17
172:13 175:9
203:4 224:18,19
233:14 235:17
256:18 274:4
**needy** 110:11
**negligence** 89:6
**negotiate** 117:6
213:10 248:19
273:22
**negotiated** 113:20
245:24 266:8

**negotiating**
281:24
**negotiations**
208:6,7 213:19
220:13
**neiger** 42:9
**neither** 58:21
179:25 267:14
**net** 137:17
**never** 47:24 91:10
140:3 164:17
183:17 188:17
203:6 210:14
214:20 231:13
**nevertheless**
53:19 56:24
**new** 1:2 36:6,14
36:21 37:11,18
38:4,11 39:11,11
40:1,3,3 78:1
106:15 138:25
142:12 165:25
167:4 180:8,22
185:22 187:1
200:11 206:1
217:22 235:8,13
242:6 270:20
278:2 279:2
**newark** 38:19
**newco** 74:12,13
127:7 143:6
160:21 161:22
162:14,18,23
168:9 219:4 224:1
273:11
**news** 197:3
**newspaper** 47:16
47:22
**nicholas** 3:17
11:22 16:21 21:21
26:17 31:21
**niece** 206:23

night 55:22 58:11
166:10 182:25
nj 38:19
nken 256:25
257:19 267:16
noat 108:20
218:17 223:25
non 51:22 53:1
68:16 89:2 90:4
90:21 91:10
111:16 114:14
119:19 147:11,23
148:8 149:6
151:19 210:22
214:4 222:11,21
231:25 232:25
241:21 249:11
259:22 274:25
276:19
norm 276:21
norma's 95:4
normally 108:14
nos 45:18 209:6
209:12
note 44:14 62:3
65:23 66:5,15
101:6 102:20
104:7,19,25
106:14 113:23
123:2 144:23
148:14 158:10
198:8 205:5
206:23 252:8
253:4,13 259:5,10
260:6,11,21 264:5
264:7 276:5
279:20
noted 71:21 164:9
194:18 238:6
262:12 268:10
277:17 279:13
notes 119:22,22
120:8 227:21

257:10
notice 2:6 5:17
7:2,10 45:21 46:3
46:4,9,19,23 47:4
47:5 48:2 62:11
92:24 93:9 165:24
166:10,11,23
170:25 178:7
180:15,18 181:4,5
181:6,10,13,16,22
182:2,9,10,17,21
184:6 187:23
188:1 199:24
200:19 219:13,13
226:4 230:11
239:16 250:1
251:7 259:2,3,9
269:23 270:7,8,16
280:14,15,20
notices 234:11,12
234:13
noticing 181:23
notion 56:15
notions 238:4
notwithstanding
52:11 56:9 114:18
117:12 202:14
244:11 262:14
263:15,18
november 1:16
2:6 44:14 56:12
57:4,21 58:4
77:10 123:9 160:8
170:7 190:11
193:12 194:11
196:10 268:24
283:25
nuances 143:10
nuisance 246:12
number 66:6 89:7
136:2 142:4 156:5
158:10 166:17,22
196:15,19 197:1,7

197:9,15,15,20
200:3,5 206:8
210:1 257:7
numbers 197:13
numerous 81:4
93:15
nw 40:9
ny 1:14 36:6,14,21
37:11,18 38:4,11
283:23

**o**

o 1:21 44:1 114:23
160:3 194:5 196:2
196:3 283:1
o'neil 4:25 13:4
18:4 23:4 28:4
33:4
obaldo 42:11
object 92:15
259:13,14,25
260:16 275:5,6
objectant 44:17
245:11
objectants 156:21
158:4 188:10
199:16 276:1
objected 70:14
93:17 202:19
249:23 272:6
objecting 91:21
127:15 134:20
192:1 211:6
253:18
objection 2:16,17
4:1,2 8:9,10 10:21
10:21 12:5,6
13:17,17 14:1,2
15:20,20 17:5,6
19:7,8 20:20,20
22:5,6 23:18,18
24:1,2 25:15,15
27:1,2 29:1,2,7,7
30:20,20 32:5,6

33:18,18 34:1,1
47:20 93:10
127:15,17,19
134:12 145:8
159:23 190:18
191:9 199:11
222:7 229:11
230:14 231:6
239:13
objections 44:11
44:13 45:21
125:19 134:15
158:5 192:5,8,12
195:2,16 222:6
279:20
objectively
257:25
objectors 47:1
52:1,18 54:17
70:10 145:18
157:4 158:17
187:4,14 190:25
199:18 277:18
obligations
252:24
observations
184:1
obtain 166:14
256:17
obtained 62:17
113:10 249:2
obtaining 60:3
112:21 264:16
obtains 277:21
obviate 185:5
225:3
obvious 68:6
130:1
obviously 58:10
58:12 67:8,10
73:2 94:9 115:15
126:16 137:12
148:2 149:13

150:23 156:18
161:6 165:25
166:25 169:5
174:7 181:11
187:4 202:6 205:1
238:11 249:17
250:20 251:9
258:4 280:19
**occasion** 153:15
**occasioned**
127:23 278:15
**occupies** 148:4
**occur** 70:24 78:1
78:10 97:25 98:5
100:8,18 101:5
107:15 109:11,15
110:11 117:15
123:5 130:19
134:8 135:15
145:23,24 164:25
165:16 166:13
170:23 173:7
174:23 176:25
184:7 187:19,22
189:9 201:1
213:14 215:13
235:8 267:11
269:3,24 272:10
274:11
**occurred** 96:12
208:10 235:13
237:15 264:12
**occurrence** 95:20
98:9
**occurrences**
134:23
**occurring** 96:24
101:13 136:2
253:8
**occurs** 71:5 99:10
103:25 108:7
117:20 168:4,7
184:12 218:12

254:18 271:7
**oct** 66:9
**october** 45:14,17
51:2 55:13 101:7
104:8 124:1 156:2
156:5 159:24
160:8 164:24
190:9 193:11
194:9 196:7 197:5
**odd** 162:8
**oel** 262:7
**offer** 176:3 191:11
202:9
**offered** 77:15
125:24 126:4
128:24 176:9
212:11 216:12
219:7 224:14
226:15 275:24
276:1 278:13
**offering** 47:4
115:9 129:3
192:14 260:15
**offers** 129:20
277:7
**office** 37:1 39:16
44:25 157:23
200:2,3 206:12
210:10
**officer** 89:11
118:19,25
**officers** 232:14
257:20
**official** 3:1,4,8,14
4:5,22 8:16,18 9:2
9:4 11:6,9,13,19
12:9 13:2 14:8,10
14:15,17 16:5,8
16:12,18 17:9
18:2 19:14,16,21
19:23 21:5,8,12
21:18 22:9 23:2
24:8,10,15,17

26:1,4,8,14 27:5
28:2 29:14,16,21
29:23 31:5,8,12
31:18 32:9 33:2
34:8,10,15,17
39:9 191:5 195:4
201:12 202:6
214:14
**officials** 238:3
**offset** 122:3
136:10 267:9
**offsetting** 187:14
**oh** 74:23 98:24
105:2 123:16
138:1 146:21
154:14 156:11
**oil** 70:6 256:8,12
257:10 267:17
**okay** 44:2 45:10
46:13 47:1,6 48:8
50:18 56:16 59:20
61:4,6,8 64:19
65:3,13 66:5
89:10 94:6,13
98:14 102:9
112:24 118:6,7
122:12,16 123:20
133:22 134:2
137:9,21 138:4
139:5 145:25
146:16,21,23,23
149:4 154:5,6,8
154:10,14,20
155:1,10,13,23
156:12,12,24
157:8 158:3,23
159:9,11,14,20
160:3,6,12,15,18
161:2,16 162:13
162:24 163:3,5,8
163:11 164:22
165:12 166:17,18
166:22 168:13,22

174:25 175:14,16
178:21 180:2
183:10,20 185:8
185:19 186:5
187:3,3 189:17,19
190:7,14,15,22
191:7 193:1,8,15
193:16,24 194:5
194:14,15,22,24
195:22,23 196:5
196:13,21 197:1
197:17,21,22
198:14 199:5,14
200:23 201:9,15
201:18,20 202:2
214:24 216:16
219:10,20,20,22
221:17 225:1,8
242:21,24 245:10
246:17 247:22
248:7,7 251:3,13
252:3 254:1,3,7,9
281:3,17 282:5
**oklahoma** 246:10
**old** 283:21
**oldco** 162:17
**once** 96:12 99:10
138:18,21 170:19
175:10 212:10
234:10
**ones** 103:21 109:4
113:18 114:9
252:21 260:20
276:10
**one's** 272:23
**ongoing** 225:11
235:1
**onus** 170:24
**op** 209:21
**opaque** 101:11
**open** 53:4 66:3,16
74:10 100:5 241:9

opens 242:13
operate 99:11
operation 124:22
operational
126:10 127:21
operations 141:23
141:24
opinion 50:9 61:2
67:13 126:4
129:15 134:8
175:25 257:11
262:6 263:2
opinions 84:23
260:10
opioid 85:21,23
130:18 132:4
134:6,8 136:2
145:20,20 191:18
192:24 202:14
204:4 205:8,9,12
206:2,8 208:21
209:9,14,17
212:11,16,20
213:16 220:22
243:7,13,21 244:2
244:16,23 245:3,5
251:23 252:24
273:14 274:8,11
281:7
opponents 75:20
78:23 103:13,20
105:9 106:9,21
119:17 167:3
208:2 224:21
227:15
opportunities
262:8
opportunity
55:19,20 58:7,12
107:25 169:3
216:3 239:18,21
240:1,2 242:1
248:25

oppose 85:23
222:8 278:19
opposed 47:13
75:10 116:17
136:21,22 168:8
175:6 202:7
210:10 214:21
219:2 261:24
262:4 263:9
opposing 75:20
85:19 227:15
opposite 80:23
251:5
opposition 2:22
2:22 3:1,7,8,13,14
3:20 4:4,12,18,22
4:22 8:16 9:2,10
9:18 11:2,2,6,12
11:13,18,19 12:1
12:8,16,22 13:1,1
14:8,15,23 15:5
16:1,1,5,11,12,17
16:18 17:1,8,16
17:22 18:1,1
19:14,21 20:3,11
21:1,1,5,11,12,17
21:18 22:1,8,16
22:22 23:1,1 24:8
24:15,23 25:5,21
25:21 26:1,7,8,13
26:14,20 27:4,12
27:18 28:1,1
29:14,21 30:3,11
31:1,1,5,11,12,17
31:18 32:1,8,16
32:22 33:1,1 34:8
34:15,23 35:5
196:9
oppositions 73:11
106:1
opt 259:22
option 272:22

oral 45:1 51:1
55:7 123:8,15
170:7 199:15
201:21 268:2,5,24
269:2 277:25
oranges 108:3
order 2:1,11 4:13
4:13 5:2,9,17,19
6:5,13,21 7:2,5,18
8:4 9:11,11 10:4
10:11 12:17,17
13:11 14:24,24
17:17,17 18:14
19:1 20:4,4 22:17
22:17 23:12 24:24
24:24 27:13,13
28:8,19 30:4,4
32:17,17 33:12
34:24,24 44:5,6
44:14 50:2,5,12
51:21 54:22 59:22
60:19 61:21 62:5
62:7,25 63:8
64:10,11,12 78:6
78:19,20,20 79:19
79:19,24 80:7,9
83:19,22 95:21,22
95:23 96:7 97:15
100:17 114:17
115:16,24 123:6
124:2,10,17,24
127:9 128:8 144:9
154:15,19 155:3
155:15,16 156:1,4
157:2,3,3 158:9
164:21,22 172:18
173:11,11 177:14
203:18 204:1,17
211:5 225:2 226:2
229:8 233:9
244:14 250:22,25
254:12,14,22
255:3,4,12 257:23

262:13 268:9
269:12 270:2
278:8 280:13,25
281:20,24
ordered 61:16
203:21,25 226:3
orders 2:11 5:3,19
6:14,22 7:6,18 8:4
10:4,11 15:16
18:8 28:9 62:2
63:2,22 164:19
254:12 269:6
282:1
ordinarily 63:3
191:16
ordinary 80:6
organization
145:2
organizations
207:24
original 65:6
139:20 216:12
originally 174:18
ortiz 258:25
259:21 260:4
280:5
oud 205:11
ought 105:23
106:9
outcome 230:19
outer 280:17
outlined 244:9
outlines 135:3
outpace 276:6
outrageous 104:6
105:21 219:24
220:24
outside 135:4
170:1 177:18
183:8 227:25
241:12 257:25
270:15,19 271:16

**outspoken** 191:16
**outweigh** 108:11
  110:4
**outweighed** 88:12
**outweighs** 87:6
**overarching**
  251:16
**overcome** 265:16
**overdose** 130:19
  196:15,20 197:7
  197:16,25 202:14
  205:15 206:8
  274:11
**overdoses** 136:2
**overlap** 89:23
  90:3 259:8 260:20
  263:6,8 264:2
  280:10
**overlapping**
  90:19 91:3,25
  261:23
**overnight** 181:17
  200:17
**override** 91:6
**overrule** 192:12
**overruled** 192:5
**overwhelming**
  214:17,18
**overwhelmingly**
  204:8 214:15,21
  244:8
**ownership** 147:19
**oxi** 206:20
**o'neil** 42:10

**p**

**p** 36:1,1 44:1
**p.c.** 38:8
**pace** 86:6
**package** 264:14
**page** 9:9 10:9
  14:22 20:2 24:22
  30:2 34:22 45:6
  56:14 68:5 148:22

