Nos. 21-cv-7532 (Lead); 21-cv-7585; 21-cv-7961; 21-cv-7962; 21-cv-7966; 21-cv-7969; 21-cv8034; 21-cv-8042; 21-cv-8049; 21-cv-8055; 21-cv-8139; 21-cv-8258; 21-cv-8271; 21-cv-8538; 21-cv-8557; 21-cv-8566 (Consolidated)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE PURDUE PHARMA L.P., ET AL., DEBTORS

APPEALS FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
BANKR. CASE NO. 19-23649 (RDD)

# APPENDIX TO THE AD HOC GROUP OF INDIVIDUAL VICTIMS' (I) APPELLEE BRIEF AND (II) JOINDER TO THE APPELLEE BRIEFS OF THE DEBTORS' AND THE OFFICIAL COMMITTEE OF UNSECURED CREDTIORS

# VOLUME III

WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020
Tel.: (212) 819-8200
Fax: (212) 354-8113
J. Christopher Shore
Michele J. Meises
Alice Tsier
Amanda J. Wong

ASK LLP
60 East 42nd Street, 46th Floor
New York, New York 10165
Tel.: (212) 267-7342
Fax: (212) 918-3427
Edward E. Neiger
Jennifer A. Christian

*Co-Counsel for Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al*

# INDEX

| Document | Appendix Pages |
|---|---|
| **VOLUME I** | |
| Order Establishing (I) Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof [Bankr. ECF No. 800] | A.1 – 55 |
| Order Appointing Mediators [Bankr. ECF No. 895] | A.56 – 66 |
| Mediators' Report [Bankr. ECF No. 1716] | A.67 – 75 |
| Order Expanding Scope of Mediation [Bankr. ECF No. 1756] | A.76 – 79 |
| Letter from Maria Ecke to Committee Members re: Objection to Settlement Amount [Bankr. ECF No. 2210] | A.80 – 81 |
| NAS PI TDP [Bankr. ECF No. 3528, 3655] | A.82 – 123 |
| Non-NAS PI TDP [Bankr. ECF No. 3528, 3655] | A.124 – 183 |
| Letter from Les Buris to Judge Drain re: Objection to Amount Paid to Creditors [Bankr. ECF No. 3028] | A.184 – 185 |
| Mediator's Report [Bankr. ECF No. 3119] | A.186 – 203 |
| Kelvin Singleton's Objection to the Amount Paid to Creditors [Bankr. ECF No. 3125] | A.204 – 207 |
| Objection to Plan and Plan Confirmation [Bankr. ECF No. 3271] | A.208 – 219 |
| Declaration of Michael Atkinson in Support of the Statement of the Official Committee of Unsecured Creditors in Support of Confirmation of the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors [Bankr. ECF No. 3460] | A.220 – 256 |
| Ellen Isaacs' Emergency Request for Immediate Injunction and Hearing for Due Process, Production for Evidentiary Documents & Other Relief [Bankr. ECF No. 3582] | A.257 – 274 |
| Letter from Ronald Bass Sr. to Judge Drain [Bankr. ECF No. 3721] | A.275 – 292 |
| Maria Ecke's Motion for Original Claim Payment and for Rule 5004 of the Federal Rules of Bankruptcy Procedure [Bankr. ECF No. 4074] | A.293 – 299 |
| **VOLUME II** | |
| *In re Purdue Pharma L.P.,* Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. June 3, 2020) (Bar Date Ext. Mot. Hr'g Tr.) | A.300 – 424 |
| *In re Purdue Pharma L.P.,* Case No. 19-23649 (RDD) (Bankr. S.D.N.Y. August 25, 2021) ("Confirmation Hr'g Tr.") | A.425 – 775 |

| | |
|---|---|
| *In re Purdue Pharm Bankruptcy Appeals*, Case No. 21-cv-7532 (CM) *et seq.* (S.D.N.Y. October 12, 2021) ("Scheduling Conference Tr.") | A.776 – 851 |
| *In re Purdue Pharma L.P.,* Case No. 19-23649 (RDD) (S.D.N.Y. November 9, 2021) ("Hr'g Tr. re: Motion for Stay Pending Appeal") | A.852 – 1208 |
| **VOLUME III** | |
| Asbestos Personal Injury Trust Distribution Procedure, *In re Yarway Corp.,* Case No. 13-11025 (BLS) (Bankr. D. Del.) [Dkt. No. 859-3] | A.1209 – 1274 |
| Asbestos Personal Injury Trust Distribution Procedure, *In re Maremont Corp.*, Case No. 19-10118 (KJC) (Bankr. D. Del.) [Dkt. No. 238-2] | A.1275 – 1338 |
| Proposed TPP Class and Third Party Payor Claim Procedures, *In re Insys Therapeutics, Inc.*, Case No. 19-11292 (KG) [Dkt. No. 1049-13] | A.1339 – 1347 |
| Fire Victim Claims Resolution Procedures, *In re PG&E Corp.*, Case No. 19-30088 (DM) (Bankr. N.D. Cal.) [Dkt. No. 7037] | A.1348 – 1359 |
| **VOLUME IV** | |
| Lloyd Dixon et al., *RAND Technical Report: Asbestos Bankruptcy Trusts: An Overview of Trust Structure and Activity with Detailed Reports on the Largest Trusts* xiv (2010) | A.1360 - 1577 |
| **VOLUME V** | |
| Objection of United States Trustee to Sixth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors [Bankr. ECF No. 3256] | A.1578 – 1612 |
| Supplemental Objection of United States Trustee to (I) Eighth Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors and (II) Proposed Confirmation Order [Bankr. ECF No. 3636] | A.1613 – 1616 |
| Supplemental Objection of United States Trustee to (I) Eleventh Amended Joint Chapter 11 Plan of Purdue Pharma L.P. and Its Affiliated Debtors, and (II) Any Proposed Confirmation Order [Bankr. ECF No. 3710] | A.1617 – 1620 |

## EXHIBIT C

ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

**YARWAY ASBESTOS PERSONAL INJURY TRUST
DISTRIBUTION PROCEDURES**

A.1210

# YARWAY ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| SECTION I — Introduction | | 1 |
| 1.1 | Purpose | 1 |
| 1.2 | Interpretation | 1 |
| SECTION II — Overview | | 2 |
| 2.1 | Asbestos PI Trust Goals | 2 |
| 2.2 | Asbestos Personal Injury Claims Liquidation Procedures | 3 |
| 2.3 | Application of the Payment Percentage | 5 |
| 2.4 | Asbestos PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment | 7 |
| 2.5 | Claims Payment Ratio | 10 |
| 2.6 | Indirect Asbestos Personal Injury Claims | 13 |
| SECTION III — TDP Administration | | 13 |
| 3.1 | Trust Advisory Committee and Future Claimants' Representative | 13 |
| 3.2 | Consent and Consultation Procedures | 13 |
| SECTION IV — Payment Percentage; Periodic Estimates | | 14 |
| 4.1 | Uncertainty of Debtor's Personal Injury Asbestos Liabilities | 14 |
| 4.2 | Computation of Payment Percentage | 14 |
| 4.3 | Applicability of the Payment Percentage | 16 |
| SECTION V — Resolution of Asbestos Personal Injury Claims | | 19 |
| 5.1 | Ordering, Processing and Payment of Asbestos Personal Injury Claims | 19 |
| (a) | Ordering of Asbestos Personal Injury Claims | 19 |
| (1) | Establishment of the FIFO Processing Queue | 19 |
| (2) | Effect of Statutes of Limitations and Repose | 20 |
| (b) | Processing of Asbestos Personal Injury Claims | 21 |
| (c) | Payment of Asbestos Personal Injury Claims | 21 |

**A.1211**

5.2    Resolution of Pre-Petition Liquidated Claims ........................................   23
       (a)    Processing and Payment ............................................................   23
       (b)    Marshalling of Security .............................................................   25
5.3    Resolution of Unliquidated Asbestos Personal Injury Claims ...............   25
       (a)    Expedited Review Process ........................................................   26
              (1)    In General ......................................................................   26
              (2)    Claims Processing Under Expedited Review  .................   27
              (3)    Disease Levels, Scheduled Value
                     and Medical/Exposure Criteria .....................................   28
       (b)    Individual Review Process ........................................................   31
              (1)    In General ......................................................................   31
                     (A)    Review of Medical/Exposure Criteria  ................   33
                     (B)    Review of Liquidated Value ................................   33
              (2)    Valuation Factors to Be Considered in
                     Individual Review .........................................................   34
              (3)    Scheduled, Average and Maximum Values ....................   36
5.4    Categorizing Asbestos Personal Injury Claims as Extraordinary
       and/or Exigent Hardship .......................................................................   37
       (a)    Extraordinary Claims ................................................................   37
       (b)    Exigent Hardship Claims ..........................................................   38
5.5    Secondary Exposure Claims ..................................................................   39
5.6    Indirect Asbestos Personal Injury Claims .............................................   40
5.7    Evidentiary Requirements ......................................................................   42
       (a)    Medical Evidence  .....................................................................   42
              (1)    In General ......................................................................   42
                     (A)    Disease Levels I–III......................................   42
                     (B)    Disease Levels IV–VII  .....................................   44
                     (C)    Exception to the Exception for Certain
                            Pre-Petition Claims .........................................   44
              (2)    Credibility of Medical Evidence ....................................   44
       (b)    Exposure Evidence .....................................................................   45
              (1)    In General ......................................................................   45
              (2)    Significant Occupational Exposure .................................   46
              (3)    Yarway Exposure...........................................................   46
5.8    Claims Audit Program ...........................................................................   48
5.9    Second Disease (Malignancy) Claims ...................................................   48
5.10   Arbitration...............................................................................................   49
       (a)    Establishment of ADR Procedures .............................................   49
       (b)    Claims Eligible for Arbitration ..................................................   50
       (c)    Limitations on and Payment of Arbitration Awards....................   50
5.11   Litigation ................................................................................................   51


SECTION VI — Claims Materials ....................................................................   51


6.1    Claims Materials ....................................................................................   51

Error! Bookmark not defined.

**A.1212**

| 6.2 | Content of Claims Materials | 52 |
| 6.3 | Withdrawal or Deferral of Asbestos Personal Injury Claims | 52 |
| 6.4 | Filing Requirements and Fees | 53 |
| 6.5 | Confidentiality of Claimants' Submissions | 53 |
| 6.6 | English Language | 54 |

**SECTION VII — General Guidelines for Liquidating and Paying Asbestos Personal Injury Claims** ......... 54

| 7.1 | Showing Required | 54 |
| 7.2 | Costs Considered | 55 |
| 7.3 | Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity | 55 |
| 7.4 | Punitive Damages | 56 |
| 7.5 | Suits in the Tort System | 57 |
| 7.6 | Payment of Judgments for Money Damages | 58 |
| 7.7 | Releases | 59 |
| 7.8 | Third-Party Services | 59 |
| 7.9 | Asbestos PI Trust Disclosure of Information | 59 |

**SECTION VIII — Miscellaneous** ......... 60

| 8.1 | Amendments | 60 |
| 8.2 | Severability | 60 |
| 8.3 | Governing Law | 61 |

Error! Bookmark not defined.

**A.1213**

## YARWAY ASBESTOS PERSONAL INJURY TRUST DISTRIBUTION PROCEDURES

The Yarway Asbestos Personal Injury Trust Distribution Procedures (the "**TDP**")

contained herein provide for resolving all "**Asbestos Personal Injury Claims**" as defined in the

Plan of Reorganization for Yarway Corporation under Chapter 11 of the Bankruptcy Code

Proposed by Yarway Corporation and Tyco International plc, dated as of [January 27, 2015] (as

it may be amended, modified or supplemented, the "**Plan**"),[1] as provided in and required by the

Plan and the Yarway Asbestos Personal Injury Trust Agreement (the "**Trust Agreement**").  The

Plan and Trust Agreement establish the Yarway Asbestos Personal Injury Trust (the "**Asbestos**

**PI Trust**").  The Trustee of the Asbestos PI Trust (the "**Trustee**") shall implement and

administer this TDP in accordance with the Trust Agreement.

### SECTION I

### Introduction

**1.1**     **Purpose.**  This TDP has been adopted pursuant to the Trust Agreement.  It is

designed to provide fair, equitable and substantially similar treatment for all Asbestos Personal

Injury Claims that may presently exist or may arise in the future.

**1.2**     **Interpretation.**  Except as expressly provided below, nothing in this TDP shall be

deemed to create a substantive right for any claimant.  The rights and benefits provided herein to

holders of Asbestos Personal Injury Claims shall vest in such holders as of the Effective Date.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to
them in the Plan.

**A.1214**

## SECTION II

### Overview

**2.1** **Asbestos PI Trust Goal.** The goal of the Asbestos PI Trust is to treat all claimants similarly and equitably in accordance with the requirements of Section 524(g) of the Bankruptcy Code. This TDP furthers that goal by setting forth procedures for processing and paying the several share of Yarway Corporation ("**Yarway**" or the "**Debtor**") with respect to the unpaid portion of the liquidated value of Asbestos Personal Injury Claims generally on an impartial, first-in-first-out ("**FIFO**") basis, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system.[2] To this end, the TDP establishes a schedule of seven asbestos-related diseases ("**Disease Levels**"), six of which have presumptive medical and exposure requirements ("**Medical/Exposure Criteria**") and specific liquidated values ("**Scheduled Values**"), and five of which have anticipated average values ("**Average Values**") and caps on their liquidated values ("**Maximum Values**"). The Disease Levels, Medical/Exposure Criteria, Scheduled Values, Average Values and Maximum Values, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the Asbestos PI Trust funds as among claimants suffering from different disease processes in light of the best available information, considering the settlement history of the Debtor and the rights claimants would have in the tort system absent the bankruptcy. A claimant may not assert more than one Asbestos Personal Injury Claim hereunder, subject to the provisions set forth in Section 5.9 below.

---

[2] As used in this TDP, the phrase "in the tort system" shall not include claims asserted against a trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or any other applicable law.

**2.2     Asbestos Personal Injury Claims Liquidation Procedures.** Asbestos Personal Injury Claims shall be processed based on their place in the FIFO Processing Queue to be established pursuant to Section 5.1(a) below.  The Asbestos PI Trust shall take all reasonable steps to resolve Asbestos Personal Injury Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include, in the Asbestos PI Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth in Section 5.3(b)(2) below.  The Asbestos PI Trust shall also make every reasonable effort to resolve each year at least that number of Asbestos Personal Injury Claims required to exhaust the Maximum Annual Payment and the Maximum Available Payment, as those terms are defined below.

The Asbestos PI Trust shall, except as otherwise provided below, liquidate all Asbestos Personal Injury Claims (except Foreign Claims as defined in Section 5.3(b)(1) below, and secondary exposure claims as described in Section 5.5 below) that meet the presumptive Medical/Exposure Criteria of Disease Levels I–IV, VI and VII under the Expedited Review Process described in Section 5.3(a) below.  Claims that do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may undergo the Asbestos PI Trust's Individual Review Process described in Section 5.3(b) below.  In such a case, notwithstanding that the claim does not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level, the Asbestos PI Trust can offer the claimant an amount up to the Scheduled Value for that Disease Level if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system.

3

**A.1216**

Asbestos Personal Injury Claims involving Disease Levels III–IV, VI and VII tend to raise more complex valuation issues than the Asbestos Personal Injury Claims in Disease Levels I and II. Accordingly, in lieu of liquidating such claimant's claim under the Expedited Review Process, claimants holding claims involving these Disease Levels may alternatively seek to establish a liquidated value for the claim that is greater than its Scheduled Value by electing the Asbestos PI Trust's Individual Review Process. However, the liquidated value of a Disease Level III, IV, VI or VII claim that undergoes the Individual Review Process for valuation purposes may be determined to be less than its Scheduled Value, and in any event shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim qualifies as an Extraordinary Claim as defined in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value specified in that provision for such claims. Level V (Lung Cancer 2) claims, Foreign Claims, as defined in Section 5.3(b)(1) below, and all secondary exposure claims, as described in Section 5.5 below, may be liquidated[3] only pursuant to the Asbestos PI Trust's Individual Review Process.

Based upon the Debtor's claims settlement history in light of applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values and Maximum Values set forth in Section 5.3(b)(3) have been established for each of the five (5) Disease Levels that are eligible for Individual Review of their liquidated values.

The Trustee shall use reasonable best efforts to ensure that the Asbestos PI Trust processes claims such that over time the combination of domestic settlements at the Scheduled Values and those resulting from the Individual Review Process for the five more serious Disease

---

[3] For purposes of this TDP, "liquidated" means approved and valued by the Asbestos PI Trust.

4

Levels approximates the Average Values set forth in Section 5.3(b)(3) below for each such Disease Level.

All unresolved disputes over a claimant's medical condition, exposure history and/or the validity or liquidated value of the claim shall be subject to binding or non-binding arbitration as set forth in Section 5.10 below, at the election of the claimant, under ADR Procedures established by the Asbestos PI Trust. Asbestos Personal Injury Claims that are the subject of a dispute with the Asbestos PI Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.11 and 7.5 below. However, if a claimant obtains a judgment in the tort system, such judgment shall be payable (subject to the Payment Percentage, Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio provisions set forth below) as provided in Section 7.6 below.

**2.3    Application of the Payment Percentage.** After the liquidated value of an Asbestos Personal Injury Claim is determined pursuant to the procedures set forth herein for Expedited Review, Individual Review, arbitration or litigation in the tort system, the claimant shall ultimately receive a pro-rata share of that value based on the Payment Percentage described in Section 4.2 below. The Payment Percentage shall also apply to all Pre-Petition Liquidated Claims as provided in Section 5.2 below.

A Payment Percentage (the **"Initial Payment Percentage"**) shall be set pursuant to Section 4.2 below promptly after the Asbestos PI Trust is established by the Trustee with the consent of the Trust Advisory Committee (the **"TAC"**) and the Future Claimants' Representative (the **"FCR"**) (who are described in Section 3.1 below). The Initial Payment Percentage shall be calculated on the assumption that the Average Values set forth in Section 5.3(b)(3) below shall

5

**A.1218**

be achieved with respect to existing present claims and projected future claims involving Disease Levels III–VII.

The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Asbestos PI Trust with the consent of the TAC and the FCR to reflect then-current estimates of the Asbestos PI Trust's assets and its liabilities, as well as the then-estimated aggregate value of then-pending and future claims. Any adjustment to the Initial Payment Percentage shall be made only pursuant to Section 4.2 below. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP shall receive additional payments only as provided in Section 4.2 below. Because there is uncertainty in the prediction of both the number and severity of future Asbestos Personal Injury Claims, and the value of the Asbestos PI Trust's assets over time, no guarantee can be made of any particular Payment Percentage that will be applicable to an Asbestos Personal Injury Claim's liquidated value.

2.4     **Asbestos PI Trust's Determination of the Maximum Annual Payment and Maximum Available Payment.** After calculating the Payment Percentage, the Asbestos PI Trust shall model the cash flow, principal and income year-by-year to be paid over its entire life to ensure that all present and future holders of Asbestos Personal Injury Claims are compensated at the Payment Percentage. In each year, based upon the model of cash flow, the Asbestos PI Trust shall be empowered to pay out the portion of its funds payable for that year according to the model (the "**Maximum Annual Payment**"). The Asbestos PI Trust's aggregate distributions to all claimants for that year shall not exceed the Maximum Annual Payment. The Payment Percentage and the Maximum Annual Payment figures are based on projections over the lifetime of the Asbestos PI Trust. As noted in Section 2.3 above, if such long-term projections are

6

**A.1219**

revised, the Payment Percentage may be adjusted accordingly, which would result in a new model of the Asbestos PI Trust's anticipated cash flow and a new calculation of the Maximum Annual Payment.

Year-to-year variations in the Asbestos PI Trust's flow of claims or the value of its assets, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the Asbestos PI Trust's long-term projections. If, in a given year, however, asset values, including earnings thereon, are below projections, the Asbestos PI Trust may need to distribute less in that year than would otherwise be permitted based on the original Maximum Annual Payment derived from long-term projections. Accordingly, the original Maximum Annual Payment for a given year may be temporarily decreased if the present value of the assets of the Asbestos PI Trust as measured on a specified date during the year is less than the present value of the assets of the Asbestos PI Trust projected for that date by the cash flow model described in the foregoing paragraph. The Asbestos PI Trust shall make such a comparison whenever the Trustee becomes aware of any information that suggests that such a comparison should be made and, in any event, no less frequently than once every six months. If the Asbestos PI Trust determines that as of the date in question, the present value of the Asbestos PI Trust's assets is less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Asbestos PI Trust based upon the reduced value of the total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the "**Temporary Maximum Annual Payment**." Additional reductions in the Maximum Annual Payment can occur during the course of that year based upon subsequent calculations. If in any year the Maximum Annual Payment was temporarily reduced

7

**A.1220**

as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Asbestos PI Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payment shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payment exceed the original Maximum Annual Payment. As a further safeguard, the Asbestos PI Trust's distribution to all claimants for the first nine months of a year shall not exceed 85% of the Maximum Annual Payment determined for that year. If on December 31 of a given year, the original Maximum Annual Payment for such year is not in effect, the original Maximum Annual Payment for the following year shall be reduced proportionately.

In distributing the Maximum Annual Payment, the Asbestos PI Trust shall first allocate the amount in question to (a) outstanding Pre-Petition Liquidated Claims, (b) any Asbestos Personal Injury Claims (i) based on a diagnosis dated prior to the Effective Date and (ii) subsequently filed with the Asbestos PI Trust within one (1) year following the date the Asbestos PI Trust first accepts for processing the proof of claim forms and other materials required to file a claim with the Asbestos PI Trust[4], which are liquidated by the Asbestos PI Trust ("**Existing Claims**"), and (c) Exigent Hardship Claims (as defined in Section 5.4(b) below). Should the Maximum Annual Payment be insufficient to pay all such claims in full, they shall be paid in proportion to the aggregate value of each group of claims and the available funds allocated to each group of claims shall be paid to the maximum extent to claimants in the particular group based on their place in their respective FIFO Payment Queue. Claims in any group for which there are insufficient funds shall be carried over to the next year, and placed at the head of their

---

[4] Exceptions to the satisfaction of this one-year filing requirement may be made where a claimant can show an inability to file within the one-year period caused by extraneous factors beyond the claimant's control.

FIFO Payment Queue. If there is a decrease in the Payment Percentage prior to the payment of such claims, any such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Maximum Annual Payment. The remaining portion of the Maximum Annual Payment (the "**Maximum Available Payment**"), if any, shall then be allocated and used to satisfy all other liquidated Asbestos Personal Injury Claims, subject to the Claims Payment Ratio set forth in Section 2.5 below; provided, however, that if the Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly. Claims in the groups described in (a), (b), and (c) above shall not be subject to the Claims Payment Ratio.

2.5     **Claims Payment Ratio.** Based upon the Debtor's domestic claims settlement history and analysis of present and future claims, a Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 90% for Category A claims, which consist of Asbestos Personal Injury Claims involving severe asbestosis and malignancies (Disease Levels III–VII) and at 10% for Category B claims, which are Asbestos Personal Injury Claims involving non-malignant Asbestosis or Pleural Disease (Disease Levels I and II).

In each year, after the determination of the Maximum Available Payment described in Section 2.4 above, 90% of that amount shall be available to pay Category A claims and 10% shall be available to pay Category B claims that have been liquidated since April 22, 2013 (the "**Petition Date**"), except for claims which, pursuant to Section 2.4 above, are not subject to the Claims Payment Ratio; provided, however, that if the Maximum Annual Payment is reduced during the year pursuant to the provisions of Section 2.4 above, the amounts available to pay Category A and Category B claims shall be recalculated based on the adjusted Maximum Available Payment. In the event there are insufficient funds in any year to pay the liquidated

9

claims within either or both of the Categories, the available funds allocated to the particular

Category shall be paid to the maximum extent to claimants in that Category based on their place

in the FIFO Payment Queue described in Section 5.1(c) below, which shall be based upon the

date of claim liquidation. Claims for which there are insufficient funds allocated to the relevant

Category shall be carried over to the next year where they shall be placed at the head of the FIFO

Payment Queue. If there is a decrease in the Payment Percentage prior to the payment of such

claims, such claims shall nevertheless be entitled to be paid at the Payment Percentage that they

would have been entitled to receive but for the application of the Claims Payment Ratio. If, at

the end of any calendar year during the first three years the Asbestos PI Trust is accepting

claims, there are excess funds in either or both Categories, because there is an insufficient

amount of liquidated claims to exhaust the respective Maximum Available Payment amount for

that Category, then the excess funds for either or both Categories shall be rolled over and remain

dedicated to the respective Category to which they were originally allocated.

Notwithstanding any other provision herein, if, at the end of any calendar year following

the third anniversary of the date the Asbestos PI Trust began accepting claims, there are excess

funds available in either Category A or Category B and insufficient funds in the other Category

to pay such Category's claims, then the Trustee may transfer up to a specified amount of excess

funds (the "Permitted Transfer Amount" as defined below) to the Category with the shortfall;

provided, however that the Trustee shall never transfer more than the amount of the receiving

Category's shortfall. The **"Permitted Transfer Amount"** shall be determined as follows: (a)

the Trustee shall first determine the cumulative amount allocated to the Category with excess

funds based on the Claims Payment Ratio since the date the Asbestos PI Trust last calculated its

Payment Percentage; (b) the Trustee shall then determine the cumulative amount that the

10

**A.1223**

Asbestos PI Trust estimated would be paid to the Category with excess funds since the date the
Asbestos PI Trust last calculated its Payment Percentage; (c) the Trustee shall then subtract the
amount determined in (b) from the amount determined in (a), and the difference between the two
shall be referred to as the "**Permitted Transfer Amount**." The Trustee shall provide the TAC
and the FCR with the Permitted Transfer Amount calculation thirty (30) days prior to making a
transfer. If, at the end of any calendar year following the third anniversary of the date the
Asbestos PI Trust began accepting claims, there are excess funds in either or both Categories
because there is an insufficient amount of liquidated claims to exhaust the respective Maximum
Available Payment amount for that Category, or, in a year where there was a transfer from one
Category to the other, if the amount transferred was less than the amount of excess funds, then
the excess funds for the Category or Categories with excess funds shall be rolled over and remain
dedicated to the respective Category to which they were originally allocated.

During the first nine months of a given year, the Asbestos PI Trust's payments to
claimants in a Category shall not exceed the amount of any excess funds that were rolled over for
such Category from the prior year plus 85% of the amount that would otherwise be available for
payment to claimants in such Category.

In considering whether to make any amendments to the Claims Payment Ratio and/or its
rollover provisions, the Trustee shall consider the reasons for which the Claims Payment Ratio
and its rollover provisions were adopted, the domestic settlement history that gave rise to its
calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any
need to make an amendment. In that regard, the Trustee should keep in mind the interplay
between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually
paid to claimants.

11

**A.1224**

No amendment to the Claims Payment Ratio may be made without the consent of the TAC members and the consent of the FCR. The consent process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement shall apply in the event of any amendments to the Claims Payment Ratio. The Trustee, with the consent of the TAC and the FCR, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment (the "**Reduced Payment Option**").

**2.6** **Indirect Asbestos Personal Injury Claims.** As set forth in Section 5.6 below, any Indirect Asbestos Personal Injury Claim (an "**Indirect Asbestos Personal Injury Claim**") shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other Asbestos Personal Injury Claims.

**SECTION III**

**TDP Administration**

**3.1** **Trust Advisory Committee and FCR.** Pursuant to the Plan and the Trust Agreement, the Asbestos PI Trust and this TDP shall be administered by the Trustee in consultation with the TAC, which represents the interests of holders of present Asbestos Personal Injury Claims, and the FCR, who represents the interests of holders of Asbestos Personal Injury Claims that may be asserted in the future. The Trustee shall obtain the consent of the TAC and the FCR on any amendments to this TDP pursuant to Section 8.1 below, and on such other matters as are otherwise required below or in Section 2.2(f) of the Trust Agreement. The Trustee shall also consult with the TAC and the FCR on such matters as are provided below or in Section 2.2(e) of the Trust Agreement. The initial Trustee, the initial members of the TAC and the initial FCR are identified in the Trust Agreement.

12

**A.1225**

**3.2     Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustee shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed.  The Trustee shall not implement such amendment or take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b), of the Trust Agreement, respectively.

