**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br>BANKRUPTCY APPEALS<br><br>This Filing Relates to<br><br><br>ALL MATTERS | 21 cv 7532 (CM)<br>21 cv 7585 (CM)<br>21 cv 7961 (CM)<br>21 cv 7962 (CM)<br>21 cv 7966 (CM)<br>21 cv 7969 (CM)<br>21 cv 8034 (CM)<br>21 cv 8042 (CM)<br>21 cv 8049 (CM)<br>21 cv 8055 (CM)<br>21 cv 8139 (CM)<br>21 cv 8258 (CM)<br>21 cv 8271 (CM)<br>21 cv 8548 (CM)<br>21 cv 8566 (CM)<br><br>On Appeal from the United<br>States Bankruptcy Court for the<br>Southern District of New York<br>(Case No.  19-23649 (RDD)) |

**THE AD HOC COMMITTEE OF NAS CHILDREN'S**
**AMICUS CURIAE BRIEF IN SUPPORT OF AFFIRMING**
**THE PURDUE CONFIRMATION ORDER**

# <u>TABLE OF CONTENTS</u>

Statement of Interest ...................................................................................................1

I.  Failure to Affirm the Confirmation Order Allows: (I) the Sacklers to Retain
    $4.3 Billion and (II) the Government to Take all Value from the Debtors
    at the Expense of Opioid Victims .......................................................................2

II. The NAS Claimants Voted Overwhelmingly to Support the Plan Because
    of the Benefits it Provides to the NAS Children ...............................................4

    A.  The NAS Committee's Recommendation to Approve the Plan, Including
        the Third-Party Releases .........................................................................4

        1.  Victims' Support for the Plan ......................................................6
        2.  The Simplicity of the NAS TDP ...............................................10

    B.  All NAS Children Will Suffer Irreparable Harm if the Confirmation
        Order is not Affirmed .............................................................................12

III. Conclusion ........................................................................................................18

## <u>TABLE OF AUTHORITIES</u>

**Cases**

<u>Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414 (1968)...........................................................................................................................................8

## STATEMENT OF INTEREST

The NAS Committee has been the primary advocate of the interests of NAS Children in the Chapter 11 Cases. This Court, when denying the NAS Committee's *Motion to Intervene*, authorized the NAS Committee to file an *amicus curiae* when it stated:

> [T]here are a number of entities that, while not technically eligible for appellee status, have participated actively in the proceedings in the Bankruptcy Court, and their voices should be heard on this appeal. The Ad Hoc Committee of NAS Children is perhaps foremost among those persons and entities. I am, therefore, granting the Ad Hoc Committee permission to file a brief amicus curiae.

*Order on the Pending Motions to Intervene by the Ad Hoc Committee of NAS Children, the Multi-State Government Entities Group, and the Ad Hoc Group of Individual Victims of Purdue Pharma, L.P.* [NAS3437-38].[1]

Given the stakes for the NAS Children, the NAS Committee has a cognizable interest in ensuring that the confirmed *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors, dated July 14, 2021* [Docket No. 3185] (the "Plan")[2] is not overturned on appeal.  Except for the NAS Committee, no party's counsel authored this brief in whole or in part; no party or party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person contributed money that was intended to fund preparing or submitting this brief.

---

[1]      References to the NAS Appendix filed concurrently herewith are cited as "NAS…"

[2]      Capitalized terms used but not defined herein shall have the meaning given to such term in the Plan.

I.    **FAILURE TO AFFIRM THE CONFIRMATION ORDER ALLOWS: (I) THE SACKLERS TO RETAIN $4.325 BILLION AND (II) THE GOVERNMENT TO TAKE ALL VALUE FROM THE DEBTORS AT THE EXPENSE OF OPIOID VICTIMS**

The NAS Committee hereby requests that this Court affirm the Confirmation Order approving the Plan because, as the following chart demonstrates, failure to affirm the Confirmation Order will: (i) enable the Sacklers to retain $4.325 billion; and (ii) transfer $2.0 billion to the United States Government at the expense of the NAS Children and all other opioid victims (past, present, and future) by eliminating all compensation to victims, all abatement programs and the document repository:

| Class | Description/ Approximate Number of Claims | Contributions/Gross Recovery Under the Plan[3] | Contribution/Recovery if Confirmation Order Overturned (Assumed Chapter 7 Liquidation – Debtors' Mid-Case)[4] |
|---|---|---|---|
| N/A | Sacker Family Contribution/N/A | **$4.325 billion** contribution to the Master Disbursement Trust | NONE |
| N/A | Public Document Repository/NA | Debtors are obligated to create a public document repository that will contain over 13 million non-privileged documents pursuant to Section 5.12 of the Plan | No obligation to create this vital document repository |
| N/A | DOJ Forfeiture Judgment Claim (1) | $225 Million | $2.0 Billion Superpriority Administrative Claim estimated to recover $1.65 billion in Debtors' Mid-Case |
| 3 | Federal Government Unsecured Claims (6) | $50.0 million | NONE |
| 4 | Non-Federal Domestic Governmental Claims (7,600) | Approximately $4.0 billion (excluding potential proceeds of insurance claims and any release of restricted cash) | NONE |
| 5 | Tribe Claims (400) | Approximately $140 million (excluding potential proceeds of | NONE |

---

[3]    *Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "Disclosure Statement"), § I.B [NAS1719-20].

