# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br>BANKRUPTCY APPEALS<br><br>This Filing Relates to<br><br><br>ALL MATTERS | 21 cv 7532 (CM)<br>21 cv 7585 (CM)<br>21 cv 7961 (CM)<br>21 cv 7962 (CM)<br>21 cv 7966 (CM)<br>21 cv 7969 (CM)<br>21 cv 8034 (CM)<br>21 cv 8042 (CM)<br>21 cv 8049 (CM)<br>21 cv 8055 (CM)<br>21 cv 8139 (CM)<br>21 cv 8258 (CM)<br>21 cv 8271 (CM)<br>21 cv 8548 (CM)<br>21 cv 8566 (CM)<br><br>On Appeal from the United<br>States Bankruptcy Court for the<br>Southern District of New York |

## AD HOC COMMITTEE OF NAS CHILDREN'S APPENDIX

**LEVENFELD PEARLSTEIN, LLC**
Harold D. Israel
2 North LaSalle St., Suite 1300
Chicago, Illinois 60602
Telephone: 312-346-8380
Facsimile: 312-346-8434
hisrael@lplegal.com

**MARTZELL, BICKFORD & CENTOLA**
Scott R. Bickford (LA 1165)
338 Lafayette Street
New Orleans, LA 70130
Telephone: 504-581-9065
Facsimile: 504-581-7635
sbickford@mbfirm.com

# TABLE OF CONTENTS

**Bankruptcy Court Filings**

Schedules of Assets and Liabilities for Purdue Pharma L.P.................................................NAS0001

NAS Ad Hoc Committee's Limited Objection to Disclosure Statement and Solicitation
    Procedures Motion ........................................................................................................NAS1583

Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue
    Pharma L.P. and its Affiliated Debtors ........................................................................NAS1683

Mediator's Report ............................................................................................................NAS2182

Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and
    Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of
    Purdue Pharma L.P. and its Affiliated Debtors ............................................................NAS2188

Declaration of Jesse DelConte ..........................................................................................NAS2253

Declaration of Timothy J. Martin .....................................................................................NAS2323

Statement of the Raymond Sackler Family in Support of Confirmation of Debtors' Sixth
    Amended Plan of Reorganization and in Reply to Plan Objections ............................NAS3048

Declaration of Jonathan Greville White. ...........................................................................NAS3186

Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter
    11 Plan ........................................................................................................................NAS3230

Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of
    Unsecured Creditors To Motions for Stay Pending Appeal .........................................NAS3389

Declaration of Kara Trainor in Support of the Opposition of the Official Committee .....NAS3399

**Appeal Filings**

Memorandum in Support of Ad Hoc Committee of NAS Children's Motion for Leave to
    Intervene as Appellee Pursuant to Rule 8013(g) of the Federal Rules of Bankruptcy
    Procedure ....................................................................................................................NAS3408

Order on the Pending Motions to Intervene by the Ad Hoc Committee of NAS Children,
    the Multi-State Government Entities Group, and the Ad Hoc Group of Individual
    Victims of Purdue Pharma L.P., et al..........................................................................NAS3437

Brief of Appellant, William K. Harrington, United States Trustee ..................................NAS3439

**<u>Bankruptcy Court Transcripts</u>**

August 23, 2021 Transcript of Proceedings........................................................................NAS3510

November 9, 2021 Transcript of Proceedings ...................................................................NAS3898

# Exhibit D

NAS2676

# Raymond-side Updated Net Assets Report

*March 1, 2021*

**NAS2677**

1
PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Confidentiality Terms

- This report is governed by the Third Amended Protective Order signed and entered by the bankruptcy court on November 12, 2020 (D.I. 1935) (the "Protective Order").

- This report is designated Professionals' Eyes Only/Highly Confidential Information under the Protective Order.

**NAS2678**

# Huron Engagement Terms

- *Huron Consulting Services LLC ("Huron") was retained by Milbank LLP and Joseph Hage Aaronson LLC (together "Counsel") to provide certain services as set forth in the engagement letter dated May 20, 2019 ("Engagement Letter").*

- Huron is a management consulting firm and not a CPA firm. Huron does not provide attest services, audits, or other engagements in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA ") or promulgated by the Public Company Accounting Oversight Board ("PCAOB"). The procedures Huron performed were for the purposes of responding to the services outlined in the Engagement Letter noted above and did not include independent verification of information provided by management, financial statement balances or internal controls, the performance of which might have revealed additional information that could affect the findings of this report. Accordingly, we express no opinion or other form of assurance on any financial statements, management representations of other derived data accompanying or included in this report.

- Any analytical, forecasting or other model that we create as part of our services will be unique to this engagement, based on specific circumstances and assumptions, and may not be appropriate for use when those circumstances and assumptions change.

**NAS2679**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Introduction

NAS2680

# Introduction

On January 15, 2020 Huron presented the Raymond-side Net Assets Report (the "Net Assets Report") in response to the Amended and Restated Stipulation which contemplated that the Shareholder Parties would provide the following to the legal and financial advisors to the Debtors and the UCC:

- (i) *"[A] report setting forth the net assets of the Initial Covered Sackler Persons, which report will set forth the approximate aggregate value of the assets owned by category (e.g. cash, securities, real estate, private and other investments, etc.) and the approximate liabilities, also by category"*

- (ii) *"An attestation from a responsible person or independent third-party as to the accuracy of the report"*

 *See Amended and Restated Stipulation ¶ 17(a)*

**The Amended and Restated Stipulation provides that "Initial Covered Sackler Person" means as follows:**

- Beverly Sackler, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, and Theresa Sackler;

- any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such); and

- each Shareholder Party and each other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors

*See Amended and Restated Stipulation ¶ 1*

*The January 15, 2020 Net Assets Report used October 31, 2019 balances. The purpose of this report (the "Updated Net Assets Report") is to update the January 15, 2020 Net Assets Report with balances as of September 30, 2020.*

- The categories used for the Updated Net Assets Report are listed and described on pages 97-100 hereof

**NAS2681**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond-side Initial Covered Sackler Persons

**Raymond-side Initial Covered Sackler Persons are listed in the Raymond-side Informational Presentation provided on November 22, 2019 (the "November 22, 2019 Presentation")**

**For the purpose of this Updated Net Assets Report, the Initial Covered Sackler Persons are organized as follows:**

- **Individuals:**
  - Individuals consist of Richard Sackler, David Sackler, the Estate of Jonathan Sackler, and the Estate of Beverly Sackler[1]
  - Certain revocable and self-settled trusts described in Categories Three and Four (defined below) of the November 22, 2019 Presentation are instead described in this Updated Net Assets Report alongside the relevant individuals (i.e., Richard Sackler, David Sackler, the Estate of Jonathan Sackler, and the Estate of Beverly Sackler)

- **Trusts:** Trusts are described in four general categories for this Updated Net Assets Report:
  - Category One: Trusts that indirectly own interests in Purdue
  - Category Two: Trusts created by division or decanting from other trusts
  - Category Three: Other trusts that directly and/or indirectly own interests in IACs
  - Category Four: Other trusts, including life insurance trusts

- **Entities:** Entities consist of various limited partnerships, limited liability companies, and corporations through which Raymond-side interests in Purdue are held
  - As discussed on page 20, because the values of all such entities are captured on the balance sheets of the individuals and trusts presented herein (because such individuals and trusts are the entities' ultimate owners), the entities are separately presented in Appendix A.

(1) The Initial Covered Sackler Persons also include trustees of the covered trusts, solely in their capacity as such; however, trusts are organized by trust rather than trustee for ease of reference

**NAS2682**

# Bridge to the January 15, 2020 Report

NAS2683

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Bridge Overview

1. The asset values contained in this presentation are the amounts as reported on the respective Initial Covered Sackler Person's September 30, 2020 balance sheets, unless otherwise noted.

2. The bridge analysis compares the amounts presented in the January 15, 2020 Raymond-side Net Assets Report, which incorporate October 31, 2019 balance sheets to September 30, 2020 balance sheets, unless otherwise noted.

3. If a change in an asset balance is shown as a positive number, the underlying asset has increased in value when comparing the October 31, 2019 to September 30, 2020 balances. A negative change indicates the asset has decreased in value. If a change in a liability balance is shown as a negative number, then the liability has decreased in value, thereby increasing net assets when comparing the October 31, 2019 to September 30, 2020 balances.

4. On June 30, 2020, Jonathan Sackler, an Initial Covered Sackler Person, passed away. Prior to Jonathan Sackler's death, certain assets were transferred to the JDS Revocable Pourover Trust as part of typical estate planning. The transfers were made pursuant to a Receipt, Refunding and Guarantee Agreement which provides that if the Estate of Jonathan Sackler requires any or all the assets transferred by Jonathan Sackler to the JDS Revocable Pourover Trust to discharge obligations of the Estate, then the JDS Revocable Pourover Trust has been instructed (and agreed) to refund on demand to the Estate such transferred assets in the amount necessary for full and timely payment of such obligations. Accordingly, solely for the purposes of reporting variances in this bridge analysis, the Estate of Jonathan Sackler and the JDS Revocable Pourover Trust are treated as if they are a single combined entity.

5. Additional detail is available on a trust-level basis in Appendix C.

**Total Variance**

- The aggregate net asset values for all Raymond-side Initial Covered Sackler Persons decreased by approximately $6.0M between October 31, 2019 and September 30, 2020.

**NAS2684**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond-side Net Asset Bridge Detail

**($ in Millions)**

| Net Assets Excluding Net IACs | | | |
|---|---|---|---|
| Net Assets Excluding IACs – Jan 15 Net Assets Report | $ | 4,963.7 | (1) |
| Net Decrease in Assets | | (239.4) | |
| (-) Net Decrease in Liabilities | | (62.4) | (2) |
| **Change in Net Equity** | **$** | **(176.9)** | |
| (+) Total Net Deficits | | 171.0 | (3) |
| **Change in Net Assets Available** | **$** | **(6.0)** | |
| **Net Assets Excluding Net IACs – Updated Net Assets Report** | **$** | **4,957.7** | |

| Summary of Changes in Net Assets Available | | | |
|---|---|---|---|
| Cheyenne Petroleum Company | $ | (349.1) | (4) |
| Marketable Securities and Hedge Funds | | (400.3) | |
| Private Equity Investments (Net CPC) | | 537.2 | |
| Notes Receivable (Net CPC) | | (1.5) | |
| Other Assets | | (25.7) | |
| **Net Decrease in Assets** | **$** | **(239.4)** | |
| (-) Net Decrease in Liabilities | | (62.4) | (2) |
| (+) Total Net Deficits | | 171.0 | (3) |
| **Change in Net Assets Available** | **$** | **(6.0)** | |

(1) The January 15, 2020 Net Assets Report stated that the sum of the net asset value presented for all Raymond-side ICSPs, net of IACs, was $4,983.1 ($19.4 more than the amount reported above) due to the net assets of the JDS CT Residence Trust 1 ($4.0) & JDS CT Residence Trust 2 ($15.4) having been double counted in the total.

(2) Decrease of $62.4M comprised of: decline of $113.8M in debt due to $146.2M of extinguished debt and mortgages offset by $32.4M of new debt raised; and an increase of $51.4M in estimated tax liability for unrealized gains.

(3) As noted in the Methodology section, ICSPs in a net deficit position (i.e., credit balances) are eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages. The Total Net Deficits line item, totaling $171.0M, aggregates three trusts together which each had net deficit positions on October 31, 2019 and September 30, 2020. The variances for the three trusts are listed below:

- Investment Trust ($168.4M),
- Irrevocable Trust under Declaration dated as of April 25, 1991 ($0.2M), and
- David Sackler ($2.4M)

(4) Cheyenne Petroleum Company ("CPC") is owned by several trusts and these trusts' interest in CPC is reflected as Private Equity Investments and/or Notes Receivable. CPC is discussed in further detail on page 10 of this Updated Net Assets Report.

**NAS2685**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Cheyenne Petroleum Company – Bridge Detail

- The value of Cheyenne Petroleum Company ("CPC"), a Raymond-side owned oil and gas business, was determined based on a third-party engineering report dated May 2020, that CPC adjusted as of June 2020. The value in the January 15, 2020 Net Assets Report was based on a third-party engineering report dated May 2019.

- The present value of the oil and gas reserves was determined using discount rates of 10% for Proved Developed Producing reserves and 20% for Proved Undeveloped reserves.

- The estimated value as of June 2020 is $169.2M, or $349.1M less than the value presented in the January 15, 2020 Net Assets Report. By way of comparison, the Cushing, OK WTI Spot Price FOB was $60.83 in May 2019, $38.31 in June 2020, and $40.05 in September 2020.

| ($ in Millions) | Jan 15, 2020 Net Assets Report | Updated Net Assets Report | Variance Increase / |
|---|---|---|---|
| **Direct Ownership - Private Equity Investments** | | | |
| Investment Trust | $ 190.6 | $ 28.9 | $ (161.6) |
| Richard Sackler | 1.4 | 0.3 | (1.2) |
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | 1.4 | 0.3 | (1.2) |
| **Indirect Ownership - Private Equity Investments** | | | |
| Richard Sackler | $ 9.0 | $ 4.1 | $ (5.0) |
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | 9.0 | 4.1 | (5.0) |
| 1A Trust | 6.0 | 2.6 | (3.4) |
| 2A Trust | 6.0 | 2.6 | (3.4) |
| 74B Trust | 0.0 | 0.0 | (0.0) |
| **Indirect Ownership - Investment Trust Notes Receivable** | | | |
| 74A Trust | $ 135.5 | $ 58.1 | $ (77.4) |
| AR Irrevocable Trust (decanted from the 74-AR Tru | 76.5 | 32.8 | (43.7) |
| AJ Irrevocable Trust (decanted from the 74-AJ Trus | 64.6 | 27.7 | (36.9) |
| 74B Trust | 18.1 | 7.8 | (10.3) |
| **Total** | **$ 518.3** | **$ 169.2** | **$ (349.1)** |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

NAS2686

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Marketable Securities and Hedge Funds / Private Equity Investments Bridge Detail

- Marketable Securities and Hedge Funds are investments made directly or indirectly (through various pooling investment vehicles) in stocks, other marketable securities and hedge funds managed by either a third-party manager or family office. The estimated value or Marketable Securities and Hedge Funds as of September 30, 2020 totaled $2,184.1M, or $400.3M less in comparison to the balance as of October 31, 2019.

- Private Equity Investments are investments made directly or indirectly in private companies, private equity funds, venture funds, joint ventures or private credit funds managed by either a third-party manager or family office. The estimated value as of September 30, 2020 was $1,662.7M, or $356.5M more than the value presented in the January 15, 2020 Net Assets Report.
  - A significant portion of the increase in Private Equity Investments is the result of an early-stage investment in a company that issued securities to the public through an IPO in 2020.
  - $180.8 million of the variance in Private Equity Investments relates to the trusts' investments in Cheyenne Petroleum. See the previous page which addresses CPC individually.

NAS2687

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Net Assets (Equity) Bridge Summary

**The table below summarizes the combined variances by grouping, as presented in this Updated Net Assets Report**

| ($ in Millions) | | 10/31/2019 | | Net Assets (Equity) 9/30/2020 | | Variance |
|---|---|---|---|---|---|---|
| Richard Sackler | $ | 216.4 | $ | 205.4 | $ | (11.0) |
| RSS Revocable Pourover Trust | | 0.0 | | 0.0 | | - |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler ("RSS BRP Trust") | | 3.4 | | 3.4 | | (0.0) |
| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler ("RSS FPC Trust") | | 133.3 | | 133.3 | | (0.0) |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler ("RSS XPC Trust") | | 0.0 | | 0.0 | | 0.0 |
| Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler | | - | | - | | - |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | | 4.0 | | 4.0 | | - |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | | 15.4 | | 15.4 | | - |
| Dabb Trust | | 2.1 | | 2.0 | | (0.1) |
| Richard S. Sackler Trust U/A 9/30/04 | | 1.1 | | 1.1 | | 0.0 |
| RSS Fiduciary Management Trust | | 0.0 | | 0.0 | | 0.0 |
| Crystal Trust | | 0.1 | | 0.0 | | (0.1) |
| Data Trust | | - | | - | | - |
| **Summary for Richard Sackler** | **$** | **375.8** | **$** | **364.7** | **$** | **(11.1)** |
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | | 132.1 | | 116.9 | | (15.2) |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler ("JDS BRP Trust") | | 4.5 | | 4.5 | | (0.0) |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler ("JDS FPC Trust") | | 5.1 | | 5.1 | | (0.0) |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler ("JDS XPC Trust") | | 0.0 | | 0.0 | | 0.0 |
| Trust Agreement dated August 29, 2003 f/b/o Issue of Jonathan D. Sackler | | - | | - | | - |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | | 4.0 | | 4.0 | | (0.0) |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | | 15.4 | | 15.3 | | (0.1) |
| MCM Fiduciary Management Trust | | 0.1 | | 0.0 | | (0.0) |
| Cornice Trust | | 0.0 | | 0.0 | | - |
| Cedar Cliff Trust | | 0.1 | | 0.4 | | 0.3 |
| **Summary for Jonathan Sackler** | **$** | **161.3** | **$** | **146.2** | **$** | **(15.1)** |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

**NAS2688**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

12

# Net Assets (Equity) Bridge Summary

**The table below summarizes the combined variances by grouping, as presented in this Updated Net Assets Report**

| ($ in Millions) | 10/31/2019 | Net Assets (Equity) 9/30/2020 | Variance |
|---|---|---|---|
| David Sackler | $        - | $        - | $        - |
| Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90 | 0.1 | 0.1 | (0.0) |
| **Summary for David Sackler** | **$      0.1** | **$      0.1** | **$      (0.0)** |
| Estate of Beverly Sackler (d. October 14, 2019) | 5.0 | 5.0 | (0.0) |
| Beverly Sackler Revocable Trust | 187.8 | 175.7 | (12.2) |
| **Summary for Beverly Sackler** | **$    192.9** | **$    180.6** | **$    (12.2)** |
| Trust U/A 11/5/74 fbo Beverly Sackler ("74A Trust") | 545.9 | 475.2 | (70.7) |
| Raymond R. Sackler Trust 1 dtd 12/23/89 ("1A Trust") | 849.1 | 838.0 | (11.1) |
| Raymond R. Sackler Trust 2 dtd 12/23/89 ("2A Trust") | 966.3 | 1,283.3 | 317.0   (1) |
| Raymond R. Sackler Trust 1B dtd 12/23/89 ("1B Trust") | 3.0 | 3.0 | (0.0) |
| Raymond R. Sackler Trust 2B dtd 12/23/89 ("2B Trust") | 3.0 | 3.0 | (0.0) |
| **Summary for Trusts that Indirectly Own Purdue** | **$  2,367.2** | **$  2,602.4** | **$    235.2** |
| Trust B U/A 11/4/74 fbo Beverly Sackler ("74B Trust") | 139.7 | 129.2 | (10.5) |
| The 1974 Irrevocable Investment Trust ("Investment Trust") | - | - | - |
| 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust") | 9.5 | 16.1 | 6.6 |
| AR Irrevocable Trust | 1,497.9 | 1,305.7 | (192.1)   (2) |
| 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust") | 13.0 | 14.1 | 1.1 |
| AJ Irrevocable Trust | 1,434.1 | 1,414.1 | (19.9) |
| **Summary for Trusts Created by Division from 74A Trust or Subsequent Decanting** | **$  3,094.1** | **$  2,879.4** | **$   (214.8)** |

(1) Variance is analyzed in greater detail on page 137. The primary driver for this increase is changes in the value of Private Equity Investments.

(2) Variance is analyzed in greater detail on page 144. The primary driver for this decline is changes in the values of the Marketable Securities and Hedge Funds asset categories.

NAS2689

# Net Assets (Equity) Bridge Summary

**The table below summarizes the combined variances by grouping, as presented in this Updated Net Assets Report**

| ($ in Millions) | 10/31/2019 | Net Assets (Equity) 9/30/2020 | Variance |
|---|---|---|---|
| | | | |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 1") | $        0.7 | $        0.6 | $        (0.1) |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 2") | 2.5 | 2.4 | (0.1) |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 3") | 25.7 | 25.6 | (0.1) |
| | | | |
| **Summary for Additional Trusts that Own Interests In IACs** | **$      28.8** | **$      28.6** | **$        (0.2)** |
| | | | |
| Richard S. Sackler Life Insurance Trust | 1.2 | 1.1 | (0.1) |
| Jonathan D. Sackler Life Insurance Trust | 2.6 | 17.2 | 14.6 |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler | 1.3 | 1.4 | 0.0 |
| David A. Sackler 2012 Trust | 0.8 | 0.7 | (0.1) |
| Irrevocable Trust under Declaration dated as of April 25, 1991 | - | - | - |
| Irrevocable Trust under Declaration dated as of August 25, 1992 | 7.3 | 7.3 | 0.0 |
| The RSS 2012 Family Trust | 6.9 | 6.9 | (0.1) |
| Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012 | 0.1 | 0.1 | - |
| Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012 | 15.0 | 12.9 | (2.1) |
| | | | |
| **Summary for Other Trusts** | **$      35.3** | **$      47.6** | **$      12.3** |
| | | | |
| **Summary for Raymond-side Trusts** | **$   6,255.5** | **$   6,249.5** | **$        (6.0)** |

Note: The Net Assets Report noted Total Net Assets of $6,275.0M and Total Net Assets Excluding IACs of $4,983.1M. These amounts were each overstated by $19.4M. The corrected amounts for the Net Assets Report are $6,255.5M and $4,963.7M, respectively.

**NAS2690**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Methodology

NAS2691

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

15

# Methodology

**The following process was followed to prepare the categorized balance sheets presented herein:**

1. The financial information for the Raymond-side Initial Covered Sackler Persons was prepared by North Bay Associates ("North Bay"), an entity that provides accounting and tax services for Raymond-side individuals, entities and trusts. North Bay, in the ordinary course of business, maintains the books and records of, and prepares monthly financial statements relating to, nearly all such Initial Covered Sackler Persons.

2. For five Initial Covered Sackler Persons for which North Bay does not, in the ordinary course of business, prepare financial statements, Huron obtained the values of their respective assets and liabilities through discussion with North Bay and review of available records relating to such assets and liabilities.[1] For an additional six Initial Covered Sackler Persons, North Bay provided Huron with balance sheets prepared by an entity other than North Bay.[2] For one Initial Covered Sackler Person, North Bay provided Huron with a balance sheet prepared by North Bay at Huron's request.

3. Each balance sheet item was classified into one of the asset or liability categories described on pages 97-100 of this Updated Net Assets Report.

(1) These five Initial Covered Sackler Persons are: the RSS Revocable Pourover Trust; Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler; and Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler.

(2) These six Initial Covered Sackler Persons are: RSS Fiduciary Management Trust, Crystal Trust, MCM Fiduciary Management Trust, Data Trust, Cornice Trust, and Cedar Cliff Trust, all of which were formed to hold interests in Wyoming entities that serve as trustees for certain Raymond-side trusts. Balance sheets for these Wyoming entities were collected by North Bay and provided to Huron.

**NAS2692**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Methodology

4. Where a particular line item on a balance sheet provided by North Bay referred to an interest in an entity that is primarily a holding company, Huron reflected the value of such line item in the category of the underlying investment. For example, several of the Initial Covered Sackler Persons have an interest in a Delaware general partnership that serves as a vehicle for making investments. This entity holds various private equity investments, hedge fund investments, and investments in marketable securities. For the purposes of this Updated Net Assets Report, each Initial Covered Sackler Person's interest in this entity has been classified based on the nature of the entity's investment.

5. In most instances, the asset values are the amounts reported on the respective Initial Covered Sackler Person's September 30, 2020 balance sheets, unless otherwise noted in this Updated Net Assets Report. The general bases of valuation used for each asset and liability type are as follows:

**Assets:**

a) Cash and Cash Equivalents: Account statement balances.

b) Accounts Receivable and Prepaid Investments: Expected amounts to be collected and amounts paid.

c) Notes Receivable and Loans: Principal amounts outstanding.

d) Marketable Securities and Hedge Funds: Closing prices (with respect to publicly-traded securities) and valuations provided by fund managers were used to value nearly all assets in this category. These assets are primarily held indirectly through various investment vehicles.

**NAS2693**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

**Assets (cont'd):**

e) Private Equity Investments: Valuations provided by fund managers for investments owned through investment vehicles comprise most of the asset value for private equity investments. Also included in this category are certain entities owned through joint ventures.

- The investment in Cheyenne Petroleum Company is based on the summarized results of a third-party engineer's petroleum reserve report dated May 2020, which was updated by CPC for June 2020. The present value of such oil and gas reserves was determined by using discount rates of 10% for Proved Developed Producing reserves and 20% for Proved Undeveloped reserves.

- The remaining assets in this category, are primarily reflective of investments made directly in private companies or investment vehicles managed by family offices or third parties and are reflected either at purchase price or using tax records.

f) Real Estate Investments: Valuations provided by third-party fund managers in nearly all cases for investments owned through investment vehicles. The remaining real estate investments, which are primarily held through investment vehicles, are reflected either at their purchase price or using tax records.

g) Life Insurance – Surrender Value: Statement balances.

h) Retirement Accounts: Statement balances.

i) Residential Real Estate: Appraised values, assessed values or, in the absence of the foregoing, tax bases.

j) Artwork (including Jewelry): Appraised value when available, otherwise acquisition cost.

k) Other Investments: Tax bases.

NAS2694

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Methodology

**Liabilities:**

a) Accounts Payable: Actual amounts due for which expected payments will be subsequently remitted.

b) Short-Term Debt: Principal amounts due.

c) Long-Term Debt: Principal amounts due.

d) Mortgage Debt: Principal amounts due.

6. The value of assets reflecting direct or indirect ownership of the Debtors were eliminated from this Updated Net Assets Report.

7. In instances where the net asset value for an Initial Covered Sackler Person would otherwise be a deficit (each such Initial Covered Sackler Person an "Obligor Person"), the net asset value was adjusted to zero. Where an Obligor Person's net asset value was a deficit in part due to debt owed to other Initial Covered Sackler Persons (each an "Obligee Person"), for the purpose of this presentation, the value of the assets of the Obligee Person are reduced by the amount by which the face amount of the debt in question exceeded the assets of the Obligor Person. This was done to reflect the net recoverable value relating to the debt. For example, if liabilities exceeded assets for an Obligor Person by $50 and the Obligor Person has a $100 note payable to an Obligee Person, the net assets of the Obligor Person would be reflected as $0.0 and the value of the Obligee Person's note receivable would be reduced by $50, thus balancing in the aggregate. In one case, where an Obligor Person had issued both secured and unsecured debt, the associated asset of the Obligee Person was reduced before the secured debt.

8. Because balances are presented in millions, totals may not foot due to rounding.

**NAS2695**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

19

9. All Raymond-side Initial Covered Sackler Persons that own one or more Debtors but are not their ultimate owners ("Intermediate Entities") were presented separately. Because the values of all Intermediate Entities are captured on the balance sheets of their ultimate owners, the net asset values of the Intermediate Entities is duplicative of information presented elsewhere in this Updated Net Assets Report and therefore should not be viewed as an addition to the total net asset value of non-Intermediate Entities.

10. Certain of the balance sheets prepared for individual Initial Covered Sackler Persons by North Bay in the ordinary course of business include line items in the asset column relating to trusts that are themselves Initial Covered Sackler Persons. The net asset values of such trusts are not reflected as assets of such individuals, but are instead presented independently, consistent with the presentation of Initial Covered Sackler Persons in this Updated Net Assets Report generally.

11. Solely in instances where a third-party provides an estimate or statement of value (such assets, "Third-Party Valued Assets"), "unrealized gain/loss" is not presented for any asset that is not a Third-Party Valued Asset.

   a) An illustrative 33% blended tax rate (for presentation purposes only) was applied to the estimated unrealized gains to illustrate the hypothetical tax obligation that would result from a sale of such Third-Party Valued Assets.

12. For each Raymond-side Initial Covered Sackler Person, we reflect net asset value in two ways:

   i. We account for all assets, using the illustrative valuation of the IACs (as defined on Appendix B) described on pages 21-23 of this Updated Net Assets Report and

   ii. We account for all assets other than the IACs to present approximate net asset value in excess of the assets pledged as part of the proposed settlement.

**NAS2696**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Allocation of Independent Associated Companies (IACs)

- The IACs have retained an investment banker to market the businesses for sale. The value of the IACs is currently carried on the balance sheets at their book values. No fair market valuation for the IACs currently exists. An independent fair market value of the IACs is outside the scope of this Updated Net Assets Report.

- For the purpose of this Updated Net Assets Report and to illustrate how the proceeds from the sale of the IACs might potentially flow to the individual Initial Covered Sackler Persons, a hypothetical gross sale value for all the IACs of $4.5B ("Hypothetical IAC Value") was chosen and the value was allocated among the IACs.

  - The Hypothetical IAC Value and the allocation of the value is unchanged from the January 15, 2020 Net Assets Report.

- In valuing the IACs, we applied a 33% blended tax rate to the Hypothetical IAC Values consistent with the methodology used for the January 2020 report.

- The 5-year (2020 – 2024) projected results from operations were prepared by the IACs as part of their normal planning process was used as the basis for allocating the Hypothetical IAC Value.

NAS2697

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Allocation of Independent Associated Companies (IACs)

- For purposes of allocation, the Hypothetical IAC Value was divided equally between the following metrics:
  - "Profit/(Loss) before Other Charges", consisting primarily of Net Sales, less:
    - Cost of Sales
    - Selling and Promotional Costs
    - General and Administrative Costs
  - Net Profit/(Loss) After Tax, consisting primarily of Profit/(Loss) before Other Charges, less:
    - R&D and New Product Expenses
    - Amortization of Intangibles
      - Depreciation is not specifically delineated on the P&L reviewed, rather it is included in multiple P&L expense categories (e.g. R&D and COGS)
    - Tax Charges, only taxes that occur at the entity level
- These metrics were chosen to allocate the Hypothetical IAC Value in a manner that considers both the operational performance of IACs both before and after non-cash charges. The allocation is a purely a mathematical exercise for illustrative purposes only, and no subjective adjustments were made.
- Half of the $4.5B was allocated based on each IAC's Profit/(Loss) before Other Charges as a percentage of total Profit/(Loss) before Other Charges, and half was allocated based on each IAC's Net Profit/(Loss) After Tax as a percentage of total Net Profit/(Loss) After Tax.

**NAS2698**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Allocation of Independent Associated Companies (IACs)

- In certain instances, where multiple income statements were prepared for an IAC, for example, where projections for each region in which an IAC operates or where there was a separate income statement for adjustments to U.S. GAAP. The aggregate IAC metrics were used for the purpose of allocating the Hypothetical IAC Value.

- Each Initial Covered Sackler Person's interest in the allocated value of the IAC was determined by mapping the allocated value through the legal structure.

- Because the Raymond and the Mortimer sides of the Sackler family each directly or indirectly own 50% of the IACs, the allocation of the Hypothetical IAC Value results in each family directly or indirectly holding an approximately equal share of the amount.

  - $4,496.1M of the total value of the IACs ($4.5B) are owned equally by the Raymond and Mortimer sides of the Sackler family.[1]

  - $1,934.5M of the Raymond-side's interests is held by Initial Covered Sackler Persons and the remaining $313.6M is held by non-Initial Covered Sackler Persons.[2]

- When applying the allocated value to an individual IAC, the value was applied first to the notes payable owed to the Initial Covered Sackler Person or entities owned directly or indirectly by the Initial Covered Sackler Person.

- If a Hypothetical IAC Value was less than the notes payable owed by that IAC, the noteholders would recover only their pro rata share of the Hypothetical IAC Value; any IAC equity interest would be eliminated. The recovery on the IAC note receivable is reclassified to the IAC balance sheet category.

- The IAC category reflects the Initial Covered Sackler Persons entire interest in IACs wholly owned by the Sackler family (both equity and notes receivable).

(1) The remaining $3.9M is owned by Purdue and a non-Initial Covered Sackler Person.
(2) As indicated in the November 22, 2019 Presentation, some of the Raymond-side interests in the IACs are directly or indirectly owned by non-Initial Covered Sackler Persons.

**NAS2699**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Executive Summary

**NAS2700**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Executive Summary

## Individuals

- Plaintiffs have asserted claims against the four specified individuals listed below:

- The net asset values for each of the individuals and the relevant revocable and self-settled trusts are as follows:

| ($ in Millions) | Net Asset Value (including IACs) | Net Asset Value (excluding IACs) |
|---|---|---|
| Richard Sackler | $ 364.7 | $ 166.5 |
| Jonathan Sackler | 146.2 | 75.2 |
| David Sackler | 0.1 | 0.1 |
| Estate of Beverly Sackler | 5.0 | 5.0 |
| Beverly Sackler Revocable Trust | 175.7 | 175.7 |

- Although claims must be considered on an entity-by-entity basis, the sum of the net asset value presented for all specified individuals is $691.6M including IACs, $422.4M excluding IACs, and $246.7M when excluding the value of the assets in the Beverly Sackler Revocable Trust whose intended beneficiaries are certain charitable organizations.

- Continued litigation of claims against the specified individuals would substantially deplete their respective assets even if judgments could be obtained.

NAS2701

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Executive Summary

**<u>Trusts that Indirectly Own Interests in Purdue</u>**

- Five trusts that are Initial Covered Sackler Persons indirectly own interests in Purdue.

- The net assets for each of these five trusts is as follows:

| ($ in Millions) | Net Asset Value (including IACs) | Net Asset Value (excluding IACs) |
|---|---|---|
| 74A Trust | $ 475.2 | $ 112.1 |
| 1A Trust | 838.0 | 516.8 |
| 2A Trust | 1,283.3 | 962.0 |
| 1B Trust | 3.0 | 2.6 |
| 2B Trust | 3.0 | 2.6 |

- Each of these trusts is an irrevocable, non-grantor, discretionary spendthrift trust.

- <u>1A and 2A Trusts:</u>

  - 1A Trust and 2A Trust each have little exposure as subsequent transferees of Purdue distributions:

    - 1A Trust and 2A Trust, which each own 50% of the common equity of Rosebay Medical Company, Inc. ("RMI"), each received $17.5M of dividends from RMI from 2007 through 2012 and no dividends thereafter.

    - RMI itself, which received $86.1M of distributions, inclusive of tax distributions, from Rosebay Medical Company, LP ("RML") from 2007 through 2018, has a net asset value of $25.6M (equivalent to $12.8M of equity value for each of the 1A and 2A Trust).

- <u>1B and 2B Trusts:</u>

  - 1B Trust and 2B Trust each have net asset values of $2.6M.

**NAS2702**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

26

# Executive Summary

## Trusts Created by Division from 74A Trust or Subsequent Decanting

- Six trusts that are Initial Covered Sackler Persons were either created by division from the 74A Trust or by subsequent decanting from such trusts.

- The net assets for each of these six trusts is as follows:

| ($ in Millions) | Date of Division or Decanting | Net Asset Value (excluding IACs) |
|---|---|---|
| 74B Trust | Feb 01, 2002 | $ 129.2 |
| Investment Trust | Apr 01, 2004 | - |
| 74-AR Trust | May 01, 2015 | 16.1 |
| 74-AJ Trust | May 01, 2015 | 14.1 |
| AR Irrevocable Trust (decanted from the 74-AR Trust) | Jul 23, 2019 | 1,305.7 |
| AJ Irrevocable Trust (decanted from the 74-AJ Trust) | Jun 08, 2019 | 1,414.1 |

- As set forth in the November 22, 2019 Presentation, the 74-AR and -AJ Trusts were decanted subject to Receipt, Refunding and Guarantee Agreements, which preserve the rights of creditors of the original trusts. The decantings of the 74-AR and -AJ trusts were effective as of July 2019 and June 2019, respectively. The Receipt, Refunding and Guarantee Agreements are annexed to the November 22, 2019 Presentation as Appendix C.

- Each of these trusts is an irrevocable, non-grantor, discretionary spendthrift trust.

NAS2703

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Executive Summary

## Purdue

- The Updated Net Assets Report excludes the value of equity in the Debtors. The proposed settlement contemplates the voluntary relinquishment of all interests in the Debtors. In absence of a settlement, approximately 98% of the Raymond-side share of the value of interests in the Debtors will flow to the 74A Trust.

## Independent Associated Companies (IACs)

- Although value of the IACs has been allocated among the Raymond-side Initial Covered Sackler Persons based upon the allocation methodology previously described, the value allocated is the proportionate share of the whole assuming integration and cooperation among various related parties. The value allocation does not represent what any particular interest could be monetized for on an individual standalone basis.

## Total Sum

- Although claims must be considered on an entity-by-entity basis, the sum of the net assets presented for all Raymond-side Initial Covered Sackler Persons is $6,249.5M, $4,957.7M excluding the IACs, and $4,782.1M when excluding the value of the assets in the Beverly Sackler Revocable Trust whose intended beneficiaries are certain charitable organizations.

Note: The Net Assets Report noted Total Net Assets of $6,275.0M and Total Net Assets Excluding IACs of $4,983.1M. These amounts were overstated by $19.4M. The corrected amounts for the Net Assets Report are $6,255.5M and $4,963.7M, respectively.

**NAS2704**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Individuals

NAS2705

# Summary for Richard Sackler

| ($ in Millions) | Total Assets | | Total Liabilities | Net Assets (Equity) | | Net Assets Excluding Net IACs |
|---|---|---|---|---|---|---|
| Richard Sackler | $ | 264.2 | $ (58.8) | $ 205.4 | $ | 143.1 |
| RSS Revocable Pourover Trust | | 0.0 | - | 0.0 | | 0.0 |
| RSS BRP Trust | | 9.1 | (5.7) | 3.4 | | - |
| RSS FPC Trust | | 198.6 | (65.3) | 133.3 | | 0.8 |
| RSS XPC Trust | | 0.0 | - | 0.0 | | 0.0 |
| August 29, 2003 f/b/o Issue of Richard S. Sackler | | - | - | - | | - |
| RSS CT Residence Trust 1 | | 6.0 | (2.0) | 4.0 | | 4.0 |
| RSS CT Residence Trust 2 | | 23.0 | (7.6) | 15.4 | | 15.4 |
| DABB Trust | | 2.0 | - | 2.0 | | 2.0 |
| Richard S. Sackler Trust U/A 9/30/04 | | 1.1 | - | 1.1 | | 1.1 |
| RSS Fiduciary Management Trust | | 0.0 | - | 0.0 | | 0.0 |
| Crystal Trust | | 0.0 | - | 0.0 | | 0.0 |
| Data Trust | | - | - | - | | - |
| **Total** | **$** | **504.0** | **$ (139.4)** | **$ 364.7** | **$** | **166.5** |

**NAS2706**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Richard Sackler

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 16.7 | | Accounts Payable | $ 0.0 | |
| Accounts Receivable and Prepaid Expenses | 0.1 | | Long-Term Debt | 13.3 | (5) |
| Marketable Securities and Hedge Funds | 62.0 | | Mortgage Debt | - | |
| Independent Associated Companies (IACs) | 92.9 | | Short-Term Debt | 5.9 | |
| Notes Receivable | 24.2 | (1) | Est. Tax Liability: IACs | 30.7 | |
| Other Investments | 0.7 | (2) | Est. Tax Liability: Unrealized Gains | 8.8 | (6) |
| Private Equity Investments | 12.9 | (3) | | | |
| Real Estate Investments | 3.5 | | **Total Liabilities** | **$ 58.8** | |
| Residential Real Estate | 13.9 | (4) | | | |
| Life Insurance -Surrender Value | 0.2 | | **Net Assets (Equity)** | **$ 205.4** | |
| Retirement Accounts | 4.3 | | | | |
| Artwork (including Jewelry) | 32.7 | | **Less: Net IACs** | **$ (62.2)** | |
| **Total Assets** | **$ 264.2** | | **Net Assets Excluding Net IACs** | **$ 143.1** | |

(1) Includes a loan of $0.5M to David Sackler which was reduced to $0.2M in accordance with the previously described methodology.

(2) Includes an investment of $8.2M in a Initial Covered Sackler Person which was removed in accordance with previously described methodology. The remaining $0.7M of other investment is in related parties.

(3) Includes $4.3M of CPC. A private equity investment was recorded on the balance sheet at -$0.2M. This asset was restated to $0.0.

(4) Certain residential real estate items were removed as they include the investments described on pages 37-38 of this Updated Net Assets Report.

(5) Relates to long-term debt borrowed from Investment Trust (see page 32 of November 22, 2019 Presentation).

(6) The hypothetical tax liability results from unrealized gains of $26.8M.

NAS2707

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408
31

# RSS Revocable Pourover Trust

| ($ in Millions) | Total | | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.0 (2) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ | 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

(1) RSS Revocable Pourover Trust was created for typical estate planning reasons, including minimizing assets subject to probate process, intergenerational planning, managing the passing of wealth to succeeding generations and tax efficiency. The trust is in the process of being funded.

(2) RSS Revocable Pourover Trust holds cash of $10.00 which is not in a bank account. The $0.0 in the Cash and Cash Equivalents line item above represents balances less than $50,000.

NAS2708

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler ("RSS BRP Trust")

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | 9.1 | Short-Term Debt | | 2.7 |
| Notes Receivable | - | Est. Tax Liability: IACs | | 3.0 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 5.7 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 3.4 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | (6.1) |
| | | | | |
| **Total Assets** | $ 9.1 | **Net Assets Excluding Net IACs** | $ | - |

NAS2709

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler ("RSS FPC Trust")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.5 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 197.8 | Short-Term Debt | - |
| Notes Receivable | 0.3  (1) | Est. Tax Liability: IACs | 65.3 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 65.3 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 133.3 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ (132.5) |
| **Total Assets** | $ 198.6 | **Net Assets Excluding Net IACs** | $ 0.8 |

(1) The Notes Receivable line item included a loan of $29.6M which was reclassified to the IAC line item.

NAS2710

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

34

# Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler ("RSS XPC Trust")

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | **$ -** |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | **$ 0.0** |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$ -** |
| **Total Assets** | **$** | **0.0** | **Net Assets Excluding Net IACs** | **$ 0.0** |

NAS2711

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

35

# Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ - |
| | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ - |

NAS2712

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under Declaration of Trust dated August 23, 1989 f/b/o Richard S. Sackler and Issue of Richard S. Sackler ("RSS CT Residence Trust 1")[1,2]

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $    - | Accounts Payable | $    - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 2.0  (3) |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $    2.0 |
| Residential Real Estate | 6.0 | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $    4.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $    - |
| | | | |
| **Total Assets** | $    6.0 | **Net Assets Excluding Net IACs** | $    4.0 |

(1) RSS CT Residence Trust 1 and JDS CT Residence Trust 1 each own an undivided one-half interest in a parcel of residential real estate in Connecticut, which is adjoined to the parcel held by RSS CT Residence Trust 2 and JDS CT Residence Trust 2. Each is a tenant in common with respect to the parcel.

(2) Real estate tax bill prepared for 2019-2020 tax year calculates tax liability based on assessed value of $8.4M. Per the tax notice the property is assessed at 70% of fair market value, which equates to a fair market value of $12.0M. Most recent assessment date was October 1, 2015.

(3) The original purchase price of the property was $1.3M. For illustration purposes, the hypothetical tax liability results from an unrealized gain equal to the property's fair market value.

NAS2713

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler ("RSS CT Residence Trust 2") [1,2]

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 7.6  (3) |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 7.6 |
| Residential Real Estate | 23.0 | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 15.4 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 23.0 | **Net Assets Excluding Net IACs** | $ 15.4 |

(1) RSS CT Residence Trust 2 and JDS CT Residence Trust 2 each own an undivided one-half interest in a parcel of residential real estate in Connecticut, which is adjoined to the parcel held by RSS CT Residence Trust 1 and JDS CT Residence Trust 1. Each is a tenant in common with respect to the parcel.

(2) Real estate tax bill prepared for 2019-2020 tax year calculates tax liability based on assessed value of $32.2M. Per the tax notice the property is assessed at 70% of fair market value, which equates to a fair market value of $46.0M. Most recent assessment date was October 1, 2015.

(3) The original purchase price of the property was $1.3M. For illustration purposes, the hypothetical tax liability results from an unrealized gain equal to the property's fair market value.

NAS2714

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

38

# DABB Trust

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | 2.0 | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 2.0 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | 2.0 | **Net Assets Excluding Net IACs** | $ | 2.0 |

NAS2715

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

39

# Richard S. Sackler Trust U/A 9/30/04

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | 1.1  (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 1.1 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 1.1 | **Net Assets Excluding Net IACs** | $ 1.1 |

(1) The $1.1M in the Other Investments line item is due from a non-Initial Covered Sackler Person.

NAS2716

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

19-23649-rdd   Doc 3422-1   Filed 08/05/21   Entered 08/05/21 21:28:38   Main Document
Pg 45 of 725

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $    0.0 | Accounts Payable | $    - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | 0.0  (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $    - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $    0.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $    - |
| | | | |
| **Total Assets** | $    0.0 | **Net Assets Excluding Net IACs** | $    0.0 |

(1) The $0.0 in the Other Investments line item is due from a non-Initial Covered Sackler Person.

NAS2717

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Crystal Trust

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | 0.0  (1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

(1) Crystal Trust owns 100% of Crystal Fiduciary Company LLC. The trust does not have any meaningful assets beyond this ownership.

**NAS2718**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Data Trust

| ($ in Millions) | Total | | | Total |
| --- | --- | --- | --- | --- |
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - (1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

(1) Data Trust owns 100% of Data LLC. The trust does not have any meaningful assets beyond this ownership. Assets recorded with a deficit value were adjusted to zero. These assets, totaling -$0.02M, were restated to $0.0.

**NAS2719**

43

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Summary for Jonathan Sackler

| ($ in Millions) | Total Assets | Total Liabilities | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | $ 188.4 | $ (71.4) | $ 116.9 | $ 55.5 |
| JDS BRP Trust | 9.1 | (4.6) | 4.5 | - |
| JDS FPC Trust | 7.6 | (2.5) | 5.1 | 0.0 |
| JDS XPC Trust | 0.0 | - | 0.0 | 0.0 |
| August 29, 2003 f/b/o Issue of Jonathan D. Sackler | - | - | - | - |
| JDS CT Residence Trust 1 | 6.0 | (2.0) | 4.0 | 4.0 |
| JDS CT Residence Trust 2 | 23.0 | (7.7) | 15.3 | 15.3 |
| MCM Fiduciary Management Trust | 0.0 | - | 0.0 | 0.0 |
| Cornice Trust | 0.0 | - | 0.0 | 0.0 |
| Cedar Cliff Trust | 0.4 | - | 0.4 | 0.4 |
| **Total** | **$ 234.4** | **$ (88.3)** | **$ 146.2** | **$ 75.2** |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

NAS2720

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Jonathan Sackler (1)

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 0.6 | Accounts Payable | $ | - | |
| Accounts Receivable and Prepaid Expenses | | 0.0 | Long-Term Debt | | 25.3 | (4) |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | 34.7 | Short-Term Debt | | 3.9 | |
| Notes Receivable | | - | Est. Tax Liability: IACs | | 11.4 | |
| Other Investments | | 1.7 (2) | Est. Tax Liability: Unrealized Gains | | - | |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | **40.6** | |
| Residential Real Estate | | - (3) | | | | |
| Life Insurance -Surrender Value | | 0.7 | **Net Assets (Equity)** | $ | **(2.3)** | |
| Retirement Accounts | | 0.6 | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **(23.2)** | |
| **Total Assets** | $ | **38.3** | **Net Assets Excluding Net IACs** | $ | **(25.6)** | (1) |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

(2) Includes in the Other Investments line a $1.7M investment in non-Initial Covered Sackler Person.

(3) Certain residential real estate holdings were removed as they include the investments described on pages 52-53 of this Updated Net Assets Report.

(4) Includes $23.3M loan payable to a Delaware limited liability company owned by a trust for the benefit of Jonathan Sackler's spouse, and a $2.0M loan payable to the Investment Trust (see page 32 of November 22, 2019 Presentation).

NAS2721

# JDS Revocable Pourover Trust

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 7.5 | Accounts Payable | $ | 0.0 | |
| Accounts Receivable and Prepaid Expenses | | 0.1 | Long-Term Debt | | 3.4 | (4) |
| Marketable Securities and Hedge Funds | | 20.3 | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | 57.0 | Short-Term Debt | | 3.6 | |
| Notes Receivable | | 24.5 | Est. Tax Liability: IACs | | 18.8 | |
| Other Investments | | 0.0 (2) | Est. Tax Liability: Unrealized Gains | | 5.0 | (5) |
| Private Equity Investments | | 14.0 (3) | | | | |
| Real Estate Investments | | 2.7 | **Total Liabilities** | $ | **30.8** | |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **119.3** | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | 23.9 | **Less: Net IACs** | $ | **(38.2)** | |
| **Total Assets** | $ | **150.1** | **Net Assets Excluding Net IACs** | $ | **81.1** | |

(1) JDS Revocable Pourover Trust was created for typical estate planning reasons, including minimizing assets subject to probate process, intergenerational planning, managing the passing of wealth to succeeding generations and tax efficiency. See page 45, note (1) for further detail.
(2) Includes $0.0M investment in a non-Initial Covered Sackler Person.
(3) Includes $4.3M of value attributable to CPC. A private equity investment was recorded on the balance sheet at -$0.2M. This asset was restated to $0.0.
(4) Includes a $1.7M loan payable to the 1A Trust and a $1.7M loan payable to the 2A Trust.
(5) The hypothetical tax liability results from unrealized gains of $15.1M.

NAS2722

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Jonathan Sackler / JDS Revocable Pourover Trust [1]

| ($ in Millions) | Total | | Total | |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $  8.1 | Accounts Payable | $  0.0 | |
| Accounts Receivable and Prepaid Expenses | 0.1 | Long-Term Debt | 28.7 | (5) |
| Marketable Securities and Hedge Funds | 20.3 | Mortgage Debt | - | |
| Independent Associated Companies (IACs) | 91.7 | Short-Term Debt | 7.5 | |
| Notes Receivable | 24.5 | Est. Tax Liability: IACs | 30.3 | |
| Other Investments | 1.7 (2) | Est. Tax Liability: Unrealized Gains | 5.0 | (6) |
| Private Equity Investments | 14.0 (3) | | | |
| Real Estate Investments | 2.7 | **Total Liabilities** | $  71.4 | |
| Residential Real Estate | - (4) | | | |
| Life Insurance -Surrender Value | 0.7 | **Net Assets (Equity)** | $  116.9 | |
| Retirement Accounts | 0.6 | | | |
| Artwork (including Jewelry) | 23.9 | **Less: Net IACs** | $  (61.4) | |
| **Total Assets** | $  188.4 | **Net Assets Excluding Net IACs** | $  55.5 | |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

(2) Includes in the Other Investments line a $1.7M investment in non-Initial Covered Sackler Person.

(3) Includes $4.3M of value attributable to CPC. A private equity investment was recorded on the balance sheet at -$0.2M. This asset was restated to $0.0.

(4) Certain residential real estate holdings were removed as they include the investments described on pages 52-53 of this Updated Net Assets Report.

(5) Includes a $23.3M loan payable to a Delaware limited liability company owned by a trust for the benefit of Jonathan Sackler's spouse, a $2.0M loan payable to the Investment Trust (see page 32 of November 22, 2019 Presentation), a $1.7M loan payable to the 1A Trust, and a $1.7M loan payable to the 2A Trust.

(6) The hypothetical tax liability results from unrealized gains of $15.1M.

NAS2723

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

47

# Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler ("JDS BRP Trust")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 9.1 | Short-Term Debt | 1.6 |
| Notes Receivable | - | Est. Tax Liability: IACs | 3.0 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 4.6 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 4.5 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ (6.1) |
| | | | |
| **Total Assets** | $ 9.1 | **Net Assets Excluding Net IACs** | $ - |

NAS2724

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

48

# Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler ("JDS FPC Trust")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 7.6 | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | 2.5 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 2.5 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 5.1 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ (5.1) |
| | | | |
| **Total Assets** | $ 7.6 | **Net Assets Excluding Net IACs** | $ 0.0 |

NAS2725

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler ("JDS XPC Trust")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $   0.0 | Accounts Payable | $   - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $   - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $   0.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $   - |
| | | | |
| **Total Assets** | $   0.0 | **Net Assets Excluding Net IACs** | $   0.0 |

NAS2726

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

50

# Trust Agreement dated August 29, 2003 f/b/o Issue of Jonathan D. Sackler

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $        - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $        - | **Net Assets Excluding Net IACs** | $ | - |

NAS2727

51

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under Declaration of Trust dated August 23, 1989 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler ("JDS CT Residence Trust 1") [1,2]

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.0 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 2.0 (3) |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 2.0 |
| Residential Real Estate | 6.0 | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 4.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 6.0 | **Net Assets Excluding Net IACs** | $ 4.0 |

(1) RSS CT Residence Trust 1 and JDS CT Residence Trust 1 each own an undivided one-half interest in a parcel of residential real estate in Connecticut, which is adjoined to the parcel held by RSS CT Residence Trust 2 and JDS CT Residence Trust 2. Each is a tenant in common with respect to the parcel.

(2) Real estate tax bill prepared for 2019-2020 tax year calculates tax liability based on assessed value of $8.4M. Per the tax notice the property is assessed at 70% of fair market value, which equates to a fair market value of $12.0M. The most recent assessment date was October 1, 2015.

(3) The original purchase price of the property was $1.3M. For illustration purposes, the hypothetical tax liability results from an unrealized gain equal to the property's fair market value.

NAS2728

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler ("JDS CT Residence Trust 2") [1,2]

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.1 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 7.6  (3) |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 7.7 |
| Residential Real Estate | 23.0 | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 15.3 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 23.0 | **Net Assets Excluding Net IACs** | $ 15.3 |

(1) RSS CT Residence Trust 2 and JDS CT Residence Trust 2 each own an undivided one-half interest in a parcel of residential real estate in Connecticut, which is adjoined to the parcel held by RSS CT Residence Trust 1 and JDS CT Residence Trust 1. Each is a tenant in common with respect to the parcel.

(2) Real estate tax bill prepared for 2019-2020 tax year calculates tax liability based on assessed value of $32.2M. Per the tax notice the property is assessed at 70% of fair market value, which equates to a fair market value of $46.0M. Most recent assessment date was October 1, 2015.

(3) The original purchase price of the property was $1.3M. For illustration purposes, the hypothetical tax liability results from an unrealized gain equal to the property's fair market value.

NAS2729

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# MCM Fiduciary Management Trust

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | 0.0  (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ 0.0 |

(1) MCM Fiduciary Management Trust owns 100% of MCM Fiduciary Management LLC. The trust does not have any meaningful assets beyond this position.

NAS2730

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

54

# Cornice Trust

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | 0.0 (1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

(1) Cornice Trust owns 100% of Cornice Fiduciary Management LLC. The trust does not have any meaningful assets beyond this position.

**NAS2731**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Cedar Cliff Trust [1]

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | | - |
| Notes Receivable | | 0.4 | Est. Tax Liability: IACs | | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | | - |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | **Total Liabilities** | | $ | - |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | | $ | 0.4 |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | | $ | - |
| | | | | | | |
| **Total Assets** | $ | 0.4 | **Net Assets Excluding Net IACs** | | $ | 0.4 |

(1) Cedar Cliff Trust was created in December 2019 and balances are as of September 30, 2020.

NAS2732

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Summary for David Sackler

| ($ in Millions) | Total Assets | Total Liabilities | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| David Sackler | $ 7.5 | $ (14.9) | $ - | $ - |
| David A. Sackler 3/8/90 | 0.1 | - | 0.1 | 0.1 |
| **Total** | **$ 7.6** | **$ (14.9)** | **$ 0.1** | **$ 0.1** |

Note: As noted in the Methodology section, ICSPs in a net deficit position (i.e., credit balances) are eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

NAS2733

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# David Sackler

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 1.2 | Accounts Payable | $ | - | |
| Accounts Receivable and Prepaid Expenses | | 0.1 | Long-Term Debt | | 14.4 | (3) |
| Marketable Securities and Hedge Funds | | 0.0 | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | 0.5 | |
| Notes Receivable | | 5.4 (1) | Est. Tax Liability: IACs | | - | |
| Other Investments | | - (2) | Est. Tax Liability: Unrealized Gains | | 0.0 | (4) |
| Private Equity Investments | | 0.5 | | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | 14.9 | |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | 0.3 | **Less: Net IACs** | $ | - | |
| **Total Assets** | $ | 7.5 | **Net Assets Excluding Net IACs** | $ | - | |

(1) Relates to a loan provided to a Delaware corporation owned by a non-Initial Covered Sackler Person.

(2) Includes an investment of $0.1M in an Initial Covered Sackler Person which was eliminated in accordance with previously described methodology.

(3) Includes a $12.0M loan payable to 1A Trust (see page 24 of November 22, 2019 Presentation) and a $0.5M loan payable to David A Sackler 2012 Trust (see page 68 of November 22, 2019 Presentation).

(4) The hypothetical tax liability results from unrealized gains of $0.0M.

**NAS2734**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | 0.1 | **Net Assets (Equity)** | $ | 0.1 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.1 | **Net Assets Excluding Net IACs** | $ | 0.1 |

NAS2735

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Summary for Beverly Sackler

| ($ in Millions) | Total Assets | Total Liabilities | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Estate of Beverly Sackler (d. October 14, 2019) | $ 5.0 | $ - | $ 5.0 | $ 5.0 |
| Beverly Sackler Revocable Trust | 177.7 | (2.1) | 175.7 | 175.7 |
| **Total** | **$ 182.7** | **$ (2.1)** | **$ 180.6** | **$ 180.6** |

**NAS2736**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Estate of Beverly Sackler (d. October 14, 2019)

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 0.0 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | 3.8 | | |
| Life Insurance -Surrender Value | 0.6 | **Net Assets (Equity)** | $ 5.0 |
| Retirement Accounts | 0.5 | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 5.0 | **Net Assets Excluding Net IACs** | $ 5.0 |

NAS2737

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Beverly Sackler Revocable Trust

| ($ in Millions) | **Total** | | | | **Total** | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 101.2 | Accounts Payable | $ | - | |
| Accounts Receivable and Prepaid Expenses | | 5.5 | Long-Term Debt | | - | |
| Marketable Securities and Hedge Funds | | 55.3 | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - | |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - | |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 2.1 | (2) |
| Private Equity Investments | | 1.8 | | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | 2.1 | |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 175.7 | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | 13.9 | **Less: Net IACs** | $ | - | |
| **Total Assets** | $ | 177.7 | **Net Assets Excluding Net IACs** | $ | 175.7 | |

(1) Although a revocable trust, Beverly Sackler passed in October 2019 and the beneficiaries of the assets (other than Artwork (including jewelry)) are charitable organizations.

(2) This hypothetical tax liability results from unrealized gains of $6.3M.

NAS2738

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trusts That Indirectly Own Interests in Purdue

NAS2739

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust U/A 11/5/74 fbo Beverly Sackler ("74A Trust")

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 15.4 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | 1.1 | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | 11.1 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | 541.9 | Short-Term Debt | | - |
| Notes Receivable | | 79.1 (1) | Est. Tax Liability: IACs | | 178.8 |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 1.1 (2) |
| Private Equity Investments | | 1.1 | | | |
| Real Estate Investments | | 5.4 | **Total Liabilities** | $ | **179.9** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **475.2** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **(363.1)** |
| **Total Assets** | $ | **655.1** | **Net Assets Excluding Net IACs** | $ | **112.1** |

(1) Includes a loan of $224.8M to the Investment Trust which was reduced to $58.1M in accordance with the previously described methodology. $21.0M relates to an amount due from Rosebay Medical Company LP (see page 75 of November 22, 2019 Presentation).

(2) The hypothetical tax liability results from unrealized gains of $3.4M.

NAS2740

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler Trust 1 dtd 12/23/89 ("1A Trust")

| ($ in Millions) | Total | | | Liabilities | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 10.7 | | Accounts Payable | $ 0.0 | |
| Accounts Receivable and Prepaid Expenses | | 1.1 | | Long-Term Debt | 2.2 | (4) |
| Marketable Securities and Hedge Funds | | 281.3 | | Mortgage Debt | 2.4 | |
| Independent Associated Companies (IACs) | | 479.4 | | Short-Term Debt | 33.4 | |
| Notes Receivable | | 162.9 | (1) | Est. Tax Liability: IACs | 158.2 | |
| Other Investments | | 0.8 | (2) | Est. Tax Liability: Unrealized Gains | 16.5 | (5) |
| Private Equity Investments | | 72.1 | (3) | | | |
| Real Estate Investments | | 2.2 | | **Total Liabilities** | **$ 212.6** | |
| Residential Real Estate | | 40.0 | | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | **$ 838.0** | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | **$ (321.2)** | |
| **Total Assets** | **$ 1,050.6** | | | **Net Assets Excluding Net IACs** | **$ 516.8** | |

(1) Includes $12.0M due from David Sackler which was reduced to $5.1M in accordance with the previously described methodology.

(2) Includes $0.8M investment in a non-Initial Covered Sackler Person.

(3) Includes $2.6M of CPC. A private equity investment was recorded on the balance sheet at -$0.2M. This asset was restated to $0.0.

(4) Includes a $1.1M loan payable to the 1A Trust and a $1.1M loan payable to the 2A Trust.

(5) The hypothetical tax liability results from unrealized gains of $49.9M.

**NAS2741**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler Trust 2 dtd 12/23/89 ("2A Trust")

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 129.8 | Accounts Payable | $ | 0.0 | |
| Accounts Receivable and Prepaid Expenses | | 1.1 | Long-Term Debt | | 2.2 | (3) |
| Marketable Securities and Hedge Funds | | 313.4 | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | 479.4 | Short-Term Debt | | 2.1 | |
| Notes Receivable | | 157.8 | Est. Tax Liability: IACs | | 158.2 | |
| Other Investments | | 0.0 (1) | Est. Tax Liability: Unrealized Gains | | 77.7 | (4) |
| Private Equity Investments | | 435.8 (2) | | | | |
| Real Estate Investments | | 6.1 | **Total Liabilities** | $ | 240.2 | |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 1,283.3 | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | (321.2) | |
| **Total Assets** | $ | 1,523.4 | **Net Assets Excluding Net IACs** | $ | 962.0 | |

(1) Includes $0.0M investment in a non-Initial Covered Sackler Person.
(2) Includes $2.6M of value attributes to CPC.
(3) Includes a $1.1M loan payable to the 1A Trust and a $1.1M loan payable to the 2A Trust.
(4) The hypothetical tax liability results from unrealized gains of $235.5M.

NAS2742

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler Trust 1B dtd 12/23/89 ("1B Trust")

| ($ in Millions) | Total | | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 2.6 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | 0.6 | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | 0.2 |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | 0.2 |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 3.0 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | (0.4) |
| **Total Assets** | $ | 3.2 | **Net Assets Excluding Net IACs** | $ | 2.6 |

**NAS2743**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler Trust 2B dtd 12/23/89 ("2B Trust")

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 2.6 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | 0.6 | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | 0.2 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 0.2 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 3.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | (0.4) |
| | | | | |
| **Total Assets** | $ 3.2 | **Net Assets Excluding Net IACs** | $ | 2.6 |

NAS2744

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trusts Created by Division from 74A Trust or Subsequent Decanting

NAS2745

# Trust B U/A 11/4/74 fbo Beverly Sackler ("74B Trust")

| ($ in Millions) | | Total | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 10.4 | Accounts Payable | $ | 0.0 | |
| Accounts Receivable and Prepaid Expenses | | 0.0 | Long-Term Debt | | 0.0 | |
| Marketable Securities and Hedge Funds | | 5.1 | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | 0.0 | |
| Notes Receivable | | 14.2 (1) | Est. Tax Liability: IACs | | - | |
| Other Investments | | 0.1 (2) | Est. Tax Liability: Unrealized Gains | | 2.9 | (4) |
| Private Equity Investments | | 96.9 | | | | |
| Real Estate Investments | | 5.4 (3) | **Total Liabilities** | $ | 2.9 | |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 129.2 | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - | |
| **Total Assets** | $ | 132.1 | **Net Assets Excluding Net IACs** | $ | 129.2 | |

(1) Includes a loan of $30.0M to the Investment Trust which was reduced to $7.8M in accordance with the previously described methodology.

(2) Includes $0.1M investment in a non-Initial Covered Sackler Person.

(3) A real estate investment recorded on the balance sheet with a credit balance of -$11.6M was adjusted to $0.0.

(4) The hypothetical tax liability results from unrealized gains of $8.7M.

NAS2746

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# The 1974 Irrevocable Investment Trust ("Investment Trust")

| ($ in Millions) | Total | | Total | |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.6 | Accounts Payable | $ - | |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 462.9 | (3) |
| Marketable Securities and Hedge Funds | 1.0 | Mortgage Debt | - | |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 26.0 | (4) |
| Notes Receivable | 92.8 (1) | Est. Tax Liability: IACs | - | |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 1.4 | (5) |
| Private Equity Investments | 29.0 (2) | | | |
| Real Estate Investments | 4.4 | **Total Liabilities** | $ 490.3 | |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - | |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - | |
| | | | | |
| **Total Assets** | **$ 127.8** | **Net Assets Excluding Net IACs** | **$ -** | |

(1) Includes an amount due of $5.9M from Jonathan D. Sackler and $9.9M from Richard S. Sackler.
(2) Includes value attributed to CPC of $28.9M.
(3) $107.2M relates to an amount borrowed from the 74-AJ Trust (see page 34 of November 22, 2019 Presentation), $127.0M relates to an amount due from the 74-AR Trust (see page 33 of November 22, 2019 Presentation), $198.8M relates to an amount borrowed from the 74A Trust (see page 23 of November 22, 2019 Presentation), and $30.0M relates to long-term debt borrowed from the 74B Trust (see page 31 of November 22, 2019 Presentation).
(4) $26.0M relates to an amount borrowed from the 74A Trust (see page 23 of November 22, 2019 Presentation).
(5) The hypothetical tax liability results from unrealized gains of $4.1M.

NAS2747

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust")[1]

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.7 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | 7.1 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - (2) |
| Private Equity Investments | - | | | |
| Real Estate Investments | 8.2 | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 16.1 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 16.1 | **Net Assets Excluding Net IACs** | $ | 16.1 |

(1) 74-AR Trust was decanted such that all beneficial ownership of all assets other than those represented on this page were transferred effective July 23, 2019 to AR Irrevocable Trust. Legal title to certain of such assets to the extent not already transferred are held in a custodial capacity by 74-AR Trust and are in the process of being transferred. Furthermore, the decanting is subject to the terms of a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the trustee of AR Irrevocable Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against 74-AR Trust.

(2) The $0 hypothetical tax liability results from unrealized losses of $2.8M.

NAS2748

# AR Irrevocable Trust [(1)]

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 10.2 | | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | 6.2 | | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | 791.9 | | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | | Short-Term Debt | | 100.0 |
| Notes Receivable | | 46.4 | (2) | Est. Tax Liability: IACs | | - |
| Other Investments | | 1.0 | (3) | Est. Tax Liability: Unrealized Gains | | 65.4 (5) |
| Private Equity Investments | | 383.9 | (4) | | | |
| Real Estate Investments | | 231.5 | | **Total Liabilities** | $ | **165.4** |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | $ | **1,305.7** |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | $ | **-** |
| **Total Assets** | $ | **1,471.2** | | **Net Assets Excluding Net IACs** | $ | **1,305.7** |

(1) This page reflects the value of AR Irrevocable Trust's beneficial interest in all assets (subject to any previously described adjustments), even where legal title is still held by 74-AR Trust. See page 72, note (1) for further details.
(2) Includes a loan of $127.0M to the Investment Trust which was reduced to $32.8M in accordance with the previously described methodology.
(3) Includes $1.0M investment in a non-Initial Covered Sackler Person.
(4) Two private equity investments were recorded on the balance sheet with a credit balance. The assets, totaling -$4.2M, were adjusted to $0.0.
(5) The hypothetical tax liability results from unrealized gains of $198.2M.

NAS2749

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust")(1)

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 1.2 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | 0.2 | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - (2) |
| Private Equity Investments | 1.2 | | |
| Real Estate Investments | 11.6 | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 14.1 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 14.1 | **Net Assets Excluding Net IACs** | $ 14.1 |

(1) 74-AJ Trust was decanted such that all beneficial ownership of all assets other than those represented on this page were transferred effective June 8, 2019 to AJ Irrevocable Trust. Legal title to certain of such assets to the extent not already transferred are held in a custodial capacity by 74-AJ Trust and are in the process of being transferred. Furthermore, the decanting is subject to the terms of a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the trustee of AJ Irrevocable Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against 74-AJ Trust.

(2) The $0 hypothetical tax liability results from unrealized losses of $0.0M.

NAS2750

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# AJ Irrevocable Trust [1]

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 102.2 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 631.9 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 27.7 [2] | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 92.5 [3] |
| Private Equity Investments | 604.9 | | |
| Real Estate Investments | 139.9 | **Total Liabilities** | $ 92.5 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 1,414.1 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 1,506.6 | **Net Assets Excluding Net IACs** | $ 1,414.1 |

(1) This page reflects the value of AJ Irrevocable Trust's beneficial interest in all assets (subject to any previously described adjustments), even where legal title is still held by 74-AJ Trust. See page 74, note (1) for further details.

(2) Includes a loan of $107.2M to the Investment Trust which was reduced to $27.7M in accordance with the previously described methodology.

(3) The hypothetical tax liability results from unrealized gains of $280.3M.

NAS2751

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Additional Trusts That Directly and/or Indirectly Own Interests in IACs

NAS2752

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 1")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 0.0 | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | 0.0 |
| Other Investments | 0.6  (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 0.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.6 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ (0.0) |
| **Total Assets** | $ 0.6 | **Net Assets Excluding Net IACs** | $ 0.6 |

(1) Includes an investment of $0.9M to a non-Initial Covered Sackler Person which was reduced to $0.6M in accordance with previously described methodology.

NAS2753

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 2")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 0.0 |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | 2.4  (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 0.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 2.4 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 2.4 | **Net Assets Excluding Net IACs** | $ 2.4 |

(1) Includes $2.4M investment in a non-Initial Covered Sackler Person.

NAS2754

# Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 3")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.3 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 24.4 | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | 8.1 |
| Other Investments | 8.9 (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 8.1 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 25.6 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ (16.4) |
| | | | |
| **Total Assets** | $ 33.7 | **Net Assets Excluding Net IACs** | $ 9.3 |

(1) Includes an investment of $30.5M to an investment in a non-Initial Covered Sackler Person, which was reduced to $7.5M in accordance with previously described methodology. Includes $1.4M investment in a non-Initial Covered Sackler Person.

NAS2755

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Other Trusts

NAS2756

# Richard S. Sackler Life Insurance Trust

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | 1.1 | **Net Assets (Equity)** | $ 1.1 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 1.1 | **Net Assets Excluding Net IACs** | $ 1.1 |

NAS2757

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Jonathan D. Sackler Life Insurance Trust

Balance Sheet

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $    17.1 | Accounts Payable | $    - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 0.2  (1) | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $    - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $    17.2 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $    - |
| | | | |
| **Total Assets** | $    17.2 | **Net Assets Excluding Net IACs** | $    17.2 |

(1) Includes an amount due of $0.0M from JDS CT Residence Trust 1 and $0.1M from JDS CT Residence Trust 2.

NAS2758

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | 1.3  (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 1.4 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 1.4 | **Net Assets Excluding Net IACs** | $ 1.4 |

(1) Includes $1.3M investment in non-Initial Covered Sackler Person.

NAS2759

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# David A. Sackler 2012 Trust

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.1 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 0.2 (1) | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | 0.4 | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.7 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 0.7 | **Net Assets Excluding Net IACs** | $ 0.7 |

(1) Includes an amount of $0.5M due from David Sackler which was reduced to $0.2M in accordance with the previously described methodology.

**NAS2760**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

84

# Irrevocable Trust under Declaration dated as of April 25, 1991

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.2 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.0 |
| Marketable Securities and Hedge Funds | 0.4 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 8.0 |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | 0.0 | | |
| Real Estate Investments | - | **Total Liabilities** | $ 8.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 0.7 | **Net Assets Excluding Net IACs** | $ - |

NAS2761

# Irrevocable Trust under Declaration dated as of August 25, 1992

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 2.3 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 0.0 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 1.0 | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | 4.0 | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 7.3 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 7.3 | **Net Assets Excluding Net IACs** | $ 7.3 |

NAS2762

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# The RSS 2012 Family Trust

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 1.7 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | 1.2 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 0.1 (1) |
| Private Equity Investments | | 1.9 | | | |
| Real Estate Investments | | 2.1 | **Total Liabilities** | **$** | **0.1** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | **$** | **6.9** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$** | **-** |
| **Total Assets** | **$** | **6.9** | **Net Assets Excluding Net IACs** | **$** | **6.9** |

(1) The hypothetical tax liability results from unrealized gains of $0.2M.

NAS2763

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.1 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.1 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 0.1 | **Net Assets Excluding Net IACs** | $ 0.1 |

NAS2764

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

88

# Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

19-23649-rdd Doc 3422-1 Filed 08/05/21 Entered 08/05/21 21:28:38 Main Document Case No.
Confidential Treatment Requested Pursuant to Pg 93 of 706

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 8.7 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | 0.0 | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 2.0 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - (1) |
| Private Equity Investments | 2.2 | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 12.9 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 12.9 | **Net Assets Excluding Net IACs** | $ 12.9 |

(1) The $0 hypothetical tax liability results from unrealized losses of $1.5M.

NAS2765

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

89

# Appendix A: Entities

**NAS2766**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Rosebay Medical Company L.P.

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 35.1 | | Accounts Payable | $ | 0.3 |
| Accounts Receivable and Prepaid Expenses | | 0.0 | | Long-Term Debt | | 39.0  (4) |
| Marketable Securities and Hedge Funds | | 0.0 | | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | 552.9 | | Short-Term Debt | | - |
| Notes Receivable | | -  (1) | | Est. Tax Liability: IACs | | 182.5 |
| Other Investments | | 0.0  (2) | | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | 7.8 | | | | |
| Real Estate Investments | | -  (3) | | **Total Liabilities** | $ | 221.8 |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | $ | 374.1 |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | $ | (370.5) |
| **Total Assets** | $ | 595.9 | | **Net Assets Excluding Net IACs** | $ | 3.6 |

(1) $7.8M was reclassified from Notes Receivable to IAC's.

(2) $0.0M other investment is in a non-Initial Covered Sackler Person.

(3) A real estate investment of -$0.0M was restated to zero.

(4) Includes a $21.0M loan payable to the 74A Trust and a $18.0M loan payable to the Rosebay Medical Company Inc. (see pages 23 and 77 of November 22, 2019 Presentation, respectively).

NAS2767

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Rosebay Medical Company, Inc.

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 11.1 | Short-Term Debt | - |
| Notes Receivable | 18.0 (1) | Est. Tax Liability: IACs | 3.6 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 3.6 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 25.5 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ (7.4) |
| **Total Assets** | $ 29.1 | **Net Assets Excluding Net IACs** | $ 18.0 |

(1) Includes a loan of $18.0M to the Rosebay Medical Company LP (see page 75 in November 22, 2019 Presentation).

NAS2768

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Linarite Holdings LLC

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ | - |

**NAS2769**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

93

# Perthlite Holdings LLC

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

**NAS2770**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Moonstone Holdings LLC

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

NAS2771

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Roselite Holdings LLC

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ | - |

**NAS2772**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Appendix B: General Description of Categories

NAS2773

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# General Description of Asset Categories

| Category | General Description |
|---|---|
| Cash and Cash Equivalents | Deposits and money market mutual funds. |
| Accounts Receivable and Prepaid Expenses | Tax refunds receivable, receivables from hedge fund redemptions, and prepaid expenses. |
| Notes Receivable | Debt financing in the form of notes and loans. |
| Independent Associated Companies (IACs) | Direct and indirect investments in II-way non-U.S. based pharmaceutical and health related assets, not including investments in joint-ventures. |
| Marketable Securities and Hedge Funds | Investments made directly or through various pooling investment vehicles investing in stocks, other marketable securities and hedge funds managed by either a third-party manager or family office. |
| Private Equity Investments | Investments made directly or indirectly in private companies, private equity funds, venture funds, joint ventures or private credit funds managed by either a third-party manager or family office. |

**NAS2774**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# General Description of Asset Categories *(cont'd)*

| Category | General Description |
|---|---|
| Real Estate Investments | Investments made directly or through various pooling investment vehicles in real estate managed either by a third-party manager or family office. |
| Life Insurance - Surrender Value | Cash surrender value of life insurance policies. |
| Retirement Accounts | IRA, 401(k) or other similar type of account. |
| Residential Real Estate | Direct or indirect ownership in residential real estate held principally for the purpose of inhabitance. |
| Artwork (including Jewelry) | Paintings, jewelry, and other collectibles. |
| Other Investments | Investments made directly or indirectly that either fall into multiple categories or do not fall into reported categories. |
| Net IACs | IACs less Est. Tax Liability: IAC. |

**NAS2775**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# General Description of Liability Categories

| Category | General Description |
|---|---|
| Accounts Payable | Money owed for services provided. |
| Short-Term Debt | Note payable that has a maturity of less than 12 months. |
| Long-Term Debt | Note payable that has a maturity of greater than 12 months. |
| Mortgage Debt | A long-term loan used to finance the purchase of residential real estate. |
| Est. Tax Liability: IAC | For illustrative and directional purposes only, the liability reflects a 33% tax obligation applied to the value of each entity's interest in IACs. |
| Est. Tax Liability: Unrealized Gains | For Illustrative and directional purposes only, the liability reflects an average 33% tax obligation on the unrealized gains related to the estimated unrealized gains associated with assets on the balance sheet. |

**NAS2776**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Appendix C: Trust Variance

NAS2777

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Individuals Variance

**NAS2778**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Variance Summary for Richard Sackler

| ($ in Millions) | Total Assets Increase / (Decrease) | Total Liabilities (Increase) / Decrease | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Richard Sackler | $ (10.3) | $ (0.7) | $ (11.0) | $ (11.0) |
| RSS Revocable Pourover Trust | - | - | - | - |
| RSS BRP Trust | (0.0) | (0.0) | (0.0) | - |
| RSS FPC Trust | (0.0) | - | (0.0) | (0.0) |
| RSS XPC Trust | 0.0 | - | 0.0 | 0.0 |
| August 29, 2003 f/b/o Issue of Richard S. Sackler | - | - | - | - |
| RSS CT Residence Trust 1 | - | - | - | - |
| RSS CT Residence Trust 2 | - | - | - | - |
| DABB Trust | (0.1) | - | (0.1) | (0.1) |
| Richard S. Sackler Trust U/A 9/30/04 | 0.0 | - | 0.0 | 0.0 |
| RSS Fiduciary Management Trust | 0.0 | - | 0.0 | 0.0 |
| Crystal Trust | (0.1) | - | (0.1) | (0.1) |
| Data Trust | - | - | - | - |
| **Total** | **$ (10.4)** | **$ (0.7)** | **$ (11.1)** | **$ (11.1)** |

Note: As noted in the Methodology section, ICSPs in a net deficit position (i.e., credit balances) are eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

NAS2779

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Richard Sackler Variance

| ($ in Millions) | Total | | | |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | **Total** |
| Cash and Cash Equivalents | $ | 1.6 | Accounts Payable | $ (0.0) |
| Accounts Receivable and Prepaid Expenses | | 0.1 | Long-Term Debt | (5.4) |
| Marketable Securities and Hedge Funds | | (7.5) | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | 5.9 |
| Notes Receivable | | 0.6 (1) | Est. Tax Liability: IACs | - |
| Other Investments | | 0.6 | Est. Tax Liability: Unrealized Gains | 0.2 |
| Private Equity Investments | | (9.2) (2) | | |
| Real Estate Investments | | (0.6) | **Total Liabilities** | **$ 0.7** |
| Residential Real Estate | | 3.8 | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | **$ (11.0)** |
| Retirement Accounts | | 0.2 | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$ -** |
| **Total Assets** | **$** | **(10.3)** | **Net Assets Excluding Net IACs** | **$ (11.0)** |

(1) Notes Receivable include amounts due from David Sackler that decreased by $0.1M when compared to the January 15, 2020 Net Assets Report. This is due to the underlying trust's Net Assets position is a deficit (the note receivable is adjusted to reflect the assets available to repay).

(2) CPC position decreased by $6.1M in the Private Equity Investments line item when compared to the January 15, 2020 Net Assets Report.

NAS2780

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

104

# RSS Revocable Pourover Trust Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

**NAS2781**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler ("RSS BRP Trust") Variance

Pg 460 of 725

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | (0.0) | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | (2.7) |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | 2.7 |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | **$ 0.0** |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | **$ (0.0)** |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$ -** |
| | | | | |
| **Total Assets** | **$** | **(0.0)** | **Net Assets Excluding Net IACs** | **$ -** |

NAS2782

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler ("RSS FPC Trust") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2783

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler ("RSS XPC Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ 0.0 |

NAS2784

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

108

# Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

NAS2785

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

109

# Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler ("RSS CT Residence Trust 1") Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

NAS2786

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler ("RSS CT Residence Trust 2") Variance

Pg 465 of 725

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

NAS2787

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# DABB Trust Variance

| ($ in Millions) | Total | | | |
|---|---:|---:|---|---:|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | (0.1) | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | (0.1) |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ | (0.1) | **Net Assets Excluding Net IACs** | $ | (0.1) |

NAS2788

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

112

# Richard S. Sackler Trust U/A 9/30/04 Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | 0.0 | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ | 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

NAS2789

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# RSS Fiduciary Management Trust Variance

| ($ in Millions) | Total | | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | 0.0 | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ | 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

NAS2790

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Crystal Trust Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $    0.0 | Accounts Payable | $    - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | (0.1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $    - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $    (0.1) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $    - |
| | | | |
| **Total Assets** | $    (0.1) | **Net Assets Excluding Net IACs** | $    (0.1) |

NAS2791

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Data Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ - |

NAS2792

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

116

# Variance Summary for Jonathan Sackler

| ($ in Millions) | Total Assets Increase / (Decrease) | Total Liabilities (Increase) / Decrease | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | $ (17.8) | $ 2.6 | $ (15.2) | $ (15.2) |
| JDS BRP Trust | (0.0) | (0.0) | (0.0) | - |
| JDS FPC Trust | (0.0) | - | (0.0) | (0.0) |
| JDS XPC Trust | 0.0 | - | 0.0 | 0.0 |
| August 29, 2003 f/b/o Issue of Jonathan D. Sackler | - | - | - | - |
| JDS CT Residence Trust 1 | - | (0.0) | (0.0) | (0.0) |
| JDS CT Residence Trust 2 | - | (0.1) | (0.1) | (0.1) |
| MCM Fiduciary Management Trust | (0.0) | - | (0.0) | (0.0) |
| Cornice Trust | - | - | - | - |
| Cedar Cliff Trust | 0.3 | - | 0.3 | 0.3 |
| **Total** | **$ (17.5)** | **$ 2.4** | **$ (15.1)** | **$ (15.1)** |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

Note: As noted in the Methodology section, ICSPs in a net deficit position (i.e., credit balances) are eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

NAS2793

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Jonathan Sackler / JDS Revocable Pourover Trust Variance [1]

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 3.2 | Accounts Payable | $ (0.0) |
| Accounts Receivable and Prepaid Expenses | 0.1 | Long-Term Debt | (7.1) |
| Marketable Securities and Hedge Funds | 0.9 | Mortgage Debt | (1.0) |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 7.5 |
| Notes Receivable | (5.8) | Est. Tax Liability: IACs | - |
| Other Investments | (0.7) | Est. Tax Liability: Unrealized Gains | (1.9) |
| Private Equity Investments | (9.0) [2] | | |
| Real Estate Investments | (0.4) | **Total Liabilities** | $ (2.6) |
| Residential Real Estate | (6.0) | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (15.2) |
| Retirement Accounts | 0.0 | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ (17.8) | **Net Assets Excluding Net IACs** | $ (15.2) |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

(2) CPC position decreased by $6.1M in the Private Equity Investments line item when compared to the January 15, 2020 Net Assets Report.

NAS2794

# Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler ("JDS BRP Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ (0.0) | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | (1.6) |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 1.6 |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 0.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (0.0) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ - |

NAS2795

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

119

# Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler ("JDS FPC Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ (0.0) | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (0.0) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ (0.0) |

NAS2796

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

120

# Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler ("JDS XPC Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ 0.0 |

NAS2797

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

121

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

NAS2798

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

122

# Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler ("JDS CT Residence Trust 1") Variance

| ($ in Millions) | Total | | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | 0.0 |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | 0.0 |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2799

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler ("JDS CT Residence Trust 2") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | 0.1 |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | **$ 0.1** |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | **$ (0.1)** |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$ -** |
| | | | | |
| **Total Assets** | **$** | **-** | **Net Assets Excluding Net IACs** | **$ (0.1)** |

NAS2800

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# MCM Fiduciary Management Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | (0.0) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2801

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Cornice Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ - |
| | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ - |

**NAS2802**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Cedar Cliff Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | 0.3 | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.3 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.3 | **Net Assets Excluding Net IACs** | $ | 0.3 |

NAS2803

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Variance Summary for David Sackler

| ($ in Millions) | Total Assets Increase / (Decrease) | | Total Liabilities (Increase) / Decrease | | Net Assets (Equity) | | Net Assets Excluding Net IACs |
|---|---|---|---|---|---|---|---|
| David Sackler | $ | (5.2) | $ | 2.8 | $ | - | $ | - |
| David A. Sackler 3/8/90 | | (0.0) | | - | | (0.0) | | (0.0) |
| **Total** | **$** | **(5.2)** | **$** | **2.8** | **$** | **(0.0)** | **$** | **(0.0)** |

Note: As noted in the Methodology section, ICSPs in a net deficit position (i.e., credit balances) are eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

**NAS2804**

# David Sackler Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.3 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | 0.0 | Long-Term Debt | | 1.9 |
| Marketable Securities and Hedge Funds | 0.0 | Mortgage Debt | | (4.6) |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | 2.8 | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | (0.1) |
| Private Equity Investments | (0.7) | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | (2.8) |
| Residential Real Estate | (7.6) | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (5.2) | **Net Assets Excluding Net IACs** | $ | - |

NAS2805

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90 Variance

| ($ in Millions) | Total | | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | (0.0) | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2806

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Variance Summary for Beverly Sackler

| ($ in Millions) | Total Assets Increase / (Decrease) | Total Liabilities (Increase) / Decrease | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Estate of Beverly Sackler (d. October 14, 2019) | $ (0.3) | $ 0.2 | $ (0.0) | $ (0.0) |
| Beverly Sackler Revocable Trust | (13.0) | 0.8 | (12.2) | (12.2) |
| **Total** | **$ (13.3)** | **$ 1.1** | **$ (12.2)** | **$ (12.2)** |

NAS2807

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Estate of Beverly Sackler (d. October 14, 2019) Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | (0.2) |
| Marketable Securities and Hedge Funds | | (0.0) | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | (0.2) |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | (0.2) | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | | (0.1) | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ | (0.3) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2808

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Beverly Sackler Revocable Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 2.4 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | 4.5 | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | (12.2) | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | (0.8) |
| Private Equity Investments | (7.7) | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | (0.8) |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (12.2) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (13.0) | **Net Assets Excluding Net IACs** | $ | (12.2) |

NAS2809

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trusts That Indirectly Own Interests in Purdue Variance

NAS2810

# Trust U/A 11/5/74 fbo Beverly Sackler ("74A Trust") Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 7.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | 1.1 | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | (1.6) | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | (77.4) (1) | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 0.5 |
| Private Equity Investments | | 0.5 | | | |
| Real Estate Investments | | 0.3 | **Total Liabilities** | $ | **0.5** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **(70.7)** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **-** |
| | | | | | |
| **Total Assets** | $ | **(70.2)** | **Net Assets Excluding Net IACs** | $ | **(70.7)** |

(1) Notes Receivable include amounts due from the Investment Trust that decreased by $77.4M when compared to the January 15, 2020 Net Assets Report. This is due to the underlying trust's Net Assets position is a deficit (the note receivable is adjusted to reflect the assets available to repay).

NAS2811

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler Trust 1 dtd 12/23/89 ("1A Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ (14.3) | Accounts Payable | $ (0.0) |
| Accounts Receivable and Prepaid Expenses | 0.9 | Long-Term Debt | (3.9) |
| Marketable Securities and Hedge Funds | (3.1) | Mortgage Debt | (0.0) |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 33.4 |
| Notes Receivable | (1.8) (1) | Est. Tax Liability: IACs | - |
| Other Investments | 0.0 | Est. Tax Liability: Unrealized Gains | (5.3) |
| Private Equity Investments | 30.4 (2) | | |
| Real Estate Investments | (0.4) | **Total Liabilities** | $ 24.1 |
| Residential Real Estate | 1.2 | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (11.1) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 12.9 | **Net Assets Excluding Net IACs** | $ (11.1) |

(1) Notes Receivable include amounts due from David Sackler that decreased by $2.2M when compared to the January 15, 2020 Net Assets Report. This is due to the underlying trust's Net Assets position is a deficit (the note receivable is adjusted to reflect the assets available to repay).

(2) CPC position decreased by $3.4M in the Private Equity Investments line item when compared to the January 15, 2020 Net Assets Report.

NAS2812

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

136

# Raymond R. Sackler Trust 2 dtd 12/23/89 ("2A Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 32.6 | Accounts Payable | $ (0.0) |
| Accounts Receivable and Prepaid Expenses | 0.9 | Long-Term Debt | (2.4) |
| Marketable Securities and Hedge Funds | 74.1 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 2.1 |
| Notes Receivable | 0.4 | Est. Tax Liability: IACs | - |
| Other Investments | (0.0) | Est. Tax Liability: Unrealized Gains | 38.2 |
| Private Equity Investments | 248.6 (1) | | |
| Real Estate Investments | (1.8) | **Total Liabilities** | $ 37.8 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 317.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 354.8 | **Net Assets Excluding Net IACs** | $ 317.0 |

(1) CPC position decreased by $3.4M in the Private Equity Investments line item when compared to the January 15, 2020 Net Assets Report. As noted on page 11, a significant portion of the increase in Private Equity Investments is the result of an early-stage investment in a company that issued securities to the public through an IPO in 2020.

NAS2813

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler Trust 1B dtd 12/23/89 ("1B Trust") Variance

| *($ in Millions)* | **Total** | | **Total** |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ (0.0) | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (0.0) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ (0.0) |

NAS2814

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler Trust 2B dtd 12/23/89 ("2B Trust") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2815

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trusts Created by Division from 74A Trust or Subsequent Decanting Variance

**NAS2816**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Trust B U/A 11/4/74 fbo Beverly Sackler ("74B Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 3.0 | Accounts Payable | $ (0.0) |
| Accounts Receivable and Prepaid Expenses | (0.0) | Long-Term Debt | (0.0) |
| Marketable Securities and Hedge Funds | 1.5 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | (0.0) |
| Notes Receivable | (10.3) (1) | Est. Tax Liability: IACs | - |
| Other Investments | (0.0) | Est. Tax Liability: Unrealized Gains | 1.0 |
| Private Equity Investments | (4.1) (2) | | |
| Real Estate Investments | 0.3 | **Total Liabilities** | $ 1.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (10.5) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ (9.5) | **Net Assets Excluding Net IACs** | $ (10.5) |

(1) Notes Receivable include amounts due from the Investment Trust that decreased by $10.3M when compared to the January 15, 2020 Net Assets Report. This is due to the underlying trust's Net Assets position is a deficit (the note receivable is adjusted to reflect the assets available to repay).

(2) CPC position decreased by $0.0M in the Private Equity Investments line item when compared to the January 15, 2020 Net Assets Report.

NAS2817

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# The 1974 Irrevocable Investment Trust ("Investment Trust") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (5.9) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | (26.0) |
| Marketable Securities and Hedge Funds | (0.2) | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | 26.0 |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | (0.2) |
| Private Equity Investments | (161.7) (1) | | | |
| Real Estate Investments | (0.7) | **Total Liabilities** | $ | **(0.2)** |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | **-** |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | **-** |
| **Total Assets** | $ (168.6) | **Net Assets Excluding Net IACs** | $ | **-** |

(1) CPC position decreased by $161.6M in the Private Equity Investments line item when compared to the January 15, 2020 Net Assets Report.

NAS2818

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

142

# 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust") Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | 7.1 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | (0.5) | **Total Liabilities** | **$** | **-** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | **$** | **6.6** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$** | **-** |
| | | | | | |
| **Total Assets** | **$** | **6.6** | **Net Assets Excluding Net IACs** | **$** | **6.6** |

NAS2819

143

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# AR Irrevocable Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (97.8) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | (18.4) | Long-Term Debt | | (100.0) |
| Marketable Securities and Hedge Funds | (336.0) | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | (40.0) |
| Notes Receivable | (42.7) (1) | Est. Tax Liability: IACs | | - |
| Other Investments | 1.0 | Est. Tax Liability: Unrealized Gains | | (8.1) |
| Private Equity Investments | 128.2 | | | |
| Real Estate Investments | 25.4 | **Total Liabilities** | $ | (148.1) |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (192.1) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (340.2) | **Net Assets Excluding Net IACs** | $ | (192.1) |

(1) Notes Receivable include amounts due from the Investment Trust that decreased by $43.7M when compared to the January 15, 2020 Net Assets Report. This is due to the underlying trust's Net Assets position is a deficit (the note receivable is adjusted to reflect the assets available to repay).

**NAS2820**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust") Variance

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | | $ | - |
| Accounts Receivable and Prepaid Expenses | | 0.2 | Long-Term Debt | | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | | - |
| Private Equity Investments | | 1.2 | | | | |
| Real Estate Investments | | (0.3) | **Total Liabilities** | | $ | - |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | | $ | 1.1 |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | | $ | - |
| | | | | | | |
| **Total Assets** | $ | 1.1 | **Net Assets Excluding Net IACs** | | $ | 1.1 |

NAS2821

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# AJ Irrevocable Trust Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 41.4 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | (0.9) | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | (120.2) | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | (36.9) (1) | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 28.3 |
| Private Equity Investments | 136.9 | | |
| Real Estate Investments | (11.9) | **Total Liabilities** | **$ 28.3** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$ (19.9)** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$ -** |
| **Total Assets** | **$ 8.4** | **Net Assets Excluding Net IACs** | **$ (19.9)** |

(1) Notes Receivable include amounts due from the Investment Trust that decreased by $36.9M when compared to the January 15, 2020 Net Assets Report. This is due to the underlying trust's Net Assets position is a deficit (the note receivable is adjusted to reflect the assets available to repay).

NAS2822

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Additional Trusts That Directly and/or Indirectly Own Interests in IACs Variance

NAS2823

# Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 1") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | (0.1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ (0.1) |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ | (0.1) | **Net Assets Excluding Net IACs** | $ (0.1) |

NAS2824

148

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 2") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | 0.0 |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | (0.1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 0.0 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.1) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.1) | **Net Assets Excluding Net IACs** | $ | (0.1) |

NAS2825

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

149

# Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 3") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | (0.1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.1) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.1) | **Net Assets Excluding Net IACs** | $ | (0.1) |

NAS2826

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

150

# Other Trusts Variance

NAS2827

# Richard S. Sackler Life Insurance Trust Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | (0.1) | **Net Assets (Equity)** | $ (0.1) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ (0.1) | **Net Assets Excluding Net IACs** | $ (0.1) |

NAS2828

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Jonathan D. Sackler Life Insurance Trust Variance

| ($ in Millions) | | Total | | | | | Total |
|---|---|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 17.1 | (1) | Accounts Payable | | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | | Long-Term Debt | | | - |
| Marketable Securities and Hedge Funds | | - | | Mortgage Debt | | | - |
| Independent Associated Companies (IACs) | | - | | Short-Term Debt | | | - |
| Notes Receivable | | 0.2 | (2) | Est. Tax Liability: IACs | | | - |
| Other Investments | | - | | Est. Tax Liability: Unrealized Gains | | | - |
| Private Equity Investments | | - | | | | | |
| Real Estate Investments | | - | | **Total Liabilities** | | $ | - |
| Residential Real Estate | | - | | | | | |
| Life Insurance -Surrender Value | | (2.6) | | **Net Assets (Equity)** | | $ | 14.6 |
| Retirement Accounts | | - | | | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | | $ | - |
| | | | | | | | |
| **Total Assets** | $ | 14.6 | | **Net Assets Excluding Net IACs** | | $ | 14.6 |

(1) The cash increase is a result of life insurance proceeds from policies wholly owned by this trust on the life of Jonathan Sackler. Jonathan Sackler died on June 30, 2020.

(2) Notes Receivable include amounts due from the JDS CT Residence Trust 1 and JDS CT Residence Trust 2, which increased by $0.2M when compared to the January 15, 2020 Net Assets Report.

NAS2829

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | 0.0 | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

NAS2830

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

154

# David A. Sackler 2012 Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | (0.1) (1) | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.1) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.1) | **Net Assets Excluding Net IACs** | $ | (0.1) |

(1) Notes Receivable include amounts due from David Sackler that decreased by $0.1M when compared to the January 15, 2020 Net Assets Report. This is due to the underlying trust's Net Assets position is a deficit (the note receivable is adjusted to reflect the assets available to repay).

NAS2831

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

155

# Irrevocable Trust under Declaration dated as of April 25, 1991 Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | (0.2) | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ (0.2) | **Net Assets Excluding Net IACs** | $ - |

NAS2832

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

156

# Irrevocable Trust under Declaration dated as of August 25, 1992 Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $  (2.1) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | (3.0) | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | 1.0 | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | (0.1) |
| Private Equity Investments | 4.0 | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | **(0.1)** |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | **0.0** |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | **-** |
| | | | | |
| **Total Assets** | $  (0.1) | **Net Assets Excluding Net IACs** | $ | **0.0** |

NAS2833

# The RSS 2012 Family Trust Variance

| ($ in Millions) | **Total** | | | **Total** |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (1.7) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | 0.1 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | 0.0 |
| Private Equity Investments | 1.5 | | | |
| Real Estate Investments | 0.1 | **Total Liabilities** | $ | 0.0 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.1) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ | (0.1) |

**NAS2834**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

158

# Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012 Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

NAS2835

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012 Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.2 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | 0.0 | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | (0.1) | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | (0.2) |
| Private Equity Investments | (2.4) | | |
| Real Estate Investments | - | **Total Liabilities** | $ (0.2) |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (2.1) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ (2.3) | **Net Assets Excluding Net IACs** | $ (2.1) |

NAS2836

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

160

# Entities Variance

NAS2837

# Rosebay Medical Company L.P. Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $        (4.0) | Accounts Payable | $ | (0.3) |
| Accounts Receivable and Prepaid Expenses | (0.0) | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | 0.0 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | 0.0 | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | (0.3) |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (3.8) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $        (4.0) | **Net Assets Excluding Net IACs** | $ | (3.8) (1) |

(1) Excludes an amount of $0.6M in accordance with the previously described methodology.

NAS2838

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Rosebay Medical Company, Inc. Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (0.2) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.2) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.2) | **Net Assets Excluding Net IACs** | $ | (0.2) |

NAS2839

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

163

# Linarite Holdings LLC Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

NAS2840

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Perthlite Holdings LLC Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ - |
| | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ - |

**NAS2841**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Moonstone Holdings LLC Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

**NAS2842**

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Roselite Holdings LLC Variance

| ($ in Millions) | Total | |
|---|---|---|
| **Assets** | | |
| Cash and Cash Equivalents | $ | - |
| Accounts Receivable and Prepaid Expenses | | - |
| Marketable Securities and Hedge Funds | | - |
| Independent Associated Companies (IACs) | | - |
| Notes Receivable | | - |
| Other Investments | | - |
| Private Equity Investments | | - |
| Real Estate Investments | | - |
| Residential Real Estate | | - |
| Life Insurance -Surrender Value | | - |
| Retirement Accounts | | - |
| Artwork (including Jewelry) | | - |
| | | |
| **Total Assets** | $ | - |

| | Total | |
|---|---|---|
| **Liabilities** | | |
| Accounts Payable | $ | - |
| Long-Term Debt | | - |
| Mortgage Debt | | - |
| Short-Term Debt | | - |
| Est. Tax Liability: IACs | | - |
| Est. Tax Liability: Unrealized Gains | | - |
| **Total Liabilities** | $ | - |
| **Net Assets (Equity)** | $ | - |
| **Less: Net IACs** | $ | - |
| **Net Assets Excluding Net IACs** | $ | - |

NAS2843

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Appendix D: Attestation of Timothy J. Martin

NAS2844

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re:                                                  Chapter 11

PURDUE PHARMA L.P., *et al.,*                           Case No. 19-23649 (RDD)

Debtors.                                                (Jointly Administered)

### ATTESTATION OF TIMOTHY J. MARTIN WITH RESPECT TO RAYMOND-SIDE UPDATED NET ASSETS REPORT

I, Timothy J. Martin, hereby attest that the following is true to the best of my knowledge, information and belief:

#### Qualifications

1.      I am a managing director at Huron Consulting Services, LLC ("Huron"), which was founded in 2002 and whose parent, Huron Consulting Group Inc. ("Huron Consulting Group"), is publicly traded on The NASDAQ Global Select Market under the symbol "HURN". Huron Consulting Group and its subsidiaries employ in excess of 3,000 full time employees in offices across the United States, including in Chicago, New York, and Boston, and abroad in Canada, India, Singapore, Switzerland, and the United Kingdom. Huron Consulting Group and its subsidiaries provide a range of professional services primarily through three operating segments: healthcare, business advisory, and education.

2.      I have more than two decades of experience providing forensic, investigative and financial advisory consulting services to companies, boards of directors, creditors, equity holders and the legal community. I have been engaged by trustees and receivers in bankruptcy cases to conduct investigations into some of the largest known frauds, including Ponzi and pyramid schemes, securities fraud, fraudulent conveyances and financial statement fraud. I am

a Certified Insolvency and Restructuring Advisor (CIRA), Certified Turnaround Professional (CTP) and Certified Fraud Examiner (CFE).

#### Compensation Disclosure

3.      Huron has been retained by Milbank LLP and Joseph Hage Aaronson LLC in their capacity as counsel to the Raymond-side Initial Covered Sackler Persons,[1] including Rosebay Medical Company L.P. ("RMLP"). Huron is being compensated for its work on this matter at its standard hourly rates. No part of Huron's compensation is presently contingent on any particular outcome or resolution of this matter.

#### Scope of Report

4.      On November 5, 2019, Purdue Pharma L.P. and certain of its affiliates that are debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors Committee appointed in the Debtors' chapter 11 cases (the "UCC"), Beacon Company and RMLP entered into that certain *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* (the "Amended Stipulation") [Docket No. 518].

5.      The Amended and Restated Stipulation contemplates that the Shareholder Parties will provide the following to the legal and financial advisors to the Debtors and the UCC:

(i)     a report setting forth the net assets of the Initial Covered Sackler Persons, which report will set forth the approximate aggregate value of the assets owned by category (e.g., cash, securities, real estate, private and other investments, etc.) and the approximate liabilities, also by category, and

(ii)    an attestation from a responsible person or independent third party as to the accuracy of the report.

---

[1]     All capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Amended Stipulation (as defined below).

2

NAS2845

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Attestation of Timothy J. Martin

See Amended Stipulation ¶ 17(a).

6.   Huron prepared an initial report with respect to each Raymond-side Initial Covered Sackler Persons (the "Raymond-side Net Assets Report") as of October 31, 2019.

7.   Huron has also prepared an updated report with respect to each of the Raymond-side Initial Covered Sackler Persons (the "Raymond-side Updated Net Assets Report") as of September 30, 2020. This attestation is annexed to the Raymond-side Updated Net Assets Report as Appendix D.

#### Information Considered

8.   I, or others working under my direction, received from North Bay Associates ("North Bay") balance sheets as of September 30, 2020 relating to the forty-seven Raymond-side Initial Covered Sackler Persons set forth on Schedule A of the *Attestation of Stephen A. Ives With Respect to Raymond-Side Updated Net Assets Report* (the "Ives Attestation"). It has been represented to Huron by North Bay that these balance sheets were prepared by North Bay in the ordinary course of business and that these balance sheets are the complete set of the available balance sheets prepared by North Bay relating to the Initial Covered Sackler Persons.

9.   North Bay does not, in the ordinary course of business, prepare balance sheets relating to twelve of the Raymond-side Initial Covered Sackler Persons.

   (i)   For five of such Initial Covered Sackler Persons,[2] Huron obtained the values of their respective assets and liabilities through discussion with North Bay and review of available records which are reflected in the Raymond-side Updated Net Assets Report.

---

[2]   These five Initial Covered Sackler Persons are: the RSS Revocable Pourover Trust; Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler; and Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler.

3

   (ii)   For six of such Initial Covered Sackler Persons,[3] North Bay provided Huron with balance sheets prepared by a third party.

   (iii)   For the remaining Initial Covered Sackler Persons,[4] Huron ascertained the values of their respective assets and liabilities by reviewing its balance sheet.

10.   North Bay also provided additional contextual information, through written and oral communications, relating to the information described in paragraphs 8 and 9 (such contextual information, together with the information described in paragraphs 8 and 9, the "Balance Sheet Information"). The Balance Sheet Information constitutes the entire set of information relied on by Huron in preparing the Raymond-side Updated Net Assets Report, except as described in paragraph 15 below.

11.   Huron has, for the purpose of the Raymond-side Updated Net Assets Report, placed each asset referenced in the Balance Sheet Information into one of the following categories based on information provided by North Bay:

   (i)   Cash and Cash Equivalents:  Deposits and money market mutual funds.

   (ii)   Accounts Receivable and Prepaid Expenses:  Tax refunds receivable, receivables from hedge fund redemptions, and prepaid expenses.

   (iii)   Notes Receivable:  Debt financing in the form of notes and loans.

   (iv)   Independent Associated Companies (IACs):  Direct and indirect investments in II-way non-U.S. based pharmaceutical and health related assets, not including investments in joint-ventures.

   (v)   Marketable Securities and Hedge Funds:  Investments made directly or through various pooling investment vehicles investing in stocks, other marketable securities and hedge funds managed by either a third-party manager or family office.

---

[3]   These six Initial Covered Sackler Persons are:  RSS Fiduciary Management Trust, Crystal Trust, MCM Fiduciary Management Trust, Data Trust, Cornice Trust, and Cedar Cliff Trust, all of which were formed to hold interests in Wyoming entities that serve as trustees for certain Raymond-side trusts.  Balance sheets for these Wyoming entities were collected by North Bay and provided to Huron.

[4]   The remaining one such Initial Covered Sackler Person is the DABB Trust.

4

NAS2846

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Attestation of Timothy J. Martin

(vi) Private Equity Investments: Investments made directly or indirectly in private companies, private equity funds, venture funds, joint ventures or private credit funds managed by either a third-party manager or family office.

(vii) Real Estate Investments: Investments made directly or through various pooling investment vehicles in real estate managed either by a third-party manager or family office.

(viii) Life Insurance - Surrender Value: Cash surrender value of life insurance policies.

(ix) Retirement Accounts: IRA, 401(k) or other similar type of account.

(x) Residential Real Estate: Direct or indirect ownership in residential real estate held principally for the purpose of inhabitance.

(xi) Artwork (including Jewelry): Paintings, jewelry, and other collectibles.

(xii) Other Investments: Investments made directly or indirectly that either fall into multiple categories or do not fall into reported categories.

12. Huron has, also for the purpose of the Raymond-side Updated Net Assets Report, placed each liability referenced in the Balance Sheet Information into one of the following categories based on information provided by North Bay:

(i) Accounts Payable: Money owed for services provided.

(ii) Short-Term Debt: Note payable that has a maturity of less than 12 months.

(iii) Long-Term Debt: Note payable that has a maturity of greater than 12 months.

(iv) Mortgage Debt: A long-term loan used to finance the purchase of residential real estate.

13. If a balance sheet line item represented an interest in a holding company, Huron classified the asset consistent with its underlying investment. For example, several of the Initial Covered Sackler Persons have an interest in a Delaware general partnership that serves as a vehicle for making investments. This entity holds various private equity, hedge fund, and

marketable securities investments. For presentation purposes, each Initial Covered Sackler Person's interest in this entity was classified consistent with its underlying assets.

14. It was necessary to create a category for "Other Investments" because the character of certain investments were not able to be easily classified using another enumerated category, particularly in cases where an asset is a holding company that holds many different types of investments (for which investment detail was not readily available) or a service provider such as North Bay. For each Initial Covered Sackler Person, descriptions for each asset classified as Other Investments are provided throughout.

15. The value of the net assets as presented in the Raymond-side Updated Net Assets Report for each of the Raymond-side Initial Covered Sackler Persons is consistent with the value of its underlying net assets as set forth in the Balance Sheet Information relating to the applicable Initial Covered Sackler Person, with the following exceptions to more appropriately reflect the value of those net assets:

(i) The values of assets reflecting direct or indirect ownership in the Debtors were eliminated from the Raymond-side Updated Net Assets Report, such as RMLP's indirect interest in the Debtors.

(ii) Where a more representative realizable value of an asset was available (e.g., third-party appraisal, tax assessment, oil and gas reserve report, etc.) the balance sheet value of the asset was adjusted to that amount and the adjustment was disclosed in the notes for the relevant Initial Covered Sackler Person.

(iii) Illustrative values were substituted for the balance sheet values related to the IACs, all of which IACs are contemplated to be sold under the settlement framework set out in the *Summary Term Sheet with Ad Hoc Committee* filed by the Debtors (the "Proposed Settlement Framework") [Docket No. 257]. An illustrative aggregate value of $4.5 billion is ascribed to the IACs and value is allocated among the various IACs according to their respective management's projections for the years 2020 – 2024 using the methodology described in the "Allocation of Independent Associated Companies" section of the Raymond-side Updated Net Assets Report. Applying an illustrative blended tax rate of 33% to the aggregate value of the IACs, the sale of the IACs generates $3 billion in net

5

6

NAS2847

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

proceeds, which is the amount guaranteed under the Proposed Settlement Framework. Neither the $4.5 billion aggregate value nor the 33% blended tax rate are projections of actual value or tax liability; they are applied solely for illustrative purposes.[5]

(iv) In instances where the net asset value for an Initial Covered Sackler Person would otherwise be negative (a "Obligor Person"), the net asset value has been adjusted to $0.0. Where an Obligor Person's net asset value was negative in part due to debt owed to other Initial Covered Sackler Persons (each an "Obligee Person"), for the purpose of this presentation, the value of the assets of the Obligee Person are reduced by the amount by which the face amount of the debt in question exceeded the assets of the Obligor Person. This was done to reflect the net recoverable value relating to the debt. For example, if liabilities exceeded assets for an Obligor Person by $50 and the Obligor Person has a $100 note payable to an Obligee Person, the net assets of the Obligee Person would be reflected as $0.0 and the value of the Obligee Person's note receivable would be reduced by $50, thus balancing in the aggregate. In one case, where an Obligor Person had issued both secured and unsecured debt, the unsecured debt was reduced before the secured debt.

(v) Certain of the balance sheets prepared for individual Initial Covered Sackler Persons by North Bay in the ordinary course of business include line items in the asset column relating to trusts that are themselves Initial Covered Sackler Persons. The net asset values of such trusts are not reflected as assets of such individuals, but are instead presented independently, consistent with the presentation of Initial Covered Sackler Persons generally.

(vi) Solely in instances where a third party provides an estimate or statement of value (such assets, "Third-Party Valued Assets"). "unrealized gain/loss" refers to the difference between that value and the tax basis of the Third-Party Valued Asset in question. An illustrative 33% blended tax rate (for presentation purposes only) was applied to the estimated unrealized gains to illustrate the hypothetical tax obligation that would result from a sale of such Third-Party Valued Assets.

16.    Although Huron expresses no opinion with respect to the value of any specific asset, Huron believes that with the adjustments made, excluding the value ascribed to the IAC's which was done for illustrative purposes only, the Raymond-side Updated Net Assets Report

---

[5]    In many cases, Initial Covered Sackler Person's interests in IAC are held through interests in I-way holding companies. Where an entity reflected on an Initial Covered Sackler Person's balance directly or indirectly held interests in IACs in addition to other assets, North Bay provided to Huron a description of the assets and liabilities not associated with the IACs.

7

represents a reasonable approach to approximate the total net asset values of the Raymond-side Initial Covered Sackler Persons. The Raymond-side Updated Net Assets Report is not intended to estimate the proceeds that would be realized from a forced sale of underlying assets.

17.    To the extent Huron discovers any information that would lead it to conclude that presentation made in the Raymond-side Updated Net Assets Report were materially inaccurate as of the date of this attestation, Huron will promptly supplement the Raymond-side Updated Net Assets Report accordingly and provide such supplemented report to the parties to the Amended Stipulation.

*Timothy J. Martin*
Timothy J. Martin
Managing Director
Huron Consulting Services LLC

8

NAS2848

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Appendix E: Attestation of Stephen A. Ives

NAS2849

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P., et al.,** | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

### ATTESTATION OF STEPHEN A. IVES WITH RESPECT TO
### RAYMOND-SIDE UPDATED NET ASSETS REPORT

I, Stephen A. Ives, hereby attest that the following is true to the best of my knowledge, information and belief:

#### Background and Qualifications

1.   I am the vice president of North Bay Associates ("North Bay"). North Bay provides tax and accounting services to members of the Raymond Sackler family, trusts established for their benefit and certain entities directly or indirectly owned by such family members or trusts.

2.   I supervise all accountants and others who provide services through North Bay Associates. I have served in this capacity for over 25 years.

3.   Since 1975, I have been a certified public accountant and I am in good standing with the accounting licensing authority in Oklahoma.

#### Huron's Reports

4.   On November 5, 2019, Purdue Pharma L.P. and certain of its affiliates that are debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "UCC"), Beacon Company and Rosebay Medical Company L.P. entered into that certain

---

*Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* (the "Amended Stipulation") [Docket No. 518].

5.   The Amended and Restated Stipulation contemplates that the Shareholder Parties will provide the following to the legal and financial advisors to the Debtors and the UCC:

    (i)    a report setting forth the net assets of the Initial Covered Sackler Persons,[1] which report will set forth the approximate aggregate value of the assets owned by category (e.g., cash, securities, real estate, private and other investments, etc.) and the approximate liabilities, also by category, and

    (ii)    an attestation from a responsible person or independent third party as to the accuracy of the report.

*See Amended Stipulation*, ¶ 17(a).

6.   Huron Consulting Services, LLC ("Huron") prepared a report with respect to each of the Raymond-side Initial Covered Sackler Persons (the "Raymond-side Net Assets Report"), which was presented to the parties to the Amended Stipulation and certain other invited parties on January 15, 2020. North Bay assisted Huron in the preparation of the Raymond-side Net Assets Report by providing the information on which the Raymond-side Net Assets Report was based.

7.   Since the presentation on January 15, 2020, Huron has prepared an updated version of the Raymond-side Net Assets Report (the "Raymond-side Updated Net Assets Report"). North Bay assisted Huron in the preparation of the Raymond-side Updated Net Assets Report by providing the information on which the updates were based, as described herein. This attestation is annexed to the Raymond-side Updated Net Assets Report as Appendix E.

#### Information Provided

---

[1]    All capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Amended Stipulation.

NAS2850

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

174

8. In connection with providing the services described above, North Bay, in the ordinary course of business, maintains the books and records of, and prepares monthly financial statements relating to, each of the Initial Covered Sackler Persons set forth on Schedule A attached hereto. Generally, the balance sheets present the assets as follows:

    (i)    Cash and Cash Equivalents: Book but reconciled to account statement balances.

    (ii)    Accounts Receivable and Prepaid Investments: Expected receivables and amounts paid.

    (iii)    Notes Receivable and Loans: Principal amounts outstanding.

    (iv)    Marketable Securities and Hedge Funds: Closing prices for publicly-traded securities, valuations provided by fund managers or, in the absence of the foregoing, tax bases (e.g., cost bases).

    (v)    Private Equity Investments: Valuations provided by fund managers, when available. Otherwise, tax bases.

    (vi)    Real Estate Investments: Valuations provided by fund managers, when available; otherwise, tax bases.

    (vii)    Life Insurance – Surrender Value: Statement balances.

    (viii)    Retirement Accounts: Statement balances.

    (ix)    Residential Real Estate: Tax bases.

    (x)    Artwork: Cost.

    (xi)    Other Investments: Tax bases.

9. Generally, the balance sheets present the liabilities as follows:

    (i)    Accounts Payable: Actual amounts owed and expected payments.

    (ii)    Short-Term Debt: Principal amounts outstanding.

    (iii)    Long-Term Debt: Principal amounts outstanding.

    (iv)    Mortgage Debt: Principal amounts outstanding.

10. In connection with Huron's preparation of the Raymond-side Updated Net Assets Report, North Bay provided to Huron forty-seven balance sheets as of September 30, 2020 relating to the Initial Covered Sackler Persons. These balance sheets were prepared in the ordinary course of business consistent with past practices, i.e., in the manner described in paragraphs 8 and 9 above. None of the balance sheets provided to Huron were altered for the purposes of the Raymond-side Updated Net Assets Report. To the best of my knowledge, the balance sheets accurately present the assets and liabilities of each of the applicable Initial Covered Sackler Persons as of the above-mentioned date.

11. To the best of my knowledge, there are no material transactions that have not been properly recorded in the accounting records underlying the balance sheets.

12. I have no knowledge of any error, fraud or suspected error or fraud where the fraud or error could have a material effect on the balance sheets.

13. North Bay does not, in the ordinary course of business, prepare balance sheets relating to twelve of the Initial Covered Sackler Persons, which consist of:

    (i)    One trust,[2] whose assets are reflected on the balance sheet of its beneficiary;

    (ii)    Four trusts,[3] whose only assets are remainder interests in residential real estate;

    (iii)    Six trusts,[4] whose only assets are interests in companies that serve as trustees for other Raymond-side trusts, the books and records of which companies are maintained by a Wyoming service company;

---

[2]    This Initial Covered Sackler Person is: the RSS Revocable Pourover Trust.

[3]    These four Initial Covered Sackler Persons are: the Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler; and Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler.

[4]    These six Initial Covered Sackler Persons are: the RSS Fiduciary Management Trust, Crystal Trust, MCM Fiduciary Management Trust, Data Trust, Cornice Trust and the Cedar Cliff Trust.

NAS2851

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

(iv)     One trust,[5] whose only assets are real estate investments.

14.     In connection with Huron's preparation of the Raymond-side Updated Net Assets Report, North Bay collected and provided to Huron, in addition to the balance sheets described at paragraph 10 above, balance sheets prepared by third persons, as well as valuation assessments from public bodies.

15.     In connection with Huron's preparation of the Raymond-side Updated Net Assets Report, North Bay also provided Huron with the following information prepared by a third party relating to the Initial Covered Sackler Persons: The summarized results of a third party engineer's petroleum reserve report dated May 2020.

16.     North Bay has provided Huron all information, such as financial records and related data, which Huron requested in connection with the preparation of the Raymond-side Updated Net Assets Report.

17.     This attestation is limited to the matters expressly set forth herein.  I express no opinion as to the fair market value of the assets or the value of the proceeds that may be derived from the forced sale of the assets.

Stephen A. Ives

---
[5]     This Initial Covered Sackler Person is:  the DABB Trust.

NAS2852

PROFESSIONALS' EYES ONLY/HIGHLY CONFIDENTIAL—SUBJECT TO PROTECTIVE ORDER AND FRE 408

# Attestation of Stephen A. Ives

## Schedule A

- Richard Sackler
- RSS Revocable Pourover Trust
- Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler ("RSS BRP Trust")
- Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler ("RSS FPC Trust")
- Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler ("RSS XPC Trust")
- Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler
- Richard S. Sackler Trust U/A 9/30/04
- RSS Fiduciary Management Trust
- Jonathan Sackler
- JDS Revocable Pourover Trust
- Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler ("JDS BRP Trust")
- Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler ("JDS FPC Trust")
- Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler ("JDS XPC Trust")
- Trust Agreement dated August 29, 2003 f/b/o Issue of Jonathan D. Sackler
- David Sackler
- Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90
- The Estate of Beverly Sackler (d. October 14, 2019)
- Beverly Sackler Revocable Trust
- Trust U/A fbo Beverly Sackler ("74 Trust")
- Raymond R. Sackler Trust 1 dtd 12/23/89 ("1A Trust")
- Raymond R. Sackler Trust 2 dtd 12/23/89 ("2A Trust")
- Raymond R. Sackler Trust 1B dtd 12/23/89 ("1B Trust")
- Raymond R. Sackler Trust 2B dtd 12/23/89 ("2B Trust")
- Trust B U/A fbo Beverly Sackler ("74B Trust")
- The 1974 Irrevocable Investment Trust ('Investment Trust")
- 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust")
- 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust")
- AR Irrevocable Trust
- AJ Irrevocable Trust
- Beverly Sackler Trust 1 f/b/o David A. Sackler 12/20/1989 ("Gallo Trust 1")
- Beverly Sackler Trust 2 f/b/o David A. Sackler 12/20/1989 ("Gallo Trust 2")
- Beverly Sackler Trust 3 f/b/o David A. Sackler 12/20/1989 ("Gallo Trust 3")
- Richard S. Sackler Life Insurance Trust
- Jonathan D. Sackler Life Insurance Trust

- Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler
- David A. Sackler 2012 Trust
- Irrevocable Trust under Declaration dated as of April 25, 1991
- Irrevocable Trust under Declaration dated as of August 25, 1992
- The RSS 2012 Family Trust
- Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012
- Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012
- Rosebay Medical Company L.P.
- Rosebay Medical Company, Inc
- Linarite Holdings LLC
- Perthlite Holdings LLC
- Moonstone Holdings LLC
- Roselite Holdings LLC

NAS2853

# Exhibit E

NAS2854

## TIMOTHY J. MARTIN

**T** 617.226.5530
**E** tmartin@hcg.com

**BUSINESS ADVISORY**
MANAGING DIRECTOR

- Timothy has over two decades of experience providing forensic, investigative and financial advisory consulting services, including leading engagements involving misappropriation of funds, Ponzi and pyramid schemes, fraudulent transfers, securities fraud and professional malpractice. Timothy has significant experience assisting clients throughout the investigation and litigation cycle, including conducting financial and forensic analyses, interviewing employees, C-level executives and board members, reconstructing events, tracing assets, assisting in the preparation of complaints and other filings, and managing the discovery process.

- Prior to joining Huron, Timothy was a Managing Director at Mesirow Financial Consulting, LLC ("MFC"). Previously, Timothy was a Director of Corporate Recovery at KPMG, LLP. Timothy started his career at Arthur Andersen, LLP.

- Representative examples of Tim's engagement experience include serving as:

  - Financial advisor to the Official Committee of Unsecured Creditors of Akorn, Inc., et al.

  - Forensic accountant and financial advisor on multiple engagements involving companies engaged in hydrocarbon exploration.

  - Financial and accounting advisor to the Ch. 11 Trustee of TelexFree, LLC, et al., a group of entities which operated a world-wide pyramid scheme involving millions of victims and billions of dollars in losses.

  - Financial advisor and forensic accountant to a payroll company which was the victim of a multi-year $100M+ check kiting scheme.

  - Multiple investigations on behalf of unsecured creditors committees, including the Kmart stewardship investigation and the Friedman's Jewelers accounting investigation.

  - Forensic investigator for former Chief U.S. Bankruptcy Judge Arthur J. Gonzalez in his capacity as the court-appointed Examiner in the Residential Capital, LLC ("ResCap") Chapter 11 case.

  - Financial advisor to the Ch. 7 Trustee of Lancelot Investors Fund, LP, et al., a family of hedge fund debtors which reported losses of over $1.5 billion related to investments in the Petters Company Ponzi scheme.

  - Forensic advisor to special counsel to a distressed national homebuilder. Mr. Martin assisted counsel in an investigation into the facts and circumstances surrounding a failed $800 million+ joint venture.

  - Forensic accountant investigating the HealthSouth fraud, one of the largest and most complex accounting frauds in United States history.

  - Litigation consultant to counsel in over a dozen accounting malpractice actions, including actions related to the Madoff, Petters, and Rothstein Ponzi schemes.

- **Education and Certification**

  - Bachelor of Arts, Accounting, University of Massachusetts - Amherst

  - Certified Insolvency & Restructuring Advisor

  - Certified Fraud Examiner

  - Certified Turnaround Professional

- **Professional Associations**

  - Member, American Bankruptcy Institute

  - Member, Turnaround Management Association

  - Member, Association of Certified Fraud Examiners

NAS2855

# Exhibit F

NAS2856

## Tim Martin – Huron Consulting Group

Prior Testimony in the Last Four Years:

- *In re TelexFree, LLC*, Case No. 14-40987-MSH (Bankr. D. Mass.)
  - o Deposition in a related adversary proceeding, Case No. 16-04006-MSH (Bankr. D. Mass.), on November 6, 2020
  - o Evidentiary hearing in a related adversary proceeding, Case No. 16-04006-MSH (Bankr. D. Mass.), on November 23, 2020

NAS2857

# Exhibit G

NAS2858

**Exhibit G**
## MATERIALS CONSIDERED

**Bates-Numbered Documents**

| | | | |
|---|---|---|---|
| 1. | RSF00002969_REPLACED | 41. | RSF00615193 |
| 2. | RSF00003294_REPLACED | 42. | RSF00615194 |
| 3. | RSF00232611 | 43. | RSF00615195 |
| 4. | RSF00232630_Unredacted_00001 | 44. | RSF00615196 |
| 5. | RSF00247658 | 45. | RSF00615197 |
| 6. | RSF00302561 | 46. | RSF00615198 |
| 7. | RSF00308084 | 47. | RSF00615199 |
| 8. | RSF00349284 | 48. | RSF00615200 |
| 9. | RSF00381306_Unredacted_00001 | 49. | RSF00615201 |
| 10. | RSF00560057 | 50. | RSF00615202 |
| 11. | RSF00560094 | 51. | RSF00615203 |
| 12. | RSF00560133 | 52. | RSF00615204 |
| 13. | RSF00560172 | 53. | RSF00615205 |
| 14. | RSF00560211 | 54. | RSF00615206 |
| 15. | RSF00560264 | 55. | RSF00615207 |
| 16. | RSF00560325 | 56. | RSF00615233 |
| 17. | RSF00560946 | 57. | RSF00615234 |
| 18. | RSF00560997 | 58. | RSF00615235 |
| 19. | RSF00615171 | 59. | RSF00615236 |
| 20. | RSF00615172 | 60. | RSF00615237 |
| 21. | RSF00615173 | 61. | RSF00615238 |
| 22. | RSF00615174 | 62. | RSF00615239 |
| 23. | RSF00615175 | 63. | RSF00615240 |
| 24. | RSF00615176 | 64. | RSF00615241 |
| 25. | RSF00615177 | 65. | RSF00615242 |
| 26. | RSF00615178 | 66. | RSF00615243 |
| 27. | RSF00615179 | 67. | RSF00615244 |
| 28. | RSF00615180 | 68. | RSF00615245 |
| 29. | RSF00615181 | 69. | RSF00615246 |
| 30. | RSF00615182 | 70. | RSF00615247 |
| 31. | RSF00615183 | 71. | RSF00615248 |
| 32. | RSF00615184 | 72. | RSF00615249 |
| 33. | RSF00615185 | 73. | RSF00615250 |
| 34. | RSF00615186 | 74. | RSF00615269 |
| 35. | RSF00615187 | 75. | RSF00634318 |
| 36. | RSF00615188 | 76. | RSF00634319 |
| 37. | RSF00615189 | 77. | RSF00634320 |
| 38. | RSF00615190 | 78. | RSF00634321 |
| 39. | RSF00615191 | 79. | RSF00634322 |
| 40. | RSF00615192 | 80. | RSF00634323 |

1

NAS2859

**Exhibit G**
**MATERIALS CONSIDERED**

| | | | | |
|---|---|---|---|---|
| 81. | RSF00634324 | | 123. | RSF00634366 |
| 82. | RSF00634325 | | 124. | RSF00634367 |
| 83. | RSF00634326 | | 125. | RSF00634368 |
| 84. | RSF00634327 | | 126. | RSF00634369 |
| 85. | RSF00634328 | | 127. | RSF00634370 |
| 86. | RSF00634329 | | 128. | RSF00634371 |
| 87. | RSF00634330 | | 129. | RSF00634372 |
| 88. | RSF00634331 | | 130. | RSF00634373 |
| 89. | RSF00634332 | | 131. | RSF00634374 |
| 90. | RSF00634333 | | 132. | RSF00634375 |
| 91. | RSF00634334 | | 133. | RSF00634376 |
| 92. | RSF00634335 | | 134. | RSF00634377 |
| 93. | RSF00634336 | | 135. | RSF00634378 |
| 94. | RSF00634337 | | 136. | RSF00634379 |
| 95. | RSF00634338 | | 137. | RSF00634380 |
| 96. | RSF00634339 | | 138. | RSF00634381 |
| 97. | RSF00634340 | | 139. | RSF00634382 |
| 98. | RSF00634341 | | 140. | RSF00634383 |
| 99. | RSF00634342 | | 141. | RSF00634384 |
| 100. | RSF00634343 | | 142. | RSF00634385 |
| 101. | RSF00634344 | | 143. | RSF00634386 |
| 102. | RSF00634345 | | 144. | RSF00634387 |
| 103. | RSF00634346 | | 145. | RSF00634388 |
| 104. | RSF00634347 | | 146. | RSF00634389 |
| 105. | RSF00634348 | | 147. | RSF00634390 |
| 106. | RSF00634349 | | 148. | RSF00634391 |
| 107. | RSF00634350 | | 149. | RSF00634392 |
| 108. | RSF00634351 | | 150. | RSF00634393 |
| 109. | RSF00634352 | | 151. | RSF00634394 |
| 110. | RSF00634353 | | 152. | RSF00634395 |
| 111. | RSF00634354 | | 153. | RSF00634396 |
| 112. | RSF00634355 | | 154. | RSF00634397 |
| 113. | RSF00634356 | | 155. | RSF00634398 |
| 114. | RSF00634357 | | 156. | RSF00634399 |
| 115. | RSF00634358 | | 157. | RSF00634400 |
| 116. | RSF00634359 | | 158. | RSF00634401 |
| 117. | RSF00634360 | | 159. | RSF00634402 |
| 118. | RSF00634361 | | 160. | RSF00634403 |
| 119. | RSF00634362 | | 161. | RSF00634404 |
| 120. | RSF00634363 | | 162. | RSF00634405 |
| 121. | RSF00634364 | | 163. | RSF00634406 |
| 122. | RSF00634365 | | 164. | RSF00634407 |

2

NAS2860

**Exhibit G**
**MATERIALS CONSIDERED**

| | |
|---|---|
| 165. | RSF00634408 |
| 166. | RSF00647063 |
| 167. | RSF00647064 |
| 168. | RSF00647065 |
| 169. | RSF00647066 |
| 170. | RSF00647067 |
| 171. | RSF00647068 |
| 172. | RSF00647069 |
| 173. | RSF00647070 |
| 174. | RSF00647071 |
| 175. | RSF00647072 |
| 176. | RSF00647073 |
| 177. | RSF00647074 |
| 178. | RSF00647075 |
| 179. | RSF00647076 |
| 180. | RSF00647077 |
| 181. | RSF00647078 |
| 182. | RSF00647079 |
| 183. | RSF00647080 |
| 184. | RSF00647081 |
| 185. | RSF00647082 |
| 186. | RSF00647083 |
| 187. | RSF00647084 |
| 188. | RSF00647085 |
| 189. | RSF00647086 |
| 190. | RSF00647153 |
| 191. | RSF00647154 |
| 192. | RSF00647155 |
| 193. | RSF00647156 |
| 194. | RSF00647157 |
| 195. | RSF00647158 |
| 196. | RSF00647159 |
| 197. | RSF00647160 |
| 198. | RSF00647161 |
| 199. | RSF00647162 |
| 200. | RSF00647163 |
| 201. | RSF00647165 |
| 202. | RSF00647166 |
| 203. | RSF00647167 |
| 204. | RSF00647168 |
| 205. | RSF00647169 |
| 206. | RSF00647170 |

| | |
|---|---|
| 207. | RSF00647171 |
| 208. | RSF00647172 |
| 209. | RSF00647173 |
| 210. | RSF00647174 |
| 211. | RSF00647175 |
| 212. | RSF00647176 |
| 213. | RSF00657298 |
| 214. | RSF00657322 |
| 215. | RSF00658953_Unredacted_00001 |
| 216. | RSF00658957_Unredacted_00001 |
| 217. | RSF00658964_Unredacted_00001 |
| 218. | RSF00658968_Unredacted_00001 |
| 219. | RSF00658975_Unredacted_00001 |
| 220. | RSF00658978_Unredacted_00001 |
| 221. | RSF00658981_Unredacted_00001 |
| 222. | RSF00658984_Unredacted_00001 |
| 223. | RSF00659045_Unredacted_00001 |
| 224. | RSF00659049_Unredacted_00001 |
| 225. | RSF00659053_Unredacted_00001 |
| 226. | RSF00659057_Unredacted_00001 |
| 227. | RSF00659060_Unredacted_00001 |
| 228. | RSF00659063_Unredacted_00001 |
| 229. | RSF00659066_Unredacted_00001 |
| 230. | RSF00659078_Unredacted_00001 |
| 231. | RSF00659088_Unredacted_00001 |
| 232. | RSF00659141_Unredacted_00001 |
| 233. | RSF00659168_Unredacted_00001 |
| 234. | RSF00659172_Unredacted_00001 |
| 235. | RSF00659176_Unredacted_00001 |
| 236. | RSF00659180_Unredacted_00001 |
| 237. | RSF00659193_Unredacted_00001 |
| 238. | RSF00659269_Unredacted_00001 |
| 239. | RSF00659277_Unredacted_00001 |
| 240. | RSF00659281_Unredacted_00001 |
| 241. | RSF00659288 |
| 242. | RSF00659294_Unredacted_00001 |
| 243. | RSF00659301 |
| 244. | RSF00659307 |
| 245. | RSF00659426 |
| 246. | RSF00660119 |
| 247. | RSF00660120 |
| 248. | RSF00660121 |

3

NAS2861

**Exhibit G**
**MATERIALS CONSIDERED**

| | | | | |
|---|---|---|---|---|
| 249. | RSF00660122 | 291. | RSF00665595 |
| 250. | RSF00660123 | 292. | RSF00665596 |
| 251. | RSF00660124 | 293. | RSF00665597 |
| 252. | RSF00660125 | 294. | RSF00665598 |
| 253. | RSF00660126 | 295. | RSF00665599 |
| 254. | RSF00660127 | 296. | RSF00665600 |
| 255. | RSF00660128 | 297. | RSF00665601 |
| 256. | RSF00660129 | 298. | RSF00665602 |
| 257. | RSF00660130 | 299. | RSF00665603 |
| 258. | RSF00660131 | 300. | RSF00665604 |
| 259. | RSF00660132 | 301. | RSF00665605 |
| 260. | RSF00660133 | 302. | RSF00665606 |
| 261. | RSF00660134 | 303. | RSF00665607 |
| 262. | RSF00660135 | 304. | RSF00665608 |
| 263. | RSF00660136 | 305. | RSF00665609 |
| 264. | RSF00660137 | 306. | RSF00665610 |
| 265. | RSF00660138 | 307. | RSF00665611 |
| 266. | RSF00660139 | 308. | RSF00665612 |
| 267. | RSF00660140 | 309. | RSF00665613 |
| 268. | RSF00660141 | 310. | RSF00665614 |
| 269. | RSF00660142 | 311. | RSF00665615 |
| 270. | RSF00660143 | 312. | RSF00665704 |
| 271. | RSF00660144 | 313. | RSF00665725 |
| 272. | RSF00660145 | 314. | RSF00665729 |
| 273. | RSF00660146 | 315. | RSF00665733 |
| 274. | RSF00660147 | 316. | RSF00665737 |
| 275. | RSF00660148 | 317. | RSF00665741 |
| 276. | RSF00660149 | 318. | RSF00665745 |
| 277. | RSF00660150 | 319. | RSF00665773 |
| 278. | RSF00660151 | 320. | RSF00665850 |
| 279. | RSF00660152 | 321. | RSF00665851 |
| 280. | RSF00660153 | 322. | RSF00665852 |
| 281. | RSF00660154 | 323. | RSF00665853 |
| 282. | RSF00660155 | 324. | RSF00688088 |
| 283. | RSF00660156 | 325. | RSF00688097 |
| 284. | RSF00660157 | 326. | RSF00734101_Unredacted_00001 |
| 285. | RSF00660158 | 327. | RSF00734124_Unredacted_00001 |
| 286. | RSF00660159 | 328. | RSF00742713 |
| 287. | RSF00660160 | 329. | RSF00742717 |
| 288. | RSF00663699 | 330. | RSF00742721 |
| 289. | RSF00663700 | 331. | RSF00742744 |
| 290. | RSF00665594 | 332. | RSF00742748 |

4

NAS2862

**Exhibit G**
**MATERIALS CONSIDERED**

| | |
|---|---|
| 333. RSF00742752 | 375. RSF00784488_Unredacted_00001 |
| 334. RSF00742756 | 376. RSF00784502 |
| 335. RSF00742760 | 377. RSF00784506_Unredacted_00001 |
| 336. RSF00742764 | 378. RSF00784510 |
| 337. RSF00742768 | 379. RSF00784514 |
| 338. RSF00742772 | 380. RSF00784517 |
| 339. RSF00742776 | 381. RSF00784521_Unredacted_00001 |
| 340. RSF00742780 | 382. RSF00784525 |
| 341. RSF00745144 | 383. RSF00784529 |
| 342. RSF00745148 | 384. RSF00784533 |
| 343. RSF00745937 | 385. RSF00784536 |
| 344. RSF00745946 | 386. RSF00784539 |
| 345. RSF00745955 | 387. RSF00784542 |
| 346. RSF00745964 | 388. RSF00784567_Unredacted_00001 |
| 347. RSF00745985 | 389. RSF00784576 |
| 348. RSF00745986 | 390. RSF00784591_Unredacted_00001 |
| 349. RSF00745987 | 391. RSF00784851 |
| 350. RSF00745997 | 392. RSF00785029 |
| 351. RSF00746011 | 393. RSF00785030_Unredacted_00001 |
| 352. RSF00746012 | 394. RSF00785036_Unredacted_00001 |
| 353. RSF00746013 | 395. RSF00785043_Unredacted_00001 |
| 354. RSF00784166 | 396. RSF00785049_Unredacted_00001 |
| 355. RSF00784184 | 397. RSF00785055_Unredacted_00001 |
| 356. RSF00784201 | 398. RSF00785067_Unredacted_00001 |
| 357. RSF00784215 | 399. RSF00785081_Unredacted_00001 |
| 358. RSF00784227 | 400. RSF00785093_Unredacted_00001 |
| 359. RSF00784240 | 401. RSF00785104 |
| 360. RSF00784254 | 402. RSF00785105_Unredacted_00001 |
| 361. RSF00784393_Unredacted_00001 | 403. RSF00785112_Unredacted_00001 |
| 362. RSF00784403 | 404. RSF00785119_Unredacted_00001 |
| 363. RSF00784419_Unredacted_00001 | 405. RSF00785126_Unredacted_00001 |
| 364. RSF00784424_Unredacted_00001 | 406. RSF00785138 |
| 365. RSF00784433 | 407. RSF00785139_Unredacted_00001 |
| 366. RSF00784437 | 408. RSF00785145_Unredacted_00001 |
| 367. RSF00784441 | 409. RSF00785157_Unredacted_00001 |
| 368. RSF00784445_Unredacted_00001 | 410. RSF00785169 |
| 369. RSF00784454 | 411. RSF00785170_Unredacted_00001 |
| 370. RSF00784458_Unredacted_00001 | 412. RSF00785184_Unredacted_00001 |
| 371. RSF00784467 | 413. RSF00785191 |
| 372. RSF00784471_Unredacted_00001 | 414. RSF00785192 |
| 373. RSF00784480 | 415. RSF00785193_Unredacted_00001 |
| 374. RSF00784484 | 416. RSF00787672 |

5

NAS2863

**Exhibit G**
**MATERIALS CONSIDERED**

417.  RSF00787672
418.  RSF00787673
419.  RSF00787674
420.  RSF00787735
421.  RSF00787768
422.  RSF00787779
423.  RSF00787945
424.  RSF00787971
425.  RSF00787977
426.  RSF00790341
427.  RSF00790342
428.  RSF00790343
429.  RSF00790344
430.  RSF00790345
431.  RSF00790346
432.  RSF00790347
433.  RSF00790349
434.  RSF00791015_Unredacted_00001
435.  RSF00791030_Unredacted_00001
436.  RSF00791039_Unredacted_00001
437.  RSF00791050_Unredacted_00001

NAS2864

**Exhibit G**

**MATERIALS CONSIDERED**

## Additional Files

1. (Cedar Cliff 10.31.19) FW_ Follow Ups from Tonight's Call.pdf
2. 2019 Cash Flows.xlsx
3. 2019.10.31 - Cornice - Balance Sheet from QB.pdf
4. 2019.10.31 - Crystal LLC - BS.pdf
5. 2019.10.31 - Data - BS.pdf
6. 2019.10.31 - MCM LLC - Balance Sheet from QB.pdf
7. 2020 Cash Flows thru 3.31.2020.xlsx
8. 2020.09.30 - Crystal Trust - BS.pdf
9. 2020.09.30 - MCM Trust - BS.pdf
10. 60 Field Point Circle.pdf
11. 74A BS 6-30-19.pdf
12. 74A BS 9-30-20.pdf
13. 74A Unrealized Report 10-31-19.xlsx
14. 74A Unrealized Report 9-30-20.xlsx
15. 74AJDS BS 9-30-20.pdf
16. 74AJDS Unrealized Report 10-31-19.xlsx
17. 74AJDS Unrealized Report 9-30-20.xlsx
18. 74ARSS BS 12-31-15.xlsx
19. 74ARSS BS 12-31-16.xlsx
20. 74ARSS BS 12-31-17.xlsx
21. 74ARSS BS 12-31-18.xlsx
22. 74ARSS BS 12-31-19.xlsx
23. 74ARSS BS 9-30-20.pdf
24. 74ARSS IS 12-31-15.xls
25. 74ARSS IS 12-31-16.xlsx
26. 74ARSS IS 12-31-17.xlsx
27. 74ARSS IS 12-31-18.xlsx
28. 74ARSS IS 12-31-19.xlsx
29. 74ARSS Unrealized Report 10-31-19.xlsx
30. 74ARSS Unrealized Report 9-30-20.xlsx
31. 74B BS 9-30-20.pdf
32. 74B Unrealized Report 10-31-19.xlsx
33. 74B Unrealized Report 9-30-20.xlsx
34. 74INVTR BS 9-30-20.pdf
35. 74INVTR Unrealized Report 10-31-19.xlsx
36. 74INVTR Unrealized Report 9-30-20.xlsx
37. 75 Field Point Circle.pdf
38. AJIRRTR BS 9-30-20.pdf
39. AJIRRTR Unrealized Report 10-31-19.xlsx
40. AJIRRTR Unrealized Report 9-30-20.xlsx
41. ANK_BS 10-19.pdf
42. ANK_BS 9-20.pdf
43. ARIRRTR BS 9-30-20.pdf
44. ARIRRTR Unrealized Report 10-31-19.xlsx
45. ARIRRTR Unrealized Report 9-30-20.xlsx
46. BRPA BS 9-30-20.pdf
47. BRPB BS 9-30-20.pdf
48. BS ESTATE BS 9-30-20.pdf
49. BS REV TR Unrealized Report 10-31-19.xlsx
50. BS REV TR Unrealized Report 9-30-20.xlsx
51. BS REV TRUST BS 9-30-20.pdf
52. Cedar, Cornice, Data Trust Email.pdf
53. China Sea Inc_BS 10-19.pdf
54. China Sea LP_BS 10-19.pdf
55. CRC_BS 9-20.pdf
56. Crissaire_BS 10-19.pdf
57. CSI_BS 9-20.pdf
58. CSL_BS 9-20.pdf
59. DABB Trust_BS 10-19.pdf
60. DABBT FS 9-30-20.pdf
61. DAS BS 9-30-20.pdf
62. DAS Unrealized Report 10-31-19.xlsx
63. DAS Unrealized Report 9-30-20.xlsx
64. DAS1 BS 9-30-20.pdf
65. DAS12 BS 9-30-20.pdf
66. DAS2 BS 9-30-20.pdf
67. DAS3 BS 9-30-20.pdf
68. DASM BS 9-30-20.pdf
69. EHI BS 10-31-19.PDF
70. EHI FS 9-30-20.pdf
71. FPCA BS 9-30-20.pdf
72. FPCB BS 9-30-20.pdf

7

**Exhibit G**
**MATERIALS CONSIDERED**

73. HPR_BS 10-19.pdf
74. HPR_BS 9-20.pdf
75. HRDI_BS 9-20.pdf
76. HRP_BS 9-20.pdf
77. Hudson River Del Inc_BS 10-19.pdf
78. IAC P&L BUDGET 18.12.19.xlsx
79. JDS ESTATE BS 9-30-20.pdf
80. JDS POUROVER TRUST BS 9-30-20.pdf
81. JDS Unrealized Report 10-31-19.xlsx
82. JDS0702 BS 9-30-20.pdf
83. JDS0803 BS 9-30-20.pdf
84. JDSPOUR TR Unrealized Report 9-30-20.xlsx
85. LHL BS 9-30-20.pdf
86. LOD_BS 10-19.pdf
87. LOD_BS 9-20.pdf
88. Mallard - Sep19.pdf
89. Mallard FS - 9-30-20.pdf
90. MIL BS 10-31-19.pdf
91. MIL_BS 9-20.pdf
92. Pacific PC_BS 10-19.pdf
93. PHL BS 9-30-20.pdf
94. PPC_BS 9-20.pdf
95. Promissory Note (20 September 2020) (Remainder Parcel).pdf
96. Promissory Note (20 September 2020) (Residence Parcel).pdf
97. RBMC_BS 10-19.pdf
98. RBMC_BS 9-20.pdf
99. RLHL BS 9-30-20.pdf
100. RLHL FS 9-30-20.pdf
101. RMI BS 9-30-20.pdf
102. RML BS 9-30-20.pdf
103. RRS CredShelter Tr BS 9-30-20.pdf
104. RRS MARITAL TR Unrealized Report 10-31-19.xlsx
105. RRS MARITAL TR Unrealized Report 9-30-20.xlsx
106. RRS MARITAL TRUST BS 9-30-20.pdf
107. RRS189A BS 9-30-20.pdf
108. RRS189A Unrealized Report 10-31-19.xlsx

109. RRS189A Unrealized Report 9-30-20.xlsx
110. RRS189B BS 6-30-19.pdf
111. RRS189B BS 9-30-20.pdf
112. RRS195 BS 9-30-20.pdf
113. RRS289A BS 9-30-20.pdf
114. RRS289A Unrealized Report 10-31-19.xlsx
115. RRS289A Unrealized Report 9-30-20.xlsx
116. RRS289B BS 6-30-19.pdf
117. RRS289B BS 9-30-20.pdf
118. RSS 8-25-92 Unrealized Report 10-31-19.xlsx
119. RSS 8-25-92 Unrealized Report 9-30-20.xlsx
120. RSS BS 9-30-20.pdf
121. RSS Revocable Email.pdf
122. RSS Unrealized Report 10-31-19.xlsx
123. RSS Unrealized Report 9-30-20.xlsx
124. RSS0702 BS 9-30-20.pdf
125. RSS0803 BS 9-30-20.pdf
126. RSS0892 BS 9-30-20.pdf
127. RSS2012 BS 9-30-20.pdf
128. RSS2012 Unrealized Report 10-31-19.xlsx
129. RSS2012 Unrealized Report 9-30-20.xlsx
130. RSSFMT BS 9-30-20.pdf
131. RSST904 BS 9-30-20.pdf
132. SLA_BS 9-20.pdf
133. Sources of Wage and Consulting Income - Family.xlsx
134. St Lawrence_BS 10-19.pdf
135. Standard Pharm_BS 10-19.pdf
136. STP_BS 9-20.pdf
137. TR42591 BS 9-30-20.pdf
138. TRA_BS 9-20.pdf
139. Tradewind_BS 10-19.pdf
140. Triangle Holdings_BS 10-19.pdf
141. TRIH_BS 9-20.pdf
142. Trust.Family Loans.xlsx
143. XPCA BS 9-30-20.pdf
144. XPCB BS 9-30-20.pdf

8

NAS2866

# Exhibit H

NAS2867

# Raymond-side March 31, 2021 Updated Net Assets Report

*July 26, 2021*

NAS2868

(This page intentionally left blank)

NAS2869

# Huron Engagement Terms

- *Huron Consulting Services LLC ("Huron") was retained by Milbank LLP and Joseph Hage Aaronson LLC (together "Counsel") to provide certain services as set forth in the engagement letter dated May 20, 2019 ("Engagement Letter").*

- Huron is a management consulting firm and not a CPA firm. Huron does not provide attest services, audits, or other engagements in accordance with standards established by the American Institute of Certified Public Accountants ("AICPA ") or promulgated by the Public Company Accounting Oversight Board ("PCAOB"). The procedures Huron performed were for the purposes of responding to the services outlined in the Engagement Letter noted above and did not include independent verification of information provided by management, financial statement balances or internal controls, the performance of which might have revealed additional information that could affect the findings of this report. Accordingly, we express no opinion or other form of assurance on any financial statements, management representations of other derived data accompanying or included in this report.

- Any analytical, forecasting or other model that we create as part of our services will be unique to this engagement, based on specific circumstances and assumptions, and may not be appropriate for use when those circumstances and assumptions change.

NAS2870

3

# Introduction

NAS2871

# Introduction

On January 15, 2020 Huron presented the Raymond-side Net Assets Report (the "Net Assets Report") in response to the Amended and Restated Stipulation which contemplated that the Shareholder Parties would provide the following to the legal and financial advisors to the Debtors and the UCC:

- (i) *"A report setting forth the net assets of the Initial Covered Sackler Persons, which report will set forth the approximate aggregate value of the assets owned by category (e.g. cash, securities, real estate, private and other investments, etc.) and the approximate liabilities, also by category"*

- (ii) "*An attestation from a responsible person or independent third-party as to the accuracy of the report*"

 ***See Amended and Restated Stipulation ¶ 17(a)***

**The Amended and Restated Stipulation provides that "Initial Covered Sackler Person" means as follows:**

- Beverly Sackler, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, and Theresa Sackler;

- any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such); and

- each Shareholder Party and each other entity or person that directly or indirectly owns equity in, or has voting control over, any of the Debtors

***See Amended and Restated Stipulation ¶ 1***

On March 1, 2021, Huron prepared an update to the Net Assets Report as of September 30, 2020 (the "Updated Net Assets Report"). *The purpose of this report (the "March 31, 2021 Updated Net Assets Report") is to further update the Net Assets Report with balances as of March 31, 2021.*

- The categories used for the March 31, 2021 Updated Net Assets Report are listed and described on pages 97-100 hereof

**NAS2872**

5

# Raymond-side Initial Covered Sackler Persons

**Raymond-side Initial Covered Sackler Persons are listed in the Raymond-side Informational Presentation provided on November 22, 2019 (the "November 22, 2019 Presentation")**

**For the purpose of this March 31, 2021 Updated Net Assets Report, the Initial Covered Sackler Persons are organized as follows:**

- **Individuals:**
  - Individuals consist of Richard Sackler, David Sackler, the Estate of Jonathan Sackler, and the Estate of Beverly Sackler[1]
  - Certain revocable and self-settled trusts described in Categories Three and Four (defined below) of the November 22, 2019 Presentation are instead described in this March 31, 2021 Updated Net Assets Report alongside the relevant individuals (i.e., Richard Sackler, David Sackler, the Estate of Jonathan Sackler, and the Estate of Beverly Sackler)

- **Trusts:** Trusts are described in four general categories for this March 31, 2021 Updated Net Assets Report:
  - Category One: Trusts that indirectly own interests in Purdue
  - Category Two: Trusts created by division or decanting from other trusts
  - Category Three: Other trusts that directly and/or indirectly own interests in IACs
  - Category Four: Other trusts, including life insurance trusts

- **Entities:** Entities consist of various limited partnerships, limited liability companies, and corporations through which Raymond-side interests in Purdue are held

  - As discussed on page 20, because the values of all such entities are captured on the balance sheets of the individuals and trusts presented herein (because such individuals and trusts are the entities' ultimate owners), the entities are separately presented in Appendix A.

(1) The Initial Covered Sackler Persons also include trustees of the covered trusts, solely in their capacity as such; however, trusts are organized by trust rather than trustee for ease of reference

**NAS2873**

6

# Bridge to the March 31, 2021 Updated Net Assets Report

NAS2874

# Bridge Overview

1. The asset values contained in this presentation are the amounts as reported on the respective Initial Covered Sackler Person's March 31, 2021 balance sheets, unless otherwise noted.

2. The bridge analysis compares the amounts presented in the Updated Raymond-side Net Assets Report, which incorporate September 30, 2020 balance sheets to March 31, 2021 balance sheets, unless otherwise noted.

3. If a change in an asset balance is shown as a positive number, the underlying asset has increased in value when comparing the September 30, 2020 to March 31, 2021 balances. A negative change indicates the asset has decreased in value. If a change in a liability balance is shown as a negative number, then the liability has decreased in value, thereby increasing net assets when comparing the September 30, 2020 to March 31, 2021 balances.

4. On June 30, 2020, Jonathan Sackler, an Initial Covered Sackler Person, passed away. Prior to Jonathan Sackler's death, certain assets were transferred to the JDS Revocable Pourover Trust as part of typical estate planning. The transfers were made pursuant to a Receipt, Refunding and Guarantee Agreement which provides that if the Estate of Jonathan Sackler requires any or all the assets transferred by Jonathan Sackler to the JDS Revocable Pourover Trust to discharge obligations of the Estate, then the JDS Revocable Pourover Trust has been instructed (and agreed) to refund on demand to the Estate such transferred assets in the amount necessary for full and timely payment of such obligations. Accordingly, solely for the purposes of reporting variances in this bridge analysis, the Estate of Jonathan Sackler and the JDS Revocable Pourover Trust are treated as if they are a single combined entity.

5. Additional detail is available on a trust-level basis in Appendix C.

## Total Variance

- The aggregate net asset values for all Raymond-side Initial Covered Sackler Persons increased by approximately $93.5M between September 30, 2020 and March 31, 2021.

**NAS2875**

8

# Raymond-side Net Asset Bridge Detail

**(\$ in Millions)**

| Net Assets Excluding Net IACs | | | Summary of Changes in Net Assets Available | | | |
|---|---|---|---|---|---|---|
| Net Assets Excluding IACs – Updated Net Assets Report | \$ | 4,957.7 | Cash and Cash Equivalents | \$ | 237.3 | (3) |
| | | | Cheyenne Petroleum Company ("CPC") | | 144.0 | (4) |
| Net Increase in Assets | | 141.0 | Other Assets | | 10.2 | |
| (+) Net Decrease in Liabilities | | 22.2 | (1) Notes Receivable (Net CPC) | | (12.3) | (5) |
| | | | Marketable Securities and Hedge Funds | | (36.4) | (6) |
| **Change in Net Equity** | **\$** | **163.2** | Private Equity Investments (Net CPC) | | (201.8) | (7) |
| (+) Total Net Deficits | | (69.7) | (2) **Net Increase in Assets** | **\$** | **141.0** | |
| **Change in Net Assets Available** | **\$** | **93.5** | (+) Net Decrease in Liabilities | | 22.2 | (1) |
| | | | (+) Total Net Deficits | | (69.7) | (2) |
| **Net Assets Excluding Net IACs –** | | | | | | |
| **March 31, 2021 Updated Net Assets Report** | **\$** | **5,051.2** | **Change in Net Assets Available** | **\$** | **93.5** | |

(1) Decrease of \$22.2M comprised of: a decline of \$99.6M in debt due to \$100.0M of debt repaid in the normal course of business and is discussed in detail on page 144 offset by \$0.4M of new debt raised; and an increase of \$77.4M in estimated tax liability for unrealized gains.

(2) As noted in the Methodology section, if an ICSP is in a net deficit position (i.e., credit balance) that ICSP is eliminated (adjusted to \$0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages. The Total Net Deficits line item, totaling (\$69.7M), aggregates two trusts and David Sackler together which each had net deficit positions on September 30, 2020 and March 31, 2021. The variances for the two trusts and David Sackler are listed below:
- Investment Trust \$68.0M,
- Irrevocable Trust under Declaration dated as of April 25, 1991 \$0.2M, and
- David Sackler \$1.5M

Additional footnotes on the following page.

**NAS2876**

9

# Raymond-side Net Asset Bridge Detail *(cont'd)*

(3) Cash and Cash Equivalents are deposits and money market mutual funds. The estimated value of Cash and Cash Equivalents as of March 31, 2021 totaled $682.0M, or $237.3M more than the value presented in the Updated Net Assets Report. The increase is primarily related to redemptions made by certain Private Equity Investments.

(4) Cheyenne Petroleum Company ("CPC") is owned by several trusts and the trusts' interest in CPC is reflected as Private Equity Investments and Notes Receivable. Of the $144.0M change in value from September 30, 2020 to March 31, 2021, $76.0M relates to Private Equity Investments and $68.0M to Notes Receivable from the Investment Trust. CPC is discussed in further detail on page 11 of this report.

(5) Notes Receivable are debt financing in the form of notes and loans. The decrease of $12.3M is net of the $68.M increase in the CPC Notes Receivable described in footnote (3) above.  In total, the estimated value of Notes Receivable as of March 31, 2021 was $692.8M, or $55.7M more than the value presented in the Updated Net Assets Report.

(6) Marketable Securities and Hedge Funds are investments made directly or indirectly (through various pooling investment vehicles) in stocks, other marketable securities and hedge funds managed by either a third-party manager or family office. The estimated value of Marketable Securities and Hedge Funds as of March 31, 2021 totaled $2,147.7M, or $36.4M less than the value presented in the Updated Net Assets Report.

(7) Private Equity Investments are investments made directly or indirectly in private companies, private equity funds, venture funds, joint ventures or private credit funds managed by either a third-party manager or family office. The decrease of $201.8M is net of the $76.M increase in the Private Equity Investments described in footnote (3) above and in more detail on page 11 of this report.  In total, the estimated value of Private Equity Investments as of March 31, 2021 was $1,536.9M, or $125.8M less than the value presented in the Updated Net Assets Report.  The decrease in Private Equity Investments is primarily related to redemptions of certain investments.  A large portion of those redemptions remain as Cash and Cash Equivalents.

NAS2877

# Cheyenne Petroleum Company Bridge Detail

- The value of Cheyenne Petroleum Company ("CPC"), a Raymond-side owned oil and gas business, was determined based on a third-party engineering report dated March 2021. The value in the Updated Net Assets Report was based on a third-party engineering report dated May 2020, that CPC adjusted as of June 2020.
- The present value of the oil and gas reserves was determined using discount rates of 10% for Proved Developed Producing reserves and 20% for Proved Undeveloped reserves.
- The estimated value as of March 2021 is $313.2M, or $144.0M more than the value presented in the Updated Net Assets Report. By way of comparison, the Cushing, OK WTI Spot Price FOB was $38.31 in June 2020 and $62.33 in March 2021.

| ($ in Millions) | | 09/30/2020 Net Assets Report | | 03/31/2021 Net Assets Report | | Variance Increase/(Decrease) |
|---|---|---|---|---|---|---|
| **Direct Ownership - Private Equity Investments** | | | | | | |
| Investment Trust | $ | 28.9 | $ | 97.0 | $ | 68.0 |
| Richard Sackler | | 0.3 | | 0.7 | | 0.5 |
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | | 0.3 | | 0.7 | | 0.5 |
| **Indirect Ownership - Private Equity Investments** | | | | | | |
| Richard Sackler | $ | 4.1 | $ | 7.5 | $ | 3.4 |
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | | 4.1 | | 7.5 | | 3.4 |
| 1A Trust | | 2.6 | | 4.3 | | 1.8 |
| 2A Trust | | 2.6 | | 1.0 | | (1.6) |
| 74B Trust | | 0.0 | | 0.0 | | 0.0 |
| **Private Equity Investments Subtotal** | $ | 42.8 | $ | 118.8 | $ | 76.0 |
| **Indirect Ownership - Investment Trust Notes Receivable** | | | | | | |
| 74A Trust | $ | 58.1 | $ | 89.4 | $ | 31.3 |
| AR Irrevocable Trust (decanted from the 74-AR Trust) | | 32.8 | | 50.5 | | 17.7 |
| AJ Irrevocable Trust (decanted from the 74-AJ Trust) | | 27.7 | | 42.6 | | 14.9 |
| 74B Trust | | 7.8 | | 11.9 | | 4.2 |
| **Notes Receivable Subtotal** | $ | 126.4 | $ | 194.4 | $ | 68.0 |
| **Total** | $ | 169.2 | $ | 313.2 | $ | 144.0 |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

NAS2878

11

# Net Assets (Equity) Bridge Summary

**The table below summarizes the combined variances by grouping, as presented in this March 31, 2021 Updated Net Assets Report**

| ($ in Millions) | 9/30/2020 | Net Assets (Equity) 3/31/2021 | Variance |
|---|---|---|---|
| Richard Sackler | $ 205.4 | $ 191.7 | $ (13.6) |
| RSS Revocable Pourover Trust | 0.0 | 0.0 | - |
| Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler ("RSS BRP Trust") | 3.4 | 3.4 | (0.0) |
| Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler ("RSS FPC Trust") | 133.3 | 139.6 | 6.3 |
| Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler ("RSS XPC Trust") | 0.0 | 0.0 | (0.0) |
| Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler | - | - | - |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | 4.0 | 4.2 | 0.2 |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler | 15.4 | 18.9 | 3.5 |
| Dabb Trust | 2.0 | 2.2 | 0.2 |
| Richard S. Sackler Trust U/A 9/30/04 | 1.1 | 1.1 | (0.0) |
| RSS Fiduciary Management Trust | 0.0 | 0.0 | 0.0 |
| Crystal Trust | 0.0 | 0.0 | (0.0) |
| Data Trust | - | - | - |
| **Summary for Richard Sackler** | **$ 364.7** | **$ 361.2** | **$ (3.5)** |
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | 116.9 | 106.7 | (10.3) |
| Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler ("JDS BRP Trust") | 4.5 | 4.5 | (0.0) |
| Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler ("JDS FPC Trust") | 5.1 | 5.9 | 0.8 |
| Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler ("JDS XPC Trust") | 0.0 | - | (0.0) |
| Trust Agreement dated August 29, 2003 f/b/o Issue of Jonathan D. Sackler | - | - | - |
| Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | 4.0 | 6.1 | 2.2 |
| Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler | 15.3 | 27.9 | 12.6 |
| MCM Fiduciary Management Trust | 0.0 | 0.0 | (0.0) |
| Cornice Trust | 0.0 | 0.0 | - |
| Cedar Cliff Trust | 0.4 | 0.4 | 0.0 |
| **Summary for Jonathan Sackler** | **$ 146.2** | **$ 151.5** | **$ 5.3** |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

NAS2879

# Net Assets (Equity) Bridge Summary

**The table below summarizes the combined variances by grouping, as presented in this March 31, 2021 Updated Net Assets Report**

| ($ in Millions) | 9/30/2020 | Net Assets (Equity) 3/31/2021 | Variance | |
|---|---|---|---|---|
| David Sackler | $ - | $ - | $ - | |
| Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90 | 0.1 | 0.1 | - | |
| **Summary for David Sackler** | **$ 0.1** | **$ 0.1** | **$ -** | |
| Estate of Beverly Sackler (d. October 14, 2019) | 5.0 | 4.5 | (0.5) | |
| Beverly Sackler Revocable Trust | 175.7 | 183.2 | 7.6 | |
| **Summary for Beverly Sackler** | **$ 180.6** | **$ 187.7** | **$ 7.0** | |
| Trust U/A 11/5/74 fbo Beverly Sackler ("74A Trust") | 475.2 | 524.7 | 49.5 | |
| Raymond R. Sackler Trust 1 dtd 12/23/89 ("1A Trust") | 838.0 | 857.3 | 19.3 | |
| Raymond R. Sackler Trust 2 dtd 12/23/89 ("2A Trust") | 1,283.3 | 1,258.2 | (25.0) | |
| Raymond R. Sackler Trust 1B dtd 12/23/89 ("1B Trust") | 3.0 | 3.0 | (0.0) | |
| Raymond R. Sackler Trust 2B dtd 12/23/89 ("2B Trust") | 3.0 | 3.0 | (0.0) | |
| **Summary for Trusts that Indirectly Own Purdue** | **$ 2,602.4** | **$ 2,646.2** | **$ 43.8** | |
| Trust B U/A 11/4/74 fbo Beverly Sackler ("74B Trust") | 129.2 | 139.9 | 10.7 | |
| The 1974 Irrevocable Investment Trust ("Investment Trust") | - | - | - | |
| 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust") | 16.1 | 20.1 | 4.0 | |
| AR Irrevocable Trust | 1,305.7 | 1,395.2 | 89.4 | (1) |
| 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust") | 14.1 | 15.3 | 1.2 | |
| AJ Irrevocable Trust | 1,414.1 | 1,362.7 | (51.4) | (2) |
| **Summary for Trusts Created by Division from 74A Trust or Subsequent Decanting** | **$ 2,879.4** | **$ 2,933.2** | **$ 53.9** | |

(1) Variance is analyzed in greater detail on page 144. The primary driver for this increase is changes in the value of Short-Term Debt.

(2) Variance is analyzed in greater detail on page 146. The primary driver for this decline is changes in the values of the Est. Tax Liability: Unrealized Gains.

**NAS2880**

# Net Assets (Equity) Bridge Summary

**The table below summarizes the combined variances by grouping, as presented in this March 31, 2021 Updated Net Assets Report**

| ($ in Millions) | | Net Assets (Equity) | | |
| --- | --- | --- | --- | --- |
| | **9/30/2020** | **3/31/2021** | **Variance** | |
| Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 1") | $ 0.6 | $ 0.6 | $ (0.0) | |
| Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 2") | 2.4 | 2.3 | (0.0) | |
| Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 3") | 25.6 | 25.6 | (0.0) | |
| **Summary for Additional Trusts that Own Interests In IACs** | $ 28.6 | $ 28.5 | $ (0.1) | |
| Richard S. Sackler Life Insurance Trust | 1.1 | 0.9 | (0.2) | |
| Jonathan D. Sackler Life Insurance Trust | 17.2 | 17.2 | (0.0) | |
| Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler | 1.4 | 1.4 | 0.0 | |
| David A. Sackler 2012 Trust | 0.7 | 0.7 | 0.1 | |
| Irrevocable Trust under Declaration dated as of April 25, 1991 | - | - | - | |
| Irrevocable Trust under Declaration dated as of August 25, 1992 | 7.3 | 7.3 | 0.0 | |
| The RSS 2012 Family Trust | 6.9 | 6.9 | 0.0 | |
| Raymond R. Sackler Credit Shelter Trust u/a 3/29/29 | 0.1 | 0.1 | - | |
| Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012 | 12.9 | 0.1 | (12.8) | |
| **Summary for Other Trusts** | $ 47.6 | $ 34.7 | $ (12.9) | |
| **Summary for Raymond-side Trusts** | $ 6,249.5 | $ 6,343.0 | $ 93.5 | |

**NAS2881**

# Methodology

NAS2882

# Methodology

**The following process was followed to prepare the categorized balance sheets presented herein:**

1. The financial information for the Raymond-side Initial Covered Sackler Persons was prepared by North Bay Associates ("North Bay"), an entity that provides accounting and tax services for Raymond-side individuals, entities and trusts. North Bay, in the ordinary course of business, maintains the books and records of, and prepares monthly financial statements relating to, nearly all such Initial Covered Sackler Persons.

2. For five Initial Covered Sackler Persons for which North Bay does not, in the ordinary course of business, prepare financial statements, Huron obtained the values of their respective assets and liabilities through discussion with North Bay and review of available records relating to such assets and liabilities.[1] For an additional six Initial Covered Sackler Persons, North Bay provided Huron with balance sheets prepared by an entity other than North Bay.[2] For one Initial Covered Sackler Person, North Bay provided Huron with a balance sheet prepared by North Bay at Huron's request.

3. Each balance sheet item was classified into one of the asset or liability categories described on pages 97-100 of this March 31, 2021 Updated Net Assets Report.

(1) These five Initial Covered Sackler Persons are: the RSS Revocable Pourover Trust; Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler; and Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler.

(2) These six Initial Covered Sackler Persons are: RSS Fiduciary Management Trust, Crystal Trust, MCM Fiduciary Management Trust, Data Trust, Cornice Trust, and Cedar Cliff Trust, all of which were formed to hold interests in Wyoming entities that serve as trustees for certain Raymond-side trusts. Balance sheets for these Wyoming entities were collected by North Bay and provided to Huron.

**NAS2883**

# Methodology

4. Where a particular line item on a balance sheet provided by North Bay referred to an interest in an entity that is primarily a holding company, Huron reflected the value of such line item in the category of the underlying investment. For example, several of the Initial Covered Sackler Persons have an interest in a Delaware general partnership that serves as a vehicle for making investments. This entity holds various private equity investments, hedge fund investments, and investments in marketable securities. For the purposes of this March 31, 2021 Updated Net Assets Report, each Initial Covered Sackler Person's interest in this entity has been classified based on the nature of the entity's investment.

5. In most instances, the asset values are the amounts reported on the respective Initial Covered Sackler Person's March 31, 2021 balance sheets, unless otherwise noted in this March 31, 2021 Updated Net Assets Report. The general bases of valuation used for each asset and liability type are as follows:

**Assets:**

a) Cash and Cash Equivalents: Account statement balances.

b) Accounts Receivable and Prepaid Investments: Expected amounts to be collected and amounts paid.

c) Notes Receivable and Loans: Principal amounts outstanding.

d) Marketable Securities and Hedge Funds: Closing prices (with respect to publicly-traded securities) and valuations provided by fund managers were used to value nearly all assets in this category. These assets are primarily held indirectly through various investment vehicles.

**NAS2884**

# Methodology

**Assets (cont'd):**

e) Private Equity Investments: Valuations provided by fund managers for investments owned through investment vehicles comprise most of the asset value for private equity investments. Also included in this category are certain entities owned through joint ventures.

- The investment in Cheyenne Petroleum Company is based on the summarized results of a third-party engineer's petroleum reserve report dated March 2021. The present value of such oil and gas reserves was determined by using discount rates of 10% for Proved Developed Producing reserves and 20% for Proved Undeveloped reserves.

- The remaining assets in this category, are primarily reflective of investments made directly in private companies or investment vehicles managed by family offices or third parties and are reflected either at purchase price or using tax records.

f) Real Estate Investments: Valuations provided by third-party fund managers in nearly all cases for investments owned through investment vehicles. The remaining real estate investments, which are primarily held through investment vehicles, are reflected either at their purchase price or using tax records.

g) Life Insurance – Surrender Value: Statement balances.

h) Retirement Accounts: Statement balances.

i) Residential Real Estate: Appraised values, assessed values or, in the absence of the foregoing, tax bases.

j) Artwork (including Jewelry): Appraised value when available, otherwise acquisition cost.

k) Other Investments: Tax bases.

NAS2885

18

# Methodology

**Liabilities:**

a)   Accounts Payable: Actual amounts due for which expected payments will be subsequently remitted.

b)   Short-Term Debt: Principal amounts due.

c)   Long-Term Debt: Principal amounts due.

d)   Mortgage Debt: Principal amounts due.

6.   The value of assets reflecting direct or indirect ownership of the Debtors were eliminated from this March 31, 2021 Updated Net Assets Report.

7.   In instances where the net asset value for an Initial Covered Sackler Person would otherwise be a deficit (each such Initial Covered Sackler Person an "Obligor Person"), the net asset value was adjusted to zero. Where an Obligor Person's net asset value was a deficit in part due to debt owed to other Initial Covered Sackler Persons (each an "Obligee Person"), for the purpose of this presentation, the value of the assets of the Obligee Person are reduced by the amount by which the face amount of the debt in question exceeded the assets of the Obligor Person. This was done to reflect the net recoverable value relating to the debt. For example, if liabilities exceeded assets for an Obligor Person by $50 and the Obligor Person has a $100 note payable to an Obligee Person, the net assets of the Obligor Person would be reflected as $0.0 and the value of the Obligee Person's note receivable would be reduced by $50, thus balancing in the aggregate. In one case, where an Obligor Person had issued both secured and unsecured debt, the associated asset of the Obligee Person was reduced before the secured debt.

8.   Because balances are presented in millions, totals may not foot due to rounding.

**NAS2886**

19

# Methodology

9. All Raymond-side Initial Covered Sackler Persons that own one or more Debtors but are not their ultimate owners ("Intermediate Entities") were presented separately. Because the values of all Intermediate Entities are captured on the balance sheets of their ultimate owners, the net asset values of the Intermediate Entities is duplicative of information presented elsewhere in this March 31, 2021 Updated Net Assets Report and therefore should not be viewed as an addition to the total net asset value of non-Intermediate Entities.

10. Certain of the balance sheets prepared for individual Initial Covered Sackler Persons by North Bay in the ordinary course of business include line items in the asset column relating to trusts that are themselves Initial Covered Sackler Persons. The net asset values of such trusts are not reflected as assets of such individuals, but are instead presented independently, consistent with the presentation of Initial Covered Sackler Persons in this March 31, 2021 Updated Net Assets Report generally.

11. Where a third party provided an estimated value of an asset (such assets were labeled "Third-Party Valued Assets"), the "unrealized gain/loss" refers to the difference between that asset's value and its tax basis of the Third-Party Valued Asset in question. Unrealized gain / loss are estimates provided by North Bay based upon valuation reports and similar information made available at the time of this report.

    a) An illustrative 33% blended tax rate was applied to the estimated unrealized gains to illustrate the hypothetical tax obligation that would result from a sale of such Third Party Valued Assets.

12. For each Raymond-side Initial Covered Sackler Person, we reflect net asset value in two ways:

    i. We account for all assets, using the illustrative valuation of the IACs (as defined on Appendix B) described on pages 21-23 of this March 31, 2021 Updated Net Assets Report and

    ii. We account for all assets other than the IACs to present approximate net asset value in excess of the assets pledged as part of the proposed settlement.

**NAS2887**

# Allocation of Independent Associated Companies (IACs)

- The IACs have retained an investment banker to market the businesses for sale. The value of the IACs is currently carried on the balance sheets at their book values. No fair market valuation for the IACs currently exists. An independent fair market value of the IACs is outside the scope of this March 31, 2021 Updated Net Assets Report.

- For the purpose of this March 31, 2021 Updated Net Assets Report and to illustrate how the proceeds from the sale of the IACs might potentially flow to the individual Initial Covered Sackler Persons, a hypothetical gross sale value for all the IACs of $4.5B ("Hypothetical IAC Value") was chosen and the value was allocated among the IACs.

  - The Hypothetical IAC Value and the allocation of the value is unchanged from the Net Assets Report and the Updated Net Assets Report.

- In valuing the IACs, we applied a 33% blended tax rate to the Hypothetical IAC Values consistent with the methodology used for the January 2020 report.

- The 5-year (2020 – 2024) projected results from operations were prepared by the IACs as part of their normal planning process was used as the basis for allocating the Hypothetical IAC Value.

**NAS2888**

21

# Allocation of Independent Associated Companies (IACs)

- For purposes of allocation, the Hypothetical IAC Value was divided equally between the following metrics:
  - "Profit/(Loss) before Other Charges", consisting primarily of Net Sales, less:
    - Cost of Sales
    - Selling and Promotional Costs
    - General and Administrative Costs
  - Net Profit/(Loss) After Tax, consisting primarily of Profit/(Loss) before Other Charges, less:
    - R&D and New Product Expenses
    - Amortization of Intangibles
      - Depreciation is not specifically delineated on the P&L reviewed, rather it is included in multiple P&L expense categories (e.g. R&D and COGS)
    - Tax Charges, only taxes that occur at the entity level
- These metrics were chosen to allocate the Hypothetical IAC Value in a manner that considers both the operational performance of IACs both before and after non-cash charges. The allocation is a purely a mathematical exercise for illustrative purposes only, and no subjective adjustments were made.
- Half of the $4.5B was allocated based on each IAC's Profit/(Loss) before Other Charges as a percentage of total Profit/(Loss) before Other Charges, and half was allocated based on each IAC's Net Profit/(Loss) After Tax as a percentage of total Net Profit/(Loss) After Tax.

**NAS2889**

22

# Allocation of Independent Associated Companies (IACs)

- In certain instances, where multiple income statements were prepared for an IAC, for example, where projections for each region in which an IAC operates or where there was a separate income statement for adjustments to U.S. GAAP. The aggregate IAC metrics were used for the purpose of allocating the Hypothetical IAC Value.

- Each Initial Covered Sackler Person's interest in the allocated value of the IAC was determined by mapping the allocated value through the legal structure.

- Because the Raymond and the Mortimer sides of the Sackler family each directly or indirectly own 50% of the IACs, the allocation of the Hypothetical IAC Value results in each family directly or indirectly holding an approximately equal share of the amount.

  - $4,496.1M of the total value of the IACs ($4.5B) are owned equally by the Raymond and Mortimer sides of the Sackler family.[1]

  - $1,934.5M of the Raymond-side's interests is held by Initial Covered Sackler Persons and the remaining $313.6M is held by non-Initial Covered Sackler Persons.[2]

- When applying the allocated value to an individual IAC, the value was applied first to the notes payable owed to the Initial Covered Sackler Person or entities owned directly or indirectly by the Initial Covered Sackler Person.

- If a Hypothetical IAC Value was less than the notes payable owed by that IAC, the noteholders would recover only their pro rata share of the Hypothetical IAC Value; any IAC equity interest would be eliminated. The recovery on the IAC note receivable is reclassified to the IAC balance sheet category.

- The IAC category reflects the Initial Covered Sackler Persons entire interest in IACs wholly owned by the Sackler family (both equity and notes receivable).

(1) The remaining $3.9M is owned by Purdue and a non-Initial Covered Sackler Person.
(2) As indicated in the November 22, 2019 Presentation, some of the Raymond-side interests in the IACs are directly or indirectly owned by non-Initial Covered Sackler Persons.

**NAS2890**

23

# Executive Summary

NAS2891

# Executive Summary

**Individuals**

- Plaintiffs have asserted claims against each of the Initial Covered Sackler Persons listed below.

- The net asset values for each of the individuals and the relevant revocable and self-settled trusts are as follows:

| ($ in Millions) | Net Asset Value (including IACs) | Net Asset Value (excluding IACs) |
|---|---|---|
| Richard Sackler | $            361.2 | $            163.0 |
| Jonathan Sackler | 151.5 | 80.5 |
| David Sackler | 0.1 | 0.1 |
| Estate of Beverly Sackler | 4.5 | 4.5 |
| Beverly Sackler Revocable Trust | 183.2 | 183.2 |

- Although claims must be considered on an entity-by-entity basis, the sum of the net asset value presented for all specified individuals is $700.4M including IACs, $431.3M excluding IACs, and $248.0M when excluding the value of the assets in the Beverly Sackler Revocable Trust whose intended beneficiaries are certain charitable organizations (other than with respect to tangible personal property).

- Continued litigation of claims against the specified individuals would substantially deplete their respective assets even if judgments could be obtained.

NAS2892

25

# Executive Summary

## Trusts that Indirectly Own Interests in Purdue

- Five trusts that are Initial Covered Sackler Persons indirectly own interests in Purdue.
- The net assets for each of these five trusts is as follows:

| ($ in Millions) | Net Asset Value (including IACs) | Net Asset Value (excluding IACs) |
|---|---|---|
| 74A Trust | $ 524.7 | $ 161.7 |
| 1A Trust | 857.3 | 536.1 |
| 2A Trust | 1,258.2 | 937.0 |
| 1B Trust | 3.0 | 2.6 |
| 2B Trust | 3.0 | 2.6 |

- Each of these trusts is an irrevocable, non-grantor, discretionary spendthrift trust.
- 1A and 2A Trusts:
  - 1A Trust and 2A Trust each have little exposure as subsequent transferees of Purdue distributions:
    - 1A Trust and 2A Trust, which each own 50% of the common equity of Rosebay Medical Company, Inc. ("RMI"), each received $17.5M of dividends from RMI from 2007 through 2012 and no dividends thereafter.
    - RMI itself, which received $86.1M of distributions, inclusive of tax distributions, from Rosebay Medical Company, LP ("RML") from 2007 through 2018, has a net asset value of $26.9M (equivalent to $13.5M of equity value for each of the 1A and 2A Trust).
- 1B and 2B Trusts:
  - 1B Trust and 2B Trust each have net asset values of $3.0M.

NAS2893

# Executive Summary

**Trusts Created by Division from 74A Trust or Subsequent Decanting**

- Six trusts that are Initial Covered Sackler Persons were either created by division from the 74A Trust or by subsequent decanting from such trusts.

- The net assets for each of these six trusts is as follows:

| ($ in Millions) | Date of Division or Decanting | Net Asset Value (excluding IACs) |
|---|---|---|
| 74B Trust | Feb 01, 2002 | $ 139.9 |
| Investment Trust | Apr 01, 2004 | - |
| 74-AR Trust | May 01, 2015 | 20.1 |
| 74-AJ Trust | May 01, 2015 | 15.3 |
| AR Irrevocable Trust (decanted from the 74-AR Trust) | Jul 23, 2019 | 1,395.2 |
| AJ Irrevocable Trust (decanted from the 74-AJ Trust) | Jun 08, 2019 | 1,362.7 |

- As set forth in the November 22, 2019 Presentation, the 74-AR and -AJ Trusts were decanted subject to Receipt, Refunding and Guarantee Agreements, which preserve the rights of creditors of the original trusts. The decantings of the 74-AR and -AJ trusts were effective as of July 2019 and June 2019, respectively. The Receipt, Refunding and Guarantee Agreements are annexed to the November 22, 2019 Presentation as Appendix C.

- Each of these trusts is an irrevocable, non-grantor, discretionary spendthrift trust.

NAS2894

# Executive Summary

## Purdue

- The March 31, 2021 Updated Net Assets Report excludes the value of equity in the Debtors. The proposed settlement contemplates the voluntary relinquishment of all interests in the Debtors. In absence of a settlement, approximately 98% of the Raymond-side share of the value of interests in the Debtors will flow to the 74A Trust.

## Independent Associated Companies (IACs)

- Although value of the IACs has been allocated among the Raymond-side Initial Covered Sackler Persons based upon the allocation methodology previously described, the value allocated is the proportionate share of the whole assuming integration and cooperation among various related parties. The value allocation does not represent what any particular interest could be monetized for on an individual standalone basis.

## Total Sum

- Although claims must be considered on an entity-by-entity basis, the sum of the net assets presented for all Raymond-side Initial Covered Sackler Persons is $6,343.0M, $5,051.2M excluding the IACs, and $4,868.0M when excluding the value of the assets in the Beverly Sackler Revocable Trust whose intended beneficiaries are certain charitable organizations (other than with respect to tangible personal property).

**NAS2895**

28

# Individuals

NAS2896

# Summary for Richard Sackler

| ($ in Millions) | | Total Assets | | Total Liabilities | | Net Assets (Equity) | | Net Assets Excluding Net IACs |
|---|---|---|---|---|---|---|---|---|
| Richard Sackler | $ | 255.3 | $ | (63.5) | $ | 191.7 | $ | 129.5 |
| RSS Revocable Pourover Trust | | 0.0 | | - | | 0.0 | | 0.0 |
| RSS BRP Trust | | 9.1 | | (5.7) | | 3.4 | | - |
| RSS FPC Trust | | 204.9 | | (65.3) | | 139.6 | | 7.1 |
| RSS XPC Trust | | 0.0 | | - | | 0.0 | | 0.0 |
| August 29, 2003 f/b/o Issue of Richard S. Sackler | | - | | - | | - | | - |
| RSS CT Residence Trust 1 | | 6.3 | | (2.1) | | 4.2 | | 4.2 |
| RSS CT Residence Trust 2 | | 28.3 | | (9.3) | | 18.9 | | 18.9 |
| DABB Trust | | 2.2 | | - | | 2.2 | | 2.2 |
| Richard S. Sackler Trust U/A 9/30/04 | | 1.1 | | - | | 1.1 | | 1.1 |
| RSS Fiduciary Management Trust | | 0.0 | | - | | 0.0 | | 0.0 |
| Crystal Trust | | 0.0 | | - | | 0.0 | | 0.0 |
| Data Trust | | - | | - | | - | | - |
| **Total** | **$** | **507.1** | **$** | **(145.9)** | **$** | **361.2** | **$** | **163.0** |

**NAS2897**

30

# Richard Sackler

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ 8.0 | (1) | Accounts Payable | | $ 0.0 | |
| Accounts Receivable and Prepaid Expenses | 0.1 | | Long-Term Debt | | 14.0 | (6) |
| Marketable Securities and Hedge Funds | 72.0 | | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | 92.9 | | Short-Term Debt | | 5.9 | |
| Notes Receivable | 23.7 | (2) | Est. Tax Liability: IACs | | 30.7 | |
| Other Investments | 0.9 | (3) | Est. Tax Liability: Unrealized Gains | | 12.9 | (7) |
| Private Equity Investments | 9.2 | (4) | | | | |
| Real Estate Investments | 3.7 | | **Total Liabilities** | | $ 63.5 | |
| Residential Real Estate | 14.5 | (5) | | | | |
| Life Insurance -Surrender Value | 0.2 | | **Net Assets (Equity)** | | $ 191.7 | |
| Retirement Accounts | 4.3 | | | | | |
| Artwork (including Jewelry) | 25.9 | | **Less: Net IACs** | | $ (62.2) | |
| **Total Assets** | $ 255.3 | | **Net Assets Excluding Net IACs** | | $ 129.5 | |

(1) Includes $0.3M received on account of Richard Sackler's status as a beneficiary of a life insurance policy on Beverly Sackler's life. The funds are currently held in escrow pending resolution of claims asserted against Beverly Sackler's estate.

(2) Includes a loan of $0.5M to David Sackler which was reduced to $0.3M in accordance with the previously described methodology.

(3) Includes investments of $18.7M in Initial Covered Sackler Persons which was removed in accordance with previously described methodology. The remaining $0.9M of other investment is in related parties.

(4) Includes $8.2M of CPC. A private equity investment was recorded on the balance sheet at -$0.3M. This asset was restated to $0.0.

(5) Certain residential real estate items were removed as they include the investments described on pages 37-38 of this March 31, 2021 Updated Net Assets Report.

(6) Includes a $2.1M loan payable to the 1A Trust and a $2.1M loan payable to the 2A Trust from a look-through entity. $9.9M relates to long-term debt borrowed from Investment Trust (see page 32 of November 22, 2019 Presentation).

(7) The hypothetical tax liability of $12.9M results from unrealized gains of $39.0M.

**NAS2898**

31

# RSS Revocable Pourover Trust

| ($ in Millions) | Total | | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | 0.0 | (2) | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | | Short-Term Debt | - |
| Notes Receivable | | - | | Est. Tax Liability: IACs | - |
| Other Investments | | - | | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | $ 0.0 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | $ - |
| **Total Assets** | $ | 0.0 | | **Net Assets Excluding Net IACs** | $ 0.0 |

(1) RSS Revocable Pourover Trust was created for typical estate planning reasons, including minimizing assets subject to probate process, intergenerational planning, managing the passing of wealth to succeeding generations and tax efficiency. The trust is in the process of being funded.

(2) RSS Revocable Pourover Trust holds cash of $10.00 which is not in a bank account. The $0.0M represents a balance of less than $50,000.

**NAS2899**

# Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler ("RSS BRP Trust")

| ($ in Millions) | | Total | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | 9.1 | Short-Term Debt | | 2.7 |
| Notes Receivable | | - | Est. Tax Liability: IACs | | 3.0 |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | 5.7 |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 3.4 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | (6.1) |
| **Total Assets** | $ | 9.1 | **Net Assets Excluding Net IACs** | $ | - |

**NAS2900**

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ 7.1 | | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 197.8 | | Short-Term Debt | - |
| Notes Receivable | - | (1) | Est. Tax Liability: IACs | 65.3 |
| Other Investments | - | | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | | **Total Liabilities** | $ 65.3 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | | **Net Assets (Equity)** | $ 139.6 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | | **Less: Net IACs** | $ (132.5) |
| | | | | |
| **Total Assets** | $ 204.9 | | **Net Assets Excluding Net IACs** | $ 7.1 |

(1) The Notes Receivable line item included a loan of $29.9M which was reclassified to the IAC line item.

NAS2901

# Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler ("RSS XPC Trust")

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | **-** |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | **0.0** |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | **-** |
| **Total Assets** | **$ 0.0** | **Net Assets Excluding Net IACs** | **$** | **0.0** |

NAS2902

35

# Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | | $ - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | | $ - |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | | $ - |
| | | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | | $ - |

NAS2903

36

# Trust under Declaration of Trust dated August 23, 1989 f/b/o Richard S. Sackler and Issue of Richard S. Sackler ("RSS CT Residence Trust 1")[1,2]

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 2.1 (3) |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | **2.1** |
| Residential Real Estate | | 6.3 | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **4.2** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **-** |
| | | | | | |
| **Total Assets** | $ | **6.3** | **Net Assets Excluding Net IACs** | $ | **4.2** |

(1) RSS CT Residence Trust 1 and JDS CT Residence Trust 1 each own an undivided one-half interest in a parcel of residential real estate in Connecticut, which is adjoined to the parcel held by RSS CT Residence Trust 2 and JDS CT Residence Trust 2. Each is a tenant in common with respect to the parcel.

(2) Jonathan Sackler passed away on June 30, 2020, An estate tax appraisal was prepared for the purpose of estimating the present market value of the residential property as of the date of his death. This appraisal determined that the property has a fair market value of $69.0M which is divided amongst the trusts mentioned in footnote (1) based on acreage and their respective statuses as tenants in common. Net Asset summaries for these trusts can be found on pages 37, 38, 52, and 53.

(3) The hypothetical tax liability of $2.1M results from unrealized gains of $6.3M on the residential real estate. The original purchase price of the property was $1.3M. For illustration purposes, the hypothetical tax liability results from an unrealized gain equal to the property's fair market value.

NAS2904

# Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler ("RSS CT Residence Trust 2") [1,2]

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 9.3  (3) |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | 9.3 |
| Residential Real Estate | | 28.3 | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 18.9 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | 28.3 | **Net Assets Excluding Net IACs** | $ | 18.9 |

(1) RSS CT Residence Trust 2 and JDS CT Residence Trust 2 each own an undivided one-half interest in a parcel of residential real estate in Connecticut, which is adjoined to the parcel held by RSS CT Residence Trust 1 and JDS CT Residence Trust 1. Each is a tenant in common with respect to the parcel.

(2) Jonathan Sackler passed away on June 30, 2020, An estate tax appraisal was prepared for the purpose of estimating the present market value of the residential property as of the date of his death. This appraisal determined that the property has a fair market value of $69.0M which is divided amongst the trusts mentioned in footnote (1) based on acreage and their respective statuses as tenants in common. Net Asset summaries for these trusts can be found on pages 37, 38, 52, and 53.

(3) The hypothetical tax liability of $9.3M results from unrealized gains of $28.3M on the residential real estate. The original purchase price of the property was $1.3M. For illustration purposes, the hypothetical tax liability results from an unrealized gain equal to the property's fair market value.

NAS2905

# DABB Trust

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | 2.2 | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 2.2 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 2.2 | **Net Assets Excluding Net IACs** | $ | 2.2 |

**NAS2906**

39

# Richard S. Sackler Trust U/A 9/30/04

| ($ in Millions) | | Total | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | 1.1 (1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 1.1 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | 1.1 | **Net Assets Excluding Net IACs** | $ | 1.1 |

(1) The $1.1M in the Other Investments line item is due from a non-Initial Covered Sackler Person.

NAS2907

40

# RSS Fiduciary Management Trust

| *($ in Millions)* | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | 0.0 (1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

(1) The $0.0M in the Other Investments line item is due from a non-Initial Covered Sackler Person. The $0.0M represents a balance of less than $50,000.

NAS2908

# Crystal Trust

| ($ in Millions) | | Total | | | | Total |
|---|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.0 | | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | | Short-Term Debt | | - |
| Notes Receivable | | - | | Est. Tax Liability: IACs | | - |
| Other Investments | | 0.0 (1) | | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | $ | - |
| | | | | | | |
| **Total Assets** | $ | 0.0 | | **Net Assets Excluding Net IACs** | $ | 0.0 |

(1) Crystal Trust owns 100% of Crystal Fiduciary Company LLC. The trust does not have any meaningful assets beyond this ownership.

NAS2909

# Data Trust

| ($ in Millions) | Total | | Liabilities | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - (1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

(1) Data Trust owns 100% of Data LLC. The trust does not have any meaningful assets beyond this ownership.

**NAS2910**

43

# Summary for Jonathan Sackler

| ($ in Millions) | Total Assets | Total Liabilities | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | $ 174.2 | $ (67.5) | $ 106.7 | $ 45.3 |
| JDS BRP Trust | 9.1 | (4.6) | 4.5 | - |
| JDS FPC Trust | 8.4 | (2.5) | 5.9 | 0.8 |
| JDS XPC Trust | 0.0 | (0.0) | - | - |
| August 29, 2003 f/b/o Issue of Jonathan D. Sackler | - | - | - | - |
| JDS CT Residence Trust 1 | 6.3 | (0.1) | 6.1 | 6.1 |
| JDS CT Residence Trust 2 | 28.3 | (0.4) | 27.9 | 27.9 |
| MCM Fiduciary Management Trust | 0.0 | - | 0.0 | 0.0 |
| Cornice Trust | 0.0 | - | 0.0 | 0.0 |
| Cedar Cliff Trust | 0.4 | - | 0.4 | 0.4 |
| **Total** | **$ 226.6** | **$ (75.1)** | **$ 151.5** | **$ 80.5** |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

NAS2911

# Jonathan Sackler [f]

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.1 | (2) | Accounts Payable | $ - | |
| Accounts Receivable and Prepaid Expenses | | 0.0 | | Long-Term Debt | 23.5 | (5) |
| Marketable Securities and Hedge Funds | | 0.7 | | Mortgage Debt | - | |
| Independent Associated Companies (IACs) | | 0.3 | | Short-Term Debt | 5.7 | (6) |
| Notes Receivable | | - | | Est. Tax Liability: IACs | 0.1 | (7) |
| Other Investments | | 1.3 | (3) | Est. Tax Liability: Unrealized Gains | - | |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | | **Total Liabilities** | $ **29.3** | |
| Residential Real Estate | | - | (4) | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | $ **(26.9)** | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | $ **(0.2)** | |
| **Total Assets** | $ | **2.3** | | **Net Assets Excluding Net IACs** | $ **(27.1)** | (1) |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

(2) Includes $0.3M received on account of Jonathan Sackler's status as a beneficiary of a life insurance policy on Beverly Sackler's life. The funds are currently held in escrow pending resolution of claims asserted against Beverly Sackler's estate.

(3) Includes in the Other Investments line a $1.3M investment in non-Initial Covered Sackler Person.

(4) Certain residential real estate holdings were removed as they include the investments described on pages 52-53 of this March 31, 2021 Updated Net Assets Report.

(5) Includes $21.5M loan payable to a Delaware limited liability company owned by a trust for the benefit of Jonathan Sackler's spouse, and a $2.0M loan payable to the Investment Trust (see page 32 of November 22, 2019 Presentation).

(6) Includes $3.9M loan payable to the Investment Trust (see page 32 of November 22, 2019 Presentation).

(7) Due to Jonathan Sackler's death, all assets within the taxable estate received a tax basis equal to the fair market value as of the date of death, June 30, 2020. The Est. Tax Liability: IACs was not affected because the figure is intended to illustrate how the proceeds from the sale of the IACs might potentially flow to the individual Initial Covered Sackler Persons generated from an IAC hypothetical gross sale

NAS2912

# JDS Revocable Pourover Trust[1]

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 5.0 | Accounts Payable | $ | 0.0 | |
| Accounts Receivable and Prepaid Expenses | | 0.1 | Long-Term Debt | | 4.1 | (4) |
| Marketable Securities and Hedge Funds | | 21.3 | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | 91.4 | Short-Term Debt | | 3.6 | |
| Notes Receivable | | 23.9 | Est. Tax Liability: IACs | | 30.2 | (5) |
| Other Investments | | 0.0 (2) | Est. Tax Liability: Unrealized Gains | | 0.3 | (6) |
| Private Equity Investments | | 10.2 (3) | | | | |
| Real Estate Investments | | 2.8 | **Total Liabilities** | $ | **38.2** | |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **133.6** | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | 17.1 | **Less: Net IACs** | $ | **(61.2)** | |
| **Total Assets** | $ | **171.8** | **Net Assets Excluding Net IACs** | $ | **72.4** | |

(1) JDS Revocable Pourover Trust was created for typical estate planning reasons, including minimizing assets subject to probate process, intergenerational planning, managing the passing of wealth to succeeding generations and tax efficiency. See page 45, note (1) for further detail.

(2) Includes $0.0M investment in a non-Initial Covered Sackler Person. The $0.0M represents a balance of less than $50,000.

(3) Includes $8.2M of value attributable to CPC. A private equity investment was recorded on the balance sheet at -$0.3M. This asset was restated to $0.0.

(4) Includes a $2.1M loan payable to the 1A Trust and a $2.1M loan payable to the 2A Trust from a look-through entity.

(5) Due to Jonathan Sackler's death, all assets within the taxable estate received a tax basis equal to the fair market value as of the date of death, June 30, 2020. The Est. Tax Liability: IACs was not affected because the figure is intended to illustrate how the proceeds from the sale of the IACs might potentially flow to the individual Initial Covered Sackler Persons generated from an IAC hypothetical gross sale value of $4.5B.

(6) The hypothetical tax liability of $0.3M results from unrealized gains of $0.9M.

**NAS2913**

# Jonathan Sackler / JDS Revocable Pourover Trust [(1)]

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 5.1 | (2) | Accounts Payable | $ 0.0 | |
| Accounts Receivable and Prepaid Expenses | | 0.1 | | Long-Term Debt | 27.6 | (6) |
| Marketable Securities and Hedge Funds | | 21.9 | | Mortgage Debt | - | |
| Independent Associated Companies (IACs) | | 91.7 | | Short-Term Debt | 9.3 | (7) |
| Notes Receivable | | 23.9 | | Est. Tax Liability: IACs | 30.3 | (8) |
| Other Investments | | 1.3 | (3) | Est. Tax Liability: Unrealized Gains | 0.3 | (9) |
| Private Equity Investments | | 10.2 | (4) | | | |
| Real Estate Investments | | 2.8 | | **Total Liabilities** | $ 67.5 | |
| Residential Real Estate | | - | (5) | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | $ 106.7 | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | 17.1 | | **Less: Net IACs** | $ (61.4) | |
| **Total Assets** | $ | 174.2 | | **Net Assets Excluding Net IACs** | $ 45.3 | |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

(2) Includes $0.3M received on account of Jonathan Sackler's status as a beneficiary of a life insurance policy on Beverly Sackler's life. The funds are currently held in escrow pending resolution of claims asserted against Beverly Sackler.

(3) Includes in the Other Investments line a $1.3M investment in non-Initial Covered Sackler Person.

(4) Includes $8.2M of value attributable to CPC. A private equity investment was recorded on the balance sheet at -$0.3M. This asset was restated to $0.0.

(5) Certain residential real estate holdings were removed as they include the investments described on pages 52-53 of this March 31, 2021 Updated Net Assets Report.

(6) Includes a $21.5M loan payable to a Delaware limited liability company owned by a trust for the benefit of Jonathan Sackler's spouse, a $2.0M loan payable to the Investment Trust (see page 32 of November 22, 2019 Presentation), a $2.1M loan payable to the 1A Trust, and a $2.1M loan payable to the 2A Trust from a look-through entity.

(7) Includes $3.9M loan payable to the Investment Trust (see page 32 of November 22, 2019 Presentation).

(8) Due to Jonathan Sackler's death, all assets within the taxable estate received a tax basis equal to the fair market value as of the date of death, June 30, 2020. The Est. Tax Liability: IACs was not affected because the figure is to illustrate how the proceeds from the sale of the IACs might potentially flow to the individual Initial Covered Sackler Persons at a hypothetical gross sale value of $4.5B.

(9) The hypothetical tax liability of $0.3M results from unrealized gains of $0.9M.

NAS2914

# Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler ("JDS BRP Trust")

| ($ in Millions) | Total | | Total | |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - | |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.0 | |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - | |
| Independent Associated Companies (IACs) | 9.1 | Short-Term Debt | 1.6 | |
| Notes Receivable | - | Est. Tax Liability: IACs | 3.0 | (1) |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - | |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ 4.6 | |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 4.5 | |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ (6.1) | |
| **Total Assets** | $ 9.1 | **Net Assets Excluding Net IACs** | $ - | |

(1) Due to Jonathan Sackler's death, all assets within the taxable estate received a tax basis equal to the fair market value as of the date of death, June 30, 2020. The Est. Tax Liability: IACs was not affected because the figure is intended to illustrate how the proceeds from the sale of the IACs might potentially flow to the individual Initial Covered Sackler Persons generated from an IAC hypothetical gross sale value of $4.5B.

NAS2915

# Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler ("JDS FPC Trust")

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.8 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | 7.6 | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | 2.5 (1) |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | 2.5 |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 5.9 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | (5.1) |
| **Total Assets** | $ | 8.4 | **Net Assets Excluding Net IACs** | $ | 0.8 |

(1) Due to Jonathan Sackler's death, all assets within the taxable estate received a tax basis equal to the fair market value as of the date of death, June 30, 2020. The Est. Tax Liability: IACs was not affected because the figure is intended to illustrate how the proceeds from the sale of the IACs might potentially flow to the individual Initial Covered Sackler Persons generated from an IAC hypothetical gross sale value of $4.5B.

NAS2916

# Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler ("JDS XPC Trust")

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | 0.0 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 0.0 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | **$ 0.0** | **Net Assets Excluding Net IACs** | **$** | **-** |

NAS2917

# Trust Agreement dated August 29, 2003 f/b/o Issue of Jonathan D. Sackler

Confidential – Subject to Protective Order In re Purdue Pharma L.P., Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.) Page 246 of document

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

NAS2918

51

# Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler ("JDS CT Residence Trust 1") [1,2]

19-23649-rdd Doc 1742-1 Filed 08/06/21 Entered 08/06/21 22:24:23 Main Document
Pg 597 of 725

| ($ in Millions) | Total | | | Total | | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - | |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | 0.1 | |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - | |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - | |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - | (3) |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | 0.1 | |
| Residential Real Estate | | 6.3 | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 6.1 | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - | |
| | | | | | | |
| **Total Assets** | $ | 6.3 | **Net Assets Excluding Net IACs** | $ | 6.1 | |

(1) RSS CT Residence Trust 1 and JDS CT Residence Trust 1 each own an undivided one-half interest in a parcel of residential real estate in Connecticut, which is adjoined to the parcel held by RSS CT Residence Trust 2 and JDS CT Residence Trust 2. Each is a tenant in common with respect to the parcel.

(2) Jonathan Sackler passed away on June 30, 2020, An estate tax appraisal was prepared for the purpose of estimating the present market value of the residential property as of the date of his death. This appraisal determined that the property has a fair market value of $69.0M which is divided amongst the trusts mentioned in footnote (1) based on acreage and their respective statuses as tenants in common. Net Asset summaries for these trusts can be found on pages 37, 38, 52, and 53.

(3) Due to Jonathan Sackler's death, all assets within the taxable estate received a tax basis equal to the fair market value as of the date of death, June 30, 2020. As a result, the presentation specifies no tax liabilities for unrealized gains as the fair market value is equal to the tax basis.

NAS2919

Pg 598 of 725

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | 0.4 |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - (3) |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | **$** | **0.4** |
| Residential Real Estate | | 28.3 | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | **$** | **27.9** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$** | **-** |
| **Total Assets** | **$** | **28.3** | **Net Assets Excluding Net IACs** | **$** | **27.9** |

(1) RSS CT Residence Trust 2 and JDS CT Residence Trust 2 each own an undivided one-half interest in a parcel of residential real estate in Connecticut, which is adjoined to the parcel held by RSS CT Residence Trust 1 and JDS CT Residence Trust 1. Each is a tenant in common with respect to the parcel.

(2) Jonathan Sackler passed away on June 30, 2020, An estate tax appraisal was prepared for the purpose of estimating the present market value of the residential property as of the date of his death. This appraisal determined that the property has a fair market value of $69.0M which is divided amongst the trusts mentioned in footnote (1) based on acreage and their respective statuses as tenants in common. Net Asset summaries for these trusts can be found on pages 37, 38, 52, and 53.

(3) Due to Jonathan Sackler's death, all assets within the taxable estate received a tax basis equal to the fair market value as of the date of death, June 30, 2020. As a result, the presentation specifies no tax liabilities for unrealized gains as the fair market value is equal to the tax basis.

NAS2920

# MCM Fiduciary Management Trust

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | 0.0 (1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

(1) MCM Fiduciary Management Trust owns 100% of MCM Fiduciary Management LLC. The trust does not have any meaningful assets beyond this position.

NAS2921

# Cornice Trust

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $      - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | 0.0  (1) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $      0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

(1) Cornice Trust owns 100% of Cornice Fiduciary Management LLC. The trust does not have any meaningful assets beyond this position.

**NAS2922**

55

# Cedar Cliff Trust [(1)]

| ($ in Millions) | | Total | | | | Total |
|---|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.0 | | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | | Short-Term Debt | | - |
| Notes Receivable | | 0.4 | | Est. Tax Liability: IACs | | - |
| Other Investments | | - | | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | $ | 0.4 |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | $ | - |
| | | | | | | |
| **Total Assets** | $ | 0.4 | | **Net Assets Excluding Net IACs** | $ | 0.4 |

(1) Cedar Cliff Trust owns 100% of Cedar Cliff Fiduciary Management Inc.

**NAS2923**

56

# Summary for David Sackler

| ($ in Millions) | Total Assets | Total Liabilities | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| David Sackler | $ 9.0 | $ (14.9) | $ - | $ - |
| David A. Sackler 3/8/90 | 0.1 | - | 0.1 | 0.1 |
| **Total** | **$ 9.0** | **$ (14.9)** | **$ 0.1** | **$ 0.1** |

Note: As noted in the Methodology section, if an ICSP is in a net deficit position (i.e., credit balance) that ICSP is eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

NAS2924

# David Sackler

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 1.6 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | 0.1 | Long-Term Debt | | 11.9  (3) |
| Marketable Securities and Hedge Funds | | 0.0 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | 3.0  (4) |
| Notes Receivable | | 6.5  (1) | Est. Tax Liability: IACs | | - |
| Other Investments | | -  (2) | Est. Tax Liability: Unrealized Gains | | 0.0  (5) |
| Private Equity Investments | | 0.5 | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | **14.9** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **-** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | 0.3 | **Less: Net IACs** | $ | **-** |
| **Total Assets** | $ | **9.0** | **Net Assets Excluding Net IACs** | $ | **-** |

(1) Relates to a loan provided to a Delaware corporation owned by a non-Initial Covered Sackler Person.

(2) Includes an investment of $0.1M in an Initial Covered Sackler Person which was eliminated in accordance with previously described methodology.

(3) Includes a $10.0M loan payable to 1A Trust (see page 24 of November 22, 2019 Presentation).

(4) Includes a $2.0M loan payable to 1A Trust (see page 24 of November 22, 2019 Presentation).

(5) The hypothetical tax liability of $0.0M results from unrealized gains of $0.0M. The $0.0M represents a balance of less than $50,000.

**NAS2925**

58

# Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90

| ($ in Millions) | Total | | Liabilities | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | 0.1 | **Net Assets (Equity)** | $ | 0.1 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | 0.1 | **Net Assets Excluding Net IACs** | $ | 0.1 |

NAS2926

# Summary for Beverly Sackler

| ($ in Millions) | Total Assets | Total Liabilities | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Estate of Beverly Sackler (d. October 14, 2019) | $ 4.5 | $ - | $ 4.5 | $ 4.5 |
| Beverly Sackler Revocable Trust | 183.2 | - | 183.2 | 183.2 |
| **Total** | **$ 187.7** | **$ -** | **$ 187.7** | **$ 187.7** |

**NAS2927**

# Estate of Beverly Sackler (d. October 14, 2019)

| ($ in Millions) | Total | | Total | |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.3 | Accounts Payable | $ - | |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - | |
| Marketable Securities and Hedge Funds | 0.0 | Mortgage Debt | - | |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - | |
| Notes Receivable | - | Est. Tax Liability: IACs | - | |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - | (1) |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ - | |
| Residential Real Estate | 3.0 | | | |
| Life Insurance -Surrender Value | 0.6 | **Net Assets (Equity)** | $ 4.5 | |
| Retirement Accounts | 0.5 | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - | |
| **Total Assets** | $ 4.5 | **Net Assets Excluding Net IACs** | $ 4.5 | |

(1) The $0 hypothetical tax liability results from unrealized losses of $0.8M.

NAS2928

# Beverly Sackler Revocable Trust

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 150.1 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | 0.8 | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 12.8 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - (2) |
| Private Equity Investments | 5.2 | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 183.2 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | 14.3 | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 183.2 | **Net Assets Excluding Net IACs** | $ 183.2 |

(1) Although a revocable trust, Beverly Sackler passed in October 2019 and the beneficiaries are certain charitable organizations (other than with respect to tangible personal property).

(2) The $0 hypothetical tax liability results from unrealized losses of $0.2M.

NAS2929

62

# Trusts That Indirectly Own Interests in Purdue

NAS2930

# Trust U/A 11/5/74 fbo Beverly Sackler ("74A Trust")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 27.8 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | 1.1 | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 14.3 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 541.9 | Short-Term Debt | - |
| Notes Receivable | 110.4 (1) | Est. Tax Liability: IACs | 178.8 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 2.1 (2) |
| Private Equity Investments | 4.9 | | |
| Real Estate Investments | 5.4 | **Total Liabilities** | **$ 181.0** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$ 524.7** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$ (363.1)** |
| **Total Assets** | **$ 705.7** | **Net Assets Excluding Net IACs** | **$ 161.7** |

(1) Includes a loan of $224.8M to the Investment Trust which was reduced to $89.4M in accordance with the previously described methodology. $21.0M relates to an amount due from Rosebay Medical Company LP (see page 75 of November 22, 2019 Presentation).

(2) The hypothetical tax liability of $2.1M results from unrealized gains of $6.5M.

NAS2931

# Raymond R. Sackler Trust 1 dtd 12/23/89 ("1A Trust")

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 11.7 | Accounts Payable | $ | 0.1 |
| Accounts Receivable and Prepaid Expenses | | 1.1 | Long-Term Debt | | 2.4 (4) |
| Marketable Securities and Hedge Funds | | 328.3 | Mortgage Debt | | 2.3 |
| Independent Associated Companies (IACs) | | 479.4 | Short-Term Debt | | 33.4 |
| Notes Receivable | | 157.5 (1) | Est. Tax Liability: IACs | | 158.2 |
| Other Investments | | 0.8 (2) | Est. Tax Liability: Unrealized Gains | | 41.1 (5) |
| Private Equity Investments | | 73.0 (3) | | | |
| Real Estate Investments | | 2.5 | **Total Liabilities** | $ | **237.5** |
| Residential Real Estate | | 40.3 | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **857.3** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **(321.2)** |
| **Total Assets** | $ | **1,094.8** | **Net Assets Excluding Net IACs** | $ | **536.1** |

(1) Includes $12.0M due from David Sackler which was reduced to $6.5M in accordance with the previously described methodology.

(2) Includes $0.8M investment in a non-Initial Covered Sackler Person. Includes an investment of $0.0M in an Initial Covered Sackler Person which was removed in accordance with previously described methodology. The $0.0M represents a balance of less than $50,000.

(3) Includes $4.3M of CPC. A private equity investment was recorded on the balance sheet at -$0.2M. This asset was restated to $0.0.

(4) Includes a $1.2M loan payable to the 1A Trust and a $1.2M loan payable to the 2A Trust from a pass-through entity.

(5) The hypothetical tax liability of $41.1M results from unrealized gains of $124.6M.

NAS2932

# Raymond R. Sackler Trust 2 dtd 12/23/89 ("2A Trust")

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 130.7 | Accounts Payable | $ | 0.0 |
| Accounts Receivable and Prepaid Expenses | | 1.3 | Long-Term Debt | | 0.5 (3) |
| Marketable Securities and Hedge Funds | | 394.3 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | 479.4 | Short-Term Debt | | 2.1 |
| Notes Receivable | | 150.6 | Est. Tax Liability: IACs | | 158.2 |
| Other Investments | | 0.0 (1) | Est. Tax Liability: Unrealized Gains | | 93.0 (4) |
| Private Equity Investments | | 349.0 (2) | | | |
| Real Estate Investments | | 6.8 | **Total Liabilities** | $ | **253.9** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **1,258.2** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **(321.2)** |
| **Total Assets** | $ | **1,512.1** | **Net Assets Excluding Net IACs** | $ | **937.0** |

(1) Includes $0.0M investment in a non-Initial Covered Sackler Person. The $0.0M represents a balance of less than $50,000.

(2) Includes $1.0M of value attributes to CPC.

(3) Includes a $0.3M loan payable to the 1A Trust and a $0.3M loan payable to the 2A Trust from a pass-through entity.

(4) The hypothetical tax liability of $93.0M results from unrealized gains of $281.9M.

NAS2933

# Raymond R. Sackler Trust 1B dtd 12/23/89 ("1B Trust")

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 2.6 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | 0.0 | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | 0.6 | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | 0.2 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 0.2 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 3.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | (0.4) |
| **Total Assets** | $ 3.2 | **Net Assets Excluding Net IACs** | $ | 2.6 |

NAS2934

# Raymond R. Sackler Trust 2B dtd 12/23/89 ("2B Trust")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 2.6 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | 0.0 | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 0.6 | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | 0.2 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | **$ 0.2** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$ 3.0** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$ (0.4)** |
| | | | |
| **Total Assets** | **$ 3.2** | **Net Assets Excluding Net IACs** | **$ 2.6** |

NAS2935

# Trusts Created by Division from 74A Trust or Subsequent Decanting

NAS2936

# Trust B U/A 11/4/74 fbo Beverly Sackler ("74B Trust")

| ($ in Millions) | Total | | Liabilities | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 30.7 | Accounts Payable | $ | 0.0 |
| Accounts Receivable and Prepaid Expenses | | 0.0 | Long-Term Debt | | 0.0 |
| Marketable Securities and Hedge Funds | | 5.6 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | 0.0 |
| Notes Receivable | | 18.4 (1) | Est. Tax Liability: IACs | | - |
| Other Investments | | 0.1 (2) | Est. Tax Liability: Unrealized Gains | | 10.7 (4) |
| Private Equity Investments | | 90.4 | | | |
| Real Estate Investments | | 5.4 (3) | **Total Liabilities** | $ | **10.7** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **139.9** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **-** |
| | | | | | |
| **Total Assets** | $ | **150.6** | **Net Assets Excluding Net IACs** | $ | **139.9** |

(1) Includes a loan of $30.0M to the Investment Trust which was reduced to $11.9M in accordance with the previously described methodology.

(2) Includes $0.1M investment in a non-Initial Covered Sackler Person.

(3) A real estate investment recorded on the balance sheet with a credit balance of -$11.6M was restated to $0.0.

(4) The hypothetical tax liability of $10.7M results from unrealized gains of $32.5M.

NAS2937

# The 1974 Irrevocable Investment Trust ("Investment Trust")

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.4 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | 438.9 (3) |
| Marketable Securities and Hedge Funds | | 1.0 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | 50.0 (4) |
| Notes Receivable | | 92.8 (1) | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 1.5 (5) |
| Private Equity Investments | | 97.0 (2) | | | |
| Real Estate Investments | | 4.6 | **Total Liabilities** | $ | **490.4** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **-** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **-** |
| **Total Assets** | $ | **195.9** | **Net Assets Excluding Net IACs** | $ | **-** |

(1) Includes an amounts due of $5.9M from Jonathan D. Sackler and $9.9M from Richard S. Sackler.

(2) Includes value attributed to CPC of $97.0M.

(3) $107.2M relates to an amount borrowed from the 74-AJ Trust (see page 34 of November 22, 2019 Presentation), $127.0M relates to an amount borrowed from the 74-AR Trust (see page 33 of November 22, 2019 Presentation), $174.8M relates to an amount borrowed from the 74A Trust (see page 23 of November 22, 2019 Presentation), and $30.0M relates to an amount borrowed from the 74B Trust (see page 31 of November 22, 2019 Presentation).

(4) $50.0M relates to an amount borrowed from the 74A Trust (see page 23 of November 22, 2019 Presentation).

(5) The hypothetical tax liability of $1.5M results from unrealized gains of $4.5M.

NAS2938

71

# 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust")[1]

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.7 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | 11.1 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - (2) |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | 8.2 | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 20.1 |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | 20.1 | **Net Assets Excluding Net IACs** | $ | 20.1 |

(1) 74-AR Trust was decanted such that all beneficial ownership of all assets other than those represented on this page were transferred effective July 23, 2019 to AR Irrevocable Trust. Legal title to certain of such assets to the extent not already transferred are held in a custodial capacity by 74-AR Trust and are in the process of being transferred. Furthermore, the decanting is subject to the terms of a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the trustee of AR Irrevocable Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against 74-AR Trust.

(2) The $0 hypothetical tax liability results from unrealized losses of $0.8M.

NAS2939

72

# AR Irrevocable Trust [1]

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 59.6 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | 0.2 | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 760.0 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 64.1 (2) | Est. Tax Liability: IACs | - |
| Other Investments | 1.0 (3) | Est. Tax Liability: Unrealized Gains | 52.6 (5) |
| Private Equity Investments | 321.6 (4) | | |
| Real Estate Investments | 241.3 | **Total Liabilities** | $ 52.6 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 1,395.2 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 1,447.8 | **Net Assets Excluding Net IACs** | $ 1,395.2 |

(1) This page reflects the value of AR Irrevocable Trust's beneficial interest in all assets (subject to any previously described adjustments), even where legal title is still held by 74-AR Trust. See page 72, note (1) for further details.
(2) Includes a loan of $127.0M to the Investment Trust which was reduced to $50.5M in accordance with the previously described methodology.
(3) Includes $1.0M investment in a non-Initial Covered Sackler Person.
(4) Two private equity investments were recorded on the balance sheet with a credit balance. The assets, totaling -$4.2M, were restated to $0.0.
(5) The hypothetical tax liability of $52.6M results from unrealized gains of $159.4M.

**NAS2940**

73

# 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust")[1]

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 1.2 | Accounts Payable | $ | - | |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - | |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - | |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - | |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - | |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 0.1 | (2) |
| Private Equity Investments | | 2.6 | | | | |
| Real Estate Investments | | 11.6 | **Total Liabilities** | $ | 0.1 | |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | 15.3 | |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - | |
| **Total Assets** | $ | 15.4 | **Net Assets Excluding Net IACs** | $ | 15.3 | |

(1) 74-AJ Trust was decanted such that all beneficial ownership of all assets other than those represented on this page were transferred effective June 8, 2019 to AJ Irrevocable Trust. Legal title to certain of such assets to the extent not already transferred are held in a custodial capacity by 74-AJ Trust and are in the process of being transferred. Furthermore, the decanting is subject to the terms of a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the trustee of AJ Irrevocable Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against 74-AJ Trust.

(2) The hypothetical tax liability of $0.1M results from unrealized gains of $0.3M.

**NAS2941**

# AJ Irrevocable Trust [1]

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 219.6 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 524.1 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 42.8  (2) | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 144.0  (3) |
| Private Equity Investments | 566.9 | | |
| Real Estate Investments | 153.2 | **Total Liabilities** | $ **144.0** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ **1,362.7** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ **-** |
| | | | |
| **Total Assets** | $ **1,506.7** | **Net Assets Excluding Net IACs** | $ **1,362.7** |

(1) This page reflects the value of AJ Irrevocable Trust's beneficial interest in all assets (subject to any previously described adjustments), even where legal title is still held by 74-AJ Trust. See page 74, note (1) for further details.

(2) Includes a loan of $107.2M to the Investment Trust which was reduced to $42.6M in accordance with the previously described methodology.

(3) The hypothetical tax liability of $144.0M results from unrealized gains of $436.3M.

**NAS2942**

# Additional Trusts That Directly and/or Indirectly Own Interests in IACs

NAS2943

# Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 1")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 0.0 | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | 0.0 |
| Other Investments | 0.6 (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 0.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.6 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ (0.0) |
| **Total Assets** | $ 0.6 | **Net Assets Excluding Net IACs** | $ 0.6 |

(1) Includes an investment of $0.9M to a non-Initial Covered Sackler Person which was reduced to $0.6M in accordance with previously described methodology.

NAS2944

77

# Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 2")

| ($ in Millions) | Total | | Total |
|---|---|---|---|

**Assets**

| | | **Liabilities** | |
|---|---|---|---|
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.0 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | 2.4 (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ 0.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 2.3 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 2.4 | **Net Assets Excluding Net IACs** | $ 2.3 |

(1) Includes $2.4M investment in a non-Initial Covered Sackler Person.

NAS2945

# Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 3")

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.3 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | 24.4 | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | 8.1 |
| Other Investments | 8.9 (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | **$ 8.1** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$ 25.6** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$ (16.4)** |
| | | | |
| **Total Assets** | **$ 33.6** | **Net Assets Excluding Net IACs** | **$ 9.2** |

(1) Includes an investment of $33.1M in a non-Initial Covered Sackler Person, which was reduced to $7.5M in accordance with previously described methodology. Includes $1.4M investment in a non-Initial Covered Sackler Person.

NAS2946

# Other Trusts

NAS2947

# Richard S. Sackler Life Insurance Trust

| ($ in Millions) | Total | | Liabilities | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | **$** | **-** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | 0.9 | **Net Assets (Equity)** | **$** | **0.9** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$** | **-** |
| **Total Assets** | **$** | **0.9** | **Net Assets Excluding Net IACs** | **$** | **0.9** |

NAS2948

# Jonathan D. Sackler Life Insurance Trust

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | 16.7 | Accounts Payable | $ | | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | | - |
| Notes Receivable | | 0.5 (1) | Est. Tax Liability: IACs | | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | | - |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | | **-** |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | | **17.2** |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | | **-** |
| | | | | | | |
| **Total Assets** | $ | 17.2 | **Net Assets Excluding Net IACs** | $ | | **17.2** |

(1) Includes amounts due of $0.1M from JDS CT Residence Trust 1 and $0.4M from JDS CT Residence Trust 2.

NAS2949

# Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $    0.0 | Accounts Payable | $    - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | 1.4  (1) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | **$    -** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$    1.4** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$    -** |
| **Total Assets** | **$    1.4** | **Net Assets Excluding Net IACs** | **$    1.4** |

(1) Includes $1.4M investment in non-Initial Covered Sackler Person.

**NAS2950**

83

# David A. Sackler 2012 Trust

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.1 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | 0.3 (1) | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | 0.4 | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.7 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.7 | **Net Assets Excluding Net IACs** | $ | 0.7 |

(1) Includes an amount of $0.5M due from David Sackler which was reduced to $0.3M in accordance with the previously described methodology.

NAS2951

84

# Irrevocable Trust under Declaration dated as of April 25, 1991

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.2 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.0 |
| Marketable Securities and Hedge Funds | 0.6 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 8.0 |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | 0.0 | | |
| Real Estate Investments | - | **Total Liabilities** | $ 8.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 0.9 | **Net Assets Excluding Net IACs** | $ - |

NAS2952

# Irrevocable Trust under Declaration dated as of August 25, 1992

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 2.2 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 0.0 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 1.0 | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | 4.1 | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 7.3 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 7.3 | **Net Assets Excluding Net IACs** | $ 7.3 |

**NAS2953**

# The RSS 2012 Family Trust

| *($ in Millions)* | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 1.5 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 1.5 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 0.2 (1) |
| Private Equity Investments | 1.9 | | |
| Real Estate Investments | 2.1 | **Total Liabilities** | $ 0.2 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 6.9 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 7.1 | **Net Assets Excluding Net IACs** | $ 6.9 |

(1) The hypothetical tax liability of $0.2M results from unrealized gains of $0.5M.

**NAS2954**

87

# Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.1 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.1 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 0.1 | **Net Assets Excluding Net IACs** | $ 0.1 |

NAS2955

# Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.1 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 0.0  (1) |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | **0.0** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **0.1** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **-** |
| **Total Assets** | $ | **0.1** | **Net Assets Excluding Net IACs** | $ | **0.1** |

(1) The hypothetical tax liability of $0.0M results from unrealized gains of $0.0M. The $0.0M represents a balance of less than $50,000.

NAS2956

89

# Appendix A: Entities

NAS2957

# Rosebay Medical Company L.P.

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 25.4 | | Accounts Payable | $ | 0.3 |
| Accounts Receivable and Prepaid Expenses | | 0.0 | | Long-Term Debt | | 39.0 (4) |
| Marketable Securities and Hedge Funds | | 0.0 | | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | 552.9 | | Short-Term Debt | | - |
| Notes Receivable | | - | (1) | Est. Tax Liability: IACs | | 182.5 |
| Other Investments | | 0.0 | (2) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | 7.8 | | | | |
| Real Estate Investments | | - | (3) | **Total Liabilities** | $ | **221.8** |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | | **Net Assets (Equity)** | $ | **364.4** |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | | **Less: Net IACs** | $ | **(370.5)** |
| **Total Assets** | $ | **586.2** | | **Net Assets Excluding Net IACs** | $ | **-** |

(1) $7.8M was reclassified from Notes Receivable to the IAC's line item.

(2) $0.0M other investment is in a non-Initial Covered Sackler Person. The $0.0M represents a balance of less than $50,000.

(3) A real estate investment of -$0.0M was restated to $0.0.

(4) Includes a $21.0M loan payable to the 74A Trust and a $18.0M loan payable to the Rosebay Medical Company Inc. (see pages 23 and 77 of November 22, 2019 Presentation, respectively).

**NAS2958**

# Rosebay Medical Company, Inc.

| *($ in Millions)* | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 1.5 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | 11.1 | Short-Term Debt | | - |
| Notes Receivable | 18.0 (1) | Est. Tax Liability: IACs | | 3.6 |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 3.6 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 26.9 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | (7.4) |
| | | | | |
| **Total Assets** | $ 30.6 | **Net Assets Excluding Net IACs** | $ | 19.5 |

(1) Includes a loan of $18.0M to the Rosebay Medical Company LP (see page 75 in November 22, 2019 Presentation).

**NAS2959**

# Linarite Holdings LLC

| *($ in Millions)* | **Total** | | **Total** |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $        - | Accounts Payable | $        - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $        - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $        - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $        - |
| | | | |
| **Total Assets** | $        - | **Net Assets Excluding Net IACs** | $        - |

NAS2960

93

# Perthlite Holdings LLC

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

**NAS2961**

94

# Moonstone Holdings LLC

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ - |
| | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ - |

**NAS2962**

95

# Roselite Holdings LLC

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

**NAS2963**

# Appendix B: General Description of Categories

NAS2964

# General Description of Asset Categories

| Category | General Description |
|---|---|
| Cash and Cash Equivalents | Deposits and money market mutual funds. |
| Accounts Receivable and Prepaid Expenses | Tax refunds receivable, receivables from hedge fund redemptions, and prepaid expenses. |
| Notes Receivable | Debt financing in the form of notes and loans. |
| Independent Associated Companies (IACs) | Direct and indirect investments in II-way non-U.S. based pharmaceutical and health related assets, not including investments in joint-ventures. |
| Marketable Securities and Hedge Funds | Investments made directly or through various pooling investment vehicles investing in stocks, other marketable securities and hedge funds managed by either a third-party manager or family office. |
| Private Equity Investments | Investments made directly or indirectly in private companies, private equity funds, venture funds, joint ventures or private credit funds managed by either a third-party manager or family office. |

**NAS2965**

# General Description of Asset Categories *(cont'd)*

| Category | General Description |
|---|---|
| Real Estate Investments | Investments made directly or through various pooling investment vehicles in real estate managed either by a third-party manager or family office. |
| Life Insurance - Surrender Value | Cash surrender value of life insurance policies. |
| Retirement Accounts | IRA, 401(k) or other similar type of account. |
| Residential Real Estate | Direct or indirect ownership in residential real estate held principally for the purpose of inhabitance. |
| Artwork (including Jewelry) | Paintings, jewelry, and other collectibles. |
| Other Investments | Investments made directly or indirectly that either fall into multiple categories or do not fall into reported categories. |
| Net IACs | IACs less Est. Tax Liability: IAC. |

**NAS2966**

# General Description of Liability Categories

| Category | General Description |
|---|---|
| Accounts Payable | Money owed for services provided. |
| Short-Term Debt | Note payable that has a maturity of less than 12 months. |
| Long-Term Debt | Note payable that has a maturity of greater than 12 months. |
| Mortgage Debt | A long-term loan used to finance the purchase of residential real estate. |
| Est. Tax Liability: IAC | For illustrative and directional purposes only, the liability reflects a 33% tax obligation applied to the value of each entity's interest in IACs. |
| Est. Tax Liability: Unrealized Gains | For illustrative and directional purposes only, the liability reflects an average 33% tax obligation on the unrealized gains related to the estimated unrealized gains associated with assets on the balance sheet. Unrealized gain / loss are estimates provided by North Bay based upon valuation reports and similar information made available at the time of this report. |

NAS2967

# Appendix C: Trust Variance

NAS2968

# Individuals Variance

NAS2969

# Variance Summary for Richard Sackler

| ($ in Millions) | Total Assets Increase / (Decrease) | Total Liabilities (Increase) / Decrease | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Richard Sackler | $ (8.9) | $ (4.8) | $ (13.6) | $ (13.6) |
| RSS Revocable Pourover Trust | - | - | - | - |
| RSS BRP Trust | (0.0) | 0.0 | (0.0) | - |
| RSS FPC Trust | 6.3 | - | 6.3 | 6.3 |
| RSS XPC Trust | (0.0) | - | (0.0) | (0.0) |
| August 29, 2003 f/b/o Issue of Richard S. Sackler | - | - | - | - |
| RSS CT Residence Trust 1 | 0.3 | (0.1) | 0.2 | 0.2 |
| RSS CT Residence Trust 2 | 5.3 | (1.7) | 3.5 | 3.5 |
| DABB Trust | 0.2 | - | 0.2 | 0.2 |
| Richard S. Sackler Trust U/A 9/30/04 | (0.0) | - | (0.0) | (0.0) |
| RSS Fiduciary Management Trust | 0.0 | - | 0.0 | 0.0 |
| Crystal Trust | (0.0) | - | (0.0) | (0.0) |
| Data Trust | - | - | - | - |
| **Total** | **$ 3.1** | **$ (6.6)** | **$ (3.5)** | **$ (3.5)** |

Note: As noted in the Methodology section, if an ICSP is in a net deficit position (i.e., credit balance) that ICSP is eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

NAS2970

# Richard Sackler Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (8.7) | Accounts Payable | $ | 0.0 |
| Accounts Receivable and Prepaid Expenses | 0.0 | Long-Term Debt | | 0.7 |
| Marketable Securities and Hedge Funds | 10.0 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | 0.0 |
| Notes Receivable | (0.5) (1) | Est. Tax Liability: IACs | | - |
| Other Investments | 0.3 | Est. Tax Liability: Unrealized Gains | | 4.0 |
| Private Equity Investments | (3.8) (2) | | | |
| Real Estate Investments | 0.2 | **Total Liabilities** | $ | 4.8 |
| Residential Real Estate | 0.5 | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (13.6) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | (6.8) (3) | **Less: Net IACs** | $ | - |
| **Total Assets** | $ (8.9) | **Net Assets Excluding Net IACs** | $ | (13.6) |

(1) Notes Receivable include amounts due from David Sackler. The value of the Note Receivable increased by $0.1M when compared to the Updated Net Assets Report. The increase is due to David Sackler's Net Assets position being a net deficit. The note receivable is adjusted to reflect David Sackler's ability to repay.

(2) CPC position increased by $3.9M in the Private Equity Investments line item when compared to the Updated Net Assets Report.

(3) Richard Sackler is the co-owner of certain assets that are within Jonathan Sackler's taxable estate. Due to Jonathan Sackler's death, all assets within the taxable estate received an updated appraisal as of the time of death. The updated appraisal is the reason for the change in value.

NAS2971

# RSS Revocable Pourover Trust Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

**NAS2972**

# Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler ("RSS BRP Trust") Variance

| ($ in Millions) | Total | | Liabilities | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | (0.0) |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | (0.0) |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | (0.0) | **Net Assets Excluding Net IACs** | $ | - |

NAS2973

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | 6.6 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | (0.3) | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ 6.3 |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ - |
| | | | | |
| **Total Assets** | $ | 6.3 | **Net Assets Excluding Net IACs** | $ 6.3 |

NAS2974

# Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler ("RSS XPC Trust") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2975

# Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

NAS2976

**Trust under Declaration of Trust dated August 23, 1989 f/b/o Richard S. Sackler and Issue of Richard S. Sackler ("RSS CT Residence Trust 1") Variance**

Pg 655 of 725

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | 0.1 |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 0.1 |
| Residential Real Estate | 0.3 | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.2 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.3 | **Net Assets Excluding Net IACs** | $ | 0.2 |

NAS2977

# Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler ("RSS CT Residence Trust 2") Variance

| *($ in Millions)* | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | 1.7 |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 1.7 |
| Residential Real Estate | 5.3 | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 3.5 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 5.3 | **Net Assets Excluding Net IACs** | $ | 3.5 |

**NAS2978**

111

# DABB Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $    - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | 0.2 | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.2 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $    0.2 | **Net Assets Excluding Net IACs** | $ | 0.2 |

NAS2979

112

# Richard S. Sackler Trust U/A 9/30/04 Variance

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | | - |
| Other Investments | | (0.0) | Est. Tax Liability: Unrealized Gains | | | - |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | **Total Liabilities** | | $ | - |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | | $ | (0.0) |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | | $ | - |
| | | | | | | |
| **Total Assets** | $ | (0.0) | **Net Assets Excluding Net IACs** | | $ | (0.0) |

NAS2980

113

# RSS Fiduciary Management Trust Variance

| _($ in Millions)_ | **Total** | | | **Total** |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | 0.0 | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

NAS2981

114

# Crystal Trust Variance

| ($ in Millions) | | Total | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2982

115

# Data Trust Variance

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | | - |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | **Total Liabilities** | | $ | - |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | | $ | - |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | | $ | - |
| | | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | | $ | - |

NAS2983

19-23649-rdd Doc 3522-1 Filed 08/05/21 Entered 08/05/21 18:28:38 Main Document Pg 313 of 706

# Variance Summary for Jonathan Sackler

| ($ in Millions) | Total Assets Increase / (Decrease) | Total Liabilities (Increase) / Decrease | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Jonathan Sackler / JDS Revocable Pourover Trust[1] | $ (14.2) | $ 4.0 | $ (10.3) | $ (10.3) |
| JDS BRP Trust | 0.0 | (0.0) | (0.0) | - |
| JDS FPC Trust | 0.8 | - | 0.8 | 0.8 |
| JDS XPC Trust | 0.0 | (0.0) | (0.0) | (0.0) |
| August 29, 2003 f/b/o Issue of Jonathan D. Sackler | - | - | - | - |
| JDS CT Residence Trust 1 | 0.3 | 1.9 | 2.2 | 2.2 |
| JDS CT Residence Trust 2 | 5.3 | 7.3 | 12.6 | 12.6 |
| MCM Fiduciary Management Trust | (0.0) | - | (0.0) | (0.0) |
| Cornice Trust | - | - | - | - |
| Cedar Cliff Trust | 0.0 | - | 0.0 | 0.0 |
| **Total** | **$ (7.9)** | **$ 13.1** | **$ 5.3** | **$ 5.3** |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

Note: As noted in the Methodology section, if an ICSP is in a net deficit position (i.e., credit balance) that ICSP is eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

NAS2984

# Jonathan Sackler / JDS Revocable Pourover Trust Variance [1]

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | (3.1) | Accounts Payable | $ | | 0.0 |
| Accounts Receivable and Prepaid Expenses | | 0.0 | Long-Term Debt | | | (1.1) |
| Marketable Securities and Hedge Funds | | 1.6 | Mortgage Debt | | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | | 1.8 |
| Notes Receivable | | (0.6) | Est. Tax Liability: IACs | | | - |
| Other Investments | | (0.4) | Est. Tax Liability: Unrealized Gains | | | (4.7) |
| Private Equity Investments | | (3.8) (2) | | | | |
| Real Estate Investments | | 0.1 | **Total Liabilities** | $ | | **(4.0)** |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | (0.7) | **Net Assets (Equity)** | $ | | **(10.3)** |
| Retirement Accounts | | (0.6) | | | | |
| Artwork (including Jewelry) | | (6.8) (3) | **Less: Net IACs** | $ | | **-** |
| **Total Assets** | $ | **(14.2)** | **Net Assets Excluding Net IACs** | $ | | **(10.3)** |

(1) As disclosed in the January 15, 2020 presentation, before his death Jonathan Sackler transferred ownership of certain assets to Cornice Fiduciary Management LLC, as Trustee under Trust Agreement dated August 15, 2019 (the "JDS Revocable Pourover Trust"). Such transfers are subject to a Receipt, Refunding and Guarantee Agreement, which provides, among other things, that the JDS Revocable Pourover Trust agrees to satisfy any valid and enforceable right to payment held by a creditor against the Estate of Jonathan Sackler.

(2) CPC position increased by $3.9M in the Private Equity Investments line item when compared to the Updated Net Assets Report.

(3) Due to Jonathan Sackler's death, all assets within the taxable estate received an updated appraisal as of the time of death. The updated appraisal is the reason for the change in value.

**NAS2985**

# Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler ("JDS BRP Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $    0.0 | Accounts Payable | $    - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.0 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 0.0 |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $    0.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $    (0.0) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $    - |
| | | | |
| **Total Assets** | $    0.0 | **Net Assets Excluding Net IACs** | $    - |

NAS2986

119

# Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler ("JDS FPC Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.8 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.8 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 0.8 | **Net Assets Excluding Net IACs** | $ 0.8 |

NAS2987

# Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler ("JDS XPC Trust") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | 0.0 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | 0.0 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2988

# Trust Agreement dated August 29, 2003 f/b/o Issue of Jonathan D. Sackler Variance

Confidential – Produced Pursuant to Final Judgment Dated 05/25/2018 – Page 1 of Document

| ($ in Millions) | Total | | | | Total | |
|---|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | | - |
| Private Equity Investments | | - | | | | |
| Real Estate Investments | | - | **Total Liabilities** | | $ | - |
| Residential Real Estate | | - | | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | | $ | - |
| Retirement Accounts | | - | | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | | $ | - |
| | | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | | $ | - |

NAS2989

# Trust under Declaration of Trust dated August 23, 1989 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler ("JDS CT Residence Trust 1") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.1 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | (2.0) |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | **$ (1.9)** |
| Residential Real Estate | 0.3 | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$ 2.2** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$ -** |
| **Total Assets** | **$ 0.3** | **Net Assets Excluding Net IACs** | **$ 2.2** |

NAS2990

# Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler ("JDS CT Residence Trust 2") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | 0.3 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | (7.6) |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | **(7.3)** |
| Residential Real Estate | 5.3 | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | **12.6** |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | **-** |
| | | | | |
| **Total Assets** | **$ 5.3** | **Net Assets Excluding Net IACs** | $ | **12.6** |

**NAS2991**

# MCM Fiduciary Management Trust Variance

| ($ in Millions) | | Total | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS2992

# Cornice Trust Variance

| ($ in Millions) | Total | | Liabilities | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

NAS2993

# Cedar Cliff Trust Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 0.0 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ 0.0 |

NAS2994

# Variance Summary for David Sackler

| ($ in Millions) | Total Assets Increase / (Decrease) | Total Liabilities (Increase) / Decrease | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| David Sackler | $ 1.5 | $ - | $ - | $ - |
| David A. Sackler 3/8/90 | - | - | - | - |
| **Total** | **$ 1.5** | **$ -** | **$ -** | **-** |

Note: As noted in the Methodology section, if an ICSP is in a net deficit position (i.e., credit balance) that ICSP is eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

NAS2995

# David Sackler Variance

| ($ in Millions) | Total | | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 0.4 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | (2.5) |
| Marketable Securities and Hedge Funds | | 0.0 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | 2.5 |
| Notes Receivable | | 1.1 | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | 1.5 | **Net Assets Excluding Net IACs** | $ | - |

NAS2996

# Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90 Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

NAS2997

# Variance Summary for Beverly Sackler

| ($ in Millions) | Total Assets Increase / (Decrease) | Total Liabilities (Increase) / Decrease | Net Assets (Equity) | Net Assets Excluding Net IACs |
|---|---|---|---|---|
| Estate of Beverly Sackler (d. October 14, 2019) | $ (0.5) | $ - | $ (0.5) | $ (0.5) |
| Beverly Sackler Revocable Trust | 5.5 | 2.1 | 7.6 | 7.6 |
| **Total** | **$ 5.0** | **$ 2.1** | **$ 7.0** | **$ 7.0** |

NAS2998

# Estate of Beverly Sackler (d. October 14, 2019) Variance

| *($ in Millions)* | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ 0.3 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | 0.0 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | (0.8) | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.5) |
| Retirement Accounts | 0.0 | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| **Total Assets** | $ (0.5) | **Net Assets Excluding Net IACs** | $ | (0.5) |

NAS2999

19-23649-scc Doc 3452-3 Filed 08/05/21 Entered 08/05/21 21:38:30 Main Document Pg 328 of 706

# Beverly Sackler Revocable Trust Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 48.9 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | (4.7) | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | (42.4) | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | (2.1) |
| Private Equity Investments | 3.4 | | |
| Real Estate Investments | - | **Total Liabilities** | $ (2.1) |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 7.6 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | 0.4 | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 5.5 | **Net Assets Excluding Net IACs** | $ 7.6 |

**NAS3000**

133

# Trusts That Indirectly Own Interests in Purdue Variance

NAS3001

# Trust U/A 11/5/74 fbo Beverly Sackler ("74A Trust") Variance

| *($ in Millions)* | Total | | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 12.4 (1) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | 3.2 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | 31.3 (2) | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | 1.0 |
| Private Equity Investments | | 3.7 | | | |
| Real Estate Investments | | 0.0 | **Total Liabilities** | $ | **1.0** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **49.5** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **-** |
| | | | | | |
| **Total Assets** | $ | **50.6** | **Net Assets Excluding Net IACs** | $ | **49.5** |

(1) Includes cash that will be contributed for B-side professional fees and other settlement-related obligations.

(2) Notes Receivable include amounts due from the Investment Trust. The value of the Note Receivable increased by $31.1M when compared to the Updated Net Assets Report. The increase is due to the Investment Trust's Net Assets position being a net deficit. The note receivable is adjusted to reflect the Investment Trust's ability to repay.

NAS3002

# Raymond R. Sackler Trust 1 dtd 12/23/89 ("IA Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 1.0 | Accounts Payable | $ 0.0 |
| Accounts Receivable and Prepaid Expenses | 0.0 | Long-Term Debt | 0.2 |
| Marketable Securities and Hedge Funds | 47.1 | Mortgage Debt | (0.0) |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 0.0 |
| Notes Receivable | (5.4) (1) | Est. Tax Liability: IACs | - |
| Other Investments | (0.0) | Est. Tax Liability: Unrealized Gains | 24.7 |
| Private Equity Investments | 0.9 (2) | | |
| Real Estate Investments | 0.3 | **Total Liabilities** | $ 24.9 |
| Residential Real Estate | 0.3 | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 19.3 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 44.2 | **Net Assets Excluding Net IACs** | $ 19.3 |

(1) Notes Receivable include amounts due from David Sackler. The value of the Note Receivable increased by $1.4M when compared to the Updated Net Assets Report. The increase is due to David Sackler's Net Assets position being a net deficit. The note receivable is adjusted to reflect David Sackler's ability to repay.

(2) CPC position increased by $1.8M in the Private Equity Investments line item when compared to the Updated Net Assets Report.

**NAS3003**

# Raymond R. Sackler Trust 2 dtd 12/23/89 ("2A Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.8 | Accounts Payable | $ 0.0 |
| Accounts Receivable and Prepaid Expenses | 0.2 | Long-Term Debt | (1.6) |
| Marketable Securities and Hedge Funds | 80.9 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | (0.0) |
| Notes Receivable | (7.2) | Est. Tax Liability: IACs | - |
| Other Investments | (0.0) | Est. Tax Liability: Unrealized Gains | 15.3 |
| Private Equity Investments | (86.8) (1) | | |
| Real Estate Investments | 0.8 | **Total Liabilities** | **$ 13.7** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$ (25.0)** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$ -** |
| | | | |
| **Total Assets** | **$ (11.3)** | **Net Assets Excluding Net IACs** | **$ (25.0)** |

(1) CPC position decreased by $1.6M in the Private Equity Investments line item when compared to the Updated Net Assets Report. As noted on page 10, a significant portion of the decrease in Private Equity Investments is associated with distributions.

NAS3004

# Raymond R. Sackler Trust 1B dtd 12/23/89 ("1B Trust") Variance

| ($ in Millions) | Total | | Liabilities | Total | |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and Cash Equivalents | $ | (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | 0.0 | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS3005

# Raymond R. Sackler Trust 2B dtd 12/23/89 ("2B Trust") Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (0.0) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | 0.0 | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

**NAS3006**

# Trusts Created by Division from 74A Trust or Subsequent Decanting Variance

NAS3007

# Trust B U/A 11/4/74 fbo Beverly Sackler ("74B Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 20.4 | Accounts Payable | $ (0.0) |
| Accounts Receivable and Prepaid Expenses | (0.0) | Long-Term Debt | (0.0) |
| Marketable Securities and Hedge Funds | 0.5 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | (0.0) |
| Notes Receivable | 4.2 (1) | Est. Tax Liability: IACs | - |
| Other Investments | (0.0) | Est. Tax Liability: Unrealized Gains | 7.8 |
| Private Equity Investments | (6.5) (2) | | |
| Real Estate Investments | 0.0 | **Total Liabilities** | $ 7.8 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 10.7 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ 18.5 | **Net Assets Excluding Net IACs** | $ 10.7 |

(1) Notes Receivable include amounts due from the Investment Trust. The value of the Note Receivable increased by $4.2M when compared to the Updated Net Assets Report. The increase is due to the Investment Trust's Net Assets position being a net deficit. The note receivable is adjusted to reflect the Investment Trust's ability to repay.

(2) CPC position increased by $0.0M in the Private Equity Investments line item when compared to the Updated Net Assets Report. The $0.0M represents a balance of less than $50,000.

NAS3008

# The 1974 Irrevocable Investment Trust ("Investment Trust") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ (0.1) | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | (24.0) |
| Marketable Securities and Hedge Funds | (0.0) | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | 24.0 |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 0.1 |
| Private Equity Investments | 68.0 (1) | | |
| Real Estate Investments | 0.2 | **Total Liabilities** | $ 0.1 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 68.1 | **Net Assets Excluding Net IACs** | $ - |

(1) CPC position increased by $68.0M in the Private Equity Investments line item when compared to the Updated Net Assets Report.

NAS3009

# 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust") Variance

| *($ in Millions)* | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | 4.0 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | 0.0 | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 4.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 4.0 | **Net Assets Excluding Net IACs** | $ | 4.0 |

**NAS3010**

# AR Irrevocable Trust Variance

| ($ in Millions) | | Total | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | 49.4 | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | (6.0) | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | (31.9) | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | (100.0) (2) |
| Notes Receivable | | 17.7  (1) | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | (12.8) |
| Private Equity Investments | | (62.4) | | | |
| Real Estate Investments | | 9.8 | **Total Liabilities** | $ | **(112.8)** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | **89.4** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | **-** |
| **Total Assets** | $ | **(23.4)** | **Net Assets Excluding Net IACs** | $ | **89.4** |

(1) Notes Receivable include amounts due from the Investment Trust. The value of the Note Receivable increased by $17.7M when compared to the Updated Net Assets Report. The increase is due to the Investment Trust's Net Assets position being a net deficit. The note receivable is adjusted to reflect the Investment Trust's ability to repay.

(2) Short-Term Debt decreased by $100.0M when compared to the Updated Net Assets Report. This is due to debt which matured and was satisfied in the normal course of business.

**NAS3011**

# 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust") Variance

19-23649-scc Doc 3432-1 Filed 08/05/21 Entered 08/05/21 21:28:38 Main Document Pg 341 of 706

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $    - | Accounts Payable | $    - |
| Accounts Receivable and Prepaid Expenses | (0.2) | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 0.1 |
| Private Equity Investments | 1.4 | | |
| Real Estate Investments | 0.0 | **Total Liabilities** | **$    0.1** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$    1.2** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$    -** |
| | | | |
| **Total Assets** | **$    1.3** | **Net Assets Excluding Net IACs** | **$    1.2** |

NAS3012

# AJ Irrevocable Trust Variance

| *($ in Millions)* | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 117.4 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | (107.8) | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 15.1 (1) | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 51.5 (2) |
| Private Equity Investments | (38.0) | | |
| Real Estate Investments | 13.3 | **Total Liabilities** | $ 51.5 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (51.4) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 0.1 | **Net Assets Excluding Net IACs** | $ (51.4) |

(1) Notes Receivable include amounts due from the Investment Trust. The value of the Note Receivable increased by $14.9M when compared to the Updated Net Assets Report. The increase is due to the Investment Trust's Net Assets position being a net deficit. The note receivable is adjusted to reflect the Investment Trust's ability to repay.

(2) Est. Tax Liabilities: Unrealized Gains increased by $51.5M when compared to the Updated Net Assets Report.

**NAS3013**

146

# Additional Trusts That Directly and/or Indirectly Own Interests in IACs Variance

NAS3014

# Beverly Sackler Trust 1 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 1") Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | (0.0) | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | (0.0) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | (0.0) | **Net Assets Excluding Net IACs** | $ | (0.0) |

NAS3015

# Beverly Sackler Trust 2 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 2") Variance

Pg 694 of 725

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | 0.0 |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | (0.0) |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | (0.0) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | **$ 0.0** |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | **$ (0.0)** |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | **$ -** |
| | | | |
| **Total Assets** | **$ (0.0)** | **Net Assets Excluding Net IACs** | **$ (0.0)** |

NAS3016

# Beverly Sackler Trust 3 f/b/o David Alex Sackler 12/20/1989 ("Gallo Trust 3") Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | (0.0) | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (0.0) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ (0.0) |

NAS3017

# Other Trusts Variance

# Richard S. Sackler Life Insurance Trust Variance

| ($ in Millions) | Total | | Liabilities | Total | |
|---|---|---|---|---|---|
| **Assets** | | | | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | (0.2) | **Net Assets (Equity)** | $ | (0.2) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | (0.2) | **Net Assets Excluding Net IACs** | $ | (0.2) |

NAS3019

# Jonathan D. Sackler Life Insurance Trust Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ (0.4) | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | 0.4 (1) | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (0.0) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ (0.0) | **Net Assets Excluding Net IACs** | $ (0.0) |

(1) Notes Receivable include amounts due from the JDS CT Residence Trust 1 and JDS CT Residence Trust 2, which increased by $0.4M when compared to the Updated Net Assets Report.

NAS3020

153

# Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | 0.0 | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.0 | **Net Assets Excluding Net IACs** | $ | 0.0 |

NAS3021

# David A. Sackler 2012 Trust Variance

| ($ in Millions) | Total | | | Total |
|---|---|---|---|---|
| **Assets** | | | **Liabilities** | |
| Cash and Cash Equivalents | $ | 0.0 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | - |
| Notes Receivable | | 0.1 (1) | Est. Tax Liability: IACs | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | | - | | |
| Real Estate Investments | | - | **Total Liabilities** | $ - |
| Residential Real Estate | | - | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ 0.1 |
| Retirement Accounts | | - | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ | 0.1 | **Net Assets Excluding Net IACs** | $ 0.1 |

(1) Notes Receivable include amounts due from David Sackler. The value of the Note Receivable increased by $0.1M when compared to the Updated Net Assets Report. The increase is due to David Sackler's Net Assets position being a net deficit. The note receivable is adjusted to reflect David Sackler's ability to repay.

**NAS3022**

# Irrevocable Trust under Declaration dated as of April 25, 1991 Variance

Case 3:04-cv-01561-D Document 266-4 Filed 00/06/08 Page 351 of 9000 PageID 2885 Document 1 right
Pg 701 of 725

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $    0.0 | Accounts Payable | $    - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | 0.2 | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $    - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $    - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $    - |
| **Total Assets** | $    0.2 | **Net Assets Excluding Net IACs** | $    - |

**NAS3023**

# Irrevocable Trust under Declaration dated as of August 25, 1992 Variance

| *($ in Millions)* | | Total | | | Total |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | (0.1) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | 0.0 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | 0.1 | | | |
| Real Estate Investments | | - | **Total Liabilities** | **$** | **-** |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | **$** | **0.0** |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | **$** | **-** |
| **Total Assets** | **$** | **0.0** | **Net Assets Excluding Net IACs** | **$** | **0.0** |

NAS3024

# The RSS 2012 Family Trust Variance

| ($ in Millions) | **Total** | | | **Total** |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ (0.2) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | 0.3 | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | 0.1 |
| Private Equity Investments | 0.0 | | | |
| Real Estate Investments | 0.0 | **Total Liabilities** | $ | 0.1 |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | 0.0 |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ 0.1 | **Net Assets Excluding Net IACs** | $ | 0.0 |

NAS3025

158

# Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012 Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

NAS3026

# Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012 Variance

09-P3624-SEC1-cobo1255-21-Filed 08/06/11 hit Entered 08/06/11 14:28:45 Main Document
Pg 705 of 725

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ (8.6) | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | (0.0) | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | (2.0) | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | 0.0 |
| Private Equity Investments | (2.2) | | |
| Real Estate Investments | - | **Total Liabilities** | $ 0.0 |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ (12.8) |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ (12.8) | **Net Assets Excluding Net IACs** | $ (12.8) |

**NAS3027**

# Entities Variance

NAS3028

# Rosebay Medical Company L.P. Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | (9.6) | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | (9.6) |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | (9.6) | **Net Assets Excluding Net IACs** | $ | (3.6) (1) |

(1) Excludes an amount of $6.0M in accordance with the previously described methodology.

Note: As noted in the Methodology section, if an ICSP is in a net deficit position (i.e., credit balance) that ICSP is eliminated (adjusted to $0). For this reason, the sum of total assets and total liabilities will not equal the net asset balances presented on the summary pages.

**NAS3029**

# Rosebay Medical Company, Inc. - Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ 1.5 | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ 1.5 |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ 1.5 | **Net Assets Excluding Net IACs** | $ 1.5 |

NAS3030

163

# Linarite Holdings LLC Variance

| ($ in Millions) | Total | | |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

**NAS3031**

164

# Perthlite Holdings LLC Variance

| ($ in Millions) | Total | | | Total | |
|---|---|---|---|---|---|
| **Assets** | | | **Liabilities** | | |
| Cash and Cash Equivalents | $ | - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | | - | Short-Term Debt | | - |
| Notes Receivable | | - | Est. Tax Liability: IACs | | - |
| Other Investments | | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | | - | | | |
| Real Estate Investments | | - | **Total Liabilities** | $ | - |
| Residential Real Estate | | - | | | |
| Life Insurance -Surrender Value | | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | | - | | | |
| Artwork (including Jewelry) | | - | **Less: Net IACs** | $ | - |
| | | | | | |
| **Total Assets** | $ | - | **Net Assets Excluding Net IACs** | $ | - |

**NAS3032**

# Moonstone Holdings LLC Variance

| ($ in Millions) | **Total** | | | **Total** |
|---|---|---|---|---|
| **Assets** | | **Liabilities** | | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ | - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | | - |
| Notes Receivable | - | Est. Tax Liability: IACs | | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | | - |
| Private Equity Investments | - | | | |
| Real Estate Investments | - | **Total Liabilities** | $ | - |
| Residential Real Estate | - | | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ | - |
| Retirement Accounts | - | | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ | - |
| | | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ | - |

**NAS3033**

# Roselite Holdings LLC Variance

| ($ in Millions) | Total | | Total |
|---|---|---|---|
| **Assets** | | **Liabilities** | |
| Cash and Cash Equivalents | $ - | Accounts Payable | $ - |
| Accounts Receivable and Prepaid Expenses | - | Long-Term Debt | - |
| Marketable Securities and Hedge Funds | - | Mortgage Debt | - |
| Independent Associated Companies (IACs) | - | Short-Term Debt | - |
| Notes Receivable | - | Est. Tax Liability: IACs | - |
| Other Investments | - | Est. Tax Liability: Unrealized Gains | - |
| Private Equity Investments | - | | |
| Real Estate Investments | - | **Total Liabilities** | $ - |
| Residential Real Estate | - | | |
| Life Insurance -Surrender Value | - | **Net Assets (Equity)** | $ - |
| Retirement Accounts | - | | |
| Artwork (including Jewelry) | - | **Less: Net IACs** | $ - |
| | | | |
| **Total Assets** | $ - | **Net Assets Excluding Net IACs** | $ - |

**NAS3034**

# Appendix D: Attestation of Timothy J. Martin

NAS3035

# Attestation of Timothy J. Martin

## Left document

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**ATTESTATION OF TIMOTHY J. MARTIN WITH RESPECT TO
RAYMOND-SIDE MARCH 31, 2021 UPDATED NET ASSETS REPORT**

I, Timothy J. Martin, hereby attest that the following is true to the best of my knowledge, information and belief:

**Qualifications**

1. I am a managing director at Huron Consulting Services LLC ("Huron"), which was founded in 2002 and whose parent, Huron Consulting Group Inc. ("Huron Consulting Group"), is publicly traded on The NASDAQ Global Select Market under the symbol "HURN". Huron Consulting Group and its subsidiaries employ in excess of 3,000 full time employees in offices across the United States, including in Chicago, New York, and Boston, and abroad in Canada, India, Singapore, Switzerland, and the United Kingdom. Huron Consulting Group and its subsidiaries provide a range of professional services primarily through three operating segments: healthcare, business advisory, and education.

2. I have more than two decades of experience providing forensic, investigative and financial advisory consulting services to companies, boards of directors, creditors, equity holders and the legal community. I have been engaged by trustees and receivers in bankruptcy cases to conduct investigations into some of the largest known frauds, including Ponzi and pyramid schemes, securities fraud, fraudulent conveyances and financial statement fraud. I am

## Right document

a Certified Insolvency and Restructuring Advisor (CIRA), Certified Turnaround Professional (CTP) and Certified Fraud Examiner (CFE).

**Compensation Disclosure**

3. Huron has been retained by Milbank LLP and Joseph Hage Aaronson LLC in their capacity as counsel to the Raymond-side Initial Covered Sackler Persons,[1] including Rosebay Medical Company L.P. ("RMLP"). Huron is being compensated for its work on this matter at its standard hourly rates. No part of Huron's compensation is presently contingent on any particular outcome or resolution of this matter.

**Scope of Report**

4. On November 5, 2019, Purdue Pharma L.P. and certain of its affiliates that are debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors Committee appointed in the Debtors' chapter 11 cases (the "UCC"), Beacon Company and RMLP entered into that certain *Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* (the "Amended Stipulation") [Docket No. 518].

5. The Amended and Restated Stipulation contemplates that the Shareholder Parties will provide the following to the legal and financial advisors to the Debtors and the UCC:

(i) a report setting forth the net assets of the Initial Covered Sackler Persons, which report will set forth the approximate aggregate value of the assets owned by category (e.g., cash, securities, real estate, private and other investments, etc.) and the approximate liabilities, also by category, and

(ii) an attestation from a responsible person or independent third party as to the accuracy of the report.

---

[1] All capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Amended Stipulation (as defined below).

2

**NAS3036**

*See Amended Stipulation* ¶ 17(a).

6.     Huron prepared an initial report with respect to each Raymond-side Initial Covered Sackler Persons (the "Raymond-side Net Assets Report") as of October 31, 2019. Huron prepared an update to the initial report with respect to each Raymond-side Initial Covered Sackler Persons (the "Raymond-side Updated Net Assets Report") as of September 30, 2020.

7.     Huron has also prepared a second updated report with respect to each of the Raymond-side Initial Covered Sackler Persons (the "Raymond-side March 31, 2021 Updated Net Assets Report") as of March 31, 2021. This attestation is annexed to the Raymond-side March 31, 2021 Updated Net Assets Report as Appendix D.

### Information Considered

8.     I, or others working under my direction, received from North Bay Associates ("North Bay") balance sheets as of March 31, 2021 relating to the forty-seven Raymond-side Initial Covered Sackler Persons set forth on Schedule A of the *Attestation of Stephen A. Ives With Respect to Raymond-Side March 31, 2021 Updated Net Assets Report* (the "Ives Attestation"). It has been represented to Huron by North Bay that these balance sheets were prepared by North Bay in the ordinary course of business and that these balance sheets are the complete set of the available balance sheets prepared by North Bay relating to the Initial Covered Sackler Persons.

9.     North Bay does not, in the ordinary course of business, prepare balance sheets relating to twelve of the Raymond-side Initial Covered Sackler Persons.

3

(i)     For five of such Initial Covered Sackler Persons,[2] Huron obtained the values of their respective assets and liabilities through discussion with North Bay and review of available records which are reflected in the Raymond-side March 31, 2021 Updated Net Assets Report.

(ii)    For six of such Initial Covered Sackler Persons,[3] North Bay provided Huron with balance sheets prepared by a third party.

(iii)   For the remaining Initial Covered Sackler Persons,[4] Huron ascertained the values of its respective assets and liabilities by reviewing its balance sheet.

10.    North Bay also provided additional contextual information, through written and oral communications, relating to the information described in paragraphs 8 and 9 (such contextual information, together with the information described in paragraphs 8 and 9, the "Balance Sheet Information"). The Balance Sheet Information constitutes the entire set of information relied on by Huron in preparing the Raymond-side March 31, 2021 Updated Net Assets Report, except as described in paragraph 15 below.

11.    Huron has, for the purpose of the Raymond-side March 31, 2021 Updated Net Assets Report, placed each asset referenced in the Balance Sheet Information into one of the following categories based on information provided by North Bay:

(i)     Cash and Cash Equivalents:  Deposits and money market mutual funds.

(ii)    Accounts Receivable and Prepaid Expenses:  Tax refunds receivable, receivables from hedge fund redemptions, and prepaid expenses.

---

[2]     These five Initial Covered Sackler Persons are: the RSS Revocable Pourover Trust; Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler; and Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler.

[3]     These six Initial Covered Sackler Persons are:  RSS Fiduciary Management Trust, Crystal Trust, MCM Fiduciary Management Trust, Data Trust, Cornice Trust, and Cedar Cliff Trust, all of which were formed to hold interests in Wyoming entities that serve as trustees for certain Raymond-side trusts.  Balance sheets for these Wyoming entities were collected by North Bay and provided to Huron.

[4]     The remaining one such Initial Covered Sackler Person is the DABB Trust.

4

NAS3037

# Attestation of Timothy J. Martin

    (iii)    <u>Notes Receivable</u>:  Debt financing in the form of notes and loans.

    (iv)    <u>Independent Associated Companies (IACs)</u>:  Direct and indirect investments in II-way non-U.S. based pharmaceutical and health related assets, not including investments in joint-ventures.

    (v)    <u>Marketable Securities and Hedge Funds</u>:  Investments made directly or through various pooling investment vehicles investing in stocks, other marketable securities and hedge funds managed by either a third-party manager or family office.

    (vi)    <u>Private Equity Investments</u>:  Investments made directly or indirectly in private companies, private equity funds, venture funds, joint ventures or private credit funds managed by either a third-party manager or family office.

    (vii)    <u>Real Estate Investments</u>:  Investments made directly or through various pooling investment vehicles in real estate managed either by a third-party manager or family office.

    (viii)    <u>Life Insurance - Surrender Value</u>:  Cash surrender value of life insurance policies.

    (ix)    <u>Retirement Accounts</u>:  IRA, 401(k) or other similar type of account.

    (x)    <u>Residential Real Estate</u>:  Direct or indirect ownership in residential real estate held principally for the purpose of inhabitance.

    (xi)    <u>Artwork (including Jewelry)</u>:  Paintings, jewelry, and other collectibles.

    (xii)    <u>Other Investments</u>:  Investments made directly or indirectly that either fall into multiple categories or do not fall into reported categories.

12.    Huron has, also for the purpose of the Raymond-side March 31, 2021 Updated Net Assets Report, placed each liability referenced in the Balance Sheet Information into one of the following categories based on information provided by North Bay:

    (i)    <u>Accounts Payable</u>:  Money owed for services provided.

    (ii)    <u>Short-Term Debt</u>:  Note payable that has a maturity of less than 12 months.

    (iii)    <u>Long-Term Debt</u>:  Note payable that has a maturity of greater than 12 months.

5

    (iv)    <u>Mortgage Debt</u>:  A long-term loan used to finance the purchase of residential real estate.

13.    If a balance sheet line item represented an interest in a holding company, Huron classified the asset consistent with its underlying investment.  For example, several of the Initial Covered Sackler Persons have an interest in a Delaware general partnership that serves as a vehicle for making investments.  This entity holds various private equity, hedge fund, and marketable securities investments.  For presentation purposes, each Initial Covered Sackler Person's interest in this entity was classified consistent with its underlying assets.

14.    It was necessary to create a category for "Other Investments" because the character of certain investments were not able to be easily classified using another enumerated category, particularly in cases where an asset is a holding company that holds many different types of investments (for which investment detail was not readily available) or a service provider such as North Bay.  For each Initial Covered Sackler Person, descriptions for each asset classified as Other Investments are provided throughout.

15.    The value of the net assets as presented in the Raymond-side March 31, 2021 Updated Net Assets Report for each of the Raymond-side Initial Covered Sackler Persons is consistent with the value of its underlying net assets as set forth in the Balance Sheet Information relating to the applicable Initial Covered Sackler Person, with the following exceptions to more appropriately reflect the value of those net assets:

    (i)    The values of assets reflecting direct or indirect ownership in the Debtors were eliminated from the Raymond-side March 31, 2021 Updated Net Assets Report, such as RMLP's indirect interest in the Debtors.

    (ii)    Where a more representative realizable value of an asset was available (e.g., third-party appraisal, tax assessment, oil and gas reserve report, etc.) the balance sheet value of the asset was adjusted to that amount and the adjustment was disclosed in the notes for the relevant Initial Covered Sackler Person.

6

**NAS3038**

# Attestation of Timothy J. Martin

(iii) Illustrative values were substituted for the balance sheet values related to the IACs, all of which IACs are contemplated to be sold under the settlement framework set out in the *Summary Term Sheet with Ad Hoc Committee* filed by the Debtors (the "Proposed Settlement Framework") [Docket No. 257]. An illustrative aggregate value of $4.5 billion is ascribed to the IACs and value is allocated among the various IACs according to their respective management's projections for the years 2020 – 2024 using the methodology described in the "Allocation of Independent Associated Companies" section of the Raymond-side March 31, 2021 Updated Net Assets Report. Applying an illustrative blended tax rate of 33% to the aggregate value of the IACs, the sale of the IACs generates $3 billion in net proceeds, which is the amount guaranteed under the Proposed Settlement Framework. Neither the $4.5 billion aggregate value nor the 33% blended tax rate are projections of actual value or tax liability; they are applied solely for illustrative purposes.[5]

(iv) In instances where the net asset value for an Initial Covered Sackler Person would otherwise be negative (a "Obligor Person"), the net asset value has been adjusted to $0.0. Where an Obligor Person's net asset value was negative in part due to debt owed to other Initial Covered Sackler Persons (each an "Obligee Person"), for the purpose of this presentation, the value of the assets of the Obligee Person are reduced by the amount by which the face amount of the debt in question exceeded the assets of the Obligor Person. This was done to reflect the net recoverable value relating to the debt. For example, if liabilities exceeded assets for an Obligor Person by $50 and the Obligor Person has a $100 note payable to an Obligee Person, the net assets of the Obligor Person would be reflected as $0.0 and the value of the Obligee Person's note receivable would be reduced by $50, thus balancing in the aggregate. In one case, where an Obligor Person had issued both secured and unsecured debt, the unsecured debt was reduced before the secured debt.

(v) Certain of the balance sheets prepared for individual Initial Covered Sackler Persons by North Bay in the ordinary course of business include line items in the asset column relating to trusts that are themselves Initial Covered Sackler Persons. The net asset values of such trusts are not reflected as assets of such individuals, but are instead presented independently, consistent with the presentation of Initial Covered Sackler Persons generally.

(vi) Where a third party provided an estimated value of an asset (such assets were labeled "Third-Party Valued Assets"), the "unrealized gain/loss" refers to the difference between that asset's value and its tax basis of the

---

[5] In many cases, Initial Covered Sackler Person's interests in IAC are held through interests in I-way holding companies. Where an entity reflected on an Initial Covered Sackler Person's balance directly or indirectly held interests in IACs in addition to other assets, North Bay provided to Huron a description of the assets and liabilities not associated with the IACs.

7

---

Third-Party Valued Asset in question. Unrealized gain / loss are estimates provided by North Bay based upon valuation reports and similar information made available at the time of this report. An illustrative 33% blended tax rate (for presentation purposes only) was applied to the estimated unrealized gains to illustrate the hypothetical tax obligation that would result from a sale of such Third-Party Valued Assets.

16.   Although Huron expresses no opinion with respect to the value of any specific asset, Huron believes that with the adjustments made, excluding the value ascribed to the IAC's which was done for illustrative purposes only, the Raymond-side March 31, 2021 Updated Net Assets Report represents a reasonable approach to approximate the total net asset values of the Raymond-side Initial Covered Sackler Persons. The Raymond-side March 31, 2021 Updated Net Assets Report is not intended to estimate the proceeds that would be realized from a forced sale of underlying assets.

17.   To the extent Huron discovers any information that would lead it to conclude that presentation made in the Raymond-side March 31, 2021 Updated Net Assets Report were materially inaccurate as of the date of this attestation, Huron will promptly supplement the Raymond-side March 31, 2021 Updated Net Assets Report accordingly and provide such supplemented report to the parties to the Amended Stipulation.

Timothy J. Martin
Managing Director
Huron Consulting Services LLC

8

**NAS3039**

# Appendix E: Attestation of Stephen A. Ives

NAS3040

# Attestation of Stephen A. Ives

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors. | (Jointly Administered) |

**ATTESTATION OF STEPHEN A. IVES WITH RESPECT TO RAYMOND SACKLER-SIDE MARCH 31, 2021 UPDATED NET ASSETS REPORT**

I, Stephen A. Ives, hereby attest that the following is true to the best of my knowledge, information and belief:

**Background and Qualifications**

1. I am the vice president of North Bay Associates ("North Bay"). North Bay provides tax and accounting services to members of the Raymond Sackler family, trusts established for their benefit and certain entities directly or indirectly owned by such family members or trusts.

2. I supervise all accountants and others who provide services through North Bay Associates. I have served in this capacity for over 25 years.

3. Since 1975, I have been a certified public accountant and I am in good standing with the accounting licensing authority in Oklahoma.

**Huron's Reports**

4. On November 5, 2019, Purdue Pharma L.P. and certain of its affiliates that are debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), the Official Committee of Unsecured Creditors appointed in the Debtors' chapter 11 cases (the "UCC"), Beacon Company and Rosebay Medical Company L.P. entered into that certain

*Amended and Restated Case Stipulation Among the Debtors, the Official Committee of Unsecured Creditors and Certain Related Parties* (the "Amended Stipulation") [Docket No. 518].

5. The Amended Stipulation contemplates that the Shareholder Parties will provide the following to the legal and financial advisors to the Debtors and the UCC:

(i) a report setting forth the net assets of the Initial Covered Sackler Persons,[1] which report will set forth the approximate aggregate value of the assets owned by category (e.g., cash, securities, real estate, private and other investments, etc.) and the approximate liabilities, also by category, and

(ii) an attestation from a responsible person or independent third party as to the accuracy of the report.

*See Amended Stipulation, ¶ 17(a).*

6. Huron Consulting Services, LLC ("Huron") prepared a report with respect to each of the Raymond-side Initial Covered Sackler Persons (the "Raymond-side Net Assets Report"), which was presented to the parties to the Amended Stipulation and certain other invited parties on January 15, 2020. North Bay assisted Huron in the preparation of the Raymond-side Net Assets Report by providing the information on which the Raymond-side Net Assets Report was based. Since the presentation on January 15, 2020, Huron prepared an update to the initial report with respect to each Raymond-side Initial Covered Sackler Person as of September 30, 2020.

7. Huron has prepared a second updated version of the Raymond-side Net Assets Report (the "Raymond-side March 31, 2021 Updated Net Assets Report"). North Bay assisted Huron in the preparation of the Raymond-side March 31, 2021 Updated Net Assets Report by providing the information on which the updates were based, as described herein. This attestation is annexed to the Raymond-side March 31, 2021 Updated Net Assets Report as Appendix E.

---

[1] All capitalized terms used herein that are not otherwise defined shall have the meanings ascribed to them in the Amended Stipulation.

2

NAS3041

# Attestation of Stephen A. Ives

**Information Provided**

8.  In connection with providing the services described above, North Bay, in the ordinary course of business, maintains the books and records of, and prepares monthly financial statements relating to, each of the Initial Covered Sackler Persons set forth on Schedule A attached hereto. Generally, the balance sheets present the assets as follows:

(i)  Cash and Cash Equivalents: Book but reconciled to account statement balances.

(ii)  Accounts Receivable and Prepaid Investments: Expected receivables and amounts paid.

(iii)  Notes Receivable and Loans: Principal amounts outstanding.

(iv)  Marketable Securities and Hedge Funds: Closing prices for publicly-traded securities, valuations provided by fund managers or, in the absence of the foregoing, tax bases (e.g., cost bases).

(v)  Private Equity Investments: Valuations provided by fund managers, when available. Otherwise, tax bases.

(vi)  Real Estate Investments: Valuations provided by fund managers, when available; otherwise, tax bases.

(vii)  Life Insurance – Surrender Value: Statement balances.

(viii)  Retirement Accounts: Statement balances.

(ix)  Residential Real Estate: Tax bases.

(x)  Artwork: Cost.

(xi)  Other Investments: Tax bases.

9.  Generally, the balance sheets present the liabilities as follows:

(i)  Accounts Payable: Actual amounts owed and expected payments.

(ii)  Short-Term Debt: Principal amounts outstanding.

(iii)  Long-Term Debt: Principal amounts outstanding.

(iv)  Mortgage Debt: Principal amounts outstanding.

3

10.  In connection with Huron's preparation of the Raymond-side March 31, 2021 Updated Net Assets Report, North Bay provided to Huron forty-seven balance sheets as of March 31, 2021 relating to the Initial Covered Sackler Persons. These balance sheets were prepared in the ordinary course of business consistent with past practices, i.e., in the manner described in paragraph 8 above. None of the balance sheets provided to Huron were altered for the purposes of the Raymond-side March 31, 2021 Updated Net Assets Report. The balance sheets are the most recent quarterly available as of the date hereof and, to the best of my knowledge, accurately present the assets and liabilities of each of the applicable Initial Covered Sackler Persons as of the above-mentioned date.

11.  To the best of my knowledge, there are no material transactions that have not been properly recorded in the accounting records underlying the balance sheets.

12.  I have no knowledge of any error, fraud or suspected error or fraud where the fraud or error could have a material effect on the balance sheets.

13.  North Bay does not, in the ordinary course of business, prepare balance sheets relating to twelve of the Initial Covered Sackler Persons, which consist of:

(i)  One trust,[2] whose assets are reflected on the balance sheet of its beneficiaries;

(ii)  Four trusts,[3] whose only assets are remainder interests in residential real estate;

---

[2]  This Initial Covered Sackler Person is: the RSS Revocable Pourover Trust.

[3]  These four Initial Covered Sackler Persons are: the Trust under Declaration of Trust dated August 23, 1988 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated December 17, 1991 f/b/o Richard S. Sackler and Issue of Richard S. Sackler; Trust under Declaration of Trust dated August 23, 1988 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler; and Trust under Declaration of Trust dated December 17, 1991 f/b/o Jonathan D. Sackler and Issue of Jonathan D. Sackler.

4

NAS3042

(iii) Six trusts,[4] whose only assets are interests in companies that serve as trustees for other Raymond-side trusts, the books and records of which companies are maintained by a Wyoming service company;

(iv) One trust,[5] whose only assets are real estate investments.

14. In connection with Huron's preparation of the Raymond-side March 31, 2021 Updated Net Assets Report, North Bay collected and provided to Huron, in addition to the balance sheets described at paragraph 10 above, balance sheets prepared by third persons, as well as valuation assessments from public bodies.

15. In connection with Huron's preparation of the Raymond-side March 31, 2021 Updated Net Assets Report, North Bay also provided Huron with the following information prepared by a third party relating to the Initial Covered Sackler Persons: The summarized results of a third party engineer's petroleum reserve report as of March 2021.

16. North Bay has provided Huron all information, such as financial records and related data, which Huron requested in connection with the preparation of the Raymond-side March 31, 2021 Updated Net Assets Report.

17. This attestation is limited to the matters expressly set forth herein. I express no opinion as to the fair market value of the assets or the value of the proceeds that may be derived from the forced sale of the assets.

Stephen A. Ives

---

[4] These six Initial Covered Sackler Persons are: the RSS Fiduciary Management Trust, Crystal Trust, MCM Fiduciary Management Trust, Data Trust, Cornice Trust and the Cedar Cliff Trust.

[5] This Initial Covered Sackler Person is: the DABB Trust.

5

NAS3043

176

**Schedule A**

- Richard Sackler
- RSS Revocable Pourover Trust
- Trust under agreement dated December 3, 1979 f/b/o Richard S. Sackler ("RSS BRP Trust")
- Trust under agreement dated June 16, 1980 f/b/o Richard S. Sackler ("RSS FPC Trust")
- Trust under agreement dated December 23, 1980 f/b/o Richard S. Sackler ("RSS XPC Trust")
- Trust Agreement dated August 29, 2003 f/b/o Issue of Richard S. Sackler
- Richard S. Sackler Trust U/A 9/30/04
- RSS Fiduciary Management Trust
- Jonathan Sackler
- JDS Revocable Pourover Trust
- Trust under agreement dated December 3, 1979 f/b/o Jonathan D. Sackler ("JDS BRP Trust")
- Trust under agreement dated June 16, 1980 f/b/o Jonathan D. Sackler ("JDS FPC Trust")
- Trust under agreement dated December 23, 1980 f/b/o Jonathan D. Sackler ("JDS XPC Trust")
- Trust Agreement dated August 29, 2003 f/b/o Issue of Jonathan D. Sackler
- David Sackler
- Richard S. Sackler Trust f/b/o David A. Sackler 3/8/90
- The Estate of Beverly Sackler (d. October 14, 2019)
- Beverly Sackler Revocable Trust
- Trust U/A fbo Beverly Sackler ("74 Trust")
- Raymond R. Sackler Trust 1 dtd 12/23/89 ("1A Trust")
- Raymond R. Sackler Trust 2 dtd 12/23/89 ("2A Trust")
- Raymond R. Sackler Trust 1B dtd 12/23/89 ("1B Trust")
- Raymond R. Sackler Trust 2B dtd 12/23/89 ("2B Trust")
- Trust B U/A fbo Beverly Sackler ("74B Trust")
- The 1974 Irrevocable Investment Trust ('Investment Trust")
- 1974 Irrevocable Trust fbo BS and RSS ("74-AR Trust")
- 1974 Irrevocable Trust fbo BS and JDS ("74-AJ Trust")
- AR Irrevocable Trust
- AJ Irrevocable Trust
- Beverly Sackler Trust 1 f/b/o David A. Sackler 12/20/1989 ("Gallo Trust 1")
- Beverly Sackler Trust 2 f/b/o David A. Sackler 12/20/1989 ("Gallo Trust 2")
- Beverly Sackler Trust 3 f/b/o David A. Sackler 12/20/1989 ("Gallo Trust 3")
- Richard S. Sackler Life Insurance Trust
- Jonathan D. Sackler Life Insurance Trust

- Irrevocable Trust under Declaration dated as of September 19, 1995 f/b/o Issue of Richard S. Sackler
- David A. Sackler 2012 Trust
- Irrevocable Trust under Declaration dated as of April 25, 1991
- Irrevocable Trust under Declaration dated as of August 25, 1992
- The RSS 2012 Family Trust
- Raymond R. Sackler Credit Shelter Trust u/a 3/29/2012
- Raymond R. Sackler GST Exempt Marital Trust u/a 3/29/2012
- Rosebay Medical Company L.P.
- Rosebay Medical Company, Inc
- Linarite Holdings LLC
- Perthlite Holdings LLC
- Moonstone Holdings LLC
- Roselite Holdings LLC

2

NAS3044

# Exhibit I

NAS3045

**Exhibit I**
**ADDITIONAL MATERIALS CONSIDERED – AMENDED REPORT**

**Additional Files**

1. 74A BS 3-31-21.pdf
2. 74AJDS BS 3-31-21.pdf
3. 74ARSS BS 3-31-21.pdf
4. 74B BS 3-31-21.pdf
5. 74INVTR BS 3-31-21.pdf
6. AJIRRTR BS 3-31-21.pdf
7. ARIRRTR BS 3-31-21.pdf
8. BRPA BS 3-31-21.pdf
9. BRPB BS 3-31-21.pdf
10. BS ESTATE BS 3-31-21.pdf
11. BS REV TRUST BS 3-31-21.pdf
12. DAS BS 3-31-21.pdf
13. DAS1 BS 3-31-21.pdf
14. DAS12 BS 3-31-21.pdf
15. DAS2 BS 3-31-21.pdf
16. DAS3 BS 3-31-21.pdf
17. DASM BS 3-31-21.pdf
18. FPCA BS 3-31-21.pdf
19. FPCB BS 3-31-21.pdf
20. JDS ESTATE BS 3-31-21.pdf
21. JDS POUROVER TRUST BS 3-31-21.pdf
22. JDS0702 BS 3-31-21.pdf
23. JDS0803 BS 3-31-21.pdf
24. LHL BS 3-31-21.pdf
25. MHL BS 3-31-21.pdf
26. PHL BS 3-31-21.pdf
27. RLHL BS 3-31-21.pdf
28. RMI BS 3-31-21.pdf
29. RML BS 3-31-21.pdf
30. RRS CredShelter Tr BS 3-31-21.pdf
31. RRS GST TR BS 3-31-21.pdf
32. RRS189A BS 3-31-21.pdf
33. RRS189B BS 3-31-21.pdf
34. RRS195 BS 3-31-21.pdf
35. RRS289A BS 3-31-21.pdf
36. RRS289B BS 3-31-21.pdf
37. RSS BS 3-31-21.pdf
38. RSS0702 BS 3-31-21.pdf
39. RSS0803 BS 3-31-21.pdf
40. RSS0892 BS 3-31-21.pdf
41. RSS2012 BS 3-31-21.pdf
42. RSSFMT BS 3-31-21.pdf
43. RSST904 BS 3-31-21.pdf
44. TR42591 BS 3-31-21.pdf
45. XPCA BS 3-31-21.pdf
46. XPCB BS 3-31-21.pdf
47. (RSS Revocable) [External] RE: March 31, 2021 Net Assets Report Update email
48. DABBTR BS 3-31-21.pdf
49. (Cornice & Data) [External] RE: March 31, 2021 Net Assets Report Update
50. 2021.03.31 - Crystal Trust - Q1 BS.pdf
51. 2021.03.31 - Cedar Cliff Tr - Q1 BS.pdf
52. 2021.03.31 - MCM Trust - Q1 BS.pdf
53. ANK_BS 3-31-21.pdf
54. CRC_BS 3-31-21.pdf
55. CSI_BS 3-31-21.pdf
56. CSL_BS 3-31-21.pdf
57. EHI BS 3-31-21.pdf
58. HPR_BS 3-31-21.pdf
59. HRDI_BS 3-31-21.pdf
60. HRP_BS 3-31-21.pdf
61. LOD_BS 3-31-21.pdf
62. Mallard BS - Mar21.pdf
63. MIL_BS 3-31-21.pdf
64. PPC_BS 3-31-21.pdf
65. RBMC_BS 3-31-21.pdf
66. SLA_BS 3-31-21.pdf
67. STP_BS 3-31-21.pdf
68. TRA_BS 3-31-21.pdf
69. TRIH_BS 3-31-21.pdf
70. Updated Asset Valuations.xlsx
71. JDS Tangible Personal Property Final Estate Tax Numbers.xlsx
72. 15DEC20 Beverly Sackler Estate Tax Appraisal_Final.pdf
73. 29April2021 EO Jonathan Sackler Estate Tax Appraisal_FINAL.pdf
74. December 2020 Apartment Appraisal.pdf
75. LETTERHEAD Quote Field Point Greenwich 4-21.pdf
76. 20110904.PDF
77. 20110904A.PDF
78. 20110904B.PDF

## Exhibit I
## ADDITIONAL MATERIALS CONSIDERED – AMENDED REPORT

79. 20110904C.PDF
80. 74AJ - Assignment and Assumption Agreement (6.8.2019).pdf
81. 74AR Trust - Assignment and Assumption Agreement (7.23.2019).pdf
82. CPC GROUP RESERVES AS OF 3-31-21 (HURON).xlsx
83. 74A Unrealized Report 3-31-21.xlsx
84. 74AJDS Unrealized Report 3-31-21.xlsx
85. 74ARSS Unrealized Report 3-31-21.xlsx
86. 74B Unrealized Report 3-31-21.xlsx
87. 74INVTR Unrealized Report 3-31-21.xlsx
88. AJIRRTR Unrealized Report 3-31-21.xlsx
89. ARIRRTR Unrealized Report 3-31-21.xlsx
90. BS REV TR Unrealized Report 3-31-21.xlsx
91. DAS Unrealized Report 3-31-21.xlsx
92. JDSPOUR TR Unrealized Report 3-31-21.xlsx
93. RRS MARITAL TR Unrealized Report 3-31-21.xlsx
94. RRS189A Unrealized Report 3-31-21.xlsx
95. RRS289A Unrealized Report 3-31-21.xlsx
96. RSS 8-25-92 Unrealized Report 3-31-21.xlsx
97. RSS Unrealized Report 3-31-21.xlsx
98. RSS2012 Unrealized Report 3-31-21.xlsx
99. IAC P&L BUDGET 18.12.19.xlsx

Gerard Uzzi
Alexander B. Lees
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Gregory P. Joseph
Mara Leventhal
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone: (212) 407-1200
Facsimile: (212) 407-1280

*Counsel for the Raymond Sackler Family*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | Jointly Administered |

**STATEMENT OF THE RAYMOND SACKLER FAMILY**
**IN SUPPORT OF CONFIRMATION OF DEBTORS' SIXTH AMENDED**
**PLAN OF REORGANIZATION AND IN REPLY TO PLAN OBJECTIONS**

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. ("**PPLP**") (7484), Purdue Pharma Inc. ("**PPI**") (7486) (collectively, PPLP and PPI are "**Purdue**"), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**NAS3048**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ vi

PRELIMINARY STATEMENT ..................................................................................... 2

EXECUTIVE SUMMARY ........................................................................................... 4

2020 AND 2007 DOJ RESOLUTIONS ...................................................................... 5

THE NON-ESTATE CLAIMS ..................................................................................... 5

ESTATE CLAIMS .................................................................................................... 8

THE SHAREHOLDER SETTLEMENT IS IN THE BEST INTERESTS OF THE ESTATE ............... 10

    I.    THE 2020 GUILTY PLEA AND CIVIL SETTLEMENTS DO NOT SUPPORT ANY CLAIMS .... 11

        A.    The Plea Agreement ........................................................................ 11

        B.    Purdue's 2020 Civil Settlement Agreement ...................................... 14

    II.    2007 FEDERAL AND STATE SETTLEMENTS & RELEASES ................................ 15

        A.    2007 Guilty Plea and Federal Settlement .......................................... 15

        B.    76 Settlements with the States: 27 Consent Judgments, 49 Medicaid ............... 16

ARGUMENT ......................................................................................................... 16

    I.    THE NON-ESTATE CLAIMS ARE FATALLY INFIRM ....................................... 18

        A.    The Former Directors Acted in Good Faith without Culpable Scienter ............ 18

        B.    The Former Directors Did Not Participate in Any Deceptive Marketing .......... 21

            1.    No Former Directors Participated in Purdue's Marketing ...................... 21

            2.    Purdue's Post-2007 Marketing was Not Deceptive .................................. 22

        C.    The Former Directors Did Not Participate in PPLP's Anti-Diversion Efforts ... 26

        D.    Public Nuisance Claims Fail Legally and Factually ........................................... 28

NAS3049

1.    The Public Nuisance Claims Fail as a Matter of Law ...............................28

2.    The Public Nuisance Claims Are Factually Unsupported ........................29

E.    Other Fatal Defects in The Non-Estate Claims.....................................30

1.    There Is No Proximate Causal Link between the Former Directors' Conduct and the Alleged Injuries ..............................................30

    a.    Causation Was Found Lacking in Litigation against Purdue Based on Misconduct Admitted in 2007 Guilty Plea ......................................32

    b.    Claimants Cannot Show That Purdue's Marketing Statements Caused Doctors to Write Medically Unnecessary Prescriptions ......32

    c.    OxyContin Has Always Had a Small Market Share—And It Has Been in Decline for over 15 Years....................................................34

    d.    Widespread Confusion between OxyContin and Oxycodone ..........35

    e.    OxyContin Did Not Trigger the Opioid Crisis ................................36

    f.    For a Decade, the Opioid Crisis Has Been Driven by Illicit Drugs ..36

    g.    Intervening Criminal Conduct Breaks the Causal Chain ................39

    h.    Addiction and Abuse Rarely Stem from Medically-Prescribed Opioid Use ....................................................................................39

    i.    Many Factors Cause the Alleged Injuries.........................................40

    j.    Conflation of All Manufacturers' Opioids........................................43

    k.    Continuing Reimbursement of Opioid Prescriptions........................44

    l.    Claims for Abatement Costs .............................................................44

2.    Federal Law Preempts Attacks on Marketing Consistent with the FDA-Approved Label ...................................................................45

    a.    Federal Law Preempts Claims Based on Statements in the FDA-Approved Label ...............................................................................46

    b.    Federal Law Preempts Alleged Failure-to-Warn Claims..................47

NAS3050

3. Personal Jurisdiction over the Former Directors Is Lacking in Many of the Non-Bankruptcy Litigations, Which Will Revive Absent Settlement.......49

a. Supreme Court Personal Jurisdiction Jurisprudence Requires Substantial Suit-Related Contacts in the Forum ..............................49

b. Unsustainable Jurisdictional Theories ..............................................51

i. No Jurisdiction Based on Purdue's Conduct ...........................51

ii. No Jurisdiction over Former Directors Based on Assertions They Oversaw Purdue's Marketing ..........................................51

iii. No Jurisdiction over Former Directors Based on Purdue's National Marketing .................................................................52

iv. No Jurisdiction Based on Agency Theory ..............................53

v. No Jurisdiction Based on Failure to Act ................................54

4. Release and Untimeliness Defenses..........................................................54

a. All Pre-2007 Conduct Has Been Released by the States .................54

b. The Discovery Rule Is Inapplicable..................................................54

II. THE ESTATE CLAIMS ARE SERIOUSLY DEFICIENT .........................................................56

A. Fraudulent Transfer Claims ................................................................................56

1. No Distribution Was Made with Actual Intent to Defraud Creditors........57

a. No Meaningful Litigation ..................................................................57

b. The Board Understood Purdue Was Operating in Compliance with Law ............................................................................................59

c. Purdue Was Hugely Profitable with Large Cash Reserves and No Debt.................................................................................................59

d. Board Documents Confirm the Board Did Not Expect to Face Judgments Purdue Could Not Pay ....................................................60

e. Side B Directors Were Intent on Keeping Money in Purdue............61

NAS3051

f.  Far from Being Stripped of Its Assets, Purdue Invested Billions of Dollars in Research and Development after 2007 ............................61

g.  There Is No Evidence That the Board Harbored Litigation Concerns.........................................................................61

h.  No Badges of Fraud ......................................................................61

2.  Constructive Fraudulent Transfer Claims Are Not Viable .......................64

a.  Purdue Was Solvent under the Balance Sheet Test in 2008-16........64

i.  The Pending Opioid Actions Do Not Support a Retroactive Finding of Insolvency ............................................................65

ii.  Purdue's 2020 Guilty Plea and Civil Settlement Do Not Support a Retroactive Finding of Insolvency ..........................68

b.  Purdue Was Solvent under the Cash Flow Test in 2008-16 ............69

c.  Purdue Satisfied the Capital Adequacy Test in 2008-16 .................70

3.  The Tax Distributions Were Not Fraudulent Transfers ............................71

a.  PPLP Received Reasonably Equivalent Value for the Tax Distributions......................................................................71

b.  Avoidance of the Tax Distributions That Were Used to Pay Taxes Would Constitute a Punitive Double Recovery ...............................72

B.  Fiduciary Duty Claims................................................................................72

1.  Under Delaware Law, Directors of a Corporate General Partner Owe Only Limited Fiduciary Duties to the Limited Partnership ................................74

2.  If *Caremark* Applied, the Former Directors Satisfied Their Duties ..........78

C.  Veil-Piercing Claims...................................................................................81

1.  There Is No Basis to Pierce the Corporate Form of PPI ...........................83

a.  No One Person or Entity Dominated PPI .........................................83

b.  PPI's Corporate Form Was Not Abused ...........................................85

2.  There Is No Basis to Pierce the Corporate Form above PPI.....................87

iv

NAS3052

|  |  | 3. | The Single Enterprise Theory Fails on the Facts | 88 |
|  | D. | Unjust Enrichment | | 88 |
|  |  | 1. | Unjust Enrichment Claims Duplicate Other Estate Claims | 89 |
|  |  | 2. | Any Unjust Enrichment Recovery Would Be Limited to the Post-September 15, 2016 Time Period | 91 |
| III. | THE SHAREHOLDER SETTLEMENT IS IN THE BEST INTERESTS OF THE CREDITORS | | | 92 |
|  | A. | Immense Value Conferred by Shareholder Settlement | | 94 |
|  | B. | Neither the Estate nor Any Creditor Can Reasonably Expect to Recover More in Litigation | | 96 |
|  | C. | The Shareholder Settlement Satisfies *Iridium* | | 102 |
|  | D. | The Release of Non-Estate Claims Is Appropriate Under *Metromedia* | | 104 |
| IV. | FOUNDATION | | | 107 |
|  | Relinquishment of Control of the Raymond and Beverly Sackler Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences | | | 107 |
| V. | SIDE B'S WEBSITE IS NOT AN IMPROPER SOLICITATION | | | 111 |
| CONCLUSION | | | | 113 |
| RESERVATION OF RIGHTS | | | | 113 |

NAS3053

<u>T</u>ABLE OF <u>A</u>UTHORITIES

**Page(s)**

**Cases**

*2009 Caiola Family Trust v. PWA, LLC*,
    2015 WL 6007596 (Del. Ch. Oct. 14, 2015) ................................ 76-77 & n.156, 77 n.159

*Access Point Med., LLC v Mandell*,
    106 A.D.3d 40 (1st Dep't 2013) ............................................................92 n.193

*Am. Lecithin Co. v. Rebmann*,
    2017 WL 4402535 (S.D.N.Y. Sept. 30, 2017).......................................83 n.171

*Amphibious Partners LLC v. Redman*,
    389 F. App'x 762 (10th Cir. 2010) ...............................................................67

*Art Capital Bermuda Ltd. v. Bank of N.T. Butterfield & Son. Ltd.*,
    169 A.D.3d 426 (1st Dep't 2019) ..........................................................87 n.178

*Bank of Am. Corp. v. City of Miami*,
    137 S. Ct. 1296 (2017).......................................................................................31

*Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*,
    2009 WL 1124451 (Del. Ch. Apr. 20, 2009) .........................................76 n.157

*Bd. of Managers v. Gateway IV LLC*,
    169 A.D.3d 617 (1st Dep't 2019) .........................................................63 n.121

*Behrmann v. Brandt*,
    2020 WL 4432536 (D. Del. July 31, 2020) ..............................................80, 81

*Beijing Zhong Xian Wei Ye Stainless Decoration Ctr. v. Guo*,
    2020 WL 2404938 (Sup. Ct. N.Y. Cnty. May 7, 2020).........................91 n.189

*Bernstein v. Starrett City, Inc.*,
    303 A.D.2d 530 (2d Dep't 2003) ..........................................................21 n.12

*Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*,
    413 F. Supp. 2d 410 (E.D. Pa. 2005) ..................................................53 n.107

*Bigio v. Coca-Cola Co.*,
    675 F.3d 163 (2d Cir. 2012)....................................................................91

**NAS3054**

*Bilinski v. Keith Haring Found., Inc.*,
  96 F. Supp. 3d 35 (S.D.N.Y. 2015),
  *aff'd in relevant part*, 632 F. App'x 637 (2d Cir. 2015) ...........................30 n.38

*Billy v. Consol. Mach. Tool Corp.*,
  51 N.Y.2d 152 (1980) ........................................................................85 n.172

*BNSF Ry. Co. v. Tyrrell*,
  137 S. Ct. 1549 (2017) ................................................................. 49-50 n.104

*Bodie v. Purdue Pharma Co.*,
  236 F. App'x 511 (11th Cir. 2007) ............................................32 n.40, 34 n.45

*Boysaw v. Purdue Pharma*,
  2008 WL 4452650 (W.D. Va. Sept. 30, 2008),
  *aff'd*, 320 F. App'x 178 (4th Cir. 2009).......................................................32 n.40

*Bristol-Myers Squibb Co. v. Superior Court of Cal.*,
  137 S. Ct. 1773 (2017) .....................................................................49 n.104, 50

*Buffalo Forge Co. v. Ogden Corp.*,
  555 F. Supp. 892 (W.D.N.Y. 1983),
  *aff'd*, 717 F.2d 757 (2d Cir. 1983) ........................................................78 n.161

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp*,
  273 F.3d 536 (3d Cir. 2001)...................................................................28 n.28

*Case v. Fargnoli*,
  182 Misc. 2d 996 (Sup. Ct. Tompkins Cnty. 1999)....................................63 n.124

*Celtig, LLC v. Patey*,
  347 F. Supp. 3d 976 (D. Utah 2018) .......................................................51 n.106

*Century Glove, Inc. v. First Am. Bank of N.Y.*,
  860 F.2d 94 (3d Cir. 1988)...................................................................112 n.244

*Chlebda v. H. E. Fortna & Bro., Inc.*,
  609 F.2d 1022 (1st Cir. 1979)................................................................54 n.111

*City of Chicago v. Beretta U.S.A. Corp.*,
  213 Ill.2d 351 (2004) ......................................... 28 n.28, 29 n.34, 45 & n.89

*City of Everett v. Purdue Pharma L.P.*,
  2017 WL 4236062 (W.D. Wash. Sept. 25, 2017)....................................28 n.27

NAS3055

*City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*,
  719 F.2d 322 (9th Cir. 1983) ............................................45 n.89

*Coast to Coast Energy, Inc. v. Gasarch*,
  149 A.D.3d 485 (1st Dep't 2017) ...............................................52

*Cofield v. Lead Indus. Ass'n, Inc.*,
  2000 WL 34292681 (D. Md. Aug. 17, 2000) ...........................29 n.31

*Cornelius v. Cain*,
  2004 WL 48102 (Fl. Cir. Ct. Broward Cnty. Jan. 5, 2004) .........32 n.40

*Corsello v. Verizon N.Y., Inc.*,
  18 N.Y.3d 777 (2012) ....................................................90 n.188

*Corwin v. Swanson*,
  2010 WL 11598013 (C.D. Cal. Apr. 27, 2010) ......................53 n.107

*Craig v. Lake Asbestos of Quebec, Ltd.*,
  843 F.2d 145 (3d Cir. 1988)............................................83 n.171

*Crowell v. Randell, Jr.*,
  35 U.S. 368 (1836)........................................................53 n.108

*CSX Transp., Inc. v. Filco Carting Corp.*,
  2011 WL 2713487 (E.D.N.Y. July 11, 2011) ........................86 n.175

*Daimler AG v. Bauman*,
  571 U.S. 117 (2014)......................................................50 n.104

*Delman v. J. Crew Grp., Inc.*,
  2017 WL 3048657 (C.D. Cal. May 15, 2017) ...............................52

*Dennis v. JPMorgan Chase & Co.*,
  342 F. Supp. 3d 404 (S.D.N.Y. 2018)..................................74 n.151

*Diamond v. Friedman (In re Century City Doctors Hospital, LLC)*,
  466 B.R. 1 (Bankr. C.D. Cal. 2012)..................................101 n.220

*District of Columbia v. Air Fla.*,
  750 F.2d 1077 (D.C. Cir. 1984) ........................................45 n.90

*D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*,
  566 F.3d 94 (3d Cir. 2009)..............................................53 n.107

NAS3056

*Dolin v. GlaxoSmithKline LLC*,
    901 F.3d 803 (7th Cir. 2018),
    *cert. denied*, 139 S. Ct. 2636 (2019) ......................................................49 n.102

*E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*,
    66 A.D.3d 122 (2d Dep't 2009) ............................................................83 n.168

*E.I. du Pont Nemours & Co. v. Agfa-Gavaert NV*,
    335 F. Supp. 3d 657 (D. Del. 2018).....................................................86 n.177

*English v. Gen. Elec. Co.*,
    496 U.S. 72 (1990)..................................................................................45 n.93

*Epiphany Cmty. Nursery Sch. v. Levey*,
    2017 WL 3386267 (Sup. Ct. N.Y. Cnty. Aug. 7, 2017),
    *aff'd*, 94 N.Y.S.3d 1 (1st Dep't 2019)..................................................78 n.160

*Estate of Goldberg v. Goss-Jewett Co., Inc.*,
    2019 WL 4221398 (C.D. Cal. June 4, 2019) ........................................30 n.36

*Ex parte Abbott Laboratories*,
    2021 WL 2176897 (Ala. May 28, 2021).................................................55 n.113

*Fannin v. UMTH Development, L.P.*,
    2020 WL 4384230 (Del. Ch. July 31, 2020).........................................76 n.156

*Fasugbe v. Willms*,
    2011 WL 3667440 (E.D. Cal. Aug. 22, 2011) ..............................................52

*Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.*,
    17 F.3d 1302 (10th Cir. 1994) .....................................................................53

*Feeley v. NHAOCG, LLC*,
    62 A.3d 649 (Del. Ch. 2012)....................................................... 78 nn.158-159

*Flocco v. State Farm Mut. Auto. Ins. Co.*,
    752 A.2d 147 (D.C. Cir. 2000) ....................................................................52

*Foister v. Purdue Pharma, L.P.*,
    295 F. Supp. 2d 693 (E.D. Ky. 2003) ...................................................32 n.40

*Floyd v. Feygin*,
    2018 WL 6528728 (Sup. Ct. Kings Cnty. Dec. 6, 2018).........................39 n.66

*Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021)..................................................................49 n.104, 50

ix

**NAS3057**

*Freeman v. Williamson*,
    383 Ill. App. 3d 933 (2008) ...............................................................101 n.220

*FSP, Inc. v. Société Générale*,
    2005 WL 475986 (S.D.N.Y. Feb. 28, 2005)........................................65 n.126

*Gartner v. Snyder*,
    607 F.2d 582 (2d Cir. 1979)...............................................................83 n.171

*Gerstle v. Nat'l Credit Adjusters, LLC*,
    76 F. Supp. 3d 503 (S.D.N.Y. 2015)....................................................52, 54

*Glucksman v. Halsey Drug Co.*,
    160 A.D.2d 305 (1st Dep't 1990) .........................................................33 n.44

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011)...........................................................50 & n.104

*Grace Plaza of Great Neck, Inc. v. Heitzler*,
    2 A.D.3d 780 (2d Dep't 2003) ............................................................69 n.133

*Grewal v. Cuneo*,
    2015 WL 4103660 (S.D.N.Y. July 7, 2015),
    *aff'd*, 2020 WL 897410 (2d Cir. Feb. 25, 2020) ...................................75 n.152

*Grewal v. Purdue Pharma L.P.*,
    2018 WL 4829660 (N.J. Super. Ct. Oct. 2, 2018) ....................................28 n.27

*Grika v McGraw*,
    2016 WL 8716417 (Sup. Ct. N.Y. Cnty. Dec. 21, 2016),
    *aff'd*, 161 A.D.3d 450 (1st Dep't 2018)................................................78 n.160

*Grynberg v. Eni S.p.A.*,
    2007 WL 2584727 (S.D.N.Y. Sept. 5, 2007).........................................92 n.192

*Harris v. Purdue Pharma, L.P.*,
    218 F.R.D. 590 (S.D. Ohio 2003) .........................................................32 n.40

*Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp., Inc.*,
    299 F. Supp. 2d 505 (D. Md. 2004) .....................................................51 n.106

*Hawk Mountain LLC v. Ram Capital Grp. LLC*,
    689 F. App'x 703 (3d Cir. 2017) .........................................................55 n.113

*HOMF II Inv. Corp. v. Altenberg*,
    2020 WL 2529806 (Del. Ch. May 19, 2020).........................................77 n.159

x

*Ingrami v. Rovner*,
  45 A.D.3d 806 (2d Dep't 2007) ............................................................92 n.192

*Innovative Custom Brands, Inc. v. Minor*,
  2016 WL 308805 (S.D.N.Y. Jan. 25, 2016) ...................................69, 70 n.135

*In re Anderson*,
  623 B.R. 199 (Bankr. D. Conn. 2020) ..................................................62 n.119

*In re Bergman*,
  293 B.R. 580 (Bankr. W.D.N.Y. 2003) .................................................70 n.134

*In re Boston Generating LLC*,
  617 B.R. 442 (Bankr. S.D.N.Y. 2020) ........................................ 90-91, 92 n.192

*In re Cal. Fid., Inc.*,
  198 B.R. 567 (B.A.P. 9th Cir. 1996).....................................................112 n.246

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996)................................................................... *passim*

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
  779 F.3d 34 (1st Cir. 2015)............................................. 46 n.96, 47 & n.99, 48, 49 n.102

*In re Charter Comm'ns*,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009) .................................................104 n.235

*In re Chin*,
  492 B.R. 117 (Bankr. E.D.N.Y. 2013)...................................................62 n.116

*In re Ditech Holding Corp.*,
  606 B.R. 544 (Bankr. S.D.N.Y. 2019) .....................................................17 n.6

*In re Estate of Sanders*,
  602 N.Y.S.2d 742 (N.Y. Sur. Ct. 1991)................................................98 n.211

*In re Extended Stay, Inc.*,
  2020 Bankr. LEXIS 2128 (Bankr. S.D.N.Y. Aug. 20, 2020) ................90 n.186

*In re FAH Liquidating Corp.*,
  572 B.R. 117 (Bankr. D. Del. 2017) ........................................... 89 nn.184-185

*In re Gaston & Snow*,
  243 F.3d 599 (2d Cir. 2001)..........................................................................74

*In re Gilbert*,
  104 B.R. 206 (Bankr. W.D. Mo. 1989)................................................112 n.246

NAS3059

*In re Global Vision Prods., Inc.*,
    2009 WL 2170253 (S.D.N.Y. July 14, 2009) .......................................104 n.234

*In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*,
    2006 WL 763212 (D. Minn. Mar. 24, 2006) ...........................................65 n.126

*In re Gulf Fleet Holdings, Inc.*,
    491 B.R. 747 (Bankr. W.D. La. 2013) ...................................87 n.181, 88 n.182

*In re Heritage Org. LLC*,
    413 B.R. 438 (Bankr. N.D. Tex. 2009)..................... 82 n.165, 87 nn.179 & 181, 88 n.182

*In re Homesteads Cmty. at Newtown, LLC*,
    526 B.R. 1 (Bankr. D. Conn. 2014),
    *aff'd*, 608 F. App'x 40 (2d Cir. 2015)..............................................................17

*In re Hydrogen, L.L.C.*,
    431 B.R. 337 (Bankr. S.D.N.Y. 2010) ..................................................75 n.154

*In re Iridium Operating LLC*,
    478 F.3d 452 (2d Cir. 2007).................................................................17, 103

*In re Iridium Operating LLC*,
    373 B.R. 283 (Bankr. S.D.N.Y. 2007) .............................................64, 68 n.129

*In re Jesup & Lamont, Inc.*,
    507 B.R. 452 (Bankr. S.D.N.Y. 2014),
    *aff'd*, 585 B.R. 41 (Bankr. S.D.N.Y. 2018) ..........................................71 n.138

*In re Keeley & Grabanski Land P'ship*,
    531 B.R. 771 (B.A.P. 8th Cir. 2015),
    *aff'd*, 832 F.3d 853 (8th. Cir. 2016)....................................................72 n.140

*In re Kupersmith*,
    614 B.R. 428 (Bankr. D. Conn. 2020) ..................................................62 n.117

*In re Lead Paint Litig.*,
    191 N.J. 405 (2007) ............................................................................28 n.28

*In re Lehman Bros. Holdings Inc.*,
    2017 WL 2889658 (Bankr. S.D.N.Y. Jul. 2017) ..................................103 n.230

*In re LXEng LLC*,
    607 B.R. 67 (Bankr. D. Conn. 2019) ...................................................64 n.125

NAS3060

*In re Lyondell Chem. Co.*,
    2016 WL 74649 (Bankr. S.D.N.Y. Jan. 4, 2016) ...................................86 n.176

*In re Lyondell Chem. Co.*,
    567 B.R. 55 (Bankr. S.D.N.Y. 2017) .......................................................17 n.6

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005)....................................... 94, 104 & n.235, 105, 107

*In re Motors Liquidation Co.*,
    555 B.R. 355 (Bankr. S.D.N.Y. 2016) ........................................................103

*In re MS Angeln GmbH & Co. KG*,
    2012 WL 1080300 (S.D.N.Y. Mar. 29, 2012),
    *aff'd*, 510 F. App'x 90 (2d Cir. 2013) ...................................................75 n.152

*In re Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
    975 F. Supp. 2d 392 (S.D.N.Y. 2013) ...................................................83 n.169

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015) ...................................................104 n.231

*In re Nirvana Rest.*,
    337 B.R. 495 (Bankr. S.D.N.Y. 2006) ...................................................69 n.133

*In re Northlake Foods, Inc.*,
    715 F.3d 1251 (11th Cir. 2013) ...........................................................72 n.139

*In re Opus E., LLC*,
    528 B.R. 30 (Bankr. D. Del. Mar. 23, 2015) ....................................................87

*In re Pers. Commc'n Devices, LLC*,
    528 B.R. 229 (Bankr. E.D.N.Y. 2015)...................................................90 n.186

*In re Purdue Pharma*,
    619 B.R. 38 (Bankr. S.D.N.Y. 2020) ...................................................95 n.202

*In re Refco Inc.*,
    461 B.R. 181 (Bankr. S.D.N.Y.2011) ...................................................89 n.184

*In re Saba Enters., Inc.*,
    421 B.R. 626 (Bankr. S.D.N.Y. 2009) ...................................................82 n.166

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016)............................103 n.229, 104 n.235, 105 n.236

NAS3061

*In re SAIC Inc. Derivative Litig.*,
948 F. Supp. 2d 366 (S.D.N.Y.2013),
*aff'd. sub nom. Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014)............................79

*In re Snyder*,
51 B.R. 432 (Bankr. D. Utah 1985) .................................................112 n. 245

*In re Stanton*,
457 B.R. 80 (Bankr. D. Nev. 2011) ...................................................62 n.116

*In re Steans Holdings*,
607 B.R. 781 (Bankr. S.D.N.Y. 2019) ...............................................105 n.236

*In re Sterman*,
594 B.R. 229 (Bankr. S.D.N.Y. 2018) ................................................71 n.137

*In re Stillwater Capital Partners Inc. Litig.*,
853 F. Supp. 2d 441 (S.D.N.Y. 2012)........................................ 74 nn.150-151

*In re SunEdison, Inc.*,
576 B.R. 453 (Bankr. S.D.N.Y. 2017) .....................................................17 n.6

*In re Ticketplanet.com*,
313 B.R. 46 (Bankr. S.D.N.Y. 2004)...................................................75 n.154

*In re Tronox Inc.*,
464 B.R. 606 (Bankr. S.D.N.Y. 2012) .................................................72 n.140

*In re USACafes, L.P. Litig.*,
600 A.2d 43 (Del. Ch. 1991)....................................... 75, 76, 77 & n.159

*In re Waterford Wedgwood USA, Inc.*,
500 B.R. 371 (Bankr. S.D.N.Y. 2013) .................................................57 n.114

*In re WorldCom, Inc.*,
2003 Bankr. LEXIS 2192 (Bankr. S.D.N.Y. May 16, 2003).........................112

*In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*,
2010 WL 3119499 (S.D. Ill. Aug 5, 2010) ............................................34 n.45

*Invs. Liquidated Tr. v. Dimenna*,
2019 WL 7050139 (D. Conn. Dec. 23, 2019).........................................90 n.187

*Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*,
585 F. Supp. 2d 1339 (M.D. Fla. 2008)................................................34 n.45

NAS3062

*J. McIntyre Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011)............................................................... 50 & n.104, 53

*Karabu Corp. v. Gitner*,
    16 F. Supp. 2d 319 (S.D.N.Y. 1998) ..........................................51, 54

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984)........................................51 n.105, 53, 54 n.109

*Kermanshah v. Kermanshah*,
    580 F. Supp.2d 247 (S.D.N.Y. 2008)...........................................92 n.192

*Kleinman v. Blue Ridge Foods*,
    2011 WL 2899428 (Sup. Ct. Kings Cnty. July 7, 2011)...........................87 n.178

*Koenig v. Purdue Pharma Co.*,
    435 F. Supp. 2d 551 (N.D. Tex. 2006) ....................................32 n.40

*Kreutter v. McFadden Oil Corp.*,
    71 N.Y.2d 460, 467 (1988) ....................................................54 n.110

*Labzda v. Purdue Pharma, L.P.*,
    292 F. Supp. 2d 1346 (S.D. Fla. 2003) ....................................32 n.40

*LaRoss Partners, LLC v. Contact 911 Inc.*,
    874 F. Supp. 2d 147 (E.D.N.Y. 2012) ....................................90 n.186

*Levin v. Kitsis*,
    82 A.D.3d 1051 (2d Dep't 2011) ............................................91 n.190

*Lewis v. AimCo Props., L.P.*,
    2015 WL 557995 (Del. Ch. Feb. 10, 2015) ...............................76 & nn.155-156

*Lia v. Saporito*,
    909 F. Supp. 2d 149 (E.D.N.Y. 2012) ....................................92 n.192

*Licata v. Coan*,
    2015 WL 9699304 (D. Conn. Sept. 22, 2015),
    *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016) ................64 n.125

*Lippe v. Bairnco Corp.*,
    218 B.R. 294 (Bankr. S.D.N.Y. 1998)........................................102 n.228

*Lippe v. Bairnco Corp.*,
    249 F. Supp. 2d 357 (S.D.N.Y. 2003),
    *aff'd*, 99 F. App'x 274 (2d Cir. 2004)...........................63 & n.121, 62 nn.117-118, 65, 66

NAS3063

*Lloyd v. Moore,*
    115 A.D.3d 1309 (4th Dep't 2014) .........................................................21 n.12

*Loengard v. Santa Fe Indus., Inc.,*
    70 N.Y.2d 262 (1987) .........................................................................92 n.191

*M & T Mortg. Corp. v. White,*
    736 F. Supp. 2d 538 (E.D.N.Y. 2010) ..................................................18 n.10

*Martin v. Hacker,*
    83 N.Y.2d 1 (1993) .................................................................................33 n.44

*Martin Hilti Family Trust v. Knoedler Gallery, LLC,*
    386 F. Supp. 3d 319 (S.D.N.Y. 2019) ...............................................................87

*Mayor & Council of Wilmington v. Dukes,*
    157 A.2d 789 (Del. 1960) ...................................................................102 n.225

*Maywalt v. Parker & Parsley Petroleum Co.,*
    808 F. Supp. 1037 (S.D.N.Y. 1992) ...................................................75 n.153

*McCarthy v. Estate of McCarthy,*
    145 F. Supp. 3d 278 (S.D.N.Y. 2015) ...............................................................65

*McCauley v. Purdue Pharma, L.P.,*
    331 F. Supp. 2d 449 (W.D. Va. 2004) .................................................32 n.40

*Mercier v. Inter-Tel (Del.), Inc.,*
    929 A.2d 786 (Del. Ch. 2007) .............................................................22 n.14

*MFS Series Tr. III ex rel. MFS Mun. High Income Fund v. Grainger,*
    96 P.3d 927 (Utah 2004) .............................................................................52

*MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.,*
    910 F. Supp. 913 (S.D.N.Y. 1995) ................................................70, 71 n.136

*MLM LLC v. Karamouzis,*
    2 A.D.3d 161 (1st Dep't 2003) .............................................................21 n.12

*Monopoly Acquisitions, LLC v. T.E.N. Invs., Inc.,*
    2007 WL 2726018, (D. Kan. Sept. 17, 2007) .....................................54 n.108

*Morris v. N.Y. State Dep't of Tax'n & Fin.,*
    82 N.Y.2d 135 (1993) ....................................................83 n.170, 86 n.173

NAS3064

*Mouzon v. Radiancy, Inc.*,
　　85 F. Supp. 3d 361 (D.D.C. 2015) ........................................................53 n.107

*Mut. Pharm. Co., Inc. v. Bartlett*,
　　570 U.S. 472 (2013)..............................................................................45 n.92

*Nealy v. U.S. Surgical Corp.*,
　　587 F. Supp. 2d 579 (S.D.N.Y. 2008).....................................................30 n.38

*Nemec v. Shrader*,
　　2009 WL 1204346 (Del. Ch. Apr. 30, 2009),
　　*aff'd*, 991 A.2d 1120 (Del. 2010).........................................................90 n.186

*Patton v. Forest Labs., Inc.*,
　　2018 WL 5269239 (C.D. Cal. Sept. 19, 2018),
　　*aff'd*, 793 F. App'x 608 (9th Cir. 2020) ...............................................49 n.102

*Peguero v. 601 Realty Corp.*,
　　58 A.D.3d 556 (1st Dep't 2009) ...........................................................21 n.12

*Peltz v. Hatten*,
　　279 B.R. 710 (D. Del. 2002)..................................................................57 n.114

*People ex rel. Spitzer v. Sturm, Ruger & Co.*,
　　309 A.D.2d 91 (1st Dep't 2003) ...........................................................29 n.29

*Pettengill v. Curtis*,
　　584 F. Supp. 2d 348 (D. Mass. 2008) ...................................................54 n.111

*Pinebrook Props. Ltd. v. Brookhaven Lake Prop. Owners Ass'n*,
　　77 S.W.3d 487 (Tex. App. 2002)...........................................................82 n.165

*PLIVA, Inc. v. Mensing*,
　　564 U.S. 604 (2011)........................................................................46 n.96, 47

*Pomerance v. McGrath*,
　　143 A.D.3d 443 (1st Dep't 2016) .........................................................21 n.12

*Port Chester Elec. Constr. Corp. v. Atlas*,
　　40 N.Y.2d 652 (1976) ...........................................................83 n.171, 87 n.180

*Prohias v. Pfizer, Inc.*,
　　490 F. Supp. 2d 1228 (S.D. Fla. 2007) .................................................46 n.97

*Protective Comm. for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*,
　　390 U.S. 414 (1968)................................................................................. 16-17

NAS3065

*Puravai, LLC v. Blue Can*,
2018 WL 5085711 (D. Utah Oct. 18, 2018) .......................................... 53 n.107

*Rank v. Hamm*,
2007 WL 894565 (S.D. W. Va. Mar. 21, 2007) ..................................... 53 n.107

*Reedeker v. Salisbury*,
952 P.2d 577 (Utah Ct. App. 1998) ....................................................... 54 n.108

*Refco Group Ltd. LLC v. Cantor Fitzgerald, L.P.*,
2014 WL 2610608 (S.D.N.Y. June 10, 2014) .................................. 76, 77 n.159

*Rhode Island v. Lead Indus., Inc.*,
951 A.2d 428 (R.I. 2008) ............................... 28 n.28, 29 nn.30-32 & 34-35

*Rhodes v. E.I. du Pont de Nemours & Co.*,
636 F.3d 88 (4th Cir. 2011) .................................................................... 29 n.33

*Ritchie Special Credit Invs., Ltd. v. JPMorgan Chase & Co.*,
2021 WL 2686079 (D. Minn. June 30, 2021) ....................................... 91 n.189

*Sahu v. Union Carbide Corp.*,
2012 WL 2422757 (S.D.N.Y. June 26, 2012),
*aff'd*, 528 F. App'x 96 (2d Cir. 2013) .................................................... 30 n.37

*Samaritan Inns v. District of Columbia*,
1995 WL 405710 (D.D.C. June 30, 1995),
*aff'd in relevant part*, 114 F.3d 1227 (D.C. Cir. 1997) .......................... 22 n.14

*Schulz v. United States*,
831 F. App'x 48 (2d Cir. 2020) ..................................................................... 87

*Shuker v. Smith & Nephew, PLC*,
885 F.3d 760 (3d Cir. 2018) .................................................................. 53 n.107

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*,
873 F.3d 574 (7th Cir. 2017) .................................................................... 34 n.45

*Small v. Lorillard Tobacco Co.*,
252 A.D.2d 1 (1st Dep't 1998),
*aff'd*, 94 N.Y.2d 43 (1999) .................................................................... 30 n.38

*Spitzer v. Shanley Corp.*,
870 F. Supp. 565 (S.D.N.Y. 1994) ........................................................ 75 n.153

NAS3066

*State ex rel. Jennings v. Purdue Pharma L.P.*,
  2019 WL 446382 (Del. Super. Ct. Feb. 4, 2019).........................................28 n.27, 29 n.35

*State ex rel. Stenehjem v. Purdue Pharma L.P.*,
  2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) ....................................28 n.27, 44 n.87

*State of Oklahoma v. Purdue Pharma, L.P.*,
  2019 WL 9241510 (Okla. Dist. Ct. Nov. 15, 2019)...................................................44 n.88

*Stewart v. Am. Ass'n of Physician Specialists, Inc.*,
  2014 WL 2011799 (C.D. Cal. May 15, 2014) .......................................................54 n.111

*Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van*
  *Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173 (2d Cir. 2003).............14, 69 n.131, 73 n.145

*Stone v. Ritter*,
  911 A.2d 362 (Del. 2006) ................................................................... 79 & n.162

*Streamline Bus. Grp., LLC v. Vidible, Inc.*,
  2016 WL 3523033 (E.D. Pa. June 27, 2016) .......................................................91 n.190

*Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*,
  136 A.3d 688 (Del. 2016) ........................................................................44 n.87

*Timmons v. Purdue Pharma Co.*,
  2006 WL 263602 (M.D. Fla. Feb. 2, 2006) ...........................................................32 n.40

*Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.*,
  984 F.2d 915 (8th Cir. 1993) ...............................................................28 n.28, 29 n.29

*Trans-World Int'l Inc. v. Smith-Hemion Prods., Inc.*,
  972 F. Supp. 1275 (C.D. Cal. 1997) ...................................................................85

*Travelers Indem. Co. v. Cephalon, Inc.*,
  620 F. App'x 82 (3d Cir. 2015) .....................................................................33 n.41

*Trevino v. Mescorp, Inc.*,
  583 F. Supp. 2d 521 (D. Del. 2008).............................................................83 n.170, 87

*Twin-Lick Oil Co. v. Marbury*,
  91 U.S. 587 (1875).............................................................................53 n.108

*Tycoons Worldwide Grp. Pub. Co. Ltd. v. JBL Supply Inc.*,
  721 F. Supp. 2d 194 (S.D.N.Y. 2010)...............................................................83 n.169

NAS3067

*Tyler v. Gibbons*,
  857 N.E.2d 885 (Ill. App. Ct. 2006) .........................................................45 n.91

*United Presbyterian House at Syosset, Inc. v. Lincks*,
  2003 WL 2004182 (Sup. Ct. Nassau Cnty. Feb. 11, 2003) ....................97 n.208

*United States v. Purdue Frederick Co.*,
  495 F. Supp. 2d 569 (W.D. Va. 2007) ....................................................32 n.39

*Usov v. Lazar*,
  2013 WL 3199652 (S.D.N.Y. June 25, 2013) .........................................91 n.190

*Utts v. Bristol-Myers Squibb Co.*,
  226 F. Supp. 3d 166 (S.D.N.Y. 2016)..........................................46 n.95, 49 n.102

*Utts v. Bristol–Myers Squibb Co.*,
  251 F. Supp. 3d 644 (S.D.N.Y. 2017), *aff'd sub nom.*
  *Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019) .........................46 n.97

*Vertex, Inc. v.*
  *City of Waterbury*, 278 Conn. 557 (2006) .............................................89 n.184

*Walden v. Fiore*,
  571 U.S. 277 (2014)..................................................... 50 & n.104, 51, 54 n.109

*Wandel v. Dimon*,
  135 A.D.3d 515 (1st Dep't 2016) ...........................................................74 n.147, 79

*Wenske v. Blue Bell Creameries*,
  2018 WL 3337531 (Del. Ch. July 6, 2018)...........................................................77

*Wesolek v. Jumping Cow Enters., Inc.*,
  51 A.D.3d 1376 (4th Dep't 2008) ..........................................................12 n.12

*Wilby v. Savoie*,
  86 A.3d 362 (R.I. 2014) ........................................................................53 n.108

*Wolfgruber v. Upjohn Co.*,
  72 A.D.2d 59 (4th Dep't 1979),
  *aff'd*, 52 N.Y.2d 768 (1980)...............................................................33 n.44

*Wyeth v. Levine*,
  555 U.S. 555 (2009)...............................................................................47

*Zimmerman v. Novartis Pharm. Corp.*,
  889 F. Supp. 2d 757 (D. Md. 2012) .......................................................46 n.98

NAS3068

*Zogenix, Inc. v. Patrick,*
    2014 WL 1454696 (D. Mass. Apr. 15, 2014) ...........................................23 n.16

*Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.,*
    2011 WL 5962804 (Sup. Ct. N.Y. Cnty. Apr. 15, 2011).........................75 n.152

## Rules & Statutes

21 C.F.R. § 201.100(d)(1) ...............................................................................23, 46 n.94

21 C.F.R. § 202.1 ...........................................................................................23, 46 n.94

21 C.F.R. § 314.3(b) .................................................................................................47

21 C.F.R. § 314.50(d) ......................................................................................48 n.100

21 C.F.R. § 314.70.......................................................................................46 n.95, 47

21 C.F.R. § 314.81(b)(3)(i) .......................................................................................20

21 C.F.R. § 314.105(c)......................................................................................48 n.101

21 C.F.R. § 1303.21 et seq. .......................................................................................12

21 C.F.R. § 1306.04(a) .....................................................................................33 n.43

CONN. GEN. STAT. § 52-552c...........................................................................62 n.117

CONN. GEN. STAT. § 52-552e...........................................................................64 n.125

CONN. GEN. STAT. § 52-552j..........................................................................101 n.222

DEL. CODE ANN. tit. 6, § 17-108 ....................................................................96 n.206

DEL. CODE ANN. tit. 6, § 17-303(a) ........................................................................82

DEL. CODE ANN. tit. 6, § 17-403(b).........................................................................82

DEL. CODE ANN. tit. 6, § 17-607 ....................................... 100, 101 & n.219, 102 n.225

DEL. CODE ANN. tit. 10, § 8106 ....................................................................73 n.143

FED. R. BANKR. P. 9019 ...........................................................................................16

FED. R. EVID. 408(a).................................................................................................14

NAS3069

MASS. GEN. LAWS ANN. ch. 93A, § 4 ............................................................... 18 n.10

N.Y. BUS. CORP. LAW § 717(a) ......................................... 19, 22 n.15, 78 & n.161

N.Y. CPLR § 202 ............................................................................................ 91, 92

N.Y. CPLR § 213(8) ................................................................................... 101 n.222

N.Y. CPLR § 214(4) ..................................................................................... 73 n.143

10 N.Y.C.R.R. § 80.64(a) .............................................................................. 33 n.43

N.Y. DEBT. & CRED. LAW § 271 ................................................................. 64 n.125

N.Y. DEBT. & CRED. LAW § 273 ......................................................................... 71

N.Y. DEBT. & CRED. LAW § 274 .................................................... 70, 71 n.136

N.Y. DEBT. & CRED. LAW § 276 ................................. 57 n.115, 63 n.121

N.Y. GEN. BUS. LAW § 349 .......................................................................... 30 n.38

N.Y. GEN. BUS. LAW § 350 .......................................................................... 30 n.38

N.Y. P'SHIP LAW § 121-901 ............................................... 74 n.151, 100

N.Y. PUB. HEALTH LAW § 3332(1) ............................................................. 33 n.43

11 U.S.C. § 1123(b)(2)(A) ...................................................................................... 16

11 U.S.C. § 1125(b) ................................................................. 111 & n.243, 112

11 U.S.C. § 1129(a)(7) .................................................................. 17 & n.6, 92

21 U.S.C. § 321(m) ...................................................................... 23, 46 n.94

21 U.S.C. § 337(a) .................................................................................................. 46

21 U.S.C. § 355(b)(1)(A) ........................................................................... 48 n.100

21 U.S.C. § 372 ...................................................................................................... 46

28 U.S.C. § 3001 *et seq.* ........................................................................... 101 n.222

UTAH CODE ANN. § 13-11-4(2) .................................................................. 18 n.10

NAS3070

# Other Authorities

Carolyn Wolff et al., *The impact of the abuse-deterrent reformulation of extended-release OxyContin on prescription pain reliever misuse and heroin initiation*, ADDICTIVE BEHAVIORS 105 (2020) ...........................................................................38 n.64

Daniel M. Hartung et al., *Patterns of Prescription Opioid Use Prior to Self-reported Heroin Initiation*, 15 J. ADDICTION MED. 130 (March/April 2021) .......................................38 n.61

Deni Carise et al., *Prescription OxyContin Abuse Among Patients Entering Addiction Treatment*, 164 AM. J. PSYCHIATRY 1750 (2007) .......................................................................40 n.67

Douglas C. McDonald & Kenneth E. Carlson, *Estimating the Prevalence of Opioid Diversion by "Doctor Shoppers" in the United States*, 8(7) PLOS ONE e69241 (2013) ................41 n.75

G. BOGERT, TRUSTS § 40 (6th ed. 1987) ............................................................................98 n.211

Hawre Jalal et al., *Changing dynamics of the drug overdose epidemic in the United States from 1979 through 2016*, 361 SCIENCE 1218 (Sep. 21, 2018)...........................................43 n.85

Kelly K. Dineen, *Between a Rock and a Hard Place: Can Physicians Prescribe Opioids to Treat Pain Adequately While Avoiding Legal Sanction?*, 42 AM. J. L. MED. 7 (2017).......41 n.74

J.A. Inciardi et al., *Prescription Opioid Abuse and Diversion in an Urban Community: The Results of an Ultra-rapid Assessment*, 10 PAIN MED. 537 (2009).....................42 n.82

Joanne Neale, *Suicidal Intent in Non-fatal Illicit Drug Overdose*, 95 ADDICTION 85 (2000) ..........41 n.72

JOHNS HOPKINS BLOOMBERG SCHOOL OF PUBLIC HEALTH & CLINTON FOUNDATION CLINTON HEALTH MATTERS INITIATIVE, THE OPIOID EPIDEMIC: FROM EVIDENCE TO IMPACT (Oct. 2017)..............................43 n.84

Marilyn Peay & Edmund Peay, *Patterns of Preference for Information Sources in the Adoption of New Drugs by Specialists*, 31 SOCIAL SCI. & MED. 467 (1990) ...........................34 n.46

MARTIN I. LUBAROFF & PAUL M. ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS § 6.10 (2d ed. 2019) ....................................................................101 n.220

Rachel N. Lipari & Arthur Hughes, *How People Obtain the Prescription Pain Relievers They Misuse*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (Jan. 12, 2017)..............................................................................................40 n.69, 42 n.81

Randy A. Sansone, MD & Lori A. Sansone, *Doctor Shopping: A Phenomenon of Many Themes*, 9(11-12) INNOVATIONS CLINICAL NEUROSCIENCE 42 (2012) ....................................41 n.76

NAS3071

RESTATEMENT (SECOND) OF TORTS § 821B(1) (1979) ......................................................7, 29 n.30

Shiyu Zhang & Daniel Guth, *The OxyContin Reformulation Revisited: New Evidence From Improved Definitions of Markets and Substitutes*, ARXIV (Jan. 28, 2021) ...............42 n.64

STERICYCLE, UNUSED PRESCRIPTIONS & THE OPIOID EPIDEMIC 3 (March 2019) .................43 n.83

3A WILLIAM MEADE FLETCHER,
    CYCLOPEDIA OF THE LAW OF CORPORATIONS (2020) ........................................21, 53 n.108

Wilson M. Compton et al., *Relationship between Nonmedical Prescription-Opioid Use and Heroin Use*, 374 NEW ENGLAND J. MED. 154 (2016) .................................................38 n.63

W. McKinney et al., *Attitudes of Internal Medicine Faculty and Residents Toward Professional Interaction with Pharmaceutical Sales Representatives*, 264 JAMA 1693 (1990) ...34 n.46

NAS3072

The Raymond Sackler Family ("**Side B**") files this Statement in support of confirmation of Debtors' Sixth Amended Joint Chapter 11 Plan of Reorganization (ECF No. 3185) (the "**Plan**") (as it may be further amended or supplemented) and in reply to objections to Plan confirmation, in accordance with ¶3(f)(iv) of the Third Amended Order Establishing Confirmation Schedule and Protocols (ECF No. 3347).[2]

<div align="center">

**PRELIMINARY STATEMENT**

</div>

The Raymond Sackler Family supports confirmation of the Plan.  If the Plan is confirmed and consummated, the Sackler Families collectively will contribute $4.325 billion to the Debtors for opioid abatement purposes in exchange for broad and comprehensive releases that will resolve all civil liability pending and threatened against the Sackler Families.  In absence of the releases and channeling injunctions in the Plan, the Sackler Families could not and would not make such a contribution.

After years of extensive investigations and massive discovery, the overwhelming majority of claimants have determined that the proposed settlement, achieved with the assistance of some of the world's best mediators, is proper.  Still, a small yet vocal minority of claimants oppose the settlement.  While the opponents raise a number of legal challenges to the Plan that the Debtors will address, fundamentally, the opposition is premised upon the assertion that the settlement is not adequate to address alleged wrongdoing by certain members of the Sackler Families—allegations that the Sackler Families vehemently dispute.

---

[2]     The Raymond Sackler Family consists of the descendants of Raymond R. Sackler and his spouse, and the descendants' current and former spouses.  Unless otherwise defined, capitalized terms are as defined in the Plan and in the Raymond Sackler Family's Proposed Findings of Fact and Conclusions of Law, filed contemporaneously herewith.  All "¶" refer to the Proposed Findings of Fact and Conclusions of Law submitted with the Declaration of Gregory P. Joseph, unless otherwise indicated.  "**JX**" refers to the Joint Exhibit Book submitted to this Court.  Emphasis is added to, and internal quotations, brackets, ellipses, and citations are omitted from, quoted material in this brief, except as indicated.

<div align="center">

2

</div>

**NAS3073**

Until now, and for what may be good reason, there has been very little discussion of the actual merits of the allegations made against the Sackler Families. Instead, the merits have largely been addressed behind the scenes in settlement discussion that began even before this case was filed and that have continued since. But now, because this Court is being asked to pass on the adequacy of the settlement, some discussion of the merits (and more than what would be required in the absence of any opposition) is required.

The Raymond Sackler Family accepts that focusing on matters other than the merits has been beneficial to the process and perhaps even necessary to achieving the proposed settlement. It has led, however, to a one-sided narrative that has been accepted by many as being true. One unfortunate consequence of the one-sided narrative is that it has created an environment in which the claims against the Raymond Sackler Family are uncritically assumed to be true. But as the Raymond Sackler Family has always maintained, there is a legitimate other side to the story, including both failures of proof and established defenses that more than confirm the adequacy of the settlement.

The Raymond Sackler Family understands that, notwithstanding the need to discuss the merits, this Court will not be making findings on the ultimate merits of the allegations made against the Sackler families or the defenses to these allegations. Instead, the Court will need to determine that there are substantial defenses to the allegations sufficient to warrant approval of the settlement. Accordingly, to assist the Court in making a fair and appropriate assessment of the adequacy of the settlement, by this brief, the Raymond Sackler Family seeks to highlight what it believes to be factual and legal weaknesses in claims made against it, and to describe the substantial defenses to those claims. Although the submission is voluminous, it does not raise all issues or make all arguments that would be made at a trial on the merits, and to the extent the Shareholder Settlement

NAS3074

is not approved, the Raymond Sackler Family reserves all rights.

In addition to this brief, the Raymond Sackler Family has submitted a transmittal declaration that attaches *hypothetical* findings and conclusions, along with supporting evidence that it would present to the Court if the Shareholder Settlement were to fail and the merits had to be addressed. To be clear, the Raymond Sackler Family offers its offers its submissions *not* for the purpose of asking the Court to make the proposed findings or conclusions. Instead, the submission of these materials is offered solely to demonstrate that, if the Plan were not confirmed, it would have substantial defenses and evidence to support them, the litigation would be significantly protracted and costly, the outcome would be highly uncertain, and that there is substantial reason to believe the Plan provides claimants—including the Debtors' Estates—more value than they are likely to obtain in litigation. As a result, the Raymond Sackler Family believes that a sufficient record is before the Court to conclude that the releases and channeling injunctions in the Plan can and should be approved.

The Raymond Sackler Family does not expect the confirmation hearing to be trial on the merits of the claims being released and channeled under the Plan and believes that one is not needed. If, however, the Court believes it would be helpful or is necessary, the Raymond Sackler Family is prepared to more comprehensively address the claims being released at the Confirmation hearing.

<u>**EXECUTIVE SUMMARY**</u>

This Court must determine whether the Plan, including the Shareholder Settlement and the Shareholder Releases, is fair, equitable and in the best interest of creditors and the Estate. That turns in significant part on the value of the claims asserted against Sackler Family Members and their trusts by (i) non-estate claimants (the "**Non-Estate Claims**") and (ii) the Estate (the "**Estate Claims**" and, together with the Non-Estate Claims, the "**Claims**"). The Shareholder Settlement is

4

an excellent result for creditors because the Claims are unlikely to succeed if litigated and, without the Shareholder Settlement, creditors will recover much less—most, if not all, creditors can expect to recover little or nothing on their Claims.

## 2020 AND 2007 DOJ RESOLUTIONS

**2020 DOJ Resolution.** Purdue's 2020 Plea Agreement with the Department of Justice is based on an agreed statement of facts. Nothing in that agreed statement of facts suggests that any Sackler Family Member was involved in, or knew anything about, Purdue's misconduct. Nor did DOJ allege any of that misconduct against any Sackler Family Member in the Settlement Agreement between DOJ and certain Former Directors ("**Sackler 2020 Settlement**").

**2007 Guilty Plea & Civil Settlements.** Purdue's 2007 civil settlements—77 in total with DOJ and 49 States—set a hard stop for limitations purposes. All 77 released Sackler Family Members, entities and trusts for OxyContin-related claims. In addition, Purdue's 2007 federal guilty plea ("**2007 Guilty Plea**") and settlements generated extensive publicity, putting all claimants on notice of their claims. Many Non-Estate Claims are also untimely, in whole or in part, under state law. At a minimum, the releases granted in 2007 and applicable statutes of limitations present a significant barrier to recovery separate and apart from the merits.

## THE NON-ESTATE CLAIMS

The Non-Estate Claims, which primarily sound in deceptive marketing, negligent diversion and public nuisance, are factually unsubstantiated and legally unsound. Directors are liable for misconduct committed by their corporation only if they personally participate in it. The Raymond Sackler Family members who served on the PPI Board (the "**Former Directors**") did not personally participate in Purdue's marketing, its anti-diversion activities, or any other misconduct alleged in the Non-Estate Claims.

**No Culpable State of Mind.** Claimants cannot establish that the Former Directors

NAS3076

possessed any required culpable state of mind—negligence, recklessness or intentionality. The Former Directors acted in good faith and reasonably. From 2007-18, management certified to the Board every quarter that PPLP was operating in compliance with law, and documented that certification in detailed compliance reports. From 2007-12, the Board received confirmation from the Office of Inspector General ("**OIG**") of the Department of Health and Human Services ("**HHS**") that PPLP was complying with its Corporate Integrity Agreement ("**CIA**"), which had been implemented to promote PPLP's compliance with federal healthcare law. In 2012, as the OIG monitorship was coming to an end, the Board was informed that PPLP hired outside counsel to provide continuing review of the compliance program. The Board was later advised that outside counsel had reviewed, and given a positive review to, PPLP's commercial compliance program.

**Marketing.** The Former Directors did not personally participate in PPLP's marketing. They had no role in drafting or approving the content of marketing material or shaping what sales representatives said to health care practitioners ("**HCPs**"). There is no evidence they ever directed sales representatives to misrepresent or deceive. The Former Directors reasonably relied on (i) review and unanimous approval of all marketing material by PPLP's Legal, Medical Services and Regulatory Affairs Departments; (ii) audits of the compliance program by outside counsel; (iii) monitoring of sales calls by district managers; (iv) review of sales representatives' call notes and district managers' reports by PPLP's Legal and Compliance Departments; and (v) audits of key risk activities by management. As Professor Lawrence Hamermesh, a leading corporate governance expert, will testify, the Former Directors' efforts to ensure compliance with law and prevent deceptive marketing are consistent with customary norms of corporate governance and practice.

**Diversion.** The Former Directors did not personally participate in implementing PPLP's

NAS3077

anti-diversion efforts but did responsibly attend to them based on reports from management about PPLP's anti-diversion activities, including that: (i) PPLP was vigorously implementing its Abuse Deterrence & Detection ("**ADD**") Program, including Region Zero (PPLP's list of suspicious prescriptions whom PPLP would not call on); (ii) employees were trained on the ADD Program and Region Zero; (iii) management monitored the ADD Program and implementation of Region Zero; (iv) an auditor approved by the New York Attorney General ("**NYAG**") audited and endorsed Purdue's implementation of Region Zero; (v) the ADD Program was working to stop diversion, and (vi) multiple departments of PPLP were working to stop diversion. Professor Hamermesh will testify that the Former Directors' efforts to ensure compliance with law and prevent improper diversion are consistent with customary norms of corporate governance and practice.

**Public Nuisance.** The Non-Estate Claimants' nuisance theory is novel and legally flawed. "A public nuisance is an unreasonable interference with a right common to the general public." RESTATEMENT (SECOND) OF TORTS §821B(1) (1979). Claimants' theory of the opioid crisis is that improper marketing or negligent diversion caused harm to individuals, not harm to a right common to the general public. This theory has consistently been rejected with respect to other lawful products, like firearms, lead paint, and over-the-counter medications. The nuisance claim also requires proof that the Former Directors personally participated in Purdue's marketing or anti-diversion efforts, and no such proof exists.

**Causation, Preemption, Personal Jurisdiction.** Three overarching defects infect all of the Non-Estate Claims. First, there is no causal link between the injuries alleged and conduct by any Former Director. Second, preemption bars many of the claims. Third, most Non-Estate Claims will fail for lack of personal jurisdiction if the Shareholder Settlement is not approved and

NAS3078

litigation resumes around the country.

## ESTATE CLAIMS

The Estate Claims are equally tenuous.  Notably, no party in interest has objected that the Estate Claims are being settled for an unfair amount.

**Intentional fraudulent transfer** claims cannot succeed because PPLP's contemporaneous documents prove that it did not in fact perceive a threat from opioid litigation before 2017.  Nor did the Former Directors.  Most distributions—$6.5 of $10.3 billion—were made while a federal monitor was overseeing PPLP and confirming that PPLP was operating in compliance with its CIA.  The Board kept enormous amounts of unrestricted cash in PPLP, while at the same time devoting over $2 billion to R&D—the opposite of asset stripping.  In 2015, the Raymond Sackler Family proposed lending its distributions back to Purdue in return for subordinated debt, exposing it to all of Purdue's risks.  Until 2017, PPLP management's detailed reports and projections repeatedly advised the Board that the risk of litigation was low and declining, and the absence of any significant litigation against PPLP corroborated that.  Nothing in the litigation experience of other opioid manufacturers indicated a litigation risk for the industry before 2017.

**Constructive Fraudulent Transfer.**  The evidence demonstrates that PPLP was solvent and adequately capitalized on the date of each distribution, and that neither PPLP nor any of the Former Directors believed or intended that PPLP would incur debts beyond its ability to pay.  PPLP was profitable; it had no meaningful financial or trade debt; its sales were in the billions, and it had massive amounts of unrestricted cash on hand.  Litigation risk was low and manageable.  From 2008-2019, PPLP paid only $342 million in total settlements (exclusive of IP).  Its net sales during that period exceeded $14 billion.  None of the investigations or litigations that led to bankruptcy began until 2014; only five evolved into litigation before 2017, and PPLP had a proven track record of settling investigations and litigations for manageable amounts.  Sophisticated financial parties—

8

NAS3079

JPMorgan in 2014, Moody's and S&P in 2016—found Purdue creditworthy and did not foresee the avalanche of litigation that descended in 2017. Other opioid manufacturers' access to capital markets confirms that sophisticated financial parties did not see material opioid litigation risk for the industry when distributions were made. Purdue survived for over a decade after the first challenged transfers and at least two years after the last challenged transfer in 2017. Professor Chakraborty will testify to PPLP's solvency at the relevant times.

**Tax Distributions.** Tax distributions are not recoverable as fraudulent transfers because PPLP's payment of tax distributions was offset by its right not to incur tax liabilities itself. As Professor Blouin will testify, the amount PPLP distributed in tax distributions is roughly equivalent to the amount of tax PPLP would have paid had it been a C corporation, so there is no loss associated with these distributions. Further, the taxes were paid to the same federal, state and local governments that have asserted claims against the Sacklers. To the extent that tax distributions were actually used to pay taxes—as about 90% were—to allow recovery of tax distributions would sanction a double recovery of the same amounts the governmental Claimants have already received and would be impermissibly punitive.

**Fiduciary Duty.** The Former Directors honored their fiduciary duties. They did not cause Purdue to engage in any misconduct. They acted in good faith to ensure that Purdue had in place a systematic information and reporting system to allow them to provide oversight of Purdue's measures to prevent diversion and ensure its compliance with law. They are not tied to the misconduct admitted in the 2020 Plea Agreement. They acted reasonably based on the information provided to them and in conformity with customary norms of director oversight, as Professor Hamermesh will testify.

**Alter Ego.** There is no basis to treat Sackler Family Members as an alter ego of Purdue.

NAS3080

### THE SHAREHOLDER SETTLEMENT IS IN THE BEST INTERESTS OF THE ESTATE

The only way that Claimants could recover the Shareholder Settlement Amount is to reach the assets of the Sackler trusts. For the Raymond Sackler Family, the overwhelming majority of these assets are in non-self-settled spendthrift trusts and can be reached only on the Estate's fraudulent transfer claim (or its largely duplicative unjust enrichment claim). On all other Claims, the most that could be recovered is the personal net worth of any Sackler Family Member found liable. Only a handful of Raymond Sackler Family members had any role at Purdue, and their combined net worth is $700.4 million, of which, approximately $170 million is dedicated for charitable purposes and nearly $270 million consists of minority interests in foreign businesses that would be difficult, if not next to impossible, to realize upon in absence of an orderly disposition as contemplated by the Settlement Agreement. Litigation against them would be protracted, expensive, value-destructive, and likely exhaust most if not all of the remaining approximately $260 million.

The Shareholder Settlement will deliver extraordinary value to the creditors and the public, and it will do so immediately. Plan participants cannot reasonably expect to recover more than they stand to receive under the Plan. Apart from the weakness of the Claims:

- The Shareholder Settlement Amount exceeds the $4.119 billion in non-tax cash distributions transferred to trusts for the benefit of certain Sackler Family Members.

- The $1.546 billion in distributions made for the benefit of the foreign independent associated companies ("**IACs**"), as well as the intercompany and non-cash transfers allegedly worth $1.4 billion, cannot be recovered from Sackler Family Members or trusts because they were not transferees of these assets.

- The $4.6802 billion in tax distributions benefited PPLP by saving it essentially the same amount in taxes, have already been paid to the governmental Claimants, and are unrecoverable for reasons summarized above.

The Plan, including the Shareholder Releases, should be approved. The Sackler Family Members' surrender of their equity interest in the Debtors, combined with the Shareholder

**NAS3081**

Settlement Amount, represents a huge contribution to the Debtors' estates.  The Raymond Sackler Family would not agree to payment of the Shareholder Settlement Amount unless all claims against it based on Purdue's Opioid-Related Activities are fully, finally and permanently released.

I.     **THE 2020 GUILTY PLEA AND CIVIL SETTLEMENTS DO NOT SUPPORT ANY CLAIMS**

The Claims against the Former Directors are worlds apart from the misconduct PPLP admitted in the 2020 Plea Agreement.  Purdue agreed to plead guilty to three felonies, admitting only a narrow set of facts in Schedule A to the Plea Agreement (JX-2094) ("**Schedule A**"). Purdue's Civil Settlement Agreement (JX-2095) resolved claims based on factual allegations that Purdue denied, except to the extent admitted in Schedule A.  None of the stipulated facts admit that Purdue's marketing was deceptive.  None suggest that any Sackler Family Member was aware of the charged conduct, much less that Purdue or the Former Directors "caused" the opioid crisis. The core of the Non-Estate Claims has been that Purdue's marketing was deceptive.  There is no support for that contention in Purdue's Plea Agreement and Civil Settlement Agreement.

A.     **The Plea Agreement**

PPLP agreed to plead guilty to a three-count Information charging it with conspiracy to defraud the United States and violate the Food Drug & Cosmetics Act and the Anti-Kickback Statute (JX-2094 (Plea Agreement) at 1-2).  There is no allegation (and no evidence) that any family member participated in the implementation of the ADD program or PPLP's decisions as to whether to continue to market to particular physicians at any point.  PPLP agreed to pay a Criminal Fine of $3.544 billion and entry of a Forfeiture Judgment of $2 billion (*id.* at 3).  PPLP was required to pay out-of-pocket $225 million, in partial satisfaction of the Forfeiture Judgment (*id.* at 8).  As part of the Plea Agreement, PPLP and DOJ agreed that (a) the remainder of the Forfeiture Judgment would be satisfied by the first $1.775 billion in value that PPLP confers on state, tribal and local governments under the Plan (*id.* at 9-10), and (b) the entirety of the $3.544 billion

11

**NAS3082**

Criminal Fine would be treated as an allowed, unsubordinated, general unsecured claim (*id*. at 8).

**Specific Admissions.**  Purdue admitted to specific facts contained in Schedule A of the Plea Agreement (*id*. at 15-18).  These admissions do not involve any of the Former Directors, do not bind them, and do not support any of the Claims asserted against them.

**Count 1 – Deceiving the Drug Enforcement Agency ("DEA") and Aiding and Abetting Prescribers in Dispensing Prescription Drugs without a Legitimate Medical Purpose.**  In connection with Count 1, PPLP admitted that:

1.  PPLP included OxyContin prescriptions written by Region Zero HCPs in sales data sent to the DEA in support of its quota allocation requests (JX-2094 (Plea Agreement) at 16, ¶e).

    - Claimants do not have similar claims because quota allocation is determined exclusively by the DEA, and no State—or any other Claimant—has any quota-setting powers.  *See* 21 C.F.R. §1303.21, *et seq*.

    - There is no admission—or allegation—that PPLP's inclusion of OxyContin prescriptions written by Region Zero HCPs actually affected the DEA's quota allocation in any year, let alone in a way that affected any particular Claimant, or did so within any applicable statute of limitations.

2.  With respect to more than 100 HCPs, PPLP "failed to: (1) report and provide complete and accurate information to DEA about HCPs after the HCPs were flagged by internal anti-diversion programs, in situations in which the Company possessed sufficient information that should have led to a report; and (2) cease detailing HCPs after receiving information suggesting that those HCPs were prescribing opioid products without a legitimate medical purpose and outside the usual course of professional practice …." (JX-2094 (Plea Agreement) at 16, ¶f).

    - The State Claimants do not advance similar claims because most of them agreed to, and all were on notice of, the requirements of PPLP's ADD Program.  They knew that (1) "flag[ing]" an HCP did not create a reporting requirement to the States, and (2) receipt of information suggesting an HCP was misprescribing opioids did not trigger cessation of detailing—it triggered a rigorous review process by PPLP's Law Department.  (¶¶154-62)

    - One State Claimant—New York—required that Purdue appoint an independent auditor approved by the NYAG to review, beginning in 2016, all Region Zero determinations concerning whether to cease detailing HCPs.  (¶¶225, 227)  The auditor endorsed Purdue's decision-making,

NAS3083

finding that Purdue's determinations were made "reasonably," "conscientiously and in good faith." (¶228)

- There is no admission—or allegation—in the Plea Agreement as to the precise number or location of the "more than one hundred HCPs" or the year in which the non-reporting to DEA occurred.

- There is no admission—or allegation—that any Claimant would have been affected if the unidentified HCPs been reported to DEA.

- There is no admission—or allegation—that any prescription written by any of the "more than one hundred HCPs" caused any Claimant to incur any cost, let alone did so within the applicable statute of limitations.

3. PPLP "fail[ed] to account for potential downstream diversion of its products in reporting sales numbers to DEA as part of its quota requests" (JX-2094 (Plea Agreement) at 16-17, ¶f).

- There is no admission—or allegation—in the Plea Agreement that the failure to account for "potential downstream diversion" had any effect on any Claimant.

- There is no admission—or allegation—as to the location of any "potential downstream diversion."

4. PPLP "knowingly and intentionally conspired and agreed with others to aid and abet HCPs' dispensing, without a legitimate medical purpose and outside the usual course of professional practice … prescription drugs held for sale after shipment in interstate commerce …." (*Id.* at 17, ¶g).

- There is no admission—or allegation—about how the illegal dispensing affected any Claimant, let alone whether it did so within the applicable statute of limitations.

**Count 2 – Payments to Two HCPs.** PPLP admitted that, from approximately June 2009 to March 2017, it unlawfully offered "payments in the form of speakers fees and other payments (e.g., travel, lodging, consulting fees) to two HCPs with at least one purpose to induce those HCPs to write more prescriptions of Purdue opioid products, for which payment was made in whole or in part under a Federal healthcare program" (JX-2094 (Plea Agreement) at 17, ¶h).

- There is no admission—or allegation—as to the location of the two HCPs.

13

**NAS3084**

- There is no admission—or allegation—that any State was financially affected by any prescription written, especially given that the prescriptions were paid for "in whole or in part under a Federal healthcare program."

- There is no admission—or allegation—as to the year in which the improper payments were made or whether they occurred within the applicable statute of limitations for relevant Claimants' claims.

**Count 3 – Practice Fusion**. PPLP admitted that, effective March 1, 2016, it entered into a one-year contract with Practice Fusion—a cloud-based electronic health records platform—to run a Clinical Decision Support program on its platform to alert HCPs to conduct pain assessments and document pain treatment plans (*id.* at 17-18, ¶¶i-p). PPLP admitted that "one of [the] purposes" of this was to increase Purdue's opioid sales, "portions of which were paid for by federal health care programs, in violation of the Anti-Kickback Statute …." (*id.* at 18, ¶o).

- There is no admission—or allegation—that the Practice Fusion alerts had any impact on any Claimant.

**No Collateral Estoppel Effect on Former Directors.** Purdue's 2020 Guilty Plea has no collateral estoppel effect against the Former Directors.[3]

### B. Purdue's 2020 Civil Settlement Agreement

At the same time it entered into the Guilty Plea, PPLP entered into the Civil Settlement Agreement for causing false claims to be submitted for payment to federal healthcare programs (JX-2095 (Civil Settlement Agreement) at 3-4, ¶I). The Civil Settlement Agreement contained 42 pages of DOJ allegations appended as Addendum A ("Purdue Addendum A"). PPLP denied those allegations except to the extent admitted in Schedule A to the Guilty Plea (JX-2094 (Plea Agreement) at 4, ¶K). The denied allegations are inadmissible under Fed. R. Evid. 408(a). Sackler 2020 Settlement

---

[3] *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 327 F.3d 173, 184, 186-87 (2d Cir. 2003).

14

NAS3085

Like PPLP's Civil Settlement Agreement, the Sackler 2020 Settlement contains a lengthy addendum of DOJ allegations ("**Sackler Addendum A**"). All were expressly denied (JX-2096 (Sackler 2020 Settlement) at Recital G). The Sackler 2020 Settlement is therefore not evidence in support of the Claims.

## II.     2007 FEDERAL AND STATE SETTLEMENTS & RELEASES

### A.     2007 Guilty Plea and Federal Settlement

In 2007, The Purdue Frederick Company, Inc. pled guilty to felony misbranding of OxyContin, three executives pled guilty to strict liability misdemeanors, and Purdue Frederick settled civil claims with the federal government (JX-1899). None of the Former Directors was charged or even named in connection with the criminal conduct, all of which ended by June 30, 2001 (JX-1895 (2007 Agreed Statement of Facts) ¶20). In the accompanying Agreed Statement of Facts (at ¶¶ 20-43), Purdue Frederick admitted that "certain Purdue supervisors and employees, with the intent to defraud or mislead" HCPs committed multiple acts of deception and misconduct in connection with OxyContin marketing (*id.* at ¶20)—essentially the same conduct alleged in the current Non-Estate marketing Claims. Purdue entered into a five-year CIA, which was designed to promote compliance with federal healthcare laws (JX-1891 (CIA) §I, first paragraph). Purdue agreed to hire an Independent Review Organization ("**IRO**") to assess its systems, processes, policies, and procedures relating to sales and marketing of OxyContin, and Purdue undertook extensive reporting obligations to OIG (*id.* at 6-16, 25-31 & Appendix B, §I). The federal government released the Sackler Family Members and entities from all civil and criminal liability arising out of Purdue's sale and marketing of OxyContin prior to May 10, 2007 (JX-1897 (2007 Civil Settlement Agreement) at ¶2).

15

NAS3086

### B.     76 Settlements with the States: 27 Consent Judgments, 49 Medicaid

**27 Consent Judgments.**  In May 2007, Purdue entered into Consent Judgments ("**2007 State Consent Judgments**") with 26 states and the District of Columbia ("**Consent Judgment States**")[4] settling claims related to "Purdue's promotional and marketing practices regarding OxyContin."  *See, e.g.*, JX-1900 (Kentucky Consent Judgment) (PPLPC051000121037).  Purdue paid $19.5 million and each of the 27 Consent Judgment States released Sackler Family Members and entities from all liability relating to marketing of OxyContin (*see, e.g.*, JX-1900 (Kentucky Consent Judgment) at ¶¶25, 35).

**49 Medicaid Settlements.**  In 2007, Purdue also settled with 48 states and the District of Columbia (the "**Medicaid Settlement States**")[5] Medicaid claims based on allegations of deceptive OxyContin marketing, and released the Sackler Family Members and entities from all such claims.  *See, e.g.*, JX-1898 (State Settlement Agreement and Release Form).  The States reserved non-Medicaid-related OxyContin claims, and Purdue agreed to cooperate with any state investigation.

## <u>ARGUMENT</u>

This Court has the authority to approve settlements that are part of reorganization plans under §1123(b)(2)(A) and Rule 9019(a).  To do so, the Supreme Court has explained, the court must "compare the terms of the compromise with the likely rewards of litigation."  *Protective Comm. for Independent Stockholders of TMT Trailer Ferry Inc. v. Anderson*, 390 U.S. 414, 425

---

[4]      The Consent Judgment States were Arizona, Arkansas, California, Connecticut, the District of Columbia, Idaho, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Montana, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin.

[5]      The Medicaid Settlement States included every State except (1) West Virginia, which had already settled with Purdue pursuant to a December 14, 2004 agreement releasing all OxyContin claims (JX-2225 (WV Settlement Agreement) VF 00932234), and (2) Kentucky, which was party to the 2007 State Consent Judgments and entered into another settlement with Purdue in 2015 (JX-2430 (KY Settlement Agreement) (PPLPUCC000701839)).

NAS3087

(1968). That is because "[t]here can be no informed and independent judgment as to whether a proposed compromise is fair and equitable until the bankruptcy judge has apprised himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated." *Id.* at 424. In the Second Circuit, that standard is informed by a multi-factor test articulated in *In re Iridium Operating LLC*, 478 F.3d 452, 461-62 (2d Cir. 2007). *Iridium*'s first factor—"the balance between the litigation's possibility of success and the settlement's future benefits," *id.*—is the "most important in determining whether or not a settlement should be approved." *In re Homesteads Cmty. at Newtown, LLC*, 526 B.R. 1, 8 (Bankr. D. Conn. 2014), *aff'd*, 608 F. App'x 40 (2d Cir. 2015).

Under §1129(a)(7), the Court must determine that the Plan is in the best interests of creditors, meaning impaired creditors will receive more under the Plan than they would if Purdue were to liquidate. That requires consideration of what claimants would obtain if no releases or channeling injunction were imposed, and litigation ensued instead. Thus, for all Claims—including the Non-Estate Claims—the Court must evaluate the relative strengths and weakness of the merits, consider the existence of the substantial defenses the Sackler would present if they were to litigate, and factor in obstacles to collectability on any judgment. If it is unlikely that Claimants would recover more than is being provided under the Plan, the Shareholder Releases and the Channeling Injunction should be approved.[6]

---

[6] *See In re Ditech Holding Corp.*, 606 B.R. 544, 614 (Bankr. S.D.N.Y. 2019) ("the best interests equation also properly mandates consideration of creditors' comparative recoveries on non-debtor claims, to the extent the plan is treating those non-debtor claims by release"); *In re SunEdison, Inc.*, 576 B.R. 453, 457 n.4 (Bankr. S.D.N.Y. 2017) ("Non-voting classes deemed to reject the Plan under 11 U.S.C. §1126(g) could not be bound by the Release. Such a provision would violate the best interests test under 11 U.S.C. §1129(a)(7)(A)(ii) and render the Plan unconfirmable. While the class would not receive a distribution in either chapter 11 or chapter 7, the class members would retain their third party claims in a chapter 7.").

NAS3088

The prospect that the Non-Estate Claims and Estate Claims against the Former Directors will be successful if litigated is remote (§§I–II, *infra*), and the Shareholder Settlement's benefits far exceed the amount recoverable, even if the Claims were to succeed (§III, *infra*). *Iridium* is satisfied. The Shareholder Settlement should be approved.

# I.   THE NON-ESTATE CLAIMS ARE FATALLY INFIRM

The Non-Estate Claims primarily sound in deceptive marketing, negligent diversion, and public nuisance. These Claims cannot prevail absent evidence any of the Former Directors acted with the requisite scienter and personally participated in the alleged misconduct. There is no meaningful evidence of either. These Claims also require proof that the conduct of one or more Former Directors proximately caused the alleged losses. The bounds of public nuisance law would have to be extended beyond that which any appellate court has ever countenanced. And the Claims are subject to preemption, jurisdictional and other defenses.

### A.   The Former Directors Acted in Good Faith without Culpable Scienter

Most of the Non-Estate Claims require a showing that the Former Directors did not act in good faith or were negligent,[7] grossly negligent,[8] reckless,[9] or acted with actual intent to deceive.[10]

---

[7]     *See, e.g.*, First Amended Complaint at Count 9, *State of Colorado v. Purdue Pharma, L.P.*, Case No. 18-CV-33300 (Colo. Dist. Ct., Denver Cty., July 1, 2019) (JX-2212); Complaint at Count 3, *State of Idaho v. Purdue Pharma L.P.*, Case No. CV01-19-10061 (Idaho Dist. Ct., Ada Cty., June 3, 2019).

[8]     *See, e.g.*, First Amended Complaint at Count 12, First Amended Complaint filed in *People of the State of New York v. Purdue Pharma L.P.*, No. 400016/2018 (N.Y. Sup. Ct., Suffolk Cty., Mar. 28, 2019) (JX-2211).

[9]     *See, e.g.*, Second Amended Complaint at Count 2, *State of Rhode Island v. Purdue Pharma L.P.*, C.A. No. PC-2018-4555 (R.I. Super. Ct., Providence Cty., Dec. 20, 2019).

[10]     *See, e.g.*, *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 560–61 (E.D.N.Y. 2010) (fraud under New York law requires a misrepresentation or omission of material fact "made deliberately or knowingly (with *scienter*)"); MASS. GEN. LAWS ANN. ch. 93A, §4 (permitting civil penalties only "[i]f the court finds that a person has employed any method, act or practice which he knew or should have known to be in violation of said section two."); UTAH CODE ANN. §13-11-4(2) ("a supplier commits a deceptive act or practice if the supplier knowingly or intentionally").

18

NAS3089

These claims cannot succeed because there is no evidence that the Former Directors—none of whom had any role other than as a director of PPI during the Relevant Period—did anything improper or knew, or had reason to know, that Purdue's marketing was deceptive.

Under New York law, each Former Director was entitled to rely on information, opinions, reports and statements of officers, employees and outside professionals. N.Y. B.C.L. §717(a)(1) & (2). The uncontradicted record proves the reasonableness, good faith and conscientiousness of the Board, including:

- From 2007 through 2018 (when the last Side B Director left the Board), management certified to the Board in quarterly compliance reports that PPLP was operating in compliance with law, and documented its certifications with detailed compliance reports. ¶¶59, 68-70, 119-121.

- There was federal oversight of PPLP's marketing and its compliance with federal health care law and FDA requirements for 5 years, from July 31, 2007 to July 30, 2012, under its Corporate Integrity Agreement. ¶¶35-39, 126.

- During this period, the Board received confirmation each year from the Office of Inspector General of HHS that PPLP was operating in compliance with the CIA, which was designed to promote compliance with federal law. ¶¶59(a), 125-127.

- In July 2012, as the federal monitorship was ending, the Board was told that PPLP was maintaining and enhancing its compliance program, including by hiring outside counsel to provide ongoing reviews of its effectiveness. ¶¶59(b), 134-141.

- The Board was repeatedly advised that employees were extensively trained on compliance. ¶¶89-91.

- The Board was repeatedly advised that PPLP audited potential areas of risk, and the Board received the results of many audits. ¶¶97-103, 105.

- The Board was repeatedly advised that the speakers' program was monitored to ensure compliance. ¶104.

- The Board was repeatedly advised that all compliance issues were reported and remediated. ¶¶114-118. They were told that most compliance issues identified were minor, and that serious violations resulted in termination. ¶113.

- The Board was repeatedly advised that all aspects of PPLP's compliance program were properly functioning and exceeded industry standards. ¶¶119-124.

19

NAS3090

As Professor Hamermesh states in his expert report, "the actions of the Former Directors in regard to the implementation and monitoring of a reporting system and controls over marketing and distribution of opioids satisfied or exceeded the norms of customary corporate governance practice."  JX-0470 (Hamermesh Report) at ¶30; *id*. at ¶¶31-42.

The Board also understood that Purdue had systems to ensure the accuracy of its marketing. Purdue required its Medical, Legal and Regulatory Affairs Departments to each review and approve all marketing material.  ¶¶79, 284.  It mandated that "all product claims made verbally by" Sales Force Personnel must "be consistent with product labeling" and prohibited "the use of unapproved Materials."  ¶80.  The Board understood that any employees who violated these policies would be, and were, disciplined.  ¶¶111-113, 172.

The Board also understood that the FDA reviewed all of Purdue's marketing materials. Under federal law, pharmaceutical companies are required to send the FDA all of their promotional materials "at the time of initial dissemination" or "initial publication."  *See* 21 C.F.R. §314.81(b)(3)(i).  The FDA issues an "Untitled Letter" or a "Warning Letter" if it determines that any particular piece is not fair and balanced, or contains inaccurate, misleading, or unsupported claims.[11]  Throughout the Relevant Period, Purdue did not receive a single Untitled or Warning Letter from the FDA in connection with OxyContin.

No theory of corporate law requires corporate directors to second-guess determinations by management or the FDA on issues as technical as the accuracy and appropriateness of marketing

---

[11]    *See* FDA Regulatory Procedures Manual, Chapter 4 – Advisory Actions (2021), *available at* https://www.fda.gov/media/71878/download. A "Warning Letter" indicates that the FDA may take action if the alleged violation is "not promptly and adequately corrected." *Id.* at 4-1-1.  An Untitled Letter, however, "cites violations that do not meet the threshold for significance of regulatory significance for a Warning Letter."  *Id.* at 4-2-1.

NAS3091

highly regulated prescription opioid medications.

### B. The Former Directors Did Not Participate in Any Deceptive Marketing

It is black-letter law that a director cannot be held liable for torts committed by his or her corporation unless s/he personally participated in the wrongdoing. *See* 3A WILLIAM MEADE Fletcher, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1137 (2020).[12] There is no evidence that any Former Director personally participated in Purdue's marketing during the Relevant Period. There is also a dearth of evidence that Purdue's marketing was actually deceptive.

#### 1. No Former Directors Participated in Purdue's Marketing

During the Relevant Period, the only role any Former Director had at Purdue was as a PPI director. ¶256. In the vast discovery taken in this case, Claimants have not identified any evidence of even one marketing statement that any Former Director wrote, edited, approved, or uttered during the Relevant Period. ¶¶278-284. There is no evidence that any post-2007 marketing material was even submitted to the Board for approval. ¶¶280-81.

Nor have Claimants identified any evidence that any marketing materials were changed or adopted because of a Board decision or the input of a Former Director. ¶282. As one Purdue executive observed, "the Board had little opportunity outside of budget meetings to see the detailed work of the Sales and Marketing group." ¶285. And inside the budget meetings, the Board was never asked to review or approve the substance of any marketing initiative. ¶280. Rather, as David Sackler testified, "management would make presentations to the board on sales and

---

[12]   *See also, e.g.*, *Lloyd v. Moore*, 115 A.D.3d 1309, 1310 (4th Dep't 2014); *Bernstein v. Starrett City, Inc.*, 303 A.D.2d 530, 532 (2d Dep't 2003); *Wesolek v. Jumping Cow Enters., Inc.*, 51 A.D.3d 1376, 1379 (4th Dep't 2008). Because personal participation is required for liability to attach to a corporate officer, "personal liability cannot be imposed on a corporate officer for nonfeasance, *i.e.*, a failure to act." *Peguero v. 601 Realty Corp.*, 58 A.D.3d 556, 559 (1st Dep't 2009); *see also Pomerance v. McGrath*, 143 A.D.3d 443, 447 (1st Dep't 2016); *MLM LLC v. Karamouzis*, 2 A.D.3d 161, 161-62 (1st Dep't 2003).

21

NAS3092

marketing," but those presentations were for "informative" purposes and not to solicit "feedback" from the Board.[13]

Some Claims rest on the argument that the Former Directors "micromanaged" Purdue, and extrapolate from this that they must have been involved in marketing. A complete review of the meritless allegations to this effect would be too voluminous for purposes of this submission and is set forth in ¶¶276-359, which demonstrate that the supposed evidence in support of these allegations is (i) mischaracterized, (ii) irrelevant or (iii) decades old and predates the 2007 releases. It has been urged that the Former Directors engaged in misconduct by relying on McKinsey, but McKinsey is "an internationally respected consulting firm"[14] on whom the Former Directors were statutorily entitled to rely.[15] *See also* ¶¶301-329.

Every decision the Former Directors made was predicated on the understanding that PPLP had a comprehensive compliance system in place and was operating in compliance with law. That understanding was reasonable, based on detailed compliance reports they received every quarter during the Relevant Period. As Professor Hamermesh will testify, their actions are consistent with prevailing norms of director conduct. JX-0470 (Hamermesh Report) at ¶50.

### 2. Purdue's Post-2007 Marketing was Not Deceptive

Deceptive marketing claims also founder because there is no evidence that Purdue's post-2007 marketing was deceptive. In 2007, Purdue admitted that its pre-June 30, 2001 marketing of OxyContin was deceptive. Purdue corrected those errors over 20 years ago—by June 30, 2001,

---

[13]     JX-1989 (David Sackler Dep. Tr.) at 245:6-17.

[14]     *Samaritan Inns v. District of Columbia*, 1995 WL 405710, at *6 (D.D.C. June 30, 1995), *aff'd in relevant part*, 114 F.3d 1227 (D.C. Cir. 1997); *see also, e.g.*, *Mercier v. Inter-Tel (Del.), Inc.*, 929 A.2d 786, 799 (Del. Ch. 2007) ("the respected firm of McKinsey & Co").

[15]     N.Y. BUS. CORP. LAW §717(a)(2) ("In performing his duties, a director shall be entitled to rely on information, opinions, reports or statements including financial statements and other financial data, in each case prepared or presented by ... persons as to matters which the director believes to be within such person's professional or expert competence").

NAS3093

the end date of the conduct charged and admitted in the 2007 Guilty Plea.  The primary regulator

of truth in pharmaceutical marketing is the FDA, which closely regulates the label and marketing

material for FDA-approved prescription drugs.  The FDA has never claimed that Purdue's post-

2007 marketing is deceptive, even though all of Purdue's post-2007 marketing materials were sent

to the FDA for comment and approval.  The FDA did not issue even a warning letter to Purdue

about its post-2007 marketing.

There is a straightforward explanation for this.  Purdue's marketing after 2007 was not

deceptive.  The vast majority of the marketing that has been challenged is entirely consistent with

the FDA-approved label, precisely as federal law <u>requires</u>.  *See* 21 U.S.C. §321(m); 21 C.F.R.

§202.1(a)(1), (2); 21 C.F.R. §201.100(d)(1); *infra* at 46.  Claims about Purdue's post-2007

marketing consist in significant part of second-guessing decisions by the FDA.  State regulatory

powers cannot be exercised to override the FDA's decision to approve a medication.[16]  Any

contention that marketing FDA-approved prescription opioids is itself tortious violates the

Supremacy Clause.  *See infra* at 45-49 (preemption).

Deceptive marketing claims asserted by two of the objecting states, Connecticut and

Maryland, illustrate the deficiency of those claims.  For example, Connecticut contends[17] that

Purdue—under the direction of the Former Directors[18]—"falsely marketed" OxyContin as

providing "12-hour relief."  Connecticut is thereby asserting that Purdue falsely marketed

OxyContin by marketing it consistently with its FDA-approved label, as Purdue was required to

do under federal law—*and under the Consent Judgment that Purdue had entered into with*

---

[16]     *Zogenix, Inc. v. Patrick*, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014).

[17]     *See* Second Amended Complaint at ¶79, *State of Connecticut v. Purdue Pharma L.P.*, No.
X07 HHD-CV-19-6105325-S (Conn. Super. Ct. July 1, 2019).

[18]     *Id.* at ¶¶7, 113, 132.

NAS3094

*Connecticut.*[19] The Connecticut Consent Judgment at ¶V(2) prohibited Purdue from "market[ing] or promot[ing] OxyContin in a manner that is, directly or indirectly, inconsistent with the 'Indication and Usage' section" of the FDA-approved label. That portion of the OxyContin label directs prescribers to "maintain[] an every-twelve-hour dosing regimen" and not to "chang[e] the 12-hour dosing interval."[20] Connecticut is thus suing the Former Directors for allegedly requiring Purdue to market OxyContin as Connecticut and federal law required.

Maryland's marketing claims are no better. For example, Maryland contends[21] that, "[d]espite Purdue's representations to the contrary"—under the direction of the Former Directors[22]—"there has never been any reliable evidence that opioids are safe and effective for the treatment of chronic pain." Maryland is thereby asserting that Purdue falsely marketed OxyContin by marketing it consistently with its FDA-approved label, as Purdue was required to do under federal law—*and under the Consent Judgment that Purdue had entered into with Maryland.* The Maryland Consent Judgment barred Purdue from "promot[ing] or market[ing] OxyContin in a manner that … avoids or minimizes the fact that OxyContin is indicated for moderate … pain when a continuous around-the-clock analgesic is needed for an extended period of time" or was otherwise "directly or indirectly inconsistent with the 'Indication and Usage' section of the

---

[19]      *See* Consent Judgment at §V(2), *State of Conn. v. Purdue Pharma L.P.*, No. 07-4029935 S (Conn. Super. Ct. May 8, 2007).

[20]      *See,           e.g.,*           JX-2107           (2010           Label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022272s006lbl.pdf) at §§2.2, 2.6; *see also* JX-2120 (2018 Label, https://www.fda.gov/media/131026/download) at §2.1 ("OXYCONTIN is administered orally every 12 hours.").

[21]      *See* Amended Statement of Charges at ¶81,*Consumer Protection Division v. Purdue Pharma, L.P., et al.*, CPD No. 19-023-311366; OAH No. OAG-CPD-4-19-23474 (Md. OAG Cons. Prot. Div. May 29, 2019).

[22]      *See, e.g., id.* at ¶¶65, 67.

24

NAS3095

Package Insert [*i.e.*, label] for OxyContin."[23]  The FDA-approved label states that OxyContin is appropriate for "[m]anagement of moderate … pain when a continuous, around-the-clock opioid analgesic is needed for an extended period of time."[24]  In 2013 the FDA <u>rejected</u> a petition that sought to limit the "long-term use" of OxyContin for "<u>chronic</u> non-cancer pain," reaffirming the FDA's determination that OxyContin is safe and effective for chronic pain.[25]  Maryland is thus suing the Former Directors for allegedly requiring Purdue to market OxyContin as Maryland and federal law required, and as the FDA reaffirmed in 2013.

More broadly, the twelve key misrepresentations alleged against Purdue either were not made during the Relevant Period or are not deceptive:

- **(1) Addictive properties of opioids**.  Prescribers knew that OxyContin was addictive because that risk was always prominently disclosed.  ¶¶363-368.

- **(2) Low risk of addiction from chronic opioid therapy**.  There is no evidence that Purdue claimed that the risk of addiction from chronic opioid therapy is low during the Relevant Period.  Claimants themselves made this representation prior to the Relevant Period, and the FDA continues to affirm its truth.  ¶¶369-372.

- **(3) Pseudoaddiction**.  The federal government and at least 27 states have recognized, and continue to recognize, the concept of pseudoaddiction.  ¶¶373-377.

- **(4) Ease of managing addiction**.  There is no evidence that Purdue falsely claimed that the risk of addiction could be easily managed.  ¶¶378-383.

- **(5) Withdrawal can be avoided with tapering**.  There is no evidence that Purdue ever claimed that tapering is an effective way to help those with opiate use disorder or otherwise discussed tapering other than as discussed on its label.  ¶¶384-387.

- **(6) Risks associated with increased doses.**  Purdue's marketing never said that opioid doses could be increased without risk.  Titration—up and down—is a well-established technique recognized by the CDC and the FDA (including in

---

[23]     Md. Consent Judgment at ¶3, *Md. OAG, Consumer Protection Division v. Purdue Pharma L.P.*, No. 24-C-07-003299 (Md. OAG Cons. Prot. Div. May 21, 2007).

[24]     *See, e.g.*, JX-2107 (2010 Label, https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/022272s006lbl.pdf).

[25]     JX-2359 (9/10/13 Letter from FDA to A. Kolodny, FDA Docket No. FDA-2012-P-0818) (PPLPC019000835061).

NAS3096

OxyContin's FDA-approved label). ¶¶388-394.

- **(7) Opioids improve quality of life.** Purdue expressly prohibited its sales representatives from making claims that long-term opioid use improved people's lives. There is no evidence that the single instance of such a claim led to the issuance of any prescription during the Relevant Period. ¶¶395-399.

- **(8) Other pain relievers are riskier than opioids.** Purdue prohibited comparative claims like this, and its Compliance Department took steps to ensure that sales reps did not make any comparative claims. ¶¶400-403.

- **(9) OxyContin provides 12 hours of relief.** The FDA approved OxyContin for 12-hour dosing only, so Purdue is required by federal law and the 2007 State Consent Judgements to tell prescribers that the drug is for 12-hour use. ¶¶404-407.

- **(10) ADF OxyContin deters abuse.** The FDA has determined that ADF OxyContin has abuse-deterrent properties. ¶¶408-410.

- **(11) Purdue works to prevent diversion.** There is no evidence of any marketing by Purdue that discussed its anti-diversion program. ¶¶411-412.

- **(12) Savings cards deceptively kept patients on opioids.** Purdue's savings cards did not contain any deceptive statements about Purdue opioids. They included the FDA-approved black box warning enumerating OxyContin's risks. ¶¶413-414.

The record clearly establishes that Purdue's marketing during the Relevant Period was not deceptive. Purdue sought to persuade HCPs to prescribe its opioids over competitors' when medically appropriate.[26]

### C. The Former Directors Did Not Participate in PPLP's Anti-Diversion Efforts

There is no evidence that any of the Former Directors personally participated in Purdue's anti-diversion activities or took any steps to undermine them. They did not. But the Board did responsibly monitor management's anti-diversion efforts based on the information provided to them (¶¶143, 197-250). Detailed compliance and other reports consistently confirmed that:

- Purdue was implementing and monitoring its ADD Program, which was designed to prevent promotion to HCPs where there was a concern about abuse or diversion.

---

[26]     *See, e.g.*, JX-2010 (11/24/20 Craig Landau Dep. Tr.) at 176:16-25; JX-2353 (Individualize the Dose Brochure) (PAZ000046439) at -442, -446; JX-2343 (Conversion and Titration Guide) (PAK000971874) at -879, -881, -883-85.

NAS3097

¶¶143, 146-148, 208-232.

- All employees were trained on the ADD Program.  ¶¶143, 171.

- District Managers were monitoring sales representatives' detailing of prescribers and preparing written field contact reports assessing the sales reps' fulfillment of their ADD Program obligations.  ¶¶102, 143, 207.

- Management was analyzing the field contact reports and reporting to the Board the results of their analysis.  ¶143.

- Compliance and Legal were monitoring sales call notes from sales representatives (which documented their interactions with HCPs) to ensure their adherence to the ADD Program.  ¶¶102-103, 143, 156, 168, 208.

- In addition to the ADD Program, Purdue was addressing diversion by requiring field personnel to file Reports of Concern ("**ROCs**") reporting any alleged occurrences of misuse, abuse or diversion and then following up with field inquiries by management.  ¶¶143, 178-180.

- Purdue was collaborating with wholesalers and national chains on order monitoring strategies.  ¶¶143, 181-189.

- Purdue's Order Monitoring System was a proactive program reducing the Company's risk.  ¶143.

- Purdue's Suspicious Order Monitoring Committee was functioning well.  ¶143.

- Purdue's anti-diversion efforts met federal government requirements.  ¶¶143, 195-196.

- Purdue's ADD Program and other anti-diversion efforts were effective in reducing and preventing abuse and diversion.  ¶¶143, 240-250.

The Board also authorized the expenditure of more than $1 billion on additional anti-diversion efforts, including the development of ADF OxyContin.  ¶145.

The record evidence, which is uncontradicted, shows that the Former Directors acted in good faith, on the understanding that Purdue had in place extensive programs to address and reduce abuse and diversion.  As Professor Hamermesh will testify, "the conduct of the Former Directors in regard to oversight of potential diversion of opioids, including OxyContin, satisfied or exceeded what the then-prevailing norms and custom[s] and practice of corporate directors in that regard

27

NAS3098

contemplated."  JX-0470 (Hamermesh Report) at ¶42.

    **D.**    **Public Nuisance Claims Fail Legally and Factually**

        **1.**    **The Public Nuisance Claims Fail as a Matter of Law**

    The public nuisance doctrine does not extend to claims about the distribution of FDA-approved medicines.  Several trial courts have expressly rejected public nuisance claims against Purdue and manufacturers or distributors,[27] and no appellate court has upheld this Claim.

    Public nuisance law has traditionally been confined to claims regarding the use of property—not the sale and distribution of products, and especially not of an FDA-approved medicine.  It has been contended that the opioid epidemic constitutes a public nuisance caused by Purdue's marketing under the direction of the Former Directors.  Appellate courts across the nation have rejected attempts like this to reframe product liability claims as public nuisance claims.[28]  Public nuisance is not a catchall tort.  Allowing product liability claims to proceed under the guise of public nuisance would "open the courthouse doors to a flood of limitless, similar theories of

---

[27]     *State ex rel. Jennings v. Purdue Pharma L.P.*, 2019 WL 446382, at *12-13 (Del. Super. Ct. Feb. 4, 2019); *State ex rel. Stenehjem v. Purdue Pharma L.P.*, 2019 WL 2245743, at *11-13 (N.D. Dist. Ct. May 10, 2019); *City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *9 (W.D. Wash. Sept. 25, 2017); *Grewal v. Purdue Pharma L.P.*, 2018 WL 4829660, at *18 (N.J. Super. Ct. Oct. 2, 2018); JX-2475 (Transcript of Bench Decision) at 23:23-24:4, *State ex rel. Ravnsborg v. Purdue Pharma L.P.*, No. 32CIV18-000065 (S.D. Cir. Ct., Hughes Cty. Jan. 13, 2021).

[28]     *See, e.g.*, *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp*, 273 F.3d 536, 540 (3d Cir. 2001) ("[N]o New Jersey court has ever allowed a public nuisance claim to proceed against manufacturers for lawful products that are lawfully placed in the stream of commerce."); *Tioga Pub. Sch. Dist. No. 15 v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993) (rejecting public nuisance claim based on asbestos); *Rhode Island v. Lead Indus., Inc.*, 951 A.2d 428, 456 (R.I. 2008) ("The law of public nuisance never before has been applied to products, however harmful."); *In re Lead Paint Litig.*, 191 N.J. 405, 421 (2007) ("[W]ere we to permit these complaints to proceed, we would stretch the concept of public nuisance far beyond recognition and would create a new and entirely unbounded tort antithetical to the meaning and inherent theoretical limitations of the tort of public nuisance."); *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill.2d 351, 375 (2004) ("there is no authority for the unprecedented expansion of the concept of public rights to encompass the right asserted by plaintiffs").

NAS3099

public nuisance … against a wide and varied array of other commercial and manufacturing enterprises and activities."[29]

The nuisance Claims against the Former Directors do not otherwise satisfy basic elements of public nuisance, which require interference with a public right[30] and control of the instrumentality causing the harm.[31] First, the alleged right of individuals not to be subjected to the risk of abuse and addiction from FDA-approved opioids when they are not medically necessary is a private, not public, right.[32] Nor does the fact that opioid abuse and addiction has affected a large number of people mean that it implicates a public right. Whether a right is public "depends on the nature of the interest affected by the defendant's conduct" and "is not simply a matter of tallying the number of people affected."[33] Courts have rejected public nuisance claims arising from widespread public health issues related to lead paint, firearms, and other products.[34]

Second, in many jurisdictions, an essential element of public nuisance is control over the instrumentality at the time of the harm.[35] That requirement is an unsurmountable obstacle. Not even Purdue, let alone its directors, had control over the alleged public nuisance at the time of the harm because PPLP ceded control over its medications when they were sold to distributors.

---

[29]    *People ex rel. Spitzer v. Sturm, Ruger & Co.*, 309 A.D.2d 91, 96 (1st Dep't 2003). *See also Tioga Pub. Sch. Dist. No. 15*, 984 F.2d at 920.

[30]    *See, e.g.*, RESTATEMENT (SECOND) OF TORTS §821B(1); *Lead Indus.*, 951 A.2d at 453.

[31]    *See, e.g.*, *Lead Indus.*, 951 A.2d at 449; *Cofield v. Lead Indus. Ass'n, Inc.*, 2000 WL 34292681, at *7 (D. Md. Aug. 17, 2000).

[32]    *See, e.g.*, *Lead Indus.*, 951 A.2d at 448 ("Products generally are purchased and used by individual consumers, and any harm they cause—even if the use of the product is widespread and the manufacturer's ... conduct is unreasonable—is not an actionable violation of a public right.").

[33]    *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 96 (4th Cir. 2011).

[34]    *See, e.g.*, *Lead Indus.*, 951 A.2d at 436 (lead paint); *City of Chicago*, 213 Ill.2d at 375 (firearms).

[35]    *See, e.g.*, *Jennings*, 2019 WL 446382, at *13; JX-2475 (Transcript of Bench Decision at 24:1-4, *State ex rel. Ravnsborg v. Purdue Pharma L.P.*, No. 32CIV18-000065 (S.D. Cir. Ct., Hughes Cty. Jan. 13, 2021); *Lead Indus.*, 951 A.2d at 454.

NAS3100

## 2.     The Public Nuisance Claims Are Factually Unsupported

The public nuisance claims also fail because there is no evidence either that the Former Directors (1) oversaw wrongful conduct by Purdue that created a public nuisance, and (2) personally participated in it.

To the extent the wrongful conduct alleged is misleading marketing by Purdue, there is no evidence establishing that. *Supra* §I.B.2. Even if there were, the Former Directors did not personally participate in Purdue marketing. *Supra* §I.B.1. Further, the personal participation requirement is not satisfied merely because a director sat on the board of a company that contributed to a public nuisance.[36] Nor is the Board's receipt of general information about Purdue's business activities a viable basis for public nuisance liability.[37]

## E.     Other Fatal Defects in The Non-Estate Claims

### 1.     There Is No Proximate Causal Link between the Former Directors' Conduct and the Alleged Injuries

The Non-Estate Claims assert that Purdue caused two types of injuries: (i) healthcare costs, and (ii) non-healthcare costs related to efforts to abate the opioid epidemic, including costs of policing, the judiciary, and incarceration; child protective care and foster care; education relating to substance abuse, and lost income and taxes. For these damages to be recoverable, there must be evidence that Purdue's allegedly deceptive marketing or diversion control failures are both the cause-in-fact and the proximate cause of the claimed injuries.[38] The inability to demonstrate

---

[36]    *Estate of Goldberg v. Goss-Jewett Co., Inc.*, 2019 WL 4221398, at *3-4 (C.D. Cal. June 4, 2019).

[37]    *Id.*; *Sahu v. Union Carbide Corp.*, 2012 WL 2422757, at *5 (S.D.N.Y. June 26, 2012), *aff'd*, 528 F. App'x 96 (2d Cir. 2013).

[38]    *See, e.g.*, *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 15-16 (1st Dep't 1998), *aff'd*, 94 N.Y.2d 43 (1999) (N.Y. GEN. BUS. LAW §§349, 350 and common-law fraud claims); *Bilinski v. Keith Haring Found., Inc.*, 96 F. Supp. 3d 35, 52 (S.D.N.Y. 2015), *aff'd in relevant part*, 632 F. App'x 637 (2d Cir. 2015) (unjust enrichment); *Nealy v. U.S. Surgical Corp.*, 587 F. Supp. 2d 579, 583-85, 588 (S.D.N.Y. 2008) (negligence).

NAS3101

"some direct relation between the injury asserted and the injurious conduct alleged" "generally bars suits for alleged harm that is too remote from the defendant's … conduct." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017).

The Non-Estate Claims face insurmountable causation problems, including:

- **There Is No Evidence That Purdue Marketing Statements Caused Any HCP to Write a Medically Unnecessary Prescription.** In past litigation against Purdue, no HCP ever testified that s/he was misled by Purdue marketing as to the risks associated with OxyContin. Nor is there evidence connecting Purdue's marketing statements to any resulting harm. Independently, the learned intermediary doctrine breaks the causal chain. *Infra* §I.E.1.b.

- **OxyContin Has Always Had A Small Share of The Prescription Opioid Market, And It Has Long Been in Decline.** The market has always been dominated by immediate-release prescription opioids. *Infra* §I.E.1.c.

- **There Is Widespread Confusion between OxyContin and Oxycodone.** The media and social media have repeatedly conflated OxyContin with far more prevalent immediate-release oxycodone. *Infra* §I.E.1.d.

- **The Introduction of OxyContin Did Not Trigger The Opioid Crisis.** Drug overdose deaths in the United States, including from opioids, began an exponential rise long before OxyContin first reached the market. *Infra* §I.E.1.e.

- **For A Decade, The Opioid Crisis Has Been Driven by Illegal Drugs, Not Prescription Opioids.** Further, overdose deaths involving prescription opioids often involve (i) illegally-obtained prescription opioids and/or (ii) illegal opioids, too. Purdue did not proximately cause harms from either. *Infra* §I.E.1.f.

- **Addiction And Abuse Rarely Stem from Medically-Prescribed Opioid Use.** Most people who abuse prescription opioids report obtaining them from a friend or relative, not from legitimate prescriptions. *Infra* §I.E.1.h.

- **Numerous Other Factors Caused The Alleged Harms.** Among those are patient-specific factors (*e.g.*, mental health), rogue pill-mill HCPs, patients deceiving HCPs, patients not taking opioids as prescribed, and illegal diversion of lawfully-prescribed pills. *Infra* §I.E.1.i.

- **There Is No Evidence That Particular Injuries Were Caused by Purdue Opioids As Opposed to Other Manufacturers' Opioids.** This proof is essential as a matter of law. For these purposes, OxyContin is not fungible with other prescription opioids. *Infra* §I.E.1.j.

- **Payors Continue to Approve And Reimburse OxyContin Prescriptions.** This

**NAS3102**

fact precludes any claim that Purdue's alleged marketing misrepresentations were material to reimbursement decisions that are the basis of claimed injury.  *Infra* §I.E.1.k.

- **Abatement Costs Are Speculative.**  They are also unrecoverable in jurisdictions that recognize the municipal cost recovery rule or economic loss doctrine.  *Infra* §I.E.1.l.

Claimants' inability to overcome each these causation-related hurdles is discussed below.

### a. Causation Was Found Lacking in Litigation against Purdue Based on Misconduct Admitted in 2007 Guilty Plea

Many personal injury cases were brought against Purdue based on the conduct that was the subject of the 2007 Guilty Plea.  But courts found there was no evidence that Purdue's misconduct caused HCPs to make prescribing decisions they otherwise would not have made.[39]  For this and other reasons (including intentional misuse), courts consistently found causation lacking.[40]

### b. Claimants Cannot Show That Purdue's Marketing Statements Caused Doctors to Write Medically Unnecessary Prescriptions

The linchpin of Claimants' marketing claims is that deceptive marketing by Purdue caused doctors to write medically unnecessary opioid prescriptions, but there is no evidence connecting any Purdue's alleged misconduct to even a single improper prescription.  Prescribers write prescriptions for many reasons other than marketing, such as the FDA-approved label, education

---

[39]    *See United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 575 (W.D. Va. 2007) (accepting guilty plea; recognizing that, "[a]s to any individuals injured by the use of OxyContin, the difficulties of establishing causation are demonstrated by the numerous civil suits that have been filed" and that "Courts have consistently found that despite extensive discovery, plaintiffs were unable to show that Purdue's misbranding proximately caused their injuries.").

[40]    *See, e.g.*, *Bodie v. Purdue Pharma Co.*, 236 F. App'x 511 (11th Cir. 2007); *Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003); *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346 (S.D. Fla. 2003); *Koenig v. Purdue Pharma Co.*, 435 F. Supp. 2d 551 (N.D. Tex. 2006); *McCauley v. Purdue Pharma, L.P.*, 331 F. Supp. 2d 449 (W.D. Va. 2004); *Boysaw v. Purdue Pharma*, 2008 WL 4452650 (W.D. Va. Sept. 30, 2008), *aff'd*, 320 F. App'x 178 (4th Cir. 2009); *Timmons v. Purdue Pharma Co.*, 2006 WL 263602 (M.D. Fla. Feb. 2, 2006); *Cornelius v. Cain*, 2004 WL 48102 (Fl. Cir. Ct. Broward Cty. Jan. 5, 2004); *Harris v. Purdue Pharma, L.P.*, 218 F.R.D. 590 (S.D. Ohio 2003).

NAS3103

and experience, individual patient characteristics, other medications being taken by the patient, availability of alternative medications, and insurance coverage.[41]

Purdue has never marketed directly to patients. Doctors—highly-trained professionals— decide whether an opioid is necessary and appropriate, as well as whether the patient is likely to abuse or divert the medication. This involves a complex professional assessment in light of the physical and mental condition of the patient, the patient's symptoms, whether the patient has a history of substance abuse or misuse, and other factors.[42]

The Former Directors do not diagnose, treat or prescribe patients. That is done exclusively by licensed, registered medical professionals in the exercise of their medical judgment.[43] Purdue and its directors have no ability to review or second-guess the validity of a prescription written by a licensed HCP.

**The Learned Intermediary Doctrine.** Prescribing physicians intervene as "the 'informed intermediary' between the manufacturer and the patient" to make decisions about medical treatment, "evaluating the patient's needs, assessing the risks and benefits of available drugs, and prescribing and supervising their use."[44] Numerous courts have dismissed claims against drug

---

[41]    *See Travelers Indem. Co. v. Cephalon, Inc.*, 620 F. App'x 82, 87 (3d Cir. 2015) ("Allegations that physicians attended presentations and interacted with Cephalon sales representatives do not sufficiently demonstrate that these interactions *caused* the physicians to write the prescriptions at issue.") (emphasis in original).

[42]    *See, e.g.*, DEA Policy Statement, *Dispensing Controlled Substances for the Treatment of Pain,* 71 Fed. Reg. 52,716 at 52,723, 52719-20 (Sept. 6, 2006) *available at* https://www.govinfo.gov/content/pkg/FR-2006-09-06/pdf/E6-14517.pdf ("[E]ach patient's situation is unique ;" "DEA takes … seriously its obligation to ensure that there is no interference with the dispensing of controlled substances to the American public in accordance with the sound medical judgment of their physicians ….").

[43]    *See* 21 C.F.R. §1306.04(a); N.Y. PUB. HEALTH LAW §3332(1); 10 N.Y.C.R.R. §80.64(a).

[44]    *See, e.g.*, *Glucksman v. Halsey Drug Co.*, 160 A.D.2d 305, 307 (1st Dep't 1990); *see also Wolfgruber v. Upjohn Co.*, 72 A.D.2d 59, 61 (4th Dep't 1979), *aff'd*, 52 N.Y.2d 768 (1980); *Martin v. Hacker*, 83 N.Y.2d 1, 9 (1993).

NAS3104

manufacturers based on this doctrine.[45]

**Sources of Information.**  Pharmaceutical marketing is only one of many informational resources used by physicians, and seldom—if ever—the most important.  In fact, physicians are often skeptical of information provided by pharmaceutical sales representatives.[46]  Among the many sources of information allowing HCPs to independently assess the appropriateness of Purdue's opioid products for a patient are:

- FDA-approved labeling.

- Peer-reviewed medical journals.

- Continuing medical education.

- Literature required under the FDA-approved Risk Evaluation and Mitigation Strategies that communicates the risks of opioids to prescribers.

### c. OxyContin Has Always Had a Small Market Share—And It Has Been in Decline for over 15 Years

OxyContin prescriptions have never represented more than a small fraction of prescriptions for opioid analgesics in the United States.  OxyContin's share of the opioid prescription market reached a peak of 4% in 2003 and its market share has been below 2% in recent years.[47]  Prescriptions for extended-release opioid prescriptions (including OxyContin) have represented "a

---

[45]   *See, e.g., Bodie*, 236 F. App'x at 521; *Ironworkers Local Union No. 68 v. AstraZeneca Pharm. LP*, 585 F. Supp. 2d 1339, 1344 (M.D. Fla. 2008); *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 576-77 (7th Cir. 2017); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, 2010 WL 3119499, at *7-9 (S.D. Ill. Aug 5, 2010).

[46]   *See, e.g.*, W. McKinney et al., *Attitudes of Internal Medicine Faculty and Residents Toward Professional Interaction with Pharmaceutical Sales Representatives*, 264 JAMA 1693 (1990) (physicians have skeptical or negative views about pharmaceutical promotion); Marilyn Peay & Edmund Peay, *Patterns of Preference for Information Sources in the Adoption of New Drugs by Specialists*, 31 SOCIAL SCI. & MED. 467 (1990) (physicians rated information provided by sales representatives 12th out of 15 potential information sources about drugs).

[47]   *See* Debtors' Informational Brief at 22, *In re Purdue Pharma L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. Sept. 9, 2019), ECF No. 17 (**"Debtors' Informational Brief"**).

34

**NAS3105**

very small and decreasing fraction of [opioid] prescriptions since 2010."[48] Even if viewed in terms of morphine milligram equivalents ("**MMEs**"), the total number of MMEs sold in all ER opioid formulations has never equaled the total MMEs sold by manufacturers of immediate release opioids,[49] which dominate the market for prescription opioids.[50]

### d. Widespread Confusion between OxyContin and Oxycodone

Confusion between OxyContin and immediate-release oxycodone, which is far more prevalent, has been widespread for years. For example, a 2010 ABC news article discussing oxycodone was given the misleading title "OxyContin Riskier Than Other Pills, Study Finds," even though the expert quotes that follow all deal with oxycodone.[51] The same confusion has been manifest in Congressional hearings.[52] A key reason for the confusion, apart from the similarity of names, is that the pills—OxyContin and oxycodone—frequently look identical.[53]

---

[48]     JX-2473 (1/21/20 Letter from Janet Woodcock, Director for FDA, to Senator Maggie Hassan) at 5, *available at* https://www.hassan.senate.gov/imo/media/doc/FDA%20RESPONSE%20HASSAN%201.21.20.pdf.

[49]     *See* U.S. FOOD & DRUG ADMINISTRATION, FDA ANALYSIS OF LONG-TERM TRENDS IN PRESCRIPTION OPIOID ANALGESIC PRODUCTS: QUANTITY, SALES, AND PRICE TRENDS at 2 (Mar. 1, 2018), https://www.fda.gov/media/111695/download.

[50]     U.S. FOOD & DRUG ADMINISTRATION, FDA BRIEFING DOCUMENT, JOINT MEETING OF THE DRUG SAFETY AND RISK MANAGEMENT ADVISORY COMMITTEE AND ANESTHETIC AND ANALGESIC DRUG PRODUCTS ADVISORY COMMITTEE, OXYCONTIN ABUSE DETERRENT FORMULATION (ADF) 98 (Sept. 10-11, 2020), https://www.fda.gov/media/141914/download .

[51]     Mikaela Conley, *Some Painkillers Safer Than Others, Study Finds*, ABC NEWS (Dec. 13, 2010), https://abcnews.go.com/Health/opioids-increase-risk-problems/story?id=12383100.

[52]     Commerce, Justice, Science, and Related Agencies Appropriations for 2012: Hearing Before the Subcomm. of the H. Comm. on Appropriations, 107th Cong. (2012), *available at* https://www.govinfo.gov/content/pkg/CHRG-112hhrg67259/html/CHRG-112hhrg67259.htm.

[53]     See JX-2375 (2015 pill card) (PPLPC020000725747) at -777. *See also* JX-2404 (2016 pill card) (PPLPC017000522734) at -774; (2017 pill card): SUBSTANCE ABUSE AND MENTAL HEALTH SERVICE ADMINISTRATION CENTER FOR BEHAVIOR HEALTH STATICS AND QUALITY, 2017 NATIONAL SURVEY ON DRUG USE AND HEALTH: PRESCRIPTION DRUG IMAGES FOR THE 2017 QUESTIONNAIRE 4-5, *available at* https://www.samhsa.gov/data/sites/default/files/NSDUH-PillImages-2017.pdf.

NAS3106

### e. OxyContin Did Not Trigger the Opioid Crisis

The modern opioid crisis took root long before the introduction of OxyContin in 1996. As stated by Dr. H. Westley Clark (Director of the SAMHSA Center for Substance Abuse Treatment) in Congressional testimony in 2002:

> This is merely the newest part of a prescription opioid diversion and abuse problem that has been rising since the mid-1980s. … SAMHSA's national household survey on drug abuse data [shows] that the incidence of new prescription opioid abuse and the number of new prescription opioid abusers has been rising steadily since well before the introduction of OxyContin.[54]

Data from the CDC show that opioid-related deaths were all rising before the launch of OxyContin in 1996, and continued to rise as OxyContin prescriptions and market share fell.[55]

### f. For a Decade, the Opioid Crisis Has Been Driven by Illicit Drugs

As the AMA recently observed: "The nation no longer has a prescription opioid-driven epidemic."[56] The CDC has described the opioid crisis as having three waves. The first wave was a rise in prescription opioid deaths beginning in 2010, which was followed by a rise in heroin overdose deaths and, most recently, a rise in deaths from misuse of synthetic opioids like illicit fentanyl beginning in 2013.[57] Overdose deaths involving prescription opioids alone (as opposed

---

[54] *OxyContin: Balancing Risks and Benefits: Hearing of the S. Comm. on Health, Educ., Labor & Pensions*, 107th Cong. 287 (2002), *available at* https://www.govinfo.gov/content/pkg/CHRG-107shrg77770/html/CHRG-107shrg77770.htm.

[55] John Kamp, *Overdose Deaths Likely to Fall for the First Time Since 1990*, WALL ST. J., June 26, 2019 https://www.wsj.com/articles/overdose-deaths-likely-to-fall-for-first-time-since-1990-11561541406.

[56] June 16, 2020 Letter from AMA to CDC, https://searchlf.ama-assn.org/undefined/documentDownload?uri=%2Funstructured%2Fbinary%2Fletter%2FLETTERS%2F2020-6-16-Letter-to-Dowell-re-Opioid-Rx-Guideline.pdf.

[57] CDC, 3 WAVES OF THE RISE IN OPIOID OVERDOSE DEATHS, https://www.cdc.gov/drugoverdose/images/epidemic/3WavesOfTheRiseInOpioidOverdoseDeaths.png (last visited Aug. 8, 2021).

NAS3107

to in combination with other substances) peaked a decade ago, in 2011.[58]

According to the CDC, between 2013 and 2016, fentanyl-related deaths approximately doubled each year.[59] The Massachusetts Department of Health reports that, among 903 opioid-related overdose deaths in 2019 where a toxicology screen was available, 838—or 93%—tested positive for fentanyl.[60]

The Non-Estate Claims lack causation as a matter of law to the extent they seek to hold Purdue and the Former Directors liable for purported injuries from illicit drugs or for illegally obtained opioid medications.

The Non-Estate Claims suffer from multiple causation deficiencies. They do not differentiate alleged harm caused by other manufacturers' prescription opioids and Purdue's. They do not differentiate alleged harm from legitimate products legally accessed from harm caused by legitimate products illegally accessed. They do not differentiate alleged harm caused by legitimate products from harm caused by illegal drugs, ignoring, among other things, that third-party criminality breaks the chain of proximate causation as a matter of law.

There is no evidence causally linking manufacturers' marketing of prescription opioids to the rise of heroin or illicit fentanyl, or to counterfeit pills, or the trafficking of illegally obtained prescription drugs by pill mills and other criminal enterprises. As the FDA's National Institute on

---

[58]    NIH, NATIONAL INSTITUTE ON DRUG ABUSE, OVERDOSE DEATH RATES (2020), *available at* https://web.archive.org/web/20210127234432/https://www.drugabuse.gov/drug-topics/trends-statistics/overdose-death-rates.

[59]    *See* Merianne Rose Spencer et al., *Drug Overdose Deaths Involving Fentanyl 2011-2016*, 68 NAT'L VITAL STAT. REP. 1, 3 (Mar. 21, 2019), https://www.cdc.gov/nchs/data/nvsr/nvsr68/nvsr68_03-508.pdf.

[60]    *See* MASS. DEP'T OF PUB. HEALTH, *Data Brief: Opioid-Related Overdose Deaths Among Massachusetts Residents* 2 (Nov. 2019), https://www.mass.gov/files/documents/2019/11/25/Opioid-related-Overdose-Deaths-among-MA-Residents-November-2019.pdf.

NAS3108

Drug Abuse has noted, "[a]ccording to general population data from the National Survey on Drug Use and Health, less than 4 percent of people who had abused prescription opioids started using heroin within 5 years."[61]  This indicates that any alleged "transitioning" from prescription opioid abuse to heroin occurs, at most, in a very small subset of users.  A recent study published in the *Journal of Addiction Medicine* found that there is no relationship between long-term or high-dose prescription opioid use and heroin initiation.[62]

Nor is there evidence that introduction of ADF OxyContin in 2010 fueled an epidemic of heroin and illicit fentanyl abuse continuing over a decade later.  Past cycles of illicit drug abuse in the U.S. are well-documented, including a heroin spike in the 1960s and 1970s followed by a cocaine spike in the 1980s and a methamphetamine spike in the 1990s.  Heroin abuse has been increasing since at least 2007, before the introduction of ADF OxyContin.[63]  A recent study published in the journal *Addictive Behaviors* examined the impacts of ADF OxyContin and found based on 2005-2014 National Survey on Drug Use and Health data that "the reformulation of OxyContin appears to have reduced prescription pain reliever misuse without contributing to relatively greater new heroin use among those who misused OxyContin prior to the reformulation."[64]  The FDA has concluded that the "[c]omplex mixture of data limitations of data,

---

[61]  JX-2188 (NIH, NATIONAL INSTITUTE ON DRUG ABUSE, PRESCRIPTION OPIOIDS AND HEROIN RESEARCH REPORT 5 (rev. Jan. 2018), https://www.drugabuse.gov/publications/research-reports/prescription-opioids-heroin/heroin-use-rare-in-prescription-drug-users).

[62]  Daniel M. Hartung, et al., *Patterns of Prescription Opioid Use Prior to Self-reported Heroin Initiation*, 15 J. ADDICTION MED. 130, 131-32 (March/April 2021).

[63]  *See, e.g.*, Wilson M. Compton, et al., *Relationship between Nonmedical Prescription-Opioid Use and Heroin Use*, 374 NEW ENG. J. MED. 154 (2016), https://www.nejm.org/doi/full/10.1056/nejmra1508490.

[64]  Carolyn Wolff, et al., *The impact of the abuse-deterrent reformulation of extended-release OxyContin on prescription pain reliever misuse and heroin initiation*, ADDICTIVE BEHAVIORS 105 at 1 (2020), *available at* https://digitalcommons.unl.edu/usfda/51/, at 1.  *See also* Shiyu Zhang & Daniel Guth, *The OxyContin Reformulation Revisited: New Evidence From Improved Definitions*

NAS3109

concurrent interventions, and secular trends make it difficult to determine the exact contribution of OxyContin's reformulation to U.S. opioid mortality trends."[65]

### g. Intervening Criminal Conduct Breaks the Causal Chain

Any causal connection is broken by criminal conduct over which Purdue and the Former Directors exercise no control. These include HCPs' unlawful prescriptions, patients' decisions to unlawfully divert prescribed opioids to others, other criminal acts to obtain opioids, and accidental or intentional misuse or abuse of opioids.[66]

### h. Addiction and Abuse Rarely Stem from Medically-Prescribed Opioid Use

A patient's risk of addiction from taking an opioid as prescribed by his or her doctor is low, as the FDA and independent studies recognize. *See* ¶¶15, 371. Prior use of prescribed OxyContin is very rare among patients treated for opioid addiction. One study published in the *American Journal of Psychiatry* in 2007 found only 5% of 27,816 subjects admitted to 157 addiction treatment programs reported prior use of OxyContin—and 78% of those users also reported that

---

*of Markets and Substitutes* at 28 (Jan. 28, 2021), *available at* https://arxiv.org/pdf/2101.01128.pdf ("OxyContin exposure is not predictive of heroin deaths once we control for [generic] oxycodone").

[65] FDA, LITERATURE REVIEW: IMPACT OF REFORMULATED OXYCONTIN ON ABUSE AND OPIOID-RELATED MORBIDITY AND MORTALITY, JOINT MEETING OF THE DRUG SAFETY AND RISK MANAGEMENT ADVISORY COMMITTEE AND ANESTHETIC AND ANALGESIC DRUG PRODUCTS ADVISORY COMMITTEE, OXYCONTIN ABUSE DETERRENT FORMULATION (ADF) 10 at 32 (2020), *available at* https://www.fda.gov/media/141974/download. *See also id. at* FDA, FDA SUMMARY OF POSTMARKETING FINDINGS ON OXYCONTIN ADF EFFECTIVENESS AND PUBLIC HEALTH IMPACT at 14, *available at* https://www.fda.gov/media/141974/download ("Despite methods to control for other factors, difficult to determine the causal role of OxyContin's reformulation in these trends").

[66] *See, e.g.*, *Floyd v. Fygin*, 2018 WL 6528728, at *16 (Sup. Ct. Kings Cnty. Dec. 6, 2018) ("The operation of the 'pill mill' was an intervening act which was of an extraordinary and criminal nature so as to break any causal nexus between any reporting requirement on the part of Actavis and plaintiff's addiction to Oxycodone.").

NAS3110

OxyContin had not been prescribed to them for any medical reason.[67]  In other words, only approximately 1% of the 27,816 subjects entering addiction treatment had previously been prescribed OxyContin.

Most people who abuse opioids obtain them illicitly from friends, relatives, or street level drug dealers, and not from the HCPs to whom Purdue's marketing was directed—HCPs prescribing opioids for legitimate use.  The National Survey on Drug Use and Health conducted by SAMHSA in 2008 found that only 7% of people who abuse OxyContin obtained their drugs from a doctor.[68]  Between 2013 and 2014, more than 65% of abused prescription opioids were obtained from a friend or relative.[69]

### i.  Many Factors Cause the Alleged Injuries

The opioid crisis is a multifaceted problem with no one actor or product as the sole cause.[70]

**Individual Patient Factors.**  As the FDA has observed, "[m]ultiple patient factors … have an association with opioid overdose (e.g., mental health diagnoses, family history of substance use disorder)."[71]  A study exploring suicidal intent among drug users experiencing non-fatal overdoses

---

[67]  Deni Carise, et al., *Prescription OxyContin Abuse Among Patients Entering Addiction Treatment*, 164 AM. J. PSYCHIATRY 1750, 1750 (2007), https://ajp.psychiatryonline.org/doi/pdf/10.1176/appi.ajp.2007.07050252.

[68]  JX-2290 (July 22-23, 2010 Joint Meeting of the FDA Anesthetic and Life Support Drugs Advisory Committee and Drug Safety and Risk Mgmt. Advisory Committee, *Risk Evaluation and Mitigation Strategies (REMS) for Extended-Release and Long-Acting Opioid Analgesics*) (PPLP003366082) at -089.

[69]  Rachel N. Lipari & Arthur Hughes, *How People Obtain the Prescription Pain Relievers They Misuse*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (Jan. 12, 2017), https://www.ncbi.nlm.nih.gov/books/NBK424785/pdf/Bookshelf_NBK424785.pdf.

[70]  *See* MASS. DEP'T OF PUB. HEALTH, The Massachusetts Opioid Epidemic: A Data Visualization of Findings From the Chapter 55 Report, at 7, https://chapter55.digital.mass.gov/ (last visited Feb. 13, 2021).

[71]  JX-2473 (1/21/20 FDA Letter to Senator Maggie Hassan) at 13, available at https://www.hassan.senate.gov/imo/media/doc/FDA%20RESPONSE%20HASSAN%201.21.20.pdf (last visited July 31, 2021).

NAS3111

found that "[h]eroin was implicated in the majority of overdose incidents," and "non-fatal illicit drug overdoses are often motivated by suicidal intent."[72] Consumption habits within high-risk populations also figure in increased opioid mortality.[73]

**Rogue HCPs.** Healthcare practitioners are expected to prescribe opioids legally and responsibly. Rogue HCPs have fueled the crisis by overprescribing opioids to patients who have no legitimate need. These HCPs are motivated by improper factors, including "financial gain, sexual favors, or impaired judgment secondary to disease or disability, none of which comply with the physician's primary professional and ethical obligations to the patient."[74]

**Deceptive Patients.** Studies show that millions of prescriptions each year are diverted as a result of patients' deceptive practices. A study of 146.1 million opioid prescriptions dispensed in 2008 found 1.9%, or 2.8 million prescriptions, were obtained by doctor-shopping.[75] An analysis of other studies found the prevalence of doctor-shopping to be higher, ranging from 6.3% to 56% of patients.[76]

**Patients Not Taking Drugs as Prescribed.** The label for pre-reformulation OxyContin

---

[72]     Joanne Neale, *Suicidal Intent in Non-fatal Illicit Drug Overdose*, 95 Addiction 85, 91-92 (2000).

[73]     *See, e.g., Criminal Justice DrugFacts*, NAT'L INST. ON DRUG ABUSE (June 2020) https://www.drugabuse.gov/publications/drugfacts/criminal-justice ("many untreated inmates will experience a reduced tolerance to opioids because they have stopped using drugs while incarcerated. Upon release, many will return to levels of use similar to what they used before incarceration, not realizing their bodies can no longer tolerate the same doses, increasing their risk of overdose and death.").

[74]     Kelly K. Dineen, *Between a Rock and a Hard Place: Can Physicians Prescribe Opioids to Treat Pain Adequately While Avoiding Legal Sanction?*, 42 AM. J. L. MED. 7 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5494184/.

[75]     Douglas C. McDonald & Kenneth E. Carlson, *Estimating the Prevalence of Opioid Diversion by "Doctor Shoppers" in the United States*, 8(7) PLoS ONE e69241 (2013).

[76]     Randy A. Sansone, MD & Lori A. Sansone, *Doctor Shopping: A Phenomenon of Many Themes*, 9(11-12) INNOVATIONS CLINICAL NEUROSCIENCE 42, 42 (2012).

NAS3112

warned that "OxyContin TABLETS are to be swallowed whole and are not to be broken, chewed, or crushed."[77]  OxyContin was reformulated to decrease its abuse potential because the original formulation could be manipulated by people who want to abuse the medicine to override the extended release feature.[78]  ADF OxyContin carries a similar warning.[79]  Further, as the label has always warned, oral abuse is possible—by taking the medication more often than prescribed.[80]

**Diversion from Friends and Relatives.**  SAMHSA found that almost two-thirds of prescription opioids for non-medical use are obtained from a friend or relative.[81]  Other studies confirm this diversion route.[82]  Patients frequently fail to properly dispose of medication. According to a 2019 study performed by Stericycle (a leading provider of medical waste services), 47% of Americans currently have between 1 and 3 bottles of unused prescription medication in

---

[77]  JX-2104 (2007 Label) (PPLPC031000441510) at -510.

[78]  *See FDA Approves Abuse Deterrent Labeling for Reformulated OxyContin*, FDA NEWS RELEASE (Apr. 16, 2013), https://web.archive.org/web/20130419012709/ http://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm348252.htm.

[79]  JX-2120 (2018 Label) at 4 ("Instruct patients to swallow OXYCONTIN tablets whole; crushing, chewing, or dissolving OXYCONTIN tablets can cause rapid release and absorption of a potentially fatal dose of oxycodone...").

[80]  *See, e.g.*, JX-2104 (2007 Label) (PPLPC031000441510) at-520 ("Patient information:.. How Should I Take OxyContin®? .... Do not take OxyContin more often than prescribed."); JX-2114 (4/16/13 Label) (PPLPC003000060503) at -525 (abuse "by the oral route is still possible").

[81]  Rachel N. Lipari & Arthur Hughes, *How People Obtain the Prescription Pain Relievers They Misuse*, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION (Jan. 12, 2017), https://www.ncbi.nlm.nih.gov/books/NBK424785/pdf/Bookshelf_NBK424785.pdf.

[82]  *See J.A.* Inciardi et al., *Prescription Opioid Abuse and Diversion in an Urban Community: The Results of an Ultra-rapid Assessment*, 10 PAIN MED. 537 (2009) ("Other sources included pill brokers and dealers, doctor and (emergency room) shoppers, open-air drug markets, family and friends...."); U.S. DEP'T HEALTH & HUMAN RESOURCES, RESULTS FROM THE 2013 NATIONAL SURVEY ON DRUG USE AND HEALTH: SUMMARY OF FINDINGS 33, https://www.samhsa.gov/data/sites/default/files/NSDUHresultsPDFWHTML2013/Web/NSDUH results2013.pdf (Among persons aged 12 or older in 2012-2013 who used pain relievers nonmedically in the past year, 53.0 percent got the pain relievers they most recently used from a friend or relative).

NAS3113

their medicine cabinet, with significant percentages of those surveyed having far more.[83]  A Johns Hopkins report observed:

> Most patients fail to store opioid products in locked locations, including patients with children and adolescents who are particularly vulnerable to risks of opioid misuse and overdose.  Many patients also retain unused opioids ….  Collectively, these practices create household reservoirs of opioids that facilitate misuse and diversion all across America.[84]

**Socioeconomic Factors.**  Socioeconomic factors have also contributed substantially to the opioid crisis.[85]  As described by the National Institute on Minority Health and Health Disparities, "the opioid crisis may be part of a larger, longer-term process.  Economic, sociological, and psychological factors, such as despair, loss of purpose, and dissolution of communities, may be at work to accelerate the crisis."[86]

### j.        Conflation of All Manufacturers' Opioids

To establish causation, it is necessary to prove that the alleged wrongful conduct of Purdue—and then the Former Directors—was a substantial factor in bringing about the alleged injuries.  Prescription opioid manufacturers' products are not interchangeable.  They vary widely in terms of their approved indications, formulation, and potency.  They are distinctly labeled and easily traceable.    OxyContin has an extended-release abuse-deterrent formulation that

---

[83]      STERICYCLE, UNUSED PRESCRIPTIONS & THE OPIOID EPIDEMIC 3 (March 2019), https://www.stericycle.com/content/dam/stericycle/global/images/legacy/2019-Unused-Prescriptions-and-The-Opioid-Epidemic-Study.pdf.coredownload.inline.pdf (last visited July 31, 2021).

[84]      Johns Hopkins Bloomberg School of Public Health & Clinton Foundation Clinton Health Matters Initiative, THE OPIOID EPIDEMIC: FROM EVIDENCE TO IMPACT 14 (Oct. 2017).

[85]      See, e.g., Hawre Jalal, et al., Changing dynamics of the drug overdose epidemic in the United States from 1979 through 2016, 361 SCIENCE 1218 (Sep. 21, 2018) at 7 ("Sociological and psychological 'pull' forces may be operative to accelerate demand, such as despair, loss of purpose, and dissolution of communities.").

[86]      See NAT'L INST. ON MINORITY HEALTH AND HEALTH DISPARITIES, The Drug Overdose Epidemic Affects All Communities (Oct. 25, 2019), https://nimhd.nih.gov/news-events/features/community-health/overdose-epidemic.html.

NAS3114

distinguishes it from many other manufacturers' opioids, and OxyContin competed with other ER formulations. The manufacturers are competitors who employed differing marketing strategies over different periods for their different opioid products. There is no known evidence attempting to differentiate and attribute any particular bad outcome to any particular opioid.

### k. Continuing Reimbursement of Opioid Prescriptions

To the extent that any payor continues to approve reimbursement of patients for opioid prescriptions for OxyContin, that precludes any claim that Purdue's alleged misrepresentations were material to decisions to authorize reimbursement.[87]

### l. Claims for Abatement Costs

Decades of future abatement costs are a principal alleged harm, but there is no reliable way of knowing what, if any, expenses will be incurred 5, 10 or 20 years from now, or what will have caused those expenses. The only court that has ordered an abatement remedy in connection with prescription opioids—the Oklahoma trial court, in a decision against Johnson & Johnson that is on appeal—rejected a twenty-year abatement plan as lacking sufficient supporting evidence.[88] Nor would a single judge have the resources to oversee and enforce a complex, multi-jurisdictional abatement plan.

In some jurisdictions, abatement costs—as well as historical costs—run afoul of the municipal cost recovery rule, "under which public expenditures made in the performance of

---

[87] *See Teamsters Local 237 Welfare Fund v. AstraZeneca Pharm. LP*, 136 A.3d 688, 696 (Del. 2016) (analyzing New York law) ("[Third-party payors] who continue to pay or reimburse for [a medication], while claiming they were harmed by allegedly false advertising, are neither 'victims' of the allegedly false advertising nor were they injured by reason of or as a result of it. They were injured by their own conduct."); *accord State ex rel. Stenehjem v. Purdue Pharma L.P.*, 2019 WL 2245743, at *9, ¶51 (N.D. Dist. Ct. May 10, 2019).

[88] *State of Oklahoma v. Purdue Pharma, L.P.*, 2019 WL 9241510, at *15 (Okla. Dist. Ct. Nov. 15, 2019).

NAS3115

governmental functions are not recoverable in tort."[89]  This rule is based on separation-of-power principles and prevents governments from coopting the judiciary "to reallocate risks."[90]

The economic loss doctrine independently bars recovery of abatement costs in several jurisdictions.[91]  The policy underlying the economic loss rule is "that because the economic consequences of any single accident are virtually endless, a defendant who could be held liable for every economic effect of its tortious conduct would face virtually uninsurable risks, far out of proportion to its culpability."  *Beretta*, 821 N.E.2d at 1140.  This doctrine bars recovery against the Former Directors or Purdue for expenses—like education costs, child welfare costs, criminal justice system costs, lost income and sales tax allegedly resulting from lower labor force participation—that relate only tangentially to opioid abuse because these damages are purely economic and involve no personal injury or harm to Claimants' property.

### 2.    Federal Law Preempts Attacks on Marketing Consistent with the FDA-Approved Label

"When federal law forbids an action that state law requires, the state law is without effect."[92]  State law is also preempted if it either "regulates conduct in a field that Congress intended the Federal Government to occupy exclusively," or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."[93]  Many of the Non-Estate Claims boil down to disagreements with FDA-approved statements or deem FDA-

---

[89]    *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1144 (Ill. 2004); *City of Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir. 1983) (Kennedy, J.).

[90]    *District of Columbia v. Air Fla.*, 750 F.2d 1077, 1080 (D.C. Cir. 1984); *Flagstaff*, 719 F.2d at 324.

[91]    *See, e.g.*, *Tyler v. Gibbons*, 857 N.E.2d 885, 888 (Ill. App. Ct. 2006) ("In Illinois, solely economic losses are generally not recoverable in tort actions.").

[92]    *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 486 (2013) (state law that makes it inherently tortious for drug manufacturer to sell FDA-approved medication is preempted).

[93]    *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990).

45

NAS3116

approved disclosures insufficient, *see supra* at 25-26 and ¶¶363-410.  Those claims are preempted.

Federal law forbids promotion of drugs in a way that is not "consistent with" or is "contrary to" the FDA-approved label.[94]  Federal law also "expressly forbids a manufacturer from [unilaterally] changing its label after the label has received FDA approval, unless such changes are made pursuant to the" so-called changes-being-effected ("**CBE**") process.[95]  As a result, federal law preempts state-law marketing claims against drug manufacturers except where (1) the manufacturer marketed its product in a way that was inconsistent with the FDA-approved label, or (2) the manufacturer could have unilaterally changed its label using the CBE process to comply with state law.[96]  Either way, the Non-Estate Claims fail.

### a. Federal Law Preempts Claims Based on Statements in the FDA-Approved Label

A state-law fraud claim is preempted if "the statements on which the fraud claim is premised depends on statements made to and approved by the FDA."[97]  Only the FDA has the authority to sue for "false or misleading" statements in an FDA-approved label.[98]  Federal law charges the FDA with enforcing violations of the drug approval process.  21 U.S.C. §337(a).  Federal law explicitly authorizes the FDA to investigate suspected fraud or misrepresentations by a manufacturer.  *Id.* §372.  Non-FDA actions seeking relief for alleged misrepresentations in a

---

[94]  *See* 21 C.F.R. §201.100(d)(1).  *See also* 21 U.S.C. §321(m) (applies to all "written, printed, or graphic matter" that accompanies drug); 21 C.F.R. §202.1(l)(2) (applies to all materials "for use by medical practitioners ... containing drug information").

[95]  *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 184–85 (S.D.N.Y. 2016); *see also* 21 C.F.R. §314.70.

[96]  *See PLIVA, Inc. v. Mensing*, 564 U.S. 604, 623-24 (2011) (claims preempted where defendant manufacturer could not use the CBE process to change label); *see also In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 40-41 (1st Cir. 2015) (same).

[97]  *Utts v. Bristol–Myers Squibb Co.*, 251 F.Supp.3d 644, 680 (S.D.N.Y. 2017), *aff'd sub nom. Gibbons v. Bristol-Myers Squibb Co.*, 919 F.3d 699 (2d Cir. 2019); *see also Prohias v. Pfizer, Inc.*, 490 F. Supp. 2d 1228, 1234 (S.D. Fla. 2007).

[98]  *Zimmerman v. Novartis Pharm. Corp.*, 889 F. Supp. 2d 757, 769 (D. Md. 2012).

NAS3117

label are barred because they improperly second-guess the FDA's determination that information on a label is true and accurate.

Non-Estate Claims based on statements contained in the FDA-approved label include allegations that Purdue's marketing improperly advised HCPs that: (1) tapering OxyContin may be appropriate to address withdrawal; (2) OxyContin has no ceiling dose; (3) pseudoaddiction exists; and (4) OxyContin provides a 12-hour dose. *Supra* at 25-26; ¶¶373-377, 384-394, 404-407.

### b. Federal Law Preempts Alleged Failure-to-Warn Claims

Federal law also preempts a state-law fraud claim based on statements contained in an FDA-approved label that the defendant could not have unilaterally removed through the CBE process. The CBE process allows a manufacturer to add to an FDA-approved label only "*newly acquired information*" that "reveal[s] risks of a different type or greater severity or frequency than previously included in submissions to the FDA." 21 C.F.R. §314.70(c)(6)(iii); 21 C.F.R. §314.3(b) (defining "newly acquired information"). Even then, the FDA has the authority to reject the label change. *See* 21 C.F.R. §314.70(c)(6), (7). If a manufacturer wants to make a change to the FDA label that does not fall within the CBE regulation, the manufacturer must obtain FDA approval.[99]

The Supreme Court has addressed the circumstances under which a drug manufacturer can be required by state law to change the warnings included in its FDA-approved label. In *PLIVA*, 564 U.S. 604 (2011), and *Wyeth v. Levine*, 555 U.S. 555 (2009), the Supreme Court drew a distinction "between changes that can be independently made using the CBE regulation and changes that require prior FDA approval." *In re Celexa*, 779 F.3d at 41. State law can impose on a manufacturer a duty to change a drug label through the CBE regulation, but federal law preempts

---

[99]     *See In re Celexa*, 779 F.3d at 40-41.

NAS3118

any claim that the manufacturer was required to make other changes to the label. *Id.* To avoid preemption, a plaintiff must identify "a labeling deficiency that Defendants could have corrected using the CBE regulation." *Gibbons*, 919 F.3d at 708.

On April 5, 2010, the FDA approved Purdue's NDA for ADF OxyContin, and the new label did not include the warnings which the Non-Estate Claimants contend should have been included.[100] The FDA's decision proves that the FDA concluded those warnings were unnecessary based on the information available on April 5, 2010.[101]

This bars the Non-Estate Claims challenging the sufficiency of the OxyContin label's warnings based on evidence that was available on April 5, 2010. As the First Circuit explained in *In re Celexa*, 779 F.3d at 41, the line drawn by the Supreme Court "lets the FDA be the exclusive judge of safety and efficacy based on information available at the commencement of marketing, while allowing the states to reach contrary conclusions when new information not considered by the FDA develops." *See also id.* at 43 (claim that manufacturer should have amended label to add information "plainly known to the FDA prior to approving the label" was preempted).

There is no evidence of new information discovered after April 5, 2010, not previously considered by the FDA, that would have allowed Purdue to unilaterally change the OxyContin label to add the warnings. Studies that were available in 2010, when the FDA first approved the label for re-formulated OxyContin, are not "newly acquired" information and are therefore

---

[100]    Under federal law, drug manufacturers seeking approval for a drug must provide the FDA with an NDA comprising "full reports of [all clinical] investigations," 21 U.S.C. §355(b)(1)(A), relevant nonclinical studies, and "any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source." 21 C.F.R. §§314.50(d)(2) & (5)(iv).

[101]    *See* 21 C.F.R. §314.105(c) ("FDA will approve an NDA after it determines that the drug meets the statutory standards for safety and effectiveness … and labeling").

NAS3119

insufficient. So, too, are post-2010 studies, unless they reveal risks of a different type or greater severity or frequency than those included in Purdue's submissions to the FDA. There is no evidence of such studies, and information that was not "newly acquired" could not have served as a basis for Purdue to change its label.[102]

The Non-Estate Claims separately fail because in 2013 the FDA explicitly rejected an attempt to add to the label the warnings that many of the Non-Estate Claims maintain should have been included in Purdue's marketing. That year the FDA rejected a PROP petition that sought to add quantity and day limits to OxyContin prescriptions.[103] The FDA's rejection of the PROP petition is "clear evidence" that the FDA would not have allowed Purdue to add those warnings to the label. *Gibbons*, 919 F.3d at 708. Non-Estate Claims that Purdue's marketing was deceptive because it did not include those warnings are therefore preempted.

### 3. Personal Jurisdiction over the Former Directors Is Lacking in Many of the Non-Bankruptcy Litigations, Which Will Revive Absent Settlement

#### a. Supreme Court Personal Jurisdiction Jurisprudence Requires Substantial Suit-Related Contacts in the Forum

All of the U.S. Supreme Court's cases addressing personal jurisdiction in this century—seven in the last decade—confirm that personal jurisdiction may be asserted only over non-resident defendants who have substantial, personal, suit-related contacts with the forum state.[104] If the

---

[102]    *See Dolin v. GlaxoSmithKline LLC*, 901 F.3d 803, 816 (7th Cir. 2018), *cert. denied*, 139 S. Ct. 2636 (2019); *Utts*, 226 F. Supp. 3d at 184; *Gibbons*, 919 F.3d at 708; *In re Celexa*, 779 F.3d at 43; *Patton v. Forest Labs., Inc.*, 2018 WL 5269239, at *11 (C.D. Cal. Sept. 19, 2018), *aff'd*, 793 F. App'x 608 (9th Cir. 2020).

[103]    *See* JX-2359 (9/10/13 FDA Response to PROP Letter) (PPLPC019000835061) at -055, -059 ("the available information does not demonstrate that the relationship [between opioid dose and risk] is necessarily a causal one") ("the cited surveys did not suggest that chronic opioid therapy causes addiction").

[104]    *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026-32 (2021); *Bristol-Myers Squibb Co. v. Superior Court of Cal.*, 137 S. Ct. 1773, 1783 (2017); *BNSF Ry. Co. v. Tyrrell*,

NAS3120

Shareholder Settlement and releases are not approved and the Non-Estate Claims revert to state courts, the overwhelming majority of them will lack personal jurisdiction over the Former Directors.

**General and Specific Jurisdiction.** Personal jurisdiction jurisprudence distinguishes between general and specific jurisdiction. Defendants are subject to general jurisdiction in their home state. But almost all of the prepetition claims against the Former Directors relied on specific jurisdiction, which "depends on an 'affiliatio[n] between the forum and the underlying controversy,' principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919. Specific jurisdiction requires that the defendant "purposefully 'reach[ed] out beyond' their State and into another," *Walden*, 571 U.S. at 285, and that the claim against the defendant "arise[s] out of or relate[s] to the defendant's contacts with the forum." *Bristol-Myers Squibb*, 137 S. Ct. at 1780.

The Supreme Court cases teach that specific jurisdiction is narrowly construed:

- Targeting the United States as a whole is not a basis for personal jurisdiction in every state. *J. McIntyre Machinery*, 564 U.S. at 886-87 (plurality opinion), 888-89 (Breyer, J., concurring) (defendant's attempts to target the U.S. market did not support jurisdiction in New Jersey).

- It is not enough that the defendant's conduct had a foreseeable impact on individuals in the forum state. *Walden*, 571 U.S. at 289 (that defendant knew his conduct would have a foreseeable impact on residents in the forum state did not create personal jurisdiction there).

- A defendant's conduct in the forum state that is not claims-related does not create personal jurisdiction there. *Bristol-Myers Squibb*, 137 S. Ct. at 1781 (no jurisdiction over company with massive sales and research facilities in state, where claims had no connection to those jurisdictional contacts); *see also Ford Motor Co.*, 141 S.Ct. at 1026 ("In the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as

137 S. Ct. 1549, 1553-54 (2017); *Walden v. Fiore*, 571 U.S. 277, 291 (2014); *Daimler AG v. Bauman*, 571 U.S. 117, 136-39 (2014); *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 929-30 (2011); *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886-87 (2011) (plurality opinion); *id.* at 888-89 (Breyer, J., concurring).

NAS3121

it must to adequately protect defendants foreign to a forum.").

### b. Unsustainable Jurisdictional Theories

### i. No Jurisdiction Based on Purdue's Conduct

Jurisdiction over a corporate officer or director cannot be based on jurisdiction over his or her corporation.[105]  Accordingly, jurisdiction over the Former Directors cannot be predicated on the mere fact that Purdue engaged in business in a state.[106]

There must be a showing that each Former Director personally engaged in "suit-related conduct" that "create[d] a substantial connection with the forum State," and that the claims arise from or relate to that conduct.  *Walden*, 571 U.S. at 284.  Consequently, each Non-Estate Claim must point to an action that each Former Director took in, or targeted at, the forum state and then show that the claims arise from or relate to their respective individual actions in or targeted at the forum state.  There is no such evidence.  Most Non-Estate Claims are predicated on the theory that the Former Directors oversaw Purdue's nationwide marketing.  That is legally insufficient.

### ii. No Jurisdiction over Former Directors Based on Assertions They Oversaw Purdue's Marketing

Case after case holds that officers and directors are not subject to personal jurisdiction on the theory that they "oversaw" or "controlled" corporate conduct.  For example:

- *Karabu Corp. v. Gitner*, 16 F. Supp. 2d 319, 324 (S.D.N.Y. 1998) (Sotomayor, D.J.), held that allegations that corporate officers "directed" corporate conduct in the forum state were insufficient to establish personal jurisdiction.

---

[105]    *See, e.g.*, *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984) ("[J]urisdiction over an employee does not automatically follow from jurisdiction over the corporation which employs him…. Each defendant's contacts with the forum State must be assessed individually.").

[106]    *See, e.g.*, *Celtig, LLC v. Patey*, 347 F. Supp. 3d 976, 983 (D. Utah 2018) ("[Defendant] did not do business in Utah in his personal capacity and his role as CEO of a company doing business in the state of Utah is insufficient to subject him to personal jurisdiction in Utah."); *Harte-Hanks Direct Mktg./Balt., Inc. v. Varilease Tech. Fin. Grp., Inc.*, 299 F. Supp. 2d 505, 513 (D. Md. 2004) ("Personal jurisdiction over an individual officer, director, or employee of a corporation does not automatically follow from personal jurisdiction over the corporation.").

NAS3122

- *Gerstle v. Nat'l Credit Adjusters, LLC*, 76 F. Supp. 3d 503, 510 (S.D.N.Y. 2015), held that "generalizations that [corporate officers] 'oversaw' or 'authorized' 'illegal policies' not described in any factual detail" were insufficient to establish personal jurisdiction.

- *Fasugbe v. Willms*, 2011 WL 3667440, at *3-4 (E.D. Cal. Aug. 22, 2011), held that allegations that a CEO was the "guiding spirit" behind corporation's alleged false advertising did not establish personal jurisdiction.

- *Delman v. J. Crew Grp., Inc.*, 2017 WL 3048657, at *2 (C.D. Cal. May 15, 2017), held that there was no personal jurisdiction over a CEO who was allegedly a "hand[s-on] micro-manager of the [business]," was "acutely aware of [tortious] pricing and marketing policy" and was "only one of two [executives] having any operational responsibility."

- *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 162-4 (D.C. Cir. 2000), held that assertions that out-of-state employees "directed and supervised subordinate employees who had engaged in the District of Columbia in [unlawful] activities" did not support personal jurisdiction.

- *MFS Series Tr. III ex rel. MFS Mun. High Income Fund v. Grainger*, 96 P.3d 927, 931 (Utah 2004), held that corporate directors were not subject to jurisdiction based on assertions they controlled a company because "[m]ere corporate status can never be the basis for jurisdiction; [e]ach defendant's contacts with the forum State must be assessed individually."

- *Coast to Coast Energy, Inc. v. Gasarch*, 149 A.D.3d 485, 487-88 ( 1st Dep't 2017), held assertions that an officer "was in daily communication" and gave "instruct[ions]" as to corporate conduct were insufficient to plead jurisdiction where the plaintiffs "failed to proffer any specific facts to demonstrate how or when [the officer] participated in preparing the [allegedly deceptive document]."

To establish jurisdiction, there must be evidence that each of the Former Directors participated in Purdue's marketing or anti-diversion activities and that each one's conduct was either taken in, or targeted at, the forum state. There is no evidence to support the assertion that any of them made decisions about what Purdue's marketing would say during the Relevant Period. As discussed *supra* at 21-22, those decisions were made by Purdue's management. *See also* ¶¶276-286.

NAS3123

### iii. No Jurisdiction over Former Directors Based on Purdue's National Marketing

The contention that the Former Directors controlled Purdue's nationwide marketing, apart from being factually untrue, is legally inadequate. Conduct directed at the nation as a whole does not automatically establish jurisdiction in every state. In *J. McIntyre Machinery*, the Supreme Court's plurality and concurring opinions agreed that the defendant's having directed its products to the U.S. market as a whole did not subject it to jurisdiction in a particular state (New Jersey). 564 U.S. at 886 (Kennedy, J., plurality opinion); *id.* at 891 (Breyer, J., concurring). Lower court cases consistently reach the same result.[107]

### iv. No Jurisdiction Based on Agency Theory

Personal jurisdiction cannot be asserted over the Former Directors on the theory that Purdue, or its employees, acted as their agents. On that argument, every director is subject to jurisdiction in every state, regardless of his or her individual conduct, which is exactly what *Keeton* rejected. Corporations are not the agents of their directors—directors are agents of their company.[108] And the Supreme Court's precedent teaches that the conduct of others cannot be used

---

[107]    *See, e.g.*, *Shuker v. Smith & Nephew, PLC*, 885 F.3d 760, 780 (3d Cir. 2018) ("what is necessary is a deliberate targeting of the forum, … so efforts 'to exploit a national market that necessarily included Pennsylvania' are insufficient" to establish jurisdiction in Pennsylvania); *Puravai, LLC v. Blue Can*, 2018 WL 5085711, at *6 (D. Utah Oct. 18, 2018); *Mouzon v. Radiancy, Inc.*, 85 F. Supp. 3d 361, 372 (D.D.C. 2015); *Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Co-op.*, 17 F.3d 1302, 1305 (10th Cir. 1994); *D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.*, 566 F.3d 94, 103-04 (3d Cir. 2009); *Rank v. Hamm*, 2007 WL 894565, at *12 (S.D. W. Va. Mar. 21, 2007); *Corwin v. Swanson*, 2010 WL 11598013, at *3 (C.D. Cal. Apr. 27, 2010); *Bhd. of Locomotive Eng'rs & Trainmen v. United Transp. Union*, 413 F. Supp. 2d 410, 420 (E.D. Pa. 2005).

[108]    3A WILLIAM MEADE FLETCHER, CYCLOPEDIA OF THE LAW OF CORPORATIONS §1066 (2020) (corporate "officers and agents are not agents of the directors but are agents of the corporation."); *Twin-Lick Oil Co. v. Marbury*, 91 U.S. 587, 589 (1875) ("The directors are the … agents of the corporation … ."); *Crowell v. Randell, Jr.*, 35 U.S. 368, 382 (1836) (directors "are but agents of the corporation"); *Wilby v. Savoie*, 86 A.3d 362, 375-76 (R.I. 2014); *accord*

---

53

NAS3124

to establish jurisdiction over a defendant.[109]

For agency to suffice, the question is whether the individual participated in <u>specific</u> corporate conduct aimed at the forum.[110]  Generalized claims that a corporate officer or director controlled the company are insufficient to establish jurisdiction on an agency theory.  *See, e.g.*, *Karabu*, 16 F. Supp. 2d at 324; *Gerstle*, 76 F. Supp. 3d at 510; *Malden Transportation, Inc. v. Uber Technologies, Inc.*, 286 F. Supp. 3d 264, 271 (D. Mass. 2017).

### v.    No Jurisdiction Based on Failure to Act

Many Non-Estate Claims are based on theory that the Former Directors were negligent, or even reckless, because they knew about the abuse of Purdue's products and failed to take some action.  A failure to act, however, is not conduct targeted at a specific state, and personal jurisdiction cannot be premised on a defendant's knowledge of the conduct of others.[111]

### 4.    Release and Untimeliness Defenses

### a.    All Pre-2007 Conduct Has Been Released by the States

The releases in Purdue's 2007 highly public 2007 State Consent Judgments and Medicaid Settlements with the District of Columbia and every state other than West Virginia (which had already settled in 2004 (¶49)) released all claims against the Former Directors and their entities based on Purdue's marketing of OxyContin.  All Non-Estate Claims based on conduct occurring

---

*Monopoly Acquisitions, LLC v. T.E.N. Invs., Inc.*, 2007 WL 2726018, at *3 (D. Kan. Sept. 17, 2007); *Reedeker v. Salisbury*, 952 P.2d 577, 582 (Utah Ct. App. 1998).

[109]    *See Keeton*, 465 U.S. at 781 n.13; *Walden*, 571 U.S. at 291 ("[I]t is the defendant, not the plaintiff or third parties, who must create contacts with the forum State."); *id.* at 284 (lawsuit "must arise out of contacts that the defendant *himself* creates with" the State) (emphasis in original).

[110]    For example, *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 467, 470 (1988), which analyzed jurisdiction under New York's long-arm statute, requires a plaintiff asserting jurisdiction on agency theory to show that the corporate officer was a "primary actor[]" in conduct targeted at New York which gave rise to plaintiff's claims.

[111]    *See, e.g.*, *Stewart v. Am. Ass'n of Physician Specialists, Inc.*, 2014 WL 2011799, at *4-5 (C.D. Cal. May 15, 2014); *Pettengill v. Curtis*, 584 F. Supp. 2d 348, 358-59 (D. Mass. 2008); *Chlebda v. H. E. Fortna & Bro., Inc.*, 609 F.2d 1022, 1023-24 (1st Cir. 1979).

NAS3125

before mid-2007 are barred.

### b. The Discovery Rule Is Inapplicable

The discovery rule is unavailable to extend limitations periods against the Former Directors for any stale Non-Estate Claims based on Purdue's sales of OxyContin because (1) Purdue's highly publicized 2007 Federal Guilty Plea put the world on notice of potential claims; (2) the 2007 Medicaid Settlements allowed the 49 Medicaid Settlement States to conduct whatever further investigations they wanted into OxyContin and obligated Purdue to cooperate in those investigations;[112] and (3) the current Non-Estate Claims are based on allegations that have been the subject of intense media attention for years.

Purdue's 2007 Federal Guilty Plea and associated admissions received extensive press coverage. ¶¶50-53. After the plea, OxyContin, its potential for abuse and addiction, and Purdue's marketing practices continued to receive enormous media attention. ¶54. The Sackler families' association with Purdue, and receipt of billions in distributions, has also been a matter of public record for years. ¶420.

The media stories constitute "storm warnings" that put every Claimant on notice of their claims. As the Third Circuit has put it: "The defendant must point to 'storm warnings'…. If that happens the plaintiff must show that, heeding those storm warnings, she exercised reasonable diligence but couldn't find and avoid the storm."[113] Due diligence cannot be shown because State

---

[112]    *See* JX-1898 (Form of State Settlement and Release) at ¶III.E.6 ("Company will make reasonable efforts to cooperate with and furnish to the State non-privileged documents and records in its possession relevant to a pending state investigation or matter.").

[113]    *Hawk Mountain LLC v. Ram Capital Grp. LLC*, 689 F. App'x 703, 706 (3d Cir. 2017) (affirming dismissal of untimely claims where "[f]acing storm warnings the plaintiffs failed to exercise reasonable diligence to discover their injuries"); *Ex parte Abbott Laboratories*, 2021 WL 2176897, at 12 (Ala. May 28, 2021) (dismissing public nuisance claim as untimely where "the opioid crisis began causing effects in the counties [plaintiff] serve[s] in 2012 or 2013. Despite that fact, [plaintiff] did not commence this action until October 2019.").

NAS3126

Claimants did not exercise their contractual power, under the 2007 Medicaid Settlements, to investigate Purdue—including its directors. ¶215 n. 323.

## II. THE ESTATE CLAIMS ARE SERIOUSLY DEFICIENT

### A. Fraudulent Transfer Claims

It is no accident that none of the objectors contends that the Estate Claims are being settled for too little. Massive as this record is, it does not come close to supporting a claim that Sackler Family Members caused Purdue to make Distributions or Non-Cash Transfers "based on fears that Purdue … was subject to potentially overwhelming liabilities for harms caused by opioids or for violations of law relating to marketing or other sales practices" (Disclosure Statement for Fifth Amended Plan of Reorganization at 138-39, *In re Purdue Pharma L.P.*, No. 19-23649-rdd (Bankr. S.D.N.Y. June 3, 2021), ECF No. 2983 ("**Disclosure Statement**")). Nor does the record support a claim that Purdue became "legally insolvent as a result of accrued but unliquidated liabilities" (*id*. at 139) before 2017, when Distributions stopped.

Overwhelming evidence establishes that there was never any intent to defraud creditors and that Purdue was solvent and adequately capitalized throughout 2008 to 2016:

- Contemporaneous corporate records, including projections, budgets, 10-year plans and numerous other submissions to the Board, demonstrate that Purdue management did not perceive a threat from opioid litigation from 2008 to 2016. ¶¶457-72; *infra* at 65.

- As late as 2016, Purdue management thought—and advised the Board—that its litigation exposure was low and declining. ¶¶432, 72; *infra* at 60.

- Almost 63% of all Distributions ($6.5 of $ 10.3 billion) were made from January 1, 2008 through July 31, 2012, while the federal monitor was in place and was confirming that PPLP was operating in compliance with the CIA, which was designed to promote compliance with federal healthcare law. ¶433; *infra* at 59.

- JPMorgan, Moody's and S&P all evaluated PPLP in 2014-2016 and concluded it was stable and highly creditworthy. ¶¶434, 533-37; *infra* at 67.

- Other opioid manufacturers that have been sued alongside Purdue for causing the

**NAS3127**

opioid crisis were not viewed by the market as insolvent based on the threat of litigation. They accessed the capital markets and raised debt financing throughout 2008-16. Credit rating agencies did not perceive substantial litigation risk for these companies during this period. ¶¶539-40; *infra* at 67.

- The expert testimony of Dr. Maureen Chakraborty establishes Purdue's solvency from 2008 to 2016. JX-1937 (Chakraborty Rep.) at ¶¶158-180.

- PPLP's net sales far exceeded its distributions, and the Board left enormous amounts of unrestricted cash in PPLP after Distributions—over $1 billion a year, every year from 2014 on, and hundreds of millions each year before then. ¶¶449-55; *infra* at 63.

- PPLP had no funded debt. ¶456.

- Purdue faced none of the thousands of legal actions that precipitated its bankruptcy filing until 2014, when 2 were filed, and only 3 more followed in 2015-16. The rest were commenced in 2017 or later. ¶¶437-48; *infra* at 58.

- When the wave of litigation hit in 2017, the Board ceased distributions. ¶¶417(a), 437.

Contemporaneous evidence vitiates any fraudulent transfer claim, and "it is not the place of fraudulent transfer law to reevaluate or question … transactions with the benefit of hindsight."[114]

### 1.     No Distribution Was Made With Actual Intent to Defraud Creditors

The *sine qua non* of an actual-intent fraudulent transfer claim is proof that the transferor—PPLP—intended to prejudice its creditors.[115]  That is unprovable on this record.

#### a.     No Meaningful Litigation

As a result of Purdue's 2007 Guilty Plea, the 2007 State Consent Judgments and Medicaid Settlements, and an earlier settlement with West Virginia (¶¶30-49), the federal government and

---

[114]     *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 382 (Bankr. S.D.N.Y. 2013) (quoting *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002)).

[115]     Under Article 10 of the DCL, as it existed at the time of the Distributions, a "conveyance made ... with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. DEBT. & CRED. LAW ("**DCL**") §276.

NAS3128

every state had by mid-2007 released claims against Purdue and the Sackler family based on Purdue's marketing of OxyContin for all periods preceding the releases. ¶¶42, 45, 47, 49. The clock for governmental OxyContin litigation starts again in mid-2007, and claims are subject to applicable statutes of limitations.

Product liability suits were never a threat to Purdue. Purdue won many suits brought by individuals claiming harm from OxyContin. ¶¶439-41. Thousands more such claims were settled on extremely manageable terms. ¶¶438-39. By 2008, management advised the Board that an appropriate reserve for "closing out" all OxyContin litigation would be a mere $200 million, less than 10% of that year's revenue. ¶458. By 2010-11, there were only 24 product liability suits pending against Purdue, and only 3 of these were being actively litigated. ¶440. The number of products suits declined after that, and all were dormant by 2014-15. ¶440.

In the 2008-16 period, there were few governmental claims and investigations, and they were resolved for manageable amounts. In 2015, Purdue settled an investigation by the New York Attorney General with a payment of $75,000. ¶438; JX-1889 (AOD) (PPLP004035441) ¶38. In 2015, Purdue settled a longstanding litigation brought by the Attorney General of Kentucky for $24 million to be paid over 8 years (and that settlement was inflated because Purdue's outside counsel had been judicially determined to have admitted liability by failing to respond to requests for admission). ¶438. From 2008 through 2019, PPLP paid a total of $342 million in settlements, excluding patent and other intellectual property disputes. ¶439. PPLP and associated companies earned net profits of $10.6 billion during a subset of this period, from 2008 to 2016.

Only five Pending Opioid Actions were filed between 2014 and 2016, and nothing that transpired in those case pre-2017 indicated that an unmanageable eruption of litigation was forthcoming. ¶442. To date, none of the thousands of Pending Opioid Actions has resulted in a

NAS3129

judgment against Purdue, and the only Pending Opioid Actions that have been litigated to judgment were decided in Purdue's favor. ¶443.

### b. The Board Understood Purdue Was Operating in Compliance with Law

Critically, nearly two-thirds of the Distributions were made from January 1, 2008 through July 31, 2012, when Purdue was under a federal monitorship, as required by Purdue's CIA. ¶433. Each year, the federal monitor—the HHS OIG—confirmed to Purdue and to the Board that Purdue was operating in compliance with the CIA, which was designed to promote compliance with federal healthcare law. *Supra* 19; ¶¶125-27. In addition, every quarter from 2007 to 2018, when the last Side B director left the PPI Board, management certified to the Board—and documented in detailed compliance reports—that Purdue was operating in compliance with law. *See* ¶¶59, 121-22. The Board had no reason to expect overwhelming litigation—let alone the avalanche that descended in 2017, or any judgments in amounts Purdue could not satisfy—from operations being conducted in full compliance with law.

### c. Purdue Was Hugely Profitable with Large Cash Reserves and No Debt

Purdue had tremendous financial resources before and after the Distributions were made:

- Purdue generated over $2 billion annually between 2009 and 2014, and more than $1.5 billion in annual revenue in each of 2015 and 2016. ¶449.

- At the time each Distribution was made, Purdue maintained substantial cash reserves set by its CFO to ensure that Purdue had prudent liquidity. ¶450.

- From 2009 to 2015, Purdue's unrestricted cash at year end grew every year, from $339.6 million in 2009 to $1.153 billion in 2014 and remained over $1 billion for the remainder of the 2008-2016 Period. ¶451.

- In 2016, the last year a significant distribution was made, Purdue held $1.153 billion in unrestricted cash at year end. ¶451.

- Purdue had over $1 billion in free cash flow every year from 2008 to 2014, and its free cash flow ranged from a high of $1.715 billion in 2010, to a low of $615 million

NAS3130

in 2016, with $955 million in cash and cash equivalents at year-end 2017.  ¶452.

- From 2008 through its bankruptcy filing, Purdue had virtually no debt.  ¶456.

> **d.    Board Documents Confirm the Board Did Not Expect to Face Judgments Purdue Could Not Pay**

Board materials produced by Purdue resoundingly demonstrate why the onslaught of opioid litigation that emerged in 2017 was not expected when the Distributions were made:

- In January 11, 2008 Board materials, management advised that it believed all OxyContin litigation could be "Clos[ed] Out" with a $200 million reserve.  ¶¶458, 498.

- A November 3, 2009 Board Agenda shows that PPLP's legal expenses for Product Litigation and Government Related Litigation were low and expected to continue to decrease.  ¶459.

- Purdue's 10-year plan presented to the Board on June 21, 2011 budgeted essentially flat annual legal fees for the years 2011 to 2017, showing clearly that no significant opioid litigation was anticipated.  ¶460.

- The updated 10-year plan presented to the Board in May 2013 projected a reduction of almost 20% in total legal fees from 2013 to 2017, budgeted *de minimis* fees for Government-Related Litigation from 2013 to 2019, and projected falling Product Liability and Government Related Litigation fees from 2013 to 2022.  ¶461.

- The Board had every reason to believe that Purdue's projections were reliable. Between the 2011 and 2013 10-year plans, annual budget reports reflect that the amounts budgeted for legal fees were in line with the 10-year projections.  ¶465.

- Purdue's Annual Budgets for 2013, 2014 and 2015 also anticipated legal fees in line with the 10-year plan, showing no expected surge in litigation.  ¶466.

- Purdue's legal fee budget for 2016 ($50.7 million) showed that Purdue projected to spend about 25% less than it had projected in 2011 ($67.1 million).  PPLP's Financial Statement for 2016 shows that the actual total spent on legal fees in 2016 ($51.0 million) was almost exactly what was budgeted.  ¶468.

Management's reports to the Board paint a compelling and consistent picture of the low litigation risk Purdue perceived before 2016.  This is accurately summed up by materials for the January 15, 2016 Board meeting.  "Major Potential Risks to the current cash flow outlook" for Purdue: "Risks: Litigations (low)."  JX-2697 (1/15/2016 Board Agenda Book) (PPLP004412586)

60

**NAS3131**

at -631; ¶472.

###### e.  Side B Directors Were Intent on Keeping Money in Purdue

In 2014 and 2015, the Side B directors sought to reinvest Side B's Distributions back into Purdue as subordinated debt.  ¶¶474-479.  While Side A directors did not seek to do the same, it was not because of any litigation concern.  *Id.*  The subordinated debt proposal—which would have exposed Side B to all the risks Purdue faced—is incontrovertible evidence that Side B directors did not anticipate the wave of litigation that led to Purdue's bankruptcy.

###### f.  Far From Being Stripped of Its Assets, Purdue Invested Billions of Dollars in Research and Development after 2007

Purdue spent vast sums on research and development during the same period that Distributions were made.  From 2008 to 2017, the Board authorized, and Purdue spent, over $2 billion on research and development. ¶684.  This is potent evidence of a business being run for long-term success, not a scheme to strip it of assets.

###### g.  There Is No Evidence That the Board Harbored Litigation Concerns

The supposed evidence that the Former Directors anticipated the unprecedented post-2017 opioid litigation that triggered Purdue's bankruptcy consists of a handful of documents from 2006 to 2008, none of which show that any Sackler Family Member had any concerns about Purdue's financial wherewithal.  To the extent these documents are relevant at all (some clearly are not), the uncertainties they discuss were resolved not long after the documents were written.  *See* ¶¶488-530.  Tellingly, in 100 million pages of discovery, there is no evidence that any director expressed any litigation concern during the period when Distributions were made, from 2008-2016.

###### h.  No Badges of Fraud

Badges of fraud sometimes provide circumstantial evidence of fraudulent intent, but the utility of such circumstantial evidence is limited where, as here, there is direct evidence that refutes

**NAS3132**

fraudulent intent.[116]  The badges of fraud that could "give rise to an inference of intent to defraud" include:

> (1) gross inadequacy of consideration; (2) a close relationship between transferor and transferee; (3) the transferor's insolvency as a result of the conveyance; (4) a questionable transfer not in the ordinary course of business; (5) secrecy in the transfer; and (6) retention of control of the property by the transferor after the conveyance.[117]

"[T]he flip side of these badges of fraud is that their absence … would constitute evidence that there was no intent to defraud."[118]  And even if "badges" are present, evidence of a legitimate purpose can overcome a finding of fraudulent intent.[119]

None of the badges of fraud support an inference of fraudulent intent here:

- **Ordinary Course of Business**:  All Distributions were made in the ordinary course of business.  Board documents show that the Distributions occurred regularly, after formal approval by PPI's Board of Directors.[120]  Tax Distributions have been paid since at least 1996 and are commonly made by pass-through entities like PPLP because owners require liquidity to cover tax obligations on the partnership's income (¶550 & JX-0425 (Blouin

---

[116]  *See In re Chin*, 492 B.R. 117, 132 (Bankr. E.D.N.Y. 2013) ("The availability of badges of fraud as circumstantial evidence fulfills an important function, but the utility of a checklist can only go so far."); *In re Stanton*, 457 B.R. 80, 94 (Bankr. D. Nev. 2011) ("Because they are only evidence of the likelihood of fraud, badges of fraud are not given equal weight; and sometimes the circumstances indicate they should be given no weight at all.").

[117]  *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374-75 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004).  *See also* CONN. GEN. STAT. §52-552e(b) (including a non-exhaustive list of badges of fraud: "(1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property after the transfer, (3) the transfer … was [not] disclosed or concealed, (4) before the transfer was made …  the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor."); *In re Kupersmith*, 614 B.R. 428, 438 (Bankr. D. Conn. 2020).

[118]  *Lippe*, 249 F. Supp. 2d at 375.

[119]  *In re Anderson*, 623 B.R. 199, 214 (Bankr. D. Conn. 2020).

[120]  *See* ¶419.

NAS3133

Report) ¶76). These facts refute an inference of fraudulent intent.[121]

- **Distributions as Percentage of Assets**: Purdue did not transfer substantially all of its assets. Distributions were always a fraction of net sales (¶¶452-55), and enormous amounts of unrestricted cash remained after the Distributions (¶451).

- **No Secrecy**: The Distributions were not concealed. ¶420. The fact that the "Sackler family's net worth" was based in part on "accumulated dividends" from Purdue and was in the billions was reported in the media years ago (¶420 n. 611), as was the fact that "the company's profits—totaling billions of dollars alone from OxyContin—go to the Sackler family trusts and entities." ¶420 n. 611. Tax payments made from Tax Distributions informed governmental claimants about PPLP's profits and distributions.[122]

- **Reasonably Equivalent Value**: The concept of reasonably equivalent value is irrelevant to the non-tax Distributions, which distributed profits. The absence of consideration "is always the case in a dividends situation and it is a generally accepted practice for a corporation to pay dividends to its shareholders." *Lippe*, 249 F. Supp. 2d at 384. In addition, as discussed in §II.A.3.a, below, PPLP received reasonably equivalent value for the Tax Distributions.

- **Insider Relationship**: A close relationship between owner and company is inherent in every closely-held company[123] and is insufficient to prove intent to defraud.[124]

---

[121]    *See Lippe*, 249 F. Supp. 2d at 384 (no reasonable jury could conclude that quarterly dividends paid over ten-year period were intended "to keep the assets away from asbestos creditors."); *accord Bd. of Managers v. Gateway IV LLC*, 169 A.D.3d 617, 618 (1st Dep't 2019) (affirming dismissal of DCL §276 claims: "plaintiff alleges that the conveyances were distributed to the individual defendants as *pro rata* proceeds of their equity interests in the sponsor, but does not allege that the transfers were not made in the normal course or that defendants were aware of plaintiff's claim and were unable to pay for it").

[122]    *See also* JX-0425 (Blouin Report) ¶¶77-78 (from the perspective of a tax professional, the Tax Distributions were not made in secret because (i) it is typical for pass-throughs to make tax distributions to their owners, so an outside tax professional would have likely assumed PPLP was making tax distributions to those that were responsible for paying taxes on its income, (ii) according to the AlixPartners Report, the Tax Distributions were recorded in PPLP's accounting system, documented by internal records, and were reflected in PPLP's audited statements of cash flows, and (iii) the Tax Distributions were largely paid directly to state and federal taxing authorities).

[123]    *See also* JX-0425 (Blouin Report) ¶75 (a close relationship between transferor and transferee is an inherent characteristic of all tax distributions, and therefore not indicative of transfers made with fraudulent intent).

[124]    *See, e.g.*, *Case v. Fargnoli*, 182 Misc. 2d 996, 1001 (Sup. Ct. Tompkins Cnty. 1999) ("While the relationships between settlor and the trustees/remaindermen are close, there was no

NAS3134

The extensive record is devoid of any direct or circumstantial evidence of fraudulent intent. All evidence is to the contrary. Actual fraudulent transfer claims are not viable.

## 2. Constructive Fraudulent Transfer Claims Are Not Viable

To establish its constructive fraudulent transfer claim, Debtors must—but cannot—prove that Purdue made a transfer for less than fair value (or less than "a reasonably equivalent value") when it (i) was insolvent on a balance sheet basis, or the fair salable value of the debtor's assets at the time of the transaction was less than Purdue's probable liabilities (the "**Balance Sheet Test**"),[125] (ii) was undercapitalized (the "**Capital Adequacy Test**"), or (iii) believed that it would incur debts beyond its ability to pay its debts as they came due (the "**Cash Flow Test**"). The uncontradicted record—including the expert testimony of Dr. Maureen Chakraborty—establishes that Purdue satisfied each of these solvency tests when each of the 2008-16 Distributions was made. In addition, Debtors' have already received reasonably equivalent value for all of the Tax Distributions. If litigated, Debtors' constructive fraudulent transfer claims would fail.

### a. Purdue Was Solvent under the Balance Sheet Test in 2008-16

The Balance Sheet Test considers whether the "present fair salable value" of Purdue's assets exceeded its liabilities at the time of each distribution. "Present fair salable value" is a market standard. *See In re Iridium Operating LLC*, 373 B.R. 283, 346-352 (Bankr. S.D.N.Y. 2007). Courts view "traditional valuation techniques and contemporaneous market evidence," including stock price and "assessments [by] market analysts" as "critical piece[s] of information

---

secrecy or duplicity in the 1987 creation of the trust and no evidence that settlor knew, at the time, that medical costs exceeding his capacity to pay would descend upon him in consequence of a future protracted illness of his spouse.").

[125] DCL §271. *See also* CONN. GEN. STAT. §52-552c; *In re LXEng LLC*, 607 B.R. 67, 97 (Bankr. D. Conn. 2019) ("To calculate a disputed claim's value properly, the court must assess the likelihood of the claim's success.") (citing *Licata v. Coan*, 2015 WL 9699304, at *7 (D. Conn. Sept. 22, 2015), *aff'd sub nom. In re Licata*, 659 F. App'x 704 (2d Cir. 2016)).

NAS3135

in valuing a company." *Id.*

As set forth in the Chakraborty Report (JX-1937) ¶¶158-63, Purdue was solvent under the Balance Sheet Test when each 2008-16 Distribution was made because, using the highest reasonable estimate of Purdue's liabilities, the positive difference between its assets and its liabilities was never less than $1.3 billion and was as much as $9.2 billion. That conclusion is supported by extensive contemporaneous evidence, discussed *supra* at 56 and at ¶¶457-72, showing that from 2008 to 2016, Purdue did not face or anticipate crippling litigation, and it had huge profits and substantial cash reserves even after the Distributions were made. To prove that the thousands of Pending Opioid Actions filed in 2017-19 render Purdue retroactively insolvent between 2008 and 2016 would require evidence that is not speculative or hypothetical. There is no such evidence.

### i. The Pending Opioid Actions Do Not Support a Retroactive Finding of Insolvency

Solvency must be judged as of "the time at which the transfer took place," *McCarthy v. Estate of McCarthy*, 145 F. Supp. 3d 278, 287 (S.D.N.Y. 2015), "not with the benefit of hindsight." *Lippe*, 249 F. Supp. 2d at 380. "The hypothetical existence of liabilities … from future tort claims … is not considered for purposes of a fraudulent conveyance analysis."[126]

For reasons discussed *supra* in §I, there is substantial reason to doubt that the still-unliquidated trillions of dollars in damages alleged against Purdue in the Pending Opioid Actions ever could have been substantiated. Many of the Pending Opioid Actions challenge marketing by

---

[126] *FSP, Inc. v. Société Générale*, 2005 WL 475986, at *15 (S.D.N.Y. Feb. 28, 2005). *See also Shelly v. Doe*, 249 A.D.2d 756, 757 (3d Dep't 1998) (no fraudulent transfer where defendant made transfer prior to tort suit being filed against him: "In our view the *amount* of his probable debt to respondent should not be considered as it was entirely speculative [at the time of the transfer]."); *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.*, 2006 WL 763212, at *4 (D. Minn. Mar. 24, 2006) (rejecting "attempts to add liabilities to Defendants' balance sheets, based on the unadjudicated, speculative damages at issue in the MDL litigation").

NAS3136

Purdue that was not deceptive, including statements required by federal law and state consent judgments; assert claims based on conduct that was released in 2007; or bring challenges that depend on scientific findings rejected by the FDA. Many also advance a novel public nuisance theory that has never been vindicated by an appellate court. It strains credulity to suggest that unasserted claims premised on novel theories, stale facts, or questionable science, or that would require violation of federal law or court orders, were anything other than speculative before 2017.

Even after the commencement of bankruptcy, Debtors stated that the claims against them "are subject to a number of defenses that bar or significantly limit them."[127] Debtors did not file a bankruptcy petition because the Pending Opioid Actions had merit; they did so because, "putting the merits of the litigations aside, the sheer number and scale of the Pending Actions is simply unmanageable."[128] Claims like the Pending Opioid Actions—only five of which were commenced before 2017—are similar to the "hotly contest[ed]" claims in *Lippe*, which the debtor "believed … were meritless" or sought "exaggerated" amounts, and which the Court found were "not 'debts' in the sense that they [are] liquidated amounts." 249 F. Supp. 2d at 379-80. *Lippe* held that evidence that the defendant "believed the asbestos problem to be a serious one … does not constitute evidence that [it] knew that someday it would be overwhelmed by the asbestos cases." *Id*. at 381. The same is true here.

There are also insurmountable practical obstacles to holding Purdue retroactively insolvent based on the novel tort claims asserted in lawsuits almost universally filed after 2017. There is no precedent, authority or sense in accepting the damages alleged in the proofs of claims before the Court as reflecting Debtors' liabilities. They total over $40 trillion—more than America's GDP.

---

[127]    Debtors' Informational Brief at 37.
[128]    *Id. See also id.* at 43 ("liability is not a foregone conclusion").

NAS3137

As the Tenth Circuit has observed, "[r]equiring a district court to predict the amount of damages that may be awarded in a pending lawsuit and then to discount that amount by its estimate of the chance of a liability verdict is equivalent to flipping a coin and is no better than gazing into a crystal ball." *Amphibious Partners LLC v. Redman*, 389 F. App'x 762, 766 (10th Cir. 2010).

Contemporaneous assessments of Purdue by investment banks and rating agencies independently confirm that opioid litigation risk was not foreseen.  In 2009, Goldman Sachs reviewed Purdue's business and the only litigation risk it identified was patent litigation. ¶532.  In 2014, JPMorgan prepared a "comprehensive valuation and debt capacity analysis" of Purdue that similarly identified only patent litigation risk and concluded that Purdue could raise about $1.0-$1.5 billion in debt financing.  ¶533.  In 2016, Purdue received an indicative credit rating from Moody's of "Ba3" based on its "low financial leverage," which Moody's said would enable "the company to absorb considerable operating or legal setbacks with minimal risk of debt impairment" (¶535).  Also in 2016, Purdue was rated "BB" by Standard & Poor's, who said that Purdue's "very low leverage metrics support our 'minimal' financial risk assessment."  ¶536.

Contemporaneous economic evidence reveals that the financial markets—in their treatment of opioid manufacturers named as Purdue's co-defendants in the Pending Opioid Actions—did not anticipate massive opioid litigation before 2017.  ¶¶538-43.  Moody's and S&P did not mention the risk of opioid litigation in credit rating reports for Mallinckrodt and Teva until 2018-2019, and for Endo until November 29, 2017.  Credit ratings for Mallinckrodt, Endo and Teva did not significantly dip until 2019.  ¶¶539.

In the absence of any contrary contemporary evidence (and there is none), the record confirming that the Pending Opioid Actions were not foreseeable when PPLP made the 2008-16

NAS3138

Distributions—and supporting a finding of Purdue's solvency—is presumptively valid.[129]

###### ii. Purdue's 2020 Guilty Plea and Civil Settlement Do Not Support a Retroactive Finding of Insolvency

Purdue's 2020 Guilty Plea does not support a conclusion that Purdue was insolvent when the Distributions were made years earlier. There is no evidence, *ex ante*, that either Purdue's management or market participants foresaw the liabilities associated with the Guilty Plea. *See* JX-1937 (Chakraborty Report) ¶146. First, Purdue learned about the federal investigation into OxyContin in 2016, when it received subpoenas from the District of Connecticut U.S. Attorney's Office (in June and September 2016 and August 2017) and the Department of Justice Consumer Protection Branch (in December 2017).[130] Distributions before June 2016—nearly all of the Distributions—were made before anyone at Purdue learned about those investigations

Second, Purdue's financial statements properly reported the subpoenas and did not disclose a probable liability associated with those subpoenas. That is real-time evidence that Purdue and its auditors at Ernst & Young did not conclude that Purdue faced a probable liability at the end of the 2008-16 period. That is consistent with the fact that (1) throughout 2008-16, Purdue had several mechanisms in place designed to ensure that its sales and marketing comported with all legal requirements (¶¶60-113); (2) based on the operation of those compliance mechanisms, none of management's extensive presentations to the Board in 2008-16 perceived an opioid litigation risk or problem that could give rise to such litigation; (3) in late 2015, outside counsel reviewed Purdue's commercial compliance program—its field promotional activities and related compliance controls—and gave the program a positive review; and (4) as part of the 2015

---

[129]   *See Iridium*, 373 B.R. at 346-351 (treating contemporaneous market evidence as presumptively valid, unless a "substantial" reason is provided for rejecting it).

[130]   JX-1850 (Purdue Pharma L.P. and Associated Companies, Audited Combined Financial Statements for the years ended 2017 and 2016) (PPLPC029000692681) at -737.

NAS3139

settlement with the New York Attorney General, an auditor approved by NYAG reviewed Purdue's implementation of its ADD Program for three years, with no negative findings. The liabilities associated with the 2020 Guilty Plea were not reasonably foreseeable from 2008 through 2016 and expert testimony concludes they do not affect the analysis of Purdue's solvency over that period. JX-1937 (Chakraborty Report) ¶¶153-54.

The 2020 Guilty Plea has no collateral estoppel effect against the Former Directors because the Former Directors had no control over Purdue when Purdue agreed to enter it.[131] A debtor cannot settle itself into insolvency for purposes of establishing its own fraudulent transfer claim against its owners. In the event of litigation, Debtors would need to establish the facts underlying the Guilty Plea—including when all of the associated liabilities were incurred.[132]

### b. Purdue Was Solvent under the Cash Flow Test in 2008-16

The Cash Flow Test "requires proof of the transferor's subjective intent or belief that it will incur debt it cannot pay at maturity" at the time of the challenged transfer, *Innovative Custom Brands, Inc. v. Minor*, 2016 WL 308805, at *3 (S.D.N.Y. Jan. 25, 2016), based on a "good indication of oncoming insolvency."[133] The test applies an "objective standard" of "reasonable foreseeability" and requires only that the company's forecasts were "reasonable and prudent when

---

[131]     *See Schreiber*, 327 F.3d at 184, 186 ("Collateral estoppel applies only against a party to a previous adjudication and that party's 'privies;'" held, corporation not bound by conviction of former CEO because they were not in privity "at the time of [his] trial.").

[132]     Side B assumes that the Debtors would not rely on the allegations contained in the DOJ's civil claims as evidence of their insolvency because the settlement agreement included a denial of all facts not admitted in the guilty plea. JX-2095 (10/21/20 Purdue Settlement with DOJ).

[133]     *Grace Plaza of Great Neck, Inc. v. Heitzler*, 2 A.D.3d 780, 781 (2d Dep't 2003); *see also In re Nirvana Rest.*, 337 B.R. 495, 509 (Bankr. S.D.N.Y. 2006) ("Section 275 requires proof of *the debtor's subjective intent* or belief that it will incur debts beyond its ability to pay as they mature."). To the extent Delaware or Connecticut law applies and imposes a "reasonably should have believed" standard, Purdue's distributions were not fraudulent because future judgments were not probable when the distributions were made.

NAS3140

made," not that the transferor had "resources sufficient to withstand any and all setbacks."[134]

Purdue was solvent under the Cash Flow Test because, using the highest reasonable estimate of Purdue's liabilities, its reasonably expected cash flows were sufficient to meet its reasonably expected liabilities as and when they would come due over a multi-year period. ¶427; JX-1937 (Chakraborty Report) ¶¶6, 16, 164-170.

### c. Purdue Satisfied the Capital Adequacy Test in 2008-16

Under DCL §274, a transfer can be set aside if it left the defendant "with unreasonably small capital."[135] This test "denotes a financial condition short of equitable insolvency" and "is aimed at transferees that leave the transferor technically solvent but doomed to fail." *MFS/Sun Life Tr.-High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995). Where a company makes a reasonable and prudent assessment that it has sufficient working capital to continue in business and manage reasonably foreseeable financial challenges, it does not have unreasonably small capital. *Id.* This is true regardless of whether the company actually does stay afloat. Fraudulent transfer laws "do not constitute insurance against the ultimate failure of the company." *Id.* at 945.

Dr. Chakraborty's analysis shows that Purdue satisfied the Capital Adequacy Test between 2008 and 2016 because, using the highest reasonable estimate of Purdue's liabilities, it had an adequate amount of capital to sustain its operations under a stress-test scenario. *See* JX-1937 (Chakraborty Report) ¶¶6, 17, 171-180. The fact that Purdue remained in business over 10 years after the earliest challenged Distributions and two years after the most recent challenged

---

[134]     *In re Bergman*, 293 B.R. 580, 584-85 (Bankr. W.D.N.Y. 2003).
[135]     *Minor*, 2016 WL 308805, at *3.

NAS3141

Distributions confirms that none of those transfers left Purdue with unreasonably small capital.[136]

### 3.    The Tax Distributions Were Not Fraudulent Transfers

Debtors' attempt to recover the Tax Distributions as fraudulent transfers would independently fail because PPLP received reasonably equivalent value for the Tax Distributions and avoidance of the Tax Distributions would constitute a punitive double recovery.

#### a.    PPLP Received Reasonably Equivalent Value for the Tax Distributions

Debtors cannot recover transfers for which they already received reasonably equivalent value.  *See* DCL §273(a)(2).[137]  Reasonably equivalent value does not mean a dollar-for-dollar exchange.  Rather, "the benefits the debtor receives … must approximate its expected costs."[138]

Someone had to pay PPLP's taxes.  PPLP's owners assumed its tax burden in exchange for Tax Distributions.  As Professor Blouin explains, this is a typical arrangement for pass-through entities like PPLP, JX-0425 (Blouin Report) ¶¶52-53, and, from her perspective as an economist and a tax expert, this is "an exchange of reasonably equivalent value because the tax distributions were made in exchange for bearing the tax obligation created by PPLP's economic activity." *Id.* at ¶59.  The amounts of Tax Distributions correlate with the amount PPLP would have been obliged to pay had it been organized as a C corporation.  *Id.* at ¶67 & Table 11.  *See also* at ¶¶545-

---

[136]     *MFS/Sun Life Tr.-High Yield Series*, 910 F. Supp. at 944 (rejecting claim under DCL §274: "That the company remained viable so long after the [transaction] strongly suggests that its ultimate failure cannot be attributed to inadequacy of capital as of the date of the [transaction]") (collecting cases).

[137]     Prior to April 4, 2020, New York's statute required the claimant to show that the transfer was for "fair consideration," rather than "reasonably equivalent value."  However, for relevant purposes here, those two standards "have substantially the same meaning."  *In re Sterman*, 594 B.R. 229, 234-35 (Bankr. S.D.N.Y. 2018).

[138]     *In re Lyondell Chem. Co.*, 567 B.R. 55, 114 (Bankr. S.D.N.Y. 2017) (quoting *In re Jesup & Lamont, Inc.*, 507 B.R. 452, 472 (Bankr. S.D.N.Y. 2014)), *aff'd*, 585 B.R. 41 (Bankr. S.D.N.Y. 2018).

NAS3142

546. Thus, "the value of the tax distributions paid by PPLP during the [2008-17] Period was reasonably equivalent to the amount of taxes PPLP would have faced if it were organized as a C corporation during the [same period]." JX-0425 (Blouin Report) at ¶¶67-71.

Because Tax Distributions were made to PPLP's owners in exchange for their agreement to bear the reasonably equivalent "tax obligation created by PPLP's economic activity" (*id.* at ¶59), they cannot be set aside as constructive fraudulent transfers.[139]

### b. Avoidance of the Tax Distributions That Were Used to Pay Taxes Would Constitute a Punitive Double Recovery

In all events, the Tax Distributions to Side B were almost entirely paid to state and federal governmental entities. Between 2008 and 2017, two Side B entities—the 74A Trust and Rosebay Medical Company, Inc.—received $2,261 million in tax distributions from PPLP and incurred (and paid) $2,072 million in taxes. *See* ¶549; *see also* JX-0425 (Blouin Report) ¶46. Thus, approximately 92% of the Tax Distributions were used to pay taxes and are in the hands of state and local governments—who are claimants in these cases—not the Raymond Sackler Family. Avoiding the Tax Distributions that were used to pay taxes would be punitive, which is highly disfavored.[140] It would also impermissibly give claimants who already received tax payments a double recovery from trusts that no longer hold the funds.

### B. Fiduciary Duty Claims

According to the Disclosure Statement, Debtors "could potentially assert claims for breach

---

[139]    *Lyondell Chem. Co.*, 567 B.R. at 114; *see also In re Northlake Foods, Inc.*, 715 F.3d 1251, 1256 (11th Cir. 2013).

[140]    *See, e.g., In re Tronox Inc.*, 464 B.R. 606, 618 (Bankr. S.D.N.Y. 2012) ("[T]he purpose of fraudulent conveyance law is remedial rather than punitive"); *accord In re Keeley & Grabanski Land P'ship,* 531 B.R. 771, 777 & n.12 (8th Cir. B.A.P. 2015) (quoting *Tronox*, 464 B.R. at 618), *aff'd*, 832 F.3d 853 (8th. Cir. 2016).

NAS3143

of fiduciary duties against members of the Board."[141]  To the extent the Debtors were to assert a

self-dealing claim, that would, as Debtors admit, "largely overlap in terms of evidence and

substance" with the Estate's fraudulent transfer claims,[142] and fails for the reasons just discussed.

Debtors acknowledge that their ability to recover on a self-dealing theory is even "more limited"

than their fraudulent transfer claims because liability would be limited to the post-September 15,

2016 time period (when few Distributions were made),[143] and because the "recovery would have

to be pursued against individual" Former Directors, whose individual net worth is far less than the

amounts received by the "transferee[s] of funds."

Even assuming that the members of the PPI Board owed fiduciary duties directly to PPLP

other than the duty to refrain from self-dealing—and, as set forth in the following section, they did

not—those duties were more than satisfied.  Debtors articulate two possible theories of recovery.

The first theory, that the Former Directors "directly caused the partnership to violate the law,"[144]

has no application here.  No evidence ties the conduct of any Former Director to the conduct

admitted in Purdue's 2020 Guilty Plea or any other illegal conduct during the Relevant Period.

Nor does the 2020 Guilty Plea bind the Former Directors because they were not in privity with,

and had no control over, PPLP when the plea was entered.[145]  *See supra* at 14.  Consequently,

Debtors would have to prove the DOJ's underlying case against Purdue, and tie it to conduct by

the Former Directors.

---

[141]     Disclosure Statement at 172.

[142]     *Id.*

[143]     *Id.* at 172-73. *See also* N.Y. CPLR 214(4) (3-year limitations period for fiduciary breach);
DEL. CODE ANN. tit. 10, §8106 (same).

[144]     Disclosure Statement at 172.  As the Debtors' note, "there would … have to be evidence
tying such conduct to individual members of the Board."  *Id.* at 173.  There is none. *See supra* at
§I.A-C.

[145]     *Schreiber*, 327 F.3d at 184, 186.

NAS3144

The second theory, that the Former Directors "failed to implement or adequately monitor internal compliance programs"[146]—the so-called *Caremark* theory of recovery—"is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment."[147] To prevail, Debtors must establish that the directors acted with a conscious disregard of their responsibilities, which normally requires showing "a sustained or systematic failure of the board to exercise oversight."[148] There was no such failure here. *Supra* at 19-20; *infra* at 80-81. The Disclosure Statement recognizes the "significant challenges of proof" that a *Caremark* claim by Debtors would face.[149] Those challenges cannot remotely be met on this record.

## 1. Under Delaware Law, Directors of a Corporate General Partner Owe Only Limited Fiduciary Duties to the Limited Partnership

New York choice-of-law rules determine which law governs state law claims, including for breach of fiduciary duty. *In re Gaston & Snow,* 243 F.3d 599, 607 (2d Cir. 2001). Those rules dictate application of the internal affairs doctrine, which "generally requires that questions relating to the internal affairs of corporations are decided in accordance with the law of the place of incorporation,"[150] or, in the case of partnerships, by "the laws of the jurisdiction where the partnership is organized."[151] Under the internal affairs doctrine, Delaware law governs fiduciary

---

[146]    Disclosure Statement at 172.
[147]    *Wandel v. Dimon*, 135 A.D.3d 515, 516 (1st Dep't 2016) (quoting *In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996)).
[148]    *Id.* (quoting *Caremark*, 698 A.2d at 971).
[149]    Disclosure Statement at 172.
[150]    *In re Stillwater Capital Partners Inc. Litig.*, 853 F. Supp. 2d 441, 450-51 (S.D.N.Y. 2012).
[151]    *Dennis v. JPMorgan Chase & Co.*, 342 F. Supp. 3d 404, 410 (S.D.N.Y. 2018). *See also* N.Y. Partnership Law §121-901 ("the laws of the jurisdiction under which a foreign limited partnership is organized govern its organization and internal affairs and the liability of its limited partners"); *In re Stillwater Capital Partners Inc. Litig.*, 853 F. Supp. 2d at 450-51 ("[O]nly one State should have the authority to regulate a corporation's internal affairs because otherwise a corporation could be faced with conflicting demands.").

NAS3145

duties owed to PPLP (a Delaware limited partnership ("**LP**")) by its general partner ("**GP**"), PPI,[152] and by PPI's Board,[153] while New York law governs fiduciary duties owed to PPI (a New York corporation) by its own Board.[154]

    *In re USACafes, L.P. Litigation*, 600 A.2d 43 (Del. Ch. 1991), is the seminal case delineating the limited duties owed under Delaware law by the directors of a corporate GP (like PPI) to the LP managed by that GP (like PPLP). In *USACafes,* the directors of the GP "all received substantial side payments that induced them to authorize the sale of the Partnership assets for less than the price that a fair process would have yielded." *Id.* at 46. Reasoning that the directors' control over LP property gave rise to duties akin to trusteeship, the court held that they owed a limited duty of loyalty with respect to the LP's property. *Id.* at 49. The court refrained from "delineat[ing] the full scope of that duty [which] may well not be so broad as the duty of the director of a corporate trustee," but explained that "it surely entails the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership."

---

[152]    *See Zutty v. Rye Select Broad Mkt. Prime Fund, L.P.*, 2011 WL 5962804 at *7 (Sup. Ct. N.Y. Cnty. Apr. 15, 2011) ("claim[s] of breach of duty pertaining to the conduct of [a Delaware limited partnership's] internal affairs, are governed by Delaware Law"); *Grewal v. Cuneo*, 2015 WL 4103660, at *5 (S.D.N.Y. July 7, 2015), *aff'd* 2020 WL 897410 (2d Cir. Feb. 25, 2020); *In re MS Angeln GmbH & Co. KG*, 2012 WL 1080300, at *3 (S.D.N.Y. Mar. 29, 2012), *aff'd* 510 F. App'x 90 (2d Cir. 2013).

[153]    *See Spitzer v. Shanley Corp.*, 870 F. Supp. 565, 569-70 (S.D.N.Y. 1994) (applying Oklahoma law "to determine [the defendant's] personal responsibility as a director" of an Oklahoma limited partnership's corporate GP); *Maywalt v. Parker & Parsley Petroleum Co.*, 808 F. Supp. 1037, 1058-59 (S.D.N.Y. 1992) (applying "law of the state in which an entity is formed" to claims against directors and officers of corporate general partner); *JFK Family Ltd. P'ship v. Millbrae Nat. Gas Dev. Fund 2005, L.P.*, 21 Misc. 3d 1102(A); 873 N.Y.S.2d 234 (Sup. Ct. Westchester Cnty. 2008) (applying Delaware law to fiduciary duty claims against officers of corporate managing partner of a Delaware LLC under internal affairs doctrine).

[154]    *See In re Ticketplanet.com*, 313 B.R. 46, 62 (Bankr. S.D.N.Y. 2004) ("the law of the state of incorporation governs an allegation of breach of fiduciary duty owed to a corporation"); *In re Hydrogen, L.L.C.*, 431 B.R. 337, 346-47 (Bankr. S.D.N.Y. 2010) (same).

NAS3146

*Id.* at 49.

The Delaware Chancery Court has since "followed *USACafes* consistently, holding that the individuals and entities who control the general partner owe to the limited partners, at a minimum, the duty of loyalty identified in *USACafes*."[155] While courts routinely articulate the *USACafes* duty of loyalty as the duty owed "at a minimum,"[156] "[i]n practice, the cases applying *USACafes* have not ventured beyond the clear application stated in *USACafes*: the duty not to use control over the partnership's property to advantage the corporate director at the expense of the partnership."[157] Then-Vice Chancellor Strine explained: "Limiting the application of *USACafes* to this duty provides, in my view, a rational and disciplined way of protecting investors in alternative entities with managing members who are themselves entities, *while not subjecting all the individuals who work for managing members to wide-ranging causes of action*." *Id.*

The directors of a corporate GP thus do not owe a duty of care towards the LP. In *Refco Group Ltd. LLC v. Cantor Fitzgerald, L.P.*, 2014 WL 2610608, at *21 (S.D.N.Y. June 10, 2014) (applying Delaware law), Judge Abrams explained that since *USACafes* "has not been extended beyond duty of loyalty claims, … the controllers of a general partner are not held liable for breaches of the duty of care, *i.e.,* gross negligence." Similarly, in *Caiola*, the Chancery Court held that under *USACafes*, a controller of the managing member of an LLC "could be sued … for breach of fiduciary duty in his capacity as the party who controls [the managing member]," but "he cannot

---

[155]     *Lewis v. AimCo Props., L.P.*, 2015 WL 557995, at *5 (Del. Ch. Feb. 10, 2015).
[156]     *See, e.g.*, *2009 Caiola Family Trust v. PWA, LLC*, 2015 WL 6007596, at *25 (Del. Ch. Oct. 14, 2015); *Fannin v. UMTH Development, L.P.*, 2020 WL 4384230, at *18 (Del. Ch. July 31, 2020); *Lewis*, 2015 WL 557995 at *5.
[157]     *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *9–10 (Del. Ch. Apr. 20, 2009).

NAS3147

be sued in that capacity for breach of the duty of care." 2015 WL 6007596, at *26.[158]

Nor do the directors of a corporate GP owe a *Caremark*-like duty to the LP. The duty they owe is *only* a duty of loyalty that prohibits self-dealing.[159] Side B is aware of no case holding that the directors of a corporate partner owe a *Caremark* or *Caremark*-like duty to oversee an LP's business. To the contrary, *dictum* in *Wenske v. Blue Bell Creameries*, 2018 WL 3337531 (Del. Ch. July 6, 2018), states that *USACafes* would not extend that far. *Wenske* dismissed *Caremark* claims against a GP's directors because the LP agreement in that case "entirely eliminate[d] the general partner's common law fiduciary duties" to the LP. *Id.* at *17. However, *Wenske* observed that, even without contractual language eliminating the GP's fiduciary duty, the GP's directors' duties to the partnership were limited by *USACafes*: "Insofar as [the GP's directors] do [owe fiduciary duties to the LP], ... those duties require only that the controllers refrain from self-dealing; *i.e.*, that they 'not ... use control over the limited partnership's property to advantage themselves at the expense of the partnership.'" *Id.*

The Estate cannot evade the limitations of *USACafes* by asserting a *Caremark*-type breach of fiduciary duty claim against the Former Directors on behalf of PPI, instead of PPLP. Unlike PPLP—"Debtors' main operating entity," Disclosure Statement at 48—PPI was not an operating entity, did not manufacture, market, or distribute opioids, and has not pled guilty to any

---

[158]  *See also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 671-72 (Del. Ch. 2012) (dismissing gross negligence claim against controller of GP because "*USACafes* has not been extended beyond duty of loyalty claims").

[159]  *See also Refco Group*, 2014 WL 2610608 at *21; *Caiola*, 2015 WL 6007596, at *26; *Feeley* 62 A.3d at 671-72 (dismissing claim duty of care claim because "*USACafes* has not been extended beyond duty of loyalty claims"); *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *43–44 (Del. Ch. May 19, 2020) ("The plaintiffs only argued in their briefs that ... Altenberg [controller of the managing member of an LLC] breached a duty of care. ... Under *USACafes* and *Feeley*, the plaintiffs cannot pursue these claims against Altenberg"); *Feeley*, 62 A.3d at 671-72.

NAS3148

wrongdoing.  Because the alleged deceptive wrongdoing was by PPLP, and PPLP is the entity

which pled guilty in 2020, a *Caremark* claim depends on the Former Directors' alleged failure to

properly oversee PPLP.

Further, the application of the *Caremark* standard, which New York law recognizes,[160] to

the directors of a New York corporation is subject to New York Business and Corporations Law

§717(a), which eliminates liability for a director who reasonably relies on information provided

by officers, counsel or other professionals:

> In performing his duties, a director shall be entitled to rely on information, opinions, reports or statements including financial statements and other financial data, in each case prepared or presented by:
>
> (1) one or more officers or employees of the corporation … whom the director believes to be reliable and competent in the matters presented, [and]
>
> (2) counsel, public accountants or other persons as to matters which the director believes to be within such person's professional or expert competence ….
>
> A person who so performs his duties shall have no liability by reason of being or having been a director of the corporation.

Under NY BCL §717, a director who properly relied on advice as set forth under the statute is not

liable for a breach of duty.[161]

### 2. If *Caremark* Applied, the Former Directors Satisfied Their Duties

*Caremark* requires that a board make a good faith effort to implement and monitor

communications with management about compliance with law and attention to business risk:

> [I]t is important that the board exercise a good faith judgment that the corporation's information and reporting system is in concept and design adequate to assure the board

---

[160]    "Under New York law, a director breaches her duty of care when she causes there to be a 'sustained or systematic failure ... to exercise oversight' over the corporation's activities." *Epiphany Cmty. Nursery Sch. v. Levey*, 2017 WL 3386267, at *5 (Sup. Ct. N.Y. Cnty. Aug. 07, 2017), *aff'd*, 94 N.Y.S.3d 1 (1st Dep't 2019).  *See also Grika v McGraw*, 55 Misc.3d 1207(A), at * 19 (Sup. Ct., NY Cnty. 2016) (Commercial Division), *aff'd* 161 A.D.3d 450 (1st Dep't 2018).
[161]    *See, e.g.*, *Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 892, 904-05 (W.D.N.Y. 1983), *aff'd*, 717 F.2d 757 (2d Cir. 1983).

NAS3149

that appropriate information will come to its attention in a timely manner as a matter of ordinary operations, so that it may satisfy its responsibility.

698 A.2d at 970. *Caremark* stresses that "the duty to act in good faith to be informed *cannot be thought to require directors to possess detailed information about all aspects of the operation of the enterprise*." *Id*. at 971.

*Caremark* recognizes that "obviously … no rationally designed information and reporting system will remove the possibility that the corporation will violate laws or regulations," and that directors may sometimes "fail reasonably to detect acts material to the corporation's compliance with the law." *Id*. at 970. As the Delaware Supreme Court emphasized in *Stone v. Ritter*, 911 A.2d 362, 370, 373 (Del. 2006), in the absence of red flags "showing that the board ever was aware that [ ] internal controls were inadequate, [and] that these inadequacies would result in illegal activity:"

> [G]ood faith in the context of oversight must be measured by the directors' actions to assure a reasonable information and reporting system exists and not by second-guessing after the occurrence of employee conduct that results in an unintended adverse outcome.

A breach of *Caremark* duties requires that the directors acted with "a <u>conscious disregard</u> to their responsibilities." *Wandel*, 135 A.D.3d at 516. If a *Caremark* claim is predicated on ignorance of wrongful activity, "only a sustained or systematic failure of the board to exercise oversight—such as an utter failure to attempt to assure a reasonable information and reporting system exists—will establish the lack of good faith that is a necessary condition to liability." *Id.* "Even a showing of gross negligence by a majority of the Board will not suffice." *Id.*[162] By

---

[162] *See also In re SAIC Inc. Derivative Litig.*, 948 F.Supp.2d 366, 381 (S.D.N.Y.2013) ("to hold directors liable for a failure in monitoring, the directors have to have acted with a state of mind consistent with a <u>conscious decision</u> to breach their duty of care"), *aff'd. sub nom.*, *Welch v. Havenstein*, 553 F. App'x 54 (2d Cir. 2014); *Stone*, 911 A.2d at 370 ("the necessary conditions predicate for director oversight liability" are: (a) the directors <u>utterly failed to implement</u> any reporting or information system or controls; *or* (b) having implemented such a system or controls, <u>consciously failed to monitor</u> or oversee its operations thus disabling themselves from being

NAS3150

contrast, "[w]here the board has in place a reasonable board-level system of monitoring and reporting, deference is given to the board and *Caremark* claims are dismissed even when illegal or harmful company activities escaped detection." *Behrmann v. Brandt*, 2020 WL 4432536, at *12 (D. Del. July 31, 2020).

Here, the record evidence shows that the Board ensured that Purdue put in place and monitored compliance systems to prevent diversion and make sure that marketing complied with the law. The Board was proactive on compliance. In 2005, it adopted a corporate compliance charter requiring a strict compliance regime, requiring the appointment of a Vice President of Corporate Compliance who was charged with implementing a program satisfying the seven elements of an "effective compliance program" as defined by the OIG of HHS and the Sentencing Guidelines. JX-2012 (10/6/05 Decision Adopting Compliance Charter) (PKY183307471). The Charter made all Purdue Executive Committee members responsible for ensuring compliance in all operating and staff departments at Purdue. *Id.* The Board was informed in November 2005 that the Compliance Department had received a highly favorable audit of the compliance program by outside counsel. JX-1836 (11/1/05 Update and Budget Report) (PPLPC018000070210) at slide 39.

In 2007, the Board amended the Compliance Charter to incorporate requirements of Purdue's Corporate Integrity Agreement. JX-2013 (Decisions of the PPI Board) (PPLP004415283) at -289-90. The updated Charter required the VP of Compliance to report to the Board quarterly and authorized additional reports whenever the VP deemed it appropriate. *Id.* It mandated a Corporate Compliance Council chaired by the VP of Corp. Compliance with

---

informed of risks or problems requiring their attention[, and i]n either case, … the directors knew that they were not discharging their fiduciary obligations.").

NAS3151

members from General Counsel's Office, H.R., Risk Management, Regulatory Affairs, Field Operations, Corporate Quality, Finance and Medical Research. *Id.*

The record establishes in great detail (*supra* at 19-20, ¶¶59-143) that Purdue had in place a rigorous and "regular protocol requiring board-level reports about the relevant risks" and that there were "third-party monitors, auditors, or consultants." *Behrmann*, 2020 WL 4432536, at *12 (dismissing *Caremark* claim where plaintiff "acknowledge[d] the existence of board-level monitoring and oversight systems").[163] As the testimony of Professor Hamermesh confirms, the Board's conduct conformed to 2015 OIG Guidance on expectations for board oversight, which cites *Caremark* in imposing an overarching requirement that a board's "good faith ... exercise of its oversight responsibility for its organization" include "inquiries to ensure" that "(1) a corporate information and reporting system exists," and "(2) the reporting system is adequate to assure the Board that appropriate information relating to compliance with applicable laws will come to its attention timely and as a matter of course." *Supra* at 20, 27-28.

The Board did not ignore any red flags during the Relevant Period. Purdue's compliance procedures were implemented by people who knew about the 2007 Guilty Plea, and were initially overseen by the HHS OIG and the IRO because of the guilty plea. The compliance processes were intended to ensure no recidivism. In the years following the 2007 Guilty Plea, the handful of government investigations that Purdue faced were resolved, and there was no meaningful litigation attacking Purdue's compliance with law until 2017. *Supra* at §II.A.1.a. In response to the red flag of burgeoning litigation, the Board ceased Distributions in 2017 and ended all marketing in February 2018. *See* ¶58, 417(1). The Former Directors did not violate any *Caremark* duties

---

[163]    In addition to outside compliance reports from the OIG HHS and outside counsel, Ernst & Young audited the combined financial statements of PPLP and associated companies every year during the Relevant Period. JX-2694 – JX-2696; JX-1841 – JX-1850.

81

NAS3152

## C.     Veil-Piercing Claims

The Disclosure Statement acknowledges that "a claimant may succeed in 'piercing' a corporation's form and recover directly from the corporation's owners or affiliates" only in "exceptional" circumstances.[164]  No exceptional circumstances are present here.

Because PPLP is a limited partnership, it has no "corporate veil" that can be pierced.[165]  PPI is PPLP's general partner, and PRALP is its limited partner.  ¶257.  Under Delaware law, which applies to Delaware limited partnerships,[166] ¶742, "a general partner of a limited partnership [PPI] has the liabilities of a partner," DEL. CODE ANN. TIT. 6, §17-403(b), while a limited partner [PRALP] "is <u>not liable</u> for the obligations of a limited partnership unless … he or she participates in the control of the business" and, then, is liable only to "persons who transact business with the limited partnership reasonably believing" that it is the general partner.  DEL. CODE ANN. TIT. 6, §17-303(a).  There is no evidence that PRALP had authority to control PPLP's business—only PPI did[167]—or that PRALP actually controlled or participated in PPLP's business.  Consequently, only PPI could be liable for PPLP's debts.

To recover debts from PPI's direct and indirect owners on an alter ego theory, Debtors must, but cannot, show a basis for setting aside PPI's corporate form.  PPI is a New York corporation.  The general rule under New York law "is that a corporation exists independently of

---

[164]     Disclosure Statement at 174.

[165]     *See In re Heritage Org. LLC*, 413 B.R. 438, 514 n.64 (Bankr. N.D. Tex. 2009) (applying Delaware law) ("the alter ego theory cannot be used to pierce the entity veil of [limited partnerships]") (applying Delaware law); *see also Pinebrook Props. Ltd. v. Brookhaven Lake Prop. Owners Ass'n*, 77 S.W.3d 487, 499 (Tex. App. 2002) ("The theory of alter ego, or piercing the corporate veil, is inapplicable to partnerships.") (applying Texas law substantively identical to Delaware).

[166]     *In re Saba Enters., Inc.*, 421 B.R. 626, 648 (Bankr. S.D.N.Y. 2009).

[167]     *See* JX-2079 (1997 LPA) (PDD9316726090) at -101 (PPI had "sole responsibility for managing and operating" PPLP).

82

NAS3153

its owners, who are not personally liable for its obligations, and that individuals may incorporate for the express purpose of limiting liability."[168]  It is axiomatic that "[s]imply owning, *even wholly owning*, a subsidiary is insufficient to pierce the corporate veil."[169]  Veil piercing requires proof that: "(1) the owners exercised complete domination of the corporation with respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."[170]  Neither element of the veil-piercing test can be satisfied on this vast record.

### 1.    There Is No Basis to Pierce the Corporate Form of PPI

#### a.    No One Person or Entity Dominated PPI

Debtors cannot show "complete domination, not only of finances but of policy and business practice" such that [PPI] had "no separate mind, will or existence of its own"[171] because PPI's governance structure prevented control from crystalizing in one person, or in either Side A or B.

---

[168]    *E. Hampton Union Free Sch. Dist. v. Sandpebble Builders, Inc.*, 66 A.D.3d 122, 126 (2d Dep't 2009).

[169]    *In re Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 975 F. Supp. 2d 392, 404 (S.D.N.Y. 2013) (emphasis in original); *see also, e.g., Tycoons Worldwide Grp. Pub. Co. Ltd. v. JBL Supply Inc.*, 721 F. Supp. 2d 194, 205 (S.D.N.Y. 2010) ("[T]he fact that [the individual] is the majority shareholder and an officer of [the corporation] is not, in itself, a basis for piercing the corporate veil.").

[170]    *In the Matter of Morris v. N.Y. State Dep't of Taxation and Fin.*, 82 N.Y.2d 135, 141-42 (1993).  *See also Trevino v. Mescorp, Inc.*, 583 F. Supp. 2d 521, 528 (D. Del. 2008) (applying Delaware law) (veil piercing claim requires plaintiffs to "show (1) that the corporation and its shareholders operated as a single economic entity, and (2) that an overall element of injustice or unfairness is present.").

[171]    *Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988).  *See also, e.g., Gartner v. Snyder*, 607 F.2d 582, 586 (2d Cir. 1979) (noting that New York courts impose alter ego liability when "the corporation has been so dominated by an individual … and its separate identity so disregarded, that it primarily transacted the dominator's business rather than its own"); *Am. Lecithin Co. v. Rebmann*, 2017 WL 4402535, at *3 (S.D.N.Y. Sept. 30, 2017) ("[T]he critical inquiry … is whether [the entity] is being used by the alleged dominating entity to advance its own personal interests as opposed to furthering the corporate ends."); *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 657 (1976) ("The determinative factor is whether the corporation is a 'dummy' for its individual stockholders who are in reality carrying on the business in their personal capacities for purely personal reasons rather than corporate ends.").

NAS3154

All PPI board action required approval by a majority of both Class A and B directors, who were appointed by the Class A and Class B shareholders. *See* ¶266. Side A indirectly held 500 Class A shares of PPI, and Side B indirectly held 500 Class B shares of PPI. ¶266. Ownership of the Class B shares was further divided equally between two entities (Linarite and Perthlite) owned by trusts for the benefit of the families of Richard and Jonathan Sackler (and the trustees of many of those trusts were not Sackler family members). ¶266 n. 399; JX-1915 (Martin Report, Ex. A — 11/2019 Raymond-Side Informational Presentation) at slides 95 and 96. As Professor Hamermesh (JX-0470 at ¶54) will testify:

> [U]nder the terms of PPI's articles of incorporation [members of the Raymond Sackler family] had no power, even as a group, to cause PPI's board of directors to take (or refrain from taking) action, because no board action could be taken unless a majority of each of the two classes of directors approved of it, and no individual director had the power to prevent the board from taking action, as long as a majority of both classes of directors approved the action. Thus, none of those persons, even in combination with other members of the Raymond Sackler family, was in a position through share ownership to impose their will on the directors elected by the holders of the Class A stock of PPI. Put more directly, none of the members of the Raymond Sackler family had the power to control PPI's board of directors, and thereby control PPI.

Running PPLP on a day-to-day basis, under PPLP's governing documents and in practice, was performed by a team of highly qualified executives overseeing a workforce of over 1,000 employees. ¶264; *supra* at 88. Even on the high-level matters within the Board's authority, neither Side A nor Side B, nor any board member, had the power—in law or fact—to compel PPI action. Each director had just one vote to be counted among the votes of all other directors, including several distinguished outside directors. *See* ¶¶268-69. The directors disagreed from time to time. *See* ¶270. There is no evidence that the efforts of even active directors on the PPI Board exhibited

NAS3155

any control or domination of PPLP's finances or day-to-day operations.[172]  The evidence is that they were resisted and resented.  *See, e.g.,* PURDUE-COR-00026762, *available at* https://oversight.house.gov/sites/democrats.oversight.house.gov/files/102720%20Purdue%20Documents%20Part%20II.pdf;  JX-2331  (3/8/12  Email  from  Russell  Gasdia) (PPLPC012000368569).

*Trans-World Int'l Inc. v. Smith-Hemion Prods., Inc.*, 972 F. Supp. 1275 (C.D. Cal. 1997), involved an attempt to pierce the veil of a Delaware corporation (JCI) founded by the Jacksons, the family of musicians.  Several members of Jackson family served as officers and directors of JCI, and, collectively, the Jacksons owned the vast majority of JCI shares, but no individual family member was a majority shareholder, and none actually controlled JCI's finances or day-to-day operations.  *Id.* at 1281-83.  The court rejected efforts to hold the Jacksons liable as JCI's alter egos, explaining that, "in every reported case in which a shareholder was held an alter ego of a corporation," the shareholder was "'dominant,' in the sense of both owning a majority of stock and controlling the corporation's general finances and day-to-day operations."  *Id.* 1291.  Because no family member satisfied that test, *id.* at 1292, piercing JCI's veil would improperly "stretch the alter ego doctrine well beyond any prior application under either Delaware or California law."  *Id.* at 1296.

Sackler Family Members indirectly beneficially owned and served as directors of PPI during the Relevant Period, but, like the Jacksons, none individually had a controlling stake or managed Purdue's finances or operations on a day-to-day basis.  Neither did either side of the

---

[172]     *See Billy v. Consol. Mach. Tool Corp.*, 51 N.Y.2d 152, 163 (1980) ("there must be direct intervention by the [owner] in the management of the [entity] to such an extent that the [entity's] paraphernalia of incorporation, directors and officers are completely ignored."); *Cummins Power Sys., LLC*, 975 F. Supp. 2d at 402 (veil piercing requires a "exclusive domination and control to the point that the subsidiary no longer has legal or independent significance of its own.").

85

NAS3156

family.  The required element of domination or control is unsatisfied.

### b. PPI's Corporate Form Was Not Abused

An alter ego claim independently founders on the lack of any evidence "that the owners, through their domination, abused the privilege of doing business in the corporate form to perpetrate a wrong or injustice against that party."[173]  Courts evaluating whether owners abused the corporate form examine whether the company was just a "sham or shell,"[174] or whether it had a "legitimate business purpose."[175]

The record refutes any suggestion that PPI or the businesses it managed were just a "sham," and not "legitimate" businesses:[176]

- **PPI Adhered to All Corporate Formalities.**  PPI was validly incorporated, enacted by-laws, maintained a board of directors and professional officers, held regular board meetings, and maintained corporate records and minutes.[177] As stated in its original 1990 certificate of incorporation (JX-2077) PPI's corporate purpose was to serve as general partner in a pharmaceutical business.  There is no dispute that PPI in fact managed pharmaceutical businesses that develop, manufacture, and sell FDA-approved medications for decades, and those businesses have had a large roster of employees.

- **PPI Was Not Established to Defraud Creditors.**  PPI managed a business that generated billions of dollars in revenue, had no funded debt, and maintained enormous cash reserves.  *Supra* at 59-60 "[T]he possibility that a plaintiff may have

---

[173]   *Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 142 (1993).

[174]   *Cummins Power Sys., LLC*, 975 F. Supp. 2d at 406.

[175]   *CSX Transp., Inc. v. Filco Carting Corp.*, 2011 WL 2713487, at *3 (E.D.N.Y. July 11, 2011) ("Where the defendant has a 'legitimate business purpose' itself, the court should not disregard the corporate structure.).

[176]   *See In re Lyondell Chemical Co.*, 2016 WL 74649, at *14 (Bankr. S.D.N.Y. Jan. 4, 2016) ("For alter ego analyses … courts have considered … "(1) the absence of corporate formalities normally attendant on corporate existence, such as issuance of stock, election of directors, keeping of corporate records, and so forth; (2) inadequate capitalization; (3) the intermingling of corporate and personal finances; and (4) the amount of business discretion displayed by the purported alter ego corporation.").

[177]   *See, e.g.*, *E.I. du Pont Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 679-80 (D. Del. 2018) (finding no evidence that entities with valid governance documents, that elected officers and directors, held board meetings, and kept corporate records were "sham[s]").

NAS3157

difficulty enforcing a judgment is not an injustice warranting piercing the corporate veil." *Trevino v. Merscorp, Inc.*, 583 F. Supp. 2d at 530.[178]

- **There Was No Intermingling of Personal and Corporate Funds or Siphoning.** "Intermingling" describes "funds [being] put in and taken out of the corporation for personal rather than corporate purposes," *Schulz v. United States*, 831 Fed. App'x 48, 49 (2d Cir. 2020), and "siphoning" is the "improper taking of funds that the owner was not legally entitled to receive." *Martin Hilti Family Trust v. Knoedler Gallery, LLC*, 386 F. Supp. 3d 319, 361 (S.D.N.Y. 2019). Neither took place. Purdue maintained its own corporate accounts. The payment of regular dividends "is not sufficient evidence to pierce the corporate veil." *In re Opus E., LLC*, 528 B.R. 30, 63-64 (Bankr. D. Del. Mar. 23, 2015).[179]

There is no evidence that PPI was merely a "dummy" that was used "purely for personal reasons rather than corporate ends."[180]

### 2. There Is No Basis to Pierce the Corporate Form above PPI

In order to recover on an alter ego theory, Debtors would also need to pierce the corporate form of PPI's shareholders, and the trusts that own those entities.[181] There is no evidence that would support doing so. Linarite and Perthlite, which together own Side B's half of PPI, were established in 2003 and are owned by trusts created in 2002 as divisions from trusts established in

---

[178] *See also Art Capital Bermuda Ltd. v. Bank of N.T. Butterfield & Son. Ltd.*, 169 A.D.3d 426, 427 (1st Dep't 2019) ("The fact that Art Capital and Bluefin might not have sufficient assets to satisfy the judgment that the Bank might obtain against them does not warrant piercing the corporate veil."); *Kleinman v. Blue Ridge Foods*, 2011 WL 2899428, at *14 (Sup. Ct. Kings Cnty. July 7, 2011) ("[T]he corporate form may not be disregarded merely because the assets of the corporation are insufficient to assure plaintiff the recovery he seeks.").

[179] Even proof that distributions were fraudulent transfers—which does not exist here—does not establish "unauthorized distributions from a corporate law standpoint." *In re The Heritage Org., LLC*, 413 B.R. 438, 517 n. 69 (Bankr. N.D. Tex. 2009) (rejecting alter ego argument).

[180] *Port Chester Elec. Constr. Corp. v. Atlas*, 40 N.Y.2d 652, 657 (1976).

[181] *See* JX-1915 (July 26, 2021 Martin Report, Ex. A — Nov. 20, 2019 Raymond-Side Informational Presentation); *In re Gulf Fleet Holdings, Inc.*, 491 B.R. 747, 790 (Bankr. W.D. La. 2013) (plaintiff seeking veil-piercing against members of a corporate structure must "establish alter ego liability with respect to each one of the entities" in that structure); *In re Heritage Org. LLC*, 413 B.R. at 514-15 (rejecting "global application" of an alter-ego theory because plaintiff failed to allege veil-piercing at "each level or layer of ownership … within the multi-faceted entity structure").

NAS3158

1989 (years before OxyContin was invented).  *See* ¶254.  The record is devoid of evidence that

any "exceptional circumstances" warrant disregarding their respective corporate forms.  Moreover,

even if it were possible to do so, it would not provide a meaningful recovery.  The trusts that own

Linarite and Perthlite are each valued at just [$3.0 M].  *See* JX-1922 (July 26, 2021 Martin Report,

Ex. H — Net Asset Report as of March 31, 2021).

To reach the ultimate owners of PPLP, certain Sackler family trusts, it would be necessary

to pierce each of numerous intermediate entities.[182]  There is no evidence supporting piercing at

any level, much less the all of the multitude of levels, of indirect ownership of PPI.

### 3.    The Single Enterprise Theory Fails on the Facts

The Disclosure Statement at 139 references the "single enterprise theory" of alter ego

recovery.  It is unclear whether such a doctrine even exists in New York apart from traditional

alter ego liability.  Even assuming it does exist, it cannot be satisfied on this record.  PPI, the

entities that owned it, and the IACs were all separately managed.  There is no competent evidence

that the PPI Board managed the IACs or that the MNP Board (which advises the IACs) managed

PPI.  There is no evidence that the managers of the entities ultimately owning PPI managed PPI

or the IACs.  The record shows that Purdue's day-to-day business was managed by a CEO and

executives who did not run the IACs, and that the IACs' management did not run Purdue.  *See*

¶275.  The fact that the IACs and Purdue were both indirectly owned by the Sacklers does not

support veil-piercing under the single enterprise theory.

---

[182]    *See, e.g.*, *In re Gulf Fleet Holdings, Inc.*, 491 B.R. at 790  ("to establish liability for all
members of a corporate" structure, plaintiff must "establish alter ego liability with respect to each
one of the entities" in that structure); *In re Heritage Org. LLC*, 413 B.R. at 514 (no "global
application" of alter-ego theory is permitted—plaintiff must establish veil piercing at "each level
or layer of ownership … within the multi-faceted entity structure.").

NAS3159

### D. Unjust Enrichment

The Debtors admit that their potential unjust enrichment claims against recipients of "the various cash and unvalued non-cash transfers" out of Purdue are "based on the same set of facts" as Debtors' infirm claims for fraudulent transfer.[183] They are thus both duplicative and will fail for the same reasons. Debtors cannot show that the challenged transfers should not have been made, and they cannot use equity to salvage defective fraudulent transfer claims. In addition, any recovery would be limited to the few transfers made within the 3-year period preceding Purdue's bankruptcy filing—and not the longer 6-year period Debtors contend applies.

### 1. Unjust Enrichment Claims Duplicate Other Estate Claims

The various unjust enrichment standards articulated by the courts all pose one question: does equity require the repayment by a defendant of a benefit that it unfairly received?[184] The gravamen of Debtors' unjust enrichment theory is that the transfers should be repaid because they were allegedly made to defraud Purdue's creditors or when Purdue was insolvent—a repeat of Debtors' claim for fraudulent transfer.[185] But, as addressed above, the record shows that the Former Directors acted in good faith, *supra* at 80-81, and did not participate in the criminal conduct

---

[183]  Disclosure Statement at 172.

[184]  *See, e.g.*, *In re Refco Inc.*, 461 B.R. 181, 200 (Bankr. S.D.N.Y.2011) (Drain, J.) (New York law) ("To prevail on a claim for unjust enrichment in New York a plaintiff must establish (1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution."); *In re FAH Liquidating Corp.*, 572 B.R. 117, 130 (Bankr. D. Del. 2017) (Delaware law) (To establish an unjust enrichment claim, the plaintiff must show: "(1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law"); *Vertex, Inc. v. City of Waterbury*, 278 Conn. 557, 573 (2006) (unjust enrichment is "a broad and flexible remedy," " [w]ith no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable").

[185]  *See* Disclosure Statement at 172. Debtors' acknowledge that they would likely not be able to seek double recovery under both unjust enrichment and fraudulent transfer theories." *Id. See also In re FAH Liquidating*, 572 B.R. at 130 (unjust enrichment claim requires "the absence of a remedy provided by law").

NAS3160

admitted in Purdue's 2020 Plea, *supra* at 73, or any alleged other wrongdoing of Purdue (*e.g.*, marketing), *supra* at §I.B-C. There is no evidence of a fraudulent scheme to strip Purdue of assets. *Supra* at 61. The expert testimony establishes that Purdue was solvent until at least the end of 2016, had substantial amounts of cash on hand at all times, and received consideration for the Tax Distributions and for royalties paid by the IACs. *Supra* at 64-71. The tax distributions and royalties paid by the IACs cannot be the subject of unjust enrichment claims because equity will not imply a quasi-contract where, as here, a governing contracts applies.[186] Nor is there anything unjust about Purdue's owners retaining lawfully paid Distributions.[187]

Courts routinely reject the use of unjust enrichment claims to circumvent defects in other claims.[188] Just last year Judge Grossman rejected an unjust enrichment claim in *In re Boston Generating LLC* as premised on "the same wrongdoing that underlies [the] intentional and constructive DCL fraudulent transfer claims" because "unjust enrichment is not a catchall cause

---

[186]    *See* ¶548 (describing tax distribution agreements and applicable portion of PPI Shareholders' Agreement); *see generally* JX-509 (P. Green Expert Rept.) (discussing licensing and royalty agreements); *see also In re Pers. Commc'n Devices, LLC*, 528 B.R. 229, 241-42 (Bankr. E.D.N.Y. 2015) (unjust enrichment claims based on contractual tax distributions failed: "As a matter of law, a claim for unjust enrichment is precluded by the existence of an express written agreement governing the subject matter at issue"); *In re Extended Stay, Inc.*, 2020 Bankr. LEXIS 2128, *333-44 (Bankr. S.D.N.Y. Aug. 20, 2020) (where dividend payments "are governed by existing, valid contracts … the Trust is precluded from recovering them on a theory of unjust enrichment."); *Nemec v. Shrader*, 2009 WL 1204346, at *6 (Del. Ch. Apr. 30, 2009) ("Delaware courts ... have consistently refused to permit a claim for unjust enrichment when the alleged wrong arises from a relationship governed by contract."), *aff'd*, 991 A.2d 1120, 1130 (Del. 2010). This rule applies "even if one of the parties to the lawsuit is not a party to the contract." *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 165 (E.D.N.Y. 2012).

[187]    *See Inv'rs Liquidated Trust v. Dimenna*, 2019 WL 7050139 at *11 (D. Conn. Dec. 23, 2019) ("it was not 'unlawful' for [owners] to receive distributions from entities in which they invested both money … and time …").

[188]    *See Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 791 (2012) (dismissing unjust enrichment claims as duplicative) ("Here, plaintiffs allege that Verizon committed actionable wrongs … To the extent that these claims succeed, the unjust enrichment claim is duplicative; if plaintiffs' other claims are defective, an unjust enrichment claim cannot remedy the defects").

NAS3161

of action to be used when others fail." 617 B.R. 442, 475-76 (Bankr. S.D.N.Y. 2020) (applying New York law).[189] Similarly, in *Bigio v. Coca-Cola Co.*, the Second Circuit held that plaintiffs "failed to state a claim for recovery under an unjust enrichment theory" against a company's shareholders because "[a]ny recovery under an unjust enrichment theory … would … require us to pierce the veil separating CCE and Defendants," and "[p]laintiffs fail[ed] to plead any facts suggesting that [the] court should pierce the corporate veil." 675 F.3d 163, 171, 177 (2d Cir. 2012).[190] Debtors cannot use the equitable remedy of unjust enrichment as an end-run to salvage the otherwise unsustainable Estate Claims.

## 2. Any Unjust Enrichment Recovery Would Be Limited to the Post-September 15, 2016 Time Period

The Disclosure Statement at 171 erroneously asserts—without citation—that any unjust enrichment recovery would be subject "to a six-year lookback period …." That is wrong. Under New York's borrowing statute, NY CPLR §202—which governs the limitations period applicable to state law claims in this Court—Debtors' unjust enrichment claims are subject to the shorter limitation period of either New York or the state where the claim accrued.

---

[189]    *See also Beijing Zhong Xian Wei Ye Stainless Decoration Ctr. v. Guo*, 2020 WL 2404938, at *4 (Sup. Ct. N.Y. Cnty. May 07, 2020) (dismissing unjust enrichment claim because it repeated plaintiff's unsuccessful fraudulent conveyance causes of action); *Ritchie Special Credit Invs., Ltd. v. JPMorgan Chase & Co.*, 2021 WL 2686079, at *12 (D. Minn. June 30, 2021) (applying New York law) (similar).

[190]    *See also Usov v. Lazar*, 2013 WL 3199652, at *6 (S.D.N.Y. June 25, 2013) (dismissing unjust enrichment claim against company's owner because Plaintiff "fails to … pierce the corporate veil"); *Levin v. Kitsis*, 82 A.D.3d 1051 (2d Dep't 2011) ("The complaint does not adequately plead [unjust enrichment] against [the corporation's owner]..., in that the plaintiffs do not allege any basis for piercing the corporate veil...."); *Streamline Bus. Grp., LLC v. Vidible, Inc.*, 2016 WL 3523033, at *2-3 (E.D. Pa. June 27, 2016) (applying New York law) (rejecting unjust enrichment claims against shareholders where plaintiff failed to show that the "purposefully abused the corporate form in order to benefit, unjustly" and therefore failed to show that the corporate form should be disregarded).

NAS3162

Under New York law, the statute of limitations for an unjust enrichment claim depends on the nature of the substantive remedy the plaintiff seeks.[191] "The limitations period is six years where a plaintiff seeks an equitable remedy, but three years where a plaintiff seeks monetary damages."[192] Here, because Debtors' unjust enrichment claim would seek monetary damages, the limitations period is at most three years.[193] The applicable statute of limitations cannot be longer, but may be shorter, under NY CPLR 202, depending on whether Debtors' unjust enrichment claims accrued in a state which a shorter limitations period. Consequently, Debtors' potential unjust enrichment claims apply at most to the less than $300 million in Distributions made after September 15, 2016 (three years before bankruptcy was commenced)—of which $233.5 million comprised Tax Distributions.[194]

## III.  THE SHAREHOLDER SETTLEMENT IS IN THE BEST INTERESTS OF THE CREDITORS

The dubious merits of the Non-Estate and Estate Claims call into question whether any Claimant or the Estate could reasonably expect to recover on the Claims at all. But even assuming they were to recover something, none can reasonably expect to recover more in a liquidation than under the Plan. The Shareholder Settlement will deliver extraordinary value, well in excess of $4.325 billion Shareholder Settlement Amount. Section 1129(a)(7)(ii)'s requirement that objectors "will receive … not less than the amount that such holder would receive … if the debtor

---

[191]    *See Loengard v. Santa Fe Indus., Inc.*, 70 N.Y.2d 262 (1987).

[192]    *In re Boston Generating LLC*, 617 B.R. at 469 (applying three-year limitations period to unjust enrichment claim). *See also Lia v. Saporito*, 909 F.Supp.2d 149, 167 (E.D.N.Y. 2012); *Kermanshah v. Kermanshah*, 580 F. Supp.2d 247, 261 (S.D.N.Y. 2008); *Grynberg v. Eni S.p.A.*, 2007 WL 2584727, at *3 (S.D.N.Y. Sept. 5, 2007); *Ingrami v. Rovner*, 45 A.D.3d 806, 808 (2d Dep't 2007).

[193]    *See Access Point Med., LLC v Mandell*, 106 A.D.3d 40, 43-44 (1st Dep't 2013) (plaintiff cannot avoid the three year limitations period by characterizing its unjust enrichment claim as seeking equitable relief because the court "cannot allow a purely semantic distinction" about what claims for money are called "to control the application of the statute of limitations").

[194]    *See* JX-1977 (Chakraborty Report Appendix H, Tab 1) at Column D, line 88 and Column F, line 88.

NAS3163

were liquidated" is fully satisfied.

The maximum possible recovery on the Non-Estate Claims and on the Estate's fiduciary duty claim is the net worth of any individual Sackler Family Member found liable. The former Side B directors are the only family members who could conceivably be found liable on these claims. While their collective net worth—assuming all were found liable—is $700.4 million, approximately $170 million of such net worth is dedicated to charitable purposes and approximately $270 million consists of minority interests in foreign businesses that would be difficult to realize upon in the event of a judgment.[195] Litigation against the Former Directors would be protracted, expensive, and value-destructive, leaving only a residual net worth that will be substantially diminished, if not exhausted, using as a reference the enormous amounts Purdue was spending on defense costs before filing bankruptcy.

No one has objected to the Plan on the grounds that the Debtors' could recover more on any Estate Claim than they will receive under the Plan, and the evidence shows that they could not. Debtors acknowledge that recoveries on the Estate Claims "in the context of a hypothetical chapter 7 liquidation would likely be lower than recoveries under the Shareholder Settlement Agreement."[196] The only way any party could even hope to recover the Shareholder Settlement Amount is to reach the assets in all of the Sackler trusts. But, on Side B, the trusts that hold the majority of Side B assets outside of the net worth of the Former Directors are non-self-settled spendthrift trusts. *See infra* §III.B. Their assets can be reached only on the Estate's fraudulent transfer claim (or its largely duplicative unjust enrichment claim). Critically:

- The $4.325 billion Full Settlement Amount exceeds the $4.213 billion in US Partner Distributions to trusts for the benefit of certain Sackler Family Members. *See* ¶417(1).

---

[195]   JX-1922 (July 26, 2021 Martin Report, Ex. H — Net Asset Report as of March 31, 2021).
[196]   Disclosure Statement, Appendix B at 5-6 (Liquidation Analysis).

NAS3164

- The $1.547 billion in Ex-US Distributions invested in or for the benefit of IAC, as well as the intercompany and non-cash transfers allegedly worth $1.4 billion, *See* ¶¶417(2), 423, cannot be recovered from Sackler Family Members or trusts because they were not transferees of these assets.

- The $4.559 billion in Tax Distributions, *see* ¶417(3), benefited PPLP by saving it essentially the same amount in taxes, have already been paid to the governmental Claimants, and are unrecoverable for reasons summarized above. *See supra* at §II.A.3.

- The $4.325 billion Shareholder Settlement Amount far exceeds the $47.2 million recovery of US Partner Distributions available under Delaware's applicable three year statute of limitations applicable to any fraudulent transfer claims. To recover more than the $4.325 billion Full Settlement Amount, the Estate would have to recover Distributions that pre-date 2008, more than a decade before Debtors filed for bankruptcy.

The Shareholder Settlement satisfies *Iridium* and the Shareholder Releases should be approved under *Metromedia*.

### A. Immense Value Conferred by Shareholder Settlement

The Shareholder Settlement will convey extraordinary value on the Estate and creditors.

*First*, the Shareholder Settlement Amount of $4.325 billion is far in excess of the value creditors would receive if Purdue were liquidated (estimated by Debtors to be between $281.1 million and $3.2 billion[197]) and more than twice the estimated value of Purdue if it were liquidated (estimated by Debtors to be approximately $1.6 to $2.0 billion[198]). Because the creditors will receive both the Shareholder Settlement Amount and the value of Purdue the Plan will provide

---

[197]   *See* Disclosure Statement, Appendix B (Liquidation) at 2. Side B notes that, as of this filing, no claims have been allowed in these cases. In the event the Plan is not confirmed, Side B intends to object to the allowance of claims and expressly reserves all rights to do so.

[198]   *See* Disclosure Statement, Appendix D (Valuation Analysis) at 2. Side B notes that, as of this filing, no claims have been allowed in these cases. In the event the Plan is not confirmed, Side B intends to object to the allowance of claims and expressly reserves all rights to do so.

NAS3165

approximately $5.925 billion to $6.325 billion in value,[199] plus the benefits that will be conferred

by NewCo post-emergence.  This value will be delivered starting on the Plan Effective Date, when

Purdue is converted to Newco and the first $300 million of the Shareholder Settlement Amount is

paid.[200]

*Second*, under the Shareholder Settlement, Sackler Family Members relinquish certain

valuable MDT Shareholder Insurance Rights arising under all MDT Insurance Policies and MDT

Insurance Collateral.[201]

*Third*, if the Shareholder Releases are approved, all litigation against Sackler Family

Members based on Opioid-Related Activities of Purdue will end.  This will save the Estate and

NewCo the likely huge expense of discovery and participation in what can be expected to be

thousands of cases because all of the relinquished claims are premised on Purdue misconduct—on

the theory that Sackler Family Members controlled Purdue and directed Purdue to commit it.[202]

Purdue's intense involvement in those litigations will be unavoidable.

*Fourth*, under the Shareholder Settlement Agreement, certain Sackler Family Members

---

[199]    *Settlement Amount*:      $4.325 billion
        *Value of Purdue*:      + $1.6 to $2.0 billion
        *Total*:                 $5.925 to $6.325 billion

[200]    *See* Form of Shareholder Settlement Agreement, Ex. AA at §§2.01(b), 8.04, *In re Purdue Pharma L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. July 19, 2021), ECF No. 3283 (**"Form of Shareholder Agreement"**).  The remainder of the Full Settlement Amount will be paid in ten subsequent annual payments (subject to certain provisos and adjustments).  *Id.* at §2.01.

[201]    *See* Form of Shareholder Settlement Agreement. Ex. AA at §8.05; Plan at §1.1 (defining "MDT Shareholder Insurance Rights").

[202]    *See, e.g.*, *In re Purdue Pharma*, 619 B.R. 38, 51 (Bankr. S.D.N.Y. 2020) ("At core, the *Dunaway* Action—like so many other cases brought against the Debtors and the Sackler family—rests on the theory that Purdue and its employees committed misconduct at the direction of Dr. Sackler and others who controlled the corporation and its actions.  It follows that Purdue's conduct and related liability "will remain at the heart" of any further litigation against Dr. Sackler.").

NAS3166

agree not to (i) engage "in the manufacturing or sale of opioids"[203] or (ii) until the Shareholder Settlement Amount has been fully paid, seek "any new naming rights with respect to charitable … organizations" while the Full Settlement Amount is still outstanding.[204]  Creditors resolutely urged each of these and consider them to be of significant value.

*Fifth*, under the Shareholder Settlement Agreement, Sackler Family Members agree to release all claims "based on or relating to … the Debtors …, their Estates or the Chapter 11 Cases," including their claims for contribution or indemnity.[205]  The Former Directors all have indemnification rights[206] and have filed proofs of claim to protect them.[207]

### B. Neither the Estate nor Any Creditor Can Reasonably Expect to Recover More in Litigation

Putting aside the merits of the Claims against the Former Directors, if the Shareholder Settlement is not approved and litigation against them were to proceed, there is no reasonable possibility that the Estate or any of the creditors could recover as much as the Shareholder Settlement Agreement provides.

---

[203]     *See* Form of Shareholder Settlement Agreement, Ex. AA at §8.09.

[204]     *See id.* at §8.09.

[205]     *See* Plan §10.7(a), (b) at pp.125-26.

[206]     JX-2011 (11/19/04 Purdue Minutes) (PPLPUCC002442662) at -663-64 ("The Company shall . . . indemnify and hold harmless each Indemnitee from and against any and all expenses (including attorneys' fees), amounts paid or incurred in satisfaction of or as part of settlements, judgments, fines, penalties, liabilities and similar or related items incurred or suffered or threatened to be incurred or suffered . . . by reason of the Indemnitee's being or the Indemnitee or his or her testator or intestate having been (or to the fullest extent permitted by law otherwise related to the fact that the Indemnitee is or the Indemnitee or his or her testator or intestate was) (a) a director, officer or Agent of the General Partner [PPI] . . . ."); *see also* DEL. CODE ANN. TIT. 6, §17-108 ("Subject to such standards and restrictions, if any, as are set forth in its partnership agreement, a limited partnership may, and shall have the power to, indemnify and hold harmless any partner or other person from and against any and all claims and demands whatsoever.").

[207]     *See* Proof of Claim of David Sackler (No. 137442), Addendum ¶3; Proof of Claim of the Estate of Beverly Sackler (No. 137599), Addendum ¶3; Proof of Claim of the Estate of Jonathan Sackler (No. 137453), Addendum ¶3; Proof of Claim of the Estate of Raymond Sackler (No. 137527), Addendum ¶3; Proof of Claim of Richard Sackler (No. 137590), Addendum ¶3.

NAS3167

*First*, neither the Non-Estate Claims nor the Estate's fiduciary duty claim can reach the bulk of Side B assets because those assets are held in non-self-settled spendthrift trusts, which are insulated from creditor claims against beneficiaries.[208]

For example, Side B's 74A Trust (holding net assets valued at $524.7 million as of March 2021), 1A Trust ($857.3 million), 2A Trust ($1.258 billion), AJ Irrevocable Trust ($1.414 billion), and AR Irrevocable Trust ($1.306 billion) are all non-self-settled spendthrift trusts, with provisions that protect each trust's assets from collection by judgment creditors of the trust's beneficiaries.[209]

---

[208] *See United Presbyterian House at Syosset, Inc. v. Lincks*, 2003 WL 2004182, at *3 (Sup. Ct. Nassau Cnty. Feb. 11, 2003) ("When the beneficiary of a spendthrift trust is not the settlor, the beneficiary's creditors ordinarily cannot compel the trustee to pay any part of the income or principal to the beneficiary of a discretionary trust or to a creditor of the beneficiary.").

[209] *See* JX-1915 (Martin Report Ex. A) at 4-5 (identifying Side B spendthrift trusts), *id.* at 23-27 (providing details on "74A Trust," "1A Trust," and "2A Trusts"); *id.* at 35-36 (details on "AR Irrevocable Trust" and "AJ Irrevocable Trust"); JX-1922 (Martin Report Ex. H) at 13-14 (summarizing assets in trusts as of March 31, 2021); *id.* at 64-66 (assets in "74A Trust," "1A Trust," and "2A Trust"); *id.* at 73 (assets in "AR Irrevocable Trust"); *id.* at 75 (assets in "AJ Irrevocable Trust"). *See also, e.g.*, JX-2491 (12/23/89 "1A Trust" Restated Irrevocable Declaration of Trust) (RSF00000438) at -462-63 (containing the following spendthrift clause: "The interest of any person in either the income or principal of the trust hereunder shall not be anticipated, alienated or in any other manner assigned or transferred by such person prior to the receipt thereof and shall not be subject to any legal process, bankruptcy proceeding or the interference or control of creditors or any other person."); JX-2492 (12/23/89 "2A Trust" Restated Irrevocable Declaration of Trust) (RSF00000468) at -492-93 (same); JX-2496 (11/5/74 "74A Trust" Declaration of Trust) (RSF00002351) at -356 ("Interests of beneficiary not to be alienated."); JX-2515 (5/31/19 "AJ Irrevocable Trust" Declaration of Trust) (RSF00002997) at -042 (spendthrift provision); JX-2516 (7/2/19 "AR Irrevocable Trust" Declaration of Trust) (RSF00003310) at -353 (spendthrift provision).

97

NAS3168

In the aggregate, Side B's non-self-settled spendthrift trusts hold $5.643 billion of the $6.343 billion in total Side B assets,[210] and all of that is shielded from beneficiaries' creditors.[211]

Without recourse to assets in the non-self-settled spendthrift trusts, judgment creditors seeking to recover from members of the Side B family are limited to the Former Directors' personal net worth, consisting of their respective personal assets, including self-settled trusts. The collective personal net worth of Side B Former Directors—the only Side B family members who had any role at Purdue that could give rise to a putative claim—is $700.4 million.[212] That is far less than Side B's contribution to the $4.325 billion Shareholder Settlement Amount.

*Litigation Risk.* To recover personal assets from any Former Director, a creditor must first obtain a judgment against that director. This means the full $700.4 million of collective net worth of the Former Directors is only available if creditors recover against all four of them. Separate and apart from the previously-discussed infirmities of the Non-Estate Claims and the Estate's fiduciary duty claim, there were no substantive allegations at all in the prepetition litigation on Non-Estate Claims against some of the Former Directors—including, for example, the late Beverly

---

[210]   *See* JX-1922 (Martin Report Ex. H) at 12-14 (adding the net asset value as of March 31, 2020 for "Trusts that Indirectly Own Purdue" ($2.646b); "Trusts Created by Division from 74A or Subsequent Decanting ($2.933b); "Additional Trusts that Own Interests In IACs" ($28.5mm) and "Other Trusts" ($34.7mm)). *See also* JX-2488 to JX-2492, JX-2494 to JX-2496, JX-2499 to JX-2501, JX-2508 to JX-2512, JX-2515 to JX-2516, JX-2521 to JX-2531, JX-2538 (documents related to Side B non-self-settled spendthrift trusts).

[211]   *See* G. BOGERT, TRUSTS §40, at 148-49 (6th ed. 1987) ("Creditors are precluded from reaching the beneficial interest in order to satisfy their claims," as "[t]he beneficiary does not have the right to transfer trust assets, and absent this right, the creditor is left with no firm right to attach its claim to."); *In re Estate of Sanders*, 602 N.Y.S.2d 742, 742-43 (N.Y. Sur. Ct. 1991) ("The purpose of a New York spendthrift trust is to protect a beneficiary … by giving him an interest that he cannot transfer and his that his creditors cannot reach.").

[212]   *See* JX-1922 (Martin Report Ex. H) at 25; *see also id.* 12-13 (summarizing net assets as of March 31, 2021 for Richard Sackler ($361.2mm), Jonathan Sackler ($151.5mm), David Sackler ($0.1mm), and Beverly Sackler ($187.7mm)).

NAS3169

Sackler, whose net worth accounts for $187.7 million of the collective $700.4 million of all four Side B Former Directors.[213] The Estate's fiduciary duty claim can only look back three years, during which very few Distributions were made.[214] The prospect that the Non-Estate Claims or the Estate's fiduciary duty claim will succeed against all Side B directors and enable a judgment creditor to recover the entire $700 million of their collective net worth is low.

***Litigation Costs.*** If the proposed settlement is not consummated, pre-petition litigation will resume, which can reasonably be expected to blossom into thousands of cases against the Former Directors, who will expend enormous amounts defending themselves in cases across the country. Defense costs will rapidly deplete the Former Directors' personal assets. For frame of reference, Purdue projected that its defense costs for 2019 <u>alone</u> were over <u>$263 million</u>[215]—and that was before a single case against Purdue had gone to trial. Litigation against the Side B family members will involve substantially identical allegations in scope and similarly massive defense expenditures. Using Purdue's historical defense costs as a gauge, the Former Directors' personal assets will be exhausted in less than three years.

***Diminished IAC Value.*** The estimated value of Side B's non-trust assets includes the interests family members hold in the IACs, which have been collectively assigned an illustrative net after tax value of $3.0 billion.[216] That valuation is predicated on the assumption that, as part

---

[213]    *Id.* at 13.

[214]    Less than 2% of the Distributions were made in 2017—approximately $186.54 million in Tax Distributions and a single U.S. Partner Distribution of $198,544. *See* ¶¶417(1), 544. The *de minimis* 2017 U.S. Partner Distribution was approved by the PPI Board in August 2016, at a time when PPLP was solvent and before the onslaught of opioid litigation in 2017-19 that led to Purdue's bankruptcy (¶¶437-456).

[215]    *See* Debtors Memorandum of Law in Support of Motion for a Preliminary Injunction at 25-26, *In re Purdue Pharma*, Case No. 19-08289 (Bankr. S.D.N.Y. Sept. 18, 2019), ECF No. 3.

[216]    JX-1914 (Amended Martin Report) ¶29.

NAS3170

of the Shareholder Settlement, the Sackler family will divest 100% of its IAC interests through a consensual, orderly, non-distressed sale process.[217] Without a settlement and an orderly sale, the IAC interests would have to be monetized by judgment creditors. The Former Directors hold only minority interests in the IACs. Judgment creditors would be forced to sell minority interests, in a distressed sale, which would yield less value than a pro rata share of $3.0 billion,[218] or become long-term owners of minority interests in foreign pharmaceutical companies. Accordingly, it is highly unlikely that anything near the full non-distressed value would be collectable absent settlement.

***Spendthrift Trust Assets Unavailable on Most Claims; Look-Back Period Limits.*** Assets in the non-self-settled spendthrift trusts can be recovered only on the fraudulent transfer claims targeting those trusts as transferees (or on the Estate's largely duplicative unjust enrichment claim). But given the timing of the transfers out of PPLP and the potentially applicable statutes of limitation, it would be nearly impossible to recover anything close to Side B's contribution to the $4.325 billion Shareholder Settlement Agreement.

To determine the look-back period for the fraudulent transfer claims, Delaware law governs, and the lookback period is three years, under §17-607(c) of the Delaware Revised Uniform Limited Partnership Act, DEL. CODE ANN. TIT. 6 §17-607(c) ("**Section 17-607(c)**"), because—under the law of Delaware (where PPLP is organized), New York (where PPI is incorporated) and Connecticut (PPLP's principal place of business)—the law of the state where a limited partnership is organized determines the liability of its limited partners. *E.g.* New York Revised Limited Partnership Act §121-901. Section 17-607(c) is a statute of repose providing

---

[217]    *Id.*
[218]    *Id.*

NAS3171

that, unless otherwise agreed, a limited partner has no liability—under any theory—for distributions it has received after three years have expired from the distribution date, absent agreement to the contrary.[219]  Here, there was no agreement to the contrary.  Section 14 of the PPLP LP Agreements tracks, nearly verbatim, the three-year bar of §17-607(c).  *See* JX-2079 (1997 LPA) (PDD9316726090) at -108; JX-2088 (2018 LPA) (PUT000010556) at -577.  "Section 17–607(c) … mak[es] clear that no matter what the basis for liability might be, the three-year expiration period applies."[220]

Applying that look-back period, the highest amount of US Partnership Distributions recoverable on the Estates' fraudulent transfer claims would be only $47.3 million.[221]  Even assuming the longer four- and six-year limitations periods available under Connecticut and New York or federal law applied,[222] the highest potential recovery of US Partnership Distributions would still be capped at $283,060,745 million and $708,883,908 million, respectively[223]—at least

---

[219]   Section 17-607(c) provides:
> Unless otherwise agreed, a limited partner who receives a distribution from a limited partnership shall have no liability under this chapter or other applicable law for the amount of the distribution after the expiration of 3 years from the date of the distribution.

[220]   *Freeman v. Williamson*, 383 Ill. App. 3d 933, 938 (2008).  *Accord Diamond v. Friedman (In re Century City Doctors Hospital, LLC)*, 466 B.R. 1, 16 (Bankr. C.D. Cal. 2012); MARTIN I. LUBAROFF & PAUL M. ALTMAN, LUBAROFF & ALTMAN ON DELAWARE LIMITED PARTNERSHIPS §6.10 (2d ed. 2019).

[221]   *See* JX-1977 (Chakraborty Report Appendix H) at row 216, column E (quantifying U.S. distributions after March 29, 2016).  The first complaint alleging fraudulent transfer claims against Sackler family members was filed by the New York Attorney General on March 29, 2019; therefore, the applicable lookback period runs from that date.  *See* First Amended Complaint, *New York v. Purdue Pharma L.P.*, et al., Index No. 400016/2018 (N.Y. Sup. Ct. , Mar. 28, 2019).

[222]   *See* CONN. GEN. STATUTES §52-552j (four years); N.Y. C.P.L.R. §213(8) (six years), Federal Debt Collection Procedures Act, 28 U.S.C. §3001, *et seq.* (six years).

[223]   *See* JX-1977 (Chakraborty Report Appendix H) at row 404, column E (quantifying U.S. distributions after March 28, 2015); *id.* at row 751, column H (quantifying U.S. distributions after March 28, 2013).

NAS3172

$3.5 billion less than the Sacklers' $4.325 billion cash contribution to the Shareholder Settlement. For claimants to even approach the full $4.325 settlement value, they would need to establish fraudulent transfer liability on more than a decade to transfers dating back to before 2008.[224] The odds of that unprecedented result approach zero.[225]

***Payments to IACs and Intercompany Transfers Are Not Recoverable from Sackler Family Members.*** From 2008 to 2017, Purdue transferred $1.5466 billion for the benefit of IACs[226] and, according to Debtors, made $1.4 billion in value in intercompany non-cash transfers.[227] Because Sackler Family Members were not the transferees of any of those distributions, they are not liable for those transfers on a fraudulent transfer theory.[228]

***Tax Distributions Are Not Recoverable.*** As explained *supra* at §II.A.3, there is no legal basis for unwinding distributions Purdue made to its owners to pay tax liabilities arising from Purdue's business activities, virtually all of which has already been paid to governmental creditors in these cases.

---

[224]    *See* JX-1902 (AlixPartners Cash Transfer Report, *In re Purdue Pharma L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. Dec. 16, 2019) (ECF No. 654-1)) ("**AlixPartners Cash Transfer Report**") at 11 (noting that "US Partner Cash Distributions" from 2008 through 2017 were $4.1198 billion).

[225]    The application of §17-607(c) to claims asserted under "other applicable law" precludes the extension of the three year period under the doctrine of *nullum tempus*, which—under the law of some states, in some circumstances—exempts sovereign state plaintiffs from the application of a statute of limitations. Delaware courts recognize the *nullum tempus* doctrine but do not apply it when "the statute expressly provides to the contrary." *Mayor & Council of Wilmington v. Dukes*, 157 A.2d 789, 795 (Del. 1960) (rejecting the application of *nullum tempus* to "actions by municipalities which would otherwise be barred by the statute of limitations").[225] Here, *nullum tempus* is inapplicable because, even apart from §17-607(c), governmental entities are expressly subject to the Delaware Uniform Fraudulent Transfer Act's four-year limitations period.

[226]    *See* JX-1977 (Chakraborty Report Appendix H) at row 1638, column G (quantifying cumulative Ex-U.S. distributions from 2008 to 2017).

[227]    *See* JX-0521 (Expert Report of David W. Deramus).

[228]    *See, e.g.*, *Lippe v. Bairnco Corp.*, 218 B.R. 294, 303 (Bankr. S.D.N.Y. 1998) ("Under New York law, a non-transferee may not be held liable for a fraudulent transfer unless it has dominion or control over the transferred assets or unless it benefits in some way from the conveyance.")).

NAS3173

## C.     The Shareholder Settlement Satisfies *Iridium*

The Shareholder Settlement satisfies *Iridium* because the Claims are not likely to succeed, *see* §§II & II, *supra*, and the settlement's benefits outweigh the alternative by billions of dollars. *See* §III.A, *supra*. *Iridium*'s first and "most important" factor—"the balance between the litigation's possibility of success and the settlement's future benefits"—is therefore satisfied. *See In re Iridium Operating LLC*, 478 F.3d at 461-62 (listing the seven factors).

Although "[n]ot all factors must point in the same direction, and not all factors must be given the same weight," *In re Motors Liquidation Co.*, 555 B.R. 355, 367 (Bankr. S.D.N.Y. 2016), *Iridium's* other factors also point in favor of approving the Shareholder Settlement and Shareholder Releases:

- Factor 2:  The Claims present myriad and complex legal and factual issues that will ensure protracted and expensive litigation that will delay, diminish and deplete any recovery through litigation.  *See* §III.A, *supra*.[229]

- Factor 3:  "[T]he paramount interest of creditors … and the degree to which creditors do not object" is clearly served by the Shareholder Settlement, which resolves the Estate's most valuable claim without the risk and expense of litigating, and assures recoveries on Non-Estate Claims.[230]

- Factor 4:  Nor is there any question that a super-majority of "other parties in interest support the settlement," thus satisfying the fourth factor.  *See* [Voting Report]; Unsecured Creditors' Committee Plan Support Letter at 3 ("the UCC has determined that the best path forward is confirmation of the Plan"),

---

[229]     *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 306  (Bankr. S.D.N.Y. 2016) ("[P]rolonged litigation will substantially delay the Debtors' ability to emerge from chapter 11, further depleting estate resources, reducing the value of the Debtors' assets, and possibly leading to a liquidation of the Company instead of the restructuring embodied in the Plan.").

[230]     *See In re Lehman Bros. Holdings Inc.*, 2017 WL 2889658, at *4 (Bankr. S.D.N.Y. Jul. 2017) ("[T]he evidence demonstrates that the Settlement provides numerous benefits to creditors, including providing a framework for a prompt determination of the Covered Loan Claims in a fair and reasonable manner before this Court, eliminating significant risks which accompany litigating the Covered Loan Claims, and burdening the LBHI Debtors' estates with significant legal expenses.").

NAS3174

http://www.kccllc.net/purduecreditors/document/1923648210616000000000001. [231]

- Factor 5: Skilled counsel negotiated the Plan; the negotiations occurred before two accomplished private mediators[232] and before the Honorable Shelley C. Chapman.[233] This Court's competence and experience to analyze this settlement is recognized in case law in this District.[234]

- Factor 6: The nature and breadth of the releases are appropriate and justified for the reasons discussed in §III.D, *infra*.[235]

- Factor 7: The settlements embodied in the Plan are the product of lengthy, arm's length bargaining between independent and experienced counsel, under the auspices of skilled mediators. *See* Disclosure Statement (ECF No. 2969) at 69-70, 85-86, 151-52; Examiners' Report (ECF No. 3285) at 29-31; *supra* at [factor 5].

### D. The Release of Non-Estate Claims Is Appropriate Under *Metromedia*

The same factors that demonstrate that the Shareholder Settlement is in the best interest of creditors and satisfied *Iridium* confirm the propriety of the Shareholder Releases under *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005), which considers whether: (1) "the estate received substantial consideration" and the release "was *itself* important to the Plan"

---

[231] *See In re NII Holdings, Inc.*, 536 B.R. 61, 119-20 (Bankr. S.D.N.Y. 2015) (noting as reason for sufficiency for *Iridium* factor 4 "the Plan received overwhelming approval from every impaired class of creditors" and "Committee [*i.e.*, the Unsecured Creditors Committee] unanimously supports the Settlement and is a co-proponent of the Plan").

[232] *See also* Kenneth Feinberg Declaration (ECF No. 882), ¶ 1 (listing qualifications); Layn Phillips Declaration (ECF No. 883), ¶1 (listing qualifications).

[233] May 20, 2021 Hearing Tr. (ECF No. 2956) at 13:3-10.

[234] *See, e.g.*, *In re Global Vision Prods., Inc.*, 2009 WL 2170253, at *6 (S.D.N.Y. July 14, 2009) (approving a settlement approved by this Court, stating that "[w]ith respect to the fifth ... factor[], counsel on both sides, as well as the Bankruptcy Court judge, are competent and experienced" and concluding that "Judge Drain made a reasoned, informed, and independent decision on the reasonableness" of the settlement).

[235] *In re Charter Comm'ns*, 419 B.R. 221, 256 (Bankr. S.D.N.Y. 2009) (debtor and third party releases satisfied *Iridium*'s sixth factor because they were "appropriate and justified as essential" to the settlement and "provided in return for substantial and unique consideration from" under the *Metromedia* analysis); *Sabine*, 555 B.R. at 309 (discussing release of third party lenders and referring back to discussion of *Metromedia*, and thus holding the third party releases to be "consistent with applicable law and should be approved for the reasons stated therein").

**NAS3175**

(2) "the enjoined claims were channeled to a settlement fund rather than extinguished;" (3) "the enjoined claims would indirectly impact the debtor's reorganization by way of indemnity or contribution;" (4) "the plan otherwise provided for the full payment of the enjoined claims," and (5) "the affected creditors consent." *Metromedia* is "not a matter of factors and prongs." *Id*. While "[n]o case has tolerated nondebtor releases absent the finding of circumstances that may be characterized as unique," *id*., many courts have approved third party releases that did not meet all of the *Metromedia* factors.[236]

**Substantial and Unique Contribution**. The *Metromedia* considerations are amply satisfied. Shareholder Releases are uniquely important to the Plan, which is not feasible without the Shareholder Settlement Amount, and the alternatives to the Plan are dire. As Debtors have stated, the "contribution required under settlement ensures that these Chapter 11 Cases will not collapse into the quagmire of expensive litigation and years of delay that would result if" the Debtors cannot meet the Plan's funding requirements[237] The Shareholder Settlement that secures the Sacklers' contribution is not available without the Shareholder Releases:

- Side B will not pay the Shareholder Settlement Amount without the Shareholder Releases. All claims against Side B Sackler Family Members arising out of Purdue's Opioid-Related Activities must be fully, finally and permanently released. *See* David Sackler Decl. ¶¶2, 4; Ives Decl. ¶¶22, 26; Lynam Decl. ¶7, 9, 10.

- The Shareholder Releases constitute the sole consideration tendered to the Sacklers in exchange for billions of dollars in value that they are contributing to the Plan.

---

[236]   *See Sabine*, 555 B.R. at 290–91 (approving third party releases despite released claims being totally extinguished rather than channeled and lack unanimous support of affected creditors); *In re Steans Holdings*, 607 B.R. 781, 788–89 (Bankr. S.D.N.Y. 2019) (approving third party releases because "the Released Parties have made significant economic and non-economic contributions that have been integral to the" reorganization, "[e]ven assuming, arguendo, that the Releasing Parties were found to not have consented to the Third-Party Releases").

[237]   *See* Disclosure Statement at 30 ("There would be substantial execution risk associated with any structure intended to allow the Debtors to satisfy the Private-Side Resolutions, the DOJ Resolution and the resolution with the Non-Federal Public Claimants without the funding provided under the settlement with Purdue Pharma's shareholders.").

NAS3176

> *See generally* Form of Shareholder Settlement Agreement, ECF No. 3283. The Shareholder Settlement would not be acceptable to Side B without the Releases. *See* Ives Decl. ¶¶22, 26.

- Side B will not endorse any Plan or resolution that leaves it exposed to new lawsuits relating to Purdue's Opioid-Related Activities. *See* David Sackler Decl. ¶¶2, 4; Ives Decl. ¶22, 26; Lynam Decl. ¶7.

It is equally essential that the Shareholder Settlement provide releases for various parties with relationships to the B-Side family, even if they never had a role with the Debtors. Ives Decl. ¶24; Lynam Decl. ¶8. The risk that other family members or parties who have relationships with them will be subject to harassing claims is demonstrable. Side B family member Marianna Sackler was sued in prepetition litigation and sat for a full day deposition in these cases despite the fact that her entire work history at Purdue consisted of a part-time four month stint in Purdue's Research & Development Department in approximately 2009-2010.[238] If claims such as those against her are not released, litigation will continue to plague Side B, directly and indirectly, subjecting Side B (and the Debtors) to expensive and inconvenient third-party discovery; potential exposure to indemnity, contribution, or similar claims; and emotional stress for Side B individuals due to harassing litigation against family members, employees, partners, advisors, and entitieas. Ives Decl. ¶25; Lynam Decl. ¶8.

In addition, certain of the B-Side Shareholder Payment Parties are trusts and entities whose owners and beneficiaries are not limited to the Former Directors. *See* Ives Decl. ¶23; Lynam Decl. ¶9. Stephen Ives and Garrett Lynam, each an officer and/or trustees of certain B-Side Payment Parties, have testified credibly that they cannot authorize those entities to contribute assets to the Shareholder Settlement without ensuring that all owners and beneficiaries of those entities—who are paying some of the Shareholder Settlement Amount—receive releases in exchange for the

---

[238]  *See* JX-1991 (Marianna Sackler Dep. Tr.) at 30:4-22; 35:21-36:2; 39:8-11.

NAS3177

contribution.  *See* Ives Decl. ¶¶24, 26; Lynam Decl. ¶¶9-10.  They have also each testified credibly

that, as a fiduciary to Side B and to the B-Side Payment Parties, they would not—and could not,

consistent with their respective fiduciary obligations—recommend that the B-Side Shareholder

Payment Parties enter into the Shareholder Settlement or pay the Shareholder Settlement Amount

without the Shareholder Releases.  The recommendation to proceed is expressly conditioned on

the achievement of a global resolution for the Side B Sackler Family Members and related parties.

*See* Ives Decl. ¶26; Lynam Decl. ¶10.

> ***Other Metromedia Factors***.  Other *Metromedia* factors also demonstrate the propriety of

approving the Shareholder Releases.  Specifically:

- The Plan does not extinguish claims against Sackler Family Members but instead channels them to creditor- and claim-specific Trusts.[239]

- The Side B Former Directors are indemnified by Purdue,[240] have been sued for Purdue's conduct, and have an "identity of interest" with Debtors that supports the Shareholder Releases.[241]

- All but a tiny minority of the "affected creditors" consent.

Because the Plan is not feasible without the Shareholder Settlement, and the Shareholder

Settlement will not be effected without the Shareholder Releases, the Shareholder Releases are the

linchpin of the Plan.  There simply is no Plan without the Shareholder Releases, which satisfy all

of *Metromedia*'s requirements.

---

[239]    Plan §10.8 (channeling injunction).

[240]    *See supra* at 96.

[241]    *See Charter*, 419 B.R. at 259 (Bankr. S.D.N.Y. 2009) ("The indemnification obligations between the Debtors and their directors, officers, agents, and professionals produce an identity of interest between the Debtors and the [Released] Parties.  This identity of interest supports approving the Third Party Releases.").

NAS3178

## IV.    FOUNDATION

### Relinquishment of Control of the Raymond and Beverly Sackler
### Foundation and the Raymond and Beverly Sackler Fund for the Arts and Sciences

During the March 24, 2021 hearing, the Court, in suggesting that parties should continue to pursue support for the Plan, observed that: "historically the Sacklers have given lots of money to charity . . . [and] there's absolutely nothing preventing the Sacklers from making an additional charitable contribution in a meaningful way . . . ." *See* Tr. at 107:4–10, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. Mar. 24, 2021).   The Court's observation encouraged the development of a proposal for a voluntary charitable contributions that could be used to help abate the opioid crisis.

On May 7, 2021, the Court appointed Bankruptcy Judge Shelley C. Chapman to mediate between the nonconsenting states and various parties, including the Debtors, certain of their creditors, and the Sacklers. *See* Order Appointing the Honorable Shelley C. Chapman as Mediator, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. May 7, 2021), ECF No. 2820; Order Establishing the Terms and Conditions of Mediation Before the Honorable Shelley C. Chapman, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. May 18, 2021), ECF No. 2879.  In the ensuing weeks, Judge Chapman conducted approximately 145 mediation negotiations among these parties by telephone, and conducted an in-person mediation lasting more than 27 hours on June 30 and July 1, 2021.  Mediator's Report, *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. July 7, 2021), ECF No. 3119.

Following the mediation, Judge Chapman issued a report (the "Mediator's Report") outlining the terms of a proposal made by Her Honor and accepted by a majority of the parties— consisting of the Debtors, the Sacklers, and 15 of the previously nonconsenting states (Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York,

**NAS3179**

North Carolina, Pennsylvania, Virginia, and Wisconsin)—to the in-person mediations.  *Id.* at 2.

The terms of Her Honor's proposal included, among other things:  (1) "[e]nhanced economic

consideration to be provided by the Sackler family members in the form of $50 million in

incremental cash payments . . . as well as acceleration of $50 million in previously agreed

settlement payments"; (2) "[a] material expansion of the scope of the public document repository

to be established" the Plan, including "tens of millions of documents and approximately 13

categories of attorney-client privileged documents"; (3) "[a] prohibition with regard to the Sackler

family's naming rights related to charitable contributions until they have fully paid all obligations

owed by them under the terms of the contemplated settlement and exited, worldwide, all businesses

that engage in the manufacturing or sale of opioids"; and (4) modification of certain aspects of the

Plan concerning the sale of assets of the new company that will be formed to continue Purdue's

businesses, and concerning the distribution of funds from the National Opioid Abatement Trust

("NOAT").  *Id.* at 2–3.

The proposal also provided that "individual trustees of NOAT, or such other qualified party

or parties as shall be selected by the Bankruptcy Court, will, subject to receipt of necessary

approvals, become the controlling members of the Raymond and Beverly Sackler Foundation [the

"Foundation"] and the Raymond and Beverly Sackler Fund for the Arts and Sciences [the

"Fund"]," which would "have an aggregate value of at least $175 million."  *Id.* at 4.  In addition,

the party or parties selected to become controlling members of the Foundation and the Fund (the

"Continuing Foundation Members") "shall be required to ... agree to promptly amend . . . the

purposes of the Foundations set forth in the certificates of incorporation of the Foundation[ and

the Fund] to be limited to purposes consistent with philanthropic and charitable efforts to

ameliorate the opioid crisis."  Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue

NAS3180

Pharma L.P. and its Affiliated Debtors at § 5.7(l), *In re Purdue Pharma LP*, No. 19-23649 (Bankr. S.D.N.Y. July 14, 2021), ECF No. 3185.  This voluntary relinquishment of control of the Foundation and the Fund to the Continuing Foundation Members would be separate from the Sackler family's cash contribution set forth in the Plan which, as a result of the mediation, was increased to $4.325 billion.

The Foundation is a New York not-for-profit corporation whose purpose is to "mak[e] and establish[] scholarships, awards, grants, endowments, gifts, loans, prizes, and/or contests for educational, cultural, scientific, and/or research purposes."  *See* JX-2143 (Certification of Incorporation of the Raymond and Beverly Sackler Foundation, Inc., dated November 28, 1967) at art. 2.  Its Board of Directors has the discretion to devote the Foundation's assets to "any other charitable, scientific, literary, artistic, benevolent, social and/or educational use" that is not inconsistent with the purposes of the Foundation.  *Id.*  Its current members are Richard Sackler and certain other lineal descendants of Raymond and Beverly Sackler.  *See* JX-2144 (By-Laws of the Raymond and Beverly Sackler Foundation, Inc.) at § 1.1.

The Fund is a Delaware corporation that was "formed exclusively for charitable, scientific, medical and educational purposes," including making distributions to non-profit organizations. *See* JX-2145 (Certification of Incorporation of the Raymond and Beverly Sackler Fund for the Arts and Sciences, dated October 13, 1999) at art. 2.  Under Delaware law, only one member is required and that member is currently Richard Sackler.

Consistent with the Mediator's Report, the members of the Foundation and the member of the Fund will relinquish control of the Foundation and the Fund, respectively, on or before the Effective Date of the Plan.  Thereafter, the members will no longer make any further decisions concerning the governance or operations of the Foundation or the Fund, including the use of their

NAS3181

assets.  Instead, the members of the Foundation and the Fund will only take actions necessary to surrender control of the corporations in accordance with Section 5.7(l) of the Plan, including, as necessary, amending the by-laws, appointing new members, resigning or being removed, and facilitating the appointment of the Continuing Foundation Members as new members and directors.

The Continuing Foundation Members must be Persons appointed to serve as members of the Foundation and the Fund in accordance with Section 5.7(l) of the Plan.  In addition, the assets of the Foundation and the Fund will not be transferred to NOAT or the Tribe Trust, but, consistent with the governing documents of the corporations, the Continuing Foundation Members must "limit the purposes of the Foundation[ and the Fund] to purposes consistent with philanthropic and charitable efforts to ameliorate the opioid crisis."  Mediator's Report at 4.  The deployment of the assets of the Foundation and the Fund for opioid abatement is consistent with the broad charitable purposes of the corporations.

The assets of the Foundation and the Fund are not included in the Shareholder Settlement Amount.  As the disclosure statement and the Plan make clear, the Shareholder Settlement Amount is sufficient consideration for the Shareholder Releases.

## V.     SIDE B'S WEBSITE IS NOT AN IMPROPER SOLICITATION

Some objectors[242] contend that Side B's website (https://www.judgeforyourselves.info/, the "**Website**") constitutes an improper solicitation under Bankruptcy Code §1125(b) without offering a single fact from the Website to support such contention.[243]  The objection is meritless.

---

[242]     *See* Objection of the State of Washington and the State of Oregon, and the Objecting States to Confirmation of the Debtors' Plan of Reorganization (ECF No. 3276) at ¶103; *see also* joinders by Maryland (ECF No. 3278), Vermont (ECF No. 3279), Delaware (ECF No. 3280).

[243]     Section 1125(b) provides:  "An acceptance or rejection of a plan may not be solicited after the commencement of the case. ... unless, at the time of or before such solicitation, there is

NAS3182

Although the term "solicitation" is not defined in the Code, most courts, including this one, agree that "a narrow reading of the term 'solicitation' in relation to section 1125(b) is essential to promote a consensual reorganization process."  *In re WorldCom, Inc.*, 2003 Bankr. LEXIS 2192 at *34-35 (Bankr. S.D.N.Y. May 16, 2003).[244]  Read in this fashion, "solicitation" refers "only to a specific request for an official vote either accepting or rejection a plan of reorganization."[245]  The Website, which was created to respond to allegations being made by parties outside of this Court, does not include a request for acceptance or rejection of the Plan, or even express a "hope" about how anyone would vote on the Plan.[246]

Moreover, the objectors acknowledge—in their objection—that the Website expressly disclaims that it is a solicitation.  ECF No. 3276 at ¶103.  The full text of the disclaimer is as follows:

> The views and opinions expressed on the website constitute those of the Raymond Sackler Family The website is for informational purposes to allow the viewer to understand the facts as well as the views and opinions of the Raymond Sackler family. The website is not intended to be and should not be construed as a solicitation of votes for or against any plan of reorganization that may be pursued in Purdue Pharma's chapter 11 case. Parties in interest entitled to vote on any such plan of reorganization should refer to the Bankruptcy Court's docket for information regarding any such plan of reorganization.[247]

---

transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information."
[244]  *See, e.g.*, *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94, 101 (3d Cir. 1988) ("We agree with the district court that 'solicitation' must be read narrowly").
[245]  *In re Snyder*, 51 B.R. 432, 437 (Bankr. D. Utah 1985) ("The terms 'solicit' and 'solicitation,' as used in §1125(b) of the Code, must be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan of reorganization.").
[246]  *In re California Fid.*, 198 B.R. 567 (9th Cir. B.A.P.) (improper solicitation occurred when president of debtor sent letter to 300 creditors 13 days before the scheduled hearing to approve the disclosure statement asking them to reject the plan); *In re Gilbert*, 104 B.R. 206 (Bankr. W.D. Mo. 1989) (improper solicitation occurred when, prior to approval of disclosure statement, one creditor told (orally) second creditor that he hoped second creditor would approve the plan).
[247]  *See* https://www.judgeforyourselves.info/ (emphasis added).

112

NAS3183

The objectors' attempt to undermine the disclaimer by describing it as "buried in the webpage" is untrue: *The disclaimer is on the front page of the Website, and on every other page*.

The objectors' contention that the Website "caused dissemination of misleading information that has not been vetted by this Court, and that, upon information and belief, presents a misleading impression contrary to the massive documentary record that has been shielded from public view by the injunctions and confidentiality orders" (ECF No. 3276, ¶103) is entirely unsubstantiated. The objectors do not identify even one fact that the Website supposedly misrepresents, nor does it cite even one document from the massive record to support this baseless claim.

The Website is a not "solicitation," much less an improper one.

<div align="center">

### CONCLUSION

</div>

The Plan should be confirmed and all objections overruled.

<div align="center">

### RESERVATION OF RIGHTS

</div>

If the Plan is not confirmed or the Shareholder Settlement Agreement and Shareholder Releases are not approved, the Raymond Sackler Family reserves the right to defend itself on all grounds available, including grounds not stated in this submission, including to object to any and all Proofs of Claim that have been filed in these cases.

NAS3184

Dated:  August 5, 2021
New York, New York

Respectfully submitted,

/s/ Gerard Uzzi

Gerard Uzzi, Esq.
Alexander B. Lees, Esq.
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:      (212) 530-5000
Facsimile:       (212) 530-5219

/s/ Gregory P. Joseph

Gregory P. Joseph, Esq.
Mara Leventhal, Esq.
Christopher J. Stanley, Esq.
**JOSEPH HAGE AARONSON LLC**
485 Lexington Avenue, 30th Floor
New York, New York 10017
Telephone:      (212) 407-1200
Facsimile:       (212) 407-1280

*Counsel for the Raymond Sackler Family*

NAS3185

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **PURDUE PHARMA L.P.,** *et al.*, | Case No. 19-23649 (RDD) |
| Debtors.[1] | **(Jointly Administered)** |

## DECLARATION OF JONATHAN GREVILLE WHITE

I, Jonathan Greville White, declare as follows:

1.      I am a director (**"Trustee Director"**) of a number of private trust companies that

act as trustees for trusts established for the benefit of the Mortimer D. Sackler family (**"Side A"**)

(**"Trusts"**).  I am submitting this Declaration in my own individual capacity.  I am also

submitting this Declaration as a representative of the private trust companies that serve as

trustees of the Trusts, as listed in Schedule B (the "**Private Trust Companies**" and "**the**

**Trustees**").  I have spoken with the other directors of the Private Trust Companies (Jörg Fischer,

Leslie J. Schreyer, and Kerry J. Sulkowicz) who have reviewed my Declaration, agree with its

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**NAS3186**

contents and have authorized me to make this Declaration on behalf of the Private Trust Companies and the Trusts.[2]

2. Under the proposed Shareholder Settlement Agreement, certain of the Trusts will (among other things) (*i*) fund the majority of Side A's share of the $4.325 billion of required payments; (*ii*) act as obligors under the terms of the applicable credit support agreements; (*iii*) contribute their ultimate equity interest in Purdue Pharma L.P. ("**Purdue**") to the public benefit; and (*iv*) sell, over the next seven years, the Side A's approximate 50% interest in certain international pharmaceutical companies ( the "**Independent Associated Companies**" or "**IACs**").

3. I am submitting this Declaration to explain to the Court (among other things) that the Private Trust Companies, as fiduciaries and trustees for 30 living beneficiaries, future unborn beneficiaries and certain charitable beneficiaries can only authorize the Trusts to participate in the settlement as described in paragraph 2 if the Plan of Reorganization (the "**Plan**") contains releases that ensure global finality, *i.e.*, the Trusts, Trustees, Trustee Directors, Protectors, Special Trustees, all of the beneficiaries and certain related persons and entities will not be subject to claims that could be brought by the Estate (the "**Estate Claims**") or statutory or common law claims relating to Purdue (the "**Third-Party Claims**") (the "**Shareholder Releases**," as set forth in Section 10.7 of the Plan). The Trustees owe a fiduciary duty to the beneficiaries and, as such, must satisfy themselves that any settlement is in the interests of the beneficiaries. In this case, any settlement must have a reasonable prospect of bringing all of the litigation to an end. Without the Shareholder Releases, the Trusts would need to preserve assets

---

[2] In the case of the Mortimer D.A. Sackler Investment Trust and the Jeffrey M Lefcourt Investment Trust, the authorisation comes only from the non-managing Trustee in each case.

**NAS3187**

to fund the considerable legal costs that would be required to defend the Trusts and beneficiaries in sprawling litigation for many years to come.

4.     Given the momentous nature of the claims that have been made, the Trustees (who are governed by the law of Jersey, Channel Islands, a British Crown Dependency ("**Jersey**")) of those trusts which are governed by Jersey law or English law have applied to the Royal Court of Jersey (the "**Royal Court**") for directions as to how they should conduct themselves in order to properly discharge their fiduciary duties to their beneficiaries.  The Trustees would fail to act in accordance with an order of the Royal Court authorizing them to enter into an agreement and settle if they approved the payment of trust assets pursuant to a settlement that did not provide appropriate releases and would expect strong opposition from the beneficiaries who are parties to the Jersey Court application if they tried to do so.

5.     The Private Trust Companies comprise 10 active Jersey limited liability companies, two Wyoming Limited Liability Companies and one Wyoming Corporation.  I am a director of each of these companies.  The Private Trust Companies act as trustee of 88 trusts governed by Jersey law ("Jersey law Trusts"), three trusts governed by English law ("English law Trusts"), six trusts governed by Wyoming law, and one trust governed by New York law.

I.     **Professional Overview**

6.     I am a resident of Jersey.  I am qualified as a solicitor of the Supreme Court of England and Wales (non-practicing) and as an Advocate of the Royal Court of Jersey.  I have almost four decades of experience in providing legal advice relating to trusts and related matters. I have practiced in Jersey since 1982 and was a partner at Ogier, a leading Jersey law firm, for much of that time.  I stood down as Chair of that firm in 2010 and decided at the same time to step back as a partner.  Shortly after that, Ogier sold its trust administration business and, as a consequence, the administration of the Private Trust Companies and the Trusts, passed to Elian

3

**NAS3188**

Fiduciary Services.  The Elian business was subsequently acquired by Intertrust.  I acted as a consultant to both Elian and Intertrust in order to oversee the work done by each organization administering the Private Trust Companies and the Trusts.  In 2018, the administration of the Private Trusts Companies and the Trusts moved to Inpendra Limited, a Jersey company owned by one of the Private Trust Companies and which was established specifically to administer these entities.  I am a director of and employed by Inpendra Limited.  I was also the Chairman of the Jersey Police Authority from 2013 through 2017.

## II.    Overview of the Formation, Purposes and Management of the Trusts

7.    The Trusts can be divided into two broad categories: "General Trusts" and "Family Trusts."  The General Trusts hold Side A's interests in the IACs or cash and other investments for the benefit of Side A generally.  The beneficiaries of the General Trusts are typically the widow and descendants of Dr. Mortimer D. Sackler.  Many of the Trusts also have charitable beneficiaries.  Dr. Mortimer Sackler, who passed away in 2010, was survived by his wife, Theresa Sackler, and seven adult children: Ilene Sackler, Kathe Sackler, Samantha Hunt, Mortimer D.A. Sackler, Marissa Sackler, Sophie Dalrymple, and Michael D. Sackler.  With grandchildren and great grandchildren, there are currently 30 living family beneficiaries of the General Trusts.  The definition of beneficiaries also includes descendants to be born in the future.

8.    The Family Trusts are typically for the benefit of particular sub-branches of Side A, *i.e.*, one of these individuals and their respective descendants.

9.    Beacon Trust (one of the General Trusts), is the ultimate owner of a 50% limited partner in Purdue Pharma L.P. ("**Purdue**"), which it holds for the benefit of Side A.  An entity for the benefit of the Raymond Sackler family (or "**Side B**") is the ultimate owner of the balance of Purdue's equity.  Beacon Trust was settled in 1993 by Dr. Mortimer D. Sackler, several years

4

NAS3189

before OxyContin was launched.[3]  I am a director of Heatheridge Trust Company Limited, which is the trustee of the Beacon Trust.  Since the death of Dr. Mortimer D. Sackler in 2010, Beacon Trust has been an irrevocable discretionary trust for the benefit of Theresa Sackler, Dr. Mortimer D. Sackler's issue, and various charitable beneficiaries.  The Beacon Trust instrument provides that its trustee holds the Beacon Trust fund in its discretion, with the prior written consent of the Special Trustees, to pay income and/or capital to, or for the benefit of, one or more of Dr. Mortimer D. Sackler's spouse, descendants, and certain charitable beneficiaries.

10.    In addition to the Beacon Trust, there are twenty-six Jersey law General Trusts which do not own any economic interest in Purdue.  Fifteen of these trusts are the ultimate owners of 50% interests in the IACs).[4]  Eleven other Jersey law General Trusts do not have any interests in the IACs[5] but hold cash and certain investments.  Each of these General Trusts is an irrevocable discretionary trust.  Their beneficiaries are typically Theresa Sackler and the issue of Dr. Mortimer D. Sackler.  One General Trust confers upon Theresa Sackler a life interest over the income that is generated each year.  Thirteen of these General Trusts also have charitable beneficiaries.  The General Trusts provide (among other things) that their trustee holds the trust fund during the Trust Period to pay, appropriate or apply the whole or such part of the income (subject to any life interest) or capital of the Trust Fund as the Trustee may in its discretion see fit with the consent of the Protectors (or of the Special Trustees in the case of Beacon Trust) for

---

[3]    Another General Trust, Hercules Trust, is the ultimate 50% owner of Purdue Pharma Inc., the general partner of Purdue.

[4]    The rest of the Sackler families' interests in the IACs are held by entities for the benefit of Side B.  In the case of one IAC, the share is less than 50% because there is a third party interest.

[5]    Save for one of these trusts which holds an 0.10% interest in an IAC.

5

NAS3190

the benefit of any or all of its beneficiaries in such shares and proportions and generally in such manner as the trustee in its discretion sees fit.

11.     In addition to the General Trusts and, as indicated in paragraph 7 above, there are also 71 "Family Trusts," of which certain of the Private Trust Companies act as trustee, which are typically focused on the individual sub-branches of Dr. Mortimer's family, *i.e.*, branches headed by Theresa Sackler or Dr. Mortimer D. Sackler's seven children as heads of their respective sub-branches (though in a small number of cases with flexibility to benefit other sub-branches),[6] and a small number of Family Trusts that have more than one branch as beneficiaries.  These Family Trusts are irrevocable discretionary trusts.[7]  Additionally, there is an investment trust for the benefit of one child of Dr. Mortimer D. Sackler and another investment trust for the benefit of a grandchild of Dr. Mortimer D. Sackler.  In each case, the respective descendant has certain authority as a managing trustee under the applicable trust instrument.  While those terms differ in certain respects, in neither case does said child or grandchild have the authority to make distributions to himself.

12.     My understanding is that Dr. Mortimer D. Sackler settled the General Trusts and Family Trusts in Jersey for the reasons that many high net worth families settle trusts:  privacy, wealth management, planning of inter-generational transfers of assets and tax efficiency.  Trusts

---

[6]   There are a number of other Family Trusts of which the Private Trust Companies do not act as trustee, so any reference to Family Trusts in this Declaration is to Family Trusts of which one of the Private Trust Companies acts as trustee.

[7]   There is one General Trust and four Family Trusts that are irrevocable discretionary trusts as to capital, with a life interest over income granted to certain members of the Mortimer D. Sackler family during such person's lifetime. For the year 2019, those particular Jersey Trusts made payments of income in the aggregate of approximately $75,328.35 to the life tenants of those particular Jersey Trusts. For the year 2020, those payments of income were approximately $111,729.66.  The Trustee Directors, consistent with their fiduciary obligations, could exercise their power of appointment to defeat the life interests should they determine it to be appropriate to do so.

NAS3191

can help ensure that family wealth is held and managed responsibly for the benefit of future generations. Dr. Mortimer D. Sackler sought to have his families' assets managed for the benefit of his spouse, seven children, descendants and certain charities.

13.     Dr. Mortimer D. Sackler's decision to settle trusts in Jersey was consistent with his longtime place of residence prior to his death. Jersey was a jurisdiction that residents of Europe and the United Kingdom frequently used for trust formation at the time (changes in tax legislation since then have affected the extent to which it remains practicable for such residents to establish trusts in Jersey today). It is regarded as a well-regulated, reliable jurisdiction by the International Monetary Fund with stable laws, strong courts and excellent financial regulation. Dr. Mortimer D. Sackler was a citizen of Austria, with his principal residence in the United Kingdom, for almost four decades before his death in 2010.[8] Side A includes many members who are citizens of countries other than the United States with principal residences outside of the United States.

14.     I have always believed – and counseled clients – that trusts should not be set up for the purposes of evading creditors, and indeed, trusts set up for such improper purposes may be set aside (depending on the circumstances). In over three decades working with Dr. Mortimer D. Sackler and his family, I was not privy to any conversations in which anyone ever suggested that any of the General Trusts or Family Trusts was established for the purposes of hiding assets from creditors.

15.     As noted above, the General Trusts and Family Trusts are irrevocable discretionary trusts. Attached as Schedule 1 is language that is representative of the full terms

---

[8]     There was a period of approximately five years during which Dr. Mortimer D. Sackler ceased to be a resident of the United Kingdom; he did not become a U.S. resident during this time.

NAS3192

that govern distribution of assets from each of the Jersey Trusts.[9]  It will be seen from this that

the principal provisions relating to the application of income and capital are as follows:

> The Trustees shall stand possessed of the Trust Fund and the income thereof upon the trusts following, that is to say:-
>
> (a)    (i)    upon trust with the prior or simultaneous written consent of the Protectors during the Trust Period to pay appropriate or apply the whole or such part of the income of the Trust Fund as the Trustees may in their discretion think fit to or for the maintenance or otherwise for the benefit of all or such one or more exclusive of the other or others of the Beneficiaries in such shares and proportions if more than one and generally in such manner as the Trustees shall in their discretion think fit;
>
> (ii)    subject as aforesaid upon trust with the prior or simultaneous written consent of the Protectors during the Trust Period to pay appropriate or apply either income or capital of the Trust Fund as the Trustees may in their discretion think fit for the benefit of all or such one or more exclusive of the other or others of the Charitable Beneficiaries if any in such shares and proportions if more than one and generally in such manner as the Trustees shall in their discretion think fit;

2.    Powers of Appointment and Advancement

> Notwithstanding the trusts powers and provisions hereinbefore declared and contained the Trustees may at any time or times during the Trust Period in their discretion with the prior or simultaneous written consent of the Protectors …:
>
> (a)    by any deed or deeds irrevocable or revocable during the Trust Period appoint the Trust Fund or any part or parts thereof on such new or other trusts powers and provisions governed by the law of any jurisdiction of and concerning the Trust Fund or any part or parts thereof for the benefit of the Beneficiaries or any one or more of them exclusive of the other or others at such age or time or respective ages or times and in such shares and proportions and subject to such powers of appointment vested in any person or persons and with such provisions for maintenance education or advancement or for accumulation of income or for the purpose of raising a portion or portions or for spendthrift or protective trusts and otherwise at the discretion of any person or persons and with such discretionary trusts and powers exercisable by such persons and such powers and provisions generally whether of a beneficial or administrative nature by whomsoever exercisable and generally in such manner as the Trustees shall in their discretion think fit and for the purpose of giving effect to any such appointment by the same deed or deeds revoke all or any of the trusts powers and provisions herein contained with respect to the Trust Fund or the part or parts thereof to which such appointment relates and so that in the event of any such appointment the Trustees shall thenceforward

---

[9]    I understand that the applicable trust instruments have been provided to creditor representatives in the bankruptcy proceedings.

NAS3193

hold the Trust Fund or the part or parts thereof to which such appointment relates upon and subject to the trusts powers and provisions so appointed in substitution for any of the trusts powers and provisions hereof so revoked as aforesaid and in priority to the other trusts powers and provisions herein declared and contained and in any appointment under the foregoing power the Trustees may delegate to any person or persons all or any of the powers and discretions by this Settlement or by law vested in the Trustees;

(b)  pay or apply the whole or any part or parts of the capital of the Trust Fund to or for the benefit of all or any one or more of the Beneficiaries or the Charitable Beneficiaries to the exclusion of the other or others of the Beneficiaries or Charitable Beneficiaries and in such respective amounts if more than one and generally in such manner as the Trustees shall in their discretion think fit.

16.  The Trustees, and where applicable, the Special Trustees or Protectors, are acting as fiduciaries for the beneficiaries and are required to make decisions based on what is in the best interests of the beneficiaries of each trust (including unborn descendants) as a whole. While the Trustees consult the beneficiaries where appropriate, the beneficiaries cannot instruct the Trustees as to whether and how assets should be distributed. There have been occasions over the years when the Trustees have distributed assets in accordance with the beneficiaries' expressed wishes and occasions when they did not. In each instance, when making a decision in relation to the distribution of assets, the Trustees exercise independent judgment pursuant to their fiduciary duties.

17.  The Trustees are responsible for overseeing investment strategy with respect to assets held in the Trusts (with the exception of the investment trusts discussed above). To assist them in this process, the Trustees have, over the years, retained a small number of investment professionals to advise them on asset allocation and manager selection and a small number of reputable investment houses are retained to invest funds either on an advisory or discretionary mandate. As the Trusts are for the benefit of a multi-generational family, out of prudence, the Trustees have adopted a conservative investment philosophy.

9

NAS3194

### III. The Trustees Can Authorize the Trusts to Participate in the Shareholder Settlement Agreement Only If the Plan Contains the Shareholder Releases

18.     As described above, the Beacon Trust owns Side A's share of Purdue.  Since 2018, certain governmental and private plaintiffs have named as defendants (among others) four beneficiaries of the General Trusts and of certain of the Family Trusts who served on Purdue's Board (Ilene Sackler, Kathe Sackler, Mortimer D.A. Sackler, and Theresa Sackler, collectively, the "**Side A Former Directors**").  I understand that there are currently approximately 2,600 suits against Purdue regarding its prescription opioid marketing practices and approximately 750 suits against the Side A Former Directors.  These claims are seeking billions, if not trillions, of dollars in damages.  In addition, the Estate has asserted that it could bring claims, styled as fraudulent conveyance or otherwise, to recover at least $10 billion in distributions from Purdue to entities for the benefit of the Sackler families (approximately half of which was for the purpose of paying taxes on Purdue's income).

19.     After months of extensive, hard-fought negotiations involving several mediations, agreement has been reached between the Sackler families, the Debtors and a wide variety of creditor groups, and this is incorporated into the Plan.  The Plan has been submitted to the Court for approval.

20.     The Settlement Agreement has significant implications for the Trusts, as certain of the Trusts will be (*i*) funding the majority of Side A's share of the $4.325 billion in payments; (*ii*) acting as obligors under the terms of the applicable credit support agreements; (*iii*) contributing their equity interest in Purdue; and (*iv*) selling their interests in the IACs so that the proceeds will be escrowed and used to fund the payment obligations of the Sackler families.

21.     As fiduciaries, the Trustee Directors, acting on behalf of the Trustees, can make the significant commitments described in the prior paragraph if and only if, having addressed any

NAS3195

conflicting interest, they consider, reasonably and having taken all relevant matters into account, that to do so is in the best interests of the beneficiaries. The Trustees consider that their entry into the settlement agreement is in the best interest of the beneficiaries if, and only if, it provides releases that provide for global finality for the Trusts, beneficiaries and related parties. Global finality means that risks of litigation related to the subject matter of the Shareholder Releases will be eliminated, once and for all so that:

- The beneficiaries, Trusts and other entities for the benefit of Side A – including the 30 beneficiaries and future descendants of Dr. Mortimer Sackler – will no longer the subject of the Purdue-related claims that seek billions of dollars (if not more) in damages.

- The Trusts will no longer have to expend millions of dollars in trust assets <u>each month</u> on fees for lawyers and advisors to defend the litigation;

- The beneficiaries (among others) will no longer have to endure the burdens and intrusion resulting from being named as defendants in countless litigation.

22.     To be clear, if one or more of parties that has objected to the Plan were carved out or otherwise excluded from the Shareholder Releases, the Trustees could not commit the assets of the Trusts to the obligations described above, because the benefits of finality would be lost.

23.     The Shareholder Releases help ensure global finality by covering parties that are affiliated with Side A who might be the subject of Purdue-related lawsuits that are seeking to target the beneficiaries or the Trusts through the "back door." This concern is particularly acute because, before even the chapter 11 filing, plaintiffs made sweeping allegations about the alleged culpability of the Sackler family in its entirety and began naming known and unknown business entities as defendants. I understand, for example, that one state alleged that the entire Sackler

NAS3196

family, together with entities for their benefit, engaged in unlawful conduct through an entity this

state termed the "Sackler Pharmaceutical Enterprise"; and one named the daughter of a Side B

Former Director, even though she never sat on Purdue's board and she worked in Purdue's R&D

group for a few months more than a decade ago; as well as fictitious "John Does" 9-100. The

Trustee Directors could not, in good conscience, agree to contribute substantial assets from the

Trusts if the beneficiaries and Trusts are still subject to the continued efforts to pursue their

assets, including through suits taking a creative approach to name tangential entities in order to

reach assets of the Trusts and beneficiaries.

      24.      The Trustees have been authorized, by an order of the Royal Court of Jersey, to

make the commitments in respect of the Jersey law Trusts and English law Trusts required under

the Shareholder Settlement Agreement if, and only if, they obtain appropriate releases, including

releases for the beneficiaries. By way of background, the Trustees brought an action in the

Royal Court, known as a "Beddoe" proceeding, to obtain the Royal Court's direction and

authority in respect of the Jersey law trusts and English law trusts to enter into the settlement.

The Trustees brought this action to confirm that the settlement was consistent with the Trustees'

fiduciary obligations to all beneficiaries of the Trusts (born and unborn). The Royal Court issued

an order governing the circumstances under which the Jersey law Trusts and English law Trusts

may participate in the Shareholder Settlement Agreement. Among other things, it expressly

conditions the Trustees' participation in the Shareholder Settlement Agreement in respect of the

Jersey law Trusts and English law Trusts on the Plan providing releases for the Trusts, Trustees,

Protectors, Special Trustees and the A-Side Individuals. If the Trustees fail to act in accordance

with this order and commit Trust assets without obtaining the required releases, the Trustees

would be at risk of being held personally liable for breach of trust. The Royal Court has, at the

NAS3197

request of the Trustees and Beneficiaries, issued an order confirming these requirements and

authorizing its disclosure (but no other documents or information in these proceedings (JX-2908

at 3–4)).

25.     In addition, the Trustees believe that the Side A Former Directors acted lawfully

and ethically at all times.  Their agreement to the settlement is not due to any doubt about that.

Rather, the burden of litigation is overwhelming, financially and in other respects.

## IV.     Absent Settlement, the Trustees Would Support a Vigorous Defense of the Trusts and Beneficiaries

26.     The proposed settlement presents a unique opportunity for billions of dollars in

assets from the Sackler families to be dedicated to carefully-tailored opioid abatement programs.

If a settlement is not approved, the result would almost certainly be that the Trusts and

beneficiaries would be subject to suit by the Estate and thousands of governmental and private

plaintiffs.  As these claimants have asserted that they are entitled to damages that vastly exceed

the assets of the Trusts and beneficiaries, the Trustees would have no alternative but to authorize

the use of assets of the Trusts to mount a vigorous legal defense – both with respect to liability

and judgment enforcement (if necessary).  The cost of this legal defense would likely be

millions, if not tens of millions, of dollars per month.  The assets of the Trusts would be rapidly

depleted under these circumstances, and the funds would not be used to assist individuals or

communities at all.

27.     Were litigation to resume against the Trusts and the beneficiaries, the current

posture – in which the Trusts are bearing the cost of legal defense for themselves and the

beneficiaries – would rapidly become financially untenable.  Under such circumstances, it seems

likely that the Side A Former Directors would seek to be indemnified by Purdue for the cost of

NAS3198

defending, and if necessary, settling litigation brought against them arising out of their service on Purdue's Board.

## V. Purdue's Tax Distributions Were in Fact Used to Pay Taxes

28. The tax distributions made by Purdue were made for the specific purpose of paying taxes on Purdue's income and, as discussed below, almost all of the tax distributions for Side A were paid directly to federal and state tax authorities.

29. Purdue is a limited partnership and is a disregarded entity for U.S. income tax purposes, meaning that it does not pay its own taxes. As set forth in the Distribution Agreement II Extended, dated as of January 1, 1998 (JX-2081), Purdue made distributions to its partners (entities owned by trusts for the benefit of the Mortimer D. Sackler and Raymond Sackler families) for the purpose of paying taxes on their shares of Purdue's income. The tax distributions were passed through a series of U.S. partnerships to BR Holdings Associates L.P. ("**B.R. Holdings**"), a U.S. limited partnership in which the Side A 50% limited partnership interest is ultimately owned by Beacon Trust. Because Side A's equity in Purdue is held in Beacon Trust, a non-U.S. entity, BR Holdings paid almost all of the Side A tax distributions to U.S. federal and state taxing authorities as withholding required by law. Beacon Trust therefore did not receive them. In other words, on Side A, the ultimate transferees of almost all of the tax distributions were the federal and state taxing authorities.[10]

## VI. Jurisdiction

30. The Trustees are prepared to submit to the Bankruptcy Court's jurisdiction only in connection with administration of the Shareholder Settlement Agreement, but not for general

---

[10] Approximately 88% of BR Holding's Side A tax distributions from 2008 through 2017 were used for federal, state, local and foreign income taxes after taking into account refunds received from some taxing authorities and additional tax payments made to others.

NAS3199

purposes. Neither the Jersey Private Trust Companies nor the Trustee Directors have submitted to the jurisdiction of the bankruptcy court in connection with the above-captioned matter. None of the Trustee Directors or Trusts has entered an appearance in the matter. If there were not a settlement but instead litigation in state and federal courts throughout the United States, the Trustees would not submit to jurisdiction in those courts. If a judgment were hypothetically reached against a beneficiary, trust assets would, in all probability, not be available to satisfy it unless parallel proceedings were to be instituted in the Royal Court and a judgment successfully obtained there.

I declare under the penalty of perjury that the foregoing is true and correct.

Jonathan Greville White

Executed at ___Jersey, Channel Isles___

on ___5 August 2021___.

NAS3200

**Schedule A**

1.       The Trustees shall stand possessed of the Trust Fund and the income thereof upon the trusts following, that is to say:-

(a)       (i)       upon trust with the prior or simultaneous written consent of the Protectors during the Trust Period to pay appropriate or apply the whole or such part of the income of the Trust Fund as the Trustees may in their discretion think fit to or for the maintenance or otherwise for the benefit of all or such one or more exclusive of the other or others of the Beneficiaries in such shares and proportions if more than one and generally in such manner as the Trustees shall in their discretion think fit;

(ii)       subject as aforesaid upon trust with the prior or simultaneous written consent of the Protectors during the Trust Period to pay appropriate or apply either income or capital of the Trust Fund as the Trustees may in their discretion think fit for the benefit of all or such one or more exclusive of the other or others of the Charitable Beneficiaries if any in such shares and proportions if more than one and generally in such manner as the Trustees shall in their discretion think fit;

(iii)       subject as aforesaid upon trust to accumulate the income of the Trust Fund and add the accumulations to the capital of the Trust Fund;

(b)       at the expiration of the Trust Period upon trust as to both capital and income of the Trust Fund for all or such one or more exclusive of the other or others of the Beneficiaries in such shares and proportions if more than one and generally in such manner as the Trustees shall prior to or on the date of such expiration in their discretion determine with the prior or simultaneous written consent of the Protectors and in default of and subject to such determination upon trust for such of the Beneficiaries as shall then be in existence and if more than one in equal shares absolutely;

(c)       subject as aforesaid and in default of any surviving Beneficiary upon trust as to both capital and income of the Trust Fund for such charitable purposes as the Trustees shall in their discretion determine with the prior or simultaneous written consent of the Protectors.

2.       Powers of Appointment and Advancement

Notwithstanding the trusts powers and provisions hereinbefore declared and contained the Trustees may at any time or times during the Trust Period in their discretion with the prior or simultaneous written consent of the Protectors except in respect of sub-clause (e) which shall not require the prior or simultaneous written consent of the Protectors:

(a)       by any deed or deeds irrevocable or revocable during the Trust Period appoint the Trust Fund or any part or parts thereof on such new or other trusts powers and provisions governed by the law of any jurisdiction of and concerning the Trust Fund or any part or parts thereof for the benefit of the Beneficiaries or any one or more of them exclusive of the other or others at such age or time or respective ages or times and in such shares and proportions and subject to such powers of appointment vested in any person or persons and with such provisions for maintenance education or advancement or for accumulation of income or for the purpose of

16

NAS3201

raising a portion or portions or for spendthrift or protective trusts and otherwise at the discretion of any person or persons and with such discretionary trusts and powers exercisable by such persons and such powers and provisions generally whether of a beneficial or administrative nature by whomsoever exercisable and generally in such manner as the Trustees shall in their discretion think fit and for the purpose of giving effect to any such appointment by the same deed or deeds revoke all or any of the trusts powers and provisions herein contained with respect to the Trust Fund or the part or parts thereof to which such appointment relates and so that in the event of any such appointment the Trustees shall thenceforward hold the Trust Fund or the part or parts thereof to which such appointment relates upon and subject to the trusts powers and provisions so appointed in substitution for any of the trusts powers and provisions hereof so revoked as aforesaid and in priority to the other trusts powers and provisions herein declared and contained and in any appointment under the foregoing power the Trustees may delegate to any person or persons all or any of the powers and discretions by this Settlement or by law vested in the Trustees;

(b)    pay or apply the whole or any part or parts of the capital of the Trust Fund to or for the benefit of all or any one or more of the Beneficiaries or the Charitable Beneficiaries to the exclusion of the other or others of the Beneficiaries or Charitable Beneficiaries and in such respective amounts if more than one and generally in such manner as the Trustees shall in their discretion think fit;

(c)    pay or transfer the whole or any part or parts of the capital or income of the Trust Fund to the trustees for the time being of any other trust wheresoever established or existing and whether governed by the Proper Law of this Settlement or by the law of any other jurisdiction which has as its beneficiaries any one or more of the Beneficiaries notwithstanding that such other trusts may also contain trusts powers or provisions (discretionary or otherwise) in favour of some other person or object if the Trustees shall in their discretion consider such payment to be for the benefit of such one or more of the Beneficiaries;

(d)    settle any capital of the Trust Fund on all or any one or more of the Beneficiaries and any settlement made by the Trustees under this present power upon or for the benefit of any one or more of the Beneficiaries as aforesaid may be created in and under the law of any jurisdiction (being a jurisdiction which recognises settlements of the kind proposed to be made) and may contain such trusts powers and provisions whatsoever (including trusts powers and provisions to be exercised at the discretion of any person or persons) for the benefit of such Beneficiaries as the Trustees shall in their discretion think fit;

(e)    (i)    without prejudice to the generality of sub-clauses (a) and (b) above pay to any person out of the income or capital of the Trust Fund the whole or any part of any sum which may whether before at or after the time of the death of the Settlor be or become lawfully payable by the Settlor or his estate to such person whether as a primary obligation or under any guarantee surety indemnity or other document whatsoever (not being a document taking effect as a testamentary disposition) signed personally by the Settlor and any such payment shall be conclusively and irrebuttably presumed to be a payment or application for the benefit of the Settlor;

NAS3202

(ii)      enter into any commitment in writing undertaking to make a payment or application of funds as set out in sub-clause 6(e)(i) hereof and the entry into such a commitment shall likewise be conclusively and irrebuttably presumed to be for the benefit of the Settlor;

(iii)      not seek to recover from the Settlor his personal representatives or his estate the whole or any part of any amount which the Trustees may be entitled to recover by reason of having made a payment pursuant to the power contained in sub-clause 6(e)(i) hereof and such decision shall likewise be conclusively and irrebuttably presumed to be for the benefit of the Settlor;

AND so that for the purposes of this clause:

(i)      the provisions and powers hereinbefore conferred on the Trustees shall have effect notwithstanding any rule of law or equity restricting the delegation of a power or discretion;

(ii)      upon any such payment or transfer to the trustees of any other trust hereinbefore referred to the Trustees shall not be bound to see to the further application of such property;

(iii)      "trust" shall mean any trust created by any settlement declaration of trust will codicil or other instrument under the law of any jurisdiction and a person shall be deemed to be interested under a trust if any capital or income comprised in the trust is or may be transferred paid applied or appointed to him or for his benefit either pursuant to the terms of the trust or in consequence of an exercise of any power or discretion thereby conferred on any person.

NAS3203

**Schedule B**

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| Angonoka Trust | Jersey, Channel Islands | Maydean Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Beacon Trust | Jersey, Channel Islands | Heatheridge Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders |
| Canadian Partnership Trust | Jersey, Channel Islands | Sandiway Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited |
| Clover Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |

NAS3204

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| Cobo Bay Trust | Jersey, Channel Islands | Maydean Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Diagonal Blue Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Fidinc Trust | Jersey, Channel Islands | Hagan Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Glebe II Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |

NAS3205

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| Gorey Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Halm Trust | Jersey, Channel Islands | Hillside Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Hercules Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Ilene S. Lefcourt Trust 88 | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. SchaepmanLeslie J. SchreyerJeffrey A. Robins |

NAS3206

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| Ilene S. Lefcourt Trust 96 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Inholmes Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| ISL 2010 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |
| ISL 2011 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |

NAS3207

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| ISL JML OSHA Trust | USA/Wyo | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | n/a |
| ISL LT Children's Trust | USA/Wyo | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | n/a |
| Jackson River Trust | Jersey, Channel Islands / Wyoming | Soft River Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. SchaepmanLeslie J. SchreyerJeffrey A. Robins |

NAS3208

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| JML 2010 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |
| JML 2011 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |
| JML Investment Trust | Jersey, Channel Islands / Wyoming | Jeffrey Lefcourt and Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |

NAS3209

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| JML OSHA Trust | USA/Wyo | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | n/a |
| KAS 1988 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| KAS 1996 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| KAS 2001 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |

NAS3210

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| KLT 2010 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. SchaepmanLeslie J. SchreyerJeffrey A. Robins |
| KLT 2011 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |
| La Coupe Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Lune River Trust | Jersey, Channel Islands | Maydean Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |

NAS3211

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| May Trust | Jersey, Channel Islands | Sandiway Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| MDAS 2010 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer |
| MDAS 2011 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer |

NAS3212

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| MDAS Children's Trust 2012 | Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | n/a |
| MDAS Investment Trust | New York / New York | Flat Creek Fiduciary Management LLC and Mortimer D.A. Sackler | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | n/a |
| MDS 1992 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MDS 2002 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |

NAS3213

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| MDS 2006 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MDS Beacon 2010 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MDS Beacon 2011 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MDS Beacon 2012 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |

NAS3214

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| MDS Beacon 2013 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MDS Family Trust 2010 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Medichem Trust | Jersey, Channel Islands | Hillside Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Meerkat Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Memphis Pharma Trust | Jersey, Channel Islands | Maydean Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company LimitedAlexa M SaundersHermance B.M. Schaepman |

NAS3215

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| MIL Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Millennium Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Milton Trust | Jersey, Channel Islands | Hillside Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Mondai Trust | Jersey, Channel Islands | Tayleigh Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |

**NAS3216**

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| Mortimer DA Sackler Trust 1996 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Hermance B.M. Schaepman |
| Mortimer DA Sackler Trust 2002 | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer |
| Morvetta Trust | Jersey, Channel Islands | Hagen Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| MTS 2002 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |

NAS3217

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| MTS 2006 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MTS 2013 Family Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. SchaepmanLeslie J. SchreyerJeffrey A. Robins |
| MTS 2016 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MTS Bare Trust | England | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | none |

NAS3218

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| MTS Beacon 2013 Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |
| MTS Beacon 2014 Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |
| MTS Beacon 2015 Trust | Jersey, Channel Islands / Wyoming | Flat Creek Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | Hermance B.M. Schaepman Leslie J. Schreyer Jeffrey A. Robins |

NAS3219

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| MTS Beacon Trust 2010 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MTS Beacon Trust 2011 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MTS Beacon Trust 2012 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| MTS Family Trust 2010 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M SaundersHermance B.M. Schaepman |
| Mundi Lab Trust | Jersey, Channel Islands | Tayleigh Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |

NAS3220

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| PALP Trust | Wyoming (originally formed under NY law)/Wyoming | Soft River Fiduciary Management LLC | Wyoming | n/a | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White, Jeffrey A. Robins, Barbara J. Hoeft, Patricia S. Overdyke | n/a |
| Perelle Bay Trust | Jersey, Channel Islands | Tenzin Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Pickering Trust | Jersey, Channel Islands | Themar Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Racine Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |

NAS3221

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| Reserve Trust | Jersey, Channel Islands | Tayleigh Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Romas Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Samantha Hunt 1996 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Samantha S Hunt 2002 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |

NAS3222

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| SDS 1992 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| SDS 2002 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M SaundersHermance B.M. Schaepman |
| SDS 2006 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| SDS Bare Trust | England | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | none |
| SDS Beacon 2011 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |

NAS3223

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| SDS Beacon 2012 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| SDS Beacon 2014 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| SDS Family Trust 2010 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Settlement dated 14 September 1998 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Hermance B.M. Schaepman |

39

NAS3224

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| Settlement dated 16 September 1998 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Hermance B.M. Schaepman |
| Settlement dated 19 December 2000 | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Sheffield Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Silver Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| SSSH 2013 Family Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M SaundersHermance B.M. Schaepman |

NAS3225

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| SSSH Beacon 2013 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Taddeo Trust | wyo/wyo | Taddeo Fiduciary Management Inc | Wyoming | J. A. Robins Leslie J. Schreyer Jonathan G. White | Leslie J. Schreyer, Patricia S. Overdyke Matthew Bahr | n/a |
| TES Bare Trust | England | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | none |

NAS3226

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| TES Beacon 2012 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| TES Beacon 2013 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |

NAS3227

| Trust | Jurisdiction of Trust Formation and Administration / Residence and Citizenship | Trustee | Trustee Jurisdiction of Formation and Administration / Residence and Citizenship | Directors of Trust Company Trustees | Officers of Trust Company Trustees | Protectors |
|---|---|---|---|---|---|---|
| TES Beacon 2014 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Theresa E. Sackler 1988 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M Saunders Hermance B.M. Schaepman |
| Theresa E. Sackler 2008 Trust | Jersey, Channel Islands | Chelsea Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Alexa M SaundersHermance B.M. Schaepman |
| Tom & Kelly Trust | Jersey, Channel Islands | Sandiway Trust Company Ltd | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |
| Varus Trust | Jersey, Channel Islands | Millborne Trust Company Ltd. | Jersey, Channel Islands | Jörg Fischer, Leslie J. Schreyer, Kerry J. Sulkowicz, Jonathan G. White | n/a | Bowland Company Limited Alexa M Saunders Hermance B.M. Schaepman |

NAS3228

NAS3229

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x

In re:                                    Chapter 11

PURDUE PHARMA L.P., et al.,               Case No. 19-23649 (RDD)

                                          (Jointly Administered)

          Debtors.

- - - - - - - - - - - - - - - - x

MODIFIED BENCH RULING ON REQUEST FOR CONFIRMATION OF
ELEVENTH AMENDED JOINT CHAPTER 11 PLAN[1]

Hon. Robert D. Drain, United States Bankruptcy Judge

     The wrongful use, including marketing and

distribution, of opioid products has contributed to a

massive public health crisis in this country.  The role of

the debtors before me (the "Debtors" or "Purdue") and their

owners in that crisis makes these bankruptcy cases highly

unusual and complex.

          This is so primarily because of the nature of the

creditor body, given the extraordinarily harmful effects of

the Debtors' primary product, the prescription drug

_____

[1] Because of the importance of promptly delivering a ruling on
confirmation of the amended joint chapter 11 plan in these cases, I gave
a lengthy bench ruling rather than reading from and issuing a written
decision.  I informed the parties, however, that after reviewing the
transcript of that ruling I might modify it to make it clearer, add
information that I inadvertently omitted, and of course correct
typographical errors in the transcript.  This Modified Bench Ruling,
while still more colloquial than a written decision, attempts to do that
and is being filed separately from the transcript of my bench ruling.

1

NAS3230

OxyContin, and other synthetic opioids on ordinary people as well as on the local governments, Indian tribes, hospitals and other first responders, states and territories, and the United States that confront these effects every day. In a very real sense, every person in the range of the Debtors' opioid products, sold throughout the United States, was a potential creditor.

Bankruptcy cases present a unique and perhaps the only means to resolve the collective problem presented by an insolvent debtor and a large body of creditors competing for its insufficient assets, including especially when there are mass claims premised on products to which, as here, massive harm is attributed.

Bankruptcy cases focus the solution away from individual litigations to a fair collective result subject to the unique ability under bankruptcy law to bind holdouts under well-defined circumstances who could not otherwise be bound under non-bankruptcy law.

Over the years courts and the parties to bankruptcy cases have refined and improved on such solutions, which clearly have been brought to bear in these cases involving likely the largest creditor body ever. And I'm not speaking solely of the roughly 618,000 claims that were filed, although I believe that is a record, but also,

2

NAS3231

as noted, the people who could arguably be said to be
represented by their local and state governments and by the
United States.

Here, too, the parties have worked in unique and
trailblazing ways to address the public health catastrophe
that underlies those claims.

These cases are complex also because the Debtors'
assets include enormous claims against their controlling
shareholders, and in some instances directors and officers,
who are members of the Sackler family, whose aggregate net
worth, though greater than the Debtors', also may well be
insufficient to satisfy the Debtors' claims against them and
other very closely related claims that are separately
asserted by third parties who are also creditors of the
Debtors.

Since the start, then, key issues for these cases
have been (a) how can such claims be resolved to best effect
for the claimants and (b) is such a resolution authorized
under the Bankruptcy Code and law?  The primary questions
for me now, focusing on the Chapter 11 plan before the
Court, are can these issues be resolved by confirmation of
the plan, and should they?

It is clear after a lengthy evidentiary hearing
that there is now no other reasonably conceivable means to

3

NAS3232

achieve the result that would be accomplished by the Chapter 11 plan in addressing the problems presented by the Debtors' Chapter 11 cases. I believe it is also clear under well-established precedent that, with a sufficient factual record, Congress in the Bankruptcy Code and the courts interpreting it provide the authority for such a resolution. That leaves the question whether the proposed resolution should be implemented.

This ruling explains my findings and conclusions regarding these issues, informed by the record of these cases, the parties' votes on the plan, the parties' briefing, and the record of a six-day trial involving 41 witnesses and a courtroom full of exhibits and two full days of oral argument.

**Notice**. The notice of the Debtors' request for confirmation of the plan was described by Jeanne C. Finegan in her declarations and live testimony, primarily in her third supplemental declaration, which, under my order setting procedures for the confirmation hearing, served as her direct testimony but also referred to prior declarations that she had provided in these cases regarding the notice to claimants and potential claimants.

As established by her testimony, the Debtors' notice of (a) these cases, (b) the right to assert a claim

4

**NAS3233**

against the Debtors, (c) the Debtors' request for confirmation of the plan, and (d) the proposed release of third parties' claims against the released parties in the plan, primarily of such claims against the Sacklers and their related entities (the "shareholder released parties"), was unprecedentedly broad.

Ms. Finegan's testimony was uncontroverted and credible that the Debtors' noticing program as implemented under her supervision reached roughly 98 percent of the adult population of the United States and approximately 86 percent of Canadian adults, with an average frequency of message exposure in each case of four times, and also was extended extensively throughout the world where the Debtors' products might have caused harm. As testified to by Ms. Finegan, the supplemental confirmation hearing notice plan reached an estimated 87 percent of all U.S. adults, with an average message frequency of five times, and an estimated 82 percent of all Canadian adults, with an average message frequency of six times. It also was expanded to 39 countries not included in the bar date notice, served over 3.6 billion online and social impressions, and resulted in over 3,400 news mentions around the world.

The program was carefully tailored to reach not only known creditors but also the population at large,

NAS3234

including through various types of media aimed especially at people who may have been harmed by the Debtors' products. Ms. Finegan's calculations reflect literally billions of hits on the internet and social media as well as reliable estimates of the very wide extent of the other means of notice by TV, radio, various types of publications, billboards, and outreach to victims' advocates and abatement-centered groups.

The only caveat that I have to the extraordinarily broad scope of the notice of the Debtors' request for confirmation of the plan pertains to notice to those in prison. The notice program was in large part effective in reaching prisons and groups known to work with people who are in prison and suffering from opioid use disorder or other adverse effects of opioids. But it is possible that because of prison regulations and at times the lack of access to TV, radio and other media, prisoners may not have received the same high level of notice of these cases, the bar date, and the Debtors' request to confirm the plan, including of the proposed third-party claim releases in the plan.

On the other hand, the Debtors, including in the plan's personal injury trust procedures, have shown a willingness to consider requests to assert and prove claims

NAS3235

late based on evidence of prisoners' unique circumstances that may have restricted notice to them.

The United States Trustee has suggested that references in notices to the plan would have sent people to a lengthy and complex set of release provisions. This is true, as is the observation that it helps to have legal training to parse those provisions, although during the confirmation hearing they have been narrowed and simplified. And as reflected by the record of the parties' responses to my comments during the hearing, those provisions were subject to some potential for differing interpretations, although I believe that is not the case now that they have been revised.

Nevertheless, the most widespread notices of the plan's proposed third-party claims release were simple, in plain English that the plan contemplated a broad release of the Sacklers and their related entities of civil claims pertaining to the Debtors, including claims against them held by third parties. Finegan Decl. at paragraphs 19-22 (describing various ways this notice was disseminated). In addition, extensive media coverage of these cases also hammered home that point. Indeed, wide media coverage exaggerated the extent of the plan's proposed releases of claims against the Sacklers and further noted controversy

7

NAS3236

over its basis in applicable law.  And it is these aspects
of the plan's third-party claims release -- that it is too
broad and unfair and that it is not authorized under
applicable law -- that primarily underly the objections to
confirmation of the plan that have been filed, including by
the U.S. Trustee, not that the releases are hard to read.

I therefore conclude that the Debtors' notice of
the confirmation hearing and the proposed releases in the
plan was sufficient and indeed unprecedentedly broad.

**Voting on the Plan**. I should next note the vote on
the plan by the classes of claimants entitled to vote.  It
is important to address this issue up front because if a
plan is not accepted by the vote of an impaired class, the
plan proponent must proceed with respect to that class under
the so-called cramdown provision of the Bankruptcy Code,
section 1129(b).  On the other hand, if the impaired classes
have voted in favor of the plan's confirmation, the Court
analyzes only section 1129(a)'s requirements for
confirmation and the incorporated provisions of the
Bankruptcy Code related to it, such as sections 1122 and
1123 of the Code.

Based on the ballot declaration and testimony of
Christina Pullo, an unprecedented number of votes were cast
on the plan, over 120,000.  In contrast, votes on most

8

NAS3237

Chapter 11 plans, even in large cases, number between a few
and a few thousand.

And of the votes cast, the plan was in fact
accepted by every voting class, thus obviating the need to
proceed with the "cramdown" provisions of the Bankruptcy
Code except as to insider classes where the plan has
satisfied section 1129(b).

In addition, and significantly, each voting class
voted in favor of confirmation of the plan overwhelmingly.
In the aggregate, the vote was over 95 percent in favor of
confirmation. That, too, is a remarkable result given the
very large number of people who got notice, who were
entitled to vote, and who voted.

For the personal-injury claims classes, the vote
was 95.7 percent (Class 10(b)) to over 98 percent (Class
10(a)). In each class the percent voting in favor of the
plan was above 93 percent with the exception of the class of
hospital claims, which was over 88 percent (and no member of
that class is pursuing an objection to the plan).

I will address later two objections that allege
that this overwhelming acceptance of the plan should be
looked at differently. They allege that the plan improperly
classified certain claims together with other claims, which,
if classified in a separate class, would not have accepted

9

NAS3238

the plan as overwhelmingly. These objectors acknowledge, though, that such a hypothetical class would still have voted in favor of confirmation by well over the 75 percent supermajority threshold that Congress provided for in section 524(g) of the Bankruptcy Code when setting a bar for the release of third-party claims in Chapter 11 plans addressing asbestos liability. Again, I will discuss such classification objections separately.

In addition, and frankly baffling to me, the United States Trustee has argued that I should not look at the votes cast but at the votes that were not cast in determining whether the plan was overwhelmingly accepted. That, of course, is not how elections are conducted. There is no conceivable way to determine the preferences of those who didn't vote other than that they didn't object to confirmation.

But where a vote is as extensive as occurred here, under any measure this plan has been overwhelmingly accepted. And of course it is the actual vote that counts under section 1126 of the Bankruptcy Code, as it does in every election, not a statement by a bureaucrat or his or her sense of where the wind is blowing. That's why we have elections.

### Burden of Proof, Uncontested Subsections of 11

10

NAS3239

**U.S.C. § 1129(a), and Statutory Bases for the Objections to Confirmation of the Plan**. A plan's proponent has the burden of proof on the applicable elements of Bankruptcy Code section 1129(a) that must be met for a plan to be confirmed. That burden of proof is satisfied by showing that the test in the applicable subsection of section 1129(a) has been met by a preponderance of the evidence. In re Ditech Holding Corp., 606 B.R. 544, 554 (Bankr. S.D.N.Y. 2019), and the cases cited therein.

Many of the subsections of section 1129(a) that are applicable to this plan are uncontested. And based on my review of the relevant witness declarations, including those of Jon Lowne, John S. Dubel, and Jesse DelConte, I conclude that with respect to the applicable uncontested subsections of section 1129(a), the Debtors have carried their burden of proof.

The subsections of section 1129(a) that have been contested in objections to the plan include section 1129(a)(1), which states that the plan "must comply with the applicable provisions of this title," i.e., the Bankruptcy Code, and thus incorporates for purposes of these objections sections 1122 and 1123(a)(1) and (4) of the Bankruptcy Code pertaining to the classification and treatment of claims.

In addition, certain objections contend that the

11

**NAS3240**

Debtors have not satisfied their burden to show under
Bankruptcy Code section 1129(a)(3) that the plan has been
proposed in good faith and not by any means forbidden by
law, including not only as to the proposed settlement of
claims against the shareholder released parties but also as
to other plan provisions or related acts that, objectors
contend, violate other provisions of the Code or were not in
good faith.

The United States Trustee has objected that the
payment of certain legal fees and expenses under section 5.8
of the plan (x) violates section 1129(a)(4) of the Code,
which states that it is a requirement for confirmation that
"[a]ny payment made or to be made by the proponent, or by
the debtor, or by a person issuing securities or acquiring
property under the plan, for services or for costs and
expenses in or in connection with the case, or in connection
with the plan and incident to the case, has been approved
by, or is subject to the approval of, the court as
reasonable," 11 U.S.C. § 1129(a)(4); and (y) can be allowed
only if sought and granted under the standard set forth in
sections 503(b)(3) and (4) of the Code, which the plan does
not propose to meet.

One set of objectors has suggested that the plan
does not satisfy section 1129(a)(11) of the Bankruptcy

NAS3241

Code's so-called feasibility test, which requires a showing
that "[c]onfirmation of the plan is not likely to be
followed by the liquidation, or the need for further
financial reorganization, of the debtor or any successor to
the debtor under the plan, unless such liquidation or
reorganization is proposed in the plan."  11 U.S.C. §
1129(a)(11).

     The remaining objections to the plan contend that
the proposed settlement of the Debtors' and third parties'
claims against the shareholder released parties are not
sustainable on various theories challenging (x) the merits
of the settlement of the Debtors' claims under section
1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule
9019, (y) the Court's jurisdiction and power to approve the
plan's third-party claims' release under 28 U.S.C. §§
157(a)-(b) and 1334(b), Article III of the U.S.
Constitution, sections 105(a) and 1123(a)(5) and (b)(6) of
the Bankruptcy Code, and (z) the merits of the shareholder
released parties settlement and third-party claims release
under applicable case law.

     In addition, these objections contend that the
Debtors have not satisfied the so-called best interests test
of section 1129(a)(7) of the Bankruptcy Code, which requires
a showing that "[w]ith respect to each impaired class of

13

**NAS3242**

claims or interests, each holder of a claim or interest of
such class has (i) accepted the plan or (ii) will receive or
retain under the plan on account of such claim or interest
property of a value as of the effective date of the plan,
that is not less than the amount that such holder would so
receive or retain if the debtor were liquidated under
Chapter 7 of this title on such date." 11 U.S.C. §
1129(a)(7).

The objectors who have argued that the Debtors
have not satisfied section 1129(a)(7) argue that because
their third-party claims against the shareholder released
parties are being channeled to the plan trusts or otherwise
precluded in return for their distributions under the plan,
whereas they would not be so channeled and precluded in a
Chapter 7 liquidation, the plan fails the "best interests "
comparison of their liquidation recovery to their recovery
under the plan.

Each of these objections will be addressed below.

**Insurers' Objections**. Navigators Specialty
Insurance Company, American Guaranty and Liability Insurance
Company, and Steadfast Insurance Company have pursued a
limited objection to confirmation of the plan, joined in by
National Union Fire Insurance Company. (Another objection,
by the Chubb Insurance USA has been withdrawn.)

NAS3243

The Debtors seek certain findings in the proposed confirmation order regarding the effectiveness of the transfer of the Debtors' insurance or insurance rights to the trusts established under the plan to fund and make distributions to creditors or to NewCo, the public benefit company to be established under the plan to fund distributions and develop and sell at or near cost drugs to combat opioid addiction and overdoses. They also seek a finding regarding the plan's settlement of claims against the Debtors that potentially are covered by such insurance: that the treatment of such claims under the plan does not violate consent rights under any applicable insurance coverage because it is a bona fide settlement on due notice to the objecting insurers, as well as to the other insurers who did not object.

The plan does not otherwise seek findings as to the Debtors' insurance. For example, it does not seek a declaration that any insurance coverage or insurance rights apply to claims that have been asserted to such coverage (this issue is the subject of a separate litigation that will take its own course). Rather, the findings that the Debtors seek are integral to the effectuation of the transfer by the Debtors of insurance and insurance rights to the plan trusts or NewCo, notwithstanding any "anti-

15

NAS3244

assignment" provisions in the applicable policies, and to
obviate a defense that the plan itself in providing for a
means to pay creditors' claims somehow derogates the
insurers' rights to review and consent to the payment of
insured claims.

The objectors contend that the plan and
confirmation order should not just be largely "insurance
neutral," however, but that it be completely so -- that is,
that even these findings should be postponed for another
day.

But there is no requirement that a Chapter 11 plan
be "insurance neutral" in any respect.  And where a plan
provides for the transfer of a debtor's insurance or
insurance rights to a trust or successor, as here, the issue
of transferability has been joined in the context of the
confirmation hearing and can and should be resolved then.
Similarly, the plan's settlement of claims that might be
covered by insurance is integral to the plan -- indeed, it
is a fundamental purpose of a plan -- and therefore the bona
fides of that settlement are ripe for determination at
confirmation.  The Court is properly situated to decide
those issues without a subset relating to the insurers'
consent rights being carved out for a separate, second
litigation.

16

**NAS3245**

This contrasts with, again, general coverage issues, such as whether any claim against the insurance is subject to a coverage exclusion, which is not something that is inherently raised in the request to confirm the plan and where the plan clearly reserves such rights assertable by the trustees of the trusts that will hold the insurance and insurance rights, on the one hand, and the insurers on the other.

The "insurance-neutral" argument of the objecting insurance companies therefore is not grounded on an underlying principle of bankruptcy law but rather only on a due process concern. The insurers contend that as originally filed the plan was arguably completely "insurance neutral" and did not seek even the foregoing limited determinations in connection with confirmation.

I find, however, that the objecting insurers and all other insurers have had sufficient notice for months that the Debtors were going to seek these limited findings in the confirmation order. The insurers were well represented and are highly sophisticated, as evidenced by their negotiations over the plan's provisions and the proposed confirmation order relating to them. They had a full opportunity to challenge the findings that I've just outlined, first disclosed to them in May 2021, which more

17

NAS3246

than subsumes the applicable notice period under Bankruptcy Rule 2002(b) for the plan and confirmation hearing.

The plan as amended during the confirmation hearing also resolves the remaining due process issue that the insurers had originally raised -- that, as originally drafted, the plan left open the possibility that additional findings could be sought or documents filed that the insurers would not have notice of and might nevertheless be binding on them. As the plan has been amended, this is not going to happen.

As far as the requested finding regarding the bona fides of the plan's resolution of arguably insured claims by providing for the distribution of 100 percent of the value of the Debtors on account of the claims asserted against them in the form of payments between 700 and $750 million through personal injury trusts and at least 5 billion more to abate the opioid crisis in various forms, it is almost impossible to see how an insurer could claim that its consent rights were violated, and in fact the insurers do not give any examples of how those rights might have been violated.

The claims filed in these cases assert at least roughly $40 trillion of liability (excluding a $100 trillion claim that was filed by an individual), which, moreover,

18

NAS3247

covers only roughly 10 percent of the claims filed, the rest
asserting wholly unliquidated amounts.  As stated in the
expert trial declaration of Jessica B. Horewitz, Ph.D., the
allowed, fixed claim of the United States under the November
2020 civil and criminal settlement between the Debtors and
the Department of Justice will receive less than a one-
percent recovery.

Under those circumstances, given the plan's wide
notice, the lack of any objection to the plan's allocation
of value either to personal injury claimants or to abate the
opioid crisis, and the fact that insurers' consent rights,
like any other contract party's consent rights, are
circumscribed by the Bankruptcy Code's separate notice and
hearing process, the Debtors' request for a finding that the
plan does not violate the policies' applicable consent
provisions is justified and appropriate.

In addition, ample case law establishes the
authority under sections 1123(a)(5)(B) and (b)(2) and (6) of
the Bankruptcy Code to transfer insurance rights and
insurance policies as part and in furtherance of a plan to
pay mass claims, such as in these cases.

The analysis of this issue in In re Federal-Mogul
Global, 684 F.3d 355 (3d. Cir. 2012), cannot be improved on.
I will note, though, that although that case was driven by

19

NAS3248

asbestos claims, the logic behind it was based on Bankruptcy

Code sections 1123(a)(5) and 1141, not section 524(g) of the

Code and, therefore, would apply here.  See also In re W.R.

Grace & Co., 475 B.R. 34, 139 n.189 (D. Del. 2012), aff'd

729 F.3d 311 (3d Cir. 2013), and the cases cited therein,

which show the extensive, and perhaps unanimous, authority

for the finding and conclusion that the Debtors seek here

that notwithstanding any anti-assignment provision in any

applicable insurance policy, under the plan the insurance

policies, insurance rights, or rights to insurance proceeds

can be lawfully assigned to the trusts created under the

plan or NewCo for administration and distribution under the

plan.

        I will note that both requested findings are also

warranted because it appears that at least at this stage the

objecting insurers have either disclaimed coverage or

indicated that they are reserving their rights to do so.

See J.P. Morgan Sec. Inc. v. Vigilant Ins. Co., 151 A.D.3d

632, 58 N.Y.S.3d 38 (1st Dep't 2017), and the cases cited

therein.

        I therefore will overrule the insurers'

confirmation objection. (And I will note that after the

colloquy during oral argument with the insurers' counsel and

counsel handling insurance issues in this case for the

**NAS3249**

Debtors, it appeared that most, if not all, of the insurers'
objections may have been resolved in any event by the
changes to the plan that I've already described.)

**U.S. Trustee's Objection to Plan's Treatment of
Certain Attorneys Fees and Expenses**. In addition to its
objection to the plan's settlement of the Debtors' and third
parties' claims against the shareholder released parties, to
be discussed later, the United States Trustee has objected
to section 5.8 of the plan's treatment of certain attorneys
fees and expenses.

The plan provides for compensation and
reimbursement of "professionals," a defined term comprising
professionals for the Debtors and the Official Unsecured
Creditors Committee who are retained pursuant an order of
the Court and paid out of the estates' assets for their
postpetition work under section 330 of the Bankruptcy Code.
The compensation and reimbursement of two other groups of
professionals -- representing the ad hoc committee of
government and other contingent litigation claimants (the
"AHC") and the multi-state governmental entities group (the
"MSGE") -- are also covered by orders of the Court that
subject the estates' payments to them to notice and Court
review.

Section 5.8 of the plan sets forth the treatment

21

NAS3250

of fee claims by other counsel, not counsel whose
compensation is separately subject to approval by prior
order of the Court.  Section 5.8 effectuates a settlement
regarding the payment from the National Opioid Abatement
Trust (the "NOAT") and Tribal Abatement Fund Trust to be
established under the Plan of counsel to beneficiaries of
those trusts. In addition, section 5.8 provides for the
payment of attorneys involved in the pursuit by hospitals of
their claims; of the so-called NAS monitoring claimants'
attorneys fees and expenses; of rate-payer attorneys' fees
and expenses; of personal injury claimants' attorneys fees
and expenses; and of payment for the public schools'
attorneys fees and expenses.

The U.S. Trustee contends that the only way that
the plan can provide for such payments is under section
503(b)(3) and (4) of the Bankruptcy Code.  Section 503(b)(4)
provides that "[a]fter notice and a hearing, there shall be
allowed administrative expenses . . . [that is, expenses
against the estate for postpetition claims], including the
actual necessary expenses . . . [comprising] reasonable
compensation for professional services rendered by an
attorney or an accountant of an entity whose expense is
allowable under subparagraph (A), (B), (C), (D), or (E) of
paragraph 3 of this subsection based on the time, the

22

**NAS3251**

nature, the extent, and the value of such services, and the
cost of comparable services other than in a case under this
title, and reimbursement of actual necessary expenses
incurred by such attorney or accountant."  11 U.S.C. §
503(b)(4).  That section refers one back to section
503(b)(3) of the Code, which requires that a creditor show
that it made a "substantial contribution in a case under
Chapter 11 of the Bankruptcy Code" to be entitled to the
administrative expense.

The U.S. Trustee's objection is misplaced in two
respects.  First, the bulk of the fees covered by section
5.8 are not for postpetition work (and therefore not an
"administrative expense" covered by section 503(b)(3) and
(4)) but rather for prepetition work in raising and pursuing
claims against the Debtors and to some extent the Sacklers,
including in the multi-district litigation that was pending
prepetition in the United States District Court for the
Northern District of Ohio.  Unsecured creditors' claims for
collection of their prepetition costs, including of
attorneys' fees and expenses, as well as rights under
applicable non-bankruptcy law, such as on a "common benefit"
basis, are enforceable in bankruptcy without the need to
comply with subsections 503(b)(3) and (4) of the Bankruptcy
Code, which, again, apply only to administrative expenses.

23

NAS3252

In re United Merchs. & Mfrs., Inc., 674 F.2d 134, 138 (2d
Cir. 1982).

      The U.S. Trustee's objection also is misplaced
because the remaining fees to be paid under section 5.8 also
are not being sought as an administrative expense payable on
the plan's effective date (as would be required under
section 1129(a)(9)(A) of the Bankruptcy Code if they were
being sought as administrative expenses) but rather as part
of a heavily negotiated compromise of those fees and the
clients' obligation to pay them reached during the mediation
in this case conducted by Kenneth R. Feinberg and Hon. Layn
R. Phillips (ret.).

      The settlements provided for in section 5.8 that
resulted from the mediation are subject to this Court's
review both under Bankruptcy Rule 9019 and, I believe --
although there are arguments to the contrary -- under
section 1129(a)(4) of the Bankruptcy Code, as has been so
recognized in this district. See In re Stearns Holdings,
LLC, 607 B.R. 781, 793 (Bankr. S.D.N.Y. 2019); In re Sabine
Oil & Gas Corp., 555 B.R. 180, 258 (Bankr. S.D.N.Y. 2016).

      The U.S. Trustee relies upon a case that is
clearly distinguishable, Davis v. Elliot Mgmt. Corp. (In re
Lehman Bros. Holdings, Inc.), 508 B.R. 283 (S.D.N.Y. 2014),
in which the district court noted that Congress specifically

24

NAS3253

precluded in Bankruptcy Code section 503(b)(3)(D) recovery by official creditors' committee members of their postpetition fees and expenses, and therefore any settlement of those expenses would have been an improper workaround of that provision.  Id. at 288-91.

Mr. Feinberg's mediator's report [Dkt. No. 3339] makes it clear (and there is, in addition, unrefuted supporting testimony by Gary Gotto, John Guard, Peter Weinberger, and Jayne Conroy) that the compromised contingency fees provided for in section 5.8 -- again, almost all of which are for services rendered prepetition –- are reasonable and indeed significantly reduced from a non-bankruptcy range of generally 20 to 40 percent to the ranges set forth in Section 5.8.

As stated at paragraphs 23-25 of the mediator's report, the contingency fee resolutions as well as the common benefit assessments reached in the mediation are consistent with fee arrangements or assessments agreed upon in other similar mass-tort contexts and are reasonable.  See also the trial declaration of Gary Gotto at paragraphs 18(g) and 25(g); the John Guard declaration at paragraphs 57 through 60, 73, and 77 through 78; the Weinberger declaration at paragraphs 20 through 27 and 31 through 32; and the Conroy declaration at paragraphs 11 through 15.

NAS3254

It has been argued that because these section 5.8
fees and expenses are not being paid by the Debtors but by
the clients through the trusts that the clients have agreed
will be the source of their recovery, they are not subject
to this Court's review for reasonableness under the plain
terms of Bankruptcy Code section 1129(a)(4) but are, rather,
like the fees any claimant would pay its counsel. I
conclude, however, that the thrust of section 1129(a)(4),
evidencing Congress' desire that unreasonable fees and
expenses not be allowed under the pressure of plan
confirmation, is that the Court have the ultimate say on the
reasonableness of these fees under section 1129(a)(4).

That reasonableness inquiry does not require an
extensive review, however, if reasonableness can be
otherwise established.  In re Journal Register Co., 407 B.R.
520, 537-38 (Bankr. S.D.N.Y. 2009), citing Mabey v.
Southwestern Elec. Power Co. (In re Cajun Elec. Power
Coop.), 150 F.3d 503, 517 (5th Cir. 1998).  Based on the
uncontested declarations and mediator's report that I've
previously cited -- and I note that the U.S. Trustee has
made no effort to contest these, despite at least implicitly
contending that the fees and expenses are improper or
unreasonable -- I find that all but one of the contingency
fees provided for in section 5.8 of the plan and the

26

NAS3255

mechanism for allocating them among counsel are reasonable. Indeed, the mediated settlement set forth in section 5.8 benefits the estates and creditors by materially reducing the fees and expenses that might otherwise be claimed from the clients and therefore indirectly reduces the claims against the estates.

There are, however, two sets of fees covered by section 5.8 that I cannot on this record make a reasonableness finding on, those of counsel to the personal injury ad hoc committee and of counsel to the school districts' ad hoc committee. I noted this issue during oral argument. These fees are not the reduced contingency fees that the parties and Mr. Feinberg as mediator negotiated and that I have analyzed based on the uncontroverted evidence as being reasonable but, rather, are based on counsels' hourly rates and perhaps in one instance a contingency fee that was not negotiated. I have not seen any time records or hourly rates charged by counsel billing at an hourly rate, nor have I seen the time spent relative to the contingency fee, nor do I have any testimony as to the reasonableness of the contingency fee, so I believe that I will need to make a reasonableness finding as to those counsel fees and expenses in the future under section 1129(a)(4).

The plan has already been amended to reflect this

NAS3256

conclusion raised during oral argument, with one wrinkle. It contemplates that the contingency fee portion of counsel for the school districts' fees will not be reviewed by the Court but, rather, by Mr. Feinberg. I'm not prepared to accept that mechanism. I will certainly consider Mr. Feinberg's views, as I have regarding the contingency fee compromises that I have approved, but I ultimately must make the reasonableness determination on notice to parties in interest, including to the U.S. Trustee, under section 1129(a)(4).

**Objections by Creighton Bloyd, Stacey Bridges, and Charles Fitch**. Creighton Bloyd, Stacey Bridges, and Charles Fitch in their individual capacities object that there was insufficient notice to those incarcerated in prison of the bar date for filing claims, notwithstanding the extensive notice testified to by Ms. Finegan.

There is a fundamental problem with these objections, however, in that all three of the objectors have filed a timely proof of claim in these cases and a timely confirmation objection. They therefore lack standing under Article III of the Constitution to pursue, and this Court lacks the power to decide, their objections because there is no remedy that the Court can grant for their complained-of wrong.

28

**NAS3257**

As stated in <u>TransUnion LLC v. Ramirez</u>, 141 S. Ct. 2190, 2202-03 (2021), to have standing, and for there to be a case and controversy, the party raising a matter with a federal court must have a personal stake in fact in obtaining a remedy, which clearly is lacking here. <u>See also Kane v. Johns-Manville, Corp.</u>, 843 F.2d 636, 642-46 (2d Cir. 1988), which dealt with almost the same issue as raised by these objections, with the same result.

Mr. Bloyd also filed a second confirmation objection based on what he believes might be the consequences of the Debtors' guilty plea in their October 2020 criminal and civil settlement with the Department of Justice. Mr. Bloyd contends that people like him might have an individual right under the Mandatory Victims Restitution Act, 18 U.S.C. § 36633A, to proceeds to be paid by the Debtors to the United States under the DOJ settlement.

His counsel acknowledged at oral argument, though, that this issue is properly raised not here but at the Debtors' sentencing before the New Jersey District Court as contemplated by the settlement.

Even if that wasn't conceded, I conclude that any entitlement of Mr. Bloyd to a portion of the DOJ settlement proceeds arises not in the context of plan confirmation but, rather, properly after the Debtors make the DOJ settlement

29

**NAS3258**

payment.  I also do not believe the issue affects the

feasibility of the plan and note, finally, that the

discretion of the district court under the MVRA to require a

specific restitution fund is likely to be informed by the

very large number of potential victims for whom the DOJ

could be said to be acting, as well as based on the

complexity of determining the number and amount of the

victims' claims and the allocation to them of the settlement

proceeds.

Mr. Bloyd also arguably has suggested that somehow

the Debtors and the Department of Justice colluded in

agreeing to the October 2020 settlement agreement by not

specifically providing for a restitution fund under the

MVRA, but this contention is not supported by the record.

Regarding the plan's treatment of the United

States, the Debtors have established that the plan was

proposed in good faith under section 1129(a)(3) of the

Bankruptcy Code.  There is no evidence of any attempt to

improperly cut off rights that individual victims would have

under the DOJ settlement and, indeed, the personal injury

class was well and actively represented in the mediation in

these cases conducted by Messrs. Feinberg and Phillips that

resulted in the plan's allocation of value among public and

private creditors, including the agreement to fund the

30

NAS3259

personal injury trusts.

It is well established in the Second Circuit that some creditors' failure to participate in a mediation does not render the results of a mediation improper or not in good faith if there was no conflict of interest.  In re Drexel Burnham Lambert Group, 960 F.2d 285, 293 (2d Cir. 1992).  The mediation between personal injury and other private claimants, on the one hand, and governmental claimants on the other over the allocation of funds to the personal injury trusts was in good faith, as shown by, among other things, the mediators' report and the ad hoc personal injury committee's alignment with all personal injury creditors.  The extent of the vote of the non-NAS personal injury claimants' class, 95.7 percent in favor of the plan, also argues in favor of the good faith treatment of the personal injury creditors under the Plan in relation to the United States' and other types of creditors' recoveries. I therefore will overrule Mr. Bloyd's second objection to confirmation of the plan.

**Certain Canadian Creditors' Objections**. Certain Canadian municipalities and First Nations have objected to the plan on various grounds, all premised ultimately on their view that rather than be treated as general unsecured creditors in Class 11(c) of the plan, they must be

NAS3260

classified with the U.S. non-federal governmental creditors
and Native American Tribes in Classes 4 and 5, respectively,
and thus participate in the opioid abatement trusts created
under the plan for those classes instead of receiving their
pro rata share of the cash payment to Class 11(c).

It should be noted that these objectors have not
contended that the value to be paid to them under the plan
differs unfairly in value from that to Classes 4 and 5.
But, in any event, they concede that if their votes were
counted in Class 11(c), as opposed to in Classes 4 and 5,
Class 11(c) would still have overwhelmingly accepted the
plan. Thus the provision in section 1129(b)'s cramdown
requirement that there be no unfair discrimination among
similarly situated creditors in different classes does not
apply. Instead, the objection is, if at all, properly
couched under different provisions of the Bankruptcy Code.

In that regard, there was some suggestion during
oral argument and in one sentence in the objection that the
claims of the Canadian municipalities and First Nations
should not have been allowed for voting purposes at $1.00,
as provided in the Court's confirmation procedures order,
along with all other contingent unliquidated claims, the
objectors' implication being that if their claims had been
liquidated they might have carried Class 11(c)'s vote. They

32

**NAS3261**

have made no request, however, to estimate their claims for voting purposes under section 502(c) of the Bankruptcy Code or to temporarily allow them in a different amount than $1 under Bankruptcy Rule 3018(a).[2]

Further, such temporary allowance in a uniform amount of mass tort claims such as those here in the sum of $1 for voting purposes is well recognized as fair. See In re Lloyd E. Mitchell, Inc., 373 B.R. 416, 428 (Bankr. D. Md. 2007), and the cases cited therein. The alternative, fixing the amount of hundreds of thousands of unliquidated disputed claims before voting on a plan (because of course once the claims liquidation process started, most, if not all, of the claimants would insist on their claims being liquidated) would take years, defeating the conduct and purpose of the bankruptcy case. Kane v. Johns-Manville Corp., 843 at 647-48.

Given that section 1129(b) doesn't apply to the

---

[2] Indeed, based on my review of these Canadian municipalities and First Nations' proofs of claim, which rely on attached complaints against both non-Debtor Purdue Canada and other non-Debtors and against the Debtors that do not distinguish between the conduct of the Debtors and the non-Debtors, it is far from clear that the claims really are against the Debtors. To the extent they are against Purdue Canada or other non-Debtors, those claims are fully preserved under the plan. Nor are claims that are based on the shareholder released parties' conduct related to non-Debtors released or enjoined under the plan.

33

NAS3262

objecting Canadian claimants because of the class vote, the only remaining issue is whether the plan's separate classification of them in Class 11(c), rather than in the classes where they want to be classified, is proper.

A plan proponent has the right under the Bankruptcy Code to classify similar claims in separate classes if there is a reasonable basis to do so.  See generally 7 Collier on Bankruptcy ¶ 1122.03[1][c] (16th Ed. 2021); see also In re LightSquared, Inc., 513 B.R. 56, 83 (Bankr. S.D.N.Y. 2014); In re Drexel Burnham Lambert Group, Inc., 138 B.R. 723, 759 (Bankr. S.D.N.Y. 1992).

Section 1123(a)(1) of the Bankruptcy Code, which is incorporated into section 1129(a)(1), states that "[n]otwithstanding any otherwise applicable non-bankruptcy law, the plan shall designate, subject to section 1122 of this title, classes of claims."  11 U.S.C. § 1123(a)(1). Section 1122 provides only that, "except as provided in subsection (b) of this section [which is inapplicable here], a plan may place a claim in a particular class only if such claim or interest is substantially similar to other claims or interests in such class."  11 U.S.C. § 1122.  It does not require all substantially similar claims be placed in the same class.

Here, there are reasonable bases for separately

34

NAS3263

classifying these objectors' claims from the U.S. public
creditors and Native American Tribes: (x) the different
regulatory regimes that the objectors operate under with
regard to opioids and abatement, as well as (y) the fact
that the allocation mediation conducted by Messrs. Feinberg
and Phillips that resulted in the plan's division of the
Debtors' assets and third-party claims among private and
public claimants and then separately the public claimants'
allocation of their share among themselves involved only
U.S.-based public claimants with their own regulatory
interests and characteristics.

There was no request by any of the objecting
Canadian creditors to participate in that mediation.  The
record is also clear, and I can take judicial notice of the
fact, as well, that those who did request to participate in
the mediation, if they had a reasonable basis to do so, were
generally invited into it, including, for example, the
NAACP.  One's failure to participate in a mediation should
not detract from the settlement reached if the
classification scheme is fair and rational.  See Ad Hoc.
Comm. of Non-Consenting Creditors v. Peabody Energy Corp.
(In re Peabody Energy Corp.), 933 F.3d 918, 927-28 (8th Cir.
2019).

This is not the first time that U.S. and Canadian

35

NAS3264

creditors have been found to be properly classified separately. See Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.), 280 F.3d 648, 661 (6th Cir. 2012, and In re W.R. Grace & Co., 729 F.3d 311, 329-30 (3d Cir. 2013), where Canadian claimants, including the Queen on behalf of Canada, were found to be separately classified properly because of the different types of recovery their claims would have under applicable law, a close analogy to the different regulatory schemes that would apply here to the NOAT and Native American Tribes Trust. The plan's classification scheme therefore is proper as it pertains to the objecting Canadian municipalities and First Nations.

These objectors also suggested that the plan was not proposed in good faith for purposes of section 1129(a)(3) of the Bankruptcy Code. But that objection is premised on the same classification argument overruled above. Again, given the plan's rational basis for separate classification and the lack of any evidence to show that the objecting creditors were improperly silenced or excluded from negotiations, I find that the plan has been proposed in good faith as to them.

These objectors also suggested that the Debtors have not satisfied the "feasibility" test under section 1129(a)(11) of the Bankruptcy Code. The uncontested

36

NAS3265

declaration of Mr. DelConte establishes, however, by showing projections for NewCo and discussing the assignability of the Debtors' insurance and insurance rights, that the plan satisfies section 1129(a)(11). The objecting Canadian municipalities and First Nations do not dispute this generally but contended at the confirmation hearing that their treatment under the plan would be sufficiently objectionable to the court presiding over the Canadian Companies Arrangement Act proceeding in Canada ancillary to those cases that it might not grant recognition of or enforce the plan in Canada.

Based on my understanding of the Model Law on Cross-Border Insolvencies, which is in effect in Canada as well as forming the basis of Chapter 15 of the Bankruptcy Code, I am reasonably comfortable, however, that the Canadian court will recognize and enforce the plan, although of course that is a decision for the Canadian court to make, and not view the plan as unduly discriminatory against Canadian creditors in the light of what they would reasonably recover from the Debtors if the plan were not confirmed, as well as the difference between the non-bankruptcy regulatory regime that governs the Canadian creditors from that applying to U.S. governmental units and Native American tribes.

37

**NAS3266**

I also believe that the "public policy" exception
to recognition under the Model Law on Cross-Border
Insolvencies would not be applied by the Canadian court
given the narrow nature of that exception, although again,
of course, that decision is left to the Canadian court.

Further, it appears based upon Mr. DelConte's
declaration that while recognition in Canada is important
and would bring clarity and finality to the claims of
Canadian creditors against these Debtors, the absence of the
Canadian CCAA court's recognition is not critical to the
survival of NewCo under the plan and the Chapter 11
feasibility test therefore is satisfied in any event.

Besides raising the foregoing objections, the
Canadian creditors object to the plan's release of third-
party claims against the shareholder released parties. To
the extent that they make the same arguments as others who
raised this issue, I will address them collectively later.

In addition, however, the Canadian objectors have
contended that because no money from the shareholder
settlement is being specifically channeled to Class 11(c),
Class 11(c) creditors like them should not be enjoined under
the plan from pursuing whatever claims they may have against
the shareholder released parties based on their U.S.
conduct.

NAS3267

Upon the record before me, though, I conclude that the lack of specific channeling of any of the third-party claims settlement proceeds to Class 11(c) does not justify this objection. It is uncontested by the Canadian creditors that under the "best interests" liquidation analysis in the DelConte declaration, Class 11(c) would receive no recovery on their claims against the Debtors if, as I believe would occur, upon their carveout from the plan's third-party release provisions that are an essential quid pro quo to the shareholder released parties' settlement, the Debtors would liquidate. That settlement, in other words, enables Class 11(c)'s recovery to exist.

Further, there has been no indication by these claimants that the shareholder released parties would be liable to them based on their conduct related to the U.S. Debtors.[3] Indeed, as noted above, there is little indication that these creditors have any claims against the U.S. Debtors in the first place, let alone claims against the Sacklers covered by the release. The Sacklers' defenses to such claims, as well as the costs and impediments to collecting on any eventual judgment against them, will be discussed later in the context of a general analysis of the

---

[3] Again, the third-party claims release does not cover claims based on the shareholder released parties' conduct related to non-Debtors.

NAS3268

plan's third-party claims release. Suffice it for now that
that any recovery by these Canadian objectors under the plan
is inextricably tied to the plan's release of the
shareholder released parties and their payment of the
settlement amount that enables the recovery to Class 11(c)
creditors, a recovery they would not receive in a Chapter 7
liquidation from the Debtors' estates and the shareholder
released parties combined. Thus even without those proceeds
being specifically channeled to Class 11(c), it is fair to
the Canadian objectors to bind them to the release
provisions in the plan.

**Certain States' Classification Objection**. Certain
of the objecting states and the District of Columbia have
also raised objections to confirmation besides their
objection to the third-party claims release and injunction
in the plan.

They have asserted, first, that the plan violates
section 1122 of the Bankruptcy Code by classifying them in
Class 4 along with their political subdivisions.

Given that classification, the objecting states
and the District of Columbia are a small percentage of Class
4's 3.13% rejecting vote, compared to the class' 96.87% vote
in favor of the plan. These objecting states and the
District of Columbia obviously do not like being portrayed

40

NAS3269

in that way, and I do view them to some extent as
representing their populations as a whole (although various
political subdivisions of these objecting states actively
support the plan, raising the question, which political
entity is closer to its constituents?).

I do not accept, however, their blanket
characterization that because they are states, the other
public creditors, political subdivisions, and municipalities
that are in Class 4 can be silenced as a matter of non-
bankruptcy law based, as the objectors argue, on the <u>parens
patriae</u> doctrine or "<u>Dillon</u> rule" with respect to some of
the subdivisions' claims. As briefed by the AHC and MSGE,
the vast majority of states have enacted "home rule" laws
that override those doctrines.

As importantly, the objecting states and the
District of Columbia have made no attempt to silence the
other members of Class 4 by seeking to disallow their claims
for lack of standing or to designate their votes under
section 1126(e) of the Bankruptcy Code so that they wouldn't
be counted.

The objectors acknowledge, moreover -- as stated
on the record by their counsel -- that their claims have the
same rights to the Debtors' assets as other general
unsecured creditors, including the political subdivisions

41

**NAS3270**

that are in their class.  That is, the states' claims are
not priority claims, they are not secured claims, they are
simply general unsecured claims like their political
subdivisions'.

And under those circumstances, the states' claims
are properly classified under Bankruptcy Code section
1122(a) with the other governmental entity claims in Class
4.  As noted by the Third Circuit in In re W.R. Grace & Co.,
729 F.3d at 326, which upheld a chapter 11 plan's
classification of the State of Montana with private
claimants also holding personal injury claims,

> "[t]o determine whether claims are 'substantially
> similar' [for purposes of section 1122(a)], 'the
> proper focus is on the legal character of the
> claim as it relates to the assets of the debtor.'
> In re AOV Indus., Inc., 792 F.2d, 1140, 1150 (D.C.
> Cir. 1986); see also In re Tribune Co., 476 B.R.
> 843, 855 (Bankr. D. Del 2012) (concluding that the
> phrase 'substantially similar' reflects 'the legal
> attributes of the claims, not who holds them')
> (internal quotation marks omitted); In re Quigley,
> 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007) ('Claims
> are similar if they have substantially similar
> rights to the debtor's' assets.') (emphasis and
> internal quotation marks omitted)."

See also In re Drexel Burnham Lambert Group, Inc., 138 B.R.
at 757; 7 Collier on Bankruptcy ¶ 1122.03[3].

That is clearly the case here and, therefore, the
claims can and should properly be classified together given
the agreement by all of the states (with the exception of
West Virginia) and territories along with the other members

42

**NAS3271**

of Class 4 to the allocation of distributions within Class 4 among themselves, as well to as the allocation of distributions to the public creditors, on the one hand, and the private creditors on the other, that was reached during the mediation conducted by Messrs. Phillips and Feinberg.

(It also is worth noting, although it has no bearing on the classification issue, that if the plan had separately classified the states and territories from the other public creditors (although that would have unduly complicated the universally agreed allocation of value as between the states and all of the other public entities in Class 4 and the public/private allocation under the plan), the percentage of states and territories accepting the plan would go to over 79 percent, still well above the 75 percent supermajority threshold in the analogous provision of Bankruptcy Code section 524(g).)

The objecting states and the District of Columbia also contend that the Court's order establishing confirmation procedures improperly allowed their claims for voting purposes at $1 (as it allowed all other opioid-related claims for voting purposes, which similarly have not been liquidated and would be disputed). Notwithstanding that the objectors have agreed to the allocation formula under the NOAT, and thus that their claims will never need to be

43

**NAS3272**

liquidated for the plan's distributions to be made on their claims, they contend that their claims must be liquidated before their votes can be counted.

But this objection should be denied for the same reasons as the similar objection made by the Canadian municipalities and First Nations objectors. These objectors have made no attempt to seek to estimate their claims or temporarily allow them for voting purposes in a different amount under section 502(c) of the Bankruptcy Code or Bankruptcy Rule 3018(a). And there is an obvious reason why they haven't. If such a request had been made, almost all, if not all, of the other claimants with unliquidated claims would have made a similar request, leading to lengthy, expensive, and, as shown by the parties' agreement to their treatment in Class 4 solely for opioid abatement under an agreed formula, unnecessary litigation over the amount of their claims. Under such circumstances, it is entirely appropriate to allow the claims for voting purposes in the sum of $1.00. Kane v. Johns-Manville Corp., 843 F.2d at 647-48; In re Lloyd E. Mitchell, Inc., 373 B.R. at 428.

The objectors also argue that they are being treated unfairly under the plan in relation to the United States, which, unlike them, is in large measure carved out of the plan's third-party claims release. This is not a

44

NAS3273

proper objection, however, under section 1123(a)(4) of the Bankruptcy Code, cited by the objectors, which states that a plan shall "provide the same treatment for each claim or interest of a particular class unless the holder of a claim or interest agrees to a less favorable treatment," 11 U.S.C. § 1123(a)(4), because the plan classifies the United States in different classes than the objectors.

        Clearly also, that separate classification is appropriate. As discussed earlier, the Bankruptcy Code gives plan proponents the ability to classify similar claims in different classes if there is a reasonable basis to do so. 7 Collier on Bankruptcy ¶ 1122.03[1][a]. Here, there clearly is a rational basis to classify the United States separately from the other public creditors. Indeed, the United States has qualitatively different claims to the Debtors' assets in some respects, mandating its multiple separate classifications from general unsecured creditors. In addition to its general unsecured claims in Class 3, it has secured claims, which are treated as part of one of the aspects of the plan's settlements, it has a superpriority administrative expense claim under the October 2020 DOJ settlement, and it has priority claims. And, unlike the claimants in Class 4, the United States has already settled civil claims against the Sacklers for a specific payment

45

under its separate postpetition DOJ settlement agreement with the Sacklers. Finally, the United States' treatment under the plan is different than the treatment of the Class 4 claims; unlike them, it is not required to use its plan distributions for abatement, although it has agreed under the DOJ settlement to forego $1.775 billion of its superpriority claim if, as the plan provides, NewCo is established on the effective date to operate for the public benefit and the states and other public claimants in Class 4 agree to use their distributions for abatement.

Clearly, then, the United States' different rights and different treatment support its separate classifications from Class 4, nor is an unfair discrimination argument available under section 1129(b) of the Bankruptcy Code given that Class 4 has accepted the plan, thus negating the need for the Code's cramdown provision to apply.

**West Virginia's Limited Objection to the NOAT Allocation Formula.** The State of West Virginia does not object to any aspect of the plan other than its allocation in Class 4 and under the NOAT distribution procedures of the funds to be distributed to it for abatement of the opioid epidemic.

First, it contends that the plan has not been proposed in good faith for purposes of section 1129(a)(3) of

46

**NAS3275**

the Bankruptcy Code because of the NOAT's assertedly unfair allocation formula for the states. Under section 1129(a)(3), the Court shall confirm a plan only if the proponent shows that "the plan has been proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). The Code does not define "good faith," but the courts have a fair consensus on its meaning in section 1129(a)(3). All courts emphasize, based on the section's plain terms, that the inquiry should primarily focus on whether the proposal of the plan was in good faith, not on whether the plan generally is in good faith or undertake an even more free ranging inquiry into fairness and equity. Many courts go further, to limit the section's application to whether the proposal of the plan was in good faith or instead infected with improper conflicts of interest or self-dealing. See, e.g., Garvin v. Cook Invs. NW, SPNWY, LLC, 922 F.3d 1031, 1035 (9th Cir. 2019) ("A contrary interpretation not only renders the words 'has been proposed' meaningless, but makes other provisions of § 1129(a) redundant."); see also 7 Collier on Bankruptcy ¶ 1129.02[3][a].

Generally, the Second Circuit has focused on the proposal of the plan. See Argo Fund Ltd. v. Bd. Of Dirs. of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom Arg.,

47

**NAS3276**

S.A.), 528 F.3d 162, 174 (2d Cir. 2008); Kane v. Johns-Manville Corp., 843 F.2d at 649; In re Koelbl, 751 F.2d 137, 139 (2d Cir. 1984).  On the other hand, courts in this district, while focusing largely on the proposal of the plan, including on the process of plan development, have also considered whether the plan, "... will achieve a result consistent with the standards prescribed under the Bankruptcy Code." In re Ditech Holding Corp., 606 B.R. at 578, and the cases cited therein.  See also In re Chemtura Corp., 439 B.R. 561, 608 (Bankr. S.D.N.Y. 2010); In re Quigley Co., Inc., 437 B.R. 102, 125 (Bankr. S.D.N.Y. 2010); In re Genco Shipping & Trading Ltd, 513 B.R. 233, 261 (Bankr. S.D.N.Y.); In re Breitburn Energy Partners LP, 582 B.R. 321, 352 (Bankr. S.D.N.Y. 2018).

As recognized by Judge Garrity in Ditech, those policies or objectives include preserving going concerns, maximizing property available to satisfy creditors, giving debtors a fresh start, discouraging debtor misconduct, the expeditious liquidation of claims and distribution of the bankruptcy estate to creditors and, where warranted, interest holders, and achieving fundamental fairness in the collective context of a bankruptcy case.  606 B.R. at 578.

Here, I have ample testimony by John Guard, from the office of the Attorney General of the State of Florida,

48

NAS3277

that the allocation of the NOAT among the states under the

plan and the NOAT distribution procedures derived from good

faith, arms' length negotiations by the states preceding the

mediation by Messrs. Phillips and Feinberg and then

continuing to completion during it.  That testimony really

is unassailable as to the plan's good faith on this issue.

It highlighted that these difficult but ultimately nearly

comprehensively successful negotiations (with the exception

of West Virginia's disagreement) took into account the

differing interests of the various states, which if not as

weighty as those underlying the compromises at the

Constitutional Convention, were similar: for example, the

interests of states with small populations, though heavily

impacted by opioids; the interests of states with large

populations and therefore more people affected by opioids;

the interest of states with different health and law

enforcement resources; and the interests of states with

different ways of reporting opioid-related deaths and other

conditions of opioids' impact.

Mr. Guard testified credibly that while the

negotiations were difficult, the states recognized and tried

to address these differing interests in an overall

allocation formula. He also testified credibly that no state

was prepared to come even close to accepting the alternate

NAS3278

allocation proposal put forth by West Virginia but that states with characteristics similar to West Virginia agreed that the plan's allocation formula adequately addressed their concerns.

The states' unanimous agreement to accept their recovery in the form of money solely devoted to opioid abatement, and their nearly unanimous agreement on the allocation of that distribution among them is truly remarkable, and, as noted during the confirmation hearing by the Attorney General of West Virginia, likely will serve as a model for the allocation of future settlement proceeds from other opioid manufacturers and distributors among the states. Without that agreement, the goals of the Bankruptcy Code would have been jeopardized. Such a failure would have resulted in extensive litigation over the various states' claims, a lengthy delay in making distributions to abate the opioid crisis, and arguably a fallback to distributing the value under the plan not for abatement purposes but, rather, for general use by states and other public creditors.

Mr. Guard's testimony was supported by the cross-examination of West Virginia's expert, Charles Cowan, Ph.D. Mr. Cowan acknowledged that in publications that he wrote before being retained by the State of West Virginia for the purpose of showing why it should receive a larger allocation

50

NAS3279

of the NOAT distributions, he recognized that other methods
of allocating money towards abatement could be fair and
reasonable, as well, and that there was no specific "best"
formula for allocating settlement funds to public creditors.
He also acknowledged that the plan's allocation formula was
an acceptable choice if West Virginia's proposal was not
adopted by the Court. He acknowledged that his proposed
allocation to West Virginia was outside the range of
allocations under formulas that he earlier had written were
reasonable, whereas West Virginia's allocation of
distributions to the NOAT was within those ranges.

It was clear that the allocation formula proposed
by Mr. Cowan also would lead to peculiar allocations of the
NOAT funds for abatement, for example that states with
substantially smaller populations would get substantially
more funds than states with large populations.  Thus the
State of Washington would have a larger recovery than Texas,
and West Virginia would have a larger recovery than
Virginia, although they are neighboring states and West
Virginia is losing population and Virginia's is growing.

Mr. Guard and Mr. Cowan agreed that West Virginia
and certain other states have been disproportionately harmed
by the opioid crisis, but their testimony also reflected
that a state's population is an important element of any

51

NAS3280

allocation formula because it reflects the resources that a
state will need to bring to bear for abatement.  Their
testimony established, moreover, that different states
report opioid deaths and opioid disorders differently from
each other, casting some doubt on the reliability of an
"intensity" emphasis for an abatement allocation formula.

Lastly, the NOAT allocation formula does in
certain ways recognize the interests of smaller states,
including levels of intensity of harm.

I therefore find and conclude that the NOAT
allocation was derived in good faith by arms' length and
fair negotiations among the parties and satisfied Bankruptcy
Code section 1129(a)(3).

I also find and conclude that the treatment of the
states in Class 4, and through it by means of the good
faith, fair, and uniform trust procedures and allocation
formula for the NOAT, provides for the same treatment of
each claim in Class 4 for purposes of section 1123(a)(4) of
the Bankruptcy Code.  As discussed in In re W.R. Grace &
Co., "[a]lthough neither the Code nor the legislative
history precisely defines the standards of equal treatment,
courts have interpreted the 'same treatment requirement' [of
section 1123(a)(4)] to mean that all claimants in a class
must have the same opportunity for recovery."  729 F.3d at

52

NAS3281

327 (internal quotations and citation omitted).  See also In re Cent. Med. Ctr., Inc., 122 B.R. 568, 575 (Bankr. E.D. Mo. 1990), which W.R. Grace cites for the proposition that "a plan that subjects all members of the same class to the same process for claim payment is sufficient to satisfy the requirements of Section 1123(a)(4)."  720 F.3d at 327.

The W.R. Grace court goes on to state, "Courts are also in agreement that § 1123(a)(4) does not require precise equality, only approximately equality," id., citing In re Quigley Co., 377 B.R. 110, 116 (Bankr. S.D.N.Y. 2007), and In re Multiut Corp., 449 B.R. 323, 334 (Bankr. N.D. Ill. 2011). The consequences of how and when the class members would be paid under W.R. Grace's plan did not produce a substantive difference in a claimant's opportunity to recover and were the result of, among other things, a comprehensive mediation and arms' length negotiations, and thus the plan satisfied section 1123(a)(4).  In re W.R. Grace & Co., 729 F.3d at 328. The same analysis applies to the treatment of the NOAT allocation among the states in Class 4.

I was not going to reach the same conclusion with respect to a former element of the NOAT allocation and distribution procedures.  One of the adjustments made for the benefit of states with smaller populations like West

53

**NAS3282**

Virginia in the NOAT allocation was a separate, so-called 1 percent fund, which all of the states, other than the small states that would participate in the fund, were going to contribute to, with, however, the exception of California.

I did not see sufficient evidence to justify California's being excepted from that contribution obligation to the 1 percent fund. However, since the discussion on the record during the confirmation hearing, California has agreed to contribute to the 1 percent fund. The one aspect of West Virginia's objection that I was going to grant has effectively been granted, therefore, by this agreement of the State of California.

Mr. Guard made it clear that all of the states recognized the huge impact that the opioid crisis has had on states like West Virginia and had tried to take that into account in negotiating the NOAT allocation. I too recognize that impact, but I believe that given the arms' length nature of the negotiation and the acceptable range of West Virginia's treatment even within the writings acknowledged by Mr. Cowan, its objection under Section 1129(a)(4) should be denied.

**Pro se Objections/Good Faith**. The remaining objections to the plan, other than objections based upon the plan's third-party release and injunction provisions and the

54

NAS3283

plan settlement with the Sacklers and their related
entities, have been asserted by several parties who were not
represented by counsel.

These objections are properly viewed in roughly
four different categories.  First, Ms. Butler-Fink, Ms.
Villnave, Mr. Cobb, and Mr. Wright have stated in one form
or another that the plan should not give the Sackler family
"... immunity from criminal charges."

I completely agree, as does the plan.  The plan
does not contain a release of criminal conduct.  That is
crystal clear in the plan and always has been in these
cases.

It is understandable that a person who is not a
lawyer and looks at these cases from afar through one form
of the media or another may have reached a different
conclusion.  In part that is because either through
ignorance or choice, the plan has been described in the
media and online as providing "immunity" to the Sacklers for
crimes, including murder and illegal drug dealing.
"Immunity" clearly suggests immunity from criminal charges;
that's how one generally thinks of the word.  But the plan
simply does not grant such a release.  It couldn't do it,
and it doesn't.

Those who should know better, whether they are

55

NAS3284

reporters, law professors, or politicians, should not
suggest otherwise.  At best, suggestions that the plan would
relieve the Sacklers of potential criminal liability reflect
a lack of understanding about these cases; at worst, such
suggestions are irresponsible and, frankly, cruel to those
whom they mislead.

If anyone has engaged in criminal activity either
before or during these cases, they are not relieved of the
consequences of that liability under the plan.  If any
prosecutor wants to pursue such a claim against the released
parties, they can.

Ms. Graham, Mr. Normile III, Mr. Burris, Ms.
Willis, Ms. Ecke, Mr. West, and Ms. Farash have in one form
or another contended that it is improper or unfair for the
plan to provide only $700 million to $750 million in the
aggregate for distribution on account of non-NAS personal
injury claims, while the bulk of the recovery goes to, as
one of the objectors stated, "the government, politicians
and big businesses."

I have said more than once during these cases,
including to Ms. Ecke, who testified during the confirmation
hearing, that one cannot put a price on a human life or an
injury such as opioid addiction, and yet that's what courts
do with respect to personal injuries.  They take into

56

**NAS3285**

account a number of factors that are relevant legally,
including potential defenses and intervening circumstances
that defeat or dilute the claim, and ultimately the claimant
must meet the burden of showing proximate cause. The dollar
amount that courts reach if they find a claim for personal
injury often does not seem like sufficient compensation.
That is particularly the case where the wrongdoer is
insolvent.

I did not have any specific valuation of personal
injury claims in this case. What I do have is a lengthy and
difficult arms-length mediation led by two of the best
mediators not only in the United States but in the world,
Messrs. Feinberg and Phillips. They are, I believe, in no
way beholden to any type of claimant or unduly sympathetic
to any type of claimant or any other party.

Mr. Feinberg, for example, had the incredibly
difficult job of working out, by dealing with victims and
their families, the proper allocation of the 9/11 fund.
Both mediators have extensively dealt with personal injury
claims over the course of their careers, and I believe they
have been so successful because they are as sympathetic, if
not more so, to individual victims as they are to states,
hospitals, and other corporate entities.

The people representing the personal injury

NAS3286

claimants in the mediation were some of the most effective personal injury lawyers in the world, which means that they are aggressive, creative, knowledgeable and responsible in the pursuit of their clients' claims. I believe that, as set forth in the mediators' report, their negotiations with the other classes of creditors were at arms-length and in good faith. Dkt. No. 2548. I also do not see any conflict between their representation of their tens of thousands of clients in the mediation and the other tens of thousands of personal injury claimants in these cases, who collectively will receive the same type of treatment under the plan and the personal injury trust claims and distribution procedures.

I also carefully considered the trial declaration of Jayne Conroy, who is one of those personal injury lawyers and in fact with her colleagues was probably the main lawyer to pursue Purdue and the Sacklers over more than a decade on behalf of personal injury claimants. Because of that dogged work, she obtained a settlement for roughly 1,100 personal injury claimants, albeit many years ago. She described those clients in her declaration as those who could tie their injury to a prescription of one of Purdue's products, from which I inferred that they probably were among those most likely to obtain a recovery in a litigation,

58

NAS3287

notwithstanding all of the arguments that the defendants would throw back at them.

After deducting a reasonable contingency fee from that settlement, I believe on average the recovery under that settlement -- and because I don't know how the recovery was divided among the clients, I simply allocate it evenly to each client -- was approximately $13,500 per person, which is well within the anticipated range under the plan for allowed personal injury claims.

The uncontroverted declarations of Peter H. Weinberger, Gary A. Gotto, and Ms. Conroy describe the hard-fought litigation and negotiation process leading to the settlement contained in the plan for personal injury claimants, a settlement they support and one which Ms. Conroy testified reflects a "settlement premium" paid to obtain a comprehensive result.

The uncontroverted trial declaration of Deborah E. Granspan details the procedures under the personal injury trust for efficiently -- though consistently with the burden to prove one's claim -- establishing the amount of one's personal injury claim and obtaining a distribution.  Her declaration was uncontroverted in describing a trust procedures mechanism that minimizes the difficulty and cost of presenting a claim for personal injury while maintaining

59

NAS3288

a sufficient degree of rigor over the burden of proof to
ensure that as much of the money allocated to personal
injury claimants can go promptly and directly to them
instead of to lawyers.

I also have reviewed the declaration of Michael
Atkinson on behalf of the Official Unsecured Creditors
Committee, which attaches the Committee's letter in support
of the plan and recognizes the Committee's role in balancing
the interests of personal injury creditors with those of the
states and other entities that also assert claims, and
strongly supports confirmation of the plan as a fair balance
of those interests.

The plan vote of approximately 95.7 percent of the
non-NAS personal injury class in favor of the plan strongly
argues that the members of that class support the plan and
the fairness -- although only in this setting where one
allocates money from a limited pot based not on a moral view
of the value of a human life or a person's health but,
rather, upon the likelihood of such claims recovering in a
litigation -- of the plan's allocation of value among
personal injury claimants and other creditors.  Under the
plan that settlement provides for funds to be paid early to
personal injury creditors, ahead of the states and other
governmental entities, and fair procedures that make it

60

NAS3289

relatively easy, though preserving the burden of proof, to
obtain a recovery.

As I will discuss later, the plan's allocation of
value to all other creditors to be devoted solely to
abatement purposes will also provide value, though
indirectly, to all surviving personal injury claimants.

In sum, then, the plan's treatment of personal
injury claimants is a fair, mediated resolution of extremely
difficult private/public allocation issues.

The next set of objections was made by Ms.
McGaha, who also was a witness at confirmation, and Ms.
VomSaal.  Both raise legitimate concerns, as do all the
objectors, although, as I said before, I believe the first
group of objectors has been misled into thinking that the
plan provides for a release of criminal conduct.

Ms. McGaha and Ms. VomSaal question why after the
plan's effective date NewCo will continue to manufacture and
sell opioids in any form, even though such sales would be
lawful.  Ms. McGaha also makes certain recommendations that
could be viewed as abatement measures but are not
necessarily included in the abatement policies and
guidelines under the plan, such as the banning of long-term
opioids or at least making different disclosures regarding
them, changes in packaging, and the promotion of non-opioid

61

NAS3290

treatments for chronic pain and alternative, non-opioid
therapies for pain.

I believe strongly that every constituency in
these cases -- including the Official Unsecured Creditors
Committee, the Debtors themselves, the United States, the
states, the other governmental entities, the Native American
tribes group, the ad hoc group of hospitals, the ratepayer
and third-party payors groups, the NAS committees, and the
ad hoc committee of personal injury claimants -- has wanted
to ensure that the production and sale of this dangerous
product be not only lawful but also conducted in a way that
is cautious, subject to layers of oversight, and informed by
the public interest at every step.  That is the purpose of
the plan's provisions dealing with NewCo:  the NewCo
governance covenants, the NewCo monitor, the NewCo operating
agreement, and the NewCo operating injunction.

From the start of these cases, this was a primary
focus of the Official Unsecured Creditors Committee. This
has also been a focus since the start of the states and
political subdivisions and I believe soon after the start of
these cases of the other institutional creditors, such as
hospitals and school districts. That is why with the
exception of personal injury creditors all claimants in
these cases have agreed to take their distributions in the

62

**NAS3291**

form of payments to be devoted solely to abatement of the
opioid crisis.

        The Debtors, too, have been focused on these
goals, for example at the start of these cases volunteering
a self-injunction pertaining to their legal manufacture and
sale of these products, agreeing to the appointment of a
monitor, and re-focusing their business in part to
developing overdose and addiction treatments to be sold at
or near cost.  Those measures are described in Mr. Lowne's
trial declaration, as well as the fact declaration of Mr.
DelConte.  They also were discussed in Mr. Atkinson
declaration and the attached letter from the Creditors
Committee, and they are reflected in the provisions of the
plan that I've just described.

        Since before the start of these cases, this focus
has not involved any input from the Sackler family or their
related entities, because since before the bankruptcy
petition date the Sacklers have not taken any role
whatsoever on the Debtors' Board or otherwise regarding the
Debtors' management.

        The Bankruptcy Code does not require this focus,
but in keeping with the broader view of section 1129(a)(3)'s
good faith requirement, the parties in interest have
required it, and I have encouraged them, so that at this

                              63

**NAS3292**

point I believe the measures that I have just described will

set a standard not only for this company but for other

companies that manufacture and distribute products like the

Debtors' that are legal yet dangerous.

       It is hard to imagine how any other company that

engaged in this business or in the distribution of these

types of products wouldn't also conclude that it was not

only the right thing to do but also was in their interest to

imitate these governance and operating constraints.  They're

not being imposed by a government; they're being imposed by

this plan with the input of state and local representatives

and the federal government and, importantly, representatives

of the victims of Purdue's prior conduct.  Again, these

governance and operating constraints should serve as a model

to similar companies as well as an implicit warning that if

such companies do not take such care, if they rely instead

only on the minimum that the F.D.A. or other federal or

state law or regulations require, they may nevertheless,

like Purdue, be found lacking if their products cause harm.

       The plan's abatement programs themselves are the

subject of substantial unchallenged testimony, including by

Dr. Gautam Gowrisankaran and Dr. Rahul Gupta, and, with

respect to the hospital class, William Legier and Dr. Gayle

Galan.  And the abatement initiatives reflect heavy input by

NAS3293

all of the states and non-state governmental entities. Again, to have reached agreement on these abatement metrics and mechanisms is an incredible achievement given the strong views that various parties have about what types of abatement are proper.

Dr. Gowrisankaran's unchallenged testimony described the clear multiplier effect of dedicating the bulk of the value to be distributed under the plan, including from the shareholder released parties, to abatement programs as opposed to individual payments that perhaps could be used for abatement but, as with prior national settlements such as the settlements with tobacco companies, also could be used for miscellaneous governmental purposes.

The foregoing testimony also shows, as do the abatement metrics themselves, that the plan contemplates abatement procedures that will take into account developments and lessons learned over time about what works and what doesn't. That incremental development is furthered by the plan's requirement for periodic reports on the use of the abatement funds, which then can be checked to see what succeeds and what doesn't and therefore how future NOAT distributions might best be reallocated.

The abatement procedures and metrics also include a consultation process taking into account the views of

65

NAS3294

local governments and people within local communities in a
reasonable and fair way; that is, they are not simply
imposed from the top down by the respective states.

Ms. McGaha and Ms. VomSaal don't identify a
specific legal basis for their objections (which is
understandable given that they are not represented by
counsel).  I have addressed them, however, in the light of
Bankruptcy Code section 1129(a)(3)'s good faith requirement.
Given all that I've just described, it is clear that the use
of most of the value to be distributed under the plan for
abatement purposes as specified is in good faith and, in
fact, beneficial to those who have individual claims against
the Debtors as well as the communities and states that also
have claims.  It is also clear that the plan's provisions
for the governance and operations of NewCo, facilitate not
only the purposes of the Bankruptcy Code but also the
broader good.  Within the constraints of federal law,
including regulations and guidance from the F.D.A, the NewCo
governance provisions go beyond that law where possible to
ensure the safety or the safe use of the Debtors' products,
including the development of products that would assist
those who are trying to recover from opioid use disorder and
provide cheap and accessible prevention mechanisms for
overdoses.

<center>66</center>

<center>**NAS3295**</center>

To suggest otherwise, to suggest that somehow this was an ill-cooked and cooked-in-secret stew (which I don't believe the two objectors are contending but has been suggested publicly by those who I don't think have been following these cases, or if they have been following them should know better), is incorrect and dramatically so.

The last objection by certain of the pro se objectors whom I've already named contends that the civil settlement under the plan with the shareholder released parties -- the Sacklers and their related entities -- is unfair and should not be approved. That settlement would resolve the claims of (x) the Debtors' estates against those parties and (y) certain claims against the shareholder released parties based in large measure on the same conduct underlying certain of the Debtors' claims against the shareholder released parties and the third parties' claims against the Debtors.

It is my main task, notwithstanding the length of this ruling already, to consider whether that settlement of the Debtors' claims and related third-party claims against the shareholder released parties is proper under the Bankruptcy Code.

One point should be addressed first regarding this inquiry, and I discuss it now in part because it has been

67

NAS3296

raised by the <u>pro se</u> objectors, perhaps because of what they have read or heard in the media or from others.

Some assert that this Chapter 11 plan and the settlement in it is "the Sacklers' plan," or perhaps, artfully, it has been suggested that because it is proposed by the Debtors, and the Sacklers own the Debtors, the Debtors' plan is "the Sacklers' plan."

While I will separately examine whether the settlements with the Sacklers under the plan are fair, one thing is crystal clear, and anyone who contends to the contrary is, again, simply misleading the public: this is <u>not</u> the Sacklers' plan. The Debtors are not the Sacklers' company anymore. The Sacklers own the Debtors, but the Debtors are not run by the Sacklers in any way and have not been since before the start of these cases. There is literally no evidence to the contrary -- none. Although it was not necessary, because the record was clear, the examiner appointed in these cases confirmed it in his report. Dkt. No. 3285.

More importantly, and as recognized by the examiner, these cases were driven as much, if not more, by the Official Unsecured Creditors Committee and the other creditors in these cases who formed well-represented ad hoc committees, including committees of the 48 states and

68

**NAS3297**

territories that have claims against the Debtors (two states having settled those claims before the start of the bankruptcy cases) and strong representatives of non-state governmental entities and Native American tribes; personal injury claimants; victims of neonatal abstinence syndrome or their guardians, hospitals, ratepayers and third-party payors, and school districts.

These creditors essentially have represented the interests of all creditors of these Debtors, although of course other creditors were free as parties in interest to appear and be heard. And from the start of these cases, all of the Debtors' assets were dedicated to them. These creditor groups wanted more than anything to obtain as much value not only from the Debtors but also from the Sacklers, who were viewed by all as the opposition, the other side, the potential defendants, the payors. And it is clear that the Official Unsecured Creditors Committee, the states and territories, the other governmental entities and tribes, and the other ad hoc groups were completely independent from the Sacklers in their focus on that goal.

They were facilitated in achieving that goal by the two incredibly experienced and effective mediators I've already discussed, Messrs. Philips and Feinberg. And, further, even after a largely successful mediation of the

69

**NAS3298**

claims against the Sacklers -- claims by the Debtors'
estates and claims assertable by others -- which ultimately
resulted from the mediators' own proposal as to what would
be a fair settlement that was accepted by all of the
foregoing groups with the exception of the so-called
nonconsenting state group of 24 states and the District of
Columbia, I directed <u>another</u> mediation with another of the
best mediators in the world, my colleague Judge Shelly
Chapman.  Based on her mediation report [Dkt. No. 3119],
Judge Chapman held over 140 discussions before the mediation
day set aside to see whether the remaining nonconsenting
states could reach agreement with the Sacklers.  That "day"
lasted 27 hours. Id.

        Judge Chapman, like Mr. Feinberg and former Judge
Phillips, is a successful mediator because she does not
browbeat people, although even if she wanted to, she could
not browbeat the nonconsenting states' representatives.
She, like Messrs. Feinberg and Phillips, is a successful
mediator because she points out the risks and rewards of not
reaching a settlement and of reaching a settlement. At the
end of her mediation, fifteen of the states that had
previously fought the Sackler settlement tooth and nail
agreed to the modified settlement in the amended plan.

        I'm saying this not to show my support for the

NAS3299

underlying settlement but to highlight again the arms-length negotiation of the plan and the fact that it is not a "Sackler plan" but a plan agreed to by 79 percent of the states and territories and well over 96 percent of the non-state governments, and actively supported by the Official Unsecured Creditors Committee and the other ad hoc committees, notwithstanding the incredible harm that the Debtors' products have caused their constituents.

Bitterness over the outcome of these cases is completely understandable. Where there has been such pain inflected, one cannot help but be bitter. But one also must look at the process and the issues in the light of the alternatives and with a clear understanding of the risks and rewards of continued litigation versus the settlements set forth in the plan. And it's that process to which I'll turn next.

**Analysis of the Settlements with the Shareholder Released Parties**. As I noted, the plan includes two settlements with the Sacklers and their related entities. It provides for the settlement of the Debtors' estates' claims -- that is, the Debtors' claims against the Sacklers and related entities for the benefit of the Debtors' creditors. (And the estates have substantial claims against the Sacklers. Indeed, one can argue that those claims are

71

**NAS3300**

the main claims against them.)  Second, the plan provides

for the settlement of certain third-party claims -- that is,

claims that could be asserted by others -- against the

Sacklers and their related parties, the "shareholder

released parties" under the plan.

        I will focus first on the settlement of the

Debtors' estates' claims, but I will note before doing so

that the plan is not just a plan that settles the estates'

claims and certain third-party claims against the Sacklers

related to those claims and the third parties' claims

against the Debtors.  In fact, the plan contains several

other settlements interrelated to those settlements that

would not be achievable if either of the settlements with

the Sacklers fell away.

        These include a settlement of the complex

allocation between personal injury claimants, NAS-personal

injury claimants and non-governmental entities, on the one

hand, and claims by public, governmental entities on the

other, a subject of months of mediation that I've already

discussed.  They also include a settlement of the allocation

of value among the public creditors -- the states and

nongovernmental entities and Native American tribes.

        Remarkably, all parties with the exception of the

personal injury claimants agreed in the mediation to use the

72

**NAS3301**

value that they would receive solely for abatement purposes,
the multiplier-effect benefits of which I've already
described.  This includes the private, corporate entity
claimants as well as the non-federal governmental claimants.

In addition, during these cases, the Debtors
settled both civil and criminal claims of the federal
government, and the plan encompasses those settlements,
importantly including the United States' agreement to
release $1.775 billion of its $2 billion superpriority
administrative expense claim for the benefit of the other
public creditors if, as is the case here, the plan meets the
requirements of the DOJ settlement to establish an abatement
structure and the corporate governance and other public
purposes for NewCo that I have previously described.

Each of those settlements hinges on at least the
amount of money to be distributed under the plan coming from
the Sacklers and their related entities in return for (x)
the Debtors' settlement and (y) the third-party claims
settlement.  Without the $4.325 billion being paid by the
Sacklers under the plan and the other elements of the
Sackler settlements, those other elements of the plan would
not happen.  The record is clear on that.  The
private/public settlement would fall apart and the abatement
settlements likely would fall apart for lack of funding and

**NAS3302**

the inevitable fighting over a far smaller and less certain recovery with its renewed focus on pursuing individual claims and races to collection.

That still begs the question, though, is the $4.325 billion, coupled with the Sackler's other agreements, including the dedication of the two charities worth at least $175 million for abatement purposes, the Sacklers' agreement to a resolution on naming rights, their agreement not to engage in any business with NewCo, their agreement to exit their foreign companies within a prescribed time, their agreement to various "snap back" protections to ensure the collectability of their settlement payments, and their agreement to an unprecedented extensive document depository accessible to the public that will archive in a comprehensive way the Debtors' history, including as it relates to the development, production, and sale of opioids, sufficient?  Obviously, _more_ money from the Sacklers, if such were obtainable, would not unravel the settlements that I've already described.

Settlements and compromises of asserted or assertable claims by debtors' estates are a normal part of the process of reorganization in bankruptcy and are strongly favored over litigation.  Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390

NAS3303

U.S. 414, 424 (1968). This is in part for the obvious reason that in bankruptcy the pie is not large enough to feed everyone. In bankruptcy the cost and delay factors in deciding whether to approve a settlement are more significant than in a non-bankruptcy context, as is an assessment of the merits of the claims that are being settled: the risks of losing a piece of the pie or having it go stale are magnified if from the start there is not enough to go around.

In determining whether to approve a settlement of a debtor's estate's claims, a bankruptcy court must make an informed independent judgment that the settlement is "fair and equitable" and "in the best interests of the estate." TMT Trailer Ferry, 390 U.S. at 424; In re Drexel Burnham Lambert Group, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991). "In undertaking an examination of the settlement . . . this responsibility of the bankruptcy judge . . . is not to decide the numerous questions of law and fact raised . . . but rather to canvas the issues and see whether the settlement falls below the lowest point in the range of reasonableness." Nuevo Pueblo, LLC v. Napolitano (In re Nuevo Pueblo, LLC), 608 Fed. Appx. 40, 42 (2d Cir. 2015), quoting In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983); see also Weinberger v. Kendrick, 698 F.2d 61, 74 (2d

75

NAS3304

Cir. 1982) ("The Supreme Court could not have intended that, in order to avoid a trial, the judge must in effect conduct one."); E. 44th Realty, LLC v. Kittay, 2008 U.S. Dist. LEXIS 7337, at *22 (S.D.N.Y. Jan. 23, 2008). Nevertheless, a request to approve a settlement, including of course a major settlement like this in the context of a Chapter 11 plan, requires careful consideration and the right to an evidentiary hearing, and here warranted a six-day trial involving 41 witnesses.

Based on the framework laid out in TMT Trailer Ferry, courts in this Circuit have long considered the following factors in evaluating proposed settlements:

(1) The probability of success, should the issues be litigated, versus the present and future benefits of the settlement;

(2) the likelihood of complex and protracted litigation if the settlement is not approved, with its attendant expense, inconvenience and delay, including the difficulty of collecting on a judgment;

(3) the interests of the creditors, including the degree to which creditors support the proposed settlement;

(4) whether other interested parties support the settlement;

(5) the competence and experience of counsel

76

NAS3305

supporting, and the experience and knowledge of the court in reviewing, the settlement;

(6) the nature and breadth of the releases to be obtained by officers and directors or other insiders; and

(7) the extent to which the settlement is the product of arms-length bargaining. See generally, Motorola, Inc. v. Off. Comm. of Unsecured Creditors & JPMorgan Chase Bank, N.A. (In re Iridium Operating LLC), 478 F.3d 452, 464-66 (2d Cir. 2007).

The Iridium court also noted that how a settlement's distribution plan complies with the Bankruptcy Code's priority scheme may be the dispositive factor. That is, unless the remaining factors weigh heavily in favor of approving a settlement, if the settlement materially varies the Bankruptcy Code's priority scheme, the court should normally not approve it. That concern does not apply here, however. As I have noted regarding objections to classification and treatment under the plan, the plan does not vary the Bankruptcy Code's priority scheme or otherwise violate the Code's requirements for classification and treatment within a class.

I will address the elements of evaluating a settlement in a different order than listed by the Iridium court, noting first, however, that they are applied even

77

NAS3306

where part of the settlement involves not just the simple trade of money for a claim but, as here, also performance, such as ceasing to be involved with Purdue or agreement to the public document depository.  See, e.g., DeBenedictis v. Truesdell (In re Global Vision Prods.), 2009 U.S. Dist. LEXIS 64213 (S.D.N.Y. July 13, 2009).

As discussed, the Sackler settlement was clearly and unmistakably the product of arm's-length bargaining conducted in two separate mediations by three outstanding mediators.  It was preceded, moreover, by the most extensive discovery process that not only I have seen after practicing bankruptcy law since 1984 and being on the bench since 2002, but I believe any court in bankruptcy has ever seen.

The record is unrefuted regarding the incredible extent of discovery taken not only by the Debtors through their Special Committee and counsel, but also the Official Unsecured Creditors Committee in consultation with the non-consenting states group and the other states and governmental entities, in fact anyone who wanted to sign a standard nondisclosure agreement to permit discovery to proceed without extensive fights over confidentiality.

From the first hearing in these cases, I made it clear -- as was also recognized by Judge McMahon in Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm. L.P.), 619 B.R.

NAS3307

38, 58-59 (S.D.N.Y. 2020), in affirming the preliminary injunction that I entered -- that the Sacklers and their related entities must provide discovery beyond even the normally extensive discovery in bankruptcy cases as a condition to retaining the continued benefit of the injunction.  And that discovery occurred.

I did not have to decide one discovery dispute on the record.  Each of the chambers conferences with parties over discovery disputes led to the production of additional discovery.  As a result of that process, approximately ten million documents were produced, comprising almost 100 million pages, an almost unfathomable record that nevertheless teams of lawyers for the creditor groups have pored through to find anything suggesting a claim against the shareholder released parties.

Thus any assertion that there has not been "transparency" in these cases, at least to those who negotiated the plan's settlements, who again in essence represented all of the creditors in these cases, is simply incorrect, and is particularly galling when asserted by any of the states that continue to object to the plan on this basis.  They know what they had access to.  They know how unprecedentedly extensive that information was.

The only argument that they can make is that the

79

NAS3308

public hasn't had access to such information. But of course
if the discovery and information-sharing process had not
been conducted as it was by the public's representatives,
including the very states that make this argument, far less
information would have been produced, most of which the
public would never have had access to in any event,
including if the settled claims instead went to trial or an
examiner issued an examiner's report. Further, the
objectors had the ability to probe the merits of the
proposed settled claims, including their own claims, during
the confirmation hearing, and objecting states took
advantage of it to, among other things, extensively examine
four members of the Sackler family and present the
deposition testimony of a fifth.

The discovery record armed the parties in their
negotiations in the mediations, and the mediations further
fostered the arms-length bargaining in these cases.

The clearly arms-length nature of the negotiations
also establishes that conflicts of interest or self-dealing
do not taint the nature and breadth of the plan's proposed
release of the shareholder released parties, who certainly
once were "insiders," one element of the analysis of the
Iridium factor focusing on such releases that otherwise will
be discussed later when focusing on the plan's proposed

NAS3309

release of third-party claims.

Applying the next _Iridium_ factor -- the competency
and experience of counsel supporting the settlement -- the
Debtors were represented by very capable counsel and
forensic and financial advisors that assisted the Debtors'
Special Committee in discovering most of the the Debtors'
claims against the Sacklers and their related entities.
These claims, for over $11 billon of assertedly avoidable
transfers, are described in the trial declarations of
Richard Collura, Mark Rule, and David DeRamus, Ph.D and
commented on by John Dubel in his trial declaration, as well
as set forth in even greater detail in the report filed by
the Debtors before the start of the mediation.  Dkt. No.
654.

The Official Unsecured Creditors Committee also
had very experienced and capable counsel and financial
advisors, who led the Committee's own extensive analysis of
potential estate claims, including vetting the Debtors'
analysis of avoidable transfer claims.  The Committee also
thoroughly investigated the estates' claims against the
Sacklers that are not in the nature of avoidable transfer
causes of action but, rather, claims based on theories of
alter ego, piercing the corporate veil, and breach of
fiduciary duty/failure to supervise.  Here it appears clear

**NAS3310**

that such claims would belong to the Debtors' estates, not individual creditors, because at least as far as the confirmation hearing record reflects, such claims would be based on a generalized injury to the estates and creditors rather than conduct directed only at certain creditors. See, e.g., St. Paul Fire and Marine Insur. Co. v. PepsiCo, Inc., 884 F.2d 688, 704-705 (2d Cir. 1989); Bd. of Trs. Of Teamster Local 863 Pension Fund v. Foodtown Inc., 296 F.3d 164, 169 (3d Cir. 2002).

Similarly, the counsel and advisors for the states and other governmental entities, all of whom were on the other side of the table from the Sacklers, were every match for the Sacklers' own able counsel. In many cases, in addition to their outside counsel, states' own attorneys general played an active role in the negotiations, such as, for example the AGs for Massachusetts and New York who after the second mediation, led by Judge Chapman, agreed to the modified settlement.

The next two Iridium factors are closely related: the interests of creditors, including the degree to which creditors support the proposed settlement, and whether other interested parties support the settlement.

Given the over 95 percent aggregate vote in favor of the plan; given the support by the Official Unsecured

82

**NAS3311**

Creditors Committee, over 79 percent of the states and territories, over 96 percent of the other governmental entities and Native American tribes, apparently in this context the United States -- although one can't really make heads or tails of the U.S. Trustee's objection, which is not based on participation in the cases' discovery process,[4] regarding the merits of the Debtors' settlement with the shareholder released parties -- approximately 96% of the personal injury and NAS personal injury claimants, and a supermajority of the other claimants; and given the paucity of objections to the plan's confirmation notwithstanding the size of the creditor body, it is clear that by an overwhelming margin the creditors support the settlements. They do so, again, after being fully informed in making that decision, or with their representatives being fully informed.

The next <u>Iridium</u> factor requires analysis of the likelihood of complex and protracted litigation if the settlement is not approved, with its attendant cost and delay, and, relatedly, the difficulty in collecting on a

---

[4] The U.S. Trustee did not participate in that discovery process and apparently took no independent discovery before the confirmation hearing to explore the merits of its factual objections to the plan. It also has offered no evidence for any of its fact-based objections to the plan, instead apparently assuming that it can nevertheless act credibly as an outside commentator on others' analysis of the settlements (which it mostly did not seek to challenge by cross examination).

NAS3312

judgment.  I'll focus first on the difficulty of collecting on a judgment absent the settlement.

As often happens, parties who support a settlement, such as here the Official Unsecured Creditors Committee, the consenting states and other governmental entities, and the Debtors are careful not to describe in detail the reasons for their support that would show the potential weaknesses of their underlying claims or their views on how difficult it would be to collect on a judgment. They are legitimately concerned that the settlement won't be approved, in which case they would have given their opponents a regretted roadmap.  This leaves the Court to draw reasonable inferences from the record, as well as its knowledge and experience regarding the legal issues bearing on the merits and collection.  Here, that record is fairly extensive in the light of submissions by the Sacklers and those overseeing their wealth.

One might think at first that the issue of collectability weighs against the settlement.  The record is uncontroverted that the Sacklers, as a family, are worth -- again, in the aggregate -- approximately $11 billion, reduced perhaps by $225 million agreed to be paid under the Sacklers' own postpetition civil settlement with the United States.  The discovery process that I have described has

84

NAS3313

largely identified their assets and where and how they are
held.  And the preliminary injunction in these cases
precluded the further transfer of their assets.  So,
assuming the entry of judgments against them instead of the
settlement, one might reasonably believe that collecting
significantly more than $4.325 billion, plus access to, or
the dedication of, at least $175 million of charitable
assets under the settlement, is readily achievable

The Sacklers are not a simple group of a few
defendants, however.  They are a large family divided into
two sides, Side A and Side B, with eight pods or groups of
family members within those divisions that have their own
unique sources and holdings of wealth.  As described in the
trial declarations of Timothy Martin and Steven Ives, their
assets are in fact widely scattered and primarily held (x)
in purportedly spendthrift offshore trusts, (y) in
purportedly spendthrift U.S. trusts, and/or (z) by people
who themselves live outside of the territorial jurisdiction
of the United States and might not have subjected themselves
sufficiently to the U.S. for a U.S. court to get personal
jurisdiction over them.

I want to be clear that I am not deciding that
jurisdictional issue, nor whether the trusts where most of
the Sackler family's wealth is held are in fact spendthrift

NAS3314

trusts that could not be invaded to collect a judgment, including in a possible bankruptcy case of a beneficiary of such a trust forced into bankruptcy by the pursuit of litigation.

A beneficial interest in a valid spendthrift trust may be excluded from a debtor's bankruptcy estate. Patterson v. Shumate, 504 U.S. 753, 757 (1992). As provided in Bankruptcy Code section 541(c)(2), "A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable non-bankruptcy law is enforceable in a case under [the Bankruptcy Code]." 11 U.S.C. § 541(c)(2). That section directs one to applicable non-bankruptcy law, which may or may not be the law of the United States with regard to the Sacklers' foreign trusts, almost all of which are established under the law of the Bailiwick of Jersey.

Based on the trial declaration and examination of Michael Cushing, an expert in the law of the Bailiwick of Jersey and the enforceability of judgments against trusts organized under that law, there is a substantial question regarding the collectability from such a trust of even a U.S. fraudulent transfer judgment against the trust, let alone a judgment against a trust beneficiary, including for his or her conduct such as the beneficiary being an alter

86

NAS3315

ego of another entity, like Purdue, or otherwise legally

responsible for Purdue's conduct.

For U.S. spendthrift trusts, on the other hand,

generally applicable non-bankruptcy law provides that a

transfer into such a trust that is fraudulent to creditors

is recoverable for the benefit of creditors.  See, e.g.,

Sec. Investor Prot. Corp. v. Bernard L. Madoff Sec. LLC (In

re BLMS), 2021 Bankr. LEXIS 1769, at 13-19 (Bankr. S.D.N.Y.

July 2, 2021); see also In re BLMIS, 476 B.R. 715, 728, n.3

(S.D.N.Y. 2012).

U.S. law also generally does not recognize self-

settled trusts that in name only are spendthrift trusts.

But again, many of the trusts here might well be governed by

the law of the Bailiwick of Jersey, which according to Mr.

Cushing's declaration -- which was not meaningfully

controverted on these points -- strongly suggests that a

different result might apply when enforcing a judgment

against a beneficiary of such a trust.  And none of the

evidence at the confirmation hearing clearly showed that any

of the trusts was self-settled.

Lastly, the summaries of the Sackler family's

wealth reveal that much of it is not held in readily

liquidated assets but rather in the shares of closely held

businesses, including the foreign businesses they are

NAS3316

required to sell within seven years under the settlement.

Once more, I'm not deciding any legal issues that would affect the collectability of judgments against Sackler family members or their entities, but, given the record before me, as well as the agreement of substantially all of the parties in these cases to a settlement of the estates' claims against the Sacklers and their related entities after the due diligence that they have undertaken, I make the reasonable inference that the issue of collection if the settlement were not approved is in fact a significant concern.

Under the settlement, on the other hand, although the shareholder released parties are given several years to make their payments (in at least partial recognition, one infers, of the illiquid nature of many of their assets), (x) the shareholder settling parties have agreed to "snap back" provisions that enhance collectability upon a default and (y) the trustees and asset managers for the foreign trusts have agreed to seek, and believe they will obtain, the approval of the Jersey court to comply with the settlement.

As noted, Iridium also requires the Court to consider the cost and delay of continued litigation in comparison to the benefits of the proposed settlement. If the estate's claims against the Sacklers and their related

88

NAS3317

entities were not settled as provided in the plan, the cost and delay to the estates clearly would be substantial. That cost and delay would not be limited to the cost and delay of pursuing litigation claims against the family members and their related entities and collecting any ensuing judgments, which primarily would involve preparation for trials against multiple defendants (the discovery for which has mostly occurred) and the trials themselves, as well as judgment enforcement litigation and other collection costs in multiple jurisdictions. That cost and delay alone would be substantial, as it is reasonable to infer that the hundreds of prepetition lawsuits naming the Sacklers would resume and proceed alongside prosecution of the estates' claims against the Sacklers and related entities.[5]

Besides that cost and delay, moreover, is the cost and delay that would ensue from the unraveling of the other plan settlements that I have described. The confirmation hearing record strongly reflects that if the settlement of the Debtors' claims against the shareholder released parties were not approved, the creditor parties would be back

---

[5] The preliminary injunction in these cases enjoined over 2,600 pending prepetition lawsuits against Purdue by governmental entities, hundreds of which named one or more Sackler family members as a co-defendant, and presumably most of the other actions would be amended to add Sackler family members as defendants, and other third parties also would attempt to pursue such claims, as well.

89

NAS3318

essentially to square one on allocating the value of the
Debtors' estates, including any ultimate recovery on the
estates' litigation claims. And the creditors would be
litigating against each other over the merits of their
respective claims against the Debtors.

In that regard, the analysis in Mr. DelConte's
second declaration, which contains the Debtors' section
1129(a)(7) "best interests" liquidation analysis, is
instructive. Under the most realistic scenarios described
in that analysis, there would literally be no recovery by
unsecured creditors from the estates in a Chapter 7
liquidation, which is, I believe, the most likely result if
the settlements with the shareholder released parties were
not approved, given the likely unraveling of the heavily
negotiated and intricately woven compromises in the plan and
the ensuing litigation chaos.

That projected outcome also reflects that in a
liquidation scenario the United States' agreement in the
DOJ's October 2020 settlement with Purdue to forego $1.775
billion of its $2 billion superpriority administrative
expense claim for the benefit of the plan's abatement
program would disappear. The United States would be
entitled to all of that recovery first from the Debtors'
estates. And no one has controverted the trial declaration

90

**NAS3319**

of Joseph Turner, the Debtors' investment banker in which he
gives a midpoint valuation of the Debtors' businesses as
going concerns at $1.8 billion.  Thus the estates would be
litigating their own claims against the Sacklers and their
related entities in that highly contested environment on a
severely reduced budget with no assurance of administrative
solvency.

That leaves the last _Iridium_ factor, a comparison
of the legal risks posed by continued litigation against the
results of the settlement.

As with the issue of the difficulty of collection,
the parties supporting the settlement have been careful not
to bare their views of the defenses that the shareholder
released parties would have to the estates' claims against
them.  However, I do have an extensive report and trial
declarations as to the nature of the assertedly over $11
billion of avoidable transfers, when they occurred, what
they comprised, and who they were made to.  Those objecting
to the settlement also had the opportunity to examine at
length four members of the Sackler family at the
confirmation hearing -- David Sackler, Richard Sackler,
Mortimer Sackler, and Kathe Sackler -- and in addition
submitted the deposition of Irene Sackler, including to
attempt to show the strength of the estates' and third-

NAS3320

parties' claims against them based on their actions in their
capacities as shareholders and members of Purdue's Board
and, in three instances, in Purdue's management. Finally, I
have extensive submissions by both sides of the Sackler
family regarding the defenses that they would argue in the
absence of the settlement in response to the claims asserted
against them and their related entities.

In evaluating that evidence and those arguments I
want to be clear again that I am not deciding anything close
to the merits of those claims. This assessment could not,
therefore, serve as collateral estoppel or res judicata.
Nor do I particularly have any fondness or sympathy for the
Sacklers.

I will note the following, however. The Sackler
family -- or rather 77, I believe, of them -- received
releases from most of the states in 2007. In addition, 2007
is about as far back under any theory that one could look to
avoid a fraudulent transfer to the Sacklers or any of their
related entities under U.S. law. Thus one would, both for
estate claims and for third-party claims, be looking at
primarily, if not exclusively, potentially wrongful actions
by the Sacklers or their related entities or potentially
avoidable transfers to them that took place only after 2007.
This would limit claims against them, for example, based on

92

**NAS3321**

OxyContin's role since its introduction in 1999 to 2007 in dramatically increasing the use of opioids and related addictions and opioid use disorders.

Avoidable Transfers.  As described in the trial declaration of Carl Trompetta and as generally acknowledged, over 40 percent of the asserted avoidable transfers to the Sacklers or their related entities went to pay taxes associated with Purdue, including large amounts to the IRS and the states that continue to object to the plan and, of course, intend to keep the tax payments.  The fact that these payments went to pay taxes obviously relieved the Sacklers of an obligation.  I do, however, have uncontroverted testimony from Jennifer Blouin that if the partnership structure of Purdue, with the taxes running through the Sacklers, was not in place, Purdue itself would have been liable for taxes in almost all of the amount of the tax payments to or for the benefit of the Sacklers and, therefore, arguably received fair consideration for those tax payments.

The Sacklers also would argue the applicability of various statutes of limitation to the fraudulent transfer claims that would limit the reach-back by the estates to most of the claims.  The estates would have arguments to the contrary, based on rights that unique creditors like the

93

**NAS3322**

federal government would have to serve as a "golden
creditor" under section 544(b) of the Bankruptcy Code, which
provides that the Debtors "may avoid any transfer of an
interest of the debtor in property . . . that is voidable
under applicable law by a creditor holding an unsecured
claim that is allowable under section 502 of this title," 11
U.S.C. § 544(b), although the Sacklers would argue that the
purportedly "golden creditor's" current claims against the
Debtors are not the claim it would have had when many of the
transfers were made that would have enabled the creditor to
avoid them.

The Sacklers would also argue that after the 2007
settlement between Purdue and the United States, Purdue paid
manageable amounts in settlements of litigation claims
related to opioid matters or of other litigation claims
between 2008 and 2019 and that as recently as 2016 Purdue
was receiving ratings from rating agencies that indicated it
was financially healthy. They would contend, therefore,
that except for the last year or so before the bankruptcy
filing date, when only a small fraction of the roughly $11
billion of transfers occurred, Purdue was not insolvent,
unable to pay its debts when they came due, or left with
unreasonably small capital -- requirements to prove
constructive fraudulent transfers. Finally, they would argue

94

NAS3323

that for these same reasons, and bolstered by at least some
of the Sacklers' willingness to continue to invest large
amounts of capital in Purdue in years after 2007, the
Debtors would not be able to prove that most, if not all, of
the transfers were intentionally fraudulent, either.

There are, on the other hand, statements in the
record suggesting that at least some of the Sacklers were
very aware of the risk of opioid-related litigation claims
against Purdue and sought to shield themselves from the
economic effect of such claims by causing Purdue to make
billions of dollars of transfers to them and to shield their
own assets, as well, from collection.  Further, the estates
would argue that the potential sheer size of opioid-related
claims against Purdue was obvious several years before the
second onslaught of litigation claims against it.

Alter Ego, Veil Piercing, and Breach of Fiduciary
Duty/Failure to Supervise Claims.  As discussed earlier,
claims based on alter ego, piercing the corporate veil, and
breach of fiduciary duty/failure to supervise theories would
appear to stem from allegations against Sackler family
members that they caused harm to the creditor body
generally, or to the Debtors, in exercising their control of
the Debtors and, therefore, would belong to the Debtors'
estates rather than to individual creditors.  As discussed

95

**NAS3324**

later, very closely related, indeed usually the same,
factual allegations also underly the objecting states'
third-party claims against Sackler family members.

In response to such claims, most Sackler family
members would argue that they did not serve on Purdue's
Board or in management during the relevant period and that
no actions by them in their capacity as a shareholder of
Purdue have been identified that would show liability for
such claims. In response, the Debtors and others would
contend that notwithstanding the large size of the Sackler
family, the Sacklers acted in a coordinated way over
investment and business strategies involving Purdue, with
regular meetings of authorized family representatives. The
Sacklers would argue, supported by the trial declaration of
Lawrence A. Hamermesh that generally the ability to control
a corporate entity and such actions as were identified at
the confirmation hearing do not give rise to such liability,
however.  In response, the Debtors' estates would argue, as
did the objecting states at the confirmation hearing, that
Mr. Hamermesh's declaration speaks only in generalities
regarding the law of corporate fiduciaries and does not
address the actual actions of Sackler family members in
controlling Purdue.

The Sacklers would also point out that after the

NAS3325

2007 settlements with the federal government and the states,
the U.S. Department of Health and Human Services entered
into a five-year corporate integrity agreement with Purdue
to monitor its compliance with federal healthcare law, which
was in effect from July 31, 2007 to July 30, 2012.  That
agreement is available as part of the record but also is
public and a matter for judicial notice.  In addition, in
2015, after Purdue implemented an "Abuse and Diversion
Detection" program, the New York Attorney General required
the program be subjected to annual reviews, which occurred
from 2015 to 2018.  The Sackers would argue that both the
H.H.S.'s OIG monitor and those ADD reviews identified no
improper actions by Purdue and therefore that as controlling
shareholders or Board members they should not be liable for
Purdue's improper actions to the extent they were
inconsistent with those reviews.  More generally they would
argue that as Board members they would not have a fiduciary
duty for actions by Purdue's management that were improper
or unlawful unless they were aware of them or blindfolded
themselves to them. Those who were not on the Board and did
not individually control ownership of Purdue would argue
that they were yet another step removed from such a duty.
They would also point out the difficulty under applicable
state law of piercing the corporate veil between a corporate

97

NAS3326

entity and its owners.

Of course trials on the merits might well
establish, as some of the testimony that I heard from the
Sacklers tended to show, that as a closely held company
Purdue was run differently than a public company and that
its Board and shareholders took a major role in corporate
decision-making, including Purdue's practices regarding its
opioid products that was more akin to the role of senior
management.

Moreover, strong arguments could be made that the
Sackler Board members and the shareholders as a whole not
only understood the highly addictive nature of Purdue's
opioid products -- which the Sackler witnesses acknowledged
-- but also that F.D.A.-approved warning labels and
modifications to the product and how it was sold that
allegedly made it less likely to be abused were not
preventing massive harm.  The Sackler witnesses testified
that their aim, especially after 2007, was to avoid Purdue's
causing more harm from the sale of highly addictive
products.  But a jury might well conclude to the contrary
that the Sacklers' evident desire to continue to drive
profits from the products' sale blinded them to evidence of
the fraud, kickbacks and other crimes to which Purdue pled
guilty in the October 2020 DOJ settlement or that the pain-

NAS3327

relieving benefits of those products was still horribly out
of balance with the harm caused, so that they could be held
liable for such harm.

I believe that in a vacuum the ultimate judgments
that could be achieved on the estates' claims (and the
closely related third-party claims that are being settled
under the plan) might well be higher than the amount that
the Sacklers are contributing.  But I do not believe that
recoveries on such judgments would be higher after taking
into account the catastrophic effect on recoveries that
would result from pursuing those claims and unravelling the
plan's intricate settlements.  And as I said at the
beginning of this analysis, there is also the serious issue
of problems that would be faced in collection that the plan
settlements materially reduce.

This is a bitter result.  B-I-T-T-E-R.  It is
incredibly frustrating that the law recognizes, albeit with
some exceptions, although fairly narrow ones, the
enforceability of spendthrift trusts.  It is incredibly
frustrating that people can send their money offshore in a
way that might frustrate U.S. law.  It is frustrating,
although a long-established principle of U.S. law, that it
is so difficult to hold board members and controlling
shareholders liable for their corporation's conduct.

99

NAS3328

It is incredibly frustrating that the vast size of the claims against the Debtors and the vast number of claimants creates the need for the plan's intricate settlements.  But those things are all facts that anyone who is a fiduciary for the creditor body would have to recognize, and that I recognize.

A settlement is not evaluated in a vacuum, as a wish list.  It takes an agreement, which means that if properly negotiated -- and I believe that's clearly the case here -- it generally reflects the underlying strengths and weaknesses of the opposing parties' legal positions and issues of collection, not moral issues or how someone might see moral issues.

It is not enough simply to say "we need more," or "I don't care whether we don't get anything; I'd rather see it all burned up before the Sacklers keep anything."  One must focus on the foreseeable consequences of litigation versus settlement.

I must say that at the middle stage of these cases, before the mediation, I would have expected a higher settlement.  And frankly anyone with half a brain would know that when I directed a second mediation, bravely undertaken by Judge Chapman, I expected a higher settlement, perhaps higher than the materially improved settlement that resulted

100

NAS3329

from that mediation.  Nevertheless, extremely well-represented and dedicated parties on the prospective plaintiffs' side, knowing far more than I have laid out today about the strengths and weaknesses of the claims, costs, delay, and collection issues, agreed to this settlement as modified as a result of that second mediation.

Are the Sacklers paying a "settlement premium" in their settlements than they would pay in litigation, as Ms. Conroy suggested?  Perhaps.  As noted, Ms. Conroy as much as anyone has dedicated much of her professional career to pursuing Purdue and the Sacklers and has no reason to pull her punches now.  In any event, I am not prepared, given the record before me, to risk that agreement.  I do not have the ability to impose what I would like on the parties. Thankfully, no judge in our system is given that power.  I can only turn down a request for approval of it and deny confirmation of the plan.  Given this record, I'm not prepared to do that.

I will note, as far as the bona fides of the settlement are concerned, and notwithstanding my reservations, under this plan 100 percent of these Debtors, closely held by the Sacklers, is taken away from them and devoted to abating opioids' ill effects in one way or another.

101

NAS3330

In addition, the amount being paid is to my knowledge the highest amount that any shareholder group has paid for these types of claims.  Throughout the history of litigation involving Purdue, the Sacklers themselves were not targets, except leading up to the relatively modest settlement payments by Purdue on their behalf to a number of states in 2007,[6] until roughly three years before the bankruptcy petition date.  The entire negotiation process in these cases has magnified that focus on them and will be remembered for doing so.

While I wish that the amount were higher, as I believe everyone on the other side of the Sacklers does, the settlement is reasonable in the light of the standards laid out by the Supreme Court and the Second Circuit. And clearly both it and the process of arriving at it have not been in any shape or form a free ride for the Sacklers or enabled them to "get away with it."

If what people mean by "getting away with it" is being relieved of criminal liability, that obviously is not

---

[6] The 2007 settlement between 26 states and the District of Columbia, on one side, and Purdue on the other called for a $19.5 million multi-state payment by Purdue to the states. Consent Judgement, Washington v. Purdue Pharma L.P., Cause No. 07-2-00917-2 (Sup. Ct. Wash. Thurston Cnty. May 3, 2007), http://www.atg.wa.gov/news/news-releases/washington-receive-share-195-million-settlement-oxycontin-maker#:~:text=FOR%20IMMEDIATE%20RELEASE%3A%20May%208%202007%20SEATTLE%20%E2%80%93,to%20doctors%20while%20downplaying%20the%20risk%20of%20addiction.

NAS3331

the case.  And I believe, given all the factors that I've outlined, the Sacklers are paying a substantial and, under the circumstances of this case, justifiable amount, as well as agreeing to the other material aspects of the settlement that I have described.

I will note, finally, that as alluded to this morning by the Debtors' counsel, they have agreed to enforcement mechanisms that are quite rigorous as part of the settlement, so that the potential collection problems that I addressed are far lessened by the settlement if any released party doesn't live up to it, including as to the ability to hide behind spendthrift trusts.

So, I will overrule the objections to the merits of the settlement of the Debtors' estates' claims against the shareholder released parties.

**Analysis of Plan's Release and Injunction of Third-Party Claims**. That leaves the last issue for determination, which is the most complex issue legally:  the propriety of the plan's release and injunction of certain third-party claims against the shareholder released parties. The third-party claims that the plan would release and enjoin are very closely related on the facts to the estates' claims for alter ego, veil piercing, and breach of fiduciary duty/failure to supervise settled under the plan. See

NAS3332

Dunaway v. Purdue Pharm. L.P., 619 B.R. at 50 (noting
virtually identical allegations against Purdue and third-
party claims against Richard Sackler, each stemming from
conduct by Purdue allegedly under his control).  My analysis
of the merits of the plan's treatment of such third-party
claims thus is in large measure informed by my analysis of
the alternatives to the settlement of the estates' claims
against the shareholder released parties that I've just
finished.  Before turning to the merits, however, multiple
other grounds for the objections to the plan's nonconsensual
release and injunction of third-party claims against the
shareholder settling parties must be addressed.

I will note first that I have agreed with certain
of those objections, namely as to the over-breadth of the
releases in the plan as initially proposed.  In the light of
colloquy during the confirmation hearing, the current form
of the plan has substantially narrowed those releases.  As
discussed in more detail later, the settling shareholder
parties are now being released of true third-party claims
only if they are opioid-related and then only for such
claims where Purdue's conduct is at least in material part a
legal element of the third-party claim.

Other released parties, including the Sacklers,
are released from certain other third-party claims, as well

104

**NAS3333**

under the plan, but it is clear, given the plan's revised definitions, that those releases cover claims that are truly derivative of the Debtors' claims such that the releases simply prevent third parties from going after released parties through the back door when the Debtors have resolved the claims, or, to change the metaphor, from improperly adding a second fork with which to eat their share of the pie.

The first objection to the release of third-party claims against the shareholder released parties is premised on the Court's asserted lack of subject matter jurisdiction to impose the release on those who do not consent to it.

It is axiomatic that federal courts, including bankruptcy courts, have only the jurisdiction given to them by the Constitution or Congress. Purdue Pharma L.P. v. Kentucky, 704 F.3d 208, 213 (2d Cir. 2013). Under 28 U.S.C. § 1334(b), however, this Court has broad jurisdiction over matters that are related to the Debtors' property and cases. Section 1334 of the Judicial Code provides that district courts have original jurisdiction (which is referred by standing orders to the bankruptcy courts under 28 U.S.C. § 157(a)-(a)) over "all cases under title 11" 28 U.S.C. § 1334(a), and "all civil proceedings arising under title 11 or arising in or related to cases under title 11."  28

105

NAS3334

U.S.C. § 1334(b).

This includes the power to enjoin claims of third parties that have a conceivable effect on the Debtors' estates. As noted by the Supreme Court in <u>Celotex Corp. v. Edwards</u>, 514 U.S. 300, 307-08 (1995), which involved a preliminary injunction of a third-party's right to pursue a third-party claim, "Congress did not delineate the scope of 'related to' jurisdiction, but its choice of words suggests a grant of some breadth." The Court found bankruptcy jurisdiction because the third-party's pursuit of the enjoined claim would affect or impede the debtor's reorganization. <u>Id</u>. at 312.

In this Circuit, "a civil proceeding is related to a title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate. If that question is answered affirmatively, it falls within the 'related to' jurisdiction of the bankruptcy court. Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate. While 'related to' jurisdiction is not limitless, it is fairly capacious and includes suits between third parties that have an effect on the bankruptcy estate. An action is related to bankruptcy if the outcome could alter the debtor's rights,

106

NAS3335

liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt's estate." SPV OSUS, Ltd. v. UBS AG, 882 F.3d 333, 339-40 (2d Cir. 2017) (internal quotations omitted), citing Celotex Corp. v. Edwards, 514 U.S. at 307-08; Parmalat Cap. Fin. Ltd. v. Bank of Am. Corp., 639 F.3d 572, 579 (2d Cir. 2001); In re Cuyahoga Equip. Corp., 980 F.2d 110, 114 (2d Cir. 1992).

In SPV OSUS, the court found bankruptcy jurisdiction over third-party claims based on the conceivable possible legal effect of an indemnification or contribution right against the debtor, although the party that might assert those rights had not filed a proof of claim in the case. 882 F.3d at 340-42. That decision is not alone. The Second Circuit has extensively dealt with bankruptcy jurisdiction over actions to stay or prevent the assertion of third-party claims in bankruptcy cases, the most informative of which for present purposes is In re Quigley Co., 676 F.3d 45 (2d Cir. 2012).

In Quigley the court undertook a lengthy analysis of bankruptcy jurisdiction over the preclusion of third-party claims. It did so because of the parties' confusion over the extent of such jurisdiction arguably injected by Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-

107

NAS3336

Manville Corp.), 517 F.3d 52 (2d Cir. 2008), rev'd sub nom. Travelers Indem. Co. v. Bailey, 557 U.S. 137 (2009), which Quigley refers to as Manville III. Manville III left the impression, at least with the third-party claimant in Quigley, that the only source for jurisdiction to enter a coercive release of third-party claims and an injunction to support it was if the claim was "derivative" -- that is, derivative of the debtor's rights and therefore affecting the res of the debtor's estate. 676 F.3d at 53-54.

The point was somewhat cleared up in the Circuit's next Manville case, Johns-Manville Corp. v. Chubb Indem. Ins. Co. (In re Johns-Manville Corp.), 600 F.3d 135 (2d Cir. 2010), referred to as Manville IV in the Quigley opinion, but Quigley addressed the asserted limitation head on.

In Manville III, a party that had brought a third-party claim against an insurer, notwithstanding the Manville Chapter 11 plan's injunction of claims against the insurer, asserted that the bankruptcy court did not have jurisdiction to enjoin the claim because it alleged a violation of an independent legal duty owed by the defendant, rather than a claim that was derivative of the debtor's claim. Quigley, 676 F.3d at 54. The Circuit disagreed that Manville III imposed this imitation on jurisdiction. Id. at 54-55, adding, "because [the third-party's] mistake as to the

108

NAS3337

nature of the jurisdictional inquiry under 28 U.S.C. §
1334(a) and (b) stems from a misunderstanding of our case
law's treatment of derivative liability in the context of
bankruptcy jurisdiction, we discuss our previous cases
addressing this subject in some detail."  Id. at 55.

After analyzing MacArthur Co. v. Johns-Manville
Corp., 837 F.2d 89 (2d Cir. 1988), the court held that there
was no independent jurisdictional requirement that to be
barred by a plan a third-party claim must be derivative of
the estate's rights.  Id.  Rather, the claim must affect the
debtor's estate, id. at 56, and "Manville III did not work a
change in our jurisprudence.  After Manville III, as before
it, a bankruptcy court has jurisdiction to enjoin third-
party non-Debtor claims that directly affect the res of the
bankruptcy estate: As in Macarthur, the salience of Manville
III's inquiry as to whether [the third party's] liability
was derivative of the debtor's rights and liabilities was
that, in the facts and circumstances of Manville III, cases
alleging derivative liability would affect the res of the
bankruptcy estate, whereas cases alleging non-derivative
liability would not." Id. (internal quotations and citations
omitted).  However, "Manville III did not impose a
requirement that an action must both directly affect the
estate and be derivative of the debtor's rights and

109

NAS3338

liabilities for bankruptcy jurisdiction over the action to exist." Id. at 57 (emphasis in the original).

After noting that Manville IV was consistent with this view, the court summed up: "It thus appears from our case law that, while we have treated whether a suit seeks to impose derivative liability as a helpful way to assess whether it has the potential to affect the bankruptcy res, the touchstone for bankruptcy jurisdiction remains 'whether its outcome might have any conceivable effect on the bankruptcy estate.' Cuyahoga, 980 F.2d at 114. This test has been almost universally adopted by our sister circuits, see Celotex Corp. v. Edwards, 514 U.S. 308 n.6 . . . (1995) (collecting cases), which is some instances have found bankruptcy jurisdiction to exist over non-derivative claims against third-parties." Id., citing EOP-Colonnade v. Faulkner (In re Stonebridge Techs., Inc.), 430 F.3d 260, 263-64, 267 (5th Cir. 2005); Dogpatch Props., Inc. v. Dogpatch U.S.A., Inc. (In re Dogpatch U.S.A., Inc.), 810 F.2d 782, 786 (8th Cir. 1987).

Thus, "[a] suit against a third party alleging liability not derivative of the debtor's conduct but that nevertheless poses the specter of direct impact on the res of the bankrupt estate may just as surely impair the bankruptcy court's ability to make a fair distribution of

110

NAS3339

the bankrupt's assets as a third-party suit alleging derivative liability. Accordingly, we conclude that where litigation of [the claimant's] suits against [the third party] would almost certainly result in the drawing down of insurance policies that are part of the bankruptcy estate . . . the exercise of bankruptcy jurisdiction to enjoin these suits was appropriate." <u>Id.</u> at 58.

I conclude that the third-party claims that are covered by the shareholder release under the plan, as I will further narrow that release in this ruling, directly affect the <u>res</u> of the Debtors' estates, including insurance rights, the shareholder released parties' rights to indemnification and contribution, and the Debtors' ability to pursue the estates' own closely related, indeed fundamentally overlapping, claims, and thus that bankruptcy subject matter jurisdiction to impose a third-party claims release and injunction under the plan exists.

Certain of the objectors cite <u>Callaway v. Benton</u>, 336 U.S. 132 (1949), for the proposition that there is no such jurisdiction. That decision, however, preceded 28 U.S.C. § 1334(b)'s jurisdictional grant, which, as discussed in <u>Celotex</u>, <u>SPV OSUS</u>, and <u>Quigley</u>, significantly broadened the jurisdictional scheme that existed before the Bankruptcy Code's enactment. <u>In re Dow Corning Corp.</u>, 255 B.R. 445,

111

NAS3340

486-87 (E.D. Mich. 2001) (distinguishing <u>Callaway</u> on this basis), <u>vacated on other grounds</u>, <u>In re Dow Corning Corp.</u>, 280 F.3d at 648.  <u>See also</u> Howard C. Buschman, III & Sean P. Madden, "Power and Propriety of Bankruptcy Court Intervention in Actions Between Non-debtors," 47 Bus. Lawyer 913, 914-19 (May 1992).[7]  <u>See</u> <u>generally</u>, <u>Lynch v. Lapidem Ltd.</u> (<u>In re Kirwan Offices S.A.R.L.</u>), 592 B.R. 489, 504-07 (S.D.N.Y. 2018), <u>aff'd</u> <u>Lynch v. Mascini Hldgs. Ltd.</u> (<u>In re Kirwan Offices S.A.R.L.</u>), 792 Fed. Appx. 99 (2d Cir. 2019).

Depending on the kinds of third-party claims covered by a plan's release and injunction of such claims, I conclude, therefore, that the Court has jurisdiction to impose such relief, based upon the effect of the claims on the estate rather than on whether the claims are "derivative," although if they are derivative that is a good sign that they affect the estate.  <u>Quigley</u>, 676 F.3d at 52.

The objectors have also contested that the release of third-party claims under a plan violates the third-party

---

[7] I will note that another case that the objectors rely on, <u>In re Aegean Marine Petroleum Network, Inc.</u>, 599 B.R. 717 (Bankr. S.D.N.Y. 2019), in questioning the Court's jurisdiction to impose the release of a third-party claim, which cites <u>Callaway v. Benton</u> but discusses neither <u>SPV OSUS</u> nor <u>Quigley</u>, nevertheless acknowledges that where there is "a huge overlap between claims that [a debtor] is making against the parent . . . [and] the parent did not want to settle the claims made by [the debtor] unless the overlapping third-party claims were also barred," a third-party release was justified. <u>Id</u>. at 727.

112

NAS3341

claimants' rights to due process.  There are two aspects to this objection.  The first is not accepted by courts in this Circuit, which is that such a release is an adjudication of the claim.  It is not.  It is part of the settlement of the claim that channels the settlement funds to the estate.  See Macarthur Co. v. Johns-Manville Corp., 837 F.2d at 91-92; Lynch v. Lapidem, 592 B.R. at 504-05; see also In re Millennium Lab Holdings II, LLC, 575 B.R. 252, 273 (Bankr. D. Del. 2017) ("An order confirming the plan with releases does not rule on the merits of the state law claims being released."), aff'd 591 B.R. 559 (D. Del. 2018), aff'd 945 F.3d 126 (3d Cir. 2019), cert. denied, Loan Tr. v. Millennium Lab Holdings, 140 S. Ct. 2085 (2020).

The other aspect of the due process objection goes to the extent and quality of notice provided regarding the proposed release.  Under the amended plan, it is now clear, however, that only holders of claims against the Debtors are being deemed to grant the shareholder release, and it is equally clear, as discussed earlier, that holders of such claims received due process notice of the plan's intention to provide a broad release of third-party claims against the shareholders and their related entities related to the Debtors.

As set forth in that widespread notice, including

113

NAS3342

the press releases, short form publication notices, and
short form notices sent, the proposed release was far
broader than it is today in the amended plan.  To argue that
because it was more complicated then it somehow violated due
process is equally incorrect.

The issue of what process is due requires a court
to ask whether the notice was reasonably calculated under
the circumstances to apprise interested parties of the
pendency of the plan's proposed release and afford them an
opportunity to present their objections.  Mullane v. Cent.
Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950).  See
also Elliott v. GM, LLC (In re Motors Liquidation Co.), 829
F.3d 135, 158 (2d Cir. 2016).  As noted in Motors
Liquidation, this requirement equally applies in bankruptcy
proceedings, where whether notice satisfies due process
turns upon what is reasonably known by the debtor of the
party who would be affected by the action for which the
debtor is seeking permission.

Based upon Ms. Finegan's testimony, holders of
claims received sufficient notice of the proposed release.
(Indeed, the media separately fostered the assumption,
though incorrect, that the release was even broader,
including of criminal liability.)  And in fact there were
multiple objections to the plan based upon its proposed

114

**NAS3343**

third-party release.  The Debtors' compliance with the
procedures described by Ms. Finegan, which also were well
within the dictates of Bankruptcy Rule 3016 (which requires
the prominent display of such release language in a proposed
plan) was more than sufficient for due process purposes.
See, e.g., Macarthur Co. v. Johns-Manville Corp., 837 F.2d
at 94; Finova Cap. Corp. v. Larson Pharma., Inc., 2003 U.S.
Dist. LEXIS 26681, at *26-27 (M.D. Fla. Oct. 6, 2003), aff'd
Finova Capital Corp. v. Larson Pharma., Inc., 425 F.3d 1294
(11th Cir. 2005); In re Retail Grp., Inc., 2021 Bankr. LEXIS
547, at *51-57 (Bankr. E.D. Va. May 28, 2021); In re Otero
Cty. Hosp. Ass'n, Inc., 551 B.R. 463, 471-72 and 478-79
(Bankr. D.N.M. 2016).

If someone can make the case after the fact that
the notice that Ms. Finegan testified to was in fact not
provided, or that they did not receive actual notice of the
confirmation hearing and proposed release although the
Debtors were aware of their specific claim, they would have
the right to return and argue that they did not receive due
process, as in Motors Liquidation, 829 F.3d at 135, but as
far as the record before me is concerned, notice of the
confirmation hearing and the plan's proposed third-party

115

NAS3344

claims release satisfied due process.[8]

The next objection is based on a bankruptcy court's alleged lack of constitutional power to issue a final order confirming a plan that contains a third-party claims release, as opposed to an alleged lack of bankruptcy jurisdiction to approve confirmation of such a plan under section 1334(b) of the Judiciary Code.

This issue was not addressed by the courts until fairly recently, but it has been resolved at length in two opinions that I will simply cite because their logic cannot be improved upon to establish that a proceeding to determine whether a Chapter 11 plan that contains such a release should be confirmed not only is a core proceeding under 28 U.S.C. § 157(b), but also is a fundamentally central aspect of a Chapter 11 case's adjustment of the debtor/creditor relationship and, therefore, "constitutionally core" under Stern v. Marshall, 564 U.S. 462 (2011), and its progeny. See In re Millennium Lab Holdings II, LLC, 945 F.3d 126, as well as the lower court opinions in that case, Opt-Out Lenders v.

---

[8] On a somewhat related point, certain objecting states asserted that the creation by some of the Sacklers of a website that described their defenses to liability constituted an improper solicitation. The objectors ignore, though, that throughout the solicitation period they publicly proselytized their objections to the plan's release, which was widely described in the media. Neither activity violated my order approving the disclosure statement for the plan and confirmation procedures.

NAS3345

Millennium Lab Holdings II, LLC, 591 B.R. at 559; In re
Millennium Lab Holdings II, LLC, 575 B.R. at 252.

Also on point is Lynch v. Lapidem, 592 B.R. 506,
509-12. See also In re Quigley Co., 676 F.3d at 51-52.

In its affirmance of Lynch v. Lapidem, the Circuit
did not reach Judge McMahon's determinations regarding the
existence of bankruptcy subject matter jurisdiction and the
bankruptcy court's power to issue a final order under
Article III of the Constitution with respect to this type of
injunction. Lynch v. Mascini Holdings, Ltd., 792 Fed. Appx.
at 102-04. Her logic was impeccable, however, in the
context of, as here, a request for confirmation of a Chapter
11 plan, which is a proceeding central to the bankruptcy
court's adjustment of the debtor/creditor relationship and
"arising in" a case (as it would "have no existence outside
of the bankruptcy," In re Motors Liquidation Co., 829 F.3d
at 151), and "under" the Bankruptcy Code (11 U.S.C. §§ 1129
and 1123) for purposes of 28 U.S.C. § 1334(b). That
traditional context is to be distinguished from a request
under Fed. R. Bankr. P. 7065, incorporating Fed. R. Civ. P.
65, for a preliminary injunction of third-party claims,
which Judge McMahon found in Dunaway v. Purdue Pharm. L.P.,
619 B.R. at 55-57, to be based on only 'related to'
jurisdiction under 28 U.S.C. § 1334(b).

117

**NAS3346**

Having addressed the jurisdictional, due process, and Stern v. Marshall objections, one still must decide, though, whether the Court has statutory or other power to confirm a plan with a third-party claim release and injunction pertaining to the shareholder released parties, as well as the merits of the settlement that is the quid pro quo for that release and injunction.

Almost every circuit has addressed those issues. The clear majority (the First, Second, Third, Fourth, Sixth, Seventh, Eleventh, and D.C. Circuits) have determined that such releases and injunctions under a plan are authorized in appropriate, narrow circumstances. See Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973, 984-85 (1st Cir. 1995); Deutsche Bank A.G. v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 141 (2d. Cir. 2005), and the cases cited therein from the Second Circuit, including the Macarthur Co. v. Johns-Manville Corp., 837 F.2d at 93-94, and In re Drexel Burnham Lambert Group, 960 F.2d at 293; In re Millennium Lab Holdings II, LLC, 945 F.3d at 133-40; Nat'l Heritage Found., Inc. v. Highbourne Found., Inc., 760 F.3d 344, 350 (4th Cir. 2014), cert. denied, 135 S. Ct. 961 (2015), and Menard-Sanford v. Mabey (In re A.H. Robins Co.), 880 F.2d 694, 700-02 (4th Cir. 1989); In re Dow Corning Corp., 280 F.3d at 656-58; Airadigm Communs. v. FCC

118

**NAS3347**

(In re Airadigm Commuins., Inc.), 519 F.3d 640, 655-59 (7th
Cir. 2008), and In re Ingersoll, Inc., 562 F.3d 856 (7th
Cir. 2009); SE Prop. Holdings, LLC v. Seaside Eng'g &
Surveying (In re Seaside Eng'g & Surveying), 780 F.3d 1070,
1076-79 (11th Cir. 2015), cert. denied, Vision-Park Props.
V. Seaside Eng'g & Surveying, 577 U.S. 823 (2015); and In re
AOV Indus., Inc., 792 F.2d 1140, 1153 (D.C. Cir. 1986).

Three circuits are on record that third-party
claims releases are improper for a court exercising
bankruptcy jurisdiction to approve.  See Bank of New York
Tr. Co., NA v. Off. Unsecured Creditors' Comm. (In re
Pacific Lumber Co.), 584 F.3d 229, 252 (5th Cir. 2009);
Resorts Int'l v. Lowenschuss (In re Lowenschuss), 67 F.3d
1394, 1401-02 (9th Cir. 1995); In re W. Real Estate Fund,
922 F.2d 592, 600 (10th Cir. 1990).

The following can be said about them, or the line
of cases from those three courts, however.  First, they are
fundamentally based on the view that section 524(e) of the
Bankruptcy Code precludes the grant of such a release.  That
section provides in relevant part, "[D]ischarge of a debt of
the debtor does not affect the liability of any other entity
on, or the property of any other entity, for such debt."  11
U.S.C. § 524(e).  This statutory reading has been
effectively refuted, however. See, e.g., In re Airadigm

119

NAS3348

Communs.: ("If Congress meant to include such a limit [in
section 524(e)], it would have used the mandatory terms
'shall' or 'will' rather than the definitional term 'does.'
And it would have omitted the prepositional phrase 'on, or
for, . . . such debt,' ensuring that 'the discharge of the
debt of a debtor *shall* not affect the liability of another
entity' -- whether a debtor or not. See 11 U.S.C. § 34
(repealed Oct. 1, 1979) ('The liability of a person who is a
co-debtor with, or guarantor or in any manner a surety for,
a bankruptcy shall not be altered by the discharge of such
bankruptcy.') (prior version of § 524(e)). Also, where
Congress has limited the powers of the bankruptcy court, it
has done so clearly.") 519 F.3d at 656; In re Dow Corning
Corp., 280 F.3d at 657 (section 524(e) "explains the effect
of a debtor's discharge. It does not prohibit the release
of a non-debtor"). See also Macarthur Co. v. Johns-Manville
Co., 837 F.2d at 91, and Lynch v. Lapidem, 592 B.R. at 504-
05, which distinguish a bankruptcy discharge or a final
determination on the merits from a settlement of claims.

Second, the Fifth Circuit observed in Pacific
Lumber that "non-debtor releases are most appropriate as a
method to channel mass claims toward a specific pool of
assets" in cases concerning "global settlements of mass
claims against the debtors and co-liable parties," 584 F.3d

120

**NAS3349**

at 252, citing a similar observation by the Fifth Circuit in
Feld v. Zale Corp., 62 F.3d 746, 760-61 (5th Cir. 1995),
thus suggesting that in a context like the plan before this
Court, the Fifth Circuit might reach a different result.

I will note, further, that notwithstanding its
reliance on Bankruptcy Code section 524(e) as precluding any
third-party claim release, which the Ninth Circuit in
Lowenschuss, 67 F.3d at 1401-02, and In re Am. Hardwoods,
885 F.2d 621, 623 (9th Cir. 1989), equated with a discharge,
the Ninth Circuit has more recently held that a release of
third-party claims based on actions taken in or related to
the bankruptcy case could, in appropriate circumstances, be
imposed in a plan, although such post-bankruptcy, pre-
confirmation claims would be subject to the discharge, as
well. Blixseth v. Credit Suisse, 961 F.3d 1074, 1081-85
(9th Cir. 2020).

Fourth, both Am. Hardwoods, 885 F.2d at 624-25,
and W. Real Estate Fund, 922 F.2d at 599, recognized the
propriety of imposing a preliminary injunction of third-
party claims to "facilitate the reorganization process,"
leading one to ask why couldn't such a stay become permanent
if it was crucial to a reorganization process involving
massive numbers of overlapping estate and third-party
claims, in contrast to the peripheral third-party claims in

121

NAS3350

those two decisions, simply because it was opposed by a small number of objecting creditors, or just one?

In any event, W. Real Estate Fund, has been interpreted by a court in the Tenth Circuit as not standing for the proposition that section 524(e) of the Bankruptcy Code precludes all third-party releases but rather that section 105(a) of the Bankruptcy Code and other applicable bankruptcy law might, in appropriate circumstances, justify a release of third-party claims under different circumstances. In re Midway Gold, 575 B.R. 475, 505 (Bankr. D. Colo. 2017).

The minority circuits' reliance on Bankruptcy Code section 524(e) to preclude third-party claims releases under a plan, is also inconsistent with section 524 as a whole. Section 524(g) of the Bankruptcy Code specifically provides for certain third-party releases if certain conditions are met in a plan that addresses asbestos liabilities, including the affirmative vote of the affected class by a super-majority of 75 percent of those voting.

But more importantly, section 524(h)(1) of the Bankruptcy Code expressly provides that section 524(g) does not mean that plans that were confirmed before the enactment of that section that are generally in conformity with it are unlawful. 11 U.S.C. § 524(h)(1). The legislative history to

122

NAS3351

the amendment makes the same point:

> "[S]ection [524(h)] contains a rule of
> construction to make clear that the special rule
> being devised for the asbestos claim
> trust/injunction mechanism is not intended to
> alter any authority bankruptcy courts may already
> have to issue injunctions in connection with a
> plan of reorganization.  Indeed, Johns-Manville
> and UNR firmly believe that the court in their
> cases had full authority to approve the trust
> injunction mechanism.  And other debtors in other
> industries are reportedly beginning to experiment
> with similar mechanisms.  The Committee expresses
> no opinion as to how much authority a bankruptcy
> court may generally have under its traditional
> equitable powers to issue an enforceable
> injunction of this kind.  The Committee has
> decided to provide explicit authority in the
> asbestos area because of the singular and
> cumulative magnitude of the claims involved.  How
> the new statutory mechanism works in the asbestos
> area may help the Committee judge whether the
> concept should be extended into other areas."

H.R. Rep. 103-834, 103d Cong., 2nd Sess. 12; 140 Cong. Rec.

H10765 (Oct. 4, 1994).

A similar floor statement by Senator Heflin at 140

Cong. Rec. S14461-01 (Oct. 6, 1994) reads, "Finally, Mr.

President, with respect to the senator's specific question,

this Section applies to injunctions in effect on or after

the date of enactment. What that means is, for any

injunction that may have been issued under a court's

authority under the Code prior to enactment, such an

injunction is afforded statutory permanence from the date of

enactment forward, assuming that it otherwise meets the

qualifying criteria described earlier."

123

NAS3352

It appears clear, therefore, under well-reasoned caselaw as well as the Code itself that section 524(e) is not a statutory impediment to the issuance or enforcement of a third-party claim release under a plan in appropriate circumstances.

That raises the issue, however, what _is_ the statutory or other source of power for such a release? This issue also has been addressed at the appellate level. See In re Airadigm Communs., Inc., where after determining that section 524(e) does not bar a third-party claims release, the Seventh Circuit stated,

> "The second related question dividing the circuits is whether Congress affirmatively gave the bankruptcy court the power to release third parties from a creditor's claims without the creditor's consent, even if 524(e) does not expressly preclude the releases. A bankruptcy court 'appl[ies] the principles and rules of equity jurisprudence,' Pepper v. Litton, 308 U.S. 295, 304 (1939), and its equitable powers are traditionally broad. United States v. Energy Resources Co, Inc., 495 U.S. 545, 549 (1990). Section 105(a) [of the Bankruptcy Code] codifies this understanding of the bankruptcy court's powers by giving it the authority to effect any 'necessary or appropriate' order to carry out the provisions of the bankruptcy code. Id. at 549; 11 U.S.C. § 105(a). And a bankruptcy court is also able to exercise these broad equitable powers within the plans of reorganizations themselves. Section 1123(b)(6) [of the Bankruptcy Code] permits a court to 'include any other appropriate provision not inconsistent with the applicable provisions of this title.' 11 U.S.C. § 1123(b)(6). In light of these provisions, we hold that this 'residual authority' permits the bankruptcy court to release third parties from

124

NAS3353

liability to participating creditors if the
release is 'appropriate' and is not inconsistent
with any provision of the Bankruptcy Code."

519 F.3d at 657. See also In re Dow Corning Corp., 280 F.3d

at 656-58; Lynch v. Lapidem, 592 B.R. at 511 ("[T]hird-party

releases contained in a confirmed plan are subject to 11

U.S.C. §§ 1129(a)(1), 1123(a)(5) & (b)(6), 105, and 524(e).

In other words, those releases flow from a federal statutory

scheme. This statutory scheme reflects Congress's exercise

of its preemption powers, which permit the abolition of

[rights] to attain a permissible legislative object.

Congress possesses exceedingly broad power [t]o establish

uniform laws on the subject of [b]ankruptcies throughout the

United States.  By way of the Bankruptcy Code, Congress

authorized wholesale preemption of state laws regarding

creditors' rights and has delegated this preemptive power to

the bankruptcy courts."); Adam J. Levitin, "Toward A Federal

Common Law of Bankruptcy: Judicial Lawmaking in a Statutory

Regime", 80 Am. Bankr. L.J. 1, 79-80, 83-84 (2006) (finding

source for third-party releases and injunctions under a plan

in federal common law as much as, if not more, than under

section 105(a) of the Bankruptcy Code coupled with sections

1123(a)(5) and (b)(6)).

All courts considering whether to approve a third-

party claims release under a plan have noted that such power

125

NAS3354

is subject to considerable scrutiny and may be exercised only in limited, rare cases.  See, e.g., In re Metromedia Fiber Network, Inc., 416 F.3d at 143, and the cases cited therein.  In deciding whether this Chapter 11 plan presents such a case, it is worthwhile to look first at the types of claims that courts find are properly subject to such a release.  In re Quigley Co., 676 F.3d 45, again provides guidance, because it extensively addressed "derivative" claims not only in the context of subject matter jurisdiction, discussed earlier, but also when considering the types of third-party claims that can properly be released and enjoined under a plan, albeit in interpreting Bankruptcy Code section 524(g).

"Derivative claims" are widely understood to be claims by a third party that asserts injury to the corporate entity and requests relief that if granted would go to the corporate entity.  See Donahue v. Bulldog Invs. Gen. P'ship, 696 F.3d 170, 176 (2d Cir. 2012).

The Second Circuit has spent substantial time interpreting what constitutes a true derivative claim, one that, though asserted by a third party, properly belongs to the debtor's estate, as opposed to being recoverable by the third party. In such disputes, the courts generally ask whether the relief sought by the third party would really

NAS3355

address only a secondary harm to that which flows primarily
to the estate.  See Marshall v. Picard (In re Bernard L.
Madoff Inv. Secs. LLC), 740 F.3d 81 (2nd Cir. 2014); Tronox
Inc. v. Kerr McGee Corp. (In re Tronox Inc.) 855 F.3d 84
(2nd Cir. 2017).  This inquiry supports the strong
bankruptcy policy in favor of the ratable recovery by all
similarly situated creditors from the debtor's estate, which
as a concomitant principle requires that claims that purport
to be independent of a remedy held by the debtor's estate
but in fact arise from harm to the debtor be reserved only
for the estate's benefit.

        This is the type of claim that is included within
the non-opioid third-party claims release under the plan.
That release, as defined in the plan's "non-opioid excluded
claim" definition, excludes "any cause of action that does
not allege (expressly or impliedly) any liability . . . that
is derivative of any liability of any Debtor or any of their
Estates."

        If, in fact, those types of claims were the only
claims to be released, we would not be talking about a
"third-party claims" release of the shareholder released
parties.  We would be talking about a release that clarifies
and protects the estates from backdoor attacks through the
assertion of purported third-party claims, that, in fact,

127

**NAS3356**

are estate claims to be shared ratably with the estate's
creditors.

Instead, true third-party releases involve claims
that are independent of the debtor's estate's claims at
least on a legal basis, if not as a factual basis. See,
e.g., In re Drexel Burnham Lambert Group, 960 F.2d at 288,
293 (release of securities laws claims against officers and
directors proper); Macarthur Co. v. Johns-Manville Corp.,
837 F.2d at 90-92 (claims of co-insured and direct claims of
personal injury claimants against debtor's insurance
properly enjoined as part of plan's resolution of claims
against insurers); Cal. Dep't of Toxic Substances Control v.
Exide Holdings, Inc. (In re Exide Holdings, Inc.) 2021 U.S.
District LEXIS 138478 (D. Del. July 26, 2021) (claims
against plan funders as potentially responsible parties
properly enjoined as part of resolution of debtor's cleanup
obligations); Cartalemi v. Karta Corp. (In re Karta Corp.)
342 B.R. 45, 50, 56-57 (S.D.N.Y. 2006) (claims against non-
debtor affiliates and their fiduciaries).

But obviously not all independent legal claims are
properly covered by such a release if based on simply having
some relationship to the debtor, a clear example being a
third party's guaranty of a debtor's obligation. Quigley
helps to sort out the degree of the necessary relationship.

128

NAS3357

There, the party relying upon a plan's third-party claims release argued that because the claim against it would not have arisen but for the debtor, because the debtor distributed its products, it should be covered by the release. 676 F.3d at 59-60. The claimant argued otherwise, and the Circuit agreed with it. Id. at 60-61.

The court concluded that a "but for" test creates too much of an "accidental nexus" to the bankruptcy estate and that instead the third-party claim, to be subject to the plan's release and injunction, must arise "as a legal consequence" of the debtor's "conduct or the claims asserted against it must be a legal cause of or a legally relevant factor to the third party's alleged liability." Id. at 60; see also id. at 61 (channeling authority limited "to situations in which the third party's relationship with the debtor is legally relevant to its purported liability [to the claimant]"). See also Cont'l Cas. Co. v. Carr (In re W.R. Grace & Co.), 900 F.3d 126, 136-37 (3d Cir. 2018) (claim need not be directly derivative of the debtor's rights; instead, "[t]he proper inquiry is . . . to determine whether the third-party's liability is wholly separate from the debtor's liability or instead depends on it").

Again, the discussion in Quigley, as well as in W.R. Grace, came in the context of interpreting the limits

129

NAS3358

of Bankruptcy Code section 524(g)'s release and injunction of third-party claims; however, the need to limit third-party claims releases and injunctions generally to such closely related, though independent, claims is a consistent theme throughout the case law, and it is reasonable therefore to be guided by the section 524(g) cases.  <u>See</u>, <u>e.g.</u>, <u>In re Karta Corp.</u>, 342 B.R. at 55-57 (relying on identity of interest between debtors and non-debtor released parties); <u>In re Dow Corning Corp.</u>, 280 F.3d at 658 (noting identity of interest between the debtor and third-party claimants).

To properly be subject to a third-party claims release under a plan, therefore, the third-party claim should be premised as a legal matter on a meaningful overlap with the debtor's conduct. Otherwise, the release would be too broad and would cover, for example, a claim against one of the Sacklers, some of whom are doctors, for negligently prescribing OxyContin to a patient.  On the other hand, given a causal legal dependence on the Debtor's conduct, or a legally meaningful relationship with the debtor's conduct, a third-party claim is sufficiently close to the claims against the debtor to be subject to settlement under the debtor's plan if enough other considerations support the settlement.

NAS3359

So, while I firmly believe that I have subject matter jurisdiction, that the Debtors have satisfied due process, that I have the power to issue a final confirmation order under Article III of the Constitution, and that there is a sufficient source of power in the Bankruptcy Code itself, in sections 105(a) and 1123(a)(5) and (b)(6), as well as in the Court's inherent equitable power, I will require section 10.7(b) of the plan, which provides for the release of third-party claims against the shareholder released parties, to be further modified to state that a Debtor's conduct, or a claim asserted against the Debtor, must be a legal cause of the released claim, or a legally relevant factor to the third-party cause of action against the shareholder released party, for the third-party claim to be subject to the release.

On the other hand, having read the objecting states' complaints against the Sacklers, which, as noted not only by me but also by Judge McMahon in Dunaway v. Purdue Pharm. L.P., 619 B.R. at 50, essentially dovetail with the facts of the claimants' third-party claims against the Debtors, such third-party claims would be properly covered by such a revised release and injunction.

This still leaves whether under the remaining applicable standards and the facts of these cases the plan's

131

NAS3360

third-party claims release in favor of the shareholder
released parties should be imposed.  Those standards vary
among the circuits.  In In re Metromedia Fiber Network,
Inc., the Second Circuit listed a number of circumstances in
which courts have exercised their power to impose such a
release under section 105(a) of the Bankruptcy Code,
observing that non-debtor releases have been approved when
the release is "important" to the plan, the estate receives
substantial consideration in return, the enjoined claims
would be channeled to a settlement fund rather than
extinguished, the released claims would otherwise indirectly
impact the debtors' reorganization by way of indemnity or
contribution, and the plan otherwise provided for the full
payment of the enjoined claims. 416 F.3d at 141-42.

The court went on to state, however, that "this is
not a matter of factors or prongs" and further that "[n]o
case has tolerated nondebtor releases absent the finding of
circumstances that may be characterized as unique." Id. at
142.  It also cautioned that such releases can be abused,
especially if they are for insiders, and need to be
supported by sufficient findings by the bankruptcy court.
Id.

The Third Circuit has used a similar set of
factors with perhaps one important difference.  As

132

**NAS3361**

summarized in In re Exide Holdings, Inc., 2021 U.S. Dist.
LEXIS 138478, at *44-45: "To grant non-consensual releases a
court must assess 'fairness, necessity to the
reorganization' and [make] specific actual findings to
support these conclusions. Cont'l Airlines, 203 F.3d at
214. These considerations might include whether: '(i) the
non-consensual release is necessary to the success of the
reorganization; (ii) the releasees have provided a critical
financial contribution to the debtor's plan; (iii) the
releasees' financial contribution is necessary to make the
plan feasible; and (iv) the release is fair to the non-
consenting creditors, i.e. whether the non-consenting
creditors received reasonable compensation in exchange for
the release.' In re Spansion, Inc., 426 B.R. 114, 144
(Bankr. D. Del. 2010)."

The Fourth, Sixth, and Eleventh Circuits have
applied a similar multifactor test: there is an identity of
interest between the debtor and the third-party, usually an
indemnity relationship, such that a suit against the non-
debtor is, in essence, a suit against the debtor or will
deplete assets of the debtor's estate; the non-debtor has
contributed substantial assets to the reorganization; the
injunction is essential to the reorganization -- namely, the
reorganization hinges on the debtor being free from indirect

133

NAS3362

suits against parties who would have indemnity or contribution claims against the debtor; the affected class or classes have voted overwhelmingly to accept the plan; the plan provides a mechanism to pay for all, or substantially all, of the claims in the class or classes affected by the injunction; the plan provides an opportunity for those claimants who choose not to settle to recover in full; and the bankruptcy court made a record of specific factual findings that support its conclusions. Behrmann v. Nat'l Heritage Found., Inc., 663 F.3d 704, 712 (4th Cir. 2011) (noting, however, that not all factors are required in each case); In re Dow Corning Corp., 280 F.3d at 658; In re Seaside Eng'g & Surveying, 780 F.3d at 1079.

The Seventh Circuit has used a broader standard, although also noting the potential for abuse, as well as the fact-based nature of the inquiry: whether the release is narrowly tailored, not blanket, whether there has been a finding that the release was an essential component of the plan, whether it was the fruit of long-term negotiations, and whether it was achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions in the case. In re Ingersoll, Inc., 562 F.3d at 865.

Again, according to Metromedia Fiber, none of

134

NAS3363

these factors is dispositive, but they do need to be
considered, the release must be supported by factual
findings in the record, and the release must be requested in
the context of unique circumstances and necessary to the
plan.

Certainly the circumstances of these cases are
unique. Every Chapter 11 case has its own difficulties, but
I believe these cases are the most complex, given the issues
before the parties and ultimately the Court, that I have
handled, and frankly that the courts under Chapter 11 have
handled. At least that view is shared by the parties to
these cases, who were represented by very capable and
experienced counsel.

The release of the shareholder released parties
under the plan as amended also is narrowly tailored and as
discussed above will need to be further narrowed.

Again for reasons that I've already stated, it is
also clear that the monetary contributions by the Sacklers
and their related entities are critical to confirmation of
the plan. Without the settlement payments, I find that the
plan would unravel, including the complex interrelated
settlements that depend upon the payments being supplied
under the settlement in addition to the non-monetary
consideration under it.

135

NAS3364

Not every shareholder released party is
necessarily going to make a specific payment under the plan,
but the Sackler family members are obligated to cause the
payments to be made, and the relationships among the
shareholder released parties are sufficiently close to lead
to the conclusion that the aggregate settlement payment
hinges on each being released.  Understandably the
shareholder released parties are not going to agree to
provide the consideration under the settlement without
receiving the shareholder release in return.

The plan also has been overwhelmingly accepted,
including by the classes affected by the third-party claims
release, by well above the 75 percent supermajority in
section 524(g) of the Bankruptcy Code. Indeed, over 95
percent of the large number of creditors voting have
accepted the plan, including in the objectors' classes.

It is also clear that the amount being paid under
the settlement is substantial.  As I noted earlier, not only
is it substantial in dollar terms, I believe that it is the
largest amount that shareholders have ever paid in such a
context of these types of third party claims and closely
related claims for piercing the corporate veil, alter ego,
and breach of fiduciary duty/failure to supervise.
Moreover, the non-monetary consideration under the

NAS3365

settlement also is substantial, including the agreement to
allocation by charities to opioid abatement valued at least
at $175 million, resolution of naming rights, and the public
document depository.

Objectors have argued that in the light of either
the aggregate amount of claims asserted against Sacklers or
the aggregate amount of their wealth, the settlement sum is
not substantial. I've considered those points carefully.
The Sackler settlement does not provide anything close to
enough to pay for all or substantially all of the asserted
claims of the classes affected by the third-party claims
release. The United States' claim alone, for example, will
recover only a small fraction of its allowed claim, and it
is fair to assume that if the other claims were liquidated
they, too, would not be paid in full. In addition, the
settlement, although clearly substantial in dollars, leaves
the Sackler family members in the aggregate with substantial
wealth.

On the other hand, neither a defendant's wealth
nor the amount of claims asserted against it should dictate
the fairness of a settlement without considering the claims'
merits, the costs and delay of continued litigation, and
risks relating to the collectability of any eventual
judgments.

137

NAS3366

More relevant than the prospect of full payment, therefore, is the Third Circuit's focus on the fairness of the settlement to the third-party claimants. In re Exide Holdings, Inc., 2021 U.S Dist. LEXIS 138478, at *44-45.[9] That issue can be assessed in two ways:  first, the Court's analysis, based on the evidence, of the factors for and against the settlement and, second, based on the process leading to the settlement -- that is, whether it was conducted at arms-length by well-informed and well-represented parties whose interests were aligned with the third parties whose claims would be released, as well as whether those parties and the overwhelming number of parties affected by the settlement, support it.

I therefore have analyzed the fairness of the settlement from the perspective of the third-party claimants in comparison to the likely result if they were instead able to separately pursue their third-party claims.

This analysis in large measure overlaps the

---

[9] Courts have analogized the power to compel a third-party claims release under a plan to the equitable doctrine of marshalling.  In re Dow Corning Corp., 280 F.3d at 656; In re A.H. Robbins Co., 880 F.2d at 701 ("A creditor has no right to choose which of two funds will pay his claim.  The bankruptcy court has the power to order a creditor who has two funds to satisfy his debt to resort to the fund that will not defeat other creditors.").  This approach similarly focuses the Court on the value of the third-party claim, taking into account all relevant factors, not just the size of the asserted claim or the target's net worth in a vacuum.

138

NAS3367

analysis of the merits of the Debtors' estates' settlement of certain of their claims against the shareholder released parties.  This is because, as noted, the third-party claims being released under the settlement are based on essentially the same facts as the Debtors' veil piercing, alter ego, and breach of fiduciary duty/failure to supervise claims.

Having considered the complaints filed against the Debtors and certain of the Sacklers by the objecting states, their claims ultimately derive from the Debtors' conduct to the extent that as a legal matter one or more of the Sacklers can be said to have directed it or have had the knowledge and power to have directed it but failed to do so. As far as the gravamen or the proof that would need to be shown, I've not gone through every state's applicable law on this point, but I will note that the main cases that they have cited -- Grayson v. Nordic Const., Co., 599 P.2d 1271 (Wash. 1979), and State v. Ralph Williams, N. W. Chrysler Plymouth, Inc., 553 P.2d 423, 439 (Wash. 976) -- found individual liability based upon the controlling shareholder's personal direction, including fraud committed by the corporation through the shareholder, of many of the unlawful acts and practices taken by the corporation.

The Sacklers therefore would raise the same defenses to these claims (to the extent that they would

139

NAS3368

belong to the third party claimants instead of to the

Debtors) as they would to the estates' closely similar

claims:  all would argue that many of the claims pre-date

2007 and are barred by prior settlements or statutes of

limitations; most of the shareholder released parties would

argue that they never served on Purdue's Board, did not

otherwise engage in decision-making for Purdue, and that

their ability to control Purdue, if they exercised their

shares along with their family members, does not, standing

alone, suffice to ascribe liability; and the Sacklers who

were on Purdue's Board would argue that the evidence does

not show their involvement sufficiently in Purdue's wrongful

conduct, such as the conduct admitted by it in the October

2020 DOJ settlement, and would point in support to the OIG

and ADD certifications, although as I've discussed, they

still face substantial legal risk on such claims.

As I've also discussed, moreover, there are

serious collection issues pertaining to any judgment against

shareholder released parties.  These issues are exacerbated

by the inevitable competition not only among all of those

who assert third-party claims against the shareholder

released parties (and it is noteworthy that none of these

claims has been identified as being based on wrongful

conduct specifically aimed at the claimant, as opposed to at

NAS3369

all claimants), but also from the estates' claims. Indeed,
as noted, the estates' fraudulent transfer avoidance claims,
which the third-party claimants clearly would not be able to
pursue on their own behalf, probably would have the best
chance of material success among all of the claims against
the shareholder released parties.

The issue of collection is two-fold. First,
because of the dispersal of the Sacklers' wealth, including
(x) among many different people or family groups, including
outside of the U.S. and (y) in allegedly spendthrift trusts,
including, again, outside of the U.S., recovery on judgments
would be difficult, especially since the generally well-
recognized fraudulent transfer exception to the integrity of
U.S. spendthrift trusts would not be available to creditors
that would not have standing to pursue fraudulent transfers
for themselves because they would be pursued by the estates
for the benefit of all creditors.

Second, as I've discussed, without the releases
the plan would unravel and the Debtors' cases would likely
convert to cases under Chapter 7 of the Bankruptcy Code.
I've already found that in a liquidation, unsecured
creditors would probably recover nothing from the Debtor's
estates, as set forth in the unrefuted liquidation analysis
by Mr. DelConte. Under that analysis, even in the less

141

**NAS3370**

likely "best case" scenario, they would receive no more than
their pro rata share of $699 million, which would be small.

        I've already gone through the dilutive effect
resulting from conversion of these cases to Chapter 7.
Claims that under the plan are to be resolved by agreed
multi-billion-dollar payments for abatement, and thus do not
require being determined on the merits, would then be
contested, as would the personal injury claims.  The
contests would be extraordinarily expensive and time-
consuming, and, after being determined, the resulting claims
would likely not only receive zero from the Debtors' estates
but also, because of their collective size, only a small pro
rata share of any recovery from the shareholder released
parties.

        Collectively, the states and territories filed
proofs of claims in these cases aggregating at least $2.156
trillion.  The share of that sum for the objectors who have
attacked the plan's third-party claims release is roughly
450 billion, or less than 21 percent.  If you factor in the
other, non-state claimants, many of which, like the City of
Seattle, would clearly assert third-party claims, too, as
well as the Debtors' estates' claims against the Sacklers
and their related entities, the dilutive effect upon any
individual third-party claimant's recovery from the

NAS3371

shareholder released parties is clear. And I have no doubt that a Chapter 7 trustee and at least the other governmental entities would pursue similar claims against the shareholder released parties (in addition to a Chapter 7 trustee's pursuit of the estates' avoidance claims). They would never permit the objecting states, which are similarly situated to them, to win a litigation race.

I therefore conclude that if I denied confirmation of the plan, the objectors' aggregate net recovery on their claims against the Debtors and the shareholder released parties would be materially less than their recovery under the plan.

This conclusion is strongly supported by the second, process-related inquiry into the fairness of the settlement from the third-party claimants' perspective that I have identified. As discussed earlier, the negotiations of the Sackler settlement were clearly arms-length. The Sacklers were on one side, and everyone else was on the other. The Sacklers and their related entities were required to provide extraordinary disclosure regarding (x) their conduct related to Purdue and (y) their assets and liabilities, at least as much, and often more, than would be reasonably expected if they themselves sought bankruptcy relief (which for many of the Sacklers and most of their

NAS3372

related entities would not be under the U.S. Bankruptcy
Code).  The parties investigating and negotiating against
the Sacklers were very well represented and aligned with the
objectors; indeed, in addition to the Official Unsecured
Creditors Committee, those parties were fellow state
attorneys general and other governmental representatives,
many of whom have been in the forefront pursuing Purdue and
its shareholders for years.  Lastly, the settlement was
negotiated in not one but two mediations conducted by superb
mediators.

Arguably the "best interests" analysis under
section 1129(a)(7) of the Bankruptcy Code overlaps with the
foregoing assessment of the fairness of the plan's third-
party claims release to the objectors.  The objectors have
argued that the plan does not satisfy section 1129(a)(7) of
the Code because in a Chapter 7 liquidation of the Debtors
they would have two sources of recovery -- from the Debtors'
estates and separately from the shareholder released
parties.

I have said that section 1129(a)7) "arguably"
applies to this objection because the section's plain
meaning may well not contemplate it.  As previously quoted,
section 1129(a)(7) provides that for the holder of a claim
that has not accepted its treatment under a plan, such

144

NAS3373

holder must be projected to "receive or retain under the
plan on account of such claim . . . property of a value, as
of the effective date of the plan, that is not less than the
amount that such holder would so receive or retain if the
debtor were liquidated under chapter 7 of this title on such
date." 11 U.S.C. § 1129(a)(7) (emphasis added). As a
matter of grammar, therefore, the comparison required by
section 1129(a)(7) apparently is between the amount that the
objecting creditor would receive under the plan on account
of its claim and what it would "so" receive -- that is, also
on account of its claim -- if the debtor were liquidated
under chapter 7. It would not, therefore, require analysis
of the claimant's rights against third parties.

I recognize that the interpretation of section
1129(a)(7) by two of my colleagues, whom I greatly respect,
was to the contrary in In re Ditech Holding Corp., 606 B.R.
at 610-14, and In re Quigley Co., 437 B.R. at 145. In
deciding, however, that when conducting the "best interests"
test the court should take into account a claimant's
recovery from a third-party source that is precluded by the
plan if one can make a reasoned determination of the
recovery on that third-party claim, neither of those
decisions addresses the plain meaning argument that I've
just described (and, moreover, the applicability of section

145

**NAS3374**

363(o) of the Bankruptcy Code in a Chapter 7 liquidation
when it was found inapplicable under the plan[10] in the Ditech
case would have placed the focus on third-party claims in a
way absent here).

I have not limited my ruling, though, to the
foregoing plain meaning interpretation.  I have instead
assessed, based on the record of the confirmation hearing,
what I believe would be recovered by the objectors if the
Debtors were liquidated in Chapter 7, both on account of
their claims against the Debtors and on account of their
third-party claims.  And based on that assessment, I have
concluded that under the plan they would recover at least as
much as their recovery in a hypothetical Chapter 7 case,
indeed materially more.

In Quigley, 437 B.R. at 145, and Ditech, 606 B.R.
at 615, the courts stated that the hypothetical recovery
from non-debtor sources should be included in the "best
interests" analysis if it was neither speculative nor
incapable of estimation.  The Debtors have argued that here
such a recovery would be too speculative.

In Quigley the court relied on various admissions

---

[10] Section 363(o) of the Code, which Ditech found did not apply in a
Chapter 11 plan context though it would in Chapter 7, id. at 595,
expressly preserves the types of third-party claims that the plan would
have released.  11 U.S.C. § 363(o).

NAS3375

by the debtor regarding an over 20-year history of
settlements of similar claims that such a recovery, which
would be barred by the plan, was not speculative. 437 B.R.
at 146. In Ditech, the court concluded that the debtors had
not carried their burden to show that the claims that would
be barred under the plan in return for a small pro rata
distribution from a settlement fund could not be estimated
or that the fund was a reasonable settlement, in part
because the limited evidence offered by the debtors
suggested to the contrary. 606 B.R. at 620-21. The
objecting states have suggested that a similar failure of
proof exists here given the absence of expert testimony
regarding the value of the third-party claims against the
shareholder released parties.

It is true that there was no such expert
testimony, but given the evidence regarding the strengths
and weaknesses of the claims, including the cost of pursuing
them, the risks of collection, and the dilutive effect of
all of the other litigation that would be pursued by all of
the other creditors in these cases, including all of the
other states and governmental entities who are otherwise
agreeing to the plan that would have the same types of
third-party claims, as well as the Chapter 7 trustee on
behalf of the estate, I conclude that no additional evidence

**NAS3376**

is required.

Unlike in <u>Quigley</u>, there is a paucity of any post-2007 settlement history here of third-party claims against the Sacklers and their related entities, with the exception of the Sacklers' postpetition payment of $225 million to the United States in respect of the civil claims that were the subject of their postpetition settlement with the DOJ; the Sacklers' settlement shortly before the bankruptcy petition date with the State of Oklahoma for $75 million;[11] and the fact that the Sacklers paid nothing to the Sate of Kentucky but obtained a release under Purdue's $24 million December 2016 settlement with the State of Kentucky,[12] which amounts reasonably compare to the proposed recoveries of the objecting states under the plan.  And unlike in <u>Ditech</u>, no one has tried to hide the Sacklers' settlement history.

In this context, the merits of the plan's settlement of the third-party claims can properly be undertaken by the Court not only in the light of that history but also the other evidence that I have already

---

[11] <u>Attorney General Hunter Announces Historic $270 Million Settlement with Purdue Pharma</u>, Office of the Oklahoma Attorney General (May 28, 2019), http://oag.ok.gov/articles/attorney-general-hunter-announces-hitoric-270-million-settlement-purdue-pharma-200-million.

[12] Settlement Agreement and General Release, <u>Commonwealth of Kentucky, ex rel. Jack Conway, Attorney General, and Pike County, Kentucky v. Purdue Pharma, L.P., et al.</u>, Civil Action No. 07-Cl-013303 (Ky. Ct. App. Dec. 22, 2015) (NO. 1606).

NAS3377

discussed at length.[13]  Accordingly, for the same reasons
that that the plan's settlement/third-party claims release
of the shareholder released parties is fair to the
objectors, the plan also meets Bankruptcy Code section
1129(a)(7)'s "best interests" test under a broad
construction of that test.  Having a second fork in the pie
does not help, it hurts because of the resulting "battle of
the century" among the creditor parties, as well as the
Chapter 7 trustee.

     The last argument made by the objecting states, as
well as the City of Seattle, is that the plan's
nonconsensual third-party release and injunction violates
their sovereignty and police power.

     There is, however, no such bar or exception under
the Bankruptcy Code.

     In certain carefully delineated instances, the
Bankruptcy Code and the Judicial Code recognize the police
power of states and other governmental units, but only in
those limited contexts.  Thus, in section 362(b)(4) of the
Code, Congress provided a limited exception to the automatic

---

[13] It is worth noting that, unlike here, both Quigley, 437 B.R. at 126-
29, and Ditech, 606 B.R. at 624-25, found that the proposed settlements
of the third-party claims at issue were not negotiated by those whose
interests were aligned with the third-party claimants and that this flaw
meant that the plan either was not in good faith for purposes of section
1129(a)(3) of the Bankruptcy Code or that the settlement was not fair
and reasonable.

NAS3378