**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br>BANKRUPTCY APPEALS | 21 cv 7532 (CM)<br>21 cv 7585 (CM)<br>21 cv 7961 (CM)<br>21 cv 7962 (CM)<br>21 cv 7966 (CM)<br>21 cv 7969 (CM)<br>21 cv 8034 (CM)<br>21 cv 8042 (CM)<br>21 cv 8049 (CM)<br>21 cv 8055 (CM)<br>21 cv 8139 (CM)<br>21 cv 8258 (CM)<br>21 cv 8271 (CM)<br>21 cv 8548 (CM)<br>21 cv 8566 (CM)<br><br>On Appeal from the United States Bankruptcy Court for the Southern District of New York |
| This Filing Relates to | |
| ALL MATTERS | |

**AD HOC COMMITTEE OF NAS CHILDREN'S APPENDIX**

**LEVENFELD PEARLSTEIN, LLC**
Harold D. Israel
2 North LaSalle St., Suite 1300
Chicago, Illinois 60602
Telephone: 312-346-8380
Facsimile: 312-346-8434
hisrael@lplegal.com

**MARTZELL, BICKFORD & CENTOLA**
Scott R. Bickford (LA 1165)
338 Lafayette Street
New Orleans, LA 70130
Telephone: 504-581-9065
Facsimile: 504-581-7635
sbickford@mbfirm.com

# TABLE OF CONTENTS

**Bankruptcy Court Filings**

Schedules of Assets and Liabilities for Purdue Pharma L.P. .......... NAS0001

NAS Ad Hoc Committee's Limited Objection to Disclosure Statement and Solicitation Procedures Motion .......... NAS1583

Disclosure Statement for Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors .......... NAS1683

Mediator's Report .......... NAS2182

Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors .......... NAS2188

Declaration of Jesse DelConte .......... NAS2253

Declaration of Timothy J. Martin .......... NAS2323

Statement of the Raymond Sackler Family in Support of Confirmation of Debtors' Sixth Amended Plan of Reorganization and in Reply to Plan Objections .......... NAS3048

Declaration of Jonathan Greville White. .......... NAS3186

Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan .......... NAS3230

Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of Unsecured Creditors To Motions for Stay Pending Appeal .......... NAS3389

Declaration of Kara Trainor in Support of the Opposition of the Official Committee .......... NAS3399

**Appeal Filings**

Memorandum in Support of Ad Hoc Committee of NAS Children's Motion for Leave to Intervene as Appellee Pursuant to Rule 8013(g) of the Federal Rules of Bankruptcy Procedure .......... NAS3408

Order on the Pending Motions to Intervene by the Ad Hoc Committee of NAS Children, the Multi-State Government Entities Group, and the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al .......... NAS3437

Brief of Appellant, William K. Harrington, United States Trustee .......... NAS3439

**Bankruptcy Court Transcripts**

August 23, 2021 Transcript of Proceedings ........................................................ NAS3510

November 9, 2021 Transcript of Proceedings ...................................................... NAS3898

stay under section 362(a) "of the commencement or continuation of an action or proceeding by a governmental unit . . . to enforce such governmental unit's . . . police or regulatory power, including enforcement of a judgment other than a monetary judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's . . . police or regulatory power." 11 U.S.C. § 362(b)(4). By its own terms, however, section 362(b)(4) does not except governmental units' actions to enforce a monetary judgment from the automatic stay under section 362(a); nor does the exception apply to governmental units' actions to obtain or enforce a lien against the estate. See Ohio v. Kovacs, 469 U.S. 274, 283 n.11 (1985); SEC v. Brennan, 230 F.3d 65, 71-72 (2d Cir. 2000); 3 Collier on Bankruptcy ¶ 362.05[5][b].

Similarly, 28 U.S.C. § 1452(a) precludes the removal, which is generally permitted under that section when the district court has bankruptcy jurisdiction under 28 U.S.C. § 1334, of a claim or cause of action in a civil proceeding to enforce a governmental unit's police or regulatory power.

The scope of the "police or regulatory power" in those exceptions has not been decided definitively by the Second Circuit. As noted in the thorough discussion in

People of Cal. V. GM L.L.C. (In re GM L.L.C. Ignition Switch Litig.) 69 F.Supp.3d 404 (S.D.N.Y. 2014), the definition of police power for purposes of these exceptions has always recognized a distinction between "whether the governmental action relates primarily to the government's pecuniary interest in the debtor's property or to matters of public health and welfare." Id. at 410 (internal quotation and citation omitted). After Bd. of Governors of Fed. Reserve Sys. v. MCorp. Fin., Inc., 502 U.S. 32, 40 (1991), courts' focus turned from assessing whether the governmental unit was truly intending to deter harmful conduct rather than seeking to benefit the government financially, to an objective inquiry into the purpose of the law that the governmental unit was attempting to enforce. In re GM L.L.C. Ignition Switch Litig., 69 F. Supp. 3d at 410-12. Thus the fact that a governmental unit seeks a money judgment is not enough to take its claim out of the police power exception, and at least for many of the governmental objectors' causes of action against shareholder released parties, therefore, the "police power exception" would apply.

But, again, that exception is a limited one. It is well recognized -- indeed the 10th Circuit states that it is a matter of hornbook law -- that actions excepted from the automatic stay, including under the police or regulatory

power, may be subject to injunctive relief under section 105(a) of the Bankruptcy Code. In re W. Real Estate Fund, 922 F.2d at 599; In re Commonwealth Cos., Inc., 913 F.2d 518, 527 (8th Cir. 1990). See also 3 Collier on Bankruptcy ¶ 362.05[5][d]; H.R. Rep. 95-595 95th Congress 1st Sess. (September 8, 1977) ("Subsection (b) lists five exceptions to the automatic stay. The effect of an exception is not to make the action immune from injunction.").

And where police and regulatory power or state sovereignty generally is not specifically recognized in the Bankruptcy Code, Congress' power under Art. I cl. 8 of the Constitution to enact uniform bankruptcy laws overrides it. See, e.g., Cty. of San Mateo v. Peabody Energy Corp. (In re Peabody Energy Corp.), 958 F.3d 717, 724-25 (8th Cir. 2020) (chapter 11 plan discharges governmental units' public nuisance claim); see also In re Fed'l-Mogul Global, 684 F.3d at 364-65, 367-70; In re Airadigm Communs., Inc., 519 F.3d at 653-54. Plan injunctions have previously been imposed over governmental units' police or regulatory power. See, e.g., In re Exide Holdings, Inc., 2021 U.S. Dist. LEXIS 138478, at *51 (California Department of Toxic Substances Control enjoined from pursuing claims against plan funder); see also In re Airadigm Communs., Inc., 519 F.3d at 557 (third-party claims release of plan funder applied to

F.C.C.); cf. In re Dow Corning Corp., 280 F.3d at 648 (plan's third-party claims release could be applied to United States as claimant under Medicare Secondary Payer Program and Federal Medicare Recovery Act; remanded for findings in accordance with opinion). Such an injunction is most clearly within the ambit of traditional bankruptcy power when it pertains primarily to the collection of money on claims that overlap claims against a debtor's estate, not to enforcement of states' rights otherwise to regulate conduct.

The objecting states' and Seattle's police power and parens patriae arguments therefore should be considered only in evaluating the fairness of the settlement to them as governmental units, not as a bar to the settlement. Given the limited scope of the plan's release of the shareholder released parties and those parties' agreement to no longer be involved with the Debtors or NewCo except to perform the settlement, as a practical matter the plan only limits the objecting states' remedies against the shareholder released parties to collect money on account of their past conduct. As to that limitation, moreover, all of the states, including the objecting states, have agreed to the public/private allocation and the NOAT allocation under the plan for abatement purposes. Indeed, during the

confirmation hearing, counsel for the objecting State of Washington lauded the constructive nature of the NOAT allocation and the plan's proposed abatement procedures guidelines. Further, I have found that if the objecting governmental units were carved out of the release, the plan would fail, the Debtors would likely liquidate, and the objectors would collect materially less money from the Debtors and the shareholder released parties in the aggregate, as would the other states and governmental entities and non-public unsecured creditors who support the plan's confirmation.

The objecting states and Seattle nevertheless contend that the plan deprives them of establishing a sufficient civil remedy for the released claims. And sending a message to others who might similarly be shown to have improperly engaged in conduct that would subject them to liability certainly can be a valid aspect of the police power.

Should that interest, though, defeat a plan that 79 percent of their sister states support, more than 96 percent of the other governmental entities and Native American Tribes support, and more than 95 percent of the other claimants support? Should that interest deprive the other creditors of their assessment of the merits of the

settlement, with which this Court's analysis agrees?

As noted earlier, moreover, the plan does not just address claims against the Debtors and the Sacklers for money. It not only deprives the Sacklers of all their interest in the Debtors and requires them to cause the delivery of $4.5 billion to the creditors, primarily for abatement purposes. It not only has been negotiated in a context that has subjected them to national opprobrium. It also addresses their naming rights and includes the Sacklers and the Debtors' agreement to provide the comprehensive public document depository, including waivers of the attorney-client privilege, for future analysis by the federal government, states, and others.

Ms. Conroy, who has been pursuing Purdue and the Sacklers for as long and as diligently as anyone, in fact testified that the document depository is perhaps the most important aspect of the settlement, even more important than the billions of dollars being paid by the shareholder released parties. It is especially important given the public interest raised by the objecting states. It will provide far more transparency to the conduct of Purdue and those it did business with and those who regulated it, including perhaps some of these very objectors, including the state of Connecticut where Purdue's headquarters is

located, as well as, of course, the federal government, than would renewed litigation and any eventual trials against various members of the Sackler family.

The record to be established by the public document depository is important for the continued pursuit of lawsuits against other parties in this industry, and it will guide legislatures and regulators about how to better address other companies with lawful products that also are incredibly dangerous.

Similarly, the plan's mandated use of most of its anticipated distributions for abatement purposes, the parties' agreement on parameters for abatement, and the required periodic reporting on those efforts should guide the public's consideration of the efficacy of abatement measures going forward.

The aspects of the plan that regulate NewCo's future governance and conduct also, as I've noted, should provide a model for further self-regulation of similar companies or regulation by governmental entities.

I conclude therefore that the objectors' expressed public interests in opposing the settlement are outweighed by the foregoing considerations.

Each of the four members of the Sackler family who testified during the evidentiary hearing was asked if they

would apologize for their role and conduct related to Purdue. Their reactions, typically for an unhappy family, varied. None would give an explicit apology, which I suppose is understandable given the legal risks faced, although I will note that in a somewhat similar context I have received a profound apology to victims of misconduct.

One of the witnesses, Richard Sackler, did not accept any level of responsibility. The other three with differing degrees of emotion stated their regret for what their companies had done. A forced apology is not really an apology. So we will have to live without one unless apologies follow the plan’s confirmation.

The writer Stendahl wrote that most people do not forgive, they just forget. But given the nature of this settlement, including the document depository, forgetting should be impossible unless by choice. To me, the elements of the settlement, taken together, more than justify the admittedly serious implications of overriding the objecting states’ and Seattle’s rights.

So, assuming that the changes to sections 5.8 and 10.07(b) of the plan that I outlined will be made, as well as one other change that I will address in a moment, I will confirm the plan. I do so agreeing with the Official Unsecured Creditors Committee and everyone else on the other

side of the table from the Sackler family, including the Debtors, that I wish the plan had provided for more, but I will not jeopardize what the plan does provide by denying its confirmation.

The other change to the plan that I believe is required involves section 11.1(e), which provides that those who would prosecute a cause of action against released parties based on its being a "non-opioid excluded claim," which by definition truly is not a derivative claim, nevertheless must obtain leave from the bankruptcy court to do so. The provision is intended to protect the estates and released parties from having to go to other courts to litigate whether someone is usurping the estates' claims and thus violating the release.

Consistent with my remarks to counsel for certain Canadian municipalities and First Nations during the confirmation hearing, that provision should be clarified to apply only to a causes of action that colorably are derivative and therefore would belong to the Debtors' estates. Thus, for example, if a cause of action seeks to avoid a fraudulent transfer made by a non-Debtor, the plaintiff should not have to obtain permission under section 11.1(e) from the bankruptcy court to bring it.

I will enter an order confirming the plan if it is

amended as required hereby, which order can generally be in the form of proposed confirmation order previously circulated to the parties and provided to chambers.

Dated: White Plains, New York
September 17, 2021

/s/Robert D. Drain
United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA, L.P., *et al.*,** | Case No. 19-23649 (RDD) |
| **Debtors.**[1] | (Jointly Administered) |

**DECLARATION OF CHERYL JUAIRE IN SUPPORT OF THE OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTIONS FOR STAY PENDING APPEAL**

I, Cheryl Juaire, pursuant to 28 U.S.C. § 1764, hereby declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a member of the Official Committee of Unsecured Creditors (the "UCC") of Purdue Pharma, L.P. and its affiliated debtors and debtors-in-possession (collectively "Purdue" or the "Debtors") in the above-captioned chapter 11 cases ("Chapter 11 Cases"). I was appointed to the UCC by the Office of the United States Trustee when the UCC was formed on September 26, 2019, at the beginning of these Chapter 11 Cases.

2. I submit this declaration (the "Declaration") in support of the *Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal*.

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**Background and Experience**

3. I am currently the founder and president of a national non-profit organization called Team Sharing. We are an organization of parents who have all lost a child or multiple children to Opioid Use Disorder ("OUD"). Team Sharing provides services and other assistance to family members who have lost loved ones to opioid and other drug-related overdoses, such as assisting with funeral expenses, sending Christmas gifts to children who have lost a parent, and so much more. Through my work with Team Sharing, I have met and talked with hundreds, if not thousands, of people who have lost family members to opioid-related overdoses and addictions. I am face-to-face with the results of the opioid epidemic every day.

4. I created Team Sharing after I lost one of my sons, Corey, to an opioid overdose on February 24, 2011. Corey was only 23. He had started taking opioids at the age of 15, when they were prescribed by a doctor following hernia surgery. When Corey died, he had a four and a half month old child, Faith, who has grown up without knowing her father.

5. On June 25, 2021, a little more than 10 years after Corey's death, I lost my second son, Sean, to an opioid overdose. Sean had a history of OUD but had turned his life around. He was actually working to help others with OUD when he relapsed and ultimately died alone. He, too, left a daughter, a son, and two grandchildren.

6. Corey's daughter, and Sean's two children, my grandchildren, no longer have their biological fathers due to the opioid epidemic.

7. As a result of these experiences, I have been active in the victim advocate community for a long time. For example, I was invited to be a member of Massachusetts Attorney General Maura Healy's opioid task force beginning on October 23, 2018, and I attended the 2020 State of the Union Address as the guest of honor of Congresswoman Lori Trahan due to my work

in advocacy. I petitioned to recognize August 31st as National Overdose Awareness Day across the country in memory of all of those lost. Approximately half of the states wrote proclamations honoring the day, and we also received recognition from the President of the United States. I participated in numerous rallies and even attempted on August 17, 2018 (with Ryan Hampton, a former UCC member) to deliver to Purdue's CEO, Craig Landau, a letter about Purdue and the Sacklers' role in the opioid epidemic. Through this advocacy and my work with Team Sharing, I have built relationships with many people around the country who, like me, are battling the opioid epidemic and/or have been personally affected by it.

**My Work on the UCC and the Plan**

8. After joining the UCC, I was asked to refrain from public advocacy during the bankruptcy cases, which was a very difficult thing to do. Nevertheless, I took this instruction seriously and accepted and followed it. I understand that the UCC owes fiduciary duties to all of Purdue's unsecured creditors, including governmental and non-governmental claimants. I have attempted at all times to fulfill my fiduciary duties to all of Purdue's unsecured creditors.

9. But serving as a UCC member in these Chapter 11 Cases has also allowed me to apply my experience and knowledge—both as a mother of two children claimed by the opioid epidemic and as a longtime victim advocate—in new ways. Throughout these cases, I have worked hard to provide a powerful voice to the many unsecured creditors represented by the UCC—including the United States, state governments, local political subdivisions, personal injury victims, children born with neonatal abstinence syndrome ("NAS"), hospitals, and others. But, in particular, I have always been aware that the voices of victims and the loved ones they leave behind must not be forgotten amid all the complicated legal issues in these Chapter 11 Cases, and most

importantly not be drowned out by those who would use the Chapter 11 Cases as a means to political gain.

10. The UCC has met approximately twice per week since it was formed almost two years ago. All together, the UCC has met approximately 200 times to date. In addition, UCC members receive email updates from the UCC's advisors on a nearly daily basis with information about developments in the ongoing Chapter 11 Cases and the work conducted by the UCC's professionals. In total, I have received approximately 700 of those updates.

11. I also attended meetings throughout these Chapter 11 Cases with many of the other major creditor groups on numerous key issues. Among other things, I worked hard with other members of the UCC in an attempt—undermined by the federal government and certain state attorneys general—to establish a $200 million Emergency Relief Fund ("ERF") more than 18 months ago, because I believed then (as I do now) that it was crucial to start trying to abate the opioid epidemic as soon as possible. I also actively participated in mediation. In addition, I watched almost every deposition taken in these Chapter 11 Cases and attended almost every court hearing.

12. Those proceedings, spanning countless hours, ultimately led to the confirmation of the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "Plan"). As a member of the UCC, which supported confirmation of the Plan, I am generally familiar with the key aspects of the Plan, especially as they relate to the various ways in which the Plan devotes funds to combatting and addressing the opioid epidemic.

13. To be clear, the UCC's position on the Plan should not be misconstrued as satisfaction with the amount of money—$4.325 billion—that the Sacklers are contributing under the Plan. I can attest that the UCC wanted more from the Sacklers. I can also attest that there is

no dollar figure large enough to solve the opioid crisis, and of course there is no dollar figure that will ever bring back the tens of thousands of people who died in 2020 or the half-million people who have died since the opioid epidemic began.

14. Nonetheless, the UCC has clearly and repeatedly communicated its position that, while the Plan is not perfect, it is the best alternative available at this point for a variety of reasons. Most importantly, the Plan provides a means to start contributing funds to help abate the opioid epidemic and compensate victims as soon as possible. As noted above, if it had been up to the UCC alone, funds would have begun to flow to those in need long ago through the ERF, but that effort failed due to lack of support from public side creditors. We cannot go back in time to implement the ERF, but at the very least allowing the Plan to go effective as soon as possible—without any more delays from a stay pending appeal—will finally allow at-risk communities to start receiving the money they so desperately need.

15. I understand the Plan requires the overwhelming majority of distributed funds to be used for opioid abatement and victim compensation.

16. Another valuable feature of the Plan is the creation of a document repository, which will make available for future study and analysis, a huge volume of documents from Purdue and the Sacklers.

**Stay of the Plan's Effectiveness Pending Appeal**

17. I understand that there is overwhelming support for the Plan from the UCC and other creditor groups—including (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the Ratepayer Mediation Participants, (viii) the NAS Committee and (ix) the Public School District Claimants. Additionally, I understand that more than 95% of creditors voted in support of the Plan. I further understand, however, that the

U.S. Trustee, two Canadian groups, three individuals, and a handful of nine states (collectively, the "Appellants") seek to challenge the Plan on appeal. In essence, I understand that the Appellants want to continue pressing their objections to the settlement with the Sacklers, and to delay implementation of the confirmed Plan for as long as it takes for the appeals of these hold-out creditor groups to be resolved.

18. It is deeply frustrating and disappointing to see the Appellants choose this course of action. The Appellants' have made clear that their objective is to reclaim their individual ability to sue the Sacklers on civil opioid-related claims. Apparently they care more about their ability to pursue those claims, than the chance to use these Chapter 11 Cases collaboratively with other creditors to develop and fund programs to try to abate the opioid epidemic. Of course, the Appellants are still free, under the Plan, to pursue any criminal claims they may have.

19. As noted, at least some of the Appellants seek not only to challenge the Plan, but also to prevent the Plan from becoming effective by obtaining a stay pending their appeals. In support of their requests for such relief, those Appellants argue that delaying implementation of the Plan will not cause any harm. That is not true, as the Appellants well know.

20. Recently released data by the Center for Disease Control ("CDC") shows that deaths due to drug overdose reached a record high of more than 96,000 from March 2020 to March 2021. This represents a stark increase from the CDC's statistics for drug overdose deaths for the year 2020. I understand that this equates to about 263 people dying *each day*—in other words, more than one person every ten minutes. Of those daily deaths, I understand that approximately 204 are opioid related. These are not just anonymous numbers to me. One of these 263 daily deaths this year was my son, and I personally know several more families who have had loved ones pass away since June.

21. I understand that (even on an expedited basis) the appeals could linger for months or even years before reaching their conclusion. Delaying implementation of the plan for such a period of time would result in incalculable cost to human life.

22. These horrifying statistics, however, do not even come close to communicating the true scale of the daily harm from the opioid epidemic. Through my work with Team Sharing, attending funerals of victims of the opioid epidemic, and from own personal experience, I understand that the harm is exponentially greater. In addition to this terrible loss of life, the daily harm includes the agony of people who are living with OUD and who are suffering and struggling with the physical pain of addiction and the mental and psychological effects of living a life that is often full of shame and embarrassment. The devastation wrought by the opioid epidemic also spreads to the parents, brothers and sisters, spouses, children, relatives, friends, classmates, and co-workers of victims of the opioid epidemic. Simply put, it devastates whole communities. For each of the more than 96,000 people who died from an overdose in the year leading up to March 2021, and for each of the more than 1.6 million Americans estimated to be suffering from OUD, there are numerous other people who are suffering as well.

23. There are societal harms, too. The spouses of deceased loved ones must find financial assistance. The children of deceased loved ones often need extra care, counseling, and psychological help. The parents of deceased loved ones must come to grips with the disaster of outliving their children. Co-workers must not only figure out a way to fill the void left by their co-worker, but also must struggle with the fact that they may have seen their co-worker every day and yet not known anything about the pain and suffering he or she was going through. The friends of those who are deceased must go on living amid the pain of thinking that they failed to do

something to save their friend.  The same goes, not just for those who have passed away, but also for those who are living.  And the list goes on and on.

24.    Implementation of the Plan is intended to address these types of harms as well. Precisely how abatement funds will be used remains open.  However, there are many kinds of programs that might receive funding under the Plan and that would contribute to fighting the opioid crisis.  For instance, there is a great need to establish more counseling, peer recovery, and community organizations.  Through my advocacy work, I have also seen firsthand how grass-roots community organizations that already serve people with OUD are in desperate need of funding to maintain day-to-day operations, hire more people, pay for transportation to pick up victims, make beds available, provide food, and provide counseling, among other things.  In addition, with additional funding, medication-assisted treatment centers could provide much needed overdose reversal medication, clean syringe centers could be established and further funded, and more education could be provided.  With additional funding, organizations dedicated to helping mothers with children born with NAS could be built and funded, and programs could be set up for children born with NAS.  Hospitals could utilize additional funding now to pay for abatement programs. Public schools could use additional funding now to pay for special needs programs.

25.    Beyond abatement, the Plan provides compensation directly to victims and their families.  I know from firsthand experience that no amount of victim compensation could ever be sufficient, but these funds will make a difference in people's lives.  Those alive can use the money they receive under the Plan to pay for medical services and other life activities.  Parents of children born with NAS can utilize the money they receive under the Plan to take care of simple needs, like extra diapers, or fund long-term needs, like education.  Families of victims often have lost hundreds of thousands of dollars while trying to keep their loved ones alive, only to have them die.  Then,

these families are forced to pay unexpected funeral expenses, and these families are also forced to scramble to replace the income of the person that has passed away. Compensation to these families would alleviate some of these expenses.

26. In addition, the sooner the document repository is established, the sooner scholars, journalists, scientists, policy makers, and others, can review the documents from Purdue and the Sacklers and begin to analyze the root causes of the opioid epidemic, and how our nation can prevent something like this from happening again.

27. In sum, the Plan must go into effect as soon as possible, so that funds can be distributed and made available to abatement programs and victims. The opioid epidemic is killing more than 204 people every day, and we cannot afford to spare one more minute. For the foregoing reasons, I believe that a stay pending appeal would cause incredible harm to countless numbers of individuals, families, and communities that would benefit from allowing the Plan to go effective as soon as possible.

[*Signature Page Follows*]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October [21], 2021

Cheryl Juaire

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **PURDUE PHARMA, L.P., *et al.*,** | Case No. 19-23649 (RDD) |
| **Debtors.**[1] | (Jointly Administered) |

**DECLARATION OF KARA TRAINOR IN SUPPORT OF THE OPPOSITION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO MOTIONS FOR STAY PENDING APPEAL**

I, Kara Trainor, pursuant to 28 U.S.C. § 1764, hereby declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am a member of the Official Committee of Unsecured Creditors (the "UCC") of Purdue Pharma, L.P. and its affiliated debtors and debtors-in-possession (collectively "Purdue" or the "Debtors") in the above-captioned chapter 11 cases ("Chapter 11 Cases"). I was appointed to the UCC by the Office of the United States Trustee when the UCC was formed on September 26, 2019, at the beginning of these Chapter 11 Cases.

2. I submit this declaration (the "Declaration") in support of the *Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal*.

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**Background and Experience**

3. I am currently a peer recovery and outreach coach at Integrated Services of Kalamazoo, working with an opioid overdose response program. Integrated Services of Kalamazoo is an organization that provides support and assistance to individuals in need of help, including individuals who are suffering from Opioid Use Disorder ("OUD"). In my work, I have worked with countless people suffering from OUD and am constantly confronted with the reality of the opioid epidemic. On a daily basis, I see the damage that opioids inflict on people, the enormous problems people face while living with OUD or trying to overcome addiction, and the substantial lack of resources that are available to help people combat those problems.

4. I also serve on the board of a non-profit organization called Recovery Institute of Southwest Michigan. Recovery Institute of Southwest Michigan is an organization that provides peer-run and peer-delivered support to those with mental health or substance use concerns. In addition to my board member duties, I am active in a group that speaks about our recovery journey at colleges, high schools, hospitals, classes of nursing students, and treatment centers in the hopes of providing education and reducing the stigma around substance abuse disorder and mental illness.

5. I, myself, am a survivor. I was a nationally competitive baton twirler during my childhood, but suffered various injuries over time. After the birth of my oldest son, I started experiencing back pain related to a previous stress fracture. I went to my primary care physician, who promptly proscribed OxyContin. I became addicted to opioids very soon thereafter. I was only 21 years old. I, like many people, went down the path from OxyContin to other opioids/opiates and other illicit substances. Fortunately, I was able to utilize medication-assisted treatment ("MAT"), which for me was methadone, which saved my life. Finally, in 2018, after

fourteen years, I successfully transitioned off MAT. Today, I remain in recovery—opioid free. I feel lucky that I did not end up dead from an overdose. More than half a million people have not been as lucky.

6. When I got pregnant with my son, Riley, I was approaching two years of abstinence from all illicit drugs, and my recovery was stable. During my pregnancy, I was advised, by physicians, to continue MAT. On December 5, 2010, Riley was born. Riley was immediately transferred to the neonatal intensive care unit and was diagnosed with Neonatal Abstinence Syndrome ("NAS"). After his discharge, one of Riley's pediatricians decided to do a "slow taper" with methadone to curb his withdrawal symptoms. Riley was on methadone for most of the first year of his life. Riley is now ten years old and suffers the lingering effects of NAS. He still uses diapers, drinks from a sippy cup, and has been diagnosed with eye conditions. He has been diagnosed as autistic and will need 24/7 care for the rest of his life. Not every NAS child will have the same experience as Riley's, but many children will have emotional, psychological, physical, and financial needs, as do their mothers and the rest of their families. I know first-hand what their lives are like, and I want to do whatever I can to make the lives of others better.

7. As a result of my experiences as a survivor and a mother, I have dedicated my life to fighting the opioid epidemic. Many politicians say they care about the epidemic and wrap themselves in the plight of the victims, just like they wrap themselves in a flag, but few have been willing or able to make choices furthering the interests of victims, as opposed to their own agendas and ambitions.

8. I am similarly motivated by a desire to help all of those living with OUD to get access to the resources they need, such as peer counseling, MAT, clean syringes, recovery community organizations, transportation to treatment, and other resources that can help someone

struggling with OUD. Unfortunately, on a daily basis I see how many of these programs have to fight for funding, including those in my community in Kalamazoo, Michigan.

**My Work on the UCC and the Plan**

9. I understand that the UCC owes fiduciary duties to all of Purdue's unsecured creditors, including governmental and non-governmental claimants. Even though I believe that I was appointed to the UCC in part to advocate for the interests of children born with NAS, their mothers, and their families, I have attempted at all times to fulfill my fiduciary duties to all of Purdue's unsecured creditors and to treat all of Purdue's unsecured creditors equally and fairly. That being said, I have been keenly focused on making sure that when the Chapter 11 Cases come to their conclusion, financial resources will be available for peer recovery, harm reduction, and grassroots organizations for opioid abatement, as well as for families who have children suffering from NAS.

10. The UCC was formed at the outset of the Chapter 11 Cases more than two years ago. Since that time, the UCC has met approximately two times per week and the members of the UCC receive email updates from the UCC's advisors with information about developments in the ongoing Chapter 11 Cases and the work conducted by the UCC's professionals on an almost daily basis. To date, the UCC has met approximately 200 times and I have received approximately 700 email updates.

11. I also attended meetings throughout these Chapter 11 Cases with some of the other major creditor groups on numerous key issues. Among other things, more than a year and a half ago, I worked with other members of the UCC to establish a $200 million Emergency Relief Fund ("ERF"). I worked hard to establish the ERF because I knew that direct funding to on-the-ground organizations would make a difference in saving lives. Unfortunately, our efforts to establish the

ERF were undermined by the federal government and certain state attorneys general. I often wonder how many lives would have been saved over the last 18 months if politics had not gotten in the way of what was such an important and life-saving program.

12. Despite my unhappiness with many developments in these Chapter 11 Cases, as a member of the UCC, I ultimately supported confirmation of the *Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors* (the "Plan"). While I took advice from my counsel on many aspects of the Plan, I am generally familiar with how much money the Sackler family is contributing, and I am aware that the Plan envisions immediate funding for abatement of the opioid epidemic and that, at most, $750 million in compensation will be awarded to the approximately 140,000 claims filed by personal injury victims.

13. To be clear, the UCC is not satisfied that the Sacklers are contributing only $4.325 billion in cash over nine years in return for releases of civil liability. Of course the UCC and every other creditor wanted more from the Sacklers. However, while the Plan is not perfect, the UCC has clearly and repeatedly communicated its position that it is the best alternative available at this point given the facts and circumstances of these cases. Most importantly, the Plan provides a means to start contributing funds to help abate the opioid epidemic and compensate victims as soon as possible. As mentioned, I wanted funds to start flowing through the ERF long ago, but that effort failed due to lack of support from public side creditors. Although we cannot go back in time to implement the ERF, what we can do *now* is to allow the Plan to be implemented as soon as possible, so that at-risk communities, including the families of children born with NAS, will start receiving the money they so desperately need.

**Stay of the Plan's Effectiveness Pending Appeal**

14. I understand that there is overwhelming support for the Plan from the UCC and other creditor groups—including (i) the Ad Hoc Committee, (ii) the MSGE Group, (iii) the Native

American Tribes Group, (iv) the Ad Hoc Group of Individual Victims, (v) the Ad Hoc Group of Hospitals, (vi) the Third-Party Payor Group, (vii) the Ratepayer Mediation Participants, (viii) the NAS Committee and (ix) the Public School District Claimants. Additionally, I understand that more than 95% of creditors voted in support of the Plan. I further understand, however, that the U.S. Trustee, two Canadian groups, three individuals, and a handful of nine states (collectively, the "Appellants") seek to challenge the Plan on appeal. In addition, some (but not all) of the Appellants want to prevent the Plan from becoming effective by obtaining a stay pending their appeals. In other words, I understand that the Appellants want to continue moving forward with their objections to the settlement with the Sacklers and to delay the distributions under the Plan for as long as it takes for the appeals of these hold-out creditor groups to be resolved. I, personally, am sickened by this request.

15. In support of their requests to stay the Plan, the Appellants argue that delaying implementation of the Plan will not cause any harm. That comment would be laughable if it were not so sad. Perhaps if these Appellants had to tell people suffering from OUD that there simply is no transportation to get them to a treatment center because the Appellants want more time to bring their appeals (or fight over naming rights or documents), they would feel differently. Or perhaps if they were the ones who watched two different community organizations in Kalamazoo, each of which was established to provide different necessary services, like counseling, close in the last 90 days, they would rethink their position. Or perhaps if they were the ones who saw another organization, on top of the other two, be abruptly displaced and forced to establish a Go Fund Me in order to continue providing services, including harm reduction, peer support, naloxone, and clean syringes, they would feel differently. Or perhaps if their children had NAS they would feel

differently. Lucky for them they do not face these issues. Lucky for them, they do not see what I see every day.

16. I understand that the appeals could go on for months or possibly years before reaching a resolution, even if the appeals are expedited. I am nauseated by this, as every American should be. Every passing day that goes by results in more harm, more death, more psychological and physical pain, more trauma, and more stress. And, to state the obvious—the effects of one person's OUD is not confined to that person alone; it spreads to their loved ones, their children, their relatives, their friends, their co-workers, and beyond. If this funding prevents even ***one*** mother from having to bury her child or ***one*** child from having to look into the stands at a sports event and not see his parent, then it would be worth allowing the settlement to go forth without delay.

17. Through my job—and through raising Riley—I have also seen firsthand how grass-roots community organizations that already serve people with OUD are in desperate need of funding. Specifically, these organizations need money to support basic day-to-day operations, to employ more people, to provide transportation to their clients, including transportation to treatment centers, to offer peer support and recovery coaching and groups for family members, and to furnish counseling, among other things. Also, additional funding could support MAT clinics and providers and help these programs provide overdose reversal medication. Funding could be used for maternal treatment centers, special programming for children born with NAS, and specific organizations for children with NAS. Funding could be used for Syringe Services Programs, Recovery Community Organizations, and re-entry programs for individuals previously incarcerated. Not to mention, funding could be used to implement and enhance wraparound services for people suffering from OUD. Funding could go to hospitals and public schools to pay

Case 7:21-cv-07532-CM Document 158-7 Filed 11/15/21 Page 31 of 879

for abatement programs and special needs programs. Simply put, there is no shortage of ways more funding could be put to use.

18. In addition to abatement programs, the Plan provides compensation directly to victims and their families. From my own experience, I understand that no amount of victim compensation could ever make up for what has happened, but these funds will make a difference in people's lives. Parents of children born with NAS could use the money to pay for basic, urgent, everyday needs, like diapers and rent. They also could put these funds toward time sensitive services and opportunities like education and counseling, the value of which may be irretrievably lost (or at least greatly diminished) if payments are delayed by the stay sought by Appellants. Compensation to these families would help offset these families' financial burdens and allow them to plan for the future.

19. In sum, the Plan must go into effect as soon as possible, so that abatement programs and victims can start receiving the support they need. The opioid epidemic is killing hundreds of people every day, and we cannot afford to wait any longer. Programs need funding. People need compensation. Governments need to put resources to work.

20. For all of these reasons, I believe that a stay pending appeal would cause incredible harm that would impact countless numbers of individuals, families, and communities that would otherwise benefit from allowing the Plan to be implemented.

[*Signature Page Follows*]

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Executed on October 21, 2021

Kara Trainor

Kara Trainor

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, Appellant, v. PURDUE PHARMA L.P., Appellee. | : | Case No. 7:21-cv-07532[1] |
| In re: PURDUE PHARMA L.P., *et al.*, Debtors. | : | Appeal from Chapter 11<br>Case No. 19-23649 (RDD)<br>(Jointly Administered) |

**MEMORANDUM IN SUPPORT OF AD HOC COMMITTEE OF NAS CHILDREN'S MOTION FOR LEAVE TO INTERVENE AS APPELLEE PURSUANT TO RULE 8013(g) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE**

[1] The following cases have been designated as "related" on the Court's docket. The District of Columbia v. Purdue Pharma L.P., No. 7:21-cv-07585 (S.D.N.Y.); The City of Grand Prairie as Representative Plaintiff for a Class Consisting of All Canadian Municipalities, the Cities of Brantford, Grand Prairie, Lethbridge, and Wetaskiwin v. Purdue Pharma L.P., No. 7:21-cv-07961 (S.D.N.Y.); Certain Canadian First Nations Creditors Peter Ballantyne Cree Nation on Behalf of All Canadian First Nations and Metis People Lac La Ronge Indian Band v. Purdue Pharma L.P., No. 7:21-cv-07962 (S.D.N.Y.); William K. Harrington, United States Trustee v. Purdue Pharma L.P., No. 7:21-cv-07966 (S.D.N.Y.); William K. Harrington, United States Trustee v. Purdue Pharma L.P., No. 7:21-cv-07969 (S.D.N.Y.); The State of Maryland v. Purdue Pharma L.P., No. 7:21-cv-08034 (S.D.N.Y.); The State of Connecticut v. Purdue Pharma L.P., No. 7:21-cv-08042 (S.D.N.Y.); Ronald Bass Sr. v. Purdue Pharma L.P., No. 7:21-cv-08049 (S.D.N.Y.); The State of California and the People of the State of California, by and through Attorney General Rob Bonta v. Purdue Pharma L.P., No. 7:21-cv-08055 (S.D.N.Y.); The State of Delaware v. Purdue Pharma, L.P., No. 21-cv-8139 (S.D.N.Y.).

Case 21-07005-rdd Document 1-5 Filed 11/12/21 Page 3 of 19

**TABLE OF CONTENTS**

Preliminary Statement....................2
Background....................3
A. The NAS Committee....................3
B. The Purdue Bankruptcy Case and the NAS Committee's Involvement....................4
C. The Purdue Mediation....................5
Argument....................8
A. Interest in the Appeals....................8
B. Grounds for Intervention....................10
C. Intervention in the Bankruptcy Court was Unnecessary....................11
D. Intervention in the Bankruptcy Court is Proper....................11
E. *Amicus Curiae*....................11
Conclusion....................13

Case 7:21-cv-07532-CM Document 154-5 Filed 10/12/21 Page 3 of 19

# TABLE OF AUTHORITIES

**Cases**

In re Bayou Grp., LLC, 431 B.R. 549 (Bankr. S.D.N.Y. 2010) ....11

In re Constellation Enterprises LLC, 587 B.R. 275 (D. Del. 2018) ....10

In re Kinney, No. 3:21-CV-131-TAV-HBG, 2021 WL 2695136 (E.D. Tenn. May 27, 2021) ....12

In re Samson Res. Corp., No. 15-11934-BLS, 2018 WL 4658212 (D. Del. Sept. 27, 2018) ....12

In re Synergy Pharms. Inc., 621 B.R. 588 (Bankr. S.D.N.Y. 2020) ....11

LaBarre v. Ulrich, Case No. 2:15-cv-1959-DGC (D. Ariz.) ....10

S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc., 227 B.R. 788 (E.D. Tex. 1998) ....8

Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.), 303 F.3d 161 (2d Cir. 2002) ....10

Valucci v. Glickman, Berkovitz, Levinson & Weiner (In re Glickman, Berkovitz, Levinson & Weiner), 204 B.R. 450 (E.D. Pa. 1997) ....8

**Statutes**

11 U.S.C. § 1109 .... 8-12

Fed. R. Bankr. P. 8013 ....8, 10

The Ad Hoc Committee of NAS Children (the "**NAS Committee**") respectfully submits this memorandum in support of the related motion (the "**Motion**") for an order granting leave to intervene as an appellee pursuant to Rule 8013(g) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") in the above-captioned appeal and related appeals (collectively, the "**Appeals**"), certain of which appeal the following orders: (i) *Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [Docket No. No. 3787][2] (the "**Confirmation Order**"); (ii) *Order (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco, (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other Related Relief* [Docket No. 3773] (the "**Funding Order**"); (iii) *Order Approving (I) Disclosure Statement for Fifth Amended Chapter 11 Plan, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto* [Docket No. 2988] (the "**Disclosure Statement Order**," and collectively with the Confirmation Order and the Funding Order, the "**Orders**"), entered by the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") in jointly-administered case number 19-23649 (RDD) (Bankr. S.D.N.Y.) (the "**Bankruptcy Cases**"). In support of the Motion, the NAS Committee respectfully states as follows:[3]

---

[2]     Unless otherwise indicated, references to "Docket No." shall refer to the Bankruptcy Court's docket. Copies of all pleadings referenced may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma.

[3]     The United States Trustee objected to the NAS Committee's participation in the Appeals, arguing, among other things, that the NAS Committee has not appeared in each Appeal. See Docket No. 39 [Case No. 7:21-cv-07966]. The NAS Committee's previously filed letter indicates its intent to appear in all of the Appeals. See Docket No. 15 [Case No. 7:-21-cv-07532]. To the

**PRELIMINARY STATEMENT**

1. The NAS Committee asserts that it is properly cast as an appellee notwithstanding the fact that it did not address the release issue at the Confirmation Hearing. As set forth herein, and recognized by Judge Drain at the Confirmation Hearing, the NAS played an active role throughout the Bankruptcy Cases. To save its clients' money, it did not brief the third-party release issue in connection with, or argue it at, the Confirmation Hearing. That decision should not be outcome determinative as to whether the NAS Committee can be an appellee. Notwithstanding that the third-party release is the "big dog," there are a host of other issues on appeal. While appellants seek to protect the "public interest" through the Appeals, the NAS Children, the most innocent victims of the opioid crisis (whose representatives voted overwhelmingly in favor of the Plan) will pay the price if there are no third-party releases. Without the third-party releases, the NAS Children are unlikely to obtain any recovery on account of their injuries. These victims therefore deserve to be recognized as appellees in these Appeals.

2. The NAS Committee was heavily involved in the negotiation and drafting of documents related to the Plan and Orders. The NAS Monitoring Trust created pursuant to the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors, dated July 14, 2021* [Docket No. 3185] (the "**Plan**")[4] and the Confirmation Order is the first of its kind in the country. It is designed to provide grants to entities that provide services to those most in need—caretakers of children born with NAS who live in some of the most underserved areas of the United States. Achieving this result took thousands of hours of

extent that all of the related Appeals are not consolidated and jointly administered under this case, the NAS Committee intends to file an appearance in each of the Appeals.

[4] Capitalized terms used but not defined herein shall have the meaning given to such term in the Plan.

fact-finding, education, and negotiation by the NAS Committee before and during the Bankruptcy Cases.

3. The NAS Committee also participated heavily in mediation and other negotiations that led to the creation of the Plan, PI Trust Agreement, NAS PI TDP, and NAS Monitoring Trust and was specifically identified as a "Supporting Claimant" in the Plan. Thus, it clearly is a party in interest in this matter and has a right to intervene pursuant to Bankruptcy Rule 8013(g).

## BACKGROUND

### A. The NAS Committee

4. As set forth in the uncontroverted and uncontested *Declaration of Scott R. Bickford, Esq. in Support of the Ad Hoc Committee of NAS Children's Reply to the United States Trustee's Objection to the Fee Settlements included in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "**Bickford Declaration**") [Docket No. 3398], admitted into evidence[5] in connection with Plan confirmation, and attached hereto as Exhibit A, the NAS Committee provided extensive services on behalf of the NAS Children in connection with the Bankruptcy Cases, including, participating in numerous mediation sessions, the creation of the NAS Monitoring Trust, the drafting of the PI Trust Agreement, the PI TDP and NAS PI TDP, and the confirmation hearing when it achieved the first of its kind distribution for the NAS Children.

5. The three member NAS Committee, and their designees, have been the sole advocates of the interests of NAS Children both individual and in the abatement settlement in the

---

[5] See In re Purdue Pharma, L.P., Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), August 17, 2021 Hr'g. Tr. at 164:5-25, 165:1-5 (admitting the Bickford Fee Declaration into evidence).

Bankruptcy Cases, and have acted on behalf of the interests of a group of laws firms collectively representing the NAS Children. See Bickford Decl. at ¶ 3.

6. The NAS Attorney Group represents approximately 3,500 NAS children and their caregivers who are located throughout the country. Id. at ¶ 4. Because the majority of these children were born to a mother with an opioid dependence problem, the family situations are not ideal. Id. Approximately half of these clients are in the care and custody of their grandparents or other family members, some have been adopted, and some are with their birth parents. Id.

7. While the effects of opioid use in adults is well-known and published, the long-term effects of opioid exposure in the womb is far less studied or understood. Id. at ¶13. The NAS Committee was thus convinced that NAS children have not and are not receiving the study and services required to fully understand their injuries and acted promptly and often in the Bankruptcy Cases. Id.

**B. The Purdue Bankruptcy Case and the NAS Committee's Involvement**

8. The NAS Committee monitored and participated in the Bankruptcy Cases from the outset, including having filed the following:

a. *Conditional Consent with Reservation of Rights of the NAS Children AD HOC Committee to Motion of Debtors for Entry of Order (i) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (ii) Approving Proof of Claim Forms and (iii) Approving the Form and Manner Thereof* [Docket No. 754], reserving its rights with respect to the Debtors' bar date motion;

b. *Motion by NAS Guardians on Behalf of the NAS Children's Abatement Class Action Claimants for Entry of an Order Pursuant to Fed. R. Bankr. P. 9014 And 7023 Permitting Them to File a Class Proof of Claim and Granting Related Relief* [Docket No. 1362], seeking to permit the NAS Committee to file a class proof of claim;

c. *Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information and Exhibits Under Seal in Connection with the NAS Children Ad Hoc Committee's Ex Parte*

*Motion Requesting a Court Order Authorizing Examinations Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006 [Docket No. 2139],* seeking to file a redacted 2004 motion;

d. *Motion for Entry of Order Pursuant to 11 U.S.C. §§ 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information and Exhibits Under Seal in Connection with the NAS Children Ad Hoc Committee's Ex Parte Motion Requesting a Court Order Authorizing Examinations Pursuant to Federal Rules of Bankruptcy Procedure 2004 and 9006* [Docket No. 2340], seeking to file redacted exhibits related to the 2004 motion;

e. *Motion to Authorize the NAS Children Ad Hoc Committee's Motion Entry of Order Pursuant to 11 U.S.C. Sections 105(a) and 107(b) and Fed. R. Bankr. P. 9018 Authorizing the Filing of Certain Information and Exhibits Under Seal in Connection with the Reply and Supplemental Declaration* [Docket No. 2538], seeking to file a reply and supplemental declaration under seal in connection with the NAS Committee's discovery motion;

f. *Limited Objection to the Disclosure Statement and Solicitation Procedures Motion* [Docket No. 2746] (the "**NAS DS Objection**");

g. *Ad Hoc Committee of NAS Children's Reply to the United States Trustee's Objection to the Fee Settlements included in the Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* (the "**NAS Reply to UST Plan Objection")** [Docket No. 3397], supporting the Plan and justifying the NAS Committee's fees in connection with the Plan; and

h. The Bickford Declaration.

9. These pleadings, filed with the bankruptcy court have, among other things, resulted in expanded notice to the NAS Children, the creation of the NAS Children subclass, creation of the NAS Monitoring Trust, PI Trust Agreement, NAS PI TDP, and confirmation of the Plan.

## C. The Purdue Mediation

10. Pursuant to the *Order Appointing Mediators* [Docket No. 895], the NAS Committee was designated as a "Mediation Party." In its role as a Mediation Party, the NAS Committee and its advisors spent hundreds, if not thousands, of hours preparing for and attending numerous mediation sessions. See Bickford Decl. at ¶ 22. The NAS Committee's participation was twofold – seeking funding for the NAS Abatement Plan to assist those who are often beyond the reach of

governmental entities and to negotiate compensation for the NAS personal injury victims (the "**NAS PI Distribution**"). Id.

11. The NAS Committee's initial focus was to educate the mediators and the Mediation Parties about NAS and injuries caused by in utero opioid exposure and the need for the NAS abatement plan. Id. at ¶ 23. The NAS Committee, with the assistance of its experts:

a. Prepared videos and other presentation materials;

b. Developed an extensive library of medical and scientific research, government legislation, policies, and programs pertaining to NAS;

c. Reviewed a substantial number of scientific journal articles on the topics of NAS, treatment of NAS, and maternal substance abuse during pregnancy and at the time of childbirth;

d. Researched genetic predispositions to addiction in addition to the long-term effects of opioid use, including changes in behavior and neural function as well as mitochondrial abnormalities;

e. Scoured the scientific literature for information pertaining to specific opioid medications and their effects on human health and bodily function; and

f. Researched scientific literature analyzing the treatment of opioid addiction and NAS. This research was not limited to contemporary scientific literature; rather, literature available at the time pharmaceutical companies began distributing opioid medications was also reviewed.

Id.

1. The NAS Monitoring Trust

12. As set forth in the first *Mediators' Report* (the "**First Mediators' Report**") filed on September 23, 2020 [Docket No. 1716], the NAS Committee negotiated a first of its kind agreement to create an abatement fund in "Phase 1" of the mediation, along with a process to distribute such funds. See First Mediators' Report at ¶5; Bickford Decl. at ¶24. The first of its kind NAS Monitoring TDP will provide grants to those who advance the following goals: (i) preparing children with a history of NAS to be ready to enter or to succeed in school;

(ii) informing through evidence the standard of care for all NAS Children ages zero to six, with priority given to NAS Children ranging in age from three to six; and/or (iii) enhancing the mother-child dyad. See NAS Monitoring TDP at Docket No. 3187, Exhibit B, p. 8. The NAS Monitoring TDP was heavily negotiated by the various Mediation Parties, including the NAS Committee. No party objected to such TDP since it was filed and the NAS Monitoring TDP was a component of the Plan and Confirmation Order. Id.

2. The NAS PI Distribution

13. The NAS Committee also participated in countless mediation sessions regarding the NAS PI Distribution. Until May, 2021 (after the filing of the NAS DS Objection), the NAS Committee was unable to achieve any meaningful progress. See Bickford Decl. ¶25. The NAS Committee proposed numerous proposals (including TDPs) to the mediators and the PI Ad Hoc (Id.), none of which were acceptable, as evidenced by the first three plans filed in the Bankruptcy Cases.

14. The NAS Committee was left with little choice but to file the NAS DS Objection to highlight the disparity between the treatment of the opioid use disorder victims and the NAS Children. As outlined in the NAS DS Objection, the NAS Committee advocated for, among other things: (i) a separate class for the NAS Children; (ii) a separate pool of money for the NAS Children; and (iii) a separate TDP for the NAS Children. The NAS Committee also drafted and negotiated the NAS PI TDP and the NAS Monitoring Trust Documents.

15. As evidenced by the plan filed on May 24, 2021, the Committee achieved all three of its objectives outlined above. All of these objectives carried through and were a part of the Plan and Confirmation Order. Under the confirmed Plan, all NAS Children that meet the minimal evidentiary requirements will likely recover on account of their claims against the Debtors.

16. Accordingly, and as set forth further below, the NAS Committee respectfully submits that the Court should grant its motion to intervene.

**ARGUMENT**

17. Bankruptcy Rule 8013(g) provides that an entity seeking to intervene in an appeal pending in the district court:

> must move for leave to intervene . . . within 30 days after the appeal is docketed. [The Motion] must concisely state the movant's interest, the grounds for intervention, whether intervention was sought in the bankruptcy court, why intervention is being sought at this stage of the proceeding, and why participating as an amicus curiae would not be adequate.

Bankruptcy Rule 8013(g). The NAS Committee satisfies each of these criteria.

18. As a preliminary matter, courts that have addressed the issue uniformly have confirmed a broad appellate participation right for affected creditors that participated in the proceedings before the bankruptcy court. See, e.g., S. Pac. Transp. Co. v. Voluntary Purchasing Grps., Inc., 227 B.R. 788, 791 n. 4 (E.D. Tex. 1998) (noting that intervening party "had an interest in the appeal and a continuing stake in the outcome of the bankruptcy court proceedings"); Valucci v. Glickman, Berkovitz, Levinson & Weiner (In re Glickman, Berkovitz, Levinson & Weiner), 204 B.R. 450, 453 (E.D. Pa. 1997) ("[C]ourts interpret § 1109(b) broadly in order to enable parties affected by a bankruptcy to protect their interests").

19. The conclusion of these courts is consistent with the plain language of section 1109(b) of the Bankruptcy Code, which provides that "a party in interest," including … a creditor's committee … [or] a creditor … may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). Given the NAS Committee's actions in the Bankruptcy Cases (as further described above), the NAS Committee is undoubtedly a party in interest, with the right to appear and be heard in the Appeals.

**A. Interest in the Appeals**

20. The NAS Committee's interest in these Appeals is clear. To summarize, with respect to the Plan and related Confirmation Order being appealed, the NAS Committee successfully negotiated for the creation and funding of the NAS Monitoring Trust, the separate classification of the claims for the NAS Children, the creation of a separate fund to pay those claims, and a relatively simple mechanism for the NAS Children to get paid. Without the involvement of the NAS Committee, the vast majority of NAS Children would not have received a distribution from the Debtors and those that did qualify would have mostly likely received the lowest gross distribution. None of the foregoing occurs if the third-party releases are not approved.

21. Moreover, the NAS Committee is one of the "Supporting Claimants" under the Plan and as a result of the NAS Committee's efforts, over 98% of the holders of NAS Claims voted in favor of the Plan (see Ballot Report[6] at 10), the second highest approval rate of any voting class.

22. Importantly, if the Court were to reverse the Confirmation Order, there is no guarantee that the NAS Children would fare as well under another plan. In fact, NAS Children would likely be prejudiced, as reversing the Confirmation Order would send the Debtors back to incredibly expensive chapter 11 proceedings, with no guaranteed path to emergence, and likely far fewer assets (if any) available for distribution to or for the benefit of NAS Children. Further, those providing services to NAS Children would be deprived of a critical source of funding.

23. Alternatively, if the Court were to affirm the Confirmation Order, including the third-party releases, it would lead to substantial benefits (direct and indirect) for NAS Children under the Plan. The NAS Committee, as a Supporting Claimant of the Plan, has a significant

---

6 *Final Declaration of Christina Pullo of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Fifth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors* [Docket No. 3372; Exhibit A].

Case 7:21-cv-07532-CM Document 154-7 Filed 10/12/21 Page 45 of 879

interest in the affirmation of the Confirmation Order and should be permitted to be an appellee in the Appeals.

**B. Grounds for Intervention**

24. As a Mediation Party and Supporting Claimant of the Plan confirmation proceedings below, the NAS Committee is a party in interest in this matter and has a right to intervene pursuant to Bankruptcy Rule 8013(g). See, e.g., In re Constellation Enterprises LLC, 587 B.R. 275, 285 (D. Del. 2018) ("The Bankruptcy Code also permits a creditor to intervene in a pending appeal.").

25. Moreover, the NAS Committee filed the NAS Reply to UST Plan Objection, voicing its support for the Plan and opposing the objection by the Office of the United States Trustee. LaBarre v. Ulrich, Case No. 2:15-cv-1959-DGC (D. Ariz. Dec. 7, 2015) [Docket No. 8], p. 2 (motion to intervene granted where creditor "participated in the bankruptcy case, made significant concessions to its secured claim in the Plan, obtained benefits from the Plan, and actively opposed [ ] objections to the Plan") (emphasis added).

26. Moreover, section 1109(b) of the Bankruptcy Code provides that "[a] party in interest. . . may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 1109(b). The Second Circuit has held that section 1109(b) of the Bankruptcy Code "confers on a party in interest an unconditional right to intervene in an adversary proceeding [or a contested matter pursuant to rule 9014, which includes confirmation of a Plan] within the meaning of [Fed. R. Civ. P.] 24(a)(1)." Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.), 303 F.3d 161, 166 (2d Cir. 2002). Calder further noted that section 1109(b)'s "phrase 'any issue in a case' plainly grants a right to raise, appear and be heard on any issue regardless of whether it arises in a contested

matter or an adversary proceeding." Id. at 169 (emphasis in original). The NAS Committee therefore has the statutory right to intervene under section 1109(b) of the Bankruptcy Court.

27. Lastly, at the Confirmation Hearing, Judge Drain noted that the NAS Committee was "active in the case and frankly I think if they wanted to, could prevail on a substantial contribution, 503 application." See In re Purdue Pharma, L.P., Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), August 27, 2021 Hr'g. Tr. at 77:14-16. Generally, in bankruptcy, to prevail on a substantial contribution claim, the claimant must show a tangible, clearly demonstrable benefit to the estate and must show that its efforts went beyond self-protection to enhance the administration of the estate. See, e.g., In re Synergy Pharms. Inc., 621 B.R. 588, 609 (Bankr. S.D.N.Y. 2020) ("Inherent in the term 'substantial' is the concept that the benefit received by the estate must be more than an incidental one arising from activities the applicant has pursued in protecting his or her own interests.") (quoting In re Dana Corp., 390 B.R. 100, 108 (Bankr. S.D.N.Y. 2008); In re Bayou Grp., LLC, 431 B.R. 549, 561 (Bankr. S.D.N.Y. 2010) ("[C]ompensation under section 503 is reserved for those rare and extraordinary circumstances when the creditor's involvement truly enhances the administration of the estate."). The Bankruptcy Court's recognition of the NAS Committee's efforts is further grounds for intervention in the Appeals.

28. The NAS Committee's significant involvement in the Bankruptcy Cases, especially with respect to the Plan and Orders at issue, confer legal and financial interests on the NAS Committee that clearly warrant intervention.

**C. Intervention in the Bankruptcy Court was Unnecessary**

29. Third, as noted, the NAS Committee actively participated in the Bankruptcy Cases. The NAS Committee was not required to formally intervene in the Bankruptcy Cases because, among other things, the Bankruptcy Code provides it with an unconditional right to be heard on

any matter in connection with a chapter 11 proceeding. See 11 U.S.C. § 1109(b) ("A party in interest. . . may raise and may appear and be heard on any issue in a case under this chapter").

30. Moreover, participation in the underlying bankruptcy case is generally sufficient to meet this requirement. See, e.g., In re Kinney, No. 3:21-CV-131-TAV-HBG, 2021 WL 2695136, at *1 (E.D. Tenn. May 27, 2021) (granting motion for leave to intervene where party "did not seek to intervene prior to the appeal because…it was an active participant in the bankruptcy process and had no reason to seek intervention before now"); In re Samson Res. Corp., No. 15-11934-BLS, 2018 WL 4658212, at *1 (D. Del. Sept. 27, 2018) (granting motion to intervene where "the [movant] actively participated in litigation of these issues before the Bankruptcy Court"). Thus, while the NAS Committee was not required to intervene in the Bankruptcy Court; it filed numerous pleadings in the Bankruptcy Cases, including the DS Objection and NAS Reply to UST Plan Objection, related to the Plan and Orders.

**D. Intervening at the Current Stage is Proper**

31. This Motion is filed at the current stage because it is within the 30-day time period required under Bankruptcy Rule 8013(g) and the NAS Committee was a party to the proceedings that led to the entry of the Orders.

**E. *Amicus Curiae***

32. Having the NAS Committee participate as *amicus curiae* would not be adequate because it would hinder the NAS Committee's ability to protect the interests of the NAS Children and would curtail the benefits it achieved on behalf of the NAS Children under the Plan. Among other things, Bankruptcy Rule 8017 places extensive limitations on the involvement of *amicus curiae*. For example, an *amicus curiae* is not a party to the appeal itself, and therefore, its standing to appeal any decision rendered by this Court, if necessary, may be questioned.

33. Moreover, the ability of *amicus curiae* to file any substantive motions in an appeal, such as a motion to dismiss, may be limited. As a party in interest under section 1109(b) of the Bankruptcy Code representing parties with a significant economic interest in the outcome of these Appeals, the NAS Committee should be permitted to participate in every aspect of these Appeals, both substantively and procedurally, without any of the limitations that could be imposed on parties who are participating purely as *amicus curiae*.

34. Notwithstanding the foregoing, in the event that the Court does not grant the Motion, the NAS Committee requests permission to participate as an *amicus curiae*.

**CONCLUSION**

35. The NAS Committee respectfully requests that the Court grant the Motion and allow the NAS Committee to intervene and fully participate in the Appeals.

Dated: October 12, 2021

**LEVENFELD PEARLSTEIN, LLC**
*Counsel for Ad Hoc Committee of NAS Children*

By: /s/ Harold D. Israel
Harold D. Israel (*pro hac vice* pending)
2 North LaSalle St., Suite 1300
Chicago, Illinois 60602
Telephone: 312-346-8380
Facsimile: 312-346-8434
hisrael@lplegal.com

**MARTZELL, BICKFORD & CENTOLA**
Scott R. Bickford (*pro hac vice* pending)
338 Lafayette Street
New Orleans, LA 70130
Telephone: 504-581-9065
Facsimile: 504-581-7635
sbickford@mbfirm.com

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I hereby certify that:

1. This document complies with the word limit of Fed. R. Bankr. P. 8013(f)(3)(A) because it contains 4,036 words.

2. This document complies with the typeface requirements of Judge McMahon's *Individual Practices and Procedures* because it has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 12-point font.

Dated: October 12, 2021

By: /s/ Harold D. Israel

**LEVENFELD PEARLSTEIN, LLC**
Harold D. Israel (*pro hac vice* pending)
2 North LaSalle St., Suite 1300
Chicago, Illinois 60602
Telephone: 312-346-8380
Facsimile: 312-346-8434
hisrael@lplegal.com

**CERTIFICATE OF SERVICE**

I hereby certify that on October 12, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of New York by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Harold D. Israel*
*Counsel for the Ad Hoc Committee of NAS Children*

Case 7:21-cv-07532-CM Document 158 Filed 10/15/21 Page 9 of 29

# EXHIBIT A

NAS3426

**TARTER KRINSKY & DROGIN**
*Counsel for Ad Hoc Committee of NAS Children*
1350 Broadway, 11th Floor
New York, NY 10018
Tel: (212) 216-8000
Scott S. Markowitz, Esq.
Rocco A. Cavaliere, Esq.
Michael Z. Brownstein, Esq.
Email: smarkowitz@tarterkrinsky.com
Email: rcavaliere@tarterkrinsky.com
Email: mbrownstein@tarterkrinsky.com

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*, | : | Case No. 19-23649 (RDD) |
| Debtors.[1] | : | (Jointly Administered) |

**DECLARATION OF SCOTT R. BICKFORD, ESQ. IN SUPPORT OF THE AD HOC COMMITTEE OF NAS CHILDREN'S REPLY TO THE UNITED STATES TRUSTEE'S OBJECTION TO THE FEE SETTLEMENTS INCLUDED IN THE SIXTH AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION OF PURDUE PHARMA L.P. AND ITS AFFILIATED DEBTORS**

Under 28 U.S.C. § 1746, I, Scott R. Bickford, declare under the penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717) and SVC Pharma Inc. (4014). The Debtors shall include their affiliates and other entities under their control. The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

1. This declaration ("**Declaration**") is submitted in support of *The Ad Hoc Committee of NAS Children's Reply* (the "**Reply**") *to the United States Trustee's Objection to the Fee Settlements Included in Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and its Affiliated Debtors.*

2. I am an attorney in good standing admitted to practice in the State of Louisiana. I make this Declaration based on my own personal knowledge and belief, and upon documents and information available to me as member of and counsel to the Ad Hoc Committee of NAS Children (the "**NAS Committee**"). Capitalized terms used but not defined herein shall have the meaning given to such term in the Reply or the *Sixth Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors, dated July 14, 2021* [Docket No. 3185], as the case may be.

**A. Background**

3. The three member NAS Committee, and their designees, have been the sole advocate of the interests of NAS Children both individual and in the abatement settlement in the Chapter 11 Cases, and have acted on behalf of the interests of a group of laws firms[2] (the "**NAS Attorney Law Group**") collectively representing the NAS Children. I have been a member of the NAS Committee since its inception

4. The NAS Attorney Group represents approximately 3,500 NAS children and their caregivers who are located throughout the country. Because the majority of these children were

[2] The NAS Attorney Law Group consists of the following firms: Bart Bernard, P.A, Calvin C. Fayard, Jr. APC, Clayborne, Sabo and Wagner, LLP, Cooper Law Firm, LLC, Creadore Law Firm, P.C., Johnson Gray, LLC, Kent Harrison Robbins, P.A., LawCo USA, PLLC., Levenfeld Pearlstein, LLC, Lowe Stein Hoffman Allweiss & Hauver, LLP, Marioneaux & Williams, LLC, Markle DeLaCruz, LLP, Martzell Bickford & Centola, APC, MacFarlane Ferguson & McMullen, P.A., The Law Office of Stephen P. New, Perrin, Landry, deLaunay, Dartez & Ouellet, Piscitelli Law Firm, Porteous Hainkel & Johnson, LLP, Ron Austin & Associates, LLC, Schonekas, Evans, McGoey & McEachin, L.L.C, Sherrard Roe Voigt & Harbison, PLC, Thompson Barney PLLC, and Winch Law Firm, LLC.

born to a mother with an opioid dependence problem, the family situations are not ideal. Approximately half of these clients are in the care and custody of their grandparents or other family members, some have been adopted, and some are with their birth parents.

5. To fully understand the impact of *in uetro* opioid exposure on NAS Children and their caregivers, the NAS Committee spent thousands of hours preparing and conducting interviews of hundreds of caregivers to identify patterns of acute and long-term complications; treatment for opioid withdrawal in infants; and social, educational, and interventional services used by its members' clients to address cognitive delays, developmental issues, and other social needs.

6. The NAS Committee also identified a group of member clients who, energized by its efforts, developed a coalition of stakeholders who met regularly and provided feedback on the needs of its client population. The NAS Committee provided resources to this group, met with them regularly and used their feedback in developing an abatement fund to reach those who are often beyond the reach of governmental entities (the "**NAS Abatement Plan**"). The NAS Abatement Plan was the starting point for what eventually became the NAS Monitoring Trust. One of the revelations of client outreach was the realization that there is no national standard of care or protocol for families, physicians, or educators to follow to make sure that NAS Children are appropriately and timely evaluated for the constellation of delays/disabilities that frequently exist in the NAS population. Absence of a national standard of care is particularly profound as most NAS Children are being raised by their grandparents, long out of the loop of child rearing. Social stigma attachments to the birth mothers and these children also created barriers to reaching out for education and medical services. These two findings, the lack of standards and

the stigma associated with rearing NAS Children, are primary issues the NAS Monitoring Trust intends to address.

7. To ensure that its efforts reached caregivers of children with NAS outside of the NAS Committee's client population, the NAS Committee monitored various online NAS support groups with thousands of caregivers, and collaborated with leaders of those groups to provide educational opportunities to their members about NAS and the ongoing opioid bankruptcy proceedings. The NAS Committee hosted in-person and virtual town-hall meetings with NAS caregivers to learn more about their experience caring for a child with NAS.

8. To better understand the work being done to support families with NAS, the NAS Committee developed working relationships with representatives from a number of non-profit organizations serving children and families impacted by NAS, including the March of Dimes, Child Welfare League of America, National Association for Children of Addiction, SAFE Project, Catholic Committee of Appalachia, Love on Wheels, and Jason's House.

9. The NAS Committee also learned a great deal about the social stigma attached to this population which makes it difficult to identify children with NAS and address their significant needs. In fact, many families avoid testing for cognitive and developmental delays associated with NAS because they do not want their children to be labeled, resulting in missed opportunities for early intervention. This social stigma is one of the problems the NAS Committee hopes the NAS Monitoring Trust will seek to address.

10. The NAS Committee expended significant resources retaining a team of world-class experts with experience in NAS, child development, addiction, pain management, healthcare, and economics. These experts include Dr. Rahul Gupta (Chief Medical Officer of the March of Dimes); Dr. Kanwaljeet S. Anand (Stanford University Professor of Pediatrics

(Pediatric Critical Care) and of Anesthesiology, Perioperative And Pain Medicine); Dr. Charles L. Werntz III (board certified preventive medicine physician); Dr. Vyvyan Howard (fetal pathologist and toxicologist); Elizabeth Davis (life care planner); Dr. Gregory Skipper (addiction psychiatry); Dr. Harvey S. Rosen (economist); Dr. Paul Keckley (healthcare researcher and policy analyst); and Herb Kuhn (President and CEO of the Missouri Hospital Association). All of these individuals assisted in advocating for and developing what ultimately became the NAS Monitoring Trust.

11. Recognizing that there are numerous aspects of injuries arising from *in utero* opioid exposure, two, one acute and one chronic, are particularly prominent. The first and most well-recognized is withdrawal - that the baby while in utero becomes dependent on the opioids and once separated from the placenta no longer receives the opioid exposure. This results in neonates being weaned by continued but diminishing opioid administration. This usually includes extended acute care hospitalization. Common withdrawal symptoms include gastrointestinal issues, nervous system irritability, and temperature instability. In severe cases, NAS newborns may also experience seizures. On average, an NAS newborn spends more days in the hospital and typically in the neonatal intensive care unit ("**NICU**") than a non-NAS newborn. The costs associated with this initial hospitalization are very high. Because there is no recognized standard of care for weaning these children, it is anticipated that the NAS Monitoring Trust will fund grants seeking to develop and fast track a standard of care. It is hoped that his will reduce costs going forward.

12. The second well recognized injury arises from the failure to fully understand that chronic injuries arise from *in utero* opioid exposure due, in part to the effect of opioids on development of bone and organ structures, including the brain. This failure contributes to the

overall incorrect perception that once discharged from the hospital after birth (and weaned from opioids), the baby was otherwise healthy.    Therefore, infants exposed to opiates in the womb have a propensity to suffer long-term consequences, such as developmental delays, speech impairment, vision problems, motor problems, and behavioral or learning problems.  Indeed, it is this constellation of injuries that makes NAS such a tenacious problem for healthcare providers, families, educators, and the like.

13.    While the effects of opioid use in adults is well-known and published, the long-term effects of opioid exposure in the womb is far less studied or understood.  The NAS Committee is convinced that NAS children have not and are not receiving the study and services required to fully understand their injuries.

14.    A reasonable review of this history reveals that the NAS population was late to be identified and late to receive services.  Socialization and learning problems left undiagnosed or treated before these children are of school age is, may be in most cases, far too late.  There is no standard of care for weaning, nor for what interventions these children should be examined for and when.

15.    Other damages to the NAS Children reach far beyond the weeks spent withdrawing from opioids.  Statistically significant numbers of these children are born with latent heart defects, spina bifida, and congenital malformations like cleft palate, club foot, and anklioglossia (tongue-tie), all requiring painful and expensive surgeries.

16.    One of the NAS Committee's important achievements in the mediation process was to educate and convince the other participants that these non-acute injuries were indeed related to the in utero exposure and that standards of care needed to be developed to identify them early on.

**B. The MDL**

17. To bring the plight of the NAS Children to the nation's attention and to seek recovery for such children notwithstanding the efforts to delegitimize such claims, legal representatives for the NAS Committee and their associates are responsible for filing multiple complaints in multiple states on behalf of NAS Children against certain of the Debtors and other manufacturers and suppliers seeking relief for NAS Children in the form of abatement and medical surveillance, including an Ohio Class and a California Class which was converted to a national class, for: (1) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* and/or state law equivalents; (2) nuisance; (3) negligence; (4) civil conspiracy; and (5) violations of state consumer protection statutes.

C. **Discovery**

18. There unfortunately has been a dearth of discovery regarding what the pharmaceutical industry knew about prenatal opioid exposure and when and how they acquired that knowledge. Further it is not evident how that information once obtained was communicated to front line medical doctors including obstetricians, gynecologists and pediatricians. In connection with the Discovery Pleadings, for the last sixteen months, the NAS Committee has engaged in discovery (both written and depositions) with Purdue, including appearing at court hearings and attending almost a dozen "meet and confers" with the various parties in the case, including the Debtors, the Sackler family, and representatives of the so-called IACs, focusing on "Scientific Information." To date, the NAS Committee has employed highly sophisticated and expensive data search tools and techniques to competently navigate the more than 2.5 terabytes of data it has received from Debtors and producing parties, like Sackler Sides 'A' and 'B' and Mundipharma.

19. Specifically, it has reviewed:

a. dozens of pre-clinical and clinical animal research studies;

b. various studies regarding good laboratory practices ("**GLP**") and non-GLP (including the terms and conditions governing agreements with third-party testing); as well as underlying governing practices and protocols concerning conduct of studies and ownership of studies and maintenance and control of research data

c. the actual underlying lab reports containing the entries made by lab assistants;

d. draft and final versions of new drug applications, investigatory new drug applications, and abbreviated new drug applications, relating to synthetic opioids like oxycodone and hydromorphone;

e. numerous periodic safety update reports;

f. communications with regulators, both domestic and foreign, regarding labeling language;

g. data preceding 2000 (and Y2K document retention/management protocols), and post-2000, concerning Debtors' internal records concerning drug research and studies conducted in-house, outside laboratories; and related persons, like the Mundipharma universe of businesses;

h. and cataloged data (obtained from tens of millions of pages), and created a timeline of internal entries concerning observations, cautionary language and the like, relating to fetal exposure to opioids; and

i. and tracked the evolution of the entries in terms of usage of 'proscription' language as well as 'qualified' language.

20. Currently, the NAS Committee is performing a comparative analysis of the 'internal' messaging (e.g., information maintained in the company core data sheets) versus the 'external' messaging (e.g., information disseminated in physician labeling and patient medication guide).

21. The information collected and examined by the NAS Committee has provided a greater understanding of NAS which the NAS Committee believes will help guide the NAS Monitoring Trust in making its grants and has to the public at large as many of the documents

will be included in the document repository contemplated under the Plan, which will undoubtedly help persons engaged in research and development of abatement programs and for enhancing general awareness of risks, and consequences, of in utero exposure to opioids.

D. **Purdue Mediation**

22. In its role as a Mediation Party, the NAS Committee and its advisors spent hundreds, if not thousands, of hours preparing for and attending numerous mediation sessions. The NAS Committee's participation was twofold – seeking funding for the NAS Abatement Plan to assist those who are often beyond the reach of governmental entities and to negotiate compensation for the NAS personal injury victims (the "**NAS PI Plan**").

23. The NAS Committee's initial focus was to educate the Mediators (as defined in the Order Appointing Mediators) and the Mediation Parties about NAS and injuries caused by in utero opioid exposure and the need for the NAS Abatement Plan. The NAS Committee, with the assistance of its experts:

a. Prepared videos and other presentation materials;

b. Developed an extensive library of medical and scientific research, government legislation, policies, and programs pertaining to NAS;

c. Reviewed a substantial number of scientific journal articles on the topics of NAS, treatment of NAS, and maternal substance abuse during pregnancy and at the time of childbirth;

d. Researched genetic predispositions to addiction in addition to the long-term effects of opioid use, including changes in behavior and neural function as well as mitochondrial abnormalities;

e. Scoured the scientific literature for information pertaining to specific opioid medications and their effects on human health and bodily function; and

f. Researched scientific literature analyzing the treatment of opioid addiction and NAS. This research was not limited to contemporary scientific literature; rather, literature available at the time pharmaceutical companies began distributing opioid medications was also reviewed.

24. The NAS Committee negotiated a groundbreaking agreement to create an abatement fund in "Phase 1" of the mediation, along with a process to distribute such funds. To achieve this result took thousands of hours of attorney and expert time. The NAS Monitoring TDP was heavily negotiated by the various Mediation Parties and no party has objected to such TDP since it was filed.

25. The NAS Committee participated in countless mediation sessions and until May, 2021 was unable to achieve any meaningful progress. The NAS Committee proposed numerous proposals (including TDPs) to the mediators and the PI Ad Hoc. The vast majority of NAS Children would not have received a distribution under the complex scoring grid described in the disclosure statement accompanying each of the first three versions of the plan and any NAS Children that did qualify would have mostly likely received the lowest gross distribution, $3,500.

Respectfully submitted this 5th day of August, 2021:

/s/ Scott R. Bickford

Scott R. Bickford, Esq.

**MARTZELL, BICKFORD & CENTOLA**
Scott R. Bickford (LA 1165)
Spencer R. Doody (LA 27795)
338 Lafayette Street
New Orleans, LA 70130
Telephone: 504-581-9065
Facsimile: 504-581-7635
sbickford@mbfirm.com
srd@mbfirm.com
usdcndoh@mbfirm.com

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/14/2021

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---x

In re: PURDUE PHARMA BANKRUPTCY APPEALS

21 cv 7532 (CM) [Master Case]

---x

[rel: 21 cv 7585 (CM)
21 cv 7961 (CM)
21 cv 7962 (CM)
21 cv 7966 (CM)
21 cv 7969 (CM)
21 cv 8034 (CM)
21 cv 8042 (CM)
21 cv 8049 (CM)
21 cv 8055 (CM)
21 cv 8139 (CM)
21 cv 8258 (CM)
21 cv 8271 (CM)]

This Filing Relates to

---x

ALL MATTERS

---x

**ORDER ON THE PENDING MOTIONS TO INTERVENE BY THE AD HOC COMMITTEE OF NAS CHILDREN, THE MULTI-STATE GOVERNMENT ENTITIES GROUP, AND THE AD HOC GROUP OF INDIVIDUAL VICTIMS OF PURDUE PHARMA L.P., ET AL**

McMahon, J.:

As anticipated following Tuesday's scheduling conference, the court has received three Motions for leave to Intervene as Appellees Pursuant to Rule 8013(g) of the Federal Rules of Bankruptcy Procedure. The motions were filed by the Ad Hoc Committee of NAS Children, the Multi-State Governmental Entities Group, and the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al. (Dkt. Nos. 44, 46, 48). All three movants were present, either in person or by telephone, at Tuesday's conference.

After reviewing the motions and the accompanying submissions, it seems clear that both the Multi-State Governmental Entities Group and the Ad Hoc Group of Individual Victims of Purdue Pharma L.P., et al. argued the issues that are being contested on appeal before the Bankruptcy Court. Their intervention motions are, therefore, granted, as I said they would be at the conference, and they shall henceforth be deemed Appellees in all the pending appeals.

The Ad Hoc Committee of NAS Children admits that it did not argue the contested issues below, so its motion for leave to intervene as appellee is denied. However, as I said at Tuesday's conference, there are a number of entities that, while not technically eligible for appellee status,

have participated actively in the proceedings in the Bankruptcy Court, and their voices should be heard on this appeal. The Ad Hoc Committee of NAS Children is perhaps foremost among those persons and entities. I am, therefore, granting the Ad Hoc Committee permission to file a brief amicus curiae. It is not necessary for the Committee to make a second, formal motion for amicus status with an attached brief; the Committee should simply file its amicus brief on the same date that appellees' brief is due.

Even as we add parties to this appeal (whatever we call them), the limited number of issues that need to be decided remains the same. While many parties are interested in the outcome, the arguments the court must consider do not need to be restated and restated and restated for me to get the point. I am also conscious of the fact that the Estate is being taxed with the cost of participation by multiple parties, and while this is but a drop in a very big bucket, I would like to minimize that burden. Given our tight time constraints, I don't expect that there will be a lot of time for consultation between Debtors and the appellees and amici before their briefs are filed; but to the extent that they can coordinate – perhaps in advance of receiving Appellants' briefs -- so that I don't have to read the same argument over and over again, I would be grateful. It strikes me that the Non-Debtor Appellees and amici who favor confirmation of the Plan have something unique to say about the court's evaluation of the so-called *Metromedia* factors, so it might behoove them to emphasize that aspect of the case in their briefs.

The Clerk is directed to close the motions at Dockets 44, 46 and 48 in the Master Case at 21-cv-7532.

Dated: October 14, 2021

U.S.D.J.

BY ECF TO ALL PARTIES

Nos. 21-cv-7532 (Lead); 21-cv-7585; 21-cv-7961; 21-cv-7962; 21-cv-7966; 21-cv-7969; 21-cv-8034; 21-cv-8042; 21-cv-8049; 21-cv-8055; 21-cv-8139; 21-cv-8258; 21-cv-8271; 21-cv-8538; 21-cv-8557; 21-cv-8566 (Consolidated)

---

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

In re PURDUE PHARMA L.P., *et al.*, Debtors.

---

WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE, *et al*., Appellants,

v.

PURDUE PHARMA L.P., *et al.*, Appellees.

---

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

**BRIEF OF APPELLANT, WILLIAM K. HARRINGTON, UNITED STATES TRUSTEE**

---

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
WENDY COX
BETH A. LEVENE
MELANIE D. HENDRY
SUMI K. SAKATA
Trial Attorneys

Department of Justice
Executive Office for
United States Trustees
441 G Street, NW, Suite 6150
Washington, DC 20530
Tel: (202) 307-1399

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
PAUL K. SCHWARTZBERG
BENJAMIN J. HIGGINS
BRIAN MASUMOTO
ANDREW VELEZ-RIVERA
Trial Attorneys

Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
Tel: (212) 510-0500

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

PRELIMINARY STATEMENT ........ 1

STATEMENT OF APPELLATE JURISDICTION ........ 3

STATEMENT OF THE ISSUES ........ 4

STANDARD OF REVIEW ........ 5

STATEMENT OF THE CASE ........ 5

I. Statutory and legal framework ........ 5

A. Bankruptcy relief under chapter 11 is limited by the Bankruptcy Code. ........ 5

B. The bankruptcy discharge in non-asbestos chapter 11 cases does not extend to non-debtors. ........ 7

C. The role of the United States Trustee ........ 8

II. Statement of the Facts ........ 8

A. Purdue—but not the Sackler Family—files for chapter 11 bankruptcy relief to resolve their respective liabilities relating to the opioid epidemic. ........ 8

B. The confirmation proceedings. ........ 10

1. The bankruptcy court sets a deadline for Purdue's creditors to file claims against Purdue—but not the Sackler Family or other non-debtors. ........ 10

2. Purdue's disclosure statement provides insufficient information about the Non-Debtor releases. ........ 10

3. Publication notice of the confirmation hearing also provides insufficient information about the termination of non-debtors' rights against the Sackler Family and other non-debtors. ........ 11

4. Purdue's proposed plan would release hundreds of non-debtor parties under its settlement with the Sackler Family allowing payment over nine to ten years and requiring a new claims process for victims to get paid. ........ 11

5. The United States Trustee objects to the proposed plan on constitutional and statutory grounds; others also object; 2,683 victims who filed opioid-related personal injury claims against Purdue vote to reject the plan; and over 70,000 (51%) victims do not vote. ........ 14

6. Purdue repeatedly amends its proposed plan but keeps the Non-Debtor releases to which the United States Trustee maintains his constitutional and statutory objections. ........ 15

7. The bankruptcy court provisionally confirms Purdue's plan. ........ 15

C. The bankruptcy court enters the Confirmation Order and a modified bench ruling... 21

D. The bankruptcy court issues the Advance Order prior to the Confirmation Order. ... 22

E. The United States Trustee appeals and seeks a stay, as do others. ........ 23

SUMMARY OF THE ARGUMENT .......... 23

ARGUMENT .......... 25

I. The Plan's extinguishment of non-debtors' claims against other non-debtors is unconstitutional. .......... 25

A. The Plan's extinguishment of non-debtors' direct claims against other non-debtors violates the Due Process Clause. .......... 25

1. Litigation rights are property rights within the Due Process Clause. .......... 25

2. The Plan deprives opioid victims of their claims without their consent. .......... 26

3. The Plan deprives opioid victims of their claims without adequate notice. .......... 28

4. The Plan deprives opioid victims of their claims without compensation. .......... 30

B. The Bankruptcy Clause does not authorize taking opioid victims' independent non-bankruptcy claims against the Sackler Family and other non-debtors. .......... 31

C. The bankruptcy court lacked constitutional authority to extinguish the non-debtors' claims against the Sackler Family and other non-debtors. .......... 33

II. The bankruptcy relief bestowed upon the Sackler Family and other non-debtors violates the Bankruptcy Code. .......... 38

A. The Bankruptcy Code does not authorize extinguishing non-debtors' claims against non-debtors in non-asbestos cases. .......... 38

B. The Plan grants the Sackler Family and other non-debtors greater relief than they could lawfully obtain if they became debtors and obtained a bankruptcy discharge. 41

C. Second Circuit precedent does not authorize the extinguishment of these claims. .... 42

1. Direct vs. derivative claims .......... 42

2. The Plan terminates non-debtors' direct claims against the Sackler Family and other non-debtors. .......... 45

3. *Metromedia* does not authorize the release of liabilities of the Sackler Family and other non-debtors. .......... 50

4. *Quigley* does not authorize the Non-Debtor releases. .......... 53

5. No other binding Second Circuit opinion authorizes the Non-Debtor releases. .......... 56

III. Because the Non-Debtor releases are improper, the bankruptcy court abused its discretion in issuing the related orders. .......... 57

CONCLUSION .......... 58

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Zarnel (In re Zarnel)*,
619 F.3d 156 (2d Cir. 2010)....................8

*In re Aegean Marine Petroleum Network Inc.*,
599 B.R. 717 (Bankr. S.D.N.Y. 2019)....................38, 51

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)....................27, 28

*Ass'n v. Gibbons*,
455 U.S. 457 (1982)....................31

*Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
526 U.S. 434 (1999) (Stevens, J., dissenting)....................6

*Barrett v. United States*,
689 F.2d 324 (2d Cir. 1982)....................25

*In re Bellingham Ins. Agency, Inc.*,
702 F.3d 553 (9th Cir. 2012), *aff'd, Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014)....................37

*In re Bernard L. Madoff Inv. Secs. LLC*,
740 F.3d 81 (2d Cir. 2014)....................42, 43, 44, 56, 57

*Blixseth v. Credit Suisse*,
961 F.3d 1074 (9th Cir. 2020)....................39

*Bullard v. Blue Hills Bank*,
575 U.S. 496 (2015)....................3

*Cedric Kushner Promotions, Ltd. v. King*,
533 U.S. 158 (2001)....................48

*Cent. Va. Cmty. Coll. v. Katz*,
546 U.S. 356 (2006)....................32

*In re Charter Commc'ns*,
419 B.R. 221 (Bankr. S.D.N.Y. 2009)....................6

*Chartschlaa v. Nationwide Mut. Ins. Co.*,
538 F.3d 116 (2d Cir. 2008)....................41

*Commonwealth v. Purdue Pharma, L.P.*,
No. 1884CV01808, 2019 WL 5617817 (Mass. Super. Oct. 8, 2019)....................................46

*Commonwealth v. Purdue Pharma, L.P.*,
No. 1884CV01808, 2019 WL 6497887 (Mass. Super. Nov. 6, 2019)..............................45, 46

*In re Cont'l Airlines*,
203 F.3d 203 (3d Cir. 2000)....................................................................................40

*Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi. R.I. & P. Ry. Co.*,
294 U.S. 648 (1935)................................................................................................31

*Corbett v. Manson*,
903 A.2d 69 (Pa. Cmwlth. 2006) ......................................................................45, 47

*Czyzewski v. Jevic Holdings Corp.*,
137 S. Ct. 973 (2017)........................................................................39, 50, 51

*Duke Power Co. v. Carolina Env't Study Grp., Inc.*,
438 U.S. 59 (1978) (Stewart, J., concurring) .......................................................25, 28

*Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm.)*,
619 B.R. 38 (S.D.N.Y. 2020).....................................................................................9

*Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*,
829 F.3d 135 (2d Cir. 2016)...............................................................25, 26, 30

*Exec. Benefits Ins. Agency v. Arkison*,
573 U.S. 25 (2014).....................................................................................................5

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017).........................................................................................5

*Feld v. Zale Corp. (In re Zale Corp.)*,
62 F.3d 746 (5th Cir. 1995) ...............................................................................39, 54

*In re Fisher Island Invs., Inc.*,
778 F.3d 1172 (11th Cir. 2015) .................................................................................37

*Galas v. Lending Co.*,
No. 12-01265, 2013 WL 308745 (D. Ariz. Jan. 25, 2013) ............................................45

*In re Glo-Tex Intern.*,
No. 07-06449, 2010 WL 4916574 (Bankr. D.S.C. Nov. 30, 2010) ..................................45, 48

*In re Glob. Technovations Inc.*,
694 F.3d 705 (6th Cir. 2012) .....................................................................................37

*Granfinanciera, S.A. v. Nordberg*,
392 U.S. 33 (1989)....................................................................................................35

*Hartman v. Sackler*,
Case No. 21-02001, Dkt. 1 (E.D. Pa. filed Apr. 30, 2021) ..............................................47, 48

*Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*,
994 F.2d 1160 (5th Cir. 1993) ...........................................................................................7

*Hebb v. Greens Worldwide, Inc.*,
No. 06-4368, 2007 WL 2935811 (Mass. Super. Sept. 17, 2007)...........................................46

*Heden v. Johnson & Johnson*,
No. 19-00586 (D.R.I. filed Nov. 12, 2019)..........................................................................47

*Hickey v. Purdue Pharma*, *et al.*,
Case No. 19-11806 (D. Mass. filed Aug. 22, 2019) ............................................................47

*Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*,
522 F.3d 575 (5th Cir. 2008) ..............................................................................................44

*Huebner v. Midland Credit Mgmt., Inc.*,
897 F.3d 42 (2d Cir. 2018).....................................................................................................5

*Jama v. Immigr. & Customs Enf't*,
543 U.S. 335 (2005)..............................................................................................................50

*In re Johns-Manville Corp.*,
517 F.3d 52 (2d Cir. 2008), *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009)....................................32, 33, 43, 55, 56

*Joseph Gen. Contracting, Inc. v. Couto*,
119 A.3d 570 (Conn. 2015) ..................................................................................................45

*In re Kirwan Offs. S.a.r.l.*,
592 B.R. 489 (S.D.N.Y. 2018), *aff'd on other grounds sub nom. In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019)................................................37, 38

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
511 U.S. 375 (1994)..............................................................................................................50

*Kothe v. Smith*,
771 F.2d 667 (2d Cir. 1985)..................................................................................................27

*Law v. Siegel*,
571 U.S. 415 (2014).........................................................................................................39, 40

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014)....................50

*Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of Cleveland*,
478 U.S. 501 (1986)....................26

*Loveridge v. Hall (In re Renewable Energy Dev. Corp.)*,
792 F.3d 1274 (10th Cir. 2015), *as amended on denial of reh'g* (July 28, 2015) (Gorsuch, J.) ....................37

*In re Lowenschuss*,
67 F.3d 1394 (9th Cir. 1995) ....................39

*Luckett v. Bure*,
290 F.3d 493 (2d Cir. 2002)....................33

*MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*,
837 F.2d 89 (2d Cir. 1988)....................43, 56

*Madeira v. Affordable Hous. Found., Inc.*,
469 F.3d 219 (2d Cir. 2006)....................38

*Map to Health v. AmerisourceBergen Drug Corp.*,
No. 21-45093 (N.D. Ohio filed July 15, 2021)....................48

*Martin v. Wilks*,
490 U.S. 755 (1989)....................26

*Mercy House Teen Challenge v. AmerisourceBergen Drug Corp.*,
No. 18-46070, Dkt. 27 (N.D. Ohio filed Mar. 15, 2019)....................48

*In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*,
725 F.3d 65 (2d Cir. 2013)....................38

*In re Metromedia Fiber Network, Inc.*,
416 F.3d 136 (2d Cir. 2005)....................40, 50, 51, 52, 53

*In re Millennium Lab Holdings II, LLC.*,
945 F.3d 126 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020)....................36

*Mullane v. Cent. Hanover Bank & Tr. Co.*,
339 U.S. 306 (1950)....................28

*N. Pipeline Const. Co. v. Marathon Pipe Line Co.*,
458 U.S. 50 (1982) (Rehnquist, J., concurring)....................33

*N.Y. State Nat'l Org. for Women v. Pataki*,
261 F.3d 156 (2d Cir. 2001)....................................................25

*In re Opioid Litig.*,
Index No. 400000/2017, 2019 N.Y. Misc. LEXIS 3324 (N.Y. Sup. Ct. June 21, 2019)....................................................46

*Ortiz v. Fibreboard Corp.*,
527 U.S. 815 (1999)....................................................26, 27, 28, 56

*In re Ortiz*,
665 F.3d 906 (7th Cir. 2011)....................................................37

*Perez v. Everett (In re Perez)*,
30 F.3d 1209 (9th Cir. 1994)....................................................3, 57

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985)....................................................27

*Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*,
721 F.3d 54 (2d Cir. 2013)....................................................44

*Purdue*,
Adv. No. 19-08289....................................................47, 48, 49

*In re Quigley Co.*,
676 F.3d 45 (2d Cir. 2012)....................................................22, 36, 53, 54, 55, 56

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
566 U.S. 639 (2012)....................................................40

*Rhodes v. Rhodes Techs., Inc.*,
No. 19-cv-00885 (M.D. Tenn. filed Oct. 5, 2019)....................................................47

*Richards v. Jefferson Cty., Ala.*,
517 U.S. 793 (1996)....................................................26

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*,
960 F.2d 285 (2d Cir. 1992)....................................................56

*St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*,
884 F.2d 688 (2d Cir. 1989)....................................................42

*State v. Purdue Pharma L.P.*,
No. PC-2018-4555, 2019 R.I. Super. LEXIS 95 (Super. Ct. Aug. 16, 2019)....................................................46

*Stern v. Marshall*,
564 U.S. 462 (2011).............................................................4, 5, 21, 24, 33, 34, 35, 36

*Matter of Tex. Extrusion Corp.*,
844 F.2d 1142 (5th Cir. 1988) .................................................................................4

*Matter of Tex. Extrusion Corp.*,
844 F.2d at 115 ..........................................................................................................57

*Tilley v. Purdue Pharma L.P.*,
No. 19-00566 (S.D. W. Va. filed Aug. 2, 2019).......................................................47

*Travelers Indem. Co. v. Bailey*,
557 U.S. 137 (2009) .......................................................................34, 39, 43, 44

*In re Tronox Inc.*,
855 F.3d 84 (2d Cir. 2017)...............................................................42, 43, 44, 57

*Trulis v. Barton*,
107 F.3d 685 (9th Cir. 1995) ..................................................................................34

*U.S. Aid Funds, Inc. v. Espinosa*,
559 U.S. 260 (2010)...................................................................................................7

*United States v. Ward Baking Co*.,
376 U.S. 327 (1964)..................................................................................................27

*Usery v. Turner Elkhorn Mining Co.*,
428 U.S. 1 (1976)......................................................................................................28

*In re VeroBlue Farms USA, Inc*.,
6 F.4th 880 (8th Cir. 2021) .......................................................................................50

*In re W.R. Grace Co.*,
13 F.4th 279 (3d Cir.2021) .......................................................................................53

*In re We. Real Estate Fund Inc*.,
922 F.2d 592 (10th Cir. 1990) ..................................................................................39

*In re Wellness Int'l Network, Ltd. v. Sharif*,
575 U.S. 665 (2015)...................................................................................................33

*Yukos Cap. S.A.R.L. v. Feldman*,
977 F.3d 216 (2d Cir. 2020).........................................................................................5

**Statutes**

11 U.S.C. § 101(5) ............................................................................................16, 17

11 U.S.C. § 105(a) ....................22, 40

11 U.S.C. § 109 ....................7

11 U.S.C. § 307 ....................8

11 U.S.C. § 341 ....................7

11 U.S.C. § 363 ....................30

11 U.S.C. §§ 501-503 ....................33, 34

11 U.S.C. § 521 ....................7

11 U.S.C. § 521(a) ....................41

11 U.S.C. § 523 ....................40

11 U.S.C. §§ 523(a)(2), (4), (6) ....................7, 17, 42

11 U.S.C. § 524 ....................40, 41

11 U.S.C. § 524(a) ....................7, 38, 40

11 U.S.C. § 524(e) ....................7, 21, 38, 40

11 U.S.C. § 524(g) ....................4, 7, 38, 39, 40, 53, 54, 55

11 U.S.C. § 524(g)(2)(B)(i) ....................39

11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb) ....................55

11 U.S.C. § 524(g)(4)(A)(ii) ....................39, 53, 54, 55

11 U.S.C. § 524(g)(4)(B)(i) ....................55

11 U.S.C. § 541(a) ....................41

11 U.S.C. § 542 ....................41

11 U.S.C. § 727 ....................7

11 U.S.C. § 1101(2) ....................22

11 U.S.C. §§ 1101 *et seq* ....................5

11 U.S.C. § 1104 ....................7

11 U.S.C. § 1108 ....................7

11 U.S.C. § 1109 .......... 7

11 U.S.C. § 1112 .......... 7

11 U.S.C. § 1122 .......... 6

11 U.S.C. § 1123(a)(5) .......... 22

11 U.S.C. § 1123(b)(6) .......... 22, 40, 41

11 U.S.C. § 1125(a) .......... 6, 10

11 U.S.C. § 1125(b) .......... 6, 10, 57

11 U.S.C. § 1126 .......... 26

11 U.S.C. § 1126(a) .......... 6

11 U.S.C. § 1126(c) .......... 6

11 U.S.C. § 1126(d) .......... 6

11 U.S.C. § 1126(f) .......... 11

11 U.S.C. § 1126(g) .......... 11

11 U.S.C. § 1128(b) .......... 6

11 U.S.C. § 1129 .......... 3, 6, 7

11 U.S.C. § 1129(a) .......... 6

11 U.S.C. § 1129(a)(1) .......... 41

11 U.S.C. § 1129(a)(7) .......... 6, 41

11 U.S.C. § 1129(a)(8)(A) .......... 6

11 U.S.C. § 1141(d) .......... 7, 41

11 U.S.C. § 1141(d)(1)(A) .......... 7, 38

18 U.S.C. § 1961, *et seq* .......... 48

28 U.S.C. §§ 157(a) and (b), and 1334(a) .......... 3

28 U.S.C. § 157(b) .......... 21, 35

28 U.S.C. § 157(b)(2) .......... 5

28 U.S.C. § 158(a)(1) ..... 3

28 U.S.C. § 158(c) ..... 5

28 U.S.C. § 158(c)(2) ..... 4

28 U.S.C. §§ 581-589 ..... 8

28 U.S.C. § 586(a)(3)(B) ..... 8

Bankruptcy Reform Act of 1994 § 111(b), 108 Stat. 4117 (1994) ..... 39

Mass. Gen. Laws ch. 93A ..... 46

N.Y. Gen. Bus. Law § 349(h) ..... 46

Pennsylvania Unfair Trade Practices Act ..... 47

**Other Authorities**

7 Collier on Bankruptcy (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) ..... 5, 41

Asbestos Injury Compensation, GAO Report No. 11-819 ..... 39, 55

Fed. R. Bankr. P. 8002(a)(3) ..... 4

Fed. R. Bankr. P. 3003(c)(3) ..... 10

Fed. R. Bankr. P. 8018.1 ..... 5

Fed. R. Civ. P. 23 ..... 56

H.R. Rep. No. 595, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.C.C.A.N. 5963 (1978) ..... 8

Restatement (Second) of Torts ..... 47

U.S. Const. amend. V ..... 25, 26

U.S. Const. amend. VII ..... 35

U.S. Const. art. I ..... 24, 34

U.S. Const. art. I, § 8, cl. 4 ..... 2, 4, 24, 31, 32

U.S. Const. art. III ..... 33, 34, 35, 36

NAS3450

## PRELIMINARY STATEMENT

This appeal arises from one of the largest mass tort and public health crises in history. The United States Trustee filed this appeal and objected to the Plan because its non-consensual third-party releases violate the Constitution and are not authorized under the Bankruptcy Code. Like other bankruptcy plans, the Plan creates a comprehensive framework for resolving and paying claims asserted by Purdue's creditors against Purdue. But the Plan goes far beyond reordering the rights of Purdue and its creditors by also shielding a broad swath of hundreds, if not thousands, of Sackler Family members and other non-debtors, including those still unborn, from all civil opioid-related suits—including those for, among other things, fraud and other liabilities excepted from discharge in an individual's bankruptcy case—over strenuous objections by victims, states, and other creditors.

Purdue's Plan strips opioid victims of their direct claims against the Sackler Family and other non-debtors for their own misconduct, in violation of the victims' constitutional rights and the Bankruptcy Code. This blanket civil immunity protects the Sackler Family and related parties from all direct liability to their victims if the victim also happens to hold a claim against Purdue, whether filed or not. Claims that have been brought against individual Sackler Family members and other non-debtor defendants alleging direct liability based on their own conduct include, but are not limited to, product liability, wrongful death, negligence, negligent misrepresentation, fraud, fraudulent concealment, deceit and other willful misconduct, unjust enrichment, public nuisance, and claims under state consumer protection and controlled substances laws. Because of the bankruptcy court's nationwide preliminary injunction, no party was allowed to file any new litigation against the Sackler Family or related non-debtors since October 11, 2019. Thus, the full universe of the direct claims against the Sackler Family remains unknown and uncounted.

The Plan violates the victims' constitutional due process rights in several ways. First, it extinguishes their direct claims against the Sackler Family without their consent. Second, it

extinguishes victims' direct claims against the Sackler Family despite the absence of constitutionally adequate notice. Third, the Plan prohibits them from being compensated on the extinguished claims against the Sackler Family and other non-debtors; they only receive any compensation on account of their claims against Purdue.

The Plan also transgresses constitutional limits on what bankruptcy courts may do. Because it terminated direct non-bankruptcy claims held by non-debtor victims against other non-debtors, it falls outside the powers conferred by the Bankruptcy Clause. The bankruptcy court also lacked constitutional authority to extinguish state law claims between private parties that arise independently of Purdue's bankruptcy filing and are not resolved by a ruling on the victims' claims against Purdue.

These harms were inflicted through a non-consensual non-debtor or "third-party" release not sanctioned by statute and expressly prohibited by no fewer than three circuit courts of appeal. The Bankruptcy Code does not authorize extinguishing non-debtors' claims against non-debtors in non-asbestos cases. Nor has the Second Circuit ever authorized third-parties releases of this scope.

Under the Plan, the victims' loss is the Sackler Family's gain. It gives the Sackler Family benefits available only to bankruptcy debtors without requiring them to satisfy the obligations the Bankruptcy Code imposes in return. First, the Plan allows the Sackler Family to ignore the Code's financial disclosure requirements. Second, it allows them to devote far less of their assets than debtors must. Third, it releases them from fraud and willful and malicious injury claims, which debtors have no right or ability to discharge under the Bankruptcy Code.

These releases do real harm. The victims are prohibited from commencing or pursuing lawsuits to collect anything from the Sackler Family for their wrongdoing. Hundreds of lawsuits were brought against the Sackler Family and other non-debtors before Purdue filed its bankruptcy case and the bankruptcy court enjoined those and new lawsuits, which injunction became permanent under the Plan. And while the victims may also have other opioid claims against Purdue that are being paid under the Plan from the proceeds of Purdue's settlement with

the Sackler Family, victims are prohibited from any recovery under the Plan on their direct claims against the Sackler Family that they have brought, or could bring, and are being forced to relinquish.

The orders extinguishing those rights violated both the Constitution and the Bankruptcy Code. The Debtors, as plan proponents, bore the burden of proving the Plan was constitutionally sound and in accordance with the law. They did not meet that burden. The orders on appeal merit reversal.

**STATEMENT OF APPELLATE JURISDICTION**

This Court has jurisdiction to hear this appeal under 28 U.S.C. § 158(a)(1), which grants district courts jurisdiction to hear appeals from final judgments, orders, and decrees of bankruptcy judges.

The bankruptcy court had jurisdiction over the chapter 11 bankruptcy cases of debtors Purdue Pharma L.P. and its related entities (collectively, "Purdue" or "Debtors") under 28 U.S.C. §§ 157(a) and (b), and 1334(a). The bankruptcy court's final order confirming the Debtors' Twelfth Amended Joint Plan of Reorganization ("Plan") under 11 U.S.C. § 1129 was entered on September 17, 2021 ("Confirmation Order"). App.1-487.[1] *See Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015) (holding that plan confirmation "alters the status quo and fixes the rights and obligations of the parties" for purposes of finality analysis).

The bankruptcy court's order approving the Debtors' disclosure statement for the Plan that was eventually confirmed (seven iterations later) was entered on June 3, 2021; that interlocutory order merged into the final confirmation order for purposes of appeal ("Disclosure Order"). App.647-945. *See Perez v. Everett (In re Perez)*, 30 F.3d 1209, 1217 (9th Cir. 1994) ("[T]he confirmation order—not the disclosure order—triggers the deadline for notices of appeal

[1] "App.___" refers to the United States Trustee's Appendix submitted with this brief. Unless otherwise indicated, "Dkt." refers to the docket numbers in bankruptcy court, Case No. 19-23649. Where applicable, cited page numbers are to the ECF pagination at the top of the referenced document.

on [disclosure statement issues].”); *Matter of Tex. Extrusion Corp.*, 844 F.2d 1142, 115 (5th Cir. 1988) (holding “approval of a disclosure statement is only one step in the process” of plan confirmation). And the bankruptcy court’s order approving the Debtors’ motion for advance funding of various entities in anticipation of, and prior to, consummation of the Plan was entered on September 15, 2021 (“Advance Order”). App.1228-1233.

The government timely filed notices of appeal of the bankruptcy court’s orders under 28 U.S.C. § 158(c)(2) and Fed. R. Bankr. P. 8002(a)(3) on September 15, 2021. Dkt. 3776, 3777. The government timely filed an amended notice of appeal of the Confirmation Order, after it was entered on the docket, on September 21, 2021. Dkt. 3799.

**STATEMENT OF THE ISSUES**

1. Did the bankruptcy court err by entering an order confirming the Plan and approving the releases of the Sackler Family and other non-debtors from claims belonging to opioid victims, states, and the other releasing parties (“Non-Debtor releases”)?

2. Does the bankruptcy court have legal authority or inherent equitable power to impose Non-Debtor releases other than those that meet all of the requirements of section 524(g) under the Bankruptcy Code?

3. Did the bankruptcy court’s order violate the victims’ and the other releasing parties’ constitutional rights by extinguishing their claims without their consent and without compensation or by failing to provide adequate notice and hearing?

4. Did the bankruptcy court exceed its constitutional authority under *Stern v. Marshall*, 564 U.S. 462 (2011), by extinguishing the victims’, the states’ and the other releasing parties’ claims against other non-debtors?

5. Did the bankruptcy court exceed its power under the Bankruptcy Clause of the Constitution or its jurisdiction by imposing the Non-Debtor releases?

6. Did the bankruptcy court err by approving the Debtors’ disclosure statement and plan solicitation materials?

7. Did the bankruptcy court err by authorizing the Debtors to advance funds to establish the creditor trusts and other entities required to implement the debtors' plan and take other related actions, prior to consummation of the plan?

## STANDARD OF REVIEW

This Court reviews "findings of fact for clear error and conclusions of law *de novo*." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 138 n.54 (2d Cir. 2017).

The Second Circuit has held that "'[a]n abuse of discretion occurs when a [trial] court bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions.'" *Yukos Cap. S.A.R.L. v. Feldman*, 977 F.3d 216, 234 (2d Cir. 2020) (quoting *Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 53 (2d Cir. 2018)).

Where, under the reasoning of *Stern v. Marshall*, 564 U.S. 462 (2011), the Constitution does not permit a bankruptcy court to enter final judgment on a bankruptcy-related claim that is a "core proceeding" under 28 U.S.C. § 157(b)(2), then that claim must be treated as "non-core" and the bankruptcy court's related findings of fact and conclusions of law should be reviewed as "proposed findings and conclusions" subject to *de novo* review by the district court under 28 U.S.C. § 158(c). *See Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 36 (2014); *see also* Fed. R. Bankr. P. 8018.1.

## STATEMENT OF THE CASE

### I. Statutory and legal framework

#### A. Bankruptcy relief under chapter 11 is limited by the Bankruptcy Code.

Chapter 11 of the Bankruptcy Code allows "a debtor to reorganize its business or financial affairs or to engage in an orderly liquidation of its property either as a going concern or otherwise." 7 Collier on Bankruptcy ¶ 1100.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); 11 U.S.C. §§ 1101 *et seq*. The "statutory goal of every chapter 11 case" is the confirmation

of a plan of reorganization, *see Bank of Am. Nat. Tr. & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 465 n.4 (1999) (Stevens, J., dissenting), which occurs when a proposed plan has been ratified by creditors and approved by the court. 11 U.S.C. § 1129.

Holders of claims against or interests in the debtor that are affected by the plan may vote to accept or reject a proposed plan. *See* 11 U.S.C. § 1126(a). A plan will typically divide those holders of claims or interests into different voting classes based on the nature of the claim or interest, *see* 11 U.S.C. § 1122, and each class will separately vote to accept or reject the plan. *See* 11 U.S.C. § 1126(c), (d). In determining whether a class has accepted a plan, the Code looks only to the percentage of votes that were cast to accept or reject the plan. 11 U.S.C. § 1126(c).

Although the acceptance or rejection of the plan by the classes will determine whether the plan has met certain of the statutory requirements for confirmation, *see* 11 U.S.C. § 1129(a)(8)(A), a vote in favor of the plan by the class is not dispositive of the rights of individual class members for other purposes. In particular, the fact that a creditor's class has voted in favor of the plan does not prevent that creditor from objecting to the plan generally, *see* 11 U.S.C. § 1128(b), or from asserting certain other individual creditor rights protected by the Bankruptcy Code. *See*, *e.g.*, 11 U.S.C. § 1129(a)(7)(A) (providing that plan that fails to satisfy statutory "liquidation test" as to a dissenting creditor may not be approved, regardless of whether plan was approved by creditor's class).

For a debtor to solicit acceptances of a proposed plan, it must provide a disclosure statement, along with a copy or summary of the proposed plan. 11 U.S.C. § 1125(b). The disclosure statement must be approved by the court "as containing adequate information" to "enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an informed judgment about the plan." 11 U.S.C. § 1125(a).

"The court shall confirm a plan only if it complies with all" of the requirements of section 1129(a), which include that "[t]he Plan complies with the applicable provisions of [the Bankruptcy Code]." 11 U.S.C. § 1129(a). The plan proponent bears the burden to prove that it met the requirements for confirmation by a preponderance of the evidence. *In re Charter*

*Commc'ns*, 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (citing *Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters. (In re Briscoe Enters.)*, 994 F.2d 1160, 1165 (5th Cir. 1993)).

Bankruptcy judges have an independent duty to inspect and disapprove improper plans. *See U.S. Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 277 (2010).

**B. The bankruptcy discharge in non-asbestos chapter 11 cases does not extend to non-debtors.**

In general, confirmation of a reorganization plan discharges a chapter 11 debtor from liability for most debts that arose before confirmation of the debtor's plan. 11 U.S.C. § 1141(d). The relief provided by a bankruptcy discharge is broad, but it is neither unlimited nor unconditional. Foremost, to receive the discharge, a person must file for bankruptcy. Those who do must subject themselves to the supervision of the bankruptcy court, provide public disclosure of their finances, and comply with numerous other statutory duties as conditions for receiving bankruptcy relief. *See* 11 U.S.C. § 521. Failing to comply with these duties can lead to dismissal, conversion to a liquidation proceeding under chapter 7, or appointment of a private trustee who assumes management of the estate. *See* 11 U.S.C. §§ 1104, 1108, 1112.

Not everyone is eligible for bankruptcy relief, *see* 11 U.S.C. §§ 109, 727, 1141(d), and not all debts are dischargeable, *see, e.g.*, 11 U.S.C. § 523(a)(2), (4), (6). A chapter 11 discharge may be granted only after the debtor complies with a detailed set of statutory procedures and requirements, *see* 11 U.S.C. §§ 1129, 1141, and only as part of a public judicial process in which all creditors can participate. *See* 11 U.S.C. §§ 341, 1109.

With one exception, the Bankruptcy Code discharges only the debtor's liabilities upon plan confirmation. 11 U.S.C. §§ 524(a), 1141(d)(1)(A). The Bankruptcy Code specifies that "[a] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The one exception applies exclusively to asbestos-related cases in which the bankruptcy court is authorized to enjoin certain types of claims against a specified set of non-debtors, and only after the court finds an extensive series of statutory requirements are met. 11 U.S.C. § 524(g).

### C. The role of the United States Trustee

The United States Trustee is a Department of Justice official appointed by the Attorney General to supervise the administration of bankruptcy cases. 28 U.S.C. §§ 581-589. United States trustees "serve as bankruptcy watch-dogs to prevent fraud, dishonesty, and overreaching in the bankruptcy arena." H.R. Rep. No. 595, 95th Cong., 2d Sess., at § 329, *reprinted in* 1978 U.S.C.C.A.N. 5963, 6049 (1978). United States Trustees have standing under 11 U.S.C. § 307 to appear and be heard on any issue in any bankruptcy case, despite the lack of pecuniary interest in the outcome. *Adams v. Zarnel (In re Zarnel)*, 619 F.3d 156, 161 (2d Cir. 2010). He is specifically authorized to comment on proposed disclosure statements and chapter 11 plans. 28 U.S.C. § 586(a)(3)(B).

## II. Statement of the Facts

### A. Purdue—but not the Sackler Family—files for chapter 11 bankruptcy relief to resolve their respective liabilities relating to the opioid epidemic.

Purdue Pharma L.P. and its related entities are pharmaceutical companies that manufacture, sell, or distribute, among other products, extended-release, long-acting opioid pain medications. App.1237. Purdue commenced a voluntary case under chapter 11 of the Bankruptcy Code on September 15, 2019. Dkt. 1. Purdue is wholly owned by a non-debtor, Pharmaceutical Research Associates LP ("PRA"). App.1252. PRA is owned by two entities, each of which is ultimately owned by various trusts for the benefit of members of the Raymond Sackler family and Mortimer Sackler family (collectively, the "Sackler Family"). *Id*. No member of the Sackler Family is a debtor in these cases.

From January 1, 2008, through September 30, 2019, Purdue made $10.347 billion in total net cash distributions to or for the benefit of the Sackler Family and related entities. App.1544. During that same time, Purdue may have transferred significant value in non-cash assets to the Sackler Family and related entities. App.1546. Purdue has confirmed that the Sackler Family's estimated current net worth is approximately $11 billion. App.1563.

When Purdue filed for bankruptcy relief, its most prominent pain medication, OxyContin, was the target of over 2,600 civil actions pending in various state and federal courts and other fora across the country. App.1237. Those lawsuits generally allege that Purdue falsely and deceptively marketed OxyContin and opioid pain medications and is liable for the national opioid crisis. *Id*. Most, but not all, plaintiffs in those actions are governmental entities, including the attorneys general of 49 states, territories, and the District of Columbia, as well as thousands of county and municipal governments. App.1274.

By the time Purdue filed for bankruptcy relief, various Sackler Family members and related entities were also defendants in approximately 400 civil actions nationwide. App.1562. Purdue and the Sackler Family determined that Purdue—but not the members of the Sackler Family—would file for bankruptcy relief to resolve their respective opioid liabilities. App.2028-2029.

Early in the case, the bankruptcy court enjoined both thousands of lawsuits against Purdue and hundreds of lawsuits against the Sackler Family. App.576, n.5; App.1562. The bankruptcy court acknowledged that absent this injunction "presumably most of the other actions would be amended to add Sackler Family members as defendants, and other third parties also would attempt to pursue such claims, as well." App.576, n.5. This Court affirmed the bankruptcy court's injunction order. *See Dunaway v. Purdue Pharm. L.P. (In re Purdue Pharm.)*, 619 B.R. 38, 42 (S.D.N.Y. 2020).[2]

During Purdue's bankruptcy case, the Sackler Family entered into a settlement agreement with the United States resolving certain civil claims against individual Sackler Family members for misconduct related to OxyContin. App.1321-1325. Although the Sackler Family denied all allegations of wrongdoing, the settlement agreement included a set of factual allegations by the federal government that detailed the personal misconduct of certain individual family members. App.1343-1373. Separately, Purdue entered into a criminal plea agreement and civil settlement

[2] The United States Trustee was not a party to that appeal.

agreement with the United States to resolve its criminal and civil liability to the federal government. Dkt. 1828.

**B. The confirmation proceedings.**

**1. The bankruptcy court sets a deadline for Purdue's creditors to file claims against Purdue—but not the Sackler Family or other non-debtors.**

The bankruptcy court set a July 30, 2020, deadline for everyone holding a pre-petition claim against Purdue to file proofs of claim against Purdue. App.1298-1301. Neither that order nor any subsequent order set a deadline or procedure for anyone to file proofs of claim based upon claims held against the Sackler Family or other parties that had not filed for bankruptcy relief. App.2163-2164. *See* Fed. R. Bankr. P. 3003(c)(3).

**2. Purdue's disclosure statement provides insufficient information about the Non-Debtor releases.**

In March 2021, Purdue filed a proposed disclosure statement for its proposed chapter 11 plan of reorganization. Dkt. 2488. A disclosure statement should provide sufficient information to permit a reasonable investor or creditor to reach an informed decision about whether to vote in favor of the proposed plan. 11 U.S.C. §§ 1125(a) & (b). The United States Trustee objected to the disclosure statement, arguing that the bankruptcy court should not approve it because, among other things, it did not contain adequate information regarding the releases and injunctions contemplated for the Sackler Family and other non-debtors, and questioned the court's authority and jurisdiction to issue the releases. Dkt. 2686.

Purdue later amended its disclosure statement but did not rectify the problems identified by the United States Trustee. App.1392-1890. On June 3, 2021, the bankruptcy court entered the Disclosure Order approving Purdue's disclosure statement and solicitation materials. App.647-945. Purdue sent the disclosure statement and proposed fifth amended plan directly to those who requested to receive service in the case and those entitled to vote on the plan. App.667.

Purdue also sent notice of the confirmation hearing and a notice of non-voting status to those who filed proofs of claim but were not entitled to vote because they were statutorily deemed to have accepted or rejected the fifth amended plan. App.652; App.656-657; *see* 11 U.S.C. § 1126(f) & (g). That notice attached an exhibit with the language of the proposed plan's provision to release "Shareholder Released Parties," but did not include a list of all the parties who would be released. App.656; App.762-866.

**3. Publication notice of the confirmation hearing also provides insufficient information about the termination of non-debtors' rights against the Sackler Family and other non-debtors.**

Purdue also provided publication notice of the confirmation hearing by a variety of means. App.654. The publication notices generally provided information about the confirmation hearing and the deadlines for Purdue's creditors to vote on and object to the Plan and they stated that the Plan includes releases of "Shareholder Released Parties," including "members of the Sackler families and certain other individuals and related entities." App.893; App.935; App.943.

The notices Purdue published did not explain that "certain other[s]" included within the releases meant hundreds of individuals and entities. Nor did they state that the Plan would pay nothing for the claims that creditors of Purdue held against the Sackler Family and the multitude of other non-debtors that would be immunized from civil liability in future opioid-related litigation. App.892-915; App.935-945.

The bankruptcy court did not approve publication notice of Purdue's confirmation hearing until June 3, 2021—ten months after the July 30, 2020, deadline to file a claim against Purdue had passed and 41 days after the deadline set by Purdue to file a claim for personal injury. App.654; App.1298-1301; App.334, n.6; App.393, n.5.

**4. Purdue's proposed plan would release hundreds of non-debtor parties under its settlement with the Sackler Family allowing payment over nine to ten years and requiring a new claims process for victims to get paid.**

Under Purdue's proposed chapter 11 plan,[3] its business would be transferred to a newly created company (NewCo) that will be indirectly owned by certain trusts. App.1402. Purdue's existing shareholders (who are ultimately owned or controlled by Sackler Family members) would pay in the aggregate $4.275 billion to various trusts to be established under the Plan. App.1402; App.1404-1405. The payments from the Sackler Family would be made over no fewer than nine or ten years under the auspices of an agreement settling claims between them. App.953; App.980.

While the Plan documents provide some information as to a division of responsibility between the different sides of the Sackler Family, it is not fully clear which members of the Sackler Family will be making which payments or from what sources. App.3236; App.3244. And some of those listed as "Shareholder Released Parties" under the Plan will make no financial contribution. App.3227; App.3235.

A portion of the contributions would be distributed through one trust (the "PI Trust") to two separate groups of personal injury claimants for their claims against Purdue (but not for their causes of action against the Sackler Family): (1) those with claims arising from exposure to opioids in utero ("NAS PI"), and (2) those with claims arising from their own opioid use or from the death of someone who had used opioids ("non-NAS PI"). App.1405. Of the approximately $5 billion committed to fund the various trusts under the proposed plan, no more than $700 to $750 million would be directed to the PI Trust, and even that will be diminished by deductions and holdbacks as directed under the Plan. App.1402-1403.

Qualified claimants in the first group would be entitled to gross awards of approximately $7,000 before deductions and holdbacks, which may be paid out in installments. App.1406. Qualified claimants in the second group would be entitled to awards between $3,500 and $48,000 before deductions and holdbacks; any award greater than $3,500 may be paid in

[3] As discussed in the following section, Purdue filed numerous amendments to its proposed plans, all of which contained the Non-Debtor release in some form, and none of which resolved the United States Trustee's statutory and constitutional concerns.

installments. App.1406. The proposed plan also directs only $5 million to a separate trust (the "PI Futures Trust") for those with opioid-related causes of action arising post-petition. App.1406. The Debtors did not seek appointment of a future claimants representative for such claims.

Both the PI Trust and PI Futures Trust would be governed by their own separate trust distribution procedures. The PI Trust would require a separate claim process on top of the bankruptcy case's claim process. App.1407-1408; App.1410; *see also* Dkt. 3404 (objecting to plan confirmation because the additional trust claim process "will emotionally, physically, psychological[ly] burden each individual Creditor by incurring, yet again, excessive time, energy and expense completing and submitting additional claim forms and evidence previous submitted."). And to seek a distribution from the PI Futures Trust, a claimant—thus far unrepresented by a future claimants representative—would have to file a formal lawsuit against it in this Court. App.433.

Section 10.7(b) of the proposed plan included the Non-Debtor releases, a broad release of causes of action against all "Shareholder Released Parties," including the "Sackler Family Members"—which was defined to include Raymond and Mortimer Sackler, any of their descendants, any current and former spouses, and any of their estates—as well as six other broad categories that encompass potentially thousands of individuals and entities. Dkt. 2982 at 40, 41-42, 132-34; App.1110-1112; App. 1201-1202. Under its terms, it is impossible to identify all those being released, but they include Sackler Family members still unborn.

In various declarations, David Sackler and certain representatives of trusts for the benefit of the Mortimer Sackler side of the family represented that they would not contribute any assets to Purdue's plan absent the Non-Debtor releases. App.2011-2012; App.2043-2086; App.2087-2094. At least one declarant threatened that, if any exception to the release were made for any objector to the Plan, the Sackler Family would instead "mount a vigorous legal defense," using the assets in these trusts so as to ensure that their Sackler Family beneficiaries would not be subject to "statutory or common law claims relating to Purdue." App.2044.

     **5. The United States Trustee objects to the proposed plan on constitutional and statutory grounds; others also object; 2,683 victims who filed opioid-related personal injury claims against Purdue vote to reject the plan; and over 70,000 (51%) victims do not vote.**

The United States Trustee advanced various arguments in his objection to the effective discharge of the non-debtors' opioid-liability, including that (1) it was not permitted by the Bankruptcy Code, (2) if approved, it would violate the non-debtor releasing parties' constitutional rights, (3) the bankruptcy court lacked constitutional authority to approve it, and (4) it was impermissible under Second Circuit precedent. Dkt. 3256 at 16-19, 21-26, 29.

The United States Attorney for the Southern District of New York filed a Statement echoing the due process and other concerns expressed by the United States Trustee. Dkt. 3268. Victims, including those who lost loved ones to opioid addiction, similarly objected to the proposed extinguishment of their claims. *See*, *e.g.*, App.2095-2098; App. 2099-2100; App.2101-2107; App.2108-2109; App.2110-2115; App.2116-2121; App.2122-2123; App.2124-2127; App.2128-2132; App.2374; *see also* App.2133-2161. And other parties such as state and local governments, insurers, and industry participants, also objected, some of whom expressed similar concerns. Dkt. 3264, 3270, 3272, 3274, 3275, 3276, 3278, 3279, 3280, 3292, and 3306. Victims also objected to the Plan because they felt that the Plan did not adequately compensate their personal injury claims. *See, e.g.,* Dkt. Nos. 2966, 3125, 3028 3404, 3575.

Overall, of the 618,194 claims filed in Purdue's case that were entitled to vote, only 120,301 creditors (or less than 20%) voted to accept or reject the Plan, with the remainder not voting at all. App.1895; App.1900. And looking specifically at the collective 137,041 creditors who filed opioid-related personal injury claims, 62,433 claimants voted to accept the Plan, 2,683 claimants affirmatively voted to reject the Plan, and over 70,000 (51% of the personal injury claimants) did not vote at all. App.1895; App.1900.

**6. Purdue repeatedly amends its proposed plan but keeps the Non-Debtor releases to which the United States Trustee maintains his constitutional and statutory objections.**

Between the morning that the confirmation hearing began and the day after the bankruptcy court rendered its oral ruling stating it would confirm the plan—a span of 21 days—the Debtors amended their proposed plan six times. *See* Dkt. 3545, 3632, 3652, 3682, 3706, 3726. Each amendment altered the release language in small ways, but continued to release an unknown, and unidentifiable, number of non-debtors from liability without the informed consent of the releasing parties. *See*, *e.g.*, Dkt. 3682 at 43 (definition of "Shareholder Released Parties"); *id*. at 132-33 (Plan § 10.7(b)).

The United States Trustee filed supplemental objections to the amended plans reasserting his prior statutory and constitutional objections, and further objecting to amendments filed after the close of evidence. Dkt. 3636, 3710.

**7. The bankruptcy court provisionally confirms Purdue's plan.**

The bankruptcy court held a confirmation hearing that culminated in a September 1, 2021, oral ruling provisionally approving Purdue's then-eleventh amended plan subject to modifications of two provisions. App.2328-2329; App.2348-2349. The first modification required that the text of the Non-Debtor releases be changed to reflect that they would terminate claims against the Shareholder Released Parties where Purdue's conduct was a "legal cause or legally relevant factor" to the cause of action. App.2328-2329. The second modification required a change in the language to the Plan provision regarding the future gate-keeping role of the bankruptcy court to determine whether a future claim brought by a plaintiff was terminated by the Non-Debtor releases or may proceed in a different court. App.2348-2349.

The following day, Purdue filed the Plan, which incorporated the bankruptcy court's requested edits. App.1070-1227.

          **a. The Plan extinguishes a vast array of non-debtors' claims against the Sackler Family and other non-debtors, including claims that could not be discharged by an individual filing for bankruptcy.**

Section 10.7(b) of the Plan, which is over a page long and cross references several other definitions, contains the release that extinguishes non-debtors' claims against the Sackler Family and related entities. App.1100; App.1201-1202. It provides, in relevant part, that "the Shareholder Released Parties . . . shall be conclusively, absolutely, unconditionally, irrevocably, fully, finally, forever and permanently released . . . by the Releasing Parties from any and all Causes of Action" that are "based on or relating to, or in any manner arising from, in whole or in part, . . . the Debtors" and "as to which any conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor." App.1201.

The Plan does not define what it means for a debtor's conduct, omission, or liability to be an "otherwise legally relevant factor" to a "Cause of Action" when such conduct, omission, or liability is not the "legal cause" of the "Cause of Action."

The Plan includes an expansive, 24-line long definition of "Cause of Action" as not only "any Claim"—separately defined as having "the meaning set forth in section 101(5) of the Bankruptcy Code," App.1079—but also any

> action, class action, claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, dispute, demand, right, Lien, indemnity, contribution, rights of subrogation, reimbursement, guaranty, suit, obligation, liability, debt, damage, judgment, loss, cost, attorneys' fees and expenses, account, defense, remedy, offset, power, privilege, license or franchise, in each case, of any kind, character or nature whatsoever . . . whether arising before, on or after the Petition Date

under any theory of law, including "fraud," "negligence," "gross negligence," "recklessness," "public or private nuisance," "breach of fiduciary duty," and "willful misconduct." App.1079. The definition expressly includes any "Cause of Action" held by those "not yet born." *Id.*

Thus, the Plan releases far more than bankruptcy "Claims," which the Bankruptcy Code defines as a "right to payment" or equitable remedies "for breach of performance if such breach

gives rise to a right to payment." 11 U.S.C. § 101(5). The released "Causes of Action," by contrast, extend to claims "of any kind, character or nature whatsoever." App.1079. Notably, the Non-Debtor releases include claims that individual debtors could not have discharged in bankruptcy, such as for fraud, breach of fiduciary duty, and willful and malicious injury. *See* 11 U.S.C. §§ 523(a)(2), (4), (6).

**b. The Plan shields the Sackler Family and hundreds of others, named and unnamed, from opioid claims held by everyone with (1) a pre-petition claim against Purdue or (2) a post-petition opioid "Cause of Action" "related to" Purdue.**

The Plan's definition of "Releasing Parties"—those non-debtors stripped of their causes of action against the Sackler Family and other non-debtors—is also opaque. Like section 10.7(b), it, too, cross-references several other definitions, which in turn cross reference more definitions. App.1109 (definition of "Releasing Parties," which includes the defined terms "Holders," "Interests," "Debtors," "Future PI Channeled Claims," and others).

The Plan defines the "Releasing Parties" as including, among others, both (1) "all Holders of Claims . . . against" Purdue, even if the Claims are not "treated under" the Plan, and (2) "all Holders of Future PI Channeled Claims." *Id.*

The first of these groups includes anyone who holds a pre-petition bankruptcy claim against Purdue, whether or not related to opioids. App.1079 (definition of "Claim").

The second group includes anyone with an opioid-related claim *relating to* Purdue if that claim arose after it filed for bankruptcy and relates to a NewCo opioid product. The Plan defines a "Future PI Channeled Claim" to include "any alleged opioid-related personal injury or similar opioid-related Cause of Action against any Released Party or Shareholder Released Party," "based on or *relating to*, or in any manner arising from, in whole or in part, the Debtors," other than certain claims that arose before Purdue filed for bankruptcy, "in each case, that arises from or relates to the use of an opioid that is manufactured by or placed in the stream of commerce by NewCo or any successor owner of NewCo's opioid business." App.1086-1087 (emphasis

added); *see also* App.1096 (definition of "NAS PI Channeled Claim,"); App.1100 (definition of "Non-NAS PI Channeled Claim"); App.1102 (definition of "PI Channeled Claim"). An extinguished "Future PI Channeled Claim" thus includes post-petition opioid-related "Causes of Action" "relating to" Purdue, whether or not the "Holder" of the cause of action also had a claim against Purdue.

Thus, regardless of whether they actually filed a claim against Purdue, or even knew that they had one, the Plan strips everyone who has either (1) a bankruptcy claim of any sort against Purdue that arose before it filed for bankruptcy, or (2) an opioid-related claim relating to Purdue that arose after it filed for bankruptcy and that relates to an opioid manufactured by or placed in the stream of commerce by NewCo, of their separate opioid-related claims against the Sackler Family and hundreds of other non-debtors. The releases thus extend even to someone *with no claim against Purdue* but who has a Purdue-*related* opioid claim against the Sackler Family that arose after bankruptcy.

**c. The Plan shields the Sackler Family and hundreds of others, named and unnamed, from opioid-related claims against them.**

The Plan's definition of the "Shareholder Released Parties" is similarly inscrutable.

The Plan lists seven categories of releasees, releasing potentially thousands of individuals, entities, and assets. App.1112. As with section 10.7(b) and the definition of "Releasing Parties," the definition of "Shareholder Released Parties" cross-references other definitions. *Id*. Among these are the "Sackler Family Members," *id*., defined to include Raymond and Mortimer Sackler, any of their descendants (including those as-yet unborn), any current and former spouses, and any of their estates, App.1110.

But looking at the Plan alone is not enough to determine who is included in the definition of the "Shareholder Released Parties" because it also includes "the Persons identified on Exhibit X" to the Shareholder Settlement Agreement approved with the Plan. App.1112; App.1041-1069. Exhibit X has over a thousand line-entries, some of which list categories without names

such as certain persons' "spouses, children and grandchildren" and such vague terms as "assets, businesses and entities." App.1042; App.1045; App.1046; App. 1050.

The Non-Debtor releases even release "property possessed or owned at any time" by the non-debtors immunized by the Plan. App.1112.

**d. The Plan pays nothing to opioid victims in return for extinguishing their claims against the Sackler Family and hundreds of other non-debtors.**

The Plan provides compensation for opioid-related personal injuries only to creditors of Purdue who timely filed proofs of claim against Purdue and who then file an additional claim against the personal injury trusts within a certain period or, for future claimants, who then file suit in federal court. App.1126-1127; App.1157; App.332; App.334; App.391; App.393; App.432. The compensation provided, even to those with catastrophic injuries, is as little as $3,500, and no more than $48,000 paid in installments for as many as ten years. *See* App.1406; App360. But the actual compensation will be less because of deductions related to, among other things, fees and expenses as directed under the Plan. *See* App.1406; App.1103 (definition of "PI Trust Deductions and Holdbacks").

Purdue's Plan denies the victims of the opioid crisis any compensation for their separate direct claims against the Sackler Family (and hundreds of other non-debtors). The Plan documents expressly prohibit any value being paid based on pre-petition causes of action against the Sackler Family or other non-debtors for opioid-related personal injury claims. App.333 ("Distributions hereunder are determined only with consideration to a Non-NAS PI Claim held against the Debtors, *and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added); App.392 ("Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, *and not to any associated NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added).

The same is true for every opioid-related cause of action arising post-petition. App.433 ("A Future PI Claimant *may not pursue* litigation against the PI Futures Trust for any Future PI

Channeled Claim *formerly held or that would have been held against a non-Debtor party*.") (emphasis added).

The trust documents for the PI Trust allow only those who filed proofs of claim against Purdue prior to April 23, 2021, to proceed against the trust. App.334 n.6; App. 393, n.5. But, as noted in section B.3 *supra*, notice of the Plan and its extinguishment of creditors' claims against the non-debtor Sackler Family and others came after June 3, 2021—over a month after the April 23 deadline. App.654; App.892-915; App.933-945. The trust documents provide only two exceptions to the April 23 deadline, if the trust's claims administrator determines that "good cause exists to treat the late-filed [claim] as if it were timely filed," or by order of the bankruptcy court. App.334, n.6; App.393, n.5. Neither the Plan nor the trust documents provide a standard by which the bankruptcy court may so order.[4]

Similarly, the trust documents for the PI Futures Trust generally require those with an opioid-related cause of action arising post-petition to have filed a proof of claim by the July 2020 bar date—long before the notice of the Plan was issued—or to file a motion for a late claim prior to the date of confirmation. App.432; App.1298-1301. The trust documents would permit a future claimant who did not meet these deadlines to proceed against the PI Futures Trust only if the bankruptcy court in its discretion determined the claim qualified under the Plan and granted leave for the claimant to assert his or her claim. *Id*.

Thus, under the procedures established for either the pre- or post-petition personal injury trusts, late-filing claimants who wanted to file a claim against one of the trusts after receiving notice of the Plan would have to proceed through multiple stages before determining whether they can even begin the process of proceeding against the trusts.

[4] *See*, *e.g.*, Dkt. 3957 (order denying motion for leave to file proof of claim after bar date for failure to show sufficient cause).

**C. The bankruptcy court enters the Confirmation Order and a modified bench ruling.**

On September 17, 2021, the bankruptcy court entered its Confirmation Order, App.1-487, and modified its September 1, 2021 bench ruling to "make it clearer, add information that [the court] inadvertently omitted, and . . . correct typographical errors in the transcript [of the bench ruling]." App.488, n.1.

The court held that "bankruptcy subject matter jurisdiction to impose a third-party claims release and injunction under the plan exists" where a release directly affects the res of the Debtors' estates, including where there are "insurance rights, the shareholder released parties' rights to indemnification and contribution, and the Debtors' ability to pursue the estates' own closely related, indeed fundamentally overlapping, claims." App.598.

The court overruled due process objections to the extinguishment of the non-debtors' claims against the Sackler Family and the other non-debtors on the ground that a third-party release is not "an adjudication of the claim . . . [but] part of the settlement of the claim that channels the settlement funds to the estate." App.600. As to notice, the court also ruled that "only holders of claims against the Debtors are being deemed to grant the shareholder release, and it is equally clear that holders of such claims received due process notice of the plan's intention to provide a broad release of third-party claims against the shareholders and their related entities related to the Debtors." App.600.

The court also held that a "proceeding to determine whether a Chapter 11 plan that contains such a release should be confirmed not only is a core proceeding under 28 U.S.C. § 157(b), but also is a fundamentally central aspect of a Chapter 11 case's adjustment of the debtor/creditor relationship and, therefore, 'constitutionally core' under *Stern v. Marshall*, 564 U.S. 462 (2011), and its progeny." App.603 (citations omitted).

As to the statutory objections, the court held that "[i]t appears clear, therefore, under well-reasoned caselaw as well as the Code itself that section 524(e) is not a statutory impediment to the issuance or enforcement of a third-party claim release under a plan in appropriate

circumstances." App.611. As to the authority supporting such releases, the court held that "there is a sufficient source of power in the Bankruptcy Code itself, in sections 105(a) and 1123(a)(5) and (b)(6), as well as in the Court's inherent equitable power." App.618.

Finally, the court held that the Non-Debtor releases satisfied Second Circuit precedent. App.612-619. The Court cited *In re Quigley Co*., 676 F.3d 45 (2d Cir. 2012), and held that "[t]o properly be subject to a third-party claims release under a plan, therefore, the third-party claim should be premised as a legal matter on a meaningful overlap with the debtor's conduct." App.617.

**D. The bankruptcy court issues the Advance Order prior to the Confirmation Order.**

Four days before the bankruptcy court entered its Confirmation Order, the bankruptcy court held a hearing on Purdue's motion seeking approval of the advance funding of various trusts before the effective date of the plan ("Advance Motion").[5] App.2361; App.1956-2010. Two days later, the court granted the Advance Motion and issued the Advance Order, App.1228-1233, over objections of the United States Trustee and four of the non-consenting states, Dkt. Nos. 3493; 3555.

The Advance Order authorized Purdue to begin implementing the Plan before its effective date and before confirmation, including by advancing millions of dollars to eight trusts. App.1228-1233. Purdue represented that the funds would be spent to retain professionals, build relevant technology, provide accounting and legal services, and compensate the managers and the trustees of the various Plan trusts. App.1956-2010.

[5] The Plan set forth various conditions precedent before its effective date could take place. App.1084; App.1192-1193. But it provides that on that effective date, the "Plan shall be deemed substantially consummated . . . consistent with the definition of 'substantial consummation' in section 1101(2) of the Bankruptcy Code." App.99.

E. The United States Trustee appeals and seeks a stay, as do others.

The same day that the bankruptcy court issued the Advance Order, and two days before the bankruptcy court entered its final order confirming the Plan, the United States Trustee appealed the bankruptcy court's oral ruling confirming the Plan and the Advance Order. App.3197-3215. The United States Trustee filed an amended notice of appeal after the bankruptcy court entered the Confirmation Order. App.3216-3220.

Others also filed notices of appeal, including eight states, the District of Columbia, certain Canadian municipalities and First Nation groups, and several individuals. Dkt. 3724 (amended by Dkt. 3812), 3725, 3774, 3775, 3780 (amended by Dkt. 3839), 3784 (amended by Dkt. 3818), 3810, 3813, 3832, 3849, 3851, 3853, 3877 & 3878.

The United States Trustee also sought a stay before the bankruptcy court. Dkt. 3778 (amended by Dkt. 3801). The states of Washington, Connecticut, and Maryland, among others, also sought a stay of the Confirmation Order pending their appeals, Dkt. 3789 & 3845.

## SUMMARY OF THE ARGUMENT

As grounds for its decision to confirm the Plan resolving and paying claims asserted by Purdue's creditors against Purdue and also immunizing the Sackler Family and hundreds of other non-debtors from opioid-related suits, the bankruptcy court cited the massive public health crisis posed by the opioid epidemic and the efforts of various parties to negotiate a global solution. App.488; App.450. The government questions neither the urgency of the opioid crisis nor the parties' motives to find a solution. But the bankruptcy court's decision must nevertheless be reversed.

On several independent and alternative grounds, the Plan is unconstitutional. It violates the due process rights of victims by foisting on them a "settlement" that terminated their litigation rights against non-debtors without their consent. It did so notwithstanding the thousands who voted against the Plan and the tens of thousands who did not vote at all. It did so without reasonable notice to thousands of victims that their claims against hundreds of as-yet-

unspecified non-debtors would receive no compensation unless they filed claims against the Purdue estate by a deadline that arose before Purdue filed its disclosure statement publicly disclosing that these claims against third parties would be extinguished. And it did so without providing any compensation in exchange for the terminated claims.

Additionally, the Bankruptcy Clause solely authorized Congress to issue laws on the subject of bankruptcies. Adjustment of obligations between non-debtors, for the purpose of achieving ends unrelated to the debtor's relationship with its creditors, falls far outside the scope of the Bankruptcy Clause.

And, in finally terminating state law claims that it had no constitutional authority to adjudicate under *Stern*, the court acted outside its authority as an Article I court. This constitutional error is compounded in establishing the bankruptcy court as a permanent gatekeeper to future lawsuits which, again, it lacks authority to adjudicate.

The Plan also violated the Bankruptcy Code. There is no statutory authority to extinguish the direct claims against the Sackler Family and related non-debtors. Only one provision allows a limited release of non-debtor claims against other non-debtors and only in asbestos-related cases under specific conditions that are not satisfied here. It is not satisfied because this is not an asbestos-related case and, even if it were, the protections required by the statute would not be satisfied.

Further, the Plan granted the individual non-debtors greater relief than they could receive if they had filed for bankruptcy themselves and did so without the concomitant obligations imposed on debtors. They neither provided the financial disclosures, nor devoted all of their assets to the estate as would have been required in their own bankruptcies. And certain of their liabilities—such as for fraud, breach of fiduciary duty, and willful and malicious injury—were extinguished that could not have been discharged under the Bankruptcy Code.

Second Circuit precedent does not authorize this perversion of the bankruptcy laws. The Plan dramatically oversteps the bounds of the Bankruptcy Code by terminating non-debtors' claims against the Sackler Family and other non-debtors for their independent misconduct,

separate and apart from the misconduct of Purdue. At no point has the Second Circuit held that a bankruptcy court could, against a constitutional challenge, permanently extinguish non-debtors' direct causes of action against other non-debtors, in the absence of express statutory authority and without compensation, adequate notice, or consent. The Confirmation Order and related orders must be reversed.

**ARGUMENT**

**I. The Plan's extinguishment of non-debtors' claims against other non-debtors is unconstitutional.**

**A. The Plan's extinguishment of non-debtors' direct claims against other non-debtors violates the Due Process Clause.**

The Due Process Clause provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. It was violated here because the Plan extinguished non-debtors' litigation rights against other non-debtors without consent, adequate notice, or compensation.

**1. Litigation rights are property rights within the Due Process Clause.**

"[L]egal claims are sufficient to constitute property such that a deprivation would trigger due process scrutiny." *Elliott v. Gen. Motors LLC (In re Motors Liquidation Co.)*, 829 F.3d 135, 158 (2d Cir. 2016) (citing *N.Y. State Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 169–70 (2d Cir. 2001)). "Statutory or common law entitlement to be fully compensated through a lawsuit for one's injuries should be considered a species of property" protected by the Due Process Clause. *Barrett v. United States*, 689 F.2d 324, 332 (2d Cir. 1982). *See also Duke Power Co. v. Carolina Env't Study Grp., Inc.*, 438 U.S. 59, 94 (1978) (recognizing the deprivation of a "state-created right to recover full compensation for tort injuries" is a cognizable property right subject to due process analysis) (Stewart, J., concurring).

The Confirmation Order ensures that the merits of the released opioid-related causes of action against the Sackler Family and other non-debtors will never be heard or determined. The bankruptcy court explained to one of the many victims who lost a loved one to opioids that "[t]he

merits [of the claims against Purdue] . . . have not yet been determined" and would not be until after the Plan is confirmed. App.2173-2174. But, as for claims against the Sackler Family and other non-debtors, the Plan simply terminates them.

**2. The Plan deprives opioid victims of their claims without their consent.**

The "deep-rooted historical tradition that everyone should have his own day in court" is a fundamental right guaranteed by the Due Process Clause. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846 (1999) (quoting *Martin v. Wilks*, 490 U.S. 755, 762 (1989)). Yet, here, opioid victims are forever deprived of their day in court against the Sackler Family and other non-debtors; they lost their claims without any opportunity to choose whether to litigate or to settle their claims, violating their due process rights. *Motors Liquidation Co.*, 829 F.3d at 158.

That some of the opioid creditors voted in favor of the Plan does not mitigate the due process violation.[6] Voting on a chapter 11 plan is the statutory system Congress designed for creditors to assess how the plan treats their claims against and interests in *a debtor*. 11 U.S.C. § 1126; *Richards v. Jefferson Cty., Ala.*, 517 U.S. 793, 799 (1996) (recognizing bankruptcy as "a special remedial scheme . . . [in which] legal proceedings may terminate pre-existing rights if the scheme is otherwise consistent with due process"). The bankruptcy system is not designed to require that creditors vote through a debtor's plan to wipe away debts owed by non-debtors.

Rather, as the bankruptcy court acknowledged, it approved the extinguishment of the claims against the Sackler Family and other non-debtors by way of a "settlement." App.600. But a plan may not constitutionally compel victims to forfeit their property rights against non-debtors without consent. *Loc. No. 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. City of*

[6] Fewer than 20% of those who filed a proof of claim in these cases voted for the Plan. App.1895; App.1900. And at no point were victims ever asked whether they consented to give up their rights to sue the Sackler Family and others. Creditors must vote on a plan as whole. That victims want and may desperately need their $3,500 for the claims against Purdue does not mean they would have knowingly given up their claims against the Sacklers and other non-debtors if given the choice. Thus, even the votes for the Plan do not constitute express and affirmative consent to the Non-Debtor releases.

*Cleveland*, 478 U.S. 501, 529 (1986) ("parties who choose to resolve litigation through settlement may not dispose of the claims of a third party"); *United States v. Ward Baking Co*., 376 U.S. 327 (1964) (court cannot enter consent decree to which one party has not consented). The law "does not sanction efforts by trial judges to effect settlements through coercion." *Kothe v. Smith*, 771 F.2d 667, 669 (2d Cir. 1985). The Confirmation Order coerces just such a so-called "settlement."

Nor could this settlement be coerced under an analogous rules-based framework of a class action. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 597-98 (1997). At least twice, the Supreme Court rebuffed attempts by courts to address a national asbestos litigation crisis in ways that would bind class action plaintiffs without permitting them a chance to decline the settlement. *Ortiz*, 527 U.S. at 845-48; *Amchem Prods.*, 521 U.S. at 597-98. The Supreme Court has held that in adjudicating claims for monetary damages, "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class . . . ." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985).

And *Ortiz* expressly disapproved of the notion of a "limited fund" set by the agreement of the parties. 527 U.S. at 848-53. To certify a mandatory settlement class based on a limited fund theory, parties "must show that the fund is limited by more than the agreement of the parties . . . ." *Id*. at 864. The Sackler Family's assertion as to what funding it would be willing to provide would not qualify under this standard.

The Supreme Court thus cautioned against "adventurous application" of class action procedures that would "sound a warning of the serious constitutional concerns" posed by attempting to certify a "mandatory" settlement class of individual tort claimants. *Ortiz*, 527 U.S. at 845. Rather, the Supreme Court admonished that the class action procedure "cannot carry the large load" that the tort-feasors, class counsel, and trial court "heaped upon it." *Amchem*, 521

U.S. at 628-29. The asbestos crisis at issue there was for Congress to address.[7] *Id.*; *see also Ortiz*, 527 U.S. at 821.

What is true about class actions is equally true about bankruptcies. The bankruptcy court failed to identify why the ordinary rules of due process did not apply here.

**3. The Plan deprives opioid victims of their claims without adequate notice.**

The Non-Debtor releases also violate the opioid victims' constitutional right to adequate notice of the release in Purdue's bankruptcy case of their claims against the Sackler Family and others. *See Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950). Regardless of how widely notice of the Plan was published, actual notice of the Non-Debtor releases was illusory. The provisions defining who was deemed to release claims, what claims were released, and who may or may not be sued under the Plan defies comprehension. And such notice came too late to allow victims to then file claims in Purdue's case.

As explained in the Statement of the Facts, sections B.3 and B.6(b) & (c), *supra*, neither the notice of the Plan nor the Plan itself provide creditors with adequate information regarding the extinguishment of their right to sue the Sackler Family and other non-debtors due to Purdue's bankruptcy case. Even if a creditor were to review the Plan, both the sheer breadth of the definition of "Shareholder Released Parties," and its inclusion of unnamed individuals and entities, make it impossible to know who one may sue after Plan confirmation. App.1112; App.1041-1069. Similarly, the scope of what claims are terminated—those to which Purdue's conduct is "legally relevant," App.1201—remains a mystery.

And a victim would likely be unable to navigate the 52-lines of section 10.7(b) itself, much less the thicket of cross-references of defined terms, as readily conceded by the bankruptcy

[7] Unlike courts, it is within the constitutional powers of Congress to issue legislation to "structure and accommodate the burdens and benefits of economic life." *Duke Power Co.*, 438 U.S. at 83-84 (holding that liability cap for nuclear disasters set by Congress did not violate due process unless it was "demonstrably arbitrary or irrational"); *see also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976).

court and multiple witnesses testifying in support of the Plan. App.494; App. 2165-2167; App.2186; App.2188-2189; App.2192. The bankruptcy court acknowledged as "true" the United States Trustee's objection that the release provisions were "lengthy and complex" and that one needed "legal training to parse those provisions." App494. Dr. Richard Sackler testified that although he tried to read the Non-Debtor releases, they were so "extremely dense" and would take such "an enormous amount of time to fully understand" that he gave up. App.2186. And neither Purdue's Chief Financial Officer nor Mortimer Sackler himself could identify who was released under the provisions. App.2165-2167; App.2188-2189; App.2192. As the Chief Financial Officer testified, if he could not identify who is being released, the average opioid victim would not be able to do so, either. App.2165. And, although Dr. Sackler and Purdue's CFO were testifying about a prior version of the plan, the Non-Debtor releases in the current version are no more understandable.

Nor was the self-described "plain-language notice" adequate. App.942-945. The bankruptcy court claimed that this notice was "simple" because it stated that "the plan contemplated a broad release of the Sackler Family and their related entities." App.494. Yet, that notice failed to reveal the vast extent of the other non-debtors granted civil immunity by the Plan. It mentioned only the Sackler Family "and certain other individuals and related entities," App.942-945, without disclosing that these parties included layers of trusts, unborn descendants, lawyers, and an unidentified array of others, App.942-945; App.1112; App.1041-1069. And the notice did not disclose that the Plan would make no payment based on the extinguished claims.

Moreover, the notice that the Plan would extinguish non-debtors' causes of action against the Sackler Family and that they would only receive compensation on account of their claims against Purdue, *see* section 4 *infra*, came too late for those who had not filed proofs of claim against Purdue. Not surprisingly, the notice of the deadline to file a proof of claim against Purdue said nothing about filing a proof of claim against the Sackler Family or other non-debtors. App.2163-2164. At least one objection to the Plan was filed by a victim who sued the Sackler Family but had not filed a claim against Purdue. App.2128. He was unaware that the

bankruptcy court had enjoined any actions against the Sackler Family until after the Plan was confirmed. *Id.* Indeed, his objection came after the Confirmation Order was entered. *Id.* Such inadequate notice violated his and other releasing parties' due process rights.

To the extent that the bankruptcy court relied on *Motors Liquidation Co.* to justify the notice provided in Purdue's case, App.601-603, such reliance was misplaced. That case involved a sale of the debtor's assets under 11 U.S.C. § 363 and established what notice was required to release claims against the debtor's estate. 829 F.3d at 155-58. It did not address what due process notice was required to terminate claims as to the debtor's successor for its own, post-closing, wrongful misconduct. *Id.*

**4. The Plan deprives opioid victims of their claims without compensation.**

Purdue, as the Plan proponent, substituted its judgment for the victims' own judgment about whether it was best to pursue their Sackler claims or accept the limited recovery based solely upon their Purdue claims. App.641-642. As made clear by the trust documents governing compensation under the Plan, compensation will be paid based on only claims against Purdue, and not those against the non-debtors like the Sackler Family. App.333; App.392; App.433.

Indeed, Purdue never even determined the value of the direct claims against the Sackler Family and other non-debtors that victims, states, and the other releasing parties are losing under the Plan's non-consensual third-party release. App.1575 (". . . the valuation of third-party claims is uncertain and highly speculative."). Yet, despite the lack of valuation of the individual victims' claims, a Plan proponent submitted a declaration from a plaintiff's lawyer asserting that "the threat of liability for at least some members of the [Sackler] family was real and that, without the protections of bankruptcy, individual family members were at risk of *substantial judgments* against them." App.2041 (emphasis added).

It is no answer to say that these victims of the opioid crisis can receive compensation through the Plan for their claims against Purdue. Purdue settled its substantial estate claims against the Sackler Family, which for avoidable transfers alone assertedly exceeded $11 billion.

App.558-568. As the bankruptcy court acknowledged, the estate's claims were settled for the benefit of the Debtors' creditors, App.558. These settlement proceeds thus pay creditors in satisfaction of claims they hold against the Debtors. They do not compensate individual opioid victims for their independent causes of action against the Sackler Family and other non-debtors.

Further, no one contends that personal injury claimants will be fully compensated for their losses through the Plan. Even if a person's claims against Purdue and their separate claims against non-debtors are based on the same losses, the claims themselves are separate property. Yet no consideration is being given based on the value of those claims against the Sackler Family and other non-debtors, even though they are distinct property taken without consent.

Under the Plan, the non-debtor victims receive limited value for their claims against Purdue and nothing for their claims against the Sackler Family. The Sackler Family's full-throated demand for involuntary releases (for them and hundreds, potentially thousands, of cohorts) makes all too clear that the extinguishment of these causes of action has value.

### B. The Bankruptcy Clause does not authorize taking opioid victims' independent non-bankruptcy claims against the Sackler Family and other non-debtors.

Because the elimination of direct causes of action held by non-debtor victims against other non-debtors involves non-bankruptcy claims, it also falls outside the powers conferred by the Bankruptcy Clause, U.S. Const. art. I, § 8, cl. 4.

"Congress' power under the Bankruptcy Clause 'contemplate[s] an adjustment of a failing debtor's obligations.'" *Ry. Lab. Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 466 (1982) (quoting *Cont'l Ill. Nat'l Bank & Tr. Co. of Chi. v. Chi. R.I. & P. Ry. Co*., 294 U.S. 648, 673 (1935)). It thus permits bankruptcy courts to approve settlements between debtors and those who have liability to them, such as a settlement between Purdue and the Sackler Family requiring the Sackler Family to make payments to the estate.

But extinguishing direct claims by non-debtors against other non-debtors falls outside of this power because it adjusts a non-debtor's obligations—not those of the debtor in the case.

While Congress may, under the Bankruptcy Clause, authorize courts to issue "ancillary" orders to enforce the courts' "in rem" adjudications, *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 370 (2006), the involuntary Non-Debtor releases here do not do so.

The Non-Debtor releases are not limited to claims that would impact the res of Purdue's bankruptcy estate. The bankruptcy court found, at most, that *some* claims against *some* defendants affected by the release *potentially* raised indemnification issues, that *some* claims affected shared insurance, and that *some* claims overlapped with Purdue's own claims against the Sacklers and others. App.598. Even assuming that were true, and even assuming all of these circumstances necessarily impact the res of the estate—which the government does not concede—the bankruptcy court never found that *all* potential claims affected by the release satisfied one or more of these conditions. Nor could the bankruptcy court plausibly have done so, given the sheer breadth of the release and its extension to unborn persons and others. And while the rationale of the bankruptcy court's decision appears to acknowledge that the releases should be limited to actions that have a direct impact on Purdue's property, no corresponding limitation is found in the terms of the Non-Debtor releases.[8]

In fact, there were direct actions available against the Sackler Family and other non-debtors for their affirmative part in the opioid crisis, as explained in section III.C.2, *infra*, and Purdue's insurers had either declined coverage for opioid-related liability or reserved their rights to do so. App.3222-3225; Dkt. 3456 at 17. Thus, the Plan terminated claims that did not impact Purdue's estate property. As a result, the Plan's Non-Debtor releases extend to claims that the

[8] The Second Circuit has expressly held that bankruptcy courts may not "enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to a debtor's estate." *In re Johns-Manville Corp*., 517 F.3d 52, 66 (2d Cir. 2008) ("*Manville III*"), *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009).

bankruptcy court could not have constitutionally adjudicated, nor had jurisdiction to do so,[9] and it should not have been approved.

**C. The bankruptcy court lacked constitutional authority to extinguish the non-debtors' claims against the Sackler Family and other non-debtors.**

Under Supreme Court precedent, bankruptcy judges as non-Article III judges do not have constitutional authority to enter a final judgment on state law claims between private parties absent all parties' knowing and informed consent. *Stern*, 564 U.S. at 482, 493; *In re Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 669 (2015). As the Court explained in *Stern*, "[w]hen a suit is made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789,'. . . and is brought within the bounds of federal jurisdiction, the responsibility for deciding that suit rests with Article III judges in Article III courts." 564 U.S. at 484 (quoting *N. Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 90 (1982) (Rehnquist, J., concurring)).

The Court set out the test for determining when a bankruptcy court has constitutional authority to enter final judgment on a claim in *Stern*: "Congress may not bypass Article III simply because a proceeding may have some bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."[10] 564 U.S. at 499. In *Stern*, because the debtor's tortious

---

[9] With respect to non-debtor releases, the Second Circuit has recognized that "related-to" jurisdiction does not extend to disputes between third parties that are based on the parties' independent conduct and that do not implicate the property of the estate—even if the factual predicate of those claims related to the debtor. *Manville III*, 517 F.3d at 56. Thus, "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that *directly affect* the res of the bankruptcy estate." *Id*. at 66 (emphasis added). As the party seeking to establish the bankruptcy court's subject matter jurisdiction, it was Purdue's burden to show that a direct effect on the estate's property was present as to each and every third-party claim extinguished by the Plan. *See Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002) (party asserting subject matter jurisdiction "has the burden of proving by a preponderance of the evidence that it exists"). That burden was not met here.

[10] The Bankruptcy Code provides procedures for the allowance or disallowance of creditors' claims and claims for reimbursement of the bankruptcy estate's administrative expenses. 11 U.S.C. §§ 501-503.

interference counterclaim neither stemmed from the bankruptcy nor would necessarily be resolved in the claims allowance process, the Court held the bankruptcy court had no constitutional authority to adjudicate it. *Id*.

The releases of third-parties' state law claims against the Sackler Family and others "involve the most prototypical exercise of judicial power, the entry of a final, binding judgment by a court . . . on a common law cause of action." *Stern*, 564 U.S. at 494. A "release" of a particular claim operates as a judgment that extinguishes the released claim as a matter of law with the same res judicata effect as a judgment on the merits of that claim. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151-54 (2009); *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995) (holding that plan confirmation order containing releases of claims against third parties constituted final judgment on those claims). A court that lacks authority to adjudicate a claim also lacks the authority to enter a final judgment releasing it.

Applying the *Stern* test, the bankruptcy court, as an Article I court, lacked constitutional authority to confirm the Plan forever barring non-debtor opioid victims from bringing direct state law claims against the Sackler Family and other non-debtors. The released claims involve rights defined by state law against non-debtor, private parties that arise independently of the Debtors' bankruptcy filing. Thus, they do not "stem from the bankruptcy itself." Nor would they "necessarily" be resolved in the Code's allowance process because that process is solely for claims against the Debtors' estate. *See* 11 U.S.C. § 501-503. Accordingly, only an Article III court may finally resolve these claims, and the bankruptcy court lacked constitutional authority to release them.

Even as to non-opioid claims excluded from the release, App.1100, the Confirmation Order exceeds the bankruptcy judge's constitutional authority by empowering him to enter a judgment barring those claims. The Plan precludes any "Person" from litigating such a claim in an Article III court without first obtaining leave of the bankruptcy court. App.1217. The Plan thus establishes a perpetual, post-confirmation gate-keeping role for the bankruptcy court before anyone—even those who are not Purdue's creditors, *see* App.1102 (defining "Person")—may

assert an excluded non-opioid claim against released non-debtors. App.1217. If the bankruptcy court determines that such a claim cannot proceed, that disposes of the claim.[11]

The bankruptcy court incorrectly held that because a confirmation proceeding is a "central aspect of a Chapter 11 case's adjustment of the debtor/creditor relationship," imposition of non-debtor releases contained in a plan is "not only [ ] a core proceeding under 28 U.S.C. § 157(b), but also . . . 'constitutionally core' under [*Stern*]." App.603. Under the bankruptcy court's interpretation of *Stern*, Article III imposes no limitation on bankruptcy courts' powers to confirm a plan and no restriction on bankruptcy courts' ability to resolve disputes between private parties through a plan. In reaching that conclusion, the bankruptcy court failed to apply the test articulated in *Stern*. As *Stern* made clear, the constitutional analysis must focus on the content of the proceeding, *i.e.*, the claims being adjudicated, not on the category of the proceeding as "core." Thus, the bankruptcy court lacks constitutional authority to extinguish common law claims between non-debtors through plan confirmation or otherwise.

The bankruptcy court's view of *Stern's* test departs from *Stern's* plain language and would give bankruptcy courts virtually limitless authority to adjudicate claims reserved to Article III courts in the context of plans. *Stern* does not authorize Congress to strip parties who wish to contest matters of private right of their constitutional right to an Article III adjudicator. *Cf. Granfinanciera, S.A. v. Nordberg*, 392 U.S. 33, 51 (1989) ("Congress may devise novel causes of action involving public rights free from the strictures of the Seventh Amendment if it assigns their adjudication to tribunals without statutory authority to employ juries as factfinders. But it lacks the power to strip parties contesting matters of private right of their constitutional right to a trial by jury.") (footnote omitted). Nor does it authorize bankruptcy courts to adjudicate claims reserved to Article III judges merely because they are raised in the context of a plan. Rather, *Stern* makes clear that the judicial power may not be exercised outside of Article III. *See Stern*, 564 U.S. at 502 ("Is there really a threat to the separation of powers where Congress has

---

[11] Appellees have argued that the released claims are not extinguished but channeled to the trusts. For the reasons set forth *supra*, that is incorrect.

conferred the judicial power outside Article III only over certain counterclaims in bankruptcy? The short but emphatic answer is yes.”).

In reaching its decision, the bankruptcy court relied on *In re Millennium Lab Holdings II, LLC.*, 945 F.3d 126, 136 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020). Contrary to the plain language of *Stern* and other courts of appeals’ understanding of *Stern*, *Millennium Lab* held that the bankruptcy court was permitted to confirm the plan “because the existence of the releases and injunctions was integral to the restructuring of the debtor-creditor relationship.” 945 F.3d at 126 (quoting *Stern*, 564 U.S at 497). The Third Circuit seized upon a statement in *Stern* explaining that “a preferential transfer claim can be heard in bankruptcy when the allegedly favored creditor has filed a claim, because then the ensuing preference action by the trustee becomes integral to the restructuring of the debtor-creditor relationship.” *Stern*, 564 U.S. at 497 (cleaned up). But the bankruptcy court’s constitutional authority to resolve a preference claim in adjudicating the creditor’s proof of claim against the debtor’s estate does not translate to authority for a non-Article III court to adjudicate private, state law claims between non-debtors.

Similarly, the bankruptcy court’s reliance on *Quigley* was misplaced. *Quigley* concerned a temporary stay of litigation rather than the permanent disposition of claims. 676 F.3d at 52 (“Enjoining litigation to protect bankruptcy estates *during the pendency of* bankruptcy proceedings, unlike the entry of the final tort judgment at issue in *Stern*, has historically been the province of the bankruptcy courts.”) (emphasis added). *Quigley* thus did not address the constitutional authority of a bankruptcy court to issue a permanent injunction of third-party actions.

Because the Non-Debtor releases extinguish state law claims between private parties that are not resolved by a ruling on their claims against the Debtors, the bankruptcy court lacked constitutional authority to confirm the Plan. As then-Judge Gorsuch explained:

> [*Stern*] held that when a “claim is a state law action . . . *and not necessarily resolvable by a ruling on the creditor’s proof of claim in bankruptcy*,” it

> implicates private rights and thus is not amenable to final resolution in bankruptcy court. . . . *Indeed, the Court repeated this point—repeatedly*.

*Loveridge v. Hall (In re Renewable Energy Dev. Corp.)*, 792 F.3d 1274, 1279 (10th Cir. 2015), *as amended on denial of reh'g* (July 28, 2015) (Gorsuch, J.) (emphasis added).

Other circuit courts of appeal agree. *In re Glob. Technovations Inc*., 694 F.3d 705, 722 (6th Cir. 2012) (describing *Stern's* holding as "[w]hen a claim is 'a state law action independent of the federal bankruptcy law and *not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy*,' the bankruptcy court cannot enter final judgment") (emphasis added) (quoting *Stern*, 564 U.S. at 487)); *In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1192 (11th Cir. 2015) (holding that bankruptcy court had constitutional authority to enter final judgment where the claim "was 'necessarily resolve[d]' by the bankruptcy court through the process of adjudicating the creditors' claims" (citation omitted)); *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 564-65 (9th Cir. 2012) (holding that bankruptcy court lacked constitutional authority to enter final judgment because the claim at issue "need not necessarily have been resolved in the course of allowing or disallowing the claims against the . . . estate"), *aff'd, Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2014). *But see In re Ortiz*, 665 F.3d 906, 911, 914 (7th Cir. 2011) ("Non-Article III judges may hear cases when the claim arises as part of the process of allowance and disallowance of claims, . . . or when the claim becomes integral to the restructuring of the debtor-creditor relationship.") (internal quotation omitted).

The bankruptcy court also relied on this Court's decision in *In re Kirwan Offs. S.a.r.l.*, 592 B.R. 489, 504 (S.D.N.Y. 2018), *aff'd on other grounds sub nom. In re Kirwan Offs. S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019). *Kirwan*, like *Millenium Lab*, focuses on whether the release of claims is "absolutely necessary to the operation of [the debtor's] reorganization plan" instead of the nature of the claims being released. 592 B.R. at 511. This Court concluded that the claims

released in *Kirwan* were not adjudicated but were preempted by the Bankruptcy Code because they stood as an obstacle to the accomplishment of the debtor's reorganization. *Id*. at 511-12.[12]

But *Kirwan's* preemption ruling was not necessary to its holding because this Court held in the alternative that the debtor had consented to the bankruptcy court's exercise of adjudicatory authority. 592 B.R. at 512. On appeal, the Second Circuit reserved the issue of whether bankruptcy courts may constitutionally enter final judgment on non-debtor releases. *Kirwan*, 792 F. App'x at 103 (affirming on basis of implied consent to court authority). The government respectfully submits that the bankruptcy court lacked that authority.

## II. The bankruptcy relief bestowed upon the Sackler Family and other non-debtors violates the Bankruptcy Code.

### A. The Bankruptcy Code does not authorize extinguishing non-debtors' claims against non-debtors in non-asbestos cases.

"As a general rule, a bankruptcy court has no power to say what happens to property that belongs to a third party, even if that third party is a creditor or otherwise is a party in interest." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 723 (Bankr. S.D.N.Y. 2019) (citation omitted) (noting the extraordinary nature of non-debtor releases). The Code specifies that "[a] discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). Rather, the Code provides only for a discharge of the debtor's liabilities. 11 U.S.C. §§ 524(a), 1141(d)(1)(A).

Congress authorized bankruptcy courts to impose non-debtor releases only under section 524(g)'s one narrow circumstance—and that applies exclusively to asbestos cases. *See*, *e.g.*, *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142-43 (2d Cir. 2005) (recognizing that while

[12] The burden of establishing obstacle preemption is heavy, even more so when the federal and state laws serve different purposes. *In re Methyl Tertiary Butyl Ether (MBTE) Prods. Liab. Litig.*, 725 F.3d 65, 101 (2d Cir. 2013). That burden is not satisfied here. Chapter 11's goal of facilitating debtors' reorganizations does "not establish that Congress had a 'clear and manifest intent' to preempt" all third-party state tort causes of action against non-debtors that might impinge upon a debtor's ability to confirm a plan on preferred terms. *Id*. at 103 (quoting *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 249 (2d Cir. 2006)).

some cases have allowed such releases, "the only explicit authorization in the Code for nondebtor releases is 11 U.S.C. § 524(g)"). Section 524(g) authorizes bankruptcy courts to enjoin actions against a limited subset of identified third parties where the debtor establishes trusts for asbestos claimants to which their claims can be channeled and compensated, and only to the extent the third party is liable "by reasons of" one of four statutory relationships between the third party and the debtor. 11 U.S.C. § 524(g)(2)(B)(i) & (4)(A)(ii); *Travelers*, 557 U.S. at 155; *see also* section II.C.4 *infra* as to further distinctions from 11 U.S.C. § 524(g). The Non-Debtor releases qualify under none of them.

Because Congress expressly authorized only this one exception, courts may not create others.[13] *Cf. Law v. Siegel*, 571 U.S. 415, 424 (2014) ("The Code's meticulous—not to say mind-numbingly detailed—enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions."); *accord Czyzewski v. Jevic Holdings Corp*., 137 S. Ct. 973, 987 (2017).

Instead, the Fifth, Ninth, and Tenth Circuits have held that the Bankruptcy Code "prohibits the discharge of debts of nondebtors." *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 760 (5th Cir. 1995); *In re Lowenschuss*, 67 F.3d 1394, 1401 (9th Cir. 1995); *accord In re We. Real Estate Fund Inc*., 922 F.2d 592, 600 (10th Cir. 1990) ("Obviously, it is the debtor, who has invoked and submitted to the bankruptcy process, that is entitled to its protections; Congress did not intend to extend such benefits to third-party bystanders."); *but see Blixseth v. Credit*

[13] Section 111(b) Bankruptcy Reform Act of 1994, which added section 524(g), included a rule of construction. 108 Stat. 4117 (1994). This rule provides that "[n]othing in [the subsection adding 11 U.S.C. § 524(g) to the Bankruptcy Code] shall be construed to modify, impair or supercede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." *Id*. The most reasonable interpretation of this rule is that Congress wanted to protect reliance interests and to provide certainty to the Manville and other asbestos trusts established under the Manville model before the 1994 legislative amendment, and it is not an endorsement of channeling injunctions in other contexts. *See* Asbestos Injury Compensation, GAO Report No. 11-819, p.8 ("Lingering concerns as to whether the injunction issued as part of [Manville's] plan could withstand all challenges underscored the 1994 amendment modeled after this approach.").

*Suisse*, 961 F.3d 1074, 1084-85 (9th Cir. 2020) (holding 11 U.S.C. § 524(e) did not preclude approval of exculpation clause).

Because section 524 is the specific provision addressing third-party releases, and the Non-Debtor releases do not qualify under it, the releases here violate the Code. The Supreme Court has explained that a general authorization may not be read to swallow a "more limited, specific authorization" in the Bankruptcy Code. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46, 649 (2012). Given section 524's specific language on releases and discharges, section 105(a) cannot be used to approve releases section 524 does not authorize. *See Law*, 571 U.S. at 424.

Section 105(a) authorizes courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code. 11 U.S.C. § 105(a). But "[a]ny power that a judge enjoys under § 105 must derive ultimately from some other provision of the Bankruptcy Code." *Metromedia*, 416 F.3d at 142 (internal quotation marks omitted). The Third Circuit has similarly questioned the use of section 105 as authority for non-debtor releases. *In re Cont'l Airlines*, 203 F.3d 203, 211 (3d Cir. 2000) (explaining that section 105(a) "does not create substantive rights that would otherwise be unavailable under the Bankruptcy Code.") (quotation marks and citation omitted).

Nor can the power to impose non-debtor releases outside of section 524(g) come from section 1123(b)(6). That section provides only that a "plan may . . . include any other appropriate provision *not inconsistent with* the applicable provisions of this title." 11 U.S.C. § 1123(b)(6) (emphasis added). But a non-debtor release is inconsistent with other provisions of the Bankruptcy Code, including: section 524(a), which provides only for the discharge of the debtor; section 524(e), which provides that the discharge of the debtor "does not affect the liability of any other entity on, or the property of any other entity for, such debt;" and section 524(g), which defines the limited asbestos-related circumstances when releases are permitted.

It is also inconsistent with 11 U.S.C. § 523, which would not allow the individual non-debtors to be discharged—if they had filed for bankruptcy relief—from certain claims against

them that the Plan terminates, *see* section II.B, *infra.* Thus, section 1123(b)(6) cannot be read to permit the Plan's extinguishment of claims against the Sackler Family and other non-debtors.

Put simply, only section 524 addresses releases, and it does not authorize the releases imposed here. This means they were rendered in violation of the Bankruptcy Code, which in turn renders the Plan unconfirmable. *See* 11 U.S.C. § 1129(a)(1). Section 1129(a)(1) expressly prohibits confirmation of a plan that does not comply with "applicable provisions" of the Bankruptcy Code. And section 1141(d), which specifies the scope of discharge upon confirmation, does not include non-debtors.

**B. The Plan grants the Sackler Family and other non-debtors greater relief than they could lawfully obtain if they became debtors and obtained a bankruptcy discharge.**

Under the Plan, the Sackler Family effectively bought hundreds of individual discharges for their role in the opioid crisis without actually filing for bankruptcy relief and subjecting themselves to the same rules of transparency and creditor protections that every consumer and business debtor who files bankruptcy must follow. *See* 11 U.S.C. § 521(a); *Chartschlaa v. Nationwide Mut. Ins. Co.*, 538 F.3d 116, 122 (2d Cir. 2008) (noting that "full disclosure by debtors is essential to the proper functioning of the bankruptcy system").

Additionally, debtors entitled to bankruptcy relief must commit all of their assets to their estate. 11 U.S.C. §§ 541(a), 542. But Purdue admits that the Sackler Family retained most of their sizeable $11 billion fortune in insisting upon their bespoke bankruptcy discharge. App.1402; App.1404-1405; App.1563. And their payments are spread out over a ten-year period, *see* App.980, during which their remaining sizeable assets may continue to accrue in value.

This turns the Bankruptcy Code on its head. Had the individual Sackler Family members become chapter 11 debtors, they would have failed the statutory liquidation test under 11 U.S.C. § 1129(a)(7), which requires that creditors not getting the full value of their claim get at least the value equal to what they would get if the debtor were liquidated. *See* 7 Collier on Bankruptcy

¶ 1129.02 (16th 2021). The Plan also allows the Sackler Family members to discharge debts that individual debtors may not. The Bankruptcy Code expressly prohibits an individual's discharge of debts for fraud, breach of fiduciary duty, and willful and malicious injury. *See* 11 U.S.C. §§ 523(a)(2), (a)(4), and (a)(6). The Sacklers avoid this substantive prohibition by not filing bankruptcy themselves. Instead, the Plan enjoins any actions against the individual Sackler Family members if Purdue's conduct is a "legally relevant" factor. App.1201; *see also* App.2128 (objector arguing that the Non-Debtor release improperly prohibits his lawsuit for fraud against Sackler Family members from proceeding).

### C. Second Circuit precedent does not authorize the extinguishment of these claims.

#### 1. Direct vs. derivative claims

The United States Trustee does not concede that the distinction between direct and derivative claims impacts his arguments on appeal. Nevertheless, because the bankruptcy court has relied on this distinction in its analysis, App.614-615, it is important to clarify the relevant definitions. As explained below, Second Circuit precedent does not permit the Debtors to settle the direct claims of non-debtors against the Sackler Family and other non-debtors for their individual misconduct that caused direct injury to those victims.

"[S]o-called 'derivative claims'—i.e., claims 'based on rights "derivative" of, or "derived" from, the debtor's own claims'—typically constitute "property of the estate."" *In re Tronox Inc*., 855 F.3d 84, 99 (2d Cir. 2017) (quoting *In re Bernard L. Madoff Inv. Secs. LLC*, 740 F.3d 81, 88 (2d Cir. 2014) ("*Madoff*")). "'Derivative claims' in the bankruptcy context are those that 'arise[ ] from harm done to the estate' and that 'seek [ ] relief against third parties that pushed the debtor into bankruptcy.'" *Id.* (quoting *Madoff*, 740 F.3d at 89). Thus, for example, a claim based on the fraudulent conveyance of assets from the debtor to a third party is one that properly belongs to the estate. *Id.* at 100 (discussing *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989)); *see also Madoff*, 740 F.3d at 91 (noting a "fraudulent

transfer claim is perhaps the paradigmatic example of a claim that is 'general' to all creditors") (citation omitted).

"Whereas a derivative injury 'is based upon "a secondary effect from harm done to [the debtor]," an injury is said to be "particularized" when it can be "directly traced to [the third party's] conduct."'" *Tronox*, 855 F.3d at 100 (quoting *Madoff*, 740 F.3d at 89). Two contrasting Second Circuit opinions from the Johns-Manville bankruptcy are illustrative.

Manville was an asbestos manufacturer and supplier. *Manville III*, 517 F.3d at 56. During its bankruptcy case, Manville settled with its insurers for $770 million in exchange for a "full and final release of Manville-related claims." *Id.* at 56-57. One of Manville's distributors challenged the release, claiming it had a right to recover against the insurer as it was coinsured under the policy. *MacArthur Co. v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 837 F.2d 89 (2d Cir. 1988) ("*Manville I*"). The Second Circuit rejected this claim, holding that the claim was "derivative" of Manville's because it sought recovery "out of the proceeds of Manville's insurance policies on the basis of Manville's conduct." *Id.* at 92-93.

By contrast, the Second Circuit held that claims brought by asbestos victims against the same insurer based on allegations of the insurer's own misconduct were *not* derivative. *Manville III*, 855 F.3d at 68. Those victims had brought statutory and common law claims against the insurer for, among other things, acquiring knowledge of the dangers of asbestos and "influenc[ing] Manville's purported failure to disclose knowledge about asbestos hazards." *Id.* at 58. As the Second Circuit held, it did not matter whether the liability arose from the same factual nexus as the claims against Manville; the inquiry was whether the insurer "owe[d] a duty [to the plaintiffs] independent of its contractual obligations to indemnify those injured by the tortious conduct of Manville." *Id.* at 67.

Although the Supreme Court reversed and remanded, it did not address this part of *Manville III*'s analysis. *Travelers Indem. Co.*, 557 U.S. at 155. Rather, the Supreme Court determined that the bankruptcy court had, in fact, enjoined the non-derivative, direct actions in a prior order that had not been appealed and thus was not subject to collateral attack. *Id*. The

Court expressly reserved judgment on whether a bankruptcy court "could properly enjoin claims against nondebtor insurers that are not derivative of the debtor's wrongdoing." *Id*. And, as noted by Justice Ginsburg in her dissent, interpreting the injunction to bar "only those claims against Manville's insurers seeking to recover from the bankruptcy estate for Manville's misconduct, not those claims seeking to recover against the insurers for their own misconduct . . . respects the limits of the Bankruptcy Court's power." *Id.* at 156 (Ginsburg, J., dissenting).

The Second Circuit has subsequently reiterated that a creditor's independent claim can arise out of the same set of facts as that of a debtor's claim. *Madoff*, 740 F.3d at 91. It explained that "there is nothing illogical or contradictory about saying that [a third-party defendant] might have inflicted direct injuries on both the [estate's creditors] and [the debtor estate] during the course of dealings that form the backdrop of both sets of claims." *Id.* (citing *Highland Capital Mgmt. LP v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 587 (5th Cir. 2008)). The claim is only derivative if the creditor's "alleged injuries are inseparable from, and predicated upon, a legal injury *to the estate*. . . ." *Id.* at 92 (emphasis added) (holding claim for fraudulent withdrawals from debtor was estate claim and not particularized to creditor). Or, if the "alleged liability" of the non-debtor "arises not from its own conduct, but from its alleged existence as the alter ego and successor to the liabilities of" its predecessor-in-interest, then that claim is derivative. *Tronox*, 855 F.3d at 88, 106-07 (expressly holding that plaintiffs had failed to allege personal misconduct by the non-debtor defendant).

Analyzed another way, if the creditor's claim is one that a bankruptcy trustee could bring on behalf of the estate, then it is derivative. *Madoff*, 40 F.3d at 90; *Tronox*, 855 F.3d at 101. If the trustee cannot, then the claim is direct. *Id.* Thus, the Second Circuit held that a trustee could not assert claims against third-party financial institutions on behalf of the debtor's customer-creditors for aiding and abetting fraud; those were injuries that "independently caused harm to individual creditors" and thus were owned by the debtor's customers, rather than by the debtor. *Tronox*, 855 F.3d at 101(citing *Picard v. JPMorgan Chase & Co. (In re Bernard L. Madoff Inv. Sec. LLC)*, 721 F.3d 54, 71 (2d Cir. 2013)).

Second Circuit precedent does not permit the bankruptcy court to immunize the Sackler Family and other non-debtors from civil liability for individual misconduct that caused direct injury to creditors. Those claims were not Purdue's to settle.

**2. The Plan terminates non-debtors' direct claims against the Sackler Family and other non-debtors.**

Here, hundreds of lawsuits were brought against the Sackler Family and other non-debtors. *See*, *e.g.*, App.2401-2597. Numerous claims, including the civil claims brought by the federal and state governments against certain Sackler Family members, alleged that certain of those individuals had engaged in misconduct. App.1343-1373; App.2040 (declaring that, after discovery, plaintiff's counsel had a "good faith basis to sue several members of the Sackler family"); App.2598-2660 (Connecticut complaint); App.2661-2774 (Delaware complaint); App.2775-3152 (Massachusetts complaint); 3153-3196 (Rhode Island complaint). "These claims include, but are not limited to, product liability, wrongful death, negligence, including negligent misrepresentation, negligence per se and gross negligence, fraud, fraudulent concealment, deceit and other willful misconduct, unjust enrichment, public nuisance, and claims under state consumer protection and controlled substances laws." App.1573.

As a general matter, corporate officers and directors are personally and directly liable for both common law and statutory torts that they authorize, direct, or participate in, even if they acted as an agent of the corporation. *See*, *e.g.*, *Joseph Gen. Contracting, Inc. v. Couto*, 119 A.3d 570, 583, 585, 586 n.11 (Conn. 2015) (collecting cases); *see also Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 6497887, at *2 (Mass. Super. Nov. 6, 2019); *Galas v. Lending Co*., No. 12-01265, 2013 WL 308745, at *3 (D. Ariz. Jan. 25, 2013); *In re Glo-Tex Intern*., No. 07-06449, 2010 WL 4916574, at *4 (Bankr. D.S.C. Nov. 30, 2010); *Corbett v. Manson*, 903 A.2d 69, 73 (Pa. Cmwlth. 2006).

Thus, other courts have upheld their jurisdiction over, or declined to dismiss complaints against, individual Sackler Family member defendants, not because they were officers or directors of Purdue, but because the allegations in the complaint reflected the individuals'

"'direct personal involvement' in conduct that 'is causally related to the plaintiff's injury. . . .'" *Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 5617817, at *4 (Mass. Super. Oct. 8, 2019) (quoting *Hebb v. Greens Worldwide, Inc.*, No. 06-4368, 2007 WL 2935811, at *4 (Mass. Super. Sept. 17, 2007)).[14] *See also In re Opioid Litig.*, Index No. 400000/2017, 2019 N.Y. Misc. LEXIS 3324, at *21-22 (N.Y. Sup. Ct. June 21, 2019) ("Under New York law . . . a director may be held individually liable for a corporate tort if he or she participated in its commission or else directed, controlled, approved or ratified the decision that led to the plaintiff's injury; this is so regardless of whether he or she acted on behalf of the corporation in the course of official duties and regardless of whether the corporate veil is pierced"); *State v. Purdue Pharma L.P.*, No. PC-2018-4555, 2019 R.I. Super. LEXIS 95, at *17 (Super. Ct. Aug. 16, 2019) (denying motion to dismiss complaint against Richard Sackler based upon allegations of personal misconduct).

In the Massachusetts case, for example, after refusing to dismiss on jurisdictional grounds, the court denied the Purdue directors' motion to dismiss for failure to state a claim for violation of the state consumer protection law. *Commonwealth v. Purdue Pharma, L.P.*, No. 1884CV01808, 2019 WL 6497887, at *2 (Mass. Super. Nov. 6, 2019). The complaint alleged that Purdue's directors, including members of the Sackler family, "repeatedly approved policies and tactics intended to aggressively promote opioid sales even though they knew that these policies and tactics were contributing to an epidemic of addiction, overdose and death." *Id*. The court found that these allegations sufficiently alleged that the directors personally participated in the wrongdoing. *Id*. at *3.

---

[14] While Massachusetts ultimately consented to the Non-Debtor release, both the causes of action it brought—violation of a state consumer protection law, Mass. Gen. Laws ch. 93A, and public nuisance—and the supporting factual allegations it made may equally be raised by others. *See id.* at § 9 (granting cause of action to "any person" injured by the deceptive practice). So too for the claims brought by New York, which included deceptive business practices, public nuisance, fraud, unjust enrichment, and negligence. *See* 2019 2019 N.Y. Misc. LEXIS 3324 at *22-35; *see also* N.Y. Gen. Bus. Law § 349(h) (providing for private right of action).

Individual and non-governmental plaintiffs have also sued Sackler Family members and other released non-debtors for their tortious conduct. *See Purdue*, Adv. No. 19-08289, Dkt. 287, 291. The following are three such examples that the Plan would terminate.[15]

*Hickey v. Purdue Pharma*, *et al.*, Case No. 19-11806, Dkt. 1 (D. Mass. filed Aug. 22, 2019), was expressly included in the bankruptcy court's preliminary injunction, *Purdue* Adv. No. 19-08289, Dkt. 291 at 120. Like the Massachusetts government's complaint above, Mr. Hickey alleged, *inter alia*, unfair and deceptive acts in violation of the state consumer protection law because "[m]embers of the Sackler Family and other Purdue Executives purposefully downplayed the addictive properties of OxyContin and promoted sales tactics meant to encourage doctors to prescribe as much OxyContin, in the highest doses and longest duration as possible—despite the potential risk of abuse . . . ." *Hickey* Dkt. 1 ¶ 3; *see also id.* at ¶¶ 6, 7.

*Hartman v. Sackler*, Case No. 21-02001, Dkt. 1 (E.D. Pa. filed Apr. 30, 2021), is a putative class action against members of the Sackler Family and other individuals, but not against Purdue. Mr. Hartman alleged two causes of action: one for misrepresentation under 402A Restatement (Second) of Torts, the other under the Pennsylvania Unfair Trade Practices Act, 73 P.S. § 201-2(4). Compl. ¶¶ 92-99. Directors and officers can be held directly liable for their conduct under the Pennsylvania Unfair Trade Practices Act. *See Corbett*, 903 A.2d at 71, 75 (affirming liability of CEO under the Act where "[the CEO] was a 'very hands-on owner,' was 'involved in certainly all of the important decisions,' and, as time went on, 'really got involved much heavier and practically in every decision that was made for the company,' 'almost micro managing the business right down to the smallest detail'").

Not only does the bankruptcy court's most recent injunction order expressly apply to this case, *Purdue*, Adv. No. 19-08289, Dkt. 291 at 123, one of the defendants has asserted that the

[15] *See also Heden v. Johnson & Johnson*, No. 19-00586 (D.R.I. filed Nov. 12, 2019); *Rhodes v. Rhodes Techs., Inc.*, No. 19-cv-00885 (M.D. Tenn. filed Oct. 5, 2019); *Tilley v. Purdue Pharma L.P.*, No. 19-00566 (S.D. W. Va. filed Aug. 2, 2019). For the convenience of this Court, copies of the above-referenced individuals' complaints have been submitted by a motion for judicial notice concurrently filed with this brief.

Plan's releases would also apply to it. *See Hartman*, Dkt. 6 (Aug. 30, 2021) (motion by defendant Mark Timney for an extension of time to answer "[i]n light of the releases in [Purdue's] pending bankruptcy plan which encompass this action. . . ."). Mr. Hartman later objected to the Plan based in part on "the extraordinarily broad nonconsensual third-party release of the Sackler Family and other non-debtors." App.2128-2132.

And *Map to Health v. AmerisourceBergen Drug Corp.*, No. 21-45093, Dkt. 1 (N.D. Ohio filed July 15, 2021), is a putative class action by a treatment facility.[16] Although it does not appear to have been served, the 317-page complaint against members of the Sackler Family and other former directors and officers of Purdue included detailed allegations of the "Sackler Defendants' micromanagement" and personal "active participat[ion]" in alleged wrongdoing, and asserted that because the defendants "directed and participated in" Purdue's tortious conduct, they are individually liable for negligence, nuisance, fraud, and under state deceptive trade statutes. *See*, *e.g.*, Dkt.1 ¶¶ 72-80, 955, 973 995, 1027, 1079. It further alleged violations of the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq*. ("RICO"), based on an alleged association-in-fact "Sackler Pharmaceutical Enterprise," which was "owned, directed and controlled at all times by the Sackler Defendants." *Id*. ¶¶ 907-17, 948-956.[17]

These complaints are just a few examples of the direct claims—not claims that belong to Purdue's bankruptcy estate that could have been brought by the estate—that were terminated by the Non-Debtor releases. *See* section II.C.1, *supra*; *see also Glo-Tex Intern*., 2010 WL 4916574,

---

[16] Although this complaint is not listed in the bankruptcy court's most recent (twenty-second amended) preliminary injunction order, *Purdue*, Adv. No. 19-08289, Dkt. 291, it was included in Purdue's Notice of Filing of the Proposed Twenty-Second Amended Preliminary Injunction Order, *id*. Dkt. 290, Ex. D at 158; *see also Mercy House Teen Challenge v. AmerisourceBergen Drug Corp*., No. 18-46070, Dkt. 27 (N.D. Ohio filed Mar. 15, 2019) (including similar allegations); *Purdue*, Adv. No. 19-08289, Dkt. 1, Ex. C at 125 (listing *Mercy House* among the actions to be enjoined).

[17] Individuals can be directly liable under RICO even if they were also owners or officers of a corporation acting within the scope of their authority. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001)).

at *4-*5 (allowing creditors' pursuit of claims against debtor's former owners, despite former owners' settlement with trustee, where plaintiffs alleged that former owners directly participated in state law torts, which were direct, not derivative, claims).

Moreover, because of the nationwide preliminary injunction issued by the bankruptcy court below, no party was allowed to file any new litigation against the Sackler Family or related non-debtors since October 11, 2019, even if Purdue was not also named as a defendant. *Purdue*, Adv. Proc. No. 19-08289, Dkt. Nos. 82, 89, 105, 115, 126, 132, 139, 145, 168, 175, 185, 190, 194, 208, 214, 219, 241, 254, 264, 274, 286, and 287. And, of course, there was no process in Purdue's case to file a proof of claim against the Sackler Family—because they were not the Debtors. As the preliminary injunction has prevented parties from asserting claims against the Sackler Family (and related non-debtors) since 2019, the full universe of the claims against them remains unknown and uncounted.

But there have been dissenting voices that have made themselves heard against the Plan and its release of the Sackler Family and other non-debtors. These include the victims who objected to the Plan and the termination of their claims. App.2095-2098; App. 2099-2100; App.2101-2107; App.2108-2109; App.2110-2115; App.2116-2121; App.2122-2123; App.2124-2127; App.2128-2132; App.2374; *see also* App.2133-2161. They include state and local governments, insurers, and industry participants that also objected with similar concerns. Dkt. Nos. 3264, 3270, 3272, 3274, 3275, 3276, 3278, 3279, 3280, 3292, and 3306. They include the 2,683 personal injury victims who voted against the Plan, and may well include some, if not many, of the nearly 70,000 personal injury claimants who did not vote on the Plan at all. And they include the numerous other appellants, including eight states, the District of Columbia, Canadian municipalities, Canadian First Nations, and three pro se individuals that have appealed the Confirmation Order. Dkt. 3724 (as amended by Dkt. 3812); Dkt. 3725; Dkt. 3774; Dkt. 3775; Dkt. 3780 (as amended by Dkt. 3839); Dkt. 3784 (as amended by Dkt. 3818); Dkt. 3810; Dkt. 3813; Dkt. 3832; Dkt. 3849; Dkt. 3851; Dkt. 3853; Dkt. 3877; and Dkt. 3878.

To the extent the Plan proponents now maintain there are no claimants with direct claims against the Shareholder Released Parties, it was their burden to prove this before the bankruptcy court. They made no attempt to do so before the Plan was confirmed. And the bankruptcy court itself recognized that the Plan terminated creditors' direct causes of action. App.614-615 ("If, in fact, [derivative] claims were the only claims to be released, we would not be talking about a 'third-party claims' release of the shareholder released parties."); App.615(A "true third-party release[]," such as the one approved here, involves "claims that are independent of the debtor's estate's claims at least on a legal basis, if not as a factual basis.").

### 3. *Metromedia* does not authorize the release of liabilities of the Sackler Family and other non-debtors.

*Metromedia* does not permit the Non-Debtor releases, notwithstanding its acknowledgement that *some* cases have tolerated non-debtor releases in "rare" circumstances despite the lack of explicit statutory authority for them. *Metromedia*, 416 F.3d at 141-43.

First, the Second Circuit did not address the constitutional arguments raised here. *Metromedia*, 416 F.3d at 141-43. Moreover, *Metromedia* dismissed the appeal as equitably moot,[18] *id*. at 143-45, rendering its statements regarding non-debtor releases dicta. *See Kokkonen v. Guardian Life Ins. Co. of Am*., 511 U.S. 375, 379 (1994) ("It is to the holdings of our cases, rather than their dicta, that we must attend. . . ."); *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 352 n.12 (2005) ("Dictum settles nothing, even in the court that utters it.").

Nor could the possibility of a "rare case" exception, as mentioned in *Metromedia*, 416 F.3d at 141, justify what happened here. The Supreme Court's recent decision in *Jevic*, 137 S. Ct. at 986, underscores the problem with creating "rare" case exceptions to the Bankruptcy

[18] Equitable mootness is a judge-made "prudential doctrine that is invoked to avoid disturbing a reorganization plan once implemented." *Metromedia*, 416 F.3d at 144. The government believes that it is inapplicable here and may run afoul of the Supreme Court's recent invalidation of similar prudential doctrines. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014); *see also In re VeroBlue Farms USA, Inc.*, 6 F.4th 880 (8th Cir. 2021).

Code's requirements. In *Jevic*, the Court rejected the argument that a proposed deviation from the Code's priorities of payment was acceptable if limited to the "rare case" and the court finds "sufficient reasons," because that would still require a "departure from the protections Congress granted particular classes of creditors." *Id*. at 986-87. The same is true here; allowing non-debtor releases departs from Congress's direction that only debtors may obtain a discharge through a bankruptcy case with a narrow exception only for asbestos cases.

As this case demonstrates, the difficulty of giving "precise content to the concept 'sufficient reasons' . . . threatens to turn a 'rare case' exception into a more general rule." *Id*. at 986. That threat is acute in the context of non-debtor releases, which have become increasingly common. *See, e.g., Aegean Marine*, 599 B.R. at 723 (likening the increasingly common requests for third-party releases to "participation trophies").

Contrary to the lower court's broad reading of *Metromedia*, the Second Circuit specifically disapproved of the non-debtor releases at issue there. 416 F.3d at 143. Among other things, it questioned both whether the release itself was necessary to the plan and separately whether the breadth of the release—which covered numerous third parties in addition to the party contributing funds—was also necessary to the plan. *Id.*

It is not established that the Non-Debtor releases were necessary to reorganize Purdue. The Debtors' estates held claims against the Sackler Family that far exceeded the amount the Sackler Family agreed to pay under the Shareholder Settlement Agreement (to which the personal injury victims were not a party). App.953. Indeed, the bankruptcy court characterized the estates' claims as "argu[ably] . . . the main claims" against the Sackler Family. App.558-559. Estate claims for avoidable transfers alone assertedly exceeded $11 billion. App.568. To the extent Purdue or its creditors litigated Purdue's claims against the Sackler Family, rather than settled them in exchange for the unprecedentedly broad Non-Debtor releases, there may well have been enough to pay the unsecured creditors, including the personal injury claimants. *See Jevic*, 137 S. Ct. at 983 (rejecting bankruptcy court's finding that without settlement, the

unsecured creditors would receive nothing, holding that "the mere possibility of failure does not eliminate the value of the claim or petitioners' injury in being unable to bring it").

*Metromedia* also stated that a non-debtor release may be permissible if "the plan otherwise provided for the full payment of the enjoined claims." 416 F.3d at 142. It should not be lost that the coerced settlement does little for individual creditors. The Plan calls for the disbursement of roughly $4 billion. But the victims' portion is modest at best. They receive only the present value of a $700 to 750 million payment stream that will be disbursed to them over ten years. App.1402-03. They will receive—at the very most—only $48,000, notwithstanding the death and misery they and their families have suffered. And no value is being paid based on victims' claims against members of the Sackler Family or other non-debtors. *See* section I.A.4, *supra*. Yet, at the end of the Plan, the Sackler Family will have shielded the bulk of their assets from their victims' reach.

And, unlike in the cases outside the Second Circuit described in *Metromedia* as permitting non-debtor releases, here they extend to persons far beyond those making contributions to the reorganization plan, and who would have no claim for indemnity or contribution against Purdue. It is not even clear whether individual Sackler Family members are making any direct financial contributions to the estate, or if all of the money attributed to them comes from trusts.[19] The Sackler Family attempts to use the trusts holding their wealth as both a

[19] App.3234-3235 [Testimony of Mortimer Sackler ("Q Do you know how much of your own personal assets will be expended or is it all going to be covered by the trusts? A Well, the -- a trust that I'm a beneficiary of that's for me, you know, is -- for me and my children and grandchildren is, in my view, is my contributing as well. You know, in terms of how much ends up coming out of my personal estate versus my trust, I don't know at this time.")]; App.3226-3227 [Testimony of David Sackler ("Q Are you paying for any of the proposed Sackler payments under this confirmation plan and proposed settlement out of your own funds or personal assets? A Trusts of which I'm a beneficiary are paying the settlement amounts. Q Right. And I guess that's the question I had. Do you intend to pay for the Sackler payments out of the trusts of which you are a beneficiary but not directly out of your own personal assets? A My, yeah, I believe that is the current plan but I'd have to refer to my counsel to be absolutely certain.")]; App.3229-3230 [Testimony of Richard Sackler ("Q Mr. Sackler, are you going to be personally contributing any of your own assets to the settlement payments over the next nine to ten years? A I don't know -- I don't believe that's been decided yet.")].

sword and a shield: to claim on the one hand that these trusts are separate from them and thus cannot be reached by their creditors, App.2054, but also to claim credit for the trusts' contribution to the estate in exchange for vast Non-Debtor releases.

Contributions from the Sackler Family trusts cannot justify a release for the hundreds of other individuals and entities, including those alleged to have personally engaged in misconduct and who are not part of the Sackler Family. Nor can they justify a release of the hundreds, if not thousands, of other released non-debtors who did not work for, or otherwise manage, Purdue, and thus could have no possibility of seeking contribution or indemnification against the Debtors. App.1375 ("While approximately a dozen members of the Sackler Families served on the Board or were otherwise involved in Purdue Pharma's business to varying degrees, the record indicates that many members of the Sackler Families were not involved in Purdue Pharma at all, other than as passive recipients—through a series of intermediate entities and trusts—of distributions.").

As *Metromedia* warned, non-debtor releases lend themselves to abuse because they "may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code" and the "potential for abuse is heightened when releases afford blanket immunity." 416 F.3d at 142. The Plan is emblematic of this sort of abuse.

**4. *Quigley* does not authorize the Non-Debtor releases.**

Likewise, *Quigley*, on which bankruptcy court heavily relied, is irrelevant as it was an asbestos case that interpreted a statute, 11 U.S.C. § 524(g), that is inapplicable here. And it did not address any of the constitutional challenges raised below.

*Quigley* applied the various procedural and substantive safeguards, including compensation, imposed by section 524(g). Section 524(g) requires that: (1) the releasees are identifiable from the terms of the injunction; (2) they are "alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor"; *and* (3) that liability must "arise by reason of" one of four "statutory relationships." 11 U.S.C. § 524(g)(4)(A)(ii); *In re*

*W.R. Grace Co.*, 13 F.4th 279 (3d Cir.2021). Ultimately, *Quigley* held that the requirements of 524(g) were not met and the claims at issue against the debtor's parent—based on the use of the parent's name on the debtors' asbestos products—could *not* be enjoined because the alleged liability was not "by reason of" any of the four "statutory relationships." *Quigley*, 676 F.3d at 49, 60-61. *Quigley* simply cannot apply to the facts of this case.

Were this a section 524(g) action and had *Quigley* controlled, it would not have justified the bankruptcy court's extinguishment of the non-debtors' direct claims against other non-debtors. Notably, *Quigley* concerned a temporary stay of litigation rather than the permanent disposition of claims. *Id*. at 52. *See also Zale Corp.*, 62 F.3d at 760-61 (distinguishing between propriety of temporary and permanent injunctions against third-party actions).

*Quigley* is also distinguishable because of the grounds for the bankruptcy court's in rem jurisdiction. 676 F.3d at 53. There, the court found the third-party action at issue would impact the estate because the non-debtor shared insurance policies with the debtor and had an *uncontested* right to draw on that insurance for the lawsuit. 676 F.3d at 57. But, here, no such uncontested rights exist. Rather, the bankruptcy court below held that subject matter jurisdiction existed based on *potential* existence of indemnification and contribution rights. App.593-598.[20] Moreover, *Quigley* made clear that simply having jurisdiction to enjoin an action does not mean it would be appropriate to do so. *Id.* at 58, n.14.

And even if section 524(g)'s provisions for asbestos cases somehow applied to this non-asbestos case—which they do not—its threshold requirements are not met here. Among other reasons, aside from not being an asbestos case, the Plan precludes claims against *unidentified* non-debtors and is not limited to claims where liability is both based on the debtor's conduct *and* arises from one of the four statutory relationships to the debtor, 11 U.S.C. § 524(g)(4)(A)(ii), but

[20] As Purdue's advisor conceded, only a dozen (of the hundreds) of the Sackler Family members and other non-debtors were covered by insurance, and its insurers had either declined coverage for opioid-related liability or reserved their rights to do so. App.3222-3225; Dkt. 3456 at 17.

extends to any claim for which a debtor's conduct is *either* a "legal cause" *or* "an otherwise legally relevant factor."[21]

In addition, although the bankruptcy court took the Plan's "legal cause" or "legally relevant factor" language from *Quigley*, the bankruptcy court miscites the opinion. App.616. *Quigley* held that to qualify for a statutory injunction under section 524(g), the defendant must not only be allegedly liable for the conduct of, or claims or demands against the debtor, but also "the liability sought to be imposed must arise as a legal consequence of one of the four enumerated *relationships*" under 11 U.S.C. § 524(g)(4)(A)(ii)(I)-(IV).[22] 676 F.3d at 60 (emphasis added). The "*relationship*"—not the debtor's conduct—must be the "legal cause or a legally relevant factor for the liability." 676 F.3d at 60. The mere fact that the parties had such a relationship is not sufficient to qualify under section 524(g).

Thus, *Quigley* rejected the parties' attempt to use section 524(g) to enjoin litigation that was based, not on the third-party's *relationship* to the debtor, but instead on the third-party's independent actions. *Id.* at 62. It similarly rejected a hypothetical in which a successor company to an asbestos concern might seek to enjoin a lawsuit against it for liability on an age discrimination suit. *Id.* at 61. It would be the company's discriminatory act, and not its position as successor, that led to the liability. *Id.*; *see also Manville III*, 517 F.3d at 68 (holding section 524(g) was "not intended to reach non-derivative claims" such as for liability of the non-debtor's "own alleged misconduct").

As explained in section II.C.2, *supra*, victims have alleged that individuals immunized by the Non-Debtor releases personally engaged in tortious behavior that injured non-debtors. Although Purdue's conduct may—arguably—be "legally relevant" to such claims, that is

[21] Moreover, section 524(g) requires an abundance of other statutory protections not present here, such as super-majority voting requirements for current claimants and the appointment of a future claimants' representative. *See* 11 U.S.C. § 524(g)(2)(B)(ii)(IV)(bb), (g)(4)(B)(i).

[22] To paraphrase, the relationships are ownership, management, insurer, or financier. 11 U.S.C. § 524(g)(4)(A)(ii). Each corresponds to "a previously-recognized relationship that may, in appropriate circumstances, give[ ] rise to the legal liability of one party for the conduct of or claims against another." *Quigley*, 676 F.3d at 61.

irrelevant to the question of whether the bankruptcy court has authority to terminate them. The bankruptcy court's attempt to enjoin victims' claims against the Sackler Family and other non-debtors for their own independent misconduct, simply because those claims may involve Purdue, is not supported by *Quigley.*

**5. No other binding Second Circuit opinion authorizes the Non-Debtor releases.**

None of the other Second Circuit decisions mentioned by the bankruptcy court support its authority to issue the Non-Debtor releases. App.615. They are inapposite.

*SEC v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 960 F.2d 285 (2d Cir. 1992), did not involve a chapter 11 plan confirmation. Instead, it involved a settlement of a securities class action in which a class representative released claims on behalf of a certified class under Fed. R. Civ. P. 23. *Id.* at 288. Notably this was in the context of a mandatory, non-opt out class, *id.*, which under *Ortiz*, would be an improper treatment for mass tort victims. *Ortiz*, 527 U.S. at 842-48.

As discussed above, *Manville I* involved the release of claims that were derivative of claims belonging to the debtor and that sought relief from insurance proceeds that were the debtor's property and part of its estate. *Manville I*, 837 F.2d at 93 (approving injunction regarding disposition of debtor's insurance proceeds where plaintiffs' claims were "inseparable from Manville's own insurance coverage"). It does not support a bankruptcy court's authority to enjoin a creditor's direct claim against a non-debtor, as made amply clear by the holding of *Manville III*, 855 F.3d at 68.

*Madoff* similarly involved a release and injunction against claims that were derivative of the debtor's. 740 F.3d at 90-94. There, the trustee had settled with certain defendants for fraudulent transfers, and the bankruptcy court enjoined any claims that were "duplicative or derivative of the claims brought by the Trustee." *Id.* at 86. Third parties then sought to sue the same debtors for the same fraudulent conveyance settled by the trustee. *Id.* at 91. The court carefully looked for any allegations of "particularized" actions by the defendants that were aimed

at the plaintiffs, such as through misrepresentations, and found none. *Id.* at 91-93. The court even noted that the plaintiffs may still amend the complaint to allege any "particularized conspiracy claim" that was not derivative of the debtor's. *Id.* at 94.

And *Tronox* involved a final and unappealed release and injunction of claims that were duplicative or derivative of those settled in the debtor's bankruptcy case. 855 F.3d at 92. There, third parties later tried to sue the settling defendants based on indirect-liability claims—fraudulent transfer actions and actions for alter-ego/successor liability—with no allegation that the settling defendant had breached a duty directly to the plaintiffs. *Id.* at 105-06; *see also id.* at 88 (noting plaintiffs did not "alter their state-court complaint to allege direct claims against [the defendant] to hold it responsible for its own alleged wrongdoing").

These cases do not stand for the proposition that a bankruptcy court may ignore individuals' constitutional rights or extinguish non-debtors' direct claims against other non-debtors that are independent of the debtor's own claims and property. To the extent this Court reads these Second Circuit decisions to permit this type of non-debtor release, they are wrongly decided for the reasons discussed in our brief.

## III. Because the Non-Debtor releases are improper, the bankruptcy court abused its discretion in issuing the related orders.

The United States Trustee separately appealed two other orders related to the Confirmation Order: the Disclosure Order, App.647-945, and the Advance Order, App.1228-1233. The Debtors proposed the disclosure statement as a condition precedent to soliciting acceptances of the Plan that was eventually confirmed (seven iterations later). 11 U.S.C. § 1125(b). As both the Fifth and Ninth Circuits agree, the Disclosure Order is an interlocutory order that merged into the Confirmation Order for purposes of appeal. *See Perez*, 30 F.3d at 1217; *Matter of Tex. Extrusion Corp.*, 844 F.2d at 115. The government's objections to both the Disclosure Order and Advance Order pertained, in part, to their issuance under the incorrect premise that the Non-Debtor releases were authorized and permissible. Dkt. 2686 at 18; Dkt. 3555 at 4-5.

For the reasons set forth above, the Non-Debtor releases are unconstitutional and violate the Bankruptcy Code. It was an abuse of the bankruptcy court's discretion to (1) approve the disclosure statement and related solicitation materials in support of the Plan, and (2) approve the Advance Order to facilitate the illegal provisions of the Plan. It was thus reversible error for the bankruptcy court to issue both the Disclosure Order and the Advance Order.

**CONCLUSION**

For these reasons, the United States Trustee respectfully asks this Court to reverse the orders on appeal.

October 25, 2021

Respectfully submitted,

WILLIAM K. HARRINGTON
United States Trustee for Region 2

By /s/ Sumi Sakata
Sumi Sakata
Trial Attorney

RAMONA D. ELLIOTT
Deputy Director/General Counsel
P. MATTHEW SUTKO
Associate General Counsel
WENDY COX
BETH A. LEVENE
WENDY COX
MELANIE D. HENDRY
SUMI K. SAKATA
Trial Attorneys

Department of Justice
Executive Office for
United States Trustees
441 G Street, NW, Suite 6150
Washington, DC 20530
Tel: (202) 307-1399

WILLIAM K. HARRINGTON
United States Trustee, Region 2
LINDA A. RIFFKIN
Assistant United States Trustee
PAUL K. SCHWARTZBERG
BENJAMIN J. HIGGINS
BRIAN MASUMOTO
ANDREW VELEZ-RIVERA
Trial Attorneys

Department of Justice
Office of the United States Trustee
201 Varick Street, Room 1006
New York, NY 10014
Tel: (212) 510-0500

**CERTIFICATE OF COMPLIANCE**

I certify that the foregoing brief complies with the type-volume, type-face, and type-style limitations of Bankruptcy Rule 8015.

Under Rule 8015(f), "[b]y local rule or order in a particular case, a district court or BAP may accept documents that do not meet all the form requirements of this rule or the length limits set by" by the Part VIII of the bankruptcy rules.

Although Rule 8015(a)(7) sets a limit of 13,000 words, this Court has stated that the briefing in this appeal need not comply with the length-limits of Rule 8015. *See* 10/12/21 Tr. at 21 ("Please forget about the page limit . . . ."). This brief contains 20,416 words.

Under Section V.D of the "Individual Practices and Procedures [of] Chief Judge Colleen McMahon," this Court requires a type-face of 12-point serif font. The foregoing complies with the typeface and type style requirements because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 12-point font.

Dated: October 25, 2021

By /s/ Sumi Sakata
Sumi Sakata
Trial Attorney

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 19-23649-rdd

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

PURDUE PHARMA L.P.

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

United States Bankruptcy Court

Tele/Video Proceedings

300 Quarropas Street, Room 248

White Plains, NY 10601

August 23, 2021

9:50 AM

B E F O R E :

HON ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

ECRO: UNKNOWN

HEARING re Notice of Continuation of Hearing on Confirmation of Seventh Amended Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. and Its Affiliated Debtors filed by Eli J. Vonnegut on behalf of Purdue Pharma L.P.. with hearing to be held on 8/23/2021 at 10:00 AM (ECF #3617)

Transcribed by: Sonya Ledanski Hyde

A P P E A R A N C E S :

DAVIS POLK WARDWELL LLP

Attorney for Debtors

450 Lexington Avenue

New York, NY 10017

BY: MARSHALL SCOTT HUEBNER (TELEPHONICALLY)

BENJAMIN KAMINETZKY (TELEPHONICALLY)

JAMES I. MCCLAMMY (TELEPHONICALLY)

ELI J. VONNEGUT (TELEPHONICALLY)

WHITE & CASE LLP

Attorneys for The Ad Hoc Group of Individual Victims of Purdue Pharma

1221 Avenue of the Americas

New York, NY 10020

BY: J. CHRISTOPHER SHORE (TELEPHONICALLY)

SULLIVAN WORCESTER LLP

Attorneys for Purdue Pharma, L.P.

1633 Broadway

New York, NY 10019

BY: JEFFREY R. GLEIT (TELEPHONICALLY)

JENNER BLOCK

Attorneys for McKesson

353 N. Clark Street

Chicago, IL 60654

BY: CATHERINE STEEGE (TELEPHONICALLY)

PILLSBURY WINTHROP SHAW PITTMAN LLP

Attorneys for Ad Hoc Group of Non-Consenting States

31 West 52nd Street

New York, NY 10019

BY: ANDREW M. TROOP (TELEPHONICALLY)

O'MELVENY MYERS

Attorneys for Johnson & Johnson

7 Times Square

Los Angeles, CA 90067

BY: EVAN JONES (TELEPHONICALLY)

AKIN GUMP STRAUSS HAUER & FELD LLP

Attorneys for The Official Committee of Unsecured Creditors

One Bryant Park

New York, NY 10036

BY: ARIK PREIS (TELEPHONICALLY)

CAPLIN DRYSDALE

Attorneys for Multi State Governmental Entities Group

One Thomas Circle

Washington, DC 20005

BY: KEVIN MACLAY (TELEPHONICALLY)

Lite DePalma Greenberg Afanador, LLC

Attorneys for Canadian Municipality and First Nation Creditors

570 Broad Street, Suite 1201

Newark, NJ 07102

BY: ALLEN J. UNDERWOOD (TELEPHONICALLY)

UNITED STATES DEPARTMENT OF JUSTICE

Attorneys for the U.S. Trustee

201 Varick Street, Suite 1006

New York, NY 10014

BY: PAUL KENAN SCHWARTZBERG (TELEPHONICALLY)

PULLMAN COMLEY

Attorneys for State of Connecticut

850 Main Street

Bridgeport, CT 06604

BY: IRVE GOLDMAN (TELEPHONICALLY)

KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

Attorneys for State of Washington

500 Fifth Avenue

New York, NY 10110

BY: MATTHEW J. GOLD (TELEPHONICALLY)

OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

Attorney for State of Maryland

200 Saint Paul Place

Baltimore, MD 20852

BY: BRIAN EDMUNDS (TELEPHONICALLY)

ATTORNEY GENERAL OFFICE OF WASHINGTON

Attorneys for State of Washington

800 Fifth Avenue, Suite 2000

Seattle, WA 98104

BY: THOMAS ROBINSON O'NEILL

ALSO PRESENT TELEPHONICALLY:

JILL S. ABRAMS

ROXANA ALEALI

ANDREW VINCENT ALFANO

PHILIP D. ANKER
MICHAEL ATINSON
MITCHELL JAY AUSLANDER
JASMINE BALL
PRIYA BARANPURIA
BROOKS BARKER
DAVID E. BLABEY JR.
LOUIS BOGRAD
SARA BRAUNER
DAVID BROWN
GABE BRUNSWICK
AARON CAHN
MARK CHALOS
GERARD CICERO
HAYDEN COLEMAN
DANIEL CONNOLLY
ABBY G. CUNNINGHAM
MELANIE L. CYGANOWSKI
MARIO D'ANGELO
PETER C. D'APICE
STACY DASARO
JOSEPH G. DAVIS
KEVIN DAVIS
MARK DEARMAN
JESSE DELACONTE

SHANNON DEVON
CLINT DOCKEN
JOHN C. DOUGHERTY
JOHN DUBEL
STEPHANIE EBERHARDT
KENNETH H. ECKSTEIN
BERNARD ARDAVAN ESKANDARI
MATHEW FARRELL
JENNIFER S. FEENEY
LAURA FEMINO
ROBERT FINZI
MATTHEW FITZSIMMONS
PAMELA FLETCHER
LAWRENCE FOGELMAN
SAM FRAIDIN
HEATHER FRAZIER
BRYCE L. FRIEDMAN
KATHERINE GALLE
CAROLINE GANGE
JOSEPHINE GARTRELL
GILL GELDREICH
MELISSA GIBSON
JARED GIDDENS
MAGALI GIDDENS
SCOTT GILBERT

MICHAEL GOLDSTEIN
GEOFFREY S. GOODMAN
ISLEY MARKMAN GOSTIN
GARY GOTTO
JARED T. GREEN
JAMES S. GREEN, JR.
DEBORAH GREENSPAN
EMILY GRIM
JOHN GUARD
ADAM P. HABERKORN
CATHERINE BEIDERMAN HEITZENRATER
ANGELA K. HERRING
MICHELE HIRSHMAN
JENNA A. HUDSON
MITCHELL HURLEY
ELISA HYDER
LINDA IMES
MARK S. INDELICATO
HAROLD D. ISRAEL
SAMUEL ISSACHAROFF
STEVEN IVES
ETHAN KAMINETZKY
NICKOLAS KARAVOLAS
KAREN KENNEDY
MARC KESSELMAN

DARREN S. KLEIN

JEREMY C. KLEINMAN

LAWRENCE KOTLER

ANN KRAMER

M. NATASHA LABOVITZ

ALEXANDER LEES

DANIEL LENNARD

NICOLE A. LEONARD

MARA LEVENTHAL

DANIELLE J. LEVINE

RUTH LICHTENFELD

JEFFREY LIESENMER

EDAN LISOVICZ

JOHN LONGMIRE

JOHN LOWNE

MICHAEL LUSKIN

BRIAN S. MASUMOTO

PATRICK C. MAXCY

LAURA MCCLOUD

HUGH M. MCDONALD

CARRIE MCGAHA

SHANNON M. MCNULTY

MICHELE MEISES

LIVY MEZEI

NATHANIEL MILLER

JONATHAN E. MITNICK

DAVID MOLTON

MAURA KATHLEEN MONAGHAN

ANDREW J. MUHA

AISLING MURRAY

EDWARD E. NEIGER

MICHAEL PATRICK O'NEIL

DAMIAN O'SULLIVAN

JAMES FRANKLIN OZMENT

JENNIFER PEACOCK

STEPHEN POHL

KATHERINE PORTER

DOUGLASS PRESS

NICHOLAS PREY

MICHELE PULGGARI

KAMI QUINN

MARION QUIRK

GILLIAN RENDEL

CHRISTINA RICARTE

JOSEPH RICE

RACHAEL RINGER

CHRISTOPHER ROBERTSON

JEFFREY J. ROSEN

JORDAN ROSENBAUM

PAUL S. ROTHSTEIN

JASON RUBINSTEIN
MEGAN PARIS RUNDLET
WILLIAM T. RUSSELL
JEREMEY W. RYAN
JAMES SALWEN
DANIEL JOSEPH SAVAL
SETH SCHINFELD
ELIZABETH SCHLECKER
FREDERICK E. SCHMIDT
MICHAEL SHEPHERD
RICHARD SHORE
RICHARD SILBERT
LIANNA SIMMONDS
PAUL SINGER
PAUL M. SINGER
MARC F. SKAPOF
ARTEM SKOROSTENSKY
D. RYAN SLAUGH
JOSEPH L. SOROKIN
CLAUDIA Z. SPRINGER
HOWARD STEEL
ERIC STODOLA
ADAM SWINGLE
JEROME TAPLEY
PAMELA THURMOND

MARC J. TOBACK

SARA E. TONNESEN

KELLY TSAI

JOSEPH TURNER

GERARD UZZI

MELISSA L. VAN ECK

MICHAEL J. VENDITTO

JONATHAN WAGNER

RYAN A. WAGNER

JORDAN A. WEBER

WENDY WEINBERG

SHIRA WEINER

WILLIAM P. WEINTRAUB

MARTIN WEIS

MARTIN JAMES WEIS

ALLISON H. WEISS

THEODORE WELLS, JR.

STEVEN WILAMOWSKY

DANIEL WOLF

LAUREN S. ZABEL

JAMIE ZEEVI

DAVID ZYLBERBERG

 P R O C E E D I N G S

THE COURT: On oral argument, the record having been closed at the end of last week's hearing, I know there's been some back and forth by the parties as to the time allotted, as opposed to the actual issues and the order in which they would be heard. I don't actually think this really is the appropriate subject of a -- any sort of additional conference or discussion. This meaning, how much time the parties are going to take. Ultimately oral argument is for the Court's benefit. The Court has already received lengthy, in fact, over the page limit, although I authorized it, briefing on most of these issues, including the one that the parties propose taking the most time on. I'll just cut people off if they're being repetitive.

So, I'm happy to begin with oral argument, unless there's any other announcement that the parties would like to make.

MR. HUEBNER: Your Honor, good morning, for the record, Marshall Huebner, Davis Polk & Wardwell, on behalf of the Debtors. Can I be heard and seen clearly?

THE COURT: Yes.

MR. HUEBNER: Terrific. Thank you, Your Honor. Your Honor, before we actually start oral argument, in our other capacity as just resharing and stewards of the cases, we have three things to announce on what the Court, through

it and others, these things more or less, two of them appeared on the docket, but it is important, I think, because it does narrow the issues.

The newest piece of news is that Dr. Rothfein and his client, the Emergency Room Physician, we have reached a settlement, and so their issues are going to be resolved. That settlement has the support of the AHC and the MSGE, and the UCC does not expect any problem in approving it. It essentially, on its face, contemplates a $375,000 broadly supported substantial contribution claim for the work that the doctor and his counsel have done. There have been some changes, obviously, into some of the issues that they raised, periodically throughout the case, and with that, that issue is resolved and needs no other further discussion, nor oral argument.

We will, obviously, file appropriate papers as we did with, for example, Mr. Stuart (indiscernible), resolving their objections, and again, we already have, I believe, the support we need since I was able to note is the residual money that the Debtors hope to be able to make available to abatement, or it goes to non-Federal Governmental creditors, and so between the UCC, AHC, and MSG, those are all of the organized groups, essentially, whose representatives, in essence, having their recoveries diminished by that amount and they are all either supportive over all or they

(indiscernible) supported. So hopefully we can -- one third of one box, I'll have it can make to (indiscernible) chambers.

I would like to apologize to the NCSG and the two halves, or really 62 percent and 37 percent, who just did not have time, this only happened a few minutes ago, but although, Peter (indiscernible) and Mr. (indiscernible), by seeming looking happy on the webcam, as Your Honor was walking out. He obviously he will explain this either to Mr. Troop, if he is still representing the full group, per this is other than confirmation, to which I believe he is, plus obviously, happened to talk to any individual non-consenting states, but, you know, to say it in its more simple form, we would probably save more for these very creditors by not continuing to wrestle with these issues, but an opinion contemplates, which is one of many reasons why we believe the settlement is appropriate. I hope that no party is offended, but we're desperately looking to settle things, and my other attorneys that were on phone calls, literally this happened, Mr. McClammy stepped out and made these phone calls in about the last 120 seconds, and so this is about as hot and breaking a piece of news as one could possibly have.

THE COURT: Okay. So just to -- just to be clear, this is a -- an agreement to support a substantial

contribution claim in that amount?

MR. HUEBNER: Mr. McClammy, please keep me honest, is that correct? That's what I've been told. We got this -- literally just happened.

THE COURT: Okay. Okay.

MR. HUEBNER: Your Honor, the second piece of good news, and I'm about to turn over the podium, because I think both of the next two things are from Mr. Vonnegut, they are complicated and -- and not for me, I have no capacity and ability to describe them, are that we have settled with the DMP's. And this is a very material development in the case, letting the Court knows it avoided needing to -- oh, it's not a full settlement, but Mr. Vonnegut will walk us through it. And then the third thing, which he will also walk us through is taking our cue as we have from the first moment of this case, both from what creditors and other stakeholders articulate to us, as their needs and concerns and issues, and of course, listening to the Court as be as we know how. We did file, I believe in the middle of the night last night, because there has been negotiating until moments before it was filed, amended documents that I do believe narrow and change a variety of things that have been the subject of objections, and so, probably to avoid inaccuracy, which would help no one, I think I will probably sit down and ask Mr. Vonnegut to walk the Court and parties,

and Ms. Deedee, I'm sure, will keep him honest of the DMP side, where we are on those two issues, and then after that we can turn to oral argument on the --

THE COURT: Okay. I -- I did see the eighth amended plan, and I -- actually, I was a little late getting onto the bench because I was reviewing the black line. But I'm happy to hear a brief explanation of the settlement with the, so called, DMP group.

MR. VONNEGUT: Good morning, Your Honor, for the record, I'm Eli Vonnegut of the Davis Polk & Wardwell, on behalf of the Debtors, can you hear me clearly?

THE COURT: Yes, thanks.

MR. VONNEGUT: Thank you. So to respect the allocation of time for argument, I will only be giving a factual explanation of the plan revisions that were filed overnight.

Those revisions, in the eighth amended plan, fall into a few principal categories. First, we have revisions agreed to with the distributors, manufacturers, and pharmacies, I will call them the DMP's to resolve the bulk of their objections to the plan. On this I will be describing only the agreed revisions. My co-counsel, Jeffrey Gleit of Sullivan, and Worcester, is acting as conflicts counsel for the Debtor, with respect to the sole component that the DMP's objection that remains unresolved,

and he will be addressing that later in argument.

Next we have revisions to the release provisions to attempt to narrow concerns that have been raised, and also, hopefully just to make it a little easier to understand the releases. Lastly, there are three miscellaneous changes that I will just cover very briefly.

So first, with respect to the DMP settlement, the agreement reached with the DMP's resolves all aspects of their objections other than those related to the Debtor's insurance policies, which Mr. Gleit will be addressing later. The crux of the agreement is very simple. It's a bilateral release. The DMP's have agreed to release their co-defendant claims against the Debtors, and to the assumption of their contracts without payment of those claims. The Debtors, in turn, have agreed to release their claims against the DMP's, including those that arise under the assumed contract and to remove the DMP's from the schedule of excluded parties.

The DMP's have also now been added to the reciprocal release, meaning that they receive a release from the Sacklers and the other shareholder release parties. There are a couple exceptions to this overall framework. Both the Debtors and the DMP's preserve their ordinary course, claims that are not related to opioid litigation, and as before, all holders of co-defendant claims, continue

to retain what we call their co-defendant defensive rights. Those are rights that they have to attempt to reduce their liabilities, judgements, or obligations, but those co-defendant, defensive rights cannot be used to seek or obtain any affirmative recovery from any protected party.

Mechanically, this settlement is implemented in a few different places in the plan. In Section 4.16, which covers the treatment of co-defendant claims, we've just simplified this a lot. It now just says that co-defendant claimholders don't receive any distributions but do retain their defensive rights. Section 8.4, addressed treatment of co-defendant contracts, contracts that have -- that give rise to co-defendant claims. That now just says that those agreements are assumed with all co-defendant claims arising under those contracts, having been released.

This treatment, with the exception of the issue that Mr. Gleit is going to address, is now consensual as to all counterparties. The DMP's withdrew the objections that they filed for this treatment and no other parties objected to this treatment prior to the deadline, which was August 2nd.

Lastly, for the DMP settlement, excluded party, the defining term now does not include any settling co-defendants. Settling co-defendants is the DMP's. These parties also become reciprocal releasees, which means that's

how they get a release from the Sacklers and the other shareholder related parties. The settling co-defendants have also been added to both releasing parties and released parties, so on both sides. And then lastly, 10.6 preserves the ordinary commercial claims I referred to earlier, and Section 10.18 preserves the defensive rights of the co-defendants.

Unless, Your Honor, has any questions about the DMP settlement --

THE COURT: I did have -- I did have a question, you describe this essentially as a mutual release of claims with the exceptions for ordinary course claims, and the like, so given that, there is no third-party release of the DMP's under the plan? If someone has a third-party claim against them, that's not being released?

MR. VONNEGUT: The DMP's are now removed from the excluded party schedule, which means that if they are -- if they are a released party in other capacities, that they would be included in the third-party release, by virtue of having them removed from the excluded party schedule.

THE COURT: See I -- I don't understand that provision. There are -- I'm not sure who is included within the DMP group, but there's pending litigation against distributors and manufacturers, it's not stayed by me, around the country, including in the MDL, and I wouldn't

think that the plan would be able to release them in that litigation.

MR. VONNEGUT: I'm -- I'm sorry, Your Honor. No, that litigation is -- is not released. So in -- in the definition of released parties, I actually, in the inserted language, clause 3, Subsection B, the settling co-defendants and their related parties are become released parties for Section 10.6A, which is the release granted by the Debtor.

THE COURT: Okay.

MR. TROOP: Your Honor, Andrew Troop, on behalf of the Non-Consenting States --

THE COURT: Go ahead.

MR. TROOP: -- thank you for asking my question. But it seems to me that the plan should be perfectly clear about this (indiscernible) --

THE COURT: I -- I agree. I just wanted to make sure I understood the intent. I think you do, Mr. Vonnegut, did point me, correctly, to the fact that that for purposes of the definition, it's just for 1.06, but I think you probably should beef that up, because just based on the breadth of the third-party litigation around the country, there shouldn't be any confusion on this point.

MR. VONNEGUT: Thank you, Your Honor, happy to clarify that.

THE COURT: Okay.

MS. STEEGE: Your Honor, this is Catherine Steege, on behalf of the DMP's, I think no one thought to go through the language, it is very clear that the relief they're receiving is from the Debtor and from the Sackler shareholder parties, or whatever that terms is. It does not in --

THE COURT: I think --

MS. STEEGE: -- in any way suggest that other parties are released from this.

THE COURT: I think that's right, but I -- I understand that to be the case, but since the third-party release also uses the term, released parties, maybe -- I mean, my suggestion might be that you drop a footnote in the definition of released parties where it says in Section 10.6A, and just make it clear that -- that this is the Debtor release and not any third-party release.

MR. VONNEGUT: We're happy to do that, Your Honor.

THE COURT: Okay.

MS. STEEGE: And Your Honor, we would expect the Debtor would share whatever language it's requesting --

THE COURT: Of course, sure.

MS. STEEGE: -- with the Court.

MR. VONNEGUT: Both parties.

THE COURT: Right.

MS. STEEGE: The other point, Your Honor, I'd make

about the withdrawal of our objection to the plan, is we have preserved one objection, which is the objection to the provisions that only insurance flights, we've agreed to rest on our brief's in connection with that objection. In addition, many of the DMP's are involved in litigation up in Canada, or are only involved in Canadian litigation, and they all reserve their rights to make the appropriate arguments in the Canadian courts, including in the recommended decision.

THE COURT: With respect to -- with respect to what?

MS. STEEGE: With respect to preservation of their defensive rights up there and there are other issues up there that interplay with the litigation that they need to be able to argue in the Canadian Courts.

THE COURT: But I just want to make sure, is it the preservation of their rights goes to the reserved issue here that the parties have briefed as to rights to insurance, and the -- and the carveout for their defenses judgement reduction, those sorts of points?

MS. STEEGE: Yes, Your Honor, that's correct.

THE COURT: All right. Not that they will -- then we argue in Canada, in the recognition proceeding, the objection that they've waived here?

MS. STEEGE: No, Your Honor, well, we would not be

rearguing the objections that we've agreed to in the plan here.

THE COURT: All right. Fine. Thank you. Okay. Thanks for those two updates.

MR. JONES: Your Honor, Evan Jones of O'Melveny Myers, we represent Johnson and Johnson, which is one of the DMP's. In Your Honor's question, we do believe under Canadian law, it may be appropriate to (indiscernible) the recognition of this Court's order, if the plan is confirmed, and we're reserving that. We're not going to reargue an objection to the plan, but to the extent Canadian law limits recognition, we believe it is appropriate to reserve.

THE COURT: All right. I -- my point's a very simple one. I wanted to make sure that that reservation of rights doesn't include raising the same objection that has been settled here.

MR. EVANS: Understood, Your Honor.

THE COURT: Okay. All right. Very well, thank you.

MR. VONNEGUT: Thank you, Your Honor. Next I will outline the revisions made to the release provisions on our few miscellaneous changes. So on the releases, I'd just like to revisit, briefly the basic architecture of the releases, I think it's -- it's helpful in understanding them.

In order to be released, a claim has to be first, held by a releasing party. Second, asserted against either a released party or a shareholder released party, and third, based on relating to or arising from, in full or in-part, the Debtors, their states, or the in the Chapter 11 cases. It also has to be not held by the federal government, not against an excluded party and not an excluded claim.

The simplest revisions to the releases that we made fall into the category of just fixing bad drafting, that tends to result when you have a document being commented on by as many intensely interested parties as we have in this case. So you'll see, throughout, we've removed duplicative language; in many cases we've attempted to streamline use of defining terms, like cause of action. I won't go through that in detail, unless, Your Honor, has any questions.

Sections 10.6 and 10.7, they've gotten a lot shorter, and we hope a lot clearer. We've removed duplicative or otherwise unnecessary language, and our core standard in sections 10.6 and 10.7 is that in order to be released, the cause of action must be based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the estates, or the Chapter 11 cases, and we have a parenthetical illustrating certain types of claims that might relate to the Debtors, but that does not expand their

provision in any way. Those claims still all have to relate to the Debtors. We don't do any of those revisions as substantively changing the scope, we're just trying to make things a little bit easier to read.

On the more substantive side, we have revised both what is an excluded claim and who is a shareholder released party, to attempt to address concerns about the breadth of the releases. So in the definition of excluded claim, the two most substantive additions are 1) mindful of, Your Honor's commentary and input from creditors regarding claims related to non-opioid issues. We've now excluded from the releases non-opioid related claims against shareholder released parties, or those shareholder released parties on willful misconduct. There are a set of definitions that impact this. We've added new defining terms for what constitutes willful misconduct, and what constitutes a willful non-opioid claim, which is a non-opioid claim arising from willful misconduct.

We also heard concerns regarding the breadth of the releases for advisors and contractors of the Sacklers, and so we have also excluded claims against those parties for their own willful misconduct, regardless of whether they are opioid related or not opioid related. That provision, again, is founded on the definition of willful misconduct and the term for those claims that are excluded is willful

party related claim, which means a claim against a shareholder, released party that is identified in Subsection VII(b) of Shareholder released party or such parties, actually and separate, willful misconduct. And that means it's their own conduct, not conduct that was imputed to them.

Both of these provisions have a deep keeping function pertinent to the plan to provide some protection against strike suits. This lives in new Section 11.01(e), and that requires a claimant that believes they have a claim that fits one of these carveouts, before they prosecute that claim, to first come to the bankruptcy court and make a showing that their claim is both colorable and within one of the two definitions.

Also, in excluded claim, we did some less substantive cleanup to just try to address some provisions that seem to have been causing confusion. First in II, we made clear that nobody is getting income tax claims released. This was always the case, but we took apart that use to apply to only to shareholder released parties and make -- and made it global, just to make clear what we're doing there.

Next in V, we eliminated a provision that only applied to releases among different shareholder released parties. That now lives in its own provision in Section

10.7(b), and lastly, we excluded any cause of action based on conduct after the effective date. This again was always the case, but there were a lot of questions about future conduct during the -- during the presentation of evidence, so we just wanted to make that very clear.

Next in the definition of shareholder released party. We've heard concerns about the scope of releases for transferees of the Sacklers, and so in VI, we have simplified that prong so that persons in which the Sackler's own an interest are no longer released parties, and we've replaced that with a provision for mediate and immediate transferees of the Sacklers, but that is very strictly limited to make clear that those parties are only released in their capacity as such, and only for the amounts that they received.

Other revisions to that -- that term, were just clarifying and we did not give a substantives. Unless, Your Honor, has any questions, I can briefly cover the -- the few other revisions that were made to the plan.

THE COURT: Okay. I -- I had a couple of questions on this topic.

MR. VONNEGUT: Sure.

THE COURT: First, in the definition of willful misconduct, it -- it comes under an action taken or not taken in bad faith and with actual knowledge that such

action or failure to act is unlawful, prohibited, or false, and will be harmful to another. It -- it doesn't include the word fraud, and much of the litigation here, asserts fraud claims, one way or another, including under Consumer Protection Act statutes, and I just want to make sure is fraud included within this?

MR. VONNEGUT: Well, I don't want to get ahead of Mr. Uzzi, who looks like he's ready to address that.

MR. UZZI: Your Honor, for the record, Gerard Uzzi, Milbank, on behalf of the Raymond Sackler Family. It was actually rose to address just a clarification on the -- the prior statements with which I -- which I can address, but to answer this question. Your Honor, I -- I -- I think we mean what we say here. It's not intended to -- to pick up fraud. It's intended to pick up what it says here.

THE COURT: I think you should pick up fraud.

MR. UZZI: All right. Understood, Your Honor. We will -- we will -- we will take -- we will discuss that with our clients, Your Honor.

THE COURT: Okay.

MR. UZZI: The clarification I wanted to make, Your Honor, is Mr. Vonnegut had made -- we made -- we made a correction as it relates to -- I'm sorry, I'm just flipping the page to get there, Your Honor, but the definition of shareholder of these parties, as it related to transferees

and we did clarify that and we limited that language, but Mr. Vonnegut made a statement that we had taken out the reference to Sackler owned entities, that's true as a cleanup comment, but that's just simply because it's picked up later in the definition as far as a catchall for subsidiaries and controlled affiliates.

THE COURT: Right.

MR. UZZI: So it was a cleanup on transferees.

THE COURT: The purpose -- the purposes of this change was to limit the release to -- to those that would be otherwise sued, as being the recipient of a fraudulent transfer that's released under the plan, right, and in that accord --

MR. UZZI: Correct, Your Honor -- correct, Your Honor.

THE COURT: All right.

MR. UZZI: Or similar theories.

THE COURT: Right. Okay. All right. The other -- the other point I had is a much smaller one, and again, I'm not -- I'm just trying to understand what's in here, I'm not -- I'm not commenting the merits of the changes or whether they're enough. Although, I appreciate the work done to narrow the release. If you go to the last paragraph of 10.6, I think there's -- I think there's potential for a little confusion in the fourth line there.

It says, in each case, unrelated to the Chapter 11 cases or the subject matter of the pending opioid actions, I think you probably should put unrelated, and then add the word either to the Chapter 11 cases or to, I think that's supposed to be disjunctive, right? It's unrelated to either one of those two or both?

MR. UZZI: Yes, sir, that's right.

THE COURT: All right. I had to read that a couple of times to figure that out and I think that would make it clearer.

MR. UZZI: We will fix that, Your Honor.

THE COURT: Okay. Okay.

MR. UZZI: Your Honor, so, but the last three changes, just to highlight for the Court and the parties, one in continuing foundation members, which describes the individuals that will be appointed to run the two Sackler Family Foundations, we've just removed from -- from that term, the possibility of the Court appointing those people, which the State of New York didn't like and didn't like and frankly we thought the Court might not like, so now that -- those foundations will just be run by either the NOAT Trustees or people otherwise agreed to by the Debtors, the governmental consent parties, and counsel for the newly consenting states.

THE COURT: A good change.

MR. UZZI: Thank you. In Section 11.1, XVII, we fixed a conflict between the plan and the NOAT and Prime Trust documents regarding jurisdiction over those documents, to make clear that they will be concurrent and not exclusive bankruptcy court jurisdiction over those entities. And lastly, to conform to the revisions to the confirmation order, we've removed the waiver of the 14 days stay imposed under Rule 3020, from 9.2, and we adjusted Section 12.8 to conform there.

THE COURT: Okay.

MR. UZZI: And that is it, Your Honor.

THE COURT: Okay. Very well.

MR. FOGELMAN: Your Honor, Lawrence Fogelman from the US Attorney's office. I wanted to quick thank the (indiscernible), we did get a draft on Saturday of some of the changes, but just this morning when we woke up, a lot of the changes that we had discussed over the weekend weren't there, and some others were different. So and a lot of it deals with the releases, which are an important part to what my offices has been the states, and the Debtors in our office don't necessarily always agree on interpretation of the same language. So to the extent that we -- we can (indiscernible), I guess the new language that came up, since it's hard to do it on the fly, I just would ask that to be involved in this and to be allowed to revisit an

issue, if we discover something prior to the final -- final (indiscernible).

THE COURT: Okay.

MR. VONNEGUT: Your Honor, that's very much understood. We were just describing the revisions made and did not mean to suggest that they resolved anybody's objection, unless somebody has said their own objection is resolved.

THE COURT: Right. I -- I --

MR. FOGELMAN: We would not think, Your Honor, that revisions developed a new issue that we didn't know about 12 hours ago. We want to be able to look at those documents and figure that out.

THE COURT: That -- that's fair, but I also think it's helpful to confine the oral argument on this point to the actual wording of the plan, at this point. Which, as I said, may or may not be sufficiently narrow.

MR. FOGELMAN: Thank you, Your Honor.

THE COURT: Okay.

MR. VONNEGUT: Okay. Thank you, Your Honor, I think I will turn the podium over to Mr. Huebner.

THE COURT: Okay.

MR. TROOP: Your Honor -- Your Honor, Andrew Troop for the Non-consenting States, just -- just quickly on this point. I have not objected, nor have I reserved any time as

part of the oral argument, but in light of this particular change, there is a question that has been raised about the formulation with regard to what the third-parties and state law, that a Uniformed Deceptive Trade Practices, I have to thank for the uniform one, that -- that imposes liability without there having to be a proof of willful misconduct or fraud, and so we may need to fold some time in for me when other parties are talking about releases or later, as I come up to speed on that particular issue.

THE COURT: Okay.

MR. TROOP: If that's fine with everyone, just to be clear.

THE COURT: That's fine. I mean, I think -- I mean, my view on this is that when you're covering related parties, which are independent contractors, co-promotors, third-party sales representatives, medical liaisons, subcontractors, agents, and the like, it's a big step forward to carve out the defined term, willful misconduct, but there may well be other types of misconduct that should fit into that definition. I think, generally, independent conduct that is wrongful is what is really meant by that language, and if an applicable law covers that, as opposed to just some form of strict liability, because you're in the -- in the same room or the same building, then I think it probably should be covered by the carve out.

MR. TROOP: Okay. Thank you, Your Honor. We'll review that language again and make a proposal to the Debtors before the close of argument on Wednesday, so that if we have to revisit it --

THE COURT: I mean, to be fair, I think that the consumer laws that might apply here all are largely addressed to engaging in activity that's misleading or fraudulent. They may not use the word fraud, they may use the word misleading, but it's some activity that where someone has their own independent role in it.

Okay.

MR. TROOP: Thank you, Your Honor.

THE COURT: Okay.

MR. VONNEGUT: Thank you, Your Honor.

MR. HUEBNER: Good morning, Your Honor. Again, for the record, Marshall Huebner, Davis Polk. Can the Court hear and see me clearly?

THE COURT: Yes.

MR. HUEBNER: Your Honor, Mr. Kaminetzky and I are splitting the Debtors' -- well, what we thought was an allocated one hour, 50/50. I will be handling more of the Iridium and TMT Trailer and explain the releases. Mr. Kaminetzky will be doing the more technical legal issues of equal important on constitutionality, due process, Metromedia, et cetera, just to give the Court some sign

posting on how we're splitting things up.

THE COURT: Okay.

MR. HUEBNER: Your Honor, let me begin with an admission. This Plan is most assuredly not perfect. No plan in these unthinkably painful and complex cases possibly could be. There is no allocation, no plan, no settlement, no amount of money that could ever compensate for the loss and devastation suffered by those impacted. The imperfect task that is, in fact, before us is to find the best available resolution for over 614,000 contingent opioid-related civil claims for money, by which the objectors' civil claims for money are one part.

At the beginning of this journey, the most likely scenario for the Purdue Bankruptcy was years of endless wasteful litigation. We had many -- a myriad of creditor claims, federal, state, and local governments, commercial counterparties, hospitals, personal injury victims, and others. Each fought with one another and with the Sacklers year after year over a diminishing asset.

So, during -- there will no doubt be two contentious days of legal arguments -- let's not lose sight of the extraordinary thing so many have collectively achieved. More than 95 percent of Purdue's creditors, including 97 percent of its governmental creditors, have come together in support of a Plan that will allow as much

pot value as possible to be used as soon as possible, for only two purposes and no others, abatement of the opioid crisis and compensation of the individual victims, to save, ameliorate, and improve as many human lives as possible in the face of one of the worst health crises in world history.

If we do no seize this opportunity, if we squander this moment, billions of dollars, and the creation of a public benefit company, all dedicated to abatement of the opioid crisis will be lost.

The legal inquiry at the heart of this hearing is whether the many interlocking, interdependent settlements embodied in the Plan and the releases are "fair and equitable" in the best interests of the estates, which of course, include their stakeholders, consistent the Supreme Court's TMT Trailer decision and the seven Iridium factors.

The Plan is a tighten woven tapestry of no fewer than 14 incredibly complex and totally mutually dependent sets of settlements among tens of thousands of the Debtors' creditors, including:

1. The split of value between the public and private side, agreed to in phase one mediation;

2. Allocation among the many private groups from phase one mediation;

3. Allocation of funds among different individual victims;

4. The interstate allocation incorporate into NOAT;

5. The intrastate allocation among the states and municipalities incorporated into NOAT;

6. Resolution of the claims of the public schools;

7. Allocation to Tribal creditors;

8. Resolution of the civil and criminal claims of the United States;

9. Allocation of the resolution of the fees due to the attorneys of both public and private creditors;

10. Resolution of federal healthcare claims and liens pertaining to personal injury recoveries;

11. Resolution of private healthcare claims and liens relating to personal injury recoveries;

12. Resolution among the United States and the AHC of certain claims of the United States that could easily -- or could have massively impacted the recovery of non-federal governmental entities;

13. The Shareholder Settlement itself; and

14. Allocation among the 10 family groups of the Sackler family.

And this list of 14, Your Honor, most of which were fully supported by the group formerly, and sort of currently known, as the nonconsenting states, that includes

the objecting states, is a simplified count. Mr. Price's number is 30 interconnected settlements. This is likely, whatever the number, whether it's 14 or 24 or 34, the most complex set of interlocking mutually dependent settlements involving the representatives of hundreds of thousands of partis, more than 10 ad hoc groups, and the federal government ever reached in the history of Chapter 11. Pull out a core thread, and the tapestry unravels.

At face, Your Honor, maybe it's an oversimplification, but I have always thought that a court's job is to apply the facts to the law, and that a lawyer's job is to demonstrate that the law is on their side when applied to the facts.

At face, the Sackler aspect of the settlement involves the giving of releases and getting $4.325 billion in cash, and scores of pages of binding covenants and other material concessions. So, it is truly remarkable that not a single one of the objectors even cites TMT Trailer. That's right, Your Honor, there's not one cite to the Supreme Court's governing decision in a single objection. Almost as remarkably, only two objectors, Washington and Oregon, even mention Iridium, the governing Second Circuit case, and even then, it is only in passing.

The objections are no less empty with respect to the facts. Despite 450 pages of objections and six trial

days, the affirmative factual case, including direct testimony by 17 expert witnesses and 18 fact witnesses, is virtually uncontroverted. For the record, of the 35 witnesses offered by the Plan proponents, 14 of them, 3 fact witnesses and 11 expert witnesses, had their direct testimony admitted with no objection and no cross-examination by any party.

In our view, clearly the objectors will it somewhat differently, there remaining 21 witnesses were asked non-germane questions, and not very many of those either, and their written and oral testimony is overwhelming in support of confirmation.

Not only have the objectors not challenged the overwhelming affirmative evidence of the Debtors, the UCC, fiduciary for all creditors, the AHC, and other parties, which includes over 4,000 pages of sworn declarations and expert reports -- 4,000 pages of evidence, Your Honor, had we had to put those witnesses on, we would have heard weeks of affirmative testimony that went unchallenged. Perhaps even more shockingly, they have no facts of their own, no evidence, none.

So, the objectors totally ignore the governing law, both from the Supreme Court of the United States of America and the Court of Appeals for the Second Circuit. They have no evidence and they have done nothing to even tap

the massive overwhelming fact record in favor of confirmation.

Please allow me now to turn to the Iridium factors which will frame out the necessity and propriety of these releases.

Factor one, the balance between the litigation's possibility of success and the settlement's future benefits. The enormous, monumental, varied benefits of the Plan settlements are undeniable and unobtainable other than under the Plan. As so many parties have advised in their briefs, and testified under oath, and the UCC has it in their letter, the Plan is the only, only viable solution that can provide this extraordinary set of benefits to the stakeholders of this case and the American people.

Among these benefits:

1. The preservation and dedication of 100 percent of the Debtors' very material assets to opioid abatement and victims, all while maintaining continuity of supply of the many medicines made by the Debtors to ensure access for appropriate patients, subject to comprehensive covenants and injunctions and under the oversight of both a monitor and a new Board of Directors.

2. Comprehensive resolution of all claims relating to these Debtors, thereby avoiding years and probably decades of intercreditor and other litigation.

More on that to come.

3. $4.325 billion of additional value on top of everything the estate has.

4. The commitment to spend all of those billions specifically for funding opioid abatement and the PIs.

On the first day of the case, every one of us swore that this would not be another tobacco, this would not be a case where the money went to potholes and redecorating. Only this Plan and no other can deliver on this collective vow. Because, Your Honor, absent the NOAT structure, and we checked, we believe that pretty much every state attorney general is legally bound to deposit settlement monies in their general state treasuries, just like they did in tobacco. See, e.g., Section 7-310.1 of Maryland State Finance and Procurement Code, which provides, and I quote, "Any money received by the State or otherwise subject to the director or control of a State official, as a result of a settlement, judgment, or consent decree...shall be deposited in the State treasury."

5. The ability to maximize value even further to all parties through the public good spillover and multiplier effect of abatement spending. This is the evidence in this case, and it is uncontroverted.

Professor Gaurisankaran testified, both in writing at length, and quite eloquently on the witness stand, about

the material public good and poverty spillover effect and multiplier, economic value provided to yet far more Americans than even the many hundreds of thousands of direct beneficiaries under the Plan.

6. Of tremendous import to noneconomic benefits. Let's start with the public document repository. Tens of millions of documents, the most in history, including tens of thousands of attorney-client privileged documents, basically never before in any major case in history, released to the public as far as we know.

And, Your Honor, there was testimony on this. It's not lawyer argument. There's testimony of Mr. Weinberger and Ms. Conroy about the monumental importance to our society of this unprecedented repository and its potential to reveal lessons to stop a crisis like this from ever happening to the American people again.

Next, the creation of a public benefit company, that will operate with substantial oversight in a responsible and sustainable manner, not only providing cash to the abatement trust, but also developing or providing at or below-cost life-saving medicines for the treatment of opioid use disorder and for reversing overdoses.

Next, the complete removal of the Sackler families from any and all involvement with Purdue or its assets from the end of 2018 until the end of time.

Next, the Sackler families' exit from the opioid business globally over time, under a complex reticulated covenant that many have been involved in negotiating.

And next, barring the Sackler families for seeking or requesting any new naming rights with respect to charitable or similar donations for years until they have fulfilled their core obligations under the Settlement Agreement.

But, Your Honor, now we need to flip it over because equally important, and maybe even more important than the extraordinary, monumental benefits of the Plan is avoiding the Hobbesian Horror that is its only alternative.

But without the shareholder settlement the many other mutually dependent and equally important complex settlements fail. For example, first the phase one mediation agreement expressly conditioned by the states themselves including the objecting states on Sackler participating in the Plan, all fail. There are no more any agreed public/private splits. There are no more intra-private splits. There are no more intrastate splits, and no more interstate splits. All gone, replaced by a maelstrom of years of litigation.

Second, there is not enough value, nor the emergence of a public benefit corporation or similar entity to satisfy the conditions precedent for the $1.775 billion

DOJ forfeiture judgment credit. This would require the Debtors to pay the DOJ at least $2 billion in cash that the Debtors do not have. It would also raise the specter of the DOJ having billions and billions of other potentially priority non-dischargeable claims.

Third, billions of dollars that will not go to abatement. The evidence -- it is evidence, it is not argument -- is clear and uncontested that the only alternative to the Debtors' Plan is the global May deal scenario described by Mr. Turner in his declaration.

Mr. DelConte testified that the alternative would provide, at most, $669.1 million in aggregate recoveries for all than the more than 614,000 contingent liability creditors who have asserted tens of trillions of dollars in damages.

And for the record, no objector challenged the results of Mr. Turner's alternative plan analysis for the scenarios considered. No objector identified any other feasible scenario. No objector submitted a competing liquidation analysis. The facts are uncontroverted and incontrovertible.

Fourth, unthinkable intercreditor warfare for years. Other than under this Plan, the over 600,000 private creditors absolutely, positively, under no circumstances would agree to limit their collective recoveries to only

about 20 percent of their recoveries from Purdue and the Sacklers. Rather, as they have told us again and again, absent this deal, they will object to the claims of the states, they will seek to subordinate the claims of the states, while asserting their own trillions of dollars of damage claims.

Fifth, uncontrollable and uncoordinated litigation by thousands or tens of thousands of creditors and the Estate itself against the Sacklers. The creditors would be brutally competing against one another in hundreds or thousands of suits, each seeking hundreds of millions or billions or tens of billions or hundreds of billions, collectively seeking tens of trillions against the same set of defendants.

Sixth, a delay of years or decades in getting money out to help victims and facilitate abatement because while this fire tornado of inter and intra-creditor litigation and claim allowance and reconciliation grievously eroded value month after month, year after year, there would likely be no material cash flows from the Debtors' business, no public health initiative to save lives, and a significant risk of supply disruption of much needed approved drugs.

And seventh, and finally, Your Honor, hundreds of millions of dollars, perhaps $1.56 billion or more in legal fees, not even counting the additional public and private

resources that would need to be spent as creditors, the estates, and state, and local governments, and the Sacklers, engaged in a war of all against all. And this is not speculation, this is not a lawyer spouting a doomsday scenario, it is in the record evidence, including the declarations of Mr. DelConte and Mr. O'Connell. Your Honor, that's just factor one.

Now, please let me turn to Iridium factor two. The likelihood of complex and protracted litigation with its attendant expense, inconvenience and delay, including the difficulty in collecting on the judgment. Your Honor, probably happily for all, I actually will be quite brief on this point because from Page 69 to Page 103 of our confirmation brief, we address this factor at great length, and tie it to the record evidence that is now undisputed again and again.

So, I will tap this only very lightly. The road to winning and collecting net judgments in excess of $4.325 billion against the Sacklers would be a fight that would be long, hard-fought, uncertain, and incredibly expensive. I don't think anybody disputes that.

The Debtors, like many other parties, passionately believe that they have strong and material claims against the Sacklers. But even the most valuable claims, including intentional or constructive fraudulent transfer will of

course be litigated to the bitter end by the Sacklers, including as to statutes of limitation, solvency, intent, and recoverability of tax distributions, and the many other factors described both in our disclosure statement and in the UCC Plan support letter.

The issues are many and they are not simple, and material loss on even one of them could be a material potential hit to the recovery profile.

Finally, Your Honor, for very good reason, we have all used the phrase, "the Sacklers" as shorthand throughout these cases. But if it ever comes to it, you can't file a lawsuit and have the defendant be "the Sacklers." You actually have to sue, and serve process, and mitigate, and win, and collect judgments against actual persons and trusts and companies.

To give one sense of this -- and then I'll turn Iridium three -- there are 204 Sackler Trusts in six jurisdictions. There are 57 individual members of the Sackler families, including spouses, children, minors, and decedent estates, in five jurisdictions. And many of the Sacklers were never on the Board, live overseas, and are not U.S. citizens. And there are 201 IACs and 2(a) entities in 58 jurisdictions.

Iridium factor three, the paramount interests of the creditors. I believe I already addressed in factors one

and two, so I will actually not address it further at all. As I've indicated, it's so clear and so overwhelming that it was also tied to factor four, whether other parties in interest affirmatively support a proposed settlement.

The facts are in. 97 percent of the 4,924-voting governmental non-federal creditors and 95 -- it's actually really 96, but we usually say 95, so nobody can say, which way did you do it -- of a over 120,000 voting creditors, the most voting creditors in the history of Chapter 11, support the Plan. Every single voting class carried by massive margins, and every single one of the 10 ad hoc groups and the UCC supports the Plan.

The group include (1) the UCC, (2) the AHC, (3) the MSG, (4) the Native American Tribes, (5) the adult PI victims, (6) the NASBI victims, (7) the NAS medical monitoring claimants, (8) the hospitals, (9) the third-party payors, (10) the late payers, and (11) of the independent school districts.

As to the states, of course, Your Honor, let us not lose sight of this. 15 of the 24 formerly nonconsenting states that fought us all through the case, more than 62 percent, now support the Plan. Which brings us, after the further improvements they got in phase three of mediation, to 38 of the 48 states participating in these cases, and also Puerto Rico -- which when I checked a couple of years

ago, I think was something like the 21st most populous, had to be considered a state.

In dramatic, dramatic contrast, the objectors to the settlements are the attorneys general of nine states the District of Columbia, one city, and the U.S. Trustee, who collectively comprise less than one, five-hundredth of one percent of the Debtors' creditors -- one five-hundredth of one percent.

Out of the approximately 22,495 cities, towns, villages, and counties in the United States, one city, Seattle, literally one, objected.

As to the nine states and the District of Columbia, even if we stick them into their own states-only class, more on that later, that class carried by 80 percent, well over the 66 and two-thirds in 1,126, which is really 50 percent, paint by number, and even greater than the 75 percent arguably, analogously, intellectually relevant in the 524. The class they were actually in, Class 4, had 4,924 voters, and carried by 97 percent.

Moreover, Your Honor, and I say this with some trepidation, but unfortunately, I mean it, it is not actually clear to me who the few objecting attorneys general are even speaking for because on average 95 percent of the private and 97 percent of the governmental stakeholder within their own states, all support the Plan. And

basically, zero claimants -- basically, literally zero in each of the states who has objected has joined them in objecting.

THE COURT: Can I --

MR. HUEBNER: In other words --

THE COURT: -- can I get in a word for a second? How do you -- how do you arrive at the figure -- how do you know that those supporting the Plan are voting in favor of the Plan, comprise -- in the states where there have been objections, comprise 95 percent of those, that group?

MR. HUEBNER: Your Honor, I don't know, which I said on average. Your Honor, we don't -- we didn't use Prime Clerk to give us customized analysis to use at trial. I don't know the break down per state, I just know on average across the country. It's certainly possible that in some of those states the vote was 99 percent, and in some states it was lower. And of course, each class had a different voting percentage, right? They ranged from 88 percent to 100 percent. So, I can't know how exactly it splits. It's more of the point that looking overall, the creditor acceptance is overwhelming, including as to the governmental units and divisions within the states.

Is it possible that within a specific state, if we did a state-by-state analysis my rhetorical point would be lost as to the some of the objectors? Absolutely. I'm not

stating it as a fact, I said, on average, because I don't know the answer to the Court's question.

THE COURT: Okay. I might as well as this to you. Now, how -- what's the basis for stating that the actual vote here was the largest in Chapter 11 history?

MR. HUEBNER: Your Honor, we can provide a chart. Our team looked very, very hard at all of the biggest cases that we know of, and we've been doing this for rather a while. It's possible somebody could say a case you didn't know of it, what -- had more voters. But Lehman Puerto Rico, G.M., PG&E -- we have a very long chart, in which we went through every case we could find to verify the veracity of the statement. I would not be comfortable putting it in a sworn declaration because it's possible I'm wrong, but we looked very, very hard and have a long list of all the mega cases, and believe we have the highest number of voters.

THE COURT: Okay. Thanks.

MR. HUEBNER: Iridium factor five, Your Honor, the competency and experience of counsel supporting, and the experience and knowledge of the bankruptcy judge reviewing settlement, and seven -- I'm going to combine them, "the extent to which the settlement is the product of arm's length bargaining."

Your Honor, we're obviously going down the why on all seven factors, and we think each one is overwhelming.

No party has contested or possibly could contest that these agreements, when tensely negotiated, indeed brutally negotiated, over a period of years by sophisticated counsel on all sides, and with over a year -- a year of assistance, from three of the most highly respected mediators in the country, the Honorable Layn Phillips, and Mr. Kenneth Feinberg, the Honorable Shelley Chapman, whose selection was supported by the objectors.

These are not someone else's mediators.

Mr. Feinberg and Judge Phillips are the mediators we all agreed on and jointly presented to the Court. With respect to negotiations, Your Honor, the testimony is thick and uncontroverted. Mr. Atkinson, Mr. Guard, and Mr. Gotto all testified about the negotiations. We also heard from Mr. Weinberger and Ms. Conroy who have spent over twenty years suing Purdue and the Sacklers.

The UCC described all this in their letter facilitated by tens of millions of legal documents conducted in a no-stone-left-unturned investigation into these issues. And, of course, Your Honor, a 4.275-billion-dollar number which came out Phase 2 mediation was the joint proposal of the mediators. It didn't come from the Debtors. It didn't come from the UCC. It didn't come from the AHC, didn't come from the NCSG. It came from the mediators after almost a year of full-time work on these pieces.

And, of course, the final number, 4.325 billion dollars with further material concessions came from the third mediator, a sitting federal judge.

So let's turn to Factor Six, which is the only one that is left. The nature and breadth of the releases obtained by officers and directors, which in this case, of course, we'll expand to include released parties, not just officers and directors.

Your Honor, no one ever would suggest that these releases are not broad. Of course they are broad, but they are the only way these cases can be resolved for many reasons. The objecting states are singularly focused on the fact that the Sacklers will not pay 4.325 billion without the finality that come from broad, binding third-party releases. But this is only one of the very many reasons that the plan must have third-party releases and could never go effective without them because, Your Honor, even if the Sacklers agreed to pay over four billion dollars and still be sued for hundreds of billions of dollars, the plan dies. This has been totally misunderstood by so many parties. It's time to hopefully make it clear.

Why would the plan never, ever work, irrespective of the wishes of the Sacklers without third-party releases?

One, fundamental fairness and equal treatment. Let us consider arguendo, a world in which the objecting

states or other material creditors are allowed to opt out from the third-party releases. The nine objecting states and the District of Columbia have filed proofs of claim alleging under penalty of perjury over 439 billion dollars in damages against Purdue and based on their theory, by extension, against the Sacklers.

Let us assume that they recover only 5 percent of the 439 billion dollars they say they are owed and they get judgments for 22 billion dollars. Even if the Sacklers somehow could pay both this 22 billion dollars, which is only 5 percent of the claims they've sworn they have, and also the 4.326 billion for the whole rest of the country, that would mean that only nine states and D.C. get 22 billion dollars, while 38 states, 614,000 creditors and every other Ad Hoc Group is supposed to share only 4.325 billion dollars. That does not and could not ever work for anyone.

But, of course, it's much worse than that because the Sacklers don't have 26.325 billion dollars to pay 22 and then another 4.325.

So in this hypothetical opt-out scenario, even if the objecting states only get judgment for five cents of what they claim they are owed, everything will fail and collapse if the Sacklers can't pay the settlement.

And to add insult to the extraordinary collective

national injury, if any of the objecting states were successful, they might be able to assert judgment liens and prime everybody else. So everyone else in American might literally end up sharing little or nothing, not even 4.325 billion, while an opt-out state could get a judgment lien for billions. Of course no one is going to do that deal, which is reason number two, no one will do that deal.

No creditor group in these cases, to my knowledge, would or will agree to a resolution of their claim if any material party remains free to pursue direct claims against the Sacklers for tens or hundreds of billions of dollars. A tragedy of the common cannot be solved by only some parties agreeing not to drain a common resource. It can only be solved if everyone is bound to the deal.

Mr. Preis and I stopped at six. But between us, we confirmed and I hereby represent that the UCC and the AHC, the NSGE and Adult PIs, the NES Committee and the Hospitals will not support a plan that allows for opt-outs that are material along the lines requested by the objecting states. Even if the Sacklers consented to the carve out, everyone of those six groups would instantly support -- withdraw -- excuse me -- would instantly withdraw their support for the plan and fiercely oppose it. And of course they would because they wouldn't ever get paid what they've agreed to.

This is precisely why, Your Honor, the objectors should be held to this. The Phase 1 Mediation Agreements agreed to among the publics and the privates with virtually no involvement of the Debtors and no involvement of any kind, of any kind by the Sacklers who were not Phase 1 mediation parties are expressed conditioned on Sackler participation in the plan.

Number three, Your Honor, 1129(a)(11), there actually is a bankruptcy code that governs what you need to make a plan go effective. 1129(a)(11) requires that a plan be feasible. I cannot and would not ever ask a federal judge to confirm a plan that I did not believe was feasible. If there are no third-party releases and material opt-out parties are allowed to sue the Sacklers for tens or hundreds of billions of dollars, I could not stand here and represent to the stakeholders, with whom I am a sworn fiduciary, or to this Court, to whom I have obligations as an officer, that the plan and its many settlements would or could be successfully consummated.

The people who so desperately need it and deserve it would get what they bargained for and what they voted for, including, because the overwhelming creditor support we have built after years of effort, would instantly supernova. The Sacklers have no right to vote on our plan, but our creditors do.

Four, without the third-party releases objected to by 1/500th of 1 percent of our creditors, everything collapses and those directly impacted by the opioid crisis would lose the billions in hand under the plan and have to wait for recoveries they may never receive and abatement programs that may never launch.

Five -- and this is very, very important to me. I find the professed outrage and shock from the objectors about the number of parties on the Sackler side being released to be some combination of confusing, misguided, or utterly hypocritical. Let me explain why with details.

I would venture a guess that every single lawyer listening to this hearing right now has done five or ten or twenty or fifty settlements that have releases in the last several years. And I would further venture a guess that virtually every single one of those settlements with any large company or enterprise expressly releases its present and former officers, directors, affiliates, subsidiaries, attorneys, accountants, and representatives or a substantial subset of those representative category because otherwise, the releases are of gossamer spun and essentially worthless.

And now I'm not going to speculate. Now I'm going to tell you facts because I know for a fact that of these exact objecting parties, every one of them, including in the last few months, and including in the opioid states, agreed

to releases with parties with whom they settled. This is exactly how they structured them.

For example, in the McKinsey settlement, trumpeted by many Attorneys General as critical and a milestone, guess who was released? And I quote: "By execution of this judgment order, the State of California -- there is a model they all used, 47 separate settlements, very complicated, allows you to do the same for all of them -- releases and discharges McKinsey and its past and present officers, directors, partners, employees, representatives, agents, affiliates, parents, subsidiaries, operating companies, predecessors, assigns, and successors, collectively the releasees.

I don' know what some of these categories mean. I don't know what an operating company is separate from the affiliate, but I guess everyone else does. Your Honor, that's all true in Insys, and Medtronic, and Career Education, and Johnson & Johnson, and Apple, and Emarsys and, and, and. I have a demonstrative in the end, I'm actually not going to use because it's very dense and its very intent. It does on for (indiscernible) and I'm happy to send it in to the Court and all parties. I was told by the litigators that it is very usable because it was all just quotes from public dockets which shows you how the release language works for case, after case, after case

including many cases to which the objectors are party as to categories of released parties: Oregon, Connecticut, Maryland, D.C., New Hampshire, California, Delaware, Rhode Island, Vermont, Washington, West Virginia. There's McKinsey. There's Apple. There's Honda. There's Johnson & Johnson. There's Medtronics. All subsets and I'm not going to read them all. I'll just send it if Your Honor would find it useful -- past and present, directors, officers, employees, representatives, affiliates, parents, subsidiaries, predecessors, assigned, and successors.

Your Honor, we would have given you two hundred examples from the public dockets but we stopped at ten including many that included the objecting states of which Your Honor can take judicial notice.

It is quite clever actually that the handful of objectors have often repeated the phrase -- I'm so used to seeing it getting used by the media -- that the Sacklers are getting "immunity." That is a gross mischaracterization of what is happening. This is a civil settlement of civil claims. A non-opt-out, civil-only settlement with historic, overwhelming support. While it is nothing less, it is also nothing more.

Now I grant you that the drafting may have been a little bit unusual. May I list by name some of the people and entities in this ubiquitous, omnipresent categorical

approach to who gets released in a complex situation because the number of releasees in every case like this numbers in the hundreds or thousands or more. Our plan, ironically, provides more information about the identify of the parties being released than the many, many settlements to which everybody, including the objectors, are so frequently a party.

And, Your Honor, I'm going to venture a guess that McKinsey, Apple, Honda, Johnson & Johnson had tens and tens of thousands more present and former directors, officers, and employees, representatives, affiliates and subsidiaries than do the Sacklers and the objecting AGs were that categorical approach in all of those cases and dozens or hundreds of others.

Your Honor, I'm about a minute from done, so let me wrap up. At bottom, these broad releases are unavoidable and indispensable first because fairness among victims and creditors demands them. Among victims and creditors, not against the Sacklers.

Two, because the tragedy of the commons cannot be solved any other way. It is impossible. Believe me, we've all tried for years.

Three, because we have no creditor support for the plan without them. It's not just that the Sacklers are insisting on them. It's that the plan doesn't work.

And four, because 1129(a)(11) cannot be satisfied without them.

Your Honor, the plan is the only way to avoid years or decades of Hobbesian hell and billions of dollars of added costs and lost value. It is for very good reason that very creditor class, every creditor group, and virtually every voting creditor has accepted it not only as the best, but as the only viable outcome. Thirty-five witnesses, over 4,000 pages of sworn declaration and expert reports, TMT Trailer, Iridium, et cetera, et cetera.

The plan and it's 14 or 24 or 34 totally interdependent, mutually conditioned settlement is indispensable and is in everyone's best interest and we ask that it be approved.

Your Honor, as promised, I will now turn the podium over to Mr. Kaminetzky for the legal factors on the release.

THE COURT: Okay.

MR. KAMINETZKY: Good morning, Your Honor, Benjamin Kaminetzky of Davis Pope for the Debtors.

As the Court has recognized repeatedly and, in fact, as recently has the final pretrial conference, the law governing the availability of third-party releases is well established in this Circuit dating back to the 1980s since the historic mass tort bankruptcy of Johns Manville.

In Johns Manville, the court fashioned a Section 105(a) injunction to channel asbestos personal injury claims against third-parties to a trust set up to handle asbestos-related claims. And the propriety of that injunction has been upheld on direct appeal and collateral attack for over 30 years. Most recently in Metromedia, the Second Circuit reaffirmed that non-consensual third-party releases may be granted in the "unique" or "rare" cases, including non-asbestos cases where such releases are "important to the success of the plan."

And this followed the Drexel case in the Second Circuit where the court held "in bankruptcy cases, a court may adjoin a creditor from suing a third-party provided the injunction plays an important part in the Debtor's reorganization plan."

The centerpiece of the plan, as we just heard, is the 4.325 billion in cash that the Sacklers will contribute in exchange for these third-party releases. Without the third-party releases, however, any one state, county, tribe, city, town, or other governmental claimant could make the unthinkable value-destructive scenario that Mr. Huebner just vividly described earlier a reality.

For all of their pages and words, the objectors have no response to this. They offer no alternative nor any hope for anything other than a meltdown. The objectors

merely allege without submitting a shred of factual, expert or any other support, and I quote from Washington's objection at Paragraph 7, they actually say this "Had Purdue Pharma simply reorganized as a business entity, this case would have been a relatively simple one. The structure would have essentially been the same as the current plan with the Sackler settlement excised."

There is simply nothing in the evidentiary record that supports this, nothing. The current plan would not be possible without the releases. This is spelled out in black and white in the unrebutted testimony of John Dubel, John Guard, Mike Atkinson. These are precisely the sort of unique and rare circumstances in the words of the Second Circuit, demanding the application of non-consensual third-party releases.

Now turning to the objections, to the extent the objections address Metromedia on its own terms at all rather than just arguing that it was wrongly decided, they resort to arguments that many of the paradigmatic circumstances justifying third-party releases discussed in Metromedia are not present here. But the Second Circuit in Metromedia explained that whether third-party releases are appropriate in any particular plan is -- and I quote -- "not a matter of factors and prongs," 416 F.3d at 142.

Instead, the point is whether under the particular

facts of the case, the third-party releases play "an important part of the Debtor's reorganization plan," same case at 143.

And for all the reasons Mr. Huebner discussed, they absolutely do. But even if we just look at the factors and prongs as the objectors would have the Court do, we win because those factors are, indeed, present here.

First, the Metromedia court recognized that third-party releases are appropriate in cases where estates receive "substantial consideration." That's at Page 142 of Metromedia. Here, the Sackler families are making a substantial contribution by parting with $4.325 billion among other terms. This is substantial from any reasonable measure.

From a qualitative perspective, it is critical and necessary consideration that enables the value maximizing resolution contained in the plan. In other words, the shareholder contribution ensures that the plan is feasible and that contingent liability creditors receive significant and defined, as opposed to potentially de minimis or actually zero value on account of their claims.

We note in our brief at Paragraph 136 that this alone is sufficient to support a finding that the contribution is substantial.

Now the shareholder contribution is no less

substantial from a quantitative perspective. 4.325 billion is a large sum. It is at least twice the value of the Debtor's business as a going concern, which Mr. Turner testified is roughly 1.6 billion to 2 billion. That's Turner's declaration at Paragraph 22. It is also more than the number in the mediator's proposal made during the Phase 2 mediation and is the number that induced the UCC and AHC, the MSGE and 15 of the 25 then non-consenting states to support the shareholder settlement. There is absolutely no support whatsoever for an ability-to-pay standard that the objection seemed to be suggesting. That would be a dangerous precedent.

With that said, I think it's relevant and hopeful, Your Honor, to remember that combined net worth of every single Sackler that is an actual defendant in the action, i.e. an alleged wrongdoer, is 400 million on Side A and 700 million on Side B. That is 1.1 billion compared to a payment of 4.325 billion. That's less than a quarter. And Your Honor you can find that at JX-0408, which is Martin's report on the Mortimer side of the Sackler family and JX-192, which is the Martin report on the Raymond side.

THE COURT: That's ex the trusts, right? This is just their own net worth separate from putting their interests in the trust.

MR. KAMINETZKY: Yes.

THE COURT: Okay.

MR. KAMINETZKY: Second, under Metromedia, third-party releases may be appropriate in cases where the "enjoined claims would indirectly impact the Debtor's reorganization by way of indemnity or contribution." That's on Page 142 of Metromedia.

Here, the release claims would have an effect on the Debtor's reorganization. Without the third-party releases as we set out in detail in our brief, released parties or shareholder released parties would certainly deplete shared insurance policies that constitute a significant asset of the estates or assert contribution or indemnification claims against the estate. In fact, many already have submitted proofs of claims asserting such claim.

The objectors contest whether these claims would ultimately succeed, but that's not right question. The outcome of those claims is uncertain and the fact that they could have an impact on the value of the estates further supports a finding that third-party releases here are appropriate and necessary.

Third, Metromedia recognized that third-party releases are appropriate in cases where the "enjoined claims were channeled to a settlement fund rather than extinguished."

Here, the domestic opioid litigation claims are to be channeled to the trust created by the plan rather than extinguished, a fact, that at least one of the objectors has not acknowledged, Washington objection at Paragraph 59, under Metromedia, the circumstances to illustrate that the third-party releases are appropriate.

Fourth, and last, but certainly not least, some cases have looked at and considered the level of support for a plan as relevant and here the plan has overwhelming support. As you've heard, Your Honor, over 95 percent of voting creditors have voted to accept the plan. More specifically, over 96 percent of domestic government entities that voted have voted to accept the plan. The fact that roughly 80 percent of the States support the plan would be more than sufficient level of support even in an analogous context of an asbestos-related channeling injunction where channel classes must vote in favor of a plan by least 75 percent.

This takes me to the remainder of the arguments raised by the objecting states, the U.S. Trustee, and the DOJ, all of which boil down to nothing more than an attack on well-established Second Circuit law. Their arguments basically fall into four buckets.

First, third-party releases should not be permitted under the bankruptcy code.

Second, even if third-party releases are authorized by law, this Court should craft a new exception to Metromedia for the so-called police power actions.

Third, they argue that third-party releases cannot be imposed because they violate due process, which, as Your Honor will see, is really just their first argument recast as a constitutional argument.

And finally, they argue this Court lacks jurisdiction or power to confirm the plan containing these releases.

Now each of these arguments are meritless. Let me begin with the first bucket of arguments which are just an attack on Metromedia itself, and I'll be brief.

Along these lines, the DOJ and U.S. Trustee, for example, claim that a third-party release should not be allowed in any case other than asbestos case because the only provision under the code expressly and specifically authorizing the injunction of third-party claims, Section 524(g), is limited to asbestos cases. Note that there is no limiting principle. They say it is categorically unavailable. Any single objector, according to them, the law mandates if there is a single objector according to the DOJ and the U.S. Trustee, the law mandates utter destruction. This is despite the unbelievably collaborative work we have done with the DOJ to craft an abatement plan, a

public benefit corporation, and public health initiatives that the DOJ fully supports, but would disappear, simply disappear if the objection is sustained.

The objectors also claim that third-party releases should be categorically prohibited as they operate as a broader discharge than would be available to a Debtor. Suffice to say though that the Second Circuit indisputably permits non-consensual third-party releases under appropriate circumstances, as do the majority of Circuits. And the Second Circuit on Page 142 of Metromedia actually addresses both of these arguments, the 524(g) argument and the discharge argument and nonetheless concludes that third-party releases are permissible.

So I will not spend more time on these particular arguments unless the Court has any questions because the Court of Appeals has already decided this issue.

Now, the second argument raised by the objecting states is that even if Metromedia is good law, this Court should essentially craft an exception to it for the objecting states so-called police power claims, the automatic stay police power exception in 362(d)(4) for governmental units.

Now, let's be clear what about the objecting states are asking for when they seek the creation of a carve out from Metromedia for their claims. They are seeking a

veto power that would effectively allow them or any one of them to decide whether the plan may be confirmed even though a super-majority of the states and over 95 percent of voting creditors have said that it should.

And to be clear, this requested police power veto would not be limited just to states. The Objecting States make much of their supposedly unique sovereign status, but the Bankruptcy Code makes no categorical distinction between them and their political subdivisions.

The definition of governmental unit under the Code also includes any "district, territory, municipality, foreign state, or any department, agency or instrumentality of the state." So if there was an exception for so-called police power claims brought by governmental units, each and every one of these entities would also have a unilateral power to impede in otherwise consensual and value-maximizing resolution, even if, say, every single state in the country was onboard. And Your Honor, you don't have to look too far to see how absolutely absurd this would be.

In this case, the State of Washington objects to the plan. And the City of Seattle joins that objection. But King County or Washington County, in which Seattle is located, is a member of the AHC, and whose lawyer, Mr. Donado, testified in favor of the plan in this case. Any one of these parties would have a veto over the others in

the Objecting States world.

It is therefore unsurprising that the objectors cannot cite a single authority, not one, remotely suggesting that there is or should be an exception to Metromedia for police powers.

Now, the Objecting States say that their consumer protection claims or public nuisance claims cannot be released because enforcement of their laws is "constitutionally protected function", or because states are "independent sovereigns in the Federal system or because their actions are parens patriae actions that seek to enforce non-monetary interests." But none of the authorities on which they rely come close to establishing that their claims should be treated any differently from others.

Let me just address a few examples, beginning with their purported statutory authorities. The Objecting States first point to the police and regulatory power exception to the automatic stay under 362(b)(4). But the provision provides no support for their carveout. For one, the exception to the automatic stay is just that. It just means that stays don't apply automatically, nothing more.

As this Court already ruled in the preliminary injunction context, and Judge McMahon affirmed on appeal, this Court has the power to enjoin police power actions

under 105(a), notwithstanding 362's exception. And the Objecting States, of course, do not dispute that Section 362 does not apply to the confirmation context at all.

Let's also be clear about something. Section 362(b)(4) creates an exception to the automatic stay for governmental units' enforcement of police and regulatory power, but not to the collection of money judgments. Here, make no mistake, the Objecting States are seeking not only to enforce their laws, but also to collect on any judgment they may ultimately obtain outside of bankruptcy, in real dollars, not in bankruptcy dollars.

Your Honor, I have never heard and of the Objecting States once say that they would share their resulting recoveries with any other states. Nor have they agreed to provide the recoveries to NOAT to be distributed for abatement purposes, or to only those deposit recoveries into their treasuries once the privates are paid off per Phase 1 mediation.

In reality, the carveout they seek is instead just another attempt in a long succession of attempts to jump the line to pursue their billion dollar money damages claims for their own state treasuries at the cost of causing the entire abatement-centric enterprise, the entire value-maximizing plan, to collapse.

Now, next, the Objecting States state in Paragraph

37 of Washington's objection that 524(g) of the Code, which covers injunctions of third-party claims in asbestos cases, does not clearly apply to governmental units, which they say indicates a Congressional intent not to allow third-party releases of claims by government units. But this is just plain wrong.

Section 524(g) does clearly authorize courts to enjoin is asbestos claims held by government units. It applies to "entities", which is defined under Section 101, to include governmental units.

They also cite 28 U.S.C. 1452(a), which governs the removal of police power actions to federal court. But that is irrelevant. The issue here is not whether this Court may remove and hear the state's claim, but enjoin the pursuit of those claims under 105(a) as part of a plan of reorganization. It's a different issue.

The Objecting States also say an exception to Metromedia should be gleaned or implied from 523(a)(7), which makes claims for fines, penalties or forfeiture against individuals nondischargeable. But as I noted earlier, Metromedia considered this general concern and rejected it as a basis to bar third-party releases categorically.

Indeed, Johns Manville case considered and rejected this argument back in 1988 at 837 F.2d at 91. And

I'm going to quote, and just substitute names of our parties. And I'm quoting now Johns Manville. The flaw in the objector's reasoning is that injunction orders do not offer umbrella protection of a discharge in bankruptcy. Rather, they preclude only those suits against the Sacklers that arise out of or relate to Purdue. And again, 837 F.2d 91.

The Objecting States' case law citations cited more for sound bites than applicable law are even further appealed. For example, many of the cases cited by the Objecting States are invoked for the vague notion that a state's ability to enforce its own regulatory laws is an essential function of its sovereignty. But these cases stand only for the narrow and irrelevant proposition that a parens patriae action does not fall within the statutory definition of class action under the Class Action Fairness Act, and thus cannot be removed to federal court under that statute.

This Court's power in no way depends on that statute here, of course, in those cases say nothing about it Bankruptcy Court's ability to enjoin parens patriae actions in the context of confirming a plan.

The states also cite a pair of Supreme Court cases, White and Medtronic, to assert that public health regulation is an important function of state government.

That's Washington Objection at Paragraph 34.

These cases, however, address the extent to which federal regulatory approval of drugs or medical devices preempts state law liability in suits by private plaintiffs. They do not support any special treatment for enforcement of actions brought by state governments during the plan confirmation process.

Now, the Objecting States rely most heavily on a single out-of-circuit case. It's called In Re First Alliance Mortgage Company, where a district court reversed a preliminary injunction against a governmental unit pursuing certain claims arising from subprime lending. In the state's view, this case somehow supports a categorical carveout in a plan confirmation context. It simply does not.

Putting aside that this case is factually inapposite, I actually love this case because it fully exposes what's going on here. The First Alliance Court found in balancing the risk of harm to the parties in the preliminary injunction context, that there was, "no risk of unequal treatment of creditors because, as the governmental unit agreed, while they are allowed by the regulatory and police power exception to proceed to judgment against the Debtor in other forums, they are not allowed to enforce any money judgments against the Debtor in any proceeding other

than the bankruptcy proceeding." 264 BR 658.

That could not be further from the case here, where the Objecting States seek not only to enforce their claims, but to collect on them outside of bankruptcy. To jump the line and to gather funds for themselves in front of everybody else.

Now, Your Honor, taking a step back, if there were any case where the Court should feel compelled to create a Metromedia police power exception from whole cloth, this is certainly not it. The Objecting States, for example, suggest that third-party releases "block the Attorneys General in their efforts to exercise the states' police powers to protect their vulnerable population from the massive ongoing scourge of the opioid epidemic. Washington Objection, at Paragraphs 1 and 4.

The plan of the third-party releases here, however, no such thing. As this Court has recognized again and again, these Chapter 11 cases are about money. And now, after nearly two years and these Chapter 11 cases and numerous days of testimony at the confirmation hearing, I think the record is clear on this point.

The Debtor stopped marketing opioids almost four years ago. They have been subject to an involuntary injunction overseen by this Court and two preeminent monitors for almost two years. Purdue will be dissolved

under the plan. NewCo will be required to operate under numerous, onerous injunctions and covenants ensuring it acts in the public interest. And pursuant to the shareholders' settlement, the Sackler Family will have no involvement with the post-emergent Debtors or the opioid business worldwide after the sale of the IACs under the plan.

The Objecting States' only response is that their claims cannot be released because they also serve "non-monetary interests", as Washington says in Paragraph 34 of its objection, or because, "bringing the Sacklers to justice through the adversarial process, however that might turn out, is a legitimate consideration," as Mr. Goldman suggested in his cross-examination on August 12, on Page 187 of the hearing transcript. But that, frankly, does not withstand scrutiny either.

The overwhelming majority of states and all but one municipality out of thousands, as well as hundreds of thousands of other creditors, have manifested the public interest in their votes in favor of the plan. In the face of the near universal support for the plan, the onus must be on the objectors to explain to this Court how these so-called nonmonetary interests, whatever those might be, under the facts of this case could possibly justify the massive destruction to a plan that will provide literally -- literally -- billions of dollars to communities and

individuals in need, including their own constituents. They have not and they cannot.

The Objecting States next supposed justification for a carveout is that their claims cannot be released because -- and I quote again from Washington's pleading -- "that a process has been shielded from public view and scrutiny." Then that's Washington's Objection at Paragraph 5.

This assertion is not only false but is also belied by the very public trial this Court is currently presiding over, which included the cross-examination of multiple Sacklers, as well as the enormous amount of disclosure and information that has been produced by the Debtors, the Sacklers, the IACs, and their financial institution.

As this Court observed, "More information has been provided with respect to this plan, and more specifically with respect to the elements of a settlement with the Sacklers, than the Court has ever seen, and perhaps has ever been provided in any Chapter 11." And I'm quoting Your Honor from the March 24th hearing.

To recap just briefly what the Court well knows, discovery included the production of over 100 million pages of material from dozens of custodians, going back decades. Publication on the docket of hundreds of pages of forensic

reports. That's the 1A and 1B Report detailing all transfers of value to the Sacklers, both cash -- announced cash -- or for their benefit. Production of millions of pages of materials by the Sackler Families. The UCC and the non-consenting states also took the deposition of over a dozen Sackler Family members and current and former Board members and others.

The extensive disclosure of the Sackler wealth, extensive disclosures from the Sacklers law firm, Norton Rose. Extensive disclosure by foreign entities, which would likely never happen in a context of normal litigation.

And as Mr. Huebner noted, the plan will result in the creation of a public document repository that will include all material produced in these cases, and tens of millions of additional documents and privileged documents, which a number of witnesses touted as an important essential element of the plan.

Finally, the Objecting States claim at Paragraph 5 of Washington's objection that the principal parties making the critical determination are not public health officials, but rather bankruptcy professionals. That is false.

As the Objecting States must surely know, the decision to support the plan was made by thousands of elected officials, including the Attorney General of the death majority of states, and representatives of thousands

of personal injury claimants, including lawyers, who have pursued Purdue and the Sacklers for decades.

At bottom, Your Honor, the Objecting States' claims are trying to collect money from the Debtors and their related parties. There is no basis in law or in fact the craft and exception to Metromedia previously unrecognized in the case law.

Moreover, the objectors articulate no limiting principles that they espouse. One Objecting State is enough. One objecting County. For any reason, financial or political or otherwise, according to them, this exception would doom any plan by one no vote by any governmental unit. There is no basis to grant the objectors, actually each objector, an effective veto over historic, almost entirely consensual, value-maximizing reorganization, that in inures fully to the benefit of the American public.

Your Honor, the third set of objections raised by the U.S. Trustee and the DOJ is that third-party releases somehow contravene the due process clause. When attacked, however, it becomes apparent that this argument is really just an attack on Metromedia by another name.

The first due process argument clearly illustrates that point. The DOJ and U.S. Trustee assert that in order to satisfy due process, a holder of the claim must receive an opportunity to either litigate the final judgment or

settle on their own accord. But if the holders of release claims must still be able to litigate those claims, as the DOJ and U.S. Trustee argue, then bankruptcy courts have no power whatsoever to impose nonconsensual releases of such claims, despite finding Second Circuit law to the contrary.

It is, therefore, hardly surprising that the DOJ and U.S. Trustee cannot cite a single case, not a single case, concluding that third-party releases violate due process because they do not provide an opportunity to be heard. Holders of claims do in fact have an opportunity to be heard on the propriety of third-party releases. Many have filed objections in this very case on this very issue. This very hearing is indeed proof positive of the opportunity to be heard.

So the DOJ and U.S. Trustee then quickly pivot to claiming that the notice of third-party releases in this case was not constitutionally sufficient. As an initial matter, Your Honor, this Court's June 3rd order approving the disclosure statement, so as to (indiscernible) procedures and voting procedures at Docket Number 2988, Paragraph 17, expressly provides -- and I quote -- "that the Confirmation Hearing Notice, Publication Notice, and plain language summary of the Confirmation Notice each, if properly delivered or published, provides sufficient notice of the releases and injunctions to any holder of a Channeled

Claim or Shareholder Release Claim."

In other words, the Court already found that the notice provided of this confirmation hearing was sufficient and constitutionally adequate. And the U.S. Trustee and DOJ certainly did not raise any alleged notice deficiency back in May. So the government's belated attempt to litigate that issue as a basis to deny confirmation should be rejected as out of hand.

In any event, the record in this confirmation hearing is clear that the notice provided in these proceedings, including on third-party releases, has been one of the most extensive, expensive, and effective noticing programs in Chapter 11 history. And although the third-party release terms are complex, the notice was simple, clear and unmistakable.

The confirmation hearing notice, which was mailed to all known holders of claims in these cases, sets out the release expressly. I'm looking JX-0937.

The Debtors also undertook an extensive supplemental publication notice campaign. A key component of the supplemental publication hearing notice plan was a plain English noticing of the potential for third-party releases that made clear in no uncertain terms that the plan could potentially release all claims and causes of action against the Sackler Families.

Take, for example, Your Honor, the Debtors' publication notice, which I'm putting up now, which was published in "The Wall Street Journal", "New York Times", "U.S.A. Today", "Financial Times", and "International Herald Tribune", that appears at JX-0939.

1:50:36 And if we could just blow it up here, it says very clearly, the plan contemplates the shareholders that have been fighting among the Debtors, the master distribution trust, and certain of the shareholders' released parties, including members of the Sackler Family, and certain other individual (indiscernible). (indiscernible) for that release of any actual or potential claims or causes of actions against the shareholder lien parties relating to the Debtors, including claims in connection with opioid related activities.

The Debtors also broadly distributed a shorter, plain-language version of the confirmation hearing notice in the form of fliers, magazine ads and newspaper ads, and bought online advertisements across the U.S., Canada and 39 countries.

Here is an example of a magazine ad. Did you file a claim against Purdue Pharma as part of its bankruptcy proceeding? Do you have a claim against Purdue Pharma's owners? And it goes on to say, releases of any actual counterclaims against Sacklers Family members and certain

other individuals and related entities.

Now, one more, Your Honor. And now here is what you would find on an online display ad. These are the various online ads that we had. And again, let's just blow one up. Could not be clearer. Did you file a claim against Purdue Pharma? Did you have a claim against the Sacklers or any of Purdue Pharma's owners?

Now, in the cross-examination of Ms. Finegan, counsel for the U.S. Trustee seemed to make much of the fact that neither the publication version nor the plain-language version of the confirmation hearing notice contained the full text of the releases or the full list of shareholder-released parties. But for all the supposed complexity and length of the shareholder releases in the plan, the plain English descriptions in the notices could not have been any more clear or simple.

As Your Honor just saw, the releases reach any actual potential claims against members of the Sackler Families. It said it loud and clear. It's not clear to me what else could be done to make this point more plain. Indeed, I would respectfully submit that if the Debtors were to have included the full text of the releases and full list of shareholder release parties, that notice would not have been nearly as effective, or easily understood, and I'm sure the Court would agree.

The record is also crystal clear that the reach of the -- crystal clear as to the reach of the supplemental confirmation hearing notice plan and how effective it was. It was conducted in 27 different languages, served over 3.6 billion online and social media impressions, and resulted in over 3,700 news stories across the U.S. and Canada. And Your Honor, this was all in addition to the extensive bar date notice and plans.

On this truly extraordinary record, set out in even more detail in our papers, and in the absence of any evidence to the contrary, there can be no doubt that the holders of release claims received adequate notice, both of these bankruptcy proceedings and the general bar date, and that there claims against the Sackler Families and related entities would be released under the plan.

Finally, Your Honor, just a minute on this, because Your Honor know this better than anybody. Several objectors, including the Objecting States, the U.S. Trustee and the DOJ, claim that this Court lacks even the power to enter an order approving the plan or the third-party releases, including because the Court lacks jurisdiction under Section 1334, statutory authority under Section 157, or constitutional authority under Stern v. Marshall. Now, each of these arguments is meritless and this is just going over well-tread case law.

Let me begin with the Court's subject matter jurisdiction, because it frankly is not controversial in the least, that this Court has jurisdiction to approve the third-party releases. Congress granted comprehensive jurisdiction over all civil proceedings that are arising under or arising in cases under Title 11 U.S.C. 1334(b).

Confirmation of a plan of reorganization is without a doubt a proceeding that arises under or arises in a case under Title 11. And as Judge McMahon explained in the Tier 1 case, this does not change merely because a plan would contain third-party releases. As Judge McMahon explained, and I quote, "A confirmed reorganization plan that includes such releases does not address the merits of the claims being released. . . rather, it effectively cancels those claims so as to permit a total reorganization of the Debtors' total affairs in a manner available only in bankruptcy."

She continues, "That a bankruptcy court's decision may have a preclusive incidental effect on claims beyond the scope of the immediate bankruptcy proceeding does not render the bankruptcy court jurisdiction non-core, i.e., outside the arising under grant of jurisdiction."

Now, the Objecting States' only response is that Kerwin did not address a release of so-called police power claims. But that, of course, is analytically irrelevant.

There is no please power exception to Metromedia. And in any case, whether the Court has subject matter jurisdiction, and whether there are substantive limits on how it should exercise that power are entirely separate. And even if the Court did not have arising under or arising in jurisdiction related to jurisdiction also provides a separate basis for approving the third-party releases as part of a plan.

As set out at length in our papers, Your Honor, the release claims and shareholder claims without a doubt have an all you need -- "a conceivable effect on the estates, either because such claims will result in a diminution of the Debtors' insurance policies, or would result in an indemnification or contribution claims, or would potentially prejudice the rights of the MPT and future Snap Act litigation.

That brings us to the last set of arguments raised only by the U.S. Trustee and the DOJ, that subject matter jurisdiction aside, this Court lacks either the statutory or constitutional authority to enter a final order confirming the plan, including -- that includes third-party releases. Those suggestions are meritless. Confirmation of the plan is clearly a core proceeding under Section 157(b)(2)(1).

Numerous courts, including the Kerwin court and this one, have held that where, as here, a Bankruptcy Court considers nonconsensual third-party releases in connection

with plan confirmation, it acts pursuant to its core statutory authority, and thus has the statutory power to enter a final order. That's Kerwin case, 592 BR at 504.

Similarly, there can be no doubt that the Court also has constitutional authority to enter a final order confirming a plan with third-party releases. The Third Circuit, in Millenium Labs Holding, and the District Court in Kerwin, both held these are both recent decisions that are directly on point, a Bankruptcy Court has constitutional authority to confirm a plan containing third-party releases, so long as the injunction is integral to the plan. And that's Millenium Labs at 945 F.3d 137-140, and In Re Kerwin, 592 BR 509-512. And Your Honor made your views very clear in the In Re N

PN Silicon case.

So, for the reasons that we have just discussed, third-party releases are integral to Debtors' plan and therefore pass constitutional muster.

In sum, Your Honor, the third-party releases are the bedrock of the plan. They are also lawful, well-established law in this and the majority of the Circuit. In a way, it all comes down to one test. All of these issues all combine into one question. Are these releases integral, important, necessary, indispensable? Use any word you like, and we still win, because if they are, Metromedia is

satisfied, subject matter jurisdiction under 1334 is satisfied. It is a core proceeding under 157, and the constitutional Stern V. Marshall test is satisfied. And there is not a shred of evidence offered by the other side that these releases are not integral, important, necessary and indispensable.

Thank you, Your Honor. I believe I'm going to turn the podium now to Arik Preis, from the UCC.

MR. PREIS: Actually, Your Honor --

THE COURT: I think the AHC, one of you, are ahead of --

MR. KAMINETZKY: I apologize. That was my mistake.

MR. ECKSTEIN: That's fine, Your Honor. Good morning, Your Honor.

WOMAN: Wait.

MR. ECKSTEIN: We'll try to adjust our cameras so that I zoom in a bit. Your Honor, I guess it's good afternoon. Is this close enough to me?

THE COURT: Yes. I can see and hear you fine.

MR. ECKSTEIN: Thank you, Your Honor. Your Honor, good afternoon. Kenneth Eckstein, of Kramer Levin, on behalf of the Ad Hoc Committee of Consenting States and Local Governments.

Your Honor, before I begin my remarks, I want to

acknowledge the law firm of Brown, Rudnick & Otterbourg, our co-counsel in this case, who have worked side-by-side with Kramer Levin on all aspects of the Chapter 11 case and join in their remarks.

Your Honor, thank you for the opportunity to address the Court at this momentous time. And I would like to supplement the very substantial, effective and comprehensive presentations made by Mr. Huebner and Mr. Kaminetzky.

Your Honor, I think as you have heard from all of the presenters, this case is truly unprecedented. Rarely, if ever, has the Bankruptcy Court been called upon to address matters of such public importance, both to the states, municipalities, tribes and other non-federal governmental creditors represented in this case by the Ad Hoc Committee and to the public at large.

Your Honor, the opioid crisis is a horrible and intractable public health emergency, one that the members of the Ad Hoc Committee have been working arduously to address for many years, together with many other constituents who have been active in this Chapter 11 case.

This plan is a concrete step towards a resolution, a vehicle to attempt to address this national health crisis in an extremely creative and constructive manner. The centerpiece of the plan is a voluntary agreement by the

Sackler Family to turn over the Purdue business, including all of its insurance policies, as well as contribute an additional $4.325 billion to their creditors, and the related agreements by the public and private creditors to devote substantially all of the plan proceeds to abate the opioid crisis.

There is no precedent for such a Chapter 11 plan. And the fact that the parties have agreed to this arrangement, with overwhelming consensus, in and of itself is a remarkable achievement.

The plan, importantly, is a global settlement of many disparate issues and it required multiple integrated agreements to get there. There is, as just mentioned, the financial settlement with the Sackler Family and the agreement by creditors to contribute essentially all of the settlement monies to abatement.

But there are also other crucial component parts of the settlement, including the detailed agreement among the States and Local Governments and Tribes as to how the funds will be distributed and employed within states to abate the crisis.

There is the allocation among the states, which will be addressed in more detail by my partner, Mr. Wagner, in a later segment of oral argument. There is a settlement between public and private creditors, which spared the

parties years of debilitating litigation and was resolved in Phase 1 of the mediation in this case.

There is the DOJ settlement, which like the Sackler settlement helped enable the public-private allocations and permitted the parties to focus their efforts on an abatement plan. And there is the attorneys fee resolution set forth in Section 5.8 of the plan, which will also be discussed in more detail at a later stage of the argument.

As the undisputed evidence shows, and as I will highlight, each of these settlements are interrelated and the removal of any piece would jeopardize the plan and the important abatement objectives it serves.

Since Mr. Huebner and Mr. Kaminetzky have thoroughly addressed the factual and legal underpinnings of both the settlement and the releases, I will focus on three specific points.

First, the dissenting states and others have focused much attention on what the plan arguably takes away from them, including the argument that they are being deprived of the opportunity to have a public airing of their claim against the Sackler Family. But what is lost in their objections is what the plan confers on the states and all creditors. Not just by way of monetary compensation and the opportunity to begin abating the opioid crisis, which are

extremely important on their own, but also in terms of how the plan helps to facilitate the very goals that the dissenting states highlight in their objections.

The plan does not, as an initial matter, provide criminal (indiscernible). This is not a criminal trial. This is a Chapter 11 bankruptcy case. The plan represents a substantial financial settlement that dedicates more than $6 billion over the life of the settlement to abate the opioid crisis.

The plan also provides for an unprecedented public presentation of the history of Purdue's and the Sacklers' involvement in the opioid crisis. The document repository is the centerpiece of that presentation.

I would point Your Honor to the testimony of Jayne Conroy, who spoke eloquently of the importance of the document repository. That testimony can be found at the August 16th hearing transcript at Pages 83-84. According to Ms. Conroy, who has been litigating against Purdue for longer than almost anyone, "In addition to any monetary settlement, it could be that the document repository is actually the most valuable piece of this settlement."

This is on top of the testimony elicited through the confirmation hearing from three members of the Sackler Family and their advisors. Even if the Court were to allow parties to go to trial outside of the bankruptcy, it is

inconceivable that the volume of documents that Purdue is committed to disclose through the repository, including documents that are privileged and confidential, would ever become public through a non-bankruptcy proceeding.

So at the end of the day, while individual creditors will not have an actual trial on the Purdue or Sackler civil liability, the benefits of the trial are largely achieved in terms of substantial monetary compensation, through the public airing of the facts of the case, and through the injunctive relief that will shut off the dangerous prepetition marketing practices and prevent the Sackler Family from having any continued role in Purdue, and ultimately, the opioid industry.

Second, Your Honor, I want to highlight the importance of the third-party release to this case and to the non-governmental creditors who are supporting the plan. Simply put, without a comprehensive release that is binding on all of the states and other public creditors, there simply cannot be a deal that will hold this case.

The public creditors that have agreed to the deal have agreed to accept a nine-year payment schedule, with substantial amounts due to the public creditors in years 5-9. Those settling creditors would never agree to a structure under which their own recoveries were delayed and in fact exposed to the threat of complete dissipation if

other similarly situated creditors asserting claims in the billions of dollars were allowed to pursue their claims to judgment now against the Sacklers.

So putting aside what the Sackers themselves would do, and the testimony is clear that they will not agree to a partial settlement and release, the states and other public creditors would not agree to such a structure either.

Third, I want to spend a short amount of time highlighting some of the critical pieces of evidence put into the record by the Ad Hoc Committee witnesses. This uncontroverted testimony establishes that each of the prongs of the global settlement, and indeed the entire abatement plan, could not survive if any leg of the stool was removed.

For instance, as to the interrelated nature of the Sackler settlement and the public-private settlement, Mr. John Guard testified, "Without the availability of the Sackler assets, compromise between the non-federal public claimants and the private claimants would not have been possible, in my opinion. Absent the large pool of assets to divide that the Sackler contribution gives, it is my opinion that each side would have likely been at an impasse and asserted its various defenses to allowance of the other's claims, and there would've been a lengthy set of estimation hearings in this bankruptcy matter, further dissipating this estate." That's the Guard declaration at Paragraph 67.

As to the importance of the DOJ settlement, Mr. Guard testified, "The DOJ settlement itself likely would not have been possible absent the Sackler contribution. Had those funds not been available and the federal government not as interested in monies going to abatement through the states, the states would've had no choice but to fight the allowance of federal government claims to the extent they reduce or eliminate assets available for abatement." That's the Guard declaration at Paragraph 68.

As to the critical issue of whether any states or other parties could "opt out" of the plan without upsetting its delicate balance, Mr. Guard testified, "The Sackler settlement is predicated on the understanding that no state will retain its claims against the Sacklers, and outcome that could cause all other states to revisit allocation and settlement." That's the Guard declaration at Paragraph 71.

The testimony of Jayne Conroy at the August 16th hearing also makes clear that no opt-outs were contemplated, and that the "peace premium" included in the Sackler settlement would not have been available with the prospect of opt-outs. That's the August 16th hearing transcript at Page 76-77, and at Page 87.

As to the role of the attorneys fee resolution in facilitating an abatement plan, Mr. Guard testified, "Absent some sort of attorney fee fund, there would have been no way

to set up an abatement fund because governmental creditors, needing to pay their counsel, could not have relinquished control over monies distributed on account of their claims, and attorneys would not have been comfortable waiving the contractual fees owed to them." That's the Guard declaration at Paragraph 75.

The testimony of Mr. Gary Gotto and Peter Weinberger is also supportive of this point. See the Gotto declaration at Paragraph 25(g) and the Weinberger declaration at Paragraph 49 and Paragraph 59-60.

In sum, Your Honor, the plan reflects a global resolution to this Chapter 11 case, with a substantial financial settlement dedicating funds to opioid abatement and a public presentation of the record, unlikely to be obtained by going to trial. But the plan reflects a resolution of many disparate issues and is an important step toward healing the nation from the devastating impacts of the opioid crisis.

On these bases, the Ad Hoc Committee supports confirmation of the plan. Unless Your Honor has any further questions, I thank Your Honor for the time.

MR. PREIS: Good morning, Your Honor. Can you hear me?

THE COURT: Yes. I can hear you and see you fine.

MR. PREIS: Okay. Good morning. For the record,

Your Honor, Arik Preis from Akin Gump Strauss Hauer & Feld, on behalf of the Official Committee of Unsecured Creditors. I will try very hard not to repeat anything that the Debtor said or that Mr. Eckstein said, although I will touch on some of the issues that they mentioned in the UCC (indiscernible). Also, while I will briefly discuss certain issues related to the third party releases, I will not be discussing any of the underlying law of such releases. Mr. Kaminetzky handled that, and I'll be handling that on rebuttal.

I'll divide my comments (indiscernible). First, I'll make a few preliminary remarks about the settlements of the objections (indiscernible). Second, I'll address three items regarding the objections of the states and the pleadings of the federal governmental entities. Third, I will conclude with three remarks about the settlement, the public good and the personal injury victim.

As I mentioned the first time we were before Your Honor, then repeated a number of times since. The case is fundamentally about three issues: First locating valuable opioid (indiscernible). Second, maximizing that value. And, third, utilizing that value and utilizing these cases for the public good.

Today, we're using the Court to confirm a plan that addresses these three issues in a manner that, as Mr.

Huebner pointedly started with, is not perfect but it's the most viable path. It's important to emphasize, as Mr. Huebner did, that the plan has the support not only of the UCC but the numerous ad hoc groups, and it's not objected to by 15 of the previously nonconsenting states. Then Mr. Huebner went through the vote. No need to repeat that.

Despite this overwhelming support and putting aside the prosaic (indiscernible) there are a few objectives. In light of the unique facts of the cases and the fact that this plan is the only agreed upon way to get what could be more than 7 billion in values to communities to abate the opioid crisis and victims to compensate them for their loss, it's difficult to understand the position of the objectives. Why are they objecting? What happens if they (indiscernible)? Do they not understand that they cannot demand (indiscernible) for one of the claim without the balance of crumbling?

As Mr. Huebner and Mr. Eckstein pointed out, the plan is a path (indiscernible) we count 30 (indiscernible) settled that have been reached on various far-reaching (indiscernible). This case is the prototype of a case that hangs by a thread with the Sackler dollars as a foundation. As obvious as that it is for those of us who have lived the case for the last two years, the objectors missed it or willfully ignore this fundamental fact.

They seem to think if you make just one change here with allowing a class of incarcerated (indiscernible) to have a class, or to change the states' allocation so that West Virginia gets more, or to give an opt-out to certain states so that they can imperil the distribution to everyone else, the rest of the plan will simply hang together. Not true.

Even more frustrating is that certain of the objectors, mainly the states, are merely trying to create a record because they fully intend on appealing any order of this Court, if the Court confirms the plan, all the way perhaps to the Supreme Court, as they say, regardless of the impact that such a lengthy and complex appeal might have on the Debtor's ability to get the (indiscernible) to the creditors. A long messy appeal does not help the still struggling people, nor does it help rebuild communities devastated by the crisis. It will have the opposite effect, by delaying recoveries for those who gave them the most.

Next, I will address three points of the objecting states of the federal government. First, the inter-(indiscernible) allocation. A lot has been said by Mr. Huebner and Mr. Huebner and Mr. Kaminetzky and Ms. (indiscernible) about mediation Phase 1 and informal Phase 3 that resulted in numerous settlements, including the allocation deals. It's impossible for those who

(indiscernible) this case to fully understand how difficult and hard-fought the mediation was, as Mr. Guard testified to.

I think it's safe to say that there were many times it was unclear that any settlement was reached, or that if settlements were reached, certain groups would be left out and subject to the -- object to the plan. The fact that it took six months to reach four or five two-page term-sheets and another nine months to close out the (indiscernible) tells you all you need to know.

To be clear, the UCC does not believe the allocations are perfect, and every party, as Mr. Huebner pointed out, would undoubtedly say it's begotten more. If every supporting party is willing to live with those settlements, because not only would doing so result in claimant versus claimant litigation, which is not only costly and time consuming, but, as many people forget, would result in a lot of unhelpful dialogue about alleged weaknesses in each other's claims. They also understand that we need to focus on moving forward, abating the crisis and compensating victims.

The objecting states and the District of Columbia were part of those negotiations. They know exactly how hard they were, and they agreed to those (indiscernible) and now they want to throw them away. In fact, as Mr. Atkinson

stated in his declaration and Mr. Kaminetzky alluded to, the states refuse to agree that the private public negotiated (indiscernible) which would be honored if there was no settlement with the Sacklers.

In other words, the objectors now know full well that if the Sackler contribution is removed, the allocation settlements go away, and we would be back in claimant versus claimant litigation where the states who are far along in their prepetition litigation would think they have a leg up. And as importantly, but something not one of these attorney generals has publicly admitted to their citizens, they will have reneged on the negotiated resolution with public or private citizens.

Second, some facts about the (indiscernible) and use of the Sackler fund. The objecting states have stressed that Purdue distributed more than $10 billion in cash -- the Sacker could've made more than $1 billion in non-cash transfers for a decade. As you know, we have strong views about whether these were intentional or constructive thoughts on (indiscernible). But the objecting states like to gloss over the fact that because the transferees of more than 4 billion of the 10.4 billion in cash for the state and the federal government through various tax statements made by the Sacklers and their affiliates on their behalf.

In other words, they're putting aside a

substantial amount for prejudgment interest, a total value to non-cash transfers. About 40 percent of the cash transfers went to the very political bodies they're objecting to. Ironically, the objecting states and the federal government are filing a (indiscernible) that would prevent their citizens and others from receiving the settlements that (indiscernible) negotiated. And yet, at no point has any objecting party, one, offered to give back their ill-gotten value into the estate for equitable distribution among creditors. Two, agreed to a full deduction on their distribution on account of the fact the party receives (indiscernible) value. Or, three, earmarked any of the they received in the last decade during the Sackler (indiscernible).

And, in addition, the federal government, one, had already taken another $225 million from the Sacklers while every other party in the case is still waiting for its distribution. And, two, is looking to stop a plan that will permit distribution.

You'll recall, Your Honor, that at the beginning of the case, we pushed for an ERF that was for less than (indiscernible) million, and recall when the federal government sought approval of a settlement with the Sacklers, we urged them to use the 225 million for abatement, to give to victims, or for an ERF, and they

refused. It's almost tragic that now, as we stand on the precipice of potentially getting more than $7 billion to use for abatement and compensate victims, the objectors, who have received more than 4 billion from the Sacklers and Purdue since 2008, want to stand in the way.

Third, the DOJ and the US Trustee. Throughout these cases, the DOJ has taken some confusing (indiscernible). For instance, during mediation, they chose to be -- not to be in mediation but to be an observer and to maintain their right to reopen the settlements, once reached. And once the settlements were reached, the DOJ did exactly that. This included, most dishearteningly, reaching into the distribution that was supposed to go the PI plan and negotiating with them, which resulted in almost 4 percent of the guaranteed PI (indiscernible) to go into the DOJ. And now as we get to confirmation, the DOJ has not filed an objection, has not voted against the plan, under the plan will get $225 million, plus 50 million for their unsecured claim, plus 26 million they've taken for the (indiscernible). They've already taken from the Sacklers an additional 225 million in addition to 4 billion of tax revenue, and yet filed a scathing statement about the non-consent (indiscernible) releases. And the U.S. Trustee, an arm and a component of the DOJ, has filed a scathing objection to releases.

Your Honor, the DOJ failed to vote, did not file an objection and made its settlement with Purdue and the Sacklers. The DOJ's statement should be ignored, and the U.S. Trustee's objection should be viewed (indiscernible).

I want to conclude, Your Honor, by addressing the Sackler agreement and the releases, the public good, and the PIs. First, let's talk about the Sackler settlement and the releases. During the evidentiary portion of the trial, we were silenced because of the no prejudice stipulations, but, unfortunately, there were a number of communications during the trial that could leave people with quite a few misunderstandings. We want to create -- we want to somewhat fix the record and give you the example.

First, a lot has been said about the so-called opioid business (indiscernible) whereby certain individuals have agreed in general terms to no longer (indiscernible) opioid business. It's actually contained in 80901 separate (indiscernible) agreement. To be clear, there are three tiers of individuals who it applies to. The first tier being the ICSBs, the second being all the living Sacklers over the age of 18, other than certain specified individuals in one of the (indiscernible), and the third tier being every other living Sackler Family member.

The first tier has the most stringent restrictions and the longest period for the (indiscernible). That's the

ICS tier. The second tier has looser restrictions, and the covenant's only applicable so long as the settlement payments have not been paid in full. In other words, when the settlements are paid, the second tier no longer is bound by (indiscernible). And the third tier has no requirements whatsoever.

A second example is the IACs and the use of the sale proceed for the IACs to pay down the Sackler obligation. It's true, the Sacklers are required to take (indiscernible) sell their interest in the IACs when they're out of their ownership of the IACs for seven years. But the proceeds from such sales are not, as has been implied, used to pay for the settlement. Rather, the settlement agreement requires (indiscernible) to make yearly (indiscernible) to the NBT regardless of the sale of the IACs.

Further, to the extent that an IAC is (indiscernible) the proceeds from such sale will be used to pay transaction cost and taxes from the sale and then to repay the Sacklers for any amounts they previously paid to the (indiscernible). Only if there are proceeds left over, after both of those, will the proceeds be used to prepay upcoming payment due for the Sacklers.

Third, with regard to the nonconsensual (indiscernible) -- in a vacuum, of course the UCC did not want to agree to the breadth of relief, but were prepared to

live with it in order to see the (indiscernible). A lot has been made about the fact that a lot of parties are getting releases and not providing any financial contribution. This is (indiscernible). It was a condition to the deal. But because our focus had always been (indiscernible) transfer, we were not concerned about getting releases (indiscernible) solely in their capacity business. And as you heard earlier from Mr. Vonnegut, even those releases have been (indiscernible).

That being said, and to provide some people's -- people some comfort, if one pod defaults, every entity and person within the pod loses its relief if the NDT chooses to step back. For people not within a specific pod, for instance, there's in (indiscernible) etc., who don't fall into a pod, we negotiated for something called (indiscernible) parties. These are people who lose their (indiscernible) and the NDT determines to step back. From our perspective, these are also some of the people we believe know the most about what the Sacklers did, and would be the most dangerous if they were concerned about their own liability.

Second, the public good aspect of these cases. I just want to highlight some of the aspects of the plan settlement that relate to the public good, which both Mr. Huebner and Mr. Eckstein alluded to, but I want to make a

few notes about them.

First, the use of the money for abatement. Is this the better off principle of the plan? And while there's no specific language that prevents supplanting of funds, we sincerely hope that the state and other parties will work to ensure that the funds distributed through this plan, if confirmed, supplement and do no supplant preexisting funds designated to abate the opioid epidemic. We believe they will and we've had conversations with them.

Second, the breadth and scope of the document repository. A lot has been said about this. I'm not going to repeat it.

Third, the continuation of the voluntary business development and, importantly, the fact that any buyer of the business has to continue (indiscernible). Fourth, the continuance of the job of the monitor who oversees the voluntary business injunctions. And, fifth, the establishment of Newco as a PBC and the use of funds by Newco for potential public (indiscernible).

Third, and finally, Your Honor, I want to touch on the personal injury victim, the (indiscernible). As you may know, (indiscernible) is a member of the UCC. He was selected to be on the UCC on the basis of a claim that she filed on one of her three sons, Cory, who died of an opioid overdose in 2011 at the age of 23 after starting to take

opioids at the age 15, when he was given them by his doctor after hernia surgery. When he died, he had a four and a half month old child.

Unfortunately, while this is very sad and traffic, (indiscernible) grew up without a biological father -- it's not terribly unique, but the story didn't end there. (indiscernible) dutifully served on the UCC for almost two years. In June, two months ago, her middle son, Sean, also died of an opioid overdose on June 25th. Sean had actually turned his life around and was working to help other people with OUD when he relapsed and ultimately died alone. He too left a daughter and a son. One family, two opioid overdose deaths, three children being raised without their father (indiscernible).

I raise this story not because I want to make people angry or grandstand about the plight of victims, or highlight Cheryl's story. This is more important than the audio. I raise this because, like Your Honor, we're all very touched and personally (indiscernible). Like Your Honor said, we need to remember the (indiscernible) but most poignantly, I raise this because one would think that people like Cheryl may want to keep pursuing this (indiscernible) like the states do.

After all, it's the human tendency -- reactions of revenge. But Cheryl, like the other fiduciary members of

the UCC, agrees that it's time to move on. Time to stop chasing and start abating the epidemic, start combating the crisis, start compensating the victims and their families so that less people die, less people become victims to OUD, more people can get recovery support, more people can get to community organizations and more victims and families of victims can get the support they need.

We wish the objecting politicians agreed. Thank you, Your Honor.

THE COURT: Okay, thank you. Mr. Shore, I think you're next in line.

MR. SHORE: I think I am, Your Honor. Good afternoon. (indiscernible)

THE COURT: Mr. Shore, can you get a little closer to the microphone? You're fading out some.

MR. SHORE: Sure. Let me turn (indiscernible). All right. Perhaps the Court has noticed that during this confirmation hearing we've been very quiet, and I intend to remain quiet. I'll just addressing three points. I'm going to touch on the releases now and how they affect the personal injury victims. I'm going to address the provision in the TDP allowing for payment of the ad hoc group fees. And I'm around to address -- and maybe I will, in any event, address any issues that the Court has or any questions the Court has with respect to the PIT (indiscernible).

On the releases, I'm not going to address the U.S. Trustee's objection, other than to say this: As bankruptcy professionals, we can all understand the need for the UST to make its policy points and the importance of the protection of the law without regard to any economic interest in the outcome of the case. We just hope that, given the extraordinary nature of this case, the U.S. Trustee would have, as it has in many other cases, let this case proceed without creating more risk around the releases.

Hopefully, in light of the material revisions, the release provisions noted by Mr. Vonnegut, the U.S. Trustee can see its way to avoid pressing objections which ultimately are not legally supported, and let the actual victims get the closure.

With respect to the state, there's already been a good deal of talk regarding the victims by people other than the victims throughout the case in the hearing today. I'm not going to do that. I don't feel eloquent enough to try to (indiscernible). What I do want to do is focus on what the actual victims had said for themselves in the evidentiary record.

If the Court looks at the final declaration of Christine Pullo of Prime Clerk -- it's ECF3372 -- it establishes three key uncontested facts. Fact one. After having received a detailed disclosure statement explaining

the case, total yes votes on the plan were 114,307. Fact two. If the Court combines Classes N, A and B -- that's the (indiscernible) claimants and the adult PI claimants, 62,433 of them voted in favor of the plan.

And let me pause here. The record establishes that if 5 percent of all yes votes in number and amount, in this case -- and everybody voted with $1 claim -- are from personal injury victims. The personal injury victims are, in fact, the largest supporting voice in this case for this plan.

Point three. Classes 10A and B accepted a (indiscernible) rate of approximately 97 percent in number and amount. We pause again. The notion that you could get 97 percent of a cross section of individuals in America to agree on anything, much less the (indiscernible) of such passion and personal import is to whether the Sacklers should ever receive closure is astonishing. But for those who are not familiar with bankruptcy cases, we hardly ever see a class of this size of individuals accept at such a high rate, unless the commercial deal is so overwhelmingly compelling to the class (indiscernible).

The evidence shows that whatever pundits may say about this plan, it represents the best available commercial deal for the victims in every state. We pause for a moment on the point raised by Mr. Huebner and Mr. (indiscernible).

This is a bankruptcy case. Bankruptcy cases and courts and professionals cannot fix everything. All we can do is apply the law to the facts to reach a commercial resolution of (indiscernible) issues consistent with the law.

This is not a criminal case or a regulatory investigation, as Your Honor has repeatedly pointed out. Each state reserves all of its police powers consistent with the Code and the law. But with respect to the commercial people, it's a completely mystery why any state would refuse money on the table and choose uncertain chaos when so many of their own citizens support.

Your Honor raised the question of whether you could break down the claims data state by state. You can't because the individuals' addresses have been redacted. I'd certainly like to see who my own state of Connecticut is purporting to represent in objecting to this deal. But the Court just has to look at the total no votes. (indiscernible) declaration in evidence. Only 2,600 individuals in classes NA and B voted no.

To be clear, there's absolutely nothing wrong with any individual exercising their right to say no, for good reasons or no reason at all. It's a terribly emotional issue for all of us. But it seems unimaginable that eight states are spending millions of dollars of their own money and causing other people to spend millions of dollars of

their own money, vindicating the rights of 2,600 people -- particularly given the state's historical (indiscernible) towards their opioid victim citizens and the tens of thousands of citizens who have voted yes for (indiscernible).

But let's give Connecticut and the other states the benefit of the doubt, that this is a matter of principle. It's not as if the rhetorical objection is without effect if their objections are sustained. Under this plan, the actual victims have set aside $750 million for payment of injury. That is an unprecedented and monumental achievement only made possible by this Court, the mediators, the professionals, and the process participated in in good faith by all the claimants in the case.

In the absence of this deal, it is hard to see how there will ever be money set aside for victims. Remember, the prepetition deal that was cut set aside zero for personal injury victims. Maybe the objecting (indiscernible) have the wherewithal and patience to chase the Sacklers into eternity. The victims didn't before and they don't now. For that reason, the ad hoc group supports confirmation of the plan, even if it means that Purdue will continue on as a business. Factors (indiscernible) own form of closure and release it.

Given the balancing of the risks and the rewards,

97 percent of actual people who were harmed by the conduct of the Sacklers and Purdue want this deal done.

THE COURT: Okay.

MR. SHORE: And other than -- if Your Honor doesn't have any questions, I'll just respond later in the hearing...

THE COURT: All right, fine. Thank you. I don't at this point. So, the Multistate Governmental Entities Group, I believe, is next?

MR. MACLAY: Thank you, Your Honor. Kevin Maclay for the Multistate Governmental Entities Group. And, of course, we've just heard a lot of argument and I will do my best, Your Honor, not to repeat any of it but to hit on a couple of points that are important to my group and I think to the case.

As Your Honor knows, I represent the Multistate Governmental Entities Group, a group of approximately 1,300 local governmental entities and tribes across 38 states and territories. And, Your Honor, one thing that I would like to highlight in my comments here today is the difficulty of getting to the resolutions reached. As Your Honor knows, it took many months of extensive negotiations involving the services of two of the most highly qualified mediators in the country in former Judge Lane Phillips and in Ken Feinberg, to get to the deal we have today.

As the mediators reported on September 23rd to Your Honor, that mediation resulted in Phase 1, in the agreement that all value received by the state and local governments would be exclusively dedicated to programs designed to abate the opioid crisis, and that such value cannot be used for any other purpose other than an amount (indiscernible) administration of the (indiscernible) themselves and to pay legal fees and costs.

And that was followed, Your Honor, by Phase 2o of the mediation by those same two esteemed mediators, which resulted, as of March 23, 2021, in a report noting a consensual agreement as to the allocation percentage between and among the public and private creditor groups engaged in the mediation. As that same mediator's report also noted, Your Honor, it also achieved an allocation inter se among the public and private creditor groups, among the overwhelming number of mediation participants. Of course, it resulted in a contribution of over $4 billion from the Sackler Family and associated entity, as also noted by that same mediator's report.

And that was followed, Your Honor, by the able assistance of a sitting a sitting court judge, Judge Chapman, who successfully concluded Phase 3 of the mediation, which resulted in additional funds and additional terms that were favorable to both state and local government

and all private entities.

And so, as a result of those very difficult and time-consuming negotiations overseen by extremely able and experienced advisors, the global settlement was reached. Each aspect of that global settlement is a crucial component of the basis of this plan, and all of them are interconnected (indiscernible) a couple of other people speaking here today.

So, just to make it completely clear, Your Honor, the releases are necessary as part of that global settlement, as part of that global deal for the public creditors and the private creditors to receive the funds they have been allocated under the plan, to put towards abatement of the opioid crisis. (indiscernible) releases could be (indiscernible) class of this carefully negotiated and very difficult to achieve settlement. It would allow other creditors to potentially cut in line and obtain funds that would otherwise go towards abatement by the states and local governments.

And that, Your Honor, is why the MSG group believes strongly that this plan should be approved. And that's what I have to say about that, Your Honor.

THE COURT: Okay, thank you.

MR. MACLAY: Thank you.

(Recess)

CLERK: Good afternoon, everyone. If everyone could just turn on their video feeds, just to make sure that everyone is able to connect. And at this time, can everyone just give me a thumb's up if they could hear me clearly?

MAN 1: Yes.

CLERK: That sounds fantastic. Okay, so we're just going to go through a few house rules just to set the expectations for today's hearing -- afternoon hearing continuation. Please keep in mind to have your mics on mute when not speaking, to avoid any background noise. Also, make sure to unmute yourself when you do need to speak so that the judge, all the parties and the court reporter could keep track of who's speaking at the time.

Also, when you're not part of the -- part of the hearing and you're also -- let's see, when you're not part of the hearing or part of that portion of the hearing, can you please turn off your video feed so that way you're able to continue if you need to multitask in the background and it's not a disruption for the other parties?

Also, although this is a -- this is a video hearing, also make sure that you remind yourself that only the audio is being recorded, so please state your name again every time you speak. And although it's being conducted through Zoom, the hearing constitutes the court proceeding, and any recording other than the official court version is

prohibited. No party may record images, sounds from any location. The formalities of the courtroom must be observed.

And with all that said, also, please make sure that you could also use the AT&T telephonic listening line only, the dial conference bridge. The phone number is 844-867-6163. Again, the number is 844-867-6163. And we encourage everyone that, if you're not going to be taking part in the hearing and you just want to listen, to please utilize that system. And the access code is 9263332-pound. Again, the access code is 9263332-pound.

Finally, make sure that -- make sure that all -- all of you guys have your full name displayed on the screen so that we could make sure and keep track of the person who's speaking and the judge also could know who he's speaking to. And also, you could rename yourself under the participant part of the Zoom or the app. If you guys have any questions, you may ask now. If not, we're going to start soon. The judge should be joining us shortly. Thank you for your cooperation.

THE COURT: Okay, good afternoon. This is Judge Drain and we're back on the record in In Re Purdue Pharma L.P., et al. with resumed oral argument now by the objectors to the plan, as to the issues that were addressed in the oral argument this morning by the parties who support the

plan, namely, the plan's Rule 9019 settlements and the issue of third party releases and injunctions.

I have a statement of allocation by those parties that has the United States Trustee being the first person or the first objector to speak. And I see Mr. Schwartzberg there for the U.S. Trustee, so you can go ahead, Mr. Schwartzberg.

MR. SCHWARTZBERG: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. SCHWARTZBERG: Your Honor, as you know, the U.S. Trustee has objected to the confirmation of the Purdue Pharma plan on statutory, constitutional and prevailing circuit law grounds.

THE COURT: I'm sorry, you're going to have -- we're having a hard time hearing you, Mr. Schwartzberg.

MR. SCHWARTZBERG: I'll talk up, Your Honor, and if that doesn't work, I'll put on -- I'll put on some earphones.

THE COURT: Okay.

MR. SCHWARTZBERG: And I'm going to adjust my volume as well.

THE COURT: All right.

MR. SCHWARTZBERG: But, Your Honor, as you well know, the United States Trustee has objected to confirmation of the Purdue Plan on statutory, constitutional and

prevailing circuit law grounds. Testimony -- testimony (indiscernible) over the past several days -- over the past several days only reinforces our argument. The Debtors assert that third party releases may be granted in rare and extraordinary cases. We do not concede that that is a valid legal justification, but we do concede that this case is rare and exceptional, which were the reasons the Debtors do not profess.

The plan is breathtaking, Your Honor, and probably unprecedented in releasing the claims of a countless number of victims who hold direct claims against the Sackler Family members and related entities, many of whose members are not named and who may number on the thousands. The plan is also extraordinary in granting a discharge of liabilities in favor of the Sackler Family that far exceeds any discharge that would be available to individuals who, like the Sackler Family members, actually filed bankruptcy (indiscernible).

By the terms of the plan and testimony of the witnesses, the Sacklers are to be discharged from the consequences of opioid-related fraud that may -- that they may have committed and for any future harm that grows out of that fraud. By evading the obligations currently posed on every bankruptcy Debtor while also seeking the benefits of a court-ordered discharge, the Sackler Family members attempt to purchase for themselves a bespoke bankruptcy

(indiscernible), an extra statutory tailor-made scheme to preserve their wealth and avoid a public reckoning. While those who hold direct claims against the Sacklers get nothing for those claims, some of them will receive $3,500 for the claims against Purdue. The direct claims of the Sacklers -- the direct claimants of the Sacklers receive no adequate notice that they may lose their day in court, and the Sacklers and they -- against the Sacklers, and that they will receive no compensation for their claim against the Sacklers.

Your Honor, why are we in this situation? Because the Sacklers say so. There's plentiful testimony, including from David Sackler himself, (indiscernible) the Sackler Family adamantly refuse to pay a penny unless they received an extraordinary release. Interestingly, they gave no reason except they bare no legal responsibility for the opioids crisis. And the Sackler Family promises that, unless they receive this extraordinary release, they will fight tooth and nail against anyone who sues them from the District of Connecticut to the isles of Jersey.

They even say they're untouchable because their trust was put together so intricately that the money is beyond the reach of the victim. In contrast, the victims, who have no adequate notice of the release provision of the plan, are losing their right to sue the Sackler Family. In

effect, Your Honor, the Sackler Family and Purdue Pharma say to the victims they're within the jurisdiction of this court and thereby within the reach of the Sackler Family, but the Sacklers are beyond your reach.

Your Honor, that cannot be so under the Bankruptcy Code, the Constitution, (indiscernible) and valid case law. As the Court is aware, the United States Trustee objects to the third party releases of the Sackler Family on all three grounds. Your Honor, first I will (indiscernible) the Code.

As we state in our objection, Your Honor, nonconsensual releases of claims held by non-debtors against other non-debtors are not allowed under the Bankruptcy Code. Section 524(a) of the Code describes the discharge of non-debtors, and Section 1129(a)(1) prohibits confirmation of a plan that does not comply with the applicable provisions of the Bankruptcy Code.

Section 1141(d) specifies the scope of discharge upon confirmation and does not include non-debtor parties within its scope. And, Your Honor, Law v. Siegel bars the equitable powers of Section 105 and being used -- used to allow that Section 524 and Section 1141(d)(2) neither authorized or (indiscernible).

Simply put, Your Honor, these charges are for debtors. The Bankruptcy Code says so. And as the Debtors (indiscernible) full stop, end of discussion. Metromedia,

the sole authority on which the Debtors rely as legal justification for the (indiscernible) releases, the Second Circuit itself recognizes that there's no authorization in the Code for approval of involuntary releases. And if the individual members --

THE COURT: That's your reading of Metromedia?

MR. SCHWARTZBERG: I'm sorry, Your Honor?

THE COURT: That's your reading of Metromedia?

MR. SCHWARTZBERG: Your Honor, Metromedia -- a few things indicated that if there's a blanket of releases that could potentially be abusive, then --

THE COURT: That's different than what you said. I understand your point now.

MR. SCHWARTZBERG: Oh. Also, Your Honor, there is no code section in the Bankruptcy Code that authorizes non-debtor limits.

THE COURT: Well, there wasn't one in the Mandel case either, as 524(h) and the legislative history to 524(g) recognize.

MR. SCHWARTZBERG: Yes, Your Honor. Because there's no exclusive authorization in the code, we believe if Congress wanted to allow the debtors -- non-debtors discharges, what we believe is an extraordinary (indiscernible) due process, they would have done so explicitly, as they did with 524 (indiscernible).

THE COURT: Well, except -- except in 524(h), they make it clear that the enactment of 524(g) does not undo any such release that was entered before the enactment of 524(g). And the legislative history makes clear that Congress very clearly wanted the law to develop in that area, and was not limiting it just to the asbestos trusts in 524(g).

MR. SCHWARTZBERG: Your Honor, if you're talking about the legislative history, I read that as dealing just with normal plan injunctions, such as assets transferred from one -- from the Debtor to a third party and the injunction --

THE COURT: Really? Well, maybe you weren't in the room when it was being drafted.

MR. SCHWARTZBERG: I was not, Your Honor.

THE COURT: Or representing the companies that needed the protection, and had already gotten the injunctions before 524(g).

MR. SCHWARTZBERG: I do point out, Your Honor, the Mandel injunction is based on enjoining claims that are derivative of the debtor, whereas the injunction here that the parties received more of a direct indiscernible)...

THE COURT: Okay.

MR. SCHWARTZBERG: Your Honor, if individual members of the Sackler Family have filed their own Chapter

11, they did not obtain the (indiscernible) the third party releases being given here, which absolves them from fraud claims, the result of (indiscernible) by growing individual and hypothetical bankruptcy cases. Moreover, if the Sackler Family plan (indiscernible) in exchange for the broadest brief possible, and actually propose individual bankruptcies to the Sackler Family, it would almost certainly not be confirmed under the best interest test of creditors, the text that requires creditors to be treated (indiscernible) Chapter 11, they would in a Chapter 7 liquidation. In other words, virtually all the Debtor's assets must be liquidated and paid to creditors.

Why? Because all available information suggested the collective assets of the Sackler -- of the (indiscernible) Sackler Family exceed $10-11 billion.

THE COURT: Can we stop there? What information are you referring to? What evidence are you referring to? You heard the testimony and you read the declarations where there was no cross as to the Sackler Family's assets. So, which evidence are you referring to?

MR. SCHWARTZBERG: Your Honor, I'm referring to the Debtor's disclosure statement.

THE COURT: You're not referring to the -- to the declarations as to the Sacklers' assets that were admitted without cross-examination in this hearing?

MR. SCHWARTZBERG: Your Honor, in the Debtor's disclosure statement, they indicated that it was estimated that the value --

THE COURT: So, the answer's no. You're not -- you're not citing any of the evidence in this hearing?

MR. SCHWARTZBERG: I'm citing the disclosure statement, Your Honor.

THE COURT: All right. Fine. Can I ask you one more question, Mr. Schwartzberg?

MR. SCHWARTZBERG: Absolutely.

THE COURT: You've couched this so far as the Sacklers' plan. Now, you've heard the oral argument today, including the remarks by counsel for the Official Creditors Committee and the Multistate Governmental Entities Ad Hoc Committee, the lawyer for the Personal Injury Ad Hoc Committee and the AHC, the committee of setting governmental entities. None of them referred to this as the Sacklers' plan or the Sacklers' deal. None of them referred to the condition that the Sacklers were placing on it. They said that if there was no such release, they would not be supporting the plan because they believe that the plan was necessarily as a whole for their recovery. What is your response to that argument?

MR. SCHWARTZBERG: Your Honor, in most cases or in a lot of cases that we see where an entity files for

bankruptcy and there are individuals who own that entity who also have liabilities in connection with it -- those individuals themselves file bankruptcy and they get a discharge. We believe here the Sackler Family, or the members who are seeking releases, are seeking the discharge for things they just thought that should not be permitted, especially since that, in some instances, victims are only getting $4,500.

Whereas I was discussing, Your Honor, if the Sacklers as a whole filed bankruptcy, there would potentially be significantly more money than -- (indiscernible) put on the table for that.

THE COURT: So, essentially, you're ignoring the statements by the representatives of all of the people that spoke today that speak for the roughly 95 percent of the people that voted in favor of the plan?

MR. SCHWARTZBERG: Your Honor, we don't believe the plan complies with the Constitution. And we believe that Your Honor is only authorized to do what is authorized under the Bankruptcy Code, and that therefore the plan could not be (indiscernible).

THE COURT: Okay. So, it's your principle against their vote?

MR. SCHWARTZBERG: Your Honor, I believe it's the Constitution and the Bankruptcy Code against their vote.

THE COURT: Okay. I was just curious about the -- who you were speaking for. I understand now.

MR. SCHWARTZBERG: Thank you, Your Honor.

THE COURT: Okay.

MR. SCHWARTZBERG: As I was indicating, Your Honor, the 4 billion being put into this case may be a huge amount of money but it is less than the -- what we believe is the 10 billion that would be considered in the best interest of the nation test.

THE COURT: So, you think all of that would come in? All of that $11 billion would come in in a bankruptcy -- in a liquidation?

MR. SCHWARTZBERG: You know, it's hard to say, Your Honor, because unlike the Debtor, the Sacklers have not provided -- the Sackler Family has not provided a fulsome set of financial information.

THE COURT: Well, you didn't cross-examine the expert who provided the liquidation analysis.

MR. SCHWARTZBERG: We did not, Your Honor.

THE COURT: And you didn't cross-examine the expert who provided the analysis of the Sacklers' wealth and where it lies, right?

MR. SCHWARTZBERG: We did not, Your Honor.

THE COURT: And so you're just, therefore, assuming that money would be available? Those transfers

would be avoidable and recoverable?

MR. SCHWARTZBERG: My argument, Your Honor, is we don't know because there has not been a fulsome disclosure of the Sackler Family (indiscernible) which would be --

THE COURT: Well, there was a declaration. Actually, there were two declarations. So, I -- I should rely on that, right? No one cross-examined, no one questioned the declarations -- the declarants.

MR. SCHWARTZBERG: I believe there was one, although I don't know what Your Honor's final decision on it was -- indicated after the period of ten years, the Sackler Family wealth would be in excess of 15 --

THE COURT: No, that's wealth. We're talking about recovery in a liquidation.

MR. SCHWARTZBERG: Your Honor, we do concede that there are -- there is money that's in a trust, and that would have to be a (indiscernible) asset.

THE COURT: And your -- obviously, your office isn't able to do that, right?

MR. SCHWARTZBERG: Your Honor, I believe there are un-consenting -- or nonconsenting, excuse me, states that could pursue that as well as -- if the plan (indiscernible) perhaps the Committee could pursue that.

THE COURT: Okay. The Committee that has supported the plan?

MR. SCHWARTZBERG: Yes, Your Honor.

THE COURT: Okay.

MR. SCHWARTZBERG: As I was saying, Your Honor, because the Sackler Family members are not debtors, they've not been subject to the comprehensive disclosure obligations required of (indiscernible). The testimony does show that certain of the Sackler Family trust went to Royal Court in (indiscernible) Jersey where secret proceedings (indiscernible) no parties in this case other than perhaps the Sackler Family could obtain a court order preventing the sale of the (indiscernible) unless the Sackler Family receives a release of fraud and other conduct.

Does this court enjoin the hundreds of pending lawsuits against the Sackler Family when the Debtor for Chapter 11 -- no lawsuits (indiscernible) judgment (indiscernible) have been liquidated. The trial testimony establishes that, despite effectively discharging the Sackler Family in this -- excuse me -- from discharging the Sackler Family in this bankruptcy from the claims of opioid victims, the Debtors liquidate -- either try to evaluate the assets and liabilities --

THE COURT: Mr. Schwartzberg, can you go a little slower? Your -- I'm not sure the court reporter will be picking up what you're saying.

MR. SCHWARTZBERG: Yes, I apologize, Your Honor.

The Debtor's liquidation analysis didn't even try to evaluate the assets or liabilities of the Sackler Family, including the opioid-related liabilities. But if the Sackler Family members are being discharged as if they were Debtors, then their assets and liabilities should be included in the liquidation effort.

Simply put, the Sackler Family members are reliable for only an infinitesimal portion of the 41 trillion opioid liability in the Debtor's liquidation analysis. The (indiscernible) arithmetic reality is that they were -- that if they were debtors (indiscernible) liquidate all of their assets (indiscernible) under the plan.

Moreover, in a Chapter 7 case, the Sackler Family wouldn't be granted the luxury of liquidating their assets over a decade (indiscernible) effectively retain (indiscernible) normally paid creditors for investment income generated over a decade, which is precisely what is being allowed here with the decades-long payout of (indiscernible).

When asked on cross-examination what the Sackler Family loss would be after the decades-long payout, David Sackler did not know what the net effect will be. He said, I don't think anybody can say that with certainty. Other witnesses were forced to draw conclusions based on the

incomplete information precisely that there's no Sackler Family member as a debtor, who made -- who has made the complete and public disclosure required of debtors so that their complete financial situation can be understood in (indiscernible).

Your Honor, not only did the releases violate the Bankruptcy Code, but they're also fundamentally at odds with the U.S. Constitution, both the Due Process clause and the Bankruptcy clause. (indiscernible) of claims against the Sackler Family for their role in the opioid crisis (indiscernible) is at the consent of this Court. Due process provides that those litigation claims (indiscernible) both notice and a meaningful opportunity to be heard.

Debtors repeatedly and (indiscernible) conflate the due process afforded Purdue creditors for their claims against Purdue and their participation of Purdue's bankruptcy with due process for those with claims against the non-debtor Sackler Family members. For example, the reply brief goes to great lengths to extol the notice given of the bar date in this bankruptcy. That is a red herring, Your Honor, because the United States Trustee does not challenge the adequacy of notice to produce creditors regarding the treatment of their claims against Purdue. But there was no bar date for filing (indiscernible) claims

against the Sackler Family precisely because they are not Debtors. We don't even know the universe of claims against them beyond the 400 lawsuits that were enjoined.

Moreover, all the notice in the world can't legitimize the Court's dictating settlements (indiscernible) not agreed to sell or forcing -- or being forced to relinquish their claims without the consent of their day in court.

THE COURT: Well, can we -- can we break that down? I'm not -- I'm not quite sure what the last point makes. But as far as due process is concerned, there's, again, I believe, evidence of extensive notice of the release that built on the notice to creditors and potential creditors of the case, as well as extensive media notice of the release. And there was certainly an opportunity to object in this court to the release.

So, at one level I think what you're arguing is an issue for the future, as the Second Circuit discussed in the Motors liquidation case. The analysis of whether some party who arguably is subject to an injunction got notice sufficient to oppose the injunction is a fact-based inquiry based upon their own particular circumstances and the debtor's knowledge of them. So, isn't that really an issue for the future?

MR. SCHWARTZBERG: Well, I think we don't believe

the notice is appropriate and, therefore, this Court should not approve the --

THE COURT: Why -- on what basis do you say the notice was not appropriate?

MR. SCHWARTZBERG: Well, Your Honor, with testimony that the confirmation notice, the publication notice, the plain language notice did not include a (indiscernible) list of the releasing parties. All it did would say the Sackler Family members or the Sackler Family. It didn't include the thousands of other people that were being released.

In addition, Your Honor, the actual notice or the actual solicitation packet that went out was incomprehensible. Richard Sackler himself said reading Section 10.7(b) was too dense and he couldn't get through it. And John Long, the CFO and the man who actually signed the petition -- the schedules -- the schedules, I'm sorry -- the disclosure statement in the plan, indicated that he could not identify all of the release parties, and he didn't believe that an opioid -- an average opioid victim could either.

We believe that if you're going to take away someone's right to sue a person or an entity that you -- they should -- that entity should be identified. So, that is reasons why we don't think there was appropriate notice.

As well as future claims, Your Honor. (indiscernible) future claims did not receive notice and there was no future claims representative. But I'll continue, Your Honor.

The releases -- as I was saying -- the uncertain and amorphous definitions of the releases and who was being released, it was virtually impossible to understand who are the released parties and releasing parties, and what are released. So, we believe no matter how many times the Debtor advertised the shareholder releases on CNN, those advertisements never provided adequate notice because those releasing and those released were never adequately specified.

The (indiscernible) even hearing the advertisement and then sought out the plan and read every word of Section 10.7(b), basically it still wouldn't have notice, because it was incomprehensible. And as I indicated, Your Honor, Mr. Lowne didn't appear to have knowledge of all released parties. In fact, on cross-examination we asked if it would be possible for an average opioid victim, based on publicly available information, to identify all the assets in individuals that are getting released, he indicated, I would presume if I'm not, they would not be able to, no.

And he further testified he couldn't identify the Sackler Family's children and grandchildren included in the releases, and he didn't know that this is an entity Sackler

Family members --

THE COURT: Well, let me just stop you there. You have referred consistently to the Sacklers, right, as a collective?

MR. SCHWARTZBERG: Yes, Your Honor.

THE COURT: And the notice itself said the Sacklers, right?

MR. SCHWARTZBERG: Yes, Your Honor.

THE COURT: Doesn't that include children and grandchildren?

MR. SCHWARTZBERG: The average person looking at it may or may not know that.

THE COURT: All right.

MR. SCHWARTZBERG: And they would --

THE COURT: Let's move on, Mr. Schwartzberg.

MR. SCHWARTZBERG: Your Honor, the purported -- purported narrowing in both the seventh amended plan and the eighth amended plan, both filed on the morning of the trial, eliminated -- eliminated certain references. For example, the seventh amended plan got rid of the reference to all other persons. We still believe, even though those changes were made, they don't do anything to clarify or materially limit the scope of the extraordinary (indiscernible) releases.

From the trial testimony, we have ascertained that

the releases extend the fraud claim to non-opioid liabilities related to Purdue's manufacture, sale and distribution of many other pharmaceuticals into future conduct -- meaning, the parties who have not yet been injured and not credited to the Debtors are having future claims extinguished. And, Your Honor --

THE COURT: Can I -- can I stop you on that point? I'm not quite sure... As far as future conduct is concerned, if they are excluded -- I'm talking now from the Sacklers -- from having anything to do with -- with Purdue or Newco in the future, what are we talking about by future conduct?

MR. SCHWARTZBERG: Your Honor, we're talking about acts that would have occurred prior to the effective date. So, for instance, appropriate (indiscernible) prior to the effective date that are used after the effective date, that would be a future claim -- that a claimant would have --

THE COURT: But the evidence is clear that the Sacklers themselves have not been involved with this company in any way, shape or form in terms of running it since before the commencement of the bankruptcy case.

MR. SCHWARTZBERG: Your Honor, then if that's -- there are no (indiscernible) claims, they should eliminate the future claims from releases.

THE COURT: I'm sorry, you're going to have to

slow down. I couldn't really hear that.

MR. SCHWARTZBERG: I said, Your Honor, if there are no future claims, they should eliminate them through the releases. But it appears that any actions that occurred before the effective date, whatever they may be, if it causes harm after the effective date, those claims are being released.

THE COURT: Right. But you're not aware of any claims that would exist against them?

MR. SCHWARTZBERG: I'm not aware of any, Your Honor, but I do know that they're being released under the plan and there must be reason for that -- or there may be a reason for that.

THE COURT: Okay.

MR. SCHWARTZBERG: Your Honor, the Court also, we believe, does not have the power to -- or authority to enjoin claims by one third party against another third party (indiscernible) there both parties to the same bankruptcy proceeding. (indiscernible) Section 105 was used to create it. The Bankruptcy Clause grants Congress power to enact uniform laws on bankruptcy. Bankruptcy reorders the rightful debtors and the creditors. It does not reorder the rights of non-debtors against non-debtors, and any effort to do so exceeds the constitutional authority granted.

It is ironic that the Debtor -- that the Debtors

and the shareholder release parties go to great lengths to explain how creditors could never obtain personal jurisdiction of the shareholder release parties and how their assets are in trusts and (indiscernible) accounts beyond the reach of creditors, while dismissing the United States (indiscernible) argument that the Bankruptcy Court does not have unlimited related to jurisdiction to adjudicate or distinguish claims between non-debtors.

And, Your Honor, I'd like to turn to Metromedia because that was discussed. Despite much argument otherwise, we didn't believe that Metromedia reflects the imposition of third party releases or dictates the outcome in this case.

First, Your Honor, Metromedia did not decide or discuss the issue of constitutional due process. Second, (indiscernible) Supreme Court decisions undercut Metromedia's analysis. Law v. Siegel established yet again that Section 105 cannot be used to grant relief that the Bankruptcy Code does not authorize. And even the Second Circuit picks up -- it expressed doubt with Metromedia about relying on Section 105.

And Stern v. Marshall established that article in Bankruptcy Courts that constitutional authority to adjudicate many state law claims. The Bankruptcy Court cannot adjudicate a claim held by one debtor against another

non-debtor -- it certainly cannot extinguish that claim their a plan confirmation.

Third, Your Honor, the statements in Metromedia on third party releases were not beholding of the case. The Court ultimately dismissed the appeal for equitable (indiscernible).

And, fourth, Your Honor, Metromedia doesn't set out factors and filings, but it does suggest that releases can't be a discharge, as this one is; a release can confirm blanket immunity, as this one does, and --

THE COURT: Can we stop on that point? It's not a discharge, right? It doesn't discharge all their debts.

MR. SCHWARTZBERG: But, Your Honor --

THE COURT: And it doesn't provide blanket immunity.

MR. SCHWARTZBERG: But, Your Honor, as it said in the Second Circuit in Metromedia, a third party release may operate as a bankruptcy discharge arranged without a filing and (indiscernible) safeguard to (indiscernible). In fact, Your Honor, this discharge provides a greater -- a super-discharge. The shareholder released parties -- if the Sackler Family filed for bankruptcy, they wouldn't be discharged from fraud. And in this case, they're getting -- they're getting fraud as part of (indiscernible) against them.

THE COURT: So, what is your view about the MacArthur-Manville case then that deals with this issue?

MR. SCHWARTZBERG: Your Honor, I'm not familiar with this case -- that case.

THE COURT: Okay.

MR. SCHWARTZBERG: But Metromedia did establish factors and -- although it did not establish factors and filings, it did at least require some types of substantial contribution for the parties being released. Mr. Lynam testified to a litany of parties being released -- perhaps hundreds of people or entities, without paying so much as a dime into the estate. And, indeed, Richard Sackler himself did not know his personal assets, including his checking account would be used for the final count.

Your Honor, I just want to point -- before I go into my next point. Mr. Huebner, in his presentation, had a whole litany of cases where there are fraud releases, and I just wanted to note that it appears that those were all consensual. Here, we're talking about nonconsensual releases, we're talking about settlement. And just before I forget that, I wanted to just address that issue.

And then regarding something that came up on cross-examination, Your Honor. The United States Trustee (indiscernible) the vote-counting rules of Section 1126 and does not contest the Debtors have established acceptance of

a plan by the voting process. It is well established that 1126, as interpreted, only counts votes actually cast and does not direct courts to consider the toll number (indiscernible) of the votes -- the voters.

But Purdue and the Sackler Family have misused the voting percentage to create the impression that the stakeholders overwhelmingly support the non-debtor involuntary releases, and that's simply not true. And to give the final (indiscernible) is not deserved. The Debtors represent that each and every class of creditors that voted has overwhelmingly voted to accept the plan. However, they also say in Paragraph 243 of the reply brief that 95 percent of all the creditors voted in favor of it.

Your Honor, 95 percent of all the creditors did not vote in favor of the plan. However, 95 percent of 20 percent of the creditors who voted --

THE COURT: Mr. Schwartzberg, how do you propose to measure overwhelming support except by how everyone measures an election, which is based on those who actually vote? Can you name me one election that counts people who just answer polls or say later what they think, as opposed to those who actually vote?

MR. SCHWARTZBERG: Your Honor, we're noting that in the --

THE COURT: You live -- I know you live in this

area instead of Washington, D.C., but I think it would be a surprise to politicians that you don't count the vote, you count something else, something amorphous?

MR. SCHWARTZBERG: Your Honor, I am not -- we are not challenging what 1126 --

THE COURT: Are you aware of any case that has looked at support, as far as overwhelming support, other than by the vote?

MR. SCHWARTZBERG: Your Honor, what we're doing is we're challenging Debtor's talking points by --

THE COURT: But on what basis?

MR. SCHWARTZBERG: Your Honor, 95 percent of all the creditors did not vote --

THE COURT: So, you don't answer my question. You would poll the man on the street?

MR. SCHWARTZBERG: We're not talking about polling, Your Honor. We're not talking about --

THE COURT: No, you're not talking about counting at all. Just move on from this point. I think the politicians who are objecting to this plan at least understand how elections work.

MR. SCHWARTZBERG: Your Honor, if the Debtors wanted to establish that the creditors consent to the releasing of claims, all they had to do was ask, but they did not.

Your Honor, in conclusion, the Bankruptcy Code is a carefully drafted, comprehensive statutory scheme that strikes a balance between the rights and obligations of debtors and creditors. But what the Debtors and the Sackler family propose here turns that scheme on its head and eviscerates both the statutory and constitutional protections to which creditors are entitled. It creates a bankruptcy-like option for the Sackler family without their actually filing for bankruptcy and being subject to obligations (indiscernible).

Neither the Bankruptcy Code nor the Constitution allow this Court to approve a plan that cuts off the rights of individuals (indiscernible) parties other than the debtors, yet that is exactly what the Debtors ask this Court to do.

Millions have already been victimized by the opioid crisis that the Sackler family helped create. They shouldn't be victimized a second time by having the claims against them extinguished in the bankruptcy case against those who are not debtors.

And so I (indiscernible) where I began. This plan is indeed extraordinary, and it is extraordinary for all the wrong reasons and confirmation should be denied. Thank you, Your Honor.

THE COURT: Okay, thank you. Okay. I think --

Mr. Goldman, are you next?

MR. GOLDMAN: I believe I am, Your Honor.

THE COURT: Okay. For the State of Connecticut.

MR. GOLDMAN: Yes. Thank you, Your Honor. Irve Goldman, Pullman & Comley, for the State of Connecticut and also for -- we've agreed to coordinate our arguments and I'll be presenting also for Delaware, Vermont, Oregon, Rhode Island, District of Columbia, and Washington, to conserve argument time.

THE COURT: Okay.

MR. GOLDMAN: And just also preliminarily, Your Honor, Mr. Gold and I will be dividing up the arguments. I'll be addressing for the most part subject matter jurisdiction and certain other aspects of the third party releases. And then Mr. Gold will be addressing Metromedia.

THE COURT: Okay.

MR. GOLDMAN: Okay. Thank you, Your Honor.

Before I proceed with my prepared remarks, if I could just go over or respond to the points that were raised by the plan proponents this morning and into the afternoon.

First, it's been suggested, although I'm not entirely clear on this point, that 9019 would govern a settlement of a creditor's direct non-state claims against non-debtors, which are really not the property of the Debtors to sell. I'm not aware of any authority that exists

for the proposition that a debtor or a trustee can attempt to force a settlement of non-state claims held by creditors based on the TMT standard that essentially says that if the settlement does not fall below the lowest in the range of reasonableness, it should be approved.

THE COURT: Yeah. I don't think that was Mr. Huebner's intention. I think he was covering the 9019 Iridium TMT Trailer Ferry argument, the one that Mr. Gold is going to cover.

MR. GOLDMAN: Okay. I just wanted to be sure.

THE COURT: Having said that, it's not a factor that the courts in the Second Circuit regularly consider, at least expressly as a factor when considering a release of a third party claim. But in the Third Circuit, they do discuss fairness or unfairness. They say that the third party release should not be unfair. So I guess at least in other jurisdictions, fairness does come in in some respects. And it probably does indirectly in the Metromedia factors by focusing on the consideration provided and who it goes to.

MR. GOLDMAN: Point well taken, Your Honor. So I'll go to the next point that I wanted to respond to.

I don't believe anything said by Mr. Huebner justifies overriding the sovereign judgements of nine states and the District of Columbia, that their view of justice and an acceptable resolution with the Sacklers given the amounts

that they propose to contribute requires a full airing of their alleged culpability in the courts of the objecting states.

The very concept of sovereignty requires that the judgements of those states be respected and that they not be forced to give up their property rights against non-debtors by a majority or even a supermajority vote.

As Ms. Conroy, who others have invoked earlier, had to acknowledge in her testimony, reasonable minds can differ about the amounts the Sacklers should be contributing in order to get a third-party release. And you have kind of those minds in the he objecting states falling on the side of inadequacy.

There was also a point that the current state of affairs was portrayed as leaving a binary choice of taking a stand or liquidating. However, there is a scenario in which additional consideration could be provided in order to achieve full consensus, but the parties have simply chosen to draw the line here and attempt to force a resolution on the objecting states.

There was another point made about --

THE COURT: Can I stop you -- can interrupt you on that point?

MR. GOLDMAN: Certainly, Your Honor.

THE COURT: Let's assume for the moment that

Connecticut agreed -- let's assume for the moment that we had a fourth mediation and the Sacklers agreed to contribute another $50 million like they did in the third mediation, the one that Judge Chapman supervised. And Connecticut, Washington, Oregon, they all went along with it except one state. Or even just the City of Seattle. Do you say that the whole thing should still be put aside for that creditor's rights?

MR. GOLDMAN: Your Honor, that would be assuming that with that one holdout the Sacklers would refuse to go forward with the contribution?

THE COURT: Yeah. Let's just say one holdout just decided that no amount of money was enough.

MR. GOLDMAN: Well, that is the difficult question to be answered. I think to be principled about things, we would have to respect the judgement of that one holdout. And if we believed that truly it was an adequate settlement ourselves, I think it would be up to us to prevail on that one holdout, to see it our way. And that's the best way I can answer Your Honor's question.

If I could move to my next point that I wanted to respond to.

There was a reference to other claimants in our state or maybe in the other objecting states to claimants who may have voted in favor of the plan. And as Your Honor

brought out, there really is no evidence of that. But even if they did, they're not elected officials of the objecting states who are charged with protecting what they believe to be in the public interest. So it really is a beside the point type of observation that was made.

There was also an observation made that municipalities overwhelmingly voted in favor of the plan, and we acknowledge that. But again, just like the individual claimant that might have voted in favor of the plan, they have no authority to assert the (indiscernible) claims on behalf of a state's citizenry, as the attorneys general in the objecting states do.

THE COURT: Do you say that applies in all of the objecting states?

MR. GOLDMAN: Your Honor --

THE COURT: Notwithstanding the home rule laws?

MR. GOLDMAN: Notwithstanding the home rule laws?

THE COURT: Yes.

MR. GOLDMAN: That I can't -- I'm honestly not sure about home rule law, but I do know that one of the -- at least one of the cases was -- of the municipalities, I believe it was the City of New Haven that was dismissed because they didn't have standing to assert the type of claims that the State of Connecticut AG has asserted.

And there was also a reference I believe by the

Unsecured Creditors' Committee that the state AGs have reneged on the allocations formula. I don't believe that is the case. That allocation formula was formulated and agreed to on the premise that there would be a fully-consensual settlement as part of a plan. And that obviously has not occurred. So those are my points in response to the points that were made this morning and this afternoon.

And if I can now turn to my formal part of my argument.

It was observed by Circuit Judge Henry Friendly in the pre-Code days that conduct of bankruptcy proceedings should not only be right, but seem right. And it's our view and the view of the other objecting state that the breadth of the releases provided for the Sacklers given what we believe they've done leading up to this bankruptcy. It does not seem right to us, and we would contend is not right. And that belief is based on the recognition that if the plan is confirmed, they will have gotten every bit of protection and more than they would have received in their own bankruptcies and will be able to put a permanent halt to all of these suits, which certainly have exposure. Yes, I understand they submitted what they believe to be strong defenses. But they will be wiped away without having to undergo the rigors of their own personal bankruptcy, which I think is a really important consideration for the Court to

take into account. And unlike individual debtors --

THE COURT: Can I interrupt you on that?

MR. GOLDMAN: Yes, Your Honor.

THE COURT: There's two parts to that. There's the rigorous part and there's the personal bankruptcy part. As far as the rigors, we'll come back to that. But if it's putting them into or forcing them to go into personal bankruptcy, if one would get less or recover less or materially less in a personal bankruptcy scenario than the states would be getting under the plan, that's really just a punishment, right, at that point? That's what you're talking about, as opposed to doing an analysis of recovery under either scenario.

MR. GOLDMAN: Well, if you assume that you would be getting less and --

THE COURT: Right.

MR. GOLDMAN: -- I'm not sure that --

THE COURT: We can explore that in a minute. But, I mean, assume that for the moment.

MR. GOLDMAN: I think to a certain degree you can view it as penal. But that is one of the purposes of the consumer protection laws as well as providing a deterrent to future wrongdoers that in essence sends a message that they can't be bailed out by piggybacking on a corporate bankruptcy to get a discharge. I mean, most individual --

THE COURT: But again, the -- to me -- and you were quite candid about this, and I think I understand the logic behind it. Reasonable minds may differ about the amount and the other consideration to be paid. But it is one thing to say I want punishment, it's another thing to say we're not getting enough money. Those are two different things. Right? I think.

MR. GOLDMAN: Well, I would -- I do understand. And I think that I would say that if the amount of compensation, so to speak, in the sense of cumulative damages reaches an amount that the states can say -- all states can say, you know, this is sufficient punishment, or however you want to phrase it, and what we believe these people caused, what we believe, then I don't see an issue with the dichotomy that Your Honor proposed.

THE COURT: Okay. And can we focus on the rigor part for a second?

MR. GOLDMAN: Absolutely.

THE COURT: I don't know whether Connecticut is a party with the McKinsey lawsuit.

MR. GOLDMAN: I'm not a hundred percent sure. I believe we are, but I'm not a hundred percent sure.

MR. HUEBNER: Okay. I mean, there was certainly, I think you'd have to agree, much less rigor as far as the disclosure regarding McKinsey and the claims against it and

its involvement and the rigor in this case with regard to the discovery pertaining to various Sackler family members' role in Purdue and their assets and liabilities. You would agree with that, right?

MR. GOLDMAN: Well, not knowing what was provided in McKinsey, I'm at a little bit of a disability to respond.

THE COURT: Okay. Well, as far as the discovery taken of the Sacklers in this case, can you imagine that there would be any other discovery taken if they filed bankruptcy as far as their liabilities, their assets, and claims against them?

MR. GOLDMAN: I'm not sure that I know what you're getting at. There was extensive discovery. You know, whether that should serve as a substitute for what one goes through in the bankruptcy process, I would question.

THE COURT: Well, I mean, there are schedules that you have to fill out. There are forms you have to fill out in bankruptcy. They're not tens of millions of pages. And the discovery and the disclosure with regard to assets that you have a beneficial interest in are even less rigorous in your own personal bankruptcy. Wouldn't the discovery just repeat itself if various members of the Sackler family were compelled to file bankruptcy that we've already had?

MR. GOLDMAN: Well, to the extent that Rule 2004 exams would be taken --

THE COURT: But wouldn't it just be updated? I mean, that's all been done, right? And in fact, more than done, because I insisted that it be broader than even normal 2004 discovery as a condition for the preliminary injunction.

MR. GOLDMAN: Well, I understand what you're saying, Your Honor. But it just seems to me that it's not really a complete substitute for having to go through the bankruptcy process oneself. You know, obviously there are non-dischargeability concerns and deadlines. And all of that could -- would likely be brought to bear on a settlement that everyone would consider acceptable, the prospect of that I would think would naturally bring parties together. But since we don't have that dynamic, I could understand why the parties here are pushing this when they have a critical mass. So that's the best response I can give.

THE COURT: Okay. That's a good response.

MR. GOLDMAN: So I think that was my last point. And that was on to my argument as well.

THE COURT: Right.

MR. GOLDMAN: So the other point I was going to make is that they are contributing an amount which in the abstract could be considered substantial. But it's a negotiated amount of their considerable wealth. And that

wealth was in substantial part obtained by the cash and non-cash transfers that they acknowledge receiving over a 10 or 11-year period, $11 billion, yes. $4 billion of it was used to pay taxes, but that's a benefit to them as well.

And it's apparent that those distributions were made in response to concerns like those expressed by David Sackler in an email to Richard Sackler dated May 17th, 2007 that, quote, "We will be sued", end quote. That is Exhibit JX2237. And that family offshore trusts were set up to protect the Sackler wealth from the claims they expected to -- that would be asserted against them, as board member Peter Boer advised Jonathan Sackler to do in his confidential email, memorandum --

THE COURT: But, Mr. Goldman, those claims are estate claims, right? That isn't a third-party claim.

MR. GOLDMAN: Absolutely agreed, Your Honor. I'm just making the point that they set up this offshore trust with the idea of protecting for claims they knew would be coming in this confidential memorandum, which is JX --

THE COURT: But isn't this Mr. Gold's point? Isn't this the Iridium analysis?

MR. GOLDMAN: Well, I'm at the point of the argument where I'm just making our preliminary view of why this does not seem right to us, the whole leadup to the --

THE COURT: Is the State of Connecticut prepared

to give back the $285 million in taxes it received from this company that was engaged in illegal practices? It got the most other than the federal government by way of tax payments.

MR. GOLDMAN: Well, there was income that was derived on which taxes were owed. I don't know why we would be giving it back. But I understand the point you're making, that we benefitted also. But it pales in comparison to what was taken out by the Sacklers, surely.

THE COURT: Although as far as the tax payments are concerned, I do have an uncontroverted affidavit that says that most of those payments, if they have not been -- if it had not been a partnership structure, would have been paid by the Debtors directly. Right? They would have -- they relieved the Debtors of the tax obligation.

MR. GOLDMAN: Well, the fact is they set the structure up this way, they took the money out, and they owed the taxes. And they had Purdue pay the taxes on their behalf. But I do understand Your Honor's point.

THE COURT: Okay.

MR. GOLDMAN: If I could just complete the memo for the benefit of the Court for what it's worth. I was going to give you the exhibit number. It was JX2241. And Mr. Boer told Jonathan Sackler, quote, "For the family, it may be that overseas assets with limited transparency and

jurisdictional shielding from U.S. judgments will be less attractive to litigants than domestic assets." And that suggestion proved to be prophetic, as the Debtors and the Sacklers are now using the difficulty of collecting any judgements against offshore trusts as one of the reasons why the shareholder settlement agreement should be approved.

So under these circumstances, we do not believe the non-consensual releases here seem right or are right --

THE COURT: But can you wish that away? Can you wish those consequences away?

MR. GOLDMAN: The most we can do I think is doing what we're doing, Your Honor. And that is to try to prevent it from happening.

THE COURT: But, again, I think the avoidable transfer issue really is an estate issue. In other words, the Creditors' Committee and the Debtors and all the other parties have their say. You all have your say, too. But it's not a third-party release issue, it's an estate issue. And one could certainly come to the conclusion that as far as the avoidable transfers are concerned, the range of the settlement is within what is reasonable given the risks on the underlying liability and the risks of collection. I mean, if you want to go to the Isle of Jersey and seek to avoid the transfers under Jersey law and deal with enforcement with the Viscount of Jersey, there are obviously

some issues involved with that.

MR. GOLDMAN: I acknowledge that, Your Honor.

THE COURT: Okay.

MR. GOLDMAN: I do acknowledge that. But I think that what this goes to also, apart from the settlement, is really to the fairness of the release itself. Because it has to be put in context. You know, why are they getting these releases when they are really just giving back a lot of what was taken out over that period of time when they knew that claims were coming. And so that's really -- I'm not so much commenting on the Iridium settlement factors as I am on how that really should bear on the permissibility of the releases themselves, taking that -- in other words, you would really take that into account as to how they got that (indiscernible).

THE COURT: Well, that's a fair point. And I have thought carefully and listened carefully and read the evidence carefully to see how much of this $4.325 billion would be attributable to estate claims and how much would be attributable arguably to non-estate claims. And no one has really addressed that issue directly. I do have arguments, and they're just arguments, because given that it is a settlement, we didn't try the merits directly. But I have a fair amount of facts and arguments that would lead one to think, I believe, that the value here is not all on account

of the estate claims necessarily, that you can evaluate this settlement as covering both. But no one particularly wants to allocate the value to one or the other set of claims because they're all quite aware of the possibility of a default in the future where they want to litigate as hard as they can.

But just the simple point as far as the non-estate claims are concerned that only -- or I actually think less than a handful of Sacklers served on the board. And I think two or three were officers out of the entire family group. So, you know, people refer to the Sacklers as a unit, but they're actually -- the testimony shows 16, eight within Side A and eight with Side B, sets of contributors, some of whom I have to assume would have much stronger defenses to these types of claims than others. So it's -- you know, it's not an easy calculus.

MR. GOLDMAN: It is not, Your Honor. And I do not --

THE COURT: I agree with you on one point. Given the size of the claims here, which have not been liquidated, but they are gigantic, one could always and fairly easily say this is not enough, this $4.325 billion isn't enough. And at one level, that's clearly the case. Everyone should get paid in full, right? On the other hand, we know, at least on the personal injury side, that payments on these

types of claims historically are fairly low, unfortunately. You know, the settlement that is in Ms. Conroy's declaration where she says her firm pretty much had the people with the best claims, who had prescriptions, et cetera, if you assume a reasonable contingency fee, it's about $13,500 per person under that settlement. And I realize that was a while ago. But it's hard to look someone in the eye and say that's enough.

So at one level it would be quite easy for me to say to the Sacklers it's not enough. On the other hand, it's hard for me to say to Mr. Price and his committee you have to take the risk that this all falls apart over -- and it's never going to be enough, so it has to be some other bid or ask, whether it's another $50 million or another 25 or another $100 million. And at some point, there's a big risk.

And certainly AGs, who have been very aggressive in pursuing the Sacklers, including the State of New York and the State of Maryland -- I'm sorry, State of Massachusetts, excuse me, reached their point where they weren't willing to take any more risk of the whole thing falling apart.

So I would love for the Sacklers to pay enough to get your clients on board. I don't think that will happen if we adopt a rule that says any one governmental entity can

kill the whole thing. So it's hard for me to see how you reconcile that ultimately without leaving somebody at least saying that they're not on board with the plan.

MR. GOLDMAN: All points well taken. I think that, you know, it's a question of line drying as I tried to get Mr. Weinberger to acknowledge he didn't quite do it. But I think that it really is (indiscernible). And I think that what happened here, or at least what I perceive to have happened is there was a certain amount of fatigue that set in. Some states just threw up their hands and maybe saw the writing on the wall. But whatever it is, I do think that this does come back to our sovereign right to make these decisions for ourselves and not to be out voting and told to give up claims that aren't held by the estate.

THE COURT: But there's no -- there's no case in a bankruptcy context that holds that as far as states, right?

MR. GOLDMAN: Well, not that I could find, Your Honor. But then again, there's nothing that goes the other way either on this.

THE COURT: Well, there's plenty of caselaw that says that police and regulatory monetary claims get discharged in a bankruptcy case. Now, those are claims against the debtor, I understand. But they don't -- those cases don't distinguish between state claims and private claims if it's to collect money, like Peabody Coal, for

example.

MR. GOLDMAN: Your Honor, I had cited in our objection a line of cases holding that these type of claims, consumer protection claims, claims brought under unfair and deceptive acts and practices acts are non-dischargeable under either Section 523(a)(7), again, I'm speaking now individual case, or in the Section 523(a)(2)(A).

In my brief in the section of the plan -- or argument that the plan usurped our rights to have those declared non-dischargeable.

THE COURT: Right. But that's for individuals. And if you're dealing with a Chapter 11 case, those wouldn't be applying except by analogy. And again, I think the circuit in the MacArthur case dealt with the 523 point.

MR. GOLDMAN: Well, I was directing it to the Sacklers and the point that the effect of discharge that we viewed they are getting by these releases really circumvented those non-dischargeability provisions, if they had --

THE COURT: I understand. I understand. But -- well, we're dealing with a concept that I guess when you're talking about the payment of money under a plan has not been directly addressed, but it's certainly been indirectly addressed by the Courts.

MR. GOLDMAN: Can I flesh out for a moment what I

believe the response is to the MacArthur argument?

THE COURT: Sure, yeah.

MR. GOLDMAN: So I'm looking at the case. And it says MacArthur argues that the injunctive orders constitute a de facto discharge in bankruptcy of non-debtor parties as not entitled to the protection of Chapter 11.

But that was directed to MacArthur, a corporation. It didn't really deal with the issue that I'm raising. And that is that the effect of discharge here in favor of the Sacklers really does circumvent the non-dischargeability provisions that would apply if they filed their own bankruptcy. That was not a -- the comment that the Second Circuit was addressing.

THE COURT: Except that you're not getting a discharge under this plan. They're settling claims in return for a release. And the MacArthur Manville case I think went off on that ground, as do a lot of the other cases. It's not the same thing as a discharge.

MR. GOLDMAN: It is not quite the same thing. But for the clear majority of their debts and for the clear majority of their current financial problems is solved by this release, we'll call it, not a discharge.

THE COURT: That's fair.

MR. GOLDMAN: And so I think it's as close as the discharges we're going to get, even though it's technically

not an actual discharge. I understand.

THE COURT: Right.

MR. GOLDMAN: But if I can turn now just to the subject matter jurisdiction argument, which I think is governed by Manville III cited in our papers, which was decided three years after (indiscernible).

And in the context of striking down the third party release there, the Second Circuit instructed us to look to a state's laws to see whether the claims are derivative of the Debtors or whether they are based on some wrongdoing of the third party to independent legal duty.

And if we look to state law here, I don't think there's any question that the Sacklers engaged, at least as alleged, in independent wrongdoing of their own as opposed to Purdue under state law.

The laws of some of the objecting states are directly on point on this. For example, in Connecticut, an individual can be liable for unfair deceptive acts of a business entity if the individual either participated directly in the entity's deceptive or unfair acts or had the authority to control them. To the same effect is Maryland law. As long as there is authority to control the acts, they can be liable under unfair and deceptive practices acts. To the same effect as Vermont law, where an individual could be liable under their consumer protection

act if he or she directly participates in the acts or gives direct aid to the corporate actor. And also too with Washington's Consumer Protection Act, where they can be liable for corporate wrongdoing if the individual participates in the wrongful conduct or with knowledge approves of it.

So all of those are independent legal duties that run to the Sacklers and that would satisfy the Second Circuit's testare of independent wrongdoing.

Now, I know that the Debtors have argued that the indemnity obligations and the insurance policies are part of the calculus here in determining whether there is jurisdiction. And I acknowledge the conceivable effects test, but maintain it is not so liberal a standard as to preclude consideration of the likelihood or probability that the indemnification claim will be upheld.

In the UBS case that the Debtor cited in their brief, the Second Circuit holds that there must be a reasonable legal basis for the claim of indemnity. And we contend here that that just doesn't exist. And they cite two sources for their obligation to indemnify the Sacklers, the Purdue Pharma bylaws and Purdue Pharma's latest limited partnership agreement, both of which require the indemnity to act in good faith in order to ultimately be entitled to indemnity.

But preliminary at least as to the limited partnership agreement, the Debtors overlooked that it's an executory contract that can be rejected along with the indemnity obligation. Judge --

THE COURT: It still creates a claim.

MR. GOLDMAN: It does. It would create a contingent claim of indemnity under the contract, no doubt. But it would remove those obligations at least going forward to indemnify. For example, for a defense clause. And there are a couple of cases that do hold it executory. In re Heafitz, 85 B.R. 274 (Bankr. S.D.N.Y. 1988) and the court in Phar-Mor, Inc. v. Strouss Bldg. Associates, 204 B.R. 948 (N.D. Ohio 1997) strongly suggested it was executory.

But even if it was not rejected, the limited partnership agreement, which is at JX0872, states that the partnership shall not be obligated to indemnify the indemnity to the extent a final decision by a court having jurisdiction in the matter shall establish that the indemnity did not act in good faith.

THE COURT: But again, in SPV OSUS v. UBS, the putative claimant that gave the -- you know, it was third party versus third party, the putative claimant that would argue contribution claims was someone who was being sued independently for having knowledge and participating in Bernie Madoff's fraud, aiding and abetting BLMIS.

Nevertheless, notwithstanding all of that dirty linen, the Circuit said that there was a basis for related to jurisdiction.

MR. GOLDMAN: Acknowledged, but I'm not sure that there was the level of dirty laundry presented to the court there as we have here. You know, we have --

THE COURT: The fundamental point, which is Manville II, 517 F.3d 52.

MR. GOLDMAN: Yes.

THE COURT: I mean, the case was vacated, right?

MR. GOLDMAN: Yes, it was.

THE COURT: And if the Circuit -- which, by the way, was dealing with a plan that had already been implemented, so it was actually accurate that these lawsuits at this time against the insurers really didn't affect the estate, because this was many years after the Manville Trust or the Manville Plan went into effect.

But leave that -- leave both of those things aside, that it was vacated and that under those facts, there really was no effect on the estate because the plan was already in place, I think over a decade, and the trust was -- had already been paying out billions of dollars of claims, in part from the insurance settlements. If the case really does stand for the notion, which it says that only derivative claims can be enjoined, it really stands for the

proposition that these injunctions really aren't including, in Metromedia and Drexel and the like, are really not what they purport to be. Because you don't need an injunction to enjoin derivative claims because the Circuit law has been clear since the '80s that derivative claims are property of the estate.

MR. GOLDMAN: Well, I believe -- I believe in that case they were asserting the derivative claims of Manville-- well, actually, if we're going to take Manville III, the claim against Travelers was -- were their own independent --

THE COURT: Right.

MR. GOLDMAN: -- wrongdoing --

THE COURT: Right.

MR. GOLDMAN: -- in failing to lead to the attention, I mean, --

THE COURT: But --

MR. GOLDMAN: -- is dangerous.

THE COURT: -- but I think the point is that Drexel and Metromedia say that under the unusual circumstance where the injunction is necessary for the plan, it's an integral part of the plan, it could be granted if you meet other factors as well, including overwhelming support for it.

The injunction at this point, according to the Circuit in the subsequently vacated opinion, wasn't

necessary because the plan was already in effect and it was operating. The plan wasn't going to be unwound. Using Mr. Huebner's metaphor, there was no string to pull to unwind the Plan. Travelers probably would have gotten the raw -- or whoever it was that was the settling insurer, would probably have gotten a raw deal, but there was -- it was after the fact.

MR. GOLDMAN: It was, indeed, after the fact, but they certainly offset their reliance interest, having paid -- I know it project -- it was upwards of $100 million, maybe not that much, into the plan. But --

THE COURT: Well, then I guess that was why --

MR. GOLDMAN: I --

THE COURT: -- they were -- they reversed, is that Judge Lifland had found there was, in fact, jurisdiction, and no one had challenged that, and therefore, it stood.

MR. GOLDMAN: It was, I thought, reversed on other grounds by the Supreme Court.

THE COURT: Right. Which said that take -- it takes no position on the jurisdictional issue in the reversal at 557 U.S. 137.

MR. GOLDMAN: So, I suppose -- technically having vacated, it may not have precedent, but --

THE COURT: Well, I guess --

MR. GOLDMAN: -- certainly --

THE COURT: -- you know, I looked at -- there were very good lawyers involved in this case, obviously.

MR. GOLDMAN: True.

THE COURT: But they were not the lawyers who were involved in the bankruptcy case. They were not the lawyers who were telling Judge Lifland, the District Court, and the Circuit Court, in Manville, this is absolutely essential to get our Plan done. They were lawyers who were looking to protect an insurance company after the fact.

And, by the way, in connection with a subsequent settlement where notwithstanding their argument that the order relieved them of liability, insurance companies agreed to pay $500 million more, so you could see why perhaps the Circuit at that point thought that there something more to squeeze here.

MR. GOLDMAN: It doesn't appear that way. But I still think for purposes of analysis, it's still good law for determining whether there is subject matter jurisdiction for these type of released, irrespective of the fact that no threat needed to be -- or was pulled --

THE COURT: Well, it's odd though because --

MR. GOLDMAN: -- to unravel the fabric.

THE COURT: -- they didn't say that they were reversing their earlier case law.

But anyway, I -- look, there's only -- there's

only so much someone can say on these cases. And certainly, the Osus case -- and it relies heavily on Celotex, of course, the Supreme Court case, as far as with the breadth of jurisdiction over third-party disputes.

MR. GOLDMAN: I would just make the point, Your Honor, then in assessing the indemnity obligation, that you do need to take into account to some degree the probability that indemnity would be upheld. And I just think there is just too much on the record here of findings that would -- will take it against a finding of good faith.

THE COURT: Well, I'm not, you know, again, the record here is in the context of a request to approve a settlement, not a trial on the merits. But having said that, the settlement here is with the entire Sackler family, some of whom, many of who -- I think the majority of whom had no role with these Debtors other than being a shareholder.

So, it's hard to, you know -- and as far as the others, we heard from three different Board member -- four different Board members, and two who were at some level, executives. They're being sued, I think, those people, for every claim throughout the relevant period, which I think is after 2007. And it's fairly clear from the testimony that while they may have been informed of marketing efforts, and in fact, some of them may have been pushing for greater

sales, there is still a callable issue as to whether they're liable for all of those claims.

MR. GOLDMAN: It didn't come as any surprise to me that they were proclaiming their innocence, and --

THE COURT: I -- I understand -- I understand. And I -- and one is skeptical, obviously, about this. I didn't use the word "pushing" lightly. But, you know, it's -- we certainly didn't have any Perry Mason moments, let's put it that way.

MR. GOLDMAN: Well, acknowledge, Your Honor. But I would say that the states were under a substantial disability, having been had their actions stayed for the entire duration of the case, and really being forced to try -- not effectively try or -- the claims that were against the Sackler on this expedited track.

THE COURT: Well, they had --

MR. GOLDMAN: So --

THE COURT: -- they had approximately 10 million documents with a Creditors' Committee and an Ad Hoc group of Non-Consenting States combing them for any signs of active management.

If, for example, I was shown a document about one ride with a salesperson, you would think that if that was unearthed and there were more then the others would be too in those 10-millions of documents.

So, I appreciate that, again, this was in the context of a trial of the merits of a settlement instead of the underlying issues and I have no brief for the Sacklers nor do I believe any of the proponents of the Plan. But I think even if one is to do some analysis of the validity of an indemnification claim, it's hard to see that there wouldn't be some effect, some conceivable effect on an asset of the estate.

MR. GOLDMAN: I'm -- I would just make a point in that regard, Your Honor, that it's hard to believe that after being under investigation from the United States Department of Justice since June of 2016, that the DOJ would come up with a document like Addendum A to the Sackler Settlement Agreement, which is the JX-2096. With the level of detail that is in there implicating the named players, after four years of investigation I think it's hard to believe that they were not well supported and then weren't proceeded by a thorough investigation.

THE COURT: Well, again --

MR. GOLDMAN: I'm saying, it's not --

THE COURT: -- I heard -- I heard the direct examination on those documents, and I'll push back a little bit in the level of detail. There are certainly a number of allegations, but a lot is left for the imagination. And I'm -- it is obviously very conceivable to me that there is

substantial potential liability here. I'm just -- I just, on this record, it's hard to see that there's no conceivable effect on the estate based on that potential.

MR. GOLDMAN: Well, I'll also add the point that -- and this references the guilty plea in 2020, which covers the conduct from -- Purdue's conduct from May 2007 to March 2017.

THE COURT: Right.

MR. GOLDMAN: Some rather serious allegations there about ceasing detailing prescribers that they knew were not prescribing correctly, and for medically and necessary reasons, and the kickbacks in the Practice Fusion.

THE COURT: I agree.

MR. GOLDMAN: Right.

THE COURT: Although, I also note that there was -- although there were four Sacklers examined, I don't think any of them was asked about Practice Fusion. Maybe one was, who said, I didn't -- I never heard of Practice Fusion. So, look, I think -- I think we've probably said enough on this one.

I want to be clear. I think there is substantial risk that the Sacklers, or some of them, would be liable for huge amounts of money, no question, both to the Debtors and to third parties. The question is where you draw the line given the risks on the other side of not just the merits,

but maybe even more importantly the effect on who gets what under -- from them, the allocation issues, the abatement issues that were discussed, and collectability.

MR. GOLDMAN: Your Honor, I don't mean to take more than my allocated time. Can I --

THE COURT: That's fine. I --

MR. GOLDMAN: -- make a --

THE COURT: -- I'm prolonging it, so you're not to blame.

MR. GOLDMAN: I just want to make a quick few points about the Kirwan decision. And, you know, I -- what's notable about Manville III is that it did not hold as did Kirwan. That's simply because it challenged third-party release position as part of a confirmed plan. The Bankruptcy Court therefore had core jurisdiction.

I think they were asserting related to jurisdiction there, and if the fact that that particular release was in the plan, you would think that if the reasoning in Kirwan, is thought to be correct, they would have just said, well, its core was in the plan. That's not what Manville III held.

THE COURT: But no one argued that because it -- they weren't -- they weren't at confirmation. They were after the fact. It was a bunch of insurance companies fighting each other and a bunch of plaintiffs' lawyers. It

was not --

MR. GOLDMAN: But even so, after the fact, they certainly could have argued there was core jurisdiction because it was part of the Plan.

THE COURT: They didn't need to. They just needed -- well, the whole thing was academic because they -- they missed, because no one briefed it to them perhaps, that the key point, which the Supreme Court picked up on, which is the jurisdictional argument had decided 10 years before, or 20 years before by Judge Lifland's order.

MR. GOLDMAN: Well, I would just make the point that the determination of whether something is core, really should depend on whether it happens to be inserted in the plan. It's just too convenient. And I understand that the Kirwan decision's response to that is that it has to be sufficiently related to the issues before the court, that's what the response was to that --

THE COURT: Right.

MR. GOLDMAN: -- argument. But if that's the case, every third-party release of an officer or director could be found could be -- could be related to the issues --

THE COURT: Well, not necessarily. I mean, those types of release may well be abused, no doubt. But I -- you know, the Third Circuit dealt with this from Judge Silverstein up to the other circuit in Millennium, same

point as CareOne.

MR. GOLDMAN: I understand and I still don't disagree -- still don't agree with the decision --

THE COURT: Okay.

MR. GOLDMAN: -- as it's, you know, simply form over substance really when they say, if it's put in a plan, it must be poor, and the third-party releases really don't address the merits of the claims, but effectively cancel them in furtherance of the reorganization.

THE COURT: Except that --

MR. GOLDMAN: And whether the claims --

THE COURT: -- again, the Third Circuit standard includes fairness and whether you agree with Judge Garrity's interpretation of 1129(a)(7) as applied here in Dietech or not, that is at least a fairness element, a fairness analysis.

And again, you know, there is a difference if it's in a plan. You have the voting. You see how people voted, you see whether it's, you know, just barely accepted or overwhelmingly accepted, you have it in the context of a confirmation hearing with, in this case, six days of evidence being presented and, you know, approximately -- well, a little under 40 witnesses. I mean, it's -- there is -- there is -- I think there is a difference by doing it through a plan, including the jurisdictional hook, which is

1123 and 1141.

This is not just a property of the estate issue. You have -- you have Congress providing for -- the proponents would argue, extraordinarily powerful tools in the confirmation context in Sections 1123 and 1141, that 105 would be in assistance of.

MR. GOLDMAN: Well, the final point I'll make on this, Your Honor, and I understand you may have a different view on this. But, I mean, whether the claims are cancelled as part of a plan or are adjudicated on the merits, the result is the same from the perspective of the party who is being forced to give up the release. They're claims are gone, they can't prosecute them anymore, and their claims, although they might be channeled into a trust, are severely limited by what it is put into that pot. And the balance of their claim is extinguished.

So, to me it is form over substance to join up a dichotomy, but I understand the Third Circuit and Judge McMahon see it differently.

THE COURT: Okay. And frankly, I think the Circuit Courts generally see it differently. At this point, at least in the Blixseth case, the Ninth Circuit has said that some types of third-party claims could be eliminated under a Plan. In Pacific Lumber, Judge Jones actually seemed to say that perhaps in the mass tort context you

could do that, but not in this sort of general release of the Os and Ds.

So, I think at this point, the only Circuit on record, as opposed to several, like, the Seventh, Second, Third, First, Sixth, Eighth, support third-party releases, is the Tenth Circuit. But they haven't had a case since 1990 really on this point.

So, I -- look, this is the -- the cases, the courts, the Circuit Courts, that say that these types of releases are proper, and therefore, I think, supported jurisdictionally, do so requiring the bankruptcy court to take a very exacting hard look at all the facts and circumstances. That's different than the normal settlement where you take a look, and a good look if someone's objecting, but not that type of level of inquiry.

But they do say that if it's within those parameters, which of course, appellate courts are free to say, well, no, it really didn't fit within those parameters, but if it does fit within those parameters, that this is authorized.

MR. GOLDMAN: With that, Your Honor, I'll just make one final point in which I haven't addressed yet. And that -- and that deals with what I view as preemption, and relating to Section 1123, which states, notwithstanding any --

THE COURT: Right.

MR. GOLDMAN: -- estate are, but the plan can provide adequate means for its implementation, which the Debtors would argue would include a third-party release. But I think that what that does, is it effectively is preempting the police power claims of the states that we're arguing here for by, you know, effectively eliminating them.

And there is case law that I cited in our objection, the PG&E case in the Ninth Circuit and -- as well as the Urban Tanner decision in the First Circuit, that hold basically that the -- a plan has no right to preempt these type of police power claims.

THE COURT: No. Except in those cases, what the plan was doing was not channeling a monetary claim to a fund. What the plan in PG&E was doing was changing the regulatory oversight of the debtor as far as the UC approval of fundamental corporate changes. They're really a couple different things. I mean, the Third Circuit's federal Mogul case, I think is pretty impeccable in its analysis of 1123 and what can be done under it and what can't be done under. And, of course, that didn't involve something exactly like this either.

But clearly, the statute means something, and it's hard to see the logic of applying PG&E to channeling money. In fact, PG&E itself said, 1123 applies to only financial

matters. Well, I think nothing's really more financial than wanting to get more than the agreed allocation for each state; that's money.

MR. GOLDMAN: I had viewed that -- and I know what Your Honor's referring to, the holding that it -- I had viewed that to be directly to the notwithstanding state law, applicable state law. I had viewed the court to meant that the state law they were talking about, being notwithstanding to, was financial related.

THE COURT: Well --

MR. GOLDMAN: So -- but that's the way I took --

THE COURT: -- to me, I mean, you don't -- you don't need -- you know, that's too narrow a description because then, you know, Ohio v. Kovacs doesn't matter. Right? I mean, you -- the statute to say it, instead of the fact that it's a discharge anyway. I mean, again, state law claims for money are discharged in corporate bankruptcies. So, I -- it has to -- it has to be broader than just getting rid of a claim.

But that's just my take on it. There's no holding exactly on point; I understand that.

MR. GOLDMAN: Okay. Well, with that, Your Honor, I will yield to my colleague to finish up on the Metromedia factors.

THE COURT: Okay.

MR. GOLDMAN: And thank you for your time, Your Honor.

THE COURT: Well, on the -- on Iridium I thought, but maybe not. Maybe I'm missing --

MR. GOLDMAN: Okay.

THE COURT: Anyway, Mr. Gold?

MR. GOLDMAN: Yes. Thanks, Your Honor.

THE COURT: Okay.

MR. GOLD: Thank you, Your Honor. Matthew Gold, Kleinberg Kaplan Wolff & Cohen, representing the states of Washington, Oregon, and the District of Columbia.

And I'll just say it again that we have coordinated with the attorneys' generals' offices of Connecticut, Delaware, Rhode Island, and Vermont in order to provide a unified presentation to the Court.

The parties were concerned because of some comments the Court had made in the context of joinders, that somehow their cooperating with us could be held against them. But -- and I am confident that that is not how the Court sees it.

THE COURT: No. The only issue that I was addressing is that if someone doesn't file their own objection and just files a joinder, if the party to whose objection they joined settles or withdraws their objection, the joining party has nothing, and that's all, and nothing

more than that.

MR. GOLD: Thank you, Your Honor. And I guess I should have started just to make sure that you can hear me okay, and that I'm --

THE COURT: I can, but when you -- when you rock back, I can't. So, if you could -- I hate to say it, if you could stay at a rigid position, or at least closer to the microphone, that would be good.

MR. GOLD: I will try to stay this way, Your Honor. Thank you.

THE COURT: All right.

MR. GOLD: Okay. Your Honor, we urge you not to make the historic mistake of confirming this Plan. The Plan contains fatal flaws, will be reversed on appeal. The pain for all the people who are hoping for benefits under the Plan will be far, far worse if the Plan is confirmed and then reversed.

This Plan is like a huge rocket ship. Many people have worked long and hard to put it together, but it is clear upon inspection that the engineer's plans contain terrible flaws, in this case, the non-consensual third-party releases in favor of the Sacklers, imposed upon sovereign states.

The Debtors are saying, we worked so hard to put this rocket ship together, so we can't stop now. We'll keep

our fingers crossed that nothing bad happens after liftoff. But it clear that the wiser course of action is to keep the rocket on the ground and work hard to correct the flaws now. The parties need to focus on their joint goal of getting help to victims, but without the mistaken premise that sovereign states can be compelled to grant releases of police power actions against the Sacklers and against their will.

Now, Your Honor, I'm going to give you a brief road map into what our argument is going to be about. We have preserved in our papers for appeal the argument that Metromedia was wrongly decided, and the United States Trustee discussed that. But we will not repeat that for Your Honor. We understand that Your Honor was bound by Metromedia.

The focus of our argument today is that the proposed injunction, non-consensual third-party release are improper under Metromedia. The impropriety is based both on the nature of what is being enjoined, states exercising police powers, which I will address briefly -- shortly, and the beneficiaries of the injunction, the Sackler family, the legal standards we think are relatively -- should be uncontroverted here.

Metromedia states that it is ultimately a matter of facts and circumstances, as the Debtors themselves

pointed out. But in addition, it is an elementary and ancient element of our laws that equitable relief, including the injunctions that are contained in the Plan, do not go to those who have unclean hands. The clean hands doctrine involves bad acts by the beneficiaries of the proposed injunction that relate to the relief sought, and that is exactly what our evidence does. It shows bad acts by the Sacklers that relate to the injunction being sought.

Now, one other housekeeping matter I need to clear up, Your Honor. It's not clear to me exactly why anyone had the impression, except for the way that the Debtors structured their chart, and I would be addressing Rule 9019/TMT Trailer/Iridium.

First of all, as Your Honor pointed out, the standards under Rule 9019 and the standards for non-consensual third-party releases are very different things. Rule 9019 covers settlements of estate causes of action. It has nothing to do with non-consensual third-party releases. Whether the Estate has satisfied its burden under Rule 9019, Iridium or TMT Trailer is irrelevant to direct claims of third-parties against non-Debtors.

In any event, we have nothing to add to what was in our papers regarding Rule 9019, Iridium or TMT Trailer with respect to the settlement of the Estate causes of action and I will be focusing my argument with respect to

non-consensual third-party releases and Metromedia.

I will -- I think it is important to note about Metromedia that like all the decisions, it stuck to the facts in the case. The Debtors are trying to read into the case more than that. The main takeaway of the case is that releases are subject to abuse and should be used rarely. That holding is being mocked by the reported use here.

I will also note that the decision surveyed earlier decisions dealing with the topic and that is why, because no earlier decisions dealt with the circumstances here, that there's nothing in Metromedia that deals with our particular circumstances.

The Debtors have made the astonishing argument that the central holding in Metromedia is that releases are appropriate as long as they are important to the Debtor's restructuring. I submit that the Debtors got it backwards. Metromedia held that releases are inappropriate unless they are important to the Debtor's restructure. In other words, importance to restructuring is necessary but not sufficient.

Debtors also argue that payments to be made by the Sacklers are substantial. Their argument is basically, it's billions of dollars. Of course it is substantial, but it is easy to lose sight of the fact that claims in this case are in the trillions of dollars. In other words, the Debtors, under the stewardship of the Sacklers caused trillions of

dollars of harm to the people of the states of the United States. As a result, the Sacklers are facing exposure to those states that measures in the trillions of dollars. Getting rid of trillions of dollars of exposure through the payment of a billion dollars is a pretty sweet deal.

In short, there are a lot of cases --

THE COURT: Can we explore that?

MR. GOLD: Certainly, Your Honor.

THE COURT: That sounds like you're accepting that they would be liable for the trillions of dollars and that more than, or materially more than the settlement sum would be collected. What is your basis for saying that?

MR. GOLD: Your Honor, I am not accepting that. I carefully used the word "exposure" --

THE COURT: Okay.

MR. GOLD: -- because there is the potential for that. We have not asked this Court -- I think all the parties have agreed that it is not for this Court to actually make findings regarding the exact merits of such actions and --

THE COURT: But I'm supposed to consider the risks and the rewards of both alternatives: the alternative of the plan versus the alternative where I deny confirmation of the plan.

MR. GOLD: Well, Your Honor, your -- I think that

is taken into account in our argument. I'm not sure exactly what you're asking me here.

THE COURT: I think, again, if you're going to get to that, fine. But I just don't accept the premise that because they face substantial exposure, they're not paying enough.

MR. GOLD: Well, no, that's not the argument that I'm making, Your Honor. I'm simply marking the argument that it's a very good deal from their perspective. And that the --

THE COURT: That's the same point. Not paying enough means it's a good deal. It's the same point.

MR. GOLD: That could be. I'm simply comparing the relative sizes of the two, Your Honor. But the Debtors have certainly not shown any case where a payment that was so trifling in connection with the claims in the case was deemed substantial.

Debtors also argue that we are --

THE COURT: But, again, trifling -- you can define trifling in a couple of different ways, but ultimately, it would seem to me that trifling means, if it really is trifling, that it is not sufficient in terms of the actual legal risk faced by both sides.

MR. GOLD: Well, first, Your Honor, we do not believe that it is for this Court to make an evaluation of

the risks faced by the sovereign states in determining whether or not to accept a settlement or to prosecute claims against the Sacklers.

THE COURT: But you were just telling me under Metromedia this is insufficient. So how am I supposed to determine sufficiency unless I do that?

MR. GOLD: What I am saying --

THE COURT: There are 38 sovereign states that say it is sufficient. So I think I need to ultimately make that determination as to whether they're right or you're right if I'm going to be applying the Metromedia factors. I understood Mr. Goldman that I shouldn't even get there. I got that point. But now we're at applying the factors and one of them is a materially sufficient contribution. So don't I have to inquire as to whether it's sufficient or not and just the fact that a state says it isn't shouldn't, end the day there if I'm applying the Metromedia Factors? And logically, because 38 states and thousands of governmental entities say it is sufficient.

MR. GOLD: Your Honor, I think we're talking about two different things here.

THE COURT: Okay.

MR. GOLD: The fact that -- we do not dispute that reasonable minds can differ about whether or not the deal that is proposed by the Debtors can be accepted or not be

accepted and the fact that 38 states have decided that they wish to take this deal does not, in our view, mean that the Court can determine that they are being more reasonable than states that are not and therefore, their view should be imposed on them.

However, with respect to the substantiality prong, if you will, under Metromedia, we think that that can be measured in a couple different ways. What I was addressing right here was the matter which I think is fairly undisputed before the Court of comparing the amount of money that is being paid with the amounts of claims in the case. The amount of money that's being paid here is a tenth of a cent on payments to Unsecured Creditors in this case. And what I am simply saying is that none of the cases involving an application of the substantiality decision under Metromedia or otherwise have found that a payment was substantial when it was such a tiny percentage of the amounts of claims in the case.

THE COURT: Do you have any cases that talk about a percentage? I know that there is language in Metromedia and in other cases that talk about paying all or substantially all of the claims. I'm aware of that language, but I'm also aware of decisions that support a payment and injunction where there is a substantial payment or contribution of consideration. So I'm not aware of --

other than that language that I alluded to -- there being any analysis of a percentage versus the claims.

MR. GOLD: Your Honor, I agree with what you have stated. Some cases, yes, have talked about substantial payment of claims, which is certainly not the case there. And other cases, although they did not expressly go through that analysis, we tried to look at what was happening in those cases and we have not found a single case where there was such a disparity between the return to Creditors and the amounts being paid.

THE COURT: Nor I expect have you found an amount as large as 4.325 billion dollars either.

MR. GOLD: But also not any case where the number of claims were in the trillions, Your Honor. We believe those two are inextricably linked.

THE COURT: Well, not necessarily.

MR. GOLD: Okay. Well, that is at least our argument, Your Honor.

THE COURT: Okay.

MR. GOLD: The Debtors argue that we are inventing a police powers exception to non-consensual third-party release juris prudence. It is not entirely a blank slate.

First of all, we are not arguing for an exception to Metromedia or carve out from Metromedia. We are suggesting that Metromedia properly applied would result in

no third-party releases being imposed on sovereign states, not that it's an exception to the case.

But we also note that there are strong hints, if you will, from related context regarding the importance of claims asserted by governmental entities.

THE COURT: Can I -- I think I'm going to do this and I apologize, but your colleague, Mr. Goldman, really did cover it. We spent a good 45 minutes on this police power argument. You've also briefed it. I just don't know if it really makes sense to spend more time on it.

MR. GOLD: Well, Your Honor, I will try to make just a few brief points then even though -- I apologize if I am running over on what Mr. Goldman said.

THE COURT: Okay.

MR. GOLD: I will fist note that Mr. Kaminetzky tried to distinguish the First Alliance case -- I don't believe Mr. Goldman addressed that -- because the governmental entities would not enforce judgments against the Debtors. That is not the issue here. Here we are talking proceeding against non-Debtors.

I will also note caselaw in the Southern District in Ion Media, 419 Bankruptcy Reporter 585, the court approved third-party releases after governmental claims have been carved out. And I will also state that the Debtor has argued that, in connection with this, that we are trying to

create an exception here, we would just note -- and I don't think that I need to cite them -- that there several provisions in the Bankruptcy Code as we've noted the rule statute, the automatic stay provision, that creates special rules protecting claims asserted by governmental entities.

But the circumstances though --

THE COURT: Actually, those rules don't protect against the constraints on paying those claims.

MR. GOLD: All I'm saying, Your Honor, is they demonstrate that Congress had in mind that claims and police power actions could be treated differently from other claims in areas where Congress had specifically provided a power in the first place. Where Congress provided that there was an automatic stay, they provided that there would be exceptions for police power actions. Where Congress provided a removal statute -- excuse me, Your Honor.

THE COURT: Yes, they did it specifically and narrowly the way they actually laid it out.

MR. GOLD: But only in connection with the power that they had first granted. Likewise with removal. They had a removal power. They provided an exception. Congress has not provided for non-consensual third-party releases and so it has not had an opportunity to carve out an exception that demonstrates the special treatment that such claims should be afforded.

THE COURT: Well, they've certainly known about it since the enactment of 524(g).

MR. GOLD: They've known about it but they've not added an expressed provision that provides any breadth to it, so we are left with a statutory void.

THE COURT: They actually did acknowledge the validity of the pre-524(g) injunctions and then Legislature said this should be worked out in the caselaw, which has happened. If they want to act, they will act in the future which is before Congress this very day so I'm not sure how much one can take away from their lack of acting other than that they've been aware of these issues for decades.

MR. GOLD: I agree with Your Honor and clearly, we are not dealing here with previous injunctions of the sort that are referred to in 524(h). I simply note that Congress should not be faulted for not crafting an exception to a rule that they have yet to legislate on specifically.

Now the Debtors also argue that this case is not about police powers, but instead about money and point out that criminal conduct is being carved out of the releases that are being granted. With all respect, this shows a fundamental misunderstanding of police powers.

Police powers go well beyond the criminal law and the carve out of criminal violations, though laudable, is completely inadequate. The Estate claims that we are

addressing here are brought in the State's parens patriae capacity. Now I want to briefly address parens patriae.

THE COURT: I'm sorry. You guys have done this in your briefs. I think you should tell me why this isn't about money and leave it at that. Isn't that all this is about?

MR. GOLD: That's why --

THE COURT: I mean the point that I think both you and either Mr. Goldman or Mr. O'Neill made is if there'd be a little more money, we might be on board, or a lot more money. There's no injunctive relief that you're seeking here. The allocation has been agreed. In fact, Mr. O'Neill touted it as the best thing since sliced bread, almost a miracle. So we're just talking about money.

MR. GOLD: With respect, Your Honor, we are not talking about money until the State agrees to take money. We are talking about a regulatory -- and if the State Attorney General decides --

THE COURT: What other relief would be sought? If the plan were confirmed and your clients were carved out, what other relief would be sought other than money?

MR. GOLD: Your Honor, our clients are very concerned about the public perception and the precedent that this case sets. They are very concerned that this case establishes the situation which I could call the perfect

crime. Now I have to backtrack because I'm not literally talking about accusations of criminal wrongdoing against the Sacklers. That's just the phrase that describes what I'm thinking of.

What I'm talking about here is the situation where a family in control of a company that is, itself, admittedly engaged in criminal activity, takes the proceeds of that activity, then dangles those proceeds in order to obtain a full release from the consequences of that action or maybe not a full release, maybe just a very, very huge release. The point is that our clients are very concerned about that precedent that is being set and recognize that the actions that are being brought here have a -- the actions that are being not brought here, the actions that are proposed to be stopped in part have the effect of disincentivizing wrongdoing on this scale. And by --

THE COURT: So, how do they make -- I've already asked Mr. Goldman. They're going to keep the tax money though, right?

MR. GOLD: Your Honor, honestly, I -- if a request is made for tax money to be returned -- this is a context that I'm not particularly -- that I don't think has been addressed in any caselaw in this context and is honestly an issue that has yet to be addressed, but I've heard of a case that faulted a state for accepting tax money under what, at

the time, it thought was a legitimate tax payment.

THE COURT: And Connecticut is not going to see the return of charitable contributions to various colleges in Connecticut and other charities? And let's just move to a different topic than that, which is -- does this mean that the State of Connecticut won't, in the future, settle with the McKinsey's and J&Js of the world?

MR. GOLD: Your Honor, just to be clear, I represent the State of Washington, not the State of Connecticut.

THE COURT: Okay. The State of Washington won't settle with the J&Js and McKinsey's of the world?

MR. GOLD: They may, Your Honor, and, in fact, they have reached a settlement with the McKinsey's, but that was their choice to do so. We maintain that there is a huge and significant difference for the State of Washington to reach a settlement that is its choice or to have this Court tell the State that that is the choice it has make.

THE COURT: All right, but that's really what it comes down to, right? That's really, ultimately, all of this police power argument in this context boils down to, which is the states that are objecting want to have the ability to decide whether the settlement money should be paid or not, right? And I guess what you're telling me is one of two things: either there is no amount of money that

would be sufficient or there just hasn't been enough so far. One of those two.

MR. GOLD: Your Honor, I am not telling you either of those. I am just telling you that the Attorney General of the State of Washington and likely the other Attorneys General who are part of the Objecting States, have weighed the package. It's a complex package. It has what I'll call apples and oranges because there's several different components to it. Money is a part of it. Money is not the only part of it. And they have weighed those in determining whether or not the settlement has the right elements in that. THE COURT: Well, I --

MR. GOLD: Even if the settlement is brought forward here --

THE COURT: -- haven't heard anything other than -- I'm sorry, Mr. Gold. I haven't heard anything other than their dissatisfaction with the money. I don't -- I haven't heard anything else about the plan being objectionable.

MR. GOLD: Your Honor, honestly, to begin with, I think properly so that Your Honor has not been privy to all of the discussions that have gone on --

THE COURT: I know, but --

MR. GOLD: -- in mediation --

THE COURT: -- as far as the --

MR. GOLD: -- that discuss the --

THE COURT: -- settlement is concerned, I haven't heard any aspect. I mean, a major part of the planned proponent support for this settlement is based upon their argument that it is not just one settlement, but it's an integrated multi-settlement settlement, and you can't pull out the Sackler piece without destroying the rest of it. And if there's something about the Sackler piece beyond the amount of money being paid that is affecting the objecting states' determination, I should know about it because so far I'm thinking that this is just about money. Now, money's important.

MR. GOLD: Your Honor, I --

THE COURT: Believe me, and I --

MR. GOLD: -- I think that --

THE COURT: -- understand your argument about each state and each municipality should have the right to say I'd need to be carved out. And I understand that issue. We don't need to cover it anymore, but if there is something other than money here that the settlement is deficient on, I should know about it.

MR. GOLD: Well, Your Honor, I think that the answer to that question I can start with a few easy items. For one thing, as you've heard repeatedly, the settlement also contains provisions carefully negotiated regarding making public certain documents and not other documents in a

document repository.

THE COURT: Oh, so, okay. We don't have any --

MR. GOLD: And --

THE COURT: -- document repository at all, and we'll waive the attorney-client privilege. We'll have the Sacklers waive the attorney-client privilege, which I'm sure the AGs would like to have established as a precedent for their privilege in the future.

MR. GOLD: Your Honor, we ask the --

THE COURT: Let's be realistic, Mr. Gold (sic), all right?

MR. GOLD: Yes.

THE COURT: So I guess what you're saying is you want to have a trial without a document depository, right? Or repository. You want to have a --

MR. GOLD: Your Honor --

THE COURT: -- full trial on the merits.

MR. GOLD: I -- I've not said that, Your Honor.

THE COURT: Okay.

MR. GOLD: I will try to restate what I am saying here.

THE COURT: All right.

MR. GOLD: First of all, I just -- let me mention by comparison. Mr. Huebner and I -- this may seem slightly roundabout, but I am honestly answering Your Honor's

question. Mr. Huebner put up a very fine chart during his presentation earlier where he showed a whole bunch of other cases that -- dealing with opioid liability. And his point was that, in those cases, there were complete releases that were granted of the scope like what was being done here.

But he left out the most compelling parts of his chart. First of all, in those cases, there were no non-consensual third-party releases imposed. The cases got resolved without having to have non-consensual third-party releases. And those cases did not devolve into the dystopian Hobbesian nightmare that the Debtor sketched out as the only alternative to the plan.

In fact, I would submit that they demonstrate the exact opposite, that the States Attorneys General are not wild, crazy actors, but extremely responsible public servants who, while trying to obtain justice and payments for their states, are mindful of trying to avoid chaotic situations and are very capable of negotiating with each other to keep things from devolving into chaos.

We submit that if this case does not proceed from the mistaken premise that non-consensual third party releases could be imposed on the states that it is likely that responsible heads would come up with a solution that protected the public interest and achieved some kind of justice. Exactly what that would be would have to be

thrashed out.

But the experience in these other cases suggests that the dismissive comments posed to Washington to say that you just want chaos, you just want to sue, you want everything to go away is far from the truth in that while what happens in one case doesn't necessarily prove what's happening in another case, it certainly gives strong reason to believe that cooler heads will prevail and that the parties, once they understand what the bounds of their jurisdiction and what they can get are, can reach a resolution.

Very compelling evidence was presented in the case by the Sacklers about how much they want the resolution, about how important it is that they have a resolution, that they need and want global finality. And they are, in fact, paying $4.25 billion, albeit over ten years, in order to obtain that, which suggests that they -- that that is important to them too. So we submit that it is -- even though no one can make predictions, especially about the future, the -- that the likelihood here is that there are plenty of different possible outcomes, and that it is a mistake to assume that, while chaos would come from having parties be able to negotiate from the premise that it is up to them when to grant a release rather than up to the Court through bankruptcy power.

THE COURT: Okay. Now, I did direct a second mediation on this issue, and I think the Sacklers, because I know they're well-represented, would've understood that that was a pretty good indication. I didn't believe that they had dug deep enough. Are you saying I should just deny confirmation and just trust that, as these cases proceeded, there would be some organization, including as to reviving all of the allocation provisions in the plan as between private and public, and within the public, and as far as abatement is concerned? Or are you saying something else?

MR. GOLD: Well, Your Honor, I'm saying something close to that, but not exactly that. I am saying, first of all, this would be far from the first case where the parties have come together to try to propose a plan have learned that there was some problem or legal problem with the plan, had been sent back to the drawing board by the Court because they have to work out that problem. And then after a period of time, negotiations produced a new plan.

And the -- and you scarcely need me to list the various tools that judges use in order to reach that point between mediations, consideration about whether the effective theory, whether other plans could be permitted to be filed, and so forth. I'm just saying that we've seen this process in many cases, and that there is ample scope if the parties are proceeding under a realistic assessment of

what they can achieve, that they will be able to reach a resolution.

Just by way of an example because it came up in our testimony, the Sacklers understood, the Debtors understood that the reach of this Court did not encompass the claims of certain Canadian creditors. They understood based on that premise that they were going to have to allow the liability and exposure to stay on one side and to address what was left. And in all these other cases that are not Perdue, resolutions have been reached where parties have negotiated around the problem that they can't compel all of the states to reach a resolution. We just submit that that would likely be here. And it's a shame we agree --

THE COURT: Look, your group --

MR. GOLD: -- that this case has reached this point.

THE COURT: -- can't even agree on how to submit evidence, right? You had your client's and you had Maryland. What assurance would I have that the extra time spent here would actually achieve anything given the theories that you are ultimately relying upon, and the apparent inability of your group to act as a unit?

MR. GOLD: Your Honor, I will not contest Your Honor's observation that sometimes dealing with this group

resembles the Seamus herding of cats. What I will say, though, is that this is far from the only situation that that has occurred. And again, I simply culled out the facts of so many things that the states have managed to agree on. They've managed to agree on allocations amongst themselves. They've managed to agree on many issues.

They have not been able as of yet to reach agreements under all issues. And that can be frustrating, I understand, but that does -- the fact that it may be painstaking and frustrating does not create a standard under Metro Media where the Court can grant releases of non -- of state claims that it wouldn't otherwise have.

THE COURT: Well, I don't know. When I've already had two mediations by two of the best mediators in the world on this issue?

MR. GOLD: And Your Honor, progress has been made. The -- I would submit that part of the problem with the mediation process so far is that the parties were proceeding under the premise that they would be able to get -- if this Court would rule that under Metro Media and otherwise that non-consensual third-party releases could be imposed on the states.

If the parties had an indication that that was not the case, I think you would see a lot of movement in the litigation because the parties have to reassess. This is

true of all mediations. Parties make their assessment based on where they think the law is going to go. So that has affected what -- how these mediations have gone.

THE COURT: I'm sorry. I have not talked to Judge Chapman about her mediation, but we view these issues, I am sure, very much the same because we're guided by precedent. So what you're asking would actually artificially tilt the playing field. But maybe we should move on. I think I did have an answer to my question.

MR. GOLD: Okay. The -- thank you, Your Honor. I will ask your indulgence for 30 seconds to address parens patriae because I don't believe Mr. Goldman addressed this point specifically. But because -- and I don't believe it's been properly explained in the Debtor's response. I believe it evidences a confusion regarding its significance here.

The -- I will just say that -- it's an odd Latin phrase that I'm probably mispronouncing. It's been mentioned in the briefs, but they show so little understanding of the concept that the Debtor's simply argue -- excuse me, but this is not a parens patriae case. Nothing could be further from the truth. My definition of parens patriae is democracy. Or to take Abraham Lincoln's definition, government of the people, for the people, by the people.

The attorneys general are elected officials. That

is government by the people. Parens patriae is nothing less than government for the people the principle that the state has the right and the obligation to protect its people from harm. And as exercised by the people's elected officials so that the people can judge them. The Creditors Committee is constituted to look at the financial interests of creditors. It is not looking at protecting the people of the states from harm. The Debtor's Special Committee is not looking at that. The Debtors are not looking at that, and we --

THE COURT: All right. But Mr. Gold --

MR. GOLD: -- submit that --

THE COURT: -- we've already covered this. The way the states are protecting people from harm here is by asking for more money. It's not to stop someone or make someone build a better fence. It's not to stop someone from polluting. It's to get more money. So it is financial. So let's move on. I understand parens patriae very well.

MR. GOLD: Thank you, Your Honor. The -- I will -- there's been a lot of discussion about how difficult a case this is, and that's been mentioned by many parties. I just want to again say that the attorneys general, including Attorney General Ferguson of Washington -- I've been grappling with this process for a long time, and I hope that the parties grant him the respect of recognizing that the actions of him and the other attorneys general are based on

a full and serious grappling of what they consider to be the proper response to this.

And again, which we say, buck stops with the attorneys general, not with these other parties. Mr. Huebner revealed what I consider to be a shocking ignorance of how our country is organized. The municipalities are subsets of the state, but more to the point, Mr. Huebner and Mr. Price had the audacity to ask in argument who supports the attorneys general.

My answer is very simple. Attorney General Ferguson of Washington received 2,226,418 votes in his last election. That's who supports Attorney General Ferguson, and he will have to face the voters again who can weigh in on whether he has made the proper choice in connection with these releases. And we again submit that's an issue for him and the voters, and not for this Court.

The Debtors argue that giving the Sacklers non-consensual third-party releases produces the best result for creditors. Now, that's a value judgment that weighs the dollars brought in this case. It ignores that I've already described as the perfect crime message that can be -- that can also be read in the result of this case.

But the key point that I want to emphasize here is that it is easy to produce a better result when one contributes value that one doesn't own. I will illustrate

this with a simple analogy. The Debtors could've improved the plan greatly and produced much more value for Creditors and opioid victims if they included the plan an injunction requiring Bill Gates to contribute several billion dollars to the plan trusts. Now, the flaw here is obvious. It is Bill Gates' money. It is up to him whether to contribute to the plan trusts.

My point is that the good that can be done with the money is irrelevant to the question of whether the debtors have the right to compel the contribution, and the same is true here. All the good that can be done with the money is not relevant. All the hard work that everyone has done is not relevant. The results of plan voting is irrelevant. What is relevant is that the Court cannot and should not grant these releases.

THE COURT: Well --

MR. GOLD: The --

THE COURT: -- I -- that sounds pretty odd. I don't think your attorney general really means that, right? Ignore the good result because, and the "because" is what? What can be done better?

MR. GOLD: Oh, I'd --

THE COURT: Not what could be done better, right?

MR. GOLD: Well --

THE COURT: Something else?

MR. GOLD: Because one of two things has to happen, Your Honor. Either a -- either an offer can be made with all its components, including money, but not exclusively money, that is satisfactory to the attorney general, or litigation continues until the parties are ready to reach a resolution that is satisfactory. That's the rule in most litigation. Happens all the time.

Now, I understand that in some contexts it's convenience to jump ahead there and to compel parties to do that, but we submit that this is not an area where the Court has the authority to do that. And so he -- so in this case, yes, it has to await the elected properly constituted attorney generals deciding that either the -- whatever's offered with all its component are adequate or to continue until a different resolution can be reached. The --

THE COURT: That's not really a Metro Media argument, though. That's really Mr. Golden -- Goldman's argument. So I think we're probably coming to the area of diminishing returns at this point.

MR. GOLD: Okay. Well, I will -- I have one more legal point to make, Your Honor, and then I'll move onto the next part of my presentation. The -- Mr. Huebner invokes the tragedy of the commons in his argument, but it's really the same issue. What would be the commons here? It seems, to understand his analogy, that the commons has to be the

Sackler family and its property.

THE COURT: No, that's not --

MR. GOLD: Yes.

THE COURT: -- at all what he's talking about. You guys just aren't listening. You have hundred and thousands of people who hate the Sacklers who have agreed to this. It's not for the Sacklers' benefit. It's because they have made a calculation that they do better, "they" the creditors do better, "they" the victims do better. They would love to have the Sacklers pay more money. This is not a plan for the Sacklers. You just get over that rhetoric, all right? I agree with you --

MR. GOLD: I'm sorry --

THE COURT: -- and I agree with Mr. Goldman. Reasonable minds can disagree as to what is the best result, but this rhetoric really doesn't help. And frankly, it just -- it's just not consistent with the record or with the constituents in this case or --

MR. GOLD: And I'm sorry --

THE COURT: -- with my view of it, which is I could care less what the Sacklers want other than the effect of pushing them too far so that you do have a tragedy of the commons. So actually address the tragedy of the commons instead of just bloviating about a plan being for the Sacklers' benefit.

MR. GOLD: Your Honor, I am sorry if I did not express my thought properly, and I certainly don't wish to upset the Court. I am simply trying to understand the analogy that when someone refers to the tragedy of the commons, that refers to some common asset that is being used by some parties to the detriment of others. A lake, perhaps, that some are polluting in so that others cannot use. I understand the basic concept, and I'm asking myself in this context what is meant by the commons.

What is the commons here that is -- that we are being accused of spoiling for the benefit of others? What I am suggesting here is that the commons in this context cannot mean the debtors or their estates because we are really not contesting what is happening with the property of the Debtors' estates --

THE COURT: Wait.

MR. GOLD: -- and what is being done there.

THE COURT: But the record is crystal clear that the current plan at least, and the work that the parties spent for over a year in allocating the value of the Debtors' estates wouldn't survive the collapse of the settlement with the Sacklers.

MR. GOLD: I understand that, Your Honor, and it was carefully constructed that way. I simply wish to observe that -- and I did not bring the analogy of the

tragedy of the commons into this. This was the Debtors' argument.

THE COURT: Right.

MR. GOLD: My only point is that the commons here, if I'm understanding the Debtors' analogy, is the money that the Sacklers are contributing or the assets of the Sacklers in general, that's what is meant by the commons in applying this analogy. And it is not really the Debtors' property at issue, and that's --

THE COURT: All right. I guess -- I think they would disagree with you, which is that the commons is the entire set of agreements that the parties have agreed to, not just the Sackler piece of it.

MR. GOLD: Well, that --

THE COURT: And I do understand your point, but we're just coming back to the same point every time, which is that you believe every state needs to agree to this, and perhaps every governmental entity.

MR. GOLD: Well, I'm not arguing --

THE COURT: And that's really what it comes down to --

MR. GOLD: -- with respect to other --

THE COURT: -- because there's really not a whole lot of on-point, directly on-point, precedent on that issue.

MR. GOLD: We agree, Your Honor, and that's why

I'm now ready to move onto new points.

THE COURT: Okay.

MR. GOLD: The -- which are the factual issues. Pursuant to a stipulation and order that the state's reached with various parties, it's on the docket at, excuse me, number 3601, all of our exhibits have been admitted into evidence without an objection for all purposes. I just note that we submitted a fair amount of evidence, and the amount of evidence we introduced is very much part of the point.

Our argument, as I said before, is that the conduct of the Sacklers weighs tremendously upon whether or not the leases are proper under Metro Media and under general federal law. And so that when we say that the Sacklers' conduct renders them undeserving of the benefits, it is significant that we are not talking about isolated pieces of evidence.

Mr. Huebner made the incredible statement that the objectors have introduced no evidence. Nothing could be further from the truth, as I've said before. Now, I'm going to -- now, Your Honor, I'm -- what I am prepared to do, but Your Honor can stop me at any point, is to address the evidence that we put forward, some of which was addressed by Mr. Goldman, and I will not repeat any piece of evidence that he discussed. But I feel that I am caught between a rock and a hard place here candidly, Your Honor, because --

THE COURT: No, I wanted you to get to the evidence about an hour ago. So please do it, yes.

MR. GOLD: Okay. I'm sorry. Okay. Very good. So the -- I will summarize the evidence that we submitted as first a series of state complaints. I could give the joint exhibit numbers if necessary. The Debtor guilty plea and DOJ statement. The DOJ Sackler settlement. Those documents are, we believe -- certainly the last several -- well-known to Your Honor. Several of them are on the court docket and were part of motions that were approved.

However, these documents have not been given their due in this context. The point has been made all too often that the salient point of these documents is that the Sacklers have not conceded that they are true, and we don't dispute that point. But this leads to what I call the fallacy of they-said-we-said. The argument is essentially being made that if a statement is made and the Sacklers deny it, that all that one can do in that circumstance is to simply not know what the answer is, or to consider that as equally likely that the fact be true or not true. And --

THE COURT: Well, you can assume that I don't approach it that way.

MR. GOLD: Okay. Thank you, Your Honor. That's why we think it is significant that the complaints that we're talking about here are not fishing expedition

allegations from some commercial complaint, but are based on years of investigations by the U.S. attorneys and the state attorneys general. And we submit that it is simply not credible that anyone would conclude that no one has any idea whether these allegations are true.

Furthermore, due to this Court's injunction, the state of knowledge is somewhat frozen in place from 2019. Now, I recognize that discovery was taken in the court process, but the Debtors and the Sacklers have often pointed to statements like, these are the only Sacklers who have been named in complaints. Well, no new complaints could be filed, so the -- even as new information came out, no new Sacklers could be named in any complaints.

THE COURT: Well --

MR. GOLD: Without that freeze, we would --

THE COURT: -- are there any documents that actually show other Sacklers in a management role or a hands-on board role that are in evidence?

MR. GOLD: Well, Your Honor, the -- let me turn to what the documents are. The -- we would start by urging the Court to carefully consider addendum A to the Sacklers' settlement. It's 31 pages long and contained 170 numbered paragraphs. It contains in detail the manner in which the named Sacklers abused their stewardship of Perdue.

I can cite to some highlights if that's helpful to

the Court, or if the Court's familiar with it I can skip through that at the Court's discretion.

THE COURT: No, we've spent a lot of time on it, and I am very familiar with it.

MR. GOLD: Okay. Then I will presume that Your Honor is familiar with this. The -- those allegations are corroborated, the statements really, are corroborated by significant extrinsic evidence, such as the Practice Fusion guilty plea, the McKenzie judgment, what I have referred to as the Price exhibits, and the exhibits that were attached to motion by the non-consenting state group at docket number 2012.

THE COURT: I'm sorry. The McKenzie -- you said the McKenzie judgment?

MR. GOLD: It was a settlement that was incorporated in the judgment --

THE COURT: All right. So it's a settlement with --

MR. GOLD: -- that are part of our papers --

THE COURT: -- McKenzie.

MR. GOLD: Yes.

THE COURT: All right. And the Practice Fusion judgment.

MR. GOLD: Yes, and please.

THE COURT: And the motion that you referred to is

the one seeking further discovery to waive the privilege? Is that the one you're referring to?

MR. GOLD: Yes. The purpose of the motions clearly was not -- and some of the legal issues involved in that motion are not directly germane to our issue here. But facts can be relevant to several different legal issues at the same time, and we submit that the facts that were adduced in connection with that are very relevant to an assessment of the -- whether the Sacklers are deserving parties to receive the benefit of a federal injunction.

I can -- again, Your Honor, I can indicate some of the elements that are taken from there or I can assume that Your Honor is familiar with all of them and that it is not necessary for me --

THE COURT: Well, I'm not familiar with the --

MR. GOLD: -- to go through them.

THE COURT: -- Practice Fusion judgment. Does that judgment refer to the Sacklers' role in dealing with Practice Fusion?

MR. GOLD: It pulls together, Your Honor, the -- a -- we submit that has two components to it. On one hand, the Debtors' interactions with Practice Fusion were part of the Debtors' guilty plea. The -- but again, we have this curious construct with respect to the guilty plea where the guilty pleas was done by the Debtors as an entity, but no

admissions were made regarding the underlying factors that went into it.

We submit that the facts of the Practice Fusion guilty plea, which are consistent with and support the elements that are described in the relevant statement, and that provide corroborating independent evidence to suggest that certainly the portions of those statements that deal with activities with Practice Fusion are, in fact, true, notwithstanding the blanket denials that have been issued by the Sacklers and the Debtors.

THE COURT: I think -- I'm not sure about the blanket -- I don't think there is a blanket denial by the Debtors, one. Two, my question really went to whether the Practice Fusion judgment or any other document related to Practice Fusion in evidence adds to the examination that was had on Addendum A, as far as any Sacklers role vis-à-vis Practice Fusion.

MR. GOLD: Honestly, Your Honor, I'm not sure I can give you a specific answer to the question the way you have phrased it there.

THE COURT: Well, I would have thought during the examination, one of the attorneys that was doing it would have pointed to some document besides Addendum A if it pertained to the Sacklers role with Practice Fusion. And I'm leaving aside general testimony that I've received as to

the four witnesses role at Purdue.

MR. GOLD: Well, Your Honor, I will simply note that Mr. Edmunds from Maryland is going to be wrapping up the presentation, at least this side, and he is probably better suited to answer that particular question than I.

Okay. I will mention, subject to Your Honor telling me you're familiar with these things, a few items from what we're calling the UCC exhibits, if Your Honor understands what I'm referring to. They're all independent -- they have all been admitted as part of the joint exhibit book.

There is an email from 2012 -- this is JX-2938 -- that describes the Sacklers as providing micromanaging the sales team beyond belief.

There is a memo -- this is JX-2943 -- in which Dr. Landeau identifies as a problem that the board was serving as de facto CEO.

There is an email exchange -- this is JX-2943 -- between Richard and Jonathan Sackler from February of 2011, attaching a memorandum discussing the board that states, "There seems to be a consensus that the role of the board and that of management is blurred, compared with the distinctions made by other major corporations."

THE COURT: I'm sorry. I think you gave me the exhibit number for both of those two, the Landeau memo and

the one you just went to.

MR. GOLD: I believe you are correct, Your Honor. If you give me just a moment, I will give you the correct numbers here. I'm sorry. The first of the two I mentioned is 2943 and the second is 2941.

THE COURT: Okay. And what's the date of that memo?

MR. GOLD: If by memo, you mean the second one, that is February 15th, 2011.

THE COURT: Okay.

MR. GOLD: There is an October 2013 business plan -- this is JX-2995 -- that are excerpt. Section 5(b) is a focus for the board on increasing sales by targeting high volume prescribers.

There is JX-2951, a September 2013 memorandum, which reflects a McKinsey presentation to the Purdue board that suggests turbocharging the sales engine, and it's a quote. There are corroborating matters also from what I'm referring to the non-consenting state group -- this was originally filed as Docket 2012, but JX-2931 are emails from 2013 reflecting that the board gave a ringing endorsement of the McKinsey proposal.

And JX-2925, a 2008 McKinsey email, describing that decision making at Purdue was an utter failure due to board interference.

THE COURT: All right. Never mind, you can go ahead, Mr. Gold.

MR. GOLD: Thank you, Your Honor. I will also note that this relates now to Ilene Sackler. Due to a stipulation that was entered just at the very end of the trial, rather than having her be examined at trial, her deposition was admitted into evidence.

It is JX-3298. She admitted at Pages 84 and 85 of her deposition that she didn't pay much attention during board meetings. At a minimum, that cinches the case for breach of fiduciary duty that could be brought with respect to her.

Counsel for Maryland --

THE COURT: All right, but that's not a third-party claim, right?

MR. GOLD: No. That reflects to -- that reflects the proprietary of the state claims more than third-party claims, I believe, Your Honor. I'm not going to say that they're completely irrelevant. It just jumped off the page at me in one consequence.

THE COURT: Well, I mean, it's hard for me to -- the ultimate issue here, as far as the third-party claims, is the balance between being what you just described Miss Ilene Sackler admitting to and someone being more than a proper board member in terms of being hands on, so why don't

we just focus on the third-party claim documents.

MR. GOLD: Thank you, Your Honor. In conclusion, I just wish to respond to the question that has been asked by plan proponents: Why are estates opposing this settlement?

I will simply say that we have not questioned the good faith that states and other parties who've accepted the settlement. I think we've established, Your Honor, that we recognize it's a difficult decision that involves weighing apples and oranges, and we ask that the decision of the objecting states be respected as well.

With respect to respect and good faith, I will not respond specifically to the cruel comments that Mr. Price made regarding the Attorneys' General of several states. I will simply say that just speaking for Washington in this regard, we suggest that you look at what Washington has done rather than what anyone might insinuate.

And for instance, the funds that McKinsey -- that Washington received in the McKinsey settlement have gone to abatement, and that was done by Washington without the need of having the Bankruptcy Court or anyone else direct Washington that that's what they had to do.

Unless the Court has any --

THE COURT: Is that in the record?

MR. GOLD: I do not believe it is on the record,

Your Honor. It's only a matter that this was raised for the first time to me by Mr. Price's comment earlier.

THE COURT: Okay.

MR. GOLD: I believe it's a matter of public record and that the Court could take judicial notice of it if we had to brief that one.

THE COURT: Did it enhance abatement or just replace funds that had already been allocated towards abatement?

MR. GOLD: Actually, I would ask -- I see that Mr. O'Neill is Mr. O'Neil is here and he can answer that specific question better than I can if I can yield to him for this, Your Honor.

THE COURT: Okay. I guess Mr. Gold put you on the spot, Mr. O'Neil, so if you could answer that question.

MR. O'NEIL: The State of Washington would be happy to supplement the record, Your Honor. It was appropriated for abatement services, and it was not replacement money. It was appropriated ad initio by the legislature on the recommendation of the attorney general.

THE COURT: All right. Thank you, Mr. Gold.

MR. GOLD: Thank you, Your Honor. Yes, unless you have any questions, I am ready to yield to Mr. Edmunds.

THE COURT: Okay, that's fine. Thanks.

MR. EDMUNDS: Your Honor, if you're ready for me,

I'm here.

THE COURT: Yes, and I can see you and hear you fine.

MR. EDMUNDS: All right. Thank you, Your Honor. Brian Edmunds for the State of Maryland.

Let me first of all say that I will adopt for our state the arguments that Mr. Goldman and Mr. Gold have made on behalf of the other states. And I'm going to kind of -- there are specific points that were assigned to me today. I think the Court has gotten into them to some extent in its questions, so I'm just going to try to, at this point, address the questions that I think may be left over that the Court has at this stage of a lengthy argument.

I mean, I think the first one that is important and what I was going to talk about anyway, is what it is that we are seeking here to do. Is it just about money? It's not. What this is is about implementing the police power that we have, and specifically about achieving deterrence and regulating the opioid market.

Money is certainly important, receiving money in the form of compensation, disgorgement, penalties that are authorized under not only the Maryland statutes, but all of the state's statutes that I'm aware of, is important. But it's important not just for the purpose of compensation. It's important for the purpose of deterrence, for the

purpose of the regulation that it provides to the conduct of businesses in the marketplace, especially in a marketplace as important as the prescription drug marketplace.

To that end, the statutes that we proceed under, Maryland's is mentioned in our separate objection, but they give -- ours is called a cease and desist proceeding, and we are authorized in that context incidentally to recover compensatory damages.

But the proceeding generally operates for an injunction, which we would I think, you know, certainly, we would seek an expansive one against both Debtors and the Sacklers in the proceeding in Maryland, and it also permits the recovery of disgorgement, of damages as I said, and of civil penalties among other things that the statute provides for.

And when I look at this, when we look at this, right, my full-time job is to assist our attorney general in carrying out the police powers that are assigned to him by our Constitution and statutes. What I look at here and what he looks at is whether this actually will bring about a change in conduct, and from that standpoint, it's not enough.

And that, I think, is also the reason why to have our claims sort of brought in the same context -- and everything I heard this morning, you know, relegates us to

the status, I think, of a co-creditor, of a private creditor is the problem that we're dealing with, right.

We have a set of responsibilities that is greater than the responsibilities of counsel who appear here for private creditors. We have a set of responsibilities to the public that yet elects our attorney general that instituted our government, for which the protection of which is what we are paid for, to see to it that conduct is changed, and we don't think that this settlement does that.

I think that when you look at it from the ex-ante perspective of somebody who operates within the marketplace, what you see from this is that the Sacklers were able to get away with a majority of the money that they took, both from Purdue and from consumers. And that, I think, as well as a full airing of the conduct and the full adjudication of the conduct is what, more than anything else, we seek.

I mean, money is certainly important, Your Honor. It is.

THE COURT: Can we just stop on that point? So I have no doubt, Mr. Edmunds, that you're a dedicated public official. So you're saying that you need a full litigation of the claims against the Sacklers; is that what you're saying?

MR. EDMUNDS: I am saying that that is one thing that we would seek and that is one thing that I think would

have value. Is it the only thing we would seek; is it something we would pursue --

THE COURT: Well, if you're going to seek money --

MR. EDMUNDS: -- or everything else?

THE COURT: -- and that in any form other than -- if you're seeking money in the form of a settlement, I think you'd have to agree with me that you wouldn't have a full public airing and a trial.

MR. EDMUNDS: I think that's true, Your Honor.

THE COURT: Okay.

MR. EDMUNDS: I mean, and I think that there are tradeoffs that have to be made, right?

THE COURT: So it isn't the main thing you're seeking.

MR. EDMUNDS: I didn't say it was. I said it's one --

THE COURT: Well, I thought I heard you actually say it was the most important thing, but maybe I misheard you.

MR. EDMUNDS: Deterrence and changing conduct are what I've said. And if I misspoke -- to be very clear, those are the most important things, right? I think they're the same thing, but that is what is most important to the State of Maryland. I believe that that is what is most important to the other objecting states.

THE COURT: And the --

MR. EDMUNDS: There are other thing- --

THE COURT: Could I just focus. The conduct that you're seeking to deter is fraudulent transfers?

MR. EDMUNDS: No, Your Honor.

THE COURT: No, okay.

MR. EDMUNDS: That is some conduct. Well, I should -- our action against the Sacklers and against Purdue did not have as its focus fraudulent transfers.

THE COURT: All right.

MR. EDMUNDS: But I think we are the State and fraudulent transfers are something that we prohibit, so I would not carve them out completely from what I think is in the State's interest to seek to redress.

THE COURT: Well, except it's not covered by any of your unique statutes. It's an estate -- not estate, a estate cause of action.

MR. EDMUNDS: I would -- I mean, I --

THE COURT: There's no dispute about that, Mr. Edmunds.

MR. EDMUNDS: I would actually --

THE COURT: There's literally no dispute about that proposition. And I hope your boss doesn't understand it differently because then that person is operating on a misconception.

MR. EDMUNDS: I don't think that we understand that differently, Your Honor, that those are the estate's causes of action.

THE COURT: Okay.

MR. EDMUNDS: But I do think we have an interest in seeing that even the estate's causes of action are successful and maintained.

THE COURT: But that's not a --

MR. EDMUNDS: But for our part --

THE COURT: -- that's not a state parens patriae protected interest.

MR. EDMUNDS: Your Honor, that's certainly not the interest, as I said, for which we brought actions against Purdue and the Sacklers, the members of the Sackler family who served as its directors.

THE COURT: Right.

MR. EDMUNDS: But those actions relate to what they have done in the marketing and sale of OxyContin and other opioids. And our interest is clearly in preventing the deaths that result from when people commit unlawful practices in the marketing and sale of dangerous drugs, and we have --

THE COURT: So let me be clear. When you're talking about a cease and desist proceeding, you're not talking about having the Sacklers ceasing and desisting,

right? Because under this agreement, consistent with their actions for the last two years, they have ceased and desisted, right?

MR. EDMUNDS: I'm not sure that that's true.

THE COURT: You're talking about someone else ceasing and desisting, not the Sacklers, right?

MR. EDMUNDS: I think that this -- no, I'm talking about direct claims against the Sacklers, Your Honor, and I think it's --

THE COURT: Well, you referred to a cease and desist proceeding, which means stopping something from happening. And I'm assuming what you're referring to is other people, stopping other people, right?

MR. EDMUNDS: It can also stop conduct that has happened from further happening, right? I mean, we don't lose the relief just because the actor, when faced with a suit, stops committing the problematic conduct. We still have the right to continue.

THE COURT: But as far as that actor is concerned, it's not a cease and desist relief that you're seeking at that point. I'm not disputing that you wouldn't have a claim, you're seeking money still. But if they've stopped, they've stopped.

MR. EDMUNDS: Your Honor, first of all, I think factually, there is room for disagreement that they have

stopped. They have stopped serving as members of the board of Purdue. There is a website that is out there now that makes false claims about OxyContin on behalf of part of the Sackler family that is at issue here.

So, I mean, I don't -- you know, stopping -- they have stopped some of the conduct perhaps. But I still think in a cease and desist order proceeding and a proceeding we would bring under our Consumer Protection Act, we still have the ability to seek a cease and desist order and an injunction that keeps them from restarting the conduct, for example.

THE COURT: And isn't this -- doesn't the plan do that very thing with an injunction?

MR. EDMUNDS: I think that the injunction in the plan would be perhaps broader and have more in it if we were to do it separately.

THE COURT: Have you made any suggestions to that effect on how to make it broader?

MR. EDMUNDS: I have not personally, but I believe that members of the NCSG have, and I would have to leave it to them to explain because it's been a while since I looked at it. But I know that that has been something that is in the works. You know, you have to divide up, I guess, and that's a part that I have not looked at specifically for purposes of what I would say to Your Honor today.

THE COURT: Okay.

MR. EDMUNDS: But I do think that there is that issue, right? I mean, we are concerned -- and not just conduct that relates to opioids. If we sought an injunction at the state level against the Sacklers, I think we would be looking at more broadly prohibiting them from engaging in future violations in the pharmaceutical space and perhaps just future violations in the sale and marketing of products in the state in general, which I believe that this injunction does not do.

So I think that that is the issue here, right? The money is important, but to put it in perspective, Your Honor, I mean, we spend -- the last figure I saw was something close to a billion dollars a year on the opioid crisis. And so, our share of this gets paid out in weeks, maybe a month, right, by money that we are already spending.

And I would note, Mr. Huebner I think erroneously cited the Maryland statute as the example of what states would do with the money were it not for the plan. In fact, Mr. Huebner overlooked our 2019 statute that dedicates all money we receive by virtue or settlement or by judgments against opioid industry participants to opioid abatement period.

There's no need for that language in Maryland's case. There's no need for the plan to commit it to

abatement. And so, if that was his example for all of the states, I can't -- I don't have a 50 state survey prepared, but I do know that a lot of others have statutes and the ones that do not have agreed.

THE COURT: Although the statutes, in some instances, have subsequently been amended as far as other types of settlements, right, and they can be amended.

MR. EDMUNDS: Your Honor, they can be amended. But, I mean, I think that they are as committed as they can get when there is a statute that dedicates opioid -- you know, when the legislature enacts, and the governor signs a statute that provides the money from opioid crisis related litigation goes for relief of the opioid crisis and cannot be replaced, I think that that's, you know, maybe the gold standard.

But I know that other states, like Washington as Mr. Robinson O'Neill just mentioned, have done it in other ways, not by statute. But there is a lot of money that I think the states have worked hard on recovering for themselves and for their citizens that are being spent on abatement without the need to impose a bankruptcy plan of reorganization that, you know, mandates that they do that.

So I think that -- but I think that, you know, money is important certainly, but the bottom line is that this is conduct that will keep going on and in our judgment

as we look and make decisions about what is necessary to protect our citizens and what is necessary to kind of avert a crisis that leaves I think 140 in the United States dead each day, almost seven in Maryland dead each day. We look at this and we don't think that it does it. We don't -- we think it --

THE COURT: Well, again, that's my question. Whose conduct are you referring to?

MR. EDMUNDS: The Sacklers here, Your Honor.

THE COURT: All right.

MR. EDMUNDS: I mean, the particular -- I know that there has been some question as to how broad that category of the Sacklers is and how far into the family it reaches. But I would say for at least the ones who served as directors, their conduct needs to be addressed and they need to --

THE COURT: Well, listen. I think if that is your state's issue, that can certainly be address very easily I believe by the Sacklers, consistent with all that has been represented to me during this trial as to their lack of a role going forward. So I don't -- I really -- you know, but that's fine.

MR. EDMUNDS: But I suppose, Your Honor, it's the Sacklers plus, right? It's also future people who engage in the marketplace, future directors, because we don't -- you

know, we can't, we don't have the resources to regulate all conduct. I think that the deterrent effect, the general deterrent effect I think is the word that the law professors would use for it, is important too.

We are worried about the conduct that the Sacklers engaged in here, but we are also worried that it will be repeated by others. And I think that the idea the amount, you know, 4.3 billion in this context when you've taken so much more and when your conduct has caused so much harm, I think that the amount is insufficient to effectuate that kind of deterrence.

It doesn't -- it's our tool to kind of stop bad conduct that we're exercising here. That's what the police power is, and I think that we don't succeed in doing that from this settlement.

THE COURT: Well, do you succeed if the result is years of litigation and, in all likelihood, a lower recovery?

MR. EDMUNDS: I don't -- I just don't agree with that.

THE COURT: I'm not asking you to accept the truth of that. I'm just posing you a hypothetical, and I should have introduced what I was saying by saying that.

MR. EDMUNDS: I think that the issue -- I mean, obviously, you can compare outcomes, right, and you can

hypothesize the outcome that wouldn't be as good but might be what happened and compare it and you see what the comparison is. But I think that the issue is that, you know, we can't know and it's our decision to make, right?

THE COURT: Well, I guess that comes back. You can actually make a fairly well-informed decision on that point, and that's why we have a six-day trial with, you know, 200 binders of evidence and thirty some plus witnesses.

MR. EDMUNDS: Right. I could talk about that.

THE COURT: Okay.

MR. EDMUNDS: Well, I'm sorry, I didn't mean to --

THE COURT: No, no. So I think that that is a point that needs to be addressed.

MR. EDMUNDS: Okay. Well, what I saw from the trial, right, our standard, the standard under the Maryland Consumer Protection Act. I believe it's the standard in all states. It derives from a case in I think the Seventh Circuit called FTC v. Amy Travel Services, and that's a case where the Seventh Circuit sets out the standard for holding people, you know, corporate individuals, individuals who are in business associations liable for conduct.

And the standard it sets is that, one, is obviously direct participation, and I think that there is evidence of that, clear evidence of that. In particular, in

Richard Sackler's concession that he engaged in things like the McKinsey marketing, the McKinsey marketing plan, and you know, had by himself a call with McKinsey's -- with the McKinsey employees that were proposing these things, and that the board then subsequently implemented their recommendations and that the board also discussed them, and it certainly didn't change them.

So I think that -- so the Amy Travel standard is direct participation, and then there's another prong and it is the right to control the conduct and knowledge or constructive knowledge of what the conduct is. And each of the board members who testified before Your Honor said that they read the board materials, which are in evidence and are, you know, among -- I think there's more, but there are documents that have been presented to the Court.

And each of them made clear that the board discussed and engaged in, you know, the review of proposals on marketing and sales put forward by management. They have -- two of the board members who testified have a disagreement as to what their purposes were in doing that, but I think they all admit to the fact that they, in fact, had the right to control the conduct and were, on some level, aware of what the conduct was.

THE COURT: What do you think the degree of that awareness was as far as the evidence shows and the conduct

that you're referring to?

MR. EDMUNDS: Well, I have to get to another point, and I will answer that. But I have to answer that based on what we've been permitted to do. Right? I was careful. We were careful to follow what Your Honor had ruled as to what evidence we were allowed to present. And as you know, you know, there is more that we did not use.

So I think that the evidence on that shows a high level of awareness of at least two of the Sackler Family members. The documents for Mortimer Sackler, the few on which we actually cross-examined him because they had a relevance directly to other issues before the court, such as the milking the business email demonstrate a degree of participation in sales and marketing that is sufficient to establish liability under Maryland, and I think, under other states' law.

So I think that the evidence, just the limited evidence before the Court, which was presented not for the purposes of establishing these claims, demonstrates that we have what we need if we were to go forward. You know, Richard Sackler's testimony goes pretty far to establishing his liability and the liability of others.

And I think that Mortimer Sackler, even, who defended his conduct, the evidence still shows that he has his hands in the sales operation and is aware of it, and is

reading reports, and is participating in discussions. And the email and documentary evidence, limited though it was --

THE COURT: Well, can we --

MR. EDMUNDS: -- under the circumstances --

THE COURT: You've said that three or four times. I limited it so that it would be necessarily for the truth, but you are certainly entitled to examine each witness on whatever documents you had.

MR. EDMUNDS: I had understood the Court as having made relevance rulings as to whether -- because Debtors' case, you know, sort of carved out the states' claims against the Sacklers from what Debtors were presented that we were not allowed to go beyond what I would call a very limited -- you know, I mean, set of things that we did.

THE COURT: Well, I don't know why --

MR. EDMUNDS: Because that wouldn't be --

THE COURT: -- you asked --

MR. EDMUNDS: -- relevant to the --

THE COURT: -- Richard Sackler --

MR. EDMUNDS: -- determining --

THE COURT: -- about his participation in actual settlement marketing calls, then.

MR. EDMUNDS: I asked that to establish the repeated conduct. I mean, I cross-examined him based on the document.

THE COURT: Right. I know.

MR. EDMUNDS: But as relevant to the issue that I mentioned before, which is the need to change conduct, the need for the settlement to --

THE COURT: That's why --

MR. EDMUNDS: -- (indiscernible) the conduct.

THE COURT: -- you were cross-examining him on that? Okay, fine.

MR. EDMUNDS: That is why I was.

THE COURT: All right.

MR. EDMUNDS: I mean, the issue there is that they had to guilty pleas, 2007 and 2020, and that they continued after 2007, and to some extent, the conduct in 2018 was repeated with respect to other foreign entities. I mean, that was the purpose. And so we did not dig underneath that to show the documents that the DOJ may have had in its possession when it came up with those allegations and incorporated them into what it did.

THE COURT: Are you representing to me that you have those documents?

MR. EDMUNDS: I have some of them. Certainly.

THE COURT: And they were offered to be introduced ever in this case?

MR. EDMUNDS: Your Honor, we understood that the underlying merits of the states' claims were not at issue,

and so limited ourselves to a short cross, short direct, rather, of each of these witnesses. I mean, you know, at one point I had sent, I think Mr. Joseph said, 6,200 pages for use. And we didn't do that. But we had those documents. The Court received them.

So, I mean, that was the... You know, we had had before the bankruptcy a much longer trial planned than the State of Maryland. It was on the schedule, I believe. And that, I think, would have been necessary to fully present the claims.

But in any case, the point is that it's the conduct, right? And to the extent the states are being treated as if they were -- you know, needed to make decisions in the same way that private creditors do here, which I'm not faulting, that's just not our consideration.

THE COURT: Okay, well --

MR. EDMUNDS: We have more.

THE COURT: I've heard them from all three lawyers, and I don't need to hear it again, because you guys have made that point and that's fine.

MR. EDMUNDS: Okay. Your Honor, let me just -- I wanted to talk -- I have one more point, and that is about the third-party -- and I think that maybe this is going to be addressed more in what the parties to over the next night and into Wednesday on the third-party releases, to the

 extent they apply to third parties other than the Sacklers. Right?

And the issue is just that that -- when Mr. Huebner presented this morning, he referenced some other settlements. I think that the list of released parties in this case is broader than any of those that he mentioned. The consultants, advisory board representatives, contract sales representatives of Purdue Pharma, whose conduct is released related to at least Purdue's opioids.

And I think that that is a broad area, that if changes aren't made we need to talk about, because those releases are so broad as to even further prevent us from changing the conduct here. Everybody who participated with Purdue and what Purdue did gets out of it. Some of them have not contributed a thing to the plan. And, you know, I hope that we are still -- I have received confirmation, but I hope that we are still discussing those issues and can present something different to the Court for its consideration jointly with other parties on Wednesday.

And I guess I'll stop at that for now. I don't think it makes sense to go farther until we know the answer to that.

THE COURT: Okay.

MR. EDMUNDS: But that is a concern. And so with that, yeah, I think that that -- those are the points that I

would like to make in addition to what Mr. Gold and Mr. Goldman said.

THE COURT: Okay. Very well. Thank you.

MR. EDMUNDS: Thank you, Your Honor.

MR. ROBINSON-O'NEILL: Your Honor, this is Tad Robinson-O'Neill from Washington. You had asked if the McKinsey documents are in the record. They are. It's JX-2623 and JX-2624. The operative provision of the 2/4 document, which is the McKinsey settlement in Washington state is Paragraph 2 under the payment information, which obligates the State of Washington to spend all of the proceeds from the McKinsey settlement on opioid abatement.

I don't think Your Honor really wants me to track down the budget allocations --

THE COURT: No, that's fine.

MR. ROBINSON-O'NEILL: -- into the program --

THE COURT: That's fine. I also know there were similar provisions in the tobacco settlement. But states have developed since then. I appreciate that.

MR. ROBINSON-O'NEILL: Thank you, Your Honor. If you have no more questions, I'll step down.

THE COURT: Okay. All right. Mr. Fogleman, you're going to go?

MR. FOGELMAN: If that's all right with the Court.

THE COURT: Yeah. Go ahead.

MR. FOGELMAN: Thank you, Your Honor. My name is Larry Fogelman, and I represent the United States of America in these proceedings. I would like to make a few points on three key issues: due process, Metromedia, and subject matter jurisdiction.

Your Honor, it would violate the due process clause of the Constitution if this Court strips the rights of sovereign states as to the Sacklers and the rights of individual victims of the opioid crisis due to the Sacklers. The states and individuals must be provided with reasonable notice and an opportunity to be heard before their property interests are taken away.

And let's make no mistake. This third-party release takes away property rights of states and individuals in their causes of actions against the Sacklers. The release is effectively a judgment on the merits. It has res judicada affect and it will render their claims worthless.

The Second Circuit in Metromedia recognized this point. The Court said, on Page 142, "In form, it is a release; in effect, it may operate as a bankruptcy discharge arranged without a filing and without the safeguards of the Code."

Now, let's talk about notice, Your Honor. The notice provided in this case was not a summons and complaint seeking to take away property rights of states and

individuals against the Sacklers. Rather, it was noticed that there would be a confirmation hearing with disclosure about losing your right to sue the Sacklers. But this short form of notice in a bankruptcy proceeding to which the Sacklers are not even debtors, is not a substitute for service of a summons and a complaint.

A notice of an impending confirmation hearing does not confer personal jurisdiction over states and individual victims, and their claims against the Sacklers, and it is not sufficient to give the Court power over those claims. Rather, formal service of process is required.

As Mr. Huebner said this morning regarding the Sacklers, to sue the Sacklers, you have to sue --

THE COURT: Did the Second Circuit --

MR. FOGELMAN: -- and secure --

THE COURT: -- require that in the Motors Liquidation case? The service of a summons and complaint? The most recent Second Circuit case --

MR. FOGELMAN: Your Honor, that --

THE COURT: -- discusses due process in this area?

MR. FOGELMAN: That case address claims against the estate, not third --

THE COURT: And against the --

MR. FOGELMAN: -- not claims against third parties --

THE COURT: -- and against the successor entity?

MR. FOGELMAN: Well, yes, Your Honor. But again, there was no third-party release at issue in GM, so it's a totally --

THE COURT: You know, Mr. Fogelman --

MR. FOGELMAN: -- distinct issue.

THE COURT: -- I think I understand this argument. I also understand that if this plan is not confirmed, your client gets roughly $2 billion more and essentially all of the value of the Debtors. So I will read your brief. I really don't think I need to hear anything more on this. You're at a complete conflict --

MR. FOGELMAN: Your Honor, that is not true, Your Honor.

THE COURT: I've said enough.

MR. FOGELMAN: May I address that point?

THE COURT: I've read your brief. Your brief is thorough. But I just, frankly, do not understand the position of the United States, and I don't believe it can be articulated in this case.

MR. FOGELMAN: I believe it can, Your Honor. And I'd be happy to do so, if you'd give me an opportunity.

THE COURT: You should do that now.

MR. FOGELMAN: Yes, Your Honor. First of all, it is not true that if this plan is not confirmed, then

automatically the government has a $2 billion claim. Purdue has a right to back out of the settlement if this plan is not confirmed. And in terms of having different positions, Your Honor, it is --

THE COURT: You have a $1.7 billion --

MR. FOGELMAN: The government did (indiscernible) --

THE COURT: -- superpriority claim. And there's no --

MR. FOGELMAN: That's right, Your Honor.

THE COURT: And there's no --

MR. FOGELMAN: But the Debtors have the right --

THE COURT: Then there's no abatement trust, right?

MR. FOGELMAN: Your Honor, the Debtors have the right unilaterally to pull out of its resolutions with the government. If the plan is not confirmed, that creates the PVC. We have worked very hard, Your Honor, to come up with resolutions that work towards the public interest, that create a PVC.

We have been working tirelessly throughout this process to help draft documents relating to the covenants of the new company, the injunction relief of the new company. We have worked nights, we have worked weekends, even leading up to this confirmation hearing, towards that end.

At the same time, Your Honor, it is also true that we believe that this release violates the due process provisions of the Constitution, and we feel it is incumbent upon us to explain that view to the Court.

THE COURT: Okay. And that's --

MR. FOGELMAN: We don't think that is --

THE COURT: -- been explained.

MR. FOGELMAN: -- inconsistent, Your Honor.

THE COURT: I've read the brief and I don't need to hear more on this, Mr. Fogelman.

MR. FOGELMAN: May I move on, then to, briefly, the Metromedia and subject matter jurisdiction points?

THE COURT: Briefly, because it's been covered already, and again, it's covered in your brief.

MR. FOGELMAN: Thank you, Your Honor. With regard to Metromedia, I'll just make a few quick points. First, with regard to one of the factors described by the Second Circuit that enjoined claims were channeled to the settlement fund, rather than extinguished.

Well, the only settlement fund that's set up here is for the opioid claims relating to Purdue's conduct. But the release that's at issue covers a far broader, almost incomprehensible, number of topics for which there is no settlement fund that's set up. It would cover -- I mean, the language in the release is, anything based on or

relating to or in any manner arising from in whole or in part, the Debtors as such entities existed prior to or after the petition date, including the Debtors' opioid-related activities, manufacture, marketing and sale of products, interactions with regulators concerning opioid-related activities or products, and involvement in the subject matter of the pending opioid actions, and the past, present or future use --

THE COURT: And I --

MR. FOGELMAN: -- or (indiscernible) use.

THE COURT: I understand that point, Mr. Fogelman, and I'm very sympathetic to it. And I think I've made my views known to the Debtors.

MR. FOGELMAN: I appreciate that, Your Honor. But it's not just the fraud claims that are a problem.

THE COURT: No, no.

MR. EDMUNDS: This release covers --

THE COURT: I understand that. I understand that.

MR. EDMUNDS: -- everything, from -- okay.

THE COURT: And in fact, some of the testimony by, I believe, the Sacklers who are closest to the issues, have focused on a release related to Purdue's opioid-related activities. That was what they're looking for. Although then they said, well, we're going to rely on our lawyers. And I think I made it very clear that the lawyers run a real

risk of proposing a release that is far too broad, and that will have the effect of not being approved, as opposed -- instead, proposing one that's consistent with the consideration is being paid for.

MR. FOGELMAN: I appreciate that, Your Honor. And in fact, that language is so broad, as to reach things like workplace safety claims, if they existed, employment packs issues, environmental law, civil fraud, beyond opioids, contracting fraud, state ADA laws, labor laws. I mean, this list is so broad that it would cover the example Your Honor gave that if somebody ran over a pedestrian while delivering opioids, the Sacklers get a release for that too. I mean, it's just an impossibly broad release that shouldn't be approved by the Court.

And Your Honor, who does it cover? It doesn't just cover the Sacklers. It covers financial advisors, attorneys, accountants, investment bankers, consultants, experts, other professionals. I mean, why is Paul Weiss getting a release in this case? It's incomprehensibly broad. And there's no evidence that any third party has contributed to the releases, and so they're not entitled to get them.

THE COURT: Well, except they're --

MR. FOGELMAN: Garrett Lynam testified --

THE COURT: I'll check on only one point on that,

which is -- and we're leaving out the excluded parties, of course -- but there are --

MR. FOGELMAN: Yes.

THE COURT: -- directors and officers who are contributing their insurance rights. So they are contributive something. But I understand your broader point.

MR. FOGELMAN: Yes. No matter how you slice it, Your Honor, maybe there's a handful of people who are contributing something, but it is not the thousand-plus people on Schedule H and all of their attorneys, accountants, investment bankers and so forth. I mean, this release would cover the McKinsey example that Your Honor given court. And I'm calling it McKinsey because they're an excluded party, but you can call it Company X, and McKinsey is off the hook or, you know, if there's turbocharging and what McKinsey did.

And Your Honor, carving out just fraud isn't enough, because a lot of state statutes that are based on the False Claims Act, you can find somebody liable for acting in reckless disregard. And so if a McKinsey type acted with reckless disregard, that's enough for a fault of claims act liability. And so, the idea that you're just going to carve out fraud doesn't get you there.

And public nuisance, another big issue we've heard

about throughout this case, that there's -- according to this release, you can't bring a public nuisance claim against McKinsey or other consulting firm that's engaging turbocharging.

Your Honor, another factor in the Metromedia standard is that the enjoined claims would directly impact the Debtors' reorganization by way of indemnity or contributions. I take Your Honor's point that there may be a few of those. But again, there's been very limited, if any, evidence presented on that point. And so the Debtors have not met the Metromedia standard for the vast majority of entities and people covered by the release.

THE COURT: But the --

MR. FOGELMAN: Another factor the Second -- yes?

HE COURT: No, I think you're making the same point. And I'm trying to say as clearly as I can, generally I agree with you.

MR. FOGELMAN: Yes.

THE COURT: So, okay.

MR. FOGELMAN: Okay. Thank you, Your Honor. Just a couple more here on Metromedia, and then I move on to subject matter jurisdiction. Another factor that the Court mentioned you had looked at is whether the plan provided for the full payment of the enjoined claims. That's obviously not the case here. I think creditors are getting less than

a tenth of a cent on the dollar.

And then there's the question of the estate receiving substantial contributions. And I'm not --

THE COURT: You know --

MR. FOGELMAN: -- Your Honor, I --

THE COURT: If you had full payment, you wouldn't need a release. So clearly, there's something wrong with that point. I think --

MR. FOGELMAN: I'm just raising it --

THE COURT: -- it has to be if you --

MR. FOGELMAN: -- because it's one of the standards --

THE COURT: I understand.

MR. FOGELMAN: -- the Second Circuit set.

THE COURT: But it's --

MR. FOGELMAN: I --

THE COURT: It has to be reviewed. I think, frankly, the Third Circuit formulation, which is, is it fair, is a better way to look at it than that factor, which just can't... I mean, it just seems really boneheaded to say that because $4.325 billion won't pay off or resolve the opioid crisis, you shouldn't take it. I think you need to really analyze what the alternatives are, and of course, how tied in it is to the plan, and who is covered by the release.

MR. FOGELMAN: Understood, Your Honor. One other factor that the Court in the Second Circuit mentioned was whether the estate receives substantial consideration. We address that point in terms of Exhibit H and in terms of very few, if any, individuals providing contribution.

I want to just point out that Garrett Lynam, the Executor of the Sackler Estate, was asked a question. "So, for example, all the facts that the release provision -- and I believe it's discussed before -- but it references his financial advisor, his attorneys, accountants, investment bankers, consultants, experts, and other professionals, none of those are giving a financial contribution to the estate, right?: And he answered, "Correct."

Richard Sackler testified that, "Question: I have just one, or expect to have just one question to you, other than members of the Sackler Family or Trust, in which they may be beneficiaries, are you aware of any personal entity that will be contributing monetarily to the more than $4 billion in settlement payments that are contemplated by Purdue's plan. Answer: I am not aware of any."

And Your Honor, with regard to the Sacklers themselves, I think there is a really important question here about the use of their trust fund assets as opposed to their personal assets. It's not clear on this record that the Sacklers themselves are actually personally contributing

anything. They're using their trust as a sword and a shield, Your Honor --

THE COURT: But can we --

MR. FOGELMAN: It's a sword because they're trying to use their contribution into the estate by their trust to say, aha, look at what we're doing; we're entitled to a release. But then, when you ask them, well, you know, is that money -- like could you be sued for that amount? And you know, if you have a judgment creditor, if the judgment creditor gets a judgment against you, can you be sued? I asked that to Mortimer Sackler. He essentially said no. So u sing your trust as a sword and a shield, and it's all their money?

THE COURT: Why is that -- I don't --

MR. FOGELMAN: It's coming from the trust, and why are the Sacklers getting a release?

THE COURT: But I guess I really would push back on that one. First of all, they're obligated for an amount. They're not obligated, you know, just from a particular asset.

Secondly, if in fact their own assets would be insufficient to make the payments and there is, as I think the record is clear, at least say an issue as to whether in a contested context, third parties could get at the trust assets, why shouldn't the trust assets be viewed as a

positive being contributed to the relief? Because they couldn't find it without it.

MR. FOGELMAN: They're trying to have it both ways.

THE COURT: No, but --

MR. FOGELMAN: They're trying to have it both ways.

THE COURT: But --

MR. FOGELMAN: They should acknowledge, then, that it's their money. I mean, I think a few of them did testify to that --

THE COURT: I'm not sure --

MR. FOGELMAN: -- and that, you know, if this plan is --

THE COURT: To me, these are both clichés. But sometimes a negotiation is a win-win, where is if you litigate, it's a lose-lose. So maybe --

MR. FOGELMAN: Your Honor, Kathe Sacker said, "My trust assets or my personal assets are my assets as well."

THE COURT: I agree. That --

MR. FOGELMAN: She treated them like they were hers.

THE COURT: That is an issue that we'll --

MR. FOGELMAN: But then when she was asked --

THE COURT: No, no. That is an issue that will be

litigated.

MR. FOGELMAN: -- do you have personal control --

THE COURT: That is an issue that would be litigated, and I don't know how it would ultimately come out because I'm not ruling on the merits. But I can see how it could come out either way, if this was a litigated attempt to reach a judgment. And this settlement avoids that issue. And to me it's --

MR. FOGELMAN: Understood, Your Honor.

THE COURT: -- you know, I don't see a problem with it because in fact the record, I believe, is uncontested that without those trust assets, neither side of the family could pay this settlement. They could pay about $1.1 billion --

MR. FOGELMAN: Your Honor --

THE COURT: -- at most. And that's before lawyers.

MR. FOGELMAN: I have a simpler point. I have a simpler point, Your Honor. There's no evidence in the record, I don't think -- someone can correct me if I'm mistaken -- that the Sacklers actually are making any personal contributions. When Mortimer Sackler was asked that question, he said, you know, in terms of how much ends up coming out of my personal estate versus my trust, I don't know at this time.

Kathe Sackler --

THE COURT: But that's because it's --

MR. FOGELMAN: (indiscernible)

THE COURT: -- it's an aggregate number that they have to pay, and ultimately, the estate doesn't care where it comes from. They have bargained to have them be out of these foreign companies by a certain date. But it's an aggregate number --

MR. FOGELMAN: Understood. But --

THE COURT: -- so those answers were accurate answers. They don't know, because it could be under either source. But it is also true --

MR. FOGELMAN: But it's a test in the Second --

THE COURT: -- that they don't have the money on their own to make the payments in a contested context. So to have --

MR. FOGELMAN: Your Honor, it's --

THE COURT: -- to have the --

MR. FOGELMAN: -- it's a test in the Second Circuit --

THE COURT: -- the trust agree to make the payment to go to the Royal Court of Jersey and asked for permission to do it is actually -- I actually think a win for the estate, because they don't have to fight that issue. They might ultimately win the issue --

MR. FOGELMAN: But it --

THE COURT: -- but they don't have to fight it this way. So I think we're being a bit --

MR. FOGELMAN: Okay. Your Honor, I --

THE COURT: -- a bit metaphysical on this point, Mr. Fogelman.

MR. FOGELMAN: I'll move on to subject matter jurisdiction, Your Honor.

THE COURT: Okay.

MR. FOGELMAN: I just wanted to make the point that it's a test of, you know, who's provided substantial contributions. On this record, it's not clear if the Sacklers personally are providing --

THE COURT: Well, they're --

MR. FOGELMAN: -- their (indiscernible).

THE COURT: -- on the hook for it. They're definitely on the hook for it.

MR. FOGELMAN: Yes. Yes, Your Honor. On subject matter jurisdiction, Your Honor, I just wanted to briefly touch a couple of points that have been raised. Your Honor, third-party releases do not arise under Title 11. There's nothing in the lawsuits of the States and individuals against the Sacklers, lawsuits that predated the bankruptcy, that arise under Title 11. They instead arose under the State substantive laws cited in those complaints that

alleged causes of actions against the Sacklers.

And so, you know, just because there is a plan and releases are included in the plan, does not mean that the settlement agreement -- I'm sorry -- that the litigations themselves arise under the Court's core jurisdiction.

The correct question is whether the Court has jurisdiction over the lawsuits filed by the sovereign states and individuals, not whether the Court has subject matter jurisdiction over confirming a plan. And that issue was addressed in the Ninth Circuit Dunmore v. United States, 358 F.3d 1107 (9th Cir. 2004). The Ninth Circuit said, when presented with a mixture of core and non-THE COURT: core claims, you must employ a claim-by-claim analysis to determine whether the Bankruptcy Court could enter a final order for that claim. And that's a similar holding from the matter of Zale in the Fifth Circuit, that landed in our brief as well.

Judge Bernstein wrote in the Drier case, 429 B.R. 112, 131 (S.D.N.Y. 2010), the question is not whether the court has jurisdiction over the settlement, but whether it has jurisdiction over the attempt to enjoin the creditors' unasserted claims against the third party. You've got to break it down and look at what's at issue. In this case, it’s the lawsuits themselves, not just the plan. The plan, the fact that it's part of a plan, doesn't confer core

jurisdiction over the third-party release. And the reason that has to be right --

THE COURT: So, I guess --

MR. FOGELMAN: -- Your Honor, is that --

THE COURT: I guess this is why I was somewhat upset with the government's stance here. I understand these are live issues. I understand that there are courts that disagree with your position, including the Third Circuit. And frankly, even the Ninth Circuit in the (indiscernible) case?

But I don't see why the United States is picking this case to raise this issue. And we'll just leave it at that.

MR. FOGELMAN: We're doing our best to get it right, Your Honor. And we believe this is the correct --

THE COURT: Right.

MR. FOGELMAN: -- legal analysis.

THE COURT: Right. Notwithstanding --

MR. FOGELMAN: And it's a case that --

THE COURT: -- what would happen as a result.

MR. FOGELMAN: Your Honor, there are 10 sovereign states that are going to lose their rights to file lawsuits. We think that's really important. As well as individuals who filed lawsuits against the Sacklers --

THE COURT: Right. So they --

MR. FOGELMAN: -- who are losing their rights --

THE COURT: -- will have a lawsuit --

MR. FOGELMAN: -- and that's why we're here.

THE COURT: -- and the United States will have a $1.7 priority claim, superpriority claim.

MR. FOGELMAN: Again, Your Honor --

THE COURT: So I think there must be --

MR. FOGELMAN: -- they do have the right to pull out of the settlement.

THE COURT: -- very grateful that you're looking after their interests as you pick their pocket. Let's move on.

MR. FOGELMAN: I disagree with Your Honor's characterization. I don't think that's fair --

THE COURT: Well --

MR. FOGELMAN: -- or correct. Your Honor, the reason that it has to be the case that Your Honor -- that you can't have core jurisdiction over a lawsuit between third parties that is included in a plan, the reason that has to be true is that it's a bedrock principle of subject matter jurisdiction.

The Supreme Court, in Insurance Corporation of Ireland v. Compagnie Des Bauxites, 456 U.S. 694, 702, from 1982, wrote, "No action of the parties can confer subject matter jurisdiction upon a federal court."

And so, Your Honor, if the Court doesn't have jurisdiction over the lawsuit from one third party against the Sacklers, then simply by putting it in a plan, if that were permitted, you'd be doing exactly what Insurance Corp. of Ireland said you can't, which is manufactured in jurisdiction. Plans are not magic. It can't be that anything you put inside a plan automatically comes within the Court's core jurisdiction.

The Johns Manville case also noted it was inappropriate for the Bankruptcy Court to enjoin third-party claims against third-party non-debtors solely on the basis of that third-party's financial contribution to a Debtor's estate. If that were possible, a debtor could create subject matter jurisdiction over any non-debtor third party by structuring a plan in such a way that it depended upon the third-party contributions.

As we have made clear, subject matter jurisdiction cannot be conferred by consent of the parties. And so too here, Your Honor, again, just by including these releases in the plan does not confer jurisdiction. Even if Your Honor disagreed and you found that because this is a plan, it was core jurisdiction of the Court, it would violate Article 3 of the Constitution for a bankruptcy judge to ultimately make the decision on whether the lawsuits filed by sovereign states and individuals against the Sacklers can be released.

The Bankruptcy Court simply can't reach (indiscernible) when it's the final adjudication of the merits of the state law claims, when neither the states nor the parties are parties to the bankruptcy proceeding. And that's Stern v. Marshall. The Supreme Court held there that just because the Code --

THE COURT: Mr. Fogelman --

MR. FOGELMAN: -- with certain --

THE COURT: I --

MR. FOGELMAN: You know Stern well. I get it, Your Honor.

THE COURT: Right.

MR. FOGELMAN: But Your Honor, look, just because the Bankruptcy Court -- look. In that case, the Bankruptcy Court lacked constitutional authority to hear Anna Nicole Smith's cross-claims --

THE COURT: I don't need to hear about Anna Nicole Smith, for the 5,000th time. All right, please. You covered this in your brief. You're apparently going to appeal this --

MR. FOGELMAN: Yes, Your Honor, my point --

THE COURT: -- whenever, and hold up the distributions to these people forever, and that's the United States' choice. So, be my guest, all right. I'm done with this argument. I want to hear the Canadian municipality --

MR. FOGELMAN: Your Honor, my point is simply that

it --

THE COURT: No. I want to hear the Canadian municipality creditors. I don't understand this. There has to be some level of prosecutorial discretion here. So, Mr. Underwood, you're next.

MR. UNDERWOOD: Good evening, Your Honor, Alan Underwood from Lite DePalma Greenberg Afanador, on behalf of certain Canadian municipal creditors, Canadian First Nations creditors.

We want to make clear, first of all, Your Honor, is that Canadian creditors not -- and there's testimony to this -- they were approached. Mr. Dubel testified to this fact -- they were not approached by the Debtors' Special Committee, they were not approached by Debtors' counsel. They did independently try to become involved in this case, but unfortunately it didn't result in -- what they hoped for.

So, the irony here is, Judge, you've got ten parties that really are trying to figure out whether they want to be a part of the abatement and claims process here. And if you've got one foreign, or a group of foreign parties that desperately wanted to be a part of this, expected to be a part of this, and were ultimately not.

And so, ultimately, where we are today -- actually, my understanding is there's 17 -- in the year

2020, there were 17 Canadians who died each day from opioid toxicity. Ultimately, in terms of the plan, the proposed plan that is before this Court, I think it's a close call, but I think it probably, ultimately is in favor of the Debtors in terms of the scope of the releases that can be granted with regard to the US States.

I think the answer is different with regard to the Canadian municipalities. And that's why -- and certainly, as to the First Nations -- and that is why when the objection, a limited objection to the Provinces settlement was filed, we attempted to alert the Court to (indiscernible).

So, ultimately, in terms of what is pending right now, before you -- there is issue with regard to the fact that subject matter jurisdiction of this Court may not extend to these claims, and there's a couple of different reasons for that. And these claims are different from the state, 50 state and territory claims that we've otherwise addressed at great length before this Court.

In terms of --

THE COURT: It's not really a subject matter jurisdiction point, is it? Because they filed their claims here. And again, there may be a recognition issue; I understand point. The Canadian Court may feel that these Canadian creditors' claims against the US entities --

because that's all we're talking about here; we're not their claims against the Canadian entities. The release doesn't extend to that. So, the Canadian Court may feel that their claims against the US entities aren't being sufficiently well-treated under the plan for recognition to be granted. But I don't think it's a jurisdictional issue.

MR. UNDERWOOD: Well, I think it is an interesting -- I understand the distinction the Court is making with regard to subject matter jurisdiction. I think, though, that the distinction may be a little bit finer. In the first case --

MR. HUEBNER: Your Honor. Your Honor, (indiscernible) I apologize, the parties may have forgotten that we actually have a separate allocation of time for Mr. Underwood, on Wednesday, to discuss Canadian jurisdiction. This is only third-party releases. I think he already expressed his view. I certainly don't mean to cut anybody off, but there's actually a different pod for this exact issue. We obviously need to respond to some of the things that were said --

THE COURT: That's fair. I think -- and I didn't appreciate which way you were going there, Mr. Underwood. If this isn't on the release, we'll cover you later. We'll cover you on Wednesday.

MR. UNDERWOOD: I think, you know, it relates to

the release, but it relates to the release in a different way than almost every other party, so I have no problem, as long as I'm afforded the time that I would have had here to address this independently later on. And I appreciate the Court's time.

THE COURT: Okay. I didn't want to cut you off totally. I just thought, on this one point, as we got into your argument, it seemed to be covering jurisdiction generally, as opposed to just the release. But if you could cover both points on Wednesday, that's fine. But I don't know if you have any other points on the release?

MR. UNDERWOOD: With the respect to the releases, if you'll just give me one very quick comment. Ultimately, I don't think that there are points that can't be addressed on Wednesday, other than I can tell you that the Canadian creditors are not beneficiaries of any form of channeling, injunction or trust. And that's a --

THE COURT: They do get -- I'm paraphrasing, I think, the Debtors' argument on this, although I'll ask them about it. You're not getting money directly as part of the Sackler settlement, as I understand it, as an unsecured creditor in that class. But I think the Debtors would say two things: First, it's far from clear that your clients have claims that are subject to the release, i.e., claims against the US entities as opposed to the Canadian entities.

And when you read the proofs of claim, I think there is some question as to, you know, how is the claim actually against the US entities? That's point one.

Point two is, I think they would say that the money that is going to unsecured creditors wouldn't go to them but for the release, and but for the Sackler settlement, because the parties that, in essence, would swallow up that money, that would be going to the unsecured creditors, aren't swallowing it up because of the money that the Sacklers are paying, which is supported by the liquidation analysis, which has unsecured creditors getting nothing. So, I think that's their argument.

MR. UNDERWOOD: Right. I mean, Your Honor, I don't know if you want to put this of until Wednesday or you want to carry forward with your --

THE COURT: Well, if you have a response to that.

MR. UNDERWOOD: Yeah, well, I do, and I think that there's a linkage there that may be the step too far under Second Circuit's holdings, meaning, you know, if we look back at where this comes from under, you know, 542(g) Johns Manville and this whole progeny of cases, I think that there is a legislative intent and a judicial intent, in most cases, to link the channel injunction, the establishment of a trust with the relief that's provided. That link is missing here.

I would also say, you know, that look, if you look at the breadth of case law, there are releases, and there are releases. I would suggest that there are Section 105(a) releases that are related to the Debtors' business and professionals that are -- and no question -- commonplace. I think that the scope of these releases is something greater, much more in the fashion of a mass tort release -- that's what it is -- and I think it requires a different analysis. That's my position on that, Your Honor.

THE COURT: Thank you, that's helpful. Okay, and I think the last group to speak to this is the Gulf Underwriters and St. Paul and Marine, et al.

MR. LUSKIN: Yes, Your Honor, Michael Luskin, Luskin, Stern & Eisler for Gulf and for St. Paul. This is very limited objection to the scope of the release insofar as it covers three non-debtor entities. We have a settlement agreement; the contract with six Purdue entities: three are debtors, three are non-debtors. And under the terms of the release provisions in the plan, the non-debtors who are listed as Side B Shareholders in Appendix H -- that's at page 498 of 499 in the disclosure statement are -- their indemnity obligations are being released.

These are third-party claims, direct claims against the insurers. For instance, a coverage claim by the Committee against Gulf. I'll be very, very brief, since

Your Honor has heard the full book on third-party releases today, but look, Metromedia is not satisfied with --

THE COURT: Can I interrupt you -- I'm sorry, Mr. Luskin.

MR. LUSKIN: Yes, you may.

THE COURT: I just want to make sure, who is giving a release of what, that you're objecting to? Gulf and St. Paul are releasing who?

MR. LUSKIN: No, no, no. Gulf and St. Paul are my clients. The plan is releasing my counterparties. They are Purdue Frederick, PF Laboratories, and PRA Holdings. Those three companies owe -- have agreed under an agreement back in 2006, to indemnify the insurance companies for defense costs, for instance, in third-party suites that exist now, at that may exist in the future.

That was part of a -- the facts on this, they're very simple and they're set out in a stipulation which is ECF3589.

THE COURT: Okay.

MR. LUSKIN: It's a two-page stipulation. So, what we have is a contract that's from 2006 --

THE COURT: I got it. I just -- it wasn't --

MR. LUSKIN: You got it, okay. Okay, I'm sorry, I wasn't clear. So, what the plan does, is it, it gives the three debtor parties, the three, my three -- three of the

six debtor counterparties, my counterparties, it gives them the benefit of the plan release. Fine, we don't have a problem with debtor parties getting release. These are non-debtor parties who have made no contribution, who have not participated in this case, who will owe us money, or do owe us money on the indemnities.

And, frankly, there's been zero showing whatsoever, that this release, for these three non-debtors is necessary for the plan. I do not see how a -- the elimination of a bargain for commercial benefit by non-debtors is fair, to use the Third Circuit, and I believe also the Second Circuit standard. I --

THE COURT: And because they're non-debtors there's no 502(e) or 509 issue.

MR. LUSKIN: Correct.

THE COURT: Okay.

MR. LUSKIN: They're non-debtors and I think that, under the standard, that seems to be a common theme in today's arguments. This is -- removal of this thread will not cause the tapestry to unravel. This is a loose end that can safely be trimmed off and should be trimmed off. I think that if the Court applies the exacting hard look that is required under Metromedia, you will require the Debtors to revise the plan to allow these -- to remove these releases and to allow the indemnity provisions to continue.

That's all I have, Your Honor.

THE COURT: Okay, thank you.

MR. LUSKIN: Thank you.

THE COURT: I think those are all of the people on the list. I know it's fairly late, but I would like the Debtors -- unless they have someone else to do it -- to respond to the last two arguments, Mr. Underwood's and Mr. Luskin's.

MR. HUEBNER: Your Honor, may I ask the Court a question --?

THE COURT: Sure.

MR. HUEBNER: -- before we -- sonto that. The objectors went for four hours, and obviously, the Court had many questions for them and that's fair. A bunch of things were said that I believe, on behalf of the estates -- and based on emails and texts I've been getting, I think with the exception of two minutes for the UCC, I will make an omnibus response that will be relatively brief and targeted. But many things were said factually; many things were said about the Debtors and the plan and other constituencies. But I actually feel relatively strongly, in a case of this import, probably do merit a response.

Obviously, if the Court's view is -- you know, I read every single thing and I don't not need or want to hear from the Debtors or, in general, the proponents in the

aggregate, to the Debtors; clearly, we will take the Court's direction. But there are some points that I actually think are very important, but obviously, in this and in all things we're guided by what the Court thinks is important; not by what we think is important. Meanwhile --

THE COURT: I would like to hear the response to Mr. Underwood's point that there's no channeling injunction for a fund to his clients, and then a response to Mr. Luskin.

And then, it would seem to me, that if you think there was a clear factual misstatement, you should point me that and point me to the evidence that would show why. I don't think I need extensive rebuttal on the arguments though, or any rebuttal, frankly. I think it's really just -- I have to confess, I want to focus on those last two points: channeling, not for the unsecured, and the Gulf Underwriters' point. And then, if you feel that you have to correct the record you should do that too, with cites to the record.

MR. HUEBNER: You know, what I'll do is, I will cut out about 95 percent of what I was going to say and confine myself to cites to the record that I believe are important. I'll have to take a little extra pause between the two points, which I hope the Court is okay with, because I'll be skipping so very many things that are important to

us. But obviously, that's what I'm going to do.

In the interim, there will be Mr. Tobak getting read to address both of those points, to which I think we're actually quite comfortable with our answers, which in part are in our papers, and part you will hear in a few minutes.

Your Honor, first of all, we heard from several of the objectors who sort of testified about the lack of adequate notice and the fact that they were stayed during the case, and they attempted to impress on the Court that that limited their ability, including with respect to disclosure of the assets and liabilities of the Sacklers.

Here are the record cites, Your Honor, that I think belie that claim. There are 2,188 pages of disclosures and forensic examination of the Sacklers assets and liabilities that are on the docket. Mr. Collura testified to the 355-page report, 1A. Mr. Rule testified to the 400-page report, 1B. Neither of those witnesses was cross-examined. Mr. DeRamus testified to the valuation of the non-cash transfers and set forth his findings in a 520-page report. No party cross-examined our witness Mr. DeRamus.

Mr. Martin, who submitted two declarations, spanning 913 pages, analyzed the assets of the A Side and B Side of the Sackler family. No one other than Mr. Underwood cross-examined Mr. Martin.

The UCC letter which was attached to Mr. Atkinson's declaration goes on for about 15 pages, providing record evidence of the extraordinary diligence done by the Creditors Committee, specifically about -- sorry, someone is on camera who I'm guessing does not want to be, in the plaid shirt -- thank you -- specifically summarizing the discovery, the financial information and the analysis of the liability and culpability of the Sacklers. That evidence, Docket Number 3460, among many other things, talks about 450,000 documents produced by the Sacklers; 800,000 documents produced by the ACs; 40,000 documents produced by the other 2A entities, which are a form of IAC, and close to 200,000 documents produced by Norton Rose.

In addition, Your Honor, Dubel declaration, paragraph 23, contains record evidence of the Special Committee of the Board, reviewed over 960,000 documents through its advisors.

A stipulation entered into, lo those many months ago, at the beginning of the case, Docket Number 518, called the Tripartite or UCC Stipulation, required the Sacklers to make detailed financial presentations. Paragraph 17, which I will not read, is very long and has many subparts, of all the financial information that the Sacklers were required to provide or risk contempt under the stipulation approved by this Court, to no objection. I believe, if my memory is

right -- and maybe it's not on that point, because it's been along day -- on Docket Number 518.

So, Your Honor, with respect to that, I'll say only one other thing: 257 parties signed the protective order entered in this case, that provided, I believe, 100 million pages of documents, to basically any and every party that participated in this case, to use as a treasure trove and a hunting ground to find things with respect to the liability and culpability of the Sacklers, 257.

So, when lawyers talk about lack of information and lack of transparency, it just seems so utterly belied by the record that it's not a surprise that they never have citations. Obviously, I will not cite Your Honor to Your Honor, since I'm directed to record evidence, but much of this information is about the foreign assets and the foreign entities where the money is. And it would be very, very difficult and arguably impossible to get in discovery without letters rogatory and (indiscernible) getting the cooperation of foreign jurisdictions, etc.

Item number two, which is factual. You know, I want to apologize to the State of Washington and to the State of Maryland. Apparently, in pulling together cites for the general proposition, that many states are obligated to put recoveries in their treasuries, I picked two bad examples. It was my fault and I take responsibility for

that.

There are many states who not only don't have such a special provision, but have the opposite provision. In Oklahoma, for example, right after we settled with them pre-filing, they passed 74 Oklahoma Statute annotated 30.6, to bar the attorney general from doing settlements and putting money directly into opioid as opposed to in the state treasuries.

So, there are many devoted public servants and many elected officials, each doing the best they can. I should have left the point more general, which is there can be no assurance that the money will go to abatement if there are direct recoveries, as opposed to, I think citing Maryland -- and I apologize again, both to Mr. Edmunds and to the AG for my mistake in not knowing that there was a subsequent, more specific statute that, praise the Lord, directed opioid recoveries to abatement.

Your Honor, with respect to transparency and notice, I will rest on the extraordinary record -- I won't respond to that at all.

Your Honor, it's not record evidence, and forgive for straying for a nanosecond -- you know what, scrap that; delete it and retract it.

Your Honor, this is in order and this is fact: Your Honor asked Mr. Gold, and got what I actually think --

actually from Mr. Goldman, excuse me -- possibly the most important question that is the cornerstone of the entire hearing. Under your theory, what happens if one governmental entity potentially is against the will of everyone else, if it's literally 613,999 creditors to one? Whether because that governmental entity is acting in the best of all possible fates and believes that the terms, etc., is not satisfied; or whether it's -- just wants much more than it deserves, and the now has ultimate extortion in a situation where a single foreign town or domestic town or municipality, or state, under 10127 which, as Mr. Kaminetzky pointed out, defines governmental units with breathtaking precision, the term that is incorporated as used in the Police Power Provision at 364.

And I apologize for picking on Connecticut, Mr. Shore's home state, as we learned today. But here's the fact? Connecticut's proof of claim, under penalty of perjury, asserts $50,686,000,000 against Purdue. And of course, we know that -- and believe me, I'm not pushing back -- that many people believe that any claim against Purdue is a claim against the Sacklers.

So, on some level, that's all you need to know; which is, since individual states, almost all of them, are asserting claims in the tens of billions of dollars, and many municipalities are asserting massive claims, what they

are, in essence telling you, is that in their view, 99.999 percent consensus is irrelevant because one entity -- and under, you know, some of the theories we heard today, including my often very dear friend Mr. Fogelman -- and how he lives with the dissonance of being one of the hardest working people in this case, for abatement and for a PHI, and working on the injunction day and night, to make sure the DA is satisfied with it, to make the new company cleaner than any company ever, while at the same time filing a statement and arguing passionately, as far as I can tell, an objector; not only has the settlement of a $2 billion claim - I don't understand any of that.

But under his theory, defining the governmental entity, if any entity -- any entity in the world -- can put a proverbial block, even if all 50 states -- and we even get Seattle on board -- and all 22,495 cities, counties (indiscernible) support, with one group of tort plaintiffs, with one lawyer, with a $20 billion asserted claim, says they're not in the deal, everything crumbles to the ground. There's no way that anybody actually believes that that can be the right answer.

You Honor, with respect to record evidence, sort of, on the direct claims versus estate claims, I would point the Court to paragraph 239 of our brief, where we clearly state that we believe that the estate claims are very

substantially stronger than any of the direct claims. Because when it comes to invading the corpus of trusts, when you have a (indiscernible) claim for estate value that was transferred into a trust, you stand very differently than having an in personam claim against a beneficiary of the trust when you try to pierce the trust to get the value out of your trust.

Suffice it to say, Your Honor, I was as bewildered as you were by your colloquy with Mr. Fogelman. The fact that someone is agreeing to dip into a trust where there is an additional layer of recovery risk, I think speaks to the wisdom and strength of the settlement. There's no sword and shield at all. It's the opposite; they're putting down a force field and making the trust obligors, instead of saying that they have no liability and will only pay out of personal assets.

Your Honor, the record evidence I think also shows -- I actually don't have pin cite for this.

You know what? Before I say that, I want to say something else, actually of extraordinary import (indiscernible) personally. And some of the new arrivals who are participating in this hearing probably do not know this, you know, we arrived, Davis Polk, for the first time, in March 2018 -- no prior connection to the Sacklers, no prior connection to Purdue.

I'll just let the facts speak for themselves; which is, by January 2019, every Saclker was gone from the Board and out of management. And there was a majority of new blue chip, independent directors, who not only were four of the seven, but were the entirety of the Special Committee, to whom there was irrevocable delegation.

I think it's fair to say that we understand cleaning house and deterrents and propriety.

So, now onto this point: It is simply a fact that out of the 57 human beings who, I believe, are descendants of Mortimer and Raymond Saclker, only 11, to our knowledge, were ever on the Board at any time. And as I said before, a fair number of them are not US citizens, do not live in the United States and have never been involved.

So, those are just the facts that inform the landscape. And, you know, when people … I'll leave that alone.

Next fact, Your Honor, the GDP of the United States of America in 2020, was $20,930,000,000,000. That's a fact. Why is that fact relevant? Because what you heard from many people is a totally unsupported new theory that the ratio of harm alleged to the settlement, is somehow legally relevant. Under that theory, if the Sacklers had the entire wealth of the United States of America's 2000 GDP, and they contributed the whole thing, it would still be

insufficient. Because the $40 trillion number, that we constantly remind people, is the amount of filed proofs of claim -- there's only 10 percent of them, because 90 percent were filed in an unliquidated amount.

So, if you extrapolate out, there could be $400 trillion worth of claims, which means that the United States of America donated its GDP, would be about 5.2 percent of the alleged harm, and would not be sufficient to settle, due to the amount alleged.

Your Honor, with respect to the police and regulatory dimension -- and this is so important -- and again, I'm not going to make argument; I'm going to stick what's in the record. The covenants contained in the Eighth Amended Plan and in the Mediator's Report, supported by 80 percent of the states and the MSGE Group, speak passionately and directly to this exact point. We don't begrudge anyone who wishes we were getting a lot more from the Sacklers. I hereby swear that I would rather take another billion or two billion or three billion from the Sacklers, and put it to work on abatement. So does everyone; that's not the issue. The issue is, did all the rest of the states and almost all the mutants -- and we'll talk the parens patriae and I'll direct Your Honor to the citations for that in just a moment -- are they entitled to have their views effectuated? Or does any individual not on board get a blocking right?

So what is the record evidence, Your Honor? The record evidence is that by the time the third mediation was concluded, the covenants to the deal that directly address deterrence and regulatory and even frankly penal include the following: the Sacklers are barred for life from any further connection to Purdue. Purdue is stomped out of existence in Chapter 11, and its assets are transferred to NewCo. NewCo's governors are picked by the government. They will pick the board and the overseeing trusts. There will be a monitor continuing. We have had two illustrative -- illustrious monitors.

And it was Your Honor's suggestion, and we did it at the very beginning of the case and it is not going away. There is an injunction that is going to be in place, and I was very confused by Mr. Edmunds until he said, quite understandably, because we're all overwhelmed by the needs of this case, that people had to divide and conquer, right?

The NCSG, as this Court remembers well, doubled in length the original injunction from 2019 after three or four or five weeks of negotiation. And we are now very close to an agreed injunction that goes yet further still that all of the states are involved in negotiating. And hopefully we will reach global piece.

Mr. Fogelman and the DEA is also deeply involved. And my understanding is that document is just about done and

has just about universal agreement. So there's that and then there's the repository which I'm not going to repeat the terms of because Your Honor has heard them enough. And then there are the naming rights, and then and then and then.

And so if you want to talk about deterrence and messaging to say we will take your company away from you, we will rip it out of your hands, we will stomp it out of existence, we will transfer its assets to a trust for the benefit of the American people, they will have a monitor, we will pick the board, you will be barred and you have to sell all your overseas companies and give us over $4 billion, the largest settlement in the history of Chapter 11, it's not what I think matters because that's irrelevant. It's what 97 percent of our governmental creditors, 80 percent of the states, and as Mr. Shore and Mr. Arik so eloquently noted, an even higher percentage of the actual human beings injured.

Back to record evidence, Mr. Gold testified that there will not by dystopia of the plan fails. That's not what the record evidence shows because in this case, the past is a very excellent prediction of future performance. And Mr. Delconte's liquidation analysis, which I'll be talking a fair bit more about when we get to best interest on Wednesday, is the evidence on this as is what the Court

of course will take judicial notice of which was described at length in our pre-filing brief, the so-called informational brief, that describes exactly what was going on pre-filing, that states and municipalities and tribes and plaintiffs competing against one another to get there first and get value from the Sacklers with new litigations being filed, sometimes 20 a day, in different courthouses, et cetera.

And that's what the evidence shows. It's not that the AGs thought that it would be irresponsible. There are 600,000 people, each who passionately believe they have enormous claims that deserve vindication.

Your Honor, with respect to sovereignism -- sovereignty, I'm not going to repeat what was in Mr. Maclay's brief, except to note that he goes on starting at Paragraph 9 on Page 5 for quite a few pages with a lot of pretty convincing-looking case law and statutory cites to me about home rule including ironically -- I'm not going to take the fall for this one if it's wrong since it's not my brief -- California, Oregon, Washington, Connecticut and Delaware are among the states that provide for home rule either in their constitutions or by legislation. Then he cites a lot of stuff.

So states are unquestionably critical sovereigns and it's true. It's true. I guess I don’t know enough

about American politics as maybe I should. I don't -- I don't know that I'm profoundly ignorant. I think that may have been a little bit much. But I do know that out of the 4,924 U.S. governments who voted, 4,914 are not objecting to the plan and ten are.

Finally, Your Honor, I think, I want to note that every one of the objectors disclaimed a desire to talk about Iridium. They said, not my thing, I'm not talking about Iridium, that's not me. But then they all did, every one of them, because what they did was they cited a document or two or three or five that, you know, suggests that the Sacklers have a lot of risk here.

Let me be very clear because you can assume that the special committee, which has looked at 960,000 documents and the UCC that has done the same, share that view passionately. The Sacklers have very substantial risk here, in the billions of dollars. I've said it at so many hearings that only new entrants to the case, I think, could possibly believe to the contrary. It is to settle that risk that they are agreeing to all of these covenants and paying this money.

Whether it's enough money is for the creditors to decide. And they have decided decisively and definitively. If it is truly unlawful, that's for the Court to decide. But for people to give you one or two documents and say,

look, Mortimer knew, that Dr. Richard knew, do you think we don’t know that? Do you think the Court doesn't know that? This has been three-and-a-half years full-time. We know much more than this were the tip of iceberg, and we never would have allowed the Sacklers to get on the stand for three days and tell their story and defend themselves.

To say that there were no Perry Mason moments is an understatement. But this is for bankruptcy is for. It's for collective action to solve otherwise unsolvable problems and to do the best or the most that one knows how. If it's truly illegal, then Your Honor will turn it down, and I actually terribly fear what will happen, as you have heard from me in spades. But to say that it shouldn't go through because they found a document or two or three that suggested that the Sacklers had risk, we found hundreds.

We know what the risk is. And that's in the negotiation and the mediation, there Judge Layn Phillips and Mr. Ken Feinberg spent 11 months full-time. No one's even heard of hiring a mediator by the month, full-time for a year. All they did, without breaching mediation privilege, was get presentations, hundreds of pages long with attachments and excerpts and arguments and quotes. And they then jointly recommended 4.275.

So I don’t appreciate the kind of, you know, sub silentio Iridium testimony to people who keep saying that's

not their issue. We are very comfortable that the will of the overall number of creditors and governmental creditors supports the deal. The issues that are left are really entirely legal, and we stand both on Mr. Kaminetzky's argument which I think address everything, along with the papers of all the supporting parties.

So with that, Your Honor, I've left out a lot of what I wanted to say. But I would ask you to indulge me. I just want to say one last thing, I promise, and then I'll turn to Mr. Tobak.

When either litigants in this case or those who report on what's happening refer to this plan as the Sackler plan or the Sacklers, you know, exploiting a loophole in the Bankruptcy Code, it's almost impossible to overstate how painful that is, not to me, but to the UCC and the AHC and the MSGE and the Native American tribes and the adult PI victims and the NASPI victims and the MAS medical monitoring claims and the hospitals and the third-party payers and the ratepayers and the schools.

Every one of those groups had to look deep inside and figure out whether they would support this plan or not. The Sacklers are the defendants. That's all they are. They're not the voters. They're not the proponents. They're not the supporters. They're not the craftsmen. In fact, they didn't even see this plan for months. They sent

Howard to get copies of it because it wasn't their business. We are the plaintiffs. And they are the defendants.

Unless the plan is unlawful, the 4,500 pages of uncontested testimony and expert reports make it clear there is no better way out of this. We all wish there was more. But the consensus of everyone in the case, except for ten people basically, is that we're not getting more voluntarily and the involuntary route is vastly, vastly worse.

With that, Your Honor, I'll ask Mr. Tobak to please come up and address the two technical questions. Your Honor, I promise you I cut out 90 percent of what I was going to say. I apologize for straying a little bit from record evidence. Obviously this is a case of tremendous, tremendous import to the Debtors who, while not government officials, are in fact the fiduciaries for all parties for whom we actually care rather desperately and passionately.

THE COURT: Okay. Thank you.

MR. TOBAK: Marc Tobak -- oh, sorry. Thank you, Your Honor. Marc Tobak, Davis Polk & Wardwell for the Debtors. With respect to Mr. Underwood's point that his clients' claims are not channeled, that's entirely correct and appropriate for four reasons. One is simply that the Canadian munis' claims are fundamentally different from those of domestic non-federal-governmental entities.

As has been discussed over the course of these

hearings, the plan treats claims against the Debtors and has refocused at length today on claims against release parties and shareholder release parties that relate to the Debtors. Thus the plan treats Canadian municipal and First Nation creditors' claims against the Debtors or claims against the shareholder release parties that relate to the Debtors.

But unlike the domestic federal -- domestic non-federal public claimants, the Canadian municipalities and Canadian First Nations can look to a separate company, to Purdue Canada for recoveries and, to the extent that they have claims against any shareholder release party that relates to the conduct of Purdue Canada and not the conduct of the Debtors, can look to those parties for those non-debtor-related claims. That means that they're both fundamentally different from the claims that are treated through NOAT.

As a consequence of that, they've received different classification and treatment under the plan. They're classified in the class 11-C as a general unsecured creditor and, unlike the participants in NOAT, don't receive distributions on account of abatement. They could however, to the extent that they succeed in proving their claim and withstand the objection that the Debtors would intend to pursue, would receive those recoveries directly in the form of a recovery from the pool of money set aside from those

creditors, unlike NOAT that receive abatement funds which are obviously subject to a great deal of carefully negotiated covenants and promises about how those funds would be used.

To the extent that this argument is intended as an argument that the releases -- the fact that these claims would not be channeled matters for the Metromedia analysis, Your Honor, I would say as we sorted out and as Mr. Kaminetzky noted, Metromedia is not a matter of factors and prongs and ultimately turns on the importance of the release to the plan and the fact that these claims, as is appropriate given their different treatment, are not channeled does not matter for the Metromedia analysis of why the third-party release of those claims with respect to claims against or related to the Debtors is appropriate.

Finally, to turn to the sovereign immunity argument, I think it's very clear, as we set forth in our brief, that Section 106 of the Bankruptcy Code abrogates sovereign immunity and abrogates the sovereign immunity of a foreign -- of a foreign entity, whether it be a foreign state or one of its instrumentalities. And there's really no case that we've been pointed to or evidence that we've been shown that a foreign sovereign immunity has any application here.

That's I think all we had to say on that argument,

unless Your Honor has any further questions.

THE COURT: Okay. No, that's fine. And then you were also going to address the insurance companies' argument.

MR. TOBAK: Yes. With respect to Gulf Underwriters, ultimately I think the safest thing to point out is that we obviously do not represent the IACs or non-debtor entities that were party to that settlement agreement. And I think the safest point is to say that that point has been the subject of discussion and I think should be continuing to be the subject of discussion. On the other hand, to the extent the analysis for the release of those claims is really the same as the analysis for all those which we've discussed.

THE COURT: Okay. All right.

MR. TOBAK: I see Mr. Underwood is on.

THE COURT: Okay. Mr. Underwood, you've made your point too. I just wanted to hear a response to it. I don’t think I needed any point/counterpoint at this point.

MR. UNDERWOOD: Thank you, Your Honor.

THE COURT: All right. Mr. Preis, I see you there. I don’t know if you have anything brief to say in rebuttal.

MR. PREIS: I do, Your Honor. It will be less than 60 seconds. Can you hear me?

THE COURT: Yes.

MR. PREIS: Thank you, Your Honor. Just for the record again, Arik Preis, on behalf of the Official Committee of Unsecured Creditors. As Mr. Peter pointed out, there are a lot of misquotes, a number of factual assertions that were simply wrong including about things that -- but it doesn't really change the legal argument. So I'm not going to take Your Honor's time.

What I did want to ask, and just to get confirmation to this point, is that the stipulation that we agreed to at the beginning of the evidentiary -- of the hearing also extends to anything that was said about the evidence during the oral argument. One could read that stipulation as not extending further.

But there was some colloquy that you had with Mr. Gold or Mr. Goldman about evidence that they had or didn't have. Obviously we're staying out of it, as we did during the evidentiary portion. But I just wanted to make sure that the stipulation also extends to the oral argument.

THE COURT: Right. That's my understanding. Again, I think the stipulation ultimately is built in suspenders in any event because I can't imagine anything being effective collateral estoppel. But yes, that's my understanding.

MR. PREIS: Thank you, Your Honor. That's all.

THE COURT: Okay. All right. I'm not sure --

MR. UZZI: Your Honor?

THE COURT: Yes?

MR. UZZI: Just -- Gerard Uzzi, from Milbank on behalf of the Raymond Sackler Family. Just to deal with a factual issue on the Gulf Underwriters objection, and I appreciate Mr. Tobak saying that there are discussions going on and we're happy to continue those discussions.

But just in case we don't come back to this topic, just to explain, you know, the background here, these relate to -- the indemnification obligations relate to policies that predate or ended in 2003. So it all deals with prior conduct prior to 2003. The only parties that can make a claim under this policy would be the MDT.

We have given not just in connection with this but other things, the Sackler family and the related parties have turned over all their insurance rights to the Debtors. So this release is just to make sure something doesn't come back through the back door just like any other claim that could be made against us for the debtor's conduct, Your Honor.

And again, I'm happy to continue the conversations with the Debtors, with Mr. Luskin as well. But in case we don't come back to it, I just wanted to put some context around that, Your Honor. And I'm happy to answer any

question you have.

THE COURT: Okay. No. That's fine. Thanks.

MR. UZZI: Thank you, Your Honor.

MR. LUSKIN: Your Honor, may I -- I just wanted to --

THE COURT: Yes. But you're not coming through clearly for some reason.

MR. LUSKIN: Because I'm not using my microphone and now I am.

THE COURT: There you go.

MR. LUSKIN: I took Mr. Huebner's admonition and got myself a headphone, and I don’t know how to use it.

THE COURT: Okay. All right.

MR. LUSKIN: I apologize. I certainly welcome the opportunity to talk to Mr. Uzzi. Please do call. And also our objection -- we have no idea whether additional claims can or will be made. These are indemnity claims. The point is they have not been -- or the possibility of such claims has not been obliterated.

They still could be asserted. And there are some litigations pending where we do have defense costs that are covered under the settlement. So there are both existing claims and potential claims. But we are happy to discuss any resolution. Give me a call. Thank you, Your Honor.

THE COURT: Okay. And just for the record, that

was Mr. Luskin on behalf of Gulf Underwriters.

MR. LUSKIN: Oh, sorry. Yes.

THE COURT: And I guess I had thought that there was some preservation of insurers' rights in the MDT. But maybe I'm missing that. I'll just leave it at that. I know that that subject is heavily documented. Okay. Anything else before we break?

MR. UNDERWOOD: Your Honor, if I may, this is Allen Underwood on behalf of the Canadian municipalities and First Nations. I do want to reserve the right on Wednesday to very briefly unpack this issue, a little bit of sovereign immunity as well as why --

THE COURT: Right. No. That's -- that's fine, and that's the jurisdictional issue. But that's fine.

MR. UNDERWOOD: Thank you, Your Honor.

THE COURT: Okay. All right. Let's break until Wednesday morning then. This -- these two issues have taken up a full day. But I have little doubt that we would finish on the remaining issues in a full day. These issues were much more significant, I believe, not to really belittle the other issues, but I think they require more time so that the parties' arguments could be fully understood.

I hope the parties use that day productively, not just on the last issue that we were discussing, but also on the release issues in two ways: first, in narrowing the

release further; secondly, while I believe I fully understand Mr. Huebner's point, that it just can't be the case that one creditor or one public creditor could veto or crater this plan, there is still risk on all sides with respect to the plan and potential appeals of the plan if only insofar as it would pertain to delay and cost and of course the delay here includes not only getting money to individual personal injury creditors but also in getting money to governmental entities to abate or help to abate the opioid crisis.

I told the parties once that they should have another mediation. That mediation went to Judge Chapman. I can't imagine anyone who would be able better to get the parties to see the pros and cons of their cases and to facilitate a settlement than Judge Chapman. I'm not going to direct further mediation. I think this hearing should illustrate to the parties on both sides of the table, that is the objecting states on the one hand and the Sacklers on the other, the risks that they face.

I will note that I found Kathe Sackler's testimony cogent and her stating that she and her family members wanted to avoid spending more money on lawyers and have that money directed to abating the opioid crisis and to personal injury creditors.

I will note however that a lot of money has been

spent on lawyers in getting to this point. If there is any message in what I've just said, it is that if an agreement can be reached with the objecting -- remaining objecting states that involves not only narrowing the release but providing for additional funds or clarifying the injunctive relief in the plan, the parties should focus on that tonight and Wednesday.

That will clearly be your best opportunity to do so. And you should use it. The time has passed at this point to speechify. One really needs to focus on the type of analysis that I was discussing with Mr. Goldman. And I'm speaking not just to the states but also to the Sacklers. So please use that time productively. Thank you all. I'll see you all on Wednesday at 10:00.

(Whereupon these proceedings were concluded at 6:41 PM)

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: August 24, 2021

**&**

**&**   3:13 5:2,8
15:19 19:10 61:18
62:5 63:9 93:1
101:1 149:5
186:10 275:14
295:19

**0**

**0408**   68:19
**06604**   6:19
**07102**   6:5
**0937**   85:18
**0939**   86:5

**1**

**1**   28:9 39:20 43:16
51:13 59:2,5 60:2
75:18 79:15 89:10
95:2 103:23
105:17 115:7
119:2 121:5
126:14
**1,126**   52:15
**1,300**   118:17
**1.06**   23:19
**1.1**   68:17 262:14
**1.56**   48:24
**1.6**   68:4
**1.7**   252:5 267:5
**1.775**   46:25
**1/500th**   60:2
**10**   40:12,21 41:6
51:11,17 105:16
132:8 159:2
176:18,25 180:9
266:21 288:3
**10-11**   129:15
**10.18**   22:6
**10.4**   105:22
**10.6**   22:4 27:17,20
32:24
**10.6a**   23:8 24:15

**10.7**   27:17,20 30:1
138:15 139:15
**100**   43:16 53:19
81:23 164:15
173:10 282:5
**10014**   6:12
**10017**   3:6
**10019**   4:4,18
**10020**   3:17
**10036**   5:12
**1006**   6:11
**101**   76:9
**10110**   7:4
**10127**   284:11
**103**   49:13
**105**   65:2 75:1
76:15 126:20
142:19 143:18,21
182:5 275:3
**106**   297:18
**10601**   1:14
**10:00**   2:5 304:14
**10a**   115:11
**11**   2:2 27:5,23
33:1,4 40:14 41:7
42:5 51:9,17 54:5
59:8,10 64:1
79:18,19 81:20
85:13 89:6,9 93:3
93:21 94:7 96:6
100:12 129:1,10
132:11 134:15
159:3,3 166:12
167:6 264:21,24
287:11 289:7
290:13 293:18
296:19
**11.01**   29:9
**11.1**   34:1
**1107**   265:11
**112**   265:19
**1123**   182:1,5
183:24 184:19,25

**1126**   145:24 146:2
147:5
**1129**   59:8,10 64:1
126:14 181:14
**114,307**   115:1
**1141**   126:17,21
182:1,5
**11501**   305:23
**12**   35:12 40:16
80:13
**12.8**   34:8
**120**   17:21
**120,000**   51:8
**1201**   6:4
**1221**   3:16
**13**   40:20
**13,500**   164:5
**131**   265:19
**1334**   88:22 89:6
92:1
**136**   67:22
**137**   173:21
**137-140**   91:12
**14**   34:7 39:17
40:21,23 41:3
42:4 64:11
**140**   239:3
**142**   66:24 67:10
69:6 72:10 249:19
**143**   67:3
**1452**   76:11
**15**   51:20 68:8
102:5 112:1
133:12 281:2
**157**   88:22 90:22
92:2
**15th**   225:9
**16**   163:12
**1633**   4:3
**16th**   96:17 99:17
99:21
**17**   42:2 84:21
270:25 271:1

281:21
**170**   220:22
**17th**   159:7
**18**   42:2 108:21
**187**   80:13
**19-23649**   1:3
**192**   68:21
**1980s**   64:24
**1982**   267:24
**1988**   76:25 170:11
**1990**   183:7
**1997**   170:13
**1:50:36**   86:6
**1a**   82:1 280:16
**1b**   82:1 280:17

**2**

**2**   39:22 43:23 47:2
50:22 51:13 55:21
68:4,7 90:22
126:21 166:7
248:10 251:9
252:1 285:11
**2,188**   280:13
**2,226,418**   212:11
**2,600**   116:18
117:1
**2/4**   248:8
**20**   48:1 146:15
180:10 285:18
291:7
**20,930,000,000,...**
287:19
**200**   7:10 241:8
**200,000**   281:13
**2000**   7:17 287:24
**20005**   5:19
**2003**   300:12,13
**2004**   157:24 158:4
265:11
**2006**   276:13,21
**2007**   159:7 175:23
178:6 245:12,13

**2008** 107:5 225:23
**201** 6:11 50:22
**2010** 265:19
**2011** 111:25 224:19 225:9
**2012** 221:12 224:12 225:20
**2013** 225:11,15,21
**2016** 177:12
**2017** 178:7
**2018** 45:25 245:13 286:24
**2019** 220:7 237:20 287:2 289:19
**2020** 178:5 245:12 271:1 287:19
**2021** 1:16 119:11 305:25
**204** 50:17 170:12
**20852** 7:11
**2096** 177:14
**21** 42:9
**21st** 52:1
**22** 57:9,10,13,19 68:5
**22,495** 52:9 285:16
**225** 106:16,24 107:18,21
**23** 1:16 111:25 119:11 281:15
**239** 285:24
**23rd** 119:1
**24** 41:3 51:20 64:11 305:25
**243** 146:12
**248** 1:13
**24th** 81:21
**25** 68:8 100:9 164:14
**257** 282:4,9
**25th** 112:9
**26** 107:19
**26.325** 57:19
**2623** 248:8
**2624** 248:8
**264** 79:1
**27** 88:4
**274** 170:11
**28** 76:11
**285** 160:1
**2925** 225:23
**2931** 225:20
**2938** 224:12
**2941** 225:5
**2943** 224:15,18 225:5
**2951** 225:15
**2988** 84:20
**2995** 225:12
**2a** 281:12
**2nd** 21:21
**2o** 119:9

**3**

**3** 23:6 39:24 42:4 44:2 51:13 103:23 119:23 268:22
**3,500** 125:4
**3,700** 88:6
**3.6** 88:4
**30** 41:2 65:6 102:19 210:11
**30.6** 283:5
**300** 1:13 305:22
**3020** 34:8
**31** 4:17 220:22
**3298** 226:8
**330** 305:21
**34** 41:3 64:11 78:1 80:9
**3460** 281:9
**35** 42:3
**353** 4:10
**355** 280:16
**358** 265:10
**3601** 218:6
**3617** 2:5
**362** 72:21 74:19 75:2,5
**362's** 75:1
**364** 284:14
**37** 17:5 76:1
**375,000** 16:9
**38** 51:24 57:14 118:18 193:8,18 194:1
**39** 86:19
**3rd** 84:18

**4**

**4** 40:1 44:4 51:14 52:18 72:21 74:19 75:5 79:15 105:22 107:4,14,21 119:18 132:6 159:3 259:18 290:12
**4,000** 42:16,17 64:9
**4,500** 131:8 295:3
**4,914** 292:4
**4,924** 51:5 52:19 292:4
**4.16** 21:7
**4.25** 206:16
**4.275** 55:20
**4.275.** 293:23
**4.3** 240:8
**4.325** 41:15 44:2 49:18 56:1,13 57:15 58:4 65:17 67:12 68:1,18 94:3 162:18 163:22 195:12 258:21
**4.325.** 57:20
**4.326** 57:12
**40** 106:2 181:23 288:1
**40,000** 281:11
**400** 68:16 137:3 280:17 288:5
**41** 135:8
**416** 66:24
**419** 196:22
**429** 265:18
**439** 57:4,8
**45** 196:8
**450** 3:5 41:25
**450,000** 281:10
**456** 267:23
**47** 61:7
**48** 51:24
**49** 100:10
**498** 275:21
**499** 275:21

**5**

**5** 40:3 44:20 51:14 57:7,11 81:8 82:18 97:22 115:6 225:12 291:16
**5,000th** 269:17
**5.2** 288:7
**5.8** 95:7
**50** 52:15 107:18 152:3 164:14 238:2 271:18 285:15
**50,686,000,000** 284:18
**50/50** 37:21
**500** 7:3 174:13
**502** 277:14
**504** 91:3
**509** 277:14
**509-512** 91:13
**517** 171:8
**518** 281:19 282:2
**52** 171:8

**520** 280:19
**523** 76:18 166:6,7 166:14
**524** 52:18 71:19 72:11 76:1,7 126:13,21 127:18 127:18,25 128:1,2 128:4,7,18 198:2 198:7,15
**52nd** 4:17
**542** 274:20
**557** 173:21
**57** 50:18 287:10
**570** 6:4
**58** 50:23
**585** 196:22
**59** 70:4
**59-60** 100:10
**592** 91:3,13

**6**

**6** 40:5 45:5 51:15 96:7
**6,200** 246:3
**60** 298:25
**600,000** 47:23 291:11
**60654** 4:11
**613,999** 284:5
**614,000** 38:10 47:13 57:14
**62** 17:5 51:21
**62,433** 115:3
**658** 79:1
**66** 52:15
**669.1** 47:12
**67** 98:25
**68** 99:9
**69** 49:13
**694** 267:23
**6:41** 304:16

**7**

**7** 5:3 40:7 51:15 66:3 76:18 102:11 107:2 129:10 135:14 166:6 181:14
**7-310.1** 44:14
**700** 68:16
**702** 267:23
**71** 99:16
**74** 283:5
**75** 52:16 70:18 100:6
**750** 117:10
**76-77** 99:22

**8**

**8** 40:8 51:16
**8.4** 21:11
**8/23/2021** 2:5
**80** 52:14 70:14 288:14 290:15
**800** 7:17
**800,000** 281:10
**80901** 108:17
**80s** 172:5
**83-84** 96:17
**837** 76:25 77:6
**84** 226:8
**844** 122:6
**844-867-6163** 122:7
**85** 170:11 226:8
**850** 6:18
**867-6163** 122:7
**87** 99:22
**88** 53:18

**9**

**9** 40:10 51:16 97:23 291:16
**9.2** 34:8
**90** 288:3 295:11
**90067** 5:4
**9019** 123:1 149:22 150:7 189:13,15 189:17,19,23
**91** 76:25 77:7
**913** 280:23
**9263332** 122:10 122:11
**945** 91:12
**948** 170:12
**95** 38:23 51:6,7 52:23 53:10 70:10 73:3 131:15 146:12,14,15 147:12 279:21
**96** 51:7 70:12
**960,000** 281:16 292:14
**97** 38:24 51:5 52:19,24 115:12 115:14 118:1 290:15
**98104** 7:18
**99** 53:16
**99.999** 285:1
**9:50** 1:17
**9th** 265:11

**a**

**aaron** 8:12
**abate** 94:5,21 96:8 102:12 111:8 119:5 303:9,9
**abatement** 16:21 39:2,8 43:18 44:5 44:22 45:20 47:7 48:16 60:5 71:25 75:16,23 94:16 95:6,13 98:12 99:5,8,24 100:1 100:13 106:25 107:3 111:2 120:14,18 179:2 207:10 227:20 228:7,9,18 237:22 238:1,21 248:12 252:13 270:20 283:12,17 285:6 288:20 296:21 297:1
**abating** 95:25 104:20 113:2 303:23
**abby** 8:17
**abetting** 170:25
**ability** 18:10 44:20 68:10 77:12 77:21 103:14 201:23 236:9 280:10
**able** 16:19,20 23:1 25:15 35:12 58:2 84:2 119:21 120:3 121:3,17 133:19 139:22 154:20 206:23 208:1 209:7,19 231:12 303:13
**abraham** 210:22
**abrams** 7:23
**abrogates** 297:18 297:19
**absence** 88:10 117:15
**absent** 44:10 48:3 98:19 99:3,24
**absolutely** 47:24 53:25 67:5 68:9 73:19 116:20 130:10 156:18 159:16 174:7
**absolves** 129:2
**abstract** 158:24
**absurd** 73:19
**abuse** 190:6
**abused** 180:23 220:24

**abusive** 127:11
**academic** 180:6
**accept** 70:11,13
  97:21 115:19
  146:11 192:4
  193:2 240:21
**acceptable** 150:25
  158:12
**acceptance** 53:21
  145:25
**accepted** 64:7
  115:11 181:19,20
  193:25 194:1
  227:7
**accepting** 191:9
  191:13 200:25
**access** 43:20
  122:10,11
**accord** 32:13 84:1
**account** 67:21
  100:3 106:11
  145:14 155:1
  162:14,25 175:7
  192:1 296:21
**accountants**
  60:19 255:17
  256:12 259:10
**accounts** 143:4
**accurate** 171:14
  263:10 305:4
**accusations** 200:2
**accused** 216:11
**achieve** 120:16
  151:18 208:1,21
**achieved** 38:23
  97:8 119:15
  205:24
**achievement**
  94:10 117:12
**achieving** 229:18
**acknowledge** 93:1
  151:9 153:8 159:2
  162:2,4 165:6

169:13 176:10
198:6 261:9
**acknowledged**
  70:4 171:4
**acs** 281:11
**act** 31:1,5 77:17
  90:15 169:1,3,24
  170:19 198:9,9
  208:23 236:8
  241:17 256:20,23
**acted** 256:22
**acting** 19:23
  198:11 256:21
  284:6
**action** 27:14,21
  30:1,24 31:1
  68:15 77:15,16,16
  85:24 188:2
  189:17,25 200:9
  233:8,17 234:3,6
  267:24 293:9
**actions** 33:2 71:3
  74:11,11,25 76:12
  77:22 78:6 86:13
  142:4 176:12
  188:7 191:20
  197:11,15 200:12
  200:13,14 211:25
  234:13,17 235:2
  249:15 254:7
  265:1
**active** 93:21
  176:20
**activities** 86:15
  223:8 254:4,6,23
**activity** 37:7,9
  200:7,8
**actor** 169:2
  235:16,19
**actors** 205:15
**acts** 80:2 91:1
  141:14 166:5,5
  168:18,20,22,24

169:1 189:5,7
**actual** 15:5 30:25
  35:16 50:14 54:4
  68:15 86:12,24
  87:18 97:6 114:13
  114:20 117:10
  118:1 138:12,13
  168:1 192:22
  244:21 290:17
**ad** 3:14 4:16 41:6
  51:11 57:15 86:21
  87:3 92:23 93:15
  93:19 98:10
  100:19 102:4
  113:22 117:21
  130:14,15 176:19
  228:19
**ada** 255:9
**adam** 10:10 13:23
**adamantly** 125:14
**add** 33:3 57:25
  178:4 189:22
**added** 20:19 22:3
  28:15 64:5 198:4
**addendum** 177:13
  220:21 223:16,23
**addition** 25:5 88:7
  96:19 106:15
  107:21 138:12
  189:1 248:1
  281:14
**additional** 15:8
  44:2 48:25 82:15
  94:3 107:21
  119:24,24 151:17
  286:11 301:16
  304:5
**additions** 28:9
**address** 21:17
  28:7 29:16 31:8
  31:11,12 49:14
  51:1 66:17 74:16
  78:2 89:13,24

93:6,13,19,23
101:13 103:19
113:21,23,24
114:1 145:21
181:8 188:20
199:2 208:9
210:11 215:23
218:21 229:12
239:18 250:21
251:16 259:4
273:4 280:3 289:3
294:5 295:10
298:3
**addressed** 21:11
  37:7 50:25 94:23
  95:15 122:24
  162:21 166:23,24
  183:22 196:17
  200:23,24 210:12
  218:22 239:15
  241:14 246:24
  265:10 271:19
  273:14
**addresses** 72:11
  101:25 116:14
**addressing** 20:1
  20:10 108:5
  113:19 149:13,15
  167:13 186:22
  189:12 194:8
  199:1
**adds** 223:15
**adduced** 222:8
**adequacy** 136:23
**adequate** 85:4
  88:12 125:7,24
  139:10 152:17
  184:3 214:14
  280:8
**adequately**
  139:11
**adjoin** 65:13

**adjudicate** 143:8 143:24,25
**adjudicated** 182:10
**adjudication** 231:15 269:2
**adjust** 92:17 123:20
**adjusted** 34:8
**administration** 119:7
**admission** 38:4
**admissions** 223:1
**admit** 242:21
**admitted** 42:6 105:11 129:24 218:6 224:10 226:7,8
**admittedly** 200:6
**admitting** 226:24
**admonition** 301:11
**adopt** 164:25 229:6
**ads** 86:18,18 87:4
**adult** 51:14 58:17 115:3 294:16
**adversarial** 80:11
**advertised** 139:9
**advertisement** 139:13
**advertisements** 86:19 139:10
**advised** 43:10 159:12
**advisor** 259:10
**advisors** 28:20 96:24 120:4 255:16 281:17
**advisory** 247:7
**afanador** 6:1 270:7
**affairs** 89:16 151:15
**affect** 113:20 171:15 249:17
**affidavit** 160:11
**affiliate** 61:16
**affiliated** 2:3
**affiliates** 32:6 60:18 61:11 62:9 63:11 105:24
**affirmative** 21:5 42:1,14,19
**affirmatively** 51:4
**affirmed** 74:24
**afforded** 136:16 197:25 273:3
**afternoon** 92:19 92:22 113:13 121:1,8 122:21 123:8,9 149:20 154:7
**ag** 153:24 283:15
**age** 108:21 111:25 112:1
**agency** 73:12
**agents** 36:17 61:10
**aggregate** 47:12 263:4,8 279:1
**aggressive** 164:17
**ago** 17:6 35:12 52:1 79:23 112:8 164:6 219:2 281:19
**agree** 23:16 34:21 47:25 58:9 87:25 97:23 98:5,7 105:2 109:25 115:15 156:24 157:4 163:19 178:13 181:3,13 195:3 198:13 208:13,18 209:4,5 209:6 215:12,14 217:17,25 232:7 240:19 257:17 261:20 263:21
**agreed** 19:19,22 20:12,15 25:3 26:1 33:22 39:21 46:19 55:11 56:18 58:25 59:3 60:25 75:15 78:22 94:8 97:20,21 102:10 104:24 106:10 108:16 113:8 137:6 149:6 152:1 152:2 154:3 159:16 174:12 185:2 191:18 199:12 215:6 217:12 238:4 276:12 289:21 299:11
**agreeing** 58:13 286:10 292:20
**agreement** 17:25 20:8,11 46:8,16 93:25 94:15,18 108:6,18 109:13 119:3,12 161:6 169:23 170:2,15 177:14 235:1 265:4 275:17 276:12 290:1 298:9 304:2
**agreements** 21:14 55:2 59:2 94:4,13 209:8 217:12
**agrees** 113:1 199:16
**ags** 63:12 154:1 164:17 204:7 291:10
**aha** 260:6
**ahc** 16:7,22 40:17 42:15 51:13 55:23 58:17 68:7 73:23 92:10 130:16 294:15
**ahead** 23:12 31:7 92:10 123:6 214:9 226:2 248:25
**aid** 169:2
**aiding** 170:25
**airing** 95:21 97:9 151:1 231:15 232:8
**aisling** 12:5
**akin** 5:8 101:1
**al** 122:23 275:12
**alan** 270:6
**albeit** 206:16
**aleali** 7:24
**alert** 271:11
**alexander** 11:6
**alfano** 7:25
**allegations** 177:24 178:9 220:1,5 221:6 245:17
**allege** 66:1
**alleged** 68:16 85:5 104:18 151:2 168:14 265:1 287:22 288:8,9
**alleging** 57:4
**allen** 6:7 302:9
**alliance** 78:10,18 196:16
**allison** 14:16
**allocate** 163:3
**allocated** 37:21 120:13 179:5 228:8
**allocating** 216:20
**allocation** 19:14 38:6 39:22,24 40:1,3,7,10,21

94:22 99:15 103:3
103:21,25 105:6
119:12,15 123:3
154:3 179:2 185:2
199:12 207:8
272:14
**allocations** 95:5
104:12 154:2
209:5 248:14
**allotted** 15:5
**allow** 38:25 43:3
73:1 76:4 96:24
120:16 126:21
127:22 148:12
208:7 277:24,25
**allowance** 48:18
98:22 99:7
**allowed** 34:25
57:1 59:14 71:16
78:22,24 98:2
126:12 135:19
243:6 244:13
293:5
**allowing** 103:2
113:22
**allows** 58:18 61:8
**alluded** 105:1
110:25 195:1
**alternative** 46:12
47:9,11,17 65:24
191:22,23 205:12
**alternatives**
191:22 258:23
**ameliorate** 39:4
**amended** 2:2
18:21 19:5,17
140:17,18,20
238:6,7,8 288:14
**america** 42:24
115:14 249:2
287:19 288:7
**america's** 287:24

**american** 43:14
45:16 51:14 58:3
83:16 290:10
292:1 294:16
**americans** 45:3
**americas** 3:16
**amorphous** 139:5
147:3
**amount** 16:24
18:1 38:7 81:12
98:8 106:1 115:6
115:13 119:6
132:7 152:13
156:4,9,11 158:23
158:25 162:24
165:9 194:10,12
195:11 201:25
203:8 218:8,8
240:7,10 260:8,18
288:2,4,9
**amounts** 30:14
97:22 109:19
150:25 151:10
178:23 194:11,17
195:10
**ample** 207:24
**amy** 241:19 242:8
**analogous** 70:16
**analogously** 52:17
**analogy** 166:13
213:1 214:25
216:4,25 217:5,8
**analysis** 47:17,20
53:13,24 132:18
132:21 135:1,10
137:19 143:17
155:12 159:21
174:17 177:5
181:16 184:19
195:2,7 265:13
266:17 274:11
275:8 281:7
290:23 297:7,13

298:12,13 304:11
**analytically** 89:25
**analyze** 258:23
**analyzed** 280:23
**ancient** 189:2
**andrew** 4:20 7:25
12:4 23:10 35:23
**angela** 10:12
**angeles** 5:4
**angry** 112:16
**anker** 8:1
**ann** 11:4
**anna** 269:14,16
**annotated** 283:5
**announce** 15:25
**announced** 82:2
**announcement**
15:16
**answer** 31:13 54:2
146:21 147:14
152:20 203:22
210:9 212:10
219:19 223:19
224:5 228:11,15
243:3,3 247:21
259:20 271:7
285:21 300:25
**answered** 152:15
259:13
**answering** 204:25
**answers** 263:10
263:11 280:4
**answer's** 130:4
**ante** 231:10
**anybody** 49:21
88:17 135:24
272:17 285:20
**anybody's** 35:6
**anymore** 182:13
203:18
**anyway** 174:25
185:16 186:6
229:15

**apart** 29:19 162:5
164:12,22
**apologize** 17:4
92:12 134:25
196:7,12 272:13
282:21 283:14
284:15 295:12
301:14
**app** 122:17
**apparent** 83:20
159:5 208:23
**apparently**
269:18 282:22
**appeal** 65:5 74:24
103:13,15 144:5
187:14 188:11
269:19
**appealed** 77:10
**appealing** 103:10
**appeals** 42:24
72:16 303:5
**appear** 139:17
174:16 231:4
**appeared** 16:2
**appears** 86:5
142:4 145:18
**appellate** 183:17
**appendix** 275:20
**apple** 61:18 62:5
63:9
**apples** 202:8
227:10
**applicable** 36:22
77:9 109:2 126:15
185:7
**application** 66:14
194:15 297:24
**applied** 29:24
41:13 181:14
195:25
**applies** 76:9
108:19 153:13
184:25 277:22

**apply** 29:20 37:6
41:11 74:22 75:3
76:3 116:2 167:11
247:1
**applying** 166:13
184:24 193:11,13
193:17 217:7
**appointed** 33:16
**appointing** 33:18
**appreciate** 32:22
177:1 248:19
254:14 255:5
272:22 273:4
293:24 300:7
**approach** 63:1,13
219:22
**approached**
270:12,13,14
**appropriate** 15:7
16:16 17:17 25:7
26:8,12 43:20
66:22 67:9 69:3
69:21,23 70:6
72:9 138:1,4,25
141:15 190:15
295:22 297:12,15
**appropriated**
228:18,19
**approval** 78:3
106:23 127:4
184:16
**approve** 89:3
138:2 148:12
175:12
**approved** 48:22
64:14 120:21
150:5 161:6
196:23 219:10
255:2,14 281:24
**approves** 169:6
**approving** 16:8
84:18 88:20 90:7

**approximately**
52:9 115:12
118:17 176:18
181:22
**architecture**
26:23
**ardavan** 9:7
**arduously** 93:19
**area** 128:6 147:1
214:10,18 247:10
250:20
**areas** 197:12
**aren't** 165:14
**arguably** 52:17
95:19 137:20
162:20 282:17
**argue** 25:15,23
71:4,8 84:3
170:23 182:4
184:4 190:20
192:18 195:20
198:18 210:19
212:17
**argued** 169:10
179:22 180:3
196:25
**arguendo** 56:25
**argues** 167:4
**arguing** 66:18
137:17 184:7
195:23 217:19
285:10
**argument** 15:2,10
15:15,23 16:15
19:3,14 20:1
35:15 36:1 37:3
45:12 47:8 71:6,7
72:11,12,17 76:25
83:20,22 94:24
95:9,20 118:12
122:23,25 124:3
130:12,23 133:2
143:6,10 149:9

150:8 154:9
158:20 159:23
166:9 167:1 168:4
174:11 180:9,19
188:10,11,16
189:25 190:13,21
192:1,7,8 195:18
196:9 201:21
203:4,15 212:8
214:17,18,23
217:2 218:10
219:16 229:13
251:7 269:24
273:8,19 274:12
288:12 294:5
297:5,6,17,25
298:4 299:7,13,19
**arguments** 25:8
38:21 66:19 70:19
70:22 71:11,12
72:11,15 88:24
90:16 149:6,12
162:21,22,24
229:7 277:19
278:7 279:13
293:22 302:22
**arik** 5:14 92:8
101:1 290:16
299:3
**arises** 89:8,8
**arising** 21:14 27:4
27:22 28:18 78:12
89:5,6,22 90:5,5
254:1
**arithmetic** 135:10
**arm** 107:24
**arm's** 54:22
**arose** 264:24
**arranged** 144:18
249:21
**arrangement** 94:9
**arrivals** 286:21

**arrive** 53:7
**arrived** 286:23
**artem** 13:17
**article** 143:22
268:22
**articulate** 18:17
83:8
**articulated**
251:20
**artificially** 210:7
**asbestos** 65:2,3,9
70:16 71:16,19
76:2,8 128:6
**ascertained**
140:25
**aside** 78:16 90:18
98:4 102:8 105:25
117:10,16,17
152:7 171:19
223:25 296:25
**asked** 42:10
135:21 139:18
178:17 191:17
200:18 227:3
244:17,23 248:6
259:7 260:11
261:24 262:22
263:22 283:25
**asking** 23:13
72:24 192:2 210:7
211:14 216:8
240:21
**aspect** 41:14
110:22 120:5
203:2
**aspects** 20:8 93:3
110:23 149:14
**assert** 58:2 69:12
77:24 83:23 124:4
153:10,23
**asserted** 27:2
47:14 98:22
153:24 159:11

196:5 197:5 285:18 301:20
**asserting** 48:5 69:14 98:1 172:8 179:16 284:24,25
**assertion** 81:9
**assertions** 299:5
**asserts** 31:3 284:18
**assessing** 175:6
**assessment** 207:25 210:1 222:9
**asset** 38:19 69:12 133:17 177:7 216:5 260:20
**assets** 43:17 45:24 98:17,19 99:8 128:10 129:11,14 129:19,24 134:21 135:2,5,12,15 139:20 143:4 145:13 157:3,10 157:19 160:25 161:2 217:6 259:23,24 260:21 260:25,25 261:19 261:19,19 262:12 280:11,14,23 282:15 286:16 289:7 290:9
**assigned** 62:10 229:9 230:18
**assigns** 61:12
**assist** 230:17
**assistance** 55:4 119:22 182:6
**associated** 119:19
**associates** 170:12
**associations** 241:22
**assume** 57:7 151:25 152:1
155:14,19 163:14 164:4 206:22 219:21 222:12 292:13
**assumed** 20:17 21:14
**assuming** 132:25 152:9 235:12
**assumption** 20:14
**assurance** 208:20 283:12
**assuredly** 38:4
**astonishing** 115:17 190:13
**at&t** 122:5
**atinson** 8:2
**atkinson** 55:13 66:12 104:25
**atkinson's** 281:2
**attached** 221:10 281:1
**attaching** 224:20
**attachments** 293:22
**attack** 65:5 70:21 71:13 83:21
**attacked** 83:19
**attempt** 20:3 21:2 28:7 75:20 85:6 93:23 124:24 150:1 151:19 262:6 265:21
**attempted** 27:13 271:11 280:9
**attempts** 75:20
**attendant** 49:10
**attention** 95:19 172:15 226:9
**attorney** 3:4 7:8,9 7:15 44:11 45:8 82:24 99:25 105:10 199:18 202:4 204:5,6
211:22 212:10,12 213:19 214:4,13 228:20 230:17 231:6 283:6
**attorney's** 34:14
**attorneys** 3:14 4:2 4:9,16 5:2,9,17 6:2,10,17 7:2,16 17:19 40:11 52:4 52:22 60:19 61:4 79:11 95:6 99:23 100:4 153:11 186:13 202:5 205:14 210:25 211:21,25 212:4,9 220:2,3 223:22 227:14 255:17 256:11 259:10
**attractive** 161:2
**attributable** 162:19,20
**audacity** 212:8
**audio** 112:18 121:22
**august** 1:16 21:20 80:13 96:17 99:17 99:21 305:25
**auslander** 8:3
**authorities** 74:13 74:17
**authority** 74:3 88:22,23 90:19 91:2,5,10 127:1 142:16,24 143:23 149:25 153:10 168:21,22 214:11 269:14
**authorization** 127:3,21
**authorize** 76:7 143:19
**authorized** 15:12 71:2 126:22
131:19,19 183:20 229:22 230:7
**authorizes** 127:15
**authorizing** 71:18
**automatic** 72:21 74:19,21 75:5 197:4,14
**automatically** 74:22 252:1 268:7
**availability** 64:23 98:16
**available** 16:20 38:10 72:6 89:16 99:4,8,20 115:23 124:16 129:13 132:25 139:20
**avenue** 3:5,16 7:3 7:17
**average** 52:23 53:12,15 54:1 138:20 139:19 140:11
**avert** 239:2
**avoid** 18:23 64:3 114:12 121:10 125:2 161:24 205:17 303:22
**avoidable** 133:1 161:14,20
**avoided** 18:12
**avoiding** 43:24 46:12
**avoids** 262:7
**await** 214:12
**aware** 126:7 142:8,10 147:6 149:25 163:4 194:22,23,25 198:12 229:23 242:23 243:25 259:17,20
**awareness** 242:25 243:9

**b**

**b** 1:21 23:6 29:3 30:1 68:17 74:19 75:5 89:6 90:22 115:2,11 116:19 138:15 139:15 163:13 225:12 275:20 280:23
**b.r.** 170:11,12 265:18
**back** 15:4 64:24 76:25 79:7 81:24 85:5 105:7 106:8 110:13,17 122:22 155:6 160:1,7 162:8 165:12 177:22 187:6 207:16 217:16 241:5 252:2 260:17 274:20 276:12 284:19 290:19 300:9,19 300:19,24
**background** 121:10,18 300:10
**backtrack** 200:1
**backwards** 190:16
**bad** 27:9 30:25 188:1 189:5,7 240:12 282:24
**bailed** 155:24
**balance** 43:6 99:12 102:17 148:3 182:15 226:23
**balancing** 78:19 117:25
**ball** 8:4
**baltimore** 7:11
**bankers** 255:17 256:12 259:11
**bankr** 170:11
**bankruptcies** 129:6 154:20 185:17
**bankruptcy** 1:1 1:11,23 29:12 34:5 38:14 54:20 59:9 64:25 65:12 70:25 73:8 75:10 75:11 77:4,21 79:1,4 82:21 84:3 86:22 88:13 89:17 89:18,20,21 90:24 91:9 93:12 96:6 96:25 97:4 98:24 114:2 115:18 116:1,1 124:17,23 124:25 126:5,12 126:16,24 127:15 129:4 131:1,3,10 131:20,25 132:11 134:19 136:7,9,18 136:21 141:21 142:18,20,21,21 143:6,19,23,24 144:18,22 148:1,8 148:9,11,19 154:11,15,24 155:5,8,9,25 157:10,15,18,21 157:23 158:9 165:16,22 167:5 167:12 174:5 179:15 183:11 196:22 197:3 206:25 227:21 238:21 246:7 249:20 250:4 264:23 265:14 268:10,23 269:1,4 269:13,13 293:8 294:14 297:18
**bar** 76:22 88:7,13 136:21,25 283:6
**baranpuria** 8:5
**bare** 125:16
**barely** 181:19
**bargain** 277:10
**bargained** 59:21 263:6
**bargaining** 54:23
**barker** 8:6
**barred** 289:5 290:11
**barring** 46:4
**bars** 126:19
**based** 23:20 27:4 27:21 30:1 57:5 128:20 135:25 137:21,22 139:19 146:19 150:3 154:17 168:10 178:3 188:18 203:3 208:7 210:1 211:25 220:1 243:4 244:24 253:25 256:19 278:16
**bases** 100:19
**basic** 26:23 216:8
**basically** 45:9 53:1,1 70:23 139:15 184:11 190:21 282:6 295:7
**basis** 54:4 76:22 83:5,13 85:7 90:6 111:23 120:6 138:3 147:11 169:19 171:2 191:12 268:11
**bauxites** 267:23
**bear** 158:11 162:12
**bedrock** 91:20 267:20
**beef** 23:20
**began** 148:21
**beginning** 38:13 74:16 106:20 281:19 289:13 299:11
**begotten** 104:13
**begrudge** 288:16
**behalf** 2:4 15:19 19:11 23:10 24:2 31:10 92:23 101:2 105:24 153:11 160:19 229:8 236:3 270:7 278:15 299:3 300:5 302:1,9
**beholding** 144:4
**beiderman** 10:11
**beings** 287:10 290:17
**belated** 85:6
**belie** 280:13
**belied** 81:10 282:11
**belief** 154:17 224:14
**believe** 16:18 17:11,17 18:19,22 26:7,12 44:11 49:23 50:25 54:16 59:12 63:21 92:7 104:11 110:19 111:9 118:9 127:21,23 130:21 131:4,17,18,24 132:7 133:9,20 137:12,25 138:20 138:22 139:8 140:21 142:16 143:11 149:2 150:22 153:3,22

153:25 154:2,15
154:22 156:13,14
156:22 161:7
162:25 167:1
172:7,7 177:4,10
177:17 192:25
195:14 196:17
203:13 206:8
207:4 210:12,13
210:14 217:17
219:8 225:2
226:18 227:25
228:4 232:24
236:19 237:9
239:19 241:17
246:8 251:19,21
253:2 254:21
259:9 262:11
266:15 277:11
278:15 279:22
281:25 282:5
284:19,20 285:25
287:10 291:11
292:19 302:20
303:1
**believed** 152:17
**believes** 29:10
  120:21 284:7
  285:20
**belittle** 302:20
**bench** 19:6
**beneficial** 157:20
**beneficiaries** 45:4
  188:21 189:5
  259:17 273:16
**beneficiary** 286:5
**benefit** 15:10 39:8
  45:17 46:24 72:1
  82:3 83:16 117:7
  159:4 160:22
  215:7,25 216:11
  222:10 277:2,10
  290:10

**benefits** 43:7,8,13
  43:15 45:5 46:11
  97:7 124:23
  187:15 218:14
**benefitted** 160:8
**benjamin** 3:9
  64:20
**bernard** 9:7
**bernie** 170:25
**bernstein** 265:18
**bespoke** 124:25
**best** 38:9 39:13
  64:8,13 115:23
  118:13 129:8
  132:8 152:19
  158:16 164:4
  199:13 209:14
  212:18 215:15
  266:14 283:10
  284:7 290:24
  293:10 304:8
**better** 88:17 111:3
  211:15 212:24
  213:21,23 215:8,9
  215:9 224:5
  228:12 258:19
  295:5 303:13
**bewildered** 286:8
**beyond** 89:19
  125:23 126:4
  137:3 143:5
  198:23 203:7
  224:14 244:13
  255:8
**bid** 164:14
**big** 36:17 164:15
  256:25
**biggest** 54:7
**bilateral** 20:12
**bill** 213:4,6
**billion** 41:15 44:2
  46:25 47:2 48:24
  49:19 55:20 56:1

56:13,18 57:4,8,9
57:10,12,14,16,19
58:5 65:17 67:12
68:1,4,4,17,18
75:21 88:5 94:3
96:8 102:11
105:16,17,22,22
107:2,4,21 119:18
129:15 132:6,8,11
159:3,3 162:18
163:22 191:5
195:12 206:16
213:4 237:14
240:8 251:9 252:1
252:5 258:21
259:19 262:14
285:11,18 288:18
288:19,19 290:12
**billions** 39:7 44:4
  47:4,4,6 48:12,12
  48:12 56:19 58:6
  58:11 59:15 60:4
  64:4 80:25 98:2
  171:22 190:22
  284:24 292:17
**binary** 151:15
**binders** 241:8
**binding** 41:16
  56:14 97:17
**biological** 112:5
**bit** 28:4 62:24
  92:18 154:18
  157:6 177:23
  264:3,5 272:10
  290:24 292:3
  295:12 302:11
**bites** 77:9
**bitter** 50:1
**blabey** 8:7
**black** 19:6 66:10
**blame** 179:9
**blank** 195:22

**blanket** 127:10
  144:10,14 223:9
  223:12,12
**bldg** 170:12
**blixseth** 182:22
**blmis** 170:25
**block** 4:8 79:11
  285:15
**blocking** 288:25
**bloviating** 215:24
**blow** 86:6 87:4
**blue** 287:4
**blurred** 224:22
**board** 43:22 50:21
  82:6 159:11 163:9
  164:24 165:3
  175:19,20 199:10
  207:16 220:18
  224:16,20,21
  225:13,16,21,25
  226:10,25 236:1
  242:5,6,12,13,16
  242:19 247:7
  281:16 285:16
  287:3,12 288:25
  289:9 290:11
**bodies** 106:3
**boer** 159:12
  160:24
**bograd** 8:8
**boil** 70:21
**boils** 201:21
**boneheaded**
  258:20
**book** 224:11
  276:1
**boss** 233:23
**bottom** 63:16 83:3
  238:24
**bought** 86:19
**bound** 44:12
  58:14 109:4
  188:14

**bounds** 206:9
**box** 17:2
**br** 79:1 91:3,13
**brauner** 8:9
**breach** 226:11
**breaching** 293:20
**bread** 199:13
**breadth** 23:21
  28:7,19 56:5
  109:25 111:10
  154:13 175:3
  198:4 275:2
**break** 53:14
  116:13 137:9
  265:23 302:7,16
**breaking** 17:22
**breathtaking**
  124:9 284:12
**brian** 7:13 11:17
  229:5
**bridge** 122:6
**bridgeport** 6:19
**brief** 19:7 49:12
  49:14 67:22 69:9
  71:13 129:6
  136:20 146:12
  166:8 169:18
  177:3 188:9
  196:12 228:6
  251:10,17,17
  253:9,14 265:17
  269:18 275:25
  278:18 285:24
  291:2,3,15,20
  297:18 298:22
**brief's** 25:4
**briefed** 25:18
  180:7 196:9
**briefing** 15:12
**briefly** 20:6 26:23
  30:18 81:22 101:6
  188:20 199:2
  253:11,13 264:19

302:11
**briefs** 43:10 199:4
  210:18
**bring** 158:13
  216:25 230:20
  236:8 257:2
**bringing** 80:10
**brings** 51:22
  90:16
**broad** 6:4 56:10
  56:10,14 63:16
  239:12 247:10,12
  255:1,6,10,13,20
**broader** 72:6
  158:3 185:18
  236:15,18 247:6
  253:22 256:6
**broadest** 129:5
**broadly** 16:9
  86:16 237:6
**broadway** 4:3
**brooks** 8:6
**brought** 73:14
  78:6 153:1 158:11
  166:4 199:1
  200:13,14 202:13
  212:20 226:11
  230:24 234:13
**brown** 8:10 93:1
**brunswick** 8:11
**brutally** 48:10
  55:2
**bryant** 5:11
**bryce** 9:17
**buck** 212:3
**bucket** 71:12
**buckets** 70:23
**budget** 248:14
**build** 211:15
**building** 36:24
**built** 59:23 137:13
  299:21

**bulk** 19:20
**bunch** 179:24,25
  205:2 278:14
**burden** 189:19
**business** 46:2
  48:20 66:4 68:3
  80:5 94:1 108:15
  108:17 110:7
  111:13,15,17
  117:23 168:19
  225:11 241:22
  243:13 275:4
  295:1
**businesses** 230:2
**buyer** 111:14
**bylaws** 169:22

**c**

**c** 3:1 8:20 9:3 11:2
  11:18 15:1 296:19
  305:1,1
**ca** 5:4
**cahn** 8:12
**calculation** 215:8
**calculus** 163:16
  169:12
**california** 61:6
  62:3 291:20
**call** 19:20 21:1
  167:22 199:25
  202:7 219:15
  242:3 244:13
  256:15 271:3
  301:15,24
**callable** 176:1
**called** 19:8 71:3
  72:20 73:13 78:9
  80:22 89:24 93:12
  108:14 110:15
  230:6 241:19
  281:19 291:2
**calling** 224:8
  256:14

**calls** 17:20,21
  244:22
**camera** 281:5
**cameras** 92:17
**campaign** 85:20
**canada** 25:6,23
  86:19 88:6 296:10
  296:12
**canadian** 6:2 25:6
  25:8,15 26:8,11
  208:6 269:24
  270:2,8,8,11
  271:8,24,25 272:2
  272:3,15 273:15
  273:25 295:23
  296:4,8,9 302:9
**canadians** 271:1
**cancel** 181:8
**cancelled** 182:9
**cancels** 89:15
**candid** 156:2
**candidly** 218:25
**can't** 116:13
  137:4 144:9
  153:19 155:24
**capable** 205:18
**capacities** 22:18
**capacity** 15:24
  18:9 30:14 110:7
  199:2
**caplin** 5:16
**care** 215:21 263:5
  295:16
**career** 61:17
**careful** 243:5,5
**carefully** 120:15
  148:2 162:17,17
  162:18 191:14
  203:24 216:24
  220:21 297:2
**careone** 181:1
**caroline** 9:19

**carrie** 11:21
**carried** 51:10 52:14,19
**carry** 274:15
**carrying** 230:18
**carve** 36:18,25 58:20 72:24 195:24 197:23 198:24 233:13 256:24
**carved** 196:24 198:20 199:20 203:17 244:11
**carveout** 25:19 74:20 75:19 78:14 81:4
**carveouts** 29:11
**carving** 256:18
**case** 1:3 3:13 16:13 18:11,16 24:11 27:12 29:19 30:3 33:1 41:22 42:1 43:14 44:6,8 44:23 45:9 51:21 54:9,12 56:6 61:25,25,25 63:2 65:11 66:4 67:1,3 71:16,16 73:20,24 76:24 77:8 78:9 78:13,16,17 79:2 79:8 80:23 83:7 84:7,8,12,17 88:25 89:9,10 90:2 91:3,15 93:2 93:3,11,15,21 95:2 96:6 97:10 97:15,19 100:12 101:19 102:21,21 102:24 104:1 106:17,21 114:6,7 114:8,17 115:1,7 115:9 116:1,5 117:14 118:15 124:6 126:6 127:18 132:6 134:9 135:14 137:14,19 141:21 143:13 144:4,23 145:2,4,4 147:6 148:19 154:3 157:1,8 163:23 165:15,22 166:7 166:12,14 167:3 167:16 169:17 171:10,23 172:8 174:2,5,24 175:2 175:3 176:13 180:20 181:21 182:22 183:6 184:8,9,19 187:21 190:4,5,5,23 192:15,16 194:11 194:13,18 195:5,8 195:13 196:2,16 198:18 199:24,24 200:24 205:20 206:6,7,12 207:13 208:16 209:24 210:20 211:20 212:20,22 214:11 215:18 226:10 237:25 241:18,19 244:11 245:23 246:11 247:6 249:24 250:17,18 250:21 251:20 255:19 257:1,25 265:18,23 266:10 266:12,19 267:17 268:9 269:13 270:15 272:11 275:2 277:5 278:21 280:9 281:19 282:5,7 285:6 289:13,17 290:21 291:17 292:18 294:11 295:6,13 297:22 300:9,23 303:3
**caselaw** 165:20 196:21 198:8 200:23
**cases** 15:24 27:5 27:13,23 33:1,4 38:5 50:11 51:24 54:7,16 56:11 58:8 62:1 63:13 65:8,9,12 67:9 69:3,23 70:8 71:19 76:2 77:10 77:13,20,24 78:2 79:18,19 82:14 85:17 89:6 101:22 102:9 107:7 110:22 114:8 115:18 116:1 124:5 129:4 130:24,25 145:17 153:21 165:24 166:3 167:18 170:10 175:1 183:8 184:13 191:6 194:14,19 194:21 195:4,6,8 205:3,4,7,8,10 206:2 207:6,24 208:9 274:21,23 303:14
**cash** 41:16 45:19 47:2 48:20 65:17 82:2,3 105:16,17 105:22 106:2,2 159:1,2 280:19
**cast** 146:2
**catchall** 32:5
**categorical** 62:25 63:13 73:8 78:13
**categorically** 71:20 72:5 76:23
**categories** 19:18 61:14 62:2
**category** 27:9 60:20 239:13
**catherine** 4:13 10:11 24:1
**cats** 209:1
**caught** 218:24
**cause** 27:14,21 30:1 99:15 233:17 277:20
**caused** 156:14 190:25 240:9
**causes** 85:24 86:13 142:6 189:17,24 234:3,6 249:15 265:1
**causing** 29:17 75:22 116:25
**cease** 230:6 234:24 235:10,20 236:7,9
**ceased** 235:2
**ceasing** 178:10 234:25 235:6
**celotex** 175:2
**cent** 194:12 258:1
**centerpiece** 65:16 93:25 96:13
**central** 190:14
**centric** 75:23
**cents** 57:22
**ceo** 224:17
**certain** 27:24 40:17 78:12 86:9 86:11,25 101:6 103:4,8 104:6 108:15,21 134:7 140:19 149:14 155:20 165:9 203:25 208:6 263:7 269:7 270:8

**certainly** 53:15 69:10 70:7 79:10 85:5 116:15 129:7 137:15 144:1 151:24 154:21 156:23 161:19 164:17 166:23 173:9,25 175:1 176:8 177:23 180:3 191:8 192:15 195:5 198:1 206:7 216:2 219:8 223:7 229:20 230:10 231:17 234:12 238:24 239:18 242:7 244:7 245:21 271:8 272:17 301:14
**certainty** 135:24
**certified** 305:3
**cetera** 37:25 64:10,10 164:4 291:8
**cfo** 138:16
**challenge** 136:23
**challenged** 42:13 47:16 173:16 179:13
**challenging** 147:5 147:10
**chalos** 8:13
**chambers** 17:3
**change** 18:22 32:10 33:25 36:2 89:10 103:1,3 230:21 242:7 245:3 299:7
**changed** 231:8
**changes** 16:12 20:6 26:22 32:22 33:14 34:16,17 140:21 184:17 247:11
**changing** 28:3 184:15 232:20 247:13
**channel** 65:2 70:17 274:23
**channeled** 69:24 70:2 84:25 182:14 253:18 295:21 297:7,13
**channeling** 70:16 184:14,24 273:16 279:7,16
**chaos** 116:10 205:19 206:4,22
**chaotic** 205:17
**chapman** 55:7 119:23 152:4 210:5 303:12,15
**chapter** 2:2 27:5 27:23 33:1,4 41:7 51:9 54:5 79:18 79:19 81:20 85:13 93:3,21 94:7 96:6 100:12 128:25 129:10,10 134:15 135:14 166:12 167:6 289:7 290:13
**characterization** 267:14
**charged** 153:3
**charges** 126:23
**charitable** 46:6 201:3
**charities** 201:4
**chart** 54:6,11 189:12 205:1,7
**chase** 117:19
**chasing** 113:2
**check** 255:25
**checked** 44:11 51:25
**checking** 145:13
**cheryl** 112:22,25
**cheryl's** 112:17
**chicago** 4:11
**child** 112:3
**children** 50:19 112:13 139:24 140:9
**chip** 287:4
**choice** 99:6 151:15 201:15,17 201:18 212:14 269:23
**choose** 116:10
**chooses** 110:12
**chose** 107:8
**chosen** 151:18
**christina** 12:19
**christine** 114:23
**christopher** 3:19 12:22
**cicero** 8:14
**cinches** 226:10
**cir** 265:11
**circle** 5:18
**circuit** 41:22 42:24 64:24 65:6 65:12 66:14,21 70:22 72:7,10 78:9 84:5 91:7,21 123:13 124:1 127:3 137:18 143:20 144:17 150:12,14 154:10 166:14 167:13 168:8 169:18 171:2,12 172:4,25 174:7,14 180:24 180:25 181:12 182:18,21,22 183:3,6,9 184:9 184:10 241:19,20 249:18 250:14,18 253:18 258:14,18 259:2 263:20 265:10,11,16 266:8,9 277:11,12
**circuit's** 184:18 274:19
**circuits** 72:9
**circuit's** 169:9
**circumstance** 172:20 219:18
**circumstances** 47:24 66:13,19 70:5 72:9 137:22 161:7 183:13 188:25 190:10,12 197:6 244:4
**circumvent** 167:10
**circumvented** 166:18
**citations** 77:8 282:13 288:23
**cite** 41:19 74:3 76:11 77:23 84:7 169:20 197:2 220:25 282:13 286:18
**cited** 77:8,10 166:2 168:5 169:17 184:8 237:18 264:25 292:10
**cites** 41:18 279:18 279:22 280:12 282:22 291:17,23
**cities** 52:9 285:16
**citing** 130:5,6 283:13
**citizenry** 153:11
**citizens** 50:22 105:11,13 106:6 116:11 117:3,4 238:20 239:2

287:13
**city** 52:5,10 65:20 73:21 152:6 153:22
**civil** 38:11,12 40:8 62:19,19,20 89:5 97:7 230:14 255:8
**claim** 16:10 18:1 22:14 27:1,7 28:6 28:8,17,17 29:1,1 29:10,12,13,15 48:18 57:3,23 58:9 69:15 71:15 72:4 76:14 82:18 83:24 85:1,1 86:22,23 87:5,6 88:19 95:22 102:16 107:19 111:23 115:7 125:9 141:1,17 143:25 144:1 150:14 159:15 169:16,19 170:5,7 172:10 175:22 177:6 182:16 184:14 185:19 226:15 227:1 235:22 252:1,8 257:2 265:13,13 265:15 267:5,5 274:1,2 275:24 280:13 284:17,20 284:21 285:11,18 286:3,5 288:3 296:22 300:14,19
**claimant** 29:10 65:20 104:16,16 105:7,8 141:17 153:9 170:21,22
**claimants** 51:16 53:1 83:1 98:18 98:18 115:3,3 117:14 125:6 152:23,24 296:8
**claimholders** 21:10
**claiming** 84:16
**claims** 20:13,15 20:16,24,25 21:8 21:13,14 22:5,11 22:12 27:24 28:1 28:10,12,21,25 29:18 31:4 38:11 38:12,16 40:5,8 40:12,14,17 43:23 47:5 48:3,4,6 49:23,24 57:11 58:10 62:20 65:2 65:4 67:21 69:4,7 69:13,14,16,18,23 70:1 71:18 72:20 72:25 73:14 74:7 74:7,14 75:21 76:2,5,8,15,19 78:12 79:4 80:8 81:4 83:4 84:2,2,5 84:10 85:17,24 86:13,14 87:18 88:12,14 89:14,15 89:19,25 90:9,9 90:11,13 98:1,2 98:23 99:7,14 100:3 104:19 116:13 124:10,11 125:3,4,5,5 126:11 128:20 129:3 134:19 136:9,12,16,18,24 136:25 137:2,7 139:1,2,2 141:6 141:23,24 142:3,6 142:9,17 143:8,24 147:24 148:18 149:23 150:2 153:11,24 156:25 157:11 159:10,14 159:15,18 162:10 162:19,20 163:1,3 163:8,15,20 164:1 164:4 165:14,21 165:22,24,25 166:3,4,4 167:15 168:9 170:23 171:22,25 172:4,5 172:8 176:2,14 181:8,11 182:9,12 182:13,23 184:6 184:12 185:17 189:20 190:23 192:16 193:2 194:11,17,22 195:2,5,14 196:5 196:23 197:5,8,10 197:11,24 198:25 208:6 209:12 226:17,18,22 230:24 231:22 235:8 236:3 243:19 244:11 245:25 246:10 249:17 250:9,10 250:21,24 253:18 253:21 254:15 255:7 256:20,23 257:6,24 265:13 265:22 268:11 269:3,15 270:20 271:16,17,18,22 271:25 272:2,4 273:24,24 275:23 275:23 284:24,25 285:23,23,25 286:1 288:6 291:12 294:18 295:21,23 296:1,2 296:5,5,11,14,15 297:6,11,14,15 298:13 301:16,17 301:18,23,23
**clarification** 31:11,21
**clarify** 23:24 32:1 140:22
**clarifying** 30:17 304:5
**clark** 4:10
**class** 51:10 52:14 52:14,18,18 53:17 64:6 77:16,16 103:2,3 115:19,21 120:15 146:10 273:22 296:19
**classes** 70:17 115:2,11 116:19
**classification** 296:18
**classified** 296:19
**claudia** 13:20
**clause** 23:6 83:19 136:8,9 142:20 170:9 249:7
**clean** 189:4
**cleaner** 285:8
**cleaning** 287:8
**cleanup** 29:16 32:4,8
**clear** 17:24 23:14 24:3,15 29:18,21 30:5,13 34:4 36:12 47:8 51:2 52:22 56:21 72:23 73:5 75:4 79:21 85:10,15,23 87:16 87:19,19 88:1,2 91:13 98:5 99:18 104:11 108:18 116:20 120:9 128:2,4 141:18 149:22 167:20,20 172:5 175:23 178:21 187:20 188:2 189:9,10

201:8 216:18 232:21 234:23 241:25 242:16 254:25 259:24 260:23 264:12 268:17 270:10 273:23 276:24 279:11 292:13 295:4 297:17
**clearer** 27:18 33:10 87:5
**clearly** 15:20 19:11 37:17 42:8 76:3,7 83:22 86:7 90:22 121:4 128:5 163:23 184:23 198:13 222:4 234:19 257:16 258:7 279:1 285:24 301:7 304:8
**clerk** 53:13 114:23 121:1,6
**clever** 62:15
**clichés** 261:15
**client** 16:5 45:8 204:5,6 251:9
**client's** 208:19
**clients** 31:19 164:24 199:20,22 200:11 273:23 276:10 279:8 295:21
**clint** 9:2
**close** 37:3 74:13 92:19 104:9 167:24 207:12 237:14 271:3 281:12 289:20
**closed** 15:3
**closer** 113:14 187:7
**closest** 254:21
**closure** 114:14 115:17 117:24
**cloth** 79:9
**cnn** 139:9
**coal** 165:25
**code** 44:15 59:9 70:25 71:17 73:8 73:10 76:1 116:8 122:10,11 126:6,9 126:12,13,16,24 127:4,15,15,21 131:20,25 136:7 143:19 148:1,11 154:11 197:3 249:22 269:5 294:14 297:18
**cogent** 303:21
**cohen** 7:1 186:10
**coleman** 8:15
**collaborative** 71:24
**collapse** 57:24 75:24 216:21
**collapses** 60:3
**collateral** 65:5 299:23
**colleague** 185:23 196:7
**collect** 50:14 75:9 79:4 83:4 165:25
**collectability** 179:3
**collected** 191:12
**collecting** 49:11 49:18 161:4
**collection** 75:7 161:22
**collective** 44:9 47:25 57:25 129:14 140:4 293:9
**collectively** 38:22 48:13 52:6 61:12
**colleges** 201:3
**colloquy** 286:9 299:15
**collura** 280:15
**colorable** 29:13
**columbia** 52:5,13 57:3 104:22 149:8 150:24 186:11
**combating** 113:2
**combination** 60:10
**combine** 54:21 91:23
**combined** 68:14
**combines** 115:2
**combing** 176:20
**come** 29:12 36:8 38:25 44:1 55:22 55:23,23,23 56:14 74:13 132:10,11 150:17 155:6 161:19 165:12 176:3 177:13 205:23 206:22 207:14 252:18 262:4,6 295:10 300:9,18,24
**comes** 30:24 50:11 91:22 201:20 217:20 241:5 263:6 268:7 274:20 286:2
**comfort** 110:11
**comfortable** 54:13 100:4 280:4 294:1
**coming** 159:19 162:10 214:18 217:16 260:15 262:24 301:6
**comley** 6:16 149:5
**commencement** 141:21
**comment** 32:4 167:12 228:2 273:13
**commentary** 28:10
**commented** 27:11
**commenting** 32:21 162:11
**comments** 101:11 118:20 186:17 206:3 227:13
**commercial** 22:5 38:16 115:20,23 116:3,8 220:1 277:10
**commit** 234:20 237:25
**commitment** 44:4
**committed** 97:2 124:21 238:9
**committee** 5:9 58:17 92:23 93:16 93:19 98:10 100:19 101:2 130:14,15,16,16 133:23,24 154:1 161:16 164:11 176:19 211:5,8 270:14 275:25 281:4,16 287:6 292:14 299:4
**committing** 235:17
**common** 58:12,13 216:5 277:18
**commonplace** 275:5
**commons** 63:20 214:23,24,25 215:23,23 216:5,9

216:10,12 217:1,4 217:7,11
**communications** 108:10
**communities** 80:25 102:11 103:16
**community** 113:6
**compagnie** 267:23
**companies** 50:15 61:11 128:16 174:12 179:24 263:7 276:12,13 290:12 298:3
**company** 39:8 45:17 60:17 61:15 78:10 141:19 160:2 174:9 200:6 252:23,23 256:15 285:8,9 290:7 296:9
**compare** 240:25 241:2
**compared** 68:17 224:22
**comparing** 192:13 194:10
**comparison** 160:8 204:24 241:3
**compel** 208:11 213:10 214:9
**compelled** 79:8 157:23 188:6
**compelling** 115:21 205:6 206:12
**compensate** 38:7 102:12 107:3
**compensating** 104:21 113:3
**compensation** 39:3 95:24 97:9 125:9 156:10 229:21,24
**compensatory** 230:8
**competency** 54:19
**competing** 47:19 48:10 291:5
**complaint** 220:1 249:24 250:6,17
**complaints** 219:5 219:24 220:11,11 220:13 264:25
**complete** 45:23 97:25 136:3,4 158:8 160:21 205:4 251:12
**completely** 116:9 120:9 198:25 226:19 233:13
**complex** 38:5 39:17 41:4 46:2 46:14 49:9 63:1 85:14 103:13 202:7
**complexity** 87:13
**complicated** 18:9 61:7
**complies** 131:18
**comply** 126:15
**component** 19:25 85:20 94:17 107:24 120:5 214:14
**components** 202:9 214:3 222:21
**comprehensive** 43:20,23 89:4 93:8 97:17 134:5 148:2
**comprise** 52:6 53:9,10
**compromise** 98:17
**concede** 124:5,6 133:15
**conceded** 219:14
**conceivable** 90:10 169:13 177:7,25 178:2
**concept** 151:4 166:21 210:19 216:8
**concern** 68:3 76:21 247:24
**concerned** 110:6 110:20 137:11 141:9 160:11 161:20 163:8 186:16 199:23,24 200:11 203:1 207:10 235:19 237:3
**concerning** 254:5
**concerns** 18:17 20:3 28:7,19 30:7 158:10 159:6
**concession** 242:1
**concessions** 41:17 56:2
**conclude** 101:16 108:5 220:4
**concluded** 119:23 289:3 304:15
**concludes** 72:12
**concluding** 84:8
**conclusion** 148:1 161:19 227:2
**conclusions** 135:25
**concrete** 93:22
**concurrent** 34:4
**condition** 110:4 130:19 158:4
**conditioned** 46:16 59:6 64:12
**conditions** 46:25
**conduct** 29:5,5 30:2,4 36:21 118:1 134:12 141:4,8,12 154:11 169:5 178:6,6 198:20 218:11,14 230:1,21 231:8,15 231:16 232:20 233:3,7 235:14,17 236:6,10 237:4 238:25 239:8,15 240:2,5,9,13 241:22 242:10,11 242:22,23,25 243:24 244:24 245:3,6,13 246:12 247:8,13 253:21 296:12,12 300:13 300:20
**conducted** 55:18 88:4 121:23
**confer** 250:8 265:25 267:24 268:20
**conference** 15:8 64:22 122:6
**conferred** 268:18
**confers** 95:23
**confess** 279:15
**confident** 186:19
**confidential** 97:3 159:13,19
**confine** 35:15 279:22
**confirm** 59:12 71:9 91:10 101:24 144:9
**confirmation** 2:1 17:11 34:6 42:12 43:2 49:14 75:3 78:7,14 79:20 84:22,23 85:3,7,9

85:16 86:17 87:11
88:3 89:7 90:21
91:1 96:23 100:20
107:16 113:18
117:22 123:11,24
126:14,18 138:6
144:2 148:23
179:23 181:21
182:5 191:23
207:6 247:16
250:2,7 252:25
299:10
**confirmed** 26:9
58:16 73:2 89:12
111:7 129:8
154:18 179:14
187:16 199:20
251:8,25 252:3,17
**confirming** 77:22
90:19 91:6 187:13
265:9
**confirms** 103:11
**conflate** 136:15
**conflict** 34:2
251:12
**conflicts** 19:24
**conform** 34:6,9
**confused** 289:15
**confusing** 60:10
107:7
**confusion** 23:22
29:17 32:25
210:15
**congress** 89:4
127:22 128:5
142:20 182:3
197:10,12,13,15
197:21 198:10,15
**congressional**
76:4
**connect** 121:3
**connecticut** 6:17
62:2 116:15 117:6

125:20 149:3,5
152:1,4 153:24
156:19 159:25
168:17 186:14
201:2,4,6,10
284:15 291:20
**connecticut's**
284:17
**connection** 25:4
86:15 90:25 131:2
174:10 192:16
196:25 197:19
212:14 222:8
286:24,25 289:6
300:15
**connolly** 8:16
**conquer** 289:17
**conroy** 45:13
55:15 96:15,18
99:17 151:8
**conroy's** 164:2
**cons** 303:14
**consensual** 21:17
65:7 66:14 72:8
73:16 83:15
119:12 145:19
154:4 161:8
187:21 188:17
189:16,18 190:1
195:21 197:22
205:8,9,21 209:21
212:18
**consensus** 94:9
151:18 224:21
285:2 295:6
**consent** 33:23
44:18 107:23
136:11 137:7
147:23 268:18
**consented** 58:20
**consenting** 4:16
17:13 23:11 33:24
35:24 68:8 82:5

92:23 133:21
176:20 221:11
225:19
**consequence**
226:20 296:17
**consequences**
124:20 161:10
200:9
**conserve** 149:8
**consider** 56:25
146:3 150:12
158:12 191:21
212:1,5 219:19
220:21
**considerable**
158:25
**consideration**
67:10,16 80:12
150:19 151:17
154:25 156:4
169:15 194:25
207:21 246:15
247:19 255:4
259:3
**considered** 47:18
52:2 70:8 76:21
76:24 132:8
158:24
**considering**
150:13
**considers** 90:25
**consistent** 39:14
116:4,7 215:17
223:4 235:1
239:19 255:3
**consistently** 140:3
**constantly** 288:2
**constituencies**
278:20
**constituents** 81:1
93:20 215:18
**constitute** 69:11
167:4

**constituted** 211:6
214:12
**constitutes** 28:16
28:16 121:24
**constitution** 126:6
131:18,25 136:8
148:11 230:19
249:7 253:3
268:23
**constitutional**
71:7 88:23 90:19
91:5,9,18 92:3
123:12,25 142:24
143:15,23 148:6
269:14
**constitutionality**
37:24
**constitutionally**
74:9 84:17 85:4
**constitutions**
291:22
**constraints** 197:8
**construct** 222:24
**constructed**
216:24
**constructive**
49:25 93:24
105:19 242:11
**consultants** 247:7
255:17 259:11
**consulting** 257:3
**consumer** 31:4
37:6 74:6 155:22
166:4 168:25
169:3 236:8
241:17
**consumers** 231:14
**consuming** 104:17
120:3
**consummated**
59:19
**contain** 89:11
187:20

**contained** 67:17 87:11 108:17 189:3 220:22 288:13

**containing** 71:9 91:10

**contains** 187:14 203:24 220:23 281:15

**contemplated** 99:18 259:19

**contemplates** 16:9 17:16 86:7

**contempt** 281:24

**contend** 154:16 169:20

**contentious** 38:21

**contest** 55:1 69:16 145:25 208:24

**contested** 55:1 260:24 263:15

**contesting** 216:14

**context** 70:16 74:24 75:3 77:22 78:14,20 82:11 162:7 165:16 168:7 175:12 177:2 181:20 182:5,25 186:17 196:4 200:21,23 201:21 216:9,12 219:12 230:7,24 240:8 260:24 263:15 300:24

**contexts** 214:8

**contingency** 164:5

**contingent** 38:10 47:13 67:19 170:7

**continuance** 111:16

**continuation** 2:1 111:13 121:9

**continue** 20:25 111:15 117:23 121:18 139:3 214:14 235:18 277:25 300:8,22

**continued** 97:12 245:12

**continues** 89:18 214:5

**continuing** 17:15 33:15 289:10 298:11

**continuity** 43:18

**contract** 20:17 170:3,7 247:7 275:17 276:21

**contracting** 255:9

**contractors** 28:20 36:15

**contracts** 20:14 21:12,12,15

**contractual** 100:5

**contrary** 84:5 88:11 292:19

**contrast** 52:3 125:23

**contravene** 83:19

**contribute** 65:17 94:2,15 151:1 152:2 213:4,6

**contributed** 247:15 255:21 261:1 287:25

**contributes** 212:25

**contributing** 151:10 158:23 217:6 256:5,10 259:18,25

**contribution** 16:10 18:1 67:12 67:18,24,25 69:5 69:12 90:13 98:20

99:3 105:6 110:3 119:18 145:9 152:11 170:23 193:14 194:25 213:10 259:5,12 260:5 268:12 277:4

**contributions** 201:3 257:8 258:3 262:22 264:12 268:16

**contributive** 256:6

**contributors** 163:13

**control** 44:17 100:3 168:21,22 200:6 242:10,22 262:2

**controlled** 32:6

**controversial** 89:2

**convenience** 214:9

**convenient** 180:14

**conversations** 111:9 300:22

**convincing** 291:17

**cooler** 206:8

**cooperating** 186:18

**cooperation** 122:20 282:19

**coordinate** 149:6

**coordinated** 186:13

**copies** 295:1

**core** 27:19 41:8 46:7 89:21 90:22 91:1 92:2 179:15 179:20 180:3,12

265:5,12,12,25 267:18 268:8,22

**cornerstone** 284:2

**corp** 268:4

**corporate** 155:24 169:2,4 184:17 185:17 241:21

**corporation** 46:24 72:1 167:7 267:22

**corporations** 224:23

**corpus** 286:2

**correct** 18:3 25:21 32:14,14 179:19 188:3 225:2,3 259:13 262:20 265:6 266:15 267:16 277:15 279:18 295:21

**correction** 31:23

**correctly** 23:18 178:11

**corroborated** 221:7,7

**corroborating** 223:6 225:18

**cory** 111:24

**cost** 45:21 75:22 109:18 303:6

**costly** 104:17

**costs** 64:5 119:8 276:14 301:21

**couched** 130:11

**could've** 213:1

**couldn't** 138:15 139:23 142:1

**could've** 105:17

**counsel** 16:11 19:22,24 33:23 54:19 55:3 87:9 93:2 100:2 130:13 226:13 231:4 270:14

**count** 41:1 102:19 145:14 147:2,3
**counterclaims** 86:25
**counterparties** 21:18 38:17 276:10 277:1,1
**counterpoint** 298:19
**counties** 52:10 285:16
**counting** 48:25 145:24 147:18
**countless** 124:10
**countries** 86:20
**country** 22:25 23:21 53:15 55:6 57:12 73:17 118:24 212:6 305:21
**counts** 146:2,20
**county** 65:19 73:22,22 83:10
**couple** 20:22 30:20 33:9 51:25 118:14 120:7 170:10 184:17 192:20 194:8 257:21 264:20 271:16
**course** 18:18 20:24 22:12 24:21 39:14 50:1 51:19 53:17 55:20 56:1 56:7,10 57:18 58:6,23 75:2 77:20 89:25 109:24 118:12 119:17 175:3 183:17 184:21 188:2 190:22 256:2 258:23 284:19 291:1 295:25 303:7
**court** 1:1,11 15:2 15:10,21,25 17:24 18:5,12,18,25 19:4,12 22:10,21 23:9,12,16,25 24:7,10,18,21,22 24:24 25:10,16,22 26:3,13,18 29:12 30:20,23 31:16,20 32:7,9,16,18 33:8 33:12,14,18,20,25 34:5,10,12 35:3,9 35:14,19,22 36:10 36:13 37:5,13,16 37:18,25 38:2 42:23,24 53:4,6 54:3,17 55:11 59:17 61:22 64:18 64:21 65:1,12,12 67:6,8 68:22 69:1 71:2,8 72:15,16 72:18 74:23,25 76:12,14 77:17,23 78:10,18 79:8,17 79:24 80:21 81:10 81:16,19,22 85:2 87:25 88:19,21 89:3,21 90:2,5,18 90:23,24 91:4,7,9 92:10,20 93:6,12 96:24 100:24 101:24 103:11,11 103:12 113:10,14 113:17,24,25 114:22 115:2 116:17 117:12 118:3,7 119:22 120:23 121:12,24 121:25 122:21 123:9,14,19,22 124:24 125:7 126:2,7 127:6,8 127:12,17 128:1 128:13,16,23 129:16,23 130:4,8 130:11 131:13,22 132:1,4,10,17,20 132:24 133:5,13 133:18,24 134:2,7 134:10,13,22,23 136:11 137:8,9,16 138:1,3 140:2,6,9 140:13,15 141:7 141:18,25 142:8 142:14,15 143:6 143:16,24 144:5 144:11,14 145:1,5 146:17,25 147:6 147:11,14,18 148:12,14,25 149:3,10,16 150:6 150:11 151:22,25 152:12 153:13,16 153:18 154:25 155:2,4,16,18 156:1,16,19 157:7 157:16 158:1,18 158:21 159:14,20 159:25 160:10,20 160:22 161:9,14 162:3,16 163:19 165:15,20 166:11 166:20 167:2,14 167:23 168:2 170:5,11,17,20 171:5,7,10,12 172:11,13,16,18 173:12,14,18,19 173:24 174:1,4,6 174:7,21,23 175:3 175:11 176:5,16 176:18 177:19,21 178:8,13,15 179:6 179:8,15,22 180:5 180:8,16,18,22 181:4,10,12 182:20 183:11 184:1,13 185:7,10 185:12,25 186:3,6 186:8,15,17,20,21 187:5,11 191:7,9 191:15,17,18,21 192:3,11,19,25 193:4,8,22 194:3 194:10,19 195:11 195:16,19 196:6 196:14,22 197:7 197:17 198:1,6 199:3,8,19 200:17 201:2,11,17,19 202:12,15,22,24 203:1,13,15 204:2 204:4,10,13,17,19 204:22 206:24 207:1,16 208:5,15 208:18 209:11,13 209:20 210:4 211:10,12 212:16 213:14,16,18,23 213:25 214:10,16 215:2,4,14,20 216:3,16,18 217:3 217:10,15,20,23 218:2 219:1,9,21 220:8,14,16,21 221:1,3,13,17,20 221:22,25 222:15 222:17 223:11,21 224:24 225:6,10 226:1,14,21 227:21,23,24 228:3,5,7,14,21 228:24 229:2,10 229:13 231:19 232:3,5,10,13,17 233:1,3,6,10,15 233:19,22 234:4,8 234:10,16,23

235:5,10,19 236:12,17 237:1 238:5 239:7,10,17 240:16,21 241:5 241:11,13 242:15 242:24 243:12,18 244:3,5,9,15,17 244:19,21 245:1,5 245:7,10,19,22 246:5,16,18 247:18,23 248:3 248:15,17,22,24 248:25 249:7,19 250:10,14,16,20 250:23 251:1,5,7 251:15,17,23 252:5,8,11,13 253:4,5,7,9,13 254:9,11,16,18,20 255:14,23,25 256:4,14 257:13 257:15,19,22 258:4,6,10,13,15 258:17 259:2 260:3,14,17 261:5 261:8,12,15,20,23 261:25 262:3,10 262:16 263:2,4,10 263:14,18,21,22 264:2,5,9,14,16 265:6,8,12,14,20 266:3,5,16,18,20 266:25 267:2,4,7 267:10,15,22,25 268:1,10,22 269:1 269:5,6,8,11,13 269:14,16,21 270:2 271:3,11,15 271:19,21,24 272:3,8,21 273:6 273:18 274:16 275:10 276:3,6,19 276:22 277:13,16 277:22 278:2,4,9 278:11,13 279:4,6 279:24 280:9 281:25 285:24 289:18 290:25 292:24 293:2 295:17 298:2,15 298:17,21 299:1 299:20 300:1,3 301:2,6,10,13,25 302:3,13,16

**court's** 15:10 26:9 39:15 41:10,20 54:2 77:19,21 84:18 89:1,18 220:6 221:1,2 265:5 268:8 273:5 278:23 279:1

**courthouses** 291:7

**courtroom** 122:2

**courts** 25:8,15 76:7 84:3 90:23 116:1 143:23 146:3 150:12 151:2 166:24 182:21 183:9,9,17 266:7

**court’s** 137:5

**covenant** 46:3

**covenants** 41:16 43:21 80:2 252:22 288:13 289:3 292:20 297:3

**covenant’s** 109:2

**cover** 20:6 30:18 150:9 196:8 203:18 253:24 255:10,15,16 256:13 272:23,24 273:10

**coverage** 275:24

**covered** 36:25 211:12 233:15 253:13,14 257:12 258:24 269:18 301:22

**covering** 36:14 150:7 163:2 273:8

**covers** 21:8 36:22 76:2 178:5 189:17 253:22 254:17 255:16 275:16

**craft** 71:2,25 72:19 83:6

**crafting** 198:16

**craftsmen** 294:24

**crater** 303:4

**crazy** 205:15

**create** 79:8 103:9 108:12 142:19 146:6 148:17 170:6 197:1 209:10 252:20 268:13

**created** 70:2

**creates** 75:5 148:7 170:5 197:4 252:17

**creating** 114:9

**creation** 39:7 45:17 72:24 82:13

**creative** 93:24

**credible** 220:4

**credit** 47:1

**credited** 141:5

**creditor** 38:15 48:17 53:21 58:8 59:22 63:23 64:6 64:6,7 65:13 119:13,16 231:1,1 260:9,10 273:22 296:20 303:3,3

**creditors** 5:10 6:3 16:21 17:15 18:16 28:10 38:23,24 39:19 40:7,11 42:15 47:14,24 48:8,9 49:1 50:25 51:6,8,9 52:7 57:1 57:14 59:25 60:2 63:18,18 67:19 70:11 73:4 78:21 80:18 93:15 94:3 94:4,15,25 95:24 97:6,16,18,20,22 97:23 98:1,7 100:1 101:2 103:15 106:10 120:12,12,17 129:8,9,12 130:13 135:17 136:16,23 137:13,14 142:22 143:2,5 146:10,13 146:14,16 147:13 147:23 148:4,7 150:2 176:19 194:13 195:9 208:6 211:5,6 212:19 213:2 215:9 231:5 246:14 257:25 265:21 270:3,8,9 270:11 271:25 273:16 274:5,9,11 281:4 284:5 290:15 292:22 294:2,2 296:5 297:1 299:4 303:8 303:24

**creditors’** 154:1 161:16

**creditor’s** 149:23 152:8

**crime** 200:1 212:21

**criminal** 40:8 96:5,5 116:5

198:20,23,24 200:2,7
**crises** 39:5
**crisis** 39:3,9 45:15 60:3 93:17,23 94:6,21 95:25 96:9,12 100:18 102:12 103:17 104:20 113:3 119:5 120:14 125:17 136:10 148:17 237:15 238:12,13 239:3 249:9 258:22 303:10,23
**critical** 61:4 67:15 82:20 98:9 99:10 158:16 291:24
**cross** 42:6 80:13 81:11 87:8 115:14 129:19,25 132:17 132:20 133:7 135:21 139:18 145:23 243:11 244:24 245:7 246:1 269:15 280:18,20,25
**crossed** 188:1
**crucial** 94:17 120:5
**cruel** 227:13
**crumbles** 285:19
**crumbling** 102:17
**crux** 20:11
**crystal** 88:1,2 216:18
**ct** 6:19
**cue** 18:15
**culled** 209:3
**culpability** 151:2 281:8 282:9
**cumulative** 156:10
**cunningham** 8:17
**curious** 132:1 222:24
**current** 66:6,9 82:6 151:14 167:21 216:19
**currently** 40:25 81:10 124:22
**custodians** 81:24
**customized** 53:13
**cut** 15:14 117:17 120:17 272:17 273:6 279:21 295:11
**cuts** 148:12
**cyganowski** 8:18

**d**

**d** 1:22 8:1 10:19 13:18 15:1 72:21 126:17,21
**d.c.** 57:13 62:3 147:1
**da** 285:8
**damage** 48:6
**damages** 47:15 57:5 75:21 156:11 230:8,13
**damian** 12:8
**dangerous** 68:12 97:11 110:20 172:17 234:21
**dangles** 200:8
**daniel** 8:16 11:7 13:6 14:19
**danielle** 11:10
**darren** 11:1
**dasaro** 8:21
**data** 116:13
**date** 30:2 88:8,13 136:21,25 141:14 141:16,16 142:5,6 225:6 254:3 263:7 305:25
**dated** 159:7
**dating** 64:24
**daughter** 112:12
**david** 8:7,10 12:2 14:22 125:13 135:22 159:6
**davis** 3:3 8:22,23 15:19 19:10 37:16 64:20 286:23 295:19
**day** 44:6 97:5 125:7 137:7 193:17 198:10 239:4,4 241:7 271:1 282:2 285:7 291:7 302:18,19 302:23
**days** 34:7 38:21 42:1 79:20 124:2 124:3 154:11 181:21 293:6
**dc** 5:19
**de** 67:20 167:5 224:17
**dea** 289:24
**dead** 239:3,4
**deadline** 21:20
**deadlines** 158:10
**deal** 47:9 48:3 58:6,7,14 97:19 97:20 110:4 114:16 115:20,24 116:16 117:15,17 118:2,25 120:11 130:18 161:24 167:8 173:6 191:5 192:9,12 193:24 194:2 223:7 285:19 289:3 294:3 297:2 300:5
**dealing** 128:9 166:12,21 171:13 190:9 198:14
205:3 208:25 222:18 231:2
**deals** 34:19 103:25 145:2 183:23 190:11 300:12
**dealt** 166:14 180:24 190:10
**dear** 285:4
**dearman** 8:24
**death** 82:25
**deaths** 112:13 234:20
**debilitating** 95:1
**deborah** 10:7
**debtor** 1:9 19:24 23:8 24:4,16,20 72:6 78:24,25 79:22 101:3 124:23 126:18 127:16 128:11,21 132:14 134:14 136:2,19 139:9 142:25 143:25 144:1 146:7 150:1 165:23 167:5 169:17 184:16 196:24 205:11 219:6 268:13,14 275:16 276:25 277:1,3,4 296:14 298:8
**debtor's** 20:9 65:14 67:2 68:3 69:4,8 190:15,18 210:14,19 211:8 268:12 300:20
**debtors** 2:3 3:4 15:20 16:20 19:11 20:13,15,23 27:5 27:23,25 28:2 33:22 34:20 37:3 37:20 39:18 42:14

43:17,19,24 47:2
47:3,9 48:20
49:22 52:7 55:22
59:4 64:20 80:5
81:14 83:4 85:19
86:1,8,14,16
87:21 89:16 90:12
91:17 124:3,7
126:11,12,14,24
126:24 127:1,22
127:22 134:4,20
135:5,11 136:3,15
137:2 141:5
142:22,23,23,25
143:8 145:25
146:9 147:22
148:4,4,14,14,20
149:24,25 151:6
155:1 160:14,15
161:3,16 168:10
169:10 170:2
175:16 178:23
184:4 187:24
188:25 189:11,21
190:4,13,16,20,24
192:14,18 193:25
195:20 196:19,20
198:18 208:4
211:9 212:17
213:1,10 216:13
216:15,21 217:1,5
217:8 220:9
222:22,23,25
223:10,13 230:11
244:10,12 250:5
251:10 252:12,15
254:2,3,13 257:7
257:10 268:11
270:13,14 271:5
273:19,22 275:4
275:18,18,19
277:8,11,13,17,23
278:6,20,25 279:1

295:14,20 296:1,3
296:5,6,13,23
297:15 300:17,23
**debtor's** 103:14
129:11,22 130:1
135:1,9 137:23
147:10
**debts** 144:12
167:20
**decade** 105:18
106:13 135:16,18
171:21
**decades** 43:25
48:15 64:4 81:24
83:2 135:19,22
198:12
**decedent** 50:20
**deceptive** 36:4
166:5 168:18,20
168:23
**decide** 73:2
143:14 201:23
292:23,24
**decided** 66:18
72:16 152:13
168:6 180:9
188:12 194:1
292:23
**decides** 199:18
**deciding** 214:13
**decision** 25:9
39:15 41:20 82:23
89:18 133:10
170:17 179:11
181:3 184:10
190:8 194:15
225:24 227:9,10
241:4,6 268:24
**decision's** 180:15
**decisions** 91:8
143:16 165:13
190:3,9,10 194:23
239:1 246:14

**decisively** 292:23
**declarants** 133:8
**declaration** 47:10
54:14 64:9 68:5
98:25 99:9,16
100:6,9,10 105:1
114:22 116:18
133:5 164:2 281:2
281:14
**declarations**
42:16 49:6 129:18
129:24 133:6,8
280:22
**declared** 166:10
**decree** 44:18
**dedicated** 39:8
119:4 231:20
**dedicates** 96:7
237:20 238:10
**dedicating** 100:13
**dedication** 43:16
**deduction** 106:11
**deedee** 19:1
**deemed** 192:17
**deep** 29:7 207:5
294:20
**deeply** 289:24
**default** 163:5
**defaults** 110:11
**defend** 293:6
**defendant** 20:13
20:25 21:1,4,8,9
21:12,13,14 50:12
68:15
**defendants** 21:24
21:24 22:2,7 23:6
48:14 294:22
295:2
**defended** 243:24
**defense** 170:9
276:13 301:21
**defenses** 25:19
98:22 154:23

163:14
**defensive** 21:1,4
21:11 22:6 25:13
**deficiency** 85:5
**deficient** 203:19
**define** 192:19
**defined** 36:18
67:20 76:9
**defines** 284:12
**defining** 21:23
27:14 28:15
285:13
**definitely** 264:17
**definition** 23:5,19
24:14 28:8,24
30:6,23 31:24
32:5 36:20 73:10
77:16 210:21,23
**definitions** 28:14
29:14 139:5
**definitively**
292:23
**degree** 155:20
175:7 242:24
243:13
**delaconte** 8:25
**delaware** 62:3
149:7 186:14
291:21
**delay** 48:15 49:10
303:6,7
**delayed** 97:24
**delaying** 103:18
**delconte** 47:11
49:6
**delconte's** 290:23
**delegation** 287:6
**delete** 283:23
**delicate** 99:12
**deliver** 44:9
**delivered** 84:24
**delivering** 255:11

**demand**  102:16
**demanding**  66:14
**demands**  63:18
**democracy**
  210:22
**demonstrate**
  41:12 197:10
  205:13 243:13
**demonstrates**
  197:24 243:19
**demonstrative**
  61:19
**denial**  223:12
**denials**  223:9
**denied**  148:23
**dense**  61:20
  138:15
**deny**  85:7 191:23
  207:5 219:17
**depalma**  6:1
  270:7
**department**  6:9
  73:12 177:12
**depend**  180:13
**depended**  268:15
**dependent**  39:17
  41:4 46:14
**depends**  77:19
**deplete**  69:11
**deposit**  44:12
  75:16
**deposited**  44:18
**deposition**  82:5
  226:7,9
**depository**  204:14
**deprived**  95:21
**deramus**  280:18
  280:21
**derivative**  128:21
  168:10 171:25
  172:4,5,8
**derived**  160:6

**derives**  241:18
**des**  267:23
**descendants**
  287:10
**describe**  18:10
  22:11
**described**  47:10
  50:4 55:17 65:22
  212:21 223:5
  226:23 253:17
  291:1
**describes**  33:15
  126:13 200:3
  224:13 291:3
**describing**  19:22
  35:5 225:23
**description**
  185:13
**descriptions**
  87:15
**deserve**  59:20
  291:12
**deserved**  146:9
**deserves**  284:9
**deserving**  222:9
**designated**  111:8
**designed**  119:5
**desire**  292:7
**desist**  230:6
  234:24 235:11,20
  236:7,9
**desisted**  235:3
**desisting**  234:25
  235:6
**desperately**  17:18
  59:20 270:22
  295:16
**despite**  41:25
  71:24 84:5 102:7
  134:17 143:10
**destroying**  203:6
**destruction**  71:24
  80:24

**destructive**  65:21
**detail**  27:15 69:9
  88:10 94:23 95:8
  177:15,23 220:23
**detailed**  94:18
  114:25 281:21
**detailing**  82:1
  178:10
**details**  60:11
**deter**  233:4
**determination**
  82:20 180:12
  193:10 203:9
**determine**  193:6
  194:3 265:14
**determines**
  110:17
**determining**
  169:12 174:18
  193:1 202:10
  244:20
**deterrence**  229:19
  229:25 232:20
  240:11 289:4
  290:6
**deterrent**  155:22
  240:2,3
**deterrents**  287:8
**detriment**  216:6
**devastated**  103:17
**devastating**
  100:17
**devastation**  38:8
**develop**  128:5
**developed**  35:11
  248:19
**developing**  45:20
**development**
  18:11 111:14
**devices**  78:3
**devolve**  205:10
**devolving**  205:19

**devon**  9:1
**devote**  94:5
**devoted**  283:9
**dial**  122:6
**dialogue**  104:18
**dichotomy**  156:15
  182:18
**dictates**  143:12
**dictating**  137:5
**didn't**  112:6
  117:20 132:17,20
  135:1 138:10,19
  139:17,25 143:11
  153:23 162:23
  165:6 167:8
  171:15 246:4
**die**  113:4
**died**  111:24 112:2
  112:9,11 271:1
**dies**  56:19
**dietech**  181:14
**differ**  151:10
  156:3 193:24
**difference**  181:17
  181:24 201:16
**different**  21:7
  29:24 34:18 39:24
  53:18 76:16 88:4
  127:12 156:6
  175:19,20 182:8
  183:13 184:18
  189:16 192:20
  193:21 194:8
  201:5 202:8
  206:21 214:15
  222:6 247:18
  252:3 271:7,16,17
  272:18 273:1
  275:8 291:7
  295:23 296:15,18
  297:12
**differently**  42:9
  74:14 182:19,21

197:11 233:24 234:2 286:4
**difficult** 102:13 104:1 120:2,16 152:14 211:19 227:9 282:17
**difficulty** 49:11 118:20 161:4
**dig** 245:15
**diligence** 281:3
**dime** 145:12
**dimension** 288:11
**diminished** 16:24
**diminishing** 38:19 214:19
**diminution** 90:12
**dip** 286:10
**direct** 42:1,5 45:3 58:10 65:5 124:11 125:3,5,6 128:22 146:3 149:23 169:2 177:21 189:20 207:1 227:21 235:8 241:24 242:9 246:1 275:23 283:13 285:23 286:1 288:23 303:16
**directed** 167:7 282:14 283:17 303:23
**directing** 166:15
**direction** 279:2
**directly** 60:3 91:9 160:14 162:21,23 166:23 168:17,20 169:1 185:6 217:24 222:5 243:12 257:6 273:20 283:7 288:16 289:3 296:24
**director** 44:17 180:20
**directors** 43:22 56:6,8 60:18 61:10 62:8 63:10 234:15 239:15,25 256:4 287:4
**dirty** 171:1,5
**disability** 157:6 176:12
**disagree** 181:3 215:15 217:11 266:8 267:13
**disagreed** 268:21
**disagreement** 235:25 242:20
**disappear** 72:2,3
**discharge** 72:6,12 77:4 124:14,15,24 126:13,17 131:4,5 144:9,12,12,18,20 144:21 155:25 166:16 167:5,9,15 167:18,22 168:1 185:16 249:20
**dischargeability** 158:10 166:18 167:10
**dischargeable** 47:5 166:5,10
**discharged** 124:19 135:4 144:23 165:22 185:17
**discharges** 61:9 127:23 167:25
**discharging** 134:17,18
**disclaimed** 292:7
**disclose** 97:2
**disclosure** 50:4 81:13 82:8,10 84:19 114:25 129:22 130:2,6 133:3 134:5 136:3 138:18 156:25 157:19 250:2 275:21 280:11
**disclosures** 82:9 280:14
**discover** 35:1
**discovery** 81:23 157:2,7,9,13,19 157:21 158:4 220:8 222:1 281:7 282:17
**discretion** 221:2 270:4
**discuss** 31:18 101:6 143:15 150:15 202:25 272:15 301:23
**discussed** 34:17 66:20 67:4 91:16 95:8 137:18 143:10 179:3 188:13 218:24 242:6,17 259:9 295:25 298:14
**discusses** 250:20
**discussing** 101:8 131:9 224:20 247:17 302:24 304:11
**discussion** 15:8 16:15 126:25 211:19 298:10,11
**discussions** 202:21 244:1 300:7,8
**disgorgement** 229:21 230:13
**dishearteningly** 107:12
**disincentivizing** 200:15
**disjunctive** 33:5
**dismissed** 144:5 153:22
**dismissing** 143:5
**dismissive** 206:3
**disorder** 45:22
**disparate** 94:12 100:16
**disparity** 195:9
**display** 87:3
**displayed** 122:13
**dispute** 75:2 193:23 219:15 233:19,22
**disputes** 49:21 175:4
**disputing** 235:21
**disregard** 256:21 256:22
**disruption** 48:22 121:19
**dissatisfaction** 202:17
**dissenting** 95:18 96:3
**dissipating** 98:24
**dissipation** 97:25
**dissolved** 79:25
**dissonance** 285:5
**distinct** 251:6
**distinction** 73:8 272:8,10
**distinctions** 224:23
**distinguish** 143:8 165:24 196:16
**distributed** 75:15 86:16 94:20 100:3 105:16 111:6
**distribution** 86:9 103:5 106:10,11 106:18,19 107:13 141:3

**distributions** 21:10 50:3 159:5 269:22 296:21
**distributors** 19:19 22:24
**district** 1:2 52:5 52:12 57:3 73:11 78:10 91:7 104:22 125:20 149:8 150:24 174:6 186:11 196:21
**districts** 51:18
**divide** 98:20 101:11 236:23 289:17
**dividing** 149:12
**divisions** 53:22
**dmp** 19:1,8 20:7 21:22 22:9,23
**dmp's** 18:11 19:20,25 20:8,12 20:16,17,19,23 21:18,24 22:14,16 24:2 25:5 26:7
**docken** 9:2
**docket** 16:2 81:25 84:20 218:5 219:9 221:11 225:20 280:15 281:9,19 282:2
**dockets** 61:24 62:12
**doctor** 16:11 112:1
**doctrine** 189:4
**document** 27:10 45:6 82:13 96:12 96:16,20 111:10 176:22 177:13 204:1,4,14 223:14 223:23 244:25 248:9 289:25 292:10 293:14
**documentary** 244:2
**documented** 302:6
**documents** 18:21 34:3,3 35:13 45:7 45:8 55:18 82:15 82:15 97:1,3 176:19,25 177:22 203:25,25 219:7 219:11,13 220:16 220:20 227:1 242:15 243:10 244:8 245:16,20 246:5 248:7 252:22 281:10,11 281:11,13,16 282:6 292:14,25
**doesn’t** 118:5 123:17 140:9 144:7,12,14 169:20
**doing** 29:22 37:23 54:8 104:15 147:9 155:12 161:11,12 181:24 184:14,15 223:22 240:14 242:20 260:6 266:14 268:4 283:6,10
**doj** 47:1,2,4 70:21 71:14,23,25 72:2 83:18,23 84:3,6 84:15 85:4 88:19 90:17 95:3 99:1,2 107:6,7,11,16,16 107:24 108:1 177:12 219:7,7 245:16
**doj’s** 108:3
**dollar** 55:20 75:21 258:1
**dollars** 39:7 47:6 47:14 48:5,24 56:2,18,19 57:4,8 57:9,10,14,16,19 58:11 59:15 64:4 75:11,11 80:25 98:2 102:22 116:24,25 171:22 190:22,24 191:1,3 191:4,5,10 195:12 212:20 213:4 237:14 284:24 292:17
**domestic** 70:1,12 161:2 284:10 295:24 296:7,7
**don** 61:14
**donado** 73:24
**donated** 288:7
**donations** 46:6
**don’t** 110:14 114:18 117:21 118:7 131:17 133:3,10 135:24 137:2,25 138:25 140:22 147:2,14 150:6,22 154:2 156:14,19 158:14 160:6 164:24 165:23,24 168:12 253:6 291:25 292:1,2 293:2,24 296:20 298:18,22 300:9,24 301:12
**doom** 83:12
**doomsday** 49:4
**door** 300:19
**doubled** 289:18
**doubt** 38:20 88:11 89:8 90:9 91:4 117:7 143:20 170:7 180:23 231:20 302:18
**dougherty** 9:3
**douglass** 12:13
**dozen** 82:6
**dozens** 63:13 81:24
**dr** 16:4 224:16 293:1
**draft** 34:15 252:22
**drafted** 128:14 148:2
**drafting** 27:9 62:23
**drain** 1:22 58:13 122:22
**dramatic** 52:3,3
**draw** 135:25 151:19 178:24
**drawing** 207:16
**drexel** 65:11 172:2,19
**drier** 265:18
**drop** 24:13
**drug** 230:3
**drugs** 48:22 78:3 234:21
**drying** 165:5
**drysdale** 5:16
**ds** 183:2
**dubel** 9:4 66:11 270:12 281:14
**due** 37:24 40:10 71:5 83:19,22,24 84:8 97:22 109:22 127:24 136:8,11 136:16,18 137:11 143:15 219:12 220:6 225:24 226:4 249:4,6,9 250:20 253:2 288:8
**dug** 207:5

**dunmore** 265:10
**duplicative** 27:13 27:19
**duration** 176:13
**duties** 169:7
**dutifully** 112:7
**duty** 168:11 226:11
**dynamic** 158:14
**dystopia** 290:20
**dystopian** 205:11
**d'angelo** 8:19
**d'apice** 8:20

**e**

**e** 1:21,21 3:1,1 8:7 12:1,6 13:9 14:2 15:1,1 29:9 277:14 305:1
**e.g.** 44:14
**earlier** 22:5 65:22 76:21 110:7 151:8 174:24 190:9,10 205:2 228:2
**earmarked** 106:12
**earphones** 123:18
**easier** 20:4 28:4
**easily** 40:17 87:24 163:21 239:18
**easy** 163:16 164:9 190:23 203:22 212:24
**eberhardt** 9:5
**ecf** 2:5
**ecf3372** 114:23
**ecf3589** 276:18
**eck** 14:6
**eckstein** 9:6 92:14 92:17,21,22 101:4 102:18 110:25
**economic** 45:2 114:5
**ecro** 1:25
**edan** 11:13
**edmunds** 7:13 224:3 228:23,25 229:4,5 231:20,24 232:4,9,11,15,20 233:2,5,7,11,18 233:20,21 234:1,5 234:9,12,17 235:4 235:7,14,24 236:14,19 237:2 238:8 239:9,11,23 240:19,24 241:10 241:12,15 243:2 244:4,9,16,18,20 244:23 245:2,6,9 245:11,21,24 246:17,21 247:24 248:4 254:17,19 283:14 289:15
**education** 61:18
**edward** 12:6
**effect** 44:22 45:1 69:7 89:19 90:10 103:17 117:9 126:1 135:23 166:16 167:9 168:21,24 171:17 171:20 173:1 177:7,7 178:3 179:1 200:15 215:21 236:18 240:2,3 249:20 255:2
**effective** 30:2 56:17 59:10 83:14 85:12 87:24 88:3 93:7 141:14,16,16 142:5,6 207:22 299:23
**effectively** 73:1 89:14 134:17 135:16 176:14 181:8 184:5,7 249:16
**effects** 169:13
**effectuate** 240:10
**effectuated** 288:24
**effort** 59:23 135:6 142:23
**efforts** 79:12 95:5 175:24
**eight** 116:23 163:12,13
**eighth** 19:4,17 140:18 183:5 288:13
**eisler** 275:14
**either** 16:25 17:9 27:2 33:4,5,21 42:11 80:15 83:25 90:11,18 98:7 127:18 134:20 138:21 155:13 165:19 166:6 168:19 184:22 195:12 199:9 201:25 202:3 214:2,2,13 262:6 263:11 291:22 294:11
**elected** 82:24 153:2 210:25 211:4 214:12 283:10
**election** 146:19,20 212:12
**elections** 147:21
**elects** 231:6
**element** 82:17 181:15 189:2
**elementary** 189:1
**elements** 81:18 202:11 222:12 223:5
**eli** 2:4 3:11 19:10
**elicited** 96:22
**eliminate** 99:8 141:23 142:3
**eliminated** 29:23 140:19,19 182:23
**eliminating** 184:7
**elimination** 277:10
**elisa** 10:16
**elizabeth** 13:8
**eloquent** 114:18
**eloquently** 44:25 96:15 290:16
**else's** 55:9
**email** 159:7,13 224:12,18 225:23 243:13 244:2
**emails** 225:20 278:16
**emarsys** 61:18
**embodied** 39:12
**emergence** 46:24
**emergency** 16:5 93:18
**emergent** 80:5
**emily** 10:8
**emotional** 116:22
**emphasize** 102:2 212:23
**employ** 265:13
**employed** 94:20
**employees** 61:10 62:9 63:11 242:4
**employment** 255:7
**empty** 41:24
**enable** 95:4
**enables** 67:16
**enact** 142:20
**enactment** 128:2 128:3 198:2

**enacts** 238:11
**encompass** 208:5
**encourage** 122:8
**ended** 300:12
**endless** 38:14
**endorsement** 225:21
**ends** 262:23
**enforce** 74:12 75:9 77:12 78:24 79:3 196:18
**enforcement** 74:8 75:6 78:5 161:25
**engage** 239:24
**engaged** 49:3 119:13 160:2 168:13 200:7 240:6 242:1,17
**engaging** 37:7 237:6 257:3
**engine** 225:17
**engineer's** 187:20
**english** 85:22 87:15
**enhance** 228:7
**enjoin** 74:25 76:8 76:14 77:21 134:13 142:17 172:4 265:21 268:10
**enjoined** 69:4,23 137:3 171:25 188:19 253:18 257:6,24
**enjoining** 128:20
**enormous** 43:8 81:12 291:12
**ensure** 43:19 111:6
**ensures** 67:18
**ensuring** 80:2
**enter** 88:20 90:19 91:3,5 265:14
**entered** 128:3 226:5 281:18 282:5
**enterprise** 60:17 75:23
**entire** 75:22,23 98:12 163:10 175:14 176:13 217:12 284:2 287:24
**entirely** 83:14 90:4 149:22 195:22 294:4 295:21
**entirety** 287:5
**entities** 5:17 32:3 34:5 40:19 50:22 62:25 70:13 73:15 76:9 82:10 87:1 88:15 101:15 118:8,11,17,18 120:1 124:12 130:14,17 145:11 193:19 196:5,18 197:5 245:14 254:2 257:12 271:25 272:2,4 273:25,25 274:3 275:16,17 281:12 282:16 295:24 298:8 303:9
**entitled** 148:7 167:6 169:24 244:7 255:21 260:6 288:24
**entity** 46:24 66:4 110:11 119:19 130:25 131:1 138:23,24 139:25 164:25 168:19 217:18 222:25 251:1 259:17 284:4,6 285:2,14 285:14,14 297:20
**entity's** 168:20
**entrants** 292:18
**environmental** 255:8
**epidemic** 79:14 111:8 113:2
**equal** 37:24 56:24
**equally** 46:10,14 219:20
**equitable** 39:13 106:9 126:20 144:5 189:2
**erf** 106:21,25
**eric** 13:22
**eroded** 48:19
**erroneously** 237:17
**eskandari** 9:7
**especially** 131:7 206:19 230:2
**espouse** 83:9
**essence** 16:24 155:23 274:7 285:1
**essential** 77:13 82:16 174:7
**essentially** 16:9 16:23 22:11 60:21 66:6 72:19 94:15 131:13 150:3 219:16 251:9 260:11
**establish** 145:6,7 147:23 170:18 243:15 244:23
**established** 64:24 70:22 91:21 143:17,22 145:25 146:1 204:7 227:8
**establishes** 98:11 114:24 115:5 134:17 199:25
**establishing** 74:13 243:19,21
**establishment** 111:18 274:23
**estate** 44:3 48:9 69:13 98:25 106:9 145:12 159:15 161:15,18 162:19 162:20 163:1,7 165:14 171:16,20 172:6 177:8 178:3 182:2 184:2 189:17,19,24 198:25 233:16,16 233:17 250:22 258:2 259:3,7,12 260:5 262:24 263:5,24 268:13 285:23,25 286:3
**estate's** 234:2,6
**estates** 27:23 39:13 49:2 50:20 67:9 69:12,19 90:11 216:13,15 216:21 227:4 278:15
**esteemed** 119:10
**estimated** 130:2
**estimation** 98:23
**estoppel** 299:23
**et** 37:25 64:10,10 122:23 164:4 275:12 291:7
**eternity** 117:20
**ethan** 10:22
**evading** 124:22
**evaluate** 134:20 135:2 163:1
**evaluation** 192:25
**evan** 5:6 26:5
**evans** 26:17
**evening** 270:6

**event** 85:9 113:23
189:22 299:22
**everybody** 58:3
63:6 79:6 115:7
247:13
**everyone's** 64:13
**evidence** 30:4
42:14,17,21,25
44:22 47:7,7 49:5
49:15 88:11 92:4
95:10 98:9 115:22
116:18 129:17,20
130:5 137:12
141:18 153:1
162:18 181:22
189:7 206:12
208:19 218:7,8,9
218:16,18,22,23
219:2,4 220:18
221:8 223:6,15
226:7 241:8,25,25
242:13,25 243:6,8
243:17,18,24
244:2 255:20
257:10 262:19
279:12 281:3,8,15
282:14 283:21
285:22 286:17
289:1,2 290:19,21
290:25 291:9
295:13 297:22
299:13,16
**evidences** 210:15
**evidentiary** 66:8
108:8 114:21
299:11,18
**eviscerates** 148:6
**ex** 68:22 231:10
**exact** 60:24
191:19 205:14
272:18 288:16
**exacting** 183:12
277:22

**exactly** 53:19 61:2
104:23 107:12
148:14 184:21
185:21 189:7,10
192:1 205:25
207:12 268:4
291:3
**examination** 42:7
80:13 81:11 87:8
129:25 135:21
139:18 145:23
177:22 223:15,22
280:14
**examine** 132:17
132:20 244:7
**examined** 133:7
178:16 226:6
243:11 244:24
280:18,20,25
**examining** 245:7
**example** 16:17
46:15 61:3 71:15
77:10 79:10 86:1
86:21 108:13
109:7 136:19
140:19 166:1
168:17 170:9
176:22 208:3
236:11 237:18
238:1 255:10
256:13 259:8
283:4
**examples** 62:12
74:16 282:25
**exams** 157:25
**exceed** 129:15
**exceeds** 124:15
142:24
**excellent** 290:22
**exception** 21:16
71:2 72:19,21
73:13 74:4,18,21
75:1,5 76:17

78:23 79:9 83:6
83:11 90:1 195:21
195:23 196:2
197:1,21,23
198:16 278:17
**exceptional** 124:7
**exceptions** 20:22
22:12 197:14
**excerpt** 225:12
**excerpts** 293:22
**excess** 49:18
133:12
**exchange** 65:18
129:5 224:18
**excised** 66:7
**excluded** 20:18
21:22 22:17,20
27:7,7 28:6,8,11
28:21,25 29:15
30:1 141:9 256:1
256:15
**exclusive** 34:4
127:21
**exclusively** 119:4
214:4
**excuse** 58:22
133:21 134:18
164:20 197:16
210:20 218:5
284:1
**execution** 61:5
**executives** 175:21
**executor** 259:7
**executory** 170:3
170:10,13
**exercise** 79:12
90:4
**exercised** 211:4
**exercising** 116:21
188:19 240:13
**exhibit** 159:8
160:23 219:6
224:10,25 259:4

**exhibits** 218:6
221:10,10 224:8
**exist** 142:9 169:20
276:14,15
**existed** 254:2
255:7
**existence** 289:6
290:9
**existing** 301:22
**exists** 149:25
**exit** 46:1
**expand** 27:25
56:7
**expansive** 230:11
**expect** 16:8 24:19
195:11 259:15
**expectations**
121:8
**expected** 159:10
270:22
**expedited** 176:15
**expedition** 219:25
**expense** 49:10
**expensive** 49:20
85:12
**experience** 54:19
54:20 206:2
**experienced**
120:4
**expert** 42:2,5,17
64:9 66:1 132:18
132:21 295:4
**experts** 255:18
259:11
**explain** 17:9
37:22 60:11 80:21
143:2 236:21
253:4 300:10
**explained** 66:22
89:9,12 210:14
253:7
**explaining** 114:25

**explanation** 19:7 19:15
**explicitly** 127:25
**exploiting** 294:13
**explore** 155:18 191:7
**exposed** 97:25
**exposes** 78:18
**exposure** 154:21 191:2,4,14 192:5 208:8
**express** 216:2
**expressed** 59:6 143:20 159:6 198:4 272:17
**expressly** 46:16 60:17 71:17 84:21 85:18 150:13 195:6
**extend** 141:1 271:16 272:3
**extending** 299:14
**extends** 299:12,19
**extension** 57:6
**extensive** 82:8,9 82:10 85:12,19 88:7 118:22 137:12,14 157:13 279:13
**extent** 26:11 34:22 54:22 66:16 78:2 99:7 109:16 157:24 170:17 229:10 245:13 246:12 247:1 296:10,22 297:5 298:12
**extinguish** 144:1
**extinguished** 69:25 70:3 141:6 148:19 182:16 253:19
**extol** 136:20
**extortion** 284:9
**extra** 125:1 208:20 279:23
**extraordinarily** 182:4
**extraordinary** 38:22 43:13 46:11 57:25 88:9 114:7 124:5,14 125:15 125:18 127:23 140:23 148:22,22 281:3 283:19 286:20
**extrapolate** 288:5
**extremely** 93:24 96:1 120:3 205:15
**extrinsic** 221:8
**eye** 164:7

**f**

**f** 1:21 13:16 305:1
**f.2d** 76:25 77:6
**f.3d** 66:24 91:12 171:8 265:11
**fabric** 174:22
**face** 16:9 39:5 41:9,14 80:19 192:5 212:13 303:19
**faced** 192:23 193:1 235:16
**facilitate** 48:16 96:2 303:15
**facilitated** 55:18
**facilitating** 99:24
**facing** 191:2
**fact** 15:11 23:18 38:9 42:2,4 43:1 54:1 56:13 60:23 64:22 69:13,18 70:3,13 83:5 84:10 87:9 94:8 97:25 102:10,25 104:7,25 105:21 106:11 110:2 111:14 114:24 115:1,9 137:21 139:18 144:19 158:2 160:16 173:7,8,15 174:9 174:19 175:25 179:17,24 180:2 184:25 185:16 190:23 193:16,23 194:1 199:12 201:13 205:13 206:15 209:9 219:20 223:8 237:19 242:21,21 254:20 255:6 260:21 262:11 265:25 270:13 271:14 280:8 283:24 284:17 286:9 287:9,18,20 287:20 294:25 295:15 297:6,11
**facto** 167:5 224:17
**factor** 43:6 49:7,8 49:14 50:24 51:3 54:18 56:4 150:11 150:13 257:5,14 257:22 258:19 259:2
**factors** 39:15 43:3 50:4,25 54:25 64:16 66:24 67:5 67:7 117:23 144:8 145:7,7 150:18 162:11 172:22 185:24 193:11,13 193:17 223:1 253:17 297:9
**facts** 41:11,13,25 42:20 47:20 51:5 60:23 67:1 80:23 97:9 102:9 105:14 114:24 116:3 162:24 171:19 183:12 188:25 190:4 209:3 222:6 222:7 223:3 259:8 276:16 287:1,15
**factual** 19:15 42:1 66:1 95:15 218:3 279:11 282:20 299:5 300:6
**factually** 78:16 235:25 278:19
**fading** 113:15
**fail** 46:15,18 57:23
**failed** 108:1
**failing** 172:14
**fails** 290:20
**failure** 31:1 225:24
**fair** 35:14 37:5 39:12 162:16,24 167:23 218:8 258:19 267:14 272:21 277:11 278:14 287:7,13 290:24
**fairly** 163:21 164:1 175:23 194:9 241:6 278:5
**fairness** 56:24 63:17 77:16 150:15,17 162:6 181:13,15,15
**faith** 30:25 117:14 169:24 170:19 175:10 227:7,12
**fall** 19:17 27:9 70:23 77:15 110:14 150:4 291:19

**fallacy** 219:16
**falling** 151:12
  164:22
**falls** 164:12
**false** 31:1 81:9
  82:21 236:3
  256:20
**familiar** 115:18
  145:3 221:1,4,6
  222:13,15 224:7
**families** 45:23
  46:1,4 50:19
  67:11 82:4 85:25
  87:19 88:14 113:3
  113:6
**family** 31:10
  33:17 40:21,22
  68:20 80:4 82:6
  86:10,25 94:1,14
  95:22 96:24 97:12
  108:23 112:12
  119:19 124:11,15
  124:17,24 125:14
  125:17,25 126:1,3
  126:8 128:25
  129:5,7,15 131:4
  132:15 133:4,12
  134:4,7,10,11,14
  134:18,19 135:2,4
  135:7,14,22 136:2
  136:10,19 137:1
  138:9,9 140:1
  144:22 146:5
  148:5,8,17 157:2
  157:22 159:9
  160:24 163:10
  175:14 188:21
  200:6 215:1
  234:14 236:4
  239:13 243:9
  259:16 262:13
  280:24 300:5,16
  303:21

**family's** 129:19
  139:24
**fantastic** 121:6
**far** 32:5 45:2,10
  73:18 102:20
  105:8 124:15
  130:11 137:11
  141:8 147:7 155:6
  156:24 157:7,10
  160:10 161:19
  163:7 165:16
  175:3,18 184:16
  187:16,16 202:1
  202:24 203:9
  206:5 207:9,13
  209:2,18 215:22
  223:16 226:22
  235:19 238:6
  239:13 242:25
  243:21 253:22
  255:1 273:23
  274:18 285:10
**farrell** 9:8
**farther** 247:21
**fashion** 275:7
**fashioned** 65:1
**fatal** 187:14
**fates** 284:7
**father** 112:5,13
**fatigue** 165:9
**fault** 256:22
  282:25
**faulted** 198:16
  200:25
**faulting** 246:15
**favor** 43:1 53:8
  70:17 73:24 80:19
  115:4 124:15
  131:16 146:13,15
  152:25 153:7,9
  167:9 187:22
  271:4

**favorable** 119:25
**fear** 293:12
**feasible** 47:19
  59:11,12 67:18
**february** 224:19
  225:9
**federal** 16:21 27:6
  38:16 40:12,19
  41:6 51:6 56:3
  59:11 74:10 76:12
  77:17 78:3 93:14
  98:17 99:4,7
  101:15 103:20
  105:23 106:5,15
  106:22 160:3
  184:18 218:13
  222:10 267:25
  295:24 296:7,8
**fee** 95:6 99:23,25
  164:5
**feed** 121:17
**feeds** 121:2
**feel** 79:8 114:18
  218:24 253:3
  271:24 272:3
  278:21 279:17
**feeney** 9:9
**fees** 40:10 48:25
  100:5 113:22
  119:8
**feinberg** 55:7,10
  118:25 293:18
**feld** 5:8 101:1
**femino** 9:10
**fence** 211:15
**ferguson** 211:22
  212:11,12
**ferry** 150:8
**fewer** 39:16
**fiduciaries** 295:15
**fiduciary** 42:15
  59:16 112:25
  226:11

**field** 210:8 286:14
**fiercely** 58:23
**fifth** 7:3,17 48:7
  111:17 265:16
**fifty** 60:14
**fight** 49:19 99:6
  125:19 263:24
  264:2
**fighting** 86:8
  179:25
**figure** 33:9 35:13
  53:7 237:13
  270:19 294:21
**file** 16:16 18:19
  50:11 86:21 87:5
  108:1 131:3
  157:23 186:22
  266:22
**filed** 2:3 18:21
  19:15 21:19 57:3
  84:12 107:17,22
  107:24 111:24
  124:17 128:25
  131:10 140:18
  144:22 157:9
  167:11 207:23
  220:12 225:20
  265:7 266:24
  268:24 271:11,22
  288:2,4 291:7
**files** 130:25
  186:23
**filing** 106:5
  136:25 144:18
  148:9 249:21
  283:5 285:9 291:2
  291:4
**filings** 144:8
  145:8
**fill** 157:17,17
**final** 35:1,1 56:1
  64:22 83:25 90:19
  91:3,5 114:22

133:10 145:14 146:9 170:17 182:7 183:22 265:14 269:2
**finality** 56:14 206:15
**finally** 48:23 50:9 71:8 82:18 88:16 111:20 122:12 292:6 297:16
**finance** 44:15
**financial** 81:14 83:10 86:4 94:14 96:7 100:13 110:3 132:16 136:4 167:21 184:25 185:1,9 211:6,16 255:16 259:10,12 268:12 281:7,21 281:23
**find** 38:9 54:12 60:8 62:8 68:19 87:3 165:17 256:20 261:2 282:8
**finding** 67:23 69:20 84:5 175:10
**findings** 175:9 191:19 280:19
**fine** 26:3 36:11,13 92:14,20 100:24 118:7 130:8 179:6 192:4 205:1 228:24 229:3 239:22 245:8 246:20 248:15,17 273:10 277:2 298:2 301:2 302:13,14
**finegan** 87:8
**finer** 272:10
**fines** 76:19
**fingers** 188:1
**finish** 185:23 302:18
**finzi** 9:11
**fire** 48:17
**firm** 82:9 93:1 164:3 257:3
**first** 6:2 18:15 19:18 20:7 27:1 29:12,17 30:23 44:6 46:15 63:17 67:8 70:24 71:6 71:12 74:18 78:9 78:18 83:22 95:18 101:11,18,20 103:20 108:7,14 108:19,24 111:2 123:4,5 126:9 143:14 149:21 183:5 184:10 189:14 192:24 195:23 196:16 197:13,20 204:23 205:7 207:12,13 219:5 225:4 228:2 229:6,14 235:24 251:24 253:16 260:18 270:8,10 271:9 272:11 273:23 280:6 286:23 291:5 296:4,9 302:10,25
**fishing** 219:25
**fist** 196:15
**fit** 36:20 183:18 183:19
**fits** 29:11
**fitzsimmons** 9:12
**five** 50:20 52:6,7 54:18 57:22 60:7 60:13 64:8 104:8 289:20 292:11
**fix** 33:11 108:13 116:2
**fixed** 34:2
**fixing** 27:9
**flaw** 77:2 213:5
**flaws** 187:14,21 188:3
**flesh** 166:25
**fletcher** 9:13
**fliers** 86:18
**flights** 25:3
**flip** 46:9
**flipping** 31:23
**flows** 48:20
**fly** 34:24
**focus** 95:5,16 104:20 110:5 114:19 156:16 188:4,16 225:13 227:1 233:3,9 279:15 304:6,10
**focused** 56:12 95:19 254:22
**focusing** 150:19 189:25
**fogelman** 9:14 34:13,13 35:10,18 248:24 249:1,2 250:15,19,21,24 251:2,5,6,13,16 251:21,24 252:6 252:10,12,15 253:6,8,10,11,15 254:10,11,14 255:5,24 256:3,8 257:14,18,20 258:5,9,11,14,16 259:1 260:4,15 261:3,6,9,13,18 261:21,24 262:2,9 262:15,18 263:3,9 263:13,17,19 264:1,4,6,7,10,15 264:18 266:4,14 266:17,19,21 267:1,3,6,8,13,16 269:6,7,9,12,20 269:25 285:4 286:9 289:24
**fogleman** 248:22
**fold** 36:7
**follow** 243:5
**followed** 65:11 119:9,21
**following** 289:5
**footnote** 24:13
**force** 150:2 151:19 286:14
**forced** 135:25 137:6 151:6 176:13 182:12
**forcing** 137:6 155:7
**foregoing** 305:3
**foreign** 73:12 82:10 245:14 263:7 270:21,21 282:15,15,19 284:10 297:20,20 297:20,23
**forensic** 81:25 280:14
**forever** 269:22
**forfeiture** 47:1 76:19
**forget** 104:17 145:21
**forgive** 283:21
**forgotten** 272:13
**form** 17:14 36:23 86:18 117:23 141:20 181:5 182:17 229:21 232:5,6 249:19 250:4 273:16 281:12 296:24

NAS3845

**formal** 154:8
250:11
**formalities** 122:2
**former** 60:18
63:10 82:6 118:24
**formerly** 40:24
51:20
**forms** 157:17
**formula** 154:2,3
**formulated** 154:3
**formulation** 36:3
258:18
**forth** 15:4 95:7
207:23 256:12
280:19 297:17
**forums** 78:24
**forward** 36:18
104:20 152:11
170:8 202:14
218:22 239:21
242:18 243:20
274:15
**fought** 38:18
49:20 51:21 104:2
**found** 78:19 85:2
96:16 173:15
180:21 194:16
195:8,11 268:21
293:14,15 303:20
**foundation** 33:15
102:22
**foundations** 33:17
33:21
**founded** 28:24
**four** 51:3 56:18
60:1 64:1 70:23
79:22 104:8 112:2
175:19 177:16
178:16 224:1
244:5 278:13
287:4 289:19
295:22

**fourth** 32:25
47:22 70:7 111:15
144:7 152:2
**fraidin** 9:15
**frame** 43:4
**framework** 20:22
**franklin** 12:9
**frankly** 33:20
80:14 89:2 182:20
215:16 251:18
258:18 266:9
277:7 279:14
289:4
**fraud** 31:3,4,6,15
31:16 36:7 37:8
124:20,22 129:2
134:12 141:1
144:23,24 145:17
170:25 254:15
255:8,9 256:18,24
**fraudulent** 32:11
37:8 49:25 233:4
233:9,12
**frazier** 9:16
**frederick** 13:9
276:11
**free** 58:10 183:17
**freeze** 220:15
**frequently** 63:6
**friedman** 9:17
**friend** 285:4
**friendly** 154:10
**front** 79:5
**frozen** 220:7
**frustrating** 103:8
209:8,10
**ftc** 241:19
**fulfilled** 46:7
**full** 17:10 18:13
27:4 55:25 87:12
87:12,22,22 105:5
106:10 109:3
122:13 126:25

151:1,18 163:24
200:9,10 204:17
212:1 230:17
231:15,15,21
232:7 257:24
258:6 276:1 293:3
293:18,19 302:18
302:19
**fully** 40:24 72:2
78:17 83:16
103:10 104:1
154:4 246:9
302:22 303:1
**fulsome** 132:15
133:3
**function** 29:8 74:9
77:13,25
**fund** 69:24 99:25
100:1 105:15
184:15 253:19,20
253:24 259:23
279:8
**fundamental**
56:24 102:25
171:7 184:17
198:22
**fundamentally**
101:20 136:7
295:23 296:15
**funding** 44:5
**funds** 39:24 79:5
94:20 99:4 100:13
111:5,6,8,18
119:24 120:12,17
227:18 228:8
297:1,3 304:5
**further** 16:14
44:20 51:1,23
56:2 60:15 69:19
77:9 79:2 98:24
100:20 109:16
139:23 210:21
218:19 222:1

235:15 247:12
289:5,21 298:1
299:14 303:1,16
**furtherance** 181:9
**furthermore**
220:6
**fusion** 178:12,17
178:18 221:8,22
222:17,19,22
223:3,8,14,15,17
223:24
**future** 30:3 43:7
90:14 124:21
137:18,24 139:1,1
139:2 141:3,5,8
141:11,11,17,24
142:3 155:23
163:5 198:9 201:6
204:8 206:20
237:7,8 239:24,25
254:8 276:15
290:22

**g**

**g** 8:17,22 15:1
71:19 72:11 76:1
76:7 100:9 127:18
128:2,4,7,18
198:2,7 274:20
**g.m.** 54:11
**gabe** 8:11
**galle** 9:18
**gange** 9:19
**garrett** 255:24
259:6
**garrity's** 181:13
**gartrell** 9:20
**gary** 10:4 100:7
**gates** 213:4,6
**gather** 79:5
**gaurisankaran**
44:24
**gdp** 287:18,25
288:7

**geldreich** 9:21
**general** 7:8,15
  44:12,13 52:4,22
  61:4 76:21 79:12
  82:24 88:13
  108:16 153:12
  183:1 199:18
  202:4,6 205:14
  210:25 211:21,22
  211:25 212:4,9,10
  212:12 213:19
  214:5 217:7
  218:13 220:3
  223:25 227:14
  228:20 230:17
  231:6 237:9 240:2
  278:25 282:23
  283:6,11 296:19
**generally** 36:20
  182:21 230:9
  257:16 273:9
**generals** 105:11
  186:13 214:13
**generated** 135:18
**geoffrey** 10:2
**gerard** 8:14 14:5
  31:9 300:4
**germane** 42:10
  222:5
**getting** 19:5 29:18
  41:15 48:15 62:17
  62:18 107:2 110:2
  110:6 118:21
  131:8 139:21
  144:23,24 155:10
  155:15 156:6
  157:13 162:7
  166:17 167:14
  185:18 188:4
  191:4 255:19
  257:25 260:16
  273:20 274:11
  277:3 278:16

280:2 282:18
288:17 295:7
303:7,8 304:1
**gibson** 9:22
**giddens** 9:23,24
**gigantic** 163:21
**gilbert** 9:25
**gill** 9:21
**gillian** 12:18
**give** 21:12 30:17
  37:25 50:16 53:13
  103:4 106:8,25
  108:13 117:6
  121:4 146:9 151:6
  158:17 160:1,23
  165:14 182:12
  188:9 219:5
  223:19 225:3,3
  230:6 250:10
  251:22 273:13
  290:12 292:25
  301:24
**given** 22:13 62:11
  112:1 114:6 117:2
  117:25 129:2
  136:20 150:25
  154:14 161:21
  162:22 163:19
  178:25 208:21
  219:11 256:14
  297:12 300:15
**gives** 98:20 169:1
  206:7 276:24
  277:1
**giving** 19:14
  41:15 160:7 162:8
  212:17 259:12
  276:7
**gleaned** 76:18
**gleit** 4:6 19:23
  20:10 21:17
**global** 29:21 47:9
  94:11 98:12

100:11 120:4,5,10
120:11 206:15
289:23
**globally** 46:2
**gloss** 105:21
**gm** 251:3
**go** 23:12 24:2
  27:15 32:23 47:6
  56:17 59:10 96:25
  105:7 107:13,15
  120:18 121:7
  123:6 134:22
  143:1 145:15
  149:19 150:21
  152:10 155:7
  158:8 161:23
  189:3 195:6
  198:23 206:5
  210:2 222:16
  226:1 243:20
  244:13 247:21
  248:23,25 263:22
  274:5 283:12
  293:13 301:10
**goal** 188:4
**goals** 96:2
**goes** 16:21 25:17
  86:24 136:20
  150:19 157:14
  162:5 165:18
  238:13 243:21
  281:2 289:21
  291:15
**going** 15:9 16:6
  21:17 26:10 54:21
  54:24 58:6 60:22
  60:22 61:20 62:6
  63:8 68:3 77:1
  78:18 81:24 88:24
  92:7 99:5 100:15
  111:11 113:19,21
  114:1,18 121:7
  122:8,18 123:14

123:20 138:22
141:25 150:9
158:22 160:23
164:13 167:25
170:8 172:9 173:2
188:9,10 192:3
193:11 196:6
200:18 201:2
208:7 210:2
218:19 224:3
226:18 229:8,11
229:15 232:3
238:25 239:21
246:23 248:23
254:24 256:24
266:22 269:18
272:22 274:5,8
279:21 280:1
288:12,12 289:13
289:14 290:2
291:3,14,18
295:12 298:3
299:7 300:7
303:15
**gold** 7:6 149:12
  149:15 150:8
  186:6,9,9 187:2,9
  187:12 191:8,13
  191:16,25 192:7
  192:13,24 193:7
  193:20,23 195:3
  195:13,17,20
  196:11,15 197:9
  197:19 198:3,13
  199:7,15,22
  200:20 201:8,13
  202:3,13,16,19,23
  202:25 203:12,14
  203:21 204:3,9,10
  204:12,16,18,20
  204:23 207:11
  208:16,24 209:16
  210:10 211:10,11

211:18 213:17,22
213:24 214:1,20
215:3,13,19 216:1
216:17,23 217:4
217:14,19,22,25
218:3 219:3,23
220:15,19 221:5
221:15,19,21,24
222:3,16,20
223:18 224:2
225:2,8,11 226:2
226:3,16 227:2,25
228:4,10,14,21,22
229:7 238:14
248:1 283:25
290:19 299:16
**golden** 214:17
**goldman** 6:21
80:12 149:1,2,4,5
149:11,17 150:10
150:20 151:24
152:9,14 153:15
153:17,19 155:3
155:14,17,20
156:8,18,21 157:5
157:12,24 158:6
158:19,22 159:14
159:16,22 160:5
160:16,21 161:11
162:2,4 163:17
165:4,17 166:2,15
166:25 167:3,19
167:24 168:3
170:6 171:4,9,11
172:7,12,14,17
173:8,13,17,22,25
174:3,16,22 175:5
176:3,10,17 177:9
177:20 178:4,9,14
179:4,7,10 180:2
180:11,19 181:2,5
181:11 182:7
183:21 184:2

185:4,11,22 186:1
186:5,7 193:12
196:7,13,17 199:9
200:18 210:12
215:14 218:23
229:7 248:2 284:1
299:16 304:11
**goldman's** 214:17
**goldstein** 10:1
**gold's** 159:20
**good** 15:18 18:6
19:9 33:25 37:15
44:21 45:1 50:9
64:5,19 72:18
92:14,18,22
100:22,25 101:17
101:23 108:6
110:22,24 113:12
114:16 116:21
117:14 121:1
122:21 123:8,9
158:18 169:24
170:19 174:2,17
175:10 183:14
187:8 192:9,12
196:8 207:4 213:8
213:11,20 219:3
227:7,12 241:1
270:6
**goodman** 10:2
**gossamer** 60:21
**gostin** 10:3
**gotten** 27:17
106:9 128:17
154:18 173:4,6
229:10
**gotto** 10:4 55:13
100:7,8
**govern** 149:22
**governed** 168:5
**governing** 41:20
41:22 42:22 64:23

**government** 27:6
41:7 70:12 76:5,8
77:25 99:4,7
103:20 105:23
106:5,15,23
119:25 160:3
210:23 211:1,2
231:7 252:1,6,17
289:8 295:14
**government's**
85:6 266:6
**governmental**
5:17 16:21 33:23
38:24 40:19 51:6
52:24 53:22 65:20
72:22 73:10,14
75:6 76:3,10
78:11,21 83:12
93:15 97:16 100:1
101:15 118:8,11
118:17,18 130:14
130:16 164:25
193:18 196:5,18
196:23 197:5
217:18 284:4,6,12
285:13 290:15
294:2 295:24
303:9
**governments**
38:16 49:2 78:6
92:24 94:19 119:4
120:19 292:4
**governor** 238:11
**governors** 289:8
**governs** 59:9
76:11
**grandchildren**
139:24 140:10
**grandstand**
112:16
**grant** 62:23 83:13
89:22 143:18
188:6 206:24

209:11 211:24
213:15
**granted** 23:8 65:8
89:4 124:4 135:15
142:24 172:21
197:20 198:21
205:5 271:6 272:5
**granting** 124:14
**grants** 142:20
**grappling** 211:23
212:1
**grateful** 267:10
**great** 49:14
136:20 143:1
271:19 297:2
**greater** 52:16
144:20 175:25
231:3 275:6
**greatly** 213:2
**green** 10:5,6
**greenberg** 6:1
270:7
**greenspan** 10:7
**grew** 112:5
**grievously** 48:18
**grim** 10:8
**gross** 62:18
**ground** 167:17
188:3 282:8
285:19
**grounds** 123:13
124:1 126:9
173:18
**group** 3:14 4:16
5:17 17:10 19:8
22:23 40:24 51:13
53:10 57:15 58:8
64:6 113:22
117:21 118:9,11
118:14,17,17
120:20 163:10
176:19 208:15,23
208:25 221:11

225:19 270:21 275:11 285:17 288:15
**groups** 16:23 39:22 40:21 41:6 51:11 58:21 102:4 104:6 119:13,16 294:20
**growing** 129:3
**grows** 124:21
**guaranteed** 107:15
**guard** 10:9 55:13 66:12 98:16,25 99:2,9,12,16,24 100:5 104:2
**guess** 34:23 60:12 60:15 61:4,16 63:8 92:18 150:16 166:21 173:12,24 187:2 201:24 204:13 217:10 228:14 236:23 241:5 247:20 260:17 266:3,5 291:25 302:3
**guessing** 281:5
**guest** 269:23
**guided** 210:6 279:4
**guilty** 178:5 219:6 221:9 222:23,24 222:25 223:4 245:12
**gulf** 275:11,14,25 276:7,9 279:16 298:5 300:6 302:1
**gump** 5:8 101:1
**guys** 122:13,17 199:3 215:5 246:19

**h**

**h** 9:6 14:16 127:18 128:1 198:15 256:11 259:4 275:20
**haberkorn** 10:10
**half** 112:3 293:3
**halt** 154:20
**halves** 17:5
**hampshire** 62:3
**hand** 60:4 85:8 163:24 164:10 222:21 298:12 303:18
**handful** 62:15 163:9 256:9
**handle** 65:3
**handled** 101:9
**handling** 37:21 101:9
**hands** 165:10 189:4,4 220:18 226:25 243:25 290:8
**hang** 103:6
**hangs** 102:22
**happen** 82:11 164:24 214:2 266:20 293:12
**happened** 17:6,12 17:20 18:4 165:8 165:9 198:9 235:15 241:2
**happening** 45:16 62:19 161:13 195:7 206:7 216:14 235:12,15 294:12
**happens** 102:14 180:13 188:1 206:6 214:7 284:3
**happily** 49:12
**happy** 15:15 17:8 19:7 23:23 24:17 61:21 228:17 251:22 300:8,22 300:25 301:23
**hard** 34:24 49:20 54:7,15 101:3 104:2,23 117:15 123:15 132:13 163:5 164:7,11 165:1 175:18 177:6,10,16 178:2 183:12 184:24 187:19,24 188:3 213:12 218:25 226:21 238:19 252:18 277:22
**hardest** 285:5
**harm** 78:19 124:21 142:6 191:1 211:4,8,13 240:9 287:22 288:8
**harmed** 118:1
**harmful** 31:2
**harold** 10:19
**hate** 187:6 215:6
**hauer** 5:8 101:1
**haven** 153:22
**hayden** 8:15
**head** 148:5
**headphone** 301:12
**heads** 205:23 206:8
**heafitz** 170:11
**healing** 100:17
**health** 39:5 48:21 72:1 77:24 82:20 93:18,23
**healthcare** 40:12 40:14
**hear** 19:7,11 37:17 76:14 92:20 100:23,24 121:4 142:1 187:3 229:2 246:19 251:11 253:10 269:14,16 269:24 270:2 278:24 279:6 280:5 298:18,25
**heard** 15:6,20 28:19 30:7 42:18 55:14 65:16 70:10 75:12 84:10,11,14 93:10 110:7 118:12 129:18 130:12 136:14 175:19 177:21,21 178:18 200:24 202:15,16,18 203:2,23 230:25 232:17 246:18 249:11 256:25 276:1 280:6 285:3 287:20 290:3 293:12,19
**hearing** 2:1,1,5 15:3 39:10 60:13 79:20 80:14 81:21 84:13,22 85:3,10 85:16,21 86:17 87:11 88:3 96:17 96:23 99:18,21 113:18 114:17 118:6 121:8,8,15 121:16,16,21,24 122:9 123:15 129:25 130:5 139:13 181:21 250:2,7 252:25 284:3 286:22 299:12 303:16
**hearings** 98:24 292:18 296:1

**heart** 39:10
**heather** 9:16
**heavily** 78:8 175:2
  302:6
**heitzenrater**
  10:11
**held** 2:5 27:2,6
  59:2 65:12 76:8
  90:24 91:8 126:11
  143:25 150:2
  165:14 179:21
  186:18 190:17
  269:5
**hell** 64:4
**help** 18:24 48:16
  103:15,16 112:10
  188:5 215:16
  252:22 303:9
**helped** 95:4
  148:17
**helpful** 26:24
  35:15 220:25
  275:10
**helps** 96:2
**henry** 154:10
**herald** 86:4
**herding** 209:1
**hernia** 112:2
**herring** 10:12
  136:21
**he's** 122:15
**high** 115:20
  225:13 243:8
**higher** 290:17
**highest** 54:16
**highlight** 33:14
  95:11 96:3 97:14
  110:23 112:17
  118:20
**highlighting** 98:9
**highlights** 220:25
**highly** 55:5
  118:23

**hints** 196:3
**hiring** 293:19
**hirshman** 10:13
**historic** 62:20
  64:25 83:14
  187:13
**historical** 117:2
**historically** 164:1
**history** 39:5 41:7
  45:7,9 51:9 54:5
  85:13 96:11
  127:18 128:4,9
  290:13
**hit** 50:8 118:13
**hobbesian** 46:12
  64:4 205:11
**hoc** 3:14 4:16 41:6
  51:11 57:15 92:23
  93:16,19 98:10
  100:19 102:4
  113:22 117:21
  130:14,15 176:19
**hold** 97:19 124:11
  125:3 170:10
  179:12 184:10
  269:21
**holder** 83:24
  84:25
**holders** 20:25
  84:1,10 85:17
  88:12
**holding** 91:7
  166:3 185:5,20
  190:7,14 241:20
  265:15
**holdings** 274:19
  276:11
**holdout** 152:10,12
  152:16,19
**holds** 165:16
  169:18
**home** 153:16,17
  153:20 284:16

  291:18,21
**hon** 1:22
**honda** 62:5 63:9
**honest** 18:2 19:1
**honestly** 153:19
  200:20,23 202:19
  204:25 223:18
**honor** 15:18,22,23
  17:8 18:6 19:9
  22:8 23:3,10,23
  24:1,17,19,25
  25:21,25 26:5,17
  26:20 27:15 30:18
  31:9,13,17,19,22
  31:24 32:14,15
  33:11,13 34:11,13
  35:4,10,18,20,23
  35:23 37:1,12,14
  37:15,19 38:3
  40:23 41:9,19
  42:17 44:10 45:11
  46:9 48:23 49:6
  49:11 50:9 51:19
  52:20 53:11,12
  54:6,18,24 55:12
  55:20 56:9,17
  59:1,8 61:16 62:7
  62:11,14 63:8,15
  64:3,15,19 68:14
  68:19 70:10 71:6
  73:18 75:12 79:7
  81:21 83:3,17
  84:18 86:1 87:2
  87:17 88:7,16,17
  90:8 91:13,19
  92:7,9,14,15,18
  92:21,21,25 93:5
  93:10,17 96:14
  97:14 100:11,20
  100:21,22 101:1
  101:19 106:20
  108:1,5 111:20
  112:18,20 113:9

  113:12 116:6,12
  118:4,10,13,16,19
  118:21 119:2,9,15
  119:21 120:9,20
  120:22 123:8,10
  123:16,23 124:9
  125:11 126:1,5,9
  126:10,19,23
  127:7,9,14,20
  128:8,15,19,24
  129:21 130:1,7,24
  131:9,17,19,24
  132:3,6,14,19,23
  133:2,15,20 134:1
  134:3,25 136:6,22
  138:5,12 139:1,3
  139:16 140:5,8,16
  141:6,13,22 142:2
  142:11,15 143:9
  143:14 144:3,7,13
  144:16,20 145:3
  145:15,23 146:14
  146:23 147:4,9,12
  147:17,22 148:1
  148:24 149:2,4,12
  149:17 150:20
  151:24 152:9,25
  153:15 155:3
  156:15 158:7
  159:16 161:12
  162:2 163:17
  165:18 166:2
  175:6 176:10
  177:10 179:4
  182:8 183:21
  185:22 186:2,7,9
  187:2,10,12 188:9
  188:14,14 189:10
  189:14 191:8,13
  191:25 192:8,14
  192:24 193:20
  195:3,14,18
  196:11 197:9,16

198:13 199:15,22 200:20 201:8,13 202:3,19,20 203:12,21 204:9 204:16,18 207:11 208:24 209:16 210:10 211:18 214:2,21 216:1,23 217:25 218:20,21 218:25 219:9,23 220:19 221:6 222:11,13,20 223:18 224:2,6,8 225:2 226:3,18 227:2,8 228:1,13 228:17,22,25 229:4 231:17 232:9 233:5 234:2 234:12 235:8,24 236:25 237:13 238:8 239:9,23 242:12 243:5 245:24 246:21 248:4,5,13,20 249:1,6,23 250:19 251:2,13,14,21,24 252:4,10,15,18 253:1,8,15 254:14 255:5,10,15 256:9 256:13,18 257:5 257:20 258:5 259:1,21 260:2 261:18 262:9,15 262:19 263:17 264:4,8,18,19,20 266:4,15,21 267:6 267:16,17 268:1 268:19,20 269:10 269:12,20,25 270:6,10 272:12 272:12 274:13 275:9,13 276:1 278:1,9 280:6,12 281:14 282:3,13 282:14 283:18,21 283:24,25 285:22 286:8,17 287:18 288:10,23 289:1 290:3 291:13 292:6 293:11 294:7 295:9,11,19 297:8 298:1,20,24 299:2,25 300:2,21 300:25 301:3,4,24 302:8,15

**honor's** 26:7 28:10 185:5 204:25 208:25 257:8 267:13 289:12 299:8

**honorable** 55:6,7

**honored** 105:3

**honor’s** 133:10 152:20 160:19

**hook** 181:25 256:16 264:16,17

**hope** 16:20 17:17 27:18 65:25 111:5 114:6 211:23 233:23 247:16,17 279:24 302:23

**hoped** 270:16

**hopeful** 68:13

**hopefully** 17:1 20:4 56:21 114:10 289:22

**hoping** 187:15

**horrible** 93:17

**horror** 46:12

**hospitals** 38:17 51:16 58:18 294:18

**hot** 17:22

**hour** 37:21 219:2

**hours** 35:12 278:13

**house** 121:7 287:8

**housekeeping** 189:9

**howard** 13:21 295:1

**hudson** 10:14

**huebner** 3:8 15:18 15:19,22 18:2,6 35:21 37:15,16,19 38:3 53:5,11 54:6 54:18 65:21 67:4 82:12 93:8 95:14 102:1,3,6,18 103:22,22 104:12 110:25 115:25 145:16 150:22 156:23 204:24 205:1 212:5,7 214:22 218:17 237:17,20 247:4 250:12 272:12 278:9,12 279:20

**huebner's** 173:3 301:11 303:2

**huebner’s** 150:7

**huge** 132:6 178:23 187:18 200:10 201:15

**hugh** 11:20

**human** 39:4 112:24 287:10 290:17

**hundred** 62:11 156:21,22 215:5

**hundreds** 41:5 45:3 48:10,11,12 48:23 56:19 58:11 59:14 63:3,14 80:17 81:25 134:13 145:11 293:15,21

**hundredth** 52:6,7

**hunting** 282:8

**hurley** 10:15

**hyde** 2:25 305:3,8

**hyder** 10:16

**hypocritical** 60:11

**hypothesize** 241:1

**hypothetical** 57:21 129:4 240:22

**i**

**i.e.** 68:16 89:21 273:24

**iac** 109:16 281:12

**iacs** 50:22 80:6 81:14 109:7,8,10 109:11,15 298:7

**iceberg** 293:4

**ics** 109:1

**icsbs** 108:20

**idea** 159:18 220:4 240:7 256:23 301:16

**identified** 29:2 47:18 138:24

**identifies** 224:16

**identify** 63:4 138:19 139:20,23

**ignorance** 212:5

**ignorant** 292:2

**ignore** 42:22 102:25 213:20

**ignored** 108:3

**ignores** 212:20

**ignoring** 131:13

**ii** 29:17 171:8

**iii** 168:5 172:9 179:12,21

**il** 4:11

**ilene** 226:4,24

**illegal** 160:2 293:11

**illustrate** 70:5 212:25 303:17
**illustrates** 83:22
**illustrating** 27:24
**illustrative** 289:10
**illustrious** 289:11
**images** 122:1
**imagination** 177:24
**imagine** 157:8 299:22 303:13
**imes** 10:17
**immediate** 30:11 89:20
**immunity** 62:18 144:10,15 297:16 297:19,19,23 302:12
**impact** 28:15 69:4 69:19 103:13 257:6
**impacted** 38:8 40:18 60:3
**impacts** 100:17
**impasse** 98:21
**impeccable** 184:19
**impede** 73:16
**impending** 250:7
**imperfect** 38:8
**imperil** 103:5
**implementation** 184:3
**implemented** 21:6 171:14 242:5
**implementing** 229:17
**implicating** 177:15
**implied** 76:18 109:12
**import** 45:5 115:16 278:22 286:20 295:14
**importance** 45:13 93:13 96:15 97:15 99:1 114:4 190:19 196:4 297:10
**important** 16:2 34:19 37:24 46:10 46:10,14 60:7 65:9,14 67:2 77:25 82:16 91:24 92:5 95:13 96:1 100:16 102:2 112:17 118:14 154:25 190:2,15 190:18 203:11 206:14,18 229:14 229:20,23,24,25 230:3 231:17 232:18,22,23,25 237:12 238:24 240:4 259:22 266:23 279:3,4,5 279:23,25 284:2 288:11
**importantly** 94:11 105:10 111:14 179:1
**impose** 84:4 238:21
**imposed** 34:7 71:5 187:22 194:5 196:1 205:8,22 209:21
**imposes** 36:5
**imposition** 143:12
**impossible** 63:21 103:25 139:6 282:17 294:14
**impossibly** 255:13
**impress** 280:9
**impression** 146:6 189:11
**impressions** 88:5
**improper** 188:18
**impropriety** 188:18
**improve** 39:4
**improved** 213:1
**improvements** 51:23
**imputed** 29:5
**inability** 208:23
**inaccuracy** 18:24
**inadequacy** 151:13
**inadequate** 198:25
**inapposite** 78:17
**inappropriate** 190:17 268:10
**incarcerated** 103:2
**incidental** 89:19
**incidentally** 230:7
**include** 21:23 26:15 31:2 39:14 51:13 56:7 76:10 82:14 126:18 138:7,10 140:9 184:4 289:4
**included** 22:19,22 31:6 62:13 81:11 81:23 87:22 99:19 107:12 135:6 139:24 213:3 265:3 267:19
**includes** 40:25 42:16 73:11 89:13 90:20 181:13 303:7
**including** 15:12 20:16 22:25 25:8 31:4 38:24 39:19 42:1 45:7 46:17 49:5,10,24 50:2 50:19 53:21 59:22 60:24,25 62:1,13 63:6 65:8 81:1 82:24 83:1 85:11 86:10,14 88:18,21 90:20,23 94:1,18 95:20 97:2 103:24 125:12 130:13 135:3 145:13 164:18 172:1,22 181:25 189:2 207:7 211:21 214:3 254:3 266:8 268:19 280:10 285:4 291:18 299:6
**income** 29:18 135:18 160:5
**incomplete** 136:1
**incomprehensible** 138:14 139:16 253:23
**incomprehensibly** 255:19
**inconceivable** 97:1
**inconsistent** 253:8
**incontrovertible** 47:21
**inconvenience** 49:10
**incorporate** 40:1
**incorporated** 40:4 221:16 245:18 284:13
**increasing** 225:13
**incredible** 218:17
**incredibly** 39:17 49:20
**incumbent** 253:3

**indelicato** 10:18
**indemnification** 69:13 90:13 169:16 177:6 300:11
**indemnify** 169:21 170:9,16 276:13
**indemnities** 277:6
**indemnity** 69:5 169:11,19,23,25 170:4,7,17,19 175:6,8 257:7 275:22 277:25 301:17
**independent** 36:15,20 37:10 51:17 74:10 168:11,14 169:7,9 172:10 223:6 224:9 287:4
**independently** 170:24 270:15 273:4
**indicate** 222:11
**indicated** 51:2 127:10 130:2 133:11 138:18 139:16,21
**indicates** 76:4
**indicating** 132:5
**indication** 207:4 209:23
**indirectly** 69:4 150:18 166:23
**indiscernible** 16:17 17:1,2,7,7 23:15 26:8 34:15 34:23 35:2 61:21 84:19 86:11,12 96:5 101:6,11,13 101:21 102:8,15 102:16,19,19,21 103:2,14,21,23 104:1,10,24 105:3 105:14,20 106:5,7 106:12,14,22 107:8,15,20,23 108:4,15,16,18,22 108:25 109:5,10 109:14,14,17,20 109:24 110:1,4,5 110:6,9,14,16,17 111:15,19,21,22 112:5,7,14,19,20 112:23 113:13,16 113:25 114:19 115:3,12,15,21,25 116:4,18 117:2,5 117:19,23 119:7,7 120:7,14,15 124:2 124:17 125:1,13 126:6,9,22,25 127:2,24,25 128:22 129:1,3,5 129:9,15 131:12 131:21 133:4,17 133:22 134:6,8,9 134:11,15,16 135:10,11,12,16 135:17,20 136:5,9 136:11,13,15,25 137:5 138:8 139:1 139:13 140:23 141:15,23 142:18 142:19 143:4,6,16 144:6,19,19,24 145:24 146:4,9 148:10,13,21 153:10 162:15 165:7 168:6 245:6 252:6 254:10 263:3 264:15 266:9 269:1 271:12 272:13 282:18 285:17 286:3,21
**indispensable** 63:17 64:13 91:24 92:6
**indisputably** 72:7
**individual** 3:14 17:12 39:3,25 50:18 86:11 97:5 116:21 127:5 128:24 129:3,6 153:9 155:1,25 166:7 168:18,19 168:25 169:4 249:9 250:8 284:23 288:25 303:8
**individuals** 33:16 76:20 81:1 87:1 108:15,19,21 115:14,19 116:19 124:16 131:1,3 139:21 148:13 166:11 241:21,21 249:10,14 250:1 259:5 264:22 265:8 266:23 268:25
**individuals'** 116:14
**induced** 68:7
**indulge** 294:8
**indulgence** 210:11
**industry** 97:13 237:22
**inextricably** 195:15
**infinitesimal** 135:8
**inform** 287:15
**informal** 103:23
**information** 63:4 81:13,16 129:13 129:16 132:16 136:1 139:20 220:12 248:10 281:7,23 282:10 282:15
**informational** 291:3
**informed** 175:24 241:6
**initial** 84:17 96:4
**initiative** 48:21
**initiatives** 72:1
**initio** 228:19
**injunction** 65:2,4 65:14 70:17 71:18 74:24 77:3 78:11 78:20 79:24 91:11 128:12,20,21 137:20,21 158:5 172:3,20,24 188:17,21 189:6,8 194:24 213:3 220:6 222:10 230:10 236:10,13 236:14 237:4,10 252:23 273:17 274:23 279:7 285:7 289:14,19 289:21
**injunctions** 43:21 76:2 80:2 84:25 111:17 123:2 128:10,18 172:1 189:3 198:7,14
**injunctive** 97:10 167:4 199:11 304:5
**injured** 141:5 290:18
**injury** 38:17 40:13,15 58:1 65:2 83:1 101:17 111:21 113:21 115:8,8 117:11,18

130:15 163:25
303:8,24
**innocence** 176:4
**input** 28:10
**inquire** 193:15
**inquiry** 39:10
137:21 183:15
**inserted** 23:5
180:13
**inside** 268:7
294:20
**insinuate** 227:17
**insisted** 158:3
**insisting** 63:25
**insofar** 275:15
303:6
**inspection** 187:20
**instance** 98:14
107:8 110:14
141:15 227:18
275:24 276:14
**instances** 131:7
238:6
**instantly** 58:21,22
59:23
**instituted** 231:6
**institution** 81:15
**instructed** 168:8
**instrumentalities**
297:21
**instrumentality**
73:12
**insufficient** 193:5
240:10 260:22
288:1
**insult** 57:25
**insurance** 20:10
25:3,19 69:11
90:12 94:2 169:11
171:23 174:9,12
179:24 256:5
267:22 268:4
276:13 298:3

300:17
**insurer** 173:5
**insurers** 171:15
275:24 302:4
**insys** 61:17
**integral** 91:11,17
91:23 92:5 172:21
**integrated** 94:12
203:5
**intellectually**
52:17
**intend** 103:10
113:18 296:23
**intended** 31:14,15
297:5
**intensely** 27:11
**intent** 23:17 50:2
61:21 76:4 274:22
274:22
**intention** 150:7
**intentional** 49:25
105:19
**inter** 48:17 103:20
119:15
**interactions**
222:22 254:5
**interconnected**
41:2 120:7
**intercreditor**
43:25 47:22
**interdependent**
39:11 64:12
**interest** 30:10
51:4 64:13 80:3
80:19 106:1
109:10 114:5
129:8 132:9 153:4
157:20 173:9
205:24 233:14
234:5,11,13,19
252:19 290:24
**interested** 27:11
99:5

**interesting** 272:7
**interestingly**
125:15
**interests** 39:13
50:24 68:24 74:12
80:9,22 211:6
249:12 267:11
**interference**
225:25
**interim** 280:2
**interlocking**
39:11 41:4
**international** 86:4
**interplay** 25:14
**interpretation**
34:21 181:14
**interpreted** 146:2
**interrelated** 95:11
98:14
**interrupt** 151:22
155:2 276:3
**interstate** 40:1
46:21
**intra** 46:19 48:17
**intractable** 93:18
**intrastate** 40:3
46:20
**intricately** 125:22
**introduced** 218:9
218:18 240:23
245:22
**inures** 83:15
**invading** 286:2
**inventing** 195:20
**investigation**
55:19 116:6
177:11,16,18
**investigations**
220:2
**investment**
135:17 255:17
256:12 259:10

**invoked** 77:11
151:8
**invokes** 214:22
**involuntary** 79:23
127:4 146:8 295:8
**involve** 184:21
**involved** 25:5,6
34:25 46:3 141:19
162:1 174:2,5
222:4 270:15
287:14 289:22,24
**involvement**
45:24 59:4,4 80:4
96:12 157:1 254:6
**involves** 41:15
189:5 227:9 304:4
**involving** 41:5
118:22 194:14
**ion** 196:22
**ireland** 267:23
268:5
**iridium** 37:22
39:15 41:22 43:3
49:8 50:17,24
54:18 64:10 150:8
159:21 162:11
186:3 189:13,20
189:23 292:8,9
293:25
**ironic** 142:25
**ironically** 63:3
106:4 291:18
**irony** 270:18
**irrelevant** 76:13
77:14 89:25
189:20 213:9,14
226:19 285:2
290:14
**irrespective** 56:22
174:19
**irresponsible**
291:10

**irrevocable** 287:6
**irve** 6:21 149:4
**island** 62:4 149:8 186:14
**isle** 161:23
**isles** 125:20
**isley** 10:3
**isn't** 133:19 137:23 159:15,20 159:21 163:22
**isolated** 218:15
**israel** 10:19
**issacharoff** 10:20
**issue** 16:14 21:16 25:17 35:1,11 36:9 72:16 76:13 76:16 84:12 85:7 99:10 116:23 123:1 137:18,23 143:15 145:2,21 156:14 161:15,15 161:18,18 162:21 167:8 173:20 176:1 182:2 186:21 196:19 200:24 203:17 207:2 209:15 212:15 214:24 217:9,24 222:5 226:22 236:4 237:3,11 239:18 240:24 241:3 245:2,11,25 247:3 251:3,6 253:22 256:25 260:23 261:23,25 262:3,7 263:24,25 265:9 265:23 266:12 271:14,23 272:6 272:19 277:14 288:20,21 294:1 300:6 302:11,14 302:24
**issued** 223:9
**issues** 15:5,12 16:3,6,12 17:15 18:18 19:2 25:13 28:11 37:23 50:6 55:19 91:22 94:12 100:16 101:5,7,20 101:25 113:24 116:4 122:24 162:1 177:3 179:2 179:3 180:16,21 198:12 209:6,8 210:5 218:3 222:4 222:6 243:12 247:17 249:4 254:21 255:8 266:7 294:3 302:17,19,19,21 302:25
**item** 282:20
**items** 101:14 203:22 224:7
**it's** 102:1,2,4,13 103:25 104:4,13 107:1 108:17 109:9 112:5,24 113:1 114:23 116:9,22 117:8 121:19,23 131:22 131:24 132:13 144:11 149:21 150:11 154:12 155:6 156:5 158:7 158:24 159:5 160:22 161:18,18 163:15,16 164:5,7 164:10,11,13,14 165:1,5,25 166:23 167:18,24,25 170:2 265:24
**ives** 10:21
**i'd** 116:14 143:9
**i'll** 101:9,11,12,13 113:19 118:5 123:16,17,17 139:3 149:7,13 150:21
**i'm** 111:11 113:19 113:21,23 114:1 114:17 123:14,20 127:7 129:21 130:6 134:23 137:10,10 138:17 139:22 141:8,9,25 142:10 145:3 149:21,25 153:19 155:17 156:21,22 157:6,12 159:16 159:22,23 162:10 164:19 166:6 167:3,8 171:4 229:1

**j**

**j** 2:4 3:11,19 6:7 7:6 11:10 12:4,23 14:1,7
**j&js** 201:7,12
**james** 3:10 10:6 12:9 13:5 14:15
**jamie** 14:21
**january** 287:2
**jared** 9:23 10:5
**jasmine** 8:4
**jason** 13:1
**jay** 8:3
**jayne** 96:14 99:17
**jeffrey** 4:6 11:12 12:23 19:23
**jenna** 10:14
**jenner** 4:8
**jennifer** 9:9 12:10
**jeopardize** 95:12
**jeremey** 13:4
**jeremy** 11:2
**jerome** 13:24
**jersey** 125:20 134:8 161:23,24 161:25 263:22
**jesse** 8:25
**jill** 7:23
**job** 41:11,12 111:16 230:17
**john** 9:3,4 10:9 11:14,15 66:11,11 98:16 138:16
**johns** 64:25 65:1 76:24 77:2 268:9 274:20
**johnson** 5:2,2 26:6,6 61:18,18 62:5,6 63:9,9
**join** 93:3 182:17
**joinder** 186:23
**joinders** 186:17
**joined** 53:2 186:24
**joining** 122:19 186:25
**joins** 73:21
**joint** 2:2 55:21 188:4 219:5 224:10
**jointly** 55:11 247:19 293:23
**jonathan** 12:1 14:8 159:12 160:24 224:19
**jones** 5:6 26:5,5 182:24
**jordan** 12:24 14:10
**joseph** 8:22 12:20 13:6,19 14:4 246:3
**josephine** 9:20
**journal** 86:3

**journey** 38:13
**jr** 8:7 10:6 14:17
**judge** 1:23 54:20
55:10 56:3 59:12
74:24 89:9,11
118:24 119:22,22
121:12 122:15,19
122:21 152:4
154:10 170:4
173:15 174:6
180:10,24 181:13
182:18,24 210:4
211:5 265:18
268:23 270:18
293:17 303:12,15
**judgement** 25:20
152:16
**judgements** 21:3
150:23 151:5
161:5
**judges** 207:20
**judgment** 44:18
47:1 49:11 57:22
58:2,5 61:6 75:9
78:23 83:25 98:3
134:15 212:19
221:9,14,16,23
222:17,18 223:14
238:25 249:16
260:9,9,10 262:7
**judgments** 49:18
50:14 57:9 75:7
78:25 161:1
196:18 237:21
**judicada** 249:17
**judicial** 62:14
228:5 274:22
291:1
**jump** 75:20 79:5
214:9
**jumped** 226:19
**june** 84:18 112:8
112:9 177:12

**juris** 195:22
**jurisdiction** 34:3
34:5 71:9 88:21
89:2,3,5,21,22
90:2,5,6,18 92:1
126:2 143:3,7
149:14 168:4
169:13 170:18
171:3 173:15
174:18 175:4
179:15,17 180:3
206:10 249:5
250:8 253:12
257:22 264:8,19
265:5,7,9,20,21
266:1 267:18,21
267:25 268:2,6,8
268:14,17,20,22
271:15,22 272:9
272:15 273:8
**jurisdictional**
161:1 173:20
180:9 181:25
272:6 302:14
**jurisdictionally**
183:11
**jurisdictions**
50:18,20,23
150:17 282:19
**justice** 6:9 80:10
150:24 177:12
205:16,25
**justification** 81:3
124:6 127:2
**justifies** 150:23
**justify** 80:23
**justifying** 66:20
**jx** 68:19,20 85:18
86:5 159:19
177:14 224:12,15
224:18 225:12,15
225:20,23 226:8
248:7,8

**jx0872** 170:15
**jx2237** 159:9
**jx2241** 160:23

**k**

**k** 10:12
**kami** 12:16
**kaminetzky** 3:9
10:22 37:19,23
64:16,19,20 68:25
69:2 92:12 93:9
95:14 101:9
103:22 105:1
196:15 284:11
297:9
**kaminetzky's**
294:4
**kaplan** 7:1 186:10
**karavolas** 10:23
**karen** 10:24
**kathe** 261:18
263:1 303:20
**katherine** 9:18
12:12
**kathleen** 12:3
**keep** 18:2 19:1
112:22 121:9,13
122:14 187:25
188:2 200:18
205:19 238:25
293:25
**keeping** 29:7
**keeps** 236:10
**kelly** 14:3
**ken** 118:24 293:18
**kenan** 6:14
**kennedy** 10:24
**kenneth** 9:6 55:6
92:22
**kerwin** 89:24
90:23 91:3,8,12
**kesselman** 10:25
**kevin** 5:21 8:23
118:10

**key** 85:20 114:24
180:8 212:23
249:4
**kickbacks** 178:12
**kill** 165:1
**kind** 59:5,5
151:11 205:24
229:8 239:2
240:11,12 293:24
**king** 73:22
**kirwan** 179:11,13
179:19 180:15
**klein** 11:1
**kleinberg** 7:1
186:10
**kleinman** 11:2
**knew** 159:18
162:10 178:10
293:1,1
**know** 15:3 17:13
18:19 35:11 45:10
53:8,11,14,14,19
54:2,8,10 60:23
61:14,15 82:22
88:17 104:10,23
105:5,18 110:19
111:22 122:15
123:10,24 132:13
133:3,10 135:23
137:2 139:25
140:12 142:11
145:13 146:25
153:20 156:12,19
157:12,13 158:9
160:6 162:7
163:11,15,24
164:2 165:5
169:10 170:21
171:6 173:10
174:1 175:11,18
176:7 179:11
180:24 181:5,17
181:19,22 184:7

185:4,13,14
194:20 196:9
202:22 203:9,20
207:3 209:13
219:19 230:10,25
236:5,22,23 238:3
238:11,14,16,22
238:23 239:11,21
240:1,8 241:4,4,8
241:21 242:3,14
242:17 243:7,7,20
244:11,14,15
245:1 246:2,6,13
247:15,21 248:17
251:5 256:16
258:4 260:7,9,19
261:13 262:4,10
262:23,25 263:11
264:11 265:2
269:9 272:25
273:11 274:2,14
274:19,20 275:1
278:5,23 279:20
282:20 283:22
284:19,22 285:3
286:19,22,23
287:16 291:25
292:2,3,11 293:2
293:2,3,16,24
294:13 298:22
300:10 301:12
302:5
**knowing** 157:5
283:15
**knowledge** 30:25
54:20 58:8 137:23
139:17 169:5
170:24 220:7
242:10,11 287:11
**known** 40:25
85:17 198:1,3
219:8 254:13

**knows** 18:12
81:22 118:16,21
293:10
**kotler** 11:3
**kovacs** 185:14
**kramer** 11:4
92:22 93:3

**l**

**l** 8:18 9:17 13:19
14:6 90:22
**l.p.** 1:7 2:3 4:2
122:23
**l.p..** 2:4
**labor** 255:9
**laboratories**
276:11
**labovitz** 11:5
**labs** 91:7,12
**lack** 198:11
239:20 280:7
282:10,11
**lacked** 269:14
**lacks** 71:8 88:19
88:21 90:18
**laid** 197:18
**lake** 216:6
**landeau** 224:16
224:25
**landed** 265:16
**landscape** 287:16
**lane** 118:24
**language** 23:6
24:3,20 27:13,19
32:1 34:22,23
36:22 37:2 61:25
84:23 86:17 87:10
111:4 138:7
194:20,23 195:1
237:24 253:25
255:6
**languages** 88:4
**large** 60:17 68:2
93:16 98:19

195:12
**largely** 37:6 97:8
**largest** 54:5 115:9
290:13
**larry** 249:2
**lastly** 20:5 21:22
22:4 30:1 34:6
**late** 19:5 51:17
278:5
**latest** 169:22
**latin** 210:16
**laudable** 198:24
**launch** 60:6
**laundry** 171:5
**laura** 9:10 11:19
**lauren** 14:20
**law** 26:8,11 36:4
36:22 41:11,12
42:23 64:22 70:22
71:2,22,23 72:18
77:8,9 78:4 82:9
83:5,7 84:5 88:25
91:21 93:1 101:8
114:5 116:3,4,8
123:13 124:1
126:6,19 128:5
143:17,24 153:20
161:24 168:12,15
168:22,24 172:4
174:17,24 184:8
185:6,7,8,16
198:23 210:2
218:13 240:3
243:16 255:8
269:2 275:2
291:17
**lawful** 91:20
**lawrence** 9:14
11:3 34:13
**laws** 37:6 74:8
75:9 77:12 142:21
153:16,17 155:22
168:9,16 189:2

255:9,9 264:25
**lawsuit** 50:12
156:20 267:2,18
268:2
**lawsuits** 134:14
134:15 137:3
171:14 264:22,23
265:7,24 266:22
266:24 268:24
**lawyer** 45:12 49:4
60:12 73:23
130:15 285:18
**lawyer's** 41:11
**lawyers** 83:1
174:2,4,5,8
179:25 246:19
254:24,25 262:17
282:10 303:22
304:1
**layer** 286:11
**layn** 55:6 293:17
**lead** 162:24
172:14
**leading** 154:15
252:24
**leads** 219:15
**leadup** 159:24
**learned** 207:14
284:16
**leases** 218:12
**leave** 108:11
171:18,18 199:5
236:20 266:12
287:16 302:5
**leaves** 239:3
**leaving** 151:15
165:2 223:25
256:1
**ledanski** 2:25
305:3,8
**lees** 11:6
**left** 55:19 56:5
104:7 109:20

112:12 177:24 198:5 205:6 208:9 229:12 283:11 294:3,7
**leg** 98:13 105:9
**legal** 37:23 38:21 39:10 48:24 55:18 64:16 95:15 119:8 124:6 125:16 127:1 168:11 169:7,19 188:22 192:23 207:15 214:21 222:4,6 266:17 294:4 299:7 305:20
**legally** 44:12 114:13 287:23
**legislate** 198:17
**legislation** 291:22
**legislative** 127:18 128:4,9 274:22
**legislature** 198:7 228:20 238:11
**legitimate** 80:12 201:1
**legitimize** 137:5
**lehman** 54:10
**lending** 78:12
**length** 44:25 49:14 54:23 87:14 90:8 271:19 289:19 291:2 296:2
**lengths** 136:20 143:1
**lengthy** 15:11 98:23 103:13 229:13
**lennard** 11:7
**leonard** 11:8
**lessons** 45:15
**letter** 43:12 50:5 55:17 281:1
**letters** 282:18
**letting** 18:12
**let's** 108:7 117:6 121:15 140:15 151:25 152:1,12
**level** 70:8,15 137:17 163:23 164:9 171:5 175:20 177:14,23 183:15 237:5 242:23 243:9 270:4 284:22
**leventhal** 11:9
**levin** 92:22 93:3
**levine** 11:10
**lexington** 3:5
**liabilities** 21:3 124:14 131:2 134:21 135:2,3,5 141:2 157:3,10 280:11,15
**liability** 36:5,23 47:13 67:19 78:4 97:7 110:21 135:9 161:22 174:12 178:1 205:3 208:8 243:15,22,22 256:23 281:8 282:9 286:15
**liable** 168:18,23 168:25 169:4 176:2 178:22 191:10 241:22 256:20
**liaisons** 36:16
**lianna** 13:13
**liberal** 169:14
**lichtenfeld** 11:11
**lien** 58:5 86:13
**liens** 40:13,15 58:2
**lies** 132:22
**liesenmer** 11:12
**life** 45:21 96:8 112:10 289:5
**lifland** 173:15 174:6
**lifland's** 180:10
**liftoff** 188:1
**light** 36:1 102:9 114:10
**lightly** 49:17 176:7
**likelihood** 49:9 169:15 206:20 240:17
**likewise** 197:20
**limit** 15:11 32:10 47:25 140:23
**limitation** 50:2
**limited** 30:13 32:1 71:19 73:6 160:25 169:22 170:1,14 182:15 243:17 244:2,6,14 246:1 257:9 271:10 275:15 280:10
**limiting** 71:20 83:8 128:6
**limits** 26:11 90:3 127:16
**lincoln's** 210:22
**linda** 10:17
**line** 19:6 32:25 75:21 79:5 113:11 120:17 122:5 151:19 165:5 166:3 178:24 238:24
**linen** 171:1
**lines** 58:19 71:14
**link** 274:23,24
**linkage** 274:18
**linked** 195:15
**liquidate** 134:20 135:12
**liquidated** 129:11 134:16 163:20
**liquidating** 135:15 151:16
**liquidation** 47:20 129:10 132:12,18 133:14 135:1,6,9 137:19 250:17 274:11 290:23
**lisovicz** 11:13
**list** 40:23 54:15 62:24 87:12,22 138:8 207:19 247:5 255:10 278:5
**listed** 275:20
**listen** 122:9 239:17
**listened** 162:17
**listening** 18:18 60:13 122:5 215:5
**litany** 145:10,17
**lite** 6:1 270:7
**literally** 17:20 18:4 52:11 53:1 58:4 80:24,25 200:1 233:22 284:5
**litigants** 161:2 294:11
**litigate** 83:25 84:2 85:6 163:5 261:17
**litigated** 50:1 262:1,4,6
**litigating** 96:18
**litigation** 20:24 22:23 23:2,4,21 25:5,6,14 31:3 38:15 43:25 46:22 48:7,18 49:9 70:1 82:11 90:15 95:1

104:16 105:8,9 136:12 209:25 214:5,7 231:21 238:13 240:17
**litigation's** 43:6
**litigations** 265:4 291:6 301:21
**litigators** 61:23
**little** 19:5 20:4 28:4 32:25 58:4 62:24 113:14 134:22 157:6 177:22 181:23 199:10 210:18 272:10 279:23 292:3 295:12 302:11,18
**live** 50:21 104:14 110:1 146:25,25 266:7 287:13
**lived** 102:23
**lives** 29:9,25 39:4 48:21 285:5
**living** 108:20,23
**livy** 11:24
**llc** 6:1
**llp** 3:3,13 4:1,15 5:8
**lo** 281:18
**local** 38:16 49:2 92:24 94:19 118:18 119:3,25 120:19
**located** 73:23
**locating** 101:20
**location** 122:2
**logic** 156:3 184:24
**logically** 193:18
**long** 49:20 54:11 54:15 75:20 91:11 103:15 109:2 135:19,22 138:16 168:22 187:19 190:15 211:23 220:22 273:3 281:22 293:21
**longer** 30:10 96:19 108:16 109:4 246:7
**longest** 108:25
**longmire** 11:14
**look** 35:12 67:5 73:18 116:17 164:7 168:9,12 174:25 178:19 183:8,12,14,14 195:7 208:15 211:6 227:16 230:16,16,19 231:10 239:1,4 258:19 260:6 265:23 269:12,13 274:19 275:1,1 276:2 277:22 293:1 294:20 296:9,13
**looked** 54:7,15 70:8 147:7 174:1 236:21,24 257:23 292:14
**looking** 17:8,18 53:20 85:18 106:18 140:11 167:3 174:8 211:7 211:8,9 237:6 254:23 267:10 291:17
**looks** 31:8 114:22 230:20
**loophole** 294:13
**loose** 277:20
**looser** 109:1
**lord** 283:16
**los** 5:4
**lose** 38:21 51:20 60:4 110:16 125:7 190:23 235:16 261:17,17 266:22
**loses** 110:12
**losing** 125:25 250:3 267:1
**loss** 38:7 50:7 102:13 135:22
**lost** 39:9 53:25 64:5 95:22
**lot** 21:9 27:17,18 30:3 34:16,18 103:21 104:18 108:14 110:1,2 111:11 118:12 130:25 162:8 167:17 177:24 191:6 199:10 209:24 211:19 217:24 221:3 238:3,18 256:19 288:17 291:16,23 292:12 294:7 299:5 303:25
**loud** 87:19
**louis** 8:8
**love** 78:17 164:23 215:10
**low** 164:1
**lower** 53:17 240:17
**lowest** 150:4
**lowne** 11:15 139:17
**lumber** 182:24
**luskin** 11:16 275:13,13,14 276:4,5,9,20,23 277:15,17 278:3 279:9 300:23 301:4,8,11,14 302:1,2
**luskin's** 278:8
**luxury** 135:15
**lynam** 145:9 255:24 259:6

m

**m** 4:20 11:5,20,22 13:15
**macarthur** 145:2 166:14 167:1,4,7 167:16
**maclay** 5:21 118:10,10 120:24
**maclay's** 291:15
**madoff's** 170:25
**maelstrom** 46:21
**magali** 9:24
**magazine** 86:18 86:21
**magic** 268:6
**mailed** 85:16
**main** 6:18 190:5 232:13
**maintain** 107:10 169:14 201:15
**maintained** 234:7
**maintaining** 43:18
**major** 45:9 203:2 224:23
**majority** 72:9 73:3 80:16 82:25 91:21 151:7 167:20,21 175:15 231:13 257:11 287:3
**making** 67:11 82:19 159:17,23 160:8 192:8 203:25 225:24 257:15 262:21 272:8 286:14
**man** 121:5 138:16 147:15

**managed** 209:4,5
209:6
**management**
176:21 220:17
224:22 242:18
287:3
**mandates** 71:22
71:23 238:22
**mandel** 127:17
128:20
**manifested** 80:18
**manner** 27:22
45:19 89:16 93:24
101:25 220:23
254:1
**manufacture**
141:2 254:4
**manufactured**
268:5
**manufacturers**
19:19 22:24
**manville** 64:25
65:1 76:24 77:2
145:2 167:16
168:5 171:8,16,17
172:8,9 174:7
179:12,21 268:9
274:21
**map** 188:10
**mara** 11:9
**marc** 10:25 13:16
14:1 295:18,19
**march** 81:21
119:11 178:6
286:24
**margins** 51:11
**marine** 275:12
**mario** 8:19
**marion** 12:17
**mark** 8:13,24
10:18
**market** 229:19

**marketing** 79:22
97:11 175:24
234:18,21 237:8
242:2,2,18 243:14
244:22 254:4
**marketplace**
230:2,2,3 231:11
239:25
**marking** 192:8
**markman** 10:3
**marshall** 3:8
15:19 37:16 88:23
92:3 143:22 269:4
**martin** 14:14,15
68:21 280:22,25
**martin's** 68:19
**maryland** 7:8,9
44:14 62:3 164:19
168:21 208:20
224:3 226:13
229:5,22 230:12
232:24 237:18
239:4 241:16
243:15 246:8
282:22 283:14
**maryland's** 230:5
237:24
**mas** 294:17
**mason** 176:8
293:7
**mass** 64:25
158:16 182:25
275:7
**massachusetts**
164:20
**massive** 43:1
51:10 79:14 80:23
284:25
**massively** 40:18
**master** 86:8
**masumoto** 11:17
**material** 18:11
41:17 43:17 45:1

48:20 49:23 50:7
50:7 56:2 57:1
58:10,19 59:13
81:24 82:14
114:10
**materially** 140:22
155:9 191:11
193:14
**materials** 82:4
242:13
**mathew** 9:8
**matter** 1:5 33:2
66:23 84:18 89:1
90:2,17 92:1 96:4
98:24 117:7 139:8
149:13 168:4
170:18 174:18
185:14 188:24
189:9 194:9 228:1
228:4 249:5
253:12 254:7
256:8 257:22
264:7,19 265:8,16
267:21,25 268:14
268:17 271:15,21
272:9 297:9,13
**matters** 93:13
185:1 225:18
290:14 297:7
**matthew** 7:6 9:12
186:9
**maura** 12:3
**maxcy** 11:18
**maximize** 44:20
**maximizing** 67:16
73:16 75:23 83:15
101:21
**mcclammy** 3:10
17:20 18:2
**mccloud** 11:19
**mcdonald** 11:20
**mcgaha** 11:21

**mckenzie** 221:9
221:13,14,20
**mckesson** 4:9
**mckinsey** 61:3,9
62:5 63:9 156:20
156:25 157:6
225:16,22,23
227:18,19 242:2,2
242:4 248:7,9,12
256:13,14,15,17
256:21 257:3
**mckinsey's** 201:7
201:12,14 242:3
**mcmahon** 74:24
89:9,11 182:19
**mcnulty** 11:22
**md** 7:11
**mdl** 22:25
**mdt** 300:14 302:4
**mean** 24:13 31:14
35:6 36:13,14
37:5 52:21 57:13
61:14 155:19,25
156:23 157:16
158:2 161:23
171:10 172:15
179:4 180:22
181:23 182:9
184:18 185:12,15
185:16 194:2
199:8 201:5 203:2
216:13 225:8
226:21 229:14
231:17 232:11
233:18 235:15
236:5 237:3,13
238:9 239:11
240:24 241:12
244:14,24 245:11
245:14 246:2,6
253:24 255:9,12
255:18 256:12
258:20 261:10

265:3 272:17 274:13
**meaning** 15:8 20:20 141:4 274:19
**meaningful** 136:13
**means** 21:25 22:17 29:1,4 74:21 117:22 184:3,23 192:12 192:21 213:19 235:11 288:6 296:14
**meant** 36:21 185:7 216:9 217:7
**measure** 67:14 146:18
**measured** 194:8
**measures** 146:19 191:3
**mechanically** 21:6
**media** 62:17 88:5 137:14 196:22 209:11,20 214:16 218:12
**mediate** 30:11
**mediation** 39:21 39:23 46:16 51:23 55:21 59:2,6 68:7 75:18 95:2 103:23 104:2 107:8,9 119:2,10,14,17,24 152:2,3 202:23 207:2 209:18 210:5 289:2 293:17,20 303:12 303:12,16
**mediations** 207:21 209:14 210:1,3
**mediator** 56:3 293:19
**mediator's** 68:6 288:14
**mediators** 55:5,9 55:10,22,24 117:13 118:23 119:1,10 209:14
**mediator’s** 119:14 119:20
**medical** 36:16 51:15 78:3 294:17
**medically** 178:11
**medicines** 43:19 45:21
**medtronic** 61:17 77:24
**medtronics** 62:6
**meet** 172:22
**meetings** 226:10
**mega** 54:15
**megan** 13:2
**meises** 11:23
**melanie** 8:18
**melissa** 9:22 14:6
**meltdown** 65:25
**member** 73:23 108:23 111:22 136:2 159:11 175:19 226:25
**members** 33:15 50:18 82:6,7 86:10,25 87:18 93:18 96:23 112:25 124:12,12 124:17,24 127:5 128:25 131:5 134:4 135:4,7 136:19 138:9 140:1 157:22 175:20 234:14 236:1,20 242:12 242:19 243:10 259:16 303:21
**members’** 157:2
**memo** 160:21 224:15,25 225:7,8
**memorandum** 159:13,19 224:20 225:15
**memory** 281:25
**mention** 41:22 204:23 224:6
**mentioned** 94:13 101:5,18 210:18 211:20 225:4 230:5 238:17 245:3 247:6 257:23 259:2
**merely** 66:1 89:10 103:9
**merit** 278:22
**meritless** 71:11 88:24 90:21
**merits** 32:21 89:13 162:23 175:13 177:2 178:25 181:8 182:10 191:19 204:17 245:25 249:16 262:5 269:2
**message** 155:23 212:21 304:2
**messaging** 290:7
**messy** 103:15
**met** 257:11
**metaphor** 173:3
**metaphysical** 264:5
**metro** 209:11,20 214:16 218:12
**metromedia** 37:25 65:6 66:17 66:20,21 67:8,11 69:2,6,22 70:5 71:3,13 72:10,18 72:25 74:4 76:18 76:21 79:9 83:6 83:21 90:1 91:25 126:25 127:6,8,9 143:9,11,14,20 144:3,7,17 145:6 149:15 150:18 172:2,19 185:23 188:12,15,18,24 190:1,3,11,14,17 193:5,11,17 194:7 194:15,20 195:24 195:24,25 249:4 249:18 253:12,16 257:5,11,21 276:2 277:23 297:7,9,13
**metromedia’s** 143:17
**mezei** 11:24
**michael** 8:2 10:1 11:16 12:7 13:10 14:7 275:13
**michele** 10:13 11:23 12:15
**micromanaging** 224:13
**microphone** 113:15 187:8 301:8
**mics** 121:9
**middle** 18:19 112:8
**mike** 66:12
**milbank** 31:10 300:4
**milestone** 61:4
**milking** 243:13
**millenium** 91:7,12
**millennium** 180:25
**miller** 11:25

**million** 47:12 68:16,17 81:23 106:16,22,24 107:18,18,19,21 117:10 152:3 160:1 164:14,15 173:10 174:13 176:18 282:6
**millions** 45:7 48:11,24 55:18 82:3,15 116:24,25 148:16 157:18 176:25
**mind** 121:9 197:10 226:1
**mindful** 28:9 205:17
**minds** 151:9,12 156:3 193:24 215:15
**mineola** 305:23
**minimis** 67:20
**minimum** 226:10
**minors** 50:19
**minute** 63:15 88:16 155:18
**minutes** 17:6 196:8 278:17 280:5
**miracle** 199:14
**miscellaneous** 20:6 26:22
**mischaracteriza...** 62:18
**misconception** 233:25
**misconduct** 28:14 28:16,18,22,24 29:4 30:24 36:6 36:18,19
**misguided** 60:10
**misheard** 232:18
**misleading** 37:7,9
**mispronouncing** 210:17
**misquotes** 299:5
**missed** 102:24 180:7
**missing** 186:4 274:25 302:5
**misspoke** 232:21
**misstatement** 279:11
**mistake** 75:8 92:13 187:13 206:22 249:13 283:15
**mistaken** 188:5 205:21 262:21
**misunderstanding** 198:22
**misunderstandi...** 108:12
**misunderstood** 56:20
**misused** 146:5
**mitchell** 8:3 10:15
**mitigate** 50:13
**mitnick** 12:1
**mixture** 265:12
**mocked** 190:7
**model** 61:6
**mogul** 184:18
**molton** 12:2
**moment** 18:15 39:7 115:24 151:25 152:1 155:19 166:25 225:3 288:23
**momentous** 93:6
**moments** 18:21 176:8 293:7
**monaghan** 12:3
**monetarily** 259:18
**monetary** 74:12 80:9 95:24 96:19 97:8 165:21 184:14
**money** 16:20 38:7 38:11,12 44:8,16 48:16 75:7,21 78:25 79:18 83:4 111:2 116:10,24 117:1,16 125:22 131:11 132:7,25 133:16 152:13 156:6 160:17 165:25 166:22 178:23 184:24 185:3,17 194:10 194:12 198:19 199:5,10,11,14,16 199:16,21 200:18 200:21,25 201:23 201:25 202:9,9,17 203:8,10,19 211:14,16 213:6,9 213:12 214:3,4 215:10 217:5 228:19 229:16,20 229:20 231:13,17 232:3,6 235:22 237:12,16,19,21 238:12,18,24 260:8,13 261:10 263:14 273:20 274:5,8,9 277:5,6 282:16 283:7,12 292:21,22 296:25 303:7,9,22,23,25
**money's** 203:10
**monies** 44:12 94:16 99:5 100:3
**monitor** 43:22 111:16 289:10 290:10
**monitoring** 51:16 294:17
**monitors** 79:25 289:11
**month** 48:19,19 112:3 237:16 293:19
**months** 60:25 104:8,9 112:8 118:22 281:18 293:18 294:25
**monumental** 43:8 45:13 46:11 117:12
**mor** 170:12
**morning** 15:18 19:9 34:16 37:15 64:19 92:15 100:22,25 122:25 140:18 149:20 154:7 230:25 247:4 250:12 302:17
**mortgage** 78:10
**mortimer** 68:20 243:10,23 260:11 262:22 287:11 293:1
**motion** 221:11,25 222:5
**motions** 219:10 222:3
**motors** 137:19 250:16
**move** 113:1 140:15 147:19 152:21 201:4 210:8 211:17 214:21 218:1 253:11 257:21 264:7 267:11
**movement** 209:24

**moving** 104:20
**mpt** 90:14
**msg** 16:22 51:14
  120:20
**msge** 16:7 68:8
  288:15 294:16
**muha** 12:4
**multi** 5:17 203:5
**multiple** 81:12
  94:12
**multiplier** 44:21
  45:2
**multistate** 118:8
  118:11,16 130:14
**multitask** 121:18
**municipal** 270:8
  296:4
**municipalities**
  40:4 93:14 153:7
  153:21 212:6
  271:8 284:25
  291:4 296:8 302:9
**municipality** 6:2
  73:11 80:17
  203:16 269:24
  270:3 284:11
**munis** 295:23
**murray** 12:5
**muster** 91:18
**mutants** 288:22
**mute** 121:9
**mutual** 22:11
**mutually** 39:17
  41:4 46:14 64:12
**myers** 5:1 26:6
**myriad** 38:15
**mystery** 116:9

**n**

**n** 3:1 4:10 15:1
  91:14 115:2 305:1
**n.d.** 170:13
**nail** 125:19

**name** 62:24 83:21
  121:22 122:13
  146:20 249:1
**named** 124:13
  177:15 220:11,13
  220:24
**names** 77:1
**naming** 46:5
  290:4
**nanosecond**
  283:22
**narrow** 16:3
  18:22 20:3 32:23
  35:17 77:14
  185:13
**narrowing** 140:17
  302:25 304:4
**narrowly** 197:18
**nas** 51:15
**nasbi** 51:15
**naspi** 294:17
**natasha** 11:5
**nathaniel** 11:25
**nation** 6:2 100:17
  132:9 296:4
**national** 58:1
  93:23
**nations** 270:8
  271:9 296:9
  302:10
**native** 51:14
  294:16
**naturally** 158:13
**nature** 56:5 98:14
  114:7 188:19
**nbt** 109:15
**ncsg** 17:4 55:24
  236:20 289:18
**ndt** 110:12,17
**near** 80:20
**nearly** 79:19
  87:24

**necessarily** 34:21
  130:22 163:1
  180:22 195:16
  206:6 244:6
**necessary** 67:16
  69:21 91:24 92:5
  120:10 172:20
  173:1 178:12
  190:19 219:6
  222:14 239:1,2
  246:9 277:9
**necessity** 43:4
**need** 16:19 25:14
  36:7 46:9 49:1
  59:9,20 81:1
  90:10 102:6
  104:10,20 112:20
  113:7 114:3
  121:11,18 172:3
  175:7 180:5
  185:13 188:4
  189:9 193:9 197:2
  203:17,18 206:15
  207:19 227:20
  231:21 237:24,25
  238:21 239:16
  243:20 245:3,4
  246:19 247:11
  251:11 253:9
  258:7,22 269:16
  272:19 278:24
  279:13 284:22
**needed** 48:22
  128:17 174:20
  180:5 246:13
  298:19
**needing** 18:12
  100:2
**needs** 16:14 18:17
  217:17 239:15
  241:14 289:16
  304:10

**negotiate** 206:23
**negotiated** 55:2,3
  105:2,12 106:7
  110:15 120:15
  158:25 203:24
  208:11 297:3
**negotiating** 18:20
  46:3 107:14
  205:18 289:22
**negotiation**
  261:16 289:20
  293:17
**negotiations**
  55:12,14 104:23
  118:22 120:3
  207:18
**neiger** 12:6
**neither** 87:10
  126:21 148:11
  262:12 269:3
  280:17
**nes** 58:17
**net** 49:18 68:14
  68:23 135:23
**never** 45:9 50:21
  56:16,22 60:5,6
  75:12 82:11 97:23
  139:10,11 143:2
  164:13 178:18
  226:1 282:12
  287:14 293:4
**nevertheless**
  171:1
**new** 1:2 3:6,17 4:4
  4:18 5:12 6:12 7:4
  28:15 29:9 33:19
  34:23 35:11 43:22
  46:5 62:3 71:2
  86:3 153:22
  164:18 207:18
  218:1 220:11,12
  220:12 252:23,23
  285:8 286:21

287:4,21 291:6 292:18
**newark** 6:5
**newco** 80:1 111:18,19 141:11 289:7
**newco's** 289:8
**newest** 16:4
**newly** 33:23
**news** 16:4 17:22 18:7 88:6
**newspaper** 86:18
**nicholas** 12:14
**nickolas** 10:23
**nicole** 11:8 269:14 269:16
**night** 18:20,20 246:24 285:7
**nightmare** 205:11
**nights** 252:24
**nine** 52:4,12 57:2 57:13 97:21 104:9 150:23
**ninth** 182:22 184:9 265:10,11 266:9
**nj** 6:5
**noat** 33:21 34:2 40:2,4 44:10 75:15 296:16,20 297:1
**noise** 121:10
**non** 4:16 16:21 17:12 23:11 28:11 28:12,17,17 35:24 40:18 42:10 47:5 51:6 62:20 65:7,8 66:14 68:8 72:8 74:12 80:8 82:5 89:21 93:14 97:4 97:16 98:17 105:17 106:2 107:22 126:11,12 126:13,18 127:15 127:22 136:19 141:1 142:23,23 143:8 144:1 146:7 149:23,24 150:2 151:6 158:10 159:1 161:8 162:20 163:7 166:5,10,18 167:5 167:10 176:20 187:21 188:17 189:15,18,21 190:1 195:21 196:20 197:22 205:7,9,21 209:11 209:21 212:17 221:11 225:19 265:12 268:11,14 275:16,18,19 277:3,8,10,13,17 280:19 295:24 296:7,13 298:7
**nonconsensual** 84:4 90:25 109:23 126:11 145:19
**nonconsenting** 40:25 51:20 102:5 133:21
**nondischargeable** 76:20
**noneconomic** 45:5
**nonmonetary** 80:22
**normal** 82:11 128:10 158:3 183:13
**normally** 135:17
**norton** 82:9 281:13
**notable** 179:12
**note** 16:19 67:22 71:19 145:18 178:15 190:2,8 196:3,15,21 197:1 198:15 218:7 224:2 226:4 237:17 291:15 292:6 303:20,25
**noted** 76:20 82:12 114:11 119:14,19 197:3 268:9 290:16 297:9
**notes** 111:1
**nothing's** 185:1
**notice** 2:1 62:14 84:16,22,22,23,24 85:3,5,10,14,16 85:20,21 86:2,17 87:11,23 88:3,8 88:12 125:7,24 136:13,20,23 137:4,12,13,14,20 138:1,4,6,7,7,12 138:25 139:2,10 139:15 140:6 228:5 249:11,23 249:24 250:4,7 280:8 283:19 291:1
**noticed** 113:17 250:1
**notices** 87:15
**noticing** 85:12,22
**noting** 119:11 146:23
**notion** 77:11 115:13 171:24
**notwithstanding** 75:1 153:16,17 171:1 174:11 183:24 185:6,8 223:9 266:18
**nsge** 58:17
**nuisance** 74:7 256:25 257:2
**number** 41:2,3 52:16 54:16 55:20 56:1 58:7 59:8 60:9 63:2 68:6,7 82:16 84:20 101:19 108:10 115:6,12 119:17 122:6,7 124:10,13 146:3 160:23 177:23 195:13 218:6 221:11 224:25 253:23 263:4,8 281:9,19 282:2,20 287:13 288:1 294:2 299:5
**numbered** 220:22
**numbers** 63:2 219:6 225:4
**numerous** 79:20 80:2 90:23 102:4 103:24
**ny** 1:14 3:6,17 4:4 4:18 5:12 6:12 7:4 305:23

**o**

**o** 1:21 15:1 305:1
**o'connell** 49:6
**o'melveny** 5:1 26:5
**o'neil** 228:11,15 228:16
**o'neill** 199:9,12 228:11 238:17 248:5,6,16,20
**oath** 43:11
**object** 48:3 104:7 137:16
**objected** 21:19 35:25 52:11 53:2 60:1 102:4 123:11 123:24
**objecting** 41:1 46:17 52:22 53:3

56:12,25 57:2,22
58:1,19 60:24
62:13 63:12 70:20
72:17,20,23 73:6
74:1,6,17 75:2,8
75:13,25 76:17
77:8,11 78:8 79:3
79:10 80:7 81:3
82:18,22 83:3,9
83:10 88:18 89:23
102:14 103:19
104:22 105:15,20
106:4,4,8 113:8
116:16 117:18
147:20 151:2,12
151:20 152:24
153:2,12,14
154:13 168:16
183:15 201:22
202:6 203:8
227:11 232:25
276:7 292:4
303:18 304:3,3
**objection** 19:25
25:1,2,2,4,24
26:11,15 35:7,7
41:20 42:6 66:3
68:11 70:4 72:3
73:21 76:1 78:1
79:15 80:10 81:7
82:19 107:17,25
108:2,4 114:2
117:8 126:10
166:3 184:9
186:23,24,24
218:7 230:5
271:10,10 275:15
281:25 296:23
300:6 301:16
**objectionable**
202:18
**objections** 16:18
18:23 19:21 20:9

21:18 26:1 41:24
41:25 53:10 66:16
66:17 83:17 84:12
95:23 96:3 101:13
101:14 114:12
117:9
**objectives** 95:13
102:9,14
**objector** 47:16,18
47:19 71:21,22
83:14 123:5
285:11
**objector's** 77:3
**objectors** 38:11
41:18,21 42:8,13
42:22 52:3 53:25
55:8 59:1 60:8
62:1,16 63:6
65:23,25 67:6
69:16 70:3 72:4
74:2 80:21 83:8
83:13 88:18
102:24 103:9
105:5 107:3
122:23 218:18
278:13 280:7
292:7
**objects** 73:20
126:7
**obligated** 170:16
260:18,19 282:23
**obligates** 248:11
**obligation** 109:9
160:15 169:21
170:4 175:6 211:3
**obligations** 21:3
46:7 59:17 124:22
134:5 148:3,10
169:11 170:8
275:22 300:11
**obligors** 286:14
**obliterated**
301:19

**observation** 153:5
153:6 208:25
**observe** 216:25
**observed** 81:16
122:3 154:10
**observer** 107:9
**obtain** 21:4 75:10
120:17 129:1
134:10 143:2
200:8 205:16
206:17
**obtained** 56:6
100:15 159:1
**obvious** 102:23
213:5
**obviously** 16:12
16:16 17:9,12
54:24 133:18
154:5 158:9
161:25 174:2
176:6 177:25
240:25 241:24
257:24 272:19
278:13,23 279:3
280:1 282:13
295:13 297:2
298:7 299:17
**occurred** 141:14
142:4 154:6 209:3
**october** 225:11
**odd** 174:21
210:16 213:18
**odds** 136:7
**offended** 17:18
**offer** 65:24 77:4
214:2
**offered** 42:4 92:4
106:8 214:14
245:22
**office** 7:8,15
34:14,21 133:18
**officer** 59:17
180:20

**officers** 56:6,8
60:18 61:9 62:8
63:10 163:10
256:4
**offices** 34:20
186:13
**official** 5:9 44:17
101:2 121:25
130:13 231:21
299:3
**officials** 82:20,24
153:2 210:25
211:4 283:10
295:15
**offset** 173:9
**offshore** 159:9,17
161:5
**oh** 18:12 127:14
204:2 213:22
295:18 302:2
**ohio** 170:13
185:14
**okay** 17:24 18:5,5
19:4 23:9,25
24:18 26:3,18
30:20 31:20 32:18
33:12,12 34:10,12
35:3,19,20,22
36:10 37:1,11,13
38:2 54:3,17
64:18 69:1 100:25
113:10 118:3
120:23 121:6
122:21 123:19
128:23 131:22
132:1,4 133:24
134:2 142:14
145:5 148:25,25
149:3,10,16,17
150:10 156:16,23
157:7 158:18
160:20 162:3
181:4 182:20

185:22,25 186:5,8 187:4,12 191:15 193:22 195:17,19 196:14 201:11 204:2,19 207:1 210:10 214:20 218:2 219:3,3,23 221:5 224:6 225:6 225:10 228:3,14 228:24 232:10 233:6 234:4 237:1 241:11,15 245:8 246:16,21 247:23 248:3,22 253:5 254:19 257:19,20 264:4,9 273:6 275:10 276:19,23 276:23 277:16 278:2 279:24 295:17 298:2,15 298:17 300:1 301:2,13,25 302:6 302:16
**oklahoma** 283:4,5
**old** 112:3 305:21
**omnibus** 278:18
**omnipresent** 62:25
**onboard** 73:18
**once** 75:13,17 107:10,11 206:9 303:11
**one's** 293:18
**onerous** 80:2
**ones** 238:4 239:14
**oneself** 158:9
**ongoing** 79:14
**online** 86:19 87:3 87:4 88:5
**onus** 80:20
**operate** 45:18 72:5 80:1 144:18 249:20
**operates** 230:9 231:11
**operating** 61:11 61:15 173:2 233:24
**operation** 243:25
**operative** 248:8
**opinion** 17:16 98:19,20 172:25
**opioid** 20:24 28:11,12,17,17,23 28:23 33:2 38:10 39:2,9 43:17 44:5 45:22 46:1 60:3 60:25 70:1 79:14 80:5 86:15 93:17 94:6 95:25 96:8 96:12 97:13 100:13,18 101:21 102:12 108:15,17 111:8,24 112:9,12 117:3 119:5 120:14 124:20 134:19 135:3,9 136:10 138:20,20 139:19 141:1 148:17 205:3 213:3 229:19 237:14,22,22 238:10,12,13 248:12 249:9 253:21 254:3,5,7 254:22 258:22 271:1 283:7,17 303:10,23
**opioids** 79:22 112:1 125:17 234:19 237:4 247:9 255:8,12
**opportunity** 39:6 83:25 84:9,10,14 93:5 95:21,25 136:13 137:15 197:23 249:11 251:22 301:15 304:8
**oppose** 58:23 137:21
**opposed** 15:5 36:22 67:20 146:21 155:12 168:14 183:4 255:2 259:23 273:9,25 283:7,13
**opposing** 227:4
**opposite** 103:17 205:14 283:3 286:13
**opt** 57:1,21 58:5 58:18 59:13 62:20 99:11,18,21 103:4
**option** 148:8
**oral** 15:2,9,15,23 16:15 19:3 35:15 36:1 42:11 94:24 122:23,25 130:12 299:13,19
**oranges** 202:8 227:10
**order** 15:5 26:9 27:1,20 34:7 61:6 83:23 84:18 88:20 90:19 91:3,5 103:10 110:1 134:10 151:11,17 169:24 174:12 180:10 186:14 200:8 206:16 207:20 218:4 236:7,9 265:15 282:5 283:24
**ordered** 124:24
**orders** 77:3 167:4
**ordinary** 20:23 22:5,12
**oregon** 41:21 62:2 149:7 152:5 186:11 291:20
**organization** 207:7
**organizations** 113:6
**organized** 16:23 212:6
**original** 289:19
**originally** 225:20
**os** 183:2
**osus** 170:20 175:2
**other's** 104:19
**otterbourg** 93:1
**oud** 112:11 113:4
**outcome** 64:8 69:18 99:14 114:6 143:12 241:1
**outcomes** 206:21 240:25
**outline** 26:21
**outrage** 60:8
**outs** 58:18 99:18 99:21
**outside** 75:10 79:4 89:21 96:25
**overall** 20:22 53:20 294:2
**overdose** 111:25 112:9,12
**overdoses** 45:22
**overlooked** 170:2 237:20
**overnight** 19:16
**overriding** 150:23
**overseas** 50:21 160:25 290:12
**overseeing** 289:9
**overseen** 79:24 120:3
**oversees** 111:16

**oversight** 43:21 45:18 184:16
**oversimplificati...** 41:10
**overstate** 294:14
**overwhelmed** 289:16
**overwhelming** 42:11,14 43:1 51:2 53:21 54:25 59:22 62:21 70:9 80:16 94:9 102:7 119:17 146:18 147:7 172:22
**overwhelmingly** 115:20 146:7,11 153:7 181:20
**owe** 276:12 277:5 277:5
**owed** 57:8,23 100:5 160:6,18
**owned** 32:3
**owners** 86:24 87:7
**ownership** 109:11
**oxycontin** 234:18 236:3
**ozment** 12:9
**o'neil** 12:7
**o'neill** 7:20
**o'sullivan** 12:8

**p**

**p** 3:1,1 10:10 14:13 15:1
**p.c.** 7:1
**pacific** 182:24
**package** 202:7,7
**packet** 138:13
**packs** 255:7
**page** 15:11 31:24 49:13,13 67:10 69:6 72:10 80:13 99:22,22 104:8 226:19 249:19 275:21 276:20 280:16,17,20 291:16
**pages** 41:16,25 42:16,17 64:9 65:23 81:23,25 82:4 96:17 157:18 220:22 226:8 246:3 280:13,23 281:2 282:6 291:16 293:21 295:3
**paid** 58:24 75:17 109:3,4,19 129:12 135:17 156:4 160:14 163:24 173:9 194:11,12 195:10 201:24 203:8 231:8 237:15 255:4
**pain** 187:14
**painful** 38:5 294:15
**painstaking** 209:10
**paint** 52:16
**pair** 77:23
**pales** 160:8
**pamela** 9:13 13:25
**papers** 16:16 88:10 90:8 168:5 188:11 189:23 221:19 280:5 294:6
**paradigmatic** 66:19
**paragraph** 32:24 66:3 67:22 68:5 70:4 75:25 78:1 80:9 81:7 82:18 84:21 98:25 99:9 99:16 100:6,9,10 100:10 146:12 248:10 281:15,21 285:24 291:16
**paragraphs** 79:15 220:23
**parameters** 183:17,18,19
**paramount** 50:24
**paraphrasing** 273:18
**parens** 74:11 77:15,21 199:1,2 210:11,20,22 211:1,17 234:10 288:22
**parenthetical** 27:24
**parents** 61:11 62:9
**paris** 13:2
**park** 5:11
**part** 27:4,22 34:19 36:1 38:12 65:14 67:2 76:15 86:22 90:7 104:23 120:10,11 121:14 121:14,15,16 122:9,17 144:24 149:13 154:5,8 155:5,5 156:17 159:1 169:11 171:23 172:21 179:14 180:4 182:10 200:15 202:6,9,10 203:2 209:17 214:22 218:9 219:10 221:19 222:22 224:10 234:9 236:3,24 254:2 265:25 270:20,22 270:23 273:20 276:16 280:4,5
**partial** 98:6
**participant** 122:17
**participants** 119:17 237:22 296:20
**participated** 117:13 168:19 247:13 277:5 282:7
**participates** 169:1 169:5
**participating** 46:18 51:24 170:24 244:1 286:22
**participation** 59:7 136:17 241:24 242:9 243:14 244:21
**particular** 36:1,9 66:23,25 72:14 137:22 179:17 190:12 224:5 239:11 241:25 260:19
**particularly** 117:2 163:2 200:22
**parties** 15:4,9,13 15:16 18:25 20:18 20:21 21:19,25 22:2,3,4 23:5,7,7 24:5,9,12,14,23 25:18 27:11 28:13 28:13,21 29:3,20 29:25 30:10,13 31:25 33:14,23 36:3,8,15 42:15 43:10 44:21 49:22 51:3 56:7,20 58:12 59:6,14 60:9,24 61:1,22

62:2 63:4 65:3
69:10,10 73:25
77:2 78:19 82:19
83:5 86:10,14
87:13,23 94:8
95:1,5 96:25
99:11 110:2,16
111:5 121:12,19
122:25 123:3
126:18 128:22
134:9 138:8,19
139:7,7,18 141:4
142:18 143:1,3
144:21 145:9,10
148:13 151:18
158:13,15 161:17
167:5 178:24
186:16 188:4
189:21 191:18
206:9,23 207:13
207:25 208:10
209:18,23,25
210:1 211:20,24
212:4 214:5,9
216:6,19 217:12
218:5 222:10
227:7 246:24
247:1,5,19 250:24
256:1 260:24
267:19,24 268:18
269:3,3 270:19,21
272:13 274:7
276:25 277:3,4
282:4 294:6
295:15 296:2,3,6
296:13 300:13,16
302:22,23 303:11
303:14,17 304:6
**parting** 67:12
**partis** 41:6
**partner** 94:23
**partners** 61:10

**partnership**
160:13 169:23
170:2,15,16
**parts** 94:17 155:4
205:6
**party** 17:18 21:5
21:22 22:13,14,17
22:18,19,20 23:21
24:11,16 27:2,3,3
27:7 28:7 29:1,2,3
30:7 36:16 42:7
51:16 55:1 56:14
56:16,23 57:2
58:10 59:13 60:1
62:1 63:7 64:23
65:7,13,18,19
66:15,20,22 67:1
67:9 69:3,8,20,22
70:6,24 71:1,4,15
71:18 72:4,8,13
76:2,4,22 79:11
79:16 83:18 84:8
84:11,16 85:11,14
85:22 88:20 89:4
89:11 90:7,20,25
91:6,10,17,19
97:15 101:7
104:12,14 106:8
106:12,17 122:1
123:2 124:4 126:8
128:11 129:1
137:19 142:17,17
143:12 144:4,17
149:14 150:14,16
151:11 156:20
159:15 161:18
168:8,11 170:22
170:22 175:4
179:13 180:20
181:7 182:11,23
183:5 184:4
186:23,25 187:21
188:17 189:16,18

190:1 195:21
196:1,23 197:22
205:8,9,21 209:21
212:18 226:15,17
226:22 227:1
246:23,25 249:13
251:3 255:20
256:15 264:21
265:22 266:1
268:2,10,11,14,16
272:16 273:2
275:23 276:1,14
280:20 282:6
294:18 296:11
297:14 298:8
**party's** 268:12
**pass** 91:18
**passed** 283:5
304:9
**passing** 41:23
**passion** 115:16
**passionately**
49:22 285:10
288:15 291:11
292:16 295:16
**path** 102:2,19
**patience** 117:19
**patients** 43:20
**patriae** 74:11
77:15,21 199:1,2
210:12,20,22
211:1,17 234:10
288:22
**patrick** 11:18
12:7
**paul** 6:14 7:10
12:25 13:14,15
255:18 275:12,14
276:8,9
**pause** 115:5,13,24
279:23
**pay** 47:2 56:13,18
57:10,19,24 68:10

100:2 109:8,13,18
119:8 125:14
159:4 160:18
164:23 174:13
215:10 226:9
258:21 262:13,13
263:5 286:15
**payers** 51:17
294:18
**paying** 145:11
171:22 192:5,11
194:21 197:8
206:16 274:10
292:20
**payment** 20:14
68:18 97:21
109:22 113:22
117:11 166:22
191:5 192:15
194:16,24,24
195:5 201:1
248:10 257:24
258:6 263:21
**payments** 109:3
160:4,10,12
163:25 190:20
194:13 205:16
259:19 260:22
263:15
**payors** 51:17
**payout** 135:19,22
**pbc** 111:18
**peabody** 165:25
**peace** 99:19
**peacock** 12:10
**pedestrian** 255:11
**penal** 155:21
289:4
**penalties** 76:19
229:21 230:14
**penalty** 57:4
284:17

**pending** 22:23 33:2 134:13 254:7 271:13 301:21
**penny** 125:14
**people** 15:14 33:18,22 43:14 45:16 59:20 62:24 103:16 104:17 108:11 110:11,13 110:16,18 112:10 112:16,22 113:4,4 113:5,5 114:16 116:9,25 117:1 118:1 120:7 131:14,16 138:10 145:11 146:20 156:14 163:11 164:3 175:21 181:18 187:15,18 191:1 210:23,23 210:24 211:1,2,3 211:5,7,13 215:6 234:20 235:13,13 239:24 241:21 256:9,11 257:12 269:22 278:4 284:20 285:6 287:16,21 288:2 289:17 290:10 291:11 292:25 293:25 295:7
**people's** 211:4
**people’s** 110:10
**perceive** 165:8
**percent** 17:5,5 38:23,24 43:17 48:1 51:5,22 52:7 52:8,14,16,17,19 52:23,24 53:10,16 53:19,19 57:7,11 60:2 70:10,12,14 70:18 73:3 106:2 107:15 115:6,12 115:14 118:1 131:15 146:12,14 146:15,16 147:12 156:21,22 279:21 285:2 288:3,3,7 288:15 290:15,15 295:11
**percentage** 53:18 119:12 146:6 194:17,20 195:2 290:17
**perception** 199:23
**perdue** 208:10 220:24
**perfect** 38:4 102:1 104:12 199:25 212:21
**perfectly** 23:14
**performance** 290:22
**period** 55:3 108:25 133:11 159:3 162:9 175:22 207:17 237:23
**periodically** 16:13
**perjury** 57:4 284:18
**permanent** 154:20
**permissibility** 162:12
**permissible** 72:13
**permission** 263:22
**permit** 89:15 106:19
**permits** 72:8 230:12
**permitted** 70:25 95:5 131:6 207:22 243:4 268:4
**perry** 176:8 293:7
**person** 110:12 122:14 123:4 138:23 140:11 164:5 233:24
**personal** 38:17 40:13,15 65:2 83:1 101:17 111:21 113:21 115:8,8,16 117:18 130:15 143:2 145:13 154:24 155:5,7,9 157:21 163:25 250:8 259:17,24 261:19 262:2,22,24 286:16 303:8,23
**personally** 112:19 236:19 259:25 264:13 286:21
**personam** 286:5
**persons** 30:9 50:14 140:21
**perspective** 67:15 68:1 110:18 182:11 192:9 231:11 237:12
**pertain** 303:6
**pertained** 223:24
**pertaining** 40:13 157:2
**pertinent** 29:8
**peter** 8:20 17:7 100:7 159:12 299:4
**petition** 138:17 254:3
**pf** 276:11
**pg&e** 54:11 184:9 184:15,24,25
**phar** 170:12
**pharma** 1:7 2:3,4 3:15 4:2 66:4 86:22 87:6 122:22 123:12 126:1 169:22 247:8
**pharma's** 86:23 87:7
**pharmaceutical** 237:7
**pharmaceuticals** 141:3
**pharmacies** 19:20
**pharma’s** 169:22
**phase** 39:21,23 46:15 51:23 55:21 59:2,5 68:6 75:18 95:2 103:23,23 119:2,9,23
**phi** 285:6
**philip** 8:1
**phillips** 55:6,10 118:24 293:17
**phone** 17:19,21 122:6
**phrase** 50:10 62:16 156:13 200:3 210:17
**phrased** 223:20
**physician** 16:5
**pi** 51:14 107:13 107:15 115:3 294:16
**pick** 31:14,15,16 267:11 289:9 290:11
**picked** 32:4 180:8 282:24 289:8
**picking** 134:24 266:11 284:15
**picks** 143:20
**piece** 16:4 17:22 18:6 95:12 96:21 203:6,7 217:13 218:23 289:23

**pieces** 55:25 98:9
218:16
**pierce** 286:6
**piggybacking**
155:24
**pillsbury** 4:15
**pin** 286:18
**pis** 44:5 58:17
108:7
**pit** 113:25
**pittman** 4:15
**pivot** 84:15
**place** 7:10 171:21
197:13 218:25
220:7 289:14
**places** 21:7
**placing** 130:19
**plaid** 281:5
**plain** 76:6 84:22
85:22 86:17 87:10
87:14,20 138:7
**plains** 1:14
**plaintiffs** 78:4
179:25 285:17
291:5 295:2
**plan** 2:2 19:5,15
19:17,21 21:7
22:14 23:1,14
25:1 26:1,9,11
29:8 30:19 32:12
34:2 35:16 38:4,5
38:6,25 39:12,16
42:4 43:8,10,12
44:9 45:4 46:11
46:18 47:9,17,23
50:5 51:10,12,22
52:25 53:8,9
56:16,19,22 58:18
58:23 59:7,10,10
59:12,18,24 60:4
63:3,24,25 64:3
64:11 65:10,15,16
66:6,9,23 67:2,17

67:18 70:2,9,9,11
70:13,14,18 71:9
71:25 73:2,21,24
75:24 76:15 77:22
78:6,14 79:16
80:1,6,19,20,24
81:17 82:12,17,23
83:12 85:21,23
86:7 87:14 88:3
88:15,20 89:7,10
89:12 90:7,20,21
91:1,6,10,11,17
91:20 93:22,25
94:5,7,11 95:6,7
95:12,19,23 96:2
96:4,6,10 97:16
98:13 99:11,24
100:11,15,20
101:24 102:3,10
102:19 103:6,11
104:7 106:18
107:13,17,18
110:23 111:3,7
115:1,4,10,23
117:10,22 120:6
120:13,21 122:24
123:1,12,25 124:9
124:13,18 125:25
126:15 128:10
129:5 130:12,18
130:21,21 131:16
131:18,20 133:22
133:25 135:13
138:18 139:14
140:17,18,20
142:12 144:2
146:1,11,15
147:20 148:12,21
149:20 152:25
153:7,10 154:5,17
155:10 165:3
166:8,9,22 167:15
171:13,17,20

172:20,21 173:1,2
173:4,11 174:8
177:4 179:14,18
179:20 180:4,14
181:6,18,25
182:10,24 184:2
184:11,14,15
187:13,13,16,16
187:18 189:3
191:23,24 199:20
202:18 205:12
207:8,14,15,18
213:2,3,5,7,13
215:11,24 216:19
225:11 227:4
236:12,15 237:19
237:25 238:21
242:2 247:15
251:8,25 252:2,17
257:23 258:24
259:20 261:13
265:2,3,9,24,24
265:25 267:19
268:3,7,15,20,21
271:2,3 272:5
275:19 276:10,24
277:2,9,24 278:20
288:14 290:20
292:5 294:12,13
294:21,25 295:3
296:1,4,18 297:11
303:4,5,5 304:6
**planned** 203:2
246:7
**plans** 88:8 187:20
207:22 268:6
**plan's** 123:1
**play** 67:1
**players** 177:15
**playing** 210:8
**plays** 65:14
**plea** 178:5 219:6
221:9 222:23,24

223:4
**pleading** 81:5
**pleadings** 101:15
**pleas** 222:25
245:12
**please** 18:2 43:3
49:8 90:1 121:9
121:17,22 122:4,9
219:2 221:24
269:17 295:10
301:15 304:13
**plentiful** 125:12
**plenty** 165:20
206:21
**plight** 112:16
**plus** 17:12 107:18
107:19 239:24
241:8 256:10
**pm** 304:16
**pn** 91:15
**pocket** 267:11
**pod** 110:11,12,13
110:15 272:18
**podium** 18:7
35:21 64:16 92:8
**pohl** 12:11
**poignantly** 112:21
**point** 23:18,22
24:25 32:19 35:15
35:16,25 49:13
53:20,24 66:25
74:18 79:21 83:23
87:20 91:9 96:14
100:8 106:8
115:11,25 118:8
127:13 128:19
137:10 141:7
144:11 145:15,16
147:19 149:22
150:20,21 151:14
151:21,23 152:21
153:5 155:11
158:19,22 159:17

159:20,22 160:7
160:19 162:16
163:7,19 164:15
164:20 166:14,16
168:17 171:7
172:18,24 174:14
175:5 177:9 178:4
180:8,11 181:1
182:7,21 183:3,7
183:22 185:21
192:11,12 193:13
198:19 199:8
200:11 205:3
207:20 208:17
210:13 212:7,23
213:8 214:19,21
217:4,15,16,24,24
218:9,21 219:12
219:13,15 229:11
231:19 235:21
241:7,14 243:3
246:3,11,20,22
249:19 251:16
254:11 255:25
256:7 257:8,10,16
258:8 259:4,6
262:18,19 264:5
264:10 269:20,25
271:22,24 273:7
274:3,4 279:7,11
279:12,17 282:1
283:11 285:23
287:9 288:16
295:20 298:6,9,10
298:18,19,19
299:10 301:17
303:2 304:1,10
**point's** 26:13
**pointed** 102:18
104:13 116:6
189:1,14 220:9
223:23 284:12
297:22 299:4

**pointedly** 102:1
**points** 25:20
95:17 103:19
113:19 114:4
118:14 147:10
149:19 154:6,6
165:4 179:11
196:12 218:1
229:9 247:25
249:3 253:12,16
264:20 273:10,11
273:14 279:2,16
279:24 280:3
**police** 71:3 72:20
72:21 73:5,14
74:5,18,25 75:6
76:12 78:23 79:9
79:12 89:24 116:7
165:21 184:6,12
188:7,20 195:21
196:8 197:10,15
198:19,22,23
201:21 229:17
230:18 240:13
284:14 288:10
**policies** 20:10
69:11 90:12 94:2
169:11 300:11
**policy** 114:4
300:14
**political** 73:9
83:11 106:3
**politicians** 113:8
147:2,20
**politics** 292:1
**polk** 3:3 15:19
19:10 37:16
286:23 295:19
**poll** 147:15
**polling** 147:17
**polls** 146:21
**polluting** 211:16
216:7

**pool** 98:19 296:25
**poor** 181:7
**pope** 64:20
**population** 79:13
**populous** 52:1
**porter** 12:12
**portion** 108:8
121:16 135:8
299:18
**portions** 223:7
**portrayed** 151:15
**posed** 124:22
206:3
**posing** 240:22
**position** 102:13
173:20 179:14
187:7 251:19
266:8 275:9
**positions** 252:3
**positive** 84:13
261:1
**positively** 47:24
**possession** 245:17
**possibility** 33:18
43:7 163:4 301:18
**possible** 39:1,1,4
53:15,23 54:9,14
66:10 98:19 99:3
117:12 129:6
139:19 206:21
268:13 284:7
**possibly** 17:23
38:5 55:1 80:23
284:1 292:19
**post** 80:5
**posting** 38:1
**pot** 39:1 182:15
**potential** 32:25
45:15 50:8 85:22
86:12 87:18
111:19 137:13
178:1,3 191:16
301:23 303:5

**potentially** 47:4
67:20 85:24 90:14
107:2 120:17
127:11 131:11
284:4
**potholes** 44:8
**pound** 122:10,11
**poverty** 45:1
**power** 71:3,9
72:20,21 73:1,5
73:14,16 74:18,25
74:25 75:7 76:12
77:19 78:23 79:9
84:4 88:19 89:24
90:1,4 91:2
142:16,20 184:6
184:12 188:7
196:8 197:11,12
197:15,19,21
201:21 206:25
229:18 240:14
250:10 284:14
**powerful** 182:4
**powers** 74:5 79:13
116:7 126:20
188:20 195:21
198:19,22,23
230:18
**pra** 276:11
**practice** 178:12
178:17,18 221:8
221:22 222:17,19
222:22 223:3,8,14
223:15,17,24
**practices** 36:4
97:11 160:2 166:5
168:23 234:21
**praise** 283:16
**pre** 154:11 198:7
283:4 291:2,4
**precedent** 46:25
68:12 94:7 173:23
199:23 200:12

204:7 210:6
217:24
**precipice** 107:2
**precisely** 59:1
66:12 135:18
136:1 137:1
**precision** 284:13
**preclude** 77:5
169:15
**preclusive** 89:19
**predate** 300:12
**predated** 264:23
**predecessors**
61:12 62:10
**predicated** 99:13
**prediction** 290:22
**predictions**
206:19
**preeminent** 79:24
**preempt** 184:11
**preempting** 184:6
**preemption**
183:23
**preempts** 78:4
**preexisting** 111:8
**preis** 5:14 58:15
92:8,9 100:22,25
101:1 298:21,24
299:2,3,25
**prejudgment**
106:1
**prejudice** 90:14
108:9
**preliminarily**
149:11
**preliminary**
74:23 78:11,20
101:12 158:4
159:23 170:1
**premise** 154:4
188:5 192:4
205:21 206:23
208:7 209:19

**premium** 99:19
**prepared** 109:25
149:18 159:25
218:20 238:2
**prepay** 109:21
**prepetition** 97:11
105:9 117:17
**prescribers**
178:10 225:14
**prescribing**
178:11
**prescription**
230:3
**prescriptions**
164:4
**present** 7:22
60:17 61:9 62:8
63:10 66:21 67:7
243:6 246:9
247:18 254:7
**presentation** 30:4
96:11,13 100:14
145:16 186:15
205:2 214:22
224:4 225:16
**presentations**
93:8 281:21
293:21
**presented** 55:11
171:5 181:22
206:12 242:15
243:18 244:12
247:4 257:10
265:12
**presenters** 93:11
**presenting** 149:7
**preservation**
25:12,17 43:16
302:4
**preserve** 20:23
125:2
**preserved** 25:2
188:11

**preserves** 22:4,6
**presiding** 81:11
**press** 12:13
**pressing** 114:12
**presume** 139:22
221:5
**pretrial** 64:22
**pretty** 44:11
164:3 184:19
191:5 207:4
213:18 243:21
291:17
**prevail** 152:18
206:8
**prevailing** 123:12
124:1
**prevent** 97:11
106:6 161:12
247:12
**preventing**
134:10 234:19
**prevents** 111:4
**previous** 198:14
**previously** 83:6
102:5 109:19
**prey** 12:14
**price** 164:11
212:8 221:10
227:13
**price's** 41:1 228:2
**prime** 34:2 53:13
58:3 114:23
**principal** 19:18
82:19
**principle** 71:20
111:3 117:8
131:22 211:2
267:20
**principled** 152:15
**principles** 83:9
**prior** 21:20 31:12
35:1 141:14,15
254:2 286:24,25

300:12,13
**priority** 47:5
267:5
**private** 39:21,22
40:11,14 46:19,20
47:23 48:25 52:24
78:4 94:4,25 95:4
98:15,18 105:2,13
119:13,16 120:1
120:12 165:24
207:9 231:1,5
246:14
**privates** 59:3
75:17
**privilege** 204:5,6
204:8 222:1
293:20
**privileged** 45:8
82:15 97:3
**privy** 202:20
**priya** 8:5
**probability**
169:15 175:7
**probably** 17:14
18:23,24 23:20
33:3 36:25 43:25
49:12 124:9
150:18 173:4,6
178:19 210:17
214:18 224:4
271:4 278:22
286:22
**problem** 16:8
207:15,15,17
208:11 209:17
224:16 231:2
254:15 262:10
273:2 277:3
**problematic**
235:17
**problems** 167:21
293:9

**procedures** 84:20
  84:20
**proceed** 78:23
  109:8 114:8
  149:18 205:20
  230:4
**proceeded** 177:18
  207:6
**proceeding** 25:23
  78:25 79:1 86:23
  89:8,20 90:22
  92:2 97:4 121:24
  142:19 196:20
  207:25 209:18
  230:6,9,12 234:24
  235:11 236:7,7
  250:4 269:4
**proceedings** 1:12
  85:11 88:13 89:5
  134:8 154:11
  249:3 304:15
  305:4
**proceeds** 94:5
  109:12,17,20,21
  200:7,8 248:12
**process** 37:24
  50:13 71:5 78:7
  80:11 81:6 83:19
  83:22,24 84:9
  117:13 127:24
  136:8,12,16,18
  137:11 143:15
  146:1 157:15
  158:9 207:24
  209:18 211:23
  220:9 249:4,6
  250:11,20 252:22
  253:2 270:20
**proclaiming**
  176:4
**procurement**
  44:15

**produce** 136:23
  212:24
**produced** 81:13
  82:14 207:18
  213:2 281:10,11
  281:11,13
**produces** 212:18
**product** 54:22
**production** 81:23
  82:3
**productively**
  302:23 304:13
**products** 237:8
  254:4,6
**profess** 124:8
**professed** 60:8
**professionals**
  82:21 114:3 116:2
  117:13 255:18
  259:11 275:5
**professor** 44:24
**professors** 240:3
**profile** 50:8
**profoundly** 292:2
**progeny** 274:21
**program** 248:16
**programs** 60:6
  85:13 119:4
**progress** 209:16
**prohibit** 233:12
**prohibited** 31:1
  72:5 122:1
**prohibiting** 237:6
**prohibits** 126:14
**project** 173:10
**prolonging** 179:8
**promise** 294:9
  295:11
**promised** 64:15
**promises** 125:17
  297:3
**promotors** 36:15

**prong** 30:9 194:6
  242:9
**prongs** 66:24 67:6
  98:11 297:10
**proof** 36:6 84:13
  284:17
**proofs** 57:3 69:14
  274:1 288:2
**proper** 183:10
  212:2,14 218:12
  226:25
**properly** 84:24
  195:25 202:20
  210:14 214:12
  216:2
**property** 149:24
  151:6 172:5 182:2
  215:1 216:14
  217:8 249:11,14
  249:25
**prophetic** 161:3
**proponent** 203:3
**proponents** 42:4
  149:20 177:4
  182:4 227:4
  278:25 294:23
**proposal** 37:2
  55:21 68:6 225:22
**proposals** 242:17
**propose** 15:13
  129:6 146:17
  148:5 151:1
  207:14
**proposed** 51:4
  156:15 188:17
  189:5 193:25
  200:14 271:2
**proposing** 242:4
  255:1,3
**proposition** 77:14
  150:1 172:1
  233:23 282:23

**proprietary**
  226:17
**propriety** 43:4
  65:4 84:11 287:8
**pros** 303:14
**prosaic** 102:8
**prosecute** 29:11
  182:13 193:2
**prosecutorial**
  270:4
**prospect** 99:20
  158:13
**protect** 79:13
  159:10 174:9
  197:7 211:3 239:2
**protected** 21:5
  74:9 205:24
  234:11
**protecting** 153:3
  159:18 197:5
  211:7,13
**protection** 29:8
  31:5 74:7 77:4
  114:4 128:17
  154:18 155:22
  166:4 167:6
  168:25 169:3
  231:7 236:8
  241:17
**protections** 148:7
**protective** 282:4
**prototype** 102:21
**protracted** 49:9
**prove** 206:6
**proved** 161:3
**proverbial** 285:15
**provide** 29:8
  43:13 47:12 54:6
  75:15 80:24 84:9
  96:4 110:10
  144:14 184:3
  186:15 223:6
  281:24 291:21

**provided** 45:2 65:13 81:17,20 85:3,10 132:15,15 132:18,21 139:10 150:19 151:17 154:14 157:5 197:12,13,14,15 197:21,22 249:10 249:24 257:23 264:11 274:24 282:5
**provides** 44:15 63:4 74:20 84:21 84:24 90:6 96:10 136:12 144:20 198:4 230:1,14 238:12
**providing** 45:19 45:20 110:3 155:22 182:3 224:13 259:5 264:13 281:2 304:5
**provinces** 271:10
**proving** 296:22
**provision** 22:22 28:1,23 29:23,25 30:11 71:17 74:19 113:21 125:24 197:4 198:4 248:8 259:8 283:3,3 284:14
**provisions** 20:2 25:3 26:21 29:7 29:16 114:11 126:15 166:18 167:11 197:3 203:24 207:8 248:18 253:3 275:19 277:25
**prudence** 195:22
**public** 39:8,20 40:5,11 44:21 45:1,6,10,17 46:19,24 48:21,25 61:24 62:12 72:1 72:1 74:7 77:24 80:3,18 81:6,10 82:13,20 83:16 93:13,16,18 94:4 94:25 95:4,21 96:10 97:4,9,18 97:20,22 98:6,15 98:17 100:14 101:17,23 105:2 105:12 108:6 110:22,24 111:19 119:13,16 120:11 125:2 136:3 153:4 199:23 203:25 205:15,24 207:9,9 228:4 231:6,20 232:8 252:19 256:25 257:2 283:9 296:8 303:3
**publication** 81:25 84:22 85:20,21 86:2 87:10 138:6
**publicly** 105:11 139:19
**publics** 59:3
**published** 84:24 86:3
**puerto** 51:25 54:10
**pulggari** 12:15
**pull** 41:7 173:3 203:5 252:16 267:8
**pulled** 174:20
**pulling** 282:22
**pullman** 6:16 149:5
**pullo** 114:23
**pulls** 222:20
**pundits** 115:22
**punishment** 155:11 156:5,12
**purchase** 124:25
**purdue** 1:7 2:3,4 3:15 4:2 38:14 45:24 48:1 55:16 57:5 66:3 77:6 79:25 83:2 86:22 86:23 87:6,7 94:1 96:18 97:1,6,12 105:16 107:5 108:2 117:22 118:2 122:22 123:11,25 125:5 126:1 136:16,17 136:24 141:10 146:5 157:3 160:18 168:15 169:22,22 224:1 225:16,24 231:14 233:8 234:14 236:2 247:8,14,14 252:1 275:17 276:11 284:18,20 286:25 289:6,6 296:10,12
**purdue's** 38:23 96:11 178:6 247:9 253:21 254:22 259:20
**purdue’s** 136:17 141:2
**purport** 172:3
**purported** 74:17 140:16,17
**purporting** 116:16
**purpose** 32:9 119:6 222:3 229:24,25 230:1 245:15
**purposes** 23:18 32:9 39:2 75:16 155:21 174:17 218:7 236:25 242:20 243:19
**pursuant** 80:3 91:1 218:4
**pursue** 58:10 75:21 98:2 133:22 133:23 232:2 296:24
**pursued** 83:2
**pursuing** 78:11 112:22 164:18
**pursuit** 76:15
**push** 177:22 260:17
**pushed** 106:21
**pushing** 158:15 175:25 176:7 215:22 284:19
**put** 33:3 42:18 97:17 98:9 120:13 123:17,17 125:22 126:23 131:12 132:6 135:7 152:7 154:20 162:7 176:9 181:6 182:15 187:19,24 205:1 218:22 228:14 237:12 242:18 268:7 274:14 282:24 285:14 288:19 300:24
**putative** 170:21 170:22
**putting** 54:13 68:23 78:16 86:2 98:4 102:7 105:25 155:7 268:3 283:6 286:13

**pvc** 252:18,20

**q**

**qualified** 118:23
**qualitative** 67:15
**quantitative** 68:1
**quarropas** 1:13
**quarter** 68:18
**question** 22:10
23:13 26:7 31:13
36:2 54:2 69:17
91:23 116:12
130:9 147:14
152:14,20 157:15
165:5 168:13
178:23,24 203:22
205:1 210:9 213:9
223:13,19 224:5
227:3 228:12,15
239:7,12 258:2
259:7,14,15,22
262:23 265:6,19
274:2 275:5
278:10 284:2
301:1
**questioned** 133:8
227:6
**questions** 22:8
27:16 30:3,18,21
42:10 72:15
100:21 113:24
118:5 122:18
228:23 229:11,12
248:21 278:14
295:10 298:1
**quick** 34:14
179:10 253:16
273:13
**quickly** 35:24
84:15
**quiet** 113:18,19
**quinn** 12:16
**quirk** 12:17

**quite** 44:25 49:12
62:15 108:11
137:10 141:8
156:2 163:4 164:9
165:6 167:19
280:4 289:15
291:16
**quote** 44:15 61:5
66:2,23 77:1 81:5
84:21 89:12 159:8
159:8 160:24
225:18
**quotes** 61:24
293:22
**quoting** 77:2
81:20

**r**

**r** 1:21 3:1 4:6 15:1
305:1
**rachael** 12:21
**raise** 47:3 85:5
112:15,18,21
266:12
**raised** 16:13 20:3
36:2 70:20 72:17
83:17 90:16
112:13 115:25
116:12 149:19
228:1 264:20
**raising** 26:15
167:8 258:9
**ran** 255:11
**range** 150:4
161:20
**ranged** 53:18
**rare** 65:8 66:13
124:4,7
**rarely** 93:11
190:6
**rate** 115:12,20
**ratepayers** 294:19
**ratio** 287:22

**raw** 173:4,6
**raymond** 31:10
68:21 287:11
300:5
**rdd** 1:3
**reach** 87:17 88:1
88:2 104:8 116:3
125:23 126:3,4
143:5 201:17
206:10 207:20
208:1,5,12 209:7
214:6 255:6 262:7
269:1 289:23
**reached** 16:5 20:8
41:7 102:20 104:5
104:6 107:11,11
118:21 120:4
164:20 201:14
208:10,16 214:15
218:4 304:3
**reaches** 156:11
239:14
**reaching** 102:20
107:12
**reactions** 112:24
**read** 28:4 33:8
62:7 128:9 129:18
139:14 162:17
190:4 212:22
242:13 251:10,17
253:9 274:1
278:24 280:3
281:22 299:13
**reading** 127:6,8
138:14 244:1
**ready** 31:8 214:5
218:1 228:23,25
**reaffirmed** 65:7
**real** 75:10 254:25
**realistic** 204:10
207:25
**reality** 65:22
75:19 135:10

**realize** 164:6
**really** 15:7 17:5
36:21 51:7 52:15
71:6 83:20 128:13
137:23 142:1
149:24 153:1,4
154:25 155:10
158:8 161:15
162:6,8,10,12,14
162:21 165:7
166:17 167:8,10
171:15,20,23,25
172:1,2 176:13
180:12 181:6,7
183:7,18 184:17
185:1 192:21
196:7,10 201:19
201:20 213:19
214:16,17,23
215:16 216:14
217:8,20,23 221:7
223:13 239:21
248:13 251:11
258:20,23 259:22
260:17 266:23
270:19 271:21
279:14 294:3
297:21 298:13
299:7 302:20
304:10
**reargue** 26:10
**rearguing** 26:1
**reason** 50:9 58:7
64:5 83:10 116:22
117:21 125:16
142:12,13 206:7
230:23 266:1
267:17,19 301:7
**reasonable** 67:13
151:9 156:3
161:21 164:5
169:19 193:24
194:3 215:15

249:10
**reasonableness**
150:5
**reasoning** 77:3
179:19
**reasons** 17:16
56:12,15 67:4
91:16 116:22
124:7 138:25
148:23 161:5
178:12 271:17
295:22
**reassess** 209:25
**rebuild** 103:16
**rebuttal** 101:10
279:13,14 298:23
**recall** 106:20,22
**recap** 81:22
**recast** 71:6
**receive** 20:20
21:10 60:5 67:10
67:19 83:24
115:17 120:12
125:4,6,9,18
139:2 222:10
237:21 296:20,24
297:1
**received** 15:11
30:15 44:16 88:12
106:13 107:4
114:25 119:3
125:14 128:22
154:19 160:1
212:11 223:25
227:19 246:5
247:16 296:17
**receives** 106:12
134:12 259:3
**receiving** 24:4
106:6 159:2
229:20 258:3
**recess** 120:25

**recipient** 32:11
**reciprocal** 20:20
21:25
**reckless** 256:21
256:22
**reckoning** 125:2
**recognition** 25:23
26:9,12 154:17
271:23 272:5
**recognize** 127:19
200:12 220:8
227:9
**recognized** 64:21
67:8 69:22 79:17
249:18
**recognizes** 127:3
**recognizing**
211:24
**recommendation**
228:20
**recommendations**
242:6
**recommended**
25:9 293:23
**reconcile** 165:2
**reconciliation**
48:18
**record** 15:2,19
19:10 31:9 37:16
42:3 43:1 47:16
49:5,15 66:8
79:21 85:9 88:1,9
98:10 100:14,25
103:10 108:13
114:21 115:5
122:1,22 175:9,12
178:2 183:4
215:17 216:18
227:24,25 228:5
228:17 248:7
259:24 260:23
262:11,20 264:12
279:18,19,22

280:12 281:3,15
282:12,14 283:19
283:21 285:22
286:17 288:13
289:1,2 290:19,21
295:13 299:3
301:25 305:4
**recorded** 121:22
**recording** 121:25
**recover** 57:7
155:8 230:7
**recoverability**
50:3
**recoverable** 133:1
**recoveries** 16:24
40:13,15 47:12,25
48:1 60:5 75:14
75:15,16 97:24
103:18 282:24
283:13,17 296:10
296:24
**recovering** 238:19
**recovery** 21:5
40:18 50:8 113:5
130:22 133:14
155:12 230:13
240:18 286:11
296:25
**red** 136:21
**redacted** 116:14
**redecorating** 44:8
**redress** 233:14
**reduce** 21:2 99:8
**reduction** 25:20
**refer** 163:11
222:18 294:12
**reference** 32:3
140:20 152:23
153:25
**referenced** 247:4
**references** 140:19
178:5 259:9

**referred** 22:5
130:17,18 140:3
198:15 221:9,25
235:10
**referring** 129:17
129:17,20,21,23
185:5 222:2 224:9
225:19 235:12
239:8 243:1
**refers** 216:4,5
**reflecting** 225:21
**reflects** 100:11,15
143:11 225:16
226:16,16
**refocused** 296:2
**refuse** 105:2
116:9 125:14
152:10
**refused** 107:1
**regard** 36:3
109:23 114:5
157:1,19 177:10
227:16 253:15,17
259:21 271:6,7,14
272:9
**regarding** 28:10
28:19 34:3 101:14
114:16 136:24
145:22 156:25
189:23 191:19
196:4 203:24
210:15 223:1
227:14 250:12
**regardless** 28:22
103:12 109:15
**regularly** 150:12
**regulate** 240:1
**regulating** 229:19
**regulation** 77:25
230:1
**regulators** 254:5
**regulatory** 74:18
75:6 77:12 78:3

78:22 116:5
165:21 184:16
199:17 288:11
289:4
**reinforces** 124:3
**rejected** 76:22,25
85:8 170:3,14
**relapsed** 112:11
**relate** 27:25 28:1
77:6 110:24 189:6
189:8 234:17
296:3,6 300:10,11
**related** 20:9,24
22:2 23:7 28:11
28:12,23,23 29:1
31:25 36:14 38:11
65:4 70:16 83:5
86:15 87:1 88:14
90:6 94:4 101:7
124:12,20 135:3
141:2 143:7 171:2
179:16 180:16,21
185:9 196:4
223:14 238:12
247:9 254:3,5,22
254:22 275:4
296:14 297:15
300:16
**relates** 31:23
226:4 237:4
272:25 273:1
296:12
**relating** 27:4,21
40:15 43:24 86:14
183:24 252:22
253:21 254:1
**relative** 192:14
**relatively** 66:5
188:22 278:18,21
**release** 20:2,12,12
20:15,20,20,21
22:1,11,13,19
23:1,8 24:12,16

24:16 26:21 32:10
32:23 61:25 64:17
69:7 71:15 84:1
85:1,14,18,24
86:12 87:23 88:12
89:24 90:9 97:15
97:17 98:6 114:11
117:24 125:15,18
125:24 128:3
130:20 134:12
137:13,15,16
138:19 143:1,3
144:9,17 150:13
150:16 151:11
161:18 162:6
167:16,22 168:8
179:14,18 180:20
180:23 182:12
183:1 184:4
188:17 195:22
200:9,10,10
206:24 249:14,16
249:20 251:3
253:2,22,25
254:17,22 255:1
255:12,13,19
256:13 257:2,12
258:7,25 259:8
260:7,16 266:1
272:2,23 273:1,1
273:9,11,24 274:6
275:7,15,19 276:7
277:2,3,8 296:2,3
296:6,11 297:10
297:14 298:12
300:18 302:25
303:1 304:4
**released** 21:15
22:3,15,18 23:4,5
23:7 24:9,12,14
27:1,3,3,21 28:6
28:13,13 29:2,3
29:19,20,24 30:6

30:10,13 32:12
45:10 56:7 60:10
61:5 62:2 63:1,5
69:9,10 74:8 80:8
81:4 86:10 87:13
88:15 89:14
138:11 139:6,7,8
139:11,17,21
142:7,11 144:21
145:9,10 174:19
247:5,9 268:25
275:22
**releasees** 21:25
61:13 63:2
**releases** 20:5
26:22,24 27:8
28:8,12,20 29:24
30:7 34:19 36:8
37:22 39:12 41:15
43:5 56:5,10,15
56:16,23 57:2
59:13 60:1,14,17
60:21 61:1,8
63:16 64:23 65:7
65:9,18,19 66:10
66:15,20,22 67:1
67:9 69:3,9,20,23
70:6,24 71:1,4,10
72:4,8,13 76:5,22
79:11,16 83:18
84:4,8,11,16,25
85:11,23 86:24
87:12,14,17,22
88:21 89:4,11,13
90:7,20,25 91:6
91:10,17,19,23
92:5 95:16 101:7
101:8 107:23,25
108:6,8 110:3,6,8
113:20 114:1,9
120:10,14 123:2
124:4 126:8,11
127:2,4,10 129:2

131:5 136:6 139:4
139:5,9,25 140:24
141:1,24 142:4
143:12 144:4,8
145:17,20 146:8
149:15 154:14
161:8 162:8,13
166:17 181:7
183:5,10 187:22
188:6 189:16,18
190:1,6,14,17
196:1,23 197:22
198:20 205:4,8,10
205:22 209:11,21
212:15,18 213:15
246:25 247:12
255:21 264:21
265:3 268:19
271:5 272:16
273:12 275:2,3,4
275:6 276:1
277:25 297:6
**releasing** 22:3
27:2 124:10 138:8
139:7,11 147:24
276:8,10
**relegates** 230:25
**relevance** 243:12
244:10
**relevant** 52:17
68:13 70:9 175:22
213:12,13,14
222:6,8 223:5
244:18 245:2
287:20,23
**reliable** 135:8
**reliance** 173:9
**relief** 24:3 97:10
109:25 110:12
143:18 189:2,6
199:11,19,21
235:16,20 238:13
252:23 261:1

274:24 304:6
**relies** 175:2
**relieved** 160:15
   174:12
**relinquish** 137:7
**relinquished**
   100:2
**rely** 74:13 78:8
   127:1 133:7
   254:24
**relying** 143:21
   208:22
**remain** 113:19
**remainder** 70:19
**remaining** 42:9
   302:19 304:3
**remains** 19:25
   58:10
**remarkable** 41:17
   94:10
**remarkably** 41:21
**remarks** 92:25
   93:4 101:12,16
   130:13 149:18
**remember** 68:14
   112:20 117:16
**remembers**
   289:18
**remind** 121:21
   288:2
**remotely** 74:3
**removal** 45:23
   76:12 95:12
   197:15,20,21
   277:19
**remove** 20:17
   76:14 170:8
   277:24
**removed** 22:16,20
   27:12,18 33:17
   34:7 77:17 98:13
   105:6

**rename** 122:16
**rendel** 12:18
**render** 89:20
   249:17
**renders** 218:14
**reneged** 105:12
   154:2
**reopen** 107:10
**reorder** 142:22
**reorders** 142:21
**reorganization**
   2:2 65:15 67:2
   69:5,8 76:16
   83:15 89:7,12,15
   181:9 238:22
   257:7
**reorganized** 66:4
**repay** 109:19
**repeat** 101:3
   102:6 111:12
   118:13 157:22
   188:13 218:23
   290:2 291:14
**repeated** 62:16
   101:19 240:7
   244:24 245:14
**repeatedly** 64:21
   116:6 136:15
   203:23
**repetitive** 15:14
**replace** 228:8
**replaced** 30:11
   46:21 238:14
**replacement**
   228:19
**reply** 136:20
   146:12
**report** 68:20,21
   82:1 119:11,14,20
   280:16,17,20
   288:14 294:12
**reported** 119:1
   190:7

**reporter** 121:12
   134:23 196:22
**reports** 42:17
   64:10 82:1 244:1
   295:4
**repository** 45:6
   45:14 82:13 96:12
   96:16,20 97:2
   111:11 204:1,4,15
   290:2
**represent** 26:6
   58:16 59:15
   116:16 118:16
   146:10 201:9
   249:2 298:7
**representative**
   60:20 139:3
**representatives**
   16:23 36:16 41:5
   60:19 61:10 62:9
   63:11 82:25
   131:14 247:7,8
**represented** 93:15
   207:3 239:20
**representing**
   17:10 128:16
   186:10 245:19
**represents** 96:6
   115:23
**request** 175:12
   200:20
**requested** 58:19
   73:5
**requesting** 24:20
   46:5
**require** 47:1
   145:8 169:23
   250:16 277:23
   302:21
**required** 80:1
   94:12 109:9 134:6
   136:3 250:11
   277:23 281:20,23

**requirements**
   109:5
**requires** 29:10
   59:10 109:14
   129:9 151:1,4
   275:8
**requiring** 183:11
   213:4
**res** 249:16
**resembles** 209:1
**reservation** 26:14
**reserve** 25:7
   26:12 302:10
**reserved** 25:17
   35:25
**reserves** 116:7
**reserving** 26:10
**resharing** 15:24
**residual** 16:19
**resolution** 38:10
   40:5,8,10,12,14
   40:16 43:23 58:9
   67:17 73:17 93:22
   95:7 99:23 100:12
   100:16 105:12
   116:3 150:25
   151:19 206:11,13
   206:14 208:2,12
   214:6,15 301:24
**resolutions**
   118:21 208:10
   252:16,19
**resolve** 19:20
   258:21
**resolved** 16:6,14
   35:6,8 56:11 95:1
   205:9
**resolves** 20:8
**resolving** 16:17
**resort** 66:18
**resource** 58:13
**resources** 49:1
   240:1

**respect** 19:13,24
20:7 25:10,10,12
41:24 46:5 55:12
81:17,18 113:25
114:15 116:8
152:16 189:24,25
194:6 198:21
199:15 211:24
217:22 222:24
226:11 227:12,12
245:14 273:12
280:10 282:3,8
283:18 285:22
288:10 291:13
295:20 297:14
298:5 303:5
**respected** 55:5
151:5 227:11
**respectfully** 87:21
**respects** 150:17
**respond** 118:5
149:19 150:21
152:22 157:6
227:3,13 272:19
278:7 283:20
**response** 65:24
80:7 89:23 130:23
154:6 158:16,18
159:6 167:1
180:15,17 210:14
212:2 274:16
278:18,22 279:6,8
298:18
**responsibilities**
231:3,4,5
**responsibility**
125:16 282:25
**responsible** 45:19
205:15,23
**rest** 25:3 57:12
103:6 203:6
283:19 288:21

**restarting** 236:10
**restate** 204:20
**restrictions**
108:24 109:1
**restructure**
190:18
**restructuring**
190:16,19
**result** 27:10 44:17
82:12 90:11,13
104:15,18 120:2
129:3 182:11
191:2 195:25
212:18,22,24
213:20 215:15
234:20 240:16
266:20 270:16
**resulted** 88:5
103:24 107:14
119:2,11,18,24
**resulting** 75:14
**results** 47:17
213:13
**resumed** 122:23
**retain** 21:1,10
99:14 135:16
**reticulated** 46:2
**retract** 283:23
**return** 167:16
195:9 201:3
**returned** 200:21
**returns** 214:19
**reveal** 45:15
**revealed** 212:5
**revenge** 112:25
**revenue** 107:22
**reversal** 173:21
**reversed** 78:10
173:14,17 187:14
187:17
**reversing** 45:22
174:24

**review** 37:2
242:17
**reviewed** 258:17
281:16
**reviewing** 19:6
54:20
**revise** 277:24
**revised** 28:5
**revisions** 19:15,17
19:18,22 20:2
26:21 27:8 28:2
30:16,19 34:6
35:5,11 114:10
**revisit** 26:23
34:25 37:4 99:15
**reviving** 207:7
**rewards** 117:25
191:22
**rhetoric** 215:11
215:16
**rhetorical** 53:24
117:8
**rhode** 62:3 149:7
186:14
**ricarte** 12:19
**rice** 12:20
**richard** 13:11,12
138:14 145:12
159:7 224:19
242:1 243:21
244:19 259:14
293:1
**rico** 51:25 54:11
**rid** 140:20 185:19
191:4
**ride** 176:23
**right** 24:10,24
25:22 26:3,13,18
31:17 32:7,12,16
32:18,18 33:5,7,8
35:9 41:19 53:18
59:24 60:13 68:22
69:17 107:10

113:17 116:21
118:7 123:22
125:25 130:8
132:22 133:7,19
138:23 140:3,7,13
142:8 144:12
154:12,12,16,16
155:11,16 156:7
157:4 158:2,21
159:15,24 160:14
161:8,8 163:24
165:12,16 166:11
168:2 171:10
172:11,13 173:19
178:8,14 180:18
184:1,11 185:15
187:11 193:10,10
194:9 200:19
201:19,20,24
202:11 203:16
204:11,14,22
208:19 211:3,10
213:10,19,23
215:12 217:3,10
221:17,22 226:1
226:14,15 228:21
229:4 230:17
231:2 232:12,22
233:10 234:16
235:1,3,6,13,15
235:18 237:3,11
237:16 238:7
239:10,24 240:25
241:4,10,16
242:10,22 243:4
245:1,10 246:12
247:2 248:22,24
250:3 252:2,10,12
252:14,16 259:13
266:2,15,16,18,25
267:8 269:11,17
269:23 271:13
274:13 282:1

283:4 285:21 288:25 289:17 298:15,21 299:20 300:1 301:13 302:10,13,16
**rightful** 142:22
**rights** 21:1,2,4,11 22:6 25:7,13,17 25:18 26:15 46:5 90:14 117:1 142:23 148:3,12 151:6 152:8 166:9 249:7,8,14,25 256:5 266:22 267:1 290:4 300:17 302:4
**rigid** 187:7
**rigor** 156:16,24 157:1
**rigorous** 155:5 157:20
**rigors** 154:24 155:6
**ringer** 12:21
**ringing** 225:21
**rip** 290:8
**rise** 21:13
**risk** 48:22 78:19 78:20 114:9 164:12,16,21 178:22 192:23 255:1 281:24 286:11 292:12,16 292:19 293:15,16 303:4
**risks** 117:25 161:21,22 178:25 191:21 193:1 303:19
**road** 49:17 188:10 305:21
**robert** 1:22 9:11
**robertson** 12:22
**robinson** 7:20 238:17 248:5,6,16 248:20
**rock** 187:5 218:25
**rocket** 187:18,25 188:3
**rogatory** 282:18
**role** 37:10 97:12 99:23 136:10 157:3 175:16 220:17,18 222:18 223:16,24 224:1 224:21 239:21
**room** 1:13 16:5 36:24 128:14 235:25
**rose** 31:11 82:10 281:13
**rosen** 12:23
**rosenbaum** 12:24
**rothfein** 16:4
**rothstein** 12:25
**roughly** 68:4 70:14 131:15 251:9
**roundabout** 204:25
**route** 295:8
**roxana** 7:24
**royal** 134:7 263:22
**rubinstein** 13:1
**rudnick** 93:1
**rule** 34:8 123:1 153:16,17,20 157:24 164:25 189:12,15,17,19 189:23 197:3 198:17 209:20 214:6 280:16 291:18,21
**ruled** 74:23 243:6
**rules** 121:7 145:24 197:5,7
**ruling** 262:5
**rulings** 244:10
**run** 33:16,21 169:8 254:25
**rundlet** 13:2
**running** 141:20 196:13
**russell** 13:3
**ruth** 11:11
**ryan** 13:4,18 14:9

**s**

**s** 3:1 7:23 9:9 10:2 10:6,18 11:1,17 12:25 14:20 15:1
**s.d.n.y.** 170:11 265:19
**sacker** 105:17 261:18
**sackers** 98:4
**sackler** 24:4 31:10 32:3 33:16 40:22 41:14 45:23 46:1 46:4,17 50:17,19 59:6 60:9 66:7 67:11 68:15,20 80:4 82:4,6,8 85:25 86:10 87:18 88:14 94:1,14 95:4,22 96:23 97:7,12 98:15,17 98:20 99:3,12,19 102:22 105:6,15 106:14 108:6,7,23 109:8 119:19 124:11,15,16,24 125:13,13,17,25 126:1,3,8 128:25 129:4,7,14,15,19 131:4 132:15 133:4,11 134:4,7 134:10,11,14,18 134:19 135:2,4,7 135:14,21,23 136:1,10,19 137:1 138:9,9,14 139:24 139:25 144:22 145:12 146:5 148:4,8,17 157:2 157:22 159:7,7,10 159:12 160:24 175:14 176:15 177:13 188:21 203:6,7 215:1 217:13 219:7 224:19 226:4,24 234:14 236:4 243:9,10,23 244:19 259:7,14 259:16 260:11 262:22 263:1 273:21 274:6 280:24 294:12 300:5,16
**sackler's** 30:9 242:1 243:21 303:20
**sacklers** 20:21 22:1 28:20 30:8 30:12 38:18 48:2 48:9 49:2,19,24 50:1,10,12,21 55:16 56:13,18,23 57:6,9,19,24 58:11,20 59:5,14 59:24 62:17 63:12 63:19,24 65:17 77:5 80:10 81:12 81:14,19 82:2,9 83:2 86:25 87:6 96:11 98:3 99:14 105:4,24 106:16 106:24 107:4,20 108:3,20 109:9,19

109:22 110:19 115:16 117:20 118:2 124:19 125:3,6,6,8,8,10 125:12 126:4 130:19 131:10 132:14 140:3,7 141:10,19 150:25 151:10 152:2,10 154:14 157:8 160:9 161:4 163:9 163:11 164:10,18 164:23 166:16 167:10 168:13 169:8,21 177:3 178:16,22 187:22 188:7 189:8 190:21,25 191:2 193:3 200:3 204:6 206:13 207:2 208:4 212:17 215:6,7,10,11,21 215:25 216:22 217:6,6 218:11,14 219:14,17 220:9 220:10,13,17,21 220:24 222:9,18 223:10,16,24 224:13 230:12 231:12,22 233:8 234:14,25 235:6,8 237:5 239:9,13,19 239:24 240:5 244:12 247:1 249:8,9,15 250:1 250:3,5,9,13,13 254:21 255:12,16 259:21,25 260:16 262:21 264:13,23 265:1 266:24 268:3,25 274:10 280:11,14 281:8 281:10,20,23 282:9 284:21 286:24 287:23 288:17,19 289:5 291:6 292:11,16 293:5,15 294:13 294:22 303:18 304:12

**sacklers’** 129:24 130:12,17,18 132:21

**saclker** 287:2,11

**sad** 112:4

**safe** 104:4

**safeguard** 144:19

**safeguards** 249:21

**safely** 277:21

**safest** 298:6,9

**safety** 255:7

**saint** 7:10

**sale** 80:6 109:8,15 109:17,18 134:11 141:2 234:18,21 237:8 254:4

**sales** 36:16 109:12 176:1 224:14 225:13,17 242:18 243:14,25 247:8

**salesperson** 176:23

**salient** 219:13

**salwen** 13:5

**sam** 9:15

**samuel** 10:20

**sara** 8:9 14:2

**satisfactory** 214:4 214:6

**satisfied** 64:1 92:1 92:2,3 189:19 276:2 284:8 285:8

**satisfy** 46:25 83:24 169:8

**saturday** 34:15

**saval** 13:6

**save** 17:14 39:3 48:21

**saving** 45:21

**saw** 87:17 165:10 237:13 241:15

**saying** 134:3,24 139:4 158:7 165:3 177:20 187:24 191:12 193:7 194:14 197:9 204:13,20 207:5 207:10,11,12,23 231:21,23,24 240:23,23 286:14 293:25 300:7

**says** 21:9,13 24:14 31:15 33:1 80:9 86:7 126:24 150:3 160:12 164:3,25 165:21 167:4 171:24 193:16 285:18

**scale** 200:16

**scarcely** 207:19

**scathing** 107:22 107:24

**scenario** 38:14 47:10,19 49:5 57:21 65:21 151:16 155:9,13

**scenarios** 47:18

**schedule** 20:18 22:17,20 97:21 246:8 256:11

**schedules** 138:17 138:17 157:16

**scheme** 125:1 148:2,5

**schinfeld** 13:7

**schlecker** 13:8

**schmidt** 13:9

**school** 51:18

**schools** 40:6 294:19

**schwartzberg** 6:14 123:5,7,8,10 123:15,16,20,23 127:7,9,14,20 128:8,15,19,24 129:21 130:1,6,9 130:10,24 131:17 131:24 132:3,5,13 132:19,23 133:2,9 133:15,20 134:1,3 134:22,25 137:25 138:5 140:5,8,11 140:14,15,16 141:13,22 142:2 142:10,15 144:13 144:16 145:3,6 146:17,23 147:4,9 147:12,16,22

**scope** 28:3 30:7 89:20 111:10 126:17,19 140:23 205:5 207:24 271:5 275:6,15

**scores** 41:16

**scott** 3:8 9:25

**scourge** 79:14

**scrap** 283:22

**screen** 122:13

**scrutiny** 80:15 81:7

**se** 119:15

**seamus** 209:1

**sean** 112:8,9

**seattle** 7:18 52:11 73:21,22 152:6 285:16

**second** 18:6 27:2 41:22 42:24 46:23 53:6 65:6,11

66:13,21 69:2
70:22 71:1 72:7
72:10,17 84:5
97:14 101:13,21
105:14 108:20
109:1,4,7 110:22
111:10 127:2
137:18 143:15,19
144:17 148:18
150:12 156:17
167:12 168:8
169:8,18 183:4
207:1 225:5,8
249:18 250:14,18
253:17 257:14
258:14 259:2
263:13,19 274:19
277:12
**secondly** 260:21
303:1
**seconds** 17:21
210:11 298:25
**secret** 134:8
**section** 21:7,11
22:6 23:8 24:14
29:9,25 34:1,8
44:14 65:1 71:18
75:2,4 76:7,9
88:22,22 90:22
95:7 115:14
126:13,14,17,20
126:21,21 127:15
138:15 139:14
142:19 143:18,21
145:24 166:6,7,8
183:24 225:12
275:3 297:18
**sections** 27:17,20
182:5
**secure** 250:15
**see** 19:4 22:21
27:12 37:17 44:14
71:6 73:19 92:20

100:8,24 110:1
114:12 115:19
116:15 117:15
121:15 123:5
130:25 152:19
156:14 162:18
165:1 168:9
174:13 177:6
178:2 181:18,19
182:19,21 184:24
201:2 209:24
228:10 229:2
231:8,12 241:2
262:5,10 266:11
277:9 294:25
298:16,21 303:14
304:14
**seeing** 62:17
234:6
**seek** 21:4 48:4
72:24 74:11 75:19
79:3 161:23
230:11 231:16,25
232:1,3 233:14
236:9
**seeking** 46:4
48:11,13 72:25
75:8 124:23 131:5
131:5 199:11
222:1 229:16
232:6,14 233:4
235:20,22 249:25
**seen** 15:20 81:19
207:23
**sees** 186:20
**segment** 94:24
**seize** 39:6
**selected** 111:23
**selection** 55:7
**sell** 109:10 137:6
149:25 290:11
**send** 61:22 62:7

**sends** 155:23
**sense** 50:16
156:10 196:10
247:21
**sent** 207:16 246:3
294:25
**separate** 29:4
61:7,15 68:23
90:4,6 108:17
230:5 272:14
296:9
**separately** 236:16
**september** 119:1
225:15
**series** 219:5
**serious** 178:9
212:1
**servants** 205:16
283:9
**serve** 50:13 80:8
157:14
**served** 88:4 112:7
163:9 234:15
239:14
**serves** 95:13
**service** 250:6,11
250:17
**services** 118:23
228:18 241:19
**serving** 224:17
236:1
**set** 28:14 41:4
43:13 48:13 65:3
69:9 83:17 88:9
90:8,16 95:7
98:23 100:1
117:10,16,17
121:7 132:16
144:7 159:9,17
160:16 163:3
165:9 200:12
217:12 231:3,5
244:14 253:20,24

258:14 276:17
280:19 296:25
297:17
**seth** 13:7
**sets** 39:18 85:17
163:13 199:24
241:20,23
**setting** 130:16
**settle** 17:19 84:1
201:6,12 288:8
292:19
**settled** 18:10
26:16 61:1 102:20
283:4
**settlement** 16:6,7
17:17 18:13 19:7
20:7 21:6,22 22:9
38:6 40:20 41:14
44:12,18 46:7,13
51:4 54:21,22
57:24 61:3 62:19
62:20 64:12 66:7
68:9 69:24 80:4
81:18 94:11,14,16
94:18,24 95:3,4
95:16 96:7,8,20
96:21 98:6,12,15
98:15 99:1,2,13
99:16,20 100:13
101:16 104:5
105:4 106:23
108:2,7 109:2,13
109:13 110:24
120:4,5,11,16
145:20 149:23
150:2,4 152:17
154:5 158:12
161:6,21 162:5,11
162:23 163:2
164:2,6 174:11
175:13,14 177:2
177:14 183:13
189:24 191:11

193:2 201:14,17 201:23 202:11,13 203:1,3,4,5,5,19 203:23 216:22 219:7 220:22 221:15,17 227:5,8 227:19 231:9 232:6 237:21 240:15 244:22 245:4 248:9,12,18 252:2 253:19,20 253:24 259:19 262:7,13 265:4,20 267:9 271:10 273:21 274:7 275:17 285:11 286:12 287:22 290:13 298:8 301:22 303:15
**settlement's** 43:7
**settlements** 39:11 39:18 41:2,4 43:9 46:15 52:4 59:18 60:14,16 61:7 63:5 95:11 101:12 103:24 104:6,15 105:7 106:7 107:10,11 109:4 123:1 137:5 171:23 189:17 238:7 247:5 283:6
**settles** 186:24
**settling** 21:23,24 22:2 23:6 97:23 167:15 173:5
**seven** 39:15 54:21 54:25 109:11 239:4 287:5
**seventh** 2:2 48:23 140:17,20 183:4 241:18,20
**severely** 182:14
**shame** 208:13
**shannon** 9:1 11:22
**shape** 141:20
**share** 24:20 57:15 75:13 237:15 292:15
**shared** 69:11
**shareholder** 20:21 22:2 24:5 27:3 28:6,12,13 29:2,3,20,24 30:6 31:25 40:20 46:13 67:18,25 68:9 69:10 85:1 86:13 87:12,14,23 90:9 139:9 143:1,3 144:21 161:6 175:17 296:3,6,11
**shareholders** 80:3 86:7,9 275:20
**sharing** 58:4
**shaw** 4:15
**sheets** 104:9
**shelley** 55:7
**shepherd** 13:10
**shield** 260:2,12 286:13
**shielded** 81:6
**shielding** 161:1
**ship** 187:18,25
**shira** 14:12
**shirt** 281:6
**shock** 60:8
**shocking** 212:5
**shockingly** 42:20
**shore** 3:19 13:11 113:10,12,14,16 118:4 290:16
**shore's** 284:16
**short** 98:8 191:6 246:1,1 250:3
**shorter** 27:18 86:16
**shorthand** 50:10
**shortly** 122:19 188:20
**shouldn't** 148:18
**show** 134:6 210:18 220:17 245:16 279:12
**showed** 205:2
**showing** 29:13 277:7
**shown** 176:22 192:15 297:23
**shows** 61:24 95:10 115:22 163:12 189:7 198:21 242:25 243:8,24 286:17 290:21 291:9
**shred** 66:1 92:4
**shut** 97:10
**sic** 204:10
**side** 19:2 28:5 39:21 41:12 60:9 68:16,17,20,21 92:4 93:2,2 98:21 151:12 163:13,13 163:25 178:25 208:8 224:4 262:12 275:20 280:23,24
**sides** 22:4 55:4 192:23 303:4,17
**siegel** 126:19 143:17
**sight** 38:21 51:20 190:23
**sign** 37:25
**signed** 138:16 282:4
**significance** 210:15
**significant** 48:21 67:19 69:12 201:16 218:15 219:24 221:8 302:20
**significantly** 131:11
**signs** 176:20 238:11
**silbert** 13:12
**silenced** 108:9
**silentio** 293:25
**silicon** 91:15
**silverstein** 180:25
**similar** 32:17 46:6 46:24 248:18 265:15
**similarly** 91:4 98:1
**simmonds** 13:13
**simple** 17:14 20:11 26:14 50:6 66:5 85:14 87:16 163:7 212:10 213:1 276:17
**simpler** 262:18,19
**simplest** 27:8
**simplified** 21:9 30:9 41:1
**simply** 32:4 66:4 66:8 72:2 78:14 97:17,19 103:6 126:23 135:7 146:8 151:18 179:13 181:5 192:8,13 194:14 198:15 209:3 210:19 216:3,24 219:19 220:3 224:2 227:6,15 268:3 269:1,25 287:9 295:22 299:6

**sincerely** 111:5
**sing** 260:12
**singer** 13:14,15
**single** 41:18,20 51:10,11 60:12,16 68:15 71:21,22 73:17 74:3 78:9 84:7,7 195:8 278:24 284:10
**singularly** 56:12
**sir** 33:7
**sit** 18:25
**sitting** 56:3 119:22,22
**situated** 98:1
**situation** 63:1 125:11 136:4 199:25 200:5 209:2 284:10
**situations** 205:18
**six** 41:25 50:17 56:4 58:15,21 104:8 181:21 241:7 275:17 277:1
**sixth** 48:15 183:5
**size** 115:19 163:20
**sizes** 192:14
**skapof** 13:16
**skeptical** 176:6
**sketched** 205:11
**skip** 221:1
**skipping** 279:25
**skorostensky** 13:17
**slate** 195:22
**slaugh** 13:18
**slice** 256:8
**sliced** 199:13
**slightly** 204:24
**slow** 142:1
**slower** 134:23
**smaller** 32:19
**smith** 269:17
**smith's** 269:15
**snap** 90:15
**social** 88:5
**society** 45:14
**sole** 19:24 127:1
**solely** 110:7 268:11
**solicitation** 138:13
**solution** 43:12 205:23
**solutions** 305:20
**solve** 293:9
**solved** 58:12,14 63:21 167:21
**solvency** 50:2
**somebody** 35:7 54:9 165:2 231:11 255:11 256:20
**someone's** 183:14
**someone’s** 138:23
**somewhat** 42:9 108:12 220:7 266:5
**son** 112:8,12
**sons** 111:24
**sonto** 278:12
**sonya** 2:25 305:3 305:8
**soon** 39:1 122:19
**sophisticated** 55:3
**sorokin** 13:19
**sorry** 23:3 31:23 123:14 127:7 138:17 141:25 164:19 199:3 202:16 210:4 215:13,19 216:1 219:3 221:13 224:24 225:4 241:12 265:4 276:3,23 281:4 295:18 302:2
**sort** 15:7 40:24 66:12 99:25 183:1 198:14 230:24 244:11 280:7 285:22
**sorted** 297:8
**sorts** 25:20
**sought** 106:23 139:14 189:6,8 199:19,21 237:4
**sound** 77:9
**sounds** 121:6 122:1 191:9 213:18
**source** 263:12
**sources** 169:21
**southern** 1:2 196:21
**sovereign** 73:7 150:23 165:12 187:22 188:6 193:1,8 196:1 249:8 265:7 266:21 268:24 297:16,19,19,23 302:11
**sovereignism** 291:13
**sovereigns** 74:10 291:24
**sovereignty** 77:13 151:4 291:14
**space** 237:7
**spades** 293:13
**spanning** 280:23
**spared** 94:25
**speak** 121:11,23 123:5 131:15 156:10 275:11 287:1 288:15
**speaking** 52:23 120:8 121:10,13 122:15,16 132:2 166:6 227:15 304:12
**speaks** 286:11
**special** 78:5 197:4 197:24 211:8 270:13 281:15 283:3 287:5 292:14
**specific** 53:23 95:17 110:13 111:4 223:19 228:12 229:9 283:16
**specifically** 44:5 70:12 71:17 81:17 197:12,17 198:17 210:13 227:13 229:18 236:24 281:4,6
**specified** 108:21 139:12
**specifies** 126:17
**specter** 47:3
**speculate** 60:22
**speculation** 49:4
**speechify** 304:10
**speed** 36:9
**spelled** 66:10
**spend** 44:4 72:14 98:8 116:25 196:10 237:13 248:11
**spending** 44:22 116:24 237:16 303:22
**spent** 49:1 55:15 196:8 208:21 216:20 221:3 238:20 293:18 304:1

**spillover** 44:21 45:1
**split** 39:20
**splits** 46:19,20,20 46:21 53:20
**splitting** 37:20 38:1
**spoiling** 216:11
**spoke** 96:15 131:15
**spot** 228:15
**spouses** 50:19
**spouting** 49:4
**springer** 13:20
**spun** 60:21
**spv** 170:20
**squander** 39:6
**square** 5:3
**squeeze** 174:15
**st** 275:12,14 276:8 276:9
**stacy** 8:21
**stage** 95:8 229:13
**stakeholder** 52:24
**stakeholders** 18:17 39:14 43:14 59:16 146:7
**stance** 266:6
**stand** 44:25 59:15 77:14 107:1,5 151:16 171:24 286:4 293:5 294:4
**standard** 27:20 68:10 150:3 169:14 181:12 209:10 238:15 241:16,16,17,20 241:23 242:8 257:6,11 277:12 277:18
**standards** 188:22 189:15,15 258:12
**standing** 153:23
**standpoint** 230:21
**stands** 171:25
**start** 15:23 45:6 113:2,2,3 122:19 203:22 220:20
**started** 102:1 187:3
**starting** 111:25 291:15
**state** 5:17 6:17 7:2 7:8,9,16 33:19 36:3 38:16 44:11 44:13,14,16,17,19 49:2 52:2 53:14 53:23,24,24 58:5 61:6 65:19 73:12 73:13,17,20 75:22 75:25 77:25 78:4 78:6 83:9 99:13 105:22 111:5 114:15 115:24 116:7,9,13,13,15 119:3,25 121:22 126:10 143:24 149:3,5,23 150:2 151:14 152:6,24 153:24 154:1,13 159:25 164:18,19 164:19 165:24 168:12,15 185:3,6 185:7,8,16 193:16 196:24 199:16,17 200:25 201:6,9,9 201:11,16,18 202:5 203:16 209:12 211:2 212:7 217:17 219:5 220:2,7 221:11 225:19 226:17 228:16 229:5,7 232:24 233:11 234:10 237:5,9 238:2 246:8 248:10,11 255:9 256:19 264:25 269:2 271:18,18 282:21 282:22 283:7 284:11,16 285:25 297:21
**state's** 76:14 77:12 78:13 199:1 218:4 229:23 233:14 239:18
**stated** 105:1 195:4
**statement** 32:2 50:4 54:13 84:19 107:22 108:3 114:25 123:3 129:22 130:2,7 138:18 218:17 219:7,17 223:5 275:21 285:10
**statements** 31:12 105:23 131:14 144:3 220:10 221:7 223:7
**states** 1:1,11 4:16 6:9 17:13 23:11 27:5 33:24 34:20 35:24 40:3,9,16 40:17,25 41:1 42:23 46:16,17 48:4,5 51:19,21 51:24 52:4,10,12 52:13,25 53:2,9 53:16,17,22 56:12 57:1,2,13,14,22 58:1,20 60:25 62:13 68:8 70:14 70:20 72:18,20,24 73:3,6,6 74:1,6,9 74:17 75:2,8,13 75:14,25 76:17 77:8,11,23 78:8 79:3,10,12 80:7 80:16 81:3 82:5 82:18,22,25 83:3 88:18 89:23 92:23 93:14 94:19,20,22 95:18,23 96:3 97:18 98:6 99:6,6 99:10,15 101:14 102:5 103:5,9,20 104:22 105:2,8,15 105:20 106:4 112:23 116:24 117:6 118:18 120:18 123:4,24 126:7 133:21 136:22 143:6 145:23 150:23 151:3,5,12,20 152:24 153:3,12 153:14 155:10 156:11,12 165:10 165:16 168:16 170:15 176:11,20 177:11 183:24 184:6 186:10 187:23 188:6,12 188:19,24 191:1,2 191:3 193:1,8,18 194:1,4 196:1 201:22 202:6 203:9 205:14,17 205:22 208:12 209:4,22 211:7,13 224:20 227:7,11 227:14 229:8 232:25 237:18 238:2,16,19 239:3 241:18 243:16 244:11 245:25 246:12 248:18 249:2,8,10,14,25 250:8 251:19 264:22 265:7,10

266:11,22 267:4
268:25 269:3,23
271:6 282:23
283:2 284:23
285:15 287:14,19
287:24 288:6,15
288:21 289:22
290:16 291:4,21
291:24 303:18
304:4,12
**states'**  103:3
**state's**  117:2
153:11 168:9
**stating**  54:1,4
303:21
**status**  73:7 231:1
**statute**  77:18,20
184:23 185:15
197:4,16 230:14
237:18,20 238:10
238:12,18 283:5
283:16
**statutes**  31:5 50:2
229:22,23 230:4
230:19 233:16
238:3,5 256:19
**statutory**  74:17
77:15 88:22 90:18
91:2,2 123:12,25
125:1 148:2,6
198:5 291:17
**stay**  34:7 72:21
74:19,21 75:5
187:7,9 197:4,14
208:8
**stayed**  22:24
176:12 280:8
**staying**  299:17
**stays**  74:22
**steege**  4:13 24:1,1
24:8,19,22,25
25:12,21,25

**steel**  13:21
**step**  36:17 79:7
93:22 100:16
110:13,17 248:21
274:18
**stephanie**  9:5
**stephen**  12:11
**stepped**  17:20
**stern**  88:23 92:3
143:22 269:4,9
275:14
**steven**  10:21
14:18
**stewards**  15:24
**stewardship**
190:25 220:24
**stick**  52:13 288:12
**stipulation**  218:4
226:5 276:17,20
281:18,20,24
299:10,14,19,21
**stipulations**  108:9
**stodola**  13:22
**stomp**  290:8
**stomped**  289:6
**stone**  55:19
**stood**  173:16
**stool**  98:13
**stop**  45:15 106:18
113:1 126:25
129:16 140:2
141:7 144:11
151:22 187:25
211:14,15 218:21
231:19 235:14
240:12 247:20
**stopped**  58:15
62:12 79:22
200:15 235:22,23
236:1,1,6
**stopping**  235:11
235:13 236:5

**stops**  212:3
235:17
**stories**  88:6
**story**  112:6,15,17
293:6
**strauss**  5:8 101:1
**straying**  283:22
295:12
**streamline**  27:14
**street**  1:13 4:10
4:17 6:4,11,18
86:3 147:15
**strength**  286:12
**stressed**  105:15
**strict**  36:23
**strictly**  30:12
**strike**  29:9
**strikes**  148:3
**striking**  168:7
**string**  173:3
**stringent**  108:24
**strips**  249:7
**strong**  49:23
105:18 154:22
196:3 206:7
**stronger**  163:14
286:1
**strongly**  120:21
170:13 278:21
**strouss**  170:12
**structure**  44:10
66:5 97:24 98:7
160:13,17
**structured**  61:2
189:12
**structuring**
268:15
**struggling**  103:16
**stuart**  16:17
**stuck**  190:3
**stuff**  291:23
**sub**  293:24

**subcontractors**
36:17
**subdivisions**  73:9
**subject**  15:7 18:23
33:2 43:20 44:16
79:23 89:1 90:2
90:17 92:1 104:7
134:5 137:20
148:9 149:13
168:4 174:18
190:6 224:6 249:4
253:12 254:6
257:22 264:7,18
265:8 267:20,24
268:14,17 271:15
271:21 272:9
273:24 297:2
298:10,11 302:6
**submit**  87:21
190:16 205:13,20
206:18 208:12,18
209:17 211:11
212:15 214:10
220:3 222:7,21
223:3
**submitted**  47:19
69:14 154:22
218:8 219:4
280:22
**submitting**  66:1
**subordinate**  48:4
**subparts**  281:22
**subprime**  78:12
**subsection**  23:6
29:2
**subsequent**
174:10 283:16
**subsequently**
172:25 238:6
242:5
**subset**  60:20
**subsets**  62:6 212:7

**subsidiaries** 32:6 60:18 61:11 62:10 63:11
**substance** 181:6 182:17
**substantial** 16:10 17:25 45:18 60:19 67:10,12,13,24 68:1 93:7 96:7 97:8,22 100:12 106:1 145:8 158:24 159:1 176:11 178:1,21 190:21,22 192:5 192:17 194:16,24 195:4 258:3 259:3 264:11 292:16
**substantiality** 194:6,15
**substantially** 94:5 194:22 286:1
**substantive** 28:5,9 29:16 90:3 264:25
**substantively** 28:3
**substantives** 30:17
**substitute** 77:1 157:14 158:8 250:5
**succeed** 69:17 240:14,16 296:22
**success** 43:7 65:10
**successful** 58:2 234:7
**successfully** 59:19 119:23
**succession** 75:20
**successor** 251:1
**successors** 61:12 62:10
**sue** 50:13 59:14 125:25 138:23 206:4 250:3,13,13
**sued** 32:11 56:19 159:8 170:23 175:21 260:8,10
**sues** 125:19
**suffered** 38:8
**suffice** 72:7 286:8
**sufficiency** 193:6
**sufficient** 67:23 70:15 84:17,24 85:3 137:21 156:12 190:19 192:22 193:9,14 193:15,19 202:1 243:14 250:10 288:8
**sufficiently** 35:17 180:16 272:4
**suggest** 24:8 35:6 56:9 79:11 144:8 223:6 227:16 275:3
**suggested** 80:13 129:13 149:21 170:13 293:14
**suggesting** 68:11 74:3 195:25 216:12
**suggestion** 24:13 161:3 289:12
**suggestions** 90:21 236:17
**suggests** 206:2,17 225:17 292:11
**suing** 55:16 65:13
**suit** 235:17
**suite** 6:4,11 7:17 305:22
**suited** 224:5
**suites** 276:14
**suits** 29:9 48:11 77:5 78:4 154:21
**sullivan** 4:1 19:23
**sum** 68:2 91:19 100:11 191:11
**summarize** 219:4
**summarizing** 281:6
**summary** 84:23
**summons** 249:24 250:6,17
**super** 73:3 144:20
**supermajority** 151:7
**supernova** 59:23
**superpriority** 252:8 267:5
**supervised** 152:4
**supplant** 111:7
**supplanting** 111:4
**supplement** 93:7 111:7 228:17
**supplemental** 85:20,21 88:2
**supply** 43:19 48:22
**support** 16:7,19 17:25 38:25 42:12 50:5 51:4,9,22 52:25 58:18,21,23 59:22 62:21 63:23 66:2 67:23 68:9 68:10 70:8,10,14 70:15 74:20 78:5 80:20 82:23 102:3 102:7 113:5,7 116:11 122:25 146:7,18 147:7,7 172:23 183:5 194:23 203:3 223:4 285:17 294:21
**supported** 16:10 17:1 40:24 55:8 114:13 133:25 177:17 183:10 274:10 288:14
**supporters** 294:24
**supporting** 53:8 54:19 97:16 104:14 115:9 130:21 294:6
**supportive** 16:25 100:8
**supports** 51:12 66:9 69:20 72:2 78:13 100:19 117:21 212:8,12 294:3
**suppose** 173:22 239:23
**supposed** 33:5 57:15 81:3 87:13 107:13 191:21 193:5
**supposedly** 73:7
**supreme** 39:14 41:19 42:23 77:23 103:12 143:16 173:18 175:3 180:8 267:22 269:5
**sure** 19:1 22:22 23:17 24:21 25:16 26:14 30:22 31:5 87:24 113:16 121:2,11,21 122:4 122:12,12,14 134:23 137:10 141:8 150:10 153:20 155:17 156:21,22 157:12 167:2 171:4 187:3 192:1 198:10 204:6 210:6 223:11,18 235:4 261:12 276:6

278:11 285:7
299:18 300:1,18
**surely** 82:22
160:9
**surgery** 112:2
**surprise** 147:2
176:3 282:12
**surprising** 84:6
**survey** 238:2
**surveyed** 190:8
**survive** 98:13
216:21
**suspenders**
299:22
**sustainable** 45:19
**sustained** 72:3
117:9
**swallow** 274:8
**swallowing** 274:9
**swear** 288:18
**sweet** 191:5
**swingle** 13:23
**sword** 260:1,4,12
286:12
**swore** 44:7
**sworn** 42:16
54:14 57:11 59:16
64:9
**sympathetic**
254:12
**system** 74:10
122:10

**t**

**t** 10:5 13:3 305:1
305:1
**table** 116:10
131:12 303:17
**tad** 248:5
**tailor** 125:1
**take** 15:9 31:18
62:14 86:1 109:9
111:25 138:22
155:1 162:14

164:12,21 172:9
173:19 175:7,10
179:4 183:12,14
185:20 194:2
198:11 199:16
210:22 228:5
249:25 257:8
258:22 279:1,23
282:25 288:18
290:7 291:1,19
299:8
**takeaway** 190:5
**taken** 30:24,25
32:2 106:16 107:7
107:19,20 150:20
157:8,9,25 160:9
162:9 165:4 192:1
220:8 222:12
240:8 249:12
302:17
**takes** 70:19 95:19
173:20 200:7
249:14
**talk** 17:12 108:7
114:16 123:16
194:19,21 229:15
241:10 246:22
247:11 249:23
282:10 288:22
290:6 292:7
301:15
**talked** 195:4
210:4
**talking** 36:8 128:8
133:13 141:9,11
141:13 145:19,20
147:10,16,17,18
155:12 166:22
185:8 193:20
196:20 199:14,16
199:17 200:2,5
215:4 218:15
219:25 234:24,25

235:5,7 272:1
290:24 292:8
**talks** 281:9
**tanner** 184:10
**tap** 42:25 49:17
**tapestry** 39:16
41:8 277:20
**tapley** 13:24
**targeted** 278:18
**targeting** 225:13
**task** 38:9
**tax** 29:18 50:3
105:23 107:21
160:3,10,15
200:18,21,25
201:1
**taxes** 109:18
159:4 160:1,6,18
160:18
**tdp** 113:22
**team** 54:7 224:14
**technical** 37:23
295:10
**technically**
167:25 173:22
**tele** 1:12
**telephonic** 122:5
**telephonically** 3:8
3:9,10,11,19 4:6
4:13,20 5:6,14,21
6:7,14,21 7:6,13
7:22
**tell** 60:23 199:4
201:18 273:15
285:10 293:6
**telling** 174:6
193:4 201:24
202:3,4 224:7
285:1
**tells** 104:10
**ten** 60:13 62:12
133:11 206:16
270:18 292:5

295:6
**tendency** 112:24
**tends** 27:10
**tens** 39:18 45:6,7
47:14 48:8,12,13
55:18 58:11 59:14
63:9,9 82:14
117:3 157:18
284:24
**tensely** 55:2
**tenth** 183:6
194:12 258:1
**term** 21:23 24:12
28:25 30:16 33:18
36:18 104:8
284:13
**terms** 24:5 27:14
28:15 66:17 67:13
85:14,23 96:1
97:8 108:16
119:25 124:18
141:20 192:22
226:25 252:3
259:4,4 262:23
271:2,5,13,20
275:19 284:7
290:3
**terrible** 187:21
**terribly** 112:6
116:22 293:12
**terrific** 15:22
**territories** 118:19
**territory** 73:11
271:18
**test** 91:22 92:3
129:8 132:9
169:14 263:13,19
264:11
**testare** 169:9
**testified** 43:11
44:24 47:11 55:14
68:4 73:24 98:16
99:2,12,24 104:2

139:23 145:10
242:12,19 255:24
259:14 270:12
280:7,16,16,18
290:19
**testify** 261:10
**testimony** 42:2,6
42:11,19 45:11,12
55:12 66:11 79:20
96:14,16,22 98:5
98:11 99:17 100:7
124:1,1,18 125:12
129:18 134:6,16
138:6 140:25
151:9 163:12
175:23 208:4
223:25 243:21
254:20 270:11
293:25 295:4
303:20
**text** 87:12,22
129:9
**texts** 278:16
**thank** 15:22 19:13
23:13,23 26:3,18
26:20 34:1,14
35:18,20 36:5
37:1,12,14 92:7
92:21 93:5 100:21
113:8,10 118:7,10
120:23,24 122:19
132:3 148:23,25
149:4,17 186:1,9
187:2,10 210:10
211:18 219:23
226:3 227:2
228:21,22 229:4
248:3,4,20 249:1
253:15 257:20
275:10 278:2,3
281:6 295:17,18
298:20 299:2,25
301:3,24 302:15

304:13
**thanks** 19:12 26:4
54:17 186:7
228:24 301:2
**that's** 108:25
115:2 120:22
127:6,8,12 133:13
133:16 141:22
146:8 152:19
155:10,11 158:2
158:16,18 159:4
162:10,16 163:23
164:7 166:11
167:23
**theme** 277:18
**theodore** 14:17
**theories** 32:17
208:22 285:3
**theory** 57:5
207:22 284:3
285:13 287:21,23
**there's** 110:14
111:4 114:15
116:20 125:12
127:3,10,21 136:1
137:11 155:4,4,5
164:15 165:15,15
165:18,20 168:13
**they're** 105:25
106:3 109:10
125:21 126:2
136:7 142:11
144:23,24 153:2
157:18 162:22
163:4,12 165:3
167:15
**they've** 107:19,20
134:4 154:15
**thick** 55:12
**thing** 18:14 38:22
79:17 118:19
152:7 156:5,5
164:21 165:1

167:18,19 180:6
199:13 203:23
231:24,25 232:1
232:13,18,23
233:2 236:13
247:15 278:24
282:4 287:25
292:8 294:9 298:6
**things** 15:25 16:1
17:19 18:8,22
28:4 38:1 127:10
131:6 152:15
156:7 171:18
184:18 189:16
193:21 201:25
205:19 209:4
214:1 224:7
230:14 232:22
242:1,4 244:14
255:6 272:19
273:23 278:14,19
278:19 279:3,25
281:9 282:8 299:6
300:16
**think** 15:6 16:2
18:7,24 23:1,17
23:19 24:2,7,10
26:24 31:13,16
32:24,24 33:2,4,9
35:10,14,21 36:13
36:20,24 37:5
49:21 52:1 54:25
68:13 79:21 92:10
93:10 103:1 104:4
105:9 112:21
113:10,12 118:14
132:10 135:24
137:17,25 138:25
146:21 147:1,19
148:25 150:6,7
152:15,18 154:25
155:20 156:2,7,9
156:24 158:13,19

161:11,14 162:4
162:25 163:8,9
164:24 165:4,7,7
165:11 166:13
167:17,24 168:4
168:12 171:21
172:18 174:17
175:8,15,21,22
176:23 177:5,16
178:16,19,19,21
179:16,18 181:24
182:20 183:3,10
184:5,19 185:1
188:22 190:2
191:17,25 192:3
193:9,20 194:7,9
196:6 197:2 199:4
199:8 200:22
202:20 203:14,21
207:2 209:24
210:2,8 213:19
214:18 217:10
219:24 223:11,12
224:24 227:8
229:10,12,14
230:10,23 231:1,9
231:10,14,25
232:6,9,11,22
233:11,13 234:1,5
235:7,9,24 236:6
236:14 237:2,5,11
237:17 238:9,14
238:19,23,23
239:3,5,6,17
240:2,3,7,10,14
240:24 241:3,13
241:18,24 242:8
242:14,21,24
243:8,15,17,23
246:3,9,23 247:5
247:10,21,25
248:13 251:7,11
253:6 254:12,25

257:15,25 258:8
258:17,22 259:22
260:22 261:10
262:20 263:23
264:3 266:23
267:7,14 271:3,4
271:7 272:6,7,9
272:16,21,25
273:14,19,22
274:1,4,12,17,21
275:6,8,11 277:17
277:22 278:4,16
279:2,5,10,13,14
280:3,13 283:13
283:25 286:11,17
287:7 290:14
292:2,6,18 293:1
293:2 294:5
297:17,25 298:6,9
298:10,19 299:21
302:21 303:16
**thinking** 200:4
203:10
**thinks** 279:4
**third** 17:1 18:14
22:13,14,19 23:21
24:11,16 27:3
36:3,16 47:6
51:16 56:3,14,16
56:23 57:2 59:13
60:1 64:23 65:3,7
65:13,18,19 66:14
66:20,22 67:1,8
69:2,8,20,22,22
70:6,24 71:1,4,4
71:15,18 72:4,8
72:12 76:2,4,22
79:11,16 83:17,18
84:8,11,16 85:11
85:13,22 88:20
89:4,11 90:7,20
90:25 91:6,6,10
91:17,19 97:15

98:8 101:7,15,22
107:6 108:22
109:5,23 111:13
111:20 123:2
124:4 126:8
128:11 129:1
142:17,17 143:12
144:3,4,17 149:14
150:14,14,15
151:11 152:3
159:15 161:18
168:7,11 170:21
170:22 175:4
178:24 179:13
180:20,24 181:7
181:12 182:18,23
183:5,5 184:4,18
187:21 188:17
189:16,18,21
190:1 195:21
196:1,23 197:22
205:8,9,21 209:21
212:18 226:14,17
226:22 227:1
246:23,25 247:1
249:13 250:22,24
251:3 255:20
258:18 260:24
264:21 265:22
266:1,8 267:19
268:2,10,11,12,14
268:16 272:16
275:23 276:1,14
277:11 289:2
294:18 297:14
**thirds** 52:15
**thirty** 64:8 241:8
**thomas** 5:18 7:20
**thorough** 177:18
251:18
**thoroughly** 95:15
**thought** 24:2
33:20 37:20 41:10

131:6 162:17
173:17 174:14
179:19 186:3
201:1 216:2
223:21 232:17
273:7 291:10
302:3
**thoughts** 105:20
**thousand** 256:10
**thousands** 39:18
41:5 45:3,8 48:8,8
48:11 63:3,10
80:17,18 82:23,25
117:4 124:13
138:10 193:18
215:6
**thrashed** 206:1
**thread** 41:8
102:22 277:19
**threat** 97:25
174:20
**three** 15:25 20:5
33:13 50:17,24
51:23 55:5 59:8
63:23 95:16 96:23
101:13,16,20,25
103:19 106:12
108:18 111:24
112:13 113:19
114:24 115:11
126:8 163:10
168:6 175:19
244:5 246:18
249:4 275:16,18
275:18 276:12,25
276:25,25,25
277:8 288:19
289:19 292:11
293:3,6,14
**threw** 165:10
**throw** 104:25
**thumb's** 121:4

**thurmond** 13:25
**tie** 49:15
**tied** 51:3 258:24
**tier** 89:10 108:19
108:22,24 109:1,1
109:4,5
**tiers** 108:19
**tighten** 39:16
**tilt** 210:7
**time** 15:5,9,13
17:6 19:14 35:25
36:7 45:25 46:2
55:25 56:21 72:14
93:6 98:8 100:21
101:18 104:17
113:1,1 120:3
121:3,13,23
123:15 148:18
149:9 162:9
171:15 179:5
186:1 196:10
201:1 207:18
208:20 211:23
214:7 217:16
221:3 222:7 228:2
230:17 253:1
262:25 269:17
272:14 273:3,5
285:9 286:23
287:12 289:2
293:3,18,19 299:8
302:21 304:9,13
**times** 5:3 33:9
86:3,4 101:19
104:5 139:8 244:5
**tiny** 194:17
**tip** 293:4
**tirelessly** 252:21
**title** 89:6,9 264:21
264:24
**tmt** 37:22 39:15
41:18 64:10 150:3
150:8 189:13,20

189:23
**tobacco** 44:7,14 248:18
**toback** 14:1
**tobak** 280:2 294:10 295:9,18 295:18,19 298:5 298:16 300:7
**today** 86:4 101:24 114:17 118:20,25 120:8 130:12 131:15 188:16 229:9 236:25 270:24 276:2 284:16 285:3 296:2
**today's** 277:19
**today's** 121:8
**told** 18:3 48:2 61:22 160:24 165:13 303:11
**toll** 146:3
**tonight** 304:6
**tonnesen** 14:2
**tool** 240:12
**tools** 182:4 207:20
**tooth** 125:19
**top** 44:2 96:22
**topic** 30:21 190:9 201:5 300:9
**topics** 253:23
**tornado** 48:17
**tort** 64:25 182:25 275:7 285:17
**total** 89:15,16 106:1 115:1 116:17
**totally** 39:17 42:22 56:20 64:11 251:4 273:7 287:21
**touch** 101:4 111:20 113:20
264:20
**touched** 112:19
**touted** 82:16 199:13
**town** 65:20 284:10,10
**towns** 52:9
**toxicity** 271:2
**track** 121:13 122:14 176:15 248:13
**trade** 36:4
**tradeoffs** 232:12
**traffic** 112:4
**tragedy** 58:12 63:20 214:23 215:22,23 216:4 217:1
**tragic** 107:1
**trailer** 37:22 39:15 41:18 64:10 150:8 189:13,20 189:23
**transaction** 109:18
**transcribed** 2:25
**transcript** 80:14 96:17 99:21 305:4
**transfer** 32:12 49:25 110:5 161:15 290:9
**transferees** 30:8 30:12 31:25 32:8 105:21
**transferred** 128:10 286:4 289:7
**transfers** 82:2 105:18 106:2,3 132:25 159:2 161:20,24 233:4,9 233:12 280:19
**transparency** 160:25 282:11 283:18
**travel** 241:19 242:8
**travelers** 172:10 173:4
**tread** 88:25
**treasure** 282:7
**treasuries** 44:13 75:17,22 282:24 283:8
**treasury** 44:19
**treated** 74:14 129:9 197:11 246:13 261:21 272:5 296:15
**treatment** 21:8,11 21:16,19,20 45:21 56:24 78:5,21 136:24 197:24 296:18 297:12
**treats** 296:1,4
**tremendous** 45:5 295:13,14
**tremendously** 218:11
**trepidation** 52:21
**trial** 41:25 53:13 81:10 96:5,25 97:6,7 100:15 108:8,11 134:16 140:18,25 175:13 177:2 204:14,17 226:6,6 232:8 239:20 241:7,16 246:7
**tribal** 40:7
**tribe** 65:19
**tribes** 51:14 93:14 94:19 118:18 291:4 294:16
**tribune** 86:5
**tried** 63:22 165:5 195:7 196:16
**trifling** 192:16,19 192:20,21,22
**trillion** 135:9 288:1,6
**trillions** 47:14 48:5,13 190:24,25 191:3,4,10 195:14
**trimmed** 277:21 277:21
**tripartite** 281:20
**troop** 4:20 17:10 23:10,10,13 35:23 35:23 36:11 37:1 37:12
**trove** 282:7
**true** 32:3 61:17 103:7 109:9 146:8 174:3 210:1 213:11 219:14,20 219:20 220:5 223:8 232:9 235:4 251:13,25 253:1 263:12 267:20 291:25,25 305:4
**truly** 41:17 88:9 93:11 152:17 292:24 293:11
**trumpeted** 61:3
**trust** 34:3 45:20 65:3 68:24 70:2 86:9 125:22 133:16 134:7 159:17 171:16,21 182:14 207:6 252:13 259:16,23 260:1,5,12,15,24 260:25 261:19 262:12,24 263:21 273:17 274:24 286:4,6,6,7,10,14

290:9
**trustee** 6:10 52:5 70:20 71:14,23 83:18,23 84:3,7 84:15 85:4 87:9 88:18 90:17 107:6 107:23 114:7,11 123:4,6,11,24 126:7 136:22 145:23 150:1 188:13
**trustees** 33:22
**trustee's** 108:4 114:2
**trusts** 50:14,17 68:22 128:6 143:4 159:9 161:5 213:5 213:7 286:2 289:9
**truth** 206:5 210:21 218:19 240:21 244:6
**try** 29:16 92:17 101:3 114:18 134:20 135:1 161:12 162:23 176:13,14 187:9 196:11 204:20 207:14 229:11 270:15 286:6
**trying** 28:3 32:20 83:4 103:9 190:4 196:25 205:16,17 216:3 257:16 260:4 261:3,6 270:19
**tsai** 14:3
**turbocharging** 225:17 256:16 257:4
**turn** 18:7 19:3 20:15 35:21 43:3 49:8 50:16 56:4 64:15 80:11 92:8 94:1 113:16 121:2 121:17 143:9 154:8 168:3 220:19 293:11 294:10 297:16
**turned** 112:10 300:17
**turner** 14:4 47:10 68:3
**turner's** 47:17 68:5
**turning** 66:16
**turns** 148:5 297:10
**twenty** 55:15 60:14
**twice** 68:2
**two** 16:1 17:4 18:8 19:2 26:4 28:9 29:14 33:6 33:16 38:20 39:2 41:21 49:8 51:1 52:15 58:7 62:11 63:20 79:19,24,25 102:24 104:8 106:10,18 112:7,8 112:12 115:2 118:23 119:10 133:6 155:4 156:6 163:10 169:21 175:20 192:14 193:21 195:15 201:25 202:2 209:14,14 214:1 222:21 223:13 224:25 225:4 235:2 242:19 243:9 273:23 274:4 276:20 278:7,17 279:15 279:24 280:22 282:20,24 288:18 289:10 292:10,25 293:14 295:10 302:17,25
**type** 153:5,23 166:3 174:19 183:15 184:12 256:21 304:10
**types** 27:24 36:19 145:8 163:15 164:1 180:23 182:23 183:9 238:7

**u**

**u** 260:12
**u.s.** 1:23 6:10 50:22 52:5 70:20 71:14,23 83:18,23 84:3,7,15 85:4 86:19 87:9 88:6 88:18 90:17 107:23 108:4 114:1,7,11 123:6 123:11 136:8 161:1 173:21 220:2 267:23 292:4
**u.s.a.** 86:4
**u.s.c.** 76:11 89:6
**ubiquitous** 62:25
**ubs** 169:17 170:20
**uc** 184:16
**ucc** 16:8,22 42:14 43:11 50:5 51:12 51:13 55:17,23 58:16 68:7 82:4 92:8 101:5 102:4 104:11 109:24 111:22,23 112:7 113:1 224:8 278:17 281:1,20 292:15 294:15
**ultimate** 226:22 284:9
**ultimately** 15:9 69:17 75:10 97:13 112:11 114:13 144:5 165:2 169:24 188:24 192:20 193:9 201:20 208:22 262:4 263:5,25 268:23 270:23,24 271:2,4,13 273:13 297:10 298:6 299:21
**umbrella** 77:4
**un** 133:21
**unasserted** 265:22
**unavailable** 71:21
**unavoidable** 63:16
**unbelievably** 71:24
**uncertain** 49:20 69:18 85:23 116:10 139:4
**unchallenged** 42:19
**unclean** 189:4
**unclear** 104:5
**uncontested** 47:8 114:24 262:12 295:4
**uncontrollable** 48:7
**uncontroverted** 42:3 44:23 47:20 55:13 98:11 160:11 188:23
**uncoordinated** 48:7
**undeniable** 43:9
**undercut** 143:16
**undergo** 154:24

**underlying** 101:8 161:22 177:3 223:1 245:25
**underneath** 245:15
**underpinnings** 95:15
**understand** 20:5 22:21 24:11 32:20 102:13,15 104:1 104:19 114:3 127:13 132:2 139:6 147:21 154:22 156:2,8 158:6,15 160:7,19 165:23 166:20,20 168:1 176:5,5 180:14 181:2 182:8,18 185:21 188:14 203:15,17 206:9 209:9 211:17 214:8,25 216:3,8,23 217:15 233:23 234:1 251:7,8,18 254:11 254:18,18 256:6 258:13 266:6,7 270:3 271:24 272:8 273:21 285:12 287:7 303:2
**understandably** 289:16
**understanding** 26:24 99:13 210:19 217:5 270:25 289:25 299:20,24
**understands** 224:9
**understatement** 293:8

**understood** 23:17 26:17 31:17 35:5 87:24 136:4 193:12 207:3 208:4,5,6 244:9 245:24 259:1 262:9 263:9 302:22
**undertook** 85:19
**underwood** 6:7 270:5,6,7 272:7 272:15,22,25 273:12 274:13,17 280:24 298:16,17 298:20 302:8,9,15
**underwood's** 278:7 279:7 295:20
**underwriters** 275:12 279:17 298:6 300:6 302:1
**undeserving** 218:14
**undisputed** 49:15 95:10 194:9
**undo** 128:2
**undoubtedly** 104:13
**unearthed** 176:24
**unequal** 78:21
**unfair** 150:16 166:4 168:18,20 168:23
**unfairness** 150:15
**unfortunately** 52:21 108:10 112:4 164:1 270:16
**unhelpful** 104:18
**unified** 186:15
**uniform** 36:5 142:21

**uniformed** 36:4
**unilateral** 73:15
**unilaterally** 252:16
**unimaginable** 116:23
**unique** 65:8 66:13 73:7 102:9 112:6 233:16
**unit** 73:10 78:11 78:22 83:12 163:11 208:23
**united** 1:1,11 6:9 40:9,16,17 42:23 52:10 123:4,24 126:7 136:22 143:5 145:23 177:11 188:12 191:1 239:3 249:2 251:19 265:10 266:11 267:4 269:22 287:14,18 287:24 288:6
**units** 53:22 72:22 73:14 75:6 76:3,5 76:8,10 284:12
**universal** 80:20 290:1
**universe** 137:2
**unknown** 1:25
**unlawful** 31:1 234:20 292:24 295:3
**unlimited** 143:7
**unliquidated** 288:4
**unmistakable** 85:15
**unmute** 121:11
**unnecessary** 27:19
**unobtainable** 43:9

**unpack** 302:11
**unprecedented** 45:14 93:11 96:10 117:11 124:10
**unquestionably** 291:24
**unravel** 174:22 277:20
**unravels** 41:8
**unrebutted** 66:11
**unrecognized** 83:7
**unrelated** 33:1,3 33:5
**unresolved** 19:25
**unsecured** 5:9 101:2 107:19 154:1 194:13 273:21 274:5,8,11 279:16 296:19 299:4
**unsolvable** 293:9
**unsupported** 287:21
**unsurprising** 74:2
**unthinkable** 47:22 65:21
**unthinkably** 38:5
**untouchable** 125:21
**unturned** 55:19
**unusual** 62:24 172:19
**unwind** 173:3
**unwound** 173:2
**upcoming** 109:22
**updated** 158:1
**updates** 26:4
**upheld** 65:5 169:16 175:8
**upset** 216:3 266:6
**upsetting** 99:11

**upwards** 173:10
**urban** 184:10
**urge** 187:12
**urged** 106:24
**urging** 220:20
**usable** 61:23
**use** 27:14 29:20
  37:8,8 45:22
  53:12,13 61:20
  91:24 105:15
  106:24 107:2
  109:7 111:2,18
  122:5 176:7 190:7
  207:20 216:8
  240:4 243:7 246:4
  254:8,10 259:23
  260:5 277:11
  282:7 301:12
  302:23 304:9,13
**useful** 62:8
**uses** 24:12
**ust** 114:3
**usually** 51:7
**usurped** 166:9
**utilize** 122:10
**utilizing** 101:22
  101:22
**utter** 71:23
  225:24
**utterly** 60:11
  282:11
**uzzi** 14:5 31:8,9
  31:10,17,21 32:8
  32:14,17 33:7,11
  33:13 34:1,11
  300:2,4,4 301:3
  301:15

**v**

**v** 29:23 88:23 92:3
  126:19 143:17,22
  170:12,20 185:14
  241:19 265:10
  267:23 269:4

**vacated** 171:10,19
  172:25 173:23
**vacuum** 109:24
**vague** 77:11
**valid** 124:5 126:6
**validity** 177:5
  198:7
**valuable** 49:24
  96:21 101:20
**valuation** 280:18
**value** 39:1,20 44:2
  44:20 45:2 46:23
  48:19 64:5 65:21
  67:16,21 68:2
  69:19 73:16 75:23
  82:2 83:15 101:21
  101:22 106:1,9,12
  119:3,5 130:3
  162:25 163:3
  212:19,25 213:2
  216:20 232:1
  251:10 286:3,6
  291:6
**values** 102:11
**van** 14:6
**varick** 6:11
**varied** 43:8
**variety** 18:22
**various** 87:4
  98:22 102:20
  105:23 157:2,22
  201:3 207:20
  218:5
**vast** 257:11
**vastly** 295:8,8
**vehicle** 93:23
**venditto** 14:7
**venture** 60:12,15
  63:8
**veracity** 54:12
**verify** 54:12
**veritext** 305:20

**vermont** 62:4
  149:7 168:24
  186:14
**version** 86:17
  87:10,11 121:25
**versus** 104:16
  105:7 170:22
  191:23 195:2
  262:24 285:23
**veto** 73:1,5,25
  83:14 303:3
**vi** 30:8
**viable** 43:12 64:8
  102:2
**victim** 101:17
  111:21 117:3
  125:23 138:20
  139:19
**victimized** 148:16
  148:18
**victims** 3:14 38:17
  39:3,25 43:18
  48:16 51:15,15
  63:17,18 102:12
  104:21 106:25
  107:3 112:16
  113:3,4,6,7,21
  114:14,16,17,20
  115:8,8,24 117:10
  117:16,18,20
  124:11 125:23
  126:2 131:7
  134:20 188:5
  213:3 215:9 249:9
  250:9 294:17,17
**video** 1:12 121:2
  121:17,20
**view** 36:14 42:8
  78:13 81:6 145:1
  150:24 154:12,13
  155:21 159:23
  182:9 183:23
  194:2,4 210:5

215:20 253:4
  272:17 278:23
  285:1 292:15
**viewed** 108:4
  166:17 185:4,6,7
  260:25
**views** 91:13
  105:18 254:13
  288:24
**vii** 29:3
**villages** 52:10
**vincent** 7:25
**vindicating** 117:1
**vindication**
  291:12
**violate** 71:5 84:8
  136:6 249:6
  268:22
**violates** 253:2
**violations** 198:24
  237:7,8
**virginia** 62:4
  103:4
**virtually** 42:3
  59:3 60:16 64:7
  129:11 139:6
**virtue** 22:19
  237:21
**vis** 223:16,16
**viscount** 161:25
**vividly** 65:22
**voice** 115:9
**void** 198:5
**volume** 97:1
  123:21 225:14
**voluntarily** 295:7
**voluntary** 93:25
  111:13,17
**vonnegut** 2:4 3:11
  18:8,13,25 19:9
  19:10,13 22:16
  23:3,17,23 24:17
  24:23 26:20 30:22

31:7,22 32:2 35:4 35:20 37:14 110:8 114:11
**vote** 53:16 54:5 59:24 70:17 83:12 102:6 108:1 131:23,25 145:24 146:15,20,22 147:2,8,13 151:7
**voted** 59:21 70:11 70:13,13 107:17 115:4,7 116:19 117:4 131:16 146:10,11,13,16 152:25 153:7,9 181:18 292:4
**voters** 52:19 54:10,16 146:4 212:13,16 294:23
**votes** 80:19 115:1 115:6 116:17 146:2,4 212:11
**voting** 51:5,8,9,10 53:8,18 64:7 70:11 73:3 84:20 146:1,6 165:13 181:18 213:13
**vow** 44:10
**vulnerable** 79:13

**w**

**w** 13:4
**wa** 7:18
**wagner** 14:8,9 94:23
**wait** 60:5 92:16 216:16
**waiting** 106:17
**waive** 204:5,6 222:1
**waived** 25:24
**waiver** 34:7
**waiving** 100:4
**walk** 18:13,14,25
**walking** 17:9
**wall** 86:3 165:11
**want** 25:16 31:5,7 35:12 92:25 97:14 98:8 104:25 107:5 108:5,12,12 109:25 110:23,25 111:20 112:15,22 114:19 118:2 122:9 145:15 156:5,13 161:23 163:5 178:21 179:10 198:9 199:2 201:22 204:14,15 206:4,4 206:4,13,15 211:21 212:23 215:21 259:6 269:24 270:2,10 270:20 273:6 274:14,15 276:6 278:24 279:15 281:5 282:21 286:19 290:6 292:6 294:9 299:9 302:10
**wanted** 23:16 26:14 30:5 31:21 34:14 127:22 128:5 145:18,21 147:23 150:10,21 152:21 219:1 246:22 264:10,19 270:22 294:8 298:18 299:18 300:24 301:4 303:22
**wanting** 185:2
**wants** 163:2 248:13 284:8
**war** 49:3
**wardwell** 3:3 15:19 19:10 295:19
**warfare** 47:22
**washington** 5:19 7:2,15,16 41:21 62:4 70:4 73:20 73:22 78:1 79:14 80:9 147:1 149:8 152:5 186:11 201:9,11,16 202:5 206:3 211:22 212:11 227:15,16 227:19,20,22 228:16 238:16 248:6,9,11 282:21 291:20
**washington's** 66:2 76:1 81:5,7 82:19
**washington’s** 169:3
**wasn’t** 127:17
**wasteful** 38:15
**way** 24:8 28:1 31:4 51:8 56:11 63:21 64:3 69:5 77:19 91:22 95:24 99:25 102:10 103:11 107:5 114:12 121:17 141:20 152:19,19 160:3,17 165:19 171:13 174:10,16 176:9 185:11 187:9 189:11 197:18 208:3 211:13 216:24 219:22 223:19 246:14 257:7 258:19 262:6 264:3 268:15 272:22 273:2 285:20 295:5
**ways** 192:20 194:8 238:18 261:4,7 302:25
**we've** 21:8 25:3 26:1 27:12,13,18 28:11,15 30:7,10 33:17 34:7 54:8 63:21 178:19 197:3 207:23 211:12 221:3 227:8 243:4 256:25 271:18 297:22,22 298:14
**weaknesses** 104:19
**wealth** 82:8 125:2 132:21 133:12,13 158:25 159:1,10 287:24
**webcam** 17:8
**weber** 14:10
**website** 236:2
**wednesday** 37:3 246:25 247:19 272:15,24 273:10 273:15 274:14 290:25 302:10,17 304:7,14
**week's** 15:3
**weekend** 34:17
**weekends** 252:24
**weeks** 42:18 237:15 289:20
**weigh** 212:13
**weighed** 202:6,10
**weighing** 227:9
**weighs** 212:19 218:11
**weinberg** 14:11
**weinberger** 45:13 55:15 100:8,9 165:6

**weiner** 14:12
**weintraub** 14:13
**weis** 14:14,15
**weiss** 14:16 255:18
**welcome** 301:14
**wells** 14:17
**wendy** 14:11
**went** 42:19 44:8 54:12 102:6 106:3 134:7 138:13 152:5 167:17 171:17 223:2,13 225:1 278:13 303:12
**weren't** 128:13 164:21
**west** 4:17 62:4 103:4
**we'll** 155:6 167:22
**we're** 17:18 101:24 112:18 121:6 122:18,22 123:15 133:13 141:13 145:19,20 146:23 147:9,10 147:16,17 156:6 161:12 166:21 167:25
**we've** 111:9 113:18 118:12 149:6 157:23
**whatever's** 214:13
**whatsoever** 68:10 84:4 109:6 277:8
**wherewithal** 117:19
**white** 1:14 3:13 66:11 77:24
**who've** 227:7
**who's** 121:13 122:15
**wilamowsky** 14:18
**wild** 205:15
**willful** 28:14,16 28:17,18,22,24,25 29:4 30:23 36:6 36:18
**willfully** 102:25
**william** 13:3 14:13
**willing** 104:14 164:21
**win** 50:14 67:6 91:25 261:16,16 263:23,25
**winning** 49:18
**winthrop** 4:15
**wiped** 154:23
**wisdom** 286:12
**wiser** 188:2
**wish** 113:8 161:9 161:10 194:2 216:2,24 227:3 295:5
**wishes** 56:23 288:17
**withdraw** 58:22 58:22
**withdrawal** 25:1
**withdraws** 186:24
**withdrew** 21:18
**withstand** 80:15 296:23
**witness** 44:25 244:7 280:20
**witnesses** 42:2,2,4 42:5,5,9,18 64:9 82:16 98:10 124:19 135:25 181:23 224:1 241:9 246:2 280:17
**woke** 34:16
**wolf** 14:19
**wolff** 7:1 186:10
**woman** 92:16
**worcester** 4:1 19:23
**word** 31:3 33:3 37:8,9 53:6 91:24 139:14 176:7 191:14 240:3
**wording** 35:16
**words** 53:5 65:23 66:13 67:17 85:2 105:5,25 109:3 129:11 161:15 162:13 190:18,24
**work** 16:10 32:23 55:25 56:22 57:16 63:25 71:25 111:6 123:17 147:21 188:3 207:17 213:12 216:19 252:19 288:20
**worked** 93:2 187:19,24 198:8 238:19 252:18,24 252:24
**working** 93:19 112:10 252:21 285:6,7
**workplace** 255:7
**works** 61:25 236:23
**world** 39:5 56:25 74:1 137:4 201:7 201:12 209:14 285:14
**worldwide** 80:5
**worried** 240:5,6
**worse** 57:18 187:16 295:8
**worst** 39:5
**worth** 68:14,23 160:22 288:6
**worthless** 60:21 249:17
**would've** 98:23 99:6 207:3
**wouldn't** 135:15 139:15 144:22 157:21 158:1 166:12 258:6
**woven** 39:16
**wrap** 63:16
**wrapping** 224:3
**wrestle** 17:15
**writing** 44:24 165:11
**written** 42:11
**wrong** 54:14 76:6 116:20 148:23 258:7 291:19 299:6
**wrongdoer** 68:16
**wrongdoers** 155:23
**wrongdoing** 168:11,14 169:4,9 172:12 200:2,16
**wrongful** 36:21 169:5
**wrongly** 66:18 188:12
**wrote** 265:18 267:24

**x**

**x** 1:4,10 256:15
**xvii** 34:1

**y**

**yeah** 150:6 152:12 167:2 247:25 248:25 274:17
**year** 38:19,19 48:19,19 55:4,4 55:25 97:21 159:3

216:20 237:14
270:25 293:20
**yearly**  109:14
**years**  38:14 43:24
46:6,22 47:23
48:15 51:25 55:3
55:16 59:23 60:15
63:22 64:4 65:6
79:19,23,25 93:20
95:1 97:22 102:24
109:11 112:8
133:11 168:6
171:16 177:16
180:9,10 206:16
220:2 235:2
240:17 293:3
**yield**  185:23
228:12,23
**york**  1:2 3:6,17
4:4,18 5:12 6:12
7:4 33:19 86:3
164:18
**you'd**  156:24
**you'll**  106:20
**you're**  113:11,15
121:14,15,15,17
122:8 123:14
128:8 129:23
130:4,5 131:13
132:24 134:24
137:17 138:22
141:25 142:8
147:18 155:11
157:12 158:6
160:7 166:12,21
167:14
**you've**  130:11,12

**z**

**z**  13:20
**zabel**  14:20
**zale**  265:16
**zeevi**  14:21

**zero**  53:1,1 67:21
117:17 277:7
**zoom**  92:18
121:24 122:17
**zylberberg**  14:22

**à**

**à**  223:16

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case No. 19-23649-rdd

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of:

PURDUE PHARMA L.P.,

Debtor.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

United States Bankruptcy Court

300 Quarropas Street, Room 248

White Plains, NY 10601

November 9, 2021

9:49 AM

B E F O R E :

HON ROBERT D. DRAIN

U.S. BANKRUPTCY JUDGE

ECRO: ART

HEARING re Order signed on 11/3/2021 Establishing Procedures for Remote Hearing on Motions for Stay Pending Appeal with hearing to be held on 11/9/2021 at 10:00 AM at Videoconference (ZoomGove) (RDD)

HEARING re Notice of Agenda / Agenda for November 9, 2021 Hearing

HEARING re Motion for Stay Pending Appeal / Memorandum of Law In Support of United States Trustees Expedited Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007 (related document(s)3777, 3776) filed by Linda Rifkin on behalf of United States Trustee. (ECF #3778)

HEARING re Objection to Motion / Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Opposition Tribal Group Joinder in Opposition to Stay Motions filed by Peter D'Apice on behalf of Certain Native American Tribes and Others (ECF #4003)

HEARING re Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s) 3801, 3873, 3789, 3845) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4006)

HEARING re Opposition The Ad Hoc Committee of NAS Children's Joinder to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Harold D. Israel on behalf of Ad Hoc Committee of NAS Babies. (ECF #4009)

HEARING re Opposition Joinder of the Private Insurance Ratepayers to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Nicholas F. Kajon on behalf of Eric, Hestrup, et al. (ECF #4010)

HEARING re Opposition /Joinder (related document(s)4006) filed by Lauren Guth Barnes on behalf of Blue Cross Blue Shield Association. (ECF #4011)

HEARING re Objection to Motion /The Ad Hoc Group of Individual Victims' (I) Objection to the United States Trustee's and Certain Public Creditors' Motion for Stay Pending Appeal and (II) Joinder in the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3873, 3972, 3789, 3845) filed by J. Christopher Shore on behalf of Ad Hoc Group of Individual Victims of Purdue Pharma L.P. (ECF #4012)

HEARING re Memorandum of Law/Debtors' Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal (related . document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4014)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016) Opposition - Joinder to the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #4017)

HEARING re Reply to Motion Reply in Support of United States Trustee's Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007 (related document(s)3801, 3972, 3778) filed by Paul Kenan Schwartzberg on behalf of United States Trustee. (ECF #4050)

Related Documents:

Order signed on 9/15/2021 Granting Motion (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco, (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other Related Relief (Related Doc# 3484). (ECF #3773)

HEARING re Motion to Shorten Time United States Trustees Ex Parte Motion For An Order Shortening Notice And Scheduling Hearing With Respect To The United States Trustees Expedited Motion For A Stay Of Confirmation Order And Related Orders Pending Appeal Pursuant To Federal Rule Of Bankruptcy Procedure 8007 (related document(s)3 778) filed by Linda Riffkin on behalf of United States Trustee.(ECF #3779)

HEARING re Modified Bench Ruling On For Confirmation Of Eleventh Amended Joint Chapter 11 Plan Signed on 9/17/2021. (ECF #3786)

HEARING re Findings Of Fact, Conclusions Of Law, And Order Confirming The Twelfth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And Its Affiliated Debtors Signed On 9/17/2021 (related document(s)3726). (ECF #3787)

HEARING re Amended Motion for Stay Pending Appeal/ Amended Memorandum of Law In Support Of United States Trustee's Expedited Motion For A Stay Of Confirmation Order And Related Orders Pending Appeal Pursuant To Federal Rule Of Bankruptcy Procedure 8007 (related document(s)3799, 3777, 3776, 3778, 3779) filed by Linda Riffkin on behalf of United States Trustee. (ECF #3801)

HEARING re Motion to Stay/ Memorandum of Law in Support of United States Trustee's Expedited Motion to Extend the Automatic Stay of the Confirmation Order and for a Limited Stay of the Related Orders Pending Resolution of His Expedited Motion for a Stay Pending Appeal (related document(s)3786, 3787, 3773) filed by Linda Riffkin on behalf of United States Trustee. (ECF #3803)

HEARING re Motion to Shorten Time I United States Trustees Ex Parte Motion for an Order Shortening Notice and Scheduling Hearing with Respect to the United States Trustee's Expedited Motion to Extend the Automatic Stay of the Confirmation Order and for a Limited Stay of the Related Orders Pending Resolution of His Expedited Motion for a Stay Pending Appeal (related document(s)3803) filed by Linda Riffkin on behalf of United States Trustee. (ECF #3804)

HEARING re Statement/ Notice of Listen-Only Dial-in for Status and Scheduling Conference (related document(s)3779) filed by Eli J. Vonnegut on behalf of Purdue Pharma L.P. (ECF #3838)

HEARING re Motion for Stay Pending Appeal / Second Amended Memorandum Of Law In Support Of United States Trustees Amended Expedited Motion For A Stay Of Confirmation Order And Related Orders Pending Appeal Pursuant To Federal Rule Of Bankruptcy Procedure 8007 (related document(s)3801, 3778) filed by Brian S. Masumoto on behalf of United States Trustee. (ECF #3972)

HEARING re Motion for Stay Pending Appeal/ Blackline Second Amended Memorandum Of Law In Support Of United States Trustees Amended Expedited Motion For A Stay Of Confirmation Order And Related Orders Pending Appeal Pursuant To Federal Rule Of Bankruptcy Procedure 8007 (related document(s)3972) filed by Brian S. Masumoto on behalf of United States Trustee. (ECF #3973)

HEARING re Objection to Motion / Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4007)

HEARING re Declaration of Kara Trainor in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4008)

HEARING re Motion to Allow/ Debtors' Motion for Leave to Exceed the Page Limit in Filing Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal filed by Marc Joseph Tobak on behalf of Purdue Pharma L.P. (ECF #4013)

HEARING re Declaration of Jesse DelConte (related document(s)4014) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4015)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Amended Statement Supplemental Designation of Record in Rebuttal and in Support of United States Trustee's Second Amended Expedited Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007 (related document(s)3972) filed by Paul Kenan Schwartzberg on behalf of United States Trustee. (ECF #4043)

HEARING re Motion to Allow Motion to Exceed Page Limit in Filing Reply in Support of United States Trustee's Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007 filed by Paul Kenan Schwartzberg on behalf of United States Trustee. (ECF #4049)

HEARING re Motion for Stay Pending Appeal (related document(s)3786, 3787, 3773) filed by Matthew J. Gold on behalf of State of Washington.(ECF #3789)

Responses Received:

Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Opposition Tribal Group Joinder in Opposition to Stay Motions filed by Peter D'Apice on behalf of Certain Native American Tribes and Others. (ECF #4003)

HEARING re Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al.(ECF #4006)

HEARING re Opposition The Ad Hoc Committee of NAS Children's Joinder to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Harold D. Israel on behalf of Ad Hoc Committee of NAS Babies. (ECF #4009)

HEARING re Opposition Joinder of the Private Insurance Ratepayers to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Nicholas F. Kajon on behalf of Eric Hestrup, et al. (ECF #4010)

HEARING re Opposition /Joinder (related document(s)4006) filed by Lauren Guth Barnes on behalf of Blue Cross Blue Shield Association. (ECF #4011)

HEARING re Objection to Motion /The Ad Hoc Group of Individual Victims' (I) Objection to the United States Trustee's and Certain Public Creditors' Motion for Stay Pending Appeal and (II) Joinder in the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3873, 3972, 3789, 3845) filed by J. Christopher Shore on behalf of Ad Hoc Group of Individual Victims of Purdue Pharma L.P. (ECF #4012)

HEARING re Memorandum of Law/ Debtors' Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal (related document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4014)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Opposition - Joinder to the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #4017)

Related Documents:
Modified Bench Ruling On Confirmation Of Eleventh Amended Joint Chapter 11 Plan Signed on 9/17/2021. (ECF #3786)

HEARING re Findings Of Fact, Conclusions Of Law, And Order Confirming The Twelfth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And Its Affiliated Debtors Signed On 9/17/2021 (related document(s)3726). (ECF #3787)

HEARING re Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Objection to Motion I Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein I on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4007)

HEARING re Declaration of Kara Trainor in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4008)

HEARING re Motion to Allow/ Debtors' Motion for Leave to Exceed the Page Limit in Filing Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal filed by Marc Joseph Tabak on behalf of Purdue Pharma L.P. (ECF #4013)

HEARING re Declaration of Jesse DelConte (related document(s)4014) filed by Marshall Scott. Huebner on behalf of Purdue Pharma L.P. (ECF #4015)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Reply to Motion Reply in Further Support of Motion of the States of Washington and Connecticut for a Stay Pending Appeal filed by Matthew J. Gold on behalf of State of Washington. (ECF #4051)

HEARING re Motion for Stay Pending Appeal of Confirmation and Trust Advances Orders filed by Brian Edmunds on behalf of State Of Maryland. (ECF #3845)

Responses Received:

Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Opposition Tribal Group Joinder in Opposition to Stay Motions filed by Peter D'Apice on behalf of Certain Native American Tribes and Others. (ECF #4003)

HEARING re Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4006)

HEARING re Opposition The Ad Hoc Committee of NAS Children's Joinder to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Harold D. Israel on behalf of Ad Hoc Committee of NAS Babies. (ECF #4009)

HEARING re Opposition Joinder of the Private Insurance Ratepayers to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Nicholas F. Kajon on behalf of Eric Hestrup, et al. (ECF #4010)

HEARING re Opposition /Joinder (related document(s)4006) filed by Lauren Guth Barnes on behalf of Blue Cross Blue Shield Association. (ECF #4011)

HEARING re Objection to Motion /The Ad Hoc Group of Individual Victims' (I) Objection to the United States Trustee's and Certain Public Creditors' Motion for Stay Pending Appeal and (II) Joinder in the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3873, 3972, 3789, 3845) filed by J. Christopher Shore on behalf of Ad Hoc Group of Individual Victims of Purdue Pharma L.P. (ECF #4012)

HEARING re Memorandum of Law/ Debtors' Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal (related document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4014)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Opposition - Joinder to the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #4017)

HEARING re Reply to Motion for a Stay of Confirmation and Trust Advances Orders Pending ;I Appeal (related document(s)3801, 3973, 3873, 3972, 3789, 3778, 3860, 3803, 3845) filed by Brian Edmunds on behalf of State Of Maryland. (ECF #4048)

HEARING re Related Documents:

Order signed on 9/15/2021 Granting Motion (I) Authorizing the Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and Topco, (II) Directing Prime Clerk LLC to Release Certain Protected Information, and (III) Granting Other elated Relief (Related Doc# 3484). (ECF #3773)

HEARING re Modified Bench Ruling On For Confirmation Of Eleventh Amended Joint Chapter 11 Plan Signed on 9/17/2021. (ECF #3786)

HEARING re Findings Of Fact, Conclusions Of Law, And Order Confirming The Twelfth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And Its Affiliated Debtors Signed On 9/17/2021 (related document(s)3726). (ECF #3787)

HEARING re Objection to Motion I Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4007)

HEARING re Declaration of Kara Trainor in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4008)

HEARING re Motion to Allow/ Debtors' Motion for Leave to Exceed the Page Limit in Filing Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal filed by Marc Joseph Tabak on behalf of Purdue Pharma L.P. (ECF #4013)

HEARING re Declaration of Jesse Del Conte ( related document( s )4014) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4015)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Motion for Stay Pending Appeal (related document(s)3810, 3847) filed by Ronald Bass Sr. (ECF #3860)

HEARING re Responses Received:
Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Opposition Tribal Group Joinder in Opposition to Stay Motions filed by Peter D'Apice on behalf of Certain Native American Tribes and Others. (ECF #4003)

HEARING re Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4006)

HEARING re Opposition The Ad Hoc Committee of NAS Children's Joinder to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Harold D. Israel on behalf of Ad Hoc Committee of NAS Babies. (ECF #4009)

HEARING re Opposition Joinder of the Private Insurance Ratepayers to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Nicholas F. Kajon on behalf of Eric Hestrup, et al. (ECF #4010)

HEARING re Opposition /Joinder (related document(s)4006) filed by Lauren Guth Barnes on behalf of Blue Cross Blue Shield Association. (ECF #4011)

HEARING re Objection to Motion /The Ad Hoc Group of Individual Victims' (I) Objection to the United States Trustee's and Certain Public Creditors' Motion for Stay Pending Appeal and (II) Joinder in the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3873, 3972, 3789, 3845) filed by J. Christopher Shore on behalf of Ad Hoc Group of Individual Victims of Purdue Pharma L.P. (ECF #4012)

HEARING re Memorandum of Law/ Debtors' Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal (related document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4014)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Opposition - Joinder to the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #4017)

HEARING re Related Documents:
Modified Bench Ruling On Confirmation Of Eleventh Amended Joint Chapter 11 Plan Signed on 9/17/2021. (ECF #3786)

HEARING re Findings Of Fact, Conclusions Of Law, And Order Confirming The Twelfth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And Its Affiliated Debtors Signed On 9/17/2021 (related document(s)3726). (ECF #3787)

HEARING re Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Objection to Motion I Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4007)

HEARING re Declaration of Kara Trainor in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4008)

HEARING re Motion to Allow/ Debtors' Motion for Leave to Exceed the Page Limit in Filing Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal filed by Marc Joseph Tabak on behalf of Purdue Pharma L.P. (ECF #4013)

HEARING re Declaration of Jesse DelConte (related document(s)4014) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4015)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Motion for Stay Pending Appeal filed by Allen J. Underwood on behalf of Certain Canadian Municipality Creditors and Canadian First Nation Creditors (ECF #3873)

Responses Received:

Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Opposition Tribal Group Joinder in Opposition to Stay Motions filed by Peter D'Apice on behalf of Certain Native American Tribes and Others. (ECF #4003)

HEARING re Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4006)

HEARING re Opposition The Ad Hoc Committee of NAS Children's Joinder to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Harold D. Israel on behalf of Ad Hoc Committee of NAS Babies. (ECF #4009)

HEARING re Opposition Joinder of the Private Insurance Ratepayers to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Nicholas F. Kajon on behalf of Eric Hestrup, et al. (ECF #4010)

HEARING re Opposition /Joinder (related document(s)4006) filed by Lauren Guth Barnes on behalf of Blue Cross Blue Shield Association. (ECF #4011)

HEARING re Objection to Motion /The Ad Hoc Group of Individual Victims' (I) Objection to the United States Trustee's and Certain Public Creditors' Motion for Stay Pending Appeal and (II) Joinder in the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3873, 3972, 3789, 3845) filed by J. Christopher Shore on behalf of Ad Hoc Group of Individual Victims of Purdue Pharma L.P. (ECF #4012)

HEARING re Memorandum of Law/ Debtors' Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal (related document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4014)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Opposition - Joinder to the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #4017)

HEARING re Reply to Motion Reply in Support of United States Trustee's Motion for a Stay of Confirmation Order and Related Orders Pending Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8007 (related document(s)3801, 3972, 3778) filed by Paul Kenan Schwartzberg on behalf of United States Trustee. (ECF #4050)

Related Documents:
Modified Bench Ruling On Confirmation Of Eleventh Amended Joint Chapter 11 Plan Signed on 9/17/2021.
(ECF #3786)

HEARING re Findings Of Fact, Conclusions Of Law, And Order Confirming The Twelfth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And Its Affiliated Debtors Signed On 9/17/2021 (related document(s)3726).
(ECF #3787)

HEARING re Objection to Motion/ Ad Hoc Conm1ittee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4007)

HEARING re Declaration of Kara Trainor in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4008)

HEARING re Motion to Allow/ Debtors' Motion for Leave to Exceed the Page Limit in Filing Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal filed by Marc Joseph Tobak on behalf of Purdue Pharma L.P. (ECF #4013)

HEARING re Declaration of Jesse DelConte (related document(s)4014) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4015)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Motion for Stay Pending Appeal filed by Ellen Isaacs (ECF #3890)

HEARING re Responses Received:

Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Opposition Tribal Group Joinder in Opposition to Stay Motions filed by Peter D'Apice on behalf of Certain Native American Tribes and Others. (ECF #4003)

HEARING re Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4006)

HEARING re Opposition The Ad Hoc Committee of NAS Children's Joinder to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Harold D. Israel on behalf of Ad Hoc Committee of NAS Babies. (ECF #4009)

HEARING re Opposition Joinder of the Private Insurance Ratepayers to Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3801, 3873, 3789, 3845) filed by Nicholas F. Kajon on behalf of Eric Hestrup, et al. (ECF #4010)

HEARING re Opposition /Joinder (related document(s)4006) filed by Lauren Guth Barnes on behalf of Blue Cross Blue Shield Association. (ECF #4011)

HEARING re Objection to Motion /The Ad Hoc Group of Individual Victims' (I) Objection to the United States Trustee's and Certain Public Creditors' Motion for Stay Pending Appeal and (II) Joinder in the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)3873, 3972, 3789, 3845) filed by J. Christopher Shore on behalf of Ad Hoc Group of Individual Victims of Purdue Pharma L.P. (ECF #4012)

HEARING re Memorandum of Law / Debtors' Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal (related document(s)3801, 3873, 3972, 3890, 3789, 3778, 3860, 3845) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4014)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

HEARING re Opposition - Joinder to the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Michael Patrick O'Neil on behalf of Ad Hoc Group of Hospitals. (ECF #4017)

Related Documents:

Modified Bench Ruling On Confirmation Of Eleventh Amended Joint Chapter 11 Plan Signed on 9/17/2021. (ECF #3786)

HEARING re Findings Of Fact, Conclusions Of Law, And Order Confirming The Twelfth Amended Joint Chapter 11 Plan Of Reorganization Of Purdue Pharma L.P. And Its Affiliated Debtors Signed On 9/17/2021 (related document(s)3726). (ECF #3787)

HEARING re Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Objection to Motion/ Ad Hoc Committee's Objection to Stay Motions (related document(s)3801, 3873, 3972, 3789, 3778, 3803, 3845) filed by Kenneth H. Eckstein on behalf of Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants. (ECF #4002)

HEARING re Declaration of Cheryl Juaire in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4007)

HEARING re Declaration of Kara Trainor in Support of the Opposition of the Official Committee of Unsecured Creditors to Motions for Stay Pending Appeal (related document(s)4006) filed by Ira S. Dizengoff on behalf of The Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (ECF #4008)

HEARING re Motion to Allow/ Debtors' Motion for Leave to Exceed the Page Limit in Filing Memorandum of Law in Opposition to the Motions for Stays of the Confirmation Order and the Advance Order Pending Appeal filed by Marc Joseph Tabak on behalf of Purdue Pharma L.P. (ECF #4013)

HEARING re Declaration of Jesse DelConte (related document(s)4014) filed by Marshall Scott Huebner on behalf of Purdue Pharma L.P. (ECF #4015)

HEARING re Opposition of the MSGE Group to the Motions to Stay Pending Appeal (related document(s)3801, 3873, 3890, 3789, 3860, 3845) filed by Kevin C. Maclay on behalf of Multi-State Governmental Entities Group. (ECF #4016)

Transcribed by: Sonya Ledanski Hyde

A P P E A R A N C E S :

UNITED STATES DEPARTMENT OF JUSTICE
Attorneys for the U.S. Trustee
201 Varick Street, Suite 1006
New York, NY 10014

BY: BENJAMIN HIGGINS (TELEPHONICALLY)
BETH LEVINE (TELEPHONICALLY)

MILBANK, TWEED, HADLEY & MCCLOY LLP
Attorneys for the Raymond Sackler Family
55 Hudson Yards
New York, NY 10001

BY: GERARD UZZI (TELEPHONICALLY)

DEBEVOISE & PLIMPTON
Attorneys for the Mortimer Sackler Family
919 Third Avenue
New York, NY 10022

BY: MAURA KATHLEEN MONAGHAN (TELEPHONICALLY)

OFFICE OF THE ATTORNEY GENERAL - STATE OF MARYLAND

Attorney for State of Maryland

200 Saint Paul Place

Baltimore, MD 20852

BY: BRIAN EDMUNDS (TELEPHONICALLY)

KRAMER LEVIN NAFTALIS FRANKEL LLP

Attorneys for the Ad Hoc Committee

1177 Avenue of the Americas

New York, NY 10036

BY: JONATHAN M. WAGNER (TELEPHONICALLY)

DAVIS POLK WARDWELL LLP

Attorney for Debtors

450 Lexington Avenue

New York, NY 10017

BY: BENJAMIN S. KAMINETZKY (TELEPHONICALLY)

WHITE & CASE LLP

Attorneys for Ad Hoc Group of Individual Victims

1221 Avenue of the Americas

New York, NY 10020

BY: J. CHRISTOPHER SHORE (TELEPHONICALLY)

KLEINBERG, KAPLAN, WOLFF COHEN, P.C.

Attorneys for the State of Washington

500 Fifth Avenue

New York, NY 10110

BY: MATTHEW J. GOLD (TELEPHONICALLY)

LITE DEPALMA GREENBERG & AFANADOR

Attorneys for Certain Canadian Municipality Creditors and Canadian First Nation Creditors

570 Broad Street

Newark, NJ 07102

BY: ALLEN J. UNDERWOOD III (TELEPHONICALLY)

PULLMAN COMLEY, LLC

Attorney on behalf of State of Connecticut

850 Main Street

Bridgeport, CT 06604

BY: IRVE J. GOLDMAN (TELEPHONICALLY)

AKIN GUMP STRAUSS HAUER & FELD LLP

Attorneys for Official Committee of Unsecured Creditors

One Bryant Park

New York, New York 10036

BY: MITCHELL HURLEY (TELEPHONICALLY)

ARIK PREIS (TELEPHONICALLY)

FLORIDA OFFICE OF THE ATTORNEY GENERAL

Attorneys for the Ad Hoc Committee

PL-01 The Capitol

Tallahassee, FL 32399

BY: JOHN GUARD (TELEPHONICALLY)

SOUTHERN DISTRICT OF NEW YORK

86 Chambers Street, 3rd Floor

New York, New York 10007

BY: LARRY FOGELMAN (TELEPHONICALLY)

CAPLIN DRYSDALE

Attorneys for Multi-State Governmental Entities Group

One Thomas Circle, NW

Washington, DC 20005

BY: JEFFREY J. LIESEMER (TELEPHONICALLY)

RONALD BASS, SR.

CHERYL JUAIRE

KARA TRAINOR

COLIN JORGENSEN

ALSO PRESENT TELEPHONICALLY:

JILL S. ABRAMS

ROXANA ALEALI

MICHAEL ATKINSON

JASMINE BALL

BROOKS BARKER

KATHRYN BENEDICT
SCOTT R. BICKFORD
DAVID E. BLABEY
SARA BRAUNER
JULIUS CHEN
DYLAN CONSLA
MARIO D'ANGELO
JESSE DELACONTE
MARIA ECKE
KENNETH H. ECKSTEIN
BERNARD ARDAVAN ESKANDARI
LAURA FEMINO
MAGALI GIDDENS
MARSHALL SCOTT HUEBNER
MITCHELL HURLEY
ELLEN ISAACS
HAROLD D. ISRAEL
EVAN C. JONES
GREGORY JOSEPH
MARC KESSELMAN
DARREN S. KLEIN
ALEXANDER LEES
BETH ANN LEVENE
MARA LEVENTHAL
DANIELLE J. LEVINE

KEVIN C. MACLAY
BRIAN S. MASUMOTO
GERARD MCCARTHY
JAMES I. MCCLAMMY
HUGH M. MCDONALD
SHANNON M. MCNULTY
MICHELE MEISES
AISLING MURRAY
EDWARD E. NEIGER
MICHAEL PATRICK O'NEIL
RACHEL OBALDO
KATHERINE PORTER
LINDA RIFKIN
RACHAEL RINGER
CHRISTOPHER ROBERTSON
JEFFREY J. ROSEN
ELIZABETH SCHLECKER
PAUL KENAN SCHWARTZBERG
LUCAS H. SELF
MICHAEL C. SHEPHERD
MARC F. SKAPOF
LAURA SMITH
KATE SOMERS
CLAUDIA Z. SPRINGER
ETHAN STERN ERIC STODOLA

JACQUELYN SWANNER
JEROME TAPLEY
MARC JOSEPH TOBAK
ESTHER TOWNES
ANDREW M. TROOP
ALICE TSIER
MELISSA L. VAN ECK
ANDREW D. VELEZ-RIVERA
ELI J. VONNEGUT
JORDAN A. WEBER
THEODORE WELLS
LAUREN S. ZABEL

P R O C E E D I N G S

THE COURT: Okay, good morning. This is Judge Drain. We're here in In re Purdue Pharma, L.P., et al on the hearing on motions for a stay pending appeal of the Court's confirmation order, as well as the Court's, what I'll refer to as implementation procedures order filed by the United States Trustee, the States of Washington, Connecticut, and California, certain Canadian creditors, Ms. Ellen Isaacs, and Mr. Ronald Bass.

So I believe I've reviewed all of the relevant pleadings on these motions, including the various objections and the replies and the declarations submitted in support of the objections.

I'll also note my order dated November 3, 2021 establishing procedures for this remote hearing, which is being held entirely remotely. For those participating in the hearing as a movant or objectant by Zoom for Government and, otherwise, by telephone.

So I'm happy to proceed with the motions, unless there's been any development on them, which I had encouraged the last time the parties were before me as a way potentially to resolve these motions.

MR. HIGGINS: Your Honor, this is Ben Higgins for the U.S. Trustee. I'm joined today by my colleague, Beth Levine from the U.S. Trustee's Washington office, and she'll

be handling the oral argument for the U.S. Trustee.

We had two housekeeping issues to flag for Your Honor, but we don't have a resolution of the stay motions, to answer Your Honor's question directly.

THE COURT: All right, very well. On the housekeeping, the request to exceed page limits on various pleadings?

MR. HIGGINS: That is the first item, yes, Your Honor.

THE COURT: Okay. And the Debtors made such a motion too. I'll grant both of those motions.

MR. HIGGINS: Thank you, Your Honor.

The second housekeeping issue, as we previewed for Your Honor at the October 14 status conference, we did file a amended memorandum of law at Docket No. 3972 with specific citations to documents.

And we also, as we discussed at the October 14 hearing, we filed two designations at Docket Nos. 3918 and 4043, identifying specific documents that are either in the record and that we're asking the Court to take judicial notice of. We haven't received any objections, but if we did, I know Your Honor raised a couple of questions at the last status conference.

So to the extent I can clarify anything or address any questions, I'm happy to do that, Your Honor.

THE COURT: I think you reduced the list to address my concerns, which were that you were seeking that I take judicial notice of matters that were not appropriate to take judicial notice of, namely press accounts and the like, correct?

MR. HIGGINS: Well, just to be clear, Your Honor, the second designation was actually a supplement to the first designation, so we were still asking you to take judicial notice of what we listed in the first designation. And I can clarify what we're seeking it for, Your Honor, and you can determine if it's appropriate or not. You know, we're happy to live with your decision on that.

THE COURT: Okay. Why don't you do that.

MR. HIGGINS: Sure, Your Honor.

So I believe the items that you raised issues with, we listed some pending legislation, as well as the records of some of congressional hearings concerning the validity of third-party releases.

And we're asking you to take judicial notice merely for the fact that the validity of third-party releases is an issue of public interest and they're publicly available documents, and we're simply asking you to take judicial notice of the fact these materials exist. That's the limit of it and we're willing to live with Your Honor's decision either way, but that's the request, Your Honor.

THE COURT: Okay. Do any of the objectors have a view on this?

MR. KAMINETZKY: Not quite sure about judicial for what purpose he's offering them judicial notice. Your Honor is welcome to notice that.

THE COURT: Okay.

MR. KAMINETZKY: The rest of -- what I saw most of what's been submitted are various pleadings from this case, we don't have a problem with that.

THE COURT: Right, and I have no problem with those pleadings or with pleadings filed in other courts, as long as they're not being -- sought to be admitted for the truth of the pleadings as opposed to just the fact that these are pleadings that have been filed.

MR. HIGGINS: And that's correct.

MR. KAMINETZKY: With respect to newspaper accounts, I'm not sure what the point is. Is it for evidentiary purposes? I'm just struggling to understand what exactly the request of the Court is before we made an objection or not.

MR. HIGGINS: Sure. I'm not sure there are any newspaper accounts, Your Honor.

THE COURT: I don't think there are at this point, and maybe there never were. I thought I saw one that you had submitted, although they were included, I believe, in

the record of the hearing.

I will take judicial notice of the bill and the hearing for the fact that they took place, not for anything as far as the hearing is concerned that any other evidentiary purpose or for which they might be asserted.

MR. HIGGINS: Thank you, Your Honor. Those are the housekeeping issues from the U.S. Trustee's perspective.

THE COURT: Okay, very well.

MR. EDMUNDS: Your Honor, Brian Edmunds for Maryland. I don't -- it may be helpful if I address a threshold issue from our reply first. I think the Court will probably want to hear what everyone has to say anyway.

But logically, the one issue which is the effect of the District Court's decision on the Trustee's and Canadian entities' motion for a stay in that Court limits, I think, what is before the Court today.

Because there's a clear ruling, an unappealed ruling, a ruling, in fact, that the appellees acquiesced from the District Court that holds that there's a likelihood of success on the merits and that the issue raised by the Trustee, which is the issue of equitable mootness, raises when the Debtors or appellees are actually doing something that the balance of hardships would tip decidedly in the Trustee's and the Canadian entities' favor.

And so, there's a finding, and there's a finding

that in the end denies those parties' motion for a stay because the District Court found that there's nothing going on right now. But you found that without prejudice to the states making motions and to the U.S. Trustee coming forward with evidence that something is happening now. So it's without prejudice to that showing or to those showings, and she does not decide the states' motions, which had not been formally brought before her.

But to the extent she rules on that equitable mootness issue and addresses the likelihood of success on the merits is raised in the other parties' motions before that Court, those findings are her decision. And I'm not sure that, you know, there's any -- they could have appealed, but I think that they become law of the case in light of the fact that they haven't.

And they've, in fact, filed a stipulation in the District Court essentially doing -- purporting to comply with the conditions that the District Court placed in its denial of the stay, so that issue, I think, is the threshold matter.

And I understand the Court is likely to hear everybody, but just as a logical matter, it seemed important to raise that first.

THE COURT: I'm looking for my copy --

MR. EDMUNDS: Your Honor, if it's helpful --

THE COURT: I'm looking for that copy of that order. This was an issue that really was, if anything, touched on in a reply, so you've caught me a little bit unprepared on this, Mr. Edmunds, but I want to get out the order.

MR. EDMUNDS: I'm sorry, Your Honor. I mean, we filed our motion before we were in the District Court.

THE COURT: I know.

MR. EDMUNDS: But if you need the opinion --

THE COURT: I'm not faulting you for not raising it when you did then, but I want to make sure I have Judge McMahon's order in front of me, which I am leafing through. Well, here it is. I found it.

MR. EDMUNDS: I think it might be attached to our reply as an exhibit. If it's helpful, Your Honor, I think the relevant language --

THE COURT: No. I'm reading -- let me read it --

MR. EDMUNDS: Okay.

THE COURT: -- as to the points that you're specifically raising.

MR. EDMUNDS: Sure.

THE COURT: Well, again, I've just reread it. And on the two points that you've raised, Mr. Edmunds, that you say would be law of the case, the first one is whether the merits prong has been satisfied. And there, Judge McMahon

says, "In this case, Debtors conceded at oral argument on October 12 the existence of sufficiently serious questions going to the merits to make them a fair ground for litigation."

The other point that you raised, however, as far as the possibility of equitable mootness is in the context of the balance of hardship and not as to a finding as to whether equitable mootness has risen above the level of speculation.

So I think it's a little more -- maybe I didn't hear you clearly enough, but I think it's a little more complicated than you stated. I think that issue of irreparable harm and its relation to equitable mootness and the issue of the balance of the harms and its relation to equitable mootness are not exactly the same issue. And secondly, I think they're both quite context specific as far as the record before the Court.

The case law seems to be uniform that the risk of equitable mootness -- and of course, that's an evaluation that the Court needs to make and that clearly is not law of the case as far as Judge McMahon's order -- standing alone or vel non is not irreparable harm or arguably harm but needs to be taken into account with other factors.

So it seems to me that the record before me is important still on that point.

If the objectors are arguing that the risk of equitable mootness just isn't to be taken into account, I completely agree with you; in fact, I wouldn't need Judge McMahon's ruling because it is to be taken into account. But I don't think it's dispositive on this point, given the different record before her and before me.

So I think the thing we should probably focus on, although I'm happy to hear you more on this, is the effect of the Debtors' concession. I mean, both -- not both -- all parties have spent a considerable amount of time, notwithstanding that concession, arguing the merits of the appeal, both in the motions themselves, which again I repeat, were made before the hearing before Judge McMahon, but also in the replies.

So I was going to suggest to the parties that they spend the vast bulk of their time not addressing the merits, but rather, addressing the other three factors and the bond issues. But why don't I hear from the objectors on the merits point in the first case as to whether their concession should be viewed as a concession for this hearing as well.

MR. EDMUNDS: Sure, Your Honor. Let me just -- you've read it the same way, I think, we have, which is that there is a fact issue on the balance of hardships and that the question of whether, you know, the possibility of

equitable mootness vel non is a, you know, irreparable harm question, is decided by her and that equitable mootness could pose irreparable harm, but the fact issues are still left open as to what's happening now.

So I think -- I'm not saying -- I wasn't saying anything different and I think that we've read it the same way.

THE COURT: Well, maybe with one qualification, Mr. Edmunds. Based on my review of the case law, and I don't think Judge McMahon is saying anything different, the weight to be given to the risk of equitable mootness constitute two ways: first, the way that we clearly agree on, which is the Court needs to evaluate how likely it is that something would become equitably moot; the second is whether -- and this second point is very closely tied to the first point -- I think the more likely it is that something becomes equitably moot, the less important it is to establish something in addition to the risk of mootness.

And nevertheless, I do think that is a second inquiry because I believe all the courts, including the Adelphia court and St. Johnsbury Trucking court have said standing alone, the risk of equitable mootness isn't enough. But what needs to be shown, in addition to that, can be any one of the other factors, it seems to me. It can be the seriousness of the issues on appeal; it can be the issue of

whether a reversal as appear at victory.

You know, there are all sorts of things that can affect that extra something that I think all the courts recognize you need to have in addition to just the risk of equitable mootness. And again, that can be merely the seriousness of the issues on appeal, and also, the courts' assessment of the likelihood of success on appeal. If something really does seem to be maybe not a frivolous appeal, but a real long shot, then the risk of mootness really doesn't seem to be something that courts care about.

So I think I may go back again to the question, which is the -- my recommendation was that we not spend a lot of time on the merits of the appeal, showing of the substantial possibility of success, and really only as it pertains to the other three issues.

So Mr. Kamenetzky's on the screen. I know there are other objectors too, but I'll look to you on that point. You're on mute.

MR. KAMINETZKY: Your Honor, good morning. Benjamin Kaminetzky of Davis Polk for the Debtors.

I could just address the effect of Judge McMahon's order, the kind of contention by Maryland that there's some sort of law of the case or issue preclusion because I think that's just completely inherently wrong. If you want, I can go further, but I just think it's important that we address

that upfront because Mr. Edmunds suggested something that just, it's just completely and utterly false. If I could get two minutes on that.

And then, you know, I assume you'd want them to go first on the other factors. And I agree that spending a lot of time on probability of success on the merits, which is devolved into another oral argument that you've heard for hours now, are so -- on the point, just Mr. Edmunds point. Again, it's just a blatant mischaracterization of Judge McMahon's decision and what happened. So let me just give you some context.

The U.S. Trustee filed an emergency stay motion before the District Court on the evening of Friday, October 8th. After entering a TRO based on the U.S. Trustee's breathless suggestion that something could be happening over the weekend, Judge McMahon heard that motion the very next business day without a single brief from the Debtors or any other party.

We had no opportunity -- the Debtors and the plan proponents had no opportunity to put in any evidence at the hearing. All the District Court had was the brief that the U.S. Trustee filed in connection with its Friday night emergency motion, had no evidence from anyone else, no briefs from anyone else. They didn't even have the confirmation hearing transcripts or anything.

What Judge McMahon focused on at this emergency hearing that was held, you know, that Tuesday, which was the next business day, was -- and the Debtors and the plan proponents didn't present any argument whatsoever on the likelihood of success of the appeal. The focus was solely on whether the movant's evidence might suffer harm in the interim period between that day and today when Your Honor will be hearing the stay motion.

All of that notwithstanding, the District Court denied the U.S. Trustee's stay motion the next business day, as she concluded that the movants had not identified any concrete harm that will arise between now and November 9 when Judge Drain is scheduled to consider the various stay motions. That's on Page 12 of her decision.

Now, the notion --

THE COURT: Okay, so could I just interrupt you? So you're basically saying that your concession that Judge McMahon's decision refers to was really just a concession for purposes of that hearing because you were focusing on the --

MR. KAMINETZKY: It wasn't even that. Judge McMahon misheard. She didn't have the transcript. What Mr. Huebner said is even if we give them all three other factors, they nevertheless lose because there's no harm. There was a hypothetical which he misheard. We corrected

her in a subsequent filing and said, no, we've reviewed the transcript. It was one of these even if they're right that there are substantial issues, there's no harm because nothing would happen between now and November 9, so it was kind of in that context.

And Judge McMahon, as you said, there was a concession, but there actually wasn't; it wasn't in the context of an even if they could prove all three other factors, they certainly can prove imminent harm. And again, we corrected her on the record. We sent a letter identifying and pointing that out in the transcript.

But more important, the law is very clear what collateral estoppel means and it doesn't mean. And, I mean, Second Circuit law here is well developed: Collateral estoppel only applies if the identical issue was decided in the prior proceeding. And none of the issues, Your Honor, none of the issues before the Court today was actually decided by Judge McMahon.

Again, what she was focused on, based on the U.S. Trustee's emergency motion, is do I need to do something now before the November 9 hearing before Judge Drain, and she said no, but that was the entire focus of the hearing. And as Your Honor knows, nothing could possibly have happened because the sentencing needs to happen and the effective date and all that.

So there was absolutely no ruling whatsoever on the balance of harm with respect to an indefinite stay, which the movants are seeking, or even any sort of stay beyond November 9.

There's also -- you know, we talked about that there wasn't a concession. There's also collateral estoppel only applies where there's a full and fair opportunity to litigate the relevant issues in the first proceeding, and I'm quoting from Central Hudson Gas & Electric Company, 56 F.3d 359 at 368. Obviously, when on an emergency motion filed on Friday night when we're imminent on Tuesday morning, was obviously not a full and fair opportunity to litigate. So even if it was the same issue, they still don't get collateral estoppel because the Judge only heard one side; there was no ability to submit evidence.

And finally, Your Honor, it's blackletter law that collateral estoppel only applies where there was a final judgment on the merits. And to say this again, this was a decision on a TRO on a stay motion, not a final judgment on the merits, and it cannot give rise to collateral estoppel.

And, of course, neither the two cases that Maryland cites in its brief has anything remotely to do with the preclusive effect of a decision on emergency stay motion. They both involve prior actions that were litigated to a final judgment on the merits. In the PCH case that

they cite, there was a final and binding decision on the merits and affirmed on appeal that the relationship between parties was a joint venture and the Court found that that was law of the case. And in the other case they cite, the Central Hudson case, there was a trial and a judgment and that's when the Court held that there was a collateral estoppel.

So, I mean, I think it speaks volumes that the actual movants before the District Court didn't even dare make this argument that there's some collateral estoppel effect of Judge McMahon's decision. And I see why now people are -- I mean, it's clear why now, because this is such a, quite frankly, bizarre argument that somehow on a TRO emergency motion that there's some sort of binding decision that's law of the case that prevents Your Honor from making his own determination I think is just completely and utterly wrong.

And I'll stop now because I don't want to, again, step on anyone's toes.

THE COURT: Okay, all right. Well, I think you've addressed the point I really wanted you to address, which is what sort of concession was referred to in that order, and I think I have the context here in any event. I don't believe it was a concession, other than for purposes of that argument and not for purposes of this argument.

Although that being said, it appears to me that the parties should primarily focus on the other three factors for obtaining a stay pending appeal and assume that I've reviewed their arguments with respect to the substantial possibility of success on the merits and still remain fully aware of how I addressed those issues in my decision.

MR. EDMUNDS: Your Honor, may I respond briefly?

THE COURT: Well, I don't think there's -- I think I've already given my view on this, and I don't think there's any other thing to say on it. I mean, I'm not sure there's anything more to be said on it really, unless you say that somehow that they did concede for all time.

MR. EDMUNDS: I don't think it matters whether it's a concession. I think the District Court made a ruling on the issue, and it made a determination as to likelihood of success on the merits and it said that it was not going to allow the appeal to come equitably mooted.

THE COURT: Clearly, the order doesn't say that. It says the Debtors concede, and the only issue is whether they conceded for purposes of that argument or for all time, and I'm satisfied that they did not concede for all time because I can't imagine they would in that context. There's no ruling on the likelihood of the merits, no discussion on the likelihood of the merits here.

MR. EDMUNDS: But I would just say we respectfully disagree, reading the entire opinion that she didn't. But I understand Your Honor's ruling.

THE COURT: Okay.

MR. EDMUNDS: I don't need to say more I guess.

THE COURT: Okay.

MR. EDMUNDS: All right. Thank you, Your Honor.

THE COURT: All right. Okay, so I do have a suggestion for structuring this argument beyond what I've already said, which is I want the parties to focus on what sort of stay they are seeking in terms of duration and activity, and also address it in the light of Bankruptcy Rule 8025.

The parties -- the U.S. Trustee has thrown out different alternatives, which includes a stay that would be ordered by me for a relatively brief period after the District Court's ruling.

It's not clear to me whether the three states have limited their request for a stay in any way or whether they're seeking a stay by me that would go through ultimately a final order, which could conceivably be either denial of certiorari or a ruling by the Supreme Court.

And I think this is important in the context again of Bankruptcy Rule 8025, which is titled, Stay of a District Court -- or BAP, but the focus here's on the District Court

of course -- Judgment, which states in (a): "Unless the District Court orders otherwise, its judgment is stayed for 14 days after entry." And I'll also note in that regard (c) of Rule 8025, which says that if the District Court enters a judgment affirming an order of judgment or a decree of the Bankruptcy Court, a stay of the District Court's judgment automatically stays the Bankruptcy Court's order, judgment, or decree for the duration of the appellate stay.

And then Rule 8025(b) states, is headed for a stay pending appeal to the Court of Appeals and states in (1) in general: "When a party's motion and notice to all other parties to the appeal, the District Court may stay its judgment pending an appeal to the Court of Appeals." In (2), it says, "Time limit. The stay must not exceed 30 days after the judgment is entered, except for cause shown," and then it says, "Stay continued if before a stay expires. The party who obtained the stay appeals to Court of Appeals, the stay continues until final disposition by the Court of Appeals."

And then finally, (d) states: "This rule does not limit the power of the Court of Appeals or any of its judges to do the following, including: a stay; stay proceedings while an appeal is pending; suspending, modifying, restore, vacating, or granting a stay while an appeal is pending; or issue any order appropriate to preserve the status quo or

the effectiveness of any judgment to be entered."

So clearly, appeals from Bankruptcy Court orders should generally and ordinarily be, where there's a motion seeking a stay, that motion should be brought first in the Bankruptcy Court, and courts regularly deny such motions if they are not brought first in the Bankruptcy Court unless there's a legitimate reason to do so. But 8007 pertains to a motion for a stay of a judgment, order, or decree of the Bankruptcy Court pending appeal.

So I have a serious concern that any request for a stay pending appeal beyond the District Court's ruling is not really properly before me or it shouldn't be decided by me -- maybe that's a better way to phrase it -- given Rule 8025.

So let me first ask, is anyone looking for relief beyond a stay up to the time that the District Court rules?

MS. LEVINE: Your Honor, this is Beth Levine for the United States Trustee.

We have asked for relief beyond that. We think, as we argued in our papers, that this Court has the authority, both under Rule 8007 and its inherent authority to control its docket, to stay its own orders, to enter a stay pending a conclusion of the appellate process, so we have asked for that full relief of a stay pending the conclusion of the appellate process or, in the alternative,

pending the District Court's decision. So we have asked for that additional relief.

THE COURT: Right. Although I don't think you addressed Rule 8025 or the case law interpreting it.

MS. LEVINE: Your Honor, I think we addressed the language if 8025, which is different. You know, Rule 8007 does not have the limiting language that refers to the duration of the stay that Rule 8025 does. 8025 refers to the District Court's stay of another court, the Bankruptcy Court's order, which I think is a somewhat different thing than a Bankruptcy Court staying its own order, and that you've got that discretion to stay your own order pending the appeals.

Certainly, you've got the discretion to determine how long that stay should be, but we are asking for that stay for the full duration of the appellate process, with the alternative request for a stay at least until the District Court has made its decision.

THE COURT: Okay.

MS. LEVINE: Your Honor, would you like me to proceed with our motion now or to hear from others on that at this point?

THE COURT: Well, let me just make sure, as far as the three states are concerned, are you looking for a stay through the entire course of any appellate process?

MR. EDMUNDS: Maryland is, Your Honor, and we'd agree with what Ms. Levine just argued.

THE COURT: Okay.

MR. GOLD: Your Honor, Matthew Gold from Kleinberg Kaplan representing State of Washington and Connecticut.

We agree with what Ms. Levine said, our original requests, so that there was no question was for the broader stay. But our alternative position minimum, if you would, is that we have a stay that preserves the status quo and leaves the positions intact so that it can be decided by the District Court or any higher Court when the issue gets put to them.

THE COURT: Okay.

MR. ESKANDARI: Bernie Eskandari on behalf of California, Your Honor. I may have misheard at the beginning of the hearing, you included California with --

THE COURT: No. If I did, it was a mistake.

MR. ESKANDARI: Thank you.

THE COURT: It's just Washington and Connecticut and Maryland. Sorry to give you a heart attack there.

MR. GOLDMAN: Your Honor, if I may add -- Irv Goldman, Pullman & Comley, for the State of Connecticut.

Just to note, Bankruptcy Rule 8007 does embrace motions not only to the Bankruptcy Court but to the District Court, so I would contend it does contemplate a stay pending

appeal through the Circuit. And there's no limiting language in Bankruptcy Rule 8000(a)(1)(A) as to what is meant by pending appeal, so it's open ended. I would just add that point.

THE COURT: Okay. Well, I will note that there are a number of decisions that rule otherwise, including In re Russo, 2017 B.R. Lexis 544 at 5-6 (Bankr. C.D. Cal, Feb. 27, 2017), In re VCR I, LLC 2019 B.R. Lexis 3376 at 27 (Bankr. S.D. Miss., Oct. 28, 2019), and In re Schupbach Investments, LLC 2016 B.R. Lexis 836 at 5-6 (Bankr. D. Kans., March 17, 2016), In re Howell-Robinson, 2008 WL 5076975 at 2 (Bankr. D.D.C. July 30, 2008), and Culwell v. Texas Equipment Co. (In re Texas Equipment Co.) 283 B.R. 222, 230-31 (Bankr. N.D. Texas 2002).

I will note that Judge Roman in this District left the issue open in Credit One Bank, N.A. v. Anderson (In re Anderson) 560 B.R. 84, 88 (S.D.N.Y. 2016). Although rather than the Bankruptcy Court decide the motion, which was made to him, in the alternative under either 8007 or 8025, he decided the motion himself under 8025 after his ruling and denied the motion on the merits for a stay.

But I think it's important, and I believe it's consistent actually with Judge McMahon's approach, for the parties to focus on the two alternative forms of stay that the parties are seeking here: their preferred one, which is

through the entire appellate process, and alternatively, through the District Court's ruling.

Because the determination of the issues and, in particular, the three factors other than on the merits, to my mind, could be quite different depending on whether it's a stay through the District Court's ruling or a stay through either denial of cert or a ruling by the Supreme Court, which obviously would take a significantly longer amount of time.

And on the merits issue, obviously a trial judge that is faced with a request for a stay pending appeal is always in the awkward position of evaluating the merits of the trial judge's own opinion -- that isn't a problem for the District Judge -- and makes that review, I think, much more, in some ways at least, if on a psychological basis, more meaningful.

So I really do want the parties to focus on those two different durations for a stay, and so, you should address your arguments accordingly.

So I don't know if you decided who was going to go first, whether it's Ms. Levine or counsel for one of the three states, but one of you should go ahead.

MS. LEVINE: Your Honor, I'm ready to proceed. Thank you. This is Beth Levine again with the Department of Justice for the United States Trustee.

I'll save my introductory remarks. You know why we're here. I will skip over much on the likelihood of success on your direction.

I wanted to say one thing, which is that Judge McMahon in Footnote 4 on Page 10 of her decision, you know, said that she considered it obvious that there are serious questions going to the merits and making the fair ground for litigation. We think that is true.

You know, certainly, we don't expect you to agree that you've erred. We know you disagree with our legal position. But we think there are very serious questions and that they merit appellate review and that the denial of that appellate review, if there were a dismissal based on equitable mootness, would be irreparable harm.

And it's not just the denial of appellate review vel non itself; it's because you have claims here that are being eliminated without consent that would be permanently irreparably gone without that appellate review.

THE COURT: Well, can we focus on that for a second? First, you went -- and I'm responsible for this since I told the parties not to focus substantially on the merits -- you went very quickly from that to the issue of irreparable harm.

And I just -- I want to be upfront with everyone. It seems to me that there are, in fact, issues going to the

merits that are somewhere between, you know, a mere possibility of success and a probability of success. I think many of the issues raised by the U.S. Trustee and the three states do not fall into that category; that, in fact, they are unlikely to prevail on appeal. Those go to the 524(e) point, the due process point, and their assessment of the merits of the settlement.

But I agree that the issue of a release of third-party claims is, in every instance, a serious issue that requires a Court to sift through complicated legal and factual considerations. And the limits, in particular, on what types of claims that would belong to a third party, i.e., not the Debtors' estate, that can be appropriately, legally enjoined requires serious parsing of the case law and is certainly something that even the Second Circuit case law recognizes as an issue where the lower court can get it wrong, as was the case in Metromedia and Carter and other decisions which recognize the underlying principle that the Court has power to enjoin third-party claims. But drawing the line as to what claims can be enjoined and what can't is something that courts can well disagree on.

So on that point -- unlike on the due process, the jurisdictional points, the 524 point, frankly, even the state sovereignty point, all of which I think are unlikely to prevail on appeal -- this issue as to how released claims

are to be cabined is, I believe, one that does satisfy the requirement to show a strong showing of likelihood to succeed on the merits, such that there's a fair ground for litigation.

Although again, as recognized, for example, by Judge Chapman in In re Sabine Oil & Gas Corp., 551 B.R. 132, 143 (Bankr. S.D.N.Y. 2016), the focus on the degree of likelihood of success is tempered by the balance of the harms or the Court's assessment of the balance of the harms.

So I suppose the objectors can try to persuade me to the contrary, but I think that I want to turn then to the irreparable harm point that you were starting to make. And the argument you made is that the people and governmental entities that objected to the release or injunction would lose their rights if a stay was not granted.

And again, this goes to my direction to you all to focus on the two different times for the stay. I confess I'm having a hard time seeing how that would be the case if the stay were granted or not granted either way through the date of the District Court's ruling with the additional 14 days that are added on under Rule 8025.

And further, I'm having a hard time, although maybe not as hard, with the argument that equitable mootness really would occur here if a stay were not granted through the date of the entire appellate process. I guess that

depends, in some measure, upon whether the plan is substantially consummated.

But as far as the release is concerned, the majority of the payments by the released parties, as you yourself point out, occurs substantially down the road, and under the plan, they have a credit only for what they've paid in the interim.

So it seems to me under either scenario too broad to say that these people who the U.S. Trustee says that he's speaking on behalf of would lose their rights. They would only lose it if there's equitable mootness, right?

MS. LEVINE: Your Honor, that is the primary concern, that is if there is equitable mootness and there's not a review on the merits, they would lose their rights that would otherwise --

THE COURT: Well, there's no other concern, right? I mean, it's just based on equitable mootness, nothing else.

MS. LEVINE: Your Honor, I think there's also a concern about what's going to happen in the interim is, you know, defendants' move to dismiss based on these releases, for example. As noted in our brief and one of the cases that's pending, one of the defense had suggested that the releases apply. This was prior to the Court's decision, so it was a different context. But we don't know how that would play out and whether cases would be dismissed with

prejudice in the intervening time, so I think there is that risk. But our primary concern is the equitable mootness risk that would make it irreparable if there's no longer a possibility of review on the merits.

THE COURT: So there are -- but that wouldn't really happen until the effective date of the plan, right?

MS. LEVINE: Your Honor, it's my understanding that the releases become effective on the effective date.

THE COURT: Right.

MS. LEVINE: So what we want to avoid happening -- but if the appeals dismissed without a review on the merits, that effective date is going to come and go, and the Debtors have --

THE COURT: But I'm asking you to focus on that if and how likely that's to happen.

MS. LEVINE: Yes, Your Honor. So focusing first on the timing of the District Court's decision, Your Honor. Under the plan -- well, first of all, they've argued that it's not just the effective date that may cause equitable mootness. They have very specifically preserved their rights to argue that the criminal sentencing, which will happen before the effective date, can be a basis for equitable mootness.

THE COURT: What do we think about that? I mean, that's under a separate plea agreement; that's not under the

plan.

MS. LEVINE: Your Honor, it obviously raises a concern because they've indicated they're going to argue it. But our concern is also, you know, they've said nothing else that's happening before the effective date can constitute equitable mootness, and we've got two concerns about that, Your Honor. One is, as we've stated, you know, their stipulation about that doesn't bind the Second Circuit, it doesn't bind other parties.

We've had other parties that haven't signed the stipulation that have filed oppositions to motions to stay. We've asked multiple times what's happening. We haven't gotten a response. So we don't know what's going on that someone else might look to and say, you know, is the basis of an equitable mootness argument.

But the other thing we're concerned about, Your Honor, is --

THE COURT: But how could any of those things -- I'm sorry to interrupt you. But how could any of those things be substantial consummation?

MS. LEVINE: Your Honor, I don't think there'll be substantial consummation, but under Second Circuit law, the test is a substantial or comprehensive change in circumstances. And, you know, clearly, the Debtors think that something can happen before substantial consummation

that would support equitable mootness because they said they might argue that based on sentencing.

And the concern, Your Honor, is it may be that, you know, they have said they've structured this so that they have time between the confirmation and the sentencing to get certain things done, that they want to get certain things done before they are sentenced. We don't have clarity on what those things are.

But we don't know, you know, what pre-effective date activity is going to open the door to sentencing or pre-effective date activity they're going to say is well, you know, say it's transferring assets to NewCo. Transferring assets to NewCo on its own, they might say, well, that can be undone. But then after we get past sentencing, we don't know what their argument is. Is it going to be that well, now that it's been sentenced, that asset transfer can't be undone?

So we don't really know how these things interplay together, which makes us very concerned about when, you know, not just the effective date, but also the sentencing. And also what else is happening and how those things work together so that if we get past sentencing, they're going to come back and say, oh, well, you know, this other pre-effective date activity on its own could be reversed, but now it can be undone. Now that bell cannot be unrung.

And so, for all these reasons, we have concerns about these other activities.

THE COURT: But look, the presumption of equitable mootness, which is when their five-step case in the Second Circuit case law comes into effect, is where the plan has been substantially consummated. Generally, courts focus on the distributions under the plan as that, or transfers to be made under the plan that cannot be unwound.

So far, I'm just hearing sort of vague fears, as opposed to anything that actually would give rise to any real risk at all of equitable mootness.

MS. LEVINE: Your Honor, we think it's a substantial risk because of what the Debtors have said regarding the impact of sentencing, but we also think that the dates here --

THE COURT: Let me -- I mean, Judge Kaplan dealt with this head on in the St. Johnsbury case. He says to begin with, the government's failure to concede that its appeal would be moot absent a stay does not help those opposing the motion any more than the opponents' failure to concede that the appeal would not be so moot it harms them.

Mootness is a doctrine grounded in constitutional considerations designed to limit courts to the resolution of actual controversies, although I think the case law has moved on since then and the focus is really, for equitable

mootness purposes, on the finality of bankruptcy plans.

And then he says the parties through additional proceeding, therefore, cannot determine even by agreement whether a case is moot; that is for the Court.

But again, we're talking about equitable mootness. I don't think there's any argument that there would be constitutional mootness here, absent probably well after the effective date. But as far as equitable mootness is concerned, I'm just not seeing it.

I mean, again, the case law in the Second Circuit focuses on the five-step test where a plan has been substantially consummated. Other circuits focus on simply whether third parties' expectations, i.e., parties who are not parties to the appeal or on either side of the contested issues, would be so harmed that the Court would not exercise what it otherwise has, which is an unflagging duty to exercise its jurisdiction. And I just... I mean, how would you undermine the plan my invoking equitable mootness for things that were done before substantial consummation? It just seems like a contradiction in terms.

MS. LEVINE: Your Honor, as I think the St. Johnsbury case pointed out, we're in a difficult position. We don't want to argue against ourselves. We don’t think equipment mootness would or should apply --

THE COURT: No, you don’t have to --

MS. LEVINE: -- but the Debtors --

THE COURT: I'm not asking you to argue against yourselves. But I just don't... But I think here you need to show me that this harm is not just conjectural.

MS. LEVINE: Your Honor, the reason we think it's more conjectural is based on what the Debtors have said regarding what they're going to argue about equitable mootness, and they've pinned it, not just to the effective date, but to the sentencing date, which under the plan could be as early as November 1st, which is the day after our argument in the District Court, with the effective date really soon after that, as early as December 8th, a week later.

So, you know, talking about the timing and the proposals that they have offered, you know, we think certainly we should at the very least get a stay until the District Court's decision to make sure those dates don't come and go before the District Court has a chance to rule. We are going at --

THE COURT: Let me focus on that point. If it is clear that the District Court is going to rule before substantial consummation of the plan, before the effective date, why is a stay needed? Why should the Debtors and the other parties who are in support of the plan be precluded from laying the groundwork in case the conditions to the

effective date do occur, such as setting up new boards, setting up the trusts, et cetera?

I raised this point, you know, the first time that a stay was asked on an emergency basis, and I'm still having a hard time seeing how that works. And frankly, if one looks at Judge McMahon's order, which I'm not doing, but it's as much in support for that view also, that there really doesn't seem to be anything that's really going to really run the risk of equitable mootness until after the effective date, which it appears, at least, would occur after Judge McMahon's ruling.

Now, I think you acknowledged that the stay you're seeking would have to be a stay of everything, but could just be a stay of the effective date, right? Or at least it doesn't have to be a stay of everything? I don't want to put words in your mouth. You didn't agree with this to the other point. You didn't agree that it could just be a stay of the effective date. But I think you did agree that the stay of the confirmation order would not have to be a stay of all of the order in order for there to be no risk of equitable mootness, right?

MS. LEVINE: Your Honor, in our motion we talked about one specific thing, because one of the opponents had raised a concern about secreting assets. And you know, we tried to have this conversation with the Debtors just to

find out what are the specific things that you would want exempted from a stay. And we didn't get an answer to that question.

So if there was a question of other specific things, those are things we would have to take under consideration or have authority to agree to any other specific thing than what we put in our brief.

But you know, we understand that Judge McMahon is moving very, very quickly. We're all moving as quickly as we can to get the appeal decided quickly. But there's no guarantee that she is going to decide before a date certain, particularly when these states are approaching in December.

THE COURT: So that would argue just for staying the effective date until after her ruling, not staying everything else that the Debtor would be doing to prepare for the effective date, which isn't really --

MS. LEVINE: Well, Your Honor --

THE COURT: -- which isn't really under the confirmation order anyway, because the confirmation order doesn't really contemplate any material transactions before the effective date, I think. Right? None have been identified.

MS. LEVINE: Your Honor, the way to stay the effective date is to stay the confirmation order, because those are the transactions that lead up to getting to the

effective date and --

THE COURT: Let me ask --

MS. LEVINE: -- lead up to getting to the sentencing.

THE COURT: Let me ask you the question different. What transactions out of the ordinary course do you believe they confirmation order authorizes now before the effective date?

MS. LEVINE: Your Honor, the confirmation order grants a broad authorization to engage in the transactions that they need to implement the plan. And part of the problem is we're in the dark on exactly what they're doing. We want to maintain the status quo because equitable mootness is an existential threat to our appeal. And maintaining the status quo is the only way to protect against that risk of equitable mootness. You know, it's --

THE COURT: Do you have any case that stands for that proposition?

MS. LEVINE: I'm sorry, which --

THE COURT: That any risk --

MS. LEVINE: -- that equitable mootness is --

THE COURT: -- any risk of equitable mootness is enough? In fact, most of the cases say just the opposite of that. It has to be a real risk, coupled with other things, or at least something else. Now, maybe that something else

here may simply be the significance of ruling on the merits of the appeal.

But it would still seem to me that if you had -- and this is repeated in numerous rulings -- there's one by Judge Briccetti in U.S. Bank National Association v. Windstream Holdings, Inc., 2020 U.S. District LEXIS 137183. Merely invoking equitable mootness as the Appellants have done here -- a risk that is present in any post-confirmation appeal of a Chapter 11 plan -- is not sufficient to demonstrate irreparable harm. If the Court were to credit this kind of argument for every such request, it would be forced to review nearly every bankruptcy appeal on an expedited basis and, of course, grant the motion if some other factor were established. And he cites there In Re Calpine Corp., 2008 Bankr. LEXIS 217 (Bankr. S.D.N.Y. Jan. 24, 2008).

But there are lots of courts that say that. That you can't just say there's a risk of equitable mootness and then get a stay pending appeal. You have to actually focus on what that risk is and how real it is, and then see how it's tied into the other factors.

And I'm still not seeing it as far as between now and a date within a reasonable time after Judge McMahon's ruling, which I think the drafters of the rule have said is at a minimum 14 days. And that would be just a stay of the

effective date. I mean, there's no discussion about how this plan could be substantially consummated before then.

And even then, there's the issue of who are the people who are harmed by a continued appeal? And if we're focusing just on the Sacklers, I don't think that's the type of harm for the shareholder released parties; that's the type of harm that the courts recognize is a basis for equitable mootness, because they're in the heart of the issues that are on appeal. There would have to be other third parties, legitimate parties who aren't in the dispute who were being harmed.

MS. LEVINE: Your Honor, you know, this sort of goes back a little bit to where I started, where we think the harm is the complete elimination of claims that becomes unreviewable if the appeals are equitably moot.

THE COURT: All right. I think we've covered --

MS. LEVINE: And --

THE COURT: -- this point, because again, I don't think you really answered my question on how it becomes unreviewable. I just don't -- I don't see it here. I don't think you carried your burden of proof on that point, at least through the date of Judge McMahon's ruling and the rule stay that goes into effect. And then parties can ask her if she thinks there's a basis for a further stay in the Second Circuit. And they will have had the benefit of

looking at the issue besides equitable mootness that you're focusing on, which is the importance of the merits, and can weigh those themselves.

I just -- I don't -- the release isn't going to be effective until the effective date. So to lose the release doesn't happen until the effective date.

MS. LEVINE: And Your Honor, we think it's -- we're asking for a stay, you know, and in the alternative, at least a stay through the District Court's decision, to make sure those dates don't pass, to make sure that we can this appeal heard on the merits. We think that's critically important. We think it raises really important issues that should be heard on the merits.

THE COURT: All right. Well, again, I can understand that argument as far as a stay of the effective date. I'm still not seeing it as far as a stay of other actions, which would not be -- I don't believe -- authorized before the effective date. And I've already ruled, and I continue to believe, that the advance order is clearly not a basis for equitable mootness. I mean, it's just -- that would be -- for a doctrine which is already under legitimate attack, to rule that that order is a basis for equitable mootness is just -- I can't imagine it. I mean, I think that's a frivolous argument. I really can't -- it's just inconceivable.

MS. LEVINE: Your Honor, I appreciate your views on that. You know, it's our concern that Second Circuit's not bound, and our hands are tied a little bit because we're in the dark about what the Debtors are actually doing. We have asked them --

THE COURT: All right. Well, I'll --

MS. LEVINE: -- multiple times.

THE COURT: -- ask the Debtors.

MS. LEVINE: We haven't gotten an answer.

THE COURT: I'll ask the Debtors what they believe they're authorized to do before the effective date to lead to the argument that the plan is substantially consummated and, therefore, it would be inequitable for third parties, not the parties who have the benefit of the release, that you are appealing, in essence. That's the harm you're trying to address is your dispute over the legitimacy of the third-party release. And I think I do have a -- just because I... Look, the cases are reported for a reason. The lower courts follow them.

So, you know, one reads Charter, one reads Windstream, one reads the Chateaugay case, and Metromedia. I mean, these are MPM Silicones. These are published opinions by the Second Circuit where they lay out when something will be found to be equitably moot. And it is an equitable doctrine, and so the facts matter.

But, you know, I think actually the trial courts have been given the job generally to find the facts in light of the case law, and I just can't imagine that the facts before me, up at least until the effective date, would lead the Second Circuit to find that the appeal was rendered equitably moot.

It's just -- there's no effective date, there's no substantial consummation, there's no sale that's happening before the effective date, there's no other transaction. And it just -- it doesn't fit even within the actually fairly pro-equitable mootness case law in the circuit, which focuses on the heavy showing someone has to make against equitable mootness when a plan has been substantially consummated. This plan isn't even effective, so it's hard to believe that it could be substantially consummated.

Anyway, so why don't we move on to the balance of hardships and public policy.

MS. LEVINE: Your Honor, so on the balance of hardships, the opposing parties have rested primarily upon a harm from delay. No one questions the importance of providing relief to those who have suffered from the opioid crisis. In our view, that supports a stay. Those who oppose the plan have also suffered from the opioid crisis. They have equally pressing interests and abatement and compensation, but they would have their claims eliminated

entirely by the plan, not just delayed.

And we don't agree that a stay would cause significant delay in the context of this case, which has been pending for over two years, with litigation against Purdue and the Sackler Family that began before that, where the appeal is being expedited at a very rapid pace before the District Court. The argument on that appeal is in just three weeks. And, of course, if it went to the Second Circuit, we would seek to expedite it there as well.

The United States Trustee is the watchdog, the congressionally appointed watchdog, acting in the public interest to try and make sure bankruptcy is not abused. We're advocating -- we understand you disagree -- but to ensure that the plan does not transgress the Constitution or the Code, and we think there's a public interest in having these issues heard on the merits regarding these third-party releases, and having, you know, the appellate courts provide more clarity on the limits of when they're allowed and when they're not allowed.

The Debtors and their allies have relied a lot on the creditors' support for the plan suggests that a stay would be against the public interest. The creditors' support for the plan is not the same thing as the public interest. It just reflects the interest of the creditors that voted in favor of the plan.

There is a significant public interest in vindicating the rights of the minority and preventing the will of the majority from going unchecked by appellate review. And we think that permanent elimination of the claims against the consent of the people who did not want to release these claims outweighs that marginal delay, which, again, we think -- particularly focusing in on the District Court decision -- is relatively minimal.

THE COURT: Well, let's not focus on the District Court decision for the moment. Let's focus on when you believe that -- when do you believe that a final decision here would be made? And I'm assuming that's through the Supreme Court process.

MS. LEVINE: Yes. If this were to go -- if someone were to petition for certiorari, it would be to the Supreme Court for process, and of course, if the Supreme Court granted cert, that would certainly reflect that these are significant issues that were review.

THE COURT: So have you projected how long that would take, that process? Are we talking 2024?

MS. LEVINE: Your Honor, I don't know the answer to that.

THE COURT: Isn't that important to figure out?

MS. LEVINE: I don't know that there's any way to predict with any kind of certainty how quickly the courts

will go, other than we've committed to expediting these appeals. And you know, that's shown through our actions with how quickly we are moving in the District Court.

THE COURT: Well, does that apply to the Supreme Court, though? They don't take expedited appeals like this, do they?

MS. LEVINE: Yeah, I don't know exactly what the process is, Your Honor, but I don't think that the expediting works in the same way in the Supreme Court. So I don't have an answer for how long that would be. But, Your Honor, we do think that these issues are important and that, you know, a delay from the stay is outweighed by the elimination of these rights. And that that would be an irreparable injury for these claims to be eliminated entirely, without a full review on the merits.

THE COURT: And as far as the individuals' rights are concerned, you assert them -- that they would be asserted by individual under state consumer protection laws?

MS. LEVINE: Some of this -- well, some of the individual claims are under state consumer protection laws, Your Honor. Some are under common law. I'm not sure I quite caught your question.

THE COURT: I'm just trying to figure out what the claims that you're looking to protect are, as far as individuals' claims.

MS. LEVINE: Direct claims, based on the individual non-debtor conduct for their own misconduct, breaching a duty directly to the Plaintiffs, such as the cases that -- the complaints that we cited in our brief, which allege claims under state consumer protection statutes, common law fraud, negligence, RICO. There's a number of claims that have been asserted along those lines that allege direct participation and direct liability, based on the individual Defendants' own misconduct.

THE COURT: Okay. And that misconduct would be misconduct in being an officer or director or shareholder of the Debtors?

MS. LEVINE: In the cases that we've cited, yes. I believe the individual defendants were in those roles. But the allegations are that they'd reached -- is not just a sort of veiled piercing, breach of fiduciary duty, imputation of the company's conduct, but that the individuals had breached their own duty and engaged in their own misconduct, making them directly liable to the Plaintiffs.

THE COURT: Have you found any of those cases or any evidence from the confirmation hearing that shows that those allegations don't substantially or entirely overlap with the showing that would be necessary for piercing the corporate veil or other causes of action that the Debtors

would have?

MS. LEVINE: Your Honor, the factual allegations may overlap, but I mean, I think this gets to where we disagree with what the proper scope of the non-debtor releases are, and that is something that we think should -- is an important issue that should be reviewed, and one of the reasons why we're seeking a stay pending appeal.

You know, when Metromedia talked about the cases that have -- the rare cases that have allowed these releases, they were in circumstances that were more limited. They were in class actions, like Drexel, which is this is not -- are aware they were, you know, more surely derivative claims, such as fraudulent -- you know, claims that were duplicate fraudulent transfer claims, like in Madoff or Tronox or in Manville I, where it was directly against the asset of the estate, and that in the claim was a secondary insured that was derivative of the primary insureds' claim, the debtor was the primary insured.

So we think that question of whether overlapping factual allegations is enough to put this within the scope of a non-debtor release and whether that's the appropriate scope is an important question, as a question that should be addressed on appellate review.

THE COURT: Well, no, I've already said I believe that's correct. I'm just trying to figure out here -- and

this is in a different context; this is balancing the harms -- the right of someone to pursue, which on the facts are duplicate claims or overlapping claims, is so strong, particularly when they would receive a recovery, at least which was found under the plan, they wouldn't receive at all without the settlement, is enough to override the harm caused by the delay.

MS. LEVINE: Your Honor, we think there is harm here. The claims directly against the Sacklers or other non-debtors were never valued. And there's a harm to having the choice of whether to settle --

THE COURT: I actually did value them.

MS. LEVINE: -- or proofs of that claim are not --

THE COURT: I don't know why --

MS. LEVINE: -- taken away from you.

THE COURT: I don't know why you say that. I actually did value them in the aggregate. And I considered those complaints. And I said, given the battle of the century that would ensue, the settlement was fair. The U.S. Trustee took no discovery on those issues and didn't make any case on them. Some of the objecting states did, and I'm sure Judge McMahon will read carefully the witness testimony on those points.

But I have to say, I am having a hard time seeing how those claims, which really are overlapping claims as far

as I can tell -- and I did the best I could to cabin the release to make it clear that they would not expand beyond that -- that the people that you're looking out for would get any recovery whatsoever in the context where the settlement was not in place and there would be a litigation free-for-all.

Again, you have the United States getting it superpriority claim. You have individual states litigating their claims. And then that's up against a class action lawyer or two or three, back in the MDL, where there already was, by the substantial private side in the MDL, a settlement for a lesser amount, namely $3 billion.

So I'm just having a hard time seeing, other than the intellectual desire to clarify this issue one way or the other, how the people who would object to the release of their claims are harmed more than the people who would be receiving the benefit of the plan distributions.

MS. LEVINE: Your Honor, I think we have a disagreement about what the evidence shows about that. But there's also a harm from having that choice taken away, and what we view of a violation of due process rights to be forced into a settlement that one does not agree to.

THE COURT: Well, the parties you're speaking on behalf of certainly had notice of the confirmation hearing and the right to hire a lawyer to make that very argument,

which is a lot easier to make than hiring a lawyer to compete against 48 states and the Debtors and the lawyers and their clients who make up the Ad Hoc Committee of Personal Injury Claimants.

If they're not prepared even to hire a lawyer to fight the plan, how do you assume that they're going to even undertake the litigation that you want to preserve for them?

MS. LEVINE: Your Honor, the premise that there was adequate notice, again, you know, we disagree with. That's part of our objection. And we know you disagree. And this is part of the reason why we think this needs appellate review.

And you know, there are parties who have filed claims that would be precluded. We think we've shown that. There are numerous cases listed in the preliminary injunction.

THE COURT: But they haven't objected to the plan. And you're not going to represent --

MS. LEVINE: Mr. Hartman has.

THE COURT: You're not going to represent them in the litigation, right?

MS. LEVINE: No, Your Honor. And of course, the United States Trustee is here not representing individuals, but representing the public interest in making sure that the bankruptcy system isn't abused. But we think, you know, you

can still look to that harm, the due process harm to people who are having claims eliminated, and to the public interest in having these significant important issues addressed on appeal as part of your harms balancing in addressing a stay pending appeal.

THE COURT: Okay.

MS. LEVINE: Your Honor, I don't know if you have further questions. You know, we've made our case in our briefs. Obviously, we have some disagreements, but we would stand on a request for a stay pending appeal. And I will, if you have no further questions, cede the floor to some of the other movants.

THE COURT: Okay.

MR. GOLD: Good morning, Your Honor. Matthew Gold, from Kleinberg Kaplan, representing the State of Washington. Can you hear me?

THE COURT: Yes.

MR. GOLD: May I proceed?

THE COURT: And see you too. Yes. You can go ahead.

MR. GOLD: Thank you, Your Honor. First, I just would like to touch on -- because I think it's an important point in context of the questions that Your Honor has raised -- the attempts that were made to try to resolve this matter prior to this hearing.

I think the key point, which Your Honor said in framing the question for us, was that it would be my wish that the schedule for the appeal is a reasonable one and does not run the risk of causing Norma's harm to creditors. I'm not going to quote every word you said, but the key point was, with a second potential look at the Appellate Court as to whether any further stay is necessary.

And I think that that is the point here where, with what we -- what I described earlier as our fallback position, that we are seeking to have a stay consistent with Rule 8025 that would at least take the process through a decision from the District Court, and then give a period of time for a higher court to decide whether to further extend the stay. The --

THE COURT: Can I represent you on that point, Mr. Gold?

MR. GOLD: Sure.

THE COURT: When talking to the U.S. Trustee's counsel, I made a distinction between a stay of the effective date, or the occurrence of the effective date under the order, which would be a specific condition to the effective date in the order and in the plan, and a stay of the order in its entirety. And it seemed to me that the latter might be warranted, but not the former. I mean --

MR. GOLD: Well --

THE COURT: -- the other way around. That the latter would not be warranted, but the former might be.

MR. GOLD: I think that a proper consideration of that question, Your Honor, requires a consideration of the effect of sentencing. And that is the -- and that is something that may not -- that is clearly contemplated under the confirmation order, although it may not be completely clear how it -- whether it arises under the plan or under a separate stipulation.

But the connection, Your Honor -- and I think the Debtor has been very clear about this -- is that they are going to press that once sentencing has occurred, they will be suffering immense harms if they are not permitted to then consummate the plan and to enter into the transactions under the plan. And so that, therefore, to enable there to be a meaningful stay of the consummation of the plan, as Your Honor has posited, there needs to be a delay of the sentencing as well.

If the Debtors can posit -- now, right now I'm positing what their argument is going to be, and I realize that that's a somewhat shaky limb to be on, but that's pretty much where I understand their position is going to be, so that to prevent the possibility of a shipwreck or major harms occurring if there is sentencing and not a -- and they can't consummate the plan, we need to have a delay

in the sentencing.

If the sentencing is delayed and concurrent with that a stay of the effective date of the plan, we believe then Your Honor's analysis is correct, that that should be sufficient to maintain the status quo and prevent there being a substantial consummation that would be the predicate for an equitable mootness argument.

Now, even there, we're at a slight disadvantage because, as the U.S. Trustee has said, we don't know exactly what the Debtors would be doing and it would be a lot cleaner for us to accept this, if the Debtors would straightforwardly say, we agree with you; nothing else that is happening here would create a predicate for equitable mootness, along the lines of the assurances they gave to the parties in connection with the advance order, so that we would have a basis of knowing that there wasn't something going on that we're not aware of and that in our saying we don't think there's a problem, someone plays a gotcha game and says, yes, they weren't aware of this and that happened.

But based on our assessment, what we're aware of being contemplated, that's the one critical point that we have to add. There has to be a delay in sentencing and then a delay in the effective date of the plan, which would happen together because the effective date of the plan can't occur without sentencing in the first instance.

And so the reason we were unable to reach any kind of resolution with the Debtors in trying to resolve this short of having this lengthy hearing today was that they insisted that any resolution we reached with them had to include a date certain for the sentencing to occur.

And so that's why we've been unable to reach an assessment with them, because they kept including the sentencing, reserving their right to argue that the occurrence of the sentencing would create an equitable mootness problem, either by itself or because of what would be entailed afterwards. They didn't get to that level of specificity. But that's why we tie those two things together.

THE COURT: Okay. And I appreciate that I may be asking you to say things that are contrary to your later argument that sentencing wouldn't render the plan moot. And all I can say is that you wouldn't be held to those things in the future, and I'm sure the Debtors have thought of them to.

So I'm having a hard time seeing how the sentencing could create equitable mootness. I mean, it's part of a plea agreement. It's scheduled in front of a different judge. I guess I could enjoin --

MR. GOLD: Oh --

THE COURT: -- the Debtors from seeking it. But

the agreement has this provision that they're supposed to go get sentenced.

MR. GOLD: Well, Your Honor, as I understand it -- and again, this will be something that the Debtors are saying this is argument that they're going to make.

THE COURT: Right.

MR. GOLD: And if they say before the Court now that they would not make this argument, that might be a lot cleaner. But as I understand it, their position is going to be that once sentencing occurs, they are no longer able to operate as the companies that are currently constituted. That because they will be sentenced, they will be unable to sell product, to receive Medicare, or contributions and other things. And that therefore, they will be threatened with an immediate shutdown, a corporate catastrophe, unless they are able to go ahead with the restructurings that are contemplated under the plan, and so then that's why those two will be tied together.

Now, I should say that, Your Honor, we would love nothing more than to engage with the Debtors and to say is there a way to allow this to go forward, to allow some corporate restructuring to take place, to allow some payments to go to the victims of Purdue and the Sacklers that are supposed to be receiving payments under the plan.

We're not trying to -- that's not our goal, to

prevent those types of assistance from happening. And if there is a way for the parties to on one hand permit some of these things to go forward, while on the other hand preserving the right of appeal, we are very -- we have always been open to having that discussion of trying to make propositions along those lines to the parties. Or perhaps something along the lines of the emergency relief fund that was proposed during the case, but that did not occur. Something like that that could perhaps take place to allow parties to get relief.

What we perceive is that the parties who have refused to engage with us on this point are doing so because they want to be able to hold up the possibility of relief as their ticket to getting an equitable mootness that would preclude further appeals.

So if there is a way of managing to separate these things through stipulation, or an order, or something that allows some of these things to occur -- and I think Your Honor is right that perhaps they are not at all necessarily as abstract principles linked, but we believe that -- our understanding is that the way this plan has been drafted and that this plan has been put together -- and this is a plan that has been drafted and put together with a clear strategy of preserving it through equitable mootness -- that the effort has been made to tie these things together so that

they could not be disentangled, and so that starting down this road would necessarily create the predicates for equitable mootness. And that starts with the sentencing and then pulls in the restructuring and then the other matters that occur there.

I will just note then with respect to the timing, the plea agreement took place, I'm going to say, in October or so of 2020, and was held in abeyance for a period of time to allow further proceedings before this Court, confirmation and other such things. The Debtors then, for reasons that are at least opaque to us, put in a further delay for them to do certain preparations prior to the sentencing occurring.

So it's pretty clear to us that the sentencing, which we are not asking to be undone but can be held in abeyance while the issues under the plan receive proper appellate review, and so holding those matters off, the Debtor has managed to stay in this presentencing period for over a year now and contemplated further staying.

So we believe that the most effective and simplest way to preserve the status quo is to have, as Your Honor said, a stay that includes the effective date plus the sentencing to avoid the shipwreck scenario. Or in the alternative, we're perfectly -- we are desirous of trying to come up with a better way to allow some benefits to go

through, if it will not -- if the parties can agree that doing that will not equitably moot an appeal.

But so far, we have not received serious engagements on that. And apparently, the parties prefer to try to use the very real need of these victims to receive money as a kind of hostage situation where they can't get their money unless our appeals are irrevocably denied through (indiscernible) risk.

THE COURT: Okay.

MR. GOLD: I will not -- I will move on, then, Your Honor. I will not touch on the merits particularly, because as I think Your Honor said, we agree that the standard is sufficiently flexible, that we've made enough of a showing with the merits of the appeals that we wish to put forward, to satisfy the test in the Second Circuit. And we concede that we have to meet several factors of the prongs, and it's not simply enough to have succeeded on one of them. But we believe that we've made a sufficient showing on those to move on to the other prongs as well.

I would just note that the irreparable harm that we will suffer here is the deprivation of the rights of the moving states to bring their independent actions under state law against the Sacklers. And that the potential loss of those claims is certainly real enough to satisfy any requirements that it not simply be mere equitable mootness,

but equitable mootness plus a consequence, that that's the consequence here.

And then there are other cases also raised in the briefs that we believe are also compelling, that says that any time a state is prevented from enforcing its laws, it has also suffered an irreparable harm. Those two together, we believe, certainly satisfy the requirement that there be a form of irreparable harm shown here.

I will then turn, if Your Honor doesn't have questions, to the question of the balancing of the harms, which is the next factor here.

It feels to us that an awful lot of the arguments that the stay opponents have put forward basically can be described from the movie, "Blazing Saddles", where the sheriff who finds himself in a difficult spot -- played by Cleavon Little -- points a gun at his own head and manages to convince the parties that the threat to himself that he is posing are sufficient to allow him to be extricated from that position. And the reason I mention that here is because the harms that the stay opponents are positing here are ones that they are themselves creating to a large extent.

So first, as I've touched on already, is the question of the sentencing. I believe their argument is going to be that if sentencing occurs, but they can't

proceed, they will suffer harm. Well, the simple answer is for them to seek to defer sentencing until the appeals have run their course.

Second, we have these arguments that the Sacklers have the right to terminate the agreement if a stay is entered. And I find this an outrageous suggestion, Your Honor. I will note that during the hearing that took place on October 14th on certification of a direct appeal, there was another issue regarding a Sackler termination right.

Mr. Huebner stated emphatically to this Court that of course he had a waiver of that Sackler termination right, and that he would not be coming into the court without having a waiver of that termination right in his pocket. And the reason for that was self-evident. How could one think that Purdue would put in jeopardy the Sackler settlement agreement, the centerpiece of the plan? But that is what Purdue is arguing right here. That they granted the Sackler a walk right.

I will note that this walk right was slipped into the agreement at literally the last moment, while the confirmation trial was proceeding, after the evidentiary portion of the confirmation trial had closed, after all the testimony about how wonderful a settlement this was had already been placed on the record.

And I will also note that Purdue did not consider

this walk right to be significant enough to advise the Court and other parties, oh, by the way, we've posted an amended Sackler settlement agreement, and it happens to contain a provision that will allow the Sacklers to terminate this if there's a stay pending appeal, which a possibility of request for a stay was clearly contemplated by everyone.

So, now, how could this be? How is it possible that all the tremendous lawyers representing the stay opponents voluntarily put in jeopardy the centerpiece of the plan? Not because they were confident that there would be no appeal, nor that there would not be a motion for a stay pending appeal. It has to be that they could not seriously expect that the Sacklers would spurn all the benefits that they get under this plan and actually exercise this right, and rather, because they intended to use this provision as a means to bludgeon the courts into denying a stay. And we submit that that should not be permitted here.

Second argument that they put forward relates to the attorneys' fees that they themselves are incurring and will incur during the period of the stay. We believe this is also an outrageous point. If they seriously believed that the size of the fees that they generate were causing harms to victims of Purdue and the Sacklers, they ought to be finding ways to limit their fees.

To start with, it was not necessary for seven

oppositions to the stay motions filed by seven different parties to be filed. They could've coordinated a single filing. I know this could be done because the states routinely coordinate to present fewer filings to Your Honor.

More to the point, steps could've been taken during the case to curtail the amount of professional fees during the case, or to curtail the amount of fees that will be charged post-confirmation. But no. The only way in which the stay opponents suggest that fees ought to be controlled is by denying this stay to the Appellants. And we submit that that is too transparent to take seriously.

Then we reach what I believe is the far more serious concern, which is the delay in relief going to the victims of Purdue and the Sacklers. I just note that this is not a new problem. This is a problem that's been weighing on everyone through the over two years that this case has been pending. This did not suddenly become a problem. The victims of Purdue and the Sacklers needed help two years ago when the cases were filed. But that undoubted need was subordinated to the legal process of this case.

The plan opponents could have during the case established the emergency relief fund to provide faster relief to the victims. But they didn't. Now, we are in a post-confirmation pre-effective date period. There was the famous 82-day period before the plan could go effective,

which was put in there, as we understand it, for the convenience of the Debtors to allow them a deliberate period of time to undertake certain corporate transactions.

If the harm to the parties of not getting their money sooner was a serious possibility, that period of time could've been shortened as well, but it wasn't. The only time when this delay apparently becomes intolerable is when it's used as a means to curtail the stay that we're requesting and the preservation of our appellate rights.

The appealing states -- and especially in this context, where we are asking for a stay -- goes through the time of the anticipated ruling of the District Court, plus a meaningful period of time to take the issue to a higher court. The incremental harm to those parties that will occur during this relatively imitated period is far less of a kind of all the terrible delays that they've had to suffer through the case and does not provide an independent basis for denying a limited stay through this time period.

THE COURT: Well, I'm having a hard time following that point, Mr. Gold. I mean, it's still harm, and I think that the real issue is how great a harm is it in comparison --

MR. GOLD: I agree, Your Honor.

THE COURT: -- to the countervailing harm of giving the Appellants the opportunity to try to vindicate

their rights on appeal.

MR. GOLD: I completely agree, Your Honor. And it's a complicated issue because this is apples and oranges, if I may say. The harms that we have here are different in type, difficult to quantify, and so the Court has to engage in the kind of balancing. I'm just suggesting that the harm here will not -- we're not disputing that it really occurs, but this harm is one that the parties have lived with throughout the case because there were important legal principles or other things that were taking place. And we're suggesting that it does not outweigh here the preservation of our appellate rights.

THE COURT: Well, again, that may be the case through a relatively short period after what would normally be the effective date, because distributions in some measure would be made into the trust, but not out of the trust, for a period after the effective date. But the longer you go, the more the delay really counts, because there comes a point when (indiscernible) claims start being liquidated and the NOAT procedures are established, and at that point, the money really does start going out.

MR. GOLD: Well, I --

THE COURT: Have your clients and the Debtors talked about when that point is likely to be?

MR. GOLD: Well, as I said, Your Honor, what we

have attempted to do with the Debtors is to find a way to -- and again, using the model that was engaged with the trust advance motion to have the parties agree to allow various steps to take place, including the ones that Your Honor has listed -- and we have had, I have to say, little engagement or appetite for engagement from the Debtors or the other parties in terms of being able to parse.

I do agree that part of the benefit of having the stay be limited to the period of time that we've discussed in terms of getting us to the next level is that we can analyze more concretely what steps are going to occur, rather than looking at and allowing the next courts to be able to focus on what issues would be arising then, and what could be concretely happening then, and weighing that against the harms that might occur.

It is certainly for the purposes of the District Court's ruling, that by all evidence, Judge McMahon is keenly aware of the importance of having a decision done quickly. And frankly, again, the other benefit is that because she was aware of this, she was able to insist on a briefing schedule to enable that all to work.

And if we are going to the next court, should that be necessary, then, again, the Second Circuit could be in a position to condition a stay upon an expedited briefing schedule before the Second Circuit, which no lower court

could meaningfully be in a position to impose on the Second Circuit, which they could do themselves.

So we posit that the harm for this period of time is not sufficient to outweigh the importance of the appellate rights that are being preserved, and that the issue may have to be revisited by another court with its own timetable in place and depending on where the matters stand at that point.

And as I said, we are more than willing to try to work with these parties to find a way to allow transactions to occur, to allow even payments to go to needy parties, if there can be a way to structure that to not affect the appellate rights.

So now I turn Your Honor to the public interest component of the process. We submit that it is manifestly in the public interest that this plan be fully tested on appeal, not -- the Debtors seem to sometimes have the position that the only appeal that is meaningful here is appeal to the District Court. This case could have been in front of the Second Circuit already, had the Debtors agreed to certification of a direct appeal. But they chose not to.

THE COURT: Well, the Circuit would have had to have taken it too.

MR. GOLD: That's true, Your Honor. I'm just saying that the Debtor -- that we didn't reach that point.

And part of the reason why we didn't reach that point was that the Debtors at that hearing insisted that it was important that we go to the full process of first review from the Bankruptcy Court, and then review from the Court of Appeals.

And so we want to -- now that we are on that path, we want to make sure that all levels of appeal are preserved and not booted out through equitable mootness. And we submit that that is manifestly in the public interest, and that it is against the public interest that parties be permitted to design plans to create equitable mootness factors in them as a means of avoiding review. I mean, Your Honor, I can state that I received emails today of CLA programs that are already being designed and marketed to teach bankruptcy lawyers how to design plans that provide non-consensual releases and that can be protected by equitable mootness. The community and the country as a whole is watching this, and it is critical --

THE COURT: Equitable mootness --

MR. GOLD: -- that this is --

THE COURT: -- has been an issue in the -- at the circuit level for decades.

MAN: I understand, Your Honor.

THE COURT: And somewhat inexplicably to me the Supreme Court turned down cert this last term on two cases

that could've resolved that issue. That has nothing to do with this plan at all. And it would seem to me that as we just discussed, the public interest in avoiding harm, tangible harm, to the victims increases with time. And you're just ignoring that when you talk about the public interest.

And again, it's well-recognized that one issue, one element of the public interest, is the finality of reorganizations. So I think it's much more complicated than you're saying here, but I also think that what you're arguing for now is well beyond what you had been arguing for, which is some form of a stay through a ruling by the District Court. Because now you're talking about staying matters through a determination by the Supreme Court, which could be in 2024. And --

MR. GOLD: Allow me to clarify, Your Honor, because I understand why you might have thought that, but that's not what I meant to say. The -- I think we have been candid that we will -- that we intend to seek stays that go on to the higher levels. What I am now suggesting to Your Honor is that the stay that we would be obtaining from Your Honor would preserve our ability to seek further stays from higher courts --

THE COURT: Okay. Fine.

MR. GOLD: -- and that --

THE COURT: Then I -- that's fine. So we're really -- I think -- look, here, the public interest point very much dovetails with the balance of harms, as far as I can see. The parties here have agreed on the form of the distribution of the money under this plan and have touted it as something that is a single achievement. When I say the parties here, I mean both the appellees and the appellants.

So what we're talking about here is a dispute between the appellants and the appellees on whether more money can be obtained through this process because that's what we're talking about. We're talking about more money, and whether that warrants additional delay. And to me that just goes back to the balancing of the harms.

MR. GOLD: Well, Your Honor, the -- I would just clarify a few points of what you have stated. I do agree that the appealing states participated in the design of many features of the plan, and that we do believe that a lot of those features of the plan are salutary and are ones that we agreed to together. But that was always -- those were always being negotiated based on the predicate that other issues, principally the releases, could also be satisfactorily resolved, and unfortunately, they were not.

The -- I will also note that the issues that arise vis-a-vis the Sacklers, are not solely issues relating to the amount of money that can be paid. Although that is

certainly an important component of it, but there are other issues regarding, for instance, the Sackler agreement to have their name taken off of various institutions, about the scope of the -- of when documents can be available in the document depository -- or repository and other things that are not, that take this case beyond a mere matter of money.

And I again state that the appealing states are highly anxious to try to find ways to reduce the burdens on the ones that Your Honor has identified rather than to hold them hostage as a means of avoiding appellate (indiscernible) important question. Because we -- because all of these are -- all the things that Your Honor stated are matters of public concern. But where you have a -- where you have what as Your Honor has identified as non-frivolous, serious questions regarding the permissible scope of a -- of releases granted pursuant to a confirmation order, having those issues clarified on appeal we submit is a compelling public interest, notwithstanding the other matters that Your Honor has identified.

THE COURT: Well, those other matters are, I think, pretty eloquently laid out in the declarations of Ms. Juaire. I'm hoping I'm pronouncing that right, J-U-A-I-R-E, and Ms. Trainor, T-R-A-I-N-O-R.

MR. GOLD: Your Honor, I will --

THE COURT: I guess I've heard you and I

appreciate what you've said, Mr. Gold, about the State's willingness to work with the appellees on intermediate steps that minimize that countervailing harm that they detail.

I guess the point that I need to press is, are the three states prepared to accept some risk of equitable mootness as part of those steps. The U.S. Trustee apparently takes the position that it's not, which seems rather bizarre to me and contrary to the case law. But I don't know whether what you're offering here is just couched by saying of course we can't take a risk of equitable mootness, or is it willing to take some risk?

MR. GOLD: Well, Your Honor, our -- we -- first, we are agreeing to accept some -- our issue is not -- our view is not identical to the U.S. Trustee, which as you've obviously seen from the briefing that has been submitted. We have not taken a separate appeal from the advance order. We're not pursuing that. We are accepting that.

While there is in theory some risk of equitable mootness from that, we don't consider it to be a significant enough one that we are pursuing that. And so we are exercising some judgment in terms of what risks of equitable mootness we are willing to take and which not.

We also recognize that the framework that was adopted with respect to the trust advance order had a -- and in fact, also the structure that Judge McMahon adopted with

respect to her ruling involved having the various parties to the appeal stipulate that they were not going to use these matters as the basis for an argument for equitable mootness. Now, we recognize that that is not bulletproof, that it's --

THE COURT: No, I actually think it is.

MR. GOLD: And the higher court could --

THE COURT: I --

MR. GOLD: The higher court could make its own determination --

THE COURT: Yeah, I --

MR. GOLD: -- but again, we --

THE COURT: -- think it is pretty bulletproof. I mean, again, my quote from Judge Kaplan was focusing on constitutional mootness, which is really a different issue --

MR. GOLD: Yes.

THE COURT: -- as opposed to equitable mootness. It would seem to me very hard for anyone to rule that it was equitable to hold something as causing mootness when the very party that would benefit from that had stipulated that it wouldn't. That would seem --

MR. GOLD: Right.

THE COURT: -- at the height of not being equitable.

MR. GOLD: Your Honor, I have said very much the

same in my analysis of that question, although it's more meaningful coming from Your Honor than it is from a mere lawyer. The point I'm making is that if we -- so, if the parties -- what we have been proposing was that the parties stipulate that they would not seek to use the steps that we are suggesting that we would be willing to negotiate with them as the basis for an equitable mootness argument.

And while that is not nearly as bullet proof in the context of payments going to parties as it is in the context of establishing trusts or other such matters, we are certainly willing to seriously consider taking the risk that some other party might raise those things, notwithstanding the party's stipulation. But we think that having the parties stipulate to that would go a long way to allow that to occur.

That's far from the situation where if we say we're willing to allow certain things to go forward knowing that the other parties, like say with the sentencing where the Debtors have said let there be no mistake. When sentencing occurs, we are going to insist that that has equitable mootness concerns. That's a very different analysis for us than something where the Debtors have stipulated that they are not going to raise equitable mootness.

So if the -- all I'm suggesting is that if these

parties -- if their principal concern is in getting aid to the victims, then they should be willing to work with us to waive equitable mootness arguments and allow the payments to go forward. If on the other hand --

THE COURT: No, that's fine. I understand your point. Okay?

MR. GOLD: Okay, Your Honor. The -- Mr. Goldman is going to be addressing the issues regarding the declarations that have been submitted, so I will not further extend this hearing by stating them myself. And the -- unless Your Honor has any questions, I don't think --

THE COURT: Well --

MR. GOLD: -- there's anything --

THE COURT: -- are one of you going to address the bond issue?

MR. GOLD: I can do that, Your Honor. The -- we submit that this case is governed by the plain language of the rule that says a bond or other security is not required when an appeal is taken by the United States, its officer, its agency, or by direction of any department of the federal government.

And we have here the -- that is our circumstance. We are dealing with appeals that have been simultaneously or substantially simultaneously filed by the U.S. Trustee, which fits the category of the United States, its officer

agency, and by the states. We are raising substantially similar issues, or I would say that the U.S. Trustee has issued a broad panoply of issues that include the issues that we are raising on our appeal, and that based on that, no bond can be required on this consolidated appeal.

Certainly if the -- if no bond is applied or a stay is granted for the U.S. Trustee, there should be no bond for -- because the same stay will be in effect, and it's the same stay that will be protecting the U.S. as well as the states.

We also -- I don't have much to add to our argument that there are other cases that recognize an analogy between sovereign states and the U.S., although the rule does not specifically mention them, and that therefore finds it inappropriate to impose bonds on the states by analogy. But that's -- though we finally -- we would simply submit that the cases that the stay opponents founded were -- had nothing to do with our circumstances, had to do with bonds being required of non-government actors, and provide no illumination on what the Court should be doing.

THE COURT: So what do you make of the committee notes to Rule 8007(c) and (d), the 2014 committee notes, which state that (c) and (d) retain the provisions of the former rule to condition the granting of relief on the posting of a bond by the Appellant except when that party is

a federal government entity?

MR. GOLD: Well, Your Honor, I will make two points here. I think that that -- first, I would say that that comment is not directed to the circumstance where there are simultaneous appeals by multiple parties, and that the -- I would secondly point out that there is substantial case law saying that what the Court should be looking at is the language of the rule itself rather than the committee notes that provide distinctions that were not included in the language of the rule itself, and that because the U.S. Trustee is entitled to an unbonded appeal here, it -- there's -- there should be no bond. There'll be no point in having an additional bond when it's the same appeal.

THE COURT: So the general rationale for exempting the United States from the bonding requirement is that most judgments, and this is consistent with 28 U.S.C. 24 something -- the U.S. Trustee cites it -- is that the United States is good for it because it's a judgment against the United States, and the United States is always good for it.

Your interpretation of this rule would mean that if there was a judgment against the United States and against third parties, the third parties would have the benefit of the United States being good for its portion of it, and that they would have -- they could just have a free ride on that, and the Plaintiff should take the risk?

MR. GOLD: Well, Your Honor, I'm not sure what the judgment would --

THE COURT: No, I'm just talking about --

MR. GOLD: -- would be --

THE COURT: -- your interpretation of the rule, which would include, I think, that scenario, which doesn't seem to me to be a -- an interpretation that Congress would want.

MR. GOLD: Well, Your Honor, when -- since we are dealing here with states, and I don't believe that there's any serious issue regarding collectability --

THE COURT: Actually, Judge Posner thought there was in Lightfoot v. Walker, 797 F.2d 505 and 506 through 07 (7th Cir. 1986). So, anyway. But I guess there is the issue as to what we've just been talking about is the balance of the harms, and that balance may become significantly greater as time goes on. Before then, the Debtors have attempted to quantify that in the DelConte declaration.

But I'm not sure -- well, it's really a question for the Debtors as to the delay by three months, what does that mean? But I think what it means is it's more on the back end than the front end where there's significant loss. But I don't think there's any doubt that the cost for a lengthy delay of, you know, several months to a year or two

really is dramatic here in terms of dollars and cents. So it would seem to me that, as time goes by, the need for a bond grows dramatically to offset the vindication or not of the Appellant's right on appeal.

MR. GOLD: Well, Your Honor, I guess that gets back to the point that we discussed before why it may make more sense to have Your Honor stay -- take us through the relative short term when the costs are relatively contained and lower and allow a later court that -- a higher court that can have a better sense of how long it will be taking on the appeal resolve that issue.

THE COURT: Okay.

MR. GOLD: Thank you, Your Honor. I have nothing further to add at this point. I may have rebuttal points after the Debtors or another party's presentation.

THE COURT: Okay.

MR. GOLDMAN: Your Honor, Irve Goldman, Pullman and Comley for the State of Connecticut. May I be up next?

THE COURT: Yes, that's fine.

MR. GOLDMAN: Thank you, Your Honor. I first wanted to just for Connecticut adopt the arguments that we made by Mr. Gold for Washington and affirm that, you know, the principal form of relief that we are seeking at this point is our fallback, or what was previously described as a fallback position.

We are looking for a stay until 14 days after Judge McMahon issues her ruling, which I would note may very well come after December 8th, which is what the Debtors described as the earliest point when the effective date can occur, which is seven days after the 75th day after the date of the confirmation order.

And it seems unlikely that it will come after that date because we have oral argument, as Your Honor knows, on November 30th, and Judge McMahon has advised us that she starts a two-defendant criminal trial on December 7th. So that would give her less than a week to get out what I would anticipate is a very complex decision. So we would project that it would likely come after that trial has concluded. But I just want to circle --

THE COURT: What's on trial? It's oral argument. Oh, the criminal trial.

MR. GOLDMAN: Yes, correct, Your Honor.

THE COURT: Well --

MR. GOLDMAN: That's what we were advised.

THE COURT: Okay.

MR. GOLDMAN: And if I could just circle back for a moment to this apprehension that we have of equitable mootness based on the Debtor's indication that they'll argue the criminal sentencing will, you know, be the fulcrum for that in a stipulation that was filed with the District Court

on October 20th that dealt with their commitment not to argue that anything pursuant to the advance order or in the preparatory stages leading up to the effective date, they would not argue with the basis for equitable mootness.

It carved out in paragraph 2 the following provision. The stipulation does not address the criminal sentencing of Perdue or the effect or consequences of such sentencing on these or other appeals. So currently, they have signaled the intention to argue that, and I think the stay of the confirmation order would be the most effective way to prevent that from happening.

The reason I say that is because the plea agreement itself provides that the parties, meaning Perdue and USDOJ will agree to request that the sentencing hearing take place no earlier than 75 days following the date of confirmation. This contemplates a joint request. And so that if there is a stay of the confirmation order, there would be no reason for any party of the Debtors or the United States to request a scheduling of the sentencing hearing for the very reason that the Debtors have argued that if they are sentenced and thereby become a convicted felon, that would put their continued operation at jeopardy.

So I think the most effective way to deal with that would be to stay the order. And I think Mr. Gold also touched on this as part of the calculus of determining

whether there was irreparable harm. We contend the Court should not only consider the risk of equitable mootness, but the consequences that would ensue to the states if their causes of action are eliminated, which is unquestionably their property, not property of the estate. And in an equitable mootness scenario, that property will have been taken away without appellate review of whether the taking was proper.

I know Your Honor has concluded that the states will likely do better or will do better financially under the plan than they would if they were permitted to go against the Sacklers and other third parties. But that does not account for the character of these release police power claims as a deterrent to future wrongdoers and simply assumes incorrectly that their value is purely financial.

Now, if I can turn to the balance of the harms, and specifically the declarations that have been submitted by the various parties. As Your Honor is aware, we've made some discreet, detailed objections to the admissibility of some portion of the declarations, and which of course must follow the Rules of Evidence. Everyone's trying to establish a record here, and so applying the Rules of Evidence is important in this context.

And under the Rules, the testimony offered by a declaration has to be based on personal knowledge, not

hearsay. The sufficiency of personal knowledge has to be established by what is in the declaration. It can't contain conclusory statements or arguments. It has to set forth specific facts. And to the extent a lay opinion is offered, it has to be based on the declarant's own person knowledge and must not be based on specialized knowledge. And all the declarations, to one degree or another, fails to satisfy one or more of those requirements.

Mr. DelConte's declaration, for example, talks about operational risk to the Debtors. He first says that the State could result in delay in bringing about public initiatives to market. He says "could". He doesn't say what initiatives are being planned to go to market during the period of any stay, no facts establishing what his personal knowledge of what the initiatives are. He's obviously not a member of Perdue's public initiative group.

Granted, he is a financial advisor for the company, but I think here he is being used as a type of all-purpose as an expert for all things Perdue. And I don't think that he can be used to just say in a conclusory fashion some unspecified initiatives will be delayed during a period of the stay we're requesting. In part four of the declaration --

THE COURT: Well, they would certainly be delayed if the Debtors weren't able to engage in any business, right

because of the criminal plea?

MR. GOLDMAN: Well, if they pled -- correct. If they were a convicted felon, according to the Debtors, that would restrict -- eventually, maybe not automatically as I'm told, but eventually it would lead to the termination of their licenses and the ability to do business unless the properties could be transferred to NewCo at that point.

But as I had indicated, Your Honor, if Your Honor stays the order for the period we're requesting, it is highly unlikely that that criminal sentencing will take place during the period of that stay. And again, those unspecified initiatives that he says aren't -- will be delayed --

THE COURT: That's not really an evidentiary objection. You're just objecting to the fact that it doesn't say very much, and I get that. I understand that, but that's not an evidentiary objection.

MR. GOLDMAN: Then I'll move on, Your Honor, to what I think is an evidentiary objection. It's part 4 of the declaration, which is a recitation of what Mr. DelConte believes could be the operational risks if the stay is granted. Based on how upset the employees, vendors, and customers would be if there was a delay occasioned by the stay, clearly that's based on what he was told the Debtors told their customers, vendors, and employees.

And certainly, Mr. DelConte is not competent to testify as to how other parties, namely the customers, vendors, and employees, would react to a stay of limited duration, particularly when they have certainly hung in there and not walked away during the two-plus years that this case is undergoing Chapter 11. There's certainly no basis for believing that now suddenly that the -- whether a confirmation order has been appealed, that they wouldn't tolerate a few additional months of delay.

In fact, if anything, there was greater uncertainty in terms of what would happen with the --

THE COURT: Mr. Goldman, can I interrupt you? Are you testifying now --

MR. GOLDMAN: Certainly.

THE COURT: -- or are you making argument based on your assessment of how people think?

MR. GOLDMAN: Well, that is argument, Your Honor.

THE COURT: And that's how I would treat this.

MR. GOLDMAN: And --

THE COURT: This is his prediction based on his knowledge of the Debtor's business of what would happen. Not what will happen, but his prediction.

MR. GOLDMAN: Well, again, I think that that -- he wasn't offered as an expert, and I think he is testifying based on what he was told. And --

THE COURT: Well, that's what you're saying too. I'm just saying it's a prediction.

MR. GOLDMAN: Well, Your Honor, I'm not offering my argument as testimony yet, but he is.

THE COURT: Well, only for this --

MR. GOLDMAN: So --

THE COURT: -- I will treat only for that purpose is what he reasonably believes based on his knowledge of the company.

MR. GOLDMAN: Let me move on to Mr. Gard. And in paragraph 3, again, this really goes over what Mr. DelConte testified to, and that it's his belief that a delay, though materially, would give us Perdue's residual value and talking about the uncertainty of the bankruptcy process. Again, he -- this is lay opinion. It's not supported by facts establishing it's within his personal knowledge.

And this is in the province of experts to say what Perdue's residual value might be given the uncertainty and delay of -- and stay of the limited duration that we're requesting. And in paragraphs 14 and 16, he offers the prediction that as a result of the delayed distributions during the stay, it's quite possible that additional Americans will die, and then suggest that a stay will allow Americans to needlessly die, who would not have died but for a stay.

Now, this is obvious argument as well and not fact. I mean, evidence of widespread death as a result of stay of limited duration has got to be based --

THE COURT: Well, again --

MR. GOLDMAN: -- on more than --

THE COURT: -- it depends on what the length of the stay is. I just -- look, on your first point, the only example that he gives for the effect of a stay is if the plea goes forward without the plan being implemented. And to me that is a meaningful effect. To the extent he's talking about other effects on keeping senior employees, I agree with you.

I don't think he's really -- unlike Mr. DelConte, he's not really in a position, you know, other than anyone else or different than anyone else to talk about that point. But on the plea point, I understand his point.

And then, look, the testimony is based upon I think an undisputed fact that roughly 200 opioid-related overdose deaths occur, and that those deaths have been increasing at remarkable percentage rates over the last couple of years. And I think he and -- he is perfectly positioned to discuss that point given his job, which he's required to assess how best to deal with that issue for his state.

And I take, again, his prediction that at some

point -- and he doesn't really say when that point is, but at some point, a stay can lead to additional deaths if it results in a meaningful delay of funds. I don't see how anyone could dispute that.

MR. GOLDMAN: Your Honor, I do -- the point I'm trying to make here is that Mr. Gar and the other declarations are trying to draw a causal connection here then because distributions will be delayed, that will result in grievous harm. And there just -- that really is in the province of experts.

What will happen, they haven't said the amount of funds that are going to be delayed. What would otherwise be disbursed and used by the various constituents --

THE COURT: The record is --

MR. GOLDMAN: -- during period of --

THE COURT: The record is crystal clear that every dollar counts because there is no surplus. If that weren't the case, then your client's lawsuits are meaningless. This is a really strange exercise, Mr. Goldman, I have to say.

MR. GOLDMAN: Well, I make --

THE COURT: And I guess --

MR. GOLDMAN: -- they're --

THE COURT: -- what you're saying is your clients really don't think this money counts?

MR. GOLDMAN: No, that is not --

THE COURT: Is that what you're --

MR. GOLDMAN: -- what I'm saying, Your Honor.

THE COURT: -- ultimately saying here in terms of saving lives and addressing the opioid crisis?

MR. GOLDMAN: No, it is not, and I would acknowledge that it certainly does count. The point I'm trying to make is that they are trying to translate that into grievous harm based on not knowing what the amount is going to be disbursed during this limited duration and for what purposes.

THE COURT: But he wasn't responding to just a limited duration. The motion sought a stay through the entire appeal process through the Supreme Court. So these declarations address through the end of 2023 and through the end of 2024. I agree with you. If you're looking for or if I'm considering a shorter injunction, then this information, although still meaningful because if anyone dies, that pretty important.

MR. GOLDMAN: Yes.

THE COURT: Plus all of the other societal harms that flow from not having the funding start. But if the funding isn't really going to start in any event until -- let's pick a date. And I'm not talking about the effective date now, I'm talking about when funding would actually start. Let's say that's January 1, then your point is a

point on argument, not an evidentiary point, which is that this declaration doesn't say that there's any harm specifically before January 1 because it doesn't establish that the funding would start then -- before then.

MR. GOLDMAN: Well, that is what my argument is directed to.

THE COURT: All right, but --

MR. GOLDMAN: -- Your Honor. I understand --

THE COURT: -- I don't think that's an evidentiary point. I think that's an argument. That's a point you can make in argument.

MR. GOLDMAN: Very well, Your Honor. I'll -- I will move on. And I would echo what Mr. Gold had said is that even beyond that date, we would welcome any sort of interim measures for disbursing funds for abatement and other purposes, similar to the ERF. An ERF2, if you will --

THE COURT: Well, the ERF didn't happen --

MR. GOLDMAN: -- and could even be --

THE COURT: -- so but I take your statement now seriously.

MR. GOLDMAN: Thank you, Your Honor.

THE COURT: Okay.

MR. GOLDMAN: I was just going to make the point it could be implemented pursuant to 363(b) and not pursuant to the plan to remove any idea that it would be -- cause

equitable moot.

THE COURT: Okay.

MR. GOLDMAN: Just moving onto the declarations that the UCC submitted, I think we -- from the two members who have experienced firsthand the devastating effects of the opioid epidemic, I think that, you know, it has to be acknowledged that of all the people who have a right to express an opinion on what will occur due to the opioid epidemic if a stay is issued, is these two people.

However, that does not make certain parts of their declarations admissible, which is really what we have the objection to. I think, you know, they have to be given all the solicitudes for the personal loss they've suffered and admiration for what they have turned that into in terms of positive giveback. And I hope the objections or challenges to certain portions of their declarations will be taken in that vein. They're simply technical in nature in terms of establishing what record is made on these proceedings.

THE COURT: Well, again, I mean, I think you're objecting to one of the declarants saying that various forms of treatment have stopped over the last year or the last several months for want of funding. And asking me to draw an inference that, under the plan, similar occurrences wouldn't -- would be prevented in the future, I think she -- again, I think that the witness can make a prediction of

that. You know, take it for what it's worth.

She's much closer in my mind to the facts that she outlines than just someone who isn't looking at it from the outside. But ultimately, I think it's the same point, which is it depends on when the funds start flowing and what can only make an educated prediction, which is certainly what the members of the UCC, including these two people, did and are doing. So that's how I treat those types of statements.

MR. GOLDMAN: I would just reiterate the point, Your Honor. There is going to be evidence that there is incalculable loss, which is the way it's phrased in one of the declarations. And I really think it should be the province of expert testimony. It is based on some specialized knowledge as to a prediction of what is going to occur and (indiscernible).

THE COURT: Well, but again, I -- look, I guess it depends on what you mean by the term "incalculable". You could certainly calculate the monetary costs of someone dying and their relatives having to take care of their children. But it is perfectly legitimate to say that actually isn't calculable. It may be calculable for purposes of posting a bond, but I don't think these two declarations are submitted for that purpose, for determining what the amount of a bond would be.

I think they're submitted for the point, which I

view as one that is adequately supported, that where you have this number of deaths due to opioid overdoses occurring on a daily basis, and you have insufficient funds as acknowledged by all of the lawsuits, including by the State of Washington and the State of Connecticut, that the more money you have, the fewer people will die. I mean, I don't see how you can dispute that.

And maybe it's one person. Maybe it's 100, but to me that's incalculable, and it's -- it pretty -- I think it does offset in terms of the balance of the harms, someone's right to pursue their appellate rights to the Supreme Court where the Supreme Court has denied certiorari on these various issues multiple times in the last decade. So again, that applies primarily, if not entirely -- and I'll hear the Debtors on this, of course, and the other parties, including the UCC's counsel, to the request for an injunction through the entire appellate process.

It may not apply in a meaningful way to an injunction through a ruling by the District Court where it's not clear to me that money would be flowing in any event during that period as opposed to personal injury claims being liquidated, as opposed to the 14 days when the abatement procedures after the effective date are supposed to be submitted, etc.

But I just -- I don't understand how in one breath

the State Attorneys General of Connecticut, Washington, and Maryland can say that their rights to decide for themselves how to pursue monetary claims against the released parties are of critical importance without focusing on the consequences of the delay caused by the -- that right.

MR. GOLDMAN: Well, Your Honor, it's one of the reasons why we did restrict and scale back the request that's before you now.

THE COURT: Okay. But I'm not going to --

MR. GOLDMAN: Which is a --

THE COURT: I'm not going to exclude anything in these two declarations other than, again, where obviously the declarant is making a prediction or stating her view as to the cause of something. It's not for the truth, but rather for her evaluation of that cause or prediction, which is what people who serve on unsecured Creditors' committee, including this one, that net 200 times and over 700 separate communications does.

MR. GOLDMAN: So except, Your Honor, that is all I have.

THE COURT: Okay. All right.

MR. EDMUNDS: Your Honor, if I --

THE COURT: Go --

MR. EDMUNDS: This is the --

THE COURT: Why don't you go ahead, Mr. Edmunds --

MR. EDMUNDS: Oh, I'm sorry. Go ahead.

THE COURT: -- and then I'll hear from Mr. Underwood?

MR. EDMUNDS: Okay. I just -- I -- thank you, Your Honor. I will just try to hit on some points that go to the second part of my argument that haven't been said so far to try to make it quicker. But I think that one issue that's been identified is the critical importance of the sentencing that it may have in creating a possibility of equitable mootness. And people have talked about already and argued that there is a chance there, including from some of the effects of the sentencing upon the Debtors, that may produce the grounds for equitable mootness may create irreparable harm.

But there's one other thing that people haven't talked about yet, and that -- and I am not an expert, but I have some experience with the difficulty of changing a sentence once it's imposed. There are constitutional, statutory, and federal criminal procedures, doctrines and issues that arise that may make it hard to undo a sentencing once it's in place. And I think that that may be one of the sources for the Debtor's clearly apparent position that, you know, that they will not agree that this -- to any stipulation against the equitable mootness of the effect of the sentencing of Perdue in the District of New Jersey.

I think that that's a huge issue that happens before the effective date that could be significant in its effects. And I don't pretend to know everything about it. I don't know the criminal doctrines.

THE COURT: Let's just move on. Okay. You raised the point, but there's no reason talking about it further if that's the extent of your knowledge. So we should move on.

MR. EDMUNDS: Well, I think -- I mean, I think, you know, the basics of it, the due process clause, the double jeopardy clause, Federal Rule 35, and certain provisions of the U.S. Code do place limits on it. I think that that's -- I mean, in part, it's hard to anticipate where that will go in advance, and everybody has that same difficulty. So I think that's an issue there, and I think others have talked about the immediate effect on Perdue and its business.

The -- our -- moving on, our motion raised other issues of irreparable harm that are not related to -- and we did not rely on the possibility of equitable mootness. We talked about in our original motion in September, the cost to the estate of going forward with a plan that may be altered or reversed on appeal. And part of that was related to the trust advances issues, but it's also related to the fact that if you look at the fee statements that are coming in, a whole lot of money is being spent on attorneys' fees

from the estate to reimburse the pursuit of the plan, things that may --

THE COURT: Mr. Edmunds, I've never seen that as a basis for irreparable harm to an Appellant. Ever. And --

MR. EDMUNDS: I think that the --

THE COURT: -- frankly, it goes to the assessment of merits. So I guess to me, that just doesn't make sense, that argument.

MR. EDMUNDS: I mean, I -- the point I would make, Your Honor, is that if potentially millions in fees are expended from the estate in pursuit of implementing the plan, that's money that the estate doesn't get back. It may not -- in fact, I'm -- I agree it would not equitably moot an appeal, but --

THE COURT: It's not anything of an equitable mootness.

MR. EDMUNDS: But it is still irreparable harm.

THE COURT: It's not a basis for irreparable harm. It's not -- cite me one case on that point.

MR. EDMUNDS: We really don't have a case, Your Honor. It's just --

THE COURT: Then please move on.

MR. EDMUNDS: -- logical that if the estate --

THE COURT: That is not a basis for irreparable harm. It just isn't.

MR. EDMUNDS: All right. I will move on. The other irreparable harm that exists, though, is I think the possibility of implementing the plan and changing relationships, and then you're having to roll it back if it's changed or if it's reversed.

THE COURT: Is that another word for mootness.

MR. EDMUNDS: No.

THE COURT: No?

MR. EDMUNDS: I don't think it is, Your Honor. I think that there are things that the Court has ruled, and Debtors have stipulated that don't constitute irreparable harm that are happening -- or that don't constitute a ground for equitable mootness that are happening right now that do constitute a potential irreparable harm. How significant they are --

THE COURT: Like what?

MR. EDMUNDS: -- is I think --

THE COURT: What are you talking about?

MR. EDMUNDS: They are, to the best of my understanding, going about forming structures, registering. I understand that there is regulatory activity that is involved on the sort of licensing side. They are -- and they're continuing their operations, moving forward with operations amid uncertainty. And there's been a lot of, I guess, question in the papers of whether there's evidence of

the effects of that uncertainty on the business.

But I would point out that these are the very things that they use to justify their first day motions. And the -- in docket number 3, the declaration of John Lowne changing things --

THE COURT: So can I interrupt --

MR. EDMUNDS: -- changing their cash management --

THE COURT: -- you? So is --

MR. EDMUNDS: -- systems.

THE COURT: Is the State of Maryland not amenable unlike the State of Washington and the State of Connecticut to permitting new code to be formed, for example? The types of stipulations that Mr. Gold and Mr. Goldman were referring to.

MR. EDMUNDS: I think I'd have to -- we are amenable to some form of agreement, but I think I would have to look at the precise contours of that and make an evaluation as to how serious it was. So not as I sit here today, I don't think I can agree to that without some sort of detail about what it is.

You know, it -- there are risks and there are harms inherent in anything that happens, and I think it requires sort of a precise evaluation as to whether we would agree to that. And I'm just not -- I don't even know exactly what the requirements or what the permissions would

be.

THE COURT: Well, the general concept would be that -- and I believe Mr. Gold laid this out -- that the appellees would not argue equitable mootness based upon a transfer of the Debtor's business as provided for under the plan to NewCo and making the initial distribution under the plan. Either under the plan or in the form of a 363 motion.

MR. EDMUNDS: Your Honor, I mean, I think that the -- things that significant, there may be ways you could -- nuances that you can remove from it, but I think that things that significant carry with them the possibility of irreparable harm. Both from the possibility of mootness and from the sheer fact that you might be unwinding, which independent of equitable mootness will cause some amount of loss. And it may not add up to the amount of loss that would --

THE COURT: Let me make sure I understand --

MR. EDMUNDS: -- could be substantial consummations.

THE COURT: -- this. You lost below, right? You lost. You're now seeking a stay pending appeal, and yet you're arguing that if you win, which is an "if", the cost of unwinding itself is irreparable harm? That's really what you're saying?

MR. EDMUNDS: I think that there are costs

associated with going forward now, both to the estate and to everyone else, that warrant consideration as part of the balance of hardships that --

THE COURT: So you're saying irreparable harm would --

MR. EDMUNDS: -- you know, that the Court has to undertake.

THE COURT: You're saying irreparable harm is literally proceeding with the order itself.

MR. EDMUNDS: I think -- again, I would have to look at the details of the --

THE COURT: Mr. Edmunds --

MR. EDMUNDS: -- specific exceptions.

THE COURT: -- look, do you have anything more to say on any --

MR. EDMUNDS: Yeah, that's usually --

THE COURT: Do you have anything more to say --

MR. EDMUNDS: I do.

THE COURT: -- on this point or any other point?

MR. EDMUNDS: I do, Your Honor. I mean --

THE COURT: All right.

MR. EDMUNDS: -- I will try to move on from it, but let -- but I would say -- I would note that the very hardships that I'm talking about are written throughout their first-day motions and in the declarations that they

submitted in support of that. They talk about changing structure and changing organization and changing management.

THE COURT: But that's before they won, and your state is appealing it. It's a big difference, so move on. Honestly.

MR. EDMUNDS: I think the hardships --

THE COURT: You know, this wasn't made in your objection.

MR. EDMUNDS: -- as a matter of fact, so --

THE COURT: This wasn't made in your motion or your reply, and if it was, it would've just been devastated. So move on. This is just silly.

MR. EDMUNDS: It was -- just to be clear, Your Honor, it was in our motion. And we did not rely on equitable mootness, but I will move on.

I would also just talk briefly about the issue of the irreparable harm that the appellees raised, the objectors raised. I think the Court is correct that we all see it as getting more money for the abatement, for the opioid crisis, and to address the opioid crisis is important. But there are other trades that are made in pursuit of this plan that I think make it hard for them to establish that the harm that they suggest will occur will actually occur from a short stay --

THE COURT: Okay. We covered --

 MR. EDMUNDS: -- to the appellate process.

THE COURT: We covered this, Mr. Edmunds. I -- we -- we've covered this point. And in fact, I generally agreed with the other -- with your colleagues on this. So I don't think we need to go over this again.

MR. EDMUNDS: Well, I'd just say that there is the deterrence effect and there are the other, I think, benefits from doing more, that the State of Maryland at least sees from proceeding to do more to enforce its laws. And I think that those have sort of a canceling effect on, you know, any hardship that -- concrete hardship that could be raised by the other parties.

So with that, I will -- I think those are the critical points, and I'll rely on others for their previous arguments.

THE COURT: Okay. Thank you.

MR. BASS: Judge Drain, this is Mr. Bass, Ronald Bass. May I come in?

THE COURT: Well, I -- someone was actually in the queue before you. Let's do Mr. Underwood first.

MR. BASS: Oh, okay.

THE COURT: And then we'll -- I'll hear from you.

MR. BASS: Okay. Okay.

MR. UNDERWOOD: Thank you, Your Honor. Allen Underwood, on behalf of Canadian municipalities -- certain

Canadian municipalities and First Nation creditors.

Very briefly, I'd like to again adopt the positions of Connecticut and Washington as stated here and in their papers. I think what's very important and what we've emphasized throughout this case is that the Canadian municipalities and First Nations are a little different than the states with regard to certain legal issues. And that has an impact on, A, what Judge McMahon is deciding but it also has an impact on the irreparable harm issue that we're -- I think we're discussing. There's no question that the Canadian municipalities have read direct claims against non-debtor, shareholder released parties.

THE COURT: I think there's a substantial question, and that's what I found in my ruling.

MR. UNDERWOOD: I believe under Canadian law, they have claims under the Competition Act, that -- it's a fairly broad act that enables direct claims against -- and this is I guess a fundamental problem, Judge, is that we've got a corporate structure that has parallel ownership.

It's not -- it's not like a typical subsidiary relationship. One -- is controlling multiple -- corporations. In effect, the shareholder -- whether through non-debtor entities that are U.S. entities or direct action on boards -- are controlling those entities. And under Canadian law, there's a basis for direct claim against those

parties.

Obviously the problem or the question or the interpretation of the plan and whether or not the release as granted occupies the territory fully -- that's the structural problem -- the appeal is we believe meritorious. And ultimately -- irreparable harm which is that ultimately these Canadian creditors stand to lose the claims they may have against U.S. non-debtor entities or U.S. released shareholders -- confirmed plan.

It's a structural problem. It's a structural problem that the debtors and the Sacklers created when they created their corporate structure. That's all it is. I wish I could change it.

THE COURT: Well, all I will note is I don't think you addressed this legal argument on the nature of the Canadian creditors' claims anywhere in your motion.

MR. UNDERWOOD: I actually believe that there is a reference.

THE COURT: Where is it?

MR. UNDERWOOD: Within -- certainly within my reply. I actually quote a portion of the brief. I think -- let me pull up the page that referenced this issue. It's cited in the reply, Your Honor. And it's more than alluded to in the actual motion.

And to remind you, Your Honor, the motion was

actually filed in advance of the briefing before the district court. So I believe if we look at, yeah, Page 4, Paragraph 8.

THE COURT: Okay. I see it.

MR. UNDERWOOD: So there is a colorable basis for a claim by my clients against non-debtor, third-party released parties. And irreparable harm, as we cited in the reply and I think in the moving papers, is the loss of that financial claim or right.

So that's a principal question that I think in the first instance you're looking for which is what is the irreparable injury in the absence of a stay. And that is obviously the concern.

I think in terms of the resolution of the matter, I think Your Honor is very thoughtful on this question of a longer stay versus a shorter stay, a stay through finality versus a stay more or less governed by a Rule 8025. And certainly I think that the Canadian appellants take the position that a stay 14 days -- through 14 days after the rendering of the district court decision is more than adequate at this time.

But I do think it is a thoughtful question by Your Honor because honestly the circumstance where a trial court would be looking at whether or not to stay its own decision for longer than any determination that might be made by an

appellate court would be a circumstance where the trial court recognized that there's some aspect, be it constitutional or structural, in the plan that would be jeopardized were it not stayed, meaning that there's something about it that deserves finality. And I would leave that question to Your Honor's best judgment.

But I would also repeat that in terms of the stay, the lesser of the two alternatives that Your Honor described is certainly -- is certainly acceptable to the First Nations, without waiving whatever Your Honor might decide about a longer or a larger stay.

I think there's a fundamental interesting question with regard to the sentencing and the plea agreement, and it is a problem. And I think in terms of it, I've read the plea agreement many times. I see it as little more than a financial settlement, and that's what we do in this court. And ultimately I'm not aware of due process issues that would bar a stay through the date of sentencing with regard to the defendants.

I think it makes a huge amount of sense because whether or not the sentencing gives rise to equitable mootness is going to impact what may happen subsequent to the appellate process because obviously you've got your superpriority claim that may come into effect if for any reason the terms of the plan are modified such that -- you

know, such that the plea is -- the plan isn't funded. So that would be the concern.

So although certainly the Canadian First Nations agree that the lesser of the two stays that Your Honor had explained would be sufficient here, I would request that the Court be mindful of the fact that the sentencing will have a material impact on this case and, depending upon the results of the appellate process, it may completely impact whether or not the assets of the debtor can be liquidated and how, if it came to that -- I don't think anybody wants it to come to that, but if it did, the fact that the sentencing had gone forward might be a problem if it's not a basis for equitable mootness.

So ultimately, Your Honor, I mean, I think that's, you know, by in large the points that I wanted to make or things that perhaps I wanted to highlight from our concern. Ultimately I think the harm that we have here is an interesting circumstance of -- so effectively the IACs are non-debtor parties.

Those are the assets that in part, over time, will fund the trust in the United States. My clients are presently stayed from pursuing those assets. Whether or not that remains to be the case will be the subject I suppose -- and the determination before the CCAA court in Canada which is pending for December 1. And that's another example.

I'm not sure if it's irreparable harm. But it is an instance of another intervening deadline with regard to an international matter where it might be worth the consideration of the Court of the fact that a stay here would probably relieve that Canadian court of a difficult decision. And maybe I'm wrong. I don't know. But that would be my take on it.

So, but ultimately I think the debtor has ultimately the benefit of these IAC assets. These are assets that ultimately my clients would be seeking to recover from if they're permitted to do so by way of appeal or before the CCAA court.

And I'm making this argument with reference to the bond issue because, first of all, I'm not aware of the debtor having an affirmative claim against the CMFN. Frankly if they're sovereigns, there's a question of whether or not there would be an applicable need for a pond under that circumstance.

But ultimately what's interesting is that it's arguable that the debtors in fact have a lien on Canadian assets by virtue of the settlement such that I would say whether or not Your Honor finds a need for posting of a bond by any other appellate creditor here, ultimately because of the fact that these Canadian assets are dedicated under the existing plan and settlement and trust to the debtor, that I

think there's a strong argument that the debtor is protected and there should be no need for an appellate bond with regard to the Canadian creditors here. That's all I have to say --

THE COURT: I'm sorry. What Canadian assets are you referring to?

MR. UNDERWOOD: Purdue Canada. At a bare minimum, Purdue Canada because it's dedicated to -- you know, to sale and contribution to the debtor. I can't -- I can't speak, and don't want to speak directly to the extent to which Purdue Canada has been securitized pursuant to those settlement agreements. But it may have been.

THE COURT: But the bond would be to protect against the damage, if any, caused by the delay or any other factor that the stay would occasion. So it would be something beyond what the debtors already have.

MR. UNDERWOOD: Right. But that's presuming that there is -- I think the argument would be that -- and I do think there's some case law to this effect, that, in effect, the debtors already have a form of a lien. I agree --

THE COURT: But it's not a lien on your clients' assets. It's their own assets.

MR. UNDERWOOD: It's not --

THE COURT: They already have it. They already -- no, but they already have it. The bond would be to bond

against damage that your clients would cause.

MR. UNDERWOOD: Right. I would -- I would differ. But thank you, Your Honor. I appreciate your --

THE COURT: Well, I mean, that was the result in the Adelphia case. Okay. Just 361 B.R. 337, S.D.N.Y. (2007). Excuse me. Okay. Thank you, Mr. Underwood.

MR. UNDERWOOD: Thank you, Your Honor.

THE COURT: Okay. Mr. Bass, are you still there?

MR. BASS: Yes. I'm here. I'm here, Your Honor.

THE COURT: Okay. All right.

MR. BASS: Well, I also filed a motion for a stay. Go ahead. What were you saying? I apologize.

THE COURT: No. I can hear you fine.

MR. BASS: Oh, okay. I had filed a motion for a stay, and I have gotten an order from Judge McMahon to have my briefing on the 19th. So I asked her an extension of time. So I'm asking you wait until she hear my motion -- I mean my brief, then we can proceed. So that's what I'm waiting for, her order of an extension of time.

THE COURT: Okay. Well --

MR. BASS: Besides -- one more thing. And I'm trying to get that merged. The cases that I have in the bankruptcy court with the Mallinckrodt to merge it with this here so she can handle both of them -- both of them, both of the cases.

THE COURT: All right. Okay. Anything else?

MR. BASS: No. I'm just waiting for -- you know, grant me the -- that order to stay as well as adopt the position --

THE COURT: I'm sorry. I heard you through, "As well as you adopt," and then I couldn't hear the rest.

MR. BASS: No. I said adopt the position of Lauren (ph), the attorney, the female attorney who came on, I said I am adopting -- I am adopting her position.

THE COURT: Okay.

MR. BASS: -- against the shareholders and, you know --

THE COURT: Okay. All right. Well, on your first point, the briefing schedule set by Judge McMahon on your appeal of the confirmation order is not the subject of a -- it's not something that I can stay. It's not my order, and it's not really covered by the bankruptcy rules. That's something you'll have to take up with her --

MR. BASS: Right.

THE COURT: -- whether you get an extension or not. So that's not really an appropriate subject for a stay that I would be considering.

MR. BASS: Okay.

THE COURT: And the same goes for your desire to have the district court consider together your appeal of the

confirmation order and the other litigation that was the subject of your motion that I heard back in mid-October.

MR. BASS: Right.

THE COURT: And I denied that motion in an order entered on October 15th that's at Docket Number 3958.

MR. BASS: Right.

THE COURT: But again, if any of that litigation is to be consolidated with your appeal, that's really up to Judge McMahon. It's not -- it's not something that I could rule on.

MR. BASS: Oh, all right.

THE COURT: Okay. Okay. I think the only movant that I haven't heard from is Ms. Isaacs, who adopted the motion filed by the State of Washington, and of course we've heard the State of Washington and the State of Connecticut at length. So I don’t know if you have anything further, Ms. Isaacs, to say. No? All right.

It's quarter to 2:00. We've obviously been going for a long time. I'm going to take a break for lunch, and be back at 2:30, at which point I'll hear from the objectants and, if warranted, brief rebuttal. And then I'll give you my ruling.

(Recess)

THE COURT: Okay. Good afternoon. We're back on the record In re Purdue Pharma, LP, et al, and the motions

by various parties, various Appellants, for a stay pending appeal of my confirmation order in the so-called advance order or preparations order. And we're turning to the objectors at this point.

MR. KAMINETZKY: Good afternoon, Your Honor. Benjamin Kaminetzky, of Davis Polk, for the Debtors. I see Ms. Isaacs is on the line.

THE COURT: Okay.

MR. KAMINETZKY: Do you want to --

THE COURT: Well, I had asked whether Ms. -- before we broke, I had asked Ms. Isaacs whether she wanted to add anything to her motion, which adopted the motion by the State of Connecticut and the State of Washington and didn't get a response. So, Ms. Isaac, I don't know if you have anything more to add to what you filed? You're on moot.

MS. ISAACS: I'm sorry. Thank you for taking the time to hear me this afternoon. I understand you called me before lunch break.

THE COURT: Yes.

MS. ISAACS: There's been multiple emails going back and forth. I am having a great deal of difficulty with the Clerk's office in getting the Zoom links and getting onto Zoom. As for anything to be added at this time, I stand with the Trustees and all of the states that are in

disagreement with what's going on with the appeal. And that's all I have.

THE COURT: Okay. Thank you. All right. So I'll hear briefly from the objectants and, again, I read the objections and all the other pleadings. I would like to focus again primarily, I think at this point, on the shorter term stay, the alternative request by the movants for a stay through the ruling by the District Court of some or all of the confirmation order, or perhaps just the effective date.

I also note that I have a number of declarations, which we've already discussed during the discussion of Connecticut and Washington's motion. I don't know if you want to -- I mean, different people have put up these different witnesses, but I don't know if you want to deal with those first or you have a time when you want to introduce those declarations. I leave that up to the objectors also.

MR. KAMINETZKY: Thank you, Your Honor. Again, Mr. Kaminetzky, of Davis Polk, for the Debtors. So I guess I could move for the admission of Mr. DelConte's declaration, just to get that over with at this point. I could address --

THE COURT: Okay.

MR. KAMINETZKY: It sounds like the Court has already ruled on, I guess it was the motion to exclude that

testimony. I'm happy to respond to the points you've made --

THE COURT: No, I --

MR. KAMINETZKY: -- but it's sounds like we've done that already.

THE COURT: I did. I ruled on that. So is Mr. DelConte available?

MR. KAMINETZKY: Yes, Your Honor. He's here.

THE COURT: Okay. Can you put him on the screen?

MR. KAMINETZKY: Yes. I'm told any second now.

THE COURT: Okay.

MR. KAMINETZKY: You know, he was in his -- I'm sorry.

THE COURT: Okay. Can you hear me, Mr. DelConte?

MR. DELCONTE: I can. Can you hear me?

THE COURT: Yes, I can. Thank you. And see you as well.

MR. DELCONTE: Can you hear me?

THE COURT: Yes.

MR. DELCONTE: Okay.

THE COURT: And I can see you too. So, Mr. DelConte, you submitted a declaration intended to be your direct testimony in connection with the objection to the stay motions. It's dated October 22, 2021. Would you raise your right hand, please? Do you swear to tell the truth,

the whole truth, and nothing but the truth, so help you God?

MR. DELCONTE: I do.

THE COURT: Okay. And it's D-E-L-C-O-N-T-E, J-E-S-S-E?

MR. DELCONTE: That's correct.

THE COURT: Okay. So, Mr. DelConte, as I said, you submitted a declaration in connection with these matters on October 22, 2021. Sitting here today, November 9th, knowing that it would be your direct testimony, is there anything in it that you wish to change?

MR. DELCONTE: No, sir.

THE COURT: Okay. Does anyone want to cross-examine Mr. DelConte on his declaration? And again, I've limited that declaration to the extent that I ruled so in the colloquy with Mr. Goldman. Okay. Mr. DelConte, I had a question for you. Do you have your declaration there?

MR. DELCONTE: I do.

THE COURT: Okay. In your declaration, you discuss the timing of payments under the plan and describe them in Paragraphs 7 through 9 and 12 through 21, and also payments to fund the NewCo under the plan in Paragraph 22. And then in Paragraph 26, 27 and 28, you do that present value calculation based on your assessment of the delay in distributions that would result from a stay of three months through 6, 9, 12, 18 and 24 months. Do you see that there?

MR. DELCONTE: Yes, I do.

THE COURT: Okay. My question is, assume for the moment a stay through the date of a ruling by the District Court of the effective date of the plan, and then tack on 14 days to that. So assume that would be sometime, let's just say, in the third or fourth week of December. Obviously, I'm making a prediction on how the District Court might rule. The court might rule later than that; might rule earlier than that. When you say three months, what are you tracking off of as the effective date?

MR. DELCONTE: I'm tracking off of the end of the year, which a good proxy for when, you know, I think the earliest that we could potentially emerge would be. So a three-month delay in this case would be delaying emergence from December 31st to the end of March.

THE COURT: Okay. And --

MR. DELCONTE: 2022.

THE COURT: I got it. And the distributions that would be -- that you track as coming in on the effective date for that period, are any of those distributions to the end-users of the money, or are those distributions to the trust and to NewCo?

MR. DELCONTE: Yeah, those distributions that we're tracking, and these are the distributions to -- both the Federal government and the creditors are in public

trusts. Those are just the timing of those payments --

THE COURT: So there would be a distribution to the Federal government --

MR. DELCONTE: -- to those trusts, not -- we haven't taken into account any -- yeah, I mean, there's the $225 million payment to DOJ and there's a $25 million payment to other Federal entities, in addition to the trusts; $600-some-odd million would be distributed to the creditor of the public trusts. And we're tracking the payments to those trusts. We haven't done anything to take into account payments from those trusts ultimately to the end-users.

THE COURT: Okay. All right. Then is there some amount that would also go to fund NewCo, or is that just there already, in essence?

MR. DELCONTE: Yeah, I mean, that money is currently sitting at OldCo or PPLP, and at emergence, $200 million of that would go to NewCo. As far as the harms that we've looked at here, we've only been looking at harm as it relates to the distributions that would ultimately go to either the Federal government or the various trusts. We haven't taken into account anything that the (sound drops) distributed to NewCo.

THE COURT: Okay. All right. Those are my only questions. Thank you. I don't know if you have any

redirect on that, Mr. Kaminetzky? No?

MR. KAMINETZKY: I do not, Your Honor. Sorry.

THE COURT: Okay. Your testimony is complete, Mr. DelConte. You can go off screen now.

MR. DELCONTE: Okay. Thank you very much.

(Declaration of Jesse DelConte Admitted Into Evidence)

MR. KAMINETZKY: Okay, Your Honor. Shall I proceed?

THE COURT: Yes.

MR. KAMINETZKY: Okay. Again, Benjamin Kaminetzky, of Davis Polk, for the Debtors. So, Your Honor, I'm going to take your guidance, of course, and at first I'll focus on what we'll call the short-term period between, let's call it, now and the District Court's ruling.

And Your Honor, what we've done is we've provided and have been willing to provide complete protection to the movants against all risk of equitable mootness in the near term, which would allow for Judge McMahon to decide the pending appeals on the merits and would have eliminated the need for today's hearing, but we're already here. And all that we ask for is an escape hatch for the movants to renotice the motion in a proper forum if there's any risk that mootness were to arise in the future in a situation that we quite frankly don't expect to happen.

And this is exactly what Your Honor suggested we do, which was to try to "hit the sweet spot," based on a reasonable prediction of when the District Court might rule. So let's be crystal clear on where we are right now and what it is that the movants have refused to accept.

The Debtors and the other plan proponents have now made the following six unilateral concessions in writing, signed, which provides everything the movants can get out of this hearing. Now, Your Honor noted that the movants need to show harm, not just conjecture -- I wrote those words down -- but we have eliminated even conjecture. What do I mean by that?

Every single party that intends to present arguments or evidence to the District Court on appeal. That includes the Debtors, the UCC, the AHC, the MSGE, the NAS group. Both sides of the Sackler Family have stipulated in writing to you, to the District Court, that they will never argue before any court that the appeals of the confirmation orders have been rendered equitably moot by the actions taken in advance of the effective date in furtherance of the plan, pursuant to both the confirmation order and the advance order. Okay?

This agreement is set forth in stipulation and was filed on October 20th on the District Court's docket. The Debtors have agreed that the effective date will not occur

until the earlier of seven days following a decision by the District Court on the appeals and December 30th. In addition, Sir, the Debtors have the --

THE COURT: Can I --

MR. KAMINETZKY: Sorry.

THE COURT: Can I just stop you there? So, on the stipulation, the movants have said that you've carved out arguing equitable mootness with respect to the sentencing and its effects.

MR. KAMINETZKY: Yes. And that's -- we test in the next point, Your Honor.

THE COURT: Okay.

MR. KAMINETZKY: We have agreed that we will not request that the criminal sentencing take place before December 20th. Now, under the plan, as Your Honor knows, the sentencing hearing could otherwise occur as of December 1st. But let's just pause for a second on that, just so it's clear.

The plea and sentencing is pursuant to a separate agreement with the DOJ, not the plan and confirmation. There was some confusion about that, but that's not something that's addressed under the plan. That's something we agreed to to the DOJ. But lest you think we're hiding anything, we've also agreed that we'll file a notice on the docket -- and obviously, it will be on the New Jersey

court's docket -- when the criminal sentencing hearing is scheduled.

And lest you think we're hiding anything and not being transparent, the sentencing hearing has not been scheduled, and suffice it to say that scheduling a sentencing hearing in a U.S. District Court can take several weeks. And we haven't asked -- we haven't reached out yet to schedule that sentencing hearing.

So isn't something that could happen in the dead of night without any notice. This is a sentencing hearing in a very public case. There'll be plenty of notice. And we've agreed already in writing that the earliest it possibly could occur is December 20th. But again, that date -- we haven't even reached out to obtain a sentencing date. And when I say we, I mean we and/or the DOJ.

THE COURT: Well --

MR. KAMINETZKY: Okay. So that's number --

THE COURT: Okay. Why don't --

MR. KAMINETZKY: -- four. The --

THE COURT: Why don't you go through all the points, and I'll come back to questions I have.

MR. KAMINETZKY: Okay, good. Number four, the Debtors will provide no less than 14-days' notice of the actual effective date. And that was something Judge McMahon asked us to do, and we obviously have agreed to do it. I

already talked about that we'll file on the docket when the criminal sentencing has been scheduled.

And finally, the plan opponents agree that the movants may renew their stay motions or file a new motion as of the earlier of the District Court's decision on appeal and December 15th.

So these concessions provide the movants complete protection from the risk of equitable mootness until December 20th at the earliest and would either allow the District Court to decide the appeals on the merits, or if contrary to everyone's expectation, Judge McMahon's ruling is delayed, tee up the stay motions at a later point in time, before any risk of mootness becomes imminent.

We've built everything in so that the two things that could possibly render -- you know, arguably render anything equitably moot, we've built into the stipulation that we've provided, protection that they could come back to court and make any -- renew this motion.

So there's literally -- I mean, the only harm that they could articulate --

THE COURT: Well --

MR. KAMINETZKY: -- in the short-term stay or in the short-term period is the equitable mootness, and we have taken it off the table.

THE COURT: So could I explore that for a minute

or two?

MR. KAMINETZKY: Please.

THE COURT: I expect you heard me initially having some doubt as to how the sentencing, when it occurs, arguably give rise to equitable mootness. And I was told one thing, and perhaps two. First I was told that if the sentencing occurs, there will be tremendous pressure to go effective at that point, because the Debtors, as opposed to NewCo, which only exists under the plan if the plan goes effective, would not be able to continue on in their business. What is your response to that?

MR. KAMINETZKY: That might very well be the case.

THE COURT: Okay.

MR. KAMINETZKY: That the -- again, it's not necessarily two seconds later, but there's certainly a risk of that.

THE COURT: Well, how --

MR. KAMINETZKY: And that is why we're not --

THE COURT: How soon afterwards does that happen?

MR. KAMINETZKY: Well, I'm not sure. I don't think it's necessarily up to us.

THE COURT: Okay.

MR. KAMINETZKY: I'm not the expert in this area. But I'm not here to argue that the sentencing isn't a very big deal. I'm here saying that there's no risk that that

could happen under the stipulation that we've provided, or are willing to provide, or have provided to the other side without giving them an opportunity to come back and get a stay, if necessary.

Obviously, if we're in that position and Judge McMahon hasn't ruled yet, we'll take that into account and most likely extend that date. We're not --

THE COURT: Well --

MR. KAMINETZKY: -- here trying --

THE COURT: I'm sorry. What is the harm to the Debtors and the other Appellees of delaying the sentencing, or having the Debtors request a sentencing hearing date that would be, say, at the end of December? Is there some difference between December 20 and December 31, or...?

MR. KAMINETZKY: No, there's no -- if you want another 10 -- put it to December 31, we're happy to do this. The issue here, Your Honor, is we all are expecting -- and if you were at Judge McMahon's hearing, we heard it -- she put this -- what she called a "rocket docket." We all expect her to rule promptly.

The only risk we are protecting -- you know, why can't I just get up and say we'll give them -- you know, we'll stipulate until Judge McMahon's ruling. In all likely circumstances, that's what we're doing. We just feel as fiduciaries, you know, who knows what could happen. So we

want some outside date that if Judge McMahon, for whatever reason, doesn't rule by then, we could come back to you or, you know, we could see where we are.

We just can't right now say, you know, we'll wait until Judge McMahon's ruling. Although, you know, that's where we all expect to be. Judge McMahon, again, she's scheduled oral arguments November 30th. Right after doing that, she said, "And I have a criminal trial starting on December 7th." The implication of that, I thought, was that she's going to try to rule very promptly. And that's why we've set the dates the way they are, December 20th, December 30th.

But, you know, those are all -- and that's why we just want the back-up drop-dead date. But again, we all expect -- and the purpose of the stipulation is to give them comfort that nothing will happen until Judge McMahon rules, both the effective date and the sentencing.

THE COURT: So, can we --

MR. KAMINETZKY: And once we've -- Your Honor, this is -- I'm sorry.

THE COURT: The proposal is, as you've repeated just now, that the agreement is that the effective date would not occur until the earlier of the District Court's ruling or December 30, which places the onus on the movants to seek a ruling within the 14-day notice period that you've

agreed to, assuming that a ruling isn't forthcoming by December 30, right? That's really what you --

MR. KAMINETZKY: Right, that's --

THE COURT: That's what you're suggesting.

MR. KAMINETZKY: Yes, because -- and again, the burden is on -- let's just -- I'm not asking for a favor, Your Honor.

THE COURT: Right.

MR. KAMINETZKY: The burden is on them. Like, a stay isn't the natural state of being. A stay is extraordinary, and they have a burden. Their only burden, the only harm that they could talk about -- and again, we're limiting this to the interim period as equitable mootness. We have taken it off the table until, you know, Judge McMahon rules, for all intents and purposes. We think we're done, then.

And again, if there's an issue or, the only thing that we've added is a -- you know, let's say something happens and Judge McMahon doesn't rule, yes, the burden would be on them. But that's fair because we don't expect that to happen and they can't -- sitting here today, they can't meet their burden.

First of all, equitable mootness alone shouldn't count. But even assuming it does, and even -- and we heard Your Honor loud and clear, that Your Honor wants meaningful

appellate review. So do I. We've given them meaningful appellate review until Judge McMahon rules.

And at that point in time, Your Honor -- and I could go through the case law; Your Honor already did it -- basically, that's all you could give them at this hearing, because under the vast majority of rule, with the exception of a single case that the U.S. Trustee found, is that Your Honor's kind of jurisdiction, or Your Honor's ability to impose a stay, or Your Honor's stay dissolves after the District Court rules.

So we're giving them, with one exception, until Judge McMahon rules. With the safety valve that the Debtors need and as plan fiduciary needs, is if something goes sideways and for some reason Judge McMahon hasn't ruled, we could come back to you at that time.

THE COURT: Are there other actions...? Let's say I just stayed the effective date and not the plan itself -- I mean, the confirmation order itself; I stayed one of the conditions to the effective date, which would -- until the District Court ruled or December 30, whatever was earlier -- are there steps that would involve either -- let me just turn to the applicable section -- the transfer of material assets under the plan or distributions to creditors before then --

MR. KAMINETZKY: No, no, no.

THE COURT: -- i.e. substantial consummation?

MR. KAMINETZKY: No, no and no. What we're doing now, as we've always said, we're setting up trusts, paying professionals, seeking regulatory approvals. There's no transfer of assets until the effective date. We're setting up for that effective date when the transfers actually occur. That's why it was giving ice in winter to say that -- you know, for us to make clear and stipulate again and again and again that we won't make any equitable mootness argument with respect to any actions pursuant to advance this order pertaining to the confirmation order, you know, with a sentencing that we talked about otherwise.

THE COURT: And --

MR. KAMINETZKY: So the answer is --

THE COURT: And that's all part of you and the Other Appellees' stipulation, that those sorts of things --

MR. KAMINETZKY: Stipulated to it --

THE COURT: Would not --

MR. KAMINETZKY: -- filed it on the docket.

THE COURT: You would not argue equitable mootness based on those sorts of things?

MR. KAMINETZKY: Absolutely. That's black and white. We've said it. It's filed upon the docket in the District Court, and we sent a signed version of it to the other side as well and to Your Honor.

Again, Your Honor, it may be a -- for us, it's an important point. If we remove the equitable mootness risk, which is the only risk or the only harm that they've identified, they are not entitled even to the short-term stay, period. And we've done that.

And we've taken into account anything that they've identified, including, obviously, the effective date and the sentencing, by giving them comfort that we won't seek sentencing before December 20th. If you want us to move that to December 31st, we're happy to do that as well.

But again, we don't control the sentencing. The District Court does. All we can say is we won't seek to schedule it until then. But again, all that we're looking for is some sort of safety valve that we think won't be necessary, because we think Judge McMahon is -- she's indicated that she realizes how exigent this is.

THE COURT: So I just want to make sure. Originally, I think you said that you would request that the current sentencing will not take place before December 8, but then you said December 20.

MR. KAMINETZKY: No, it's December -- we've agreed not to... I'm sorry. We've agreed not to seek to have the sentencing hearing occur before December 20th. That's in the current stipulation that we had sent over.

THE COURT: Okay. And --

MR. KAMINETZKY: December 8th was the earliest. Just the dates are a little -- December 1st was the --

THE COURT: That was the earliest that it could happen.

MR. KAMINETZKY: It could happen. Exactly. As opposed to -- but this in a further agreement. But we're happy to -- there's nothing written in stone about December (indiscernible). But all we're trying to do is give Judge McMahon time that she needs to rule without any risk of equitable mootness between now and then. And once we've done that, they have what they need, all the harm that they've identified has been dealt with, and we should be done. It's really as simple as that.

THE COURT: Okay. Well, why don't I hear from counsel for the U.S. Trustee on this point.

MR. KAMINETZKY: Okay. All right. I'll be back.

MS. LEVINE: Your Honor, my video takes just a second.

THE COURT: No, that's fine, Ms. Levine.

MS. LEVINE: I'll go ahead and start. I don't know what's going on with my video. It'll come up soon.

But, Your Honor, I think what I've heard is that there is an agreement that there should not be equitable mootness, at least before the District Court rules. And where there is a difference of opinion is what would cause

that to happen. And you know, with respect to the stipulation that they've sent, it's really unclear to us. You know, that was an offer that they had sent, which we did not agree to for various reasons, including that it purported to limit our ability to seek stay relief.

And we're, again -- you the concern here is sentencing, which as you've heard, they do intend to argue sentencing will constitute equitable mootness, and we don't know what -- they've offered to have that, I guess, as early -- no earlier than December 20th. That's part of the stipulation, but it's attached to conditions that would limit when we could seek further state relief. That would prevent us from going back to court until December 15th, just five days before then.

THE COURT: Well, let's say it's December 30th instead, so you have a full 14 days.

MS. LEVINE: Your Honor, we were willing to discuss a stipulation in the context of trying to get to a consensual resolution --

THE COURT: No, no. I'm just --

MS. LEVINE: -- and we weren't --

THE COURT: -- focusing on the merits. I'm trying to figure out what's the harm in that, in what has just been proposed with the change that the sentencing also would occur no earlier than December 30. So you pretty much know

that the 14 days to renew the stay motion would be in mid-December, if there hasn't been a ruling by them. And you'd tea that up before the 30th.

MS. LEVINE: Your Honor, our concern is twofold. You know, one is making sure that we get a ruling before that day comes, with plenty of time to seek a further stay. You know, I know you disagree about this, but we do have concerns about the other activities that are going on. And the only way to ensure that someone doesn't come in and say those other activities don't cause equitable mootness is a stay. And the only sure way to ensure that they're not going to request a sentencing date that then ends up falling before a ruling by the District Court is a stay of the confirmation order. That's the only sure way we know of.

THE COURT: I don’t understand -- I guess --

MS. LEVINE: And the --

THE COURT: You're saying because there's an outside date for the effective date, which would be December 30 in the proposal, right?

MS. LEVINE: Well, it's the sentencing, Your Honor, that they say that they're going to --

THE COURT: Well, both dates. But December 30 could be a date before the District Court rules.

MS. LEVINE: It could be, yes. And that would undermine sort of the whole project, which is to make sure

we're getting a ruling before there is --

THE COURT: But the U.S. Trustee was making emergency motions for a stay while I was still on the bench ruling on the plan. The U.S. Trustee is perfectly capable of making this motion. In fact, it's already done so, and we've already had a hearing on it. So it wouldn't seem to me that hard when you have 14-days' notice to do it.

MS. LEVINE: We certainly could go back to the Court if we have to go back to the Court, Your Honor. We don't see the harm in entering the stay now, though, to prevent that additional motion practice, which will cost everyone resources, you know, particularly if the stay is less than what we are asking for, but is just through the date of the District Court decision.

THE COURT: That's all you're going to get.

MS. LEVINE: You know, that --

THE COURT: You're not going to get any more than that, Ms. Levine. So I don't think you should worry about giving up anything on this point.

MS. LEVINE: I got that impression, Your Honor.

THE COURT: Okay.

MS. LEVINE: So, you know, what we're talking about balancing is, you know, that short amount of time, that short amount of delay, to ensure that the District Court is able to rule on the merits, which I think --

THE COURT: All right. So let me just ask Mr. --

MS. LEVINE: -- everybody agrees on this is something that should happen.

THE COURT: -- Mr. Kaminetzky. Your concern is really just if something happens that is unexpected, that delays Judge McMahon from ruling, right? I mean, that's really why you've put this earlier of District Court ruling or December 30, right?

MR. KAMINETZKY: Exactly. We did --

THE COURT: So --

MR. KAMINETZKY: -- I mean, again --

THE COURT: I mean, if that happens -- I mean, I don't what it would be. Maybe, you know... I don't know what happens. But I think what Ms. Levine is saying is why can't the Debtors come back to me and say it's a port for us to have the effective date go forward now?

MR. KAMINETZKY: The answer is, Your Honor, just that's not what the law is. The law --

THE COURT: Because it --

MR. KAMINETZKY: -- isn't that --

THE COURT: It would shift the burden. You're saying it would shift the burden.

MR. KAMINETZKY: It shifts the burden. Yeah, the burden is on them to show -- and I'm now quoting from the Calpine case, how it has to be neither remote nor

speculative, but actual and imminent. There is no harm.

THE COURT: Okay.

MR. KAMINETZKY: The only harm they've articulated is equitable mootness, and we've taken that off the table. They are not entitled to a stay. We've written it in blood seven or eight times that we've eliminated any risk to them. And if the unexpected happens, I'm fine with -- you know, December 15th they could file their new motion. We'll wait until December -- the earliest sentencing date is December 31st, which means that the effective date -- the earliest one has to be seven days later. They have all the time in the world if the risk becomes actual and imminent. But it isn't, because we've agreed to take that off the table.

THE COURT: So when -- I'm just trying to figure out how the 14-days' notice of the effective date would tie into a December 30 sentencing date and a December 30 end date to the voluntary stay. When would you give that notice?

I guess you'd get -- can I interrupt you? I guess what you would do -- correct me if I'm wrong -- is you would fairly soon, I suppose, reach out to the District Court in New Jersey and say, can you give us a sentencing hearing sometime between December 30 and the next available date thereafter. Right? So you know when that would be? And then you would -- then you would --

MR. KAMINETZKY: Yes, Your Honor. We can't --

THE COURT: And then you would say in your --

MR. KAMINETZKY: We can't go --

THE COURT: Then you would say in your notice, we're giving you more than 14-days' notice. We're giving you a notice that we plan to go effective whatever date is after that sentencing hearing that you have to go effective? Or would it be the date of the sentencing hearing?

MR. KAMINETZKY: Well, it's both, Your Honor. We would give them notice of the sentencing hearing when it's scheduled. And obviously, it hasn't been scheduled yet. So, you know -- and Your Honor knows how busy District Courts are. So we'd give them immediate notice of that. They'll then know for sure that we can't go effective until after that date. The earliest is seven days after that date under the plan. And then they have plenty of notice of both the sentencing hearing, which won't happen overnight, as well as the effective date that will happen there after.

THE COURT: So is the sentencing hearing date, though, the key date, because the puzzle really does arguably change -- that's the missing piece of the puzzle as far as mootness is concerned? So really, the notice of the effective date is less important than the noticing of the sentence date?

MR. KAMINETZKY: Correct. And I mean, perhaps,

yes, maybe perhaps, but the answer is they're going to have plenty of notice of the sentencing date. And there's a reason we're not playing games, Your Honor. We're not ready to be sentenced yet. We still have work to do that's --

THE COURT: Right. Well, so --

MR. KAMINETZKY: -- you know, to get ready for this --

THE COURT: So I could require that you provide not only 14-days' notice of the actual effective date, but also 14-days' notice of the sentencing date.

MR. KAMINETZKY: I have no problem with that. I mean, again, it's in the District Court's discretion. But like --

THE COURT: No, I mean -- but I --

MR. KAMINETZKY: -- no problem here.

THE COURT: I'm assuming the District Court will give you at least 14-days' notice, right?

MR. KAMINETZKY: I certainly expect that to be the case. I think it would be quite -- in a public case like this, for a company like Purdue to be sentenced, I assume the District Court will give plenty of notice to everyone, including the public. So there's nothing happening here in secret. This isn't the type of, you know, equitable mootness that you're scared that wires will be sent out in the middle of the night. This is the most public events

that you could imagine is the sentencing of Purdue Pharma in a United States District Court.

And again, Your Honor, we're happy to -- I can repeat this -- we're all thinking -- you know, we all think that Judge McMahon, when she indicated in reading between the lines that she's going to rule quickly, so setting December 30th and January 7th is really not a problem. We just feel we need the protection of some outside date, just in case who knows what.

THE COURT: Okay. All right.

MR. KAMINETZKY: And Your Honor, Ms. Levine came back to these, you know, mysterious other things that are happening. But we've already dealt with those mysterious other things that are happening. How many times does Your Honor have to rule that there's just simply no equitable mootness possibility there? And again, we've stipulated it, and every plan proponent has stipulated that we will never, ever, ever make the argument that that would be to equitable mootness, any of those activities.

THE COURT: Okay. All right. Does any other movant have anything to say on these points? Any other stay movant?

MR. GOLD: Your Honor, Matthew Gold. Can you hear me?

THE COURT: Yes.

MR. GOLD: Just a couple of brief observations, Your Honor. The first is it seems to me, given the construct of the Debtors' (indiscernible) that there would be no additional burden on the Debtor, and it would make perfect sense for them to provide us with substantially immediate notice a time when a request is made of the District Court for sentencing to occur, rather than saying send a date and -- I mean, if they're making a request to the District Court, they should be able to tell everyone that they have done so right then and there, or substantially (sound drops) thereafter, regardless of when that occurs.

The second thing is that I still find in the Debtors' proposal a subtle rewriting of Rule 8025, which Your Honor discussed earlier, which provides for a two-week stay following the ruling of the District Court, rather than --

THE COURT: That still applies. That still applies. This is just -- this just takes you up to the District Court ruling.

MR. GOLD: I understand. I just... It just seems, to us, cleanest when not creating confusion to say that whatever Your Honor grants would be coterminous with the stay that comes from under Rule 8025, rather than having to have anyone puzzle out what happens if one stay applies -

- ends earlier, and another stay does not.

THE COURT: Well, to me, the way to do that is to say it's... First of all, the Debtors are not proposing a stay here. They're proposing a stipulation that would obviate the need for a stay. And that at that point, you know, you have the District Court ruling. And then 8025 comes into play.

MR. GOLD: Okay. Well, the Debtors' stipulation did not contain anything that said that it was not -- it was possible we were concerned in reading it that it might be intended to be a derogation of whatever rights --

THE COURT: No.

MR. GOLD: -- under 8025 --

THE COURT: I understand, but I don't --

MR. GOLD: -- and not --

THE COURT: Well, no one even mentioned 8025, but I understand that point. But I think that that would be clear from my ruling here.

MR. GOLD: Okay. And Your Honor, I mean, the only other thing which I will suggest is it's hard for me to believe that anyone wants to be deliberately setting a deadline that runs to New Years Eve, or immediately, giving a few days after that, if parties are going to be having to run in for emergency applications would make a certain amount of sense, given that the Debtors have conceded that a

few days here or there is not going to make a meaningful difference in this context.

Other than that, I have nothing to add on this point, Your Honor.

THE COURT: Okay.

MR. GOLDMAN: Your Honor, may I just add one additional point? Irv Goldman, Pullman & Comley, for the State of Connecticut.

THE COURT: Sure.

MR. GOLDMAN: I think Your Honor hit directly on the head that the important date here, especially if the District Court has ruled by December 30, is the criminal sentencing date. Although they've agreed to postpone asking for that to be held to December 30 or December 31, if it does actually fall on that date, I think it does make it -- and this follows up on Mr. Gold's point -- somewhat of a difficulty in trying to get an emergency stay motion over the holiday season, running up to December 30th. So I think it does, for that reason, make (sound drops) sense to have that pushed out so we're not running into the holidays.

THE COURT: Well, I'm assuming you would make it -- you would file it and get a date a couple weeks before then. But I understand the hearing time. Understand that point, I don't think any court is particularly excited to have a hearing, although I think it would probably be

shorter than this one, on the New Year's Eve.

MR. GOLDMAN: Yes. That's all I had, Your Honor.

THE COURT: Okay. All right. Okay, so, look, I think obviously there is a lot more that the objectors want to get in the record for this hearing. But I do think that the Debtors' proposal, with some tweaking, really does make a lot of sense in the interim, particularly given Mr. DelConte's testimony that the money itself wouldn't be flowing even to the trusts until the beginning of 2022, and wouldn't thereafter, at least for a while, be going out -- at least for a couple of weeks -- be going out to third parties in the form of the abatement payments. And probably a little bit longer for the personal injury claimants, which is the offsetting harm that the objectors have highlighted, and rightfully so.

So, why don't I throw out -- and people can be thinking about this while I hear the rest of the argument -- that the Court's ruling would be to deny the stay request, on the conditions that the effective date not occur until the earlier of the issuance of the District Court's ruling and January 7th. That the Debtors will not seek a sentencing hearing to occur any earlier than January 7th, and that they will provide notice, not only of when that hearing is scheduled, but also their request for one to the Appellants. And that the movants may renew their stay

motion on at least 14-days' notice. And of course, that would also be accompanied by the stipulation that's been signed that the Appellees will not argue that any of the other actions that would be taken leading up to either the District Court ruling or January 7 would serve as a basis for equitable mootness.

So you all can mull that over, but I don't know if you want to go into additional argument, Mr. Kaminetzky, or does that conclude your argument? In which case, I'll hear from the other objectants. I think you're on mute still.

MR. KAMINETZKY: I am on mute. I have a double mute because I don't trust just one mute. But here's -- well, Your Honor, we have -- if Your Honor wants me to address the longer stay, if that's still on the table, then I have a lot to say about that in terms of irreparable harm and the other prongs. If not, then I'll save that for, hopefully, never. But it's really up to you.

We do have a -- you know, we have a lot to say on the three-hour argument that the other side had on irreparable harm and the balances of harms and public policy and bond and all of that. So, Your Honor, I don't want to do something that you're not -- you don't want us to do, but we're happy to make that record or not make that record.

THE COURT: Well, unfortunately, where I know where I'm coming out, at least some of the movants, not all

of them, really are, I think, still actively pursuing as an alternative the stay through the conclusion of the appellate process. So I think we should, albeit maybe so as to preserve the record, at least get in the witness declarations and hear brief argument on the irreparable harm and balance of the harms and public policy points for, or with respect to, movants' request for a stay beyond the dates that I have posited, which again would be the earlier to occur of the District Court's ruling and January 7th, although that wouldn't be a stay. That would be a denial of the motion on the conditions that these agreements be made by the Appellees.

MR. WAGNER: Your Honor, Jonathan Wagner, from Kramer Levin, on the issue of the declarants -- on behalf of the Ad Hoc Committee. Our declarant, Mr. Guard, has to leave by 4:00 --

THE COURT: Okay.

MR. WAGNER: -- to pick up his son.

THE COURT: Okay.

MR. WAGNER: So can we swear him in now and have him attest to his declaration?

THE COURT: Yes, that's fine.

MR. WAGNER: That's fine.

THE COURT: And I see him there on the screen. So, Mr. Guard, would you raise your right hand, please? Do

you swear or affirm to tell the truth, the whole truth, and nothing but the truth, so help you God?

MR. GUARD: I do.

THE COURT: Thank you. And it's John M. G-U-A-R-D?

MR. GUARD: Yes, sir.

THE COURT: Okay. So, Mr. Guard, you submitted a declaration intended to be your direct testimony on these motions for stay pending appeal. It's dated October 22, 2021. Knowing again that it would be your direct testimony, is there anything in it sitting here on November 9 that you want to change?

MR. GUARD: No, Your Honor.

THE COURT: Okay. Does anyone want to cross-examine Mr. Guard? Okay. I have reviewed Mr. Guard's declaration. I believe it's quite clear. I have, in part, limited it, as I ruled in my colloquy with Mr. Goldman, in light of Connecticut and Washington's objection to its admissibility. But otherwise, I'll admit it now. It's just direct testimony. So, you can sign off, Mr. Guard.

MR. GUARD: Thank you, Your Honor.

THE COURT: Okay.

(Declaration of John M. Guard Admitted Into Evidence)

THE COURT: I think other objectors also submitted

declarations that they may want to move the admission of now. Mr. Jorgensen and the Committee's two witnesses, Ms. Juaire and Ms. Trainor.

MR. HURLEY: Your Honor, if I may, it's Mitch Hurley, on behalf of the Official Committee of Unsecured Creditors.

THE COURT: Okay.

MR. HURLEY: Your Honor, my colleague, Arik Preis, is going to argue the objection to the stay motion on behalf of the UCC. I'm taking the virtual podium here only to offer into evidence the declarations of Ms. Juaire and Ms. Trainor.

Both witnesses are members of the UCC, who have dedicated countless uncompensated hours to these cases. Both agreed during the course of the cases to cease their ordinarily outspoken public advocacy relating to Purdue. Both have suffered unthinkable personal loss as a result of the opioid epidemic. And both have responded by devoting virtually all of their time helping others (indiscernible) community.

As such, the ICC submits these witnesses have unique knowledge and insights in matters of great relevance to the exercise the Court is undertaking on the stay motion, and that those insights should be a part of the record.

The states of Washington and Connecticut were

alone in objecting to admission of the declarations of Ms. Juaire and Ms. Trainor, and then only with respect to several discrete statements included in those declarations.

My understanding is that the Court already has overruled the objections of Washington and Connecticut, as explained in more detail by the Court earlier in these proceedings today. And I therefore will not address further those objections, unless Your Honor has questions for me. And both of the witnesses are present and available to affirm their declarations, if Your Honor wishes.

THE COURT: Just to be clear, I didn't completely overrule the two states' objections. I granted them to the extent that I found that each declarant was predicting or offering a rationale for the exact effect of the delay of payments under the plan and/or stating their belief as to why certain sources of abatement have shut down over the last several months.

I admit them for predictions by a reasonably informed person who has dedicated, as you said, substantially all of their time to these types of issues, and who have in each case involved them to a significant degree in understanding and interacting with others like them, who have devoted themselves as well to abatement of the opioid crisis.

So, why don't we start with Ms. Juaire? She can

go on the screen. Okay. Would you raise your right hand, please? Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth, so help you God?

MS. JUAIRE: I do.

THE COURT: And it's Cheryl, C-H-E-R-Y-L, Juaire, J-U-A-I-R-E?

MS. JUAIRE: Yes.

THE COURT: Okay. Ms. Juaire, you submitted a declaration in connections with these motions for a stay pending appeal that was intended to be your direct testimony. It's dated October 21, 2021. Sitting here today on November 9, is there anything in it that you would wish to change?

MS. JUAIRE: No.

THE COURT: Okay. Does anyone want to cross-examine Ms. Juaire? Okay.

I have read the declaration and I don't have any questions on it. It's quite clear to me, and I will admit it as Ms. Juaire's direct testimony subject to the limitation on admission that I previously articulated.

So thank you, Ms. Juaire, and you can sign off at this point.

MS. JUAIRE: Thank you.

THE COURT: Okay. And then can we bring Ms. Trainor on the screen? Good afternoon. Would you raise

your right hand, please? Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth, so help you God?

MS. TRAINOR: I do.

THE COURT: Okay. And it's K-A-R-A T-R-A-I-N-O-R?

MS. TRAINOR: Yes.

THE COURT: And Ms. Trainor, you submitted a declaration in connection with this set of motions for a stay pending appeal. It's dated October 21, 2021, and it's intended to be your direct testimony.

Sitting here today on November 9, is there anything in it that you wish to change?

MS. TRAINOR: No.

THE COURT: Okay. Does anyone want to cross-examine Ms. Trainor on her declaration? Okay.

And again, I've reviewed it and I found it to be quite clear and subject to the limitation on admissibility that I previously noted, I will admit it as Ms. Trainor's direct testimony. I don't have any questions of her, so thank you and you can sign off, ma'am.

MS. TRAINOR: Thank you.

THE COURT: Okay.

MAN 1: Thank you, Your Honor.

THE COURT: Okay. I think there were two other declarations, one by Mr. Jorgensen and then one that came

out very recently, which may or may not be necessary given my ruling on the objections to admissibility by the State of Connecticut and the State of Washington, but I think that's Mr. Jorgensen. And a declaration by another official from Arkansas, which I'm looking for and can't find at the moment -- here it is, I have it -- Mr. Lane.

MR. LIESEMER: Yes, Your Honor. This is Jeffrey Liesemer on behalf of the multi-state governmental entities group. We had filed the declaration of Mr. Jorgensen, and if we could proceed, I can see if we can bring him up.

THE COURT: Yes. If you could pull him on the screen, that'd be fine.

MR. LIESEMER: And while we are waiting for Mr. Jorgensen to appear, I just did want to remind Your Honor that Washington and Connecticut had raised certain evidentiary objections to the declaration of Mr. Jorgensen, similar to the other declarants.

And we filed the declaration of Mr. Kirk Lane yesterday to respond to the narrow point that was raised by the two states, and Mr. Lane's declaration is at Docket 4075.

THE COURT: Okay, right. I have it here now. Okay. I see Mr. Jorgensen now. Would you raise your right hand, please? Do you swear or affirm to tell the truth, the whole truth, and nothing but the truth, so help you God?

MR. JORGENSEN: I do.

THE COURT: And it's Colin, C-O-L-I-N, Jorgensen, J-O-R-G-E-N-S-E-N?

MR. JORGENSEN: Yes, Your Honor.

THE COURT: Okay. So, Mr. Jorgensen, you submitted in connection with the motions for stay pending appeal. It's dated October 20, 2021. It's intended to be your direct testimony in support of the multi-state governmental entities group in opposition to those motions.

Knowing that and sitting here today on November 9th, is there anything in it that you would wish to change?

MR. JORGENSEN: One thing, Your Honor, an update.

THE COURT: Okay.

MR. JORGENSEN: In Paragraph 12 on Page 5-6 of my affidavit, I cite the number 515 drug overdose deaths in Arkansas for 2020.

THE COURT: Right.

MR. JORGENSEN: And since I wrote and signed the declaration, I've learned that the updated final number is 547 overdose deaths in Arkansas in 2020.

THE COURT: Okay.

MR. JORGENSEN: I can source that for you if you want.

THE COURT: I think you should do that for you, yes.

MR. JORGENSEN: Okay. So I found that number on the Arkansas Drug Director's website, which is artakeback.org. There's a news button you can push. And when you go into that, it's the most recent post on the website is from October 28th, just less than two weeks ago, and that article, the last sentence in that articles cites the number 547 drug overdose deaths in Arkansas in 2020.

When I saw that, I knew that must mean they have arrived at a final number, and I reached out to Kirk Lane, who is the Arkansas Drug Director, and I asked him to source that for me. And he sent me several reports from the Arkansas Department of Health, which maintains these final numbers and death certificates and things.

And I reviewed the reports and saw that they consistently all cited the number 547 as the number for overdose deaths in Arkansas in 2020.

THE COURT: Okay.

MR. JORGENSEN: It doesn't change much in substance for my affidavit. It's just the more accurate number now with that update.

THE COURT: Okay, thank you. Does anyone want to cross-examine Mr. Jorgensen on his declaration? Okay.

Again, I've reviewed his declaration carefully. It, like other declarations that I've already admitted into evidence, cites the CDC estimates for drug overdose deaths

in 2020, and also as we've just heard, focuses on the State of Arkansas for that sad statistic.

I will admit Mr. Jorgensen's declaration, subject to admitting Mr. Lane's declaration, and the limitations generally as to any assumptions as to other parties' actions that would derive from third parties as being only Mr. Jorgensen's analysis or prediction.

But I will note that his task here, I believe, qualifies him to make such predictions and analyses, given his role on behalf of the AAC; that is the Association of Arkansas Counties.

So you can sign off Mr. Jorgensen.

MR. JORGENSEN: Thank you, Your Honor.

THE COURT: Okay. And then can we pull up Mr. Lane?

MR. LIESEMER: Your Honor, Mr. Lane's declaration goes to a very narrow point. Washington and Connecticut had asserted that the document that is attached to Mr. Jorgensen's declaration as Exhibit 1 did not fall under the public records exception to the rule against hearsay. We provide Mr. Lane's declaration to give assurance that it does meet the public records exception. And so, he's not speaking to any of the four prongs regarding the motion to stay, so it's a very narrow point.

If Your Honor does not need Mr. Lane's declaration

to admit all of Mr. Jorgensen's declaration, including the exhibit, then I think we can dispense with that. We do not, because of the narrow issue, we do not have Mr. Lane on standby.

THE COURT: Okay. All right, well, let me ask Mr. Goldman and Mr. Gold. Having seen Mr. Lane's declaration, would you still challenge the admission of the report that's attached as Exhibit 1 to his declaration, the Naloxone Saves Program report?

MR. GOLDMAN: Your Honor, Irv Goldman. No, no objection.

THE COURT: So I will admit Mr. Lane's declaration for that purpose.

Okay. I think those are all the witnesses, so I'm happy to go back now for brief oral argument by the objectants, although again, I've reviewed the pleadings.

MR. LIESEMER: Your Honor, I'll just be very brief and turn it over then to the other plan proponent objectors.

Let me just say two things: one is with respect to, you know, your tentative rulings or what have you. That's all fine, except for -- I'm just a civil litigator that plays in Bankruptcy Court from time to time.

I am told that Your Honor's suggestion or requirement that we provide notice of even a request for sentencing, that is something that perhaps we should not

agree to, given that this is an agreement between the U.S. Attorney's Office and the Debtors, and we're not sure how the U.S. Attorney's Office would feel about that; number one.

Number two. If we're talking about just a request for sentencing and not the sentencing date itself, we'll be getting in front of the U.S. District Court. I mean, if we're calling up the clerk of the court and asking for a sentencing date and that somehow triggers a requirement to tell the world that we've done so, that seems like kind of stepping on the toes of the New Jersey District Court.

And finally and most importantly, Your Honor, is I'm told that the sentencing schedule is going to be scheduled plenty in advance of any hearing, reporting likely, you know, 30-45 days. I can't guarantee because I don't have the judge's calendar. But this again isn't something that happens overnight; this is something that the public is going to be invited to.

So we believe that, you know, giving notice as soon as it's scheduled will give plenty of time for anyone to do whatever they feel they need to do to protect their rights.

THE COURT: Okay.

MR. LIESEMER: And then on the balance of harms, we'll rely on Mr. DelConte's declaration and the extensive

discussion of the cataclysmic harms that could occur to the Debtors should this thing delay the -- should confirmation be -- sorry -- emergence be delayed for any significant period of time.

But I will turn it over to the various creditors' group to make the principal argument with respect to the balance of harm, the public interest, as well as the bond issue.

THE COURT: Okay.

MR. PREIS: Good afternoon, Your Honor. This is Arik Preis from Akin Gump Strauss Hauer & Feld on behalf of the Official Committee. Can you hear me? Are there any issues?

THE COURT: I can hear you and see you fine.

MR. PREIS: Okay.

THE COURT: Although you seem to be inside a filing cabinet. I don't know, it looks -- I'm worried for you, but that's okay. Now I see you're in a conference room.

MR. PREIS: So I want to do this, if it's okay, I want to address my oral argument first and then, hopefully, that will inform my response to your proposal from a little while ago about how you would propose resolving the issue through a stipulation.

Can I proceed in that manner?

THE COURT: Sure.

MR. PREIS: Okay. And I'm going to, if I've hesitated, it's because I want to try to speak through some things, and so, it may take me a second to (sound glitch) over.

In general, obviously, the Official Committee vehemently opposed the movant's request. We actually spent quite a bit of time with them trying to avoid this hearing because we thought the offer we gave them gave them the functional (sound glitch) of what they were asking.

They insisted on having the hearing. And lest any of us forget, I won't belabor this, but during the course of this hearing, approximately 30 people have died due to opioid overdose. But notwithstanding our views regarding, you know, the impropriety of this hearing, we must do what we can to protect the interests of the 630,000 claimants who are waiting to receive their money, that roughly 96 percent of voting claimants who voted in support of the plan and then 10 ad hoc groups who all expressed support and objected to the stay motion.

So I'm going to pensively just address harm to the movants and then the public interest.

On harm to the movants, I'm not going to address equitable mootness; you addressed that already. The only real other argument that the movants made is that the three

state attorney generals argue that if a stay is not granted, their ability to enforce their police power will be irreparably harmed.

That's misguided for two reasons. First, it needs to be repeated that there's absolutely nothing, has been nothing, and will never be anything that stops anyone from criminally prosecuting any of the Debtors receiving the relief. Attorneys general and those that can bring the criminal prosecution has had this (sound glitch) for more than -- forever, and they've been investigating the Sacklers for more than three years, and they had the right to gain access to every piece of evidence the UCC and the NCSP uncovered in one of the most thorough investigations ever in the history of bankruptcy. If they thought they had a viable criminal case, they would have brought.

Instead, they've gone out of their way to confuse people, including their citizens, by blaming Your Honor for issuing an order that gives permanent immunity to the Sacklers, which they therefore cry -- used to cry irreparable harm.

General Tong ordered on September 20th that the Bankruptcy Court's ruling let the Sacklers off the hook by affording them permanent immunity from lawsuit that would hold them accountable for the damage they've caused.

General Ferguson in Washington ordered on

September 2nd, the confirmation order let the Sacklers off the hook by granting them permanent immunity from lawsuits in exchange for (sound glitch) profits they made from the opioid epidemic.

In fact, they well know that this is the creditors' plan. If the states and municipalities that drives the public (sound glitch), the NAS, the third-party payers, the ratepayers, the hospitals who all overwhelmingly voted in favor of the plan. They know this, but it's easier for them to blame Your Honor and this Court.

Second, it cannot be the case that these three AGs' ability to enforce (sound glitch) is irreparably harmed, while the ability of no other attorney general across the United States is similarly harmed. Indeed, we actually are forgetting that there are five other state attorneys generals who are vigorously appealing the confirmation order and the District of Columbia which have not joined in the request for a stay. They all looked at the facts and circumstances of the case and determined there's no irreparable harm to the citizens of their state if the plan is permitted to be effective without a stay.

Said another way, 94 percent of the AGs representing 95 percent of the population chose to follow the whim of 96 percent of the voters. So why is every single creditor, other than three AGs, not seeking an

extraordinary remedy of a stay? Obviously, the answer is the irreparable harm.

A lot has been written about this. Your Honor said you read the papers. I'm not going to belabor some of this, but I just want to note a few things.

You mentioned the CDC estimates. You mentioned how they've gone up in the past year. The simple answer is they're losing the fight in the opioid epidemic. But the daily deaths, approximately 204, are opioid (sound glitch).

There are currently more than 1.6 million Americans estimated to be suffering from OUD. By some estimates, the annual cost of dealing with the opioid epidemic is $78 billion. Each day that funds are held back, there are real-world and life-and-death consequences. Abatement programs go unfunded, overdose reversal medicine does not get distributed, community centers are not (sound glitch). I could go on and on and on.

The point is, as Your Honor said earlier, every day and every dollar makes a difference.

The three AGs and the U.S. Trustee are unswayed. They give three responses. First, they argue that they're working hard to get their appeals heard quickly, so a little delay is tolerable. Second, they argue that the cases have been delayed for two years by the UCC, among others, and therefore, a few more months isn't going to matter in the

big picture or a few days. They argue the new National Opioid Settlement that's bringing in lots of money, and therefore, not getting money from the Sacklers isn't as bad as it may seem.

These are dangerous arguments. Let's start with the first one. No delay is tolerable.

The attorney general from the State of Missouri recently stated that the number of opioid overdose deaths is like a plane going down every day, a month, a year. As Miss Juaire and Miss Trainor explained in their declarations, they see the devastation every day.

Indeed, our office has fielded more than 500 calls, letters, and emails from victims over the past two years and returned each one. We've listened to their stories, we've grieved with them, we've attempted to explain the injustice being done.

Indeed, yesterday, just as an example, I took a call from Robert Bernhoff, a resident of the State of Washington, who was in a 2009 ski accident, was prescribed Oxi and was on it for three years and it changed and ruined his life. Now why do I mention him? It turns out he was a fifth grade teacher in 2006 for Attorney General Ferguson's niece, and he asked that I note his unhappiness and the State of Washington's attempt to (sound glitch) distribution of funds.

If the U.S. Trustee and the attorney generals get their wish and we're stayed for even six months, and assuming that that's all it is, there will be 36,000 more deaths; that's 1 percent of the population of the State of Connecticut.

As Mr. Guard said in his declaration, it's unconscionable that the remote chance that some (sound glitch) creditor could recover some money from the Sacklers on some distant day or that some known creditors could receive additional money after years of litigation could justify the additional death of a single American; Paragraph 14 of his declaration.

The second argument that the movants make is that the case has already been delayed for two years by the UCC, among others, and therefore, incremental delay should be on us and shouldn't be a big deal. We don't believe those arguments even merit a response, but I just want to point out a few things.

First, the UCC has done virtually everything in its power since the day it was appointed to move (sound glitch) out for abatement and victim compensation. We all know what happened with the ERF. We saw the potential that this looks to be a long case, and we tried very hard to get money out to community organizations two years ago.

Everyone knows, now in hindsight, look at how

important that money could have been if the DOJ, among others, was one of the biggest opponents to the ERF.

Second, I won't go through everything that's happened over the course of the last two years. But to be clear, there was six months of mediation, of which three months was just public and public negotiations and three months of public and private negotiations, six months of mediation with the Sacklers, another three or four months to document the deal, and the elongated confirmation hearing.

All that has occurred with the movants sitting there and watching and being part of every little piece of it. I'm not criticizing them, but they couldn't say that the past two years, because the case has lasted two years, that in some way that another few days isn't going to make a difference.

The movants' third rationale, and admittedly only Generals Tong and Ferguson make this harmfully misleading argument, is that there's money from other sources coming in, and so the Purdue money -- not getting the Purdue money now is tolerable. Specifically, AGs Tong and Ferguson trumpet the National Opioid Settlement with three distributors and Johnson & Johnson, 26 billion over 15 years. Without a doubt, the UCC applauds these efforts, although ironically, the State of Washington hasn't agreed to it.

But what the AGs don't say in their papers, and indeed, they haven't said publicly in anything we can find, is that not one dollar of the 26 billion goes to private side claimants. That's not an accident.

But why am I raising that here? Washington and Connecticut makes such a big deal about the NOS in their papers, and they say that the money is coming in, but they don't say that 1.4 billion of the Purdue money goes to claimants who are getting zero from the National Opioid Settlement. It's something they don't want to admit.

Moreover, it's just innate to say that an (sound glitch) claimant because they're getting money from the NOS and tolerate some delay in getting the Purdue money. The cost of the opioid crisis is $78 billion a year.

As Your Honor said on August 23rd and during the confirmation hearing, it just seems really boneheaded to say this 4.25 billion won't pay off from all the opioid (sound glitch), you shouldn't take it.

With that, Your Honor, I'll turn to the public interest program.

The U.S. Trustee states that the co-op with the U.S. Trustee and the public interest are, "one in the same" because the government's interest is the public interest. The U.S. Trustee further states that when the government is the movant, the public interest and irreparable injury fact

(sound glitch), despite through a number of cases for that proposition.

Let me respond in four ways. First, not one case that the U.S. Trustee cite stands for the proposition that when the U.S. Trustee is the movant that the federal government's interest is the one being implicated for confirmation over (sound glitch).

Knowing this, in its appellate papers, the U.S. Trustee has started referring to itself as the government, as opposed to the Office of the United States Trustee. We're not disputing that the U.S. Trustee's website says that it's a component arm of the DOJ. But perhaps the U.S. Trustee has not cited any cases where the U.S. -- because the U.S. Trustee is never a creditor. And therefore, it's role as a so-called (indiscernible) doesn't merit its interest being equated with the public for the purpose of this analysis.

In other words, no one with the (sound glitch) to say that such an extraordinary remedy that should only be granted in the most narrow of circumstances. Perhaps courts should be wary of holding up the will of actual creditors for the desires of a non-creditor.

Second, under the facts and circumstances of this case in particular, it's inexplicable that the U.S. Trustee is taking the position that its interest are those of the

government. To be clear, there are other federal government interests in this case, and not one of them has brought a motion for a stay pending appeal.

Even the DOJ, who is unimaginably -- imaginably filed amicus briefs all but appealing the confirmation order and objecting to confirmation has not asked (sound glitch) pending appeal. The DOJ settled its civil claims for 225 million. They settled their criminal claims for 225 million. They settled their unsecured claims for 65 million. The various governmental agencies settled their issues with Purdue and other private side claimants and public side claimants by taking 4 percent of the amount that was going to go to PIs and taking and transferring it to themselves.

So the case where every governmental entity that is a creditor has already settled with Purdue and the Sacklers and the other plaintiffs is either getting money on the effective date or has already received such money. It's pretty difficult to believe that the U.S. Trustee, which is not a creditor, nor does it act in any interest other than what it perceives to be others' interest, to take the position its acting as the government.

Third, (sound glitch) for one moment that the U.S. Trustee could credibly argue that their interests are those of the government. In that instance, the question is, is

the government's interest really coterminous with the public interest in this case. Let's consider the following factors.

First, between 2008 and 2017, the Sackler's family took approximately 11 billion out (sound glitch). Of this amount, 4 billion went straight to the federal government in the form of taxes. That makes the federal government not only the biggest recipient of Sackler money in the last 13 years, but the transferee of an alleged fraudulent conveyance. Yet, the federal government has not once offered to make this money available for opioid abatement for victims of (sound glitch).

Second, the DOJ settled their civil differences with the Sackler family in 2020 in return for a cash payment of 225 million. They received the money. They refused to agree that the money would be earmarked for opioid abatement and compensation or in ERF.

Third, they settled their criminal claims against Purdue in 2020 in return for 225 million and an unsecured claim of 25 million. Unlike every single other opioid claimant in the case under the plan, the DOJ refused to agree that their money would be used for abatement or victim compensation.

Fourth, in 2007, in return they received -- they settled their differences with Purdue in return for 634

million, none of which was earmarked for abatement or victim compensation, and Purdue's agreement to comply with the CIA for five years. The terms of the CIA are publicly available. To be clear, Purdue was required to maintain a reporting to the federal government. During those five years, Purdue generated the most money they did and took out the most money out of Purdue during the 2008 to 2012 period.

Yet, after all public and private companies, they were done with mediation, the federal government, through its agency, entered to negotiate and demanded and took 25 million for personal injury claim and transferred that to federal agencies. The DOJ's settlement with Purdue contains a clause (sound glitch) under certain conditions, one of which will occur if the U.S. Trustee prevails in its appeal, the DOJ (sound glitch) a $2 billion priority claim ahead of all the other opioid claimants.

So again, not only if their appeal wins do the claimants not get anything, but the DOJ takes all of it. (sound glitch) negotiations of the ERF, the DOJ argued vigorously against the ERF. During the UCC's investigation of the Sacklers, the DOJ refused to insert itself on the claims (sound glitch) in any discovery dispute regarding the documents uncovered in the DOJ's investigation.

In other words, when given the chance to help the public by joining forces with the UCC and the (sound

glitch), the DOJ didn't do anything.

And perhaps most egregiously, the U.S. Trustee argues that the due process rights of PIs have been violated because of the imposition of the non-consenting third-party releases. Unbelievably, the U.S. Trustee went out and tried to recruit personal injury victims who will join their brief; apparently, their first foray into speaking to personal injury victims in this case.

Yet, nowhere in their papers did they explain the reality that if they are successful in their appeal, it's almost certain that every single one of the Debtors' 140,000 personal injury victims will receive close to zero, if not zero, in their own litigation.

Fourth, the Official Committee contends the public interest in this case overwhelmingly supports denying the stay for the reasons of the irreparable harm that I mentioned earlier, the overwhelming support of the voters, the overwhelming support of the ad hoc group.

Indeed, I think it's fair to say that there's never been a case where the public interest is so overwhelmingly opposed to the (sound drops).

Your Honor, with that, I'd like to address the proposal that you made about 15 minutes ago.

THE COURT: Okay.

MR. PREIS: If I understood your proposal earlier,

Your Honor said that it'll be -- a condition to the effective date is that it will be the earlier of January 7th and the District Court ruling; is that correct? Do I have that right?

THE COURT: Well, first, I have not -- this proposal does not contemplate the entry of a stay. What it contemplates is the denial of the stay motions without prejudice to the future right to bring them on the conditions of the denial and that it lays out the conditions.

And the first condition is, in fact, that the appellees would agree that the effective date would not occur until the District Court's ruling and January 7.

MR. PREIS: So if I understand that correctly and if the Debtors are not permitted to seek a sentencing hearing earlier than January 7th, which was I believe another condition, then it's possible if, as we all heard Judge McMahon say that she -- you know, she has a trial coming up on December 7th, and we kind of read between the lines that Her Honor may rule before that.

Then between, let's call it December 7th and January 7th -- now actually, it's really January 14th because we can't go into (sound glitch) until seven days after the criminal sentencing, you would be delaying (sound glitch), but because by those terms. Is that correct? I

want to understand if that's what you meant.

THE COURT: Well, yes, correct. And that's primarily to give the movants the opportunity to renew their motion.

MR. PREIS: Again, (sound glitch) that will be 37 days -- I'm sorry -- 30 days, 37 because (crosstalk).

THE COURT: Well, except that under Rule 8025, unless Judge McMahon shortened it, there would be 14 days added on to the December 7th date, so you'd be at December 21.

MR. PREIS: Right. Which is I think why in the original proposal, we get offered December 20th, which I understand was not December 21. The only reason I'm raising this is because part of our argument, the irreparable harm (sound glitch). And I know Mr. Kaminetzky said, you know, being December 20th to December 30th is okay. And then, you know, there was some discussion about the holidays, so let's move it to January 7.

In effect, we've now elongated almost more than half a month before -- if it turns out that Judge McMahon actually rules by December 7 and we're able to get a sentencing hearing by December 20th, we will move their effective date by 17 or 18 days at the very least. And again, from our perspective, every day matters.

THE COURT: Well, except -- let me address that

because, again, I fully accept that there is almost immeasurable harm in not getting the plan distributions to PI claimants and to the state and governmental entities for the purpose of abatement, and the other entities, the Indian tribes and the hospitals and the like.

But based on my understanding of the plan and Mr. DelConte's testimony, the money wouldn't actually go to them until sometime after the effective date and probably weeks after the effective date.

So I think that the real issue where the balancing of the harms comes into play or the real time comes into play is where the movants would seek a stay after the District Court's ruling, pending appeal to the Second Circuit.

MR. PREIS: I don't dispute your reading of Mr. DelConte's declaration. But isn't what all you've done is just move the same period back (sound glitch).

THE COURT: I did. I moved it a week from the end of the year to January 7th, and that's basically because -- or arguably two weeks from December 21 to January 7, and that's basically because I have some concerns about imposing a hearing date on Judge McMahon around New Year's Eve or around the Christmas holiday, so that's the only reason.

And it didn't seem to me, given the testimony, that the delivery of the distributions beyond the trusts

would happen any slower because of that.

MR. PREIS: I'm sorry, that wasn't my point. I'm sorry.

What I was trying to say is if all you've done is move the initial distribution date back from December 21 to January 14th or whatever it is, then that same period, between the time the money first goes to the trust and the money goes out, that same increment just gets added whenever the money first goes out (sound glitch).

So that delay, that lag from the time the money goes to the trust to the time it actually goes out, that occurs no matter when the money (sound glitch) mid-January, then you have a delay of (sound drops).

So the fact that there's -- you understand what I'm saying or am I not making myself clear?

THE COURT: No, I do. I understand. For example, the 14 days for the states to deliver their final NOAT allocation would start running from the effective date, which would be those 14 days later. I do see that.

MR. PREIS: Yes, that was my point. And that's why when I said every day mattered, so it is actually by moving everything back 17 days, it has a real effect. So anyways, that was my first point.

My second point is --

THE COURT: Well, could I interrupt you for a

second? I guess for mootness purposes, it doesn't really help to change it to the distribution date, as opposed to the effective date because the effective date is also the date when you transfer it to the trusts and set up NewCo, the benefit company.

So I'm thinking out loud, but I think you may have offered a solution of just making it the distribution date, but I don't think that works for mootness purposes.

MR. PREIS: Yeah.

THE COURT: Okay.

MR. PREIS: The second point, and I know Mr. Kaminetzky raised this, this idea of having to give public notice of when the Debtors even request the notice.

THE COURT: No, I understand. I understand that point. I don't think that really helps very much in any event. I mean, the key thing is when the District Court schedules it.

MR. PREIS: Correct, yes.

THE COURT: Right.

MR. PREIS: Okay, that was it. Okay, that was it, Your Honor. That's all I had. Thank you.

THE COURT: Okay.

MR. FOGELMAN: Your Honor, may I briefly respond to Mr. Preis's, frankly, outrageous accusations against the government?

THE COURT: I think you have a right to do that, Mr. Fogelman.

MR. FOGELMAN: Your Honor, I just want to say about everything Mr. Preis said was a mischaracterization or just absolutely blatantly untrue. That time, Your Honor, is all entirely irrelevant as to whether a stay should be granted.

And, you know, I'm happy to go into everything one by one if Your Honor would like. Again, I don't think any of this is even relevant, but just to give one brief example. The government, you know, submitted a letter to the Court at Mr. Preis's urging, when the government first was in settlement negotiations with the Sacklers and Mr. Preis raised the issue about providing those funds toward abatement.

And we clearly explained to the Court on the record that the government is constrained in how it can respond by the Miscellaneous Receipts Act. And that, in any event, while we couldn't direct those monies towards an abatement fund, you know, the largest recipients of civil recoveries are federal health care agencies that provide billions of dollars towards opioid use disorder treatment.

So for Mr. Arik to stand up there and make the statements he made is absolutely outrageous, Your Honor, and completely irrelevant.

I'm not going to -- sorry.

THE COURT: Anyway, I think it is largely irrelevant. The only way it is relevant or the remarks about the role of the federal government in the case and in history of prior settlement really goes to what the U.S. Trustee's public interest argument is.

And in that sense, I think the U.S. Trustee has been clear, in front of me at least, that it's not focusing on anything other than its party in interest right as a watchdog over the bankruptcy system, not on the other interests of the federal government.

And on that point, Mr. Preis is basically just saying that, you know, the watchdog is, in his view, barking at the wrong person. But I think we should just cut it off at this point.

MR. FOGELMAN: Thank you, Your Honor.

THE COURT: Okay. Should I hear from the ad hoc group of states and other plaintiffs?

MR. WAGNER: Yes, Your Honor. Jonathan Wagner from Kramer Levin Naftalis & Frankel, representing the ad hoc committee of governmental and other contingent litigation claimants. Can you hear me?

THE COURT: Yes.

MR. WAGNER: I'll make some introductory remarks and then address the issues of irreparable harm, balance of

hardship, and public policy. And I'll address a long-term stay and short-term stay, and I'll try not to repeat the arguments that have been made today.

It's important to remember that the committee represents dozens of governmental agencies and entities. And despite the handful of state objections and the U.S. Trustee's objection, far more government entities support the plan and oppose a stay than seek a stay; it's really far more.

And there's a super-majority of states who support the plan and 97 percent of the non-federal domestic governmental entities who voted on the plan voted in favor and there's a good reason for that and Your Honor has recognized that in the confirmation decision. The sooner the money is allowed to be spent on abatement, the better the citizens of those states and those supporting states and local governments will be.

And despite suggestions to the contrary, the dissenting states, their citizens will benefit as well. They'll get their fair share of the monetary recovery, and they'll get non-monetary benefits as well.

So let me now turn to irreparable harm, balance of hardships, and public interest. In terms of a long-term stay, that issue has been addressed in Mr. Guard's declaration, which Your Honor I know has read and read

carefully, and it's been addressed in the other declarations as well.

And just to sum up at Paragraph 16 of his declaration, "The abatement plan is designed to save lives, and any delay in funding the abatement plan will thwart that critical goal." And between now and June, there's close a billion dollars that's supposed to be allocated with respect to abatement. That's a serious amount of money.

In terms of a short-term stay, I make three points. Most of the points on the short-term stay have been made already, including with respect to equitable mootness -- that's clearly off the table -- the mechanics of the sentencing, and also the suggestion that somehow the Court can cherry pick the settlement here and have it rejigger. This was a settlement that was really a herculean task to achieve, and it was carefully constructed and can't easily be pulled apart.

The three points I want to make on the short-term stay are as follows. First, burden matters, and here the burden is squarely on the movants, and they have not satisfied their burden.

Second, a stay, even a short-term stay, creates a cloud and to give one -- and an unnecessary cloud. And just to give one example, the committee has been interviewing potential board members for the MDT, the NOAT, and for

NewCo. And I think it's not a stretch to say that the more there's a delay in the effective date of the plan, the more the candidates -- some of them are very prominent people -- may be reluctant to sign on.

And then the final point I want to make with respect to the short-term stay is that the Court has to exercise its equitable powers sparingly. That's, in many cases, just give you a couple, United States against Veres, 1989 U.S. District Lexis 7069 at *17, "A court should exercise its equitable powers sparingly." And the same point is made in many bankruptcy cases, In re Rix 2015 B.R. Lexis 3988 at *6.

And in light of the safeguards that have been offered here, it would be an improper exercise of the Court's equitable powers to grant a stay.

The last point I want to make, and I hope this isn't a point that Your Honor has to address, is the bond. I don't think Your Honor needs to get into the issue of whether the U.S. Trustee needs to post a bond because the states do. And Your Honor made the point, citing the advisory committee language and other opponents of the stay have cited the cases, that made clear that the states can't piggyback on any rules that might apply to the U.S. Trustee.

That's all I have, Your Honor, unless you have any questions.

THE COURT: Okay. Well, I guess -- look, what I've been considering is not a stay, but an order denying the motion on conditions, so that would obviate the need to deal with a bond. And, you know, I don't think that your side of the issue would prefer a stay with a bond to that, right?

MR. WAGNER: Certainly not.

THE COURT: Okay, all right. Thank you.

MR. WAGNER: Thank you.

THE COURT: I'm also assuming, because I would also, if I were to grant a stay, condition it on the ongoing commitment as the appellants have already committed, to pursue all appellant relief on an expedited basis. But I'm assuming they will continue to do that based on their statements and their understand of the importance of resolving these issues promptly.

MR. LIESEMER: Your Honor, may I be heard very briefly?

THE COURT: Sure.

MR. LIESEMER: Jeffrey Liesemer on behalf of the MSGE Group.

Your Honor, when Judge McMahon ruled on the United States Trustee's emergency motion for a stay before she denied it without prejudice and she did so on the condition that the appellees, which included the MSGE Group, enter

into a stipulation saying that all of the preparatory actions under the advance order are not a basis for invoking equitable mootness. She ordered the Debtors to impose a 14-day advance notice requirement on any effective date, and she also said that the appeals would proceed on a rocket docket.

And on that basis with those guardrails in place, Judge McMahon said that the U.S. Trustee's speculation about the possibility of equitable mootness did not rise to the level of irreparable harm, and I would submit that it's the same today. There really hasn't been any material change. The movants haven't identified anything that changes the situation from the time that Judge McMahon has ruled.

And in addition to that, we have the Debtor, who has offered up even additional guardrails, and Your Honor is now contemplating guardrails as well insofar as denying the stay motions with conditions.

So no showing with respect to irreparable harm and specifically equitable mootness has been made, and I think the motions can be safety denied on that basis, subject to the guardrails, which Judge McMahon found to be sufficient as is.

With respect to a longer-term stay, we share Your Honor's concerns that that would clash with Rule 8025 and essentially read Rule 8025 out of the bankruptcy rules. And

so, therefore, if there were a stay in place if they did make their showing, then it would have to be limited up through the District Court's ruling.

And with respect to the other elements, with respect to balance of harms and the public interest and the bond in the event that there would be an unlimited stay to allow the appellate avenues to be exhausted, we simply stand on our papers and on Colin Jorgensen's declaration.

Your Honor understands the point as time progresses, the financial and human toll increases, and that puts a big weight against any stay. And with respect to public interest, there is public interest in settlements and the finality of reorganizations and, above all, finding one way to resolve this public health crisis.

So we join the other opponents in opposing any stay pending appeal. Thank you.

THE COURT: Thank you.

MR. SHORE: Your Honor, Chris Shore from White & Case on behalf of the ad hoc group of individual victims.

I want to -- and I've been feverishly kind of working on my notes to address what I think is the issue here, both respect the long-term stay, short-term stay, and the idea of a denial of motions with conditions.

Let me start here. Look, we tried to address the issue outside of Court with respect to essentially a denial

of the stay without conditions. The appellants refused, so now we have two pending motions with two separate requests: one is a pending motion for a stay through the District Court decision plus 14 days, and another is a request from the U.S. Trustee for a stay through all appeals.

I think you need to deny both of those on the merits with findings and conclusion. And you ask, why can't I just do this simply if we prevail at the District Court on the appeal, and we think we will -- we wouldn't be here fighting this and have fought for the plan if we didn't think we will -- there is going to be another hearing. Whether that is in the end of December or the beginning of January, someone's bringing a motion in front of Judge McMahon for the big stay, the one that nobody can control, which is the time between when the Second Circuit appeal gets docketed and when the Second Circuit rules.

So there is a fact of a hearing coming up. And as one of the very creditor constituencies who isn't either funded by taxpayers or by the estate, we simply can't have 10-hour hearings all the time on these subjects without getting work-product which can be used in subsequent hearings.

So my request is that we actually make use of the evidentiary record that's here, not just throw this to Judge McMahon to deal with with her busy docket and to have a

whole other hearing, evidentiary hearing, which she may not even have the time for given the announcement of what her schedule is.

So let me turn to the merits on why you should deny the stay and what the specific findings I'm talking about. Let me just address very briefly the likelihood of success because no one touched on this. I'll only say this: The order that was presented to you reflected what the Debtors conceded, not what anybody else did. We all became appellants after that hearing, or at least we became appellants after that hearing over the objection of the U.S. Trustee and we all joined the argument. So that's a technical argument that you can get rid of.

I want to focus on only one event: The day that the Debtors are ready to consummate their plan but can't because of some existing stay or the existence of some conditions and how we protect the individuals, just the individuals, from the harms accrue from that day forward. I think those harms accrue whether the stay is short or whether the stay is long, and I want to address an issue that Mr. Preis raised on that (sound glitch).

Let me start here. You know that at the beginning of the hearing that (sound glitch) rules are set up so that (sound glitch) did this. It's not, I don't think, because the Bankruptcy Court is likely to agree or disagree that its

own findings are subject to appeal or not, but rather because the Bankruptcy Court is in the best position, understanding who the parties are, what they're looking for, what they're promising, and what the harms are in the event there is or is not a stay.

So even if Judge McMahon were to rule before an available exit and contemplate a further stay, this Court's view of what (sound glitch) stay, that is a stay that would exist through a Second Circuit ruling or a cert denial may prove critical to her own analysis, which is likely have to be conducted on a short notice brief period if and when that (sound drops).

As to the harm calculus here, as we pointed out in our objection, it's not a one-size-fit-all analysis. Each applicant must make its own case based upon its own harmed balanced against the harms to the others and the public.

The U.S. Trustee is in a different position than the states. First, they allege no harms to themselves. They have no economic (sound glitch) in the outcome of this (sound drops). Two, the U.S. Trustee's claim, I think as part of the public interest prong, is that there's a societal harm of the erosion of constitutional rights of individuals who allegedly have direct claims against the Sacklers, which are being released for no compensation.

I'm not going to repeat arguments I made at the

last hearing regarding this no compensation argument. I'll just say that the intention is both counterfactual in light of the TEPs and inflammatory. But their whole analysis centers on the harm to these hypothetical individual Sackler claimants.

Now, as we pointed out in our objection, we represent probably the bulk of individuals who would otherwise have the right to bring claims against the Sacklers in light of the fact that 35,000 of our group didn't vote on the plan and several hundred voted no.

But I think the U.S. Trustee misses the mark when they attack our group for what seems to be a criticism that we do not speak for every victim. We have never purported to speak for every victim. We've only purported to speak for our group, and we have spoken, sometimes in a loud voice, on behalf of those who've authorized us.

In contrast, not one victim has authorized or come forward in support of the U.S. Trustee's motion for a stay. And the important part here is not the authorization piece; it's the lack of identification of the individuals who may be harmed and a quantification of that harm.

At the last hearing, Your Honor spoke directly to the U.S. Trustee about trauma and what you viewed as the narrow window that it provides for direct claims against non-debtor fiduciaries and shareholders. The time for them

to come forward with proof of harm was now. What followed was not proof, but an attempt to cite to complaints that allege claims squarely within (indiscernible) and Madoff.

There was a reference today to the Hartman pleading, which they did not include. I don't know how they expect Your Honor to make the analysis that everyone of these circuit court says is you need to look at the substance of the claim, not the label, to determine whether they are derivative claims or individual claims. I've reviewed the complaints. They are all classic-looking derivative claim. You can't just say something is a consumer rights claim when, in fact, it is just dressed up as a breach of fiduciary duty claim by directors and officers.

So this is a stay hearing where they are supposed to come forward with evidence. Just saying that someone has alleged it in a complaint does not quantify the harm of denying that. There is no articulation -- these claims are worth $30, these claims are worth $100, these claims are worth a billion dollars. There is none of that in the U.S. Trustee's application.

So what we are left with on their application in the harm calculus is on the one side, the constitutional rights of unidentified individuals with unquantified claims that are hypothetically, but not proven, to be non-

derivative, all of which can be asserted and against and recovered from the TADPs that will be funded by the Sacklers. That's what their harm is.

Balanced against that and what the remainder of my analysis focuses on and the real harms of real individuals that accrue the moment the Debtors are ready to consummate the plan, which could be December 14th, it could be January 6th, whatever, were contemplating that they won't be able to do that because there is a pending order of court, whether written as a stay or a denial of a stay with conditions.

And let me pause here because people are just getting it wrong with respect to the harms. There are two harm prongs and two things to be balanced. The applicant on a stay needs to prove irreparable harm to them. They also need to prove the lack of any harm to individuals. It's their burden. And we're not talking about irreparable harm because people aren't focusing on, and I think Your Honor was alluding to it, what a bond means.

The bond is the source of recovery for people who were harmed by the imposition of a stay. None of these applicants have come forward and said regardless of whether there's a bond, you can feel free to sue me if I turn out to be wrong and I lose on appeal after a three-month delay. That's not how bonds work.

Now, as to the harm for the individuals, which

need to be protected, some of those harms are mathematically certain. Under the plan, the personal injury victims don't ride with the ups and downs of the Debtor. We get a fixed (sound drops). Whether the plan is funded in December 2021, January 2022, January 2023, or some other time, the fund and this plan remains in place, the amount paid stays the same, which means there is a certain loss of the time value of money.

And to amplify what Mr. Preis said, with respect to the individuals, once the trusts get funded, then the notices -- remember, we had the hearing on the advanced payments so that we can get the notices out immediately -- the notices go out. In addition, all the expenses, the frontloaded expenses of the trust, can get paid. Then as soon as someone gets a form, they can check a quick pay and it can go back and we can start the distribution process.

So if the plan is delayed 14 days, the initiation of that process starts 14 days later, the first payment that goes out is 14 days after that. So there is a demonstrable harm in any stay of the effective date of the plan beyond the date that the Debtors are ready to go forward.

There are also mathematically certain but unquantifiable fees of just the cost of continuing in the bankruptcy case. The advantage of an effective date is people can go pencils down with respect to issues that are

ongoing in the case. And again, we are not a state funded or taxpayer funded, my participation in hearings like this is just coming out of creditor recoveries.

I won't touch, because Mr. Preis did it so well, the harm in delaying abatement funds. But in a world in which a stay is in place for only 14 days, the Debtors are told cool it 14 days and 10 -- let's leave aside debts payment -- 10 new injuries occur, who's paying for that? Why is it the Debtors responsibility? They wanted to start the process of getting money out to people. The applicants came forward and said, hold your horses, I've got hypothetical rights that need to be protected here in the interest of (sound glitch) and 10 new injuries occurred, the United States Trustee is not stepping forward and saying don't worry, we'll take care of those people.

But the real risk here, and which nobody is articulated and which I think Your Honor needs to tell to Judge McMahon, is the risk to the deal. Right? Now let me start -- I'm still trying to wrap my head around a public use of the plea bonds, a little example, but the personal injury victims are not holding a gun to anybody. We have no power over this situation. And unless and until the Debtors are ready to consummate this plan and the Sacklers are willing to fund, we're not getting anything. We can't compel anybody to do anything.

And as to the risks of harm, the Court has a detailed exhaustive record of the difficulties they faced getting to consensus in these cases, the hard fought triumph of the deal coming together, especially for victims, through direct cash payments and the use of essentially all but the U.S. Government's money for abatement.

This Court, not the District Court or the Second Circuit, is in the best position to understand and articulate the risks to Debtors, that it should articulate I believe in findings and conclusions, when their effective date gets stayed.

And the risk is what happens if something stops the effective date of the plan. First, if this deal were to fall apart prior to an affirmance, right? We get in a situation where someone delivers a termination of the deal, right, and then we find out we were right all along. And were this case to liquidate, there's unopposed evidence that everybody gets nothing. The liquidation analysis results in a zero for individuals.

That's not hypothetical. Remember Mr. Preis said to you with respect to the super-priority admin claim, the U.S. Government has not committed that in the event that the confirmation is -- or sorry -- the plan does not go effective, they won't set forth their super-priority administrative claim. In other words, there is a real

possibility if this deal doesn't get to closure that all of the money goes to the United States. Does anybody really want to be responsible for that?

The Court's also in a unique position to understand what basis what a big case like this puts forward in terms of harms, the potential harms, to a deal in an uncertain period. First, plans face market risks. During this case, the Dow had its second biggest percentage drop ever. Is anybody really committing that if the Dow goes up 30 percent that we're all going to let the Sacklers walk away with that additional bounty, or if the Dow goes down 30 percent, the Sacklers are still going to be willing and able to fund?

Plans face regulatory risk, right. I mean, those risks in all fields that occurred or what they're talking about there, let's get the Sacklers out of jail for free deal, regulations change and what was possible at one point in time may not be possible later. Again, is that really going to happen between December 14th and January 7th? Probably not, though not certain. But if we're talking about informing Judge McMahon of what could happen between January and August, that matters.

Plans face legislative risks. Nobody here, by the way, none of the appellants here is committing that they would not be pursuing any legislation that could have an

impact on this case.

Plans face political risk, especially in this case in which half the creditor body are elected officials. The notions that come or others will all stay in the deal as their political landscape changes is not certain.

And as Your Honor noted during the confirmation hearing, this settlement is around a shifting landscape of judicial precedent that exists, all of which at any given time will empower somebody who cut the deal to say they got a bad deal and somebody else to say they got a good deal.

Obviously, the risks increase over time. But nobody is promising anything if they are wrong in the law and it takes long enough for us to prove that to the Appellate Court that the plan falls apart and we have to start over. Nobody is assuring that a plan which is consummatable on December 14 will still be consummatable on January 14th.

So how does this play out? Again, I think the U.S. Trustee, given their role, statutory role, and the absence of any direct harm to them and the fact that they're purporting to speak on behalf of individuals and have yet to articulate who they're speaking for, what their claims are, and what they're worth should have their application denied on the merits with prejudice right now with specific findings about their lack of proof, with one caveat.

They've taken the position that they have zero responsibility to post the bond. I don't need to get into that argument at this late date. They have zero economic responsibility if they're right.

So deny their motion. But they can be clear, nothing prevents the U.S. Trustee from piggybacking off a stay that is awarded to some other party, and nothing prevents the U.S. Trustee from volunteering to post a bond to protect for a month.

So what does a bond look like with respect to the other applicants? I don't think any stay is necessary. I think a denial of the stay with conditions isn't necessary. But we have no objection to this Court giving Judge McMahon until January 7th to rule.

But if the Debtors are ready to consummate before January 7th, they should provide a notice, everybody, 14 days that we're ready to consummate. And that will give the applicants the opportunity to post a bond in that window if they want to have a stay or they can go to Judge McMahon if they're riding on her stay, that is your stay is requiring and she still hasn't ruled, that gives them an opportunity to raise that with (sound drops).

Even with respect to this short bump, right. That's our only source of recovery for both catastrophe and the mathematically certain funds that accrue. We shouldn't

equate an opportunity for a meaningful appellate review with a free opportunity for appellate review. And I tend to that that if and when the states are forced into a position of having to post a bond, they'll think long and hard about their pursuit of further appellate relief beyond Judge McMahon.

To form an amount, I'm not -- I can't quite figure out how best to create the right dynamic for that. But it seems to me that if the Court set a per diem or a bond for the period between the time the Debtors are ready to rule and when Judge McMahon are ready to exit and when Judge McMahon rules, that will precipitate a discussion with Judge McMahon about when she is able to rule. And it will allow a ready calculation. If she says I can't do it by the 7th, I can do it by January 30th, that's 23 days of per diem (indiscernible). And I tend to think, as I said, that sparks a conversation about how this is going to proceed forward.

As to the larger bond, I guess if Your Honor is not contemplating extending beyond the time that's necessary for her to rule, it still, as I said, provides context if you were to provide findings and conclusions that there are real harms, demonstrable harms, and the manifest risk of catastrophic harms that need to be protected with a bond. Again, subject to upward or downward revision by Judge

McMahon and subject to what other parties use. But we're talking about (indiscernible) in the hundreds of millions of dollars or billions. Because if the risk were to manifest itself, something comes out that causes somebody to walk away from this deal and we end up in a liquidation scenario, nobody wants to wear the risk of having stopped a plan which would have provided (indiscernible) to people and that turned out to be legal, but nonetheless was frustrated because there was an open-ended stay in place.

Not one of the states has come forward and say they didn't have the wherewithal to post a bond. And again, a bond only sets the outside amount of the damages which get compensated. If it turns out that they have to post a $500 million bond and only a million dollars is proven to be the actual damages, so be it. Then only a million dollars gets compensated out of that. But we don't set a bond based upon a hope that the debtors will be able to consummate in this fixed 12-month window that the Second Circuit is going to need to be able to issue what we all hope will be a ruling which sets forth in chapter and verse exactly what the rules are with respect to non-debtor reliefs.

The last point on these conditions. Conditions run both ways. And this is why I think that the denial with conditions on the Debtor which you are raising now is a bit fraught. Conditions run both ways, right? The appellants

here will be taking an opportunity of having an additional 14 days to do whatever they're going to do. Are they allowed to legislate in that period? Are they allowed to exercise their police powers in that period? Are they, as Mr. Kaminetzky hinted to, able to stand in front of the district court in New Jersey and argue that the Court should adjourn that hearing? Right? Which would be the setup date for how this goes forward. Are they required to commit to move quickly as well? Are they free to argue in front of the Second Circuit that they really need 90 days to file a (indiscernible).

I just think lifting it and saying a denial with conditions opens up a whole debate about what they're allowed to do that I think (indiscernible) with a denial of these motions on the merits or -- or if they want a stay, a stay with an interim bond requirement, that is a shot bond requirement and an understanding going forward of what that stay -- that bond is going to look like if we are getting a ruling, you know, at the end of December or the beginning of January.

THE COURT: Okay.

MR. SHORE: And other than that unless Your Honor has any questions, that's all I have.

THE COURT: Okay.

MR. ISRAEL: Good afternoon, Your Honor. Harold

Israel on behalf of the NAS Committee. May I be heard very briefly?

THE COURT: Sure.

MR. ISRAEL: Thank you, Your Honor. The NAS Committee, another entity that is not funded by the taxpayers, represents the most innocent victims of the opioid crisis, the NAS children, will focus its argument exclusively on the irreparable harm and the public interest in light of Mr. Shore and Mr. Preis' arguments which they adopt.

The appellants in this case have made clear that they will go to the ends of the earth to prevent the plan from becoming effective. In the meantime, the opioid crisis rages across the country.

A stay will mean, ironically, that the Sacklers will retain all of their money, except of course what they have to pay the professionals, while compensation to the NAS children and the other personal injury victims will be delayed indefinitely if not forever. There will also be a delay of billions of dollars of abatement funds that would otherwise be used to combat the opioid crisis and a delay in making vital documents available to the public through the document repository.

For what reason? So that the appellants can exact vengeance on the Sacklers without any regard to whether

there will be any corresponding benefit to the personal injury victims, including the NAS children, of the opioid crisis.

To be clear, the NAS Committee had hoped for a far larger settlement. However, the plan, including the settlement and the third-party releases and the corresponding public interest must be viewed in reality. The NAS class voted overwhelmingly in favor of the plan, and Kara Trainor, a parent of an NAS child, outlined in great detail in her declaration why she supports the plan, notwithstanding her personal situation. The appellants ignore this massive support of both the voters and Ms. Trainor in their pleadings.

Simply put, a stay of the confirmation order delays implementation of what could be lifesaving programs for opioid victims, current and future, and compensation for some of the neediest people in the country. For what? So perhaps the U.S. Government can get an additional $2 billion at the expense of all other claimants, a result worse than the tobacco litigation? Or so three states or five states can make life miserable for the Sacklers by litigating against them for the foreseeable future, resulting in no compensation to the NAS children and the other opioid use victims and allowing the Sacklers to retain billions of dollars that would otherwise go for abatement? Who wins in

this case?

Vengeance is not a purpose of the Bankruptcy Code and will not compensate the NAS children or the other opioid victims, will not fund research and other abatement strategies, will not make millions of opioid-related research documents available to the public domain. It will, however, allow the Sacklers to retain more of their wealth than they would under the plan. It cannot be said that such a result is in the public interest. Thank you, Your Honor.

THE COURT: Okay, thank you.

I don't know if any other objectant wants to speak. I forgot to ask Mr. Kaminetzky if he could update me on the termination right that was addressed in the pleadings and in Mr. Gold's argument.

It seems to me that, at least with respect to the type of relief I am contemplating, it's highly unlikely that that termination right would be exercised. But I'd like your thoughts on where it stands, whether it's been waived through the date that you've proposed and the like.

MR. KAMINETZKY: Apologies, Your Honor, for that dramatic camera movement.

The answer is I don't -- we have not had that discussion. Maybe you should ask the Sackler. This is something that was heavily negotiated and it's in there, it's part of the agreement. I would suspect that it won't

be a problem given the short term that we're talking about. But kind of following up, I mean, it's in there, and it's their right to waive it or not.

Unlike the previous way that we talked about before when it came to the direct certification, I don't have an answer sitting here whether or not they'd waive, but I certainly hope that they would.

Maybe it's time to mention just to underscore -- and maybe this is the appropriate time in the changing landscape. During this hearing, actually, the Oklahoma Supreme Court reversed the J&J judgment, saying that public nuisance statute doesn't apply in this are to legally-manufactured products. And this comes on the heels of the California decision earlier this week going the same way.

But let me just leave it at that. And, you know, I assume you could direct this to the Sacklers.

THE COURT: Okay. Well, do I have the two sides of the Sacklers' counsel on the call?

MR. UZZI: Your Honor, it's Gerard Uzzi of Millbank on behalf of the Raymond Sackler Family.

THE COURT: Afternoon.

MR. UZZI: As it relates to -- go ahead, Your Honor, I'm sorry.

THE COURT: I was going to say, first of all, I'm not sure whether the denial of these motions as I've posited

it would trigger the termination right. But assuming it did, would that brief extension be something that your clients would be prepared to assert as a termination right?

MR. UZZI: Well, Your Honor, just before I get to that, just to check a box. As it relates to what Mr. Kaminetzky raised on the issue of certification, that has been waive. I think, frankly, we had formally memorialized it (indiscernible).

THE COURT: Right.

MR. UZZI: As it relates to -- I think the termination right you're referring to now is that three months after confirmation date -- there has not been a request made of our clients to waive that. So I'm not in a position today to say (indiscernible) specifically on that issue. And right now we are anticipating at least that the court is going to rule before then, the district court is going to rule before that time.

Your Honor, I don't want to speculate as to if and when I do consult with my client as to what they'll say other than to say we've come this far, Your Honor. There is certainly not a desire to abandon this at this point.

THE COURT: Okay, thank you.

Ms. Monaghan, I know you represent the other side of the Sackler family.

MS. MONAGHAN: Correct, Your Honor. On behalf of

the so-called Side A of the family, we are in the same position as Mr. Uzzi is in that no request was made of us for a waiver. That said, we're not looking to walk away from the settlement in any regard. I just haven't actually gotten instruction from my clients on the questions they have put to us.

THE COURT: Okay, thanks. Okay. I said that I would be willing to hear a brief rebuttal, but I really want this to be very brief, not a rehash of arguments that have previously been made, if anyone wants to speak in rebuttal.

MS. LEVINE: Your Honor, this is Beth Levine. My computer is going very slowly right now, so hopefully we'll get video in a second. I did just want to speak briefly. I will try not to repeat anything. I wanted to address a couple of things that have been raised that I think are inaccurate.

You know, there was a suggestion that it is somehow improper for us to seek a hearing because while we tried to negotiate a consensual resolution, it didn't work. And we did as part of that effort suggest why don't you give us -- you know, if you've got a list of things you have exempted from the stay, tells what they are. And, you know, it didn't work.

THE COURT: I am not blaming either side for the fact of this hearing. I had the opportunity after the

appellees sent me an email requesting a chambers conference to meet and see if a settlement could be obtained. And I just concluded it was of more benefit to have a full record.

MS. LEVINE: Thank you, Your Honor. There were suggestions or allegations that the United States Trustee is taking the position it's taking because it's trying to get the, you know, $2 billion. And that is just an absolutely baseless allegation. I think if Your Honor wanted to hear more about that, Mr. Fogelman could address it. But I think it's enough to say that that's baseless. We've taken this position on the non-debtor releases the whole time. It's not just some way to try and get back that money.

With respect to the United States Trustee's role, I think you've recognized in your comment that, you know, we are not representing the government in its creditor role, but we are representing the government in the government interests. We obviously have a disagreement on where the public interest is. You know, we've talked about the harm. I don't want to repeat myself but, you know, we don't represent individual victims, White & Case doesn't represent individual victims. They've acknowledged they don't represent anyone. There are individuals who have come forward and objected. There have been over 200,000 people who voted no. So we've cited some of those examples. Ms. Isaacs, for example, Mr. Hartman. And we did include the

complaints in our request for judicial notice, including Mr. Hartman's complaint.

With respect to the suggestion that we might voluntarily post a bond, we don't have the authority to do that, so we think that's just not a factor to be considered.

THE COURT: Well, I would consider it in the sense of it's a factor to consider in balancing the harms. Not as something that I could require, but the absence of one may make it harder to balance the harms in your client's favor.

MS. LEVINE: I do think it's interesting with respect to this question of the termination right. There are two questions. One is just as a factual matter; my understanding is that termination right doesn't come into play if there has been a delay because of licensing delays. And we don't know what the status is, but we think it's interesting that the Debtor's proposed the stipulation without checking on that. But we don't think, as we put in our papers, that that is likely to happen. And it does not sound like it is based on what's been said here today.

Lastly, you know, obviously we are here on our motion. We're asking for a stay at least until the district court's decision. But with respect to the order it sounds like you are considering, you made a comment that I wanted to clarify, which is whether you're suggesting you would enter or include in your order a limit on the ability to

seek a stay from the district court.

THE COURT: No, I don't remember saying that.

MS. LEVINE: Okay. Then I may just have not heard that correctly.

THE COURT: It's just the opposite. You would have the ability to seek a stay from the district court after you get the notice.

MS. LEVINE: Your Honor, it's been a long day. I don't want to repeat what we've said. Obviously we disagree with a lot of what the stay movants had said, but we will at this point stand on our papers and I will cede the floor to any other movants who had something to add.

THE COURT: Okay.

MR. EDMUNDS: Your Honor, if I may just for less than a minute. Brian Edmunds for the State of Maryland. I would just point out some of the overarching themes that have been presented to you, that we are a state and we are charged with protecting our public and believe that we are doing that in appealing. And I think that some of the arguments that would give to us the status of essentially a private creditor are what requires us to appeal. I think that it's our job, and we do this, to protect. And we are spending money now on the opioid crisis on trying to abate it. And I think that our -- I think it's important to remember that and recognize that, that we wouldn't be doing

this and pursuing an appeal if we didn't think that we were serving the public. And that's all I have, Your Honor.

THE COURT: Okay.

MR. GOLD: Your Honor, Matthew Gold, Kleinberg Kaplan. Can you hear me?

THE COURT: Yes.

MR. GOLD: Thank you. Your Honor, I too will be very brief. First, I just want to note that the argument that Mr. Preis made, and we've heard this several times about how criminal liability is not being affected by this, is a total red herring. No one has ever contended the criminal liability was implicated by this, but that's not at all the point. The states have a significant statutory scheme that involves both criminal and civil penalties for which to go against wrongdoers. And among other things, there are different burdens of proof. And that's why the states have both criminal and civil laws that play in this area.

And it's not for Mr. Preis or the Debtors to say you have your criminal remedies, that's enough, you don't need those other ones, in the first instance. And secondly, for us to be pointing out that the result of this settlement and this plan is to give the Sacklers complete immunity of their opioid-related obligations on the civil side does not mean that we're implying that it has anything to do with the

criminal liability. And it's valuable enough that the Sacklers have been insisting on it. So I think that's just simply a matter of misdirection.

Second, I just want to note Mr. Shore, after making a statement about how we needed to not engage in speculation and to needed concrete matters, engaged in a 10 to 15-minute series of speculations and hypotheticals about various risks without evidence about them occurring, but simply as speculation that this might happen and that might happen as risks involved of Court's resolution. We submit that those are not germane for these purposes and have no demonstrated basis other than just speculation.

Third, I just want to note that this morning, I stated for the record, and not for the first time, that states are extremely willing to try to find a way to mitigate the harms to parties and allow the appeals to proceed. I heard not a whisper, complete crickets from all the objecting parties with respect to engaging with us on that point. And we can't do it by ourselves.

THE COURT: I know you can't do it by yourself, but you can't do it without Maryland and the U.S. Trustee, too. And they're not willing to do that. So, I mean, it's good for your two clients, but it would be a waste of time if they are not prepared to do it. And I took away from their candid comments that they aren't.

MR. GOLD: Okay. We will review the issue with them, Your Honor.

THE COURT: Okay.

MR. GOLD: Thank you for that comment.

THE COURT: If they were, that would be great. But that's not the record before me.

MR. GOLD: Okay. Thank you, Your Honor. I have no further comments.

THE COURT: Okay. All right. I have before me three motions for a stay pending appeal, a first day motion by the United States Trustee for a stay pending appeal of two orders, the Court's order confirming the Twelfth Amended Chapter 11 Plan in these cases, and secondly, the Court's so-called Advance Order permitting the Debtors to take certain procedural steps and spend a relatively modest amount of money to be more ready to effectuate the transaction under the plan if and when the effective date occurs.

The other two motions are first by the states of Washington and Connecticut, and second by the State of Maryland, which seek a stay pending appeal over the confirmation order.

Three other appellants have joined in one or the other of those motions, and in respect of one of them have supplemented the joinder to some extent. So Mr. Bass has

joined in the other motions, although it is clear to me both from his filing and his remarks today that his focus really was not on a stay pending appeal of the confirmation order -- he hasn't joined in or appealed the advance order -- but rather to have the briefing schedule and hearing schedule with respect to his appeal delayed by the district court. And I have explained to him that that really is a decision for the district court to make.

I also have a motion and a joinder by certain Canadian Creditors, Municipality, and First Nations Claimants that has joined in the other motions, although I don't believe that they have appealed the advance order. And that they primarily focus, if not exclusively focus on the issues raised by the states. And I have Ms. Isaacs' motion, which literally adopts the State of Washington and the State of California -- I'm sorry, the State of Connecticut's motion.

When I address the State of Washington and the State of Connecticut's motion, I will also be addressing, therefore, Ms. Isaacs' motion. And similarly, when I address the first three motions that I mentioned, I will be addressing the Canadian claimants' motion except when I briefly address their unique issues on the prong in the standard for evaluating motions for a stay pending appeal, focusing on the need for a strong showing that the movant is

likely to succeed on the merits of the appeal.

The movants have the burden of proof with respect to their motions for the stay pending appeal, and that has been characterized as a heavy one. And the grant of a stay pending appeal has been characterized as extraordinary relief. See In re General Motors Corp., 409 B.R. 24 (Bankr. S.D.N.Y. 2009 with regard to the first point, and In re Sabine Oil & Gas Corporation, 551 B.R. 132, 142 (Bankr. S.D.N.Y 2016) on the second point.

The grant of a stay pending appeal is an exercise of judicial discretion dependent on the circumstances of a particular case, id Sabine Oil, 548 B.R. 681 and In re General Motors, 409 B.R. 30. They are, again, treated as an exception, not the rule, and are granted only in limited circumstances, In re Brown, 2020 WL 3264057, at *5 (Bankr. S.D.N.Y. June 10, 2020).

To satisfy its burden to obtain a stay pending appeal, the movant needs to establish a proper balance in its favor of the following four factors; whether the movant has made a strong showing that it is likely to succeed on the merits, whether the movant will be irreparably injured absent a stay, whether a stay will substantially injure the other parties interested in the proceeding, sometimes referred to as the assessment of the balance of harms, and four, where the public interest lies. See Nken v. Holder,

556 U.S. 418, 434 (2009) and Kelly v. Honeywell Int'l, Inc., 933 F.3d 173, 188-184 (2d Cir. 2019).

The Honeywell case is an important gloss on the first factor requiring a strong showing that the movant is likely to succeed on the merits of the underlying appeal by its focus on the need for that showing to show a fair ground for litigation. A number of courts have phrased this as a showing regarding the success on appeal somewhere between possible and probable. Again, see Brown, 2020 WL 3264057 *7 and Sabine Oil, 548 B.R. 683, 684, which also notes in Judge Chapman's opinion that the probability of success that must be demonstrated can be viewed as inversely proportional to the amount of irreparable injury that the movant will suffer absent of the stay. In other words, more of one excuse is less of the other, id at 684.

I will briefly address the first prong, which, along with the prong of a showing of irreparable harm, are the two factors that are viewed as most critical in the analysis, Nken v. Holder, 556 U.S. 434. See also Uniformed Fire Officers Association v. De Blasio, 973 F.3d 41-48 (2d Cir. 2020).

This analysis of the merits by the court that issued the order upon which the appeal is based is one that places that court in the position of looking at its ruling objectively as one would from the outside to see whether

there are fair grounds for litigation of the appeal. And depending on the strength, or lack thereof, of a showing of irreparable harm, perhaps more than that to warrant a stay.

Obviously the Court's determination of the issues before it that are the subject of the movants' appeals was carefully undertaken by me after a lengthy trial and set forth in a 155-page written memorandum of decision. The issues on appeal I believe do not all warrant a finding of a strong showing likely to succeed on the merits or of likely success on the merits somewhere between possible and probable. Again, recognizing the sliding scale for this -- for purposes of this stay pending appeal determination.

Certain of the issues raised I believe are clear under applicable Second Circuit law and a real stretch by the appellants. Those include the so-called due process argument, the so-called 524(e) argument, the analysis of the merits of the settlement, and the argument that the Second Circuit should change its law from how it is currently articulated.

As far as the due process argument is concerned, the United States Trustee has argued that the plan, with its injunction of certain third-party direct claims against the released parties, violates the due process clause by taking those claims without the right to a hearing and a trial, citing and relying on large measure upon Ortiz v. Fibreboard

Corp., 527 U.S. 815 (1999).

As far as the notice point is concerned, I made extensive factual findings as to the notice that was provided and was received by those who are creditors of the Debtors. I will note my view that the plan itself and the underlying claims that have been identified by the U.S. Trustee apply to release or enjoin direct third-party claims that overlap with in a highly meaningful way claims of the Debtors or against the Debtors. And therefore, such notice would be sufficient. I will note further that there is no absolute right to a trial beyond the trial that the court held as to the bona fides of the settlement with its right to object, which was preceded by a right to vote on the plan and to object to the plan generally, including the classification scheme set forth in the plan.

That scheme and the right to vote and the review by the bankruptcy court clearly distinguishes the bankruptcy process as recognized by the Second Circuit that would encompass certain types of releases of third-party claims from the fact pattern and concerns raised by the Supreme Court in Ortiz, where there was a concern that those that would be bound by a non-opt-out settlement were not adequately represented because of conflicts of interest, where there was no vote, and no plan process including the right to object to classification and voting, and ultimately

the court's review of the proposed settlement in that context.

The Supreme Court largely recognized this fact in Ortiz itself, recognizing that its general view as to due process was qualified by a special remedial scheme, quoting Martin v. Wilks, 490 U.S. 755, 762, Note 2 (1989), which specifically referenced the bankruptcy legislative scheme.

I believe the bench ruling sufficiently dealt with the inapplicability of the 524(e) argument, including citing well-reasoned opinions by other circuit courts on it.

As a factual matter, I will note that the U.S. Trustee took no discovery in connection with the confirmation hearing or generally in the case as a whole and largely played the role of a kibitzer on the evidence during the trial, offering no witnesses of its own. And to the extent it does, or the U.S. Trustee does object to the analysis of the merits of the settlement, I find it highly unlikely that that analysis would prevail on appeal.

As far as the moving states' arguments on the merits that overlap with the ones that I just raised, I won't address them again. But I will note that I believe I comprehensively dealt with their classification arguments and their voting arguments and that the evidence in my analysis of recoveries under 1129(a)(7) clearly establishes that the plan would satisfy the best interest test even if

one considered the rights that they were being required to give up to pursue third-party claims against the released parties, although that was an alternative holding.

The U.S. Trustee's and the states' other arguments, however, I believe if there was a strong showing of irreparable harm, would satisfy the first prong of their burden of proof. The U.S. Trustee is clearly wrong that personal injury claimants and other creditors are receiving nothing on account of their third-party claims against the released parties. It is clear that it is the settlement of those third-party claims that enables the entire plan and the distributions under the plan, without which they would receive in my view as I found based on the analysis of the evidence, including the rights of the United States in the DOJ settlement to a super-priority claim and the limited recoveries that they would have in the free-for-all litigation that would ensue, literally no recovery.

The plan treats personal injury claims as receiving a distribution based on the liquidation of the underlying claim against the Debtor. That does not mean that the personal injury claimants are not receiving value on account of their third-party claims, but it reflects I believe that their third-party claims are overlapping, and though entitling them perhaps to a direct recover as opposed to a recovery through the Debtor, viewed as derivative

claims under the analysis by the circuit in the Tronox case as well as by other courts that have distinguished claims that may be direct but are asserted because of harm to all of a debtor's creditors as opposed to individual creditors as discussed in the Tronox case, which is referenced and discussed at some length in my opinion. See also the discussion in Deutsche Oel & Gas S.A. v. Energy Capital Partners Mezzanine Opportunities Fund A, LP, U.S. Dist. LEXIS 181000 (S.D.N.Y. September 20, 2020), and In re CIL Limited, 2018 Bankr. LEXIS 354 (Bankr. S.D.N.Y. February 9, 2018).

As I also noted in the memorandum in support of the order, the circuit has now made it clear, notwithstanding the citation by the U.S. Trustee of Johns Manville Corp. v. Chubb Indemnity Insurance Company, 606 F.2d 135, 153-154 (2d. Cir. 2010), that the evaluation is only in respect of in rem claims. As stated and discussed at length in the Quigley case, the Court's power extends to in personam claims as long as the factors laid out by the Circuit are satisfied after a searching inquiry by the Court.

However, those factors have been the subject of different analyses over the years as to what is properly subject to an injunction of a direct third-party claim. And I believe that it is that issue, i.e. how those claims are

cabined between the clear instance where they should not be enjoined as discussed in the Manville III opinion, and where they should be.

I have tried to narrow those so that it does reflect in the plan that such claims are only those where there is a substantial or an entire overlap. And I believe that the factual record of the claims that the U.S. Trustee purports to be protecting reflects just that overlap, i.e. a lack of direct fraud as opposed to allegations of extensive control over an enterprise that itself engaged in fraud or other violations of consumer law which would apply to all creditors, to protect all creditors of the debtors.

While I believe there is less of a fair ground for litigation on the second point which is raised only by the moving states, namely that notwithstanding there being any specific protection for them in the Bankruptcy Code, their status as a governmental entity takes them out of the reach of this particular plan injunction. Notwithstanding that, the injunction at this point given the creditors' other agreements applies just to the creditors' right to pursue monetary claims against the third parties.

The state creditors have argued that the deterrent effect of pursuing those claims is a valid governmental interest, which to some extent it is. But I believe that it is going far too far to state that that interest requires

them to decide whether there would be a trial or not of such claims where they overlap with the claims against the Debtor's estate and by the Debtor's estate, as I believe they are cabined under the plan.

I will note that the moving states have at times argued that that public interest extends to their right to take discovery and engage in a trial, but I will also note that they have touted in this motion the benefits of the so-called national settlement in the multi-district litigation in which two of the three of them are parties where there has been no trial by them, and I believe far less discovery that occurred in this case, that they would have and did have direct access to. But with that also I believe that that package of issues is an issue for consideration appropriately under the first prong of the test for obtaining a stay pending appeal.

The other most critical factor is whether the movant will be irreparably injured absent the stay. For all intents and purpose, although the movants have each attempted to argue other injuries, the injury that they posit as an irreparable injury is the risk that during the course of their appeals, the plan would be so far consummated that the appeals would become equitably moot.

The equitable mootness doctrine is at one level fairly well established in the Second Circuit, although

throughout the country there is a wide variation on how courts look at it. I say at one level because the courts have also made it clear that, "The doctrine is deployed in a pragmatic and flexible fashion and must be responsive to the specific factors presented in a particular case ultimately to focus on as a prudential matter whether a court should dismiss a bankruptcy appeal when even though effective relief could conceivably be fashioned, implementation of that relief would be inequitable." See Beeman v. BGI Creditors' Liquidating Trust (In re BGI, Inc.), 772 F.3d 102, 107-08 (2d Cir. 2014) and GLM DWF Inc. v. Windstream Holdings Inc. (In re Windstream Holdings Inc.), 838 Fed. Appx. 634 (2d Cir. Feb. 18, 2021. Where a plan has been substantially consummated, the circuit presumes that an appeal is equitably moot. And in that circumstance, a party seeking to overcome that presumption may do so only by demonstrating that five factors are met. But that of course is only where, again, a plan has been substantially consummated under the Bankruptcy Code, id In re Windstream Holdings Ind., 838 Fed. Appx. 634, 636.

The course by a vast majority have held that the possibility of equitable mootness standing alone does not constitute irreparable harm. Rather, it is a form of prejudice which with some other consideration can constitute equitable harm. Again, taking into account the equitable

nature of the request for relief, i.e. the stay pending appeal, it would seem to me that that other factor can be any one of the three other factors, i.e. the very importance and seriousness of the appeal on the merits and the harm or lack of harm to other parties and/or the public interest, which includes both a sense of the importance of the finality of bankruptcy plans where they are complicated and involve delicately-negotiated and extensively-reviewed compromises as against the public interest in literally getting an appeal right beyond the trial court determination. See for example the discussion of this topic in In Re Adelphia Communications Corp., 361 B.R. 337, 347-348 (S.D.N.Y. 2007) and In re St. Johnsbury Trucking Company, 185 B.R. 687 (S.D.N.Y. 1995), both of which cases considered some balancing of the other factors in addition to the risk of equitable mootness.

And on the other side of the equation, the discussion in In re Windstream Holdings Ind., 2020 U.S. Dist. LEXIS 167183 (S.D.N.Y. August 3, 2020) where the district court makes the clearly correct point that merely invoking equitable mootness as the appellants have done here, a risk that is present in any post-confirmation appeal of a Chapter 11 plan, is not sufficient on its own to demonstrate irreparable harm. That's id at Page 7 quoting In re Calpine Corp., 2008 Bankr. LEXIS 217 (Bankr. S.D.N.Y.

January 24, 2018). See also In re W.R. Grace & Company, 475 B.R. 34 -- I'm sorry, I have the wrong cite. It's at Pages 207 through 08 (D. Del. 2012), affirmed 729 F.3d 332 (3rd Cir. 2013).

In the cases where courts have taken seriously the risk of equitable mootness, they have either, as in the Adelphia case, had grave doubts about the merits of the appeal and believe that they needed to be addressed, or the harm to the other parties was offset by the need for an appeal where there was other irreparable harm besides mootness that would occur if the appeal were not heard.

As for the mootness issue as irreparable harm and irreparable harm in general, the allegation of irreparable harm and the showing of it must be neither remote nor speculative, but actual and imminent. The possibility of irreparable harm is too lenient. Nken v. Holder, 556 U.S. 434-435 and In re Sabine Oil & Gas Corp., 551 B.R. 143.

Here, the appellants are in two different camps as far as the relief that they are seeking from me. The U.S. Trustee has clearly asked for a stay pending appeal throughout all of the appeals, i.e. through potentially determination of its appeal by the Supreme Court. It has a fallback position in which it asks for a stay through the district court determination on the appeal plus some additional time.

The moving states I think are much more focused on a short-term stay. And based on their remarks during oral argument, I believe they would confine their motion to such a request.

As I stated during oral argument, and I won't repeat the cases that I cited, it seems to me that Bankruptcy Rule 8025 effectively limits the bankruptcy court's ability to issue a stay pending appeal of a district court's order. The provisions of Rule 8007 and Rule 8025 do not entirely mesh, as noted by the district court in Credit One Bank N.A. v. Anderson (In re Anderson), 560 B.R. 84, 88 (S.D.N.Y. 2016). But as I've previously cited, there are plenty of cases where bankruptcy courts have limited their stays because of Rule 8025 up to the date of the district court's ruling.

I believe that is appropriate here not only because of Rule 8025, but also because of the distinctly different factual considerations underlying a request for a stay pending appeal in these appeals and in these cases for a stay pending appeal through the district court's ruling and a stay thereafter.

The district court has made it clear that it is on a fast track to determining the appeal, which it will hear oral argument on at the end of November and may well rule on by the end of the first week of December. Moreover, the

appellees have stipulated and will be prepared to add to that stipulation based on the record at oral argument that they will not cause the effective date to occur, that is the effective date of the plan, until the earlier of the district court's ruling, which under Rule 8025 and results in, unless the district court orders otherwise, a 14-day stay and December 31.

They have also stipulated that they will not argue equitable mootness to a subsequent appellate court, whether that's the Second Circuit or the Supreme Court based on actions taken prior to the effective date of the plan, including in respect of the advance order.

Based on my review of the plan in addition to that stipulation, it is highly unlikely that the plan would permit any actions to be taken prior to the effective date that would come anywhere close to the types of transactions that give rise to equitable mootness under the law of the Second Circuit. That includes coming anywhere close to achieving substantial consummation of the plan under the Bankruptcy Code.

The appellees have further stipulated that they will give the appellants, including the movants, 14 days' notice of their actual efforts to cause the effective date to occur, of the actual effective date that is, or the projected effective date.

Finally, they have stated -- and again, this would be a condition for my order -- that they would render the movant's equitable mootness arguments moot by agreeing that the hearing on the sentencing of the debtors under the DOJ settlement agreement, that that hearing would be no earlier than December 31, which it is clear is the actual date that will be one where there is ample notice, clearly more than 14 days' notice, to the appellants, including the moving parties here.

Given all of the foregoing and the burden of proof as to irreparable harm that the movants have, I conclude that they have not established irreparable harm with respect to a stay which I believe is the only appropriate stay that I could grant, which is to the date of the district court ruling and a reasonable outside date wherein there would be sufficient notice for the movants to renew a stay motion in the district court.

The Debtors have suggested December 31 for that outside date, and it has been suggested to me by the movants that that date, being New Year's Eve and during the holiday season, may place an undue burden on the district court in scheduling a stay hearing, and to a lesser extent a burden on the parties. However, again, it appears more likely to me, although of course this is entirely up to the district court, that the district court will rule before December 31.

And I believe that the scheduling issue can be dealt with by saying the earlier of the district court's ruling and December 31 or such later date. I'm sorry, subject to the district court's calendar. So if the district court is not available at or around December 31 to hear a potential renewed stay motion depending on the district court's ruling and when that occurs, then it would be the later date for the district court to hold the hearing.

Clearly, the parties here have already prepared their stay motions. Indeed, the U.S. Trustee prepared four of them, which are all in my pleading binder. And we have had an extensive record for this hearing. I believe under those circumstances it's not a burden for them if the district court can schedule a stay hearing if they decide to make a stay motion after the district court's ruling by the outside date of December 31 if the district court had not ruled by then.

Otherwise, the appellate process would be governed by Rule 8025. And accordingly, I believe that a key element on the conditions that I just stated for the movants prevailing on the request for a stay pending appeal has not been met.

I will also address, however, the last two prongs that the movants would have to show, namely that there is no substantial injury to other parties interested in the

proceeding and where the public's interest lies.

As far as there being no substantial harm to other parties interested, the record here is clear and I believe, frankly, uncontroverted that there is to the contrary substantial harm to the Debtor's creditors, the vast majority of whom have either not objected to the plan and/or voted in favor of the plan affirmatively in each instance, the vast majority that is.

After the Debtors are ready to have the effective date of the plan occur, and it appears to me that that would not be realistically before December 31, although perhaps a week before they could be ready, after that date when they are ready, every day that they do not implement the effective date which starts the process of liquidating personal injury claims and making distributions on them and making the initial distributions for abatement purposes seriously causes harm to the creditors. It is clear to me that the personal injury creditors bargained for a rapid payout, which is reflected not only in their bargaining for a fixed, upfront sum of several hundred million dollars, but also the procedures they've adopted for consistent with due process and the burden of proof a streamlined option to liquidate one's proof of claim.

Similarly, the roughly up to a billion dollars minus the funds going to the personal injury creditors would

be going out shortly after the effective date through 2023 for abatement purposes, as well as the $225 million payment to the United States, which although not specifically earmarked for abatement purposes, United States has represented the vast majority of which will go to hospitals and other care facilities. This is amply testified to by Mr. Guard as far as the payments are concerned at Paragraphs 9 through 13 of his declaration as well as at Paragraphs 7 through 9 and 12 through 21 and in the summary at Paragraph 25 of Mr. DelConte's declaration. That declaration also address in Paragraph 22 and 23 the funding of Newco and setting it up as a public benefit company to focus on developing products at a reasonable price to combat the opioid crisis.

As Mr. Guard eloquently summarized, many states have been litigating these issues since, well -- I'll quote him, because it's actually quite telling -- for as long as five years before the commencement of the bankruptcy case in addition to the two years of this bankruptcy case. I believe that that length of time was necessary to satisfy the due process Iridium and Metromedia factors as well as to negotiate the intricate intercreditor deals in the plan. The additional time of a stay pending appeal after the district court's ruling is necessary only to have further appeals. There is nothing else that would hold up the

payment of the money.

As Ms. Juaire and Ms. Trainor eloquently have testified, that payment is, if made, to be put to use both for the immediate needs of the individual victims and for abatement purposes at a time when every dollar counts. And as time passes, the problem only gets worse.

As testified to by Mr. Guard and Mr. Jorgenson, opioid deaths have been increasing over the last two years at a very disturbing level, roughly 30 percent nationally, such that in the last year of March to March, roughly 200 opioid-related overdose deaths occur each day.

I agree with the states of Washington and Connecticut that if the parties could all agree that those initial distributions could be made and the parties who are appealing would take the risk on equitable mootness with regard to those distributions, that would be all to the good. But the U.S. Trustee and the State of Maryland do not seem to be prepared to agree to such a resolution to get money out promptly.

So on the one hand, we have that clear, tangible harm. On the other hand, post the date when the Debtors would be ready to go effective, which, again, would be at the end of this year, we have tangible harm as described in the Juaire, Trainor, Guard and Jorgenson declarations, contrasted with the legitimate but non-economic harm of

having extra layers of appeal.

The public interest factor in some respects dovetails with the foregoing analysis. The U.S. Trustee states that it is protecting the interests of those who did not object to the plan but did not affirmatively accept it and those who did object to the plan. It has not, however, provided any information to me that would indicate that those parties would effectively be able to pursue their claims against the released parties to recover anything and would not -- and in addition would not recover any amounts from the Debtors.

The vindication of that public policy, i.e. protecting the minority, at some point -- and I believe that point comes soon after the Debtors are ready for the effective date, although maybe with enough time to have an expedited appeal to the circuit depending on the seriousness of the issues on appeal -- is sufficient to carry the day on the public policy point. But those issues can be addressed by the district court if there is a motion for a stay after its ruling.

In light of its assessment of all four factors, including the first factor, the likelihood of success on appeal, and with the benefit of this record which, again, is extensive with extensive evidence offered by the party that doesn't have the burden of proof on this issue, the

objectants, with no evidence offered for what I'll refer to as the longer stay issue of the balance of harms by the movants.

The other public interest factor I have been told is the deterrence factor. I will note, however, that at some point the public's desire to get paid may well outpace that deterrence factor, particularly where, again, the issue is one simply of a fight over money and the movants can simply not close their eyes to the fact that their litigation alternatives are ones where they already with regard to other defendants that they have pursued have resulted in settlements rather than trials and where the effect of a lengthy stay would prevent the release of the document repository which can be used not only by the public and academics, but also to actually fight the remaining trials and litigation that's pending against other parties.

Counsel for the Ad Hoc Committee of Personal Injury Claimants has suggested that I require at this point the posting of a bond by the states and the non U.S. Trustee appellants. Of course the posting of a bond to protect the appellees from the adverse effects of a stay is the norm rather than the exception. And even where the Court has believed that there are not just possible but quite probable issues on the merits, it has required the posting of a bond, and a substantial bond pending appeal. See In re Adelphia

Communications Corp., 361 B.R. 337.

The U.S. Trustee I believe correctly points out that Rule 8007(d) exempts the federal government from a bond requirement. And while that language is not entirely clear, I believe that that is the case. However, that does not help the U.S. Trustee on the issue of the harm to other parties or the balancing of the harms since it offers nothing in return for the risk that it will have been wrong and have pursued a lengthy appeal process that results in the substantial delay of payments that literally save lives and families.

8007(d) says nothing about any other entity, including any other governmental entity being exempt from the bond requirements. And in fact, there is meaningful caselaw on that point or under the analogous Federal Rule of Civil Procedure 62. The fact that state courts don't impose a bond on other states I believe is irrelevant, as noted by more than one of the objectors. A federal statute including the Bankruptcy Code as interpreted by the bankruptcy courts will defeat a state's interest in enforcing its law and in protecting appellees if in fact it obtains a stay. The basic principle was set forth in Butner v. United States, 440 U.S. 45, 48 (1979). And, in fact, in other cases bonds have been imposed on states. I cited one of those during oral argument, Lightfoot v. Walker 797 F.2d 505 (7th Cir.

1986), a decision by Judge Posner. See also Cayuga Indian Nation of New York v. Pataki, 188 F. Supp. 2d 223 (S.D.N.Y 2002) and PAO Tatneft v. Ukraine, 2021 U.S. Dist. LEXIS 102179, 6-7 (D.D.C. June 1, 2021). That latter decision also is authority for requiring the Canadian entities to post a bond.

Again, I do not believe a bond is required with respect to the order that I will grant, which denies the stay request. But I am denying the U.S. Trustee's request for a broader stay, i.e. one that would last through the entire appellate process because it is not posting a bond. And I would deny a similar request by the movant states because they have not offered to post a bond where it is clear that there would be substantial harm to third parties occasioned by delay after the date when the Debtors have acknowledged they will, and only by that date, be ready to go effective with their plan.

Counsel for the Ad Hoc Committee of Personal Injury Claimants has also suggested that I oppose additional reciprocal conditions on my not granting the motion, reciprocal to the conditions that I am imposing on the debtors and the other plan proponents. They would basically go to any efforts by the movants to delay emergence other than of course through the appellate process. That would include continuing their commitment to an expedited

appellate process, not seeking to adjourn the sentencing hearing before the district court in New Jersey and the like.

I am not prepared to impose those conditions. However, I will reserve the appellee's right to revisit those conditions if such delaying tactics are undertaken. I don't believe they will be because I believe they are antithetical to the stated goals of the movants to expedite the appeal process and get money out to claimants. But if that proves not to be the case, then I will lift the conditions that I am imposing as a quid pro quo to my not granting the stay motions.

I noted that the Canadian claimants' motion essentially rides along on the mootness point with the other three motions that I have described. On the merits point, it addresses arguments unique to the Canadian claimants based on their assertions that they are sovereign entities and therefore that their rights cannot be constrained. I have clearly disagreed with that in my confirmation ruling.

I will also note that the objections to the Canadian claimants' points on this argument are well taken. Canadian claimants, not all of them, but Canadian claimants in their group have filed proofs of claim in these cases on behalf of all of the claimants, which would subject them to the court's jurisdiction. Moreover, the claimants' rights

are not specifically protected under the Bankruptcy Code. They fall into the waiver of sovereign immunity for governmental entities.

And again, I believe that the comprehensive bankruptcy scheme recognized by not only Ortiz but also Butner and the circuit in Manville IV, 606 F.3d 135, all contemplate that those types of rights can be constrained by the Court even where they pertain to or limit the ability to pursue claims that are direct claims, at least where those direct claims overlap with claims assertable by all creditors and based on actions that are primarily actions through the Debtors.

So I will look for an order consistent with my ruling. I will not require a notice of when the Debtors are asking for a hearing date, but only a notice of the hearing date (indiscernible) the hearing date. I will not extend the outer date for their condition beyond December 31, but that will be subject to the district court's schedule, obviously tying into the commitment that has already been given by the appellees of a 14-day notice of the actual effective date, which is all tied to giving the movants time to renew their motion for appeal -- I'm sorry, for a stay pending appeal, excuse me.

All right, are there any questions on what the order should say?

MR. FOGELMAN: Your Honor, this is Larry Fogelman on behalf of the United States. May I make one comment?

THE COURT: Okay.

MR. FOGELMAN: It's really -- it's just a clarification of one of the comments that Your Honor made. While it's true that almost all of our civil recoveries for the federal healthcare agencies that do help treat opioid use disorder, I just -- and that includes the $225 million from the Sackler settlement which will be a civil claim. And that was addressed in the letter that we filed with the Court. I just want to clarify that the $225 million asset forfeiture recovery under the plea agreement, that's required by statute to go to the asset forfeiture fund (indiscernible). I think Your Honor had said that the asset forfeiture amount goes to the federal healthcare agencies. So I just wanted to make that clarification for the Court.

THE COURT: Okay. Thank you.

MR. FOGELMAN: Thank you.

THE COURT: All right. So are there any questions on the order? No?

MR. KAMINETZKY: We will do our best, Your Honor. I think we understand.

THE COURT: I don't want the parties to spend an enormous amount of time negotiating this order. If there is a disagreement about what the parties think I said, you

should promptly send me the alternative proposed orders with the second one blacklined to show the changes and I'll enter the one that I believe is consistent with my ruling.

MR. KAMINETZKY: We will do so, Your Honor.

THE COURT: Okay, very well. Thank you.

(Whereupon these proceedings were concluded at 6:32 PM)

C E R T I F I C A T I O N

I, Sonya Ledanski Hyde, certified that the foregoing transcript is a true and accurate record of the proceedings.

Sonya Ledanski Hyde

Veritext Legal Solutions
330 Old Country Road
Suite 300
Mineola, NY 11501

Date: November 12, 2021

**&**

**&** 36:11,18 38:1 38:15 39:8 58:9 65:22 70:6 186:7 201:11 208:22 221:20 227:18 249:20 256:8 262:7 267:1,17

**0**

**01** 39:18
**06604** 39:4
**07** 121:13
**07102** 38:19
**08** 265:11 267:3

**1**

**1** 62:10 66:2 132:25 133:3 151:25 194:23 198:19 199:8 207:4 278:4
**1.4** 209:8
**1.6** 205:10
**10** 68:5 169:16 202:19 228:20 235:7,8,13 253:6 256:16
**100** 136:8 232:19
**10001** 36:14
**10007** 40:3
**10014** 36:6
**10017** 37:18
**10020** 38:4
**10022** 36:21
**10036** 37:11 39:11
**1006** 36:5
**10110** 38:11
**102** 265:11
**102179** 278:4
**10601** 1:14
**107** 265:11
**10:00** 2:3
**11** 6:2,6 13:9,12 18:22 19:2 23:9 23:13 28:16,20 33:9,13 81:9 128:6 212:5 254:13 266:23
**11/3/2021** 2:1
**11/9/2021** 2:3
**1129** 260:24
**11501** 283:23
**1177** 37:10
**12** 51:2 56:14 160:20,25 196:14 241:18 273:9 283:25
**12151** 283:7
**1221** 38:3
**13** 212:8 273:8
**132** 70:6 256:8
**135** 262:16 280:6
**137183** 81:6
**14** 45:14,17 62:3 70:20 81:25 123:1 129:20 136:22 149:19,19 161:4 166:23 170:25 176:16 177:1 178:7 180:15 181:5 182:9,10,17 188:1 207:12 216:8 218:17,19 226:3 228:4 234:17,18,19 235:6,7 238:16 239:16 242:2 269:6,22 270:8 280:20
**140,000** 214:11
**142** 256:8
**143** 70:7 267:17
**14th** 104:8 215:22 218:6 233:7 237:19 238:17
**15** 208:22 214:23 253:7
**153-154** 262:16
**155** 258:7
**15th** 156:5 167:6 176:13 180:8
**16** 129:20 223:3
**167183** 266:19
**17** 66:11 216:23 218:22 224:9
**173** 257:2
**18** 160:25 216:23 265:13
**181000** 262:9
**185** 266:14
**188** 278:2
**188-184** 257:2
**19-23649** 1:3
**1979** 277:23
**1986** 121:14 278:1
**1989** 224:9 260:6
**1995** 266:14
**1999** 259:1
**19th** 154:16
**1st** 77:10 165:17 175:2

**2**

**2** 62:14 66:12 124:5 213:15 244:18 249:7 260:6
**20** 169:14 174:20 196:7 262:9
**200** 37:3 130:18 137:17 162:17 274:10
**200,000** 249:23
**20005** 40:10
**2002** 66:14 278:3
**2006** 206:22
**2007** 154:6 212:24 266:13
**2008** 66:11,12 81:15,16 212:4 213:7 266:25
**2009** 206:19 256:7 257:1
**201** 36:5
**2010** 262:16
**2012** 213:7 267:3
**2013** 267:4
**2014** 119:22 265:11
**2015** 224:11
**2016** 66:10,11,17 70:7 256:9 268:12
**2017** 66:7,8 212:4
**2018** 262:10,11 267:1
**2019** 66:8,9 257:2
**2020** 81:6 101:8 196:16,20 197:7 197:16 198:1 212:14,19 256:15 256:16 257:9,21 262:9 266:18,19
**2021** 1:16 2:6 44:14 159:24 160:8 190:10 193:11 194:9 196:7 234:4 265:13 278:3,4 283:25
**2022** 161:17 187:9 234:5
**2023** 132:14 234:5 273:1
**2024** 87:20 112:15 132:15
**204** 205:9
**207** 267:3
**20852** 37:4
**20th** 124:1 164:24 165:15 166:13 167:9 170:11

174:9,23 176:10
203:21 216:12,16
216:22
**21**   160:20 193:11
194:9 216:10,13
217:20 218:5
273:9
**217**   81:15 266:25
**22**   159:24 160:8
160:21 190:9
273:11
**222**   66:14
**223**   278:2
**225**   162:6 211:7,8
212:15,19 273:2
281:8,11
**23**   240:15 273:11
**230-31**   66:14
**23rd**   209:15
**24**   81:16 120:16
160:25 256:6
267:1
**248**   1:13
**25**   162:6 212:20
213:10 273:10
**26**   160:22 208:22
209:3
**27**   66:8,8 160:22
**28**   66:9 120:16
160:22
**283**   66:13
**28th**   197:5
**2:00**   156:18
**2:30**   156:20
**2d**   257:2,20
262:16 265:11,13
278:2
**2nd**   204:1

**3**

**3**   5:21 44:14 92:12
129:11 142:4
266:19

**30**   62:14 66:12
170:24 171:2
172:20 176:25
177:19,22 179:8
180:16,16,23
186:12,14 202:13
216:6 232:19
237:10,11 256:13
274:9
**30-45**   200:15
**300**   1:13 283:22
**30th**   123:9 165:2
170:7,12 176:15
177:3 183:7
186:18 216:16
240:15
**31**   169:14,16
186:14 269:7
270:6,18,25 271:3
271:5,16 272:11
280:17
**31st**   161:15
174:10 180:10
**32399**   39:19
**3264057**   256:15
257:9
**330**   283:21
**332**   267:3
**337**   154:5 266:12
277:1
**3376**   66:8
**34**   267:2
**347**   266:12
**348**   266:13
**3484**   5:13 18:18
**35**   139:10
**35,000**   231:9
**354**   262:10
**359**   58:10
**36,000**   207:3
**361**   154:5 266:12
277:1

**363**   133:24 143:7
**368**   58:10
**37**   216:5,6
**3726**   6:8 13:14
19:4 23:15 28:22
33:15
**3773**   5:14 6:24
10:17 18:19
**3776**   2:13 6:16
**3777**   2:13 6:15
**3778**   2:14,18 4:14
5:5 6:16 7:20 8:11
10:22 12:18 13:19
14:3 15:21 17:18
18:9 19:9 20:21
22:18 23:20 24:3
25:16 27:14 28:11
29:3,9 30:21
32:18 33:20 34:3
**3779**   5:22 6:16
7:11
**3786**   6:3,24 10:17
13:9 18:23 23:10
28:17 33:10
**3787**   6:9,24 10:17
13:15 19:5 23:16
28:23 33:16
**3789**   2:18 3:3,16
4:6,14,20 8:11
9:20 10:18,22
11:8,21 12:10,18
12:24 13:18 14:3
15:7,21 16:7,20
17:10,18,24 18:9
19:9 20:13,21
21:7,20 22:10,18
22:24 23:19 24:3
25:7,16 26:3,16
27:6,14,20 29:3,8
30:13,21 31:7,20
32:10,18,24 33:19
34:2 35:7

**3799**   6:15
**3801**   2:17 3:3,16
4:14,19 5:4 6:17
7:19 8:10 9:19
10:22 11:8,21
12:18,23 13:18
14:2 15:6,21 16:7
16:20 17:18,23
18:9 19:8 20:12
20:21 21:7,20
22:18,23 23:19
24:2 25:6,16 26:3
26:16 27:14,19
28:10 29:2,8
30:12,21 31:7,20
32:18,23 33:19
34:2 35:6
**3803**   2:18 6:25 7:7
8:11 10:23 13:19
14:3 15:22 18:9
19:9 20:22 23:20
24:3 25:17 29:3,9
30:22 33:20 34:3
**3804**   7:8
**3810**   20:17
**3838**   7:13
**3845**   2:18 3:3,16
4:7,14,20 8:11
9:20 10:23 11:8
11:21 12:11,18,24
13:19 14:3 15:7
15:17,22 16:7,20
17:11,18,24 18:10
19:9 20:13,22
21:7,20 22:11,18
22:24 23:20 24:3
25:7,17 26:3,16
27:7,14,20 29:3,9
30:13,22 31:7,20
32:11,18,24 33:20
34:3 35:7
**3847**   20:17

**3860** 4:14,20 9:20 12:18,24 15:7 17:18,24 18:9 20:13,17 22:18,24 25:7 27:14,20 30:13 32:18,24 35:7
**3873** 2:17 3:3,16 4:6,14,19 8:10 9:19 10:22 11:8 11:21 12:10,18,23 13:18 14:2 15:6 15:21 16:7,20 17:10,18,23 18:9 19:8 20:12,21 21:7,20 22:10,18 22:23 23:19 24:2 25:6,12,16 26:3 26:16 27:6,14,19 29:2,8 30:12,21 31:7,20 32:10,18 32:23 33:19 34:2 35:6
**3890** 4:14,19 9:19 12:18,23 15:6 17:18,23 20:12 22:18,23 25:6 27:14,19 30:12,17 32:18,23 35:6
**3918** 45:18
**3958** 156:5
**3972** 2:18 4:6,14 5:4 7:21 8:5,11 10:5,22 12:10,18 13:18 14:3 15:21 17:10,18 18:9 19:9 20:21 22:10 22:18 23:19 24:3 25:16 27:6,14 28:10 29:3,8 30:21 32:10,18 33:19 34:2 45:15
**3973** 8:7 18:9
**3988** 224:12
**3rd** 40:2 267:3

**4**

**4** 68:5 127:19 149:2 211:12 212:6
**4.25** 209:17
**4002** 2:20 8:13 10:25 13:21 14:5 15:24 19:11 20:24 23:22 24:5 25:19 29:5,11 30:24 33:22 34:5
**4003** 2:24 11:4 16:3 21:3 25:23 31:3
**4006** 3:5,10,20 4:24 8:17 9:3 11:10,15 12:1 13:3 14:9,16 16:9 16:14 17:1 18:3 19:15,22 21:9,14 22:1 23:3 24:9,16 26:5,10,20 28:3 29:15,22 31:9,14 32:1 33:3 34:9,16
**4007** 8:20 14:12 19:18 24:12 29:18 34:12
**4008** 9:6 14:19 19:25 24:19 29:25 34:19
**4009** 3:11 11:16 16:15 21:15 26:11 31:15
**4010** 3:18 11:23 16:22 21:22 26:18 31:22
**4011** 3:22 12:3 17:3 22:3 26:22 32:3
**4012** 4:9 12:13 17:13 22:13 27:9 32:13
**4013** 9:12 14:25 20:5 24:25 30:5 34:25
**4014** 4:16 9:15 12:20 15:2 17:20 20:8 22:20 25:2 27:16 30:8 32:20 35:2
**4015** 9:16 15:3 20:9 25:3 30:9 35:3
**4016** 4:21 9:21 12:25 15:8 17:25 20:14 22:25 25:8 27:21 30:14 32:25 35:8
**4017** 4:25 13:5 18:5 23:5 28:5 33:5
**4043** 10:7 45:19
**4048** 18:11
**4049** 10:14
**4050** 5:6 28:12
**4051** 15:13
**4075** 195:21
**409** 256:6,13
**41-48** 257:20
**418** 257:1
**434** 257:1,19
**434-435** 267:17
**440** 277:23
**45** 277:23
**450** 37:17
**475** 267:1
**48** 93:2 277:23
**490** 260:6
**4:00** 189:16

**5**

**5** 256:15
**5-6** 66:7,10 196:14
**500** 38:10 206:12 241:13
**505** 121:13 277:25
**506** 121:13
**5076975** 66:12
**515** 196:15
**524** 69:6,23 258:16 260:9
**527** 259:1
**544** 66:7
**547** 196:20 197:7 197:15
**548** 256:12 257:10
**55** 36:13
**551** 70:6 256:8 267:17
**556** 257:1,19 267:16
**56** 58:9
**560** 66:17 268:11
**570** 38:18

**6**

**6** 160:25 224:12
**6-7** 278:4
**600** 162:8
**606** 262:15 280:6
**62** 277:16
**630,000** 202:16
**634** 212:25 265:13 265:20
**636** 265:20
**65** 211:9
**681** 256:12
**683** 257:10
**684** 257:10,15
**687** 266:14
**6:32** 282:7
**6th** 233:8

**7**

**7** 160:20 188:5 215:13 216:18,21 217:20 257:9 260:24 266:24 273:8
**700** 137:17
**7069** 224:9
**729** 267:3
**75** 124:15
**755** 260:6
**75th** 123:5
**762** 260:6
**772** 265:10
**778** 5:21
**78** 205:13 209:14
**797** 121:13 277:25
**7th** 121:14 123:10 170:9 183:7 187:21,22 189:9 215:2,16,19,21,22 216:9 217:19 237:19 239:14,16 240:14 277:25

**8**

**8** 149:3 174:19
**8000** 66:2
**8007** 2:12 5:4,21 6:15 7:19 8:5 10:5 10:12 28:10 63:7 63:21 64:6 65:23 66:19 119:22 268:9 277:3,12
**8025** 61:13,24 62:4,9 63:14 64:4 64:6,8,8 66:19,20 70:21 95:11 149:17 184:14,24 185:6,13,16 216:7 226:24,25 268:7,9 268:14,17 269:5 271:19
**815** 259:1
**82** 106:25
**836** 66:10
**838** 265:12,20
**84** 66:17 268:11
**850** 39:3
**86** 40:2
**88** 66:17 268:11
**8th** 55:14 77:12 123:3 175:1

**9**

**9** 1:16 2:6 28:16 56:12 57:4,21 58:4 160:20,25 190:11 193:12 194:11 262:10 273:8,9
**9/15/2021** 5:9 18:14
**9/17/2021** 6:2,8 13:9,14 18:22 19:4 23:9,15 28:22 33:9,15
**90** 242:10
**919** 36:20
**933** 257:2
**94** 204:22
**95** 204:23
**96** 202:17 204:24
**97** 222:11
**973** 257:20
**9:49** 1:17
**9th** 160:8 196:11

**a**

**aac** 198:10
**abandon** 247:21
**abate** 251:23
**abatement** 85:24 133:15 136:23 145:19 187:12 192:16,23 205:15 207:21 212:11,16 212:22 213:1 217:4 220:15,20 222:15 223:4,5,8 235:5 236:6 243:20 244:25 245:4 272:16 273:2,4 274:5
**abeyance** 101:8 101:16
**ability** 58:15 112:22 127:6 172:8 176:5 203:2 204:12,13 250:25 251:6 268:8 280:8
**able** 99:10,16 100:13 109:7,13 109:20 126:25 168:10 178:25 184:9 216:21 233:8 237:12 240:13 241:17,19 242:5 275:8
**abrams** 40:21
**absence** 149:12 238:20 250:8
**absent** 75:19 76:7 256:22 257:14 264:18
**absolute** 259:11
**absolutely** 58:1 173:22 203:5 220:5,24 249:7
**abstract** 100:20
**abused** 86:12 93:25
**academics** 276:15
**accept** 97:11 115:5,13 164:5 217:1 275:5
**acceptable** 150:9
**accepting** 115:17
**access** 203:12 264:13
**accident** 206:19 209:4
**accompanied** 188:2
**account** 51:23 52:2,4 125:13 162:5,11,22 169:6 174:6 261:9,22 265:25
**accountable** 203:24
**accounts** 46:4 47:17,22
**accrue** 229:18,19 233:6 239:25
**accurate** 197:19 283:4
**accusations** 219:24
**achieve** 223:16
**achievement** 113:6
**achieving** 269:19
**acknowledge** 132:6
**acknowledged** 78:12 134:7 136:4 249:21 278:16
**acquiesced** 48:18
**act** 147:16,17 211:20 220:18
**acting** 86:11 211:22
**action** 89:25 92:9 125:4 147:23
**actions** 58:24 83:17 88:2 90:11 102:22 164:19 172:16 173:10 188:4 198:5 226:2 269:11,15 280:11 280:11

**actively** 189:1
**activities** 75:2
  177:8,10 183:19
**activity** 61:12
  74:10,11,24
  141:21
**actors** 119:19
**actual** 59:9 75:24
  148:24 166:24
  180:1,12 182:9
  210:21 241:15
  267:15 269:23,24
  270:6 280:20
**ad** 2:16,19 3:7,10
  4:1,7,25 8:9,12
  10:21,23 11:12,15
  12:5,11 13:4,17
  13:20 14:1,4
  15:20,22 16:11,14
  17:5,11 18:4 19:7
  19:10 20:20,22
  21:11,14 22:5,11
  23:4,18,21 24:1,4
  25:15,17 26:7,10
  27:1,7 28:4 29:1,4
  29:7,10 30:20,22
  31:11,14 32:5,11
  33:4,18,21 34:1,4
  37:9 38:2 39:17
  93:3 189:15
  202:19 214:18
  221:17,20 227:19
  276:17 278:18
**add** 65:21 66:4
  97:22 119:11
  122:14 143:15
  157:12,15 186:3,6
  251:12 269:1
**added** 70:21
  157:24 171:18
  216:9 218:8
**addition** 53:18,23
  54:4 162:7 165:3

226:14 234:13
  266:15 269:13
  273:19 275:10
**additional** 64:2
  70:20 76:2 113:12
  120:13 128:9
  129:22 131:2
  178:11 184:4
  186:7 188:8
  207:10,11 226:15
  237:11 242:1
  244:18 267:25
  273:23 278:19
**address** 45:24
  46:2 48:10 54:21
  54:25 59:21 61:12
  67:19 84:16
  118:14 124:6
  132:14 145:20
  158:22 188:14
  192:7 201:21
  202:21,23 214:22
  216:25 221:25
  222:1 224:17
  227:21,24 229:6
  229:20 248:14
  249:9 255:18,21
  255:23 257:16
  260:21 271:23
  273:11
**addressed** 59:21
  60:6 64:4,5 90:23
  94:3 148:15
  165:22 202:24
  222:24 223:1
  245:13 267:8
  275:18 281:10
**addresses** 49:10
  279:16
**addressing** 52:16
  52:17 94:4 118:8
  132:4 255:19,22

**adelphia** 53:21
  154:5 266:12
  267:7 276:25
**adequate** 93:9
  149:21
**adequately** 136:1
  259:23
**adjourn** 242:7
  279:1
**admin** 236:21
**administrative**
  236:25
**admiration**
  134:14
**admissibility**
  125:19 190:19
  194:17 195:2
**admissible** 134:11
**admission** 158:20
  191:1 192:1
  193:20 199:7
**admit** 190:19
  192:18 193:18
  194:18 198:3
  199:1,12 209:10
**admitted** 47:12
  163:6 190:23
  197:24
**admittedly**
  208:16
**admitting** 198:4
**adopt** 122:21
  147:2 155:3,6,7
  243:10
**adopted** 115:24
  115:25 156:13
  157:12 272:21
**adopting** 155:9,9
**adopts** 255:15
**advance** 4:13 9:11
  12:17 14:24 17:17
  20:4 22:17 24:24
  27:13 30:4 32:17

34:24 83:19 97:15
  109:3 115:16,24
  124:2 139:13
  149:1 157:2
  164:20,22 173:10
  200:14 226:2,4
  254:14 255:4,12
  269:12
**advanced** 234:11
**advances** 15:16
  18:8 139:23
**advantage** 234:24
**adverse** 276:21
**advise** 105:1
**advised** 123:9,19
**advisor** 126:17
**advisory** 224:21
**advocacy** 191:16
**advocating** 86:13
**afanador** 38:15
**affect** 54:3 110:12
**affidavit** 196:15
  197:19
**affiliated** 6:7
  13:13 19:3 23:14
  28:21 33:14
**affirm** 122:22
  190:1 192:10
  193:2 194:1
  195:24
**affirmance**
  236:14
**affirmative**
  152:15
**affirmatively**
  272:7 275:5
**affirmed** 59:2
  267:3
**affirming** 62:5
**affording** 203:23
**afternoon** 156:24
  157:5,18 193:25
  201:10 242:25

246:21
**agencies** 211:10
213:12 220:21
222:5 281:7,15
**agency** 118:20
119:1 213:10
**agenda** 2:6,6
**aggregate** 91:17
**ago** 106:19 197:5
201:23 207:24
214:23
**agree** 52:3 53:12
55:5 65:2,6 68:9
69:8 78:16,17,18
79:6 86:2 92:22
97:12 102:1,12
107:23 108:2
109:3,8 113:15
124:14 130:12
132:15 138:23
140:13 142:19,24
151:4 153:20
167:3 176:4 200:1
212:16,22 215:12
229:25 274:12,13
274:18
**agreed** 110:20
113:4,19 146:4
164:25 165:13,23
165:24 166:12,25
171:1 174:21,22
180:13 186:13
191:15 208:24
**agreeing** 115:13
270:3
**agreement** 72:25
76:3 98:22 99:1
101:7 104:5,16,20
105:3 114:2
124:13 142:16
150:13,15 164:23
165:20 170:22
175:6,23 200:1

213:2 245:25
270:5 281:12
**agreements**
153:12 189:11
263:20
**agrees** 179:2
**ags** 204:12,22,25
205:20 208:20
209:1
**ahc** 164:15
**ahead** 67:22 94:20
99:16 137:25
138:1 154:12
175:20 213:15
246:22
**aid** 118:1
**aisling** 42:8
**akin** 39:8 201:11
**al** 3:5,17 8:20 9:6
11:10,22 14:12,19
16:9,21 19:18,25
21:9,21 24:12,19
26:5,17 29:18,25
31:9,21 34:12,19
44:3 156:25
**albeit** 189:3
**aleali** 40:22
**alexander** 41:22
**alice** 43:6
**allegation** 249:8
267:13
**allegations** 89:15
89:23 90:2,20
249:5 263:9
**allege** 89:5,8
230:18 232:3
**alleged** 212:9
232:17
**allegedly** 230:23
**allen** 25:10 38:21
146:24
**allies** 86:20

**allocated** 223:7
**allocation** 218:18
**allow** 9:8 10:9
14:21 20:1 24:21
30:1 34:21 60:18
99:21,21,22 100:9
101:9,25 103:18
105:4 107:2 109:3
110:10,11 112:16
117:14,17 118:3
122:9 129:23
163:19 167:9
227:7 240:13
245:7 253:16
**allowed** 86:18,19
90:9 222:15 242:3
242:3,14
**allowing** 109:12
244:24
**allows** 100:18
**alluded** 148:23
**alluding** 233:18
**altered** 139:22
**alternative** 63:25
64:17 65:8 66:19
66:24 83:8 101:24
158:7 189:2 261:3
282:1
**alternatively** 67:1
**alternatives** 61:15
150:8 276:10
**amenable** 142:10
142:16
**amended** 6:2,6,11
6:11 7:15,17 8:2,3
10:1,3 13:8,12
18:22 19:2 23:8
23:13 28:15,20
33:8,13 45:15
105:2 254:12
**american** 2:24
11:4 16:3 21:3
25:23 31:3 207:11

**americans** 129:23
129:24 205:11
**americas** 37:10
38:3
**amicus** 211:5
**amid** 141:24
**amount** 52:10
67:8 92:12 106:6
106:7 113:25
131:11 132:8
135:24 143:14,15
150:20 162:14
178:23,24 185:25
211:12 212:6
223:8 234:6 240:7
241:12 254:16
257:13 281:15,24
**amounts** 275:10
**ample** 270:7
**amplify** 234:9
**amply** 273:6
**analogous** 277:15
**analogy** 119:13,16
**analyses** 198:9
262:23
**analysis** 97:4
117:1,22 198:7
210:17 230:10,14
231:3 232:6 233:5
236:18 257:19,22
258:16 260:17,18
260:24 261:13
262:1 275:3
**analyze** 109:11
**anderson** 66:16
66:17 268:11,11
**andrew** 43:5,8
**ann** 41:23
**announcement**
229:2
**annual** 205:12
**answer** 45:4 79:2
84:9 87:21 88:10

104:1 173:14
179:17 182:1
205:1,7 245:22
246:6
**answered**  82:19
**anticipate**  123:12
139:12
**anticipated**
107:12
**anticipating**
247:15
**antithetical**  279:8
**anxious**  114:8
**anybody**  151:10
229:9 235:21,25
237:2,9
**anyone's**  59:19
**anyway**  48:12
79:19 85:16
121:14 221:2
**anyways**  218:23
**apart**  223:17
236:14 238:14
**apologies**  245:20
**apologize**  154:12
**apparent**  138:22
**apparently**  102:4
107:7 115:7 214:7
**appeal**  2:2,9,12
3:2,9,15 4:4,6,13
4:19,24 5:3,20
6:11,14,23 7:7,15
7:18 8:1,4,17 9:3
9:11,19 10:4,12
10:16 11:7,14,20
12:8,10,17,23
13:3 14:9,16,24
15:6,12,15 16:6
16:13,19 17:8,10
17:17,23 18:3,8
19:15,22 20:4,12
20:16 21:6,13,19
22:8,10,17,23

23:3 24:9,16,24
25:6,10 26:2,9,15
27:4,6,13,19 28:3
28:9 29:15,22
30:4,12,16 31:6
31:13,19 32:8,10
32:17,23 33:3
34:9,16,24 35:6
44:4 52:12 53:25
54:6,7,9,13 56:5
59:2 60:3,18
62:10,12,13,23,24
63:9,11 66:1,3
67:11 69:5,25
75:19,21 76:14
79:10 80:14 81:2
81:9,12,19 82:4,9
83:11 85:5 86:6,7
90:7 94:4,5,10
95:3 100:4 102:2
104:8 105:5,11,12
108:1 110:17,18
110:19,21 111:7
114:17 115:16
116:2 118:19
119:4,5 120:11,13
122:4,11 132:13
139:22 140:14
143:21 148:5
152:11 155:15,25
156:8 157:2 158:1
164:14 167:5
190:9 193:10
194:9 196:7 211:3
211:7 213:14,17
214:10 217:13
227:16 228:9,15
230:1 233:23
251:21 252:1
254:10,11,21
255:3,6,24 256:1
256:3,5,10,18
257:5,8,23 258:1

258:8,12 260:18
264:16 265:7,15
266:2,4,10,22
267:8,10,11,20,22
267:24 268:8,19
268:20,23 271:21
273:23 275:1,16
275:17,23 276:25
277:9 279:9
280:22,23
**appealed**  49:14
128:8 255:4,12
**appealing**  84:15
107:10 113:16
114:7 145:4
204:16 211:5
251:19 274:15
**appeals**  62:10,13
62:17,17,19,21
63:2 64:13 72:11
82:15 88:2,5
100:15 102:7,14
104:2 111:5
118:23 120:5
124:8 163:20
164:18 165:2
167:10 205:22
226:5 228:5
253:16 258:5
264:22,23 267:21
268:19 273:25
**appear**  54:1
195:14
**appears**  60:1
78:10 270:23
272:10
**appellant**  119:25
140:4 225:13
**appellant's**  122:4
**appellants**  81:7
106:10 107:25
113:7,9 149:18
157:1 187:25

225:12 228:1
229:10,11 237:24
241:25 243:11,24
244:11 254:23
258:15 266:21
267:18 269:22
270:8 276:20
**appellate**  62:8
63:23,25 64:16,25
67:1 68:12,13,15
68:18 70:25 86:17
87:3 90:23 93:12
95:6 101:17 107:9
108:12 110:5,13
114:10 125:7
136:11,17 146:1
150:1,23 151:8
152:23 153:2
172:1,2 189:2
210:8 227:7
238:14 240:1,2,5
269:9 271:18
278:11,24 279:1
**appellees**  48:18
48:22 113:7,9
115:2 143:4
145:17 169:11
173:16 188:3
189:12 215:12
225:25 249:1
269:1,21 276:21
277:21 280:20
**appellee's**  279:5
**appetite**  109:6
**applauds**  208:23
**apples**  108:3
**applicable**  152:17
172:22 258:14
**applicant**  230:15
233:13
**applicants**  233:21
235:10 239:11,18

**application**
232:21,22 238:23
**applications**
185:24
**applied** 119:6
**applies** 57:15 58:7
58:17 136:14
184:18,19,25
263:20
**apply** 71:23 76:24
88:4 136:18
224:23 246:12
259:7 263:11
**applying** 125:22
**appointed** 86:11
207:20
**appreciate** 84:1
98:14 115:1 154:3
**apprehension**
123:22
**approach** 66:23
**approaching**
79:12
**appropriate** 46:3
46:11 62:25 90:21
155:21 246:9
268:16 270:13
**appropriately**
69:13 264:15
**approvals** 173:4
**approximately**
202:13 205:9
212:5
**appx** 265:13,20
**ardavan** 41:11
**area** 168:23
252:18
**aren't** 253:25
**arguable** 152:20
**arguably** 51:22
167:15 168:5
181:21 217:20

**argue** 72:21 73:3
74:2 76:23 77:2,7
79:13 98:8 123:23
124:2,4,9 143:4
164:18 168:24
173:20 176:7
188:3 191:9 203:1
205:21,23 206:1
211:24 242:6,9
264:20 269:8
**argued** 63:20 65:2
72:18 124:20
138:11 213:19
258:21 263:22
264:6
**argues** 214:3
**arguing** 52:1,11
104:17 112:11,11
143:22 165:8
**argument** 45:1
51:1 55:7 56:4
59:10,13,25,25
60:21 61:9 70:13
70:23 73:15 74:15
76:6 77:11 81:11
83:15,24 84:12
86:7 92:25 96:20
97:7 98:16 99:5,8
103:24 105:18
116:3 117:7
119:12 123:8,15
128:15,17 129:4
130:1 133:1,5,10
133:11 138:6
140:8 148:15
152:13 153:1,18
173:10 183:18
187:17 188:8,9,19
189:5 199:15
201:6,21 202:25
207:13 208:18
216:14 221:6
229:12,13 231:1

239:3 243:7
245:14 252:8
258:16,16,17,20
260:9 268:3,5,24
269:2 277:25
279:21
**arguments** 60:4
67:19 103:12
104:4 118:3
122:21 126:3
146:15 164:14
170:7 206:5
207:17 222:3
230:25 243:9
248:9 251:20
260:19,22,23
261:5 270:3
279:16
**arik** 39:14 191:8
201:11 220:23
**arises** 96:8
**arising** 109:13
**arkansas** 195:5
196:16,20 197:2,7
197:10,12,16
198:2,11
**arm** 210:12
**arrived** 197:9
**art** 1:25
**artakeback.org.**
197:3
**article** 197:6
**articles** 197:6
**articulate** 167:20
236:9,9 238:22
**articulated** 180:3
193:20 235:17
258:19
**articulation**
232:18
**aside** 235:7
**asked** 63:19,24
64:1 73:12 78:4

84:5 154:16
157:10,11 166:7
166:25 197:10
206:23 211:6
267:20
**asking** 45:20 46:8
46:19,22 64:15
72:14 77:2 83:8
98:15 101:15
107:11 134:22
154:17 171:6
178:13 186:13
200:8 202:10
250:21 280:15
**asks** 267:23
**aspect** 150:2
**assert** 88:17 247:3
**assertable** 280:10
**asserted** 48:5
88:18 89:7 198:18
233:1 262:3
**assertions** 279:17
**assess** 130:23
**assessment** 54:7
69:6 70:9 97:20
98:7 128:16 140:6
160:23 256:24
275:21
**asset** 74:17 90:16
281:11,13,14
**assets** 74:12,13
78:24 151:9,20,22
152:9,10,21,24
153:5,22,22
172:23 173:5
**assistance** 100:1
**associated** 144:1
**association** 3:22
12:3 17:3 22:3
26:22 32:3 81:5
198:10 257:20
**assume** 55:4 60:3
93:6 161:2,5

182:20 246:16
**assumes** 125:15
**assuming** 87:12 171:1,24 182:16 186:21 207:3 225:10,14 247:1
**assumptions** 198:5
**assurance** 198:21
**assurances** 97:14
**assuring** 238:15
**atkinson** 40:23
**attached** 50:14 176:11 198:18 199:8
**attack** 65:20 83:22 231:12
**attempt** 206:24 232:2
**attempted** 109:1 121:18 206:15 264:20
**attempts** 94:24
**attest** 189:21
**attorney** 37:1,2 37:16 39:2,16 155:8,8 203:1 204:13 206:7,22 207:1
**attorney's** 200:2,3
**attorneys** 36:4,12 36:19 37:9 38:2,9 38:16 39:9,17 40:8 105:19 137:1 139:25 203:8 204:16
**august** 209:15 237:22 266:19
**authority** 63:21 63:21 79:6 250:4 278:5
**authorization** 80:10 231:19
**authorized** 83:17 84:11 231:16,17
**authorizes** 80:7
**authorizing** 5:9 18:14
**automatic** 6:21 7:4
**automatically** 62:7 127:4
**available** 46:22 114:4 159:7 180:23 192:9 212:11 213:4 230:7 243:22 245:6 271:5
**avenue** 36:20 37:10,17 38:3,10
**avenues** 227:7
**avoid** 72:10 101:23 202:8
**avoiding** 111:12 112:3 114:10
**awarded** 239:7
**aware** 60:6 90:12 97:17,19,20 109:18,20 125:18 150:17 152:14
**awful** 103:12
**awkward** 67:12

**b**

**b** 1:21 62:9 133:24
**b.r.** 66:7,8,10,13 66:17 70:6 154:5 224:11 256:6,8,12 256:13 257:10 266:12,14 267:2 267:17 268:11 277:1
**babies** 3:11 11:16 16:15 21:15 26:11 31:15
**back** 54:11 74:23 82:13 92:10 113:13 121:23 122:6 123:21 137:7 140:12 141:4 156:2,20,24 157:22 166:21 167:17 169:3 170:2,14 172:15 175:16 176:13 178:8,9 179:15 183:12 199:15 205:13 217:17 218:5,22 234:16 249:12
**bad** 206:3 238:10
**balance** 48:23 51:7,14 52:24 58:2 70:8,9 85:16 85:18 113:3 121:16,16 125:16 136:10 144:3 189:6 200:24 201:7 221:25 222:22 227:5 250:9 256:18,24 276:2
**balanced** 230:16 233:4,13
**balances** 188:20
**balancing** 91:1 94:4 103:10 108:6 113:13 178:23 217:10 250:7 266:15 277:7
**ball** 40:24
**baltimore** 37:4
**bank** 66:16 81:5 268:11
**bankr** 66:7,9,10 66:12,14 70:7 81:15,15 256:6,8 256:15 262:10,10 266:25,25
**bankruptcy** 1:1 1:12,23 2:12 5:4 5:20 6:15 7:19 8:5 10:5,12 28:10 61:12,24 62:6,7 63:2,5,6,9 64:9,11 65:23,24 66:2,18 76:1 81:12 86:12 93:25 111:4,15 129:14 154:23 155:17 199:22 203:14,22 221:10 224:11 226:25 229:25 230:2 234:24 245:2 259:17,17 260:7 263:16 265:7,19 266:7 268:7,7,13 269:20 273:18,19 277:19,19 280:1,5
**bap** 61:25
**bar** 150:18
**bare** 153:7
**bargained** 272:18
**bargaining** 272:19
**barker** 40:25
**barking** 221:13
**barnes** 3:21 12:2 17:2 22:2 26:21 32:2
**based** 53:9 55:14 57:19 68:13 71:17 71:20 74:2 77:6 89:1,8 97:20 113:20 119:4 123:23 125:25 126:5,6 127:22,24 128:15,20,25 129:8 130:3,17 132:8 135:13 143:4 160:23

NAS4189

164:2 173:21 217:6 225:14 230:15 241:16 250:19 257:23 261:13,19 268:2 269:2,10,13 279:17 280:11
**baseless** 249:8,10
**basic** 277:22
**basically** 56:17 103:13 172:5 217:19,21 221:12 278:22
**basics** 139:9
**basis** 67:15 72:22 73:14 78:4 81:13 82:7,24 83:20,22 97:16 107:17 116:3 117:7 124:4 128:7 136:3 140:4 140:18,24 147:25 149:5 151:12 188:5 225:13 226:2,7,20 237:5 253:12
**bass** 20:17 40:14 44:9 146:17,17,18 146:21,23 154:8,9 154:11,14,21 155:2,7,11,19,23 156:3,6,11 254:25
**battle** 91:18
**becoming** 243:13
**beeman** 265:9
**began** 86:5
**beginning** 65:16 187:9 228:12 229:22 242:19
**behalf** 2:14,19,23 3:4,10,17,21 4:7 4:15,20,25 5:5,22 6:16,25 7:8,12,20 8:6,12,18 9:4,12 9:15,20 10:6,13 10:18,23 11:3,9 11:15,22 12:2,11 12:19,24 13:4,19 14:4,10,17,25 15:2,7,12,16,22 16:2,8,14,21 17:2 17:11,19,24 18:4 18:10 19:10,16,23 20:5,8,13,22 21:2 21:8,14,21 22:2 22:11,19,24 23:4 23:20 24:4,10,17 24:25 25:2,7,11 25:17,22 26:4,10 26:17,21 27:7,15 27:20 28:4,11 29:4,9,16,23 30:5 30:8,13,22 31:2,8 31:14,21 32:2,11 32:19,24 33:4,20 34:3,10,17,25 35:2,7 39:2 65:14 71:10 92:24 146:25 189:14 191:5,9 195:8 198:10 201:11 225:20 227:19 231:16 238:21 243:1 246:20 247:25 279:24 281:2
**belabor** 202:12 205:4
**belief** 129:12 192:15
**believe** 44:10 46:15 47:25 53:20 59:23 66:22 70:1 80:6 83:17,19 84:10 85:15 87:11 87:11 89:14 90:24 97:3 100:20 101:20 102:18 103:4,7,24 105:20 106:12 113:17 121:10 143:3 147:15 148:5,17 149:2 185:21 190:16 198:8 200:19 207:16 211:19 215:16 236:10 251:18 255:12 258:8,13 260:8,21 261:5,23 262:25 263:6,13 263:24 264:3,11 264:13 267:8 268:3,16 270:13 271:1,12,19 272:3 273:20 275:13 277:2,5,17 278:7 279:7,7 280:4 282:3
**believed** 105:21 276:23
**believes** 127:21 129:8
**believing** 128:7
**bell** 74:25
**belong** 69:12
**ben** 44:23
**bench** 6:1 13:8 18:21 23:8 28:15 33:8 178:3 260:8
**benedict** 41:1
**benefit** 82:25 84:14 92:17 109:8 109:19 116:20 120:23 152:9 219:5 222:19 244:1 249:3 273:12 275:23
**benefits** 101:25 105:13 146:7 222:21 264:8
**benjamin** 36:8 37:20 54:20 157:6 163:11
**bernard** 41:11
**bernhoff** 206:18
**bernie** 65:14
**best** 92:1 130:23 141:19 150:6 230:2 236:8 240:8 260:25 281:21
**beth** 36:9 41:23 44:24 63:17 67:24 248:11
**better** 63:13 101:25 122:10 125:10,10 222:15
**beyond** 58:4 61:9 63:11,16,19 92:2 112:11 114:6 133:14 153:16 189:7 217:25 234:20 240:5,20 259:11 266:10 280:17
**bgi** 265:9,10
**bickford** 41:2
**big** 145:4 168:25 206:1 207:16 209:6 227:11 228:14 237:5
**biggest** 208:2 212:8 237:8
**bill** 48:2
**billion** 92:12 205:13 208:22 209:3,8,14,17 212:5,6 213:15 223:7 232:20 244:18 249:7 272:24
**billions** 220:22 241:3 243:20 244:24

**bind** 73:8,9
**binder** 271:11
**binding** 59:1,14
**bit** 50:3 82:13 84:3 187:13 202:8 241:24
**bizarre** 59:13 115:8
**blabey** 41:3
**black** 173:22
**blackletter** 58:16
**blackline** 8:1
**blacklined** 282:2
**blame** 204:10
**blaming** 203:17 248:24
**blasio** 257:20
**blatant** 55:9
**blatantly** 220:5
**blazing** 103:14
**blood** 180:5
**bludgeon** 105:16
**blue** 3:21,21 12:2 12:2 17:2,2 22:2,2 26:21,21 32:2,2
**board** 223:25
**boards** 78:1 147:24
**body** 238:3
**bona** 259:12
**bond** 52:17 118:15,18 119:5,6 119:8,25 120:12 120:13 122:3 135:22,24 152:14 152:22 153:2,13 153:25,25 188:21 201:7 224:17,19 225:4,5 227:6 233:18,19,22 239:2,8,10,18 240:4,9,19,24 241:11,12,14,16 242:16,16,18 250:4 276:19,20 276:24,25 277:3 277:14,17 278:6,7 278:11,13
**bonding** 120:15
**bonds** 119:15,19 233:24 235:20 277:23
**boneheaded** 209:16
**booted** 111:8
**bound** 84:3 259:22
**bounty** 237:11
**box** 247:5
**brauner** 41:4
**breach** 89:16 232:13
**breached** 89:18
**breaching** 89:3
**break** 156:19 157:19
**breath** 136:25
**breathless** 55:15
**brian** 7:20 8:6 15:16 18:10 37:6 42:2 48:9 251:15
**briccetti** 81:5
**bridgeport** 39:4
**brief** 55:17,21 58:22 61:16 71:21 79:7 89:4 148:21 154:18 156:21 184:1 189:5 199:15,17 214:7 220:10 230:11 247:2 248:8,9 252:8
**briefing** 109:21 109:24 115:15 149:1 154:16 155:14 255:5
**briefly** 60:8 145:16 147:2 158:4 219:23 225:18 229:6 243:2 248:13 255:23 257:16
**briefs** 55:24 94:9 103:4 211:5
**bring** 102:22 193:24 195:10 203:8 215:8 231:8
**bringing** 126:11 206:2 228:13
**broad** 38:18 71:8 80:10 119:3 147:17
**broader** 65:7 278:10
**broke** 157:11
**brooks** 40:25
**brought** 49:8 63:4 63:6 203:15 211:2
**brown** 256:15 257:9
**bryant** 39:10
**built** 167:14,16
**bulk** 52:16 231:7
**bullet** 117:8
**bulletproof** 116:4 116:12
**bump** 239:23
**burden** 82:21 171:6,9,11,11,19 171:22 179:21,22 179:23,24 184:4 223:19,20,21 233:16 256:2,17 261:7 270:10,21 270:22 271:13 272:22 275:25
**burdens** 114:8 252:16
**business** 55:17 56:3,10 126:25 127:6 128:21 139:16 142:1 143:5 168:11
**busy** 181:12 228:25
**butner** 277:22 280:6
**button** 197:3

**c**

**c** 4:20 9:20 12:24 15:7 17:24 20:13 22:24 25:7 27:20 30:13 32:24 35:7 36:1 41:18 42:1 42:20 44:1 62:3 119:22,23 160:3 193:5 196:2 283:1 283:1
**c.d.** 66:7
**cabin** 92:1
**cabined** 70:1 263:1 264:4
**cabinet** 201:17
**cal** 66:7
**calculable** 135:21 135:21
**calculate** 135:18
**calculation** 160:23 240:14
**calculus** 124:25 230:13 232:23
**calendar** 200:16 271:4
**california** 44:8 65:15,16 246:14 255:16
**call** 163:14,15 206:18 215:21 246:18
**called** 157:2,18 169:19 210:15

248:1 254:14
258:15,16 264:9
**calling** 200:8
**calls** 206:13
**calpine** 81:15
179:25 266:25
**camera** 245:21
**camps** 267:18
**canada** 151:24
153:7,8,11
**canadian** 25:11
25:12 38:16,17
44:8 48:15,24
146:25 147:1,5,11
147:15,25 148:7
148:16 149:18
151:3 152:5,20,24
153:3,5 255:10,22
278:5 279:13,16
279:21,22,22
**canceling** 146:10
**candid** 112:19
253:25
**candidates** 224:3
**can't** 240:7,14
253:19,20,21
**capable** 178:4
**capital** 262:7
**capitol** 39:18
**caplin** 40:7
**care** 54:10 135:19
220:21 235:15
273:6
**carefully** 91:22
197:23 223:1,16
258:6
**carried** 82:21
**carry** 143:11
275:17
**carter** 69:17
**carved** 124:5
165:7

**case** 1:3 38:1 47:8
49:14 50:24 51:1
51:18,21 52:19
53:9 54:23 58:25
59:4,4,5,15 64:4
69:14,15,17 70:18
75:4,5,17,24 76:4
76:10,22 77:25
80:17 84:21 85:3
85:11 86:3 91:21
94:8 100:8 106:6
106:7,17,20,21
107:17 108:9,13
110:19 114:6
115:8 118:17
120:6 128:6
131:18 140:19,20
147:5 151:7,23
153:19 154:5
161:14 166:11
168:12 172:4,7
179:25 182:19,19
183:9 188:9
192:21 203:15
204:11,19 207:14
207:23 208:13
210:3,24 211:2,15
212:2,21 214:8,15
214:20 221:4
227:19 230:15
234:24 235:1
236:17 237:5,8
238:1,2 243:11
245:1 249:20
256:12 257:3
260:13 262:1,5,18
264:12 265:5
267:7 273:18,19
277:5 279:10
**caselaw** 277:15
**cases** 58:21 71:21
71:25 80:23 84:18
89:4,13,21 90:8,9

93:15 103:3
106:19 111:25
119:12,17 154:22
154:25 191:14,15
205:23 210:1,13
224:8,11,22 236:3
254:13 266:14
267:5 268:6,13,19
277:23 279:23
**cash** 142:7 212:14
236:5
**cataclysmic** 201:1
**catastrophe** 99:15
239:24
**catastrophic**
240:24
**category** 69:4
118:25
**caught** 50:3 88:22
**causal** 131:7
**cause** 62:15 72:19
86:2 133:25
137:14,15 143:14
154:1 175:25
177:10 269:3,23
**caused** 91:7 137:5
153:14 203:24
**causes** 89:25
125:4 241:4
272:17
**causing** 95:4
105:22 116:19
**caveat** 238:25
**cayuga** 278:1
**ccaa** 151:24
152:12
**cdc** 197:25 205:6
**cease** 191:15
**cede** 94:11 251:11
**centerpiece**
104:16 105:9
**centers** 205:16
231:4

**central** 58:9 59:5
**cents** 122:1
**century** 91:19
**cert** 67:7 87:17
111:25 230:9
**certain** 2:23 4:3
5:12 11:3 12:7
16:2 17:7 18:17
21:2 22:7 25:11
25:22 27:3 31:2
32:7 38:16 44:8
74:6,6 79:11 98:5
101:12 107:3
117:17 134:10,16
139:10 146:25
147:7 185:24
192:16 195:15
213:13 214:11
234:2,7,22 237:20
238:5 239:25
254:15 255:9
258:13,22 259:19
**certainly** 57:9
64:14 68:9 69:15
77:16 87:17 92:24
102:24 103:7
109:16 114:1
117:11 119:6
126:24 128:1,4,6
128:14 132:6
135:6,18 148:20
149:18 150:9,9
151:3 168:15
178:8 182:18
225:7 246:7
247:21
**certainty** 87:25
**certificates**
197:13
**certification**
104:8 110:21
246:5 247:6

**certified** 283:3
**certiorari** 61:22 87:15 136:12
**cetera** 78:2
**challenge** 199:7
**challenges** 134:15
**chambers** 40:2 249:1
**chance** 77:18 138:11 207:7 213:24
**change** 73:23 148:13 160:10 176:24 181:21 190:12 193:13 194:12 196:11 197:18 219:2 226:11 237:17 258:18
**changed** 141:5 206:20
**changes** 226:12 238:5 282:2
**changing** 138:17 141:3 142:5,7 145:1,2,2 246:9
**chapman** 70:6
**chapman's** 257:11
**chapter** 6:2,6 13:9 13:12 18:22 19:2 23:9,13 28:16,20 33:9,13 81:9 128:6 241:20 254:13 266:23
**character** 125:13
**characterized** 256:4,5
**charged** 106:8 251:18
**charter** 84:20
**chateaugay** 84:21
**check** 234:15 247:5
**checking** 250:17
**chen** 41:5
**cherry** 223:14
**cheryl** 8:15 14:7 19:13 24:7 29:13 34:7 40:15 193:5
**child** 244:9
**children** 135:20 243:7,18 244:2,23 245:3
**children's** 3:7 11:12 16:11 21:11 26:7 31:11
**choice** 91:11 92:20
**chose** 110:21 204:23
**chris** 227:18
**christmas** 217:23
**christopher** 4:7 12:11 17:11 22:11 27:7 32:11 38:6 42:15
**chubb** 262:15
**cia** 213:2,3
**cil** 262:9
**cir** 121:14 257:2 257:21 262:16 265:11,13 267:4 277:25
**circle** 40:9 123:14 123:21
**circuit** 57:14 66:1 69:15 73:8,22 75:5 76:10 82:25 84:23 85:5,11 86:9 102:15 109:23,25 110:2 110:20,22 111:22 217:14 228:15,16 230:9 232:7 236:8 241:18 242:10 258:14,18 259:18 260:10 262:1,13 262:20 264:25 265:14 269:10,18 275:16 280:6
**circuit's** 84:2
**circuits** 76:12
**circumstance** 118:22 120:4 149:23 150:1 151:18 152:18 265:15
**circumstances** 73:24 90:10 119:18 169:24 204:19 210:20,23 256:11,15 271:13
**citation** 262:14
**citations** 45:16
**cite** 59:1,4 140:19 196:15 210:4 232:2 267:2
**cited** 89:4,13 148:23 149:7 197:15 210:13 224:22 249:24 268:6,12 277:24
**cites** 58:22 81:14 120:17 197:6,25
**citing** 224:20 258:25 260:9
**citizens** 203:17 204:20 222:16,19
**civil** 199:21 211:7 212:13 220:20 252:14,17,24 277:16 281:6,9
**cla** 111:13
**claim** 90:16,17 91:13 92:8 147:25 149:6,9 150:24 152:15 212:20 213:11,15 230:20 232:8,11,12,13 236:21,25 261:15 261:20 262:24 272:23 279:23 281:9
**claimant** 209:12 212:21
**claimants** 2:20 8:13 10:25 13:21 14:5 15:24 19:11 20:24 23:22 24:5 25:19 29:5,11 30:24 33:22 34:5 93:4 187:13 202:16,18 209:4,9 211:11,12 213:16 213:18 217:3 221:22 231:5 244:19 255:11 261:8,21 276:18 278:19 279:9,16 279:22,22,24
**claimants'** 255:22 279:13,21,25
**claims** 68:16 69:9 69:12,19,20,25 82:14 85:25 87:5 87:6 88:14,20,24 88:25 89:1,5,7 90:13,13,14 91:3 91:3,9,25,25 92:9 92:16 93:14 94:2 102:24 108:19 125:14 136:21 137:3 147:11,16 147:17 148:7,16 211:7,8,9 212:18 213:22 230:23 231:8,24 232:3,9 232:9,18,19,19,24 238:22 258:22,24 259:6,7,8,19

261:2,9,11,18,22 261:23 262:1,2,17 262:19,25 263:5,7 263:21,23 264:2,2 272:15 275:9 280:9,9,10,10
**clarification** 281:5,16
**clarified** 114:17
**clarify** 45:24 46:10 92:14 112:16 113:15 250:24 281:11
**clarity** 74:8 86:18
**clash** 226:24
**class** 90:11 92:9 244:8
**classic** 232:10
**classification** 259:15,25 260:22
**claudia** 42:24
**clause** 139:9,10 213:13 258:23
**cleaner** 97:11 99:9
**cleanest** 184:22
**clear** 46:6 48:17 57:12 59:12 61:18 77:21 92:2 96:8 96:11 100:23 101:14 131:16 136:20 145:13 164:4 165:18 171:25 173:8 185:18 190:16 192:11 193:18 194:17 208:5 211:1 213:4 218:15 221:8 224:22 239:5 243:11 244:4 255:1 258:13 261:10 262:13
263:1 265:3 268:22 270:6 272:3,17 274:20 277:4 278:14
**clearly** 51:11,20 53:12 60:19 63:2 73:24 83:19 96:6 105:6 127:24 138:22 220:16 223:12 259:17 260:24 261:7 266:20 267:20 270:7 271:9 279:19
**cleavon** 103:16
**clerk** 5:12 18:17 200:8
**clerk's** 157:23
**client** 247:19
**client's** 131:18
**clients** 93:3 108:23 131:23 149:6 151:21 152:10 153:21 154:1 247:3,13 248:5 253:23
**client’s** 250:9
**close** 214:12 223:6 269:16,18 276:9
**closed** 104:22
**closely** 53:15
**closer** 135:2
**closure** 237:1
**cloud** 223:23,23
**cmfn** 152:15
**code** 86:15 139:11 142:12 245:2 263:16 265:19 269:20 277:19 280:1
**cohen** 38:8
**colin** 40:17 196:2 227:8
**collateral** 57:13 57:14 58:6,14,17 58:20 59:6,10
**colleague** 44:24 191:8
**colleagues** 146:4
**collectability** 121:11
**colloquy** 160:15 190:17
**colorable** 149:5
**columbia** 204:17
**combat** 243:21 273:13
**come** 60:18 72:12 74:23 77:18 101:25 123:3,7,13 146:18 150:24 151:10 166:21 167:17 169:3 170:2 172:15 175:21 177:9 179:15 231:17 232:1,16 233:21 238:4 241:10 247:20 249:22 250:13 269:16
**comes** 75:5 108:18 177:6 184:24 185:7 217:11,11 241:4 246:13 275:14
**comfort** 170:16 174:8
**coming** 49:4 104:12 117:2 139:24 161:19 188:25 208:18 209:7 215:19 228:17 235:3 236:4 269:18
**comley** 39:1 65:22 122:18 186:7
**commencement** 273:18
**comment** 120:4 249:14 250:23 254:4 281:2
**comments** 253:25 254:8 281:5
**commit** 242:8
**commitment** 124:1 225:12 278:25 280:19
**committed** 88:1 225:12 236:22
**committee** 2:19 3:1,4,7,8,11,14 4:5,23 8:12,16,19 9:2,5 10:24 11:6,9 11:12,13,16,19 12:9 13:2,20 14:4 14:8,11,15,18 15:23 16:5,8,11 16:12,15,18 17:9 18:2 19:10,14,17 19:21,24 20:23 21:5,8,11,12,15 21:18 22:9 23:2 23:21 24:4,8,11 24:15,18 25:18 26:1,4,7,8,11,14 27:5 28:2 29:4,10 29:14,17,21,24 30:23 31:5,8,11 31:12,15,18 32:9 33:2,21 34:4,8,11 34:15,18 37:9 39:9,17 93:3 119:21,22 120:8 137:16 189:15 191:5 201:12 202:6 214:14 221:21 222:4 223:24 224:21 243:1,5 244:4

276:17 278:18
**committee's** 8:9 10:21 13:17 14:1 15:20 19:7 20:20 23:18 24:1 25:15 29:7 30:20 33:18 34:1 191:2
**committee's** 2:16
**committing** 237:9 237:24
**common** 88:21 89:6
**communications** 137:18 266:12 277:1
**community** 111:17 191:20 205:16 207:24
**companies** 99:11 213:8
**company** 58:9 126:18 129:9 182:20 219:5 262:15 266:14 267:1 273:12
**company's** 89:17
**comparison** 107:21
**compel** 235:25
**compelling** 103:4 114:18
**compensate** 245:3
**compensated** 241:13,16
**compensation** 85:25 207:21 212:17,23 213:2 230:24 231:1 243:17 244:16,23
**compete** 93:2
**competent** 128:1
**competition** 147:16
**complaint** 232:17 250:2
**complaints** 89:4 91:18 232:2,10 250:1
**complete** 82:14 163:3,17 167:7 252:23 253:17
**completely** 52:3 54:24 55:2 59:16 96:7 108:2 151:8 192:11 220:25
**complex** 123:12
**complicated** 51:12 69:10 108:3 112:9 266:7
**comply** 49:17 213:2
**component** 110:15 114:1 210:12
**comprehensive** 73:23 280:4
**comprehensively** 260:22
**compromises** 266:9
**computer** 248:12
**concede** 60:13,20 60:22 75:18,21 102:16
**conceded** 51:1 60:21 185:25 229:9
**conceivably** 61:21 265:8
**concept** 143:2
**concern** 63:10 71:13,16,19 72:2 73:3,4 74:3 78:24 84:2 106:13 114:13 118:1 149:13 151:2,16 176:6 177:4 179:4 259:21
**concerned** 48:4 64:24 71:3 73:16 74:19 76:9 88:17 181:22 185:10 258:20 259:2 273:7
**concerning** 46:17
**concerns** 46:2 73:6 75:1 117:21 177:8 217:21 226:24 259:20
**concession** 52:9 52:11,20,20 56:17 56:18 57:7 58:6 59:22,24 60:15
**concessions** 164:7 167:7
**conclude** 188:9 270:11
**concluded** 56:11 123:13 125:9 249:3 282:6
**conclusion** 63:23 63:25 189:2 228:7
**conclusions** 6:5 13:11 19:1 23:12 28:19 33:12 236:10 240:22
**conclusory** 126:3 126:20
**concrete** 56:12 146:11 253:6
**concretely** 109:11 109:14
**concurrent** 97:2
**condition** 95:21 109:24 119:24 215:1,11,17 225:11,24 270:2 280:17
**conditions** 49:18 77:25 172:19 176:11 187:19 189:11 213:13 215:9,10 225:3 226:17 227:23 228:1 229:17 233:10 239:12 241:22,22,24,25 242:13 271:20 278:20,21 279:4,6 279:11
**conduct** 89:2,17
**conducted** 230:11
**conference** 7:11 45:14,23 201:18 249:1
**confess** 70:17
**confident** 105:10
**confine** 268:3
**confirmation** 2:11 4:12 5:2,19 6:1,13 6:21 7:5,17 8:3 9:10 10:3,11 12:16 13:8 14:23 15:15 17:16 18:7 18:21 20:3 22:16 23:8 24:23 27:12 28:8,15 30:3 32:16 33:8 34:23 44:5 55:25 74:5 78:19 79:19,19,24 80:7,9 81:8 89:22 92:24 96:7 101:9 104:21,22 106:8 106:24 114:16 123:6 124:10,16 124:17 128:8 155:15 156:1 157:2 158:9 164:18,21 165:20 172:18 173:11 177:14 201:2

204:1,17 208:9 209:16 210:7 211:5,6 222:14 236:23 238:6 244:14 247:12 254:22 255:3 260:13 266:22 279:19
**confirmed** 148:9
**confirming** 6:6 13:12 19:2 23:13 28:20 33:13 254:12
**conflicts** 259:23
**confuse** 203:16
**confusion** 165:21 184:22
**congress** 121:7
**congressional** 46:17
**congressionally** 86:11
**conjectural** 77:4,6
**conjecture** 164:10 164:11
**conm1ittee's** 29:1
**connecticut** 15:11 39:2 44:8 65:5,19 65:22 122:18,21 136:5 137:1 142:11 147:3 156:15 157:13 158:12 186:8 190:18 191:25 192:5 195:3,15 198:17 207:5 209:6 254:20 274:13
**connecticut's** 255:17,19
**connection** 55:22 96:10 97:15 131:7 159:23 160:7
194:8 196:6 260:12
**connections** 193:9
**consensual** 111:16 176:19 248:19
**consensus** 236:3
**consent** 68:17 87:5
**consenting** 214:4
**consequence** 103:1,2
**consequences** 124:7 125:3 137:5 205:14
**consider** 56:13 104:25 115:19 117:11 125:2 155:25 212:2 250:6,7
**considerable** 52:10
**consideration** 79:6 96:3,4 144:2 152:4 264:14 265:24
**considerations** 69:11 75:23 268:18
**considered** 68:6 91:17 250:5 261:1 266:15
**considering** 132:16 155:22 225:2 250:23
**consistent** 66:23 95:10 120:16 272:21 280:13 282:3
**consistently** 197:15
**consla** 41:6
**consolidated** 119:5 156:8
**constituencies** 228:18
**constituents** 131:13
**constitute** 53:12 73:5 141:11,12,14 176:8 265:23,24
**constituted** 99:11
**constitution** 86:14
**constitutional** 75:22 76:7 116:14 138:18 150:3 230:22 232:23
**constrained** 220:17 279:18 280:7
**construct** 184:3
**constructed** 223:16
**consult** 247:19
**consumer** 88:18 88:20 89:5 232:12 263:11
**consummatable** 238:16,16
**consummate** 96:14,25 229:15 233:6 235:23 239:15,17 241:17
**consummated** 71:2 75:6 76:12 82:2 84:12 85:14 85:15 264:23 265:14,19
**consummation** 73:20,22,25 76:19 77:22 85:8 96:16 97:6 173:1 269:19
**consummations** 143:19
**contain** 105:3 126:2 185:9
**contained** 122:8
**contains** 213:12
**conte** 20:7
**contemplate** 65:25 79:20 215:6 230:7 280:7
**contemplated** 96:6 97:21 99:17 101:19 105:6
**contemplates** 124:16 215:7
**contemplating** 226:16 233:8 240:20 245:16
**contend** 65:25 125:1
**contended** 252:11
**contends** 214:14
**contention** 54:22
**contested** 76:14
**context** 51:6,16 55:11 57:5,8 59:23 60:23 61:23 71:24 86:3 91:1 92:4 94:23 107:11 117:9,10 125:23 176:18 186:2 240:21 260:2
**contingent** 2:20 8:13 10:24 13:20 14:5 15:23 19:11 20:23 23:21 24:5 25:18 29:5,10 30:23 33:21 34:4 221:21
**continue** 83:19 168:10 225:14
**continued** 62:16 82:4 124:22
**continues** 62:18

**continuing** 141:23
234:23 278:25
**contours** 142:17
**contradiction**
76:20
**contrary** 70:11
98:15 115:8
167:11 222:18
272:4
**contrast** 231:17
**contrasted** 274:25
**contribution**
153:9
**contributions**
99:13
**control** 63:22
174:11 228:14
263:10
**controlled** 106:10
**controlling**
147:21,24
**controversies**
75:24
**convenience**
107:2
**conversation**
78:25 240:17
**conveyance**
212:10
**convicted** 124:21
127:3
**convince** 103:17
**cool** 235:7
**coordinate** 106:4
**coordinated**
106:2
**copy** 49:24 50:1
**corp** 70:6 81:15
256:6 259:1
262:15 266:12,25
267:17 277:1
**corporate** 89:25
99:15,22 107:3

147:19 148:12
**corporation** 256:8
**corporations**
147:22
**correct** 46:5 47:15
90:25 97:4 123:17
127:2 145:18
160:5 180:20
181:25 215:3,25
216:2 219:18
247:25 266:20
**corrected** 56:25
57:10
**correctly** 215:14
251:4 277:2
**corresponding**
244:1,7
**cost** 121:24
139:20 143:22
178:11 205:12
209:14 234:23
**costs** 122:8 135:18
143:25
**coterminous**
184:23 212:1
**couched** 115:9
**could've** 106:2,5
107:6 112:1
**counsel** 67:21
95:19 136:16
175:15 246:18
276:17 278:18
**count** 132:6
171:24
**counterfactual**
231:2
**countervailing**
107:24 115:3
**counties** 198:11
**countless** 191:14
**country** 111:17
243:14 244:17
265:1 283:21

**counts** 108:18
131:17,24 274:5
**couple** 45:22
130:21 184:1
186:22 187:11
224:8 248:15
**coupled** 80:24
**course** 51:19
58:21 62:1 64:25
80:6 81:13 86:8
87:16 93:22 104:3
104:11 115:10
125:20 136:15
156:14 163:13
188:1 191:15
202:12 208:4
243:16 264:22
265:17,21 270:24
276:20 278:24
**court** 1:1,12 44:2
45:5,10,20 46:1
46:13 47:1,6,10
47:19,23 48:8,11
48:15,16,19 49:2
49:12,17,18,21,24
50:1,7,8,10,17,19
50:22 51:17,20
53:8,13,21,21
55:13,21 56:9,16
57:17 59:3,6,9,20
60:9,15,19 61:4,6
61:8,22,25,25
62:2,4,6,10,12,13
62:17,18,21 63:2
63:5,6,9,16,20
64:3,9,11,18,19
64:23 65:3,11,11
65:13,17,19,24,25
66:5,18 67:7
68:19 69:10,16,19
71:16 72:5,9,14
72:24 73:18 75:3
75:16 76:4,15,25

77:2,11,18,20,21
79:13,18 80:2,5
80:17,20,22 81:10
82:16,18 83:14
84:6,8,10 86:7
87:8,9,10,13,16
87:17,19,23 88:3
88:4,5,9,16,23
89:10,21 90:24
91:12,14,16 92:23
93:17,20 94:6,13
94:17,19 95:7,12
95:13,15,18 96:1
98:14,25 99:6,7
101:9 102:9
104:10,12 105:1
107:12,14,19,24
108:5,13,23
109:22,25 110:6
110:19,22 111:4,4
111:19,21,24,25
112:13,14,24
113:1 114:20,25
116:5,6,7,8,10,12
116:17,23 118:5
118:12,14 119:20
119:21 120:7,14
121:3,5,12 122:9
122:9,12,16,19
123:15,18,20,25
125:1 126:24
127:14 128:12,15
128:18,20 129:1,5
129:7 130:4,6
131:14,16,21,23
132:1,3,11,13,20
133:7,9,17,19,22
134:2,19 135:16
136:11,12,19
137:9,11,21,23,25
138:2 139:5 140:3
140:6,15,18,22,24
141:6,8,10,16,18

142:6,8,10 143:2 143:17,20 144:4,6 144:8,12,14,17,19 144:21 145:3,7,10 145:18,25 146:2 146:16,19,22 147:13 148:14,19 149:2,4,20,23 150:1,2,16 151:6 151:24 152:4,5,12 153:5,13,21,24 154:4,8,10,13,20 154:23 155:1,5,10 155:13,20,24,25 156:4,7,12,24 157:8,10,20 158:3 158:8,23,24 159:3 159:6,9,11,14,16 159:19,21 160:3,6 160:12,18 161:2,4 161:7,8,16,18 162:2,13,24 163:3 163:10 164:3,14 164:17,18 165:2,4 165:6,12 166:6,16 166:18,20 167:10 167:18,21,25 168:3,13,17,19,22 169:8,10 170:18 170:21 171:4,8 172:10,16,20 173:1,13,15,18,20 173:24 174:12,17 174:25 175:3,14 175:19,24 176:13 176:15,20,22 177:13,15,17,22 177:23 178:2,9,9 178:14,15,17,21 178:25 179:1,4,7 179:10,12,19,21 180:2,14,21 181:2 181:4,19 182:5,8 182:14,16,16,21 183:2,10,20,25 184:7,9,16,18,20 185:2,6,12,14,16 186:5,9,12,21,24 187:3 188:5,24 189:17,19,22,24 190:4,7,14,22,25 191:7,23 192:4,6 192:11 193:5,8,15 193:24 194:5,7,14 194:22,24 195:11 195:22 196:2,5,13 196:17,21,24 197:17,21 198:14 199:5,12,22 200:7 200:8,11,23 201:9 201:14,16 202:1 204:10 214:24 215:3,5 216:2,7 216:25 217:18 218:16,25 219:10 219:14,16,19,22 220:1,12,16 221:2 221:17,23 223:13 224:6,9 225:1,8 225:10,19 227:17 227:25 228:4,8 229:25 230:2 232:7 233:9 236:1 236:7,7 238:14 239:13 240:9 242:6,6,21,24 243:3 245:10 246:11,17,21,24 247:9,16,16,22 248:7,24 250:6 251:1,2,5,6,13 252:3,6 253:20 254:3,5,9 255:6,8 257:22,24 259:11 259:17,21 260:3 262:21 265:6 266:10,20 267:22 267:24 268:10,22 269:6,9,10 270:14 270:17,21,25,25 271:4,8,14,16 275:19 276:22 279:2 280:8 281:3 281:11,16,17,19 281:23 282:5

**court's** 44:5,5 48:14 61:17 62:6 62:7 63:11 64:1,9 64:10 67:2,6 70:9 70:20 71:23 72:17 77:17 83:9 109:17 163:15 164:24 166:1 167:5 170:23 182:12 187:18,20 189:9 203:22 215:13 217:13 224:15 227:3 230:7 237:4

**courts** 47:11 53:20 54:3,6,10 63:5 69:21 75:6 75:23 81:17 82:7 84:19 85:1 86:17 87:25 105:16 109:12 112:23 181:13 210:20 257:7 260:10 262:2 265:2,2 267:5 268:13 277:16,19

**court’s** 250:22 253:10 254:12,13 258:4 260:1 262:18 268:8,9,15 268:20 269:5 271:2,4,6,15 273:24 279:25 280:18

**covered** 82:16 145:25 146:2,3 155:17

**create** 97:13 98:9 98:21 101:2 111:11 138:13 240:8

**created** 148:11,12

**creates** 223:22

**creating** 103:21 138:9 184:22

**credibly** 211:24

**credit** 66:16 71:6 81:10 268:10

**creditor** 5:10 18:15 152:23 162:9 204:25 207:8 210:14,22 211:16,20 228:18 235:3 238:3 249:15 251:21

**creditors** 3:2,5,9 3:15 4:3,5,23 8:16 8:19 9:2,5 11:7,9 11:14,20 12:7,9 13:2 14:8,11,15 14:18 16:6,8,13 16:19 17:7,9 18:2 19:14,17,21,24 21:6,8,13,19 22:7 22:9 23:2 24:8,11 24:15,18 25:12,12 26:2,4,9,15 27:3,5 28:2 29:14,17,21 29:24 31:6,8,13 31:19 32:7,9 33:2 34:8,11,15,18 38:16,17 39:9 44:8 86:21,22,24 95:4 137:16 147:1 148:7,16 153:3 161:25 172:23 191:6 201:5 204:6

207:9 210:21
255:10 259:4
261:8 262:4,4
263:12,12,22
272:5,17,18,25
280:11
**creditors'** 263:19
263:20 265:10
**crickets** 253:17
**criminal** 72:21
123:10,16,24
124:6 127:1,10
138:19 139:4
165:14 166:1
167:2 170:8
186:12 203:9,15
211:8 212:18
215:24 252:10,12
252:14,17,20
253:1
**criminally** 203:7
**crisis** 85:22,23
132:4 145:20,20
192:24 209:14
227:14 243:7,13
243:21 244:3
251:23 273:14
**critical** 97:21
111:18 137:4
138:8 146:14
223:6 230:10
257:18 264:17
**critically** 83:11
**criticism** 231:12
**criticizing** 208:12
**cross** 3:21 12:2
17:2 22:2 26:21
32:2 160:12
190:14 193:15
194:14 197:22
**crosstalk** 216:6
**cry** 203:19,19

**crystal** 131:16
164:4
**ct** 39:4
**culwell** 66:12
**current** 174:19,24
244:16
**currently** 99:11
124:8 162:17
205:10 258:18
**curtail** 106:6,7
107:8
**customers** 127:23
127:25 128:2
**cut** 221:14 238:9

**d**

**d** 1:22 3:10 11:15
16:14 21:14 26:10
31:14 41:17 43:8
44:1 62:20 66:10
119:22,23 160:3
190:5 267:3 277:3
277:12
**d'apice** 11:3 16:2
21:2 25:22 31:2
**d.d.c.** 66:12 278:4
**daily** 136:3 205:9
**damage** 153:14
154:1 203:24
**damages** 241:12
241:15
**dangerous** 206:5
**danielle** 41:25
**dare** 59:9
**dark** 80:12 84:4
**darren** 41:21
**date** 57:25 70:20
70:25 72:6,8,12
72:19,22 73:5
74:10,11,20,24
76:8 77:9,9,11,23
78:1,10,14,18
79:11,14,16,21,24
80:1,8 81:23 82:1

82:22 83:5,6,16
83:18 84:11 85:4
85:7,9 95:20,20
95:22 97:3,23,24
98:5 101:22
106:24 108:15,17
123:4,5,8 124:3
124:15 132:23,24
133:14 136:23
139:2 150:18
158:9 161:3,4,10
161:20 164:20,25
166:13,14,24
169:7,12 170:1,14
170:17,22 172:17
172:19 173:5,6
174:7 177:12,18
177:18,23 178:14
179:16 180:9,10
180:15,16,17,23
181:6,8,15,15,18
181:19,20,23,24
182:2,9,10 183:8
184:8 186:11,13
186:15,22 187:19
200:6,9 211:18
215:2,12 216:9,23
217:8,9,22 218:5
218:18 219:2,3,3
219:4,7 224:2
226:4 234:20,21
234:24 236:11,13
239:3 242:7
245:19 247:12
254:17 268:14
269:3,4,11,15,23
269:24,25 270:6
270:14,15,19,20
271:3,7,16 272:10
272:12,14 273:1
274:21 275:15
278:15,16 280:15
280:16,16,17,21

283:25
**dated** 44:14
159:24 190:9
193:11 194:9
196:7
**dates** 75:15 77:17
83:10 170:11
175:2 177:22
189:8
**david** 41:3
**davis** 37:15 54:20
157:6 158:19
163:12
**day** 55:17 56:3,7
56:10 77:10
106:25 123:5
142:3 144:25
170:25 177:6
205:13,19 206:9
206:11 207:9,20
216:24 218:21
226:4 229:14,18
251:8 254:10
269:6 272:13
274:11 275:17
280:20
**days** 62:3,14
70:21 81:25 123:1
123:5 124:15
136:22 149:19,19
161:5 165:1
166:23 176:14,16
177:1 178:7
180:11,15 181:5
181:15 182:9,10
182:17 185:23
186:1 188:1
200:15 206:1
208:14 215:23
216:6,6,8,23
218:17,19,22
228:4 234:17,18
234:19 235:6,7

239:17 240:15 242:2,10
**days’** 269:22 270:8
**dc** 40:10
**de** 257:20
**dead** 166:9 170:14
**deadline** 152:2 185:22
**deal** 124:23 130:23 157:22 158:14 168:25 207:16 208:9 209:6 225:4 228:25 235:18 236:4,13,15 237:1 237:6,17 238:4,9 238:10,10 241:5
**dealing** 118:23 121:10 205:12
**deals** 273:22
**dealt** 75:16 124:1 175:12 183:13 260:8,22 271:1
**death** 130:2 197:13 205:14 207:11
**deaths** 130:19,19 131:2 136:2 196:15,20 197:7 197:16,25 205:9 206:8 207:4 274:8 274:11
**debate** 242:13
**debevoise** 36:18
**debtor** 1:9 79:15 89:2 90:4,18,21 96:11 101:18 110:25 147:12,23 148:8 149:6 151:9 151:19 152:8,15 152:25 153:1,9 184:4 226:14 231:25 234:3 241:21,24 249:11 261:20,25
**debtor's** 123:23 128:21 138:22 143:5
**debtors** 4:11 5:10 6:8 9:8 12:15 13:14 14:21 17:15 18:15 19:4 20:1 22:15 23:15 24:21 27:11 28:22 30:1 32:15 33:15 34:21 37:16 45:10 48:22 51:1 52:9 54:20 55:17,19 56:3 60:20 69:13 72:12 73:24 75:13 77:1 77:6,23 78:25 84:4,8,10 86:20 89:12,25 91:10 93:2 96:19 97:10 97:11 98:2,18,25 99:4,20 101:10 107:2 108:23 109:1,6 110:17,20 111:2 117:19,22 121:18,21 122:15 123:3 124:18,20 126:10,25 127:3 127:24 136:15 138:12 141:11 148:11 152:20 153:16,20 157:6 158:19 163:12 164:6,15,25 165:3 166:23 168:8 169:11,12 172:12 179:15 184:3,14 185:3,8,25 187:6 187:21 200:2 201:2 203:7 214:11 215:15 219:13 226:3 229:9,15 233:6 234:21 235:6,9,22 236:9 239:15 240:10 241:17 252:19 254:14 259:5,9,9 263:12 270:4,18 272:9 274:21 275:11,14 278:15,22 280:12 280:14
**debtor’s** 250:16 262:4 264:3,3 272:5
**debts** 235:7
**decade** 136:13
**decades** 111:22
**december** 77:12 79:12 123:3,10 151:25 161:6,15 165:2,15,16 166:13 167:6,9 169:13,14,14,16 170:9,11,12,24 171:2 172:20 174:9,10,19,20,21 174:23 175:1,2,7 176:10,13,15,25 177:2,18,22 179:8 180:8,9,9,16,16 180:23 183:7 186:12,14,14,18 215:19,21 216:9,9 216:12,13,16,16 216:21,22 217:20 218:5 228:12 233:7 234:4 237:19 238:16 242:19 268:25 269:7 270:6,18,25 271:3,5,16 272:11 280:17
**decide** 49:7 66:18 79:11 95:13 137:2 150:10 163:19 167:10 264:1 271:14
**decided** 53:2 57:15,18 63:12 65:10 66:20 67:20 79:10
**decidedly** 48:23
**deciding** 147:8
**decision** 46:12,25 48:14 49:12 55:10 56:14,18 58:19,23 59:1,11,15 60:7 64:1,18 68:5 71:23 72:17 77:17 83:9 87:8,10,11 95:12 109:18 123:12 149:20,24 152:6 165:1 167:5 178:14 222:14 228:4 246:14 250:22 255:7 258:7 278:1,4
**decisions** 66:6 69:18
**declarant** 137:13 189:15 192:13
**declarant's** 126:5
**declarants** 134:20 189:14 195:17
**declaration** 8:15 9:1,14 14:7,14 15:1 19:13,20 20:7 24:7,14 25:1 29:13,20 30:7 34:7,14 35:1 121:19 125:25 126:2,9,23 127:20 133:2 142:4 158:21 159:22 160:7,13,14,16,18

163:6 189:21 190:8,16,23 193:9 193:17 194:8,15 195:4,9,16,18,20 196:19 197:22,23 198:3,4,16,19,21 198:25 199:1,6,8 199:12 200:25 207:6,12 217:16 222:25 223:4 227:8 244:10 273:8,10,10
**declarations** 44:12 114:21 118:9 125:17,20 126:7 131:7 132:14 134:3,11 134:16 135:12,23 137:12 144:25 158:10,16 189:5 191:1,11 192:1,3 192:10 194:25 197:24 206:10 223:1 274:24
**decree** 62:5,8 63:8
**dedicated** 152:24 153:8 191:14 192:19
**defeat** 277:20
**defendant** 123:10
**defendants** 71:20 89:9,14 150:19 276:11
**defense** 71:22
**defer** 104:2
**degree** 70:7 126:7 192:22
**del** 20:7 267:3
**delaconte** 41:8
**delay** 85:20 86:3 87:6 88:12 91:7 96:17,25 97:22,23 101:11 106:13 107:7 108:18 113:12 121:21,25 126:11 127:23 128:9 129:12,19 131:3 137:5 153:14 160:23 161:14 178:24 192:14 201:2 205:23 206:6 207:15 209:13 218:10,13 223:5 224:2 233:23 243:20,21 250:14 277:10 278:15,23
**delayed** 86:1 97:2 126:21,24 127:13 129:21 131:8,12 167:12 201:3 205:24 207:14 234:17 243:19 255:6
**delaying** 161:14 169:11 215:24 235:5 279:6
**delays** 107:16 179:6 244:15 250:14
**delconte** 9:14 15:1 25:1 30:7 35:1 121:18 127:20 128:1 129:11 130:13 159:7,14 159:15,18,20,22 160:2,5,6,11,13 160:15,17 161:1 161:11,17,23 162:4,16 163:4,5 163:6
**delconte's** 126:9 158:20 187:8 200:25 217:7,16
**delconte’s** 273:10
**deliberate** 107:2
**deliberately** 185:21
**delicately** 266:8
**deliver** 218:17
**delivers** 236:15
**delivery** 217:25
**demanded** 213:10
**demonstrable** 234:19 240:23
**demonstrate** 81:10 266:24
**demonstrated** 253:12 257:12
**demonstrating** 265:17
**denial** 49:19 61:22 67:7 68:12 68:15 189:10 215:7,9 227:23,25 230:9 233:10 239:12 241:23 242:12,14 246:25
**denied** 56:10 66:21 102:7 136:12 156:4 225:24 226:20 238:23
**denies** 49:1 278:8
**deny** 63:5 187:18 228:6 229:5 239:5 278:12
**denying** 105:16 106:10 107:18 214:15 225:2 226:16 232:18 278:9
**depalma** 38:15
**department** 36:3 67:24 118:20 197:12
**dependent** 256:11
**depending** 67:5 110:7 151:7 258:2 271:6 275:16
**depends** 71:1 130:6 135:5,17
**deployed** 265:3
**depository** 114:5
**deprivation** 102:21
**derivative** 90:12 90:17 232:9,11 233:1 261:25
**derive** 198:6
**derogation** 185:11
**describe** 160:19
**described** 95:9 103:14 122:24 123:4 150:8 274:23 279:15
**deserves** 150:5
**design** 111:11,15 113:16
**designation** 10:1 46:7,8,9
**designations** 45:18
**designed** 75:23 111:14 223:4
**desire** 92:14 155:24 247:21 276:6
**desires** 210:22
**desirous** 101:24
**despite** 210:1 222:6,18
**detail** 115:3 142:20 192:6 244:10
**detailed** 125:19 236:2
**details** 144:11

**determination** 59:16 60:16 67:3 112:14 116:9 149:25 151:24 258:4,12 266:11 267:22,24
**determine** 46:11 64:14 76:3 232:8
**determined** 204:19
**determining** 124:25 135:23 268:23
**deterrence** 146:7 276:5,7
**deterrent** 125:14 263:22
**deutsche** 262:7
**devastated** 145:11
**devastating** 134:5
**devastation** 206:11
**developed** 57:14
**developing** 273:13
**development** 44:20
**devolved** 55:7
**devoted** 192:23
**devoting** 191:18
**dial** 7:10
**didn't** 241:11 248:19,23 252:1
**die** 129:23,24 136:6
**died** 129:24 202:13
**diem** 240:9,15
**dies** 132:17
**differ** 154:2
**difference** 145:4 169:14 175:25 186:2 205:19 208:15
**differences** 212:13,25
**different** 52:6 53:6,10 61:15 64:6,10 67:5,18 70:17 71:24 80:5 91:1 98:23 106:1 108:4 116:14 117:21 130:15 147:6 158:13,14 230:17 252:16 262:23 267:18 268:18
**difficult** 76:22 103:15 108:5 152:5 211:19
**difficulties** 236:2
**difficulty** 138:17 139:14 157:22 186:17
**direct** 89:1,8,8 104:8 110:21 147:11,17,23,25 159:23 160:9 190:8,10,20 193:10,19 194:10 194:19 196:8 220:19 230:23 231:24 236:5 238:20 246:5,16 258:22 259:7 261:24 262:3,24 263:9 264:13 280:9,10
**directed** 120:4 133:6
**directing** 5:11 18:16
**direction** 68:3 70:16 118:20
**directly** 45:4 89:3 89:19 90:15 91:9 153:10 186:10 231:22
**director** 89:11 197:10
**director's** 197:2
**directors** 232:13
**disadvantage** 97:8
**disagree** 61:2 68:10 69:21 86:13 90:4 93:9,10 177:7 229:25 251:9
**disagreed** 279:19
**disagreement** 92:19 158:1 249:17 281:25
**disagreements** 94:9
**disbursed** 131:13 132:9
**disbursement** 5:11 18:16
**disbursing** 133:15
**discovery** 91:20 213:22 260:12 264:7,11
**discreet** 125:19
**discrete** 192:3
**discretion** 64:12 64:14 182:12 256:11
**discuss** 130:22 160:19 176:18
**discussed** 45:17 109:9 112:3 122:6 158:11 184:15 262:5,6,17 263:2
**discussing** 147:10
**discussion** 60:24 82:1 100:5 158:11 201:1 216:17 240:12 245:23 262:7 266:11,18
**disentangled** 101:1
**dismiss** 71:20 265:7
**dismissal** 68:13
**dismissed** 71:25 72:11
**disorder** 220:22 281:8
**dispense** 199:2
**disposition** 62:18
**dispositive** 52:5
**dispute** 82:10 84:16 113:8 131:4 136:7 213:22 217:15
**disputing** 108:7 210:11
**dissenting** 222:19
**dissolves** 172:9
**dist** 262:8 266:19 278:3
**distant** 207:9
**distinction** 95:19
**distinctions** 120:9
**distinctly** 268:17
**distinguished** 262:2
**distinguishes** 259:17
**distributed** 162:8 162:23 205:16
**distribution** 113:5 143:6 162:2 206:24 218:5 219:2,7 234:16 261:19
**distributions** 75:7 92:17 108:15 129:21 131:8 160:24 161:18,20 161:21,23,24

162:20 172:23 217:2,25 261:12 272:15,16 274:14 274:16
**distributors** 208:22
**district** 1:2 40:1 48:14,19 49:2,17 49:18 50:7 55:13 55:21 56:9 59:9 60:15 61:17,24,25 62:2,4,6,12 63:11 63:16 64:1,9,18 65:11,24 66:15 67:2,6,14 70:20 72:17 77:11,17,18 77:21 81:6 83:9 86:7 87:7,9 88:3 95:12 107:12 109:16 110:19 112:13 123:25 136:19 138:25 149:2,20 155:25 158:8 161:3,7 163:15 164:3,14 164:17,24 165:2 166:6 167:5,10 170:23 172:10,20 173:24 174:12 175:24 177:13,23 178:14,24 179:7 180:21 181:12 182:12,16,21 183:2 184:7,9,16 184:20 185:6 186:12 187:20 188:5 189:9 200:7 200:11 204:17 215:3,13 217:13 219:16 224:9 227:3 228:3,8 236:7 242:6 247:16 250:21 251:1,6 255:6,8 264:9 266:20 267:24 268:8,10 268:14,20,22 269:5,6 270:14,17 270:21,24,25 271:2,4,4,6,8,14 271:15,16 273:24 275:19 279:2 280:18
**disturbing** 274:9
**dizengoff** 3:4 8:18 9:4 11:8 14:10,17 16:7 19:16,23 21:7 24:10,17 26:3 29:16,23 31:7 34:10,17
**doc** 5:13 18:18
**docket** 45:15,18 63:22 142:4 156:5 164:24 165:25 166:1 167:1 169:19 173:19,23 195:20 226:6 228:25
**docketed** 228:16
**doctrine** 75:22 83:21 84:25 264:24 265:3
**doctrines** 138:19 139:4
**document** 2:13,17 3:3,10,16,20 4:6 4:14,19,24 5:4,21 6:8,15,24 7:7,11 7:19 8:5,10,17 9:3 9:15,19 10:5,17 10:22 11:8,15,21 12:1,10,18,23 13:3,14,18 14:2,9 14:16 15:2,6,21 16:7,14,20 17:1 17:10,18,23 18:3 18:9 19:4,8,15,22 20:8,12,17,21 21:7,14,20 22:1 22:10,18,23 23:3 23:15,19 24:2,9 24:16 25:2,6,16 26:3,10,16,20 27:6,14,19 28:3 28:10,22 29:2,8 29:15,22 30:8,12 30:21 31:7,14,20 32:1,10,18,23 33:3,15,19 34:2,9 34:16 35:2,6 114:5 198:18 208:9 243:23 276:14
**documents** 5:8 13:7 18:13 23:7 28:14 33:7 45:16 45:19 46:22 114:4 213:23 243:22 245:6
**doesn't** 131:1 246:12 249:20 250:13 275:25
**doing** 48:22 49:17 78:6 79:15 80:12 84:4 97:10 100:12 102:2 119:20 135:8 146:8 169:24 170:7 173:2 251:19,25
**doj** 162:6 165:20 165:23 166:15 208:1 210:12 211:4,7 212:13,21 213:15,18,19,21 214:1 261:15 270:4
**doj's** 213:12,23
**dollar** 131:17 205:19 209:3 274:5
**dollars** 122:1 220:22 223:7 232:20 241:3,14 241:15 243:20 244:25 272:20,24
**domain** 245:6
**domestic** 222:11
**don't** 76:23,25 82:5,20 83:17 146:5 148:14 151:10 152:6 153:10 156:16 177:15 241:16 245:11,22 246:5 247:18 248:20 249:19,19,21 250:4,15,17 251:2 251:9 252:20 255:12 277:16 279:7 281:23
**door** 74:10
**double** 139:10 188:11
**doubt** 121:24 168:4 208:23
**doubts** 267:7
**dovetails** 113:3 275:3
**dow** 237:8,9,11
**downs** 234:3
**downward** 240:25
**dozens** 222:5
**drafted** 100:21,23
**drafters** 81:24
**drain** 1:22 44:3 56:13 57:21 146:17
**dramatic** 122:1 245:21
**dramatically** 122:3

**draw** 131:7
134:22
**drawing** 69:19
**dressed** 232:12
**drexel** 90:11
**drives** 204:7
**drop** 170:14 237:8
**drops** 162:22
184:11 186:19
214:21 218:13
230:12,20 234:4
239:22
**drug** 196:15 197:2
197:7,10,25
**drysdale** 40:7
**due** 69:6,22 92:21
94:1 134:8 136:2
139:9 150:17
202:13 214:3
258:15,20,23
260:4 272:21
273:21
**duplicate** 90:14
91:3
**duration** 61:11
62:8 64:8,16
128:4 129:19
130:3 132:9,12
**durations** 67:18
**duty** 76:16 89:3
89:16,18 232:13
**dwf** 265:11
**dying** 135:19
**dylan** 41:6
**dynamic** 240:8
**d'angelo** 41:7
**d'apice** 2:23

**e**

**e** 1:21,21 36:1,1
41:3 42:9 44:1,1
69:6 114:22 160:3
160:3,3,4 193:5,6
196:3,3 258:16

260:9 283:1
**earlier** 95:9
124:15 161:9
165:1 167:5
170:23 172:20
176:10,25 179:7
184:15 185:1
187:20,22 189:8
192:6 205:18
214:17,25 215:2
215:16 246:14
269:4 270:5 271:2
**earliest** 123:4
161:13 166:12
167:9 175:1,3
180:9,10 181:15
**early** 77:10,12
176:9
**earmarked**
212:16 213:1
273:4
**earth** 243:12
**easier** 93:1 204:9
**easily** 223:16
**ecf** 2:14,20,24 3:5
3:11,18,22 4:9,16
4:21,25 5:6,14,22
6:3,9,17,25 7:8,13
7:21 8:7,13,20 9:6
9:12,16,21 10:7
10:14,18,25 11:4
11:10,16,23 12:3
12:13,20,25 13:5
13:9,15,21 14:5
14:12,19,25 15:3
15:8,13,17,24
16:3,9,15,22 17:3
17:13,20,25 18:5
18:11,19,23 19:5
19:11,18,25 20:5
20:9,14,17,24
21:3,9,15,22 22:3
22:13,20,25 23:5

23:10,16,22 24:5
24:12,19,25 25:3
25:8,12,19,23
26:5,11,18,22
27:9,16,21 28:5
28:12,17,23 29:5
29:11,18,25 30:5
30:9,14,17,24
31:3,9,15,22 32:3
32:13,20,25 33:5
33:10,16,22 34:5
34:12,19,25 35:3
35:8
**echo** 133:13
**eck** 43:7
**ecke** 41:9
**eckstein** 2:18 8:11
10:23 13:19 14:3
15:22 19:9 20:22
23:20 24:3 25:17
29:3,9 30:22
33:20 34:3 41:10
**economic** 230:19
239:3 274:25
**ecro** 1:25
**edmunds** 15:16
18:10 37:6 48:9,9
49:25 50:4,6,9,14
50:18,21,23 52:22
53:9 55:1,8 60:8
60:14 61:1,5,7
65:1 137:22,24,25
138:1,4 139:8
140:3,5,9,17,20
140:23 141:1,7,9
141:17,19 142:7,9
142:15 143:8,18
143:25 144:6,10
144:12,13,16,18
144:20,22 145:6,9
145:13 146:1,2,6
251:14,15

**educated** 135:6
**edward** 42:9
**effect** 48:13 52:8
54:21 58:23 59:11
75:5 82:23 96:5
119:8 124:7 130:8
130:10 138:24
139:15 146:7,10
147:22 150:24
153:19,19 192:14
216:19 218:22
263:23 276:13
**effective** 57:24
72:6,8,8,12,19,22
73:5 74:9,11,20
74:24 76:8 77:8
77:11,22 78:1,10
78:14,18 79:14,16
79:21,24 80:1,7
82:1 83:5,5,6,15
83:18 84:11 85:4
85:7,9,14 95:20
95:20,22 97:3,23
97:24 101:20,22
106:24,25 108:15
108:17 123:4
124:3,10,23
132:23 136:23
139:2 158:9 161:4
161:10,19 164:20
164:25 166:24
168:8,10 170:17
170:22 172:17,19
173:5,6 174:7
177:18 179:16
180:10,15 181:6,7
181:14,18,23
182:9 187:19
204:21 211:18
215:2,12 216:23
217:8,9 218:18
219:3,3 224:2
226:4 234:20,24

236:10,13,24
243:13 254:17
265:7 269:3,4,11
269:15,23,24,25
272:9,14 273:1
274:22 275:15
278:17 280:21
**effectively** 151:18
268:7 275:8
**effectiveness** 63:1
**effects** 130:11
134:5 138:12
139:3 142:1 165:9
276:21
**effectuate** 254:16
**effort** 100:25
248:20
**efforts** 208:23
269:23 278:23
**egregiously** 214:2
**eight** 180:6
**either** 45:19 46:25
61:21 66:19 67:7
70:19 71:8 76:14
98:10 143:7
162:21 167:9
172:21 188:4
211:17 228:18
248:24 267:6
272:6
**elated** 18:18
**elected** 238:3
**electric** 58:9
**element** 112:8
271:19
**elements** 227:4
**eleventh** 6:2 13:8
18:22 23:8 28:15
33:8
**eli** 7:12 43:9
**eliminated** 68:17
85:25 88:14 94:2
125:4 163:20

164:11 180:6
**elimination** 82:14
87:4 88:13
**elizabeth** 42:17
**ellen** 30:16 41:16
44:9
**elongated** 208:9
216:19
**eloquently** 114:21
273:15 274:2
**email** 249:1
**emails** 111:13
157:21 206:13
**embrace** 65:23
**emerge** 161:13
**emergence** 161:14
162:17 201:3
278:23
**emergency** 55:12
55:23 56:1 57:20
58:10,23 59:14
78:4 100:7 106:22
178:3 185:24
186:17 225:23
**emphasized** 147:5
**emphatically**
104:10
**employees** 127:22
127:25 128:3
130:11
**empower** 238:9
**enable** 96:15
109:21
**enables** 147:17
261:11
**encompass** 259:19
**encouraged** 44:20
**ended** 66:3 241:9
**ends** 177:12 185:1
243:12
**energy** 262:7
**enforce** 146:9
203:2 204:12

**enforcing** 103:5
277:20
**engage** 80:10
99:20 100:12
108:5 126:25
253:5 264:7
**engaged** 89:18
109:2 253:6
263:10
**engagement** 109:5
109:6
**engagements**
102:4
**engaging** 253:18
**enjoin** 69:19
98:23 259:7
**enjoined** 69:14,20
263:2
**enormous** 281:24
**ensue** 91:19 125:3
261:17
**ensure** 86:14
177:9,11 178:24
**entailed** 98:11
**enter** 63:22 96:14
225:25 250:25
282:2
**entered** 62:15
63:1 104:6 156:5
213:10
**entering** 55:14
178:10
**enterprise** 263:10
**enters** 62:4
**entire** 57:22 61:2
64:25 67:1 70:25
132:13 136:17
261:11 263:6
278:11
**entirely** 44:16
86:1 88:15 89:23
136:14 220:6
268:10 270:24

277:4
**entirety** 95:23
**entities** 4:21 9:21
12:25 15:8 17:25
20:14 22:25 25:8
27:21 30:14 32:25
35:8 40:8 48:15
48:24 70:14
147:23,23,24
148:8 162:7 195:8
196:9 217:3,4
222:5,7,12 278:5
279:17 280:3
**entitled** 120:11
174:4 180:5
**entitling** 261:24
**entity** 120:1
211:15 243:5
263:17 277:12,13
**entry** 62:3 215:6
**epidemic** 134:6,9
191:18 204:4
205:8,13
**equally** 85:24
**equate** 240:1
**equated** 210:16
**equation** 266:17
**equipment** 66:13
66:13 76:24
**equitable** 48:21
49:9 51:6,8,13,15
51:19 52:2 53:1,2
53:11,22 54:5
68:14 70:23 71:11
71:13,17 72:2,19
72:23 73:6,15
74:1 75:3,11,25
76:5,8,18 77:7
78:9,21 80:13,16
80:21,22 81:7,18
82:8 83:1,20,22
84:25 85:11,13
97:7,13 98:9,21

100:14,24 101:3 102:25 103:1 111:8,11,17,19 115:5,10,18,21 116:3,17,19,24 117:7,21,23 118:3 123:22 124:4 125:2,6 134:1 138:10,13,24 139:19 140:15 141:13 143:4,14 145:15 150:21 151:13 163:18 165:8 167:8,23 168:5 171:13,23 173:9,20 174:2 175:10,23 176:8 177:10 180:4 182:23 183:15,18 188:6 202:24 223:11 224:7,10 224:15 226:3,9,19 264:24 265:22,25 265:25 266:16,21 267:6 269:9,17 270:3 274:15
**equitably** 53:14 53:17 60:18 82:15 84:24 85:6 102:2 140:13 164:19 167:16 264:23 265:15
**erf** 133:16,17 207:22 208:2 212:17 213:19,20
**erf2** 133:16
**eric** 3:17 11:22 16:21 21:21 26:17 31:21 42:25
**erosion** 230:22
**erred** 68:10
**escape** 163:22
**eskandari** 41:11 65:14,14,18
**especially** 107:10 186:11 236:4 238:2
**essence** 84:15 162:15
**essentially** 49:17 226:25 227:25 236:5 251:20 279:14
**establish** 53:18 125:22 133:3 145:23 256:18
**established** 81:14 106:22 108:20 126:2 264:25 270:12
**establishes** 260:24
**establishing** 2:1 44:15 117:10 126:14 129:16 134:18
**establishment** 5:10 18:15
**estate** 69:13 90:16 125:5 139:21 140:1,11,12,23 144:1 228:19 264:3,3
**esther** 43:4
**estimated** 205:11
**estimates** 197:25 205:6,12
**estoppel** 57:13,15 58:6,14,17,20 59:7,10
**et** 3:5,17 8:19 9:5 11:10,22 14:11,18 16:9,21 19:17,24 21:9,21 24:11,18 26:5,17 29:17,24 31:9,21 34:11,18 44:3 78:2 156:25
**ethan** 42:25
**evaluate** 53:13
**evaluating** 67:12 255:24
**evaluation** 51:19 137:15 142:18,23 262:16
**evan** 41:18
**eve** 185:22 187:1 217:22 270:20
**evening** 55:13
**event** 59:23 132:22 136:20 219:16 220:19 227:6 229:14 230:4 236:22
**events** 182:25
**eventually** 127:4 127:5
**everybody** 49:22 139:13 179:2 236:18 239:16
**everyone's** 125:21 167:11
**evidence** 49:5 55:20,23 56:6 58:15 89:22 92:19 109:17 125:21,23 130:2 135:10 141:25 163:7 164:14 190:24 191:11 197:25 203:12 232:16 236:17 253:8 260:14,23 261:14 275:24 276:1
**evident** 104:14
**evidentiary** 47:18 48:5 104:21 127:14,17,19 133:1,9 195:16 228:24 229:1
**ex** 5:16 7:2
**exact** 192:14 243:24
**exactly** 47:19 51:15 80:12 88:7 97:9 142:25 164:1 175:5 179:9 241:20
**examine** 160:13 190:15 193:16 194:15 197:22
**example** 70:5 71:21 126:9 130:8 142:12 151:25 206:17 218:16 220:11 223:24 235:20 249:25 266:11
**examples** 249:24
**exceed** 9:9 10:9 14:22 20:2 24:22 30:2 34:22 45:6 62:14
**exception** 172:6 172:11 198:20,22 256:14 276:22
**exceptions** 144:13
**exchange** 204:3
**excited** 186:24
**exclude** 137:11 158:25
**exclusively** 243:8 255:13
**excuse** 154:6 257:14 280:23
**exempt** 277:13
**exempted** 79:2 248:22
**exempting** 120:14
**exempts** 277:3
**exercise** 76:15,17 105:14 131:19 191:23 224:7,10

224:14 242:4 256:10
**exercised** 245:17
**exercising** 115:21
**exhausted** 227:7
**exhaustive** 236:2
**exhibit** 50:15 198:19 199:2,8
**exigent** 174:16
**exist** 46:23 230:9
**existence** 51:2 229:16
**existential** 80:14
**existing** 152:25 229:16
**exists** 141:2 168:9 238:8
**exit** 230:7 240:11
**expand** 92:2
**expect** 68:9 105:13 163:25 168:3 169:20 170:6,15 171:20 182:18 232:6
**expectation** 167:11
**expectations** 76:13
**expecting** 169:17
**expedite** 86:9 279:8
**expedited** 2:10 5:18 6:13,20,23 7:4,6,17 8:3 10:3 81:13 86:6 88:5 109:24 225:13 275:16 278:25
**expediting** 88:1,9
**expended** 140:11
**expense** 244:19
**expenses** 234:13 234:14
**experience** 138:17
**experienced** 134:5
**expert** 126:19 128:24 135:13 138:16 168:23
**experts** 129:17 131:10
**expires** 62:16
**explain** 206:15 214:9
**explained** 151:5 192:6 206:10 220:16 255:7
**explore** 167:25
**express** 134:8
**expressed** 202:19
**extend** 6:20 7:4 95:13 118:10 169:7 280:16
**extending** 240:20
**extends** 262:18 264:6
**extension** 154:16 154:19 155:20 247:2
**extensive** 200:25 259:3 263:9 271:12 275:24,24
**extensively** 266:8
**extent** 45:24 49:9 103:22 126:4 130:10 139:7 153:10 160:14 192:13 254:25 260:16 263:24 270:22
**extra** 54:3 275:1
**extraordinary** 171:11 205:1 210:19 256:5
**extremely** 253:15
**extricated** 103:18
**eyes** 276:9

**f**

**f** 1:21 3:17 11:22 16:21 21:21 26:17 31:21 42:21 278:2 283:1
**f.2d** 121:13 262:16 277:25
**f.3d** 58:10 257:2 257:20 265:10 267:3 280:6
**face** 237:7,14,23 238:2
**faced** 67:11 236:2
**facilities** 273:6
**fact** 6:5 13:11 19:1 23:12 28:19 33:12 46:20,23 47:13 48:3,18 49:15,16 52:3,24 53:3 68:25 69:4 80:23 115:25 127:15 128:10 130:2,18 139:24 140:13 143:13 145:9 146:3 151:6 151:11 152:4,20 152:24 178:5 204:5 209:25 215:11 218:14 228:17 231:9 232:12 238:20 248:25 259:20 260:3 276:9 277:14,16,21,23
**factor** 81:14 103:11 153:15 250:5,7 257:4 264:17 266:2 275:2,22 276:4,5 276:7
**factors** 51:23 52:17 53:24 55:5 56:24 57:9 60:3 67:4 81:21 102:16 111:12 212:3 256:19 257:18 262:19,22 265:5 265:17 266:3,15 273:21 275:21
**facts** 84:25 85:2,3 91:2 126:4,14 129:16 135:2 204:19 210:23
**factual** 69:11 90:2 90:20 250:12 259:3 260:11 263:7 268:18
**fails** 126:7
**failure** 75:18,20
**fair** 51:3 58:7,12 68:7 70:3 91:19 171:20 214:19 222:20 257:6 258:1 263:13
**fairly** 85:11 147:16 180:21 264:25
**fall** 69:4 186:15 198:19 236:14 280:2
**fallback** 95:9 122:24,25 267:23
**falling** 177:12
**falls** 238:14
**false** 55:2
**families** 277:11
**family** 36:12,19 86:5 164:16 212:4 212:14 246:20 247:24 248:1
**famous** 106:25
**far** 48:4 51:5,16 51:21 64:23 71:3

75:9 76:8 81:22
83:15,16 88:16,24
91:25 102:3
106:12 107:15
113:3 117:16
138:7 162:18
181:22 222:7,8
244:4 247:20
258:20 259:2
260:19 263:25,25
264:11,22 267:19
272:2 273:7
**fashion** 126:21
265:4
**fashioned** 265:8
**fast** 268:23
**faster** 106:22
**faulting** 50:10
**favor** 48:24 86:25
171:6 204:9
222:12 244:8
250:9 256:19
272:7
**fears** 75:9
**features** 113:17
113:18
**feb** 66:7 265:13
**february** 262:10
**fed** 265:12,20
**federal** 2:12 5:3
5:20 6:14 7:18 8:4
10:4,12 28:9
118:20 120:1
138:19 139:10
161:25 162:3,7,21
210:5 211:1 212:6
212:7,10 213:5,9
213:12 220:21
221:4,11 222:11
277:3,15,18 281:7
281:15
**fee** 139:24

**feel** 169:24 183:8
200:3,21 233:22
**feels** 103:12
**fees** 105:19,22,24
106:6,7,9 139:25
140:10 234:23
**feld** 39:8 201:11
**felon** 124:22
127:3
**female** 155:8
**femino** 41:12
**ferguson** 203:25
208:17,20
**ferguson's** 206:22
**feverishly** 227:20
**fewer** 106:4 136:6
**fibreboard**
258:25
**fides** 259:12
**fiduciaries** 169:25
231:25
**fiduciary** 89:16
172:13 232:13
**fielded** 206:12
**fields** 237:15
**fifth** 38:10 206:22
**fight** 93:6 205:8
276:8,15
**fighting** 228:10
**figure** 87:23 88:23
90:25 176:23
180:14 240:7
**file** 45:14 165:24
167:1,4 180:8
186:22 242:10
**filed** 2:13,18,23
3:3,10,16,21 4:7
4:15,20,24 5:5,21
6:16,24 7:7,12,20
8:6,11,18 9:4,11
9:15,20 10:6,13
10:17,23 11:3,8
11:15,21 12:2,11

12:19,24 13:3,19
14:3,10,17,24
15:2,7,12,16,22
16:2,7,14,20 17:2
17:11,19,24 18:3
18:10 19:9,16,23
20:4,8,13,17,22
21:2,7,14,20 22:2
22:11,19,24 23:3
23:20 24:3,10,17
24:24 25:2,7,10
25:17,22 26:3,10
26:16,21 27:7,15
27:20 28:3,11
29:3,9,16,23 30:4
30:8,13,16,22
31:2,7,14,20 32:2
32:11,19,24 33:3
33:20 34:3,10,17
34:24 35:2,7 44:6
45:18 47:11,14
49:16 50:7 55:12
55:22 58:11 73:11
93:13 106:1,2,19
118:24 123:25
149:1 154:11,14
156:14 157:15
164:24 173:19,23
195:9,18 211:5
279:23 281:10
**filing** 9:9 10:10
14:22 20:2 24:22
30:2 34:22 57:1
106:3 201:17
255:2
**filings** 106:4
**final** 58:17,19,25
59:1 61:21 62:18
87:11 196:19
197:9,12 218:17
224:5
**finality** 76:1 112:8
149:16 150:5

227:13 266:7
**finally** 58:16
62:20 119:16
167:3 200:12
270:1
**financial** 125:15
126:17 149:9
150:16 227:10
**financially** 125:10
**find** 79:1 85:2,5
104:6 109:1
110:10 114:8
184:13 195:5
209:2 236:16
253:15 260:17
**finding** 48:25,25
51:7 105:24
227:13 258:8
**findings** 6:5 13:11
19:1 23:12 28:19
33:12 49:12 228:7
229:5 230:1
236:10 238:25
240:22 259:3
**finds** 103:15
119:15 152:22
**fine** 112:24 113:1
118:5 122:19
154:13 175:19
180:7 189:22,23
195:12 199:21
201:14
**fire** 257:20
**first** 25:12 38:17
45:8 46:8,9 48:11
49:23 50:24 52:19
53:12,16 55:5
58:8 63:4,6,15
67:21 68:20 72:16
72:18 78:3 94:21
97:25 103:23
111:3 115:12
120:3 122:20

126:10 130:7
142:3 144:25
146:20 147:1,6
149:11 150:9
151:3 152:14
155:13 158:15
163:13 168:6
171:23 184:2
185:3 201:21
203:4 205:21
206:6 207:19
210:3 212:4 214:7
215:5,11 218:7,9
218:23 220:12
223:19 230:18
234:18 236:13
237:7 246:24
252:8,21 253:14
254:10,19 255:10
255:21 256:7
257:4,16 261:6
264:15 268:25
275:22
**firsthand** 134:5
**fit** 85:10 230:14
**fits** 118:25
**five** 75:4 76:11
176:14 204:15
213:3,5 244:20
265:17 273:18
**fixed** 234:3
241:18 272:20
**fl** 39:19
**flag** 45:2
**flexible** 102:13
265:4
**floor** 40:2 94:11
251:11
**florida** 39:16
**flow** 132:21
**flowing** 135:5
136:20 187:9

**focus** 52:7 56:5
57:22 60:2 61:10
61:25 66:24 67:17
68:19,21 70:7,17
72:14 75:6,25
76:12 77:20 81:19
87:9,10 109:13
158:6 163:14
229:14 243:7
255:2,13,13 257:6
265:6 273:12
**focused** 56:1
57:19 268:1
**focuses** 76:11
85:12 198:1 233:5
**focusing** 56:19
72:16 82:5 83:2
87:7 116:13 137:4
176:22 221:8
233:17 255:25
**fogelman** 40:5
219:23 220:2,3
221:16 249:9
281:1,1,4,18
**follow** 84:19
125:21 204:23
**followed** 232:1
**following** 62:22
107:19 124:5,15
164:7 165:1
184:16 212:2
246:2 256:19
**follows** 186:16
223:19
**footnote** 68:5
**foray** 214:7
**forced** 81:12
92:22 240:3
**forces** 213:25
**foregoing** 270:10
275:3 283:3
**foreseeable**
244:22

**forever** 203:10
243:19
**forfeiture** 281:12
281:13,15
**forget** 202:12
**forgetting** 204:15
**forgot** 245:12
**form** 103:8
112:12 113:4
122:23 142:16
143:7 153:20
187:12 212:7
234:15 240:7
265:23
**formally** 49:8
247:7
**formed** 142:12
**former** 95:24 96:2
119:24
**forming** 141:20
**forms** 66:24
134:20
**forth** 126:3
157:22 164:23
236:24 241:20
258:7 259:15
277:22
**forthcoming**
171:1
**forum** 163:23
**forward** 49:4
99:21 100:3
102:15 103:13
105:18 117:17
118:4 130:9
139:21 141:23
144:1 151:12
179:16 229:18
231:18 232:1,16
233:21 234:21
235:11,14 237:5
240:18 241:10
242:8,17 249:23

**fought** 228:10
236:3
**found** 49:2,3
50:13 59:3 84:24
89:21 91:5 147:14
172:7 192:13
194:16 197:1
226:21 261:13
**founded** 119:17
**four** 126:22
166:19,22 198:23
208:8 210:3
256:19,25 271:10
275:21
**fourth** 161:6
212:24 214:14
**framework**
115:23
**framing** 95:2
**frankel** 37:8
221:20
**frankly** 59:13
69:23 78:5 109:19
140:6 152:16
163:25 219:24
247:7 272:4
**fraud** 89:6 263:9
263:10
**fraudulent** 90:13
90:14 212:9
**fraught** 241:25
**free** 92:6 120:24
233:22 237:16
240:2 242:9
261:16
**friday** 55:13,22
58:11
**frivolous** 54:8
83:24 114:15
**front** 50:12 98:22
110:20 121:23
200:7 221:8
228:13 242:5,9

**frontloaded**
234:14
**frustrated** 241:8
**fulcrum** 123:24
**full** 58:7,12 63:24
64:16 88:15 111:3
176:16 249:3
**fully** 60:6 110:16
148:4 217:1
**functional** 202:10
**fund** 5:10 18:15
100:7 106:22
151:21 160:21
162:14 220:20
234:5 235:24
237:13 245:4
262:8 281:13
**fundamental**
147:18 150:12
**funded** 151:1
228:19 233:2
234:4,10 235:1,2
243:5
**funding** 132:21,22
132:24 133:4
134:22 223:5
273:11
**funds** 131:3,12
133:15 135:5
136:3 205:13
206:25 220:14
235:5 239:25
243:20 272:25
**further** 15:10
54:25 70:22 82:24
94:8,11 95:7,13
100:15 101:9,11
101:19 112:22
118:9 122:14
139:6 156:16
175:6 176:12
177:6 192:7
209:24 230:7

240:5 254:8
259:10 269:21
273:24
**furtherance**
164:20
**future** 98:18
125:14 134:24
163:24 215:8
244:16,22

**g**

**g** 44:1 190:4 196:3
**gain** 203:11
**game** 97:18
**games** 182:3
**gar** 131:6
**gard** 129:10
**gas** 58:9 70:6
256:8 262:7
267:17
**general** 37:1
39:16 62:11
120:14 137:1
143:2 202:6 203:8
203:21,25 204:13
206:7,22 256:6,13
260:4 267:13
**generally** 63:3
75:6 85:2 146:3
198:5 259:14
260:13
**generals** 203:1
204:16 207:1
208:17
**generate** 105:22
**generated** 213:6
**gerard** 36:16 42:3
246:19
**germane** 253:11
**getting** 79:25 80:3
92:7 100:14 107:4
109:10 118:1
145:19 157:23,23
178:1 200:7 206:3

208:19 209:9,12
209:13 211:17
217:2 228:21
233:12 235:10,24
236:3 242:18
266:10
**giddens** 41:13
**give** 55:10 56:23
58:20 65:20 75:10
95:12 123:11
129:13 156:22
168:5 169:22
170:15 172:5
175:8 180:17,22
181:10,13 182:17
182:21 198:21
200:20 205:21
216:3 219:12
220:10 223:23,24
224:8 239:17
248:20 251:20
252:23 261:2
269:17,22
**giveback** 134:15
**given** 52:5 53:11
60:10 63:13 85:2
91:18 129:18
130:22 134:12
172:1 184:2
185:25 187:7
195:1 198:9 200:1
213:24 217:24
229:2 238:8,19
246:1 263:19
270:10 280:20
**gives** 130:8
150:21 203:18
239:21
**giving** 107:25
169:3 172:11
173:7 174:8
178:19 181:5,5
185:22 200:19

239:13 280:21
**glitch** 202:4,10
203:9 204:3,7,12
205:9,17 206:24
207:8,21 209:12
209:18 210:1,7,18
211:6,23 212:5,12
213:13,15,19,22
214:1 215:23,25
216:5,15 217:17
218:9,12 229:21
229:23,24 230:8
230:19 235:13
**glm** 265:11
**gloss** 257:3
**go** 54:11,25 55:4
61:20 67:20,22
69:5 72:12 77:18
87:14 88:1 94:19
99:1,16,21,23
100:3 101:25
106:25 108:17
110:11 111:3
112:19 117:14,17
118:4 125:11
126:13 137:23,25
138:1,5 139:13
146:5 154:12
162:14,18,20
163:4 166:20
168:7 172:4
175:20 178:8,9
179:16 181:3,6,7
181:14 188:8
193:1 197:4
199:15 205:15,17
208:3 211:13
215:23 217:7
220:8 234:13,16
234:21,25 236:23
239:19 243:12
244:25 246:22
252:15 273:5

274:22 278:17,23 281:13
**goal** 99:25 223:6
**goals** 279:8
**god** 160:1 190:2 193:3 194:3 195:25
**goes** 70:16 82:13 82:23 107:11 113:13 121:17 122:2 129:11 130:9 140:6 155:24 168:9 172:13 198:17 209:3,8 218:7,8,9 218:11,11 221:5 234:19 237:2,9,11 242:8 281:15
**going** 49:2 51:3 52:15 60:17 67:20 68:7,25 71:19 72:12 73:3,13 74:10,11,16,22 77:7,19,21 78:8 79:11 83:4 87:3 93:6,18,20 95:5 96:12,20,22 97:17 99:5,9 101:7 103:25 106:13 108:21 109:11,22 116:2 117:9,20,23 118:8,14 131:12 132:9,22 133:23 135:10,14 137:9 137:11 139:21 141:20 144:1 150:22 156:18,19 157:21 158:1 163:13 170:10 175:21 176:13 177:8,12,21 178:15,17 182:1 183:6 185:23 186:1 187:10,11 191:9 200:13,18 202:2,21,23 205:4 205:25 206:9 208:14 211:13 221:1 228:11 230:25 237:10,12 237:19 240:17 241:18 242:2,17 242:18 246:14,24 247:16,17 248:12 263:25 272:25 273:1
**gold** 10:17 15:12 38:13 65:4,4 94:14,15,18,21 95:16,17,25 96:3 98:24 99:3,7 102:10 107:20,23 108:2,22,25 110:24 111:20 112:16,25 113:14 114:24 115:1,12 116:6,8,11,16,22 116:25 118:7,13 118:16 120:2 121:1,4,9 122:5 122:13,22 124:24 133:13 142:13 143:3 183:23,23 184:1,21 185:8,13 185:15,19 199:6 252:4,4,7 254:1,4 254:7
**gold's** 186:16
**goldman** 39:6 65:21,22 118:7 122:17,17,20 123:17,19,21 127:2,18 128:12 128:14,17,19,23 129:3,6,10 130:5 131:5,15,19,20,22 131:25 132:2,5,19 133:5,8,12,18,21 133:23 134:3 135:9 137:6,10,19 142:13 160:15 186:6,7,10 187:2 190:17 199:6,10 199:10
**gold’s** 245:14
**good** 44:2 54:19 94:14 120:18,19 120:23 156:24 157:5 161:12 166:22 193:25 201:10 222:13 238:10 242:25 253:23 274:17
**gotcha** 97:18
**gotten** 73:13 84:9 154:15 248:5
**governed** 118:17 149:17 271:18
**government** 44:17 118:21 119:19 120:1 161:25 162:3,21 209:24 210:9 211:1,1,22 211:25 212:6,7,10 213:5,9 219:25 220:11,12,17 221:4,11 222:7 236:22 244:18 249:15,16,16 277:3
**government's** 75:18 209:23 210:6 212:1 236:6
**governmental** 2:19 4:21 8:12 9:21 10:24 12:25 13:20 14:4 15:8 15:23 17:25 19:10 20:14,23 22:25 23:21 24:4 25:8 25:18 27:21 29:4 29:10 30:14,23 32:25 33:21 34:4 35:8 40:8 70:13 195:8 196:9 211:10,15 217:3 221:21 222:5,12 263:17,23 277:13 280:3
**governments** 222:17
**grace** 267:1
**grade** 206:22
**grant** 45:11 81:13 155:3 224:15 225:11 256:4,10 270:14 278:8
**granted** 70:15,19 70:19,24 87:17 104:17 114:16 119:7 126:17 127:22 148:4 192:12 203:1 210:20 220:7 256:14
**granting** 5:9,13 18:14,18 62:24 119:24 204:2 278:20 279:12
**grants** 80:10 184:23
**grave** 267:7
**great** 107:21 157:22 191:22 244:9 254:5
**greater** 121:17 128:10
**greenberg** 38:15
**gregory** 41:19
**grieved** 206:15
**grievous** 131:9 132:8

**ground** 51:3 68:7 70:3 141:12 257:6 263:13
**grounded** 75:22
**grounds** 138:13 258:1
**groundwork** 77:25
**group** 2:22 4:1,8 4:18,21,25 9:18 9:21 11:2 12:5,12 12:22,25 13:4 15:5,8 16:1 17:5 17:12,22,25 18:4 20:11,14 21:1 22:5,12,22,25 23:4 25:5,8,21 27:1,8,18,21 28:4 30:11,14 31:1 32:5,12,22,25 33:4 35:5,8 38:2 40:8 126:16 164:16 195:9 196:9 201:6 214:18 221:18 225:21,25 227:19 231:9,12,15 279:23
**groups** 202:19
**grows** 122:3
**guarantee** 79:11 200:15
**guard** 39:21 189:15,25 190:3,6 190:7,13,15,20,21 190:23 207:6 273:7,15 274:7,24
**guard's** 190:15 222:24
**guardrails** 226:7 226:15,16,21
**guess** 61:5 70:25 98:23 114:25 115:4 121:14 122:5 131:21 135:16 140:7 141:25 147:18 158:19,25 176:9 177:15 180:19,19 219:1 225:1 240:19
**guidance** 163:13
**gump** 39:8 201:11
**gun** 103:16 235:21
**guth** 3:21 12:2 17:2 22:2 26:21 32:2

**h**

**h** 2:18 8:11 10:23 13:19 14:3 15:22 19:9 20:22 23:20 24:3 25:17 29:3,9 30:22 33:20 34:3 41:10 42:19 193:5
**hadley** 36:11
**half** 216:20 238:3
**hand** 100:2,3 118:4 159:25 189:25 193:1 194:1 195:24 274:20,21
**handful** 222:6
**handle** 154:24
**handling** 45:1
**hands** 84:3
**happen** 57:4,24 71:19 72:6,15,22 73:25 83:6 97:24 128:11,21,22 131:11 133:17 150:22 163:25 166:9 168:19 169:1,25 170:16 171:21 175:4,5 176:1 179:3 181:17,18 218:1 237:19,21 250:18 253:9,10
**happened** 55:10 57:23 97:19 207:22 208:4
**happening** 49:5 53:4 55:15 72:10 73:5,12 74:21 85:8 97:13 100:1 109:14 124:11 141:12,13 182:22 183:13,14
**happens** 105:3 139:1 142:22 171:19 179:5,12 179:14 180:7 184:25 200:17 236:12
**happy** 44:19 45:25 46:12 52:8 159:1 169:16 174:10 175:7 183:3 188:23 199:15 220:8
**hard** 70:18,22,23 78:5 85:14 91:24 92:13 98:20 107:19 116:18 138:20 139:12 145:22 178:7 185:20 205:22 207:23 236:3 240:4
**harder** 250:9
**hardship** 51:7 146:11,11 222:1
**hardships** 48:23 52:24 85:17,19 144:3,24 145:6 222:23
**harm** 51:13,22,22 53:1,3 56:6,12,24 57:3,9 58:2 68:14 68:23 70:12 77:4 81:10 82:6,7,14 84:15 85:20 91:6 91:8,10 92:20 94:1,1 95:4 102:20 103:6,8 104:1 107:4,14,20 107:21,24 108:6,8 110:3 112:3,4 115:3 125:1 131:9 132:8 133:2 138:14 139:18 140:4,17,18,25 141:2,12,14 143:12,23 144:4,8 145:17,23 147:9 148:6 149:7 151:17 152:1 162:19 164:10 167:19 169:10 171:12 174:3 175:11 176:23 178:10 180:1,3 187:14 188:15,20 189:5 201:7 202:21,23 203:20 204:20 205:2 214:16 216:14 217:2 221:25 222:22 226:10,18 230:13,22 231:4 231:21 232:1,17 232:23 233:3,13 233:14,15,16,25 234:20 235:5 236:1 238:20 243:8 249:18 257:17 258:3 261:6 262:3 265:23,25 266:4,5 266:24 267:9,10 267:12,13,14,16

270:11,12 272:2,5
272:17 274:21,23
274:25 277:6
278:14
**harmed** 76:15
82:4,11 92:16
203:3 204:13,14
230:15 231:21
233:20
**harmfully** 208:17
**harms** 51:14 70:9
70:9 75:21 91:1
94:4 96:13,24
103:10,20 105:23
108:4 109:15
113:3,13 121:16
125:16 132:20
136:10 142:22
162:18 188:20
189:6 200:24
201:1 217:11
227:5 229:18,19
230:4,16,18 233:5
233:12 234:1
237:6,6 240:23,23
240:24 250:7,9
253:16 256:24
276:2 277:7
**harold** 3:10 11:15
16:14 21:14 26:10
31:14 41:17
242:25
**hartman** 93:19
232:4 249:25
**hartman's** 250:2
**hasn't** 255:4
**hatch** 163:22
**hauer** 39:8 201:11
**haven't** 248:4
**head** 75:17 103:16
186:11 235:19
**headed** 62:9

**health** 197:12
220:21 227:14
**healthcare** 281:7
281:15
**hear** 48:12 49:21
51:11 52:8,18
64:21 94:16
136:14 138:2
146:22 154:13,17
155:6 156:20
157:18 158:4
159:14,15,18
175:14 183:23
187:17 188:9
189:5 201:12,14
221:17,22 248:8
249:8 252:5
268:23 271:5
**heard** 55:7,16
58:14 83:11,13
86:16 114:25
155:5 156:2,13,15
168:3 169:18
171:24 175:22
176:7 198:1
205:22 215:17
225:17 243:1
251:3 252:9
253:17 267:11
**hearing** 2:1,2,3,6
2:7,9,16,22 3:1,7
3:13,20 4:1,11,18
5:1,16,18 6:1,5,11
6:19 7:1,3,10,15
8:1,9,15 9:1,8,14
9:18 10:1,9,16
11:2,6,12,18 12:1
12:5,15,22 13:1
13:11,17 14:1,7
14:14,21 15:1,5
15:10,15 16:1,5
16:11,17 17:1,5
17:15,22 18:1,7

18:13,21 19:1,7
19:13,20 20:1,7
20:11,16,19 21:1
21:5,11,17 22:1,5
22:15,22 23:1,7
23:12,18 24:1,7
24:14,21 25:1,5
25:10,21 26:1,7
26:13,20 27:1,11
27:18 28:1,7,19
29:1,7,13,20 30:1
30:7,11,16,19
31:1,5,11,17 32:1
32:5,15,22 33:1
33:12,18 34:1,7
34:14,21 35:1,5
44:4,15,17 45:18
48:1,3,4 52:13,20
55:21,25 56:2,8
56:19 57:21,22
65:16 75:9 89:22
92:24 94:25 98:3
104:7 111:2
118:10 124:14,20
163:21 164:9
165:16 166:1,4,6
166:8,10 169:12
169:18 172:5
174:23 178:6
180:22 181:7,8,10
181:17,19 186:23
186:25 187:5,22
187:24 200:14
202:8,11,13,15
208:9 209:16
215:16 216:22
217:22 228:11,17
229:1,1,10,11,23
231:1,22 232:15
234:11 238:7
242:7 246:10
248:18,25 255:5
258:24 260:13

270:4,5,22 271:8
271:12,14 279:2
280:15,15,16
**hearings** 46:17
228:20,22 235:2
**hearsay** 126:1
198:20
**heart** 65:20 82:8
**heavily** 245:24
**heavy** 85:12 256:4
**heels** 246:13
**height** 116:23
**held** 2:3 44:16
56:2 59:6 98:17
101:8,15 186:14
205:13 259:12
265:21
**help** 75:19 106:18
160:1 190:2 193:3
194:2 195:25
213:24 219:2
277:6 281:7
**helpful** 48:10
49:25 50:15
**helping** 191:19
**helps** 219:15
**herculean** 223:15
**herring** 252:11
**hesitated** 202:3
**hestrup** 3:17
11:22 16:21 21:21
26:17 31:21
**hiding** 165:23
166:3
**higgins** 36:8 44:23
44:23 45:8,12
46:6,14 47:15,21
48:6
**higher** 65:11
95:13 107:13
112:20,23 116:6,8
122:9

**highlight** 151:16
**highlighted** 187:14
**highly** 114:8 127:10 245:16 259:8 260:17 269:14
**hindsight** 207:25
**hinted** 242:5
**hire** 92:25 93:5
**hiring** 93:1
**history** 203:14 221:5
**hit** 138:5 164:2 186:10
**hoc** 2:16,19 3:7,11 4:1,7,25 8:9,12 10:21,23 11:12,16 12:5,11 13:4,17 13:20 14:1,4 15:20,22 16:11,15 17:5,11 18:4 19:7 19:10 20:20,22 21:11,15 22:5,11 23:4,18,21 24:1,4 25:15,17 26:7,11 27:1,7 28:4 29:1,4 29:7,10 30:20,22 31:11,15 32:5,11 33:4,18,21 34:1,4 37:9 38:2 39:17 93:3 189:15 202:19 214:18 221:17,21 227:19 276:17 278:18
**hold** 100:13 114:9 116:19 203:24 235:11 271:8 273:25
**holder** 256:25 257:19 267:16
**holding** 101:17 210:21 235:21 261:3
**holdings** 81:6 265:12,12,20 266:18
**holds** 48:19
**holiday** 186:18 217:23 270:20
**holidays** 186:20 216:17
**hon** 1:22
**honestly** 145:5 149:23
**honeywell** 257:1,3
**honor** 44:23 45:3 45:9,12,14,22,25 46:6,10,14,25 47:4,22 48:6,9 49:25 50:6,15 52:22 54:19 56:7 57:16,23 58:16 59:15 60:8 61:7 63:17 64:5,20 65:1,4,15,21 67:23 71:12,18 72:7,16,17 73:2,7 73:17,21 74:3 75:12 76:21 77:5 78:22 79:17,23 80:9 82:12 83:7 84:1 85:18 87:21 88:8,11,21 90:2 91:8 92:18 93:8 93:22 94:7,14,21 94:23 95:1 96:4 96:10,17 99:3,19 100:19 101:21 102:11,12 103:9 104:7 106:4 107:23 108:2,25 109:4 110:14,24 111:13,23 112:16 112:21,22 113:14 114:9,12,14,19,24 115:12 116:25 117:2 118:7,11,16 120:2 121:1,9 122:5,7,13,17,20 123:8,17 125:9,18 127:8,8,18 128:17 129:3 131:5 132:2 133:8,12,21 135:10 137:6,19 137:22 138:5 140:10,21 141:9 143:8 144:20 145:14 146:24 148:23,25 149:15 149:23 150:8,10 151:4,14 152:22 154:3,7,9 157:5 158:18 159:8 163:2,8,12,16 164:1,9 165:11,15 169:17 170:19 171:7,25,25 172:3 172:4 173:25 174:1 175:17,22 176:17 177:4,21 178:9,20 179:17 181:1,9,12 182:3 183:3,11,15,23 184:2,15,23 185:19 186:4,6,10 187:2 188:13,13 188:21 189:13 190:13,21 191:4,8 192:8,10 194:23 195:7,14 196:4,12 198:13,16,25 199:10,17 200:12 201:10 203:17 204:10 205:3,18 209:15,19 214:22 215:1,20 219:21 219:23 220:3,5,9 220:24 221:16,19 222:13,25 224:17 224:18,20,24 225:17,22 226:15 227:9,18 231:22 232:6 233:17 235:17 238:6 240:19 242:22,25 243:4 245:9,20 246:19,23 247:4 247:18,20,25 248:11 249:4,8 251:8,14 252:2,4 252:7 254:2,7 281:1,5,14,21 282:4
**honor's** 45:4 46:24 61:3 97:4 150:6 172:8,8,9 199:23 226:24
**hook** 203:22 204:2
**hope** 134:15 224:16 241:17,19 246:7
**hoped** 244:4
**hopefully** 188:17 201:21 248:12
**hoping** 114:22
**horses** 235:11
**hospitals** 4:25 13:5 18:5 23:5 28:5 33:5 204:8 217:5 273:5
**hostage** 102:6 114:10
**hour** 188:19 228:20
**hours** 55:8 191:14
**housekeeping** 45:2,6,13 48:7
**howell** 66:11
**hudson** 36:13 58:9 59:5

**huebner** 4:15 9:15
  12:19 15:2 17:19
  20:8 22:19 25:2
  27:15 30:8 32:19
  35:2 41:14 56:23
  104:10
**huge** 139:1 150:20
**hugh** 42:5
**human** 227:10
**hundred** 231:10
  272:20
**hundreds** 241:2
**hung** 128:4
**hurley** 39:13
  41:15 191:4,5,8
**hyde** 35:25 283:3
  283:8
**hypothetical**
  56:25 231:4
  235:12 236:20
**hypothetically**
  232:25
**hypotheticals**
  253:7

                    **i**

**i.e.** 69:13 76:13
  173:1 262:25
  263:8 266:1,3
  267:21 275:12
  278:10
**iac** 152:9
**iacs** 151:18
**icc** 191:21
**ice** 173:7
**idea** 133:25
  219:12 227:23
**identical** 57:15
  115:14
**identification**
  231:20
**identified** 56:11
  79:22 114:9,14,19
  138:8 174:4,7

  175:12 226:12
  259:6
**identifying** 45:19
  57:11
**ignore** 244:12
**ignoring** 112:5
**ii** 4:4 5:11 12:8
  17:8 18:16 22:8
  27:4 32:8
**iii** 5:13 18:18
  38:21 263:2
**illumination**
  119:20
**imaginably** 211:4
**imagine** 60:23
  83:23 85:3 183:1
**imitated** 107:15
**immeasurable**
  217:2
**immediate** 99:15
  139:15 181:13
  184:6 274:4
**immediately**
  185:22 234:12
**immense** 96:13
**imminent** 57:9
  58:11 167:13
  180:1,12 267:15
**immunity** 203:18
  203:23 204:2
  252:23 280:2
**impact** 75:14
  147:8,9 150:22
  151:7,8 238:1
**implement** 80:11
  272:13
**implementation**
  44:6 244:15 265:8
**implemented**
  130:9 133:24
**implementing**
  140:11 141:3

**implicated** 210:6
  252:12
**implication** 170:9
**implying** 252:25
**importance** 83:2
  85:20 109:18
  110:4 137:4 138:8
  225:15 266:3,6
**important** 49:22
  51:25 53:17 54:25
  57:12 61:23 66:22
  83:12,12 87:23
  88:11 90:6,22
  94:3,22 108:9
  111:3 114:1,11
  125:23 132:18
  145:21 147:4
  174:2 181:23
  186:11 208:1
  222:4 231:19
  251:24 257:3
**importantly**
  200:12
**impose** 110:1
  119:15 172:9
  226:3 277:16
  279:4
**imposed** 138:18
  277:24
**imposing** 217:21
  278:21 279:11
**imposition** 214:4
  233:20
**impression**
  178:20
**improper** 224:14
  248:18
**impropriety**
  202:15
**imputation** 89:17
**inaccurate** 248:16
**inapplicability**
  260:9

**inappropriate**
  119:15
**incalculable**
  135:11,17 136:9
**include** 98:5
  119:3 121:6 232:5
  249:25 250:25
  258:15 278:25
**included** 47:25
  65:16 120:9 192:3
  225:25
**includes** 61:15
  101:22 164:15
  266:6 269:18
  281:8
**including** 44:11
  53:20 62:22 66:6
  98:7 109:4 135:7
  136:4,15 137:17
  138:11 174:7
  176:4 182:22
  199:1 203:17
  223:11 244:2,5
  250:1 259:14,24
  260:9 261:14
  269:12,22 270:8
  275:22 277:13,18
**inconceivable**
  83:25
**incorrectly**
  125:15
**increase** 238:11
**increases** 112:4
  227:10
**increasing** 130:20
  274:8
**increment** 218:8
**incremental**
  107:14 207:15
**incur** 105:20
**incurring** 105:19
**ind** 265:20 266:18

**indefinite** 58:2
**indefinitely** 243:19
**indemnity** 262:15
**independent** 102:22 107:17 143:14
**indian** 217:4 278:1
**indicate** 275:7
**indicated** 73:3 127:8 174:16 183:5
**indication** 123:23
**indiscernible** 102:8 108:19 114:11 135:15 175:8 184:3 191:19 210:15 232:3 240:16 241:2,7 242:11,14 247:8,14 280:16 281:14
**individual** 4:2,8 12:6,12 17:6,12 22:6,12 27:2,8 32:6,12 38:2 88:18,20 89:2,9 89:14 92:8 227:19 231:4 232:9 249:20,21 262:4 274:4
**individuals** 88:16 88:25 89:18 93:23 229:17,18 230:23 231:7,20 232:24 233:5,15,25 234:10 236:19 238:21 249:22
**inequitable** 84:13 265:9
**inexplicable** 210:24
**inexplicably** 111:24
**inference** 134:23
**inflammatory** 231:3
**inform** 201:22
**information** 5:12 18:17 132:16 275:7
**informed** 192:19
**informing** 237:21
**inherent** 63:21 142:22
**inherently** 54:24
**initial** 143:6 218:5 272:16 274:14
**initially** 168:3
**initiation** 234:17
**initiative** 126:16
**initiatives** 126:12 126:13,15,21 127:12
**injunction** 70:14 93:16 132:16 136:16,19 258:22 262:24 263:18,19
**injure** 256:22
**injured** 256:21 264:18
**injuries** 235:8,13 264:20
**injury** 88:14 93:4 136:21 149:12 187:13 209:25 213:11 214:6,8,12 234:2 235:21 243:18 244:2 257:13 261:8,18 261:21 264:20,21 271:25 272:15,18 272:25 276:18 278:19
**injustice** 206:16
**innate** 209:11
**innocent** 243:6
**inquiry** 53:20 262:20
**insert** 213:21
**inside** 201:16
**insights** 191:22,24
**insist** 109:20 117:20
**insisted** 98:4 111:2 202:11
**insisting** 253:2
**insofar** 226:16
**instance** 69:9 97:25 114:2 149:11 152:2 211:25 252:21 263:1 272:7
**institutions** 114:3
**instruction** 248:5
**insufficient** 136:3
**insurance** 3:13 11:18 16:17 21:17 26:13 31:17 262:15
**insured** 90:17,18
**insureds** 90:17
**int'l** 257:1
**intact** 65:10
**intellectual** 92:14
**intend** 112:19 176:7
**intended** 105:15 159:22 185:11 190:8 193:10 194:10 196:7
**intends** 164:13
**intention** 124:9 231:2
**intents** 171:15 264:19
**interacting** 192:22
**intercreditor** 273:22
**interest** 46:21 86:12,15,22,24,24 87:1 93:24 94:2 110:14,16 111:9 111:10 112:3,6,8 113:2 114:18 201:7 202:22 209:20,22,23,23 209:25 210:6,16 210:25 211:20,21 212:1,2 214:15,20 221:6,9 222:23 227:5,12,12 230:21 235:13 243:8 244:7 245:9 249:18 256:25 259:23 260:25 263:24,25 264:6 266:5,9 272:1 275:2 276:4 277:20
**interested** 256:23 271:25 272:3
**interesting** 150:12 151:18 152:19 250:10,16
**interests** 85:24 202:16 211:2,24 221:11 249:17 275:4
**interim** 56:7 71:7 71:19 133:15 171:13 187:7 242:16
**intermediate** 115:2
**international** 152:3

**interplay** 74:18
**interpretation** 120:20 121:5,7 148:3
**interpreted** 277:19
**interpreting** 64:4
**interrupt** 56:16 73:19 128:12 142:6 180:19 218:25
**intervening** 72:1 152:2
**interviewing** 223:24
**intolerable** 107:7
**intricate** 273:22
**introduce** 158:16
**introductory** 68:1 221:24
**inversely** 257:12
**investigating** 203:10
**investigation** 213:20,23
**investigations** 203:13
**investments** 66:10
**invited** 200:18
**invoking** 76:18 81:7 226:2 266:21
**involve** 58:24 172:21 266:8
**involved** 116:1 141:22 192:21 253:10
**involves** 252:14
**ira** 3:3 8:18 9:4 11:8 14:10,17 16:7 19:16,23 21:7 24:10,17 26:3 29:16,23 31:7 34:10,17
**iridium** 273:21
**ironically** 208:24 243:15
**irrelevant** 220:6 220:25 221:3 277:17
**irreparable** 51:13 51:22 53:1,3 68:14,23 70:12 72:3 81:10 88:14 102:20 103:6,8 125:1 138:14 139:18 140:4,17 140:18,24 141:2 141:11,14 143:12 143:23 144:4,8 145:17 147:9 148:6 149:7,12 152:1 188:15,20 189:5 203:20 204:20 205:2 209:25 214:16 216:14 221:25 222:22 226:10,18 233:14,16 243:8 257:13,17 258:3 261:6 264:21 265:23 266:24 267:10,12,13,13 267:16 270:11,12
**irreparably** 68:18 203:3 204:12 256:21 264:18
**irrevocably** 102:7
**irv** 65:21 186:7 199:10
**irve** 39:6 122:17
**isaac** 157:14
**isaacs** 30:17 41:16 44:9 156:13,17 157:7,11,17,21 249:25
**isaacs'** 255:14,20
**israel** 3:10 11:15 16:14 21:14 26:10 31:14 41:17 242:25 243:1,4
**issuance** 187:20
**issue** 45:13 46:21 48:11,13,20,21 49:10,19 50:2 51:12,14,15 52:24 53:25 54:23 57:15 58:13 60:16,20 62:25 65:11 66:16 67:10 68:22 69:8 69:9,16,25 82:3 83:1 90:6 92:14 104:9 107:13,21 108:3 110:6 111:21 112:1,7 115:13 116:14 118:15 121:11,15 122:11 130:23 138:7 139:1,14 145:16 147:9 148:22 152:14 169:17 171:17 189:14 199:3 201:8,23 217:10 220:14 222:24 224:18 225:5 227:21,25 229:20 241:19 247:6,15 254:1 262:25 264:14 267:12 268:8 271:1 275:25 276:2,7 277:6
**issued** 119:3 134:9 257:23
**issues** 45:2 46:15 48:7 52:18 53:3 53:25 54:6,15 57:3,16,17 58:8 60:6 67:3 68:25 69:3 76:15 82:9 83:12 86:16 87:18 88:11 91:20 94:3 101:16 109:13 113:21,23,24 114:2,17 118:8 119:2,3,3 123:2 136:13 138:20 139:18,23 147:7 150:17 192:20 201:13 211:11 221:25 225:16 234:25 255:14,23 258:4,8,13 264:14 273:16 275:17,18 276:24
**issuing** 203:18
**it'll** 175:21 215:1
**item** 45:8
**items** 46:15
**it's** 245:16,18,24 245:25 246:2,2,8 246:19 249:6,6,10 249:11 250:7,10 250:15 251:5,8,22 251:24 252:19 253:1,22 267:2 271:13 273:17 281:4,4,6
**iv** 280:6
**i'd** 245:17
**i'll** 273:16 276:1 282:2
**i'm** 240:7 246:23 246:24 247:13 255:16 267:2 271:3 280:22
**i've** 246:25 268:12

**j**

**j** 4:7 7:12 10:17 12:11 15:12 17:11 22:11 25:10 27:7

32:11 38:6,13,21 39:6 40:12 41:25 42:16 43:9 114:22 160:3 193:6 196:3
**j&j** 246:11
**jacquelyn** 43:1
**jail** 237:16
**james** 42:4
**jan** 81:15
**january** 132:25 133:3 183:7 187:21,22 188:5 189:9 215:2,13,16 215:22,22 216:18 217:19,20 218:6 218:12 228:13 233:7 234:5,5 237:19,22 238:17 239:14,16 240:15 242:20 267:1
**jasmine** 40:24
**jeffrey** 40:12 42:16 195:7 225:20
**jeopardized** 150:4
**jeopardy** 104:15 105:9 124:22 139:10
**jerome** 43:2
**jersey** 138:25 165:25 180:22 200:11 242:6 279:2
**jesse** 9:14 15:1 20:7 25:1 30:7 35:1 41:8 163:6
**jill** 40:21
**job** 85:2 130:22 251:22
**john** 39:21 142:4 190:4,23
**johns** 262:14
**johnsbury** 53:21 75:17 76:22 266:13
**johnson** 208:22 208:22
**join** 214:6 227:15
**joinder** 2:22 3:8 3:13,20 4:4,22 11:2,13,18 12:1,8 13:1 16:1,12,17 17:1,8 18:1 21:1 21:12,17 22:1,8 23:1 25:21 26:8 26:13,20 27:4 28:1 31:1,12,17 32:1,8 33:1 254:25 255:9
**joined** 44:24 204:18 229:12 254:23 255:1,4,11
**joining** 213:25
**joint** 6:2,6 13:9,12 18:22 19:2 23:9 23:13 28:16,20 33:9,13 59:3 124:16
**jonathan** 37:13 189:13 221:19
**jones** 41:18
**jordan** 43:10
**jorgensen** 40:17 191:2 194:25 195:4,9,14,16,23 196:1,2,4,5,12,14 196:18,22 197:1 197:18,22 198:12 198:13
**jorgensen's** 198:3 198:7,19 199:1 227:8
**jorgenson** 274:7 274:24
**joseph** 9:12 14:25 20:5 24:25 30:5 34:25 41:19 43:3
**juaire** 8:15 14:7 19:13 24:7 29:13 34:7 40:15 114:22 191:3,11 192:2,25 193:4,5,7,8,14,16 193:21,23 206:10 274:2,24
**juaire's** 193:19
**judge** 1:23 44:2 50:11,25 51:21 52:3,13 53:10 54:21 55:9,16 56:1,13,17,21 57:6,18,21 58:14 59:11 66:15,23 67:10,14 68:4 70:6 75:16 78:6 78:11 79:8 81:5 81:23 82:22 91:22 98:23 109:17 115:25 116:13 121:12 123:2,9 146:17 147:8,18 154:15 155:14 156:9 163:19 166:24 167:11 169:5,18,23 170:1 170:5,6,16 171:14 171:19 172:2,12 172:14 174:15 175:8 179:6 183:5 215:18 216:8,20 217:22 225:22 226:8,13,21 228:13,24 230:6 235:18 237:21 239:13,19 240:5 240:11,11,12,25 257:10 278:1
**judge's** 67:13 200:16
**judges** 62:21
**judgment** 58:18 58:19,25 59:5 62:1,2,5,5,6,7,13 62:15 63:1,8 115:21 120:18,21 121:2 150:6 246:11
**judgments** 120:16
**judicial** 45:20 46:3,4,9,19,23 47:3,4 48:2 238:8 250:1 256:11
**julius** 41:5
**july** 66:12
**june** 223:6 256:16 278:4
**jurisdiction** 76:17 172:8 279:25
**jurisdictional** 69:23
**justice** 36:3 67:25
**justify** 142:3 207:11

**k**

**k** 194:5
**kajon** 3:17 11:22 16:21 21:21 26:17 31:21
**kamenetzky's** 54:16
**kaminetzky** 37:20 47:3,7,16 54:19 54:20 56:21 157:5 157:6,9 158:18,19 158:24 159:4,8,10 159:12 163:1,2,8 163:11,12 165:5 165:10,13 166:17 166:19,22 167:22 168:2,12,14,18,20

168:23 169:9,15
170:19 171:3,5,9
172:25 173:2,14
173:17,19,22
174:21 175:1,5,16
179:4,9,11,17,20
179:23 180:3
181:1,3,9,25
182:6,11,15,18
183:11 188:8,11
216:15 219:12
242:5 245:12,20
247:6 281:21
282:4
**kans** 66:11
**kaplan** 38:8 65:5
75:16 94:15
116:13 252:5
**kara** 9:1 14:14
19:20 24:14 29:20
34:14 40:16 244:9
**kate** 42:23
**katherine** 42:12
**kathleen** 36:23
**kathryn** 41:1
**keenly** 109:18
**keeping** 130:11
**kelly** 257:1
**kenan** 5:5 10:6,13
28:11 42:18
**kenneth** 2:18 8:11
10:23 13:19 14:3
15:22 19:9 20:22
23:20 24:3 25:17
29:3,9 30:22
33:20 34:3 41:10
**kept** 98:7
**kesselman** 41:20
**kevin** 4:20 9:20
12:24 15:7 17:24
20:13 22:24 25:7
27:20 30:13 32:24
35:7 42:1

**key** 95:1,5 181:20
219:16 271:19
**kibitzer** 260:14
**kind** 54:22 57:5
81:11 87:25 98:1
102:6 107:16
108:6 172:8
200:10 215:19
227:20 246:2
**kirk** 195:18 197:9
**klein** 41:21
**kleinberg** 38:8
65:4 94:15 252:4
**knew** 197:8
**know** 45:22 46:11
49:13 50:8 52:25
53:1 54:2,16 55:4
56:2 58:5 64:6
67:20 68:1,5,9,10
69:1 71:20,24
73:4,7,13,14,24
74:4,9,9,12,15,18
74:20,23 77:14,15
78:3,24 79:8
80:16 82:12 83:8
84:2,20 85:1
86:17 87:21,24
88:2,7,12 90:8,12
90:13 91:14,16
93:9,10,13,25
94:7,8 97:9 106:3
115:9 121:25
122:22 123:24
125:9 130:14
134:6,12 135:1
138:23 139:3,4,9
142:21,24 144:6
145:7 146:10
151:1,15 152:6
153:8 155:2,12
156:16 157:14
158:12,14 159:12
161:12 162:25

167:15 169:21,22
169:25 170:3,4,5
170:13 171:14,18
173:8,11 175:21
176:1,3,9,25
177:5,7,7,14
178:12,16,22,23
179:13,13 180:7
180:24 181:12,14
182:6,23 183:4,12
185:6 188:7,18,24
199:20 200:15,19
201:17 202:15
204:5,9 207:22
215:18 216:15,15
216:17 219:11
220:8,11,20
221:13 222:25
225:4 229:22
232:5 242:19
245:11 246:15
247:23 248:17,21
248:22 249:7,14
249:18,19 250:15
250:20 253:20
**knowing** 97:16
117:17 132:8
160:9 190:10
196:10 210:8
**knowledge** 125:25
126:1,5,6,15
128:21 129:8,16
135:14 139:7
191:22
**known** 207:9
**knows** 57:23
123:8 165:15
169:25 181:12
183:9 207:25
**kramer** 37:8
189:14 221:20

**l**

**l** 43:7 160:3 193:5
196:2
**l.p.** 1:7 3:5 4:8,16
6:7 7:12 8:19 9:5
9:12,16 11:10
12:12,20 13:13
14:11,18,25 15:3
16:9 17:12,20
19:3,17,24 20:5,9
21:9 22:12,20
23:14 24:11,18,25
25:3 26:5 27:8,16
28:21 29:17,24
30:5,9 31:9 32:12
32:20 33:14 34:11
34:18,25 35:3
44:3
**l7/2021** 28:16
**label** 232:8
**lack** 231:20
233:15 238:25
258:2 263:9 266:5
**lag** 218:10
**laid** 114:21 143:3
262:19
**landscape** 238:5,7
246:10
**lane** 195:6,18
197:9 198:15
199:3
**lane's** 195:20
198:4,16,21,25
199:6,12
**language** 50:16
64:6,7 66:2
118:17 120:8,10
224:21 277:4
**large** 103:21
151:15 258:25
**largely** 221:2
260:3,14

**larger** 150:11
240:19 244:5
**largest** 220:20
**larry** 40:5 281:1
**lasted** 208:13
**lastly** 250:20
**late** 239:3
**laura** 41:12 42:22
**lauren** 3:21 12:2
17:2 22:2 26:21
32:2 43:12 155:8
**law** 2:10 4:11,11
6:5,12,19 7:16 8:2
9:9 12:15,15
13:11 14:22 17:15
17:15 19:1 20:2
22:15,15 23:12
24:22 27:11,11
28:19 30:2 32:15
32:15 33:12 34:22
45:15 49:14 50:24
51:18,20 53:9
54:23 57:12,14
58:16 59:4,15
64:4 69:14,16
73:22 75:5,24
76:10 85:3,11
88:21 89:6 102:23
115:8 120:7
147:15,25 153:19
172:4 179:18,18
238:12 258:14,18
263:11 269:17
277:20
**laws** 88:18,20
103:5 146:9
252:17
**lawsuit** 203:23
**lawsuits** 131:18
136:4 204:2
**lawyer** 92:10,25
93:1,5 117:3

**lawyers** 93:2
105:8 111:15
**lay** 84:23 126:4
129:15
**layers** 275:1
**laying** 77:25
**lays** 215:9
**lead** 79:25 80:3
84:11 85:4 127:5
131:2
**leading** 124:3
188:4
**leafing** 50:12
**learned** 196:19
**leave** 9:8 14:21
20:1 24:21 30:1
34:21 150:6
158:16 189:16
235:7 246:15
**leaves** 65:10
**ledanski** 35:25
283:3,8
**lees** 41:22
**left** 53:4 66:15
232:22
**legal** 68:10 69:10
106:20 108:9
147:7 148:15
241:8 283:20
**legally** 69:14
246:12
**legislate** 242:3
**legislation** 46:16
237:25
**legislative** 237:23
260:7
**legitimacy** 84:16
**legitimate** 63:7
82:10 83:21
135:20 274:25
**length** 130:6
156:16 262:6,18
273:20

**lengthy** 98:3
121:25 258:6
276:13 277:9
**lenient** 267:16
**lesser** 92:12 150:8
151:4 270:22
**lest** 165:23 166:3
202:11
**letter** 57:10
220:11 281:10
**letters** 206:13
**level** 51:8 98:11
109:10 111:22
226:10 264:24
265:2 274:9
**levels** 111:7
112:20
**levene** 41:23
**leventhal** 41:24
**levin** 37:8 189:14
221:20
**levine** 36:9 41:25
44:25 63:17,17
64:5,20 65:2,6
67:21,23,24 71:12
71:18 72:7,10,16
73:2,21 75:12
76:21 77:1,5
78:22 79:17,23
80:3,9,19,21
82:12,17 83:7
84:1,7,9 85:18
87:14,21,24 88:7
88:19 89:1,13
90:2 91:8,13,15
92:18 93:8,19,22
94:7 175:17,19,20
176:17,21 177:4
177:16,20,24
178:8,16,18,20,22
179:2,14 183:11
248:11,11 249:4
250:10 251:3,8

**lexington** 37:17
**lexis** 66:7,8,10
81:6,15 224:9,12
262:9,10 266:19
266:25 278:3
**liability** 89:8
252:10,12 253:1
**liable** 89:19
**licenses** 127:6
**licensing** 141:22
250:14
**lien** 152:20 153:20
153:21
**lies** 256:25 272:1
**liesemer** 40:12
195:7,8,13 198:16
199:17 200:24
225:17,20,20
**life** 205:14 206:21
244:21
**lifesaving** 244:15
**lift** 279:10
**lifting** 242:12
**light** 49:15 61:12
85:2 190:18
224:13 231:2,9
243:9 275:21
**lightfoot** 121:13
277:25
**likelihood** 48:19
49:10 54:7 56:5
60:16,24,25 68:2
70:2,8 229:6
275:22
**limb** 96:21
**limit** 9:9 10:9
14:22 20:2 24:22
30:2 34:22 46:24
62:14,21 75:23
105:24 176:5,12
250:25 280:8
**limitation** 193:20
194:17

**limitations** 198:4
**limited** 6:21 7:5
  61:19 90:10
  107:18 109:9
  128:3 129:19
  130:3 132:9,12
  160:14 190:17
  227:2 256:14
  261:15 262:10
  268:13
**limiting** 64:7 66:1
  171:13
**limits** 45:6 48:15
  69:11 86:18
  139:11 268:7
**linda** 2:13 5:21
  6:16,24 7:7 42:13
**line** 69:20 157:7
**lines** 89:7 97:14
  100:6,7 183:6
  215:20
**linked** 100:20
**links** 157:23
**liquidate** 236:17
  272:23
**liquidated** 108:19
  136:22 151:9
**liquidating**
  265:10 272:14
**liquidation**
  236:18 241:5
  261:19
**list** 46:1 248:21
**listed** 46:9,16
  93:15 109:5
**listen** 7:10
**listened** 206:14
**lite** 38:15
**literally** 104:20
  144:9 167:19
  255:15 261:17
  266:9 277:10

**litigate** 58:8,13
**litigated** 58:24
**litigating** 92:8
  244:21 273:16
**litigation** 2:20
  8:13 10:24 13:21
  14:5 15:23 19:11
  20:23 23:22 24:5
  25:18 29:5,11
  30:23 33:22 34:5
  51:4 68:8 70:4
  86:4 92:5 93:7,21
  156:1,7 207:10
  214:13 221:22
  244:20 257:7
  258:1 261:17
  263:14 264:9
  276:10,16
**litigator** 199:21
**little** 50:3 51:10
  51:11 82:13 84:3
  103:16 109:5
  147:6 150:15
  175:2 187:13
  201:22 205:22
  208:11 235:20
**live** 46:12,24
**lived** 108:8
**lives** 132:4 223:4
  277:10
**llc** 5:12 18:17 39:1
  66:8,10
**llp** 36:11 37:8,15
  38:1 39:8
**local** 222:17
**logical** 49:22
  140:23
**logically** 48:13
**long** 47:12 54:9
  64:15 87:19 88:10
  117:14 122:10
  156:19 207:23
  222:1,23 227:22

229:20 238:13
  240:4 251:8
  262:19 273:17
**longer** 67:8 72:3
  99:10 108:17
  149:16,25 150:11
  187:13 188:14
  226:23 276:2
**look** 54:17 73:14
  75:3 84:18 94:1
  95:6 113:2 130:7
  130:17 135:16
  139:24 142:17
  144:11,14 149:2
  187:3 207:25
  225:1 227:24
  232:7 239:10
  242:18 265:2
  280:13
**looked** 162:19
  204:18
**looking** 49:24
  50:1 63:15 64:24
  83:1 88:24 92:3
  109:12 120:7
  123:1 132:15
  135:3 149:11,24
  162:19 174:13
  195:5 230:3
  232:10 248:3
  257:24
**looks** 78:6 201:17
  207:23
**lose** 56:24 70:15
  71:10,11,14 83:5
  148:7 233:23
**losing** 205:8
**loss** 102:23 121:23
  134:13 135:11
  143:15,15 149:8
  191:17 234:7
**lost** 143:20,21

**lot** 54:13 55:5
  86:20 93:1 97:10
  99:8 103:12
  113:17 139:25
  141:24 187:4,7
  188:15,18 205:3
  251:10
**lots** 81:17 206:2
**loud** 171:25 219:6
  231:15
**love** 99:19
**lower** 69:16 84:19
  109:25 122:9
**lowne** 142:4
**lp** 156:25 262:8
**lucas** 42:19
**lunch** 156:19
  157:19

**m**

**m** 37:13 42:5,6
  43:5 190:4,23
**ma'am** 194:20
**maclay** 4:20 9:20
  12:24 15:7 17:24
  20:13 22:24 25:7
  27:20 30:13 32:24
  35:7 42:1
**madoff** 90:14
  232:3
**magali** 41:13
**main** 39:3
**maintain** 80:13
  97:5 213:4
**maintaining**
  80:15
**maintains** 197:12
**major** 96:24
**majority** 71:4
  87:3 172:6 222:10
  265:21 272:6,8
  273:5
**making** 49:4
  59:16 68:7 89:19

93:24 117:3 128:15 137:13 143:6 152:13 161:7 177:5 178:2 178:5 184:8 218:15 219:7 243:22 253:5 272:15,16
**mallinckrodt** 154:23
**man** 111:23 194:23
**managed** 101:18
**management** 142:7 145:2
**manages** 103:16
**managing** 100:16
**manifest** 240:23 241:3
**manifestly** 110:15 111:9
**manner** 201:25
**manufactured** 246:13
**manville** 90:15 262:15 263:2 280:6
**mara** 41:24
**marc** 9:11 14:24 20:4 24:24 30:4 34:24 41:20 42:21 43:3
**march** 66:11 161:15 274:10,10
**marginal** 87:6
**maria** 41:9
**mario** 41:7
**mark** 231:11
**market** 126:12,13 237:7
**marketed** 111:14
**marshall** 4:15 9:15 12:19 15:2 17:19 20:8 22:19 25:2 27:15 30:8 32:19 35:2 41:14
**martin** 260:6
**maryland** 15:17 18:10 37:1,2 48:10 54:22 58:22 65:1,20 137:2 142:10 146:8 251:15 253:21 254:21 274:17
**massive** 244:12
**master** 5:11 18:16
**masumoto** 7:20 8:6 42:2
**material** 79:20 151:7 172:22 226:11
**materially** 129:13
**materials** 46:23
**mathematically** 234:1,22 239:25
**matter** 1:5 49:20 49:22 84:25 94:24 114:6 145:9 149:14 152:3 205:25 218:12 250:12 253:3 260:11 265:6
**mattered** 218:21
**matters** 46:3 60:14 101:4,17 110:7 112:14 114:13,19,20 116:3 117:10 160:7 191:22 216:24 223:19 237:22 253:6
**matthew** 10:17 15:12 38:13 65:4 94:14 183:23 252:4
**maura** 36:23
**mccarthy** 42:3
**mcclammy** 42:4
**mccloy** 36:11
**mcdonald** 42:5
**mcmahon** 50:25 52:13 53:10 55:16 56:1,22 57:6,18 68:5 79:8 91:22 109:17 115:25 123:2,9 147:8 154:15 155:14 156:9 163:19 166:24 169:6 170:1,6,16 171:15 171:19 172:2,12 172:14 174:15 175:9 179:6 183:5 215:18 216:8,20 217:22 225:22 226:8,13,21 228:14,25 230:6 235:18 237:21 239:13,19 240:6 240:11,12,13 241:1
**mcmahon's** 50:12 51:21 52:4 54:21 55:10 56:18 59:11 66:23 78:6,11 81:23 82:22 167:11 169:18,23 170:5
**mcnulty** 42:6
**md** 37:4
**mdl** 92:10,11
**mdt** 223:25
**mean** 50:6 52:9 57:13,13 59:8,12 60:11 71:17 72:24 75:16 76:10,17 82:1 83:20,23 84:22 90:3 95:24 98:21 107:20 111:12 113:7 116:13 120:20 121:22 130:2 134:19 135:17 136:6 139:8,12 140:9 143:8 144:20 151:14 154:4,18 158:13 162:5,16 164:12 166:15 167:19 172:18 179:6,11 179:12,12 181:25 182:12,14 184:8 185:19 197:8 200:7 219:16 237:14 243:15 246:2 252:25 253:22 261:20
**meaning** 124:13 150:4
**meaningful** 67:16 96:16 107:13 110:18 117:2 130:10 131:3 132:17 136:18 171:25 172:1 186:1 240:1 259:8 277:14
**meaningfully** 110:1
**meaningless** 131:18
**means** 57:13 105:16 107:8 111:12 114:10 121:22 180:10 233:18 234:7
**meant** 66:3 112:18 216:1
**measure** 71:1 108:15 258:25

**measures** 133:15
**mechanics** 223:12
**mediation** 208:5,8 213:9
**medicare** 99:13
**medicine** 205:15
**meet** 102:16 171:22 198:22 249:2
**meises** 42:7
**melissa** 43:7
**member** 126:16
**members** 134:4 135:7 191:13 223:25
**memorandum** 2:9 4:11,11 6:12,19 7:16 8:2 9:9 12:15 12:15 14:22 17:15 17:15 20:2 22:15 22:15 24:22 27:11 27:11 30:2 32:15 32:15 34:22 45:15 258:7 262:12
**memorialized** 247:7
**mention** 103:19 119:14 206:21 246:8
**mentioned** 185:16 205:6,6 214:17 255:21
**mere** 69:1 102:25 114:6 117:2
**merely** 46:20 54:5 81:7 266:20
**merge** 154:23
**merged** 154:22
**merit** 68:12 207:17 210:15
**meritorious** 148:5
**merits** 48:20 49:11 50:25 51:3 52:11,16,19 54:13 55:6 58:18,20,25 59:2 60:5,17,24 60:25 66:21 67:4 67:10,12 68:7,22 69:1,7 70:3 71:14 72:4,11 81:1 83:2 83:11,13 86:16 88:15 102:11,14 140:7 163:20 167:10 176:22 178:25 228:7 229:4 238:24 242:15 256:1,21 257:5,22 258:9,10 258:17 260:17,20 266:4 267:7 276:24 279:15
**mesh** 268:10
**met** 265:17 271:22
**metromedia** 69:17 84:21 90:8 273:21
**mezzanine** 262:8
**michael** 4:24 13:4 18:4 23:4 28:4 33:4 40:23 42:10 42:20
**michele** 42:7
**mid** 156:2 177:1 218:12
**middle** 182:25
**milbank** 36:11
**millbank** 246:20
**million** 162:6,6,8 162:18 205:10 211:8,9,10 212:15 212:19,20 213:1 213:11 241:14,14 241:15 272:20 273:2 281:8,11
**millions** 140:10 241:2 245:5
**mind** 67:5 135:2
**mindful** 151:6
**mineola** 283:23
**minimal** 87:8
**minimize** 115:3
**minimum** 65:8 81:25 153:7
**minority** 87:2 275:13
**minus** 272:25
**minute** 167:25 251:15 253:7
**minutes** 55:3 214:23
**miscellaneous** 220:18
**mischaracteriza...** 55:9 220:4
**misconduct** 89:2 89:9,10,11,19
**misdirection** 253:3
**miserable** 244:21
**misguided** 203:4
**misheard** 56:22 56:25 65:15
**misleading** 208:17
**misses** 231:11
**missing** 181:21
**missouri** 206:7
**mistake** 65:17 117:19
**mitch** 191:4
**mitchell** 39:13 41:15
**mitigate** 253:16
**model** 109:2
**modest** 254:15
**modified** 6:1 13:8 18:21 23:8 28:15 33:8 150:25
**modifying** 62:23
**moment** 87:10 104:20 123:22 161:3 195:5 211:23 233:6
**monaghan** 36:23 247:23,25
**monetary** 135:18 137:3 222:20,21 263:21
**money** 102:6,7 107:5 108:21 113:5,10,11,25 114:6 131:24 136:6,20 139:25 140:12 145:19 161:21 162:16 187:8 202:17 206:2,3 207:8,10 207:24 208:1,18 208:19,19 209:7,8 209:12,13 211:17 211:18 212:8,11 212:15,16,22 213:6,7 217:7 218:7,8,9,10,12 222:15 223:8 234:8 235:10 236:6 237:2 243:16 249:12 251:23 254:16 274:1,19 276:8 279:9
**monies** 220:19
**month** 161:14 206:9 216:20 233:23 239:9 241:18
**months** 121:21,25 128:9 134:22 160:24,25 161:9 192:17 205:25 207:2 208:5,6,7,7

208:8 247:12
**moot** 53:14,17 75:19,21 76:4 82:15 84:24 85:6 98:16 102:2 134:1 140:13 157:16 164:19 167:16 264:23 265:15 270:3
**mooted** 60:18
**mootness** 48:21 49:10 51:6,8,13 51:15,19 52:2 53:1,2,11,18,22 54:5,9 68:14 70:23 71:11,13,17 72:2,20,23 73:6 73:15 74:1 75:4 75:11,22 76:1,5,7 76:8,18,24 77:8 78:9,21 80:14,16 80:21,22 81:7,18 82:8 83:1,20,23 85:11,13 97:7,14 98:10,21 100:14 100:24 101:3 102:25 103:1 111:8,11,17,19 115:6,11,19,22 116:3,14,17,19 117:7,21,24 118:3 123:23 124:4 125:2,6 138:10,13 138:24 139:19 140:16 141:6,13 143:4,12,14 145:15 150:22 151:13 163:18,24 165:8 167:8,13,23 168:5 171:13,23 173:9,20 174:2 175:10,24 176:8 177:10 180:4 181:22 182:24 183:16,19 188:6 202:24 219:1,8 223:11 226:3,9,19 264:24 265:22 266:16,21 267:6 267:11,12 269:9 269:17 270:3 274:15 279:14
**morning** 44:2 54:19 58:12 94:14 253:13
**mortimer** 36:19
**motion** 2:9,10,16 4:1,3 5:1,2,9,16 5:17,19 6:11,13 6:19,20,23 7:1,2,4 7:6,15,17 8:1,3,9 9:8,8 10:3,9,9,10 10:16,21 12:5,7 13:17 14:1,21,21 15:10,11,15,20 17:5,7 18:7,14 19:7 20:1,1,16,20 22:5,7 23:18 24:1 24:21,21 25:10,15 27:1,3 28:7,8 29:1 29:7 30:1,1,16,20 32:5,7 33:18 34:1 34:21,21 45:11 48:15 49:1 50:7 55:12,16,23 56:8 56:10 57:20 58:10 58:19,24 59:14 62:11 63:3,4,8 64:21 66:18,20,21 75:20 78:22 81:13 105:11 109:3 132:12 139:17,20 143:7 145:10,14 148:16,24,25 154:11,14,17 156:2,4,14 157:12 157:12 158:12,25 163:23 167:4,18 177:1 178:5,11 180:8 186:17 188:1 189:11 191:9,23 198:23 202:20 211:3 216:4 225:3,23 228:3,13 231:18 239:5 250:21 254:10 255:9,15 255:17,19,20,22 264:8 268:3 270:16 271:6,15 275:19 278:20 279:13 280:22
**motions** 2:2,17,23 3:2,9,15 4:5,12,18 4:23 8:10,17 9:3 9:10,18 10:22 11:3,7,14,20 12:9 12:16,22 13:2,18 14:2,9,16,23 15:5 15:21 16:2,6,13 16:19 17:9,16,22 18:2 19:8,15,22 20:3,11,21 21:2,6 21:13,19 22:9,16 22:22 23:2,19 24:2,9,16,23 25:5 25:16,22 26:2,9 26:15 27:5,12,18 28:2 29:2,8,15,22 30:3,11,21 31:2,6 31:13,19 32:9,16 32:22 33:2,19 34:2,9,16,23 35:5 44:4,11,19,22 45:3,11 49:4,7,11 52:12 56:14 63:5 65:24 73:11 106:1 142:3 144:25 156:25 159:24 167:4,12 178:3 190:9 193:9 194:8 196:6,9 215:7 226:17,20 227:23 228:2 242:15 246:25 254:10,19 254:24 255:1,11 255:21,24 256:3 271:10 279:12,15
**motors** 256:6,13
**mouth** 78:16
**movant** 44:17 156:12 183:21,22 209:25 210:5 255:25 256:18,19 256:21 257:4,13 264:18 278:12
**movant's** 56:6 202:7
**movants** 56:11 58:3 59:9 94:12 158:7 163:18,22 164:5,8,9 165:7 167:4,7 170:24 187:25 188:25 189:7 202:22,23 202:25 207:13 208:10,16 216:3 217:12 223:20 226:12 251:10,12 256:2 264:19 269:22 270:11,16 270:19 271:20,24 276:3,8 278:23 279:8 280:21
**movants’** 258:5
**movant’s** 270:3
**move** 71:20 85:16 102:10,19 127:18 129:10 133:13 139:5,7 140:22 141:1 144:22 145:4,12,15

158:20 174:9
191:1 207:20
216:18,22 217:17
218:5 242:9
**moved** 75:25
217:18
**movement** 245:21
**movie** 103:14
**moving** 79:9,9
88:3 102:22 134:3
139:17 141:23
149:8 218:22
260:19 263:15
264:5 268:1 270:8
**mpm** 84:22
**msge** 4:18 9:18
12:22 15:5 17:22
20:11 22:22 25:5
27:18 30:11 32:22
35:5 164:15
225:21,25
**mull** 188:7
**multi** 4:21 9:21
12:25 15:8 17:25
20:14 22:25 25:8
27:21 30:14 32:25
35:8 40:8 195:8
196:8 264:9
**multiple** 73:12
84:7 120:5 136:13
147:21 157:21
**municipalities**
146:25 147:1,6,11
204:6
**municipality**
25:11 38:16
255:10
**murray** 42:8
**mute** 54:18
188:10,11,12,12
**mysterious**
183:12,13

**n**

**n** 36:1 44:1
114:23 160:3
194:5 196:2,3,3
283:1
**n.a.** 66:16 268:11
**n.d.** 66:14
**naftalis** 37:8
221:20
**naloxone** 199:8
**name** 114:3
**narrow** 195:19
198:17,24 199:3
210:20 231:24
263:4
**nas** 3:7,11 11:12
11:16 16:11,15
21:11,15 26:7,11
31:11,15 164:15
204:7 243:1,4,7
243:17 244:2,4,8
244:9,23 245:3
**nation** 25:12
38:17 147:1 278:2
**national** 81:5
206:1 208:21
209:9 264:9
**nationally** 274:9
**nations** 147:6
150:10 151:3
255:10
**native** 2:24 11:4
16:3 21:3 25:23
31:3
**natural** 171:10
**nature** 134:17
148:15 266:1
**ncsp** 203:12
**near** 163:18
**nearly** 81:12
117:8
**necessarily**
100:19 101:2

168:15,21
**necessary** 89:24
95:7 105:25
109:23 169:4
174:15 195:1
239:11,12 240:20
273:20,24
**need** 50:9 52:3
54:4 57:20 61:5
77:3 80:11 96:25
102:5 106:20
115:4 122:2 146:5
152:17,22 153:2
163:21 164:9
172:13 175:11
183:8 185:5
198:25 200:21
225:3 228:6 232:7
233:15 234:1
235:12 239:2
240:24 241:19
242:10 252:21
255:25 257:6
267:9
**needed** 77:23
106:18 253:5,6
267:8
**neediest** 244:17
**needlessly** 129:24
**needs** 51:20,23
53:13,23 57:24
93:11 96:17
172:13 175:9
203:4 224:18,19
233:14 235:17
256:18 274:4
**needy** 110:11
**negligence** 89:6
**negotiate** 117:6
213:10 248:19
273:22
**negotiated** 113:20
245:24 266:8

**negotiating**
281:24
**negotiations**
208:6,7 213:19
220:13
**neiger** 42:9
**neither** 58:21
179:25 267:14
**net** 137:17
**never** 47:24 91:10
140:3 164:17
183:17 188:17
203:6 210:14
214:20 231:13
**nevertheless**
53:19 56:24
**new** 1:2 36:6,14
36:21 37:11,18
38:4,11 39:11,11
40:1,3,3 78:1
106:15 138:25
142:12 165:25
167:4 180:8,22
185:22 187:1
200:11 206:1
217:22 235:8,13
242:6 270:20
278:2 279:2
**newark** 38:19
**newco** 74:12,13
127:7 143:6
160:21 161:22
162:14,18,23
168:9 219:4 224:1
273:11
**news** 197:3
**newspaper** 47:16
47:22
**nicholas** 3:17
11:22 16:21 21:21
26:17 31:21
**niece** 206:23

**night** 55:22 58:11 166:10 182:25
**nj** 38:19
**nken** 256:25 257:19 267:16
**noat** 108:20 218:17 223:25
**non** 51:22 53:1 68:16 89:2 90:4 90:21 91:10 111:16 114:14 119:19 147:11,23 148:8 149:6 151:19 210:22 214:4 222:11,21 231:25 232:25 241:21 249:11 259:22 274:25 276:19
**norm** 276:21
**norma's** 95:4
**normally** 108:14
**nos** 45:18 209:6 209:12
**note** 44:14 62:3 65:23 66:5,15 101:6 102:20 104:7,19,25 106:14 113:23 123:2 144:23 148:14 158:10 198:8 205:5 206:23 252:8 253:4,13 259:5,10 260:6,11,21 264:5 264:7 276:5 279:20
**noted** 71:21 164:9 194:18 238:6 262:12 268:10 277:17 279:13
**notes** 119:22,22 120:8 227:21
257:10
**notice** 2:6 5:17 7:2,10 45:21 46:3 46:4,9,19,23 47:4 47:5 48:2 62:11 92:24 93:9 165:24 166:10,11,23 170:25 178:7 180:15,18 181:4,5 181:6,10,13,16,22 182:2,9,10,17,21 184:6 187:23 188:1 199:24 200:19 219:13,13 226:4 230:11 239:16 250:1 251:7 259:2,3,9 269:23 270:7,8,16 280:14,15,20
**notices** 234:11,12 234:13
**noticing** 181:23
**notion** 56:15
**notions** 238:4
**notwithstanding** 52:11 56:9 114:18 117:12 202:14 244:11 262:14 263:15,18
**november** 1:16 2:6 44:14 56:12 57:4,21 58:4 77:10 123:9 160:8 170:7 190:11 193:12 194:11 196:10 268:24 283:25
**nuances** 143:10
**nuisance** 246:12
**number** 66:6 89:7 136:2 142:4 156:5 158:10 166:17,22 196:15,19 197:1,7 197:9,15,15,20 200:3,5 206:8 210:1 257:7
**numbers** 197:13
**numerous** 81:4 93:15
**nw** 40:9
**ny** 1:14 36:6,14,21 37:11,18 38:4,11 283:23

**o**

**o** 1:21 44:1 114:23 160:3 194:5 196:2 196:3 283:1
**o'neil** 4:25 13:4 18:4 23:4 28:4 33:4
**obaldo** 42:11
**object** 92:15 259:13,14,25 260:16 275:5,6
**objectant** 44:17 245:11
**objectants** 156:21 158:4 188:10 199:16 276:1
**objected** 70:14 93:17 202:19 249:23 272:6
**objecting** 91:21 127:15 134:20 192:1 211:6 253:18
**objection** 2:16,17 4:1,2 8:9,10 10:21 10:21 12:5,6 13:17,17 14:1,2 15:20,20 17:5,6 19:7,8 20:20,20 22:5,6 23:18,18 24:1,2 25:15,15 27:1,2 29:1,2,7,7 30:20,20 32:5,6 33:18,18 34:1,1 47:20 93:10 127:15,17,19 134:12 145:8 159:23 190:18 191:9 199:11 222:7 229:11 230:14 231:6 239:13
**objections** 44:11 44:13 45:21 125:19 134:15 158:5 192:5,8,12 195:2,16 222:6 279:20
**objectively** 257:25
**objectors** 47:1 52:1,18 54:17 70:10 145:18 157:4 158:17 187:4,14 190:25 199:18 277:18
**obligations** 252:24
**observations** 184:1
**obtain** 166:14 256:17
**obtained** 62:17 113:10 249:2
**obtaining** 60:3 112:21 264:16
**obtains** 277:21
**obviate** 185:5 225:3
**obvious** 68:6 130:1
**obviously** 58:10 58:12 67:8,10 73:2 94:9 115:15 126:16 137:12 148:2 149:13

150:23 156:18
161:6 165:25
166:25 169:5
174:7 181:11
187:4 202:6 205:1
238:11 249:17
250:20 251:9
258:4 280:19
**occasion** 153:15
**occasioned**
127:23 278:15
**occupies** 148:4
**occur** 70:24 78:1
78:10 97:25 98:5
100:8,18 101:5
107:15 109:11,15
110:11 117:15
123:5 130:19
134:8 135:15
145:23,24 164:25
165:16 166:13
170:23 173:7
174:23 176:25
184:7 187:19,22
189:9 201:1
213:14 215:13
235:8 267:11
269:3,24 272:10
274:11
**occurred** 96:12
208:10 235:13
237:15 264:12
**occurrence** 95:20
98:9
**occurrences**
134:23
**occurring** 96:24
101:13 136:2
253:8
**occurs** 71:5 99:10
103:25 108:7
117:20 168:4,7
184:12 218:12

254:18 271:7
**oct** 66:9
**october** 45:14,17
51:2 55:13 101:7
104:8 124:1 156:2
156:5 159:24
160:8 164:24
190:9 193:11
194:9 196:7 197:5
**odd** 162:8
**oel** 262:7
**offer** 176:3 191:11
202:9
**offered** 77:15
125:24 126:4
128:24 176:9
212:11 216:12
219:7 224:14
226:15 275:24
276:1 278:13
**offering** 47:4
115:9 129:3
192:14 260:15
**offers** 129:20
277:7
**office** 37:1 39:16
44:25 157:23
200:2,3 206:12
210:10
**officer** 89:11
118:19,25
**officers** 232:14
257:20
**official** 3:1,4,8,14
4:5,22 8:16,18 9:2
9:4 11:6,9,13,19
12:9 13:2 14:8,10
14:15,17 16:5,8
16:12,18 17:9
18:2 19:14,16,21
19:23 21:5,8,12
21:18 22:9 23:2
24:8,10,15,17

26:1,4,8,14 27:5
28:2 29:14,16,21
29:23 31:5,8,12
31:18 32:9 33:2
34:8,10,15,17
39:9 191:5 195:4
201:12 202:6
214:14
**officials** 238:3
**offset** 122:3
136:10 267:9
**offsetting** 187:14
**oh** 74:23 98:24
105:2 123:16
138:1 146:21
154:14 156:11
**oil** 70:6 256:8,12
257:10 267:17
**okay** 44:2 45:10
46:13 47:1,6 48:8
50:18 56:16 59:20
61:4,6,8 64:19
65:3,13 66:5
89:10 94:6,13
98:14 102:9
112:24 118:6,7
122:12,16 123:20
133:22 134:2
137:9,21 138:4
139:5 145:25
146:16,21,23,23
149:4 154:5,6,8
154:10,14,20
155:1,10,13,23
156:12,12,24
157:8 158:3,23
159:9,11,14,20
160:3,6,12,15,18
161:2,16 162:13
162:24 163:3,5,8
163:11 164:22
165:12 166:17,18
166:22 168:13,22

174:25 175:14,16
178:21 180:2
183:10,20 185:8
185:19 186:5
187:3,3 189:17,19
190:7,14,15,22
191:7 193:1,8,15
193:16,24 194:5
194:14,15,22,24
195:22,23 196:5
196:13,21 197:1
197:17,21,22
198:14 199:5,14
200:23 201:9,15
201:18,20 202:2
214:24 216:16
219:10,20,20,22
221:17 225:1,8
242:21,24 245:10
246:17 247:22
248:7,7 251:3,13
252:3 254:1,3,7,9
281:3,17 282:5
**oklahoma** 246:10
**old** 283:21
**oldco** 162:17
**once** 96:12 99:10
138:18,21 170:19
175:10 212:10
234:10
**ones** 103:21 109:4
113:18 114:9
252:21 260:20
276:10
**one's** 272:23
**ongoing** 225:11
235:1
**onus** 170:24
**op** 209:21
**opaque** 101:11
**open** 53:4 66:3,16
74:10 100:5 241:9

**opens** 242:13
**operate** 99:11
**operation** 124:22
**operational** 126:10 127:21
**operations** 141:23 141:24
**opinion** 50:9 61:2 67:13 126:4 129:15 134:8 175:25 257:11 262:6 263:2
**opinions** 84:23 260:10
**opioid** 85:21,23 130:18 132:4 134:6,8 136:2 145:20,20 191:18 192:24 202:14 204:4 205:8,9,12 206:2,8 208:21 209:9,14,17 212:11,16,20 213:16 220:22 243:7,13,21 244:2 244:16,23 245:3,5 251:23 252:24 273:14 274:8,11 281:7
**opponents** 75:20 78:23 103:13,20 105:9 106:9,21 119:17 167:3 208:2 224:21 227:15
**opportunities** 262:8
**opportunity** 55:19,20 58:7,12 107:25 169:3 216:3 239:18,21 240:1,2 242:1 248:25
**oppose** 85:23 222:8 278:19
**opposed** 47:13 75:10 116:17 136:21,22 168:8 175:6 202:7 210:10 214:21 219:2 261:24 262:4 263:9
**opposing** 75:20 85:19 227:15
**opposite** 80:23 251:5
**opposition** 2:22 2:22 3:1,7,8,13,14 3:20 4:4,12,18,22 4:22 8:16 9:2,10 9:18 11:2,2,6,12 11:13,18,19 12:1 12:8,16,22 13:1,1 14:8,15,23 15:5 16:1,1,5,11,12,17 16:18 17:1,8,16 17:22 18:1,1 19:14,21 20:3,11 21:1,1,5,11,12,17 21:18 22:1,8,16 22:22 23:1,1 24:8 24:15,23 25:5,21 25:21 26:1,7,8,13 26:14,20 27:4,12 27:18 28:1,1 29:14,21 30:3,11 31:1,1,5,11,12,17 31:18 32:1,8,16 32:22 33:1,1 34:8 34:15,23 35:5 196:9
**oppositions** 73:11 106:1
**opt** 259:22
**option** 272:22
**oral** 45:1 51:1 55:7 123:8,15 170:7 199:15 201:21 268:2,5,24 269:2 277:25
**oranges** 108:3
**order** 2:1,11 4:13 4:13 5:2,9,17,19 6:5,13,21 7:2,5,18 8:4 9:11,11 10:4 10:11 12:17,17 13:11 14:24,24 17:17,17 18:14 19:1 20:4,4 22:17 22:17 23:12 24:24 24:24 27:13,13 28:8,19 30:4,4 32:17,17 33:12 34:24,24 44:5,6 44:14 50:2,5,12 51:21 54:22 59:22 60:19 61:21 62:5 62:7,25 63:8 64:10,11,12 78:6 78:19,20,20 79:19 79:19,24 80:7,9 83:19,22 95:21,22 95:23 96:7 97:15 100:17 114:17 115:16,24 123:6 124:2,10,17,24 127:9 128:8 144:9 154:15,19 155:3 155:15,16 156:1,4 157:2,3,3 158:9 164:21,22 172:18 173:11,11 177:14 203:18 204:1,17 211:5 225:2 226:2 229:8 233:9 244:14 250:22,25 254:12,14,22 255:3,4,12 257:23 262:13 268:9 269:12 270:2 278:8 280:13,25 281:20,24
**ordered** 61:16 203:21,25 226:3
**orders** 2:11 5:3,19 6:14,22 7:6,18 8:4 10:4,11 15:16 18:8 28:9 62:2 63:2,22 164:19 254:12 269:6 282:1
**ordinarily** 63:3 191:16
**ordinary** 80:6
**organization** 145:2
**organizations** 207:24
**original** 65:6 139:20 216:12
**originally** 174:18
**ortiz** 258:25 259:21 260:4 280:5
**oud** 205:11
**ought** 105:23 106:9
**outcome** 230:19
**outer** 280:17
**outlined** 244:9
**outlines** 135:3
**outpace** 276:6
**outrageous** 104:6 105:21 219:24 220:24
**outside** 135:4 170:1 177:18 183:8 227:25 241:12 257:25 270:15,19 271:16

**outspoken** 191:16
**outweigh** 108:11 110:4
**outweighed** 88:12
**outweighs** 87:6
**overarching** 251:16
**overcome** 265:16
**overdose** 130:19 196:15,20 197:7 197:16,25 202:14 205:15 206:8 274:11
**overdoses** 136:2
**overlap** 89:23 90:3 259:8 260:20 263:6,8 264:2 280:10
**overlapping** 90:19 91:3,25 261:23
**overnight** 181:17 200:17
**override** 91:6
**overrule** 192:12
**overruled** 192:5
**overwhelming** 214:17,18
**overwhelmingly** 204:8 214:15,21 244:8
**ownership** 147:19
**oxi** 206:20
**o'neil** 42:10

**p**

**p** 36:1,1 44:1
**p.c.** 38:8
**pace** 86:6
**package** 264:14
**page** 9:9 10:9 14:22 20:2 24:22 30:2 34:22 45:6 56:14 68:5 148:22 149:2 196:14 258:7 266:24
**pages** 267:2
**paid** 71:7 113:25 234:6,14 276:6
**panoply** 119:3
**pao** 278:3
**papers** 63:20 141:25 147:4 149:8 205:4 209:1 209:7 210:8 214:9 227:8 250:18 251:11
**paragraph** 124:5 129:11 149:3 160:21,22 196:14 207:11 223:3 273:9,11
**paragraphs** 129:20 160:20 273:7,8
**parallel** 147:19
**parent** 244:9
**park** 39:10
**parse** 109:7
**parsing** 69:14
**part** 80:11 93:10 93:11 94:4 98:22 109:8 111:1 115:6 124:25 126:22 127:19 138:6 139:12,22 144:2 151:20 173:15 176:10 190:16 191:24 208:11 216:14 230:21 231:19 245:25 248:20
**parte** 5:17 7:2
**participated** 113:16
**participating** 44:16
**participation** 89:8 235:2
**particular** 67:4 69:11 210:24 256:12 263:18 265:5
**particularly** 79:12 87:7 91:4 102:11 128:4 178:12 186:24 187:7 276:7
**parties** 44:21 49:1 49:11 52:10,15 59:3 60:2 61:10 61:14 62:12 66:24 66:25 67:17 68:21 71:4 73:9,10 76:2 76:13,13,14 77:24 82:6,10,10,23 84:13,14 85:19 92:23 93:13 97:15 100:2,6,10,11 102:1,4 103:17 105:2 106:2 107:4 107:14 108:8 109:3,7 110:10,11 111:10 113:4,7 116:1 117:4,4,9 117:14,18 118:1 120:5,22,22 124:13 125:12,18 128:2 136:15 137:3 146:12 147:12 148:1 149:7 151:19 157:1 185:23 187:12 198:5,6 230:3 241:1 253:16,18 256:23 258:23 261:3,10 263:21 264:10 266:5 267:9 270:9 270:23 271:9,25 272:3 274:13,14 275:8,9 276:16 277:7 278:14 281:23,25
**partners** 262:8
**parts** 134:10
**party** 46:18,20 55:18 62:17 69:9 69:12,19 84:17 86:16 116:20 117:12 119:25 124:18 149:6 164:13 204:7 214:4 221:9 239:7 244:6 258:22 259:7,19 261:2,9 261:11,22,23 262:24 265:15 275:24
**party's** 62:11 117:13 122:15
**pass** 83:10
**passes** 274:6
**pataki** 278:2
**path** 111:6
**patrick** 4:24 13:4 18:4 23:4 28:4 33:4 42:10
**pattern** 259:20
**paul** 5:5 10:6,13 28:11 37:3 42:18
**pause** 165:17 233:11
**pay** 209:17 234:15 243:17
**payers** 204:8
**paying** 173:3 235:8
**payment** 162:6,7 212:14 234:18 235:8 273:2 274:1 274:3

**payments** 71:4
99:23,24 110:11
117:9 118:3
160:19,21 162:1
162:10,11 187:12
192:15 234:12
236:5 273:7
277:10
**payout** 272:19
**pch** 58:25
**penalties** 252:14
**pencils** 234:25
**pending** 2:2,9,11
3:2,9,15 4:4,6,13
4:19,23 5:3,20
6:11,14,22,23 7:6
7:7,15,18 8:1,4,17
9:3,11,19 10:4,11
10:16 11:7,14,20
12:8,10,17,23
13:3 14:9,16,24
15:6,12,15 16:6
16:13,19 17:8,10
17:17,23 18:3,8
19:15,22 20:4,12
20:16 21:6,13,19
22:8,10,17,23
23:3 24:9,16,24
25:6,10 26:2,9,15
27:4,6,13,19 28:3
28:9 29:15,22
30:4,12,16 31:6
31:13,19 32:8,10
32:17,23 33:3
34:9,16,24 35:6
44:4 46:16 60:3
62:10,13,23,24
63:9,11,23,24
64:1,12 65:25
66:3 67:11 71:22
81:19 86:4 90:7
94:5,10 105:5,12
106:17 143:21

151:25 157:1
163:20 190:9
193:10 194:9
196:6 211:3,7
217:13 227:16
228:2,3 233:9
254:10,11,21
255:3,24 256:3,5
256:10,17 258:12
264:16 266:1
267:20 268:8,19
268:20 271:21
273:23 276:16,25
280:23
**pensively** 202:21
**people** 59:12
70:13 71:9 82:4
87:5 92:3,15,16
94:1 128:16 134:7
134:9 135:7 136:6
137:16 138:10,15
158:13 187:16
202:13 203:17
224:3 233:11,17
233:19 234:25
235:10,15 241:7
244:17 249:23
**perceive** 100:11
**perceives** 211:21
**percent** 202:17
204:22,23,24
207:4 211:12
222:11 237:10,12
274:9
**percentage**
130:20 237:8
**perdue** 124:7,13
126:19 138:25
139:15
**perdue's** 126:16
129:13,18
**perfect** 184:5

**perfectly** 101:24
130:21 135:20
178:4
**period** 56:7 61:16
95:12 101:8,18
105:20 106:24,25
107:2,5,13,15,18
108:14,17 109:9
110:3 126:14,22
127:9,11 131:15
136:21 161:20
163:14 167:23
170:25 171:13
174:5 201:4 213:7
217:17 218:6
230:11 237:7
240:10 242:3,4
**permanent** 87:4
203:18,23 204:2
**permanently**
68:17
**permissible**
114:15
**permissions**
142:25
**permit** 100:2
269:15
**permitted** 96:13
105:17 111:11
125:11 152:11
204:21 215:15
**permitting** 142:12
254:14
**person** 126:5
136:8 192:19
221:14
**personal** 93:4
125:25 126:1,15
129:16 134:13
136:21 187:13
191:17 213:11
214:6,8,12 234:2
235:20 243:18

244:1,11 261:8,18
261:21 272:15,18
272:25 276:17
278:18
**personam** 262:19
**perspective** 48:7
216:24
**persuade** 70:10
**pertain** 280:8
**pertaining** 173:11
**pertains** 54:15
63:7
**peter** 2:23 11:3
16:2 21:2 25:22
31:2
**petition** 87:15
**ph** 155:8
**pharma** 1:7 3:5
4:8,15 6:7 7:12
8:19 9:5,12,16
11:10 12:12,19
13:13 14:11,18,25
15:3 16:9 17:12
17:19 19:3,17,24
20:5,9 21:9 22:12
22:19 23:14 24:11
24:18,25 25:3
26:5 27:8,15
28:21 29:17,24
30:5,9 31:9 32:12
32:19 33:14 34:11
34:18,25 35:3
44:3 156:25 183:1
**phrase** 63:13
**phrased** 135:11
257:7
**pi** 217:3
**pick** 132:23
189:18 223:14
**picture** 206:1
**piece** 181:21
203:12 208:11
231:19

**piercing** 89:16,24
**piggyback** 224:23
**piggybacking**
  239:6
**pinned** 77:8
**pis** 211:13 214:3
**pl** 39:18
**place** 37:3 48:3
  92:5 99:22 100:9
  101:7 104:7
  108:10 109:4
  110:7 124:15
  127:11 138:21
  139:11 165:14
  174:19 226:7
  227:1 234:6 235:6
  241:9 270:21
**placed** 49:18
  104:24
**places** 170:24
  257:24
**plain** 118:17
**plains** 1:14
**plaintiff** 120:25
**plaintiffs** 89:3,20
  211:17 221:18
**plan** 6:2,6 13:9,12
  18:22 19:2 23:9
  23:13 28:16,20
  33:9,13 55:19
  56:3 71:1,6 72:6
  72:18 73:1 75:5,7
  75:8 76:11,18
  77:9,22,24 80:11
  81:9 82:2 84:12
  85:13,14,23 86:1
  86:14,21,23,25
  91:5 92:17 93:6
  93:17 95:22 96:8
  96:14,15,16,25
  97:3,23,24 98:16
  99:17,24 100:21
  100:22,22 101:16

104:16 105:10,14
106:21,25 110:16
112:2 113:5,17,18
125:11 130:9
133:25 134:23
139:21 140:1,12
141:3 143:6,7,7
145:22 148:3,9
150:3,25 151:1
152:25 160:19,21
161:4 164:6,21
165:15,20,22
167:3 168:9,9
172:13,17,23
178:4 181:6,16
183:17 192:15
199:18 202:18
204:6,9,21 212:21
217:2,6 222:8,11
222:12 223:4,5
224:2 228:10
229:15 231:10
233:7 234:2,4,6
234:17,20 235:23
236:13,23 238:14
238:15 241:6
243:12 244:5,8,10
245:8 252:23
254:13,17 258:21
259:5,13,14,15,24
260:25 261:11,12
261:18 263:5,18
264:4,22 265:13
265:18 266:23
269:4,11,13,14,19
272:6,7,10 273:22
275:5,6 278:17,22
**plane** 206:9
**planned** 126:13
**plans** 76:1 111:11
  111:15 237:7,14
  237:23 238:2
  266:7

**play** 71:25 185:7
  217:11,12 238:18
  250:14 252:17
**played** 103:15
  260:14
**playing** 182:3
**plays** 97:18
  199:22
**plea** 72:25 98:22
  101:7 124:12
  127:1 130:9,16
  150:13,15 151:1
  165:19 235:20
  281:12
**pleading** 232:5
  271:11
**pleadings** 44:11
  45:7 47:8,11,11
  47:13,14 158:5
  199:16 244:13
  245:13
**please** 140:22
  159:25 168:2
  189:25 193:2
  194:1 195:24
**pled** 127:2
**plenty** 166:11
  177:6 181:16
  182:2,21 200:14
  200:20 268:13
**plimpton** 36:18
**plus** 101:22 103:1
  107:12 128:5
  132:20 228:4
  267:24
**pm** 282:7
**pocket** 104:13
**podium** 191:10
**point** 47:17,23
  51:5,25 52:5,19
  53:15,16 54:17
  55:8,8 59:21
  64:22 66:4 69:6,6

69:22,23,24 70:12
71:5 77:20 78:3
78:17 82:18,21
94:23 95:1,6,8,15
97:21 100:12
105:21 106:5
107:20 108:19,20
108:24 110:8,25
111:1 113:2 115:4
117:3 118:6 120:6
120:12 122:6,14
122:24 123:4
127:7 130:7,15,16
130:16,22 131:1,1
131:2,5 132:6,25
133:1,1,10,10,23
135:4,9,25 139:6
140:9,19 142:2
144:19,19 146:3
155:14 156:20
157:4 158:6,21
165:11 167:12
168:8 172:3 174:2
175:15 178:19
185:5,17 186:4,7
186:16,24 193:22
195:19 198:17,24
205:18 207:17
218:2,20,23,24
219:11,15 221:12
221:15 224:5,11
224:16,17,20
227:9 237:17
241:22 247:21
251:11,16 252:13
253:19 256:7,9
259:2 263:14,19
266:20 275:13,14
275:18 276:6,18
277:15 279:14,15
**pointed** 76:22
  230:13 231:6

**pointing** 57:11 252:22
**points** 50:19,23 69:23 91:23 103:16 113:15 120:3 122:14 138:5 146:14 151:15 159:1 166:21 183:21 189:6 223:10,10 223:18 277:2 279:21
**police** 125:13 203:2 242:4
**policy** 85:17 188:20 189:6 222:1 275:12,18
**political** 238:2,5
**polk** 37:15 54:20 157:6 158:19 163:12
**pond** 152:17
**population** 204:23 207:4
**port** 179:15
**porter** 42:12
**portion** 104:22 120:23 125:20 148:21
**portions** 134:16
**pose** 53:3
**posing** 103:18
**posit** 96:19 110:3 264:21
**posited** 96:17 189:8 246:25
**positing** 96:20 103:20
**position** 65:8 67:12 68:11 76:22 95:10 96:22 99:9 103:19 109:24 110:1,18 115:7 122:25 130:14 138:22 149:19 155:4,7,9 169:5 210:25 211:22 230:2,17 236:8 237:4 239:1 240:3 247:14 248:2 249:6,11 257:24 267:23
**positioned** 130:22
**positions** 65:10 147:3
**positive** 134:15
**posner** 121:12 278:1
**possibility** 51:6 52:25 54:14 60:5 69:2 72:4 96:23 100:13 105:5 107:5 138:9 139:19 141:3 143:11,12 183:16 226:9 237:1 265:22 267:15
**possible** 105:7 129:22 185:10 215:17 237:17,18 257:9 258:10 276:23
**possibly** 57:23 166:13 167:15
**post** 81:8 106:8,24 197:4 224:19 239:2,8,18 240:4 241:11,13 250:4 266:22 274:21 278:6,13
**posted** 105:2
**posting** 119:25 135:22 152:22 276:19,20,24 278:11
**postpone** 186:13
**potential** 95:6 102:23 141:14 207:22 223:25 237:6 271:5
**potentially** 44:22 140:10 161:13 267:21
**power** 62:21 69:19 125:13 203:2 207:20 235:22 262:18
**powers** 224:7,10 224:15 242:4
**pplp** 162:17
**practice** 178:11
**pragmatic** 265:4
**pre** 74:9,11,23 106:24
**preceded** 259:13
**precedent** 238:8
**precipitate** 240:12
**precise** 142:17,23
**preclude** 100:15
**precluded** 77:24 93:14
**preclusion** 54:23
**preclusive** 58:23
**predicate** 97:6,13 113:20
**predicates** 101:2
**predict** 87:25
**predicting** 192:13
**prediction** 128:20 128:22 129:2,21 130:25 134:25 135:6,14 137:13 137:15 161:7 164:3 198:7
**predictions** 192:18 198:9
**prefer** 102:4 225:5
**preferred** 66:25
**preis** 39:14 191:8 201:10,11,15,20 202:2 214:25 215:14 216:5,11 217:15 218:2,20 219:9,11,18,20 220:4,14 221:12 229:21 234:9 235:4 236:20 252:9,19
**preis's** 219:24 220:12
**preis’** 243:9
**prejudice** 49:3,6 72:1 215:8 225:24 238:24 265:24
**preliminary** 93:15
**premise** 93:8
**preparations** 101:12 157:3
**preparatory** 124:3 226:1
**prepare** 79:15
**prepared** 93:5 115:5 247:3 253:24 269:1 271:9,10 274:18 279:4
**prescribed** 206:19
**present** 40:19 56:4 81:8 106:4 160:22 164:13 192:9 266:22
**presentation** 122:15
**presented** 229:8 251:17 265:5
**presentencing** 101:18

**presently** 151:22
**preservation**
 107:9 108:12
**preserve** 62:25
 93:7 101:21
 112:22 189:4
**preserved** 72:20
 110:5 111:7
**preserves** 65:9
**preserving** 100:4
 100:24
**press** 46:4 96:12
 115:4
**pressing** 85:24
**pressure** 168:7
**presumes** 265:14
**presuming** 153:17
**presumption** 75:3
 265:16
**pretend** 139:3
**pretty** 96:22
 101:14 114:21
 116:12 132:18
 136:9 176:25
 211:19
**prevail** 69:5,25
 228:8 260:18
**prevailing** 271:21
**prevails** 213:14
**prevent** 96:23
 97:5 100:1 124:11
 176:13 178:11
 243:12 276:13
**prevented** 103:5
 134:24
**preventing** 87:2
**prevents** 59:15
 239:6,8
**previewed** 45:13
**previous** 146:14
 246:4
**previously** 122:24
 193:20 194:18

248:10 268:12
**price** 273:13
**primarily** 60:2
 85:19 136:14
 158:6 216:3
 255:13 280:11
**primary** 71:12
 72:2 90:17,18
**prime** 5:12 18:17
**principal** 118:1
 122:23 149:10
 201:6
**principally**
 113:21
**principle** 69:18
 277:22
**principles** 100:20
 108:10
**prior** 57:16 58:24
 71:23 94:25
 101:12 221:5
 236:14 269:11,15
**priority** 213:15
 236:21,24 261:15
**private** 3:13 11:18
 16:17 21:17 26:13
 31:17 92:11 208:7
 209:3 211:11
 213:8 251:21
**pro** 85:11 279:11
**probability** 55:6
 69:2 257:11
**probable** 257:9
 258:11 276:23
**probably** 48:12
 52:7 76:7 152:5
 186:25 187:12
 217:8 231:7
 237:20
**problem** 47:9,10
 67:13 80:12 97:18
 98:10 106:15,15
 106:18 147:18

148:2,5,10,11
 150:14 151:12
 182:11,15 183:7
 246:1 274:6
**procedural**
 254:15
**procedure** 2:12
 5:4,21 6:15 7:19
 8:5 10:5,12 28:10
 277:16
**procedures** 2:1
 44:6,15 108:20
 136:23 138:19
 272:21
**proceed** 44:19
 64:21 67:23 94:18
 104:1 154:18
 163:9 195:10
 201:25 226:5
 240:17 253:17
**proceeding** 57:16
 58:8 76:3 104:21
 144:9 146:9
 256:23 272:1
**proceedings**
 62:22 101:9
 134:18 192:7
 282:6 283:4
**process** 63:23,25
 64:16,25 67:1
 69:6,22 70:25
 87:13,16,20 88:8
 92:21 94:1 95:11
 106:20 110:15
 111:3 113:10
 129:14 132:13
 136:17 139:9
 146:1 150:17,23
 151:8 189:3 214:3
 234:16,18 235:10
 258:15,20,23
 259:18,24 260:5
 271:18 272:14,22

273:21 277:9
 278:11,24 279:1,9
**produce** 138:13
**product** 99:13
 228:21
**products** 246:13
 273:13
**professional**
 106:6
**professionals**
 173:4 243:17
**profits** 204:3
**program** 199:9
 209:20
**programs** 111:14
 205:15 244:15
**progresses** 227:10
**project** 123:12
 177:25
**projected** 87:19
 269:25
**prominent** 224:3
**promising** 230:4
 238:12
**promptly** 169:20
 170:10 225:16
 274:19 282:1
**prong** 50:25
 230:21 255:23
 257:16,17 261:6
 264:15
**prongs** 102:16,19
 188:16 198:23
 233:13 271:23
**pronouncing**
 114:22
**proof** 82:21 117:8
 232:1,2 238:25
 252:16 256:2
 261:7 270:10
 272:22,23 275:25
**proofs** 91:13
 279:23

**proper** 90:4 96:3
  101:16 125:8
  163:23 256:18
**properly** 63:12
  262:23
**properties** 127:7
**property** 125:5,5
  125:6
**proponent** 183:17
  199:18
**proponents** 55:20
  56:4 164:6 278:22
**proportional**
  257:12
**proposal** 170:21
  177:19 184:14
  187:6 201:22
  214:23,25 215:6
  216:12
**proposals** 77:15
**propose** 201:23
**proposed** 100:8
  176:24 245:19
  250:16 260:1
  282:1
**proposing** 117:4
  185:3,4
**proposition** 80:18
  210:2,4
**propositions**
  100:6
**prosecuting** 203:7
**prosecution** 203:9
**protect** 80:15
  88:24 153:13
  200:21 202:16
  229:17 239:9
  251:22 263:12
  276:20
**protected** 5:12
  18:17 111:16
  153:1 234:1
  235:12 240:24

280:1
**protecting** 119:9
  169:21 251:18
  263:8 275:4,13
  277:21
**protection** 88:18
  88:20 89:5 163:17
  167:8,17 183:8
  263:16
**prove** 57:8,9
  230:10 233:14,15
  238:13
**proven** 232:25
  241:14
**proves** 279:10
**provide** 86:17
  106:22 107:17
  111:15 119:19
  120:9 163:17
  166:23 167:7
  169:2 182:8 184:5
  187:23 198:21
  199:24 220:21
  239:16 240:22
**provided** 143:5
  163:16 167:17
  169:1,2 241:7
  259:4 275:7
**provides** 124:13
  164:8 184:15
  231:24 240:21
**providing** 85:21
  220:14
**province** 129:17
  131:10 135:13
**provision** 99:1
  105:4,15 124:6
**provisions** 119:23
  139:11 268:9
**proxy** 161:12
**prudential** 265:6
**psychological**
  67:15

**public** 4:3 12:7
  17:7 22:7 27:3
  32:7 46:21 85:17
  86:11,15,22,23
  87:1 93:24 94:2
  110:14,16 111:9
  111:10 112:3,5,8
  113:2 114:13,18
  126:11,16 161:25
  162:9 166:11
  182:19,22,25
  188:20 189:6
  191:16 198:20,22
  200:18 201:7
  202:22 204:7
  208:6,6,7 209:19
  209:22,23,25
  210:16 211:12
  212:1 213:8,25
  214:14,20 219:12
  221:6 222:1,23
  227:5,12,12,14
  230:16,21 235:19
  243:8,22 244:7
  245:6,9 246:11
  249:18 251:18
  252:2 256:25
  264:6 266:5,9
  273:12 275:2,12
  275:18 276:4,14
**publicly** 46:21
  209:2 213:3
**public's** 272:1
  276:6
**published** 84:22
**pull** 148:22
  195:11 198:14
**pulled** 223:17
**pullman** 39:1
  65:22 122:17
  186:7
**pulls** 101:4

**purdue** 1:7 3:5
  4:8,15 6:7 7:12
  8:19 9:5,12,16
  11:10 12:12,19
  13:13 14:11,18,25
  15:3 16:9 17:12
  17:19 19:3,17,24
  20:5,9 21:9 22:12
  22:19 23:14 24:11
  24:18,25 25:3
  26:5 27:8,15
  28:21 29:17,24
  30:5,9 31:9 32:12
  32:19 33:14 34:11
  34:18,25 35:3
  44:3 86:5 99:23
  104:15,17,25
  105:23 106:14,18
  153:7,8,11 156:25
  182:20 183:1
  191:16 208:19,19
  209:8,13 211:11
  211:16 212:19,25
  213:4,6,7,12
**purdue's** 213:2
**purely** 125:15
**purported** 176:5
  231:13,14
**purporting** 49:17
  238:21
**purports** 263:8
**purpose** 47:4 48:5
  126:19 129:7
  135:23 170:15
  199:13 210:16
  217:4 245:2
  264:19
**purposes** 47:18
  56:19 59:24,25
  60:21 76:1 109:16
  132:10 133:16
  135:22 171:15
  219:1,8 253:11

258:12 272:16
273:2,4 274:5
**pursuant**   2:12 5:3
5:20 6:14 7:18 8:4
10:4,12 28:9
114:16 124:2
133:24,24 153:11
164:21 165:19
173:10
**pursue**   91:2
136:11 137:3
225:13 261:2
263:20 275:8
280:9
**pursued**   276:11
277:9
**pursuing**   115:17
115:20 151:22
189:1 237:25
252:1 263:23
**pursuit**   140:1,11
145:22 240:5
**push**   197:3
**pushed**   186:20
**put**   55:20 65:11
78:16 79:7 90:20
100:22,23 101:11
102:14 103:13
104:15 105:9,18
107:1 124:22
158:13 159:9
169:16,19 179:7
244:14 248:6
250:17 274:3
**puts**   227:11 237:5
**puzzle**   181:20,21
184:25

**q**

**qualification**   53:8
**qualified**   260:5
**qualifies**   198:9
**quantification**
231:21

**quantify**   108:5
121:18 232:17
**quarropas**   1:13
**quarter**   156:18
**question**   45:4
52:25 53:2 54:11
65:7 79:3,4 80:5
82:19 88:22 90:19
90:22,22 95:2
96:4 103:10,24
114:11 117:1
121:20 141:25
147:10,14 148:2
149:10,15,22
150:6,12 152:16
160:16 161:2
211:25 250:11
**questions**   45:22
45:25 51:2 68:7
68:11 85:20 94:8
94:11,23 103:10
114:15 118:11
162:25 166:21
192:8 193:18
194:19 224:25
242:23 248:5
250:12 280:24
281:19
**queue**   146:20
**quick**   234:15
**quicker**   138:7
**quickly**   68:22
79:9,9,10 87:25
88:3 109:19 183:6
205:22 242:9
**quid**   279:11
**quigley**   262:18
**quite**   47:3 51:16
59:13 67:5 88:22
129:22 163:25
182:19 190:16
193:18 194:17
202:8 240:7

273:17 276:23
**quo**   62:25 65:9
80:13,15 97:5
101:21 279:11
**quote**   95:5 116:13
148:21 273:16
**quoting**   58:9
179:24 260:5
266:24

**r**

**r**   1:21 36:1 41:2
44:1 114:22,23,23
190:4 193:5,6
194:5,5,5 196:3
283:1
**rachael**   42:14
**rachel**   42:11
**rages**   243:14
**raise**   49:23 117:12
117:23 159:24
189:25 193:1,25
195:23 239:22
**raised**   45:22
46:15 48:20 49:11
50:23 51:5 69:3
78:3,24 94:23
103:3 139:5,17
145:17,18 146:11
195:15,19 219:12
220:14 229:21
247:6 248:15
255:14 258:13
259:20 260:20
263:14
**raises**   48:21 73:2
83:12
**raising**   50:10,20
119:1,4 209:5
216:13 241:24
**rapid**   86:6 272:18
**rare**   90:9
**ratepayers**   3:14
11:19 16:18 21:18

26:14 31:18 204:8
**rates**   130:20
**rationale**   120:14
192:14 208:16
**raymond**   36:12
246:20
**rdd**   1:3 2:4
**reach**   98:1,6
106:12 110:25
111:1 180:21
263:17
**reached**   89:15
98:4 166:7,14
197:9
**react**   128:3
**read**   50:17 52:23
53:6 91:22 147:11
150:14 158:4
193:17 205:4
215:19 222:25,25
226:25
**reading**   50:17
61:2 183:5 185:10
217:15
**reads**   84:20,20,21
**ready**   67:23 182:3
182:6 229:15
233:6 234:21
235:23 239:15,17
240:10,11,14
254:16 272:9,12
272:13 274:22
275:14 278:16
**real**   54:9 75:11
80:24 81:20 102:5
102:24 107:21
202:25 205:14
217:10,11 218:22
233:5,5 235:16
236:25 240:23
258:14
**realistically**
272:11

**reality** 214:10
244:7
**realize** 96:20
**realizes** 174:16
**really** 50:2 54:8
54:10,14 56:18
59:21 60:12 63:12
67:17 70:24 72:6
74:18 75:25 77:12
78:8,8,9 79:16,18
79:20 82:19 83:12
83:24 91:25 108:7
108:18,21 113:2
116:14 121:20
122:1 127:14
129:11 130:13,14
131:1,9,19,24
132:22 134:11
135:12 140:20
143:23 155:17,21
156:8 171:2
175:13 176:2
179:5,7 181:20,22
183:7 187:6
188:17 189:1
209:16 212:1
215:22 219:1,15
221:5 222:8
223:15 226:11
237:2,9,18 242:10
248:8 255:2,7
281:4
**reason** 63:7 77:5
84:18 93:11 98:1
103:19 104:14
111:1 124:12,18
124:20 139:6
150:25 170:2
172:14 182:3
186:19 216:13
217:23 222:13
243:24

**reasonable** 81:23
95:3 164:3 270:15
273:13
**reasonably** 129:8
192:18
**reasoned** 260:10
**reasons** 75:1 90:7
101:10 137:7
176:4 203:4
214:16
**rebuttal** 10:2
122:14 156:21
248:8,10
**receipts** 220:18
**receive** 91:4,5
99:13 101:16
102:5 202:17
207:10 214:12
261:13
**received** 10:20
15:19 20:19 25:14
30:19 45:21 102:3
111:13 211:18
212:15,24 259:4
**receiving** 92:17
99:24 203:7 261:8
261:19,21
**recess** 156:23
**recipient** 212:8
**recipients** 220:20
**reciprocal** 278:20
278:21
**recitation** 127:20
**recognize** 54:4
69:18 82:7 115:23
116:4 119:12
251:25
**recognized** 70:5
112:7 150:2
222:14 249:14
259:18 260:3
280:5

**recognizes** 69:16
**recognizing**
258:11 260:4
**recommendation**
54:12
**record** 10:2 45:20
48:1 51:17,24
52:6 57:10 104:24
125:22 131:14,16
134:18 156:25
187:5 188:23,23
189:4 191:24
220:17 228:24
236:2 249:3
253:14 254:6
263:7 269:2
271:12 272:3
275:23 283:4
**records** 46:17
198:20,22
**recover** 152:11
207:8 261:24
275:9,10
**recovered** 233:2
**recoveries** 220:21
235:3 260:24
261:16 281:6
**recovery** 91:4
92:4 222:20
233:19 239:24
261:17,25 281:12
**recruit** 214:6
**red** 252:11
**redirect** 163:1
**reduce** 114:8
**reduced** 46:1
**refer** 44:6 276:1
**reference** 148:18
152:13 232:4
**referenced** 148:22
260:7 262:5
**referred** 59:22
256:24

**referring** 142:13
153:6 210:9
247:11
**refers** 56:18 64:7
64:8
**reflect** 87:17
263:5
**reflected** 229:8
272:19
**reflects** 86:24
261:22 263:8
**refused** 100:12
164:5 212:15,21
213:21 228:1
**regard** 62:3 147:7
150:13,18 152:2
153:3 243:25
248:4 256:7
274:16 276:11
**regarding** 75:14
77:7 86:16 104:9
114:2,15 118:8
121:11 198:23
202:14 213:22
231:1 257:8
**regardless** 184:11
233:21
**registering**
141:20
**regularly** 63:5
**regulations**
237:17
**regulatory** 141:21
173:4 237:14
**rehash** 248:9
**reimburse** 140:1
**reiterate** 135:9
**rejigger** 223:14
**related** 2:11,13,17
3:2,9,16,20 4:6,13
4:19,24 5:3,4,8,13
5:13,19,21 6:8,14
6:15,22,23 7:5,7

7:11,18,19 8:4,5
8:10,17 9:3,14,19
10:4,5,11,16,22
11:7,14,21 12:1
12:10,17,23 13:3
13:7,14,18 14:2,9
14:16 15:1,6,21
16:6,13,20 17:1
17:10,17,23 18:3
18:8,13,18 19:4,8
19:15,22 20:7,12
20:16,21 21:6,13
21:20 22:1,10,17
22:23 23:3,7,15
23:19 24:2,9,16
25:1,6,16 26:2,9
26:16,20 27:6,13
27:19 28:3,9,10
28:14,22 29:2,8
29:15,22 30:7,12
30:21 31:6,13,20
32:1,10,17,23
33:3,7,15,19 34:2
34:9,16 35:1,6
130:18 139:18,22
139:23 245:5
252:24 274:11
**relates** 105:18
162:20 246:22
247:5,10
**relating** 113:24
191:16
**relation** 51:13,14
**relationship** 59:2
147:21
**relationships**
141:4
**relative** 122:8
**relatively** 61:16
87:8 107:15
108:14 122:8
254:15

**relatives** 135:19
**release** 5:12 18:17
69:8 70:14 71:3
83:4,5 84:14,17
87:6 90:21 92:2
92:15 125:13
148:3 259:7
276:13
**released** 69:25
71:4 82:6 137:3
147:12 148:8
149:7 230:24
258:23 261:2,10
275:9
**releases** 46:18,21
71:20,23 72:8
86:17 90:5,10
111:16 113:21
114:16 214:5
244:6 249:11
259:19
**relevance** 191:22
**relevant** 44:10
50:16 58:8 220:10
221:3
**relied** 86:20
**relief** 5:13 18:18
63:15,19,24 64:2
85:21 100:7,10,13
106:13,22,23
119:24 122:23
176:5,12 203:8
225:13 240:5
245:16 256:6
265:8,9 266:1
267:19
**reliefs** 241:21
**relieve** 152:5
**reluctant** 224:4
**rely** 139:19
145:14 146:14
200:25

**relying** 258:25
**rem** 262:17
**remain** 60:6
**remainder** 233:4
**remaining** 276:15
**remains** 151:23
234:6
**remarkable**
130:20
**remarks** 68:1
221:3,24 255:2
268:2
**remedial** 260:5
**remedies** 252:20
**remedy** 205:1
210:19
**remember** 222:4
234:11 236:20
251:2,25
**remind** 148:25
195:14
**remote** 2:2 44:15
179:25 207:7
267:14
**remotely** 44:16
58:22
**remove** 133:25
143:10 174:2
**render** 98:16
167:15,15 270:2
**rendered** 85:5
164:19
**rendering** 149:20
**renew** 167:4,18
177:1 187:25
216:3 270:16
280:22
**renewed** 271:6
**renotice** 163:23
**reorganization**
6:7 13:13 19:3
23:14 28:21 33:14

**reorganizations**
112:9 227:13
**repeat** 52:13
150:7 183:4 222:2
230:25 248:14
249:19 251:9
268:6
**repeated** 81:4
170:21 203:5
**replies** 44:12
52:14
**reply** 5:1,1 10:10
15:10,10 18:7
28:7,7 48:11 50:3
50:15 145:11
148:21,23 149:8
**report** 199:7,9
**reported** 84:18
**reporting** 200:14
213:5
**reports** 197:11,14
**repository** 114:5
243:23 276:14
**represent** 93:18
93:20 95:15 231:7
247:23 249:20,20
249:22
**represented**
259:23 273:5
**representing** 65:5
93:23,24 94:15
105:8 204:23
221:20 249:15,16
**represents** 222:5
243:6
**request** 45:6
46:25 47:19 61:19
63:10 64:17 67:11
81:11 94:10 105:6
124:14,16,19
136:16 137:7
151:5 158:7
165:14 169:12

174:18 177:12
184:6,8 187:18,24
189:7 199:24
200:5 202:7
204:18 219:13
228:4,23 247:13
248:2 250:1 266:1
268:4,18 271:21
278:9,9,12
**requesting** 107:9
126:22 127:9
129:20 249:1
**requests** 65:7
228:2
**require** 182:8
250:8 276:18
280:14
**required** 118:18
119:5,19 130:23
213:4 242:8 261:1
276:24 278:7
281:13
**requirement** 70:2
103:7 120:15
199:24 200:9
226:4 242:16,17
277:4
**requirements**
102:25 126:8
142:25 277:14
**requires** 69:10,14
96:4 142:23
251:21 263:25
**requiring** 239:20
257:4 278:5
**reread** 50:22
**research** 245:4,6
**reserve** 279:5
**reserving** 98:8
**resident** 206:18
**residual** 129:13
129:18

**resolution** 6:22
7:6 45:3 75:23
98:2,4 149:14
176:19 248:19
253:10 274:18
**resolve** 44:22
94:24 98:2 122:11
227:14
**resolved** 112:1
113:22
**resolving** 201:23
225:16
**resources** 178:12
**respect** 5:18 7:3
47:16 58:2 60:4
101:6 115:24
116:1 165:8
173:10 176:1
189:7 192:2
199:19 201:6
223:7,11 224:6
226:18,23 227:4,5
227:11,22,25
233:12 234:9,25
236:21 239:10,23
241:21 245:15
249:13 250:3,11
250:22 253:18
254:24 255:6
256:2 262:17
269:12 270:12
278:8
**respectfully** 61:1
**respects** 275:2
**respond** 60:8
159:1 195:19
210:3 219:23
220:18
**responded** 191:18
**responding**
132:11
**response** 73:13
157:14 168:11

201:22 207:17
**responses** 10:20
15:19 20:19 25:14
30:19 205:21
**responsibility**
235:9 239:2,4
**responsible** 68:20
237:3
**responsive** 265:4
**rest** 47:7 155:6
187:17
**rested** 85:19
**restore** 62:23
**restrict** 127:4
137:7
**restructuring**
99:22 101:4
**restructurings**
99:16
**result** 126:11
129:21 130:2
131:8 154:4
160:24 191:17
244:19 245:9
252:22
**resulted** 276:12
**resulting** 244:22
**results** 131:3
151:7 236:18
269:5 277:9
**retain** 119:23
243:16 244:24
245:7
**return** 212:14,19
212:24,25 277:8
**returned** 206:14
**reversal** 54:1
205:15
**reversed** 74:24
139:22 141:5
246:11
**review** 53:9 67:14
68:12,13,15,18

71:14 72:4,11
81:12 87:4,18
88:15 90:23 93:12
101:17 111:3,4,12
125:7 172:1,2
240:1,2 254:1
259:16 260:1
269:13
**reviewed** 44:10
57:1 60:4 90:6
190:15 194:16
197:14,23 199:16
232:10 266:8
**revision** 240:25
**revisit** 279:5
**revisited** 110:6
**rewriting** 184:14
**rico** 89:6
**rid** 229:13
**ride** 120:25 234:3
**rides** 279:14
**riding** 239:20
**riffkin** 5:22 6:16
6:24 7:8
**rifkin** 2:13 42:13
**right** 45:5 47:10
49:3 57:2 59:20
61:7,8 64:3 71:11
71:16 72:6,9
78:14,21 79:21
82:16 83:14 84:6
91:2 92:25 93:21
96:19 98:8 99:6
100:4,19 104:5,9
104:11,13,17,18
104:19 105:1,14
114:22 116:22
122:4 126:25
133:7 134:7
136:11 137:5,21
141:1,13 143:20
144:21 149:9
153:17 154:2,10

155:1,13,19 156:3
156:6,11,17 158:3
159:25 162:13,24
164:4 170:4,7
171:2,3,8 175:16
177:19 179:1,6,8
180:24 182:5,17
183:10,20 184:10
187:3 189:25
193:1 194:1
195:22,23 196:17
199:5 203:11
215:4,8 216:11
219:19 220:1
221:9 225:6,8
231:8 235:18
236:14,16,16
237:14 238:24
239:4,23 240:8
241:25 242:7
245:13,17 246:3
247:1,3,9,11,15
248:12 250:11,13
254:9 258:24
259:11,12,13,16
259:25 263:20
264:6 266:10
279:5 280:24
281:19
**rightfully** 187:15
**rights** 70:15 71:10
71:14 72:21 87:2
88:13,16 92:21
102:21 107:9
108:1,12 110:5,13
136:11 137:2
185:11 200:22
214:3 230:22
232:12,24 235:12
261:1,14 279:18
279:25 280:7
**ringer** 42:14

**rise** 58:20 75:10
150:21 168:5
226:9 269:17
**risen** 51:8
**risk** 51:18 52:1
53:11,18,22 54:4
54:9 72:2,3 75:11
75:13 78:9,20
80:16,20,22,24
81:8,18,20 95:4
102:8 115:5,10,11
115:18 117:11
120:25 125:2
126:10 163:18,23
167:8,13 168:15
168:25 169:21
174:2,3 175:9
180:6,12 235:16
235:18 236:12
237:14 238:2
240:23 241:3,6
264:21 266:16,22
267:6 274:15
277:8
**risks** 115:21
127:21 142:21
236:1,9 237:7,15
237:23 238:11
253:8,10
**rivera** 43:8
**rix** 224:11
**road** 71:5 101:2
283:21
**robert** 1:22
206:18
**robertson** 42:15
**robinson** 66:11
**rocket** 169:19
226:5
**role** 198:10
210:15 221:4
238:19,19 249:13
249:15 260:14

**roles** 89:14
**roll** 141:4
**roman** 66:15
**ronald** 20:17
40:14 44:9 146:17
**room** 1:13 201:19
**rosen** 42:16
**roughly** 130:18
202:17 272:24
274:9,10
**routinely** 106:4
**roxana** 40:22
**ruined** 206:20
**rule** 2:12 5:3,20
6:14 7:19 8:5 10:5
10:12 28:9 61:13
61:24 62:4,9,20
63:13,21 64:4,6,8
65:23 66:2,6
70:21 77:18,21
81:24 82:23 83:22
95:11 116:18
118:18 119:14,22
119:24 120:8,10
120:20 121:5
139:10 149:17
156:10 161:8,8,8
164:3 169:20
170:2,10 171:19
172:6 175:9
178:25 183:6,15
184:14,24 198:20
215:20 216:7
226:24,25 230:6
239:14 240:10,13
240:21 247:16,17
256:14 268:7,9,9
268:14,17,24
269:5 270:25
271:19 277:3,15
**ruled** 83:18
141:10 158:25
159:6 160:14

169:6 172:14,20
186:12 190:17
225:22 226:13
239:21 271:17
**rules** 49:9 63:16
125:21,22,24
155:17 170:16
171:15 172:2,10
172:12 175:24
177:23 216:21
224:23 226:25
228:16 229:23
240:12 241:20
**ruling** 6:1 13:8
18:21 23:8 28:15
33:8 48:17,18,18
52:4 58:1 60:15
60:24 61:3,17,22
63:11 66:20 67:2
67:6,7 70:20
78:11 79:14 81:1
81:24 82:22
107:12 109:17
112:12 116:1
123:2 136:19
147:14 156:22
158:8 161:3
163:15 167:11
169:23 170:5,24
170:25 171:1
177:2,5,13 178:1
178:4 179:6,7
184:16,20 185:6
185:18 187:18,20
188:5 189:9 195:2
203:22 215:3,13
217:13 227:3
230:9 241:19
242:19 257:24
260:8 268:15,20
269:5 270:15
271:2,6,15 273:24
275:20 279:19

280:14 282:3
**rulings** 81:4 199:20
**run** 78:9 95:4 104:3 185:24 241:23,25
**running** 186:18 186:20 218:18
**runs** 185:22
**russo** 66:7

**s**

**s** 2:13,17 3:3,3,10 3:16,20 4:6,14,19 4:24 5:4,21 6:8,15 6:24 7:7,11,19,20 8:5,6,10,17,18 9:3 9:4,15,19 10:5,17 10:22 11:8,8,15 11:21 12:1,10,18 12:23 13:3,14,18 14:2,9,10,16,17 15:2,6,21 16:7,7 16:14,20 17:1,10 17:18,23 18:3,9 19:4,8,15,16,22 19:23 20:8,12,17 20:21 21:7,7,14 21:20 22:1,10,18 22:23 23:3,15,19 24:2,9,10,16,17 25:2,6,16 26:3,3 26:10,16,20 27:6 27:14,19 28:3,10 28:22 29:2,8,15 29:16,22,23 30:8 30:12,21 31:7,7 31:14,20 32:1,10 32:18,23 33:3,15 33:19 34:2,9,10 34:16,17 35:2,6 36:1 37:20 40:21 41:21 42:2 43:12 44:1 160:4,4 196:3
**s.a.** 262:7
**s.d.** 66:9
**s.d.n.y** 256:9 278:2
**s.d.n.y.** 66:17 70:7 81:15 154:5 256:7 256:16 262:9,10 266:13,14,19,25 268:12
**sabine** 70:6 256:8 256:12 257:10 267:17
**sackler** 36:12,19 86:5 104:9,11,15 104:18 105:3 114:2 164:16 212:8,14 231:4 245:23 246:20 247:24 281:9
**sackler's** 212:4
**sacklers** 82:5 91:9 99:23 102:23 104:4 105:4,13,23 106:14,18 113:24 125:12 148:11 203:10,19,22 204:1 206:3 207:8 208:8 211:17 213:21 220:13 230:24 231:9 233:3 235:23 237:10,12,16 243:15,25 244:21 244:24 245:7 246:16 252:23 253:2
**sacklers’** 246:18
**sad** 198:2
**saddles** 103:14
**safeguards** 224:13
**safety** 172:12 174:14 226:20
**saint** 37:3
**sale** 85:8 153:8
**salutary** 113:18
**sara** 41:4
**satisfactorily** 113:22
**satisfied** 50:25 60:22 223:21 262:20
**satisfy** 70:1 102:15,24 103:7 126:7 256:17 260:25 261:6 273:20
**save** 68:1 188:16 223:4 277:10
**saves** 199:8
**saving** 132:4
**saw** 47:7,24 197:8 197:14 207:22
**saying** 53:5,5,10 56:17 97:17 99:5 110:25 112:10 115:10 120:7 129:1,2 131:23 132:2,3 134:20 143:24 144:4,8 154:12 168:25 177:17 179:14,22 184:7 218:15 221:13 226:1 232:16 235:14 242:12 246:11 251:2 271:2
**says** 51:1 60:20 62:4,14,16 71:9 75:17 76:2 97:19 103:4 118:18 126:10,12 127:12 210:11 232:7 240:14 277:12
**scale** 137:7 258:11
**scared** 182:24
**scenario** 71:8 101:23 121:6 125:6 241:5
**schedule** 95:3 109:21,25 155:14 166:8 174:13 200:13 229:3 255:5,5 271:14 280:18
**scheduled** 56:13 98:22 166:2,5 167:2 170:7 181:11,11 187:24 200:14,20
**schedules** 219:17
**scheduling** 5:17 7:3,11 124:19 166:5 270:22 271:1
**scheme** 252:14 259:15,16 260:5,7 280:5
**schlecker** 42:17
**schupbach** 66:9
**schwartzberg** 5:5 10:6,13 28:11 42:18
**scope** 90:4,20,22 114:4,15
**scott** 4:15 9:15 12:19 15:2 17:19 20:8 22:19 25:2 27:15 30:8 32:19 35:2 41:2,14
**screen** 54:16 159:9 163:4 189:24 193:1,25 195:12
**searching** 262:20
**season** 186:18 270:21

**second** 7:15 8:1
10:3 45:13 46:7
53:14,15,19 57:14
68:20 69:15 73:8
73:22 75:4 76:10
82:25 84:2,23
85:5 86:8 95:6
102:15 104:4
105:18 109:23,25
110:1,20 138:6
159:10 165:17
175:18 184:13
202:4 204:11
205:23 207:13
208:3 210:23
212:13 217:13
218:24 219:1,11
223:22 228:15,16
230:9 236:7 237:8
241:18 242:10
248:13 253:4
254:20 256:9
258:14,17 259:18
263:14 264:25
269:10,18 282:2
**secondary** 90:16
**secondly** 51:16
120:6 252:21
254:13
**seconds** 168:15
**secret** 182:23
**secreting** 78:24
**section** 172:22
**securitized**
153:11
**security** 118:18
**see** 59:11 81:20
82:20 94:19 113:4
131:3 136:7
145:19 149:4
150:15 157:6
159:16,21 160:25
170:3 178:10

189:24 195:10,23
201:14,18 206:11
218:19 249:2
256:6,25 257:9,19
257:25 262:6
265:9 266:11
267:1 276:25
278:1
**seeing** 70:18 76:9
78:5 81:22 83:16
91:24 92:13 98:20
**seek** 86:9 104:2
112:19,22 117:5
170:25 174:8,12
174:22 176:5,12
177:6 187:21
215:15 217:12
222:8 248:18
251:1,6 254:21
**seeking** 46:2,10
58:3 61:11,20
63:4 66:25 78:13
90:7 95:10 98:25
122:23 143:21
152:10 173:4
204:25 265:16
267:19 279:1
**seen** 115:15 140:3
199:6
**sees** 146:8
**self** 42:19 104:14
**sell** 99:13
**send** 184:8 282:1
**senior** 130:11
**sense** 122:7,10
140:7 150:20
184:5 185:25
186:19 187:7
221:7 250:6 266:6
**sent** 57:10 173:24
174:24 176:2,3
182:24 197:11
249:1

**sentence** 138:18
181:24 197:6
**sentenced** 74:7,16
99:2,12 124:21
182:4,20
**sentencing** 57:24
72:21 74:2,5,10
74:15,20,22 75:14
77:9 80:4 96:5,12
96:18,24 97:1,2
97:22,25 98:5,8,9
98:16,21 99:10
101:3,12,14,23
103:24,25 104:2
117:18,20 123:24
124:7,8,14,19
127:10 138:9,12
138:20,25 150:13
150:18,21 151:6
151:11 165:8,14
165:16,19 166:1,4
166:6,8,10,14
167:2 168:4,7,24
169:11,12 170:17
173:12 174:8,9,11
174:19,23 176:7,8
176:24 177:12,20
180:9,16,22 181:7
181:8,10,17,19
182:2,10 183:1
184:7 186:13
187:22 199:25
200:6,6,9,13
215:15,24 216:22
223:13 270:4
279:1
**separate** 72:25
96:9 100:16
115:16 137:17
165:19 228:2
**september** 139:20
203:21 204:1
262:9

**series** 253:7
**serious** 51:2 63:10
68:6,11 69:9,14
102:3 106:13
107:5 114:15
121:11 142:18
223:8
**seriously** 105:12
105:21 106:11
117:11 133:20
267:5 272:17
**seriousness** 53:25
54:6 266:4 275:16
**serve** 137:16
188:5
**serving** 252:2
**set** 126:3 155:14
164:23 170:11
194:8 219:4
229:23 236:24
240:9 241:16
258:6 259:15
277:22
**sets** 241:12,20
**setting** 78:1,2
173:3,5 183:6
185:21 273:12
**settle** 91:11
**settled** 211:7,8,9
211:10,16 212:13
212:18,25
**settlement** 69:7
91:6,19 92:5,12
92:22 104:16,23
105:3 150:16
152:21,25 153:12
206:2 208:21
209:10 213:12
220:13 221:5
223:14,15 238:7
244:5,6 248:4
249:2 252:22
258:17 259:12,22

260:1,17 261:10
261:15 264:9
270:5 281:9
**settlements**
227:12 276:12
**setup** 242:7
**seven** 105:25
106:1 123:5 165:1
180:6,11 181:15
215:23
**shaky** 96:21
**shannon** 42:6
**share** 222:20
226:23
**shareholder** 82:6
89:11 147:12,22
**shareholders**
148:9 155:11
231:25
**she'll** 44:25
**sheer** 143:13
**shepherd** 42:20
**sheriff** 103:15
**shield** 3:22 12:3
17:3 22:3 26:22
32:3
**shift** 179:21,22
**shifting** 238:7
**shifts** 179:23
**shipwreck** 96:23
101:23
**shore** 4:7 12:11
17:11 22:11 27:7
32:11 38:6 227:18
227:18 242:22
243:9 253:4
**short** 98:3 108:14
122:8 145:24
163:14 167:22,23
174:4 178:23,24
222:2 223:9,10,18
223:22 224:6
227:22 229:19

230:11 239:23
246:1 268:2
**shorten** 5:16 7:1
**shortened** 107:6
216:8
**shortening** 5:17
7:2
**shorter** 132:16
149:16 158:6
187:1
**shortly** 273:1
**shot** 54:9 242:16
**show** 70:2 77:4
164:10 179:24
257:6 271:24
282:2
**showing** 49:6
54:13 70:2 85:12
89:24 102:14,18
226:18 227:2
255:25 256:20
257:4,6,8,17
258:2,9 261:5
267:14
**showings** 49:6
**shown** 53:23
62:15 88:2 93:14
103:8
**shows** 89:22 92:19
**shut** 192:16
**shutdown** 99:15
**side** 58:15 76:14
92:11 141:22
169:2 173:25
188:19 209:4
211:11,12 225:5
232:23 247:23
248:1,24 252:24
266:17
**sides** 164:16
246:17
**sideways** 172:14

**sift** 69:10
**sign** 190:20
193:21 194:20
198:12 224:4
**signaled** 124:9
**signature** 283:7
**signed** 2:1 5:9 6:2
6:8 13:9,14 18:14
18:22 19:4 23:9
23:15 28:16,22
33:9,15 73:10
164:8 173:24
188:3 196:18
**significance** 81:1
**significant** 86:3
87:1,18 94:3
105:1 115:19
121:23 139:2
141:14 143:9,11
192:21 201:3
252:13
**significantly** 67:8
121:17
**silicones** 84:22
**silly** 145:12
**similar** 119:2
133:16 134:23
195:17 278:12
**similarly** 204:14
255:20 272:24
**simple** 104:1
175:13 205:7
**simplest** 101:20
**simply** 46:22
76:12 81:1 102:17
102:25 119:16
125:14 134:17
183:15 227:7
228:8,19 244:14
253:3,9 276:8,9
**simultaneous**
120:5

**simultaneously**
118:23,24
**single** 55:17 106:2
113:6 164:13
172:7 204:25
207:11 212:20
214:11
**sir** 160:11 165:3
190:6
**sit** 142:18
**sitting** 160:8
162:17 171:21
190:11 193:11
194:11 196:10
208:10 246:6
**situation** 102:6
117:16 163:24
226:13 235:22
236:15 244:11
**six** 164:7 207:2
208:5,7
**size** 105:22 230:14
**skapof** 42:21
**ski** 206:19
**skip** 68:2
**sliding** 258:11
**slight** 97:8
**slipped** 104:19
**slower** 218:1
**slowly** 248:12
**smith** 42:22
**societal** 132:20
230:22
**solely** 56:5 113:24
**solicitudes** 134:13
**solution** 219:7
**solutions** 283:20
**somebody** 238:9
238:10 241:4
**someone's** 136:10
228:13
**somers** 42:23

**somewhat** 64:10 96:21 111:24 186:16
**son** 189:18
**sonya** 35:25 283:3 283:8
**soon** 77:12 168:19 175:21 180:21 200:20 234:15 275:14
**sooner** 107:5 222:14
**sorry** 50:6 65:20 73:19 80:19 138:1 153:5 155:5 157:17 159:13 163:2 165:5 169:10 170:20 174:22 201:3 216:6 218:2,3 221:1 236:23 246:23 255:16 267:2 271:3 280:22
**sort** 54:23 58:3 59:14,22 61:11 75:9 82:12 89:16 133:14 141:22 142:19,23 146:10 174:14 177:25
**sorts** 54:2 173:16 173:21
**sought** 47:12 132:12
**sound** 162:22 184:11 186:19 202:4,10 203:9 204:3,7,12 205:9 205:16 206:24 207:7,20 209:11 209:17 210:1,7,18 211:6,23 212:5,12 213:13,15,19,22 213:25 214:21 215:23,24 216:5 216:15 217:17 218:9,12,13 229:21,23,24 230:8,12,19,20 234:4 235:13 239:22 250:19
**sounds** 158:24 159:4 250:22
**source** 196:22 197:10 233:19 239:24
**sources** 138:22 192:16 208:18
**southern** 1:2 40:1
**sovereign** 119:13 279:17 280:2
**sovereigns** 152:16
**sovereignty** 69:24
**sparingly** 224:7 224:10
**sparks** 240:17
**speak** 153:9,10 202:3 231:13,14 231:14 238:21 245:12 248:10,13
**speaking** 71:10 92:23 198:23 214:7 238:22
**speaks** 59:8
**special** 260:5
**specialized** 126:6 135:14
**specific** 45:15,19 51:16 78:23 79:1 79:4,7 95:21 126:4 144:13 229:5 238:24 263:16 265:5
**specifically** 50:20 72:20 119:14 125:17 133:3 208:20 226:19 247:14 260:7 273:3 280:1
**specificity** 98:12
**speculate** 247:18
**speculation** 51:9 226:8 253:6,9,12
**speculations** 253:7
**speculative** 180:1 267:15
**spend** 52:16 54:12 254:15 281:23
**spending** 55:5 251:23
**spent** 52:10 139:25 202:7 222:15
**spoke** 231:22
**spoken** 231:15
**spot** 103:15 164:2
**springer** 42:24
**spurn** 105:13
**squarely** 223:20 232:3
**sr** 20:17 40:14
**st** 53:21 75:17 76:21 266:13
**stages** 124:3
**stand** 94:10 110:7 148:7 157:25 220:23 227:7 242:5 251:11
**standard** 102:13 255:24
**standby** 199:4
**standing** 51:21 53:22 265:22
**stands** 80:17 210:4 245:18
**start** 105:25 108:19,21 132:21 132:22,25 133:4 135:5 175:20 192:25 206:5 218:18 227:24 229:22 234:16 235:9,19 238:15
**started** 82:13 210:9
**starting** 70:12 101:1 170:8
**starts** 101:3 123:10 234:18 272:14
**state** 4:21 9:21 10:18 12:25 15:8 15:13,17 17:25 18:10 20:14 22:25 25:8 27:21 30:14 32:25 35:8 37:1,2 38:9 39:2 40:8 65:5,22 69:24 88:18,20 89:5 94:15 102:22 103:5 111:13 114:7 119:23 122:18 126:11 130:24 136:4,5 137:1 142:10,11 142:11 145:4 146:8 156:14,15 156:15 157:13,13 171:10 176:12 186:8 195:2,3,8 196:8 198:1 203:1 204:15,20 206:7 206:18,24 207:4 208:24 217:3 222:6 235:1 251:15,17 254:20 255:15,16,16,18 255:19 263:22,25 274:17 277:16
**state's** 115:1

**stated** 51:12 73:7 104:10 113:15 114:12 147:3 206:8 253:14 262:17 268:5 270:1 271:20 279:8
**statement** 7:10 10:1 133:19 253:5
**statements** 126:3 135:8 139:24 192:3 220:24 225:15
**states** 1:1,12 2:10 2:14 4:2 5:1,6,16 5:18,22 6:12,17 6:20,25 7:1,3,8,16 7:20 8:2,6 10:2,6 10:10,13 12:6 15:11 17:6 22:6 27:2 28:7,12 32:6 36:3 44:7,7 49:4,7 61:18 62:1,9,10 62:20 63:18 64:24 67:22,25 69:4 79:12 86:10 91:21 92:7,8 93:2,23 102:22 106:3 107:10 113:16 114:7 115:5 118:19,25 119:1 119:10,13,15 120:15,18,19,19 120:21,23 121:10 124:19 125:3,9 147:7 151:21 157:25 183:2 191:25 192:12 195:20 204:6,14 209:21,24 210:10 218:17 221:18 222:10,16,16,19 224:8,20,22 225:23 230:18 235:14 237:2 240:3 241:10 244:20,20 249:5 249:13 252:13,17 253:15 254:11,19 255:14 258:21 261:14 263:15 264:5 268:1 273:3 273:4,15 274:12 275:4 276:19 277:17,22,24 278:12 281:2
**states’** 260:19 261:4
**state’s** 277:20
**stating** 118:10 137:13 192:15
**statistic** 198:2
**status** 7:11 45:14 45:23 62:25 65:9 80:13,15 97:5 101:21 250:15 251:20 263:17
**statute** 246:12 277:18 281:13
**statutes** 89:6
**statutory** 138:19 238:19 252:13
**stay** 2:2,9,11,17 2:23 3:2,9,15 4:3 4:6,19,23 5:2,19 6:11,13,19,21,22 6:23 7:4,5,7,15,17 8:1,3,10,17 9:3,19 10:3,11,16,21 11:3,7,14,20 12:7 12:10,23 13:3,18 14:2,9,16 15:6,12 15:15,20 16:2,6 16:13,19 17:7,10 17:23 18:3,7 19:8 19:15,22 20:12,16 20:20 21:2,6,13 21:19 22:7,10,23 23:3,19 24:2,9,16 25:6,10,15,22 26:2,9,15 27:3,6 27:19 28:3,8 29:2 29:8,15,22 30:12 30:16,20 31:2,6 31:13,19 32:7,10 32:23 33:3,19 34:2,9,16 35:6 44:4 45:3 48:15 49:1,19 55:12 56:8,10,13 58:2,3 58:19,23 60:3 61:11,15,19,20,24 62:6,8,9,12,14,16 62:16,17,18,22,22 62:24 63:4,8,11 63:16,22,23,24 64:8,9,12,15,16 64:17,24 65:8,9 65:25 66:21,24 67:6,6,11,18 70:15,17,19,24 73:11 75:19 77:16 77:23 78:4,12,13 78:14,15,17,19,19 79:2,23,24 81:19 81:25 82:23,24 83:8,9,15,16 85:22 86:2,21 88:12 90:7 94:4 94:10 95:7,10,14 95:19,22 96:16 97:3 101:18,22 103:13,20 104:5 105:5,6,8,11,16 105:20 106:1,9,10 107:8,11,18 109:9 109:24 112:12,21 119:7,8,9,17 122:7 123:1 124:10,17,24 126:14,22 127:11 127:21,24 128:3 129:19,22,23,25 130:3,7,8 131:2 132:12 134:9 143:21 145:24 149:12,16,16,16 149:17,19,24 150:7,11,18 152:4 153:15 154:11,15 155:3,16,21 157:1 158:7,7 159:24 160:24 161:3 167:4,12,22 169:4 171:10,10 172:9,9 174:5 176:5 177:1 177:6,11,13 178:3 178:10,12 180:5 180:17 183:21 184:16,24,25 185:1,4,5 186:17 187:18,25 188:14 189:2,7,10 190:9 191:9,23 193:9 194:9 196:6 198:24 202:20 203:1 204:18,21 205:1 211:3 214:16 215:6,7 217:12 220:6 222:2,2,8,8,24 223:9,10,19,22,22 224:6,15,21 225:2 225:5,11,23 226:17,23 227:1,6 227:11,16,22,22 228:1,3,5,14 229:5,16,19,20 230:5,7,8,8 231:18 232:15 233:10,10,14,20 234:20 235:6

238:4 239:7,11,12
239:19,20,20
241:9 242:15,16
242:18 243:15
244:14 248:22
250:21 251:1,6,10
254:10,11,21
255:3,24 256:3,4
256:10,17,22,22
257:14 258:3,12
264:16,18 266:1
267:20,23 268:2,8
268:19,20,21
269:7 270:13,13
270:16,22 271:6
271:10,14,15,21
273:23 275:19
276:2,13,21
277:21 278:9,10
279:12 280:22
**stayed** 62:2 150:4
151:22 172:17,18
207:2 236:11
**staying** 64:11
79:13,14 101:19
112:13
**stays** 4:12 9:10
12:16 14:23 17:16
20:3 22:16 24:23
27:12 30:3 32:16
34:23 62:7 112:19
112:22 127:9
151:4 234:6
268:14
**step** 59:19 75:4
76:11
**stepping** 200:11
235:14
**steps** 106:5 109:4
109:11 115:2,6
117:5 172:21
254:15

**stern** 42:25
**stipulate** 116:2
117:5,14 169:23
173:8
**stipulated** 116:20
117:23 141:11
164:16 173:17
183:16,17 269:1,8
269:21
**stipulation** 49:16
73:8,11 96:9
100:17 117:13
123:25 124:6
138:24 164:23
165:7 167:16
169:1 170:15
173:16 174:24
176:2,11,18 185:4
185:8 188:2
201:24 226:1
250:16 269:2,14
**stipulations**
142:13
**stodola** 42:25
**stone** 175:7
**stop** 59:18 165:6
**stopped** 134:21
241:6
**stops** 203:6
236:12
**stories** 206:15
**straight** 212:6
**straightforwardly**
97:12
**strange** 131:19
**strategies** 245:5
**strategy** 100:23
**strauss** 39:8
201:11
**streamlined**
272:22
**street** 1:13 36:5
38:18 39:3 40:2

**strength** 258:2
**stretch** 224:1
258:14
**strong** 70:2 91:3
153:1 255:25
256:20 257:4
258:9 261:5
**structural** 148:5
148:10,10 150:3
**structure** 110:12
115:25 145:2
147:19 148:12
**structured** 74:4
**structures** 141:20
**structuring** 61:9
**struggling** 47:18
**subject** 151:23
155:15,21 156:2
193:19 194:17
198:3 226:20
230:1 240:25
241:1 258:5
262:22,24 271:3
279:24 280:18
**subjects** 228:20
**submit** 58:15
105:17 106:11
110:15 111:9
114:17 118:17
119:17 226:10
253:10
**submits** 191:21
**submitted** 44:12
47:8,25 115:15
118:9 125:17
134:4 135:23,25
136:24 145:1
159:22 160:7
190:7,25 193:8
194:7 196:6
220:11
**subordinated**
106:20

**subsequent** 57:1
150:22 228:21
269:9
**subsidiary** 147:20
**substance** 197:19
232:8
**substantial** 54:14
57:3 60:5 73:20
73:22,23,25 75:13
76:19 77:22 85:8
92:11 97:6 120:6
143:18 147:13
173:1 263:6
269:19 271:25
272:2,5 276:25
277:10 278:14
**substantially**
68:21 71:2,5 75:6
76:12 82:2 84:12
85:13,15 89:23
118:24 119:1
184:5,11 192:20
256:22 265:14,18
**subtle** 184:14
**succeed** 70:3
256:1,20 257:5
258:9
**succeeded** 102:17
**success** 48:20
49:10 54:7,14
55:6 56:5 60:5,17
68:3 69:2,2 70:8
229:7 257:8,11
258:10 275:22
**successful** 214:10
**suddenly** 106:17
128:7
**sue** 233:22
**suffer** 56:6 102:21
104:1 107:16
257:13
**suffered** 85:21,23
103:6 134:13

191:17
**suffering**  96:13
  205:11
**suffice**  166:5
**sufficiency**  126:1
**sufficient**  81:9
  97:5 102:18
  103:18 110:4
  151:5 226:21
  259:10 266:23
  270:16 275:17
**sufficiently**  51:2
  102:13 260:8
**suggest**  52:15
  106:9 129:23
  145:23 185:20
  248:20
**suggested**  55:1
  71:22 164:1
  270:18,19 276:18
  278:19
**suggesting**  108:6
  108:11 112:20
  117:6,25 171:4
  250:24
**suggestion**  55:15
  61:9 104:6 199:23
  223:13 248:17
  250:3
**suggestions**
  222:18 249:5
**suggests**  86:21
**suite**  36:5 283:22
**sum**  223:3 272:20
**summarized**
  273:15
**summary**  273:9
**super**  222:10
  236:21,24 261:15
**superpriority**
  92:8 150:24
**supp**  278:2

**supplement**  46:7
**supplemental**
  10:1
**supplemented**
  254:25
**support**  2:10 5:1
  6:12,19 7:16 8:2
  8:15 9:1 10:2,10
  14:7,14 15:10
  19:13,20 24:7,14
  28:7 29:13,20
  34:7,14 44:12
  74:1 77:24 78:7
  86:21,23 145:1
  196:8 202:18,19
  214:17,18 222:7
  222:10 231:18
  244:12 262:12
**supported**  129:15
  136:1
**supporting**
  222:16
**supports**  85:22
  214:15 244:10
**suppose**  70:10
  151:23 180:21
**supposed**  99:1,24
  136:23 223:7
  232:15
**supreme**  61:22
  67:7 87:13,16,16
  88:4,9 111:25
  112:14 132:13
  136:11,12 246:11
  259:20 260:3
  267:22 269:10
**sure**  46:14 47:3
  47:17,21,21 49:13
  50:11,21 52:22
  60:11 64:23 77:17
  83:10,10 86:12
  88:21 91:22 93:24
  95:17 98:18 111:7

121:1,20 143:17
152:1 168:20
174:17 177:5,11
177:14,25 181:14
186:9 200:2 202:1
225:19 243:3
246:25
**surely**  90:12
**surplus**  131:17
**suspect**  245:25
**suspending**  62:23
**swanner**  43:1
**swear**  159:25
  189:20 190:1
  193:2 194:1
  195:24
**sweet**  164:2
**system**  93:25
  221:10
**systems**  142:9

**t**

**t**  114:23 160:3
  194:5 283:1,1
**tabak**  14:25 20:5
  24:25 34:25
**table**  167:24
  171:14 180:4,13
  188:14 223:12
**tack**  161:4
**tactics**  279:6
**tadps**  233:2
**take**  45:20 46:3,4
  46:8,19,22 48:2
  67:8 79:5 87:20
  88:5 95:11 99:22
  100:9 106:11
  107:13 109:4
  114:6 115:10,11
  115:22 120:25
  122:7 124:15
  127:10 130:25
  133:19 135:1,19
  149:18 152:7

155:18 156:19
162:10 163:13
165:14 166:6
169:6 174:19
180:13 202:4
209:18 211:21
235:15 254:14
264:7 274:15
**taken**  51:23 52:2
  52:4 91:15 92:20
  106:5 110:23
  114:3 115:16
  118:19 125:7
  134:16 162:5,22
  164:20 167:24
  171:14 174:6
  180:4 188:4 239:1
  249:10 267:5
  269:11,15 279:21
**takes**  115:7
  175:17 184:19
  213:18 238:13
  263:17
**talk**  112:5 130:15
  145:1,16 171:12
**talked**  58:5 78:22
  90:8 108:24
  138:10,16 139:15
  139:20 167:1
  173:12 246:4
  249:18
**talking**  76:5 77:14
  87:20 95:18
  112:13 113:8,11
  113:11 121:3,15
  129:14 130:11
  132:23,24 139:6
  141:18 144:24
  178:22 200:5
  229:5 233:16
  237:15,20 241:2
  246:1

**talks** 126:9
**tallahassee** 39:19
**tangible** 112:4 274:20,23
**tapley** 43:2
**task** 198:8 223:15
**tatneft** 278:3
**taxes** 212:7
**taxpayer** 235:2
**taxpayers** 228:19 243:6
**tea** 177:3
**teach** 111:15
**teacher** 206:22
**technical** 134:17 229:13
**tee** 167:12
**telephone** 44:18
**telephonically** 36:8,9,16,23 37:6 37:13,20 38:6,13 38:21 39:6,13,14 39:21 40:5,12,19
**tell** 92:1 159:25 184:9 190:1 193:2 194:1 195:24 200:10 235:17
**telling** 273:17
**tells** 248:22
**tempered** 70:8
**tend** 240:2,16
**tentative** 199:20
**teps** 231:3
**term** 111:25 122:8 135:17 158:7 163:14,19 167:22 167:23 174:4 222:1,2,23 223:9 223:10,18,22 224:6 226:23 227:22,22 246:1 268:2
**terminate** 104:5 105:4
**termination** 104:9 104:11,13 127:5 236:15 245:13,17 247:1,3,11 250:11 250:13
**terms** 61:11 76:20 109:7,10 115:21 122:1 128:11 132:3 134:14,17 136:10 149:14 150:7,14,25 188:15 213:3 215:25 222:23 223:9 237:6
**terrible** 107:16
**territory** 148:4
**test** 73:23 76:11 102:15 165:10 260:25 264:15
**tested** 110:16
**testified** 129:12 273:6 274:3,7
**testify** 128:2
**testifying** 128:13 128:24
**testimony** 91:22 104:23 125:24 129:4 130:17 135:13 159:1,23 160:9 163:3 187:8 190:8,10,20 193:11,19 194:10 194:19 196:8 217:7,24
**texas** 66:13,13,14
**thank** 45:12 48:6 61:7 65:18 67:24 94:21 122:13,20 133:21 138:4 146:16,24 154:3,6 154:7 157:17 158:3,18 159:16 162:25 163:5 190:4,21 193:21 193:23 194:20,21 194:23 197:21 198:13 219:21 221:16 225:8,9 227:16,17 243:4 245:9,10 247:22 249:4 252:7 254:4 254:7 281:17,18 282:5
**thanks** 248:7
**that'd** 195:12
**that’s** 240:15,20 242:23 249:10 250:5 252:2,12,16 252:20 253:2 254:6 266:24 269:10 276:16 281:12
**themes** 251:16
**theodore** 43:11
**theory** 115:18
**thereof** 258:2
**they’d** 246:6
**they’ll** 247:19
**they’re** 242:2,13 253:22
**they’ve** 249:21 272:21
**thing** 52:7 60:11 64:10 68:4 73:16 78:23 79:7 86:23 138:15 154:21 168:6 171:17 184:13 185:20 196:12 201:2 219:16
**things** 54:2 73:18 73:20 74:6,7,8,18 74:21 76:19 79:1 79:5,5 80:24 98:12,15,17 99:14 100:3,17,18,25 101:10 108:10 114:5,12 117:12 117:17 126:19 140:1 141:10 142:3,5 143:9,10 151:16 167:14 173:16,21 183:12 183:14 197:13 199:19 202:4 205:5 207:18 233:13 248:15,21 252:15
**think** 46:1 47:23 48:11,16 49:14,19 50:14,15 51:10,11 51:12,16 52:5,7 52:23 53:5,6,10 53:16,19 54:3,11 54:23,25 59:8,16 59:20,23 60:9,9 60:10,14,15 61:23 63:19 64:3,5,10 66:22 67:14 68:8 68:11 69:3,24 70:11 71:18 72:1 72:24 73:21,24 75:12,14,24 76:6 76:21,23 77:3,5 77:15 78:12,18 79:21 81:24 82:5 82:13,16,19,21 83:7,11,12,23 84:17 85:1 86:15 87:4,7 88:8,11 90:3,5,19 91:8 92:18 93:11,14,25 94:22 95:1,8 96:3 96:10 97:18 100:18 102:12 104:15 107:20 112:9,10,18 113:2

114:21 116:5,12
117:13 118:11
120:3 121:6,22,24
124:9,23,24
126:18,20 127:19
128:16,23,24
130:13,18,21
131:24 133:9,10
134:4,6,12,19,24
134:25 135:4,12
135:22,25 136:9
138:7,21 139:1,8
139:8,11,14,14
140:5 141:2,9,10
141:17 142:15,16
142:19,22 143:8
143:10,25 144:10
145:6,18,22 146:5
146:7,9,13 147:4
147:10,13 148:14
148:21 149:8,10
149:14,15,18,22
150:12,14,20
151:10,14,17
152:8 153:1,18,19
156:12 158:6
161:12 165:23
166:3 168:21
171:15 174:14,15
174:18 175:22
178:18,25 179:14
182:19 183:4
185:17 186:10,15
186:18,24,25
187:4,5 188:10
189:1,3 190:25
194:24 195:3
196:24 199:2,14
214:19 216:11
217:10 219:6,8,15
220:1,9 221:2,7
221:14 224:1,18
225:4 226:19

227:21 228:6,9,11
229:19,24 230:20
231:11 233:17
235:17 238:18
239:11,12 240:4
240:16 241:23
242:12,14 247:7
247:10 248:15
249:8,9,14 250:5
250:10,15,17
251:19,21,24,24
252:1 253:2 268:1
281:14,22,25
**thinking** 183:4
187:17 219:6
**thinks** 82:24
**third** 36:20 46:18
46:20 69:8,12,19
76:13 82:10 84:13
84:17 86:16
120:22,22 125:12
149:6 161:6
187:11 198:6
204:7 208:16
211:23 212:18
214:4 244:6
253:13 258:22
259:7,19 261:2,9
261:11,22,23
262:24 263:21
278:14
**thomas** 40:9
**thorough** 203:13
**thought** 47:24
98:18 112:17
121:12 170:9
202:9 203:14
**thoughtful** 149:15
149:22
**thoughts** 245:18
**threat** 80:14
103:17

**threatened** 99:14
**three** 52:17 54:15
56:23 57:8 60:2
61:18 64:24 67:4
67:22 69:4 86:8
92:10 115:5
121:21 160:24
161:9,14 188:19
202:25 203:11
204:11,25 205:20
205:21 206:20
208:5,6,8,21
223:9,18 233:23
244:20 247:11
254:10,23 255:21
264:10 266:3
279:15
**threshold** 48:11
49:19
**throw** 187:16
228:24
**thrown** 61:14
**thwart** 223:5
**ticket** 100:14
**tie** 98:12 100:25
180:15
**tied** 53:15 81:21
84:3 99:18 280:21
**time** 5:16 7:1
44:21 52:10,16
54:13 55:6 60:13
60:21,22 62:14
63:16 67:9 70:18
70:22 72:1 74:5
78:3,5 81:23
91:24 92:13 95:13
98:20 101:8 103:5
107:3,5,7,12,13
107:18,19 109:9
110:3 112:4
121:17 122:2
149:21 151:20
154:17,19 156:19

157:18,24 158:15
167:13 172:3,15
175:9 177:6
178:23 180:11
184:6 186:23
191:19 192:20
199:22,22 200:20
201:4 202:8
217:11 218:7,10
218:11 220:5
226:13 227:9
228:15,20 229:2
231:25 234:5,7
237:18 238:9,11
240:10,20 246:8,9
247:17 249:11
253:14,23 267:25
273:20,23 274:5,6
275:15 280:21
281:24
**times** 70:17 73:12
84:7 136:13
137:17 150:15
180:6 183:14
252:9 264:5
**timetable** 110:7
**timing** 72:17
77:14 101:6
160:19 162:1
**tip** 48:23
**titled** 61:24
**tobacco** 244:20
**tobak** 9:12 30:5
43:3
**today** 44:24 48:16
56:7 57:17 98:3
111:13 142:19
160:8 171:21
192:7 193:11
194:11 196:10
222:3 226:11
232:4 247:14
250:19 255:2

**today's** 163:21
**toes** 59:19 200:11
**told** 68:21 127:5 127:24,25 128:25 159:10 168:5,6 199:23 200:13 235:7 276:4
**tolerable** 205:23 206:6 208:20
**tolerate** 128:9 209:13
**toll** 227:10
**tong** 203:21 208:17,20
**topco** 5:11 18:16
**topic** 266:11
**total** 252:11
**touch** 94:22 102:11 235:4
**touched** 50:3 103:23 124:25 229:7
**touted** 113:5 264:8
**townes** 43:4
**track** 161:19 268:23
**tracking** 161:10 161:11,24 162:9
**trades** 145:21
**trainor** 9:1 14:14 19:20 24:14 29:20 34:14 40:16 114:23 191:3,12 192:2 193:25 194:4,6,7,13,15 194:21 206:10 244:9,13 274:2,24
**trainor's** 194:18
**transaction** 85:9 254:17
**transactions** 79:20,25 80:6,10 96:14 107:3 110:10 269:16
**transcribed** 35:25
**transcript** 56:22 57:2,11 283:4
**transcripts** 55:25
**transfer** 74:17 90:14 143:5 172:22 173:5 219:4
**transferee** 212:9
**transferred** 127:7 213:11
**transferring** 74:12,13 211:13
**transfers** 75:7 173:6
**transgress** 86:14
**translate** 132:7
**transparent** 106:11 166:4
**trauma** 231:23
**treat** 128:18 129:7 135:8 281:7
**treated** 256:13
**treatment** 134:21 220:22
**treats** 261:18
**tremendous** 105:8 168:7
**trial** 59:5 67:10 67:13 85:1 104:21 104:22 123:10,13 123:15,16 149:23 150:1 170:8 215:18 258:6,24 259:11,11 260:15 264:1,7,11 266:10
**trials** 276:12,16
**tribal** 2:22 11:2 16:1 21:1 25:21 31:1
**tribes** 2:24 11:4 16:3 21:3 25:23 31:3 217:5
**tried** 78:25 207:23 214:5 227:24 248:19 263:4
**trigger** 247:1
**triggers** 200:9
**triumph** 236:3
**tro** 55:14 58:19 59:14
**tronox** 90:15 262:1,5
**troop** 43:5
**trucking** 53:21 266:13
**true** 68:8 110:24 281:6 283:4
**trumpet** 208:21
**trust** 5:11 15:16 18:8,16 108:16,16 109:2 115:24 139:23 151:21 152:25 161:22 188:12 218:7,11 234:14 265:10
**trustee** 2:14 5:6 5:22 6:17,25 7:8 7:21 8:7 10:7,14 28:12 36:4 44:7 44:24 45:1 48:21 49:4 55:12,22 61:14 63:18 67:25 69:3 71:9 86:10 91:20 93:23 97:9 115:6,14 118:24 119:2,7 120:11,17 172:7 175:15 178:2,4 205:20 207:1 209:21,22 209:24 210:4,5,9 210:10,13,14,24 211:19,24 213:14 214:2,5 221:7 224:19,23 228:5 229:12 230:17 231:11,23 235:14 238:19 239:6,8 249:5 253:21 254:11 258:21 259:7 260:12,16 261:7 262:14 263:7 267:20 271:10 274:17 275:3 276:19 277:2,6
**trustee's** 4:3 5:2 6:12,20 7:4 10:2 10:10 12:7 17:7 22:7 27:3 28:8 32:7 44:25 48:7 48:14,24 55:14 56:10 57:20 95:18 210:11 221:6 222:7 225:23 226:8 230:20 231:18 232:21
**trustees** 2:10 5:16 5:18 7:1,16 8:3 157:25
**trustee’s** 249:13 261:4 278:9
**trusts** 5:10 18:15 78:2 117:10 162:1 162:4,8,9,10,11 162:21 173:3 187:9 217:25 219:4 234:10
**truth** 47:13 137:14 159:25 160:1,1 190:1,1,2 193:2,3,3 194:2,2 194:2 195:24,25 195:25
**try** 70:10 86:12 94:24 102:5

107:25 110:9
114:8 138:5,7
144:22 164:2
170:10 202:3
222:2 248:14
249:12 253:15
**trying** 84:16
88:23 90:25 98:2
99:25 100:5
101:24 125:21
131:6,7 132:7,7
154:22 169:9
175:8 176:18,22
180:14 186:17
202:8 218:4
235:19 249:6
251:23
**tsier** 43:6
**tuesday** 56:2
58:11
**turn** 70:11 103:9
110:14 125:16
172:22 199:18
201:5 209:19
222:22 229:4
233:22
**turned** 111:25
134:14 241:8
**turning** 157:3
**turns** 206:21
216:20 241:13
**tweaking** 187:6
**tweed** 36:11
**twelfth** 6:6 13:12
19:2 23:13 28:20
33:13 254:12
**two** 45:2,18 50:23
53:12 55:3 58:21
66:24 67:18 70:17
73:6 86:4 92:10
98:12 99:18 103:6
106:16,19 111:25
120:2 121:25

123:10 128:5
134:4,9 135:7,22
137:12 150:8
151:4 167:14
168:1,6,15 184:15
191:2 192:12
194:24 195:20
197:5 199:19
200:5 203:4
205:24 206:13
207:14,24 208:4
208:13,13 217:20
228:2,2 230:20
233:12,13 246:17
250:12 253:23
254:12,19 257:18
264:10 267:18
271:23 273:19
274:8
**twofold** 177:4
**tying** 280:19
**type** 82:5,7 108:5
126:18 182:23
245:16
**types** 69:12 100:1
135:8 142:12
192:20 259:19
269:16 280:7
**typical** 147:20

**u**

**u** 114:22 190:4
193:6
**u.s.** 1:23 36:4
44:24,25 45:1
48:7 49:4 55:12
55:14,22 56:10
57:19 61:14 69:3
71:9 81:5,6 91:19
95:18 97:9 115:6
115:14 118:24
119:2,7,9,13
120:10,17 139:11
147:23 148:8,8

166:6 172:7
175:15 178:2,4
200:1,3,7 205:20
207:1 209:21,22
209:24 210:4,5,8
210:11,12,13,14
210:24 211:19,23
213:14 214:2,5
221:5,7 222:6
224:9,19,23 226:8
228:5 229:11
230:17,20 231:11
231:18,23 232:20
236:6,22 238:19
239:6,8 244:18
253:21 257:1,19
259:1,6 260:6,11
260:16 261:4,7
262:8,14 263:7
266:18 267:16,19
271:10 274:17
275:3 276:19
277:2,6,23 278:3
278:9
**u.s.c.** 120:16
**ucc** 134:4 135:7
164:15 191:10,13
203:12 205:24
207:14,19 208:23
213:25
**ucc's** 136:16
213:20
**ukraine** 278:3
**ultimately** 61:21
132:3 135:4 148:6
148:6 150:17
151:14,17 152:8,9
152:10,19,23
162:11,20 259:25
265:5
**unable** 98:1,6
99:12

**unappealed** 48:17
**unbelievably**
214:5
**unbonded** 120:11
**uncertain** 237:7
**uncertainty**
128:11 129:14,18
141:24 142:1
**unchecked** 87:3
**unclear** 176:2
**uncompensated**
191:14
**unconscionable**
207:7
**uncontroverted**
272:4
**uncovered** 203:13
213:23
**undergoing** 128:6
**underlying** 69:18
257:5 259:6
261:20 268:18
**undermine** 76:18
177:25
**underscore** 246:8
**understand** 47:18
49:21 61:3 79:8
83:15 86:13 96:22
99:3,9 107:1
111:23 112:17
118:5 127:16
130:16 133:8
136:25 141:21
143:17 157:18
177:15 184:21
185:14,17 186:23
186:23 215:14
216:1,13 218:14
218:16 219:14,14
225:15 236:8
237:5 281:22
**understanding**
72:7 100:21

141:20 192:4,22 217:6 230:3 242:17 250:13
**understands** 227:9
**understood** 214:25
**undertake** 93:7 107:3 144:7
**undertaken** 258:6 279:6
**undertaking** 191:23
**underwood** 25:11 38:21 138:3 146:20,24,25 147:15 148:17,20 149:5 153:7,17,23 154:2,6,7
**undisputed** 130:18
**undo** 138:20
**undone** 74:14,17 74:25 101:15
**undoubted** 106:19
**undue** 270:21
**unexpected** 179:5 180:7
**unflagging** 76:16
**unfortunately** 113:22 188:24
**unfunded** 205:15
**unhappiness** 206:23
**unidentified** 232:24
**uniform** 51:18
**uniformed** 257:19
**unilateral** 164:7
**unimaginably** 211:4
**unique** 191:22 237:4 255:23 279:16
**united** 1:1,12 2:10 2:14 4:2 5:1,5,16 5:18,22 6:12,16 6:20,25 7:1,3,8,16 7:20 8:2,6 10:2,6 10:10,13 12:6 17:6 22:6 27:2 28:7,11 32:6 36:3 44:7 63:18 67:25 86:10 92:7 93:23 118:19,25 120:15 120:17,19,19,21 120:23 124:19 151:21 183:2 204:14 210:10 224:8 225:22 235:14 237:2 249:5,13 254:11 258:21 261:14 273:3,4 277:22 281:2
**unlimited** 227:6
**unnecessary** 223:23
**unopposed** 236:17
**unprepared** 50:4
**unquantifiable** 234:23
**unquantified** 232:24
**unquestionably** 125:4
**unreviewable** 82:15,20
**unrung** 74:25
**unsecured** 3:1,4,8 3:15 4:5,23 8:16 8:19 9:2,5 11:6,9 11:13,20 12:9 13:2 14:8,11,15 14:18 16:5,8,12 16:19 17:9 18:2 19:14,17,21,24 21:5,8,12,19 22:9 23:2 24:8,11,15 24:18 26:1,4,8,15 27:5 28:2 29:14 29:17,21,24 31:5 31:8,12,19 32:9 33:2 34:8,11,15 34:18 39:9 137:16 191:5 211:9 212:19
**unspecified** 126:21 127:12
**unswayed** 205:20
**unthinkable** 191:17
**untrue** 220:5
**unwinding** 143:13 143:23
**unwound** 75:8
**update** 196:12 197:20 245:12
**updated** 196:19
**upfront** 55:1 68:24 272:20
**ups** 234:3
**upset** 127:22
**upward** 240:25
**urging** 220:12
**usdoj** 124:14
**use** 102:5 105:15 116:2 117:5 142:3 220:22 228:23 235:20 236:5 241:1 244:23 274:3 281:8
**users** 161:21 162:12
**usually** 144:16
**utterly** 55:2 59:17
**uzzi** 36:16 246:19 246:19,22 247:4 247:10 248:2

**v**

**v** 66:12,16 81:5 121:13 256:25 257:1,19,20 258:25 260:6 262:7,15 265:9,11 267:16 268:11 277:22,25 278:2,3
**vacating** 62:24
**vague** 75:9
**valid** 263:23
**validity** 46:18,20
**valuable** 253:1
**value** 91:12,17 125:15 129:13,18 160:23 234:7 261:21
**valued** 91:10
**valve** 172:12 174:14
**van** 43:7
**variation** 265:1
**varick** 36:5
**various** 44:11 45:6 47:8 56:13 109:3 114:3 116:1 125:18 131:13 134:20 136:13 157:1,1 162:21 176:4 201:5 211:10 253:8
**vast** 52:16 172:6 265:21 272:5,8 273:5
**vcr** 66:8
**vehemently** 202:7
**veil** 89:25
**veiled** 89:16

**vein** 134:17
**vel** 51:22 53:1 68:16
**velez** 43:8
**vendors** 127:22 127:25 128:3
**vengeance** 243:25 245:2
**venture** 59:3
**veres** 224:8
**veritext** 283:20
**verse** 241:20
**version** 173:24
**versus** 149:16,17
**viable** 203:15
**victim** 207:21 212:22 213:1 231:13,14,17
**victims** 4:2,8 12:6 12:12 17:6,12 22:6,12 27:2,8 32:6,12 38:2 99:23 102:5 105:23 106:14,18 106:23 112:4 118:2 206:13 212:12 214:6,8,12 227:19 234:2 235:21 236:4 243:6,18 244:2,16 244:24 245:4 249:20,21 274:4
**victory** 54:1
**video** 175:17,21 248:13
**videoconference** 2:4
**view** 47:2 60:10 78:7 85:22 92:21 115:14 136:1 137:13 221:13 230:8 259:5 260:4 261:13
**viewed** 52:20 231:23 244:7 257:12,18 261:25
**views** 84:1 202:14
**vigorously** 204:16 213:20
**vindicate** 107:25
**vindicating** 87:2
**vindication** 122:3 275:12
**violated** 214:3
**violates** 258:23
**violation** 92:21
**violations** 263:11
**virtual** 191:10
**virtually** 191:19 207:19
**virtue** 152:21
**vis** 113:24,24
**vital** 243:22
**voice** 231:16
**volumes** 59:8
**voluntarily** 105:9 250:4
**voluntary** 180:17
**volunteering** 239:8
**vonnegut** 7:12 43:9
**vote** 231:10 259:13,16,24
**voted** 86:25 202:18 204:9 222:12,12 231:10 244:8 249:24 272:7
**voters** 204:24 214:17 244:12
**voting** 202:18 259:25 260:23

**w**

**w.r.** 267:1
**wagner** 37:13 189:13,13,18,20 189:23 221:19,19 221:24 225:7,9
**wait** 154:17 170:4 180:8
**waiting** 154:19 155:2 195:13 202:17
**waive** 118:3 246:3 246:6 247:7,13
**waived** 245:18
**waiver** 104:11,13 248:3 280:2
**waiving** 150:10
**walk** 104:18,19 105:1 237:10 241:4 248:3
**walked** 128:5
**walker** 121:13 277:25
**want** 48:12 50:4 50:11 54:24 55:4 59:18 61:10 67:17 68:24 70:11 72:10 74:6 76:23 78:15 79:1 80:13 87:5 93:7 100:13 111:6 111:7 121:8 123:14 134:22 153:10 157:9 158:13,14,15 160:12 169:15 170:1,14 174:9,17 187:4 188:8,21,22 190:12,14 191:1 193:15 194:14 195:14 196:23 197:21 201:20,21 202:3 205:5 207:17 209:10 216:1 220:3 223:18 224:5,16 227:20 229:14,20 237:3 239:19 242:15 247:18 248:8,13 249:19 251:9 252:8 253:4 253:13 281:11,23
**wanted** 59:21 68:4 122:21 151:15,16 157:11 235:9 248:14 249:8 250:23 281:16
**wants** 151:10 171:25 185:21 188:13 241:6 245:11 248:10
**wardwell** 37:15
**warrant** 144:2 258:3,8
**warranted** 95:24 96:2 156:21
**warrants** 113:12
**wary** 210:21
**washington** 10:18 15:11,13 38:9 40:10 44:7,25 65:5,19 94:16 122:22 136:5 137:1 142:11 147:3 156:14,15 157:13 191:25 192:5 195:3,15 198:17 203:25 206:19 208:24 209:5 254:20 255:15,18 274:12
**washington's** 158:12 190:18 206:24
**waste** 253:23

**watchdog** 86:10
86:11 221:10,13
**watching** 111:18
208:11
**way** 44:21 46:25
52:23 53:7,12
61:19 63:13 70:19
79:23 80:15 87:24
88:9 92:14 96:1
99:21 100:2,16,21
101:21,25 105:2
106:8 109:1
110:10,12 117:14
124:11,23 135:11
136:18 152:11
170:11 177:9,11
177:14 185:2
203:16 204:22
208:14 221:3
227:14 237:24
246:4,14 249:12
253:15 259:8
**ways** 53:12 67:15
105:24 114:8
143:9 210:3
241:23,25
**we've** 53:6 57:1
73:6,7,10,12
82:16 88:1 89:13
93:14 94:8 98:6
102:13,18 105:2
109:9 121:15
125:18 146:3
147:5,18 156:14
156:18 158:11
159:4 162:19,19
163:16,16 165:24
166:12 167:14,16
167:17 169:1
170:11,19 171:18
172:1 173:3,23
174:5,6,21,22
175:10 178:6

180:4,5,6,13
183:13,16 198:1
200:10 206:14,15
206:15 216:19
231:14
**wealth** 245:7
**wear** 241:6
**weber** 43:10
**website** 197:2,5
210:11
**week** 77:12
123:11 161:6
184:15 217:18
246:14 268:25
272:12
**weekend** 55:16
**weeks** 86:8 166:7
186:22 187:11
197:5 217:8,20
**weigh** 83:3
**weighing** 106:16
109:14
**weight** 53:11
227:11
**welcome** 47:5
133:14
**wells** 43:11
**went** 68:20,22
86:8 212:6 214:5
**we'll** 248:12
**we're** 241:1 246:1
248:3 250:21
252:25
**we've** 247:20
249:10,18,24
251:9 252:9
**whatsoever** 56:4
58:1 92:4
**what's** 250:19
**wherewithal**
241:11
**whim** 204:24

**whisper** 253:17
**white** 1:14 38:1
173:23 227:18
249:20
**who've** 231:16
**wide** 265:1
**widespread** 130:2
**wilks** 260:6
**willing** 46:24
110:9 115:11,22
117:6,11,17 118:2
163:17 169:2
176:17 235:24
237:12 248:8
253:15,22
**willingness** 115:2
**win** 143:22
**window** 231:24
239:18 241:18
**windstream** 81:6
84:21 265:11,12
265:19 266:18
**wins** 213:17
244:25
**winter** 173:7
**wires** 182:24
**wish** 95:2 102:14
148:13 160:10
193:12 194:12
196:11 207:2
**wishes** 192:10
**witness** 91:22
134:25 189:4
**witnesses** 158:14
191:2,13,21 192:9
199:14 260:15
**wl** 66:11 256:15
257:9
**wolff** 38:8
**won** 145:3
**wonderful** 104:23
**won't** 245:25
260:21 268:5

**word** 95:5 141:6
**words** 78:16
164:10 210:18
213:24 236:25
257:14
**work** 74:21
109:21 110:10
115:2 118:2 182:4
228:21 233:24
248:19,23
**working** 205:22
227:21
**works** 78:5 88:9
219:8
**world** 180:12
200:10 205:14
235:5
**worried** 201:17
**worry** 178:18
235:15
**worse** 244:19
274:6
**worth** 135:1 152:3
232:19,19,20
238:23
**would've** 145:11
**wouldn't** 251:25
**wrap** 235:19
**writing** 164:7,17
166:12
**written** 144:24
175:7 180:5 205:3
233:10 258:7
**wrong** 54:24
59:17 69:17 152:6
180:20 221:14
233:12,23 238:12
261:7 267:2 277:8
**wrongdoers**
125:14 252:15
**wrote** 164:10
196:18

**x**

**x** 1:4,10

**y**

**y** 193:5
**yards** 36:13
**yeah** 88:7 116:10 144:16 149:2 161:23 162:5,16 179:23 219:9
**year** 101:19 121:25 134:21 161:12 205:7 206:9 209:14 217:19 274:10,23
**year's** 187:1 217:22
**years** 86:4 106:16 106:19 128:5 130:21 185:22 203:11 205:24 206:14,20 207:10 207:14,24 208:4 208:13,13,23 212:9 213:3,6 262:23 273:18,19 274:8
**year's** 270:20
**yesterday** 195:19 206:17
**york** 1:2 36:6,14 36:21 37:11,18 38:4,11 39:11,11 40:1,3,3 278:2
**you're** 247:11 250:24
**you've** 245:19 248:21 249:14

**z**

**z** 42:24
**zabel** 43:12
**zero** 209:9 214:12 214:13 236:19 239:1,3
**zoom** 44:17 157:23,24
**zoomgove** 2:4