UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re:<br><br>PURDUE PHARMA L.P., *et al.*,<br>BANKRUPTCY APPEALS<br><br>---<br><br>This Filing Relates to<br><br>---<br><br>ALL MATTERS | 21 cv 7532 (CM)<br>21 cv 7585 (CM)<br>21 cv 7961 (CM)<br>21 cv 7962 (CM)<br>21 cv 7966 (CM)<br>21 cv 7969 (CM)<br>21 cv 8034 (CM)<br>21 cv 8042 (CM)<br>21 cv 8049 (CM)<br>21 cv 8055 (CM)<br>21 cv 8139 (CM)<br>21 cv 8258 (CM)<br>21 cv 8271 (CM)<br>21 cv 8548 (CM)<br>21 cv 8566 (CM)<br><br>On Appeal from the United States Bankruptcy Court for the Southern District of New York |

## **DEBTORS-APPELLEES APPENDIX – VOLUME 1 OF 23 (A0001-A0068)**

Marshall S. Huebner
(*marshall.huebner@davispolk.com*)
Benjamin S. Kaminetzky
(*ben.kaminetzky@davispolk.com*)
Eli J. Vonnegut
(*eli.vonnegut@davispolk.com*)
James I. McClammy
(*james.mcclammy@davispolk.com*)
Marc J. Tobak
(*marc.tobak@davispolk.com*)
Gerard X. McCarthy
(*gerard.mccarthy@davispolk.com*)


DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile:  (212) 607-7984

*Counsel to the Debtors-Appellees
and Debtors in Possession*

# TABLE OF CONTENTS

| Tab | Document | Page |
|---|---|---|
| | **Docket Entries:** | |
| 1 | Settlement Framework Term Sheet (Bankr. Dkt. No. 257) | A0001 |
| 2 | Declaration of Jeanne Finegan, dated Jan. 3, 2020 (Bankr. Dkt. No. 719; JX-0401) | A0013 |
| 3 | Order Appointing Mediators (Bankr. Dkt. No. 895) | A0094 |
| 4 | Supplemental Declaration of Jeanne Finegan, dated May 20, 2020 (Bankr. Dkt. No. 1179; JX-0402) | A0105 |
| 5 | Phase 1 Mediators' Report (Bankr. Dkt. No. 1716; JX-1637) | A0118 |
| 6 | U.S. Department of Justice Plea Agreement with Purdue Pharma L.P. (Bankr. Dkt. No. 1828-2; JX-2094) | A0127 |
| 7 | U.S. Department of Justice Civil Settlement Agreement with Purdue Pharma L.P. (Bankr. Dkt. No. 1828-3; JX-2095) | A0223 |
| 8 | Order Granting Motion Pursuant to 11 U.S.C. § 105 and Fed. R. Bankr. P. 9019 Authorizing and Approving Settlements Between the Debtors and the United States (Bankr. Dkt. No. 2004) | A0288 |
| 9 | Phase 2 Mediators' Report (Bankr. Dkt. No. 2548; JX-1638) | A0294 |
| 10 | Order Appointing the Honorable Shelley C. Chapman as Mediator (Bankr. Dkt. No. 2820) | A0303 |
| 11 | Personal Injury Trust Distribution Procedures—Fourth Plan Supplement Ex. C (PI TDPs) (Bankr. Dkt. No. 2868; JX-1594) | A0305 |
| 12 | Order Approving Disclosure Statement (Bankr. Dkt. No. 2988) | A0374 |
| 13 | Phase 3 Mediators' Report (Bankr. Dkt. No. 3119; JX-1639) | A0673 |
| 14 | Examiner's Report (Bankr. Dkt. No. 3285; JX-0873) | A0691 |
| 15 | Declaration of Christina Pullo (Bankr. Dkt. No. 3372; JX-3028) | A0726 |

**16**  Third Supplemental Declaration of Jeanne Finegan
(Bankr. Dkt. No. 3403; JX-3030) ....................................................................... A0791

**17**  Amended Expert Declaration of Jesse DelConte
(Bankr. Dkt. No. 3411; JX-3051) ....................................................................... A0806

**18**  Declaration of Deborah Greenspan
(Bankr. Dkt. No. 3414; JX-3052) ....................................................................... A0876

**19**  Declaration of Gautam Gowrisankaran
(Bankr. Dkt. No. 3414; JX-3053) ....................................................................... A0934

**20**  Declaration of Stephen Ives
(Bankr. Dkt. No. 3417; JX-3033) ....................................................................... A1006

**21**  Declaration of David Sackler
(Bankr. Dkt. No. 3418) ....................................................................... A1018

**22**  Declaration of Timothy Martin on behalf of The Raymond Sackler Family
(Bankr. Dkt. 3422; JX-3057) ....................................................................... A1020

**23**  Declaration of Joseph Turner
(Bankr. Dkt. No. 3431; JX-3035) ....................................................................... A1745

**24**  Declaration of John Dubel
(Bankr. Dkt. No. 3433; JX-3037) ....................................................................... A1757

**25**  Declaration of Jon Lowne
(Bankr. Dkt. No. 3440; JX-3038) ....................................................................... A1785

**26**  Declaration of John Guard
(Bankr. Dkt. No. 3446; JX-3041) ....................................................................... A1799

**27**  Declaration of Jayne Conroy
(Bankr. Dkt. No. 3447; JX-3042) ....................................................................... A1823

**28**  Declaration of Timothy Martin on behalf of Beacon Company
(Bankr. Dkt. No. 3448; JX-3092) ....................................................................... A1829

**29**  Declaration of Peter Weinberger
(Bankr. Dkt. No. 3449; JX-3043) ....................................................................... A2017

**30**  Declaration of Jonathan Greville White
(Bankr. Dkt. No. 3451; JX-3093) ....................................................................... A2038

**31**  Declaration of Jesse DelConte
(Bankr. Dkt. No. 3456; JX-3044) ....................................................................... A2082

**32**  Stipulation and Agreed Order By and Among Debtors and Canadian Governmental
Claimants
(Bankr. Dkt. No. 3520) ....................................................................... A2100

33   Seventeenth Plan Supplement Pursuant to the Eleventh Plan (includes Master TDP, NewCo Credit Support Agreement, Shareholder Settlement Agreement) (Bankr. Dkt. No. 3711) ........................................................................................... A2112

34   Twelfth Amended Joint Chapter 11 Plan of Reorganization (Bankr. Dkt. No. 3726) ........................................................................................... A3049

35   Blackline of Twelfth Amended Plan to Eleventh Amended Plan (Bankr. Dkt. No. 3727) ........................................................................................... A3207

36   Order Authorizing Debtors to Fund Establishment of the Creditor Trusts, the Master Disbursement Trust and TopCo. (Bankr. Dkt. No. 3773) ........................................................................................... A3372

37   Modified Bench Ruling on Request for Confirmation of Eleventh Amended Joint Chapter 11 Plan (Bankr. Dkt. No. 3786) ........................................................................................... A3378

38   Findings of Fact, Conclusions of Law, and Order Confirming the Twelfth Amended Plan (Bankr. Dkt. No. 3787) ........................................................................................... A3537

**Other Parts of the Record:**

39   Purdue Notice Letter to Marsh Risk Services, dated Oct. 26, 2001 (JX-1515) ........................................................................................................................ A4024

40   Minutes of a Meeting of the Board of Directors, dated Nov. 19, 2004 (JX-2011) ........................................................................................................................ A4058

41   Purdue Pharma Inc. Amendments to By-Laws, dated Apr. 18, 2008 (JX-1222) ........................................................................................................................ A4068

42   Purdue Notice Letter to XL, dated Nov. 29, 2017 (JX-1508) ........................................................................................................................ A4076

43   Purdue Notice Letter to AIG, dated Nov. 29, 2017 (JX-1509) ........................................................................................................................ A4078

44   Purdue Notice Letter to Arch, dated Nov. 29, 2017 (JX-1510) ........................................................................................................................ A4081

45   Purdue Notice Letter to AWAC, dated Nov. 29, 2017 (JX-1511) ........................................................................................................................ A4083

46   Purdue Notice Letter to Beazley, dated Nov. 29, 2017 (JX-1512) ........................................................................................................................ A4085

47   Purdue Notice Letter to QBE, dated Nov. 29, 2017 (JX-1513) ........................................................................................................................ A4086

**48**      Purdue Notice Letter to US Specialty, dated Nov. 29, 2017
           (JX-1514) .................................................................................................... A4088

**49**      Purdue Pharma L.P. Third Amended and Restated Limited Partnership Agreement, dated
           Mar. 7, 2018
           (JX-1803) .................................................................................................... A4089

**50**      Purdue Notice Letter to Marsh USA
           (JX-1517) .................................................................................................... A4127

**51**      Purdue Notice Letter to Marsh USA
           (JX-1516) .................................................................................................... A4129

**52**      Purdue Notice Letter to Marsh USA
           (JX-1518) .................................................................................................... A4130

**53**      Purdue Pharma L.P. Amended and Restated Limited Partnership Agreement, dated Jun. 20,
           2019
           (JX-0872) .................................................................................................... A4131

**54**      Sept. 17, 2019 Hearing Transcript (Excerpt)
           (JX-1116) .................................................................................................... A4173

**55**      Declaration of Hayden Coleman (Excerpt)
           (JX-0537) .................................................................................................... A4177

**56**      Nov. 19, 2019 Hearing Transcript (Excerpt)
           (JX-1120) .................................................................................................... A4208

**57**      Mar. 18, 2020 Hearing Transcript (Excerpt)
           (JX-1127) .................................................................................................... A4212

**58**      Claim No. 145592 – Canadian Municipal Creditors, dated Jul. 22, 2020
           (JX-0727) .................................................................................................... A4216

**59**      Claim No. 83026 – Mark Timney, dated Jul. 24, 2020 (Excerpt)
           (JX-0769) .................................................................................................... A4315

**60**      Claim No. 82991 – John Stewart, dated Jul. 24, 2020 (Excerpt)
           (JX-1153) .................................................................................................... A4321

**61**      Claim No. 115412 – Judith Lewent, dated Jul. 24, 2020 (Excerpt)
           (JX-1210) .................................................................................................... A4327

**62**      Claim No. 115353 – Peter Boer, dated Jul. 24, 2020 (Excerpt)
           (JX-1211) .................................................................................................... A4330

**63**      Claim No. 115334 – Cecil Picket, dated Jul. 24, 2020 (Excerpt)
           (JX-1212) .................................................................................................... A4333

**64**    Claim No. 115110 – Paulo Costa, dated Jul. 24, 2020 (Excerpt)
(JX-1213)................................................................................................................A4336

**65**    Claim No. 114761 – Ralph Snyderman, dated Jul. 24, 2020 (Excerpt)
(JX-1214)................................................................................................................A4339

**66**    Claim No. 144366 – City of Grand Prairie, dated Jul. 28, 2020 (Excerpt) .........................A4342

**67**    Claim No. 144455 – City of Brantford, dated Jul. 28, 2020 (Excerpt) ...............................A4350

**68**    Claim No. 144465 – City of Wetaskiwin, dated Jul. 28, 2020 (Excerpt)............................A4358

**69**    Claim No. 144475 – City of Lethbridge, dated Jul. 28, 2020 (Excerpt) .............................A4366

**70**    Claim No. 144535 – La La Ronge Indian Band, dated Jul. 28, 2020 (Excerpt)..................A4374

**71**    Claim No. 144545 – Peter Ballantyne Cree Nation on Behalf of all Canadian First
Nations and Metis People, dated Jul. 28, 2020 (Excerpt).....................................................A4481

**72**    Claim No. 137706 – Kathe Sackler, dated Jul. 29, 2020 (Excerpt)
(JX-1202)................................................................................................................A4489

**73**    Claim No. 137599 – Estate of Beverly Sackler, dated Jul. 29, 2020 (Excerpt)
(JX-1203)................................................................................................................A4495

**74**    Claim No. 137590 – Richard Sackler, dated Jul. 29, 2020 (Excerpt)
(JX-1204)................................................................................................................A4501

**75**    Claim No. 137527 – Estate of Raymond Sackler, dated Jul. 29, 2020 (Excerpt)
(JX-1205)................................................................................................................A4507

**76**    Claim No. 137453 – Estate of Jonathan Sackler, dated Jul. 29, 2020 (Excerpt)
(JX-1206)................................................................................................................A4513

**77**    Mar. 24, 2021 Hearing Transcript (Excerpts)
(JX-1141)................................................................................................................A4519

**78**    UCC Cover Letter in Support of Fifth Amended Plan, dated Jun. 15, 2021
(JX-2869)................................................................................................................A4523

**79**    Confirmation Hearing Press Release, dated Jun. 16, 2021
(JX-0938)................................................................................................................A4547

**80**    Aug. 9, 2021 Hearing Transcript (Excerpt) .........................................................................A4551

**81**    Aug. 12, 2021 Hearing Transcript (Excerpts) .....................................................................A4554

**82**    Aug. 13, 2021 Hearing Transcript (Excerpts) .....................................................................A4571

**83**    Aug. 16, 2021 Hearing Transcript (Excerpts) .....................................................................A4593

**84**    Aug. 19, 2021 Hearing Transcript (Excerpts) ................................................. A4610

**85**    Aug. 23, 2021 Hearing Transcript (Excerpts) ................................................. A4612

**86**    Named Insured Example
(JX-0599)........................................................................................................... A4626

**87**    Confirmation Hearing Magazine Advertisement Samples
(JX-0940)........................................................................................................... A4723

**88**    Confirmation Hearing Flyer Notice
(JX-0941)........................................................................................................... A4727

**89**    Sample of Online Advertisements
(JX-0942)........................................................................................................... A4730

**Complaints:**

**90**    *State of Oregon v. Purdue Pharma L.P.*, 18cv40526 (Cir. Ct. Or. Nov. 13, 2018), Complaint
(JX-0943)........................................................................................................... A4734

**91**    *State of Oregon v. Richard Sackler*, 19cv22185 (Ore. Cir. Ct., Multnomah Cty. May 16, 2019), Complaint
(JX-1647)........................................................................................................... A4814

**92**    *Consumer Protection Division, Office of the Attorney General v. Purdue Pharma et al.*, Amended Statement of Charges, dated May 29, 2019
(JX-1753)........................................................................................................... A4838

**93**    *District of Columbia v. Purdue Pharma L.P.*, 2019 ca 003680 (Super. Ct. D.C. Jul. 8, 2019), Unredacted Complaint
(JX-0946)........................................................................................................... A4946

**94**    *The People of the State of California v. Purdue Pharma L.P.*, 19STcv19045 (Super. Ct. Cal. Oct. 2, 2019), First Amended Complaint
(JX-0947)........................................................................................................... A4974

**95**    *State of Oregon v. Richard Sackler*, 19cv44161 (Cir. Ct. Or. Oct. 10, 2019), Complaint
(JX-0783)........................................................................................................... A5038

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
Eli J. Vonnegut

*Proposed Counsel to the Debtors
and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **Chapter 11** |
| **PURDUE PHARMA L.P.,** *et al.*, | **Case No. 19-23649 (RDD)** |
| Debtors.[1] | **(Jointly Administered)** |

<u>**NOTICE OF FILING OF TERM SHEET WITH AD HOC COMMITTEE**</u>

**PLEASE TAKE NOTICE** that on September 15, 2019 (the "**Petition Date**"),

Purdue Pharma L.P. and certain of its affiliates, as debtors and debtors in possession

(collectively, the "**Debtors**"), each filed a voluntary petition for relief under chapter 11 of title 11

of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for

the Southern District of New York (the "**Bankruptcy Court**").

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (N/A), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF LP (0495), SVC Pharma LP (5717) and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the settlement term sheet, attached hereto as **<u>Exhibit A</u>** (the "**Term Sheet**"),[2] by and among the Debtors, the Ad Hoc Committee and the Shareholder Parties.

**PLEASE TAKE FURTHER NOTICE** that copies of the Term Sheet may be obtained free of charge by visiting the website of Prime Clerk LLC at https://restructuring.primeclerk.com/purduepharma. You may also obtain copies of any pleadings by visiting the Bankruptcy Court's website at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated:   October 8, 2019
         New York, New York

                              DAVIS POLK & WARDWELL LLP

                              By:   */s/ Timothy Graulich*
                                   _____

                              450 Lexington Avenue
                              New York, New York 10017
                              Telephone: (212) 450-4000
                              Facsimile:  (212) 701-5800
                              Marshall S. Huebner
                              Benjamin S. Kaminetzky
                              Timothy Graulich
                              Eli J. Vonnegut

                              *Proposed Counsel to the Debtors*
                              *and Debtors in Possession*

---

[2] Unless otherwise defined herein, each capitalized term shall have the meaning ascribed to such term in the Term Sheet.

A0002

**<u>Exhibit A</u>**

**Term Sheet**

## SUMMARY TERM SHEET

This Summary Term Sheet summarizes the salient terms of a proposed comprehensive settlement of the claims relating to the opioid business of Purdue Pharma L.P. and its subsidiaries (collectively, "**Purdue**" or the "**Debtors**").  The ad hoc committee of consenting claimants (the "**Ad Hoc Committee**") consists of certain members, including the MDL Plaintiffs' Executive Committee, representative States, Municipalities and others.  The Debtors and the Ad Hoc Committee recognize that there may be other important stakeholders that will have a meaningful participation in the chapter 11 cases, and the Debtors and the Ad Hoc Committee will work together and with such other stakeholders, as applicable, in good faith to negotiate, draft and finalize definitive documents in furtherance of the proposed settlement set forth herein (the "**Settlement**").

1.  No later than 14 days following the finalization of this Summary Term Sheet (or such earlier date as required to have the motion heard at the earlier of the hearing scheduled for November 19, 2019 or any earlier hearing scheduled), the Debtors shall file and thereafter pursue a motion in a form reasonably acceptable to the Ad Hoc Committee with the Bankruptcy Court to (i) assume the pre-petition reimbursement agreement with the Ad Hoc Committee and (ii) pay, on a monthly basis, the reasonable and documented expenses (e.g., hotels, meals, travel costs, etc., but excluding the fees and expenses of any professional, including internal counsel, retained or employed by any Ad Hoc Committee member) incurred by the Ad Hoc Committee members in furtherance of their service on the Ad Hoc Committee.

