UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------x

In re: PURDUE PHARMA
BANKRUPTCY APPEALS

---------------------------------------------------------x

This Filing Relates to

---------------------------------------------------------x

ALL MATTERS

21 cv 7532 (CM) [lead case]
[Rel: 21 cv 7585 (CM)
21 cv 7961 (CM)
21 cv 7962 (CM)
21 cv 7966 (CM)
21 cv 7969 (CM)
21 cv 8034 (CM)
21 cv 8042 (CM)
21 cv 8049 (CM)
21 cv 8055 (CM)
21 cv 8139 (CM)
21 cv 8258 (CM)
21 cv 8271 (CM)
21 cv 8548 (CM)
21 cv 8557 (CM)
21 cv 8566 (CM)

---------------------------------------------------------x

## SCHEDULE FOR FURTHER BRIEFING

McMahon, J.:

At the close of argument yesterday I invited the parties to weigh in in writing on a question I raised at the end of the day. Because it had been a long day, and because we had discussed so much, the question was inelegantly phrased. The issue is this:

In *Metromedia*, the Second Circuit cautioned against the approval of a release of third-party claims against a non-debtor because the granting of such releases is subject to abuse. And in *Manville III*, the Circuit indicated that the possibility of abuse was heightened in situations where the non-debtors condition their financial contribution to the debtor's estate on such releases. *In re Johns-Manville Corp.*, 517 F.3d 52, 66 (2d Cir. 2008).

From 1995-2007, Purdue only "upstreamed" enough money to the Sacklers to allow them to pay taxes and retain a relatively modest dividend for themselves. According to information provided by the Debtor, the Sacklers used 90% of Purdue's upstreamed earnings were used to pay taxes; just 10% of those distributions were retained by the family. Purdue kept the rest of its earnings in treasury.

From 2008-2018, this changed. During that period only 44% of the money that Purdue upstreamed to the Sacklers was needed to pay taxes on Purdue's earnings. 56% of those distributions were retained by the family. This change – regardless of what occasioned it --

resulted in Purdue's having far less in its treasury when it declared bankruptcy than would have been the case had the family adhered to the prior distribution pattern.

I am struggling with whether this is something that a court can/should take into account in deciding whether the releases on which the Sacklers conditioned their financial contribution to the Debtors' estate are "abusive" in the *Metromedia/Manville III* sense – especially in light of evidence in the record that the Sacklers were concerned about litigation risk during those later years and were being advised to adopt an "aggressive" plan of cash distribution during that period. I can't find any guidance in prior cases because, as far as I can tell, nothing remotely similar happened in any prior case. And as I told you yesterday, I don't think this has anything to do with whether the distributions to the Sacklers qualify as fraudulent conveyances.

I would very much appreciate your weighing in on this issue, both on its merits and on what it might mean in terms of the need for a remand to Judge Drain. As to the latter question, would your answer be different if there were a *Stern v. Marshall* problem (which is different from whether there is a subject matter jurisdiction problem – I think the Debtor has pretty much resolved that issue to my satisfaction)?

Finally, while I doubt that there is much of anything that anyone has to say on the statutory authorization issue that has not already been said, if, after yesterday's argument, you have thought of some new argument, feel free to bring it to my attention.

I don't need (or want) additional briefing on any other issue.

I would appreciate having your thoughts by next Monday morning at 9 AM at the latest. I would like to promise you an opinion next week, but I simply cannot, although I will try. Please bring me up to date on the various deadlines that are presently in force.

Dated: December 1, 2021

_____
U.S.D.J.

BY ECF TO ALL PARTIES