UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re: PURDUE PHARMA<br><br>BANKRUPTCY APPEALS | 21-cv-7532;<br>21-cv-7585;<br>21-cv-7961;<br>21-cv-7962;<br>21-cv-7966;<br>21-cv-7969;<br>21-cv-8034;<br>21-cv-8042;<br>21-cv-8049;<br>21-cv-8055;<br>21-cv-8139;<br>21-cv-8258;<br>21-cv-8271;<br>21-cv-8548;<br>21-cv-8557;<br>21-cv-8566<br>(Consolidated) |

**SUPPLEMENTAL BRIEF OF APPELLEES**
**MORTIMER-SIDE INITIAL COVERED SACKLER PERSONS**

Maura K. Monaghan
Jasmine Ball
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
Telephone:  (212) 909-6000
Facsimile:  (212) 909-6836

*Attorneys for Mortimer-Side Initial Covered*
*Sackler Persons*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................... ii

PRELIMINARY STATEMENT ......................................................................................... 1

ARGUMENT ..................................................................................................................... 1

I.     Changes in the Ratio of Tax to Non-Tax Distributions Were the Result of
       Business Developments, Not a Plan To Abuse the Bankruptcy Process ........................... 1

II.    There Is Neither Documentary Nor Testimonial Evidence of Any Plan To
       Leverage an Opportunity To Seek Third-Party Releases .................................... 9

III.   There Is No "Abuse" Here Because the Bankruptcy Court, as Required by Second
       Circuit Authority, Found That the Shareholder Releases Are Necessary to the
       Debtors' Reorganization ......................................................................... 11

IV.    The Bankruptcy Court's Findings That There Was No Abuse of the System Took
       into Account Allegations That Distributions Were Improper .......................... 17

CONCLUSION .................................................................................................................. 23

CERTIFICATE OF COMPLIANCE .............................................................................. 25

CERTIFICATE OF SERVICE ....................................................................................... 26

i

# TABLE OF AUTHORITIES

**CASES**

*Dunaway v. Purdue Pharmaceuticals L.P. (In re Purdue Pharm. L.P.)*,
    619 B.R. 38 (S.D.N.Y. 2020)............................................................................15

*In re Aegean Marine Petroleum Network Inc.*,
    599 B.R. 717 (Bankr. S.D.N.Y. 2019)......................................................15, 16

*In re Delphi Corp.*,
    No. 05-44481 (RDD),
    2009 WL 2482146 (Bankr. S.D.N.Y. July 30, 2009) .......................................13

*In Re Direct Access Partners, LLC*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019).................................................................6

*In re Edwards*,
    228 B.R. 552 (Bankr. E.D. Pa. 1998) ...............................................................22

*In re Exide Holdings, Inc.*,
    No. 20-11157-CSS,
    2021 WL 3145612 (D. Del. July 26, 2021) ......................................................19

*In re Johns-Manville Corp. (Manville III)*,
    517 F.3d 52 (2d Cir. 2008),
    *rev'd on other grounds*, 557 U.S. 137 (2009)........................................16, 17, 18

*In re Love*,
    957 F.2d 1350 (7th Cir. 1992) ..........................................................................23

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005)..............................................13, 14, 15, 17, 22

*In re Millennium Holdings II, LLC*,
    945 F.3d 126 (3d Cir. 2019)..............................................................................12

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015).................................................................22

*In re OxyContin Antitrust Litig.*,
    530 F. Supp. 2d 554 (S.D.N.Y. 2008).................................................................6

*In re Residential Cap., LLC*,
    497 B.R. 720 (Bankr. S.D.N.Y. 2013)...............................................................19

*In re Sabine Oil & Gas Corp.*,
    547 B.R. 503 (Bankr. S.D.N.Y. 2016)...............................................................12

*In re Sabine Oil & Gas Corp.*,
    555 B.R. 180 (Bankr. S.D.N.Y. 2016) ..................................................................12

*Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*,
    190 F.3d 64 (2d Cir. 1999)..................................................................................23

*Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*,
    No. 00 Civ. 8029 (SHS),
    2004 WL 26523 (S.D.N.Y. Jan. 5, 2004) ...............................................................6

*Urban Archaeology Ltd. v. Dencorp. Invs., Inc.*,
    12 A.D.3d 96 (1st Dep't 2004) ..............................................................................7

## PRELIMINARY STATEMENT

Appellees, the Mortimer-side Initial Covered Sackler Persons ("Side A"),[1] by and
through their undersigned counsel, submit this statement in response to questions raised by this
Court during the November 30, 2021 hearing and in a docket order dated December 1, 2021.

## ARGUMENT

I.  **Changes in the Ratio of Tax to Non-Tax Distributions Were the Result of Business
    Developments, Not a Plan To Abuse the Bankruptcy Process**

The Court raised the question of whether the history of distributions out of Purdue, and in
particular changes in the ratio of non-tax to tax distributions between the periods before and after
2007, raise the specter that the Bankruptcy Court failed to consider the possible existence of any
plan by the shareholders to obtain third-party releases in bankruptcy by compelling the need for
their separate contribution in order to allow Purdue to reorganize. The Court characterized this
question as distinct from the issue of whether the distributions were actual or constructive
fraudulent conveyances, but rather as a separate, overriding question related to the integrity of
the bankruptcy process. Schedule for Further Briefing, ECF No. 234.[2] Fortunately, there is a
clear answer that is well supported by the existing record before Judge Drain, which should put
to rest any questions that the Court might have.

Nothing in the undisputed and extensive financial records suggests that any decisions
about distributions were made as part of a secret plan to obtain leverage for releases in

---

[1] The Side A ICSPs include Theresa Sackler, Ilene Sackler Lefcourt, Kathe Sackler, and
Mortimer D.A. Sackler, as well as trusts of which they are beneficiaries and the trustees of those
trusts, and Beacon Company. Amended and Restated Case Stipulation Among the Debtors, the
Official Committee of Unsecured Creditors and Certain Related Parties ¶ 1, Bankr. ECF No. 518.
Capitalized terms not otherwise defined herein shall have the meaning set forth in Side A's
Appellee Brief, ECF No. 156.

