**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br>PURDUE PHARMA L.P., *et al.*,<br>BANKRUPTCY APPEALS | No. 21-cv-7532 (CM) (Consolidated) |
| This Filing Relates to | |
| ALL MATTERS | |

## SUPPLEMENTAL BRIEF OF APPELLEE THE RAYMOND SACKLER FAMILY

**MILBANK LLP**
Gerard Uzzi
Alexander B. Lees
55 Hudson Yards
New York, New York 10001
Tel.: (212) 530-5000
Facsimile: (212) 530-5219
guzzi@milbank.com
alees@milbank.com

**JOSEPH HAGE AARONSON LLC**
Gregory P. Joseph
Mara Leventhal
485 Lexington Avenue, 30th Floor
New York, New York 10017
Tel.: (212) 407-1200
Facsimile: (212) 407-1280
gjoseph@jhany.com
mleventhal@jhany.com

*Counsel for the Raymond Sackler Family*

# TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

I.     JUDGE DRAIN CONSIDERED WHETHER THERE WAS ABUSE AND PROPERLY
       CONCLUDED THE RELEASES SATISFIED *METROMEDIA* ...................................... 8

II.    NO DISTRIBUTION WAS MADE WITH INTENT TO ABUSE
       THE BANKRUPTCY PROCESS .................................................................... 13

       A.    The Increased Distributions in 2008 Followed the Restoration of Patent
             Exclusivity For OxyContin .................................................................. 13

       B.    Purdue Was Hugely Profitable with Large Cash Reserves and No Debt .......... 15

       C.    The Board Invested Billions of Dollars in Research and Development after
             2007 ................................................................................................ 17

       D.    Side B Directors Sought to Invest More in Purdue ............................... 18

       E.    No Threat From Opioid Litigation Was Perceived When The Challenged
             Distributions Were Made .................................................................... 19

       F.    The Board Understood Purdue Was Operating in Compliance with Law .......... 22

       G.    Board Materials Confirm the Board Did Not Expect to Face Judgments
             Purdue Could Not Pay ...................................................................... 28

       H.    Sophisticated Market Participants Did Not Foresee the Opioid Litigation
             Risk to Purdue or Other Opioid Manufacturers ..................................... 29

       I.    Purdue's 2020 Guilty Plea and Civil Settlement Were Not Foreseen or
             Reasonably Foreseeable by the Board when Distributions Were Made ............ 30

III.   THERE IS NO EVIDENCE THAT THE BOARD HARBORED LITIGATION CONCERNS ........... 30

       A.    November 20, 2006 Email from Jonathan Sackler (JX-2229) ..................... 31

       B.    March 25, 2007 Email from Jonathan Sackler (JX-2235) ......................... 32

       C.    March 22, 2007 Email from Jonathan Sackler (JX-2234) ......................... 33

i

D.     May 17, 2007 Email from David Sackler (JX-2237)............................................34

E.     June 22, 2007 Email from David Sackler (JX-2239)..........................................35

F.     June 25, 2007 Email from David Sackler (JX-2240).........................................35

G.    July 24, 2007 Peter Boer Memorandum (JX-2241 & JX-1660)........................36

H.    April 12, 2008 Memo from Peter Boer (JX-2254) ............................................37

CONCLUSION.....................................................................................................................39

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*,
    483 F. App'x 634 (2d Cir. 2012) ...............................................................13 n.44

*Baugh v. United States*,
    53 F. App'x 572 (2d Cir. 2002) .................................................................13 n.44

*Bodie v. Purdue Pharma Co.*,
    236 F. App'x 511 (11th Cir. 2007) ............................................................20 n.69

*Boysaw v. Purdue Pharma*,
    2008 WL 4452650 (W.D. Va. Sept. 30, 2008),
    *aff'd*, 320 F. App'x 178 (4th Cir. 2009)....................................................20 n.69

*City of New Haven v. Purdue Pharma L.P.*,
    2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019)....................................22 n.81

*Foister v. Purdue Pharma, L.P.*,
    295 F. Supp. 2d 693 (E.D. Ky. 2003) .......................................................20 n.69

*In re Adelphia Commc'ns Corp.*,
    368 B.R. 140 (Bankr. S.D.N.Y. 2007) ........................................................8 n.30

*In re Direct Access Partners, LLC*,
    602 B.R. 495 (Bankr. S.D.N.Y. 2019)......................................................13 n.45

*In re Ingersoll, Inc.*,
    562 F.3d 856 (7th Cir. 2009) ......................................................................8 n.30

*In re Johns-Manville Corp.*,
    517 F.3d 52 (2d Cir. 2008), *rev'd on other grounds sub nom.*
    *Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009).............................2, 8 n.30

*In re Karta Corp.*,
    342 B.R. 45 (S.D.N.Y. 2006)................................................. 2, 8 & n.30, 9 n.31

*In re Metromedia Fiber Network, Inc.*,
    416 F.3d 136 (2d Cir. 2005)...................................................................... *passim*

*In re OxyContin Antitrust Litig.*,
    530 F. Supp. 2d 554 (S.D.N.Y. 2008)........................................................6, 14

*In re Spiegel Inc.*,
    2006 WL 2577825 (Bankr. S.D.N.Y. Aug. 16, 2006) ................................................8 n.30

*Koenig v. Purdue Pharma Co.*,
    435 F. Supp. 2d 551 (N.D. Tex. 2006) .......................................................20 n.69

*Labzda v. Purdue Pharma, L.P.*,
    292 F. Supp. 2d 1346 (S.D. Fla. 2003) .....................................................20 n.69

*McCauley v. Purdue Pharma L.P.*,
    331 F. Supp. 2d 449 (W.D. Va. 2004) ......................................................20 n.69

*People v. Purdue Pharma*,
    2015 WL 5123273 (Cal. Super. Ct. Aug. 27, 2015) ...........................................21

*People v. Purdue Pharma L.P.*,
    2021 WL 5227329 (Cal. Super. Ct. Nov. 1, 2021) ....................................21 n.73

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
    2004 WL 26523 (S.D.N.Y. Jan. 5, 2004) .......................................................6, 14

*Purdue Pharma L.P. v. Endo Pharms. Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006) ..............................................................14

*State of N.D. ex rel. Stenehjem v. Purdue Pharma L.P.*,
    2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019) ...................................22 n.81

*State of Okla. ex rel. Hunter v. Johnson & Johnson*,
    2021 WL 5191372 (Okla. Nov. 9 2021) ....................................................21 n.73

*Timmons v. Purdue Pharma Co.*,
    2006 WL 263602 (M.D. Fla. Feb. 2, 2006) ............................................20 n.69

*United States v. Purdue Frederick Co.*,
    495 F. Supp. 2d 569 (W.D. Va. 2007) ............................................................20

## Rules & Statutes

21 C.F.R. § 314.81(b)(3)(i) ...............................................................................27

6 DEL. C. § 17-607(a)  ............................................................................... 15 & n.53

N.Y. B.C.L. § 717(a) ......................................................................................22

## PRELIMINARY STATEMENT[1]

This Court expressed concern that certain documents bearing on the Debtors' fraudulent transfer claims against the Sacklers, which are settled by the Plan, also raise the specter of "circumstantial evidence" that the "Sacklers began to take steps against the possibility that things would go south again."[2] They do not.  Appellants' contention that the Sacklers predicted, even before 2008, that massive opioid litigation would erupt and drive Purdue into bankruptcy more than a decade later is pure fiction.  The record evidence, summarized in this submission, refutes it.  All of this evidence was before Judge Drain; he expressly considered it; and this led to Plan confirmation.

The creditors in the bankruptcy case exhaustively investigated the allegation that the Sackler directors ("**Former Directors**") who sat on the board ("**Board**") of Purdue Pharma L.P.'s ("**PPLP's**") general partner, Purdue Pharma Inc. ("**PPI**"), authorized distributions between 2008 and 2017 ("**Challenged Distributions**") to place funds beyond the reach of creditors.  From more than 90 million pages of produced materials, a handful of stale documents was identified by the Unsecured Creditors Committee ("**Creditors' Committee**") as potentially inculpatory.  This contention was thoroughly refuted by the Sacklers in a discovery motion that

---

[1]     Undefined capitalized terms have the meaning set forth in Exhibit A to Debtors' Notice of Filing of Glossary of Terms Related to the Chapter 11 Cases, *In re Purdue Pharma L.P., et al., Bankruptcy Appeals*, No. 21-cv-7532 (S.D.N.Y. Oct. 27, 2021) ("***In re Purdue Appeal***"), Dkt. 115.  "**JX**" refers to joint exhibits submitted to the Bankruptcy Court, which are part of the record before the Court (and the RSF stands ready to provide a supplemental appendix if doing so will assist the Court).  Emphasis is added to, and internal quotations, brackets, ellipses, and citations are omitted from, quoted material, except as indicated.

[2]     November 30, 2021 Hearing Tr. at 223:8-14, *In re Purdue Appeal*.  As the Court observed, "If Purdue wants to settle a fraudulent conveyance claim, it's welcome to do so, but it is possible to draw more than one inference from a set of facts."  *Id.* at 229:16-20.  *See also* Schedule for Further Briefing, *In re Purdue Appeal*, Dkt. 234.

was briefed but never argued—and that will be settled by the confirmation of the Plan.[3]  With full knowledge of that discredited evidence—and the overwhelming evidence of good faith and absence of abuse—the Debtors, the Creditors' Committee, and states and municipalities representing almost the entire U.S. population agreed to settle for $4.325 billion and other consideration, and the vast majority of creditors approved the Plan.

In their objections to the Plan, several Appellants argued that the third-party releases constituted "abuse," citing *Metromedia*, *Manville III*, *In re Karta Corp.*, and other cases.[4]  They argued precisely the issue presented here: whether "releases are inappropriate" under *Metromedia* based on the "Sacklers' [alleged] brazen scheme to place their massive profits beyond the reach of creditors"[5] or because the Sacklers' $4.325 billion settlement contribution "represents less than half of the $10.4 billion in cash transfers" since 2008 (including over $4 billion in taxes paid from those distributions).[6]

In response, the Raymond Sackler Family ("**RSF**" or "**Side B**") provided a point-by-point refutation, cataloguing copious and unrefuted evidence of the Former Directors' good faith and the absence of any evidence of a "scheme" to hinder Purdue's non-existent judgment creditors.[7] The evidence proved that throughout that period Purdue maintained enormous cash reserves, and that the Side B Former Directors <u>sought to reinvest their distributions into Purdue as</u>

---

[3]    *See* Creditors' Committee Motion to Compel at ¶¶2-3, 18-25, 33-34, *In re Purdue Pharma L.P.*, Case No. 19-23649-rdd (Bankr. S.D.N.Y. Dec. 18, 2020) ("***In re Purdue***"), Dkt. 2157; RSF Opposition to Motion to Compel, *In re Purdue*, Dkt. 2191; Creditors' Committee Reply in Support of Motion to Compel at ¶¶7, 48-63, *In re Purdue*, Dkt. 2316; RSF Surreply in Opposition to Motion to Compel, *In re Purdue*, Dkt. 2167

[4]    *See, e.g.*, Joint Objection of Connecticut, Maryland and D.C. at ¶¶37, 53-63, *In re Purdue*, Dkt. 3270; *see also* n.5 and n.6, *infra*.

[5]    Objection of Washington Oregon, and the Objection States at ¶21, *In re Purdue*, Dkt. 3276. *See also id*. at ¶¶14-21.

