UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| *In re Purdue Pharma, L.P.* Bankruptcy Appeals: | * | |
| | * | |
| *State of Maryland,* | * | |
| Appellant, | * | No. 7:21-CV-7532-CM (ALL CASES) |
| | * | |
| v. | * | |
| | * | |
| *Purdue Pharma, L.P., et al.*, | * | |
| Appellees. | * | |
| | * | |

## MARYLAND'S SECOND SUPPLEMENTAL BRIEF

## INTRODUCTION

Pursuant to this Court's Order of December 1, 2021, the State of Maryland respectfully submits this second supplemental brief to address the questions posed by the Court at and after oral argument regarding (1) the bankruptcy court's subject-matter jurisdiction and (2) this Court's authority to consider and conclude that the non-debtor releases here are "abusive" under *Manville III* and *Metromedia*, particulary in light of *Stern v. Marshall*, 564 U.S. 502 (2011).

In brief, the debtors' contentions at oral argument regarding subject-mater jurisdiction fall flat because the debtors overlook settled Second Circuit law governing the application of multiple precedents under *stare decisis* and distinguishing features of *SPV* that render *Manville III* and *Manville IV* – not *SPV* – controlling here. If, however, the Court ultimately reaches the merits, the Court not only may – but is obligated to – consider the crystal clear record evidence of abuse in determining whether the releases fail to pass muster under the "very small exception" to the "rule against non-debtor releases" that the Court of Appeals has recognized in *Metromedia* and *Manville*. *See Karta*, 342 B.R. 45, 55 (S.D.N.Y. 2006). Contrary to the Side A family's wishful and misleading claims, there is ample evidence here of abuse and of the potential liability of even non-director Sacklers for their role in harming the public. The Court should evaluate this evidence

as it relates to the legal question of whether the releases are abusive or inappropriate under *Manville III* and 11 U.S.C. §§ 105(a) and 1123(b)(6).  As *Manville III* and other reviewing courts have, the Court may evaluate any fact-findings supporting the bankruptcy court's decision against the record and, in this case, may make its own findings under *Stern*, 11 U.S.C. 157(b), and Rule 9033.

## ARGUMENT

I.    <u>Subject-Matter Jurisdiction – *Manville III, Manville IV, & SPV* Revisited</u>

Debtors' contentions at oral argument regarding *SPV* do not enable the releases here to escape *Manville III*'s clearly applicable holding.   *Manville III* and *IV*, not *SPV*, are clearly applicable and control the outcome here.

In arguing that *SPV* is somehow controlling over *Manville III*, debtors run afoul of ordinary principles of stare decisis.  In the face of multiple controlling precedents, a court's task is not simply to apply the most recent panel holding and discount prior panel cases as somehow less entitled to weight.  Instead, courts apply the "most closely analogous precedent to the situation presented" in the case at hand.  *Curley v. Brignoli, Curley & Roberts Associates*, 915 F.2d 81, 91 (2d Cir. 1990).  *Manville III* and *IV* would notably apply even if they and *SPV* were truly in conflict – though, as discussed below, they are not.  In that circumstance, *stare decisis* would require application of the *older* precedent unless and until it has been overruled by the Second Circuit *en banc* or the Supreme Court.  *Tanasi v. New All. Bank*, 786 F.3d 195, 200 (2d Cir. 2015), *as amended* (May 21, 2015) (Katzmann, C.J.) ("A subsequent panel is bound by the decisions of a prior panel absent a ruling from the Second Circuit sitting en banc or from the United States Supreme Court.").  *Lotes Co. v. Hon Hai Precision Indus. Co.,* 753 F.3d 395, 405 (2d Cir.2014); *see also United States v. Sanchez*, 623 Fed. Appx. 35, 39 (2d Cir. 2015) (summary order) (*per*

