```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____           │
│ DATE FILED: 12/16/2021           │
└─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

In re: PURDUE PHARMA, L.P.

21 cv 7532 (CM) [Master Case]

[rel: 21 cv 7585 (CM)

--------------------------------------------------------x

This Filing Relates to

21 cv 7961 (CM)
21 cv 7962 (CM)
21 cv 7966 (CM)
21 cv 7969 (CM)

--------------------------------------------------------x

21 cv 8034 (CM)
21 cv 8042 (CM)

ALL MATTERS

21 cv 8049 (CM)
21 cv 8055 (CM)
21 cv 8139 (CM)
21 cv 8258 (CM)
21 cv 8271 (CM)
21 cv 8548 (CM)
21 cv 8557 (CM)

--------------------------------------------------------x

21 cv 8566 (CM)]

## DECISION AND ORDER ON APPEAL

McMahon, J.:

This is an appeal from an order of the United States Bankruptcy Court for the Southern

District of New York ("Bankruptcy Court") (Drain, B.J.), announced from the bench on September

1, 2021, and filed on September 17, 2021, confirming the Plan of Reorganization proposed by

Debtors Purdue Pharma L.P. ("Purdue Pharma") and certain associated companies[1] (the

"Confirmation Order"). Appeal is also taken from two merged and related orders of the Bankruptcy

Court: the June 3, 2021, order approving Purdue's disclosure statement and solicitation materials

(the "Disclosure Order") and the September 15, 2021, order authorizing the implementation of

---

[1] Purdue Pharma Inc. ("PPI"), Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue
Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas
Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products
L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P., Paul
Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF LP, SVC Pharma LP, and
SVC Pharma Inc. (together, the "Debtors" or "Purdue").

certain preliminary aspects of the Plan (the "Advance Order").

Purdue's bankruptcy was occasioned by a health crisis that was, in significant part, of its own making: an explosion of opioid addiction in the United States over the past two decades, which can be traced largely to the over-prescription of highly addictive medications, including, specifically and principally, Purdue's proprietary, OxyContin.

Despite a 2007 Plea Agreement with the United States – in which Purdue admitted that it had falsely marketed OxyContin as non-addictive and had submitted false claims to the federal government for reimbursement of medically unnecessary opioid prescriptions ("2007 Plea Agreement") – Purdue's profits after 2007 were driven almost exclusively by its aggressive marketing of OxyContin. (*See* JX-2094.0047-88; JX-2481). But by 2019, Purdue was facing thousands of lawsuits brought by persons who had become addicted to OxyContin and by the estates of addicts who had overdosed – either on OxyContin itself or on the street drugs (heroin, fentanyl) for which Purdue's product served as a feeder. It also faced new federal, state and local Medicare reimbursement claims and a number of new false marketing claims brought under various state consumer protection laws. Finally, in November 2020, Purdue pled guilty to a criminal Information filed by the Department of Justice ("DOJ") in the United States District Court for the District of New Jersey; in its plea agreement, the company (though not the people through whom the company acted) admitted to substantial deliberate wrongful conduct ("2020 Plea Agreement"). *See USA v. Purdue Pharma L.P.*, No. 2:20-cr-01028.

Engulfed in a veritable tsunami of litigation, Purdue filed for chapter 11 bankruptcy in September 2019. The intent was for a "*Manville*-style" bankruptcy that would resolve both existing and future claims against the company arising from the prescription of OxyContin. The automatic stay brought a stop to civil litigation against Purdue; and a court-ordered stay halted litigation

against certain non-debtors affiliated with the company – principally members of the Sackler family (the "Sacklers" or "Sackler family"),[2] which had long owned the privately-held company – to buy time to craft a resolution. For two years, committees of various classes of creditors – individuals, state and local governments, indigenous North American tribes, even representatives of unborn children who were destined to suffer from opioid addiction – negotiated with Purdue and the Sacklers under the watchful eye of the experienced Bankruptcy Judge, with the assistance of two of this country's finest and most experienced mediators (Layn Phillips and Kenneth Feinberg), as well as a second Bankruptcy Judge (The Hon. Shelley Chapman).

Eventually, the parties crafted a plan of reorganization for Purdue that would, if implemented, afford billions of dollars for the resolution of both private and public claims, while funding opioid relief and education programs that could provide tremendous benefit to the consuming public at large (the "Plan").[3] That Plan was approved by supermajority of the votes cast by the members of each class of creditors.[4] It was confirmed by Judge Drain, who had invested so much of himself in the effort to find a workable solution to a seemingly intractable problem.

But not everyone voted yes. Eight states and the District of Columbia ("D.C."), as well as certain Canadian municipalities and Canadian indigenous tribes, the City of Seattle (alone among all voting municipalities in the United States), as well as some 2,683 individual personal injury claimants, voted against the adoption of the Plan. The same states, municipalities and tribes, together with three of those individual claimants (representing themselves), filed formal objections

---

[2] The Sacklers or Sackler family in this opinion means the Mortimer D. Sackler Family (also known as "Side A" of the Sackler family) and the Raymond R. Sackler Family (also known as "Side B" of the Sackler family).

[3] The Plan refers to confirmed chapter 11 bankruptcy plan of reorganization at Bankruptcy Docket Number 3726. (*See* Dkt. No. 91-3, at App.1070-1227).

[4] It is true that many members of some creditor classes did not cast a vote, but the law provides that a plan must be approved, not by a supermajority of all eligible voters, but by a supermajority of all actual voters. 11 U.S.C. § 1126. That being so, there is no merit to Appellants' argument that the court should not deem the Plan approved by a supermajority of the affected creditor classes.

to the Plan and have appealed from its confirmation.[5] The United States Trustee (the "U.S. Trustee") in Bankruptcy[6] and the U.S. Attorney's Office for this District on behalf of the United States of America join in their objections.

All Appellants assign the same reason for their opposition: the Plan provides broad releases, not just of derivative, but of particularized or direct claims – including claims predicated on fraud, misrepresentation, and willful misconduct under various state consumer protection statutes – to the members of the Sackler family (none of whom is a debtor in the bankruptcy case) and to their affiliates and related entities. As the opioid crisis continued and worsened in the wake of Purdue's 2007 Plea Agreement, the Sacklers – or at least those members of the family who were actively involved in the day to day management of Purdue[7] – were well aware that they were exposed to personal liability over OxyContin. Concerned about how their personal financial situation might be affected, the family began what one member described as an "aggressive[]" program of withdrawing money from Purdue almost as soon as the ink was dry on the 2007 papers. The Sacklers upstreaming some $10.4 billion out of the company between 2008 and 2017, which, according to their own expert, substantially reduced Purdue's "solvency cushion." Over half of that money was either invested in offshore companies owned by the Sacklers or deposited into spendthrift trusts that could not be reached in bankruptcy and off-shore entities located in places like the Bailiwick of Jersey.

---

[5] While the City of Seattle objected to the Plan before the Bankruptcy Court, it did not appeal.

[6] The U.S. Trustee "is a DOJ official appointed by the Attorney General to supervise the administration of bankruptcy cases" and has standing under 11 U.S.C. § 307 to appear in bankruptcy cases and "comment on proposed disclosure statements and chapter 11 plans." (Dkt. No. 91, at 8 (citing 28 U.S.C. §§ 581-589 and 28 U.S.C. § 586(a)(3)(B)).

[7] Ilene Sackler Lefcourt, Kathe Sackler, Mortimer D.A. Sackler, Theresa Sackler, Richard Sackler, Jonathan Sackler, and David Sackler were at some or all relevant times directors of Purdue and its related enterprises. Mortimer D. Sackler and Raymond Sackler had management roles at the company as co-chief executive officers; Richard Sackler also served as president; and Mortimer D.A. Sackler, Ilene Sackler Lefcourt, and Kathe Sackler held officer roles as vice presidents. Mariana Sackler worked at Purdue in research and development.

When the family fortune was secure, the Sackler family members withdrew from Purdue's Board and management. Bankruptcy discussions commenced the following year. As part of those pre-filing discussions, the Sacklers offered to contribute toward a settlement, but if – and only if – every member of the family could "achieve global peace" from all civil (not criminal) litigation, including litigation by Purdue to claw back the money that had been taken out of the corporation. The Plan confirmed by the Bankruptcy Court extinguishes all civil claims against the Sacklers that relate in any way to the operations of Purdue – including claims on which certain members of the Sackler family could be held personally liable to entities other than Purdue (principally the various states). These claims could not be released if the Sacklers were themselves debtors in bankruptcy.

Appellants attack the legality of the Plan's non-consensual release of third-party claims against non-debtors on a number of grounds. They argue that the release (referred to in this opinion as the "Section 10.7 Shareholder Release") is both constitutionally defective and not statutorily authorized; that the Bankruptcy Court lacks constitutional authority and subject matter jurisdiction to approve the release or to carry out certain "gatekeeping" aspects of the Plan that relate to it; and that granting a release to the non-debtor Sacklers is unwarranted as a matter of fact and would constitute an abuse of the bankruptcy process.

Debtors and those who voted in favor of the Plan – buttressed by Judge Drain's comprehensive Confirmation Order – argue that the Bankruptcy Court had undoubted jurisdiction to impose these broad third-party releases; insist that they are a necessary feature of the Plan; point out the tremendous public benefit that will be realized by implementing the Plan's many forward-looking provisions; and urge that the alternative – Purdue's liquidation – will inevitably yield far less benefit to all creditors and victims, in light of the cost and extraordinary hurdles that would have to be surmounted in order to claw back the billions of dollars that the Sacklers have taken out

of Purdue.

Two of the questions raised by appellants are easily answered. The Bankruptcy Court had undoubted subject matter jurisdiction to enter the challenged releases. And while it may have lacked constitutional authority to give them final approval under the rule of *Stern v. Marshall*, 546 U.S. 462 (2011), that matters little in the great scheme of things; it changes the level of deference this court should give to Judge Drain's findings of fact, but those findings are essentially unchallenged.

The great unsettled question in this case is whether the Bankruptcy Court – or any court – is statutorily authorized to grant such releases. This issue has split the federal Circuits for decades. While the Circuits that say no are united in their reasoning, the Circuits that say yes offer various justifications for their conclusions. And – crucially for this case – although the Second Circuit identified the question as open back in 2005, it has not yet had occasion to analyze the issue. Its only guidance to the lower courts, uttered in that 2005 opinion, is this: because statutory authority is questionable and such releases can be abused, they should be granted sparingly and only in "unique" cases.

This will no longer do. Either statutory authority exists or it does not. There is no principled basis for acting on questionable authority in "rare" or "unique" cases, especially as the United States Supreme Court has recently held that there is no "rare case" rule in bankruptcy that allows a court to trump the Bankruptcy Code. *See Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973, 986 (2017).

Moreover, the lower courts desperately need a clear answer. As one of my colleagues on the Bankruptcy Court recently noted, plans releasing non-debtors from third party claims are no rarity: "Unfortunately, in actual practice the parties . . . often seek to impose involuntary releases

based solely on the contention that anybody who makes a contribution to the case has earned a third-party release. *Almost every proposed Chapter 11 Plan that I receive includes proposed releases.*" *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 726 (S.D.N.Y. 2019) (Wiles, B.J.) (emphasis added). When every case is unique, none is unique. Given the frequency with which this issue arises, the time has come for a comprehensive analysis of whether authority for such releases can be found in the Bankruptcy Code – that "comprehensive scheme" devised by Congress for resolving debtor-creditor relations. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012).

Aided by superb briefing and argument on both sides of the question, and by extended ruminations on the subject by several esteemed bankruptcy judges of our own District – Judge Drain not the least – this Court concludes that the Bankruptcy Code does not authorize such non-consensual non-debtor releases: not in its express text (which is conceded); not in its silence (which is disputed); and not in any section or sections of the Bankruptcy Code that, read singly or together, purport to confer generalized or "residual" powers on a court sitting in bankruptcy. For that reason, the Confirmation Order (and the Advance Order that flows from it) must be vacated.

Because I conclude that the Bankruptcy Court lacked statutory authority to impose the Section 10.7 Shareholder Release, I need not and do not reach the constitutional questions that have been raised by the parties. Nor do I need to decide whether this is a case in which such releases should be imposed if my statutory analysis is incorrect. Those issues may need to be addressed some day, but they do not need to be addressed in order to dispose of this appeal.

This opinion will not be the last word on the subject, nor should it be. This issue has hovered over bankruptcy law for thirty-five years – ever since Congress added §§ 524(g) and (h)

to the Bankruptcy Code. It must be put to rest sometime; at least in this Circuit, it should be put to rest now.

## PARTIES[8]

The Appellants in this case are the U.S. Trustee William K. Harrington; the States of California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, Washington, and D.C. (together, the "State Appellants"); the City of Grande Prairie as Representative for a Class Consisting of All Canadian Municipalities, the Cities of Brantford, Grand Prairie, Lethbridge, and Wetaskiwin; the Peter Ballantyne Cree Nation on behalf of All Canadian First Nations and Metis People; the Peter Ballantyne Cree Nation on behalf itself, and the Lac La Ronge Indian Band (together, the "Canadian Appellants"); and *pro se* Appellants Ronald Bass, Marie Ecke, Andrew Ecke, Richard Ecke, and Ellen Isaacs on Behalf of Patrick Ryan Wroblewski (together, the "Pro Se Appellants").

The Appellees are the Purdue Debtors, as well as the Official Committee of Unsecured Creditors of Purdue Pharma L.P., et al. (the "UCC"),[9] the Ad Hoc Committee of Governmental and Other Contingent Litigation Claimants ("AHC"),[10] the Ad Hoc Group of Individual Victims of Purdue Pharma, L.P. ("PI Ad Hoc Group"), the Multi-State Governmental Entities Group ("MSGE"), the Mortimer-side Initial Covered Sackler Persons ("Side A"), and the Raymond Sackler Family ("Side B").

The Ad Hoc Committee of NAS Children ("NAS Children") appears as *amicus curiae* and

---

[8] In this decision, docket numbers abbreviated "Dkt. No." refer to the consolidated docketed appeals at 7:21-cv-7532; docket numbers abbreviated "Bankr. Dkt. No." refer to the underlying bankruptcy docket at 19-23649.

[9] The UCC is also referred to in court filings and the appellate record as the "Creditors' Committee." The Court uses the terminology "UCC" consistent with the language provided in the glossary at Docket Number 115-1.

[10] The AHC is also referred to in court filings and the appellate record as the "Ad Hoc Committee." The Court uses the terminology "AHC" consistent with the language provided in the glossary at Docket Number 115-1.

has filed an *amicus* brief. (Dkt. No. 158). The U.S. Attorney's Office for this District also appears

on behalf of the United States of America as *amicus curiae* and has filed a statement of interest in

this case. (Dkt. No. 94).

## BACKGROUND

The following facts are derived from the appellate record as designated by the parties to

this appeal, unless indicated otherwise. (*See* Dkt. Nos. 78-1, 105, 255). The Court judicially notices

certain public court records and other matters that are subject to judicial notice. *See* Fed. R. Evid.

201(b)-(d).[11]

### I.   Purdue Pharma, L.P.

Purdue – originally known as "Purdue Frederick Company" – was founded by John Purdue

Gray and George Frederick Bingham in 1892. The company was sold to brothers Arthur, Mortimer

and Raymond Sackler in 1952. (*See* JX-2148; JX-1985, at 33:12-13).

Purdue Pharma, the Debtors' main operating entity, is a Delaware limited partnership

headquartered in Stamford, Connecticut. (Dkt. No. 91-4, at App.1244). Purdue Pharma's general

partner is Purdue Pharma Inc. ("PPI"), a New York corporation, also headquartered in Stamford,

Connecticut. (*Id.*, JX-1221). The board of directors of PPI manages Purdue Pharma (the "Board").

(Dkt. No. 91-4, at App.1250). Purdue Pharma has 22 wholly owned subsidiaries in the United

States and the British Virgin Islands. (*Id.* at App.1244).

---

[11] *See Garber v. Legg Mason Inc.*, 347 F. App'x 665, 669 (2d Cir. 2009) ("'[a] court may take judicial notice, whether requested or not.'") (quoting Fed. R. Evid. 201(c)); *Hotel Emps. & Rest. Emps. Union, Local 100 of New York, N.Y. & Vicinity, AFL-CIO v. City of NY Dep't of Parks & Recreation*, 311 F.3d 534, 540 n.1 (2d Cir. 2002) ("'Judicial notice may be taken at any stage of the proceeding.'") (quoting Fed. R. Evid. 201(d)); *Schenk v. Citibank/Citigroup/ Citicorp*, No. 10-CV-5056 (SAS), 2010 WL 5094360, at *2 (S.D.N.Y. Dec. 9, 2010) (citing *Anderson v. Rochester– Genesee Reg'l Transp. Auth.*, 337 F.3d 201, 205 n.4 (2d Cir. 2003)) ("Judicial notice may encompass the status of other lawsuits in other courts and the substance of papers filed in those actions"); *Giraldo v. Kessler*, 694 F.3d 161, 163 (2d Cir. 2012) (courts may "take judicial notice of relevant matters of public record.").

Purdue Pharma is wholly owned by Pharmaceutical Research Associates, L.P. ("PRA"), a Delaware limited partnership that is not a debtor in this case. (*Id.* at App.1252). PRA is 99.5% owned, in equal parts, by non-debtors Beacon Company ("Beacon"), a Delaware general partnership, and Rosebay Medical Company L.P. ("Rosebay"), a Delaware limited partnership, which are in turn owned by certain trusts established for the benefit of the Sackler Families. (*Id.*). Beacon is the partnership of Side A of the Sackler family; Rosebay is the partnership of Side B of the Sackler family. (*See* JX-1987, at 42:10-23; JX-3298 at 160:8-10).[12]

Purdue Pharma operates Purdue's branded prescription pharmaceutical business, which includes both opioid and non-opioid products. (Dkt. No. 91-4, at App.1244). OxyContin is one of Purdue Pharma's three principal branded opioid medications. (*Id.*). The other two are Hysingla and Butrans. (*Id.*). Purdue generated approximately $34 billion in revenue total between 1996-2019, most of which came from OxyContin sales (*See e.g.*, JX-2481); prior to bankruptcy, OxyContin accounted for some 91% of Purdue's U.S. revenue. (*See* JX-1984, at 40:24-41:5; JX-3275, at 338:6-9; JX-0999).

Purdue Pharma manufactures OxyContin for itself and, in limited quantities, for certain foreign independent associated companies ("IAC"), which are ultimately owned by the Sackler family. (Dkt. No. 91-4, at App.1245). Purdue Pharma receives royalties from IACs' sales for OxyContin abroad. (*Id.*). The IACs are not debtors in this case.

Until early 2019, members of the Sackler family served as directors of Purdue; the last Sackler's resignation from the Board became effective in the beginning of that year, although many family members stepped down during 2018.

---

[12] In this opinion, unless otherwise specified, where reference is made to the "Sackler entities" this means Rosebay and Beacon, as well as other Sackler family affiliated trusts and entities relevant to this appeal, including those in Exhibit X to the Settlement Agreement, incorporated into the Plan. (*See* Dkt. No. 91-3, at App. 1112, App.1041-1069).

## II.   The Sackler Family

Since Purdue was sold to brothers Arthur, Mortimer and Raymond Sackler in 1952 (*see* JX-1985, at 33:12-13),[13] the company has been closely held and closely run by members of the Sackler family, many of whom took on an active role in the company comparable to that of senior management prior to 2018. *See In re Purdue Pharma L.P.*, No. 19-23649, 2021 WL 4240974, at *33 (Bankr. S.D.N.Y. Sept. 17, 2021). In large part due to the success of their pharmaceutical business, the Sackler family have long been ranked on Forbes' list of America's Richest Families, becoming one of the top twenty wealthiest families in America in 2015, with a reported net worth of $14 billion dollars. (*See* JX-1985, at 40:24-42:10).

Mortimer Sackler's side of the family is known as "Side A," and Raymond Sackler's side is known as "Side B." (Dkt. No. 91-4, at App.1250). From approximately 1993 until 2018, there were always at least six or seven members of the Sackler family on the Board; independent directors never equaled or outnumbered the number of Sackler family directors on the Board. (*See* Confr. Hr'g Tr., Aug. 19, 2021, at 159:17-25, 22:5-9; Dkt. No. 91-4, at App.1345).

In addition to Purdue, certain members of the Sackler family served as directors of an entity called "MNP," later "MNC" ("MNP/MNC"), which operated as an advisory board for IACs worldwide, including for "specific pharmaceutical manufacturer IACs" and "corporations throughout the world that [the Sackler] family owns and that are in the . . . pharmaceutical business." (*See* Confr. Hr'g Tr., Aug. 18, 2021, at 31:8-18; Confr. Hr'g Tr., Aug. 19, 2021, at 24:12-23). MNP/MNC's recommendations were typically followed by the IACs. (Confr. Hr'g Tr., Aug. 19, 2021, at 23:9-17).

---

[13] The Arthur Sackler family sold its interest in Purdue to the other two branches of the family prior to the invention of OxyContin and has no involvement in the company or in this bankruptcy.

*A.  Side A*

Mortimer D. Sackler, who died in 2010, served as the co-chief executive officer of Purdue with his brother Raymond until the end of his life. (JX-3275.0168-69; Dkt. No. 91-5, at App.2089).

Three of his seven children – Ilene Sackler Lefcourt, Kathe Sackler, and Mortimer David Alfons Sackler ("Mortimer D.A. Sackler") – sat on the Board of Purdue for nearly 30 years, until 2018. (Confr. Hr'g Tr., Aug. 19, 2021, at 19:13-20, 158:6-15; JX-3298.0037; Dkt. No. 91-5, at App.2089). They also served as officers of Purdue, with Mortimer D.A. and Ilene holding the title of vice president and Kathe the title of senior vice president. (Confr. Hr'g Tr., Aug. 19, 2021, at 19:21-25, 22:18-23:4, 158:16-21; JX-3298.0075; JX3275.0169).

Mortimer Sackler's wife Theresa Sackler also served on the Board of Purdue from 1993 until 2018, explaining that her "husband asked me to join . . . it was a family company and he felt that family members should be on the board." (JX-3275.0034, 36; Dkt. No. 91-4, at App.1345).

All four – Ilene, Kathe, Theresa, and Mortimer D.A. Sackler – served as directors on the board of MNP/MNC for many years. (Confr. Hr'g Tr., Aug. 19, 2021, at 19:21-25, 22:18-23:4, 161:2-11; JX-3298.0080; JX-3275.0059).

*B.  Side B*

Raymond Sackler, who died in 2017, served as co-chief executive officer of Purdue with his brother Mortimer D. Sackler. (*See* JX-3275.0168-69).

Raymond Sackler's wife and two sons served as Board members of Purdue. (*See* Dkt. No. 91-4, at App.1345). His sons, Jonathan and Richard Sackler, served from 1990 until 2018, and his wife Beverly Sackler from approximately 1993 until 2017. (*See id.*; Confr. Hr'g Tr., Aug. 18, 2021, at 30:6-8).

In addition to his role as director, Richard Sackler also served as president of Purdue from

2000-2003, co-chair of the Board from 2003-2007, and chair of the Board from approximately 2008 until 2010 or 2011. (Confr. Hr'g Tr., Aug. 18, 2021, at 30:6-22, 44:20-21). He served as a director of MNP/MNC until 2018 and has served as director of at least one IAC. (*Id.* at 31:23-32:19).

Richard Sackler's son David Sacker also served on the Board from 2012 until 2018 and as a director of MNP/MNC. (Confr. Hr'g Tr., Aug. 17, 2021, at 43:12-14, 44:6-13).

Finally, Mariana Sackler, Richard Sackler's daughter, held several roles within the "family business" (JX-1991, at 58:19-25), including working as a consultant in the "research and development department" of Purdue on OxyContin projects and a "PR" role at Mundipharma Italy, an IAC, advancing "information around topics about pain in Italy" and "marketing and selling OxyContin" there. (*Id.* at 30:4-18; 32:12-33:3; 58:19-64:25). Marianna has never been an officer or director of Purdue.

## III.   OxyContin

OxyContin is a synthetic opioid analgesic – a powerful narcotic substance designed to relieve pain. (*See* JX-2181; JX-2195.0048; JX-2195.0059). Opioid analgesics have been available for several decades to treat moderate to severe pain. (JX-2181; Dkt. No. 91-4, at App.1259). But until the early 1980's they were limited to immediate-release dosage forms. (JX-2181; *see* JX-2199). Immediate-release pain killers are less than ideal because they control pain for only 4-6 hours at a time; by contrast, a controlled-release pain killer can provide relief from serious pain for up to 12 hours at a time. (*See* Dkt. No. 91-4, at App.1259; JX-2181; JX-2199; JX-2185-0010).

In the early 1980's, Purdue developed its first controlled-release morphine drug which it marketed as "MS Contin" (also called "MSContin" and "MS-Contin"). (JX-2181; *see* JX-2199; JX-2180-0030, 0084). MS Contin solved many of the difficulties associated with immediate-

release opioids, and it was marketed, largely without abuse, throughout the 1980's and 1990's. (JX-2180-0015, 0078; Dkt. No. 91-4, at App.1262). However, morphine's stigma as an addictive narcotic caused patients and physicians alike to avoid it. (*See* JX-2180-0030).

So Purdue concentrated on the research, development, and testing of a non-morphine drug: its controlled-release semisynthetic opioid analgesic named "OxyContin." (*See* JX-2181; JX-2199; Dkt. No. 91-4, at App.1261-62). In December 1995, the Food and Drug Administration ("FDA") approved OxyContin for use. (*Id.*). OxyContin's formulations were labeled as "extended release" or "time release" doses because the active ingredients continuously enter into a patient's system over time; a single dose could provide relief from serious pain for up to 12 hours. (*See* JX-2181). A 2000 *Time* Magazine article explains that OxyContin was quickly "hailed as a miracle" after its introduction in 1995, because "it eases chronic pain because its dissolvable coating allows a measured does of the opiate oxycodone to be released into the bloodstream." (JX-2147).

For years, Purdue contended that OxyContin, due to its "time release" formulation, posed virtually no threat of either abuse or addiction – as opposed to other pain relief drugs, such as Percocet or Vicodin, which are not controlled-release painkillers. *See the Purdue Frederick Company, Inc.*, No. 1:07-cr-00029, Dkt. No. 5-1, at ¶¶20-27 ("Agreed Statement"); (Dkt. No. 91-4, at App.1268-1269). Purdue delivered that message to prescribing physicians and patients alike.

But time-release OxyContin proved to have an efficacy and safety profile similar to that of immediate-release opioid pain relievers. (*See* JX-2195.0027, 48-49, 59). Indeed, in 2001, the FDA required that Purdue remove from its drug label the claim that OxyContin had a very low risk of iatrogenic addiction; Purdue was ordered to add instead the highest level of safety warning that the FDA can place on an approved drug product. (*See* JX-2181; JX-2199; JX-2220).

**IV.    Purdue's Deceptive Marketing of OxyContin**

To promote its new product OxyContin, Purdue launched an aggressive marketing campaign. (*See* JX-2153). That campaign was multi-fold, aiming in part to combat concerns about the abuse potential of opioids and to encourage doctors to prescribe OxyContin for more and different types of pain. (*See* Dkt. No. 91-4, at App.1268-1269; Agreed Statement, at ¶20; JX-2181.0002).

Before OxyContin, opioid pain relievers were usually prescribed for cancer patients and patients with chronic diseases whose pain was "undertreated." (*See* JX-2181.0002). But Purdue pushed OxyContin as a treatment for many types of pain patients, including those with "noncancer pain" and other "nonmalignant" pain. (*Id.*; *see id.* at 0023, 0044). Purdue repeatedly published advertisements claiming, for example, that OxyContin can be an effective "first-line therapy for the treatment of arthritis" and safely used for "osteoarthritis pain" (JX-2218) and in many cases "mak[ing] unsubstantiated efficacy claims promoting the use of OxyContin for pain relief," "promoting OxyContin for a much broader range of patients with pain than are appropriate for the drug," "overstat[ing] the safety profile of OxyContin," and repeatedly omitting OxyContin's "abuse liability" (JX-2221) – all of which was contemporaneously documented in FDA warning letters to the company throughout the early 2000's. (*See, e.g.*, JX-2218; JX-2221).

By its marketing campaign, Purdue sought to eliminate concerns regarding "OxyContin's addictive potential." (*See* Agreed Statement, at ¶¶19-20; Dkt. No. 91-4, at App.1268-1269). To do this, Purdue needed to encourage doctors and patients to overcome their reservations about the use of opioids. For this purpose, Purdue created a website called "*In The Face of Pain*," which promoted OxyContin pain treatment and urged patients to "overcome" their "concerns about addiction." *See* Petition, *State of Kansas, ex rel. Derek Schmidt, Attorney General v. Purdue*

*Pharma L.P., et al.*, Case No. 2019-cv-000369, at ¶89 (Shawnee Cnty. Dist. Ct. May 16, 2019). Testimonials on the website were allegedly presented as personal stories of OxyContin patients who had overcome life-long struggles with debilitating pain, although they were allegedly written by Purdue consultants who were paid to promote the drug. *Id.*

Purdue also allegedly distributed pamphlets to doctors. *Id.* at ¶33. In one such pamphlet, *Providing Relief, Preventing Abuse: A Reference Guide To Controlled Substance Prescribing Practices*, Purdue wrote that addiction "is not caused by drugs." *Id.* In another, the "Resource Guide for People with Pain," Purdue explained, "Many people living with pain and even some healthcare providers believe that opioid medications are addictive. The truth is that when properly prescribed by a healthcare professional and taken as directed, these medications give relief – not a 'high.'" *Id.* at ¶35.

Purdue's marketing campaign proved successful. OxyContin was widely prescribed; bonuses to Purdue sales representatives for the sale of OxyContin increased from $1 million in 1996 to $40 million by 2001; and by 2001, annual sales of OxyContin reached $1 billion. (JX-2181.0007; JX-2151). By 2001, OxyContin was "the most prescribed brand-name narcotic medication" in the U.S. (JX-2181.0002, 0007).

## V.   The Opioid Crisis

But OxyContin's popularity as a pain reliever coincided with the scourge of widespread abuse of the drug around the country. (*See, e.g.*, JX-2147; JX-2148; JX-2149; JX-2180-0078; JX-2181). Many individuals who had been prescribed OxyContin by their doctors for legitimate pain conditions became addicted to the drug. (*See* JX-2181). And hundreds of thousands of seasoned addicts and novice drug abusers, including teenagers, quickly discovered that crushing an OxyContin tablet and then snorting or injecting it resulted in a quick "morphine-like high." (*See*

JX-2148; JX-2149; JX-2183; JX-2195.0059).

By the early 2000's, rates of opioid addiction in connection with OxyContin use were skyrocketing throughout the country. (*See* JX-2147; JX-2148; JX-2149). In the early years, "remote, rural areas" were particularly hard hit, due in part to the fact that these areas are

> home to large populations of disabled and chronically ill people who are in need of pain relief; they're marked by high unemployment and a lack of economic opportunity; they're remote, far from the network of Interstates and metropolises through which heroin and cocaine travel; and they're areas where prescription drugs have been abused—though in much smaller numbers—in the past.

*Foister v. Purdue Pharma, L.P.*, 295 F. Supp. 2d 693, 696 (E.D. Ky. 2003) (quotation and internal citation omitted).

However, the crisis was not limited to one type of community or part of the country. (*See* JX-2147). Pill mills opened in urban areas, as unscrupulous physicians began writing prescriptions for OxyContin to stooge purchasers (often drug addicts themselves), who were recruited to obtain and fill prescriptions, turning over the pills to drug dealers, who resold them on the street, making astronomical profits. (*See* JX-2175; JX-2176). This Court presided over the criminal trial of a doctor who ran such a pill mill in Hamilton Heights on the Upper West Side of Manhattan, through which he garnered millions of dollars in ill-gotten gains at the expense of desperate people who were addicted to OxyContin. *See United States v. Mirilashvili*, No. 14-cr-0810 (CM), Dkt. No. 1 (S.D.N.Y. Dec. 9, 2014).

Prosecutions like the one of Dr. Mirilashvili, coupled with enhanced regulatory oversight over both prescribers of opioids and pharmacies that had filled suspiciously high numbers of prescriptions, reduced the number of illicit prescriptions of OxyContin. But drying up the source. did not end the problem of addiction. Individuals who had been feeding an OxyContin habit turned to alternative sources to get their fix – including street drugs like heroin and its even stronger and more lethal cousin, fentanyl, which is fast acting and 100 times more potent than morphine. (*See*

JX-2195.0050-52). The recent increase in overdose deaths in this country is driven in significant part by the increasingly widespread use of fentanyl. (*See* Dkt. No. 91-4, at App.1271).