149:2 196:14
  258:7 266:24
**pages** 267:2
**paid** 71:7 113:25
  234:6,14 276:6
**panoply** 119:3
**pao** 278:3
**papers** 63:20
  141:25 147:4
  149:8 205:4 209:1
  209:7 210:8 214:9
  227:8 250:18
  251:11
**paragraph** 124:5
  129:11 149:3
  160:21,22 196:14
  207:11 223:3
  273:9,11
**paragraphs**
  129:20 160:20
  273:7,8
**parallel** 147:19
**parent** 244:9
**park** 39:10
**parse** 109:7
**parsing** 69:14
**part** 80:11 93:10
  93:11 94:4 98:22
  109:8 111:1 115:6
  124:25 126:22
  127:19 138:6
  139:12,22 144:2
  151:20 173:15
  176:10 190:16
  191:24 208:11
  216:14 230:21
  231:19 245:25
  248:20
**parte** 5:17 7:2
**participated**
  113:16
**participating**
  44:16

**participation** 89:8
  235:2
**particular** 67:4
  69:11 210:24
  256:12 263:18
  265:5
**particularly**
  79:12 87:7 91:4
  102:11 128:4
  178:12 186:24
  187:7 276:7
**parties** 44:21 49:1
  49:11 52:10,15
  59:3 60:2 61:10
  61:14 62:12 66:24
  66:25 67:17 68:21
  71:4 73:9,10 76:2
  76:13,13,14 77:24
  82:6,10,10,23
  84:13,14 85:19
  92:23 93:13 97:15
  100:2,6,10,11
  102:1,4 103:17
  105:2 106:2 107:4
  107:14 108:8
  109:3,7 110:10,11
  111:10 113:4,7
  116:1 117:4,4,9
  117:14,18 118:1
  120:5,22,22
  124:13 125:12,18
  128:2 136:15
  137:3 146:12
  147:12 148:1
  149:7 151:19
  157:1 185:23
  187:12 198:5,6
  230:3 241:1
  253:16,18 256:23
  258:23 261:3,10
  263:21 264:10
  266:5 267:9 270:9
  270:23 271:9,25

272:3 274:13,14
  275:8,9 276:16
  277:7 278:14
  281:23,25
**partners** 262:8
**parts** 134:10
**party** 46:18,20
  55:18 62:17 69:9
  69:12,19 84:17
  86:16 116:20
  117:12 119:25
  124:18 149:6
  164:13 204:7
  214:4 221:9 239:7
  244:6 258:22
  259:7,19 261:2,9
  261:11,22,23
  262:24 265:15
  275:24
**party's** 62:11
  117:13 122:15
**pass** 83:10
**passes** 274:6
**pataki** 278:2
**path** 111:6
**patrick** 4:24 13:4
  18:4 23:4 28:4
  33:4 42:10
**pattern** 259:20
**paul** 5:5 10:6,13
  28:11 37:3 42:18
**pause** 165:17
  233:11
**pay** 209:17 234:15
  243:17
**payers** 204:8
**paying** 173:3
  235:8
**payment** 162:6,7
  212:14 234:18
  235:8 273:2 274:1
  274:3

**payments** 71:4
99:23,24 110:11
117:9 118:3
160:19,21 162:1
162:10,11 187:12
192:15 234:12
236:5 273:7
277:10
**payout** 272:19
**pch** 58:25
**penalties** 252:14
**pencils** 234:25
**pending** 2:2,9,11
3:2,9,15 4:4,6,13
4:19,23 5:3,20
6:11,14,22,23 7:6
7:7,15,18 8:1,4,17
9:3,11,19 10:4,11
10:16 11:7,14,20
12:8,10,17,23
13:3 14:9,16,24
15:6,12,15 16:6
16:13,19 17:8,10
17:17,23 18:3,8
19:15,22 20:4,12
20:16 21:6,13,19
22:8,10,17,23
23:3 24:9,16,24
25:6,10 26:2,9,15
27:4,6,13,19 28:3
28:9 29:15,22
30:4,12,16 31:6
31:13,19 32:8,10
32:17,23 33:3
34:9,16,24 35:6
44:4 46:16 60:3
62:10,13,23,24
63:9,11,23,24
64:1,12 65:25
66:3 67:11 71:22
81:19 86:4 90:7
94:5,10 105:5,12
106:17 143:21

151:25 157:1
163:20 190:9
193:10 194:9
196:6 211:3,7
217:13 227:16
228:2,3 233:9
254:10,11,21
255:3,24 256:3,5
256:10,17 258:12
264:16 266:1
267:20 268:8,19
268:20 271:21
273:23 276:16,25
280:23
**pensively** 202:21
**people** 59:12
70:13 71:9 82:4
87:5 92:3,15,16
94:1 128:16 134:7
134:9 135:7 136:6
137:16 138:10,15
158:13 187:16
202:13 203:17
224:3 233:11,17
233:19 234:25
235:10,15 241:7
244:17 249:23
**perceive** 100:11
**perceives** 211:21
**percent** 202:17
204:22,23,24
207:4 211:12
222:11 237:10,12
274:9
**percentage**
130:20 237:8
**perdue** 124:7,13
126:19 138:25
139:15
**perdue's** 126:16
129:13,18
**perfect** 184:5

**perfectly** 101:24
130:21 135:20
178:4
**period** 56:7 61:16
95:12 101:8,18
105:20 106:24,25
107:2,5,13,15,18
108:14,17 109:9
110:3 126:14,22
127:9,11 131:15
136:21 161:20
163:14 167:23
170:25 171:13
174:5 201:4 213:7
217:17 218:6
230:11 237:7
240:10 242:3,4
**permanent** 87:4
203:18,23 204:2
**permanently**
68:17
**permissible**
114:15
**permissions**
142:25
**permit** 100:2
269:15
**permitted** 96:13
105:17 111:11
125:11 152:11
204:21 215:15
**permitting** 142:12
254:14
**person** 126:5
136:8 192:19
221:14
**personal** 93:4
125:25 126:1,15
129:16 134:13
136:21 187:13
191:17 213:11
214:6,8,12 234:2
235:20 243:18

244:1,11 261:8,18
261:21 272:15,18
272:25 276:17
278:18
**personam** 262:19
**perspective** 48:7
216:24
**persuade** 70:10
**pertain** 280:8
**pertaining** 173:11
**pertains** 54:15
63:7
**peter** 2:23 11:3
16:2 21:2 25:22
31:2
**petition** 87:15
**ph** 155:8
**pharma** 1:7 3:5
4:8,15 6:7 7:12
8:19 9:5,12,16
11:10 12:12,19
13:13 14:11,18,25
15:3 16:9 17:12
17:19 19:3,17,24
20:5,9 21:9 22:12
22:19 23:14 24:11
24:18,25 25:3
26:5 27:8,15
28:21 29:17,24
30:5,9 31:9 32:12
32:19 33:14 34:11
34:18,25 35:3
44:3 156:25 183:1
**phrase** 63:13
**phrased** 135:11
257:7
**pi** 217:3
**pick** 132:23
189:18 223:14
**picture** 206:1
**piece** 181:21
203:12 208:11
231:19

piercing 89:16,24
piggyback 224:23
piggybacking
239:6
pinned 77:8
pis 211:13 214:3
pl 39:18
place 37:3 48:3
92:5 99:22 100:9
101:7 104:7
108:10 109:4
110:7 124:15
127:11 138:21
139:11 165:14
174:19 226:7
227:1 234:6 235:6
241:9 270:21
placed 49:18
104:24
places 170:24
257:24
plain 118:17
plains 1:14
plaintiff 120:25
plaintiffs 89:3,20
211:17 221:18
plan 6:2,6 13:9,12
18:22 19:2 23:9
23:13 28:16,20
33:9,13 55:19
56:3 71:1,6 72:6
72:18 73:1 75:5,7
75:8 76:11,18
77:9,22,24 80:11
81:9 82:2 84:12
85:13,14,23 86:1
86:14,21,23,25
91:5 92:17 93:6
93:17 95:22 96:8
96:14,15,16,25
97:3,23,24 98:16
99:17,24 100:21
100:22,22 101:16

104:16 105:10,14
106:21,25 110:16
112:2 113:5,17,18
125:11 130:9
133:25 134:23
139:21 140:1,12
141:3 143:6,7,7
145:22 148:3,9
150:3,25 151:1
152:25 160:19,21
161:4 164:6,21
165:15,20,22
167:3 168:9,9
172:13,17,23
178:4 181:6,16
183:17 192:15
199:18 202:18
204:6,9,21 212:21
217:2,6 222:8,11
222:12 223:4,5
224:2 228:10
229:15 231:10
233:7 234:2,4,6
234:17,20 235:23
236:13,23 238:14
238:15 241:6
243:12 244:5,8,10
245:8 252:23
254:13,17 258:21
259:5,13,14,15,24
260:25 261:11,12
261:18 263:5,18
264:4,22 265:13
265:18 266:23
269:4,11,13,14,19
272:6,7,10 273:22
275:5,6 278:17,22
plane 206:9
planned 126:13
plans 76:1 111:11
111:15 237:7,14
237:23 238:2
266:7

play 71:25 185:7
217:11,12 238:18
250:14 252:17
played 103:15
260:14
playing 182:3
plays 97:18
199:22
plea 72:25 98:22
101:7 124:12
127:1 130:9,16
150:13,15 151:1
165:19 235:20
281:12
pleading 232:5
271:11
pleadings 44:11
45:7 47:8,11,11
47:13,14 158:5
199:16 244:13
245:13
please 140:22
159:25 168:2
189:25 193:2
194:1 195:24
pled 127:2
plenty 166:11
177:6 181:16
182:2,21 200:14
200:20 268:13
plimpton 36:18
plus 101:22 103:1
107:12 128:5
132:20 228:4
267:24
pm 282:7
pocket 104:13
podium 191:10
point 47:17,23
51:5,25 52:5,19
53:15,16 54:17
55:8,8 59:21
64:22 66:4 69:6,6

69:22,23,24 70:12
71:5 77:20 78:3
78:17 82:18,21
94:23 95:1,6,8,15
97:21 100:12
105:21 106:5
107:20 108:19,20
108:24 110:8,25
111:1 113:2 115:4
117:3 118:6 120:6
120:12 122:6,14
122:24 123:4
127:7 130:7,15,16
130:16,22 131:1,1
131:2,5 132:6,25
133:1,1,10,10,23
135:4,9,25 139:6
140:9,19 142:2
144:19,19 146:3
155:14 156:20
157:4 158:6,21
165:11 167:12
168:8 172:3 174:2
175:15 178:19
185:5,17 186:4,7
186:16,24 193:22
195:19 198:17,24
205:18 207:17
218:2,20,23,24
219:11,15 221:12
221:15 224:5,11
224:16,17,20
227:9 237:17
241:22 247:21
251:11,16 252:13
253:19 256:7,9
259:2 263:14,19
266:20 275:13,14
275:18 276:6,18
277:15 279:14,15
pointed 76:22
230:13 231:6

pointing  57:11
  252:22
points  50:19,23
  69:23 91:23
  103:16 113:15
  120:3 122:14
  138:5 146:14
  151:15 159:1
  166:21 183:21
  189:6 223:10,10
  223:18 277:2
  279:21
police  125:13
  203:2 242:4
policy  85:17
  188:20 189:6
  222:1 275:12,18
political  238:2,5
polk  37:15 54:20
  157:6 158:19
  163:12
pond  152:17
population
  204:23 207:4
port  179:15
porter  42:12
portion  104:22
  120:23 125:20
  148:21
portions  134:16
pose  53:3
posing  103:18
posit  96:19 110:3
  264:21
posited  96:17
  189:8 246:25
positing  96:20
  103:20
position  65:8
  67:12 68:11 76:22
  95:10 96:22 99:9
  103:19 109:24
  110:1,18 115:7

122:25 130:14
138:22 149:19
155:4,7,9 169:5
210:25 211:22
230:2,17 236:8
237:4 239:1 240:3
247:14 248:2
249:6,11 257:24
267:23
positioned  130:22
positions  65:10
  147:3
positive  134:15
posner  121:12
  278:1
possibility  51:6
  52:25 54:14 60:5
  69:2 72:4 96:23
  100:13 105:5
  107:5 138:9
  139:19 141:3
  143:11,12 183:16
  226:9 237:1
  265:22 267:15
possible  105:7
  129:22 185:10
  215:17 237:17,18
  257:9 258:10
  276:23
possibly  57:23
  166:13 167:15
post  81:8 106:8,24
  197:4 224:19
  239:2,8,18 240:4
  241:11,13 250:4
  266:22 274:21
  278:6,13
posted  105:2
posting  119:25
  135:22 152:22
  276:19,20,24
  278:11

postpone  186:13
potential  95:6
  102:23 141:14
  207:22 223:25
  237:6 271:5
potentially  44:22
  140:10 161:13
  267:21
power  62:21
  69:19 125:13
  203:2 207:20
  235:22 262:18
powers  224:7,10
  224:15 242:4
pplp  162:17
practice  178:11
pragmatic  265:4
pre  74:9,11,23
  106:24
preceded  259:13
precedent  238:8
precipitate
  240:12
precise  142:17,23
preclude  100:15
precluded  77:24
  93:14
preclusion  54:23
preclusive  58:23
predicate  97:6,13
  113:20
predicates  101:2
predict  87:25
predicting  192:13
prediction  128:20
  128:22 129:2,21
  130:25 134:25
  135:6,14 137:13
  137:15 161:7
  164:3 198:7
predictions
  192:18 198:9

prefer  102:4
  225:5
preferred  66:25
preis  39:14 191:8
  201:10,11,15,20
  202:2 214:25
  215:14 216:5,11
  217:15 218:2,20
  219:9,11,18,20
  220:4,14 221:12
  229:21 234:9
  235:4 236:20
  252:9,19
preis's  219:24
  220:12
preis'  243:9
prejudice  49:3,6
  72:1 215:8 225:24
  238:24 265:24
preliminary
  93:15
premise  93:8
preparations
  101:12 157:3
preparatory
  124:3 226:1
prepare  79:15
prepared  93:5
  115:5 247:3
  253:24 269:1
  271:9,10 274:18
  279:4
prescribed  206:19
present  40:19
  56:4 81:8 106:4
  160:22 164:13
  192:9 266:22
presentation
  122:15
presented  229:8
  251:17 265:5
presentencing
  101:18