## SECTION IV

### Payment Percentage; Periodic Estimates

**4.1     Uncertainty of Debtor's Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding Debtor's total asbestos-related liabilities, as well as the total value of the assets available to the Asbestos PI Trust to pay Asbestos Personal Injury Claims.  Consequently, there is inherent uncertainty regarding the amounts that holders of Asbestos Personal Injury Claims shall receive.  To seek to ensure substantially equivalent treatment of all present and future Asbestos Personal Injury Claims, the Trustee must determine from time to time the percentage of full liquidated value that holders of present and future Asbestos Personal Injury Claims are likely to receive, *i.e.*, the "**Payment Percentage**" described in Section 2.3 above and Section 4.2 below.

**4.2     Computation of Payment Percentage.**  As provided in Section 2.3 above, the Initial Payment Percentage shall be set by the Trustee with the consent of the TAC and the FCR promptly after the Asbestos PI Trust is established.

The Payment Percentage shall be subject to change pursuant to the terms of this TDP and the Trust Agreement if the Trustee, with the consent of the TAC and FCR, determines that an adjustment is required.  No less frequently than once every three (3) years, commencing with the

13

**A.1226**

date that is three (3) years after the Effective Date, the Trustee shall reconsider the then

applicable Payment Percentage to assure that it is based on accurate, current information and

may, after such reconsideration, change the Payment Percentage if necessary with the consent of

the TAC and the FCR. The Trustee shall also reconsider the then-applicable Payment

Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if

requested to do so by the TAC or the FCR. In any event, no less frequently than once every

twelve (12) months, commencing on the Initial Claims Filing Date, the Trustee shall compare the

liability forecast on which the then-applicable Payment Percentage is based with the actual

claims filing and payment experience of the Asbestos PI Trust to date. If the results of the

comparison call into question the ability of the Asbestos PI Trust to continue to rely upon the

current liability forecast, the Trustee shall reconsider the Payment Percentage.

The Trustee must base his or her determination of the Payment Percentage on current

estimates of the number, types, and values of present and future Asbestos Personal Injury

Claims, the value of the assets then available to the Asbestos PI Trust for their payment, all

anticipated administrative and legal expenses, and any other material matters that are reasonably

likely to affect the sufficiency of funds to pay a comparable percentage of full value to all

holders of Asbestos Personal Injury Claims. When making these determinations, the Trustee

shall exercise common sense and flexibly evaluate all relevant factors. The Payment Percentage

applicable to Category A or Category B claims may not be reduced to alleviate delays in

payments of claims in the other Category; both Categories of claims shall receive the same

Payment Percentage, but the payment may be deferred as needed, and a Reduced Payment

Option may be instituted as described in Section 2.5 above.

14

**4.3**     **Applicability of the Payment Percentage.**     Except as otherwise provided (a) in Section 5.1(c) below for Asbestos Personal Injury Claims involving deceased or incompetent claimants for which approval of the Asbestos PI Trust's offer by a court or through a probate process is required and (b) in the paragraph below with respect to Released Claims, no holder of any Asbestos Personal Injury Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustee, in his or her sole discretion, may cause the Asbestos PI Trust to pay an Asbestos Personal Injury Claim based on the Payment Percentage that was in effect prior to the reduction if such Asbestos Personal Injury Claim was filed and actionable with the Asbestos PI Trust ninety (90) days or more prior to the date the Trustee proposed the new Payment Percentage in writing to the TAC and the FCR (the "**Proposal Date**") and the processing of such claim was unreasonably delayed due to circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.

If a redetermination of the Payment Percentage has been proposed in writing by the Trustee to the TAC and the FCR but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage.  However, if the proposed Payment Percentage is the lower amount but is not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount.  Conversely, if the proposed Payment Percentage is the higher amount and is subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

A.1228

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose Asbestos Personal Injury Claim was liquidated prior to the Proposal Date and who either (a) transmitted[5] an executed release to the Asbestos PI Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the Asbestos PI Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to herein as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**"). For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the Asbestos PI Trust transmits a release electronically, the release shall be deemed to have been received on the date the Asbestos PI Trust transmits the offer notification, and (c) if the Asbestos PI Trust places the release in the U.S. mail, postage prepaid, the release shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including delays resulting from limitations on payment amounts in a given year pursuant to Sections 2.4 and 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to proposing in writing to the TAC and the FCR a change in the Payment Percentage, the Trustee shall issue a written notice to claimants or claimants' counsel indicating that the Trustee is reconsidering such Payment Percentage.

---

[5] For purposes of this sentence, "transmitted" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

A.1229

There is uncertainty surrounding the value of the Asbestos PI Trust's assets in the future. There is also uncertainty surrounding the totality of the Asbestos Personal Injury Claims to be paid over time.  If the value of the Asbestos PI Trust's future assets increases significantly and/or if the value or volume of Asbestos Personal Injury Claims actually filed with the Asbestos PI Trust is significantly lower than originally estimated, the Asbestos PI Trust shall use those proceeds and/or claims savings, as the case may be, first to maintain the Payment Percentage then in effect.

If the Trustee, with the consent of the TAC and the FCR, makes a determination to increase the Payment Percentage due to a material change in the estimates of the Asbestos PI Trust's future assets and/or liabilities, the Trustee shall also make supplemental payments to all claimants who previously liquidated their claims against the Asbestos PI Trust and received payments based on a lower Payment Percentage.  The amount of any such supplemental payment shall be the liquidated value of the claim in question times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim.

The Asbestos PI Trust's obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $100.00, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $100.00.  However, the Asbestos PI Trust's obligation shall resume, and the Asbestos PI Trust shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $100.00.

**A.1230**

## SECTION V

### Resolution of Asbestos Personal Injury Claims.

**5.1**     **Ordering, Processing and Payment of Asbestos Personal Injury Claims.**

**5.1(a)  Ordering of Asbestos Personal Injury Claims.**

**5.1(a)(1)  Establishment of the FIFO Processing Queue.**  The Asbestos PI Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**").  For all claims filed on or before the date six (6) months after the date that the Asbestos PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos PI Trust (such six-month anniversary being referred to herein as the "**Initial Claims Filing Date**"), a claimant's position in the FIFO Processing Queue shall be determined as of the earliest of (i) the date prior to the Petition Date that the claim was either filed against the Debtor in the tort system or was actually submitted to the Debtor pursuant to an administrative settlement agreement; (ii) the date before the Petition Date that the claim was filed against another defendant in the tort system if at the time the claim was subject to a tolling agreement with the Debtor; (iii) the date after the Petition Date but before the date that the Asbestos PI Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos PI Trust that the claim was filed against another defendant in the tort system; (iv) the date after the Petition Date but before the Effective Date that a proof of claim was filed by the claimant against the Debtor in the Chapter 11 proceeding; or (v) the date a ballot was submitted on behalf of the claimant for purposes of voting to accept or reject the Plan pursuant to the voting procedures approved by the Bankruptcy Court.

18

**A.1231**

Following the Initial Claims Filing Date, the claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Asbestos PI Trust.  If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease, with claimants with earlier diagnosis dates given priority over later diagnosed claimants.  If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

**5.1(a)(2)  Effect of Statutes of Limitation and Repose.**  All unliquidated Asbestos Personal Injury Claims must meet either (i) for claims first filed in the tort system against the Debtor prior to the Petition Date, the applicable federal, state or foreign statutes of limitation and repose that were in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed against the Debtor in the tort system prior to the Petition Date, the applicable federal, state or foreign statutes of limitation and repose that were in effect at the time of the filing with the Asbestos PI Trust. However, the running of the relevant statute of limitation and repose shall be tolled as of the earliest of (X) the actual filing of the claim against the Debtor prior to the Petition Date, whether in the tort system or by submission of the claim to the Debtor pursuant to an administrative settlement agreement; (Y) the tolling of the claim against the Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (Z) the Petition Date.  If an Asbestos Personal Injury Claim meets any of the tolling provisions described in the preceding sentence and was not barred by the applicable federal, state or foreign statute of limitation and repose at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos PI Trust within three (3)

19

**A.1232**

years after the Initial Claims Filing Date.  In addition, any Asbestos Personal Injury Claim that was first diagnosed after the Petition Date, irrespective of the application of any relevant federal, state or foreign statute of limitation and repose, may be filed with the Asbestos PI Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later.  However, the processing of any Asbestos Personal Injury Claim by the Asbestos PI Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

**5.1(b)  Processing of Asbestos Personal Injury Claims.**  As a general practice, the Asbestos PI Trust shall review its claims files on a regular basis and notify all claimants whose claims are likely to come up in the FIFO Processing Queue in the near future.

**5.1(c)  Payment of Asbestos Personal Injury Claims.**  Asbestos Personal Injury Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a) below, by the Individual Review Process as provided in Section 5.3(b) below, by arbitration as provided in Section 5.10 below or by litigation in the tort system as provided in Section 5.11 below, shall be paid in FIFO order based on the date their liquidation became final (the "**FIFO Payment Queue**"); all such payments are subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio. Pre-Petition Liquidated Claims, as defined in Section 5.2 below, Existing Claims and Exigent Hardship Claims, as defined in Section 5.4(b) below, shall be subject to the Maximum Annual Payment and Payment Percentage limitations, but not to the Maximum Available Payment and Claims Payment Ratio provisions set forth above.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process

A.1233

prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos PI Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos PI Trust has been furnished with evidence that the settlement offer has been submitted to such court or is in the probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos PI Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos-related disease, with claimants having earlier diagnosis dates given priority over later-diagnosed claimants. If any claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the Asbestos PI Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

**A.1234**

**5.2    Resolution of Pre-Petition Liquidated Claims.**

**5.2(a)    Processing and Payment.**    As soon as practicable after the Effective Date, the Asbestos PI Trust shall pay, upon submission by the claimant of the appropriate documentation, all Asbestos Personal Injury Claims that were liquidated by (i) a binding settlement agreement for the particular claim entered into prior to the Petition Date that is judicially enforceable by the claimant, (ii) after the Petition Date according to the terms of a binding settlement agreement entered into prior to the Petition Date (a "**Pre-Petition Agreement**"), (iii) a jury verdict or non-final judgment in the tort system obtained prior to the Petition Date or (iv) a judgment that became final and non-appealable prior to the Petition Date (collectively "**Pre-Petition Liquidated Claims**").    In order to receive payment from the Asbestos PI Trust, the holder of a Pre-Petition Liquidated Claim must submit all documentation necessary to demonstrate to the Asbestos PI Trust that the claim was liquidated in the manner described above, which documentation shall include (A) a court authenticated copy of the jury verdict (if applicable), a non-final judgment (if applicable) or a final judgment (if applicable) and (B) the name, social security number and date of birth of the claimant and the name and address of the claimant's lawyer; provided, however, that such documentation shall not be required with respect to any Pre-Petition Liquidated Claim that Debtor has identified to the Asbestos PI Trust as a Pre-Petition Liquidated Claim as to which all conditions to payment under the applicable agreement, jury verdict or judgment have been satisfied.    Debtor shall deliver to the Asbestos PI Trust a list of the Pre-Petition Liquidated Claims that Debtor has approved for payment, which claims shall be entitled to rely upon the exception set forth in the preceding sentence.

The liquidated value of a Pre-Petition Liquidated Claim shall be the unpaid portion of the amount agreed to in the binding settlement agreement or Pre-Petition Agreement, the unpaid

A.1235

portion of the amount awarded by the jury verdict or non-final judgment or the unpaid portion of the amount of the final judgment, as the case may be, plus interest, if any, that has accrued on that amount in accordance with the terms of the agreement, if any, or under applicable state law for settlements or judgments, as of the Petition Date; however, except as otherwise provided in Section 7.4 below, the liquidated value of a Pre-Petition Liquidated Claim shall not include any punitive or exemplary damages. In addition, the amounts payable with respect to such claims shall not be subject to or taken into account in consideration of the Claims Payment Ratio and the Maximum Available Payment limitations, but shall be subject to the Maximum Annual Payment and Payment Percentage provisions. In the absence of a Final Order of the Bankruptcy Court determining whether a settlement agreement is binding and judicially enforceable, a dispute between the claimant and the Asbestos PI Trust over this issue shall be resolved pursuant to the same procedures in this TDP that are provided for resolving the validity and/or liquidated value of an Asbestos Personal Injury Claim (*i.e.*, arbitration and litigation in the tort system as set forth in Sections 5.10 and 5.11 below).

Pre-Petition Liquidated Claims shall be processed and paid in accordance with their order in a separate FIFO queue to be established by the Asbestos PI Trust based on the date the Asbestos PI Trust received all required documentation for the particular claim. If any Pre-Petition Liquidated Claims were filed on the same date, the claimants' position in the FIFO queue for such claims shall be determined by the date on which the claim was liquidated. If any Pre-Petition Liquidated Claims were both filed and liquidated on the same dates, the position of the claimants in the FIFO queue shall be determined by the dates of the claimants' birth, with older claimants given priority over younger claimants.

23

**A.1236**

**5.2(b)  Marshalling of Security.**  Holders of Pre-Petition Liquidated Claims that are secured by letters of credit, appeal bonds, or other security or sureties shall first exhaust their rights against any applicable security or surety before making a claim against the Asbestos PI Trust.  Only in the event that such security or surety is insufficient to pay the Pre-Petition Liquidated Claim in full shall the deficiency be processed and paid as a Pre-Petition Liquidated Claim by the Asbestos PI Trust.

**5.3    Resolution of Unliquidated Asbestos Personal Injury Claims.**  Within six (6) months after the establishment of the Asbestos PI Trust, the Trustee, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Asbestos Personal Injury Claims, which shall include deadlines for processing such claims.  Such procedures shall also require that claimants seeking resolution of unliquidated Asbestos Personal Injury Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below.  It is anticipated that the Asbestos PI Trust shall provide an initial response to the claimant within six (6) months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing.  Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

Upon filing of a valid proof of claim form with the required supporting documentation, the claim shall be placed in the FIFO Processing Queue in accordance with the ordering criteria

A.1237

described in Section 5.1(a) above. When the claim reaches the top of the FIFO Processing

Queue, the Asbestos PI Trust shall process and liquidate the claim based upon the

medical/exposure evidence submitted by the claimant and under the process elected by the

claimant. If the claimant fails to elect either the Individual Review Process or the Expedited

Review Process, then the Asbestos PI Trust shall process and liquidate the claim under the

Expedited Review Process, although the claimant shall retain the right to request Individual

Review as described in Section 5.3(b) below.

### 5.3(a)  Expedited Review Process.

**5.3(a)(1)  In General.** The Asbestos PI Trust's Expedited Review

Process is designed primarily to provide an expeditious, efficient, consistent and inexpensive

method for liquidating all valid Asbestos Personal Injury Claims (except those involving Lung

Cancer 2 – Disease Level V, all secondary exposure claims (as described in Section 5.5 below)

and Foreign Claims, which shall only be liquidated pursuant to the Asbestos PI Trust's

Individual Review Process), where the claim can easily be verified by the Asbestos PI Trust as

meeting the presumptive Medical/Exposure Criteria for the relevant Disease Level. Expedited

Review thus provides claimants with a substantially less burdensome process for pursuing

Asbestos Personal Injury Claims than does the Individual Review Process described in Section

5.3(b) below. Expedited Review is also intended to provide qualifying claimants a fixed and

certain claims value.

Claims that undergo Expedited Review and meet the presumptive Medical/Exposure

Criteria for the relevant Disease Level shall be liquidated at the Scheduled Value for such

Disease Level set forth in Section 5.3(a)(3) below. However, all claims liquidated by Expedited

Review shall be subject to the applicable Payment Percentage, the Maximum Annual Payment,

A.1238

the Maximum Available Payment and the Claims Payment Ratio limitations set forth above; provided, however, that Existing Claims and Exigent Hardship Claims shall not be subject to the Maximum Available Payment and Claims Payment Ratio. Claimants holding claims that cannot be liquidated by Expedited Review because they do not meet the presumptive Medical/Exposure Criteria for the relevant Disease Level may elect the Asbestos PI Trust's Individual Review Process set forth in Section 5.3(b) below.

Subject to the provisions of Section 5.8 below, the claimant's eligibility to have his or her Asbestos Personal Injury Claim liquidated at the Scheduled Value pursuant to the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below for each of the Disease Levels eligible for Expedited Review.

**5.3(a)(2) Claims Processing Under Expedited Review.** All claimants seeking liquidation of their claims pursuant to Expedited Review shall file the Asbestos PI Trust's proof of claim form. As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos PI Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the six Disease Levels eligible for Expedited Review, and shall advise the claimant of its determination. If a Disease Level is determined, the Asbestos PI Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level multiplied by the applicable Payment Percentage, together with (x) a form of release approved by the Asbestos PI Trust and (y) the Asbestos Personal Injury Claimant Release attached hereto as Exhibit A. If the claimant accepts the Asbestos PI Trust's offer of payment and returns the two (2) releases properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos PI Trust shall disburse payment subject to the

26

limitations of the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio, if any.

> **5.3(a)(3)  Disease Levels, Scheduled Values and Medical/Exposure Criteria.**  The seven Disease Levels covered by this TDP, together with the Medical/Exposure Criteria for each and the Scheduled Values for the six Disease Levels eligible for Expedited Review, are set forth below.  These Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all Trust Voting Claims[6] filed with the Asbestos PI Trust (except Pre-Petition Liquidated Claims) on or before the Initial Claims Filing Date provided in Section 5.1 above for which the claimant elects the Expedited Review Process.  Thereafter, for purposes of administering the Expedited Review Process, the Trustee may, with the consent of the TAC and the FCR, add to, change, or eliminate Disease Levels, Scheduled Values, or Medical/Exposure Criteria; develop subcategories of Disease Levels, Scheduled Values or Medical/Exposure Criteria; or determine that a novel or exceptional Asbestos Personal Injury Claim is compensable even though it does not meet the Medical/Exposure Criteria for any of the then current Disease Levels.

---

[6] The term **"Trust Voting Claims"** includes (i) Pre-Petition Liquidated Claims as defined in Section 5.2(a) below; (ii) claims filed against the Debtor in the tort system or actually submitted to the Debtor pursuant to an administrative settlement agreement prior to the Petition Date; and (iii) all asbestos claims filed against another defendant in the tort system prior to December 22, 2014, the date the Plan was filed with the Bankruptcy Court; provided, however, that (1) the holder of a claim described in subsection (i), (ii) or (iii) above, or his or her authorized agent, actually voted to accept or reject the Plan pursuant to the voting procedures established by the Bankruptcy Court (unless such holder certifies to the satisfaction of the Trustee that he or she was prevented from voting in this proceeding as a result of circumstances resulting in a state of emergency affecting, as the case may be, the holder's residence, the holder's principal place of business or legal representative's place of business at which the holder or his or her legal representative receives notice and/or maintains material records relating to his or her Trust Voting Claim); and provided further that (2) the claim was subsequently filed with the Asbestos PI Trust pursuant to Section 6.1 below by the Initial Claims Filing Date defined in Section 5.1(a) below.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma (Level VII) | $55,000 | (1) Diagnosis[7] of mesothelioma, and (2) Yarway Exposure as defined in Section 5.7(b)(3) below. |
| Lung Cancer 1 (Level VI) | $17,500 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease[8], (2) six months Yarway Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[9] to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question. |

---

[7] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[8] Evidence of "**Bilateral Asbestos-Related Nonmalignant Disease**," for purposes of meeting the criteria for establishing Disease Levels I, II, IV, and VI, means either (i) a chest X-ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X-ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (*e.g.,* an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against the Debtor or another defendant in the tort system prior to the Petition Date, if an ILO reading is not available, either (i) a chest X-ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels I, II, IV, and VI. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). For all purposes of this TDP, a "**Qualified Physician**" is a physician who is board-certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8 below, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose X-ray and/or CT scan readings are submitted for deceased holders of Asbestos Personal Injury Claims.

[9] The term "Significant Occupational Exposure" is defined in Section 5.7(b)(2) below.

A.1241

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Lung Cancer 2 (Level V) | None | (1) Diagnosis of a primary lung cancer; (2) Yarway Exposure prior to December 31, 1982, and (3) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question.<br><br>Lung Cancer 2 (Level V) claims are claims that do not meet the more stringent medical and/or exposure requirements of Lung Cancer 1 (Level VI) claims.  All claims in this Disease Level shall be individually evaluated.  The estimated likely average of the individual evaluation awards for this category is $5,000, with such awards capped at $15,000 unless the claim qualifies for Extraordinary Claim treatment.<br><br>Level V claims that show no evidence of either an underlying Bilateral Asbestos-Related Nonmalignant Disease or Significant Occupational Exposure may be individually evaluated, although it is not expected that such claims shall be treated as having any significant value, especially if the claimant is also a Smoker.[10]  In any event, no presumption of validity shall be available for any claims in this category. |
| Other Cancer (Level IV) | $5,000 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Yarway Exposure prior to December 31, |

---

[10] There is no distinction between Non-Smokers and Smokers for either Lung Cancer 1 (Level VI) or Lung Cancer 2 (Level V), although a claimant who meets the more stringent requirements of Lung Cancer 1 (Level VI) (evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease plus Significant Occupational Exposure), and who is also a Non-Smoker, may wish to have his or her claim individually evaluated by the Asbestos PI Trust.  In such a case, absent circumstances that would otherwise reduce the value of the claim, it is anticipated that the liquidated value of the claim might well exceed the $17,500 Scheduled Value for Lung Cancer 1 (Level VI) shown above.  "**Non-Smoker**" means a claimant who either (a) never smoked or (b) has not smoked during any portion of the twelve (12) years immediately prior to the diagnosis of the lung cancer.  A "**Smoker**" is a claimant who does not qualify as a Non-Smoker.

A.1242

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level III) | $10,000 | (1) Diagnosis of asbestosis with ILO[11] of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a) TLC less than 65%, or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Yarway Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level II) | $2,000 | (1) Diagnosis of Bilateral Asbestos-Related Nonmalignant Disease, plus (a) TLC less than 80%, or (b) FVC less than 80% and FEV1/FVC ratio greater than or equal to 65%, and (2) six months Yarway Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, and (4) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |
| Asbestosis/Pleural Disease (Level I) | $500 | (1) Diagnosis of a Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Yarway Exposure prior to December 31, 1982, and (3) five years cumulative occupational exposure to asbestos. |

---

[11] If the diagnostic images being interpreted in such regard are digital images, then a written report by a Qualified Physician confirming that the images reviewed are with reasonable certainty equivalent to those that would qualify for the required ILO grade shall be acceptable as well.

30

**A.1243**

**5.3(b)  Individual Review Process.**

**5.3(b)(1)  In General.**  Subject to the provisions set forth below, a claimant may elect to have his or her Asbestos Personal Injury Claim reviewed for purposes of determining whether the claim would be cognizable and valid in the tort system even though it does not meet the presumptive Medical/Exposure Criteria for any of the Disease Levels set forth in Section 5.3(a)(3) above.[12]  In addition or alternatively, a claimant may elect to have a claim undergo the Individual Review Process for purposes of determining whether the liquidated value of a claim involving Disease Levels III, IV, VI, or VII exceeds the Scheduled Value for the relevant Disease Level also set forth in said provision.  However, until such time as the Asbestos PI Trust has made an offer on such claim pursuant to Individual Review, the claimant may change his or her Individual Review election and have the claim liquidated pursuant to the Asbestos PI Trust's Expedited Review Process (except those claims involving Lung Cancer 2 – Disease Level V, secondary exposure claims (as described in Section 5.5 below) and Foreign Claims, which shall only be liquidated pursuant to the Asbestos PI Trust's Individual Review Process).  In the event of such a change in the processing election, the claimant shall nevertheless retain his or her place in the FIFO Processing Queue.

The liquidated value of all Foreign Claims payable under this TDP shall be established only under the Asbestos PI Trust's Individual Review Process.  Asbestos Personal Injury Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("**Canadian Claims**") shall not be considered Foreign Claims hereunder and shall be eligible for

---

[12] Under this provision, an Asbestos Personal Injury Claim that does not include evidence of exposure prior to December 31, 1982, as set forth in the Significant Occupational Exposure or Yarway Exposure provisions below, may still undergo the Individual Review Process for purposes of determining whether such claim would be cognizable and valid in the tort system.

A.1244

liquidation under, at the claimant's election, either the Expedited Review Process or the Individual Review Process.  Accordingly, a "**Foreign Claim**" is an Asbestos Personal Injury Claim with respect to which the claimant's exposure to an asbestos-containing product or conduct for which the Debtor has legal responsibility occurred outside of the United States and its Territories and Possessions, and outside of the Provinces and Territories of Canada.[13]

In reviewing Foreign Claims, the Asbestos PI Trust shall take into account all relevant procedural and substantive legal rules to which the claims would be subject in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) below.  The Asbestos PI Trust shall determine the liquidated value of Foreign Claims based on historical settlements and verdicts in the Claimant's Jurisdiction as well as the other valuation factors set forth in Section 5.3(b)(2) below.

For purposes of the Individual Review Process for Foreign Claims, the Trustee, with the consent of the TAC and the FCR, may develop separate Medical/Exposure Criteria and standards, as well as separate requirements for physician and other professional qualifications, which shall be applicable to all Foreign Claims channeled to the Asbestos PI Trust; provided however, that such criteria, standards or requirements shall not effectuate substantive changes to the claims eligibility requirements under this TDP, but rather shall be made only for the purpose of adapting those requirements to the particular licensing provisions and/or medical customs or practices of the foreign country in question.

At such time as the Asbestos PI Trust has sufficient historical settlement, verdict and other valuation data for claims from a particular foreign jurisdiction, the Trustee, with the

---

[13] Notwithstanding any other provision of the TDP, all issues related to Foreign Claims shall be agreed to by the Trustee, the TAC and the FCR.

A.1245

consent of the TAC and the FCR, may also establish a separate valuation matrix for any such Foreign Claims based on that data.

**5.3(b)(1)(A)  Review of Medical/Exposure Criteria.  The** Asbestos PI Trust's Individual Review Process provides a claimant with an opportunity for individual consideration and evaluation of an Asbestos Personal Injury Claim that fails to meet the presumptive Medical/Exposure Criteria for a Disease Level.  In such a case, the Asbestos PI Trust shall either deny the claim or, if the Asbestos PI Trust is satisfied that the claimant has presented a claim that would be cognizable and valid in the tort system, the Asbestos PI Trust can offer the claimant a liquidated value amount up to the Scheduled Value for that Disease Level.

**5.3(b)(1)(B)  Review of Liquidated Value.  Claimants** holding claims in Disease Levels III–VII shall also be eligible to seek Individual Review of the liquidated value of their claims, as well as of their medical/exposure evidence.  The Individual Review Process is intended to result in payments equal to the full liquidated value for each claim multiplied by the Payment Percentage; however, the liquidated value of any Asbestos Personal Injury Claim that undergoes Individual Review may be determined to be less than the Scheduled Value the claimant would have received under Expedited Review.  Moreover, the liquidated value for a claim involving Disease Levels III–VII shall not exceed the Maximum Value for the relevant Disease Level set forth in Section 5.3(b)(3) below, unless the claim meets the requirements of an Extraordinary Claim described in Section 5.4(a) below, in which case its liquidated value cannot exceed the maximum extraordinary value set forth in that provision for such claims.  Because the detailed examination and valuation process pursuant to Individual Review may require additional time and effort, claimants electing to undergo the Individual

33

A.1246

Review Process may be paid the liquidated value of their Asbestos Personal Injury Claims later than would have been the case had the claimant elected the Expedited Review Process. Subject to the provisions of Section 5.8 below, the Asbestos PI Trust shall devote reasonable resources to the review of all claims to ensure that there is a reasonable balance maintained in reviewing all classes of claims.