[4]    *Declaration of Jesse DelConte* (the "DelConte Decl.") at ¶ 10 [NAS2260-62].

| Class | Description/ Approximate Number of Claims | Contributions/Gross Recovery Under the Plan[3] | Contribution/Recovery if Confirmation Order Overturned (Assumed Chapter 7 Liquidation – Debtors' Mid-Case)[4] |
|---|---|---|---|
| | | insurance claims and any release of restricted cash) | |
| 6 | Hospital Claims (1,180) | $250 million | NONE |
| 7 | Third-Party Payor Claims (467,108) | $365 million | NONE |
| 8 | Ratepayer Claims (31) | $6.5 million | NONE |
| 9 | NAS Monitoring Claims (3,439) | $60 million | NONE |
| 10(a) | NAS PI Claims (**6,283**) | Up to $45 million | NONE |
| 10(b) | Non-NAS PI Claims (**129,631**) | $655 million to $705 million | NONE |

While the focus of the pending appeals are the third-party releases, they are equally about the transfer of value away from opioid victims to the United States government, a result far worse than the tobacco litigation. With respect to the Objecting States,[5] the appeals are about vengeance against the Sacklers, as there will be no little or no ability to pay any judgments they may obtain against: (i) the Debtors, as they are worth less than $2.0 billion[6] and (ii) the Sacklers, as the vast majority of the Sackler's wealth may ultimately be outside the reach of creditors and take years, if not decades, of litigation to reach.[7] The NAS Committee is certainly sympathetic to the *pro se* appellants, but, for the reasons set forth herein, even if they have viable claims against the Sacklers that are being released and such appellants are able to prosecute and prevail on such claims,  the possibility of collecting on such judgments is remote at best. As to the third-party releases, the

---

[5]     For purposes of this brief, the term "Objecting States" shall mean the States of California, Connecticut, Delaware, Maryland, Rhode Island, Oregon, Vermont, Washington, and Washington D.C.

[6]     Disclosure Statement, § III.N [NAS1771-73].

[7]     *Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan* ("MBR") at p. 73-75 [NAS3302-04].

Confirmation Order should be affirmed for the reasons set forth in the pleadings filed by the Appellees as the Metromedia standards are easily satisfied.

**II.   THE NAS CLAIMANTS VOTED OVERWHELMINGLY TO SUPPORT THE PLAN BECAUSE OF THE BENEFITS IT PROVIDES TO THE NAS CHILDREN**

The background of NAS and the NAS Committee's role in the Debtors' Chapter 11 cases is set forth in the *Memorandum in Support of Ad Hoc Committee of NAS Children's Motion For Leave to Intervene as Appellee Pursuant to Rule 8013(g) of the Federal Rules of Bankruptcy Procedure* [NAS3413-18], including the *Declaration of Scott R. Bickford* [NAS3427-36] in support thereof, and will not be repeated here.  As an initial matter, the NAS Committee notes that neither the Office of the United States Trustee (the "UST") nor any of the Objecting States represent actual, individual victims of the opioid crisis.  The NAS Committee represents over 3,500 of the most innocent victims of the opioid crisis, the vast majority of whose representatives voted to approve the Plan.

**A.   The NAS Committee's Recommendation to Approve the Plan, Including the Third-Party Releases**

The NAS Committee, in considering whether to recommend approval of the Plan to its clients, took into consideration the following factors: (a) the recoveries (both timing and amount) to the NAS Children under the Plan (both directly and indirectly through the NAS Monitoring Trust)[8] as opposed to outside of the Plan; (b) the relative probability of obtaining that recovery,

---

[8]   The groundbreaking NAS Monitoring Trust is designed to provide grants to entities that provide services to those most in need – caretakers of children born with NAS who live in some of the most underserved areas of the United States.  Specifically, grant recipients from the NAS Monitoring Trust must advance all or any of the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school; (ii) informing through evidence the standard of care for all NAS Children ages zero to six, with priority given to NAS Children ranging in age from three to six; and/or (iii) enhancing the mother-child dyad.  Disclosure Statement, § I.B [NAS1708].

including avoiding the impact of what would likely be painful and burdensome discovery that its clients would have to comply with in any litigation; (c) the likelihood of prevailing in litigation against the beneficiaries of the third party releases, including the Sacklers; and (d) the ability to "win the race to the courthouse" against tens of thousands of other parties and collect if they were able to prevail in such litigation.