2.  Pursuant to the chapter 11 plan, 100% of the assets or equity of Purdue – which together with its subsidiaries constitutes 100% of Purdue's U.S. pharmaceutical business – will be placed under a trust or a similar post-emergence structure, for the benefit of claimants and the U.S. public (the "**Trust**").[1]  The company ("**NewCo**") and the Trust will be run by independent directors or trustees disclosed to the Bankruptcy Court and selected by creditors or their representatives (subject to reasonable approval by the Ad Hoc Committee) pursuant to a process reasonably acceptable to the Ad Hoc Committee and the Debtors.  The Trust will own NewCo.

3.  The corporate charter of NewCo will (i) require it to deploy its assets to address the opioid crisis through the provision of cash payments, the contribution of doses of overdose reversal medications or through other means chosen by the directors and trustees, (ii) obligate it to periodically evaluate the optimum methods of fulfilling its obligations, including a strategic winddown or liquidation, and (iii) be approved by the Ad Hoc Committee and the Debtors, approval of which shall not be unreasonably withheld, *provided* that Purdue and Shareholder Parties will have no role, control or consent/approval rights in NewCo from and after the Effective Date (as defined below).  Both the charter of NewCo and the Trust governance documents will require the directors and trustees to periodically consider, *inter alia*, a strategic winddown of the entirety of NewCo or the monetization of its various asset classes.

4.  The Shareholder Parties (defined below) will have no role in the appointment of the persons overseeing the Trust, the board members of NewCo, or the operations of either entity, and the Shareholder Parties will release, and will receive no recovery under the

---

[1]  For the avoidance of doubt, the contribution of Purdue includes all property, interests and assets of the Debtors and their estates as such terms are understood and defined under the Bankruptcy Code, including, without limitation: (i) all cash on their balance sheets; (ii) insurance policies and proceeds therefrom, and (iii) all other estate assets including causes of action belonging to the Debtors or their estates.

1

A0004

chapter 11 plan on account of, any equity interests in, or claims that have been or may be asserted against, any of the Debtors or any of their successors (including on account of any legacy liabilities, unpaid rent, or outstanding debts otherwise owed to the Shareholder Parties). There shall be no payments made by the Debtors to or for the benefit of the Shareholder Parties (including the IACs and any affiliates) during the pendency of the chapter 11 cases, other than in the ordinary course of business pursuant to contracts validated by the Special Committee, and, if outside the ordinary course of business, approved by the Special Committee and the Bankruptcy Court. The Ad Hoc Committee reserves the right to contest any of these transactions or payments. Each of the Shareholder Parties will consent to the jurisdiction of the Bankruptcy Court solely for the enforcement of any parties' rights, if any, under (i) the Stay Order, (ii) this Summary Term Sheet, or (iii) any definitive documents (including any restructuring support agreement or chapter 11 plan), and for no other purpose.

5.    Pursuant to the chapter 11 plan, NewCo and the Trust will have no liability for any claims or causes of action that have been or could have been asserted against the Debtors (including but not limited to claims based on successor liability), and all assets or equity interests will be transferred to NewCo "free and clear." In addition, the chapter 11 plan will also include releases and exculpations, consistent with applicable law, with respect to Purdue's restructuring and chapter 11 cases, including (i) releases and discharges of the Debtors and their related parties from all claims and causes of action of any nature and (ii) exculpations of the Debtors and their related parties with respect to all acts or omissions arising in connection with the chapter 11 cases.

6.    In exchange for comprehensive releases in the form and manner to be agreed upon by the parties and set forth in, *inter alia*, the chapter 11 plan and related confirmation order, from each of (i) the Debtors and their estates, (ii) NewCo and (iii) all claimants, the existing shareholders, including trusts, beneficiaries, companies, affiliates, family members and any similar related parties (together, the "**Shareholder Parties**") will make or cause to be made the Consenting Shareholder Cash Contribution (defined below), subject to appropriate security interests and negative pledges relating to the IACs (defined below), tolling agreements, and appropriate protections to preserve the value of the IACs pending sale, to be negotiated with creditor representatives including the Ad Hoc Committee, on the terms set forth on Exhibit A.[2] Releases provided to any releasee will sunset and become null and void in the event that such releasee defaults in its obligation to make any payments under its allocated portion of the Consenting Shareholder Cash Contribution.[3] It shall be a condition precedent to agreement on the definitive documents that the Ad Hoc Committee, the Debtors, and Shareholder Parties, each in their discretion, shall have agreed upon the allocation among payors of the Consenting Shareholder Cash Contribution, which shall be based on further diligence reasonably acceptable to the Ad Hoc Committee and tied to assurances of the ability of the Shareholder Parties to satisfy the Guaranteed Contribution in full when due, taking into account the results of diligence regarding the IACs. A list of identifiable releasees

---

[2] For the avoidance of doubt, the releases in favor of the Shareholder Parties to be set forth in the chapter 11 plan will not include liabilities owed by them to governmental units that are not related to Purdue and/or opioid/litigation liability, such as individual taxes or other unrelated categories of liabilities.

[3] Shareholder Parties who are subject to voidable releases will agree to toll all statutes of limitations, repose, or otherwise, until the Consenting Shareholder Cash Contribution of such releasee is paid in full in accordance with the terms set forth on Exhibit A and the definitive documents.

2

will be provided by the Shareholder Parties to the Debtors and the Ad Hoc Committee and updated as appropriate.

7.   Prior to the effective date of a chapter 11 plan (the "**Effective Date**"), the Debtors, with Bankruptcy Court approval and after consultation with the Creditors' Committee and the Ad Hoc Committee, may settle claims and coverage disputes with any of Purdue's insurers.  Following the Effective Date, NewCo and/or the Trust, as applicable, will have all rights with respect to the insurance, including, without limitation, the authority to assert, pursue and settle such claims and coverage disputes with Purdue's insurers.

8.   All distributable cash (including, without limitation, the Consenting Shareholder Cash Contribution, the company's excess cash, and insurance proceeds) will be distributed through a chapter 11 plan on terms and conditions, and in accordance with a formula consistent with applicable law and acceptable to the Debtors and the Ad Hoc Committee, *provided, however*, that the Shareholder Parties must also be reasonably satisfied that the allocation of consideration under the plan is consistent with the requirements of the Bankruptcy Code and applicable bankruptcy law.  Any sales proceeds from any post-bankruptcy sale of NewCo or its assets will be distributed pursuant to this same agreed-to formulation.

9.   The Debtors and NewCo will be bound by, and the Shareholder Parties will not oppose and will not take any action to frustrate, injunctive relief reasonably acceptable to the Ad Hoc Committee, including marketing restrictions, both during the chapter 11 cases and thereafter, with respect to the Debtors' opioid business-related activities.

10.  As a condition to the Settlement, Purdue, the Shareholder Parties, and their respective related parties shall have resolved with the U.S. Department of Justice on terms satisfactory to them and approved by the Bankruptcy Court on appropriate notice, all potential federal liability arising from or related to opioid-related activities.  If the economic terms of any such resolution are materially inconsistent with this Settlement or otherwise materially adverse to the Debtors, the Ad Hoc Committee shall have the right, within 30 days thereof, to terminate the Settlement.

11.  Each consenting creditor, including without limitation each member of the Ad Hoc Committee, will (i) affirmatively undertake efforts to adjourn, sever, suspend or otherwise stay any of their own respective actions against Purdue, the Shareholder Parties, and their respective related parties related to Purdue's opioid business; and (ii) either affirmatively support, or not oppose, object to, delay, impede, or take any other action to interfere with, efforts to stay all pending litigation against Purdue, the Shareholder Parties, and their respective related parties related to Purdue's opioid business, in each case for the Initial Stay Period (as defined below).  The Ad Hoc Committee will affirmatively support a request by the Debtors to stay all pending litigation against Purdue, the Shareholder Parties, and their respective related parties related to Purdue's opioid business for an initial period of 180 days (the "**Initial Stay Period**") from the date of entry by the Bankruptcy Court (the "**Stay Date**") of an order approving the stay (the "**Stay Order**"), to facilitate the orderly and efficient implementation of the terms of this Summary Term Sheet.  The Debtors and the Shareholder Parties will negotiate, complete and, if agreed to, execute a restructuring support agreement with the Ad Hoc Committee within 120 days of the earlier of the Stay Date or, if the Stay Date is later than October 15, 2019, October 15, 2019, and the Debtors will move for approval of the restructuring support agreement at a hearing to be held as promptly as practicable following the expiration of the Initial Stay Period.  The

3

Ad Hoc Committee may move the Bankruptcy Court to terminate the Initial Stay Period if a restructuring support agreement has not been executed by the Debtors, the Ad Hoc Committee, its members, and the Shareholder Parties within 120 days of the Stay Date, it being expressly understood that the Debtors' execution thereof shall be subject to Bankruptcy Court approval that shall not be obtained, absent the consent of the Creditors' Committee, prior to the date that is 180 days from the Stay Date.  Among other things, the restructuring support agreement will provide for appropriate termination events, and for an appropriate "fiduciary out" for the Debtors acceptable to the Debtors and the Ad Hoc Committee.  An order of the Bankruptcy Court shall provide for the restrictions set forth on Exhibit C, which shall apply during the Initial Stay Period and any extension thereof (the "**Stay Period**").

12.   The Shareholder Parties will promptly provide the Ad Hoc Committee and the Debtors with a list and description of all IACs.  During negotiations of a restructuring support agreement and the definitive documents, the Debtors and/or the Shareholder Parties, as applicable, shall promptly and on a rolling basis provide the Ad Hoc Committee and its professionals with information and documents, including the categories of information and documents set forth on Exhibit B, reasonably requested and necessary to perform due diligence regarding the terms of this Settlement and any chapter 11 plan premised upon this Settlement.  All diligence in this paragraph is referred to herein as "**Diligence**".  If the Ad Hoc Committee reasonably believes that the Shareholder Parties are not reasonably working in good faith to provide the Diligence promptly and on a rolling basis, subject to written notice and a ten day cure period, the Ad Hoc Committee shall have the right to move the Bankruptcy Court to terminate the Stay Period.

13.   The Debtors' agreement to provide any Diligence to the Ad Hoc Committee pursuant to the terms hereof does not extend to information that otherwise could not be obtained in connection with discovery by the Ad Hoc Committee under applicable bankruptcy or federal laws or rules, including Bankruptcy Rule 2004.  Nothing herein shall constitute a waiver of the attorney-client privilege by the Debtors.  As to matters where there is a basis for information sharing without a waiver of privilege, the Debtors agree to work with the Ad Hoc Committee to explore mechanisms that will ensure that any information or documents shared by the Debtors will remain confidential and privileged.

14.   The restructuring support agreement will provide for appropriate consultation and consent rights, including with respect to the definitive documents necessary to effectuate this Settlement, for the Ad Hoc Committee (and any other creditor representative signatory to the restructuring support agreement) to be agreed. All definitive documents relating to the Settlement shall be on terms acceptable to the Ad Hoc Committee, the Debtors and, except as otherwise expressly provided herein, the Shareholder Parties.  Among other things, the parties will enter into a mutually agreeable tax protocol, and will seek to maximize tax efficiencies when drafting definitive documentation.  The forms of governmental proofs of claim and related documents with respect to the bar date shall be reasonably acceptable to the Ad Hoc Committee.

15.   Within 270 days of the earlier of the Stay Date or, if the Stay Date is later than October 15, 2019, October 15, 2019, the parties will negotiate the terms of a chapter 11 plan and disclosure statement and, in the event agreement is reached on all material terms, the Debtors will file a chapter 11 plan and disclosure statement, together with an agreed upon schedule for confirmation.

4

16.     The definitive documents will provide that no State or other governmental entity that is not an initially consenting party with respect to the Settlement will receive a distribution or other benefit under the Debtors' chapter 11 plan that is not provided on an equivalent or pro rata basis to initially consenting parties.

17.     Purdue's obligations hereunder shall terminate on written notice to the Ad Hoc Committee if Purdue determines, in its sole discretion (and in keeping with its fiduciary duties, including the duties of the members of its Special Committee), that the Settlement is no longer in its best interests, *provided*, that prior to terminating its obligations hereunder, Purdue shall provide proposed amendments or alternatives to the Settlement to the Ad Hoc Committee and shall provide the Ad Hoc Committee with a reasonable period to determine whether to incorporate such amendments into the Settlement or to proceed consensually with any such alternatives.  The Debtors represent that, as of the date of hereof, they believe that reaching agreement on and finalizing this Settlement Term Sheet is consistent with their fiduciary duties.

18.     For the avoidance of doubt, all dates set forth herein may be amended with the consent of the Debtors, the Ad Hoc Committee, and the Shareholder Parties.

_____

5

A0008

## Exhibit A

## Consenting Shareholder Cash Contribution

| Shareholder Cash Contribution | The Shareholder Parties will contribute $3 billion (the "**Guaranteed Contribution**") to NewCo or such other designated vehicle over a period no longer than seven years from the Effective Date. |
|---|---|
| | The Shareholder Parties will make the Guaranteed Contribution in the following minimum annual amounts: |
| | 1. Year 1 (to be paid on one or more dates in Year 1 to be agreed by the Debtors, the Shareholder Parties and the Ad Hoc Committee based on timing of initial asset sales): $500 million;<br>2. Years 2–6: $300 million per year; and<br>3. Year 7: $1 billion[4] |
| | The Shareholder Parties will engage in a sale process for their Ex-U.S. pharmaceutical companies (collectively, the "**IACs**"). A list of all IACs will be promptly provided to the Ad Hoc Committee, and the Shareholder Parties shall represent that the list of IACs is an accurate and complete list of all Ex-U.S. pharmaceutical entities, related businesses, joint ventures, or other holdings directly or indirectly owned or controlled by any Shareholder Party, and that are included in the financial information provided in the investment banker presentation made available to certain of the settling parties' financial experts (the "**IB Presentation**"). It is understood and agreed by the parties that further Diligence and agreement is required with respect to any entities that are controlled, actively managed, or 20% or more owned, by Shareholder Parties consisting both of the descendants of Raymond Sackler and of Mortimer Sackler and engaged in the pharmaceutical business but not included in the IB Presentation, including whether any of such entities shall be included as IACs under the Settlement. The Shareholder Parties will provide representations and enforceable covenants acceptable to the Ad Hoc Committee and the Shareholder Parties to ensure that subsequent to the disposition of the IACs, the Shareholder Parties will no longer be engaged in the opioid business, and if necessary, diligence on specific investments raised by the Ad Hoc Committee, with such enforceable covenants to be set forth in the confirmation order for the chapter 11 plan, such covenants to be specifically enforceable through injunctive relief. |
| | The first use of Net Proceeds (defined below) from one or more equity or asset sales of an IAC (an "**Ex-U.S. Sale**") during this seven-year period, will be to fulfill the Guaranteed Contribution. Any such accelerated contributions will be applied and deemed to satisfy (on a dollar for dollar basis and in whole or part as applicable) the next due installment or installments of the Guaranteed Contribution. The Shareholder Parties (i) will provide the Ad Hoc Committee and the Debtors with financial information (including current audited financial statements for each IAC) as reasonably requested and available for the IACs prior to the execution of the restructuring support agreement, and (ii) will |

---

[4] Amounts payable in years two through seven shall be payable on dates to be agreed.

A0009

provide access to books and records of the IACs to permit the Ad Hoc Committee and the Debtors to document and monitor the Ex-U.S. Sales and Guaranteed Contribution on terms and conditions to be agreed upon and set forth in the definitive documentation.

In addition to the Guaranteed Contribution, the Shareholder Parties will contribute (i) 90% of any Net Proceeds in excess of $3 billion until the Shareholder Parties have contributed an additional $1.5 billion *plus* (ii) 50% of any Net Proceeds realized from any Ex-U.S. Sale thereafter (such amounts, together with the Guaranteed Contributions, the "**Consenting Shareholder Cash Contribution**").

The Shareholder Parties will provide quarterly reports regarding the progress of any Ex-U.S. Sale to the Debtors and the Ad Hoc Committee during the chapter 11 cases and to the Trust or its successor or designee following the Effective Date.   The parties will agree to additional financial disclosures, reporting mechanisms, oversight, and covenants with respect to the IACs in connection with the definitive documentation, with appropriate protections to be agreed to preserve and maximize the value of IACs pending the Ex-U.S. Sale.

The payment of the Consenting Shareholder Cash Contribution will be secured by appropriate security interests in and negative pledges relating to, as well as informational and consultation rights with respect to, the IACs reasonably acceptable to the Ad Hoc Committee.

In accordance with to be agreed-upon terms and timing mechanisms, the IACs will not retain excess cash and will, no less than annually and periodically on intervals to be agreed, distribute excess cash only for, and in the following order of priority: (i) *first,* the taxes generated by the income or sale of (including any required presale restructurings of) the IACs and Purdue, and for the legal and other expenses incurred by the shareholders in connection with the restructuring and the Ex-U.S. Sales, (ii) *second,* to repay to the owners any amount of the Consenting Shareholder Cash Contribution advanced from sources other than such distributions and the proceeds from any Ex-U.S. Sale, and (iii) *third,* (a) the Consenting Shareholder Cash Contribution and (b) any amount to be distributed to the owners alongside the Consenting Shareholder Cash Contribution (i.e., 10% of Net Proceeds after $3 billion and 50% of Net Proceeds after the Shareholder Parties have contributed an additional $1.5 billion).  Any distributions and the gross proceeds from any Ex-U.S. Sale minus the amounts described in clause (i) of the immediately preceding sentence shall constitute "**Net Proceeds**".

Determination of what constitutes excess cash of the IACs will, at all times prior to an Ex-U.S. Sale of the IACs, be made in accordance with terms to be agreed with the Ad Hoc Committee, the Debtors, and the Shareholder Parties.

Promptly following the date of finalization of this Summary Term Sheet, the protections requested by and reasonably acceptable to the Debtors, the Ad Hoc Committee, and the Shareholder Parties will be agreed to preserve the value of IACs, including any excess cash of the IACs generated or proceeds of any Ex-U.S. Sale received prior to the Effective Date.

7

## **Exhibit B**

### **Initial Diligence**

The following shall be provided initially on a Professionals' Eyes Only ("**PEO**") basis, with further dissemination of diligence to be agreed through the negotiation of a confidentiality agreement among the parties, and subject to court-ordered confidentiality, it being expressly agreed and understood that the parties shall negotiate in good faith as to which Diligence items remain PEO:

1. Any final report(s) prepared for or by the Special Committee of the board of directors regarding transactions between the Debtors and the Shareholder Parties (and/or their respective affiliates).

2. IAC presentation materials, including the IB Presentation, historical financial results, accounting of excess cash for 2019, current projections, business plans and valuations, on an entity level basis where available, and other customary financial, operational, and legal diligence reasonably requested by the Ad Hoc Committee.