[2] References to "ECF No." are references to items on the docket of the lead case in these
appeals, *In re Purdue Pharma L.P.*, No. 21-cv-7532 (CM) (S.D.N.Y.). References to "Bankr.
ECF No." are references to items on the docket of the bankruptcy case below, *In re Purdue
Pharma L.P.*, No. 19-23649 (Bankr. S.D.N.Y.).

bankruptcy.  To the contrary, the pattern of distributions here is instead entirely consistent with Purdue's business results—including the sudden restoration in early 2008 of the patent on its key product after Purdue had been subject to generic competition—and evolving needs at different points in time.  Indeed, it is hard to fathom how anyone could have embarked on any plan dependent upon the uncertainties of obtaining substantial cash commitments from many separate parties, negotiating a bankruptcy settlement with third-party releases, <u>and</u> obtaining approval of such releases by the bankruptcy court under the nuanced, complex precedents that would govern such releases.

If the scheme posited by the question was to deliberately weaken Purdue so it could not reorganize without a shareholder contribution, the critical question, as the Court's reference to Purdue's "treasury" captures, ***is what the shareholders left in Purdue, in alleged anticipation of a Chapter 11 filing and third-party releases***, not what the shareholders took out (the subject of a fraudulent conveyance analysis).  The indisputable data on that point shows the exact opposite of a pattern aimed at leveraging third-party releases.  The amount of cash left in the business <u>increased</u> materially in the post-2007 period compared to the earlier period, more than tripling from approximately $426 million in 2007 to $1.36 billion in unrestricted cash on hand at the time of the Chapter 11 filing.[3]  Purdue was in a stronger, more robust cash position filing for bankruptcy in 2019 than it would have been had it filed for bankruptcy in 2007 (which was never contemplated).

On an annual basis, Purdue retained significantly more free cash after 2007 than before. The record demonstrates that in the period from 2008 through the Chapter 11 filing in 2019, after

---

[3] Audited Combined Financial Statements for Years Ended December 31, 2008 & 2007 at 2 (JX-2695); Decl. of Jon Lowne in Supp. of Debtors' Chapter 11 Pets. & First Day Pleadings ¶ 40, Bankr. ECF No. 3.

paying taxes, the average amount of annual free cash flow remaining in Purdue was 2.6 times

<u>higher</u> than it had been on average during the period from the introduction of OxyContin in 1996

through 2007, as the graph below clearly shows:



**Annual Free Cash Flow Retained by Purdue- Average Per Year ($MM)[4]**

Further illustrating the absence of any plan to bolster leverage in order to obtain third-

party releases, as litigation against Purdue ramped up, Purdue's already impressive cash cushion

grew substantially.  The first governmental case against Purdue in the current wave of litigation

was filed in 2014; in 2015, there were only three such cases, and in 2016 only four.[5]  The wave

of litigation only gathered steam with large numbers of filings in 2017.  None of the cases named

the Sackler Former Directors as defendants until mid-2018, well after the very last non-tax

distribution in 2016.  That is to say:  Purdue never in its entire history made a single non-tax

distribution at a time when there was a case pending against Sackler family members.  Far from a

pattern indicative of a plan to starve Purdue in order to obtain third-party releases, Purdue's

---

[4] Retained free cash flow equals free cash flow minus total distributions as shown on
Purdue Pharma LP – Analysis of Historical Cash Distributions.  Debtors-Appellees' Statement in
Resp. to Question for Counsel, Attach. 2, Purdue Pharma LP – Analysis of Historical Cash
Distributions, ECF No. 177 [hereinafter "Analysis of Historical Cash Distributions"].

[5] *See* Decl. of Maureen Chakraborty at App. F-1, F-1-16 – F-1-18, Bankr. ECF. No. 3420

already robust unrestricted cash on hand <u>grew</u> by more than $500 million (more than 60 percent) from the period starting in 2014 to the Chapter 11 filing:[6]



**_Annual Cumulative Distributions and Purdue Cash Cushion 2007-2019_**[7]

If the pattern the Court is concerned about were taking place, the blue (distribution) and green (cash reserve) lines would move in the opposite direction than they do:  distributions would rise and cash reserves would fall as the threat of litigation appeared.  That is indisputably not what happened.

Turning from the cash reserves to the distribution history, Purdue's distributions were driven by the amount of free cash flow it had on hand, not by some pre-ordained ratio between tax and non-tax distributions.  The Court wondered whether the relationship between free cash flow and distributions changed dramatically post-2007 as compared to the period before.  *See* Nov. 30, 2021 Hr'g Tr. at 218:24–219:9.  It did not.  While there was no fixed proportionality either before or after 2007, distributions starkly tracked free cash flow in essentially the same way:

---

[6] Decl. of Maureen Chakraborty at Ex. 8, Bankr. ECF. No. 3420; Lowne Decl ¶ 40.
[7] *See* Analysis of Historical Cash Distributions.



*Annual Free Cash Flow and Distributions 1996–2019 ($MM)*[8]

There are good and normal-course reasons why distributions would be correlated to free cash flow, while the relationship between tax and non-tax distributions would not be particularly instructive.  Side A is not aware of any evidence of any decision-making that calculated shareholder distributions as a percentage of tax distributions.  As a pass-through entity for tax purposes, Purdue's shareholder agreement (like the shareholder agreements of many partnerships, including, for example, many law partnerships) required it to distribute sufficient cash for payment of the taxes on Purdue's income.  *See* Decl. of Jonathan Greville White ¶ 29, Bankr. ECF No. 3451.  For Side A, taxes were estimated and the withholding paid directly by a U.S.-based entity to the taxing authorities.  *Id.*  Those calculations, based on revenues and tax rates, had nothing to with the discussion of how much of the cash remaining after payment of all expenses (including not only taxes and working capital, but capital investment funding) should be reinvested in the business or distributed to shareholders.