[6]    Objection of US Trustee at 30, *In re Purdue*, Dkt. 3256; *see also id*. at 28-31.

[7]    RSF Statement in Support of Confirmation and in Reply at 18-21, 57-71, *In re Purdue*, Dkt. 3438.

<u>subordinated debt as late as 2014 and 2015</u>—which would have exposed them to all the risks

Purdue faced.[8]  This is unrefuted evidence that they did not anticipate the litigation risk they are

falsely alleged to have foreseen a decade earlier and belies any suggestion of a "longstanding

plan to get as much money out" of Purdue so that it would "need [a Sackler] contribution in

order to come out of bankruptcy."[9]

       These issues were both briefed and ruled on by Judge Drain when he approved the Plan.

He heeded *Metromedia*'s "caution[] that [third-party] releases can be abused and, especially if

they are for insiders, and need to be supported by sufficient findings by the bankruptcy court."[10]

He observed that the Seventh Circuit "also not[ed] the potential for abuse, as well as the fact-

based nature of the inquiry."[11]  He considered the facts and made relevant findings.

       First, Judge Drain found that uncontroverted expert evidence established that the $4.68

billion in tax distributions paid an obligation for which "Purdue itself would have been liable …

and, therefore, arguably received fair consideration."[12]

       Second, he found that the "Sacklers would argue":

> that after the 2007 settlement between Purdue and the United States, **Purdue paid manageable amounts in settlements of litigation claims related to opioid matters or of other litigation claims between 2008 and 2019** and that **as recently as 2016 Purdue was receiving ratings from rating agencies that indicated it was financially healthy**. They would contend, therefore, that except for the last year or so before the bankruptcy filing date, when only a small fraction of the roughly $11 billion of transfers occurred, **Purdue was not insolvent**, unable to pay its debts when they came due, or left with unreasonably small capital …

> Finally, they would argue that for **these same reasons, and bolstered by at least some of the Sacklers' willingness to continue to invest large amounts of capital in Purdue in years after 2007, the Debtors would not be able to prove that most, if**

---

[8]     *Id.* at 61.

[9]     November 30, 2021 Hearing Tr. at 223:8-14, *In re Purdue Appeal*.

[10]    Modified Bench Ruling on Request for Confirmation of Joint Chapter 11 Plan at 132, *In re Purdue*, Dkt. 3786 ("**MBR**").

[11]    *Id.* at 134.

[12]    *Id.* at 93.

**not all, of the transfers were intentionally fraudulent**.[13]

At the same time, Judge Drain considered the "statements in the record suggest[ing] that at least some of the Sacklers were very aware of the risk of opioid-related litigation claims against Purdue and sought to shield themselves" by causing Purdue to make billions of dollars in distributions.[14]

Ultimately, Judge Drain recognized that a "settlement … generally reflects the underlying strengths and weaknesses of the opposing parties' legal positions"[15] and that the process that produced the settlement depended on a massive record that "teams of lawyers for the creditors groups have pored through to find anything suggesting a claim" against the Sacklers.[16] He catalogued the "bona fides" of the Plan, including that "100 percent of the[] Debtors … is taken away from [the Sacklers] and devoted to abating opioids ill effects;" the settlement was "the highest amount that any shareholder group has paid for these types of claims;" and "the Sacklers themselves were not targets … until roughly three years before the bankruptcy petition date."[17]

He found that Debtors and creditor groups each made "its own independent judgment— free of influence or coercion from any party in the case, and acting solely on behalf of, and in the best interests of, its constituents, in each case—to support the Plan."[18] He concluded that "the settlement is reasonable in the light of the standards laid out by the Supreme Court and the Second Circuit," and both the settlement "and the process of arriving at it have not been in any shape or form a free ride for the Sacklers or enabled them to 'get away with it.'"[19] It is beyond

---

[13]    *Id.* at 94-95 (emphasis added).
[14]    *Id.* at 95.
[15]    *Id.* at 100.
[16]    *Id*. at 79.
[17]    *Id.* 101-02.
[18]    Order Confirming Joint Chapter 11 Plan at 34, *In re Purdue*, Dkt. 3787.
[19]    MBR at 102 (emphasis added).

dispute that a thorough investigation of what motivated the Challenged Distributions was conducted, and that "whether the releases on which the Sacklers conditioned their financial contribution"[20] satisfied the abuse standard under *Metromedia* was briefed, argued, and decided. That is the antithesis of an abusive process.

Judge Drain has already thoroughly considered whether "a court can/should take into account"—in deciding whether the releases "are 'abusive' in the *Metromedia/Manville III* sense"—"whether the Sacklers were concerned about litigation risk."[21] Further, the record on appeal conclusively establishes that there was no abuse, much less bad faith or intent to defraud. *See* §§II and III, *infra*. Among other things:

- Almost 63% of the Challenged Distributions—$6.5 of $10.3 billion—were made between January 1, 2008 and July 31, 2012,[22] when Purdue was under a federal monitor, and the Board received quarterly reports that Purdue was operating in compliance with its Corporate Integrity Agreement.  *See* §II.F, *infra*.

- Most of the $4.68 billion in tax distributions—approximately 90%, or more than $4.2 billion—went to governmental entities, including Appellants here,[23] who would have to disgorge the proceeds if fraud were established.

- The more than $4.2 billion paid in taxes, plus the Sacklers' $4.325 billion settlement contribution totals over $8.5 billion of the $10.3 billion in Challenged Distributions.

- The approximately $1.94 billion in non-tax distributions made after the federal monitorship ended in July 2012[24] were made at a time period when the RSF sought to reinvest its distributions in Purdue and when management certified quarterly to the Former Directors—in detailed quarterly compliance reports—that PPLP was operating in compliance with law.  That figure is roughly equivalent to the value that the Sacklers

---

[20]     Schedule for Further Briefing at 2, *In re Purdue Appeal*, Dkt. 234.

[21]     Schedule for Further Briefing at 2, *In re Purdue Appeal*, Dkt. 234.

[22]     JX-1977 (Chakraborty Rept. Appendix H, Tab 1) (column D, row 1638 [$10,318,183,895] minus column D, row 828 [$3,833,753,745] = $6,484,430,150).

[23]     JX-1902 (AlixPartners Cash Transfer Report) at slides 27, 61-71, 73; JX-3045 at ¶28 (Atkinson Decl.).

[24]     JX-1977 (Chakraborty Rept. Appendix H, Tab 1, column B).

are relinquishing on top of the $4.325 billion they are paying—namely, their 100% interest in the Debtors (estimated between $1.6 and $2 billion).[25]

The record demonstrates that neither Purdue nor the Former Directors perceived the threat of bankruptcy before 2017, which marked the beginning of the onslaught of lawsuits that forced Purdue into bankruptcy.  The record firmly establishes the Sacklers' good faith:

- Distributions ramped up in 2008 because Purdue finally won a longstanding patent battle that, in 2004, had led to the invalidation of the OxyContin patent and decimation of Purdue's workforce and operating income.  *See Purdue Pharma L.P. v. Endo Pharms. Inc.*, 2004 WL 26523, at *1 (S.D.N.Y. Jan. 5, 2004) (invalidation of patent); *In re OxyContin Antitrust Litig.*, 530 F. Supp. 2d 554, 574 (S.D.N.Y. 2008) (restoration).  *See* §II.A, *infra*.

- The Board left enormous amounts of unrestricted cash in PPLP at all times—never less than hundreds of millions, and over $1 billion a year from 2014 on.  *See* §II.B, *infra*.

- Far from stripping Purdue of assets, the Board invested over $1.5 billion in R&D after 2007.  *See* §II.C, *infra*.

- In 2015, the RSF proposed lending its distributions back to Purdue in return for subordinated debt, exposing it to all of Purdue's risks.  *See* §II.D, *infra*.

- Through 2017, PPLP management's detailed reports and projections repeatedly advised the Board that the risk of litigation was low and declining, and the absence of any significant litigation against PPLP corroborated that.  *See* §§II.E-G & I, *infra*.

PPLP was a financially sound company, facing no reasonable prospect of entering bankruptcy based on mass tort litigation or otherwise, and neither PPLP nor any of the Former Directors believed or intended that PPLP would incur debts beyond its ability to pay.

- PPLP was profitable; its sales were in the billions, and it had massive amounts of unrestricted cash-on-hand.

- Litigation risk was low and manageable.  From 2008 to 2019, PPLP paid only $342 million in total settlements (exclusive of IP).  Its net sales during that period exceeded $14 billion.

---

[25]     Debtors' Disclosure Statement, Appendix D (Valuation Analysis) at 2, *In re Purdue*, Dkt. 2983.

- None of the investigations or litigations that led to bankruptcy began until 2014; only a handful evolved into litigation before 2017, and PPLP had a proven track record of settling investigations and litigations for manageable amounts.

- Sophisticated financial parties—JPMorgan in 2014, Moody's and S&P in 2016—found Purdue creditworthy and did not foresee the avalanche of litigation that descended in 2017.

- Purdue survived for over a decade after the first Challenged Distributions and at least two years after the last challenged transfer in 2017.

- The Sacklers submitted <u>unchallenged</u> expert evidence on PPLP's solvency at all relevant times.[26]

The Former Directors did not put Purdue into bankruptcy. The last Former Director left the Board in January 2019, nine months before bankruptcy was commenced. By then, "a majority of the Board ha[d] no prior connection to the Sackler Families."[27] A subset of these independent Board members later comprised the Special Committee, and their independence in evaluating and recommending the Shareholder Settlement and Plan was reviewed by an independent examiner who found "no evidence of any lack of independence of the Special Committee or attempted direction or influence by the Sackler Families."[28] Judge Drain ruled, categorically, that "the Debtors are not run by the Sacklers in any way and have not been since before the start of these cases. There is literally no evidence to the contrary—none."[29]

Judge Drain concluded that the Plan and Settlement reflected a careful balance of the risks and uncertainties of litigation. While he noted that the Sackler families might face large liabilities, he also recognized that they had substantial defenses. This careful balance should be

---

[26]     The Chakraborty Report (JX-1937) was the only expert evidence on solvency presented at the confirmation hearing, and it was unchallenged. *See* Aug. 13, 2021 Hearing Tr., *In re Purdue*, at 192:16-18 ("hearing no one, I will admit Ms. Chakraborty's expert report[.]").
[27]     Debtors' Informational Brief at 15, *In re Purdue*, Dkt. 17 ("**Debtors' Informational Brief**").
[28]     Report of Stephen D. Lerner, Examiner at 4, *In re Purdue*, Dkt. 3285 ("**Examiner's Report**").
[29]     MBR at 68.

respected. There is no evidence of abuse, and all evidence has been fully vetted by the Debtors, the creditors and the Bankruptcy Court. The Plan should be affirmed.