*curiam*) ("Even if these more recent precedents conflict with *Diaz* to some extent, *Diaz* remains controlling authority."). *Teva Pharm. USA, Inc. v. Sandoz Inc.*, 2013 WL 3732867, at *7 (S.D.N.Y. July 16, 2013) (noting, in patent infringement case, that "[e]ven if [more recent Federal Circuit panel decision] were found to be relevant [*i.e.*, not distinguishable], the Federal Circuit has instructed that when two cases from the Federal Circuit conflict, the earlier precedent controls until overruled or an *en banc* decision issues."); *A to Z Welding & Mfg. Co., Inc. v. U.S. By and Through I.R.S.*, 58 B.R. 138, 139 (E.D. Ark. 1985) ("The decision of the Bankruptcy Court here was based primarily on its belief that although *Bostwick* and *Kelly* present seemingly conflicting holdings, *Bostwick* did not expressly or impliedly overrule *Kelly, Kelly* remains a viable precedent, and *Kelly,* on its facts, was most closely analogous to the case before the court. There is nothing in the record that would necessitate modifying the Bankruptcy Court's order, and it is affirmed in all respects."), *aff'd sub nom. A to Z Welding & Mfg. Co., Inc. v. U.S., I.R.S.*, 803 F.2d 932 (8th Cir. 1986)."). *BCCA App. Group v. U.S. E.P.A.*, 355 F.3d 817, 829 (5th Cir. 2003), *as amended on denial of reh'g and reh'g en banc* (Jan. 8, 2004).

Consistent with these principles, the holdings of *Manville III* and *IV* – not *SPV* – are controlling here.  Debtors overlook the key distinguishing feature of *SPV*:  *SPV* involved purely derivative claims against the third parties that would have required the state court from which the third-party claims were removed to reexamine, like the arbitration at issue in *Kirwan*, any conclusion reached in the bankruptcy court concerning the *debtor's* liability for fraud.  As Judge Rakoff's affirmed opinion for this Court helps make clear, in *SPV*, the claimant asserted that third-party defendants – financiers who funded Madoff's and his company's Ponzi scheme had provided essentially *behind-the-scenes* financial support to the fraud that  Madoff's perpetrated against them:

> Critically, SPV does not plead that its assignor OSUS had any dealings whatsoever with the Access Defendants . . . let alone invested in Madoff through them. Instead, OSUS appears to have been a direct investor in BLMIS [Madoff's LLC] with its own customer account.   Nonetheless, SPV pleads that the Access Defendants' alleged assistance to Madoff proximately caused its assignor's injury because "[w]ithout the Access Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi scheme."

*SPV OSUS Ltd. v. AIA LLC*, 2016 WL 3039192, at *6 (S.D.N.Y. May 26, 2016) (citations omitted), *aff'd sub nom. SPV*, 882 F.3d at 346.  In short, the claimant's claim against the non-debtors – with whom neither the claimant nor its predecessor had any direct contact – depended entirely on the fraud committed by the debtors.  *SPV*, 882 F.3d at 346 (noting that the theory was that if the Access defendants did not provide support and assistance to the feeder funds [like BLMIS], the feeder funds would not have collected money from investors . . . [and] the fraudulent scheme would have collapsed much sooner") ("SPV points to nothing showing OSUS [SPV's assignor] relied on the marketing materials provided by the Access Defendants, was aware of the Access Defendants, or even knew of the feeder funds at issue.").  Thus, when Judge Pooler observed for the *SPV* court that "there is a high degree of interconnectedness between this action and the Madoff bankruptcies" because "SPV can only proceed on these claims if it establishes that the Madoff fraud occurred," *Id.* at 342, she meant it literally:  The third-party claims against non-debtors would rise or fall on the state courts' reexamination of any decision of the bankruptcy court regarding Madoff's liability

Here, however, the states' direct claims against the Sacklers stand independently of any claims they may have against the debtors, and it is not necessary to establish the debtors' liability as a predicate to establishing the Sacklers or other non-debtors liability for violations of state unfair and deceptive trade practices statutes.  This fact, and the clear instructions that the Second Circuit

and other courts have given about how to apply precedent, mean that *Manville III* and *IV*, which recognize that the jurisdictional test for is not automatically satisfied by the when direct claims are at issue, are controlling here.  *See Manville III*, 517 F.3d at 68 (relying upon the "independent legal duty in [Travelers'] dealing with plaintiffs notwithstanding the factual background in which the duty arose."); *id.* at 65 ("Plaintiff's seek to recover directly from [a non-debtor] for the [non-debtor's] own *independent wrongdoing*.  Plaintiffs aim to pursue the assets of [the non-debtor].  They raise no claim against Manville's insurance coverage.  They make no claim against an asset of the bankruptcy estate, nor do their actions affect the estate.  The bankruptcy court had no jurisdiction to enjoin he Direct Action claims against [the non-debtor].") (citations omitted).  Indeed, in another iteration of the Madoff bankruptcy, the Second Circuit recognized the jurisdictional differences that arise in the consideration of direct and indirect claims.  *See In re Bernard L. Madoff Invest. Secs. LLC*, 740 F.3d 81 (2014) ("A claim based on rights 'derivative' of, or 'derived' from, the debtor's typically involves property of the estate.  By contrast, a bankruptcy court generally has limited authority to approve releases of a non-debtor's independent claims.") (citation omitted).