In 2017, the U.S. Department of Health and Human Services ("DHHS") declared the opioid epidemic to be a national public health emergency.[14] According to the Centers for Disease Control and Prevention, from 1999 to 2019, nearly 247,000 people died in the United States from overdoses involving prescription opioids.[15] DHHS estimates the "economic burden" of prescription opioid misuse in the United States is between $53-72 billion a year, including medical costs, lost work productivity, addiction treatment, and criminal justice costs.[16]

Today, it is estimated that between 21-29% of patients who are prescribed opioids for chronic pain misuse them.[17] Between 8-12% of people who are using an opioid for chronic pain develop an opioid use disorder. *Id.* An estimated 4-6% of those who misuse prescription opioids transition to using heroin. *Id.* About 80% of people who use heroin first misused prescription opioids. *Id.* OxyContin, it seems, is the ultimate "gateway" drug.

## VI.    Pre-Bankruptcy Litigation Involving Purdue and Members of the Sackler Family

With the swelling opioid crisis, Purdue began to face inquiries about and investigations into OxyContin.

In 2000, the U.S. Attorney of Maine alerted the company to widespread abuse of the drug in rural Maine. (*See* JX-2151; JX-2180-0078; JX-2181). In 2001, the Attorney General of Virginia

---

[14] *HHS Acting Secretary Declares Public Health Emergency to Address National Opioid Crisis*, DHHS (Oct. 26, 2017), https://www.hhs.gov/about/news/2017/10/26/hhs-acting-secretary-declares-public-health-emergency-address-national-opioid-crisis.html.

[15] *Drug Overdose: Overview*, Centers for Disease Control and Prevention (Mar. 17, 2021), https://www.cdc.gov/drugoverdose/deaths/prescription/overview.html.

[16] DHHS, "Addressing Prescription Drug Abuse in the United States," *available at* https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf.

[17] *Opioid Overdose Crisis*, National Institute on Drug Abuse (Mar. 11, 2021), https://www.drugabuse.gov/drug-topics/opioids/opioid-overdose-crisis.

Mark Earley requested a meeting with company officials regarding widespread abuse of the drug in Virginia. (*See* JX-2151). By 2002, the then-Purdue spokesman Tim Bannon confirmed that there were federal investigations into Purdue's marketing of OxyContin. (*Id.*).

Two decades of litigation, both civil and criminal, ensued.

### A.  The First Round of Lawsuit: 2001-2007

By 2001, plaintiffs across the country had begun to file individual and class actions against Purdue in state and federal courts, including in the U.S. District Court for the Southern District of New York and in the Supreme Court of the State of New York. (*See e.g.*, JX-2181; Dkt. No. 91-5, at App.2037-2038).[18] Members of the Sackler family were not named as defendants in these lawsuits. (*See* Dkt. No. 91-5, at App.2040).

Plaintiffs in early cases plead a variety of theories of liability pursuant to which Purdue could be held liable as a result of its development, testing, manufacturing, distributing and marketing of OxyContin, including: negligence, strict product liability, failure to warn, breach of express and/or implied warranty, violation of state consumer protection statutes, conspiracy, fraud, and unjust enrichment. *See e.g.*, *Wethington v. Purdue Pharma LP*, 218 F.R.D. 577, 581 n. 1 (S.D. Ohio 2003).

Many of the early cases filed were class actions that sought certification of classes of people who had been prescribed OxyContin and suffered harm as a result. *See e.g.*, *Hurtado v. Purdue*

---

[18] *See Hurtado, et al. v. The Purdue Pharma Co.*, No. 12648/03 (Richmond Cnty., filed 2003); *Sara v. The Purdue Pharma Co.*, No. 13699/03 (Richmond Cnty., filed 2003); *Serafin v. Purdue Pharma, L.P.*, No. 103031/04 (New York Cnty., filed 2004); *Washington v. Purdue Pharma L.P.*, No. 107841/04 (New York Cnty., filed 2004); *Machey v. The Purdue Pharma Co.*, No. 1:04-cv-02098 (S.D.N.Y., filed 2004); *Pratt v. The Purdue Pharma Co.*, No. 1:04-cv-02100 (S.D.N.Y., filed 2004); *Wilson v. The Purdue Pharma Co.*, No. 1:04-cv-02103 (S.D.N.Y., filed 2004); *Ruth v. The Purdue Pharma Co.*, No. 1:04-cv-02101 (S.D.N.Y., filed 2004); *Terry v. The Purdue Pharma Co.*, No. 1:04-cv-02102 (S.D.N.Y., filed 2004); *Foister v. Purdue Pharma L.P.*, No. 6:01-cv-00268 (E.D. Ky., removed 2001); *Gevedon v. Purdue Pharma*, No. 7:02-cv-00008 (E.D. Ky., removed 2002); *Campbell v. Purdue Pharma, L.P.*, No. 1:02-cv-00163 TCM (ED Mo. removed 2002); *Howland et al. v. Purdue Pharma, L.P. et al.*, No. CV01 07 1651 (Butler Cnty. Ohio, filed 2001); *see also In re OxyContin Products Liability Litigation*, 268 F.Supp.2d 1380, 1380 (J.P.M.L 2003) (stating 20 actions then pending in five federal districts in South Carolina, Mississippi, Alabama, and Louisiana).

*Pharma Co.*, No. 12648/03, 2005 WL 192351, at **9-14 (Sup. Ct. Richmond Cnty. Jan. 24, 2005) (discussing cases). But given the stringent requirements for class certification, class certification motions in these cases were often denied. For example, in *Foister v. Purdue Pharma L.P.*, plaintiffs in the Eastern District of Kentucky sought unsuccessfully to certify class of "all persons who have been harmed due to the addictive nature of OxyContin." No. Civ.A. 01–268–DCR, 2002 WL 1008608, at *1 (E.D. Ky. Feb. 26, 2002); *see also Gevedon v. Purdue Pharma*, 212 F.R.D. 333, 336 (E.D. Ky. Oct. 17, 2002) (denying class certification); *Campbell v. Purdue Pharma, L.P.*, No. 1:02 CV 00163 TCM, 2004 WL 5840206, at *1 (ED Mo. June 25, 2004) (denying class certification). Class certification was generally deemed inappropriate because courts concluded that individual questions predominated ("addiction to the drug is an individualized question of fact"), thus precluding a finding of commonality. *See Howland et al. v. Purdue Pharma, L.P. et al.*, 821 N.E.2d 141, 146-147 (Oh. Sup. Ct. Dec. 15, 2004). When such motions were granted, the decisions were often reversed. *See id.*

Absent class certification, the sheer number of individual cases that were filed meant that cases had to be sent to judicial coordinating panels. In New York, for example, five state cases were transferred to the New York Litigation Coordinating Panel in 2005 – after which 1,117 additional lawsuits were filed and coordinated. *See Hurtado*, 2005 WL 192351, at *15; *Matter of OxyContin*, 15 Misc.3d 388, 390 (Sup. Ct. Richmond Cnty. 2007). Within these coordinated cases, after much discovery, settlements were pursued. *See e.g.*, *Matter of OxyContin II*, 23 Misc.3d 974, 975 (Sup. Ct. Richmond Cnty. 2009) (discussing efforts in 2006-2007 to reach a "universal settlement" of the thousands of New York cases).

Discovery in these lawsuits proved useful to state and federal regulatory agencies that were also investigating Purdue's role in the opioid crisis. Attorney Jayne Conroy, who testified at the

Confirmation Hearing on behalf of the AHC, explained that the discovery taken by her firm in hundreds of New York cases against Purdue was later subpoenaed by the Justice Department as part of the federal government's 2006-2007 investigation into Purdue. (Dkt. No. 91-5, at App.2038-2039).

### B.   The 2007 Settlement and 2007 Plea Agreement

#### 1.   Purdue's 2007 Settlements with 26 States and the District of Columbia

In 2007, twenty-six states[19] and D.C. settled investigations into Purdue's promotional and marketing practices regarding OxyContin for $19.5 million ("2007 Settlement").[20] (Dkt. No. 91-4, at App.1269-70; *see* JX-2152). As part of the 2007 Settlement, Purdue entered into a consent judgment with each government party. (Dkt. No. 91-4, at App.1270); *see, e.g.*, Consent Judgement, *Washington v. Purdue Pharma L.P.*, Cause No. 07-2-00917-2 (Sup. Ct. Wash. Thurston Cnty. May 9, 2007), at Section I(M), ¶25 ("Consent Judgment").

Pursuant to the Consent Judgment, Purdue agreed to "establish, implement and follow an OxyContin abuse and diversion detection" ("ADD") program which "consist[ed] of internal procedures designed to identify potential abuse or diversion of OxyContin" for a minimum of ten years. (*See* Dkt. No. 91-4, at App.1270; Consent Judgment, ¶¶13-14). Purdue also agreed to submit "annual compliance certifications to a multistate group of attorneys general for three years." (Dkt. No. 91-4, at App.1270).

In exchange for Purdue's payment and compliance, the settling States agreed to:

---

[19] Settling states were Arizona, Arkansas, California, Connecticut, Idaho, Illinois, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Montana, Nebraska, Nevada, New Mexico, North Carolina, Ohio, Oregon, Pennsylvania, South Carolina, Tennessee, Texas, Vermont, Virginia, Washington, and Wisconsin. This includes all State Appellants except Delaware and Rhode Island.

[20] Purdue is defined in the Consent Judgment as Purdue Pharma, PPI, The Purdue Frederick Company, and all of their United States affiliates, subsidiaries, predecessors, successors, parents and assigns, who manufacture, sell, distribute and/or promote OxyContin.

> release[] and forever discharge[], to the fullest extent permitted by law, *Purdue and its past and present officers, directors, shareholders,* employees, co-promoters, affiliates, parents, subsidiaries, predecessors, assigns, and successors ( collectively, the "Releasees"), of and from any and all civil causes of action, claims, damages, costs, attorney's fees, or penalties that the Attorney General could have asserted against the Releasees under the State Consumer Protection Law by reason· of any conduct that has occurred at any time up to and including the Effective Date of this Judgment relating to or based upon the Subject Matter of this Judgment ("Released Claims").

(Consent Judgement, Section VI) (emphasis added). According to Judge Drain, these 2007 releases covered about seventy-seven members of the Sackler family. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *31. The release covered only claims that could have been asserted by the Attorneys General of the settling states; among the claims that were not released were: (1) private rights of action by consumers, (2) claims relating to best price, average wholesale price or wholesale acquisition cost reporting practices or Medicaid fraud or abuse; (3) claims asserting antitrust, environmental or tax liability; (4) claims for property damage; (5) claims to enforce the terms and conditions of the judgment; and (6) any state or federal criminal liability that any person or entity, including Releasees, has or may have to the settling state.

Some of the states did not participate in this 2007 Settlement. Several had already entered into individual settlements with Purdue, while others entered into separate settlements subsequently. (*See* Dkt. No. 91-4, at App.1270). For example, in 2002, Florida settled an investigation into Purdue for $500,000 (*id.*); in 2004, West Virginia settled an action against Purdue for $10 million (*id.*); in 2006, Mississippi settled its investigation into Purdue for $250,000 (*id.*). In 2015, New York signed an assurance of discontinuance of its investigation in exchange for Purdue's payment of a $75,000 penalty and certain promises, including ongoing implementation of the ADD program in New York and submission to annual reviews and monitoring by the Attorney General. *Id.*; *In the Matter of Purdue Pharma L.P.*, Attorney General

of the State of New York Assurance No. 15-151, at ¶¶8, 28, 38, 40, 49 (Aug. 19, 2015). In 2016, Kentucky settled an action against Purdue for $24 million. (Dkt. No. 91-4, at App.1270). And in March 2019, Purdue agreed to pay the State of Oklahoma $270 million to settle that state's opioid claims. (*Id.* at App.1278); *see* Consent Judgment, *Oklahoma v. Purdue Pharma et al.*, No. CJ-2017-816, § 4.1 (Dist. Ct. Cleveland Cnty. Mar. 26, 2019).

The releases in these separate cases generally extinguished the claims of the respective state against Purdue for opioid-related misconduct. For example, the West Virginia settlement released "any and all claims and demands" of the Attorney General of West Virginia (on behalf of the state and state agencies) against Purdue and its affiliates, shareholders, officers, directors, and others[21] that were "sustained or incurred as a result of the manufacture, marketing and sale of OxyContin" in West Virginia. (*See* JX-2225). Similarly, the Oklahoma settlement released "any and all claims of any nature" of the Attorney General (the state and its subdivisions) against Purdue, its officers, directors, shareholders, direct and indirect owners, beneficiaries of the owners, and enumerated others, arising out of the conduct alleged in the complaint, including conduct related to the marketing and sale of opioids in Oklahoma. *See* Consent Judgment, *Oklahoma v. Purdue Pharma et al.*, No. CJ-2017-816, §§ 1.1, 5.1, 5.2 (Dist. Ct. Cleveland Cnty. Mar. 26, 2019).

### 2. Purdue Frederick Company, Inc.'s 2007 Plea Agreement and Related Civil Settlements

Also in 2007, Purdue Frederick Company[22] pled guilty to one felony count of misbranding OxyContin, with the intent to defraud or mislead, in violation of 21 U.S.C. §§ 331(a), 333(a)(2). (Dkt. No. 91-4, at App.1268-69; *see* JX-2153–JX-2168); *see* JX-1899. Purdue Frederick's

---

[21] "all . . . present, former, or future masters, insurers, principals, agents, assigns, officers, directors, shareholders, owners, employees, attorneys, representatives. subsidiaries, divisions, affiliates, associated companies, holding companies, partnerships, and joint ventures . . . " (JX-2225).

[22] Purdue Frederick Company is an affiliate of Purdue that manufactures and distributes OxyContin. (Dkt. No. 91-4, at App.1268).

President and CEO Michael Friedman, its Executive Vice President and Chief Legal Officer Howard R. Udell, and its Chief Scientific Officer Paul D. Goldenheim, in their capacity as corporate officers, each pled guilty to a misdemeanor charge of misbranding. (Dkt. No. 91-4, at App.1268); *see The Purdue Frederick Company, Inc.,* No. 1:07-cr-00029, at Dkt. Nos. 7-9.

> As part of the Agreed Statement of Facts, the Purdue Frederick Company admitted that:
>
> [b]eginning on or about December 12, 1995, and continuing until on or about June 30, 2001, certain PURDUE supervisors and employees, with the intent to defraud or mislead, marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications . . .

(Agreed Statement, at ¶20; *see* Dkt. No. 91-4, at App.1268-1269).

As part of the 2007 Plea Agreement, Purdue Frederick agreed to pay over $600 million dollars in fines and various other payments.[23] (Dkt. No. 91-4, at App.1269; JX-1899, at § 3). This included $160 million to the United States and the states to settle various civil claims that had been asserted by governments – over $100 million to the United States and over $59 million to "Each state that elects to participate in this settlement . . ." (JX-1899, at § 3(b)). In the federal government's settlement agreement, the United States and its various departments agreed to release "*Purdue and its current and former directors, officers, employees, affiliates, owners, predecessors, successors and assigns from any civil or administrative monetary claim the United States has or may have*" under federal statutes creating causes of action for civil damages or penalties, as well as from administrative actions under various federal departments and programs.

---

[23] The fine and payments include: approximately $276.1 million forfeited to the United States; approximately $160 million paid to federal and state government agencies to resolve liability for false claims made to Medicaid and other government healthcare programs; approximately $130 million set aside to resolve private civil claims; approximately $5.3 million paid to the Virginia Attorney General's Medicaid Fraud Control Unit; approximately $20 million paid to fund the Virginia Prescription Monitoring Program; approximately $3 million to Federal and State Medicaid programs for improperly calculated Medicaid rebates; approximately $5 million in monitoring costs; and a $500,000 maximum statutory fine.

(*See id.* at Dkt. No. 5-4, at § IIII). The participating states' settlement agreement and release were limited to Medicaid fraud claims:

> release and forever discharge [the] Company *and its current and former directors, officers, employees, affiliates, owners,* predecessors, successors and assigns from any civil or administrative monetary claim that the State has or may have for any claim submitted or caused to be submitted to the State Medicaid Program for the Covered Conduct . . .

*See The Purdue Frederick Company, Inc., et al.*, No. 1:07-cr-00029, Dkt. No. 5-14, at §III(2)) (emphasis added).

All states except Kentucky opted into the federal settlement. *See id.* at Dkt. No. 141, at 5.

An additional $130 million was set aside to settle private civil liability claims related to OxyContin. (*Id.* at § 3(d)). Ms. Conroy of the AHC testified in the Confirmation Hearing that her approximately 5,000 clients received a total of $75 million out of this settlement fund. (Dkt. No. 91-5, at App.2039).

As part of the resolution of the criminal case, Purdue agreed to a five-year corporate integrity program with the DHHS, pursuant to which DHHS was to monitor Purdue's compliance with federal healthcare law. This monitoring period expired on July 30, 2012. (Dkt. No. 91-4, at App.1269); *see The Purdue Frederick Company, Inc.*, No. 1:07-cr-00029, at Dkt. No. 5-5. In 2013, Purdue completed the corporate integrity program with no significant adverse findings. (Dkt. No. 91-4, at App.1269).

The Honorable James P. Jones approved the 2007 Plea Agreement in July of that year. *See The Purdue Frederick Company, Inc.*, No. 1:07-cr-00029, at Dkt. No. 77.

### C.  The Second Round of Lawsuits: 2014-2019

The 2007 Settlement and Plea Agreement were intended to resolve for all time issues relating to Purdue's misrepresentations about OxyContin. (Dkt. No. 91-5, at App.2039). The

corporate integrity agreement with DHHS meant ongoing monitoring (*see The Purdue Frederick Company, Inc.*, No. 1:07-cr-00029, at Dkt. No. 5-5), and the ADD program agreed to with the 26 states and D.C. was meant to create internal procedures that would identify and interrupt abuse or diversion related to OxyContin. (Consent Judgment, ¶14). Purdue, for its part, insisted in its Informational Brief before the Bankruptcy Court that it "accepted responsibility for the misconduct in 2007 and has since then strived never to repeat it." (Dkt. No. 91-4, at App.1268).

However, if Purdue's admissions in its 2020 Plea Agreement are believed, this purported acceptance of responsibility was a charade, and the oversight mechanisms built into the settlements were a conspicuous failure. Judge Drain found that the Sacklers had an "evident desire to continue to drive profits from the products' sale," *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *33, and as they did so, the opioid crisis not only continued, it worsened. (*See* Dkt. No. 91-5, at App.2039-2040; JX-2185). As Mortimer D.A. Sackler testified in the Confirmation Hearing, "overdose deaths . . . continued to rise . . . The overdose deaths kept going up and up." (Confr. Hr'g Tr. Aug. 19, 2021, at 52:7-12).

Starting in about 2014, new lawsuits began to be filed against Purdue concerning its promotion and marketing of OxyContin. (*See e.g.*, JX-2411). But this time, members of the Sackler family were named as defendants. (*See, e.g.*, Confr. Hr'g Tr. Aug. 16, 2021, at 69: 4-15).

    1.  The Federal Multi-District Litigation in the Northern District of Ohio

At the end of 2017, sixty-four federal cases that had been brought in nine districts across the country by various government entities (state, cities, and counties) against Purdue and other defendants – including pharmacies (like Rite Aid), pharmaceutical companies (like Johnson & Johnson), and pharmaceutical distributors (like McKesson Corporation) – were sent to coordinated multi-district litigation in the Northern District of Ohio ("Opioid MDL"). *See IN RE: National*

*Prescription Opiate Litigation*, MDL-2804, Dkt. No. 1, at Schedule A. The cases in the Opioid MDL asserted a variety of claims against Purdue and others for their role in the opioid crisis, under theories of liability including: (1) public nuisance, (2) false representations, (3) unjust enrichment, (4) common law *parens patriae*, (5) negligence, (6) gross negligence, and (7) consumer protection act claims. (Dkt. No. 91-4, at App.1276); *see e.g.*, Complaint, *County of San Joaquin, et al. v. Purdue Pharma L.P., et al.*, No. 2:17-cv-01485, Dkt. No. 1, Ex. 1 (E.D. Ca. May 24, 2017); Complaint, *Everett v. Purdue Pharma LP et al.*, No. 2:17-00209, Dkt. No. 1-1 (W.D. Wa. Jan. 18, 2017).

The Opioid MDL was assigned to The Honorable Dan A. Polster. At the time of Purdue's filing for bankruptcy, approximately 2,200 actions against Purdue related to the opioid crisis were pending before Judge Polster. (*See* Dkt. No. 91-4, at App.1273).

Judge Polster put the cases before him on a settlement track and litigation track and assigned a Special Master to assist in their management. (*See* MDL Dkt. No. 2676, at 3). Given "the immense scope of the opioid crisis" Judge Polster was "very active from the outset of [the] MDL in encouraging all sides to consider settlement." (MDL Dkt. No. 2676, at 11).

Within the litigation track, Judge Polster designated attorneys to coordinate discovery in related state and federal cases (MDL Dkt. No. 616) and issued a case management order meant to "facilitate, to the maximum extent possible, coordination with parallel state court cases." (MDL Dkt. No. 876, at ¶I(b)). Judge Polster ordered the establishment of a joint database of all prescription opiate cases filed in state and federal courts, so that information and documents could be tracked and discovery cross-noticed. (*Id.* at ¶¶III-V). Over 450 depositions were taken under the Opioid MDL umbrella, and over 160 million pages of documents were produced. (MDL Dkt. No. 2676, at 5; *see* Dkt. No. 91-4, at App.1276).

The extensive discovery in the Opioid MDL, and the discovery coordination it facilitated, revealed for the first time the involvement of certain members of the Sackler family in acts that Purdue had agreed not to commit as part of the 2007 Plea Agreement. Schedule A to the 2020 Plea Agreement – to which facts the corporation has stipulated, so they are deemed proved[24] – chronicles Purdue's extensive violation of the 2007 Plea Agreement, which began almost from the time the ink was dry on the papers. (*See* JX-2094.0006, 0015-18). Unable to deny what was apparent from the Opioid MDL discovery, the corporation admitted that Purdue had engaged in aggressive efforts to boost opioid sales, including: offering payments to induce health care providers to write more prescriptions of Purdue opioid products, offering "prescription savings cards" for health care providers to give patients to encourage them to fill prescriptions for opioids, and failing to maintain effective controls against diversion, which included failing to inform the United States Drug Enforcement Administration that health care providers flagged for abuse filled over 1.4 million OxyContin prescriptions. (*Id.*).

Evidence produced in discovery also "subjected the Sacklers to increasing scrutiny and pointed towards culpability of certain members of the family . . ." (Dkt. No. 91-5, at App.2040). This evidence demonstrated that members of the Sackler family were heavily involved in decisions on how to market and sell opioids (*see* JX-2944-45, JX-2952, JX-3013-14, JX-1652). Certain Sacklers, notably Richard, Mortimer D.A., and Theresa, aggressively set and pushed sales targets for OxyContin that were higher than those recommended by Purdue executives (*see* Confr. Hr'g Tr., Aug. 18, 2021, at 84:2-6; Dkt. No. 91-4, at App.1350-51); accompanied sales representatives on "ride along" visits to health care providers to promote "the sale of Purdue's opioids" (Confr. Hr'g Tr., Aug. 18, 2021, at 70:2-7); approved countless settlements related to Purdue's culpable

---

[24] The Sacklers do not concede the truth of Purdue's admissions.

28

conduct (*id.* at 126:2-18); and oversaw sales and marketing budgets and corresponding upward trends in OxyContin prescribing. (Confr. Hr'g Tr., Aug. 19, 2021, at 106:15-109:6).

As discovery turned up evidence of the involvement of members of the Sackler family in Purdue's misconduct, those family members were added as defendants in a number of cases pending against Purdue. For example, attorney Jayne Conroy testified that, as a result of information disclosed during the Opioid MDL discovery, she added the Sacklers as defendants in the lawsuits her firm was pursuing against Purdue in New York State Supreme Court. (Confr. Hr'g Tr. Aug. 16, 2021, at 70:16-25; *see also* Dkt. No. 91-5, at App.2040). Peter Weinberger, another attorney with AHC, similarly acknowledged to the Bankruptcy Court that, "State complaints naming Sackler family members relied on MDL documents extensively." (Bankr. Dkt. No. 3449, at ¶¶ 36-37, 40).

### 2. State Multi-District Litigations

In addition to the Opioid MDL, over 390 parallel actions against Purdue proliferated in state courts, as well as in local courts in D.C., Puerto Rico, and Guam. (Dkt. No. 91-4, at App.1273). The causes of actions asserted in these various litigations included: (1) violations of state false claims acts; (2) violations of state consumer protection laws; (3) public nuisance; (4) fraud; (5) negligence; (6) unjust enrichment; (7) civil conspiracy; (8) violations of state controlled-substances acts; (9) fraudulent transfer; (10) strict products liability; and (11) wrongful death and loss of consortium. (*Id.*, at App.1276).

In some states, these lawsuits were consolidated in coordinated state proceedings. (*Id.* at App.1273-1274; *see e.g.*, Dkt. No. 91-5, at App.2039-2040). Such coordination occurred in Connecticut, Illinois, New York, Pennsylvania, Texas, and South Carolina. (Dkt. No. 91-4, at App.1273). In New York, cases brought by 58 counties and two dozen cities against Purdue were

transferred to and coordinated in Suffolk County. (Dkt. No. 91-5, at App.2040).

While members of the Sackler family were not originally named as defendants in these state court coordinated actions, once their role in the marketing of OxyContin post-2007 was revealed in the Opioid MDL discovery, complaints in many state litigations were amended to name members of the Sackler family as defendants. (*See, e.g.*, Dkt. No. 91-5, at App.2040; *see* Bankr. Dkt. No. 3449, at ¶¶ 36-37, 40). Specifically, Richard Sackler, Jonathan Sackler, Mortimer D.A. Sackler, Kathy Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, Mariana Sackler, and David Sackler were named as defendants in various lawsuits. (*See e.g.*, Dkt. No. 91-7, at App.2402-2597). In at least three of these cases, state courts denied the Sackler defendants' motions to dismiss the claims against them. (*See* Dkt. No. 94, at 5; Dkt. No. 91-5, At App.2041); *see e.g.*, Order, *In re Opioid Litigation*, No. 400000/2017, Dkt. No. 1191 (Sup. Ct. Suffolk Cnty. June 21, 2019).

Thus, when Purdue filed for bankruptcy in September 2019, ". . . the threat of liability for at least some members of the [Sackler] family was real and [] without the protections of bankruptcy, individual family members were at risk of substantial judgments against them." (*See* Dkt. No. 91-5, at App.2040). As explained by the UCC in the Confirmation Hearing, it was estimated that ". . . litigating against the Sacklers could eventually lead to a judgment or multiple judgments greater than $4.275 billion." (Bankr. Dkt. No. 3460, at 33; *see also* Bankr. Dkt. No. 3449, at ¶ 10).

3.  <u>The Renewed Lawsuits Against Purdue and Members of the Sackler Family by the Individual States</u>

But private litigation was far from the only game in town. By the middle of 2019, forty-nine states' Attorneys General had filed new or amended lawsuits against Purdue, all of which named specific members of the Sackler family and/or Sackler-related entities. (*See* App.1274); *see*

*e.g.*, Amended Complaint, *New York v. Purdue Pharma L.P., et al.*, No. 400016/2018 (Sup. Ct. Suffolk Cnty. Mar. 28, 2019). For example, in March 2019, the New York Attorney General amended its earlier complaint against Purdue to add claims against the same eight members of the Sackler family and various Sackler entities.[25] *Id.* at ¶¶814-900. The newly-asserted claims included claims for public nuisance, fraud, gross negligence, willful misconduct, unjust enrichment, fraudulent conveyances, violations of state finance laws and social services laws, and "repeated and persistent" fraud and illegality in violation of Executive Law § 63(12). *Id.* Against the "Sackler entities," the complaint asserted claims for unjust enrichment and fraudulent conveyance. *Id.*

The Attorneys General of all but one of the State Appellants – California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, and D.C. – filed or amended complaints that include a range of charges against both Purdue and members of the Sackler family. (*See, e.g.*, Dkt. No. 103-7, at A-1553; Dkt. No. 95-1, at A0008; Dkt. No. 91-7, at App.2598; Dkt. No. 91-8, at App.2661; Dkt. No. 91-9, at App.3153; Dkt. No. 121-2, at MDA-008; JX-1647; JX-0946). The State of Washington did not assert claims against members of the Sackler family specifically but asserted claims against "Does 1 through 99" and "Doe Corporations 1 through 99" who – although not yet named – allegedly acted with Purdue "in committing all acts" in their complaint. (*See* Dkt No. 103-3, at App-630; JX-0944). This left open the possibility of naming members of the Sackler family and Sackler family entities.

The State Appellants' asserted claims included:

- fraudulent transfer (*see e.g.*, Dkt. No. 91-7, at App. 2649; Dkt. No. 91-9, at App.3194);

- fraud and fraudulent misrepresentation (*see e.g.*, Dkt. No. 91-9, at App.3184);

---

[25] The entities were described as those "known and unknown entities" that the Sacklers allegedly "used as vehicles to transfer funds from Purdue directly or indirectly to themselves," including Rosebay and Beacon. *Id.* at ¶¶49-54.

- unjust enrichment (*see e.g.*, Dkt. No. 91-9, at App.3192; Dkt. No. 103-7, at A-1752; JX-1647.0199);

- negligence (*see e.g.*, Dkt. No. 91-8, at App.2766; Dkt. No. 91-9, at App.3187; JX-0944.0123);

- public nuisance (*see e.g.*, Dkt. No. 91-8, at App.2768-69; Dkt. No. 91-9, at App.3175; Dkt. No. 103-7, at A-1749; Dkt. No. 95-1, at A0068; JX-1647.0197; JX-0944.0120); and

- violation of state consumer protection statutes by deceptive and unfair acts and practices. (*see e.g.*, Dkt. No. 91-7, at App.2642-2648; Dkt. No. 91-8, at App.2764; Dkt. No. 103-7, at A-1746-47; Dkt. No. 95-1, at A0066-67; Dkt. No. 121-2, at MDA-110; JX-1647.0194; JX-0944.0118).

For example, California asserted two claims for violations of its False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), and Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*), as well as a public nuisance claim (Cal. Civ. Code §3494 *et seq.*), against Purdue and nine individual members of the Sackler family, including Mariana Sackler.[26] (Dkt. No. 95-1, at A0066-68; JX-0947). California sought, *inter alia*, the assessment of civil penalties against each defendant and an order directing Purdue and the Sacklers to abate the public nuisance.

Connecticut – the state where Purdue's headquarters are located – asserted four claims for violations of its Unfair Trade Practices Act (Conn. Gen. Stat. §42-110a *et seq.*) and one claim for fraudulent transfer against Purdue and eight individual members of the Sackler family. (Dkt. No. 91-7, at App.2642-49; JX-0840). Connecticut sought, *inter alia*, civil penalties, restitution, and disgorgement from all defendants, including the Sacklers.

---

[26] A California court recently issued a "tentative decision" rejecting the public nuisance theory of liability against Johnson & Johnson and other pharmaceutical companies, including Teva, Allergan, Endo and Janssen. *See* Tentative Decision, *California v. Purdue Pharma, L.P., et al.*, No. 30-2014-00725287-CU-BT-CXC, Dkt. No. 7939 (Cal. Sup. Ct. Nov. 1, 2021). The same theory of liability was thrown out by the Oklahoma Supreme Court in a case against Johnson & Johnson. *See State ex rel. Hunter v. Johnson & Johnson*, --- P.3d ----, 2021 WL 5191372 (Okla. Sup. Ct. Nov. 9, 2021). However, also last month, an Ohio jury found three major pharmacy chains liable for damages on the theory that their filling of pill mill prescriptions for opioids created a public nuisance. *See Ohio jury holds CVS, Walgreens and Walmart liable for opioid crisis*, NPR (Nov. 23, 2021), *available at* https://www.npr.org/2021/11/23/1058539458/a-jury-in-ohio-says-americas-big-pharmacy-chains-are-liable-for-the-opioid-epide.