**presently** 151:22
**preservation**
  107:9 108:12
**preserve** 62:25
  93:7 101:21
  112:22 189:4
**preserved** 72:20
  110:5 111:7
**preserves** 65:9
**preserving** 100:4
  100:24
**press** 46:4 96:12
  115:4
**pressing** 85:24
**pressure** 168:7
**presumes** 265:14
**presuming** 153:17
**presumption** 75:3
  265:16
**pretend** 139:3
**pretty** 96:22
  101:14 114:21
  116:12 132:18
  136:9 176:25
  211:19
**prevail** 69:5,25
  228:8 260:18
**prevailing** 271:21
**prevails** 213:14
**prevent** 96:23
  97:5 100:1 124:11
  176:13 178:11
  243:12 276:13
**prevented** 103:5
  134:24
**preventing** 87:2
**prevents** 59:15
  239:6,8
**previewed** 45:13
**previous** 146:14
  246:4
**previously** 122:24
  193:20 194:18

248:10 268:12
**price** 273:13
**primarily** 60:2
  85:19 136:14
  158:6 216:3
  255:13 280:11
**primary** 71:12
  72:2 90:17,18
**prime** 5:12 18:17
**principal** 118:1
  122:23 149:10
  201:6
**principally**
  113:21
**principle** 69:18
  277:22
**principles** 100:20
  108:10
**prior** 57:16 58:24
  71:23 94:25
  101:12 221:5
  236:14 269:11,15
**priority** 213:15
  236:21,24 261:15
**private** 3:13 11:18
  16:17 21:17 26:13
  31:17 92:11 208:7
  209:3 211:11
  213:8 251:21
**pro** 85:11 279:11
**probability** 55:6
  69:2 257:11
**probable** 257:9
  258:11 276:23
**probably** 48:12
  52:7 76:7 152:5
  186:25 187:12
  217:8 231:7
  237:20
**problem** 47:9,10
  67:13 80:12 97:18
  98:10 106:15,15
  106:18 147:18

148:2,5,10,11
  150:14 151:12
  182:11,15 183:7
  246:1 274:6
**procedural**
  254:15
**procedure** 2:12
  5:4,21 6:15 7:19
  8:5 10:5,12 28:10
  277:16
**procedures** 2:1
  44:6,15 108:20
  136:23 138:19
  272:21
**proceed** 44:19
  64:21 67:23 94:18
  104:1 154:18
  163:9 195:10
  201:25 226:5
  240:17 253:17
**proceeding** 57:16
  58:8 76:3 104:21
  144:9 146:9
  256:23 272:1
**proceedings**
  62:22 101:9
  134:18 192:7
  282:6 283:4
**process** 63:23,25
  64:16,25 67:1
  69:6,22 70:25
  87:13,16,20 88:8
  92:21 94:1 95:11
  106:20 110:15
  111:3 113:10
  129:14 132:13
  136:17 139:9
  146:1 150:17,23
  151:8 189:3 214:3
  234:16,18 235:10
  258:15,20,23
  259:18,24 260:5
  271:18 272:14,22

273:21 277:9
  278:11,24 279:1,9
**produce** 138:13
**product** 99:13
  228:21
**products** 246:13
  273:13
**professional**
  106:6
**professionals**
  173:4 243:17
**profits** 204:3
**program** 199:9
  209:20
**programs** 111:14
  205:15 244:15
**progresses** 227:10
**project** 123:12
  177:25
**projected** 87:19
  269:25
**prominent** 224:3
**promising** 230:4
  238:12
**promptly** 169:20
  170:10 225:16
  274:19 282:1
**prong** 50:25
  230:21 255:23
  257:16,17 261:6
  264:15
**prongs** 102:16,19
  188:16 198:23
  233:13 271:23
**pronouncing**
  114:22
**proof** 82:21 117:8
  232:1,2 238:25
  252:16 256:2
  261:7 270:10
  272:22,23 275:25
**proofs** 91:13
  279:23

**proper** 90:4 96:3
  101:16 125:8
  163:23 256:18
**properly** 63:12
  262:23
**properties** 127:7
**property** 125:5,5
  125:6
**proponent** 183:17
  199:18
**proponents** 55:20
  56:4 164:6 278:22
**proportional**
  257:12
**proposal** 170:21
  177:19 184:14
  187:6 201:22
  214:23,25 215:6
  216:12
**proposals** 77:15
**propose** 201:23
**proposed** 100:8
  176:24 245:19
  250:16 260:1
  282:1
**proposing** 117:4
  185:3,4
**proposition** 80:18
  210:2,4
**propositions**
  100:6
**prosecuting** 203:7
**prosecution** 203:9
**protect** 80:15
  88:24 153:13
  200:21 202:16
  229:17 239:9
  251:22 263:12
  276:20
**protected** 5:12
  18:17 111:16
  153:1 234:1
  235:12 240:24

  280:1
**protecting** 119:9
  169:21 251:18
  263:8 275:4,13
  277:21
**protection** 88:18
  88:20 89:5 163:17
  167:8,17 183:8
  263:16
**prove** 57:8,9
  230:10 233:14,15
  238:13
**proven** 232:25
  241:14
**proves** 279:10
**provide** 86:17
  106:22 107:17
  111:15 119:19
  120:9 163:17
  166:23 167:7
  169:2 182:8 184:5
  187:23 198:21
  199:24 220:21
  239:16 240:22
**provided** 143:5
  163:16 167:17
  169:1,2 241:7
  259:4 275:7
**provides** 124:13
  164:8 184:15
  231:24 240:21
**providing** 85:21
  220:14
**province** 129:17
  131:10 135:13
**provision** 99:1
  105:4,15 124:6
**provisions** 119:23
  139:11 268:9
**proxy** 161:12
**prudential** 265:6
**psychological**
  67:15

**public** 4:3 12:7
  17:7 22:7 27:3
  32:7 46:21 85:17
  86:11,15,22,23
  87:1 93:24 94:2
  110:14,16 111:9
  111:10 112:3,5,8
  113:2 114:13,18
  126:11,16 161:25
  162:9 166:11
  182:19,22,25
  188:20 189:6
  191:16 198:20,22
  200:18 201:7
  202:22 204:7
  208:6,6,7 209:19
  209:22,23,25
  210:16 211:12
  212:1 213:8,25
  214:14,20 219:12
  221:6 222:1,23
  227:5,12,12,14
  230:16,21 235:19
  243:8,22 244:7
  245:6,9 246:11
  249:18 251:18
  252:2 256:25
  264:6 266:5,9
  273:12 275:2,12
  275:18 276:4,14
**publicly** 46:21
  209:2 213:3
**public's** 272:1
  276:6
**published** 84:22
**pull** 148:22
  195:11 198:14
**pulled** 223:17
**pullman** 39:1
  65:22 122:17
  186:7
**pulls** 101:4

**purdue** 1:7 3:5
  4:8,15 6:7 7:12
  8:19 9:5,12,16
  11:10 12:12,19
  13:13 14:11,18,25
  15:3 16:9 17:12
  17:19 19:3,17,24
  20:5,9 21:9 22:12
  22:19 23:14 24:11
  24:18,25 25:3
  26:5 27:8,15
  28:21 29:17,24
  30:5,9 31:9 32:12
  32:19 33:14 34:11
  34:18,25 35:3
  44:3 86:5 99:23
  104:15,17,25
  105:23 106:14,18
  153:7,8,11 156:25
  182:20 183:1
  191:16 208:19,19
  209:8,13 211:11
  211:16 212:19,25
  213:4,6,7,12
**purdue's** 213:2
**purely** 125:15
**purported** 176:5
  231:13,14
**purporting** 49:17
  238:21
**purports** 263:8
**purpose** 47:4 48:5
  126:19 129:7
  135:23 170:15
  199:13 210:16
  217:4 245:2
  264:19
**purposes** 47:18
  56:19 59:24,25
  60:21 76:1 109:16
  132:10 133:16
  135:22 171:15
  219:1,8 253:11

258:12 272:16
273:2,4 274:5
**pursuant** 2:12 5:3
5:20 6:14 7:18 8:4
10:4,12 28:9
114:16 124:2
133:24,24 153:11
164:21 165:19
173:10
**pursue** 91:2
136:11 137:3
225:13 261:2
263:20 275:8
280:9
**pursued** 276:11
277:9
**pursuing** 115:17
115:20 151:22
189:1 237:25
252:1 263:23
**pursuit** 140:1,11
145:22 240:5
**push** 197:3
**pushed** 186:20
**put** 55:20 65:11
78:16 79:7 90:20
100:22,23 101:11
102:14 103:13
104:15 105:9,18
107:1 124:22
158:13 159:9
169:16,19 179:7
244:14 248:6
250:17 274:3
**puts** 227:11 237:5
**puzzle** 181:20,21
184:25

**q**

**qualification** 53:8
**qualified** 260:5
**qualifies** 198:9
**quantification**
231:21

**quantify** 108:5
121:18 232:17
**quarropas** 1:13
**quarter** 156:18
**question** 45:4
52:25 53:2 54:11
65:7 79:3,4 80:5
82:19 88:22 90:19
90:22,22 95:2
96:4 103:10,24
114:11 117:1
121:20 141:25
147:10,14 148:2
149:10,15,22
150:6,12 152:16
160:16 161:2
211:25 250:11
**questions** 45:22
45:25 51:2 68:7
68:11 85:20 94:8
94:11,23 103:10
114:15 118:11
162:25 166:21
192:8 193:18
194:19 224:25
242:23 248:5
250:12 280:24
281:19
**queue** 146:20
**quick** 234:15
**quicker** 138:7
**quickly** 68:22
79:9,9,10 87:25
88:3 109:19 183:6
205:22 242:9
**quid** 279:11
**quigley** 262:18
**quite** 47:3 51:16
59:13 67:5 88:22
129:22 163:25
182:19 190:16
193:18 194:17
202:8 240:7

273:17 276:23
**quo** 62:25 65:9
80:13,15 97:5
101:21 279:11
**quote** 95:5 116:13
148:21 273:16
**quoting** 58:9
179:24 260:5
266:24

**r**

**r** 1:21 36:1 41:2
44:1 114:22,23,23
190:4 193:5,6
194:5,5,5 196:3
283:1
**rachael** 42:14
**rachel** 42:11
**rages** 243:14
**raise** 49:23 117:12
117:23 159:24
189:25 193:1,25
195:23 239:22
**raised** 45:22
46:15 48:20 49:11
50:23 51:5 69:3
78:3,24 94:23
103:3 139:5,17
145:17,18 146:11
195:15,19 219:12
220:14 229:21
247:6 248:15
255:14 258:13
259:20 260:20
263:14
**raises** 48:21 73:2
83:12
**raising** 50:10,20
119:1,4 209:5
216:13 241:24
**rapid** 86:6 272:18
**rare** 90:9
**ratepayers** 3:14
11:19 16:18 21:18

26:14 31:18 204:8
**rates** 130:20
**rationale** 120:14
192:14 208:16
**raymond** 36:12
246:20
**rdd** 1:3 2:4
**reach** 98:1,6
106:12 110:25
111:1 180:21
263:17
**reached** 89:15
98:4 166:7,14
197:9
**react** 128:3
**read** 50:17 52:23
53:6 91:22 147:11
150:14 158:4
193:17 205:4
215:19 222:25,25
226:25
**reading** 50:17
61:2 183:5 185:10
217:15
**reads** 84:20,20,21
**ready** 67:23 182:3
182:6 229:15
233:6 234:21
235:23 239:15,17
240:10,11,14
254:16 272:9,12
272:13 274:22
275:14 278:16
**real** 54:9 75:11
80:24 81:20 102:5
102:24 107:21
202:25 205:14
217:10,11 218:22
233:5,5 235:16
236:25 240:23
258:14
**realistically**
272:11

**reality** 214:10
244:7
**realize** 96:20
**realizes** 174:16
**really** 50:2 54:8
54:10,14 56:18
59:21 60:12 63:12
67:17 70:24 72:6
74:18 75:25 77:12
78:8,8,9 79:16,18
79:20 82:19 83:12
83:24 91:25 108:7
108:18,21 113:2
116:14 121:20
122:1 127:14
129:11 130:13,14
131:1,9,19,24
132:22 134:11
135:12 140:20
143:23 155:17,21
156:8 171:2
175:13 176:2
179:5,7 181:20,22
183:7 187:6
188:17 189:1
209:16 212:1
215:22 219:1,15
221:5 222:8
223:15 226:11
237:2,9,18 242:10
248:8 255:2,7
281:4
**reason** 63:7 77:5
84:18 93:11 98:1
103:19 104:14
111:1 124:12,18
124:20 139:6
150:25 170:2
172:14 182:3
186:19 216:13
217:23 222:13
243:24

**reasonable** 81:23
95:3 164:3 270:15
273:13
**reasonably** 129:8
192:18
**reasoned** 260:10
**reasons** 75:1 90:7
101:10 137:7
176:4 203:4
214:16
**rebuttal** 10:2
122:14 156:21
248:8,10
**receipts** 220:18
**receive** 91:4,5
99:13 101:16
102:5 202:17
207:10 214:12
261:13
**received** 10:20
15:19 20:19 25:14
30:19 45:21 102:3
111:13 211:18
212:15,24 259:4
**receiving** 92:17
99:24 203:7 261:8
261:19,21
**recess** 156:23
**recipient** 212:8
**recipients** 220:20
**reciprocal** 278:20
278:21
**recitation** 127:20
**recognize** 54:4
69:18 82:7 115:23
116:4 119:12
251:25
**recognized** 70:5
112:7 150:2
222:14 249:14
259:18 260:3
280:5