### 5.3(b)(2) Valuation Factors to Be Considered in Individual Review.

The Asbestos PI Trust shall liquidate the value of each Asbestos Personal Injury Claim that undergoes Individual Review based on the historic liquidated values of other similarly situated claims in the tort system for the same Disease Level. The Asbestos PI Trust shall thus take into consideration all of the factors that affect the severity of damages and values within the tort system including, but not limited to, credible evidence of (i) the degree to which the characteristics of a claim differ from the presumptive Medical/Exposure Criteria for the Disease Level in question; (ii) factors such as the claimant's age, disability, employment status, disruption of household, family or recreational activities, dependents, special damages, and pain and suffering; (iii) whether the claimant's damages were caused by asbestos exposure, including exposure to the Yarway Product Lines, as defined in Section 5.7(b)(3) hereof, prior to December 31, 1982 (for example, alternative causes, and the strength of documentation of injuries); (iv) the industry of exposure; (v) settlement and verdict histories and other law firms' experience in the Claimant's Jurisdiction for similarly situated claims; and (vi) settlement and verdict histories for the claimant's law firm for similarly situated claims. Where the claimant's law firm submits clear and convincing evidence to the Asbestos PI Trust, and the Trustee determines, in his or her sole discretion, that the claimant's law firm, prior to the Petition Date, played a substantial role in the prosecution, trial and resolution of asbestos personal injury claims against the Debtor in

A.1247

the Claimant's Jurisdiction, such as actively participating in court appearances, discovery and trial of the subject cases (evidence will be required of all three phases:  prosecution, trial and resolution for each law firm involved; necessary evidence will include evidence of active participation in the cases; and the mere referral of a case, without further involvement will not be viewed as having played a substantial role in the prosecution and resolution of a case), irrespective of whether a second law firm also was involved, the Asbestos PI Trust shall include such cases in the settlement and verdict histories for the claimant's law firm in the Claimant's Jurisdiction.  If this occurs, the claimant's law firm shall certify, as required by the Asbestos PI Trust, that it has provided all settlement and verdict history information for asbestos cases against the Debtor in which claimant's law firm, prior to the Petition Date, played a substantial role in the prosecution, trial and resolution of asbestos personal injury claims against the Debtor in the Claimant's Jurisdiction, as described above.

For these purposes, the "**Claimant's Jurisdiction**" is the jurisdiction in which the claim was filed (if at all) against the Debtor in the tort system prior to the Petition Date.  If the claim was not filed against the Debtor in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of diagnosis or when the claim is filed with the Asbestos PI Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product or to conduct for which the Debtor has legal responsibility.

With respect to the "Claimant's Jurisdiction" in the event a personal representative or authorized agent makes a claim under this TDP for wrongful death with respect to which the governing law of the Claimant's Jurisdiction could only be the Alabama Wrongful Death Statute, the Claimant's Jurisdiction for such claim shall be the Commonwealth of Pennsylvania, and such

35

**A.1248**

claimant's damages shall be determined pursuant to the statutory and common laws of the Commonwealth of Pennsylvania without regard to its choice of law principles. The choice of law provision in Section 7.4 below applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the Asbestos PI Trust and the claimant, and, to the extent the Asbestos PI Trust seeks recovery from any entity that provided insurance coverage to the Debtor, the Alabama Wrongful Death Statute shall govern.

5.3(b)(3) **Scheduled, Average, and Maximum Values.** The Scheduled, Average and Maximum Values for domestic claims involving Disease Levels I–VII are the following:

| Scheduled Disease | Scheduled Value | Average Value | Maximum Value |
|---|---|---|---|
| Mesothelioma (Level VII) | $55,000 | $80,000 | $150,000 |
| Lung Cancer 1 (Level VI) | $17,500 | $20,000 | $40,000 |
| Lung Cancer 2 (Level V) | None | $5,000 | $15,000 |
| Other Cancer (Level IV) | $5,000 | $6,000 | $15,000 |
| Severe Asbestosis (Level III) | $10,000 | $12,000 | $20,000 |
| Asbestosis/Pleural Disease (Level II) | $2,000 | None | None |
| Asbestosis/Pleural Disease (Level I) | $500 | None | None |

These Scheduled Values, Average Values and Maximum Values shall apply to all Trust Voting Claims other than Pre-Petition Liquidated Claims filed with the Asbestos PI Trust on or before the Initial Claims Filing Date as provided in Section 5.1 above. Thereafter, the Asbestos

36

**A.1249**

PI Trust, with the consent of the TAC and the FCR pursuant to Sections 5.7(b) and 6.6(b) of the Trust Agreement, may change these valuation amounts for good cause and consistent with other restrictions on the amendment power.

### 5.4 Categorizing Asbestos Personal Injury Claims as Extraordinary and/or Exigent Hardship.

**5.4(a) Extraordinary Claims.** "**Extraordinary Claim**" means an Asbestos Personal Injury Claim that otherwise satisfies the Medical Criteria for Disease Levels I–VII, and that is held by a claimant whose exposure to asbestos (i) occurred predominantly as a result of working in a manufacturing facility of the Debtor or Gimpel Corporation, a Delaware corporation ("**Gimpel**") during a period in which the Debtor or Gimpel was manufacturing asbestos-containing products at that facility, or (ii) was at least 75% the result of Yarway Exposure (as defined in Section 5.7(b)(3) below), and in either case there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims shall be presented for Individual Review and, if valid, shall be entitled to an award of up to a maximum extraordinary value of five (5) times the Scheduled Value set forth in Section 5.3(b)(3) above for claims qualifying for Disease Levels I–IV, VI and VII, and five (5) times the Average Value for claims in Disease Level V, in either case multiplied by the applicable Payment Percentage.  The Trustee may ask that a holder of an Extraordinary Claim provide the Asbestos PI Trust with evidence of all recoveries from other asbestos trusts and all asbestos-related recoveries from other defendants. If a claimant submits such evidence, the Asbestos PI Trust shall preserve the confidentiality of the submission as provided in Section 6.5 below.

Any dispute as to Extraordinary Claim status shall be submitted to a special Extraordinary Claims panel established by the Asbestos PI Trust with the consent of the TAC

A.1250

and the FCR (the "**Extraordinary Claims Panel**").  All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim, following its liquidation, shall be placed in the FIFO Payment Queue ahead of all other Asbestos Personal Injury Claims, except Pre-Petition Liquidated Claims, Existing Claims and Exigent Hardship Claims, based on its date of liquidation and shall be paid subject to the Maximum Available Payment and Claims Payment Ratio described above.

**5.4(b)  Exigent Hardship Claims.**  At any time the Asbestos PI Trust may liquidate and pay Asbestos Personal Injury Claims that qualify as Exigent Hardship Claims as defined below.  Such claims may be considered separately no matter what the order of processing otherwise would have been under this TDP.  An Exigent Hardship Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other liquidated Asbestos Personal Injury Claims except Pre-Petition Liquidated Claims and Existing Claims, which claims, together with the Exigent Hardship Claims, shall be paid in accordance with the provisions of Section 2.4 hereof.  An Asbestos Personal Injury Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Severe Asbestosis (Disease Level III) or an asbestos-related malignancy (Disease Levels IV–VII), and the Asbestos PI Trust, in its sole discretion, determines that (i) the claimant needs financial assistance on an immediate basis based on the claimant's expenses and all sources of available income, and (ii) there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

**5.5     Secondary Exposure Claims.**  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must seek Individual Review of his or her claim pursuant to Section 5.3(b) above.

A.1251

In such a case, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP for the claimant's Disease Level that would have been applicable had the occupationally exposed person filed a direct claim against the Asbestos PI Trust.  In addition, the claimant with secondary exposure must establish that he or she is suffering from one of the seven Disease Levels described in Section 5.3(a)(3) above or an asbestos-related disease otherwise compensable under this TDP, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos or asbestos-containing products manufactured, produced or distributed by the Debtor or to conduct for which the Debtor has legal responsibility, and that such secondary exposure was a cause of the claimed disease.  If the claimant establishes the elements called for in this Section 5.5, the Asbestos PI Trust shall offer the claimant the Scheduled Value for the applicable Disease Level unless the claimant is seeking review of the liquidated value of the claim pursuant to Section 5.3(b)(1) hereof.  All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

**5.6** **Indirect Asbestos Personal Injury Claims.**  An Indirect Asbestos Personal Injury Claim asserted against the Asbestos PI Trust shall be treated as presumptively valid and paid by the Asbestos PI Trust subject to the applicable Payment Percentage if (a) such claim satisfied the requirements of any bar date for such claim established by the Bankruptcy Court, if applicable, and is not otherwise disallowed by Section 502(e) of the Code or subordinated under Section 509(c) of the Code, (b) the holder of such claim (the "**Indirect Claimant**") establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the liability and obligation of the Asbestos PI Trust to the individual claimant to whom the Asbestos PI Trust would otherwise have had a liability or obligation under this TDP (the "**Direct Claimant**"),

39

**A.1252**

(ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Asbestos PI Trust and the "**Released Parties**" (as defined in the Asbestos Personal Injury Claimant Release attached hereto as Exhibit A) from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitation and repose or by other applicable law and (c) the Asbestos PI Trust has not yet paid the Direct Claimant. In no event shall any Indirect Claimant have any rights against the Asbestos PI Trust superior to the rights of the related Direct Claimant against the Asbestos PI Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect Asbestos Personal Injury Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect Asbestos Personal Injury Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Asbestos PI Trust and the Released Parties) or a Final Order (as defined in the Plan) and such claim must be valid under the applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Asbestos PI Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Asbestos PI Trust a release in form and substance satisfactory to the Trustee and the Released Parties.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Asbestos PI Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the Asbestos PI Trust review the Indirect Asbestos Personal Injury Claim individually to determine whether the

40

A.1253

Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Asbestos PI Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation and the Asbestos PI Trust has not already paid the Direct Claimant, the Asbestos PI Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, multiplied by the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled under this TDP. Further, the liquidated value of any Indirect Asbestos Personal Injury Claim paid by the Asbestos PI Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos Personal Injury Claim that might be subsequently asserted by the Direct Claimant against the Asbestos PI Trust.

Any dispute between the Asbestos PI Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Section 5.10 below. If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.11 and 7.5 below.

The Trustee may develop and approve a separate proof of claim form for Indirect Asbestos Personal Injury Claims. Indirect Asbestos Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustee consistent with the provisions of this Section 5.6, which procedures shall (a) determine the validity, acceptability and enforceability of such claims; and (b) otherwise provide the same

41

A.1254

liquidation and payment procedures and rights to the holders of such claims as the Asbestos PI Trust would have afforded the holders of the underlying valid Asbestos Personal Injury Claims.

### 5.7    Evidentiary Requirements.

#### 5.7(a)  Medical Evidence.

5.7(a)(1)  **In General.**  All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.  A finding by a physician after the Effective Date that a claimant's disease is "consistent with" or "compatible with" asbestosis shall not alone be treated by the Asbestos PI Trust as a diagnosis.

5.7(a)(1)(A)  **Disease Levels I–III.**  Except for asbestos claims filed against the Debtor or any other defendant in the tort system prior to the Petition Date, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–III) shall be based, in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease.  All living claimants must also provide (i) for Disease Levels I–II, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 8 above); (ii) for Disease Level III, an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iii) for Disease Levels II and III, pulmonary function testing.[14,15]

---

[14] All diagnoses of Asbestos/Pleural Disease (Disease Levels I and II) not based on pathology shall be presumed to be based on findings of bilateral asbestosis or pleural disease, and all diagnoses of Mesothelioma (Disease Level VII) shall be presumed to be based on findings that the disease involves a malignancy.  However, the Asbestos PI Trust may rebut such presumptions.

42

A.1255

In the case of a claimant who was deceased at the time the claim was filed, all diagnoses of a non-malignant asbestos-related disease (Disease Levels I–III) shall be based upon (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease; (ii) pathological evidence of the non-malignant asbestos-related disease; or (iii) in the case of Disease Levels I–II, evidence of Bilateral Asbestos-Related Nonmalignant Disease (as defined in Footnote 8 above), and for Disease Level III, either an ILO reading of 2/1 or greater or pathological evidence of asbestosis; and (iv) for either Disease Level II or III, pulmonary function testing.

**5.7(a)(1)(B)  Disease Levels IV–VII.**  All diagnoses of an asbestos-related malignancy (Disease Levels IV–VII) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by the JCAHO.

**5.7(a)(1)(C)  Exception to the Exception for Certain Pre-Petition Claims.**  If the holder of an Asbestos Personal Injury Claim that was filed against the

---

[15] **"Pulmonary function testing"** or **"PFT"** shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society (**"ATS"**) and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by the Joint Commission on Accreditation of Healthcare Organizations (**"JCAHO"**), or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in an JCAHO-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the Asbestos PI Trust, certifying that the PFT was conducted in material compliance with ATS standards.

A.1256

Debtor or any other defendant in the tort system prior to the Petition Date has available a report of a diagnosing physician engaged by the holder or his or her law firm who conducted a physical examination of the holder as described in Sections 5.7(a)(1)(A) above, or if the holder has filed such medical evidence and/or a diagnosis of the asbestos-related disease by a physician not engaged by the holder or his or her law firm who conducted a physical examination of the holder with another asbestos-related personal injury settlement trust that requires such evidence, without regard to whether the claimant or the law firm engaged the diagnosing physician, the holder shall provide such medical evidence and/or diagnosis to the Asbestos PI Trust notwithstanding the exception in Section 5.7(a)(1)(A) above.

   **5.7(a)(2)  Credibility of Medical Evidence.**  Before making any payment to a claimant, the Asbestos PI Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Asbestos PI Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examinations or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.  Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to the Debtor to settle for payment similar disease cases prior to the Petition Date, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state, federal or foreign judge, is presumptively reliable, although the Asbestos PI Trust may seek to rebut the presumption. Notwithstanding the foregoing or any other provision of these TDP, any medical evidence

44

**A.1257**

submitted by a physician or entity that the Asbestos PI Trust has determined, after consulting with the TAC and the FCR, to be unreliable shall not be acceptable as medical evidence in support of any Asbestos Personal Injury Trust Claim. In addition, claimants who otherwise meet the requirements of this TDP for payment of an Asbestos Personal Injury Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a judgment involving another defendant, may be introduced by either the claimant or the Asbestos PI Trust in any Individual Review proceeding conducted pursuant to Section 5.3(b) above or any Extraordinary Claim proceeding conducted pursuant to Section 5.4(a) above.

### 5.7(b) Exposure Evidence.

**5.7(b)(1) In General.** As set forth above in Section 5.3(a)(3), to qualify for any Disease Level, the claimant must demonstrate a minimum exposure to the Yarway Product Lines, as defined in Section 5.7(b)(3) hereof. Claims based on conspiracy theories that involve no such exposure to the Yarway Product Lines are not compensable under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, Yarway Exposure as defined in Section 5.7(b)(3) below prior to December 31, 1982; (ii) for Asbestos/Pleural Disease Level I, six (6) months Yarway Exposure prior to December 31, 1982, plus five (5) years cumulative occupational asbestos exposure; and (iii) for Asbestosis/Pleural Disease (Disease Level II), Severe Asbestosis (Disease Level III), Other Cancer (Disease Level IV) or Lung Cancer 1 (Disease Level VI), six (6) months Yarway Exposure prior to December 31, 1982, plus Significant Occupational Exposure to asbestos. If the claimant cannot meet the relevant

45

presumptive exposure requirements for a Disease Level eligible for Expedited Review, the claimant may seek Individual Review pursuant to Section 5.3(b) above of his or her claim based on exposure to the Yarway Product Lines.

**5.7(b)(2) Significant Occupational Exposure. "Significant Occupational Exposure"** means employment for a cumulative period of at least five (5) years with a minimum of two (2) years prior to December 31, 1982, in an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular basis; (b) fabricated asbestos-containing products such that the claimant in the fabrication process was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c) above.

**5.7(b)(3) Yarway Exposure.** The claimant must demonstrate meaningful and credible exposure, which occurred prior to December 31, 1982, to the Yarway Product Lines ("**Yarway Exposure**"). That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, a co-worker, or a family member in the case of a deceased claimant (providing the Asbestos PI Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the Asbestos PI Trust to process a claim under either Expedited or Individual Review shall be set forth on the proof of claim form to be used by the Asbestos PI Trust. The Asbestos PI Trust may also require submission of other or additional evidence of exposure when it deems such to be necessary.

**A.1259**

"**Yarway Product Lines**" means asbestos-containing products, equipment, components, parts, improvements to real property, or materials engineered, designed, marketed, manufactured, constructed, sold, supplied, produced, installed, maintained, serviced, specified, selected, repaired, removed, replaced, released, distributed, or in any way used by Yarway (including, without limitation, Gimpel), including without limitation any of those products manufactured, sold or distributed by (a) Yarway Corporation (a Pennsylvania corporation), the statutory predecessor to Yarway, (b) Gimpel Corporation (f/k/a Triple G Acquisition Corporation), a Delaware corporation, which merged into Yarway in 2000 and/or (c) Gimpel Corporation (f/k/a Gimpel Machine Works, Inc.), a Pennsylvania corporation that sold all or substantially all of its assets to Gimpel.  For the avoidance of doubt, "Yarway Product Lines" does not include products, equipment, components, parts, improvements to real property, or materials engineered, designed, manufactured, constructed or produced by Grinnell Corporation, Mueller Company, Anderson, Greenwood & Co., Kunkle Valve Company Inc., The Henry Pratt Company, or any other Non-Debtor Affiliate, or any Representative of any of the foregoing Entities.

Evidence submitted to establish proof of Yarway Exposure is for the sole benefit of the Asbestos PI Trust, not third parties or defendants in the tort system.  The Asbestos PI Trust has no need for, and therefore, claimants are not required to furnish the Asbestos PI Trust with, evidence of exposure to specific asbestos products other than the Yarway Product Lines, except to the extent such evidence is required elsewhere in this TDP.  Similarly, failure to identify the Yarway Product Lines in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from recovering from the Asbestos PI Trust, provided the claimant satisfies the medical and exposure requirements of this TDP.

A.1260

**5.8     Claims Audit Program.**  The Asbestos PI Trust, with the consent of the TAC and the FCR, may develop methods for auditing the reliability of medical evidence, including additional reading of X-rays, CT scans and verification of pulmonary function tests, as well as the reliability of evidence of exposure to asbestos, including exposure to the Yarway Product Lines prior to December 31, 1982.  In the event that the Asbestos PI Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable medical or exposure evidence to the Asbestos PI Trust, it may decline to accept additional evidence from such provider in the future.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos PI Trust, the Asbestos PI Trust may penalize any claimant or claimant's attorney by rejecting the Asbestos Personal Injury Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos Personal Injury Claims, raising the level of scrutiny of additional information submitted from the same source or sources, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

**5.9     Second Disease (Malignancy) Claims.**  Notwithstanding the provisions of Section 2.1 above that a claimant may not assert more than one Asbestos Personal Injury Claim hereunder, the holder of an Asbestos Personal Injury Claim involving a non-malignant asbestos-related disease (Disease Levels I–III) may assert a new Asbestos Personal Injury Claim against the Asbestos PI Trust for a malignant disease (Disease Levels IV–VII) that is subsequently diagnosed.  Any additional payments to which such claimant may be entitled with respect to such

A.1261

malignant asbestos-related disease shall not be reduced by the amount paid for the non-malignant asbestos-related disease, provided that the malignant disease had not been diagnosed by the time the claimant was paid with respect to the original claim involving the non-malignant disease.

### 5.10  Arbitration.

**5.10(a)  Establishment of ADR Procedures.**  The Trustee, with the consent of the TAC and the FCR, shall establish binding and non-binding arbitration procedures, as part of the Alternative Dispute Resolution ("**ADR**") Procedures to be established by the Trustee with the consent of the TAC and the FCR, for resolving disputes concerning whether a pre-petition settlement agreement with the Debtor is binding and judicially enforceable in the absence of a Final Order of the Bankruptcy Court determining the issue, whether the Asbestos PI Trust's rejection or denial of a claim was proper, or whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I–VII.  Binding and non-binding arbitration shall also be available for resolving disputes over the liquidated value of a claim, as well as disputes over the Debtor's share of the unpaid portion of a Pre-Petition Liquidated Claim described in Section 5.2 above and disputes over the validity of an Indirect Asbestos Personal Injury Claim.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above.  In the case of an arbitration involving the liquidated value of a claim involving Disease Levels III–VII, the arbitrator shall consider the same valuation factors that are set forth in Section 5.3(b)(2) above.  In order to facilitate the Individual Review Process with respect to such claims, the Asbestos PI Trust may develop a valuation model that enables the Asbestos PI Trust to efficiently make initial liquidated value offers on those claims in the Individual Review setting.  In an arbitration involving any such claim, the Asbestos

49

PI Trust shall neither offer into evidence or describe any such model nor assert that any information generated by the model has any evidentiary relevance or should be used by the arbitrator in determining the presumed correct liquidated value in the arbitration. The underlying data that was used to create the model may be relevant and may be made available to the arbitrator but only if provided to the claimant or his or her counsel ten (10) days prior to the arbitration proceeding. With respect to all claims eligible for arbitration, the claimant, but not the Asbestos PI Trust, may elect either non-binding or binding arbitration. The ADR Procedures may be modified by the Asbestos PI Trust with the consent of the TAC and the FCR.

      **5.10(b) Claims Eligible for Arbitration.** In order to be eligible for arbitration, the claimant must first complete the Individual Review Process with respect to the disputed issue as well as any processes required under the ADR Procedures. Individual Review shall be treated as completed for these purposes when the claim has been individually reviewed by the Asbestos PI Trust, the Asbestos PI Trust has made an offer on the claim, the claimant has rejected the liquidated value resulting from the Individual Review, and the claimant has notified the Asbestos PI Trust of the rejection in writing. Individual Review shall also be treated as completed if the Asbestos PI Trust has rejected the claim.

      **5.10(c) Limitations on and Payment of Arbitration Awards.** In the case of a non-Extraordinary Claim involving Disease Level I or II, the arbitrator shall not return an award in excess of the Scheduled Value for such claim. In the case of a non-Extraordinary Claim involving Disease Levels III–VII, the arbitrator shall not return an award in excess of the Maximum Value for the appropriate Disease Level as set forth in Section 5.3(a)(3) above, and for an Extraordinary Claim involving any Disease Level, the arbitrator shall not return an award greater than the maximum extraordinary value for such a claim as set forth in Section 5.4(a) above. A claimant

**A.1263**

who submits to arbitration and who accepts the arbitral award shall receive payments in the same manner as one who accepts the Asbestos PI Trust's original valuation of the claim.

    **5.11**    **Litigation.** Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos PI Trust pursuant to Section 7.5 below.  However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Asbestos PI Trust's available cash only as provided in Section 7.6 below.

**SECTION VI**

**Claims Materials**

    **6.1**    **Claims Materials.** The Asbestos PI Trust shall prepare suitable and efficient claims materials ("**Claims Materials**") for all Asbestos Personal Injury Claims, and shall provide such Claims Materials upon a written request for such materials to the Asbestos PI Trust. The proof of claim form to be submitted to the Asbestos PI Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing.  The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure.  In developing its claim filing procedures, the Asbestos PI Trust shall make every effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the internet and electronically by disk or CD-ROM. The proof of claim form to be used by the Asbestos PI Trust shall be developed by the Trustee and submitted to the TAC and the FCR for approval; it may be changed by the Trustee with the consent of the TAC and the FCR.

51

**6.2     Content of Claims Materials.**  The Claims Materials shall include a copy of this TDP, such instructions as the Trustee shall approve, and a detailed proof of claim form.  If feasible, the forms used by the Asbestos PI Trust to obtain claims information shall be the same or substantially similar to those used by other asbestos claims resolution organizations.  If requested by the claimant, the Asbestos PI Trust shall accept information provided electronically.  The claimant may, but shall not be required to, provide the Asbestos PI Trust with evidence of recovery from other defendants and claims resolution organizations; provided, however, that if a claim is an Extraordinary Claim and the Trustee requests such information pursuant to the provisions of Section 5.4(a) above, the claimant shall be required to provide such evidence to the Asbestos PI Trust.

**6.3     Withdrawal or Deferral of Claims.**  A claimant can withdraw an Asbestos Personal Injury Claim at any time upon written notice to the Asbestos PI Trust and file another claim subsequently without affecting the status of the claim for purposes of statutes of limitations or repose, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing.  A claimant can also request that the processing of his or her Asbestos Personal Injury Claim by the Asbestos PI Trust be deferred for a period not to exceed three (3) years without affecting the status of the claim for statute of limitations purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue.  Except for Asbestos Personal Injury Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Asbestos PI Trust's offer is required, or an Asbestos Personal Injury Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within six (6) months of the Asbestos PI Trust's written offer of payment

A.1265

or rejection of the claim. Upon written request and good cause, the Asbestos PI Trust may extend the withdrawal or deferral period for an additional six (6) months.

**6.4** **Filing Requirements and Fees.** The Trustee shall have the discretion to determine, with the consent of the TAC and the FCR, whether a filing fee should be required for any Asbestos Personal Injury Claims.

**6.5** **Confidentiality of Claimants' Submissions.** All submissions to the Asbestos PI Trust by a holder of an Asbestos Personal Injury Claim, including a proof of claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Asbestos PI Trust, and intended by the parties to be confidential and to be protected by all applicable state and federal privileges, including but not limited to those directly applicable to settlement discussions. The Asbestos PI Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only (i) with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, (ii) to such other persons as authorized by the holder or (iii) in response to a valid subpoena of such materials issued by a Delaware State Court or the United States District Court for the District of Delaware. Furthermore, the Asbestos PI Trust shall provide counsel for the holder a copy of any such subpoena immediately after being served. The Asbestos PI Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before a Delaware State Court or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto. Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the FCR, the Asbestos PI Trust may, in specific limited circumstances, disclose information, documents or other

A.1266

materials reasonably necessary in the Asbestos PI Trust's judgment to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy or settlement agreement within the Asbestos Personal Injury Trust Assets; provided, however, that the Asbestos PI Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Asbestos PI Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Asbestos PI Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party except as set forth in the written agreement of confidentiality.  Nothing in this TDP, the Plan or the Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in any underlying civil action regarding his or her submission of factual information to the Asbestos PI Trust for the purpose of obtaining compensation for asbestos-related injuries from the Asbestos PI Trust.

**6.6     English Language.** All claims, claim forms, submissions, and evidence submitted to the Asbestos PI Trust or in connection with any claim or its liquidation shall be in the English language.

## SECTION VII

### General Guidelines for Liquidating and Paying Claims

**7.1     Showing Required.** To establish a valid Asbestos Personal Injury Claim, a claimant must meet the requirements set forth in this TDP.  The Asbestos PI Trust may require the submission of X-rays, CT scans, laboratory tests, medical examinations or reviews, other

A.1267

medical evidence or any other evidence to support or verify the Asbestos Personal Injury Claim, and may further require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable.

**7.2     Costs Considered.**  Notwithstanding any provisions of this TDP to the contrary, the Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos Personal Injury Claims so that the payment of valid Asbestos Personal Injury Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting an Asbestos Personal Injury Claim.  The Trustee shall also have the latitude to make judgments regarding the costs to be expended by the Asbestos PI Trust so that valid Asbestos Personal Injury Claims are not unduly further impaired by the costs of additional investigation.  Nothing herein shall prevent the Trustee, in appropriate circumstances, from contesting the validity of any claim against the Asbestos PI Trust whatever the costs, or declining to accept medical evidence from sources that the Trustee has determined to be unreliable pursuant to any claims audit program implemented pursuant to Section 5.8 above, or otherwise.

**7.3     Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**  Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio requirements set forth above, the Trustee shall proceed as quickly as possible to liquidate valid Asbestos Personal Injury Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims

A.1268

are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Asbestos PI Trust's income and liabilities over time remain uncertain, and decisions about payments must be based on estimates that cannot be done precisely, such decisions may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustee shall use his or her best efforts to treat similar claims in substantially the same manner, consistent with his or her duties as Trustee, the purposes of the Asbestos PI Trust, the established allocation of funds to claims in Categories A and B and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Asbestos PI Trust faces temporary periods of limited liquidity, the Trustee may, with the consent of the TAC and the FCR, (a) suspend the normal order of payment, (b) temporarily limit or suspend payments altogether, (c) offer a Reduced Payment Option as described in Section 2.5 above and/or (d) commence making payments on an installment basis.

**7.4     Punitive Damages.** Except as provided below for claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated Asbestos Personal Injury Claim, punitive or exemplary damages, *i.e.*, damages other than compensatory damages, shall not be considered or paid, notwithstanding their availability in the tort system.

Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Asbestos PI Trust in the tort system pursuant to Sections 5.11 above and 7.5 below. The only damages that may be awarded pursuant to this TDP to Alabama Claimants who

**A.1269**

are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to its choice of law principles. The choice of law provision in this Section 7.4 applicable to any claim with respect to which, but for this choice of law provision, the applicable law of the Claimant's Jurisdiction pursuant to Section 5.3(b)(2) is determined to be the Alabama Wrongful Death Statute, shall only govern the rights between the Asbestos PI Trust and the claimant including, but not limited to, suits in the tort system pursuant to Section 7.5 below.