Suffice it to say, the NAS Committee was a very late supporter of the Plan, notwithstanding that the earliest versions of the Plan provided for an abatement program dedicated to addressing the needs of the NAS Children. In fact, it filed an extensive objection to the Disclosure Statement outlining the unfair burden on the NAS Children to recover under the PI TDP included in the first three versions of the Plan. See generally *NAS Ad Hoc Committee's Limited Objection to Disclosure Statement and Solicitation Procedures Motion* [NAS1583]. After months of arduous and often contentious negotiations, and with the invaluable assistance of Mediator Kenneth R. Feinberg, the Plan was substantially modified to address the NAS Committee's most significant concerns—that the NAS Children's claims be separately classified from the non-NAS claims, that such claims be payable from a dedicated pool of funds pursuant to a separate trust distribution procedures (the "NAS PI TDP").

These changes offer a fast, certain, and relatively smooth path to recovery for virtually all NAS Children, a result that is unlikely to be replicated in any aspect outside of the Plan. The NAS Committee, fully aware of the third-party releases, therefore became a "Supporting Claimant" and recommended that its clients vote in favor of the Plan. Those clients, in fact, voted overwhelmingly in favor of the Plan, including the third-party releases. *Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and*

*its Affiliated Debtors* (the "Balloting Report") [NAS2197] (noting that 98.08% of NAS Children that voted chose to accept the Plan as drafted).

For these reasons and those set forth below, the NAS Committee strongly urges the Court to affirm the Bankruptcy Court's opinion confirming the Plan.

        1.    Victims' Support for the Plan

More compelling than the hundreds of pages of legal argument on the propriety of third-party releases in these cases was the eloquent testimony of Creditor Committee members Kara Trainor, an opioid use disorder ("OUD") victim, and parent of NAS Child, and Cheryl Juaire, a parent who lost two children to the opioid crisis, regarding the need for immediate payments to opioid victims.[9] See *Declaration of Kara Trainor in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal* (the "Trainor Declaration"), ¶ 13, 16   [NAS3403, 3405]; *Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal* (the "Juaire Declaration," and together with the Trainor Declaration, the "Victim Declarations")*,* ¶¶ 11, 14, 21-22 [NAS3392-93, 3395].

As set forth in the Victim Declarations, Ms. Trainor and Ms. Juaire have dedicated their lives to fighting the opioid epidemic.  Trainor Declaration at ¶¶ 3-4 [NAS3400]; Juaire Declaration at ¶¶ 3, 7 [NAS3390-91].  Ms. Trainor and Ms. Juaire have seen first-hand how grass-roots community organizations that already serve people with OUD and NAS are in desperate need of

---

[9]    When denying the motions to stay the Confirmation Order pending appeal filed by the UST, certain Objecting States and certain other Appellants (the "Stay Motions"), the Bankruptcy Court noted "[a]s Ms. Juaire and Ms. Trainor eloquently have  testified, that payment is, if made, to be put to use both for the immediate needs of the individual victims and for  abatement purposes at a time when every dollar counts. And as time passes, the problem only gets worse."  See Nov. 9, 2021 Hr'g. Tr. at 274:2-6 (the "November 9 Transcript") [NAS4171].

funding through their leadership and advocacy work.   See Trainor Declaration at ¶¶ 17-19 [NAS3405-06]; Juaire Declaration at ¶¶ 24-25 [NAS3396-97].

Ms. Trainor and Ms. Juaire were active Creditors' Committee members in which capacity they participated in approximately 200 hundred phone calls and reviewed over 700 hundred emails, many of which had multiple attachments.  Trainor Declaration at ¶ 10 [NAS3402]; Juaire Declaration at ¶ 10 [NAS3392].   After having direct access to all available information, Ms. Trainor and Ms. Juaire decided to support the Plan, including the third-party releases.   Trainor Declaration at ¶ 12 [NAS3403]; Juaire Declaration at ¶ 10 [NAS3392].

Why?  Two reasons.  First, it is best alternative available at this point given the facts and circumstances of these cases.  Second, it is the most expeditious way to both start funding programs to help abate the opioid epidemic and compensate victims.  Trainor Declaration at ¶ 16 [NAS3395]. ("Every passing day that goes by results in more harm, more death, more psychological and physical pain, more trauma, and more stress"); Juaire Declaration at ¶ 14 [NAS3393]. ("[T]he Plan provides a means to start contributing funds to help abate the opioid epidemic and compensate victims as soon as possible").  From their own experiences, Ms. Trainor and Ms. Juaire understand that no amount of victim compensation could ever make up for what has happened, but these funds will make a difference in people's lives.   Trainor Declaration at ¶ 18 [NAS3406]; Juaire Declaration at ¶ 25 [NAS3396-97].

The Plan will enable vital programs to be funded, and for victims to be compensated, far faster than any alternative.  Are any of Ms. Trainor, Ms. Juaire, the Creditors' Committee, and the NAS Committee satisfied with the amount the Sacklers are contributing to the Plan?  No. However, in the view of Ms. Trainor (Trainor Declaration at ¶ 13), Ms. Juaire (Juaire Declaration

at ¶ 14), the Bankruptcy Court,[10] and the NAS Committee, the Plan is the best alternative available

under the circumstances and should be approved as each of the <u>TMT Trailer</u> factors were met

regarding the proposed Plan Settlement.  <u>MBR</u>, at p. 76-77 [NAS3305-06]; <u>see also Protective</u>

<u>Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414 (1968).