3. Updated financials for the Debtors and each of the IACs.

4. Business plan and forecasts for the Debtors as well as detailed historical financial information and/or valuations of the Debtors and other customary financial, operational, and legal diligence reasonably requested by the Ad Hoc Committee.

5. Reasonable access by the professionals to the Ad Hoc Committee to members of the Debtors' and the IAC's management teams to answer questions and elaborate on Diligence items 2-4.

6. Tax information necessary to determine the tax liability set forth in the clause (i) referenced in the definition of Net Proceeds on Exhibit A.

7. Quarterly reports listing the material legal and other fees and expenses incurred by the Shareholder Parties in connection with the chapter 11 cases and the Ex-U.S. Sales.

8. Information necessary to assess the reasonableness of any proposed allocation among payors of the Consenting Shareholder Cash Contribution, and to determine the assurances that are necessary regarding the ability of the Shareholder Parties to satisfy the Guaranteed Contribution in full when due, taking into account the results of diligence regarding the IACs.

9. A list of all contracts validated by the Special Committee providing for any payments by the Debtors to the Shareholder Parties during the chapter 11 cases, and reasonable prior notice regarding any payments approved by the Special Committee to the Shareholder Parties outside the ordinary course of business.

A0011

## Exhibit C

(a) For purposes of this Order, "Covered Sackler Person" shall mean: Beverly Sackler, David A. Sackler, Ilene Sackler, Jonathan D. Sackler, Kathe Sackler, Mortimer D.A. Sackler, Richard S. Sackler, Theresa Sackler, any trusts of which any of the foregoing are beneficiaries, and the trustees thereof (solely in their capacities as such). The Shareholder Parties represent that the Covered Sackler Persons own, directly or indirectly, each of the IACs.

(b) While the injunction hereunder in respect of Related-Party Claims is in effect, no Covered Sackler Person shall take any action with respect to any material amount of his, her, or its property that is located inside or outside the United States with the intent or material effect of frustrating enforcement of any potential judgment of this Court in these cases or any other actions pending against them.

(c) Solely to the extent necessary to enforce the foregoing, each Covered Sackler Person consents to the jurisdiction of this Court in respect of the foregoing.

A0012

DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Marshall S. Huebner
Benjamin S. Kaminetzky
Timothy Graulich
James I. McClammy
Eli J. Vonnegut

*Counsel to the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| PURDUE PHARMA L.P., *et al.*,[1] | Case No. 19-23649 (RDD) |
| Debtors. | Jointly Administered |

Pursuant to 28 U.S.C. § 1746, I, Jeanne C. Finegan, hereby declare as follows under penalty

of perjury:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's registration number in the applicable jurisdiction, are as follows: Purdue Pharma L.P. (7484), Purdue Pharma Inc. (7486), Purdue Transdermal Technologies L.P. (1868), Purdue Pharma Manufacturing L.P. (3821), Purdue Pharmaceuticals L.P. (0034), Imbrium Therapeutics L.P. (8810), Adlon Therapeutics L.P. (6745), Greenfield BioVentures L.P. (6150), Seven Seas Hill Corp. (4591), Ophir Green Corp. (4594), Purdue Pharma of Puerto Rico (3925), Avrio Health L.P. (4140), Purdue Pharmaceutical Products L.P. (3902), Purdue Neuroscience Company (4712), Nayatt Cove Lifescience Inc. (7805), Button Land L.P. (7502), Rhodes Associates L.P. (NA/), Paul Land Inc. (7425), Quidnick Land L.P. (7584), Rhodes Pharmaceuticals L.P. (6166), Rhodes Technologies (7143), UDF L.P. (0495), SVC Pharma L.P. (5717), and SVC Pharma Inc. (4014). The Debtors' corporate headquarters is located at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901.

#9278961lv2

## I.      INTRODUCTION

1.      I am the Vice President of Notice Media Solutions at Prime Clerk LLC ("**Prime**

**Clerk**"),[2] the Debtors' court-appointed claims and noticing agent in these chapter 11 cases.  Except

as otherwise noted, this Declaration is based upon my personal knowledge of the matters set forth

herein, my review of relevant documents, information provided to me by Purdue Pharma L.P.

("**PPLP**") (together, with its debtor-affiliates, the "**Debtors**") and their agents and professionals,

including professionals at Davis Polk & Wardwell LLP, and Prime Clerk, and my prior experience

in bankruptcy and class action noticing.  If called and sworn as a witness, I could and would testify

competently thereto.

2.      I submit this Declaration in support of the *Debtors' Motion for Entry of an Order*

*Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, Approving*

*the Proof of Claim Forms, and Approving the Form and Manner of Notice Thereof* (the "**Bar Date**

**Motion**"), filed contemporaneously herewith.  This Declaration describes and details my view

regarding the Debtors' robust procedures for providing notice of the Bar Dates to known and

unknown claimants and parties in interest, including the Supplemental Notice Plan.

3.      I have been working with Prime Clerk and the Debtors on the comprehensive notice

procedures set forth in the Bar Date Motion, including the traditional procedures for providing

notice to all "known" creditors and the multi-faceted Supplemental Notice Plan to provide notice

to "known" and "unknown" claimants of the need to file proofs of claim to assert any claims

against the Debtors' estates, including claims related to Purdue Opioids (the "**Opioid Claimants**"),

all as more fully described below and in the Bar Date Motion.

---

[2] Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Bar Date
Motion (as defined below).

4.          The Debtors' Supplemental Notice Plan is one of the largest legal notice programs ever deployed,[3] reaching an estimated ninety-five (95) percent of all men and women over the age of eighteen (18)[4] with an average frequency of message exposure of six (6) times. Additionally, the Debtors will provide notice in Canada, estimated to reach over eighty (80) percent of all adults over the age of eighteen (18) on average three (3) times.

5.          This Declaration describes in detail the Debtors' Supplemental Notice Plan to be implemented in the United States and in Canada.

6.          The comprehensive Supplemental Notice Plan comprises an extensive advertising campaign utilizing network broadcast and cable television, terrestrial and streaming radio, newspaper, magazine, advanced television, out-of-home advertising, online video, online display, and social media.[5] The scope and selection of media channels and geographical considerations have been guided by careful analysis of multiple data sources providing information concerning all prescription opioid distribution. The total estimated cost of the Supplemental Notice Plan to be implemented in the U.S. and Canada as described herein and in the Bar Date Motion is $23,750,000. Implementation of the Supplemental Notice Plan will commence within twenty-one (21) days of approval and will run for sixty (60) days.

7.          Based on my experience, as set forth below, I believe that the Debtors' notice procedures, and in particular the Supplemental Notice Plan, are broad, multi-faceted, and designed to have the greatest possible reach to all known and unknown claimants and parties in interest,

---

[3] *See infra* ¶ 22.

[4] Approximately 234,000,000 people in the U.S., regardless of age, gender, or socio-economic condition.

[5] There are four types of media: paid (advertising you control and pay for), earned (news content, mentions you earn), shared (user generated social content and social media), and owned (content you generate on a platform you own such as a blog). The Supplemental Notice Plan utilizes paid, earned, owned (through a post on the Debtors' website), and shared media.

3

including those who have been prescribed or may have otherwise consumed opioids possibly manufactured by the Debtors.  Furthermore, the scope of the Debtors' Supplemental Notice Plan budget is appropriate to achieve the optimal reach and frequency for noticing given the extensive geographical, ethnic and socio-economic availability, distribution, and use of opioids.

### III.   NOTICE EXPERTISE AND QUALIFICATIONS

8.      My credentials, expertise, and experience that qualify me to provide an expert opinion and advice regarding notice in these chapter 11 cases include more than 30 years of communications and advertising experience, specifically in the bankruptcy and class action notice context.  My Curriculum Vitae delineating my experience is attached hereto as **Exhibit A**.

9.      I have served as an expert and have been directly responsible for the design and implementation of numerous notice programs, including some of the largest and most complex programs ever implemented in the United States as well as globally in over 140 countries and thirty-seven (37) languages.  I have been recognized by numerous courts in the United States and in Canada[6] as an expert on notification and outreach.

10.     During my career, I have planned and implemented over 1,000 complex notice programs for a wide range of bankruptcy, class action, regulatory, and consumer matters.  I have been recognized as being at the forefront of modern notice practices,[7] and I was one of the first notice experts to integrate digital media[8] and social media into court-approved legal notice programs.

---

[6] *See Bell v. Canadian Imperial Bank of Commerce, et al.*, No. CV-08-359335 (Ont. Super. Ct. of Justice, 2016); *In re Canadian Air Cargo Shipping Class Actions*, No. 50389CP (Ont. Super. Ct. of Justice, Supreme Ct. of B.C. 2011); *Fischer v. IG Inv. Mgmt. LTD.*, No. 06-CV-307599CP (Ont. Super. Ct. of Justice 2010); *In re Canadian Air Cargo Shipping Class Actions* (Que. Super. Ct. 2009); *Frohlinger v. Nortel Networks Corp. et al.*, No.: 02-CL-4605 (Ont. Super. Ct. of Justice 2007).

[7] *See, e.g.*, Deborah R. Hensler et al., *Class Action Dilemmas, Pursuing Public Goals for Private Gain*, RAND (2000).

[8] *See In re La.-Pac. Inner-Seal Siding Litig.*, Nos. 879-JE, 1453-JE (D. Or. 1995).

4

11.    I have significant experience planning and implementing complex court-approved

notice programs in chapter 11 cases, including some of the earliest bankruptcy noticing programs:

- *In re The LTV Corp., et al.*, No. 86-11270 (Bankr. S.D.N.Y. 1986);
- *In re Cont'l Airlines, et al.*, No. 90-932 (Bankr. D. Del. 1990);
- *In re E. Air Lines, Inc.,* No. 89-10448 (Bankr. S.D.N.Y. 1989);
- *In re Pan Am Corp.*, No. 91-10080 (Bankr. S.D.N.Y 1991);
- *In re R.H. Macy & Co., Inc., et al.*, No. 92-40477 (Bankr. S.D.N.Y. 1992);
- *In re Schwinn Bicycle Co., et al.*, No. 92-22474 (Bankr. N.D. Ill. 1992);
- *In re Caldor, Inc. NY, The Caldor Corp., Caldor, Inc. CT, et al.*, No. 95-44080 (Bankr. S.D.N.Y. 1995);
- *In re Harnischfeger Indus.*, No. 99-2171 (Bankr. D. Del. 1999);
- *In re Columbia Gas Transmission Corp.*, No. 91-804 (Bankr. S.D.N.Y. 1991);
- *In re Decora Indus., Inc. & Decora, Inc.*, No. 00-4459 (Bankr. D. Del. 2000).

12.    I have also formulated notice and media plans for some of the largest chapter 11

matters in history:

- *In re PG&E Corp., et al.*, No. 19-30088 (Bankr. N.D. Cal. 2019)
- *In re AMR Corp., et al.*, No. 11-15463 (Bankr. S.D.N.Y. 2011);
- *In re Gen. Motors Corp. et al*, No. 09-50026 (Bankr. S.D.N.Y. 2009);
- *In re United Airlines, Inc.*, No. 02-B-48191 (Bankr. N.D. Ill. 2002);
- *In re Enron Corp.*, No. 01-16034 (Bankr. S.D.N.Y. 2001); and
- *In re Dow Corning*, No. 95-20512 (Bankr. E.D. Mich. 1995).

13.    These are but a few examples of the numerous bankruptcy notice plans that I have

designed and implemented, which are a small sampling of my thousands of notice programs overall.

14.    I am the <u>only</u> notice expert regularly recognized by courts who is accredited in

Public Relations by the Universal Accreditation Board, a program administered by the Public

Relations Society of America.  I have provided testimony before the United States Congress on

5

issues of notice.[9]  I have lectured, published, and been cited extensively on various aspects of legal

noticing, product recall, and crisis communications.  I have served the Consumer Product Safety

Commission ("**CPSC**") as an expert to determine ways in which the CPSC can increase the

effectiveness of its product recall campaigns.  Additionally, I have published and lectured

extensively on various aspects of legal noticing and taught continuing education courses for Jurists

and lawyers alike on best practice methods for providing notice in various contexts.

15.      I worked with the Special Settlement Administrator's team to assist with the

outreach strategy for the historic Auto Airbag Settlement.  *In re Takata Airbag Prods. Liab. Litig.*,

No. 15-MD-2599 (S.D. Fla. 2015).  I was extensively involved as a lead contributing author for

*"Guidelines and Best Practices Implementing 2018 Amendments to Rule 23 Class Action*

*Settlement Provisions"* published by Duke University School of Law.  And, more recently, I have

been involved with New York University School of Law and The Center on Civil Justice assisting

with a class action settlement data analysis and comparative visualization tool called the *Aggregate*

*Litigation Project*, designed to help judges make decisions in aggregate cases on the basis of data

as opposed to anecdotal information.

16.      I am a member of the Board of Directors for the Alliance for Audited Media, which

is the recognized advertising industry leader in cross-media verification with unparalleled

expertise across all brand platforms including web, mobile, email, and print. It was founded in

---

[9] *See, e.g.*, Report on the Activities of the Committee on the Judiciary of the House of Representatives: "Notice"
Provision in the *Pigford v. Glickman* Consent Decree: Hearing Before Subcommittee on the Constitution, 108th
Cong. 2nd Sess. 805 (2004) (statement of Jeanne C. Finegan); *Pigford v. Glickman & U.S. Dep't of Agric.*, 185
F.R.D. 82, 102 (D. D.C. Apr. 14, 1999) (J. Finegan provided live testimony and was cross-examined before
Congress in connection with a proposed consent decree settling a class action suit against the U.S. Department of
Agriculture.  In the court opinion that followed, the Honorable Paul L. Friedman approved the consent decree and
commended the notice program, stating, "The [c]ourt concludes that class members have received more than
adequate notice . . . the timing and breadth of notice of the class settlement was sufficient . . . The parties also
exerted extraordinary efforts to reach class members through a massive advertising campaign in general and African
American targeted publications and television stations.")

6

1914 as the Audit Bureau of Circulations to bring order and transparency to the media industry.
Today, more than 4,000 publishers, advertisers, agencies, and technology vendors depend on their
data-driven insights, technology certification audits, and information services to transact with trust.
Its leadership consists of top performers across each discipline, including directors of ad agencies,
vice presidents of major national brands, and publishers of leading newspapers and magazines.

      17.      I also personally pioneered many "firsts" related to notice and media in the chapter
11 context, from designing and implementing the very first website in the bankruptcy context
(which has since been adopted by the industry as the norm in the modern day) to being the first
notice expert to include and utilize online media in complex restructuring cases. [10]

## IV.    **SUMMARY OF SUPPLEMENTAL NOTICE ELEMENTS IN THE U.S.**

      18.      The objective of the notice procedures is to successfully reach (through objective
quantifiable validation measures)[11] and inform known and unknown claimants of the deadline and
process for filing proofs of claim in these chapter 11 cases.  The notice procedures being
implemented here include actual, written notice to all known claimants using physical mail.  These
claimants will receive via first class mail the Bar Date Package, which includes (a) the Bar Date
Notice and (b) the appropriate proof of claim form and instructions.

      19.      As actual notice may not reach all potential claimants, a supplemental notice
program using various forms of media targeted to unidentified claimants is necessary.  The
Supplemental Notice Plan being implemented in the United States and its territories (collectively,

---

[10] *See In re Jackson Hewitt Tax Serv. Inc., et al.*, No 11-11587 (Bankr. D. Del. 2011).  The *Jackson Hewitt* notice program constituted one of the first large chapter 11 cases to incorporate online advertising, with more than 350 local newspaper and television websites, online display advertising, a website notice linked to a press release, and notice on eight major websites, including CNN and Yahoo.  *See also Foster v. ABTco Siding Litig.*, No. 95-151-M (Cir. Ct. Ala. 2000) (media campaign involving broad national notice through television and print media, regional and local newspapers, and the Internet).

[11] *See infra* ¶ 24 for a discussion of the objective quantifiable validation measures used to develop this Supplemental Notice Plan.

JX-0401.0007            PPLP-0401.0007

A0019

the "**U.S.**") utilizes the following Paid Media channels to reach unknown claimants for which

Direct Notice is not available:

### U.S. SUPPLEMENTAL NOTICE PLAN PAID MEDIA CHANNELS

| | | |
|---|---|---|
| TELEVISION | Broadcast Networks - ABC, NBC, CBS | |
| | Cable TV – e.g., CNN, FOX, HIST, HGTV, Galavision (Spanish Language) | |
| | Advanced Digital TV (OTT) – e.g., Roku, Xbox, PlayStation, Sling | |
| RADIO | Terrestrial Radio - Westwood One, Univision (Spanish Language) | Streaming Radio - Pandora, Spotify |
| PRINT | National Newspapers - WSJ, USA Today, New York Times | Local Newspapers – eleven (11) States |
| | Magazines – Eight (8) Nationally Distributed Titles | |
| ONLINE | Display - Cross Devices: Desktop, Mobile, Tablet | Search - Google and Bing |
| | Video – YouTube | Podcasts |
| SOCIAL MEDIA | Facebook/Instagram | LinkedIn |
| | Twitter | Influencers |
| OUT OF HOME (OOH) | Billboards in select markets[12] | |
| | Movie Theater (e.g., AMC, Regal and Cinemark theaters) in select markets | |
| TERRITORY | Television | Radio |
| | Newspaper | Digital/Social Media |
| TRIBAL | Newspaper | Radio |
| TRADE MEDIA | Insurance Industry | Healthcare Providers |
| | Physicians/Nurses | Treatment/Addiction Centers |
| | Military | Unions |
| COMMUNITY OUTREACH | Tribal Leaders | Law Enforcement |
| | Veterans Communities | Mining Communities |
| | Treatment/Addiction centers | Religious Leaders |
| | Mobile Health Teams | Homeless Shelters/Women's Shelters |
| EARNED MEDIA | General Media, Specialty Beats, Bloggers | Vehicles: Press releases, Tweets |
| CREATIVE & MESSAGING | Multiple languages | Cultural and Demographic |
| | Multiple creatives per target audience | |
| RESPONSE HUBS | Informational website | Live operators/ languages TBD |
| | Toll-free telephone support | |

---

[12] Assets will be posted in high prescription opioid distribution states.