---

[8] *See* Analysis of Historical Cash Distributions.

Instead, the change in ratios beginning in 2008 observed by the Court is purely a function of business developments at Purdue that provided it with varying levels of revenues and profits—and, ultimately, free cash.  Like all new drugs, when OxyContin was launched in the 1990s, it was not immediately profitable.[9]  And in 2004, Purdue's revenue plummeted because it lost patent exclusivity for OxyContin and thereafter faced generic competitors in the market.  *See Purdue Pharma L.P. v. Endo Pharmaceuticals Inc.*, No. 00 Civ. 8029 (SHS), 2004 WL 26523 (S.D.N.Y. Jan. 5, 2004).  At this time, there were minimal profits, and therefore little free cash available for non-tax distributions.[10]  There was, however, still the obligation to pay taxes on Purdue's income and thus the need for tax distributions.  In a dramatic turnaround, a later decision restored the patent in January 2008.  *See In re OxyContin Antitrust Litig.*, 530 F. Supp. 2d 554 (S.D.N.Y. 2008).  Revenues more than doubled after the ruling:  in 2006, Purdue's revenues had dropped to $867 million; in 2008, its revenues jumped above $2 billion and remained above $2 billion for each of the following six years.[11]  It was during this period that Purdue had significant amounts of free cash and authorized the vast majority of non-tax distributions and distributions to the IACs that were noted by the Court.  Notice of Filing of Report of Special Committee, Attach. 1, Cash Transfers of Value Analysis at 25 [hereinafter "AlixPartners Report"].  As the court held in *In Re Direct Access Partners, LLC*, 602 B.R. 495, 545–46 (Bankr. S.D.N.Y. 2019), "corporations and limited liability companies often make profit distributions—in fact, that is the very purpose for which business is conducted. . . . [Large profit distributions were] perfectly consistent with the executives' belief that DA Partners was more profitable after 2009 than it had ever been before."

---

[9] *See* Analysis of Historical Cash Distributions.
[10] *See* Analysis of Historical Cash Distributions.
[11] *See* Analysis of Historical Cash Distributions.

Mature companies like Purdue with greater free cash flow very often make higher distributions than early stage companies with lower revenues. *See, e.g.*, *Urban Archaeology Ltd. v. Dencorp. Invs., Inc.*, 12 A.D.3d 96, 97 (1st Dep't 2004) ("Under the management of Ronan and Shapiro, the Company has increased its revenues from $40,000 in 1988 to $12 million in 2002, with a high level of profitability. As a result, both Shapiro and Reiver have received substantial yearly distributions."). Purdue also was not an outlier in the proportion of its free cash flow that it distributed to its shareholders. Many privately held companies, and even publicly held companies, distribute a similarly significant percentage of their free cash flow to shareholders in the form of dividends and share buybacks. *See, e.g.*, IBM Annual Report 2020 at 2, A Letter from Our Chairman and Chief Executive Officer (Feb. 23, 2021)[12] (IBM generated $10.8 billion in free cash flow and issued $5.8 billion in dividend payments to shareholders); Rio Tinto Interim Results 2021 at 2 (July 28, 2021) (as of June 2021, Rio Tinto has offset $10.2 billion in free cash flow with $6.4 billion in dividends).[13]

Finally, the Court sought reassurance that the shareholders did not wait until federal oversight was out of the way after Purdue's 2007 plea agreement to ramp up distributions. As an initial matter, it was simply not the case that federal scrutiny went away after Purdue's 2007 plea agreement, thus freeing the shareholders to put into place a bankruptcy-focused plan, as the Court's inquiry suggested. *See* Nov. 30, 2021 Hr'g Tr. at 223:8–20. To the contrary, pursuant to the five-year Corporate Integrity Agreement ("CIA") that Purdue entered into alongside its plea, Purdue was under intense observation by an independent review organization and the

---

[12] Available at https://www.ibm.com/annualreport/assets/downloads/IBM_Annual_Report_2020.pdf (last accessed 12/3/2021).

[13] Available at https://www.riotinto.com/-/media/Content/Documents/Invest/Financial-news-and-performance/Results/RT-Half-year-results-2021.pdf (last accessed 12/1/2021).

Department of Health and Human Services Office of the Inspector General overseeing its marketing and promotional activities during precisely the time when the lion's share of the distributions at issue indisputably took place. The Board was consistently and emphatically assured that all of Purdue's operations were in compliance with its legal obligations and Purdue, in fact, successfully closed out the CIA in January 2013.[14]



*Non-Tax Cash Distributions 2007–2019 ($MM) and Relevant Litigation Events*

The chart above demonstrates another reason the pattern of distributions does not support an inference of abuse: post-2007, the amount of the distributions is <u>inversely</u> correlated to the imminence of the Chapter 11 filing. In the five year period from 2008 to 2012, non-tax distributions averaged $808 million per year; in the period from 2013 to 2018 (the last full year before the Chapter 11 filing), they averaged $287 million, nearly 65% lower. Each year from 2013 to 2018, the annual non-tax distribution was lower than it was in each year between 2008 and 2012. Non-tax cash distributions ceased altogether by the end of 2016, nearly three years

---

[14] *See, e.g.,* Side A Suppl. App., Feb. 8, 2008, Corporate Compliance Quarterly Report to Board of Directors at 3 (JX-1828); Side A Suppl. App., DHHS OIG, Fifth Annual Report – Purdue Pharma, LP (JX-1791).

before the bankruptcy filing.[15]  This pattern does not support any notion that distributions were determined in anticipation of bankruptcy; instead, distributions were made out of free cash flow when it was available, while ample—and indeed growing—cash reserves were maintained.