## I.   JUDGE DRAIN CONSIDERED WHETHER THERE WAS ABUSE AND PROPERLY CONCLUDED THE RELEASES SATISFIED *METROMEDIA*

The Second Circuit in *Metromedia* and this Court in *Karta* have cautioned against the possibility that third-party releases could be the subject of an "abuse." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 142 (2d Cir. 2005); *In re Karta Corp.*, 342 B.R. 45, 55 (S.D.N.Y. 2006). The abuse referenced in *Metromedia* means abuse of the bankruptcy process and the scope and appropriateness of non-party releases—not underlying allegations of wrongdoing about the events that ultimately led to the bankruptcy. This is why courts addressing abuse under *Metromedia* have focused on issues related to the scope and necessity of releases, not concerns about underlying allegations of wrongdoing.[30]

No authority suggests that the *Metromedia* abuse inquiry requires a bankruptcy court to make an express determination of the merits of underlying allegations. Such a requirement would make little sense. It would mean that a court could only approve a release after adjudicating the very issues that the settlement resolves. Applied here, conditioning the releases on findings that the unproven allegations that the Sacklers unlawfully took money out of Purdue

---

[30]     *See, e.g.*, *Karta*, 342 B.R. at 55 (finding it abusive to use the "mere fact of financial contribution by a non-debtor … to trigger the right to a *Metromedia/Drexel* release of non-debtor claims"); *In re Johns-Manville Corp.*, 517 F.3d 52, 66, 67 n.24 (2d Cir. 2008) (release with improper scope "would embody the abuse foreseen by this Court in *Metromedia*"), *rev'd on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009); *In re Ingersoll, Inc.*, 562 F.3d 856, 865 (7th Cir. 2009) (after discussing abuse standard, approving release because it "does not provide blanket immunity" and "is narrowly tailored and critical to the plan as a whole"); *In re Spiegel Inc.*, 2006 WL 2577825, at *10 (Bankr. S.D.N.Y. Aug. 16, 2006) (construing *Metromedia*'s warning against abuse as "prohibit[ing] a third party plan release from granting abusive blanket immunity"); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 267 (Bankr. S.D.N.Y. 2007) (addressing the abuse standard as an issue of the scope of releases and commenting that releases are less likely to be abusive under *Metromedia* if they are limited in scope to "postpetition" events).

are false—which they are—would require the Debtors, as Plan proponents, to prove that their most valuable claim against the Sacklers has no merit.  Making that showing would vindicate the Sacklers and mean they have no need settle on the terms agreed in the Plan.  No precedent requires such a procedure.

The record shows that Judge Drain properly and fully considered *Metromedia*'s caution against abuse of the bankruptcy system and the allegations about improper distributions.  Plan objectors argued that the releases constituted an abuse, on the theory, *inter alia*, that the pattern of distributions from Purdue made the releases improper.[31]  Judge Drain considered and rejected these arguments.

Thus, his Modified Bench Ruling expressly took account of *Metromedia*'s "caution[] that [third-party] releases can be <u>abused</u>, especially if they are for insiders, and need to be supported by sufficient findings by the bankruptcy court."[32]  He observed that the Seventh Circuit "also not[ed] the potential for <u>abuse</u>, as well as the fact-based nature of the inquiry."[33]  He specifically addressed the issues that this Court has raised as a potential indication of abuse—the transfers of money out of Purdue—in explaining why the Plan was appropriate under *Metromedia*.  This necessarily encompassed a finding that the Plan was not abusive.  He did so in three ways.

---

[31]     *See, e.g.*, Joint Objection of Connecticut, Maryland and D.C. at ¶¶37, 53-63, *In re Purdue*, Dkt. 3270 (arguing that the releases were abusive under *Metromedia* and *Karta*); Objection of Washington Oregon, and the Objecting States at ¶¶14-21, *In re Purdue*, Dkt. 3276 (arguing that "releases are inappropriate" under *Metromedia* based on the "Sacklers' [alleged] brazen scheme to place their massive profits beyond the reach of creditors"); Objection of US Trustee at 30, *In re Purdue*, Dkt. 3256 (arguing that the releases are abusive because the Sackler's $4.3 billion settlement contribution "represents less than half of the $10.4 billion in cash transfers … for the Sackler Family's benefit since 2008" (not taking into account over $4 billion in taxes paid from those distributions)).

[32]     MBR at 132 (emphasis added).

[33]     *Id.* at 134 (emphasis added).

*First*, Judge Drain observed that the Plan before the Court embodied a settlement between the parties of disputed claims, including disputed claims about the propriety of the Challenged Distributions.  He observed that a "settlement … generally reflects the underlying strengths and weaknesses of the opposing parties' legal positions."[34]  And he recognized that the process that resulted in the settlement was based on "an almost unfathomable record" that had been painstakingly examined by the creditor groups.[35]  His conclusion was that the process that led to the Plan was a fair settlement of claims about, among other things, the distributions out of Purdue, which showed that it was not an abuse.

*Second*, Judge Drain expressly observed that there was contested evidence as to whether there was anything improper about the transfers.  After hearing evidence about the Challenged Distributions, he made express findings that the settlement took into account the defenses raised by the Sacklers.  He observed that the Sacklers had arguments, supported by an "uncontroverted" tax expert, that the tax distributions were proper because they were used to pay taxes.[36]  And he went through in detail defenses the Sacklers had put forward and the claims against them.[37]

While Judge Drain did not endorse the Sacklers' arguments—he was careful to observe that his ruling was not an endorsement of either side's views of the legal claims being settled— the record shows that he clearly considered them in concluding that the settlement was proper. Judge Drain's recognition that the Sackler families had substantial defenses to claims that the transfers were improper necessarily reflects that he was not persuaded by the Objectors'

---

[34]    *Id.* at 100.
[35]    *Id.* at 79.
[36]    *Id.* at 93.
[37]    *Id.* at 93-94.

assertions that the record showed that the Challenged Distributions formed a basis for rejecting the Plan as abusive.

*Third*, in approving the plan, Judge Drain made express findings that the Plan was not improper in the sense of allowing the Sacklers to abuse the bankruptcy process. He found that "the settlement is reasonable in the light of the standards laid out by the Supreme Court and the Second Circuit," and both the settlement "and the process of arriving at it have not been in any shape or form a free ride for the Sacklers or enabled them to 'get away with it.'"[38] He thus expressly rejected the argument that the Plan should not be confirmed on the theory that the Sacklers had taken improper amounts out of Purdue and then used the Bankruptcy process extract third party releases to escape liability.

His conclusion that there was no abuse of the bankruptcy process—that the Plan was led by creditors, not the Sacklers—was supported by the record. The Sacklers did nothing to cause Purdue to commence this bankruptcy proceeding. All of the Former Directors left the board months or years before Purdue filed its petition.[39] At the time of the filing, Purdue had seven directors, and four of them had no prior relationship with the Debtors and no prior connection to the Sackler Families. *See* Debtor's Informational Brief at 14-15.

Nor did the Sacklers influence the Debtors' or Creditors Committee's decisions to approve the Shareholder Settlement or Plan. There are no allegations that the Sacklers had any influence over the creditors. And in June 2021, a court-appoint examiner investigated whether the Special Committee of PPI's board "acted independently and not under the direction and

---

[38]    *Id*. at 102.
[39]    JX-2090 (Purdue Directors List).

influence of the Sackler Families with respect to the Shareholder Settlement."[40]  After an intensive investigation—prompted by allegations that "the owners of the Debtors, the Sackler families, may have manipulated this process to obtain releases"[41]—the examiner found "**no evidence** that the Special Committee acted other than independently in its consideration and recommendation of the Shareholder Settlement and the Plan" and "**no evidence** that the Sackler Families either attempted to, or did, influence the Special Committee in its work."  Examiner's Report at 3.  "To the contrary, **all of the evidence** … indicated that the Special Committee acted independently in evaluating and recommending the Shareholder Settlement and Plan and that it was not controlled or influenced, or subjected to attempted control or influence, by the Sackler Families."  Examiner's Report at 3-4.

In approving the Plan, Judge Drain rejected arguments that the Sacklers had abused the bankruptcy process in expressly finding that the Sacklers had no influence over the Debtors.

> Some assert that this Chapter 11 plan and the settlement in it is "the Sacklers' plan," or perhaps, artfully, it has been suggested that because it is proposed by the Debtors, and the Sacklers own the Debtors, the Debtors' plan is "the Sacklers' plan." … <u>[O]ne thing is crystal clear, and anyone who contends to the contrary is, again, simply misleading the public: this is not the Sacklers' plan. The Debtors are not the Sacklers' company anymore. The Sacklers own the Debtors, but the Debtors are not run by the Sacklers in any way and have not been since before the start of these cases. There is literally no evidence to the contrary—none.</u> Although it was not necessary, because the record was clear, the examiner appointed in these cases confirmed it in his report.[42]

The Sacklers could not force the creditors to support a settlement that involved third-party releases.  They could not abuse a process that they did not control.

Judge Drain appropriately found that the Plan met the *Metromedia* standard and was not an abuse of the process by the Sacklers.  To the extent this Court is concerned that Judge Drain's

---

[40]     *See* Order Appointing an Examiner Pursuant to 11 U.S.C. § 1104(c) at 2, *In re Purdue*, Dkt. 3048.
[41]     June 16, 2021 Hearing Tr. at 18:4-21, *In re Purdue*, Dkt. 3094.
[42]     MBR at 68 (emphasis added).

decision failed to use the word "abuse" enough in framing his findings—although he did reference the abuse standard[43]—it is important to follow the Second Circuit's instruction that Judge Drain's decision should be reviewed for its substance, not whether it used specific words or phrases.[44]   A reading of Judge Drain's decision as a whole shows that he considered the pattern of distributions and the question of abuse and, as is set forth above, made a number of findings supporting the conclusion that the releases were appropriate under *Metromedia*.   There is no need for further rulings on this issue.   This Court should affirm Judge Drain's findings because they are amply supported by the record.

## II.  NO DISTRIBUTION WAS MADE WITH INTENT TO ABUSE THE BANKRUPTCY PROCESS

### A.  The Increased Distributions in 2008 Followed the Restoration of Patent Exclusivity For OxyContin

This Court has asked why Purdue's distributions were so much higher in the 2008 to 2016 period than they were in the 1996 to 2007 period.   The simple answer is that Purdue distributed more profits to its owners because it had more money on hand, not being used by the business, to distribute.[45]

Purdue's net income was $12 million in 1996, the year it launched OxyContin; it increased to a high of $303 million in 2001, and then decreased to a loss of $6 million in 2006.[46] A key contributor to the downward trend was Purdue's 2004 loss of a patent infringement suit,

---

[43]      *Id.* at 132, 134.

[44]      *See, e.g.*, *Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd.*, 483 F. App'x 634, 636-37 (2d Cir. 2012) (affirming; no magic words necessary when "a full reading of the … ruling[] leaves no doubt" the court ruled on an issue); *Baugh v. United States*, 53 F. App'x 572, 573 (2d Cir. 2002) (affirming; "[w]hile not explicit, the record … ma[de] clear that the district court weighed the proper factors in its determination").

[45]      *See In re Direct Access Partners*, *LLC*, 602 B.R. 495, 545 (Bankr. S.D.N.Y. 2019) ("[C]orporations and limited liability companies often make profit distributions—in fact, that is the very purpose for which business is conducted[.]").