Additionally, debtors are incorrect in their assertions that *SPV*'s articulation of the test as whether a non-debtor claim's "outcome might have a conceivable effect on the bankrupt estate" requires a different result.  *SPV*, 882 F.3d at 340.  That language is not Judge Pooler's; it was Judge Cardamone's in *In re Cuyahoga Equipment Corp.*, 980 F.2d 110, 114 (2d Cir. 1992), where the Court of Appeals equated the standard with the "significant connection" phrase articulated by Judge Friendly in *In re Turner*, 724 F.2d 338, 340 (2d Cir. 1983).  *See* Md. Init. Br. at 16.  It is clear that the phrase, which has been repeatedly used both before and after *Manville III*, does not lend itself to the virtually automatic exercise of "related to" jurisdiction for which the debtor's

hope here.  The Court of Appeals repeated the same phrase in *In re Quigley Co.*, 676 F.3d 45, 53 (2012), but equated it with also with the "significant effect" test and held that *Manville III* was decided "quite propery" under it.  *Id.* at 56.

Because, like *Manville III*, this complex bankruptcy involves non-derivative third-party statutory and tort claims against non-debtors, *Manville III* – not the court's resolution of derivative claims in *SPV* – should guide this Court's analysis of subject-matter jurisdiction.  *Manville III* and *IV*, unlike *SPV*, also involved claims under the same state consumer protection statues as here and, similarly to this case, claims "that the magnitude and complexity of the underyling bankruptcy proceedings are unparalleled."  *Manville IV*, 600 F.3d at 138.  As stated in Maryland's initial, reply, and first supplemental briefs, the insurance, indemnity, contribution, and overlapping factual issues upon which debtors have relied in asserting jurisdiction do not withstand scrutiny and do not, under *Manville III* and *IV* and *Quigley* do not demonstrate *any*, let alone a "significant," "direct[] effect upon the res of the bankruptcy estate."  *Quigley*, 676 F.3d at 53 (quoting *Manville III*, 517 F.3d at 66.

II.      The Court Is Obligated By Metromedia, *Manville III*, And Statute To
         <u>Consider Whether The Non-Debtor Releases Are Abusive As A Matter Of Law</u>

As demonstrated repeatedly in Maryland's prior briefing, the releases in this case are exactly the kind of releases that *Metromedia*, *Manville III,* and *Karta* warned against.  The potential for abuse is "heightened when releases afford blanket immunity . . . against any claims relating to the debtor."  *Metromedia* 416 F.3d at 142.  *Manville III* expressly determined as a matter of law that "it was *inappropriate* for the bankruptcy court to enjoin claims brought against a third-party non-debtor solely on the basis of that third-party's financial contribution to the debtor's estate." 517 F.3d at 66.  It rejected grounds of reaching "global peace" and factual overlap similar to those asserted here.  *See id.* at 66-67 (emphasis added).

Ultimately, the source of a court's authority to consider the abusiveness and inappropriateness of non-debtor releases is grounded in the statutes said here to confer the power to grant them. Section 105(a) provides that "the court may issue any order . . . necessary or appropriate to carry out the provisions of this title" [and] "tak[e] any action or mak[e] any determination necessary . . . to prevent an abuse of process." 11 U.S.C. § 105(a). Section 1123(b)(6) similarly provides that "a plan may . . . include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C. § 1123(b)(6). Neither provision authorizes third-party releases. However, Courts considering the validity of non-debtor releases have determined that, to the extent they confer authority to grant releases, the inherent equitable considerations required by these provisions make it necessary for courts to determine that any non-debtor releases are "appropriate" and "fair." *See, e.g., In re Airadigm Commun., Inc*., 519 F.3d 640, 657 (7th Cir. 2008) ("Ultimately, whether a release is "appropriate" for the reorganization is fact intensive and depends on the nature of the reorganization. Given the facts of this case, we are satisfied that the release was necessary for the reorganization and appropriately tailored."); *In re Dow Corning Corp*., 280 F.3d 648, 658 (6th Cir. 2002) (discussing grounding of non-debtor injunction in sections 105(a) and 1123(b)(6) and framing applicable legal questions as "when such an injunction is an "appropriate provision" of a reorganization plan pursuant to section 1123(b)(6) [and section 105(a)] . . . "Because such an injunction is a dramatic measure to be used cautiously, we follow those circuits that have held that enjoining a non-consenting creditor's claim is only appropriate in 'unusual circumstances.'"); *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000) (Rendell, J.) ("The hallmarks of permissible non-consensual releases—fairness, necessity to the reorganization, and specific factual findings to support these conclusions—are all absent here."); *id.* at 215 ("[T]he District Court did not discuss whether the release and permanent