Delaware – where Purdue Pharma's limited partnership was formed – asserted three claims for violations of Delaware's Consumer Fraud Act (6 Del. C. §2511 *et seq.*) as well as claims for negligence and public nuisance against seven individual members of the Sackler family.[27] (Dkt. No. 91-8, at App.2764-2768; JX-0945; JX-1646). Delaware sought, *inter alia*, civil penalties and abatement.

Maryland asserted a claim for violation of the state's consumer protection laws (Md. Code Ann., Com. Law §§13-301 *et seq.*) against the same seven individual members of the Sackler family. (*See* Dkt. No. 121-2, at MDA-008). Maryland, like the other opposing states, sought civil penalties against the Sackler defendants, among other relief.

Oregon asserted three claims against Purdue and eight individual members of the Sackler family – the first seeking a declaratory judgment that Purdue and related entities are the alter egos of the Sacklers and that the state may pierce the corporate veil; the other two asserting claims for fraudulent conveyance. (*See* JX-1647). Oregon sought, *inter alia*, a judgment restraining the Sackler defendants from disposing of property and ordering a return of the conveyed funds.

Rhode Island asserted six claims against Purdue and the eight individual members of the Sackler family for public nuisance, fraud and fraudulent misrepresentation, fraudulent and voidable transfers, violations of Rhode Island's State False Claims Act (R.I. Gen. Laws §9-1.1-1 *et seq.*), negligence, and unjust enrichment. (Dkt. No. 91-9, at App.3175-94; JX-1648; JX-2214). Rhode Island sought, *inter alia*, civil penalties, treble damages, disgorgement, and restitution.

Vermont asserted four claims against the eight individual members of the Sackler family: two violations of the Vermont Consumer Protection Act (9 V.S.A. §2451 *et seq.*), unjust

---

[27] Beverly Sackler was not sued in Delaware or Maryland. Mariana Sackler was only sued in California.

enrichment, and public nuisance. (Dkt. No. 103-7, at A-1746-52; JX-1649). Vermont also sought civil penalties, among other relief.

Washington State brought an action against Purdue, "Does 1 through 99," and "Doe Corporations 1 through 99" for violating the Washington's Consumer Protection Act (Wash. Rev. Code §19.86), for causing a public nuisance, and for breaching Washington's common law of negligence. (JX-0944). The Complaint sought abatement, restitution, and statutory penalties, among other relief.

D.C. brought two claims against Purdue and Richard Sackler for violations of its consumer protection statutes (D.C. Code §28-3904(f)). (*See* JX-0946). D.C. sought, like the others and among other relief, statutory civil penalties against each defendant.

Each State Appellant filed its claims before Purdue filed for bankruptcy in September 2019. None of the cases had been litigated to judgment.[28] (*See* Dkt. 91-4, at App.1278). These cases were not subject to the automatic stay that stopped private litigation in its tracks once Purdue filed, (11 USCA § 362(b)), but the Bankruptcy Court preliminarily enjoined all litigation against Purdue and the Sacklers; that order was affirmed by this court, *In re Purdue Pharms. L.P.*, 619 B.R. 38 (S.D.N.Y. 2020). As a result, no activity has taken place in any of these lawsuits since shortly after Purdue's filing.

> 4.  Lawsuits in Canada

In Canada, a number of class actions were filed against certain of the Debtors with allegations similar to those made in the U.S. (*See* Dkt. No. 91-4, at App.1273, 1477; *see e.g.*, Dkt No. 98-1, at 13–102, 113–202). Prior to Purdue's Chapter 11 filing, the lead plaintiffs in ten of the

---

[28] Prior to bankruptcy, the lawsuit brought by North Dakota was litigated to judgment, and that judgment was in favor of Purdue. (*See* Dkt. No. 91-4, at App.1278).

Canadian class actions settled their claims for $20 million, and Purdue Pharma (Canada) ("Purdue Canada")[29] placed that amount in trust pending approval of the settlement by the Ontario Superior Court of Justice, the Superior Court of Quebec, the Supreme Court of Nova Scotia and the Saskatchewan Court of Queen's Bench (the "Canadian Settlement"). (Dkt. No. 91-4, at App.1477-1478). The Canadian Settlement, once approved and after funds are disbursed, "completely and unconditionally released, forever discharged, and acquitted [the Debtors] from any and all Settled Patient Claims against the Debtors and from any other Proof of Claim or portion thereof in respect of any Settled Patient Claim filed against any Debtor." (*Id.*). Under the Canadian Settlement, no member of the Canadian classes party to that settlement can recover from any source other than the Canadian Settlement trust, and every class member in a settling class bears the burden of proving in the U.S. bankruptcy that its claim was not released and discharged by the Canadian Settlement. (*Id.*).

However, the Canadian Settlement did not cover the claims of the Canadian Appellants, which are Canadian municipalities and indigenous tribes. The Canadian Appellants' lawsuits concerned sales and distribution of OxyContin in Canada, affecting Canadian communities, by Purdue Canada, which the Canadian Appellants assert was controlled by Sackler family members. (Dkt. 98, at 5; Bank. Dkt. No. 3421, at 89-92). The Canadian Appellants' lawsuits against Purdue Canada assert, *inter alia*, claims for conspiracy, public nuisance, negligence, fraud, and unjust enrichment. (Dkt No. 98-1, at 18-19). The Canadian Appellants also stated at oral argument that that they "were barred by the imposition of the stay and the stay-related orders" – the preliminary injunction described above – "from actually naming [certain] Competition Act claim[s] against the

---

[29] Purdue Canada is an IAC. It is not a Debtor in this case. Purdue Canada as defined in the Shareholder Settlement Agreement, means Bard Pharmaceuticals Inc., Elvium Life Sciences GP Inc., Elvium Life Sciences Limited Partnership, Elvium ULC, Purdue Frederick Inc. (Canada), Purdue Pharma (Canada), Purdue Pharma Inc. (Canada), and Purdue Pharma ULC. (JX-1625.0027).

Sacklers and the [Shareholder Released Parties]," which they would assert if given the opportunity. (Oral Arg. Tr., Nov. 30, 2021, at 80:11-16).

The Canadian Appellants do not include the Canadian federal government or any Canadian province – all of whom seem to be content with the fact that the Plan excludes claims against Purdue Canada. (*See* Plan, at 10). Indeed, the ten Canadian provinces for their part seem to believe their claims are excluded and have decided to pursue their claims in Canada instead. For example, in press on the topic, Reidar Mogerman, counsel for the British Columbia government, explained that the provinces gave up their claims (worth US$67.4 billion) before the Bankruptcy Court in the U.S. to protect lawsuits they filed against Purdue's Canadian entities.[30] "We didn't want to get swallowed in competition with the U.S. claims and lose our Canadian claims," he explained to the press. *Id.* To date, in Canada, the various Canadian provinces have asked the Ontario Superior Court of Justice to continue to pursue their separate class actions against Purdue Canada. *Id.*

## VII.  Members of The Sackler Family Insulate Themselves Against Creditors

As Judge Drain found, the evidence indicates members of the Sackler family distributed significant sums of Purdue money to themselves in the years 2008-2016, during which time those Sackler family members were closely involved in the operations of Purdue and aware of the opioid crisis and the litigation risk. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *32. As detailed below, this "aggressive[]" (to use Richard Sackler's word, *see* JX-1703) pattern of distribution of earnings to shareholders represented a sharp departure from prior practice in two ways.

First, during the period 1996-2007, Purdue up-streamed on average 9% of its revenue per year to the Sacklers; but during the period 2008-2016, Purdue up-streamed on average 53%, and

---

[30]*Provinces plan legal push against Purdue Pharma in wake of U.S. opioid deal*, The Globe and Mail (Sept. 3, 2021), https://www.theglobeandmail.com/canada/article-provinces-plan-legal-push-against-purdue-pharma-in-wake-of-us-opioid.

as much as 70%, of its revenue to the Sacklers. (*See* JX-2481).

Second, during the earlier period (1996-2007), the Sacklers kept less than 10% of the money that was distributed by Purdue for themselves, while using over 90% of those distributions to pay taxes on Purdue's earnings; but during the years between 2008-2016, the Sacklers retained, in one form or another, 56% of those distributed earnings, while using just 44% to pay taxes. (Bankr. Dkt. 3410-2).

The 2008-2016 distributions to shareholders also contrasted with the practices of Purdue's peer pharmaceutical companies. (*See* JX 1703).

According to the Sacklers' own expert, this pattern of upstreaming corporate earnings substantially depleted Purdue's treasury during that eight-year period. (JX-0431, p. 77, Fig. 10).

### A.   The Sacklers Cause the Transfer of Billions of Dollars from Purdue to Themselves

In March 2007, Richard, Jonathan, Kathe, and Mortimer Sackler exchanged emails noting that the "future course [for the business] is uncertain" (JX-2976) and identified the "emergence of numerous new lawsuits" as a "risk[] . . . we're not really braced for." (JX-2957). Just a few months later, in May, shortly after the 2007 guilty plea and settlement, David Sackler emailed Jonathan Sackler, Richard Sackler, and their financial advisor, expressing concern about the family's personal liability for the opioid crisis: "what do you think is going on in all of these courtrooms right now? We're rich? For how long? Until suits get through to the family?" (JX-2237; *see also* JX-2096, at ¶ 161). In his deposition, David Sackler agreed that his May 17, 2007, email reflects "concern[] that the family would be sued in connection with Purdue's sale of OxyContin." (JX-1989, at 183:14-184:20, 187:18-188:20). Less than a week after David Sackler sent his email, Richard and Jonathan Sackler met with a bankruptcy attorney, though Purdue was not in debt and not at risk of bankruptcy. (*See* JX-2985; JX-2986).

Thereafter, on July 26, 2007, a family financial advisor sent a confidential memorandum to Jonathan Sackler, in which he advised that Purdue faced "[u]ncapped liabilities" that posed "a huge valuation question" for Purdue at that very moment – the moment when the Plea and settlements were ostensibly ending any illegal behavior and putting further corporate liability – and potential shareholder liability – in the rear view mirror. (JX-1660, at 2-3). He added, "I presume the family has taken most of the appropriate defensive measures." (*Id.* at 3; *see also* JX-2241). One such measure, proposed in a separate memorandum, was "to distribute more free cash flow so [the owners] can purchase diversifying assets." (JX-2254; *see also* JX-2096, at ¶ 162).

By January 2008, the anxiety over impending lawsuits was apparent; Richard Sackler emailed Mortimer Sackler that, "I've been told by Silbert that I will be [sued] and probably soon." (JX-3001). Mortimer Sackler lamented in a later email in February 2008 that he wished to get out of the pharmaceutical business altogether "given the horrible risks, outlooks, difficulties, etc." (Bankr. Dkt. No. 2161, at Ex. 67). In this vein, in April 18, 2008, Richard Sackler warned in a memo that the business posed a "dangerous concentration of risk" and proposed that the family either sell the company or "distribute more free cash flow" to themselves. (JX-2214, ¶ 86; JX-3004; JX-3104). The family chose the latter course.

Beginning in 2008, Purdue began to make significant cash distributions to and for the benefit of the Sacklers. (JX-1988, at 226:13-19 (deposition of Richard Sackler); Confr. Hr'g Tr., Aug. 19, 2021, at 149:6-14 (testimony of Mortimer D.A. Sackler); Confr. Hr'g Tr., Aug. 18, 2021, at 65:8-17 (testimony of Richard Sackler); *see also* Dkt. No. 91-4, at App.1544). As noted above, about 44% of the money distributed went to pay taxes; a small fraction was invested in the IACs, which were owned by the Sacklers; and the rest went to Rosebay and Beacon, the Side A and B

Sackler family trusts. (*See* JX-1987, at 156:8-158:4; Confr. Hr'g Tr., Aug. 19, 2021, at 27:7-28:1-12).

In the years leading up to the 2007 Plea Agreement and Settlement, the Sackler family had been content to leave most of Purdue's earnings in the company, except insofar as was necessary to pay taxes. In response to a question from this Court, Debtors acknowledged that, between January 1, 1995 and December 31, 2007, distributions to the Sacklers totaled $1.322 billion, of which $1.192 billion (or 90.2%) was used to pay taxes. (Dkt. No. 177; *see* JX-3050.0042; JX-2481; Bankr. Dkt. 3410-2). In the twelve years prior to 2008, the Sacklers took personal distributions from Purdue that averaged 9% of Purdue's revenue. (*See* JX-2481).

After 2007, Purdue went from distributing less than 15% of its revenue to distributing as much as 70% of revenue.[31] (*Id.*). It also jumped from distributing approximately 38% of its free cash flow in 2006 to distributing 167.4% of free cash flow in 2007 and continued to distribute free cash flow in the 90% range for the next decade. (*Id.*). These distributions totaled approximately $10.4 Billion. (*See* Dkt. No. 91-4, at App.1544; Bankr. Dkt. No. 3410-1, at ¶ 12; Confr. Hr'g Tr., Aug. 18, 2021, at 65:8-17 (testimony of Richard Sackler); Confr. Hr'g Tr., Aug. 19, 2021, at 27:7-28:1-12, 149:6-14 (testimony of Mortimer D.A. Sackler)).

Approximately $4.6 billion of that amount was used to pay pass through taxes (*see* Bankr. Dkt. 3410-2), which attests to the tremendous profitability of Purdue's OxyContin business during that same eleven-year period. In fact, the vast majority of Purdue's earnings between 2008-2017 came from OxyContin sales. (*See* JX-1984, at 40:24-41:5; JX-3275, at 338:6-9; JX-0999).

---

[31] The absolute amount of these distributions dwarfed distributions for the 1995-2007 period because concerns about the validity of Purdue's OxyContin patent capped its earnings until 2008, when it was definitively held that the patent was valid. (*See* Dkt. No. 241, at 6). After that, Purdue's earnings soared – as did both the amount owed in taxes and the amount that ended up in the Sackler family trusts.

According to the Sacklers' own expert, the change in distribution pattern drained Purdue's total assets by 75% and Purdue's "solvency cushion" by 82% between 2008 and 2016. (JX-0431, p 77, Fig. 10). Richard Sackler later acknowledged in an email in 2014 that, "in the years when the business was producing massive amounts of cash, the shareholders departed from the practice of our industry peers and took the money out of the business." (JX 1703). In at least one email in 2014, Jonathan Sackler referred to this distributing of cash flow from OxyContin as a "milking" program. (JX-2974).

The obvious implication of this evidence was recognized by Judge Drain in his bankruptcy decision, discussed *infra* in Background Section XII. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *27, 31, 32–33. In particular, Judge Drain noted, "I do have an extensive report and trial declarations as to the nature of the assertedly over $11 billion of avoidable transfers, when they occurred, what they comprised, and who they were made to," *id.* at 31; and found, "The record suggest[s] that at least some of the Sacklers were very aware of the risk of opioid-related litigation claims against Purdue and sought to shield themselves from the economic effect of such claims by causing Purdue to make billions of dollars of transfers to them and to shield their own assets, as well, from collection." *Id.* at 32. While he made no finding that these distributions qualified as fraudulent conveyances, or that they could be recouped by Purdue, Judge Drain also acknowledged that the estate had potential claims of "over $11 billon of assertedly avoidable transfers." *Id.* at 27.

As Judge Drain also acknowledged, the distribution of Purdue money to the Sackler family occurred during a time when members of the Sackler family, including those named in many pending cases, were closely involved in the operations of Purdue and well aware of the opioid crisis and the litigation risk. He said, "The testimony that I heard from the Sacklers tended to show, that as a closely held company Purdue was run differently than a public company and that its Board

and shareholders took a major role in corporate decision-making, including Purdue's practices regarding its opioid products that was more akin to the role of senior management." *Id.* at 33. As Richard Sackler acknowledged in the Confirmation Hearing, he oversaw as director "many settlements," stating, "I was director, and I cannot count up all the settlements that the company entered into while I was a director. But there were many settlements, both private and public." (Confr. Hr'g Tr., Aug. 18, 2021, at 126:2-18). For example, as part of the Board, he approved the settlement of $24 million to the State of Kentucky to resolve unlawful and unfair deceptive trade practice allegations against Purdue in 2015. (*Id.* at 124:16-125:1).

The Sacklers vehemently deny any suggestion that any of these transfers would qualify as fraudulent conveyances. (*See* JX-2096, at ¶G). However, in Addendum A to the 2020 "Settlement Agreement" with the DOJ, the Government asserted its confidence that it could prove that: "From approximately 2008 to 2018, at the Named Sacklers' request, billions of dollars were transferred out of Purdue as cash distributions of profits and transfers of assets into Sackler family holding companies and trusts. Certain of these distributions and transfers were made with the intent to hinder future creditors and/or were otherwise voidable as fraudulent transfers." (*Id.* at Addendum A, ¶6; *see also id.* at ¶¶158-159)

The fact of these extensive transfers of money out of Purdue and into the family coffers is not contested. For example, during the Confirmation Hearing, when Richard Sackler was asked if it were "true that during that time period generally [2008-2018] . . . the Purdue Board of Directors transferred out billions of dollars to Sackler family trusts or holding companies," he answered, "Yes . . . yes, that we did." (Confr. Hr'g Tr., Aug. 18, 2021, at 65:8-17). Only whether those transfers (or any of them) would qualify as fraudulent conveyances is in dispute. But while that presents an important and interesting question, I agree with Judge Drain that it was not one he

needed to resolve in order to rule on the confirmability of the Plan. But at some point – certainly by 2018 – Purdue itself was in a precarious financial position in face of the lawsuits. At the time of the bankruptcy filing, Purdue represented that, while it had "no funded debt and no material past due trade obligations" – or even any "judgment creditors" – "the onslaught of lawsuits has proved unmanageable" and "will result only in the financial and operational destruction of the Debtors and the immense value they could otherwise provide . . . " (Dkt. No. 91-4, at App.1237).

   B.  *A Pre-Petition Settlement Framework Is Proposed That Would Release the Sackler Family From Liability.*

   In the months before Purdue filed for bankruptcy, Purdue, the Sackler family (now no longer represented on Purdue's Board) and Sackler entities were engaged in discussions about a potential framework for settlement of all claims against Purdue and the Sacklers with "the various parties in the MDL litigation" and certain "subgroups" of creditors and potential creditors. (*See* Confr. Hr'g Tr., Aug. 12, 2021, at 152:23-153:22). John Dubel testified in the Confirmation Hearing[32] that the pre-petition settlement framework discussions involved the concept of third-party releases *and* the concept of using the bankruptcy process to release all claims against the Sacklers in exchange for their contribution of funding to the settlement. (*Id.* at 154:1-5). Mr. Dubel explained:

> [I]t was very clear from the . . . Sacklers that if they were going to post up X amount of dollars – and I believe at the time, the settlement framework was somewhere around $3 billion or so – that they were going to seek broad third party releases, and releases from the Debtors, releases of all the estate claims, etc., so that they could be able to put all of that – all of the litigation behind them . . . *it was something that was a prerequisite or a condition to them posting the amount of money that was in the settlement framework* and then ultimately what is in the plan of organization we were seeking approval of.

---

[32] Mr. Dubel served as the Chairman of the Special Committee of the Board. He was appointed to the Board in July 2019 and chaired the Special Committee investigating the potential claims of Purdue or its estates against the Sacklers. (*See* Bankr. Dkt. No. 3433, at ¶1).

(*Id.* at 155:25-156:1-12; *see id.* at 209:1-4, 214:8-19) (emphasis added).

So the Sacklers made it clear well before the Debtors filed for chapter 11 bankruptcy that they would contribute toward Purdue's bankruptcy estate only if they received blanket releases that would put "all of the litigation behind them." (*Id.* at 155:25-156:1-12). This was reported heavily in the press at the time of the bankruptcy filing.[33]

This pre-petition settlement framework was then imported into the bankruptcy process. As Mr. Dubel testified, once a pre-petition settlement framework was created, the plan was to "Us[e] the Chapter 11 process to enable us to then organize all of the various claimants into one group under . . . the auspices of the Chapter 11 bankruptcy process." (*Id.* at 154:14-18). He further explained that, "It was the framework that would help us continue to bring all of the various creditor groups towards a decision as to whether it was better to litigate against the Sacklers or attempt to come up with a settlement that would be fair and equitable for all the creditors of the Debtor's estates." (*Id.* at 155:2-9). He testified that some 24 states "were supportive of us moving forward in the process of filing a Chapter 11 and using this [bankruptcy] as a means of coalescing all the parties into one organized spot to address the potential claims that the estates would have against the Sacklers." (*Id.* at 157:4-9).

Purdue's bankruptcy was thus a critical part of a strategy to secure for the Sacklers a release from any liability for past and even future opioid-related litigation without having to pursue personal bankruptcy. David Sackler acknowledged as much in his testimony, "I don't know of

---

[33] *See e.g.*, *Purdue Pharma's bankruptcy plan includes special protection for the Sackler family fortune*, The Washington Post (Sept. 19, 2019), https://www.washingtonpost.com/business/2019/09/18/purdue-pharmas-bankruptcy-plan-includes-special-protection-sackler-family-fortune; *Where did the Sacklers move cash from their opioid maker?*, ABC News (Sept. 5, 2019), https://abcnews.go.com/US/wireStory/sacklers-move-cash-opioid-maker-65407504.

another forum that would allow this kind of global solution, this kind of equitable solution for all parties." (Confr. Hr'g Tr., Aug. 17, 2021, at 35:4-6).

## VIII.    The Underlying Bankruptcy

Facing the mounting lawsuits against both Purdue and members of the Sackler family in the U.S. and abroad, certain U.S. based Purdue entities (Debtors) filed for bankruptcy relief on September 15, 2019. (Bankr. Dkt. No. 1). Members of the Sackler family and the Sackler entities – such as Rosebay and Beacon – did not file for bankruptcy, despite having been named as defendants in opioid-related lawsuits.

### A.   *Pending Actions Against Purdue and Members of the Sackler Family Are Halted*

Purdue quickly moved on September 18, 2019, before the Bankruptcy Court for an injunction halting all actions against Purdue as well as "against their current and former owners (including any trusts and their respective trustees and beneficiaries), officers, directors, employees, and associated entities." (Dkt. No. 91-4, at App.1471, 1562). This meant enjoining over 2,900 actions against Purdue and at least 400 civil suits against the Sacklers. (*Id.*, at App.1562).

Purdue argued that enjoining all litigation was necessary to facilitate the parties' work towards a global settlement in a single forum – the Bankruptcy Court. After an evidentiary hearing, on October 11, 2019, the Bankruptcy Court temporarily halted all such litigation until November 6, 2019 (*Id.* at App.1472), at which point it granted Purdue's motion enjoining all plaintiffs from continuing or commencing any judicial, administrative, or investigative actions, as well as any other enforcement proceeding, against Purdue or the non-debtor related parties, including against members of the Sackler family. (*Id.*; *see* Bankr. Dkt., No. 2983, at 171). This Court affirmed the Bankruptcy Court's grant of the preliminary injunction. *Dunaway v. Purdue Pharma. L.P. (In re Purdue Pharma. L.P.)*, 619 B.R. 38 (S.D.N.Y. 2020). The expiration date of the preliminary

injunction has been extended 18 times, during which period the parties negotiated to come up with the Plan. (*See* Dkt. No. 91-4, at App.1402, 1429, 1472-73; Bankr. Dkt. Nos. 2897, 2488).

    *B.  The Creditor Constituencies in the Bankruptcy*

On September 27, 2019, the U.S. Trustee appointed nine creditors to the UCC, an independent fiduciary to represent the interests of all unsecured creditors in the Purdue bankruptcy. (Dkt. No. 91-1, at App.7).[34] The UCC's appointees are Blue Cross and Blue Shield Association; CVS Caremark Part D Services L.L.C. and CaremarkPCS Health, L.L.C.; Cheryl Juaire; LTS Lohmann Therapy Systems, Corp.; Pension Benefit Guaranty Corporation; Walter Lee Salmons; Kara Trainor; and West Boca Medical Center. (Bankr. Dkt. No. 1294; *see* Dkt. No. 115-1, at 5). The UCC also has several ex-officio, non-voting representatives: (i) Cameron County, Texas, on behalf of the MSGE; (ii) the Cheyenne and Arapaho Tribes, on behalf of certain Native American Tribes and Native American-affiliated creditors; and (iii) Thornton Township High School District 205, on behalf of certain public school districts. (*See* Bankr. Dkt. No. 1294).

Between September and November 2019, various other creditor groups were formed to represent creditor constituencies in the bankruptcy, including as follows:

- The AHC was formed in September 2019 and is comprised of ten States, six counties, cites, parishes, or municipalities, one federally recognized American Indian Tribe (the Muscogee (Creek) Nation, as well as the court-appointed Co-Lead Counsel on behalf of the Plaintiffs' Executive Committee in the Opioid MDL (*see* Bankr. Dkt. No. 279);

- NAS Children was formed in September 2019 and is comprised of around 3,500 children, who born with "neonatal abstinence syndrome" due to exposure to opioids in utero, and/or their guardians (*see* Bankr. Dkt. No. 1582; Dkt. No. 115-1, at 3);

- The PI Ad Hoc Group was formed in October 2019 and is comprised of 60,761 personal injury claimants, each holding "one or more unsecured, unliquidated, opioid-related personal injury claims against one or more of the Debtors" (*see* Bankr. Dkt. Nos. 3939, 348);

---

[34] See Official Committee of Unsecured Creditors of Purdue Pharma L.P. and Affiliated Debtors: General Information, KKC, available at http://www.kccllc.net/PurdueCreditors.

- MSGE was formed in October 2019 and is comprised of 1,317 entities: 1,245 cities, counties and other governmental entities, 9 tribal nations, 13 hospital districts, 16 independent public school districts, 32 medical groups, and 2 funds across 38 states and territories (*see* Bankr. Dkt. No. 1794);

- The Ad Hoc Group of Non-Consenting States ("NCSG") was formed in October 2019 and is comprised of 25 states that did not reach a pre-petition agreement with Purdue or the Sacklers regarding "the general contours of a potential chapter 11 plan" to settle their claims – California, Colorado, Connecticut, Delaware, D.C., Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin (*see* Bankr. Dkt. No. 296);

- The Ratepayer Mediation Participants ("Ratepayers") was formed in October 2019 and is comprised of "proposed representatives of classes of privately insured parties who are plaintiffs and proposed class representatives in their individual and representative capacities in suits brought against [Purdue]" in 25 actions in 25 states (*see* Bankr. Dkt. No. 333; Dkt. No. 91-3, at App.1108); and

- The Ad Hoc Group of Hospitals ("Hospitals") was formed in November 2019 and is comprised of hundreds of hospitals that have treated and treat patients for conditions related to the use of opiates manufactured by Purdue (*see* Bankr. Dkt. 1536).

Other groups that formed during the pendency of the bankruptcy proceedings include:

- The Third-Party Payor Group ("TPP Group"), comprised of certain holders of third-party payor claims (*see* Dkt. No. 91-3, at App.1114);

- The Native American Tribes Group ("Tribes Group"), comprised of the Muscogee (Creek) Nation, the Cheyenne & Arapaho Tribes, an ex officio member of the Creditors' Committee, and other Tribes represented by various counsel from the Tribal Leadership Committee and the Opioid MDL Plaintiffs' Executive Committee (*see id.* at App.1096); and

- The Public School District Claimants ("Public Schools"), comprised of over 60 public school districts in the United States (*see id.* at App.1106; Bankr. Dkt. Nos. 2707, 2304).

Each of these groups was representative of certain creditor constituencies, whose "members" (there was no certified class) held similar types of claims against Purdue.

### C. *The Court Sets A Bar Date for Filing of Proof of Claims*

On January 3, 2020, Purdue filed a "Motion for Entry of an Order (I) Establishing Deadlines for Filing Proofs of Claim and Procedures Relating Thereto, (II) Approving the Proof

of Claim Forms, and (III) Approving the Form and Manner of Notice Thereof" (the "Bar Date Motion")." (*See* Dkt. No. 91-4, at App.1475). On February 3, 2020, the Bankruptcy Court approved the Bar Date Motion, setting June 30, 2020 as the deadline for all persons and entities holding a prepetition claim against Purdue, as defined in section 101(5) of the Bankruptcy Code (a "Claim"), to file a proof of claim. (*Id.*). On June 3, 2020, the Bankruptcy Court entered an order extending the Bar Date to July 30, 2020. (*Id.*; *see id.* at App.1298).

During the five months while the window for filing proofs of claims was open, over 614,000 claimants did so. Just 10% of the claims so filed would give rise to over $140 trillion in aggregate liability – more than the whole world's gross domestic product. (Dkt. No. 91-4, at App.1421; *see* Dkt. No. 91-1, at App.28).[35] The claimants included the federal government, states and political subdivisions, Native American Tribes, hospitals, third-party payors, ratepayers, public schools, NAS monitoring claims,[36] more than 130,000 personal injury victims, and others. (*See* Dkt. No. 91-4, at App.1425-1429; *see* Dkt. No. 91-1, at App.28).

### D. The Court Approves Mediation and Appoints Mediators to Facilitate Resolution

On February 20, 2020, Purdue filed an unopposed "Motion for Entry of an Order Appointing Mediators," seeking the appointment of mediators and mandating that the various creditor constituencies participate in mediation. (Dkt. No. 91-4, at App.1486). On March 2, 2020, the Bankruptcy Court approved Purdue's motion and appointed The Honorable Layn Phillips (ret.) and Mr. Kenneth Feinberg as co-mediators (*Id.*; Bankr. Dkt. No. 895). Both are among the most experienced and respected mediators in the country.

---

[35] As of October 21, 2021, 628,389 claims have been filed. *See* Bankruptcy Claim Report, *available at* https://restructuring.primeclerk.com/purduepharma/Home-DownloadPDF?id1=MTMwMjM2Mw%3D%3D&id2=0.

[36] NAS monitoring claims are those of legal guardians of children born with neonatal abstinence syndrome due to exposure to opioids in utero. (Dkt. No. 91-4, at App.1404; *see* Dkt. No. 115-1 at 3).

## IX.    The Negotiation of the Bankruptcy Plan

Through mediation, Purdue and stakeholders worked to negotiate a complex settlement framework that would ultimately direct the Debtors' assets and $4.275 billion from the Sackler families toward abating the opioid crisis and restoring victims of the crisis. (*See* Dkt. No.91-4, at App.1402, 1429; *see* Bankr. Dkt. 2488).

The parties involved in the negotiations included the Debtors and non-debtor related parties (*i.e.*, members of the Sackler family) and the various creditor constituencies. Together, as defined in the court's mediation order, the participating "Mediation Parties" were the Debtors, the UCC, the AHC, the NCSG, the MSGE, the PI Ad Hoc Group, NAS Children, the Hospitals, the TPP group, and the Ratepayers. (Dkt. No. 91-4, at App.1486). The Tribes Group, the Public Schools, the National Association for the Advancement of Colored People, and others also participated in mediation, although not as official Mediation Parties. (*Id.*; *see* Bankr. Dkt. No. 2548).

The mediation progressed in three phases (*id.* at App.1404), as follows:

### A.  Phase 1: March 2020-September 2020

Phase one of the mediation addressed "the allocation of value/proceeds available from the Debtors' Estates" as disputed between the "Non-Federal Public Claimants" (the states, federal districts and U.S. territories, political subdivisions, and Native American tribes) and "Private Claimants" (hospitals, private health insurance carriers and third-party payors, and individuals and estates asserting personal injury, including NAS Children). (Dkt. No. 91-4, at App.1487; Bankr. Dkt. No. 855, at 6-7). It proceeded with a "series of rigorous formal mediation sessions during the period from March 6, 2020 to September 11, 2020." (Dkt. No. 91-4, at App.1487).

The mediation resulted in certain resolutions (*see generally* Bankr. Dkt. 1716), the most critical of which included value allocation between and among the various parties, such as:

> First, the Non-Federal Public Claimants agreed that all value received by them through the Chapter 11 Cases would be exclusively dedicated to programs designed to abate the opioid crisis . . .
>
> Second, the Non-Federal Public Claimants addressed and resolved . . . value allocation for all Native American Tribes . . . and a default mechanism that, in the absence of a stand-alone agreement between a State or territory and its political subdivisions, provides a structure and process for applying funds to abate the opioid crisis . . .
>
> Third, agreement was reached on written term sheets with certain individual Private Claimant groups that addressed allocation of estate value to each Private Claimant group. These agreements provided, among other things, that each class of Private Claimants will receive fixed cash distributions over time, the values and time periods varying for each class. Moreover, the Ad Hoc Group of Hospitals, the Third-Party Payors, and the NAS Committee (with regard to medical monitoring) each agreed to dedicate substantially all the distributions from their respective Private Creditor Trusts to abate the opioid crisis.