**recognizes** 69:16
**recognizing**
258:11 260:4
**recommendation**
54:12
**record** 10:2 45:20
48:1 51:17,24
52:6 57:10 104:24
125:22 131:14,16
134:18 156:25
187:5 188:23,23
189:4 191:24
220:17 228:24
236:2 249:3
253:14 254:6
263:7 269:2
271:12 272:3
275:23 283:4
**records** 46:17
198:20,22
**recover** 152:11
207:8 261:24
275:9,10
**recovered** 233:2
**recoveries** 220:21
235:3 260:24
261:16 281:6
**recovery** 91:4
92:4 222:20
233:19 239:24
261:17,25 281:12
**recruit** 214:6
**red** 252:11
**redirect** 163:1
**reduce** 114:8
**reduced** 46:1
**refer** 44:6 276:1
**reference** 148:18
152:13 232:4
**referenced** 148:22
260:7 262:5
**referred** 59:22
256:24

**referring** 142:13
153:6 210:9
247:11
**refers** 56:18 64:7
64:8
**reflect** 87:17
263:5
**reflected** 229:8
272:19
**reflects** 86:24
261:22 263:8
**refused** 100:12
164:5 212:15,21
213:21 228:1
**regard** 62:3 147:7
150:13,18 152:2
153:3 243:25
248:4 256:7
274:16 276:11
**regarding** 75:14
77:7 86:16 104:9
114:2,15 118:8
121:11 198:23
202:14 213:22
231:1 257:8
**regardless** 184:11
233:21
**registering**
141:20
**regularly** 63:5
**regulations**
237:17
**regulatory** 141:21
173:4 237:14
**rehash** 248:9
**reimburse** 140:1
**reiterate** 135:9
**rejigger** 223:14
**related** 2:11,13,17
3:2,9,16,20 4:6,13
4:19,24 5:3,4,8,13
5:13,19,21 6:8,14
6:15,22,23 7:5,7

7:11,18,19 8:4,5
8:10,17 9:3,14,19
10:4,5,11,16,22
11:7,14,21 12:1
12:10,17,23 13:3
13:7,14,18 14:2,9
14:16 15:1,6,21
16:6,13,20 17:1
17:10,17,23 18:3
18:8,13,18 19:4,8
19:15,22 20:7,12
20:16,21 21:6,13
21:20 22:1,10,17
22:23 23:3,7,15
23:19 24:2,9,16
25:1,6,16 26:2,9
26:16,20 27:6,13
27:19 28:3,9,10
28:14,22 29:2,8
29:15,22 30:7,12
30:21 31:6,13,20
32:1,10,17,23
33:3,7,15,19 34:2
34:9,16 35:1,6
130:18 139:18,22
139:23 245:5
252:24 274:11
**relates** 105:18
162:20 246:22
247:5,10
**relating** 113:24
191:16
**relation** 51:13,14
**relationship** 59:2
147:21
**relationships**
141:4
**relative** 122:8
**relatively** 61:16
87:8 107:15
108:14 122:8
254:15

**relatives** 135:19
**release** 5:12 18:17
69:8 70:14 71:3
83:4,5 84:14,17
87:6 90:21 92:2
92:15 125:13
148:3 259:7
276:13
**released** 69:25
71:4 82:6 137:3
147:12 148:8
149:7 230:24
258:23 261:2,10
275:9
**releases** 46:18,21
71:20,23 72:8
86:17 90:5,10
111:16 113:21
114:16 214:5
244:6 249:11
259:19
**relevance** 191:22
**relevant** 44:10
50:16 58:8 220:10
221:3
**relied** 86:20
**relief** 5:13 18:18
63:15,19,24 64:2
85:21 100:7,10,13
106:13,22,23
119:24 122:23
176:5,12 203:8
225:13 240:5
245:16 256:6
265:8,9 266:1
267:19
**reliefs** 241:21
**relieve** 152:5
**reluctant** 224:4
**rely** 139:19
145:14 146:14
200:25

**relying** 258:25
**rem** 262:17
**remain** 60:6
**remainder** 233:4
**remaining** 276:15
**remains** 151:23
234:6
**remarkable**
130:20
**remarks** 68:1
221:3,24 255:2
268:2
**remedial** 260:5
**remedies** 252:20
**remedy** 205:1
210:19
**remember** 222:4
234:11 236:20
251:2,25
**remind** 148:25
195:14
**remote** 2:2 44:15
179:25 207:7
267:14
**remotely** 44:16
58:22
**remove** 133:25
143:10 174:2
**render** 98:16
167:15,15 270:2
**rendered** 85:5
164:19
**rendering** 149:20
**renew** 167:4,18
177:1 187:25
216:3 270:16
280:22
**renewed** 271:6
**renotice** 163:23
**reorganization**
6:7 13:13 19:3
23:14 28:21 33:14

**reorganizations**
112:9 227:13
**repeat** 52:13
150:7 183:4 222:2
230:25 248:14
249:19 251:9
268:6
**repeated** 81:4
170:21 203:5
**replies** 44:12
52:14
**reply** 5:1,1 10:10
15:10,10 18:7
28:7,7 48:11 50:3
50:15 145:11
148:21,23 149:8
**report** 199:7,9
**reported** 84:18
**reporting** 200:14
213:5
**reports** 197:11,14
**repository** 114:5
243:23 276:14
**represent** 93:18
93:20 95:15 231:7
247:23 249:20,20
249:22
**represented**
259:23 273:5
**representing** 65:5
93:23,24 94:15
105:8 204:23
221:20 249:15,16
**represents** 222:5
243:6
**request** 45:6
46:25 47:19 61:19
63:10 64:17 67:11
81:11 94:10 105:6
124:14,16,19
136:16 137:7
151:5 158:7
165:14 169:12

174:18 177:12
184:6,8 187:18,24
189:7 199:24
200:5 202:7
204:18 219:13
228:4,23 247:13
248:2 250:1 266:1
268:4,18 271:21
278:9,9,12
**requesting**  107:9
126:22 127:9
129:20 249:1
**requests**  65:7
228:2
**require**  182:8
250:8 276:18
280:14
**required**  118:18
119:5,19 130:23
213:4 242:8 261:1
276:24 278:7
281:13
**requirement**  70:2
103:7 120:15
199:24 200:9
226:4 242:16,17
277:4
**requirements**
102:25 126:8
142:25 277:14
**requires**  69:10,14
96:4 142:23
251:21 263:25
**requiring**  239:20
257:4 278:5
**reread**  50:22
**research**  245:4,6
**reserve**  279:5
**reserving**  98:8
**resident**  206:18
**residual**  129:13
129:18

**resolution**  6:22
7:6 45:3 75:23
98:2,4 149:14
176:19 248:19
253:10 274:18
**resolve**  44:22
94:24 98:2 122:11
227:14
**resolved**  112:1
113:22
**resolving**  201:23
225:16
**resources**  178:12
**respect**  5:18 7:3
47:16 58:2 60:4
101:6 115:24
116:1 165:8
173:10 176:1
189:7 192:2
199:19 201:6
223:7,11 224:6
226:18,23 227:4,5
227:11,22,25
233:12 234:9,25
236:21 239:10,23
241:21 245:15
249:13 250:3,11
250:22 253:18
254:24 255:6
256:2 262:17
269:12 270:12
278:8
**respectfully**  61:1
**respects**  275:2
**respond**  60:8
159:1 195:19
210:3 219:23
220:18
**responded**  191:18
**responding**
132:11
**response**  73:13
157:14 168:11

201:22 207:17
**responses**  10:20
15:19 20:19 25:14
30:19 205:21
**responsibility**
235:9 239:2,4
**responsible**  68:20
237:3
**responsive**  265:4
**rest**  47:7 155:6
187:17
**rested**  85:19
**restore**  62:23
**restrict**  127:4
137:7
**restructuring**
99:22 101:4
**restructurings**
99:16
**result**  126:11
129:21 130:2
131:8 154:4
160:24 191:17
244:19 245:9
252:22
**resulted**  276:12
**resulting**  244:22
**results**  131:3
151:7 236:18
269:5 277:9
**retain**  119:23
243:16 244:24
245:7
**return**  212:14,19
212:24,25 277:8
**returned**  206:14
**reversal**  54:1
205:15
**reversed**  74:24
139:22 141:5
246:11
**review**  53:9 67:14
68:12,13,15,18

71:14 72:4,11
81:12 87:4,18
88:15 90:23 93:12
101:17 111:3,4,12
125:7 172:1,2
240:1,2 254:1
259:16 260:1
269:13
**reviewed**  44:10
57:1 60:4 90:6
190:15 194:16
197:14,23 199:16
232:10 266:8
**revision**  240:25
**revisit**  279:5
**revisited**  110:6
**rewriting**  184:14
**rico**  89:6
**rid**  229:13
**ride**  120:25 234:3
**rides**  279:14
**riding**  239:20
**riffkin**  5:22 6:16
6:24 7:8
**rifkin**  2:13 42:13
**right**  45:5 47:10
49:3 57:2 59:20
61:7,8 64:3 71:11
71:16 72:6,9
78:14,21 79:21
82:16 83:14 84:6
91:2 92:25 93:21
96:19 98:8 99:6
100:4,19 104:5,9
104:11,13,17,18
104:19 105:1,14
114:22 116:22
122:4 126:25
133:7 134:7
136:11 137:5,21
141:1,13 143:20
144:21 149:9
153:17 154:2,10

155:1,13,19 156:3
156:6,11,17 158:3
159:25 162:13,24
164:4 170:4,7
171:2,3,8 175:16
177:19 179:1,6,8
180:24 182:5,17
183:10,20 184:10
187:3 189:25
193:1 194:1
195:22,23 196:17
199:5 203:11
215:4,8 216:11
219:19 220:1
221:9 225:6,8
231:8 235:18
236:14,16,16
237:14 238:24
239:4,23 240:8
241:25 242:7
245:13,17 246:3
247:1,3,9,11,15
248:12 250:11,13
254:9 258:24
259:11,12,13,16
259:25 263:20
264:6 266:10
279:5 280:24
281:19
**rightfully** 187:15
**rights** 70:15 71:10
71:14 72:21 87:2
88:13,16 92:21
102:21 107:9
108:1,12 110:5,13
136:11 137:2
185:11 200:22
214:3 230:22
232:12,24 235:12
261:1,14 279:18
279:25 280:7
**ringer** 42:14

**rise** 58:20 75:10
150:21 168:5
226:9 269:17
**risen** 51:8
**risk** 51:18 52:1
53:11,18,22 54:4
54:9 72:2,3 75:11
75:13 78:9,20
80:16,20,22,24
81:8,18,20 95:4
102:8 115:5,10,11
115:18 117:11
120:25 125:2
126:10 163:18,23
167:8,13 168:15
168:25 169:21
174:2,3 175:9
180:6,12 235:16
235:18 236:12
237:14 238:2
240:23 241:3,6
264:21 266:16,22
267:6 274:15
277:8
**risks** 115:21
127:21 142:21
236:1,9 237:7,15
237:23 238:11
253:8,10
**rivera** 43:8
**rix** 224:11
**road** 71:5 101:2
283:21
**robert** 1:22
206:18
**robertson** 42:15
**robinson** 66:11
**rocket** 169:19
226:5
**role** 198:10
210:15 221:4
238:19,19 249:13
249:15 260:14

**roles** 89:14
**roll** 141:4
**roman** 66:15
**ronald** 20:17
40:14 44:9 146:17
**room** 1:13 201:19
**rosen** 42:16
**roughly** 130:18
202:17 272:24
274:9,10
**routinely** 106:4
**roxana** 40:22
**ruined** 206:20
**rule** 2:12 5:3,20
6:14 7:19 8:5 10:5
10:12 28:9 61:13
61:24 62:4,9,20
63:13,21 64:4,6,8
65:23 66:2,6
70:21 77:18,21
81:24 82:23 83:22
95:11 116:18
118:18 119:14,22
119:24 120:8,10
120:20 121:5
139:10 149:17
156:10 161:8,8,8
164:3 169:20
170:2,10 171:19
172:6 175:9
178:25 183:6,15
184:14,24 198:20
215:20 216:7
226:24,25 230:6
239:14 240:10,13
240:21 247:16,17
256:14 268:7,9,9
268:14,17,24
269:5 270:25
271:19 277:3,15
**ruled** 83:18
141:10 158:25
159:6 160:14

169:6 172:14,20
186:12 190:17
225:22 226:13
239:21 271:17
**rules** 49:9 63:16
125:21,22,24
155:17 170:16
171:15 172:2,10
172:12 175:24
177:23 216:21
224:23 226:25
228:16 229:23
240:12 241:20
**ruling** 6:1 13:8
18:21 23:8 28:15
33:8 48:17,18,18
52:4 58:1 60:15
60:24 61:3,17,22
63:11 66:20 67:2
67:6,7 70:20
78:11 79:14 81:1
81:24 82:22
107:12 109:17
112:12 116:1
123:2 136:19
147:14 156:22
158:8 161:3
163:15 167:11
169:23 170:5,24
170:25 171:1
177:2,5,13 178:1
178:4 179:6,7
184:16,20 185:6
185:18 187:18,20
188:5 189:9 195:2
203:22 215:3,13
217:13 227:3
230:9 241:19
242:19 257:24
260:8 268:15,20
269:5 270:15
271:2,6,15 273:24
275:20 279:19

280:14 282:3
**rulings** 81:4
199:20
**run** 78:9 95:4
104:3 185:24
241:23,25
**running** 186:18
186:20 218:18
**runs** 185:22
**russo** 66:7

**s**

**s** 2:13,17 3:3,3,10
3:16,20 4:6,14,19
4:24 5:4,21 6:8,15
6:24 7:7,11,19,20
8:5,6,10,17,18 9:3
9:4,15,19 10:5,17
10:22 11:8,8,15
11:21 12:1,10,18
12:23 13:3,14,18
14:2,9,10,16,17
15:2,6,21 16:7,7
16:14,20 17:1,10
17:18,23 18:3,9
19:4,8,15,16,22
19:23 20:8,12,17
20:21 21:7,7,14
21:20 22:1,10,18
22:23 23:3,15,19
24:2,9,10,16,17
25:2,6,16 26:3,3
26:10,16,20 27:6
27:14,19 28:3,10
28:22 29:2,8,15
29:16,22,23 30:8
30:12,21 31:7,7
31:14,20 32:1,10
32:18,23 33:3,15
33:19 34:2,9,10
34:16,17 35:2,6
36:1 37:20 40:21
41:21 42:2 43:12
44:1 160:4,4