**7.5** **Suits in the Tort System.** If the holder of a disputed claim disagrees with the Asbestos PI Trust's determination regarding the Disease Level of the claim, the claimant's exposure or medical history, the validity of the claim or the liquidated value of the claim, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.10 above, the holder may file a lawsuit against the Asbestos PI Trust in the Claimant's Jurisdiction as defined in Section 5.3(b)(2) above. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos PI Trust, all defenses which could have been asserted by the Debtor, except as otherwise provided in the Plan) shall be available to both sides at trial; however, the Asbestos PI Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the Asbestos PI Trust, the case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

**A.1270**

**7.6    Payment of Judgments for Money Damages.**  If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final.  Thereafter, the claimant shall receive from the Asbestos PI Trust an initial payment (subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the Asbestos PI Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system.  The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage, the Maximum Annual Payment, the Maximum Available Payment and the Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

In the case of a non-Extraordinary Claim involving Disease Level I or II, the total amount paid with respect to such claim shall not exceed the Scheduled Value for such Disease Level as set forth in Section 5.3(b)(3) above.  In the case of a claim that does not attain classification under a Disease Level, the amount payable shall not exceed the Scheduled Value for the Disease Level most comparable to the disease proven.  In the case of non-Extraordinary Claims involving Disease Levels III-VII, the total amounts paid with respect to such claims shall not exceed the Maximum Values for such Disease Levels set forth in Section 5.3(b)(3).  In the case of Extraordinary Claims, the total amounts paid with respect to such claims shall not exceed the maximum extraordinary values for such claims set forth in Section 5.4(a) above.  Under no

58

**A.1271**

circumstances shall interest be paid under any statute on any judgments obtained in the tort system.

**7.7     Releases.**  The Trustee shall, with the consent of the TAC and the FCR, determine the form and substance of the release to be provided to the Asbestos PI Trust.  As a condition to receiving any payment from the Asbestos PI Trust, a Direct Claimant or, in the case of an Indirect Claim, an Indirect Claimant and the related Direct Claimant shall be required to execute such form of release and, in addition, the Asbestos Personal Injury Claimant Release attached hereto as <u>Exhibit A</u>.  Notwithstanding anything to the contrary in this TDP, (i) the form of Asbestos Personal Injury Claimant Release attached hereto as <u>Exhibit A</u> and (ii) the requirement that the Asbestos PI Trust obtain a properly-executed Asbestos Personal Injury Claimant Release from any Direct Claimant or, in the case of an Indirect Claim, from any Indirect Claimant and the related Direct Claimant as a pre-condition to making a distribution to any Direct Claimant or Indirect Claimant shall not be modified in any way without the written consent of Tyco and Reorganized Yarway.

**7.8     Third-Party Services.**  Nothing in this TDP shall preclude the Asbestos PI Trust from contracting with another asbestos claims resolution organization to provide services to the Asbestos PI Trust so long as decisions about the categorization and liquidated value of Asbestos Personal Injury Claims are based on the relevant provisions of this TDP, including the Disease Levels, Scheduled Values, Average Values, Maximum Values, and Medical/Exposure Criteria set forth above.

**7.9     Asbestos PI Trust Disclosure of Information.**  Periodically, but not less often than once a year, the Asbestos PI Trust shall make available to claimants the number of claims by Disease Levels that have been resolved both by the Individual Review Process and by

**A.1272**

arbitration as well as by litigation in the tort system indicating the amounts of the awards and the averages of the awards by jurisdiction.

## SECTION VIII

### Miscellaneous

**8.1    Amendments.**  Except as otherwise provided herein, the Trustee may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided the Trustee first obtains the consent of the TAC and the FCR pursuant to the consent process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the restrictions in Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above.  Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustee, in writing, amendments to this TDP.  Any amendment proposed by the TAC or the FCR shall remain subject to Section 7.3 of the Trust Agreement.

**8.2    Severability.**  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability or operative effect of any and all other provisions of this TDP.  Should any provision contained in this TDP be determined to be inconsistent with or contrary to the Debtor's obligations to any insurance company providing insurance coverage to the Debtor in respect of claims for personal injury based on exposure to an asbestos-containing product or to conduct for which the Debtor has legal responsibility, the Asbestos PI Trust with the consent of the TAC and the FCR may amend this TDP and/or the Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtor to said insurance company.

60

**A.1273**

**8.3    Governing Law.**  Except for purposes of determining the validity and/or liquidated value of any Asbestos Personal Injury Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware.  The law governing the determination of validity and/or liquidation of Asbestos Personal Injury Claims in the case of Individual Review, arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described in Section 5.3(b)(2) above.

A.1274

**Exhibit D**

**Asbestos Personal Injury Trust Distribution Procedures**

# MAREMONT ASBESTOS PERSONAL INJURY TRUST

# DISTRIBUTION PROCEDURES

**A.1276**

ACTIVE 243359360

# MAREMONT ASBESTOS PERSONAL INJURY
# TRUST DISTRIBUTION PROCEDURES

## TABLE OF CONTENTS

**Page**

**ARTICLE 1** INTRODUCTION ........................................................................................ 1

    1.1    Purpose ........................................................................................................ 1

    1.2    Interpretation .............................................................................................. 1

**ARTICLE 2** OVERVIEW ................................................................................................ 2

    2.1    Asbestos Trust Goals .................................................................................. 2

    2.2    Claims Liquidation Procedures .................................................................. 4

    2.3    Establishment and Application of the Payment Percentage ........................ 5

    2.4    Asbestos Trust's Determination of the Maximum Annual Payment ................... 6

    2.5    Claims Payment Ratio ................................................................................. 9

    2.6    Indirect Asbestos Personal Injury Claims ................................................ 11

**ARTICLE 3** TDP ADMINISTRATION ........................................................................ 11

    3.1    Trust Advisory Committee and Future Claimants' Representative ................... 11

    3.2    Consent and Consultation Procedures ...................................................... 12

**ARTICLE 4** PAYMENT PERCENTAGE: PERIODIC ESTIMATES ........................... 12

    4.1    Uncertainty of Debtors' Personal Injury Asbestos Liabilities ........................... 12

    4.2    Computation of Payment Percentage ........................................................ 13

    4.3    Applicability of the Payment Percentage .................................................. 14

**ARTICLE 5** RESOLUTION OF ASBESTOS CLAIMS ................................................ 17

    5.1    Ordering, Processing and Payment of Asbestos Claims. ................................. 17

        5.1(a)  Ordering of Claims. ...................................................................... 17

            **5.1(a)(1)  Establishment of the FIFO Processing Queue** .................. 17

            **5.1(a)(2)  Effect of Statutes of Limitation and Repose** ...................... 17

        5.1(b)  Payment of Claims ....................................................................... 18

    5.2    Reserved.................................................................................................... 19

    5.3    Resolution of Unliquidated Asbestos Claims ........................................... 20

        5.3(a)  Expedited Review Process. ........................................................... 21

            **5.3(a)(1)  In General** .................................................................... 21

            **5.3(a)(2)  Claims Processing Under Expedited Review Process** ........ 22

-i-

**A.1277**

# TABLE OF CONTENTS
(continued)

|  |  |  |  |
|---|---|---|---|
| | 5.3(a)(3) | **Disease Levels, Scheduled Values and Medical/ Exposure Criteria** | 22 |
| | 5.3(b) | Individual Review Process | 24 |
| 5.4 | Categorizing Claims as Extraordinary and/or Exigent or Extraordinary Claims. | | 25 |
| | 5.4(a) | "Extraordinary Claim" | 25 |
| | 5.4(a)(1) | **Requirement to Identify Other Claims.** | 25 |
| | 5.4(a)(2) | **Information Required About Other Claims.** | 26 |
| | 5.4(a)(3) | **Authorization for Release of Information.** | 27 |
| | 5.4(a)(4) | **Claimant Certification.** | 27 |
| | 5.4(b) | Exigent Claims | 28 |
| | 5.4(b)(1) | **Exigent Health Claims** | 28 |
| | 5.4(b)(2) | **Exigent Hardship Claims** | 29 |
| 5.5 | Secondary Exposure Claims | | 29 |
| 5.6 | Indirect Asbestos Personal Injury Claims | | 29 |
| 5.7 | Evidentiary Requirements | | 32 |
| | 5.7(a) | Medical Evidence | 32 |
| | 5.7(a)(1) | **In General** | 32 |
| | 5.7(a)(1)(A) | Disease Level I | 32 |
| | 5.7(a)(1)(B) | Disease Levels II - V | 32 |
| | 5.7(a)(2) | **Credibility of Medical Evidence** | 33 |
| | 5.7(a)(3) | **Reliance by Asbestos Trust on Finding of another Asbestos Trust** | 34 |
| | 5.7(b) | Exposure Evidence | 34 |
| | 5.7(b)(1) | **In General** | 34 |
| | 5.7(b)(2) | **Significant Occupational Exposure** | 34 |
| | 5.7(b)(3) | **Debtor Exposure** | 35 |
| | 5.7(b)(3)(A) | Presumptive Occupations | 36 |
| | 5.7(b)(3)(B) | Standard of Exposure | 36 |
| 5.8 | Claims Audit Program | | 36 |
| 5.9 | Arbitration | | 38 |

**A.1278**

# TABLE OF CONTENTS
(continued)

|  |  |  |  |
|---|---|---|---|
|  | 5.9(a) | Establishment of ADR Procedures | 38 |
|  | 5.9(b) | Limitations on and Payment of Arbitration Awards | 39 |
| 5.10 | Litigation |  | 39 |
| 5.11 | Second Disease Claims |  | 39 |
| **ARTICLE 6** | CLAIMS MATERIALS |  | 39 |
| 6.1 | Claims Materials |  | 39 |
| 6.2 | Content of Claims Materials |  | 40 |
| 6.3 | Withdrawal or Deferral of Claims |  | 40 |
| 6.4 | Filing Requirements and Fees |  | 41 |
| 6.5 | Confidentiality of Claimants' Submissions |  | 41 |
| **ARTICLE 7** | GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS | | 43 |
| 7.1 | Showing Required |  | 43 |
| 7.2 | Costs Considered |  | 43 |
| 7.3 | Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity | | 44 |
| 7.4 | Punitive Damages |  | 45 |
| 7.5 | Sequencing Adjustment. |  | 45 |
|  | 7.5(a) | In General | 45 |
|  | 7.5(b) | Unliquidated Asbestos Claims | 46 |
| 7.6 | Suits in the Tort System |  | 46 |
| 7.7 | Payment of Judgments for Money Damages |  | 47 |
| 7.8 | Releases |  | 47 |
| 7.9 | Third-Party Services |  | 48 |
| **ARTICLE 8** | MEDICARE |  | 48 |
| 8.1 | Medicare |  | 48 |
| **ARTICLE 9** | MISCELLANEOUS |  | 54 |
| 9.1 | Amendments |  | 54 |
| 9.2 | Severability |  | 55 |
| 9.3 | Governing Law |  | 55 |

**A.1279**

## MAREMONT ASBESTOS PERSONAL INJURY
## TRUST DISTRIBUTION PROCEDURES

The Maremont Asbestos Personal Injury Trust Distribution Procedures (the **"TDP"**) contained herein provide for resolving all Asbestos Personal Injury Claims (**"Asbestos Claims"**) as defined in the Modified Joint Prepackaged Plan of Reorganization of Maremont Corporation and its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code, dated as of May 14, 2019 (as it may be amended or modified, the **"Plan"**),[1] as provided in and required by the Plan and the Maremont Personal Injury Trust Agreement (the **"Trust Agreement"**). The Plan and the Trust Agreement establish the Maremont Asbestos Personal Injury Trust (the **"Asbestos Trust"**). The trustee of the Asbestos Trust (the **"Trustee"**) shall implement and administer this TDP in accordance with the Trust Agreement.

## ARTICLE 1

## INTRODUCTION

**1.1    Purpose.**  This TDP has been adopted pursuant to the Trust Agreement. It is designed to provide fair, equitable and substantially similar treatment for all similarly situated Asbestos Claims that may presently exist or may arise in the future.

**1.2    Interpretation.**  Except as may otherwise be provided below, nothing in this TDP shall be deemed to create a substantive right for any claimant. The rights and benefits provided herein, if any, to holders of Asbestos Claims shall vest in such holders as of the Effective Date.

---

[1] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Plan and, as applicable, the Trust Agreement.

**A.1280**

## ARTICLE 2

## OVERVIEW

**2.1     Asbestos Trust Goals.**   The goal of the Asbestos Trust is to treat all similarly situated claimants equitably and in accordance with the requirements of Section 524(g) of the Bankruptcy Code. This TDP furthers that goal by setting forth procedures for processing and paying the Debtors' several shares of the unpaid portion of the liquidated value of Asbestos Claims, with the intention of paying all claimants over time as equivalent a share as possible of the value of their claims based on historical values for substantially similar claims in the tort system. To this end, the TDP establishes five (5) asbestos-related diseases (**"Disease Levels"**) which have presumptive medical and exposure requirements (**"Medical/Exposure Criteria"**) and specific liquidated values (**"Scheduled Values"**) and one of which has a liquidated value for those claims that qualify as an Extraordinary Claim as defined in Section 5.4 below ("**Maximum Value**").

The Disease Levels, Medical/Exposure Criteria, Scheduled Values and Maximum Value, which are set forth in Sections 5.3 and 5.4 below, have all been selected and derived with the intention of achieving a fair allocation of the Asbestos Trust assets as among claimants suffering from these different Disease Levels in light of the best available information considering the settlement history of the Debtors and the rights claimants would have in the tort system absent the bankruptcy. Except as set forth in Section 5.11 hereof, a claimant may not assert more than one Asbestos Claim hereunder.

Historically, Debtors Maremont and MEP have been subjected to thousands of personal injury and wrongful death claims asserting that they are liable for damages caused by exposure to asbestos-containing products that Maremont or its predecessor(s)-in-interest and certain

-2-

**A.1281**

successor-in-interest allegedly used, sold, manufactured, marketed, produced or distributed. Maremont manufactured, distributed, and sold aftermarket automotive products, including friction products such as brake linings, disc pads, and clutch facings, and aftermarket mufflers. As defined in the Plan, the "**Debtor Product Lines**" includes, among other products, all asbestos-containing products historically manufactured, sold, or distributed by, or branded with the name of or under a license granted by (a) any of the Debtors or any predecessor thereof or any subsidiary of any of the foregoing and/or (b) Nuturn Corporation or Ferodo America, Inc. as successors-in-interest to Maremont's Friction Products Business with respect to all of the Debtors' business lines.

Because of the nature of certain of the Debtor Products Lines, the vast majority of asbestos-related claims asserted against Maremont and MEP were asserted by (1) professional auto mechanics who were allegedly exposed to the Debtor Product Lines while working as professional mechanics in the automotive industry ("**Occupationally Exposed Claims**"); or (2) individual auto enthusiasts who worked on maintenance and upgrades to automobiles at home ("**Shade Tree Mechanic Claims**"). Because of the nature of the claims pool and the limited resources of the Asbestos Trust, this TDP only provides for the payment by the Asbestos Trust of Asbestos Claims based on certain diseases. The Trustee shall supervise the review of filed Asbestos Claims with the goal of approving only those Asbestos Claims that provide evidence of the type of exposure that was required by Maremont for settlement of claims in the tort system. To that end, the claim forms will contain objective criteria to qualify for payment.  For example, such forms will require detailed employment history with years of service and the Asbestos Trust may make reasonable inquiries of claimants and/or co-workers, friends and relatives as to the

A.1282

nature and extent of a claimant's exposure to the Debtor Product Lines. Affidavit guidelines will also be developed by the Asbestos Trust to be used by Shade Tree Mechanic Claims.

**2.2     Claims Liquidation Procedures.** Except as set forth below with respect to Disease Level V Claims, Asbestos Claims shall be processed based on their place in the FIFO Processing Queue (as defined in Section 5.1(a)(1)) to be established pursuant to Section 5.1(a)(1) below. The Asbestos Trust shall take all reasonable steps to resolve Asbestos Claims as efficiently and expeditiously as possible at each stage of claims processing and arbitration, which steps may include, in the Asbestos Trust's sole discretion, conducting settlement discussions with claimants' representatives with respect to more than one claim at a time, provided that the claimants' respective positions in the FIFO Processing Queue are maintained and each claim is individually evaluated pursuant to the valuation factors set forth herein. The Asbestos Trust shall also make every reasonable effort to resolve each year at least that number of Asbestos Claims required to exhaust the applicable Maximum Annual Payments (as that term is defined in Section 2.4 below).

The Asbestos Trust shall, except as otherwise provided below, liquidate all Asbestos Claims under the Expedited Review Process described in Section 5.3(a) below. Based upon the Debtors' claims settlement history, applicable tort law, and current projections of present and future unliquidated claims, the Scheduled Values for all Disease Levels have been established as set forth in Section 5.3(a)(3).

A Disease Level V (Mesothelioma 2) claim seeking to qualify as an Extraordinary Claim (as defined in Section 5.4(a)) and all Foreign Claims (as defined in Section 5.3(b)) may be liquidated only pursuant to the IR Process (as defined in Section 5.3(b)(1)).

**A.1283**

All unresolved disputes over a claimant's medical condition or exposure history shall be subject to binding or non-binding arbitration as set forth in Section 5.9 below, at the election of the claimant, under the ADR Procedures (as defined in Section 5.9(a)) that are to be established by the Asbestos Trust. Asbestos Claims that are the subject of a dispute with the Asbestos Trust that cannot be resolved by non-binding arbitration may enter the tort system as provided in Sections 5.10 and 7.6 below. However, if and when a claimant obtains a judgment in the tort system, the judgment shall be payable as provided in Section 7.7 below (subject to, as applicable, the Payment Percentage (as defined in Section 4.1 below), and the Maximum Annual Payments, Maximum Available Payment and Claims Payment Ratio provisions set forth in Sections 2.4 and 2.5 herein).

2.3    **Establishment and Application of the Payment Percentage.**    The initial Payment Percentage (the "**Initial Payment Percentage**") shall be 29.1%.[2] The Payment Percentage may thereafter be adjusted upwards or downwards from time to time by the Asbestos Trust, with the consent of the Trust Advisory Committee **("TAC")** and the Legal Representative for Future Claims **("FCR").** After the Distribution Value as defined in Section 2.4 below for a Shade Tree Mechanic Claim or the liquidated value of an Occupationally Exposed Claim as defined in Section 5.3(a)(3) below is determined pursuant to the procedures set forth herein under the Expedited Review Process, IR Process, arbitration, or litigation in the tort system, the claimant shall ultimately receive a pro rata share of that value based on a Payment Percentage described in Section 4.2 below. The Payment Percentage shall also apply to all sequencing adjustments paid pursuant to Section 7.5 below.

---

[2] The current initial payment percentage assumes initial funding of not less than $58 million.  Should the initial funding be between $58 million and $65 million, the initial payment percentage will increase proportionately. To the extent the Asbestos Trust is funded with less than $58 million or more than $65 million the initial payment percentage may be adjusted.

**A.1284**

The Payment Percentage may be adjusted upwards or downwards after a two (2) year re-evaluation period by the Asbestos Trust with the consent of the TAC and the FCR to reflect then-current estimates of the Asbestos Trust's assets and its liabilities, as well as the then-estimated value of then-pending and future claims. If the Payment Percentage is increased over time, claimants whose claims were liquidated and paid in prior periods under the TDP shall receive additional payments only as provided in Section 4.3 below. Because there is uncertainty in the prediction of both the number and severity of future Asbestos Claims, and the amount of the Asbestos Trust's assets, no guarantee can be made of any Payment Percentage of an Asbestos Claim's liquidated value.

**2.4      Asbestos Trust's Determination of the Maximum Annual Payment.**  After calculating the Payment Percentage, the Asbestos Trust shall create two models of cash flow, principal and income year-by-year to be paid over its entire life to ensure that all present and future holders of Occupationally Exposed Claims ("**Occupational Model**") and Shade Tree Mechanic Claims ("**Shade Tree Model**") (collectively, "**Models**") are compensated at the Payment Percentage. In each year, based upon the Occupational Model of cash flow, the Asbestos Trust shall be empowered to pay out the portion of its funds payable for that year to Occupationally Exposed Claims according to the Occupational Model (the "**Occupational Maximum Annual Payment**").  In each year, based upon the Shade Tree Model of cash flow, the Asbestos Trust shall be empowered to pay out the portion of its funds payable for that year to Shade Tree Mechanic Claims according to the Shade Tree Model (the "**Shade Tree Maximum Annual Payments**" and together with the Occupational Maximum Annual Payments, the "**Maximum Annual Payments**")**. The Asbestos Trust's distributions to Occupationally Exposed Claims and Shade Tree Mechanic Claims for that year shall not exceed the applicable Maximum

A.1285

Annual Payment.  All approved Shade Tree Mechanic Claims shall be paid at the end of each year and shall be paid the lesser of the pro rata share of the Shade Tree Maximum Annual Payment or the liquidated values established by the Asbestos Trust, subject to the Payment Percentage ("**Distribution Value**"). The Payment Percentage and the Maximum Annual Payments are based on projections over the lifetime of the Asbestos Trust. If such long-term projections are revised, the Payment Percentage may be adjusted accordingly, which will result in new Models of the Asbestos Trust's anticipated cash flow and a new calculation of the Occupational Maximum Annual Payment and the Shade Tree Maximum Annual Payment.

Year-to-year variations in the Asbestos Trust's flow of claims or the value of its assets, including earnings thereon, will not mean necessarily that the long-term projections are inaccurate; they may simply reflect normal variations, both up and down, from the smooth curve created by the Asbestos Trust's long-term projections. If, in a given year, however, asset values, including earnings thereon, are below projections, the Asbestos Trust may need to distribute less in that year than would otherwise be permitted based on the applicable Maximum Annual Payments derived from long-term projections. Accordingly, the applicable Maximum Annual Payments for a given year may be temporarily decreased if the present value of the assets of the Asbestos Trust as measured on a specified date during the year is less than the present value of the assets of the Asbestos Trust projected for that date by the Models described in the foregoing paragraph. The Asbestos Trust shall make such a comparison whenever the Trustee becomes aware of any information that suggests that such a comparison should be made. If the Asbestos Trust determines that as of the date in question, the present value of the Asbestos Trust's assets is less than the projected present value of its assets for such date, then it will remodel the cash flow year-by-year to be paid over the life of the Asbestos Trust based upon the reduced value of the

-7-

**A.1286**

total assets as so calculated and identify the reduced portion of its funds to be paid for that year, which will become the "**Temporary Maximum Annual Payments**" (additional reductions in the Maximum Annual Payments can occur during the course of that year based upon subsequent calculations). If in any year the Maximum Annual Payments were temporarily reduced as a result of an earlier calculation and, based upon a later calculation, the difference between the projected present value of the Asbestos Trust's assets and the actual present value of its assets has decreased, the Temporary Maximum Annual Payments shall be increased to reflect the decrease in the differential. In no event, however, shall the Temporary Maximum Annual Payments exceed the original Maximum Annual Payments. As a further safeguard, the Asbestos Trust's distribution to Occupationally Exposed Claims for the first nine months of a year shall not exceed 85% of the Occupational Maximum Annual Payment determined for that year.  To the extent the Occupational Maximum Annual Payment is reached in a given year, the Asbestos Trust may continue processing such claims, but shall delay issuing offers or releases until January 1 of the next year. If on December 31 of a given year, the original Maximum Annual Payments for such year is not in effect, the original Maximum Annual Payments for the following year shall be reduced proportionately.

The remaining portion of the Occupational Maximum Annual Payment (the "**Maximum Available Payment**") shall be allocated and used to satisfy all previously liquidated Occupationally Exposed Claims subject to the Claims Payment Ratio set forth in Section 2.5 below; provided, however, that if the Occupational Maximum Annual Payment is reduced during a year pursuant to the provisions above, the Maximum Available Payment shall be adjusted accordingly. The Occupational Maximum Annual Payment shall apply to offers on all Occupationally Exposed Claims.

-8-

**A.1287**

2.5    **Claims Payment Ratio.**  A Claims Payment Ratio has been determined which, as of the Effective Date, has been set at 90% for Category A claims, which consist of Asbestos Claims involving Disease Level IV) and at 10% for Category B claims, which are Asbestos Claims involving Disease Levels I-III. In each year, after the determination of the Occupational Maximum Available Payment described in Section 2.4 above, 90% of that amount shall be available to pay Category A claims and 10% shall be available to pay Category B claims that have been liquidated since the Effective Date; provided, however, that if the Occupational Maximum Annual Payment is reduced during the year pursuant to Section 2.4 above, the amounts available to pay Category A and Category B claims shall be recalculated based on the adjusted Occupational Maximum Available Payment. In the event there are insufficient funds in any year to pay the liquidated claims within either or both of the Categories, the available funds allocated to the particular Category shall be paid to the maximum extent to claimants in that Category based on their place in the FIFO Payment Queue described in Section 5.1(b) below. Claims for which there are insufficient funds allocated to the relevant Category shall be carried over to the next year where they shall be placed at the head of the FIFO Payment Queue. If there is a decrease in the Payment Percentage prior to the payment of such claims, such claims shall nevertheless be entitled to be paid at the Payment Percentage that they would have been entitled to receive but for the application of the Claims Payment Ratio. If, at the end of any calendar year during the first three years the Asbestos Trust is accepting claims, there are excess funds in Category A, because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, then the excess funds for that Category shall be rolled over and remain dedicated to Category A.  Notwithstanding any other provision herein, if, at the end of any calendar year following the third anniversary of the date

**A.1288**

the Asbestos Trust began accepting claims, there are excess funds available in Category B and insufficient funds in Category A to pay such Category's claims, then the Trustee may transfer up to a specified amount of excess funds (the "**Permitted Transfer Amount**" as defined below) to Category A to cover the shortfall; provided, however, that the Trustee shall never transfer more than the amount of the Category A shortfall. The "Permitted Transfer Amount" shall be determined as follows: (a) the Trustee shall first determine the cumulative amount allocated to Category B based on the Claims Payment Ratio since the date the Asbestos Trust last calculated its Payment Percentage; (b) the Trustee shall then determine the cumulative amount that the Asbestos Trust estimated would be paid to Category B since the date the Asbestos Trust last calculated its Payment Percentage; (c) the Trustee shall then subtract the amount determined in (b) from the amount determined in (a), and the difference between the two shall be referred to as the "Permitted Transfer Amount." The Trustee shall provide the TAC and the FCR with the Permitted Transfer Amount calculation thirty (30) days prior to making a transfer. If, at the end of any calendar year following the third anniversary of the date the Asbestos Trust began accepting claims, there are excess funds in either or both Categories because there is an insufficient amount of liquidated claims to exhaust the respective Maximum Available Payment amount for that Category, or, in a year where there was a transfer from Category B to Category A, if the amount transferred was less than the amount of excess funds, then the excess funds for the Category or Categories with excess funds shall be rolled over and remain dedicated to the respective Category to which they were originally allocated.

During the first nine months of a given year, the Asbestos Trust's payments to claimants in either Category shall not exceed the amount of any excess funds that were rolled over for such

-10-

Category from the prior year plus 85% of the amount that would otherwise be available for payment to claimants in such Category.

In considering whether to make any amendments to the Claims Payment Ratio and/or its rollover provisions, the Trustee shall consider the reasons for which the Claims Payment Ratio and its rollover provisions were adopted, the settlement history that gave rise to its calculation, and the foreseeability or lack of foreseeability of the reasons why there would be any need to make an amendment. In that regard, the Trustee should keep in mind the interplay between the Payment Percentage and the Claims Payment Ratio as it affects the net cash actually paid to claimants.

No amendment to the Claims Payment Ratio may be made without the consent of the TAC members and the FCR as set forth in the Trust Agreement and Article 3 below. The consent process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement shall apply in the event of any amendments to the Claims Payment Ratio. The Trustee, with the consent of the TAC and the FCR, may offer the option of a reduced Payment Percentage to holders of claims in either Category A or Category B in return for prompter payment (the "**Reduced Payment Option**").

2.6    **Indirect Asbestos Personal Injury Claims.**  As set forth in Section 5.6 below, any Indirect Asbestos Personal Injury Claim shall be subject to the same categorization, evaluation, and payment provisions of this TDP as all other Asbestos Claims.

## ARTICLE 3

## TDP ADMINISTRATION

3.1    **Trust Advisory Committee and Future Claimants' Representative.**  Pursuant to the Plan and the Trust Agreement, the Asbestos Trust and this TDP shall be administered by the Trustee in consultation with the TAC, which represents the interests of holders of present

-11-

**A.1290**

Asbestos Claims, and the FCR, who represents the interests of holders of Asbestos Claims that will be asserted in the future. The duties of the TAC and FCR with respect to the Asbestos Trust are set forth in the Trust Agreement.  The Trustee shall obtain the consent of the TAC and the FCR on any amendments to this TDP pursuant to Section 9.1 below, and on such other matters as are otherwise required below and in Section 2.2(f) of the Trust Agreement. The Trustee shall also consult with the TAC and the FCR on such matters as are provided below and in Section 2.2(e) of the Trust Agreement. The initial Trustee, the initial members of the TAC and the initial FCR are identified in the Trust Agreement.