The victims of the opioid crisis have spoken clearly and loudly, overwhelmingly approving

the Plan.  Unfortunately, the Appellants are not listening, instead focusing on those who did not

vote (despite having notice of the Debtors bankruptcy cases through the most expensive and

extensive noticing campaign in bankruptcy history).[11]  The Appellants' arguments are far too

---

10      After noting that "[b]itterness over the outcome of these cases is completely
understandable. Where there has been such pain inflected, one cannot help but be bitter. But one
also must look at the process and the issues in the light of the alternatives and with a clear
understanding of the risks and rewards of continued litigation versus the settlements set forth in
the plan," the Bankruptcy Court stated, "I must say that at the middle stage of these cases, before
the mediation, I would have expected a higher settlement. And frankly anyone with half a brain
would know that when I directed a second mediation, bravely undertaken by Judge Chapman, I
expected a higher settlement, perhaps higher than the materially improved settlement that resulted
from that mediation. **Nevertheless, extremely well represented and dedicated parties on the
prospective plaintiffs' side, knowing far more than I have laid out today about the strengths
and weaknesses of the claims, costs, delay, and collection issues, agreed to this settlement as
modified as a result of that second mediation**."  <u>MBR</u> at p. 71, 100-01 [NAS3300, 3329-30]
(emphasis added).

11      Throughout the *Brief of Appellant, William K. Harrington, United States Trustee* (the "<u>UST</u>
<u>Brief</u>") [NAS3439], the UST alleges there was an issue with notice.  These complaints ring hollow
considering that the Debtors' bankruptcy cases, including the third-party releases, are among the
most publicized cases in the history of the United States.  <u>MBR</u>, p. 5-8 [NAS3233-37]; <u>Balloting</u>
<u>Report</u> [NAS2190-93].  The UST further asserts that the releases are incomprehensible.  While
they may be the most heavily negotiated and carefully drafted release provisions in history, they
boil down to a simple concept that everyone understands - that the Sacklers will not have liability
related to the Debtors' opioid products if the Plan becomes effective.  <u>MBR</u>, p. 7 [NAS3236]
(notices of Sackler releases were in "plain English").  This concept has been reported by nearly
every media outlet in the country, whether it be broadcast, newspapers, magazines, Facebook,
Twitter, Snapchat, Tik-Tok and numerous other social media platforms throughout the world since
the filing of the Debtors' bankruptcy cases.  <u>MBR</u>, p. 6 [NAS3235] ("Ms. Finegan's calculations
reflect literally **billions of hits** on the internet and social media as well as reliable estimates of the
very wide extent of the other means of notice by TV, radio, various types of publications,
billboards, and outreach to victims' advocates and abatement-centered groups") (emphasis added).
To say that someone did not have notice that the Plan included these third-party releases is

speculative.  To illustrate, the Appellants emphasize claims that may be brought, without any regard to whether such claims will be actually brought, and if brought whether the movant could prevail, and if the movant prevails, whether the movant will be able to collect.  The NAS Committee urges the Court to follow the Bankruptcy Court's lead of focusing on the reality of the situation and those interested parties who **did** participate, either by serving on the Creditors' Committee like Ms. Trainor and Ms. Juaire or the tens of thousands of others that voted overwhelmingly to approve the Plan (including the third-party releases), rather than focusing on the hypothetical and those who **did not** participate in the Debtors' Chapter 11 Cases.

The opioid crisis is getting worse, not better.  According to the Health Resources & Services Administration website,[12] **more than 130 people a day are dying** from opioid-related drug overdoses.  How many more lives have to be lost before more is done to abate the crisis? Funds need to be expended NOW to fight the crisis.  Eliminating $4.3 billion of funds is clearly not the answer.  See MBR at p. 102 [NAS3331] (noting that the $4.3 billion is, to the Bankruptcy Court's knowledge, "the highest amount that any shareholder group has paid for these types of claims").  Yet this is exactly what Appellants ask this Court to do.[13]  Given that there is no

---

preposterous.  See also MBR at p. 114 [NAS3343] (noting that "holders of claims received sufficient notice of the proposed release").

[12]      Opioid Crisis, HEALTH RESOURCES & SERVICES ADMINISTRATION, https://www.hrsa.gov/opioids#:~:text=More%20than%20130%20people%20a%20day%20die%20from,reversal%20drugs%20are%20critical%20to%20fighting%20this%20epidemic.

[13]      The NAS Committee understands that the UST uniformly opposes third-party releases as a matter of principle.  It has, however, never opposed such releases when the risk to society is as great as it is in the case. Never has it done so when the parties receiving the releases are contributing $4.325 billion to abate the second (only to COVID-19) worst public health crisis in the country today.  Plainly stated, if the UST is successful and the Confirmation Order is overturned, lives will be lost.  Lives that could be saved through the abatement programs contemplated by the Plan. At what cost is the UST willing to litigate on principle?  Apparently at all costs, even at the risk of loss of life, even when there are no alternatives, as in the Debtors' cases.

alternative to the Plan, this Court should listen to the actual victims of the opioid crisis instead of those without an actual stake in the outcome and affirm the Confirmation Order.