8

V.    **THE DEBTORS' SUPPLEMENTAL NOTICE PLAN IS THOROUGH, INNOVATIVE, AND EFFECTIVE**

20.    <u>Direct Mail</u>.  As set forth in the Bar Date Motion, the Debtors are proposing to serve via first class mail the Bar Date Notice and the applicable proof of claim forms to each known claimant at the claimant's address, if known, or to the attorney of record set forth in the complaints initiating the prepetition actions (or other document or correspondence notifying the Debtors of an intention to commence a prepetition action or otherwise assert a claim against the Debtors).  For the Debtors, known claimants include: (i) persons or entities that have filed proofs of claim as of the Bar Date Order; (ii) all creditors and other known holders of claims (including those listed on the Debtors' Schedules); (iii) all counterparties to the Debtors' executory contracts and unexpired leases; (iv) all current parties to litigation with the Debtors; (v) current, former, and retired employees, officers, and directors; and (vi) parties known to the Debtors as having potential claims against the Debtors.  Parties known to the Debtors as having potential claims against the Debtors include (i) prescribers of Purdue brand name medications; (ii) Purdue Opioid users who are included in an adverse event report or who have filed a product complaint and provided contact information; (iii) callers to Purdue who have threatened but not filed litigation and provided contact information; and (iv) entities and individuals, other than current, former, and retired employees, officers, and directors, that have requested indemnification.

21.    <u>Supplemental Notice Plan</u>.  The Debtors' Supplemental Notice Plan was designed utilizing well-researched methodologies and communication principles accepted by the advertising industry and embraced by courts in the United States for legal noticing.  In formulating the Supplemental Notice Plan, we have employed the best-in-class advertising industry tools and technology to ensure that the Debtors provide due process to all constituents and comply with

9

Bankruptcy Rule 2002.[13]  Based on these methodologies and principles, we are able to measure and report to the Court the reach[14] and frequency[15] to determine the most effective noticing methods, which have been embodied in the Supplemental Notice Plan.

22.    The reach and frequency contemplated by the Debtors' Supplemental Notice Plan is consistent with numerous, high-profile, high stakes bankruptcy and class action cases, including:

### COMPARABLE NOTICE PROGRAMS OF SIMILAR SCOPE

| Case | Reach | Frequency |
|---|---|---|
| *In re PG&E Corp.*, No. 19-30088 | 95% | 8x |
| *In re Takata Airbag Prods. Liab. Litig.*, MDL No. 2599 | 95% | 4x |
| *In re Oil Spill by Oil Rig Deepwater Horizon*, MDL. No. 2179 | 95% | 4x |
| *Cook v. Rockwell Int'l Corp. (Rocky Flats Nuclear Weapons Plant Contamination)*, No. 90-00181 | 96% | 7x |
| *In re W.R. Grace Co.*, No. 01-01139 (Bankr. D. Del.  2006) | 90% | 4x |
| *Babcock & Wilcox Co. et al.*, No. 00-0558 (Bankr. E.D. La. 2002) | 94% | 4x |

---

[13] *See* Fed. R. Bank. P. 2004 (governing notice to creditors and other parties in interest).

[14] Net reach in advertising refers to the total number of persons, expressed as a percentage, with at least one view of an ad, i.e., they have been exposed to the medium at least once. In net reach, each person who has at least one such impression is counted, but they are counted only once, regardless of the number of impressions served to that person.

[15] Frequency is the average number of times a person has the opportunity to see a message. Net reach measures the number of people exposed (unduplicated), and frequency is a report of the number of exposures. In advertising, this is commonly referred to as a "Reach and Frequency" analysis, where "Reach" refers to the estimated percentage of the unduplicated audience exposed to the campaign, and "Frequency" refers to how many times, on average, the target audience had the opportunity to see the message. The calculations are used by advertising and communications firms worldwide and have become a critical element to help provide the basis for determining the adequacy of notice. The primary theoretical justification for effective reach and frequency is the notion of a communication threshold. That is, a certain level of exposure is needed to break into people's awareness and capture their attention to effectively reach them. While early studies suggested that the appropriate number for frequency was three, most experts now agree that the optimal average frequency level is between five (5) to ten (10) times. *See, e.g.*, Gerard Broussard & Jim Dravillas, The "*Magic of Three*" Disputed, iMedia, May 25, 2005, *accessible at* https://www.imediaconnection.com/articles/ported-articles/red-dot-articles/2005/may/the-magic-of-three-disputed/; Karl Siebrecht, *What is Optimal Frequency?*, iMedia, Jan. 21, 2006, *accessible at* https://www.imediaconnection.com/article/138044/what-is-optimal-frequency.

10

| | | |
|---|---|---|
| *In re Air Cargo Shipping Services Antitrust*, No. 06-1775 | 82%[16] | 3x |

## VI.    THE DEBTORS' SUPPLEMENTAL NOTICE PLAN HAS BEEN METICULOUSLY CRAFTED USING PREEMINENT NOTICING STANDARDS

23.       The Supplemental Notice Plan is guided by optimal frequency levels and was prepared using a refined demographic analysis, with the end result being a thoughtful and focused media selection and projected media delivery to appropriately reach the target audience of known claimants and potential claimants.  The estimated cost of the Supplemental Notice Plan to be implemented in the U.S. as described herein and in the Bar Date Motion is $23,000,000.

### A.    SYNDICATED MEDIA RESEARCH DATA

24.       The Debtors' Supplemental Notice Plan was formulated utilizing syndicated media research data provided by GfK Mediamark Research and Intelligence LLC ("MRI") in its GFK MRI Doublebase 2018, [17] online measurement currency comScore, [18] A.C. Nielsen, [19]

---

[16] Average estimated reach and frequency of Business/Cargo purchasers in all 15 tier-one countries.

[17] GfK MRI is a nationally syndicated research tool.  It is the leading supplier of multi-media audience research, and provides comprehensive reports on demographic, lifestyle, product usage, and media exposure.  MRI conducts more than 26,000 personal interviews annually to gather their information and is used by more than 450 advertising agencies as the basis for the majority of media and marketing campaigns.  *See generally* https://mri.gfk.com.

[18] comScore (U.S. and Canada) is a global Internet information provider on which leading companies and advertising agencies rely on for consumer behavior insight and Internet usage data.  comScore maintains a proprietary database of more than 2 million consumers who have given comScore permission to monitor their browsing and transaction behavior, including online and offline purchasing.  This data includes and fuses first-party (website data), second-party (data shared by websites for marketing purposes), and third-party data, tied to offline purchasing behavior.  *See generally* https://www.comscore.com/.

[19] The Nielsen Corporation measures and monitors television and radio audiences and media delivery.  The company measures programming and advertising across all distribution points, including, among others, network television and radio.  Nielsen's ratings are used by advertisers and networks to shape the buying and selling of advertising.  *See generally* https://www.nielsen.com/.

11

Kantar/Standard Rate and Data Service ("SRDS"),[20] Telmar,[21] Strata,[22] Vividata[23] and Cision,[24] among others, which provide data on media consumption habits and audience delivery verification of the potentially affected population.  These data resources are used by advertising agencies nationwide as the basis to select the most appropriate media to reach specific target audiences.

25.    The research reports prepared by these sources were instrumental in our selection of media channels and outlets and determination of the estimated net audience reached through the Debtors' Supplemental Notice Plan.  Specifically, this research identifies which media channels are favored by the target audience (i.e., the potential claimants) by considering browsing behaviors on the internet, the use of social media channels, magazine readership, and television program viewers.

26.    These tools allow us to create target audience characteristics or segments, and then select the most appropriate media communication methods to best reach them.  As a result, the Debtors are applying the most sophisticated and modern media-relevant approach to audience targeting, similar to that used by large brands to select the most appropriate digital and social media platforms to communicate with customers and market products.

---

[20] SRDS is the leading database providing rates and contact data for magazines, digital media, newspapers, television, direct marketing, and out-of-home media.  *See generally* https://next.srds.com/home.

[21] Telmar Group, Inc. analyzes thousands of consumer and media data sets to assess target markets for media performance and to calculate audience reach and frequency.  *See generally* https://www.telmar.com/about-us/.

[22] Freewheel's media buying platform Strata combines targeting and measurement for digital and television inventory. *See generally* https://www.freewheel.com/technology-for-agencies/.

[23] Vividata is a Toronto, Canada based research company that provides impact and marketing data on print media readership in Canada. *See generally* https://vividata.ca.

[24] Cision is a public relations and earned media software company and services provider that provides monitoring services for news mentions, social media discussions, and analysis of media coverage. *See generally* https://www.cision.com/us/.

12

### B.  POPULATION/EPIDEMIOLOGICAL RESEARCH

27.     Importantly, in addition to the media research data, my team and I studied various data sources to ensure that the Debtors' Supplemental Notice Plan is appropriately targeted and optimized.  These sources include:  the U.S. Census Bureau, the Centers for Disease Control (CDC) and Prevention, the U.S. Department of Health and Human Services (HHS) including the Substance Abuse and Mental Health Services Administration (SAMHSA), and the National Institutes of Health (NIH), including the National Institute on Drug Abuse (NIDA).  We also reviewed reporting from the Drug Enforcement Administration (DEA) and Public Health Agency Data of Canada.

28.     These data cumulatively provide information covering the period from 2006-2017, including at a national, regional, state, and county level and regarding both medical and non-medical use of opioids.  They also reflect varying levels of prescription opioid misuse or abuse across different regions, as well as population demographics (including age, gender, ethnicity, and race).  In addition, they indicate an association between socio-economic disadvantages (as measured by variables including education, employment, and income levels) and misuse and abuse of prescription opioids.

29.     Analysis of these data provides the foundation for the scope and media selection to be utilized in the Supplemental Notice Plan.

### C.  APPLICATION OF FINDINGS

30.     The Debtors acknowledge that prescription opioids, including opioids manufactured by the Debtors, have been prescribed and used nationally, across all regions of the country, and across all socio-economic groups and age demographics.  Consequently, quantifying the media delivery against all U.S. adults eighteen (18) years of age and older is central to the

13

effectiveness of media selection for notice in these chapter 11 cases.[25]   Additionally, because

consumers have significant variations in media use across the age clusters, specific consideration

has been given to media performance within certain age clusters.[26]

      **31.**    **Demographics**: The Debtors are casting a wide net nationwide, reaching all adults

who are eighteen (18) years of age and older, while making thoughtful decisions in media selection

based on three demographic clusters: 18-24, 25-44, and 45 and over. The purpose of this division

is to recognize that media use changes with age, income, and education levels.

---

[25] In its Opioid Rx Awareness Campaign, the CDC identified a core, target audience of all adults ages 25-54 for its opioid prevention messaging. Other research reports that younger age groups may be exposed to opioids for reasons other than chronic pain such as sports injury or dental procedures. The flyer, titled "CDC Rx Awareness Campaign Overview," associated with the CDC's campaign is accessible at https://www.cdc.gov/rxawareness/pdf/RxAwareness-Campaign-Overview-508.pdf ("CDC's *Rx Awareness* campaign focuses on adults ages 25-54 who have taken opioids at least once for medical or nonmedical use."). Because the Debtors' opioid medicines have been FDA-approved for use in all adults 18 years and older and because data sources reflect both medical and non-medical use in persons younger than 24, we are incorporating a broader population of adults eighteen (18) years of age and older to include all groups potentially exposed. While the notice campaign does not directly target persons under the age of eighteen that population will nevertheless be exposed to the notice provided under this plan, as will their parents.
[26] MRI's *Survey of the American Consumer®* (Gfk Mediamark Research and Intelligence LLC Doublebase 2018) is the industry standard for magazine audience ratings in the U.S. and is used in the majority of media and marketing agencies in the country. MRI provides comprehensive reports on demographics, lifestyle, product usages, and media exposure. *See generally* https://mri.gfk.com/solutions/the-survey-of-the-american-consumerr/the-survey-of-the-american-consumerr/.

A0026

**MEDIA USE BY AGE GROUP**

| Medium | Age 18 – 24 | Age 25 – 44 | Age 45+ |
|---|---|---|---|
| **TRADITIONAL MEDIA** | | | |
| Read Newspapers | | | √√√ |
| Broadcast Television | √ | √√√ | √√√ |
| Cable Television | √ | √√ | √√√ |
| Read Magazines | √ | √√ | √√√ |
| Listen to Terrestrial Radio | √√√ | √√√ | √√ |
| **NEW MEDIA** | | | |
| Use the Internet | √√√ | √√√ | √ |
| Use a Mobile Device/App | √√√ | √√√ | √ |
| Social Networking | √√√ | √√√ | √ |
| Watch Online/Steaming Video | √√√ | √√√ | |
| Use OTT Devices | √√ | √√√ | |
| Use Streaming Radio | √√ | √√ | |

32.     Based on media use data, it is clear that the Debtors' Supplemental Notice Plan is appropriately employing a mix of traditional, online, social and mobile media channels, and earned media outreach, to effectively reach claimants of all age demographics and ethnicities who have been prescribed or otherwise used opioids.

33.     Further, the Supplemental Notice Plan includes noticing efforts aimed at demographic groups whom the data indicate have experienced higher rates of prescription opioid misuse and abuse.

34.     **Geography**:  In addition to the need for a nationwide notice plan, data reflects – and the Supplemental Notice Plan takes into account – regional differences in opioid misuse and abuse.

15

35.     Based on the combined research described above, the Debtors' Supplemental
Notice Plan includes increased media efforts in 17 states[27] through hyper-local channels, including
out of home advertising and local newspaper advertising.

| NEWSPAPER, MOVIE THEATERS & BILLBOARDS | |
| --- | --- |
| West Virginia | Tennessee |
| Kentucky | Alabama |
| NEWSPAPER & MOVIE THEATERS | |
| Arkansas | Ohio |
| Mississippi | New Hampshire |
| Oklahoma | Pennsylvania |
| Louisiana | |
| SELECT MOVIE THEATERS | |
| Nevada | Utah |
| Oregon | New Mexico |
| Washington | California |

36.     **Language:** The Supplemental Notice Plan also takes into consideration media
targeted at specific ethnic populations and will include consideration for populations across the
nation with notice primarily in English and Spanish.  According to MRI, approximately ninety (90)
percent of U.S. adults speak English most often at home and nine (9) percent speak Spanish most
often at home.  When looking at the highest-affected opioid states, over ninety-five (95) percent

---

[27] The use of hyper-local media is guided by CDC data identifying states and counties with the highest prescription opioid distribution.  The four states with the highest prescription opioid distribution rates are West Virginia, Kentucky, Alabama, and Tennessee.  As a result, the Supplemental Notice Plan contemplates a greater use of local newspapers and out of home advertising including billboards and theaters as compared to other states.  The next highest prescription opioid distribution rates arise in Arkansas, Louisiana, Mississippi, New Hampshire, Ohio, Oklahoma, and Pennsylvania.  The Supplemental Notice Plan will utilize newspapers and theater out of home advertising in the counties with the highest prescription opioid distribution.  The third highest prescription opioid distribution rates occur in California, Nevada, New Mexico, Oregon, Utah and Washington.  In these states, theater out of home advertising will be employed in the counties with the highest prescription opioid distribution.

16

of adults in West Virginia primarily speak English at home, nearly 100 percent in Tennessee, ninety-nine (99) percent in Kentucky and nearly 100 percent in Alabama. Media may run in additional languages as required by the editorial of selected publications.

## VII.   PAID MEDIA CHANNELS

37.     To achieve the optimal reach and frequency, the Supplemental Notice Plan contemplates the use of five categories of paid media outlets[28]: (i) television, (ii) radio, (iii) out of home, (iv) print, (v) social media, and (vi) online:

**PAID MEDIA SCOPE**

| MEDIA CHANNEL | IMPRESSIONS |
|---|---|
| BROADCAST TV | 525,000,000 |
| CABLE TV | 245,000,000 |
| RADIO (NETWORK) | 210,000,000 |
| DISPLAY | 200,000,000 |
| SOCIAL | 585,000,000 |
| MAGAZINES | 120,000,000 |
| NEWSPAPERS | 4,000,000 |
| OUT OF HOME | 44,000,000 |

### A.   TELEVISION

38.     **Network Broadcast Television.** According to A.C. Nielsen's National Television Household Universe Estimates, there are 120 million TV homes in the U.S. for the 2019-2020 TV

---

[28] Actual media selections, including newspapers, radio stations, magazines, and trade publications, may vary based on availability and negotiations at the time of media buy.

17

season.[29]   The broadcast networks capture a majority of these homes, with over 82 percent of homes watching CBS, 79 percent watching ABC, and 74 percent watching NBC.[30]

39.      The Supplemental Notice Plan contemplates :30-second commercials that will air across ABC, NBC, and CBS networks.  The commercials will air across multiple dayparts,[31] including early morning, daytime, early news, fringe, prime, and late-night, to reach potential Opioid Claimants with differing viewing habits.  An estimated total of approximately 41,000 network television commercials are planned to air. The specific programs selected are based on research provided by A.C. Nielsen for their reach among the target audiences described above.

40.      **Cable and OTT.**  Commercials also will air across multiple nationwide cable television networks, including CNN, Fox News, History, HGTV, and Galavision (Spanish).  See **Exhibit B** hereto for a list of the proposed national cable channels, which have the broadest reach among the U.S. cable viewing population.  An estimated total of approximately 82,000 cable television commercials are planned to air. The Debtors' Supplemental Notice Plan will also use digital Over the Top Television ("**OTT**") video ads.[32]

---

[29] *See 2019-2020 Advance National TV Household Universe Estimates*, the Nielsen Company, May 7, 2019, *accessible at* https://www.truthindata.tv/sites/default/files/2019-05/2019-2020%2BNielsen%2BAdvance%2BNational%2BTV%2BUniverse%2BEstimates%2BPresentation.pdf.

[30] *See Broadcast TV Maintains Media Dominance*, MediaPost, May 18, 2017, *accessible at* https://www.mediapost.com/publications/article/301434/broadcast-tv-maintains-media-dominance.html.

[31] A "daypart" is a term traditionally used when buying television but is also used for radio.  It is a block of time that divides the day into segments for purchase, scheduling, and delivery.  The dayparting method is often used to tailor content to specific audiences throughout the day, e.g., early morning is 5 a.m. to 9 a.m.; daytime is 9 a.m. to 4 p.m.; early fringe is 4 p.m. to 6 p.m.; evening news is 6 p.m. to 7 p.m.; prime time is 8 p.m. to 10 p.m. and late is 11:30 p.m. to 2 a.m.

[32] "Over the Top Television" refers to film and television content provided via a high-speed Internet connection rather than a cable or satellite provider.  Viewers are often referred to as "cord-cutters."  OTT encompasses services such as Netflix, Amazon, iTunes, and HBO Now.