In addition, Purdue had substantially enhanced its internal governance post-2007 such that every single non-tax distribution was unanimously approved by a board that in addition to members of the Sackler family included eminent outside directors, including the former CFO of Merck, the Dean of Duke Medical School, the former President of Janssen Pharmaceuticals, and a highly renowned product development specialist.  These outside directors approved the distributions because they were consistent with Purdue's business results.[16]

Purdue's undisputed financial records thus put to rest any question about the existence of a plan at any time by the shareholders to take distributions in order to compel a shareholder contribution to a Chapter 11 reorganization that would warrant a third-party release.  The objective record of Purdue's financial circumstances is devoid of any such evidence.  Instead, the full record of Purdue's revenues, free cash flow, distributions, and cash reserves contains abundant evidence that the pattern that this Court observed is fully explained by Purdue's business circumstances.

## II.    There Is Neither Documentary Nor Testimonial Evidence of Any Plan To Leverage an Opportunity To Seek Third-Party Releases

No party has come forward with a single document or testimonial excerpt indicating that, at the time the distributions were made from Purdue, the Shareholder Released Parties were

---

[15] In fact, every year after the CIA concluded, a substantial majority of the non-tax distributions were invested in the IACs, not made in cash distribution.  Far from being hidden, these funds were invested in businesses that, under the Plan, will be sold and the proceeds paid to the Estate.  *See* AlixPartners Report at 25.

[16] *See, e.g.*,  Side A Suppl. App., Excerpts from Deposition of Cecil Pickett at 176–77; Side A Suppl. App., June 24, 2011 Minutes of a Meeting of the Purdue Pharma Inc. Board of Directors; Side A Suppl. App., June 24, 2011 Handwritten Notes of Anthony Roncalli of Meeting of the Purdue Pharma Inc. Board of Directors.

planning for a possible Purdue bankruptcy years later, much less demonstrating that the

Shareholder Released Parties were taking steps aimed at enhancing their chances of obtaining a

third-party release as part of such a bankruptcy. Appellants, the Debtors, and all creditors had

ample opportunity to scour the record to see if any such evidence exists—but there is none.

During the discovery process that followed Purdue's Chapter 11 filing, creditor

fiduciaries had unprecedented access to information regarding Purdue and the Sackler families,

including more than 100 million pages of documents from Purdue, the Sackler families

(including emails going all the way back to 1996), the IACs, and advisors. Modified Bench

Ruling 78-79, *In re Purdue Pharma L.P.*, No. 19-23649 (RDD) (Bankr. S.D.N.Y. Sept. 17,

2021), ECF No. 3786 [hereinafter "MBR"]. Even Norton Rose Fulbright, longtime counsel to

the Sackler families, produced nearly 200,000 documents. Decl. of Michael Atkinson in Support

of Statement of Official Committee of Unsecured Creditors, Ex. A at 13, Bankr. ECF No. 3460

[hereinafter "Atkinson Decl."]. The Debtors gave the UCC access to thousands of otherwise

privileged communications involving Sackler family members under a common interest

agreement. Atkinson Decl. ¶ 12, Ex. A at 10-11. Creditors deposed every living Sackler Former

Director that had ever been sued and many advisors to the Sackler families. Two Side A family

members testified at the Confirmation Hearing. On Side A, the senior trustee-director of the

trust that is the ultimate owner of Purdue was both deposed and testified at the confirmation

hearing.

Out of that enormous documentary and testimonial record, there is <u>not a single reference</u>

to taking distributions in order to position Purdue for a bankruptcy or to position family members

to receive third-party releases in bankruptcy. As far as we are aware (and no Appellant has made

a contrary showing), before the very last non-tax distribution was made in 2016, a plan involving

bankruptcy and third-party releases was far beyond anyone's contemplation, discussion, or comprehension. Indeed, given the highly contextualized showing necessary to obtain approval of a third-party release under the Second Circuit's governing law, it seems impossible that anyone ever <u>could</u> plan, let alone years in advance, to obtain one.

Bankruptcy was not even Purdue's or the Shareholder Released Parties' first choice for resolution of these liabilities. As the Debtors' first day brief underscored, everyone hoped that a resolution in the tort system would be possible, and the parties, including the Sackler families, made every effort to achieve a consensual settlement in the tort system, engaging in intense negotiations in the Multi-District Litigation before Judge Polster in Ohio. Debtors' Informational Brief at 1–7, Bankr. ECF No. 17. The Debtors highlighted that only after months of hard-fought negotiations, the Debtors "learned through the negotiations that achieving a truly global consensual resolution of mass tort litigation in the civil tort system on the scale faced by the . . . Debtors is not achievable," as the myriad plaintiffs have "diverse interests" and "an ever-increasing number of lawsuits . . . continue[d] to deplete their estates." *Id.* at 7.

## III. There Is No "Abuse" Here Because the Bankruptcy Court, as Required by Second Circuit Authority, Found That the Shareholder Releases <u>Are</u> Necessary to the Debtors' Reorganization

The Court's inquiry about the pattern of distributions also raises the question of what constitutes "abuse" under the case law of non-debtor releases. As set forth above, it is incontestable that the distributions here were not made with any eye on gaining an advantage in the analysis of third-party releases in bankruptcy. There is simply no evidence in the pattern of distributions or the voluminous documents and testimony that would support such an implication.

Side A recognizes that various claimants have made the distinct allegation that these distributions are actual or constructive fraudulent conveyances, relying on certain documents—

and Side A has vigorously contested those allegations and cited to countervailing evidence.  *See* Nov. 30, 2021 Hr'g Tr. 220:1-2 (The Court: "I'm not interested in whether a fraudulent conveyance claim can be proved."); *see also* Obj. of Side A to UCC Mot. to Compel, Bankr. ECF No. 2171; Sur-Reply Mem. of Obj. of Side A, Bankr. ECF No. 2246.  But allegations of fraudulent conveyance do not offer a basis to undermine a release as part of the settlement of, among other claims, **<u>exactly those allegations</u>**.  Were it otherwise, settlement of fraudulent conveyance claims in bankruptcy would prove impossible because the court would necessarily have to make a finding that the claims were unfounded in order to approve the release.