[46]      Debtors-Appellees' Statement in Response to Question at Ex. B, *In re Purdue Appeal*, Dkt. 177-2.

resulting in the loss of OxyContin's patent exclusivity.  *See Endo*, 2004 WL 26523, at *1.  A 2008 email recounted the calamitous impact the 2004 decision had on Purdue:

> As a result, 3 generic competitors launched their products, Purdue's revenue plummeted, we laid off 2/3 of the employees (2,000 out of 3,000), sold some facilities, discontinued most of our research programs, was hit with 92 antitrust suits claiming that the company had committed fraud to obtain a monopoly and requesting $8 billion in damages, and the federal prosecutor in the Western District of Virginia made it a major feature in the threatened charges against the company.[47]

In February 2006, the decision stripping Purdue's OxyContin patent exclusivity was vacated and remanded, *see Purdue Pharma L.P. v. Endo Pharms. Inc.*, 438 F.3d 1123 (Fed. Cir. 2006), and in January 2008, the district court rejected further arguments that the patent was invalid because of Purdue's conduct before the Patent and Trademark Office.  *See In re OxyContin Antitrust Litig.*, 530 F. Supp. 2d 554, 558 (S.D.N.Y. 2008).  Once OxyContin's patent exclusivity was restored, Purdue's outlook improved dramatically.  The day after the district court's 2008 decision came out, Jonathan Sackler correctly anticipated that Purdue would "see [its] sales climb across the year as stocks of generic product get consumed," and "2009 should be a huge year."[48]  Richard Sackler similarly expected the restoration of patent exclusivity to "secure[] 2008 and most of 2009 revenue stream with little or no generic competition," and to increase Purdue's "sales expectations … by 2-3X and [Purdue's] profit expectations [by] 3-5X."[49]  Their expectations bore out: Purdue's free cash flow went from $157 <u>million</u> in 2007 to $1.41 <u>billion</u> in 2008 and $1.73 <u>billion</u> in 2009.[50]

After the 2008 patent decision, Purdue generated over a billion dollars more free cash

---

[47]  JX-2248 (1/8/08 email from Jonathan Sackler).

[48]  JX-2248 (1/8/08 email from Jonathan Sackler).

[49]  JX-2249 (1/11/08 email from Richard Sackler) ("It will be difficult to overestimate the impact this will have on our performance."); *see also* JX-2247 (1/15/08 email from Richard Sackler).

[50]  Debtors-Appellees' Statement in Response to Question at Ex. B, *In re Purdue Appeal*, Dkt. 177-2; *see also* JX-1945 (Chakraborty Rept. Ex. 8).

flow yearly.[51]  The company had over $420 million in cash or equivalents in 2008—a number that ballooned to over $1.2 billion by 2015.[52]  Throughout, Purdue consistently reinvested hundreds of millions in R&D, kept huge amounts of free cash flow in the business and distributed the excess cash that was not required, as 6 Del. C. § 17-607(a) permits.[53]

The record evidence establishes that Purdue's distributions were calculated by determining how much free cash Purdue had <u>after</u> providing for the needs of the business.[54] Purdue's distributions were much greater after 2008 because Purdue generated much more free cash that was not needed for business purposes, and could therefore be distributed, then.

**B.**     **Purdue Was Hugely Profitable with Large Cash Reserves and No Debt**

Purdue had tremendous financial resources when the Challenged Distributions were made.  Purdue generated over $2 billion annually between 2009 and 2014, and more than $1.5 billion in annual revenue in each of 2015 and 2016:

---

[51]     *Id.*

[52]     JX-2696 (2008 Financial Statement); JX-1849 (2015 Financial Statement).

[53]     *See* 6 Del. C. § 17-607(a) (authorizing partnership distributions that do not "exceed the fair value of the assets").

[54]     *See* JX-2007 (9/6/19 Edward Mahony Dep. Tr.) at 249:7-250:9 (testimony from the CFO that the goal was always to have significant amounts of cash on the balance sheet based on recommendations from management), 270:19-21; August 19, 2021 Hearing Tr., *In re Purdue*, at 30:6-16 (Mortimer Sackler: distributions came from "excess cash that was not required in the business"), Dkt. 3638.



JX-1944 (Chakraborty Rept. Ex. 7).

At the time each Distribution was made, Purdue maintained substantial cash reserves set by its CFO to ensure that Purdue had prudent liquidity.[55] Purdue's year-end balance of unrestricted cash and cash equivalents grew every year, from $339.6 million in 2009 to over a $1 billion in 2014, 2015, and 2016.[56] In 2016, the last year a significant distribution was made, Purdue held $1.153 billion in unrestricted cash and cash equivalents at year end, after the Challenged Distributions:

---

[55]    *See* JX-2007 (9/6/19 Edward Mahony Dep. Tr.) at 249:74-250:9, 270:19-21.

[56]    *See* JX-2696 (2008-09 Financial Statements) at -662; JX-1843 (2009-10 Financial Statements) at -954; JX-1844 (2010-11 Financial Statements) at -540; JX-1845 (2011-12 Financial Statements) at -178; JX-1846 (2012-13 Financial Statements) at -139; JX-1847 (2013-14 Financial Statements) at -619; JX-1848 (2014-15 Financial Statements) at -531; JX-1849 (2015-16 Financial Statements) at -266; *see also* JX-1861 (Purdue financials and sales information 2008-2012) at 10 (providing unrestricted cash 2008-2012); JX-1862 (Purdue P&L Estimates 2015-16) at -076 (providing unrestricted cash for 2013-2014); JX-1860 (6/8/2016 Mid-year update) at -384 (providing unrestricted cash for 2015).



JX-1945 (Chakraborty Rept. Ex. 8).  From 2008 through its bankruptcy filing, Purdue had

virtually no debt.  JX-1937 (Chakraborty Rept.) ¶87.

The Board had no reason to think that Purdue—a company generating over a billion

dollars in profits every year and with huge amounts of cash-on-hand—would face insolvency.

The fact that the Board directed that Purdue maintain huge cash-on-hand belies any suggestion

that the Former Directors were participating in a scheme to strip Purdue of its assets it would

someday "need … to come out of a bankruptcy"[57] that they did not foresee.

### C.    The Board Invested Billions of Dollars in Research and Development after 2007

The Board invested vast sums on research and development during the period that

Challenged Distributions were made.  The Board substantially increased Purdue's research and

---

[57]    November 30, 2021 Hearing Tr. at 221:23-25, *In re Purdue Appeal*.

development budget every year from 2008 ($127.3 million) to 2013 ($377.4 million)[58]—a six-year period over which more than 75% of the Challenged Distributions were made.[59]  From 2008 to 2017, the Board authorized, and Purdue spent, over $1.5 billion on research and development.[60]  This is potent evidence of a business being run for long-term success, not a scheme to strip it of "necessary"[61] assets.

### D.   Side B Directors Sought to Invest More in Purdue

In 2014 and 2015, the Side B directors sought to reinvest Side B's distributions back into Purdue as subordinated debt:

- In November 2014, Jonathan Sackler informed the Board that Side B opposed further distributions that year.  He explained that Side B "prefer[red] to leave the remaining cash in the business" to make more "cash available for acquisitions."[62]

- He further explained: "While there is no certainty in life or in business, the Raymond Sackler family is optimistic about the prospects for the overall business, the quality of management, and the soundness of the strategy adopted by the board.  The strategy will

---

[58]   JX-2018 (4/18/08 Decision approving revised 2008 budget) at -699, -700 (authorizing $127,281,000 in R&D); JX-2340 (2013 Budget Submission) at -131 (R&D proposed budget: $377,347,000); JX-2038 (11/16/12 Decision approving 2013 budget) at -299, -300 (authorizing $377,347,000 in R&D).

[59]   JX-1902 (AlixPartners Cash Transfer Report at slides 11, 25 (over $7.8 billion out of a total of $10.3 billion in distributions).  *See also* JX-1940 (Chakraborty Rept. Ex. 3); *compare id.*, JX-1977 (Chakraborty Rept. Appendix H) tab 1, row 1638, column D *with id.*, tab 1, row 599 column D (reflecting that $2,424,459,044 out of $10,318,183,895 in total Distributions were made after 2013).

[60]   *See* JX-2425 (2016 Budget) at -373 (Actual R&D 2008: $120,449,000; 2009: $132,623,000; 2010: $164,784,000; 2011: $269,973,000; 2012: $312,513,000; 2013: $279,200,000; 2014: $150,163,000; 2015 (budget): $107,771,000); JX-2453 (7/25/17 EC Meeting) at -855 (Actual R&D 2016: $124,000,000; 2017 (budget): $146,000,000).  *See also* JX-2018 (4/18/08 Decision approving revised 2008 budget) at -699, -700 (authorizing $127,281,000 in R&D); JX-2019 (11/6/08 Decision approving 2009 budget) at -757-58  (authorizing $190,000,000 in R&D); JX-2025 (11/3/2009 Decision approving 2010 budget) at -983-84 (authorizing $204,100,000 in R&D); JX-2026 (11/3/10 Decision approving 2011 budget) at -106-07 (authorizing $300,000,000 in R&D); JX-2036 (4/27/12 Decision approving revised 2012 budget) at -228-229 (authorizing $322,500,000 in R&D); JX-2038 (11/16/12 Decision approving 2013 budget) at -299-300 (authorizing $377,347,000 in R&D).

[61]   November 30, 2021 Hearing Tr. at 223:19-20, *In re Purdue Appeal*.

[62]   JX-2419 (11/15/14 email from J. Sackler) at -231.

take time to bear fruit, but we believe that patience and persistence will be rewarded and the value of the family's pharmaceutical assets will grow in value."[63]

- A June 2015 email evidences Side B's ongoing efforts to lower distributions from, and to reinvest in, Purdue. The email reflects communications between Side A and Side B directors in which Side B urged that "cash distributions … be tempered," and expressed Side B's desire to have "the lowest acceptable amount of cash coming out of the company."[64]

- The June 2015 email also discusses the subordinated debt proposal that Side B made, reflecting its desire to keep money in Purdue.[65] Side B proposed allowing distributions to both sides of the family, and then Side B would lend its distributions back to Purdue in return for subordinated debt. As set forth in the email, Side B "push[ed] the notion of sub debt as a means of putting both families on equal footing as to their fundamental desires (cash distributions on one hand and strengthening the business on the other)."[66]

- In August 2015, Side B reworked terms for its subordinated debt proposal.[67]

Ultimately the subordinated debt proposal was not adopted. But the proposal—which would have exposed Side B to all the risks Purdue faced—is incontrovertible evidence that Side B directors did not anticipate the wave of litigation that led to Purdue's bankruptcy.

E.    **No Threat From Opioid Litigation Was Perceived When The Challenged Distributions Were Made**

There is no basis for any suggestion that the Challenged Distributions were made because the Sacklers expected Purdue to be overwhelmed by litigation. The federal government and every state had by mid-2007 released claims against Purdue and the Sackler family based on Purdue's marketing of OxyContin for prior periods.[68] In the years that followed, Purdue faced

---

[63]    *Id*.

[64]    JX-1856 (6/28/15 email from S. Ives) at -305, -306.  While Side A sought higher distributions, this had nothing to do with any perceived litigation risk.

[65]    *Id*. at -303, -305, -306.

[66]    *Id*. at -306.  *See also* JX-1857 (3/22/15 Term Sheet–Subordinated Debt); JX-1858 (7/13/15 email from S. Ives).

[67]    JX-1859 (8/13/15 email from David Sackler).

[68]    *See* Information, Attachment D at ¶2, *United States v. The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007), Dkt. 5-4; *See* Plea Agreement at ¶11, *United States v. The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007), Dkt. 6; JX-1900 (Consent Judgment at

no threatening litigation. Neither did the Former Directors.