injunction were fair to Plaintiffs and were given in exchange for reasonable consideration."); *In re SunEdison, Inc.*, 576 B.R. 453, 463 (Bankr. S.D.N.Y. 2017) ("Debtors have failed to demonstrate that the third party releases are appropriate under *Metromedia*."); *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015) ("To the contrary: the plain admonition of the Second Circuit Court of Appeals is that third party releases are frequently a subject of abuse and that they are appropriate only in narrow and unusual circumstances."). These decisions are wholly consistent with *Manville III* and with the Second Circuit's general holdings that section 105(a) requires courts to apply equitable principles in determining whether to grant relief. *In re Dairy Mart Convenience Stores, Inc.,* 351 F.3d 86, 92 (2d Cir. 2003) (recognizing that section 105(a) must be applied to favor party supported by "the equities"); *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("It is well settled that bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process. Section 105(a) of the Code provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.""); *In re Berry Estates, Inc.*, 812 F.2d 67, 71 (2d Cir. 1987) (invalidating order directing excess rents to landlord because Congress did not "intend that the bankruptcy court be a haven for wrongdoers" in which they could escape state "police powers.").

The question of whether a non-debtor release is permissible – thus grounded in statute – has been treated as a question of law by the Second Circuit and other appellate courts that have scrutinized the evidentiary record to determine whether record supports the conclusion that the releases are appropriate. *Metromedia*, 416 F.3d at 139 ("We conclude . . . that the bankruptcy court *erred* in approving the nondebtor releases.") (emphasis added); *Continental* Airlines, 203 F.3d at 218 ("The provision releasing and permanently enjoining Plaintiffs' claims is legally

insupportable."); *see also Manville III*, 517 F.3d at 63 ("But the factual determination was only half of the equation.").   These courts have universally held that "factual findings" are required to support the ultimate legal conclusion that a non-debtor release, but have usually rejected findings that were conclusory and insufficient and have instead reached their own conclusions.   *See Metromedia*, 416 F.3d at 143 ("The bankruptcy court's findings were insufficient."); *Continental Airlines*, 203 F.3d at 214-15 ("In attempting to salvage the release and permanent injunction of Plaintiffs' claims, the District Court did not discuss the lack of findings of the Bankruptcy Court, but instead made its own findings."); *Id.* at 218 *In re Airadigm Commun., Inc.*, 519 F.3d 640, 657 (7th Cir. 2008) ("Ultimately, whether a release is "appropriate" for the reorganization is fact intensive and depends on the nature of the reorganization. Given the facts of this case, we are satisfied that the release was necessary for the reorganization and appropriately tailored."); *In re Dow Corning Corp.*, 280 F.3d 648, 658 (6th Cir. 2002) ("For several reasons, the record produced by the bankruptcy court in this case does not support a finding of "unusual circumstances" such that we can endorse enjoining non-consenting creditors' claims against a non-debtor. The bankruptcy court's findings of fact with regards to the "unusual circumstances" test were no more than conclusory statements that restated elements of the test in the form of factual conclusions. The bankruptcy court provided no explanation or discussion of the evidence underlying these findings.  Moreover, the findings did not discuss the facts as they related specifically to the various released parties, but merely made sweeping statements as to all released parties collectively. Such factual determinations are not sufficiently specific and explained to support a finding of "unusual circumstances.").  The bankruptcy court's findings, as Maryland has demonstrated in its previous briefs, are similarly conclusory here, and do not qualify under Second Circuit precedent as sufficient fact-findings to be entitled to deference.