(*See* Dkt. No. 91-4, at App.1487). Ultimately, all participants except "the public school districts and the NAS children physical injury group" were able to achieve "agreement *inter se* as to their respective allocations as a result of the mediation process." (Bankr. Dkt. 2548, at 8).

Each of the term sheets with the private plaintiffs was conditioned on the confirmation of a plan of reorganization that includes participation by the Sackler Families in the plan of reorganization. (Bankr. Dkt. 1716, at 5).

However, not all issues were resolved. On September 23, 2020, while phase one of the mediation had reached "substantial completion" (Bankr. Dkt. 2548), the mediators' report indicated that "there remain terms to be negotiated by the parties with respect to each of the term sheets in order to reach final agreements . . ." (Bankr. Dkt. 1716, at 5-6). With several open terms and the estate claims still to be negotiated, on September 30, the Bankruptcy Court entered a Supplemental Mediation Order, authorizing further mediation to resolve the open issues and to mediate the estate claims (phase 2). (Dkt. No. 91-4, at App.1551; Bankr. Dkt. Nos. 1756).

### B.  Phase 2: October 2020-January 31, 2021

The Bankruptcy Court's Supplemental Mediation Order authorized the mediators "to mediate any and all potential claims or causes of action that may be asserted by the estate or any of the Non-Federal Public Claimants" against the Sackler families and entities "or that may otherwise become the subject of releases potentially granted to" members of the Sackler families and entities (defined as the "Shareholder Claims"). (*See* Bankr. Dkt. Nos. 1756, at 2; 2584, at 1; 518, at 4). This Order also "narrowed the number of mediating parties on the Shareholder Claims aspect of the mediation" to the Debtors, the UCC, the "Consenting Ad Hoc Committee,"[37] the NCSG, the MSGE, and representatives of the Sacklers. (Bankr. Dkt. Nos. 2584, at 1; 2548, at 2).

In phase two, the mediators received presentations from the parties on their positions regarding the estate claims, including a presentation by the UCC of its "views and findings on its investigation of estate causes of action." (Dkt. No. 91-4, at at App.1551-52; Bankr. Dkt. No. 2584).[38] After the presentations, "numerical negotiation began," with offers and counteroffers proposed. However, no "mutually agreed resolution" was reached among all constituencies before the end of the phase two on January 31, 2021. (Bankr. Dkt. No. 2584).

### C.  Phase 2 Negotiations Continue with the Sackler families: January 2021 to March 2021

Although court-ordered mediation formally ended on January 31, 2021, settlement negotiations continued among the Sackler families and entities, the Debtors, the NCSG, the UCC,

---

[37] The Bankruptcy Court did not define what the "Consenting Ad Hoc Committee" was, but the mediators' March 23, 2021 report lists "the Consenting States and the Ad Hoc Committee" as consisting of the AHC plus the various consenting states listed there – notably Texas, Tennessee, and Florida. (*See* Bankr. Dkt. No. 2548, at 2). The Court assumes this is what is meant by the "Consenting Ad Hoc Committee."

[38] Occurring contemporaneously with the mediation was a Special Committee's "comprehensive investigation into potential claims that the Debtors may have against the Sackler Families and Sackler Entities," led by attorneys from Davis Polk, who represent the Debtors in the bankruptcy. (Dkt. No. 91-4, at App.1537-1553). Throughout the mediation, the Special Committee was kept apprised of the "offers and counteroffers that had been communicated through the Mediators by the NCSG, on the one hand, and the Sackler Families, on the other hand." (*Id.* at App.1552).

the ACH, and the MSGE regarding the "Sackler contribution" to the Debtors' estate. (*See* Bankr. Dkt. No. 2584, at 9; Dkt. No. 91-4, at App.1552-53). Eight more offers and counteroffers were exchanged between the end of January 2021 and February 18, 2021. (Dkt. No. 91-4, at App.1553).

Ultimately, the Sackler families and entities, the Debtors, the AHC, the "Consenting Ad Hoc Committee," and the MSGE reached an agreement in principle, which settled on a guaranteed amount that the Sackler families would be required to contribute to the Debtors' estate –$4.275 billion over nine years (or ten years if certain amounts were paid ahead of schedule in the first six years). (*Id.* at App.1552-53; *see* Bankr. Dkt. Nos. 2488, 2879). The principal consideration for this payment was the "Shareholder Release" that was to be included in the Debtors' plan of reorganization. (*See* Bankr. Dkt. 2487, at § 10.8). That plan, along with the Debtors' "Disclosure Statement" containing the "Sackler Settlement Agreement Term Sheet" reached in negotiation, were filed with the Bankruptcy Court on March 15, 2021. (*See* Bankr. Dkt. Nos. 2487, 2488).

D. *Phase 3: May 7, 2021-June 29, 2021*

Phase three of the mediation involved a final push to resolve the dispute of the NCSG[39] over the terms of the agreement reached in phase two of the mediation between and among the Sackler families and entities, the Debtors, the AHC, the "Consenting Ad Hoc Committee," and the MSGE. (Bankr. Dkt. Nos. 2820, 2879). To that end, on May 7, 2021, the Bankruptcy Court asked his colleague, the Honorable Shelley C. Chapman, to preside over a mediation between the NCSG and the Sackler Families with respect to the terms of the settlement. (Bankr. Dkt. No. 2820). Between May 7 and June 29, 2021, Judge Chapman conducted 145 telephone meetings and several

---

[39] At that time, the non-consenting states included Colorado, Connecticut, Delaware, the District of Columbia, Hawaii, Idaho, Illinois, Iowa, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Hampshire, New Jersey, New York, North Carolina, Oregon, Pennsylvania, Rhode Island, Vermont, Virginia, Washington, and Wisconsin.

in-person sessions between the NCSG and the Sackler families and entities. (*See* Bankr. Dkt. No. 3119).

The result of the mediation was a modified shareholder settlement with the Sackler families and entities, which was agreed to in principle by a fifteen of the twenty-five non-consenting states – specifically, Colorado, Hawaii, Idaho, Illinois, Iowa, Maine, Massachusetts, Minnesota, Nevada, New Jersey, New York, North Carolina, Pennsylvania, Virginia, and Wisconsin. (*Id.* at 2). Those states that reached agreement in principle also agreed to support and/or not object to the Plan.

The remaining non-consenting states – most of which are parties to this appeal – did not agree to the revised settlement. (*Id.*).

The new terms of the settlement included additional payments of $50 million by the Sackler families, and the acceleration of another $50 million in previously agreed settlement payments, resulting in total payments of $4.325 billion. In addition to the money, Judge Chapman induced the parties to agree to several non-monetary terms; specifically, a "material expansion of the scope of the public document repository" to be established under the Plan, and certain prohibitions on Sackler family demands for naming rights in exchange for charitable contributions, together with a few other, minor concessions. (*See* Bankr. Dkt. No. 3119).[40] The Shareholder Release was unchanged. (*See id.*).

On July 7, 2021, Purdue filed the mediator's report in the bankruptcy proceeding, informing Judge Drain of the result of the mediation.

---

[40] The value of the "naming rights" concession is dubious, since institution after institution, both here and abroad, is taking the Sacklers' name off various endowed facilities, including the Louvre and the Metropolitan Museum of Art. *See Louvre Removes Sackler Family Name From Its Walls*, The N.Y. Times (Jul. 17, 2019), https://www.nytimes.com/2019/07/17/arts/design/sackler-family-louvre.html; *Met Museum Removes Sackler Name From Wing Over Opioid Ties*, The N.Y. Times (Dec. 9, 2021), https://www.nytimes.com/2021/12/09/arts/design/met-museum-sackler-wing.html

## X.    Confirmation of the Plan: Summary of the Order on Appeal

Purdue filed the first version of the Plan on March 15, 2021. (Bankr. Dkt. No. 2487). It has subsequently filed twelve amendments to the Plan, the last of which was dictated by Judge Drain as a condition of confirmation. (*See* Bankr. Dkt. No. 3787).

On August 9, 2021, the Confirmation Hearing began before the Bankruptcy Court (Dkt. No. 91-3, at App.651), a six-day event during which 41 witnesses testified (by declaration or otherwise), after which the parties engaged in extensive oral argument. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *2.

On September 1, 2021, the Bankruptcy Court rendered an oral ruling, stating it would confirm the proposed plan provided certain changes were made to it, the most relevant of which for purposes of this appeal was a modification of the Section 10.7 Shareholder Release:

> I . . . require that the shareholder releases in paragraph 10.7(b) [the release of third-party claims against the shareholder released parties], by the releasing parties, be further qualified than they now are. To apply [only] where . . . a debtor's conduct or the claims asserted against it [are] a legal cause or a legally relevant factor to the cause of action against the shareholder released party.

(Confr. Hr'g Tr., Sept. 1, 2021, at 134:18-135:2); *see also In re Purdue Pharma L.P.*, 2021 WL 4240974, at *45; *see* Plan, at § 10.7(b) (modifying the Plan in accordance with Judge Drain's instructions). Purdue filed the final version of the Plan the next day (Bankr. Dkt., No. 3726), and on September 17, 2021, Judge Drain issued his edited written decision confirming the Plan.

The salient features of the Plan are as follows:

Trusts to Administer Abatement and Distribution. Under the Plan, the majority of Purdue's current value will be distributed among nine "creditor trusts" that will fund opioid abatement efforts and compensate personal injury claimants, including the National Opioid Abatement Trust ("NOAT"), which will make distributions to qualified governmental entities. (Bankr. Dkt. No. 3456, at ¶¶ 5-6). Most of the creditor trusts are abatement trusts and may only make distributions

for the purpose of opioid abatement or to pay attorneys' fees and associated costs. (*Id.* ¶¶ 5-6). Two trusts – the "PI Trust" and "PI Futures Trust" – are the only exceptions: those creditor trusts will make distributions to qualifying personal injury claimants. (*Id.*)

The Public Document Repository. Under the Plan the Debtors are required to create a public document repository of Purdue material available for public review. (Bankr. Dkt. No. 3440, at ¶ 7.) The AHC testified at the Confirmation Hearing that the establishment of this public document repository was among their highest priorities. (Confr. Hr'g Tr., Aug. 13, 2021, at 151:17-152:9 ("[O]f all the aspects of . . . the injunctive relief part of [the Plan], [the public document repository] . . . is extremely important from the standpoint of, not only what it is that we developed in terms of evidence, [but also] lessons to be learned from the conduct that was uncovered and revealed."); Confr. Hr'g Tr., Aug. 16, 2021, at 83:20-22, 84:12-23 ("[I]it could be that the document repository is actually the most valuable piece of this settlement.")). The public document repository will be hosted by an academic institution or library and will include more than 13,000,000 documents (consisting of more than 100,000,000 pages) produced in the chapter 11 case and tens of millions of additional documents, including certain documents currently subject to the attorney client privilege that would not have been produced in litigation. (Bankr. Dkt. No. 3440, at ¶ 7.) The Plan ensures that scholars and the public can have access to all of these materials.

Purdue Pharma Will Cease to Exist. Under the Plan, Purdue Pharma will cease to exist. Its current business operating assets will be transferred to and operated by a new entity, known as "NewCo" in the Plan (Plan, at 28), but to be named KNOA. (Oral Arg. Tr., Nov. 30, 2021, at 158:1-17). NewCo will be governed by a board of five or seven disinterested and independent managers initially selected by the AHC and the MSGE, in consultation with the Debtors and UCC,

subject to a right of observation by the DOJ. (Plan, at §5.4). NewCo will manufacture products, including Betadine, Denokot, Colace, magnesium products, opioids and opioid-abatement medications, and oncology therapies. (*See* Oral Arg. Tr., Nov. 30, 2021, at 157:19-159:23). Additionally, NewCo will continue the Debtors' development of opioid overdose reversal and addiction treatment medications, and it must deliver millions of doses of those medications at low or no cost when development is complete (these will be distributed to groups or entities to be determined post-emergence). (*Id.* at 159:19-160:7). NewCo will be subject to an "Operating Injunction" that prohibits it from, among other things, promoting opioid products and providing financial incentives to its sales and marketing employees that are "directly" (but not indirectly) based on sales volumes or sales quotas for opioid products. (Bankr. Dkt. No. 3456, at ¶10). It also is subject to "Governance Covenants" that ensure that NewCo provides all its products in a "safe manner," complies with settlement obligations, pursues public health initiatives, and follows pharmaceutical best practices. (*Id.* at ¶11). The Plan provides for the appointment of a monitor to ensure that NewCo complies with the Operating Injunction and Governance Covenants; the monitor will provide the public with regular updates and seek relief from the Bankruptcy Court to the extent necessary to carry out the monitor's obligations. (*Id.* at ¶13). Above all, NewCo is not intended to operate indefinitely: The Plan instruct the managers to use reasonable best efforts to sell the assets of NewCo by December 21, 2024. (*Id.* at ¶15).

Shareholder Settlement Agreement. The Plan incorporates the "Shareholder Settlement Agreement" and the transactions contemplated therein whereby, in exchange for the release of third-party claims against over 1,000 individuals and entities related to the Sackler family ("Shareholder Released Parties"), the Sackler family will give $4.275 billion toward the Purdue estate. (Plan, at 37; Dkt. No. 91-3, at App.1042, 1045-1046, 1050).

Section 10.7(b) of the Plan sets out the terms of the release that the Sacklers, from the inception of the bankruptcy and earlier, insisted on in exchange for contributing funds to Purdue's estate. The Plan "releases and discharges" certain claims that third parties (including states and personal injury claimants) have asserted or might in the future assert against the Shareholder Released Parties. The release of claims against the Shareholder Released Parties permanently enjoins third parties from pursuing their current claims against the Shareholder Released Parties and precludes the commencement of future litigation against any of the Sacklers and their related entities, as long as (i) those claims are "based on or related to the Debtors, their estates, or the chapter 11 cases," and (ii) the "conduct, omission or liability of any Debtor or any Estate is the legal cause or is otherwise a legally relevant factor." (Plan § 10.7(b)). The third-party releases under the Plan are non-consensual; they bind the objecting parties as well as the parties who consented. All present and potential claims connected with OxyContin and other opioids would be covered by the Section 10.7 Shareholder Release.

<u>Channeling Injunction</u>. Under the Plan, all enjoined claims against the Debtors and those against the Shareholder Released Parties are to be channeled to the nine creditor trusts for treatment according to the trust documents of each respective trust ("Channeling Injunction"). (Plan, at p. 10 and § 10.8). However – as the U.S. Trustee points out, and the Debtors do not contest (*see* Dkt. No. 91, at 19-20; Dkt. No. 151, at 23-24) – the claims against the Shareholder Released Parties are effectively being extinguished for nothing, even though they are described as being "channeled." (*See e.g.*, Oral Arg. Tr., Nov. 30, 2021, at 37:9-14; 29:16-17). The U.S. Trustee explains that the Plan documents expressly prohibit value being paid based on causes of action (whether pre-or post-petition) against the Sackler family or other non-debtors for opioid-related claims. (Dkt. No. 91, at 19-20; *see, e.g.*, Dkt. No. 91-2, at App.333 ("Distributions hereunder are determined only

with consideration to a Non-NAS PI Claim held against the Debtors, *and not to any associated Non-NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added); *id.* at App.392 ("Distributions hereunder are determined only with consideration to an NAS PI Claim held against the Debtors, *and not to any associated NAS PI Channeled Claim against a non-Debtor party*.") (emphasis added); *id.* at App.433 ("A Future PI Claimant may not pursue litigation against the PI Futures Trust for any Future PI Channeled Claim *formerly held or that would have been held against a non-Debtor party*.") (emphasis added)). And to assert any third-party claim against the trust, the claimant must have filed a proof of claim in the bankruptcy prior to the bar dates, but each of the bar dates passed by the time anyone was notified of the claims' extinguishment. (Dkt. No. 91, at 20). And to get an exception for an untimely filing, a party must proceed through multiple steps, after which the Bankruptcy Court – which serves as a gatekeeper – determines, in its discretion, that the untimely claim qualified under the Plan and granted leave to assert the claim. (*Id.*).

Debtors sidestepped the Plan's effective extinguishment of purportedly channeled third-party claims in its brief by not addressing the U.S. Trustee's points; they made no effort to clarify this in oral argument for the Court. (*See* Dkt. No. 151, at 23-27).

## XI. Objections to the Plan

On June 3, 2021, the Bankruptcy Court approved Purdue's disclosure statement. (*See* Bankr. Dkt., No. 2988).

On July 19, 2021, the U.S. Trustee objected to confirmation of the Plan, arguing that the Section 10.7 Shareholder Release was unconstitutional, violates the Bankruptcy Code, and is inconsistent with Second Circuit law. (*See* Bankr. Dkt. No. 3256). Eight states – California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Washington, Vermont – and D.C. all

filed objections, as did the City of Seattle, four Canadian municipalities, two Canadian First Nations and three *pro se* plaintiffs. (Bankr. Dkt. No. 3787, at 28; *see also* Bankr. Dkt. No. 3594). The U.S. Attorney's Office for this District on behalf of the United States of America filed a statement of interest supporting these objections to the Section 10.7 Shareholder Release. (*See* Bankr. Dkt. No. 3268).

The objectors argued, *inter alia* and as applicable to them, that the Section 10.7 Shareholder Release (1) violates the third-party claimants' rights to due process, (2) violates the objecting states' sovereignty and police power, (3) is not permitted under the Bankruptcy Code, and (4) the Bankruptcy Court lacks constitutional, statutory, and equitable authority to approve the Section 10.7 Shareholder Release.

## XII. Judge Drain's Decision to Confirm the Plan

Judge Drain's opinion is a judicial *tour de force* – delivered from the bench only days after the end of a lengthy trial, it included extensive findings of fact and addressed every conceivable legal argument in great detail. Sixteen days later, on September 17, the learned bankruptcy judge filed a written version of that oral decision, running to 54 pages on Westlaw, which is the version summarized here. *See In re Purdue Pharma L.P.*, –– B.R. ––, 2021 WL 4240974 (Bankr. S.D.N.Y. Sept. 17, 2021).

Judge Drain began by describing the highly unusual and complex nature of the situation before him – a "massive public health crisis," with a potential creditor body that included "every person in the range of the Debtors' opioid products sold throughout the United States" – individuals, local, state and territorial governments, Indian tribes, hospitals, first responders, and the United States itself. *Id.* at *1. He noted that over 618,000 claims, in an amount exceeding two trillion dollars, had been filed in the bankruptcy. And he commended the parties for working in "unique and trailblazing ways to address the public health crisis that underlies those claims." *Id.*

In his opening remarks, Judge Drain also addressed the elephant in the room:

> These cases are complex also because the Debtors' assets include enormous claims against their controlling shareholders, and in some instances directors and officers, who are members of the Sackler family, whose aggregate net worth, though greater than the Debtors', also may well be insufficient to satisfy the Debtors' claims against them and other very closely related claims that are separately asserted by third parties who are also creditors of the Debtors.

*Id.*

Judge Drain then announced the ultimate result:

First, he concluded that there existed no other reasonably conceivable means to achieve the result that would be accomplished by the Plan in addressing the problems presented by this case. Second, he found that well-established precedent – which he described as "Congress in the Bankruptcy Code and the courts interpreting it" – authorized him to confirm the Plan. *Id.* Insofar as is relevant to this appeal,[41] Judge Drain reached the following conclusions.

### A.  *The Section 10.7 Shareholder Release and Settlement with the Sacklers*

The meat of this case, both before Judge Drain and on this appeal, is the Bankruptcy Court's approval of the broad releases that the Plan affords to all members of the Sackler family and to their related entities, including businesses and trusts.

The Plan includes two settlements with every member of the Sackler family – whether or not that individual had anything to do with the management of Purdue or personally exercised any control over Purdue – and with a variety of entities related to the Sacklers, including various trusts,

---

[41] Many issues addressed by Judge Drain in his comprehensive opinion are not implicated by any of the appeals to this Court, and so will not be addressed in this decision. These include: objections from insurers that the Plan was not insurance neutral; from the U.S. Trustee to the Plan's treatment of certain attorney fees and expenses; to objections by certain prisoners who filed claims but challenged the sufficiency of notice and what they perceived as a compromising of their rights under the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A; objections by certain states to their classification in the same voting class as their political subdivisions; an objection by the State of West Virginia to the allocation plan for states from the NOAT; and objections by certain Pro Se Appellants to the Plan's release of the Sacklers from criminal liability (it does not).

businesses, and IACs. Taken together these individuals and entities (not all of whom have been or apparently can be identified) are known as the "Shareholder Released Parties." *Id.* at *24.

The first settlement disposed of claims that the Debtors could assert against the Shareholder Released Parties for the benefit its creditors. *Id.* These included claims for (1) breach of fiduciary duty against those members of the Sackler family who were involved in – indeed, who drove – the business decisions that were the basis for Purdue's criminal and civil liability, and (2) fraudulent conveyance arising out of the Sackler family's removal of nearly $11 billion from the Debtor corporations over the course of a decade. *See id.* at *31-32.

The second settlement disposed of certain third-party claims that could not be asserted by the Debtors against the Shareholder Released Parties, but were particularized to others. Chief among these claims are claims asserted by the states – both the consenting states and the objecting states – arising under various unfair trade practices and consumer protection laws that make officers, directors and managers who are responsible for corporate misconduct personally liable for their actions. Judge Drain did not review on a state-by-state basis the various state laws applicable to these objector claims, including laws that might forbid insurance coverage or indemnification and contribution claims by those individuals, such that their personal assets are very much at risk. *Id.* at *48.

In exchange for these releases, the Shareholder Released Parties agreed to contribute $4.325 billion to a fund that would be used to resolve both public and private civil claims as well as both civil and criminal settlements with the federal government. *Id.* at *25. The Sacklers also agreed to the dedication of two charities worth at least $175 million for abatement purposes; to a resolution that barred them from insisting on naming rights in exchange for charitable contributions; to refrain from engaging in any business with NewCo and to dispose of their interest

in the non-U.S. Purdue entities within seven years; to certain "snap back" provisions that were designed to ensure the collectability of their settlement payments; and to the creation of an extensive document repository that would archive in a comprehensive manner the history of the Debtors and their involvement in the development, production and sale of opioids. *Id.*

Judge Drain made three fundamental findings relating to these settlements: that the Sackler Settlements were necessary to the Plan; that they were fair and reasonable; and that it was necessary and appropriate for him to approve the non-consensual release of certain third-party claims against the Sacklers, even though they are not debtors.

### B.  *The Sackler Settlements Were Necessary*

Judge Drain concluded that these settlements were necessary to the Plan. He noted that a variety of other settlements that were essential components of the Plan – including agreed-upon allocations of the pot of money to be created by the Debtors' estate and the Sackler contribution – would unravel for lack of funding if the Sacklers did not make their $4.325 billion contribution. And he found that they would not make that contribution unless they obtained broad releases from past and future liability. *Id.* at *46-47.

### 1.   The Sackler Settlements Were Fair and Reasonable in Amount

Judge Drain evaluated the fairness of the settlement in light of the factors laid out by the Second Circuit in *Motorola Inc. v. Official Committee of Unsecured Creditors & JP Morgan Chase Bank, N.A. (In re Iridium Operating LLC),* 478 F. 3d 452, 464-66 (2d Cir. 2007), which is controlling law in this Circuit on the questions. He made the following findings:[42]

(a)     The Sackler settlements were the product of arms-length bargaining conducted by able counsel in two separate mediations presided over by three outstanding mediators and preceded

---

[42] Judge Drain considered all of the *Iridium* factors, but not in the order in which they are discussed in *Iridium*. I employ Judge Drain's framework in this decision.

by what he described as the "most extensive discovery process not only I have seen after practicing bankruptcy law since 1984 and being on the bench since 2002, but I believe any court in bankruptcy has ever seen." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *26-27. That process led to the production of almost 100 million pages of documents, through which all interested parties could learn "anything suggesting a claim against the shareholder released parties." *Id.*

(b)     The settlements were negotiated by exceedingly competent counsel who were, as a result of the discovery process described above, well-informed about both the claims they might bring against the Shareholder Released Parties and the difficulties they would have in pursuing those claims. *Id.* at *27-28.

(c)     Purdue's creditors overwhelmingly supported the settlement. *Id.* at *28. Some 120,000 votes were cast on the Plan – a number far exceeding the voting in any other bankruptcy case. *Id.* at *3. Over 95% of those voting in the aggregate favored the Plan: over 79% of the states and territories supported the Plan; over 96% of other governmental entities and tribes; and over 96% of the personal injury claimants; together with a supermajority of all other claimants. *Id.* at *28.

(d)     The failure to approve the settlement was likely to result in complex and protracted litigation, with attendant cost and delay, while the settlement offered significant and immediate benefits to the estate and its creditors. *Id.* at *28-29.

(e)     Judge Drain focused particularly on the difficulty of collecting any judgments that might be obtained against the Sacklers. *Id.* at *29. Ordinarily this factor would rest on things like the paucity of assets available to satisfy judgments. But in this case the problems with collection were the result of what the Sacklers did with the money that they admittedly took out of the corporations between 2008-2016. The assets of family members are held principally in purportedly

spendthrift trusts located in the United States and offshore – many of them on the Bailiwick of Jersey – and many of those assets cannot readily be liquidated. As Judge Drain correctly observed, spendthrift trusts can and often do insulate assets from the bankruptcy process. And while generally applicable law governing U.S. trusts allows those trusts to be invaded when they are funded by fraudulent conveyances, there is a substantial question whether the same is true under Jersey law. Additionally, he noted that many Sackler family members live abroad, raising a barrier to an American court's acquiring personal jurisdiction over them. Although the learned bankruptcy judge did not reach any final conclusion about these complicated issues, he readily drew the conclusion that collectability presented a significant concern, one that was obviated by the settlement.

(f)       Judge Drain also noted that the cost and delay attendant to the pursuit of the Sacklers – which was in and of itself substantial – would be compounded by the unraveling of the other settlements that were baked into the Plan. Judge Drain concluded that the unraveling of the Plan would inevitably result in the liquidation of Debtors under Chapter 7, which would in turn lead to no recovery for the unsecured creditors (including the personal injury plaintiffs), and no money for any abatement programs. *Id.* at *30. This conclusion was reinforced by the fact that, absent confirmation of the Plan, the United States would have a superpriority administrative expense claim in an amount ($2 billion) that would wipe out the value of Purdue's business as a going concern ($1.8 billion). *Id.* at *16.

(g)       Finally, Judge Drain considered the legal risks of the estates' pursuit of claims against the Sacklers against the benefits of settlement. *Id.* at *31-33.

Judge Drain first chronicled the problems Purdue would have in proving that the admitted conveyances qualified as fraudulent. He noted that over 40% of the purportedly avoidable transfers

were used to pay federal and states taxes associated with Purdue, none of which was going to be refunded. *Id.* at *31. He identified various technical defenses that the Sacklers could assert to fraudulent conveyance claims, including statutes of limitations and the impact of prior settlements. *Id.* at *32. And while admitting that at least some of the Sacklers appeared to have been very much aware of the risk of opioid litigation to Purdue's solvency and their own, he also pointed to evidence that Purdue may not have been "insolvent, unable to pay its debts when due, or left with unreasonably small capital" – which would be necessary to make a conveyance fraudulent – until as late as 2017 or 2018, by which time most or all of the conveyances had been made. *Id.*

As for alter ego, veil-piercing and breach of fiduciary duty claims, Judge Drain noted that most of the Sackler family members had nothing to do with Purdue's operations, and that no one had identified any action taken by any of them in their capacity as passive shareholders that would make them liable on such claims. *Id.* He also identified the extensive government oversight of Purdue after its 2007 Plea Agreement and Settlement with the federal government and certain states, and the fact that neither DHHS nor various state reviews ever identified any improper actions. *Id.* at *33.[43]

Judge Drain made no findings about the actual merit of any of the estates' claims against any member of the Sackler family. But weighing these difficulties against the benefits that would be derived from the settlement, he concluded:

> I believe that in a vacuum the ultimate judgments that could be achieved on the estates' claims . . . might well be higher than the amount that the Sacklers are contributing. But I do not believe that recoveries on such judgments would be higher after taking into account the catastrophic effects on recoveries that would result from pursuing those claims and unravelling the plan's intricate settlements. And as I said at the beginning of this analysis, there is also the serious issue of

---

[43] Given Purdue's admissions in connection with its 2020 Plea Agreement, this Court cannot assign much weight to the "oversight" factor.

problems that would be faced in collection that the plan settlements materially reduce.

*Id.*

Judge Drain ended his discussion of the *Iridium* factors with a deeply personal reflection – dare I say, a *cri de coeur* – that is perfectly understandable coming from one who had labored so long and so hard to try to achieve a better result. Admitting that he had "expected a higher settlement," he said:

> This is a bitter result. B-I-T-T-E-R. It is incredibly frustrating that the law recognizes, albeit with some exceptions, although fairly narrow ones, the enforceability of spendthrift trusts. It is incredibly frustrating that people can send their money offshore in a way that might frustrate U.S. law. It is frustrating, although a long-established principle of U.S. law, that it is so difficult to hold board members and controlling shareholders liable for their corporation's conduct.
>
> It is incredibly frustrating that the vast size of the claims against the Debtors and the vast number of claimants creates the need for this plan's intricate settlements. But those things are all facts that anyone who is a fiduciary for the creditor body would have to recognize, and that I recognize.

*Id.*

Ultimately, however, the learned bankruptcy judge decided that the perfect was the enemy of the good:

> I am not prepared, given the record before me, to risk [the parties'] agreement. I do not have the ability to impose what I would like on the parties.

*Id.* at *34. And so, albeit with obvious reluctance, he concluded that the settlement was reasonable as that term is understood at law.

### 2.   The Section 10.7 Shareholder Release Was In all Respects Legal

Having concluded that the settlements were fair and reasonable in amount, Judge Drain went on to address a number of challenges to his legal authority to impose the most controversial

element of those settlements: The Section 10.7 Shareholder Release. *Id.* at *35. He rejected each such challenge.

**Subject matter jurisdiction.** First, Judge Drain concluded that he had subject matter jurisdiction to impose the third-party releases and injunctions. Citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-08 (1995) and *SPV OSUS, Ltd. v. UBS AG*, 882 F. 3d 333, 339-40 (2d Cir. 2018), he held that he had the undoubted power to enjoin the claims of third parties that had "any conceivable effect" on the Debtors' estates as part of a Bankruptcy Court's "related to" jurisdiction, conferred by Congress in 28 U.S.C. § 1334(b). *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *36-38. He concluded that the third-party claims covered by the Section 10.7 Shareholder Release would directly affect the *res* of the Debtors' estates in three different ways: insurance rights, the Shareholder Released Parties' right to indemnification and contribution, and the Debtors' ability to pursue its own overlapping claims against the Sacklers. He concluded by saying, "Depending on the kinds of third-party claims covered by a plan's release and injunction of such claims, *I conclude, therefore, that the Court has jurisdiction to impose such relief, based upon the effect of the claims on the estate rather than on whether the claims are 'derivative . . .'*" *Id.* at *38 (emphasis added).

**Due process.** Next, Judge Drain concluded that the Section 10.7 Shareholder Release did not violate the third-party claimants' right to due process. *Id.* at *38-39. He rejected the argument that a release constitutes a *de facto* adjudication of the claim, holding that such a release "is part of the settlement of the claim that channels settlement funds to the estate." *Id.* at 38. And he held that claimants had been provided with constitutionally sufficient notice of the proposed releases. Uncontroverted testimony that Judge Drain found credible established that messages tailored to reach persons who may have been harmed by Debtors' products had reached roughly 98% of the

adult population of the United States and 86% of the adult population of Canada, with supplemental notice reaching an estimated 87% of all U.S. adults and 82% of Canadian adults, as well as audiences in 39 countries, with billions of hits on the internet and social media in addition to notice delivered by TV, radio, publications, billboards and outreach to victim advocate and abatement-centered groups. While references contained in the notices sent readers to complex lawyerly descriptions of the release provisions, the notices themselves were written in plain English and specifically mentioned that the Plan contemplated a broad release of civil (not criminal) claims against the members of the Sackler family and related entities.