196:3
**s.a.** 262:7
**s.d.** 66:9
**s.d.n.y** 256:9
278:2
**s.d.n.y.** 66:17 70:7
81:15 154:5 256:7
256:16 262:9,10
266:13,14,19,25
268:12
**sabine** 70:6 256:8
256:12 257:10
267:17
**sackler** 36:12,19
86:5 104:9,11,15
104:18 105:3
114:2 164:16
212:8,14 231:4
245:23 246:20
247:24 281:9
**sackler's** 212:4
**sacklers** 82:5 91:9
99:23 102:23
104:4 105:4,13,23
106:14,18 113:24
125:12 148:11
203:10,19,22
204:1 206:3 207:8
208:8 211:17
213:21 220:13
230:24 231:9
233:3 235:23
237:10,12,16
243:15,25 244:21
244:24 245:7
246:16 252:23
253:2
**sacklers'** 246:18
**sad** 198:2
**saddles** 103:14
**safeguards**
224:13

**safety** 172:12
174:14 226:20
**saint** 37:3
**sale** 85:8 153:8
**salutary** 113:18
**sara** 41:4
**satisfactorily**
113:22
**satisfied** 50:25
60:22 223:21
262:20
**satisfy** 70:1
102:15,24 103:7
126:7 256:17
260:25 261:6
273:20
**save** 68:1 188:16
223:4 277:10
**saves** 199:8
**saving** 132:4
**saw** 47:7,24 197:8
197:14 207:22
**saying** 53:5,5,10
56:17 97:17 99:5
110:25 112:10
115:10 120:7
129:1,2 131:23
132:2,3 134:20
143:24 144:4,8
154:12 168:25
177:17 179:14,22
184:7 218:15
221:13 226:1
232:16 235:14
242:12 246:11
251:2 271:2
**says** 51:1 60:20
62:4,14,16 71:9
75:17 76:2 97:19
103:4 118:18
126:10,12 127:12
210:11 232:7
240:14 277:12

**scale** 137:7 258:11
**scared** 182:24
**scenario** 71:8
101:23 121:6
125:6 241:5
**schedule** 95:3
109:21,25 155:14
166:8 174:13
200:13 229:3
255:5,5 271:14
280:18
**scheduled** 56:13
98:22 166:2,5
167:2 170:7
181:11,11 187:24
200:14,20
**schedules** 219:17
**scheduling** 5:17
7:3,11 124:19
166:5 270:22
271:1
**scheme** 252:14
259:15,16 260:5,7
280:5
**schlecker** 42:17
**schupbach** 66:9
**schwartzberg** 5:5
10:6,13 28:11
42:18
**scope** 90:4,20,22
114:4,15
**scott** 4:15 9:15
12:19 15:2 17:19
20:8 22:19 25:2
27:15 30:8 32:19
35:2 41:2,14
**screen** 54:16
159:9 163:4
189:24 193:1,25
195:12
**searching** 262:20
**season** 186:18
270:21

**second** 7:15 8:1
10:3 45:13 46:7
53:14,15,19 57:14
68:20 69:15 73:8
73:22 75:4 76:10
82:25 84:2,23
85:5 86:8 95:6
102:15 104:4
105:18 109:23,25
110:1,20 138:6
159:10 165:17
175:18 184:13
202:4 204:11
205:23 207:13
208:3 210:23
212:13 217:13
218:24 219:1,11
223:22 228:15,16
230:9 236:7 237:8
241:18 242:10
248:13 253:4
254:20 256:9
258:14,17 259:18
263:14 264:25
269:10,18 282:2
**secondary** 90:16
**secondly** 51:16
120:6 252:21
254:13
**seconds** 168:15
**secret** 182:23
**secreting** 78:24
**section** 172:22
**securitized**
153:11
**security** 118:18
**see** 59:11 81:20
82:20 94:19 113:4
131:3 136:7
145:19 149:4
150:15 157:6
159:16,21 160:25
170:3 178:10

189:24 195:10,23
201:14,18 206:11
218:19 249:2
256:6,25 257:9,19
257:25 262:6
265:9 266:11
267:1 276:25
278:1
**seeing** 70:18 76:9
78:5 81:22 83:16
91:24 92:13 98:20
**seek** 86:9 104:2
112:19,22 117:5
170:25 174:8,12
174:22 176:5,12
177:6 187:21
215:15 217:12
222:8 248:18
251:1,6 254:21
**seeking** 46:2,10
58:3 61:11,20
63:4 66:25 78:13
90:7 95:10 98:25
122:23 143:21
152:10 173:4
204:25 265:16
267:19 279:1
**seen** 115:15 140:3
199:6
**sees** 146:8
**self** 42:19 104:14
**sell** 99:13
**send** 184:8 282:1
**senior** 130:11
**sense** 122:7,10
140:7 150:20
184:5 185:25
186:19 187:7
221:7 250:6 266:6
**sent** 57:10 173:24
174:24 176:2,3
182:24 197:11
249:1

**sentence** 138:18
181:24 197:6
**sentenced** 74:7,16
99:2,12 124:21
182:4,20
**sentencing** 57:24
72:21 74:2,5,10
74:15,20,22 75:14
77:9 80:4 96:5,12
96:18,24 97:1,2
97:22,25 98:5,8,9
98:16,21 99:10
101:3,12,14,23
103:24,25 104:2
117:18,20 123:24
124:7,8,14,19
127:10 138:9,12
138:20,25 150:13
150:18,21 151:6
151:11 165:8,14
165:16,19 166:1,4
166:6,8,10,14
167:2 168:4,7,24
169:11,12 170:17
173:12 174:8,9,11
174:19,23 176:7,8
176:24 177:12,20
180:9,16,22 181:7
181:8,10,17,19
182:2,10 183:1
184:7 186:13
187:22 199:25
200:6,6,9,13
215:15,24 216:22
223:13 270:4
279:1
**separate** 72:25
96:9 100:16
115:16 137:17
165:19 228:2
**september** 139:20
203:21 204:1
262:9

**series** 253:7
**serious** 51:2 63:10
68:6,11 69:9,14
102:3 106:13
107:5 114:15
121:11 142:18
223:8
**seriously** 105:12
105:21 106:11
117:11 133:20
267:5 272:17
**seriousness** 53:25
54:6 266:4 275:16
**serve** 137:16
188:5
**serving** 252:2
**set** 126:3 155:14
164:23 170:11
194:8 219:4
229:23 236:24
240:9 241:16
258:6 259:15
277:22
**sets** 241:12,20
**setting** 78:1,2
173:3,5 183:6
185:21 273:12
**settle** 91:11
**settled** 211:7,8,9
211:10,16 212:13
212:18,25
**settlement** 69:7
91:6,19 92:5,12
92:22 104:16,23
105:3 150:16
152:21,25 153:12
206:2 208:21
209:10 213:12
220:13 221:5
223:14,15 238:7
244:5,6 248:4
249:2 252:22
258:17 259:12,22

260:1,17 261:10
261:15 264:9
270:5 281:9
**settlements**
227:12 276:12
**setup** 242:7
**seven** 105:25
106:1 123:5 165:1
180:6,11 181:15
215:23
**shaky** 96:21
**shannon** 42:6
**share** 222:20
226:23
**shareholder** 82:6
89:11 147:12,22
**shareholders**
148:9 155:11
231:25
**she'll** 44:25
**sheer** 143:13
**shepherd** 42:20
**sheriff** 103:15
**shield** 3:22 12:3
17:3 22:3 26:22
32:3
**shift** 179:21,22
**shifting** 238:7
**shifts** 179:23
**shipwreck** 96:23
101:23
**shore** 4:7 12:11
17:11 22:11 27:7
32:11 38:6 227:18
227:18 242:22
243:9 253:4
**short** 98:3 108:14
122:8 145:24
163:14 167:22,23
174:4 178:23,24
222:2 223:9,10,18
223:22 224:6
227:22 229:19

230:11 239:23
246:1 268:2
**shorten** 5:16 7:1
**shortened** 107:6
216:8
**shortening** 5:17
7:2
**shorter** 132:16
149:16 158:6
187:1
**shortly** 273:1
**shot** 54:9 242:16
**show** 70:2 77:4
164:10 179:24
257:6 271:24
282:2
**showing** 49:6
54:13 70:2 85:12
89:24 102:14,18
226:18 227:2
255:25 256:20
257:4,6,8,17
258:2,9 261:5
267:14
**showings** 49:6
**shown** 53:23
62:15 88:2 93:14
103:8
**shows** 89:22 92:19
**shut** 192:16
**shutdown** 99:15
**side** 58:15 76:14
92:11 141:22
169:2 173:25
188:19 209:4
211:11,12 225:5
232:23 247:23
248:1,24 252:24
266:17
**sides** 164:16
246:17
**sideways** 172:14

**sift** 69:10
**sign** 190:20
193:21 194:20
198:12 224:4
**signaled** 124:9
**signature** 283:7
**signed** 2:1 5:9 6:2
6:8 13:9,14 18:14
18:22 19:4 23:9
23:15 28:16,22
33:9,15 73:10
164:8 173:24
188:3 196:18
**significance** 81:1
**significant** 86:3
87:1,18 94:3
105:1 115:19
121:23 139:2
141:14 143:9,11
192:21 201:3
252:13
**significantly** 67:8
121:17
**silicones** 84:22
**silly** 145:12
**similar** 119:2
133:16 134:23
195:17 278:12
**similarly** 204:14
255:20 272:24
**simple** 104:1
175:13 205:7
**simplest** 101:20
**simply** 46:22
76:12 81:1 102:17
102:25 119:16
125:14 134:17
183:15 227:7
228:8,19 244:14
253:3,9 276:8,9
**simultaneous**
120:5

**simultaneously**
118:23,24
**single** 55:17 106:2
113:6 164:13
172:7 204:25
207:11 212:20
214:11
**sir** 160:11 165:3
190:6
**sit** 142:18
**sitting** 160:8
162:17 171:21
190:11 193:11
194:11 196:10
208:10 246:6
**situation** 102:6
117:16 163:24
226:13 235:22
236:15 244:11
**six** 164:7 207:2
208:5,7
**size** 105:22 230:14
**skapof** 42:21
**ski** 206:19
**skip** 68:2
**sliding** 258:11
**slight** 97:8
**slipped** 104:19
**slower** 218:1
**slowly** 248:12
**smith** 42:22
**societal** 132:20
230:22
**solely** 56:5 113:24
**solicitudes** 134:13
**solution** 219:7
**solutions** 283:20
**somebody** 238:9
238:10 241:4
**someone's** 136:10
228:13
**somers** 42:23

**somewhat** 64:10
96:21 111:24
186:16
**son** 189:18
**sonya** 35:25 283:3
283:8
**soon** 77:12 168:19
175:21 180:21
200:20 234:15
275:14
**sooner** 107:5
222:14
**sorry** 50:6 65:20
73:19 80:19 138:1
153:5 155:5
157:17 159:13
163:2 165:5
169:10 170:20
174:22 201:3
216:6 218:2,3
221:1 236:23
246:23 255:16
267:2 271:3
280:22
**sort** 54:23 58:3
59:14,22 61:11
75:9 82:12 89:16
133:14 141:22
142:19,23 146:10
174:14 177:25
**sorts** 54:2 173:16
173:21
**sought** 47:12
132:12
**sound** 162:22
184:11 186:19
202:4,10 203:9
204:3,7,12 205:9
205:16 206:24
207:7,20 209:11
209:17 210:1,7,18
211:6,23 212:5,12
213:13,15,19,22

213:25 214:21
215:23,24 216:5
216:15 217:17
218:9,12,13
229:21,23,24
230:8,12,19,20
234:4 235:13
239:22 250:19
**sounds** 158:24
159:4 250:22
**source** 196:22
197:10 233:19
239:24
**sources** 138:22
192:16 208:18
**southern** 1:2 40:1
**sovereign** 119:13
279:17 280:2
**sovereigns** 152:16
**sovereignty** 69:24
**sparingly** 224:7
224:10
**sparks** 240:17
**speak** 153:9,10
202:3 231:13,14
231:14 238:21
245:12 248:10,13
**speaking** 71:10
92:23 198:23
214:7 238:22
**speaks** 59:8
**special** 260:5
**specialized** 126:6
135:14
**specific** 45:15,19
51:16 78:23 79:1
79:4,7 95:21
126:4 144:13
229:5 238:24
263:16 265:5
**specifically** 50:20
72:20 119:14
125:17 133:3

208:20 226:19
247:14 260:7
273:3 280:1
**specificity** 98:12
**speculate** 247:18
**speculation** 51:9
226:8 253:6,9,12
**speculations**
253:7
**speculative** 180:1
267:15
**spend** 52:16 54:12
254:15 281:23
**spending** 55:5
251:23
**spent** 52:10
139:25 202:7
222:15
**spoke** 231:22
**spoken** 231:15
**spot** 103:15 164:2
**springer** 42:24
**spurn** 105:13
**squarely** 223:20
232:3
**sr** 20:17 40:14
**st** 53:21 75:17
76:21 266:13
**stages** 124:3
**stand** 94:10 110:7
148:7 157:25
220:23 227:7
242:5 251:11
**standard** 102:13
255:24
**standby** 199:4
**standing** 51:21
53:22 265:22
**stands** 80:17
210:4 245:18
**start** 105:25
108:19,21 132:21
132:22,25 133:4