      **3.2**     **Consent and Consultation Procedures.**  In those circumstances in which consultation or consent is required, the Trustee shall provide written notice to the TAC and the FCR of the specific amendment or other action that is proposed. The Trustee shall not implement such amendment nor take such action unless and until the parties have engaged in the Consultation Process described in Sections 5.7(a) and 6.6(a), or the Consent Process described in Sections 5.7(b) and 6.6(b), of the Trust Agreement, respectively.

<u>**ARTICLE 4**</u>

<u>**PAYMENT PERCENTAGE: PERIODIC ESTIMATES**</u>

      **4.1**     **Uncertainty of Debtors' Personal Injury Asbestos Liabilities.**  As discussed above, there is inherent uncertainty regarding the Debtors' total asbestos-related tort liabilities, as well as the total value of the assets available to the Asbestos Trust to pay Asbestos Claims. Consequently, there is inherent uncertainty regarding the amounts that holders of Asbestos Claims will receive. To seek to ensure substantially equivalent treatment of all present and future Asbestos Claims, the Trustee must determine from time to time the percentage of full liquidated

-12-

value that holders of present and future Asbestos Claims shall be likely to receive, *i.e.,* the **"Payment Percentage"** described in Section 2.3 above and Section 4.2 below.

    **4.2    Computation of Payment Percentage.** As provided in Section 2.3 above, the Payment Percentage shall be established by the Trustee with the consent of the TAC and the FCR, and shall apply to all Asbestos Claims.

    The Payment Percentage shall be subject to change pursuant to the terms of this TDP and the Trust Agreement if the Trustee with the consent of the TAC and FCR determines that an adjustment is required. No less frequently than once every two (2) years, commencing with the first day of January occurring after the Effective Date, the Trustee shall reconsider the then-applicable Payment Percentage to assure that it is based on accurate, current information and may, after such reconsideration, change the Payment Percentage, if necessary, with the consent of the TAC and the FCR. The Trustee shall also reconsider the then-applicable Payment Percentage at shorter intervals if he or she deems such reconsideration to be appropriate or if requested to do so by the TAC or the FCR. In any event, no less frequently than once every twelve (12) months commencing on the date that the Asbestos Trust first makes available the proof of claim forms and other claims materials required to file a claim with the Asbestos Trust (the six-month anniversary of the date the Asbestos Trust first makes available the proof of claim form and other claims materials required to file a claim being referred to herein as the "**Initial Claims Filing Date**"), the Trustee shall compare the liability forecast on which the then applicable Payment Percentage is based with the actual claims filing and payment experience of the Asbestos Trust to date. If the results of the comparison call into question the ability of the Asbestos Trust to continue to rely upon the current liability forecast, the Trustee shall undertake a reconsideration of the Payment Percentage.

-13-

**A.1292**

The Trustee must base his or her determination of the Payment Percentage on current estimates of the number, types, and values of present and future Asbestos Claims, the value of the assets then available to the Asbestos Trust for their payment, all anticipated administrative and legal expenses, and any other material matters that are reasonably likely to affect the sufficiency of funds to pay a comparable percentage of full value to all holders of Asbestos Claims. When making these determinations, the Trustee shall exercise common sense and flexibly evaluate all relevant factors.

   **4.3**   **Applicability of the Payment Percentage.**   Except as otherwise provided (a) in Section 5.1(b) below for Asbestos Claims involving deceased or incompetent claimants for which approval of the Asbestos Trust's offer by a court or through a probate process is required, (b) in the paragraph below with respect to Released Claims, and (c) in Section 2.5 above with respect to Asbestos Claims whose payment is delayed as a result of the Claims Payment Ratio, no holder of any other Asbestos Claim shall receive a payment that exceeds the liquidated value of the claim times the Payment Percentage in effect at the time of payment; provided, however, that if there is a reduction in the Payment Percentage, the Trustee, in his or her sole discretion, may cause the Asbestos Trust to pay an Asbestos Claim based on the Payment Percentage that was in effect prior to the reduction if such Asbestos Claim was filed and actionable with the Asbestos Trust ninety (90) days or more prior to the date the Trustee proposed the new Payment Percentage in writing to the TAC and the FCR (the "**Proposal Date**") and the processing of such claim was unreasonably delayed due to circumstances beyond the control of the claimant or the claimant's counsel, but only if such claim had no deficiencies for the ninety (90) days prior to the Proposal Date.

-14-

If a redetermination of the Payment Percentage has been proposed in writing by the Trustee to the TAC and the FCR but has not yet been adopted, the claimant shall receive the lower of the current Payment Percentage or the proposed Payment Percentage. However, if the proposed Payment Percentage was the lower amount but was not subsequently adopted, the claimant shall thereafter receive the difference between the lower proposed amount and the higher current amount. Conversely, if the proposed Payment Percentage was the higher amount and was subsequently adopted, the claimant shall thereafter receive the difference between the lower current amount and the higher adopted amount.

Notwithstanding anything contained herein, if the proposed Payment Percentage is lower than the current Payment Percentage, a claimant whose Asbestos Claim was liquidated prior to the Proposal Date and who either (a) transmitted[3] an executed release to the Asbestos Trust prior to the Proposal Date or (b) with respect to those claimants who had received releases fewer than thirty (30) days prior to the Proposal Date, transmitted an executed release to the Asbestos Trust within thirty (30) days of the claimant's receipt of the release (the claims described in (a) and (b) are collectively referred to herein as the "**Released Claims**") shall be paid based on the current Payment Percentage (the "**Released Claims Payment Percentage**"). For purposes hereof, (a) a claimant represented by counsel shall be deemed to have received a release on the date that the claimant's counsel receives the release, (b) if the Asbestos Trust transmits a release electronically, the release shall be deemed to have been received on the date the Asbestos Trust transmits the offer notification, and (c) if the Asbestos Trust places the release in the U.S. mail, postage prepaid, the release shall be deemed to have been received three (3) business days after such mailing date. A delay in the payment of the Released Claims for any reason, including

---

[3] For purposes of this sentence, "transmitted" is defined as the date/time postmarked if submitted by mail or the date/time uploaded if submitted electronically.

-15-

**A.1294**

delays resulting from limitations on payment amounts in a given year pursuant to Section 2.4 or Section 2.5 hereof, shall not affect the rights of the holders of the Released Claims to be paid based on the Released Claims Payment Percentage.

At least thirty (30) days prior to proposing in writing to the TAC and the FCR a change in the Payment Percentage, the Trustee shall issue a written notice to claimants or claimants' counsel indicating that the Trustee is reconsidering such Payment Percentage.

If the Trustee, with the consent of the TAC and the FCR, makes a determination to increase the Payment Percentage, the Trustee shall make supplemental payments to all claimants who previously liquidated their claims against the Asbestos Trust and received payments based on a lower Payment Percentage. The amount of any such supplemental payment for Occupationally Exposed Claims shall be, the liquidated value of the claim in question, times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below). The amount of any such supplemental payment for Shade Tree Mechanic Claims shall be the Distribution Value, times the newly adjusted Payment Percentage, less all amounts previously paid to the claimant with respect to the claim (excluding the portion of such previously paid amounts that was attributable to any sequencing adjustment paid pursuant to Section 7.5 below).

The Trustee's obligation to make a supplemental payment to a claimant shall be suspended in the event the payment in question would be less than $250, and the amount of the suspended payment shall be added to the amount of any prior supplemental payment/payments that was/were also suspended because it/they would have been less than $250. However, the

-16-

Trustee's obligation shall resume and the Trustee shall pay any such aggregate supplemental payments due the claimant at such time that the total exceeds $250.

## ARTICLE 5

## RESOLUTION OF ASBESTOS CLAIMS

**5.1     Ordering, Processing and Payment of Asbestos Claims.**

**5.1(a)  Ordering of Claims.**

**5.1(a)(1)     Establishment of the FIFO Processing Queue**.   The Asbestos Trust shall order claims that are sufficiently complete to be reviewed for processing purposes on a FIFO basis except as otherwise provided herein (the "**FIFO Processing Queue**"). The claimant's position in the FIFO Processing Queue shall be determined by the date the claim is filed with the Asbestos Trust. If any claims are filed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the date of the diagnosis of the asbestos-related disease for which the claim was filed. If any claims are filed and diagnosed on the same date, the claimant's position in the FIFO Processing Queue shall be determined by the claimant's date of birth, with older claimants given priority over younger claimants.

**5.1(a)(2)     Effect of Statutes of Limitation and Repose**.   All unliquidated Asbestos Claims must meet either (i) for claims first filed in the tort system against a Debtor prior to the Petition Date, the applicable federal or state statute of limitation and repose that was in effect at the time of the filing of the claim in the tort system, or (ii) for claims not filed against a Debtor in the tort system prior to the Petition Date, the applicable federal or state statute of limitation that was in effect at the time of the filing with the Asbestos Trust. However, the running of the relevant statute of limitation shall be tolled as of the earliest of (A) the actual filing of the claim against a Debtor prior to the Petition Date, whether in the tort system or by

-17-

**A.1296**

submission of the claim to a Debtor pursuant to an administrative settlement agreement; (B) the tolling of the claim against a Debtor prior to the Petition Date by an agreement or otherwise, provided such tolling is still in effect on the Petition Date; or (C) the Petition Date.

If an Asbestos Claim meets any of the tolling provisions described in the preceding sentence and the claim was not barred by the applicable federal or state statute of limitation at the time of the tolling event, it shall be treated as timely filed if it is actually filed with the Asbestos Trust within three (3) years after the Initial Claims Filing Date, or within three (3) years after the date of the diagnosis of the disease for which the claim is filed, whichever occurs later. In addition, any Asbestos Claims that were first diagnosed after the Petition Date, irrespective of the application of any relevant federal or state statute of limitation or repose, may be filed with the Asbestos Trust within three (3) years after the date of diagnosis or within three (3) years after the Initial Claims Filing Date, whichever occurs later. However, the processing of any Asbestos Claim by the Asbestos Trust may be deferred at the election of the claimant pursuant to Section 6.3 below.

**5.1(b) Payment of Claims.**  Occupationally Exposed Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a)(1) below, by arbitration as provided in Section 5.9 below, or by litigation in the tort system provided in Section 5.10 below, shall be paid in FIFO order based on the date their liquidation became final (the **"FIFO Payment Queue"**), all such payments being subject to the applicable Payment Percentage, the Occupational Maximum Annual Payment, the Claims Payment Ratio and the sequencing adjustment provided for in Section 7.5 below.

All Shade Tree Mechanic Claims that have been liquidated by the Expedited Review Process as provided in Section 5.3(a)(1) below, the IR Process as provided in Section 5.3(b)

-18-

**A.1297**

below, by arbitration as provided in Section 5.9 below, or by litigation in the tort system provided in Section 5.10 below, shall be paid at the end of each year and shall be paid the Distribution Value, all such payments being subject to the Payment Percentage, the Shade Tree Maximum Annual Payment provisions above, and the sequencing adjustment provided for in Section 7.5 below.

Where the claimant is deceased or incompetent, and the settlement and payment of his or her claim must be approved by a court of competent jurisdiction or through a probate process prior to acceptance of the claim by the claimant's representative, an offer made by the Asbestos Trust on the claim shall remain open so long as proceedings before that court or in that probate process remain pending, provided that the Asbestos Trust has been furnished with evidence that the settlement offer has been submitted to such court or in the probate process for approval. If the offer is ultimately approved by the court or through the probate process and accepted by the claimant's representative, the Asbestos Trust shall pay the claim in the amount so offered, multiplied by the Payment Percentage in effect at the time the offer was first made.

If any Occupationally Exposed Claims are liquidated on the same date, the claimant's position in the FIFO Payment Queue shall be determined by the date of the diagnosis of the claimant's asbestos- related disease for which the claim was filed. If any Occupationally Exposed Claims are liquidated on the same date and the respective holders' asbestos-related diseases were diagnosed on the same date, the position of those claims in the FIFO Payment Queue shall be determined by the Asbestos Trust based on the dates of the claimants' birth, with older claimants given priority over younger claimants.

**5.2    Reserved.**

-19-

5.3     **Resolution of Unliquidated Asbestos Claims.**  As soon as possible after the establishment of the Asbestos Trust, the Trustee, with the consent of the TAC and the FCR, shall adopt procedures for reviewing and liquidating all unliquidated Asbestos Claims, which shall include deadlines for processing such claims. Such procedures shall also require that claimants seeking resolution of unliquidated Asbestos Claims must first file a proof of claim form, together with the required supporting documentation, in accordance with the provisions of Sections 6.1 and 6.2 below.  It is anticipated that the Asbestos Trust shall provide an initial response to the claimant within six (6) months of receiving the proof of claim form.

The proof of claim form shall require the claimant to assert his or her claim for the highest Disease Level for which the claim qualifies at the time of filing. Irrespective of the Disease Level alleged on the proof of claim form, all claims shall be deemed to be a claim for the highest Disease Level for which the claim qualifies at the time of filing, and all lower Disease Levels for which the claim may also qualify at the time of filing or in the future shall be treated as subsumed into the higher Disease Level for both processing and payment purposes.

The proof of claim form shall also require the claimant to specify whether the claim is asserted to be an Occupationally Exposed Claim or a Shade Tree Mechanic Claim as defined in Section 2.1 above.  The Trustee shall have the right (in addition to all other rights) to challenge any such assertion or designation.

Upon filing of a valid proof of claim form with the required supporting documentation, the claimant shall be placed in the FIFO Processing Queue in accordance with the ordering criteria described in Section 5.1(a) above.  When the claim reaches the top of the FIFO Processing Queue, the Asbestos Trust shall process and liquidate the claim based upon the medical/exposure evidence submitted by the claimant and under the process elected by the

-20-

**A.1299**

claimant, if such an elections is available under this TDP for the Disease Level alleged by the claimant.

### 5.3(a)  Expedited Review Process.

**5.3(a)(1)      In General.**  The Expedited Review Process is designed primarily to provide an expeditious, efficient and inexpensive method for liquidating all Asbestos Claims (except those involving Disease Level V Extraordinary Claims and all Foreign Claims, which shall only be liquidated pursuant to the IR Process) eligible for payment under this TDP. Expedited Review is also intended to provide qualifying claimants a fixed and certain claims payment.

Thus, except as set forth in Sections 2.4 and 5.1(b) above, claims that undergo Expedited Review and meet the presumptive Medical/ Exposure Criteria for the relevant Disease Level shall be paid the Scheduled Value for such Disease Level set forth in Section 5.3(a)(3) below. All claims liquidated by Expedited Review Process shall be subject to the Payment Percentage, the applicable Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio limitations set forth above.

Subject to the provisions of Section 5.7, the claimant's eligibility to receive the Scheduled Value for his or her Occupationally Exposed Claim under the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below.

Subject to the provisions of Section 5.7, the claimant's eligibility to receive the lesser of the pro rata share of the Shade Tree Maximum Annual Payment or Scheduled Value for his or her Shade Tree Mechanic Claim under the Expedited Review Process shall be determined solely by reference to the Medical/Exposure Criteria set forth below.

-21-

**A.1300**

**5.3(a)(2)** **Claims Processing Under Expedited Review Process**. All claimants seeking liquidation of their claims pursuant to Expedited Review Process shall file the Asbestos Trust's proof of claim form. As a proof of claim form is reached in the FIFO Processing Queue, the Asbestos Trust shall determine whether the claim described therein meets the Medical/Exposure Criteria for one of the Disease Levels, and shall advise the claimant of its determination. Except as provided herein for Shade Tree Mechanic Claims, if a Disease Level is determined, the Asbestos Trust shall tender to the claimant an offer of payment of the Scheduled Value for the relevant Disease Level that is subject to the applicable Payment Percentage, together with a form of release approved by the Asbestos Trust. If the claimant accepts the Scheduled Value and returns the release properly executed, the claim shall be placed in the FIFO Payment Queue, following which the Asbestos Trust shall disburse payment subject to the limitations of the Occupational Maximum Annual Payment, Maximum Available Payment, and the Claims Payment Ratio.

**5.3(a)(3)** **Disease Levels, Scheduled Values and Medical/ Exposure Criteria.** The five Disease Levels covered by this TDP, together with the Medical/Exposure Criteria and the Scheduled Values for these Disease Levels are set forth below. Except as provided herein, these Disease Levels, Scheduled Values, and Medical/Exposure Criteria shall apply to all Asbestos Claims filed with the Asbestos Trust on or before the Initial Claims Filing Date provided in Section 4.2. In addition, commencing on January 1, 2020, the Asbestos Trust shall increase these valuation amounts proportionately by one percent (1%) per annum. Any such increases shall be applicable to offers made following the dates of such increases.

A.1301

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| Mesothelioma 2 (Level V) | $12,100 | (1) Diagnosis[4] of mesothelioma; (2) Substantial Debtor Exposure[5]; and (3) claim qualifies as Shade Tree Mechanic Claim as defined in Section 2.1. Holders of a Disease Level V Claim may also seek to establish that such claim qualifies as an Extraordinary Claim under Section 5.4(a) below. No presumption of validity shall be available for any claims in this category. |
| Mesothelioma (Level IV) | $111,500 | (1) Diagnosis of mesothelioma; (2) Debtor Exposure as defined in Section 5.7(b)(3); and (3) claimant qualifies as an Occupationally Exposed Claim as defined in Section 2.1. |
| Lung Cancer (Level III) | $25,400 | (1) Diagnosis of a primary lung cancer plus evidence of an underlying Bilateral Asbestos-Related Nonmalignant Disease,[6] (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure[7] to asbestos, (4) claimant qualifies as an Occupationally Exposed Claim as defined in Section 2.1, and (5) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the lung cancer in question |
| Other Cancer (Level II) | $5,400 | (1) Diagnosis of a primary colo-rectal, laryngeal, esophageal, pharyngeal, or stomach cancer, plus evidence of an |

[4] The requirements for a diagnosis of an asbestos-related disease that may be compensated under the provisions of this TDP are set forth in Section 5.7 below.

[5] **"Substantial Debtor Exposure"** requires that the claimant (1) to demonstrate meaningful and credible exposure to the Debtor Product Lines; and (2) provide evidence that claimant's Debtor Product Lines exposure was substantial in duration.

[6] Evidence of "Bilateral Asbestos-Related Nonmalignant Disease," for purposes of meeting the criteria for establishing Disease Levels II and III means either (i) a chest X ray read by a qualified B reader of 1/0 or higher on the ILO scale or (ii)(x) a chest X ray read by a qualified B reader or other Qualified Physician, (y) a CT scan read by a Qualified Physician, or (z) pathology, in each case showing either bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification. Evidence submitted to demonstrate (i) or (ii) above must be in the form of a written report stating the results (*e.g.*, an ILO report, a written radiology report or a pathology report). Solely for asbestos claims filed against a Debtor or another defendant in the tort system prior to the Commencement Date, if an ILO reading is not available, either (i) a chest X ray or a CT scan read by a Qualified Physician, or (ii) pathology, in each case showing bilateral interstitial fibrosis, bilateral pleural plaques, bilateral pleural thickening, or bilateral pleural calcification consistent with or compatible with a diagnosis of asbestos-related disease, shall be evidence of a Bilateral Asbestos-Related Nonmalignant Disease for purposes of meeting the presumptive medical requirements of Disease Levels II or III. Pathological proof of asbestosis may be based on the pathological grading system for asbestosis described in the Special Issue of the Archives of Pathology and Laboratory Medicine, "Asbestos-associated Diseases," Vol. 106, No. 11, App. 3 (October 8, 1982). For all purposes of this TDP, a "Qualified Physician" is a physician who is board-certified (or in the case of Canadian Claims or Foreign Claims, a physician who is certified or qualified under comparable medical standards or criteria of the jurisdiction in question) in one or more relevant specialized fields of medicine such as pulmonology, radiology, internal medicine or occupational medicine; provided, however, subject to the provisions of Section 5.8, that the requirement for board certification in this provision shall not apply to otherwise qualified physicians whose X ray and/or CT scan readings are submitted for deceased holders of Asbestos Claims.

[7] The term "Significant Occupational Exposure" is defined in Section 5.7(b)(2) below.

| Disease Level | Scheduled Value | Medical/Exposure Criteria |
|---|---|---|
| | | underlying Bilateral Asbestos-Related Nonmalignant Disease, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, (4) claimant qualifies as an Occupationally Exposed Claim as defined in Section 2.1, and (5) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the other cancer in question. |
| Severe Asbestosis (Level I) | $25,400 | (1) Diagnosis of asbestosis with ILO of 2/1 or greater, or asbestosis determined by pathological evidence of asbestos, plus (a) TLC less than 65%,[8] or (b) FVC less than 65% and FEV1/FVC ratio greater than 65%, (2) six months Debtor Exposure prior to December 31, 1982, (3) Significant Occupational Exposure to asbestos, (4) claimant qualifies as an Occupationally Exposed Claim as defined in Section 2.1, and (5) supporting medical documentation establishing asbestos exposure as a contributing factor in causing the pulmonary disease in question. |

### 5.3(b)  Individual Review Process.

(1)   **In General**.   Whether a Disease Level V Claim qualifies as an Extraordinary Claim under Section 5.4(a) shall be established only under the Individual Review Process ("**IR Process**").

The liquidated value of all Foreign Claims[9] asserted or payable under this TDP shall be established only under the IR Process.  Asbestos Claims of individuals exposed in Canada who were resident in Canada when such claims were filed ("**Canadian Claims**") shall not be considered Foreign Claims hereunder and shall be eligible for liquidation under the Expedited Review Process. Accordingly, a "**Foreign Claim**" is an Asbestos Claim with respect to which the claimant's exposure to an asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which the Debtors have legal responsibility as

---

[8] Actual measured value as opposed to the percentage of predicted.

[9] The Debtors have represented that they have no history of paying Foreign Claims. Should the Asbestos Trust receive any Foreign Claims, prior to processing the Foreign Claims, the Trustee, in consultation with TAC and the FCR, shall develop the procedures and requirements for the submission, evaluation and payment of Foreign Claims.

-24-

**A.1303**

a result of the purchase of or exposure to asbestos-containing products outside the United States and its Territories and Possessions.

**5.4    Categorizing Claims as Extraordinary and/or Exigent or Extraordinary Claims.**

**5.4(a) "Extraordinary Claim"** means a Shade Tree Mechanic Claim that otherwise satisfies the Medical Criteria for Disease Level– V, and that is held by a claimant whose exposure to asbestos was at least 75% the result of exposure to asbestos-containing product, or to conduct that exposed the claimant to an asbestos-containing product, for which the Debtors have legal responsibility, and there is little likelihood of a substantial recovery elsewhere.  All such Extraordinary Claims shall be presented for IR Process and, if valid, shall be entitled, except as set forth below, to a liquidation value of up to $34,264 ("**Maximum Value**"), multiplied by the applicable Payment Percentage.

Any dispute as to Extraordinary Claim status shall be submitted to a special panel established by the Asbestos Trust with the consent of the TAC and FCR (the "**Extraordinary Claims Panel**").  All decisions of the Extraordinary Claims Panel shall be final and not subject to any further administrative or judicial review.  An Extraordinary Claim shall be paid at the end of each year and shall be paid the lesser of the pro rata share of the Shade Tree Maximum Annual Payment or the Maximum Value, subject to the Payment Percentage.

**5.4(a)(1)    Requirement to Identify Other Claims**. A claimant asserting an Extraordinary Claim must submit the information described in Section 5.4(a)(2) about all other claims asserted by the claimant that relate in any way to the alleged injuries for which the claimant seeks compensation. Other claims about which information must be submitted include claims by the claimant, the claimant's decedent, and any present or past

-25-

**A.1304**

Holder of the Claim. Such other claims include, but are not limited to, the following: (a) lawsuits filed in any court, arbitration proceedings before any panel or tribunal, and administrative proceedings (such as workers' compensation claims) before any governmental or quasi-governmental body; (b) claims that were resolved or settled without the institution of litigation (such as pre-filing settlements reached after notification of the existence of a claim without the need to file a lawsuit); and (c) claims that have been submitted in bankruptcy proceedings or to other asbestos trusts or settlement facilities that resulted from bankruptcy proceedings.

        **5.4(a)(2)**       **Information Required About Other Claims**. A claimant asserting an Extraordinary Claim shall submit the following information for each other claim: (a) the name of the entity against whom the other claim was made, (b) the date of the other claim, and (c) the amounts of all payments received or to be received from the entity to whom the other claim was submitted. The claimant must also submit copies of any documents submitted to or served upon any such entity containing information regarding the alleged injured party's contact with or exposure to asbestos or asbestos-containing products, including without limitation any claim forms submitted to other asbestos trusts or settlement facilities that resulted from bankruptcy proceedings (along with any attachments), ballots submitted by or on behalf of the claimant in any bankruptcy case, and any discovery response filed or served in tort litigation. The claimant shall also certify that, to the best of his knowledge, at that time, with the exception of the other claims that have been expressly disclosed and identified by the claimant, no other entity is known to the claimant to be potentially responsible for the alleged injuries that are the basis of the Extraordinary Claim.

**A.1305**

**5.4(a)(3)     Authorization for Release of Information.** A claimant asserting an Extraordinary Claim shall execute a release of information form in favor of the Asbestos Trust, in the form attached hereto as Appendix I, authorizing all other asbestos trusts or settlement facilities against whom any such other claim has been made or asserted based on the injured party's injury to release to the Asbestos Trust all information submitted to it by such claimant or entity who made such other claim and to disclose the status of any such claim and the amount and date of any payment on the claim. The release of information form shall authorize the Asbestos Trust to obtain all submissions made by the claimant or his or her heirs, executors, successors, or assigns in the future to any other asbestos trust or settlement facility. The Asbestos Trust may amend the form attached as Appendix I from time to time to add newly established asbestos trusts or settlement facilities. These authorizations will be used not only to verify information provided in connection with particular Extraordinary Claims but also in connection with the Asbestos Trust's periodic audits for fraud

**5.4(a)(4)     Claimant Certification.**

(i) If the claimant asserting an Extraordinary Claim is or has been represented by an attorney in any litigation or in the filing of other asbestos trust claims based on the injury that forms the basis for the Extraordinary Claim, the claimant's attorney shall provide a certification under penalty of perjury. The certification shall affirm that the attorney has fully investigated the alleged injuries that are the basis of the Extraordinary Claim, including conferring with any other attorneys who represent the claimant asserting an Extraordinary Claim with respect to claims against other asbestos trusts or any other entity, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any entity that is not identified in the proof of claim form submitted to the Asbestos Trust by the claimant asserting an Extraordinary Claim.

-27-

**A.1306**

(ii)  If the claimant asserting an Extraordinary Claim has not been represented by an attorney in any litigation or in the filing of other asbestos trust claims based on the injury that forms the basis for the Extraordinary Claim, the claimant shall provide a certification under penalty of perjury that he or she has fully investigated the alleged injuries that are the basis of the Extraordinary Claim, and that no good-faith basis exists, at the time the certification is executed, to bring a claim against any entity that is not identified in the proof of claim form submitted to the Asbestos Trust by the claimant.

      **5.4(b)  Exigent Claims**.  At any time the Asbestos Trust may liquidate and pay Occupationally Exposed Claims that qualify as Exigent Health Claims or Exigent Hardship Claims (together, "**Exigent Claims**") as defined below.  An Exigent Claim, following its liquidation, shall be placed first in the FIFO Payment Queue ahead of all other Asbestos Claims and shall be subject to the Payment Percentage, Occupational Maximum Annual Payment and Claims Payment Ratio described above.

      **5.4(b)(1)       Exigent Health Claims**.  An Occupationally Exposed Claim qualifies for payment as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for Mesothelioma (Disease Level IV) and the claimant is living when the claim is filed. A claim in Disease Levels I-III qualifies as an Exigent Health Claim if the claim meets the Medical/Exposure Criteria for the Disease Level, and the claimant provides a declaration or affidavit made under penalty of perjury by a physician who has examined the claimant within one hundred twenty (120) days of the date of declaration or affidavit in which the physician states (a) that there is substantial medical doubt that the claimant will survive beyond six (6) months from the date of the declaration or affidavit, and (b) that the claimant's terminal condition is caused by the relevant asbestos-related disease.