        2.     The Simplicity of the NAS TDP

While unclear in its pleading, the UST appears to be objecting to the NAS PI TDP when it states that the additional trust claim process "will emotionally, physically, psychological[ly] burden each individual Creditor by incurring, yet again, excessive time, energy and expense completing and submitting additional claim forms and evidence previous [sic] submitted."). UST Brief at p. 13 [NAS3463]. Nothing could be further from the truth, as the NAS PI TDP (drafted by the NAS Committee) is a model of egalitarian simplicity that would not be achievable outside of the Plan.

To recover under the NAS TDP, an NAS caregiver must only submit evidence showing that the NAS Child was diagnosed by a licensed medical provider with a medical, physical, cognitive, or emotional condition resulting from such natural person's intrauterine exposure to opioids or opioid replacement or treatment medication, including but not limited to a diagnosis of NAS. Disclosure Statement, § III.S.7 [NAS1808-10].

Those satisfying this comparatively light burden are expected to be allocated approximately $7,000 per claimant, before deductions and holdbacks for costs, fees, and expenses. Id. [NAS1810]. This is a result that, as set forth in the Final Mediator's Report, is certainly reasonable under the circumstances. *Mediator's Report* at ¶ 11 [NAS2184] ("I believe this resolution is fair and appropriate, and consistent with my understanding of what is a reasonable award for certain types of personal injury victims within a wider group of general personal injury victims"). Upon information and belief, as many caregivers' incomes are below the poverty line

(annual income of $26,500 for a family of four),[14] this distribution will materially improve the ability of these caregivers to care for NAS Children.

The NAS PI TDP eliminates the following perceived and actual barriers to recovery:

- Reluctance of both the birth mother and/or the caregivers of NAS Children to come forward, (i) as it could expose the birth mother to arrest for violation of various state laws (birth mother), and (ii) for fear of NAS caregivers being stigmatized both individually and because they do not want their children to be known as NAS Children;[15]

- Difficulty in proving their cases because an NAS Child caregiver is unable to produce required medical records because the birth mother cannot be located;

- Difficulty in proving damages as NAS symptoms are less understood then OUD.  In fact, it was not until 2017 that Health and Human Services even recognized the need for a clear definition of NAS and standardized diagnosis methods and codes. These standardized codes and methods are just now being issued;[16] Medical understanding of long-term effects of NAS started in 2019 with the first longitudinal study now underway, which will not conclude until 2023;[17]

---

[14]    See Federal Poverty Level (FPL), HealthCare.gov Glossary, https://www.healthcare.gov/glossary/federal-poverty-level-FPL/.

[15]    Kris Mamula and Stephanie Strasburg, *Offspring of the Drug Crisis: Substance Exposed Babies*, PITTSBURGH POST-GAZETTE, Oct. 2, 2021(acknowledging stigma of giving birth while on drugs and noting "40% of substance-exposed babies, many born underweight or early, will show muscle rigidity and other signs of drug withdrawal. Sometimes the moms of these children check out of the hospital early without good contact information, leaving their babies behind so child protection authorities can take care of them…And even when parents desperately want to keep their babies, they are often walled off from the rest of the world by the shame and stigma of giving birth while using drugs or other substances"); see also *COVID-19 Converges With The Opioid Epidemic: Challenges For Pregnant And Postpartum Women With Opioid Use Disorder*, HEALTH AFFAIRS BLOG, Feb. 19, 2021, https://www.healthaffairs.org/do/10.1377/hblog20210218.847791/full/ ("Pregnant and postpartum women with OUD face many barriers to care including availability, cost, stigma, and fear of legal consequences and/or child welfare involvement." In fact, it was not until January 2020 that "CMS made grants to 10 states for Maternal Opioid Misuse (MOM) model programs designed to increase quality of care, improve maternal and infant outcomes, and expand access to treatment. The initial start date for the program was January 2021 but has been delayed until July 2021 due to the public health emergency").

[16]    GAO-18-32.

[17]    *ACT NOW Longitudinal Study: Outcomes of Babies With Opioid Exposure Study (OBOE)*, CLINICALTRIALS.GOV, Sept. 2, 2021, https://clinicaltrials.gov/ct2/show/NCT04149509.

- Inability to collect, as an NAS Child would likely "lose the race to the courthouse" to the public entities and other opioid victims as NAS trials would likely take more time than other opioid-related trials and, given that there are not sufficient resources to pay all potential judgments, would face insurmountable hurdles in collecting any judgment against the Debtors or the Sacklers (assuming that they could satisfy the heavy burden that the Sacklers would be held individually liable for the Debtors' conduct).  See generally *Declaration of Timothy J. Martin* [NAS2323]; *Statement of the Raymond Sackler Family in Support of Confirmation of Debtors' Sixth Amended Plan of Reorganization and in Reply to Plan Objections* [NAS3048]; *Declaration of Jonathan Greville White* (the "White Decl.") [NAS3186]; MBR, 92-103 [NAS3321-32].