18

   **B.    RADIO**

   41.    Network radio is highly useful for reaching the target of the Supplemental Notice

Plan.  According to Nielsen Audio, an average of ninety-two (92) percent of all U.S. radio listeners

eighteen (18) years of age and older tune into a network-affiliated radio station every week.[33]

Radio can provide nationwide reach across various listening formats to appropriately reach

discrete target audience subgroups across age, gender, ethnicity, and cultural affiliation.  There are

two primary formats of radio—terrestrial and streaming.  Here, a combination of both terrestrial

radio and streaming radio will be employed through national radio networks.[34]  The terrestrial

radio networks are carried by local radio stations throughout the country.  The Westwood One

Radio Network reaches  209 U.S. media markets through 425 owned-and-operated[35] radio stations

and more than 4,000 affiliate stations.  Univision Radio is the top Hispanic radio network, carried

in 74 markets through 226 stations.  Each radio network carries a variety of radio formats, e.g.,

Country, Adult Contemporary, Spanish, Native American, Rhythm, Hip-hop, etc.

   42.    **Terrestrial Radio.**  Terrestrial radio is a highly effective medium to amplify target

audience reach and to generate frequency of message delivery.  Typically, terrestrial radio time

will be purchased in :30-second or :60-second increments.  While television combines two forms

of communication, audio and video—which allows more information to be conveyed in a shorter

---

[33] *See Audio Today 2018 – A Focus on Network Radio*, at 2, the Nielsen Company, June 2018, *accessible at* https://www.nielsen.com/wp-content/uploads/sites/3/2019/04/audio-today-a-focus-on-network-radio.pdf.

[34] A radio broadcasting network is a collection of radio stations that air programming from a unified source.  Radio networks may have nationwide reach and include multiple, various formats including Country, Adult Contemporary, Rock, Rhythm, News/Talk, and Oldies, among others.  Under Federal Communication Commission ("FCC") rules, between twelve (12) to eighteen (18) minutes of advertising inventory may be sold each hour.  That inventory is allocated into either local commercial time or national commercial time.  Local commercials are inserted independently by each station.  National commercials air across the entire network collection.

[35] In the broadcasting industry, an "owned-and-operated" station usually refers to a television or radio station that is owned by the network with which it is associated.  This distinguishes such a station from an affiliate, which is independently owned and carries network programming by contract.

19

amount of time—radio utilizes only audio and requires more time to convey detailed information. Therefore, we are planning to primarily use :60-second commercials for radio.

43.     The Supplemental Notice Plan contemplates that the audio ads will air on English and Spanish radio stations carefully selected using Nielsen Audio ranker reports identifying the stations with the most significant reach and popular formats against the Supplemental Notice Plan's target audience.  Approximately 146,000 terrestrial radio commercials will air.  Attached as **Exhibit B** is a summary of radio networks.

44.     In addition to the above, in view of the research showing heightened opioid use among Native Americans, we will air ads on Native Voice One ("**NV1**").  NV1 distributed programs are carried by over 180 affiliates, from reservation and village-based stations to top-market urban radio stations throughout the United States and Canada.  NV1 also offers a twenty-four-hour webstream with access to unique programming with an Indigenous perspective.[36]

45.     **Streaming Radio.** Streaming audio ads (digital radio played via an internet connection) will run on Pandora and/or Spotify with :15-second or :30-second ads[37] accompanied, commonly, by a digital banner ad.  The digital banner ads will appear while the audio spot is playing and allow a user to click on the banner and be directed to the dedicated case website. Approximately 15 million streaming audio impressions are planned.

### C.     SOCIAL MEDIA

46.     Numerous research studies report that young adults are some of the largest abusers of prescription opioids.[38]  The age group with the greatest past-year non-medical use of opioids is

---

[36] *See* Native Voice One, Native American Radio Network, *accessible at* https://www.nv1.org/about/

[37] Streaming radio ads are only offered in :15 and :30-second intervals.

[38] In 2014, the nonmedical use of prescription drugs was highest among young adults.  Last year, nonmedical use of regulated drugs by age group was as follows: (i) six (6) percent of persons age twelve (12) to seventeen (17); (ii) twelve (12) percent of persons age eighteen (18) to twenty-five (25); and (iii) five (5) percent of persons age twenty-

20

young adults aged eighteen (18) to twenty-five (25), yet the greatest use (i.e., exposure) of prescription opioids is among adults aged twenty-six (26) and older.[39]

47.     Social media is particularly useful in reaching younger audiences. According to MRI, ninety-six (96) percent of adults aged eighteen (18) to twenty-four (24) and ninety-two (92) percent of adults aged twenty-five (25) to forty-four (44) use social media.[40]  The Debtor's Supplemental Notice Plan is estimated to serve over 600 million impressions on Facebook, Instagram, Twitter, LinkedIn, and YouTube. Over 9,000 audience targeting resources have been identified in the following categories:

| **Homeless Organizations** | **Coal Miners** |
|---|---|
| 210 Pages & Groups | 298 Pages & Groups |
| **Recovery Rehabilitation** | **Veterans** |
| 395 Pages, Groups & Profiles | 2,092 Pages & Groups |
| **Treatment Programs** | **Medical Doctor** |
| 366 Pages, Groups & Profiles | 527 Pages, Groups & Profiles |
| **Native American Related** | **Hispanic** |
| 506 Pages & Groups | 506 Pages & Groups |
| **Pharmacy** | **Awareness** |
| 3,227 Pages & Location Pages | 977 Pages, Groups & Profiles |

48.     Facebook and Instagram Pages are public profiles created for community groups, causes, and other organizations. Facebook Groups are for people who share common interests.  On Facebook and Instagram, we will serve ads to people nationwide with varying creative tactics aimed to appeal to different demographics.  We will also target fans of specialized pages and

---

six (26) and older. *See Abuse of Prescription (Rx) Drugs Affects Young Adults Most*, National Institute on Drug Abuse, Feb. 2016, *accessible at* https://www.drugabuse.gov/related-topics/trends-statistics/infographics/abuse-prescription-rx-drugs-affects-young-adults-most.

[39] *See Pain Management and the Opioid Epidemic: Balancing Societal and Individual Benefits and Risks of Prescription Opioid Use*, National Academies of Sciences, Engineering, and Medicine; Health and Medicine Division; Board on Health Sciences Policy; Committee on Pain Management and Regulatory Strategies to Address Prescription Opioid Abuse, Jul. 13, 2017, *accessible at* https://www.ncbi.nlm.nih.gov/books/NBK458661/.

[40] *See* GfK Mediamark Research and Intelligence LLC 2018 Doublebase Survey.

groups that relate to opioid abuse such as addiction centers, recovery groups, specialized doctors, and national organizations.

## FACEBOOK TARGETING - EXAMPLE RESOURCES

| Type | Resources | Fans |
|---|---|---|
| Facebook Page | Ryan Hampton | 132,818 |
| Facebook Group | Voices to End Addiction & Inspire Recovery | 13,725 |
| Facebook Page | A Forever Recovery \| Drug Rehab Center | 34,974 |
| Facebook Page | Above the Influence | 1,469,407 |
| Facebook Page | Addiction Recovery Support | 2,979 |
| Facebook Group | Addiction Recovery Support Group | 78,947 |
| Facebook Page | Alcohol and Drug Addiction Recovery | 14,303 |
| Facebook Page | Beating Addiction | 21,719 |
| Facebook Page | Breaking Free from Addiction | 23,057 |
| Facebook Page | Daily Recovery quotes | 25,877 |
| Facebook Page | Dr. Mehmet Oz | 5,982,866 |
| Facebook Page | Dr. Phil | 4,706,095 |
| Facebook Page | Elite Rehab Placement | 52,570 |
| Facebook Page | Faces & Voices of Recovery | 26,577 |
| Facebook Page | Hugs Not Drugs | 1,566,979 |
| Facebook Group | Narcotics Anonymous Recovery Forum | 104,612 |
| Facebook Group | Narcotics Anonymous Recovery Group | 73,163 |
| Facebook Page | National Institute of Mental Health | 290,939 |
| Facebook Page | Opens Hearts Project for Opioid Awareness | 490 |
| Facebook Page | Partnership for Drug-Free Kids | 47,349 |
| Facebook Page | Recovery and Addiction | 24,094 |
| Facebook Page | Recovery Month | 52,472 |
| Facebook Page | Recovery Road | 165,063 |
| Facebook Page | Recovery Support Network | 922 |
| Facebook Page | Recovery Unplugged | 99,549 |
| Facebook Page | Recovery Ways | 6,458 |
| Facebook Page | Rehab Center | 63,238 |
| Facebook Page | Renew Magazine | 6,608 |
| Facebook Page | SAMHSA | 89,789 |
| Facebook Page | Steps to Recovery | 83,964 |
| Facebook Page | The Academy for Addiction Professionals | 3,533 |
| Facebook Page | The Addict's Mom Public Page | 98,320 |
| Facebook Page | The Crisis Next Door | 5,197 |
| Facebook Page | The Doctor's Channel | 98,168 |
| Facebook Page | The Fix | 127,558 |

22

| Facebook Page | The National Institute on Drug Abuse – NIDA | 139,234 |
| Facebook Page | United Recovery Project | 27,292 |
| Facebook Page | Wavelengths Recovery | 6,120 |

49.     On Twitter, we will target people who have "tweeted" (i.e., posted) about opioid
addiction by using hashtags including, among others, *#recoverymovement*, *#PurduePharma*,
*#opioids*, *#opioidcrisis*, *#abuse*, *#rehab*, *#recovery*, *#pain*, *#addictiontreatment*, *#oxycontin*,
*#butrans*, and *#hysingla*, among others.[41]  Twitter users put hashtags in their tweets to categorize
them in a way that makes it easy for other users to find and follow tweets about a specific topic.
We will also target followers of pages that relate to opioids such as addiction centers, recovery
groups, specialized doctors, and national organizations.  A sample list of resources is below:

### TWITTER TARGETING - EXAMPLE RESOURCES

| Type | Resources | Fans |
| --- | --- | --- |
| Twitter Profile | Above the Influence | 1,266 |
| Twitter Profile | Allied Against Opioid Abuse | 1,479 |
| Twitter Profile | American Medical Association (AMA) | 684,195 |
| Twitter Profile | CDC | 1,243,219 |
| Twitter Profile | Doctors Channel | 9,982 |
| Twitter Profile | Dr. Mehmet Oz | 1,400,200 |
| Twitter Profile | Dr. Phil | 1,500,000 |
| Twitter Profile | Faculty of Medicine | 21,100 |
| Twitter Profile | FDA | 252,491 |
| Twitter Profile | Health Care Gov | 228,189 |
| Twitter Profile | National Institute of Mental Health | 1,200,000 |
| Twitter Profile | Purdue Pharma L.P. | 2,736 |
| Twitter Profile | The National Institute on Drug Abuse – NIDA | 48,100 |

---

[41] Additional hashtags likely will be used during the course of the Supplemental Notice Plan.

23

| Twitter Profile | The United States Department of Justice | 1,623,039 |
|---|---|---|
| Twitter Profile | U.S. Department of Health and Human Services | 773,494 |
| Twitter Profile | World Health Organization (WHO) | 4,929,384 |

50.     LinkedIn is a social network for professionals.  Here, we plan to target individuals that work in the field of addiction treatment, medical professionals, nurses, homeless shelters, and more.

### D.   ONLINE NOTICE (NON-SOCIAL MEDIA)

51.     While traditional media[42] is typically purchased based on both demographic (i.e., age, gender, ethnicity, income, education) and psychographic (i.e., lifestyle, product and brand preference, media usage, and media definition) characteristics, online media such as Internet and mobile may be purchased through more granular target audience characteristics.

52.     **Banner Ads**.  The Supplemental Notice Plan's online noticing efforts will feature banner ads in English and Spanish using a variety of tactics to ensure quality placements.  Varying creative styles will be used to appeal to people of different demographics based on research data relating to online usage by the Supplemental Notice Plan's target audience.  We will run ads across a whitelist[43] of comScore top-rated websites, national and local news websites, Spanish language sites, and numerous others, and we will retarget users who visit the website with additional notice reminders to take action.

---

[42] Traditional media is a reference to pre-internet media: magazine, newspaper, terrestrial radio, and broadcast and cable television.

[43] A whitelist is a custom list of acceptable websites where ad content may be served.  This way we can control the quality of advertising inventory that is served on the creditors.  The creation of a whitelist helps to ensure that our ads are targeted to real websites where actual (human) creditors are likely to visit, rather than serving ads to websites and fraudsters who are attempting to fraudulently earn advertising revenue from the campaign, and thereby depriving actual creditors of their due process rights to see the Notice.  Further, the whitelist helps to ensure that ads will not appear next to offensive or objectionable content.  Our whitelist is actively maintained during the campaign with site-level reporting of brand safety, which allows culling of improper or suspicious activity on websites.  Further, as a measure of privacy, all ads feature AdChoices Icons whenever available.

24

53.     Moreover, online display ads will be aired across multiple devices including desktop, tablet, and mobile devices.  Multiple layers of ad fraud detection are used to reduce the risk of appearing on spoofed, fake, or offensive websites with counterfeit ad fraud inventory and fake audience profiles.

54.     The online ads will provide information for visitors to self-identify as potential Opioid Claimants, where they may "click" on the banner and then link directly to a website containing information regarding the Bar Date and submission of proofs of claim with a further link to the Case Website for more information regarding the important deadlines and documents, including downloadable copies of the Opioid Proof of Claim Forms, and where they may submit their completed forms.

55.     In addition to the above-targeted banner placement, online banner ads will run on Native American and Alaskan Native focused websites, where available.  For instance, Powwows.com reaches Native American consumers, researchers, teachers, students, service groups, and civic organizers.  Powwows.com has an online reach of over 471,000 users monthly and is the nation's leading media resource for Native Americans.  Powwow's Native American social media pages have also become a highly interactive platform for sharing and celebrating Native American culture.  The Facebook page has over 427,000 Fans, the Instagram page has over 26,500 users, and the Twitter page has 6,656 users that we will target with this campaign.

56.     **Internet Search Terms**.  The Supplemental Notice Plan will employ both Google and Bing keyword search terms.  According to MRI Doublebase 2018, ninety-one (91) percent of search engine users have used Google or Bing in any 30-day period.[44]  When users search for target phrases and keywords identified for this Supplemental Notice Plan on the search engines, links

---

[44] *See* GfK Mediamark Research and Intelligence LLC 2018 Doublebase Survey.

will appear on the search result pages.  Representative key terms will include but are not limited to topics including Purdue Pharma bankruptcy, opioids, drug treatment, drug overdose, drug addiction, addiction therapy, treatment centers, among others.

57.  **YouTube Video**. According to Statista, ninety-six (96) percent of eighteen (18) to twenty-four (24)-year-old American internet users use YouTube, reaching more people in that age demographic than any TV network.[45]  Therefore, the Debtors' Supplemental Notice Plan will target this audience by, among other things, posting video ads on this platform.

E.  **PRINT – MAGAZINE NATIONWIDE**

58.  MRI reports that almost 71 percent of the U.S. population over the age of eighteen (18) reads magazines.  Magazine notice (ads) will contain no more than 650 words and will be written as a summary of the Bar Date Notice in plain and concise English, with a Spanish sub-headline to direct Spanish-speaking claimants to the website for more information in Spanish.  The magazines to be used in the Supplemental Notice Plan were selected based on MRI data reporting their reach against these target audiences.  Importantly, they were also selected for their index,[46] or the qualitative measure indicating that readers are highly engaged with these titles.

59.  The magazine notices will be published in eight (8) magazines as follows:

- ▪ *People Magazine* is a general circulation magazine reporting on entertainment.  A plain language summary notice will be <u>published once</u> as a one-half page ad in the national edition of this magazine.  *People Magazine* reports a circulation of 3,031,000.

---

[45] *See* Paige Cooper, *22 YouTube Stats that Matter to Marketers in 2019*, Hootsuite (Jan. 22, 2019), https://blog.hootsuite.com/youtube-stats-marketers/.

[46] An index is a media metric that describes a target audience's inclination to use a given outlet.  An index over 100 suggests a target population's inclination to use a medium to a greater degree than the rest of the population.  For example, an index of 157 would mean that the target is fifty-seven (57) percent more likely than the rest of the population to use a medium.

JX-0401.0026                                                          PPLP-0401.0026
A0038

- **Sports Illustrated** reports on the world of sports through in-depth articles, photography, and stories. A plain language summary notice will be <u>published once</u> as a one-half page ad in this magazine. *Sports Illustrated*'s circulation is 2,715,000.

- **People En Espanol** delivers celebrity access, beauty, and fashion coverage and human-interest stories that celebrate Hispanic culture. A plain language summary notice will be <u>published once</u> as a one-half page ad in the national edition of this magazine. *People En Espanol* reports a circulation of 507,000.

- **National Geographic** is the flagship magazine of the National Geographic Society. Editorial coverages encompass people and places of the world, with an emphasis on human involvement in a changing universe. A plain language summary notice will be <u>published once</u> as a one-full page ad in the national edition of this magazine. *National Geographic*'s circulation is 2,252,000.

- **Men's Health** is a lifestyle magazine that aims to show men the practical and positive actions that make their lives better. A plain language summary notice will be <u>published once</u> as a one-half page ad in the national edition of this magazine. *Men's Health* reports a circulation of 1,731,000.

- **Good Housekeeping** focuses on food, fashion, relationships, home decorating and home care, health and childcare, and consumer and social issues. A plain language summary notice will be <u>published once</u> as a one-half page ad in the national edition of this magazine. *Good Housekeeping* reports a circulation of 4,101,000.

- **Parents** helps parents navigate parenting and make decisions for their families. A plain language summary notice will be <u>published once</u> as a one-half page ad in the national edition of this magazine. *Parents* reports a circulation of 2,216,000.

- **Parents Latina** covers topics of interest to parents, such as health, education, and nutrition, from a Latino perspective. A plain language summary notice will be <u>published once</u> as a one-half page ad in the national edition of this magazine. *Parents Latina* reports a circulation of 850,000.