Instead, courts have readily approved releases where a releasee has received distributions from the Debtor—including distributions that are subject to colorable challenge as fraudulent conveyances and provide part or all of the funding of the contribution of the releasee to the plan of reorganization—where those releases are otherwise supported by sufficient findings.  *See In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 291–93 (Bankr. S.D.N.Y. 2016) (approving third-party releases for lenders where claims were based on a credit agreement alleged to be a fraudulent conveyance and would have greatly reduced value available to other creditors if successfully asserted), *and In re Sabine Oil & Gas Corp.*, 547 B.R. 503 (Bankr. S.D.N.Y. 2016) (analyzing at length potential fraudulent conveyance claims against lenders).; *see also In re Millennium Holdings II, LLC*, 945 F.3d 126, 130–32, 139 (3d Cir. 2019) (commending bankruptcy and district courts for "exercis[ing] appropriate—indeed, exemplary—caution and diligence" in approving releases for equity holders who received a $1.3 billion "special dividend" and contributed $325 million to reorganization, where releases were key to payment of DOJ claims that enabled the debtor to reorganize).  In the *Delphi* bankruptcy, GM received a third-party release in exchange for various contributions to the reorganization.  That third-party release was

an integral part of a settlement with the debtors of the parties' respective claims against each

other, which included allegations that GM had extracted billions of dollars in value in the very

spinoff transaction that created the debtors. *See* First Am. Disclosure Statement DS-54–DS-87,

*In re Delphi Corp.*, No. 05-44481 (RDD) (Bankr. S.D.N.Y. Dec. 10, 2007), ECF No. 11388; *see*

*also In re Delphi Corp.*, No. 05-44481 (RDD), 2009 WL 2482146, at *19 (Bankr. S.D.N.Y. July

30, 2009) (approving third-party release where GM's contributions "provide[d] a substantial

source of funds to the Debtors' estates and allows substantial distributions to be made to

[creditors]").

The abuse courts are concerned with is the naked purchase of third-party releases that do

not contribute to the plan of reorganization and confer no benefit on the debtor and creditor body

at large, instead providing value to the third parties alone. For that reason, instead of looking at

contested allegations of pre-petition conduct, analysis of potential abuse focuses <u>on the</u>

<u>bankruptcy case itself</u> and on whether the bankruptcy court has made adequate and specific

findings that the third-party releases are integral to the plan of reorganization and offer

meaningful benefit to the estate and creditors, rather than conferring value only on the releasees.

*See In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142–43 (2d Cir. 2005) (holding, in

discussion about potential for abuse, that the fundamental problem was that "[t]he bankruptcy

court's findings were insufficient. A nondebtor release in a plan of reorganization should not be

approved **absent the finding that truly unusual circumstances render the release terms**

**important to the success of the plan, focusing on the considerations discussed above**"

(emphasis added)).

*Metromedia* makes clear that the <u>antidote</u> to concerns about abuse is detailed findings

about the centrality of the third-party releases to the reorganization, such as the Bankruptcy

Court made here, explicitly weighing exactly the considerations identified by the court in
*Metromedia*. *See* MBR at 132–44 (making affirmative findings that each *Metromedia* factor was
met, including that the cases "are unique," the release was "narrowly tailored," the "plan would
unravel" without the shareholder contribution, the plan was "overwhelmingly accepted," the
payment was substantial in light of litigation risks, and the settlement was negotiated through a
fair process). There also can be no doubt that the third-party releases here are valuable to other
stakeholders in the bankruptcy and not just the third-party releasees when statutory fiduciaries to
the creditors have proclaimed that even if the Sackler families were not seeking the releases, the
creditors would themselves insist upon them because without them, the entire interlocking
structure of the Plan fails. *See, e.g.*, UCC Brief at 18, ECF No. 162 ("[W]itnesses and counsel
for significant creditor groups confirmed at the confirmation hearing that they would not have
agreed to the settlement, and to limit themselves to the guaranteed recoveries available under the
Plan, unless all stakeholders were bound by the Release.").

In *Metromedia*, the Second Circuit expressed its disapproval of a third-party release
where there was "no finding (or evidence presented) that the [non-debtor release] was *itself*
important to the Plan." 416 F.3d at 143 (emphasis in original). In fact, strikingly, when that
debtor's chief operating officer was asked if he knew "what happens with respect to [the
settlement] in the event the [non-debtor release] is not granted," he answered "[n]o, not really."
*Id.* at 143 n.7. The situation here could not be more different: Judge Drain expressly found that
without the third-party releases, the consequences to the Plan of Reorganization were immediate
and dire. *See* MBR at 141–43 (explaining that, without the releases, the cases would convert to
Chapter 7, litigation creditors would likely recover nothing from the Estate, and creditors would
be at war with each other in costly and risky litigation against the released parties).

In *In re Aegean Marine Petroleum Network Inc.*, the court set forth a thoughtful analysis of when third-party releases are and are not appropriate. The proposed plan at issue provided non-debtor releases to audit committee members, with the only justification offered being the need to give the directors "peace of mind as a reward for the service that they provided." 599 B.R. 717, 728 (Bankr. S.D.N.Y. 2019). None of the committee members was making any financial contribution to the plan of reorganization and no party was able to identify any claim that if not released would disrupt the reorganization. *Id.* That was particularly true because the plan already contained a broad exculpation clause for those directors' work on the restructuring itself. The court held those releases did not pass muster under *Metromedia*.

By contrast, the *Aegean Marine* court described the non-debtor releases in *Residential Capital, LLC* and *Johns-Manville* as warranted, precisely because of the determinations that the bankruptcy judges there had made that mirror what Judge Drain did here:

> In the *Residential Capital* case that was cited to me, for example, there was a huge overlap between claims that Residential Capital was making against its parent company and claims that various other parties were making against the parent. In that case, the parent company did not want to settle the claims made by Residential Capital unless the overlapping third-party claims were also barred. In that context, the Court was able to make a determination as to whether the settlement with the debtor, and the funds that would be made available to third parties as a result of the settlement, justified the third-party release.