Product liability suits were not threatening. Purdue won many suits brought by individuals claiming harm from OxyContin.[69] As the United States District Court for the Western District of Virginia observed, "Courts have consistently found that despite extensive discovery, plaintiffs were unable to show that Purdue's misbranding proximately caused their injuries." *United States v. Purdue Frederick Co.*, 495 F. Supp. 2d 569, 575-76 (W.D. Va. 2007) (approving 2007 Federal Settlement). In early 2007, Purdue had settled claims brought by approximately 5,000 individuals for $75 million (an average settlement of around $15,000).[70] In 2008, management advised the Board that an appropriate reserve for "closing out" all OxyContin litigation would be a mere $200 million, less than 10% of that year's revenue.[71] There is no evidence that any Former Director had reason to think that product liability suits would threaten Purdue's solvency.

In the 2008-16 period, there were few governmental claims or investigations of Purdue, and they were resolved for manageable amounts. Only a handful of lawsuits were filed by

---

¶35, *In re Purdue Pharma*, No. 07-C-00740 (Ky. Cir. Ct., Franklin Cnty. May 8, 2007)); Information, Attachment M at ¶III.2, *United States v. The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007), Dkt. 5-14; JX-2430 (12/18/15 settlement between Purdue and Kentucky) at -141; JX-2225 (Dec. 15, 2004 Settlement Agreement and Release, *State of West Virginia v. Purdue Pharma, L.P.*, No. 01-CV-137 (W. Va. Cir. Ct. McDowell Cnty. Dec. 15, 2004)).

[69]     *See, e.g.*, *Boysaw v. Purdue Pharma*, 2008 WL 4452650 (W.D. Va. Sept. 30, 2008), *aff'd*, 320 F. App'x 178 (4th Cir. 2009) (affirming dismissal OxyContin product liability claim); *Bodie v. Purdue Pharma*, 236 F. App'x 511 (11th Cir. 2007) (same); *Timmons v. Purdue Pharma*, 2006 WL 263602 (M.D. Fla. Feb. 2, 2006) (dismissing OxyContin product liability claims); *Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693 (E.D. Ky. 2003) (same); *Labzda v. Purdue Pharma, L.P.*, 292 F. Supp. 2d 1346 (S.D. Fla. 2003) (same); *Koenig v. Purdue Pharma*, 435 F. Supp. 2d 551 (N.D. Tex. 2006) (same); *McCauley v. Purdue Pharma*, 331 F. Supp. 2d 449 (W.D. Va. 2004) (same).

[70]     JX-3042 (Decl. of J. Conroy) ¶9.

[71]     JX-1851 (1/11/2008 Board Agenda Book) at -677.

governments against Purdue before 2017 (and none against any Former Directors until 2018),

and nothing that transpired in them indicated that Purdue would later be subject to an

unmanageable increase in litigation:

- *California v. Purdue*, the first of the opioid cases pending against Purdue at the time of its bankruptcy filing (the "**Pending Opioid Actions**") was filed in May 2014[72] and stayed in August 2015 in deference to the FDA. *People v. Purdue Pharma*, 2015 WL 5123273, at *2 (Cal. Super. Ct. Aug. 27, 2015). In October 2016, the court lifted that stay "to permit defendants to challenge the [Third Amended Complaint]" and to "facilitate early resolution efforts," which the court "strongly encouraged."[73]

- *Chicago v. Purdue* was commenced on June 2, 2014.[74] In May 2015, the court granted in large part Purdue's motion to dismiss.[75] All but two consumer protection claims relating to Purdue's website were dismissed. A September 2016 order granted in part a subsequent motion to dismiss some of the remaining claims.[76] After the Third Amended Complaint was filed in October 2016, it was subject to yet another round of dismissal briefing that was not decided until November 2017.[77]

- *Mississippi v. Purdue* was commenced on December 15, 2015, but the Court did not rule on a threshold motion by Defendants to transfer venue until February 2017.[78]

- *County of Suffolk v. Purdue* was filed in August 2016, but the court did not rule on Purdue's motion to dismiss until June 2018.[79]

---

[72]     *See* Complaint, *California v. Purdue*, Case No. 30-2014-00725287-CU-BT-CXC (Cal. Super. Ct., Orange Cnty.) ("***California v. Purdue***") (May 21, 2014).

[73]     *See* Minute Order, *California v. Purdue* (Oct. 19, 2016). More recently, the court rejected claims against co-defendants after trial, holding that "Plaintiffs have failed to prove an actionable public nuisance for which Defendants, or any of them, are legally liable." *People v. Purdue Pharma L.P.*, 2021 WL 5227329, at *20 (Cal. Super. Ct. Nov. 1, 2021). *See also State of Oklahoma v. Johnson & Johnson*, 2021 WL 5191372, at *11 (Okla. Nov. 9 2021) (overturning public nuisance claim against opioid manufacturer).

[74]     *See* Notice of Removal, *City of Chicago v. Purdue Pharma L.P.*, No. 14-cv-04361 (N.D. Ill.) ("***Chicago v. Purdue***") (June 11, 2014), Dkt. 4.

[75]     *See* Opinion and Order, *Chicago v. Purdue* (May 8, 2015), Dkt. 288.

[76]     *See* Opinion and Order, *Chicago v. Purdue* (Sept. 29, 2014), Dkt. 471.

[77]     *See* Third Amended Complaint, *Chicago v. Purdue* (Oct. 25, 2016), Dkt. 478; Minute Entry, *Chicago v. Purdue* (Nov. 16, 2017), Dkt. 659.

[78]     *See* Order, *State of Mississippi v. Purdue Pharma L.P. et al*, No. G2015-1814 O/3 (Miss. Ch. Ct. Feb. 13, 2017).

[79]     *See* Complaint, *County of Suffolk v. Purdue Pharma L.P., et al.*, Index No. 613760/2016 (N.Y. Sup. Ct. Suffolk Cnty. Aug. 31, 2016), NYSCEF No. 2; Order Denying Motion to Dismiss, *In re Opioid Litigation*, Index No. 400000/2017 (Sup. Ct. Suffolk Cnty. June 18, 2018), NYSCEF 454.

In 2015, Purdue settled (i) an investigation by the New York Attorney General with a payment of $75,000 and (ii) a longstanding litigation brought by the Attorney General of Kentucky for $24 million to be paid over 8 years.[80]  Even today, none of the thousands of Pending Opioid Actions has resulted in a judgment against Purdue or the Sacklers, and the only Pending Opioid Actions that have been litigated to a judgment were decided in their favor.[81]

### F.    The Board Understood Purdue Was Operating in Compliance with Law

Prior to 2017, none of the Former Directors—or any of the distinguished outside directors who also served on the Board after 2007[82]—had any reason to expect overwhelming litigation, let alone the avalanche that descended on Purdue in 2017.  The uncontradicted record proves that they acted in good faith reliance on Purdue's legal compliance program, the reports of the federal monitor, and outside law firm compliance review.  As directors of a New York corporation, the Former Directors were entitled to rely on information, opinions, reports and statements of officers, employees and outside professionals.  N.Y. B.C.L. § 717(a)(1) & (2).

The Board implemented a comprehensive compliance program at Purdue, requiring all seven elements of an effective compliance program as determined by the OIG of HHS and the Sentencing Guidelines.  This program was designed to prevent and detect wrongdoing.[83]  Every quarter, management certified to the Board—and documented in detailed compliance reports—

---

[80]    JX-1889 (8/9/15 AOD); JX-2430 (12/18/15 settlement between Purdue and Kentucky).

[81]    *See City of New Haven v. Purdue Pharma L.P.*, 2019 WL 423990 (Conn. Super. Ct. Jan. 8, 2019); *State of North Dakota ex rel. Stenehjem v. Purdue Pharma L.P.*, 2019 WL 2245743 (N.D. Dist. Ct. May 10, 2019); *Sackler v. Utah Div. of Consumer Prot.*, No. 190905862 at 10 (D. Utah Oct. 10, 2019).

[82]    *See* JX-2090 (Purdue Directors List).

[83]    The Board adopted a 2005 Compliance Charter establishing an extensive compliance program, and another compliance charter in 2007.  *See* JX-2012 (2005 Compliance Charter); (JX-2013) (2007 Compliance Charter).

that Purdue was operating in compliance with law.[84]  For example:

- **<u>2007</u>**:      "Purdue is in full compliance with AG Agreement" ● "Purdue is in full compliance with CIA" ● "Full compliance with State Law Requirements"[85]

- **<u>2008</u>**:      "First Annual Report to OIG submitted ... certifies to all CIA requirements" ● "Purdue is also in full compliance with its AG Agreements" ● "State Law Reporting Update ... No compliance issues identified"[86]

- **<u>2009</u>**:      "Review of call notes and other monitoring has uncovered[:]  No Improper Promotion ● No Inappropriate discussion of abuse, diversion, tolerance, withdrawal ● No violations of Law" ● "State Law Reporting Update ... No compliance issues identified"[87]

- **<u>2010</u>**:      "Year three of Purdue's five year CIA closes as of July 30, with all requirements met...."[88]

- **<u>2011</u>**:      "All requirements under the CIA have been met in Reporting Period 4, including all critical field-based CIA requirements" ● "Marketing & Sales ... No compliance shortcomings to report"[89]

---

[84]      *See* JX-2654 (10/31/07 Quarterly Compliance Report); JX-1828 (2/8/08 Quarterly Compliance Report); JX-1829 (1Q 2008 Quarterly Compliance Report); JX-2655 (2Q 2008 Quarterly Compliance Report); JX-2656 (3Q 2008 Quarterly Compliance Report); JX-2657 (4Q 2008 Quarterly Compliance Report); JX-2658 (1Q 2009 Quarterly Compliance Report); JX-2659 (2Q 2009 Quarterly Compliance Report); JX-2660 (3Q 2009 Quarterly Compliance Report); JX-2661 (4Q 2009 Quarterly Compliance Report); JX-2662 (1Q 2010 Quarterly Compliance Report); JX-2663 (2Q 2010 Quarterly Compliance Report); JX-2664 (3Q 2010 Quarterly Compliance Report); JX-2665 (4Q 2010 Quarterly Compliance Report); JX-2666 (1Q 2011 Quarterly Compliance Report); JX-2667 (2Q 2011 Quarterly Compliance Report); JX-2668 (3Q 2011 Quarterly Compliance Report); JX-2669 (4Q 2011 Quarterly Compliance Report); JX-2670 (1Q 2012 Quarterly Compliance Report); JX-1830 (Jul. 19, 2012 Quarterly Compliance Report); JX-2672 (3Q 2012 Quarterly Compliance Report); JX-2673 (4Q 2012 Quarterly Compliance Report); JX-2674 (1Q 2013 Quarterly Compliance Report); JX-1831 (Jul. 25, 2013 Quarterly Compliance Report); JX-2675 (3Q 2013 Quarterly Compliance Report); JX-2676 (4Q 2013 Quarterly Compliance Report); JX-2677 (1Q 2014 Quarterly Compliance Report); JX-2678 (2Q 2014 Quarterly Compliance Report); JX-2679 (4Q 2014 Quarterly Compliance Report); JX-2680 (1Q 2015 Quarterly Compliance Report); JX-2681 (2Q 2015 Quarterly Compliance Report); JX-2682 (3Q 2015 Quarterly Compliance Report); JX-1832 (4Q 2015 Quarterly Compliance Report); JX-1833 (8/25/16 Quarterly Compliance Report); JX-2683 (3Q 2016 Quarterly Compliance Report).
[85]      JX-1827 (8/6/07 Compliance Report) at -955.
[86]      JX-2656 (3Q 2008 Quarterly Compliance Report) at -036, -044.
[87]      JX-2658 (1Q 2009 Quarterly Compliance Report) at -654, -665.
[88]      JX-2057 (2Q 2010 Board Report) at -034.
[89]      JX-2705 (2Q 2011 Board Report) at -915, -920, -940.