Ultimately, it may be best to think, as this Court may have done in *Karta*, of the "rule against non-debtor releases" as a presumption that the releases are abusive with a "very small exception." *Karta*, 342 B.R. at 55. To the extent that the releases are permitted, the presumption may be overcome by showing of "unique circumstances," but only if those circumstances are supported by a clear and specific factual record that is sufficient to overcome the general presumption and record regarding abuse. *See, e.g., Manville III*, 517 F.3d at 66-67; *Karta*, 342 B.R. at 55 ("[T]he challenge for a court is to parse the facts of the case before it to see whether a significant non-debtor financial contribution plus other unusual factors render a situation so 'unique' that non-debtor releases are appropriate.") Here, as set forth in Maryland's earlier briefs, there is simply no showing of unique circumstances that overcome the "rule against non-debtor releases." And, as the Court has already recognized, and as the other States and U.S. Trustee make clear in their supplemental briefs, record is replete with ample evidence of abuse. *See* Dec. 1, 2021 Order; U.S. Trustee Supplemental Brief (Dec. 6, 2021); Connecticut, Washington, Vermont, Delaware, Rhode Island Supplemental Br. (Dec. 6, 2021).

Whether dictated by *Metromedia* and *Manville III* as a matter of law or by some other standard as a matter of fact, *this Court's* task *here* is to conduct a *de novo* review of questions of law and fact. *Stern v. Marshall*, 564 U.S. 502 (2011) is applicable here because the claims at issue are state law claims that protect existing rights to property, life and liberty under the Fifth and Fourteenth Amendments, not create new public ones. 564 U.S. at 487 ("It is clear that the Bankruptcy Court in this case exercised the 'judicial Power of the United States' in purporting to resolve and enter final judgment on a state common law claim . . . . No 'public right' exception excuses the failure to comply with Article III in doing so . . . . Here' Vickie's claims is a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the

creditor's proof of claim in bankruptcy.  [We have] rejected the application of the 'public rights' exception in such cases.").  Independently of *Metromedia*, Manville III, and other cases, This Court therefore is required to "enter final judgment [on the propriety of the releases of state law claims] . . . after reviewing *de novo* any matter to which a party objects."  *Id.* at 475; 28 U.S.C. § 157(c)(1) ("A bankruptcy judge may hear a proceeding that is not a core proceeding but that is otherwise related to a case under title 11.  In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing de novo those matters to which any party has timely and specifically objected."); Fed. R. Bankr. P. 9033 ("The district judge shall make a de novo review upon the record or, after additional evidence, of any portion of the bankruptcy judge's findings of fact or conclusions of law to which specific written objection has been made in accordance with this rule. The district judge may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions.").

On the ample evidence of record introduced below, it is abundantly clear that the releases are abusive.  *See* U.S. Trustee Supp. Br.; Appealing States Supp. Br.  Both the financial, testimonial, and documentary evidence demonstrates that the Sacklers contrived to cause debtors to make excess distributions after 2007, in an effort aimed at "milking the business" and leaving debtors unfit to compete.  In addition, there is no question that the bankruptcy court could have, if necessary, protected the bankruptcy estate my measures significantly less abusive than extinguishing the States' police power claims against the Sacklers and other non-debtors.  *See Karta*, 342 B.R. at 57 ("A necessary corollary of *Metromedia* must be that the releases offered to

the Non-Debtors bear a reasonable relationship to the protection of the estate and go no further than necessary to protect those interests."). There is no question that the Sacklers retain multiple billions of dollars in liability over and above the value of the estates claims. The bankruptcy court could have protected estate assets without doing away with the police power claims entirely. There is no question that these releases are abusive under *Metromedia* and *Manville III*.

Dated:  December 6, 2021                          Respectfully submitted,

                                                  BRIAN E. FROSH
                                                  Attorney General of Maryland


                                                  /s/ Brian T. Edmunds
                                                  BRIAN T. EDMUNDS
                                                  Assistant Attorney General
                                                  Office of the Attorney General
                                                  200 Saint Paul Place
                                                  Baltimore, Maryland 21202
                                                  Tel.:   (410) 576-6578
                                                  Fax:    (410) 576-6656
                                                  bedmunds@oag.state.md.us


                                                  *Attorneys for the State of Maryland*