**Constitutional authority.** Judge Drain next concluded that he had constitutional power to issue a final order confirming a plan that contains a third-party claims release. *Id.* at *40. He determined that a proceeding to determine whether a chapter 11 plan containing such a release was a "core" proceeding, so ordering the non-debtor releases and enjoining the prosecution of third-party claims against non-the Sacklers qualified as "constitutionally core" under *Stern v. Marshall*, 546 U.S. 462 (2011) and its progeny.

**Statutory authority.** Finally, Judge Drain concluded that he had statutory power to confirm and enter the third-party releases. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *40-43. He started from the proposition that the Second Circuit, in *Deutsche Bank A.G. v. Metromedia Fiber Network, Inc., (In re Metromedia Fiber Network, Inc.)*, 416 F. 3d 136, 141 (2d Cir. 2005), had indicated that non-consensual third-party releases of claims against non-debtors could be approved, albeit only in "appropriate, narrow circumstances." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *40. He noted that most of the Circuits were of that view and rejected the reasoning of those courts of appeal that held otherwise. Indeed, he asserted that the view of those Circuits (the Fifth, Ninth, and Tenth Circuits) – which is that Section 524(e) of the Bankruptcy

Code precluded the grant of any such release in the context of a settlement – "has been effectively refuted." *Id.* at *41. He analogized the enjoining of third-party claims against non-debtors to his undoubted power to impose a preliminary injunction against the temporary prosecution of third-party claims in order to facilitate the reorganization process. And he asked rhetorically why such a stay could not become permanent if it was crucial to a reorganization process involving massive numbers of overlapping estate and third-party claims. *Id.* at *42.

Having concluded that Section 524(e) was not a statutory impediment to a Bankruptcy Court's approval of third-party releases, the Bankruptcy Judge then addressed the question of exactly what provision or provisions in the Bankruptcy Code conferred the necessary authority over claims against non-debtors on him. *Id.* at *42-43. He found such authority in the "necessary or appropriate" power in Section 105(a) of the Bankruptcy Code coupled with Section 1123(b)(6)'s grant of power to "include any other appropriate provision not inconsistent with the applicable provisions of this title" – what the Seventh Circuit referred to in *In re Airadigm Communications, Inc.*, 519 F. 3d 640, 657 (7th Cir. 2008) as a bankruptcy court's "residual authority." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *43. He also cited Sections 1123(b)(5) and 1129 of the Bankruptcy Code.

Judge Drain carefully noted that the release in this case extended beyond so-called "derivative" claims – claims that the Debtors could bring against the Sacklers– which claims could assuredly be released by a bankruptcy court exercising *in rem* jurisdiction over the *res* of the estate. But he concluded – largely in reliance on *In re Quigley Co., Inc.*, 676 F.3d 45, 59-60 (2d Cir. 2012) – that he had statutory authority to authorize the release of non-derivative – direct or particularized – claims, because the third party claims to be released in this case were "premised as a legal matter on a meaningful overlap with the debtor's conduct." *In re Purdue Pharma L.P.*, 2021 WL 4240974,

at *43-47. Such a claim – one that "essentially dovetail[s] with the facts of the claimants' third-party claims against the Debtors" – was, in Judge Drain's view, "sufficiently close to the claims against the debtor to be subject to settlement under the debtor's plan if enough other considerations support the settlement." *Id*. at *45-46.

As noted above, Judge Drain did insist that the Section 10.7 Shareholder Release be modified so that it covered only third-party claims in which "a Debtor's conduct, or a claim asserted against the Debtor, must be a legal cause of the released claim, or a legally relevant factor to the third-party cause of action against the shareholder released party." *Id.* at *45. In other words, he insisted that there be substantial factual overlap between the released particularized claims and the derivative claims that no one disputes he had the power to release, such that the released non-derivative claims were "sufficiently close to the claims against the debtor."

*Metromedia* **analysis.** Having disposed of all constitutional, jurisdictional, and statutory challenges to his authority to enter the Section 10.7 Shareholder Release (as modified), Judge Drain turned finally to whether this was the "unique" case in which it would be was appropriate to impose them. *Id.* at *46. He concluded that it was.

In this regard, he reviewed the law in the various circuits on the subject, viewing with special interest the Third Circuit's conclusion that:

> "To grant non-consensual releases a court must assess 'fairness, necessity to the reorganization' and make specific actual findings to support these conclusions." *In re Cont'l Airlines*, 203 F. 3d 203, 214 (3d Cir. 2001). Relevant consideration might include whether the non-consensual release is necessary to the success of the reorganization; whether the releasees have provided a critical financial contribution to the debtor's plan and whether that financial contribution is necessary to make the plan feasible; and whether the non-consenting creditors received reasonable compensation in exchange for the release, such that the release is fair." *In re Spansion, Inc.,* 426 B.R. 114, 144 (Bankr. D. Del 2010).

*In re Purdue Pharma L.P.*, 2021 WL 4240974, at *46.

Judge Drain also cited with approval the Seventh Circuit's practice of engaging in a fact-based inquiry into such matters as whether the release is "narrowly tailored, not blanket" (unlike the Section 10.7 Shareholder Release, which releases all types of conduct, including fraud and willful misconduct); whether the release is an essential component of the plan; and whether it was achieved by the exchange of good and valuable consideration that will enable unsecured creditors to realize distributions (which is in fact going to happen in this case). *Id.* at *47.

Judge Drain also noted that the Fourth, Sixth and Eleventh Circuits apply a multi-factor test in deciding when it is appropriate to impose a non-consensual release of third-party claims. (*Id.* at *46).

Then, while recognizing that "this is not a matter of factors or prongs" (*id.* citing *Metromedia*, 416 F. 3d at 142), Judge Drain made a long list of findings about why this was the "rare" and "unique" case in which a nonconsensual third-party claims release was appropriate. *Id.* at *46-49. These include the following: (i) the Purdue bankruptcy was exceedingly complex; (ii) the Plan has overwhelming creditor support; (iii) without the Sackler payment the settlements would unravel; (iv) while not every Sackler would be making a specific payment toward the settlement,[44] the aggregate settlement payment hinged on each member of the family's being released; (v) the settlement amount was substantial; (vi) the release "is narrowly tailored;"[45] (vii) the settlement was fundamentally fair to the third parties; and (viii) for the reasons discussed at length *supra*, Background Section XII(B)(1), the cost and likelihood of success on the third party

---

[44] It is actually not clear what members of the Sackler family are contributing to the settlement and in what amounts. The record contains some suggestion that the various trusts that are contributing are for the benefit of all members of the family.

[45] Judge Drain did not explain what he meant by that, except to say that the release would be further narrowed so that it was limited in the manner discussed above. I assume that he meant that the release was limited to claims involving the Debtor's conduct, and claims in which the Debtor's conduct is "a legal cause of the released claim, or a legally relevant factor to the third-party cause of action." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *45.

claims against the Sacklers – including both the merits and the impediments to collection of any judgment – was outweighed by the immediate and definite benefits of the settlement.

**"Best interests" analysis.** Section 1129 of the Bankruptcy Code requires that a plan of reorganization may be confirmed only if a litany of requirements is met. One such requirement is found in Subsection (a)(7) of Section 1129, which provides that, for any impaired creditor or class of creditors, if all members of the class do not approve the plan, each member of the class "will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *50.

Judge Drain applied this so-called "best interests" test to conclude that the holders of claims against non-debtor third parties would receive, on account of the Plan (and taking into account their claims against the Debtors as well as the third parties), materially more than they would receive in a hypothetical chapter 7 liquidation.[46] *Id.* at *50-51.

**State police powers.** Judge Drain concluded that his ordering of the non-debtor releases did not violate state sovereignty or any state police power. *Id.* at *51-53. He concluded that actions exempted from the automatic stay by virtue of Section 362(b)(4) were nonetheless subject to court-ordered (*i.e.*, not automatic) injunctive relief, and that Congress' express power under the bankruptcy clause of the Constitution to enact uniform bankruptcy laws overrode any state regulatory or sovereignty argument.

---

[46] Judge Drain also argued that the best interest test under section 1129(a)(7) requires that the amount that an objecting creditor stands to receive under the plan on account of its claim be at least as much it would receive if the debtor were liquidated under chapter 7. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *50. Thus, he concluded, the best interest test does not require analysis of the claimant's rights against third parties. *Id.* He acknowledged that his reading of the statute was at odds with at least two of his colleagues' reading of the same statute. I mention this fact but it has nothing to do with the ultimate decision on this appeal.

**The classification of the Canadians**. Finally, Judge Drain addressed whether that the Canadian creditor's classification as Class 11(c) creditors, rather than as Class 4 and 5 creditors, was impermissible. Certain Canadian creditor groups objected to the confirmation of the Plan, arguing that they should be classified with the U.S. unsecured creditor groups in Classes 4 and 5 to participate in the opioid abatement trusts created under the Plan for those classes, rather than receiving their pro rata share of the cash payment to Class 11(c). But Judge Drain concluded that, because there were legitimate reasons for separately classifying the Canadian unsecured creditors from there domestic counterparts, the classification was perfectly permissible. First, the Canadian creditors operate under "different regulatory regimes . . . with regard to opioids and abatement" than their domestic counterparts. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *12. And second, "the allocation mediation conducted by Messrs. Feinberg and Phillips that resulted in the plan's division of the Debtors' assets . . . involved only *U.S.-based* public claimants with their own regulatory interests and characteristics." *Id.* (emphasis added).

## XIII.    The Appeal

The U.S. Trustee, eight states,[47] D.C., certain Canadian municipalities and First Nation groups,[48] and five *pro se* individuals[49] filed notices of appeal of Judge Drain's Confirmation Order in September 2021. (*See* Bankr. Dkt. No. 3724 (amended by Dkt. No. 3812), 3725, 3774 (amended by 3949), 3775 (amended by 3948), 3776 (amended by 3799), 3780 (amended by Dkt. No. 3839), 3784 (amended by Dkt. No. 3818), 3810, 3813, 3832, 3849, 3851, 3853, 3877, 3878). The U.S. Trustee also appealed the Advance Order (Bankr. Dkt. No. 3777) and the Disclosure Order (Dkt.

---

[47] California, Connecticut, Delaware, Maryland, Oregon, Rhode Island, Vermont, and Washington.

[48] The City of Grande Prairie as Representative for a Class Consisting of All Canadian Municipalities, the Cities of Brantford, Grand Prairie, Lethbridge, and Wetaskiwin; the Peter Ballantyne Cree Nation on behalf of All Canadian First Nations and Metis People and on behalf itself and the Lac La Ronge Indian Band.

[49] Ronald Bass, Marie Ecke, Andrew Ecke, Richard Ecke, and Ellen Isaacs on Behalf of Patrick Ryan Wroblewski.

No. 3776).

Among those who did not appeal the Plan were the UCC, the ACH, MSGE, the PI Ad Hoc Group, and other creditors supporting the Plan.

## ISSUES ON APPEAL AND CONCLUSIONS OF LAW

This Court's answers to the questions that are being decided on appeal are summarized as follows:

1. Does the Bankruptcy Court have subject matter jurisdiction to impose a release of non-debtor claims?

Yes. Under the law of this Circuit, as most recently set forth in *SPV OSUS Ltd. v. UBS*, 882 F.3d 333 (2d Cir. 2018), the Bankruptcy Court has broad "related to" jurisdiction over any civil proceedings that "might have any conceivable effect" on the estate. *Id.* 339-340. Because the civil proceedings asserted against the non-debtor Sackler family members *might have* a conceivable impact on the estate, the Bankruptcy Court has subject matter jurisdiction to approve the Section 10.7 Shareholder Release and release the claims against the non-debtor Shareholder Released Parties.

2. Does the Bankruptcy Court have statutory authority to approve the non-debtor releases?

No. The Bankruptcy Code does not authorize a bankruptcy court to order the non-consensual release of third-party claims against non-debtors in connection with the confirmation of a chapter 11 bankruptcy plan. The Confirmation Order fails to identify any provision of the Bankruptcy Code that provides such authority. Contrary to the bankruptcy judge's conclusion, Sections 105(a) and 1123(a)(5) & (b)(6), whether read individually or together, do not provide a bankruptcy court with such authority; and there is no such thing as "equitable authority" or "residual authority" in a bankruptcy court untethered to some specific, substantive grant of authority in the Bankruptcy Code. Second Circuit law is not to the contrary; indeed, the Second

Circuit has not yet taken a position on this question.

3. <u>Did the Bankruptcy Court fail to provide equal treatment between the Canadian Appellants and their domestic unsecured creditor counterparts?</u>

No. Under the Plan, the Canadian Appellants belong to a different class than their domestic, unsecured creditor "counterparts" – the non-federal governmental claimants and tribe claimants – but legitimate reasons are proffered for that differentiation. The Code does not require that all creditor classes be treated the same – only that there be a reasonable basis for any differentiation between classes. *See Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 482-83 (2d Cir. 1994). Here, Judge Drain identified a reasonable basis for differentiating between the Canadian Appellants and the non-federal governmental claimants and tribe claimants. The Plan's classification of the Canadian Appellants thus does not violate the Bankruptcy Code.

It is not necessary to reach any of the other issues that were briefed. The issues identified above are dispositive of all the appeals that have been filed.[50] Nor is it necessary to reach either the various constitutional challenges to the Section 10.7 Shareholder Release (lack of due process, infringement on state police powers), or to decide whether, if there were no other legal impediment to approving the Section 10.7 Shareholder Release, it should be approved on the facts of this particular case.

## STANDARD OF REVIEW

The Court has jurisdiction to hear bankruptcy appeals pursuant to 28 U.S.C. § 158(a). "Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings

---

[50] Beyond the above issues, (1) the State Appellants asserts a further issue that the bankruptcy court improperly applied the best interest of creditors test; (2) the Canadian Appellants assert that the Bankruptcy Court does not have personal jurisdiction over their claims, and that the bankruptcy court's approval of the release violated their foreign sovereign immunity and the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 et seq.; and (3) the U.S. Trustee also asserts that the Bankruptcy Court erred by approving the Debtors' disclosure statement and plan solicitation materials and by authorizing the Debtors to advance funds under Advance Order.

for clear error and its conclusions of law *de novo*." *In re Charter Commc'ns, Inc.*, 691 F.3d 476, 482-83 (2d Cir. 2012) (citing Fed. R. Bankr. P. 8013). Conclusions of law reviewed *de novo* include "rulings as to the bankruptcy court's jurisdiction" and "interpretations of the Constitution." *In re Motors Liquidation Co.*, 829 F.3d 135, 152, 158 (2d Cir. 2016). As to findings of fact, the "clear error standard is a deferential one." *Id.* at 158. A finding of fact is clearly erroneous only if this Court is "left with the definite and firm conviction that a mistake has been committed." *In re Lehman Bros. 3 Holdings Inc.*, 855 F.3d 459, 469 (2d Cir. 2017).

The standard of review of findings of act is far less deferential if a bankruptcy court is presented with something it cannot adjudicate to final judgment as a constitutional matter unless the parties consent. *Stern v. Marshall*, 564 U.S. 462 (2011). In such a circumstance, a bankruptcy judge has authority only to "hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for *de novo* review and entry of judgment." *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34-36 (2014). In that case, the findings of fact are reviewed *de novo* as well. If a bankruptcy court issues a final order in the mistaken belief that it has constitutional authority to do so, the district court can treat a bankruptcy court's order as a report and recommendation, but it "must review the proceeding *de novo* and enter final judgment." *Id.* at 34.

In this case, the Bankruptcy Court concluded that it had constitutional authority under *Stern* to enter a final order granting the release, because the issue arose in the context of confirming a plan of reorganization – the most "core" of bankruptcy proceedings. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *40. Appellants urge that Judge Drain misreads *Stern* and argue that he lacked authority to give final approval to those releases, even though they were incorporated into a plan of reorganization.

I agree with Appellants.

In 28 U.S.C. §157(a), Congress divided bankruptcy proceedings into three types: (1) those that "arise under" title 11; (2) those that "arise in" a title 11 case; (3) and those that are "related to" a title 11 case. Cases that "arise under" or "arise in" a title 11 matter are known as core bankruptcy proceedings, while "related to" proceedings are non-core. 28 U.S.C. § 157(b)(1)-(2)(C). Every proceeding pending before a bankruptcy court is either core or non-core.[51]

The core vs. non-core distinction is critical when assessing a bankruptcy court's constitutional authority to enter a final judgment disposing of that proceeding.[52] In particular, a bankruptcy court lacks the constitutional authority to enter a final judgment in a proceeding over which it has only "related to" subject matter jurisdiction unless all parties consent. Any doubt on that score was put to rest by the United States Supreme Court in *Stern v. Marshall*, 564 U.S. 462 (2011). In that case, the Supreme Court held that a bankruptcy court lacked constitutional power to adjudicate and enter judgment on a counterclaim asserted by a debtor, Vickie Marshall (aka Anna Nicole Smith) in an adversary proceeding that a creditor (her stepson) had filed against her. The counterclaim (for tortious interference with an *inter vivos* gift from the debtor Marshall's late husband, who was also the creditor's father) did not arise under title 11, nor did it arise in a title 11 case. Even though the claim was asserted in the context of a bankruptcy proceeding, it existed prior to and was independent of debtor Marshall's bankruptcy case.

The Supreme Court ruled that Congress could not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at common law, or in equity, or in admiralty." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 284 (1855). Because

---

[51] "Non-core" proceedings are interchangeably referred to as "related to" proceedings.

[52] The core/non-core distinction is also critically important when assessing the bankruptcy court's subject matter jurisdiction, a topic that will be taken in that section.

Marshall's counterclaim for tortious interference was just such a claim, it could only be adjudicated to final judgment by an Article III court; and Congress had no power to alter that simply because the counterclaim might have "some bearing on a bankruptcy case." *Stern,* 564 U.S. at 499.

In this case, the learned Bankruptcy Judge improperly elided his authority to confirm a plan of reorganization (indubitably a core function of a bankruptcy court) with his authority to finally dispose of claims that were non-consensually extinguished pursuant to that plan over which – as he himself recognized – he has only "related to" jurisdiction over the third-party claims against the non-debtor Sacklers. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *36-38. *Stern* itself illustrates that not every issue that is litigated under the umbrella of a core proceeding is, to use Judge Drain's phrase, "constitutionally core." The stepson-creditor's claim against Marshall's estate was properly litigated to judgment by the bankruptcy court in a claims allowance adversary proceeding – a core proceeding – but because the debtor's counterclaim was not a "core" claim, it could not be adjudicated to final judgment by the Bankruptcy Court, even though it would impact how much the creditor was ultimately owed.

Judge Drain reasoned that the non-consensual third-party releases that he was approving were "constitutionally core" under *Stern* because plan confirmation is a "fundamentally central aspect of a Chapter 11 case's adjustment of the debtor/creditor relationship." *Id.* at *40. But nothing in *Stern* or any other case suggests that a party otherwise entitled to have a matter adjudicated by an Article III court forfeits that constitutional right if the matter is disposed of as part of a plan of reorganization in bankruptcy. Were it otherwise, then parties could manufacture a bankruptcy court's *Stern* authority simply by inserting the resolution of some otherwise non-core matter into a plan.

The learned bankruptcy judge relied on the Third Circuit's recent decision in *In re Millennium Lab Holdings II, LLC*., 945 F.3d 126, 139 (3d Cir. 2019), *cert. denied sub nom. ISL Loan Tr. v. Millennium Lab Holdings II, LLC*, 140 S. Ct. 2805 (2020). In *Millennium*, the court, like Judge Drain in this case, concluded that the "operative proceeding" for purposes of *Stern* analysis was the confirmation proceeding, not the underlying third-party claim against a non-debtor that was being released pursuant to the plan. *In re Millennium Lab Holdings II, LLC*, 591 B.R. 559, 574 (D. Del. 2018), *aff'd sub nom. In re Millennium Lab Holdings II, LLC*., 945 F.3d 126 (3d Cir. 2019). The Third Circuit read *Stern* to allow a bankruptcy court to confirm a plan containing such releases "because the existence of the releases and injunctions" are "'integral to the restructuring of the debtor-creditor relationship.'" *Millennium Lab Holdings II, LLC*., 945 F.3d at 129 (quoting *Stern*, 564 U.S. at 497).

Perhaps they are, but that is beside the point. In *Stern*, the Supreme Court held that bankruptcy courts have the power to enter a final judgment only in proceedings that "stem[] from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 564 U.S. at 499. It did not say that a bankruptcy court could finally dispose of non-core proceedings as long as they were "integral to the restructuring of the debtor-creditor relationship." The counterclaim in the lawsuit between debtor Marshall and her stepson-creditor was integral to the restructuring of their debtor-creditor relationship, but it was not a core proceeding, so the bankruptcy court could not finally adjudicate it. The correct constitutional question, and the question on which the Bankruptcy Court should have focused in this case, is whether the third-party claims released and enjoined by the Bankruptcy Court either stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process – not whether the release and injunction are "integral to the restructuring of the debtor-creditor relationship."

The third-party claims at issue neither stem from Purdue's bankruptcy nor can they be resolved in the claims allowance process. Yet those claims are being finally disposed of pursuant to the Plan; they are being released and extinguished, without the claimants' consent and without any payment, and the claimants are being enjoined from prosecuting them. Debtors and their affiliated non-debtor parties cannot manufacture constitutional authority to resolve a non-core claim by the artifice of including a release of that claim in a plan of reorganization. As Bankruptcy Judge Bernstein made clear in *In re SunEdison, Inc*., 576 B.R. 453, 461 (Bankr. S.D.N.Y. 2017), "In assessing a court's jurisdiction to enjoin a third party dispute under a plan, the question is not whether the court has jurisdiction over the settlement that incorporates the third party release, but whether it has jurisdiction over the attempts to enjoin the creditors' unasserted claims against the third party." That proposition applies with equal force to a bankruptcy court's *Stern* authority.

Appellees' argument that *Stern* only limits a bankruptcy court's authority to *adjudicate* claims – not its authority to enter judgments that terminate claims without adjudicating them on the merits – is also flawed. As the U.S. Trustee correctly points out, *Stern's* holding is to the contrary: "The Bankruptcy Court in this case exercised the judicial power of the United States by *entering a final judgment* on a common law tort claim, even though the judges of such courts enjoy neither tenure during good behavior nor salary protection." *Stern*, 564 U.S. at 469 (emphasis added). A bankruptcy court's order extinguishing a non-core claim and enjoining its prosecution without an adjudication on the merits "finally determines" that claim. It is equivalent to entering a judgment dismissing the claim. It bars the claim under principles of former adjudication. Therefore, Congress may not allow a bankruptcy court to enter such an order absent the parties' consent – and consent is lacking here. *See Stern* at 484.

There really can be no dispute that the release of a claim "finally determines" that claim. It does so by extinguishing the claim, so that it cannot be adjudicated on the merits. A nonconsensual third-party release is essentially a final judgment against the claimant, in favor of the non-debtor, entered "without any hearing on the merits." *In re Aegean Marine Petroleum Network Inc.*, 599 B.R. 717, 725 (Bankr. S.D.N.Y. 2019) (citing *In re Digital Impact*, 223 B.R. 1, 13 n. 6 (Bankr. N.D. Okla. 1998)) (noting that a third-party release has "the effect of a judgment – a judgment against the claimant and in favor of the non-debtor, accomplished without due process."). The fact that the releases are being ordered in the overall context of a plan confirmation that "settles" many disputed matters (against the Debtors, not against non-debtors) does not alter this. The Appellants in this case do not want to settle their claims against the non-debtors – at least, not on the terms set forth in the Plan. This "settlement" is non-consensual – which means that, under *Stern*, a bankruptcy court cannot enter the order that finally disposes of their claims against those non-debtors.

Nor is there any doubt that the entry of an order releasing a claim has former adjudication effects, which is a key attribute of a final judgment. The Supreme Court has twice held that non-consensual third-party releases confirmed by final order are entitled to *res judicata* claim preclusion barring any subsequent action bringing a released claim: First in *Stoll v. Gottlieb*, 305 U.S. 165, 171 (1938), and again in *Travelers Indemnity Co. v. Bailey*, 557 U.S. 137, 155 (2009).[53]

 Because the non-consensual releases and injunction are the equivalent of a final judgment for *Stern* purposes, Judge Drain did not have the power to enter an order finally approving them.

---

[53] This court's decision in *In re Kirwan Offices S.à.R.L.*, 594 B.R. 489 (S.D.N.Y. 2018) does not stand for the proposition that *Stern* authorizes a bankruptcy court to release non-core claims because a release is not a final judgment on the merits of the third-party claim. In that case, *Stern* was of no moment because, as this court held and the Second Circuit affirmed, all parties had consented to the bankruptcy court's exercise of jurisdiction. *In re Kirwan Offices S.à.R.L*, 792 F. App'x 99, 103 (2d Cir. 2019).

To the extent of his approval of the Section 10.7 Shareholder Releases, his opinion should have been tendered as proposed findings of fact and conclusions of law, both of which this court could review *de novo*. 11 U.S.C. § 157(c)(1). *Stern*, 564 U.S. at 475. If approved by this Court, those releases would of course be incorporated into the Plan.

So the standard of review in this case is *de novo* as to both the Bankruptcy Court's factual findings and its conclusions of law.[54]

## DISCUSSION

### I.   The Bankruptcy Court Has Subject Matter Jurisdiction Over Third-Party Claims Against Non-Debtors That Might Have Any Conceivable Effect on the Debtors' Estate.

A bankruptcy court is a creature of statute. *See Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995). Its subject matter jurisdiction is *in rem* and is limited to the *res* of the estate. *Central Virginia Community College v. Katz*, 546 U.S. 356, 362 (2006) ("Bankruptcy jurisdiction, at its core, is *in rem*."). Its jurisdiction is limited to "civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

A proceeding "arises under" title 11 if the claims "invoke substantive rights created by" that title. *See In re Housecraft Industries USA, Inc.*, 310 F.3d 64, 70 (2d Cir. 2002). A proceeding "arises in" a title 11 case if for example "Parties . . . , by their conduct, submit themselves to the bankruptcy court's jurisdiction" by litigating proofs of claim without contesting personal jurisdiction. *In re Millenium Seacarriers, Inc.*, 419 F.3d 83, 98 (2d Cir. 2005); *see In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 706 (2d Cir. 1995) ("*a claim filed against the estate . . . could arise only in the context of bankruptcy*") (emphasis in original) (quotation omitted). And a proceeding is "related to" a title 11 proceeding if its "outcome might have any conceivable effect

---

[54] The practical impact of this holding is non-existent, as no one has challenged any of Judge Drain's findings of fact – only the conclusions he drew from them – and the court has always had the obligation to review those conclusions *de novo*.

on the bankrupt estate." *In re Cuyahoga Equip. Corp.*, 980 F.2d 110, 114 (2d Cir.1992) *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011); *SPV OSUS Ltd. v. UBS*, 882 F.3d 333, 339-340 (2d Cir. 2018).

The release of most third-party claims against a non-debtor touches the outer limit of the Bankruptcy Court's jurisdiction. *See In re Johns-Manville Corp*., 517 F.3d 52, 55 (2d Cir. 2008) ("*Manville III*"), *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009). But the Second Circuit defines that limit quite broadly. *See SPV OSUS Ltd.*, 882 F.3d at 339-340. The standard is not that an action's outcome will certainly have, or even that it is likely to have, an effect on the *res* of the estate, as is the case in some other Circuits. It is, rather, whether it *might have any conceivable impact* on the estate. *Id.*

Bound to adhere to this broad standard, which has been consistently followed in this Circuit for almost three decades and was applied most recently in *SPV Osus*, I agree with the Debtors that the Bankruptcy Court had subject matter jurisdiction over the direct (non-derivative) third party claims against the Sacklers, under the "related to" prong of bankruptcy jurisdiction.

A.  *Governing Law*

Decades ago, the Second Circuit concluded that the outer limit of a bankruptcy court's *in rem* jurisdiction was defined by whether the outcome of a proceeding asserting a particular claim "might have any conceivable effect" on the *res* of the estate. *See In re Cuyahoga Equipment Corp.*, 980 F.2d at 114. In that case, a liquor distillery and its site of operation containing hazardous wastes was sold to a purchaser that subsequently went bankrupt; the bankruptcy court was asked to resolve not only the proceedings in bankruptcy but approve a settlement that released a creditor bank from claims related to separate environmental cleanup litigation (brought by the creditor Environmental Protection Agency (the "EPA")). *Id.* at 111-112. The original owner of the liquor distillery site – a non-debtor third party and defendant in the environmental cleanup litigation –

objected and appealed arguing, *inter alia*, that the court lacked jurisdiction to approve the settlement. The Second Circuit found that the court had related to jurisdiction because the bank's and the EPA's claims against the estate "bring into question the very distribution of the estate's property." *Id.* at 114. "[Section] 1334(b) undoubtedly vested the district court with the power to approve the agreement between the parties at least to the extent it compromised the bankruptcy claims asserted by the bank and the government." *Id.* at 115.

In *Celotex Corp. v. Edwards*, 514 U.S. 300 (1995), the United States Supreme Court decreed that "related to" jurisdiction was "a grant of some breadth" and that "jurisdiction of bankruptcy courts may extend . . . broadly" in "reorganization under Chapter 11." *Id.* at 308. And while some courts of appeal have circumscribed the scope of "related to" jurisdiction in their circuits, *see e.g.*, *In re W.R. Grace & Co.*, 900 F.3d 126 (3d Cir. 2018), the Second Circuit has never backed away from its broad reading of "related to" jurisdiction. *See, e.g., In re Ampal-American Israel Corporation*, 677 Fed.Appx. 5, 6 (2d Cir. 2017) (summary order).

The Circuit's most recent discussion of the subject can be found in *SPV OSUS Ltd. v. UBS AG*, 882 F.3d 333 (2d Cir. 2018). SPV Osus Ltd. ("SPV") had sued UBS AG ("UBS") (among others) in the New York State Supreme Court for aiding and abetting Bernie Madoff ("Madoff") and Bernard L. Madoff Investment Securities LLC ("BLMIS") in perpetrating their massive Ponzi scheme. *Id.* at 337-338. If UBS was indeed a joint tortfeasor with Madoff, it had a contingent claim for contribution against the Madoff estate. *Id.* at 340. However, it had not yet asserted such a claim (it was not yet ripe), and the unwaivable bar date for filing claims against the Madoff estate under the Securities Investor Protection Act ("SIPA") had already passed. *Id.* Moreover, there was no realistic possibility that there would be any money available at the end of the day to fund a claim for contribution. *Id.* SPV argued that these facts meant there was no possibility that the outcome

of UBS' contribution case "might have any conceivable effect" on the *res* of the Madoff estate. *Id.* It is indeed hard to quarrel with that factual analysis.

But Judge Pooler, writing for a unanimous panel, concluded that UBS's contingent claim for joint tortfeasor contribution against the Madoff estate "might" have an effect on the Madoff estate if there were any "reasonable legal basis" for its assertion. *Id.* at 340-41 (quotation omitted). She explained that the broad jurisdictional standard reflects Congress' intent "'to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate.'" *Id.* at 340 (quoting *Celotex*, 514 U.S. at 308). While recognizing that "'related to' jurisdiction is not 'limitless,'" Judge Pooler indicated that "it is fairly capacious." *Id.* And she said, "'An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate.'" *Id.* (quoting *Celotex*, 514 U.S. at 308, n. 6).

The fact that UBS and the debtor (Madoff) were alleged to be joint tortfeasors – who, as a matter of state law, have a right of contribution against one another – provided a "reasonable legal basis" why UBS might someday be able to assert its contingent claim. And while Judge Pooler recognized that ". . . a payout by the estate to defendants may be improbable, it is not impossible." *Id.* at 342. Since "any claim by defendants potentially alters that distribution of assets among the estates' creditors," *id.*, that was all it took to make the contingent claim "conceivably related" to the Madoff bankruptcy.

Finally – and of particular importance for the case at bar – Judge Pooler found that the "high degree of interconnectedness between this action and the Madoff bankruptcies" supported a finding of "related to" jurisdiction. *Id.* She explained that, "SPV can only proceed on [its claims

against UBS] if it establishes that the Madoff fraud occurred" and "it is difficult to imagine a scenario wherein SPV would not also sue Madoff and BLMIS, given that SPV alleges that UBS aided and abetted in their fraud." *Id.*

So in this Circuit, it is well settled that the only question a court need ask is whether "the action's outcome *might have* any conceivable effect on the bankrupt estate." *Id.* (emphasis added). If the answer to that question is yes, then related to jurisdiction exists – no matter how implausible it is that the action's outcome actually will have an effect on the estate.