135:5 175:20
192:25 206:5
218:18 227:24
229:22 234:16
235:9,19 238:15
**started** 82:13
210:9
**starting** 70:12
101:1 170:8
**starts** 101:3
123:10 234:18
272:14
**state** 4:21 9:21
10:18 12:25 15:8
15:13,17 17:25
18:10 20:14 22:25
25:8 27:21 30:14
32:25 35:8 37:1,2
38:9 39:2 40:8
65:5,22 69:24
88:18,20 89:5
94:15 102:22
103:5 111:13
114:7 119:23
122:18 126:11
130:24 136:4,5
137:1 142:10,11
142:11 145:4
146:8 156:14,15
156:15 157:13,13
171:10 176:12
186:8 195:2,3,8
196:8 198:1 203:1
204:15,20 206:7
206:18,24 207:4
208:24 217:3
222:6 235:1
251:15,17 254:20
255:15,16,16,18
255:19 263:22,25
274:17 277:16
**state's** 115:1

**stated** 51:12 73:7
104:10 113:15
114:12 147:3
206:8 253:14
262:17 268:5
270:1 271:20
279:8
**statement** 7:10
10:1 133:19 253:5
**statements** 126:3
135:8 139:24
192:3 220:24
225:15
**states** 1:1,12 2:10
2:14 4:2 5:1,6,16
5:18,22 6:12,17
6:20,25 7:1,3,8,16
7:20 8:2,6 10:2,6
10:10,13 12:6
15:11 17:6 22:6
27:2 28:7,12 32:6
36:3 44:7,7 49:4,7
61:18 62:1,9,10
62:20 63:18 64:24
67:22,25 69:4
79:12 86:10 91:21
92:7,8 93:2,23
102:22 106:3
107:10 113:16
114:7 115:5
118:19,25 119:1
119:10,13,15
120:15,18,19,19
120:21,23 121:10
124:19 125:3,9
147:7 151:21
157:25 183:2
191:25 192:12
195:20 204:6,14
209:21,24 210:10
218:17 221:18
222:10,16,16,19
224:8,20,22

225:23 230:18
235:14 237:2
240:3 241:10
244:20,20 249:5
249:13 252:13,17
253:15 254:11,19
255:14 258:21
261:14 263:15
264:5 268:1 273:3
273:4,15 274:12
275:4 276:19
277:17,22,24
278:12 281:2
**states'** 260:19
261:4
**state's** 277:20
**stating** 118:10
137:13 192:15
**statistic** 198:2
**status** 7:11 45:14
45:23 62:25 65:9
80:13,15 97:5
101:21 250:15
251:20 263:17
**statute** 246:12
277:18 281:13
**statutes** 89:6
**statutory** 138:19
238:19 252:13
**stay** 2:2,9,11,17
2:23 3:2,9,15 4:3
4:6,19,23 5:2,19
6:11,13,19,21,22
6:23 7:4,5,7,15,17
8:1,3,10,17 9:3,19
10:3,11,16,21
11:3,7,14,20 12:7
12:10,23 13:3,18
14:2,9,16 15:6,12
15:15,20 16:2,6
16:13,19 17:7,10
17:23 18:3,7 19:8
19:15,22 20:12,16

20:20 21:2,6,13
21:19 22:7,10,23
23:3,19 24:2,9,16
25:6,10,15,22
26:2,9,15 27:3,6
27:19 28:3,8 29:2
29:8,15,22 30:12
30:16,20 31:2,6
31:13,19 32:7,10
32:23 33:3,19
34:2,9,16 35:6
44:4 45:3 48:15
49:1,19 55:12
56:8,10,13 58:2,3
58:19,23 60:3
61:11,15,19,20,24
62:6,8,9,12,14,16
62:16,17,18,22,22
62:24 63:4,8,11
63:16,22,23,24
64:8,9,12,15,16
64:17,24 65:8,9
65:25 66:21,24
67:6,6,11,18
70:15,17,19,24
73:11 75:19 77:16
77:23 78:4,12,13
78:14,15,17,19,19
79:2,23,24 81:19
81:25 82:23,24
83:8,9,15,16
85:22 86:2,21
88:12 90:7 94:4
94:10 95:7,10,14
95:19,22 96:16
97:3 101:18,22
103:13,20 104:5
105:5,6,8,11,16
105:20 106:1,9,10
107:8,11,18 109:9
109:24 112:12,21
119:7,8,9,17
122:7 123:1

124:10,17,24
126:14,22 127:11
127:21,24 128:3
129:19,22,23,25
130:3,7,8 131:2
132:12 134:9
143:21 145:24
149:12,16,16,16
149:17,19,24
150:7,11,18 152:4
153:15 154:11,15
155:3,16,21 157:1
158:7,7 159:24
160:24 161:3
167:4,12,22 169:4
171:10,10 172:9,9
174:5 176:5 177:1
177:6,11,13 178:3
178:10,12 180:5
180:17 183:21
184:16,24,25
185:1,4,5 186:17
187:18,25 188:14
189:2,7,10 190:9
191:9,23 193:9
194:9 196:6
198:24 202:20
203:1 204:18,21
205:1 211:3
214:16 215:6,7
217:12 220:6
222:2,2,8,8,24
223:9,10,19,22,22
224:6,15,21 225:2
225:5,11,23
226:17,23 227:1,6
227:11,16,22,22
228:1,3,5,14
229:5,16,19,20
230:5,7,8,8
231:18 232:15
233:10,10,14,20
234:20 235:6

238:4 239:7,11,12
239:19,20,20
241:9 242:15,16
242:18 243:15
244:14 248:22
250:21 251:1,6,10
254:10,11,21
255:3,24 256:3,4
256:10,17,22,22
257:14 258:3,12
264:16,18 266:1
267:20,23 268:2,8
268:19,20,21
269:7 270:13,13
270:16,22 271:6
271:10,14,15,21
273:23 275:19
276:2,13,21
277:21 278:9,10
279:12 280:22
**stayed**   62:2 150:4
151:22 172:17,18
207:2 236:11
**staying**   64:11
79:13,14 101:19
112:13
**stays**   4:12 9:10
12:16 14:23 17:16
20:3 22:16 24:23
27:12 30:3 32:16
34:23 62:7 112:19
112:22 127:9
151:4 234:6
268:14
**step**   59:19 75:4
76:11
**stepping**   200:11
235:14
**steps**   106:5 109:4
109:11 115:2,6
117:5 172:21
254:15

**stern**   42:25
**stipulate**   116:2
117:5,14 169:23
173:8
**stipulated**   116:20
117:23 141:11
164:16 173:17
183:16,17 269:1,8
269:21
**stipulation**   49:16
73:8,11 96:9
100:17 117:13
123:25 124:6
138:24 164:23
165:7 167:16
169:1 170:15
173:16 174:24
176:2,11,18 185:4
185:8 188:2
201:24 226:1
250:16 269:2,14
**stipulations**
142:13
**stodola**   42:25
**stone**   175:7
**stop**   59:18 165:6
**stopped**   134:21
241:6
**stops**   203:6
236:12
**stories**   206:15
**straight**   212:6
**straightforwardly**
97:12
**strange**   131:19
**strategies**   245:5
**strategy**   100:23
**strauss**   39:8
201:11
**streamlined**
272:22
**street**   1:13 36:5
38:18 39:3 40:2

**strength**   258:2
**stretch**   224:1
258:14
**strong**   70:2 91:3
153:1 255:25
256:20 257:4
258:9 261:5
**structural**   148:5
148:10,10 150:3
**structure**   110:12
115:25 145:2
147:19 148:12
**structured**   74:4
**structures**   141:20
**structuring**   61:9
**struggling**   47:18
**subject**   151:23
155:15,21 156:2
193:19 194:17
198:3 226:20
230:1 240:25
241:1 258:5
262:22,24 271:3
279:24 280:18
**subjects**   228:20
**submit**   58:15
105:17 106:11
110:15 111:9
114:17 118:17
119:17 226:10
253:10
**submits**   191:21
**submitted**   44:12
47:8,25 115:15
118:9 125:17
134:4 135:23,25
136:24 145:1
159:22 160:7
190:7,25 193:8
194:7 196:6
220:11
**subordinated**
106:20

**subsequent**   57:1
150:22 228:21
269:9
**subsidiary**   147:20
**substance**   197:19
232:8
**substantial**   54:14
57:3 60:5 73:20
73:22,23,25 75:13
76:19 77:22 85:8
92:11 97:6 120:6
143:18 147:13
173:1 263:6
269:19 271:25
272:2,5 276:25
277:10 278:14
**substantially**
68:21 71:2,5 75:6
76:12 82:2 84:12
85:13,15 89:23
118:24 119:1
184:5,11 192:20
256:22 265:14,18
**subtle**   184:14
**succeed**   70:3
256:1,20 257:5
258:9
**succeeded**   102:17
**success**   48:20
49:10 54:7,14
55:6 56:5 60:5,17
68:3 69:2,2 70:8
229:7 257:8,11
258:10 275:22
**successful**   214:10
**suddenly**   106:17
128:7
**sue**   233:22
**suffer**   56:6 102:21
104:1 107:16
257:13
**suffered**   85:21,23
103:6 134:13

191:17
**suffering** 96:13
205:11
**suffice** 166:5
**sufficiency** 126:1
**sufficient** 81:9
97:5 102:18
103:18 110:4
151:5 226:21
259:10 266:23
270:16 275:17
**sufficiently** 51:2
102:13 260:8
**suggest** 52:15
106:9 129:23
145:23 185:20
248:20
**suggested** 55:1
71:22 164:1
270:18,19 276:18
278:19
**suggesting** 108:6
108:11 112:20
117:6,25 171:4
250:24
**suggestion** 55:15
61:9 104:6 199:23
223:13 248:17
250:3
**suggestions**
222:18 249:5
**suggests** 86:21
**suite** 36:5 283:22
**sum** 223:3 272:20
**summarized**
273:15
**summary** 273:9
**super** 222:10
236:21,24 261:15
**superpriority**
92:8 150:24
**supp** 278:2

**supplement** 46:7
**supplemental**
10:1
**supplemented**
254:25
**support** 2:10 5:1
6:12,19 7:16 8:2
8:15 9:1 10:2,10
14:7,14 15:10
19:13,20 24:7,14
28:7 29:13,20
34:7,14 44:12
74:1 77:24 78:7
86:21,23 145:1
196:8 202:18,19
214:17,18 222:7
222:10 231:18
244:12 262:12
**supported** 129:15
136:1
**supporting**
222:16
**supports** 85:22
214:15 244:10
**suppose** 70:10
151:23 180:21
**supposed** 99:1,24
136:23 223:7
232:15
**supreme** 61:22
67:7 87:13,16,16
88:4,9 111:25
112:14 132:13
136:11,12 246:11
259:20 260:3
267:22 269:10
**sure** 46:14 47:3
47:17,21,21 49:13
50:11,21 52:22
60:11 64:23 77:17
83:10,10 86:12
88:21 91:22 93:24
95:17 98:18 111:7

121:1,20 143:17
152:1 168:20
174:17 177:5,11
177:14,25 181:14
186:9 200:2 202:1
225:19 243:3
246:25
**surely** 90:12
**surplus** 131:17
**suspect** 245:25
**suspending** 62:23
**swanner** 43:1
**swear** 159:25
189:20 190:1
193:2 194:1
195:24
**sweet** 164:2
**system** 93:25
221:10
**systems** 142:9

**t**

**t** 114:23 160:3
194:5 283:1,1
**tabak** 14:25 20:5
24:25 34:25
**table** 167:24
171:14 180:4,13
188:14 223:12
**tack** 161:4
**tactics** 279:6
**tadps** 233:2
**take** 45:20 46:3,4
46:8,19,22 48:2
67:8 79:5 87:20
88:5 95:11 99:22
100:9 106:11
107:13 109:4
114:6 115:10,11
115:22 120:25
122:7 124:15
127:10 130:25
133:19 135:1,19
149:18 152:7

155:18 156:19
162:10 163:13
165:14 166:6
169:6 174:19
180:13 202:4
209:18 211:21
235:15 254:14
264:7 274:15
**taken** 51:23 52:2
52:4 91:15 92:20
106:5 110:23
114:3 115:16
118:19 125:7
134:16 162:5,22
164:20 167:24
171:14 174:6
180:4 188:4 239:1
249:10 267:5
269:11,15 279:21
**takes** 115:7
175:17 184:19
213:18 238:13
263:17
**talk** 112:5 130:15
145:1,16 171:12
**talked** 58:5 78:22
90:8 108:24
138:10,16 139:15
139:20 167:1
173:12 246:4
249:18
**talking** 76:5 77:14
87:20 95:18
112:13 113:8,11
113:11 121:3,15
129:14 130:11
132:23,24 139:6
141:18 144:24
178:22 200:5
229:5 233:16
237:15,20 241:2
246:1

talks  126:9
tallahassee  39:19
tangible  112:4
  274:20,23
tapley  43:2
task  198:8 223:15
tatneft  278:3
taxes  212:7
taxpayer  235:2
taxpayers  228:19
  243:6
tea  177:3
teach  111:15
teacher  206:22
technical  134:17
  229:13
tee  167:12
telephone  44:18
telephonically
  36:8,9,16,23 37:6
  37:13,20 38:6,13
  38:21 39:6,13,14
  39:21 40:5,12,19
tell  92:1 159:25
  184:9 190:1 193:2
  194:1 195:24
  200:10 235:17
telling  273:17
tells  248:22
tempered  70:8
tend  240:2,16
tentative  199:20
teps  231:3
term  111:25 122:8
  135:17 158:7
  163:14,19 167:22
  167:23 174:4
  222:1,2,23 223:9
  223:10,18,22
  224:6 226:23
  227:22,22 246:1
  268:2

terminate  104:5
  105:4
termination  104:9
  104:11,13 127:5
  236:15 245:13,17
  247:1,3,11 250:11
  250:13
terms  61:11 76:20
  109:7,10 115:21
  122:1 128:11
  132:3 134:14,17
  136:10 149:14
  150:7,14,25
  188:15 213:3
  215:25 222:23
  223:9 237:6
terrible  107:16
territory  148:4
test  73:23 76:11
  102:15 165:10
  260:25 264:15
tested  110:16
testified  129:12
  273:6 274:3,7
testify  128:2
testifying  128:13
  128:24
testimony  91:22
  104:23 125:24
  129:4 130:17
  135:13 159:1,23
  160:9 163:3 187:8
  190:8,10,20
  193:11,19 194:10
  194:19 196:8
  217:7,24
texas  66:13,13,14
thank  45:12 48:6
  61:7 65:18 67:24
  94:21 122:13,20
  133:21 138:4
  146:16,24 154:3,6
  154:7 157:17