-28-

**A.1307**

5.4(b)(2)    **Exigent Hardship Claims**.  An Occupationally Exposed Claim qualifies for payment as an Exigent Hardship Claim if the claim meets the Medical/Exposure Criteria for Disease Levels I-IV and the Asbestos Trust, in its sole discretion, determines (i) that the claimant needs immediate financial assistance based on the claimant's expenses and all sources of available income, and (ii) that there is a causal connection between the claimant's dire financial condition and the claimant's asbestos-related disease.

5.5    **Secondary Exposure Claims.**  If a claimant alleges an asbestos-related disease resulting solely from exposure to an occupationally exposed person, such as a family member, the claimant must establish that the occupationally exposed person would have met the exposure requirements under this TDP that would have been applicable had that person filed a direct claim against the Asbestos Trust.  In addition, the claimant with secondary exposure must establish that he or she is suffering from Disease Levels I-IV described in Section 5.3(a)(3) above, that his or her own exposure to the occupationally exposed person occurred within the same time frame as the occupationally exposed person was exposed to asbestos, asbestos-containing products, or conduct for which the Debtors have legal responsibility, and that such secondary exposure was a cause of the claimed disease. All other liquidation and payment rights and limitations under this TDP shall be applicable to such claims.

5.6    **Indirect Asbestos Personal Injury Claims.**  Indirect Asbestos Personal Injury Claims asserted against the Asbestos Trust shall be treated as presumptively valid and paid by the Asbestos Trust subject to the applicable Payment Percentage if the holder of such claim (the **"Indirect Claimant"**) establishes to the satisfaction of the Trustee that (i) the Indirect Claimant has paid in full the liability and obligation of the Asbestos Trust to the individual claimant to whom the Asbestos Trust would otherwise have had a liability or obligation under this TDP (the

**A.1308**

**"Direct Claimant")** (and which has not been paid by the Asbestos Trust), (ii) the Direct Claimant and the Indirect Claimant have forever and fully released the Asbestos Trust from all liability to the Direct Claimant, and (iii) the claim is not otherwise barred by a statute of limitations or repose or by other applicable law. In no event shall any Indirect Claimant have any rights against the Asbestos Trust superior to the rights of the related Direct Claimant against the Asbestos Trust, including any rights with respect to the timing, amount or manner of payment. In addition, no Indirect Asbestos Personal Injury Claim may be liquidated and paid in an amount that exceeds what the Indirect Claimant has actually paid the related Direct Claimant.

To establish a presumptively valid Indirect Asbestos Personal Injury Claim, the Indirect Claimant's aggregate liability for the Direct Claimant's claim must also have been fixed, liquidated and paid fully by the Indirect Claimant by settlement (with an appropriate full release in favor of the Asbestos Trust) or a Final Order (as defined in the Plan) provided that such claim is valid under the applicable state law. In any case where the Indirect Claimant has satisfied the claim of a Direct Claimant against the Asbestos Trust under applicable law by way of a settlement, the Indirect Claimant shall obtain for the benefit of the Asbestos Trust a release in form and substance satisfactory to the Trustee.

If an Indirect Claimant cannot meet the presumptive requirements set forth above, including the requirement that the Indirect Claimant provide the Asbestos Trust with a full release of the Direct Claimant's claim, the Indirect Claimant may request that the Asbestos Trust review the Indirect Asbestos Personal Injury Claim individually to determine whether the Indirect Claimant can establish under applicable state law that the Indirect Claimant has paid all or a portion of a liability or obligation that the Asbestos Trust had to the Direct Claimant. If the Indirect Claimant can show that it has paid all or a portion of such a liability or obligation, the

**A.1309**

Asbestos Trust shall reimburse the Indirect Claimant the amount of the liability or obligation so paid, times the then applicable Payment Percentage. However, in no event shall such reimbursement to the Indirect Claimant be greater than the amount to which the Direct Claimant would have otherwise been entitled. Further, the liquidated value of any Indirect Asbestos Personal Injury Claim paid by the Asbestos Trust to an Indirect Claimant shall be treated as an offset to or reduction of the full liquidated value of any Asbestos Claim that might be subsequently asserted by the Direct Claimant against the Asbestos Trust.

Any dispute between the Asbestos Trust and an Indirect Claimant over whether the Indirect Claimant has a right to reimbursement for any amount paid to a Direct Claimant shall be subject to the ADR Procedures provided in Section 5.9 below. If such dispute is not resolved by said ADR Procedures, the Indirect Claimant may litigate the dispute in the tort system pursuant to Sections 5.10 and 7.6 below.

The Trustee may develop and approve a separate proof of claim form for Indirect Asbestos Personal Injury Claims. Indirect Asbestos Personal Injury Claims that have not been disallowed, discharged, or otherwise resolved by prior order of the Bankruptcy Court shall be processed in accordance with procedures to be developed and implemented by the Trustee consistent with the provisions of this Section 5.6, which procedures (a) shall determine the validity, acceptability and enforceability of such claims; and (b) shall otherwise provide the same liquidation and payment procedures and rights to the holders of such claims as the Asbestos Trust would have afforded the holders of the underlying valid Asbestos Claims.

**A.1310**

**5.7    Evidentiary Requirements.**

**5.7(a)  Medical Evidence.**

5.7(a)(1)      **In General.**   All diagnoses of a Disease Level shall be accompanied by either (i) a statement by the physician providing the diagnosis that at least ten (10) years have elapsed between the date of first exposure to asbestos or asbestos-containing products and the diagnosis, or (ii) a history of the claimant's exposure sufficient to establish a 10-year latency period.

5.7(a)(1)(A)    **Disease Level I**.   All diagnoses of Severe Asbestosis (Disease Level I) shall be based, in the case of a claimant who was living at the time the claim was filed, upon a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related disease. All living claimants must also provide (i) an ILO reading of 2/1 or greater or pathological evidence of asbestosis and (ii) pulmonary function testing (unless the claimant is able to meet the requirements in (l)(c) of the Medical/Exposure Criteria for Severe Asbestosis in Section 5.3(a)(3) above). [10]

5.7(a)(1)(B)    **Disease Levels II - V**.   All diagnoses of an asbestos-related malignancy (Disease Levels II - V) shall be based upon either (i) a physical examination of the claimant by the physician providing the diagnosis of the asbestos-related

---

[10] "Pulmonary function testing" or "PFT" shall mean testing that is in material compliance with the quality criteria established by the American Thoracic Society ("**ATS**") and is performed on equipment which is in material compliance with ATS standards for technical quality and calibration. PFT performed in a hospital accredited by The Joint Commission ("**JC**"), or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician shall be presumed to comply with ATS standards, and the claimant may submit a summary report of the testing. If the PFT was not performed in a JC-accredited hospital, or performed, reviewed or supervised by a board certified pulmonologist or other Qualified Physician, the claimant must submit the full report of the testing (as opposed to a summary report); provided, however, that if the PFT was conducted prior to the Effective Date of the Plan and the full PFT report is not available, the claimant must submit a declaration signed by a Qualified Physician or other qualified party, in the form provided by the Asbestos Trust, certifying that the PFT was conducted in material compliance with ATS standards.

**A.1311**

disease, or (ii) a diagnosis of such a malignant Disease Level by a board-certified pathologist or by a pathology report prepared at or on behalf of a hospital accredited by The Joint Commission.

5.7(a)(2)    **Credibility of Medical Evidence.**  Before making any payment to a claimant, the Asbestos Trust must have reasonable confidence that the medical evidence provided in support of the claim is credible and consistent with recognized medical standards. The Asbestos Trust may require the submission of X-rays, CT scans, detailed results of pulmonary function tests, laboratory tests, tissue samples, results of medical examination or reviews of other medical evidence, and may require that medical evidence submitted comply with recognized medical standards regarding equipment, testing methods and procedures to assure that such evidence is reliable. Medical evidence (i) that is of a kind shown to have been received in evidence by a state or federal judge at trial, (ii) that is consistent with evidence submitted to a Debtor to settle for payment similar disease cases prior to the Debtors' bankruptcy, or (iii) that is a diagnosis by a physician shown to have previously qualified as a medical expert with respect to the asbestos-related disease in question before a state or federal judge, using the same methodology or standard, is presumptively reliable, although the Asbestos Trust may seek to rebut the presumption. Notwithstanding the foregoing or any other provision of this TDP, any medical evidence submitted by a physician or entity that the Asbestos Trust has determined, after consulting with the TAC and the FCR, to be unreliable shall not be acceptable as medical evidence in support of any Asbestos Claim.

In addition, claimants who otherwise meet the requirements of this TDP for payment of an Asbestos Claim shall be paid irrespective of the results in any litigation at any time between the claimant and any other defendant in the tort system. However, any relevant evidence submitted in a proceeding in the tort system, other than any findings of fact, a verdict, or a

**A.1312**

judgment, involving another defendant may be introduced by either the claimant or the Asbestos

Trust in any Arbitration proceeding conducted pursuant to 5.9.

5.7(a)(3)    **Reliance by Asbestos Trust on Finding of another**

**Asbestos Trust.**  The Trustee may review the governing documents of another asbestos trust or

claims facility and, with the consent of the TAC and the FCR, and for the sole purpose of

accepting the medical diagnosis of a claimant determine to accept the disease level

classifications as found by such other asbestos trust or claims facility in lieu of the medical

evidence claimants are required to submit under this TDP.

5.7(b)  **Exposure Evidence.**

5.7(b)(1)    **In General.**  As set forth above in Section 5.3(a)(3), to

qualify for any Disease Level, the claimant must demonstrate a minimum exposure to asbestos,

asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility.

Claims based on conspiracy theories that involve no exposure to asbestos, asbestos-containing

products, or conduct for which the Asbestos Trust has legal responsibility are not compensable

under this TDP. To meet the presumptive exposure requirements of Expedited Review set forth

in Section 5.3(a)(3) above, the claimant must show (i) for all Disease Levels, Debtor Exposure as

defined in Section 5.7(b)(3) below; and (ii) for Severe Asbestosis (Disease Level I), Other

Cancer (Disease Level II), or Lung Cancer (Disease Level III), the claimant must show six (6)

months Debtor Exposure plus Significant Occupational Exposure to asbestos.

5.7(b)(2)    **Significant Occupational Exposure**.    "**Significant**

**Occupational Exposure**" means employment for a cumulative period of at least five (5) years in

an industry and an occupation in which the claimant (a) handled raw asbestos fibers on a regular

basis; (b) fabricated asbestos-containing products so that the claimant in the fabrication process

-34-

**A.1313**

was exposed on a regular basis to raw asbestos fibers; (c) altered, repaired or otherwise worked with an asbestos-containing product such that the claimant was exposed on a regular basis to asbestos fibers; or (d) was employed in an industry and occupation such that the claimant worked on a regular basis in close proximity to workers engaged in the activities described in (a), (b) and/or (c).

     **5.7(b)(3)**  **Debtor Exposure.**  The claimant must demonstrate meaningful and credible exposure to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility as described in this Section 5.7(b)(3) **("Debtor Exposure").** That meaningful and credible exposure evidence may be established by an affidavit or sworn statement of the claimant, by an affidavit or sworn statement of a co-worker or the affidavit or sworn statement of a family member in the case of a deceased claimant (providing the Asbestos Trust finds such evidence reasonably reliable), by invoices, employment, construction or similar records, or by other credible evidence. The specific exposure information required by the Asbestos Trust to process a claim shall be set forth on the proof of claim form to be used by the Asbestos Trust. The Asbestos Trust can also require submission of other or additional evidence of exposure when it deems such to be necessary.

    Evidence submitted to establish proof of Debtor Exposure is for the sole benefit of the Asbestos Trust, not third parties or defendants in the tort system. Except with respect to Disease Level 5, the Asbestos Trust has no need for, and therefore claimants are not required to furnish the Asbestos Trust with, evidence of exposure to specific asbestos products other than those for which the Asbestos Trust has responsibility, except to the extent such evidence is required elsewhere in this TDP. Similarly, failure to identify Debtor Product Lines in the claimant's underlying tort action, or to other bankruptcy trusts, does not preclude the claimant from

**A.1314**

recovering from the Asbestos Trust, provided the claimant otherwise satisfies the medical and exposure requirements of this TDP.

      **5.7(b)(3)(A)    Presumptive Occupations.**  Because of the nature of the Debtors' businesses, the Asbestos Trust shall consider that there is a limited universe of occupations in which claimants are likely to have been directly exposed to asbestos, asbestos- containing products, or conduct for which the Asbestos Trust has legal responsibility. Those occupations are automotive mechanics (the **"Presumptive Occupations").** The Asbestos Trust may add occupations to the Presumptive Occupations if the Trustee determines, with the consent of the TAC and FCR, that based on an analysis of claims submitted to the Asbestos Trust establishing Debtor Exposure, claimants with such occupations are likely to have been directly exposed to asbestos, asbestos-containing products, or conduct for which the Asbestos Trust has legal responsibility.  The Asbestos Trust may also remove occupations from the Presumptive Occupations if it determines that such occupations should not have been included.

      **5.7(b)(3)(B)    Standard of Exposure.**  In order for a claim to be approved by the Asbestos Trust, the injured party must have worked in a Presumptive Occupation and must demonstrate to the Asbestos Trust's satisfaction that he or she worked directly with the Debtor Product Lines.   When evaluating whether an injured party has demonstrated that he or she worked directly with the Debtors' Product Lines, the Asbestos Trust shall base its determination upon whether the circumstances of the injured party's exposure to the product are the same as those of claimants with respect to which the Debtors historically paid claims.

      **5.8    Claims Audit Program.**  The Asbestos Trust, with the consent of the TAC and the FCR, shall develop methods for auditing (i) the reliability of medical evidence, including

**A.1315**

additional reading of X-rays, CT scans and verification of pulmonary function tests, and (ii) the reliability of evidence of exposure to asbestos, including exposure to asbestos-containing products for which the Asbestos Trust has legal responsibility and occupational evidence (a claims audit program). The Asbestos Trust may hire independent third-parties to implement the audit programs. In the event that the Asbestos Trust reasonably determines that any individual or entity has engaged in a pattern or practice of providing unreliable evidence to the Asbestos Trust, it may decline to accept additional evidence from such provider in the future.

The Asbestos Trust shall utilize the services of a third-party claims processing facility (the **"Claims Processor"**) to assist in the evaluation of claims submitted to the Asbestos Trust.  The Asbestos Trust shall participate in a cross-trust audit program.   Such cross-trust audit program shall include a comparison of claims filed with the Asbestos Trust against claims filed with all other asbestos trusts administered by the Claims Processor that participate in the cross trust audit program but in any case shall include no fewer than four other trusts.  The filing of any claim with the Asbestos Trust, regardless of the treatment sought, shall constitute consent for each other asbestos trust participating in the cross-trust audit program to release to the entity overseeing the cross-trust audit program all information submitted to such other asbestos trust by or on behalf of the claimant pursuant to the provisions of the cross-trust audit program and to disclose the status of any such claim and the amount and date of any payment on the claim.

To the extent that the Asbestos Trust or the entity overseeing the claims audit program or cross-trust audit program believe that it is relevant, nothing herein shall preclude the Asbestos Trust or the entity overseeing the claims audit program or cross-trust audit program, in the Asbestos Trust's sole discretion, from reviewing or taking into consideration other claims filed in state court complaints or against trusts in addition to those trusts involved in the cross-trust audit

**A.1316**

program.  Any claimant subject to the claims audit program or cross-trust audit program shall cooperate and, if requested, provide the Asbestos Trust or the entity overseeing the claims audit program or cross-trust audit program with authorization to obtain from other asbestos trusts any information such claimant has submitted to such other asbestos trusts.

Further, in the event that an audit reveals that fraudulent information has been provided to the Asbestos Trust, the Asbestos Trust may penalize any claimant or claimant's attorney by rejecting the Asbestos Claim or by other means including, but not limited to, requiring the source of the fraudulent information to pay the costs associated with the audit and any future audit or audits, reordering the priority of payment of all affected claimants' Asbestos Claims, raising the level of scrutiny of additional information submitted from the same source or sources, increasing the filing fee for future claims submitted by such claimant or claimant's attorney, refusing to accept additional evidence from the same source or sources, seeking the prosecution of the claimant or claimant's attorney for presenting a fraudulent claim in violation of 18 U.S.C. § 152, and seeking sanctions from the Bankruptcy Court.

### 5.9    Arbitration.

**5.9(a) Establishment of ADR Procedures.**   The Asbestos Trust, with the consent of the TAC and the FCR, shall institute binding and non-binding arbitration procedures ("**ADR Procedures**") for resolving disputes concerning whether the claimant's medical condition or exposure history meets the requirements of this TDP for purposes of categorizing a claim involving Disease Levels I-V.

In all arbitrations, the arbitrator shall consider the same medical and exposure evidentiary requirements that are set forth in Section 5.7 above. With respect to all claims eligible for arbitration, the claimant, but not the Asbestos Trust, may elect either non-binding or binding

-38-

**A.1317**

arbitration. The ADR Procedures may be modified by the Asbestos Trust with the consent of the TAC and the FCR.

**5.9(b) Limitations on and Payment of Arbitration Awards.** The arbitrator shall not return an award in excess of the Scheduled Value for the appropriate Disease Level as set forth in Section 5.3(a)(3) above, and for an Extraordinary Claim Disease Level V, the arbitrator shall not return an award greater than the Maximum Value as set forth in Section 5.4 above. A claimant who submits to arbitration and who accepts the arbitral award shall receive payments in the same manner as one who accepts the Asbestos Trust's original valuation of the claim.

**5.10    Litigation.** Claimants who elect non-binding arbitration and then reject their arbitral awards retain the right to institute a lawsuit in the tort system against the Asbestos Trust pursuant to Section 7.6 below. However, a claimant shall be eligible for payment of a judgment for monetary damages obtained in the tort system from the Asbestos Trust's available cash only as provided in Section 7.7 below.

**5.11    Second Disease Claims.** The holder of a Severe Asbestosis (Disease Level I) claim may assert a new Asbestos Claim against the Asbestos Trust for a Mesothelioma (Disease Level IV) claim that is subsequently diagnosed. Any additional payments to which such claimant may be entitled with respect to the Mesothelioma (Disease Level IV) claim shall be reduced by the amount paid to the claimant for the Severe Asbestosis (Disease Level I) claim.

## ARTICLE 6

## CLAIMS MATERIALS

**6.1    Claims Materials.** The Asbestos Trust shall prepare suitable and efficient claims materials (**"Claims Materials"**) for all Asbestos Claims, and shall provide such Claims

A.1318

Materials upon a written request for such materials to the Asbestos Trust. The proof of claim form to be submitted to the Asbestos Trust shall require the claimant to assert the highest Disease Level for which the claim qualifies at the time of filing. The proof of claim form shall also include a certification by the claimant or his or her attorney sufficient to meet the requirements of Rule 11(b) of the Federal Rules of Civil Procedure. In developing its claim filing procedures, the Asbestos Trust shall make every reasonable effort to provide claimants with the opportunity to utilize currently available technology at their discretion, including filing claims and supporting documentation over the Internet. The proof of claim form to be used by the Asbestos Trust shall be developed by the Asbestos Trust and submitted to the TAC and the FCR for approval; it may be changed by the Asbestos Trust with the consent of the TAC and the FCR.

6.2    **Content of Claims Materials.**  The Claims Materials shall include a copy of this TDP, such instructions as the Trustee shall approve, and a detailed proof of claim form. This TDP has been prepared with the goal of simplifying the filing of claims, reducing paperwork by claimants, and reducing the cost of reviewing claims in an effort to maximize distribution to claimants, as well as ensuring the accuracy of such submissions. Accordingly, instead of collecting some or all of the claims information from a claimant or the claimant's attorney, the Asbestos Trust may, with the consent of the claimant or the claimant's attorney, obtain such information from electronic databases maintained by any other asbestos claims resolution organization. If requested by the claimant, the Asbestos Trust shall accept information provided electronically. The claimant may, but shall not be required to, provide the Asbestos Trust with evidence of recovery from other defendants and claims resolution organizations.

6.3    **Withdrawal or Deferral of Claims.**   A claimant can withdraw an Asbestos Claim at any time upon written notice to the Asbestos Trust and file another claim subsequently

without affecting the status of the claim for statute of limitations purposes, but any such claim filed after withdrawal shall be given a place in the FIFO Processing Queue based on the date of such subsequent filing. A claimant can also request that the processing of his or her Asbestos Claim by the Asbestos Trust be deferred for a period not to exceed two (2) years without affecting the status of the claim for statute of limitations purposes, in which case the claimant shall also retain his or her original place in the FIFO Processing Queue. During the period of such deferral, a sequencing adjustment on such claimant's Asbestos Claim as provided in Section 7.5 hereunder shall not accrue and payment thereof shall be deemed waived by the claimant. Except for Asbestos Claims held by representatives of deceased or incompetent claimants for which court or probate approval of the Asbestos Trust's offer is required, or an Asbestos Claim for which deferral status has been granted, a claim shall be deemed to have been withdrawn if the claimant neither accepts, rejects, nor initiates arbitration within one (1) year of the Asbestos Trust's written offer of payment or rejection of the claim. Upon written request and good cause, the Asbestos Trust may extend the withdrawal or deferral period for an additional six (6) months,

6.4     **Filing Requirements and Fees.**  Each claimant must submit a filing fee of $100 to have an Asbestos Claim processed by the Asbestos Trust. The fee shall be refunded in full to claimants who receive and accept payment of a settlement offer from the Asbestos Trust.  The filing fee may be changed by the Trustee with the consent of the TAC and the FCR.  The Asbestos Trust may impose a higher filing fee as set forth in Section 5.8 above.

6.5     **Confidentiality of Claimants' Submissions.**  All submissions to the Asbestos Trust by a holder of an Asbestos Claim, including a proof of claim form and materials related thereto, shall be treated as made in the course of settlement discussions between the holder and the Asbestos Trust, and intended by the parties to be confidential and to be protected by all

**A.1320**

applicable state and federal privileges and protections, including but not limited to those directly applicable to settlement discussions. The Asbestos Trust will preserve the confidentiality of such claimant submissions, and shall disclose the contents thereof only, with the permission of the holder, to another trust established for the benefit of asbestos personal injury claimants pursuant to section 524(g) of the Bankruptcy Code or other applicable law, to such other persons as authorized by the holder, or in response to a valid subpoena of such materials issued by the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware. Furthermore, the Asbestos Trust shall provide counsel for the holder a copy of any such subpoena immediately upon being served; provided, however, that if a subpoena seeks records or information pertaining to more than fifty (50) claimants, the Asbestos Trust may instead first provide a copy of the subpoena to counsel for the TAC and the FCR and delay providing a copy of the subpoena to counsel for individual holders of Asbestos Claims until, in the Trustee's judgment, it appears likely that information or records relating to the holders may have to be produced in response to the subpoena. In such a case, the Asbestos Trust shall ensure that the notice that is provided to counsel for the holders allows such counsel sufficient time to object to the production. The Asbestos Trust shall on its own initiative or upon request of the claimant in question take all necessary and appropriate steps to preserve said privileges before the Bankruptcy Court, a Delaware State Court, or the United States District Court for the District of Delaware and before those courts having appellate jurisdiction related thereto. Notwithstanding anything in the foregoing to the contrary, with the consent of the TAC and the FCR, the Asbestos Trust may, in specific limited circumstances, disclose information, documents or other materials reasonably necessary in the Asbestos Trust's judgment to preserve, litigate, resolve, or settle coverage, or to comply with an applicable obligation under an insurance policy

or settlement agreement; provided, however, that the Asbestos Trust shall take any and all steps reasonably feasible in its judgment to preserve the further confidentiality of such information, documents and materials, and prior to the disclosure of such information, documents or materials to a third party, the Asbestos Trust shall receive from such third party a written agreement of confidentiality that (a) ensures that the information, documents and materials provided by the Asbestos Trust shall be used solely by the receiving party for the purpose stated in the agreement and (b) prohibits any other use or further dissemination of the information, documents and materials by the third party except as set forth in the written agreement of confidentiality. Nothing in this TDP, the Plan or the Trust Agreement expands, limits or impairs the obligation under applicable law of a claimant to respond fully to lawful discovery in any underlying civil action regarding his or her submission of factual information to the Asbestos Trust for the purpose of obtaining compensation for asbestos-related injuries from the Asbestos Trust.

## ARTICLE 7

## GENERAL GUIDELINES FOR LIQUIDATING AND PAYING CLAIMS

**7.1   Showing Required.**  To establish a valid Asbestos Claim, a claimant must meet the requirements set forth in this TDP.

**7.2   Costs Considered.**  Notwithstanding any provisions of this TDP to the contrary, the Trustee shall always give appropriate consideration to the cost of investigating and uncovering invalid Asbestos Claims so that the payment of valid Asbestos Claims is not further impaired by such processes with respect to issues related to the validity of the medical evidence supporting an Asbestos Claim. The Trustee shall also have the latitude to make judgments regarding the amount of transaction costs to be expended by the Asbestos Trust so that valid Asbestos Claims are not unduly further impaired by the costs of additional investigation. Nothing

-43-

**A.1322**

herein shall prevent the Trustee, in appropriate circumstances, from contesting the validity of any claim against the Asbestos Trust whatever the costs, or declining to accept medical evidence from sources that the Trustee has determined to be unreliable pursuant to the Claims Audit Program described in Section 5.8 above or otherwise.

**7.3     Discretion to Vary the Order and Amounts of Payments in Event of Limited Liquidity.**   Consistent with the provisions hereof and subject to the FIFO Processing and Payment Queues and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio requirements set forth above, the Trustee shall proceed as quickly as possible to liquidate valid Asbestos Claims, and shall make payments to holders of such claims in accordance with this TDP promptly as funds become available and as claims are liquidated, while maintaining sufficient resources to pay future valid claims in substantially the same manner.

Because the Asbestos Trust's income over time remains uncertain, and decisions about payments must be based on estimates that cannot be done precisely, they may have to be revised in light of experiences over time, and there can be no guarantee of any specific level of payment to claimants. However, the Trustee shall use his or her best efforts to treat similar claims in substantially the same manner, consistent with his or her duties as Trustee, the purposes of the Asbestos Trust, and the practical limitations imposed by the inability to predict the future with precision.

In the event that the Asbestos Trust faces temporary periods of limited liquidity, the Trustee may, with the consent of the TAC and the FCR, (a) suspend the normal order of payment, (b) temporarily limit or suspend payments altogether, (c) offer a Reduced Payment

**A.1323**

Option as described in Section 2.5 above and/or (d) commence making payments on an installment basis.

**7.4     Punitive Damages.**   Except as provided below for claims asserted under the Alabama Wrongful Death Statute, in determining the value of any liquidated or unliquidated Asbestos Claim, punitive or exemplary damages, i.e., damages other than compensatory damages, shall not be considered or paid, notwithstanding their availability in the tort system. Similarly, no punitive or exemplary damages shall be payable with respect to any claim litigated against the Asbestos Trust in the tort system pursuant to Sections 5.10 above and 7.6 below. The only damages that may be awarded pursuant to this TDP to Alabama claimants who are deceased and whose personal representatives pursue their claims only under the Alabama Wrongful Death Statute shall be compensatory damages determined pursuant to the statutory and common law of the Commonwealth of Pennsylvania, without regard to the choice of law principles.

**7.5     Sequencing Adjustment.**

**7.5(a)  In General**.   Subject to the limitations set forth below, a sequencing adjustment shall be paid on all Asbestos Claims with respect to which the claimant has had to wait a year or more for payment, provided, however, that no claimant shall receive a sequencing adjustment for a period in excess of seven (7) years, or for a period when the claim was deferred or withdrawn at the claimant's request. The sequencing adjustment factor shall be the one-year U.S. Treasury bill interest rate in effect on January 1 of the year in which the accrual of the sequencing adjustment commences. The rate of the sequencing adjustment shall be adjusted each January 1 to correspond to the one-year Treasury bill interest rate then in effect. The applicable sequencing adjustment shall be calculated based only on the value of the claim specified in

**A.1324**

Section 7.5(b) or (c) below, subject to the Payment Percentage; any accrued but unpaid sequencing adjustment shall not be included in such calculation.

        **7.5(b) Unliquidated Asbestos Claims**.  A sequencing adjustment shall be payable on the Scheduled Value of any unliquidated Asbestos Claim, whether the claim is liquidated under Expedited Review, IR Process, or by arbitration. No sequencing adjustment shall be paid on any claim liquidated in the tort system pursuant to Section 5.10 above and Section 7.6 below. Sequencing adjustments on all such unliquidated claims shall be measured from the date of payment back to the earliest of the date that is one year after the date on which (a) the claim was filed against a Debtor prior to the Petition Date; (b) the claim was filed against another defendant in the tort system on or after the Petition Date but before the Effective Date; (c) the claim was filed with the Bankruptcy Court during the pendency of the Chapter 11 proceeding; or (d) the claim was filed with the Asbestos Trust after the Effective Date.