In summary, under the Plan, the NAS Children do not face any of the overwhelming hurdles to recovery they would face outside of the Plan, which is why the caregivers of NAS Children voted overwhelmingly in favor of the Plan.  It is only if this Court fails to affirm the Confirmation Order that NAS claimants will need to spend "excessive time, energy and expense completing and submitting additional claim forms and evidence previous [sic] submitted" as they will be asked to produce extensive medical records (that they may not have access to if there is no contact with the birth mother) and be subject to burdensome discovery that the UST is concerned about.  UST Brief at p. 13 [NAS3463].

### B.    All NAS Children Will Suffer Irreparable Harm if the Confirmation Order is not Affirmed

As the Bankruptcy Court found throughout the MBR, the same settlement could not have been reached outside of the Plan.   Further, without the Plan, there would be a disastrous transfer of value **to** the United States government **from** those parties injured by the Debtors' products (including NAS Children) and those seeking to abate the opioid crisis (including the NAS Monitoring Trust).  Under the Plan, creditors will receive approximately $5.5 billion over time, funded primarily by the Sacklers.  Disclosure Statement at p. 2-3 [NAS1693-94]; DelConte Decl. at ¶¶ 9-10, 48 [NAS2260-62, NAS2276-77].  Outside of the Plan, with the exception of the U.S. Government, all other creditors will likely receive **nothing**.   DelConte Decl. at ¶ 10

[NAS2260-62].   Indeed, the Bankruptcy Court found that even in the "best case" liquidation scenario, unsecured creditors would "receive no more than their *pro rata* share of $699 million, which would be small" as compared to the billions provided for under the Plan.  MBR at 141-142 [NAS3370-71].

Why?  Under the DOJ Resolution, the United States will have a $2 billion superpriority administrative expense claim against the Debtors if the Plan does not become effective, leaving nothing for all other creditors. Why?  As of the Petition Date, the Debtors' assets were worth approximately $1.5 billion [NAS0163].   The NAS Committee is unaware of any evidence suggesting that the Debtors are worth more than $1.8 billion.  MBR at p. 91 [NAS3320].  As set forth in the DelConte Decl., no creditor, including the Objecting States, will recover anything from the Debtors in such circumstances [NAS2260-62].

Moreover, when confirming the Plan, the Bankruptcy Court noted the lack of alternatives when stating that "[w]ithout the $4.325 billion being paid by the Sacklers under the plan and the other elements of the Sackler settlements . . . [t]he private/public settlement would fall apart and the abatement settlements would likely fall apart for lack of funding," and "inevitable fighting [would occur] over a far smaller and less certain recovery with its renewed focus on pursuing individual claims and races to collection."  MBR at p. 73-74 [NAS3302-03]; see also MBR at 135 [NAS3364] ("[I]t is also clear that the monetary contributions by the Sacklers and their related entities are critical to confirmation of the plan. Without the settlement payments, I find that the plan would unravel, including the complex interrelated settlements that depend upon the payments being supplied under the settlement in addition to the non-monetary consideration under it").

The Bankruptcy Court further stated that a chapter 7 liquidation and "ensuing litigation chaos" would be "the most likely result" if the Shareholder Settlement was not approved and the

Plan not confirmed.  Id. at p. 90 [NAS3319]; see also id. at p. 141 [NAS3370] ("[W]ithout the releases the plan would unravel and the Debtors' cases would likely convert to cases under Chapter 7 of the Bankruptcy Code"). [18]   Indeed, the Bankruptcy Court approved the Shareholder Settlement, while noting that the Chapter 11 Cases had "the most extensive discovery process … any court in bankruptcy has ever seen."  MBR at p. 78 [NAS3307].  Conversion to chapter 7, on the other hand, would be the worst possible outcome, as the Debtors and the other Appellees, with their advisors, previously considered a potential sale of the business, but found that the Plan Settlement was a better outcome.  It was determined that the sale proposals "were not value maximizing for the Debtors and its stakeholders, provided significantly less cash to the estate than the Debtors' Plan, [and] resulted in stakeholders continuing to be tied to the performance of the Debtors' opioids business for a significantly longer period of time than would the Plan."  Disclosure Statement, § III.N [NAS1773].