60.     In addition to the eight (8) magazines identified above, trade magazines will be used to notify people in select industries who interact with affected populations. A total of fifteen (15) industry specific trade magazines have been selected in associated industries such as Health Insurance Industry, Physician/Nurses, Military, Addiction Abuse Treatment Centers/Pain

27

Management, and Coal Mining. A plain and concise summary notice of no more than 650 words

will be published one time as a full-page ad in each of the following publications:

## SELECTED TRADE PUBLICATIONS

| TRADE PUBLICATION | DESCRIPTION | CIRCULATION |
|---|---|---|
| Modern Healthcare | The only weekly magazine that covers the latest in national and local healthcare news. Circulation in hospitals, medical clinics, payers, nursing homes, and hospices | 71,444 |
| JAMA (Journal of the American Medical Association) | Peer-reviewed medical journal published 48 times/year. Received by physicians in 222 specialties | 286,953 |
| American Nurse Today | The official journal of the American Nurses Association. Published 10 times/year | 102,000 |
| Nurse practitioner | Monthly source of information for practice nurses and other primary care clinicians | 75,000 |
| Journal of American Academy of Physicians Assistants | Official monthly award-winning journal of the American Academy of Pas | 62,500 |
| Military Times | Military Times is a print and digital publication consisting of Army Times, Navy Times, Air Force Times, and Marine Corps Times. It is a source for military news and information for service members. | 203,727 |
| Army Magazine | Monthly Magazine of the Association of the United States Army | 100,000 |
| Counselor | The Magazine for Addiction & Behavioral Health Professionals. Published 6 times/year | 23,120 |
| Journal of Pain and Symptoms Management | Monthly publication with readership among pain and palliative care professionals | 17,703 |
| Pain Medicine News | The most widely read trade pain publication in the US. Published 10 times/year | 46,760 |
| Advances in Addiction and Recovery | Quarterly publication of NAADAC. Provides information and trends to addiction counselors, educators, and other addiction focused professionals | 19,339 |
| Journal of Addiction Medicine | The official journal of the American Society of Addiction Medicine. Published 6 times/year | 15,242 |
| Journal of Opioid Management | A peer-reviewed journal that deals with opioids as a class of drug. Covering basic science, research, clinical applications, pain management, abuse and compliance. | 23,300 |

28

| | | |
|---|---|---|
| *Social Work Today* | ACA's monthly magazine, which covers hard news, in depth coverage of major issues, and information about new products and services related to counseling. Including legislative and governmental issues affecting counselors. | 54,000 |
| *Coal Age* | The magazine for professionals in the coal mining and processing industries. | 14,599 |

### F.    NEWSPAPERS

61.    **National Newspapers.** The Supplemental Notice Plan will include three (3) nationally circulated newspapers. The full Bar Date Notice will be published one time in the largest nationally circulated newspapers: *USA Today*, *The Wall Street Journal*, and *The New York Times* as follows:

- *The Wall Street Journal*. The full Bar Date Notice will be published once in the *Wall Street Journal's* national edition. *The Wall Street Journal's* circulation is 1,005,000.

- *USA Today*. The full Bar Date Notice will be published once in *USA Today*. *USA Today's* circulation is 1,541,000.

- *The New York Times*. The full Bar Date Notice will be published once in *The New York Times* national edition. *The New York Times* circulation is 507,000.

62.    **Local Newspapers.** A summary of the Bar Date Notice will be published in approximately 80 local newspapers in eleven (11) states, which papers and states have been chosen based on the demographic and geographic research discussed above. The summary Bar Date Notice will be an abbreviated, plain language version of the full Bar Date Notice published in the nationally distributed newspapers. It will be approximately 650 words in length and written in plain and concise language. Attached as **Exhibit C** is a list of the local newspapers in which the summary notices will be published.

63.    Further, as discussed above, research shows concentrated use of opioids among the Native American population. For this reason, numerous local print publications such as

29

newspapers as well as nationally circulated titles will be used to reach Native American populations. A list of the Native American newspapers to be used in the Supplemental Notice Plan is included as **Exhibit D**.

### G. OUT OF HOME (HYPER-LOCAL)

64.   **Billboards.** Out of home advertising such as billboards are a hyper-localized form of advertising. Only people within visual proximity and who are physically at those locations are able to see these advertisements. Billboards deliver maximum exposure to traffic on expressways, highways, and primary arteries and are highly visible due to their large size. Digital billboards are electronic displays that rotate in a slide show fashion every six (6) to eight (8) seconds and are located on highways, major arteries, and city streets. A minimum of sixty (60) static and digital billboards will be posted along major interstates, highways, and other highly traveled areas for at least four (4) weeks in the highest opioid-affected states of West Virginia, Kentucky, Tennessee, and Alabama to ensure multiple opportunities for exposure.

65.   **Movie Theater**. In addition to billboards, :30-second video ads will run in movie theaters for at least four (4) weeks during the previews of films in over 300 AMC, Cinemark, and Regal movie theaters across the seventeen (17) states identified above as having relatively greater levels of opioid use. Cinema ads typically receive higher recall scores than other traditional media as they are played in an unskippable format to a captive audience on giant, hard-to-miss screens. Nielsen reports pre-show cinema ads have a recall of seventy-six (76) percent.[47]  In certain states with specific pockets of opioid-affected areas, ads will run in movie theaters in those areas rather than statewide.[48]

---

[47] *See* NCM Intercept Tests (Jan '13-Jan '16) Nielsen, Market Force, eWorks.

[48] Ads will run in movie theaters in certain counties within (Northern) California, Oregon, Nevada, Washington, Utah, and New Mexico.

JX-0401.0030                                                      PPLP-0401.0030

A0042

### H. OUTREACH

66.    **U.S. Territories Outreach.**  The Supplemental Notice Plan also includes outreach in the U.S. Territories of Guam, U.S. Virgin Islands, Marianas, American Samoa, and Puerto Rico. Notice in the territories will include a combination of local newspaper, digital outreach, and television and radio (where available).  Additionally, press releases will be distributed to news outlets (broadcast, newspaper, and radio stations) in the territories.  A list of the territorial news media is included as **Exhibit E**.

67.    **Additional Outreach.**  In addition to the media outlets described above, the Supplemental Notice Plan employs public relations, dedicated websites, and toll-free numbers, each of which are thoughtfully designed to achieve the greatest reach among the target audiences.

### I. PUBLIC RELATIONS

68.    **Earned Media.**  The Debtors will issue multiple press releases across various newslines. These include PR Newswire, US1 plus Hispanic, PR Newswire newslines to the U.S. Territories, and the Native American/First Nations newsline.

69.    **Media Outreach.**  To supplement press release distribution, we will directly contact a strategically developed comprehensive list of media outlets, reporters, and editors. Media outlets range from national broadcast networks, cable networks, radio networks, national and local publications, blogs, online outlets, among others.  In addition, we will directly contact reporters who have shown an interest in the opioid crisis, opioid litigation, substance abuse, and similar topics. The list has over 1,900 outlets and contacts. A summary of the number of contacts by category is available as **Exhibit F.**

70.    **Community Outreach.**  The Supplemental Notice Plan includes outreach to third-party organizations that may help expand awareness of the Bar Date and claims process.  We will

31

send a one-page notice to appropriate contacts to post or provide the notice to their members, patients, or customers. The 8.5 x 11 notice will be printed in full-color on the front and back, and will describe in plain-language how claimants can file a proof of claim and where they may obtain additional information about the Bar Date.

71.      Further, we plan to take a boots-on-the-ground approach to enhance the notice of the Bar Date, by attending various community events. At these events, information including the summary notice, full bar date notice and other materials will be made available to attendees.

72.      A sample of the organizations include, among numerous others:

| ORGANIZATIONS |
| --- |
| Community Leaders |
| Veteran's Organizations |
| Mining Organizations and Trade Unions |
| Health and Addiction Centers |
| Mobile Health Teams in 14 states |
| Addition/Rehab Centers, including among others:<br>Alcoholics Anonymous, Narcotics Anonymous and SMART Recovery |
| Pharmacies and Institutions that received Purdue Opioids |

73.      The community outreach element of the Debtors' plan will also include distribution of the one-page notice to all prescribers of Purdue brand name medications, to be posted or provided to their patients.

74.      **Influencers.** In addition to the efforts detailed above, we will engage the help of influencers to post and share information about the Bar Date on their social media platforms such as Instagram, Facebook and Twitter as well as on popular podcasts and blogs. We also will identify key influencers who have been personally affected, either directly or indirectly, by opioid misuse and abuse and encourage them to post appropriate content related to the matter.

32

## VIII.   CANADIAN SUPPLEMENTAL NOTICING EFFORTS

75.     The Debtors' Supplemental Notice Plan will implement a robust outreach effort in Canada with an estimated reach of over eighty (80) percent of the population over the age of eighteen (18), or approximately 23.4 million people out of the total Canadian adult population of approximately twenty-nine (29) million, with an estimated frequency of three (3) times.   The estimated cost of the Supplemental Notice Plan in Canada as described herein and in the Bar Date Motion is $750,000.

76.     Consistent with the research conducted relating to U.S. prescription opioid use, Prime Clerk also reviewed prescription opioid data from Canadian sources including the Canadian Institutes for Health Information. According to Vividata, Canadians are heavy consumers of print and online media.  Vividata reports that eighty-five (85) percent of Canadian adults read/access magazine or news brands weekly via print or digital platforms.  The Canadian Internet Registration Authority (CIRA) reports that seventy-four (74) percent of Canadians spend at least three-to-four hours online per day.   Canadians are also heavy users of social platforms such as Facebook. According to Canadian's Internet,[49] "[n]o matter the age, education level, employment status, income or gender, at least 75% of online Canadians use Facebook and at least 69% visit the network once per month or more."

77.     Taking into account the foregoing, to accomplish effective outreach in Canada, the Supplemental Notice Plan will implement a multifaceted approach including print, digital online, social media, and earned media efforts.

---

[49] *See* Melody McKinnon, 2018 Report: Canadian Social Media Use Statistics, CanadiansInternet.com (Business), Mar. 1, 2018, *accessible at* https://canadiansinternet.com/2018-report-canadian-social-media-use-statistics/.

33

### A.   CANADIAN MAGAZINES

78.   The Bar Date Notice will be published in Canadian magazines as a one-half page plain language summary notice of approximately 650 words, consistent with the summary notice published in magazines in the United States. The summary Bar Date Notice will be published in plain concise English and French languages in nine (9) nationally distributed magazines, as follows:

| CANADIAN MAGAZINES | LANGUAGE | CIRCULATION |
|---|---|---|
| Canadian Geographic | English | 147,252 |
| Canadian Living | English | 342,782 |
| Chatelaine | English | 258,000 |
| Maclean's | English | 173,000 |
| Reader's Digest | English | 447,577 |
| Coup de Pouce | French | 169,515 |
| Chatelaine | French | 90,000 |
| L'actualite | French | 87,000 |
| Reader's Digest | French | 87, 160 |

### B.   CANADIAN NEWSPAPERS

79.   The summary Bar Date Notice of approximately 650 words will be published in plain and concise language in the largest Canadian nationally circulated newspapers, as follows:

| NATIONAL NEWSPAPER | LANGUAGE | CIRCULATION |
|---|---|---|
| Globe & Mail Weekday | English | 346,593 |
| Globe & Mail Saturday | English | 406,893 |
| National Post Weekday | English | 167,240 |
| National Post Saturday | English | 186,302 |
| Le Journal de Montreal Weekday | French | 232,137 |
| Le Journal de Montreal Saturday | French | 232,137 |

JX-0401.0034                                                    PPLP-0401.0034
A0046

### C.   CANADA ONLINE

80.   **Online Display.**   Online display advertising in Canada will target Canadians eighteen (18) years of age and older. Targeting considerations will be made consistent with those in the United States to appropriately reach relevant demographic clusters with a higher tendency to be prescribed opioids[50].   The online advertisements will be served in English and French as follows:

| ONLINE DIGITAL MEDIA | LANGUAGE | IMPRESSIONS |
|---|---|---|
| Adults 18+ | English & French | 23,000,000 |
| Google Search | English & French | 700,000 |

81.   **Social Media.**   Social media advertising in Canada will include Facebook, Instagram and YouTube as follows:

| SOCIAL MEDIA | LANGUAGE | IMPRESSIONS |
|---|---|---|
| Facebook/Instagram | English/French | 45,000,000 |
| YouTube | English/French | 5,000,000 |

82.   **Press Releases.**   The Debtors will issue press releases across the Canadian Bilingual General Media Newsline in English and French.

83.   **Community Outreach.**   The Supplemental Notice Plan includes outreach to third-party organizations that may help expand awareness of the Bar Date and claims process. We will send a one-page notice to appropriate contacts to post or provide the notice to their members, patients, or customers. The 8.5 x 11 notice will be printed in full-color on the front and

---

[50]As of 2016, apparent opioid-related deaths and hospitalization rates were highest in the western provinces of British Columbia and Alberta and in both Yukon and the Northwest Territories. Nationally, most apparent opioid-related deaths occurred among males; individuals between 30 and 39 years of age accounted for the greatest proportion. See https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6034966/

JX-0401.0035                                                    PPLP-0401.0035

A0047

back and will describe in plain-language how claimants can file a proof of claim and where they may obtain additional information about the Bar Date. Further, we intend to employ an influencer campaign through social media, bloggers and podcasters to amplify the message.

84.    A sample of the organizations include, among numerous others:

| ORGANIZATIONS |
| --- |
| Alcoholics Anonymous |
| Addictions Foundation-Manitoba |
| Narcotics Anonymous |
| Addiction Services Recovery |
| Iris Addiction Recovery-Women |
| Salvation Army-Addictions |
| Alberta Alcohol & Drug Abuse |
| Turning Point Recovery Society |

## IX.    DEDICATED WEBSITE(S) AND TOLL-FREE NUMBERS

85.    The Debtors, through Prime Clerk, have established the dedicated Case Website and toll-free numbers in connection with these chapter 11 cases. The Case Website and toll-free numbers will be available in English, Spanish and French. The website address will be prominently displayed in all printed notice documents and other paid advertising and will provide notice of the Bar Dates and all requirements to comply therewith, as well as other relevant information relating to the chapter 11 cases. Included within the Case Website will be a page specifically tailored to, and designed for, Opioid Claimants, which will, among other things, inform them of certain key dates and deadlines, allow them to view certain key documents in these chapter 11 cases free of charge, and allow holders of claims and other creditors to register their email addresses and consent to e-mail service of certain notices required to be sent during these chapter 11 cases. In addition,

36

translations of the Summary Notice, Frequently Asked Questions sheet, and the Bar Date Notice

will be available for download on the Case Website in English, Spanish and French.

## X.   PROJECT MANAGEMENT MONITORING AND QUALITY CONTROL

86.     The Supplemental Notice Plan will not be a static noticing plan.  Rather, the

Supplemental Notice Plan will have the ability to adapt to ensure the optimal reach and frequency

levels are in fact met in the face of evolving external factors. Actual media selections may vary at

the time of media buy based on media channel availability, publisher approval and legal review.

Prime Clerk's media team will constantly perform quality control reviews of the Supplemental

Notice Plan's implementation to ensure resources are maximized and deployed efficiently and

effectively.

## XI.   ACTIVE CAMPAIGN MANAGEMENT AND OPTIMIZATION

87.     Prime Clerk actively manages and optimizes all media channels to minimize waste

and to increase visibility and response.  As the notice program progresses, it will continue to be

refined by shifting budget toward the media channels and targeting that are delivering the greatest

results and away from under-performing channels.  Optimizations are made based on data from

attribution sources such as Google Analytics, and other sources including social and general media

tools Cision[51] and Socialbakers[52], among others. These tools provide detailed, real-time insight

into how a campaign is performing and allow us to improve campaign performance on a

continuous basis.

## XII.   ONLINE QUALITY CONTROL - AD FRAUD IDENTIFICATION, MITIGATION, AND REPORTING

88.     I am the first court-approved legal notice expert to actively monitor, mitigate, and

---

[51] *See generally* https://www.cision.com/us/.

[52] *See generally* https://www.socialbakers.com/.

37

cull non-human (ad fraud bot traffic) from digital notice programs.[53]   In my opinion, the Supplemental Notice Plan incorporates state of the art quality control mechanisms to ensure that the Debtors' online ads will be properly targeted to real websites where actual humans are likely to visit, rather than serving ads to websites and bots that attempt to fraudulently earn advertising revenue from the campaign (which would prevent actual claimants from seeing the Bar Date Notice).

89.     Digital ad fraud, counterfeit impressions, and bots are an ever-present reality in the digital environment, silently stealing impressions from advertising budgets and, more importantly, potentially depriving Opioid Claimants of an opportunity to see a notice, which can have an impact on response rates and claims filed.  The Association of National Advertisers reports that up to thirty-three (33) percent of advertising inventory can be lost to bots or non-human traffic, and buying premium inventory is no guarantee.  Multiple layers of ad fraud detection technology, as well as human eyes, reviewing the logs are required to effectively mitigate ad fraud.

90.     Prime Clerk's media team deploys multiple tactics of online audience verification to ensure that digital ads are served to humans on real websites in brand-safe environments:

i.     *Employing a whitelist of publishers.*  Prime Clerk's "Trusted Publishers Whitelist[54]" is comprised of approximately 4,000-plus, pre-vetted comScore top-visited websites selected for

---

[53] *See* Jeanne Finegan, *Creating a Class Notice Program that Satisfies Due Process*, Law360 (Feb. 13, 2018, 12:58 PM ET), *accessible at* https://www.law360.com/articles/1011316/creating-a-class-notice-program-that-satisfies-due-process; *see also Rule 23 Changes, Are you Ready for the Digital Wild, Wild West?*, CLE Webinar, *accessible at* https://bit.ly/2PfuGvJ.

[54] A whitelist is a custom list of acceptable websites where ad content may be served. This allows our team to better control the quality of advertising inventory that is served to creditors.  The creation of a whitelist helps to  ensure that our ads are targeted to real websites where actual (human) class members are likely to visit, rather than serving ads to websites and fraudsters who are attempting to illegally earn advertising revenue from the campaign, and thereby depriving actual class members of their due process rights to see the Notice. Further, the whitelist helps to ensure that ads will not appear next to offensive, objectionable content or on fake news sites.  Our whitelist is actively maintained over the campaign by using site-level reporting of brand safety, viewability and ad fraud.

audience scale that are regularly tested for ad fraud and brand safety to ensure we continue to serve only on the highest quality websites.

        ii.    *Ad fraud and brand safety tracking and scanning tools.*  We use Integral Ad Science ("IAS") tools to analyze online inventory quality and, based on our findings, manage our buys to include sites deemed by IAS to be limited in the potential for ad fraud, and are brand safe and viewable.

        iii.    *Human review of log-level data by our fraud expert.*  In addition to utilizing best in class technology, we work with one of the industry's top independent cybersecurity experts[55] who personally analyzes and monitors as logs for fraudulent anomalies such as ads being called to data centers, uncommon browser sizes, outdated browser versions and other parameters that indicate non-human traffic. Based on these tools and techniques, we will identify which websites are generating validated human click-throughs to the Debtors' claimant websites and then redirect advertising traffic (impressions) to those sites.