*Id.* at 727 (cited in MBR at 112 n.7). So too here: Judge Drain was able to, and did, make the determination that the "the objecting states' complaints against the Sacklers . . . essentially dovetail with the facts of the claimants' third-party claims against the Debtors" and that, without the releases, the Estate would engage in a costly, value-destructive litigation race with the Appellant States. *See* MBR at 131 (citing *Dunaway v. Purdue Pharmaceuticals L.P. (In re Purdue Pharm. L.P.)*, 619 B.R. 38, 50 (S.D.N.Y. 2020); *id.* at 143.

*Aegean Marine* also distinguished the non-essential releases in that plan from the integral

role third-party releases played in the Johns-Manville restructuring:

> Similarly, in the original *Johns-Manville* bankruptcy the court channeled certain
> future claims to a court-approved trust, in order to induce insurers to contribute
> policy proceeds to the trust.  The court was able to assess the claims that were
> being released, to see the direct connection between those claims and the
> contributions that were being made, and to decide not only whether the rights of
> affected parties were being protected, but whether the terms of the restructuring
> really depended on those releases.

599 B.R. at 727.  Judge Drain had exactly that visibility here, including from extensive testimony

from witnesses for all parties supporting the settlement, and concluded that the terms of Purdue's

restructuring depended on the releases because, "[w]ithout the settlement, . . . the plan would

unravel, including the complex interrelated settlements that depend upon the payments" from the

releasees.  MBR at 135.

The Second Circuit's decision in *In re Johns-Manville Corp.* (*Manville III*) is consistent

with the imperative to focus on the effect of the releases on the plan of reorganization.  517 F.3d

52 (2d Cir. 2008), *rev'd on other grounds*, 557 U.S. 137 (2009).  *Manville III* is about the extent

of the court's jurisdiction to issue non-debtor releases.  The court in that case concluded, in line

with case law cited in all of the Appellees' briefs here, that the bankruptcy court had jurisdiction

where the released dispute "would have an effect on the estate" and lacked jurisdiction where the

dispute to be released "has no effect on the estate."  517 F.3d at 65.  The court concluded that the

bankruptcy court lacked jurisdiction to issue third-party releases where, for example, those

releases would extend to claims against Travelers in relation to policies issued to <u>other</u>

manufacturers simply because Travelers' knowledge of asbestos risks derived from its

relationship with Manville.  *Id.* at 68.  Judge Drain's imposition of a requirement that the

Debtors' conduct be a legally relevant factor in all released claims against the third-party

releasees avoids exactly this problem.  Manville's conduct would not have been "legally

relevant" to the claims against Travelers that the court could not release; it would merely have been a background fact because Travelers would have the same liability if its knowledge of the risks of asbestos came from its insuring of another manufacturer. *Id.* at 67 n.24[17]

Judge Drain's detailed findings stand in stark contrast to what the Second Circuit was concerned could lead to abuse: the issuance of third-party releases that are irrelevant to the Plan of Reorganization. He thoroughly reviewed the applicable law set forth in *Metromedia*, *Manville III* (and its predecessors), and numerous other cases evaluating third-party releases; applying that law, he made detailed factual findings in support of the conclusion that the Shareholder Releases were necessary to the Plan and the Debtors' reorganization, and that the Shareholder Releases covered claims that, if litigated, would inflict harm on the Estate and creditors. Appellants have barely contested those findings and certainly cannot point to any clear error undermining Judge Drain's holding that the Shareholder Releases were crucial to the Debtors' reorganization.

## IV.   The Bankruptcy Court's Findings That There Was No Abuse of the System Took into Account Allegations That Distributions Were Improper

While the Confirmation Order does not recite in so many words that the Shareholder Released Parties did not abuse the bankruptcy process by taking distributions with a plan to leverage them to receive third-party releases, the Bankruptcy Court both worked zealously to guard the integrity of the process and made specific findings that the process had not been manipulated by the Sackler families to obtain unjustified third-party releases. These findings

---

[17] Similarly, as discussed at oral argument, the conduct of the Debtor is not legally relevant to the claim of her roommate against "Susie Sackler" in the hypothetical posed by the Court because Susie Sackler would have the same liability if she distributed some other drug to her roommate not manufactured by Purdue. *See* Nov. 30, 2021 Hr'g Tr. at 210:13–211:6 ("[I]f Susie Sackler did the exact same thing with a non-Purdue opioid . . . she would have the same legal problems that she has for giving her roommate OxyContin and, therefore, Purdue's conduct is not a legally relevant fact to the case . . . .").

were well supported by an extensive record that focused in very large part on the propriety of the distributions.

The Bankruptcy Court extensively analyzed <u>both</u> allegations that Purdue's distributions were improper <u>and</u> allegations that the bankruptcy process was somehow tainted by abuse from the Sackler families, and expressly found that (*i*) the Plan was the Debtors' and the creditors' Plan, free from undue influence by the Sackler families, *see* MBR at 68–71, 91–95, and (*ii*) the settlement, including the third-party releases for claims premised on the history and pattern of Purdue's distributions, was lawful and appropriate, *see id.* at 103–54. Those findings—which are not remotely erroneous—preclude any conclusion of abuse and obviate the need for any remand in order for this Court to affirm.

From the very outset of the case, and certainly from the start of the Confirmation Hearing, the question of abuse of the bankruptcy process was front and center before the Bankruptcy Court. The pre-hearing brief filed by Connecticut, Maryland, and the District of Columbia, for example, objected to the Plan based on allegations that "[t]he <u>Sackler settlement</u> and Plan create a massive moral hazard – billionaires are able to use their closely-held enterprises to extricate themselves from an onslaught of legal actions . . . by having the enterprises file for bankruptcy and then arranging to 'buy' releases for a fraction of the claims that have been made against them and profits they took from their companies."[18]

The Modified Bench Ruling rejected out of hand the allegations that the Sackler families were manipulating the bankruptcy process, stating (*i*) "clearly both [the settlement] and the process of arriving at it have not been in any shape or form a free ride for the Sacklers or enabled

---

[18] Joint Obj. of State of Connecticut, State of Maryland & District of Columbia to Confirmation of Debtors' Sixth Am. Plan or Reorganization dated Jul.19, 2021 ¶ 13, Bankr. ECF. No. 3270 (emphasis added).

them to 'get away with it'"; and (*ii*) this was "not the Sacklers' plan"; "[t]here is literally no evidence to the contrary – none."  MBR at 68, 102.