- **2012**:    "[T]he Company continued to maintain a state of effective compliance"[90]

- **2013**:    "There are no significant violations or gaps to report"[91]

- **2014**:    "There have been no significant compliance issues in ... Full Year 2014"[92]

- **2015**:    "There have been no significant compliance issues"[93]

- **2016**:    "In 2016, there were no significant compliance issues"[94]

In connection with its 2007 guilty plea, Purdue entered into a CIA with the OIG which lasted until July 31, 2012.[95]  From 2007-2012, Purdue was subject to federal oversight.  Each year, the Board was told that the OIG of HHS confirmed that Purdue was operating in compliance with the CIA.[96]  Nearly 63% of the Challenged Distributions were made between

---

[90]    JX-2673 (4Q 2012 Quarterly Compliance Report) at -363.

[91]    JX-2675 (3Q 2013 Quarterly Compliance Report) at -507 (also reporting: "The Company continues to have good systems and processes in place committed to the prevention and detection of violations, with continuous attention to improvement").

[92]    JX-2679 (4Q 2014 Quarterly Compliance Report) at -812.

[93]    JX-2680 (1Q 2015 Quarterly Compliance Report) at -072.

[94]    JX-1834 (3/17 Quarterly Compliance Report) at -917.

[95]    *See* Information, Attachment E, *United States v. The Purdue Frederick Co.*, 1:07-cr-0029 (W.D. Va. May 10, 2007), Dkt. 5-5 (CIA).

[96]    *See* JX-2659 (2Q 2009 Quarterly Compliance Report) at slide 6 ("By May 6th letter, OIG confirmed Purdue's compliance with the requirements of our CIA during the first year, based on their review of our Annual Report and other materials."); JX-2056 (1Q 2010 Board Report) at -559 ("By letter dated April 1st, Purdue's OIG Monitor confirmed that ... Purdue was in compliance with the terms of its Corporate Integrity Agreement during the second reporting period"); JX-2692 (1Q 2011 Board Report) at -448 ("We have received the Office of Inspector General's (OIG) January 28th letter confirming satisfactory completion of their review of Purdue's Third Annual Report: 'it appears that Purdue was in compliance with the terms of the Corporate Integrity Agreement'"); JX-1839 (3/8/12 OIG Letter to Purdue) at -603 ("Based on our review of all this additional information and the information provided in Purdue's Fourth Annual Report, it appears that Purdue was in compliance with the terms of the Corporate Integrity Agreement (CIA) … during the fourth annual reporting period."); JX-1840 (1/24/13 OIG Letter to Purdue) at -723 ("Based on our review of all this information, it appears that Purdue was in compliance with the terms of the Corporate Integrity Agreement (CIA) during the fifth annual reporting period."); JX-2674 (1Q 2013 Quarterly Compliance Report) at -695 ("From Letter dated January 24th, Office of Inspector General, HHS: ...'[I]t appears that Purdue was in compliance with the terms of the Corporate Integrity Agreement (CIA) … during the fifth annual reporting period.... [T]he Purdue CIA has now concluded.'").

January 1, 2008 and July 31, 2012, when the federal monitor was in place and the Board was receiving regular reports that Purdue was operating in compliance with the CIA.[97]

In July 2012, as the monitorship was ending, the Board was informed that PPLP was maintaining and enhancing its compliance program, including by hiring outside counsel to provide ongoing reviews of its effectiveness.[98]  In early 2016, management advised the Board that outside counsel gave a positive review of the commercial compliance program (which reviewed PPLP's field promotional activities) and concluded that compliance controls were consistent with industry practice and requirements.[99]

When the Challenged Distributions were made, the Board was advised that:

- Purdue's employees were extensively trained on compliance.[100]

---

[97]     JX-1977 (Chakraborty Rept. Appendix H, Tab 1) (column D, row 1638 [$10,318,183,895] minus column D, row 828 [$3,833,753,745] = $6,484,430,150).

[98]     JX-1830 (2Q 2012 Quarterly Compliance Report) at slide 7.

[99]     JX-1832 (4Q 2015 Quarterly Compliance Report) at slide -837; JX-2683 (3Q2016 Quarterly Ethics & Compliance Report) at 3.  The Board was also informed that management was implementing outside counsel's suggestions for improving the compliance programs.  *See* JX-1834 (3/17 Quarterly Compliance Report) at –920 ("Complete deployment" of outside counsel's "enhancements"). *See also* JX-1833 (8/25/16 Quarterly Compliance Report) at –546–47 ("During Q4 2015, a compliance review was conducted by outside counsel … which focused on field promotional activities and compliance controls in place with respect to those activities. … [The] review identified a limited number of discretionary opportunities for enhancement of the compliance program, one of which was regular email monitoring of the field … . the Ethics & Compliance team has developed an email monitoring methodology and selected a system to conduct a monitoring pilot by year end. The pilot is scheduled to begin in the third quarter.").

[100]     *See, e.g.*, JX-2664 (3Q 2010 Quarterly Compliance Report) at -470; JX-1833 (8/25/16 Quarterly Compliance Report) at -547; JX-1834 (3/17 Quarterly Compliance Report) at -917.

- PPLP audited potential areas of risk, and the Board received the results of many audits,[101] including audits of Purdue's sales force.[102]

- The speakers' program was monitored to ensure compliance.[103]

- All compliance issues were reported and remediated.[104] They were told that most compliance issues identified were minor, and that serious violations resulted in termination.[105]

These compliance programs were addressed in Professor Lawrence Hamermesh's

uncontradicted expert report, in which he concluded that, "the actions of the Former Directors in

---

[101]    *See*, *e.g.*, JX-2656 (3Q 2008 Quarterly Compliance Report) at -058, -081; JX-2666 (1Q 2011 Quarterly Compliance Report) at -047–48; JX-2672 (3Q 2012 Quarterly Compliance Report) at -455; JX-2676 (4Q 2013 Quarterly Compliance Report) at -798, -801, -807–08; JX-2677 (1Q 2014 Quarterly Compliance Report) at -170–73; JX-2678 (2Q 2014 Quarterly Compliance Report) at -282–84; JX-2679 (4Q 2014 Quarterly Compliance Report) at -815; JX-2681 (2Q 2015 Quarterly Compliance Report) at -155; JX-2684 (6/17 Quarterly Compliance Report) at -246.

[102]    JX-2667 (2Q 2011 Quarterly Compliance Report) at -482–90 (slides addressing how Purdue's sales force is audited).

[103]    *See*, *e.g.*, JX-2678 (2Q 2014 Quarterly Compliance Report) at -284 ("Compliance Audits in Progress — 2Q2014[:]  Speaker Programs[:] To assess compliance with speaker program procedures and company guidelines"); JX-2679 (4Q 2014 Quarterly Compliance Report) at -815 ("Completed 13 compliance audits in 2014[.]  Areas audited include ... Speaker Programs … Out of these 13 audits, there were a total of 27 findings — 0 Critical"); JX-2680 (1Q 2015 Quarterly Compliance Report) at -073 ("2015 Compliance Priorities ... Speaker Programs"); JX-1833 (Aug. 25, 2016 Quarterly Compliance Report) at -545–46; JX-1834 (3/17 Quarterly Compliance Report) at -919 ("Enhanced controls and monitoring related to speaker programs"); JX-2684 (June 2017 Compliance Report) at -246 ("Speaker program monitoring continues").

[104]    *See, e.g.*, JX-2667 (2Q 2011 Quarterly Compliance Report) at 489–90 (telling Board: "Law and Compliance reviewed all email"; compliance "[c]onducted investigations with representatives who had more significant violations"; "Major discipline for one representative"); JX-2655 (2Q 2008 Quarterly Compliance Report) at -356–57 (updating Board on ongoing investigations and reporting investigation of "106 matters in 2Q08," of which "10 had compliance implications"); JX-2679 (4Q 2014 Quarterly Compliance Report) at -817 (describing "Most Important Investigation of 2014"); JX-2682 (3Q 2015 Quarterly Compliance Report) at -551 ("Matters by Quarter"); JX-1834 (3/17 Quarterly Compliance Report) at -917 ("More than 250 inquiries and matters addressed in 2016"); JX-2687 (3/18 Quarterly Compliance Report) at -940 (detail on "Investigations and Inquiries: YTD 2018").

[105]    *See, e.g.,* JX-1829 (1Q 2008 Quarterly Compliance Report) at -184; JX-2655 (2Q 2008 Quarterly Compliance Report) at -348–49; JX-2657 (4Q 2008 Quarterly Compliance Report) at -212; JX-2058 (3Q 2010 Board Report) at -7004; JX-2667 (2Q 2011 Quarterly Compliance Report) at -490; JX-2679 (4Q 2014 Quarterly Compliance Report) at -816; JX-2684 (3/17 Quarterly Compliance Report) at -246.

regard to implementation and monitoring of a reporting system and controls over marketing and distribution of opioids satisfied or exceeded the norms of customary corporate governance practice."  JX-3056 (Hamermesh Report) at ¶30; *id*. at ¶¶31-42.[106]

Most underlying claims against the Former Directors focused on Purdue's allegedly deceptive marketing of opioids after 2007.  There is <u>no evidence</u> that the Former Directors or the Board ever made any decisions about what Purdue's post-2007 marketing should say.  The Board understood that Purdue had systems to ensure the accuracy of its marketing and that the FDA reviewed all of Purdue's marketing material when they made the Challenged Distributions. *See* 21 C.F.R. § 314.81(b)(3)(i).  The Board relied on the fact that Purdue's Medical, Legal and Regulatory Affairs Departments each reviewed and approved all marketing material.[107]  Purdue required that "[a]ll product claims made verbally by" Purdue sales representatives must "be consistent with the product labeling and Company approved Materials," and expressly "prohibit[ed] the use of unapproved Materials to promote Purdue products at any time."[108]

No theory of corporate law requires corporate directors to second-guess determinations by management or the FDA on issues as technical as the accuracy and appropriateness of marketing highly-regulated prescription opioid medications.  There is no evidence that any of the Sacklers acted knowingly wrongfully with respect to the content of Purdue's marketing, much

---

[106]     Although it was not offered at the Confirmation hearing, the Consolidated States' Reply Brief (at 11) cites an expert report prepared by Professor John C. Coffee, Jr. in Utah's administrative proceeding against Purdue and two Sacklers.  Professor Coffee did not testify in Utah; there was no trial; he was never deposed or cross-examined; and his report was not submitted or received in evidence.  The report is hearsay and inadmissible.  The report is also based on almost no evidence.  He was not aware of, and does not acknowledge or address, the federal monitorship or Purdue's extensive compliance program.  He largely focuses on events before 2007 that have been released.

[107]     *See* JX-1873 (Purdue SOP, Material Review Process); *see also* JX-1886 (Purdue SOP, Material Approval Process).

[108]     JX-2245 (Compliance Officer Certification) at -091.

less that they authorized the Challenged Distributions in anticipation that future lawsuits

challenging Purdue's marketing would precipitate a bankruptcy filing.