### B.  Application of the Law to the Facts

Under the broad standard set forth in *SPV Osus*, I find that the Bankruptcy Court had "related to" subject matter jurisdiction to approve the release of direct, non-derivative third-party claims against the Sacklers. There is absolutely no question that the answer to the question of whether the third-party claims *might have* any conceivable impact on the res of the debtors' estate is yes. Moreover, the intertwining of direct and derivative claims against certain members of the Sackler family, as well as the congruence between the only claim that anyone has identified against the other Sacklers and Purdue's own claim for fraudulent conveyance, justifies the assertion of "related to" jurisdiction under *SPV Osus*'s "interconnectedness" test.

**First,** the non-derivative third-party claims that are being or might be asserted against the Sacklers are, as in *In re Cuyahoga Equipment Corp.*, the type of claims that "bring into question the very distribution of the estate's property." 980 F.2d at 114. As the Debtors pointed out in oral argument, and as Judge Drain recognized in his opinion, pursuit of the third-party claims threatens to "unravel[] the plan's intricate settlements" and "recoveries on . . . judgments" against the Sacklers would have a "catastrophic effect" on all parties' possible recovery under the Plan. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *33; (Oral Arg. Tr., Nov. 30, 2021, at 124:14-

16 ("Continued litigation against the Sacklers destroys all of the interlocking intercreditor settlements enshrined in the plan.")).

**Second,** as in *SPV Osus*, the claims raised against the Sacklers might have a conceivable impact on the estate, in that they threaten to alter "the liabilities of the estate" and "change" "the amount available for distribution to other creditors." *SPV Osus*, 882 F.3d 341. This "is sufficient to find that litigation among non-debtors is related to the bankruptcy proceeding." *Id.*

Here, the non-derivative litigation against the Sacklers *might* alter the liabilities and change the amount available for distribution. If, for example, the Appellants were successful in their related claims against the Sacklers, the findings could alter, or even determine, Purdue's own liability on similar claims, as well as the amount owed to Appellants as creditors. Further, as the Debtors explained at oral argument, there also is the threat that the Appellants' claims could affect "the debtors' ability to pursue the estate's own closely related, indeed, fundamentally overlapping claims against the Sacklers"; this is so because, if the related third-party claims were litigated poorly, the debtor's estate might be less likely to recover on its own claims against the Sacklers, which are worth billions. (*See* Oral Arg. Tr., Nov. 30, 2021, at 123:17-124:13).

Judge Drain pointed out the conceivable effect that the potential alteration of liabilities and ultimate amounts owed creditors and the estate would have on the *res* in his opinion. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *37. I agree that these potential effects support a finding of "related to" jurisdiction.

**Third,** as in *SPV Osus*, all the claims in this case have a high degree of interconnectedness with the lawsuits against the debtors and against the Sacklers – especially those members of the family who can be sued derivatively as well as directly.

As the *SPV Osus* Court explained, "'The existence of strong interconnections between the third-party action and the bankruptcy has been cited frequently by courts in concluding that the third-party litigation is related to the bankruptcy proceeding.'" *SPV OSUS*, 882 F.3d at 342 (quoting *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 321 (S.D.N.Y. 2003)). Here, the Section 10.7 Shareholder Release only extends to those claims where the "debtor's conduct or the claims asserted against it [are] a legal cause or a legally relevant factor." (Confr. Hr'g Tr., Sept. 1, 2021, at 134:18-135:2); *see In re Purdue Pharma L.P.*, 2021 WL 4240974, at *45; Plan, at § 10.7(b)). This limitation alone supports a conclusion that any claim that could fall within the scope of the release would necessarily have a high degree of interconnectedness with the debtor's conduct.

Looking at the claims of the Appellants themselves, the interconnectedness of the claims against the Sacklers with those against the Debtors is patent. (*See, e.g.*, Dkt. No. 103-7, at A-1553; Dkt. No. 95-1, at A0008; Dkt. No. 91-7, at App.2598; Dkt. No. 91-8, at App.2661; Dkt. No. 91-9, at App.3153). In fact, the direct and derivative claims against the "insider" or "managerial" Sacklers are essentially congruent. The Appellants have asserted claims in multiple instances against both Purdue and the Sacklers, and in every case they rely on detailed and virtually identical sets of facts to make the claims. Because various state statutes authorize the assertion of direct claims against certain managerial personnel of a corporation who can be held independently liable for the same conduct that subjects the corporation to liability (and them to liability to the corporation for faithless service in their corporate roles), a determination in one of the State Appellants' cases would likely have preclusive impact on a case alleging derivative liability against the same people – a case over which the Bankruptcy Court has undoubted jurisdiction. As the Debtor pointed out at oral argument, there is an obvious inconsistency in bringing "lawsuits against the Sackler[s] alleging that they controlled Purdue, and that Purdue did terrible things, and

500,000 people's lives were maybe snuffed out by Purdue's conduct" yet arguing that those suits "will [not] affect the debtors in any conceivable way." (*See* Oral Arg. Tr., Nov. 30, 2021, at 123:12-17). Some things have not changed since this court decided *Dunaway v. Purdue Pharma. L.P.*, 619 B.R. 38 (S.D.N.Y. 2020); one that has not is this: "Appellants would rely on the same facts to establish the liability of both parties" and there would be "no way for the Appellants to pursue the allegations against Dr. Sackler without implicating Purdue, and vice versa." *Id.* at 51. The acts of the Sacklers that could form the basis of any released claim "are deeply connected with, if not entirely identical to, Purdue's alleged misconduct." *See id.*

In so holding, I acknowledge that in *In re Johns-Manville Corp.*, 517 F.3d 52 (2d Cir. 2008) ("*Manville III*"), *rev'd and remanded on other grounds sub nom. Travelers Indem. Co. v. Bailey*, 557 U.S. 137 (2009) and *In re Johns-Manville Corporation v. Chubb Insurance*, 600 F. 3d 135 (2d Cir. 2010) ("*Manville IV*"), the Second Circuit said that the existence of shared facts between claims against the debtor and claims against the non-debtor arising out of an independent legal duty that was owed by the non-debtor to a third party was not sufficient to confer "related to" subject matter jurisdiction over the claims against the non-debtors. *Manville III*, 517 F.3d at 64-65. As a result, the Court of Appeals held that the bankruptcy court lacked jurisdiction to enjoin the prosecution of claims asserted by third parties against Travelers, Manville's erstwhile insurer, that arose out of Travelers' alleged failure to alert those third parties to the harmful properties of asbestos, about which Travelers had allegedly learned during its long relationship with Manville. *Id.* at 65. However, while there was a substantial factual overlap between defective product claims against Manville and the failure to disclose claims asserted against its insurer Travelers that were discussed in *Manville III*, there was absolutely no basis for asserting that there could be any impact

on the res of Manville's bankruptcy estate if the third party claims were not enjoined. For that reason, *Manville III/IV* is not inconsistent with *SPV/OSUS*.

The fact that the release extends to members of the Sackler family who played no role in running the affairs of the company does not alter the analysis. At the present time, the court is not aware of any lawsuits that have been brought against any of those individuals; and despite months of my asking, no one can identify any claim against them that would be released by the Section 10.7 Shareholder Release, other than as the recipients of money taken out of Purdue and up-streamed to the family trusts. But any claims relating to those transfers rightfully belong to the Debtors, whose claims against the world either "arise under" or "arise in" the bankruptcy. And those claims are not implicated by the Section 10.7 Shareholder Release.

**<u>Fourth</u>**, it is more than conceivable that Purdue's litigation of the question of its indemnification, contribution, or insurance obligations to the director/officer/manager Sacklers could burden the assets of the estate.

Appellants – most particularly the State and Canadian Appellants – insist that their claims lie beyond the "related to" jurisdiction of the Bankruptcy Court in part because their laws bar indemnification, contribution, or insurance coverage for actions like those of the Sacklers (*see* Dkt. Nos. 224, 228-231), and so the claims cannot be extinguished by that court. Without viable claims for indemnification, contribution, or insurance claims, the Appellants argue that their claims against the Sacklers will not have any conceivable effect on the Debtors' estate, thereby depriving the Bankruptcy Court of subject matter jurisdiction.

I begin by noting that this is precisely the type of reasoning that Judge Pooler rejected in *SPV Osus* – a case, I submit, in which the actual possibility that a contingent contribution claim would have any impact on the *res* of the Madoff estate was far less likely than it is in this case.

89

The issue is not whether, at the end of the day, the Sacklers would lose on their contingent claims; it is whether they have a reasonable legal basis for asserting them. (*See* Dkt. Nos. 154, 156).

And the Sacklers do have a reasonable legal basis to assert those claims. The Sacklers named in the State Appellants' suits served as officers, directors or managers of Purdue. As a result, they have claims against Purdue for indemnification and contribution, as well as a call on any D&O insurance proceeds that cover Purdue's officer and directors. As this court noted almost two years ago in *Dunaway*, Purdue's current and former directors and officers of the company are covered by various Limited Partnership Agreements ("LPA"), which provide that Purdue shall indemnify these directors and officers "so long as the Indemnitee shall be subject to any possible Proceeding by reason of the fact that the Indemnitee is or was . . . a director, officer or Agent of [the Purdue entities]." (JX-1773; *see also* JX-1806; JX-1049). The various state unfair trade practices laws that have been cited to this court all subject the Sacklers to the potential for liability because of their status as officers, directors or managers of the corporation – even though that liability is direct, not derivative. Moreover, the LPAs are governed by Delaware law, which allows for indemnification (*see* 6 Del. C. § 17-108; 8 Del. C. § 145), and the states as a general matter look to the state of incorporation for the availability of indemnity. (*See, e.g.*, Dkt. No. 230, at 3, 8–9, 13, 17). Similarly, the Purdue insurance policies that cover the Sackler former directors could be depleted, *inter alia*, if a Sackler former director prevailed in litigation or a plaintiff prevailed in litigation on a non-fraud claim. (*See* Dkt. No. 156, at 15).[55] Under various state laws, the Sacklers parties can also seek an advance against defense costs; even if those costs are ultimately recouped, those defense funds will, for at least some time, leave the estate. *See* CT Gen Stat § 33-776; 8 Del.

---

[55] The debtors clarified at oral argument that for the relevant periods of time "like 2017 when the claims were made and those policies got triggered" there are applicable claims-made insurance policies, as well as "over a billion dollars of general liability policies" and other policy language that "creates the risk that all Sackler-owned entities could assert claims under those policies." (Oral Arg. Tr., Nov. 30, 2021, at 125:21-12614).

C. § 145. The law governing insurance coverage is generally the law governing the policy – not the law of the objecting state. Only one state has an exception to that – California, whose law specifically prohibits indemnity or insurance coverage for losses resulting from a violation of its false advertising law or unfair competition law, and under which law an insurer has no duty to defend or advance costs. (Dkt. No. 95, at 3-4); *see* Cal. Ins. Code § 533.5; *Adir International, LLC v. Starr Indemnity and Liability Co.*, 994 F.3d 1032, 1045 (9th Cir. 2021).

And while each objecting state asserts that its laws would bar one or more of indemnification, contribution or insurance in certain instances, no state's law bars all three – not even California's. (*See* Dkt. Nos. 228-231; *see also* Dkt. No. 224).

Recognizing this, the states argue that there can be no indemnification, contribution, or insurance on these facts, including on public policy grounds, because the Sacklers acted in bad faith. (*See e.g.*, Dkt. No. 230, at 2). However, the question of bad faith in this case is hotly disputed. There is no doubt that the Shareholder Released Parties' right to indemnification, contribution, and/or insurance will be vigorously litigated, as Judge Drain rightly pointed out below. *See In re Purdue Pharma L.P.*, 2021 WL 4240974, at *38. That litigation will cost money. And so it very well *might have* an impact on the estate; in fact, it likely *will have* such an impact.

Given the breadth of the Second Circuit law under *SPV Osus*, I must and I do find that the claims asserted against the Shareholder Released Parties *might have* some conceivable effect on the estate of a debtor, for each of the foregoing reasons, and thus fall within the "related to" jurisdiction of the Bankruptcy Court.

But that only gets us to the next question. And it is the next question that is, in my view, dispositive.

## II.     The Bankruptcy Court Does Not Have Statutory Power to Release Particularized Third-Party Claims Against Non-Debtors.

Appellants argue that the Bankruptcy Court has no statutory authority to approve a release of third-party claims against non-debtors.

One would think that this had been long ago settled.

It has not been.

There is a long-standing conflict among the Circuits that have ruled on the question, which gives rise to the anomaly that whether a bankruptcy court can bar third parties from asserting non-derivative claim against a non-debtor– a matter that surely ought to be uniform throughout the country – is entirely a function of where the debtor files for bankruptcy.

And while the Second Circuit long ago identified as questionable a court's statutory authority to do this outside of asbestos cases, *In re Metromedia Fiber Network, Inc*., 416 F.3d 136 (2d Cir. 2005), it has not yet been required to identify any source for such authority.

Lacking definitive guidance from our own Court of Appeals, Judge Drain consulted the law in every Circuit. He concluded that he was statutorily authorized to approve the Section 10.7 Shareholder Release because it is "subject to 11 U.S.C. 1129(a)(1), 1123(a)(5) & (b)(6), 105, and 524(e)." *In re Purdue Pharma L.P*., 2021 WL 4240974, at *43. "In other words," he stated, "those releases flow from a federal statutory scheme." *Id*.

I appreciate that this Court has, on a prior occasion, said exactly the same thing, using exactly the same language – albeit in the context of affirming a plan that contained an easily distinguishable injunction that barred third parties (one in particular) from bringing one specific type of claim against non-debtors (his former partners) in order to protect the integrity of bankruptcy court orders. *In re Kirwan Offices S.à.R.L.*, 592 B.R. 489, 511 (S.D.N.Y. 2018*), aff'd sub nom. In re Kirwan Offices S.a.R.L.*, 792 F. App'x 99 (2d Cir. 2019). But in *Kirwan,* this Court

did not analyze whether there was a statutory (as opposed to a jurisdictional or constitutional) basis for the injunction that was at issue in that case. Indeed, no statutory argument was made.[56]

In this case, however, Appellants – most particularly, the U.S. Trustee, with the United States Attorney for this District appearing as *amicus* – have mounted a full-throated attack on a court's statutory authority to release third-party claims against non-debtors in connection with someone else's bankruptcy.

With the benefit of full briefing and extensive argument from experienced counsel, it is possible to decide whether a court adjudicating a bankruptcy case has the power to release third-party claims against non-debtors. Moreover, it is necessary to reach a conclusion on this subject before delving into constitutional issues that need not be reached if Appellants are correct.

I conclude that the sections of the Code on which the learned Bankruptcy Judge explicitly relied, whether read separately or together, do not confer on any court the power to approve the release of non-derivative third-party claims against non-debtors, including specifically the Section 10.7 Shareholder Release that is under attack on this appeal.

As no party has pointed to any other section of the Bankruptcy Code that confers such authority, I am constrained to conclude that such approval is not authorized by statute.

**A Caveat and Some Definitions**: I begin this discussion with a caveat. The topic under discussion is a bankruptcy court's power to release, on a non-consensual basis, *direct/particularized* claims asserted *by third parties* against *non-debtors* pursuant to the Section 10.7 Shareholder Release. This speaks to a very narrow range of claims that might be asserted against the Sacklers.

---

[56] In *Kirwan*, the appellant chalked up his failure to raise the issue of statutory authority to his belief that the U.S. Trustee ought to have done so. *In re Kirwan Offices S.à.R.L.*, 592 B.R. at 501. The U.S. Trustee, for perfectly understandable reasons that will be noted when *Kirwan* is discussed below, had no particular interest in using that case as a vehicle to mount such an attack.

For these purposes, by derivative claims, I mean claims that would render the Sacklers liable because of Purdue's actions (which conduct may or may not have been committed because of the Sacklers). "Derivative" claims are those seek to recover from the estate indirectly "on the basis of [the debtor's] conduct," as opposed to the non-debtor's own conduct. *Manville III*, 517 F.3d at 62 (quoting *MacArthur Co. v. Johns-Manville Corp*., 837 F.2d 89 (2d Cir. 1988)). Derivative claims in every sense relate to the adjustment of the debtor-creditor relationship, because they are claims that relate to injury to the corporation itself. If the creditor's claim is one that a bankruptcy trustee could bring on behalf of the estate, then it is derivative. *Madoff*, 40 F.3d at 90.

By direct claims, I mean claims that are not derivative of Purdue's liability, but are based on the Sacklers' own, individual liability, predicated on their own alleged misconduct and the breach of duties owed to claimants other than Purdue. "Direct" claims are based upon a "particularized" injury to a third party that can be directly traced to a non-debtor's conduct. *Id*.

The release of claims against the Sacklers that are derivative of the estate's claims them is effected by Section 10.6(b) of the Plan, which is not attacked as being beyond the power of the Bankruptcy Court.

The Section 10.7 Shareholder Release under attack is different. It releases all members of the Sackler families, as well as a variety of trusts, partnerships and corporations associated with the family and the people who run and advise those entities,[57] from liability for claims that have been brought against them personally by third parties – claims that are not derivative, but as to

---

[57] The Section 10.7 Shareholder Release extends to every Sackler presently alive, to their unborn progeny, and to various trusts, partnerships, corporations, and enterprises with which they are affiliated or that have been formed for their benefit. Exhibit X to the Settlement Agreement, expressly incorporated into the Plan (*see* Dkt. No. 91-3, at App. 1112), identifies over 1,000 separate released parties, either by name or by some "identifying" feature, such as "the assets, businesses and entities owned by" the named released parties. (*See* Dkt. No. 91-3, at App.1041-1069).

which Purdue's conduct is a legally relevant factor. Example: nearly all of the State Appellants have a law under which individuals who serve in certain capacities in a corporation are individually and personally liable for their personal participation in certain unfair trade practices. As Judge Drain recognized (*see In re Purdue Pharma L.P*., 2021 WL 4240974, at *44), the liability imposed by these statutes is not derivative; the claims arise out of a separate and independent duty that is imposed by statute on individuals who, by virtue of their positions, personally participated in acts of corporate fraud, misrepresentation and/or willful misconduct. Liability under those laws is limited to persons who occupied the roles of officer, manager or director of a corporation – which means that there is considerable *factual* overlap, perhaps even complete congruence, between those claims and the derivative claims against the same individuals that Judge Drain had undoubted authority to release and enjoin. But it is undisputed that these laws impose liability, and even penalties, on such persons independent of any corporate liability (or lack of same), and independent of any claim the corporation could assert against them for faithless service as a result of those same acts.[58]

The discussion that follows, then, applies only to direct (non-derivative) claims – sometimes referred to as "particularized" claims – that arise out of the Sacklers' own conduct (*In re Purdue Pharma L.P.*, 2021 WL 4240974, at *45), and that either have been or could be asserted against the non-debtor members of the Sackler family and their affiliates (the Shareholder Released Parties) by parties other than the Debtors' estate.

---

[58] While Judge Drain expressly found that these claims were not derivative (*In re Purdue Pharma L.P.*, 2021 WL 4240974, at *44), he was quite clear that the congruence between these claims and derivative claims against the same individuals was critically important to his conclusion that they could be released.

### The Text of the Bankruptcy Code

As one always should when assessing statutory authority, we turn first to the text of the statute.

All parties agree that one and only one section of the Bankruptcy Code expressly authorizes a bankruptcy court to enjoin third party claims against non-debtors without the consent of those third parties. That section is 11 U.S.C. § 524(g), which was passed by Congress in 1994. It provides for such an injunction solely and exclusively in cases involving injuries arising from the manufacture and sale of asbestos. And it sets out a host of conditions that must be satisfied before any such injunction can be entered, including all of the following:

(i)     the injunction is to be implemented in connection with a trust the is to be funded in whole or in party by the securities of the debtor and that the debtor will make future payments, including dividends, to that trust 524(g)(2)(B)(i)(I);

(ii)    the extent of such alleged liability of a third party arises by reason of one of four enumerated relationships between the debtor and third party (524(g)(4)(A)(ii));

(iii)   as part of the proceedings leading to issuance of such injunction, the court appoints a legal representative for the purpose of protecting the rights of persons that might subsequently assert demands of such kind (524(g)(4)(B)(i)); and

(iv)    the court determines the injunction is fair and equitable to persons that might subsequently assert such demands, and, in light of the benefits provided to such trust on behalf of such third parties. § 524(g)(4)(B)(ii)).

Section 524(g) injunctions barring third party claims against non-debtors cannot be entered in favor of just any non-debtor. They are limited to enjoin actions against a specific set of non-

debtors: those who have a particular relationship to the debtor, including owners, managers, officers, directors, employees, insurers, and financiers. 11 U.S.C. § 524(g)(4)(A).

The language of the statute plainly indicates that Congress believed that Section 524(g) created an exception to what would otherwise be the applicable rule of law. Subsection 524(g)(4)(A)(ii) says: "Notwithstanding the provisions of section 524(e), such an injunction may bar any action directed against a third party who is identifiable from the terms of such injunction (by name or as part of an identifiable group) and is alleged to be directly or indirectly liable for the conduct of, claims against, or demands on the debtor." 11 U.S.C. § 524(g)(4)(A)(ii). Section 524(e) provides: "Except as provided in subsection (a)(3) of this section, discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The word "notwithstanding," suggests that the type of injunction Congress was authorizing in § 524(g) would be barred by § 524(e) in the absence of the statute.

### A.  Legislative History of the Statute

Section 524(g) was passed after the United States Court of Appeals for the Second Circuit had affirmed the entry of an unprecedented injunction barring claims against certain non-debtors in connection with the bankruptcy of the nation's leading manufacturer of asbestos, the Johns Manville Corporation. *MacArthur Co. v. Johns–Manville Corp.* (*In re Johns–Manville Corp.*), 837 F.2d 89, 91 (2d Cir. 1988) ("*Manville I*"). The permanent injunction in that case extended to actions against Manville's insurers, all of whom had dedicated the entire proceeds of their policies – proceeds on which parties other than Manville were additional insureds and had a call – to a settlement fund into which the claims of asbestos victims would be channeled, valued, and resolved. The Second Circuit concluded that the bankruptcy court could permanently enjoin and channel lawsuits against a debtor's insurer relating to those insurance policies because those

policies were "property of the debtor's estate." *Id*. at 90. The Court of Appeals did not cite to a single section of the Bankruptcy Code as authorizing entry of the injunction.

Despite the Second Circuit's affirmance of the *Manville I* injunction, questions continued to be raised about its legality. Congress passed Sections 524(g) and (h) of the Bankruptcy Code to remove any doubt that those injunctions were authorized. *See* H.R. Rep. 103-835 at *41 (noting that Subsection (g) was added to Section 524 "in order to strengthen the Manville and UNR trust/injunction mechanisms and to offer similar certitude to other asbestos trust/injunction mechanisms that meet the same kind of high standard with respect to regard for the rights of claimants, present and future, as displayed in the two pioneering cases").

That Section 524(g) applies only to asbestos cases is clear. The statute explicitly states than the trust that "is to assume the liabilities of a debtor" be set up in connection with "actions seeking recovery for damages allegedly caused by the presence of, or exposure to, asbestos or asbestos-containing products" (11 U.S.C. § 524(g)(B)(i)(I)). If that were not clear enough, Congress passed another section to provide that injunctions that had previously been entered *in asbestos cases* – not in any other kind of case – would automatically be deemed statutorily compliant, even if those injunctions did not have all the features required by § 524(g). *See*, 11 U.S.C. § 524(h) ("Application to Existing Injunctions"). The limitation of § 524(h) to asbestos injunctions is important because, prior to the statute's passage, injunctions releasing third party claims against non-debtors had been entered by a few courts in cases involving other industries. *See e.g*., *In re Drexel Burnham Lambert Grp*., Inc., 960 F. 2d 285 (2d Cir. 1992) (securities); *In re A.H. Robins Co., Inc*., 880 F.2d 694 (4th Cir. 1989) (medical devices). The revisions to the Bankruptcy Code neither extend to those injunctions nor deem them to be statutorily compliant.

At the same Congress passed Sections 524(g) and (h), it passed Public Law 111, which provided a rule of construction for Section 524(g). It states that nothing in the 1994 amendments to the Bankruptcy Code, including 524(g), "shall be construed to modify, impair, or supersede any other authority the court has to issue injunctions in connection with an order confirming a plan of reorganization." Pub. L. 103–394 § 111(b) (uncodified). Congress made this statement because the parties in non-asbestos bankruptcy cases took the position that Sections 524(g) and (h) were unnecessary, in that bankruptcy courts already authorized the entry of such injunctions and corresponding approval of non-debtor releases – viz, *Robins* and *Drexel*. But the passage of Public Law 111 did not mean that Congress agreed with that position. As the House Committee on the Judiciary noted in the legislative history of these new provisions:

> Section 111(b) . . . make[s] clear that the special rule being devised for the asbestos claim trust/injunction mechanism is not intended to alter any authority bankruptcy courts *may* already have to issue injunctions in connection with a plan [of] reorganization. Indeed, [asbestos suppliers] Johns–Manville and UNR firmly believe that the court in their cases had full authority to approve the trust/injunction mechanism. And other debtors in other industries are reportedly beginning to experiment with similar mechanisms. *The Committee expresses no opinion as to how much authority a bankruptcy court may generally have under its traditional equitable powers to issue an enforceable injunction of this kind.*

Vol. E., *Collier on Bankruptcy,* at App. Pt. 9–78 (reprinting legislative history pertaining to the 1994 Code amendments) (emphasis added). P.L. 111 was not incorporated into the Bankruptcy Code.

Congress' used of the word "may" indicates that a bankruptcy court's authority to enter such an injunction was at best uncertain. And in light of the last sentence – in which the Committee made it clear that Congress expressed no opinion on that subject – one cannot read this tidbit of legislative history as indicating that Congress had concluded that a bankruptcy court already had such authority under its "traditional equitable powers."

During the course of this appeal, it has been suggested that P.L. 111 expresses Congress' intent to pass a limited law and then allow the courts to work out the contours of whether and how to extend § 524(g)-style authority outside the asbestos context.[59] The very next sentence from that statute's legislative history reveals that nothing could be further from the truth:

> The Committee has decided to provide explicit authority in the asbestos area because of the singular cumulative magnitude of the claims involved. How the new statutory mechanism works *in the asbestos area* may help the Committee judge whether the concept should be extended into other areas.

*Id*. (Emphasis added)

Plainly, Congress made a decision to limit the scope of the experimenting that was "reportedly" to be happening (and that was in fact happening) in other industries. And it left to itself, not the courts, the task of determining whether and how to extend a rule permitting non-debtor releases "notwithstanding the provisions of section 524(e)" into other areas.

Since 1994, Congress has been deafeningly silent on this subject.

B.  *Survey of the Relevant Case Law*

1. Supreme Court Law

The United States Supreme Court has never specifically considered whether the non-consensual release of non-derivative claims asserted by third parties against non-debtors can be approved in the context of a debtor's bankruptcy. Indeed, on *certiorari* to the Second Circuit from one of its orders in the ongoing *Manville* saga, the High Court announced that its opinion did "not resolve whether a bankruptcy court, in 1986 or today, could properly enjoin claims against

---

[59] I can only assume that this argument derives from Congress' mention of the fact that courts dealing with non-asbestos bankruptcies were "reportedly beginning to experiment with similar mechanism."

nondebtor insurers that are not derivative of the debtor's wrongdoing." *Travelers Indem. Co. v. Bailey*, 557 U.S. at 155.

The Court has, however, spoken on several occasions about issues that are germane to the consideration of that question.

For one thing, the Court has indicated that the Bankruptcy Code was intended to be "comprehensive." *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) ("Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions") (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 519 (1996) (Thomas, J., dissenting)).

For another, it has held that the "traditional equitable power" of a bankruptcy court "can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988).

And in two recent cases, the Supreme Court has held, albeit in contexts different from the one at bar, that a bankruptcy court lacks the power to award relief that varies or exceeds the protections contained in the Bankruptcy Code – not even in "rare" cases, and not even when those orders would help facilitate a particular reorganization.

For example, in *Law v. Siegel*, 571 U.S. 415 (2014), the Supreme Court unanimously held the bankruptcy court does not have "a general, equitable power" to order that a debtor's statutorily exempt assets be made available to cover attorney's fees incurred by an estate's trustee in the course of the chapter 7 bankruptcy case. Section 522 of the Bankruptcy Code, by reference to applicable state law, entitled the debtor in that case to exempt equity in his home from the bankruptcy estate. *See* 11 U.S.C. § 522(b)(3)(A). A dispute arose between the debtor and the trustee of the estate, causing the trustee to incur substantial legal fees, purportedly as a result of

the debtor's "abusive litigation practices." *Law v. Siegel*, 571 U.S. at 415-16. Seeking to recoup the cost of resolving the dispute with the debtor, the trustee asked the bankruptcy court to order that the otherwise exempt assets be made available to cover his attorney's fees. He argued that such an order was authorized by the "inherent power" of the Bankruptcy Court and by Section 105(a) of the Bankruptcy Code, which provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

11 U.S.C. § 105(a).

The High Court disagreed, stating flatly, "A bankruptcy court may not exercise its authority to 'carry out' the provisions of the Code" by taking an action inconsistent with its other provisions. *Law v. Siegel*, 571 U.S. at 425. It announced that there is "no authority for bankruptcy courts to deny an exemption on a ground not specified in the Code," because the Bankruptcy Code was intended to be a *comprehensive* statement of the rights and procedures applicable in bankruptcy. *Id*. at 416. The Code explicitly exempts certain debtor assets from the bankruptcy estate and provides a finite number of exceptions and limitations to those asset exemptions. *See* 11 U.S.C. § 522. To the Supreme Court, "comprehensive" means precisely that: "The Code's meticulous – not to say mind-numbingly detailed – enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions." *Law v. Siegel*, 571 U.S. at 424.

More recently, in *Czyzewski v. Jevic Holdings Corp.*, 137 S. Ct. 973 (2017), the Court held that the protections explicitly afforded by the Bankruptcy Code could not be overridden in a "rare" case, even if doing so would carry out certain bankruptcy objectives. In chapter 11 bankruptcies,

a plan that does not follow normal priority rules cannot be confirmed over the objection of an impaired class of creditors. 11 U.S.C § 1129(b). Notwithstanding that, the bankruptcy court in *Jevic* approved the structured dismissal[60] of a chapter 11 case in which unsecured creditors were prioritized over non-consenting judgment creditors – a violation of ordinary priority rules. The bankruptcy court and the proponents of the structured dismissal argued that the Bankruptcy Code did not specifically state whether normal priority rules had to be followed in chapter 11 (as opposed to chapter 7) cases – that is, the statute was "silent" on the subject – so the court could exercise such authority in "rare" cases in which there were "sufficient reasons" to disregard priority. But the Supreme Court disagreed that any such power existed. It observed that the priority system applicable to those distributions had long been considered fundamental to the Bankruptcy Code's purposes and held that the "importance of the priority system leads us to expect more than simply statutory silence if, and when, Congress were to intend a major departure." *Jevic Holding Corp*., 137 S. Ct. at 984. To the argument that a bankruptcy court could disregard priority if there were "sufficient reasons" to do so, Justice Breyer aptly noted: "It is difficult to give precise content to the concept 'sufficient reasons.' That fact threatens to turn a 'rare case' exception into a more general rule." *Id.* at 986.

It is with these holdings in mind that I examine the law in the various Circuits on the subject of non-consensual release of third-party claims against non-debtors.

I begin, of course, with our own.

---

[60] In a structured dismissal, the debtor obtains an order that simultaneously dismisses its chapter 11 case and provides for the administration and distribution of its remaining assets.

2. Second Circuit Law

**Manville I:** The relevant law in the Second Circuit begins with *Manville I*, which has already been discussed. *Manville's I*'s injunction was subsequently codified in §§ 524(g) and (h)[61] – which, as noted above, are plainly in the Bankruptcy Code, and are limited to the asbestos context, and have never been extended by Congress to other areas of endeavor. It is, moreover, significant that the injunction authorized by the Second Circuit in *Manville I* extended only to claims against parties (insurance companies) holding property that was indisputably part of the *res* of the debtor's estate (policies covering Manville for the manufacture and sale of asbestos). As will be seen when we get to *Manville III/IV*, when the non-debtor was seeking a release in exchange for contributing property to the debtor's estate – as opposed to surrendering property that already was part of the debtor's estate – the result, even in a statutorily authorized asbestos case, was different.