158:3,18 159:16
  162:25 163:5
  190:4,21 193:21
  193:23 194:20,21
  194:23 197:21
  198:13 219:21
  221:16 225:8,9
  227:16,17 243:4
  245:9,10 247:22
  249:4 252:7 254:4
  254:7 281:17,18
  282:5
thanks  248:7
that'd  195:12
that's  240:15,20
  242:23 249:10
  250:5 252:2,12,16
  252:20 253:2
  254:6 266:24
  269:10 276:16
  281:12
themes  251:16
theodore  43:11
theory  115:18
thereof  258:2
they'd  246:6
they'll  247:19
they're  242:2,13
  253:22
they've  249:21
  272:21
thing  52:7 60:11
  64:10 68:4 73:16
  78:23 79:7 86:23
  138:15 154:21
  168:6 171:17
  184:13 185:20
  196:12 201:2
  219:16
things  54:2 73:18
  73:20 74:6,7,8,18
  74:21 76:19 79:1
  79:5,5 80:24

98:12,15,17 99:14
  100:3,17,18,25
  101:10 108:10
  114:5,12 117:12
  117:17 126:19
  140:1 141:10
  142:3,5 143:9,10
  151:16 167:14
  173:16,21 183:12
  183:14 197:13
  199:19 202:4
  205:5 207:18
  233:13 248:15,21
  252:15
think  46:1 47:23
  48:11,16 49:14,19
  50:14,15 51:10,11
  51:12,16 52:5,7
  52:23 53:5,6,10
  53:16,19 54:3,11
  54:23,25 59:8,16
  59:20,23 60:9,9
  60:10,14,15 61:23
  63:19 64:3,5,10
  66:22 67:14 68:8
  68:11 69:3,24
  70:11 71:18 72:1
  72:24 73:21,24
  75:12,14,24 76:6
  76:21,23 77:3,5
  77:15 78:12,18
  79:21 81:24 82:5
  82:13,16,19,21
  83:7,11,12,23
  84:17 85:1 86:15
  87:4,7 88:8,11
  90:3,5,19 91:8
  92:18 93:11,14,25
  94:22 95:1,8 96:3
  96:10 97:18
  100:18 102:12
  104:15 107:20
  112:9,10,18 113:2

114:21 116:5,12
117:13 118:11
120:3 121:6,22,24
124:9,23,24
126:18,20 127:19
128:16,23,24
130:13,18,21
131:24 133:9,10
134:4,6,12,19,24
134:25 135:4,12
135:22,25 136:9
138:7,21 139:1,8
139:8,11,14,14
140:5 141:2,9,10
141:17 142:15,16
142:19,22 143:8
143:10,25 144:10
145:6,18,22 146:5
146:7,9,13 147:4
147:10,13 148:14
148:21 149:8,10
149:14,15,18,22
150:12,14,20
151:10,14,17
152:8 153:1,18,19
156:12 158:6
161:12 165:23
166:3 168:21
171:15 174:14,15
174:18 175:22
178:18,25 179:14
182:19 183:4
185:17 186:10,15
186:18,24,25
187:4,5 188:10
189:1,3 190:25
194:24 195:3
196:24 199:2,14
214:19 216:11
217:10 219:6,8,15
220:1,9 221:2,7
221:14 224:1,18
225:4 226:19

227:21 228:6,9,11
229:19,24 230:20
231:11 233:17
235:17 238:18
239:11,12 240:4
240:16 241:23
242:12,14 247:7
247:10 248:15
249:8,9,14 250:5
250:10,15,17
251:19,21,24,24
252:1 253:2 268:1
281:14,22,25
**thinking** 183:4
187:17 219:6
**thinks** 82:24
**third** 36:20 46:18
46:20 69:8,12,19
76:13 82:10 84:13
84:17 86:16
120:22,22 125:12
149:6 161:6
187:11 198:6
204:7 208:16
211:23 212:18
214:4 244:6
253:13 258:22
259:7,19 261:2,9
261:11,22,23
262:24 263:21
278:14
**thomas** 40:9
**thorough** 203:13
**thought** 47:24
98:18 112:17
121:12 170:9
202:9 203:14
**thoughtful** 149:15
149:22
**thoughts** 245:18
**threat** 80:14
103:17

**threatened** 99:14
**three** 52:17 54:15
56:23 57:8 60:2
61:18 64:24 67:4
67:22 69:4 86:8
92:10 115:5
121:21 160:24
161:9,14 188:19
202:25 203:11
204:11,25 205:20
205:21 206:20
208:5,6,8,21
223:9,18 233:23
244:20 247:11
254:10,23 255:21
264:10 266:3
279:15
**threshold** 48:11
49:19
**throw** 187:16
228:24
**thrown** 61:14
**thwart** 223:5
**ticket** 100:14
**tie** 98:12 100:25
180:15
**tied** 53:15 81:21
84:3 99:18 280:21
**time** 5:16 7:1
44:21 52:10,16
54:13 55:6 60:13
60:21,22 62:14
63:16 67:9 70:18
70:22 72:1 74:5
78:3,5 81:23
91:24 92:13 95:13
98:20 101:8 103:5
107:3,5,7,12,13
107:18,19 109:9
110:3 112:4
121:17 122:2
149:21 151:20
154:17,19 156:19

157:18,24 158:15
167:13 172:3,15
175:9 177:6
178:23 180:11
184:6 186:23
191:19 192:20
199:22,22 200:20
201:4 202:8
217:11 218:7,10
218:11 220:5
226:13 227:9
228:15,20 229:2
231:25 234:5,7
237:18 238:9,11
240:10,20 246:8,9
247:17 249:11
253:14,23 267:25
273:20,23 274:5,6
275:15 280:21
281:24
**times** 70:17 73:12
84:7 136:13
137:17 150:15
180:6 183:14
252:9 264:5
**timetable** 110:7
**timing** 72:17
77:14 101:6
160:19 162:1
**tip** 48:23
**titled** 61:24
**tobacco** 244:20
**tobak** 9:12 30:5
43:3
**today** 44:24 48:16
56:7 57:17 98:3
111:13 142:19
160:8 171:21
192:7 193:11
194:11 196:10
222:3 226:11
232:4 247:14
250:19 255:2

**today's** 163:21
**toes** 59:19 200:11
**told** 68:21 127:5
  127:24,25 128:25
  159:10 168:5,6
  199:23 200:13
  235:7 276:4
**tolerable** 205:23
  206:6 208:20
**tolerate** 128:9
  209:13
**toll** 227:10
**tong** 203:21
  208:17,20
**topco** 5:11 18:16
**topic** 266:11
**total** 252:11
**touch** 94:22
  102:11 235:4
**touched** 50:3
  103:23 124:25
  229:7
**touted** 113:5
  264:8
**townes** 43:4
**track** 161:19
  268:23
**tracking** 161:10
  161:11,24 162:9
**trades** 145:21
**trainor** 9:1 14:14
  19:20 24:14 29:20
  34:14 40:16
  114:23 191:3,12
  192:2 193:25
  194:4,6,7,13,15
  194:21 206:10
  244:9,13 274:2,24
**trainor's** 194:18
**transaction** 85:9
  254:17
**transactions**
  79:20,25 80:6,10

96:14 107:3
  110:10 269:16
**transcribed** 35:25
**transcript** 56:22
  57:2,11 283:4
**transcripts** 55:25
**transfer** 74:17
  90:14 143:5
  172:22 173:5
  219:4
**transferee** 212:9
**transferred** 127:7
  213:11
**transferring**
  74:12,13 211:13
**transfers** 75:7
  173:6
**transgress** 86:14
**translate** 132:7
**transparent**
  106:11 166:4
**trauma** 231:23
**treat** 128:18 129:7
  135:8 281:7
**treated** 256:13
**treatment** 134:21
  220:22
**treats** 261:18
**tremendous** 105:8
  168:7
**trial** 59:5 67:10
  67:13 85:1 104:21
  104:22 123:10,13
  123:15,16 149:23
  150:1 170:8
  215:18 258:6,24
  259:11,11 260:15
  264:1,7,11 266:10
**trials** 276:12,16
**tribal** 2:22 11:2
  16:1 21:1 25:21
  31:1

**tribes** 2:24 11:4
  16:3 21:3 25:23
  31:3 217:5
**tried** 78:25 207:23
  214:5 227:24
  248:19 263:4
**trigger** 247:1
**triggers** 200:9
**triumph** 236:3
**tro** 55:14 58:19
  59:14
**tronox** 90:15
  262:1,5
**troop** 43:5
**trucking** 53:21
  266:13
**true** 68:8 110:24
  281:6 283:4
**trumpet** 208:21
**trust** 5:11 15:16
  18:8,16 108:16,16
  109:2 115:24
  139:23 151:21
  152:25 161:22
  188:12 218:7,11
  234:14 265:10
**trustee** 2:14 5:6
  5:22 6:17,25 7:8
  7:21 8:7 10:7,14
  28:12 36:4 44:7
  44:24 45:1 48:21
  49:4 55:12,22
  61:14 63:18 67:25
  69:3 71:9 86:10
  91:20 93:23 97:9
  115:6,14 118:24
  119:2,7 120:11,17
  172:7 175:15
  178:2,4 205:20
  207:1 209:21,22
  209:24 210:4,5,9
  210:10,13,14,24
  211:19,24 213:14

214:2,5 221:7
  224:19,23 228:5
  229:12 230:17
  231:11,23 235:14
  238:19 239:6,8
  249:5 253:21
  254:11 258:21
  259:7 260:12,16
  261:7 262:14
  263:7 267:20
  271:10 274:17
  275:3 276:19
  277:2,6
**trustee's** 4:3 5:2
  6:12,20 7:4 10:2
  10:10 12:7 17:7
  22:7 27:3 28:8
  32:7 44:25 48:7
  48:14,24 55:14
  56:10 57:20 95:18
  210:11 221:6
  222:7 225:23
  226:8 230:20
  231:18 232:21
**trustees** 2:10 5:16
  5:18 7:1,16 8:3
  157:25
**trustee's** 249:13
  261:4 278:9
**trusts** 5:10 18:15
  78:2 117:10 162:1
  162:4,8,9,10,11
  162:21 173:3
  187:9 217:25
  219:4 234:10
**truth** 47:13
  137:14 159:25
  160:1,1 190:1,1,2
  193:2,3,3 194:2,2
  194:2 195:24,25
  195:25
**try** 70:10 86:12
  94:24 102:5

107:25 110:9
114:8 138:5,7
144:22 164:2
170:10 202:3
222:2 248:14
249:12 253:15
**trying**   84:16
88:23 90:25 98:2
99:25 100:5
101:24 125:21
131:6,7 132:7,7
154:22 169:9
175:8 176:18,22
180:14 186:17
202:8 218:4
235:19 249:6
251:23
**tsier**   43:6
**tuesday**   56:2
58:11
**turn**   70:11 103:9
110:14 125:16
172:22 199:18
201:5 209:19
222:22 229:4
233:22
**turned**   111:25
134:14 241:8
**turning**   157:3
**turns**   206:21
216:20 241:13
**tweaking**   187:6
**tweed**   36:11
**twelfth**   6:6 13:12
19:2 23:13 28:20
33:13 254:12
**two**   45:2,18 50:23
53:12 55:3 58:21
66:24 67:18 70:17
73:6 86:4 92:10
98:12 99:18 103:6
106:16,19 111:25
120:2 121:25

123:10 128:5
134:4,9 135:7,22
137:12 150:8
151:4 167:14
168:1,6,15 184:15
191:2 192:12
194:24 195:20
197:5 199:19
200:5 203:4
205:24 206:13
207:14,24 208:4
208:13,13 217:20
228:2,2 230:20
233:12,13 246:17
250:12 253:23
254:12,19 257:18
264:10 267:18
271:23 273:19
274:8
**twofold**   177:4
**tying**   280:19
**type**   82:5,7 108:5
126:18 182:23
245:16
**types**   69:12 100:1
135:8 142:12
192:20 259:19
269:16 280:7
**typical**   147:20

**u**

**u**   114:22 190:4
193:6
**u.s.**   1:23 36:4
44:24,25 45:1
48:7 49:4 55:12
55:14,22 56:10
57:19 61:14 69:3
71:9 81:5,6 91:19
95:18 97:9 115:6
115:14 118:24
119:2,7,9,13
120:10,17 139:11
147:23 148:8,8

166:6 172:7
175:15 178:2,4
200:1,3,7 205:20
207:1 209:21,22
209:24 210:4,5,8
210:11,12,13,14
210:24 211:19,23
213:14 214:2,5
221:5,7 222:6
224:9,19,23 226:8
228:5 229:11
230:17,20 231:11
231:18,23 232:20
236:6,22 238:19
239:6,8 244:18
253:21 257:1,19
259:1,6 260:6,11
260:16 261:4,7
262:8,14 263:7
266:18 267:16,19
271:10 274:17
275:3 276:19
277:2,6,23 278:3
278:9
**u.s.c.**   120:16
**ucc**   134:4 135:7
164:15 191:10,13
203:12 205:24
207:14,19 208:23
213:25
**ucc's**   136:16
213:20
**ukraine**   278:3
**ultimately**   61:21
132:3 135:4 148:6
148:6 150:17
151:14,17 152:8,9
152:10,19,23
162:11,20 259:25
265:5
**unable**   98:1,6
99:12