       **7.6**    **Suits in the Tort System.**  If the holder of a disputed claim disagrees with the Asbestos Trust's determination regarding the Disease Level of the claim or the claimant's exposure history, and if the holder has first submitted the claim to non-binding arbitration as provided in Section 5.9 above, the holder may file a lawsuit against the Asbestos Trust in the Claimant's Jurisdiction as defined in Section 9.3 below. Any such lawsuit must be filed by the claimant in his or her own right and name and not as a member or representative of a class, and no such lawsuit may be consolidated with any other lawsuit. All defenses (including, with respect to the Asbestos Trust, all defenses which could have been asserted by a Debtor) shall be available to both sides at trial; however, the Asbestos Trust may waive any defense and/or concede any issue of fact or law. If the claimant was alive at the time the initial pre-petition complaint was filed or on the date the proof of claim form was filed with the Asbestos Trust, the

**A.1325**

case shall be treated as a personal injury case with all personal injury damages to be considered even if the claimant has died during the pendency of the claim.

7.7 **Payment of Judgments for Money Damages.** If and when a claimant obtains a judgment in the tort system, the claim shall be placed in the FIFO Payment Queue based on the date on which the judgment became final. Thereafter, the claimant shall receive from the Asbestos Trust an initial payment (subject to the applicable Payment Percentage and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio provisions set forth above) of an amount equal to the greater of (i) the Asbestos Trust's last offer to the claimant or (ii) the award that the claimant declined in non-binding arbitration; provided, however, that in no event shall such payment amount exceed the amount of the judgment obtained in the tort system. The claimant shall receive the balance of the judgment, if any, in five (5) equal installments in years six (6) through ten (10) following the year of the initial payment (also subject to the applicable Payment Percentage and the Maximum Annual Payment, Maximum Available Payment and Claims Payment Ratio provisions above in effect on the date of the payment of the subject installment).

The total amounts paid with respect to such claims shall not exceed the relevant Scheduled Value for the appropriate Disease Level as set forth in Section 5.3(b)(2) above, and for an Extraordinary Claim involving one of those Disease Levels, the arbitrator shall not return an award greater than the Maximum Value for such a claim as set forth in Section 5.3(b)(2) above. Under no circumstances shall (a) a sequencing adjustment be paid pursuant to Section 7.5 or (b) interest be paid under any statute on any judgments obtained in the tort system.

7.8 **Releases.** As a condition to receiving any payment from the Asbestos Trust, a claimant shall be required to execute the Asbestos Personal Injury Claimant Release attached

-47-

**A.1326**

hereto as Exhibit 1. In the case of an Indirect Personal Injury Claim, the Indirect Claimant.  The

Trustee may modify the provisions of the Asbestos Personal Injury Claimant Release with the

consent of the TAC and FCR, provided, however, that notwithstanding anything to the contrary

in this TDP, the Trustee may not modify any provision that would materially impact the rights

and protections afforded to the Reorganized Debtors, the Non-Debtor Affiliates, the Settling

Insurers and Representatives of the foregoing under the Asbestos Personal Injury Claimant

Release without the written consent of Meritor and the Reorganized Debtors, including, without

limitation, (i) the scope and the terms of the release of the Reorganized Debtors, the Non-Debtor

Affiliates, the Settling Insurers, and the Representatives of each of the foregoing (each as defined

in the Plan), (ii) the requirement that the Asbestos Trust obtain a properly-executed Asbestos

Personal Injury Claimant Release from any claimant as a pre-condition to making a distribution

to any such claimant.

    **7.9    Third-Party Services.**  Nothing in this TDP shall preclude the Asbestos Trust

from contracting with another asbestos claims resolution organization to provide services to the

Asbestos Trust so long as decisions about the categorization and liquidated value of Asbestos

Claims are based on the relevant provisions of this TDP, including the Disease Levels,

Scheduled Values, and Medical/Exposure Criteria set forth above.

**ARTICLE 8**

**MEDICARE**

    **8.1    Medicare.**

        (a)    It is the position of the parties to the Trust Agreement that the Protected

Parties will have no reporting obligations in respect of their contributions to the Asbestos Trust,

or in respect of any payments, settlements, resolutions, awards, or other claim liquidations by the

-48-

**A.1327**

Asbestos Trust, under the reporting provisions of 42 U.S.C. §1395y et seq. or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or relating thereto ("**MSPA**"), including Section 111 of the Medicare, Medicaid, and SCHIP Extension Act of 2007 (P. L. 110-173), or any other similar statute or regulation, and any related rules, regulations, or guidance issued in connection therewith or relating thereto ("**MMSEA**").  Unless and until there is definitive regulatory, legislative, or judicial authority (as embodied in a final non-appealable decision from the United States Court of Appeals for the Third Circuit or the United States Supreme Court), or a letter from the Secretary of Health and Human Services confirming that the Protected Parties have no reporting obligations under MMSEA with respect to any settlements, payments, or other awards made by the Asbestos Trust or with respect to contributions the Protected Parties have made or will make to the Asbestos Trust, the Asbestos Trust shall, at its sole expense, in connection with the implementation of the Plan, act as a reporting agent for the Protected Parties, and shall timely submit all reports that would be required to be made by any of the Protected Parties under MMSEA on account of any claims settled, resolved, paid, or otherwise liquidated by the Asbestos Trust or with respect to contributions to the Asbestos Trust.  The Asbestos Trust, in its role as reporting agent for the Protected Parties, shall follow all applicable guidance published by the Centers for Medicare & Medicaid Services of the United States Department of Health and Human Services and/or any other agent or successor entity charged with responsibility for monitoring, assessing, or receiving reports made under MMSEA (collectively, "**CMS**") to determine whether or not, and, if so, how, to report to CMS pursuant to MMSEA.

(b)     As long as the Asbestos Trust is required to act as a reporting agent for any Protected Party pursuant to the provisions of Section 8.1(a) above, the Asbestos Trust shall

**A.1328**

within ten (10) business days following the end of each calendar quarter, provide a written certification to the party designated in writing by each Protected Party for which the Asbestos Trust is required to act as reporting agent, confirming that all reports to CMS required by Section 8.1(a) above have been submitted in a timely fashion, and identifying (i) any reports that were rejected or otherwise identified as noncompliant by CMS, along with the basis for such rejection or noncompliance, and (ii) any payments to Medicare benefits recipients or Medicare-eligible beneficiaries that the Asbestos Trust did not report to CMS.

(c)    With respect to any reports rejected or otherwise identified as noncompliant by CMS, the Asbestos Trust shall, upon request by a Protected Party for which the Asbestos Trust is required to act as reporting agent, promptly provide copies of the original reports submitted to CMS, as well as any response received from CMS with respect to such reports; provided, however, that the Asbestos Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators and/or other personal representatives, as applicable.   With respect to any such reports, the Asbestos Trust shall reasonably undertake to remedy any issues of noncompliance identified by CMS and resubmit such reports to CMS, and, upon request by a Protected Party, provide such Protected Party with copies of such resubmissions; provided, however, that the Asbestos Trust may redact from such copies the names, Social Security numbers other than the last four digits, health insurance claim numbers, taxpayer identification numbers, employer identification numbers, mailing addresses, telephone numbers, and dates of birth of the injured parties, claimants, guardians, conservators

**A.1329**

and/or other personal representatives, as applicable.  In the event the Asbestos Trust is unable to remedy any issues of noncompliance, the provisions of Section 8.1(g) below shall apply.

(d)      As long as the Asbestos Trust is required to act as a reporting agent for a Protected Party pursuant to Section 8.1(a) above, with respect to each claim of a Medicare benefits recipient or Medicare-eligible beneficiary that was paid by the Asbestos Trust and not reported to CMS, the Asbestos Trust shall, upon request by such Protected Party, promptly provide the claimant's name, last four digits of the claimant's Social Security number, the year of the claimant's birth, the claimants' asbestos-related disease, and any other information that may be necessary in the reasonable judgment of such Protected Party to satisfy its obligations, if any, under MMSEA, as well as the basis for the Asbestos Trust's failure to report the payment. In the event the Protected Party informs the Asbestos Trust that it disagrees with the Asbestos Trust's decision not to report a claim paid by the Asbestos Trust, the Asbestos Trust shall promptly report the payment to CMS.  All documentation relied upon by the Asbestos Trust in making a determination that a payment did not have to be reported to CMS shall be maintained for a minimum of six years following such determination.  The Protected Parties shall keep any information and documents received from the Asbestos Trust pursuant to this Section 8.1(d) confidential and shall not use such information for any purpose other than meeting obligations under MSPA and/or MMSEA.

(e)      As long as the Asbestos Trust is required to act as a reporting agent for any Protected Party pursuant to Section 8.1(a) above, the Asbestos Trust shall make the reports and provide the certifications required by Section 8.1(a) and (b) above until such time as the Protected Party shall determine, in its reasonable judgment, that it has no further legal obligation under MMSEA or otherwise to report any settlements, resolutions, payments, or liquidation

-51-

**A.1330**

determinations made by the Asbestos Trust or contributions to the Asbestos Trust. Furthermore, following any permitted cessation of reporting, or if reporting has not previously commenced due to the satisfaction of one or more of the conditions set forth in Section 8.1(a) above, and if the Protected Party reasonably determines, based on subsequent legislative, administrative, regulatory, or judicial developments, that reporting is required, then the Asbestos Trust shall promptly perform its obligations under Section 8.1(a) and (b) above.

(f)    Section 8.1(a) above is intended to be purely prophylactic in nature, and does not imply, and shall not constitute an admission, that any Protected Party, is, in fact, an "applicable plan" within the meaning of MMSEA, or that any Protected Party has a legal obligation to report any actions undertaken by the Asbestos Trust or contributions to the Asbestos Trust under MMSEA or any other statute or regulation.

(g)    In the event that CMS concludes that reporting done by the Asbestos Trust in accordance with Section 8.1(a) above is or may be deficient in any way, and has not been corrected to the satisfaction of CMS in a timely manner, or if CMS communicates to the Asbestos Trust or any of the  Protected Parties a concern with respect to the sufficiency or timeliness of such reporting, or there appears to a Protected Party a reasonable basis for a concern with respect to the sufficiency or timeliness of such reporting or non-reporting based upon the information received pursuant to Section 8.1(b), (c) or (d) above, or other credible information, then each Protected Party shall have the right to submit its own reports to CMS under MMSEA, and the Asbestos Trust shall provide in a timely manner to any Protected Party that elects to file its own reports such information as the electing Protected Party may require in order to comply with MMSEA, including, without limitation, the full reports filed by the Asbestos Trust pursuant to Section 8.1(a) above without any redactions.  Such Protected Party

**A.1331**

shall keep any information it receives from the Asbestos Trust pursuant to this Section 8.1(g) confidential and shall not use such information for any purpose other than meeting obligations under MSPA and/or MMSEA.

(h)      Notwithstanding any other provision hereof, if the Asbestos Trust is required to act as a reporting agent for any of the Protected Parties pursuant to the provisions contained herein, then such Protected Parties shall take all steps necessary and appropriate as required by CMS to permit any reports contemplated by  Section 8.1 to be filed.  Furthermore, until a Protected Party provides the Asbestos Trust with any necessary information regarding that Protected Party's identifying information that may be required by CMS's Coordination of Benefits Contractor to effectuate reporting, the Asbestos Trust shall have no obligation to report under Section 8.1 (a) above with respect to any such entity that has not provided such information and the Asbestos Trust shall have no indemnification obligation under Section 8.1 to such Protected Party for any penalty, interest, or sanction that may arise solely on account of the Protected Party's failure to timely provide such information to the Asbestos Trust in response to a timely request by the Asbestos Trust for such information.

(i)      The Trustee shall obtain prior to remittance of funds to claimants' counsel or to the claimant, if pro se, in respect of any Asbestos Claim a certification from the claimant to be paid that said claimant has or will provide for the payment and/or resolution of any obligations owing or potentially owing under MSPA in connection with, or relating to, such Asbestos Claim and that the Protected Parties also are beneficiaries of such certification.  The Asbestos Trust shall provide a quarterly certification of its compliance with the terms of the immediately preceding sentence to the party designated in writing by each Protected Party for which the Asbestos Trust is required to act as reporting agent, and shall permit reasonable audits

-53-

**A.1332**

by such Protected Parties, no more often than quarterly, to confirm the Asbestos Trust's compliance with this Section 8.1(i) during which Protected Parties may request copies of claimant certifications.  For the avoidance of doubt, the Asbestos Trust shall be obligated to comply with the requirements of this Section 8.1(i) regardless of whether a Protected Party elects to file its own reports under MMSEA pursuant to Section 8.1(g) above.  The Protected Parties shall keep any information and documents received from the Asbestos Trust pursuant to this Section 8.1(i).

## ARTICLE 9

## MISCELLANEOUS

**9.1     Amendments.**  Except as otherwise provided herein, the Trustee may amend, modify, delete, or add to any provisions of this TDP (including, without limitation, amendments to conform this TDP to advances in scientific or medical knowledge or other changes in circumstances), provided he or she first obtains the consent of the TAC and the FCR pursuant to the Consent Process set forth in Sections 5.7(b) and 6.6(b) of the Trust Agreement, except that the right to amend the Claims Payment Ratio is governed by the provisions of Section 2.5 above, and the right to adjust the Payment Percentage is governed by Section 4.2 above. Nothing herein is intended to preclude the TAC or the FCR from proposing to the Trustee, in writing, amendments to this TDP. Any amendment proposed by the TAC or the FCR shall remain subject to Section 7.3 of the Trust Agreement.  For the avoidance of doubt, nothing herein shall permit the Trustee, TAC or FCR to amend any provision in this TDP that would materially impact the rights and protections afforded to the Reorganized Debtors, the Non-Debtor Affiliates, the Settling Insurers and Representatives of the foregoing under the Plan without the written consent of Meritor and the Reorganized Debtors, including, without limitation,  (i) the scope and the

-54-

**A.1333**

terms of the release of the Reorganized Debtors, the Non-Debtor Affiliates, the Settling Insurers, and the Representatives of each of the foregoing (each as defined in the Plan) included in the Asbestos Personal Injury Claimant Release or (ii) the requirement that the Asbestos Trust obtain a properly-executed Asbestos Personal Injury Claimant Release as a pre-condition to making a distribution to a claimant.

9.2     **Severability.**  Should any provision contained in this TDP be determined to be unenforceable, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of this TDP. Should any provision contained in this TDP be determined to be inconsistent with or contrary to the Debtors' obligations to any insurance company providing insurance coverage to a Debtor in respect of claims for personal injury based on exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility, the Asbestos Trust with the consent of the TAC and the FCR may amend this TDP and/or the Trust Agreement to make the provisions of either or both documents consistent with the duties and obligations of the Debtors to said insurance company.

9.3     **Governing Law.**  Except for purposes of determining the liquidated value of any Asbestos Claim, administration of this TDP shall be governed by, and construed in accordance with, the laws of the State of Delaware. The law governing the liquidation of Asbestos Claims in the case of arbitration or litigation in the tort system shall be the law of the Claimant's Jurisdiction as described below.

For these purposes, the "**Claimant's Jurisdiction**" is the jurisdiction in which the claim was filed (if at all) against a Debtor in the tort system prior to the Petition Date. If the claim was not filed against a Debtor in the tort system prior to the Petition Date, the claimant may elect as the Claimant's Jurisdiction either (i) the jurisdiction in which the claimant resides at the time of

-55-

**A.1334**

diagnosis or when the claim is filed with the Asbestos Trust; or (ii) a jurisdiction in which the claimant experienced exposure to an asbestos-containing product or to conduct for which a Debtor has legal responsibility.

**A.1335**

# APPENDIX I

## AUTHORIZATION FOR RELEASE OF RECORDS OF OTHER ASBESTOS TRUSTS AND SETTLEMENT FACILITIES

TO WHOM IT MAY CONCERN:

     The claimant named below hereby authorizes each other asbestos trust or settlement facility listed in the attachment hereto to provide directly to the Maremont Asbestos Personal Injury Trust ("Asbestos Trust"), or any of its representatives, all submissions made by claimant and (if different from the claimant) the party whose injury forms the basis of the claim (the "Injured Party"), including claim forms, any attachments to claim forms, and any amended or supplemental claim forms. Claimant expressly acknowledges that the other asbestos trust or settlement facility may provide such documents directly to the Asbestos Trust and need not obtain any further authorization from the claimant or his/her representatives.

     A copy of this Authorization shall be as valid as the original. This Authorization contains no expiration date and may be exercised by the Trust at any time. If claimant's representative has signed this Authorization, a notarized power of attorney is attached.

Name of Claimant: _____

Social Security No.: _____

Date of Birth: _____

Name of Injured Party (if different from claimant):

Social Security No.: _____

Date of Birth: _____

Name of representative for claimant or Injured Party:

Signing party: _____

Signature: _____

Date: _____

Notarized:

Attachment: List of Other Asbestos Trusts and Settlement Facilities

**A.1336**

## List of Other Asbestos Trusts and Settlement Facilities

| | | |
|---|---|---|
| A&I Corp. Asbestos Bodily Injury Trust | Forty-Eight Insulations Qualified Settlement Trust | Raytech Corp. Asbestos Personal Injury Settlement Trust |
| A-Best Asbestos Settlement Trust | Fuller-Austin Asbestos Settlement Trust | Rock Wool Mfg Company Asbestos Trust |
| AC&S Asbestos Settlement Trust | G-I Asbestos Settlement Trust | Rutland Fire Clay Company Asbestos Trust |
| Amatex Asbestos Disease Trust Fund | H.K. Porter Asbestos Trust | Shook & Fletcher Asbestos Settlement Trust |
| APG Asbestos Trust | Hercules Chemical Company, Inc. Asbestos Trust | Skinner Engine Co. Asbestos Trust |
| API, Inc. Asbestos Settlement Trust | J.T. Thorpe Settlement Trust | Stone and Webster Asbestos Trust |
| Armstrong World Industries Asbestos Personal Injury Settlement Trust | JT Thorpe Company Successor Trust | Swan Asbestos and Silica Settlement Trust |
| ARTRA 524(g) Asbestos Trust | Kaiser Asbestos Personal Injury Trust | T H Agriculture & Nutrition, LLC Industries Asbestos Personal Injury Trust |
| ASARCO LLC Asbestos Personal Injury Settlement Trust | Keene Creditors Trust | Thorpe Insulation Company Asbestos Personal Injury Settlement Trust |
| Babcock & Wilcox Company Asbestos Personal Injury Settlement Trust | Lummus 524(g) Asbestos PI Trust | United States Gypsum Asbestos Personal Injury Settlement Trust |
| Bartells Asbestos Settlement Trust | Lykes Tort Claims Trust | United States Lines, Inc. and United States Lines (S.A.) Inc. Reorganization Trust |
| Brauer 524(g) Asbestos Trust | M.H. Detrick Company Asbestos Trust | United States Mineral Products Company Asbestos Personal Injury Settlement Trust |

**A.1337**

| | | |
|---|---|---|
| Burns and Roe Asbestos Personal Injury Settlement Trust | Manville Personal Injury Settlement Trust | UNR Asbestos-Disease Claims Trust |
| C.E. Thurston & Sons Asbestos Trust | Muralo Trust | Utex Industries, Inc. Successor Trust |
| Celotex Asbestos Settlement Trust | NGC Bodily Injury Trust | Wallace & Gale Company Asbestos Settlement Trust |
| Combustion Engineering 524(g) Asbestos PI Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (OC Sub-Fund) | Western MacArthur-Western Asbestos Trust |
| Congoleum Plan Trust | Owens Corning Fibreboard Asbestos Personal Injury Trust (FB Sub-Fund) | W.R. Grace Trust |
| DII Industries, LLC Asbestos PI Trust | PLI Disbursement Trust | Pittsburgh Corning Trust |
| Eagle-Picher Industries Personal Injury Settlement Trust | Plibrico Asbestos Trust | Bondex Trust |
| Federal Mogul U.S. Asbestos Personal Injury Trust | Porter Hayden Bodily Injury Trust | Flintkote Company and Flintkote Mines Limited Asbestos Personal Injury Trust |
| ffMLC Asbestos Personal Injury Trust | Metex Asbestos Trust | Leslie Controls, Inc. Asbestos Personal Injury Trust |
| Plant Insulation Company Asbestos Settlement Trust | Quigley Co. Inc. Asbestos Personal Injury Trust | Yarway Asbestos Personal Injury Trust |
| GST Settlement Facility | Geo. V. Hamilton, Inc. Asbestos Trust | |

**Exhibit M**

Personal Injury Claims Analysis Protocol

# INDIVIDUAL SUBSYS CLAIMANT CLAIMS CRITERIA[1]

## § 1.    CLAIMS ADMINISTRATOR.

The Trust claims administrator[2] shall have the authority to determine the validity and valuation of any claim.  Pursuant to that authority, the Trust claims administrator may investigate any claim, and may request information from any claimant to ensure compliance with the terms outlined in this document.

The Trust claims administrator shall be and is appointed as the successor of the Debtors and will retain all property, rights and privileges of the Debtors with respect to any claims administered by the Trust, including all medical, prescription, or business records of the Debtors, or in the Debtors' possession, custody or control, related to any claims administered under this Criteria. Prior to the Effective Date of the Plan, the Debtors shall compile all such records and transfer the same to the Trust claims administrator on the effective date.

## § 2.    APPLICABILITY.

The claims at issue concern SUBSYS (fentanyl sublingual spray) an opioid agonist indicated for the management of breakthrough pain in cancer patients 18 years of age and older who are already receiving and tolerant to opioid therapy for their underlying persistent pain.  Patients prescribed SUBSYS must remain on around-the-clock opioids when taking SUBSYS.  This fentanyl cancer medication and its limited FDA approved use varies significantly from other manufactured, marketed and distributed opioids.

## § 3.    INITIAL CLAIM VALIDITY REQUIREMENTS.

A claimant must demonstrate both of:

(a) The claimant or decedent received a prescription for Subsys, including any prescription for off-label use; and

(b) Injury from Subsys use – The claimant must demonstrate one or more of the following:

---

[1] These claims procedures and the agreements reflected herein solely relate to the unique facts present in the Debtors' bankruptcy case and their drug Subsys.  By agreement of the parties, to be so ordered by the Court, these criteria shall have no precedential impact or effect whatsoever and shall not be used by parties or counsel in any manner as such in any other litigation or proceeding of any kind involving any entity or individual outside of the Debtors' bankruptcy cases.  The chemical composition of Subsys, the physical reactions to Subsys, and the FDA labeling and TIRF-Rems procedures associated with Subsys, as well as the financial aspects of the Insys bankruptcy case and its assets, all contribute to the parties willingness to make the compromise reflected herein and those factors are unlikely to exist in other matters.

[2] Acceptance of these Claims Criteria is contingent upon the selection of a Trust claims administrator that is acceptable to the SMT group.

**A.1340**

1. Prescribed use of Subsys by the claimant for a period of 30 days or more;[3]

2. Addiction to Subsys;

3. The decedent's death was at least partially caused by a Subsys addiction, overdose or complication; or

4. The claimant sustained other bodily injury arising out of the claimant's use of Subsys.

## § 4.   CLAIM VALIDITY EVIDENCE.

(a) A claimant shall demonstrate a qualifying prescription of Subsys as described in § 2(a) by submitting to the Trust claims administrator:

1. A copy of a Subsys prescription or pharmacy record issued in the name of the claimant or decedent;

2. A photograph of a prescription container clearly showing the name of the claimant or decedent thereon;

3. Medical records identifying a prescription of Subsys for the claimant or decedent; or

4. Medical or insurance billing records that reflect charges for Subsys administered to claimant or decedent.

(b) Alternatively, a claimant may demonstrate the existence of a Subsys prescription by use of a certification supplied by the debtor, its successors, or by a third party at the debtor's or its successors' request, indicating that TIRF REMS or similar prescription data otherwise available to the Debtor reflects that the claimant had at least one prescription for Subsys.

(c) A claimant may demonstrate a qualifying injury by submitting to the Trust claims administrator:

1. One or more prescriptions evidenced by the methods identified in § 2(b) for a period of and in amounts reflecting Subsys use of 30 days or more;[4]

---

[3] Evidence of a prescribed use of Subsys for 30 days or more will support an award of nominal damages. Such use will not, however, be presumed to be proof of any other specific bodily injury. Other bodily injury must be evidenced by appropriate specific evidence.

[4] Evidence of a prescribed use of Subsys for 30 days or more will support an award of nominal damages. Such use will not, however, be presumed to be proof of any other specific bodily injury. Other bodily injury must be evidenced by appropriate specific evidence.

**A.1341**

2. A death certificate or similar official record identifying a cause of death as opioid overdose, complications arising out of opioid use, and/or drug interactions involving opioid use

3. Medical records identifying Subsys use as a cause of an injury or death;

4. A report by a qualified physician indicating that (i) he or she personally examined the claimant's medical records and/or the claimant, and (ii) based upon that review states to a reasonable medical probability that the claimant died or has an injury caused in part by a prescribed use of Subsys;

5. Documents supporting or establishing a claimant's addiction to Subsys; or

6. Any other credible evidence that tends to establish the existence of a qualifying injury, to be accepted or rejected at the Trust claims administrator's discretion.

(c) A claimant and their attorney must deliver a certification signed by both the claimant and their attorney attesting to the accuracy and truthfulness of the claimant's submission.

a. Such certification must include an attestation to the best of their knowledge that the claimant has provided all evidence, consistent with this procedure, of his or her use of other opioids, legal or illegal, prior to, during, of after his or her use of Subsys.

b. Such certification must include an attestation that no records or information that would reasonably be relevant to the valuation of the claim have been withheld.

## § 5. CLAIM VALUATION.

(a) The Trust claims administrator will determine the amount of any claim that has satisfied the initial claim validity requirements described in § 2. Such claim valuation shall be limited as described below. These limitations shall apply collectively to all claims that arise from a single individual's use of Subsys regardless of the number of claimants. Such allowed claims may include:

1. Actual present and future damages as described below in § 4(d), subject to any limitations on such amounts as provided herein and as would be applied under applicable law; and

2. Pain and suffering damages, as may be permitted under applicable law, and subject to the further limitations provided in § 2(b) or (c), as applicable.

(b) Wrongful death claims may include pain and suffering damages in an amount not to exceed $575,000 per claim.

3

**A.1342**

(c) Claims that are not based upon a wrongful death claim may include pain and suffering damages in an amount set by the Trust claims administrator so the aggregate of all pain and suffering components of all non-wrongful death claims administered by the Trust that have satisfied the requirements of § 2 will not exceed an average of $195,000 per Subsys user.

(d) The claimant will provide the following information to the Trust claims administrator. The Trust claims administrator will consider, as he or she deems appropriate, the following non-exhaustive factors in deciding the value of any claim:

1. The amount of any medical expenses incurred due to injuries caused by the claimant or decedent's use of Subsys;

2. The duration of any medical, mental health, or rehabilitative treatment arising out of the claimant or decedent's use of Subsys;

3. The amount of any lost wages caused by the claimant or decedent's use of Subsys;

4. The amount of any funeral or burial expenses for the decedent, so long as the claimants' death was consistent with Section 2(b)(3) of this Procedure.

5. The claimant or decedent's age;

6. The claimant or decedent's employment history;

7. The claimant or decedent's medical history, including, specifically, the conditions that prompted any prescription for opioid use, including Subsys;

8. Whether the claimant or decedent had surviving spouse, parents, or dependents, and if so, the age of those dependents;

9. The nature of the claimant or decedent's bodily injury caused by the use of Subsys;[5]

10. The nature, extent and duration of a claimant's addiction to Subsys;

11. The nature of claimant's neurological, cardiovascular, or any other injury related to Subsys use (e.g., hypoxic brain injury);

12. The claimant or decedent's prior use usage of opioid analgesics, including the duration, quantity, dosage, and escalation of any opioid mediations;

---

[5] Evidence of a prescribed use of Subsys for 30 days or more will support an award of nominal damages. Such use will not, however, be presumed to be proof of any other specific bodily injury. Other bodily injury must be evidenced by appropriate specific evidence.