Outside of the Plan, the Sacklers will, of course, retain their $4.3 billion.  While they may assuredly be subject to litigation, the path to liability is, uncertain at best, given the various

---

[18]     It is extraordinarily unlikely that any bankruptcy filing by a Sackler family member would yield any benefit to creditors given that the Sackler family finances have been thoroughly investigated by the attorney generals of nearly every state and some of the largest, most respected and sophisticated professional firms in this country, all of whom are incentivized to achieve the highest settlement possible, including (i) law firms Akin Gump Strauss Hauer & Feld LLP, Brown Rudnick, LLP, Caplin & Drysdale, Chartered, Kramer Levin Naftalis & Frankel LLP, Brown Rudnick LLP, Motley Rice LLC, Otterburg PC, Pillsbury Winthrop Shaw Pittman LLP, Simmons Hanly Conroy LLC  and White & Case LLP, and (ii) financial advisory and investment banking firms FTI Consulting, Inc., Houlihan Lokey Capital, Inc, Jefferies, LLC, and Province, LLC.  See, e.g., MBR at p. 81-82 [NAS3310-11] (noting that the Sacklers were vetted by a plethora of sophisticated firms).  None of the parties retaining such firms would have agreed to the Plan if it was believed that they could achieve a better result outside of the Plan.  In the unlikely event that members of the Sackler family file individual bankruptcy cases, there is no reason to believe that an estate fiduciary would discover collectable assets.  The only beneficiaries of such bankruptcy cases would be, of course, the estate professionals, who would be paid at the expense of creditors.  There is no reason to go through what would clearly be an exercise in futility in light of the thorough completed investigations of the Sacklers' assets.

defenses that they will undoubtedly raise and even worse with respect to collectability as the Sacklers' assets may ultimately be found to be out of the reach of creditors.  See, e.g., MBR at p. 85-89 [NAS3314-18] (detailing the difficulties creditors will have in collecting against the Sacklers); p. 99 [NAS3328] (commenting on the enforceability of spendthrift trusts); White Decl. at ¶ 7-17 [NAS3189-94].

In this scenario, creditors would be in a substantially worse position than they were even as of the Petition Date as hundreds of millions of dollars of professional fees will, in effect, have gone down the drain, with nothing in return.   The Appellants fail to allege, if successful, either how they would collect on any claims against the Sacklers or the Debtors or how that recovery would be greater than the amounts proposed under the Plan.  As the Bankruptcy Court recognized, vengeance is not a reason not to confirm the Plan as the settlement "**generally reflects the underlying strengths and weaknesses of the opposing parties' legal positions and issues of collection, not moral issues or how someone might see moral issues.  It is not enough simply to say 'we need more,' or 'I don't care whether we don't get anything; I'd rather see it all burned up before the Sacklers keep anything**.'  One must focus on the foreseeable consequences of litigation versus settlement."  See MBR at p. 100 [NAS3329] (emphasis added).  The Sacklers will clearly assert numerous defenses to allegations of personal liability for the actions of the Debtors, many of which have already been brought to the forefront during mediation and throughout the Chapter 11 Cases.

Indeed, even if the Appellants were able to chase the Sacklers through the court systems (no doubt at a cost of millions of dollars that otherwise could have gone to the NAS Children, among others), it is likely that the parties most affected by the opioid crisis—individual claimants (those parties that the UST claims to be protecting)—are unlikely to win the "race to the

courthouse" that would ensue and collect any funds from the parties.  See, e.g., MBR at p. 88-91 [NAS3317-20] (noting potential collectability issues against the Debtors and Sacklers).

Thus, without the Plan, the NAS Children, all other creditors, and the United States public, will be irreparably harmed as follows:

- No abatement dollars.  Under the Plan, approximately $4 billion will be committed to combatting the opioid crisis, to be primarily funded by the Sacklers, including $60 million to the NAS Monitoring Trust. Outside of the Plan, **no** funds will be funneled to the NAS Monitoring Trust and the net proceeds of the Debtors' estates will range from $281.1 million to $3.1 billion, with a midpoint of $1.65 billion. DelConte Decl. at ¶ 8 [NAS2259].  Based on the mid-point, these funds (substantially less than $4.3 billion) will be paid directly to the United States government and will not be required to be used to abate the opioid crisis, [19] unlike the States who are required to dedicate the settlement proceeds exclusively to abatement.  Id. at ¶ 9-10 [NAS2260-62]; see also MBR at p. 50 [NAS3279] ("Without that agreement, the goals of the Bankruptcy Code would have been jeopardized. Such a failure would have resulted in extensive litigation over the various states' claims, a lengthy delay in making distributions to abate the opioid crisis, and arguably a fallback to distributing the value under the plan not for abatement purposes but, rather, for general use by states and other public creditors.").

- No compensation to victims.  Victims will have to pursue their claims in state courts throughout the country, resulting in them having to relive their opioid nightmares, including complying with burdensome discovery (including, for NAS Children, trying to obtain medical records that may be difficult to obtain if the birth mother is either not alive or in the picture), overcoming numerous defenses, being subject to cross-examination at trial, and likely losing the race to the assets of the Debtors and the Sacklers to the better-funded public claimants.