## IX.    __CONCLUSION__

    91.    In my opinion, the robust and comprehensive outreach efforts employed for the Debtors' notice procedures, including the Supplemental Notice Plan, reflect a particularly appropriate, highly targeted, efficient, and modern way to provide notice to known and unknown claimants. The Debtors' notice procedures are broad and multi-faceted and are designed to reach the target nationwide in a variety of different ways. The Debtors' Supplemental Notice Plan is estimated to reach 95 percent of adults eighteen (18) years and older with an average frequency of over six (6) times nationwide in the United States—the optimal reach and frequency. The Supplemental Notice Plan is estimated to also reach 80 percent of adults eighteen (18) years and

---

[55] Dr. Augustine Fou, Marketing Science Consulting Group, Inc. *See* https://www.linkedin.com/in/augustinefou/

JX-0401.0039                                                                 PPLP-0401.0039

A0051

older with an average frequency of three (3) times nationwide in Canada. Ultimately, when combined with the other methods of notice—including unmeasured methods such as community outreach—I believe that the overall effort will achieve even greater results.

92.     For all of the reasons discussed in this Declaration, it is my opinion that the Debtors' Supplemental Notice Plan described above will effectively and efficiently reach the targeted population.

40

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed: January 3, 2020
Tigard, Oregon.

_Jeanne C. Finegan_
Jeanne C. Finegan

PPLP-0401.0041

## EXHIBIT A  - CURRICULUM VITAE

JX-0401.0042                                    PPLP-0401.0042

A0054

# JEANNE C. FINEGAN, APR

## BIOGRAPHY

Jeanne Finegan, APR, is Vice President of Notice Media Solutions of Prime Clerk. She is a member of the Board of Directors for the prestigious Alliance for Audited Media (AAM), and was named by *Diversity Journal* as one of the "Top 100 Women Worth Watching." She is a distinguished legal notice and communications expert with more than 30 years of communications and advertising experience.

She was a lead contributing author for Duke University's School of Law, *"Guidelines and Best Practices Implementing Amendments to Rule 23 Class Action Settlement Provisions."* And more recently, she has been involved with New York School of Law and The Center on Civil Justice (CCJ) assisting with a class action settlement data analysis and comparative visualization tool called the *Aggregate Litigation Project*, designed to help judges make decisions in aggregate cases on the basis of data as opposed to anecdotal information. Moreover, her experience also includes working with the Special Settlement Administrator's team to assist with the outreach strategy for the historic Auto Airbag Settlement, In re: *Takata Airbag Products Liability Litigation* MDL 2599.

During her tenure, she has planned and implemented over 1,000 high-profile, complex legal notice communication programs. She is a recognized notice expert in both the United States and in Canada, with extensive international notice experience spanning more than 170 countries and over 40 languages.

Ms. Finegan has lectured, published and has been cited extensively on various aspects of legal noticing, product recall and crisis communications. She has served the Consumer Product Safety Commission (CPSC) as an expert to determine ways in which the Commission can increase the effectiveness of its product recall campaigns. Further, she has planned and implemented large-scale government enforcement notice programs for the Federal Trade Commission (FTC) and the Securities and Exchange Commission (SEC).

Ms. Finegan is accredited in Public Relations (APR) by the Universal Accreditation Board, which is a program administered by the Public Relations Society of America (PRSA), and is also a recognized member of the Canadian Public Relations Society (CPRS). She has served on examination panels for APR candidates and worked *pro bono* as a judge for prestigious PRSA awards.

Ms. Finegan has provided expert testimony before Congress on issues of notice, and expert testimony in both state and federal courts regarding notification campaigns. She has conducted

numerous media audits of proposed notice programs to assess the adequacy of those programs
under Fed R. Civ. P. 23(c)(2) and similar state class action statutes.

She was an early pioneer of plain language in notice (as noted in a RAND study,[1]) and continues
to set the standard for modern outreach as the first notice expert to integrate social and mobile
media into court approved legal notice programs.

In the course of her class action experience, courts have recognized the merits of, and admitted
expert testimony based on, her scientific evaluation of the effectiveness of notice plans.  She
has designed legal notices for a wide range of class actions and consumer matters that include
product liability, construction defect, antitrust, medical/pharmaceutical, human rights, civil
rights, telecommunication, media, environment, government enforcement actions, securities,
banking, insurance, mass tort, restructuring and product recall.

## JUDICIAL COMMENTS AND LEGAL NOTICE CASES

In evaluating the adequacy and effectiveness of Ms. Finegan's notice campaigns, courts
have repeatedly recognized her excellent work. The following excerpts provide some examples
of such judicial approval.

*In re: The Bank of New York Mellon ADR FX Litigation*, 16-CV-00212-JPO-JLC (S.D.N.Y. 2019).  In
the Final Order and Judgement, dated June 17, 2019, para 5,  the Honorable J. Paul Oetkin
stated:
> *"The dissemination of notice constituted the best notice practicable under the
> circumstances."*

*Simerlein et al., v. Toyota Motor Corporation,* Case No. 3:17-cv-01091-VAB (District of CT
2019). In the Ruling and Order on Motion for Preliminarily Approval, dated January 14, 2019, p.
30, the Honorable Victor Bolden stated:

> *"In finding that notice is sufficient to meet both the requirements of Rule 23(c) and due
> process, the Court has reviewed and appreciated the high-quality submission of
> proposed Settlement Notice Administrator Jeanne C. Finegan. See Declaration of
> Jeanne C. Finegan, APR,  Ex. G to Agrmt., ECF No. 85-8."*

*Fitzhenry- Russell et al., v Keurig Dr. Pepper Inc.,* Case No. :17-cv-00564-NC, (ND Cal). In the
Order Granting Final Approval of Class Action Settlement,  Dated April 10, 2019, the Honorable
Nathanael Cousins stated:

> *"...the reaction of class members to the proposed Settlement is positive. The parties
> anticipated that 100,000 claims would be filed under the Settlement (see Dkt. No. 327-*

---

1 Deborah R. Hensler et al., CLASS ACTION DILEMAS, PURSUING PUBLIC GOALS FOR PRIVATE GAIN.  RAND (2000).

5 ¶ 36)—91,254 claims were actually filed (see Finegan Decl ¶ 4). The 4% claim rate
was reasonable in light of Heffler's efforts to ensure that notice was adequately
provided to the Class."

*Pettit et al., v. Procter & Gamble Co.*, Case No. 15-cv-02150-RS ND Cal. In the Order Granting
Final Approval of the Class Action Settlement and Judgement, Dated March 28, 2019, p. 6,  the
Honorable Richard Seeborg stated:

"The Court finds that the Notice Plan set forth in the Settlement Agreement, and
effectuated pursuant to the Preliminary Approval Order, constituted the best notice
practicable under the circumstances and constituted due and sufficient notice to the
Settlement Class. ...the number of claims received equates to a claims rate of 4.6%,
which exceeds the rate in comparable settlements."

*Carter v Forjas Taurus S.S., Taurus International Manufacturing*, Inc., Case No. 1:13-CV-24583
PAS (S.D. Fl. 2016). In her Final Order and Judgment Granting Plaintiffs Motion for Final
Approval of Class Action Settlement, the Honorable Patricia Seitz stated:

"The Court considered the extensive experience of Jeanne C. Finegan and the notice
program she developed. ...There is no national firearms registry and Taurus sale
records do not provide names and addresses of the ultimate purchasers... Thus the
form and method used for notifying Class Members of the terms of the Settlement was
the best notice practicable. ...The court-approved notice plan used peer-accepted
national research to identify the optimal traditional, online, mobile and social media
platforms to reach the Settlement Class Members."

Additionally, in January 20, 2016, Transcript of Class Notice Hearing, p. 5 Judge Seitz,
noted:

"I would like to compliment Ms. Finegan and her company because I was quite
impressed with the scope and the effort of communicating with the Class."

*Cook et. al v. Rockwell International Corp. and the Dow Chemical Co.*, No. 90-cv-00181- KLK
(D.Colo. 2017)., aka, Rocky Flats Nuclear Weapons Plant Contamination. In the Order Granting
Final Approval, dated April 28, 2017, p.3, the Honorable John L. Kane said:

The Court-approved Notice Plan, which was successfully implemented by
[HF Media- emphasis added] (see Doc. 2432), constituted the best notice practicable
under the circumstances. In making this determination, the Court finds that the Notice
Plan that was implemented, as set forth in Declaration of Jeanne C. Finegan, APR
Concerning Implementation and Adequacy of Class Member Notification (Doc. 2432),
provided for individual notice to all members of the Class whose identities and

JX-0401.0045                                        PPLP-0401.0045
                                                                A0057

> *addresses were identified through reasonable efforts, … and a comprehensive national*
> *publication notice program that included, inter alia, print, television, radio and*
> *internet banner advertisements. …Pursuant to, and in accordance with, Rule 23 of the*
> *Federal Rules of Civil Procedure, the Court finds that the Notice Plan provided the best*
> *notice practicable to the Class.*

*In re: Domestic Drywall Antitrust Litigation,* MDL. No. 2437, in the U.S. District Court for the
Eastern District of Pennsylvania. For each of the four settlements, Finegan implemented and
extensive outreach effort including traditional, online, social, mobile and advanced television
and online video. In the Order Granting Preliminary Approval to the IPP Settlement, Judge
Michael M. Baylson stated:

> *"The Court finds that the dissemination of the Notice and summary Notice constitutes*
> *the best notice practicable under the circumstances; is valid, due, and sufficient notice*
> *to all persons… and complies fully with the requirements of the Federal rule of Civil*
> *Procedure."*

*Warner v. Toyota Motor Sales, U.S.A. Inc., Case No 2:15-cv-02171-FMO FFMx (C.D. Cal. 2017).*
In the Order Re: Final Approval of Class Action Settlement; Approval of Attorney's Fees, Costs &
Service Awards, dated May 21, 2017, the Honorable Fernando M. Olguin stated:

> *Finegan, the court-appointed settlement notice administrator, has implemented the*
> *multiprong notice program. …the court finds that the class notice and the notice*
> *process fairly and adequately informed the class members of the nature of the action,*
> *the terms of the proposed settlement, the effect of the action and release of claims,*
> *the class members' right to exclude themselves from the action, and their right to*
> *object to the proposed settlement. (See Dkt. 98, PAO at 25-28).*

*Michael Allagas, et al., v. BP Solar International, Inc., et al., BP Solar Panel Settlement*, Case
No. 3:14-cv-00560- SI (N.D. Cal., San Francisco Div. 2016). In the Order Granting Final Approval,
Dated December 22, 2016, The Honorable Susan Illston stated:

> *Class Notice was reasonable and constituted due, adequate and sufficient notice to all*
> *persons entitled to be provided with notice; and d. fully satisfied the requirements of*
> *the Federal Rules of Civil Procedure, including Fed. R. Civ. P. 23(c)(2) and (e), the*
> *United States Constitution (including the Due Process Clause), the Rules of this Court,*
> *and any other applicable law.*

*Foster v. L-3 Communications EOTech*, Inc. et al (6:15-cv-03519), Missouri Western District
Court.
> *In the Court's Final Order, dated July 7, 2017, The Honorable Judge Brian Wimes*
> *stated: "The Court has determined that the Notice given to the Settlement Class fully*

*and accurately informed members of the Settlement Class of all material elements of
the Settlement and constituted the best notice practicable."*

*In re: Skechers Toning Shoes Products Liability Litigation*, No. 3:11-MD-2308-TBR (W.D. Ky.
2012). In his Final Order and Judgment granting the Motion for Preliminary Approval of
Settlement, the Honorable Thomas B. Russell stated:

> *... The comprehensive nature of the class notice leaves little doubt that, upon receipt,
> class members will be able to make an informed and intelligent decision about
> participating in the settlement.*

*Brody v. Merck & Co., Inc., et al,* No. 3:12-cv-04774-PGS-DEA (N.J.) (Jt Hearing for Prelim App,
Sept. 27, 2012, transcript page 34). During the Hearing on Joint Application for Preliminary
Approval of Class Action, the Honorable Peter G. Sheridan acknowledged Ms. Finegan's work,
noting:

> *Ms. Finegan did a great job in testifying as to what the class administrator will do. So,
> I'm certain that all the class members or as many that can be found, will be given
> some very adequate notice in which they can perfect their claim.*

*Quinn v. Walgreen Co., Wal-Mart Stores Inc.,* 7:12 CV-8187-VB (NYSD) (Jt Hearing for Final
App, March. 5, 2015, transcript page 40-41). During the Hearing on Final Approval of Class
Action, the Honorable Vincent L. Briccetti stated:

> *"The notice plan was the best practicable under the circumstances. ... [and] "the proof
> is in the pudding. This settlement has resulted in more than 45,000 claims which is
> 10,000 more than the Pearson case and more than 40,000 more than in a glucosamine
> case pending in the Southern District of California I've been advised about.  So the
> notice has reached a lot of people and a lot of people have made claims."*

*In Re: TracFone Unlimited Service Plan Litigation, No. C-13-3440 EMC (ND Ca).* In the Final
Order and Judgment Granting Class Settlement, July 2, 2015, the Honorable Edward M. Chen
noted:

> *"...[D]epending on the extent of the overlap between  those class members who will
> automatically receive a payment and those who filed claims, the total claims rate is
> estimated to be approximately 25-30%. This is an excellent result...*

*In Re:  Blue Buffalo Company, Ltd., Marketing and Sales Practices Litigation*, Case No. 4:14-
MD-2562 RWS (E.D. Mo. 2015),  (Hearing for Final Approval, May 19, 2016 transcript p. 49).
During the Hearing for Final Approval, the Honorable Rodney Sippel said:

> *It is my finding that notice was sufficiently provided to class members in the manner
> directed in my preliminary approval order and that notice met all applicable
> requirements of due process and any other applicable law and considerations.*

***DeHoyos, et al. v. Allstate Ins. Co.***, No. SA-01-CA-1010 (W.D.Tx. 2001). In the Amended Final Order and Judgment Approving Class Action Settlement, the Honorable Fred Biery stated:

> *[T]he undisputed evidence shows the notice program in this case was developed and implemented by a nationally recognized expert in class action notice programs. … This program was vigorous and specifically structured to reach the African-American and Hispanic class members. Additionally, the program was based on a scientific methodology which is used throughout the advertising industry and which has been routinely embraced routinely [sic] by the Courts. Specifically, in order to reach the identified targets directly and efficiently, the notice program utilized a multi-layered approach which included national magazines; magazines specifically appropriate to the targeted audiences; and newspapers in both English and Spanish.*

***In re: Reebok Easytone Litigation***, No. 10-CV-11977 (D. MA. 2011). The Honorable F. Dennis Saylor IV stated in the Final Approval Order:

> *The Court finds that the dissemination of the Class Notice, the publication of the Summary Settlement Notice, the establishment of a website containing settlement-related materials, the establishment of a toll-free telephone number, and all other notice methods set forth in the Settlement Agreement and [Ms. Finegan's] Declaration and the notice dissemination methodology implemented pursuant to the Settlement Agreement and this Court's Preliminary Approval Order… constituted the best practicable notice to Class Members under the circumstances of the Actions.*

***Bezdek v. Vibram USA and Vibram FiveFingers*** LLC, No 12-10513 (D. MA) The Honorable Douglas P. Woodlock stated in the Final Memorandum and Order:

> *…[O]n independent review I find that the notice program was robust, particularly in its online presence, and implemented as directed in my Order authorizing notice. …I find that notice was given to the Settlement class members by the best means "practicable under the circumstances." Fed.R.Civ.P. 23(c)(2).*

***Gemelas v. The Dannon Company Inc.***, No. 08-cv-00236-DAP (N.D. Ohio). In granting final approval for the settlement, the Honorable Dan A. Polster stated:

> *In accordance with the Court's Preliminary Approval Order and the Court-approved notice program, [Ms. Finegan] caused the Class Notice to be distributed on a nationwide basis in magazines and newspapers (with circulation numbers exceeding 81 million) specifically chosen to reach Class Members. … The distribution of Class Notice constituted the best notice practicable under the circumstances, and fully satisfied the requirements of Federal Rule of Civil Procedure 23, the requirements of due process, 28 U.S.C. 1715, and any other applicable law.*

*Pashmova v. New Balance Athletic Shoes, Inc.*, 1:11-cv-10001-LTS (D. Mass.). The Honorable
Leo T. Sorokin stated in the Final Approval Order:

> *The Class Notice, the Summary Settlement Notice, the web site, and all other notices in
> the Settlement Agreement and the Declaration of [Ms Finegan], and the notice
> methodology implemented pursuant to the Settlement Agreement: (a) constituted the
> best practicable notice under the circumstances; (b) constituted notice that was
> reasonably calculated to apprise Class Members of the pendency of the Actions, the
> terms of the Settlement and their rights under the settlement ... met all applicable
> requirements of law, including, but not limited to, the Federal Rules of Civil Procedure,
> 28 U.S.C. § 1715, and the Due Process Clause(s) of the United States Constitution, as
> well as complied with the Federal Judicial Center's illustrative class action notices.*

*Hartless v. Clorox Company*, No. 06-CV-2705 (CAB) (S.D.Cal.).  In the Final Order Approving
Settlement, the Honorable Cathy N. Bencivengo found:

> *The Class Notice advised Class members of the terms of the settlement; the Final
> Approval Hearing and their right to appear at such hearing; their rights to remain in or
> opt out of the Class and to object to the settlement; the procedures for exercising such
> rights; and the binding effect of this Judgment, whether favorable or unfavorable, to
> the Class. The distribution of the notice to the Class constituted the best notice
> practicable under the circumstances, and fully satisfied the requirements of Federal
> Rule of Civil Procedure 23, the requirements of due process, 28 U.S.C. §1715, and any
> other applicable law.*

*McDonough et al v. Toys 'R' Us et al,* No. 09:-cv-06151-AB (E.D. Pa.).  In the Final Order and
Judgment Approving Settlement, the Honorable Anita Brody stated:

> *The Court finds that the Notice provided constituted the best notice practicable under
> the circumstances and constituted valid, due and sufficient notice to all persons
> entitled thereto.*

*In re: Pre-Filled Propane Tank Marketing & Sales Practices Litigation,* No. 4:09-md-02086-GAF
(W.D. Mo.)  In granting final approval to the settlement, the Honorable Gary A. Fenner stated:

> *The notice program included individual notice to class members who could be
> identified by Ferrellgas, publication notices, and notices affixed to Blue Rhino propane
> tank cylinders sold by Ferrellgas through various retailers. ... The Court finds the notice
> program fully complied with Federal Rule of Civil Procedure 23 and the requirements
> of due process and provided to the Class the best notice practicable under the
> circumstances.*

*Stern v. AT&T Mobility Wireless*, No. 09-cv-1112 CAS-AGR (C.D.Cal. 2009).  In the Final Approval
Order, the Honorable Christina A. Snyder stated:

*[T]he Court finds that the Parties have fully and adequately effectuated the Notice
Plan, as required by the Preliminary Approval Order, and, in fact, have achieved better
results than anticipated or required by the Preliminary Approval Order.*

*In re: Processed Egg Prods. Antitrust Litig.*, MDL No. 08-md-02002 (E.D.P.A.).  In the Order
Granting Final Approval of Settlement, Judge Gene E.K. Pratter stated:

*The Notice appropriately detailed the nature of the action, the Class claims, the
definition of the Class and Subclasses, the terms of the proposed settlement
agreement, and the class members' right to object or request exclusion from the
settlement and the timing and manner for doing so…. Accordingly, the Court
determines that the notice provided to the putative Class Members constitutes
adequate notice in satisfaction of the demands of Rule 23.*

*In re Polyurethane Foam Antitrust Litigation*, 10- MD-2196 (N.D. OH). In the Order Granting
Final Approval of Voluntary Dismissal and Settlement of Defendant Domfoam and Others, the
Honorable Jack Zouhary stated:

*The notice program included individual notice to members of the Class who could be
identified through reasonable effort, as well as extensive publication of a summary
notice. The Notice constituted the most effective and best notice practicable under the
circumstances of the Settlement Agreements, and constituted due and sufficient notice
for all other purposes to all persons and entities entitled to receive notice.*

*Rojas v Career Education Corporation*, No. 10-cv-05260 (N.D.E.D. IL) In the Final Approval Order
dated October 25, 2012, the Honorable Virgina M. Kendall stated:

*The Court Approved notice to the Settlement Class as the best notice practicable under
the circumstance including individual notice via U.S. Mail and by email to the class
members whose addresses were obtained from each Class Member's wireless carrier
or from a commercially reasonable reverse cell phone number look-up service,
nationwide magazine publication, website publication, targeted on-line advertising,
and a press release.  Notice has been successfully implemented and satisfies the
requirements of the Federal Rule of Civil Procedure 23 and Due Process.*

*Golloher v Todd Christopher International, Inc. DBA Vogue International (Organix), No. C
1206002 N.D CA.*  In the Final Order and Judgment Approving Settlement, the Honorable
Richard Seeborg stated:

*The distribution of the notice to the Class constituted the best notice practicable
under the circumstances, and fully satisfied the requirements of Federal Rule of Civil
Procedure 23, the requirements of due process, 28 U.S.C. §1715, and any other
applicable law.*

*Stefanyshyn v. Consolidated Industries*, No. 79 D 01-9712-CT-59 (Tippecanoe County Sup. Ct.,
Ind.). In the Order Granting Final Approval of Settlement, Judge Randy Williams stated:

> *The long and short form notices provided a neutral, informative, and clear explanation
> of the Settlement. ... The proposed notice program was properly designed,
> recommended, and implemented ... and constitutes the "best practicable" notice of
> the proposed Settlement. The form and content of the notice program satisfied all
> applicable legal requirements. ... The comprehensive class notice educated Settlement
> Class members about the defects in Consolidated furnaces and warned them that the
> continued use of their furnaces created a risk of fire and/or carbon monoxide. This
> alone provided substantial value.*

*McGee v. Continental Tire North America, Inc. et al*, No. 06-6234-(GEB) (D.N.J.).

> *The Class Notice, the Summary Settlement Notice, the web site, the toll-free telephone
> number, and all other notices in the Agreement, and the notice methodology
> implemented pursuant to the Agreement: (a) constituted the best practicable notice
> under the circumstances; (b) constituted notice that was reasonably calculated to
> apprise Class Members of the pendency of the Action, the terms of the settlement and
> their rights under the settlement, including, but not limited to, their right to object to
> or exclude themselves from the proposed settlement and to appear at the Fairness
> Hearing; (c) were reasonable and constituted due, adequate and sufficient notice to all
> persons entitled to receive notification; and (d) met all applicable requirements of law,
> including, but not limited to, the Federal Rules of Civil Procedure, 20 U.S.C. Sec. 1715,
> and the Due Process Clause(s) of the United States Constitution, as well as complied
> with the Federal Judicial Center's illustrative class action notices,*

*Varacallo, et al. v. Massachusetts Mutual Life Insurance Company, et al.*, No. 04-2702 (JLL)
(D.N.J.). The Court stated that:

> *[A]ll of the notices are written in simple terminology, are readily understandable by
> Class Members, and comply with the Federal Judicial Center's illustrative class action
> notices. ... By working with a nationally syndicated media research firm, [Finegan's
> firm] was able to define a target audience for the MassMutual Class Members, which
> provided a valid basis for determining the magazine and newspaper preferences of the
> Class Members. (Preliminary Approval Order at p. 9). . . . The Court agrees with Class
> Counsel that this was more than adequate. (Id. at § 5.2).*

*In re: Nortel Network Corp., Sec. Litig.*, No. 01-CV-1855 (RMB) Master File No. 05 MD 1659
(LAP) (S.D.N.Y.).  Ms. Finegan designed and implemented the extensive United States and
Canadian notice programs in this case.  The Canadian program was published in both French
and English, and targeted virtually all investors of stock in Canada.  *See*

www.nortelsecuritieslitigation.com. Of the U.S. notice program, the Honorable Loretta A.
Preska stated:

> *The form and method of notifying the U.S. Global Class of the pendency of the action
> as a class action and of the terms and conditions of the proposed Settlement ...
> constituted the best notice practicable under the circumstances, and constituted due
> and sufficient notice to all persons and entities entitled thereto.*

Regarding the B.C. Canadian Notice effort: *Jeffrey v. Nortel Networks*, [2007] BCSC 69 at para.
50, the Honourable Mr. Justice Groberman said:

> *The efforts to give notice to potential class members in this case have been thorough.
> There has been a broad media campaign to publicize the proposed settlement and the
> court processes.  There has also been a direct mail campaign directed at probable
> investors.  I am advised that over 1.2 million claim packages were mailed to persons
> around the world.  In addition, packages have been available through the worldwide
> web site nortelsecuritieslitigation.com  on the Internet.  Toll-free telephone lines have
> been set up, and it appears that class counsel and the Claims Administrator have
> received innumerable calls from potential class members. In short, all reasonable
> efforts have been made to ensure that potential members of the class have had notice
> of the proposal and a reasonable opportunity was provided for class members to
> register their objections, or seek exclusion from the settlement.*

*Mayo v. Walmart Stores and Sam's Club*, No. 5:06 CV-93-R (W.D.Ky.).  In the Order Granting
Final Approval of Settlement, Judge Thomas B. Russell stated:

> *According to defendants' database, the Notice was estimated to have reached over
> 90% of the Settlement Class Members through direct mail. The Settlement
> Administrator ... has classified the parties' database as 'one of the most reliable and
> comprehensive databases [she] has worked with for the purposes of legal notice.'...
> The Court thus reaffirms its findings and conclusions in the Preliminary Approval Order
> that the form of the Notice and manner of giving notice satisfy the requirements of
> Fed. R. Civ. P. 23 and affords due process to the Settlement Class Members.*

*Fishbein v. All Market Inc.*, (d/b/a **Vita Coco**) No. 11-cv-05580 (S.D.N.Y.).  In granting final
approval of the settlement, the Honorable J. Paul Oetken stated:

> *"The Court finds that the dissemination of Class Notice pursuant to the Notice
> Program...constituted the best practicable notice to Settlement Class Members under
> the circumstances of this Litigation ... and was reasonable and constituted due,
> adequate and sufficient notice to all persons entitled to such notice, and fully satisfied
> the requirements of the Federal Rules of Civil Procedure, including Rules 23(c)(2) and
> (e), the United States Constitution (including the Due Process Clause), the Rules of this
> Court, and any other applicable laws."*

*Lucas, et al. v. Kmart Corp.*, No. 99-cv-01923 (D.Colo.), wherein the Court recognized Jeanne Finegan as an expert in the design of notice programs, and stated:

> *The Court finds that the efforts of the parties and the proposed Claims Administrator in this respect go above and beyond the "reasonable efforts" required for identifying individual class members under F.R.C.P. 23(c)(2)(B).*

*In re: Johns-Manville Corp.* **(Statutory Direct Action Settlement, Common Law Direct Action and Hawaii Settlement)**, No 82-11656, 57, 660, 661, 665-73, 75 and 76 (BRL) (Bankr. S.D.N.Y.). The nearly half-billion dollar settlement incorporated three separate notification programs, which targeted all persons who had asbestos claims whether asserted or unasserted, against the Travelers Indemnity Company.  In the Findings of Fact and Conclusions of a Clarifying Order Approving the Settlements, slip op. at 47-48 (Aug. 17, 2004), the Honorable Burton R. Lifland, Chief Justice, stated:

> *As demonstrated by Findings of Fact (citation omitted), the Statutory Direct Action Settlement notice program was reasonably calculated under all circumstances to apprise the affected individuals of the proceedings and actions taken involving their interests, Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314 (1950), such program did apprise the overwhelming majority of potentially affected claimants and far exceeded the minimum notice required. . . . The results simply speak for themselves.*

*Pigford v. Glickman and U.S. Department of Agriculture,* No. 97-1978. 98-1693 (PLF) (D.D.C.). This matter was the largest civil rights case to settle in the United States in over 40 years. The highly publicized, nationwide paid media program was designed to alert all present and past African-American farmers of the opportunity to recover monetary damages against the U.S. Department of Agriculture for alleged loan discrimination.  In his Opinion, the Honorable Paul L. Friedman commended the parties with respect to the notice program, stating;

> *The parties also exerted extraordinary efforts to reach class members through a massive advertising campaign in general and African American targeted publications and television stations. . . . The Court concludes that class members have received more than adequate notice and have had sufficient opportunity to be heard on the fairness of the proposed Consent Decree.*

*In re: Louisiana-Pacific Inner-Seal Siding Litig.*, Nos. 879-JE, and 1453-JE (D.Or.).  Under the terms of the Settlement, three separate notice programs were to be implemented at three-year intervals over a period of six years.  In the first notice campaign, Ms. Finegan implemented the print advertising and Internet components of the Notice program.  In approving the legal notice communication plan, the Honorable Robert E. Jones stated:

> *The notice given to the members of the Class fully and accurately informed the Class
> members of all material elements of the settlement…[through] a broad and extensive
> multi-media notice campaign.*

Additionally, with regard to the third-year notice program for Louisiana-Pacific, the Honorable
Richard Unis, Special Master, commented that the notice was:

> *…well formulated to conform to the definition set by the court as adequate and
> reasonable notice.  Indeed, I believe the record should also reflect the Court's
> appreciation to Ms. Finegan for all the work she's done, ensuring that noticing was
> done correctly and professionally, while paying careful attention to overall costs. Her
> understanding of various notice requirements under Fed. R. Civ. P. 23, helped to insure
> that the notice given in this case was consistent with the highest standards of
> compliance with Rule 23(d)(2).*

*In re: Expedia Hotel Taxes and Fees Litigation*, No. 05-2-02060-1 (SEA) (Sup. Ct. of Wash. in and
for King County).  In the Order Granting Final Approval of Class Action Settlement, Judge
Monica Benton stated:

> *The Notice of the Settlement given to the Class … was the best notice practicable
> under the circumstances.  All of these forms of Notice directed Class Members to a
> Settlement Website providing key Settlement documents including instructions on how
> Class Members could exclude themselves from the Class, and how they could object to
> or comment upon the Settlement.  The Notice provided due and adequate notice of
> these proceeding and of the matters set forth in the Agreement to all persons entitled
> to such notice, and said notice fully satisfied the requirements of CR 23 and due
> process.*

*Thomas A. Foster and Linda E. Foster v. ABTco Siding Litigation*, No. 95-151-M (Cir. Ct.,
Choctaw County, Ala.).  This litigation focused on past and present owners of structures sided
with Abitibi-Price siding.  The notice program that Ms. Finegan designed and implemented was
national in scope and received the following praise from the Honorable J. Lee McPhearson:

> *The Court finds that the Notice Program conducted by the Parties provided individual
> notice to all known Class Members and all Class Members who could be identified
> through reasonable efforts and constitutes the best notice practicable under the
> circumstances of this Action.  This finding is based on the overwhelming evidence of
> the adequacy of the notice program.  … The media campaign involved broad national
> notice through television and print media, regional and local newspapers, and the
> Internet (see id. ¶¶9-11) The result: over 90 percent of Abitibi and ABTco owners are
> estimated to have been reached by the direct media and direct mail campaign.*

*Wilson v. Massachusetts Mut. Life Ins. Co.*, No. D-101-CV 98-02814 (First Judicial Dist. Ct.,
County of Santa Fe, N.M.). This was a nationwide notification program that included all persons

in the United States who owned, or had owned, a life or disability insurance policy with
Massachusetts Mutual Life Insurance Company and had paid additional charges when paying
their premium on an installment basis. The class was estimated to exceed 1.6 million
individuals. www.insuranceclassclaims.com. In granting preliminary approval to the settlement,
the Honorable Art Encinias found:

> *[T]he Notice Plan [is] the best practicable notice that is reasonably calculated, under
> the circumstances of the action.  …[and] meets or exceeds all applicable requirements
> of the law, including Rule 1-023(C)(2) and (3) and 1-023(E), NMRA 2001, and the
> requirements of federal and/or state constitutional due process and any other
> applicable law.*

***Sparks v. AT&T Corp.***, No. 96-LM-983 (Third Judicial Cir., Madison County, Ill.). The litigation
concerned all persons in the United States who leased certain AT&T telephones during the
1980's. Ms. Finegan designed and implemented a nationwide media program designed to
target all persons who may have leased telephones during this time period, a class that
included a large percentage of the entire population of the United States.
In granting final approval to the settlement, the Court found:

> *The Court further finds that the notice of the proposed settlement was sufficient and
> furnished Class Members with the information they needed to evaluate whether to
> participate in or opt out of the proposed settlement. The Court therefore concludes
> that the notice of the proposed settlement met all requirements required by law,
> including all Constitutional requirements.*

***In re: Georgia-Pacific Toxic Explosion Litig.***, No. 98 CVC05-3535 (Ct. of Common Pleas, Franklin
County, Ohio). Ms. Finegan designed and implemented a regional notice program that included
network affiliate television, radio and newspaper.  The notice was designed to alert adults living
near a Georgia-Pacific plant that they had been exposed to an air-born toxic plume and their
rights under the terms of the class action settlement.  In the Order and Judgment finally
approving the settlement, the Honorable Jennifer L. Bunner stated:

> *[N]otice of the settlement to the Class was the best notice practicable under the
> circumstances, including individual notice to all members who can be identified
> through reasonable effort.  The Court finds that such effort exceeded even reasonable
> effort and that the Notice complies with the requirements of Civ. R. 23(C).*

***In re: American Cyanamid***, No. CV-97-0581-BH-M (S.D.Al.).  The media program targeted
Farmers who had purchased crop protection chemicals manufactured by American Cyanamid.
In the Final Order and Judgment, the Honorable Charles R. Butler Jr. wrote:

> *The Court finds that the form and method of notice used to notify the Temporary
> Settlement Class of the Settlement satisfied the requirements of Fed. R. Civ. P. 23 and
> due process, constituted the best notice practicable under the circumstances, and*

constituted due and sufficient notice to all potential members of the Temporary Class Settlement.

*In re: First Alert Smoke Alarm Litig.*, No. CV-98-C-1546-W (UWC) (N.D.Al.).  Ms. Finegan designed and implemented a nationwide legal notice and public information program.  The public information program ran over a two-year period to inform those with smoke alarms of the performance characteristics between photoelectric and ionization detection.  The media program included network and cable television, magazine and specialty trade publications.  In the Findings and Order Preliminarily Certifying the Class for Settlement Purposes, Preliminarily Approving Class Settlement, Appointing Class Counsel, Directing Issuance of Notice to the Class, and Scheduling a Fairness Hearing, the Honorable C.W. Clemon wrote that the notice plan:

> ...*constitutes due, adequate and sufficient notice to all Class Members; and (v) meets or exceeds all applicable requirements of the Federal Rules of Civil Procedure, the United States Constitution (including the Due Process Clause), the Alabama State Constitution, the Rules of the Court, and any other applicable law.*

*In re: James Hardie Roofing Litig.,* No. 00-2-17945-65SEA (Sup. Ct. of Wash., King County). The nationwide legal notice program included advertising on television, in print and on the Internet. The program was designed to reach all persons who own any structure with JHBP roofing products.  In the Final Order and Judgment, the Honorable Steven Scott stated:

> *The notice program required by the Preliminary Order has been fully carried out... [and was] extensive.  The notice provided fully and accurately informed the Class Members of all material elements of the proposed Settlement and their opportunity to participate in or be excluded from it; was the best notice practicable under the circumstances; was valid, due and sufficient notice to all Class Members; and complied fully with Civ. R. 23, the United States Constitution, due process, and other applicable law.*

*Barden v. Hurd Millwork Co. Inc., et al,* No. 2:6-cv-00046 (LA) (E.D.Wis.) (*"The Court approves, as to form and content, the notice plan and finds that such notice is the best practicable under the circumstances under Federal Rule of Civil Procedure 23(c)(2)(B) and constitutes notice in a reasonable manner under Rule 23(e)(1)."*)

*Altieri v. Reebok*, No. 4:10-cv-11977 (FDS) (D.C.Mass.) (*"The Court finds that the notices ... constitute the best practicable notice... The Court further finds that all of the notices are written in simple terminology, are readily understandable by Class Members, and comply with the Federal Judicial Center's illustrative class action notices."*)

*Marenco v. Visa Inc.,* No. CV 10-08022 (DMG) (C.D.Cal.) (*"[T]he Court finds that the notice plan...meets the requirements of due process, California law, and other applicable precedent. The Court finds that the proposed notice program is designed to provide the Class with the best notice practicable, under the circumstances of this action, of the pendency of this*

JX-0401.0056                                      PPLP-0401.0056

A0068