That determination was not a happenstance.  The Bankruptcy Court itself put in place safeguards to ensure that this bankruptcy (arguably the most highly publicized bankruptcy in the United States), the process that led to the settlement, and the Shareholder Releases would be free from abuse.  Among those safeguards:

- The Bankruptcy Court ordered an unprecedented level of transparency and discovery in this bankruptcy.  The Bankruptcy Court found that this case involved more and deeper discovery than any prior Chapter 11 matter.  MBR at 78 ("[The settlement] was preceded, moreover, by the most extensive discovery process that not only I have seen after practicing bankruptcy law since 1984 and being on the bench since 2002, but I believe any court in bankruptcy has ever seen.").  Indisputably, a significant focus of that discovery was the distributions from Purdue to its shareholders.  *See* Atkinson Decl., Ex. A at 14–15; *see also* Disclosure Statement for Fifth Am. Joint Chapter 11 Plan of Reorganization of Purdue Pharma L.P. & Its Affiliated Debtors at 142–47, Bankr. ECF No. 2983 [hereinafter "Disclosure Statement"].

- Settlement negotiations between the creditors and the Sackler families were overseen by two of the leading mediators in the country, Judge Layn Phillips and Kenneth Feinberg.  These were not negotiations that took place in a smoky back room; they were supervised by mediators of unchallenged integrity and the settlement between the Sackler families and the creditors embodied in the Plan took as its starting place their recommended number.  *See* MBR at 69–70; *see also* Mediators' Report at 1, 8, Bankr. ECF No. 2548.

- A further round of settlement negotiations that led to a heightened level of consensus and the final terms of the creditors' settlement with the Sackler families was overseen by Judge Shelley Chapman, who devoted an extraordinary amount of time and effort on top of her regular judicial responsibilities to the achievement of the enhanced settlement.  *See* MBR at 70; *see also* Mediator's Report ¶¶ 4–7, Bankr. ECF No. 3119.

Courts have held that protections like a well-regarded mediator operate to ensure that a settlement that includes third-party releases is surrounded by assurances of good faith and absence of abuse.  *See, e.g.*, *In re Exide Holdings, Inc.*, No. 20-11157-CSS, 2021 WL 3145612, at *12–13 (D. Del. July 26, 2021) ("The record demonstrates that the plan was proposed in good faith as a way to preserve the proposal made by the mediators, and I see no error in the Bankruptcy Court's finding."); *In re Residential Cap., LLC*, 497 B.R. 720, 751 (Bankr. S.D.N.Y.

19

2013) (noting that the "Settlement was achieved after months of global mediation" and that the "parties that negotiated this Settlement were represented by sophisticated counsel and they did so under the supervision of [the mediators]").

The Bankruptcy Court's statement in response to a motion for an examiner is also instructive. One creditor (represented by a bankruptcy professor) filed a motion for an examiner, arguing that "the owners of the Debtors, the Sackler families, <u>may have manipulated this process to obtain releases</u>" and claimed that the Sackler families had "significant and undue influence" over the bankruptcy process. *See* June 16, 2021 Hr'g Tr. at 18:4–21, Bankr. ECF No. 3094 (emphasis added). The Bankruptcy Court rejected this contention—but nonetheless appointed an independent examiner who affirmed the same conclusion. The Bankruptcy Court explicitly stated that the motion was being granted not because he credited the allegations, but in order to ensure that the public understood that the process was one of integrity, free from undue influence. June 16, 2021 Hr'g Tr. at 137:17–139:23, 168:25–171:16, Bankr. ECF No. 3094.

The examiner's report hammered home the conclusion that the process was not abused. The negotiation and evaluation of the final settlement on the Debtors' behalf was conducted by a special committee of independent board members, most of whom never had even met any member of the Sackler families. Report of Stephen D. Lerner, Examiner, at 15–17, Bankr. ECF No. 3285 ("The Examiner's investigation revealed the general absence of communications between the Sackler Families and the members of the Special Committee after the filing of the Debtors' bankruptcy cases."). In negotiating the settlement and the third-party releases, the independent Special Committee was of course joined by fierce advocates for the creditors, including the UCC, the Ad Hoc Group of Supporting States, the MSGE Group, the Native American Tribes Group, the Ad Hoc Group of Individual Victims, the Ad Hoc Group of

Hospitals, the Third-Party Payor Group, the Ratepayer Mediation Participants, and the NAS Committee.  None of those advocates overlooked the distributions in negotiating the settlement.

The Bankruptcy Court's decision to confirm the Plan and to reject allegations of manipulation of the process was similarly informed by a detailed analysis concerning distributions by Purdue.  The history and amount of the distributions were no secret:  they were fully disclosed from the very start of the bankruptcy, and the circumstances surrounding them were also thoroughly explored.  *See generally* AlixPartners Report.  Every board record of Purdue was disclosed.  Every non-privileged communication between and among the Sacklers regarding distributions was disclosed.  Atkinson Decl. Ex. A at 13–16; Disclosure Statement at 140–41.  In the Disclosure Statement that went to creditors as part of the voting package, both the third-party releases and the distributions were prominently featured.  Disclosure Statement at 13, 32–38, 143–46.  In its report to the creditors embodying its recommendation that creditors vote in favor of the Plan, the UCC outlined the intensive investigation it had made into the distributions.  Atkinson Decl., Ex. A at 13–16.