### G.  Board Materials Confirm the Board Did Not Expect to Face Judgments Purdue Could Not Pay

Board materials demonstrate that the onslaught of opioid litigation that emerged in 2017

was not expected when the Challenged Distributions were made:

- In January 11, 2008, management advised the Board that all OxyContin litigation could be "Clos[ed] Out" with a $200 million reserve.[109]

- A November 3, 2009 Board Agenda shows that PPLP's legal expenses for Product Litigation and Government Related Litigation were low and expected to continue to decrease.[110]

- Purdue's 10-year plan presented to the Board on June 21, 2011 budgeted essentially flat annual legal fees for the years 2011 to 2017, showing clearly that no significant opioid litigation was anticipated.[111]

- The updated 10-year plan presented to the Board in May 2013 projected a reduction of almost 20% in total legal fees from 2013 to 2017, budgeted *de minimis* fees for Government-Related Litigation from 2013 to 2019, and projected falling Product Liability and Government Related Litigation fees from 2013 to 2022.[112]

- The Board had every reason to believe that Purdue's projections were reliable. Between the 2011 and 2013 10-year plans, annual budget reports reflect that the amounts budgeted for legal fees were in line with the 10-year projections. At the end of 2011, the budget report informed the Board that Purdue's product liability costs were "on budget" and that "only 1 new [product liability] claim" had been filed against Purdue.[113]  At the end of 2012, the budget report informed the Board that the latest estimate of 2012 legal fees was $56.9 million—in line with the projections made in 2011.[114]

---

[109]   JX-1851 (1/11/2008 Board Agenda Book) at -677.
[110]   JX-1852 (11/3/09 Board Agenda Book) at -495.
[111]   JX-2309 (6/21/11 Purdue 10-Year Plan) at slide 107.
[112]   JX-1853 (5/9/13 10-Year Plan) at -584.
[113]   JX-2322 (2012 Budget Submission) at -628-29.
[114]   JX-2340 (2013 Budget Submission) at -131.

- Purdue's Annual Budgets for 2013, 2014 and 2015 also anticipated legal fees in line with the 10-year plan, showing no expected surge in litigation.[115]

- Purdue's legal fee budget for 2016 ($50.7 million) showed that Purdue projected to spend about 25% less than it had projected in 2011 ($67.1 million).[116]  PPLP's Financial Statement for 2016 shows that the actual total spent on legal fees in 2016 ($51.0 million) was almost exactly what was budgeted.[117]

Management's reports to the Board paint a compelling picture of the low litigation risk Purdue perceived before 2016.  This is accurately summed up by materials for the January 15, 2016 Board meeting.  "**Major Potential Risks to the current cash flow outlook" for Purdue: "Risks: Litigations (low)**."  JX-2697 (1/15/2016 Board Agenda Book) at -631.

## H.    Sophisticated Market Participants Did Not Foresee the Opioid Litigation Risk to Purdue or Other Opioid Manufacturers

Contemporaneous assessments of Purdue by investment banks and rating agencies independently confirm that opioid litigation risk was not foreseen by market participants at the time of the Challenged Distributions.

- In 2009, Goldman Sachs reviewed Purdue's business and the only litigation risk it identified was patent litigation.[118]

- In 2014, JPMorgan prepared a "comprehensive valuation and debt capacity analysis" of Purdue that similarly identified only patent litigation risk and concluded that Purdue could raise about $1.0-$1.5 billion in debt financing.[119]

- In 2016, Purdue received an indicative credit rating from Moody's of "Ba3" based on its "low financial leverage," which Moody's said would enable "the company to absorb considerable operating or legal setbacks with minimal risk of debt impairment."[120]

---

[115]    JX-2340 (2013 Budget Submission) at -607; JX-2418 (2015 Budget Executive Summary) at -463.

[116]    *Compare* JX-2425 (2016 Annual Budget Report) at -373 *with* JX-2309 (6/21/11 Ten Year Plan) at slide 107.

[117]    JX-2425 (2016 Annual Budget Report) at -373; JX-2453 (7/25/17 Executive Committee Meeting Slides) at -855.

[118]    JX-1904 (7/14/09 Goldman, Sachs & Co. "Discussion Materials for Purdue") at -733.

[119]    JX-1905 (8/13/14 JPMorgan Debt Capacity Presentation) at -301, -335, -336.

[120]    JX-1906 (3/30/16 Moody's Investors Service Indicative Ratings Letter) at -943.

- Also in 2016, Purdue was rated "BB" by Standard & Poor's, who said that Purdue's "very low leverage metrics support our 'minimal' financial risk assessment."[121]

Neither Moody's nor Standard & Poor's discussed any risk of current or future opioid litigation or investigations as a risk to Purdue's ability to repay debt.[122]

## I.    Purdue's 2020 Guilty Plea and Civil Settlement Were Not Foreseen or Reasonably Foreseeable by the Board when Distributions Were Made

Purdue's 2020 Guilty Plea and associated liabilities were not foreseen or foreseeable years earlier when the Challenged Distributions were made.  As addressed above, the Former Directors understood that Purdue was operating under federal monitorship and compliance programs to ensure it was in compliance with all law.  There is no evidence that Purdue foresaw the liabilities associated with the Guilty Plea when distributions were made.  *See* JX-1937 (Chakraborty Report) ¶146.  Purdue learned about the federal investigation into OxyContin when it received subpoenas from the District of Connecticut U.S. Attorney's Office in June 2016 and September 2016 and August 2017, and the Department of Justice Consumer Protection Branch in December 2017.[123]  Distributions before June 2016—nearly all of the Challenged Distributions—were made before anyone at Purdue was aware of those investigations.

## III.    THERE IS NO EVIDENCE THAT THE BOARD HARBORED LITIGATION CONCERNS

The supposed evidence that the Former Directors anticipated the unprecedented post-2017 opioid litigation that triggered Purdue's bankruptcy consists of a handful of patently misconstrued documents from 2006 to 2008, none of which shows that any Sackler family member had any concerns about Purdue's financial wherewithal.[124]  To the extent these

---

[121]      JX-1907 (4/7/16 Standard & Poor's Indicative Ratings Letter) at -922; *see also* JX-1937 (Chakraborty Rept.) ¶117.
[122]      *See* JX-1906 (3/30/16 Moody's Indicative Ratings Letter); JX-1907 (4/7/16 Standard & Poor's Indicative Ratings Letter).
[123]      JX-1850 (2016-17 Financial Statements) at -737.
[124]      *See supra* at 1-2 & n.3.

documents are relevant at all, the uncertainties they discuss were resolved not long after the documents were written.  <u>Tellingly, in 90 million pages of discovery, there is no evidence that any Former Director expressed any litigation concern during the period from 2008-2016, when all but approximately $199,000 of the Challenged Distributions were made</u>.

### A.    <u>November 20, 2006 Email from Jonathan Sackler (JX-2229)</u>

In a November 20, 2006 email from Jonathan Sackler to his brother Richard about "pharma issues,"[125] Jonathan stated that (1) the pharma industry had been "enshrined as a permanent whipping boy for … the bar;" (2) "[g]etting caught in the crossfire of the war on drugs is obviously a huge risk;" and (3) "contingent liabilities continue to hover over the business."  He also (4) emphasized the need to "maximize[e] free cash."[126]  The text, timing and context of the email show that this email did not reflect any concern about litigation when the Challenged Distributions were made, beginning more than a year later.  On the contrary, the issues he was addressing were resolved by then:

- **Patent Exclusivity**. Jonathan Sackler wrote in the email that "[t]he financial results in the States will revolve around [patent] exclusivity[.]"[127]  As discussed above, Purdue was appealing a decision which stripped OxyContin of patent exclusivity.  That was one of the "contingent liabilities" that was "hover[ing] over the business" in November 2006, and it was resolved by the time the Challenged Distributions were begun.

- **DOJ Investigation**.  On December 21, 2006, one month after Jonathan Sackler sent his email, PPLP management recognized that the DOJ investigation remained one of Purdue's most significant legal risks.[128]  It settled in May 2007, resolving that contingent liability that was "hover[ing] over the business" in November 2006, and it was resolved before the Challenged Distributions were made.

- **State Settlements**.  By August 2007, eight months after this November 20, 2006 email, the state consumer protection and Medicaid matters were no longer "hover[ing] over the business" because by then Purdue had entered into 76 settlements with every state

---

[125]    JX-2229 (11/20/06 email from Richard Sackler).
[126]    *Id.* at -694, -699.
[127]    *Id.* at -699.
[128]    JX-2231 (12/21/06 Year-End Business Update) at -063.

other than West Virginia (which had settled in 2004).[129]  Only Kentucky continued to litigate its case, which was settled in 2015 for $24 million paid over eight years.[130]

- **Product Liability Suits**.  At the time Jonathan Sackler wrote the November 2006 email, more than 1,000 product liability lawsuits were "hover[ing] over the business." Purdue settled or disposed of substantially all of them between December 2006 and May 2007.[131]  Product liability suits were filed in the wake of the 2007 federal and state settlements but, by January 2008, management informed the Board they could be closed out with a $200 million reserve.[132]  By early 2011, these suits had largely been settled in principle.[133]  By early 2012, only 24 product liability cases remained, and all but 3 were dormant.[134]

Jonathan Sackler's November 20, 2006 email also discusses a "need to protect the company"—not the family—"by maximizing free cash."  That means maximizing <u>Purdue's</u> "free cash" and is the opposite of a suggestion to strip Purdue of assets.[135]  The Board did just that.  It made sure that Purdue had free cash—from hundreds of millions to over a billion dollars—on-hand, after distributions, every year, from 2006-2016.[136]

The November 20, 2006 email does not manifest any concern about litigation in 2008-2016, when the Challenged Distributions were made.

**B.**   **March 25, 2007 Email from Jonathan Sackler (JX-2235)**

A March 25, 2007 email from Jonathan Sackler to other directors similarly manifests no concern about future opioid litigation overwhelming Purdue.

In the email, Jonathan Sackler states that, "as WDVA empties our coffers," "[t]here are a number of risks" that "we're really not braced for," including "[t]he emergence of numerous

---

[129]     *See* JX-2225 (2004 Settlement Agreement and Release with West Virginia).

[130]     JX-2430 (12/18/15 settlement between Purdue and Kentucky) at -845-46.

[131]     JX-2484 (4/13/20 Email from Russell Gasdia) at slide 3; JX-2231 (12/21/06 email to all Purdue colleagues) at -063; JX-2694 (2004-05 Financial Statements) at -351; JX-1841 (2005-06 Financial Statements) at -629.

[132]     JX-1843 (2009-10 Financial Statements) at -983-4.

[133]     *Id.*

[134]     JX-1844 (2010-11 Financial Statements) at -574.

[135]     *Id*.

[136]     *See supra* at 15-17 (2008-16); JX-1842 (2006-07 Financial Statements) at -382.

lawsuits."[137]  The email was written before the 76 settlements Purdue entered into in 2007 with

49 states that resolved all non-federal governmental OxyContin litigation except one case with

Kentucky.  To the extent that "[t]he emergence of numerous lawsuits" anticipated product

liability lawsuits in the wake of the 2007 guilty plea, this email precedes management's advice to

the PPI board in January 2008 that all OxyContin litigation could be "Clos[ed] Out" for $200

million,[138] and the settlement, dismissal or collapse into dormancy of those product liability suits

by 2011-12.  *See supra* at 20.