**Drexel:** The debtor in *In re Drexel Burnham Lambert Grp*., Inc., 960 F. 2d 285 (2d Cir. 1992) was the investment bank Drexel Burnham Lambert Group ("DBL"), which filed for bankruptcy in 1990. DBL's principal creditor was the Securities and Exchange Commission, which was owed $150 million pursuant to a prior settlement. But over 15,000 creditors filed proof of claims against the estate, alleging fraud in connection with four different types of securities transactions.

Judge Milton Pollack of this district withdrew all of these securities claims from the bankruptcy court pursuant to 28 U.S.C. § 157(d) in order to facilitate their settlement. The parties negotiated a settlement that had as its key feature the certification of all the securities claimants

---

[61] The Court is advised that the *Manville I* injunction did not conform in every particular to the rules set out in Section 524(g), and that Section 524(h) was included in the Bankruptcy Code to be sure that the *Manville I* injunction was deemed to be Code-compliant notwithstanding that fact.

into a single, mandatory, non-opt-out class (Rule 23(b)(1)(B)), which was itself divided into two subclasses: A and B. The members of Subclass B – comprised of securities fraud class action plaintiffs – were, as part of the settlement, enjoined from bringing any future actions against the former officers and directors of DBL; while not themselves debtors, those individuals had contributed to DBL's estate.

The district court certified the classes and approved the settlement over the objections of 8 of the 850 proposed class members. Three of the objectors filed appeals, contending in relevant part that the district court had erred by approving the settlement with it the mandatory injunction against the pursuit of third-party claims by non-consenting plaintiffs.

The Second Circuit affirmed the settlement of the securities fraud cases. It noted in passing that, "In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided this injunction plays an important part in the debtor's reorganization plan." *Drexel*, 960 F. 2d at 293 (citing *In re A.H. Robins Co*., 880 F.2d 694, 701 (4th Cir.)). But it cited no section of the Bankruptcy Code that authorized this proposition. In its brief discussion of the objectors' challenge to the provision in the settlement agreement that barred members of subclass B from bringing or maintaining suits against DBL's officers and directors, the Court of Appeals, reasoning tautologically, said this:

> The Settlement Agreement is unquestionably an essential element of Drexel's reorganization. In turn, the injunction is a key component of the Settlement Agreement. As the district court noted, the injunction limits the number of lawsuits that may be brought against Drexel's former directors and officers. This enables the directors and officers to settle those suits without fear that future suits will be filed. Without the injunction, the directors and officers would be less likely to settle. Thus, we hold that the district court did not abuse its discretion in approving the injunction.

*In re Drexel Burnham Lambert Grp., Inc*., 960 F. 2d at 293. In other words, the Circuit held that the district court had discretion to approve non-debtor releases as part of the settlement of

numerous securities fraud class actions in the context of a bankruptcy, simply and solely because funds were being funneled to the estate that would not otherwise be contributed.

There are numerous reasons why *Drexel* does not answer the question about a court's statutory authority under the Bankruptcy Code to release non-debtors over the objection of third parties who have direct claims against them. Two, however, are dispositive.

First and foremost, the Second Circuit simply did not address this question in *Drexel*. *Drexel* mentioned in passing something about a bankruptcy court's power to enjoin claims but did not identify any source of that power in the Bankruptcy Code. It appears to have assumed *sub silentio* that such authority existed.

Second, *Drexel* was decided two years before Congress passed Sections 524(g) and (h). The opinion's passing mention of a bankruptcy court's power to enjoin a creditor from suing a non-debtor became far less persuasive after Congress (1) amended the Bankruptcy Code to authorize such injunctions, but only in asbestos cases; (2) expressed agnosticism about whether any such authority existed outside of its new legislation; and (3) indicated its intent to consider at some later time whether to extend this authority to industries that were "reportedly experimenting" with such injunctions – which it never has.[62]

There are other reasons to question the continuing viability of *Drexel*. Whether its reasoning can be extended to mass tort cases like this one is highly dubious. Seven years after the Second Circuit's opinion in *Drexel*, the Supreme Court expressed grave doubt about whether the Rule 23(b)(1)(B) "limited fund class action" device that was employed in *Drexel* could ever be employed in the mass tort context like this one, *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999).

---

[62] It bears reiterating that *Drexel* was one of those cases to which the Judiciary Committee referred when it said that debtors in other industries were "reportedly experimenting" with non-debtor injunctions in the years prior to the passage of Section 524(g). *See supra*, note 59.

Subsequent to *Ortiz*, courts have consistently rejected attempts to apply the limited fund mandatory class action device to mass torts. *See, e.g., In re Simon II Litig.*, 407 F.3d 125, 137-38 (2d Cir. 2005) (tobacco punitive damages litigation); *Doe v. Karadzic*, 192 F.R.D. 133, 140-44 (S.D.N.Y. 2000) (actions by victims of war crimes committed by Bosnia–Herzegovina brought under the Alien Tort Claims Act).

Moreover, the Supreme Court also said in *Ortiz* that a fund which is "limited" only because the contributing party keeps a large portion of its wealth (*a la* the Sacklers) is "irreconcilable with the justification of necessity in denying any opportunity for withdrawal of class members whose jury trial rights will be compromised, whose damages will be capped, and whose payments will be delayed." *Ortiz v. Fibreboard Corp.*, 527 U.S. at 860. The exact same thing could be said of the third parties whose claims are being extinguished as part of the Debtors' Plan.

Subsequent Second Circuit law in the *Manville* cases also casts doubt on a bankruptcy court's subject matter jurisdiction to authorize the release of third-party claims against the officers and directors of DBL simply because they would not otherwise have made a contribution to the debtor's estate. *Manville III*, 517 F.3d at 66. In *Manville III/IV*, the Second Circuit concluded that "a bankruptcy court only has jurisdiction to enjoin third-party non-debtor claims that directly affect the *res* of the bankruptcy estate," and held that claims asserted against non-debtors that sought "to recover directly from [the] debtor's insurer for the insurer's own independent wrongdoing" did not have such impact. *Manville III*, 517 F.3d at 65-66. In so ruling the Second Circuit held it of no moment for jurisdictional purposes that the non-debtor was making made a financial contribution to a debtor's estate (*id.*), saying: "It was inappropriate for the bankruptcy court to enjoin claims brought against a third-party non-debtor *solely on the basis of that third-party's financial contribution to a debtor's estate*." *Id.* (Emphasis added) For this proposition, the *Manville III* panel

cited with approval the Third Circuit's warning from *In re Combustion Engineering*, where the court had observed that:

> a debtor could create subject matter jurisdiction over any on-debtor third-party [simply] by structuring a plan in such a way that it depended upon third party contribution. As we have made clear, subject matter jurisdiction cannot be conferred by consent of the parties. Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.

*In re Combustion Engineering*, 391 F. 3d 190, 228 (3d Cir. 2004).

Finally, changes in class action law since *Drexel* was decided have rendered its facile analysis of the Rule 23(a) factors, especially commonality and typicality, highly suspect. *Amchem Products, Inc., v. Windsor*, 521 U.S. 591 (1997); *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). I strongly suspect that the *Drexel* class certification, and so the *Drexel* settlement, would not and could not be approved today.[63]

But one thing is clear: *Drexel* sheds no light whatsoever on the issue of whether releases like the one at bar are authorized *by the Bankruptcy Code*. That statute was never mentioned.

**New England Dairies/Metromedia**: In *New England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc., (In re Dairy Mart Conveniences Stores),* 351 F. 3d 86, 92 (2d Cir. 2003), the Court of Appeals for this circuit definitively rejected the argument that §105(a) of the Bankruptcy Code (*see supra*, at p. 101-102) could "create substantive rights that are otherwise unavailable under applicable law." As the author of the opinion (Judge Jacobs) recognized:

> The equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the *provisions* of the Bankruptcy Code, rather than to further the purposes of the Bankruptcy Code generally, or otherwise to do the right thing. This language "suggests that an exercise of section 105 power

---

[63] It is, of course, for the Second Circuit to make that call – not a district court in the Second Circuit.

be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." 2 *Collier on Bankruptcy* ¶ 105.01[1].[64]

*In re Dairy Mart Conveniences Stores,* 351 F. 3d at 92.

*In re Dairy Mart* did not involve the confirmation of a plan containing non-debtor releases of third-party claims, so technically it did not speak to the question pending before this Court. But two years later, Judge Jacobs authored *In re Metromedia Fiber Network, Inc*., 416 F.3d 136 (2d Cir. 2005), which did.

Metromedia Fiber Network, Inc. and its subsidiaries declared bankruptcy. *See Metromedia,* 416 F.3d 136, 138 (2d. Cir. 2005). The company's founder, John W. Kluge, did not. However, as part of the plan of reorganization, Kluge, as grantor, established the "Kluge Trust." *Id.* at 141 n.4. Under the plan of reorganization proposed to the court, the Kluge Trust was to make "a 'material contribution' to the estate" in the bankruptcy, (*id.* at 143), by "[i] forgiv[ing] approximately $150 million in unsecured claims against Metromedia; [ii] convert[ing] $15.7 million in senior secured claims to equity in the Reorganized Debtors; [iii] invest[ing] approximately $12.1 million in the Reorganized Debtors; and [iv] purchas[ing] up to $25 million of unsold common stock in the Reorganized Debtors' planned stock offering." *Id.* at 141. Metromedia itself would continue to exist after its reorganization – albeit under a new name, AboveNET – and to engage in the business of providing high bandwidth telecommunications circuits, which was its historic business model.

In exchange for the Kluge Trust's contributions, the Kluge Trust and certain "Kluge Insiders" were to receive 10.8% of the Reorganized Debtors' common stock and something called the "Kluge Comprehensive Release." *Id.* The Kluge Comprehensive Release provided:

---

[64] *In re Dairy Mart* was hardly the first time this settled principle had been recognized by the Second Circuit. *See, e.g*., *FDIC v. Colonial Realty Co.,* 966 F.2d 57, 59 (2d Cir. 1992) ("105(a) limits the bankruptcy courts equitable powers, which `must and can only be exercised within the confines of the Bankruptcy Code") (quoting *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 206, (1988)).

the Kluge Trust and each of the Kluge Insider shall receive a full and complete release, waiver and discharge from . . . any holder of a claim of any nature . . . of any and all claims, obligations, rights, causes of action and liabilities arising out of or in connection with any matter related to [Metromedia] or one or more subsidiaries . . . based in whole or in part upon any act or omission or transaction taking place on or before the Effective Date.

*Id.*

The release was broad and did not carve out any exception – even for claims that could not be discharged against a debtor in bankruptcy, such as those predicated on fraud or willful misconduct.

Following confirmation of the plan, appellant creditors Deutsche Bank AG (London Branch) and Bear, Stearns & Co., Inc. challenged the "largely implemented" plan of reorganization and argued that the releases in the plan of reorganization "improperly shield certain nondebtors from suit by the creditors." *Id.* at 138. On appeal, the district court both affirmed the plan of reorganization and ruled that the relief sought by the two banks was not "barred by the doctrine of equitable mootness because effective relief could have been afforded without 'unraveling the plan.'" *Id.* at 139.

The Second Circuit vacated the district court's affirmance of the plan, on the ground that the bankruptcy court had failed to make certain findings necessary to a determination that the non-consensual third-party releases should be approved. *Id.* at 143. But the plan had been substantially consummated by the time the appeal was heard, so the Circuit concluded that the matter was indeed equitably moot. As a result, it declined to remand so that a lower court could make the missing findings and reconsider the propriety of the releases. *Id.* at 145.

Before reaching this result, the panel discussed whether non-debtor releases were available in connection with someone else's bankruptcy. The Circuit identified "two considerations that

justify . . . reluctance to approve non-debtor releases." *Id*. at 141. It noted that such releases were

not specifically authorized outside of the asbestos context:

> [T]he only explicit authorization in the Bankruptcy Code for nondebtor releases is
> 11 U.S.C. § 524(g), which authorizes releases in asbestos cases when specified
> conditions are satisfied, including the creation of a trust to satisfy future claims . . .

*Metromedia Fiber Network, Inc*., 416 F.3d at 142. And it held, consistent with *In re Dairy Mart*,

that Section 105(a) of the Bankruptcy Code did not authorize the approval of such releases:

> True, 11 U.S.C. § 105(a) authorizes the bankruptcy court to "issue any order,
> process, or judgment that is necessary or appropriate to carry out the provisions of
> [the Bankruptcy Code]"; but section 105(a) does not allow the bankruptcy court "to
> create substantive rights that are otherwise unavailable under applicable law." *New
> England Dairies, Inc. v. Dairy Mart Convenience Stores, Inc. (In re Dairy Mart
> Convenience Stores, Inc.)*, 351 F.3d 86, 92 (2d Cir.2003) (quotations and citation
> omitted). Any "power that a judge enjoys under § 105 must derive ultimately from
> some other provision of the Bankruptcy Code." Douglas G. Baird, Elements of
> Bankruptcy 6 (3d ed.2001); accord *Dairy Mart*, 351 F.3d at 92 ("Because no
> provision of the Bankruptcy Code may be successfully invoked in this case, section
> 105(a) affords [appellant] no independent relief.").

*Metromedia*, 416 F. 3d at 142.

The panel also cautioned that courts should be careful about approving a non-consensual

non-debtor release because the device "lends itself to abuse." *Id.* One particular form of abuse

identified by the panel manifests when the release, in effect, "operate[s] as a bankruptcy discharge

arrange without a filing and without the safeguards of the Bankruptcy Code." *Id*. Indeed, "The

potential for abuse is heightened when releases afford blanket immunity." *Id*.

After observing that, "No case has tolerated nondebtor releases absent a finding of

circumstances that may be characterized as unique,." *Id.* , the panel listed circumstances in which

such releases had been authorized in the past, and identified factors that a court should consider

when evaluating such releases in the future: (1) the release is important to the plan, (2) the enjoined

claims would be channeled to a settlement fund rather than extinguished, (3) the estate receives

substantial consideration in return, (4) the released claims would otherwise indirectly impact the debtors' reorganization by way of indemnity or contribution, and (5) the plan otherwise provided for the full payment of the enjoined claims. *Id.* at 141–42. However, the Circuit insisted that the ultimate decision about whether to authorize such releases was "not a matter of factors and prongs." *Id.* 142.

Having said all that, the *Metromedia* court did not rule on whether any or all of the factors it had identified were satisfied in the particular case before it. Nor did it conclude that a non-debtor release should be approved if the factors were satisfied, or consider whether, in the case before it, there might be other reasons why the proposed non-debtor releases should not be approved.

Instead, as noted above, the Circuit vacated approval of the plan and declined to remand for further consideration because the matter had become equitably moot – thereby guaranteeing that those open questions – including the question about whether there was statutory authority for such releases – would not be answered.

So to summarize: No third-party releases were approved in *Metromedia*. The Court of Appeals did not conclude that such releases were consistent with or authorized by the Bankruptcy Code. It did not conclude that the case before it was one of the "unique" instances in which a court's reluctance to approve such releases might (assuming they were authorized) be overcome. And it did not decide whether the Kluge releases measured up to the level that might justify approving them if the case qualified as "unique." *In re Metromedia Fiber Network*, 416 F.3d at 142–143.

In other words, while *Metromedia* said a great deal, the case did not hold much of anything.[65] Its relevance, for present purposes, is that Judge Jacobs cautioned that statutory

---

[65] I disagree with Appellants that *Metromedia*'s discussion of non-consensual third-party releases is dictum. (*See id.*). The actual holding in the case is that the bankruptcy court failed to make the findings in order to justify approval of

authority for non-consensual non-debtor releases outside of the asbestos context was at best uncertain – and then disposed of the case on other grounds, without identifying what section or sections of the Bankruptcy Code might actually authorize such relief in non-asbestos bankruptcy.[66]

No subsequent Second Circuit case has filled in the blank.

**Manville III/IV and In re Quigley**[67]: These were asbestos cases, in which a court's statutory authority to impose such non-debtor injunctions is undoubted, as long as all the conditions listed in § 524(g) are met.

As discussed above, in *Manville III/IV*, the Second Circuit concluded that the bankruptcy court lacked subject matter jurisdiction over third party claims against Manville's non-debtor insurer that arose out of an alleged independent duty owed by the insurer to those third parties, rather than out of its contractual relationship as Manville's insurer. The court did not discuss any issue of statutory authority.

And in *Quigley*, the Circuit held that certain claims against the debtor's parent—claims based on the use of the parent's name on the debtors' asbestos products—could not be enjoined pursuant to § 524(g) because the alleged liability was not "by reason of" any of the four "statutory relationships" identified in that section. *Quigley*, 676 F.3d at 49, 60-61. Had the proposed injunction fallen within one of the express statutory relationships, it would have been authorized because the case involved asbestos.

---

such a release. *Metromedia*, 416 F.3d at 143. A discussion of what type of findings would be necessary to approve a non-consensual third-party release was, at least arguably, a necessary predicate to that holding. The court's equitable mootness ruling only justified the decision not to remand so that the missing findings could be made. The court did not vacate approval of the releases on equitable mootness grounds, so it was not the actual holding in the case.

[66] Further to the discussion of *Drexel* – the case was cited by a Second Circuit in *Metromedia*, but only for the proposition that a contribution to a debtor's estate from a released third party was one factor that had in the past been relied on by a court to justify a non-debtor release. That is true as a matter of simple fact. As far as this Court can tell, that is about all that can be said to be left of *Drexel*.

[67] *Manville III*, 517 F.3d at 66; *Manville IV*, 600 F. 3d at 152; *In re Quigley Co.*, 676 F.3d 45 (2d Cir. 2012).

**Madoff**: *In re Bernard L. Madoff Inv. Securities LLC*, 740 F.3d 81 (2d Cir. 2014) involved a chapter 7 liquidation under the Securities Investor Protection Act (SIPA). The debtor, Bernie L. Madoff Investment Securities ("BLMIS"), was an investment enterprise created to effect the Ponzi scheme of its principal, Bernie Madoff. The bankruptcy estate settled its claims against the estate of Jeffry M. Picower, an alleged Madoff co-conspirator, releasing its claims in exchange for a $5 billion dollar contribution to Madoff bankruptcy estate. In addition to approving that settlement and release, the bankruptcy court permanently enjoined two of the debtor's customers from pursuing putative state tort law class actions against the estate of Jeffry M. Picower in the United States District Court for the Southern District of Florida, to the extent those claims arose from or related to the Madoff Ponzi scheme.

The Second Circuit affirmed the non-debtor injunction because the customer's complaints were predicated on secondary harms flowing from to them from BLMIS, and so were derivative claims that a bankruptcy court had power to discharge pursuant to Section 105(a). The *Madoff* court explained that the Florida plaintiffs had not alleged any direct claim against Picower's estate, because they failed to allege that Picower took any actions aimed at BLMIS customers (such as making misrepresentations to them) that caused particularized injury to those customers. *Id*. at 93.

However, the Second Circuit was careful to note that factual congruence between an estate's claim and an individual creditor's claim against the same non-debtor was not what rendered the asserted claims derivative. It held that, "there is nothing illogical or contradictory" about factual overlap between the allegations asserted in direct claim and a derivative claim; a non-debtor "might have inflected direct injuries on both the [estate's creditors] and [the debtor estate] during the course of dealings that form the backdrop of both sets of claims." *Id*. at 91 (quoting *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 587 (5th Cir. 2008)). A creditor could,

therefore, bring a direct claim against a non-debtor, even though the debtor might have suffered an identical injury – provided the creditor was not seeking to recover for injuries suffered by the debtor, but for injuries it suffered *directly*. *Id.*

Significantly for our purposes, the Second Circuit did not simply sweep away the Florida class actions; it permitted the creditors to amend their Florida complaints to assert direct claims if they could identify some direct injury that Picower caused them, as there was "conceivably some particularized claim" that the customers could assert against the non-debtor that could not also be asserted or released by the estate. *Id.* at 94.

**Tronox:** *In re Tronox, Inc.*, 855 F.3d 84 (2d Cir. 2017) was not an asbestos case, but it adds nothing to the above discussion, for two reasons. First and foremost, the Court of Appeals dismissed the appeal for lack of appellate jurisdiction. Second, in that case, the claims asserted against the non-debtors by the third party were again derivative, not direct, claims (*e.g.*, alter ego, piercing the corporate veil, and successor liability) – as in *Madoff*, the plaintiff alleged "no particularized injury" to the claimant. *Id.* Because success on a derivative claim benefits all creditors of the estate, the Circuit held that the bankruptcy "trustee is the proper person to assert the claim, and the creditors are bound by the outcome of the trustee's action." *In re Tronox Inc.*, 855 F.3d at 103 (internal quotation omitted).

But the court went on to say that, "when creditors have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy estate is precluded from doing so." *Id.* at 99 (internal citation omitted). There was no discussion of enjoining such particularized claims, let alone any discussion of statutory authority for doing so.

**<u>Kirwan (Lynch v. Lapidem):</u>** And so we come to *Lynch v. Lapidem* (*In re Kirwan Offs. S.à.R.L.*) 792 Fed. Appx. 99 (2d Cir. 2019) ("*Kirwan*").

In *Kirwan*, the Second Circuit affirmed a bankruptcy court injunction that was included in a plan of reorganization in order to prevent collateral attacks on prior orders of that court. The appellant in *Kirwan* (Lynch) was one of three shareholders in the bankrupt enterprise. He challenged the *bona fides* of the bankruptcy filed by his former partners but lost after trial. The dissident shareholder then absented himself from the hearing on the plan of reorganization, of which he had notice. He did so in the (mistaken) belief that he could avoid any *res judicata* effect of the bankruptcy court's orders as long as he did not participate. *See In re Kirwan Offs. S.à.R.L.*, 592 B.R. 489, 501 (S.D.N.Y. 2018), *aff'd sub nom. In re Kirwan Offs. S.à.R.L.*, 792 F. App'x 99 (2d Cir. 2019).

Anticipating that the dissident shareholder would try to mount a collateral attack on the bankruptcy court's order confirming the plan, the other two shareholders had included therein a provision enjoining any person, including Lynch, from suing anyone in any forum on a claim arising out of the bankruptcy proceeding and the court-approved reorganization. Judge Drain confirmed the plan containing that provision. At the time he entered the order confirming the plan, the Bankruptcy Judge made it clear that Lynch's "opposition to any reasonable restructuring . . . scurried, if not crossed the line, over into bad faith" (*Kirwan,* 592 B.R. at 499), and said it was "in that context . . . that I am prepared to approve the exculpation and injunction provisions of the plan." *Id*. He specifically found that the provision was narrowly tailored and necessary in order to forestall "back-door attacks and collateral litigation for their activities related to those things," which would impact the reorganized debtor as well the non-debtors who had proceeded in good faith throughout the bankruptcy. *Id*.

In short, the injunction affirmed in *Kirwan* was plainly one designed to preserve and protect the authority of the bankruptcy court and the integrity of its actions *vis a vis* the debtor's estate. Unlike the third-party claims in this case, Lynch's claims against his erstwhile partnership inherently involved the property of the estate – the relief sought would have redistributed *post hoc* the estate following the bankruptcy court's confirmation of the plan.

As noted earlier (*see* footnote 56), Lynch did not argue, either in this Court or in the Second Circuit, that the injunction was not statutorily authorized by the Bankruptcy Code. The grounds asserted and decided were jurisdictional and constitutional, not statutory. Neither this Court nor the Second Circuit analyzed the question of statutory authority, even in the context of the very limited and specially targeted injunction that was included in the debtor's plan.

**Summary of Second Circuit Law**: The only fair characterization of the law on the subject of statutory authority to release and enjoin the prosecution of third-party claims against non-debtors in a bankruptcy case is: unsettled, except in asbestos cases, where statutory authority is clear. Because the Court of Appeals has decided every other case on non-statutory grounds, its only clear statement is that Section 105(a), standing alone, does not confer such authority on the bankruptcy court outside the asbestos context.

3. The Law in Other Circuits

All but three of the other Circuits have spoken directly to the issue of statutory authority. They have reached conflicting results – a most unfortunate circumstance when dealing with a supposedly uniform and comprehensive nationwide scheme to adjust debtor-creditor relations.

Three of the eleven Circuits – the Fifth, Ninth, and Tenth – reject entirely the notion that a court can authorize non-debtor releases outside the asbestos context. *See In re Pacific Lumber Co*., 584 F.3d 229, 252 (5th Cir. 2009); *In re Lowenschuss*, 67 F.3d 1394, 1401-02 (9th Cir. 1995); *In re W. Real Estate Fund*, 922 F.2d 592, 600 (10th Cir. 1990). Those courts read § 524(e) as barring

the granting of such relief – put otherwise, they under Congress' use of the phrase "Notwithstanding the provisions of §524(e)" in § 524(g) as creating an exception to an otherwise applicable rule.

The Third Circuit also has not identified any section of the Bankruptcy Code that authorizes such non-debtor releases. Judge Drain points to *In re Millennium Lab Holdings II, LLC*, 945 F.3d 126, 133-40 (3d Cir. 2019) (*In re Purdue Pharma L.P.,* 2021 WL 4240974, at *40), but as in the Second Circuit cases like *Manville III/IV* and *Tronox*, the Third Circuit does not discuss statutory authority in that case. Instead, the *Millennium* court concluded that the bankruptcy court had *constitutional* authority to extinguish certain third-party claims by confirming a chapter 11 plan. *In re Millennium Lab Holdings II, LLC*, 945 F.3d 139-40.

On those occasions when the Third Circuit did address a bankruptcy court's *statutory* authority to impose non-debtor releases, it overturned bankruptcy court orders granting them. For example, in *In re Continental Airlines*, 203 F.3d 203 (3d Cir. 2000), the Court of Appeals *rejected as extra-statutory* the provision in a plan of reorganization that released claims against current and former directors of Continental, and that permanently enjoined shareholder actions against them, finding that the Bankruptcy Code "does not explicitly authorize the release and permanent injunction of claims against non-debtors, except in one instance not applicable here" – that being asbestos cases. *Id*. at 211; 11 U.S.C. § 524(g). And in *In re Combustion Engineering, Inc.*, 391 F.3d 190 (3d Cir. 2004), the Third Circuit, like the Second Circuit in *Metromedia*, held that Section 105(a) does not give the court the power to create substantive rights that would otherwise be unavailable under the Bankruptcy Code, and vacated the channeling injunction. *Id*. at 238. Neither *Continental Airlines* nor *Combustion Engineering* has ever been overruled by the Third Circuit.

The First, Eighth, and D.C. Circuits have yet to weigh in on the question of whether statutory authority to impose non-debtor releases exists. Judge Drain contends that the First Circuit did decide that issue, in *Monarch Life Ins. Co. v. Ropes & Gray*, 65 F. 3d 973 (1st Cir 1995), but again, the First Circuit did not identify any statutory authority to impose non-debtor releases in that case. It declined to decide whether Section 105(a) authorized the imposition of a non-debtor release; and it did not cite any other section of the Bankruptcy Code as conferring that authority. *Id*. at 983-94.

Judge Drain cited *In re AOV Indus., Inc*., 792 F.2d 1140, 1153 (D.C. Cir. 1986) for the proposition that the D.C. Circuit has approved the non-consensual release of third-party claims against non-debtors. But that is wrong. The *AOV Industries* court did not say a word about whether such relief was authorized by statute. The court simply found that the issue before it – whether the bankruptcy court had *constitutional* authority to enter an order releasing non-debtor claims – was equitably moot. *Id*.

The Fourth and Eleventh Circuits have concluded that Section 105(a), without more, authorizes such releases. *See Nat'l Heritage Found., Inc. v. Highbourne Found., Inc*., 760 F.3d 344, 350 (4th Cir. 2014); *In re Seaside Eng'g & Surveying*, 780 F.3d 1070, 1076-79 (11th Cir. 2015). After *In re Dairy Mart* and *Metromedia,* we know that is not the law in the Second Circuit. So Fourth and Eleventh Circuit law contradict Second Circuit law, and cannot be relied on as authority for the proposition that such releases are statutorily authorized.

That leaves the Sixth and Seventh Circuits, both of which have concluded that Sections 105(a) and 1123(b)(6) of the Bankruptcy Code, read together, codify something that they call a bankruptcy court's "residual authority," and hold that a bankruptcy court can impose non-consensual releases of third-party claims against non-debtors in connection with a chapter 11 plan

pursuant to that "residual authority."[68] As discussed in my summary of his opinion, Judge Drain adopted the reasoning of these courts, and added two other sections of the Bankruptcy Code to buttress the analysis.

**Summary of Extra-Circuit Law**: A majority of the Circuits that have spoken to the statutory authority question either dismiss the idea that such authority exists or, as with the Second Circuit, (i) reject the notion that such authority can be found by looking solely to Section 105(a) and then (ii) fail to answer the question of where such authority can be found. Two Circuits rely solely on Section 105(a), and so have law that conflicts with the Second Circuit's pronouncement. Only two Circuits support the position taken by the learned Bankruptcy Judge.

It is against that backdrop of higher court authority that I turn to the order on appeal.

*C.  The Statutory Provisions Upon Which the Bankruptcy Court Relied*

Judge Drain was quite explicit about the statutory provisions that he believed gave him authority to approve these releases as "necessary or appropriate" to carry out the provisions of the Bankruptcy Code: Sections 105(a), 1123(a)(5) and (b)(6), and 1129, together with "residual authority." *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *43.

The question that arises is whether any of the sections other than Section 105(a) confers some substantive right such that a release to enforce that right could be entered pursuant to Section 105(a).

I conclude that they do not.

Rather, each of the cited sections, like Section 105(a), confers on the Bankruptcy Court only the power to enter orders that carry out other, substantive provisions of the Bankruptcy Code.

---

[68] They get the phrase "residual authority" from *United States v. Energy Res. Co.*, 495 U.S. 545, 549 (1990), which I discuss in detail below.

None of them creates any substantive right; neither do they create some sort of "residual authority" that authorizes the action taken by the Bankruptcy Court.

**Section 1123(b)(6):** Subsections (a) and (b) of 11 U.S.C. § 1123, entitled "Contents of Plan," lay out in considerable detail what a plan of reorganization *must* (subsection (a)) and *may* (subsection (b)) contain in order to be confirmed.

We can quickly dispense with the notion that Section 1123(b)(6) provides the substantive authority for a Section 105(a) injunction or approval of a release.

Section 1123(b)(6) provides that a plan may "include any other appropriate provision not inconsistent with the applicable provisions of this title." 11 U.S.C § 1123(b)(6). In form, Section 1123(b)(6) is substantively analogous to Section 105(a)'s authorization of "any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). If the latter does not confer any substantive authority on the bankruptcy court – and that proposition is well settled, at least in this Circuit – then the former can in no way be read to do so.

That alone would be reason to conclude that Section 1123(b)(6) does not provide the statutory authorization we are seeking. But as Appellants point out, various aspects of the non-consensual Section 10.7 Shareholder Release are indeed inconsistent with certain other provisions of title 11.

First and foremost, the Section 10.7 Shareholder Release is inconsistent with the Bankruptcy Code because it discharges a non-debtor from debts that Congress specifically said could not be discharged by a debtor in bankruptcy. The Section 10.7 Shareholder Release does not carve out or exempt claims for fraud or willful and malicious conduct, liabilities from which Purdue cannot be discharged in its own bankruptcy. *See* 11 U.S.C. §§ 523(a)(2), (4), (6). Reading the Bankruptcy Code as authorizing a bankruptcy court to discharge a non-debtor from fraud

liability – something it is strictly forbidden from doing for a debtor – cannot be squared with the fact that Congress intended that the Bankruptcy Code "ensure that all debts arising out of fraud are excepted from discharge no matter what their form." *Archer v. Warner*, 538 U.S. 314, 321 (2003) (internal citation omitted). In other cases in which the releases at issue called for relief from suit that encompassed otherwise non-dischargeable claims, courts either ensured fraud claims were exempt from the releases before approving them, *In re Airadigm Commc'ns, Inc*., 519 F.3d 640, 657 (7th Cir. 2008), or simply refused to approve the releases because they included otherwise non-dischargeable claims. *See e.g*., *In re Fusion Connect, Inc*., No. 20-05798, 2021 WL 3932346, at *7 (S.D.N.Y. Sept. 2, 2021) (reversing the bankruptcy court's decision to discharge a debtor from an outstanding civil penalty because liability "arising from fraud on consumers" and payable to a governmental entity is "nondischargeable" in a chapter 11 bankruptcy under Section 523(a)(2)). Aside from *Drexel* – which, for all the reasons discussed above, is probably no longer good law – the Second Circuit has never approved a non-consensual release of claims against non-debtors of this sort, nor has it ever explained what provision of the Bankruptcy Code authorizes a bankruptcy court to do so.