**unappealed**   48:17
**unbelievably**
214:5
**unbonded**   120:11
**uncertain**   237:7
**uncertainty**
128:11 129:14,18
141:24 142:1
**unchecked**   87:3
**unclear**   176:2
**uncompensated**
191:14
**unconscionable**
207:7
**uncontroverted**
272:4
**uncovered**   203:13
213:23
**undergoing**   128:6
**underlying**   69:18
257:5 259:6
261:20 268:18
**undermine**   76:18
177:25
**underscore**   246:8
**understand**   47:18
49:21 61:3 79:8
83:15 86:13 96:22
99:3,9 107:1
111:23 112:17
118:5 127:16
130:16 133:8
136:25 141:21
143:17 157:18
177:15 184:21
185:14,17 186:23
186:23 215:14
216:1,13 218:14
218:16 219:14,14
225:15 236:8
237:5 281:22
**understanding**
72:7 100:21

141:20 192:4,22
217:6 230:3
242:17 250:13
**understands**
227:9
**understood**
214:25
**undertake** 93:7
107:3 144:7
**undertaken** 258:6
279:6
**undertaking**
191:23
**underwood** 25:11
38:21 138:3
146:20,24,25
147:15 148:17,20
149:5 153:7,17,23
154:2,6,7
**undisputed**
130:18
**undo** 138:20
**undone** 74:14,17
74:25 101:15
**undoubted**
106:19
**undue** 270:21
**unexpected** 179:5
180:7
**unflagging** 76:16
**unfortunately**
113:22 188:24
**unfunded** 205:15
**unhappiness**
206:23
**unidentified**
232:24
**uniform** 51:18
**uniformed** 257:19
**unilateral** 164:7
**unimaginably**
211:4

**unique** 191:22
237:4 255:23
279:16
**united** 1:1,12 2:10
2:14 4:2 5:1,5,16
5:18,22 6:12,16
6:20,25 7:1,3,8,16
7:20 8:2,6 10:2,6
10:10,13 12:6
17:6 22:6 27:2
28:7,11 32:6 36:3
44:7 63:18 67:25
86:10 92:7 93:23
118:19,25 120:15
120:17,19,19,21
120:23 124:19
151:21 183:2
204:14 210:10
224:8 225:22
235:14 237:2
249:5,13 254:11
258:21 261:14
273:3,4 277:22
281:2
**unlimited** 227:6
**unnecessary**
223:23
**unopposed**
236:17
**unprepared** 50:4
**unquantifiable**
234:23
**unquantified**
232:24
**unquestionably**
125:4
**unreviewable**
82:15,20
**unrung** 74:25
**unsecured** 3:1,4,8
3:15 4:5,23 8:16
8:19 9:2,5 11:6,9
11:13,20 12:9

13:2 14:8,11,15
14:18 16:5,8,12
16:19 17:9 18:2
19:14,17,21,24
21:5,8,12,19 22:9
23:2 24:8,11,15
24:18 26:1,4,8,15
27:5 28:2 29:14
29:17,21,24 31:5
31:8,12,19 32:9
33:2 34:8,11,15
34:18 39:9 137:16
191:5 211:9
212:19
**unspecified**
126:21 127:12
**unswayed** 205:20
**unthinkable**
191:17
**untrue** 220:5
**unwinding** 143:13
143:23
**unwound** 75:8
**update** 196:12
197:20 245:12
**updated** 196:19
**upfront** 55:1
68:24 272:20
**ups** 234:3
**upset** 127:22
**upward** 240:25
**urging** 220:12
**usdoj** 124:14
**use** 102:5 105:15
116:2 117:5 142:3
220:22 228:23
235:20 236:5
241:1 244:23
274:3 281:8
**users** 161:21
162:12
**usually** 144:16

**utterly** 55:2 59:17
**uzzi** 36:16 246:19
246:19,22 247:4
247:10 248:2

**v**

**v** 66:12,16 81:5
121:13 256:25
257:1,19,20
258:25 260:6
262:7,15 265:9,11
267:16 268:11
277:22,25 278:2,3
**vacating** 62:24
**vague** 75:9
**valid** 263:23
**validity** 46:18,20
**valuable** 253:1
**value** 91:12,17
125:15 129:13,18
160:23 234:7
261:21
**valued** 91:10
**valve** 172:12
174:14
**van** 43:7
**variation** 265:1
**varick** 36:5
**various** 44:11
45:6 47:8 56:13
109:3 114:3 116:1
125:18 131:13
134:20 136:13
157:1,1 162:21
176:4 201:5
211:10 253:8
**vast** 52:16 172:6
265:21 272:5,8
273:5
**vcr** 66:8
**vehemently** 202:7
**veil** 89:25
**veiled** 89:16

Veritext Legal Solutions
www.veritext.com

**A.1205**

| | | w | 216:1 220:3 |
|---|---|---|---|
| **vein** 134:17 | **viewed** 52:20 | | 223:18 224:5,16 |
| **vel** 51:22 53:1 | 231:23 244:7 | **w.r.** 267:1 | 227:20 229:14,20 |
| 68:16 | 257:12,18 261:25 | **wagner** 37:13 | 237:3 239:19 |
| **velez** 43:8 | **views** 84:1 202:14 | 189:13,13,18,20 | 242:15 247:18 |
| **vendors** 127:22 | **vigorously** 204:16 | 189:23 221:19,19 | 248:8,13 249:19 |
| 127:25 128:3 | 213:20 | 221:24 225:7,9 | 251:9 252:8 253:4 |
| **vengeance** 243:25 | **vindicate** 107:25 | **wait** 154:17 170:4 | 253:13 281:11,23 |
| 245:2 | **vindicating** 87:2 | 180:8 | **wanted** 59:21 |
| **venture** 59:3 | **vindication** 122:3 | **waiting** 154:19 | 68:4 122:21 |
| **veres** 224:8 | 275:12 | 155:2 195:13 | 151:15,16 157:11 |
| **veritext** 283:20 | **violated** 214:3 | 202:17 | 235:9 248:14 |
| **verse** 241:20 | **violates** 258:23 | **waive** 118:3 246:3 | 249:8 250:23 |
| **version** 173:24 | **violation** 92:21 | 246:6 247:7,13 | 281:16 |
| **versus** 149:16,17 | **violations** 263:11 | **waived** 245:18 | **wants** 151:10 |
| **viable** 203:15 | **virtual** 191:10 | **waiver** 104:11,13 | 171:25 185:21 |
| **victim** 207:21 | **virtually** 191:19 | 248:3 280:2 | 188:13 241:6 |
| 212:22 213:1 | 207:19 | **waiving** 150:10 | 245:11 248:10 |
| 231:13,14,17 | **virtue** 152:21 | **walk** 104:18,19 | **wardwell** 37:15 |
| **victims** 4:2,8 12:6 | **vis** 113:24,24 | 105:1 237:10 | **warrant** 144:2 |
| 12:12 17:6,12 | **vital** 243:22 | 241:4 248:3 | 258:3,8 |
| 22:6,12 27:2,8 | **voice** 231:16 | **walked** 128:5 | **warranted** 95:24 |
| 32:6,12 38:2 | **volumes** 59:8 | **walker** 121:13 | 96:2 156:21 |
| 99:23 102:5 | **voluntarily** 105:9 | 277:25 | **warrants** 113:12 |
| 105:23 106:14,18 | 250:4 | **want** 48:12 50:4 | **wary** 210:21 |
| 106:23 112:4 | **voluntary** 180:17 | 50:11 54:24 55:4 | **washington** 10:18 |
| 118:2 206:13 | **volunteering** | 59:18 61:10 67:17 | 15:11,13 38:9 |
| 212:12 214:6,8,12 | 239:8 | 68:24 70:11 72:10 | 40:10 44:7,25 |
| 227:19 234:2 | **vonnegut** 7:12 | 74:6 76:23 78:15 | 65:5,19 94:16 |
| 235:21 236:4 | 43:9 | 79:1 80:13 87:5 | 122:22 136:5 |
| 243:6,18 244:2,16 | **vote** 231:10 | 93:7 100:13 111:6 | 137:1 142:11 |
| 244:24 245:4 | 259:13,16,24 | 111:7 121:8 | 147:3 156:14,15 |
| 249:20,21 274:4 | **voted** 86:25 | 123:14 134:22 | 157:13 191:25 |
| **victory** 54:1 | 202:18 204:9 | 153:10 157:9 | 192:5 195:3,15 |
| **video** 175:17,21 | 222:12,12 231:10 | 158:13,14,15 | 198:17 203:25 |
| 248:13 | 244:8 249:24 | 160:12 169:15 | 206:19 208:24 |
| **videoconference** | 272:7 | 170:1,14 174:9,17 | 209:5 254:20 |
| 2:4 | **voters** 204:24 | 187:4 188:8,21,22 | 255:15,18 274:12 |
| **view** 47:2 60:10 | 214:17 244:12 | 190:12,14 191:1 | **washington's** |
| 78:7 85:22 92:21 | **voting** 202:18 | 193:15 194:14 | 158:12 190:18 |
| 115:14 136:1 | 259:25 260:23 | 195:14 196:23 | 206:24 |
| 137:13 221:13 | | 197:21 201:20,21 | **waste** 253:23 |
| 230:8 259:5 260:4 | | 202:3 205:5 | |
| 261:13 | | 207:17 209:10 | |

**watchdog** 86:10
86:11 221:10,13
**watching** 111:18
208:11
**way** 44:21 46:25
52:23 53:7,12
61:19 63:13 70:19
79:23 80:15 87:24
88:9 92:14 96:1
99:21 100:2,16,21
101:21,25 105:2
106:8 109:1
110:10,12 117:14
124:11,23 135:11
136:18 152:11
170:11 177:9,11
177:14 185:2
203:16 204:22
208:14 221:3
227:14 237:24
246:4,14 249:12
253:15 259:8
**ways** 53:12 67:15
105:24 114:8
143:9 210:3
241:23,25
**we've** 53:6 57:1
73:6,7,10,12
82:16 88:1 89:13
93:14 94:8 98:6
102:13,18 105:2
109:9 121:15
125:18 146:3
147:5,18 156:14
156:18 158:11
159:4 162:19,19
163:16,16 165:24
166:12 167:14,16
167:17 169:1
170:11,19 171:18
172:1 173:3,23
174:5,6,21,22
175:10 178:6

**word** 95:5 141:6
**words** 78:16
164:10 210:18
213:24 236:25
257:14
**work** 74:21
109:21 110:10
115:2 118:2 182:4
228:21 233:24
248:19,23
**working** 205:22
227:21
**works** 78:5 88:9
219:8
**world** 180:12
200:10 205:14
235:5
**worried** 201:17
**worry** 178:18
235:15
**worse** 244:19
274:6
**worth** 135:1 152:3
232:19,19,20
238:23
**would've** 145:11
**wouldn't** 251:25
**wrap** 235:19
**writing** 164:7,17
166:12
**written** 144:24
175:7 180:5 205:3
233:10 258:7
**wrong** 54:24
59:17 69:17 152:6
180:20 221:14
233:12,23 238:12
261:7 267:2 277:8
**wrongdoers**
125:14 252:15
**wrote** 164:10
196:18

180:4,5,6,13
183:13,16 198:1
200:10 206:14,15
206:15 216:19
231:14
**wealth** 245:7
**wear** 241:6
**weber** 43:10
**website** 197:2,5
210:11
**week** 77:12
123:11 161:6
184:15 217:18
246:14 268:25
272:12
**weekend** 55:16
**weeks** 86:8 166:7
186:22 187:11
197:5 217:8,20
**weigh** 83:3
**weighing** 106:16
109:14
**weight** 53:11
227:11
**welcome** 47:5
133:14
**wells** 43:11
**went** 68:20,22
86:8 212:6 214:5
**we'll** 248:12
**we're** 241:1 246:1
248:3 250:21
252:25
**we've** 247:20
249:10,18,24
251:9 252:9
**whatsoever** 56:4
58:1 92:4
**what's** 250:19
**wherewithal**
241:11
**whim** 204:24

**whisper** 253:17
**white** 1:14 38:1
173:23 227:18
249:20
**who've** 231:16
**wide** 265:1
**widespread** 130:2
**wilks** 260:6
**willing** 46:24
110:9 115:11,22
117:6,11,17 118:2
163:17 169:2
176:17 235:24
237:12 248:8
253:15,22
**willingness** 115:2
**win** 143:22
**window** 231:24
239:18 241:18
**windstream** 81:6
84:21 265:11,12
265:19 266:18
**wins** 213:17
244:25
**winter** 173:7
**wires** 182:24
**wish** 95:2 102:14
148:13 160:10
193:12 194:12
196:11 207:2
**wishes** 192:10
**witness** 91:22
134:25 189:4
**witnesses** 158:14
191:2,13,21 192:9
199:14 260:15
**wl** 66:11 256:15
257:9
**wolff** 38:8
**won** 145:3
**wonderful** 104:23
**won't** 245:25
260:21 268:5

| x |
| --- |
| **x**   1:4,10 |

| y |
| --- |
| **y**   193:5 |

**yards**   36:13

**yeah**   88:7 116:10
  144:16 149:2
  161:23 162:5,16
  179:23 219:9

**year**   101:19
  121:25 134:21
  161:12 205:7
  206:9 209:14
  217:19 274:10,23

**year's**   187:1
  217:22

**years**   86:4 106:16
  106:19 128:5
  130:21 185:22
  203:11 205:24
  206:14,20 207:10
  207:14,24 208:4
  208:13,13,23
  212:9 213:3,6
  262:23 273:18,19
  274:8

**year's**   270:20

**yesterday**   195:19
  206:17

**york**   1:2 36:6,14
  36:21 37:11,18
  38:4,11 39:11,11
  40:1,3,3 278:2

**you're**   247:11
  250:24

**you've**   245:19
  248:21 249:14

| z |
| --- |
| **z**   42:24 |

**zabel**   43:12

**zero**   209:9 214:12
  214:13 236:19

239:1,3

**zoom**   44:17
  157:23,24

**zoomgove**   2:4