**A.1343**

13. The claimant or decedent's prior usage of fentanyl products, including transmucosal immediate release fentanyl (TIRF) products (Actiq, Lazanda, Fentora, Abstral, Onsolis, Subsys), including the duration, quantity, dosage, and escalation of such medications;

14. The claimant or decedent's usage concurrent with Subsys of any around the clock and short acting opioid analgesics, including any other fentanyl or TIRF product;

15. The claimant or decedent's prior usage of any benzodiazepine concurrent with another opioid;

16. The claimant or decedent's history of prior substance abuse, including opioid use disorder, as reflected in the claimant or decedent's medical records;

17. The claimant or decedent's prior use of illicit drugs or of distribution or diversion of controlled dangerous substances;

18. Information that might suggest the existence of another source or condition that may have caused or contributed to any injuries;

19. The potential liability of other entities or persons for some or all of the claimant's injuries or damages of decedent's death and any compensation and recoveries, of any kind received from any person or entities connected to claimants' injuries; and

20. Information as to why the claimant did not pursue a claim against Insys substantially contemporaneous with any assertion of a claim related to opioid use against any other party if the claimant pursued other claims and did not assert a claim against Insys; and

21. Information as to any explanation as to why the claimant did not pursue a claim against Insys prior to the filing of the bankruptcy case if no such claim was filed prior to the Insys bankruptcy petition date.

(e) In no circumstance shall the Trust claims administrator assign any claim value for any punitive damages, statutory enhanced damages, attorney's fees or costs, or claims presentation-related expenses.

## § 6.    CLAIM VALUATION EVIDENCE.

(a) To permit the Trust claims administrator to evaluate the value of a claim, a claimant shall submit if applicable, all of the following, non-exhaustive, types of documents, to the extent reasonably available and unless for good cause shown:

5

**A.1344**

1. A properly completed claim form as established by the Trust claims administrator, consistent with the requirements herein;

2. A death certificate, if the claim is presented for a deceased individual;

3. Evidence of the claimant's condition at the time of the claimant's use of Subsys and evidence of the condition that prompted a prescription of Subsys;

4. Medical records that document, the claimant's injuries, and the nature and cost of treatments resulting from use of Subsys;

5. Documents reflecting payment of medical expenses, *e.g.*, receipts, hospital records, insurance records, any applicable funeral or burial expenses;

6. Copies of all claims, complaints, proofs of claim, notices, settlement documents, releases, recoveries, compensation received, or similar documents that claimant submits or entered into in respect of claims asserted against or to be asserted against any other entity or person arising from or related to claimant's or decedent's use of opioids or related to any of the injuries that underlie that claim presented to the Trust claims administrator. (To the extent that additional such documents or evidence becomes available to the claimant after his or her claim submission and before the claims administrator determines the amount of the claim, the claimant will supplement his or her claim with such additional evidence); and

7. Affidavits from claimant, heirs, or others with personal knowledge, describing the timing, length and circumstances of claimant or decedent's addiction to Subsys, injuries, or history of use.

(b) The claimant may submit such additional information as the claimant believes will assist the Trust claims administrator determine that appropriate amount of any claim that has satisfied the initial claim validity requirements.

(c) The Trust claims administrator may request additional information as reasonably necessary in the opinion of the Trust claims administrator to determine the amount of a claim.

(f) A claimant that has satisfied the initial claim validity requirements described in § 2 and who has submitted the required claim supporting evidence described in § 3 may request an opportunity – by personal appearance, telephone, or video conference – to make a presentation to the Trust claims administrator regarding the amount of a claimant's claim, and shall be granted, at least, one thirty (30) minute oral presentation.

(g) Representatives of the SMT group will be permitted to submit a memorandum to the Trust claims administrator highlighting scientific or medical background, research, or

6

**A.1345**

literature that the SMT group believes may assist the Trust claims administrator generally to evaluate the claims asserted against Insys or to assist the Trust claims administrator to judge the causal connection between Subsys use and particular forms of injury. Such memorandum may cite generally available published materials. Such memorandum will not address any specific claim but will instead focus on the general experience of Subsys users. Such memorandum will not exceed 20 pages in length and will be made available by the Trust claims administrator to claimants. Claimants may submit as part of their claims submission any rebuttal material that they believe will assist the Trust claims administrator achieve a just conclusion.

## § 7.   CLAIM VALUATION FACTORS.

(a) The following factors will tend to reduce the amount of an allowed claim below the maximum values established as to such claims:

   1. Any illegal drug use prior to the prescribed use of an opioid for pain management;

   2. The manifestation of particular injuries prior to the fist prescribed use of Subsys;

   3. Forms of injury that, based on the medical research or literature, the Trust claim administrator concludes are more commonly associated with other opioids that were also utilized by the claimant prior to or concurrent with the claimant's first prescribed use of Subsys where the claimant has not demonstrated to the Trust claims administrator a likelihood of causal connection between the injury and the claimant's Subsys use;

   4. Forms of injury that would have been expected given the nature of claimant's or decedent's pre-existing medical condition at the time of the first Subsys prescription, although the acceleration or exacerbation of any such conditions after prescription of Subsys may ameliorate any downward implication of any appropriate award; and

   5. Any assertion by claimant in any other claims or pleadings that is inconsistent with claimant's contentions that Subsys was a significant contributor to any element of claimant's damages.

(b) The following factors will tend to increase the amount of an allowed claim closer to any maximum values established as to such claims:

   1. The claimant's likely inability to recover material compensation from other potentially liable entities for the same injuries supporting claimants' asserted damages;

**A.1346**

2. A substantial worsening of elements of injury or initial manifestation of injuries after the first prescribed use of Subsys;

3. Use of relatively high doses of Subsys; and

4. Indications that use of other opioid drugs with generally less serious side effects were successful in managing claimant's pain issues prior to the first prescribed use of Subsys;

(c) The following factors will generally not, alone, tend to increase or reduce the allowed amount of a claim:

1. The fact that the prescribing doctor has been accused of improper conduct with respect to opioid prescriptions where the circumstances do not clearly indicate some wrongful conduct by the claimant; and

2. The illegal use of opioids after a prescribed use;

**A.1347**

**EXHIBIT 2**

**FIRE VICTIM CLAIMS RESOLUTION PROCEDURES**

Case: 19-30088   Doc# 7037   Filed: 05/01/20   Entered: 05/01/20 06:15:57   Page 1901 of 2063

# FIRE VICTIM CLAIMS RESOLUTION PROCEDURES

## PREAMBLE

The goal of the Fire Victim Trust[1] is to provide an efficient process to fairly compensate the holders of timely filed Fire Victim Claims (respectively, "Claimants" and "Claims") in an equitable manner and on a *pro rata* basis consistent with the terms of the Trust Agreement, Plan, and California and federal law. These Fire Victim Claims Resolution Procedures ("CRP") apply to all Claims. The Claims Administrator shall implement and administer the CRP in consultation with the Trustee, Claims Processor, Neutrals, and Trust Professionals with the goal of securing the just, speedy, and cost-efficient determination of every Claim. Those entrusted with the consideration and determination of Claims shall treat all Claimants with abiding respect and shall strive to balance the prudent stewardship of the Trust with care in its administration, allocation, and distribution.

The speed of any distribution in a program involving thousands of claimants relies on multiple variables impacting administrative expediency. To achieve maximum fairness and efficiency, the CRP is founded on the following principles:

1. Objective eligibility criteria;
2. Clear and reliable proof requirements;
3. Administrative transparency;
4. Rigorous review processes that generate consistent outcomes regardless of the asserted amount of the claim; and
5. Independence of the Trustee, Claims Administrator, Claims Processor, Neutrals, and Trust Professionals.

The Trustee and Claims Administrator will consult with the Claims Processor and other Trust Professionals to develop claims valuation processes that result in fair and reasonable compensation of eligible Claims in accordance with the Trust Agreement and CRP.

## I.    CLAIMANT ELIGIBILITY

To be eligible to receive compensation from the Trust, a Claimant must: (1) have a Claim related to an Included Fire; (2) have timely filed a Proof of Claim; and (3) submit supporting documentation outlined in Section II of this CRP or required by the Claims Administrator ("Supporting Documents"). Upon submission of the Supporting Documents, the Trust will review each Claim and consider all damages and costs recoverable under California law or, if applicable, other non-bankruptcy law.

**A.    Included Fires.** The Trust is established to administer Claims related to the fires identified in Exhibit 1 (each a "Fire" and collectively the "Fires"). Any Claims unrelated to the Fires are ineligible for payment by the Trust and, pursuant to the process described

---

[1]    All capitalized terms not otherwise defined herein shall have their respective meanings as set forth in the PG&E Fire Victim Trust Agreement (the "Trust Agreement") and the Debtors' Amended Joint Chapter 11 Plan of Reorganization dated March 16, 2020 (as it may be amended, modified, or supplemented, the "Plan").

herein, shall be held to be ineligible on a final basis. For the purposes of the CRP, all Fires set forth in Exhibit 1 are deemed to have been caused by PG&E's equipment and as a result of PG&E's negligence.

**B.    Proof of Claim.** All Claimants must have filed a Proof of Claim for their claims or those of their family in the Bankruptcy Cases on or before December 31, 2019, and as amended, which was the extended Bar Date for Fire Claimants. Claims that were not timely submitted to the Bankruptcy Cases are ineligible for payment by the Trust, unless the claimant obtains relief from the Bankruptcy Court to file a late Claim and submits the Claim to the Bankruptcy Cases and Trust within 30 days after the Bankruptcy Court order allowing such late filing. Claims that have been disallowed or that have been withdrawn from the official claims registry in the Bankruptcy Cases are ineligible for payment by the Trust.

**C.    Supporting Documents.** Section II sets forth each Claim Type the Trust will consider and the Supporting Documents that may be submitted for each. In addition to the Supporting Documents outlined in Section II, Claimants will be required to submit a Claims Questionnaire, as explained in Section V.

## II.    CLAIM TYPES AND SUPPORTING DOCUMENTS

The Trust will use all information that assists in objectively valuing Claims and alleviates the burden on Claimants. This includes, but is not limited to, data from a Claimant's (a) Bankruptcy Proof of Claim Form; (b) Wildfire Assistance Program Claim Form; (c) Damages Questionnaire established under Case Management Order 5 in the California North Bay Fire Cases (JCCP 4955); and (d) other reasonably ascertainable and reliable information. Claimants may be required to submit additional facts and documents to support their Claims for each of the following Claim Types:

**A.    Real Property.**

   1.    ***Description of Real Property Claim.*** Real Property Claims include claims for damage to structures on residential or commercial real property, landscaping, forestry, and other real property improvements (*e.g.*, hardscape, fencing, retaining walls, pools, and solar panels) as a result of the Fires. Real Property damages may be measured in one of two ways: (1) the loss in fair market value to the property ("Diminution in Value"); or (2) the reasonable costs to rebuild or repair the property ("Cost of Repair"). Whether Diminution in Value or Cost of Repair is awarded will depend on the facts of each Claim.

       (a)    ***Diminution in Value.*** Diminution in Value will be calculated by subtracting the fair market value of the property immediately after the Fire from the fair market value of the property immediately before the Fire.

(b)    ***Cost of Repair.*** The reasonable costs to rebuild or repair the property will be determined based on: (1) the use of the structure(s) and other improvement(s); (2) the extent of damage to the structure(s) [*e.g.*, burn damage versus smoke and soot damage]; (3) the square footage of structure(s); (4) the geographic location of the property; (5) the size of the vegetation on the property immediately before the Fire; (6) the extent of damage to vegetation; (7) the type of vegetation damaged; and (8) the fair market value of the property immediately before the Fire. In addition, the Claimant may claim the value of trees lost.

(c)    ***Consequential Damages.*** Claimants also may make a claim for other reasonably foreseeable economic losses directly caused by destruction of or damage to real property.

2.    ***Types of Supporting Documents.*** Claimants may provide the following documents to support a Real Property Claim:

(a)    Verification of ownership;
(b)    Appraisals;
(c)    Tax records;
(d)    Purchase records;
(e)    Mortgage or loan documentation showing the pre-Fire condition or value of the property;
(f)    Pre-Fire and post-Fire photos or videos of the structures (interior or exterior) or other damaged areas of the property;
(g)    Architectural or engineering drawings;
(h)    Permits;
(i)    Contractor rebuild or repair estimates or invoices;
(j)    Arborist reports, timber surveys, or documents relating to landscaping; and
(k)    Other supporting documents within the Claimant's possession.

## B.    Personal Property.

1.    ***Description of Personal Property Claim.*** Personal Property Claims include claims for loss of or damages to personal property, such as household items (*e.g.*, clothes, furniture, or tools) and automobiles, as a result of the Fires.

2.    ***Types of Supporting Documents.*** Claimants may provide the following documents to support a Personal Property Claim:

(a)    List of items destroyed or damaged in the residency;
(b)    Proofs of purchase;
(c)    Pre-Fire and post-Fire photos;

      (d)      Appraisals; and

      (e)      Other supporting documents within the Claimant's possession.

**C.**    **Personal Income Loss.**

    1.    ***Description of Personal Income Loss Claim.*** Personal Income Loss Claims include claims of individuals who lost income because (a) they were displaced by the Fires; (b) their employer suffered Business Losses and reduced or stopped paying wages to the Claimant as a result of the Fires; or (c) the Fires or resulting injuries or conditions otherwise interfered with their ability to earn income.

    2.    ***Loss of Rental Income.*** Personal Income Loss Claims also include loss of income from rental of a damaged or destroyed property.

    3.    ***Types of Supporting Documents.*** Claimants may provide the following documents to support a Personal Income Loss Claim:

      (a)      Tax returns, including all schedules and attachments;

      (b)      W-2 Forms;

      (c)      1099 Forms;

      (d)      Lease agreements or canceled rent checks;

      (e)      Bank account statements identifying earnings;

      (f)      Paycheck stubs or payroll records; and

      (g)      Other supporting documents within the Claimant's possession.

**D.**    **Business Loss.**

    1.    ***Description of Business Loss Claim.*** Business Loss Claims include claims for economic losses suffered by a business as a result of the Fires, including loss of business property or inventory used to conduct business and lost profits or revenue.

    2.    ***Types of Supporting Documents.*** Claimants may provide the following documents to support a Business Loss Claim:

      (a)      Description of the business, including its mission statement;

      (b)      Tax returns, including all schedules or attachments;

      (c)      Financial statements, including profit and loss statements;

      (d)      Articles of Incorporation, bylaws, shareholder lists, or partnership or limited partnership agreements;

      (e)      Leases, deeds, titles, or other documents identifying the property owned or occupied by the business;

      (f)      Canceled contracts;

      (g)      Photos, videos, or other documentary evidence of fire damage to the Claimant's home or business; and

(h)     Other supporting documents within the Claimant's possession.

**E.      Other Out of Pocket Expenses.**

1.     ***Description of Other Out of Pocket Loss Claim.*** Other Out of Pocket Loss Claims include claims for out of pocket expenses that are not considered in any other claim type. These may include additional living expenses, medical and counseling expenses, and other out of pocket expenses as a result of the Fires.

2.     ***Types of Supporting Documents.*** Claimants may provide the following documents to support an Other Out of Pocket Loss Claim:

(a)     Documentation supporting a claim for additional living expenses;
(b)     Medical bills;
(c)     Counseling bills; and
(d)     Other supporting documents within the Claimant's possession.

**F.      Wrongful Death and Serious Personal Injury.**

1.     ***Description of Wrongful Death and Serious Personal Injury Claim.*** Wrongful Death and Serious Personal Injury Claims include claims relating to individuals who died or suffered serious personal injury as a result of the Fires. The Trustee and Claims Administrator will devise procedures ensuring a streamlined and sensitive process providing Claimants and their family members the dignity that is critical to successfully resolving Claims relating to these extraordinary losses.

2.     ***Types of Supporting Documents.*** Claimants may provide medical records and other documents supporting a Wrongful Death or Serious Personal Injury Claim, as well as documents supporting a claim for loss of relationship, love, support, and companionship.

**G.      Emotional Distress.**

1.     ***Description of Emotional Distress Claim.*** Emotional Distress Claims include claims arising from: (a) zone of danger evacuation from the Fires; (b) physical injury as a result of the Fires; and (c) substantial interference with the use and enjoyment of or invasion of property occupied by the Claimant, as well as the impact of the loss of the community.

2.     ***Types of Supporting Documents.*** Claimants may provide the following documents to support an Emotional Distress Claim:

(a)    A written narrative or an audio or video recording detailing the Claimant's evacuation and impact of the Fire on the Claimant and his or her family, including impact related to the loss of property and any sentimental items in the home;

(b)    Texts, emails, or social media content the Claimant created during the evacuation;

(c)    Photos or videos taken during the evacuation;

(d)    Pre-Fire and post-Fire photos and videos of the Claimant's property;

(e)    Records describing bodily injury or mental health counseling or treatment;

(f)    Documentation of medical and counseling expenses; and

(g)    Other supporting documents in the Claimant's possession.

## III.    <u>OTHER DAMAGES</u>

The Trustee and Claims Administrator will devise procedures to evaluate any additional categories of recoverable damages.

## IV.    <u>CLAIMS SUBMISSION</u>

The Claims Processor will maintain a secure, web-based portal (a "Portal") for Claimants to submit Claims Questionnaires, Supporting Documents, Releases, and any other relevant information or documents. After submitting a Claim, Claimants will be able to use the Portal check their Claim status, receive and respond to determination notices, submit supplementary materials, and update contact information and other demographic information, if necessary.

## V.    <u>CLAIMS QUESTIONNAIRE</u>

In addition to the Claim-specific Supporting Documents identified in Section II, the Claims Administrator will require Claimants to complete a Claims Questionnaire that provides sufficient information to: (1) verify the Claimant's identity; (2) identify and support the claimed damages; and (3) demonstrate the Claimant's authority to assert the Claims.

Individual Claimants may submit Claims Questionnaires by household. The Claims Processor will pre-populate Claims Questionnaires with information already in its possession, including but not limited to data from a Claimant's (a) Bankruptcy Claim Proof of Claim Form; (b) Wildfire Assistance Program Claim Form; (c) Damages Questionnaire established under Case Management Order 5 in the California North Bay Fire Cases (JCCP 4955); and (d) information that is otherwise reasonably ascertainable and reliable.

The Trustee will use reasonable efforts to obtain insurance claim files directly from a Claimant's insurance carrier but may require certain insurance information directly from the Claimant in support of their Claim. The Claim Questionnaire may include a consent by the Claimant to the Trust obtaining any and all information related to the Claim from Claimant's

insurer. The Plan does not absolve the insurance carriers of their duty to fulfill their coverage obligations under their policies of insurance with a Claimant.

## VI.    RELEASE

Before receiving payment from the Trust, Claimants must submit signed releases in substantially the same form and content as the Claimant Release and Mutual Made Whole Release, attached to the Trust Agreement as Exhibits 4 and 5, respectively.

By signing the Claimant Release, the Claimant will agree to release Trust, the Trustee, Delaware Trustee, TOC, Claims Administrator and Special Master (the "Released Parties") from any and all past, present and future claims, counterclaims, actions, rights or causes of action, liabilities, suits, demands, damages, losses, payments, judgments, debts, dues, sums of money, costs and expenses (including, without limitation, attorneys' fees and costs), accounts, reckonings, bills, covenants, contracts, controversies, agreements, obligations, or promises, in law or in equity, contingent or non-contingent, known or unknown, suspected or unsuspected, foreseen or unforeseen, matured or unmatured, accrued or unaccrued, liquidated or unliquidated, whether direct, representative, class or individual in nature, in any forum that an applicant had, have, or may have in the future ("Released Claims") arising from, relating to, resulting from or in any way connected to, in whole or in part, the discharge of the Released Parties' duties and responsibilities under the Retention Order, the Trust Agreement, including any agreement, document, instrument or certification contemplated by the Trust Agreement, the CRP, the Chapter 11 Plan, the formulation, preparation, negotiation, execution or consummation of the Trust Agreement, the CRP and the Chapter 11 Plan, and any and all other orders of the District Court or Bankruptcy Court relating to the Released Parties and/or their duties and responsibilities.

The Release will also require the Claimant to (i) acknowledge and agree that the Claimant remains solely responsible for resolving all open Government Payors[2] and Non-Government Payors' liens, rights of reimbursement, and other claims (collectively, "Liens"); (ii) use best efforts to resolve all known Liens; (iii) agree to indemnify and hold harmless the Trust in connection with all known Liens and any future Liens; (iv) agree that the Trust will not be liable for any act, or failure to act, of the lien resolution administrator retained in connection with the Fire Victim Trust; and (v) assign the Trust the right to pursue the 2015 Insurance Rights, if any, and the Claimant Insurance Rights (as defined in the Trust Agreement), if applicable, for the full value of the Fire Victim Claim.

## VII.    NOTICE OF CLAIMS DETERMINATION

The CRP will govern the process by which each Claim is reviewed, including whether the Claim is eligible or ineligible for payment and, if eligible, the amount approved for payment

---

[2] "Governmental Payor" means any federal, state, or other governmental body, agency, department, plan, program, or entity that administers, funds, pays, contracts for, or provides medical items, services, and/or prescription drugs, including, but not limited to, the Medicare Program, the Medicaid Program, Tricare, the Department of Veterans Affairs, and the Department of Indian Health Services.

("Claims Determination"). After the Trust has fully evaluated a Claim, the Claims Processor will issue a notice to the Claimant explaining the review result ("Determination Notice"). If the Claim has been approved and is eligible for payment ("Approved Claim"), the notice will include the specific amount that the Trust has approved for payment ("Approved Claim Amount") and the stages in which payment may occur. If the Claim is missing documents or information required for the Trust to fully evaluate the Claim ("Deficient Claim"), the notice will explain what is required and provide a timeline within which the Claimant may resolve the deficiencies. If the Claim is ineligible for payment from the Trust pursuant to the CRP ("Disallowed Claim"), the notice will explain the reason(s) that the Claim is ineligible.

## VIII.   **DISPUTE RESOLUTION**

Claimants dissatisfied with their Claims Determination will have the opportunity to dispute the determination and to provide supplemental information or documents to support their dispute. The Trust will implement the following three-tiered process:

1.   ***Reconsideration.*** If a Claimant contests a Claims Determination, the Claims Administrator and Claims Processor will review the Claim again and will consider any newly submitted information and documents and all previously submitted information. Afterwards, the Claims Processor will issue a Reconsideration Determination. The Claimant may accept the Reconsideration Determination or may appeal to a Neutral.

2.   ***Appeal.*** If a Claimant appeals a Reconsideration Determination, the Claimant shall submit a Notice of Appeal to the Claims Administrator. The Claims Administrator shall submit the Claim to the Appeals Officer[3] for further consideration de novo in accordance with the procedure set forth herein.

   (a)   The Claims Administrator shall submit the following:

      (i)   The Notice of Appeal;

      (ii)   The record from the Claims Administrator and Claims Processor resulting in the Claims Determination;

      (iii)   The record from the Claims Administrator and Claims Processor resulting in the Reconsideration Determination;

   (b)   Claimant may submit the following:

      (i)   Any additional information and/or documents not included in the record from either the Claims or Reconsideration Determination;

---

[3] The Appeals Officer shall be an individual appointed for the sole purpose of determining whether an appeal from a Determination of the Claims Administrator should be heard by a Neutral from the General Panel or by a Neutral from the Complex Panel. Such determination shall be at the sole and exclusive discretion of the Appeals Officer, who shall at all times remain independent of the Trustee and the Claims Administrator.

(ii)    A brief not to exceed twenty (20) pages setting forth the issues on appeal and the basis for appeal as to each such issue.

(c)    Claimant shall designate the type of review sought:

    (i)    Document review only;

    (ii)    Document review followed by telephonic hearing;

    (iii)    Document review followed by virtual hearing

    (iv)    Document review followed by in-person hearing.

(d)    The Appeals Officer shall determine whether the appeal shall be considered by a Neutral from the Complex Panel. The Claimant may request that the appeal be considered by a Neutral from the Complex Panel, subject to a determination by the Appeals Officer.

    (i)    The determination of whether an appeal should be considered by a Neutral from the Complex Panel shall be made by the Appeals Officer in his sole discretion.

    (ii)    The Appeals Officer may consider the type, amount and complexity of a Claim and the type of review requested when determining whether an appeal should be considered by a Neutral from the Complex Panel the Claim

    (iii)    The Appeals Officer's determination of whether an appeal should be considered by a Neutral from the Complex Panel shall be final, binding and non-appealable and is not subject to review by any Court.

(e)    A  Neutral shall be chosen at random from the General Panel or from the Complex Panel, as determined by the Appeals Officer, to consider the Claim de novo in accordance with the type of review requested by Claimant;

(f)    The Neutral shall consider the appeal based on all items submitted by Claimant through the close of the review and/or hearing.

(g)    Within thirty (30) days of the close of the hearing, the Neutral shall issue an Appeals Determination, increasing, decreasing, or confirming the Reconsideration Determination.

**3.**    ***Trustee Determination.*** The Neutral shall submit to the Trustee the Appeals Determination, increasing, decreasing, or confirming the Reconsideration Determination. The Trustee may accept, reject, or revise the Appeals Determination and then will issue a Trustee Determination to the Claimant. The Trustee Determination is the final Claims

Determination regarding both eligibility and payment amount, if any. The Trustee Determination will be final, binding, and non-appealable and is not subject to review by any Court, **including right to trial by jury**.[4]

## IX.     HOLD-BACK FOR ATTORNEY LIENS

Prior to receiving any award in respect of any Claim Determination, any Claimant who was represented by an attorney ("**Claimant Attorney**") at the time of filing its Proof of Claim in the Chapter 11 Cases or at any time thereafter, shall: (1) agree to receive their award through their Claimant Attorney; or (2) provide evidence to the satisfaction of the Claims Administrator and Trustee that there is no lien or potential lien on their Claims Determination asserted or assertable by a Claimant Attorney (an "**Attorney Lien**"), including by providing written confirmation from such Claimant Attorney that no Attorney Lien exists.  If an Attorney Lien exists, is asserted or assertable, then only the undisputed portion of the award shall be provided to the Claimant.  The disputed portion shall be held back until the Claims Administrator receives satisfactory notice in his or her sole determination, that such dispute and Attorney Lien has been resolved. The payment of attorney's fees incurred by Claimant and the satisfaction of any Attorney Lien is the sole obligation of Claimant. Neither the Trustee nor the Trust is responsible for the payment of any attorney's fees or the resolution of any Attorney Lien incurred in connection with a Claim.

## X.     CREDITS AND DEDUCTIONS

**A.     Credits for Amounts Covered By Insurance.**   In determining all award amounts, the Trustee will take into account all insurance recoveries available to the Claimant as provided in the Trust Agreement.

**B.     Deduction for Payment Received from Wildfire Assistance Fund.**   In determining all award amounts, the Trustee will take into account any payment Claimant has received from the Wildfire Assistance Fund as provided in the Trust Agreement.

**C.     Deduction for Payment Received from FEMA.**   In determining all award amounts, the Trustee will take into account any payment Claimant has received from the Federal Emergency Management Agency ("FEMA") on account of the same damages or losses, as provided in the Trust Agreement.

**D.     Medical Liens.**   In determining all award amounts, the Trustee will take into account all known outstanding governmental medical liens, if any, currently owed by the Claimant. Claimants shall be responsible for the payment of all medical or other applicable liens. The Claimant will undertake to resolve such liens, and if not done, the Trustee will take over the process, solely with respect to governmental liens. The Trustee will retain the services of a Lien Resolution Administrator to identify, resolve, and satisfy, in accordance with applicable law, certain Claimant governmental repayment obligations, including, but not limited to, Medicare (Parts A and B), Medicaid, and other governmental liens.

---

[4]   As of the Effective Date, all Fire Victim Claims against PG&E are discharged and channeled into this Trust. Any trial would be against the Trust and against the interests of fellow Fire Victims, not against PG&E. As such, the procedures in this Trust are set up to protect Fire Victims' due process rights and create fair, just, and expedient results.

**E.     Taxes.**  In connection with their duties hereunder, the Trustee and Claims Administrator will make every effort to ensure that the Trust complies with all applicable laws, including without limitation all tax return filings and information reporting requirements set forth in applicable laws.

## XI.      <u>CONFIDENTIALITY OF CLAIMS INFORMATION</u>

All personal information, facts, and documents submitted to the Trust by or regarding any Claimant or Claim shall be kept confidential and shall only be disclosed: (1) to the Trustee, Claims Administrator, Claims Processor, Neutrals, and Trust Professionals to the extent necessary to process and pay Claims; or (2) as may be required by applicable law, ethical requirements, or legitimate business uses associated with administering the Trust.

63737092 v7