- No public repository. Under the Plan, the Debtors will create the Public Document Repository, which shall contain a copy of the more than 13,000,000 documents (of more than 100,000,000 pages) produced by Debtors during the course of the Purdue

---

[19]     The U.S Attorney comment at the hearing on the Stay Motions that "while we couldn't direct those monies towards an abatement fund, you know, the largest recipients of civil recoveries are federal health care agencies that provide billions of dollars towards opioid use disorder treatment" is not to the contrary.  November 9 Transcript at 220:19-22 [NAS4117].  First, he admits that the U.S. Government cannot, and would not, be *required* to use the funds towards abatement as the states are so required under the Plan.  More importantly, he fails to acknowledge that, even in the best case, the funds committed to abate the opioid crisis will *decrease by over $2.0 billion*.

Legal Matters, providing critical information and documents that, *inter alia*, reflect clinical and pre-clinical research regarding opioids, including research related to safety and effectiveness of opioids, suspicious order monitoring data and documents; and reports of concern and ADD files pertaining to prescribers.  See Disclosure Statement at III.X [NAS1825-27].  If the Confirmation Order is not affirmed, there can be no assurances that any of these documents will be made public.

Without the Plan, actual victims of the opioid crisis face an uncertain, if not impossible, path to desperately-needed compensation, especially funding for those caring for NAS Children. Further, essential programs will be deprived of critical funding that is desperately needed to carry out their missions, including programs that focus on: (i) combatting addiction; (ii) saving people from overdoses; (iii) providing recovery support and preventing relapses; and (iv) providing other services to victims of the opioid funds.

In such circumstances, not only will the NAS Children lose any benefits bestowed by the confirmed Plan, the NAS Children will likely fare significantly worse under a different plan. Simply put, litigation on principle (the UST) or vengeance against the Sacklers (the Objecting States) defeats the very purposes of the Bankruptcy Code[20] especially as it will not compensate the NAS Children and other opioid victims, will not fund research and other abatement strategies,

---

[20]     As the Bankruptcy Court stated:

> Bankruptcy cases present a unique and perhaps the only means to resolve the collective problem presented by an insolvent debtor and a large body of creditors competing for its insufficient assets, including especially when there are mass claims premised on products to which, as here, massive harm is attributed.  Bankruptcy cases focus the solution away from individual litigations to a fair collective result subject to the unique ability under bankruptcy law to bind holdouts under well-defined circumstances who could not otherwise be bound under non-bankruptcy law.

MBR at p. 3 [NAS3232].

and will not make millions of opioid-related research documents available to the public domain.  It will, however, allow the Sacklers to retain $4.325 billion.

### III.    CONCLUSION

Overturning the Confirmation Order would have a disastrous impact on the country's ability to combat the ongoing opioid crisis.  For what?  So the UST can prevail on principle? So that a small number of states can make life miserable for the Sackers by litigating against them for the foreseeable future.  Who "wins" in that case?  Not the actual victims who voted for this Plan.

If any Sackler family member committed a crime, the federal government and the Objecting States (and all other states) have every right, and indeed the obligation, to charge them at any time.  It is telling that none of them have been charged criminally.  The Objecting States and the U.S. Government are not seeking to protect anyone's interest but their own, at a terrible cost to society that is impossible to compute.  Most can agree the Sacklers are, to put it mildly, not a sympathetic family.  Neither principle nor vengeance, however, will compensate the NAS Children and other opioid victims, fund research and other abatement strategies, and make millions of opioid-related research documents available to the public domain.   The Confirmation Order should therefore be affirmed.

Dated: November 15, 2021
New York, New York

<div style="margin-left:40%">

**LEVENFELD PEARLSTEIN, LLC**
*Counsel for Ad Hoc Committee of NAS Children*


By:  /s/ Harold D. Israel

Harold D. Israel
2 North LaSalle St., Suite 1300
Chicago, Illinois 60602
Telephone: 312-346-8380
Facsimile: 312-346-8434
hisrael@lplegal.com

</div>

**MARTZELL, BICKFORD & CENTOLA**
Scott R. Bickford (LA 1165)
338 Lafayette Street
New Orleans, LA 70130
Telephone: 504-581-9065
Facsimile: 504-581-7635
sbickford@mbfirm.com
srd@mbfirm.com
usdcndoh@mbfirm.com

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION

I hereby certify that:

1.      This document complies with the word limit of Fed. R. Bankr. P. 8017(a)(5) because it contains 6,017 words.

2.      This document complies with the typeface requirements of Judge McMahon's *Individual Practices and Procedures* because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point font.

Dated: November 15, 2021                    By:  /s/ Harold D. Israel

**LEVENFELD PEARLSTEIN, LLC**
Harold D. Israel (admitted *pro hac vice*)
2 North LaSalle St., Suite 1300
Chicago, Illinois 60602
Telephone: 312-346-8380
Facsimile: 312-346-8434
hisrael@lplegal.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of New York by using the CM/ECF system.  I certify that participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Further, in compliance with the Court's Standing Order dated November 25, 2009, and the May 21, 2021 Individual Practices and Procedures—Chief Judge Colleen McMahon § V(A), I have caused courtesy copies, marked as such, to be sent via first class U.S. mail to:

The Honorable Colleen McMahon
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street, Room 2550
New York, NY 10007-1312

/s/ Harold D. Israel