The Confirmation Hearing similarly fully explored allegations about the distributions.  In pre-hearing briefs, Appellant States raised allegations about those distributions and both Side A and Side B responded to those allegations.  The Modified Bench Ruling summarized arguments that could be made by both sides regarding those distributions and concluded that the settlement was appropriate and would provide creditors with a far greater recovery then they would receive in litigation.  MBR at 143 ("I therefore conclude that if I denied confirmation of the plan, the objectors' aggregate net recovery on their claims against the Debtors <u>and</u> the shareholder released parties would be <u>materially less than their recovery under the plan</u>." (emphasis added)).  To be sure, the Bankruptcy Court did not ultimately decide the question of whether the

distributions were proper; but the very essence of settlement is that settled issues are compromised rather than decided. *See In re NII Holdings, Inc.*, 536 B.R. 61, 65, 100 (Bankr. S.D.N.Y. 2015) (explaining that a court should not "focus[] on a precise measurement of likely outcomes" because "[c]ompromise and settlement are the heart and soul of every successful chapter 11 proceeding"); *In re Edwards*, 228 B.R. 552, 569 (Bankr. E.D. Pa. 1998) ("The court's role is not to conduct a trial or mini-trial, or to decide the merits of individual issues."). A settlement cannot be attacked because the court did not decide the ultimate issue that is being resolved by the settlement.

What the Bankruptcy Court <u>did</u> decide was that the process surrounding the settlement ensured that it was appropriate, taking into account all of the allegations surrounding the distributions and all of the defenses to them. While, as this Court observed, the Bankruptcy Court expressed personal sentiment regarding the settlement amount, it went on to buttress its actual finding that the settlement amount was appropriate by pointing to the process that led to the settlement:

> [E]xtremely well-represented and dedicated parties on the prospective plaintiffs' side, knowing far more than I . . . about the strengths and weaknesses of the claims, costs, delay, and collection issues, agreed to this settlement as modified as a result of that second mediation. . . . [T]he negotiations of the Sackler settlement were clearly arms-length.

MBR at 101, 143. This conclusion again confirms that the settlement was appropriately reached after intense negotiations among well-informed adversaries, and was not the product of abuse.

If this Court concludes that under *Metromedia* and other Second Circuit case law, the Confirmation Order needs to include an explicit statement that the bankruptcy process was not abused, there is fortunately no need for a remand that would delay the implementation of what the UCC has characterized as a resolution that "will save lives now." Nov. 30, 2021 Hr'g Tr. at 173:13. Judge Drain made ample findings in direct support of that conclusion, including:

- "[T]he Debtors are not run by the Sacklers in any way and have not been since before the start of these cases" and "these cases were driven as much, if not more, by the [UCC] and other creditors in these cases . . . ."  MBR at 68–69.

- The settlement process was overseen by three "incredibly experienced and effective mediators," and "was clearly and unmistakably the product of arm's-length bargaining . . . ."  MBR at 69–71, 78.

- Settlement was preceded "by the most extensive discovery process" that Judge Drain has ever seen in almost forty years of practice and almost twenty years on the bench or that, to Judge Drain's knowledge, "any court in bankruptcy has ever seen."  MBR at 78.

On appeal, this Court is free to rely on those findings and, if it so decides, simply add a line to the Confirmation Order connecting those dots.  *See, e.g.*, *Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190 F.3d 64, 69 (2d Cir. 1999) ("[The trial court's] failure to make factual findings regarding the latent defect defense does not require a remand. . . . [W]e may review the district court's decision 'if we are able to discern enough solid facts from the record to permit us to render a decision.'" (quoting *Davis v. N.Y.C. Hous. Auth.*, 166 F.3d 432, 436 (2d Cir. 1999)) (citations omitted)); *In re Love*, 957 F.2d 1350, 1361 (7th Cir. 1992) ("Deciding a factual question on appeal not considered by the lower court is very different from looking to the entire record in order to find further support for a lower court's factual findings and inferences.").

## CONCLUSION

Nothing in the record supports an inference that decisions about distributions were made by the Sackler families to leverage an opportunity to obtain third-party releases.  To the contrary, over time, Purdue built up a greater cash reserve and its distributions were driven by business results, not anticipation of a bankruptcy.  The Bankruptcy Court did not allow the shareholders to simply purchase releases.  Instead, the Bankruptcy Court made detailed findings regarding the centrality of the releases to the Plan and their value to the Estate and creditors.  The Court also thoroughly reviewed the history of distributions and the arguments for and against their

propriety, and found that there was no abuse of the bankruptcy system.  For all of the reasons set forth above, the Confirmation Order should be affirmed.


Dated: December 5, 2021                          Respectfully submitted,
New York, New York

                                                 DEBEVOISE & PLIMPTON LLP
                                                 By:  */s/ Maura Kathleen Monaghan*
                                                 Maura Kathleen Monaghan
                                                 Jasmine Ball
                                                 919 Third Avenue
                                                 New York, New York 10022
                                                 Telephone:(212) 909-6000
                                                 Facsimile: (212) 909-6836
                                                 Email:      mkmonaghan@debevoise.com
                                                             jball@debevoise.com

                                                 *Counsel for the Mortimer-side Initial Covered Sackler Persons*

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that the foregoing brief complies with the type-volume, type-face, and type-style limitations of Bankruptcy Rule 8015.  Excluding table of contents, table of authorities, signature blocks, and certificates, this brief contains 7,376 words.  Under the Individual Rules of Chief Judge Colleen McMahon, this Court requires a type-face of twelve-point serif font.  The foregoing complies with the typeface and type style requirements.

Dated: December 5, 2021
New York, New York

By:  <u>*/s/ Maura Kathleen Monaghan*</u>
Maura Kathleen Monaghan

*Counsel for the Mortimer-side Initial Covered Sackler Persons*

## <u>CERTIFICATE OF SERVICE</u>

I, Maura Kathleen Monaghan, hereby certify that, on December 5, 2021, I caused true and correct copies of the foregoing document to be served by the Court's CM/ECF System to all parties who are deemed to have consented to electronic service. I have also caused a courtesy copy of the foregoing document to be sent by hand delivery to the Chambers of Judge Colleen McMahon.

Dated: December 5, 2021
New York, New York

By: */s/ Maura Kathleen Monaghan*
Maura Kathleen Monaghan

*Counsel for the Mortimer-side Initial Covered Sackler Persons*

26