      **C.**      <u>**March 22, 2007 Email from Jonathan Sackler (JX-2234)**</u>

      In a March 22, 2007 email, Jonathan Sackler wrote that he wanted Purdue to hire a

consulting firm "to review strategic options for the business, like a McKinsey," in light of:

> [1] the ongoing risks created by the WDVA (in other words, if there's a future
> perception that Purdue has screwed up on compliance, we could get murdered) … [2]
> an uncertain contingent liabilities picture … [3] an uncertain exclusivity asset … [and
> 4] unexploited generics opportunities.[139]

      The text and context of the email do not reflect any concern about future opioid liability

overwhelming Purdue.  Issue 1—"future perception"—addresses a public perception concern.

There is no reason to believe that issues 2 and 3—"contingent liabilities" and "uncertain

exclusivity asset"—refer to anything other than the same "contingent liabilities" and patent

"exclusivity" issues addressed in Jonathan Sackler's November 20, 2006 email, *supra*, which

also references "contingent liabilities" and expresses concern about "exclusivity."

      The first three issues were the same litigation risks that were resolved between May 2007

and late 2008, after this email was sent.  The fourth issue—unexploited generic opportunities—

was a business risk.  The March 22, 2007 email does not manifest any concern about litigation in

---

[137]     JX-2235 (3/25/07 email from Jonathan Sackler) at -767.
[138]     JX-1851 (1/11/08 Board Agenda Book) at -677.
[139]     JX-2234 (3/22/07 email from Jonathan Sackler) at -942.

2008-2016, when the Challenged Distributions were made.

### D.   May 17, 2007 Email from David Sackler (JX-2237)

In a May 17, 2007 email written just after Purdue's 2007 Guilty Plea, 26 year-old David

Sackler wrote to his father and uncle, "We will be sued."[140]  At the time he wrote this email,

David Sackler was working at a hedge fund.  He had never worked at Purdue except as a high

school intern.[141]  He testified:  "I really didn't know much about what was happening.  I don't

think at this point I even knew that the payment to the federal government was being paid out of

Purdue cash."[142]

He sent the email a week after Purdue's 2007 guilty plea and federal settlement.  The

email did not predict litigation against Purdue—it expressed concern that the 2007 guilty plea

would be followed by suits against the family.  He was writing in response to an email from his

uncle Jonathan Sackler, which stated:  "you should rest assured that there is no basis to sue 'the

family."[143]   David Sackler expresses concern that plaintiffs' lawyers might "freeze our assets

and threaten us," forcing a settlement by the family.[144]

As it turned out, David Sackler's concern was misplaced and Jonathan Sackler's

statement was vindicated.  None of the hundreds of product liability suits filed in the wake of

Purdue's 2007 guilty plea named the family—and all were settled, dismissed or dormant within a

few years.

In 2012, five years after writing JX-2237, David Sackler joined the Board.  He clearly

would not have done so if he anticipated future massive opioid litigation against Purdue or his

---

[140]     JX-2237 (5/17/07 email from David Sackler).
[141]     JX-1989 (8/28/20 David Sackler Dep. Tr.) at 61:24-62:7.
[142]     *Id.* at 186:17-187:8.

[143]     *See also* JX-2237 (5/17/07 email from David Sackler).
[144]     *Id.*

family.

In 2015, eight years after writing this email, David Sackler (together with Richard and Jonathan Sackler) proposed that Side B lend its distributions back to Purdue in return for subordinated debt.  That would have exposed Side B to all of Purdue's litigation risk.  That is proof that David, Jonathan and Richard Sackler did not anticipate massive opioid litigation against Purdue in 2015.

### E.    June 22, 2007 Email from David Sackler (JX-2239)

An email from David Sackler dated June 22, 2007[145] similarly does not show that he was worried that Purdue's future liabilities could affect a merger.[146]  The email clearly states that David Sackler's concern was that <u>negative publicity</u> associated with Purdue's 2007 Guilty Plea could decimate a merger:

> [W]e have absolutely no idea how our negative publicity will play with investors. It may be that we're tainted and the negative press around Oxy will decimate a smaller company's stock price.... If we merge with a company like SEPR the analysts could very well start saying crazy things about future liabilities and we could see the value of our investment seriously diminished.[147]

The June 22, 2007 email does not manifest any concern about litigation.

### F.    June 25, 2007 Email from David Sackler (JX-2240)

In an email dated June 25, 2007, David Sackler wrote to his father Richard, his uncle Jonathan, and his cousin Mortimer Sackler, Jr., about potential merger opportunities for Purdue and posed the "fundamental[]" question whether the families "want to be in the pharmaceutical business going forward."[148]  He wrote: "I would vote no. I think we've all had enough of a rough

---

[145]    JX-2239 (6/22/07 Email from David Sackler).
[146]    *See* Creditors' Committee Motion to Compel at ¶¶23, *In re Purdue*, Dkt. 2157.
[147]    JX-2239 (6/22/07 Email from David Sackler) at -4000.
[148]    JX-2240 (6/25/07 Email from David Sackler).

ride over the past 10 years to make me wary of committing for another venture in the space."[149]
He also wrote: "Since you guys are closer to this than I am, I obviously will support the decision
100% if the family decides to retrench in the industry.[150]

At the time he wrote this email, David Sackler was 26 years old and working at a hedge
fund and had never worked at Purdue except as a high school intern.[151]  He deferred to his father,
uncle and cousin, who were directors of Purdue.[152]  They elected to remain in the business, and
David Sackler did not object and in fact joined them.  The June 25, 2007 email does not support
an inference that David Sackler was anticipating massive future litigation liability in 2008-2016.

G.  **July 24, 2007 Peter Boer Memorandum (JX-2241 & JX-1660)**

A July 24, 2007 memorandum that Peter Boer wrote to Jonathan Sackler about a potential
sale of Purdue does not manifest a concern that future litigation liabilities would overwhelm the
Company.[153]

At the time the memorandum was written, Peter Boer was a former executive with W.R.
Grace & Co. (a chemical company).[154]  He was not on the Board and did not become an outside
director of PPI until the following year.  The memorandum expresses Peter Boer's thoughts to
Jonathan Sackler based on Boer's prior experience at Grace, which had substantial asbestos
liability.[155]  In the memorandum, Peter Boer stated that legal liabilities would impact the sale
value of Purdue "until interest in litigation has died down."[156]  As discussed above, by 2010-

---

[149]    *Id*.
[150]    *Id*.
[151]    JX-1989 (8/28/20 David Sackler Tr.) 61:24-62:7.
[152]    *See* JX-2240 (6/25/07 Email from David Sackler) (stating that he will "support the decision 100%" if his cousin, father and uncle want to "retrench in the industry").
[153]    *See* JX-2241 & JX-1660 (7/24/07 Memo from Peter Boer).
[154]    JX-2479 (Peter Boer Resume).
[155]    JX-2241& JX-1660 (7/24/07 Memo from Peter Boer) at –388.
[156]    *Id.* at -389.

2011, only three of the product liability suits filed after the 2007 Guilty Plea were still being actively litigated, and none of the Pending Opioid Actions was filed until years later.

Some parties have argued that the memorandum "recommend[ed]" the Sacklers take "defensive measures."  But there is no such recommendation in the memorandum, and there is no evidence that anyone took any defensive measures after receiving the memorandum.

The memorandum states that: "it may be that overseas assets with limited transparency and jurisdictional shielding from U.S. judgments will be less attractive to litigants than domestic assets.  Obviously, this factor depends on how the ownership is structured, and I presume the family has taken most of the appropriate defensive measures."[157]  There is no evidence that Peter Boer had any actual knowledge of the organizational structure of the family's holdings, and the phrasing of the memorandum implies that he did not.  The B-side trusts that own Purdue are domestic and date to 1974 and 1989—years before OxyContin was introduced.[158]  There is no evidence that anyone took any "defensive measures" in response to this memorandum.

The July 24, 2007 memorandum was written by a non-family member, generated no action by the family, and does not manifest any concern about litigation on the part of Purdue or the RSF in 2008-2016, when the Challenged Distributions were made.

### H.    April 12, 2008 Memo from Peter Boer (JX-2254)

An April 2008 memorandum from Peter Boer to Richard Sackler does not manifest a concern that massive opioid litigation liabilities would engulf Purdue.  This argument is not supported by the text of the memorandum.

The memorandum makes clear that its references to "dangerous concentration of risk"

---

[157]    *Id.*
[158]    *See* JX-1915 (Martin Report, Ex. A—Nov. 20, 2019 Raymond-Side Informational Presentation) at slides 4, 23-29.

and "distribut[ing] more free cash flow"[159] were not discussing opioid litigation.  The memo expressly identified the risk as the anticipated end of "our period of [OxyContin's patent] exclusivity, currently estimated to be through 2013."[160]

The subject of the memo is CEO loyalty in the context of a possible sale or recapitalization of Purdue.[161]  The memo states that:  "A successful CEO will diversify sources of cash flow over the next five years to reduce the company's vulnerability to loss of exclusivity, and increase investor estimates of EBITDA beyond this timeframe."[162]  The memo states that a CEO must "achieve results within the short time frame afforded by our exclusivity position," and emphasized that "[m]ajor risks must be avoided, especially non-compliance with the Corporate Integrity Agreement,"[163] showing the importance of compliance to the directors.

The memo says nothing about opioid litigation and does not evince any concern about opioid litigation risk.

                    *        *        *

The foregoing are the documents that the Creditors' Committee (*supra*, n.3) focused on as supposed evidence that members of the Sackler family authorized the Challenged Distributions because of alleged concerns about opioid litigation risk.  The evidence refutes this suggestion.  If the Court has concerns or questions about other documents, the RSF would be happy to address them.  All documents were disclosed in the massive discovery before Judge Drain, and Appellants had the opportunity to examine witnesses concerning these documents and present arguments that they showed an abuse of the bankruptcy process at the trial.  Appellants

---

[159]    JX-2254 (4/12/08 Memo from Peter Boer).
[160]    *Id.* at -304 (first paragraph under the heading "Priority 1"), -305, -306.
[161]    *Id.* at -303.
[162]    *Id.* at -305.
[163]    *Id*. at -305-06.

elected not to do so.

## <u>CONCLUSION</u>

Judge Drain considered and rejected the argument that the Plan was an abuse of the

Bankruptcy process.  Because the record supports his conclusions and belies any evidence of

fraud or abuse, this Court should affirm his decision.

Dated:  December 6, 2021
        New York, New York

                                        Respectfully submitted,

                                        /s/ Gerard Uzzi
                                        Gerard Uzzi, Esq.
                                        Alexander B. Lees, Esq.
                                        **MILBANK LLP**
                                        55 Hudson Yards
                                        New York, New York 10001
                                        Telephone:    (212) 530-5000
                                        Facsimile:    (212) 530-5219


                                        /s/ Gregory P. Joseph
                                        Gregory P. Joseph, Esq.
                                        Mara Leventhal, Esq.
                                        Christopher J. Stanley, Esq.
                                        **JOSEPH HAGE AARONSON LLC**
                                        485 Lexington Avenue, 30th Floor
                                        New York, New York 10017
                                        Telephone:    (212) 407-1200
                                        Facsimile:    (212) 407-1280

                                        *Counsel for the Raymond Sackler Family*

840613

## **CERTIFICATE OF COMPLIANCE**

  I, Mara Leventhal, hereby certify that the foregoing document complies with the word limit of Federal Bankruptcy Rule 8015 because, excluding the parts of the document exempted by FRBP 8015(g), it contains 12,917 words.


Dated: December 6, 2021


          /s/  *Mara Leventhal*
             Mara Leventhal