Second, as the State Appellants point out, a debtor's discharge cannot relieve him of "any debt . . . to the extent such debt is for a fine, penalty, or forfeiture payable to and for the benefit of a governmental unit, and is not compensation for actual pecuniary loss, other than a tax penalty. . ." 11 U.S.C. § 523(a)(7). At least some of the claims asserted by the State Appellants seek relief in the nature of non-dischargeable civil penalties payable to and for the benefit of governmental units. Such claims could not be discharged if the Sacklers had filed for personal bankruptcy.

To the extent that Judge Drain held that the Section 10.7 Shareholder Release was not inconsistent with these sections, I respectfully disagree.

Appellants also argue that the Section 10.7 Shareholder Release and corresponding injunctions are inconsistent with Section 524(e) of the Bankruptcy Code, which provides that "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). On the facts of this case, I cannot agree with that argument – but not because the Code is silent on the subject.

Section 524(e) says, in sum and substance, that releasing a debtor on a debt owed to a creditor does not affect the liability that a non-debtor may have for the same debt. But the claims that would be released by the Section 10.7 Shareholder Release are not claims on which the Sacklers are jointly liable with Purdue. The various state statutes being invoked by Appellants give rise to Sackler liability *independent* of Purdue's liability – albeit for the very same violations of the very same laws – because those laws impose an independent duty on persons who occupy certain managerial positions in a corporation. We would not have this appeal if the Sackler debts being eliminated by the Section 10.7 Shareholder Release were also debts owed by Purdue; we would be back in Section 10.6 land, dealing with derivative claims, where the Bankruptcy Court's power is unchallenged.

It is true that, when passing Section 524(g), Congress stated explicitly that the non-debtor releases therein authorized were being allowed "notwithstanding the provisions of sect. 524(e)." 11 U.S.C. § 524(g). It is hard to read that phrase and not conclude that Congress thought it was creating an exception to Section 524(e) by authorizing the release of third-party claims against non-debtors in certain limited circumstances.

However, back when Congress was considering § 524(g), it had before it a specific situation: the claims being released were against non-debtor insurance companies whose liability was premised on the conduct of their insureds that fell within the terms of the policies they had

issued. Everything that was being released was part and parcel of the bankruptcy estate; the debts owed by Manville and its insurers were the same debts; § 524(e) was obviously implicated. There is no indication, either in the text of the statute or in the legislative history, that Congress ever envisioned that a bankruptcy court could discharge the debts of non-debtors that were not also debts of the debtor. That being so, I cannot read the "notwithstanding" language to create an inconsistency on the facts of this case.

I am, therefore, constrained to conclude that the Section 10.7 Shareholder Release is not inconsistent with § 524(e), because it contains the discharge of debts that are not contemplated by § 524(e).

**Section 1123(a)(5):** Section 1123(a)(5) of the Bankruptcy Code provides that a plan of reorganization must "provide adequate means for [its] implementation." 11 U.S.C. § 1123(a)(5). That section contains a laundry list of things that a plan can include in order to make sure that resources are available to implement the plan – any of which can be ordered by a bankruptcy court.

Injunctions against the prosecution of third-party claims against non-debtors, and the release of such claims, are nowhere to be found on that list. Every single example listed in Subsections 5(A) through (J) authorizes the court to do something with the *debtor's assets* (retaining estate property; transfer of property; sale of property; satisfaction or modification of a lien; cancellation or modification of an indenture or similar instrument; curing or waiving defaults; extension of maturity dates; issuing securities; even amending the debtor's charter). Since the bankruptcy court has *in rem* jurisdiction over the *res* of the debtor's estate, none of that should be surprising. It is equally unsurprising that none of the types of relief listed in Section 1123(a)(5) involves disposing of property belonging to someone other than the debtor or a creditor of the

debtor. That is because it is the debtor's resources – not the resources of some third party – that are supposed to be used to implement a plan that will adjust the debtor's relations with its creditors.

Of course, this is not the first case in which the resources of non-debtors are being used to implement a plan; and § 1123(a)(5) does not pretend to contain an exhaustive list of all ways that a plan can provide means for its implementation. The Section begins, after all, with the words "such as." In this case, Debtors argue that the only way to get the resources necessary to implement a viable plan was to agree to the Sacklers' demand for broad releases in exchange for their contribution of money to the bankruptcy estate. They insist that the Section 10.7 Shareholder Release and corresponding injunctions carry out the requirements of Section 1123(a)(5) by ensuring that the Plan has the funding it needs – and if that funding was obtained from some third-party funder on condition of a release and an injunction, then those forms of relief are authorized because the money is needed to fund the Plan.

But the fact that Purdue needs the Sacklers to give the money back does not mean that Section 1123(a)(5) confers on the Debtors or the Sacklers any right to have the non-debtors receive a release from non-derivative third-party claims in exchange for a contribution to Purdue's estate. The Debtors' suggestion that this Section confers some substantive right is exactly the sort of circular reasoning that was rejected by Judge Jacobs where Section 105(a) was concerned. *See In re Dairy Mart,* 351 F.3d at 92 (any such power conferred by Section 105(a) must "be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective") (quoting 2 *Collier on Bankruptcy* ¶ 105.01[1]). Getting to a confirmable plan is the general bankruptcy objective, nothing more.

Nor does Section 1123(a)(5) confer any special power on the Bankruptcy Court. A court does not propose the plan; the debtor and its creditors put the plan together and present it to the

court, which cannot approve the plan unless it contains the required provisions and need not approve it even then. To the extent that any court order is contemplated by Section 1123(a), it is the Confirmation Order – not an injunction and release of claims against non-debtors in order to obtaining funding for a plan, which is essentially what Debtors are proposing.

Finally, and most important, Section 1123(a)(5) does not authorize a court to give its imprimatur to something the Bankruptcy Code does not otherwise authorize, simply because doing so would ensure funding for a plan. Nothing in Section 1123(a)(5) suggests that a debtor has the right to secure sufficient funds for implementation by any means necessary. Section 1123(a)(5) would not, for example, authorize a court to enter an order enjoining a bank from suing a non-debtor employee who embezzled funds and then offered them to her bankrupt brother's estate in exchange for a release of all claims a third party could assert against her. That example is silly, of course, but the point is simple: the mere fact that the money is being used to fund implementation of the plan does give a bankruptcy court statutory authority to enter an otherwise impermissible order in order to obtain that funding. As was the case with Section 1123(b)(6), Judge Drain's reliance on Section 1123(a)(5) begs the ultimate question that must be answered: whether the court has some *independent* statutory authority to issue the non-debtor releases and enjoin third party claims against the Sacklers, such that the Bankruptcy Court can enter a "necessary and appropriate" order to obtain the funding.

**Section 1129(a)(1):** Finally, Section 1129(a)(1) does not provide the substantive authority for a Section 105(a) injunction or approval of a release. Section 1129 is entitled "Confirmation of plan," and Subsection 1129(a)(1) provides that a bankruptcy court "shall confirm a plan only if . . . the plan complies with the applicable provisions of this title." 11 U.S.C.A. § 1129. Like the cited sections of §1123, §1129(a) confers no substantive right that could be used to undergird a §

105(a) injunction. One highly general provision simply does not confer substantive authority that is required to invoke another highly general provision.

**Lack of Any Statutory Prohibition:** Having exhausted the statutory provisions on which Judge Drain relied and finding that none of them confers any substantive right as required by *Metromedia,* our exercise should be at an end. But it is not. The Debtors argue that the Bankruptcy Court must be statutorily authorized to approve these releases because no provision of the Bankruptcy Code – including but not limited to § 524(e) – expressly prohibits them.

The notion that statutory authority can be inferred from Congressional silence is counterintuitive when, as with the Bankruptcy Code, Congress put together a "comprehensive scheme" designed to target "specific problems with specific solutions." *RadLAX Gateway Hotel,* 566 U.S. at 645. In this particular case, a number of red flags suggest that Congressional silence (if indeed Congress was silent) was not intended to mean consent.

The first is that silence is inconsistent with comprehensiveness, and the Bankruptcy Code "provides a *comprehensive* federal system . . . to govern the orderly conduct of debtors' affairs and creditors' rights." *E. Equip. & Servs. Corp. v. Factory Point Nat. Bank, Bennington,* 236 F.3d 117, 120 (2d Cir. 2001) (emphasis added). "Comprehensive" means "complete, including all elements." Reading elements that do not appear in the text of the Code into the Code is the antithesis of comprehensiveness.

Then-District Judge Sullivan recognized as much in *In re Lehman Bros. Holdings Inc*., 508 B.R. 283 (S.D.N.Y. 2014). There, the bankruptcy court granted a certain creditor's application for reimbursement of post-petition counsel fees over the U.S. Trustee's objection that the Bankruptcy Code only permitted reimbursement of post-petition administrative expenses. On appeal, Judge Sullivan was not persuaded by appellees' argument that reimbursement for professional fees was

authorized by the Bankruptcy Code simply because nothing in the Bankruptcy Code expressly forbade it. He held that, "no such explicit prohibition is necessary" because the requested reimbursement clearly goes against the *purpose* of a reorganization – "Reorganization plans exist to pay claims . . . [the] professional fee expenses were all incurred post-petition, and thus cannot be treated as 'claims.'" *Id*. at 293. He further noted that the federal bankruptcy scheme "cannot remain comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law to fit their preferences." *In re Lehman Bros. Holdings Inc*., 508 B.R. 283, 294 (S.D.N.Y. 2014) (internal citations omitted).

As I noted above, Justice Breyer recently wrote when discussing the priority scheme set out in the Bankruptcy Code, the importance of certain critical aspects of the bankruptcy scheme "leads us to expect more than simple statutory silence if, and when, Congress were to intend a major departure." *Jevic Holdings Corp*., 137 S. Ct. at 984. Granting releases to non-debtors for claims that could not be released in favor of the debtors themselves is so far outside the scope of the Bankruptcy Code and the purposes of bankruptcy that the "silence does not necessarily mean consent" principle applies with equal force.

Second, it is hard to infer consent from silence in circumstances when one would not expect Congress to speak. The Code was intended "to free the debtor of his personal obligations *while ensuring that no one else reaps a similar benefit*" *Green v. Welsh*, 956 F.2d 30, 33 (2d Cir. 1992) (emphasis added). It is counterintuitive to imagine that Congress would have thought it necessary to include language specifically forbidding things that that ran counter to that purpose. As one of Judge Drain's colleagues recently reminded us, the ordering of an involuntary release of third-party claims against non-debtors is "an extraordinary thing" that is "different . . . from what courts ordinarily do." *In re Aegean Marine Petroleum Network Inc*., 599 B.R. 717, 723 (S.D.N.Y. 2019).

That is especially true where, as is proposed here, we find ourselves in what Judge Wiles called "the odd situation where we are being asked to use an unwritten authority to release non-debtor officers and directors from claims when the Bankruptcy Code would bar us from giving similar relief to those persons if they were debtors in their own cases." *Id*. at 726 (citing *Metromedia*, 416 F.3d at 142).

Third, Congress has in fact spoken on this subject, and what it has said suggests that it intended Sections 524(g) and (h) to preempt the field where non-debtor releases were concerned. I will not repeat the extensive discussion about the law and its legislative history that appears above, except to say that Congress in its wisdom elected to limit Code-based authority to release third party claims against non-debtors to asbestos litigation – and it declined either to agree with those who argued that bankruptcy courts already had a broader power to authorize such releases. Congress was not unaware that there were non-asbestos bankruptcies with thousands of claimants and nationwide implications in the early 1990s. Other mass tort bankruptcies with thousands upon thousands of potential claimants were pending (*i.e.*, in *A.H. Robins/Dalkon Shield*), as was the highly publicized bankruptcy of a major investment bank (*Drexel*). The Judiciary Committee mentioned the "experimentation" with *Manville*-like relief that was beginning in other industries.

Yet Congress declined to make this extraordinary form of relief – relief that ran counter to the fundamental purpose of the Bankruptcy Code – available in circumstances other than asbestos bankruptcies. And it reserved for itself the right to change that.

So the silence that speaks volumes is not Congress' failure to say, "And you can't give involuntary non-debtor releases to anyone except in an asbestos case." The silence that speaks volumes is the twenty-seven years of unbroken silence that have passed since Congress said, "We

are limiting this to asbestos for now, and maybe, when we see how it works in that context, we will extend it later."

Fourth, but by no means least, "it is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel*, 504 U.S. at 384. The Supreme Court of the United States has relied on that principle on multiple occasions in refusing to allow generalized provisions of the Bankruptcy Code to override specific directives on a particular subject.

Take, for example, *RadLAX* itself. The plan proposed by the debtors in *RadLAX* provided for the sale of unencumbered assets securing a bank creditor's claim free and clear of all liens. But, in contravention of the provision governing such a "cram down" plan under the Bankruptcy Code, the bid procedures proposed by the debtors precluded the bank holding the mortgage on the property from credit-bidding the amount of its claim, which the Bankruptcy Code specifically authorized the bank to do. 11 U.S.C. § 1129(b)(2)(A)(ii). Nonetheless, the bankruptcy court approved the plan. It agreed with the debtors that the bank did not need to be permitted to bid on the property as long as it was provided with the "indubitable equivalent" of its claim in some other fashion – in this particular case, the cash generated by the auction. 11 U.S.C. § 1129(b)(2)(A)(i)-(iii).

The Supreme Court rejected the debtors' justification, holding that the "indubitable equivalents" subclause (subclause iii) was a general subclause that could not be used to circumvent the specific requirement of subclause (ii) that the bank be permitted to credit-bid at the sale. The Court stated that the debtors' reading of the statute – that clause (iii) permits precisely what clause (ii) proscribes – is "hyperliterally contrary to common sense." *RadLAX Gateway Hotel*, 566 U.S. at 640. The Court called it "axiomatic" that specific statutory provisions control over general provisions and emphasized that the "general/specific canon" applies with particular force in

bankruptcy, because "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *Id*.

Where, as here, Congress has deliberately limited a specific targeted solution (the release of third-party claims against non-debtors) to a specific identified problem (asbestos bankruptcies) – and has even denominated that solution as an exception to the usual rule – *RadLAX* strongly suggests that the general/specific canon should apply with particular force.

*Ginsberg & Sons v. Popkin*, 285 U.S. 204 (1932) is a pre-Code case, but it illustrates the same principle. There, petitioner argued that Clause 15 of Section 2 of the Bankruptcy Act empowered district judges to issue orders directing the arrest of the former officers and directors of the debtor. Clause 15 provided, "The courts of bankruptcy are hereby invested with such jurisdiction at law and in equity as will enable them to exercise original jurisdiction in bankruptcy proceedings . . . [t]o make such orders, issue such process, and enter such judgments in addition to those specifically provided for as may be necessary for the enforcement of the provisions of this title." Section 2, 11 USCA s 11(15). The reader will immediately appreciate that Clause 15 is the Bankruptcy Act's equivalent of Section 105(a) of the Bankruptcy Code – it was the "necessary and appropriate" clause in the old statutory scheme.

But Section 9(a) of the Bankruptcy Act specifically precluded "a court of bankruptcy" from directing the arrest of former directors and officers, except for contempt or disobedience of its lawful orders. And Section 9(b) prescribed in great detail the conditions to and procedures for invoking the exception under which the court could direct the arrest and detention of such former directors and officers who posed a flight risk.

The Supreme Court refused to read Clause 15 of Section 2 in a way that would render the specific prohibitions and procedures enumerated in Sections 9(a) and (b) superfluous: "In view of

the general exemption of bankrupts from arrest under section 9a and the carefully guarded exception made by section 9b as to those about to leave the district to avoid examination, there is no support for petitioner's contention that the general language of section 2(15) is a limitation upon section 9(b) or grants additional authority in respect of arrests of bankrupts." *D. Ginsberg & Sons v. Popkin*, 285 U.S. at 207–08.

The Supreme Court's holdings in these cases old and new are instructive in the present context. Here, Debtors and their allies seek to apply general provisions – Sections 105(a) and 1123(a)(5) and (b)(6) – to justify expanding the express authority conferred by Congress under §524(g) into a situation that is manifestly not comprehended by that statute. Because the specific controls the general, that reliance is misplaced.

For all these reasons, I cannot conclude that Congressional "silence" should be deemed consent to an expansion of Section 524(g). In fact, I do not believe that Congress has been silent at all. But to the extent it has, its silence supports the Appellants' position, not the Debtors'.

**Residual Authority:** Finally, I turn to the concept of "residual statutory authority." In these circumstances, I conclude that such authority simply does not exist.

Judge Drain framed the question before him as, "whether the court has statutory *or other power* to confirm a plan with a third-party claim release," and, if so, "what is the statutory *or other source of power* for such a release?" *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *40, *43 (emphasis added). He identified the "other source of power" as the residual power of bankruptcy courts.

But such power, if it even exists, is of no help where, as here, it is being exercised in contravention of specific provisions of the Bankruptcy Code.

Debtors rely heavily on the Supreme Court's decision in *In re Energy Resources Co*, 495 U.S. 545 (1990) for the proposition that a bankruptcy court has "residual authority" to approve reorganization plans that includes all "necessary and appropriate" provisions, as long as those provisions are not inconsistent with title 11. In that case, the Court concluded that two bankruptcy courts – which were forbidden by the Bankruptcy Code from discharging a tax debt[69] and required not to confirm a plan unless satisfied that the IRS would in all likelihood be able to collect taxes owed within six years[70] – had not "transgressed one of the limitations on their equitable power" by directing in a plan of reorganization that certain tax payments be credited in the first instance to so-called "trust fund" tax debt, and only when that debt was satisfied to so-called "non-trust fund" tax debt. *In re Energy Resources Co*., 495 U.S. 499-50. Trust fund tax debt is guaranteed by third parties; an order directing that the guaranteed debt be paid first meant that if there were any unpaid taxes at the end of the plan period, the IRS could probably not look to third parties for payment. The IRS argued that this provision of the plan was inconsistent with the Bankruptcy Code, because requiring the debtor to pay non-trust fund taxes first would give the IRS a greater chance of recovering 100 cents on the dollar.

But the Supreme Court ruled that the Bankruptcy Code did not require that a plan of reorganization be structured so that the unsecured tax debt was paid first. The bankruptcy court had found (as required by the Bankruptcy Code) that the plan of reorganization proposed by the debtors was likely to succeed. It further found that, if the plan did succeed, all taxes would be fully paid within six years. The express terms of the Bankruptcy Code required nothing more. Therefore, the order directing that tax payments be credited first to back taxes secured by the trust fund, and

---

[69] 11 U.S.C. §§ 507(a)(7), 523(a)(1)(A).

[70] 11 U.S.C. § 1129(a)(9)(C).

then to unsecured back taxes, was not inconsistent with any applicable provision of title 11. All the substantive guarantees that the Bankruptcy Code afforded to the IRS were baked into the court's approval of the plan.

No reference in *Energy Resources* to a bankruptcy court's "residual power" authorizes the learned Bankruptcy Judge's approval of the Section 10.7 Shareholder Release under any "residual power" theory. Just two years prior to the *In re Energy Resources* decision, the same Supreme Court – made up of the same nine justices – held that the bankruptcy court's residual equitable authority was bounded by the provisions of the Bankruptcy Code. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988) (holding "whatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code"). *Energy Resources* is consistent with this principle. Congress legislated a particular right into the Bankruptcy Code; the Supreme Court refused to allow lower courts to expand that right and held that the Bankruptcy Court had the power to authorize anything that was not inconsistent with that right. But the Bankruptcy Code conferred a specific right. In this case, there is nothing in the Bankruptcy Code that specifically authorizes the Section 10.7 Shareholder Release; the Bankruptcy Court (and this Court) is being asked to insert a right that does not appear in the Bankruptcy Code in order to achieve a bankruptcy objective. That is precisely what *In re Dairy Mart* and *Metromedia* prohibit.

Additionally, the *Energy Resources* Court, echoing its own holding of two years earlier, recognized that any residuary power enjoyed by a bankruptcy court must be exercised in a way that "is not inconsistent with the applicable provisions of this title." I have become convinced, for the reasons discussed in great detail above, that the Section 10.7 non-debtor releases are in fact inconsistent with applicable provisions of title 11 – with Sections 524 (g) and (h), with Section

523, and with Section 1141(d), and possibly even with Section 524(e). Therefore, no residual power can authorize such an order.

As a corollary to the "residual authority" argument, several Appellees argue the release of claims against the non-debtor Sacklers and their related entities are proper because the Bankruptcy Code, taken as a whole, creates a "special remedial scheme" in which certain legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process. They cite *Martin v. Wilks*, 490 U.S. 755 (1989) for their proposition.

In *Martin v. Wilks*, the Supreme Court announced that, as a general rule, "A judgment or decree among parties to a lawsuit resolves issues as among them, but it does not conclude the rights of strangers to those proceedings." It affirmed the Eleventh Circuit's judgment allowing certain individuals who were *not* parties to an original action to challenge consent decrees entered in that original case. *Id*. at 762. But, in a footnote, the Court acknowledged an exception to the general rule exists "where a special remedial scheme exists expressly foreclosing successive litigation by nonlitigants, as for example in bankruptcy or probate, legal proceedings may terminate preexisting rights if the scheme is otherwise consistent with due process." *Id*. at 762, n. 2.

Judge Drain did not adopt this reasoning or rest his view about his statutory authority on the Bankruptcy Code's "special remedial scheme" – and rightly so, because it is contrary to Second Circuit law. The "special remedial scheme" contemplated by the Bankruptcy Code addresses the rights of persons who have claims against a debtor in bankruptcy – not claims against other non-debtors. The Code lays out a claims allowance process so that creditors can file their claims against someone who has invoked the protection of the Bankruptcy Code; it provides a mechanism for those parties to litigate those claims against the debtor and to determine their value. In order to

take advantage of this "special remedial scheme," debtors have to declare bankruptcy, disclose their assets, and apply them – all of them, with *de minimis* exceptions – to the resolution of the claims of their creditors.

Non-debtors have no such obligations, and so do not have any rights at all under the "special remedial scheme" that is bankruptcy – certainly not the "right" to have claims that are being asserted against them outside the bankruptcy process released. As the Second Circuit held in *Manville III*, the "special remedial scheme" due process exception relating to *in rem* bankruptcy proceedings simply does not give a bankruptcy court subject matter jurisdiction to release *in personam* third-party claims against a non-debtor. *In re Johns-Manville Corp.*, 600 F. 3d 135, 158 (2d Cir. 2010).

**Conclusion: No Statutory Authority.** In *Metromedia*, the Second Circuit signaled that a Bankruptcy Code could not order the non-consensual release of third-party claims against non-debtors unless some provision of the Bankruptcy Code aside from Section 105(a) authorized it to do so. For the reasons stated above, I conclude that there is no such section, and so no such authority.

It is indeed unfortunate that that this decision comes very late in a process that, from its earliest days in 2019, has proceeded on the assumption that releases of the sort contemplated in Section 10.7 of the Debtors' Plan would be authorized – this despite the language of the Bankruptcy Code and the lack of any clear ruling to that effect. I am sure that the last few years would have proceeded in a very different way if the parties had thought otherwise. But that is why the time to resolve this question for once and for all is now – for this bankruptcy, and for the sake of future bankruptcies. It should not be left to debtors and their creditors to guess whether such

releases are statutorily authorized; and it most certainly should not be the case that their availability, or lack of same, should be a function of where a bankruptcy filing is made.

I also acknowledge that the invalidating of these releases will almost certainly lead to the undoing of a carefully crafted plan that would bring about many wonderful things, including especially the funding of desperately needed programs to counter opioid addiction. But just as, "A court's ability to provide finality to a third-party is defined by its jurisdiction, not its good intentions" (*Manville III*, 517 F.3d at 66), so too its power to grant relief to a non-debtor from non-derivative third party claims "can only be exercised within the confines of the Bankruptcy Code." *Norwest Bank Worthington*, 485 U.S. at 206.

Because the Bankruptcy Code confers no such authority, the order confirming the Plan must be vacated. Because the Advance Order is an adjunct of and follows from the Confirmation Order, it, too, must be vacated.[71]

### III.    The Plan's Classification and Treatment of the Canadian Appellants' Claims Does Not Violate the Bankruptcy Code.

Because the court reverses on the ground that there is no statutory authorization in the Bankruptcy Code for the Bankruptcy Court to impose a non-voluntary release of third-party claims against non-debtors, I do not reach the Canadian Appellants' separate attack on the Section 10.7 Shareholder Release. But part of the Canadian Appellants' argument on appeal is that the Plan as confirmed violates the Bankruptcy Code by treating the Canadian Appellants' unsecured claims unfavorably as compared to the claims of their domestic counterpart creditors. The Canadian Appellants explained at Oral Argument that this "inequality" issue must be decided, regardless of

---

[71] The U.S. Trustee has also appealed from the Disclosure Order, asserting that it was inaccurate in certain respects. (Dkt. No. 91, at 10; Dkt. No. 191, at 10). As the Confirmation Order has been vacated without reaching the notice/due process constitutional issues that were raised by the U.S. Trustee, I do not understand that any substantive ruling is needed with respect to the Disclosure Order. Like everything else connected with the Plan, it simply falls by the wayside.

how the court ruled on the Section 10.7 Shareholder Release. (*See* Oral Arg. Tr., Nov. 30, 2021, at 71:6-21).

Pursuant to the Plan, the Canadian Appellants are entitled to a share of the $15 million dollars distributed to a trust that will be divided among all of the general unsecured creditors of the Debtor. (Dkt. No. 59, at 47). At the same time, domestic government and tribe unsecured creditors are not classified as "general" unsecured creditors but are placed in classes 4 and 5 as "Non-Federal Domestic Governmental" claimants and "Tribe" claimants respectively. (*See* Plan, at 2). The Canadian Appellants argue that the Bankruptcy Code contains an "equal-treatment mandate" in Section 1129(a)(4) requiring that "all creditors within the same class enjoy the same 'opportunity' to recover." (Dkt. No. 59, at 47). Because, they argue, the domestic non-federal government claims (Class 4) and tribal claims (Class 5) are "indistinguishable" from theirs (*id.*), the Canadian Appellants posit that they are "similarly situated" to their "domestic counterparts" and thus should be part of the same creditor "class." Since the Plan does not allow the Canadian Appellants to "enjoy shares in trusts seeded with $4.5 billion—300 times as much" as would be available to the general unsecured creditors of Purdue (*Id.*) – the Canadian Appellants argue that there exists "an inequality that is independently fatal to the Plan's treatment of the Canadian Appellants' claims." (*Id.*).

The Court disagrees. Under the Plan, the Canadian Appellants belong to a different class than their domestic, unsecured creditor "counterparts" for perfectly legitimate reasons. The Code does not require that all creditor classes be treated equally, only that there be a reasonable basis for any differentiation. *See Boston Post Rd. Ltd. P'ship v. FDIC (In re Boston Post Rd. Ltd. P'ship)*, 21 F.3d 477, 482-83 (2d Cir. 1994).

First, the Bankruptcy Code expressly permits differentiation *between* classes of creditors and the Canadian Appellants rightly recognize that their "equal-treatment mandate" applies only to claims of "all creditors within the same class." (*See* Dkt. No. 59, at 47). The Canadian Appellants' argument that they are of the same "class" as the non-federal government and tribe claimants is unconvincing. It does not matter that the Canadian Appellants' claims are purportedly "indistinguishable" from those held by the domestic unsecured creditors in Classes 4 and 5; a chapter 11 plan may separately classify similar claims so long as the classification scheme has a reasonable basis for doing so. *See In re Boston Post Rd. Ltd. P'ship*, 21 F.3d at 482-83.

In *Boston Post Rd. Ltd. P'ship*, the chapter 11 plan classified unsecured claims against the insolvent Debtor, the Boston Post Road Limited Partnership ("BRP"), differently between the Federal Deposit Insurance Corporation ("FDIC") and BPR's other trade creditors. The classification treated the unsecured trade creditors more favorably than FDIC, while FDIC was BPR's largest unsecured creditor and an anticipated objector to the plan; the differentiation between these classes was done to achieve a "cramdown" of the plan over FDIC's objections. *Id.* at 479. The bankruptcy court denied confirmation of a chapter 11 plan on the basis that the plan impermissibly separately classified similar claims, holding that FDIC's unsecured claims should have been placed in the same class with other unsecured creditors, and the District Court affirmed. *Id.* On appeal, the Second Circuit found that the "Debtor was unable and failed to adduce credible proof of any legitimate reason for segregating the FDIC's unsecured claim from the unsecured claims of BPR's trade creditors." *Id.* at 483. The Debtor's only reasons were that the FDIC's claim purportedly "were created from different circumstances" and "BPR's future viability as a business depends on treating its trade creditors more favorably than the FDIC." *Id.* These reasons were "availing" to the Circuit. *Id.* In particular, the Circuit took issue with classifying similar claims

differently "in order to gerrymander an affirmative vote on a reorganization plan." *Id.* at 482-83 (quotation omitted). The Circuit explained, "approving a plan that aims to disenfranchise the overwhelmingly largest creditor through artificial classification is simply inconsistent with the principles underlying the Bankruptcy Code." *Id.*

In this case, unlike in *Boston Post Rd.* Judge Drain identified a reasonable basis for separately classifying the Canadian Appellants from the domestic unsecured creditors: First, Judge Drain explained that the Canadian creditors operate under "different regulatory regimes . . . with regard to opioids and abatement" than their domestic counterparts. *In re Purdue Pharma L.P.*, 2021 WL 4240974, at *12. Second, Judge Drain explained that "the allocation mediation conducted by Messrs. Feinberg and Phillips that resulted in the plan's division of the Debtors' assets . . . involved only *U.S.-based* public claimants with their own regulatory interests and characteristics." *Id.* (emphasis added). As the Debtors point out, the Canadian Appellants themselves differentiate themselves from the other classes in this manner, explaining (i) "[t]he Canadian Appellants are in Canada, [(ii)] the bulk of their legal claims arise in Canada, [(iii)] those claims concern the operations of Purdue Canada," and (iv) the Canadian Appellants' claims "bear no relation to the Shareholder Released Parties' control, direction, and oversight of the Debtors or their U.S. operations." (Dkt. No. 59, at 17-18; Dkt. No. 151, at 120-121). That very classification on the part of the Canadian Appellants accords with Judge Drain's findings that there is a reasonable basis for the separate classifications. And there is no argument that such separate classification was done for the purpose of disenfranchising a particular group in a manner inconsistent with the Bankruptcy Code, to engineer an assenting impaired class; or manipulate class voting, all of which must be carefully scrutinized by the court. Indeed, it was not.

Under the Plan, the Canadian creditors are classified in Class 11(c), while the domestic municipalities and domestic Indian tribes are classified as Class 4 and 5 creditors. These are perfectly legitimate classifications and the proffered reasons for doing so are reasonable. And the Canadian Appellants do not (and cannot) argue that under the Plan their claims will receive unequal treatment as compared to other claims in their class, Class 11(c), as indeed all claims classified as Class 11(c) are treated equally under the Plan. (Dkt. No. 59, at 44, 47-48).

Finally, Canadian Appellants *cannot* argue that their Class 11(c) claims are treated unfavorably as compared the other creditor classes (like Class 4 and/or Class 5) because their class, Class 11(c), voted to accept the Plan. Under the Bankruptcy Code, only creditors of a *dissenting* class can object to the confirmation of a plan on the grounds that the plan discriminates against its creditor class. Pursuant to section 1129(b)(1) of the Bankruptcy Code, a plan shall be confirmed "if the plan does not discriminate unfairly . . . with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b)(1). Because the Canadian creditors – as part of Class 11(c) – voted to accept the Plan, the Canadian Appellants cannot contend that they are being treated unfavorably.

The classification and treatment of the Canadian Appellants' claims under the Plan does not violate the Bankruptcy Code.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's Confirmation Order and related Advance Order must be vacated.

This decision leaves on the table a number of critically important issues that were briefed and argued on appeal – principal among them, whether the Section 10.7 Shareholder Release can

or should be approved on the peculiar facts of this case, assuming all the other legal challenges to their validity were resolvd in Debtors' favor.

But sufficient unto the day. This and the other issues raised by the parties can be addressed if they need to be addressed – which is to say, if this ruling is reversed.

This constitutes the decision and order of the court. This is a written opinion.

Dated: December 16, 2021

_____
U.S.D.J.

BY ECF TO ALL COUNSEL